**APPEAL, APPEAL_NAT**

# U.S. Bankruptcy Court
# Southern District of Texas (Houston)
# Adversary Proceeding #: 22-03035

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Nature[s] of Suit:* 01 Determination of removed claim or cause

*Date Filed:* 02/28/22
*Date Removed From State:* 02/28/22

***Plaintiff***
-----------------------
**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
Ste 3600
Houston, TX 77002
713-226-6681
Email: afalcon@porterhedges.com
*LEAD ATTORNEY*

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6609
Fax : 713-226-6209
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-228-1331
Email: jwolfshohl@porterhedges.com
*LEAD ATTORNEY*

V.

***Defendant***
-----------------------
**SN EF UnSub, LP**
1111 Bagby Street

represented by **Paul M Basta**
Paul, Weiss, Rifkind, Wharton & Garrison

Suite 2050
Houston, TX 77002

1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com
*LEAD ATTORNEY*

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com
*LEAD ATTORNEY*

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3740
Email: mtattnall@paulweiss.com
*LEAD ATTORNEY*

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 T.C. Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com
*LEAD ATTORNEY*

***Defendant***
**------------------------**
**Eagle Ford TX LP**
5599 San Felipe Road
Suite 725
Houston, TX 77056

represented by **Julia Frost-Davies**
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02115
617-341-7700
Email: julia.frost-davies@morganlewis.com
*LEAD ATTORNEY*

**Amy L Kyle**
Morgan Lewis & Bockius LLP
One Federal St

Boston, MA 02115
617-951-8288
Email: amy.kyle@morganlewis.com
*LEAD ATTORNEY*

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5455
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
100 Louisiana Street
Houston, TX 770002
713-890-5460
Email: jared.wilkerson@morganlewis.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Venado EF L.P.**
13215 Bee Cave Pkwy.
Suite B-350
Austin, TX 78738
***aka* Javelin EF L.P.**

represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com
*LEAD ATTORNEY*

**Conor P. McNamara**
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 N. LaSalle
Chicago, IL 60654
312-86202000
Email: conor.mcnamara@kirkland.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Mitsui E&P Texas LP**
1300 Post Oak Blvd.
Suite 1800
Houston, TX 77056

represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 5900
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4618
Email: mquejada@sidley.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**SN EF Maverick, LLC**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
Foley & Lardner LLP
1000 Louisiana Street
Suite 2000
Houston, Tx 77002
713-276-5086
Email: sbeausoleil@foley.com

**Joseph Bretschneider**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Email: jbretschneider@willkie.com
*LEAD ATTORNEY*

**Sara Ann Brown**
Thompson Coburn LLP
2100 Ross Avenue
Ste 3200
Dallas, TX 75201
972-629-7100
Fax : 972-629-7171
Email: sbrown@thompsoncoburn.com

**Dennis Jenkins**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Fax : 212-728-8111
Email: djenkins@willkie.com
*LEAD ATTORNEY*

**James G Munisteri**
Foley Gardere
1000 Louisiana Street
Ste 2000
Houston, TX 77002
713-276-5500
Fax : 713-276-5555

Email: jmunisteri@foley.com

**Mark T. Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
(See above for address)

**Joseph Bretschneider**
(See above for address)
*LEAD ATTORNEY*

**Sara Ann Brown**
(See above for address)

**Dennis Jenkins**
(See above for address)
*LEAD ATTORNEY*

**James G Munisteri**
(See above for address)

**Mark T. Stancil**
(See above for address)
*LEAD ATTORNEY*

***Defendant***
-----------------------

**Mesquite Comanche Holdings, LLC**
c/o Registered Agent -
C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

represented by **Sharon Marie Beausoleil**
(See above for address)

**James G Munisteri**
(See above for address)

***Intervenor***
-----------------------

**ETC Texas Pipeline Ltd.**
1300 Main Street
Suite 2000
Houston, TX 77002

represented by **Yelena Archiyan**
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
214.765.3657
Email: yelena.archiyan@katten.com

**John E. Mitchell**
Katten Muchin Rosenman
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
469-627-7017
Email: john.mitchell@katten.com

| Filing Date | # | Docket Text |
|---|---|---|
| 02/28/2022 | 1 (91 pgs; 5 docs) | Adversary case 22-03035. Nature of Suit: (01 (Determination of removed claim or cause)) Notice of Removal Carnero G&P, LLC. Fee Amount $350 (Attachments: # 1 Index of Attachments # 2 List of Counsel # 3 State Court Document List # 4 Index of State Court Filings) (Munisteri, James) (Entered: 02/28/2022) |
| 03/01/2022 | | Receipt of Notice of Removal( 22-03035) [cmp,ntcrmvl] ( 350.00) Filing Fee. Receipt number A23566758. Fee amount $ 350.00. (U.S. Treasury) (Entered: 03/01/2022) |
| 03/01/2022 | 2 (2 pgs) | Order for Conference Pre-Trial Conference set for 4/6/2022 at 10:00 AM at Houston, Courtroom 404 (MI). (LinhthuDo) (Entered: 03/01/2022) |
| 03/03/2022 | 3 (4 pgs) | BNC Certificate of Mailing. (Related document(s):2 Order for Conference) No. of Notices: 14. Notice Date 03/03/2022. (Admin.) (Entered: 03/03/2022) |
| 03/07/2022 | 4 (12 pgs) | Answer to Complaint (Related document(s):1 Notice of Removal) Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 03/07/2022) |
| 03/08/2022 | 5 (12 pgs) | Corrected Answer to Complaint (Related document(s):1 Notice of Removal) Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 03/08/2022) |
| 03/30/2022 | 6 (173 pgs; 11 docs) | Motion for Remand. Objections/Request for Hearing Due in 21 days. Filed by Carnero G&P, LLC (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Proposed Order) (Wolfshohl, Joshua) (Entered: 03/30/2022) |
| 04/04/2022 | 7 (4 pgs) | Notice *of Adversary Plaintiff's Supplement to Its Motion to Remand to State Court or for Abstention*. (Related document(s):6 Motion for Remand) Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 04/04/2022) |
| 04/06/2022 | 8 (11 pgs) | Joint Discovery Plan/Case Management Plan (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) (Entered: 04/06/2022) |

| | | |
|---|---|---|
| 04/06/2022 | 9 | Courtroom Minutes. Time Hearing Held: 10:03 am - 10:08 am. Appearances: Josh Wolfshohl and Amy Falcon for the Plaintiff. Maegan Quejada for Defendant Mitsui E&P Texas LP. James Munisteri and Dennis Jenkins for Defendant SN EF Maverick, LLC. Conor McNamaa for Defendant Venado EF L.P. aka Javelin EF L.P. Sean Mitchell and Andrew Ehrlich for Defendant SN EF UnSub, LP. Julia Frost-Davies for Eagle Ford TX LP. Briefing to be filed not later than the evening of 5/16/22, hearing scheduled for 5/23/22 at 9:00 am. Agreed order to be filed by the parties to set the briefing deadlines as stated on the record. (Related document(s):2 Order for Conference, 6 Motion for Remand) **Hearing scheduled for 5/23/2022 at 09:00 AM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 04/06/2022) |
| 04/06/2022 | 10 (1 pg) | PDF with attached Audio File. Court Date & Time [ 4/6/2022 10:03:31 AM ]. File Size [ 2481 KB ]. Run Time [ 00:05:10 ]. (admin). (Entered: 04/06/2022) |
| 04/13/2022 | 11 (5 pgs) | Stipulation By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation and SN EF UnSub, LP, Mitsui E&P Texas LP, Eagle Ford TX, LP, Carnero G&P, LLC and Javelin EF L.P. (f/k/a Venado EF L.P.. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ).(Related document(s):6 Motion for Remand) (Munisteri, James) (Entered: 04/13/2022) |
| 04/14/2022 | 12 (4 pgs) | Stipulation and Scheduling Order Governing Briefing on Plaintiff's Motion to Remand to State Court or for Abstention, Signed on 4/14/2022 (Related document(s):6 Motion for Remand) (TylerLaws) (Entered: 04/14/2022) |
| 04/16/2022 | 13 (6 pgs) | BNC Certificate of Mailing. (Related document(s):12 Generic Order) No. of Notices: 14. Notice Date 04/16/2022. (Admin.) (Entered: 04/16/2022) |
| 04/27/2022 | 14 (44 pgs) | Objection *to Plaintiff's Motion to Remand to State Court or For Abstention* (related document(s):6 Motion for Remand). Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 04/27/2022) |
| 04/29/2022 | 15 (21 pgs) | Stipulation By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC and SN EF UnSub, LP, Eagle Ford TX, LP, Mitsui E&P Texas LP, Javelin EF L.P. (f/k/a Venado EF L.P.) and Carnero G&P LLC. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC ). (Munisteri, James) (Entered: 04/29/2022) |
| 04/29/2022 | 16 (21 pgs) | Stipulated Protective Order, Signed on 4/29/2022 (Related document(s):15 Stipulation) (TylerLaws) (Entered: 04/29/2022) |
| 05/01/2022 | 17 (23 pgs) | BNC Certificate of Mailing. (Related document(s):16 Generic Order) No. of Notices: 14. Notice Date 05/01/2022. (Admin.) (Entered: 05/01/2022) |

| | | |
|---|---|---|
| 05/09/2022 | 18 (18 pgs) | Reply - *Adversary Plaintiff's Reply in Support of Its Motion to Remand to State Court or for Abstention* (related document(s):6 Motion for Remand). Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 05/09/2022) |
| 05/11/2022 | 19 (1427 pgs; 47 docs) | Motion *Defendants' Motion for Judgment on the Pleadings* Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Proposed Order # 2 Exhibit 1 # 3 Exhibit 2 # 4 Exhibit 3 # 5 Exhibit 4 # 6 Exhibit 5 # 7 Exhibit 6 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9 # 11 Exhibit 10 # 12 Exhibit 11 # 13 Exhibit 12 # 14 Exhibit 13 # 15 Exhibit 14 # 16 Exhibit 15 # 17 Exhibit 16 # 18 Exhibit 17 # 19 Exhibit 18 # 20 Exhibit 19 # 21 Exhibit 20 # 22 Exhibit 21 # 23 Exhibit 22 # 24 Exhibit 23 # 25 Exhibit 24 # 26 Exhibit 25 # 27 Exhibit 26 # 28 Exhibit 27 # 29 Exhibit 28 # 30 Exhibit 29 # 31 Exhibit 30 # 32 Exhibit 31 # 33 Exhibit 32 # 34 Exhibit 33 # 35 Exhibit 34 # 36 Exhibit 35 # 37 Exhibit 36 # 38 Exhibit 37 # 39 Exhibit 38 # 40 Exhibit 39 # 41 Exhibit 40 # 42 Exhibit 41 # 43 Exhibit 42 # 44 Exhibit 43 # 45 Exhibit 44 # 46 Exhibit 45) (Munisteri, James) (Entered: 05/11/2022) |
| 05/11/2022 | 20 | Sealed Document *Exhibit Nos. 7-22 and 45 to Defendants' Motion for Judgment on the Pleadings [Docket No. 19]* (Filed By Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ). (Attachments: # 1 Exhibit 7 (Part 1 of 2) # 2 Exhibit 7 (Part 2 of 2) # 3 Exhibit 8 # 4 Exhibit 9 # 5 Exhibit 10 # 6 Exhibit 11 # 7 Exhibit 12 # 8 Exhibit 13 # 9 Exhibit 14 # 10 Exhibit 15 # 11 Exhibit 16 # 12 Exhibit 17 # 13 Exhibit 18 # 14 Exhibit 19 # 15 Exhibit 20 # 16 Exhibit 21 # 17 Exhibit 22 # 18 Exhibit 45) (Munisteri, James) (Entered: 05/11/2022) |
| 05/16/2022 | 21 (23 pgs) | Reply */Sur-Reply in Opposition to Plaintiff's Motion to Remand to State Court or for Abstention* (related document(s):6 Motion for Remand). Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 05/16/2022) |
| 05/17/2022 | 22 (12 pgs; 2 docs) | Emergency Motion *to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to Dismiss, and the Motion for Summary Judgment on the Pleadings*, Motion to Set Hearing. Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Proposed Order) (Munisteri, James) (Entered: 05/17/2022) |
| 05/18/2022 | 23 (7 pgs; 2 docs) | Objection - *Carnero G&P's Objection to Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to Dismiss, and the Motion for Summary Judgment on the Pleadings* (related document(s):22 Emergency Motion (Adversary), Motion to Set Hearing). Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 05/18/2022) |
| 05/18/2022 | 24 (2 pgs) | Order on Emergency Motion to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to |

| | | |
|---|---|---|
| | | Dismiss, and the Motion for Summary Judgment on the Pleadings, Signed on 5/18/2022 (Related document(s):22 Emergency Motion (Adversary), Motion to Set Hearing) (TylerLaws) (Entered: 05/18/2022) |
| 05/19/2022 | 25 (177 pgs; 12 docs) | Witness List, Exhibit List (Filed By Carnero G&P, LLC ).(Related document(s):6 Motion for Remand) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11) (Wolfshohl, Joshua) (Entered: 05/19/2022) |
| 05/19/2022 | 26 (1999 pgs; 54 docs) | Exhibit List, Witness List (Filed By Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):6 Motion for Remand, 9 Courtroom Minutes) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 # 46 Exhibit 46 # 47 Exhibit 47 # 48 Exhibit 48 # 49 Exhibit 49 # 50 Exhibit 50 # 51 Exhibit 51 # 52 Exhibit 52 # 53 Exhibit 53) (Munisteri, James) (Entered: 05/19/2022) |
| 05/20/2022 | 27 (4 pgs) | BNC Certificate of Mailing. (Related document(s):24 Generic Order) No. of Notices: 14. Notice Date 05/20/2022. (Admin.) (Entered: 05/20/2022) |
| 05/22/2022 | 28 (16 pgs; 2 docs) | Exhibit List (Filed By Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):6 Motion for Remand, 9 Courtroom Minutes, 26 Exhibit List, Witness List) (Attachments: # 1 [Supplement] Exhibit 54 - Certificate of Authenticity of Business Records) (Munisteri, James) (Entered: 05/22/2022) |
| 05/23/2022 | 29 | Courtroom Minutes. Time Hearing Held: 9:00 am - 10:47 am. Appearances: Joshua Wolfshohl, Aaron Powers and Amy Falcon for the Plaintiff. Mark Stancil and James Munisteri for the Debtors. Duston McFaul for Defendant Mitsui E&P Texas LP. Paul Basta and Andrew Ehrlich for Defendant SN EF UnSub, LP. Julia Frost-Davies for Eagle Ford TX LP. Conor McNamara for Defendant Venado EF L.P. aka Javelin EF L.P. Exhibits admitted: ECF No. 25 1-11. ECF No. 26 1-6, 16-21, 23-44, 46-53. The Court issued findings, the motion for remand 6 is denied on the record. Scheduling conference 2 continued to 6/13/22 at 1:30 pm. Deadline set for 6/6/22 for the parties to file pre-conference papers. (Related document(s):2 Order for Conference, 6 Motion for Remand, 19 Generic Motion) **Hearing scheduled for 6/13/2022 at 01:30 PM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 05/23/2022) |

| | | |
|---|---|---|
| 05/23/2022 | 30 (1 pg) | PDF with attached Audio File. Court Date & Time [ 5/23/2022 8:58:46 AM ]. File Size [ 51991 KB ]. Run Time [ 01:48:19 ]. (admin). (Entered: 05/23/2022) |
| 05/23/2022 | 31 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Defendants SN EF Maverick LLC & Mesquite Energy, Inc.. This is to order a transcript of Adversary Hearing: 5/23/2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC ). (Brown, Sara) Electronically forwarded to Veritext Legal Solutions on 5/25/2022. Estimated completion date: 05/26/2022. Modified on 5/25/2022 (ShannonHolden). (Entered: 05/23/2022) |
| 05/27/2022 | 32 (2 pgs) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by Joshua W. Wolfshohl. This is to order a transcript of May 23, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) Copy request electronically forwarded Veritext Legal Solutions on 5/27/2022. Estimated due date is 06/03/2022. Modified on 5/27/2022 (ShannonHolden). (Entered: 05/27/2022) |
| 06/01/2022 | 33 (80 pgs) | Transcript RE: motion hearing held on 5/23/22 before Judge Marvin Isgur. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 08/30/2022. (VeritextLegalSolutions) (Entered: 06/01/2022) |
| 06/02/2022 | 34 (1 pg) | Notice of Filing of Official Transcript as to 33 Transcript. Parties notified (Related document(s):33 Transcript) (GabrielleClair) (Entered: 06/02/2022) |
| 06/04/2022 | 35 (3 pgs) | BNC Certificate of Mailing. (Related document(s):34 Notice of Filing of Official Transcript (Form)) No. of Notices: 14. Notice Date 06/04/2022. (Admin.) (Entered: 06/04/2022) |
| 06/06/2022 | | Hearing Set (Related document(s):19 Generic Motion) **Status conference to be held on 6/13/2022 at 01:30 PM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 06/06/2022) |
| 06/13/2022 | 36 | Courtroom Minutes. Time Hearing Held: 1:30 pm - 2:16 pm. Appearances: Joshua Wolfshohl and Amy Falcon for the Plaintiff. Duston McFaul for Defendant Mitsui E&P Texas LP. Mark Stancil and Denis Jenkins for the Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation. Conor McNamara for Defendant Javelin EF L.P. Lydia Webb for Western Midstream Partners, LP. Julia Frost-Davies for Eagle Ford TX LP. Sean Mitchell and Andrew Ehrlich for UnSub. As stated on the record, not later than 6/17/22 at 4:00 pm, limited redaction documents need to be turned over to Counsel Joshua Wolfshohl such that only numbers are redacted when possible. In a separate group, redacted documents should be turned over where more than numbers are redacted. As to the ones where more than numbers are redacted, as long as there are 10 or fewer of those than not later than 6/24/22 at 12:00 pm, Counsel Joshua Woflshohl may file a motion to compel productions with fewer redactions or none. A hearing to be held on the motion on 6/27/22 at 4:00 pm. Counsel Joshua Wolfshohl authorized to share whatever he is provided by 6/17/22 with in-house counsel who will be restricted to professional eyes only to in-house |

| | | |
|---|---|---|
| | | counsel. Parties to file an agreed order on the balance of the scheduling in the case, if an agreement can't be reached parties may request a further hearing or submit competing orders. (Related document(s):2 Order for Conference, 19 Generic Motion) **Hearing scheduled for 6/27/2022 at 04:00 PM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 06/13/2022) |
| 06/13/2022 | 37 (1 pg) | PDF with attached Audio File. Court Date & Time [ 6/13/2022 1:27:40 PM ]. File Size [ 23255 KB ]. Run Time [ 00:48:27 ]. (admin). (Entered: 06/13/2022) |
| 06/14/2022 | 38 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Expedited (7 days)) by SN EF Maverick LLC & Mesquite Energy, Inc/Sara Brown. This is to order a transcript of Status Conference - June 13, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC ). (Brown, Sara) Electronically forwarded to Judicial Transcribers of Texas 6/17/2022. Estimated Transcript Completion Date: 6/24/2022. Modified on 6/17/2022 (JacquelineMata). (Entered: 06/14/2022) |
| 06/16/2022 | 39 (7 pgs) | Notice *of Proposed Scheduling and Disclosure Order*. Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 06/16/2022) |
| 06/16/2022 | 40 (21 pgs) | Notice *of Proposed Order and Briefing Schedule for Defendants' Motion for Judgment of the Pleadings*. Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 06/16/2022) |
| 06/17/2022 | 41 (4 pgs) | Scheduling and Disclosure Order, Signed on 6/17/2022 (Related document(s):16 Generic Order, 19 Generic Motion, 36 Courtroom Minutes, 39 Notice, 40 Notice) **Hearing scheduled for 7/27/2022 at 09:30 AM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 06/17/2022) |
| 06/19/2022 | 42 (6 pgs) | BNC Certificate of Mailing. (Related document(s):41 Order Setting Hearing) No. of Notices: 14. Notice Date 06/19/2022. (Admin.) (Entered: 06/19/2022) |
| 06/23/2022 | 43 (2 pgs) | Certificate *of Service* (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC ).(Related document(s):41 Order Setting Hearing) (Munisteri, James) (Entered: 06/23/2022) |
| 06/24/2022 | 44 | Sealed Motion - *Carnero's Motion to Compel Removal of Redactions* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 06/24/2022) |
| 06/24/2022 | 45 (9 pgs; 2 docs) | Motion to Seal - *Carnero G&P, LLCs Emergency Motion for Entry of an Order (I) Authorizing the Filing of Motion to Compel Removal of Redactions Under Seal and (II) Granting Related Relief* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 06/24/2022) |
| 06/24/2022 | | Hearing Set On (Related document(s):44 Sealed Motion, 45 Motion to Seal) Movant to notice all interested parties and file a certificate of |

| | | |
|---|---|---|
| | | service with the court. **Hearing scheduled for 6/27/2022 at 04:00 PM at Houston, Courtroom 404 (MI).** (LinhthuDo) (Entered: 06/24/2022) |
| 06/27/2022 | 46 (3 pgs) | Notice *of Withdrawal of Carnero's Motion to Compel Removal of Redactions without Prejudice*. (Related document(s):44 Sealed Motion) Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 06/27/2022) |
| 06/27/2022 | 47 | *Notice of Cancellation of Hearing.* (Related document(s): 36 Courtroom Minutes, 44 Sealed Motion, 45 Motion to Seal) Contacted Joshua Wolfshohl. The hearings previously scheduled for 6/27/2022 are *canceled.* (LinhthuDo) (Entered: 06/27/2022) |
| 07/05/2022 | 48 (39 pgs) | Transcript RE: Motion Hearing (Via Zoom) held on June 13, 2022 before Judge Marvin Isgur. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 10/3/2022. (mhen) (Entered: 07/05/2022) |
| 07/06/2022 | 49 (1 pg) | Notice of Filing of Official Transcript as to 48 Transcript. Parties notified (Related document(s):48 Transcript) (hcar) (Entered: 07/06/2022) |
| 07/08/2022 | 50 (3 pgs) | BNC Certificate of Mailing. (Related document(s):49 Notice of Filing of Official Transcript (Form)) No. of Notices: 14. Notice Date 07/08/2022. (Admin.) (Entered: 07/08/2022) |
| 07/12/2022 | 51 (1594 pgs; 47 docs) | Motion *(Redacted) Defendants' Motion for Judgment on the Pleadings* Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 - filed under seal # 8 Exhibit 8 - filed under seal # 9 Exhibit 9 - filed under seal # 10 Exhibit 10 - filed under seal # 11 Exhibit 11 - filed under seal # 12 Exhibit 12 - filed under seal # 13 Exhibit 13 - filed under seal # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 - filed under seal # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31 # 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34 # 35 Exhibit 35 # 36 Exhibit 36 # 37 Exhibit 37 # 38 Exhibit 38 # 39 Exhibit 39 # 40 Exhibit 40 # 41 Exhibit 41 # 42 Exhibit 42 # 43 Exhibit 43 # 44 Exhibit 44 # 45 Exhibit 45 - filed under seal # 46 Proposed Order) (Munisteri, James) (Entered: 07/12/2022) |
| 07/12/2022 | 52 | Sealed Document */Exhibit Nos. 7-13, 22 and 45 to Defendants' Motion for Judgment on the Pleadings [Docket No. 51]* (Filed By Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ). (Attachments: # 1 Exhibit 7 (Part 1 of 2) # 2 Exhibit 7 (Part 2 of 2) # 3 Exhibit 8 # 4 Exhibit 9 # 5 Exhibit 10 # 6 Exhibit 11 # 7 Exhibit 12 # 8 Exhibit 13 # 9 Exhibit 22 # 10 Exhibit 45) (Munisteri, James) (Entered: 07/12/2022) |
| 07/12/2022 | 53 | Sealed Motion - *Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint* Filed by Carnero G&P, LLC |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A # 2 Proposed Order) (Wolfshohl, Joshua) (Entered: 07/12/2022) |
| 07/12/2022 | 54 (9 pgs; 2 docs) | Motion to Seal - *Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of Emergency Motion for Leave to File Second Amended Complaint and Its Exh. A Second Amended Complaint Under Seal and (II) Granting Related Relief* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 07/12/2022) |
| 07/13/2022 | 55 (15 pgs; 2 docs) | Response */Defendants' Response to Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint* (related document(s):53 Sealed Motion). Filed by Eagle Ford TX LP, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Proposed Order) (Munisteri, James) (Entered: 07/13/2022) |
| 07/14/2022 | 56 (5 pgs) | Reply - *Carnero's Reply in Support of Its Emergency Motion for Leave to File Second Amended Complaint* (related document(s):53 Sealed Motion). Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 07/14/2022) |
| 07/14/2022 | 57 (5 pgs) | Order on Motion for Leave to File Second Amended Complaint, Signed on 7/14/2022 (Related document(s):53 Sealed Motion) (LinhthuDo) (Entered: 07/15/2022) |
| 07/17/2022 | 58 (7 pgs) | BNC Certificate of Mailing. (Related document(s):57 Generic Order) No. of Notices: 14. Notice Date 07/17/2022. (Admin.) (Entered: 07/17/2022) |
| 07/21/2022 | | Hearing Set On (Related document(s):51 Motion for Judgment on the Pleadings) Movant to notice all interested parties and file a certificate of service with the court. **Hearing scheduled for 8/17/2022 at 01:30 PM at Houston, Courtroom 404 (MI).** (LinhthuDo) (Entered: 07/21/2022) |
| 07/21/2022 | | Hearing Reset (Related document(s):51 Motion for Judgment on the Pleadings) Contacted by the parties. **Hearing rescheduled for 10/5/2022 at 01:30 PM at Houston, Courtroom 404 (MI).** (LinhthuDo) (Entered: 07/21/2022) |
| 07/22/2022 | 59 (2 pgs) | Request for Issuance of Summons on Mesquite Comanche Holdings, LLC. (Wolfshohl, Joshua) (Entered: 07/22/2022) |
| 07/25/2022 | 60 (2 pgs) | Summons Issued on Mesquite Comanche Holdings, LLC. Date Issued 7/25/2022. (AkeitaMichael) Modified on 7/25/2022 (AkeitaMichael). (Entered: 07/25/2022) |
| 08/01/2022 | 61 (2 pgs) | Summons Service Executed on Mesquite Comanche Holdings, LLC 7/25/2022. (Wolfshohl, Joshua) (Entered: 08/01/2022) |
| 08/03/2022 | 62 (2 pgs) | Order (I) Authorizing the Filing of Carnero's Emergency Motion for Leave to File Second Amended Complaint and its Ex. A Second Amended Complaint Under Seal and (II) Granting Related Relief |

| | | |
|---|---|---|
| | | (Related Doc # 54) Signed on 8/3/2022. (TylerLaws) (Entered: 08/03/2022) |
| 08/22/2022 | 63 (11 pgs; 2 docs) | Motion - *Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 08/22/2022) |
| 08/24/2022 | 64 (3 pgs) | Notice *of Appearance of Dennis Jenkins on behalf of Mesquite Comanche Holdings, LLC*. Filed by Mesquite Comanche Holdings, LLC (Munisteri, James) (Entered: 08/24/2022) |
| 08/24/2022 | 65 (3 pgs) | Notice *of Appearance of Mark T. Stancil on behalf of Mesquite Comanche Holdings, LLC*. Filed by Mesquite Comanche Holdings, LLC (Munisteri, James) (Entered: 08/24/2022) |
| 08/24/2022 | 66 (25 pgs) | Answer to Complaint (Related document(s):61 Summons Service Executed) Filed by Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Related document(s):53-1 *Sealed* Second Amended Complaint) Modified on 8/25/2022 (LinhthuDo). (Entered: 08/24/2022) |
| 08/24/2022 | 67 | Sealed Document */Defendants' Motion for Judgment on the Pleadings* (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ). (Attachments: # 1 Proposed Order # 2 Ex. 6 (Part 1 of 4) # 3 Ex. 6 (Part 2 of 4) # 4 Ex. 6 (Part 3 of 4) # 5 Ex. 6 (Part 4 of 4) # 6 Ex. 7 # 7 Ex. 8 # 8 Ex. 9 # 9 Ex. 10 # 10 Ex. 11 # 11 Ex. 12 # 12 Ex. 20 # 13 Ex. 26) (Munisteri, James) (Entered: 08/24/2022) |
| 08/24/2022 | 68 (3567 pgs; 36 docs) | Additional Attachments Re: *Exhibit Nos. 1-35 to Defendants' Motion for Judgment on the Pleadings* (related document(s):67 Sealed Document) (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):67 Sealed Document) (Attachments: # 1 Ex. 1 # 2 Ex. 2 # 3 Ex. 3 # 4 Ex. 4 # 5 Ex. 5 # 6 Ex. 6 - Filed Under Seal # 7 Ex. 7 - Filed Under Seal # 8 Ex. 8 - Filed Under Seal # 9 Ex. 9 - Filed Under Seal # 10 Ex. 10 - Filed Under Seal # 11 Ex. 11 - Filed Under Seal # 12 Ex. 12 - Filed Under Seal # 13 Ex. 13 # 14 Ex.14 # 15 Ex. 15 # 16 Ex. 16 # 17 Ex. 17 # 18 Ex. 18 # 19 Ex. 19 # 20 Ex. 20 - Filed Under Seal # 21 Ex. 21 # 22 Ex. 22 # 23 Ex. 23 # 24 Ex. 24 # 25 Ex. 25 # 26 Ex. 26 - Filed Under Seal # 27 Ex. 27 # 28 Ex. 28 # 29 Ex. 29 # 30 Ex. 30 # 31 Ex. 31 # 32 Ex. 32 # 33 Ex. 33 # 34 Ex. 34 # 35 Ex. 35) (Munisteri, James) (Entered: 08/25/2022) |
| 09/12/2022 | 69 (2 pgs) | Notice *of Appearance*. Filed by Enterprise Products Operating, LLC (Mitchell, Paul) (Entered: 09/12/2022) |
| 09/12/2022 | 70 (18 pgs; 3 docs) | Response (Filed By Enterprise Products Operating, LLC ).(Related document(s):63 Generic Motion) (Attachments: # 1 Exhibit 1 Affidavit of Zach Strait # 2 Proposed Order) (Mitchell, Paul) (Entered: 09/12/2022) |

| | | |
|---|---|---|
| 09/12/2022 | 71 (14 pgs; 2 docs) | Motion to Intervene. Objections/Request for Hearing Due in 21 days. Filed by Interested Parties Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP (Attachments: # 1 Proposed Order) (Webb, Lydia). Related document(s) 63 Motion - *Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* filed by Plaintiff Carnero G&P, LLC. (Entered: 09/12/2022) |
| 09/12/2022 | 72 (18 pgs) | Objection *to Carnero G&P's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (related document(s):63 Generic Motion). Filed by Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP (Webb, Lydia) (Entered: 09/12/2022) |
| 09/12/2022 | 73 (8 pgs) | Declaration re: *Declaration of Craig W. Collins in Support of the WES Parties' Objection to Carnero G&P's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (Filed By Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP ).(Related document(s):72 Objection) (Webb, Lydia) (Entered: 09/12/2022) |
| 09/12/2022 | 74 (12 pgs; 2 docs) | Motion to Intervene. Objections/Request for Hearing Due in 21 days. Filed by ETC Texas Pipeline Ltd. (Attachments: # 1 Proposed Order) (Archiyan, Yelena) (Entered: 09/12/2022) |
| 09/12/2022 | 75 (13 pgs) | Objection *Non-Party ETC Texas Pipeline Ltd.'s Objection to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material and Motion for Protective Order* (related document(s):63 Generic Motion). Filed by ETC Texas Pipeline Ltd. (Mitchell, John) (Entered: 09/12/2022) |
| 09/13/2022 | 76 (3 pgs) | Certificate *Supplemental Certificate of Conference Regarding the WES Parties' Motion for Leave to Intervene for Limited Purpose of Objecting to Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material* (Filed By Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP ).(Related document(s):71 Motion to Intervene) (Webb, Lydia) (Entered: 09/13/2022) |
| 09/13/2022 | 77 (8 pgs; 2 docs) | Motion to Intervene. Objections/Request for Hearing Due in 21 days. Filed by Enterprise Products Operating, LLC (Attachments: # 1 Proposed Order) (Mitchell, Paul) (Entered: 09/13/2022) |
| 09/14/2022 | 78 | Sealed Document - *Carnero G&P LLC's Objection to Defendants' Motion for Judgment on the Pleadings* (Filed By Carnero G&P, LLC ). (Attachments: # 1 Exhibit 1 # 2 Proposed Order) (Wolfshohl, Joshua) (Entered: 09/14/2022) |
| 09/14/2022 | 79 (9 pgs; 2 docs) | Motion to Seal - *Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to Defendants' Motion for Judgment on the Pleadings Under Seal and (II) Granting Related Relief* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 09/14/2022) |
| 09/14/2022 | | Hearing Set On (Related document(s):63 Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material) Movant to notice all interested parties and file a |

| | | |
|---|---|---|
| | | certificate of service with the court. **Hearing scheduled for 9/19/2022 at 10:00 AM at Houston, Courtroom 404 (MI).** (LinhthuDo) (Entered: 09/14/2022) |
| 09/15/2022 | | Hearing Set On (Related document(s):71 Motion to Intervene, 74 Motion to Intervene, 77 Motion to Intervene) Movant(s) to notice all interested parties and file a certificate of service with the court. **Hearing scheduled for 9/19/2022 at 10:00 AM at Houston, Courtroom 404 (MI).** (LinhthuDo) (Entered: 09/15/2022) |
| 09/15/2022 | 80 | Sealed Document - *Carnero's Witness and Exhibit List for the Haring on September 19, 2022* (Filed By Carnero G&P, LLC ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Wolfshohl, Joshua) (Entered: 09/15/2022) |
| 09/15/2022 | 81 (11 pgs; 2 docs) | Witness List, Exhibit List (Filed By Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP ).(Related document(s):63 Generic Motion, 72 Objection) (Attachments: # 1 Exhibit 1) (Webb, Lydia) (Entered: 09/15/2022) |
| 09/15/2022 | 82 (2 pgs) | Notice *of Hearing*. (Related document(s):71 Motion to Intervene) Filed by Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP (Webb, Lydia) (Entered: 09/15/2022) |
| 09/15/2022 | 83 (3 pgs) | Witness List (Filed By ETC Texas Pipeline Ltd. ).(Related document(s):63 Generic Motion, 75 Objection) (Archiyan, Yelena) (Entered: 09/15/2022) |
| 09/15/2022 | 84 (2 pgs) | Notice *Notice of Hearing*. (Related document(s):74 Motion to Intervene) Filed by ETC Texas Pipeline Ltd. (Archiyan, Yelena) (Entered: 09/15/2022) |
| 09/15/2022 | 85 (6 pgs; 3 docs) | Exhibit List, Witness List (Filed By Enterprise Products Operating, LLC ). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Mitchell, Paul) (Entered: 09/15/2022) |
| 09/15/2022 | 86 (3 pgs) | Notice *of Hybrid Hearing Scheduled for Monday, September 19, 2022*. (Related document(s):63 Generic Motion) Filed by Carnero G&P, LLC (Wolfshohl, Joshua) (Entered: 09/15/2022) |
| 09/16/2022 | 87 (3 pgs) | Notice *of Hearing*. (Related document(s):77 Motion to Intervene) Filed by Enterprise Products Operating, LLC (Mitchell, Paul) (Entered: 09/16/2022) |
| 09/16/2022 | 88 (11 pgs; 4 docs) | Exhibit List, Witness List (Filed By Enterprise Products Operating, LLC ).(Related document(s):85 Exhibit List, Witness List) (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3) (Mitchell, Paul) (Entered: 09/16/2022) |
| 09/17/2022 | 89 (5 pgs) | Declaration re: *Declaration of Todd McEuen* (Filed By ETC Texas Pipeline Ltd. ).(Related document(s):75 Objection) (Archiyan, Yelena) (Entered: 09/17/2022) |
| 09/19/2022 | 90 | Courtroom Minutes. Time Hearing Held: 10:00 am - 10:40 am. Appearances: Joshua Wolfshohl and Amy Falcon for the Plaintiff. Conor McNamara for Javelin EF L.P. Jason Brookner and Lydia Webb |

| | | |
|---|---|---|
| | | for Western Midstream Partners, LP. Paul Mitchell and Justin Braga for Enterprise Products Operating, LLC. John Mitchell for ETC Texas Pipeline, Ltd. Mark Stancil for Mesquite Energy, Inc. Duston McFaul and Megan Quejada for Defendant Mitsui E&P Texas LP. Sean Mitchell for SN EF UnSub, LP. David Whittlesey for Eagle Ford Midstream. The Court orders that the hearing on 51 will not include any matter on damages. The Court will presume for the purposes of that hearing that changes that invade Carnero's rights could produce damages. If there are changes that invade Carnero's rights that could produce damages, the Court will revisit at that time whether, how, and who would receive that information on the business side of Carnero and work on providing adequate protection from the entities whose business information is potentially subject to compromise. (Related document(s):63 Generic Motion, 71 Motion to Intervene, 74 Motion to Intervene, 77 Motion to Intervene) (TylerLaws) (Entered: 09/19/2022) |
| 09/19/2022 | 91 (1 pg) | PDF with attached Audio File. Court Date & Time [ 9/19/2022 9:57:34 AM ]. File Size [ 20655 KB ]. Run Time [ 00:43:02 ]. (admin). (Entered: 09/19/2022) |
| 09/20/2022 | 92 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Joshua W. Wolfshohl. This is to order a transcript of Hearing held on Sept. 19, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) Electronic Transcript Request Received and Forwarded to Judicial Transcribers of Texas on 09/20/2022. Estimated Date of Completion: 09/21/2022. Modified on 9/20/2022 (AntonioBanda). (Entered: 09/20/2022) |
| 09/21/2022 | 93 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Defendants. This is to order a transcript of Hearing held on September 19, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ). (Brown, Sara) Copy request electronically forwarded to Judicial Transcribers of Texas on 9/21/22. Estimated completion date: 9/24/22. Modified on 9/21/2022 (RachelWillborg). (Entered: 09/21/2022) |
| 09/21/2022 | 94 (34 pgs) | Transcript RE: Motion Hearing held on September 19, 2022 before Judge Marvin Isgur. Transcript is available for viewing in the Clerk's Office. Filed by Transcript access will be restricted through 12/20/2022. (mhen) (Entered: 09/21/2022) |
| 09/22/2022 | 95 (1 pg) | Notice of Filing of Official Transcript as to 94 Transcript. Parties notified (Related document(s):94 Transcript) (ShannonHolden) (Entered: 09/22/2022) |
| 09/22/2022 | 96 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (3-Day) by Paul Mitchell. This is to order a transcript of 09/19/2002 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Enterprise Products Operating, LLC ). (Mitchell, Paul) Copy request electronically forwarded to original transcription company Judicial Transcribers of Texas on 9/23/22. Estimated completion date: 9/26/22. Modified on 9/23/2022 (RachelWillborg). (Entered: 09/22/2022) |
| 09/22/2022 | 97 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Lydia R. Webb. This is to order a transcript of the Hearing held on |

| | | |
|---|---|---|
| | | September 19, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Springfield Pipeline LLC, WGR Operating, LP, Western Midstream Partners, LP ). (Webb, Lydia) Copy request electronically forwarded to Judicial Transcribers of Texas on 9/23/22. Estimated completion date: 9/24/22. Modified on 9/23/2022 (RachelWillborg). (Entered: 09/22/2022) |
| 09/24/2022 | 98 (4 pgs) | BNC Certificate of Mailing. (Related document(s):95 Notice of Filing of Official Transcript (Form)) No. of Notices: 17. Notice Date 09/24/2022. (Admin.) (Entered: 09/24/2022) |
| 09/28/2022 | 99 | Brief, Sealed Document */Defendants' Reply in Support of Their Motion for Judgment on the Pleadings* (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, Venado EF L.P. ).(Related document(s):67 Sealed Document, 78 Sealed Document) (Munisteri, James) (Entered: 09/28/2022) |
| 09/28/2022 | 100 (40 pgs; 3 docs) | Additional Attachments Re: *Exhibit Nos. 36-37 to Defendants' Reply in Support of Their Motion for Judgment on the Pleadings* (related document(s):99 Brief, Sealed Document) (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):99 Brief, Sealed Document) (Attachments: # 1 Exhibit 36 # 2 Exhibit 37) (Munisteri, James) (Entered: 09/28/2022) |
| 09/30/2022 | 101 (3 pgs) | Notice *of Withdrawal as Counsel of Sara Ann Brown*. Filed by Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation (Brown, Sara) (Entered: 09/30/2022) |
| 10/03/2022 | 102 (3 pgs) | Exhibit List (Filed By Carnero G&P, LLC ).(Related document(s):67 Sealed Document, 78 Sealed Document) (Wolfshohl, Joshua) (Entered: 10/03/2022) |
| 10/03/2022 | 103 (3702 pgs; 40 docs) | Exhibit List, Witness List (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):67 Sealed Document, 78 Sealed Document, 99 Brief, Sealed Document) (Attachments: # 1 Ex. 1 # 2 Ex. 2 # 3 Ex. 3 # 4 Ex. 4 # 5 Ex. 5 # 6 Ex. 6 - Filed Under Seal # 7 Ex. 7 - Filed Under Seal # 8 Ex. 8 - Filed Under Seal # 9 Ex. 9 - Filed Under Seal # 10 Ex. 10 - Filed Under Seal # 11 Ex. 11 - Filed Under Seal # 12 Ex. 12 - Filed Under Seal # 13 Ex. 13 # 14 Ex. 14 # 15 Ex. 15 # 16 Ex. 16 # 17 Ex. 17 # 18 Ex. 18 # 19 Ex. 19 # 20 Ex. 20 - Filed Under Seal # 21 Ex. 21 # 22 Ex. 22 # 23 Ex. 23 # 24 Ex. 24 # 25 Ex. 25 # 26 Ex. 26 - Filed Under Seal # 27 Ex. 27 # 28 Ex. 28 # 29 Ex. 29 # 30 Ex. 30 # 31 Ex. 31 # 32 Ex. 32 # 33 Ex. 33 # 34 Ex. 34 # 35 Ex. 35 # 36 Ex. 36 # 37 Ex. 37 # 38 Ex. 38 # 39 Ex. 39) (Munisteri, James) (Entered: 10/03/2022) |
| 10/05/2022 | 104 | Courtroom Minutes. Time Hearing Held: 1:30 pm - 3:46 pm, 4:00 pm - 7:25 pm. Cases 21-04419, 22-03035 heard concurrently. Appearances: Joshua Wolfshohl and Amy Falcon for Carnero G&P, LLC. Duston McFaul and Megan Quejada for Mitsui E&P Texas LP. Andrew Ehrlich, Rusty Woolley and Sean Mitchell for SN EF UnSub, LP. Mark Stancil and Dennis Jenkins for SN EF Maverick, LLC/Mesquite |

| | | |
|---|---|---|
| | | Entities. Julia Frost-Davies for Eagle Ford TX, LP. Conor McNamara for Venado EF L.P. aka Javelin EF L.P. Jason Brookner and Lydia Webb for Western Midstream Partners, LP. Paul Mitchell for Enterprise Products Operating, LLC. Additional appearances: Harry Quarls, Cameron George and Greg Kopel with Mesquite Energy. Jerry Schroeder, Dustin Perry, Matt Hawthorn and Kaylan Dunn with Carnero. Brett Miller present. Exhibits admitted: ECF No. 103 1-39. Additional simultaneous briefing limited to 10 pgs. per topic to be filed not later than 10/26/22. The Court will take the matters under advisement on 10/27/22. (Related document(s):51 Generic Motion) (TylerLaws) Modified on 10/5/2022 (TylerLaws). (Entered: 10/05/2022) |
| 10/05/2022 | 105 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Joshua Wolfshohl. This is to order a transcript of Hearing held on 10/05/22 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) Hearing is sealed. Per case manager attorneys need to file a motion and proposed order to have transcribed. Modified on 10/11/2022 (ShannonHolden). (Entered: 10/05/2022) |
| 10/06/2022 | 106 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Defendants/Sharon Beausoleil. This is to order a transcript of Hearing on October 5, 2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Judicial Transcribers of Texas (Filed By Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ). (Beausoleil, Sharon) Hearing is sealed. Per the case manager a motion and proposed order must be filed. Modified on 10/11/2022 (ShannonHolden). Per Docket number 110. Electroncially forward to Judicial Transcribers of Texas on 10/17/2022. Expedited. Modified on 10/17/2022 (ShannonHolden). (Entered: 10/06/2022) |
| 10/06/2022 | 107 (1 pg) | AO 435 TRANSCRIPT ORDER FORM (Daily (24 hours)) by Paul Mitchell. This is to order a transcript of 10/05/2022 before Judge Marvin P. Isgur. Court Reporter/Transcriber: Veritext Legal Solutions (Filed By Enterprise Products Operating, LLC ). (Mitchell, Paul) Hearing is sealed. Per case manager a motion and proposed order must be filed to process transcripts. Modified on 10/11/2022 (ShannonHolden). (Entered: 10/06/2022) |
| 10/06/2022 | 108 (3 pgs) | Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to Defendants' Motion for Judgment on the Pleadings Under Seal and (II) Granting Related Relief (Related Doc # 79) Signed on 10/6/2022. (TylerLaws) (Entered: 10/06/2022) |
| 10/11/2022 | 109 (7 pgs; 2 docs) | Emergency Motion *to Transcribe October 5, 2022 Hearing and File Transcript Under Seal* Filed by Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation (Attachments: # 1 Proposed Order) (Beausoleil, Sharon) (Entered: 10/11/2022) |
| 10/11/2022 | 110 (2 pgs) | Order Granting Emergency Motion to Transcribe October 5, 2022 Hearing and File Transcript Under Seal (Related Doc # 109) Signed on 10/11/2022. (LinhthuDo) (Entered: 10/12/2022) |
| 10/14/2022 | 111 (5 pgs) | BNC Certificate of Mailing. (Related document(s):110 Order on Emergency Motion (Adversary)) No. of Notices: 17. Notice Date |

| | | |
|---|---|---|
| | | 10/14/2022. (Admin.) (Entered: 10/14/2022) |
| 10/18/2022 | 112 (235 pgs) | Sealed Transcript RE: Sealed Motion Hearing held on October 5, 2022 before Judge Marvin Isgur. Filed by (mhen) (Entered: 10/18/2022) |
| 10/25/2022 | 113 (5 pgs) | Stipulation By Carnero G&P, LLC and. Does this document include an agreed order or otherwise request that the judge sign a document? Yes. (Filed By Carnero G&P, LLC ).(Related document(s): 104 Courtroom Minutes) (Wolfshohl, Joshua) (Entered: 10/25/2022) |
| 10/25/2022 | 114 (4 pgs) | Agreed Stipulation nd Order Regarding Additional Briefing Requested by the Court at the October 5, 2022 Hearing, Signed on 10/25/2022 (Related document(s):53 Sealed Motion, 67 Sealed Document, 104 Courtroom Minutes) (TylerLaws) (Entered: 10/25/2022) |
| 10/27/2022 | 115 (7 pgs) | BNC Certificate of Mailing. (Related document(s):114 Generic Order) No. of Notices: 17. Notice Date 10/27/2022. (Admin.) (Entered: 10/27/2022) |
| 11/04/2022 | 116 | Brief, Sealed Document */Defendants' Supplemental Briefing in Response to Issues Raised During the October 5 Hearin* (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):67 Sealed Document, 78 Sealed Document, 99 Brief, Sealed Document, 104 Courtroom Minutes) (Munisteri, James) (Entered: 11/04/2022) |
| 11/04/2022 | 117 | Sealed Document *Carnero G&P LLC's Post-Hearing Brief* (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) (Entered: 11/04/2022) |
| 11/04/2022 | 118 (9 pgs; 2 docs) | Motion to Seal - *Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Post-Hearing Brief Under Seal and (II) Granting Related Relief* Filed by Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 11/04/2022) |
| 11/18/2022 | 119 (9 pgs; 2 docs) | Emergency Motion *for Leave to File Responses to Supplemental Briefs* Filed by Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Proposed Order) (Beausoleil, Sharon) (Entered: 11/18/2022) |
| 11/21/2022 | 120 (2 pgs) | Order Granting Defendant's Emergency Motion for Leave to File Responses to Supplemental Briefs (Related Doc # 119) Signed on 11/21/2022. (TylerLaws) (Entered: 11/21/2022) |
| 11/23/2022 | 121 (5 pgs) | BNC Certificate of Mailing. (Related document(s):120 Order on Emergency Motion (Adversary)) No. of Notices: 17. Notice Date 11/23/2022. (Admin.) (Entered: 11/23/2022) |
| 11/28/2022 | 122 (3 pgs) | Order Authorizing the Filing of Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Post-Hearing Brief Under Seal and (II) Granting Related Relief (Related Doc # 118) Signed on 11/28/2022. (TylerLaws) (Entered: 11/28/2022) |

| | | |
|---|---|---|
| 11/30/2022 | 123 | Sealed Document - *Carnero G&P LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing* (Filed By Carnero G&P, LLC ). (Wolfshohl, Joshua) (Entered: 11/30/2022) |
| 11/30/2022 | 124 (9 pgs; 2 docs) | Motion to Seal - *Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of its - Carnero G&P LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised during the October 5 Hearing Under Seal and (II) Granting Related Relief* Filed by Plaintiff Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 11/30/2022) |
| 11/30/2022 | 125 | Supplemental Brief, Sealed Document */Defendants' Supplemental Reply Brief in Response to Issues Raised During the October 5 Hearing* (Filed By Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. ).(Related document(s):67 Sealed Document, 78 Sealed Document, 99 Brief, Sealed Document, 104 Courtroom Minutes, 116 Brief, Sealed Document, 117 Sealed Document, 120 Order on Emergency Motion (Adversary)) (Munisteri, James) (Entered: 11/30/2022) |
| 12/22/2022 | 126 (3 pgs) | Order Authorizing the Filing of Carnero G&P, LLC's Response to Defendants' Supplemental Briefing in Response to Issues Raised During the October 5 Hearing Under Seal and (II) Granting Related Relief (Related Doc # 124) Signed on 12/22/2022. (TylerLaws) (Entered: 12/22/2022) |
| 01/12/2023 | 127 | Emergency Motion *for Status Conference*, Sealed Motion , Motion to Set Hearing. Filed by Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC (Attachments: # 1 Proposed Order) (Munisteri, James) (Entered: 01/12/2023) |
| 01/13/2023 | 128 (1 pg) | Case Management Order, Signed on 1/13/2023 (Related document(s):127 Emergency Motion (Adversary), Sealed Motion, Motion to Set Hearing) (TylerLaws) (Entered: 01/13/2023) |
| 01/15/2023 | 129 (4 pgs) | BNC Certificate of Mailing. (Related document(s):128 Generic Order) No. of Notices: 16. Notice Date 01/15/2023. (Admin.) (Entered: 01/15/2023) |
| 01/19/2023 | 130 | Amended Emergency Motion *for Status Conference*, Sealed Motion , Motion to Set Hearing. Filed by Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC Hearing scheduled for 1/26/2023 at 10:00 AM at Houston, Courtroom 404 (MI). (Attachments: # 1 Proposed Order) (Munisteri, James) (Entered: 01/19/2023) |
| 01/25/2023 | 131 | Sealed Document - *Carnero's Response to the Emergency Motion of Mesquite Defendants for Status Conference* (Filed By Carnero G&P, LLC ). (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 01/25/2023) |
| 01/25/2023 | 132 (9 pgs; 2 docs) | Motion to Seal *Carnero G&P, LLCs Emergency Motion for Entry of an Order (I) Authorizing the Filing of its Objection to the Amended* |

| | | |
|---|---|---|
| | | *Emergency Motion of Mesquite Defendants for Status Conference Under Seal and (II) Granting Related Relief* Filed by Plaintiff Carnero G&P, LLC (Attachments: # 1 Proposed Order) (Wolfshohl, Joshua) (Entered: 01/25/2023) |
| 01/26/2023 | 133 | Courtroom Minutes. Time Hearing Held: 10:00 am - 10:06 am. Appearances: Mark Stancil for the Mesquite Defendants. Maegan Quejada for Mitsui E&P Texas LP. Joshua Wolfshohl and Amy Falcon for Carnero G&P, LLC. Andrew Ehrlich and Sean Mitchell for Crown Eagle Energy LP. Conor McNamara for Javelin EF L.P. Hearing continued to 2/17/23 at 10:30 am as a status/scheduling conference. (Related document(s):130 Emergency Motion (Adversary), Sealed Motion, Motion to Set Hearing) **Hearing scheduled for 2/17/2023 at 10:30 AM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 01/26/2023) |
| 01/26/2023 | 134 (1 pg) | PDF with attached Audio File. Court Date & Time [ 1/26/2023 9:57:22 AM ]. File Size [ 4328 KB ]. Run Time [ 00:09:01 ]. (admin). (Entered: 01/26/2023) |
| 02/01/2023 | 135 (68 pgs) | Motion */[REDACTED] Defendants' Motion for Judgment on the Pleadings* Filed by Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Munisteri, James) (Entered: 02/01/2023) |
| 02/01/2023 | 136 (10 pgs; 2 docs) | Motion to Seal - *Defendants' Motion for Judgment on the Pleadings* Filed by Eagle Ford TX LP, Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, Mitsui E&P Texas LP, SN EF Maverick, LLC, SN EF UnSub, LP, Venado EF L.P. (Attachments: # 1 Proposed Order) (Munisteri, James) (Entered: 02/01/2023) |
| 02/02/2023 | 137 (33 pgs) | **Memorandum Opinion,** Signed on 2/2/2023 (Related document(s):51 Generic Motion, 53 Sealed Motion) (TylerLaws) (Entered: 02/02/2023) |
| 02/02/2023 | 138 (1 pg) | **Judgment** in 4:22-ap-3035, Signed on 2/2/2023 (TylerLaws) (Entered: 02/02/2023) |
| 02/04/2023 | 139 (36 pgs) | BNC Certificate of Mailing. (Related document(s):137 Opinion) No. of Notices: 16. Notice Date 02/04/2023. (Admin.) (Entered: 02/04/2023) |
| 02/04/2023 | 140 (4 pgs) | BNC Certificate of Mailing. (Related document(s):138 Judgment) No. of Notices: 16. Notice Date 02/04/2023. (Admin.) (Entered: 02/04/2023) |
| 02/15/2023 | 141 (65 pgs) | Notice of Appeal filed. (related document(s): 29 Courtroom Minutes, 90 Courtroom Minutes, 137 Opinion, 138 Judgment). Fee Amount $298. Appellant Designation due by 03/1/2023. (Wolfshohl, Joshua) (Entered: 02/15/2023) |
| 02/15/2023 | | Receipt of Notice of Appeal( 22-03035) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A24205131. Fee amount $ 298.00. (U.S. Treasury) (Entered: 02/15/2023) |

| | | |
|---|---|---|
| 02/15/2023 | 142 | Election to Appeal to District Court . (Wolfshohl, Joshua) (Entered: 02/15/2023) |
| 02/16/2023 | 143 (3 pgs) | Order Authorizing the Filing of Carnero G&P, LLC's (I) Objection to the Amended Emergency Motion of Mesquite Defendants for Status Conference Under Seal and (II) Granting Related Relief (Related Doc # 132) Signed on 2/16/2023. (TylerLaws) (Entered: 02/16/2023) |
| 02/16/2023 | 144 (1 pg) | Clerk's Notice of Filing of an Appeal. On 02/15/2023, Carnero G&P, LLC filed a notice of appeal. The appeal has been assigned to U.S. District Judge Kenneth M. Hoyt, Civil Action 4:23-cv-00587. Parties notified (Related document(s):141 Notice of Appeal) (SierraThomasAnderson) (Entered: 02/16/2023) |
| 02/16/2023 | 145 (10 pgs) | BILL OF COSTS in total amount $4,490.75 (Filed By Mesquite Comanche Holdings, LLC, Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation, SN EF Maverick, LLC ). (Munisteri, James) (Entered: 02/16/2023) |
| 02/17/2023 | 146 (1 pg) | Order Canceling Status Conference, Signed on 2/17/2023 (Related document(s):130 Emergency Motion (Adversary), Sealed Motion, Motion to Set Hearing, 133 Courtroom Minutes, 141 Notice of Appeal, 144 Clerk's Notice of Filing of an Appeal) (TylerLaws) (Entered: 02/17/2023) |
| 02/18/2023 | 147 (4 pgs) | BNC Certificate of Mailing. (Related document(s):144 Clerk's Notice of Filing of an Appeal) No. of Notices: 16. Notice Date 02/18/2023. (Admin.) (Entered: 02/18/2023) |
| 02/19/2023 | 148 (4 pgs) | BNC Certificate of Mailing. (Related document(s):146 Generic Order) No. of Notices: 16. Notice Date 02/19/2023. (Admin.) (Entered: 02/19/2023) |
| 02/23/2023 | 149 (2 pgs) | Order Granting Defendants' Emergency Motion for Entry of an Order (I) Authorizing the Defendants" Motion for Judgment on the Pleadings to Remain Under Seal, and (II) Granting Related Relief (Related Doc # 136) Signed on 2/23/2023. (TylerLaws) (Entered: 02/23/2023) |
| 03/01/2023 | 150 (11 pgs) | Appellant Designation of Contents For Inclusion in Record On Appeal (related document(s):141 Notice of Appeal, 144 Clerk's Notice of Filing of an Appeal). (Wolfshohl, Joshua) (Entered: 03/01/2023) |
| 03/06/2023 | | Costs Taxed in amount of $ 4,490.75 re: 145 Bill of Costs (Related document(s):145 Bill of Costs). (DarleneHansen) (Entered: 03/06/2023) |
| 03/15/2023 | 151 (6 pgs) | Appellee Designation of Contents for Inclusion in Record of Appeal (related document(s):141 Notice of Appeal, 144 Clerk's Notice of Filing of an Appeal). (Munisteri, James) (Entered: 03/15/2023) |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. ______________ |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc. | § | |
| | § | |
| *Defendants.* | | |

**NOTICE OF REMOVAL**

Defendants SN EF UnSub LP, Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc. remove the state court action styled *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.,* Cause No. 2022-04224, in the 215th District Court of Harris County, Texas (the "**State Court Action**"), to the United States

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), through referral by the United States District Court for the Southern District of Texas, Houston Division (the "**District Court**"), pursuant to the District Court's General Order 2012-6. This Notice of Removal is filed pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, and Rules 9027-1 and 9027-2 of the Southern District of Texas Bankruptcy Local Rules. Jurisdiction of this case arises under 28 U.S.C. § 1334 and 11 U.S.C. §§1142, 105.

## PROCEDURAL BACKGROUND

### A. The Parties

1. Plaintiff Carnero G&P LLC ("**Carnero**") is a Delaware limited liability company, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("**Targa**") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**SNMP**") with its principal place of business in Houston, Texas. Plaintiff's counsel is:

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

2. Defendant SN EF UnSub, LP ("**UnSub**") is a limited partnership organized under the laws of Delaware with its principal place of business at 1111 Bagby Street, Suite 2050, Houston, Texas 77002. UnSub's counsel is:

Paul M. Basta
Alice Belisle Eaton

Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

and

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

3. Defendant Eagle Ford TX LP ("**Eagle Ford**") is a limited partnership organized under the laws of Texas with its principal place of business at 5599 San Felipe Road, Suite 725, Houston, Texas 77056. Eagle Ford's counsel is:

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700

Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

4. Defendant Venado EF L.P., now known as Javelin EF L.P. ("**Javelin**"), is a limited partnership organized under the laws of Delaware with its principal place of business at 13215 Bee Cave Pkwy, Suite B-350, Austin, Texas 78738. Javelin's counsel is:

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

5. Defendant Mitsui E&P Texas LP ("**Mitsui**") is a limited partnership organized under the laws of Texas with its principal place of business at 1300 Post Oak Blvd., Suite 1800, Houston, Texas 77056. Mitsui's counsel is:

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

6. Defendant SN EF Maverick, LLC ("**Maverick**") is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Maverick's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

7. Defendant Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**") is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Mesquite's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555

jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

8. Mitsui, Javelin, and Eagle Ford are referred to collectively as the "**WIPs**". The WIPs, along with UnSub, Maverick, and Mesquite are referred to collectively as "**Defendants**".

### B. The Bankruptcy Case

9. On August 11, 2019, Sanchez Energy Corporation and certain of its affiliates (the "**Debtors**") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On August 12, 2019, the Court entered an order directing joint administration of the bankruptcy cases of the Debtors, with the lead bankruptcy case as Case No. 19-3408, *In re Sanchez Energy Corporation, et al.* (the "**Bankruptcy Case**").

10. As the Court is aware, these Chapter 11 cases followed an unusual course. On April 30, 2020, the Court confirmed the Debtors' Plan of reorganization under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [19-

34508 Dkt. No. 1212] (the "**Confirmation Order**") and *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "**Plan**"). The Plan provided for, among other things, the equitization of approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed litigation with respect to assumption or rejection of the Debtors' executory contracts until after the Plan Effective Date (as defined below), allowing for a restructuring of the Debtors' midstream arrangements. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp*., 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). To forestall liquidation, Sanchez and its creditors agreed to confirm a Chapter 11 plan first and restructure the Debtors' midstream operations later. *Id.*

11. On June 30, 2020 (the "**Plan Effective Date**"), the Debtors filed the Notice of Effective Date. *See* Dkt. No. 1417.

12. Pursuant to the Plan, the Debtors were required to identify certain executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "**Rejection Schedule**") or to be assumed as listed on Exhibit C (as amended, the "**Assumption Schedule**") to the Plan. [19-34508 Dkt. 1212 at 10 ¶¶17, 18, 55]; *see also* Plan, Art. V. If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or Assumption Schedule, the executory contract or unexpired lease was deemed assumed or rejected as indicated, effective as of the Plan Effective Date. *Id.* For those contracts to which an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" of such executory contract or unexpired lease. *Id.*

13. Section XI of the Plan further provides that the Bankruptcy Court would "retain exclusive jurisdiction over all matters arising out of, or related

to, the Chapter 11 Cases and the Plan" including to "**resolve any matters related to Executory Contracts or Unexpired Leases**, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]" [19-34508 Dkt. 1212 at 69 (emphasis added).]

14. Paragraph 17 of the Confirmation Order provides that any "Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease . . . shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute approving the assumption or rejection." [19-34508 Dkt. 1212 at 10 ¶17.] Paragraph 24 provides that, until the bankruptcy court resolves the dispute regarding assumption or rejection, the "agreement shall continue as in effect immediately prior to the Effective Date." [19-34508 Dkt. 1212 at 15 ¶24.]

### C. The State Court Action

15. Carnero filed *Plaintiff's Original Petition* and initiated the State Court Action on January 21, 2022. Eagle Ford, Mitsui, and Javelin were each served with the Original Petition on January 27, 2022.

16. On January 27, 2022, Carnero filed *Plaintiff's Amended Petition*.

17. Maverick, Mesquite, Mitsui, Eagle Ford, Javelin, and UnSub, were served with Plaintiff's Amended Petition on February 2, 2022.

18. None of the Defendants has filed an answer or other responsive pleading in state court. The Defendants and Plaintiff executed a stipulation extending the Defendants' deadline to file responsive pleadings until February 28, 2022.

## BASIS FOR REMOVAL

19. Section 1452 provides that a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim

or cause of action under section 1334 of this title." 28 U.S.C. § 1452. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Chapter 11 or arises in or is related to the Bankruptcy Case.

20. "Subject matter jurisdiction remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (cleaned up); *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). This authority includes "jurisdiction to interpret and enforce its own prior orders." *Burch v. Freedom Mortgage Corporation (Matter of Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021).

21. Specifically, bankruptcy courts maintain "'arising in or under' jurisdiction" (or "core" jurisdiction) over disputes centering on the interpretation of one of their orders. *Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*, 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd on other grounds*, 978 F.3d 323 (5th Cir. 2020); *see also Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

22. Bankruptcy courts have "related to" (or "non-core" jurisdiction) over matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015); *see also Crown Vantage*, 421 F.3d 963 (9th Cir. 2005) (discussing factors for retention of "related to" jurisdiction).

23. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).

24. This Court's jurisdiction over this adversary proceeding was expressly contemplated by Article XI of the Plan; paragraph 43 of the Confirmation Order; paragraph 6 of the *Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [19-34508 Dkt. No. 1415] (the "**Carnero Settlement Approval Order**"); and Section 6.2.1 of the Carnero Settlement Agreement (attached as Exhibit A to the *Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "**Carnero Settlement Motion**").

25. Carnero's allegations in the State Court Action, as set forth in the First Amended Petition, fall squarely within this Court's jurisdiction and directly affect the success of the Plan. Specifically, the State Court Action directly implicates the "implementation or execution" of the restructuring of the Reorganized Debtors' midstream and marketing arrangements under a global midstream settlement with the Oxy/Wes Parties[2] (the **"Midstream Restructuring"**), and requires interpretation of at least four Plan provisions, including:

- Article V, which established the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts;
- Article IV.D., which provided that all property of the estate "shall vest in each applicable Reorganized Debtor, free and clear" of all claims and other encumbrances;
- Article IV.F., which provided that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter . . . the validity, priority, or amount of

[2] The Oxy/Wes Parties include Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP.

any Claims that may arise in connection therewith"; and

- Article VIII of the Plan, which provided for the discharge of claims against the Reorganized Debtors as of the Effective Date, exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of . . . the formulation, preparation, dissemination, negotiation, filing, or termination of the . . . Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoined all claims released or discharged pursuant to the Plan.

26. The State Court Action also implicates the interpretation of at least three of the Court's prior orders, including:

- the Confirmation Order, which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, provided that it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do); and

- the Carnero Settlement Approval Order, which approved the Carnero Settlement Agreement but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interests;

- the Stipulation and Agreed Order in *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corporation*, et. al., Adv. No. 20-03198 (the "**Sanchez/Oxy Adversary Proceeding**"), which approved the assumption and rejection of certain of the Debtors' midstream contracts and effected the settlement with the Oxy/Wes Parties [No. 20-03198 Dkt. No. 157];

27. The State Court Action also raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, Section 3.1(b) of the Firm Gas Gathering Processing and Purchasing Agreement between

Maverick and Carnero, effective April 1, 2018 [19-34508 Dkt. 1373-8],[3] would be unenforceable as a matter of federal bankruptcy law, because it would subject the Debtors to significant liability simply because the Debtors negotiated improvements to their midstream cost structure which were necessary to effectuate the Midstream Restructuring.

28. Lastly, the State Court Action also implicates important federal policy interests underlying the Bankruptcy Code: whether the federal policy interests underlying section 365 preempt Carnero's rights to claim that the Midstream Restructuring breached the Firm Gas Gathering Processing and Purchasing Agreement when Carnero was otherwise restored to its prepetition status quo.

29. One of the most powerful tools in a debtor-in-possession's bankruptcy "tool kit" is the ability to, subject to court approval, assume or reject any executory contract under section 365 of the Bankruptcy Code. *See In re Szenda*, 406 B.R. 574, 579 (Bankr. D. Mass. 2009). Part and parcel of a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."); *In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for

[3] The GGPA was amended, through the Amendment to Firm Gas Gatherings, Processing and Purchase Agreement by and among SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018.

assumption"); *see also Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975) ("The practical effect of [the predecessor statute to section 365] is to force all creditors doing business under executory contracts with the debtor in economic distress to renegotiate their mutual rights.").

30. Here, the Debtors negotiated improvements to their midstream cost structure which were necessary to effectuate the Midstream Restructuring and benefited the estate. Importantly, the Midstream Restructuring did not alter the scope or duration of "Existing Commitments" under the Firm Gas Gathering Processing and Purchasing Agreement.[4] Despite being restored to its prepetition status quo, Carnero now claims it is entitled to damages because the Debtors successfully renegotiated certain terms of its prepetition executory contracts with Defendants. Defendants respectfully submit that allowing the State Court Action to proceed outside the Bankruptcy Case would not only undercut the federal policy interests underlying section 365, but would also permit Carnero to pursue a windfall at the expense of the estate. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (noting the federal bankruptcy policy that creditors should not receive a windfall merely by reason of the happenstance of bankruptcy).

## ADDITIONAL PROCEDURAL MATTERS

### A. Timely Removal under § 1446 and Bankruptcy Rule 9027(a)(3)

31. This notice of removal is timely filed because it is filed within 30 days of service and within the period provided by Federal Rule of Bankruptcy Procedure 9027(a)(3) and 28 U.S.C. §1446(b).

[4] The treatment of the "Existing Commitments" pursuant to the Midstream Restructuring is discussed in detail in the *Amended Complaint* filed contemporaneously herewith in Adversary Proceeding No. 21-04419.

**B. Proper Federal Court**

32. The 215th District Court of Harris County, Texas is located within the Southern District of Texas, Houston Division. Therefore, under 28 U.S.C. §§ 1334 and 1452, and Fed. R. Bankr. P. 9027, this action is properly removed to this Court. *See, e.g., In re SBMC Healthcare, LLC,* 519 B.R. 172 (Bankr. S.D. Tex. 2014).

33. Pursuant to Local Rule 9027-1, Defendants state that they do consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**C. State Court Documents Attached**

34. Pursuant to Fed. R. Bankr. P. 9027(a) and Bankruptcy Local Rule 9027-1, an appendix is attached to this notice, which includes a copy of the state-court docket sheet and all documents filed with the state court.

**D. Notice**

35. Upon the filing of this notice of removal, the Defendants will duly notify the Clerk for the 215th District Court for Harris County, Texas, attaching a copy of this notice of removal.

*/s/ James G. Munisteri* Date: February 28, 2022

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III* Date: February 28, 2022

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Jared Wilkerson* Date: February 28, 2022

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry* Date: February 28, 2022

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada* Date: February 28, 2022

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Defendant Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on February 28, 2022, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*James G. Munisteri*
James G. Munisteri

**NOTICE OF REMOVAL**
INDEX OF ATTACHMENTS

| NO. | DESCRIPTION |
|---|---|
| 1 | Index of Attachments to Notice of Removal |
| 2 | List of Counsel |
| 3 | State Court Action Docket Sheet |
| 4 | Pleadings, Executed Process, Signed Orders, and Other Filings from State Court Action |

**NOTICE OF REMOVAL**
LIST OF COUNSEL OF RECORD

| **PARTY** | **COUNSEL** |
|---|---|
| PLAINTIFF CARNERO G&P LLC | Eugene M. Nettles<br>Joshua W. Wolfshohl<br>Amy C. Falcon<br>**Porter Hedges LLP**<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Telephone: (713) 226-6000<br>Facsimile: (713) 226-6295<br>enettles@porterhedges.com<br>jwolfshohl@porterhedges.com<br>afalcon@porterhedges.com |
| DEFENDANT SN EF UNSUB, LP | Paul M. Basta<br>Alice Belisle Eaton<br>Andrew J. Ehrlich<br>Sean A. Mitchell<br>**Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3900<br>pbasta@paulweiss.com<br>aeaton@paulweiss.com<br>aehrlich@paulweiss.com<br>smitchell@paulweiss.com<br><br>Thomas A. Woolley, III<br>**McCloskey Roberson, PLLC**<br>945 Heights Blvd.<br>Houston, Texas 77008<br>Telephone: (713) 337-3910<br>Facsimile: (713) 868-1275<br>rwoolley@mrwpllc.com |

| PARTY | COUNSEL |
|---|---|
| DEFENDANT EAGLE FORD TX LP | Michelle Pector, Esq.<br>Jared Wilkerson, Esq.<br>**Morgan, Lewis & Bockius LLP**<br>1000 Louisiana St., Suite 4000<br>Houston, TX 77002<br>Telephone: (713) 890-5000<br>Facsimile: (713) 890-5001<br>michelle.pector@morganlewis.com<br>jared.wilkerson@morganlewis.com<br><br>Julia Frost-Davies, Esq.<br>Amy L. Kyle, Esq.<br>**Morgan, Lewis & Bockius LLP**<br>One Federal Street<br>Boston, MA 02215<br>Telephone: (617) 341-7700<br>Facsimile: (617) 341-7701<br>julia.frost-davies@morganlewis.com<br>amy.kyle@morganlewis.com |
| DEFENDANT JAVELIN EF L.P. (F/K/A VENADO EF L.P.) | Sydney Corry<br>**Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>609 Main Street<br>Houston, Texas 77002<br>Telephone: (713) 836-3600<br>Facsimile: (713) 836-3601<br>sydney.corry@kirkland.com<br><br>Conor P. McNamara<br>**Kirkland & Ellis LLP**<br>**Kirkland & Ellis International LLP**<br>300 N. LaSalle<br>Chicago, Illinois 60654<br>Telephone: (312) 862-2000<br>Facsimile: (312) 862-2200<br>conor.mcnamara@kirkland.com |

| PARTY | COUNSEL |
|---|---|
| DEFENDANT MITSUI E&P TEXAS LP | Duston K. McFaul<br>Maegan Quejada<br>**Sidley Austin LLP**<br>1000 Louisiana St., Suite 5900<br>Houston, Texas 77002<br>Telephone: (713) 495-4500<br>dmcfaul@sidley.com<br>mquejada@sidley.com |
| DEFENDANT MESQUITE ENERGY, INC. F/K/A SANCHEZ ENERGY CORPORATION | James G. Munisteri<br>**Foley & Lardner LLP**<br>1000 Louisiana, Suite 2000<br>Houston, Texas 77002<br>Tel. 713.276.5500 / Fax 713.276.5555<br>jmunisteri@foley.com<br><br>Dennis Jenkins<br>Joseph Bretschneider<br>**Willkie Farr & Gallagher LLP**<br>787 Seventh Avenue<br>New York, NY 10019-6099<br>Telephone: (212) 728-8276<br>Facsimile: (212) 728-8111<br>djenkins@willkie.com<br>jbretschneider@willkie.com<br><br>Mark T. Stancil<br>**Willkie Farr & Gallagher LLP**<br>1875 K Street, N.W.<br>Washington, DC 20006-1238<br>Telephone: (202) 303-1133<br>Facsimile: (202) 303-2133<br>mstancil@willkie.com |

**HCDistrictclerk.com** CARNERO G&P LLC vs. SN EF UNSUB LP 2/26/2022
Cause: 202204224 CDI: 7 Court: 215

## DOCUMENTS

| Number | Document | Post Jdgm | Date | Pgs |
|---|---|---|---|---|
| 100529484 | Stipulation | | 02/22/2022 | 6 |
| 100319097 | Affidavit of Service-Amdd Pet-Eagle Ford TX | | 02/10/2022 | 4 |
| 100319475 | Affidavit of Service-Amdd Pet-Mesquite Energy | | 02/10/2022 | 4 |
| 100319624 | Affidavit of Service-Amdd Pet-Mitsui E&P Texas | | 02/10/2022 | 4 |
| 100319794 | Affidavit of Service-Amdd Pet-SN EF Maverick | | 02/10/2022 | 4 |
| 100322770 | Affidavit of Service | | 02/10/2022 | 4 |
| 100300139 | Return of Service | | 02/09/2022 | 4 |
| 100300152 | Affidavit of Service | | 02/09/2022 | 4 |
| 100300239 | Return of Service | | 02/09/2022 | 4 |
| 100300242 | Return of Service | | 02/09/2022 | 4 |
| 100300454 | Return of Service | | 02/09/2022 | 4 |
| 100148754 | Request for Issuance of Service | | 02/01/2022 | 2 |
| 100152210 | Affidavit of Service | | 02/01/2022 | 3 |
| 100072998 | Plaintiff's Amended Petition | | 01/27/2022 | 13 |
| -> 100073001 | Request for Issuance of Service | | 01/27/2022 | 6 |
| 99991210 | Plaintiff's Original Petition | | 01/21/2022 | 13 |
| -> 99991211 | Civil Case Information Sheet | | 01/21/2022 | 2 |
| -> 99991212 | Request for Issuance of Service | | 01/21/2022 | 6 |

**NOTICE OF REMOVAL**
INDEX OF PLEADINGS, PROCESS, AND
ORDERS FROM STATE COURT ACTION

| DATE | DESCRIPTION |
|---|---|
| 01/21/2022 | Plaintiff's Original Petition |
| 01/27/2022 | Plaintiff's Amended Petition |
| 02/02/2022 | Certificate of Service – Plaintiff's Amended Petition |
| 02/10/2022 | Affidavit of Service – Eagle Ford TX, LP |
| 02/10/2022 | Affidavit of Service – Mesquite Energy, Inc. |
| 02/10/2022 | Affidavit of Service – Mitsui E&P Texas LP |
| 02/10/2022 | Affidavit of Service – SN EF Maverick LLC |
| 02/22/2022 | Stipulation |

1/21/2022 5:06 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61052774
By: Adiliani Solis
Filed: 1/21/2022 5:06 PM

2022-04224 / Court: 215

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, and MESQUITE ENERGY, INC., | §<br>§<br>§<br>§ | |
| | § | |
| Defendants. | § | ___ JUDICIAL DISTRICT |

## **Plaintiff's Original Petition**

Plaintiff Carnero G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UnSub, LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui"), SN EF Maverick, LLC ("Maverick"), and Mesquite Energy, Inc. ("Mesquite") and alleges as follows:

### I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

### II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. SN EF Maverick, LLC is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

7. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

8. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

9. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

10. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

11. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief, monetary relief over $1,000,000, and attorney's fees and costs.

## VI. Factual Background

12. This is a dispute over contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas.

### A. The Comanche Assets

13. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**B. The Comanche Acquisition and Later Conveyances of the Comanche Assets**

14. By a Purchase and Sale Agreement (the "Comanche PSA") dated January 12, 2017, Maverick and various co-investors, including Gavilan Resources, LLC ("Gavilan") and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets (the "Comanche Acquisition") effective July 1, 2016. After closing the Comanche Acquisition, Maverick became the operator of the Comanche Assets.

15. On or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite.[1] Gavilan did not, however, assign the Comanche PSA to Mesquite in this transaction.

16. Currently, Maverick, UnSub, Mesquite, and the WIPs own all of the working interests in the Comanche Assets.

**C. Comanche Assets Existing Commitments Dedications**

17. At the time of the Comanche Acquisition, Anadarko was obligated to gather and process its hydrocarbons from the Comanche Assets through certain midstream providers pursuant to various agreements to which Anadarko was a party (the "Existing Commitments"). The Existing Commitments prevent, in part, the delivery of gas to other service providers, such as Carnero.[2] Anadarko retained these Existing Commitments in the Comanche Acquisition transaction and did not assign them to Maverick, Gavilan, and UnSub. As a result, Maverick, Gavilan, and UnSub had no obligation to deliver their Comanche Gas to the midstream providers under the Existing Commitments. Only Anadarko had that obligation.

---

[1] *See In re Gavilan Resources, LLC*, Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [Dkt. 366 Asset Purchase Agreement at pdf p. 291)].

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time the execution of the Ratification Agreements.

18. To require Maverick, as operator of the Comanche Assets, to deliver the gas produced from Maverick's, Gavilan's, and UnSub's interests in fulfillment of Anadarko's retained obligation under the Existing Commitments, Maverick, as "Provider," and Anadarko, as the "Recipient," concurrently executed a new agreement, the Retained Midstream Contracts Services Agreement (the "Midstream Agency Agreement"). Under this agreement, Provider acts as Recipient's agent for delivering gas from the Comanche Assets on behalf of Recipient to the midstream providers who are the parties to the Existing Commitments.

19. Maverick, UnSub, Mesquite, and the WIPS never became parties to the underlying Existing Commitments. Mesquite, UnSub, and the WIPs never became parties to the Midstream Agency Agreement. As a result, none of them has a direct obligation to deliver gas under the Existing Commitments. Only Anadarko has that obligation. Once the Existing Commitments end or are terminated, Maverick, UnSub, Mesquite, and the WIPS can send the gas to other midstream providers operating in the area.

**D. Comanche Assets Dedication to Carnero under the GGPA**

20. Carnero is another midstream provider that operates in the area of the Comanche Assets. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA") regarding gas from the Comanche Assets. Effective that same date, (i) UnSub, Maverick, and Carnero entered into a ratification agreement ratifying the GGPA; (ii) Gavilan (now Mesquite), Eagle Ford and Venado executed ratification agreements in substantially the same form (collectively referred to as the "Ratification Agreements"); and (iii) Unsub, Eagle Ford, Venado, Maverick, Gavilan (now Mesquite), and Carnero entered into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment"). As a consequence of the various Ratification Agreements and the GGPA

Amendment, UnSub, Gavilan (now Mesquite), Eagle Ford, and Venado owe the same obligations as Maverick under the GGPA.

21. Additionally, Mitsui, Maverick, and Carnero signed a Letter Agreement also dated effective April 1, 2018 ("Letter Agreement") authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA as a Comanche Producer (as defined in the GGPA) after Mitsui rejects certain "Commitment Agreements" (as defined in the Letter Agreement).

**E. Producer Obligations under the GGPA**

22. The GGPA is like a top lease—it becomes effective to flow gas from the Comanche Assets to Carnero when the then-existing delivery obligations under the Existing Commitments end or are terminated. In the GGPA, Maverick, UnSub, Gavilan, and the WIPs dedicated the gas ("Dedicated Gas") from their existing interest in the Comanche Assets to Carnero ("Dedicated Acreage"). The GGPA notes that "Producer" (which includes Maverick, UnSub, Gavilan (now Mesquite), and the WIPs by virtue of the Ratification Agreements, the GGPA Amendment, and the Letter Agreement) "desires that Carnero provide certain gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement." Therefore, part of the consideration for Carnero to enter into the GGPA was the expectation that the Producers would direct their Dedicated Gas from the Dedicated Acreage to Carnero for processing in accordance with the terms of GGPA.

**23.** Those terms and conditions include that Producer may continue to deliver gas from the Dedicated Acreage under "binding contractual commitments [the Existing Commitments]…that exist as of the Effective Date and prevent delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero" until the "earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent 'evergreen' or 'renewal' terms, it

being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any 'evergreen' or 'renewal term')…."

### F. Mesquite's Gas from the Former Gavilan Dedicated Acreage Is No Longer Subject to the Existing Commitments

24. As stated, on or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite, but specifically did not assign the Comanche PSA to Mesquite. As a result, on information and belief, Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments.

25. On information and belief, effective December 21, 2021, Anadarko, Mesquite, Maverick, and others, with the input and participation of UnSub and the WIPs, entered into agreements that (i) modify the commercial terms of or applicable to the Existing Commitments; (ii) cause the extension the Existing Commitments; and/or (iii) otherwise modify (or in the case of the Gavilan acreage, reinstate) the Existing Commitments in a manner that violates the GGPA. As a result, Mesquite, Maverick, UnSub, and the WIPs have undermined the purpose of the GGPA and breached their representations and promises to Carnero and their obligations as "Producers" under the GGPA.

## VII. Causes of Action

### A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are

affected by those contracts. Carnero may have determined any questions of construction or validity arising under those contracts and obtain declarations of its rights, status, or other legal relations under the GGPA, the GGPA Amendments, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";

(b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";

(c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and

(g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement.

**B. Breach of Contract – All Defendants**

38. The Defendants are parties to valid and enforceable agreements with Carnero.

39. Maverick is a party to the GGPA with Carnero.

40. By virtue of their respective Ratification Agreements and the GGPA Amendment, Mesquite, UnSub, Venado, and Eagle Ford are parties to the GGPA with Carnero.

41. By virtue of the Letter Agreement, Mitsui owes the obligations of a Producer under the GGPA to Carnero.

42. Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui promised to deliver their Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

43. On information and belief, Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui have breached their promises by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

44. Maverick's, Mesquite's, UnSub's, Venado's, Eagle Ford's, and Mitsui's breaches of their promises have damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from gathering, processing, and purchasing the Dedicated Gas from the Dedicated

Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration these parties gave to Carnero, and on which it relied, for its execution of the GGPA.

**C. Breach of Contract – Mesquite**

45. The Defendants are parties to valid and enforceable agreements with Carnero.

46. By virtue of its Ratification Agreement and the GGPA Amendment, Mesquite, as successor to Gavilan, is a party to the GGPA with Carnero.

47. Mesquite promised to deliver its Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

48. On or about October 16, 2020, Mesquite acquired Gavilan's interest in the Comanche Assets, but Gavilan did not assign the Comanche PSA to Mesquite. Mesquite's interest in the Comanche Assets is, thus, free and clear of any obligations in the Comanche PSA. As a result, Mesquite did not assume the obligation to be bound by the Existing Commitments, and therefore, is not required to deliver its Dedicated Gas to the midstream providers under the Existing Commitments. Carnero was entitled to gather and process Mesquite's Dedicated Gas under the GGPA after October 16, 2020.

49. On information and belief, Mesquite has breached its promise by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that its Dedicated Gas was again made subject to the Existing Commitments, rather than being directed to Carnero under the GGPA.

50. Mesquite's breach of its promise has damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from receiving Mesquite's Dedicated Gas from the Dedicated Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration Mesquite gave to Carnero, and on which it relied, for its execution of the GGPA.

### D. Attorney's Fees

51. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code Chs. 37 and 38, and any other applicable statutes, and as allowed by the GGPA, the GGPA Amendment, the Ratification Agreements, the Letter Agreement, or other applicable agreement.

### E. Conditions Precedent

52. All conditions precedent to Plaintiff's right to recover against Defendants has occurred, has been performed, or has otherwise been waived.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: January 21, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Eugene M. Nettles*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61052774
Status as of 1/24/2022 8:01 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 1/21/2022 5:06:11 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 1/21/2022 5:06:11 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 1/21/2022 5:06:11 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 1/21/2022 5:06:11 PM | SENT |

1/27/2022 12:48 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61211675
By: Cynthia Clausell-McGowan
Filed: 1/27/2022 12:48 PM

CAUSE NO. 2022-04224

| | | |
|---|---|---|
| CARNERO G&P LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, and MESQUITE ENERGY, INC.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br>HARRIS COUNTY, TEXAS<br><br>215TH JUDICIAL DISTRICT |

# Plaintiff's Amended Petition

Plaintiff Carnero G&P LLC ("Carnero" or "Plaintiff") files this amended petition against Defendants SN EF UnSub, LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui"), SN EF Maverick, LLC ("Maverick"), and Mesquite Energy, Inc. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent Attorney Service Associates, Inc., 3610-2 N Josey Ln., Suite 223, Carrolton, Texas 75007.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Maverick is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

7. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

8. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

9. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

10. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

11. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief, monetary relief over $1,000,000, and attorney's fees and costs.

## VI. Factual Background

12. This is a dispute over contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas.

### A. The Comanche Assets

13. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**B. The Comanche Acquisition and Later Conveyances of the Comanche Assets**

14. By a Purchase and Sale Agreement (the "Comanche PSA") dated January 12, 2017, Maverick and various co-investors, including Gavilan Resources, LLC ("Gavilan") and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets (the "Comanche Acquisition") effective July 1, 2016. After closing the Comanche Acquisition, Maverick became the operator of the Comanche Assets.

15. On or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite.[1] Gavilan did not, however, assign the Comanche PSA to Mesquite in this transaction.

16. Currently, Maverick, UnSub, Mesquite, and the WIPs own all of the working interests in the Comanche Assets.

**C. Comanche Assets Existing Commitments Dedications**

17. At the time of the Comanche Acquisition, Anadarko was obligated to gather and process its hydrocarbons from the Comanche Assets through certain midstream providers pursuant to various agreements to which Anadarko was a party (the "Existing Commitments"). The Existing Commitments prevent, in part, the delivery of gas to other service providers, such as Carnero.[2] Anadarko retained these Existing Commitments in the Comanche Acquisition transaction and did not assign them to Maverick, Gavilan, and UnSub. As a result, Maverick, Gavilan, and UnSub had no obligation to deliver their Comanche Gas to the midstream providers under the Existing Commitments. Only Anadarko had that obligation.

---

[1] *See In re Gavilan Resources, LLC,* Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [Dkt. 366 Asset Purchase Agreement at pdf p. 291)].

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time the execution of the Ratification Agreements.

18. To require Maverick, as operator of the Comanche Assets, to deliver the gas produced from Maverick's, Gavilan's, and UnSub's interests in fulfillment of Anadarko's retained obligation under the Existing Commitments, Maverick, as "Provider," and Anadarko, as the "Recipient," concurrently executed a new agreement, the Retained Midstream Contracts Services Agreement (the "Midstream Agency Agreement"). Under this agreement, Provider acts as Recipient's agent for delivering gas from the Comanche Assets on behalf of Recipient to the midstream providers who are the parties to the Existing Commitments.

19. Maverick, UnSub, Mesquite, and the WIPS never became parties to the underlying Existing Commitments. Mesquite, UnSub, and the WIPs never became parties to the Midstream Agency Agreement. As a result, none of them has a direct obligation to deliver gas under the Existing Commitments. Only Anadarko has that obligation. Once the Existing Commitments end or are terminated, Maverick, UnSub, Mesquite, and the WIPS can send the gas to other midstream providers operating in the area.

**D. Comanche Assets Dedication to Carnero under the GGPA**

20. Carnero is another midstream provider that operates in the area of the Comanche Assets. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA") regarding gas from the Comanche Assets. Effective that same date, (i) UnSub, Maverick, and Carnero entered into a ratification agreement ratifying the GGPA; (ii) Gavilan (now Mesquite), Eagle Ford and Venado executed ratification agreements in substantially the same form (collectively referred to as the "Ratification Agreements"); and (iii) Unsub, Eagle Ford, Venado, Maverick, Gavilan (now Mesquite), and Carnero entered into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment"). As a consequence of the various Ratification Agreements and the GGPA

Amendment, UnSub, Gavilan (now Mesquite), Eagle Ford, and Venado owe the same obligations as Maverick under the GGPA.

21. Additionally, Mitsui, Maverick, and Carnero signed a Letter Agreement also dated effective April 1, 2018 ("Letter Agreement") authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA as a Comanche Producer (as defined in the GGPA) after Mitsui rejects certain "Commitment Agreements" (as defined in the Letter Agreement).

**E. Producer Obligations under the GGPA**

22. The GGPA is like a top lease—it becomes effective to flow gas from the Comanche Assets to Carnero when the then-existing delivery obligations under the Existing Commitments end or are terminated. In the GGPA, Maverick, UnSub, Gavilan, and the WIPs dedicated the gas ("Dedicated Gas") from their existing interest in the Comanche Assets to Carnero ("Dedicated Acreage"). The GGPA notes that "Producer" (which includes Maverick, UnSub, Gavilan (now Mesquite), and the WIPs by virtue of the Ratification Agreements, the GGPA Amendment, and the Letter Agreement) "desires that Carnero provide certain gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement." Therefore, part of the consideration for Carnero to enter into the GGPA was the expectation that the Producers would direct their Dedicated Gas from the Dedicated Acreage to Carnero for processing in accordance with the terms of GGPA.

**23.** Those terms and conditions include that Producer may continue to deliver gas from the Dedicated Acreage under "binding contractual commitments [the Existing Commitments]…that exist as of the Effective Date and prevent delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero" until the "earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent 'evergreen' or 'renewal' terms, it

being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any 'evergreen' or 'renewal term')…."

**F. Mesquite's Gas from the Former Gavilan Dedicated Acreage Is No Longer Subject to the Existing Commitments**

24. As stated, on or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite, but specifically did not assign the Comanche PSA to Mesquite. As a result, on information and belief, Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments.

25. On information and belief, effective December 21, 2021, Anadarko, Mesquite, Maverick, and others, with the input and participation of UnSub and the WIPs, entered into agreements that (i) modify the commercial terms of or applicable to the Existing Commitments; (ii) cause the extension the Existing Commitments; and/or (iii) otherwise modify (or in the case of the Gavilan acreage, reinstate) the Existing Commitments in a manner that violates the GGPA. As a result, Mesquite, Maverick, UnSub, and the WIPs have undermined the purpose of the GGPA and breached their representations and promises to Carnero and their obligations as "Producers" under the GGPA.

## VII. <u>Causes of Action</u>

**A. Declaratory Judgment**

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are

affected by those contracts. Carnero may have determined any questions of construction or validity arising under those contracts and obtain declarations of its rights, status, or other legal relations under the GGPA, the GGPA Amendments, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";

(b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";

(c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and

(g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement.

**B. Breach of Contract – All Defendants**

38. The Defendants are parties to valid and enforceable agreements with Carnero.

39. Maverick is a party to the GGPA with Carnero.

40. By virtue of their respective Ratification Agreements and the GGPA Amendment, Mesquite, UnSub, Venado, and Eagle Ford are parties to the GGPA with Carnero.

41. By virtue of the Letter Agreement, Mitsui owes the obligations of a Producer under the GGPA to Carnero.

42. Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui promised to deliver their Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

43. On information and belief, Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui have breached their promises by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

44. Maverick's, Mesquite's, UnSub's, Venado's, Eagle Ford's, and Mitsui's breaches of their promises have damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from gathering, processing, and purchasing the Dedicated Gas from the Dedicated

Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration these parties gave to Carnero, and on which it relied, for its execution of the GGPA.

**C. Breach of Contract – Mesquite**

45. The Defendants are parties to valid and enforceable agreements with Carnero.

46. By virtue of its Ratification Agreement and the GGPA Amendment, Mesquite, as successor to Gavilan, is a party to the GGPA with Carnero.

47. Mesquite promised to deliver its Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

48. On or about October 16, 2020, Mesquite acquired Gavilan's interest in the Comanche Assets, but Gavilan did not assign the Comanche PSA to Mesquite. Mesquite's interest in the Comanche Assets is, thus, free and clear of any obligations in the Comanche PSA. As a result, Mesquite did not assume the obligation to be bound by the Existing Commitments, and therefore, is not required to deliver its Dedicated Gas to the midstream providers under the Existing Commitments. Carnero was entitled to gather and process Mesquite's Dedicated Gas under the GGPA after October 16, 2020.

49. On information and belief, Mesquite has breached its promise by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that its Dedicated Gas was again made subject to the Existing Commitments, rather than being directed to Carnero under the GGPA.

50. Mesquite's breach of its promise has damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from receiving Mesquite's Dedicated Gas from the Dedicated Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration Mesquite gave to Carnero, and on which it relied, for its execution of the GGPA.

**D. Attorney's Fees**

51. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code Chs. 37 and 38, and any other applicable statutes, and as allowed by the GGPA, the GGPA Amendment, the Ratification Agreements, the Letter Agreement, or other applicable agreement.

**E. Conditions Precedent**

52. All conditions precedent to Plaintiff's right to recover against Defendants has occurred, has been performed, or has otherwise been waived.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: January 27, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *<u>/s/ Eugene M. Nettles</u>*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61211675
Status as of 1/27/2022 12:57 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |

CT Corporation

**Service of Process Transmittal**
02/02/2022
CT Log Number 540990372

**TO:** Amy Blakeway
MESQUITE ENERGY, INC.
700 MILAM ST STE 600
HOUSTON, TX 77002-2862

**RE:** **Process Served in Texas**

**FOR:** Mesquite Energy, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | CARNERO G&P LLC vs. SN EF UNSUB, LP |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified<br>Case # 202204224 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 02/02/2022 at 03:02 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via UPS Next Day Air<br>Image SOP<br>Email Notification, Amy Blakeway ablakeway@mesquite-energy.com<br>Email Notification, Aimee Stadtfeld astadtfeld@mesquite-energy.com<br>Email Notification, Gregory B Kopel gkopel@mesquite-energy.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>1999 Bryan Street<br>Suite 900<br>Dallas, TX 75201<br>866-539-8692<br>CorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

CT Corporation

**Service of Process Transmittal**
02/02/2022
CT Log Number 540990372

**TO:** Amy Blakeway
MESQUITE ENERGY, INC.
700 MILAM ST STE 600
HOUSTON, TX 77002-2862

**RE:** **Process Served in Texas**

**FOR:** Mesquite Energy, Inc. (Domestic State: DE)

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND HOUR OF SERVICE: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| -- | By Process Server on 01/27/2022 at 02:13 | Amy Blakeway<br>Mesquite Energy, Inc. | 540953631 |

Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:** Wed, Feb 2, 2022

**Server Name:** Steven Treni

| | |
|---|---|
| Entity Served | MESQUITE ENERGY, INC. |
| Case Number | 202204224 |
| Jurisdiction | TX |

CAUSE NO. 202204224

COPY OF PLEADING PROVIDED BY PLT

RECEIPT NO: 917802 TRACKING NO: 73966477
EML

| | |
|---|---|
| Plaintiff: | In The 215th |
| CARNERO G&P LLC | Judicial District Court of |
| vs. | Harris County, Texas |
| Defendant: | 201 CAROLINE |
| SN EF UNSUB LP | Houston, Texas |

**CITATION CORPORATE**

**THE STATE OF TEXAS**
**County of Harris**

**To: MESQUITE ENERGY INC (A CORPORATION) MAY BE SERVED THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN ST SUITE 900, DALLAS TX 75201**

Attached is a copy of: PLAINTIFFS AMENDED PETITION

This instrument was filed on January 27, 2022 in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED.** You may employ an attorney. If you or your Attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

This citation was issued on January 28, 2022, under my hand and seal of said court.

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 CAROLINE Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

Generated By:CYNTHIA CLAUSELL

Issued at the request of:

FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681
Bar Number: 24053576

DISTRICT COURT OF HARRIS COUNTY TEXAS

Tracking Number: 73966477

EML

**CAUSE NUMBER: 202204224**

| | |
|---|---|
| **PLAINTIFF: CARNERO G&P LLC** | **In the 215th** |
| vs. | **Judicial District Court of** |
| **DEFENDANT: SN EF UNSUB LP** | **Harris County, Texas** |

OFFICER - AUTHORIZED PERSON RETURN

Came to hand at _______ o'clock ___. M. on the _________ day of ________________________, 20_____. Executed at

(Address)__________________________________________________________________________________________
in

____________________ County at o'clock ___. M. On the _________ day of ________________________, 20_____, by

Delivering to ______________________________________________defendant, in person, a true copy of this Citation together with the accompanying ______ copy (ies) of the «Attachment». Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _______________day of ________________________________, 20.

Fees $_________________________

____________________________________________ By_______________________________________

Affiant Deputy

On this day, _________________________________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, On this ______ day of ________________________________, 20__.

_________________________________________

Notary Public

1/27/2022 12:48 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61211675
By: Cynthia Clausell-McGowan
Filed: 1/27/2022 12:48 PM

CAUSE NO. 2022-04224

| | | |
|---|---|---|
| CARNERO G&P LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, and MESQUITE ENERGY, INC., | §<br>§<br>§<br>§ | |
| | § | |
| Defendants. | § | 215TH JUDICIAL DISTRICT |

## Plaintiff's Amended Petition

Plaintiff Carnero G&P LLC ("Carnero" or "Plaintiff") files this amended petition against Defendants SN EF UnSub, LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui"), SN EF Maverick, LLC ("Maverick"), and Mesquite Energy, Inc. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent Attorney Service Associates, Inc., 3610-2 N Josey Ln., Suite 223, Carrolton, Texas 75007.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Maverick is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

7. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

8. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

9. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

10. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

11. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief, monetary relief over $1,000,000, and attorney's fees and costs.

## VI. Factual Background

12. This is a dispute over contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas.

### A. The Comanche Assets

13. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**B. The Comanche Acquisition and Later Conveyances of the Comanche Assets**

14. By a Purchase and Sale Agreement (the "Comanche PSA") dated January 12, 2017, Maverick and various co-investors, including Gavilan Resources, LLC ("Gavilan") and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets (the "Comanche Acquisition") effective July 1, 2016. After closing the Comanche Acquisition, Maverick became the operator of the Comanche Assets.

15. On or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite.[1] Gavilan did not, however, assign the Comanche PSA to Mesquite in this transaction.

16. Currently, Maverick, UnSub, Mesquite, and the WIPs own all of the working interests in the Comanche Assets.

**C. Comanche Assets Existing Commitments Dedications**

17. At the time of the Comanche Acquisition, Anadarko was obligated to gather and process its hydrocarbons from the Comanche Assets through certain midstream providers pursuant to various agreements to which Anadarko was a party (the "Existing Commitments"). The Existing Commitments prevent, in part, the delivery of gas to other service providers, such as Carnero.[2] Anadarko retained these Existing Commitments in the Comanche Acquisition transaction and did not assign them to Maverick, Gavilan, and UnSub. As a result, Maverick, Gavilan, and UnSub had no obligation to deliver their Comanche Gas to the midstream providers under the Existing Commitments. Only Anadarko had that obligation.

[1] *See In re Gavilan Resources, LLC*, Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [Dkt. 366 Asset Purchase Agreement at pdf p. 291)].

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time the execution of the Ratification Agreements.

18. To require Maverick, as operator of the Comanche Assets, to deliver the gas produced from Maverick's, Gavilan's, and UnSub's interests in fulfillment of Anadarko's retained obligation under the Existing Commitments, Maverick, as "Provider," and Anadarko, as the "Recipient," concurrently executed a new agreement, the Retained Midstream Contracts Services Agreement (the "Midstream Agency Agreement"). Under this agreement, Provider acts as Recipient's agent for delivering gas from the Comanche Assets on behalf of Recipient to the midstream providers who are the parties to the Existing Commitments.

19. Maverick, UnSub, Mesquite, and the WIPS never became parties to the underlying Existing Commitments. Mesquite, UnSub, and the WIPs never became parties to the Midstream Agency Agreement. As a result, none of them has a direct obligation to deliver gas under the Existing Commitments. Only Anadarko has that obligation. Once the Existing Commitments end or are terminated, Maverick, UnSub, Mesquite, and the WIPS can send the gas to other midstream providers operating in the area.

**D. Comanche Assets Dedication to Carnero under the GGPA**

20. Carnero is another midstream provider that operates in the area of the Comanche Assets. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA") regarding gas from the Comanche Assets. Effective that same date, (i) UnSub, Maverick, and Carnero entered into a ratification agreement ratifying the GGPA; (ii) Gavilan (now Mesquite), Eagle Ford and Venado executed ratification agreements in substantially the same form (collectively referred to as the "Ratification Agreements"); and (iii) Unsub, Eagle Ford, Venado, Maverick, Gavilan (now Mesquite), and Carnero entered into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment"). As a consequence of the various Ratification Agreements and the GGPA

Amendment, UnSub, Gavilan (now Mesquite), Eagle Ford, and Venado owe the same obligations as Maverick under the GGPA.

21. Additionally, Mitsui, Maverick, and Carnero signed a Letter Agreement also dated effective April 1, 2018 ("Letter Agreement") authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA as a Comanche Producer (as defined in the GGPA) after Mitsui rejects certain "Commitment Agreements" (as defined in the Letter Agreement).

**E. Producer Obligations under the GGPA**

22. The GGPA is like a top lease—it becomes effective to flow gas from the Comanche Assets to Carnero when the then-existing delivery obligations under the Existing Commitments end or are terminated. In the GGPA, Maverick, UnSub, Gavilan, and the WIPs dedicated the gas ("Dedicated Gas") from their existing interest in the Comanche Assets to Carnero ("Dedicated Acreage"). The GGPA notes that "Producer" (which includes Maverick, UnSub, Gavilan (now Mesquite), and the WIPs by virtue of the Ratification Agreements, the GGPA Amendment, and the Letter Agreement) "desires that Carnero provide certain gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement." Therefore, part of the consideration for Carnero to enter into the GGPA was the expectation that the Producers would direct their Dedicated Gas from the Dedicated Acreage to Carnero for processing in accordance with the terms of GGPA.

**23.** Those terms and conditions include that Producer may continue to deliver gas from the Dedicated Acreage under "binding contractual commitments [the Existing Commitments]...that exist as of the Effective Date and prevent delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero" until the "earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent 'evergreen' or 'renewal' terms, it

being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any 'evergreen' or 'renewal term')...."

**F. Mesquite's Gas from the Former Gavilan Dedicated Acreage Is No Longer Subject to the Existing Commitments**

24. As stated, on or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite, but specifically did not assign the Comanche PSA to Mesquite. As a result, on information and belief, Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments.

25. On information and belief, effective December 21, 2021, Anadarko, Mesquite, Maverick, and others, with the input and participation of UnSub and the WIPs, entered into agreements that (i) modify the commercial terms of or applicable to the Existing Commitments; (ii) cause the extension the Existing Commitments; and/or (iii) otherwise modify (or in the case of the Gavilan acreage, reinstate) the Existing Commitments in a manner that violates the GGPA. As a result, Mesquite, Maverick, UnSub, and the WIPs have undermined the purpose of the GGPA and breached their representations and promises to Carnero and their obligations as "Producers" under the GGPA.

## VII. Causes of Action

**A. Declaratory Judgment**

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are

affected by those contracts. Carnero may have determined any questions of construction or validity arising under those contracts and obtain declarations of its rights, status, or other legal relations under the GGPA, the GGPA Amendments, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";

(b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";

(c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and

(g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement.

**B. Breach of Contract – All Defendants**

38. The Defendants are parties to valid and enforceable agreements with Carnero.

39. Maverick is a party to the GGPA with Carnero.

40. By virtue of their respective Ratification Agreements and the GGPA Amendment, Mesquite, UnSub, Venado, and Eagle Ford are parties to the GGPA with Carnero.

41. By virtue of the Letter Agreement, Mitsui owes the obligations of a Producer under the GGPA to Carnero.

42. Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui promised to deliver their Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

43. On information and belief, Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui have breached their promises by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

44. Maverick's, Mesquite's, UnSub's, Venado's, Eagle Ford's, and Mitsui's breaches of their promises have damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from gathering, processing, and purchasing the Dedicated Gas from the Dedicated

Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration these parties gave to Carnero, and on which it relied, for its execution of the GGPA.

**C. Breach of Contract – Mesquite**

45. The Defendants are parties to valid and enforceable agreements with Carnero.

46. By virtue of its Ratification Agreement and the GGPA Amendment, Mesquite, as successor to Gavilan, is a party to the GGPA with Carnero.

47. Mesquite promised to deliver its Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

48. On or about October 16, 2020, Mesquite acquired Gavilan's interest in the Comanche Assets, but Gavilan did not assign the Comanche PSA to Mesquite. Mesquite's interest in the Comanche Assets is, thus, free and clear of any obligations in the Comanche PSA. As a result, Mesquite did not assume the obligation to be bound by the Existing Commitments, and therefore, is not required to deliver its Dedicated Gas to the midstream providers under the Existing Commitments. Carnero was entitled to gather and process Mesquite's Dedicated Gas under the GGPA after October 16, 2020.

49. On information and belief, Mesquite has breached its promise by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that its Dedicated Gas was again made subject to the Existing Commitments, rather than being directed to Carnero under the GGPA.

50. Mesquite's breach of its promise has damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from receiving Mesquite's Dedicated Gas from the Dedicated Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration Mesquite gave to Carnero, and on which it relied, for its execution of the GGPA.

**D. Attorney's Fees**

51. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code Chs. 37 and 38, and any other applicable statutes, and as allowed by the GGPA, the GGPA Amendment, the Ratification Agreements, the Letter Agreement, or other applicable agreement.

**E. Conditions Precedent**

52. All conditions precedent to Plaintiff's right to recover against Defendants has occurred, has been performed, or has otherwise been waived.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: January 27, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *_/s/ Eugene M. Nettles_*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61211675
Status as of 1/27/2022 12:57 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 1/27/2022 12:48:58 PM | SENT |

2/10/2022 2:20 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61635071
By: A Davis
Filed: 2/10/2022 2:20 PM

# AFFIDAVIT OF SERVICE

**State of Texas** **County of Harris** **215th Judicial District Court**

Case Number: 202204224

Plaintiff:
**CARNERO G&P LLC**

vs.

Defendant:
**SN EF UNSUB, LP, et al**

Received these papers on the 2nd day of February, 2022 at 9:20 am to be served on **EAGLE FORD TX, LP care of its Registered Agent, CAPITOL CORPORATE SERVICES, INC., 206 E. 9th Street, Suite 1300, Austin, Travis County, TX 78701.**

I, Vivian Smith, being duly sworn, depose and say that on the **2nd day of February, 2022 at 10:50 am, I:**

hand-delivered a true copy of this **Citation together with Plaintiff's Amended Petition,** to **EAGLE FORD TX, LP care of its Registered Agent, CAPITOL CORPORATE SERVICES, INC.** by and through its designated agent, **MARY ANN QUICK,** at the address of: **206 E. 9th Street, Suite 1300, Austin, Travis County, TX 78701,** having first endorsed upon such copy of such process the date of delivery.

I certify that I am approved by the Judicial Branch Certification Commission, Misc. Docket No. 05-9122 under rule 103, 501, and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas. I am competent to make this oath; I am not less than 18 years of age, I am not a party to the above-referenced cause, I have not been convicted of a felony or a crime of moral turpitude, and I am not interested in the outcome of the above-referenced cause.

Subscribed and Sworn to before me on the 2nd day of February, 2022 by the affiant who is personally known to me.

NOTARY PUBLIC

SCOTT L. THOMAS
NOTARY PUBLIC
STATE OF TEXAS
ID# 10407286
EXPIRES 1-9-2024

**Vivian Smith**
PSC-12617, Exp. 5/31/2022

Our Job Serial Number: THP-2022000594
Ref: 032-0461

Copyright © 1992-2022 Database Services, Inc. - Process Server's Toolbox V8.2c

Receipt Number: 917802
Tracking Number: 73966473

EML
**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: EAGLE FORD TX LP MAY BE SERVED THROUGH ITS REGISTERED AGENT CAPITOL CORPORATE SERVICES INC
206 E 9TH STREET SUITE 1300
AUSTIN TX 78701

Attached is a copy of PLAINTIFFS AMENDED PETITION.

This instrument was filed on January 27, 2022, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this January 28, 2022.

DISTRICT COURT OF HARRIS COUNTY TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: CYNTHIA CLAUSELL

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73966473
EML

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at ________o'clock _____. M., on the ________ day of ________________________________________, 20________.

Executed at (address) ________________________________________________
in _______________ County
at _______ o'clock _____. M., on the ________ day of ________________________________________, 20 ______,

by delivering to ________________________________________________ defendant, in person, a true copy of this
Citation together with the accompanying ______ copy(ies) of the ________________________________________ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this ________ day of ________________________________________, 20 ______.

FEE: $ ____________

________________________________________

______________ of ______________

County, Texas

________________________________ By: ________________________________

Affiant Deputy

On this day, ________________________________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this ________ of ________________________________________, 20 ______

________________________________________
Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61635071
Status as of 2/10/2022 2:23 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 2/10/2022 2:20:28 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 2/10/2022 2:20:28 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 2/10/2022 2:20:28 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 2/10/2022 2:20:28 PM | SENT |

2/10/2022 2:24 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61635362
By: A Davis
Filed: 2/10/2022 2:24 PM

**CAUSE NO. 2022-04224**

| | | |
|---|---|---|
| **CARNERO G&P LLC,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff(s),** | § | |
| **vs.** | § | |
| | § | **215TH JUDICIAL DISTRICT** |
| **SN EF UNSUB, LP, EAGLE FORD TX LP, et al.,** | § | |
| | § | **HARRIS COUNTY, TEXAS** |
| **Defendant(s).** | § | |

# RETURN OF SERVICE

Came to my hand on **Tuesday, February 1, 2022 at 7:00 PM,**
Executed at: **1999 BRYAN STREET, SUITE 900, DALLAS, TX 75201**
at **2:28 PM,** on **Wednesday, February 2, 2022,** by delivering to the within named:

**MESQUITE ENERGY INC (A CORPORATION)**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Employee, TERRI THONGSAVAT**
a true copy of this

**CITATION and PLAINTIFF'S AMENDED PETITION**

having first endorsed thereon the date of the delivery.

*BEFORE ME, the undersigned authority, on this day personally appeared Steven J. Treni who after being duly sworn on oath states: "My name is Steven J. Treni.* I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By: [signature]
**Steven J. Treni - PSC 1912 - Exp 4/30/23**
**served@specialdelivery.com**

**Subscribed and Sworn to by Steven J. Treni, Before Me, the undersigned authority, on this 7th day of February, 2022.**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

[signature]
**Notary Public in and for the State of Texas**

CAUSE NO. 202204224

COPY OF PLEADING PROVIDED BY PLT

RECEIPT NO: 917802 TRACKING NO: 73966477
EML

| | |
|---|---|
| Plaintiff:<br>CARNERO G&P LLC<br>vs.<br>Defendant:<br>SN EF UNSUB LP | In The 215th<br>Judicial District Court of<br>Harris County, Texas<br>201 CAROLINE<br>Houston, Texas |

**CITATION CORPORATE**

**THE STATE OF TEXAS**
**County of Harris**

**To: MESQUITE ENERGY INC (A CORPORATION) MAY BE SERVED THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM**
**1999 BRYAN ST SUITE 900, DALLAS TX 75201**

Attached is a copy of: PLAINTIFFS AMENDED PETITION

This instrument was filed on January 27, 2022 in the above cited cause number and court. The instrument attached describes the claim against you.

**YOU HAVE BEEN SUED.** You may employ an attorney. If you or your Attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration date of 20 days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

This citation was issued on January 28, 2022, under my hand and seal of said court.

Issued at the request of:

FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681
Bar Number: 24053576

DISTRICT COURT OF HARRIS COUNTY, TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk

Harris County, Texas
201 CAROLINE Houston Texas 77002
(PO Box 4651, Houston, Texas 77210)

Generated By:CYNTHIA CLAUSELL

EML

Tracking Number: 73966477

**CAUSE NUMBER: 202204224**

**PLAINTIFF: CARNERO G&P LLC**

**vs.**

**DEFENDANT: SN EF UNSUB LP**

**In the 215th**

**Judicial District Court of**

**Harris County, Texas**

OFFICER - AUTHORIZED PERSON RETURN

Came to hand at _______ o'clock ___. M. on the _________ day of ________________________, 20_____. Executed at

(Address)______________________________________________ RETURN / AFFIDAVIT ______________________ in

PROOF / ATTACHED

____________________ County at o'clock ___. M. On the _________ day of ________________________, 20_____, by

Delivering to _______________________________________________defendant, in person, a true copy of this Citation together with the accompanying ______ copy (ies) of the «Attachment». Petition attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this _______________day of ________________________________, 20.

Fees $_________________________

____________________________________________
Affiant

By________________________________________
Deputy

On this day, ___________________________________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, On this ______ day of ________________________________, 20__.

________________________________________
Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61635362
Status as of 2/10/2022 2:32 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 2/10/2022 2:24:22 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 2/10/2022 2:24:22 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 2/10/2022 2:24:22 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 2/10/2022 2:24:22 PM | SENT |

2/10/2022 2:28 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61635680
By: A Davis
Filed: 2/10/2022 2:28 PM

**CAUSE NO. 2022-04224**

| | | |
|---|---|---|
| **CARNERO G&P LLC,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff(s),** | § | |
| **vs.** | § | **215TH JUDICIAL DISTRICT** |
| **SN EF UNSUB, LP, EAGLE FORD TX LP, et al.,** | § | |
| **Defendant(s).** | § | **HARRIS COUNTY, TEXAS** |

# RETURN OF SERVICE

Came to my hand on **Tuesday, February 1, 2022 at 7:00 PM,**
Executed at: **1999 BRYAN STREET, SUITE 900, DALLAS, TX 75201**
at **2:29 PM,** on **Wednesday, February 2, 2022,** by delivering to the within named:

**MITSUI E&P TEXAS LP**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Employee, TERRI THONGSAVAT**
a true copy of this

**CITATION and PLAINTIFF'S AMENDED PETITION**

having first endorsed thereon the date of the delivery.

*BEFORE ME, the undersigned authority, on this day personally appeared Steven J. Treni who after being duly sworn on oath states: "My name is Steven J. Treni.* I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By: [signature]
**Steven J. Treni - PSC 1912 - Exp 4/30/23**
**served@specialdelivery.com**

**Subscribed and Sworn to by Steven J. Treni, Before Me, the undersigned authority, on this 7th day of February, 2022.**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

[signature]
**Notary Public in and for the State of Texas**

Receipt Number: 917802
Tracking Number: 73966476

EML
**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: MITSUI E&P TEXAS LP MAY BE SERVED THROUGH ITS REGISTERED AGENT CT CORPORATION SYSTEM
1999 BRYAN STREET SUITE 900
DALLAS TX 75201

Attached is a copy of PLAINTIFFS AMENDED PETITION.

This instrument was filed on January 27, 2022, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this January 28, 2022.

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: CYNTHIA CLAUSELL

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73966476
EML

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

RETURN / AFFIDAVIT PROOF / ATTACHED

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at ________o'clock _____. M., on the __________ day of ______________________________, 20______.

Executed at (address) ____________________________________________
in ______________ County
at _______ o'clock _____. M., on the ________ day of ______________________________, 20 _____,
by delivering to ____________________________________________ defendant,
in person, a true copy of this
Citation together with the accompanying ______ copy(ies) of the ______________________________ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this ________ day of ______________________________, 20 ______.

FEE: $ ____________

____________________________________

______________ of ______________

County, Texas

______________________________ By: ______________________________
Affiant Deputy

On this day, ____________________________________________, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this __________ of ______________________________, 20 _____

______________________________
Notary Public

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61635680
Status as of 2/10/2022 2:34 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 2/10/2022 2:28:37 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 2/10/2022 2:28:37 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 2/10/2022 2:28:37 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 2/10/2022 2:28:37 PM | SENT |

2/10/2022 2:35 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61636271
By: A Davis
Filed: 2/10/2022 2:35 PM

**CAUSE NO. 2022-04224**

| | | |
|---|---|---|
| **CARNERO G&P LLC,** | § | **IN THE DISTRICT COURT** |
| **Plaintiff(s),** | § | |
| **vs.** | § | **215TH JUDICIAL DISTRICT** |
| **SN EF UNSUB, LP, EAGLE FORD TX LP, et al.,** | § | |
| **Defendant(s).** | § | **HARRIS COUNTY, TEXAS** |

# RETURN OF SERVICE

Came to my hand on **Tuesday, February 1, 2022 at 7:00 PM,**
Executed at: **1999 BRYAN STREET, SUITE 900, DALLAS, TX 75201**
at **2:28 PM,** on **Wednesday, February 2, 2022,** by delivering to the within named:

**SN EF MAVERICK LLC**

By delivering to its **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its **Authorized Employee, TERRI THONGSAVAT**
a true copy of this

**CITATION and PLAINTIFF'S AMENDED PETITION**

having first endorsed thereon the date of the delivery.

BEFORE ME, the undersigned authority, on this day personally appeared Steven J. Treni who after being duly sworn on oath states: "My name is Steven J. Treni. I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

By: [signature]
**Steven J. Treni - PSC 1912 - Exp 4/30/23**
**served@specialdelivery.com**

**Subscribed and Sworn to by Steven J. Treni, Before Me, the undersigned authority, on this 7th day of February, 2022.**

CHARITY N COLEMAN
Notary Public
STATE OF TEXAS
ID# 12523831-2
My Comm. Exp. March 21, 2025

[signature]
**Notary Public in and for the State of Texas**

Receipt Number: 917802
Tracking Number: 73966474

EML
**COPY OF PLEADING PROVIDED BY PLT**

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th Judicial |
| vs. | District Court of |
| DEFENDANT: SN EF UNSUB LP | Harris County, Texas |

CITATION

THE STATE OF TEXAS
County of Harris

TO: SN EF MAVERICK LLC MAY BE SERVED THROUGH ITS REGISTERED AGENT C T CORPORATION SYSTEM

1999 BRYAN STREET SUITE 900

DALLAS TX 75201

Attached is a copy of PLAINTIFFS MENDED PETITION.

This instrument was filed on January 27, 2022, in the above numbered and styled cause on the docket in the above Judicial District Court of Harris County, Texas, in the courthouse in the City of Houston, Texas. The instrument attached describes the claim against you.

YOU HAVE BEEN SUED. You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org.

ISSUED AND GIVEN UNDER MY HAND and seal of said Court, at Houston, Texas, this January 28, 2022.

DISTRICT COURT OF HARRIS COUNTY TEXAS

Marilyn Burgess

Marilyn Burgess, District Clerk
Harris County, Texas
201 Caroline, Houston, Texas 77002

Generated By: CYNTHIA CLAUSELL

Issued at request of:
FALCON, AMY COATES
1000 MAIN STREET, STE 3600
HOUSTON, TX 77002
713-226-6681

Bar Number: 24053576

Tracking Number: 73966474
EML

CAUSE NUMBER: 202204224

| | |
|---|---|
| PLAINTIFF: CARNERO G&P LLC | In the 215th |
| vs. | Judicial District Court |
| DEFENDANT: SN EF UNSUB LP | of Harris County, Texas |

OFFICER/AUTHORIZED PERSON RETURN

Came to hand at _______o'clock ____. M., on the _______ day of _______________________________, 20______.

Executed at (address) ________________________________________
in ______________ County
at _______ o'clock _____. M., on the _______ day of ____________________________________, 20 _____,

by delivering to ________________________________________ defendant,
in person, a true copy of this
Citation together with the accompanying ______ copy(ies) of the ______________________________ Petition
attached thereto and I endorsed on said copy of the Citation the date of delivery.

To certify which I affix my hand officially this ________ day of ____________________________, 20 ______.

FEE: $ ____________

______________________________

______________ of ______________

County, Texas

RETURN / AFFIDAVIT PROOF ATTACHED

______________________________
Affiant

By: ______________________________
Deputy

On this day, ________________________________________, known to me to be the person whose signature appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME on this _________ of __________________________, 20 _____

______________________________
Notary Public

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacqueline Chin on behalf of Amy Falcon
Bar No. 24053576
jchin@porterhedges.com
Envelope ID: 61636271
Status as of 2/10/2022 2:37 PM CST

Case Contacts

| **Name** | **BarNumber** | **Email** | **TimestampSubmitted** | **Status** |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 2/10/2022 2:35:30 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 2/10/2022 2:35:30 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 2/10/2022 2:35:30 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 2/10/2022 2:35:30 PM | SENT |

2/22/2022 8:05 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61988423
By: A Davis
Filed: 2/22/2022 8:05 PM

Cause No. 2022-04224

| | | |
|---|---|---|
| Carnero G&P, LLC | § § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| SN EF Unsub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc. | § § § § | |
| *Defendants*. | § | 215th DISTRICT COURT |

## STIPULATION

By the signatures of the counsel below, Plaintiff Carnero G&P, LLC and Defendants SN EF Unsub LP, Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, SN EF Maerick, LLC, and Mesquite Energy, Inc. (collectively "**Defendants**") have agreed to extend the Defendants' deadline to file responsive pleadings, including, without limitation, an answer, in connection with the above-captioned lawsuit, until **February 28, 2022.**

*/s/ Joshua W. Wolfshohl*

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Plaintiff Carnero G&P, LLC**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Defendant Mitsui E&P Texas LP**

*/s/ Sydney Corry*

Sydney Corry
**Kirkland & Ellis LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ James G. Munisteri*

James G. Munisteri
**Foley & Lardner LLP**
Texas Bar No. 14667380
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendants Mesquite Energy, Inc. and SN EF Maverick, LLC**

*/s/ Thomas A. Wooley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF Unsub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sara Brown on behalf of Sara Brown
Bar No. 24075773
sabrown@foley.com
Envelope ID: 61988423
Status as of 2/23/2022 8:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Amy CFalcon | | afalcon@porterhedges.com | 2/22/2022 8:05:25 PM | SENT |
| Eugene MNettles | | emnettles@porterhedges.com | 2/22/2022 8:05:25 PM | SENT |
| Joshua Wolfshohl | | jwolfshohl@porterhedges.com | 2/22/2022 8:05:25 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 2/22/2022 8:05:25 PM | SENT |
| Duston K.McFaul | | dmcfaul@sidley.com | 2/22/2022 8:05:25 PM | SENT |
| Maegan Quejada | | mquejada@sidley.com | 2/22/2022 8:05:25 PM | SENT |
| Thomas Andrew Woolley | 24042193 | twoolley@mrwpllc.com | 2/22/2022 8:05:25 PM | SENT |
| James Munisteri | | jmunisteri@foley.com | 2/22/2022 8:05:25 PM | SENT |
| Sara AnnBrown | | sabrown@foley.com | 2/22/2022 8:05:25 PM | SENT |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Carnero G&P, LLC,<br>Plaintiff,<br>v.<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br>Defendants. | Adv. No. 22-03035 |

**DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED PETITION**

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui"), and SN EF UnSub, LP ("UnSub") (collectively, the "Defendants"), by and through their undersigned attorneys, submit the following as their Answer to Plaintiff's Amended Petition.

Except as expressly admitted below, Defendants deny each and every allegation in the Amended Petition.

**DISCOVERY CONTROL PLAN**

1. The allegations in Paragraph 1 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue discovery in the manner pleaded in Paragraph 1.

**PARTIES**

2. Defendants deny knowledge and information sufficient to admit or deny the allegations in Paragraph 2, and on that basis deny the allegations in Paragraph 2.

3. Defendants admit that UnSub is a limited partnership organized under the laws of Delaware, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for UnSub's principal place of business is 1000 Main Street, Suite 3000, Houston, Texas.

4. Defendants admit that Eagle Ford is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Eagle Ford's principal place of business is 555 San Felipe Road, Suite 1175, Houston, Texas 77056.

5. Defendants admit the allegations in Paragraph 5.

6. Defendants admit that Javelin is a limited partnership organized under the laws of Delaware, that its principal place of business is in Austin, Texas, and that it may be served as alleged in Paragraph 6. Defendants deny that the address for Javelin's principal place of business is 13501 Galleria Circle, Suite 350, Austin, Texas 78738.

7. Defendants admit that Mitsui is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Mitsui's principal place of business is 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

8. Defendants admit the allegations in Paragraph 8.

## JURISDICTION

9. The allegations in Paragraph 9 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter, as set forth in the *Notice of Removal* [Dkt. No. 1] filed by Defendants on February 28, 2022. Defendants deny any remaining allegations in Paragraph 9.

## VENUE

10. The allegations in Paragraph 10 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 10.

## RULE 47 STATEMENT OF RELIEF

11. The allegations in Paragraph 11 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue the relief pleaded in Paragraph 11, but deny any entitlement to such relief.

## FACTUAL BACKGROUND

12. Defendants admit that the dispute involves, in part, contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas. To the extent Plaintiff contends that the allegations in Paragraph 12 fully describe this dispute, Defendants deny the allegations in Paragraph 12.

13. Defendants admit, prior to January 2017, Eagle Ford, Javelin, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil & Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights predominantly in the western portion of the Eagle Ford Shale.

14. Defendants admit that certain parties entered into a Purchase and Sale Agreement ("PSA") dated January 12, 2017, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

15. Defendants admit that Gavilan and Mesquite entered into an Asset Purchase Agreement (the "Gavilan APA") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

16. Defendants admit that, currently, Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, Maverick, UnSub, and the WIPs own all of the working interests in the Comanche Assets.

17. Defendants admit that Anadarko (and/or certain of its affiliates) entered into various agreements with midstream service providers to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants further admit that certain of those agreements were not subsequently directly assigned to Maverick, Gavilan, and UnSub. Defendants otherwise deny Plaintiff's characterization of those agreements and the "Existing Commitments" (as defined in either the Amended Petition or the GGPA (as defined below)).

18. Defendants admit that Anadarko and Maverick entered into the Midstream Agency Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

19. Paragraph 19 constitutes legal conclusions purporting to define legal relationships among Maverick, UnSub, and the WIPs with respect to the Existing Commitments and the Midstream Agency Agreement, to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 19.

20. Defendants admit that Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "GGPA"), to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof, including but not limited to Defendants' obligations under the GGPA. Defendants further admit that UnSub, Maverick, Gavilan, Eagle Ford, Javelin and Carnero entered into certain Ratification Agreements, to which Defendants refer the Court for their true and correct terms, which speak

for themselves, and deny Plaintiff's characterization thereof, including but not limited to Plaintiff's characterization of Defendants' obligations under such agreements.

21. Defendants admit that Mitsui, Maverick, and Carnero signed a Letter Agreement effective April 1, 2018 ("Letter Agreement") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

22. Defendants admit that certain parties entered into the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and which agreement defines "Dedicated Gas," "Dedicated Acreage," and "Producer," but otherwise deny Plaintiff's characterization of Defendants' obligations under the agreement.

23. Defendants admit that certain parties entered into or ratified the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

24. Defendants admit that Gavilan sold its interest in the Comanche Assets to MCom on or about October 16, 2020, through the Gavilan APA to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

25. Defendants admit that (A) on December 21, 2021, pursuant to that certain Stipulation and Agreed Order (the "Oxy/Wes Stipulation and Order") [Dkt. No. 2253] entered by the Court, and that certain Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (the "Plan") [Dkt. No. 1205], Maverick and Mesquite assumed certain executory contracts and unexpired leases relating to the Existing Commitments, in some cases with amendments, and that in connection therewith, (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), Kerr-McGee Oil & Gas

Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, WGR Operating, LP, Mesquite, Maverick, MCom, and for limited purposes UnSub, entered into a Master Settlement Agreement, and (ii) Maverick and UnSub entered into an amendment in respect of the Hydrocarbons Purchase and Marketing Agreement (the "HPMA"), and (B) on June 28, 2021, pursuant to the Plan and that certain Stipulation of Dismissal and Agreed Order (the "UnSub Stipulation and Order"), [Dkt. No. 1983] entered by the Court, Mesquite and Maverick, among others, assumed and rejected certain executory contracts and unexpired leases related to the Existing Commitments, and, in connection therewith, Maverick and UnSub entered into an amendment in respect of the HPMA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.[1]

## CAUSES OF ACTION

34. Defendants incorporate by reference their responses in the preceding paragraphs.[2]

35. The allegations in Paragraph 35 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Carnero purports to pursue a claim pursuant to Texas Uniform Declaratory Judgment Act, §37.001, *et seq.* of the Texas Civil Practice and Remedies Code, admit that Carnero is party to the contracts identified in Paragraph 35, and otherwise deny the allegations in Paragraph 35.

36. The allegations in Paragraph 36 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 36.

---

1 For clarity, this Answer cites entries on the docket of the main bankruptcy case as "Dkt. No. __".

2 Paragraphs 26-33 have been omitted from the Amended Petition. Defendants therefore have omitted Paragraphs 26-33 from their Answer to avoid confusion.

37. Paragraph 37 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 37.

38. Paragraph 38 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 38.

39. Defendants admit the allegations in Paragraph 39.

40. Defendants deny the allegations in Paragraph 40.

41. Defendants admit that Mitsui is a party to the Letter Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

42. Defendants deny the allegations in Paragraph 42.

43. Defendants deny the allegations in Paragraph 43.

44. Defendants deny the allegations in Paragraph 44.

45. The allegations in Paragraph 45 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 45.

46. Defendants deny the allegations in Paragraph 46.

47. Defendants deny the allegations in Paragraph 47.

48. Defendants admit that on or about October 16, 2020, MCom acquired certain of Gavilan's interests in the Comanche Assets pursuant to the Gavilan APA, but otherwise deny Plaintiff's characterization of the Gavilan APA or the other agreements referenced in Paragraph 48, to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants otherwise deny the allegations in Paragraph 48.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50.

51. The allegations in Paragraph 51 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 51.

52. The allegations in Paragraph 52 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 52.

**AFFIRMATIVE DEFENSES**

53. Plaintiff's claims are barred, in whole or part, because it has failed to state any claim for which relief can be granted.

54. Plaintiff's claims are barred, in whole or part, because they were not damaged.

55. Plaintiff's claims are barred, in whole or part, because of the doctrine of laches.

56. Plaintiff's claims are barred, in whole or part, because of the doctrine of estoppel.

57. Plaintiff's claims are barred, in whole or part, because of the doctrine of unclean hands.

58. Plaintiff's claims are barred, in whole or part, because of the doctrine of waiver.

59. Plaintiff's claims are barred, in whole or part, because of Plaintiff's failure to comply with Section 15.2 of the GGPA.

60. Plaintiff's claims are barred, in whole or in part, by the Plan, the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization [Dkt. No. 1212], the Oxy/Wes Stipulation and Order, the UnSub Stipulation and Order and/or bankruptcy law.

61. Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the settlement agreement, dated June 6, 2020, by and among Plaintiff, the Debtors (as defined in the

Plan), Catarina Midstream LLC, Seco Pipeline, LLC, Sanchez Midstream Partners, LP, Sanchez Midstream Partners GP, LLC, SP Holdings, LLC and TPL SouthTex Processing Company LP (the "Carnero Settlement Agreement"). The parties acknowledged at the June 29-30, 2020 hearing before the Court that the Carnero Settlement Agreement would not preordain the Debtors' midstream restructuring, and that the Debtors would have to renegotiate the terms of the Midstream Agency Agreement if they were unable to reject it. Carnero's counsel did not dispute these statements. The parties' understanding was clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and renegotiating and assuming the Midstream Agency Agreement. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating this action. Carnero also breached Section 6.2.1 of the Carnero Settlement Agreement by suing Defendants in Texas state court.

Respectfully submitted this 7th day of March, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Michelle Pector*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Defendant Javelin EF L.P.**
**(f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 7, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508[2] |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**<u>Adversary Plaintiff's Motion to Remand to State Court or for Abstention</u>**

(Related to Dkt. No. 1)

**If you object to the relief requested, you must respond in writing.**

**Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed.**

**If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The "<u>Reorganized Debtors</u>," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Referred to as "<u>Main Case</u>" in docket entry references.

# Table of Contents


Summary of the Relief Requested ........ 1

Background ........ 3

Argument ........ 7

I. The Court lacks both core and "related-to" jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit. ........ 7

A. The Court's post-confirmation jurisdiction is limited under Craig's Stores to matters pertaining to the implementation or execution of the Plan. ........ 10

1. Carnero's claims are non-core. ........ 10

2. *Craig's Stores* defines the post-confirmation "related to" standard for this Court's subject matter jurisdiction analysis. ........ 11

B. The Craig's Stores factors do not support jurisdiction over Carnero's claims. ........ 13

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts. ........ 13

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date. ........ 13

3. No facts or law deriving from the Plan are necessary to decide Carnero's claims. ........ 14

II. The factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. ........ 16

A. Carnero has timely filed this motion for abstention and its claim is based on state law. ........ 16

B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b). ........ 17

C. Carnero's claims are non-core. ........ 17

D. Carnero filed its claims in the State Court Lawsuit. ........ 18

E. The state court can timely adjudicate Carnero's claims. ........ 18

III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention. ........ 19

A. The permissive abstention factors. ........ 19

B. The balance of the factors favors permissive abstention. ........ 20

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention. ........ 20

2. The extent to which state law issues predominate over bankruptcy issues. ........ 21

3. The difficult or unsettled nature of applicable law. ........ 21

4. The presence of a related proceeding commenced in state court or other nonbankruptcy proceeding. ........ 21

5. The jurisdictional basis, if any, other than § 1334. ........ 22

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case. ..... 22
7. The substance rather than the form of an asserted core proceeding. ..... 22
8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court. ..... 23
9. The burden on the bankruptcy court's docket. ..... 23
10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties ..... 23
11. The existence of a right to a jury trial. ..... 24
12. The presence in the proceeding of nondebtor parties. ..... 24
13. Comity. ..... 24
14. The possibility of prejudice to other parties in the action. ..... 25

Conclusion ..... 26

## Table of Authorities

**Page(s)**

**Cases**

*In re Austin Development Co.*,
19 F. 3d 1077 (5th Cir. 1994) ....................................................12, 15

*City of Covington v. Covington Landing Ltd. P'ship*,
71 F.3d 1221 (6th Cir. 1995) ....................................................6

*In re Craig's Stores of Tex., Inc.*,
266 F.3d 388 (5th Cir. 2001) .................................................... *passim*

*Davis v. Retail Fin. Co. of Tex., Inc.*,
No. 06-7016, 2006 WL 2827270 (Bankr. S.D. Tex. Sept. 27, 2006) ....................11

*In re Doctors Hosp. 1997, L.P.*,
351 B.R. 813 (Bankr. S.D. Tex. 2006) (Bohm, J.) ....................................20, 21

*In re Encompass Services Corp.*,
337 B.R. 864 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006) ....................................13

*In Matter of Galaz*,
665 Fed. Appx. 372, 376 (5th Cir. 2016) ....................................15

*In Matter of Galaz*,
841 F.3d 316 (5th Cir. 2016) ....................................................10

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*,
522 F.3d 575 (5th Cir. 2008) ....................................................15, 16

*In re Hous. Reg'l Sports Network, L.P.*,
547 B.R. 717 (S.D. Tex. 2016) ....................................................10

*Latham v. Wells Fargo Bank, N.A.*,
896 F.2d 979 (5th Cir. 1990) ....................................................10

*Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*,
408 B.R. 90 (Bankr. S.D. Tex. 2009) ....................................................11

*In re Lutfak*,
536 B.R. 765 (Bankr. S.D. Tex. 2015) ....................................................11

*In re OCA, Inc.*,
551 F.3d 359 (5th Cir. 2008) ....................10

*In re Performance Interconnect Corp.*,
No. 06-34482-BJH-7, 2007 WL 2088281 (Bankr. N.D. Tex. July 19, 2007) ....................16

*In re Petroleum Products & Services, Inc.*,
561 B.R. 662 (Bankr. S.D. Tex. 2016) ....................11, 16, 17, 18

*Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brooks Mays Music Co.)*,
363 B.R. 801 (Bankr. N.D. Tex. 2007) ....................11

*Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.)*,
336 B.R. 286 (Bankr. S.D. Tex. 2005) ....................7

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ....................6, 11, 17

*In re SBMC Healthcare, LLC*,
519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017) .................... *passim*

*Smith v. Bank of Am. Corp.*,
605 Fed. Appx. 311 (5th Cir. 2015) ....................7, 17

*In re Today's Destiny, Inc.*,
No. 05-90080, 2007 WL 2028111 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) ....................2

*In re Treyson Dev., Inc.*,
No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.) ....................16

*In re TXNB Internal Case*,
483 F.3d 292 (5th Cir. 2007) ....................2

*In re U.S. Brass Corp.*,
301 F.3d 296 (5th Cir. 2002) ....................10

*In re Wood*,
825 F.2d 90 (5th Cir. 1987) ....................10, 19

*Matter of Zale Corp.*,
62 F.3d 746 (5th Cir. 1995) ....................7

**Statutes**

11 U.S.C. § 365 .......... 6, 9, 11, 17

28 U.S.C. § 157 .......... 2, 10

28 U.S.C. § 1334 .......... *passim*

28 U.S.C. § 1367 .......... 2

28 U.S.C. § 1452 .......... 1, 2, 3

Tex. Civ. Prac. & Rem Code Ch. 37 .......... 2, 21

**Other Authorities**

Bankr. L.R. 9013-1 .......... 1

Fed. R. Bankr. P. 5011(b) .......... 1

Fed. R. Bankr. P. 9014 .......... 1

Fed. R. Bankr. P. 9019 .......... 5

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Adversary Plaintiff Carnero G&P LLC ("Carnero") files this Motion to Remand to State Court or for Abstention to return this case to the 215th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. This suit involves a dispute that arose post-confirmation, post-effective date among largely non-debtor entities over contractual gas gathering, processing, and purchasing rights and obligations in assumed contracts. Carnero understands that the non-debtors control an approximate 87.5% of the oil and gas lease working interests subject to the contracts in dispute.[3] Specifically, the contracts between Carnero and SN EF UnSub LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (collectively, the "WIPs"), former debtor Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) ("Mesquite"), and former debtor SN EF Maverick, LLC ("Maverick") (collectively, the WIPs, Maverick, and Mesquite are the "Defendants") are as follows:

- April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC ("Maverick"), as amended by Carnero, the WIPs and Maverick, **Exhibit 1**;
- April 1, 2018 Ratification Agreements among Carnero, Maverick, UnSub, Eagle Ford, Venado, and Mesquite Comanche Holdings, LLC ("MCom") (successor to Gavilan Resources, LLC ("Gavilan") and Mesquite subsidiary) ratifying the GGPA ("Ratification Agreements"), **Exhibit 2, Exhibit 3, Exhibit 4, Exhibit 5**;
- April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui regarding the GGPA ("Letter Agreement"), **Exhibit 6**.

[3] Indeed, it appears that a full 25% of non-debtor working interests are held by an affiliate of Mesquite.

2. The Reorganized Debtors assumed all of these contracts (collectively, the "GGPA Contracts"). Twenty-one months after confirmation [Main Case Dkt. 1212], Carnero filed this lawsuit on January 21, 2022, in state court against Defendants as Cause No. 2022-04224 in the 215th Judicial District Court, Harris County, Texas ("State Court Lawsuit").

3. Carnero asserts claims for declaratory relief under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the GGPA Contracts, breach of the GGPA Contracts by all Defendants, and a separate breach of the GGPA Contracts by Mesquite,[4] as successor working interest owner to Gavilan. The claims arise from Defendants' post-confirmation, post-effective date amendments to certain assumed contracts (defined in the GGPA as "Existing Commitments") or to contracts affecting those Existing Commitments.

4. On February 28, 2022, Defendants removed the case to this Court based on purported bankruptcy jurisdiction under 28 U.S.C. § 1334(b) and 28 U.S.C. § 1452. But the State Court Lawsuit asserts only non-core, post-confirmation contract claims under state law that do not relate to implementation or execution of the Reorganized Debtors' plan of reorganization. This Court should remand this case to the state court or abstain for three reasons: (i) the Court lacks post-confirmation subject matter jurisdiction over the State Court Lawsuit under 28 U.S.C. § 157, § 1334(b), and § 1367; [5] (ii) the factors applicable to 28 U.S.C. § 1334(c)(2) require mandatory

---

[4] After filing the State Court Lawsuit, Carnero became aware that MCom acquired Gavilan's interest in the Comanche Assets.

[5] Defendants assert, without supporting argument, supplemental jurisdiction under 28 U.S.C. § 1367. [Dkt. 1 ¶ 23]. "Bankruptcy courts may not exercise supplemental jurisdiction." *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir. 2007). This Court agrees that it "does not have supplemental subject matter jurisdiction over pendent claims under 28 U.S.C. § 1367." *In re Today's Destiny, Inc.*, No. 05-90080, 2007 WL 2028111, at *2 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) (cleaned up). If the Court were to have jurisdiction, it could only be under Section 1334 (*Id.*), but as explained in Carnero's argument, the Court lacks jurisdiction under that section, too.

abstention; and (iii) the factors applicable to 28 U.S.C. § 1334(c)(1) favor permissive abstention and equitable remand pursuant to 28 U.S.C. § 1452(b).

## Background

5. The Reorganized Debtors filed their Chapter 11 petitions on August 11, 2019. [Main Case Dkt. 1]. The Court approved the plan of reorganization (the "Plan") on April 30, 2020. [Main Case Dkt. 1212]. On June 30, 2020, the Plan became effective. [Main Case Dkt. 1417].

6. On July 30, 2021, Carnero filed a lawsuit ("First Carnero Action") against Defendants seeking declarations about the parties' rights and obligations under the GGPA Contracts.[6] [Prior RAP Dkt. 1-4].

7. The GGPA Contracts relate to oil and gas assets known as the "Comanche Assets." The GGPA contains terms requiring Defendants to deliver gas from the Comanche Assets to Carnero in certain circumstances. The declarations Carnero sought in the First Carnero Action addressed the parties' rights and obligations under the GGPA Contracts and how those rights and obligations may be affected by certain other contracts—to which Carnero is not a party—that currently cause the natural gas (and its components) to be delivered to gatherers, processors, or purchasers other than Carnero. Those other contracts—identified in the GGPA as "Existing Commitments"—include:

(i) a rejected Hydrocarbons Purchase and Marketing Agreement ("Marketing Agreement") between UnSub and Maverick dated January 12, 2017 [Main Case Dkt. 1373]; and

(ii) a then executory Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and Mesquite as guarantor dated on or about June 1, 2017 ("Midstream Agency Agreement") [Main Case Dkt. 1544-2], which the Reorganized Debtors have since assumed.

[6] Cause No. 2021-46431, *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, in the 269th Judicial District Court, Harris County, Texas.

8. Defendants removed the First Carnero Action to this Court.[7] [Prior RAP Dkt. 1]. Carnero moved to remand. [Prior RAP, Dkt. 6]. On December 7, 2021, the Court held a hearing on the motion to remand. [DAP[8] Dkt. 1-1]. Also pending at that time was the Oxy Adversary,[9] in which the issue in dispute was the rejection of the Midstream Agency Agreement. At the hearing, the Court expressed concern that Carnero sought to compel Maverick/Mesquite to take action in the Bankruptcy Court to implement Carnero's rights under the GGPA and to have the State Court determine those rights before Mesquite/Maverick ever acted in the Bankruptcy Court with respect to the Midstream Agency Agreement. [*Id*. at 14:16-15:5]. But the Court also recognized, "at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of that are a State Court issue." [*Id*. at 2:22-22:1].

9. The Court ordered Carnero to amend the First Carnero Action by December 10, 2021. [*Id*. at 26:1-6]. On December 10, 2021, to address the Court's concern and to allow Maverick/Mesquite time to decide to reject or assume the Midstream Agency Agreement, Carnero dismissed the First Carnero Action without prejudice. [Prior RAP Dkt. 31].

10. At a December 21, 2021 hearing in the Oxy Adversary, the Court entered a Stipulation and Agreed Order between Maverick/Mesquite and the plaintiffs ("Agreed Order") [Main Case Dkt. 2253] that settled the case for $50 million paid to Maverick/Mesquite in exchange for undisclosed amendments made to the Existing Commitments ("Oxy/Wes Settlement").

---

[7] *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 21-03908, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Prior RAP").

[8] *SN EF Maverick, LLC, et al. v. Carnero G&P, LLC,* Adversary No. 21-04419, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. This is Defendants' separate adversary proceeding abbreviated for docket references as "DAP."

[9] Adversary No. 20-03198, *Occidental Petroleum Corp., et al. v. Sanchez Energy Corporation, et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Oxy Adversary").

11. Mesquite's counsel began that hearing by emphasizing that the parties were not before the Court on a Fed. R. Bankr. P. 9019 motion to approve the Oxy/Wes Settlement:

> So, let me start by putting out that we're not here on a 9019 motion to approve the settlement. And the reason for that is it's not necessary given the process that we've built into our plan of reorganization and confirmation order.

He then stated the order did only three things—none of which included the Court's approval of actions taken by Maverick/Mesquite to settle the Oxy Adversary:

> simple. First, these orders in these two cases provide for the amendment and modification of this Court's partial rejection order. That's the one, Your Honor, entered on May 6, 2020, Docket 89290

> In addition, Your Honor, it provides for the dismissal of the Oxy West litigation, both the contested matter commenced by the objections can be assumptions and rejections in this adversary proceedings.
>
> And then there's assumption of 18 agreements and the rejection of 6 agreements.

**December 21, 2021 Hearing Transcript** [Main Case Dkt. 2254, at 7:11-15, 8:6-11; *see also* 9:21-10:4; 18:8-21:8]. Thus, while the Agreed Order listing "Assumed Comanche Agreements" (which include the Existing Commitments) footnotes that several agreements were "assumed *as amended* pursuant to the terms of the Settlement Agreement," the Reorganized Debtors settled the Oxy Adversary and amended the Existing Commitments without supervision, review, or approval by the Court. [Main Case Dkt. 2253 at p. 10-11 (emphasis added)].

12. The Court could not have approved the Oxy/Wes Settlement or the amendments to the Assumed Comanche Agreements because the parties did not file the settlement agreement with

the Court or seek the Court's approval of the settlement agreement or the contract amendments. The decision to amend the Assumed Comanche Agreements was a post-confirmation operational decision pertaining to commercial transactions, not corporate transactions, undertaken by former debtors to "renegotiate their midstream contracts" and "restructure [their] midstream operations." [DAP Dkt. 29 ¶¶ 27, 31]. The amendments, according to the Plan, were outside the supervision, review, and approval of the Court and outside the restrictions of the Bankruptcy Code and Bankruptcy Rules. [Main Case Dkt. 1212, Art. V.G]. They were also beyond the bounds of Section 365. A renegotiation of the midstream contracts resulted in the amendments to the Assumed Comanche Agreements. [DAP Dkt. 29 ¶¶ 27, 31, 41]. This "***true renegotiation of [the Reorganized Debtors'] obligations…falls entirely outside of § 365's concern***." *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("Section 365 does not speak to the situation in which the parties to the contract negotiate an amended contract.").

13. The Oxy/Wes Settlement resolved the Court's timing concerns as stated at the December 7, 2021 hearing. Thereafter, on January 21, 2022, Carnero filed the State Court Lawsuit asserting claims under the GGPA Contracts. [Dkt. 1-4 at 2]. On February 28, 2022, Defendants removed the State Court Lawsuit to this Court. [Dkt. 1]. The Court's comment that at some point the consequences of rejection or assumption are "a State Court issue" is well taken. Carnero's claims that seek adjudication of the consequences of Defendants' obligations under the GGPA Contracts in light of Maverick/Mesquite's modifications to the Existing Commitments that were done without Court supervision, review, or approval are "State Court issue[s]" and should be remanded to state court.

## Argument

14. The Court should remand this adversary proceeding to the state court for three reasons. First, under 28 U.S.C. § 1334(b), this Court lacks jurisdiction to hear Carnero's state law contract interpretation claim under the GGPA Contracts. Second, the factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. Third, the factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention and remand.

### I. The Court lacks both core and "related-to" jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit.

15. To sustain removal of the State Court Lawsuit, Defendants bear the burden to show this Court has subject matter jurisdiction over Carnero's state law claims under the GGPA Contracts. *See Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311, 313 (5th Cir. 2015). This burden cannot be satisfied by pointing to allegations that merely share something in common with the Reorganized Debtors' bankruptcy. *See Matter of Zale Corp.*, 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy."). Even if the State Court Lawsuit may share a few common facts with the Reorganized Debtors' bankruptcy, this does not confer "related to" jurisdiction on the Court. *See Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.),* 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005); *see also Zale Corp.*, 62 F.3d at 753.

16. In the State Court Lawsuit, Carnero alleges three claims arising from amendments made to the Midstream Agency Agreements and other Existing Commitments. First, a claim for certain declarations under the GGPA Contracts:

36. Carnero seeks the following declarations:

(a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";

(b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";

(c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and

(g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

[Dkt. 1-4 at 22, ¶ 36]. None of these declarations touches or concerns any aspect of the bankruptcy proceeding. Carnero also alleges two claims for breach of the GGPA Contracts. [*Id.* at 23-24, ¶¶ 38-50].

17. To persuade the Court to exercise jurisdiction, over these purely state law claims, Defendants posit that the Court must:

- interpret four Plan [Main Case Dkt. 1212] provisions in Article V (post-confirmation assumption/ rejection), Article IV.D (property vesting), Article IV.F (assumption includes modifications), and Article VIII (discharge provisions) (Dkt. 1 ¶ 25; Dkt. 5 ¶ 60);

- interpret three orders–Confirmation Order [Main Case Dkt. 1212], Carnero Settlement Approval Order [Mai Case Dkt. 1415], and the Oxy Adversary Stipulation and Agreed Order [Oxy Adversary Dkt. 159] (Dkt. 1 ¶ 26; Dkt. 5 ¶ 60);

- decide whether Section 3.1(b) in the GGPA is unenforceable under bankruptcy law (*Id.* ¶ 27); and

- decide whether Section 365 preempts Carnero's right to claim the amendments to the Midstream Agency Agreement breached the GGPA (*Id.* ¶ 28).

Defendants make these assertions even though (1) Carnero's claims arose post-confirmation when Maverick/Mesquite amended contracts in the course of operating the business without supervision or approval by the Court; (2) Carnero's claims arise only under the GGPA Contracts; (3) Maverick/Mesquite have already assumed *and* modified the Midstream Agency Agreement; and (4) amendments to executory contracts are outside the scope of Section 365. As explained below, the Court need not reference the Plan, its orders, or Section 365 to decide Carnero's state law contract claims, and as a result, this Court lacks jurisdiction to hear those claims.

18. Defendants also claim only this Court should hear the State Court Lawsuit because the amendments "benefited the estate" and Carnero's claims permit it to get a windfall "at the expense of the estate." That claim is without merit because after confirmation, no estate exists and the $50 million paid to Maverick/Mesquite does not flow into the non-existent estate to the benefit of any creditors.[10] Moreover, when Carnero prevails, it will not receive more distributions than estate creditors from Cash that was on hand at confirmation or from the New Common Stock set aside for satisfying Claims because Carnero's post-confirmation claims fall outside all Classes of

[10] Article IV.C in the Plan provided that distributions to pay Claims under the Plan were funded from "Cash on hand on the Effective Date and the New Common Stock." [Main Case Dkt. 1212]. Article III prescribed the treatment for the various classes of Claims, which were to be paid from Cash or various types of distributions of New Common Stock. *Id*. The Plan does not provide that sums paid to Reorganized Debtors to settle adversary proceedings relating to proposed contract rejections—which settlement is carried out by the Reorganized Debtors after the Effective Date and free of supervision, review, and approval of the Court—flow to the estate to pay Claims. *Id*. at Art. IV.B, G. Further, after settlement of the Oxy Adversary, Reorganized Debtors have stipulated that certain claims are to be allowed [e.g., Main Case Dkt. 2424, 2428]. In these example stipulations, Reorganized Debtors designate the claims as General Unsecured Claims in Class 5 under the Plan. Article III.C.5 of the Plan provides that these Claims receive a "Pro Rata share of the Post-Effective Date Equity Distribution," not a portion of the settlement consideration paid to Maverick/Mesquite in the Oxy Adversary. The settlement of the Oxy Adversary did not benefit the non-existent estate. Any sums that Carnero recovers in the State Court Lawsuit will not detrimentally impact the estate because Carnero's contract claims are not based on any Claim filed in the bankruptcy proceeding and so receive no treatment under the Plan.

Claims given treatment under the Plan. Defendants' phantom complaints do not create jurisdiction in this Court.

***A. The Court's post-confirmation jurisdiction is limited under Craig's Stores to matters pertaining to the implementation or execution of the Plan.***

19. While the Plan contains retention of jurisdiction language (*see* Plan at Art. XI; Confirmation Order, ¶ 43), the source of subject matter jurisdiction for the Bankruptcy Court post-confirmation is solely 28 U.S.C. § 1334. *See In re Hous. Reg'l Sports Network, L.P.*, 547 B.R. 717, 735 (S.D. Tex. 2016). Neither the Plan nor any order nor the Court can create jurisdiction where it does not exist. *See In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002).

20. Generally, the Bankruptcy Court's jurisdiction extends to "'all civil proceedings arising under title 11, or arising in or related to cases under title 11,'" *In Matter of Galaz*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting 28 U.S.C. § 1334(b)). Core proceedings under 28 U.S.C. § 157 are those that arise under title 11 or in a title 11 proceeding. *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). A proceeding arises under title 11 if it "involves a cause of action created or determined by a statutory provision of title 11." *Id*. at 96. Proceedings "arising in" bankruptcy are those "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id*. at 97. Once the court confirms a debtor's chapter 11 plan of reorganization, however, "related to" jurisdiction ceases to exist, other than for "matters pertaining to the *implementation or execution* of the plan." *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). As explained below, neither core nor related-to jurisdiction exists here.

1. <u>Carnero's claims are non-core.</u>

21. The Fifth Circuit has long held that state law contract actions, like the State Court Lawsuit, do not arise under title 11. *See Wood*, 825 F.2d at 97; *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 984 (5th Cir. 1990); *In re OCA, Inc.*, 551 F.3d 359, 367-68 (5th Cir. 2008). Because

Carnero's state law contract claims can—and do—exist outside bankruptcy, they do not arise in bankruptcy. *See In re Petroleum Products & Services, Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016); *In re Lutfak*, 536 B.R. 765, 771 (Bankr. S.D. Tex. 2015); *Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*, 408 B.R. 90, 96 (Bankr. S.D. Tex. 2009).

22. Defendants assert core jurisdiction exists because their *defenses* to Carnero's claims that modifications to the Existing Commitments breach the GGPA Contracts require interpretation of the Court's orders, the Plan, and Section 365. [Dkt. 1 ¶ 21; Dkt. 5 ¶¶ 60-61]. But Carnero does not seek any relief under the Plan, the Code, or any order of this Court. When the plaintiff's complaint does not itself create federal jurisdiction, the court should not use the defendant's answer to determine if the case "arises under" federal law. *Davis v. Retail Fin. Co. of Tex., Inc.*, No. 06-7016, 2006 WL 2827270, at *1 (Bankr. S.D. Tex. Sept. 27, 2006) (holding counterclaims in answer did not create core jurisdiction) (citing *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (recognizing that federal defenses to claims do not create "arising under" jurisdiction)). Thus, Defendants' defenses based on an interpretation of an order, the Code, or the Plan (which are wholly lacking in merit) do not create core bankruptcy jurisdiction. *See Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brooks Mays Music Co.)*, 363 B.R. 801, 810 (Bankr. N.D. Tex. 2007) (noting that defense based on release in bankruptcy court order does not create "core" jurisdiction in bankruptcy court); *Richmond Leasing*, 762 F.2d at 1311 (stating that renegotiation of executory contract obligations is not concern of Section 365).

2. *Craig's Stores* defines the post-confirmation "related to" standard for this Court's subject matter jurisdiction analysis.

23. The Court confirmed the Plan on April 30, 2020, and the Plan went effective on June 30, 2020. [Main Case Dkt. 1417]. Thus, absent core jurisdiction, which does not exist, the

Court's jurisdiction could only be the more narrow, post-confirmation "related to" jurisdiction standard described in *Craig's Stores*. Defendants cannot establish this related-to jurisdiction either.

24. Here, the parties' rights and obligations under GGPA Contracts post-confirmation—after contracts have been assumed or rejected—are matters of contract interpretation and enforcement under state law and do not relate to the implementation or execution of the Plan or any order. *See Craig's Stores*, 266 F.3d at 390; *see also In re Austin Development Co.*, 19 F. 3d 1077, 1084 (5th Cir. 1994) (holding that after lease was rejected, cause of action for breach of lease "should be decided in state court" because "the debtor's estate had no remaining interest in the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction").

25. The Fifth Circuit addressed a post-confirmation dispute about performance under an assumed contract in *Craig's Stores*. There, 18 months after the court confirmed debtor Craig's Stores' plan of reorganization, Craig's Stores sued a bank in bankruptcy court asserting state law claims under an assumed contract. *Craig's Stores*, 266 F.3d at 390. The court determined the bankruptcy court lacked jurisdiction over the claim based on three factors: (1) it "dealt with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and was, by implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan was necessary" to Craig's Stores' claim. *Id*. at 391. Instead, reorganized Craig's Stores was "capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court" and could not "come running to the bankruptcy judge every time something unpleasant happens." *Id*. at 390-91 (internal quotations omitted).

26. This is exactly where Mesquite and Maverick are now—out in the cold, cruel business world where they face the consequences of their business decision. And it is in this context that their decision to modify the Exiting Commitments should be analyzed. Considering the three *Craig's Stores* factors, the Court lacks jurisdiction over the State Court Lawsuit.

### *B. The* **Craig's Stores** *factors do not support jurisdiction over Carnero's claims.*

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts.

27. Carnero seeks declaratory relief and alleges breach of contract claims (including associated damages) against Maverick/Mesquite and the WIPs arising from a post-confirmation dispute relating to the GGPA Contracts. Specifically, the dispute arises from Maverick/Mesquite's decision to modify the Midstream Agency Agreement and other Existing Commitments in a manner that violates theirs and the WIPs' obligations under the GGPA Contracts. Maverick/Mesquite made those amendments without supervision, review, or approval by the Court and with full knowledge of the existing obligations to Carnero under the GGPA Contracts. The dispute does not arise out of obligations imposed on Mesquite/Maverick by the Plan, and only implicates the post-confirmation relations of the parties under the terms of the GGPA Contracts. *See In re Encompass Services Corp.*, 337 B.R. 864, 875 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006).

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date.

28. The Court confirmed the Plan on April 30, 2020. This dispute did not arise until December 2021—long after the Effective Date—when Defendants amended the Existing Commitments. Carnero had no inkling about what changes Maverick/Mesquite might make to the Existing Commitments at confirmation because Maverick/Mesquite's intent at that time was to reject the Midstream Agency Agreements. [Main Case Dkt. 1197 at 402]. Carnero filed the State

Court Lawsuit on January 30, 2022, complaining only of breaches of the GGPA Contracts caused by Defendants' amendments to the now assumed Existing Commitments.

29. Carnero's claims arising from those modifications cannot affect the implementation or execution of the Plan because the Plan provided that "[o]n and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules." [Main Case Dkt. Arts. IV.G]. That is, Maverick/Mesquite assumed the GGPA Contracts and have now amended the Existing Commitments during the ordinary course of their post-confirmation operations. No action under the Plan, any order, or the Code remains pending that could be affected by Carnero's claims.

3. <u>No facts or law deriving from the Plan are necessary to decide Carnero's claims.</u>

30. The state court can decide Carnero's claims without facts or law deriving from Mesquite/Maverick's the Plan or any order of this Court, and without reference to the Bankruptcy Code. The Plan does not address resolving disputes concerning the Reorganized Debtors' rights and obligations under assumed contracts. Instead, the Plan creates procedures for the assumption, assignment, and rejection of Executory Contracts (*see* Plan at Art. V.A.), a claims process for rejected contracts (*see id.* at Art. V.B.), and a cure process for assumed contracts (*see id.* at Art. V.C.). Moreover, Reorganized Debtors take all of these actions free from the supervision, review, and approval of the Court. *See* Plan at Arts. IV.A, G, N; Arts. V.B, C; Arts. VII.B, D.

31. The Reorganized Debtors have carried out the assumption/rejection process in full as to all contracts at issue here. Resolving a dispute as to the Reorganized Debtors' rights and obligations under the GGPA Contracts as they are impacted by the assumed but modified Existing

Commitments simply does not impact compliance with the Plan or its completion. *See, e.g.*, *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where litigation at issue did not attempt to subvert confirmed plan).

32. While a bankruptcy court retains jurisdiction to interpret and enforce its own prior orders (*In Matter of Galaz*, 665 Fed. Appx. 372, 376 (5th Cir. 2016)), Carnero's claims under the GGPA Contracts do not invoke that jurisdiction. Carnero does not assert claims under or arising from the Midstream Settlement Approval Order [Main Case Dkt. 1415] or otherwise seek enforcement of that order. As a result, the claims do not interfere with this Court's authority under that order or involve interpretation or enforcement of that order.

33. The post-confirmation implications of the amended Existing Commitments on the parties' rights and obligations under GGPA Contracts are just the sort of matter that involves contract interpretation under state law, and not implementation or execution of the Plan or any order of this Court. *See Craig's Stores*, 266 F.3d at 390 (holding that court lacked jurisdiction to hear post-confirmation cause of action for breach of assumed contract); *Austin Development*, 19 F.3d at 1084 (holding that court lacked jurisdiction to hear post-confirmation cause of action regarding third party beneficiary's rights in rejected contract). For purposes of a post-confirmation jurisdictional analysis, the Court can draw no meaningful distinction between the post-confirmation breach of contract dispute under an assumed contract in *Craig's Stores* and Carnero's post-confirmation State Court Lawsuit seeking declaratory relief of the parties' rights and obligations under the assumed GGPA Contracts.

34. Any dispute regarding the parties' relations under the GGPA Contracts on a post-confirmation, go-forward basis simply does not impact compliance with or implementation of the Plan or enforcement of any Bankruptcy Court order, and, in fact, has no impact on the Plan or any Bankruptcy Court order whatsoever. *See Seven Seas Petroleum*, 522 F.3d at 589 (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted). Therefore, this Court lacks jurisdiction to hear the State Court Lawsuit and should remand it to the state court.

## II. The factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention.

35. The Court must abstain from hearing claims when: (1) a motion requesting abstention has been timely filed; (2) the claim is essentially premised on state law; (3) the claims have no independent basis for federal jurisdiction other than § 1334(b); (4) the claims are non-core; (5) an action has been commenced in state court; and (6) the action can be timely adjudicated in state court. *See In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *21 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.); *Petroleum Products*, 561 B.R. at 665 (quoting *In re Mugica*, 362 B.R. 782, 792 (Bankr. S.D. Tex. 2007) (Isgur, J.)). The factors applied to the State Court Lawsuit support mandatory abstention.

### *A. Carnero has timely filed this motion for abstention and its claim is based on state law.*

36. The first two factors are met. Section 1334(c)(2) does not specify any deadline for motions to abstain. *In re Performance Interconnect Corp.*, No. 06-34482-BJH-7, 2007 WL 2088281, at *3 and n.2 (Bankr. N.D. Tex. July 19, 2007). They must only be "timely." 28 U.S.C. § 1344(c)(2). Carnero filed this motion for abstention timely with the motion for remand, which was filed within 30 days after Defendants filed the Notice of Removal on February 28, 2022. This

satisfies the first factor. Carnero's claims under the GGPA Contracts are state law claims. *See Craig's Stores*, 266 F.3d. at 390. This satisfies the second factor. These two factors support mandatory abstention.

***B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b).***

37. Defendants bear the burden to show the Court has jurisdiction. *See Smith*, 605 Fed. Appx. at 313. In their Notice of Removal [Dkt. 1], Defendants allege only 28 U.S.C. § 1334(b) as the basis for this Court's jurisdiction. As explained in Section I, in these circumstances, the Court lacks such jurisdiction. No other basis for federal jurisdiction exists. This factor supports mandatory abstention.

***C. Carnero's claims are non-core.***

38. As explained in Section I.A.1, Carnero's state law contract claims are non-core. They do not relate to the Reorganized Debtors' chapter 11 case. Carnero's claims do not invoke Section 365, which does not apply to amendments to assumed contracts. *Richmond Leasing*, 762 F.2d at 1311. Carnero's claims do not invoke any other substantive rights under the Bankruptcy Code. The State Court Lawsuit did not arise under title 11 or in a case under title 11, as Carnero filed it post-confirmation when no estate to administer exists. Further, the State Court Lawsuit does not invoke any right provided by title 11. As a garden-variety contract action, it could—and does—arise outside the context of a bankruptcy case. Thus, the State Court Lawsuit is a non-core proceeding. *See Petroleum Products*, 561 B.R. at 665 (citing *Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999)). ("A claim based on state created rights, which could have proceeded in state court had there been no bankruptcy, is likely not core…Petroleum Products' claims do not invoke a substantive right provided by Title 11 nor are they of a nature

that could only arise in a bankruptcy case—they are simply state contract claims."). This factor supports mandatory abstention.

### *D. Carnero filed its claims in the State Court Lawsuit.*

39. Carnero filed the State Court Lawsuit in state court on January 31, 2022. Defendants do not dispute this. This factor supports mandatory abstention.

### *E. The state court can timely adjudicate Carnero's claims.*

40. Carnero bears the burden to show that the State Court Lawsuit can be timely adjudicated in the state court. *Petroleum Products*, 561 B.R. at 666. It can carry that burden. Official court and caseload statistics for the period January 2020 through December 2021 from The Texas Office of Court Administration Court Activity Reporting and Directory System for Harris County, Texas,[11] and for the period January 2020 through December 2021 from the United States Courts Caseload Statistics Data Tables[12] show that both the Harris County District Courts and the United States Bankruptcy Court for the Southern District of Texas continue to manage significant caseloads during these periods. *See* **Exhibit 7**, Harris County statistics, **Exhibit 8**, US Bankruptcy Court SD TX statistics. Those same statistics show that both courts are also clearing thousands of cases each year. The Harris County District Courts data shows that even in pandemic-affected 2020 and 2021, the courts still disposed of most cases in 18 months or less. Ex. 6 (71% in 2020 and 62% in 2021). Considering these data, the state court can timely adjudicate the State Court Lawsuit.[13] This factor supports mandatory abstention.

---

[11] The Texas Office of Court Administration data and records are available here: https://card.txcourts.gov/.

[12] The United States Courts Caseload Statistics Data Tables are available here: https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

[13] *See* **Exhibit 9**, the Affidavit of Amy C. Falcon, proving up the process by which Carnero obtained the court statistics reflected in Exhibits 7-8.

41. In sum, Carnero can establish all six factors applicable to mandatory abstention under 28 U.S.C. § 1334(c)(2). The Court should mandatorily abstain from adjudicating this adversary proceeding and remand the case to the state court.

## III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention.

42. If the Court disagrees that mandatory abstention applies, it should permissively abstain from hearing the adversary proceeding and remand the case to state court because the factors applicable to 28 U.S.C. § 1334(c)(1) heavily favor permissive abstention or remand.

### *A. The permissive abstention factors.*

43. A bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). The bankruptcy court has "broad power to abstain whenever appropriate." *Wood,* 825 F.2d at 93. The factors courts consider include:

(a) the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(b) the extent to which state law issues predominate over bankruptcy issues;

(c) the difficult or unsettled nature of applicable law;

(d) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(e) the jurisdictional basis, if any, other than § 1334;

(f) the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(g) the substance rather than the form of an asserted core proceeding;

(h) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(i) the burden on the bankruptcy court's docket;

(j) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(k) the existence of a right to a jury trial;

(l) the presence in the proceeding of nondebtor parties;

(m) comity; and

(n) the possibility of prejudice to other parties in the action.

*In re SBMC Healthcare, LLC*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017). Application of these factors to this adversary proceeding favor permissive abstention.

***B. The balance of the factors favors permissive abstention.***

1. <u>The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention.</u>

44. The State Court Lawsuit largely involves non-debtor parties. Only Maverick is a Reorganized Debtor as to its interest in the GGPA Contracts. The other five parties, including Mesquite, as successor to Gavilan's interest in the Comanche Assets (which it acquired post-confirmation), are non-debtors. The non-debtor parties control an approximate 87.5% of the working interest.

45. The outcome of the suit will not deplete or increase the estate. Post-confirmation, no estate exists. Moreover, the Reorganized Debtors assumed the GGPA Contracts and have either assumed or rejected the Existing Commitments. The effect of the assumption or rejection on the estate was established when the contracts were assumed or rejected. Remand to the state court to declare the parties' rights and obligations under the GGPA Contracts will not change those effects. Accordingly, this factor favors abstention. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 848 (Bankr. S.D. Tex. 2006) (Bohm, J.) (recognizing that this factor does not apply post-confirmation when no estate exists).

2. The extent to which state law issues predominate over bankruptcy issues.

46. The State Court Proceeding only involves state law issues—the parties' rights and obligations under the GGPA Contracts. *See Craig's Stores*, 266 F.3d at 390 (recognizing contract claims as state law claims). Carnero has not alleged claims seeking enforcement of the Plan or an order issued by this Court or requesting this Court take action on any executory contract. No bankruptcy issues arise from Carnero's claims. State law issues predominate over bankruptcy issues in this circumstance. This factor also favors abstention. *See Doctors Hosp.*, 351 B.R. at 849 (recognizing that when proceeding includes only state law claims and no bankruptcy issues, state law claims predominate)

3. The difficult or unsettled nature of applicable law.

47. Carnero's contract claims are garden-variety state law contract claims. The claims are premised on the GGPA Contracts and Carnero's rights under Texas common law and Tex. Civ. Prac. & Rem. Code Ch. 37. These are state law principles to which the state court is better able to respond. *See SBMC Healthcare*, 519 B.R. at 191. This factor favors abstention.

4. The presence of a related proceeding commenced in state court or other nonbankruptcy proceeding.

48. Carnero filed the State Court Lawsuit in the state district court in Harris County, Texas. There are no other related state court proceedings. While proceedings continue in the bankruptcy case, including Defendants' entirely defensive and baseless adversary complaint[14] that opposes the State Court Lawsuit, for the reasons set forth above, those proceedings do not

[14] Defendants' adversary proceeding is styled *SN EF Maverick, LLC, et al. v. Carnero G&P, LLC*, Case No. 21-04419, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [DAP Dkt. 29]. For the reasons that Case No. 21-04419 does not negatively impact this Court's exercise of permissive abstention, please see the Motion to Dismiss Plaintiffs' March 23, 2022 Amended and Supplemental Complaint that will be filed in that adversary proceeding.

implicate the claims asserted in the State Court Lawsuit. This factor is likely neutral, at best, when viewed most favorably to Defendants. *See SBMC Healthcare*, 519 B.R. at 191.

5. The jurisdictional basis, if any, other than § 1334.

49. Defendants pleaded only Section 1334(b) as the basis for jurisdiction. As shown above, the Court lacks jurisdiction under that section. Even if the Court had jurisdiction under Section 1334(b), this is the only basis on which jurisdiction rests. The State Court Lawsuit raises no federal question or complete diversity grounds for jurisdiction. This factor heavily favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case.

50. As discussed above, Carnero's claims are not "related to" the post-confirmation Reorganized Debtors' Chapter 11 case. Even if related, that relationship is remote. This dispute involves (1) mostly non-debtors (Maverick is the only Reorganized Debtor defendant); (2) events occurring after confirmation when no estate remains to be administered; and (3) exclusively non-bankruptcy issues—the parties' rights and obligations under the GGPA Contracts. At most, this dispute is remotely related to the Reorganized Debtors' Chapter 11 proceeding. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

7. The substance rather than the form of an asserted core proceeding.

51. Carnero's direct causes of action are non-core, as discussed above. Even if the claims were core, the substance of the dispute consists of state law claims based on the rights and relationship of the parties post-confirmation under the GGPA Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court.

52. Carnero's direct causes of action are non-core, as discussed above. Thus, this factor does not apply. Even if Carnero's claims were core, the dispute consists of state law claims with no bankruptcy matters that exist post-confirmation from which to sever the claims. The state court can enter and enforce an order that decides the parties' rights and obligations under the GGPA Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191-92.

9. The burden on the bankruptcy court's docket.

53. This Court remains among the busiest bankruptcy courts in the country for complex bankruptcies such as that involving the Reorganized Debtors. While Carnero does not doubt the Court will prioritize this case, there is no question that adding purely state law issues to the Court's docket will further tax the Court's time and resources unnecessarily. *See* Ex. 7. As such, this factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties

54. Defendants are forum shopping. Their removal of the State Court Lawsuit involving only state law claims under the GGPA Contracts that arose post-confirmation against multiple non-debtor defendants controlling an approximate 87.5% of the affected working interest and one Reorganized Debtor tells as much. As in *Craig's Stores*, Defendants want to run to the Bankruptcy Court to protect themselves from unpleasantness that arose after the Reorganized Debtors emerged from bankruptcy. To seek shelter from the state court in the Bankruptcy Court, in their Notice of Removal [Dkt. 1] and their Answer [Dkt. 5], Defendants must resort to urging the Court to find jurisdiction based only on their defenses, not Carnero's actual claims. As discussed above, 28 U.S.C § 1334(b) does not authorize "related to" jurisdiction over Carnero's

post-confirmation claims under the GGPA Contracts based on Defendants' defenses. This factor favors abstention.

11. The existence of a right to a jury trial.

55. The parties waived their right to trial by jury in the GGPA Contracts. This factor weighs against abstention. *See SBMC Healthcare*, 519 B.R. at 192.

12. The presence in the proceeding of nondebtor parties.

56. Of the six parties involved the State Court Lawsuit, only one is a Reorganized Debtor, Maverick, who was more than 21 months past confirmation of the Plan when Carnero filed the State Court Lawsuit. Mesquite is not a Reorganized Debtor for purposes of this proceeding because it acquired Gavilan's interest in the Comanche Assets in October 2020, nearly six months after confirmation in the main case here. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

13. Comity.

57. Carnero instituted this lawsuit in Texas state court on January 21, 2022; Defendants removed it on February 28, 2022. While Defendants filed a wholly defensive separate adversary proceeding against Carnero's anticipated claims on December 21, 2021, they anticipated the wrong claims. [DAP Dkt. 3]. Thus, Defendants filed claims that were not ripe, moot, or sought impermissible advisory declarations as to claims Carnero does not assert along with a groundless claim that Carnero breached a settlement agreement [Main Case Dkt. 1309 at Ex. A] that does not implicate Carnero's post-confirmation claims. Defendants amended their complaint but request additional declarations that, again, only defend against Carnero's claims in this State Court Lawsuit.

58. In an attempt to salvage the "claims" in their separate adversary proceeding, Defendants amended their complaint on March 23, 2022, [DAP Dkt. 29] but did so only after

Carnero moved to dismiss their original complaint. Most of Defendants' amended claims are entirely new, defensive claims that merely respond to Carnero's claims in the State Court Lawsuit that was filed first. [DAP Dkt. 29]. The state court can decide Carnero's claims in the State Court Lawsuit *and* Defendants' defensive claims in their separate adversary proceeding (because they are asserted as defenses in the State Court Lawsuit). This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

14. The possibility of prejudice to other parties in the action.

59. The issue is which court, this Court or the state court, should hear Carnero's state law claims. Both forums are capable of adjudicating the claims. But the State Court Lawsuit involves no active debtors; thus, no debtor rights require this Court's protection. At best, this factor is neutral. *See SBMC Healthcare*, 519 B.R. at 192.

60. Eleven of the 14 permissive abstention factors favor abstention; two factors are neutral. Only the lack of a right to a jury trial favors retention. Because the clear weight of factors favors abstention, the Court should permissively abstain.

61. The Court may give greater weight to some factors. The Court should give more weight to the fact that: (a) the resolution of the Carnero's direct claims does not implicate the estate, because no estate exists post-confirmation, or the implementation or execution of the Plan (factor 1); (b) the law governing the dispute is entirely Texas state law (factor 2); (c) this Court has no subject matter jurisdiction over Carnero's direct claims, or even if it does, the only jurisdictional basis is 28 U.S.C. § 1334 (factor 5); and (d) five of the six parties in this dispute are non-debtors (factor 12). Giving greater weight to these factors, the Court should permissively abstain from hearing the adversary proceeding and remand the case to the Harris County District Court. *See SBMC Healthcare*, 519 B.R. at 193.

## Conclusion

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and five non-debtors, seeks only state court relief. As a result, this Court lacks post-confirmation jurisdiction under 28 U.S.C. § 1334(b) to hear this adversary proceeding and Carnero asks that it remand the case to the state court. Alternatively, Carnero requests that this Court mandatorily abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(2), and the factors support its request. Finally, the factors relating to permissive abstention under 28 U.S.C. § 1334(c)(1) favor this Court's permissively abstaining from hearing this adversary proceeding. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

Dated: March 30, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

## **Certificate of Service**

I hereby certify that on March 30, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# Exhibit 1

***Execution Version***

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i) or (ii) will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a) Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b) Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s), the Treating Facility, the Delivery Point(s) and the Plant(s), Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c) or Section 6.6(e).

"Cashout Price" for any Month means (i) if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii) if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i) of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i) the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii) the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv) any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i) Emissions or (ii) the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i) Producer and (ii) each of SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee) and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s).

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s)" means the inlet flange of the custody transfer meter(s) owned by the Redelivery Pipeline(s) at the Residue Gas Delivery Point(s), as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s) to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i) Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii) Gathering L&U, plus (iii) Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas) and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s) connecting the Receipt Point(s) to the Plant(s).

"Governmental Authority" means: (i) the United States of America; (ii) any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii) any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1) Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73) psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a). The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s) and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i) for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii) for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas) used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s)" means the processing plant(s) at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s), including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i) Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income); (ii) the T&F Fee; and (iii) any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i) and (iii) above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges)).

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000) and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s)" means the inlet flange of the custody transfer meter(s) on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s) less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s).

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s)" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu) confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c).

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities) to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant).

"Taxes" means taxes, fees, or charges (including penalties and interest thereon) now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s). Theoretical Gallons will be determined by multiplying: (i) the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii) the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities).

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c).

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1) year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1) year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be subject to the dedication hereunder as of the end of such one (1) year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3) years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) or Released Well (and associated Dedicated Acreage included in the proration unit for such well), as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d) to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e) to retain all liquids (and title to such liquids) separated from Producer's Gas by the use of conventional lease separators prior to delivery of Producer's Gas to Carnero at the Receipt Point(s), provided that Producer will not be permitted to remove or recover hydrocarbons from Producer's Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s) in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer) will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer's Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer's obligations are as follows:

(a) Subject to Sections 3.1(c), 3.1(d), 3.1(e) and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5);

(b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure), Carnero may, within sixty (60) Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10%) of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b) Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a) the Maximum Daily Quantity, or (b) the Maximum Receipt Capacity for the Receipt Point(s), as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s) to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c).

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corporation that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s). Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s).

**Section 4.2** Delivery Point(s). Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s).

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s) at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i) 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii) 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder), and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s) at the pressures existing in the Redelivery Pipeline(s), from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s) for the account of Producer on any Day differs from the Scheduled Quantity(ies) for such Receipt Point(s), then Carnero shall only be obligated to deliver at the Delivery Point(s) on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i) no obligation to accept variations from a uniform hourly rate of flow, and (ii) the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting) as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice), as applicable:

Payments to Carnero:
For the account of: Carnero G&P LLC
Bank: JP Morgan Chase
ABA: 021000021
Account Number: 263735760

Payments to Producer:
For the account of: SN EF Maverick, LLC
Bank: SunTrust Bank
ABA: 061000104
Account Number: 1000205698318

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees")) shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any) between the Consumer Price Index (All Urban Consumers (CPI-U); U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS") (the "CPI")) for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10) calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30) Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24) Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB"), or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time), two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s) and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1) the Receipt Quantity, and (2) the Delivery Quantity.

(a) Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b) Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c) If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d) Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset) at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO).

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i) while such Gas is within Carnero's control and possession; or (ii) to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof), the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER).

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT), CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO). CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S) WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b) Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero’s disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate), which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero’s sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term") and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term").

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

**ARTICLE 14**
**FAILURE TO PAY; REMEDIES**

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a) if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b) if Producer fails to post credit assurance as required pursuant to Section 5.8(e), and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e);

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III) WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a) if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b) if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c) if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d) if delivered personally, upon the date of actual delivery; and (e) if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly).

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A) ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B) FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY)). THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement), and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives") in the following circumstances:

(a) to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b) to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c) as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d) to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e) to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f) to independent certified public accountants for purposes of obtaining a financial audit; and

(g) as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s) under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s). This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period) from the earlier of (i) the date such Change in Law becomes effective or (ii) the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements) to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________

Name: ______________________

Title: ______________________

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: Antonio R. Sanchez III

Title: Chief Executive Officer

# EXHIBIT A

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Receipt Point(s); Delivery Point(s)**

## Receipt Point(s)

| *Meter Number* | *Receipt Point* | *Maximum Receipt Capacity (MMcf/d)* |
|---|---|---|
| 4043654 | Maverick CDP | 235 MMcfd |
| 4043653 | Highway 83 – Carnero CDP | 75 MMcfd |
| 2048026 | Highway 83 – T2 CDP* | 75 MMcfd |

## Delivery Point(s)

| *Meter Number(s)* | *Residue Gas Delivery Point(s)* | |
|---|---|---|
| 4034034 | Western | 115 MMcfd |
| TBD*** | Eagle Ford Midstream Pipeline (NET)** | 150 MMcfd |
| 4034036 | SECO | 250 MMcfd |
| 02-T2-09-8090 | TPL SouthTex Transmission Company LP* | 35 MMcfd |
| 02-T2-09-3630 | TPL SouthTex Transmission Company LP* | 35 MMcfd |

*Deliveries to Silver Oak II Plant only

**Potential future Delivery Point – there is no current interconnect

***Meter number not currently available

# EXHIBIT B

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## FEES

Gathering Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement at the same fees, the Gathering Fee shall be $0.15 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Treating Fee (based on $CO_2$ content and Mcf as determined at the Receipt Point(s)):

| | |
|---|---|
| If $CO_2$ content is 2.00% or less | no fee |
| If $CO_2$ content is greater than 2.0% | **To be determined when service is required.** |

Compression Fee: **To be determined when compression is required**

Processing Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement, the Processing Fee shall be $0.253 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Gathering and Processing Fees for Excess Gas: The Gathering Fee, Treating Fee, Compression Fee, and Processing Fee set forth above shall apply with respect to the Firm Volumes (as determined with respect to the then-effective MDQ) and the Priority Interruptible volumes that Carnero accepts under the terms of Section 3.4 of the Agreement. Carnero may refuse to accept any Excess Gas for gathering and processing under this Agreement due to lack of available capacity on the Carnero System. All Excess Gas that Carnero does not accept from Producer shall be, at Producer's sole discretion, temporarily released from the dedication hereunder, subject to the following paragraph.

Producer will give Carnero not less than one hundred twenty (120) days prior written notice and the applicable production projections and forecast, identifying the scope, source and nature of the applicable volumes in reasonable detail (the "Excess Gas Notice") in the event Producer anticipates delivering volumes of Excess Gas on a continuing basis for which Carnero has insufficient capacity on the Carnero System and which Carnero does not accept. Within forty-five (45) days following delivery of Producer's Excess Gas Notice, Carnero may, acting in its sole discretion, propose to accept Excess Gas at adjusted gathering and processing fees (the "Adjusted Gathering, Treating, Compression and Processing Fees"), mutually agreed between the parties that are reflective of: (i) Carnero's capital expenditures (including a reasonable return

on investment with respect to such expenditures); and (ii) any incremental expenses, fees or other costs, in each case, with respect to the receipt, gathering, processing and redelivery (including delivery of contractually allocated Residue Gas and Plant Products) of Producer's Gas. Within ninety (90) days following receipt of Producer's Excess Gas Notice, Producer and Carnero shall negotiate in good faith to arrive at mutually agreeable Adjusted Gathering, Treating, Compression and Processing Fees and an incremental maximum daily quantity, including the period during which such fees will be effective. If Producer and Carnero are unable to agree on the Adjusted Gathering, Treating, Compression and Processing Fees during the Negotiation Period, then Producer may enter into negotiations with a third party for the gathering, processing or redelivery of the Excess Gas. Once Producer has substantially negotiated definitive agreements with a third party, such that all commercial terms (and terms allocating risk) have been finally determined (the "Third Party Offer"), Producer will provide such agreements to Carnero and offer to Carnero, by irrevocable written notice, the option to enter into such agreements, with such changes as are necessary to reflect usage of Carnero's facilities and Carnero shall have 30 days after receipt of the Third Party Offer to elect to accept the Third Party Offer, except that the Receipt Point(s) and Redelivery Point(s) shall be the same as the Receipt and Redelivery Point(s) set forth under this Agreement. In the event that Carnero declines to accept the Third Party Offer, Producer may thereafter elect to cause such Excess Gas to be permanently released from dedication under this Agreement; provided that in no event will Excess Gas be released under this provision if such release would cause (or be reasonably expected to cause) Producer to not be able to deliver the then existing MDQ hereunder.

# EXHIBIT C

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Allocations**

1. Allocation of Producer's Condensate. A share of Condensate recovered by Carnero upstream of the Plant(s) will be allocated to Producer each Month in accordance with the following formula:

$$\text{Producer's Share of Condensate} = AC \times \frac{PHV}{THV}$$

Where:

AC = the aggregate volume of Condensate delivered from the Carnero System for such Month;

PHV = the total MMBtus attributable to the C5+ component of Producer's Gas gathered and received at all Receipt Point(s) during such Month; and

THV = the total MMBtus attributable to the C5+ component of all Gas gathered and received in the Carnero System upstream of the Plant(s) during such Month.

2. Allocation of Producer's Products.

(a) In the event Producer has elected Full Recovery Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated in paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 90% |
| Propane | 96% |
| Butanes plus | 99% |

(b) In the event Producer has elected Ethane Rejection Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated under paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 35% |
| Propane | 94% |
| Butanes plus | 99% |

(c) At Carnero's election, Carnero may implement a different allocation methodology that it determines, in good faith, provides for a reasonable allocation of Plant Products.

3. <u>Residue Gas</u>. Producer's allocated share of Residue Gas for all Receipt Point(s) under this Agreement will be the quantity of Producer's Gas, in MMBtus, as measured at all Receipt Point(s), minus each of the following: (i) FL&U, (ii) shrinkage attributable to Producer's Condensate and (iii) Product Shrinkage. Plant Fuel, Gathering L&U and Compression Fuel (each as comprising a part of FL&U), Product Shrinkage and shrinkage attributable to Producer's Condensate will be determined as follows.

(a) Producer's share of Plant Fuel, stated in MMBtus, will be determined each Month by multiplying the actual quantity of MMBtus utilized or incurred in the operation of the Plant(s) for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee), use requirements and Gas lost as a result of, but not limited to, leakage, venting or flaring, discrepancies due to meter inaccuracies or variations of temperature and/or pressure at the Plant(s), as well as any Gas that is otherwise unaccounted for in the Plant(s) by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas delivered to the inlet of the Plant(s) during that Month, and (ii) the denominator of which is the total MMBtus attributable to all Gas delivered to the inlet of the Plant(s) during such Month.

(b) Producer's share of Gathering L&U, stated in MMBtus, will be determined each Month by multiplying the actual Gas that is lost and Gas that is unaccounted for in the Gathering System (which is the total MMBtus attributable to all Gas received into the Gathering System, less the total MMBtus attributable to all Gas delivered to facilities downstream of the Gathering System, less Compression Fuel and less shrinkage attributable to Condensate), by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) and transported on the Gathering System during that Month, and (ii) the denominator of

which is the total MMBtus attributable to all Gas received into and transported on the Gathering System during such Month.

(c) Producer's share of Compression Fuel, stated in MMBtus, will be determined each Month by multiplying the actual fuel in MMBtus used by Carnero in the operation of the compression facilities by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) during that Month that require compression at the compression facilities, and (ii) the denominator of which is the total MMBtus attributable to all Gas received into the Carnero System during such Month that require compression at the compression facilities.

(d) Producer's allocated share of product shrinkage (the "Product Shrinkage") for each Month will be the aggregate Btus determined by multiplying the gallons of each Plant Product, by component, of Producer's Products at all Receipt Point(s) by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145*, and superseding revisions thereof, and as adjusted to 60º Fahrenheit and a 14.73 psia pressure base.

(e) Producer's allocated share of shrinkage attributable to Producer's Condensate will be calculated by Carnero each Month by multiplying the number of gallons of each component of Condensate attributable to Producer's Gas by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145,* and superseding revisions thereof, and as adjusted to 60° Fahrenheit and a 14.73 psia pressure base. The aggregate Btu of all such components will constitute the shrinkage attributable to Producer's Condensate hereunder.

**EXHIBIT D**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**DEDICATED ACREAGE**

**For SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is all of Maverick, Webb, Dimmit and LaSalle Counties, Texas.**

**For each Comanche Producer other than SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is such Comanche Producer's existing right, title and interest as of the Effective Date (excluding any after acquired interest) in and to lands, leaseholds, property rights, and/or wells (and the right to produce Gas therefrom) located in the area circled in red in the below diagram, excluding Mexico.**



**EXHIBIT E**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**MEMORANDUM OF AGREEMENT**

THIS MEMORANDUM OF Agreement (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), among SN EF Maverick, LLC, a Delaware limited liability company ("Producer"), and Carnero G&P LLC, a Delaware limited liability company ("Carnero").

**RECITALS**

WHEREAS, on the Effective Date, Producer and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "Agreement") under which Carnero agreed to provide gas gathering and gas processing services to Producer for its benefit and for the benefit of certain other producers;

WHEREAS, Producer and Carnero desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreement and certain provisions contained therein.

1. **Term**. The term of the Agreement commenced on the Effective Date and continues in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the Agreement is terminated by Carnero or Producer upon at least 90 days' written notice to the other Party prior to the expiration of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreement, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreement and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreement or otherwise excluded as provided in the Agreement) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage, excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released or excluded from the Dedication in accordance with the Agreement (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, treat, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreement.

4. **Covenant Running with the Land**. So long as the Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns.

5. **Incorporation of Terms**. The terms and conditions of the Agreement are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreement in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreement.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Producer and Carnero have signed this Memorandum as of the date first above written, but effective as of the Effective Date.

**CARNERO:**
**CARNERO G&P LLC**

By: ___________________________
Name: _________________________
Title: __________________________

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ___________________________
Name: _________________________
Title: __________________________

**THIS INSTRUMENT PREPARED BY:**

_________________
_________________
_________________
Attention: _________

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED INSTRUMENTS**

See attached.

**EXHIBIT F**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**EXISTING COMMITMENTS**

Residue Gas Commitment Agreements

1. Firm Gas Transportation Agreement dated October 1, 2012 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any

2. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any

3. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any

4. Firm Intrastate Gas Transportation Agreement dated March 01, 2013 between Anadarko E&P Onshore, LLC and Springfield Pipeline, LLC and associated amendments if any

5. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

6. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

7. Firm Transportation Agreement dated October 05, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

11. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

Natural Gas Liquids Commitment Agreements

1. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

2. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

3. Firm Transportation Agreement dated October 01, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

4. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

5. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

6. Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any
7. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

# EXHIBIT G

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## TRANSPORTATION AND FRACTIONATION FEE

A. For the first four (4) Contract Years during the Term, T&F Fee (expressed in cents per gallon) shall mean the following:

T&F Fee (expressed in cents per gallon) = (Combined T&F Fee) + (.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

B. Beginning on the fourth (4th) anniversary of the Effective Date and continuing for the remainder of the Term, the T&F Fee shall be comprised of each of the following components:

(i) Transportation Fee: means the actual out-of-pocket cost for transportation of Producer's Products, including any (i) pipeline transportation or exchange fees; (ii) truck and tank car rental fees incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product; and (iii) any other out-of-pocket costs incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product (other than take or pay fees or demand charges), plus (ii) Fractionation Fee (expressed in cents per gallon) = (Base Fractionation Fee) + [(.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

where:

*Combined T&F Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product

*Base Fractionation Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product, adjusted annually beginning on the 5th anniversary of the Effective Date by multiplying the then effective Base Fractionation Fee by the FERC Index

*FERC Index* means the FERC Oil Pipeline Index "Multiplier to Use", as published by the Federal Energy Regulatory Commission pursuant to 18 CFR 342.3, or its successor index then in effect.

*Gas Price* means the sum of (i) the Houston Ship Channel-Index (HSC) as published in the first issue of such Month of INSIDE FERC's GAS MARKET REPORT (or any replacement thereof mutually agreeable to the Parties if it is no longer published), expressed in $/MMBtu, plus (ii) a market differential expressed in $/MMBtu, which is currently $0.15/MMBtu. Producer acknowledges that the market differential represents Carnero's best approximation of the costs reasonably to be incurred by a fractionator of all natural gas fuel being delivered to the fractionator in relation to the HSC Index, and

that Carnero may change the market differential as utilized in determining the T&F Fee as warranted by market conditions.

*Electricity Price* *means* the average cost of purchased electricity (expressed in dollars/kWh) at the fractionator for the Month prior to the Month in which Producer's Plant Products or Additional Plant Products were delivered to the fractionator.

*Execution Version*

**AMENDMENT TO**

**FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT**

This Amendment to Firm Gas Gathering, Processing and Purchase Agreement, (this "Amendment"), is effective as of the 1st day of April, 2018 (the "Effective Date") and is entered into by and among SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC (collectively the "Producers") and Carnero G&P LLC ("Carnero"). Carnero and each Producer are each referred to herein individually as a "Party" and collectively as the "Parties".

**Recitals**

A. Effective as of the Effective Date, SN EF Maverick, LLC and Carnero entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (the "FGGPPA").

B. Also effective as of the Effective Date, each of the other Producers ratified the FGGPPA pursuant to a Ratification Agreement, by and among such Producer, Carnero and SN EF Maverick, LLC (each, a "Ratification Agreement").

C. The Parties desire to amend the FGGPPA as set forth herein.

**Agreement**

For and in consideration of the foregoing and the mutual covenants and agreements contained herein and in the FGGPPA and the Ratification Agreements, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Amendment of FGGPPA. The FGGPPA is hereby amended as follows:

(a) The following definitions are inserted in Section 1.1 of the FGGPPA in appropriate alphabetic order:

""Carnero Group" has the meaning set forth in Section 7.1."

""Producer Group" has the meaning set forth in Section 7.2."

(b) Section 7.1 of the FGGPPA is deleted and replaced with the following:

"Section 7.1 Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully

responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination arising from: (i) such Gas while such Gas is within Producer's control and possession; (ii) the failure of Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof; or (iii) the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "CARNERO GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO GROUP)."

(c) Section 7.2 of the FGGPPA is deleted and replaced with the following:

"Section 7.2 Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, arising from: (i) such Gas while such Gas is within Carnero's control and possession (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof); or (ii) the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "PRODUCER GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING

TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP)."

2. Effectiveness. All matters contemplated in this Amendment will become effective, for all purposes, as of the Effective Date.

3. Effect on FGGPPA and Ratification Agreements. Except as expressly amended by this Amendment, the FGGPPA remains in full force and effect. The Parties acknowledge and agree that this Amendment shall in no manner impair or affect the validity or enforceability of the FGGPPA or any Ratification Agreement.

4. Counterparts. This Amendment may be executed in any number of counterparts (including by .pdf or other electronic means), each of which shall be an original but all of which together shall constitute one instrument.

**[Signature Pages Follow]**

The Parties have executed this Amendment as of the day and year first above written.

**CARNERO G&P LLC**

By: ______________________ GRS

Name: Patrick J. McDonie

Title: President

**SN EF MAVERICK, LLC**

By: ________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**EAGLE FORD TX LP**

By: ______________________

Name: Joo hyo Lee

Title: Treasury and Commercial Manager

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**GAVILAN RESOURCES, LLC**

By: ______________________

Name: David E. Roberts Jr.

Title: Chief Executive Officer

**VENADO EF L.P.**

By: ______________________

Name: Stacy Shivers

Title: VP of Operations

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

# Exhibit 2

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**SN EF UnSub LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF UnSub GP, LLC, the general partner of SN EF UnSub LP, a Delaware limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

**EXHIBIT A**

**DEDICATED INSTRUMENTS**

**All of Producer's right, title and interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce gas therefrom) located in Maverick, Webb, Dimmit and LaSalle Counties, Texas, including the instruments listed on the attached Exhibit A.**

# Exhibit 3

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case solely with respect to Producer's Share of such representations and warranties and obligations and subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, or otherwise satisfy Producer's Share of such payment or obligation; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Termination. This Agreement shall terminate in its entirety upon the earlier to occur of (i) termination of GGPA, or (ii) the mutual written agreement between Parties. Upon termination Producer shall not have any further obligations or liability under this Agreement beyond that prescribed in the GGPA.

10. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Eagle Ford TX LP**

By:________________________________
Name:
Title:

**Carnero G&P LLC**

By:________________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Eagle Ford TX LP**

By: [signature]
Name: Joohyo Lee
Title: Treasury and Commercial Manager

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ________________________________
Name:
Title:

**Eagle Ford TX LP**

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Eagle Ford TX LP, a Texas limited partnership, on behalf of said partnership.

_________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of _____________

## EXHIBIT A

## DEDICATED INSTRUMENTS

# Exhibit 4

**RATIFICATION AND ASSUMPTION AGREEMENT**

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

**RECITALS**

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

**AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as such term is defined in the GGPA). In addition, if Carnero seeks payment directly from Producer as

permitted in Section 5.8(c) of the GGPA, Producer will have the rights provided in Sections 5.10 and 5.11 of the GGPA to dispute such invoices and audit the records applicable to such invoices.

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By: Venado EF GP LLC, its general partner

By:______________________________
Name: Stacy L. Shivers
Title: Vice President – Operations

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:____________________________
Name:
Title:

**Venado EF L.P.**

By:____________________________
Name:
Title:

**Carnero G&P LLC**

By: [signature] GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Venado EF L.P.**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Venado EF L.P., a Delaware limited partnership, on behalf of said partnership.

_________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of _____________

**EXHIBIT A**

**DEDICATED INSTRUMENTS**

# Exhibit 5

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is dated May 22, 2018, to be effective as of April 1, 2018, by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name: David E. Roberts Jr.
Title: Chief Executive Officer

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is dated May ____, 2018, to be effective as of April 1, 2018 (the "Effective Date"), by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**Gavilan Resources, LLC**

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_____________________________________
Notary Public, State of _____________

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED ACREAGE**

**Maverick, Webb, Dimmit and LaSalle Counties, Texas**

**The area circled in red in the below diagram**



# Exhibit 6

MEPTX
Mitsui E&P Texas LP

SN EF Maverick, LLC
1000 Main St. Suite 3000
Houston, TX 77002
Attn: John Happ

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: Patrick McDonie

Attn: Mr. John Happ and Mr. Patrick McDonie

RE: Retained Take-In-Kind Rights of Mitsui E&P Texas LP in Volumes Committed to the Raptor Gas Processing Facility in La Salle County, Texas

This Letter Agreement ("Agreement") is hereby entered into by and among Mitsui E&P Texas LP, a Texas Limited Partnership ("Mitsui") and SN EF Maverick, LLC, a Delaware Limited Liability Company ("Sanchez") and Carnero G&P LLC, a Delaware Limited Liability Company ("Carnero"), dated this ___ day of April, 2018 and effective as of April 1, 2018 ("Effective Date"). Mitsui, Sanchez and Carnero may be referred to herein individually as "Party", or collectively as "Parties.

Whereas, Mitsui and Sanchez are now parties to that certain Maverick Natural Gas Liquids Marketing Agreement dated effective January 1st, 2012, and that certain Maverick Residue Gas Marketing Agreement dated effective January 1st, 2012 (the "PMAs"), and said PMAs give broad powers to Sanchez as a marketer of Mitsui's share of gas and natural gas liquids (collectively, "Products") produced from the contract areas of seventeen joint operating agreements to which both Mitsui and Sanchez are parties ("Comanche Area"), and said marketing powers include the ability to enter into certain contracts with third parties covering the gathering, treating, processing, transportation, etc., of Mitsui's Products ("Commitment Agreements").

Whereas, if Mitsui rejects a Commitment Agreement per the PMAs, then said Commitment Agreement is deemed a "Rejected Commitment Agreement" under the PMAs, and Mitsui retains the right to take-in-kind its Products as to any excess volumes over and above the volumes committed pursuant to that particular Rejected Commitment Agreement.

Whereas, Sanchez is now considering entering into a Firm Gas Gathering Processing and Purchase Agreement with Carnero for gas produced from the Comanche Area ("the FGGPPA"), and the FGGPPA would be considered a new Commitment Agreement under the PMAs requiring a written election by Mitsui to either approve or reject the FGGPPA.

Whereas, prior to the inception of the FGGPPA, Mitsui rejected a Commitment Agreement dated September 1st, 2016 committing an aggregate of 299,000 MMBtus/day in volumes in the Comanche Area to the Brasada gas processing plant currently owned by WGR Operating, LP in La Salle County, Texas, resulting in Mitsui's ability to take its Products in-kind as to any volumes in excess of the 299,000 MMBtus/day committed to the Brasada plant ("Mitsui Excess Production").

Now, therefore, in consideration of the premises and covenants contained herein, the Parties hereby agree as follows:

1. In accordance with the election procedures provided for in the PMAs, Mitsui shall hereby agree to grant in writing via a ballot its consent to, and acceptance of, Sanchez entering into the FGGPPA with Carnero, resulting in the FGGPPA becoming a Commitment Agreement under the PMAs. However, irrespective of the FGGPPA's status as an accepted Commitment Agreement under the PMAs and of any terms of the PMAs to the contrary, subject to Paragraph 2. below, Mitsui shall retain its right to take the Mitsui Excess Production in-kind throughout the "Initial Term" of the FGGPPA (as said term is defined in the FGGPPA).

2. Notwithstanding Mitsui's retained right to take the Mitsui Excess Production in-kind pursuant to Paragraph 1. above, and subject to Paragraph 3. below, Mitsui hereby agrees and promises to not exercise its right to take the Mitsui Excess Production in-kind during the entire Initial Term of the FGGPPA, to the extent such Mitsui Excess Production would be dedicated to the FGGPPA under the terms thereof as if Mitsui had ratified the FGGPPA as a Comanche Producer (as defined in the FGGPPA).

3. It is hereby understood by the Parties that if, during the Initial Term, the FGGPPA is subsequently amended or the terms thereof waived by Sanchez and Carnero without Mitsui's prior written consent (but excluding elections or actions expressly contemplated by Section 2.1 (to the extent providing for connection of Additional CGPs, new wells or Released Wells within the Dedicated Acreage), Section 3.1 (to the extent providing for releases of volumes of Gas), Section 3.3(a) (to the extent authorizing reductions in MDQ), Section 3.7 (relating to ethane rejection/recovery elections), Section 5.9 (to the extent providing for annual adjustments in fees), Section 10.1(c) (to the extent providing for modification of specifications based upon specifications of Redelivery Pipelines or T2 Pipeline) and Section 10.4(b)(vii) (to the extent adopting revised GPA standards) of the FGGPPA), and said amendment or waiver is:

a. Adverse or disadvantageous to Mitsui's interests or the marketing of Mitsui's Products as determined by Mitsui in its reasonable discretion, when such amendment or waiver addresses:

   i. Fees (other than implementation of the existing annual adjustment in Section 5.9);
   ii. Purchase price for Plant Products, Additional Plant Products and Condensate;
   iii. Imbalance cash out arrangements and the Cashout Price;
   iv. Treatment of disputed billing statements and audit rights;
   v. Plant Products, Additional Plant Products and Condensate allocation procedures in Exhibit C;
   vi. Change to the Dedicated Acreage (other than as a result of lease termination);
   vii. Elimination of any Receipt Point or Delivery Point;
   viii. Change to the Maximum Daily Quantity, or Maximum Receipt Capacity for any Receipt Point, other than pursuant to Section 3.3;
   ix. Alteration of Carnero's obligations described in Section 3.2 or 11.5;
   x. Procedures, costs and standards for connection of new wells and Additional CGPs as set out in Section 2.1;
   xi. Producer's reservations in Section 2.3;
   xii. Treatment of Subject Volumes not accepted, as described in Section 3.1(c) or Producer's Gas volumes not accepted as a result of Force Majeure or other reasons under Sections 3.1(d), (e) and (f) and Section 11.4, or otherwise;
   xiii. Priorities, whether under Section 3.3(b), Section 3.5, or otherwise; or
   xiv. Term of the Agreement; or

b. materially adverse or materially disadvantageous to Mitsui's interests or the marketing of Mitsui's Products in cases other than those set forth in Paragraph 3(a),

(each such amendment or waiver, an "Amendment"), then Sanchez and Carnero may proceed with the Amendment; however Paragraph 2. above shall no longer have any force or effect, and Mitsui shall again have the right to take the Mitsui Excess Production in-kind. This right to take-in-kind by Mitsui shall take effect sixty (60) days from the effective date of any Amendment which Mitsui did not consent to in writing. Notwithstanding the preceding, before exercising its right to take in kind under this Agreement, Mitsui shall send notice to Sanchez and Carnero, and Sanchez and Carnero shall have thirty (30) days following receipt of notice (which may fall within the sixty (60) day period noted above) in which to retract the Amendment, revise the Amendment so it does not apply in any manner to Mitsui and Mitsui's Products, or reach an alternate solution accepted by Mitsui in writing, in which case the right to take in kind shall no longer apply with respect to that specific Amendment (without prejudice to Mitsui's rights with respect to any subsequent proposed amendment or waiver). If sixty (60) days have passed since the effective date of the relevant Amendment, and the thirty (30) day cure period for Sanchez and Carnero under the preceding sentence has passed

without resolution, then Mitsui is free to commence taking the Mitsui Excess Production in kind, notwithstanding any provisions of the PMAs to the contrary..

4. Provided that the consent requirement of Paragraph 3. above is complied with at all times, in the event the PMAs expire, in whole or in part, prior to the expiration of the Initial Term of the FGGPPA, then Mitsui agrees that Sanchez can continue to market Mitsui's Products to the extent necessary and required by the FGGPPA throughout the entire Initial Term of the FGGPPA and Mitsui will execute a mutually-acceptable form of agreement with Sanchez providing for such rights.

5. Provided that the consent requirement of Paragraph 3. above is complied with at all times, Mitsui agrees that, without prejudice to any other rights it may have against Sanchez for any default or failure to perform its duties and obligations under the PMAs with respect to the FGGPPA ("Default"), Mitsui will not suspend deliveries of gas under, or otherwise suspend performance under, or terminate, any PMA in a manner that would impact Sanchez's performance of or ability to perform its then-existing commitments under the FGGPPA due to any default by Sanchez that is capable of being cured by Carnero without first notifying Carnero in writing of the details of any such Default with reasonable specificity, providing Carnero a copy of the applicable PMA, and providing Carnero 30 days (or in the case of a payment default, 10 business days) following Carnero's receipt of such notice to cure such Default on behalf of Sanchez. If Carnero, in its sole discretion, cures the Default within such 30-day (or in the case of a payment default, 10 business day) period in accordance with the terms of the applicable PMA, the Default will be deemed cured in accordance with the applicable PMA and Mitsui will not have any further right (to the extent arising due to that cured Default) to suspend performance under, or otherwise terminate, the applicable PMA.

6. So long as Mitsui is not exercising its right to take Mitsui Excess Production in-kind and the FGGPPA is still in effect, Carnero agrees that, without prejudice to any other rights it may have in respect of any default by Sanchez under the FGGPPA, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA in a manner that would impact Mitsui's production, marketing and sale of Products, or ability to produce, market and sell Products, due to any default by Sanchez that is capable of being cured by Mitsui without first notifying Mitsui in writing of the nature and details of such default with reasonable specificity and providing Mitsui 30 days (or in the case of a payment default, 10 business days) following Mitsui's receipt of such notice to cure such default, including the right to step into the position of Sanchez and assume the obligations and responsibilities of Sanchez hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share of such responsibilities and obligations. If Mitsui, in its sole discretion, cures the default within such 30 day (or in the case of a payment default, 10 business day) period in accordance with the terms of the FGGPPA, then as to Mitsui, the default will be deemed cured in accordance with the FGGPPA and Sanchez and Carnero will not (to the extent arising due to the cured default) suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA with respect to Mitsui's Producer's Share. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Comanche

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By: [signature]

Its: SVP & COO

Dated: May 9th, 2018

SN EF Maverick, LLC

By:____________________

Its:____________________

[initials]

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:______________________________

Its:______________________________

Dated:____________________________

SN EF Maverick, LLC

By: [signature]
Antonio R. Sanchez, III

Its: Chief Executive Officer

Dated:______________________________

Carnero G&P LLC

By:__________________________________

Its:__________________________________

Dated:______________________________

Dated:______________________________

Carnero G&P LLC

By: [signature] GPS

Its: President

Dated:______________________________

# Exhibit 7

Court Type = District | Section Type = Civil | Court = All Courts
County = Harris | From Date = 01/01/2020 | To Date = 12/31/2020

| Row Name | Injury or Damage - Motor Vehicle | Injury or Damage - Medical Malpractice | Injury or Damage - Other Professional Malpractice | Injury or Damage - Product Liability - Asbestos Silica | Injury or Damage - Other Product Liability | Injury or Damage - Other Injury or Damage | Real Property - Eminent Domain | Real Property - Other Real Property | Contract - Consumer/Commercial/Debt | Contract - Other Contract | Civil Cases Relating to Criminal Matters | All Other Civil Cases | Tax Cases | Total Cases |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cases Pending First of Month Active Cases | 19310 | 456 | 87 | 234 | 212 | 4154 | 72 | 10754 | 6509 | 2566 | 8691 | 3559 | 12005 | 68609 |
| Cases Pending First of Month Inactive Cases | 1038 | 34 | 16 | 4 | 17 | 305 | 1 | 540 | 789 | 361 | 324 | 244 | 351 | 4024 |
| New Cases Filed | 12737 | 261 | 38 | 39 | 80 | 2685 | 38 | 6688 | 6082 | 2341 | 10368 | 3953 | 6575 | 51885 |
| Cases Reactivated | 2491 | 68 | 20 | 4 | 23 | 529 | 8 | 1973 | 656 | 257 | 1185 | 309 | 1869 | 9392 |
| All Other Cases Added | 313 | 4 | 1 | 3 | 3 | 93 | 1 | 82 | 223 | 99 | 37 | 471 | 36 | 1366 |
| Total Cases Disposed | 10558 | 205 | 48 | 36 | 74 | 2296 | 53 | 6830 | 5225 | 2590 | 5846 | 3306 | 5153 | 42220 |
| Cases Placed on Inactive Status | 2592 | 55 | 12 | 2 | 19 | 595 | 8 | 1951 | 689 | 321 | 1262 | 361 | 1591 | 9458 |
| Cases Pending End of Month Active Cases | 21889 | 535 | 89 | 252 | 244 | 4607 | 59 | 10756 | 7639 | 2381 | 10276 | 4633 | 13508 | 76868 |
| Cases Pending End of Month Inactive Cases | 1147 | 24 | 9 | 2 | 14 | 375 | 1 | 530 | 821 | 424 | 399 | 292 | 184 | 4222 |
| Age of Cases Disposed | 3 Months or Less | Over 3 to 6 Months | Over 6 to 12 Months | Over 12 to 18 Months | Over 18 Months | Total Cases | | | | | | | | |
| Number of Cases | 5230 | 5984 | 10826 | 8245 | 11935 | 42220 | | | | | | | | |
| Change of Venue Transfers | 8 | 0 | 0 | 0 | 1 | 5 | 0 | 0 | 6 | 2 | 0 | 4 | 0 | 26 |
| Default Judgments | 201 | 0 | 1 | 0 | 0 | 37 | 0 | 83 | 1072 | 512 | 190 | 250 | 1381 | 3727 |
| Findings of Delinquent Conduct | 3253 | 50 | 11 | 1 | 15 | 667 | 10 | 5484 | 914 | 519 | 2028 | 755 | 85 | 13792 |
| Summary Judgments Disposing Of Cases | 111 | 8 | 6 | 1 | 2 | 89 | 0 | 70 | 362 | 86 | 1 | 110 | 2 | 848 |
| Final Judgments After Non Jury Trial | 16 | 0 | 0 | 0 | 0 | 14 | 22 | 24 | 70 | 20 | 44 | 104 | 542 | 856 |
| Final Judgments by Jury Verdicts | 64 | 3 | 0 | 0 | 0 | 6 | 0 | 4 | 21 | 9 | 0 | 9 | 0 | 116 |
| Final Judgments by Directed Verdicts or JNOV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Cases Dismissed for Want of Prosecution | 1049 | 8 | 5 | 2 | 7 | 185 | 1 | 135 | 475 | 140 | 77 | 290 | 317 | 2691 |
| Cases Non Suited or Dismissed By Plaintiff | 3139 | 63 | 13 | 29 | 19 | 549 | 5 | 440 | 1061 | 508 | 12 | 709 | 2555 | 9102 |
| All Other Dispositions | 2717 | 73 | 12 | 3 | 30 | 744 | 15 | 590 | 1244 | 794 | 3494 | 1074 | 271 | 11061 |
| Total Cases Disposed | 10558 | 205 | 48 | 36 | 74 | 2296 | 53 | 6830 | 5225 | 2590 | 5846 | 3306 | 5153 | 42220 |
| Additional Court Activity | Total Cases | | | | | | | | | | | | | |
| Cases in which Jury Selected | 129 | | | | | | | | | | | | | |
| Cases in which Mistrial Declared | 7 | | | | | | | | | | | | | |
| Injunction or Show Cause Order Issued | 2281 | | | | | | | | | | | | | |
| Cases in which Plaintiff or Petitioner Represented Self | 2511 | | | | | | | | | | | | | |

Court Type = District
County = Harris

Section Type = Civil Court = All Courts
From Date = 01/01/2021 To Date = 12/31/2021

| Row Name | Injury or Damage - Motor Vehicle | Injury or Damage - Medical Malpractice | Injury or Damage - Other Professional Malpractice | Injury or Damage - Product Liability - Asbestos Silica | Injury or Damage - Other Product Liability | Injury or Damage - Other Injury or Damage | Real Property - Eminent Domain | Real Property - Other Real Property | Contract - Consumer/Commercial/Debt | Contract - Other Contract | Civil Cases Relating to Criminal Matters | All Other Civil Cases | Tax Cases | Total Cases |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cases Pending First of Month Active Cases | 21895 | 536 | 89 | 251 | 245 | 4617 | 59 | 10758 | 7643 | 2388 | 9860 | 4633 | 13500 | 76474 |
| Cases Pending First of Month Inactive Cases | 1155 | 23 | 9 | 2 | 14 | 376 | 1 | 530 | 824 | 423 | 404 | 291 | 184 | 4236 |
| New Cases Filed | 13935 | 277 | 26 | 31 | 60 | 3206 | 16 | 7344 | 5869 | 2068 | 13638 | 3634 | 6990 | 57094 |
| Cases Reactivated | 3004 | 46 | 10 | 0 | 16 | 684 | 4 | 2014 | 859 | 310 | 1331 | 400 | 1486 | 10164 |
| All Other Cases Added | 330 | 4 | 2 | 5 | 5 | 219 | 1 | 85 | 161 | 58 | 45 | 540 | 31 | 1486 |
| Total Cases Disposed | 12179 | 203 | 43 | 30 | 70 | 2550 | 30 | 7217 | 6095 | 2223 | 7702 | 3868 | 6508 | 48718 |
| Cases Placed on Inactive Status | 3157 | 62 | 9 | 3 | 14 | 741 | 5 | 1834 | 845 | 348 | 1335 | 431 | 1398 | 10182 |
| Cases Pending End of Month Active Cases | 23912 | 593 | 77 | 251 | 244 | 5435 | 46 | 11166 | 7629 | 2304 | 10844 | 4855 | 13947 | 81303 |
| Cases Pending End of Month Inactive Cases | 1363 | 36 | 8 | 5 | 14 | 438 | 2 | 379 | 819 | 470 | 410 | 329 | 172 | 4445 |
| Age of Cases Disposed | 3 Months or Less | Over 3 to 6 Months | Over 6 to 12 Months | Over 12 to 18 Months | Over 18 Months | Total Cases | | | | | | | | |
| Number of Cases | 5350 | 6380 | 10716 | 7827 | 18445 | 48718 | | | | | | | | |
| Change of Venue Transfers | 6 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 3 | 1 | 0 | 0 | 0 | 14 |
| Default Judgments | 207 | 0 | 0 | 0 | 1 | 51 | 0 | 80 | 1291 | 360 | 370 | 342 | 1106 | 3808 |
| Findings of Delinquent Conduct | 3086 | 37 | 11 | 1 | 10 | 681 | 13 | 5906 | 923 | 449 | 2367 | 950 | 72 | 14506 |
| Summary Judgments Disposing Of Cases | 120 | 2 | 7 | 1 | 1 | 75 | 0 | 59 | 304 | 67 | 0 | 120 | 2 | 758 |
| Final Judgments After Non Jury Trial | 20 | 0 | 0 | 0 | 0 | 11 | 8 | 29 | 93 | 22 | 34 | 101 | 435 | 753 |
| Final Judgments by Jury Verdicts | 34 | 2 | 0 | 0 | 1 | 8 | 0 | 4 | 4 | 4 | 0 | 5 | 0 | 62 |
| Final Judgments by Directed Verdicts or JNOV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cases Dismissed for Want of Prosecution | 1861 | 22 | 10 | 1 | 7 | 319 | 3 | 188 | 995 | 179 | 149 | 535 | 1057 | 5326 |
| Cases Non Suited or Dismissed By Plaintiff | 1708 | 33 | 4 | 23 | 13 | 361 | 0 | 144 | 575 | 258 | 22 | 404 | 3444 | 6989 |
| All Other Dispositions | 5137 | 107 | 11 | 4 | 37 | 1040 | 6 | 807 | 1907 | 883 | 4760 | 1411 | 392 | 16502 |
| Total Cases Disposed | 12179 | 203 | 43 | 30 | 70 | 2550 | 30 | 7217 | 6095 | 2223 | 7702 | 3868 | 6508 | 48718 |
| Additional Court Activity | Total Cases | | | | | | | | | | | | | |
| Cases in which Jury Selected | 145 | | | | | | | | | | | | | |
| Cases in which Mistrial Declared | 1 | | | | | | | | | | | | | |
| Injunction or Show Cause Order Issued | 2457 | | | | | | | | | | | | | |
| Cases in which Plaintiff or Petitioner Represented Self | 2631 | | | | | | | | | | | | | |

# Exhibit 8

**Table F.**
**U.S. Bankruptcy Courts—Bankruptcy Cases Commenced, Terminated and Pending**
**During the 12-Month Periods Ending December 31, 2020 and 2021**

| Circuit and District | Filed | | | Terminated | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | Percent Change [1] | 2020 | 2021 | Percent Change [1] | 2020 [2] | 2021 | Percent Change [1] |
| **Total** | **544,463** | **413,616** | **-24.0** | **681,480** | **546,938** | **-19.7** | **862,627** | **729,287** | **-15.5** |
| **5th** | **42,977** | **31,977** | **-25.6** | **56,724** | **46,494** | **-18.0** | **90,503** | **75,989** | **-16.0** |
| LA,E | 2,202 | 1,537 | -30.2 | 3,194 | 2,272 | -28.9 | 5,969 | 5,234 | -12.3 |
| LA,M | 882 | 641 | -27.3 | 1,393 | 1,083 | -22.3 | 1,816 | 1,374 | -24.3 |
| LA,W | 4,558 | 3,871 | -15.1 | 7,287 | 6,999 | -4.0 | 18,057 | 14,929 | -17.3 |
| MS,N | 3,639 | 2,563 | -29.6 | 4,908 | 3,991 | -18.7 | 9,539 | 8,111 | -15.0 |
| MS,S | 4,973 | 3,603 | -27.5 | 6,948 | 4,970 | -28.5 | 10,155 | 8,788 | -13.5 |
| TX,N | 8,689 | 6,574 | -24.3 | 11,109 | 8,725 | -21.5 | 12,966 | 10,817 | -16.6 |
| TX,E | 4,366 | 3,356 | -23.1 | 5,310 | 4,373 | -17.6 | 7,917 | 6,901 | -12.8 |
| TX,S | 7,796 | 5,381 | -31.0 | 9,072 | 8,226 | -9.3 | 15,485 | 12,640 | -18.4 |
| TX,W | 5,872 | 4,451 | -24.2 | 7,503 | 5,855 | -22.0 | 8,599 | 7,195 | -16.3 |

NOTE: Due to differences among districts in reporting intra-district transfers, the total provided above for cases pending at the end of the last Reporting Period may not equal the number obtained by adding totals for cases pending at the end of the prior period plus cases filed during the current period, then subtracting cases terminated during the current period. The United States territorial courts assume the jurisdiction of United States bankruptcy courts within their respective territories, which do not have separate bankruptcy courts.

[1] Percent change not computed when fewer than 10 cases reported for the previous period.

[2] Revised.

[3] The United States Bankruptcy Court for Arkansas (AR) includes both the Eastern and Western Districts of Arkansas.

**Table F-8.**
**U.S. Bankruptcy Courts––Adversary Proceedings Commenced, Terminated, and Pending Under the Bankruptcy Code, During the 12-Month Periods Ending December 31, 2020 and 2021**

| Circuit and District | Filings | | | Terminations | | | Pending | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2020 | 2021 | Percent Change[1] | 2020 | 2021 | Percent Change[1] | 2020[2] | 2021 | Percent Change[1] |
| **Total** | **20,326** | **15,100** | **-25.7** | **21,124** | **18,534** | **-12.3** | **23,111** | **19,675** | **-14.9** |
| **5th** | **1,762** | **2,364** | **34.2** | **1,733** | **1,460** | **-15.8** | **2,449** | **3,352** | **36.9** |
| LA,E | 79 | 47 | -40.5 | 105 | 52 | -50.5 | 91 | 86 | -5.5 |
| LA,M | 66 | 35 | -47.0 | 61 | 47 | -23.0 | 35 | 23 | -34.3 |
| LA,W | 82 | 79 | -3.7 | 142 | 99 | -30.3 | 95 | 74 | -22.1 |
| MS,N | 76 | 39 | -48.7 | 69 | 54 | -21.7 | 68 | 53 | -22.1 |
| MS,S | 92 | 46 | -50.0 | 122 | 80 | -34.4 | 75 | 41 | -45.3 |
| TX,N | 373 | 229 | -38.6 | 366 | 328 | -10.4 | 434 | 335 | -22.8 |
| TX,E | 131 | 172 | 31.3 | 144 | 144 | 0 | 137 | 165 | 20.4 |
| TX,S | 561 | 1,475 | 162.9 | 506 | 351 | -30.6 | 1,279 | 2,403 | 87.9 |
| TX,W | 302 | 242 | -19.9 | 218 | 305 | 39.9 | 235 | 172 | -26.8 |

NOTE: National and circuit totals are derived from the totals for the districts named in this table.
[1] Percent change not computed when fewer than 10 cases reported for the previous period.
[2] Revised
[3] The United States Bankruptcy Court for Arkansas (AR) includes both the Eastern and Western Districts of Arkansas. The United States territorial courts assume the jurisdiction of United States bankruptcy courts within their respective territories, which do not have separate bankruptcy courts.

# Exhibit 9

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**Affidavit of Amy C. Falcon**

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

BEFORE ME, the undersigned authority, on this day personally appeared Amy C. Falcon having been by me first duly sworn according to law, upon his oath did depose and say the following:

1. "My name is Amy C. Falcon, and I am over the age of twenty-one. I am fully qualified to make this affidavit. I verify that the factual statements contained in this affidavit are based upon my personal knowledge and are true and correct.

2. I am an attorney duly licensed in the State of Texas since May 2009. I am also admitted to practice before the United States District Courts for the Northern, Southern, and Western Districts of Texas. I am a Partner at the law firm of Porter Hedges, LLP ("Porter Hedges"), where I have practiced for approximately 11 years. I am one of the attorneys representing Plaintiff

---

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Carnero G&P, LLC in the above styled action. I have been involved in drafting Carnero's Motion to Remand to State Court or for Abstention ("Motion") filed concurrently with this affidavit.

3. In support of that motion, I personally accessed the Texas Office of Court Administration data and records located at https://card.txcourts.gov/ (note that you must use Internet Explorer to run the reports). From that website, I downloaded the official case statistics for the State district courts of Harris County, Texas. That is the county where the lawsuit styled *Carnero G&P LLC v. SN EF UnSub, LP, et al.*, Cause No 2022-04224, in the 215th Judicial District Court, Harris County, Texas ("State Court Lawsuit") is pending. **Exhibit 7** to the Motion is a true and accurate copy of the Report: District Court Activity Detail for the period January 2020 through December 2021 for Harris County, Texas,[2] exported to Excel and formatted to print the data for the civil district courts.

4. I personally accessed the United States Courts Caseload Statistics Data Tables located at https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables. From that website, I downloaded the spreadsheet Table F – Bankruptcy Filings (December 31, 2021) showing U.S. Bankruptcy Courts-Bankruptcy Cases Filed, Terminated, and Pending During the 12-Month Periods Ending December 31, 2020 and 2021 and Table F-8 U.S. Bankruptcy Courts-Adversary Proceedings Commenced, Terminated, and Pending Under the Bankruptcy Code, During the 12-Month Periods Ending December 31, 2020 and 2021.[3] **Exhibit 8** to the Motion is a true and accurate copy of those reports, exported to Excel and formatted to print the data for the Southern District of Texas only."

Amy C Falcon
**Amy C. Falcon**
**Attorney for Plaintiff Carnero G&P LLC**

STATE OF TEXAS §
§
COUNTY OF HARRIS §

**SUBSCRIBED AND SWORN BEFORE ME** on this 29th day of March, 2022, to certify which witness my hand and official seal. This notarial act was an online notarization.

BRENDA K GORMAN
5717218
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
FEBRUARY 9, 2023

Notary Public in and for the State of Texas

My Commission expires: ___________

[2] *See* https://card.txcourts.gov/ReportCriteria.aspx?ddlReportName=119&ddlReportType=5018&ddlReportPeriod= using search criteria From Year: 2020, From Month: January. To Year: 2021, To Month December, County Harris, Court All, Format Export to MS Excel (do not check separate monthly report box).

[3] *See* https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

## Order Granting Adversary Plaintiff Carnero G&P, LLC's Motion to Remand to State Court or for Abstention

[Relates to Docket No.__]

Pending before this Court is Adversary Plaintiff Carnero G&P, LLC's Motion to Remand to State Court or for Abstention pursuant to 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas to return this Adversary Proceeding to the 215th Judicial District Court, Harris County, Texas. After considering the motion, the response, and any reply, the pertinent pleadings, the evidence, and the argument of counsel, the Court finds that the motion should be granted. It is therefore **ORDERED** that:

1. Pursuant to 28 U.S.C. § 1334(b), this Court lacks jurisdiction to hear this Adversary Proceeding, which is hereby remanded to the 215th Judicial District Court of Harris County, Texas;

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. In the alternative, pursuant to 28 U.S.C §§ 1334(c) and 1452 (b), the Court abstains from hearing the Adversary Proceeding, which is hereby remanded to the 215th Judicial District Court of Harris County, Texas; and

3. Upon entry of this Order, the Adversary Proceeding is hereby closed.

DATED: _____________, 2022

_________________________________
**Honorable Marvin Isgur**
**United States Bankruptcy Judge**

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508[2] |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**Adversary Plaintiff's Supplement to Its**
**Motion to Remand to State Court or for Abstention**
(Related to Dkt. No. 6)

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Adversary Plaintiff Carnero G&P LLC ("Carnero") files this Supplement to Its Motion to Remand to State Court or for Abstention to correct an inadvertent factual error:

---

1 The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2 Referred to as "Main Case" in docket entry references.

In Paragraph 10 in its Motion to Remand to State Court or for Abstention [Dkt. 6], made the following factual assertions:

> 10. At a December 21, 2021 hearing in the Oxy Adversary, the Court entered a Stipulation and Agreed Order between Maverick/Mesquite and the plaintiffs ("Agreed Order") [Main Case Dkt. 2253] that settled the case for $50 million paid to Maverick/Mesquite in exchange for undisclosed amendments made to the Existing Commitments ("Oxy/Wes Settlement").

The Oxy/Wes Settlement resulted in Maverick/Mesquite paying settlement funds to Springfield Pipeline LLC. As a result, Carnero corrects paragraph 10 as follows:

> 10. At a December 21, 2021 hearing in the Oxy Adversary, the Court entered a Stipulation and Agreed Order between Maverick/Mesquite and the plaintiffs ("Agreed Order") [Main Case Dkt. 2253] that settled the case for approximately $50 million paid **by** Maverick/Mesquite in exchange for undisclosed amendments made to the Existing Commitments ("Oxy/Wes Settlement").

With this correction to paragraph 10, Carnero amends its argument in Paragraph 18 as follows:

> 18. Defendants also claim only this Court should hear the State Court Lawsuit because the amendments "benefited the estate" and Carnero's claims permit it to get a windfall "at the expense of the estate." That claim is without merit because after confirmation, no estate exists. *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). In terms of jurisdiction over Carnero's claims, whether the amendments to the

Existing Commitments benefitted the estate is irrelevant. Maverick/Mesquite paid the settlement funds in the Oxy Adversary under 11 U.S.C. § 365 as a cure amount in connection with the assumption of the Springfield Agreements. [Main Case Dkt. 2245 ¶ 10]. The Court had jurisdiction to enter the Stipulation and Agreed Order in the Oxy Adversary because a cure claim can only arise under title 11. *See* 11 U.S.C. § 365(b)(1)(A); *In re O'Brien Envtl. Energy, Inc.*, 188 F.3d 116, 124 (3d Cir. 1999) ("determining the amount necessary to cure existing defaults is necessarily related to the assumption or rejection of executory contracts"). In contrast, Carnero withdrew its claims in the main bankruptcy case and Carnero's claims in the State Court Lawsuit are neither cure claims nor rejection claims—they are new post-assumption breach of contract claims. The state law contract claims in the State Court Lawsuit arise from the Reorganized Debtors' post-confirmation actions. Therefore, any recovery to Carnero in the State Court Lawsuit would not be "at the expense of the estate." The resolution of the State Court Lawsuit will have no effect on the non-existent estate. Defendants' phantom complaints do not create jurisdiction in this Court.

Dated: April 4, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on April 4, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**APPEAL, APPEAL_NAT**

**U.S. Bankruptcy Court**
**Southern District of Texas (Houston)**
**Adversary Proceeding #: 22-03035**

*Assigned to:* Bankruptcy Judge Marvin Isgur
*Lead BK Case:* 19-34508
*Lead BK Title:* Sanchez Energy Corporation, et al
*Lead BK Chapter:* 11
*Demand:*

*Date Filed:* 02/28/22
*Date Removed From State:* 02/28/22

*Nature[s] of Suit:* 01 Determination of removed claim or cause

***Plaintiff***
**-----------------------**

**Carnero G&P, LLC**

represented by **Amy Coates Falcon**
Porter Hedges LLP
1000 Main St
Ste 3600
Houston, TX 77002
713-226-6681
Email: afalcon@porterhedges.com
*LEAD ATTORNEY*

**Eugene Montgomery Nettles**
Porter & Hedges
1000 Main St
36th Floor
Houston, TX 77002-2764
713-226-6609
Fax : 713-226-6209
Email: enettles@porterhedges.com
*LEAD ATTORNEY*

**Joshua W. Wolfshohl**
Porter Hedges LLP
1000 Main, 36th Floor
Houston, TX 77002
713-226-6000
Fax : 713-228-1331
Email: jwolfshohl@porterhedges.com
*LEAD ATTORNEY*

V.

***Defendant***
**-----------------------**

**SN EF UnSub, LP**
1111 Bagby Street

represented by **Paul M Basta**
Paul, Weiss, Rifkind, Wharton & Garrison

Suite 2050
Houston, TX 77002

1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3000
Email: pbasta@paulweiss.com
*LEAD ATTORNEY*

**Alice Belisle Eaton**
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
212-373-3000
Fax : 212-492-0125
Email: aeaton@paulweiss.com
*LEAD ATTORNEY*

**Andrew Ehrlich**
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019-6064
212-373-3166
Email: aehrlich@paulweiss.com
*LEAD ATTORNEY*

**Sean Anthony Mitchell**
Paul Weiss et al
1285 Ave of the Americas
New York, NY 10019
212-373-3740
Email: mtattnall@paulweiss.com
*LEAD ATTORNEY*

**Thomas Andrew Woolley, III**
McCloskey Roberson Woolley, PLLC
190 T.C. Jester, Suite 400
Houston, TX 77007
713-337-3900
Fax : 713-337-3915
Email: rwoolley@mrwpllc.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**Eagle Ford TX LP**
5599 San Felipe Road
Suite 725
Houston, TX 77056

represented by **Julia Frost-Davies**
Morgan Lewis & Bockius LLP
One Federal St
Boston, MA 02115
617-341-7700
Email: julia.frost-davies@morganlewis.com
*LEAD ATTORNEY*

**Amy L Kyle**
Morgan Lewis & Bockius LLP
One Federal St

Boston, MA 02115
617-951-8288
Email: amy.kyle@morganlewis.com
*LEAD ATTORNEY*

**Michelle Dawn Pector**
Morgan Lewis Bockius LLP
1000 Louisiana St
Ste 4000
Houston, TX 77002
713-890-5455
Email: michelle.pector@morganlewis.com
*LEAD ATTORNEY*

**Jared Wilkerson**
Morgan Lewis & Bockius LLP
100 Louisiana Street
Houston, TX 770002
713-890-5460
Email: jared.wilkerson@morganlewis.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Venado EF L.P.**
13215 Bee Cave Pkwy.
Suite B-350
Austin, TX 78738
***aka* Javelin EF L.P.**

represented by **Sydney Corry**
Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
253-455-6202
Email: sydney.corry@kirkland.com
*LEAD ATTORNEY*

**Conor P. McNamara**
Kirkland & Ellis LLP
Kirkland & Ellis International LLP
300 N. LaSalle
Chicago, IL 60654
312-86202000
Email: conor.mcnamara@kirkland.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**
**Mitsui E&P Texas LP**
1300 Post Oak Blvd.
Suite 1800
Houston, TX 77056

represented by **Duston K McFaul**
SIdley Austin LLP
1000 Louisiana St.
Suite 5900
Houston, TX 77002
713-495-4500
Fax : 713-495-7799
Email: dmcfaul@sidley.com
*LEAD ATTORNEY*

**Maegan Quejada**
Sidley Austin LLP
1000 Louisiana St
Ste 5900
Houston, TX 77002
713-495-4618
Email: mquejada@sidley.com
*LEAD ATTORNEY*

***Defendant***
**-----------------------**

**SN EF Maverick, LLC**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
Foley & Lardner LLP
1000 Louisiana Street
Suite 2000
Houston, Tx 77002
713-276-5086
Email: sbeausoleil@foley.com

**Joseph Bretschneider**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Email: jbretschneider@willkie.com
*LEAD ATTORNEY*

**Sara Ann Brown**
Thompson Coburn LLP
2100 Ross Avenue
Ste 3200
Dallas, TX 75201
972-629-7100
Fax : 972-629-7171
Email: sbrown@thompsoncoburn.com

**Dennis Jenkins**
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
212-728-8276
Fax : 212-728-8111
Email: djenkins@willkie.com
*LEAD ATTORNEY*

**James G Munisteri**
Foley Gardere
1000 Louisiana Street
Ste 2000
Houston, TX 77002
713-276-5500
Fax : 713-276-5555

Email: jmunisteri@foley.com

**Mark T. Stancil**
Willkie Farr & Gallagher LLP
1875 K Street, N.W.
Washington, DC 20006-1238
202-303-1133
Email: mstancil@willkie.com
*LEAD ATTORNEY*

***Defendant***
-----------------------
**Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation**
700 Milam Street
Suite 600
Houston, TX 77002

represented by **Sharon Marie Beausoleil**
(See above for address)

**Joseph Bretschneider**
(See above for address)
*LEAD ATTORNEY*

**Sara Ann Brown**
(See above for address)

**Dennis Jenkins**
(See above for address)
*LEAD ATTORNEY*

**James G Munisteri**
(See above for address)

**Mark T. Stancil**
(See above for address)
*LEAD ATTORNEY*

***Defendant***
-----------------------
**Mesquite Comanche Holdings, LLC**
c/o Registered Agent -
C T Corporation System
1999 Bryan St., Suite 900
Dallas, TX 75201

represented by **Sharon Marie Beausoleil**
(See above for address)

**James G Munisteri**
(See above for address)

***Intervenor***
-----------------------
**ETC Texas Pipeline Ltd.**
1300 Main Street
Suite 2000
Houston, TX 77002

represented by **Yelena Archiyan**
Katten Muchin Rosenman LLP
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
214.765.3657
Email: yelena.archiyan@katten.com

**John E. Mitchell**
Katten Muchin Rosenman
2121 North Pearl Street
Suite 1100
Dallas, TX 75201
469-627-7017
Email: john.mitchell@katten.com

| Filing Date | # | Docket Text |
|---|---|---|
| 04/06/2022 | 9 | Courtroom Minutes. Time Hearing Held: 10:03 am - 10:08 am. Appearances: Josh Wolfshohl and Amy Falcon for the Plaintiff. Maegan Quejada for Defendant Mitsui E&P Texas LP. James Munisteri and Dennis Jenkins for Defendant SN EF Maverick, LLC. Conor McNamaa for Defendant Venado EF L.P. aka Javelin EF L.P. Sean Mitchell and Andrew Ehrlich for Defendant SN EF UnSub, LP. Julia Frost-Davies for Eagle Ford TX LP. Briefing to be filed not later than the evening of 5/16/22, hearing scheduled for 5/23/22 at 9:00 am. Agreed order to be filed by the parties to set the briefing deadlines as stated on the record. (Related document(s):2 Order for Conference, 6 Motion for Remand) **Hearing scheduled for 5/23/2022 at 09:00 AM at Houston, Courtroom 404 (MI).** (TylerLaws) (Entered: 04/06/2022) |

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

April 14, 2022

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035 (MI)** |

**STIPULATION AND SCHEDULING ORDER GOVERNING BRIEFING ON PLAINTIFF'S MOTION TO REMAND TO STATE COURT OR FOR ABSTENTION**

1 The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

1. WHEREAS, on January 21, 2022, Adversary Plaintiff Carnero G&P, LLC ("Plaintiff") filed a lawsuit in the 215th Judicial District Court, Harris County, Texas, styled as *Carnero G&P, LLC v. SN EF UnSub, L.P., et al.*, Cause No. 2022-04224 (the "State Court Lawsuit");

2. WHEREAS, on February 28, 2022, Adversary Defendants SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EP L.P.), Mitsui E&P Texas LP, and SN EF UnSub LP (collectively "Defendants") filed their *Notice of Removal* to remove the State Court Lawsuit to this Court, alleging subject matter jurisdiction under 28 U.S.C. §§ 157, 1334, and 1367 [Doc. 1];

3. WHEREAS, on March 30, 2022, Plaintiff filed its *Motion to Remand to State Court or for Abstention* (the "Motion to Remand"), seeking to remand the State Court Lawsuit to the 215th Judicial District Court, Harris County, Texas [Doc. 6.];

4. WHEREAS, on April 6, 2022, the parties participated in a status conference for the above-captioned action before the Court; and

5. WHEREAS, on April 6, 2022, the Court scheduled a hearing on the Motion to Remand for Monday, May 23, 2022, at 9:00 am Central Time;

6. IT IS HEREBY STIPULATED AND AGREED, by the parties hereto, through their undersigned counsel, subject to the approval of the Court, that the following schedule shall govern briefing on the Motion to Remand:

7. Defendants shall file and serve their response to the Motion to Remand on or before **April 27, 2022**.

8. Plaintiff shall file and serve its reply in further support of the Motion to Remand on or before **May 9, 2022 at 12:00 pm**.

9. Defendants shall file and serve their sur-reply on or before **May 16, 2022**.

Signed: April 14, 2022

Marvin Isgur
United States Bankruptcy Judge

AGREED AS TO FORM:

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New
York, New York 10019 Telephone:
(212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

*s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl
Aaron J. Power
Eugene M. Nettles
Amy C. Falcon
**Porter Hedges LLP**
100 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshol@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Carnero G&P, LLC**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.,*<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**OBJECTION TO PLAINTIFF'S MOTION**
**TO REMAND TO STATE COURT OR FOR ABSTENTION**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

I. The Comanche Midstream Commitments ..... 4

II. The GGPA, the Ratification Agreements, and the Letter Agreement ..... 6

III. MCom's Purchase of Gavilan's Interest in the Comanche Assets ..... 7

IV. The Midstream Restructuring ..... 8

V. Procedural History ..... 10

A. The Chapter 11 Cases ..... 10

B. The First Carnero Action and the Second Carnero Action ..... 12

LEGAL STANDARD ..... 14

ARGUMENT ..... 16

I. THE SECOND CARNERO ACTION IS A CORE PROCEEDING ..... 16

A. Because the Second Carnero Action Concerns Mesquite's Rights and this Court's Authority Under Section 365 of the Bankruptcy Code, it "Arises Under" Title 11 ..... 16

B. Because the Second Carnero Action Involves Rights Created By Bankruptcy Law and Requires Interpretation and Enforcement of At Least Five of This Court's Prior Orders, it "Arises In" the Debtors' Bankruptcy Cases ..... 20

II. AT MINIMUM, THIS COURT HAS "RELATED TO" JURISDICTION ..... 25

III. MANDATORY ABSTENTION DOES NOT APPLY ..... 30

IV. TO THE EXTENT PERMISSIVE ABSTENTION MAY APPLY, THE BALANCE OF FACTORS FAVORS THIS COURT RETAINING JURISDICTION ..... 31

CONCLUSION ..... 35

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Atencio v. Atencio (In re Petroleum Prods. & Servs., Inc.),*
556 B.R. 296 (Bankr. S.D. Tex. 2016) ....................30, 32

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP),*
581 B.R. 206 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020) ....................16

*Bissonnet Invs. LLC v. Quinlan (In re Bissonnet Invs. LLC),*
320 F.3d 520 (5th Cir. 2003) ....................14

*In re Blast Energy Servs., Inc.,*
396 B.R. 676 (Bankr. S.D. Tex. 2008) ....................26, 27, 28

*Burch v. Freedom Mortg. Corp. (Matter of Burch),*
835 F. App'x 741 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 253 (2021)....................16, 22

*Butner v. United States,*
440 U.S. 48 (1979)....................29

*Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin),*
507 B.R. 169 (W.D. Tex. 2014)....................26

*City of Covington v. Covington Landing Ltd. Partnership,*
71 F.3d 1221 (6th Cir. 1995) ....................18, 19

*Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.),*
266 F.3d 388 (5th Cir. 2001) ....................21, 25, 26, 27

*EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.),*
430 F.3d 260 (5th Cir. 2005) ....................15

*Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.),*
644 F.3d 259 (5th Cir. 2011) ....................21

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
No. 17 BK 3288-LTS, 2021 WL 2676983 (D. P.R. June 29, 2021)....................17

*Fire Eagle, LLC v. Spillman Dev. Grp., Ltd. ( In re Spillman Dev. Grp. Ltd.),*
710 F.3d 299 (5th Cir. 2013) ....................25

*G-I Holdings, Inc. v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),*
564 B.R. 217 (Bankr. D. N.J. 2016) ....................25

*Galaz v. Katona (In re Galaz),*
841 F.3d 316 (5th Cir. 2016) ....................15, 30, 33

*Galaz v. Katona (In re Galaz),*
No. 5:14-CV-967, 2015 WL 5565266 (W.D. Tex. Sept. 21, 2015), *aff'd*, 841 F.3d 316 (5th Cir. 2016) ....................31, 33, 34

*In re: Gavilan Resources, LLC,*
Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) ....................3, 7, 8

*Gilbane Bldg. Corp. v. Air Systems Inc. (In re Encompass Servs. Corp.),*
337 B.R. 864 (Bankr. S.D. Tex. 2006) ....................26, 27

*Glasstex, Inc. v. Arch Aluminum & Glass Co. Inc. (In re Polvado),*
No. 06-70151, 2006 WL 2993333 (Bankr. S.D. Tex. Oct. 17, 2006)....................25

*Hassell Constr. Co. Inc. v. Hassell (In re Hassell),*
No. 19-30694, 2020 WL 728890 (Bankr. S.D. Tex. Jan. 7, 2020)....................35

*Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),*
522 F.3d 575 (5th Cir. 2008) ....................21

*Houston Reg'l Sports Network, L.P. v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.),*
514 B.R. 211 (Bankr. S.D. Tex. 2014) ....................32

*Maddox v. O'Cheskey (In re Amer. Hous. Found.),*
No. 09-ap-20232-RLJ, 2015 WL 5781396 (Bankr. N.D. Tex. Sept. 30, 2015) ....................15

*Mirant Corp. v. Potomac Elec. Power Corp. (In re Mirant Corp.),*
378 F.3d 511 (5th Cir. 2004) ....................17

*Mission Prod. Holdings, Inc. v. Tempnology, LLC,*
139 S. Ct. 1652 (2019)....................17, 18

*MPF Holding U.S. LLC v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC),*
495 B.R. 303 (Bankr. S.D. Tex. 2013) ....................18

*In re Nat'l Gypsum Co.*
118 F.3d 1056 (5th Cir. 1997) ....................26, 31

*In re Nat'l Gypsum Co.,*
208 F.3d 498 (5th Cir. 2000) ....................17

*New Orleans & Gulf Coast Ry. Co. v. Barrios*,
533 F.3d 321 (5th Cir. 2008) ....................................................................................22

*Newby v. Enron (In re Enron Corp. Sec.)*,
535 F.3d 325 (5th Cir. 2008) ................................................................................26, 27

*NiGen Biotech, L.L.C. v. Paxton*,
804 F.3d 389 (5th Cir. 2015) ....................................................................................22

*Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
631 B.R. 847 (Bankr. S.D. Tex. 2021) ........................................................... *passim*

*Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
No. 20-ap-3198, 2021 WL 1827708 (Bankr. S.D. Tex. May 6, 2021)..................10–11, 12, 16

*In re Order of Reference to Bankruptcy Judges*,
General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012)............................14

*Quarternorth Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*,
No. 20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021).....................................15

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ..............................................................................18, 19

*In re: Sanchez Energy Corp. et al.*,
Case No. 20-3197 (MI) (Bankr. S.D. Tex. 2021) ..................................................................12

*Schlotzsky's Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's Inc.)*,
351 B.R. 430 (Bankr. W.D. Tex. 2006)...........................................................31, 32, 34

*Sportsman's Warehouse v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*,
457 B.R. 372 (D. Del. 2011).....................................................................................22, 25, 33

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009).............................................................................................15, 22

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*,
622 B.R. 680 (Bankr. N.D. Tex. 2020)...................................................................15, 34

*U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*,
301 F.3d 296 (5th Cir. 2002) ....................................................................................29

*Wood v. Wood (In re Wood)*,
825 F.2d 90 (5th Cir. 1987) ....15

**Statutes**

11 U.S.C. § 365(g) ....17

28 U.S.C. § 157 ....14, 30

28 U.S.C. § 157(b) ....21

28 U.S.C. § 1334 .... *passim*

28 U.S.C. § 1334(b) ....30

28 U.S.C. § 1334(c)(1) ....2, 31

28 U.S.C. § 1334(c)(2) ....1, 30

28 U.S.C. § 1367 ....14, 30

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding “Rejection,”* 59 U. Colo. L. Rev. 845 (1988) ....17

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite" or "Sanchez"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to collectively as the "WIPs"), and SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Defendants") respectfully submit, by and through counsel, this Objection (the "Objection") to the *Motion to Remand to State Court or for Abstention* (the "Motion") filed by Plaintiff Carnero G&P, LLC ("Carnero") [Carnero II Dkt. No. 6].[2]

**PRELIMINARY STATEMENT**

1. Carnero's latest lawsuit (captioned above), originally filed in Harris County District Court (the "Second Carnero Action"), is yet another attempt to evade this Court's jurisdiction. The Second Carnero Action is a core proceeding, as it involves interpreting the Debtors' confirmed Plan (as defined below), several of this Court's prior orders, and Mesquite's and Maverick's rights under the Bankruptcy Code. Moreover, Carnero's declaratory judgment and breach of contract claims arise under title 11 and would not exist but for the Debtors' bankruptcy cases. At the very least, the Second Carnero Action is "related to" the bankruptcy cases, thus affording this Court jurisdiction. With core jurisdiction established, mandatory abstention under 28 U.S.C. §

---

[2] Unless otherwise specified, capitalized terms used but not defined in this Objection have the meanings given them in the *Amended and Supplemental Complaint* filed on the docket of the Declaratory Action (as defined below). [Decl. Action Dkt. No. 29]. The Declaratory Action is captioned *SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP* v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI).

This Objection cites entries on the docket of the main bankruptcy case as "Dkt. No. _", entries on the docket of the Second Carnero Action as "Carnero II Dkt. No. _", entries on the docket of the Declaratory Action as "Decl. Action Dkt. No. _", and entries on the docket of the First Carnero Action (as defined below) as "Carnero I Dkt. No _."

The First Carnero Action is captioned *Carnero G&P, LLC* v. *SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Adv. Pro. No. 21-03908 (MI).

1334(c)(2) is inapplicable, and the factors governing permissive abstention under 28 U.S.C. § 1334(c)(1) weigh against remand.

2. Carnero frames the Second Carnero Action as a standalone post-confirmation dispute over assumed contracts with no relation to the bankruptcy cases that have been before this Court for the past two years. But that is not correct. In reality, the Debtors effected a comprehensive midstream restructuring by rejecting certain contracts and assuming others as amended pursuant to the Plan.

3. Carnero believes that the Debtors breached the GGPA by assuming certain midstream contracts as amended. Typically, assumption and rejection decisions are made and litigated before the effective date of a chapter 11 plan. If a party in interest believes that the proposed assumption or rejection of an executory contract may affect its contractual rights, it must object (or otherwise reserve its rights) at the time of assumption or rejection. Carnero strategically declined to do so here. Instead, Carnero chose to lay in wait and now seeks to litigate the effect of assumption in state court. That form of forum shopping should not be countenanced. If the Debtors had assumed the midstream contracts in connection with confirmation, Carnero's claims would have resulted, at best, in an administrative claim subject to the jurisdiction of this Court. The outcome does not change because of the bespoke post-confirmation (and in some cases, post-effective date) assumption and rejection process established under the Plan and the Confirmation Order (as defined below). In either scenario, this Court retains jurisdiction over any claim that the Debtors' assumption of midstream contracts, as amended, breached a third party agreement such as the GGPA.

4. In its quest to evade this Court's jurisdiction, Carnero seeks declaratory judgments that concern Mesquite's rights and obligations under section 365 of the Bankruptcy Code and

would interfere with several prior orders entered by this Court. For example, although Carnero asserts that its requested relief only concerns interpretation of the GGPA and related agreements, the GGPA is intrinsically tied to the implementation and finality of the Plan, the Confirmation Order, and various other agreements and orders entered by this Court (*i.e.*, the Oxy/Wes Stipulation and Agreed Order, the Oxy/Wes Settlement Agreement, the Carnero Settlement Approval Order (as defined below), the Carnero Settlement Agreement, the Stipulation of Dismissal and Agreed Order, and the WIP PMA Assumption Order (as defined below)).

5. Carnero maintains that its claims can be resolved without reference to this Court's prior orders. Yet it simultaneously alleges that Maverick cannot retain the existing commitments for those Comanche working interests previously owned by Gavilan Resources, LLC ("Gavilan") specifically because of this Court's prior order approving the section 363 sale of those assets to Mesquite and Mesquite Comanche Holdings, LLC ("MCom"), as Mesquite's assignee. Thus, Carnero's allegations put an order of this Court directly at issue. In fact, at least ***five*** of this Court's prior orders are implicated by the Second Carnero Action. Although, for purposes of their go-forward operations, the Reorganized Debtors have re-entered the non-bankruptcy world, the fact that the Plan has been confirmed does not divest this Court of jurisdiction with respect to key issues related to the bankruptcy cases—especially given the Plan's unique post-confirmation assumption and rejection procedures approved by this Court. Carnero did not object to the Plan's unique assumption and rejection procedures and cannot collaterally attack them now.[3]

6. The claims asserted in the Second Carnero Action also give rise to important legal and policy questions under federal bankruptcy law concerning Carnero's interpretation of section 3.1(b) of the GGPA and section 365 of the Bankruptcy Code. Carnero's new breach of contract

[3] *See Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021) (denying a "collateral attack on the procedure set out in Sanchez's Plan").

claims and request for damages confirm that resolving this dispute could reduce the value of the Debtors' estates. Thus, at a minimum, "related to" jurisdiction exists.

7. Finally, as with the First Carnero Action, remand or abstention would lead to inefficiencies. This Court has more than two years of experience with the parties and the intricate matrix of contracts involved in the Debtors' bankruptcy cases. As much as Carnero may wish to avoid this Court, this is not a garden variety contract dispute, and it does not belong in Texas state court. Forcing the Defendants to litigate these issues in a forum that lacks the background and context obtained from the bankruptcy cases would waste significant time and resources as well as risk inconsistent or conflicting outcomes. To suggest that the Second Carnero Action exists in a vacuum outside this Court's jurisdiction is misguided. The Motion should be denied.

## BACKGROUND

### I. The Comanche Midstream Commitments

8. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties in South Texas (the "Comanche Assets"). *In re Sanchez Energy Corp.*, 631 B.R. at 851. In January 2017, pursuant to a Purchase and Sale Agreement dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan, purchased Anadarko's working interests in the Comanche Assets, and operatorship of all the Comanche Assets was ultimately transferred to Maverick. *Id.* at 852. The transaction closed on or about March 1, 2017. *Id.*

9. Before the sale of the Comanche Assets, Anadarko had developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production (including that of the WIPs) downstream to customers. *Id.* at 851–52. To that end, Anadarko and its affiliates contracted with midstream parties that invested in and built the infrastructure required to monetize

production from the Comanche Assets, in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Comanche Midstream Commitments").

10. As a condition to the sale of the Comanche Assets, Anadarko insisted that the purchasers assume and maintain the Comanche Midstream Commitments, which the purchasers agreed to do pursuant to a number of agreements. To facilitate and continue the gathering, processing, transportation, and marketing of Comanche hydrocarbons in accordance with the Comanche Midstream Commitments, Maverick agreed to purchase the hydrocarbon production from all the other working interest owners pursuant to separate purchase and marketing agreements with each of them (collectively the, "PMAs"). [Comanche PSA § 11.15(f)]. Maverick, in turn, then agreed to deliver all the Comanche production it owns and controls to be gathered, processed, transported, and ultimately sold consistent with the Comanche Midstream Commitments. [*Id.*]

11. Although the purchasers sought to buy all of Anadarko's interest in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their transfer. Maverick and Anadarko, therefore, entered into two agency agreements (collectively, the "Midstream Agency Agreements") through which Maverick would act as Anadarko's agent under the Retained Agreements. Maverick would receive the benefits of those agreements and undertake Anadarko's obligations under them.

12. Maverick, UnSub, and Gavilan agreed to process, transport, and sell hydrocarbons (including hydrocarbons Maverick purchases from the other working interest owners pursuant to the PMAs) as provided in the Midstream Agency Agreements. Accordingly, pursuant to the terms of the Comanche PSA and related agreements, the Comanche hydrocarbons remained subject to

the Comanche Midstream Commitments following the sale of Anadarko's interests to the purchasers.

## II. The GGPA, the Ratification Agreements, and the Letter Agreement

13. After the 2017 Anadarko sale closed, Maverick and Carnero entered into a back-up midstream gathering and processing agreement—the GGPA, dated April 1, 2018—for uncommitted production from the Comanche Assets. Pursuant to the GGPA, Carnero is second in line for Maverick's hydrocarbons, behind certain agreed-upon commitments and dedications. Section 3.1(b) of the GGPA provides:

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) ***is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero,*** or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), ***such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment . . . and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…***

GGPA § 3.1(b) (emphasis added). The agreements containing the Existing Commitments include without limitation, the agreements enumerated in Exhibit F to the GGPA.

14. On the same day the GGPA was executed, Carnero, UnSub, and Maverick entered into an agreement by which UnSub ratified Maverick's obligations under the GGPA. Eagle Ford, Javelin, and Gavilan also executed similar ratification agreements (the "Ratification Agreements"). UnSub, Eagle Ford, Javelin, and Gavilan thus ratified Maverick's commitment to deliver hydrocarbons to Carnero subject to the Existing Commitments. Concurrently, Mitsui

signed a letter agreement, authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the "Letter Agreement").

**III. MCom's Purchase of Gavilan's Interest in the Comanche Assets**

15. In 2017, both Gavilan and Maverick agreed through the Comanche PSA to assume and perform all obligations and liabilities "with respect to the undivided interest" in the Comanche Assets acquired by such party and to market its hydrocarbons in accordance with the Comanche Midstream Commitments. [Comanche PSA §§ 8.1(a) & 11.15(f)]. Gavilan also agreed to sell its Comanche production to Maverick through three purchase and marketing agreements (the "Gavilan PMAs"). [Dkt. No. 1967 n. 29]. Maverick, in turn, promised Anadarko that it would ensure that all co-working interest owner production, including Gavilan's, would remain subject to the Comanche Midstream Commitments, and in the case of Gavilan, subject to the Gavilan PMAs.[4] These agreements were part of the overall agreement to maintain and meet the Comanche Midstream Commitments.

16. In October 2020, pursuant to the "363" Asset Purchase Agreement dated October 16, 2020, and approved by this Court (the "Gavilan PSA"),[5] Mesquite and MCom, as Mesquite's assignee, acquired some of Gavilan's interests in the Comanche Assets, including the Gavilan PMAs, which were assumed and assigned by Gavilan to MCom, as Mesquite's assignee, without material amendment.[6] Because it acquired the Gavilan PMAs, MCom remains bound to sell its

---

[4] *See* GPA Agency Agreement §3.1(j) (agreeing to take "all actions necessary to ensure that all co-working interest owner production" remains subject to the Retained Midstream Contracts governing the Comanche Midstream Commitments); *see also* GPA Agency Agreement §§ 3.1(h), (i), (o), (q), and (r).

[5] The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020).

[6] The Gavilan PMAs were listed on Exhibit B to the Debtors' Plan Supplement for assumption. Pursuant to a stipulation dated November 12, 2020, Gavilan consented to the assumption of the PMAs pursuant to the Plan [*see*

production to Maverick, and Maverick must gather, process, transport, and market those hydrocarbons in accordance with the Comanche Midstream Commitments, including the Existing Commitments.

17. Consistent with the Gavilan PSA, this Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in Mesquite "free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, ***other than the Assumed Liabilities and Permitted Liens****[.]*" *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) [Dkt. No. 361 at ¶ V] (emphasis added). "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Gavilan PSA, Ex. I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA. Gavilan PSA, Disclosure Schedule 3.05(a) at 1. Accordingly, through the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the Comanche PSA and the Existing Commitments.

## IV. The Midstream Restructuring

18. On April 30, 2020, this Court confirmed the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan"). On the Effective Date of the Plan, the Reorganized Debtors had not yet finalized their comprehensive midstream restructuring (the "Midstream Restructuring"), and they had not yet finally determined which of the executory contracts and unexpired leases were to be assumed or rejected under the Plan. Following months of litigation and negotiations, the Reorganized Debtors determined that

Dkt. No. 1758], and they were deemed assumed by Reorganized Debtor Maverick as of the Effective Date of the Plan.

it was in their best interests, under the Plan and the confirmation order (the "Confirmation Order"), to assume and maintain the Existing Commitments as they existed pre-bankruptcy, while amending the terms of the Comanche Midstream Commitments to improve the economics for the Reorganized Debtors, UnSub, MCom, and the WIPs.

19. To effectuate this assumption, in part, the Reorganized Debtor, Maverick, and the WIPs entered into the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* (the "WIP PMA Assumption Order"), which this Court approved on December 6, 2021. [Dkt. No. 2201]. The WIP PMA Assumption Order found that the WIPs' Comanche production is sold by Maverick under the Agency Agreements and approves Maverick's assumption of the PMAs, as of the Effective Date of the Plan. [Dkt. No. 2201 ¶¶ F & 3].

20. In addition, in December 2021, to further evidence and consummate the Midstream Restructuring, Mesquite and Maverick entered into the Master Settlement Agreement with (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite, Maverick, and MCom (the "Settlement Agreement"). UnSub signed the Settlement Agreement for limited provisions as well.

21. Pursuant to the Settlement Agreement, the parties submitted the *Stipulation and Agreed Order* (the "Settlement Order"), which this Court entered on December 21, 2021, agreeing to the (a) dismissal of certain litigation, (b) rejection of the "Rejected Comanche Agreements" (as defined in the Settlement Order), and (c) assumption of the "Assumed Comanche Agreements" (as

defined in the Settlement Order). The Settlement Order identified which of the Assumed Comanche Agreements were being assumed with amendments. [Dkt. No. 2253].

22. Carnero did not object to entry of either the WIP PMA Assumption Order or the Settlement Order.

23. The Assumed Comanche Agreements left the Existing Commitments intact. In fact, the Midstream Restructuring did not amend or modify the Existing Commitments. Amendments, however, were made to the terms of the Comanche Midstream Commitments, improving certain midstream economics and making conforming and clarifying changes to the agreements. ***But the amendments did not alter the scope or duration of the Existing Commitments.*** Indeed, the Existing Commitments were unchanged and prevented any of the committed hydrocarbons from flowing to Carnero's facilities. There were in fact changes to the economics that these volumes could produce for the working interest parties over time, but those changes are irrelevant because none of them altered the scope or duration of the Existing Commitments. In short, the hydrocarbons subject to the Existing Commitments prior to the Midstream Restructuring will physically flow through the gathering, processing, transportation, and marketing system exactly as anticipated when the GGPA was executed in 2018.

## V. Procedural History

### A. The Chapter 11 Cases

24. As this Court is aware, the Debtors' chapter 11 cases have followed an unusual course. After an August 11, 2019 bankruptcy filing, [Dkt. No. 1], the Plan was confirmed on April 30, 2020. [Dkt. No. 1212]. The Plan became effective on June 30, 2020 (the "Plan Effective Date"). [Dkt. No. 1417].

25. The Plan provided for the assumption and rejection of contracts under section 365 of the Bankruptcy Code ***after*** confirmation and the Plan Effective Date. *See Occidental Petroleum*

*Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)* (hereinafter "*Sanchez-Oxy*"), No. 20-ap-3198, 2021 WL 1827708, at *4 (Bankr. S.D. Tex. May 6, 2021). As this Court has explained, this unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *Id.* at *1. "To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later." *Id.*

26. The Plan set out a procedure to resolve rejection disputes after the Plan Effective Date. The Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B to the Plan (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C to the Plan (as amended, the "Assumption Schedule"). [Dkt Nos. 1212 at 10–16 (¶¶ 17–26), and 1198 at 29 (Article V)]. If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or the Assumption Schedule, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date. *Id.* If an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" and in the interim, the "agreement shall continue as in effect immediately prior to the effective date." *Id.* Pursuant to the Confirmation Order, Carnero could have objected to the inclusion of a contract on either the Rejection Schedule or the Assumption Schedule. Carnero failed to do so and thereby should be deemed to have waived its right to pursue the claims in the Second Carnero Action.

27. Article XI of the Plan provides that this Court "retain[s] exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan," specifically

enumerating this Court's jurisdiction to "resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under an Executory Contract[.]" [Dkt. No. 1212 at 69 (emphasis added)].

28. Reserving determinations of assumption and rejection until after the date of the Confirmation Order and the Plan Effective Date necessarily affects the scope of this Court's post-confirmation jurisdiction; indeed, this Court has continued to hear core matters since the Plan Effective Date. *See, e.g.*, *Sanchez-Oxy*, 2021 WL 1822708, at *5. In *Sanchez-Oxy*, this Court denied Occidental's after-the-fact challenge to the rejection procedure, concluding that the Plan and the Confirmation Order are entitled to *res judicata* effect. *Id.* at *6–8 ("Occidental assented to this procedure at confirmation and failed to appeal the Confirmation Order. For those reasons, Occidental's argument against post-effective date rejection amounts to a collateral attack on the procedure set out in Sanchez's Plan. Occidental waived that argument in this case.").

29. On June 28, 2021, this Court entered the UnSub Stipulation and Agreed Order which, among other things, authorized the rejection of the Marketing Agreement and assumption of the UnSub Ratification Agreement. *In re: Sanchez Energy Corp. et al.*, Case No. 20-3197 (MI) (Bankr. S.D. Tex. 2021) [Dkt. No. 64].

**B. The First Carnero Action and the Second Carnero Action**

30. One month after this Court entered the UnSub Stipulation and Agreed Order, Carnero sued Mesquite, UnSub, and the WIPs in Harris County, Texas, seeking declarations that (a) the GGPA, the Ratification Agreements, and the Letter Agreement obligated Mesquite, UnSub and the WIPs to terminate their delivery obligations under certain midstream commitments at the earliest possible time, including the requirement that Mesquite pursue rejection of the Midstream Agency Agreements, and (b) following rejection of the Midstream Agency Agreements, Mesquite

and the WIPs would be obligated to deliver the gas from the Comanche Assets to Carnero (the "First Carnero Action"). *See Original Petition* [Carnero I Dkt. No. 1-4] (the "Petition") ¶ 36(k), (l).

31. Mesquite, UnSub, and the WIPs removed the First Carnero Action to this Court, *Notice of Removal*, [Carnero I Dkt. No. 1], and Carnero moved to remand the action to state court. *Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero I Dkt. No. 6].

32. This Court heard Carnero's motion to remand the First Carnero Action on December 7, 2021, and observed that "the plain language" of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" and to "declare the effect of rejection of a contract before it's ever rejected." December 7, 2021 Hr'g Tr. at 15:25–16:1 (discussing ¶ 36(l) and 18:10–11 (discussing ¶ 36(k)). After Carnero suggested that it could excise those requests from the First Carnero Action, this Court allowed for Carnero to amend its pleading until December 10, 2021. *Id.* at 17:11–13, 26:5–6. But rather than amend, Carnero dismissed the First Carnero Action without prejudice. *See Plaintiff's Notice of Dismissal Without Prejudice* [Carnero I Dkt. No. 31].

33. On December 21, 2021, this Court approved a *Stipulation and Agreed Order* [Dkt. No. 2253] dismissing certain litigation and paving the way for the Midstream Restructuring of the Reorganized Debtors' gathering, transportation, processing, and marketing agreements in accordance with the Plan and the Settlement Agreement. *See supra* at ¶¶ 18–23.

34. That same day, seeking resolution of the ongoing Carnero dispute, Maverick, Mesquite, UnSub, and the WIPs filed an adversary proceeding to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts (the "Declaratory Action").

35. But in another effort to evade this Court's jurisdiction, on January 21, 2022, Carnero moved to dismiss the Declaratory Action, [Decl. Action Dkt. No. 8], and filed the Second Carnero Action in Harris County, Texas, advancing a new meritless theory that the Defendants breached the GGPA by assuming and amending, or participating in amending, certain terms of the Comanche Midstream Commitments in connection with the Midstream Restructuring. [Carnero II Dkt. No. 1-4].

36. The Defendants removed the Second Carnero Action to this Court based on "arising in," "arising under," and "related to" jurisdiction, under 28 U.S.C. § 1334. [Carnero II Dkt. No. 1].

37. On March 30, 2022, Carnero filed its *Motion to Remand to State Court or for Abstention*. [Carnero II Dkt. No. 6]. Although the Second Carnero Action includes breach of contract claims, Carnero still seeks declaratory relief regarding the GGPA, the Ratification Agreements, and the Letter Agreement. Motion at ¶ 1. All of these agreements relate to oil and gas assets in Texas's Comanche Field and the complex web of interconnected contracts involved in the Debtors' bankruptcy cases. This Court has subject matter jurisdiction over the Second Carnero Action.

**LEGAL STANDARD**

38. "The existence of subject matter jurisdiction is determined at the time of removal." *Bissonnet Invs. LLC v. Quinlan (In re Bissonnet Invs. LLC)*, 320 F.3d 520, 525 (5th Cir. 2003) (internal citations omitted). As stated in the Defendants' *Notice of Removal* [Carnero II Dkt. No. 1], this Court has "arising in," "arising under," and "related to" jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).

39. "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11, while "arising in" jurisdiction is not based on a right expressly

created by title 11, but rather based on claims that would have no existence outside of bankruptcy. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 96–97 (5th Cir. 1987). After confirmation, bankruptcy courts maintain "arising in" or "arising under" jurisdiction over disputes implicating the interpretation of their orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Thus, state contract-law claims can be core proceedings "if they are dependent upon the rights created in bankruptcy." *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.*), 430 F.3d 260, 266–67 (5th Cir. 2005).

40. Although the Second Carnero Action asserts claims for declaratory judgment under state law, such claims are not fatal to jurisdiction because "bankruptcy courts have 'arising under' subject matter jurisdiction to issue declaratory judgments interpreting the plan." *Quarternorth Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*, No. 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15, 2021) (Isgur, J.).

41. Bankruptcy courts also have "related to" or ("non-core" jurisdiction) over matters that could "conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Amer. Hous. Found.)*, No. 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

42. Generally, subject matter jurisdiction "remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (internal quotations omitted); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). If Carnero were to prevail on its causes of action for breach of contract and declaratory relief concerning the GGPA, the Reorganized

Debtors' relationships and rights under the Bankruptcy Code and the Plan would be substantially affected. Thus, this Court should retain jurisdiction to vindicate such rights.

43. Lastly, this Court maintains "jurisdiction to interpret and enforce its own prior orders." *Burch v. Freedom Mortg. Corp. (Matter of Burch)*, 835 F. App'x 741, 747–48 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 253 (2021) (affirming bankruptcy court's jurisdiction when a state-court claim rests on the debtor's "interpretation of a Chapter 11 bankruptcy order" and therefore "arises from or is related to his Title 11 bankruptcy proceedings"). Similarly, evaluation and enforcement of a debtor's plan fall within a bankruptcy court's jurisdiction because such actions concern the administration of the bankruptcy case and may arise only in the context of that case. *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP)*, 581 B.R. 206, 215 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020).

## ARGUMENT

## I. THE SECOND CARNERO ACTION IS A CORE PROCEEDING

### A. Because the Second Carnero Action Concerns Mesquite's Rights and this Court's Authority Under Section 365 of the Bankruptcy Code, it "Arises Under" Title 11

44. This Court has jurisdiction over the Second Carnero Action as a core proceeding because Carnero seeks declarations concerning matters that directly arise under title 11 or arise in the Debtors' bankruptcy cases.

45. It is undisputed that (a) this Court has jurisdiction over litigation regarding Mesquite's assumption or rejection of executory contracts, including the Midstream Agency Agreement, and (b) such litigation constitutes "core" proceedings. *See Sanchez-Oxy*, 2021 WL 1822708, at *5. The Second Carnero Action arises under section 365 of the Bankruptcy Code and

in the continuing assumption/rejection litigation, seeking determinations of the impact of section 365 assumptions and rejections, and Mesquite's rights and obligations under section 365.

46. Section 365(a) gives debtors the choice to breach ("reject") or perform ("assume") executory contracts. *Mirant Corp. v. Potomac Elec. Power Corp. (In re Mirant Corp.)*, 378 F.3d 511, 518 (5th Cir. 2004); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy to decide whether the contract is a good deal for the estate going forward"). If the debtor elects to reject, then "the rejection of an executory contract . . . of the debtor constitutes a breach of such contract." 11 U.S.C. § 365(g). That formal act of breach allows the non-debtor to make a pre-petition claim for damages that can be discharged through the ordinary claims allowance process. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L. Rev. 845, 888 (1988) ("Rejection does not . . . cause an executory contract to vanish or become unenforceable against the debtor, and is not a matter of the 'debtor reject[ing] its obligation.'").

47. "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504–05 (5th Cir. 2000) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)). "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3288-LTS, 2021 WL 2676983, at *5 (D. P.R. June 29, 2021) (quoting *Eagle Ins. Co. v. BankVest Cap. Corp.* (*In re BankVest Cap. Corp.*), 360 F.3d 291, 296 (1st Cir. 2004)). Therefore, bankruptcy courts retain jurisdiction to determine the

consequences of a debtor's assumption or rejection under section 365. *See, e.g.*, *Mission Prod.*, 139 S. Ct. at 1658 (noting that case began when creditor "returned to the Bankruptcy Court for a declaratory judgment confirming its view" of the consequence of rejection).

48. That the Oxy/Wes Settlement Agreement included amendments and modifications to the Midstream Agency Agreements does not excise the Oxy/Wes Stipulation and Agreed Order from the purview of section 365 and this Court's jurisdiction. Consensual modification of contracts to be assumed is permissible under section 365 and such modification "does not mean that section 365 no longer applies." *MPF Holding U.S. LLC v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC)*, 495 B.R. 303, 321 (Bankr. S.D. Tex. 2013). However, Carnero argues that its claims for declaratory judgment fall outside this Court's jurisdiction because section 365 does not apply to modifications or renegotiations of executory contracts. *See* Motion at ¶¶ 11–13. Carnero relies on two cases: *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985), and *City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1227 (6th Cir. 1995)—neither of which supports this proposition.

49. In *Richmond Leasing*, the Fifth Circuit considered objections filed by bank creditors to a debtor's assumption of an ***amended*** lease. 762 F.2d at 1303. The objecting creditors argued that the creditor holding the lease acquired greater rights through the amendment and assumption was therefore improper. *Id.* at 1310. The Fifth Circuit rejected the objection, emphasizing that "the often-repeated statement that the debtor must accept the contract as a whole means only that debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement." *Id.* at 1311 (citations omitted). This does not mean, however, that amendments to executory contracts are prohibited. Indeed the *Richmond Leasing* court concluded that the debtor's modifications to the lease agreement were consistent

with the requirements of section 365, and assumption of the modified lease agreement under that section was therefore appropriate. *Id.*

50. In *Covington,* the Sixth Circuit quoted *Richmond Leasing,* and held that where new agreements "fundamentally changed the parties' . . . relationship" the question was "outside strict application of Section 365." *Id.* But falling outside the "strict application of Section 365" did not mean that section 365 was inapplicable or that the amendments were outside of the bankruptcy process. In fact, the Sixth Circuit held just the opposite—concluding the bankruptcy court had the power to redraft and split a lease in two, but that this answer did not depend "solely" on section 365 and was also informed by the bankruptcy court's prior orders and the parties agreements in the course of the bankruptcy proceedings. 71 F.3d at 1227.[7]

51. In the Second Carnero Action, Carnero seeks declaratory judgments that directly concern Mesquite's rights and obligations under section 365 and interfere with this Court's authority to approve any rejection or assumption. These declarations "arise under" title 11 and address the heart of the restructuring of debtor-creditor relations. Section 365 exists for the benefit not just of the parties to any one contract, but also for the benefit of all creditors and the debtor's

---

[7] In *Covington,* the debtor owned and operated two vessels offering restaurants and retail shopping, that were anchored in the Ohio River. *Id.* at 1222. The debtor leased docking and parking facilities from the city. *Id.* at 1223. During the bankruptcy, the bankruptcy court approved the sale of one of the vessels; the city also approved the sale, committing to negotiate in good faith with the debtor on the impact of the sale on the lease. *Id.* Ultimately, however, the parties could not reach an agreement on all terms. *Id.* at 1224. The Court held "an evidentiary hearing to determine appropriate rental terms" for the city's facilities and "divided the Mooring lease into two separate leases" carving off a separate lease "pertaining to the area formerly occupied" by the vessel that had been sold. *Id.* at 1225. The city appealed, arguing that "the bankruptcy court lacked the power under 11 U.S.C. § 365 to redraft the lease as it did without the City's consent." *Id.*

The Sixth Circuit first noted that the city had "agreed to the sale of the [vessel], agreed that the sale would not constitute a default, agreed that the partnership would retain rights to the Wharf space under a modified rental schedule, and agreed to future action with respect to the space vacated by the [vessel]." *Id. a*t 1227. The court then held: "These agreements fundamentally changed the parties' leasehold relationship putting this case ***outside strict application of § 365***. The outcome of this case thus depends ***not solely on § 365***, but on the legal effect of the agreements made by the parties in this particular case, as reflected in the agreed order and the attorneys' remarks at the . . . hearing." *Id.* (emphasis added).

estate—it is therefore critical for the implementation of the Plan that this Court preside over the Second Carnero Action.

### B. Because the Second Carnero Action Involves Rights Created By Bankruptcy Law and Requires Interpretation and Enforcement of At Least Five of This Court's Prior Orders, it "Arises In" the Debtors' Bankruptcy Cases

52. In the Motion, Carnero maintains that its claims are divorced from the Debtors' bankruptcy cases and do not require a court to interpret or consult any part of the Plan, the Confirmation Order, or any order of this Court. *See* Motion at ¶ 17. That position is untenable.

53. This Court's jurisdiction over this adversary proceeding was expressly contemplated by Article XI of the Plan; paragraph 43 of the Confirmation Order; paragraph 6 of the Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts (the "Carnero Settlement Approval Order"); and section 6.2.1 of the Carnero Settlement Agreement (attached as Exhibit A to the Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties [Dkt. No. 1309]).

54. Next, the allegations in the Second Carnero Action fall within this Court's jurisdiction and directly affect the success of the Plan. The Second Carnero Action directly implicates the "implementation or execution" of the Midstream Restructuring settlement with the Oxy/Wes Parties, and requires interpretation of at least four Plan provisions, including:

- **Article V**, which establishes the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts;
- **Article IV, D.**, which provides that all property of the estate "shall vest in each applicable Reorganized Debtor free and clear" of all claims and other encumbrances;
- **Article IV, F.**, which provides that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter . . . the validity, the priority, or amount of any Claims that may arise in connection therewith; and

- **Article VIII**, which provides for the discharge of claims against the Reorganized Debtors as of the Effective Date, exculpates the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of . . . the formulation, preparation, dissemination, negotiation, filing, or termination of the . . . Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoins all claims released or discharged pursuant to the Plan.

Because the allegations in the Second Carnero Action implicate aspects of the Plan, this Court may assert jurisdiction. *See, e.g.*, *Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259, 262 n.3 (5th Cir. 2011) ("We are persuaded that [the Bankruptcy Court] had core jurisdiction to interpret the Plan and confirmation order pursuant to 28 U.S.C. § 157(b)"); *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) ("This jurisdiction extends to matters that impact compliance with or completion of the reorganization plan") (internal quotations omitted); *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").

55. The Second Carnero Action also implicates the interpretation of at least ***five*** of this Court's prior orders, including:

- the Confirmation Order [Dkt. No. 1212], which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, *as long as* it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do);

- the Carnero Settlement Approval Order [Dkt. No. 1415], which approved the Carnero Settlement Agreement [Dkt No. 1309], but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interests;

- the Stipulation of Dismissal and Agreed Order [Dkt. No. 1983], which approved the assumption and rejection of certain agreements with UnSub;

- the WIP PMA Assumption Order [Dkt. No. 2201], which approved the assumption of certain production marketing agreements pursuant to the Plan; and
- the Oxy/Wes Stipulation and Agreed Order [Dkt. No. 2253], which approved the assumption and rejection of some of the Debtors' midstream contracts as amended by the settlement with Oxy/Wes Parties and effected the Midstream Restructuring.

That five of this Court's prior orders are needed to resolve the issues at hand in the Second Carnero Action reinforces this Court's exercise of jurisdiction. *See Travelers Indem. Co.*, 557 U.S. at 151 ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *Burch*, 835 F. App'x at 747–48.

56. Carnero further argues that the Defendants rely on federal defenses against Carnero's declaratory judgment claims in order to manufacture subject matter jurisdiction and to frame the Second Carnero Action as a core proceeding. Motion at ¶ 22. However, because the Second Carnero Action seeks declaratory judgments, the relevant question is not whether ***Carnero's*** claims purport to sound in state law but "whether 'if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'" *New Orleans & Gulf Coast Ry. Co. v. Barrios*, 533 F.3d 321, 329 (5th Cir. 2008) (emphasis added) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983)); *see also NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) ("Since a declaratory judgment action is inherently anticipatory, the federal issue must form part of the hypothetical well-pleaded complaint that the ***declaratory judgment defendant*** would have filed but for the anticipatory action.") (emphasis added); *see also Sportsman's Warehouse v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372, 387 (D. Del. 2011) ("Resolution of the various defenses that SWI asserts in Count VI ultimately requires the Court to interpret, validate, and enforce the Assumption Order.").

57. In this instance, adjudication of the Defendants' rights against Carnero must be pursued not through state law claims, but rather before this Court, applying the Bankruptcy Code: approval of the assumption and rejection decisions under section 365 pursuant to the Plan, and approval of the Midstream Restructuring and associated settlements under Bankruptcy Rule 9019 pursuant to the Plan. Indeed, that is precisely what the Defendants did when they filed the Declaratory Action in this Court in December 2021.

58. Additionally, Carnero cites *Davis v. Retail Fin. Co. of Tex., Inc.*, for the proposition that where a petition does not create federal jurisdiction, a court is prohibited from using the defendant's answer or counterclaims to determine if core jurisdiction exists. No. 06-7016, 2006 WL 2827270, at *1 (Bankr. S.D. Tex. Sept. 27, 2006). This is a recycled argument from the First Carnero Action, where Carnero maintained that this Court's authority to hear a petition depends on the "well-pleaded complaint rule," which compels federal courts to only look to the face of the petition to determine if a claim establishes federal jurisdiction. [Carnero I Dkt. No. 23 ¶¶ 6–7].

59. However, as this Court recently held in *ABC Dentistry, P.A. v. Brewer & Prichard, P.C. (In re ABC Dentistry)*, the well-pleaded complaint rule does not apply to jurisdiction under 28 U.S.C. § 1334, as it would nullify the "arising in" and "related to" language of that statute. No. 16-34221, 2021 WL 955932 at *3 (Bankr. S.D. Tex. Mar. 12, 2021) (Isgur, J.). In that case, this Court considered whether it retained jurisdiction over state law claims involving non-debtor parties that had been removed to federal court following the closure of the main bankruptcy case. *Id.* at *2–3. The plaintiff in *In re ABC Dentistry* argued that because his petition alleged exclusively state law claims, the bankruptcy court lacked subject matter jurisdiction on the face of the well-pleaded complaint. *Id.* at *3. This Court disagreed. Because "[t]he well-pleaded complaint rule seemingly prohibits bankruptcy courts from analyzing the effect an action might have on a

bankruptcy estate," *id*., rather than applying the well-pleaded complaint rule to ascertain jurisdiction, this Court ruled that it "must look to both the amended complaint ***and its relation to the ABC Dentistry bankruptcy*** to determine whether the Court has subject matter jurisdiction." *Id.* (emphasis added).

60. Similar to the petition in *In re ABC Dentistry*, even if the Second Carnero Action may not "directly challenge" the Plan's provisions or this Court's prior orders, the Plan and the prior orders "are factually central to this dispute. [The Second Carnero Action] is not just vaguely or tangentially related to the [Chapter 11] bankruptcy. The bankruptcy case is front and center." *Id.* at *4. Given the connection between the Second Carnero Action and the Debtors' chapter 11 cases, this Court should exercise jurisdiction over the Second Carnero Action.

61. Lastly, Carnero alleges that Mesquite cannot retain the midstream commitments as to the Comanche working interests previously owned by Gavilan because of this Court's approved section 363 sale of such assets to MCom. As a result, Carnero argues, the dedicated hydrocarbons associated with the Gavilan working interests acquired by MCom are now free of the midstream commitments. [Carnero II Dkt. No. 1-4 at 21, 24]. To test the viability of this argument, this Court must review the section 363 sale that it approved in the Gavilan bankruptcy case. The Second Carnero Action concedes that interpretation of one of this Court's prior orders is necessary to resolve Carnero's claims. The action therefore "arises in" the bankruptcy cases, affording this Court jurisdiction.

62. Because Carnero's claims invoke the effect of this Court's prior orders and the outcome will impact many other parties affected by the bankruptcy cases, those claims should be adjudicated by this Court, which presided over the bankruptcy cases. The Second Carnero Action arises in the bankruptcy cases because Carnero challenges the assumption/rejection proceedings

regarding the Midstream Agency Agreement and asks for determinations that implicate bankruptcy law. It is crucial for all parties and this Court to know what consequences might flow from a decision to reject or assume that contract.

## II. AT MINIMUM, THIS COURT HAS "RELATED TO" JURISDICTION

63. Even if this Court determines that it lacks "arising under" or "arising in" jurisdiction, "related to" jurisdiction still exists.

64. "An action is related to bankruptcy if the outcome could alter the debtors' rights, liabilities, opinions, or freedom of action (either positively or negatively) and which in any way impacts the handling and administration of the bankruptcy estate." *Glasstex, Inc. v. Arch Aluminum & Glass Co. Inc. (In re Polvado)*, No. 06-70151, 2006 WL 2993333, at *1 (Bankr. S.D. Tex. Oct. 17, 2006) (Isgur, J.); *see also Fire Eagle, LLC v. Spillman Dev. Grp., Ltd. ( In re Spillman Dev. Grp. Ltd.)*, 710 F.3d 299, 305 (5th Cir. 2013) ("related to" bankruptcy jurisdiction can emerge from attenuated, hypothetical effects of third-party litigation). Bankruptcy courts have determined that they at minimum had "related to" jurisdiction over a declaratory judgment action regarding the interpretation of assumed contracts. *In re Sportsman's Warehouse, Inc.*, 457 B.R. at 386–88; *see also G-I Holdings, Inc. v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 564 B.R. 217, 251–53 (Bankr. D. N.J. 2016) (court could exercise "related to" jurisdiction regarding breach of contract claims removed from state court).

65. While "related to" jurisdiction is curtailed after plan confirmation, bankruptcy courts retain subject matter jurisdiction over important debtor rights created by the Bankruptcy Code. *In re Craig's Stores of Tex., Inc.*, 266 F.3d at 390.

66. Carnero posits that under *In re Craig's Stores*—which it heavily relies on—this dispute is a non-core proceeding and therefore this Court lacks jurisdiction. Motion at ¶ 25. But subsequent decisions have made clear that the narrow language used in *In re Craig's Stores* was

unique to that case, which dealt with post-confirmation relations between the parties and where there was no dispute as of the date of confirmation and no facts or law derived from the chapter 11 plan were necessary to resolve the dispute. *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684 (Bankr. S.D. Tex. 2008); *see Newby v. Enron (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008) (noting that the "facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities"); *Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin)*, 507 B.R. 169, 178 (W.D. Tex. 2014) ("Although the holding of *Craig's Stores*—that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan'—was somewhat broad, the facts that precipitated that holding were narrow, involving post-confirmation claims based on post-confirmation activities"). *In re Nat'l Gypsum Co.* 118 F.3d 1056, 1063–64 (5th Cir. 1997), holds that even where a debtor's claim could constitute an affirmative defense to a state law contract claim, a debtor's claim to enforce the Bankruptcy Code and provisions of a confirmed plan are ***core proceedings*** that are sufficient to convey subject matter jurisdiction.

67. The Bankruptcy Court for the Southern District of Texas has considered six factors to determine whether a bankruptcy court has post-confirmation "related to" jurisdiction. These factors include: (a) when the claim at issue arose; (b) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (c) whether the plan has been substantially consummated; (d) the nature of the parties involved; (e) whether state law or bankruptcy law applies; and (f) indices of forum-shopping. *Gilbane Bldg. Corp. v. Air Systems Inc. (In re Encompass Servs. Corp.)*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006). *In re Blast Energy* is an instructive case applying these factors.

68. *In re Blast Energy* involved a dispute over prepetition contract claims where a creditor had assigned all of its rights in certain oil and gas wells to the debtor prepetition. The debtor eventually engaged in separate litigation against the assigning creditor and the remaining contract counterparty during the bankruptcy cases. Separate settlements were reached with the debtor and both parties during the bankruptcy cases and post-confirmation, respectively. However, one of the non-debtor parties sued the other non-debtor party for the same dispute post-confirmation. Out of fear that the state court dispute would jeopardize the parties' performance under the bankruptcy case settlements, the debtor filed a motion in the bankruptcy court seeking declaratory relief enforcing the bankruptcy court orders approving the settlements and the confirmed plan. The bankruptcy court found that it had subject matter jurisdiction over the dispute because it related primarily to pre-confirmation relationships among the parties and the antagonism between the parties had initiated pre-confirmation as well. 396 B.R. at 682–85.

69. To the extent this Court determines that it must resort to "related to" jurisdiction, as in *In re Blast Energy,* applying the *Encompass* factors to the Second Carnero Action demonstrates that this Court has "related to" subject matter jurisdiction:

- As laid out in the Carnero Settlement Agreement [Dkt. No. 1309], the disputes between the Defendants and Carnero relate back to the pre-confirmation period, and these current issues were at the heart of the settlement between the parties. Unlike *In re Craig's Stores*, the Second Carnero Action does not primarily address the post-confirmation relationship between the parties. 266 F.3d at 391. This dispute over the interpretation of the GGPA and section 365 did not emerge post-confirmation. Rather, the seeds of antagonism between the parties existed at the time of confirmation and the Plan Effective Date. Moreover, as stated previously, analysis of the facts surrounding the Plan and this Court's prior orders are necessary to resolve the claims at issue in the Second Carnero Action. *See Enron*, 535 F.3d at 335.

- The Carnero Settlement Approval Order and the Carnero Settlement Agreement both provide that this Court would retain jurisdiction over all matters arising from or relating to the Carnero Settlement Agreement, including any issues relating to the assumption of the

GGPA. Additionally, the dispute with Carnero requires interpretation of Articles IV, V, and VIII of the Plan.

- The Second Carnero Action does not focus on the post-confirmation business relationship between Carnero and the Defendants. Rather, the dispute is centered on the Reorganized Debtors' implementation of the Plan and their exercise of rights under section 365 of the Bankruptcy Code. As referenced in the Carnero Settlement Agreement [Dkt. No. 1309 at 30–31], the extraordinary circumstances the Debtors faced at the time of confirmation required assumption and rejection decisions to be preserved and addressed at a later time.

- The Second Carnero Action requires this Court to interpret the GGPA in connection with the Plan and prior orders entered by this Court. Bankruptcy law thus predominates over state law.

- As in *In re Blast Energy*, the parties' dispute underlying the Second Carnero Action has been litigated extensively before this Court, and the previous settlement was approved by order of this Court under Bankruptcy Rule 9019. In the First Carnero Action, Carnero withdrew its lawsuit despite agreeing to amend its claims. It then waited to bring this second lawsuit after the Midstream Restructuring was completed, never raising any objections along the way. To allow Carnero to proceed in state court now would constitute the same "egregious breed of forum shopping" that *In re Blast Energy* found impermissible. 396 B.R. at 688.

70. The Second Carnero Action also raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, section 3.1(b) of the GGPA would be unenforceable as a matter of federal bankruptcy law under section 365 of the Bankruptcy Code because it would subject the Debtors to significant liability or Carnero termination rights simply because—without extending the term of the Existing Commitments or otherwise expanding their scope—the Debtors negotiated improvements to their midstream cost structure, which were necessary to carry out the Midstream Restructuring and benefitted the Debtors' estates.

71. Moreover, the Second Carnero Action implicates important federal policy interests underlying the Bankruptcy Code: primarily, whether awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to

its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

72. Here, the Defendants negotiated improvements to their midstream cost structure, which were necessary to effectuate the Midstream Restructuring and benefited the Debtors' estates. The Midstream Restructuring did not alter the scope or duration of the Existing Commitments. Despite being restored to its prepetition status quo, Carnero now claims it is entitled to damages because the Defendants successfully renegotiated certain terms of prepetition executory contracts. The Defendants respectfully submit that allowing the Second Carnero Action to proceed outside this Court would not only undercut the federal policy interests underlying section 365 of the Bankruptcy Code but also permit Carnero to pursue a windfall at the expense of the estates. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (noting the federal bankruptcy policy that creditors should not receive a windfall merely through the happenstance of bankruptcy). Indeed, Carnero is seeking over a million dollars in monetary relief. [Carnero II Dkt. No. 1-4 at 17].

73. Finally, permitting a state court to adjudicate questions regarding one part of the "web of contracts setting forth the parties' rights and obligations with respect to the Comanche Assets," *In re Sanchez Energy Corp.*, 631 B.R. at 851, would invade this Court's statutory authority to enter orders necessary for the consummation of a confirmed plan. *See U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002) ("Proceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan meet this criteria because the authority can be exercised only in the context of a bankruptcy case. In other words, such proceedings arise only in bankruptcy.").

74. Try as it might, Carnero cannot sever its claims in the Second Carnero Action from what preceded it. Because the Second Carnero Action involves rights created by bankruptcy law and requires interpretation and enforcement of at least five of this Court's prior orders, as well as four provisions of the Plan, this Court has "arising in," "arising under," or (at the very least) "related to" jurisdiction.

## III. MANDATORY ABSTENTION DOES NOT APPLY

75. "If an adversary proceeding is core, then mandatory abstention does not apply and a court would look to permissive abstention." *Atencio v. Atencio (In re Petroleum Prods. & Servs., Inc.)*, 556 B.R. 296, 301 (Bankr. S.D. Tex. 2016) (citing *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1206 (5th Cir. 1996)). Mandatory abstention is not warranted here because this Court has "arising in" or "arising under" jurisdiction over the Second Carnero Action, as described above. Even so, even if this Court determines that it has only "related to" jurisdiction, mandatory abstention would not apply under the factors listed in 28 U.S.C. § 1334(c)(2).

76. First, although it is true that Carnero has timely filed a motion requesting abstention, the Second Carnero Action is not merely premised on state law claims and is far from the typical contract action seen every day by Texas state courts. *See In re Galaz*, 841 F.3d at 323 (recognizing that even state law claims "may be considered core if they are dependent upon the rights created in bankruptcy") (internal quotations omitted). As discussed *supra* at ¶¶ 70–71, the Second Carnero Action raises important questions relating to bankruptcy law under section 365 of the Bankruptcy Code, as well as federal policy interests underlying the Bankruptcy Code. Moreover, Carnero is wrong in asserting that the Defendants have only alleged jurisdiction under 28 U.S.C. § 1334(b). As explicitly stated in the Defendants' *Notice of Removal*, this Court "has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367." [Carnero II Dkt. No. 1 at ¶ 23].

77. Second, although Carnero insists that the Second Carnero Action can be promptly resolved by the Harris County District Court, Carnero ignores the more than two years of time and resources invested by this Court into understanding these issues, as well as the various interconnected agreements. The Defendants do not dispute that the Harris County District Court is capable, but remand to the state level would almost certainly require additional resources and result in additional cost to educate the court and bring it up to speed.

78. For these reasons, mandatory abstention is inapplicable. Although Carnero asserted its claim through the procedural mechanism of a Texas declaratory judgment action, the substance of that claim is intertwined with the Debtors' bankruptcy cases and bankruptcy law, thus militating against mandatory abstention. *See In re Nat'l Gypsum Co.*, 118 F.3d at 1061 n.9 (noting that the bankruptcy court found that mandatory abstention did not apply to a declaratory judgment action raising a core matter); *Galaz v. Katona (In re Galaz)*, No. 5:14-CV-967, 2015 WL 5565266, at *7 (W.D. Tex. Sept. 21, 2015) (bankruptcy court did not abuse its discretion in holding that mandatory abstention did not apply in core proceeding involving a declaratory judgment action), *aff'd*, 841 F.3d 316 (5th Cir. 2016). Finally, to the extent that Carnero's claims also call for the interpretation of Texas contracts to determine whether a breach occurred, the claims raise no novel questions of state law.

## IV. TO THE EXTENT PERMISSIVE ABSTENTION MAY APPLY, THE BALANCE OF FACTORS FAVORS THIS COURT RETAINING JURISDICTION

79. Normally, abstention is the exception, not the rule. As a general principle, federal courts have a "virtually unflagging obligation to exercise their jurisdiction" except in "extraordinary circumstances." *Schlotzsky's Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's Inc.)*, 351 B.R. 430, 434 (Bankr. W.D. Tex. 2006) (internal quotations omitted). 28 U.S.C. § 1334(c)(1) governs permissive abstention, providing, "nothing in this section prevents a district

court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

80. The relevant factors for permissive abstention include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficult or unsettled nature of applicable law; (4) the presence of related proceedings commenced in state court or other non-bankruptcy proceedings; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy docket; (10) the likelihood that the commencement of the bankruptcy proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of the right to a jury trial; (12) comity; and (13) the possibility of prejudice to other parties in the action. *Atencio*, 556 B.R. at 301. As noted by other bankruptcy courts, these factors are not dispositive, but must be viewed in the larger context of arriving at the equitable application of the permissive abstention doctrine. *See Houston Reg'l Sports Network, L.P. v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.)*, 514 B.R. 211, 217 (Bankr. S.D. Tex. 2014); *In re Schlotzsky's Inc.*, 351 B.R. at 435.

81. The vast majority of these factors weighs against permissive abstention and in favor of this Court retaining jurisdiction over the Second Carnero Action:

- **Factor 1**: Resolving the action in this Court will benefit the efficient administration of the estate because it will keep critical issues with fundamental, core bankruptcy matters (*i.e.*, Mesquite's and Maverick's assumption and rejection of executory contracts) before this Court.

- **Factor 2**: Although Carnero asserts a declaratory judgment claim under Texas state procedural law, bankruptcy law issues (*i.e.*, the effect and meaning of this Court's authorization of the Debtors' assumption and rejection of executory contracts) predominate. The presence of a declaratory judgment claim and state law breach of contract claims does not require remanding an action to state court. *See In re Galaz*, 841 F.3d at 323; *In re Sportsman's Warehouse, Inc.*, 457 B.R. at 387.

- **Factor 3**: If there are difficult or unsettled questions of law, they relate to bankruptcy law (*i.e.*, the applicability of section 365 of the Bankruptcy Code) and not state law.

- **Factor 4**: There are no related state-court proceedings. There, is, however, a related adversary proceeding before this Court: the Declaratory Action (No. 21-04419).

- **Factor 6**: The action is closely related to the Debtors' bankruptcy cases.

- **Factor 7**: Although the action takes the form of a state court declaratory judgment claim and breach of contract claim, the substance of the claim is a core proceeding, implicating vital aspects of the bankruptcy cases.

- **Factor 8**: There is no way to sever Carnero's claims to permit the state court to proceed with portions of the action.

- **Factor 9**: The impact on this Court's docket will be minimal, especially considering this Court's experience in handling the related bankruptcy cases.

- **Factor 11**: Carnero did not make a jury demand in state court, which militates against abstention.

- **Factor 12**: This Court has spent years with the bankruptcy cases. To the extent comity is relevant, it favors the action remaining with the court that has far greater familiarity and history with the cases and the parties. "Given that the case is complicated and has a lengthy history, judicial efficiency supports retaining jurisdiction in this case, despite the [court's] large case load." *In re Galaz*, 2015 WL 5565266, at *9.

- **Factor 13**: No party will be prejudiced by this Court exercising jurisdiction over this action, particularly considering this Court's experience in handling the bankruptcy cases. Indeed, Carnero concedes that "[b]oth forums are capable of adjudicating the claims." Motion at ¶ 59.

82. Of the two remaining factors, Factor 10 is inapplicable because the Second Carnero Action was not initiated in this Court. Carnero accuses the Defendants of forum shopping, Motion

at ¶ 54, yet it is Carnero that has repeatedly sought to evade this Court's jurisdiction by filing actions in state court. Indeed, rather than amend its petition in the First Carnero Action, Carnero voluntarily dismissed the action, laid in wait, and decided to try its luck again in state court, where it alleged effectively the same facts and claims as in the First Carnero Action. Such efforts to abuse or game the judicial process constitute forum shopping on Carnero's part. *See In re Schlotzsky's*, 351 B.R. at 435–36. Carnero cannot complain that Mesquite, Maverick, and the other Defendants are forum shopping by invoking this Court's jurisdiction over the Second Carnero Action simply because they have had success during the course of the Debtors' chapter 11 cases. *See Galaz*, 2015 WL 5565266, at *10.

83. Finally, Factor 5 does not weigh in favor of abstention. Although the Defendants rely on 28 U.S.C. § 1334 for jurisdiction, as discussed *supra*, the Second Carnero Action is closely associated with the Debtors' bankruptcy cases, and there are numerous ties between the two actions. Carnero itself has challenged one of this Court's prior orders by referencing the section 363 sale in the Gavilan bankruptcy case. Resolving Carnero's requests for declaratory judgments will require the interpretation of bankruptcy law, including the effect of assumption and rejection under section 365 of the Bankruptcy Code, and interpretation of at least five of this Court's prior orders. These circumstances weigh against permissive abstention. *See, e.g.*, *In re Senior Care Ctrs. LLC*, 622 B.R. at 694 ("[I]t is readily apparent that the factors weigh heavily against permissive abstention and remand. The crux of this matter . . . requires interpretation of complex aspects of bankruptcy law, including the effect of section 365 lease assumption, plan and plan support document interpretation, plan implementation and consummation, and interpretation of this court's prior orders.").

84. There would be no prejudice to any party resulting from the adjudication of the Second Carnero Action by this Court. That this Court can most efficiently address the action will benefit the Debtors' estates, this Court, and the state court. *See, e.g.*, *Hassell Constr. Co. Inc. v. Hassell (In re Hassell)*, No. 19-30694, 2020 WL 728890, at *6 (Bankr. S.D. Tex. Jan. 7, 2020) (declining to exercise permissive abstention when state law claims were asserted where "efficiency, as well as the direct impact these claims have on the estate, supports hearing these claims in federal court"). Remand would only undermine the Debtors' chapter 11 cases, creating further inefficiency and potentially giving rise to conflicting decisions. Accordingly, this Court should retain jurisdiction over the Second Carnero Action.

**CONCLUSION**

85. For all of these reasons, the Defendants request that the Motion be denied in its entirety.

*[Signature pages to follow]*

Respectfully submitted this 27th day of April, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, Texas 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, Massachusetts 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 27, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
April 29, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP, | § | Adversary No. 21-04419 |
| Plaintiffs, | § | |
| v. | § | |
| Carnero G&P, LLC, | § | |
| Defendant. | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| v. | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# Stipulated Protective Order

Subject to Carnero G&P, LLC's ("Carnero") objection to this Court's subject matter jurisdiction over the above-captioned adversary proceedings (collectively, the "Adversary Proceedings"),[2] this Stipulated Protective Order ("Order") is entered into by and among: (a) the Reorganized Debtors, (b) the parties to the Adversary Proceedings and (c) any other persons or entities who become bound by this Order by signifying their assent through execution of **Exhibit A** hereto. Each of the persons or entities identified in the foregoing clauses (a) through (c) shall be referred to herein individually as a "Party," and collectively as the "Parties."[3] The Parties, by and through their respective attorneys of record and subject to Court approval, have agreed to entry of this Order pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and, as applicable, pursuant to Bankruptcy Rules 7026 and 9014 and Rule 26(c) of the Federal Rules of Civil Procedure (the "Federal Rules").

## RECITALS

WHEREAS, the debtors in the above-captioned Chapter 11 proceeding (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101-1532 (the "Bankruptcy Code") in this Court (the cases commenced by such petitions, the "Chapter 11 Cases"); and the Adversary Proceedings (each a "Dispute" and, collectively, the "Disputes") are now pending in this Court; and

WHEREAS, the Parties have sought or may seek certain Discovery Material (as defined below) from one another with respect to one or more Disputes, including through informal or

---

[2] Entry of this Order in no way shall be construed as a waiver by Carnero G&P, LLC of its objections to this Court's subject matter jurisdiction over the Adversary Proceedings.

[3] The designation of a "Party" is for purposes of reference in this Order only.

formal requests, Rule 2004 notices or motions, or service of document requests, interrogatories, depositions, and other discovery requests (collectively, the "Discovery Requests") as provided by the Federal Rules, the Bankruptcy Rules, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

NOW, THEREFORE, to facilitate and expedite the production, exchange, and treatment of Discovery Material (as defined below) and to protect Discovery Material that a Party seeks to maintain as Confidential Material or Highly Confidential Material (as those terms are defined below), it is hereby stipulated and agreed, and, upon Court approval, it is hereby ORDERED that the following terms will govern any requests for and production of Discovery Material (as defined below):

**Scope of Order**

1. This Order governs the disclosure or exchange of all information and documents produced on or after the entry of this Order ("Effective Date"), by a Party (each a "Producing Party"), to any other Party (each a "Receiving Party"), formally or informally, in connection with a Dispute, in response to or in connection with any Discovery Requests, including, without limitation, deposition testimony (whether based upon oral examination or written questions); interrogatories; answers to interrogatories; requests for admission; responses to requests for admission; documents, information, and things produced in discovery or as an exhibit to a pleading or deposition as well as any and all copies, abstracts, digests, notes, summaries, and excerpts thereof (collectively referred to as "Discovery Material"). "Material," as that term is used herein, includes hard copy documents and electronically stored information contemplated by the Bankruptcy Rules, and the Federal Rules, including but not limited to, writings, drawings, graphs,

charts, photographs, sound recordings, images, data, or data compilations stored in any medium, testimony, exhibits, discovery responses, and all other mediums of expression.

2. Any Party or its counsel serving a subpoena or request upon a non-Party, which subpoena or request requires the production of documents or testimony, shall serve a copy of this Order along with such subpoena or request. Any non-Party that executes and delivers Exhibit A to the other Parties shall be treated as a Party to this Order with all rights and obligations of the signatory Parties hereto. For the avoidance of any doubt, however, reference to becoming a "Party" upon execution of Exhibit A is for the purposes of this Order only and not intended to reflect any agreement as to such party's status as a litigant.

3. Any Producing Party may designate Discovery Material as "Confidential Material" or "Highly Confidential Material" (any such designated Discovery Material, "Designated Material") in accordance with the following provisions:

(a) Confidential Material: A Producing Party may designate Discovery Material as "Confidential" if such Producing Party reasonably believes that: (i) such Discovery Material (A) constitutes or contains nonpublic proprietary or confidential technical, business, financial, personal, or other information of a nature that should be protected under the Bankruptcy Rules or the Federal Rules or (B) is subject by law or by contract to a legally protected right of privacy; or (ii) the Producing Party (A) is under a preexisting obligation to a third party to treat such Discovery Material as confidential or (B) has been reasonably requested by another Party or non-Party to so designate such Discovery Material on the grounds that such other Party or non-Party considers such Discovery Material to contain information that is confidential or proprietary to such Party or non-Party.

(b) Highly Confidential Material: A Producing Party may designate Discovery Material as "Highly Confidential" if such Producing Party reasonably believes (or with respect to documents received from another person, has been reasonably advised by such other person) that such Discovery Material is of such a nature that a risk of competitive injury would be created if such Discovery Material were disclosed to persons other than those identified in Paragraph 8 of this Order, such as trade secrets, sensitive financial or business information, or material prepared by its industry advisors, financial advisors, accounting advisors, experts, or by its consultants (and their respective staff) that are retained by the signatories to this Order in connection with the Disputes or these Chapter 11 Cases if such materials contain trade secrets or sensitive financial or business information, and only to the extent that the Producing Party reasonably believes that such material is of such a nature that "Highly Confidential" treatment is warranted.

(c) Undesignated Material: Subject to the rights and obligations of the Parties under Paragraphs 6 and 22 of this Order, no Party shall have any obligation or duty to maintain confidential or prevent from disclosure any Discovery Material that is not Designated Material ("Undesignated Material").

4. Manner of Designating Discovery Material: Where reasonably practicable, any Designated Material shall be designated by the Producing Party as such by marking each such page "Confidential" or "Highly Confidential" as applicable. Such markings should not obliterate or obscure the content of the material that is produced. Where marking of every page of such materials is not reasonably practicable, such as with certain native file documents, a Producing Party may designate material as "Confidential" or "Highly Confidential" by informing the Receiving Party in a clear and conspicuous manner at the time of production of such material that such material is "Confidential" or "Highly Confidential," such as by including such designation in

the filename and/or the produced Concordance (or other document review platform) load file, if applicable.

5. Late Designation of Discovery Material: The failure to designate particular Discovery Material as "Confidential" or "Highly Confidential" at the time of production shall not operate to waive a Producing Party's right to later designate such Discovery Material as Designated Material or later apply another designation pursuant to this Order ("Misdesignated Material"). At such time, arrangements will be made for the destruction of the Misdesignated Material or for the return to the Producing Party of all copies of the Misdesignated Material and for the substitution, where appropriate, of properly labeled copies of such Discovery Material. Upon receipt of replacement copies of such Misdesignated Material with the proper designation, the Receiving Party or Parties shall take all reasonable steps to return or destroy all previously produced copies of such Misdesignated Material. If requested by the Producing Party, a Receiving Party shall verify in writing that it has taken all reasonable steps to return or destroy such Misdesignated Material. No Party shall be deemed to have violated this Order if, prior to notification of any later designation, such Discovery Material was disclosed or used in any manner consistent with its original designation but inconsistent with its later designation. Once such later designation has been made, however, any Discovery Material shall be treated in accordance with that later designation; provided, however, that if the material that was not designated has been, at the time of the later designation, previously publicly filed with a court, no Party shall be bound by such later designation except to the extent determined by the Court upon motion of the Party that failed to make the designation.

**Use and Disclosure of Confidential or Highly Confidential Material**

6. General Limitations On Use And Disclosure Of All Discovery Material: All Discovery Material shall be used by the Receiving Parties solely for the purposes of a Dispute, and not for any other purpose, including any other litigation or judicial proceedings that are not a Dispute or any business, competitive, governmental, commercial, or administrative purpose or function.

7. Confidential Material: Confidential Material, and any and all information contained therein, may be given, shown, made available to, or communicated only to the following:

(a) the Parties identified in clauses (a) and (b) of the first paragraph of this Order who are signatories to this Order;

(b) any other Party who has signed Exhibit A; and

(c) any other persons specified in Paragraph 8 below.

8. Highly Confidential Material: Highly Confidential Material, and any and all information contained therein, may be given, shown, made available to, or communicated only to the following:

(a) outside counsel, and staff working under the express direction of such counsel, for:

i. the Parties identified in clauses (a) and (b) of the first paragraph of this Order who are signatories to this Order; and

ii. any other Party who has signed Exhibit A; and

(b) professionals retained under Sections 328 and 1103 of the Bankruptcy Code, industry advisors, financial advisors, accounting advisors, experts, and consultants (and their respective staff) that are retained by the signatories to this Order or a Party who has signed Exhibit A in connection with the Disputes; and

(c) any person who is indicated on the face of a document to have been an author, addressee, or copy recipient thereof, an actual recipient thereof, or in the case of meeting minutes, an attendee of the meeting; and

(d) any adverse witness during the course of a deposition where counsel questioning the witness reasonably believes that questioning the witness regarding the document is necessary and that doing so would not cause competitive harm; and

(e) outside photocopying, graphic production services, or litigation support services, as necessary for use in connection with a Dispute; and

(f) court reporters, stenographers, or videographers who record deposition or other testimony in connection with a Dispute; and

(g) the Court, its officers, and clerical staff in any judicial proceeding that may result from a Dispute; and

(h) any mediators and their staffs retained in connection with a Dispute; and

(i) any other person or entity with respect to whom the Producing Party may consent in writing or on the record at a deposition.

9. Designated Material To Be Disclosed Only In Accordance With Paragraphs 7 and 8: Highly Confidential Material, and any and all information contained therein, shall not be given, shown, made available to, disclosed, or communicated in any way, except to those people provided in Paragraph 8 of this Order. Confidential Material, and the substantive information contained therein, shall not be given, shown, made available to, disclosed, or communicated in any way, except to those people provided in Paragraph 7 of this Order. Notwithstanding anything in this Order to the contrary, Highly Confidential Material disclosed by any Producing Party (other than Carnero) to Carnero shall not be disclosed to any employee, officer, director, member, or partner

of TPL SouthTex Processing Company LP, Sanchez Midstream Partners, LP., Evolve Transition Infrastructure LP, or any other member or holder of equity or similar rights in Carnero.

10. Prerequisite to Disclosure of Designated Material: Before any person or their representative identified in Paragraph 8(b), 8(d), or 8(i) hereof is given access to Designated Material, such person or their representative shall be provided with a copy of this Order and shall execute Exhibit A annexed hereto. Each such executed Exhibit A shall be retained in the files of counsel for the Party who gave access to the Designated Material to the person who was provided such access. Such executed Exhibit A shall not be subject to disclosure under the Federal Rules or the Bankruptcy Rules unless a showing of good cause is made and the Court so orders.

11. Sealing of Designated Material Filed With Or Submitted To Court: Unless otherwise agreed by the Producing Party, all Designated Material filed with the Court, and all portions of pleadings, motions, or other papers filed with the Court that disclose Highly Confidential or Confidential Material, shall be filed under seal in accordance with the Federal Rules, the Bankruptcy Rules, the Local Rules, and the individual practice rules of the Court, except that a Party may, at its option, file redacted pleadings containing the Designated Material so long as such portions of the pleadings concerning the Designated Material have been redacted, and such redacted pleading is also filed pursuant to Local Rule 9037-1.

12. Use of Discovery Material in Open Court: The limitations on disclosure in this Order shall not apply to any Discovery Materials offered or otherwise used by any Party at trial or any hearing held in open court except as provided in this paragraph. As part of any pretrial conference or any meet and confer regarding the use of exhibits in any evidentiary hearing, and where practicable at least 24 hours prior to the use of any Designated Material at trial or any hearing to be held in open court, counsel for any Party who desires to offer or use such Designated

Material at trial or any hearing to be held in open court shall meet and confer in good faith with the Producing Party to discuss ways to redact the Designated Material so that the material may be offered or otherwise used by any party, in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules. If the Parties are unable to resolve a dispute related to such Designated Material, then the Producing Party bears the burden of seeking relief from the Court.

**Depositions and Rule 2004 Examinations**

13. Deposition and Rule 2004 Examination Testimony - Manner Of Designation: In the case of depositions, if counsel for a Party believes that a portion of the testimony given at a deposition should be Designated Material of such Party, such testimony may be designated as appropriate by: (a) stating so orally on the record and requesting that only the relevant portion(s) of testimony is so designated; or (b) providing written notice within seven (7) days of the Party's receipt of the final transcript from the court reporter that only the relevant portion(s) of such transcript or recording of a deposition thereof is so designated, except in the event that a hearing on related issues is scheduled to occur within seven (7) days, in which case the foregoing seven (7) day period will be reduced to three (3) business days. Where a hearing or pleading deadline on related issues is scheduled to occur in such close proximity to a deposition that a three-day period is not practical, notice shall be given at the deposition or as soon as practical thereafter. Until expiration of the aforesaid designation period, as applicable, following receipt of the transcript by the Parties, all deposition transcripts and recordings shall be considered and treated as Confidential unless otherwise specified by counsel to any Party on the record at the deposition.

14. Designated Material Used As Exhibits During Depositions: Nothing in Paragraph 13 shall apply to or affect the confidentiality designations on Discovery Material entered as exhibits at depositions.

15. Witness Review of Deposition Testimony: Nothing in Paragraph 13 hereof shall preclude the witness from reviewing his or her deposition transcript.

16. Presence of Persons During Deposition Testimony: When Designated Material is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall, upon request, be excluded from the portion of the deposition so designated. After such exclusion from the portion of any deposition containing Designated Material, if such persons wish to receive written or other recordings of the deposition testimony containing Designated Material, such persons must become a Party to this Order.

17. Responsibilities And Obligations Of Court Reporters: In the event that testimony is designated as Confidential or Highly Confidential, the court reporter, who shall first have agreed to abide by the terms of this paragraph, shall be instructed to include on the cover page of each such transcript the legend, "This transcript portion contains information subject to a Protective Order and shall be used only in accordance therewith," and each page of the transcript shall include the legend "Confidential" or "Highly Confidential," as appropriate. If the deposition is recorded, the recording shall also be subject to the same level of confidentiality as the transcript and include the legend "Confidential" or "Highly Confidential," as appropriate, if any portion of the transcript itself is so designated.

**General Provisions**

18. Unless otherwise agreed by the Parties or ordered by the Court, all deadlines and time periods herein shall be computed pursuant to Bankruptcy Rule 9006.

19. This Order is a procedural device intended to protect Discovery Materials designated as Designated Material. Nothing in this Order shall affect any Party's rights or obligations unrelated to the confidentiality of Discovery Materials.

20. For the purposes of this Order, "writing" shall include electronic mail.

21. Nothing contained herein shall be deemed a waiver or relinquishment by any Party of any objection, including, but not limited to, any objection concerning the alleged confidentiality or proprietary nature of any documents, information, or data requested by a Party; any right to object to any discovery request; any right to object to the admissibility of evidence on any ground; any right to seek any further protective order; or any right to seek relief from the Court or any other applicable court from any provision of this Order by application on notice on any grounds.

22. Unauthorized Disclosure Of Designated Material: In the event of a disclosure by a Receiving Party of Designated Material to persons or entities not authorized by this Order to receive such Designated Material, the Receiving Party making the unauthorized disclosure shall, upon learning of the disclosure: immediately notify the person or entity to whom the disclosure was made that the disclosure contains Designated Material subject to this Order; immediately make reasonable efforts to recover the disclosed Designated Material as well as preclude further dissemination or use by the person or entity to whom the disclosure was made; and immediately notify the Producing Party of the identity of the person or entity to whom the disclosure was made, the circumstances surrounding the disclosure, and the steps taken to recover the disclosed Designated Material and ensure against further dissemination or use thereof. Disclosure of Designated Material other than in accordance with the terms of this Order may subject the disclosing person to such sanctions and remedies as the Court may deem appropriate.

23. Manner Of Objecting To Designated Material: If any Receiving Party objects to the designation of any Designated Material, the Receiving Party shall first raise the objection with the Producing Party in writing, and confer in good faith to attempt to resolve any dispute respecting the terms or operation of this Order. The Receiving Party may seek relief from the Court if the

Receiving Party and the Producing Party cannot resolve their dispute. The burden of justifying a Confidential" or "Highly Confidential" designation is on the Producing Party. Until the Court rules on such an issue, the Designated Material shall continue to be treated according to its designation. Upon motion, the Court may order the removal of the "Confidential" or "Highly Confidential" designation from any Discovery Material so designated that is subject to the provisions of this Order.

24. Timing Of Objections To Designated Material: A Receiving Party shall not be obliged to challenge the propriety of a "Confidential" or "Highly Confidential" designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. The failure of any Party to challenge the designation by a Producing Party of Discovery Materials as "Confidential" or "Highly Confidential" during the discovery period shall not be a waiver of that Party's right to object to such designation at an evidentiary hearing or at trial.

25. Production Of Privileged Discovery Material: Pursuant to Rule 502(d) of the Federal Rules of Evidence, if a Producing Party inadvertently produces materials that the Producing Party later claims in good faith should not have been produced because of a privilege or other protection, such as work-product protection, the production of that material shall not be deemed to constitute the waiver of any applicable privileges or protections. In such circumstances, when the Producing Party becomes aware that privileged or protected material was produced, it must notify the Receiving Party and request, at the Producing Party's election, either the return or the destruction of the produced material. Within 7 days after receiving such notification, the Receiving Party shall, as instructed, return or destroy and confirm destruction of all such produced material, including all copies, notes, and/or summaries thereof in any Receiving Party work product. The Receiving Party shall not use the contents of such material for any purpose, including

in connection with any effort seeking to compel production of the produced material. The Receiving Party must take reasonable steps to retrieve the produced material if the Receiving Party disclosed it before being notified. Such return or destruction and confirmation of destruction shall not preclude the Receiving Party from seeking to compel production of the produced material for reasons other than its production or any information about the contents of the material that was gained due to its production. Moreover, this Order shall not prevent any Party from challenging the designation of such material as privileged or protected and moving to compel production of allegedly privileged or protected documents.

26. Challenging Privilege Determinations: The Receiving Party shall not be obliged to challenge the propriety of privilege determinations at the time asserted, and a failure to do so shall not preclude a subsequent challenge thereto. If the Receiving Party wishes to challenge one or more of the privilege designations made by the Producing Party, the Parties shall first meet and confer in a good faith effort to resolve any dispute concerning any challenged privilege designations. If the Parties are unable to agree on the appropriateness of one or more privilege designations, the Party challenging the privilege designations may present such dispute to the Court. The burden of justifying a privilege designation is on the Party asserting the privilege. Neither Party shall contend that the meet and confer process set forth in this paragraph constitutes a waiver of attorney-client privilege or attorney work product for any document claimed to be protected from disclosure.

27. Use Of Non-Discovery Material: To the extent that any Party has documents or information that would otherwise constitute Discovery Material that (i) are received or become available to a Party on a non-confidential basis not in violation of an obligation of confidentiality to any other person; (ii) were independently developed by such Party without violating its

obligations hereunder; or (iii) are published or become publicly available in a manner that is not in violation of this Order or of any obligation of confidentiality to any other person, including a Party (collectively "Non-Discovery Material"), nothing in this Order shall limit a Party's ability to use Non-Discovery Material for any purpose, including in a deposition, hearing, trial, or otherwise in connection with any Dispute.

28. Obligations Following Conclusion Of The Disputes: Within 90 days of the later of the conclusion of the Dispute(s), including all appeals as to all Parties, all Parties and non-Parties shall, upon the request of the Producing Party, take all commercially reasonable steps to return to counsel for the respective Producing Party, or to destroy, all Discovery Material, and all copies thereof in the possession of any person, except that: counsel may retain for its records their work product and a copy of court filings, deposition transcripts, deposition recordings, deposition exhibits, expert reports, and exhibits introduced at any hearing; and a Receiving Party may retain Discovery Material that is auto-archived or otherwise "backed up" on electronic management and communications systems or servers, or as may be required for regulatory recordkeeping purposes; provided that such retained documents will continue to be treated as provided in this Order. If a Receiving Party chooses to take all commercially reasonable steps to destroy, rather than return, documents in accordance with this paragraph, that Receiving Party shall, if requested by the Producing Party, verify such destruction in writing to counsel for the Producing Party. Notwithstanding anything in this paragraph, to the extent that the information in the Discovery Material remains confidential, the terms of this Order shall remain binding.

29. Continuing Applicability Of Confidentiality Agreement And Stipulated Protective Order: The provisions of this Order shall survive the final termination of the Disputes for any retained Discovery Material. The final termination of the Disputes shall not relieve counsel or

other persons obligated hereunder from their responsibility to maintain the confidentiality of Discovery Material pursuant to this Order, and the Court shall retain jurisdiction to enforce the terms of this Order.

30. Amendment Of Confidentiality Agreement And Stipulated Protective Order: Upon good cause shown, and on notice to all Parties, any Party may move to amend the provisions of this Order at any time or the Parties may agree by written stipulation, subject to further order of the Court if applicable, to amend the provisions of the Order.

31. Disclosure Of Discovery Material In Other Proceedings: Any Receiving Party that may be subject to a motion or other form of legal process or any regulatory process, demand, or request seeking the disclosure of a Producing Party's Discovery Material: (i) shall promptly notify the Producing Party (unless such notice is prohibited by applicable law) to enable it to have an opportunity to appear and be heard on whether that information should be disclosed, and (ii) in the absence of a court order preventing such legally required disclosure, the Receiving Party shall be permitted to disclose only that portion of the information that is legally required to be disclosed and shall inform in writing any person to whom such information is so disclosed of the confidential nature of such information.

32. Use Of Discovery Material By Producing Party: Nothing in this Order affects the right of any Producing Party to use or disclose its own Discovery Material in any way. Such disclosure, other than publicly filing its own Discovery Material, will not waive the protections of this Order and, subject to Paragraph 27, will not otherwise entitle other Parties, non-Parties, or their attorneys to use or disclose such Discovery Material in violation of this Order.

33. Obligations Of Parties: Nothing herein shall relieve a Party of its obligations under the Federal Rules, Bankruptcy Rules, Local Rules, or under any future stipulations and orders,

regarding the production of documents or the making of timely responses to Discovery Requests in connection with any Dispute.

34. Advice Of Counsel: Nothing herein shall prevent or otherwise restrict counsel from rendering advice to their clients in connection with the Disputes and, in the course thereof, relying on examination of Discovery Material; provided, however, that in rendering such advice and otherwise communicating with such clients, counsel shall not make specific disclosure of any information in any manner that is inconsistent with the restrictions or procedures set forth herein.

35. Prior Agreements: The Parties agree that the provisions and requirements set forth in this Order supersede all prior agreements with respect to Discovery Material, provided however, that this Order shall not affect, amend, or modify any existing confidentiality agreements, non-disclosure agreements, intercreditor agreements, or protective orders applicable to any Party or between any Parties that relate to documents or information exchanged or received prior to the Effective Date of this Order.

36. Enforcement: The provisions of this Order constitute an Order of this Court and violations of the provisions of this Order are subject to enforcement and the imposition of legal sanctions in the same manner as any other Order of the Court.

**THE FOREGOING STIPULATION IS SO ORDERED**.

Signed: April 29, 2022

Marvin Isgur
United States Bankruptcy Judge

**IT IS SO STIPULATED**:

Dated: April 29, 2022

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Reorganized Debtors and Defendants Mesquite Energy, Inc. and SN EF Maverick, LLC**

*/s/ Thomas A. Woolley, II*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant Mitsui E&P Texas LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Joshua W. Wolfshohl*
Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36thFloor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com
**Attorneys for Carnero G&P LLC**

# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| SN EF Maverick, LLC, Mesquite | § | |
| Energy, Inc., Eagle Ford TX LP, Venado | § | Adversary No. 21-04419 |
| EF L.P., Mitsui E&P Texas LP, and SN | § | |
| EF UnSub LP, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Carnero G&P, LLC, | § | |
| Defendant. | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| SN EF Maverick, LLC, and Mesquite | § | |
| Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

## Acknowledgement

1. My name is _______________________________________________________.

2. My address is ______________________________________________________.

3. My present employer is ______________________________________________.

4. My present occupation or job description is ________________________________.

5. I have been engaged as______________________________________________ on behalf of ____________________________________________________________ in one of the above-captioned Adversary Proceedings.

6. I acknowledge that I have read and understand the terms of the Stipulated Protective Order ("Order"). I agree to comply with and be bound by all the provisions of the Order. I agree that I will not use Discovery Material for any purpose other than the Disputes, and will not disclose or cause Discovery Material to be disclosed to anyone not expressly permitted by the Order to receive Discovery Material. By acknowledging these obligations under the Order, I understand that I am submitting myself to the jurisdiction of the United States Bankruptcy Court for the Southern District of Texas for the sole purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Order could subject me to punishment for contempt of Court.

By:________________________________________ Executed on __________________ , 2022.

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508[2] |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |

## Adversary Plaintiff's Reply in Support of Its Motion to Remand to State Court or for Abstention

(Related to Dkt. No. 6)

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Referred to as "Main Case" in docket entry references.

# Table of Contents


Summary of the Relief Requested ........................................................................................ 1

Argument ........................................................................................................................ 2

I. The State Court Lawsuit does not arise under the Code. ...................................................... 2

II. The State Court Lawsuit does not arise in bankruptcy. ......................................................... 6

III. The State Court Lawsuit does not give rise to post-confirmation, related-to jurisdiction. .... 9

IV. The factors in favor of mandatory abstention and permissive abstention are met. ............. 12

# Table of Authorities

**Page(s)**

**Cases**

*ABB Inc. v. Cooper Indus., LLC*,
635 F.3d 1345 (Fed. Cir. 2011)....7

*In re ABC Dentistry, P.A.*,
No. 16-34221, 2021 WL 955932 (Bankr. S.D. Tex. Mar. 12, 2021)....8

*In re Blast Energy Servs., Inc.*,
396 B.R. 676 (Bankr. S.D. Tex. 2008) ....9

*Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin)*,
507 B.R. 169 (W.D. Tex. 2014)....9

*City of Covington v. Covington Landing Ltd. P'ship*,
71 F.3d 1221 (6th Cir. 1995) ....4

*In re Craig's Stores of Tex., Inc.*,
266 F.3d 388 (5th Cir. 2001) ....3, 9, 11, 13

*E.I. DuPont De Nemours & Co. v. Sawyer*,
No. CV H-06-1417, 2006 WL 8445549 (S.D. Tex. June 30, 2006)....7

*In re Fieldwood Energy LLC*,
No. 20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021)....9

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*,
463 U.S. 1 (1983)....6

*In Re G-I Holdings, Inc.*,
564 B.R. 217 (Bankr. D.N.J. 2016), *aff'd sub nom. In re G-I Holdings Inc.*,
No. 01-30135 (RG), 2017 WL 1788656 (D.N.J. May 5, 2017)....13

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)....3

*In re MPF Holding U.S. LLC*,
495 B.R. 303 (Bankr. S.D. Tex. 2013) ....5

*Newby v. Enron (In re Enron Corp. Sec.)*,
535 F.3d 325 (5th Cir. 2008) ....9

*Perelman v. Perelman*,
688 F. Supp. 2d 367 (E.D. Pa. 2010) ........................................................................7

*Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*,
344 U.S. 237 (1952)...........................................................................................................7

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ...........................................................................................4

*In re Sanchez Energy Corp.*,
631 B.R. 847 (Bankr. S.D. Tex. 2021) .............................................................................12

*In re Today's Destiny, Inc.*,
No. 05-90080, 2007 WL 2028111 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) .......................12

*Trent v. Nat'l City Bank of Indiana*,
145 F. App'x 896 (5th Cir. 2005) ......................................................................................7

*In re TXNB Internal Case*,
483 F.3d 292 (5th Cir. 2007) ...........................................................................................12

**Statutes**

11 U.S.C. § 365.......................................................................................................... *passim*

28 U.S.C. § 1334.................................................................................................6, 12, 13

28 U.S.C. § 1367.........................................................................................................12

Carnero G&P LLC ("Carnero") files this reply in support of its Motion to Remand to State Court or for Abstention to return this case to the 215th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. Carnero is not sure what petition serves as the basis of Defendants' Objection to Plaintiff's Motion to Remand or for Abstention ("Response"). To avoid remand, like many of the positions taken by Defendants and others throughout the course of the bankruptcy proceeding, the Response focuses on a litany of contracts and orders that are neither germane, relevant, nor even mentioned in Carnero's petition. Carnero's state law claims are premised only on the GGPA Contracts,[3] contracts that the Reorganized Debtors assumed more than two years ago. The State Court Lawsuit addresses Carnero's rights under those agreements and the effect on the GGPA Contracts of Defendants' post-Effective Date amendments to other assumed contracts, all such amendments being made without Bankruptcy Court supervision, action, or approval. For the state court to decide Carnero's breach of contract and declaratory relief claims, it must only review and interpret contracts—tasks which state district courts in Texas tackle thousands of times each year,[4] including cases involving hydrocarbons agreements like those at issue in this case.[5] This is unsurprising for two reasons—contract claims are borne of State law, not federal law, and Texas is the oil and gas capital of the world. Carnero's claims are narrow, involving the Defendants'

---

[3] Capitalized terms have the same meaning as in Carnero's motion to remand.

[4] The Texas Judicial Branch Statistics show that statewide plaintiffs filed 111,836 new contract based lawsuits in Texas District Courts between January 1, 2020, and April 30, 2022. TJB | Judicial Data | Statistics & Other Data (txcourts.gov)

[5] With just these search terms, adv: (oil gas hydrocarbons midstream "production sharing" purchasing gathering processing marketing) +4 (agreement contract), Westlaw returns more than 1,600 Texas appellate cases involving oil and gas contracts.

dedications to Carnero and Carnero's rights with respect to that dedication. As such, there is no question that state courts are well-equipped to address Carnero's purely Texas state law claims.

2. When focusing on what Carnero actually pleaded, this Court will recognize that all of Defendants' responsive arguments are predicated on claims Carnero does not make and address issues that are not raised in Carnero's petition. Defendants swing and miss on all of their arguments in favor of this Court's jurisdiction. It's time to end the Defendants' far-fetched and ill-founded arguments claiming bankruptcy court jurisdiction and send this case back to Texas state court, where it rightfully belongs. Moreover, as the Reorganized Debtors have exited bankruptcy and only an approximate 12.5% of the Comanche working interest was subject to the Reorganized Debtors' bankruptcy case, this Court should not be further burdened with proceedings relating to claims principally against non-debtors and, to a lesser extent, post-confirmation claims against the Reorganized Debtors. The State Court Lawsuit is neither a core proceeding nor a related-to proceeding. The Court should remand this adversary proceeding to state court or abstain from hearing the State Court Lawsuit under either mandatory abstention or permissive abstention or both.

## Argument

### I. The State Court Lawsuit does not arise under the Code.

3. On December 21, 2021, the dust settled as to the assumption/rejection battles that entangled the Midstream Agency Agreements and other contracts at issue when Reorganized Debtors announced their settlement of the Oxy Adversary.[6] Yet, Defendants curiously assert that the State Court Lawsuit arises under the Code because Section 365 gives the Court jurisdiction over lawsuits litigating assumption or rejection of executory contracts. Carnero does not dispute

[6] Adversary No. 20-03198, *Occidental Petroleum Corp., et al. v. Sanchez Energy Corporation, et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Oxy Adversary").

that Section 365 gives the Court such jurisdiction. But Section 365 is inapplicable here. Not a single claim in the State Court Lawsuit seeks to litigate assumption or rejection of any executory contract. Contrary to Defendants' assertion, no continuing assumption/rejection litigation remains as to the contracts at issue.

4. Defendants cite *Mission Prod. Holdings, Inc. v. Tempnology, LLC,* 139 S. Ct. 1652, 1659 (2019) for the proposition that the Bankruptcy Court automatically has jurisdiction to decide the consequences of assumption or rejection. That case is distinguishable. Tempnology filed for bankruptcy on September 1, 2015, and the next day filed a motion to reject executory contracts including its contract with Mission. The court granted that motion. Just six weeks later, on October 15, 2015—*before the court confirmed any plan of reorganization or liquidation*—debtor Tempnology, as plaintiff, returned to the bankruptcy court for clarification whether the rejection of Mission's contract had terminated its right to use debtor's trademarks for the duration of the contract. No party disputed that the court had jurisdiction to hear a claim that arose pre-confirmation, while an estate still existed, concerning Mission's pre-confirmation activities and the application of Section 365(n) to Mission's license to use debtor's trademarks.

5. The posture here differs materially. Carnero did not return to this Court; Defendants returned to this Court by removing the State Court Lawsuit. The removal came long after plan confirmation, when jurisdiction is limited and does not extend to post-confirmation contract disputes between Reorganized Debtors and their counterparty arising from post-confirmation activity. *See In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 391 (5th Cir. 2001). Unlike Tempnology, Carnero is not seeking any relief under Section 365 or an interpretation of that section or any order of this Court.

6. Additionally, Reorganized Debtors proposed, confirmed, and implemented a Plan that authorized them (1) to operate their business and settle causes of action without supervision or approval by the Court and free of restrictions of the Code or the Rules; and (2) to modify assumed contracts by agreement with counterparties without court authorization. *See* [Main Dkt. 1212], Plan Art. IV.G, V.A. Reorganized Debtors made the decision to modify the Existing Commitments while operating in the post-confirmation, cold, cruel business world and must face the consequences of that decision by defending Carnero's state law contract claims under the GGPA Contracts in state court. To decide the State Court Lawsuit in this Court would turn post-confirmation jurisdiction into a never-ending proposition that allows Reorganized Debtors (or, speaking more broadly, any debtor) to return to this Court and litigate issues arising from post-confirmation modifications made to any assumed contracts, even many years later. It would mean once a debtor, always a debtor, for purposes of protection under the Code. That is not, and for practical policy reasons cannot be, the law.

7. Defendants also argue that Reorganized Debtors had authority to undertake consensual modification to contracts assumed in December 2021 pursuant to the Stipulation and Agreed Order [Main Case Dkt. 2253] entered in the Oxy Adversary. Carnero has never argued that Reorganized Debtors did not have the ability to modify the contracts. However, consensual modifications to these assumed contracts fall outside of Section 365's concern. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("true renegotiation of [the Reorganized Debtors'] obligations…falls entirely outside of § 365's concern"); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("Section 365 does not speak to the situation in which the parties to the contract negotiate an amended contract."). As a result, Carnero's claims arising from the effect of Reorganized Debtors' consensual, post-

confirmation modifications to assumed contracts made to settle the Oxy Adversary do not arise under Section 365.

8. Defendants cite *In re MPF Holding U.S. LLC*, 495 B.R. 303, 312 (Bankr. S.D. Tex. 2013) to argue that consensual modification does not mean that Section 365 does not apply. But the facts in *MPF Holdings* differ from those here. There, the issue was whether the trustee could avoid, as preferences, payments made to Mustang that arose from the debtor's assumption and novation of its contract with Mustang, which was subsequently assigned to COSCO. The novation of that contract (and other contracts with other vendors) was *expressly authorized* under the plan—which attached as an exhibit the authorized Novation Agreements (a term defined in the plan). The plan further stated executory contracts were "being assumed pursuant to the Plan or the Assignment and Purchase Agreement and the *applicable Novation Agreement*" and provided that the "Confirmation Order shall constitute an order of the Court under [Section 365] approving the contract Novation Agreements." *Id.* The court held that the plan authorized assumption of executory contracts under Section 365 pursuant to the novation agreements. The court had knowledge of the existing contracts and the agreed novations when confirming that the assumption, novation, and assignment of the vendor contracts was a proper exercise of the debtor's business judgment under Section 365.

9. In contrast, here the Reorganized Debtors (1) did not include any specific provisions in the Plan addressing modifications to any executory contracts, (2) did not attach any proposed amendments to any executory contracts to the Plan, (3) did not provide that modifications to any specific assumed executory contracts were being approved under Section 365 pursuant to the Plan, and (4) did not disclose the December 21, 2021 amendments to the Court. Instead, Reorganized Debtors included provisions in the Plan allowing them to operate their business post-

Effective Date without supervision or approval by the Court, free of any restrictions of the Code or the Rules ([Main Dkt. 121], Plan Art. IV.G), and to agree with their counterparties to make consensual modifications to assumed contracts without court authorization. *Id*. at Art. V.A. As a result, Mesquite's (undisclosed) post-confirmation modifications to its assumed contracts were not made pursuant to Section 365. Accordingly, it is not critical to the implementation of the Plan—which is now complete—that the Court hear the State Court Lawsuit. Defendants' arguments provide no basis for this Court to exercise arising under jurisdiction over the State Court Lawsuit.

**II. The State Court Lawsuit does not arise in bankruptcy.**

10. To support their argument that the Court has arising-in jurisdiction over the State Court Lawsuit, Defendants cite numerous Plan provisions and prior orders of this Court. Defendants argue those Plan provisions and orders give this Court jurisdiction over Carnero's claims. Defendants never once explain *why* the Plan or the orders need to be consulted to address the merits of Carnero's state law contract claims. For that, the state court need only consult the contracts at issue. As a result, Carnero's claims arise purely under state law and not in the bankruptcy.

11. Defendants also assert that the Court should consider their defenses to Carnero's claims because the "coercive action" rule requires the Court to consider defenses in determining its jurisdiction under 28 U.S.C. § 1334. Even if this standard applies (which it does not in this case), Defendants can't carry their burden.

12. The rule that Defendants cite provides that federal courts may exercise jurisdiction over declaratory judgment suits where, ***if*** the declaratory-judgment defendant (Defendants here) were to bring a coercive action to enforce its rights, the suit would present a federal question. *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 20 (1983). Coercive claims seek compensatory damages or injunctive relief; declaratory claims

only declare the rights and legal relations of an interested party seeking the declaration. *Perelman v. Perelman*, 688 F. Supp. 2d 367, 373 (E.D. Pa. 2010) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) and 28 U.S.C. § 2201(a)); *see also Trent v. Nat'l City Bank of Indiana*, 145 F. App'x 896, 898 (5th Cir. 2005) (recognizing difference between claims for declaratory relief and claims for monetary, injunctive, or other relief).

13. This rule recognizes that declaratory-judgment plaintiffs often use declaratory judgment actions to assert defenses to expected claims, not already pending claims. Thus, where the declaratory judgment complaint "seeks in essence to assert a defense to an impending or threatened" suit, "the character of the threatened action, and not of the defense" determines whether federal question jurisdiction exists. *Pub. Serv. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 248 (1952); *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1351 (Fed. Cir. 2011) ("The general rule…is that declaratory judgment jurisdiction exists where the defendant's coercive action arises under federal law" and applying the rule to contract dispute concerning patents, which presented federal questions whether claimant seeks to enforce or invalidate patent or declaration of noninfringement).

14. A declaratory judgment action merely substitutes "for a more traditional action for damages or injunctive relief[, so] the Court must consider whether a well-pleaded complaint in such a traditional action would present a federal issue." *E.I. DuPont De Nemours & Co. v. Sawyer*, No. CV H-06-1417, 2006 WL 8445549, at *3 (S.D. Tex. June 30, 2006) (citing *Franchise Tax Bd.*, 463 U.S. at 19-20; *Wycoff*, 344 U.S. at 248).

15. Applying this "coercive action" test to the State Court Lawsuit does not give this Court jurisdiction. First, the State Court Lawsuit does not seek only declaratory relief. Carnero seeks affirmative declaratory relief *and* breach of contract relief; it is not seeking declarations to

defend coercive contract claims that Defendants would make in a traditional action. That alone means the "coercive action" test does not apply. Even if it did, Defendants' reliance on the complaint in their December 21, 2021 Declaratory Action filed in this Court does not satisfy the test. That complaint asserts *no* coercive claims—no breach of contract claims, no injunctive relief, or any other coercive claims of any kind. It seeks only declarations, many of which are aimed at defending Carnero's affirmative declaratory relief and breach of contract claims in the State Court Lawsuit, and advisory declarations against claims Carnero does not make. Accordingly, Defendants' non-coercive Declaratory Action does not give this Court arising-in jurisdiction over the State Court Lawsuit under the "coercive action" rule.

16. Defendants' reliance on *In re ABC Dentistry, P.A.*, No. 16-34221, 2021 WL 955932, at *4 (Bankr. S.D. Tex. Mar. 12, 2021) to support their arising-in argument is similarly misplaced. In that case, this Court held that it had arising-in jurisdiction over state law claims between non-debtors not because those claims implicated the plan or any orders of the former debtor's bankruptcy case, but because "the conduct set forth in the amended complaint involved Dr. Rohi's attorneys making material representations to Dr. Rohi, which directly influenced proceedings before this Court, and then failing to disclose those agreements to the Court." *Id*. The claims were "front and center" to the bankruptcy case because Dr. Rohi's attorneys had allegedly corrupted the very proceedings of the Court itself. *Id*.

17. Here, the State Court Lawsuit asserting state law contract claims under the GGPA Contracts does not raise issues that make the Plan or any order of the Court factually central to the dispute. Defendants continue to assert that the Court must review its orders to decide Carnero's claims, but they do not identify how or why such review is necessary. The state court can resolve

the State Court Lawsuit with reference only to the specific contracts at issue. This Court lacks arising-in jurisdiction over Carnero's post-confirmation state law contract claims.

**III. The State Court Lawsuit does not give rise to post-confirmation, related-to jurisdiction.**

18. The State Court Lawsuit involves post-confirmation state law contract claims that arose based on Defendants' post-confirmation activities to amend certain assumed contracts in a manner that breaches Defendants' contracts with Carnero. Thus, the Court lacks related-to jurisdiction over the State Court Lawsuit under the rule and three-prong test announced by the Fifth Circuit in *Craig's Stores*. *See Newby v. Enron (In re Enron Corp. Sec.),* 535 F.3d 325, 335 (5th Cir. 2008) (noting that the "facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities"); *Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin),* 507 B.R. 169, 178 (W.D. Tex. 2014) ("Although the holding of *Craig's Stores*—that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan'—was somewhat broad, the facts that precipitated that holding were narrow, involving post-confirmation claims based on post-confirmation activities").

19. This Court has analyzed the post-confirmation, related-to jurisdiction under *Craig's Stores'* three prong test. *In re Fieldwood Energy LLC*, No. 20-33948, 2021 WL 4839321, at *5 (Bankr. S.D. Tex. Oct. 15, 2021). It has not applied the six-factor test set out in *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684 (Bankr. S.D. Tex. 2008). The three factors are: (1) the claims at issue "principally dealt with post-confirmation relations between the parties;" (2) "[t]here was no antagonism or claim pending between the parties as of the date of the reorganization;" and (3) "no facts or law deriving from the reorganization or the plan [were] necessary to the claim." *Fieldwood*, 2021 WL 4839321 at *5 (quoting *Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008)).

20. As to the first factor, Carnero's claims in the State Court Lawsuit did not arise until Reorganized Debtors amended the Midstream Agency Agreements in December 2021. Carnero's claims seek relief that directly relates to the effect of those amendments (not Defendants' choice to assume the contracts) on Carnero's rights under the GGPA Contracts. Consequently, Carnero's claims arose post-confirmation based on Defendants' post-confirmation activities and deal with the post-confirmation relations of the parties to the GGPA Contracts with respect to Comanche Gas.

21. As to the second factor, Defendants claim that the issues in the State Court Lawsuit "relate back to the pre-confirmation period and these *current issues* were at the heart of the settlement between the parties." The Court will recall that the issues pre-confirmation related to rejection of the onerous Midstream Agency Agreements. Carnero and Defendants had not discussed nor contemplated the (still undisclosed) amendments that Defendants made on December 21, 2021 to those agreements, which were all made without court supervision, review, or approval. The June 2020 Settlement Agreement [Main Dkt. 1309, 1415] was entered into with court supervision, review, and approval and nowhere reflects that amendments to the Midstream Agency Agreements were contemplated. Instead, the Settlement Agreement contemplated amendments to certain of Carnero's agreements and others but rejection of the Midstream Agency Agreements. Antagonism may have existed at confirmation between Reorganized Debtors and the *Oxy parties* regarding assumption of the Midstream Agency Agreements, but there was none with Carnero, who expected the Reorganized Debtors to consummate rejection of those agreements and the amendments to the Carnero agreements. Carnero had no ability to divine what the Reorganized Debtors would do more than 18 months later. As a result, no antagonism between Carnero and

Defendants existed at confirmation in April 2020 [Main Dkt. 1212] as to the current issues that arose in December 2021.

22. As to the third factor, as noted, the state court can decide Carnero's claims in the State Court Lawsuit without reference to any facts or law deriving from the reorganization or the Plan. The Texas state court need only analyze the contracts at issue. The Reorganized Debtors have already implemented the Plan with respect to these contracts—i.e., they have already exercised their Section 365 rights—despite whatever extraordinary circumstances they faced at confirmation. And Defendants again cite no provision of the Plan or any order that would be necessary to decide the merits of Carnero's claims. As a result, the State Court Lawsuit does not bear on the implementation, interpretation, or execution of the Plan, and the Court lacks related-to jurisdiction. *See Craig's Stores*, 266 F.3d at 390-91.

23. Defendants make several other arguments that do not address the issue of related-to jurisdiction but instead assert policy concerns about the operation of Section 3.1(b) of the GGPA. That section does not raise any important question of federal bankruptcy law or policy. The Plan is long confirmed, there is no more estate, and no windfall can be had at the expense of the non-existent estate. That section has—and had—no impact on Reorganized Debtor's exercise of their Section 365 rights, and the *exercise* of those rights is not what Carnero complains about in the State Court Lawsuit. The core issue is whether the still-undisclosed amendments Reorganized Debtors made to certain assumed contracts[7] caused Defendants to breach their obligations to Carnero under the assumed as-is GGPA Contracts. The Defendants were free to amend the contracts however they saw fit, but they cannot escape facing the consequences of their operational

[7] Defendants purport to summarize those amendments in their response, but Carnero (and this Court) has not seen the amendments and thus it has no basis to assess for itself whether what Defendants assert is true. Carnero continues to believe that the amendments have a material impact on the parties' rights and obligations under the GGPA to the detriment of Carnero.

decisions as reorganized debtors sailing forth in the cold, cruel business world. Carnero's claims raise no specter of additional orders needed from this Court to consummate the Plan.

24. Finally, this Court has not dealt with the terms of the GGPA Contracts as applied to the parties' rights and obligations under that agreement. The fact that the GGPA Contracts are tangentially related to a web of contracts among Defendants and Oxy does not create related-to jurisdiction over the State Court Lawsuit that does not seek relief under contracts other than the GGPA Contracts. This Court did not so hold in *In re Sanchez Energy Corp.*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021), and Defendants cite no other case supporting their assertion.

**IV. The factors in favor of mandatory abstention and permissive abstention are met.**

25. Carnero's Motion to Remand has sufficiently briefed the issues of mandatory and permissive abstention. Both the mandatory and permissive abstention factors are met for the reasons stated in the Motion to Remand [Dkt. 6] and this Reply. Carnero responds on only three points.

26. First, in their argument against mandatory abstention, Defendants again contend that they asserted supplemental jurisdiction under 11 U.S.C. § 1367, but again offer no argument in support. "Bankruptcy courts may not exercise supplemental jurisdiction." *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir. 2007). This Court agrees that it "does not have supplemental subject matter jurisdiction over pendent claims under 28 U.S.C. § 1367." *In re Today's Destiny, Inc.*, No. 05-90080, 2007 WL 2028111, at *2 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) (cleaned up). If the Court were to have jurisdiction, it could only be under Section 1334 (*Id.*), but as explained in Carnero's argument, the Court lacks jurisdiction under that section, too.

27. Second, Defendants assert that the Court's investment of two-years' time in this bankruptcy proceeding disfavors mandatory abstention in a lawsuit in which the Court has no core jurisdiction. Courts have mandatorily abstained in cases where the court has a *15-year* history with

the bankruptcy proceeding. *See In Re G-I Holdings, Inc.*, 564 B.R. 217, 253 (Bankr. D.N.J. 2016), *aff'd sub nom. In re G-I Holdings Inc.*, No. 01-30135 (RG), 2017 WL 1788656 (D.N.J. May 5, 2017). While Carnero appreciates the Court's history with the Sanchez bankruptcy proceeding, as Defendants concede, the Harris County District Courts are perfectly capable of hearing the State Court Lawsuit. The Court should mandatorily abstain.

28. Third, Defendants assert Carnero would suffer no prejudice from adjudication of the State Court Lawsuit in this Court because this Court can most efficiently address the action to the benefit of Debtors' estates and the state court. As *Craig's Stores* notes, at this post-confirmation stage, no estate exists that can benefit. *Craig's Stores*, 266 F.3d at 390. The Harris County District Courts handle thousands of contract actions every year.[8] Carnero, as plaintiff, chose the state court in which to file the State Court Lawsuit. It should be given the benefit of its chosen forum.

**Conclusion**

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and five non-debtors, seeks only state court relief. As a result, this Court lacks post-confirmation jurisdiction under 28 U.S.C. § 1334(b) to hear this adversary proceeding, and Carnero asks that it remand the case to the state court. Alternatively, Carnero requests that this Court mandatorily abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(2), and the factors support its request. Finally, the factors relating to permissive abstention under 28 U.S.C. § 1334(c)(1) favor this Court's permissively abstaining from hearing this adversary proceeding. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

Dated: May 9, 2022.

[8] *See* n.4, *supra*.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on May 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshoh

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

# DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

**If you object to the relief requested, you must respond in writing.**

**Unless otherwise directed by this Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed.**

**If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, this Court may treat the pleading as unopposed and grant the relief requested.**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

# TABLE OF CONTENTS


TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 7

I. The Comanche Assets—Midstream Development and Sale ........ 7

II. The Carnero Processing Arrangement ........ 11

A. The GGPA, the Ratification Agreements, and the Letter Agreement ........ 11

III. MCom's Purchase of Gavilan's Interest in the Comanche Assets ........ 14

IV. The Midstream Restructuring ........ 16

V. Procedural History ........ 18

ARGUMENT ........ 21

I. The Midstream Restructuring Did Not Breach The GGPA ........ 22

II. Carnero's Attack On The Midstream Restructuring Is Now Barred ........ 28

III. The WIPs And UnSub Have Not Breached Any Obligation To Carnero ........ 32

A. The WIPs' and UnSub's Obligation to Supply Hydrocarbons Is Entirely Derivative of Maverick's Obligations, and Hence Also Excepted from Delivery to Carnero ........ 32

B. Even if the WIPs and UnSub are Synthetic Parties to the GGPA, Their Obligation to Supply Hydrocarbons Is Subject to the Existing Commitments ........ 33

IV. The Comanche Working Interests Acquired From Gavilan Remain Subject To The Existing Commitments ........ 35

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*,
523 F.2d 164 (2d Cir. 1975)....................27

*In re Boscov's Inc., et al.*,
No. 08-11637 (Bankr. D. Del. Aug. 15, 2008) ....................28

*In re Boston Blackies Mgmt., Inc.*,
Nos. 09-B-44643, 09-B-44734, 2010 WL 3310351 (Bankr. N.D. Ill. May 17, 2010) ....................31

*Brand Coupon Net., LLC. v. Catalina Mktg. Corp.*,
748 F.3d 631 (5th Cir. 2014) ....................22

*In re Burner*,
109 B.R. 216 (Bankr. W.D. Tex. 1989)....................31

*In re Charter Commc'ns, Inc.*,
691 F.3d 476 (2d Cir. 2012)....................31

*In re Fairway Grp. Holdings Corp., et al.*,
No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020) ....................28

*In re: Gavilan Resources, LLC*,
Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) ....................15

*In re Golfsmith Int'l Holdings, Inc.*,
No. 16-12033 (LSS), 2017 WL 5564291 (Bankr. D. Del. Jan. 19, 2017) ....................28

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) ....................22

*Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.*,
914 F.2d 74 (5th Cir. 1990) ....................21

*In re Howe*,
78 B.R. 226 (Bankr. D. S.D. 1987)....................27

*James v. Wells Fargo Bank, N.A.*,
CA No. H-14-0449, 2014 WL 2123060 (S.D. Tex. May 21, 2014)....................21, 22

*In re Jamesway Corp.*,
201 B.R. 73 (Bankr. S.D.N.Y. 1996)....................27, 28

*N.L.R.B. v. Bildisco & Bildisco*,
465 U.S. 513 (1984)....................27

*Peacock v. AARP, Inc.*,
181 F. Supp. 3d 430 (S.D. Tex. 2016)....................22

*Peddy v. Aaron's Inc.*,
CA No. 18-1625, 2019 WL 763510 (E.D. La. Feb. 21, 2019)....................22

*In re Platinum Oil Props., LLC*,
465 B.R. 621 (Bankr. D.N.M. 2011)....................31

*Reservoir, Inc. v. Truesdell*,
CA No. 4:12-2756, 2013 WL 1828838 (S.D. Tex. Apr. 30, 2013)....................21

*Richmond Leasing Co. v. Cap. Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985)....................27

*Robb v. Schindler*,
142 B.R. 589 (D. Mass. 1992)....................28

*In re Sanchez Energy Corp. ("Sanchez")*,
631 B.R. 847 (Bankr. S.D. Tex. 2021)....................7, 8, 10

*Semi-Tech Litig., LLC v. Bankers Tr. Co.*,
272 F. Supp. 2d 319 (S.D.N.Y. 2003)....................31

*South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*,
129 B.R. 200 (9th Cir. BAP 1991)....................28

*Sparks v. Tex. Dept. of Transp.*,
144 F. Supp. 3d 902 (S.D. Tex. 2015)....................22

*In re Sportsman's Warehouse, Inc.*,
No. 09-10990 (CSS), 2013 WL 492554 (Bankr. D. Del. Feb. 7, 2013)....................32

*In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
9 F.4th 1 (1st Cir. 2021)....................27

*In re The National Sugar Refining Co*.,
21 B.R. 196 (Bankr. S. D. N. Y. 1982)....................28

*In re Trans World Airlines, Inc*.,
261 B.R. 103 (Bankr. D. Del. 2001)....................26

*Matter of U. L. Radio Corp*.,
19 B.R. 537 (Bankr. S.D.N.Y. 1982)....................26

*In re Winn-Dixie, Inc.*,
No. 05-03817 (M. D. Fla 2005) ....................................................................................28

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), and SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Defendants"), by and through counsel, bring this Motion for Judgment on the Pleadings (the "Motion") as to the claims asserted against them in this action, and in support thereof state as follows:

## PRELIMINARY STATEMENT[2]

1. Under the 2018 GGPA (as defined below), Maverick promised all ***undedicated*** "Comanche" volumes to Carnero for processing until April 1, 2033. However, virtually all Comanche volumes were already subject to Existing Commitments (as defined below) for processing elsewhere through June 30, 2033. At the time, the parties expected that the Comanche hydrocarbon volumes would grow under a robust drilling program; unfortunately for Carnero, such volumes did not grow. In December 2021, Maverick assumed the Existing Commitments without modification, but improved midstream economics for working interest owners. Carnero's Amended Petition (as defined below) in this action presents a straightforward question: Does Maverick's Midstream Restructuring (as defined below) permit Maverick to retain the Existing Commitments while improving economics for working interest owners? Carnero seeks a finding that it does not and that the assumption in bankruptcy unwittingly destroyed the Existing Commitments.

---

2 Unless otherwise specified, capitalized terms used but not defined in this Motion have the meanings given them in the *Amended and Supplemental Complaint* filed on the docket of the Declaratory Action (as defined below). For clarity, this Motion cites entries on the docket of the main bankruptcy case as "Dkt. No. ___."

2. In addition, Carnero alleges that Maverick cannot, in any event, retain the Existing Commitments as to the Comanche working interests previously owned by Gavilan Resources, LLC ("Gavilan") as a consequence of this Court's approved section "363" bankruptcy sale of such assets to a subsidiary of Maverick.

3. As more fully explained below, the Amended Petition is another attempt in Carnero's campaign to derail the Reorganized Debtors' efforts to maximize the value of the Comanche field and grab Comanche value to which Carnero is not entitled. In Carnero's first action, Carnero alleged that the Reorganized Debtors were required by the Firm Gas Gathering, Processing and Purchase Agreement ("GGPA") to reject the Existing Commitments. Carnero abandoned that action, rather than amend its petition to make good on its assurances to this Court that Carnero did not wish to interfere with the Debtors' rights under section 365 of the Bankruptcy Code. Shortly thereafter, the Reorganized Debtors finalized a comprehensive midstream restructuring (the "Midstream Restructuring"), with nary a peep from Carnero, suggesting that the Reorganized Debtors' assumption of the Existing Commitments and amendments to improve economics for the working interest owners was constrained by—or would somehow trigger liability under—the GGPA.

4. A few weeks later, however, Carnero filed this action in Texas state court, laying bare its continued intention to collaterally attack the Midstream Restructuring. More particularly, Carnero claims that the Reorganized Debtors and the Comanche working interest owners breached the GGPA and related agreements by assuming and amending, or participating in amending, certain midstream contracts in connection with the Midstream Restructuring. Carnero is wrong on both its interpretation of the relevant agreements as well as the facts.

5. The Amended Petition is brought "on information and belief" and concerns the terms of third-party contracts that Carnero admits it has not seen. Because Carnero referenced all agreements entered into "effective December 21, 2021"—the GGPA, the GGPA Amendment, the Ratification Agreements, the Letter Agreement, and the Midstream Agency Agreements, among others—in the Amended Petition, those agreements are properly considered on a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Those agreements—which are attached to this Motion pursuant to the parties' *Stipulated Protective Order* entered by this Court on April 29, 2022 (attached hereto as Exhibit 1 ("Ex. 1"))—demonstrate that Carnero's beliefs regarding the relevant contracts are wrong as a matter of law, and Carnero has not (and cannot) plead a single fact that plausibly alleges a breach of contract. The Defendants are entitled to judgment on the pleadings for the following principal reasons.

6. *First*, Carnero is wrong in arguing that the Midstream Restructuring changed the status quo under the GGPA. Carnero is under the false impression that, as a result of the Midstream Restructuring, the Defendants' obligations under the Existing Commitments have terminated or were otherwise amended in some way. This is demonstrably incorrect, as is clear on the face of the relevant agreements.

7. The Existing Commitments are agreed-upon "binding contractual commitments" that prevent delivery of hydrocarbons to Carnero under the GGPA. As part of the Midstream Restructuring, the Reorganized Debtors assumed the Existing Commitments without amendment. The Midstream Restructuring included the rejection, assumption, and assumption and amendment of various agreements, ***but none of the amendments altered the Existing Commitments***, all of which remain binding with the same length of commitment and the same scope of dedicated volumes as they did prior to the Midstream Restructuring. The amendments at

issue left the Existing Commitments intact, improved certain midstream economics, and made conforming and clarifying changes to agreements, which is precisely what section 365 of the Bankruptcy Code contemplates when a debtor assumes an agreement with amendments. As a result of the continuing Existing Commitments, which have not changed, Carnero does not have a contractual claim on the volumes committed under the Existing Commitments. Carnero is no better or worse off.

8. Relatedly, Carnero's reading of the GGPA is demonstrably incorrect. As Carnero admits, "[t]he GGPA is like a top lease—it becomes effective to flow gas from the Comanche Assets to Carnero when the then-existing delivery obligations under the Existing Commitments ***end or are terminated***." Amended Petition ¶ 22 (emphasis added) (attached hereto as Exhibit 2 ("Ex. 2")). But the Existing Commitments, now assumed, have neither ended nor terminated. Carnero's allegations to the contrary with respect to the working interests generally and with respect to Gavilan's volumes specifically have no basis whatsoever, as demonstrated by the various agreements governing the Existing Commitments.

9. Carnero also insists, however, that the Existing Commitments, together with all the "commercial terms of or applicable to the Existing Commitments," must remain exactly "as they 'exist[ed] as of the Effective Date'" of the GGPA. Carnero argues that, even if the Existing Commitments themselves have not been terminated or amended directly, any modification to purely commercial terms applicable to an Existing Commitment destroys the carve-out of the Defendants' gas dedication to Carnero. *Id.* ¶¶ 25, 36(a)–(b), 42, 43, 47. But the GGPA does not require that the Existing Commitments and every commercial term remain frozen in time "as of" a certain date—those are Carnero's words, added to its selective quotation of the agreement's text to change its meaning. The GGPA instead provides only that it is subject to the Existing

Commitments until the earlier of (a) the end of the "then-current term" of such Existing Commitment and (b) as soon as Maverick has the "right or option to terminate" such Existing Commitment without "out-of-pocket cost" to Maverick. The referenced terms have not been amended and continue in the same form that they existed since 2018 when the GGPA was executed, and Maverick has had no right or option to terminate without cost. Despite Carnero's assertion to the contrary, the GGPA does not prohibit all amendments to the Existing Commitments and certainly does not prohibit amendments that do not affect the term or scope of the Existing Commitments. Nor, in any event, could the GGPA (or any contract) be read to effectively punish the Debtors for exercising assumption or rejection rights under section 365 in compliance with the confirmed Plan (as defined below).

10. *Second*, even if the Existing Commitments had been assumed and amended or modified in contravention of the GGPA (which they have not), the Defendants are entitled to judgment as a matter of law on the Amended Petition because Carnero failed to timely object or preserve its rights on or before the June 22, 2020 "Contract Objection Deadline" established by this Court's orders. *See* Dkt. Nos. 1118, 1212, and 1263 (attached hereto as Exhibit 3 ("Ex. 3"), Exhibit 4, ("Ex. 4") and Exhibit 5 ("Ex. 5"), respectively). The Plan is clear that contracts assumed pursuant to the Plan include all "modifications, amendments, supplements, restatements, or other agreements." Dkt. No. 1205, Plan Art. V.F (attached hereto as Exhibit 6 ("Ex. 6")). And, all the contracts assumed and amended as part of or implicated by the Midstream Restructuring, including, but not limited to, the GGPA, were assumed as of the effective date of the Plan (the "Effective Date") and re-vested in the Reorganized Debtors free and clear of all liens, claims, charges or encumbrances. *Id.* Plan Arts. IV.G, V.A, V. F. In short, in the absence of an objection, the Plan permits the Reorganized Debtors to assume the GGPA and amend or even extend the

Existing Commitments. The Confirmation Order (as defined below) provides that any counterparty to an executory contract or unexpired lease that fails to object timely to a proposed assumption "shall be deemed to have assented to such assumption." Ex. 3 ¶ 18. While many other contract counterparties filed timely objections and preserved claims, Carnero waited almost two years to see how the Midstream Restructuring "dust" would settle before raising its objections in state court. Furthermore, it also failed to object or reserve its right when the Reorganized Debtors sought to effect the assumption of amended agreements containing certain of the Existing Commitments. Now, it is too late. Carnero is deemed to assent to the assumptions and amendments pursuant to the Plan, and this Court should grant the Defendants judgment as a matter of law on the claims raised in the Amended Petition with prejudice.

11. *Third*, Carnero incorrectly characterizes the WIPs' and UnSub's obligations under the Ratification Agreements. Carnero asserts that Defendant UnSub and the Defendant WIPs—Eagle Ford, Javelin, and Mitsui—have independent obligations to supply gas to Carnero under the GGPA, the "same as Maverick." But certain of the WIPs and UnSub, at best, guaranteed only Maverick's obligations under the GGPA, so any obligations they may owe to Carnero are entirely derivative of Maverick's obligations. Because Maverick is in compliance with its GGPA obligations, there is no breach for UnSub or the guarantor WIPs to step into. Mitsui's agreement with Carnero is even narrower; it merely agreed to take certain actions (or refrain from taking actions) with respect to certain marketing agreements it has with Maverick, and it has complied with that agreement. That is where the inquiry ends. And even if the WIPs' and UnSub's obligations were independent of Maverick's obligations—which they are not—their volumes would still be contractually bound by the Existing Commitments, including the dedications under the Brasada Processing Agreement and the ETC Processing Agreement. That is because, among

other things, each committed to sell its production to Maverick under its respective marketing agreements. Once sold to Maverick, such hydrocarbons become subject to the Existing Commitments that bind Maverick and preempt Carnero's claim to the hydrocarbons.

## **BACKGROUND**

### **I. The Comanche Assets—Midstream Development and Sale**

12. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in the West Texas Eagle Ford Shale (the "Comanche Assets"). *In re Sanchez Energy Corp. ("Sanchez")*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). In January 2017, pursuant to a Purchase and Sale Agreement, dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan, purchased Anadarko's working interests in the Comanche Assets, and operatorship of all the Comanche Assets was ultimately transferred to Maverick. *Id.* at 852. The transaction closed on or about March 1, 2017. *Id.*

13. Prior to the sale of the Comanche Assets, Anadarko had developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production (including that of the WIPs) downstream to customers. *Id.* at 851–852. To that end, Anadarko and certain of its affiliates contracted with several midstream parties that made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets, in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Comanche Midstream Commitments"). *Id.*

14. Pursuant to these contracts, the natural gas ("Gas") and natural gas liquids ("NGLs") produced from the Comanche Assets were committed to be gathered, processed, transported, and marketed as follows:




15. Pursuant to agreements executed prior to 2017, the Gas from the Comanche Assets (including that of the WIPs) was committed to (a) the gas gathering system owned by Springfield Pipeline LLC ("Springfield") through December 2034, *see* Master Settlement Agreement, Exhibit M (attached hereto as Exhibit 7 ("Ex. 7")); *Sanchez*, 631 B.R. at 852, and (b) the Brasada natural gas processing plant ("Brasada Plant") and associated facilities in La Salle County, Texas, operated by WGR Operating, LP through June 2033. Brasada Gas Processing Agreement, Amendment No. 4 § 1 (attached hereto as Exhibit 8 ("Ex. 8")). Natural "residue" gas was also committed to transmission facilities and pipelines operated by Eagle Ford Midstream, LP through April 2023, *see* Firm NGPA Section 311 Gas Transportation Agreement Arts. II, VI and Firm Intrastate Transportation Agreement, dated January 17, 2012 (attached hereto as Exhibit 9

("Ex. 9")), and NGLs were committed to transmission facilities and pipelines operated by Enterprise Products Operating LLC ("Enterprise") through April 2023. Enterprise Transportation Services Agreement §§ 2.2, 3.1 (attached hereto as Exhibit 10 ("Ex. 10")). Enterprise also had the right to purchase the NGLs processed at the Brasada Plant through the same date. Enterprise Purchase Agreement Arts. II, III (attached hereto as Exhibit 11 ("Ex. 11")).[3]

16. As a condition to the sale of the Comanche Assets, Anadarko insisted that the purchasers assume and maintain these and all the other Comanche Midstream Commitments, which the purchasers agreed to do pursuant to a number of agreements. To facilitate and continue the gathering, processing, transportation, and marketing of Comanche hydrocarbons in accordance with the Comanche Midstream Commitments, Maverick agreed to purchase the hydrocarbon production from all the other working interest owners pursuant to separate purchase and marketing agreements with each of them (collectively, the "PMAs"). Comanche PSA § 11.15(f) (attached hereto as Exhibit 13 ("Ex. 13")). Maverick, in turn, then agreed to deliver all the Comanche production it owns and controls to be gathered, processed, transported, and ultimately sold consistent with the Comanche Midstream Commitments. *Id.*

17. Not all of the agreements governing the Comanche Midstream Commitments were assigned directly, however. While the purchasers sought to buy all of Anadarko's interests in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their

---

[3] An immaterial amount of Gas committed to Springfield and the Brasada Plant was also subject to preexisting commitments to be gathered through the "Howard" pipeline system owned by Texas Pipeline LLC and processed at facilities owned or controlled by ETC Texas Pipeline, Ltd. ("ETC"). Individual Transaction Confirmation to ETC Processing Agreement, dated April 1, 2011 (attached hereto as Exhibit 12 ("Ex. 12")). The Comanche Midstream Commitments also included agreements governing the gathering, processing, transportation, and marketing of oil. Because the GGPA is focused on Gas and NGLs, the oil midstream marketing system is not specifically detailed in this Motion.

transfer. *Sanchez*, 631 B.R. at 852.[4] Maverick and Anadarko therefore entered into two agency agreements (together, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements. Ex. 13 Comanche PSA § 11.15(f).[5] Maverick would thus receive the benefits of the Retained Agreements and undertake Anadarko's obligations thereunder.

18. Maverick, UnSub, and Gavilan agreed to process, transport, and sell hydrocarbons (including hydrocarbons Maverick purchases from the other working interest owners pursuant to the PMAs) as provided in the Midstream Agency Agreements. *Id.* Section 11.15(f) of the Comanche PSA specifically provides that "each of [Maverick], UnSub and [Gavilan] agrees that all of its production and Hydrocarbons attributable to the Assets will be transported and/or sold as provided in . . . the Marketing Agency Agreement and/or the Midstream Agency Agreement and it will not elect to takes its [sic] production in kind." *Id.* Accordingly, pursuant to the terms of the Comanche PSA and related agreements, the Comanche hydrocarbons

---

[4] The Retained Agreements included the Brasada Processing Agreement and the ETC Processing Agreement as well as the following marketing contracts: (a) the Enterprise Products Transportation Agreement; (b) the Double Eagle/Kinder Morgan Throughput Agreement; (c) the BP Crude Oil Sales Agreement; and (d) the Enterprise Products Purchase Agreement. Ex. 13 Comanche PSA, Schedule 1.1(b).

[5] The Midstream Agency Agreements include: (a) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, SN Catarina, LLC ("Catarina"), Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), Anadarko Energy Services Company ("AESC"), and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017, and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 (collectively, the "Marketing Agency Agreement") (attached hereto as Exhibit 14 ("Ex. 14")); and (b) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017, by and among Maverick, AEP, KMOG, and Sanchez Energy Corporation, as amended and modified from time to time (the "GPA Agency Agreement") (attached hereto as Exhibit 15 ("Ex. 15")).

Maverick, UnSub, and Gavilan agreed to sell and transport hydrocarbons as provided in the Midstream Agency Agreements. Section 11.15(f) of the Comanche PSA specifically provides that "each of [Maverick], UnSub and [Gavilan] agrees that all of its production and Hydrocarbons attributable to the Assets will be transported and/or sold as provided in . . . the Marketing Agency Agreement and/or the Midstream Agency Agreement and it will not elect to takes [sic] its production in kind." Ex. 13 Comanche PSA § 11.15(f).

remained subject to the Comanche Midstream Commitments following the sale of Anadarko's interests to the purchasers.

## II. The Carnero Processing Arrangement

### A. The GGPA, the Ratification Agreements, and the Letter Agreement

19. Following the closing of the 2017 Anadarko sale, on April 1, 2018, Maverick and Carnero entered into a back-up midstream gathering and processing agreement—the GGPA—covering uncommitted production from the Comanche Assets. Ex. 2 Amended Petition ¶¶ 20, 22. Specifically, pursuant to the GGPA, Maverick agreed, through March 2033, to "tender for delivery to Carnero at the Primary Receipt Points" all uncommitted Gas. GGPA § 3.1(a) (attached hereto as Exhibit 16 ("Ex. 16")). The "Primary Receipt Points" are two interconnection points between the Springfield and Carnero pipelines, at the effective end of the Springfield gathering system. *Id.* Exhibit A. Carnero's agreement was to take delivery of this excess or uncommitted Gas after it passed through the Springfield gathering system at these two Primary Receipt Points and then transport it to Carnero's facilities for processing. *Id.* § 3.2.

20. At the time, however, as Carnero was aware, the Comanche field had two other gas processors, Brasada and ETC. *See id.* Exhibit F. Consequently, Maverick promised to deliver 100% of the gas produced from the Comanche field, defined to be "Dedicated Gas,"[6] to Carnero, subject to these prior commitments that bound Maverick to deliver Gas elsewhere (*i.e.*, to Brasada and ETC). *Id.* §§ 3.1(a), 3.1(b).

21. Section 3.1(b) of the GGPA expressly provides that Maverick's prior commitments come ahead of Carnero's rights under the GGPA:

---

[6] "Dedicated Gas" is defined as "Producer's Gas" generated from certain specified land, and "Producer's Gas" is defined as "all Gas that is owned or controlled by Producer [*i.e.*, Maverick] or which Producer has the right to market." Ex. 16 GGPA § 1.1.

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) **is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero**, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), **such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment . . . and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…**
>
> *Id.* § 3.1(b) (emphasis added).

More specifically, the Gas and/or NGLs that are subject to the Existing Commitments are entirely "excluded" from the dedication until the Existing Commitments terminate. The agreements containing the Existing Commitments include, without limitation, the agreements enumerated in Exhibit F to the GGPA, which are set forth in Table 1 attached hereto.

22. The following chart summarizes the Existing Commitments for the processing of Gas as of the effective date of the GGPA:[7]

[7] The dedicated quantity of Gas to Brasada was to be no less than the "Supplier's Reserved Capacity" or "SRC." Ex. 8 Brasada Processing Agreement, Amendment No. 4 § 2. On April 1, 2018, when the GGPA was executed, the SRC was 299,000 MMbtu per day through June 30, 2023, *id.* Amendment No. 3, and 300,000 MMbtu per day thereafter through June 30, 2033. *Id.* Amendment No. 4 § 2.

Existing Commitments (Processing)
As of April 1, 2018

| Party | Primary Plants/Facilities | Dedicated Comanche Gas per day | MVCs | Execution Date | Termination Date |
|---|---|---|---|---|---|
| WGR Operating, LP | "Brasada" | 299,000 MMbtu (≈291,704 Mcf) | Yes | February 27, 2012 | June 30, 2033 |
| ETC Texas Pipeline, Ltd. | "Jackson" | ≈102,500 MMbtu (100,000 Mcf) | Yes | April 1, 2011 | March 31, 2023 |

23. Pursuant to the Brasada Processing Agreement and the ETC Processing Agreement, the Defendants were already bound to deliver dedicated quantities of Gas to "Receipt Points" that were connection points between the Springfield and Brasada or Springfield and ETC pipelines, respectively. Ex. 8 Brasada Processing Agreement § 2, Exhibit C; Ex. 12 Individual Transaction Confirmation to ETC Processing Agreement. Over 400,000 MMbtu per day of Gas had to be delivered to the Brasada or ETC Receipt Points, preventing its delivery to the Carnero Primary Receipt Points. *See id.* Because a relatively small volume of Gas is actually available to flow to ETC's Jackson Plant, approximately 37,500 Mcf per day, virtually all Gas from the Comanche field had prior dedications through June 2033.

24. On the same day the GGPA was executed, Carnero and Defendants UnSub and Maverick entered into a ratification agreement, pursuant to which UnSub ratified Maverick's obligations under the GGPA. UnSub Ratification and Assumption Agreement § 2 (attached hereto as Exhibit 17 ("Ex. 17")). Defendant Eagle Ford, Defendant Javelin, and Gavilan also executed ratification agreements in substantially the same form as the UnSub ratification agreement. *See* Exhibit 18 ("Ex. 18"), Exhibit 19 ("Ex. 19"), and Exhibit 20 ("Ex. 20"), respectively.[8] The UnSub,

[8] UnSub, Eagle Ford, and Javelin each agreed to "assume all the obligations of a 'Producer' (as defined in the GGPA) under the GGPA[.]" Ex. 17 § 2; Ex. 18 § 2; Ex. 19 § 2. "Producer" is defined in the GGPA as Maverick. Ex. 16, Preamble.

Eagle Ford, and Javelin ratification agreements are collectively referred to as the "Ratification Agreements." The Ratification Agreements required each of UnSub and the WIPs to "assume all of the obligations of a 'Producer' (as defined in the GGPA) under the GGPA" and to "confirm" the dedication of its gas interests "to Carnero and the performance of the GGPA," as provided in the GGPA. Exs. 17–19, §§ 2, 4. The GGPA defines "Producer" to be Maverick, so the Ratification Agreements simply require UnSub, Eagle Ford, and Javelin to perform Maverick's obligations under the GGPA in the event that Maverick does not. *See id.*

25. Defendant Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA. Letter Agreement (attached hereto as Exhibit 21 ("Ex. 21")). Under the Letter Agreement, Mitsui consented to Maverick entering into the GGPA, but Mitsui retained its right to take certain production in kind. *Id.* § 1. It also agreed not to exercise its right to take production in kind during the initial term of the GGPA "to the extent such [production] would be dedicated to the [GGPA] under the terms thereof." *Id.* § 2. Mitsui has not "taken in kind" and Carnero does not allege otherwise. Accordingly, the Letter Agreement merely governs what actions Mitsui agrees to take (or refrain from taking) with respect to the marketing agreements it has with Maverick. Mitsui did not ratify the GGPA and is not a party thereto.

## III. MCom's Purchase of Gavilan's Interest in the Comanche Assets

26. In 2017, both Gavilan and Maverick agreed in the Comanche PSA to assume and perform all obligations and liabilities "with respect to the undivided interest" in the Comanche Assets acquired by such parties and to market their respective hydrocarbons in accordance with the Comanche Midstream Commitments. Ex. 13 Comanche PSA §§ 8.1(a) & 11.15(f). In addition, Gavilan entered into three purchase and marketing agreements with Maverick (the "Gavilan PMAs" (a/k/a the "Gavilan/MCom PMAs"), attached hereto as Exhibit 22

("Ex. 22")), agreeing to sell its Comanche production to Maverick. Maverick, in turn, promised Anadarko that it would ensure that all co-working interest owner production, including Gavilan's, would remain subject to the Comanche Midstream Commitments, and in the case of Gavilan, subject to the Gavilan PMAs.[9] These agreements were part of the overall agreement by the purchaser to maintain and meet the Comanche Midstream Commitments.

27. Pursuant to that certain "363" Asset Purchase Agreement, dated October 16, 2020 (the "Gavilan PSA," attached hereto as Exhibit 23 ("Ex. 23")), approved by this Court,[10] Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, acquired certain of Gavilan's interests in the Comanche Assets, including the Gavilan PMAs, which were assumed and assigned by Gavilan to MCom without material amendment.[11] As a consequence of acquiring the Gavilan PMAs, MCom remains bound to sell its production to Maverick which, in turn, must gather, process, transport, and market such hydrocarbons in accordance with the Comanche Midstream Commitments, including the Existing Commitments.

28. Consistent with the terms of the Gavilan PSA, this Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in MCom "free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, **other than the Assumed Liabilities and Permitted Liens**[.]" *In re: Gavilan Resources, LLC*, Case No. 20-

---

[9] *See* Ex. 15 GPA Agency Agreement § 3.1(j) (agreeing to take "all actions necessary to ensure that all co-working interest owner production" remains subject to the Retained Midstream Contracts governing the Comanche Midstream Commitments); *see also id.* §§ 3.1(h), (i), (o), (q), (r).

[10] The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020).

[11] The Gavilan PMAs were listed on Exhibit B to the Debtors' Plan Supplement for assumption. Pursuant to a stipulation dated November 12, 2020, Gavilan consented to the assumption of the PMAs pursuant to the Plan, *see* Dkt. No. 1758 (attached hereto as Exhibit 24 ("Ex. 24")), and they were deemed assumed by Reorganized Debtor Maverick as of the Effective Date of the Plan.

32656 (MI), Dkt. No. 361 ¶ V (Bankr. S. D. Tex. 2020) (emphasis added) (attached hereto as Exhibit 25 ("Ex. 25")). "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Ex. 23 Gavilan PSA, Exhibit I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA.[12] *Id.* Disclosure Schedule 3.05(a) at 1. Accordingly, pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments.

## IV. The Midstream Restructuring

29. On April 30, 2020, this Court confirmed the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan"). Dkt. No. 1198. On the Effective Date of the Plan, the Reorganized Debtors had not yet finalized the Midstream Restructuring, and they had not yet finally determined all the executory contracts and unexpired leases to be assumed or rejected pursuant to the Plan. Following months of litigation and negotiations, the Reorganized Debtors determined that the Midstream Restructuring was in their best interests and that all of the Comanche working interest owners would, pursuant to the Plan and the order confirming it (the "Confirmation Order"), assume and maintain the Existing Commitments, as they existed pre-bankruptcy, with amendments to improve the economics for the Reorganized Debtors, UnSub, MCom, and the WIPs.

30. To effectuate such assumption, in part, the Reorganized Debtor Maverick and the WIPs entered into the *Stipulation and Agreed Order Authorizing Assumption of Comanche*

[12] Disclosure Schedule 3.05(a) also lists the GGPA and the Ratification and Assumption Agreement, dated May 22, 2018, among Gavilan, Maverick, and Carnero, whereby Gavilan ratified the GGPA. Ex. 23 Gavilan PSA, Disclosure Schedule 3.05(a) at 24.

*Non-Ops' Production Marketing Agreements* (the "WIP PMA Assumption Order"), which was approved by this Court on December 6, 2021. Dkt. No. 2201 (attached hereto as Exhibit 26 ("Ex. 26")). The WIP PMA Assumption Order includes findings that the WIPs' Comanche production is sold by Maverick pursuant to the Agency Agreements (as defined in the WIP PMA Assumption Order) and provides for Reorganized Debtor Maverick's assumption of the PMAs with each of the WIPs as of the Effective Date of the Plan. Ex. 26 ¶¶ F & 3. The WIP PMA Assumption Order also provides:

> The PMAs shall remain in full force and effect and shall be binding upon each of the parties thereto in accordance with their terms, and the PMAs shall be enforceable in accordance with their terms pursuant to otherwise applicable law. For purposes of clarification, in connection with the entry of this Order, the Reorganized Debtors and the Comanche Non-Ops have not agreed to any amendments or modifications to the terms of the PMAs.
>
> *Id.* ¶ 5.

31. In addition, in December 2021, to further evidence and consummate the Midstream Restructuring, Mesquite and Maverick entered into a Master Settlement Agreement by and among (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite, Maverick, and MCom (the "Settlement Agreement"). Ex. 7 at 1. UnSub signed the Settlement Agreement for limited provisions as well. *Id.*

32. Pursuant to the Settlement Agreement, the parties submitted the *Stipulation and Agreed Order*, Dkt. No. 2253 (attached hereto as Exhibit 27 ("Ex. 27")), (the "Settlement Order"), which this Court entered on December 21, 2021, agreeing, in accordance with the Plan and the Confirmation Order, to (a) the dismissal of certain litigation, (b) the rejection of the

"Rejected Comanche Agreements" (as defined in the Settlement Order), and (c) the assumption of the "Assumed Comanche Agreements" (as defined in the Settlement Order). *Id.* ¶¶ 2, 8, 9. The Settlement Order identified which of the Assumed Comanche Agreements were being assumed with amendments. *Id.* Exhibit 1.

33. The Assumed Comanche Agreements left the Existing Commitments intact, and the amendments improved certain midstream economics and made conforming and clarifying changes to agreements. The amendments did not, however, alter the scope or duration of the Existing Commitments. Immediately prior to and after the Midstream Restructuring, the Existing Commitments remained unchanged, as described in paragraph 7 above. Prior to the Midstream Restructuring, approximately 300,000 MMbtu of Comanche Gas was dedicated to the Brasada Plant through June 30, 2033, and 102,500 MMbtu was dedicated to the Jackson Plant through March 31, 2023. These Existing Commitments were unchanged and prevented any of the committed Gas from flowing to Carnero's facilities. There were indeed changes to the economics that these volumes could produce for the working interest owners over time, but those changes are irrelevant because none of them altered the scope or duration of the Existing Commitments. In short, the Gas molecules subject to the Existing Commitments prior to the Midstream Restructuring will physically flow through the gathering, processing, transportation, and marketing system exactly as anticipated when the GGPA was executed in 2018.

## V. Procedural History

34. On July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") against Mesquite, UnSub and the WIPs in the District Court of Harris County, Texas, seeking, among other things, declarations that (a) the GGPA and the Ratification Agreements obligated Mesquite, UnSub, and the WIPs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, including the requirement that Mesquite pursue

rejection of the Midstream Agency Agreements; and (b) following rejection of the Midstream Agency Agreements, Mesquite and the WIPs would be obligated to deliver the gas from the Comanche Assets to Carnero. *See Original Petition* (the "Petition") ¶¶ 36(k), (l) (attached hereto as Exhibit 28 ("Ex. 28")).[13]

35. On September 10, 2021, Mesquite, UnSub, and the WIPs removed the First Carnero Action to this Court. *See Notice of Removal* (attached hereto as Exhibit 29 ("Ex. 29")). On October 8, 2021, Carnero filed a motion to remand the First Carnero Action to state court or for abstention. *Adversary Plaintiff's Motion to Remand to State Court or for Abstention* (the "First Motion to Remand") (attached hereto as Exhibit 30 ("Ex. 30")).

36. At the December 7, 2021 hearing on the First Motion to Remand, this Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" December 7, 2021 Hr'g Tr. at 18:10–11 (attached hereto as Exhibit 31 ("Ex. 31")) and that paragraph 36(l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25–16:1. This Court suggested that Carnero amend the Petition to remove those paragraphs, *id.* at 17:11–13, and Carnero agreed to file an amended petition by December 10, 2021. *Id.* at 26:5–6. However, rather than file an amended petition, Carnero dismissed the First Carnero Action without prejudice. *See Plaintiff's Notice of Dismissal without Prejudice* (attached hereto as Exhibit 32 ("Ex. 32")).

37. On December 21, 2021, this Court approved a *Stipulation and Agreed Order*, Ex. 27, dismissing certain litigation and paving the way for a midstream restructuring of

[13] The First Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Adv. Pro. No. 21-03908 (MI).

the Reorganized Debtors' gathering, transportation, processing, and marketing agreements in accordance with the Plan and the Settlement Agreement.

38. On the same day, in an effort to resolve the ongoing Carnero dispute, Maverick, Mesquite, UnSub, and the WIPs commenced an action in this Court to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts (the "Declaratory Action").[14] On January 21, 2022, Carnero filed a motion to dismiss the Declaratory Action (the "Motion to Dismiss") (attached hereto as Exhibit 33 ("Ex. 33")) and filed a new state court lawsuit (the "Second Carnero Action") against the Defendants in the District Court of Harris County.[15] Carnero thus sought to evade this Court's jurisdiction for the second time and advanced a meritless theory that the Defendants breached the GGPA by amending certain midstream contracts in connection with the Midstream Restructuring.

39. On February 28, 2022, the Defendants removed the Second Carnero Action to this Court. *Notice of Removal* (attached hereto as Exhibit 34 ("Ex. 34")).[16]

40. On March 1, 2022, Mesquite, Maverick, UnSub, and the WIPs simultaneously filed a response to the Motion to Dismiss (attached hereto as Exhibit 38 ("Ex.

---

14 The Declaratory Action is captioned *SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP v. Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI).

15 On January 27, 2022, Carnero filed an amended petition (the "Amended Petition") against the Defendants. Ex. 2.

16 The Second Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.*, Adv. Pro. No. 22-03035 (MI). On March 30, 2022, Carnero filed a motion to remand the Second Carnero Action to state court or for abstention. *Adversary Plaintiff's Motion to Remand to State Court or for Abstention* (the "Second Motion to Remand") (attached hereto as Exhibit 35 ("Ex. 35")). The Defendants filed an objection to the Second Motion to Remand on April 27, 2022 *Objection to Plaintiff's Motion to Remand to State Court or for Abstention* (attached hereto as Exhibit 36 ("Ex. 36")). For present purposes, the Defendants note that, among other things, the Second Motion to Remand amounts to a collateral attack on the Plan and the Confirmation Order, which expressly established the post-confirmation process for the Debtors' assumption (or rejection) of executory contracts, including any amendments thereto. Dkt. No. 1198 Art. V (attached hereto as Exhibit 37 ("Ex. 37")).

38")), a *Motion for Leave to Amend* (the "Motion to Amend") (attached hereto as Exhibit 39 ("Ex. 39")), and an *Amended and Supplemental Complaint* (the "First Amended Complaint") (attached hereto as Exhibit 40 ("Ex. 40")), which seeks to confirm the Debtors' rights under the Bankruptcy Code, the Plan, and the Confirmation Order to restructure their midstream contracts. On March 23, 2022, this Court granted the Motion to Amend, and the First Amended Complaint was filed at Dkt. No. 29 of the Declaratory Action (attached hereto as Exhibit 41 ("Ex. 41")).

41. On March 7, 2022, the Defendants filed their *Answer to Plaintiff's Amended Petition* (attached hereto as Exhibit 42 ("Ex. 42")) in the Second Carnero Action.[17] This Motion follows.

## ARGUMENT

42. "A motion brought pursuant to Fed. R. Civ. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co., Inc. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990); *see also Reservoir, Inc. v. Truesdell*, CA No. 4:12-2756, 2013 WL 1828838, at *3–4 (S.D. Tex. Apr. 30, 2013) (granting plaintiffs' motion for judgment on the pleadings and holding that plaintiffs met their burden of proof for trademark infringement based on an application of the law to the undisputed facts in the pleadings). Like a motion for summary judgment, a "motion brought pursuant to Rule 12(c) should be granted if there is no issue of material fact and if the pleadings show that the moving party is entitled to judgment as a matter of law." *James v. Wells Fargo Bank, N.A.*, CA No. H-14-0449, 2014 WL 2123060, at *2 (S.D. Tex. May 21, 2014) (citing *Greenberg v. General Mills Fun Grp.,*

[17] On March 8, 2022, the Defendants filed a corrected version of the *Answer to Plaintiff's Amended Petition* (attached hereto as Exhibit 43 ("Ex. 43")).

*Inc.*, 478 F.2d 254, 256 (5th Cir. 1973)). Disputes regarding contract interpretation are questions of law properly resolved by motions for judgment on the pleadings. *Peddy v. Aaron's Inc.*, CA No. 18-1625, 2019 WL 763510, at *2 (E.D. La. Feb. 21, 2019).

43. When considering a motion for judgment on the pleadings, courts may consider (a) the contents of the pleadings, (b) any documents attached to the pleadings, (c) any documents attached to the motion for judgment on the pleadings that are central to the claim and referenced by the complaint, and (d) any judicially noticed matters of public record. *See Brand Coupon Net., LLC. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002) (holding that the district court properly considered a letter agreement not attached to the complaint in ruling on a Rule 12(c) motion); *Sparks v. Tex. Dept. of Transp.*, 144 F. Supp. 3d 902, 903 (S.D. Tex. 2015); *James*, 2014 WL 2123060, at *3. "Although the United States Court of Appeals for the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claims." *Peacock v. AARP, Inc.*, 181 F. Supp. 3d 430, 434 (S.D. Tex. 2016) (internal quotation marks omitted).

## I. The Midstream Restructuring Did Not Breach The GGPA

44. The Amended Petition concerns Carnero's rights under the GGPA to (a) process Dedicated Gas at one of its facilities (either the Raptor Plant or the Silver Oak II Plant) and (b) purchase NGLs processed at one of these facilities, in each case to the extent such Dedicated Gas or NGLs are not subject to other Existing Commitments. Carnero's central claim is that the Midstream Restructuring consummated pursuant to the Plan breached the GGPA by (x) extending the Existing Commitments (Ex. 2 Amended Petition ¶ 25(ii)), (y) modifying the Existing

Commitments in any respect as they "exist[ed]" as of the GGPA effective date for the "then-current term of such Existing Commitment" (*id.* ¶¶ 25(iii), 36(a)-(b), 42, 43, 47), and/or (z) modifying "the commercial terms of or applicable to the Existing Commitments" (*id.* ¶25(i)).

45. Carnero is wrong as a matter of law in its extreme, noncommercial reading of the GGPA. What is more, Carnero makes these allegations merely "on information and belief," without actually seeing any agreements that would purport to make these changes, including the Settlement Agreement.

46. First and foremost, the Existing Commitments have not been modified or extended. Carnero broadly argues that the Defendants amended or participated in amending the agreements that flow the gas from the Dedicated Acreage to the midstream providers, such that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment." This is simply not true. Tellingly, Carnero's claim that the Existing Commitments have been amended or extended is offered on mere "information and belief," and the Amended Petition does not include a single other allegation purporting to support that speculation.

47. Carnero's failure to include such allegations is unsurprising because it did not even see the agreements effectuating the Midstream Restructuring before filing the Amended Petition. In reality, and as the relevant agreements reflect, the Midstream Restructuring ***maintained*** the comprehensive system of gathering, transportation, and processing arrangements that Anadarko developed prior to the 2017 Comanche acquisition, but with improved economics that benefit the Reorganized Debtors and the other Comanche working interest owners. ***Critically, the Midstream Restructuring assumed the Existing Commitments and, contrary to Carnero's***

***unfounded allegations, neither extended nor expanded the term or scope of the Existing Commitments.***

48. As a backup processor, Carnero's rights are necessarily limited. Pursuant to the GGPA and the Ratification Agreements, Carnero is not entitled to any Dedicated Gas or any NGLs attributable to such Gas if: (a) it is subject "to binding contractual commitments preventing [its] delivery" to Carnero, and (b) either (i) the contractual commitments existed on April 1, 2018 and were referenced on Exhibit F to the GGPA (Ex. 16), or (ii) the contractual commitments were established prior to (and not in anticipation of) the Defendants acquiring the right to control, market or deliver the Gas or NGLs after April 1, 2018.

49. As of April 1, 2018, when Carnero executed the GGPA, the Dedicated Gas and NGLs were subject to the following binding contractual commitments referenced on Exhibit F to the GGPA (Ex. 16) that prevented its delivery to Carnero's "Primary Receipt Points":

**EXISTING COMMITMENTS**

| Committed Gas/NGLs (per day) | Commitment Beneficiary | Agreements Listed on GGPA Exhibit F | Execution Date | Termination Date |
|---|---|---|---|---|
| 299,000 MMbtu (≈291,704 Mcf)[18] | WGR Operating, LP | Gas Processing Agreement, dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments | 2/27/2012 | 6/30/2033 |
| ≈102,500 MMbtu (100,000 Mcf) | ETC Texas Pipeline, Ltd. | Gathering & Processing Agreement, dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments | 4/1/2011 | 3/31/2023 |

18 The committed amount is set at 300,000 MMbtu commencing on July 1, 2023.

50. In short, these Existing Commitments prevent over 400,000 MMbtu of Dedicated Gas per day from being delivered to the Carnero Primary Receipt Points through March 30, 2023 and 300,000 MMbtu per day thereafter through June 30, 2033. This was true when the GGPA was executed and remains true now. The Midstream Restructuring did not amend or modify these Existing Commitments.

51. Carnero, however, also alleges that even if the Existing Commitments are unchanged, the Midstream Restructuring nevertheless breached the GGPA by modifying commercial terms that apply to the Existing Commitments. In this respect, Carnero misreads the GGPA. As a backup processor under the GGPA, Carnero is entitled only to uncommitted volumes and, unsurprisingly, has no right to dictate any of the economic or other commercial terms relating to volumes committed to third parties. Indeed, Carnero has no claim on uncommitted volumes whatsoever until the Existing Commitments end or are terminated, and all such uncommitted Gas and NGLs are expressly "excluded" from the GGPA dedication.[19] Ex. 16 § 3.1(b). In any event, there were no amendments to the ETC Processing Agreement, and the only amendments to the Brasada Processing Agreement did nothing to affect the scope or duration of the Existing Commitments.[20]

---

[19] Carnero appears to have dropped its claims that the Existing Commitments should have been rejected or terminated. The GGPA provides that Dedicated Gas is excluded from the GGPA dedication "until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent 'evergreen' or 'renewal' terms, it being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any 'evergreen' or 'renewal' term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1". Ex. 16 § 3.1(b). The term and scope of the Existing Commitments have not changed, and the Defendants had no applicable termination rights in any event.

[20] Most significantly, with respect to the Brasada Processing Agreement, the settlement provided merely for (a) Anadarko's assignment of the Brasada Processing Agreement to Maverick and MCom, effective July 1, 2023, and (b) reduced rates for Brasada, effective June 30, 2023. The commitment of volumes under the Brasada

52. None of the commercial or other adjustments made in connection with the Midstream Restructuring prejudice Carnero's contractual rights because Carnero's rights to "Dedicated Gas" under the GGPA arise only at the end of the ***term*** of the Existing Commitments, not upon an amendment to a commercial term applicable to an Existing Commitment. Nothing in the GGPA prevented Maverick from freely adjusting prices or other provisions in light of the dynamic business environment and in order to resolve ongoing legal claims.

53. In short, the Midstream Restructuring assumed the Existing Commitments, binding Comanche volumes to the Existing Commitments precisely as contemplated when Maverick acquired its interest in the Comanche Assets in 2017 and when it executed the GGPA in 2018. As before the Midstream Restructuring, Gas that would otherwise be dedicated to Carnero remains excluded from that dedication to the extent subject to an Existing Commitment. Carnero remains entitled to Dedicated Gas after Maverick's obligations with respect to the Existing Commitments are satisfied.

54. Even if (as Carnero claims) the GGPA imposes liability on the Defendants for agreeing to amend certain of their midstream contracts (which it does not), such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc*., 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption…Such a policy…insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp*., 19 B.R. 537, 544 (Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental

---

Processing Agreement expires on June 30, 2033. The terms of the Brasada Processing Agreement, including its June 30, 2033 expiration date, remain unchanged by the Midstream Restructuring. *See* Ex. 7 at Exhibit K.

bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp.*, 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

55. Part and parcel of the federal bankruptcy policy underlying a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."). Indeed, the practical effect of section 365 is to force all creditors doing business under executory contracts with the debtor to renegotiate their mutual rights. *See Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975); *see also In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for assumption").

56. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition a debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (a) condition consent to assignment upon payment by a debtor of an "assumption fee;"[21] (b) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-

[21] *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S.D. 1987).

debtor third party to such contract upon assignment;[22] (c) provide for any rights of first refusal on a counterparty's part;[23] and (d) provide for any recapture or termination rights in favor of the counterparty.[24]

57. Courts routinely invalidate such punitive provisions because they contravene the central purpose of section 365 by restricting a debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on a debtor for utilizing the tools of the Bankruptcy Code to negotiate better commercial terms that maximize the value of the estate, particularly where, as here, those terms do not injure said creditor. Awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

## II. Carnero's Attack On The Midstream Restructuring Is Now Barred

58. Even if the Midstream Restructuring violated the GGPA (which it does not), Carnero is now deemed to have assented to all the applicable assumptions of and amendments to executory contracts and unexpired leases pursuant to the Plan and is barred and/or estopped from raising further objections to the Midstream Restructuring or its consequences for the GGPA or otherwise.

---

22 *See In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. at 78; *Robb v. Schindler*, 142 B.R. 589, 591–92 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200, 202–03 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196, 198–99 (Bankr. S. D. N. Y. 1982).

23 *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

24 *See In re Fairway Grp. Holdings Corp., et al.*, No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc.*, *et al.*, No. 08-11637 (Bankr. D. Del. Aug. 15, 2008).

59. The Plan, consistent with sections 365 and 1123 of the Bankruptcy Code, preserved the Reorganized Debtors' rights to assume and reject executory contracts and unexpired leases, even after the Effective Date, and provided for all related assumed rights to re-vest in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Ex. 37 Art. IV.G. The Plan also, importantly, established a process for identifying such contracts and leases and for objecting to and resolving any and all objections.

60. Under the Plan, with exceptions not applicable here, the assumptions of executory contracts and unexpired leases are effective as of the Effective Date. Article V.A of the Plan provides:

> Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

*Id.* Art. V.A.

61. In all cases, the executory contracts and unexpired leases implicated by the Amended Petition, including the GGPA (to the extent assumed), the PMAs, and the Assumed Comanche Agreements, are deemed assumed simultaneously on the Effective Date. In other words, the assumption and rejections are clearly all part of the single restructuring contemplated by the Plan.

62. The Plan is also clear that executory contracts and unexpired leases assumed pursuant to the Plan include all amendments and modifications. Specifically, Article V.F provides:

> [E]ach Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the

> foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.
>
> *Id.* Art. V.F.

63. Pursuant to the Plan, the Solicitation Procedures Order, and the Confirmation Order, all objections to the assumption or rejection of executory contracts and unexpired leases pursuant to the Plan had to be filed on or before the Contract Objection Deadline, which was June 22, 2020, except for limited unrelated exceptions. *See* Ex. 3, Ex. 4, Ex. 5. In fact, a number of counterparties to executory contracts and unexpired leases negotiated the terms of the Confirmation Order regarding objection rights. Carnero was expressly included in the defined "Counterparties" seeking the protections in the Confirmation Order. Ex. 4 ¶ 23. The Confirmation Order provides that "[a]ny counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim by the Contract Objection Deadline shall be deemed to have assented to such assumption or Cure Claim." *Id.* ¶ 18. Furthermore, while the Plan and the Confirmation Order provided the Debtors and the Reorganized Debtors with the right to reschedule executory contracts and unexpired leases from the list of agreements to be rejected to the list of agreements to be assumed, and vice versa, Carnero failed to object or reserve its rights when the Reorganized Debtors moved to assume certain amended agreements containing the Existing Commitments.

64. Carnero now complains that the assumptions and amendments to contracts pursuant to the Plan violated the GGPA and the Ratification Agreements, but it did not file a single objection to any assumption or rejection of any of the contracts implicated by the Midstream Restructuring or the Amended Petition. Carnero cannot credibly argue that it did not know about the provisions of the Plan or the Confirmation Order or that assumed contracts might be amended. Carnero requested to be included as a "Counterparty" in the Confirmation Order. Moreover,

Carnero was involved in responding to objections by the WIPs, UnSub, and others to the assumption of the GGPA and other assumptions and amendments to contracts involving Carnero. *See* Dkt. No. 1415, *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended* (attached hereto as Exhibit 44("Ex. 44")).

65. Pursuant to the Plan and the Confirmation Order, Carnero is now deemed to assent to the assumption of executory contracts, with amendments. *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483–86 (2d Cir. 2012) (affirming that appeal of substantially consummated plan was equitably moot where it sought return of consideration that was an essential part of plan settlement, parties had substantially performed under plan, and requested relief would necessitate unraveling of plan); *In re Platinum Oil Props., LLC*, 465 B.R. 621, 638–41 (Bankr. D.N.M. 2011) (finding creditor is bound by the terms of confirmed chapter 11 plan even if creditor had a different understanding of terms' meaning or did not realize their effect); *In re Boston Blackies Mgmt., Inc.*, Nos. 09-B-44643, 09-B-44734, 2010 WL 3310351, at *4 (Bankr. N.D. Ill. May 17, 2010) ("Those non-debtor parties to Designated Contracts and Added Contracts who did not object to the assumption, cure, and assignment of their Designated Contract . . . are deemed to have consented to the assumption, cure, and assignment"); *In re Burner*, 109 B.R. 216, 222 (Bankr. W.D. Tex. 1989) (finding creditor had waived right to object to provisions of plan by failing to file objection to plan prior to confirmation, casting ballot accepting plan, and not attacking confirmation order by appeal). This assent constitutes a bar to the Amended Petition and its claims that the GGPA, which is deemed assumed as of the Effective Date, is breached by the simultaneous assumption of other contracts as of the same date. *See Semi-Tech Litig., LLC v. Bankers Tr. Co.*, 272 F. Supp. 2d 319, 325–27 (S.D.N.Y. 2003) (holding that creditor's challenge to assignment of

claims under confirmed plan was barred by the doctrine of res judicata); *In re Sportsman's Warehouse, Inc.*, No. 09-10990 (CSS), 2013 WL 492554, at *7 (Bankr. D. Del. Feb. 7, 2013) ("But since Landlord did not object to assumption of Lease . . . the default is deemed cured and Landlord's claims are barred").

## III. The WIPs And UnSub Have Not Breached Any Obligation To Carnero

### A. The WIPs' and UnSub's Obligation to Supply Hydrocarbons Is Entirely Derivative of Maverick's Obligations, and Hence Also Excepted from Delivery to Carnero

66. Carnero argues that, pursuant to the Ratification Agreements, the WIPs and UnSub became parties to the GGPA, assuming all obligations of a "Producer" as defined in the GGPA and that they "owe the same obligations as Maverick under the GGPA." Ex. 2 ¶ 20. This is incorrect. Pursuant to the Ratification Agreements, each of Eagle Ford, Javelin, and UnSub agreed to live up to Maverick's obligations under the GGPA in the event that Maverick failed to do so. Pursuant to the Letter Agreement, Mitsui consented to Maverick's entry into the GGPA and agreed not to exercise its right to take production in kind during the initial term of the GGPA. Ex. 21 § 2.[25] Here, because Maverick has lived up to its obligations under the GGPA, there is no breach for the WIPs or UnSub to step into. Further, Mitsui has not exercised its right to take in kind. This ends the inquiry.

67. Through ratification agreements, Eagle Ford, Javelin, and UnSub agreed to guarantee Maverick's performance obligations, not to enter into freestanding agreements unconnected to Maverick's obligations. In particular, each of UnSub, Eagle Ford, and Javelin "ratifie[d] and confirm[ed] the GGPA in all respects," and agreed to "assume all the obligations of

[25] Under the marketing agreements, Mitsui is expressly not a party to Commitment Agreements (as defined in the marketing agreements). *See, e.g.*, Mitsui Marketing Agreement ("Mitsui PMA") § 2.f. Ex. 7, Exhibit R at 938–71.

a 'Producer' (as defined in the GGPA)" with respect to its share of the gas volume from the Dedicated Acreage, *see* Exs. 17–19 § 2, and "Producer" is defined in the GGPA to be Maverick. Ex. 16, Preamble. Therefore, each of UnSub, Eagle Ford, and Javelin agreed to step into Maverick's shoes—"Producer" under the GGPA—to fulfill Maverick's obligations under the GGPA. Accordingly, because Maverick has fully complied with its obligations under the GGPA, there is nothing for the WIPs or UnSub to assume and the inquiry ends.

### B. Even if the WIPs and UnSub are Synthetic Parties to the GGPA, Their Obligation to Supply Hydrocarbons Is Subject to the Existing Commitments

68. Even if Carnero's reading of the Ratification Agreements and the Letter Agreement was correct (it is not) and each WIP became a party to the GGPA with "the same obligations as Maverick," Carnero's arguments still fail. The relevant agreements provide that each of the WIPs' and UnSub's volumes is subject to the Existing Commitments, including the Brasada Processing Agreement and the ETC Processing Agreement, and thus excepted from delivery to Carnero (to the extent of these commitments). There is no path of contractual interpretation that leads the WIPs or UnSub to owe its hydrocarbons to Carnero unburdened by the Existing Commitments.

69. Each WIP and UnSub are bound to sell their volumes to Maverick pursuant to a marketing agreement. *See, e.g.*, UnSub Hydrocarbons Purchase and Marketing Agreement § 2.1 ("[UnSub] shall sell and deliver to [Marketer] . . . all [UnSub]'s Hydrocarbons") (attached hereto as Exhibit 45 ("Ex. 45")); *see also* Mitsui PMA (Ex. 7, Exhibit R at 938–71), Eagle Ford PMA; Javelin PMA; and MCom/Gavilan PMA.[26] As the volumes are sold to Maverick, they are then bound by Maverick's commitments with respect to such volumes, including the Existing

[26] The Eagle Ford PMA and Javelin PMA are attached at Ex. 7, Exhibit R at 851–94 and Ex. 7, Exhibit R at 895–937, respectively. The MCom/Gavilan PMA is attached at Ex. 22.

Commitments. This has been the arrangement since Carnero first contracted with Maverick in 2018, and it is explicitly acknowledged under the GGPA, which defines "Producer's Gas" as gas that is owned or controlled by Maverick or which Maverick has the right to market. Ex. 16 § 1.1. Nothing has changed following the Midstream Restructuring.

70. Additionally, UnSub is separately bound by the Comanche PSA to deliver its volumes pursuant to the Existing Commitments, including to Brasada and ETC.[27] Section 11.15(f) of the Comanche PSA provides that "each of [Maverick], UnSub and [Gavilan] agrees that ***all of its production and Hydrocarbons attributable to the Assets will be transported and/or sold as provided in*** the Marketing Transition Services Agreement and, ***if applicable, the Marketing Agency Agreement and/or the Midstream Agency Agreement*** and it will not elect to takes [sic] its production in kind." Ex. 13 (emphasis added). Thus, UnSub explicitly agreed to deliver its hydrocarbons in accordance with the Midstream Agency Agreements, which bind Maverick to the Existing Commitments.

71. The plain language of the documents makes clear that the WIPs and UnSub were obliged to sell their hydrocarbons to Maverick, and therefore that their hydrocarbons would never be committed to midstream providers in any manner inconsistent with Maverick's own obligations to Brasada and ETC. Although Carnero suspects or believes the term or scope of the Existing Commitments was expanded, the documents unambiguously show that Carnero is wrong. Carnero's attempt to muddy the waters and upset the parties' efforts at resolution should be rejected.

---

[27] Specifically, the Ratification Agreements provide that each of UnSub's, Eagle Ford's, and Javelin's volumes are dedicated under the GGPA only "to the extent provided in the GGPA." Exs. 17–19 § 4. Under the Letter Agreement, Mitsui agreed not to exercise its right to take in kind during the initial term of the GGPA "to the extent such [production] would be dedicated to the [GGPA] under the terms thereof." Ex. 21 § 2.

### IV. The Comanche Working Interests Acquired From Gavilan Remain Subject To The Existing Commitments

72. Carnero is also wrong that the Dedicated Gas associated with the Gavilan working interests acquired by MCom is now free of the Existing Commitments. MCom acquired Gavilan's interests through a section "363" sale approved by this Court. The Gavilan assets were transferred to MCom, not Mesquite, subject to the Existing Commitments. Among other things, Gavilan assumed and assigned to MCom all of its right, title, and interest in and to the Gavilan PMAs. Maverick assumed the PMAs as of the Effective Date of the Plan. Ex. 4 Art. V.A. As a consequence, MCom remains bound to sell its production to Maverick which, in turn, must gather, process, transport, and market such hydrocarbons in accordance with the Comanche Midstream Commitments, including the Existing Commitments.

73. Even if MCom had not assumed the Gavilan PMAs (which it did), MCom did not purchase Gavilan's rights free and clear of the Existing Commitments. Instead, it purchased them subject to the Existing Commitments. Ex. 23 § 11.15. The Gavilan PSA, the Gavilan Sale Order, the GPA Agency Agreement, and the Gavilan Marketing Agreements independently require Maverick and MCom to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments.

## CONCLUSION

74. For all of the foregoing reasons, the Defendants respectfully request that this Court enter judgment on the pleadings in their favor on all causes of action set forth in the Amended Petition.

Respectfully submitted this 11th day of May, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Reorganized Debtors and Defendants Mesquite Energy, Inc. and SN EF Maverick, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Boulevard
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

Case 4:23-cv-03560 Document 19-3 Filed on 05/11/22 in TXSD Page 43 of 45

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana Street, Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I hereby certify that, on May 11, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

/s/ *James G. Munisteri*
James G. Munisteri

**Table 1**

| | Agreements |
|---|---|
| 1. | Firm Gas Transportation Agreement dated October 1, 2012, between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any (the "Enterprise Gas Transportation Agreement") |
| 2. | Firm NGPA Section 311 Gas Transportation Agreement, dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any (the "Section 311 Gas Transportation Agreement") |
| 3. | First Amendment to Section 311 Gas Transportation Agreement, dated June 27, 2016 |
| 4. | Firm Intrastate Gas Transportation Agreement, dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any (the "Firm Intrastate Gas Transportation Agreement," and together with the Section 311 Gas Transportation Agreement, the "EFM Agreements") |
| 5. | First Amendment to Firm Intrastate Gas Transportation Agreement, dated June 27, 2016 |
| 6. | Firm Intrastate Gas Transportation [Service] Agreement, dated March 1, 2013 between Springfield Pipeline, LLC and Anadarko E&P Onshore LLC and associated amendments if any (the "Tailgate Transportation Agreement") |
| 7. | Gathering & Processing Agreement, dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any (the "ETC Processing Agreement") |
| 8. | Gas Processing Agreement, dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP (the "Brasada Processing Agreement") |
| 9. | First Amendment to Brasada Processing Agreement, dated January 3, 2013 ("Brasada Amendment No. 1") |
| 10. | Second Amendment to Brasada Processing Agreement, dated March 11, 2014 ("Brasada Amendment No. 2") |
| 11. | Third Amendment to Brasada Processing Agreement, dated September 1, 2016 ("Brasada Amendment No. 3") |
| 12. | Fourth Amendment to Brasada Processing Agreement, dated September 1, 2016 ("Brasada Amendment No. 4") |
| 13. | Firm Transportation Agreement, dated October 5, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any (the "Howard Gathering Agreement (Residue Gas)") |
| 15. | Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC (the "Springfield GGA") |

| | Agreements |
|---|---|
| 16. | First Amendment to Springfield GGA, dated August 14, 2017 |
| 17. | Amended and Restated Lease Dedication and Gas Gathering Agreement, dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any (the "Mitsui GGA") |
| 18. | Amended and Restated Lease Dedication and Gas Gathering Agreement, dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any (the "Eagle Ford GGA") |
| 19. | Amended and Restated Lease Dedication and Gas Gathering Agreement, dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any (the "Venado GGA" and together with the Mitsui GGA and Eagle Ford GGA, the "WIP Gathering Agreements") |
| 20. | Firm Transportation Agreement, dated October 1, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any (the "Howard Gathering Agreement (NGLs)") |
| 21. | First Amendment to Howard Gathering Agreements (NGLs), dated September 1, 2012 |
| 22. | Second Amendment to Howard Gathering Agreements (NGLs), dated December 4, 2012 |
| 23. | Third Amendment to Howard Gathering Agreements (NGLs), dated October 1, 2016 |
| 24. | Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company, dated March 1, 2012, and associated amendments if any (the "Enterprise Transportation Services Agreement") |
| 25. | Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any (the "Enterprise Purchase Agreement" and together with the Enterprise Transportation Services Agreement, the "Existing T&F Agreements") |
| 26. | Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any (the "PGS Y-Grade Agreement") |

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC.<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035(MI)** |

**Order Granting Defendants' Motion for Judgment on the Pleadings**
[Relates to Docket No. __]

Pending before this Court is Defendants' Motion for Judgment on the Pleadings (the "Motion"). After considering the Motion, response, pertinent pleadings, and all papers and argument submitted by the parties regarding the Motion, the Court finds that the Motion should be, and it is hereby, **GRANTED**. It is therefore **ORDERED** that:

1. Plaintiff Carnero G&P, LLC's ("Carnero") request for declaratory judgment is DENIED;

2. Carnero's claims against SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, and SN EF UnSub, LP (collectively, "Defendants"), are DISMISSED WITH PREJUDICE; and

3. Judgment is ENTERED in favor of Defendants.

Signed: _______________, 2022

MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

Case 4:22-cv-01365 Document 19-3 Filed on 04/29/22 in TXSD Page 444 of 1867

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
April 29, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re:<br><br>Sanchez Energy Corporation, et al.,<br><br>Reorganized Debtors.[1] | §<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP,<br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 21-04419 |
| Carnero G&P, LLC<br>Plaintiff,<br><br>v.<br><br>SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 22-03035 |

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

## Stipulated Protective Order

Subject to Carnero G&P, LLC's ("Carnero") objection to this Court's subject matter jurisdiction over the above-captioned adversary proceedings (collectively, the "Adversary Proceedings"),[2] this Stipulated Protective Order ("Order") is entered into by and among: (a) the Reorganized Debtors, (b) the parties to the Adversary Proceedings and (c) any other persons or entities who become bound by this Order by signifying their assent through execution of **Exhibit A** hereto. Each of the persons or entities identified in the foregoing clauses (a) through (c) shall be referred to herein individually as a "Party," and collectively as the "Parties."[3] The Parties, by and through their respective attorneys of record and subject to Court approval, have agreed to entry of this Order pursuant to 11 U.S.C. § 107(b) and Rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and, as applicable, pursuant to Bankruptcy Rules 7026 and 9014 and Rule 26(c) of the Federal Rules of Civil Procedure (the "Federal Rules").

## RECITALS

WHEREAS, the debtors in the above-captioned Chapter 11 proceeding (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, U.S.C. §§ 101-1532 (the "Bankruptcy Code") in this Court (the cases commenced by such petitions, the "Chapter 11 Cases"); and the Adversary Proceedings (each a "Dispute" and, collectively, the "Disputes") are now pending in this Court; and

WHEREAS, the Parties have sought or may seek certain Discovery Material (as defined below) from one another with respect to one or more Disputes, including through informal or

---

[2] Entry of this Order in no way shall be construed as a waiver by Carnero G&P, LLC of its objections to this Court's subject matter jurisdiction over the Adversary Proceedings.

[3] The designation of a "Party" is for purposes of reference in this Order only.

formal requests, Rule 2004 notices or motions, or service of document requests, interrogatories, depositions, and other discovery requests (collectively, the "Discovery Requests") as provided by the Federal Rules, the Bankruptcy Rules, and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of Texas (the "Local Rules").

NOW, THEREFORE, to facilitate and expedite the production, exchange, and treatment of Discovery Material (as defined below) and to protect Discovery Material that a Party seeks to maintain as Confidential Material or Highly Confidential Material (as those terms are defined below), it is hereby stipulated and agreed, and, upon Court approval, it is hereby ORDERED that the following terms will govern any requests for and production of Discovery Material (as defined below):

**Scope of Order**

1. This Order governs the disclosure or exchange of all information and documents produced on or after the entry of this Order ("Effective Date"), by a Party (each a "Producing Party"), to any other Party (each a "Receiving Party"), formally or informally, in connection with a Dispute, in response to or in connection with any Discovery Requests, including, without limitation, deposition testimony (whether based upon oral examination or written questions); interrogatories; answers to interrogatories; requests for admission; responses to requests for admission; documents, information, and things produced in discovery or as an exhibit to a pleading or deposition as well as any and all copies, abstracts, digests, notes, summaries, and excerpts thereof (collectively referred to as "Discovery Material"). "Material," as that term is used herein, includes hard copy documents and electronically stored information contemplated by the Bankruptcy Rules, and the Federal Rules, including but not limited to, writings, drawings, graphs,

charts, photographs, sound recordings, images, data, or data compilations stored in any medium, testimony, exhibits, discovery responses, and all other mediums of expression.

2. Any Party or its counsel serving a subpoena or request upon a non-Party, which subpoena or request requires the production of documents or testimony, shall serve a copy of this Order along with such subpoena or request. Any non-Party that executes and delivers Exhibit A to the other Parties shall be treated as a Party to this Order with all rights and obligations of the signatory Parties hereto. For the avoidance of any doubt, however, reference to becoming a "Party" upon execution of Exhibit A is for the purposes of this Order only and not intended to reflect any agreement as to such party's status as a litigant.

3. Any Producing Party may designate Discovery Material as "Confidential Material" or "Highly Confidential Material" (any such designated Discovery Material, "Designated Material") in accordance with the following provisions:

(a) Confidential Material: A Producing Party may designate Discovery Material as "Confidential" if such Producing Party reasonably believes that: (i) such Discovery Material (A) constitutes or contains nonpublic proprietary or confidential technical, business, financial, personal, or other information of a nature that should be protected under the Bankruptcy Rules or the Federal Rules or (B) is subject by law or by contract to a legally protected right of privacy; or (ii) the Producing Party (A) is under a preexisting obligation to a third party to treat such Discovery Material as confidential or (B) has been reasonably requested by another Party or non-Party to so designate such Discovery Material on the grounds that such other Party or non-Party considers such Discovery Material to contain information that is confidential or proprietary to such Party or non-Party.

(b) Highly Confidential Material: A Producing Party may designate Discovery Material as "Highly Confidential" if such Producing Party reasonably believes (or with respect to documents received from another person, has been reasonably advised by such other person) that such Discovery Material is of such a nature that a risk of competitive injury would be created if such Discovery Material were disclosed to persons other than those identified in Paragraph 8 of this Order, such as trade secrets, sensitive financial or business information, or material prepared by its industry advisors, financial advisors, accounting advisors, experts, or by its consultants (and their respective staff) that are retained by the signatories to this Order in connection with the Disputes or these Chapter 11 Cases if such materials contain trade secrets or sensitive financial or business information, and only to the extent that the Producing Party reasonably believes that such material is of such a nature that "Highly Confidential" treatment is warranted.

(c) Undesignated Material: Subject to the rights and obligations of the Parties under Paragraphs 6 and 22 of this Order, no Party shall have any obligation or duty to maintain confidential or prevent from disclosure any Discovery Material that is not Designated Material ("Undesignated Material").

4. Manner of Designating Discovery Material: Where reasonably practicable, any Designated Material shall be designated by the Producing Party as such by marking each such page "Confidential" or "Highly Confidential" as applicable. Such markings should not obliterate or obscure the content of the material that is produced. Where marking of every page of such materials is not reasonably practicable, such as with certain native file documents, a Producing Party may designate material as "Confidential" or "Highly Confidential" by informing the Receiving Party in a clear and conspicuous manner at the time of production of such material that such material is "Confidential" or "Highly Confidential," such as by including such designation in

the filename and/or the produced Concordance (or other document review platform) load file, if applicable.

5. Late Designation of Discovery Material: The failure to designate particular Discovery Material as “Confidential” or “Highly Confidential” at the time of production shall not operate to waive a Producing Party’s right to later designate such Discovery Material as Designated Material or later apply another designation pursuant to this Order (“Misdesignated Material”). At such time, arrangements will be made for the destruction of the Misdesignated Material or for the return to the Producing Party of all copies of the Misdesignated Material and for the substitution, where appropriate, of properly labeled copies of such Discovery Material. Upon receipt of replacement copies of such Misdesignated Material with the proper designation, the Receiving Party or Parties shall take all reasonable steps to return or destroy all previously produced copies of such Misdesignated Material. If requested by the Producing Party, a Receiving Party shall verify in writing that it has taken all reasonable steps to return or destroy such Misdesignated Material. No Party shall be deemed to have violated this Order if, prior to notification of any later designation, such Discovery Material was disclosed or used in any manner consistent with its original designation but inconsistent with its later designation. Once such later designation has been made, however, any Discovery Material shall be treated in accordance with that later designation; provided, however, that if the material that was not designated has been, at the time of the later designation, previously publicly filed with a court, no Party shall be bound by such later designation except to the extent determined by the Court upon motion of the Party that failed to make the designation.

**Use and Disclosure of Confidential or Highly Confidential Material**

6. General Limitations On Use And Disclosure Of All Discovery Material: All Discovery Material shall be used by the Receiving Parties solely for the purposes of a Dispute, and not for any other purpose, including any other litigation or judicial proceedings that are not a Dispute or any business, competitive, governmental, commercial, or administrative purpose or function.

7. Confidential Material: Confidential Material, and any and all information contained therein, may be given, shown, made available to, or communicated only to the following:

(a) the Parties identified in clauses (a) and (b) of the first paragraph of this Order who are signatories to this Order;

(b) any other Party who has signed Exhibit A; and

(c) any other persons specified in Paragraph 8 below.

8. Highly Confidential Material: Highly Confidential Material, and any and all information contained therein, may be given, shown, made available to, or communicated only to the following:

(a) outside counsel, and staff working under the express direction of such counsel, for:

i. the Parties identified in clauses (a) and (b) of the first paragraph of this Order who are signatories to this Order; and

ii. any other Party who has signed Exhibit A; and

(b) professionals retained under Sections 328 and 1103 of the Bankruptcy Code, industry advisors, financial advisors, accounting advisors, experts, and consultants (and their respective staff) that are retained by the signatories to this Order or a Party who has signed Exhibit A in connection with the Disputes; and

(c) any person who is indicated on the face of a document to have been an author, addressee, or copy recipient thereof, an actual recipient thereof, or in the case of meeting minutes, an attendee of the meeting; and

(d) any adverse witness during the course of a deposition where counsel questioning the witness reasonably believes that questioning the witness regarding the document is necessary and that doing so would not cause competitive harm; and

(e) outside photocopying, graphic production services, or litigation support services, as necessary for use in connection with a Dispute; and

(f) court reporters, stenographers, or videographers who record deposition or other testimony in connection with a Dispute; and

(g) the Court, its officers, and clerical staff in any judicial proceeding that may result from a Dispute; and

(h) any mediators and their staffs retained in connection with a Dispute; and

(i) any other person or entity with respect to whom the Producing Party may consent in writing or on the record at a deposition.

9. Designated Material To Be Disclosed Only In Accordance With Paragraphs 7 and 8: Highly Confidential Material, and any and all information contained therein, shall not be given, shown, made available to, disclosed, or communicated in any way, except to those people provided in Paragraph 8 of this Order. Confidential Material, and the substantive information contained therein, shall not be given, shown, made available to, disclosed, or communicated in any way, except to those people provided in Paragraph 7 of this Order. Notwithstanding anything in this Order to the contrary, Highly Confidential Material disclosed by any Producing Party (other than Carnero) to Carnero shall not be disclosed to any employee, officer, director, member, or partner

of TPL SouthTex Processing Company LP, Sanchez Midstream Partners, LP., Evolve Transition Infrastructure LP, or any other member or holder of equity or similar rights in Carnero.

10. Prerequisite to Disclosure of Designated Material: Before any person or their representative identified in Paragraph 8(b), 8(d), or 8(i) hereof is given access to Designated Material, such person or their representative shall be provided with a copy of this Order and shall execute Exhibit A annexed hereto. Each such executed Exhibit A shall be retained in the files of counsel for the Party who gave access to the Designated Material to the person who was provided such access. Such executed Exhibit A shall not be subject to disclosure under the Federal Rules or the Bankruptcy Rules unless a showing of good cause is made and the Court so orders.

11. Sealing of Designated Material Filed With Or Submitted To Court: Unless otherwise agreed by the Producing Party, all Designated Material filed with the Court, and all portions of pleadings, motions, or other papers filed with the Court that disclose Highly Confidential or Confidential Material, shall be filed under seal in accordance with the Federal Rules, the Bankruptcy Rules, the Local Rules, and the individual practice rules of the Court, except that a Party may, at its option, file redacted pleadings containing the Designated Material so long as such portions of the pleadings concerning the Designated Material have been redacted, and such redacted pleading is also filed pursuant to Local Rule 9037-1.

12. Use of Discovery Material in Open Court: The limitations on disclosure in this Order shall not apply to any Discovery Materials offered or otherwise used by any Party at trial or any hearing held in open court except as provided in this paragraph. As part of any pretrial conference or any meet and confer regarding the use of exhibits in any evidentiary hearing, and where practicable at least 24 hours prior to the use of any Designated Material at trial or any hearing to be held in open court, counsel for any Party who desires to offer or use such Designated

Material at trial or any hearing to be held in open court shall meet and confer in good faith with the Producing Party to discuss ways to redact the Designated Material so that the material may be offered or otherwise used by any party, in accordance with the provisions of the Bankruptcy Code and Bankruptcy Rules. If the Parties are unable to resolve a dispute related to such Designated Material, then the Producing Party bears the burden of seeking relief from the Court.

**Depositions and Rule 2004 Examinations**

13. Deposition and Rule 2004 Examination Testimony - Manner Of Designation: In the case of depositions, if counsel for a Party believes that a portion of the testimony given at a deposition should be Designated Material of such Party, such testimony may be designated as appropriate by: (a) stating so orally on the record and requesting that only the relevant portion(s) of testimony is so designated; or (b) providing written notice within seven (7) days of the Party's receipt of the final transcript from the court reporter that only the relevant portion(s) of such transcript or recording of a deposition thereof is so designated, except in the event that a hearing on related issues is scheduled to occur within seven (7) days, in which case the foregoing seven (7) day period will be reduced to three (3) business days. Where a hearing or pleading deadline on related issues is scheduled to occur in such close proximity to a deposition that a three-day period is not practical, notice shall be given at the deposition or as soon as practical thereafter. Until expiration of the aforesaid designation period, as applicable, following receipt of the transcript by the Parties, all deposition transcripts and recordings shall be considered and treated as Confidential unless otherwise specified by counsel to any Party on the record at the deposition.

14. Designated Material Used As Exhibits During Depositions: Nothing in Paragraph 13 shall apply to or affect the confidentiality designations on Discovery Material entered as exhibits at depositions.

15. Witness Review of Deposition Testimony: Nothing in Paragraph 13 hereof shall preclude the witness from reviewing his or her deposition transcript.

16. Presence of Persons During Deposition Testimony: When Designated Material is elicited during a deposition, persons not entitled to receive such information under the terms of this Order shall, upon request, be excluded from the portion of the deposition so designated. After such exclusion from the portion of any deposition containing Designated Material, if such persons wish to receive written or other recordings of the deposition testimony containing Designated Material, such persons must become a Party to this Order.

17. Responsibilities And Obligations Of Court Reporters: In the event that testimony is designated as Confidential or Highly Confidential, the court reporter, who shall first have agreed to abide by the terms of this paragraph, shall be instructed to include on the cover page of each such transcript the legend, "This transcript portion contains information subject to a Protective Order and shall be used only in accordance therewith," and each page of the transcript shall include the legend "Confidential" or "Highly Confidential," as appropriate. If the deposition is recorded, the recording shall also be subject to the same level of confidentiality as the transcript and include the legend "Confidential" or "Highly Confidential," as appropriate, if any portion of the transcript itself is so designated.

**General Provisions**

18. Unless otherwise agreed by the Parties or ordered by the Court, all deadlines and time periods herein shall be computed pursuant to Bankruptcy Rule 9006.

19. This Order is a procedural device intended to protect Discovery Materials designated as Designated Material. Nothing in this Order shall affect any Party's rights or obligations unrelated to the confidentiality of Discovery Materials.

20. For the purposes of this Order, "writing" shall include electronic mail.

21. Nothing contained herein shall be deemed a waiver or relinquishment by any Party of any objection, including, but not limited to, any objection concerning the alleged confidentiality or proprietary nature of any documents, information, or data requested by a Party; any right to object to any discovery request; any right to object to the admissibility of evidence on any ground; any right to seek any further protective order; or any right to seek relief from the Court or any other applicable court from any provision of this Order by application on notice on any grounds.

22. Unauthorized Disclosure Of Designated Material: In the event of a disclosure by a Receiving Party of Designated Material to persons or entities not authorized by this Order to receive such Designated Material, the Receiving Party making the unauthorized disclosure shall, upon learning of the disclosure: immediately notify the person or entity to whom the disclosure was made that the disclosure contains Designated Material subject to this Order; immediately make reasonable efforts to recover the disclosed Designated Material as well as preclude further dissemination or use by the person or entity to whom the disclosure was made; and immediately notify the Producing Party of the identity of the person or entity to whom the disclosure was made, the circumstances surrounding the disclosure, and the steps taken to recover the disclosed Designated Material and ensure against further dissemination or use thereof. Disclosure of Designated Material other than in accordance with the terms of this Order may subject the disclosing person to such sanctions and remedies as the Court may deem appropriate.

23. Manner Of Objecting To Designated Material: If any Receiving Party objects to the designation of any Designated Material, the Receiving Party shall first raise the objection with the Producing Party in writing, and confer in good faith to attempt to resolve any dispute respecting the terms or operation of this Order. The Receiving Party may seek relief from the Court if the

Receiving Party and the Producing Party cannot resolve their dispute. The burden of justifying a Confidential" or "Highly Confidential" designation is on the Producing Party. Until the Court rules on such an issue, the Designated Material shall continue to be treated according to its designation. Upon motion, the Court may order the removal of the "Confidential" or "Highly Confidential" designation from any Discovery Material so designated that is subject to the provisions of this Order.

24. Timing Of Objections To Designated Material: A Receiving Party shall not be obliged to challenge the propriety of a "Confidential" or "Highly Confidential" designation at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. The failure of any Party to challenge the designation by a Producing Party of Discovery Materials as "Confidential" or "Highly Confidential" during the discovery period shall not be a waiver of that Party's right to object to such designation at an evidentiary hearing or at trial.

25. Production Of Privileged Discovery Material: Pursuant to Rule 502(d) of the Federal Rules of Evidence, if a Producing Party inadvertently produces materials that the Producing Party later claims in good faith should not have been produced because of a privilege or other protection, such as work-product protection, the production of that material shall not be deemed to constitute the waiver of any applicable privileges or protections. In such circumstances, when the Producing Party becomes aware that privileged or protected material was produced, it must notify the Receiving Party and request, at the Producing Party's election, either the return or the destruction of the produced material. Within 7 days after receiving such notification, the Receiving Party shall, as instructed, return or destroy and confirm destruction of all such produced material, including all copies, notes, and/or summaries thereof in any Receiving Party work product. The Receiving Party shall not use the contents of such material for any purpose, including

in connection with any effort seeking to compel production of the produced material. The Receiving Party must take reasonable steps to retrieve the produced material if the Receiving Party disclosed it before being notified. Such return or destruction and confirmation of destruction shall not preclude the Receiving Party from seeking to compel production of the produced material for reasons other than its production or any information about the contents of the material that was gained due to its production. Moreover, this Order shall not prevent any Party from challenging the designation of such material as privileged or protected and moving to compel production of allegedly privileged or protected documents.

26. Challenging Privilege Determinations: The Receiving Party shall not be obliged to challenge the propriety of privilege determinations at the time asserted, and a failure to do so shall not preclude a subsequent challenge thereto. If the Receiving Party wishes to challenge one or more of the privilege designations made by the Producing Party, the Parties shall first meet and confer in a good faith effort to resolve any dispute concerning any challenged privilege designations. If the Parties are unable to agree on the appropriateness of one or more privilege designations, the Party challenging the privilege designations may present such dispute to the Court. The burden of justifying a privilege designation is on the Party asserting the privilege. Neither Party shall contend that the meet and confer process set forth in this paragraph constitutes a waiver of attorney-client privilege or attorney work product for any document claimed to be protected from disclosure.

27. Use Of Non-Discovery Material: To the extent that any Party has documents or information that would otherwise constitute Discovery Material that (i) are received or become available to a Party on a non-confidential basis not in violation of an obligation of confidentiality to any other person; (ii) were independently developed by such Party without violating its

obligations hereunder; or (iii) are published or become publicly available in a manner that is not in violation of this Order or of any obligation of confidentiality to any other person, including a Party (collectively "Non-Discovery Material"), nothing in this Order shall limit a Party's ability to use Non-Discovery Material for any purpose, including in a deposition, hearing, trial, or otherwise in connection with any Dispute.

28. Obligations Following Conclusion Of The Disputes: Within 90 days of the later of the conclusion of the Dispute(s), including all appeals as to all Parties, all Parties and non-Parties shall, upon the request of the Producing Party, take all commercially reasonable steps to return to counsel for the respective Producing Party, or to destroy, all Discovery Material, and all copies thereof in the possession of any person, except that: counsel may retain for its records their work product and a copy of court filings, deposition transcripts, deposition recordings, deposition exhibits, expert reports, and exhibits introduced at any hearing; and a Receiving Party may retain Discovery Material that is auto-archived or otherwise "backed up" on electronic management and communications systems or servers, or as may be required for regulatory recordkeeping purposes; provided that such retained documents will continue to be treated as provided in this Order. If a Receiving Party chooses to take all commercially reasonable steps to destroy, rather than return, documents in accordance with this paragraph, that Receiving Party shall, if requested by the Producing Party, verify such destruction in writing to counsel for the Producing Party. Notwithstanding anything in this paragraph, to the extent that the information in the Discovery Material remains confidential, the terms of this Order shall remain binding.

29. Continuing Applicability Of Confidentiality Agreement And Stipulated Protective Order: The provisions of this Order shall survive the final termination of the Disputes for any retained Discovery Material. The final termination of the Disputes shall not relieve counsel or

other persons obligated hereunder from their responsibility to maintain the confidentiality of Discovery Material pursuant to this Order, and the Court shall retain jurisdiction to enforce the terms of this Order.

30. Amendment Of Confidentiality Agreement And Stipulated Protective Order: Upon good cause shown, and on notice to all Parties, any Party may move to amend the provisions of this Order at any time or the Parties may agree by written stipulation, subject to further order of the Court if applicable, to amend the provisions of the Order.

31. Disclosure Of Discovery Material In Other Proceedings: Any Receiving Party that may be subject to a motion or other form of legal process or any regulatory process, demand, or request seeking the disclosure of a Producing Party's Discovery Material: (i) shall promptly notify the Producing Party (unless such notice is prohibited by applicable law) to enable it to have an opportunity to appear and be heard on whether that information should be disclosed, and (ii) in the absence of a court order preventing such legally required disclosure, the Receiving Party shall be permitted to disclose only that portion of the information that is legally required to be disclosed and shall inform in writing any person to whom such information is so disclosed of the confidential nature of such information.

32. Use Of Discovery Material By Producing Party: Nothing in this Order affects the right of any Producing Party to use or disclose its own Discovery Material in any way. Such disclosure, other than publicly filing its own Discovery Material, will not waive the protections of this Order and, subject to Paragraph 27, will not otherwise entitle other Parties, non-Parties, or their attorneys to use or disclose such Discovery Material in violation of this Order.

33. Obligations Of Parties: Nothing herein shall relieve a Party of its obligations under the Federal Rules, Bankruptcy Rules, Local Rules, or under any future stipulations and orders,

regarding the production of documents or the making of timely responses to Discovery Requests in connection with any Dispute.

34. Advice Of Counsel: Nothing herein shall prevent or otherwise restrict counsel from rendering advice to their clients in connection with the Disputes and, in the course thereof, relying on examination of Discovery Material; provided, however, that in rendering such advice and otherwise communicating with such clients, counsel shall not make specific disclosure of any information in any manner that is inconsistent with the restrictions or procedures set forth herein.

35. Prior Agreements: The Parties agree that the provisions and requirements set forth in this Order supersede all prior agreements with respect to Discovery Material, provided however, that this Order shall not affect, amend, or modify any existing confidentiality agreements, non-disclosure agreements, intercreditor agreements, or protective orders applicable to any Party or between any Parties that relate to documents or information exchanged or received prior to the Effective Date of this Order.

36. Enforcement: The provisions of this Order constitute an Order of this Court and violations of the provisions of this Order are subject to enforcement and the imposition of legal sanctions in the same manner as any other Order of the Court.

**THE FOREGOING STIPULATION IS SO ORDERED**.

Signed: April 29, 2022

Marvin Isgur
United States Bankruptcy Judge

**IT IS SO STIPULATED**:

Dated: April 29, 2022

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Reorganized Debtors and Defendants Mesquite Energy, Inc. and SN EF Maverick, LLC**

*/s/ Thomas A. Woolley, II*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant Mitsui E&P Texas LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Joshua W. Wolfshohl*
Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36thFloor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com
**Attorneys for Carnero G&P LLC**

# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP, | § § § § | Adversary No. 21-04419 |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Carnero G&P, LLC, | § | |
| Defendant. | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § § § § | |
| Defendants. | § | |
| | § | |

# Acknowledgement

1. My name is ____________________________________________.

2. My address is ___________________________________________.

3. My present employer is ____________________________________.

4. My present occupation or job description is ______________________.

5. I have been engaged as_________________________________ on behalf of _________________________________________ in one of the above-captioned Adversary Proceedings.

6. I acknowledge that I have read and understand the terms of the Stipulated Protective Order ("Order"). I agree to comply with and be bound by all the provisions of the Order. I agree that I will not use Discovery Material for any purpose other than the Disputes, and will not disclose or cause Discovery Material to be disclosed to anyone not expressly permitted by the Order to receive Discovery Material. By acknowledging these obligations under the Order, I understand that I am submitting myself to the jurisdiction of the United States Bankruptcy Court for the Southern District of Texas for the sole purpose of any issue or dispute arising hereunder and that my willful violation of any term of the Order could subject me to punishment for contempt of Court.

By:______________________________ Executed on ____________ , 2022.

# EXHIBIT 2

1/27/2022 12:48 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 61211675
By: Cynthia Clausell-McGowan
Filed: 1/27/2022 12:48 PM

CAUSE NO. 2022-04224

| | | |
|---|---|---|
| CARNERO G&P LLC, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, SN EF MAVERICK, LLC, and MESQUITE ENERGY, INC., | § § § § | |
| | § | |
| Defendants. | § | 215TH JUDICIAL DISTRICT |

# Plaintiff's Amended Petition

Plaintiff Carnero G&P LLC ("Carnero" or "Plaintiff") files this amended petition against Defendants SN EF UnSub, LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui"), SN EF Maverick, LLC ("Maverick"), and Mesquite Energy, Inc. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent Attorney Service Associates, Inc., 3610-2 N Josey Ln., Suite 223, Carrolton, Texas 75007.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Maverick is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent C T Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

6. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

7. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

8. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

9. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

10. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claims occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

11. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief, monetary relief over $1,000,000, and attorney's fees and costs.

## VI. Factual Background

12. This is a dispute over contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas.

### A. The Comanche Assets

13. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**B. The Comanche Acquisition and Later Conveyances of the Comanche Assets**

14. By a Purchase and Sale Agreement (the "Comanche PSA") dated January 12, 2017, Maverick and various co-investors, including Gavilan Resources, LLC ("Gavilan") and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets (the "Comanche Acquisition") effective July 1, 2016. After closing the Comanche Acquisition, Maverick became the operator of the Comanche Assets.

15. On or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite.[1] Gavilan did not, however, assign the Comanche PSA to Mesquite in this transaction.

16. Currently, Maverick, UnSub, Mesquite, and the WIPs own all of the working interests in the Comanche Assets.

**C. Comanche Assets Existing Commitments Dedications**

17. At the time of the Comanche Acquisition, Anadarko was obligated to gather and process its hydrocarbons from the Comanche Assets through certain midstream providers pursuant to various agreements to which Anadarko was a party (the "Existing Commitments"). The Existing Commitments prevent, in part, the delivery of gas to other service providers, such as Carnero.[2] Anadarko retained these Existing Commitments in the Comanche Acquisition transaction and did not assign them to Maverick, Gavilan, and UnSub. As a result, Maverick, Gavilan, and UnSub had no obligation to deliver their Comanche Gas to the midstream providers under the Existing Commitments. Only Anadarko had that obligation.

[1] *See In re Gavilan Resources, LLC,* Case No. 20-32656, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [Dkt. 366 Asset Purchase Agreement at pdf p. 291)].

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time the execution of the Ratification Agreements.

18. To require Maverick, as operator of the Comanche Assets, to deliver the gas produced from Maverick's, Gavilan's, and UnSub's interests in fulfillment of Anadarko's retained obligation under the Existing Commitments, Maverick, as "Provider," and Anadarko, as the "Recipient," concurrently executed a new agreement, the Retained Midstream Contracts Services Agreement (the "Midstream Agency Agreement"). Under this agreement, Provider acts as Recipient's agent for delivering gas from the Comanche Assets on behalf of Recipient to the midstream providers who are the parties to the Existing Commitments.

19. Maverick, UnSub, Mesquite, and the WIPS never became parties to the underlying Existing Commitments. Mesquite, UnSub, and the WIPs never became parties to the Midstream Agency Agreement. As a result, none of them has a direct obligation to deliver gas under the Existing Commitments. Only Anadarko has that obligation. Once the Existing Commitments end or are terminated, Maverick, UnSub, Mesquite, and the WIPS can send the gas to other midstream providers operating in the area.

**D. Comanche Assets Dedication to Carnero under the GGPA**

20. Carnero is another midstream provider that operates in the area of the Comanche Assets. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA") regarding gas from the Comanche Assets. Effective that same date, (i) UnSub, Maverick, and Carnero entered into a ratification agreement ratifying the GGPA; (ii) Gavilan (now Mesquite), Eagle Ford and Venado executed ratification agreements in substantially the same form (collectively referred to as the "Ratification Agreements"); and (iii) Unsub, Eagle Ford, Venado, Maverick, Gavilan (now Mesquite), and Carnero entered into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment"). As a consequence of the various Ratification Agreements and the GGPA

Amendment, UnSub, Gavilan (now Mesquite), Eagle Ford, and Venado owe the same obligations as Maverick under the GGPA.

21. Additionally, Mitsui, Maverick, and Carnero signed a Letter Agreement also dated effective April 1, 2018 ("Letter Agreement") authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA as a Comanche Producer (as defined in the GGPA) after Mitsui rejects certain "Commitment Agreements" (as defined in the Letter Agreement).

**E. Producer Obligations under the GGPA**

22. The GGPA is like a top lease—it becomes effective to flow gas from the Comanche Assets to Carnero when the then-existing delivery obligations under the Existing Commitments end or are terminated. In the GGPA, Maverick, UnSub, Gavilan, and the WIPs dedicated the gas ("Dedicated Gas") from their existing interest in the Comanche Assets to Carnero ("Dedicated Acreage"). The GGPA notes that "Producer" (which includes Maverick, UnSub, Gavilan (now Mesquite), and the WIPs by virtue of the Ratification Agreements, the GGPA Amendment, and the Letter Agreement) "desires that Carnero provide certain gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement." Therefore, part of the consideration for Carnero to enter into the GGPA was the expectation that the Producers would direct their Dedicated Gas from the Dedicated Acreage to Carnero for processing in accordance with the terms of GGPA.

**23.** Those terms and conditions include that Producer may continue to deliver gas from the Dedicated Acreage under "binding contractual commitments [the Existing Commitments]…that exist as of the Effective Date and prevent delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero" until the "earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent 'evergreen' or 'renewal' terms, it

Case 4:22-cv-03585 Document 19-3 Filed in TXSD on 02/28/22 Page 47 of 63

being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any 'evergreen' or 'renewal term')…."

**F. Mesquite's Gas from the Former Gavilan Dedicated Acreage Is No Longer Subject to the Existing Commitments**

24. As stated, on or about October 16, 2020, Gavilan sold its interest in the Comanche Assets to Mesquite, but specifically did not assign the Comanche PSA to Mesquite. As a result, on information and belief, Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments.

25. On information and belief, effective December 21, 2021, Anadarko, Mesquite, Maverick, and others, with the input and participation of UnSub and the WIPs, entered into agreements that (i) modify the commercial terms of or applicable to the Existing Commitments; (ii) cause the extension the Existing Commitments; and/or (iii) otherwise modify (or in the case of the Gavilan acreage, reinstate) the Existing Commitments in a manner that violates the GGPA. As a result, Mesquite, Maverick, UnSub, and the WIPs have undermined the purpose of the GGPA and breached their representations and promises to Carnero and their obligations as "Producers" under the GGPA.

## VII. <u>Causes of Action</u>

**A. Declaratory Judgment**

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are

affected by those contracts. Carnero may have determined any questions of construction or validity arising under those contracts and obtain declarations of its rights, status, or other legal relations under the GGPA, the GGPA Amendments, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";

(b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";

(c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;

(f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and

(g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement.

**B. Breach of Contract – All Defendants**

38. The Defendants are parties to valid and enforceable agreements with Carnero.

39. Maverick is a party to the GGPA with Carnero.

40. By virtue of their respective Ratification Agreements and the GGPA Amendment, Mesquite, UnSub, Venado, and Eagle Ford are parties to the GGPA with Carnero.

41. By virtue of the Letter Agreement, Mitsui owes the obligations of a Producer under the GGPA to Carnero.

42. Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui promised to deliver their Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

43. On information and belief, Maverick, Mesquite, UnSub, Venado, Eagle Ford, and Mitsui have breached their promises by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

44. Maverick's, Mesquite's, UnSub's, Venado's, Eagle Ford's, and Mitsui's breaches of their promises have damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from gathering, processing, and purchasing the Dedicated Gas from the Dedicated

Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration these parties gave to Carnero, and on which it relied, for its execution of the GGPA.

**C. Breach of Contract – Mesquite**

45. The Defendants are parties to valid and enforceable agreements with Carnero.

46. By virtue of its Ratification Agreement and the GGPA Amendment, Mesquite, as successor to Gavilan, is a party to the GGPA with Carnero.

47. Mesquite promised to deliver its Dedicated Gas from the Dedicated Acreage to Carnero under the GGPA subject only to the Existing Commitments as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment."

48. On or about October 16, 2020, Mesquite acquired Gavilan's interest in the Comanche Assets, but Gavilan did not assign the Comanche PSA to Mesquite. Mesquite's interest in the Comanche Assets is, thus, free and clear of any obligations in the Comanche PSA. As a result, Mesquite did not assume the obligation to be bound by the Existing Commitments, and therefore, is not required to deliver its Dedicated Gas to the midstream providers under the Existing Commitments. Carnero was entitled to gather and process Mesquite's Dedicated Gas under the GGPA after October 16, 2020.

49. On information and belief, Mesquite has breached its promise by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that its Dedicated Gas was again made subject to the Existing Commitments, rather than being directed to Carnero under the GGPA.

50. Mesquite's breach of its promise has damaged Carnero by denying it the benefit of its bargain to collect millions of dollars in fees from receiving Mesquite's Dedicated Gas from the Dedicated Acreage as per the terms of the GGPA and has caused the GGPA to fail of essential purpose from the destruction of the consideration Mesquite gave to Carnero, and on which it relied, for its execution of the GGPA.

**D. Attorney's Fees**

51. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code Chs. 37 and 38, and any other applicable statutes, and as allowed by the GGPA, the GGPA Amendment, the Ratification Agreements, the Letter Agreement, or other applicable agreement.

**E. Conditions Precedent**

52. All conditions precedent to Plaintiff's right to recover against Defendants has occurred, has been performed, or has otherwise been waived.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: January 27, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *__/s/ Eugene M. Nettles__*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

# EXHIBIT 3

United States Bankruptcy Court Southern - Texas
ENTERED
04/09/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 1110** |

**ORDER APPROVING DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION; (III) APPROVING THE FORM OF BALLOT, AND NOTICES IN CONNECTION THEREWITH; (VI) SCHEDULING CERTAIN DATES WITH RESPECT THERETO; AND (V) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") (i) conditionally approving the adequacy of the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement");

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

(ii) approving the Solicitation and Voting Procedures; (iii) approving the Voting Record Date; (iv) approving the manner and form of the Solicitation Packages and the materials contained therein; (v) approving the Non-Voting Status Notices; (vi) approving the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan; (vii) approving the Voting and Tabulation Procedures; (viii) approving the Combined Hearing Notice; (ix) scheduling certain dates and deadlines related thereto; and (x) granting related relief; all as more fully set forth in the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of the cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore; it is HEREBY ORDERED THAT:

1. Omitted.

2. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

## I. CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT.

3. The Disclosure Statement, attached as **Schedule 1**, is hereby conditionally approved as providing Holders of Claims and Interests entitled to vote on the Plan with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1121(a)(1).

4. The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction and exculpation provisions contained in Articles VIII.B and C of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II. APPROVAL OF THE SOLICITATION AND VOTING PROCEDURES.

5. The Debtors shall solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached as **<u>Schedule 2</u>**, which are hereby approved in their entirety.

## III. APPROVAL OF THE MATERIALS AND TIMELINE FOR SOLICITING VOTES AND THE PROCEDURES FOR CONFIRMING THE PLAN AND FOR APPROVING THE DISCLOSURE STATEMENT ON A FINAL BASIS.

### A. Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

6. Cause exists to shorten the deadlines set forth by Bankruptcy Rule 2002(b). The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept, and voting on, the Plan, as well as filing objections to the Plan and Disclosure Statement and approving the Disclosure Statement and confirming the Plan:

| | |
|---|---|
| Voting Record Date | April 8, 2020 |
| Solicitation Deadline | April 13, 2020 |
| Voting Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Response Deadline | April 29, 2020 at 12:00 p.m., prevailing Central Time |
| Deadline to File Voting Report | April 29, 2020 at 12:00 p.m., prevailing Central Time |

[redacted]

| | |
|---|---|
| Combined Hearing Date | April 30, 2020, at 9:00 a.m., prevailing Central Time, or such other time as may be scheduled by the Court |

**B. Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

7. In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits), the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those Holders of Claims in the Voting Class entitled to vote on the Plan as of the Voting Record Date shall include the following, the form of each of which is hereby approved:

(a) a copy of the Solicitation and Voting Procedures attached as **Schedule 2**;[2]

(b) an appropriate form of Ballot attached as **Schedule 3A, 3B, 3C, and 3D**; and

(c) the Combined Hearing Notice attached as **Schedule 4**.

8. The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

9. The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline. Such service shall satisfy the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Bankruptcy Local Rules.

[2] The Debtors will use commercially reasonable efforts to ensure that any Holder of a Claim who has filed duplicate Claims or Interests against the Debtors (whether against the same or multiple Debtors) receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim.

10. The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to Holders of Claims entitled to vote on the Plan in electronic format. On or before the Solicitation Deadline, the Debtors shall provide (i) complete Solicitation Packages (other than Ballots) to the U.S. Trustee and (ii) the Order (in electronic format) and the Combined Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

11. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the corresponding materials received in electronic format (to be provided at the Debtors' expense).

12. The Balloting Agent is authorized to assist the Debtors in (i) distributing the Solicitation Packages; (ii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims or Interests; (iii) responding to inquiries from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; and (iv) if necessary, contacting creditors and equity holders regarding the Plan.

13. The Balloting Agent is also authorized to accept Ballots via electronic online transmission through a customized online balloting portal on the Debtors' case website. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

**C. Approval of the Combined Hearing Notice.**

14. The Combined Hearing Notice, substantially in the form attached as **Schedule 4** filed by the Debtors and served upon parties in interest in these chapter 11 cases on or before the Solicitation Deadline, constitutes adequate and sufficient notice of the hearing to consider

adequacy of the Disclosure Statement and approval of the Plan, the manner in which a copy of the Plan can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

15. The Combined Hearing Notices provide Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the exculpation and injunction provisions contained in Article VIII.B and C of the Plan and the effect thereof.

**D. Approval of the Form of Notices to Non-Voting Classes.**

16. Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes because such Holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Deadline, the Balloting Agent shall mail (first class, postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, and 7 | Unimpaired-Presumed to Accept | Will receive a notice, substantially in the form attached hereto as **Schedule 5A** in lieu of a Solicitation Package. |
| 8, 9 and 10 | Impaired-Deemed to Reject | Will receive a notice, substantially in the form attached hereto as **Schedule 5B** in lieu of a Solicitation Package. |

17. The Debtors are not required to provide the Holders of Class 6 Intercompany Claims with a Solicitation Package or any other type of notice in connection with solicitation.

18. The Debtors are not required to mail Solicitation Packages or other solicitation materials to (i) Holders of Claims or Interests that have already been paid in full during these chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant

to an order previously entered by this Court or (ii) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

**E. Approval of Notices to Contract and Lease Counterparties.**

19. The Debtors shall mail a notice of assumption or rejection of any Executory Contracts or Unexpired Leases (and any corresponding Cure Claims), substantially in the forms attached hereto as **Schedule 6** and **Schedule 7**, to the applicable counterparties to the Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan prior to the Combined Hearing. The deadline for objections to the Cure Claims and/or the assumption or rejection of Executory Contracts or Unexpired Leases is May 20, 2020.

**F. Approval of the Procedures for Filing Objections to the Plan.**

20. Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, must (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the nature and amount of the Claim against or Interest in the Estates or property of the Debtors; (iv) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (v) be filed with the Court.

21. The Debtors (and other parties in support of the Plan) may file a reply to any objections to Confirmation of the Plan and a memorandum in support of Confirmation by April 29, 2020, at 12:00 p.m., prevailing Central Time.

## IV. MISCELLANEOUS.

22. The Debtors' rights are reserved to modify, revoke, or withdraw the Plan in accordance with the provisions of Article X of the Plan.

23. Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

24. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

26. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

27. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

28. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

29. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: April 09, 2020

Marvin Isgur
United States Bankruptcy Judge

# Schedule 1

## Disclosure Statement

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Jason P. Rubin (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: jsavin@akingump.com

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
Email: mcavenaugh@jw.com
efreeman@jw.com

Dated: April 9, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**<u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>**[2]

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.**

**<u>THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.</u>**

**THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION,**

2 Terms shall have the meaning ascribed to them, if any, elsewhere in this Disclosure Statement.

MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCE AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED**

**THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- **BUSINESS STRATEGY;**
- **THE AMOUNT OF OIL AND NATURAL GAS THE DEBTORS PRODUCE;**
- **OIL, NATURAL GAS AND NATURAL GAS LIQUIDS ("NGLs") RESERVES;**
- **THE DEBTORS' ABILITY TO REPLACE RESERVES AND INCREASE RESERVE VALUE;**
- **THE DEBTORS' DRILLING LOCATIONS AND THEIR ABILITY TO CONTINUE DEVELOPMENT ACTIVITIES AT ECONOMICALLY ATTRACTIVE COSTS;**
- **THE DEBTORS' ABILITY TO DIVEST NON-CORE ASSETS AT ECONOMICALLY ATTRACTIVE PRICES;**
- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**
- **OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;**
- **THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;**
- **AVAILABILITY AND TERMS OF CAPITAL;**
- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**
- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**
- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**
- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**
- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**
- **PLANS, OBJECTIVES, AND EXPECTATIONS;**
- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY; AND**
- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING: THE OUTCOME OF THE CHAPTER 11 CASES; RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES, INCLUDING THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN OR TO DEVELOP, CONFIRM AND CONSUMMATE AN ALTERNATIVE RESTRUCTURING TRANSACTION IF THE PLAN IS NOT CONFIRMED, WHICH MAY BE NECESSARY TO CONTINUE AS A GOING CONCERN; THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, CUSTOMERS, EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILINGS; EACH DEBTOR'S**

**ABILITY TO OBTAIN SUFFICIENT FINANCING TO ALLOW IT TO EMERGE FROM BANKRUPTCY AND EXECUTE ITS BUSINESS PLAN POST-EMERGENCE; THE LENGTH OF TIME THAT THE DEBTORS WILL OPERATE UNDER CHAPTER 11 PROTECTION AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES; RISKS ASSOCIATED WITH THIRD PARTY MOTIONS IN THE CHAPTER 11 CASES, WHICH MAY INTERFERE WITH THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE A PLAN OF REORGANIZATION; THE POTENTIAL ADVERSE EFFECTS OF THE CHAPTER 11 CASES ON THE DEBTORS' LIQUIDITY AND RESULTS OF OPERATIONS; INCREASED ADVISORY COSTS TO EXECUTE A REORGANIZATION; THE TIMING AND EXTENT OF CHANGES IN PRICES OF, AND DEMAND FOR, COMMODITIES; THE EXTENT TO WHICH THE DEBTORS' DRILLING PLANS ARE SUCCESSFUL; EACH DEBTOR'S ABILITY TO REPLACE THE RESERVES IT PRODUCES; EACH DEBTOR'S ABILITY TO SATISFY ITS CAPITAL EXPENDITURE, DEBT SERVICE AND OTHER FUNDING REQUIREMENTS THROUGH INTERNALLY GENERATED CASH FLOWS, ASSET SALES AND OTHER ACTIVITIES; THE ACCURACY OF RESERVE ESTIMATES; AND OTHER FACTORS DESCRIBED IN THIS DISCLOSURE STATEMENT OR THE PLAN.**

**SEE "RISK FACTORS" IN THE ANNUAL REPORT OF SANCHEZ ENERGY CORPORATION ("SN") ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2018 FOR A FURTHER DESCRIPTION OF ADDITIONAL RISK FACTORS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE DEBTORS' OPERATING PERFORMANCE, AND SEE SN'S OTHER FILINGS WITH THE SEC FOR ADDITIONAL DISCLOSURES REGARDING RISKS AND FORWARD-LOOKING STATEMENTS.**

**TABLE OF CONTENTS**

Page


| | | | |
|---|---|---|---|
| **I.** | **INTRODUCTION.** | | **1** |
| **II.** | **PRELIMINARY STATEMENT.** | | **1** |
| **III.** | **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.** | | **3** |
| | A. | What is chapter 11? | 3 |
| | B. | Why are the Debtors sending me this Disclosure Statement? | 4 |
| | C. | Am I entitled to vote on the Plan? | 4 |
| | D. | What will I receive from the Debtors if the Plan is consummated? | 4 |
| | E. | What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim? | 7 |
| | F. | Are any regulatory approvals required to consummate the Plan? | 10 |
| | G. | What happens to my recovery if the Plan is not confirmed or does not go effective? | 10 |
| | H. | If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" | 10 |
| | I. | Is there potential litigation related to the Plan? | 10 |
| | J. | How will the preservation of the Causes of Action impact my recovery under the Plan? | 11 |
| | K. | Will there be releases and exculpation granted to parties in interest as part of the Plan? | 11 |
| | L. | How do I vote for or against the Plan? | 13 |
| | M. | What is the deadline to vote on the Plan? | 14 |
| | N. | When is the Confirmation Hearing set to occur? | 14 |
| | O. | What is the purpose of the Confirmation Hearing? | 14 |
| | P. | Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? | 15 |
| | Q. | Do the Debtors recommend voting in favor of the Plan? | 15 |
| | R. | Who supports the Plan? | 15 |
| **IV.** | **THE DEBTORS' PLAN.** | | **16** |
| | A. | The Plan. | 16 |
| | B. | Cancellation of Instruments, Certificates, and Other Documents. | 25 |
| | C. | Section 1146(a) Exemption. | 25 |
| | D. | DIP Agent Fees and Expenses. | 26 |
| **V.** | **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** | | **26** |
| | A. | The Company's Corporate History. | 26 |
| | B. | The Debtors' Assets. | 27 |
| | C. | The Debtors' Prepetition Capital Structure. | 29 |
| **VI.** | **MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.** | | **33** |
| | A. | First Day Relief. | 33 |
| | B. | Other Procedural and Administrative Motions. | 33 |
| | C. | Schedules and Statements. | 34 |
| | D. | Establishment of a Claims Bar Date. | 34 |
| | E. | The GSO Tolling Agreement. | 35 |
| | F. | Investigation of Related Party Transactions. | 35 |

| | | | |
|---|---|---|---|
| | G. | Litigation Matters. | 36 |
| | H. | Retention of Professionals. | 39 |
| | I. | Rejection and Assumption of Executory Contracts and Unexpired Leases. | 40 |
| | J. | Appointment and Retention of Chief Restructuring Officer. | 40 |
| | K. | Appointment of Examiner. | 40 |
| | L. | Exclusivity. | 41 |
| | M. | Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts. | 41 |
| | N. | Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property. | 41 |
| | O. | DIP Motion. | 42 |
| | P. | Analysis of Lien Perfection Regarding Secured Notes. | 42 |
| | Q. | Creditors' Committee Claim Objection. | 43 |
| | R. | Creditors' Committee Related Party Transaction Standing Motion. | 44 |
| | S. | Shared Services. | 44 |
| | T. | Analysis of the Debtors' Midstream and Marketing Contract Review. | 44 |
| | U. | Postpetition Restructuring Process. | 45 |
| **VII.** | **RISK FACTORS.** | | **46** |
| | A. | Bankruptcy Law Considerations. | 46 |
| | B. | Risks Related to Recoveries under the Plan. | 49 |
| | C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses. | 52 |
| **VIII.** | **SOLICITATION AND VOTING PROCEDURES.** | | **60** |
| | A. | Holders of Claims and Interests Entitled to Vote on the Plan. | 61 |
| | B. | Voting Record Date. | 61 |
| | C. | Voting on the Plan. | 61 |
| | D. | Ballots Not Counted. | 62 |
| **IX.** | **CONFIRMATION OF THE PLAN.** | | **62** |
| | A. | Requirements for Confirmation of the Plan. | 62 |
| | B. | Best Interests of Creditors/Liquidation Analysis. | 63 |
| | C. | Feasibility. | 63 |
| | D. | Acceptance by Impaired Class. | 64 |
| | E. | Confirmation without Acceptance by All Impaired Classes. | 64 |
| | F. | Valuation of the Debtors. | 65 |
| **X.** | **CERTAIN SECURITIES LAW MATTERS.** | | **65** |
| | A. | New Common Stock. | 65 |
| | B. | Issuance and Resale of New Common Stock Under the Plan. | 66 |
| **XI.** | **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.** | | **69** |
| | A. | Introduction. | 69 |
| | B. | Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors. | 70 |
| | C. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. | 73 |
| | D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. | 77 |
| | E. | Information Reporting and Backup Withholding. | 80 |

**XII. RECOMMENDATION. ......................................................................................................82**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Corporate Organization Chart |
| EXHIBIT C | Liquidation Analysis |
| EXHIBIT D | Financial Projections |
| EXHIBIT E | Valuation Analysis |

# I. INTRODUCTION.

Sanchez Energy Corporation ("SN") and its debtor affiliates, as debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors"), and its non-debtor subsidiaries and certain affiliates (collectively, the "Non-Debtor Affiliates," and together with the Debtors, the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates [Docket No. [●] (the "Plan"), filed contemporaneously herewith.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 Plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES. ACCORDINGLY, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

# II. PRELIMINARY STATEMENT.

SN, a publicly-owned Delaware corporation headquartered in Houston, Texas, is, together with its direct and indirect Debtor and non-Debtor subsidiaries, an independent oil and natural gas exploration and production ("E&P") company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources. SN was formed by the Sanchez Group[2] in August 2011 and completed its initial public offering ("IPO") in December 2011. SN's common stock (the "Existing SN Common Stock") subsequently traded on the New York Stock Exchange (the "NYSE") until the opening of trading on February 20, 2019 when the NYSE suspended the trading of the Existing SN Common Stock and commenced delisting proceedings. As a result of delisting proceedings initiated by the NYSE, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date). The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit B**. As set forth therein, SN is either the direct or indirect parent company of each of the other Debtors.

The sustained decline and volatility in commodity prices have weighed heavily on the energy industry globally and, in particular, on U.S. independent oil and natural gas producers such as the Debtors. The E&P industry has been challenged by low oil and natural gas prices for years. Beginning in 2014, oil prices declined precipitously from a price of more than $100 per barrel, and continued to languish throughout 2015 into the start of 2016, ultimately reaching a 13-year low of approximately $26 per barrel in February 2016. Oil prices made a slight rebound in 2017, only to decline again in the second half of 2018. The extreme volatility continued in 2019 through early 2020, and oil prices trended downward beginning in late January 2020. Even more recently, the coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial and consumer activity and travel and social distancing restrictions that are expected to continue and may expand in the near future. Disagreements between the Organization of Petroleum Exporting Countries ("OPEC") and Russia in early March 2020 have caused additional historic price declines and volatility. Oil prices fell to a four-year low

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan will govern.

[2] The "Sanchez Group" comprises Sanchez Oil & Gas Corporation and certain other affiliated entities.

in March 2020 below $20 per barrel, and have somewhat abated to the high $20 to low $30 per barrel range over the first several trading sessions in April 2020 in response to headlines regarding potential further OPEC actions. This market downturn has negatively impacted and continues to negatively impact the volume and discounted future net cash flows of the Debtors' estimated proved reserves, and the prolonged price volatility also has caused the Debtors to incur losses related to their commodity hedging arrangements, the last of which expired as of January 31, 2020. Additionally, the Debtors' revenue, profitability, and cash flow depend on the prices of and demand for oil, natural gas, and NGLs, and continued low and volatile commodity prices have significantly and adversely affected the Debtors' financial results and prospects for long-term operation under their current capital structure. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crisis, reflecting fears of a global recession and potential further global economic damage from the coronavirus pandemic, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

Deteriorating commodity market conditions have impacted energy companies throughout the industry and around the world. Companies throughout the oil and natural gas industry have endured the effects of this downward trend, and the Debtors are no exception. Specifically, U.S. independent E&P companies like the Debtors have suffered enormously, as their revenues are generated from the sale of oil and natural gas. Many U.S. oil and natural gas companies have filed for chapter 11 bankruptcy protection over the last few years, which is an indicator of difficult and unsustainable market conditions. In addition, many other oil and natural gas companies have defaulted on their debt obligations, negotiated covenant relief with creditors to avoid defaulting, or have pursued out-of-court restructurings.

The Company's success depends on receiving market-based prices for its oil and natural gas production that allow the Company to generate a profit after accounting for capital expenditures and costs. Additionally, the Company depends upon the vitality of the midstream and downstream companies that comprise its customer base to purchase and transport its hydrocarbons to the market. Similar to the Company, these other companies and the physical markets have also experienced detrimental impacts and disruptions caused by the price downturn and supply imbalance.

Operating their businesses in light of the extended downturn in commodity prices has negatively impacted the Company's liquidity. The Company's cash position has declined steadily through 2017, 2018, and 2019. As of August 11, 2019 (the "Petition Date"), the Debtors had a total of approximately $91 million in cash. The Debtors' cash on hand in addition to the Debtors' DIP financing has been, and will continue to be, used to fund operations during the Chapter 11 Cases.

On a prepetition basis, SN, as borrower, and certain of the Debtor entities which constitute restricted subsidiaries (the "Restricted Subsidiaries") under the Credit Agreement (as defined below), as guarantors, had an approximately $17.1 million issued and undrawn letter of credit under the $25 million first-out senior secured working capital and letter of credit facility (the "First-Out Senior Secured Revolving Credit Facility") pursuant to the Third Amended and Restated Credit Agreement (the "Credit Agreement") dated as of February 14, 2018 with Royal Bank of Canada ("RBC"), as administrative agent. This letter of credit was drawn by the beneficiary thereof on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral (as defined below). On January 28, 2020, in conjunction with the closing of the DIP Facility (as defined below), SN used its available cash, including net proceeds of the borrowings under the DIP Facility, to pay off all $7.9 million of borrowings and the additional $17.1 million in such reimbursement obligations, together with $0.7 million in accumulated fees and interest on such amounts since the Petition Date.

In addition to liquidity concerns, the Debtors faced impending maturities of their 7.75% Senior Notes[3] at a time when the Company was navigating dire financial circumstances. Any attempt to re-finance that maturity would likely have been extremely difficult in the environment at that time under the Debtors' existing capital structure, shown below as of the Petition Date.

As of the Petition Date, the Existing SN Common Stock was trading at $0.08 per share, with a total market capitalization of $7.5 million. As detailed herein, SN struggled prepetition to maintain compliance with the NYSE's listing standards when the average closing price per share of the Existing SN Common Stock fell below $1.00, and SN's average market capitalization fell below $50 million. On January 3, 2019, SN was notified in writing by the NYSE that it was out of compliance with the NYSE's continued listing standards requiring that a company maintain an average market capitalization of $50 million over a consecutive 30 trading day period, which subsequently caused the NYSE to initiate delisting proceedings of the Existing SN Common Stock. As a result, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date).

This confluence of circumstances, and the related adverse effects and negative prospects for satisfying their future financial obligations, directly caused the Debtors to commence these Chapter 11 Cases. To protect their residual values and to successfully restructure their businesses in light of these challenges, the Debtors have been actively implementing strategies designed to maximize liquidity and preserve capital. Specifically, in the past several years the Debtors have substantially reduced personnel, divested a number of assets, and implemented numerous technical processes to further develop assets to increase production. The Debtors also significantly reduced drilling and development activity and reduced their capital expenditures from approximately $593 million in 2018 to $83 million in 2019.

The Plan provides for a comprehensive restructuring of the Debtors' outstanding indebtedness and equity interests through a plan of reorganization.

The formulation of the Plan is a significant achievement for the Debtors. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders. The Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code

[3] SN has issued and outstanding $600 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "7.75% Senior Notes"), $1,150 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "6.125% Senior Notes" and together with the 7.75% Senior Notes, the "Senior Unsecured Notes"), and $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes," and together with the Senior Unsecured Notes, the "Notes").

provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| Classified Claims Against and Interests In the Debtors | | | | |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:<br>i. payment in full in Cash;<br>ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br>iii. reinstatement of such Other Secured Claim; or<br>iv. other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:<br>i. Cash in an amount equal to such Allowed Other Priority Claim; or<br>ii. such other treatment rendering such Other Priority Claim Unimpaired. | $0 | 100% |
| 3 | DIP Claims | In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of | $ 151.4 MM | 11%-53% |

[4] The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed, as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| | | an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:<br>i. the DIP Equity Distribution on the Effective Date; and<br>ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code. | | |
| 4 | Secured Notes Claims | In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code | $ 450 MM | 0%-TBD |
| 5 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code. | $1.815 MM | 0%-TBD |
| 6 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:<br>i. Reinstated;<br>ii. compromised;<br>iii. released, or<br>iv. offset, contributed, and/or distributed to the applicable Debtor. | N/A | N/A |

Case 4:22-cv-03387 Document 1-13 Filed on 09/30/22 in TXSD Page 26 of 1867

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 8 | Existing SN Preferred Interests | On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 9 | Existing SN Common Interests | On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 10 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim. | N/A | 0% |

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1. Administrative Claims.

Except as otherwise provided in Article II.A of the Plan and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

**2. Professional Fee Claims.**

**A. Professional Fee Settlement.**

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly,

any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

**B. Final Fee Applications.**

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "Draft Report Review Period"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

**3. Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**4. Statutory Fees.**

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### F. Are any regulatory approvals required to consummate the Plan?

There are not expected to be any known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 63, and the Liquidation Analysis attached hereto as **Exhibit C**.

### H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After the Plan is confirmed, there are conditions that need to be satisfied or waived so that the Plan can be Consummated and go effective. *See* Article IX of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion on the confirmation procedures.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for such Allowed Claims in accordance with the applicable Class on the date the Plan becomes effective, *i.e.*, the "Effective Date," or as soon as reasonably practicable thereafter, unless the Plan provides otherwise.

### I. Is there potential litigation related to the Plan?

Parties in interest may object to the Plan being confirmed, which potentially gives rise to litigation. In the event that it becomes necessary to confirm the Plan over a Class's objection to or vote to reject the Plan, the Debtors may seek to confirm the Plan notwithstanding such objecting Class's dissent. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan that an impaired class has rejected, if it determines that the plan meets certain requirements for confirmation.

The Bankruptcy Court has established **April 27, 2020, at 5:00 p.m. prevailing Central Time**, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**J. How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

**K. Will there be releases and exculpation granted to parties in interest as part of the Plan?**

The Plan proposes to exculpate the Exculpated Parties, but will not grant any other releases. The exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations with respect to the Plan. The exculpation provisions not only benefit the Exculpated Parties, but also the Debtors' post-emergence enterprise as a whole.

The Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. In addition, many of the

Exculpated Parties are entitled to indemnification by the Debtors, which indemnification obligations are expressly preserved under the Plan. Accordingly, each of the Exculpated Parties warrants the benefit of the exculpation provisions.

**1. Exculpation.**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**2. Injunction.**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any**

**manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

### 3. Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

## L. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. Additional information on the voting process is contained in Article VIII below, entitled "Solicitation and Voting Procedures."

| BALLOTS |
| --- |
| The Balloting Agent[5] must **actually receive** ballots on or before the Voting Deadline, which is **April 27, 2020, at 5:00 p.m., prevailing Central Time**, either (i) via the online portal, https://cases.primeclerk.com/sanchezenergy or (ii) at the following address:<br><br>**Sanchez Ballot Processing**<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165<br><br>or (iii) if permitted under the instructions accompanying your ballot, via email to sanchezballots@primeclerk.com<br><br>If you have any questions on the procedure for voting on the Plan, please call the Debtors at:<br><br>(844) 232-0067 (U.S. and Canada toll free) or (917) 942-6393 (international) |

### M. What is the deadline to vote on the Plan?

The Voting Deadline is April 27, 2020, at 5:00 p.m. (prevailing Central Time).

### N. When is the Confirmation Hearing set to occur?

On April [9], 2020, the Bankruptcy Court entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (VI) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. #] (the "Scheduling Order"). As part of the Scheduling Order, the Bankruptcy Court has scheduled a Combined Hearing to consider the adequacy of this Disclosure Statement and Confirmation of the Plan for April 30, 2020, at 9:00 a.m. (prevailing Central Time) (the "Combined Hearing"). The Combined Hearing may be adjourned from time to time without further notice.

In addition, pursuant to the Scheduling Order, objections to Confirmation or the adequacy of this Disclosure Statement must be filed and served on the Debtors, and certain other parties, by no later than April 27, 2020, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and is incorporated herein by reference.

### O. What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain

[5] "Balloting Agent" refers to the Claims, Noticing and Solicitation Agent with respect to the performance of its solicitation activities.

limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

The Combined Hearing will consider the adequacy of this Disclosure Statement, as well as Confirmation of the Plan.

### P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Balloting Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
**Sanchez Ballot Processing**
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

*By electronic mail at:*
sanchezballots@primeclerk.com

*By telephone (toll free) at:*
(844) 232-0067 (U.S. and Canada)
(917) 942-6393 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Balloting Agent at http://cases.primeclerk.com/sanchezenergy (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

To the extent that you have questions about your rights pursuant to the Plan or the Disclosure Statement, you should seek the advice of your own counsel.

### Q. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### R. Who supports the Plan?

The Plan is the product of a negotiated settlement reached through mediation. The Plan is supported by the Debtors and the Secured Ad Hoc Group.

# IV. THE DEBTORS' PLAN.

## A. The Plan.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Plan contains the following provisions:

### 1. Sources of Consideration for Plan of Reorganization Distributions.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

### 2. Issuance and Distribution of New Common Stock.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2 of the Plan. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

### 3. Distribution of Post-Effective Date Equity Distribution.

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

### 4. Lien-Related Litigation.

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; provided that in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection

with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

**5. Continuation of Gavilan Proceeding.**

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

**6. Corporate Existence.**

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

**7. Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**8. Corporate Action.**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have

occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

**9. New Organizational Documents.**

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

**10. Directors and Officers of Reorganized SN.**

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

**11. Retention of Current Workforce by Reorganized SN; Severance Payments.**

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by

SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

### 12. Management Incentive Plan.

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

### 13. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

### 14. Preservation of Causes of Action.

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the

Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

**15. Distributions.**

**(i) Distributions on Account of Claims Allowed as of the Effective Date.**

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

**(ii) Rights and Powers of the Disbursing Agent.**

**(a) Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(b) Expenses Incurred On or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**(iii) Special Rules for Distributions to Holders of Disputed Claims.**

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to

Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

**16. Executory Contracts and Unexpired Leases.**

**(i) Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in Article V of the Plan, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

**(ii) Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy

Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**(iii) Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**17. Exemption from Registration Requirements.**

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**18. Conditions Precedent.**

**(i) Conditions Precedent to the Effective Date of the Plan.**

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

(1) the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

(2) the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

(3) the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

(4) the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

(5) the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

(6) the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

(7) the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

**(ii) Waiver of Conditions.**

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may only be waived only by the Debtors, with the consent of the DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**(iii) Effect of Non-Occurrence of Conditions to Consummation.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**(iv) Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**B. Cancellation of Instruments, Certificates, and Other Documents.**

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

**C. Section 1146(a) Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the

Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D. DIP Agent Fees and Expenses.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

### A. The Company's Corporate History.

SN was formed by certain members of the Sanchez Group in August 2011 and completed its IPO in December 2011. SN is engaged in the development and production of onshore domestic oil and natural gas properties, with a particular focus on the horizontal development of the Eagle Ford Shale in South Texas.

Concurrently with the IPO, the Debtors acquired certain assets in the Eagle Ford Shale, where they continued to expand their presence, predominantly in the western portion, and as of December 31, 2019, hold approximately 415,000 gross (215,000 net) acres (collectively, the "Eagle Ford Assets"). The Debtors' core acreage position, which is large and strategically concentrated within an approximately 40-mile radius, provides a unique competitive advantage by offering the potential for significant synergies of scale. These synergies include the opportunity to derive cost savings in connection with the positioning of rigs and equipment, shared resources for in-field gathering, water and water transportation, more efficient drilling processes and field operations, substantial asset-level knowledge, and enhanced pricing based on the close proximity to attractive markets along the U.S. Gulf Coast. In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, also hold certain other producing properties and

undeveloped acreage, including in the Tuscaloosa Marine Shale (the "TMS") in Mississippi and Louisiana as well as other locations in Louisiana and Texas.[6]

In connection with the IPO, the Debtors entered into certain agreements with Sanchez Oil & Gas Corporation ("SOG"), a full-service oil and natural gas operating company founded in 1972 and privately owned by members of the Sanchez family. These agreements govern SOG's performance of various services, on a pass-through cost basis, that support the Debtors' operations, including, among other things, general and administrative, reserve engineering, operational, and geological and geophysical services. Additionally, pursuant to these arrangements, SOG has granted the Debtors unrestricted access to certain extensive seismic and other data developed or licensed by SOG. Moreover, as a result of the Debtors' shared services arrangements with SOG (collectively, the "Shared Services"), all individuals comprising the Debtors' workforce, including their executive officers, are SOG employees, as the Debtors do not have any employees of their own.

SN's direct and indirect subsidiaries total 22 (including the Non-Debtor Affiliates).

The Debtors are highly experienced and historically proven low-cost operators for many types of onshore oil and natural gas assets, and the Debtors act as operators for most of their oil and natural gas assets. While the Debtors' businesses primarily involve the operation of unconventional oil and natural gas properties (e.g., shale assets) using advanced horizontal drilling and completion techniques, with a current focus on the Eagle Ford Shale, they are also highly experienced in operating conventional assets using traditional development methods. Indeed, the Debtors are currently one of the largest and most active operators in the Eagle Ford Shale and have vast amounts of experience and technical expertise in all facets of the oil and natural gas E&P industry, and, therefore, are well-positioned as industry leading operators.

## B. The Debtors' Assets.

As of December 31, 2019, approximately 94% of the Debtors' net acreage was held by production and/or continuous operations. Leases that are not held by production and/or continuous operations represent approximately 14,000 net acres (all in the Eagle Ford Shale) of which approximately 6,000 net acres are set to expire in 2020, approximately 6,900 net acres are set to expire in 2021 and approximately 1,100 net acres are set to expire in 2022 and beyond. Of the 6,000 net Eagle Ford acres set to expire in 2020, approximately 5,100 net acres are subject to two-year extension options, which would permit the Debtors to extend the primary term of those leases into 2022. The typical oil and natural gas lease agreement covering the Debtors' properties provides for the payment of royalties to the mineral owner for all oil and natural gas produced from any well drilled on the lease premises. The lessor royalties and other leasehold burdens on the majority of the Debtors' wells range from approximately 20%-28%, resulting in a net revenue interest ranging from approximately 72%-80%.[7]

### 1. The Eagle Ford Assets.

#### (i) The Catarina Assets.

On June 30, 2014, the Debtors acquired certain Eagle Ford Shale properties of Royal Dutch Shell plc, which included approximately 106,000 net acres in Dimmit, La Salle, and Webb Counties, Texas

[6] All acreage figures discussed herein exclude interests held by the Debtors in certain undeveloped acreage in Louisiana and Texas.

[7] For more details on the agreements and arrangements governing the Debtors' oil and natural gas business, see the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings and (II) Granting Related Relief* and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses and (C) Shipping and Warehousing Claims and (II) Granting Related Relief.*

representing a unique single block of acreage on one ranch in the Western Eagle Ford (the "Catarina Assets"). The Debtors have a drilling commitment with respect to the Catarina Assets that requires them to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 (subject to certain well banking rights) and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Debtor SN Operating, LLC ("SN Operating") is the operator of the Catarina Assets, and Debtor SN Catarina, LLC ("SN Catarina") holds 100% of the working interests in the Catarina Assets.

**(ii) The Comanche Assets.**

On March 1, 2017, SN EF Maverick, LLC ("SN Maverick") and SN UnSub, along with Gavilan Resources, LLC ("Gavilan"), an unaffiliated entity controlled by The Blackstone Group Inc. ("Blackstone"), completed the acquisition of approximately 318,000 gross (155,000 net) acres largely adjacent and in many areas adjoining to the Catarina Assets, comprising (i) 252,000 gross (122,000 net) Eagle Ford Shale acres and (ii) 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing, in the aggregate, an approximately 49% average working interest therein (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") for an adjusted purchase price of approximately $2.1 billion in cash (the "Comanche Acquisition"). In connection with the closing of the Comanche Acquisition, SN, SN Maverick, SN UnSub, and Gavilan entered into a joint development agreement regarding the operation of the Comanche Assets (the "Comanche JDA"). Simultaneously therewith, SN, SN Maverick, SN UnSub, Gavilan, and Anadarko also entered into a development agreement (the "Anadarko Development Agreement") which, among other things, sets forth certain minimum annual drilling obligations on the Comanche Assets as described below.

Collectively, SN Maverick and SN UnSub represent a working interest of approximately 24% in the Comanche Assets (the "SN Comanche Assets"). Upon closing of the Comanche Acquisition, the SN Comanche Assets were further divided between SN Maverick and SN UnSub, whereby SN UnSub retained a 100% interest in the estimated proved developed producing reserves (essentially all of the producing wells) at the acquisition closing, and a 40% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development, while SN Maverick retained the remaining 60% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development (in each case represented as a percentage of the SN Comanche Assets). Accordingly, through SN Maverick, the Debtors have a working interest estimated at approximately 15% in new wells that were developed post-acquisition (*e.g.*, 60% interest in the post-acquisition development attributable to the approximately 24% total working interest of the SN Comanche Assets).

SN Maverick is the operator of all of the Comanche Assets under various operating agreements, and operates existing wells and manages and performs drilling and completion activities of new wells, on behalf of itself and the other working interest partners: SN UnSub, Gavilan, and third parties Venado Oil and Gas, LLC, Korea National Oil Corporation, and Mitsui E&P USA, LLC.

As noted above, the Debtors have a development commitment under the Anadarko Development Agreement, which the Debtors are also obligated to satisfy under the Comanche JDA, with respect to the Comanche Assets that, in addition to other requirements in the leases that must be met in order to maintain the Debtors' acreage position, requires the Debtors to complete and equip 60 wells in each annual period (subject to certain well banking rights) commencing on September 1, 2017 and continuing for five years thereafter until September 1, 2022 or, with Gavilan, pay jointly to Anadarko a cash penalty amounting to $200,000 per well for the failure to do so. The Debtors are currently in compliance with their drilling and development commitments with respect to the Comanche Assets. As explained in more detail below, the Comanche JDA is currently the subject of a pending dispute between SN Maverick and Gavilan.

In aggregate, the Catarina Assets and the Comanche Assets represent a substantial and geologically diverse land position, which stretches approximately 70 miles from west to east in four counties in South Texas.

### 2. The Maverick Assets.

The Debtors have approximately 40,000 net acres in Dimmit, Frio, La Salle, and Zavala Counties, Texas (the "Maverick Assets"). The Debtors have a drilling commitment that requires the Debtors to drill and complete three Eagle Ford wells by June 1, 2020 in order to maintain access to approximately 2,000 net undeveloped acres. The Debtors cannot provide assurance that their current and future drilling plans along with selected lease extensions will address the majority of their leases subject to potential expiration with respect to the Maverick Assets in 2020 and beyond. SN Operating is the operator of the Maverick Assets, and Debtor SN Cotulla Assets, LLC holds 100% of the working interests in the Maverick Assets.

### 3. The Palmetto Assets.

The Debtors have approximately 7,600 net acres in Gonzales County, Texas (the "Palmetto Assets") near the prolific Karnes Trough, which is located in the eastern portion of the Eagle Ford Shale and generally considered to be the core area of the basin. Marathon Oil Corporation is the operator of the Palmetto Assets, in which Debtor SN Palmetto, LLC owns a non-operated working interest (approximately 50% of future development). Marathon Oil Corporation drilled four gross wells for the 2019 commitment period, and completed ten gross wells, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain the Debtors' Palmetto acreage position. Rather than participating in such operations as a consenting working interest partner, the Debtors elected to not participate and, instead, reserve and retain an overriding royalty interest in and to production from such wells as provided for in the applicable joint operating agreement. The Debtors cannot provide assurance that current and future drilling plans along with selected lease extensions will address the majority of leases subject to potential expiration with respect to the Palmetto Assets in 2020 and beyond.

### 4. The TMS and Other Assets.

In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, hold other producing properties and undeveloped acreage, including in the TMS located in Mississippi and Louisiana as well as other locations in Louisiana and Texas. Successful and economic TMS development has been and continues to be challenged due to high well costs and low commodity prices.

## C. The Debtors' Prepetition Capital Structure.

As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $2.3 billion. Prior to the Petition Date, SN had issued approximately 3.12 million shares of Existing SN Preferred Stock (as defined below) that remained outstanding immediately prior to the Petition Date with a liquidation preference of $50 per share and approximately 100 million shares of outstanding Existing SN Common Stock. The Existing SN Preferred Stock is currently trading on the over-the-counter markets under ticker symbol "SNZYQ" and "SCAZQ." The Existing SN Common Stock is currently trading on the over-the-counter markets under ticker symbol "SNECQ." The primary components of the Debtors' consolidated funded debt obligations outstanding and equity interests as of the Petition Date are as follows:

| Obligation | Maturity | Principal Amount |
|---|---|---|
| **First-Out Senior Secured Revolving Credit Facility** | 2023 | $25,000,000 |
| **7.25% Senior Secured Notes** | 2023 | $500,000,000 |
| **Aggregate Secured Debt:** | | **$525,000,000** |
| **7.75% Senior Notes** | 2021 | $600,000,000 |
| **6.125% Senior Notes** | 2023 | $1,150,000,000 |
| **Aggregate Unsecured Debt:** | | **$1,750,000,000** |
| **Aggregate Total Debt:** | | **$2,275,000,000** |

### 1. First-Out Senior Secured Revolving Credit Facility.

As of the Petition Date, SN, as borrower, and the Restricted Subsidiaries[8] under the Credit Agreement, as guarantors, had outstanding $25 million in aggregate principal amount, including approximately $17.1 million issued and undrawn letter of credit under the First-Out Senior Secured Revolving Credit Facility pursuant to the Credit Agreement. The letter of credit was drawn on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral. In addition, as of the Petition Date, the Debtors had approximately $400,000 in obligations under cash-settled commodity hedging arrangements with certain counterparties that were secured on a pari passu basis with the obligations under the First-Out Senior Secured Revolving Credit Facility, pursuant to the terms of the Credit Agreement and the CTA (as defined below).

Although secured by the Shared Collateral (as defined below) with the 7.25% Senior Secured Notes (as defined below), the obligations under the Credit Agreement and specified hedging and cash management obligations had, pursuant to the terms of the CTA, "first-out" status as to proceeds of the Shared Collateral and thus the 7.25% Senior Secured Notes were, to the extent of the value of the collateral securing the Credit Agreement, subject to the discharge of the obligations under the Credit Agreement and such specified hedging and cash management obligations. In connection with the Final DIP Order and entry into the amended and restated DIP Facility on January 28, 2020, on January 31, 2020 the Debtors used approximately $25.7 million from the proceeds of the initial borrowing made under the DIP Facility on August 19, 2019, which included $0.7 million in accumulated fees and interest on such amounts since the Petition Date, to pay off the Credit Agreement in full (the "Discharge"), and the Credit Agreement terminated as of such date.

### 2. The 7.25% Senior Secured Notes.

On February 14, 2018, SN issued $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes") under an indenture among SN, as issuer, the

[8] The Restricted Subsidiaries consist of Debtors SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, and SN EF Maverick, LLC. Unrestricted subsidiaries (collectively, the "Unrestricted Subsidiaries,") consist of Debtors SN UR Holdings, LLC, Sanchez Resources, LLC, SN UnSub Holdings and non-Debtors SN Capital, LLC, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN EF UnSub GP, LLC, SR TMS, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC, and SN EF UnSub, LP.

guarantors party thereto, Delaware Trust Company ("Delaware Trust"), as trustee and RBC, as collateral trustee (as supplemented by a First Supplemental Indenture dated as of April 3, 2018, the "7.25% Senior Secured Notes Indenture"). The Restricted Subsidiaries are guarantors of the 7.25% Senior Secured Notes. The 7.25% Senior Secured Notes and the guarantees thereto were intended to be secured on a first-priority basis by substantially all of the assets of SN and the Restricted Subsidiaries. However, pursuant to a collateral trust agreement among SN, RBC, as the first-out representative, Delaware Trust, as the first lien representative, and RBC, as collateral trustee, dated as of February 14, 2018 (the "CTA"), repayment of the 7.25% Senior Secured Notes was subject to the "first-out" obligations under the Credit Agreement and certain hedging and cash management arrangements permitted under the Credit Agreement to the extent of the value of, certain shared collateral described in more detail below (the "Shared Collateral"). Following the Discharge, the 7.25% Senior Secured Notes and the guarantees are secured on a first-priority basis, subject in priority only to permitted collateral liens and to "first-out" obligations under the CTA, if any, and as set forth in the Final DIP Order. The Shared Collateral consists of: (i) SN's and the Restricted Subsidiaries' oil and natural gas properties with proved reserves; (ii) 100% of the equity interest of the Restricted Subsidiaries and any of their future direct material subsidiaries that qualify as Restricted Subsidiaries; and (iii) substantially all of SN's and the Restricted Subsidiaries' other material personal property, but in each case excluding, among other things, deposit accounts, oil and natural gas properties with no proved reserves, equity interests in SN UnSub and other existing and future subsidiaries designated as "Unrestricted Subsidiaries." The 7.25% Senior Secured Notes are senior to all unsecured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing the 7.25% Senior Secured Notes and the guarantees thereto. Following the Discharge, Wilmington Savings Fund Society, FSB ("WSFS"), as trustee under the Indenture, replaced RBC as the "Controlling Priority Lien Representative" under the CTA. Subsequently, Wilmington Trust, National Association, was appointed by WSFS (as permitted under the CTA) to replace RBC as the collateral trustee under the Indenture pursuant to the Successor Collateral Trustee Agreement, dated as of January 31, 2020, between the Company, WSFS and Wilmington Trust, National Association.

### 3. The 7.75% Senior Notes.

On June 13, 2013, SN issued $400 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Original 7.75% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "7.75% Senior Notes Indenture"). On September 18, 2013, SN issued an additional $200 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Additional 7.75% Senior Notes" and together with the Original 7.75% Senior Notes, the "7.75% Senior Notes") in a private offering, as permitted under the 7.75% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 7.75% Notes. The 7.75% Senior Notes are unsecured obligations and rank equally in right of payment with all of existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

### 4. The 6.125% Senior Notes.

On June 27, 2014, SN issued $850 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Original 6.125% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "6.125% Senior Notes Indenture"). On September 12, 2014, SN also issued an additional $300 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Additional 6.125% Notes" and together with the Original 6.125% Senior Notes, the "6.125% Senior Notes") in a private offering, as permitted under the 6.125% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 6.125% Senior Notes. The 6.125% Senior Notes are unsecured

obligations and rank equally in right of payment with all existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

### 5. The Debtors' Equity Interests.

#### (i) Preferred Stock.

On September 17, 2012, SN issued 3,000,000 shares of Series A Convertible Perpetual Preferred Stock ("Series A Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 619,503 shares of Series A Preferred Stock were issued and outstanding. The annual dividend rate for each share of Series A Preferred Stock is 4.875%. The Series A Preferred Stock currently trades over-the-counter in the OTC Pink market. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by SN's board of directors (the "Board"). The liquidation preference for each share of Series A Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.325 shares of Existing SN Common Stock per share of Series A Preferred Stock, subject to certain specified adjustments.

On March 26, 2013, SN issued 4,500,000 shares of Series B Convertible Perpetual Preferred Stock ("Series B Preferred Stock," and together with the Series A Preferred Stock, the "Existing SN Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 2,466,013 shares of Series B Preferred Stock were issued and outstanding. The Series B Preferred Stock currently trades over-the-counter in the OTC Pink market. The annual dividend rate for each share of Series A Preferred Stock is 6.500%. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by the Board. The liquidation preference for each share of Series B Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.337 shares of Existing SN Common Stock per share of Series B Preferred Stock, subject to certain specified adjustments.

The Board suspended the dividends on the Series A Preferred Stock and the Series B Preferred Stock, beginning with the three-month period ending March 31, 2019.

#### (ii) Common Stock.

There are approximately 100 million shares of Existing SN Common Stock issued and outstanding, along with outstanding warrants to purchase 8.5 million shares of Existing SN Common Stock at an exercise price of $10 per share. The Existing SN Common Stock traded on the NYSE until its delisting in 2019. The Existing SN Common Stock currently trades over-the-counter on the OTC Pink market. SN has never paid dividends on its Existing SN Common Stock. As of the Petition Date, members of the Sanchez family, SOG and other affiliated entities collectively owned approximately 10% of the Existing SN Common Stock.

On July 28, 2015, in order to protect the Debtors' tax attributes, the Debtors adopted an "NOL Rights Plan" that operates to dilute the holdings of certain parties that acquire Existing SN Common Stock without the approval of the Board. As of December 31, 2018, the Debtors estimate that they had federal consolidated net operating losses ("NOLs") in the amount of approximately $1.9148 billion.[9]

Despite these efforts to preserve equity value, on February 20, 2019, the NYSE notified the Company that it had initiated delisting proceedings against the Existing SN Common Stock because the Debtors' average market capitalization over a consecutive 30 trading day period fell below the NYSE's

[9] The Debtors also have an additional $106 million in state NOLs in Montana, Mississippi, Louisiana, Kansas and Oklahoma.

minimum $50 million threshold. The Existing SN Common Stock now trades exclusively on over-the-counter markets under the ticker symbol "SNECQ."

**(iii) Warrants.**

In connection with the Comanche Acquisition, SN issued warrants to the GSO Funds to purchase approximately 1.9 million shares in the aggregate of Existing SN Common Stock. Such warrants will expire March 1, 2032 in accordance with the terms of the applicable warrant agreement. In addition, SN issued warrants to three affiliates of Blackstone to purchase 6.5 million shares of Existing SN Common Stock pursuant to three separate warrant agreements, which will expire by their terms on March 1, 2022. In March 2019, the Debtors were notified that the GSO Funds and Blackstone affiliates donated all of the foregoing warrants to various charitable organizations. In the aggregate, the Debtors have 8.5 million warrants which remain outstanding.

## VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A. First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (collectively, the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Cameron W. George, Executive Vice President and Chief Financial Officer of Sanchez Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"). At a hearing on August 13, 2019, the Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions.

On September 9, 2019, the Debtors held their "second day" hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including: (i) notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock; (ii) authority to continue to pay certain compensation obligations; (iii) authority to provide adequate assurance for future utility services; (iv) authority to continue prepetition insurance coverage and renew or enter into new insurance policies; (v) authority to pay certain taxes and fees; (vi) authority to pay certain prepetition claims; and (vii) authority to continue using the Debtors' cash management system and maintain existing bank accounts.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/sanchezenergy.

### B. Other Procedural and Administrative Motions.

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion. On September 9, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Used in the Ordinary Course of Business Effective Nunc Pro Tunc* [Docket No. 277] (the "OCP Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief

requested in the OCP Motion [Docket No. 412]. On October 8, 2019, the Bankruptcy Court entered an amended order including (a) revisions to the OCP Cap and OCP Case Cap (each as defined therein), (b) additional language regarding procedures with respect to contingency fees paid to certain OCPs and (c) certain revisions to the OCP List (as defined in the OCP Motion) [Docket No. 443].

- Interim Compensation Motion. On September 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 273] (the "Interim Compensation Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 412] (the "Interim Compensation Order").

- Motion to Extend Removal Deadlines. On October 7, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 436]. On November 6, 2019, the Bankruptcy Court entered an order enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including March 8, 2020 [Docket No. 562]. On February 10, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 913]. On March 4, 2020, the Bankruptcy Court entered an order further enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including July 6, 2020 [Docket No. 1009].

- Record Date Motion. On October 4, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* [Docket No. 433] (the "Record Date Motion"). On November 7, 2019, the Bankruptcy Court entered an order granting the relief requested in the Record Date Motion [Docket No. 566].

- Claims Objection Procedures. On January 10, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Omnibus Claims Objection Procedures and Filing of Substantive Omnibus Claims Objections* [Docket No. 807] (the "Claims Objection Procedures"). On January 31, 2020, the Bankruptcy Court entered an order granting the relief requested in the Claims Objection Procedures Motion [Docket No. 898].

### C. Schedules and Statements.

On September 24, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "SOFAs and Schedules") [Docket Nos. 374-395]. Consistent with ongoing disclosure requirements, on October 4, 2019, the Debtors subsequently filed amended schedules E/F for certain of the filing entities.

### D. Establishment of a Claims Bar Date.

On October 24, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date;(III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 520] (the "Bar Date Motion"). By the Bar Date Motion, the Debtors sought entry

of an order by the Bankruptcy Court that establishes January 10, 2020, as the general claims bar date and February 7, 2020 as the governmental claims bar date, before which any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim. On November 21, 2019, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion and establishing the bar dates therein [Docket No. 617].

**E. The GSO Tolling Agreement.**

Prior to the Petition Date, on August 10, 2019, SN entered into a tolling agreement (the "Tolling Agreement"), along with SN UR Holdings, SN UnSub Holdings, SN Maverick (together with the Company, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP ("GSO LP" and, together with GSO LLC, the "GSO Parties").

On August 29, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Performance of Obligations Under Tolling Agreement and (II) Limited Modification of the Automatic Stay* [Docket No. 239], and on September 19, 2019, the Bankruptcy Court entered an order authorizing the Debtors' performance of their obligations under the Tolling Agreement [Docket No. 352].

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "GP LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any such Investor Redemption Event will be tolled during the Tolling Period.

The Tolling Agreement will expire on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the GP LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary Chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; or (2) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

**F. Investigation of Related Party Transactions.**

On November 9, 2018, the Board established a standing special committee (the "Special Committee") pursuant to Article V, Section 5.1 of SN's Amended and Restated By-Laws. The Special Committee is comprised of two disinterested and independent directors—Eugene I. Davis (Chairman) and

Adam C. Zylman (Member). The Board initially assigned the Special Committee the task of considering, evaluating, or negotiating strategic and/or financial alternatives for the Company, including a potential sale, restructuring, reorganization, or other transaction.

Subsequently, the Board also delegated to the Special Committee the exclusive power and authority to conduct an investigation into, and pursue or resolve as it determines to be in the best interests of SN, potential causes of action SN may have against affiliated entities or individuals, including SOG, Sanchez Midstream Partners LP ("SNMP"), and SN's directors and officers, in connection with any actual or potential related party transaction (the "Investigation"). The Special Committee retained Ropes & Gray LLP ("Ropes") as its counsel in connection with the Investigation. Alvarez & Marsal North America, LLC ("A&M") and Moelis, as advisors to SN, assisted Ropes with regards to certain aspects of the Investigation.

In connection with the Investigation, Ropes collected emails from twenty-three current or former executives, directors, or employees of SOG and/or SN, consisting of approximately 3.6 million documents. In addition to the email collection, Ropes submitted multiple sets of targeted diligence requests to SOG and SN, comprising more than forty requests, seeking documents relevant to the Investigation, including transaction documents, board materials and minutes, and other documents. SOG and SN fully cooperated with the diligence requests and produced approximately 1,500 responsive documents. Ropes also conducted 25 interviews—with Sanchez family members, all current named executive officers, three former CFOs, all current and former members of the Audit and Compensation Committees, internal and external counsel, including counsel to the Audit and Compensation Committees, and the CEO of SNMP.

Upon completion of the Investigation, Ropes prepared and delivered to the Special Committee a comprehensive report concerning its investigation into various actual or potential related party transactions and subsequently evaluated certain other transactions and potential claims.

### G. Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases. Significantly, the Debtors are engaged in various litigations matters, certain of which are the subject of adversary proceedings pending in these Chapter 11 Cases, as discussed further below.

#### 1. The Derivative Action.

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain SN directors (*Armato et al. v. A.R. Sanchez, Jr. et al.*, No. 2018-0642, the "Derivative Action"). The Derivative Action complaint, which does not specify damages sought, alleges breach of fiduciary duty, unjust enrichment, and waste of corporate assets against directors of SN based on purportedly excessive compensation of SN's non-employee directors. On October 22, 2018, SN and defendant directors filed an answer in the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. The Derivative Action remains

in its preliminary stages. As a result, the Debtors are unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution.

### 2. The Comanche JDA Dispute.

SN Maverick is currently engaged in a disagreement with Gavilan regarding operations of the Comanche Assets under the Comanche JDA with Gavilan. Among other things, Gavilan has asserted that SN Maverick is in default of the Comanche JDA and Gavilan has the right to take over operations of the Comanche Assets. SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan. However, if Gavilan prevails in the disagreement, SN Maverick would potentially lose its rights to operate the Comanche Assets and certain rights under the Comanche JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the Comanche JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the Comanche JDA. SN Maverick disputes that Gavilan has the ability to invoke the division of operatorship provision under the Comanche JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the Comanche JDA, could have a material adverse effect on the Debtors' business, financial condition or results of operations.

Gavilan served its initial arbitration demand against SN Maverick on February 18, 2019. SN Maverick and SN answered that demand and served their counterclaim against Gavilan on February 26, 2019. The American Arbitration Association appointed an arbitrator on April 8, 2019. On August 23, 2019, Gavilan filed *Gavilan Resources, LLC's Motion for Relief from the Automatic Stay to Allow Completion of Arbitration* [Docket No. 222] ("Gavilan Lift Stay Motion"), seeking relief from the automatic stay to allow the arbitration to proceed. On September 12, 2019, the Debtors filed an Objection to the Gavilan Lift Stay Motion [Docket No. 292]. The Secured Ad Hoc Group and the Creditors' Committee each filed a joinder to the Debtors' objection [Docket Nos. 670 and 673, respectively].

The arbitration was initially set for hearing the week of October 14, 2019. A hearing on the Gavilan Lift Stay Motion was set for September 19, 2019, and then reset to be heard on December 12, 2019. At the hearing on December 12, 2019, the parties agreed that (a) the arbitration and the underlying dispute should be resolved by the Bankruptcy Court with a trial to begin on March 9, 2020 at 8:30 am (CT), (b) the matter, including discovery, continued to be stayed until January 23, 2020, (c) pre-trial briefing by Gavilan and the Debtors was due on March 2, 2020, and (d) the Bankruptcy Court conducted a pre-trial conference on March 3, 2020. On March 9, 2020, the Bankruptcy Court began the trial on the Comanche JDA Dispute. On March 10, the parties agreed to continue the remainder of the trial to engage in settlement negotiations. On March 12, the Bankruptcy Court held a status conference to discuss the status of the settlement discussions. The Bankruptcy Court scheduled a further status conference regarding settlement discussions for March 18, 2020. On March 24, 2020, the Bankruptcy Court cancelled the hearing on the Gavilan Lift Stay Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1086]. On April 2, 2020, Gavilan filed *Gavilan Resources' Emergency Motion for Status Conference on Schedule to Consider Dispositive Legal Issues and, if Necessary, to Resume Trial* [Docket No. 38] requesting a status conference in the adversary proceeding. The Bankruptcy Court held a status conference on the matter on April 7, 2020, at which the Bankruptcy Court ruled in part in favor of Gavilan. The Bankruptcy Court will set a trial schedule for the matter at the next status conference currently scheduled for May 5, 2020.

### 3. Dimension Litigation.

In December 2017, Dimension Energy Services, LLC ("Dimension") commenced *Dimension Energy Services, LLC v. Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, and Sanchez*

*Midstream Partners, LP*, Cause No. 2017-85247 (the "Dimension State Court Action") in the 165th Judicial District, Harris County, Texas (the "Dimension State Court") against SN and non-debtor SOG. Dimension alleges claims for breach of the Master Services Agreement (the "Dimension MSA") between Dimension and SOG, fraud, quantum meruit/unjust enrichment, violations of the Texas Prompt Payment Act, and foreclosure of liens based on a pipeline construction project (the "Project"). On February 9, 2018, SOG and SN answered and asserted a counterclaim against Dimension for breach of the Dimension MSA based on Dimension's failure to substantiate additional payments for increased work costs and failure to pay subcontractors, which led to various liens being placed on the Project and lawsuits against SOG, including the Sunbelt Litigation. Dimension later filed its First Amended Original Petition adding non-debtor SNMP as a defendant. Non-debtor SNMP signed the work order at issue in the Dimension State Court Action and owns the property that is subject to the liens for which Dimension is seeking foreclosure.

On September 5, 2019, Dimension filed an adversary proceeding (Case No. 19-03606) against SN seeking to remove the Dimension State Court Action. SN filed a motion to remand the proceeding back to the state court on October 7, 2019. [Adv. Docket No. 7]. The Court heard arguments on the motion on November 4, 2019, and issued an order remanding the adversary proceeding. [Adv. Docket No. 14].

On January 21, 2010, Dimension filed *Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 856] (the "Dimension Lift Stay Motion"). On February 11, 2020, the parties filed a *Stipulation and Agreed Order Resolving Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 923] (the "Dimension Agreed Order") modifying the automatic stay to permit Dimension to continue the Dimension State Court Action starting February 28, 2020. The Court entered the Dimension Agreed Order on February 12, 2020 [Docket. No. 933]. The Dimension State Court set the trial for February 1, 2021.

### 4. Sunbelt Litigation.

Dimension hired several sub-subcontractors to complete the pipeline Project, including (1) Sunbelt Tractor & Equipment Company ("Sunbelt") and (2) Swan Transportation Service, Ltd. ("Swan"). Sunbelt filed lawsuits in Webb County and LaSalle County, Texas, to recover unpaid amounts from Dimension and foreclose on subcontractor liens against SOG, SNMP, and SN. *Sunbelt Tractor v. Dimension Energy Servs., et al.*, Cause No. 2018-CV-I00165-D1 (49th Judicial District Court of Webb County, Texas); *Sunbelt Tractor v. Dimension Energy Servs., et al.*, Cause No. 18-08-00177-CVL (81st Judicial District Court of LaSalle County, Texas) (the "Sunbelt State Court Actions"). Swan also filed a lawsuit in Smith County, Texas, but that case has been resolved. *Swan Transp. v. Dimension Energy Servs., et al.*, Cause No. 18-0244-B (114th Judicial District Court of Smith County, Texas).

On October 25, 2019, Sunbelt filed an adversary proceeding (Case No. 19-03641) against SN seeking to remove the Sunbelt State Court Actions. The Debtors and Sunbelt filed an agreed order remanding the actions on November 22, 2019 [Adv. Docket No. 11] (the "Sunbelt Agreed Order"). The Court entered the Sunbelt Agreed Order on December 12, 2019 [Adv. Docket No. 12]. Sunbelt has since non-suited SN in the Sunbelt State Court Actions.

### 5. Automatic Stay Motions.

Following commencement of the Chapter 11 Cases, certain litigation counterparties have filed, or may file in the future, requests to modify or lift the automatic stay to continue pursuing prepetition litigation against the Debtors. The Debtors also filed one motion relating to the automatic stay. In addition to the Gavilan Lift Stay Motion and the Dimension Lift Stay Motion described above, the following motions have been filed to lift the automatic stay:

**(i) Fernandez Lift Stay Motion**

On September 30, 2019, Ricardo Fernandez ("Fernandez") filed the *Motion for Relief from the Automatic Stay* [Docket No. 410] (the "Fernandez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, non-debtor SOG, non-Debtor SNMP, and Scientific Drilling International, Inc. On December 10, 2019, the parties filed a *Stipulation and Agreed Order Resolving Ricardo Fernandez's Motion for Relief from the Stay* [Docket No. 717] (the "Fernandez Agreed Order"). The Fernandez Agreed Order modified the automatic stay so as to limit discovery against SN and non-Debtor SOG and limited Fernandez's recovery to insurance proceeds. The Court entered the Fernandez Agreed Order on December 12, 2019 [Docket No. 728].

**(ii) Valdez Lift Stay Motion.**

On August 30, 2019, Marco Valdez filed the *Marco Valdez's Motion for Relief from the Automatic Stay* [Docket No. 246] (the "Valdez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, SN Operating, non-debtor SOG, non-Debtor SNMP, and other non-debtor parties. On October 16, 2019, Debtors filed the *Objection of the Debtors to Marco Valdez's Motion for Relief from the Stay* [Docket No. 471] (the "Debtors' Valdez Objection"), and non-debtor SOG filed a *Response of Sanchez Oil & Gas Corporation to Marco Valdez's Motion for Relief from Stay* [Docket No. 472]. On December 5, 2019, the hearing for the Valdez Lift Stay Motion was adjourned and has not yet been reset. *See Sixth Notice of Reset Hearing on Marco Valdez's Motion for Relief from Stay* [Docket No. 682]. On January 2, 2020, Valdez filed *Plaintiffs' Motion to Sever Bankrupt Defendants Sanchez Energy Corporation and SN Operating, LLC* (the "Valdez Motion to Sever") in the Valdez state court action. *Marco Valdez v. RDZ Oilfield Lease Services, Inc. et al.*, Cause No. 18-10-13542-DCV (293rd District Court of Dimmit County, Texas). The Valdez Motion to Sever has yet not been set for hearing or ruled upon by the state court judge.

**(iii) Terra Lift Stay Motion.**

On February 18, 2020, Debtors filed the *Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket No. 975] (the "Terra Lift Stay Motion"), seeking an order allowing a state court action and interlocutory appeal involving Terra Energy Partners LLC and certain individual defendants to proceed or, alternatively, lifting the automatic stay. On March 16, 2020, the parties filed, and the Bankruptcy Court entered, a *Stipulation and Agreed Order Resolving the Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket Nos. 1045, 1047] (the "Terra Agreed Order"). The Terra Agreed Order modified the automatic stay to permit certain individual defendants to continue to judgment or other resolution to determine the amount of attorneys' fees and sanctions which may be awarded, if any, by the state court pursuant to its order dated September 25, 2018, as well as any attorney's fees or costs, if any, that may be awarded to those certain individual defendants in connection with the state court action.

**H. Retention of Professionals.**

Beginning on the Petition Date, the Debtors filed applications to retain the following professionals:

- Akin Gump Strauss Hauer & Feld (Co-Counsel) [Docket No. 268];
- Jackson Walker (Co-Counsel) [Docket No. 269];

- Alvarez & Marsal (Financial Advisor) [Docket No. 270];
- Moelis & Company (Investment Banker) [Docket No. 271];
- Ropes & Gray (Counsel to Special Committee of Sanchez Energy Corporation Board of Directors) [Docket No. 272];
- Prime Clerk (Claims and Noticing Agent) [Docket No. 13];
- KPMG (Audit and Tax Consultant) [Docket No. 283];
- Gibbs & Bruns (Special Litigation Counsel) [Docket No. 284]; and
- Richards Layton & Finger (Special Counsel to the Audit Committee) [Docket No. 1012].

## I. Rejection and Assumption of Executory Contracts and Unexpired Leases.

### 1. Motion to Reject Shell Sublease.

On October 22, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Shell Sublease Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 504]. On November 15, 2019, the Bankruptcy Court entered an order authorizing rejection of the Shell Sublease Agreement [Docket No. 592].

### 2. Motion to Reject Cornerstone Master Agreement.

On October 27, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Cornerstone Master Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 533], seeking to reject a human capital management software agreement. On November 20, 2019, the Bankruptcy Court entered an order authorizing rejection of the Cornerstone Master Agreement *nunc pro tunc* to October 27, 2019 [Docket No. 608].

### 3. Motion to Reject Lease Participation Agreement.

On January 3, 2020, the Debtors filed a motion to reject the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Lease Participation Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 781]. On January 28, 2020, the Bankruptcy Court entered an order authorizing rejection of the Lease Participation Agreement effective *nunc pro tunc* to January 3, 2020 [Docket No. 890].

## J. Appointment and Retention of Chief Restructuring Officer.

On November 15, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Retention of M-III Advisory Partners, LP and (B) Designation of Mohsin Y. Meghji as Chief Restructuring Officer; and (II) Granting Related Relief* [Docket No. 593], seeking to retain M-III Advisory Partners, LP ("M-III") and to designate Mohsin Y. Meghji ("Mr. Meghji") as the Debtors' Chief Restructuring Officer ("CRO"). On December 9, 2019, the Bankruptcy Court entered an order retaining M-III and designating Mr. Meghji as the Debtors' CRO [Docket No. 704].

## K. Appointment of Examiner.

On November 26, 2019, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Emergency Motion, Pursuant to Sections 105(a), 1104(c), 1106(b), and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2007.1, For Entry of an Order Appointing an Examiner with Power to Prosecute* [Docket No. 638] (the "Examiner Motion"). On December 12, 2019, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint an

examiner [Docket No. 735]. The Examiner Motion has been adjourned at the request of the Ad Hoc Group of Unsecured Noteholders and is currently set for a status conference on April 16, 2020, to determine if the Ad Hoc Group of Unsecured Noteholders will continue to prosecute the Examiner Motion.

### L. Exclusivity.

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 694]. On January 8, 2020, the Bankruptcy Court entered an order extending the Debtors' exclusivity period to March 9, 2020 [Docket No. 800]. On February 26, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*, seeking to further extend the Debtors' exclusive plan filing and solicitation period to June 8, 2020 [Docket No. 694] ("Exclusivity Motion"). On March 20, 2020, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Objection to Debtors' Second Motion to Extend Exclusivity Periods to File Chapter 11 Plan and Solicit Acceptances* [Docket No. 1061] opposing an extension of exclusivity. On March 24, 2020, the Secured Ad Hoc Group filed a *Statement of the Secured Ad Hoc Group Regarding Debtors' Second Motion for Entry of an Order to Extend their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1088] supporting a short extension of exclusivity to April 30, 2020. That same day, the Bankruptcy Court cancelled the hearing on the Exclusivity Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1087].

### M. Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts.

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 693]. On February 3, 2020, the Bankruptcy Court entered an order extending the deadline within which the Debtors may assume or reject unexpired leases of non-residential real property and executory contracts to March 9, 2020 [Docket No. 904]. Additionally, the Debtors are party to three unexpired leases of nonresidential real property for: (i) their corporate headquarters in Houston, Texas; (ii) their field office in Carrizo Springs, Texas; and (iii) their office in San Antonio, Texas (collectively, the "Office Leases"). The Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* (the "Office Lease Motion"), seeking approval of stipulations with the landlords for each of these leases, which provide for an extension of the time within which the Debtors must assume or reject the three Office Leases to the earlier of (a) June 30, 2020, and (b) the effective date of a confirmed plan of reorganization, without prejudice to the rights of the Debtors to seek additional extensions of time to assume or reject the Office Leases. [Docket No. 1001]. On March 24, 2020, the Bankruptcy Court entered the *Order Approving Stipulations Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* [Docket No. 1081] approving the Office Lease Motion.

### N. Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property.

On March 6, 2020, the Debtors filed the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Assumption of Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* (the "Rejection Motion"), seeking authority to assume certain unexpired oil and natural gas leases and related surface leases, rights of way, easements and other similar types of surface access agreements [Docket No. 1016]. No objections to the Rejection Motion have been Filed. Certain informal objections are in the process of being resolved.

## O. DIP Motion.

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing* Limited *Use of Cash Collateral; (II) Obtaining Postpetition Credit Secured by Senior Liens; (III) Granting Adequate Protection; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 15] (the "DIP Motion"), seeking approval of the DIP Facility in an aggregate amount of $350 million (including a roll-up of $175 million of obligations arising under the Secured Notes Indenture held by the DIP Lenders) (the "DIP Facility"), provided by the Secured Ad Hoc Group (the "DIP Lenders").

The Debtors received objections to the DIP Motion from each of: (a) the Creditors' Committee [Docket No. 300], (b) the Ad Hoc Group of Unsecured Noteholders [Docket No. 301], (c) certain Texas taxing authorities [Docket No. 295], (d) certain equity security holders [Docket No. 297], (e) M. Light Acomb Materials LLC [Docket No. 330], and (f) Tulsa Inspection Resource, LLC [Docket No. 332]. On August 13, 2019, over the unresolved objections of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the DIP facility on an interim basis, which authorized the Debtors to access an interim draw of $50 million [Docket No. 97].

On September 19, 2019, the Court withheld approval of the DIP Motion on a final basis. Following hard-fought negotiations with the Debtors' various creditor constituencies, the Debtors requested that the final hearing on the DIP Motion be scheduled for January 22, 2020, and filed a revised proposed final DIP order on January 10, 2020 [Docket No. 808], and a further revised proposed final DIP order on January 21, 2020 (the "Further Revised Proposed Final DIP Order") [Docket No. 857]. The Further Revised Proposed Final DIP Order (a) reduced the aggregate principal amount of the new money component of DIP Facility from $175 million to $150 million and (b) reduced the roll-up amount from $175 to $50 million.

On January 21, 2020, the Creditors' Committee filed the only remaining objection to the DIP Motion, concerning the DIP Facility maturity date [Docket No. 858]. At the final hearing on January 22, 2020, after modifying the final order to resolve the Creditors' Committee's limited objection, the Court granted the DIP Motion on a final basis [Docket No. 865].

## P. Analysis of Lien Perfection Regarding Secured Notes.

### 1. The Correction Instruments

In April 2018, the initial collateral trustee or an agent of the initial collateral trustee recorded a series of Amended and Restated Mortgages, Deeds of Trust, Security Agreements, Financing Statements, and Assignments of Production (the "Deeds of Trust") with respect to the collateral pledged in support of the Secured Notes and the other secured obligations. Certain of the Deeds of Trust contained errors in the description of the county, book numbers, page numbers and instrument numbers in the official county records.

In June and July 2019, the Secured Ad Hoc Group, acting through its designated landman agent, delivered for recording notices of correction and correction affidavits (the "Correction Instruments") in at least nine counties in Texas pursuant to section 5.028 of the Texas Property Code to make certain corrections to the original Deeds of Trust, including to add, correct, or clarify the recording data for instruments referenced in the Correction Instruments, and to correct land descriptions and add land descriptions to certain conveyances.

### 2. The Lien Investigation and the Creditors' Committee Lien Challenge Standing Motion

Prior to the Petition Date, the Debtors, through their professionals and led by Jackson Walker, began a review and investigation of the Liens which purport to secure the Secured Notes, with a particular focus on the effect and validity of the Correction Instruments discussed above and the particular deficiencies which were the subject of such Correction Instruments (the "Lien Investigation").

The Lien Investigation, which continued following the Petition Date, revealed that the Debtors' estates have colorable claims or causes of action (i) that certain of the Deeds of Trust did not provide adequate notice to third parties of the underlying security interest, and are insufficient under Texas Property Code § 13.002 to perfect the security interests, and (ii) to the extent that the Correction Instruments had the effect of perfecting the Secured Noteholders' otherwise unperfected Liens in the underlying collateral, the Correction Instruments are avoidable transfers under 11 U.S.C. §§ 544, 547, and 548 (the "Potential Claims").

On January 24, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 875] (the "Lien Challenge Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve the Potential Claims. Following a hearing on February 20, the Court entered the *Order Resolving Committee's Standing Motion* [Docket No. 984] (the "Lien Challenge Standing Motion Order"). The Lien Challenge Standing Motion Order provides that the Debtors retain the exclusive right to file a lien challenge complaint in an adversary proceeding through March 10, 2020. If the Debtors do not file such a complaint by that time, the exclusive right to file such a complaint will vest with the Creditors' Committee. The Lien Challenge Standing Motion Order further provides that if the Debtors file a motion under Bankruptcy Rule 9019 in respect of any lien challenge adversary proceeding, the complaint in respect of such adversary proceeding will be abated pending a ruling on such motion. The Debtors, through their co-counsel, Jackson Walker, filed an adversary proceeding pursuing the Potential Claims under case number 20-03057 on March 10, 2020 [Docket No. 1026].

### Q. Creditors' Committee Claim Objection.

On March 10, 2020, the Creditors' Committee filed *The Official Committee of Unsecured Creditors' Objection to Claim Number 216 Filed by Wilmington Savings Fund Society, FSB As Indenture Trustee on Behalf of the 7.25% Senior Secured First Lien Notes* [Docket No. 1027] (the "Creditors' Committee Claim Objection"). By the Creditors' Committee Claim Objection, the Creditors' Committee seeks disallowance of claim number 216, filed by WSFS, as Indenture Trustee on behalf of the holders of the 7.25% Senior Secured Notes, asserting a secured claim against the Debtors' estates in "the aggregate principal amount of not less than $500,000,000.00, plus any other amounts owing under the Claim Documents (as defined in the proof of claim), including, without limitation all accumulated and unpaid interest, fees, premiums, and expenses, plus contingent unliquidated claims as described" therein ("Claim Number 216"). The Creditors' Committee Claim Objection is based on the following grounds: (a) Claim Number 216 should be disallowed in its entirety pursuant to section 502(d) of the Bankruptcy Code because the holders of the 7.25% Senior Secured Notes are in possession of transfers avoidable under section 547 of the Bankruptcy Code and of property recoverable under section 550 of the Bankruptcy Code; (b) Claim Number 216 should be disallowed to the extent that it seeks to recover any unamortized original issue discount ("OID") associated with the 7.25% Senior Secured Notes because such OID constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code; (c) Claim Number 216 should be disallowed to the extent it seeks recovery of any make-whole premium because the 7.25% Senior Secured Notes were accelerated upon the Debtors' chapter 11 filing and the 7.25% Senior Secured Notes Indenture does not provide for the payment of make-whole premiums upon or after acceleration; and (d) Claim Number 216 should be disallowed to the extent it seeks to recover any make-whole premium because

such premium constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code. The response deadline for the Creditors' Committee Claim Objection is April 9, 2020.

### R. Creditors' Committee Related Party Transaction Standing Motion.

On March 13, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1032] (the "Related Party Transactions Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve certain claims and causes of action on behalf of the Debtors' estates against SNMP, SN Catarina, SOG, and certain of Sanchez Midstream Partners GP LLC's and SOG's officers and directors (the "Proposed Defendants"). The proposed claims that the Creditors' Committee seeks to assert include: (i) recharacterization of a transaction between SN and SNMP as a disguised financing arrangement (in the alternative, avoidance of the Catarina Arrangement (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer); (ii) breach of fiduciary duty against certain of the Proposed Defendants in connection with the approval of the Catarina Arrangement and Catarina Gathering Agreement Amendment (both as defined in the Related Party Transactions Standing Motion); (iii) avoidance of payments made as a result of increased rates payable for water and gas delivered through the gathering system subject to the Catarina Arrangement as constructively fraudulent transfers; (iv) avoidance of the Carnero Sale (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer; (v) avoidance of excessive compensation payments made by SN to certain Sanchez family members as constructively fraudulent transfers; (vi) breach of fiduciary duty against Antonio R. Sanchez, III; (vii) breach of fiduciary duty against certain of the Proposed Defendants in connection with allowing SN to enter into and continue the Lease Participation Agreement between SN and SOG; and (viii) breach of contract against SOG in connection with SOG's failure to perform its obligations under a services agreement between SOG and SN. The hearing on the Related Party Transactions Standing Motion is continued to a date to be determined [Docket No. 1091].

### S. Shared Services.

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Shared Services Arrangements* [Docket No. 10] (the "Shared Services Motion"), seeking to continue performing under certain shared services arrangements with SOG. On August 16, 2019, the Court entered an order approving certain of the relief requested in the Shared Services Motion on an interim basis [Docket No. 189]. The Court entered subsequent interim orders on September 11, 2019 [Docket No. 287] and October 23, 2019 [Docket No. 510].

The Debtors entered into negotiations with the Creditors' Committee regarding the Shared Services Motion and were able to negotiate a form of agreed upon final order. On December 2, 2019, the Ad Hoc Group of Unsecured Noteholders filed an objection to the Shared Services Motion [Docket No. 660]. On December 12, 2019, after resolving the objection of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the Shared Services Motion on a final basis [Docket No. 733].

### T. Analysis of the Debtors' Midstream and Marketing Contract Review.

As the operator of substantially all of the Debtors' assets, the Debtors have a complex midstream and marketing contract program that governs their gathering, processing and marketing of hydrocarbons. Since the Petition Date, the Debtors have undertaken an extensive review of their midstream and marketing contracts in order to develop an actionable midstream strategy that will maximize value of the Debtors' estates for the benefit of their stakeholders. In connection with confirmation of the Plan, the Debtors or the

Reorganized Debtors, as applicable, anticipate seeking to reject and/or renegotiate certain of their midstream and marketing contracts in order to maximize value for the Debtors estates.

### U. Postpetition Restructuring Process.

#### 1. Negotiations with Creditors.

Following the appointment of the Debtors' CRO, the Debtors embarked on the intensive process of revising their business plan to account for current market conditions. This process required the Debtors' newly appointed CRO to take on the substantial task of learning about all elements of the Debtors' complex business and operations and consumed substantially all of the months of December and January.

On January 26, 2020, the Debtors shared their business plan and an illustrative restructuring term sheet for a proposed a plan of reorganization with each of the Creditors' Committee, the advisors for the Secured Ad Hoc Group, and the Ad Hoc Group of Unsecured Noteholders. To aid negotiations, on February 23 and 24, 2020, the Debtors entered into confidentiality agreements with (a) eight members of the Secured Ad Hoc Group and (b) three members of the Ad Hoc Unsecured Noteholder Group. On February 25, 2020 the Debtors met with the Creditors' Committee, Secured Ad Hoc Group and Ad Hoc Group of Unsecured Noteholders to further advance plan negotiations. On March 11, 2020, SN filed a Form 8-K disclosing a presentation regarding its proposed business plan and related materials, as required under the terms of the confidentiality agreements with members of the Ad Hoc Unsecured Noteholder Group.

Despite their best efforts, the Debtors were unable to obtain consensus on a plan of reorganization before the unprecedented disruption in the financial markets in mid-March due to the COVID-19 pandemic and the Russian-Saudi oil price war. To reach a comprehensive resolution in light of the foregoing, the Debtors requested that the key creditor groups participate in a mediation conducted by the Bankruptcy Court. On March 26, 2020, the Honorable Chief Judge David R. Jones was appointed as a mediator in the Chapter 11 Cases [Docket No. 1068]. Mediation commenced on March 27, 2020, and continued several days, ultimately resulting in an agreement between the Debtors and the Secured Ad Hoc Group, which agreement is embodied in the Plan.

#### 2. Notice of Default under DIP Facility.

On March 27, 2020, WSFS filed the *Notice of Filing of Enforcement Notice in Accordance with Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(B)* [Docket No. 1098] (the "Enforcement Notice"). The Enforcement Notice referenced a default under the DIP Facility, terminated all remaining New Money Commitments and declared all Obligations and DIP Obligations (as defined the DIP Order) immediately due and payable after the requisite notice and cure period set forth in the DIP Order. On March 27, 2020, WSFS delivered a "Carve-Out Trigger Notice" (as defined the DIP Order) indicating that a Termination Event had occurred, and, among other things, placing a cap of $5 million dollars on professional fees incurred by "Debtor Professionals" and "Committee Professionals" (each as defined in the DIP Order) after the first business day following delivery of the Carve-Out Trigger Notice. In accordance with the DIP Order, upon receipt of the Carve-Out Trigger Notice, the Debtors funded the Carve-Out Reserves for the payment of all unpaid Allowed Professional Fees. On March 27, 2020, the Secured Ad Hoc Group filed the *Emergency Motion of the Secured Ad Hoc Group for Entry of an Order Suspending Interim Compensation Order* [Docket No. 1099] ("Emergency Interim Comp Motion"), asking the Bankruptcy Court to immediately suspend the Interim Compensation Order and require the Debtors to pay professional fees no more than once every 120 days. On March 30, 2020, the Secured Ad Hoc Group (i) cancelled the hearing on the Emergency Interim

Comp Motion and abated the Emergency Interim Comp Motion [Docket No. 1102], and (ii) abated the Enforcement Notice [Docket No. 1103].

## VII. RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation. For additional risk factors that may affect the Debtors' restructuring, please refer to the Debtors' publicly available filings with the SEC.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A. Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

#### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Case 22-90018 Document 1983 Filed in TXSB on 04/19/22 Page 544 of 1867

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 cases, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 52. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no

guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Bankruptcy Court has issued an order extending the Debtors' exclusive period to propose a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

**7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

**8. The Debtors May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**9. Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. Occurrence of the Effective Date is, among other things, contingent upon the Requisite DIP Lenders being satisfied, in the exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient operating cash flow to operate in the ordinary course of business. There is no assurance that the Effective Date conditions will be satisfied quickly after the Confirmation Date, if at all.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11. Injunctions and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain injunctions, exculpations, and a release of liens. The injunctions and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

The exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts. Additionally, the directors and officers of the Debtors, who are Exculpated Parties, have contributed significant efforts to the Debtors' reorganization by maintaining the Debtors' operations, guiding the Debtors through difficult financial circumstances, and facilitating a value-maximizing restructuring transaction in the midst of contentious Chapter 11 cases. The Plan's exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries under the Plan.

### 1. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results.

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "Financial Projections"). The Financial Projections are attached hereto as **Exhibit D**. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Reorganized Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not

be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. A Liquid Trading Market for the New Common Stock May Not Develop.

There can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

### 3. The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date.

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to Holders of certain Classes of Claims. Holders of Claims or Interests (as applicable) that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

### 4. Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities.

To the extent that shares of the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock. *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

### 5. Restricted Securities or Securities Held by "Underwriters" Under Section 1145(b) of the Bankruptcy Code Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies.

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate

of the issuer during the preceding three months may resell restricted securities after a six-month holding period (if the issuer is a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and has been for the past 90 days (a "Reporting Issuer")) unless certain current public information regarding the issuer is not available at the time of sale, in which case (or if the issuer is not a Reporting Issuer) the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period (or one year, if the issuer is not a Reporting Issuer) but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

As the New Common Stock may be held by fewer than 300 holders, the Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension. The New Organizational Documents or the New Stockholders' Agreement, if any, may include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require any Reorganized Debtors to continue or resume filing periodic or other reports pursuant to the Exchange Act. These restrictions may adversely impact the value of the shares of New Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares, at a time when they may wish to do so.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

### 6. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review Article X of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 69, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

### 7. The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting. However, even an effective system of internal control over financial reporting, no matter how well designed, has inherent limitations, including the possibility of human error, circumvention of controls or overriding of controls and, therefore, can provide only reasonable assurance with respect to reliable financial reporting. Furthermore, the effectiveness of a system of internal control over financial reporting in future periods can change as conditions change. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. If the Debtors or the Reorganized Debtors, as applicable, fail to maintain the adequacy of their internal controls, they may be unable to provide financial information in a timely and reliable manner within the time periods required for their financial reporting under SEC rules and regulations, the terms of the agreements governing the Debtors' indebtedness, or as otherwise required. Any such difficulties or failure could materially adversely affect the Debtors' or Reorganized Debtors' business, results of operations, and financial condition. Further, the Debtors or Reorganized Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect their businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses.

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service their Indebtedness.

The Reorganized Debtors' ability to meet their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay their debt as it comes due and/or fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

If the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Reorganized Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Reorganized Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections

contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 4. The Debtors' Substantial Liquidity Needs May Impact Revenue.

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate cash on hand; (b) their ability to generate cash flow from operations; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions, commodity prices and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 5. Market Conditions for Oil, Natural Gas, and NGLs are Highly Volatile. A Sustained Decline in Prices for These Commodities Could Adversely Affect the Debtors' Revenue, Cash Flows, Profitability, and Growth.

The prices for oil, natural gas and NGLs fluctuate widely in response to a variety of factors that are beyond the Debtors' control, such as:

- domestic and foreign supply of and demand for oil, natural gas and NGLs;
- weather conditions and the occurrence of natural disasters, pandemics, epidemics, and outbreaks of disease such as the recent coronavirus, which may reduce demand for oil, NGLs and natural gas because of reduced global or national economic activity;
- overall domestic and global economic conditions;
- political and economic conditions in countries producing oil, natural gas and NGLs, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;

- actions of OPEC and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on prices for oil, natural gas and NGLs;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting the Debtors' ability to apply hydraulic fracturing to the Debtors' wells, and taxation;
- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of production and transportation facilities for oil, natural gas and NGLs;
- the availability of refining capacity; and
- the price and availability of, and consumer demand for, alternative fuels.

Governmental actions may also affect prices for oil, natural gas and NGLs. In the past, prices for oil, natural gas and NGLs have been extremely volatile, and the Debtors expect this volatility to continue. Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. Although oil prices rebounded somewhat in 2017, they declined again in the fourth quarter of 2018 and remained lower through 2019 and into 2020 and trended downward beginning in late January 2020. Even more recently, the recent coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial activity and travel restrictions that are expected to continue and expand in the near future. Disagreements between OPEC and Russia in early March 2020 have caused additional price declines and volatility, and oil prices fell to a four-year low in March 2020. Such downward volatility has negatively affected the amount of the Debtors' net estimated proved reserves and the Standardized Measure of discounted future net cash flows of the Debtors' net estimated proved reserves. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crises, reflecting fears of a global recession and potential further global economic damage from the coronavirus, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

In addition, the Debtors' revenue, profitability and cash flows depend upon the prices of and demand for oil, natural gas and NGLs, and continued price volatility and low commodity prices, or a sustained drop in prices could continue to negatively affect the Debtors' financial results and further impede the Debtors' growth. In particular, sustained declines in commodity prices have and will:

- limit the Debtors' ability to enter into commodity derivative contracts at attractive prices;
- reduce the value and quantities of the Debtors' reserves, because declines in prices for oil, natural gas and NGLs would reduce the amount of oil, natural gas and NGLs that the Debtors can economically produce;
- reduce the amount of cash available to fund capital expenditures;

- limit the Debtors' ability to borrow money or raise additional capital; and
- make it uneconomical for the Debtors' and their operating partners to commence or continue production levels of oil, natural gas and NGLs.

### 6. The Debtors' Derivative Risk Management Activities Could Result in Financial Losses or Reduced Income.

To mitigate the effect of commodity price volatility on the Debtors' net cash provided by operating activities, support the Debtors' annual capital budgeting and expenditure plans and reduce commodity price risk associated with certain capital projects, the Debtors have historically entered into derivative contracts covering a portion of the Debtors' production. The Debtors terminated their derivative contracts postpetition, but the Reorganized Debtors may decide to engage in post-emergence hedging activities following the reorganization, and certain of the non-Debtor subsidiaries that report on a consolidated basis with the Debtors may have or enter into derivative agreements or continue to engage in hedging activities. These derivative arrangements will be subject to mark to market accounting treatment, and the changes in fair market value of the contracts will be reported in the Reorganized Debtors' statements of operations each quarter, which may result in significant non-cash gains or losses. These derivative contracts may also expose the Reorganized Debtors to risk of financial loss (or reduced income) in certain circumstances, including when:

- production is less than the contracted derivative volumes, in which case the Reorganized Debtors might be forced to satisfy all or a portion of their hedging obligations without the benefit of the cash flow from the Reorganized Debtors' sale of the underlying physical commodity;
- the counterparty to the derivative contract defaults on its contractual obligations;
- there is a widening of price basis differentials between delivery points for the Reorganized Debtors' production and the delivery point assumed in the hedge instrument, which limits the effectiveness of the hedge itself; or
- the derivative contracts limit the benefit the Reorganized Debtors would otherwise receive from increases in commodity prices.

Such financial losses (or reduced income) could materially impact our liquidity, business, financial condition and results of operations.

### 7. The Debtors are Subject to Complex Federal, State, Local and Other Laws and Regulations that Could Adversely Affect the Cost, Manner or Feasibility of Conducting their Operations. In Addition, the Third Parties on Whom the Debtors Rely for Gathering and Transportation Services are also Subject to Complex Federal, State and Other Laws that Could Adversely Affect the Cost, Manner or Feasibility of Conducting the Debtor's Business.

The Debtors' oil and natural gas development and production operations are subject to complex and stringent laws and regulations. To conduct operations in compliance with these laws and regulations, the Debtors must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. The Debtors may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, the Debtors' costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become

applicable to their operations. Failure to comply with such laws and regulations, as interpreted and enforced, could have a material adverse effect on their business, financial condition and results of operations.

In addition, the operations of the third parties on whom the Debtors rely for gathering and transportation services are also subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that the Debtors pay for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom the Debtors rely could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**8. The Debtors' Operations are Subject to Operational Hazards and Unforeseen Interruptions for Which the Debtors May Not Be Adequately Insured.**

There are a variety of operating risks inherent in the Debtors' wells and other operating properties and facilities, such as leaks, explosions, mechanical problems, natural disasters, pandemics, epidemics and outbreaks of disease, all of which could cause substantial financial losses. Any of these or other similar occurrences could result in the disruption of the Debtors' operations, substantial repair costs, personal injury or loss of human life, significant damage to property, environmental pollution, impairment of the Debtors' operations and substantial revenue losses. The location of the Debtors' wells and other operating properties and facilities near populated areas, including residential areas, commercial business centers and industrial sites, could significantly increase the level of damages resulting from these risks.

Insurance against all operational risks is not available to the Debtors. The Debtors are not fully insured against all risks, including development and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable. Additionally, the Debtors may elect not to obtain insurance if the Debtors believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs or on commercially reasonable terms. Changes in the insurance markets due to weather, adverse economic conditions, and the aftermath of the Macondo well incident in the Gulf of Mexico have made it more difficult for the Debtors to obtain certain types of coverage. As a result, the Debtors may not be able to obtain the levels or types of insurance the Debtors would otherwise have obtained prior to these market changes, and the Debtors cannot be sure the insurance coverage the Debtors do obtain will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**9. The Reorganized Debtors May Be Adversely Affected by Potential Litigation.**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 10. The Loss of Key Personnel Could Adversely Affect the Reorganized Debtors' Operations.

The Reorganized Debtors' operations will depend on a relatively small group of key management personnel, including the Reorganized Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Reorganized Debtors may experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Reorganized Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Reorganized Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect.

### 11. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 12. The Debtors' Estimated Reserves and Future Production Rates are Based on Many Assumptions that May Prove to Be Inaccurate. Any Material Inaccuracies in These Reserve Estimates or Underlying Assumptions Will Materially Affect the Quantities and Present Value of the Debtors' Estimated Reserves.

Numerous uncertainties are inherent in estimating reserves of oil, natural gas and NGLs and future production. It is not possible to measure underground accumulations of oil, natural gas and NGLs in an exact way. Reserve engineering is complex, requiring subjective estimates of underground accumulations of oil, natural gas and NGLs and assumptions concerning future prices for oil, natural gas and NGLs, future production levels and operating and development costs. In estimating the Debtors' reserves of oil, natural gas and NGLs, the Debtors and their independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- prices for oil, natural gas and NGLs;
- future production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;
- the accuracy and reliability of the underlying engineering and geologic data; and
- the availability of funds.

If these assumptions prove to be incorrect, the Debtors' estimates of their reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery and the Debtors' estimates of the future net cash flows from their estimated reserves could change significantly.

The Debtors' Standardized Measure is calculated using unhedged prices for oil, natural gas and NGLs and is determined in accordance with the rules and regulations of the SEC. Over time, the Debtors may make material changes to reserve estimates to take into account changes in their assumptions and the results of actual development and production.

The reserve estimates the Debtors make for wells or fields that do not have a lengthy production history are less reliable than estimates for wells or fields with lengthy production histories. A lack of production history may contribute to inaccuracy in our estimates of proved reserves, future production rates and the timing of development expenditures.

**13. The Debtors' Estimated Reserves of Oil, Natural Gas and NGLs Will Naturally Decline Over Time, and the Debtors May Be Unable To Develop, Find or Acquire Additional Reserves to Replace Their Current and Future Production at Acceptable Costs, Which Would Adversely Affect Their Business, Financial Condition and Results of Operations.**

The Debtors' future reserves of oil, natural gas and NGLs, production volumes and cash flows depend on their success in efficiently developing their current reserves and economically finding or acquiring additional recoverable reserves. The Debtors' estimated reserves of oil, natural gas and NGLs will naturally decline over time as they are produced. The Debtors' success depends, in part, on their ability to economically develop, find or acquire additional reserves to replace their own current and future production. If the Debtors are unable to do so, or if expected development is delayed, reduced or cancelled, their production and reserves will continue to decline. To the extent cash flows from operations and external sources of capital remain limited or become unavailable, the Debtors' ability to make the necessary capital investments needed to maintain or expand their asset base of oil and natural gas reserves may be diminished. Over the long term, a continuing decline in their production and reserves would further reduce their liquidity and ability to satisfy their debt obligations by negatively affecting their cash flows from operations and the value of their assets.

**14. The Debtors' Identified Drilling Location Inventories are Scheduled out over Several Years, Making Them Susceptible to Uncertainties that Could Materially Alter the Occurrence or Timing of Their Drilling.**

The Debtors' management has specifically identified and scheduled drilling locations as an estimation of their future drilling activities on their existing acreage. Developing these identified drilling locations represents a significant part of the Debtors' long term business strategy. The Debtors' ability to drill and develop these locations depends on a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, prices for oil, natural gas and NGLs, costs, drilling results, the outcome of the Chapter 11 Cases and other factors. In connection with the Chapter 11 Cases, the Debtors may revise their capital budget or development plan due to the aforementioned uncertainties or other reasons, including in connection with ongoing negotiations or discussions with their various stakeholders as part of the Chapter 11 Cases. Because of these uncertainties, the Debtors do not know if the numerous potential drilling locations they have identified will ever be drilled or if they will be able to produce oil, natural gas or NGLs from these or any other potential drilling locations. As such, the Debtors' actual drilling activities may materially differ from those presently identified, which could adversely affect their business, financial condition and results of operations.

15. **Developing and Producing Oil, Natural Gas and NGLs are Costly and High Risk Activities With Many Uncertainties That Could Adversely Affect the Debtors' Business, Financial Condition and Results Of Operations.**

The cost of developing, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well. Additionally, drilling wells with no or sub-economic levels of production (dry holes) will negatively impact the Debtors' financial position. In addition, the Debtors' use of 2D and 3D seismic data and visualization techniques to identify subsurface structures and hydrocarbon indicators do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures and requires additional pre development expenditures. Furthermore, the Debtors' development and production operations may be curtailed, delayed or canceled as a result of other factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor or other services;
- composition of sour gas, including sulfur and mercaptan content;
- unexpected operational events and conditions;
- reductions in prices for oil, natural gas and NGLs;
- increases in severance taxes;
- adverse weather conditions and natural disasters, pandemics, epidemics, and outbreaks of disease;
- facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of the Debtors' facilities and equipment due to the highly corrosive nature of sour gas;
- title problems;
- pipe or cement failures, casing collapses or other downhole failures;
- compliance with ever changing environmental and other governmental requirements;
- environmental hazards, such as chemical or hydrocarbon leaks or spills, salt water leaks or spills, pipeline ruptures, discharges of toxic gases or other releases of hazardous substances;
- lost or damaged oilfield development and service tools;
- unusual or unexpected geological formations and pressure or irregularities in formations;
- loss of drilling fluid circulation;
- fires, blowouts, surface craterings and explosions;
- uncontrollable flows of oil, natural gas, NGLs or well fluids;

- loss of leases due to incorrect payment of royalties;
- limited availability of financing on acceptable terms, or at all; and
- other hazards, including those associated with sour gas such as an accidental discharge of hydrogen sulfide gas, that could also result in personal injury and loss of life, pollution and suspension of operations.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their' investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their business, financial condition and results of operations.

The Debtors routinely apply hydraulic fracturing techniques in many of their drilling and completion operations. Hydraulic fracturing has become subject to increased public scrutiny and recent changes in federal and state law, as well as proposed legislative changes, could significantly restrict the use of hydraulic fracturing. Such laws could make it more difficult or costly for us to perform fracturing to stimulate production from dense subsurface rock formations and, in the event of local prohibitions against commercial production of natural gas, may preclude their ability to drill wells. In addition, such laws could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. If hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, the Debtors' fracturing activities could become subject to additional permitting requirements and result in permitting delays, financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, more stringent plugging and abandonment requirements and potential increases in costs.

Additionally, hydraulic fracturing, drilling, transportation and processing of hydrocarbons bear an inherent risk of loss of containment. Potential consequences include loss of reserves, loss of production, loss of economic value associated with the affected wellbore, contamination of soil, ground water, and surface water, as well as potential fines, penalties or damages associated with any of the foregoing consequences.

## VIII. SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order [Docket No. #].

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER [DOCKET NO. #] FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims and Interests Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims in Class 3, Class 4 and Class 5 (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, 9 or 10.

### B. Voting Record Date.

**The Voting Record Date is April 8, 2020**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C. Voting on the Plan.

**The Voting Deadline is April 27, 2020 at 5:00 p.m. (prevailing Central Time)**. Holders of DIP Claims in Class 3, Secured Notes Claims in Class 4, and General Unsecured Claims in Class 5 should submit their ballots such that it is **actually received** by the Balloting Agent by the Voting Deadline. To be counted as votes to accept or reject the Plan, all votes must be submitted pursuant to the instructions and deadlines set forth on the ballot.

| DELIVERY OF BALLOTS |
|---|
| 1. All Ballots should be sent to:<br><br>(a) if by U.S. Postal Service, courier or personal delivery, to:<br><br>**Sanchez Ballot Processing**<br>**c/o Prime Clerk LLC**<br>**One Grand Central Place**<br>**60 East 42nd Street, Suite 1440**<br>**New York, NY 10165**<br><br>(b) if permitted pursuant to the instructions accompanying your ballot, via electronic mail, to: sanchezballots@primeclerk.com.<br><br>2. Ballots may also be submitted via the e-ballot system at https://cases.primeclerk.com/sanchezenergy. To have their votes to accept or reject the Plan counted, Holders of Claims in Classes 3, 4, and 5 must properly execute, complete, and deliver their ballots according to the instructions so that it is actually received by the Balloting Agent no later than the Voting Deadline. |

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE BALLOTING AGENT AT (844) 232-0067 (U.S. and Canada) or (917) 942 6393 (International). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

### D. Ballots Not Counted.

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

## IX. CONFIRMATION OF THE PLAN.

### A. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the

Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the material going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D. Acceptance by Impaired Class.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[10]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims or interests in that class, counting only those claims or interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. There are no Classes of Interests entitled to vote on the Plan.

Pursuant to Article III.F of the Plan, if a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

### E. Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

If any impaired class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. Subject to the requirements of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same

[10] A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100% of the amount of the allowed claims or interests in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## X. CERTAIN SECURITIES LAW MATTERS.

### A. New Common Stock.

As discussed herein, the Plan provides for the Reorganized Debtors to issue New Common Stock to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

The Debtors believe that the New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Stock pursuant to the Plan is, and subsequent transfers of the New Common Stock issued pursuant to section 1145 of the Bankruptcy Code by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

**RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM**

**REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

**B. Issuance and Resale of New Common Stock Under the Plan.**

**1. Issuance under Section 1145 of the Bankruptcy Code, Private Placement Exemptions.**

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**RECIPIENTS OF THE NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW**.

**2. Resale of New Common Stock; Definition of Underwriter.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more

intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock.

Resales of the New Common Stock by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act. Generally, Rule 144 promulgated under the Securities Act would permit the public sale of securities received by such Person if the required holding period for "restricted securities" has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is, or within the three months prior to the sale has been, an affiliate of the issuer. In addition, Rule 144 provides an exemption for the public resale of "control securities" (i.e., securities that are not restricted securities but held by an affiliate or a person that was an affiliate within the past three months) if certain conditions are met. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the three months preceding the sale may resell restricted securities after a six-month holding period if the issuer is a Reporting Issuer (or a 12-month holding period if the issuer is not a Reporting Issuer) if at the time of the sale there is available certain current public information regarding the issuer (or without regard to the current public information requirement after the 12-month holding period). Adequate current public information is available for a Reporting Issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Exchange Act during the twelve months (or for such shorter period that the issuer was required to file such reports) preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension and the current public information requirement may not be satisfied in future periods.

An affiliate may resell (i) restricted securities after the applicable holding period or (ii) control securities if, in each case, at the time of the sale certain current public information regarding the issuer is

available. As noted above, the Debtors currently expect that Reorganized SN may not be a Reporting Issuer and, as a result, this current public information requirement may not be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of securities sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that such securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of securities except in certain situations. Third, if the sale involves more than 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to New Common Stock, if any, issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (whether held by non-affiliates or affiliates) until at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, after the Effective Date. Accordingly, holders of any such New Common Stock will be required to hold such New Common Stock for at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, and, thereafter, to sell New Common Stock only in accordance with the applicable requirements of Rule 144, unless such New Common Stock is registered under the Securities Act (or is otherwise resold pursuant to an exemption from registration under the Securities Act).

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN OR WHO MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Class 3 DIP Claims, Class 4 Secured Note Claims, and Class 5 General Unsecured Claims, and it does not address the U.S. federal income tax consequences to all other Holders of Claims or Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or Interests who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including a beneficial owner of Claims or Interests) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more

United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of Claims or Interests are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES.**

### B. Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.

#### 1. Effects of Restructuring on the Debtors.

As of December 31, 2019, the Debtors estimate that they have approximately $1.93 billion of federal NOL carryforwards and $318 million of interest deductions deferred under section 163(j) of the Tax Code ("163(j) Deductions"). The Debtors may generate additional tax attributes, potentially including 163(j) Deductions, prior to the Effective Date in 2020. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income, and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year. Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the Tax Code. However, just enacted Coronavirus Air, Relief and Economic Security Act ("CARES Act") made several changes with respect to NOL's and related components of same as follows:

- NOL's arising in taxable years beginning after Dec. 31, 2017 and before Jan. 1, 2021 can be carried back to each of the five tax years preceding the tax year of such loss.

- The 80% taxable income limitation on NOL deduction is temporarily repealed so that for tax years beginning before 2021 taxpayers can take an NOL deduction equal to 100% of taxable income and for tax years beginning after 2021, taxpayers will be able to take a 100% deduction of NOLs arising in tax years prior to 2018 and a deduction limited to 80% of modified taxable income for NOLs arising in tax years after 2017.

- Repeals certain limits on claiming any refundable corporate minimum tax credit of a corporation and provides for an election claim a tentative carryback refund claim of any such credit for 2018.

- Temporarily and retroactively increases the deductibility of certain interest expense.

The Debtors have not yet determined the impact, if any, of these changes on its financial and tax situation including the amount of any NOL's and refundable corporate minimum tax credit which can be carried back to prior tax years and which might survive the reduction of such tax attributes upon confirmation of the Plan.

**(i) Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, the Debtors will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of the New Common Stock, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable (but not depletable) assets pursuant to section 108(b)(5) of the Tax Code. Although not free from doubt, in the absence of contrary guidance, it appears to be the case that the 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize COD Income; however, the exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, however, the Debtors expect that the amount of such COD Income will reduce some of their NOLs and tax credits allocable to taxable periods prior to the Effective Date pursuant to section 108 of the Tax Code. Depending on the amount of COD Income, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

**(ii) Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, net unrealized built-in losses, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or

consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10.0 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

**(a) General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.63 percent for April 2020 but which may decline due to the recent precipitous drop in yields). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(b) Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or

(ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claims will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims as "securities" for U.S. federal income tax purposes.

#### 1. U.S. Federal Income Tax Consequences to the Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 3 DIP Claims, each Holder thereof will receive its Pro Rata share of the DIP Equity Distribution; and the Post-Effective Date Equity Distribution allocated, if any, to the DIP Claims based upon the outcome of the Lien-Related Litigation to the DIP Claims in an amount determined in the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 4 Secured Notes Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 5 General Unsecured Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Whether and to what extent the U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim pursuant to the Plan depends, in part, on whether the exchange qualifies as a tax-free recapitalization pursuant to Section 368(e)(1)(E) of the Tax Code (a "Tax-Free Exchange") or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition. If Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims qualify as a "security" of the Company, then the Holders of Class 3 DIP Claim, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims, as applicable, would be treated as receiving its distribution under the Plan in a "recapitalization", and therefore a Tax-Free Exchange for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (i) the fair market value of property not entitled to be received tax-free under section 354 of the Tax Code; and (ii) the difference between (1) the fair market value of all consideration received pursuant to the Plan and (2) such Holder's adjusted basis, if any, in such Allowed Claim. The Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (a) the tax basis of the Allowed Claim surrendered by such Holder increased by (b) gain recognized (if any) by such Holder, allocated between the non-cash consideration received in accordance with the respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the consideration received should include the holding period for the exchanged Allowed Claim. The holding period for any other property received should begin on the day following the receipt of such property.

If the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims do not qualify as a "security" of the Debtors, then the Holders of the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims, as applicable, will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the Holder should recognize gain or loss in an amount equal to the difference, if any, between the fair market value of all the consideration received and the Holder's adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The holding period for the property received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the Holder should obtain a tax basis in the property received equal to its fair market value.

### 2. Accrued Interest.

A portion of the consideration received by U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be able to recognize a deductible loss to the extent that any accrued interest

on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 3. Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Class 4 Secured Notes Secured Claim, Allowed Class 5 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID (as defined below), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

U.S. federal income tax laws enacted in December 2017 added section 451 of the Tax Code. This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market

discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 4. Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 5. Limitation on Use of Capital Losses.

A U.S. Holder of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Secured Claim, and Allowed Class 5 General Unsecured Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 6. U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock.

#### (i) Dividends on New Common Stock.

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

#### (ii) Sale, Redemption, or Repurchase of New Common Stock.

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above under Section Limitation on Use of Capital Losses.

## D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

### 1. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Holders of Class 5 General Unsecured Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

### 2. Gain Recognition.

Any gain realized by a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder’s capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder’s conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 3. Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.

#### (i) Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below under "FIRPTA" and "FATCA," dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to

such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**(ii) Sale, Redemption, or Repurchase of New Common Stock.**

Subject to the discussion below under "FIRPTA," "FATCA" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) the Reorganized Debtors is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. Holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed below under "FIRPTA."

**5. FIRPTA.**

Under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), gain or loss of a foreign person on a disposition of a United States real property interest ("USRPI") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("USRPHC"). Any class of stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "5% Public Shareholder Exception").

If the common stock of the corporation were not considered regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, the Non-U.S. Holder (regardless of the percentage of common stock owned) would be subject to U.S. federal income tax on a taxable disposition of the common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

The Debtors expect that SN will be a USRPHC. Accordingly, the New Common Stock Stock will be treated as USRPI, unless a Non-U.S. Holder qualifies for the 5% Public Shareholder Exception.

Following the Effective Date, SN may take steps to create a market for the New Common Stock, but no assurance can be given that SN will take such steps or, that if they do, SN's action will permit certain Non-U.S. Holders to rely on the 5% Public Shareholder Exception.

### 6. FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and U.S.-source interest (including OID)), and also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source income or dividends that occurs after December 31, 2018.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS OR INTERESTS PURSUANT TO THE PLAN.**

### E. Information Reporting and Backup Withholding.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

**F. Recent and Possible Future Legislative Tax Changes.**

The just enacted CARES Act made a variety of tax and other changes in addition to those outlined the preceding discussion at Section XI.B.1., *Effects of Restructuring on the Debtors,* which may have material consequences to both the Debtors and Holders. Additionally, Congress and the President are discussing additional legislation which could further impact the Debtors and Holders. The consequences of the new CARES Act, implementation of same and any future legislative changes is not known at this time and could materially impact Debtors and Holders as well as suppliers and customers of the Debtors.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF CLASS 3 DIP CLAIMS, CLASS 4 SECURED NOTES CLAIMS, AND CLASS 5 GENERAL UNSECURED CLAIMS IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII. RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 9, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

## Exhibit A

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | Case No. 19-34508 (MI) |
| Debtors. | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 6, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ........ 1**
A. Defined Terms ........ 1
B. Rules of Interpretation ........ 11
C. Computation of Time ........ 12
D. Governing Law ........ 12
E. Reference to Monetary Figures ........ 12
F. Reference to the Debtors or the Reorganized Debtors ........ 12
G. Controlling Document ........ 12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........ 13**
A. Administrative Claims ........ 13
B. Professional Fee Claims ........ 13
C. Priority Tax Claims ........ 14
D. Statutory Fees ........ 14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........ 15**
A. Formation of Debtor Group for Convenience Purposes Only ........ 15
B. Classification of Claims and Interests ........ 15
C. Treatment of Classes of Claims and Interests ........ 15
D. Special Provision Governing Unimpaired Claims ........ 19
E. Elimination of Vacant Classes ........ 19
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ........ 19
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........ 19
H. Intercompany Interests ........ 19
I. Subordinated Claims and Interests ........ 19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........ 20**
A. General Settlement of Claims, Interests, and Causes of Action ........ 20
B. Restructuring Transactions ........ 20
C. Sources of Consideration for Plan of Reorganization Distributions ........ 20
D. Lien-Related Litigation ........ 21
E. Continuation of Gavilan Proceeding ........ 22
F. Corporate Existence ........ 22
G. Vesting of Assets in the Reorganized Debtors ........ 22
H. Corporate Action ........ 22
I. New Organizational Documents ........ 22
J. Directors and Officers of Reorganized SN ........ 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ........ 23
L. Management Incentive Plan ........ 23
M. Effectuating Documents; Further Transactions ........ 23
N. Preservation of Causes of Action ........ 23
O. Exemption from Registration Requirements ........ 24
P. Cancellation of Instruments, Certificates, and Other Documents ........ 24
Q. Section 1146(a) Exemption ........ 25
R. DIP Agent Fees and Expenses ........ 25
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 25**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ........ 25
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 26
D. Indemnification Obligations ........ 27
E. Insurance Policies ........ 27
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........ 28
G. Contracts and Leases After the Petition Date ........ 28
H. Reservation of Rights ........ 28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........ 28**
A. Distributions on Account of Claims Allowed as of the Effective Date ........ 28
B. Rights and Powers of the Disbursing Agent ........ 29
C. Special Rules for Distributions to Holders of Disputed Claims ........ 29

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....29
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....33**
A. Allowance of Claims ....33
B. Claims Administration Responsibilities ....33
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....34
E. Time to File Objections to Claims ....34
F. Disallowance of Claims ....34
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....35**
A. Discharge of Claims and Termination of Interests ....35
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....36
E. Release of Liens ....37
F. Reimbursement or Contribution ....37
G. Recoupment ....37
H. Subordination Rights ....37

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**
A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....38
D. Effect of Non-Occurrence of Conditions to Consummation ....38
E. Substantial Consummation ....38

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**
A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....39**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**
A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....41
D. Payment of Statutory Fees ....41
E. Reservation of Rights ....41
F. Successors and Assigns ....42
G. Service of Documents ....42
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....43
J. Plan Supplement ....43
K. Non-Severability ....43
L. Votes Solicited in Good Faith ....43
M. Closing of Chapter 11 Cases ....43
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. “*Allowed*” means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. “*Authorized Plan Distribution Shares*” means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. “*Avoidance Actions*” means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544,545, and 547 through and including 553 of the Bankruptcy Code.

10. “*Bankruptcy Code*” means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. “*Bankruptcy Court*” means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. “*Bankruptcy Rules*” means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. “*Bar Date*” means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the “Bar Date Order”), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. “*Carve-Out Trigger Notice Reserves*” means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. “*Cash*” means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. “*Causes of Action*” means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on [●], 2020 [Docket No. [●]].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*Fee Examiner*" means a fee examiner selected by the Reorganized Debtors and appointed by an order of the Bankruptcy Court, which may be in the Confirmation Order, to review each of the Final Fee Applications of the Non-Participating Professionals and to issue the Fee Examiner Report as provided in Article II.B.

63. "*Fee Examiner Report*" means the report and recommendation with respect to the Final Fee Applications of each of the Non-Participating Professionals prepared by the Fee Examiner in accordance with Article II.B.

64. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

65. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

66. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

67. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

68. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

69. "*Gavilan*" means Gavilan Resources, LLC.

70. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

71. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

72. "*Holder*" means an entity holding a Claim or Interest, as applicable.

73. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

75. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

76. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date;

Case 22-90035 Document 1914-3 Filed in TXSB on 03/01/22 Page 15 of 1867

(ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

77. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

78. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

79. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

80. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

81. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

82. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

83. "*Lien-Related Litigation*" means all litigation related to challenges to the scope or validity of the liens of the Prepetition Secured Parties (as defined in the Final DIP Order) or DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims, (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code and (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

84. "*Lien-Related Litigation Creditor Representative*" means a representative selected by the Creditors' Committee.

85. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

86. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

87. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

88. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

89. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

90. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

91. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

92. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

93. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

94. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

95. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

96. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

97. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

98. "*Plan*" means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

99. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

100. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

102. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

103. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

104. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that

Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

105. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

107. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

108. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

109. "*Professional Fee Settlement Reserve Amount*" means $22.8 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

110. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

111. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

112. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

113. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

114. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

115. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

116. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

117. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

118. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

119. "*Sanchez Parties*" means A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

120. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

121. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

122. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

123. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

124. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

125. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

126. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

127. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

128. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

129. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

130. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

131. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

132. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

133. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

134. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

135. "*SN*" means Sanchez Energy Corporation.

136. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

137. "*SOG*" means Sanchez Oil & Gas Corporation.

138. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

139. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

140. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

141. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

142. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

143. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

144. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

145. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to

Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to

the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. Final Fee Applications

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "*Draft Report Review Period*"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the

earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

**ARTICLE III.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided* that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of

an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

   a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

   b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

      i. payment in full in Cash;

      ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

      iii. reinstatement of such Other Secured Claim; or

      iv. other treatment rendering such Claim Unimpaired.

   c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

   a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

   b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

      i. Cash in an amount equal to such Allowed Other Priority Claim; or

      ii. such other treatment rendering such Other Priority Claim Unimpaired.

   c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

   a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

   b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

      i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant

to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. <u>Issuance and Distribution of New Common Stock</u>

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is

intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock

as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required,

each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and

may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated

in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed

Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of

future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a

change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common

Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable

Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity,

including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims,

regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any**

**further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.**

**The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but

before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

**ARTICLE IX.**
**DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

Case 20-34508 Document 4914 Filed in TXSB on 01/12/21 Page 142 of 1867

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule

of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicated, decide, or resolve any motions, adversary proceedings, contested or litigation matters, and any other matters involving the Lien-Related Litigation, SOG or SNMP;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 6, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

**Exhibit B**

**Corporate Organization Chart**

# Organizational Chart

SANCHEZ ENERGY CORPORATION




1. *As of March 8, 2019.*
2. *GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.*



© 2017 Sanchez Energy Corporation

**Exhibit C**

**Liquidation Analysis**

# Liquidation Analysis

## I. Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the Bankruptcy Court would: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated by chapter 7; and (3) compare each such Holder's Liquidation Distribution to the distribution under the Plan (the "Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The analysis (the "Liquidation Analysis") is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION. ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

## II. Basis of Presentation

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding. Any recoveries on account of non-Debtor affiliates would be recovered, after payment of non-Debtor claims, by the parent Entity according to the corporate structure.

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about April 30, 2020 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' unaudited pro forma, consolidated balance sheets as of December 31, 2019, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. The Liquidation Analysis was prepared on an unconsolidated basis.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the Debtors' assets and distribute the cash proceeds, net of liquidation related costs, to Holders of Claims and Interests in accordance with applicable bankruptcy and non-bankruptcy law.

The Liquidation Analysis assumes that all cash, excluding cash held by SN EF Maverick LLC., would be immediately distributed to the DIP Lenders. The Trustee would then utilize cash generated by the conversion of working capital to fund ongoing operations for the estate wind down period. The recovery

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan").

by the DIP Lenders does not account for any potential discount related to a hold back or carve out for potential P&A liability of the reserves. Such discount could be significant.

The Liquidation Analysis assumes the continuation of production for the three months following a conversion to chapter 7 to allow a reasonable amount of time for the sale of producing assets; however, post-Conversion revenue and production related disbursements would be included in the final sale price as post-Effective Date working capital adjustments. The Liquidation Analysis further assumes negative operating cash flows during the initial wind-down period prior to sale of assets as production receivables and joint interest billing ("JIB") receivables would be collected from pre-Conversion produced oil and gas.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist absent a liquidation, including potential administrative expense Claims, including for any unpaid amounts under the shared services agreements for such items as severance and any unpaid compensation and bonuses payable to SOG employees who performed services for the Debtors, and Claims for Executory Contract and Unexpired Lease rejection damages. Some of these Claims could be significant.

The Liquidation Analysis assumes recoveries on account of retained Causes of Action, including, but not limited to, claims against the Sanchez Parties, SOG, or SNMP, based upon estimates from counsel of net recoveries to the Estates. For purposes of comparison of the Plan and this Liquidation Analysis, however, any recovery on account of such claims would increase the Plan Distribution (which is based upon entitlements pursuant to section 726 of the Bankruptcy Code) and Liquidation Distribution by equivalent amounts, meaning that, in no event will Holders of Claims or Interests receive more in a Chapter 7 liquidation than in a Plan scenario.

Further, the Liquidation Analysis also assumes that the prepetition secured creditors prevail in the Lien-Related Litigation. Once again, however, because the Lien-Related Litigation is preserved by the Plan and the Plan Distributions are based upon entitlement pursuant to section 726 of the Bankruptcy Code, the outcome of the Lien-Related Litigation would not result in Holders of Claims or Interests receiving more in a Chapter 7 liquidation than in a Plan scenario. Accordingly, the assumption regarding the Lien-Related Litigation should have no impact on the "best interests" test.

The Debtors have assumed that a liquidation would occur over an approximately six-month time period during which the Trustee would sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the Estates. In an actual liquidation, the process and length of wind-down could be materially longer and more expensive than assumed herein and thereby significantly reduce the actual recoveries shown herein.

For example, the potential for Priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to Holders of Claims and Interests. Also, in the context of a liquidation, there would likely be a myriad of potential offset claims, particularly with respect to JIB receivables, that would take time to reconcile and resolve. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were in fact to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

Pursuant to Bankruptcy Code section 1129, no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. Further, Trustee fees, Professional Fee Claims, Administrative Claims, and Priority Claims, among other such Claims that may arise in a liquidation scenario, would have to be paid in full from the Liquidation Proceeds prior to proceeds being made available to the Holders of Unsecured Claims.

The Liquidation Analysis does not include estimates for the tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

## III. Liquidation Process

The Debtors' liquidation would be conducted in Chapter 7 cases with the Trustee managing the Estates to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors in accordance with the priority scheme dictated in Chapter 7. The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, marketed and sold in order to maximize value to the Estates;

- costs related to the liquidation process, such as post-Conversion Date operating disbursements and Estate wind-down costs including professional fees, Trustee fees, and other administrative fees; and

- distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme dictated in Chapter 7.

## IV. Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

- Certain Administrative Expense Claims: Includes fees and expenses of certain professionals retained in the Debtors' Chapter 7 cases, the Trustee's fees, and critical post-Petition Date disbursements required for the maintenance of the Debtors' assets until the sale date;

- Superpriority Secured Claims: Includes outstanding balances owed under the DIP Facility and professional Carve-Out pursuant to the DIP Order;

- Secured Claims: Includes claims relating to the Debtors' prepetition Secured Notes;

- Administrative and Priority Expense Claims: Includes claims for postpetition accounts payable, postpetition accrued expenses, certain accrued / unpaid Professional Fee Claims not covered by the Carve-Out, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;

- Unsecured Claims: Any non-secured, non-priority debt, including Unsecured Notes, deficiency claims related to Secured Notes, prepetition trade payables, Intercompany Claims, and various other General Unsecured Claims.

## V. Conclusion

As summarized in the below table and subsequent detailed analysis, the Debtors have determined that upon the Effective Date, the Plan will provide all creditors and equity security holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under

Chapter 7 of the Bankruptcy Code, and therefore believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

The Best Interests Test Summary in the below table compares the Plan creditor recoveries against those estimated in the low and high cases of the Liquidation Analysis.

**Best Interests Test Summary**

| | Recovery Estimates | | |
|---|---|---|---|
| | Plan of | Chapter 7 Liquidation | |
| **Claims:** | **Reorganization** | **Low** | **High** |
| Administrative Claims | 100% | 0% | 0% |
| Priority Tax Claims | 100% | 0% | 0% |
| Class 1: Other Secured Claims | 100% | 0% | 0% |
| Class 2: Other Priority Claims | 100% | N/A | N/A |
| Class 3: DIP Claims | 11% to 53% | 21% | 21% |
| Class 4: Secured Notes Claims | 0% to TBD | 0% | 0% |
| Class 5: General Unsecured Claims | 0% to TBD | 0% | 0% |
| Class 6: Intercompany Claims | N/A | 0% | 0% |
| Class 7: Intercompany Interests | N/A | 0% | 0% |
| Class 8: Existing SN Preferred Interests | 0% | 0% | 0% |
| Class 9: Existing SN Common Interests | 0% | 0% | 0% |
| Class 10: Section 510(b) Claims | 0% | 0% | 0% |

## Liquidation Summary

| Asset Recovery Summary | | | | | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Balance Sheet | Adjustments | Pro Forma | Recovery Estimate % | | | Recovery Estimate $ | | |
| *$ in Millions* | | As of 12/31/19 | | As of 4/30/20 | Low | Mid | High | Low $ | Mid $ | High $ |
| Cash | [A] | $ 153.4 | $ (111.4) | $ 42.0 | 100% | 100% | 100% | $ 42.0 | $ 42.0 | $ 42.0 |
| AR | [B] | 59.6 | 4.1 | 63.7 | 100% | 100% | 100% | 63.7 | 63.7 | 63.7 |
| O&G Assets | [C] | 828.8 | (696.4) | 132.4 | 36% | 45% | 53% | 48.2 | 59.3 | 70.4 |
| PP&E | [D] | 34.9 | - | 34.9 | 2% | 4% | 6% | 0.6 | 1.4 | 2.1 |
| Other Assets | [E] | 268.1 | (259.1) | 9.0 | 6% | 13% | 19% | 0.6 | 1.2 | 1.7 |
| Investments | [F] | 4.6 | (3.3) | 1.3 | 100% | 100% | 100% | 1.3 | 1.3 | 1.3 |
| Investments in Subsidiaries | [G] | 204.0 | - | 204.0 | - | - | - | - | - | - |
| Intercompany Receivables | [H] | (9.4) | 168.7 | 159.3 | 0% | 0% | 0% | 0.4 | 0.4 | 0.4 |
| **Total Asset Value** | | $ 1,544.1 | $ (897.5) | $ 646.6 | **24%** | **26%** | **28%** | $ 156.9 | $ 169.3 | $ 181.7 |
| *Net Encumbered Proceeds* | | | | | | | | *119.6* | *131.8* | *143.9* |
| *Net Unencumbered Proceeds* | | | | | | | | *37.3* | *37.6* | *37.8* |
| **Total Asset Recovery** | | | | | | | | **$ 156.9** | **$ 169.3** | **$ 181.7** |
| Liquidation Adjustments: | | | | | | | | | | |
| Chapter 7 Trustee | [I] | | | | | | | (3.4) | (3.8) | (4.2) |
| Chapter 7 Professional Fees | [I] | | | | | | | (8.1) | (8.1) | (8.1) |
| Purchase Price Adjustments | [I] | | | | | | | (4.6) | (4.6) | (4.6) |
| Post Conversion Cash Flow | [I] | | | | | | | (137.2) | (137.2) | (137.2) |
| Wind Down Costs | [I] | | | | | | | (14.1) | (14.1) | (14.1) |
| Total Liquidation Adjustments | | | | | | | | (167.4) | (170.3) | (173.2) |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after Liquidation Adjustments** | | | | | | | | **$ -** | **$ -** | **$ -** |

| Claims Recovery Summary | | Claims | | | Potential Recovery of Claims | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Recovery Estimate % | | | Recovery Estimate $ | | |
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| Class 3: DIP Claims | [J] | $ 151.4 | $ 151.4 | $ 151.4 | 21% | 21% | 21% | $ 32.1 | $ 32.1 | $ 32.1 |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after DIP Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 4: Secured Notes Claims | [K] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 1: Other Secured Claims | [K] | - | - | - | - | - | - | - | - | - |
| Total Secured Claims | | $ 450.0 | $ 450.0 | $ 450.0 | - | - | - | $ - | $ - | $ - |
| **Proceeds Available after Secured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Administrative Claims | [L] | 5.9 | 5.9 | 5.9 | - | - | - | - | - | - |
| Priority Tax Claims | [L] | - | - | - | - | - | - | - | - | - |
| Class 2: Other Priority Claims | [L] | - | - | - | - | - | - | - | - | - |
| Total Administrative and Priority Claims | | $ 5.9 | $ 5.9 | $ 5.9 | - | - | - | $ - | $ - | $ - |
| **Proceeds Available to Unsecured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 5: General Unsecured Claims | [M] | 1,815.3 | 1,815.3 | 1,815.3 | - | - | - | - | - | - |
| Class 4: Secured Notes Claims (Deficiency) | [M] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 6: Intercompany Claims | [M] | TBD | TBD | TBD | - | - | - | - | - | - |
| Total Unsecured Claims | | $ 2,265.3 | $ 2,265.3 | $ 2,265.3 | - | - | - | $ - | $ - | $ - |
| **Net Proceeds Remaining** | | | | | | | | **$ -** | **$ -** | **$ -** |

## Specific Notes to the Liquidation Analysis

## Gross Liquidation Proceeds

### A. Cash and Cash Equivalents

- Cash consists of cash held in bank accounts and highly liquid investment securities that have original maturities of three months or less.

- According to the 13 week cash forecast, Sanchez cash balances are estimated as of April 30, 2020 to be:

  - Sanchez Energy Corporation: $6.3mm
  - SN UR Holdings LLC: $27.7mm
  - SN EF Maverick: $29.4mm

- The cash balance will further be increased by $2.0mm related to cash disbursements withheld on account of administrative expenses offset by an additional $4.0mm of Post-Trigger Carve out payments not accounted for in the 13 week cash forecast.

- All projected cash and equivalents are assumed to be 100% recoverable.

### B. Accounts Receivable

- Accounts receivable balances are based on the Debtors' estimated unaudited pro forma accounts receivable as of the Conversion Date.

- Accounts receivable includes amounts due from purchasers of the Debtors' oil and gas production, joint interest billings, and miscellaneous receivables.

- Accounts receivable balances have an estimated recovery of 100%.

### C. Oil & Gas Assets

- Given the daily production and depletion of the oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prudent, prompt, and broad marketing of the assets over a three-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets.

- The liquidation value of the Debtors' Oil & Gas Reserves is based on a present value analysis of the Debtors' reserves, based on a reserves plan which includes all costs associated with maintaining the Debtors' leases. Proved Developed Producing Reserves ("**PDP**") are viewed as having the highest realizable value of the Debtors' reserve categories, followed by Proved Undeveloped Reserves ("**PUD**"), which reflect a higher recovery risk (compared to PDP) and are discounted accordingly. Other reserve categories are discounted at higher discount factors to account for the risk associated with the likelihood of recovery of probable and possible reserves.

- In assessing the reasonableness of the estimates provided by the above-mentioned present value analysis, the results were compared to two supplementary data points. First, the Liquidation Analysis high case is generally in line with recent going-concern transactions for comparable assets in the Eagle Ford. Additionally, valuation factors presented in the latest Society of Petroleum Evaluation Engineers ("**SPEE**") discount rate survey imply that the values obtained in the Liquidation Analysis high case generally correspond to the lower end recovery value if reserve adjusted discount rates ("**RADRs**") from the survey were applied. These SPEE discount rates reflect respondent petroleum engineers' assumptions when evaluating a target acquisition price or value of a going-concern asset.

- Given the nature of a going-concern sale versus a liquidation, it would be expected that each of these going-concern metrics would, on-average, exceed the values that could be obtained in a liquidation scenario. As each of these independently derived data points generally exceeds or overlaps the higher end of the values provided by the Liquidation Analysis, the reasonableness of the Liquidation Analysis outcomes are favorably supported.

- Based on the methodology outlined above, a sale of the Debtors' Oil & Gas Reserves implies a liquidation value in the range of $48.2mm to $70.4mm. This liquidation value provides for a blended recovery in the range of 36% to 53% of the April 30, 2020 pro forma PV-10 of proved reserves.

**D. Other PP&E**

- "Other PP&E" includes the Debtors' facilities, computers, software, and other PP&E.

- For purposes of the Liquidation Analysis, the recovery of "Other PP&E" is estimated to be 2% to 6% of pro forma net book value.

**E. Other Assets**

- "Other Assets" includes prepaid expenses, deposits, and unsold crude inventory. Recoveries are estimated to be 6% to 19% pro forma net book value.

**F. Investments**

- "Investments" consists of investments in publicly traded entities including SNMP and Lonestar Resources. Pro forma values are based on closing share prices as of 3/30/2020. Recoveries are estimated to be 100% pro forma market values.

**G. Investments in Subsidiary**

- "Investment in Subsidiary" includes Sanchez's investment in its Non-Debtor affiliates. No recoveries are expected.

**H. Intercompany Receivables**

- "Intercompany Receivables" includes intercompany balances between debtor and non-debtor entities. No recoveries are expected.

## Liquidation Adjustments

### I. Liquidation Adjustments

- "Liquidation Adjustments" consists of Post-Conversion Receipts and Disbursements, Chapter 7 Trustee Fees, Chapter 7 Professional Fees, and Mineral Payments.

- "Chapter 7 Trustee Fees" includes the maximum compensation as allowed by Section 326 of the Bankruptcy Code, or 25% of the initial $5,000 disbursed, 10% of anything between $5,001 and $50,000, 5% of anything between $50,001 and $1,000,000, and 3% of any amount over $1,000,000.

- "Chapter 7 Professional Fees" include estimates for outside legal counsel, investment banking professionals, and other professionals required and retained by the Trustee during the wind-down period. Legal professionals are assumed to charge on an hourly basis for assistance with asset monetization, Estate wind-down, and administration of the claims reconciliation and related processes. To maximize the value of the Estates, it is assumed that the Trustee would retain an investment banking firm to lead the asset sale process. The investment banking firm is assumed to charge a flat nominal monthly fee and a transaction fee equal to 1% of oil and gas asset sale value.

- "Causes of Action" includes estimated investigation claims value from $0 to $5.0 mm.

- "Purchase Price Adjustments" includes assumed liabilities related to Oil & Gas Assets which would serve as a reduction to sale proceeds as a purchaser of the Oil & Gas Assets. Adjustments are primarily related to revenue in suspense, accrued ad valorem tax, and prepayments from Gavilan and UnSub, and are offset by prepayments to Springfield LLC and line-fill. The Liquidation Analysis estimates Purchase Price Adjustments to be $4.6mm.

- "Post-Conversion Cash Flow" includes cash disbursements from operations from May 1, 2020 through September 30, 2020. The Liquidation Analysis assumes that operations will continue during the sale process and any short-term pre-Conversion liabilities, including accrued capital expenditures, lease operating expenses, gathering expenses, royalty and working interest, and production tax would be satisfied prior to sale of the Oil & Gas Assets. Receipts related to Pre-Conversion activity are accounted for in the recovery of Accounts Receivable. The Liquidation Analysis assumes that the Bankruptcy Court would authorize the Debtors, through a lien or joint interest billing motion and order, to make Post-Conversion Disbursements necessary to maintain the value of their assets.

- "Wind-Down Costs" include the Post-Conversion estate administration expenses and consist primarily of the regularly occurring general and administrative costs (such as facilities' rent, telephone, internet, office supplies, etc.) which will be required to operate the Debtors' businesses for the six-month asset monetization and Estate wind-down period.

## Claims:

### J. Class 3: DIP Claims

- "Class 3: DIP Claims" include principal and accrued interest of $151.4mm on account of the DIP Facility. DIP Claims would be increased by any additional professional fees of the DIP Lenders' advisors, which are not included in this claim amount.

**K. Secured Claims - Class 4: Secured Notes Claims and Class 1: Other Secured Claims**

- "Class 4: Secured Notes Claims" includes $450.0 mm of Secured Notes Claims plus $17.7mm of accrued prepetition interest.

- The Liquidation Analysis assumes that no "Class 1: Other Secured Claims" would exist at Conversion as any Pre-Conversion operating expenses are accounted for in Post-Conversion Cash Flow.

**L. Administrative & Priority Claims - Administrative Claims, Priority Tax Claims, and Class 2: Other Priority Claims**

- "Administrative Claims" consist of unpaid postpetition expenses as of the Conversion Date not included in Post-Conversion Cash Flow and are estimated to be $5.9mm

- The Liquidation Analysis assumes that no additional "Priority Tax Claims" would exist as of the Conversion Date as severance tax and ad-valorem tax are included in purchase price adjustments and Post-Conversion Cash Flow.

- The Liquidation Analysis assumes no additional "Class 2: Other Priority Claims" as of the Conversion Date.

**M. Unsecured Claims - Class 5: Unsecured Claims and Class 6: Intercompany Claims**

- "Class 5: Unsecured Claims" includes the following:
  - $606.4mm of principal and accrued interest on account of 7.75% Senior Notes due 2021
  - $1,189.3mm of principal and accrued interest on account of 6.125% Senior Notes due 2023.
  - $19.6mm of general unsecured claims of the Debtor. General unsecured claims do not include certain rejection claims related to marketing and midstream contracts which could significantly increase the total unsecured claims.

- "Class 6: Intercompany Claims" are to be determined.

# Exhibit D

## Financial Projections

## Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized Debtors for the periods ending December 31, 2020 through December 31, 2023 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized Debtors, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil, natural gas, and natural gas liquids. Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices;

2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;

3. the timing and amount of future production of oil and natural gas;

4. changes in the availability and cost of capital;

5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;

6. proved and unproved drilling locations and future drilling plans; and

7. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of Reorganized Sanchez future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

## I. OVERVIEW

The Debtors are a publicly-traded Houston, Texas-based independent oil and natural gas company engaged in the exploration, development, production, and acquisition of oil and natural gas properties in the United States, more specifically in Texas.

## II. ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

## III. REORGANIZED SANCHEZ ENERGY PRO FORMA BALANCE SHEET FOR THE PERIODS ENDING DECEMBER 31, 2020 THROUGH DECEMBER 31, 2023

The Debtor's opening balance sheet was prepared utilizing the preliminary, unaudited December 31, 2019 balance sheet and projected results of operations and cash flows over the projected period to the assumed emergence date of April 30, 2020. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan. The reorganized pro forma balance sheets for the periods ending December 31, 2020 through December 31, 2023 contain certain pro forma adjustments as a result of consummation of the Plan. The reorganized pro forma balance sheets include the debt and other obligations of Reorganized Sanchez Energy that remain outstanding after the Effective Date that will be paid in the ordinary course of operations. The estimated pro forma adjustments regarding the equity value of Reorganized Sanchez Energy, its assets, or estimates of its liabilities as of the Effective Date will be based upon the fair value of its assets and liabilities as of that date, which could be materially different than the values assumed in the foregoing estimates.[1]

[1] The above pro forma balance sheet assumes a mid-point TEV of Reorganized Sanchez of $80 million for purpose of determining the fair value of the assets on the Effective Date.

## IV. METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Debtors' operating divisions. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

## V. ASSUMPTIONS

The Financial Projections include projected financial statements for 2020–2023 assuming that the Effective Date of the Plan is April 30, 2020 (the **"**Emergence Date"). The Financial Projections include consolidated financial statements for Debtor entities only. Further, the Financial Projections assume specific midstream contract rejections, but no renegotiation of remaining midstream contracts. There is also an assumption of $2.6M for causes of action, which is an estimate provided by Counsel; Actual recoveries may materially differ with an estimated range of $0 - $5M.

## VI. GENERAL ASSUMPTIONS

### A. Exit Financing

The Financial Projections assume no exit financing. The Financial Projections do not estimate any borrowings over the forecast period, however post-emergence financing will be available to fund working capital and general corporate needs, as necessary.

### B. Total Revenue

Total revenue consists of production revenue and other revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids. The Financial Projections make no assumption for Reorganized Sanchez Energy hedge revenue.

### C. Commodity Pricing

Commodity pricing is based on March 27, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil, natural gas, and NGL/petrochemicals. Management estimates realized pricing based on forecasted oil and gas differentials for each producing area and includes select gathering, processing, and transportation ("GPT") offsets against sold volumes.

| | Fiscal Year | | | |
|---|---|---|---|---|
| | 2020 [2] | 2021 | 2022 | 2023 |
| **REALIZED PRICING** | | | | |
| Oil ($/Bbl) | $ 27.12 | $ 33.60 | $ 36.45 | $ 38.37 |
| Gas ($/Mcf) | $ 1.93 | $ 2.35 | $ 2.29 | $ 2.31 |
| NGLs ($/Bbl) | $ 6.37 | $ 7.71 | $ 8.63 | $ 8.89 |

**D. Operating Expenses**

Operating expenses consist of lease operating expenses, transportation expenses, processing fees, pre-drilling, workover, and other non-operating expenses.

Lease operating expenses ("LOE") for Reorganized Sanchez Energy reserves are forecasted at the well level and are expected to range from approximately $12.12 to $13.20 per boe over the Projection Period.

**E. Production and Property Taxes**

Production and property taxes includes severance and ad valorem taxes, and are forecasted at the well level based on tax rates applicable in the jurisdiction of production.

**F. Cash General and Administrative Expenses**

Cash general and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company requirements. The Reorganized Debtors' projected G&A expenses are based on the current development and operational plans, and exclude non-cash expenses.

**G. Capital Expenditures**

Capital expenditures include capital expenditures related to developing and optimizing oil & gas properties, capitalized engineering expenses, and expenditures to acquire properties. The Company's capital budget for 2020 is $12 million, of which $11 million is dedicated to drilling and completing wells and $1 million is for workovers, leasing, and other capital projects. Of the $12 million drilling and completion budget, all capital expenditures are for Comanche.

**H. Changes In Working Capital**

Management projects a change in net working capital during the year ending December 31, 2020 of $11.1 million. Annual working capital changes for FY 2021 through 2023 are expected to be a source of cash totaling $4.1 million.

**I. Cash Interest & Fees**

The current plan does not provide for a financing facility upon exit and therefore does not contemplate any post-Effective Date interest.

# REORGANIZED DEBTORS FINANCIAL PROJECTIONS

| | Fiscal Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2020 [2] | | 2021 | | 2022 | | 2023 | |
| **Total Production** | | | | | | | | |
| Oil (MBbl) | | 2,366 | | 3,017 | | 2,820 | | 2,725 |
| Gas (MMcf) | | 2,674 | | 3,378 | | 3,056 | | 2,826 |
| NGL (MBbl) | | 2,939 | | 3,730 | | 3,417 | | 3,191 |
| **Total (Mboe)** | | **7,979** | | **10,125** | | **9,293** | | **8,742** |
| *($ in thousands)* | | | | | | | | |
| **Revenue** | **$** | **113,848** | **$** | **177,831** | **$** | **174,258** | **$** | **172,029** |
| **Operating Expenses** | | **(96,735)** | | **(128,708)** | | **(122,686)** | | **(111,330)** |
| **Production & Property Taxes** | | **(6,814)** | | **(10,685)** | | **(10,559)** | | **(10,541)** |
| **Cash G&A** | | **(14,814)** | | **(3,913)** | | **(3,204)** | | **(2,400)** |
| **EBITDAX** | **$** | **(4,515)** | **$** | **34,524** | **$** | **37,808** | **$** | **47,758** |
| Capital Expenditures | | (11,945) | | (40,442) | | (49,059) | | (46,289) |
| Net Change in Working Capital | | 11,118 | | 738 | | (1,809) | | 5,141 |
| **Unlevered Operating Cash Flow** | **$** | **(5,343)** | **$** | **(5,179)** | **$** | **(13,059)** | **$** | **6,610** |
| Cash Interest & Fees | | - | | - | | - | | - |
| **Levered Cash Flow** | **$** | **(5,343)** | **$** | **(5,179)** | **$** | **(13,059)** | **$** | **6,610** |
| **Beginning Cash** | **$** | **43,690** | **$** | **38,347** | **$** | **33,168** | **$** | **20,109** |
| **Ending Cash** | **$** | **38,347** | **$** | **33,168** | **$** | **20,109** | **$** | **26,719** |

[2] For avoidance of doubt, FY2020 estimates based on NewCo stub period from April 30, 2020 (Effective Date) through year-end.

## Exhibit E

**Valuation Analysis**

## VALUATION ANALYSIS

The Debtors have been advised by Moelis with respect to the enterprise value of the Reorganized Debtors (the "Enterprise Value") on a going concern basis.

The valuation analysis herein is based on information as of the date of this Disclosure Statement and is based on the Business Plan provided by management (the "Business Plan"). For purposes of this valuation, Moelis has assumed that no material changes that would affect value occur between the date of this Disclosure Statement and May 1, 2020 (the "Assumed Effective Date").

As a result of the analysis described herein, Moelis estimates the Enterprise Value of the Reorganized Debtors to be approximately $65 million to $95 million, with a mid-point of $80 million, as of the Assumed Effective Date. Further, this analysis assumes that the Reorganized Debtors will emerge with no debt on the balance sheet and will have no excess cash after accounting for net working capital obligations as of the Assumed Effective Date. Moelis' mid-point estimate of Enterprise Value of $80 million therefore implies an equity value for the Reorganized Debtors, of approximately $80 million (the "Equity Value"). Other restructuring costs and professional fees were also taken into account when estimating the pro-forma cash balance of the Reorganized Debtors.

Moelis' estimate of a range of Enterprise Values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MAY 1, 2020, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF MARCH 30, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

MOELIS DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH MOELIS' ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION

TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Moelis assumed the Business Plan was reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate, currently-available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the Reorganized Debtors will achieve their projections in all material respects, including revenue, EBITDA margins, and cash flows. If the business performs at levels below or above those set forth in the Business Plan, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, Moelis (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial, reserves and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly-available financial data for, and considered the market value of, public companies that Moelis deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other analyses, inquiries and investigations as it deemed appropriate. Moelis assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly-available information. Moelis does not offer an opinion as to the attainability of the Business Plan, as future results are dependent on various factors, many of which are beyond the control or knowledge of the Reorganized Debtors and Moelis, and thus are difficult to project.

The following is a brief summary of analyses performed by Moelis to arrive at its recommended range of estimated Enterprise Value for the Reorganized Debtors and does not purport to be a complete description of all of the analyses and factors undertaken. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances.

In performing its analysis, Moelis applied the following valuation methodologies as applicable to the operations of the Debtors: (a) a net asset valuation analysis; and (b) a selected publicly-traded companies analysis. In addition, Moelis considered a precedent transactions analysis but because the precedent transactions occurred in different commodity pricing environments and other market conditions, Moelis believed the inclusion of this approach was of limited applicability.

**Net Asset Valuation Analysis**

The value of the Debtors' oil and gas reserves was estimated using a net asset value ("NAV") approach. The Debtors' reserve report associated with its Business Plan calculates the estimated sum of net cash flows directly attributable to the Debtors' oil and gas properties. Future production volumes attributable to the properties are estimated and multiplied by the projected realized price, which incorporates the projected market price less an expected differential between the market price and the price at which the Debtors can sell their production. Projected severance taxes, ad valorem taxes, lease operating expenses, gathering, processing, transportation and marketing expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows. Moelis then risk adjusted the reserve values by reserve category using both reserve adjustment factors and risk adjusted discount rates as detailed by the Society of Petroleum Evaluation Engineers in its 38th annual survey dated June 2019. These values were then adjusted for other non-reserve assets and liabilities, including general and administrative expenses, maintenance capital expenditures, and marketing deficiencies of the Debtors not reflected in the reserve report to determine the net asset value of the Debtors.

**Selected Publicly-Traded Companies Analysis**

A selected publicly-traded companies analysis estimates the value of a company based on a comparison with certain other publicly-traded companies in lines of business and operating characteristics similar in certain respects to the company being valued. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to certain of the Debtors' financial metrics to imply an enterprise value for the Debtors. Moelis used enterprise value as a multiple of each selected company's publicly-available consensus projected 2021 EBITDA adjusted for estimates deemed to be stale based on the recent commodity price downturn. This implies a range of EV/EBITDA multiples that Moelis then applied to the Debtors' Business Plan projections to determine a range of the Debtors' Enterprise Value. Although the selected companies were compared to the Debtors for purposes of this analysis, no entity used in this analysis is identical to the Reorganized Debtors. The selection of public entities for this purpose was based upon characteristics that were deemed relevant based on Moelis' professional judgment. The selection of appropriate companies is a matter of judgment and subject to limitations due to sample size and the availability of meaningful

market-based information. Accordingly, Moelis' comparison of the selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors that could affect the relative values of the selected companies and the Debtors.

Moelis did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Moelis believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The estimated Enterprise Value and Equity Value do not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time. The estimated Enterprise Value and Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Moelis did not account for the impact of any income tax attributes. The impact of any income tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Moelis' valuation analysis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

MOELIS IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, OR LEGAL ADVICE.

# Schedule 2

## Solicitation and Voting Procedures

Case 20-34508 Document 1212-3 Filed in TXSB on 04/19/20 Page 17 of 1867

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**SOLICITATION AND VOTING PROCEDURES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing Sanchez Energy Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit votes on the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

## A. The Voting Record Date

The Court has established April 8, 2020 as the record date for purposes of determining which Holders of Claims in Class 3 (DIP Claims), Class 4 (Secured Notes Claims), and Class 5 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

## B. The Voting Deadline

The Court has established the date of April 27, 2020 at 5:00 p.m., prevailing Central Time as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline, in their discretion, without further notice or order of the Court. To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and returned in accordance with the instructions provided on the applicable Ballot, so that they are *actually received*, in any case, no later than the Voting Deadline by Prime Clerk LLC (the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

"Balloting Agent"). Delivery of a Ballot to the Balloting Agent by e-mail or facsimile shall not be valid with the exception of Class 3 DIP Claim Ballots and Master Ballots transmitted by Nominees via e-mail. To have their votes to accept or reject the Plan counted, Beneficial Holders must properly submit their vote to the appropriate broker, bank, other nominee, or their agent (each of the foregoing, a "Nominee"), in sufficient time so that such Nominee can verify, tabulate, and include such Ballots in a master ballot and timely return such master ballot, so that it is actually received no later than the Voting Deadline by the Balloting Agent. In the case of Beneficial Holders[2] of the Secured Notes Claims and the General Unsecured Claims who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by such Nominee.

## C. Form, Content and Manner of Notices

### 1. The Solicitation Package

The Solicitation Packages shall contain the following materials:

a. the Disclosure Statement Order (excluding the exhibits thereto, except as set forth below);

b. the approved Disclosure Statement (annexed as **Schedule 1** to the Disclosure Statement Order) and the exhibits thereto, including the Plan;

c. these Solicitation and Voting Procedures (annexed as **Schedule 2** to the Disclosure Statement Order);

d. the applicable form of Ballot, in substantially the form of Ballots annexed as **Schedule 3A, 3B, 3C, and 3D** to the Disclosure Statement Order;

e. the *Notice of Hearing to Consider (A) the Adequacy of the Debtors' Disclosure Statement, and (B) Confirmation of the Chapter 11 Plan Filed By the Debtors*, in substantially the form annexed as **Schedule 4** to the Disclosure Statement Order (the "Combined Hearing Notice");

f. a pre-addressed, postage pre-paid reply envelope; and

g. any additional documents that the Court has ordered to be made available.

---

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees.

## 2. Distribution of Solicitation Package

The Plan, the Disclosure Statement, the Disclosure Statement Order (including exhibits) will be available by visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy. All other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact Balloting Agent by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy; (b) writing to Sanchez Energy Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing sanchezballots@primeclerk.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense); and (d) calling the Debtors' restructuring hotline at the following number:

**US/Canada Toll Free: (855) 631-5345**

**International: (347) 338-6451**

The Debtors shall serve, or cause to be served, electronically and by first-class U.S. mail (a) all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee, and (b) the Disclosure Statement Order (in electronic format) and the Combined Hearing Notice to all parties who have requested service of papers in these cases pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

The Debtors shall serve, or cause to served, the Solicitation Package (minus the Disclosure Statement, Plan, and Disclosure Statement Order, which will be posted online) to all Holders of Claims in the Voting Class who are entitled to vote, as described in section D below on or before April 13, 2020 (the "Solicitation Deadline").

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claims and with respect to that Class as against that Debtor.

## 3. Non-Voting Status Notices

Certain Holders of Claims or Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code, or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept or reject the Plan under sections 1126(f) and 1126(g) of the Bankruptcy Code, will receive the applicable Notice of Non-Voting Status, substantially in the forms annexed as **Schedule 5A and 5B** to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

**4. Resolution of Disputed Claims for Voting Purposes; Resolution Events**

a. Absent a further order of the Court, the Holder of a Claim or Interest in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

b. If a Claim in a Voting Class is subject to an objection (other than a "reduce and allow" objection) that is filed with the Court on or prior to 7 days before the Voting Deadline, the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

c. If a Claim in a Voting Class is subject to an objection by the Debtors (other than a "reduce and allow" objection) that is filed with the Court less than 7 days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d. A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

i. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

ii. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

iii. a stipulation or other agreement is executed between the Holder and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

iv. the pending objection is voluntarily withdrawn by the objecting party.

e. No later than one business day following the occurrence of a Resolution Event, the Debtors shall cause the Balloting Agent to distribute via electronic mail, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package.

5. **Notices in Respect of Executory Contracts and Unexpired Leases**

Counterparties to Executory Contracts and Unexpired Leases that receive an *Assumption Notice* or a *Rejection Notice*, substantially in the forms attached as **Schedule 6** and **Schedule 7** to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, rejection, and/or cure amount, as applicable. Such objections must be filed with the Court (contemporaneously with a proof of service) and served upon the applicable notice parties (as set forth in the *Assumption Notice* or *Rejection Notice*) by May 20, 2020.

**D. Voting and Tabulation Procedures**

1. **Holders of Claims Entitled to Vote**

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a. Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection (other than a "reduce and allow" objection) filed with the Court at least 7 days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided,* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package (minus the Disclosure Statement, Plan, and Disclosure Statement Order, which will be posted online) and be entitled to vote such Claim in the reduced amount contained in such objection pending the occurrence of a Resolution Event as provided herein or further order of the Court;

b. Holders of Claims that are subject to an objection that is filed less than 7 days prior to the Voting Deadline;

c. Holders of Claims and Interests that are listed in the Schedules for which a timely Proof of Claim was not filed; *provided* that if the applicable Bar Date has expired prior to the Voting Record Deadline, a Claim listed on the Schedules as contingent, disputed, or unliquidated shall be disallowed for voting purposes; *provided further* that if the applicable Bar Date has not expired prior to the Voting Record Deadline, a Claim listed on the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00;

d. Holders of Claims and Interests that arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court (other than the Schedules), in each case regardless of whether a Proof of Claim has been filed;

e. Holders of Disputed Claims that have been temporarily allowed to vote on the

Plan pursuant to Bankruptcy Rule 3018; and

f. the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

2. **Establishing Claim Amounts for Voting Purposes**

**Class 3 DIP Claims**. The amount of DIP Claims for voting purposes only will be established by reference to the list of record holders maintained by the DIP Agent, dated as of the Voting Record Date, which shall be provided by counsel for the DIP Agent to the Debtors or the Balloting Agent no later than one (1) Business Day following the Voting Record Date.

**Class 4 Secured Notes Claims and Unsecured Notes Claims in Class 5**. The Claims amount of Secured Notes Claims and Unsecured Notes Claims for voting purposes only will be established by reference to (a) the Debtors' applicable books and records and (b) the list of record holders maintained by the applicable agent, indenture trustee, or Nominee as reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date, which shall be provided by the applicable agent, indenture trustee, or Nominee to the Debtors or the Balloting Agent no later than one (1) Business Day following the Voting Record Date.

**Class 5 General Unsecured Claims (Other than Unsecured Notes Claims)**. Each Holder (other than the Holders of Unsecured Notes Claims) of a Claim in Class 5 as of the Voting Record Date shall be entitled to vote the amount of its claim in accordance with the procedures set forth below for Filed and Scheduled Claims.

**Filed and Scheduled Claims**. The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Balloting Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a. the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court (other than the Schedules);

b. the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation Procedures;

c. the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the

Petition Date; *provided* that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Balloting Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim will be Allowed for voting purposes only in the liquidated amount; *provided*, *further*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; provided, further, that any Claim filed in an amount denominated by a currency other than USD will vote at $1.00;

d. the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); provided that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided* that if the applicable Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00;

e. in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

### 3. Voting and Ballot Tabulation Procedures

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a. except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors, in their sole discretion, shall be entitled to reject such Ballot as invalid and, therefore, not count it in connection with Confirmation of the Plan;

b. the Debtors will file with the Court by no later than April 29, 2020 at 12:00 p.m. (prevailing Central Time) a voting report (the "Voting Report"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, or lacking necessary information, received via facsimile, or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report

shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c. the method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Holder. Except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the properly executed Ballot;

d. an executed Ballot is required to be submitted by the Entity submitting such Ballot. Subject to the other procedures and requirements herein, completed, executed Ballots (except Beneficial Holders' Ballots) may be submitted via the online "E-Balloting" portal maintained by the Balloting Agent;

e. Ballots should not be submitted by facsimile—any Ballots submitted by facsimile will not be valid;

f. Class 3 DIP Claims Ballots and Master Ballots ***may*** be submitted by Nominees via e-mail to sanchezballots@primeclerk.com;

g. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors, and if so sent will not be counted;

h. if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot received will be counted and all prior received Ballots will be disregarded;

i. Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot (other than a Master Ballot) that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims held by the same Holder within the same Class, the applicable Debtor may, in its discretion, seek to aggregate the Claims of any particular Holder within a Class for the purpose of counting votes. The Debtors shall identify any such aggregation of multiple Claims in the Voting Report, and any party in interest may contest such aggregation at the Confirmation Hearing including, without limitation, on the basis that the Debtors have not satisfied Bankruptcy Code section 1129(a)(8)(A) for failure to meet the numerosity requirement of Bankruptcy Code section 1126(c).

j. A Holder of a Claim that may be asserted against multiple Debtors must vote all such Claims in the same way (*i.e.*, either all to accept the Plan at each Debtor against whom they have Claims or all to reject the Plan at each Debtor against whom they have Claims and may not vote any such Claim to accept at one Debtor and reject at another Debtor). Accordingly, a Ballot (other than a Master Ballot) that rejects the Plan for a Claim at one Debtor and accepts the Plan for the same Claim at another Debtor will not be counted;

k. a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

l. the Debtors, unless subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

m. neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

n. unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

o. in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

p. subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

q. if a Claim has been estimated or a Claim has otherwise been Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

r. if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

s. the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by an Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the

amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, Ballots submitted through the online "E-Balloting" portal or a Master Ballot sent by a Nominee via electronic mail shall be deemed to include an original signature); (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by an Entity not entitled to vote pursuant to the procedures described herein;

t. after the Voting Deadline, and subject to the requirements of Bankruptcy Rule 3018(a), no Ballot may be withdrawn or modified without the prior written consent of the Debtors and order of the Court;

u. the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

v. where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted; and

w. for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, in which case all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities, including any funds or accounts that are advised or managed by the same entity or by affiliated entities, hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity or managed fund or account will be counted separately as a vote to accept or reject the Plan.

**Master Ballot Voting Procedures**

These rules will apply with respect to the tabulation of master ballots cast by Nominees for Beneficial Holders of certain Claims (the "Master Ballots"):

a. votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees of certain Claims, as applicable, as of the Voting Record Date, as evidenced by the applicable records. Votes submitted by a Nominee will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

b. if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

c. if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of certain Claims;

d. for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Holder includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Secured Notes Claims or Unsecured Notes Claims; and

e. a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.

**E. Amendments to the Plan and Solicitation and Voting Procedures**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

* * *

<u>**Schedule 3A**</u>

**DIP Claims Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**CLASS 3 – DIP CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on **April [9], 2020** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

You are receiving this Class 3 DIP Claims ballot (this "Ballot") because you are a Holder of a DIP Claim as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Prime Clerk LLC (the "Balloting Agent"), at no charge by: (i) accessing the Debtors' restructuring website at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 3 DIP Claims under the Plan.

**ITEM 1. CLAIM AMOUNT FOR VOTING PURPOSES.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 3 DIP Claim in the following aggregate unpaid amount:[2]

| |
|---|
| $ ______________________ |

**ITEM 2. VOTE ON PLAN.**

The Holder of the Class 3 DIP Claim set forth in Item 1 votes to (please check one):

| **ACCEPT THE PLAN** | **REJECT THE PLAN** |
|---|---|
| ☐ | ☐ |

2 For voting purposes only, subject to tabulation rules.

Any Ballot that is executed by the Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**ITEM 3. CERTIFICATION.**

By signing this Ballot, the undersigned Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Class 3 DIP Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 3 DIP Claim being voted;

b. that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Class 3 DIP Claims; and

d. that no other Ballots with respect to the amount of the Class 3 DIP Claim identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 3 DIP Claim, then any such earlier Ballots are hereby revoked.

| | |
|---|---|
| Name of Claim Holder (Print or Type): | _______________ |
| Social Security or Federal Tax I.D. No. (Optional): | _______________ |
| Signature: | _______________ |
| Name of Signatory: | _______________ |
| If Authorized Agent of Claimant, Title of Agent: | _______________ |
| Street Address: | _______________ |
| City, State, and Zip Code: | _______________ |
| Telephone Number: | _______________ |
| Email Address: | _______________ |
| Date Completed: | _______________ |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Ballot shall not constitute or be deemed to be proof of claim or an assertion of a claim.

[*Remainder of Page Intentionally Left Blank, Continued on Next Page*]

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

**If by electronic, online submission:**

**The Balloting Agent will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit http://cases.primeclerk.com/sanchezenergy, click on the "Submit E-Ballot" section of the website, and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:______________________________________________**

**The Balloting Agent's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the E-Balloting Portal should NOT also submit a paper Ballot.**

**If your Ballot is not received by the Balloting Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

**If by e-mail:**

The Balloting Agent will accept a scan of the completed signed Ballot at sanchezballots@primeclerk.com.

**If by U.S. Postal Service mail, overnight delivery or personal delivery by hand:**

Sanchez Ballot Processing,
c/o Prime Clerk LLC,
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

## INSTRUCTIONS FOR COMPLETING THIS BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which also accompany the Ballot.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. In order for your vote to count, you ***must either***: (a) complete and submit this hard copy Ballot, or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/sanchezenergy. **Ballots will not be accepted by facsimile.**

4. **Use of Hard Copy Ballot**. To ensure that your Ballot is counted, you must:

   i. Complete and certify the amount of your Claim in Item 1;

   ii. Cast ONE vote to accept or reject the Plan by checking the proper box in Item 2;

   iii. Review and sign the certifications in Item 4;

   iv. Return your original Ballot in order for your vote to count.

      i. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing, and provide proof of your authorization to so sign. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

      ii. Please either return the original, completed Ballot to Prime Clerk **by U.S. Postal Service mail, overnight delivery or personal delivery by hand** in the pre-addressed, stamped envelope enclosed with this Ballot, or

      iii. Scan and e-mail the signed Ballot to sanchezballots@primeclerk.com.

**Ballots Should Be Returned to Prime Clerk to the Below Address Prior to the Voting Deadline:**

**Sanchez Ballot Processing,**
**c/o Prime Clerk LLC,**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

| **OR VIA E-MAIL TO:** sanchezballots@primeclerk.com |
|---|

5. **Use of Online Ballot Portal**. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/sanchezenergy. You will need to enter your unique E-Ballot identification number indicated above. **Ballots will not be accepted by facsimile**.

6. Your Ballot ***must*** be returned to Prime Clerk so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is April 27, 2020, at 5:00 p.m.**, prevailing Central Time.

7. You must vote all of your Claims within a particular class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a holder has multiple Claims, within the same Class the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

8. If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise. The method of delivery of Ballots to the Balloting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery. **No Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

9. If multiple Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Ballot timely received will supersede and revoke any earlier received Ballot.

10. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Ballot.

11. This Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

12. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

13. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the

identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (e) any unsigned Ballot; and (f) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

14. If you believe you have received the wrong Ballot, you should contact Prime Clerk immediately at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international).

**PLEASE RETURN YOUR BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

**Schedule 3B**

**Form Beneficial Holder Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**BENEFICIAL HOLDER BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THE DEADLINE FOR THE RECEIPT OF BALLOTS AND MASTER BALLOTS IS APRIL 27, 2020, AT 5:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE")**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE (AS DEFINED HEREIN)*, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE RECEIVED BY YOUR NOMINEE AND INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

***IF YOUR BENEFICIAL HOLDER BALLOT WAS "PRE-VALIDATED" BY YOUR NOMINEE AND YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE BALLOTING AGENT (PRIME CLERK LLC)*, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on **April 9, 2020** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot for Beneficial Holders[2] (this "Beneficial Holder Ballot") because you are a Beneficial Holder of a Claim in the Class indicated on **Exhibit A** hereto as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Beneficial Holder Ballot and, in accordance with the instructions provided by your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), either: (i) return your completed Beneficial Holder Ballot to your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of the Class of Claims indicated on **Exhibit A** hereto, or (ii) return your completed pre-validated Beneficial Holder Ballot directly to Prime Clerk LLC (the "Balloting Agent").

Your rights are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact your Nominee ***immediately***.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class of Claims indicated on **Exhibit A** hereto, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

[2] A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

**<u>ITEM 1.</u>** **<u>CLAIM AMOUNT FOR VOTING PURPOSES.</u>**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of a Claim in the Class and CUSIP indicated on **<u>Exhibit A</u>** hereto in the following principal amount (insert amount in box below, unless otherwise completed by your Nominee):

| |
|---|
| $ _______________________ |

**<u>ITEM 2.</u>** **<u>VOTE ON PLAN.</u>**

The Beneficial Holder of the Claim against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

| **<u>ACCEPT THE PLAN</u>** | **<u>REJECT THE PLAN</u>** |
|---|---|
| ☐ | ☐ |

Any Beneficial Holder Ballot that is executed by the Beneficial Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**<u>ITEM 3.</u>** **<u>OTHER BENEFICIAL HOLDER BALLOTS SUBMITTED</u>.**

By returning this Beneficial Holder Ballot, the Beneficial Holder of the Claims identified in Item 1 certifies that (i) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for the Claims identified in Item 1 owned by such Beneficial Holder, except as identified in the following table, and (ii) *all* Beneficial Holder Ballots submitted by the Beneficial Holder indicate the same vote to accept or reject the Plan that the Beneficial Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

| Account Number with Nominee of Other Claims Voted | Name of Nominee through which You Held Other Claims Voted | CUSIP Number or Description of Other Claims Voted | Principal Amount of Other Claims Voted |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

[Plan Class and CUSIP Indicated on **<u>Exhibit A</u>** hereto]

**ITEM 4.** **CERTIFICATION.**

By signing this Beneficial Holder Ballot, the undersigned Beneficial Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Beneficial Holder of the Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Beneficial Holder of the Claims being voted;

b. that the Entity (or in the case of an authorized signatory, the Beneficial Holder) has accessed the Solicitation Materials and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Claims in a single Class; and

d. that no other Beneficial Holder Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Claims, then any such earlier Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Beneficial Holder (Print or Type): | ______________________ |
| Social Security or Federal Tax I.D. No. (Optional): | ______________________ |
| Signature: | ______________________ |
| Name of Signatory: | ______________________ |
| If Authorized Agent of Claimant, Title of Agent: | ______________________ |
| Street Address: | ______________________ |
| City, State, and Zip Code: | ______________________ |
| Telephone Number: | ______________________ |
| Email Address: | ______________________ |
| Date Completed: | ______________________ |

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Beneficial Holder Ballot shall not constitute or be deemed to be a Proof of Claim or an assertion of a Claim.

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

## INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Beneficial Holder Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which are available at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Beneficial Holder Ballot; and (c) sign and return the Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. **The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is April 27, 2020, at 5:00 p.m., prevailing Central Time.** Your completed Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline. If it is your Nominee's customary practice to collect your vote through the use of a "voting instruction form", online voting, phone, facsimile, e-mail, or other methods in lieu of (or in addition to) a Beneficial Holder Ballot, you are authorized to follow your Nominee's customary practice as instructed by your Nominee.

4. If your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee. No Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

5. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting

Agent; (g) any unsigned Ballot; and (h) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

6. You must vote all of your Claims within a particular Class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Beneficial Holder Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

7. If multiple Beneficial Holder Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballot.

8. This Beneficial Holder Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

9. **Please be sure to sign and date your Beneficial Holder Ballot**. If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

10. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

11. The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Beneficial Holder Ballot.

12. If you believe you have received the wrong Beneficial Holder Ballot, you should contact your Nominee immediately.

**PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT YOUR NOMINEE. IF YOU HAVE ANY QUESTIONS ABOUT THE DEBTORS' CHAPTER 11 CASES OR UPCOMING HEARINGS, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

**Exhibit A**

**Please check one (1) box below to indicate the Plan Class and CUSIP/ISIN to which this Beneficial Holder Ballot pertains (or clearly indicate such information directly on the Beneficial Holder Ballot or on a schedule thereto). If you check more than one (1) box, you risk your vote being invalidated.**

| | | |
|---|---|---|
| **Class 4 (Secured Notes Claims)** | | |
| | 7.25% senior secured notes due February 2023 (144A) | CUSIP 79970YAE5<br>ISIN US79970YAE59 |
| | 7.25% senior secured notes due February 2023 (REG-S) | CUSIP U7967PAE7<br>ISIN USU7967PAE70 |
| **Class 5 (General Unsecured Claims)** | | |
| | 7.75% senior unsecured notes due June 2021 | CUSIP 79970YAB1<br>ISIN US79970YAB11 |
| | 7.75% senior unsecured notes due June 2021 (144A) | CUSIP 79970YAA3<br>ISIN US79970YAA38 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAA5<br>ISIN USU7967PAA58 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAB3<br>ISIN USU7967PAB32 |
| | 6.125% senior unsecured notes due January 2023 | CUSIP 79970YAD7<br>ISIN US79970YAD76 |
| | 6.125% senior unsecured notes due January 2023 (144A) | CUSIP 79970YAC9<br>ISIN US79970YAC93 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAD9<br>ISIN USU7967PAD97 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAC1<br>ISIN USU7967PAC15 |

## Schedule 3C

**Form Master Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**MASTER BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS MASTER BALLOT.**

**THE MASTER BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on April [9], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) for one or more Beneficial Holders[2] of Claims indicated on **Exhibit A** hereto as of **April 8, 2020** (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders of the Claims indicated on Exhibit A hereto, to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Claims to accept or reject the Plan.** This Master Ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

**THE VOTES TRANSMITTED ON THIS MASTER BALLOT FOR BENEFICIAL HOLDERS OF CLAIMS SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form", online voting, phone, facsimile, e-mail, or other methods in lieu of (or in addition to) a Beneficial Holder Ballot.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. **To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.**

**THE VOTING DEADLINE IS ON APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME.**

---

[2] A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

**<u>ITEM 1.</u>** **<u>CERTIFICATION OF AUTHORITY TO VOTE.</u>**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

- ❑ is a Nominee for the Beneficial Holders of the aggregate amount of the Claims listed in Item 2 below and is the record Holder of such bonds; or
- ❑ is acting under a power of attorney and/or agency agreement (a copy of which will be provided upon request) granted by a Nominee that is the registered holder of the aggregate amount of the Claims listed in Item 2 below; or
- ❑ has been granted a proxy (an original of which is annexed hereto) from (a) a Nominee or (b) a Beneficial Holder, that is the registered holder of the aggregate amount of the Class Claims listed in Item 2 below;

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Claims described in Item 2 below.

**<u>ITEM 2.</u>** **<u>CLAIMS VOTE ON PLAN.</u>**

The undersigned transmits the following votes and releases of Beneficial Holders of Claims in the Class and CUSIP indicated on **<u>Exhibit A</u>** hereto and certifies that the following Beneficial Holders of Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "<u>Ballots</u>") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table. Please note that each Beneficial Holder must vote all such Beneficial Holder's Claims to accept or reject the Plan and may not split such vote. Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| Your Customer Account Number for Each Beneficial Owner of Claims | Principal Amount Held as of Voting Record Date | Indicated the vote cast on the Beneficial Holder Ballot in Item 2 by checking the appropriate box below | |
|---|---|---|---|
| | | Accept the Plan | Reject the Plan |
| 1. | $ | | |
| 2. | $ | | |
| 3. | $ | | |
| 4. | $ | | |
| 5. | $ | | |
| 6. | $ | | |
| TOTALS: | $ | | |

**ITEM 3.** **OTHER BALLOTS SUBMITTED BY BENEFICIAL HOLDERS.**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 3 of the Beneficial Holder Ballot:

| Your Customer Account Number for Each Beneficial Owner Who Completed Item 3 of the Beneficial Holder Ballot | TRANSCRIBE FROM ITEM 3 OF THE BENEFICIAL HOLDER BALLOTS: | | | |
|---|---|---|---|---|
| | Your Customer's Account Number with Other Nominee | Name of Other Nominee | CUSIP Number or Description of Other Claims Voted | Principal Amount of Other Class Claims Voted |
| 1. | | | | $ |
| 2. | | | | $ |

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

| | | | | |
|---|---|---|---|---|
| 3. | | | | $ |
| 4. | | | | $ |
| 5. | | | | $ |
| 6. | | | | $ |
| 7. | | | | $ |
| 8. | | | | $ |
| 9. | | | | $ |
| 10. | | | | $ |

**ITEM 5. CERTIFICATION.**

By signing this Master Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. it has reviewed the Solicitation Materials, the Master Ballots, and the Beneficial Holder Ballots and has delivered the same (or otherwise conveyed the pertinent information) to the Beneficial Holders of Claims listed in Item 2 above;

b. it has received a completed and signed Beneficial Holder Ballot (or other appropriate communication conveying a vote) from each Beneficial Holder listed in Item 2 of this Master Ballot;

c. it is the registered Holder of all Claims listed in Item 2 above being voted, or it has been authorized by each Beneficial Holder of Claims listed in Item 2 above to vote on the Plan;

d. no other Master Ballots with respect to the same Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

e. it has properly disclosed: (a) the number of Beneficial Holder of Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Claims owned, as the case may be, by each Beneficial Holder of Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Claims' certification as to other Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Claims; and

f. it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Claims (whether properly completed or defective) for at

least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

[*Remainder of Page Intentionally Left Blank, Continued Below*]

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

| | |
|---|---|
| Name of Holder (Print or Type): | ______________________ |
| Participant Number: | ______________________ |
| Name of Proxy Holder or Agent for Nominee (if applicable): | ______________________ |
| Signature: | ______________________ |
| Name of Signatory: | ______________________ |
| Street Address: | ______________________ |
| City, State, and Zip Code: | ______________________ |
| Telephone Number: | ______________________ |
| Email Address: | ______________________ |
| Date Completed: | ______________________ |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

**By mail, courier, or personal delivery, to:**

Sanchez Ballot Processing,
c/o Prime Clerk LLC,
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**Via electronic mail service to:** sanchezballots@primeclerk.com

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, accessible at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind the Holders by the terms of the Plan. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and to collect votes from Beneficial Holders through online voting or by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by April 27, 2020, at 5:00 p.m., prevailing Central Time.

4. If a Nominee is transmitting the votes of any Beneficial Holder of Claims other than itself, the Nominee may either:

   i. "Pre-validate" the individual Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Claim for voting within three (3) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Claims held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.

   ii. Within three (3) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective

owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline. For the avoidance of doubt, a Nominee is authorized to circulate the information contained in the Solicitation Package and Beneficial Holder Ballot to its Beneficial Holder client(s) in accordance with its customary practices, including the use of a "voting instruction form," phone, facsimile, or other electronic means in lieu of (or in addition to) a Beneficial Holder Ballot, and the Nominee is similarly authorized to collect votes from Beneficial Holders through such "voting information form," online voting or by phone, facsimile, or other electronic means.

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

The Master Ballot must be returned to the Balloting Agent so as to be actually received by the Balloting Agent on or before the Voting Deadline. The Voting Deadline is **April 27, 2020, at 5:00 p.m., prevailing Central Time**.

6. If a Master Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, the following Master Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Master Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Master Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Master Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Master Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Master Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (g) any unsigned Ballot; and (h) any Master Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

7. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery. **No Master Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

8. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the last valid Master Ballot timely received will supersede and revoke any earlier received Master Ballot.

9. This Master Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

10. **Please be sure to sign and date the Master Ballot.** You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

11. If you are both the Nominee and the Beneficial Holder of any of the Claims indicated on **Exhibit A** of the Master Ballot or Beneficial Holder Ballot, as applicable, and you wish to vote such Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Claims and you must vote your entire Claims in the same Class to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

12. The following additional rules shall apply to Master Ballots:

    i. Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Claims as of the Record Voting Date, as evidenced by the record and depository listings.

    ii. Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Claims held by such Nominee;

    iii. To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

iv. To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Claims; and

v. For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

**Exhibit A**

**Please check one (1) box below to indicate the Plan Class and CUSIP/ISIN to which this Master Ballot pertains (or clearly indicate such information directly on the Master Ballot or on a schedule thereto). If more than one (1) box is checked, you risk the votes cast through this Master Ballot being invalidated.**

| | | |
|---|---|---|
| **Class 4 (Secured Notes Claims)** | | |
| | 7.25% senior secured notes due February 2023 (144A) | CUSIP 79970YAE5<br>ISIN US79970YAE59 |
| | 7.25% senior secured notes due February 2023 (REG-S) | CUSIP U7967PAE7<br>ISIN USU7967PAE70 |
| **Class 5 (General Unsecured Claims)** | | |
| | 7.75% senior unsecured notes due June 2021 | CUSIP 79970YAB1<br>ISIN US79970YAB11 |
| | 7.75% senior unsecured notes due June 2021 (144A) | CUSIP 79970YAA3<br>ISIN US79970YAA38 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAA5<br>ISIN USU7967PAA58 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAB3<br>ISIN USU7967PAB32 |
| | 6.125% senior unsecured notes due January 2023 | CUSIP 79970YAD7<br>ISIN US79970YAD76 |
| | 6.125% senior unsecured notes due January 2023 (144A) | CUSIP 79970YAC9<br>ISIN US79970YAC93 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAD9<br>ISIN USU7967PAD97 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAC1<br>ISIN USU7967PAC15 |

## <u>Schedule 3D</u>

## Form General Unsecured Creditor Ballot

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING**
**<u>THE DEBTORS' CHAPTER 11 PLAN</u>**

**CLASS 5 – GENERAL UNSECURED CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "<u>VOTING DEADLINE</u>").**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "<u>Disclosure Statement</u>"). The Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") has conditionally approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on April **[9]**, 2020 (the "<u>Disclosure Statement Order</u>"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

You are receiving this Class 5—General Unsecured Claims ballot (this "Class 5 GUC Ballot") because you are a Holder of a General Unsecured Claim in Class 5 as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 5 GUC Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 GUC Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5 General Unsecured Claims under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**ITEM 1. CLAIM AMOUNT FOR VOTING PURPOSES.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 5 General Unsecured Claim in the following aggregate unpaid amount:[2]

$ ______________________________

**ITEM 2. VOTE ON PLAN.**

The Holder of the Class 5 General Unsecured Claim set forth in Item 1 votes to (please check one):

| **ACCEPT THE PLAN** | **REJECT THE PLAN** |
|---|---|
| ☐ | ☐ |

[2] For voting purposes only, subject to tabulation rules.

Any Class 5 GUC Ballot that is executed by the Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**ITEM 3. CERTIFICATION.**

By signing this Class 5 GUC Ballot, the undersigned Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Class 5 General Unsecured Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 5 General Unsecured Claim being voted;

b. that the Entity (or in the case of an authorized signatory, the Holder) has accessed the Solicitation Materials and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Class 5 General Unsecured Claims in a single Class; and

d. that no other Class 5 GUC Ballots with respect to the amount of the Class 5 General Unsecured Claims identified in Item 1 have been cast or, if any other Class 5 GUC Ballots have been cast with respect to such Class 5 General Unsecured Claims, then any such earlier Class 5 GUC Ballots are hereby revoked.

| | |
|---|---|
| Name of Claim Holder (Print or Type): | ______________________________ |
| Social Security or Federal Tax I.D. No. (Optional): | ______________________________ |
| Signature: | ______________________________ |
| Name of Signatory: | ______________________________ |
| If Authorized Agent of Claimant, Title of Agent: | ______________________________ |
| Street Address: | ______________________________ |
| City, State, and Zip Code: | ______________________________ |
| Telephone Number: | ______________________________ |
| Email Address: | ______________________________ |
| Date Completed: | ______________________________ |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Ballot shall not constitute or be deemed to be proof of claim or an assertion of a claim.

[*Remainder of Page Intentionally Left Blank, Continued on Next Page*]

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

| |
|---|
| **<u>If by electronic, online submission</u>:**<br><br>**The Balloting Agent will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit http://cases.primeclerk.com/sanchezenergy, click on the "Submit E-Ballot" section of the website, and follow the instructions to submit your Ballot.**<br><br>**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**<br><br>**Unique E-Ballot ID#:__________________________________________**<br><br>**The Balloting Agent's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**<br><br>**Each E-Ballot ID# is to be used solely for voting only those Claims described in <u>Item 1</u> of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the E-Balloting Portal should NOT also submit a paper Ballot.**<br><br>**If your Ballot is not received by the Balloting Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.** |
| **<u>If by U.S. Postal Service mail</u>:**<br><br>Sanchez Ballot Processing,<br>c/o Prime Clerk LLC,<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 |
| **<u>If by overnight delivery or personal delivery by hand</u>:**<br><br>Sanchez Ballot Processing,<br>c/o Prime Clerk LLC,<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 |

**<u>INSTRUCTIONS FOR COMPLETING THIS CLASS 5 GUC BALLOT</u>**

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which are accessible at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. In order for your vote to count, you ***must either***: (a) complete and submit this hard copy Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/sanchezenergy. **Ballots will not be accepted by e-mail or facsimile.**

4. **<u>Use of Hard Copy Ballot</u>**. To ensure that your hard copy Ballot is counted, you must:

    i. Complete and certify the amount of your Claim in Item 1;

    ii. Cast ONE vote to accept or reject the Plan by checking the proper box in Item 2;

    iii. Review and sign the certifications in Item 4;

    iv. Return your original Ballot in order for your vote to count;

    v. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing, and provide proof of your authorization to so sign. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot; and

    vi. Return the original, completed Ballot to Prime Clerk in the pre-addressed, stamped envelope enclosed with this Ballot.

| |
|---|
| **<u>Ballots Should Be Returned to Prime Clerk to the</u>**<br>**<u>Below Address Prior to the Voting Deadline</u>:**<br><br>**Sanchez Ballot Processing,**<br>**c/o Prime Clerk LLC,**<br>**One Grand Central Place**<br>**60 East 42nd Street, Suite 1440**<br>**New York, NY 10165** |

5. **Use of Online Ballot Portal**. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/sanchezenergy. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal)**.

6. Your Ballot ***must*** be returned to Prime Clerk so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is April 27, 2020, at 5:00 p.m.**, prevailing Central Time.

7. You must vote all of your Claims within a particular Class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

8. If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise. The method of delivery of Ballots to the Balloting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery. **No Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

9. If multiple Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Ballot timely received will supersede and revoke any earlier received Ballot.

10. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Ballot.

11. This Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

12. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

13. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not

entitled to vote on the Plan; (d) any Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (g) any unsigned Ballot; and (h) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

14. If you believe you have received the wrong Ballot, you should contact Prime Clerk immediately at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international).

**PLEASE RETURN YOUR BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

# Schedule 4

## Combined Hearing Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER (A) THE ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Sanchez Energy Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Disclosure Statement") as, together with the Disclosure Statement Supplement, containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the supplemental solicitation materials and documents to be included in the solicitation package; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **April 30, 2020 at 9:00 a.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**Please be advised: The Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court, by agenda filed with the Court, or by a Notice of Adjournment filed with the Court and served on all parties entitled to notice.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**IMPORTANT INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is **April 8, 2020** (the "Voting Record Date"), which is the date for determining which Holders of Claims in Class 3 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **April 27, 2020, at 5:00 p.m.**, prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' balloting agent, Prime Clerk LLC (the "Balloting Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote**.

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN**

**ARTICLE VIII** OF THE PLAN CONTAINS EXCULPATION AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Plan Objection Deadline.** The deadline for filing objections to the Plan is **April 27, 2020, at 5:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). All objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy; (b) writing Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 E. 42nd Street, Suite 1440, New York, NY 10165; (c) emailing sanchezballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at: (844) 232-0067 (toll free) or (917) 942-6393 (international). You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov. Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement on or before April [22], 2020, and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement. Notwithstanding the foregoing, the Debtors have the right to amend and supplement the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, in accordance with the terms of the Plan.

## BINDING NATURE OF THE PLAN

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Houston, Texas
Dated: April __, 2020

/s/

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and Debtors in Possession*

<u>**Schedule 5A**</u>

**Presumed to Accept Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NON-VOTING STATUS NOTICE WITH RESPECT TO UNIMPAIRED CLASSES PRESUMED TO ACCEPT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. ___] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under § 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"); and (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package may be obtained by (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (International), or (d) emailing sanchezballots@primeclerk.com. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because, pursuant to the terms of Article III of the Plan, and the applicable provisions of the Bankruptcy Code, your Claim(s) against the Debtors are Unimpaired and, therefore, pursuant to Bankruptcy Code § 1126(f), you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the Combined Hearing Notice are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the **Combined Hearing will commence on April 30, 2020, at 9:00 a.m., prevailing Central Time**, before Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **April 27, 2020, at 5:00 p.m., prevailing Central Time (the "Plan Objection Deadline")**. Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claim(s), you should contact the Balloting Agent in accordance with the instructions provided above.

# Schedule 5B

## Deemed to Reject Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NON-VOTING STATUS NOTICE WITH RESPECT TO IMPAIRED CLASSES DEEMED TO REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. ___] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under § 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"); and (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package may be obtained by (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (International), or (d) emailing sanchezballots@primeclerk.com. You may also obtain copies of any pleadings filed in this chapter 11 case for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because, under the terms of Article III of the Plan, and the applicable provisions of the Bankruptcy Code, your Claim(s) against the Debtors are Impaired and pursuant to Bankruptcy Code § 1126(g), you are deemed to have rejected the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the Combined Hearing Notice are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the **Combined Hearing will commence on April 30, 2020 at 9:00 a.m., prevailing Central Time**, before Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan **is April 27, 2020 at 5:00 p.m., prevailing Central Time (the "Plan Objection Deadline")**. Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claim(s), you should contact the Balloting Agent in accordance with the instructions provided above.

## Schedule 6

## Assumption Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE TO CONTRACT COUNTERPARTIES OF ASSUMPTION, OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Forms of Ballot and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. [●] (the "Disclosure Statement Order") that, among other things: (i) conditionally approved the adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) approved the Solicitation and Voting Procedures; (iii) approved the Voting Record Date; (iv) approved the manner and form of the Solicitation Packages and the materials contained therein; (v) approved the Plan Supplement Notice; (vi) approved the Non-Voting Status Notices; (vii) approved the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed pursuant to the Plan; (viii) approved the Voting and Tabulation Procedures; (ix) approved the Combined Hearing Notice; and (x) granted related relief; all as more fully set forth in the Motion.[2]

**PLEASE TAKE FURTHER NOTICE** that the hearing (the "Combined Hearing") to approve the adequacy of the Disclosure Statement and confirm the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Plan") will commence on April 30, 2020, at 9:00 a.m. (prevailing Central Time).

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the Schedule of Assumed Executory Contract and Unexpired Leases [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on [●], 2020, as contemplated under the Plan. **The Debtors or Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection.**

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to an Executory Contract or Unexpired Lease that is listed on the Assumption Schedule. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE THAT** Bankruptcy Code section 365(b)(1) requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the assumed Executory Contact(s) and Unexpired Lease(s), which amounts are listed in **Exhibit A**. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** if you object to the proposed assumption or assumption and assignment or disagree with the proposed Cure Claim, you must file an objection with the Bankruptcy Court and serve it **no later than 11:59 p.m. (prevailing Central Time) on May 20, 2020** (the "Cure Objection Deadline"). Any objection must (a) be in writing; (b) conform to the Bankruptcy rules, the Bankruptcy local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Cure Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification that would resolve such objection; and (e) be filed with the Court and served upon the following parties so as to be actually received on or before the Cure Objection Deadline: (i) Jackson Walker LLP, 1401

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan, the Plan Supplement, or each Debtors' schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor(s) or Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors or Reorganized Debtors, as applicable, expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, at any time through the Effective Date and (b) dispute Cure Claim asserted in connection with assumption of any Executory Contract or Unexpired Lease.

McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh, Elizabeth C. Freeman; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Lisa Beckerman, Jason Rubin; Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, District of Columbia 20006, Attn: James Savin; and (iii) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019. Attn: Dennis Jenkins, Brett Miller; and (iv) each of the entities listed on the Master Service List (available on the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/).

**PLEASE TAKE FURTHER NOTICE THAT** if no objection to (a) the Cure Claim(s) or (b) the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which you are a counterparty is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Claim as determined by the Debtor is correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Claim under the proposed assigned Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to any assumption or assumption and assignment of the Executory Contract or Unexpired Lease to which you are a counterparty.

**PLEASE TAKE FURTHER NOTICE THAT** assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed, in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases attached to the Plan Supplement; (2) those that have previously been rejected by a Final Order; (3) those that are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** if you are a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive a Solicitation Package in accordance with the Solicitation Procedures. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk LLC ("Prime Clerk"), the balloting agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the

Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if you are not a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive notice of non-voting status. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT FOR DETAILS REGARDING THE POSSIBLE ASSUMPTION, ASSUMPTION AND ASSIGNMENT, AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE PLAN'S TREATMENT OF YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE.**

| |
|---|
| **IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE DEBTORS' BALLOTING AGENT AT THE ABOVE INSTRUCTIONS.** |

**Exhibit A**

Schedule of Contracts and Leases and Proposed Cure Cost

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|---|---|---|---|
| | | | |

**Schedule 7**

**Rejection Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE TO CONTRACT COUNTERPARTIES OF**
**REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Forms of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (i) conditionally approved the adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) approved the Solicitation and Voting Procedures; (iii) approved the Voting Record Date; (iv) approved the manner and form of the Solicitation Packages and the materials contained therein; (v) approved the Plan Supplement Notice; (vi) approved the Non-Voting Status Notices; (vii) approved the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan; (viii) approved the Voting and Tabulation Procedures; (ix) approved the Combined Hearing Notice; and (x) granted related relief; all as more fully set forth in the Motion.[2]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing (the "Combined Hearing") to approve the adequacy of the Disclosure Statement and confirm the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Plan") will commence on April 30, 2020, at 9:00 a.m. (prevailing Central Time).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the [Schedule of Rejected Executory Contracts and Unexpired Leases] [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on [April __, 2020], as contemplated under the Plan. **The Debtors or Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases and move it to the Schedule of Assumed Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection.**

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to an Executory Contract or Unexpired Lease that is listed on the Rejection Schedule. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Rejection Schedule.

**PLEASE TAKE FURTHER NOTICE THAT** any objection to the Debtors' decision to reject the Executory Contract or Unexpired Lease must (a) be in writing; (b) conform to the Bankruptcy rules, the Bankruptcy local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification that would resolve such objection; and (e) be filed with the Court and served upon the following parties so as to be actually received **no later than 11:59 p.m. (prevailing Central Time) on May 20, 2020** (the "Objection Deadline"): (i) Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh, Elizabeth C. Freeman; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Lisa Beckerman, Jason Rubin; Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, District of Columbia 20006, Attn: James Savin; (iii) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, and (iv) each of the entities listed on the Master Service List (available on the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/).

**PLEASE TAKE FURTHER NOTICE THAT** if you do not object to the proposed rejection of any Executory Contract or Unexpired Lease to which you are a counterparty by the Objection Deadline, then you will be forever barred, estopped, and enjoined from asserting a future objection with regard to any Executory Contract or Unexpired Lease to which you are a counterparty.

**PLEASE TAKE FURTHER NOTICE THAT** on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed, in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases attached to the Plan Supplement; (2) those that have previously been rejected by a Final Order; (3) those that are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** if the Debtors reject an Executory Contract(s) or Unexpired Lease(s) to which you are a counterparty, you may be entitled to an unsecured claim for which a Proof of Claim must be filed. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) calendar days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the applicable Debtor, its Estate, or property of the foregoing parties without the need for any objection by the Debtor, or further notice to, or action, order, or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article II of the Plan, as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you are a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive a Solicitation Package in accordance with the Solicitation Procedures. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk LLC ("Prime Clerk"), the balloting agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if you are not a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive notice of non-voting status. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk, the Balloting Agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT FOR DETAILS REGARDING THE POSSIBLE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE PLAN'S TREATMENT OF YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE DEBTORS' BALLOTING AGENT AT THE ABOVE INSTRUCTIONS.**

Case 4:22-cv-03535 Document 19-5 Filed on 07/19/23 in TXSD Page 1 of 75

# EXHIBIT 4

United States Bankruptcy Court Southern - Texas
ENTERED
04/30/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

**ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Upon the filing by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") of the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] on April 30, 2020 (the "Plan"),[2] a copy of which is attached as **Exhibit 1**, which Plan amends and replaces the previously filed plans of reorganization at Docket Nos. 1119 and 1149; and this Court previously having conditionally approved the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1124] (the "Disclosure Statement") and the solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan, in each case pursuant to the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

*Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (VI) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 1118], entered on April 9, 2020 (the "Solicitation Procedures Order"); and the Debtors having served the Disclosure Statement, ballots for holders of Claims entitled to vote on the Plan, and all required notices in compliance with the requirements and procedures set forth in the Solicitation Procedures Order, *see Affidavit Re: Mailings for the Period from April 10, 2020 through April 16, 2020* [Docket No. 1142]; and the Debtors having filed the documents comprising the Plan Supplement on April 25, 2020 and April 29, 2020 [Docket Nos. 1148, 1194, 1196, 1197]; and this Court having considered the record in these chapter 11 cases, the creditor support for the Plan evidenced in the *Declaration of Craig Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Solicitation and Voting Declaration") [Docket No. 1181], filed on April 29, 2020, the compromises and settlements embodied in and contemplated by the Plan, the briefs and arguments regarding Confirmation of the Plan, and the evidence regarding Confirmation of the Plan; and this Court having found that notice and opportunity for any party in interest to object to Confirmation has been adequate and appropriate as to all parties affected by the Plan and the transactions contemplated thereby; and a hearing on Confirmation of the Plan and the adequacy of the Disclosure Statement having commenced on April 30, 2020 (the "Combined Hearing"); and this Court having considered the sworn testimony of the witnesses proffered or called at the Combined Hearing, the exhibits admitted into evidence at the Combined Hearing, the arguments of counsel and other parties-in-interest presented at the Combined Hearing, and the objections filed or asserted with respect to final approval of the Disclosure Statement and/or Confirmation of the

Plan (the "Objections"); and after due deliberation, it is HEREBY FOUND AND ORDERED THAT:

1. The Disclosure Statement contains "adequate information" within the meaning of, and is approved on a final basis pursuant to, section 1125 of the Bankruptcy Code.

2. As described in and evidenced by the Solicitation and Voting Declaration, transmittal and service of the Solicitation Packages (as defined in the Solicitation Procedures Order) (collectively, the "Solicitation") was timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (a) was conducted in good faith, and (b) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation.

3. Each of the Debtors has met the burden of proving each element of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence. The Plan, including (a) all of the modifications to the Plan filed with this Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement (including the final forms thereof to be filed on or before the Effective Date), satisfies all of the requirements of and is confirmed pursuant to section 1129 of the Bankruptcy Code.

4. Pursuant to a settlement between the Debtors, the DIP Lenders, the Creditors' Committee and the Unsecured Noteholder Ad Hoc Group (the "Settling Parties") stated on the record at the Combined Hearing, the Settling Parties stipulate for settlement purposes only that the enterprise value of the Reorganized Debtors on a going concern basis shall be deemed to be $85 million (the "Enterprise Value") for all purposes of confirmation, including section 1129 of the Bankruptcy Code. The Enterprise Value does not include the value of Debtors' Causes of Action,

and the Enterprise Value (excluding the value of such Causes of Action) shall be binding for purposes of the Lien-Related Litigation.

5. Any and all Objections to the final approval of the Disclosure Statement and/or Confirmation of the Plan that have not been withdrawn or resolved prior to or during the Combined Hearing are hereby overruled.

6. The documents contained in the Plan Supplement are an integral part of the Plan. The Debtors and the Reorganized Debtors (in each case, as applicable) are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan, including, but not limited to, (a) the implementation of the Restructuring Transactions; (b) the selection of the directors and officers for the Reorganized Debtors; (c) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board pursuant to Article IV.L of the Plan; (d) the issuance and distribution of the New Common Stock pursuant to Article IV.C of the Plan; (e) the entry into the New Organizational Documents pursuant to Article IV.I of the Plan; (f) the entry into the New Executive Employment Agreements; (g) the retention and employment by the Reorganized Debtors of certain members of the Debtors' current workforce and the payment of severance consistent with Article IV.K of the Plan; (h) the assumption of the D&O Liability Insurance Policies; and (i) the assumption of the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpated Claims.

7. The terms of the Plan, the Plan Supplement, and any exhibits thereto are incorporated herein by reference, and are an integral part of this order (the "Confirmation Order"). The terms of the Plan, the Plan Supplement, any exhibits thereto, and all other relevant and necessary documents to effectuate the Plan shall be effective and binding as of the Effective Date. The failure to specifically include or refer to any particular article, section, or provision of the Plan,

the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision, it being the intent of this Court that the Plan, the Plan Supplement, and the exhibits thereto be confirmed in their entirety. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between this Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, this Confirmation Order shall control.

8. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including (a) any dispute regarding the treatment of any Intercompany Claims and (b) the Professional Fee Settlement. The compromise and settlement of all such Claims, Interests, Causes of Action, and controversies is hereby approved and found to be in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and fair, equitable and reasonable.

9. Except to the extent expressly provided otherwise in this Confirmation Order, pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and shall be immediately effective on the Effective Date without further order or action by this

Court, any of the parties to such provisions, or any other Entity: (a) Exculpation (Article VIII.B); (b) Injunction (Article VIII.C); and (c) Release of Liens (Article VIII.E).

10. **Exculpation.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, and without limiting in any way the Exculpation in Article VIII.B of the Plan for the benefit of the Exculpated Parties, this paragraph 10 applies. If in a proceeding against one or more of the Sanchez Parties, but for the exculpation provisions in the Plan or this Confirmation Order, applicable non-bankruptcy law would have entitled one or more of Sanchez Parties to a claim against or a credit on account of the liability of any Exculpated Party, the obligation of any Sanchez Party to satisfy a judgment shall be reduced by the amount of any such credit or claim in the amount that would have existed under applicable non-bankruptcy law.

11. **Injunction.** Except to the extent expressly provided otherwise in this Confirmation Order, to the extent permitted by applicable law, and for the avoidance of doubt, pursuant to the Injunction set forth in Article VIII.C of the Plan, and without limiting any other provision of the Plan, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in

connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

12. **Lien-Related Litigation.** The Lien-Related Litigation shall be adjudicated following the Effective Date by this Court pursuant to and in accordance with the terms of Article IV.D of the Plan.

13. There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by this Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by this Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of this Court, which order shall designate the allocation of New Common Stock as between

the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

14. **Professional Fee Settlement**. The Professional Fee Settlement, as set forth in Article II.B of the Plan, is approved. Upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and, with such funds and other funds as necessary, the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, and such funds shall be maintained in trust solely for the Participating Professionals and used to pay the amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, within two (2) business days after such Professional Fee Claims are Allowed by an order of this Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of this Court.

15. If the Effective Date does not occur within 45 days of the Confirmation Date, except to the extent a Participating Professional agrees to a later date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise, and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

16. Notwithstanding anything to the contrary in the Plan, including in Article II.B. thereof, the following settlement among the Committee, the Participating Committee's Professionals (as defined below), the Debtors, and the Secured Ad Hoc Group is hereby approved (the "Committee Professional Fee Settlement"):

(a) The "Participating Committee Professionals" are: Milbank LLP; Locke Lord LLP; Jefferies LLC; and FTI Consulting, Inc.

(b) The Participating Committee Professionals agree to limit the aggregate payments on account of their Professional Fee Claims (including amounts paid on an interim basis to date) to $24,000,000.00 (exclusive of Committee member expenses that are submitted with Participating Committee Professionals' fee statements for convenience). Participating Committee Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims from the Debtors or Reorganized Debtors, either as Administrative Claims or otherwise.

(c) The Participating Committee Professionals consent to the DIP Agent releasing the Carve-out Trigger Notice Reserves to the Reorganized Debtors on the Effective Date, provided that the Reorganized Debtors shall immediately fund the a reserve account (the "Committee Professional Fee Settlement Reserve") in an amount equal to $24,000,000.00 minus any amounts previously paid to the Participating Committee Professionals, solely for the unpaid Professional Fee Claims of the Participating Committee Professionals.

(d) The Committee Professional Fee Settlement Reserve shall be an interest-bearing escrow account (or a segregated account with similar protections as an escrow account, maintained in trust solely for the Participating Committee Professionals with the consent of the Participating Committee Professionals). Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Committee Professional Fee Settlement Reserve; provided that any fees and expenses due up from or in excess of the interest accruing on the funds in the Committee Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors.

(e) The amount of Professional Fee Claims owing to the Participating Committee Professionals, as limited by the Committee Professional Fee Settlement, shall be paid in Cash to such Participating Committee Professionals by the Reorganized Debtors from the Committee Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all

such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Committee Professional Fee Settlement, any remaining amount in the Committee Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(f) No Fee Examiner shall be appointed or shall review the Final Fee Applications of the Participating Committee Professionals. The Professional Fee Claims of any Participating Committee Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Committee Professional Fee Settlement.

(g) The Debtors, Reorganized Debtor, and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Committee Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

(h) If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Committee Professional Fee Settlement shall be withdrawn, (b) the Participating Committee Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Committee Professionals shall be withdrawn, and all rights of all parties are reserved.

17. **Executory Contracts and Unexpired Leases.** Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties and except as expressly otherwise provided in paragraphs 23-25 of this Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease is May 20, 2020 (the "Contract Objection Deadline"), which may be after the Effective Date. Any Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease that is filed prior to the Contract Objection Deadline shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute and

approving the assumption or rejection, as applicable, of such Executory Contract or Unexpired Lease or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty; *provided that* after the Effective Date, the Reorganized Debtors may settle any dispute regarding any Cure Claim without any further notice to any party or any action, order, or approval of this Court.

18. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the *Schedule of Assumed Executory Contracts and Unexpired Leases* and move it to the *Schedule of Rejected Executory Contracts and Unexpired Leases* or remove an Executory Contract or Unexpired Lease from the *Schedule of Rejected Executory Contracts and Unexpired Leases* and move it to the *Schedule of Assumed Executory Contracts and Unexpired Leases*, as applicable, until the later of (a) the Contract Objection Deadline or (b) if an objection is Filed by the Contract Objection Deadline, prior to the date of a decision by this Court with respect to such objection. Any such objection shall be heard at a date determined by this Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim by the Contract Objection Deadline shall be deemed to have assented to such assumption or Cure Claim.

19. A Cure Claim, if any, under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan that is undisputed or, if disputed, either resolved consensually by the Reorganized Debtors and the counterparty to such Executory Contract or Unexpired Lease or by a Final Order shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, (a) by payment in Cash as soon as reasonably practicable following the later of the Effective Date and the order authorizing assumption, or (b) as otherwise agreed by the Reorganized Debtors and the counterparty to such Executory Contract or Unexpired Lease. For the avoidance of doubt, a Cure

Claim shall not include amounts that have been incurred as of the Effective Date but are not yet due and payable. Such amounts shall be paid by the Reorganized Debtors in the ordinary course of business subsequent to the Effective Date.

20. Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of this Court or any other Entity.

21. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with this Court by no later than forty-five (45) calendar days after the date of entry of an order of this Court (including this Confirmation Order) approving such rejection or any other order of this Court establishing the date by which such Proofs of Claim must be Filed. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed as required by the preceding sentence shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of this Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully

satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

22. Notwithstanding anything in the Plan or this Confirmation Order to the contrary, it is the intent of the Debtors to reject any Executory Contract or Unexpired Lease with SOG, SNMP, SN EF UnSub, LP, SN EF UnSub GP, LLC and SN EF UnSub Holdings, LLC that is not expressly assumed. For the avoidance of doubt, that certain Master Service Agreement between Sanchez Energy Corporation and SOG shall be deemed rejected as of the Effective Date. SOG is barred from issuing any new work orders, or taking any other action, on behalf of the Debtors or the Reorganized Debtors, as applicable.

23. **Executory Contract Counterparties**. Notwithstanding any other provision in this Confirmation Order or the Plan to the contrary, nothing in this Confirmation Order or the Plan (and neither the confirmation nor consummation of the Plan) shall eliminate, alter or impair (or otherwise prevent any Counterparty (as defined below) from asserting), any or all of the Counterparties' respective defenses, arguments or appellate rights to the extent relating to (a) any proposed assumption or rejection of any Executory Contract or Unexpired Lease with such Counterparty or real property interests of such Counterparty (including rights, defenses, or arguments that such agreements or interests, as applicable, constitute covenants running with the land not subject to assumption or rejection, do not constitute Executory Contracts or Unexpired Leases under the Bankruptcy Code and the terms of the Plan, or are not otherwise subject to assumption or rejection) and (b) the vesting of any property in the Reorganized Debtors free and clear of any real property interests of such Counterparty, including any covenants that run with the

land (notwithstanding anything herein to the contrary, whether the Bankruptcy Code and the United States Constitution would permit the Plan to discharge any such property interests and transfer such property free and clear of any such property interests is not being determined at this time and shall be adjudicated by the Court at a later date together with any related rejection or assumption disputes, and the rights, defenses and arguments of each party to such disputes are hereby fully preserved); *provided* that each Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to the Contract Objection Deadline. For purposes of this Confirmation Order, "Counterparty" shall mean each of the following: (i) Occidental Petroleum Corporation, and each of its affiliates that have a contractual relationship with the Debtors, including Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP, (ii) Western Midstream Partners, LP, and each of its affiliates that have a contractual relationship with the Debtors, including Springfield Pipeline, LLC, (iii) GSO ST Holdings LP, and each of its affiliates that have a contractual relationship with the Debtors, (iv) GSO ST Holdings Associates LLC, and each of its affiliates that have a contractual relationship with the Debtors, (v) SNEF UnSub GP, LLC, (vi) SN EF UnSub LP, (vii) SN EF UnSub Holdings, LLC, (viii) Catarina Midstream, LLC, (ix) Carnero G&P LLC and its affiliates, (x) Eagle Ford TX LP, (xi) Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries, (xii) Gavilan Resources, LLC and its affiliates and predecessors in interest, (xiii) Seco Pipeline, LLC, (xiv) Sanchez Midstream Partners LP, and (xv) Sanchez Midstream Partners GP LLC, (xvi) Marathon Oil EF LLC and its affiliates or subsidiaries ("Marathon"), including but not limited to, Marathon's rights as successors-in-interest/assignees of Hilcorp Energy I, L.P. ("Hilcorp") under the Joint Operating Agreement dated December 28, 2009 by and between SEP Holdings II, LLC

and Hilcorp, (xvii) Archrock Partners Operating LLC and Archrock Services LP, (xviii) Plains South Texas Gathering, LLC and Plains Gas Solutions, LLC, (xix) Eagle Ford TX LP, (xx) TPL SouthTex Processing Company LP and TPL SouthTex Transmission Company LP, (xxi) Mitsui E&P Texas LP and Mitsui & Co. Energy Marketing & Services (USA), Inc., and (xxii) B.L. Stanley, Ltd., Worthey Properties, Ltd., Robert Edward Worthey Trust, Teressa Kountz Trust and Tonya Hedleston Trust in Webb County, Texas.

24. Except as agreed upon by the applicable Counterparty and the Reorganized Debtors, notwithstanding any other provision of this Order or the Plan, from the period commencing on the Effective Date through the date of the entry of an order of this Court resolving any and all disputes raised in a timely filed objection by one or more applicable Counterparties with this Court relating to the proposed assumption or rejection of any agreement, (i) such agreement shall continue as in effect immediately prior to the Effective Date, (ii) the terms of such agreement shall continue to apply to the applicable Reorganized Debtor and Counterparty in accordance with otherwise applicable law, without alteration or modification, including without limitation the obligation to pay all amounts due thereunder as and when due, and (iii) the relative obligations of the applicable Reorganized Debtor and Counterparty arising under such agreements during such time shall not be excused, relieved or otherwise impaired by the rejection of such agreements. Upon the Effective Date, the automatic stay shall not apply to limit the respective rights or remedies of the Counterparties or the Reorganized Debtors under such agreements, and nothing in this Order or the Plan shall prevent, alter, or impair any rights of the Reorganized Debtors or the Counterparties from exercising any and all rights afforded under such agreement (including cessation of services under the agreements) in the event of non-performance or breach by the other party or parties during such period, and any disputes arising out of or relating to the

same shall be heard by the Bankruptcy Court or any other court of competent jurisdiction. Notwithstanding anything to the contrary herein or in the Plan, including language in Article V.B. of the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases with the Counterparties shall be Allowed in accordance with applicable law and shall be classified in accordance therewith.

25. For any Executory Contract or Unexpired Lease removed from or added to the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases after the date of this Confirmation Order, the Contract Objection Deadline shall be extended to the date that is twenty-one (21) days after the date of such removal or addition.

26. **Retention of Defenses.** Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in the Plan or this Confirmation Order shall prevent Sanchez Midstream Partners LP, Catarina Midstream, LLC, Sanchez Midstream Partners GP LLC, and Carnero G&P LLC (and its affiliates) from asserting any rights, defenses, and/or counterclaims against the Debtors and/or the Reorganized Debtors in defense of any Causes of Action retained by the Debtors and the Reorganized Debtors under the Plan and pursued by or on behalf of the Debtors and the Reorganized Debtors, including, but not limited to, any retained Causes of Action relating to the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1032]; *provided*, however, for purposes of clarification, this paragraph reserves such rights, defenses, and/or counterclaims solely to the extent asserted defensively, and nothing in this paragraph permits affirmative recovery from the Debtors or the Reorganized Debtors on account of any such rights, defenses, and/or counterclaims.

27. **<u>Release of Liens.</u>** Notwithstanding the language in Article VIII.E of the Plan, nothing in the Plan or this Confirmation Order shall discharge or release any valid, enforceable, and perfected Liens that constitute Permitted Liens under the DIP Order or similar Liens that arose after the Petition Date in connection with the Debtors' ordinary course operations, which Liens shall be fully preserved to the extent they continue to exist pursuant to applicable non-bankruptcy law until they are fully paid or otherwise satisfied.

28. Notwithstanding anything to the contrary herein or in the Plan, nothing in this Confirmation Order shall alter or impair the rights of any party to seek, in accordance with applicable law, the turnover from the Debtors or Reorganized Debtors of any property that is, as of the date such turnover is sought, (i) property of such party pursuant to applicable law, (ii) in the possession and control of the Debtors or the Reorganized Debtors, and (iii) is not in any respect property of the Estates or of the Reorganized Debtors, as applicable.

29. **<u>RBC.</u>** Notwithstanding anything in the Plan or this Confirmation Order to the contrary (i) on the Effective Date, or as soon as reasonably practicable thereafter the Reorganized Debtors shall pay all reasonable accrued and unpaid expenses of Thompson & Knight LLP, as counsel to Royal Bank of Canada ("<u>RBC</u>"), in RBC's various capacities, in accordance with the Final DIP Order, (ii) any rights or defenses of RBC arising from or relating to the Lien-Related Litigation are preserved and not prejudiced by Confirmation of the Plan, (iii) all rights, claims and obligations in favor of RBC in respect of any First-Out Obligations (as defined in the Collateral Trust Agreement and Final DIP Order), which may include claims for indemnification by RBC pursuant to the Final DIP Order or the First Out Documents (as defined in the Collateral Trust Agreement) to the extent such indemnification claims constitute First Out Obligations, shall not be discharged by the Plan and any liens or security interests for the benefit of RBC, including liens,

security interests, super-priority claims, or other elevated payment priorities granted for the benefit of RBC under the Final DIP Order, if any, in respect of the First Out Obligations shall not be released, shall be deemed enforceable by RBC, and shall be held with the same priority and extent against the Reorganized Debtors as such liens or claims had under the Collateral Trust Agreement or the Final DIP Order, as applicable, (iv) the satisfaction and discharge of the DIP Claims or treatment of any DIP Obligations (as defined in the Final DIP Order) pursuant to the Plan shall not impair or prejudice any rights of RBC pursuant to the Final DIP Order, the Collateral Trust Agreement or this Confirmation Order in respect of any First-Out Obligations, and (v) the Collateral Trust Agreement, the Prepetition Credit Agreement (as defined in the Final DIP Order), and the Final DIP Order each shall survive for purposes of enforcing the terms of this paragraph. For the avoidance of doubt, but without limiting the foregoing, (x) nothing herein shall prejudice the right of the Reorganized Debtors to contest whether any right, claim or obligation in favor of RBC is a valid First Out Obligation entitled to the treatment provided in clause (iii) above.

30. **Ongoing Royalty Audits.** Notwithstanding anything in the Plan (including Article VII.G) and this Confirmation Order to the contrary, claim numbers 357, 366, 390, 402, 403, 406, 409, 412, 417, 428, 432, 442, 506, 525, 526, 528, 529, 534, 535, 536, 538, 539, 540, 542, 544, 549, 550, 551, 556, 558, 564, 565, 566, 567, 568, 582 and 583 in the estate of SN EF Maverick, LLC (19-34516), which are the subject of ongoing data exchange between the Debtor SN EF Maverick, LLC and the claimants, may be amended within forty-five (45) days from the conclusion of the ongoing royalty review and audit, solely to reflect any results or conclusions related to that review and audit.

31. Notwithstanding anything in the Plan (including Article VII.G) and this Confirmation Order to the contrary, claim number 231 in the estate of Sanchez Energy Corporation

(19-34508), which is the subject of ongoing data exchange between the Debtors and the claimants, may be amended within forty-five (45) days from the conclusion of the ongoing review and audit, solely to reflect any results or conclusions related to that review and audit.

32. **Dimension Litigation.** For the avoidance of doubt and notwithstanding anything to the contrary in the Plan or this Confirmation Order, in the remanded state court action in the 165th Judicial District, Harris County, Texas, assigned cause number 2017-85247, styled Dimension Energy Services, LLC v. Sanchez Oil & Gas Corporation, Sanchez Energy Corporation and Sanchez Midstream Partners, LP (the "Dimension State Court Action"), none of the parties to said Dimension State Court Action are required to seek approval of any settlement or compromise of any causes of action asserted by Dimension Energy Services, LLC. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, this Court shall not retain jurisdiction over the causes of action asserted by and between the parties in the remanded Dimension State Court Action, and jurisdiction for the claims at issue in the Dimension State Court Action shall rest with the Harris County, Texas 165th Judicial District Court, or other court of competent jurisdiction.

33. **Texas Attorney General; Federal Leases.** Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after Confirmation; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or the Reorganized Debtors. Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

Notwithstanding any provision of the Plan or this Confirmation Order, the United States' setoff rights under federal law as recognized in section 553 of the Bankruptcy Code, and recoupment rights, shall be preserved and are unaffected. Nothing in this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or the Plan or to adjudicate any defense asserted under this Confirmation Order or the Plan. Nor shall anything in the Plan (1) affect the rights of the United States (including any agencies or subagencies thereof) to assert setoff and recoupment and such rights are expressly preserved; (2) be construed as a compromise or settlement of any claim, interest or cause of action of the United States; or (3) affect the entitlement of the United States to the payment of interest on its Allowed Claims.

34. **Federal Leases.** Moreover, nothing in the Plan shall affect the treatment of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government or involving federal land or minerals (collectively, the "Federal Lease(s)"). For the avoidance of doubt and without limiting the foregoing, any assumption, assignment, and/or transfer of any interests in the Federal Leases will be ineffective absent the consent of the United States. Nothing in the Plan shall be interpreted to set cure amounts or require the United States to novate, approve or consent to the assumption, sale, assignment and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law.

35. Moreover, nothing in the Plan shall be interpreted to release the Debtors from any reclamation, plugging and abandonment, or other operational requirement under applicable Federal law; to address or otherwise affect any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States, that must be

met by the Debtors or their successors and assigns on the Federal Leases going forward; or to impair audit rights. In addition, nothing in the Plan nullifies the United States' right to assert, against the Debtors and their estates, any decommissioning liability and/or claim arising from the Debtors' interest in any Federal Lease not assumed by the Debtors. Notwithstanding any provision to the contrary in the Plan, the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors and/or their successor(s) and assign(s) in full any additional monies owed by the Debtors prior to the assumption and/or assignment of the Federal Leases without those rights being adversely affected by these bankruptcy cases; and such rights shall be preserved in full as if this bankruptcy had not occurred. The Debtors and their successors and assigns will retain all defenses and/or rights, other than defenses and/or rights arising from these bankruptcy cases, to challenge any such determination: *provided, however*, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by the Department of the Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq. Nothing in the Plan or this Confirmation Order shall cause or otherwise be deemed to require any Holders of Claims receiving New Common Stock to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operations or management of the Debtors within the meaning of 42 U.S.C. § 9601(20)(F).

36. **Texas Taxing Authorities.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, any and all tax liens securing the property tax claims of Dimmit County, Maverick County, La Pryor Independent School District, Atascosa County, Bee

County, Cameron County LaSalle County, Cotulla ISD, Dewitt County, Dilley ISD, Duval County, Eagle Pass ISD, Freer ISD, Frio Hospital District, Goliad County, Goliad ISD Gonzales County, Harris County, Hidalgo County, Jackson County, Jim Wells CAD, Kenedy County, Lasara ISD, Matagorda County, Pearsall ISD, City of Pleasanton, Raymondville ISD, Roma ISD, Smith County, Jim Wells CAD, Starr County, Willacy County and Zavala County (the "Texas Taxing Authorities") for the 2020 tax year are retained. The Reorganized Debtors shall pay the 2020 tax claims of the Texas Taxing Authorities in the ordinary course of business and prior to delinquency under Texas law. In the event the 2020 taxes are not paid prior to delinquency as required under Texas law, penalties and interest shall accrue as provided under Texas law and the Texas Taxing Authorities are authorized to immediately commence any and all collection actions authorized under Texas law, in state court without further order of this Court. The Debtors or the Reorganized Debtors, as applicable, shall maintain any of their rights under Texas law to contest, protest, or appeal the 2020 tax claims of the Texas Taxing Authorities.

37. **Zavala CAD.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Reorganized Debtors shall pay the pre-petition tax claim of Zavala CAD in a manner consistent with 11 U.S.C. §1129(a)(9)(D) with applicable statutory interest pursuant to 11 U.S.C. §§506(b) and 511. The pre-petition tax lien shall be retained until said taxes are paid in full. In the event the Zavala CAD pre-petition claim is not paid consistent with this provision, penalties and interest shall accrue as provided under Texas law and Zavala CAD is authorized to immediately commence any and all collection actions authorized under Texas law in state court without further order of this Court. The Debtors or the Reorganized Debtors, as applicable, shall maintain any of their rights under Texas law to contest, protest, or appeal the tax claims of Zavala CAD.

Case 23-90085 Document 1153 Filed in TXSB on 04/26/22 Page 24 of 1867

38. **Harrison and Cathexis.** Nothing in the Plan or this Confirmation Order, including, without limitation, the provisions within Articles V and VIII of the Plan, shall reduce, expand, amend, or supplement the rights, obligations, claims, and defenses, of (i) DJH Minerals, LP, DJH Ranching, LP, Cathexis Royalties & Minerals, LP, and Cat HIL Piloncillo, LLC, or any of the foregoing's successors or assignees (collectively, the "Catarina Lessors") or (ii) the Debtors, the Reorganized Debtors, or their successors or assignees under the Catarina Agreements (as defined below); *provided further* that to the extent, as of the Petition Date, a Catarina Lessor held a validly perfected and unavoidable lien, encumbrance or interest arising under a Catarina Agreement—including reversionary interests—such lien, encumbrance or interest shall not be modified or otherwise altered by anything in the Plan or Confirmation Order. Any Cure Claims under the Catarina Agreements shall be resolved in accordance with the Plan; *provided, however*, that nothing in this Confirmation Order or the Plan shall be construed as making a determination that any Catarina Agreement is or is not an Executory Contract, and all parties expressly reserve their rights with respect to such determination. For purposes of this paragraph, the term "Catarina Agreements" means each of the following agreements, in each case, as amended, supplemented and in effect on the date hereof: (i) the Oil and Gas Lease, dated as of May 12, 2010 (as amended), by and between DJH Minerals, LP, DJH Ranching, LP, Cathexis Royalties & Minerals, LP, Cat HIL Piloncillo, LLC, and SN Catarina, LLC (the "Lease"); (ii) that certain First Amended and Restated Water Injection Agreement, dated as of December 1, 2015, by and between DJH Ranching, LP, Cat HIL Piloncillo, LLC, and SN Catarina, LLC; (iii) those certain Voluntary Pooling Agreements related to the Lease; (iv) that certain Guaranty, dated as of June 30, 2014, with Sanchez Energy Corporation; (v) that certain Guaranty, dated as of June 30, 2014, with SN Operating, LLC; (vi) that Mineral Deed, dated as of May 12, 2010, with P Ranch Working Interest,

LLC; and (vii) that certain Conveyance of Non-Participating Royalty Interest, dated as of May 12, 2010, with P Ranch Royalty Interest, LLC.

39. **Amendment of New Organizational Documents.** At the Effective Date, the Reorganized Debtors and the Reorganized SN Board are authorized and directed to amend, restate, and file with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation or formation the Reorganized Debtors' respective New Organizational Documents and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation, the New Organizational Documents, and the organizational documents of the non-Debtor subsidiaries, as applicable.

40. **Abandonment.** All of the rights of the Debtors or the Reorganized Debtors, as applicable, to abandon property prior to or after the Effective Date pursuant to section 554 of the Bankruptcy Code are preserved, and the Debtors or the Reorganized Debtors, as applicable, may seek to abandon any such property on or after the Effective Date.

41. Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order shall be immediately effective and enforceable upon its entry.

42. The Debtors and the Reorganized Debtors are authorized to take all actions necessary to effectuate the relief granted in this Confirmation Order in accordance with the Plan.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Confirmation Order.

Signed: April 30, 2020

Marvin Isgur
United States Bankruptcy Judge

# <u>Exhibit 1</u>

## Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**


**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

\- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

\- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*


Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ... 1**

A. Defined Terms ... 1
B. Rules of Interpretation ... 11
C. Computation of Time ... 12
D. Governing Law ... 12
E. Reference to Monetary Figures ... 12
F. Reference to the Debtors or the Reorganized Debtors ... 12
G. Controlling Document ... 12

**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ... 12**

A. Administrative Claims ... 12
B. Professional Fee Claims ... 13
C. Priority Tax Claims ... 14
D. Statutory Fees ... 14

**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ... 14**

A. Formation of Debtor Group for Convenience Purposes Only ... 14
B. Classification of Claims and Interests ... 15
C. Treatment of Classes of Claims and Interests ... 15
D. Special Provision Governing Unimpaired Claims ... 18
E. Elimination of Vacant Classes ... 18
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ... 18
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 19
H. Intercompany Interests ... 19
I. Subordinated Claims and Interests ... 19

**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ... 19**

A. General Settlement of Claims, Interests, and Causes of Action ... 19
B. Restructuring Transactions ... 19
C. Sources of Consideration for Plan of Reorganization Distributions ... 20
D. Lien-Related Litigation ... 21
E. Continuation of Gavilan Proceeding ... 22
F. Corporate Existence ... 22
G. Vesting of Assets in the Reorganized Debtors ... 22
H. Corporate Action ... 23
I. New Organizational Documents ... 23
J. Directors and Officers of Reorganized SN ... 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ... 23
L. Management Incentive Plan ... 24
M. Effectuating Documents; Further Transactions ... 24
N. Preservation of Causes of Action ... 24
O. Exemption from Registration Requirements ... 24
P. Cancellation of Instruments, Certificates, and Other Documents ... 25
Q. Section 1146(a) Exemption ... 25
R. DIP Agent Fees and Expenses ... 26

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 26**

A. Assumption or Rejection of Executory Contracts and Unexpired Leases ... 26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ... 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ... 27
D. Indemnification Obligations ... 28
E. Insurance Policies ... 28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ... 28
G. Contracts and Leases After the Petition Date ... 28
H. Reservation of Rights ... 28

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ... 29**

A. Distributions on Account of Claims Allowed as of the Effective Date ... 29
B. Rights and Powers of the Disbursing Agent ... 29
C. Special Rules for Distributions to Holders of Disputed Claims ... 29

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....................30
E. Claims Paid or Payable by Third Parties ....................32
F. Setoffs ....................33
G. Allocation Between Principal and Accrued Interest ....................33
H. No Postpetition Interest on Claims ....................33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....................34**

A. Allowance of Claims ....................34
B. Claims Administration Responsibilities ....................34
C. Estimation of Claims ....................34
D. Adjustment to Claims Without Objection ....................35
E. Time to File Objections to Claims ....................35
F. Disallowance of Claims ....................35
G. Amendments to Claims ....................35
H. No Distributions Pending Allowance ....................35
I. Distributions After Allowance ....................35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....................36**

A. Discharge of Claims and Termination of Interests ....................36
B. Exculpation ....................36
C. Injunction ....................36
D. Protection Against Discriminatory Treatment ....................37
E. Release of Liens ....................37
F. Reimbursement or Contribution ....................38
G. Recoupment ....................38
H. Subordination Rights ....................38

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....................38**

A. Deadline for Occurrence of the Effective Date ....................38
B. Conditions Precedent to the Effective Date of the Plan ....................38
C. Waiver of Conditions ....................39
D. Effect of Non-Occurrence of Conditions to Consummation ....................39
E. Substantial Consummation ....................39

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....................39**

A. Modification of Plan ....................39
B. Effect of Confirmation on Modifications ....................39
C. Revocation or Withdrawal of Plan ....................39

**ARTICLE XI. RETENTION OF JURISDICTION ....................40**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....................41**

A. Immediate Binding Effect ....................41
B. Additional Documents ....................41
C. Dissolution of the Creditors' Committee ....................42
D. Payment of Statutory Fees ....................42
E. Reservation of Rights ....................42
F. Successors and Assigns ....................42
G. Service of Documents ....................43
H. Term of Injunctions or Stays ....................43
I. Entire Agreement ....................44
J. Plan Supplement ....................44
K. Non-Severability ....................44
L. Votes Solicited in Good Faith ....................44
M. Closing of Chapter 11 Cases ....................44
N. Waiver or Estoppel ....................44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

63. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

64. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

65. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

66. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

67. "*Gavilan*" means Gavilan Resources, LLC.

68. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

69. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

70. "*Holder*" means an entity holding a Claim or Interest, as applicable.

71. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

73. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

74. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date; (ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

75. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

76. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

77. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

Case 19-34508 Document 1253 Filed in TXSB on 04/30/20 Page 36 of 73 867

78. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

79. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

81. "*Lien-Related Litigation*" means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

82. "*Lien-Related Litigation Creditor Representative*" means a representative, as selected by the Creditors' Committee, of general unsecured creditors in the Lien-Related Litigation.

83. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

84. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

85. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

86. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

87. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

88. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

89. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

90. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

92. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

93. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

94. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

95. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

96. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

97. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

98. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

99. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

100. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

102. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

103. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

104. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

105. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

106. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

107. "*Professional Fee Settlement Reserve Amount*" means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

108. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

109. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

111. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

112. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

113. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

114. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

115. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

116. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

117. "*Sanchez Parties*" means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

118. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by

the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

120. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

121. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

123. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

124. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

125. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

126. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

127. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

128. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

129. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

130. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

131. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

132. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

133. "*SN*" means Sanchez Energy Corporation.

134. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

135. "*SOG*" means Sanchez Oil & Gas Corporation.

136. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

137. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

138. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

139. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

140. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

141. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

142. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

143. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders,

rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and

the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. Final Fee Applications

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided*

that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any

Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New

Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Confirmation Date by the Bankruptcy Court according to the following timeline:

- Phase 1*:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- Phase 2*:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Effective Date.

- Phase 3*:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- Post-Effective Date Equity Distribution Allocations*:* The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ

professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity

Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected

Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned**

**shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory

or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

Case 19-34508 Document 1253 Filed on 04/30/20 in TXSB Page 39 of 48

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in

the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be

distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery

on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest

shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

**ARTICLE VIII.**
**EFFECT OF CONFIRMATION OF THE PLAN**

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or**

**(3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of

Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Case 23-90007 Document 1915 Filed in TXSB on 07/10/22 Page 794 of 1867

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: ECF No. 1248** |

**ORDER GRANTING EMERGENCY MOTION MODIFYING PARAGRAPH 17 OF THE ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Upon the motion (the "Motion")[2] of the above-captioned Debtors (collectively, the "Debtors") for entry of an order (this "Order") modifying paragraph 17 of the Confirmation Order for the limited purpose of extending the Contract Objection Deadline (as defined in the Confirmation Order) from May 20, 2020 to June 22, 2020 with respect to specified counterparties and executory contracts, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the circumstances warrant the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

modification proposed by the Debtors, and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion was appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; this Court ORDERS:

1. The Confirmation Order is hereby modified by deleting paragraph 17 thereof in its entirety and replacing it with the following:

> 17. **Executory Contracts and Unexpired Leases**. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties and except as expressly otherwise provided in paragraphs 23-25 of this Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease is May 20, 2020, or such later date as the Debtors or Reorganized Debtors and the applicable party may agree (the "**Contract Objection Deadline**"), which may be after the Effective Date; *provided that* with respect to those parties identified on **Exhibit 2** and those Executory Contracts identified on **Exhibit 3**, the Contract Objection Deadline is June 22, 2020 or such later date as the Debtors or Reorganized Debtors and the applicable party may agree. Any Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease that is filed prior to the Contract Objection Deadline shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection, as applicable, of such Executory Contract or Unexpired Lease or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty; *provided that* after the Effective Date, the Reorganized Debtors may settle any dispute regarding any Cure Claim without any further notice to any party or any action, order, or approval of this Court.

2. **Exhibits A** and **B** to the Motion are deemed annexed to the Confirmation Order as **Exhibits 2** and **3**, respectively.



1" = "1" "25885938v.1" "" 25885938v.1

3. The requirements set forth in Local Rule 9013-1 are satisfied by the contents of the Motion.

4. The terms and conditions of this Order shall be immediately effective and enforceable upon entry.

Dated:

______________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE



1" = "1" "25885938v.1" "" 25885938v.1

**EXHIBIT A**

**Specified Contract Counterparties**

- Occidental Petroleum Corporation and Western Midstream Partners, LP and their respective direct and indirect subsidiaries and affiliates (collectively, the "Occidental and Western Parties"), including:[1]
    - Anadarko Petroleum Corporation
    - Anadarko Energy Services Company
    - Anadarko E&P Onshore, LLC
    - Anadarko E&P Company LP
    - Kerr-McGee Oil & Gas Onshore LP
    - Kerr-McGee Oil & Gas Onshore, LLC
    - Springfield Pipeline, LLC
    - WGR Operating, LP
    - Western Gas Operating, LLC
    - Western Gas Partners, LP
    - Western Midstream Partners, LP
- Marathon Oil EF, LLC
- Mitsui E&P Texas LP
- Mitsui & Co. Energy Marketing & Services (USA), Inc.
- Eagle Ford TX LP
- Gavilan Resources, LLC
- GSO ST Holdings LP, and each of its affiliates that have a contractual relationship with the Debtors
- GSO ST Holdings Associates LLC, and each of its affiliates that have a contractual relationship with the Debtors
- SN EF UnSub GP, LLC
- SN EF UnSub LP
- SN EF UnSub Holdings, LLC
- Catarina Midstream, LLC
- Plains South Texas Gathering, LLC and Plains Gas Solutions, LLC
- TPL SouthTex Processing Company LP

---

[1] The Occidental and Western Parties are provided an extension, through the Contract Objection Deadline, to raise any objections with respect to the Debtors' proposed rejection of all contracts listed on the Schedule of Rejected Executory Contracts and Unexpired Leases that name any of the Occidental and Western Parties and with respect to the counterparties listed below (solely with respect to the contracts identified below), or any other agreements that amend, supplement, or otherwise are related to or are allegedly integrated with such contracts; *provided* that (a) nothing contained herein shall confer upon the Occidental and Western Parties standing to object to the Debtors' proposed assumption or rejection of any such contracts and all parties' rights to raise any and all claims or defenses to such objections are expressly reserved, and (b) nothing contained in this footnote shall limit the rights of Gavilan Resources, LLC to object, through June 22, 2020, to the Debtors' proposed assumption or rejection of any contracts to which it is a party.

- Gavilan Resources, LLC (with respect to the Joint Development Agreement, Crude Oil Production Marketing Agreement, Residue Gas Marketing Agreement, and Natural Gas Liquids Marketing Agreement and any amendments to any of these agreements only).

- BP Oil Supply, a division of BP Products North America, Inc. (with respect to a certain "Amendment to the Purchase Agreement" and any other agreement to which it and any of the above-referenced entities are jointly listed as counterparties).

- TPL SouthTex Transmission Company LP
- Carnero G&P LLC and its affiliates
- Hilcorp Energy I, L.P.
- Archrock Partners Operation LLC, Archrock Sevices LP and their affiliates
- Seco Pipeline, LLC
- Sanchez Midstream Partners LP
- Sanchez Midstream Partners GP LLC
- Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)
- Targa Resources Corporation
- B.L. Stanley, Ltd., Worthey Properties, Ltd. Robert Edward Worthey Trust, Teressa Kountz Trust and Tonya Hedleston Trust

**EXHIBIT B**

**Specified Contracts**

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Frio LaSalle Pipeline, LP | Fourth Amendment to Gas Gathering Agreement |
| SN Palmetto, LLC | Marathon Oil EF LLC | Marketing Agreement |
| SN Cotulla Assets, LLC | Eagle Ford Gathering LLC | Amendment to Gas Services Agreement |
| SN Marquis, LLC | American Midstream (Lavaca) LLC | Firm Gas Gathering Agreement |
| SN Cotulla Assets, LLC | Regency Field Services LLC | Natural Gas Sale and Purchase Contract |
| SN Cotulla Assets, LLC | Frio Lasalle Pipeline LP | Letter Agreement |
| SN Catarina, LLC | Catarina Midstream, LLC | Firm Gathering and Processing Agreement |
| SN Cotulla Assets, LLC | ETC Field Services LLC | First Amendment to Gas Gathering Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>Shell Western E&P | Gathering and Natural Gas Services Agreement |
| SN Catarina, LLC | Houston Pipe Line Company, LP<br>Shell Western E&P<br>SWEPI, LP<br>Houston Pipe Line Company LP | Intrastate Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | Houston Pipe Line Company LP<br>SWEPI LP d/b/a Shell Western E&P<br>Houston Pipe Line Company LP | Interruptible Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>Shell Western E&P | Gathering and Natural Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP dba Shell Western E&P<br>Houston Pipe Line Company LP | Intrastate Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Eagle Ford<br>SWEPI LP | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford Gathering LLC | Interconnect Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Velocity South Texas Gathering, LLC<br>Velocity Midstream Partners, LLC | Oil Gathering Agreement |
| SN Catarina, LLC | Etc Texas Pipeline, Ltd<br>SWEPI LP, dba Shell Western E&P | Gathering and Processing Agreement |
| SN Catarina, LLC | Plains Gas Solutions, LLC<br>SWEPI LP | Interruptible Condensate Stabilization Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>SWEPI LP, dba Shell Western E&P | Second Amendment to Individual Transaction Confirmation |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>SWEPI LP, dba Shell Western E&P | First Amendment to Individual Transaction Confirmation |
| SN Catarina, LLC | Gazelle Transportation Inc.<br>Shell Exploration & Production Company (SEPCOo) on behalf of SWEPI LP | Sale to and Purchase from Gazelle Transportation, Inc. |
| SN Catarina, LLC | Shell Exploration & Production Company (SEPCO) on behalf of SWEPI LP<br>Gazelle Transportation Inc. | Amendment to Purchase and Sale Agreement |
| SN Catarina, LLC | Gazelle Transportation<br>Shell Exploration & Production Company (SEPCO) on behalf of SWEPI LP | Amendment to Purchase and Sale Agreement |
| SN Catarina, LLC | Jag Energy USA, Inc.<br>SWEPI LP | Natural Gas Liquids. Commercial Terms Confirmation |
| SN Catarina, LLC | Eagle Ford Gathering LLC | First Amendment to Gas Services Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Extension Rider for License Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Anadarko E&P Onshore, LLC<br>Eagle Ford Gathering, LLC | Gas Service Agreement |
| SN Catarina, LLC | Axis Marketing, LLC | Raw Make Purchase/Sales Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | TPL Southtex Processing Company LP by TPL Southtex Pipeline Company LLC, its general partner | Amendment Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP by TPL Southtex Pipeline Company LLC, its general partner | First Amendment to Firm Gas Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP | Firm Gas Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP | Firm Gas Gathering Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP<br>Carnero Processing, LLC | Omnibus Amendment to the Gathering LLC and the Processing LLC Agreement |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | First Amendment to Gas Gathering Agreement |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | Second Agreement Gas Services |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | Third Amendment to Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford Gathering LLC | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP, Doing Business As Shell Western E&P<br>Etc Texas Pipeline, Ltd | Individual Transaction Confirmation to Gathering and Processing Agreement |
| SN Catarina, LLC | SWEPI LP, doing business as<br>SWEPI LP, doing business as Shell Western E&P<br>ETC Texas Pipeline, Ltd. | Gathering and Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to the Purchase Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation<br>SN Catarina, LLC | Shell Trading (US) Company | Amendment 2 to the Purchase Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to the Purchase Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Crude Oil Purchase Agreement |
| SN Catarina, LLC | Seco Pipeline, LLC | Firm Transportation Service Agreement |
| SN EF Maverick, LLC | Kerr-Mcgee Oil & Gas Onshore, LP<br>Anadarko E&P Onshore, LLC | Specified Midstream Assumption Agreement |
| SN EF Maverick, LLC | Bp Products North America, Inc.<br>Anadarko E&P Onshore, LLC | First Amendment to Service Contract |
| SN EF Maverick, LLC | Bp Oil Supply, a division of BP Products North America, Inc. | Amendment to the Purchase Agreement |
| SN EF Maverick, LLC | BP Products North America, Inc.<br>Anadarko E&P Onshore, LLC | Crude Oil Purchase Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Double Eagle Pipeline, LLC C/O Copano Double Eagle, LLC<br>Kinder Morgan Crude & Condensate, LLC | Throughput and Deficiency Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC, F.K.A. Anadarko E&P Company, LP<br>WGR Operating, LP by Western Gas Operating, LLC, its General Partner | Treating and Handling Fees - Brasada Gas Processing Plant |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 1 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 2 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 3 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 4 |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Wgr Operating, LP by Western Gas Operating, LLC, its General Partner<br>Anadarko E&P Company, LP | Gas Processing Agreement |
| SN EF Maverick, LLC<br>SN Catarina, LLC | WGR Operating, LP | WGR Gas Agreement |
| SN EF Maverick, LLC | TPL SouthTex Processing Company, LP by TPL Southtex Processing Company, LLC, its General Partner | First Amendment to the Interruptible Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Firm Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company, LP | Interruptible Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP By Net General Partners, LLC, Its General Partner | First Amendment to Firm Agreement NGPA Sec. 311 Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP by Net General Partners, LLC, its General Partner | First Amendment to Firm Intrastate Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP | Firm NGPA Section 311 Gas Transportation Agreement |
| SN EF Maverick, LLC | Eagle Ford Midstream, LP<br>Anadarko Energy Services Company | Firm Intrastate Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP<br>Cima Energy, Ltd<br>Upstream Energy Services, LLC | Gas Gathering Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | First Amendment to Gas Gathering Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Enterprise Products Operating, LLC, By Enterprise Products Olpgp, Inc. | Purchase Agreement |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC<br>Anadarko Energy Services Company | Transportation Services Agreement |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC, By Enterprise Products Olpgp, Inc.<br>Anadarko Petroleum Corporation | First Amendment to Gas Gathering, Processing and Purchase Contract |
| SN EF Maverick, LLC | Anadarko Petroleum Corporation<br>Enterprise South Texas Gathering, LP | Second Amendment to Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC | Anadarko Petroleum Corporation<br>Enterprise South Texas Gathering, LP | Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC | Anadarko E&P Company, LP, c/o Anadarko Petroleum Corporation<br>Enterprise Hydrocarbons L.P., by Enterprise Products Operating, LLC, its general partner | Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise Texas Pipeline, LLC | Interruptible Gas Transportation Agreement for Intrastate Service |
| SN EF Maverick, LLC | Enterprise Texas Pipeline, LLC | Interruptible Gas Transportation Agreement for NGPA Section 311 Service |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Enterprise Hydrocarbons LP, by Enterprise Products Operating | Second Amendment to Gas Processing Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | LLC, its general partner, by Enterprise Products OLPGP Inc., its sole manager | |
| SN EF Maverick, LLC | Enterprise Hydrocarbons, LP; by Enterprise Products Operating, LLC; by Enterprise Products OLPGP, Inc. | Third Amendment to Gas Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>ETC Texas Pipeline, Ltd; by LG Pl, LLC | Individual Transaction Confirmation |
| SN EF Maverick, LLC | ETC Texas Pipeline, Ltd.<br>Anadarko E&P Company LP | Gathering and Processing Agreement |
| SN EF Maverick, LLC | ETC Texas Pipeline, Ltd.; by LG PL, LLC<br>Anadarko E&P Company LP | Second Amendment to Amended and Restated Individual Transaction Confirmation |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company, LP | First Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company, LP | Second Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore LLC<br>Texas Pipeline, LLC | Third Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company LP | Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Texas Pipeline LLC | Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Texas Pipeline, LLC, By Howard Midstream Energy Partners, LLC<br>Allocation Specialists, Ltd., By Petroleum Documentation, LLC | NGL Bank Service Agreement |
| SN EF Maverick, LLC | Amid Crude Trucking, LLC | Truck Purchase Agreement |
| SN EF Maverick, LLC | Anadarko E&P Company, LP<br>Trimac Transportation Central, Inc. | Motor Transportation Contract |
| SN EF Maverick, LLC | Dupre Logistics, LLC | Truck Transportation Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Plains Gas Solutions, LLC<br>Anadarko E&P Onshore, LLC | First Amendment to Firm Condensate Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Plains Gas Solutions, LLC | Condensate Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement |
| SN EF Maverick, LLC | Plains South Texas Gathering, LLC<br>Anadarko E&P Onshore, LLC | Shipping Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Crude Oil Production Marketing Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Crude Oil Production Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | Maverick Crude Oil Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Maverick Residue Gas Marketing Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | |
| SN EF Maverick, LLC | Sm Energy Company<br>Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC | Maverick Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC , f/k/a Anadarko E&P Company LP<br>Anadarko Energy Services Company<br>Sm Energy Company | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC , f/k/a Anadarko E&P Company LP<br>Anadarko Energy Services Company<br>SM Energy Company | Maverick Oil Production Marketing Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Anadarko Energy Services Company<br>Kerr-Mcgee Oil & Gas Onshore LP | First Amendment to the Retained Marketing Contracts Services Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP | Assignment and Consent to Assignment Agreement |
| SN EF Maverick, LLC<br>Sanchez Energy Corporation | Anadarko E&P Onshore, LLC<br>Kerr-Mcgee Oil & Gas Onshore, LP | Retained Midstream Contracts Services Agreement |
| SN Catarina, LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation | Anadarko E&P Onshore LLC<br>Kerr-Mcgee Oil & Gas Onshore LP<br>Anadarko Energy Services Company | Retained Marketing Contracts Services Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Kerr-Mcgee Oil & Gas Onshore LP<br>Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC | Second Amendment to the Retained Marketing Contracts Services Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | TPL Southtex Transmission Company, LP | Interruptible Interstate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | TPL Southtex Transmission Company, LP | Interruptible Interstate Gas Transportation Service Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Agreement to Amend Gas Gathering Agreements |
| SN EF Maverick, LLC | Anadarko E&P Onshore LLC Springfield Pipeline LLC | Attachment to Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC Springfield Pipeline, LLC | Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Tauber Oil Company | Purchase Contract |
| SN EF Maverick, LLC | Tauber Oil Company | Sales Contract |
| SN EF Maverick, LLC | WGR Operating, LP | Confirmation for Delivery |
| Sanchez Energy Corporation | WGR Operating, LP | Master Agreement for Purchase, Sale or Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | Kinder Morgan Tejas Pipeline, LLC | Confirmation Email |
| SN EF Maverick, LLC | Kinder Morgan Tejas Pipeline, LLC | Confirmation Email |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | WTG Gas Marketing, Inc. | Transaction Confirmation for Immediate Delivery |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Techgen SA De CV | Transaction Confirmation |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Interconnect Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Memorandum of Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Chesapeake Energy Marketing, Inc. | First Amendment to Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | EXCOo Operating Company, LP<br>Chesapeake Energy Marketing, LLC | Second Amendment to Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Chesapeake Energy Marketing, Inc. | Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | Flint Hills Resources, LP | Purchase Agreement |
| SN Cotulla Assets, LLC | Flint Hills Resources, LP | Purchase Agreement |
| SN Cotulla Assets, LLC | Enterprise Hydrocarbons, LP<br>EXCO Operating Company, LP | Gas Processing Agreement |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Mockingbird Midstream Gas Services, LLC | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC<br>Buffco Production, Inc. | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC<br>Buffco Production, Inc. | Gas Gathering Contract |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 5 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 6 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 7 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 10 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 11 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 12 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |

Case 21-30085 Document 1263 Filed in TXSB on 07/12/22 Page 825 of 1867

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 5 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 6 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 7 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 8 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 9 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 13 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 14 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 15 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 16 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 17 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 18 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 19 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 20 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 21 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 22 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 23 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 24 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 25 to Purchase Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 26 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 27 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 28 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 29 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 30 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| SN Cotulla Assets, LLC | Trafigura Trading, LLC | Amendment to Purchase Agreement |
| SN Cotulla Assets, LLC | Buffco Production, Inc.<br>Upstream Energy Services, LP | Natural Gas Marketing, Transportation and Processing Agency Agreement |
| SN Cotulla Assets, LLC | Upstream Energy Services, LLC | Natural Gas Marketing, Transportation and Processing Agency Agreement Amended |
| SN Cotulla Assets, LLC | Upstream Energy Services, LLC | Natural Gas Marketing, Transportation and Processing Agency Agreement |
| SN Catarina, LLC | BASF Intertrade Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | BASF Intertrade Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | ENGIE Energy Marketing Na, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | ENGIE Energy Marketing Na, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Anadarko Energy Services Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Air Liquide Large Industries US, LP | Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | ARM Energy Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | BG Energy Merchants, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC<br>SN Catarina, LLC | BP Energy Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | CIMA Energy, Ltd | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Coahuila Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Conocophillips Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Conocophillips Company | Special Provisions to NAESB Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Direct Energy Business Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | DTE Energy Trading, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Hartree Partners, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Houston Pipe Line Company, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Howard Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Koch Energy Services, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Kinder Morgan Texas Pipeline, LLC<br>Kinder Morgan Tejas Pipeline, LLC | Amendment to Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Kinder Morgan Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Macquarie Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Mercuria Energy America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Mmgs, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | WTG Gas Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Occidental Energy Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Pacific Summit Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Petrochina International (America), Inc | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Repsol Energy North America Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Sempra Gas & Power Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Sempra Gas & Power Marketing, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC Sanchez Energy Corporation | Shell Energy North America (US), LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Targa Gas Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tenaska Marketing Ventures | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tenaska Marketing Ventures | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trafigura Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trafigura Trading, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trailstone NA Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tripolarity Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Twin Eagle Resource Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | United Energy Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | BP Energy Comopany | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | Kinder Morgan Texas Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | Texla Energy Management, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Occidental Energy Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Master Agreement for Purchase, Sale or Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | Air Liquide Large Industries US, LP | Master Agreement for Purchase, Sale and Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | ARM Energy Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | BP Energy Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Calpine Energy Services, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | CIMA Energy, Ltd | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Coahuila Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Cokinos Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Conocophillips Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Conocophillips Company | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Diamond Shamrock Refining Company, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Direct Energy Business Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | DTE Energy Trading, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Hartree Partners, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Houston Pipe Line Comapny, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Koch Energy Services, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Kinder Morgan Texas Pipeline, LLC<br>Kinder Morgan Texas Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Macquarie Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mercuria Energy America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mitsui & Co. Energy Marketing And Services (USA), Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | WTG Gas Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Pacific Summit Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Petrochina International (America), Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Sempra Gas & Power Markering,LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Sempra Gas & Power Marketing, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Shell Energy North America (US), LP | Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | | |
| SN EF Maverick, LLC | Superior Natural Gas Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Superior Natural Gas Corporation | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Techgen SA DE CV | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tenaska Marketing Ventures | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tenaska Marketing Ventures | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trafigura Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trafigura Trading, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trailstone Na Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tripolarity Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Twin Eagle Resource Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | United Energy Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Valero Refining - Texas, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Targa Gas Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| Sanchez Energy Corporation | Tenaris Global Services (USA) Corporation | Agreement For The Provision Of Goods |
| SN Cotulla Assets, LLC | EP Energy E&P Company, LP | Letter Agreement to Purchase Oil and Gas Interests |
| Sanchez Energy Corporation | SN Midstream, LLC<br>Sanchez Midstream Partners LP | Gathering Letter Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | NGL Crude Terminals, LLC | Letter Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | Catarina Midstream, LLC | Amendment No.1 to Firm Gathering and Processing Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Firm Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Memorandum of Firm Gas Gathering Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Firm Gas Gathering, Processing, and Purchasing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX, LP<br>Carnero G&P, LLC | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Memorandum Of Agreement Relating To Firm Gas Gathering Agreement |
| SN EF Maverick, LLC | Venado EF L.P. | Approval Letter to Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC<br>Venado EF, L.P | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Venado EF, L.P<br>Carnero G&P, LLC | Memorandum of Agreement |
| SN EF Maverick, LLC | Mitsui E&P Texas, LP | Take-In-Kind Letter Agreement with Mitsui |
| SN EF Maverick, LLC | Mitsui E&P Texas, LP<br>Carnero G&P, LLC | Letter Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Memorandum of Agreement |
| SN Catarina, LLC | Nextera Energy Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mitsui & Co. Energy Marketing And Services (USA), Inc. | Amendment to Special Provisions to Base Contract |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | | for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Nextera Energy Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Palmetto LLC | Marathon Oil EF LLC | Marketing Agreement (Oil-Gas) |
| SN EF Maverick, LLC | Enterprise Hydrocarbons LP | Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise Hydrocarbons LP | Amendment No. 2 to Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise South Texas Gathering LP | Amendment No. 2 to Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Enterprise South Texas Gathering LP<br>Anadarko Petroleum Corporation | Gas Gathering, Processing, and Purchase Contract |
| SN EF Maverick, LLC | Jag Energy USA, Inc. | Purchase Order |
| SN Marquis, LLC | Lonestar Resources US Inc. | Amendment No. 1 to Purchase and Sale Agreement |
| SN Catarina, LLC | WWM Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | WWM Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Total Gas & Power North America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC<br>SN EF Maverick, LLC | SN EF Maverick, LLC<br>SN Catarina, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Springfield Pipeline LLC<br>Anadarko E&P Onshore LLC | Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Total Gas & Power North America, Inc. | Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Central Inc.<br>Anadarko E&P Company LP | Motor Transportation Contract |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Central Inc.<br>Anadarko E&P Onshore LLC | Revised Appendix A |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Inc.<br>Anadarko E&P Onshore LLC | Revised Appendix A |
| SN Cotulla Assets, LLC | EP Energy E&P Company LP | Letter Agreement Re Agreement to Purchase Oil & Gas Interests |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Exco Operating Company LP<br>Enterprise Hydrocarbons LP | Base Contract for Sale and Purchase of Natural Gas |
| Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC<br>SN EF Maverick, LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC | Anadarko Energy Services Company<br>Kerr Mcgee Oil & Gas Onshore LP<br>Anadarko E&P Onshore LLC<br>Anadarko Energy Services Company<br>Kerr Mcgee Oil & Gas Onshore LP<br>Anadarko E&P Onshore LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation | Marketing Transition Services Agreement |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Carnero G&P LLC<br>SN EF Unsub, LP | Memorandum of Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Eagle Ford TX LP | Letter Agreement Re: Gas Agreements |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Carnero G&P LLC<br>Eagle Ford TX LP | Memorandum of Agreement |
| SN EF Maverick, LLC | Venado EF LP | Letter Agreement Re: Gas Agreements |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment No. 1 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Oil Delivery Contract |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Downstream Marketing Agreements Assumption Agreement |
| SN Cotulla Assets, LLC | Flint Hills Resources LP | Purchase Agreement |
| SN Catarina, LLC | Catarina Midstream, LLC | Letter Re: Notice of Rate Adjustment |
| SN Catarina, LLC | Conocophillips Company | Transaction Confirmation |
| SN EF Maverick, LLC<br>SN Catarina, LLC<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Texas Pipeline Webb County Lean System LLC<br>SN Catarina, LLC<br>Texas Pipeline Webb County Lean System LLC<br>SN EF Maverick, LLC | Interruptible Transport Service Agreement |
| SN EF Maverick, LLC | BP Energy Company | Transaction Confirmation |
| SN EF Maverick, LLC | Conocophillips Company | Transaction Confirmation |
| SN EF Maverick, LLC | Eagle Ford Midstream, LP | Natural Gas Transportation Service Agreement |
| Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC | Shell Energy North America (US), L.P.<br>SN EF Maverick, LLC<br>Shell Energy North America (US), L.P.<br>SN EF Maverick, LLC | Transaction Confirmation |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | | |
| SN EF Maverick, LLC | Shell Trading (US) Company | STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment 002 to STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment 0001 to STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Twin Eagle Resource Management, LLC | Gas Transaction Confirmation |
| Sanchez Energy Corporation SN Catarina, LLC | Shell Trading (US) Company | Supply Agreement |
| Sanchez Energy Corporation SN Catarina, LLC | Shell Trading (US) Company | Price Amendment to Supply Agreement |
| Sanchez Energy Corporation SN Payables, LLC | Shell Trading (US) Company | Price Amendment to Supply Agreement |
| Sanchez Energy Corporation SN Catarina, LLC | Shell Trading (US) Company | Abstract of Amendment No. 3 to Price Contract |
| SN EF Maverick, LLC | BP Oil Supply | Oil Trade Confirmation |
| SN EF Maverick, LLC | BP Oil Supply | Trade Confirmation |
| SN EF Maverick, LLC | Flint Hills Resources LP | Purchase Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

# EXHIBIT 6

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ....... 1**
A. Defined Terms ....... 1
B. Rules of Interpretation ....... 11
C. Computation of Time ....... 12
D. Governing Law ....... 12
E. Reference to Monetary Figures ....... 12
F. Reference to the Debtors or the Reorganized Debtors ....... 12
G. Controlling Document ....... 12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ....... 12**
A. Administrative Claims ....... 12
B. Professional Fee Claims ....... 13
C. Priority Tax Claims ....... 14
D. Statutory Fees ....... 14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ....... 14**
A. Formation of Debtor Group for Convenience Purposes Only ....... 14
B. Classification of Claims and Interests ....... 15
C. Treatment of Classes of Claims and Interests ....... 15
D. Special Provision Governing Unimpaired Claims ....... 18
E. Elimination of Vacant Classes ....... 18
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ....... 18
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ....... 19
H. Intercompany Interests ....... 19
I. Subordinated Claims and Interests ....... 19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ....... 19**
A. General Settlement of Claims, Interests, and Causes of Action ....... 19
B. Restructuring Transactions ....... 19
C. Sources of Consideration for Plan of Reorganization Distributions ....... 20
D. Lien-Related Litigation ....... 21
E. Continuation of Gavilan Proceeding ....... 22
F. Corporate Existence ....... 22
G. Vesting of Assets in the Reorganized Debtors ....... 22
H. Corporate Action ....... 23
I. New Organizational Documents ....... 23
J. Directors and Officers of Reorganized SN ....... 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ....... 23
L. Management Incentive Plan ....... 24
M. Effectuating Documents; Further Transactions ....... 24
N. Preservation of Causes of Action ....... 24
O. Exemption from Registration Requirements ....... 24
P. Cancellation of Instruments, Certificates, and Other Documents ....... 25
Q. Section 1146(a) Exemption ....... 25
R. DIP Agent Fees and Expenses ....... 26
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....... 26**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ....... 26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ....... 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....... 27
D. Indemnification Obligations ....... 28
E. Insurance Policies ....... 28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ....... 28
G. Contracts and Leases After the Petition Date ....... 28
H. Reservation of Rights ....... 28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....... 29**
A. Distributions on Account of Claims Allowed as of the Effective Date ....... 29
B. Rights and Powers of the Disbursing Agent ....... 29
C. Special Rules for Distributions to Holders of Disputed Claims ....... 29

TABLE OF CONTENTS (CONT'D)

**Page**


D. Delivery of Distributions ....30
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....34**

A. Allowance of Claims ....34
B. Claims Administration Responsibilities ....34
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....35
E. Time to File Objections to Claims ....35
F. Disallowance of Claims ....35
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....36**

A. Discharge of Claims and Termination of Interests ....36
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....37
E. Release of Liens ....37
F. Reimbursement or Contribution ....38
G. Recoupment ....38
H. Subordination Rights ....38

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**

A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....39
D. Effect of Non-Occurrence of Conditions to Consummation ....39
E. Substantial Consummation ....39

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**

A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....40**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**

A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....42
D. Payment of Statutory Fees ....42
E. Reservation of Rights ....42
F. Successors and Assigns ....42
G. Service of Documents ....43
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....44
J. Plan Supplement ....44
K. Non-Severability ....44
L. Votes Solicited in Good Faith ....44
M. Closing of Chapter 11 Cases ....44
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

63. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

64. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

65. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

66. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

67. "*Gavilan*" means Gavilan Resources, LLC.

68. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

69. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

70. "*Holder*" means an entity holding a Claim or Interest, as applicable.

71. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

73. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

74. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date; (ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

75. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

76. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

77. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

78. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

79. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

81. "*Lien-Related Litigation*" means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

82. "*Lien-Related Litigation Creditor Representative*" means a representative, as selected by the Creditors' Committee, of general unsecured creditors in the Lien-Related Litigation.

83. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

84. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

85. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

86. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

87. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

88. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

89. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

90. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

92. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

93. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

94. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

95. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

96. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

97. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

98. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

99. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

100. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

102. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

103. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

104. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

105. “*Professional Fee Settlement*” means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

106. “*Professional Fee Settlement Reserve*” means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

107. “*Professional Fee Settlement Reserve Amount*” means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

108. “*Proof of Claim*” means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

109. “*Reinstated*” or “*Reinstatement*” means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110. “*Reorganized Boards*” means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

111. “*Reorganized Debtors*” means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

112. “*Reorganized SN*” means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

113. “*Reorganized SN Board*” means the initial board of directors of Reorganized SN.

114. “*Requisite DIP Lenders*” means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

115. “*Restructuring Fee*” has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors’ Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

116. “*Restructuring Transactions*” means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

117. “*Sanchez Parties*” means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

118. “*Schedule of Assumed Executory Contracts and Unexpired Leases*” means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by

the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

120. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

121. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

123. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

124. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

125. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

126. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

127. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

128. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

129. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

130. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

131. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

132. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

133. "*SN*" means Sanchez Energy Corporation.

134. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

135. "*SOG*" means Sanchez Oil & Gas Corporation.

136. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

137. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

138. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

139. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

140. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

141. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

142. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

143. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders,

rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and

the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. Final Fee Applications

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided*

that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any

Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New

Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Confirmation Date by the Bankruptcy Court according to the following timeline:

- *Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- *Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Effective Date.

- *Phase 3:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- *Post-Effective Date Equity Distribution Allocations:* The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ

professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity

Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected

Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned**

**shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory

or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in

the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be

distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery

on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest

shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

### A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

### B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

### C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "<u>Exculpation Claims</u>"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or**

**(3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of

Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 7

# (FILED UNDER SEAL)

# EXHIBIT 8

# (FILED UNDER SEAL)

# EXHIBIT 9

# (FILED UNDER SEAL)

# EXHIBIT 10

# (FILED UNDER SEAL)

# EXHIBIT 11

# (FILED UNDER SEAL)

# EXHIBIT 12

# (FILED UNDER SEAL)

# EXHIBIT 13

# (FILED UNDER SEAL)

# EXHIBIT 14

# (FILED UNDER SEAL)

# EXHIBIT 15

# (FILED UNDER SEAL)

# EXHIBIT 16

# (FILED UNDER SEAL)

# EXHIBIT 17

# (FILED UNDER SEAL)

# EXHIBIT 18

# (FILED UNDER SEAL)

# EXHIBIT 19

# (FILED UNDER SEAL)

# EXHIBIT 20

# (FILED UNDER SEAL)

# EXHIBIT 21

# (FILED UNDER SEAL)

# EXHIBIT 22

# (FILED UNDER SEAL)

# EXHIBIT 23

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |

**NOTICE OF FILING OF ASSET AND PURCHASE AGREEMENT**

**PLEASE TAKE NOTICE** that, on October 16, 2020, the Court entered the *Order (A) Approving Sale of Debtors' Assets, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 361] (the "**Sale Order**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file, in accordance with the Sale Order, the final and executed Asset and Purchase Agreement between the Debtors and Mesquite Energy, Inc., attached hereto as **Exhibit A**.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Dated: October 16, 2020
Houston, Texas

*/s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Brenda Funk (24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com
Brenda.Funk@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Garrett A. Fail (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Ray.Schrock@weil.com
Garrett.Fail@weil.com

*Attorneys for Debtors and Debtors in Possession*

**Certificate of Service**

I hereby certify that on October 16, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

# <u>Exhibit A</u>

## Asset and Purchase Agreement

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 16, 2020**

**by and between**

**GAVILAN RESOURCES, LLC and**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC,**

**as Sellers**

**and**

**MESQUITE ENERGY, INC.,**

**as Buyer**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS ....................................................................................1**

Section 1.01 *Definitions* .......................................................................1

**ARTICLE II PURCHASE AND SALE ...................................................................1**

Section 2.01 *Purchase and Sale of the Assets* .......................................1
Section 2.02 *Excluded Assets* ...............................................................4
Section 2.03 *Consideration* ..................................................................5
Section 2.04 *Adjustments to the Purchase Price* ...................................5
Section 2.05 *Closing* ............................................................................10
Section 2.06 *Final Settlement Statement* ..............................................12
Section 2.07 *Post-Closing Payments* .....................................................14
Section 2.08 *No Duplicative Effect; Methodologies* ..............................14
Section 2.09 *Purchase Price Deposit* .....................................................15
Section 2.10 *Division of Hydrocarbons* .................................................15
Section 2.11 *Division of Expenses; Burdens* ..........................................16
Section 2.12 *Preferential Purchase Rights* .............................................16
Section 2.13 *Consents to Assign* ..........................................................17
Section 2.14 *Consents for Leases and Purchased Contracts* .....................19
Section 2.15 *Assets Sold "As Is, Where Is"* ...........................................19
Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos* ........20

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS........................20**

Section 3.01 *Organization* ....................................................................20
Section 3.02 *Authority and Authorization* ..............................................20
Section 3.03 *Enforceability* ..................................................................21
Section 3.04 *Conflicts* ..........................................................................21
Section 3.05 *Material Contracts* ............................................................21
Section 3.06 *Approvals* ........................................................................23
Section 3.07 *Environmental Matters* ......................................................23
Section 3.08 *Well Status* .......................................................................24
Section 3.09 *Imbalances* ......................................................................24
Section 3.10 *Litigation* .........................................................................24
Section 3.11 *Hedging* ...........................................................................24
Section 3.12 *Intellectual Property* .........................................................25
Section 3.13 *Insurance Coverage* ..........................................................25
Section 3.14 *Taxes* ...............................................................................25
Section 3.15 *Letters of Credit* ...............................................................25
Section 3.16 *Outstanding Obligations* ....................................................25
Section 3.17 *Preferential Purchase Rights* .............................................26
Section 3.18 *Broker* ..............................................................................26
Section 3.19 *[Reserved]* ........................................................................26
Section 3.20 *Working Interest Payments* .................................................26

Section 3.21 *[Reserved]* ....26
Section 3.22 *[Reserved]* ....26
Section 3.23 *FCPA; Sanctions* ....26

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ....27**

Section 4.01 *Organization* ....27
Section 4.02 *Authorization and Authority* ....27
Section 4.03 *Enforceability* ....27
Section 4.04 *Conflicts* ....27
Section 4.05 *Broker* ....27
Section 4.06 *Financial Ability* ....28
Section 4.07 *Approvals* ....28
Section 4.08 *Litigation* ....28
Section 4.09 *Bankruptcy* ....28
Section 4.10 *Investor Status; Investigation* ....28
Section 4.11 *Qualification* ....29
Section 4.12 *No Other Representations* ....29

**ARTICLE V COVENANTS OF SELLERS ....30**

Section 5.01 *Operating Covenants* ....30
Section 5.02 *Operatorship* ....31
Section 5.03 *Assumption and Rejection of Executory Contracts and Leases* ....32
Section 5.04 *Access.* ....34

**ARTICLE VI COVENANTS OF BUYER ....35**

Section 6.01 *Access; Data Retention* ....35

**ARTICLE VII COVENANTS OF BUYER AND SELLERS ....36**

Section 7.01 *Commercially Reasonable Efforts; Further Assurances* ....36
Section 7.02 *Bankruptcy Proceedings* ....36
Section 7.03 *Public Announcements* ....38
Section 7.04 *Confidentiality* ....39
Section 7.05 *Audits and Other Tax Proceedings* ....39
Section 7.06 *Employee Matters* ....39
Section 7.07 *Tax Matters; Apportionment of Tax Liability* ....40
Section 7.08 *Supplemental Disclosures* ....42
Section 7.09 *Replacement of Existing Letters of Credit* ....42

**ARTICLE VIII CONDITIONS TO CLOSING ....43**

Section 8.01 *Conditions to Obligations of Buyer and Sellers* ....43
Section 8.02 *Conditions to Obligation of Buyer* ....43
Section 8.03 *Conditions to Obligation of Sellers* ....44

**ARTICLE IX TERMINATION ....44**

Section 9.01 *Grounds for Termination* ....44
Section 9.02 *Effect of Termination* ....46

**ARTICLE X CASUALTY LOSS** ....................................................................................49

Section 10.01 *Casualty Loss* ....................................................................................49

**ARTICLE XI RESERVED** ....................................................................................49

**ARTICLE XII RESERVED** ....................................................................................49

**ARTICLE XIII SURVIVAL AND INDEMNIFICATION** ....................................................................................49

Section 13.01 *Survival; Limited Recourse Against Sellers* ....................................................................................49
Section 13.02 *Indemnification by Buyer* ....................................................................................50
Section 13.03 *Indemnification Procedures* ....................................................................................51
Section 13.04 *Express Negligence* ....................................................................................52
Section 13.05 *Tax Treatment of Indemnity Payments* ....................................................................................52
Section 13.06 *Sole and Exclusive Remedy* ....................................................................................52

**ARTICLE XIV MISCELLANEOUS** ....................................................................................52

Section 14.01 *Notices* ....................................................................................52
Section 14.02 *Amendments and Waivers* ....................................................................................54
Section 14.03 *Expenses* ....................................................................................54
Section 14.04 *Successors and Assigns/Liquidating Trust* ....................................................................................54
Section 14.05 *Governing Law* ....................................................................................54
Section 14.06 *Jurisdiction* ....................................................................................55
Section 14.07 *Waiver of Jury Trial* ....................................................................................55
Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries.* ....................................................................................55
Section 14.09 *Entire Agreement* ....................................................................................55
Section 14.10 *Severability* ....................................................................................55
Section 14.11 *Specific Performance* ....................................................................................56
Section 14.12 *Certain Acknowledgements and Limitations* ....................................................................................56
Section 14.13 *Disclosure Schedules* ....................................................................................56
Section 14.14 *Preparation of Agreement* ....................................................................................57
Section 14.15 *No Recourse* ....................................................................................57

**EXHIBITS, ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES**

Exhibits

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Assignment and Bill of Sale |
| Exhibit C | Form of Assumption Agreement |
| Exhibit D | Form of Seller Certificate |
| Exhibit E-1 | Form of Seller FIRPTA Certificate – Resources |
| Exhibit E-2 | Form of Seller FIRPTA Certificate – ManagementCo |
| Exhibit F | Form of Buyer Certificate |
| Exhibit G | Form of Post-Closing Escrow Agreement |
| Exhibit H | Form of Release Agreement |
| Exhibit I | Special Warranty |

Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Purchased Contracts |
| Annex D | Permits |

Schedules

| | |
|---|---|
| Schedule 1.01 | Allocated Values |
| Schedule 2.02(k) | Excluded Contracts and Other Assets |
| Schedule 5.03(a) | 365 Schedule |
| Schedule 5.03(b) | Desired 365 Contracts |
| Schedule 7.06 | Seller Employees |
| Schedule 8.02(d) | Specified Required Consents |

Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05(a) | Material Contracts |
| Disclosure Schedule 3.05(b) | Material Contract Defaults |
| Disclosure Schedule 3.06(a) | Approvals |
| Disclosure Schedule 3.07 | Environmental Matters |
| Disclosure Schedule 3.08 | Well Status |
| Disclosure Schedule 3.09 | Imbalances |
| Disclosure Schedule 3.10 | Litigation |
| Disclosure Schedule 3.12 | Intellectual Property |
| Disclosure Schedule 3.13 | Insurance Coverage |
| Disclosure Schedule 3.14 | Taxes |
| Disclosure Schedule 3.16 | Outstanding Obligations |

| | |
|---|---|
| Disclosure Schedule 3.17 | Preferential Purchase Rights |
| Disclosure Schedule 3.20 | Working Interest Payments |
| Disclosure Schedule 3.22 | No Violation of Laws |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") dated as of October 16, 2020 (the "Execution Date"), is entered into by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers"). Buyer and Sellers are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## WITNESETH:

**WHEREAS**, on May 15, 2020 (the "Petition Date"), each Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "Bankruptcy Cases");

**WHEREAS**, on June 9**,** 2020, the Bankruptcy Court entered the Bid Procedures Order (which has been further modified as described in the definition thereof);

**WHEREAS**, pursuant to section 363 of the Bankruptcy Code and upon the terms and conditions set forth herein, effective as of the Effective Time, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire from Sellers, the Assets, and, in connection therewith, the Parties desire for Buyer to assume the Assumed Liabilities; and

**WHEREAS**, Sellers' ability and obligation to consummate the Transactions are subject to, among other things, the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 *Definitions*. The capitalized terms used but not defined herein and defined in Exhibit A shall have the meanings set forth in Exhibit A hereto, which is incorporated herein by reference.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01 *Purchase and Sale of the Assets*. Subject to the terms and conditions and for the consideration herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers agree to sell, assign, convey and deliver to Buyer, and Buyer agrees to purchase and acquire from Sellers at the Closing, to the extent permitted under section 363 and 365 of the Bankruptcy Code after giving effect to the Bid Procedures Order and the Sale Order, all of Sellers' right, title and interest in and to the properties and interests described below, other than the Excluded Assets (collectively, the "Assets"):

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Sellers in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Sellers as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Sellers' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties": the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time ("Effective Time Hydrocarbons") and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Sellers to Buyer, and subject to the payment by Buyer of any fees required as a condition to the assignment thereof to Buyer, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided, however,* that (1) Buyer's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (*provided* that Sellers shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Buyer only to the same extent as such rights are vested in Sellers, and (3) after the Closing, Buyer shall provide Sellers with access to, and Sellers shall have the right to receive copies of, the Data as provided in Article VI;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (collectively, the "Purchased Contracts");

(h) Permits. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights, (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

Section 2.02 *Excluded Assets.* Notwithstanding the foregoing provisions of this Article II, any assets of Sellers that are not described or otherwise identified as Assets in Section 2.01, together with all of the following assets, shall not constitute Assets and shall not be sold, assigned or conveyed to Buyer pursuant to this Agreement (such assets as described herein below, the "Excluded Assets"):

(a) all cash and cash equivalents of Sellers;

(b) all corporate and financial records of Sellers to the extent they relate to Sellers' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Sellers arising under this Agreement;

(f) all of the matters listed on Disclosure Schedule 3.10 (other than (i) item 1 of Disclosure Schedule 3.10 and (ii) item 45 of Disclosure Schedule 3.10 to the extent such item does not relate to the Contracts or other assets listed on Schedule 2.02(k)), and all rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Sellers attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Sellers under Section 7.07;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Sellers' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Schedule 2.02(k);

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Sellers, other than the Equipment;

(o) all assets excluded pursuant to the express terms of this Agreement, including Section 2.12(d), Section 2.13 or Section 5.03;

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 2.01(e), Section 2.01(f)(ii) and Section 2.01(h), in each case, that are not assignable to Buyer pursuant to this Agreement after giving effect to the Bid Procedures Order and the Sale Order (*provided* that Sellers have used commercially reasonable efforts to obtain any necessary consents to assignment with respect thereto in accordance with this Agreement);

(r) all engagements and similar letters and agreements with Sellers' legal advisors, it being agreed that Buyer shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Sellers or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii); and

(t) any assets or properties otherwise expressly identified as Excluded Assets under this Agreement.

Section 2.03 *Consideration*. As consideration for the Assets, Buyer shall pay or deliver to Sellers in accordance with this Agreement, Fifty Million Dollars ($50,000,000.00) in cash (the "Purchase Price") and assume all Assumed Liabilities in accordance with this Agreement. The Purchase Price shall be paid as provided in Section 2.05 and shall be subject to adjustment as provided in Section 2.04, Section 2.06, Section 2.12, Section 2.13 and Section 7.07. The Purchase Price, as increased or reduced, as applicable, in accordance with this Agreement, is referred to as the "Adjusted Purchase Price".

Section 2.04 *Adjustments to the Purchase Price*. Adjustments to the Purchase Price shall be made according to this Section 2.04, as applied in accordance with GAAP (as applied on a basis consistent for the periods covered).

(a) Upward Adjustments. The Purchase Price shall be adjusted upward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses paid or borne by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), whether paid by (or applied as an offset against amounts (including Suspended Revenue Receivables) due and payable to) Sellers prior to the Closing Date or after the Closing Date but prior to the determination of the Adjusted Purchase Price, to the extent attributable to the period on or after the Effective Time; *provided, however,* that to the extent that any Property Expenses would be deemed to be an upward adjustment pursuant to this Section 2.04(a)(i) but such expenses have not been paid by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), no upward adjustment to the Purchase Price shall be made but instead the obligation to perform and pay when due with respect to such Property Expense shall be an Assumed Liability;

(ii) to the extent not covered in Section 2.04(a)(i), an amount equal to all prepaid Property Expenses attributable to the Assets to the extent related to periods on or after the Effective Time that were paid or borne by Sellers as of the Closing, including without limitation, prepaid drilling and/or completion costs, insurance costs through Closing and prepaid utility charges;

(iii) to the extent the proceeds thereof are not received by Sellers or any of their Affiliates as of the Closing Date, an amount equal to the value of Sellers' interest in the Effective Time Hydrocarbons, to be calculated as follows: the value shall be the product of (A) the volume of marketable Effective Time Hydrocarbons (attributable to Sellers' interest) as of the Effective Time as shown by the gauging reports prepared by Sellers as of the Effective Time (absent any manifest errors), *multiplied by* (B) the price that would have been received by Sellers with respect to such Effective Time Hydrocarbons if such Effective Time Hydrocarbons were sold at the Effective Time pursuant to the contract price in effect as of the Effective Time, or, if there is no contract price in effect, the posted price in the field in which such Hydrocarbons were produced in effect as of the Effective Time, in each case, net of the following (without duplication of any such amounts that are taken into account in determining the contract price, if applicable): (1) Non-Income Taxes and Burdens paid or payable out of such proceeds or otherwise borne by Buyer and not taken into account for purposes of Section 2.04(b)(v); and (2) expenses (other than Property Expenses) incurred or payable to Third Parties under Applicable Contracts in earning or receiving such proceeds;

(iv) an amount equal to any Imbalance Adjustment Amount owed to Sellers by a Third Party;

(v) the amount of Non-Income Taxes allocated to Buyer pursuant to Section 7.07 but paid or borne by Sellers or any of their Affiliates;

(vi) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(a)(i) or Section 2.04(a)(ii), the amount of Cure Costs, if any, by which the Purchase Price is to be increased pursuant to Section 5.03, but only to the extent such Cure Costs are Property Expenses which were incurred after the Effective Time;

(vii) [Reserved]; and

(viii) any other adjustment expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(b) Downward Adjustments. The Purchase Price shall be adjusted downward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses attributable to the Assets to the extent related to periods prior to the Effective Time that are actually paid or economically borne by Buyer, including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement;

(ii) an amount equal to all proceeds actually received by Sellers and attributable to the sale of Hydrocarbons produced from or allocable to the Oil and Gas Properties (excluding any Excluded Assets) during the Interim Period, net of the following (without duplication of any such amounts previously deducted from the proceeds paid to Sellers): (A) amounts paid or borne by Sellers as Burdens on such production; (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds; and (C) applicable Non-Income Taxes paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v);

(iii) the Allocated Value of any Oil and Gas Property excluded from the Assets pursuant to Section 2.12(a), Section 2.12(d) or Section 2.13;

(iv) an amount equal to the absolute value of any Imbalance Adjustment Amount owed by Sellers to a Third Party;

(v) the amount of Non-Income Taxes allocated to Sellers or any of their Affiliates pursuant to Section 7.07 but paid or borne by Buyer;

(vi) [Reserved];

(vii) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(b)(i), an amount equal to all Excess Cure Costs, if any, paid or economically borne by Buyer;

(viii) if applicable, the amount of the Suspended Revenue Receivables (provided that either (A) a corresponding increase to the Purchase Price is made for

Property Expenses attributable to periods from and after the Effective Time that are payable by Sellers under the operating agreements under which such Suspended Revenue Receivables are payable or (B) Buyer has paid or economically borne the Property Expenses described in clause (A), including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement, by payment of Cure Costs or otherwise); and

(ix) any other amount expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(c) Tax Adjustments/Apportionment of Prepaid Expense Items; Withholding.

(i) To adjust the Purchase Price for the apportionment of Non-Income Taxes and Tax refunds, the Parties agree to adjust the Purchase Price, downward or upward, as appropriate, pursuant to the provisions of Section 7.07.

(ii) For purposes of the Purchase Price, to the extent not otherwise expressly provided for under Section 2.04(a) and Section 2.04(b), any Property Expenses with respect to the Oil and Gas Properties that are paid or payable on an annual, quarterly, monthly or other regular periodic basis and relate to a period before or after the Effective Time ("Prorated Expense Items") shall be prorated as of the Effective Time and apportioned, such that Buyer will receive the economic benefit or burden, as applicable, of all such items on and after the Effective Time and Sellers shall receive the economic benefit or burden, as applicable, of all such items for the period prior to the Effective Time. After the Closing Date, (x) if Buyer receives any bills or accounts or any reimbursement for prepaid Property Expenses in relation to Prorated Expense Items that are attributable in whole to the period prior to the Effective Time, then Buyer shall promptly forward the same to Sellers (for payment, in the case of any such bills or accounts), (y) if Sellers receive any bills or accounts or any reimbursement for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in whole to the period on or after the Effective Time, then Sellers shall promptly forward the same to Buyer (for payment, in the case of any such bills or accounts) and (z) if Buyer or Sellers receive any bills or accounts or any reimbursements for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in part to the period prior to the Effective Time, and in part to the period on and after the Effective Time, the amount thereof shall be apportioned between Sellers, on the one hand, and Buyer, on the other hand, respectively, as of the Effective Time, based on the number of days in such period falling prior to the Effective Time, on the one hand, and on and after the Effective Time, on the other hand. In the case of bills or accounts referred to in clause (z), the party receiving the same shall be required to pay only such portion of such bill or account for which it is responsible in accordance with this Section 2.04(c)(ii).

(iii) Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Sellers pursuant to this

Agreement such amounts as may be required to be deducted or withheld therefrom under any Applicable Law. The Parties shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any such deduction or withholding. To the extent such amounts are so deducted or withheld, and timely remitted to the applicable Governmental Authority in accordance with Applicable Law, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

(d) Closing Statement.

(i) Sellers shall prepare and deliver to Buyer, not less than five (5) Business Days before the Closing Date, a statement (the "Closing Statement") setting forth the adjustments to the Purchase Price provided in this Section 2.04, using estimates where actual amounts are not known at such time, and Sellers' calculation of the estimated Adjusted Purchase Price; such estimated Adjusted Purchase Price (as such may be modified pursuant to any changes proposed by Buyer and accepted by Sellers) shall be referred to as the "Closing Date Adjusted Purchase Price." The Closing Statement shall be prepared by Sellers in good faith in accordance with this Agreement, including Section 2.08 and shall include reasonable supporting detail for each adjustment or estimate included therein. If Buyer has any questions or disagreements regarding the Closing Statement, then, upon written request by Buyer, at least two (2) Business Days prior to the Closing Date, Sellers and Buyer shall in good faith attempt to resolve any disagreements, and Sellers shall afford Buyer the opportunity to examine the Closing Statement and Sellers' calculation of the Closing Date Adjusted Purchase Price, and shall provide to Buyer such additional supporting schedules, analyses, workpapers or other data on which the Closing Statement is based or from which the Closing Statement is derived as are reasonably requested by Buyer. If (A) Buyer and Sellers agree on changes to the Closing Statement based on such discussions, then the Closing Date Adjusted Purchase Price shall be paid at Closing based on such changes; or (B) Buyer and Sellers do not agree on changes to the Closing Statement, then the Closing Date Adjusted Purchase Price shall be paid at the Closing based on the amounts set forth in the Closing Statement; *provided, however*, that in the case of clause (B), appropriate adjustments to the Purchase Price shall be made after the Closing pursuant to Section 2.06.

(ii) Sellers will include in the Closing Statement Sellers' good faith calculation of the prorations provided for in Section 2.04(c). If final bills or accounts in relation to any Prorated Expense Items referred to in Section 2.04(c) are not available or have not been issued prior to that date for any Prorated Expense Item, Sellers shall estimate the amount of each such item in good faith and in accordance with customary industry practices, and such estimate shall be reflected in the Closing Statement. The amount payable by Buyer at the Closing will be increased or decreased to reflect the net amount owing between the Parties as shown on the Closing Statement, using such estimates where necessary. Final adjustment between the Parties as to any item used in the preparation of the Closing Statement

in accordance with this Section 2.04 shall be made in accordance with Section 2.06 and Section 7.07.

(e) If, prior to Closing, Sellers discover an error in the Imbalances set forth in Disclosure Schedule 3.09, then the Purchase Price shall be adjusted at Closing pursuant to Section 2.04(a)(iv) or Section 2.04(b)(iv), as applicable, and Disclosure Schedule 3.09 will be deemed amended immediately prior to Closing to reflect the Imbalances for which the Purchase Price is so adjusted.

Section 2.05 *Closing*. The closing of the purchase and sale of the Assets, the assumption by Buyer of the Assumed Liabilities and the other transactions contemplated herein (the "Closing") shall take place at the offices Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1700, Houston, Texas 77002, on October 30, 2020 (the "Target Closing Date"); *provided* that, if the conditions to Closing set forth in Article VIII have not yet been satisfied or waived as of the Target Closing Date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), then the Closing shall occur on November 30, 2020 if the conditions to Closing set forth in Article VIII have been satisfied or waived as of such date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), or at such other time or place as Buyer and Sellers may agree in writing. At and as of the Closing:

(a) Pursuant to section 363 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, assign and convey all Assets (other than Excluded Assets) to Buyer Free and Clear;

(b) Buyer shall assume, and from and after the Closing, shall perform and pay when due, all Assumed Liabilities; *provided* that Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any Liability or obligation of Sellers that are not expressly Assumed Liabilities (referred to herein collectively as the "Excluded Liabilities");

(c) Sellers shall deliver (or cause to be delivered) to Buyer the following instruments, each dated as of the Closing Date, properly executed by an authorized officer or representative of each Seller or signatory party thereto and, where appropriate, acknowledged:

(i) executed counterparts to an Assignment and Bill of Sale in the form of Exhibit B (the "Assignment and Bill of Sale") in sufficient counterparts for recording in the real property records in each county where the Oil and Gas Properties are located;

(ii) executed counterparts to letters in lieu of division orders or other appropriate designation of assignment, on forms prepared by Sellers and reasonably acceptable to Buyer, directing all operators of the Oil and Gas Properties and/or purchasers of production to make payment to Buyer of proceeds attributable to production from the Oil and Gas Properties from and after the Effective Time, for

delivery by Buyer to such operators and/or purchasers of production (collectively, the "Letters in Lieu");

(iii) executed counterparts to an Assumption Agreement between Sellers and Buyer in the form of Exhibit C (the "Assumption Agreement");

(iv) executed counterparts to the Post-Closing Escrow Agreement;

(v) a certificate in the form of Exhibit D;

(vi) a certificate in the form of Exhibit E-1 or Exhibit E-2, as applicable;

(vii) an executed counterpart of the Closing Statement;

(viii) duly executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interests over the Assets, in each case, securing indebtedness for borrowed money of Sellers or any of their respective Affiliates;

(ix) the Release Agreement (and Sellers shall cause Gavilan Resources Holdings, LLC and Gavilan Resources HoldCo, LLC to execute and deliver a counterpart of the Release Agreement to Buyer at the Closing); and

(x) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Sellers at or prior to the Closing;

(d) Buyer shall deliver to Sellers executed counterparts of the following instruments each dated as of the Closing Date, properly executed by an authorized officer or representative of Buyer and, where appropriate, acknowledged:

(i) a certificate in the form of Exhibit F;

(ii) the Assignment and Bill of Sale;

(iii) the Assumption Agreement;

(iv) the Post-Closing Escrow Agreement;

(v) the Letters in Lieu;

(vi) an executed counterpart of the Closing Statement;

(vii) the Release Agreement (and Buyer shall cause SN EF Maverick to execute and deliver a counterpart of the Release Agreement to Sellers at the Closing); and

(viii) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Buyer at or prior to the Closing; and

(e) Buyer shall deliver an amount equal to the Closing Date Adjusted Purchase Price, *less* the amount of the Deposit Escrow Funds, by wire transfer of immediately available funds, to one or more accounts designated by Sellers.

Section 2.06 *Final Settlement Statement.*

(a) As soon as practical and, in any event, no later than ninety (90) calendar days after the Closing Date, Resources shall prepare and deliver to Buyer a statement (the "Final Settlement Statement") setting forth the adjustments to the Purchase Price in accordance with Section 2.04. The Final Settlement Statement shall be prepared in good faith in accordance with this Agreement and on a basis consistent with the preparation of the Closing Statement as described in Section 2.04(d), and shall set forth Resources' calculation of the Adjusted Purchase Price and include reasonable supporting detail for each adjustment included therein.

(b) Following the delivery of the Final Settlement Statement, Resources shall afford Buyer the opportunity to examine the Final Settlement Statement and Resources' calculation of the Adjusted Purchase Price, and such supporting schedules and analyses as are reasonably necessary and appropriate in connection with such review. Resources shall cooperate with Buyer in such examination, including responding to questions asked by Buyer, and Resources shall make available to Buyer any records under Sellers' control or otherwise available to Sellers that are requested by Buyer in connection with such review.

(c) If, within fifteen (15) calendar days following delivery of the Final Settlement Statement to Buyer, Buyer has not delivered to Resources written notice (the "Objection Notice") of Buyer's objections to the Final Settlement Statement or Resources' calculation of the Adjusted Purchase Price (which Objection Notice in order to be valid must contain a statement describing in reasonable detail the items objected to, the basis of such objections and Buyer's calculation of the amount(s) for the items objected to that Buyer asserts should be used for purposes of the Final Settlement Statement), then the Adjusted Purchase Price as set forth in such Final Settlement Statement shall be deemed final and conclusive. In addition, any of Resources' calculations of the Adjusted Purchase Price as set forth in the Final Settlement Statement which are not objected to in the Objection Notice shall be deemed final and conclusive.

(d) If Buyer delivers the Objection Notice satisfying Section 2.06(c) above, within such fifteen (15)-day period, then Resources and Buyer shall endeavor in good faith to resolve the objections of Buyer set forth in the Objection Notice for a period not to exceed fifteen (15) calendar days from the date of delivery of the Objection Notice. If at the end of such fifteen (15)-day period there are any objections that remain in dispute, then either Buyer or Resources may require by written notice to the other that the remaining objections in dispute be submitted for resolution to an independent accounting firm to be selected jointly by Buyer and Resources within the ten (10) calendar days following a written request by Buyer or Resources or, if Buyer and Resources are unable to mutually agree within such ten (10)-day period, such accounting firm shall be the Houston, Texas office of PricewaterhouseCoopers ("PwC") (such jointly selected

accounting firm or PwC (the "Referee"). The Referee's engagement shall be limited to the resolution of disputed amounts set forth in the Final Settlement Statement that have been identified by Buyer in the Objection Notice, which resolution shall be in accordance with this Agreement and no other matter relating to the Final Settlement Statement shall be subject to determination by the Referee except to the extent affected by resolution of the disputed amounts. In connection with the engagement of the Referee, each of Buyer and Resources shall execute any engagement, indemnity and other agreement as the Referee shall require as a condition to such engagement. If PwC is unable or unwilling to serve as the Referee and Buyer and Resources are unable to agree upon the designation of a Person as substitute arbitrator, then Buyer or Resources, or either of them, may in writing request the Bankruptcy Court to appoint the substitute referee; *provided* that such Person so appointed shall be a national or regional accounting firm with no current or prior material relationships with Buyer or Sellers or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities.

(e) The Referee shall determine such items of the calculation of the Adjusted Purchase Price as are disputed within thirty (30) calendar days after the objections that remain in dispute are submitted to it.

(f) If any disputed items are submitted to the Referee for resolution, (i) each of Buyer and Resources shall furnish to the Referee such workpapers and other documents and information relating to such disputed items as the Referee may request and are available to that Party or its Affiliates (or its independent public accountants) and will be afforded the opportunity to present to the Referee any materials relating to the determination of the matters in dispute and to discuss such determination with the Referee prior to any written notice of determination hereunder being delivered by the Referee; (ii) the Referee shall not assign a value to such objection that is greater than the greatest value for such objection claimed by either Party or less than the smallest value for such objection claimed by either Party; (iii) the determination by the Referee of items of the calculation of the Adjusted Purchase Price, as applicable, as set forth in a written notice delivered to Resources and Buyer by the Referee, shall be made in accordance with this Agreement and shall be binding and conclusive on the Parties and shall constitute an arbitral award that is final, binding and unappealable (absent manifest error or fraud) and upon which a judgment may be entered by a court having jurisdiction thereof; and (iv) the fees and expenses of the Referee (the "Audit Fees") shall be paid by and apportioned one-half by Buyer and one-half by Sellers.

(g) Upon agreement of Buyer and Resources to the Adjusted Purchase Price set forth in the Final Settlement Statement, or upon final determination by the Referee of the disputed items set forth in the Objection Notice, as the case may be (such date of determination being the "Cut-Off Date"), the Final Settlement Statement (as adjusted pursuant to such agreement or determination by the Referee) will be deemed final and binding on the Parties. From and after the Closing Date, Sellers (and, after formation of a Liquidating Trust, if applicable, the Liquidating Trustee) shall retain in the Post-Closing Escrow Account a portion of the Closing Date Adjusted Purchase Price equal to the greater of (x) an amount equal to five percent (5%) of the unadjusted Purchase Price or (y) any unresolved amounts with respect to the Closing Statement disputed by Buyer in good faith in accordance with Section 2.04(d) (as applicable, the "Settlement Statement Escrow Amounts") as a cash reserve for the express purpose of fulfilling Sellers' obligations under this Section 2.06 and Section 2.07, and any claims against the Special Warranty, until the Cut-Off

Date and, if a payment is due by Sellers pursuant to Section 2.07(b), the date that such payment is made pursuant to Section 2.07(b).

Section 2.07 *Post-Closing Payments.*

(a) If the Closing Date Adjusted Purchase Price is less than the Adjusted Purchase Price determined in accordance with Section 2.06 (the amount by which the Adjusted Purchase Price exceeds the Closing Date Adjusted Purchase Price herein referred to as the "Closing Amount Shortfall"), then (i) Buyer shall pay to Sellers the amount of the Closing Amount Shortfall within five (5) Business Days of the final determination of the Adjusted Purchase Price in accordance with Section 2.06 and (ii) Sellers and Buyer shall jointly instruct the Escrow Agent to disburse to Sellers from the Post-Closing Escrow Account all of the Settlement Statement Escrow Amounts.

(b) If the Adjusted Purchase Price determined in accordance with Section 2.06 is less than the Closing Date Adjusted Purchase Price (the amount by which the Closing Date Adjusted Purchase Price exceeds the Adjusted Purchase Price herein referred to as the "Closing Amount Overpayment"), then Sellers and Buyer shall jointly instruct the Escrow Agent to disburse from the Post-Closing Escrow Account (i) to Buyer, a portion of the Settlement Statement Escrow Amounts equal to the Closing Amount Overpayment and (ii) if the Closing Amount Overpayment is less than the Settlement Statement Escrow Amounts, to Sellers the remaining portion of the Settlement Statement Escrow Amounts. Notwithstanding anything in this Agreement to the contrary, in no event shall Sellers be liable to Buyer for any Closing Amount Overpayment or any claims against the Special Warranty for any amounts other than out of amounts in the Post-Closing Escrow Account.

(c) Sellers shall pay to Buyer, and Buyer shall pay to Sellers, as applicable, any post-Closing payments as may be required herein, including pursuant to Section 2.10, Section 2.11, or Section 7.07. Notwithstanding the foregoing, (i) subject to the following clause (ii), neither Party shall be obligated to account for or remit to the other Party any Property Expenses, Burdens or proceeds (including Hydrocarbon proceeds) attributable to the Assets after the date that is thirty (30) days following the date the final Adjusted Purchase Price is agreed by the Parties or finally determined by the Referee in accordance with Section 2.06 and (ii) if Buyer receives after the Closing any Suspended Revenue Receivables for which an adjustment to the Purchase Price is made pursuant to Section 2.04(b)(viii), Buyer shall pay such Suspended Revenue Receivables to Sellers within three (3) Business Days after Buyer's receipt of same.

Section 2.08 *No Duplicative Effect; Methodologies*. The provisions of Section 2.04, Section 2.06, this Section 2.08 and of any other Transaction Document shall apply in such a manner so as not to give the components and calculations duplicative effect to any item of adjustment and the Parties covenant and agree that no amount shall be (or is intended to be) included, in whole or in part (either as an increase or reduction) more than once in the calculation of (including any component of) the Adjusted Purchase Price, or any other calculated amount pursuant to this Agreement if the effect of such additional inclusion (either as an increase or reduction) would be to cause such amount to be overstated or understated for purposes of such calculation. "Earned" and "incurred", as used in this Agreement, shall be interpreted in accordance with GAAP and COPAS standards, as applied by Sellers consistent with past practice, subject to

the other provisions in this Section 2.08; *provided* if not determinable pursuant to the foregoing, the date an item or work is ordered is not the date of a transaction or incurrence for settlement purposes in the Closing Statement or Final Settlement Statement and otherwise under this Agreement, as applicable, but rather the date on which the item ordered is delivered to the job site, or the date on which the work ordered is performed, is the relevant date, regardless of when the applicable invoice was sent (i.e., on an accrual basis). The Parties acknowledge and agree that, if there is a conflict between a determination, calculation, methodology, procedure or principle set forth in the definitions contained in this Agreement, as applicable, on the one hand, and those provided by GAAP or COPAS, on the other hand, (i) the determination, calculation, methodology, procedure or principle set forth in this Agreement, as applicable, shall control to the extent that the matter is specifically provided for in this Agreement and (ii) the determination, calculation, methodology, procedure or principle prescribed by GAAP or COPAS, as applied by Sellers consistent with past practice, shall control to the extent the matter is not so addressed in this Agreement, as applicable, or requires reclassification as an asset or liability to be included in a line item or specific adjustment.

Section 2.09 *Purchase Price Deposit.*

(a) Escrow Deposit. Buyer previously deposited into the Escrow Account an amount equal to Eight Million Dollars ($8,000,000) (such amount, together with any interest earned thereon, the "Deposit Escrow Funds").

(b) Distribution of Deposit Escrow Funds. The Deposit Escrow Funds shall be distributed as follows:

(i) if the Closing occurs, the Deposit Escrow Funds shall be applied as a credit towards the Closing Date Adjusted Purchase Price as provided in Section 2.05(e) and Sellers shall deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to deliver to one or more accounts designated by Sellers the Deposit Escrow Funds; and

(ii) if this Agreement is terminated prior to Closing for any reason, the Deposit Escrow Funds shall be delivered in accordance with Section 9.02.

Section 2.10 *Division of Hydrocarbons*. After the Closing, all Buyer Hydrocarbons and Effective Time Hydrocarbons shall be owned by Buyer and all Seller Hydrocarbons shall be owned by Sellers. To the extent Sellers have sold Hydrocarbons (other than Seller Hydrocarbons) which constitute Assets and the Purchase Price has not been adjusted pursuant to Section 2.04(b)(i) for the proceeds of such sales, Sellers shall deliver such proceeds received after Closing (without duplication of any such amounts previously deducted from the proceeds paid to Sellers, net of (A) amounts payable as Burdens on such production paid or borne by Sellers, (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v)) to Buyer promptly upon Sellers' receipt thereof. To the extent Buyer actually receives proceeds or other income from the sale of any Seller Hydrocarbons, Buyer shall deliver such proceeds (without duplication of any such amounts previously deducted from

the proceeds paid to Buyer, net of (A) amounts payable as Burdens on such production paid or borne by Buyer, (B) expenses (other than Property Expenses) incurred by Buyer to Third Parties in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Buyer and not reimbursed to Buyer by a Third Party and not taken into account for purposes of Section 2.04(b)(v)) to Sellers promptly upon Buyer's receipt thereof.

Section 2.11 *Division of Expenses; Burdens*. For purposes of determining the amount of the adjustments to the Purchase Price provided for in Section 2.04, the principles set forth in this Section 2.11 shall apply except as expressly provided otherwise in this Agreement. Subject to Section 2.04(c)(ii) with respect to any Prorated Expense Items, as between Buyer and Sellers, (i) all Property Expenses attributable to periods prior to the Effective Time and Burdens attributable to the Assets on the production of Hydrocarbons prior to the Effective Time, other than Assumed Liabilities shall be borne by Sellers and (ii) all Property Expenses attributable to periods from and after the Effective Time and Burdens (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A) attributable to Assets on the production of Hydrocarbons from and after the Effective Time), shall be borne by Buyer. For purposes of allocating production (and expenses, Burdens and proceeds with respect thereto) under this Agreement, (a) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the pipeline connecting into the storage facilities into which they are transported from the lands covered by the applicable Well, or if there are no storage facilities, when they pass through the LACT meter or similar meter at the entry point into the pipelines through which they are transported from such lands and (b) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the delivery point sales meters or similar meters at the entry point into the pipelines through which they are transported from such lands. Sellers shall utilize reasonable interpolative procedures to arrive at an allocation of production when exact meter readings (including gas production meters or sales meters) or gauging and strapping data is not available.

Section 2.12 *Preferential Purchase Rights.*

(a) Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Preferential Purchase Right with respect to any Oil and Gas Property a notice in compliance with the contractual provisions applicable to such Preferential Purchase Right and requesting a waiver thereof. If a bona fide Preferential Purchase Right with respect to any Oil and Gas Property is exercised prior to the Closing, such Oil and Gas Property and the related Contracts (solely to the extent related to such Oil and Gas Property) shall be excluded from the Assets conveyed to Buyer at the Closing, the affected Oil and Gas Property will be deemed to be an Excluded Asset, the Purchase Price shall be reduced by an amount equal to the Allocated Value for such Oil and Gas Property and related Contracts (or portions thereof), and Sellers shall be entitled to retain all proceeds received for the affected Oil and Gas Property and related Contracts (or portion thereof) from the Person exercising such Preferential Purchase Right.

(b) Buyer shall purchase at the Closing all Oil and Gas Property burdened by a Preferential Purchase Right that has not been exercised as of the Closing Date, regardless of whether the time period for the exercise of such right has expired, and no reduction of the Purchase Price paid at the Closing shall be made with respect thereto. If, for any reason, such Preferential

Purchase Right is successfully exercised by the holder thereof after the Closing, Buyer shall be entitled to retain all proceeds paid for the affected Oil and Gas Property by the holder of the relevant Preferential Purchase Right, and Sellers shall have no liability with respect to such affected Oil and Gas Property and no adjustment to the Purchase Price shall be made with respect thereto.

(c) To the extent any Asset is subject to a valid and enforceable Preferential Purchase Right in favor of a Third Party, Buyer and Sellers agree that the portion of the consideration to be paid under this Agreement allocable to each such Asset is the Allocated Value of such Asset, *plus* the assumption of the Assumed Liabilities related to such Asset.

(d) If prior to Closing any Person asserts that it is the beneficiary of a Preferential Purchase Right with respect to any Oil and Gas Property and objects to the sale of such Oil and Gas Property to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale of such Oil and Gas Property free and clear of such right (as applicable to the sale to Buyer pursuant to this Agreement) to Buyer (by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction), then, at Buyer's option, such Oil and Gas Property shall be excluded from the Assets and the Purchase Price shall be reduced by the Allocated Value of such Oil and Gas Property.

Section 2.13 *Consents to Assign*. Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Applicable Schedule 3.06(a) Consent with respect to each Lease and any Purchased Contract that is not a 365 Contract (for which notices regarding 365 Contracts are addressed in Section 5.03) a notice in compliance with the contractual provisions applicable to such Applicable Schedule 3.06(a) Consent seeking such holder's consent to the transactions contemplated hereby and any such other notice as necessary to permit the assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement upon entry of the Sale Order (a "Consent Notice"). With respect to each Consent (A) relating to a Contract for which the counterparty's consent to assignment would be required for such Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code or (B) that burdens a Lease, but which Consent is not set forth on Disclosure Schedule 3.06 and is discovered by Sellers (including, if applicable, any such Consent that is identified by Buyer) prior to Closing, all such Consents shall thereafter be Applicable Schedule 3.06(a) Consents and Sellers shall send to the holder of each such Consent a Consent Notice.

(a) If Sellers fail to obtain an Applicable Schedule 3.06(a) Consent prior to Closing and (A) with respect to any Lease or Purchased Contract that is not a 365 Contract, (1) the failure to obtain such Applicable Schedule 3.06(a) Consent would cause the assignment of the Assets affected thereby to Buyer to be void or voidable, or (2) the failure to obtain such Applicable Schedule 3.06(a) Consent could reasonably result in the termination of such Lease or Purchased Contract under the express terms thereof upon the purported assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement or (B) with respect to any Lease or Purchased Contract, a party holding such Applicable Schedule 3.06(a) Consent right has objected to the assignment of the affected Asset in accordance with the terms of the relevant Applicable Schedule 3.06(a) Consent right or based on any anti-assignment or consent to assign provision contained in such Lease or Purchased Contract (each Consent as to which clause (A) or (B) is

applicable, a "Required Consent"), then, unless the Bankruptcy Court has entered an order approving (or in the case of clause (B), such objection is resolved to permit) the sale and assignment of the affected Asset to Buyer pursuant to this Agreement without obtaining such Required Consent, the Assets (or portions thereof) affected by such un-obtained Required Consent shall be excluded from the Assets to be assigned to Buyer at Closing (and shall be considered Excluded Assets hereunder) and the Purchase Price shall be reduced by the Allocated Value(s) of such Assets (or portions thereof) so excluded. In the event that any such Required Consent with respect to any such excluded Asset (or portion thereof) is obtained during the Post-Closing Consent Period (or if during the Post-Closing Consent Period the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear (as applicable to the sale of the affected Assets to Buyer pursuant to this Agreement) of such Required Consent), then, (1) Sellers shall so notify Buyer and (2) on the tenth (10th) Business Day after the date such Consent is obtained and Sellers shall assign the Assets (or portions thereof) that were so excluded as a result of such previously un-obtained Consent to Buyer pursuant to an instrument in substantially the same form as the Assignment and Bill of Sale (and such Assets (or portions thereof) shall no longer be considered Excluded Assets hereunder) and, contemporaneously with said assignment, Buyer shall pay by wire transfer in same day funds to Sellers, to one or more accounts designated by Sellers, the amount by which the Purchase Price was reduced at Closing with respect to such excluded Assets (or portions thereof), subject to any adjustment in the allocable portion of the Purchase Price affecting such Asset (or portions thereof) pursuant to Section 2.04 and Buyer shall assume all Assumed Liabilities with respect thereto.

(b) If Sellers fail to obtain a Consent prior to Closing and such Consent is not a Required Consent (or if prior to Closing the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear of such Required Consent), then the Assets (or portions thereof) subject to such un-obtained Consent shall nevertheless be assigned by Sellers to Buyer at Closing as part of the Assets and Buyer shall be deemed to have assumed any and all Liabilities for the failure to obtain any such Consent as part of the Assumed Liabilities hereunder and Buyer shall have no claim against the Seller Indemnified Parties from any Liability for, the failure to obtain such Consent.

(c) Prior to Closing and until the earlier to occur of (x) the effective date of the Plan and (y) the one hundred twentieth (120th) day after Closing (the period from Closing until the earlier of clause (x) or (y), the "Post-Closing Consent Period"), with respect to any un-obtained Required Consents with respect to which the Bankruptcy Court shall not have entered an order providing that (A) such Required Consent is not required to consummate the sale and assignment of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (B) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement free and clear of such Required Consent, Sellers shall use their commercially reasonable efforts to obtain all Consents; *provided, however,* that Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Consent. Buyer shall use its commercially reasonable efforts (without any obligation to incur any Liability, pay money

or provide any other consideration) to assist and cooperate with Sellers in furtherance of Sellers' efforts pursuant to this Section 2.13(c).

Section 2.14 *Consents for Leases and Purchased Contracts*. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required Consents in respect of the assumption and/or assignment of any Lease or Purchased Contract if (a) Sellers have properly served under the Bankruptcy Code notice of assumption and assignment on the counterparty to such Lease or Purchased Contract, (b) any objections to assumption and/or assignment of such Lease or Purchased Contracts filed by such counterparty have been withdrawn or overruled (including pursuant to the Sale Order or other order of the Bankruptcy Court), and (c) pursuant to the Sale Order, Sellers are authorized to assume and/or assign such Leases or Purchased Contracts to Buyer Free and Clear pursuant to section 365 of the Bankruptcy Code or otherwise.

Section 2.15 *Assets Sold "As Is, Where Is"*.

(a) BUYER ACKNOWLEDGES AND AGREES THAT THE ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE AND THAT, EXCEPT AS SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT SELLERS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ASSETS BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH ASSETS IN THE CONDITION EXISTING ON THE CLOSING DATE "AS IS, WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE.

(b) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, AND WITHOUT LIMITING THE GENERALITY OF SECTION 2.15(a), SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE PURCHASED ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (vi) THE CONDITION,

QUALITY, SUITABILITY OR MARKETABILITY OF THE ASSETS, INCLUDING THE MARKETABILITY OF ANY HYDROCARBONS, (vii) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF SELLERS OR THIRD PARTIES WITH RESPECT TO THE ASSETS, AND (ix) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY AFFILIATE OF BUYER, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO. ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF SELLERS IS PROVIDED TO BUYER AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK.

Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos*. BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON OR THEREFROM. ADDITIONALLY, THE ASSETS, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR REMEDIATION, REMOVING, TRANSPORTING AND DISPOSING OF ASBESTOS, NORM, HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE ASSET. With respect to the Assets actually acquired by Buyer at Closing hereunder, Buyer assumes all liability for the assessment, remediation, removal, transportation and disposal of these materials and associated activities after the Closing (other than any Excluded Liabilities).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, represent and warrant to Buyer as follows, except as set forth in the Disclosure Schedule (and subject to Section 14.13):

Section 3.01 *Organization*. Each Seller is an entity duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of the jurisdiction of its organization. Each Seller is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect.

Section 3.02 *Authority and Authorization*. Each Seller has full power and authority to carry on its business as presently conducted and to enter into this Agreement and the other

Transaction Documents to which such Seller is or will be a party and, subject to the entry of the Bid Procedures Order and the entry of the Sale Order, to perform its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party, and the performance by each Seller of its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite limited liability company action on the part of such Seller.

Section 3.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of each Seller and (assuming due authorization, execution and delivery thereof by Buyer), subject to requisite Bankruptcy Court approval, will constitute the legal, valid and binding obligation of each Seller enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization or moratorium statutes, or other similar Applicable Laws affecting the rights of creditors generally or equitable principles (collectively, "Equitable Limitations"). At the Closing, all other Transaction Documents required hereunder to be executed and delivered by each Seller shall be duly executed and delivered and (assuming due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of such Seller enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations, subject to the entry of the Sale Order and provided no stay exists with respect to the Sale Order.

Section 3.04 *Conflicts*. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party does not, and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which such Seller is or will be a party shall not, (a) violate or be in conflict with, or require the consent (other than consents that have been obtained) of any Person or entity under, any provision of such Seller's Organizational Documents, (b) subject to the entry of the Bid Procedures Order and the Sale Order and obtaining the consents described on Disclosure Schedule 3.06, conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both would constitute a default) or give rise to any right of termination, cancellation or acceleration under any agreement or instrument to which such Seller is a party or by which any of the Oil and Gas Properties are bound, (c) subject to the entry of the Bid Procedures Order and the Sale Order, violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to any Seller or the Oil and Gas Properties or (d) result in the creation of any Lien on any of the Oil and Gas Properties, other than Permitted Liens.

Section 3.05 *Material Contracts.*

(a) Disclosure Schedule 3.05(a) sets forth a complete list, as of the Execution Date, of all Applicable Contracts of the type described below and any and all amendments, extensions, or other modifications thereof and thereto (each, other than any such Contract that is an Excluded Asset or an Excluded Liability, a "Material Contract"):

(i) any Applicable Contract that constitutes a lease under which a Seller is the lessor or the lessee of real or personal property (other than any Lease) that

(A) cannot be terminated by Sellers without penalty upon ninety (90) days' or less notice and (B) involves an annual base rental of more than $25,000;

(ii) any Contract with any Affiliate of Sellers that will be binding on Buyer or the Oil and Gas Properties after the Closing;

(iii) any Applicable Contract that is a Hydrocarbon purchase and sale, transportation, gathering, treating, processing, compression or similar Contract that is not terminable without penalty on ninety (90) days' or less notice;

(iv) any Contract to sell, lease or otherwise dispose of any Sellers' interests in any of the Oil and Gas Properties;

(v) any tax partnership agreement or joint venture Contract;

(vi) any joint or unit operating agreement to which any Seller's interests in any of the Oil and Gas Properties is subject;

(vii) any Contract providing for an "earnout," "back-in" working interest, or other contingent payment or interest;

(viii) any Contract for drilling or well workover services or other well services agreement, rig Contracts or fracturing services Contracts;

(ix) any Contract for the providing, use, processing and/or analysis of seismic or geophysical data;

(x) any development Contract, participation Contract, exploration Contract, farm-in Contract, farm-out Contract, area of mutual interest Contract or similar Contract;

(xi) any Contract containing any preferential purchase rights, rights of purchase, rights of first offer, right of first refusal or other similar rights affecting the Oil and Gas Properties;

(xii) any Contract, the primary purpose of which is to provide indemnity rights;

(xiii) any Contract that includes non-competition restrictions, non-solicitation or no-hire obligations;

(xiv) any Contract that can reasonably be expected to result in aggregate payments by or on behalf of Sellers or aggregate revenues paid to Sellers, in each case, of more than One Hundred Thousand Dollars ($100,000.00) during the current or any subsequent fiscal year or Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate over the term of such Contract (in each case, based solely on the terms thereof);

(xv) any Contract that contains mandatory drilling requirements with respect to the Oil and Gas Properties, which obligations have not yet been fulfilled; or

(xvi) any Applicable Contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of financial obligation, bond, letter of credit or similar financial Contract.

(b) Except as set forth on Disclosure Schedule 3.05(b), (i) subject to entry of the Sale Order and payment of all Cure Costs, all of the Material Contracts are in full force and effect and no Seller nor, to Sellers' Knowledge, any other party to any such Material Contract is in material breach of or material default, or with the lapse of time or the giving of notice, or both, would be in material breach or material default, with respect to any of its obligations thereunder; and (ii) (A) except as set forth on Disclosure Schedule 3.05(b), as of the Execution Date, Sellers have made available to Buyer (electronically or otherwise) copies of all Material Contracts listed on Disclosure Schedule 3.05(a) and, (B) to Sellers' Knowledge, such copies are complete and accurate copies of such Material Contracts.

Section 3.06 *Approvals*.

(a) Disclosure Schedule 3.06(a) contains a complete and accurate list or description of all approvals, consents, filings and notifications required to be obtained, made or given by Sellers, after giving effect to the entry of the Bid Procedures Order and the Sale Order, for the consummation of the Transactions (each, a "Consent"), other than (i) for Preferential Purchase Rights, (ii) under Contracts that are terminable without cost upon not greater than thirty (30) days' notice, and (iii) any approvals, consents, filings and notifications of or with any Governmental Authority of the type customarily obtained, made or given after Closing.

(b) [Reserved]

Section 3.07 *Environmental Matters*.

(a) Except as set forth on Disclosure Schedule 3.07, Sellers have not entered into any agreements with or consents from any Governmental Authority and, to Sellers' Knowledge, are not subject to any order, decree or judgments issued against Sellers, with respect to the Assets, by a Governmental Authority, in each case, in existence as of the Execution Date and based on any material violation of, or Liability under, Environmental Laws, including any such violations or Liabilities that relate to the future use of any of the Assets or that presently require any material remedial or other corrective action with respect to any Asset. As of the Execution Date, (a) to Sellers' Knowledge, with respect to the Assets, neither Sellers nor any Third Party operator of the Oil and Gas Properties has released, disposed or arranged for disposal of, transported, treated, stored or exposed any Person to, any Hazardous Substances and (b) Sellers have not received written notice from any Person of any release, event, condition or disposal of any Hazardous Substances (for which all required remediation has not already been completed) concerning any of the Assets, in each case of clauses (a) or (b) that would (i) materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) result in any material liability of Sellers to any

Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(b) Except as set forth on Disclosure Schedule 3.07, no Seller has received any written notice from any Governmental Authority in the two-year period immediately preceding the Execution Date alleging that a violation of Environmental Law has occurred at any Asset that remains unresolved as of the Execution Date.

(c) To Sellers' Knowledge, except as set forth on Disclosure Schedule 3.07, as of the Execution Date, no Hazardous Substances are present, or have been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or have escaped on, in, from, under or in connection with the Assets such as to cause a condition or circumstance that (i) as of the Execution Date, materially interferes with or prevents material compliance, or would reasonably be expected to materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) has resulted or would reasonably be expected to result in any material liability of Sellers to any Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(d) All reports, studies or other material documents addressing the environmental conditions at the Oil and Gas Properties that are in Sellers' possession have been made available for Buyer's review.

This Section 3.07 shall constitute Sellers' sole representation and warranty as to Environmental Claims, compliance with Environmental Laws or environmental conditions of or affecting the Oil and Gas Properties

Section 3.08 *Well Status*. As of the Execution Date, except as set forth on Disclosure Schedule 3.08, to Sellers' Knowledge, there are no Wells located on the Oil and Gas Properties that: (i) were required by Applicable Law or Lease to be plugged and abandoned that have not been plugged and abandoned in accordance in all material respects with all Applicable Laws; or (ii) have been plugged and abandoned but have not been plugged and abandoned in accordance in all material respects with all Applicable Laws.

Section 3.09 *Imbalances*. To Sellers' Knowledge, Disclosure Schedule 3.09 sets forth all Imbalances with respect to the Oil and Gas Properties as of the date(s) shown on Disclosure Schedule 3.09.

Section 3.10 *Litigation*. Except as set forth in Disclosure Schedule 3.10, as of the Execution Date, there is no Proceeding pending or, to Sellers' Knowledge, threatened in writing against any Seller (a) with respect to the Assets, (b) that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions or (c) that affects or impairs the execution, delivery or performance by any Seller of this Agreement or any other Transaction Document to which any Seller is or will be a party.

Section 3.11 *Hedging*. There are no futures, hedges, swaps, collars, puts, calls, floors, caps, options or other Contracts that are intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in the price of commodities, including Hydrocarbons, that have been

entered into by any Seller or are otherwise binding on the Assets that will be binding on the Assets at any time following the Closing Date.

Section 3.12 *Intellectual Property*. Except as set forth on Disclosure Schedule 3.12, Sellers do not own any Intellectual Property related to or used in connection with the ownership of the Oil and Gas Properties.

Section 3.13 *Insurance Coverage*. Disclosure Schedule 3.13 sets forth a list of all material insurance policies and fidelity bonds of Sellers in effect as of the Execution Date relating to the Oil and Gas Properties.

Section 3.14 *Taxes*. Except as set forth on Disclosure Schedule 3.14, to Sellers' Knowledge:

(a) (i) all Tax Returns with respect to any material amount of Non-Income Taxes have, to the extent required by Applicable Law to be filed (taking into account extensions of time within which to file), been filed when due in accordance with all Applicable Law, (ii) as of the time of filing, such Tax Returns were true and complete in all material respects; and (iii) each Seller has paid (or has had paid on its behalf) or has withheld and remitted to the appropriate Taxing Authority all Taxes due and payable with respect to such filed Tax Returns;

(b) there are no liens for Taxes on the Assets, other than statutory liens for Taxes that are not yet due and payable;

(c) there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Non-Income Taxes;

(d) no claim has been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns with respect to Non-Income Taxes that Seller is or may be subject to taxation by that jurisdiction with respect to Non-Income Taxes;

(e) there is no claim, audit, action, suit, proceeding or investigation pending against or with respect to any Seller in respect of any material amount of Non-Income Taxes; and

(f) no Oil and Gas Property is subject to any tax partnership agreement or provisions requiring a partnership income tax return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code (the "Code").

This Section 3.14 shall constitute Sellers' sole representation and warranty as to Tax matters.

Section 3.15 *Letters of Credit*. As of the Execution Date, there are no Existing Letters of Credit posted by Sellers.

Section 3.16 *Outstanding Obligations*. As of the Execution Date, except as described on Disclosure Schedule 3.16, there are no existing commitments or obligations for which Sellers have outstanding any unfunded amount under an authorization for expenditure in excess, individually

or in the aggregate, of $50,000 (net to Sellers' interests) for drilling, completing, equipping, maintaining, deepening, side tracking, reworking, plugging and abandonment or other costs or expenses arising from or relating to the ownership of the Oil and Gas Properties.

Section 3.17 *Preferential Purchase Rights*. Except as set forth on Disclosure Schedule 3.17, there are no preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights or other similar rights that are applicable to the transfer of the Assets in connection with the Transactions (the "Preferential Purchase Rights").

Section 3.18 *Broker*. Other than amounts as may be payable by Sellers for which Buyer shall have no liability, no broker, finder, investment banker or other similar person is or will be, in connection with the transactions contemplated by this Agreement or the other Transaction Documents, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of Sellers.

Section 3.19 *[Reserved]*.

Section 3.20 *Working Interest Payments*. Except for any Cure Costs or as set forth on Disclosure Schedule 3.20, all joint interest billings, cash calls, invoices or other Working Interest payments attributable to Sellers' interest in the Oil and Gas Properties have been timely and properly paid.

Section 3.21 *[Reserved]*.

Section 3.22 *[Reserved]*.

Section 3.23 *FCPA; Sanctions.*

(a) In the past five (5) years, neither the Sellers or any of their Subsidiaries, any of their respective directors or officers, or, to Sellers' Knowledge, any agent or employee of the Sellers or any of their Subsidiaries or other Person acting for or on behalf or at the direction of any of the Sellers or any of their Subsidiaries have:

(i) directly or indirectly, (1) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (2) made any unlawful payment to any government official, (3) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment, nor (4) otherwise violated any applicable Anti-Corruption Laws; nor

(ii) been a Sanctioned Person nor has transacted business, directly or knowingly indirectly, with any Sanctioned Person nor otherwise violated Sanctions.

(b) In the past five (5) years, neither the Sellers nor any of their Subsidiaries have received any notice or communication that alleges that the Sellers or any of their Subsidiaries, or any representative or other Person acting for or on behalf or at the direction thereof may have violated any Anti-Corruption Laws or Sanctions.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.01 *Organization*. Buyer is a corporation duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of Delaware. Buyer is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

Section 4.02 *Authorization and Authority*. Buyer has full power and authority to carry on its business as presently conducted, to enter into this Agreement and the other Transaction Documents to which Buyer is or will be a party, to purchase the Assets on the terms described in this Agreement and to perform its other obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party, and the performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite action on the part of Buyer.

Section 4.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by Sellers) constitutes a legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms, except as enforceability may be limited by Equitable Limitations. At the Closing all other Transaction Documents required hereunder to be executed and delivered by Buyer shall be duly executed and delivered and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of Buyer enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations.

Section 4.04 *Conflicts*. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party does not, and the consummation by Buyer of the transactions contemplated by this Agreement and the other Transaction Documents to which Buyer is or will be a party shall not, (a) violate or be in conflict with, or require the consent of any Person under, any provision of Buyer's Organizational Documents, (b) conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both, would constitute a default) under any agreement or instrument to which Buyer is a party or is bound, or (c) violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to Buyer.

Section 4.05 *Broker*. No broker, finder investment banker or other similar Person is or will be, in connection with the transactions contemplated by this Agreement or any other Transaction Documents, entitled to any brokerage, finders or other fee or compensation based on any arrangement or agreement made by or on behalf of Buyer.

Section 4.06 *Financial Ability*. As of the Execution Date, Buyer has sufficient funds committed and unconditionally available to it to perform all of Buyer's obligations under this Agreement, including without limitation to pay the Adjusted Purchase Price in accordance with the terms of this Agreement and to assume the Assumed Liabilities. Buyer's ability to consummate the transactions contemplated hereby is not contingent upon its ability to secure any financing or to complete any public or private placement of securities prior to or upon Closing.

Section 4.07 *Approvals*. There are no approvals, consents, filings or notifications required to be obtained, made or given by Buyer as a condition to or in connection with the performance by Buyer of its obligations under this Agreement or any other Transaction Documents to which Buyer is or will be a party or the consummation by Buyer of the transactions contemplated by this Agreement or such other Transaction Documents.

Section 4.08 *Litigation*. There are no Proceedings pending to which Buyer is a party or, to Buyer's Knowledge, which have been threatened against Buyer which affect the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which Buyer is or will be a party, the performance by Buyer of its obligations under this Agreement or such other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.09 *Bankruptcy*. There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to Buyer's Knowledge, threatened against Buyer.

Section 4.10 *Investor Status; Investigation.*

(a) The Assets are being acquired by Buyer for investment purposes only, for Buyer's own account and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the 1933 Act.

(b) Buyer is an "accredited investor" as defined in Regulation D promulgated under the 1933 Act. Buyer acknowledges that the sale of the Assets has not been registered under the 1933 Act or any state or foreign securities laws and that the Assets may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c) Buyer has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Assets. Buyer is knowledgeable of the oil and gas business and of the usual and customary practices of oil and gas producers, including those in the areas where the Assets are located. Further, Buyer is capable of making such investigation, inspection, review and evaluation of the Assets as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Assets, their value, operation and suitability.

(d) Buyer has had the opportunity to examine all aspects of the Assets that Buyer has deemed relevant and has had access to all information requested by Buyer with respect to the Assets in order to enter into this Agreement. In connection with the Transactions, Buyer has had the opportunity to ask such questions of, and has received sufficient answers from, the Representatives of Sellers and obtain such additional information about the Assets as Buyer deems necessary to enter into this Agreement.

(e) Buyer confirms, acknowledges and agrees that Buyer is relying entirely upon the representations and warranties of Sellers in this Agreement, as well as Buyer's own investigations and inspections of the books, records and assets of Sellers, including the Assets, prior to the execution of this Agreement in entering into this Agreement and proceeding with the Transactions on the terms as set forth herein. Buyer acknowledges and agrees that, other than the express representations and warranties of Sellers set forth in Article III, in the certificates delivered by Sellers at Closing and the Special Warranty, any description of Sellers, their businesses, operations and assets (including the Oil and Gas Properties) in this Agreement, the Disclosure Schedules or any other Transaction Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by Sellers in respect of the accuracy of any description. In deciding to enter into this Agreement, and to consummate the Transactions, other than the express representations and warranties of Sellers set forth in Article III, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis and not on any other disclosure or representation made by, or any duty to disclose on the part of, Sellers or Sellers' Representatives.

Section 4.11 *Qualification*. At the Closing, Buyer (or an Affiliate of Buyer to which the Oil and Gas Properties are assigned at Closing) will be qualified to own and, where applicable, Buyer or its designating operating Affiliate will be qualified to assume operatorship of, the Oil and Gas Properties in all jurisdictions where the Oil and Gas Properties are located. The consummation of the transactions contemplated by this Agreement will not cause Buyer or its applicable Affiliate to be disqualified as such an owner or operator. To the extent required by the applicable state and federal Governmental Authorities, as of Closing Buyer (or, if applicable (as contemplated by Section 5.02), Buyer's operating Affiliate) will have such lease bonds, area-wide bonds or any other surety bonds or insurance policies in each case as required by, and in accordance with, any Governmental Authorities with jurisdiction over the ownership or operatorship of such Oil and Gas Properties or any operating agreement or joint operating agreement applicable to such Oil and Gas Properties.

Section 4.12 *No Other Representations*. No Seller nor any other Person (on behalf of any Seller or otherwise) has made or is making any representation or warranty whatsoever, express or implied, at law or in equity, with respect to Sellers, the Assets, this Agreement or the transactions contemplated by this Agreement other than the representations and warranties expressly set forth in Article III (as modified by the Disclosure Schedules), and Buyer is not relying on and has not relied on any representation or warranty other than those representations or warranties set forth in Article III (as modified by the Disclosure Schedules) and any reliance by Buyer on any representation or warranty other than those representations and warranties set forth in Article III (as modified by the Disclosure Schedules) is hereby expressly disclaimed.

**ARTICLE V**
**COVENANTS OF SELLERS**

Section 5.01 *Operating Covenants*. From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (u) as required by this Agreement or any other Transaction Document, (v) as required by any Applicable Law or any Governmental Authority (including by order or directive of the Bankruptcy Court), (w) to the extent related solely to Excluded Assets and/or Excluded Liabilities, (x) for renewal of expiring insurance coverage in the Ordinary Course of Business, (y) for emergency operations or (z) as otherwise consented to in writing by Buyer:

(a) Sellers will:

(i) maintain or cause its Affiliates to maintain the books of account and records relating to the Assets in the usual, regular and ordinary manner, in accordance with its usual accounting practices;

(ii) give written notice to Buyer as soon as is practicable of any material damage or casualty to or destruction or condemnation of any Oil and Gas Property of which Sellers have Knowledge;

(iii) use reasonable best efforts to maintain insurance coverage on the Assets in the amounts and types described on Disclosure Schedule 3.13;

(iv) take such actions, at Buyer's expense (so long as such expenses are reasonable and documented expenses and do not exceed a maximum of $250,000, without prior consent of Buyer, and so long as such expenses would not have been incurred absent direction from Buyer), as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any final resolution or guarantee any outcome of any such actions);

(v) give appropriate notice to counterparties to the Maverick Basin Area Participation Agreement with respect to any co-sell rights or other similar rights thereunder;

(vi) not take any action to enforce any rights against Buyer or any of its Affiliates under the JDA or take any enforcement actions with respect to any related orders (except in cooperation with Buyer or a Buyer Affiliate); *provided* that, the Parties acknowledge and agree that, notwithstanding anything otherwise provided in this Agreement, all rights between them are preserved pending the occurrence of the Closing and the Parties shall be entitled to take any and all actions as such Party deems necessary or appropriate to preserve such rights (including with respect to the Applicable Contracts and the JDA);

(vii) if requested by Buyer, object to proofs of claim relating to oil and gas properties identified by Buyer, with reasonable legal fees and expenses related thereto paid by Buyer; and

(viii) notify and consult with Buyer of any election that Sellers are required or have the right to make with respect to the Oil and Gas Properties under any joint operating agreement, marketing or purchase contract, area of mutual interest agreement or farmout agreement, specifying the nature and time period associated with such election;

(b) no Seller shall:

(i) sell, lease or otherwise transfer any Oil and Gas Property, or otherwise voluntarily divest or relinquish any right or Asset, other than (A) sales of Hydrocarbons in the Ordinary Course of Business, (B) sales or other dispositions of materials, supplies, machinery, equipment, improvements or other personal property or fixtures which are obsolete and have been replaced with an item of equal suitability and (C) dispositions of Excluded Assets;

(ii) enter into, assume or acquire any Contract that if entered into prior to the Execution Date would be required to be listed in Disclosure Schedule 3.05(a) other than (A) Contracts for the sale of Hydrocarbons in the Ordinary Course of Business, not to exceed thirty (30) days in duration or terminable without penalty on thirty (30)-days' or less notice or (B) in connection with an Alternative Transaction (subject to the remaining provisions of this Agreement);

(iii) amend or modify in any material respect or terminate (other than termination or expiration in accordance with its terms) any Purchased Contract, Lease, Permit or any 365 Contract that could become a Purchased Contract;

(iv) settle any suit or litigation or waive any material Claims, in each case, relating or attributable to the Assets and affecting the period from and after the Effective Time for which Buyer will be responsible for all or any portion;

(v) grant or create any right to Consent to the disposition of, or Preferential Purchase Rights with respect to, any of the Assets;

(vi) make any elections or take any other actions that would require the Sellers (or, after Closing, Buyer) to take its share of Hydrocarbon production produced from or attributable to the Assets in-kind;

(vii) change the methods of accounting or accounting practice by Sellers, except as required by concurrent changes in Applicable Law or GAAP as agreed to by its independent public accountants; or

(viii) authorize, agree or commit to do any of the foregoing.

Section 5.02 *Operatorship*. Buyer acknowledges and agrees that Sellers cannot and do not covenant, represent or warrant that Buyer (or, if applicable, Buyer's operating Affiliate) shall become or have the right to become successor operator of any Oil and Gas Properties and that the Oil and Gas Properties may be subject to operating or other agreements that govern the right to operate the Oil and Gas Properties and the appointment of a successor operator. The failure of

Buyer (or an Affiliate of Buyer) to be designated as operator of any Oil and Gas Property or to have obtained the consents required therefor as of the Closing shall not cause the failure of any other condition to Closing or otherwise affect Buyer's obligations under Section 2.05.

Section 5.03 *Assumption and Rejection of Executory Contracts and Leases.*

(a) Schedule 5.03(a) (as may be amended from time to time or supplemented with written notice to Buyer) sets forth each 365 Contract and Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract (and if no Cure Cost is estimated to be payable in respect of any 365 Contract, the amount of such Cure Cost designated for such 365 Contract shall be "$0.00") (as such schedules may from time to time be amended or supplemented with written notice to Buyer, the "365 Schedule").

(b) Subject to Buyer's rights under Section 5.03(d) below to subsequently amend such designations, Schedule 5.03(b) sets forth a complete list of the 365 Contracts listed on the 365 Schedule that Buyer desires to be assumed by Sellers and transferred and conveyed to Buyer as a Purchased Contract, which shall include each Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule (collectively, and as further modified by Buyer pursuant to the provisions of this Section 5.03(b), the "Desired 365 Contracts"). Any 365 Contracts that are not Desired 365 Contracts shall be an Excluded Asset for all purposes and, for the avoidance of doubt, Buyer shall have no liability on account of any 365 Contracts that are not Desired 365 Contracts.

(c) Promptly following the Execution Date (to the extent not previously filed), Sellers shall file the 365 Schedule with the Bankruptcy Court and deliver a written notice, in a form acceptable to Buyer, of the proposed assignments of the Desired 365 Contracts and the proposed Cure Costs for each Desired 365 Contract (consistent with Sellers' good faith estimates set forth on Schedule 5.03(a)) to all non-debtor parties of the Desired 365 Contracts, which notice shall notify each non-debtor party to such Desired 365 Contract of (i) the proposed Cure Cost for such Desired 365 Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. To the extent that any formal or informal objections are received from such non-debtor parties in response to such notice, Sellers shall (A) promptly provide Buyer with written notice of any objection that is not filed publicly on the Bankruptcy Court's docket, and (B) take all reasonably necessary actions to resolve (excluding providing any payment of Cure Costs unless agreed to and funded by Buyer, without limiting Seller's retention of responsibility for any Excess Cure Costs) such disputes with the applicable non-debtor party; *provided* that any and all such resolutions with respect to any Desired 365 Contract shall be reasonably acceptable to Buyer.

(d) Notwithstanding the foregoing, at any time prior to the Designation Deadline (or, solely for the purpose of clause (i) below, if any 365 Contract is first identified to Buyer by Sellers after the Designation Deadline and prior to the Closing Date, within one (1) Business Day prior to the Closing Date), (i) Buyer may, in its absolute and sole discretion, designate any 365 Contract that has not been rejected as a Desired 365 Contract and upon receipt of any such notice Sellers shall use commercially reasonable efforts to effect the assumption of such 365 Contract by Sellers in accordance with the Bankruptcy Code, *provided* that, any Cure Cost on account of such 365 Contract shall be acceptable to Buyer in its sole discretion, and, if Sellers are successful in effecting such assumption as of Closing, such 365 Contract shall become

a Desired 365 Contract and transferred and conveyed to Buyer as a Purchased Contract at Closing, or (ii) Buyer may revise Schedule 5.03(b) by excluding one or more Desired 365 Contracts at any time prior to the Designation Deadline and upon such exclusion such Contract shall constitute an Excluded Asset; *provided, however,* that Buyer may not exclude from Schedule 5.03(b) any Desired 365 Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule. If a Desired 365 Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Desired 365 Contract that has not been resolved to the satisfaction of Buyer, in Buyer's sole discretion, prior to the Designation Deadline, then, unless otherwise agreed to by Buyer and Sellers, the Designation Deadline shall be extended (but only with respect to such Desired 365 Contract) to no later than the earliest of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Sellers, (B) the date on which such 365 Contract is deemed rejected by operation of sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, or (C) the date required by the Bankruptcy Court and set forth in the Sale Order. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(d).

(e) If Buyer exercises its rights in Section 5.03(d) above to designate a 365 Contract (including a 365 Contract that was a Desired 365 Contract immediately before such designation) as an Excluded Asset, there shall be no change in the Purchase Price as a result of such designation or change in designation.

(f) Notwithstanding anything in this Agreement to the contrary, Sellers shall not reject any 365 Contracts without the prior written consent of Buyer in its sole discretion; *provided* that, after the Designation Deadline, Sellers may reject 365 Contracts (other than Desired 365 Contracts) without the consent of Buyer so long as such 365 Contracts were identified to Buyer in writing prior to the Designation Deadline. In the event that Sellers identify (whether before or after the Designation Deadline) any additional 365 Contracts capable of being assumed or rejected that were not previously identified as such, Sellers shall promptly notify Buyer of (i) such 365 Contracts and (ii) Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract by supplementing Schedule 5.03(a) as required by Section 5.03(a). For the avoidance of doubt and subject to Section 5.03(d), Buyer may, in its sole discretion, designate each such additional 365 Contract as a Desired 365 Contract or Excluded Asset pursuant to this Section 5.03(f), notwithstanding the passage of the Designation Deadline. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(f).

(g) Notwithstanding anything in this Agreement to the contrary, including Section 5.03(d) above, Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule shall at all times constitute Desired 365 Contracts and shall be assigned to Buyer at the Closing.

(h) Buyer shall provide adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Sellers and assigned to Buyer at or prior to the Closing in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement; *provided* that Buyer shall cooperate with Sellers in providing such adequate assurance of future performance of all of the Desired 365 Contracts and Buyer acknowledges that such cooperation may require Buyer to provide reasonably necessary

information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts, and Sellers' obligation to assume and assign such Desired 365 Contracts is subject to the cooperation and providing of such information and commitment by Buyer.

(i) At the Closing, subject to Section 5.03(j), (i) the Purchase Price shall be increased by, pursuant to section 365 of the Bankruptcy Code, if applicable section 1123(b)(2) of the Bankruptcy Code, and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A), 365(b)(1)(B) and 1123(b)(2) of the Bankruptcy Code, as applicable, or any other applicable provision of the Bankruptcy Code to effectuate the assumption and assignment of the Desired 365 Contracts (such costs or expenses, if any, the "Cure Costs") with respect to the Desired 365 Contracts actually paid by Sellers prior to Closing if, and only to the extent that, Sellers have provided evidence of such pre-payment prior to Closing (the "Pre-Paid Cure Costs") and (ii) Buyer (and not Sellers) shall pay all Cure Costs with respect to the Desired 365 Contracts that are not Pre-Paid Cure Costs. Notwithstanding the foregoing, if any Desired 365 Contract is subject to a dispute as to Cure Costs that has not been resolved as of Closing and such Desired 365 Contract is assigned to Buyer (at or after Closing) then, upon resolution of such Cure Costs, Buyer shall pay such Cure Costs; *provided* that, any and all resolutions of disputes related to Cure Costs for any Desired 365 Contract shall be acceptable to Buyer in Buyer's reasonable discretion; *provided, further*, that Buyer retains any and all rights under Section 5.03(d) of this Agreement with respect to the 365 Contracts.

(j) Notwithstanding anything to the contrary in this Agreement, including in this Section 5.03, the Purchase Price shall not be increased by, and Buyer shall not be required to pay, (and Sellers shall retain and be responsible for) the amount of any Excess Cure Costs.

(k) Notwithstanding anything in this Agreement to the contrary, after the Closing, in the event that any Springfield Gathering Contract or the JDA is not assumed and/or assigned to Buyer, (i) Sellers (or a responsible Person appointed by Sellers), at Buyer's expense, shall take all actions as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any guarantee of any outcome of any such actions), and such Springfield Gathering Contract and/or the JDA, as applicable, shall not constitute Excluded Assets unless otherwise so designated as such in writing by the Buyer and (ii) if such actions are not promptly taken by Sellers (or the applicable responsible Person) following Buyer's request, Sellers hereby grant Buyer a limited power of attorney to take actions in Sellers stead to effectuate the purposes of this Section 5.03(k); *provided* that, nothing in this Section 5.03(k) shall (x) require any Seller to be a going concern or otherwise remain in existence for any period after the Closing or (y) prohibit any Seller from liquidating and dissolving at any time after the Closing and, upon such liquidation and dissolution, such Seller shall no longer be obligated to perform the covenants set forth in this Section 5.03(k).

Section 5.04 *Access.*

(a) Each Seller shall afford to Buyer and its authorized representatives from the Execution Date until the Closing Date, during normal business hours, reasonable access to the

Assets (subject to the terms, conditions and restrictions of agreements related to Assets to which such Seller is a party and the consent of the operator, as applicable), appropriate Seller personnel and to such Seller's title, Leases, Contracts, environmental and legal materials, books, records, statements and operating data and information relating to the Assets available as of the Execution Date and that becomes available to any Seller at any time prior to the Closing Date, together with the opportunity to make copies of such books, records and other documents at Buyer's expense, and will furnish to Buyer such other information in Sellers' possession with respect to the Assets as Buyer may reasonably request; *provided, however*, that all such information shall be held in confidence by Buyer in accordance with the terms of the Confidentiality Agreement; *provided, further,* that in no event shall Sellers be obligated to provide (i) access or information in violation of Applicable Law, (ii) any information (other than title opinions, runsheets or similar information) the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound; *provided* that the applicable Seller has used its reasonable efforts to protect the privilege or to obtain a waiver of the applicable contractual obligation, or (iii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications, except to the extent required in the Bid Procedures Order.

(b) BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD EACH SELLER, EACH OF THEIR SUCCESSORS, THEIR AFFILIATES AND ALL OF THEIR RESPECTIVE DIRECTORS AND OFFICERS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES CAUSED DIRECTLY OR INDIRECTLY BY THE ACTS OR OMISSIONS OF BUYER, BUYER'S AFFILIATES OR ANY PERSON ACTING ON BUYER'S OR ITS AFFILIATE'S BEHALF IN CONNECTION WITH ANY DUE DILIGENCE CONDUCTED PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY SITE VISITS CONDUCTED PURSUANT TO SECTION 5.04(a), EXCEPTING ONLY LIABILITIES TO THE EXTENT ACTUALLY RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SELLER OR ANY SELLER INDEMNIFIED PARTIES. Buyer shall comply with all rules, regulations, policies and instructions reasonably required by Sellers, or any Third Party operator of any Assets, which are provided to Buyer regarding Buyer's actions while upon, entering or leaving any Asset, including any insurance requirements that Sellers may reasonably impose, or any such Third Party operator may impose, on contractors authorized to perform work on any Asset owned or operated by Sellers (or any such Third Party operator, as applicable).

## ARTICLE VI
## COVENANTS OF BUYER

Section 6.01 *Access; Data Retention*. Buyer agrees that, following the Closing, and subject to Applicable Law and any confidentiality restrictions to Third Parties, and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Subsidiaries to) upon advance written request give to Sellers and their Representatives reasonable access during normal business hours to the Data (unless Sellers were permitted to retain a copy of such Data as part of the Excluded Records) pertaining to any and all periods prior to and including the Closing Date as Sellers and their Representatives may reasonably request and to make copies of the same (at Sellers' sole cost and expense) in connection with (a) the preparation of Tax Returns or

information returns, (b) reports or other obligations by Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases (including objecting to proofs of claims or administrative expense claims), (d) preparing the Final Settlement Statement and any other matters contemplated by Section 2.06 and (e) any final determination of any audit or examination, Proceeding or determination. Buyer shall (and shall cause its Subsidiaries to) preserve all such Data for a period of three (3) years after the Closing; *provided, however,* that Buyer shall have the right at any time after the second (2nd) anniversary of the Closing Date to request in writing that Sellers take any such Data and, if Sellers do not agree to take such Data within ninety (90) Business Days after receipt of the request, Buyer (or its Subsidiaries, as applicable) may dispose of such records.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLERS

Section 7.01 *Commercially Reasonable Efforts; Further Assurances*. Subject to the terms and conditions of this Agreement, and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions; *provided* that the Parties understand and agree that the commercially reasonable efforts of any Party, and the reasonable best efforts of Buyer, shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions; *provided*, *further* that this Section 7.01 shall not (a) limit or affect the obligation of any Party to perform its obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to Third Parties not otherwise required under this Agreement. Sellers and Buyer agree to execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

Section 7.02 *Bankruptcy Proceedings.*

(a) Sellers shall take such actions as may be reasonably necessary to (i) obtain entry of the Sale Order as soon as reasonably practicable following completion of the Auction and (ii) consummate the Transactions, in each case, in accordance with this Agreement.

(b) Each Seller and Buyer acknowledge that this Agreement and the sale of the Assets and assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval. Each Seller and Buyer acknowledge that (i) to obtain such approval and to satisfy Sellers' fiduciary duties to all applicable stakeholders in accordance with Applicable Law, each Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction, (ii) Buyer must provide adequate assurance of future performance as may be required under section 365 of the Bankruptcy Code with respect to the Purchased Contracts, and (iii) to the extent such adequate assurance of future performance is not provided with respect

to an Purchased Contract, then such Purchased Contract will be excluded from the Assets and included in the Excluded Assets.

(c) In the event an objection is filed, an appeal is taken or a stay pending appeal is requested, from either the Bid Procedures Order, the Sale Order or any other order reasonably necessary in connection with the Transactions, as applicable, Sellers shall promptly notify Buyer of such objection, appeal or stay request and shall provide to Buyer promptly a copy of the related objection, notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with an objection or any appeal from either of such orders and Sellers agree to take all action as may be reasonably necessary and appropriate to defend against such appeal, petition or motion and Buyer shall cooperate in such efforts.

(d) From and after the Execution Date and until the Closing, no Seller shall take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bid Procedures Order. If Buyer is the Successful Bidder at the Auction, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(e) From and after the Execution Date and until the Closing, at least one (1) Business Day prior to the filing thereof, to the extent reasonably practicable under the circumstances, Sellers shall deliver to Buyer, and make reasonable efforts to consult and cooperate with Buyer, regarding (i) any pleadings, motions, notices, statements, applications, schedules, reports or other papers to be filed with the Bankruptcy Court in relation to the implementation of the Transactions, (ii) any discovery taken in connection with the seeking entry of the Sale Order (including any depositions) and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(f) Without limiting the requirements of Section 7.02(a) through Section 7.02(e), from and after the Execution Date until the Closing, Sellers and the Buyer agree to:

(i) support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(ii) to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Transactions, support and take all steps reasonably necessary and desirable to address any such impediment;

(iii) negotiate in good faith and use commercially reasonable efforts to execute and deliver the definitive documents and any other required agreements to effectuate and consummate the Transactions;

(iv) consult and negotiate in good faith with material stakeholders and their advisors regarding the execution of definitive documents and the implementation of the Transactions; and

(v) take such actions as reasonably requested by the other Party to abate, suspend or toll any existing adversarial proceedings or litigation among the Parties or any of their Affiliates, consistent with the purposes of the Release Agreement.

(g) Without limiting the requirements of Section 7.02(a) through Section 7.02(f), from and after the Execution Date and through the Closing or the termination of this Agreement in accordance with its terms, Seller agrees to:

(i) upon reasonable request of Buyer, inform legal counsel to Buyer as to: (A) the status and progress of the Transactions; and (B) the status of obtaining any necessary authorizations (including any consents) from each secured lender, any competent judicial body, Governmental Authority, banking, taxation, supervisory, or regulatory body, as applicable; and

(ii) inform legal counsel to Buyer as soon as reasonably practicable after becoming aware of: (A) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Transactions; and (B) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any Person in respect of any Seller.

(h) Notwithstanding anything to the contrary in this Agreement, including this Section 7.02, each Seller's obligations hereunder are subject in all respects to its obligations as a debtor in possession, including its fiduciary obligations to its bankruptcy estate, and nothing in this Agreement shall require any manager, director or officer of a Seller to violate their fiduciary duties to such Seller or its estate. No action or inaction on the part of any manager, director or officer of a Seller that such manager, director or officer reasonably believes, based on and consistent with the written advice of outside counsel, is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement; *provided, however,* that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

(i) INTENTIONALLY OMITTED

(j) The Deposit Escrow Funds shall be applied as provided in this Agreement or returned to Buyer in accordance with this Agreement and the Bid Procedures. Any instructions provided by Sellers to the Escrow Agent in respect of the Deposit Escrow Funds shall be consistent with this Agreement and the Bid Procedures.

Section 7.03 *Public Announcements*. Sellers and Buyer agree that, prior to Closing, the consent (as to both form and content), not to be unreasonably withheld, of the other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions, except to the extent that such press release or other public announcement is required in connection with the Auction, the Bid Procedures Order or by Applicable Law; *provided* that Sellers shall be permitted to issue a press release or make a public announcement upon the execution of this Agreement to announce such execution of this Agreement and will provide Buyer with a copy of such press release or public

announcement at least one (1) business day in advance of its release and provide Buyer with a reasonable opportunity to comment on the same. From the Closing until one (1) month after the Closing, Buyer and Resources will provide each other a copy, at least one (1) business day in advance of its release (to the extent reasonably practicable under the circumstances), of any press release or other public announcement with respect to this Agreement, the other Transaction Documents or the Transactions that Buyer or Resources proposes to issue or make in advance of its release and provide the other with a reasonable opportunity to comment on the same (*provided* that the issuing Party shall not be required to accept or incorporate the other Party's comments), except to the extent that such press release or other public announcement is required by Applicable Law and such prior notice is not practicable given the circumstances giving rise to the requirement to issue such release.

Section 7.04 *Confidentiality*. The Parties acknowledge that Buyer (or its Affiliates) and Resources previously executed the Confidentiality Agreement. Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail. The Parties acknowledge and understand that this Agreement may be filed with the Bankruptcy Court and may be made available by Sellers to Auction Participants if this Agreement is selected as the Initial Highest Bid pursuant to the Bid Procedures Order. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.04 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by Sellers or their Affiliates in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

Section 7.05 *Audits and Other Tax Proceedings.* Resources shall control the conduct of any audit, litigation or other administrative or judicial proceeding with respect to Non-Income Taxes (each a "Tax Proceeding") for any Seller Tax Period; *provided*, that Buyer may participate in such Tax Proceeding and no such Tax Proceeding that could have an adverse Tax impact on Buyer or the Assets shall be settled without the consent of Buyer, such consent not to be unreasonably withheld. Resources and Buyer shall jointly control the conduct of any Tax Proceeding for any Straddle Tax Period. Each Party shall promptly provide the other Parties with notice regarding the commencement of any Tax Proceeding for any Seller Tax Period or Straddle Tax Period and shall cooperate fully as and to the extent reasonably requested by the other Parties in connection therewith. Neither Party shall enter into any settlement or agreement of compromise with respect to any Tax Proceeding for any Straddle Tax Period without the prior written consent of the other Parties, such approval may not be unreasonably withheld, conditioned or delayed.

Section 7.06 *Employee Matters.*

(a) Pursuant to Section 6 of the Confidentiality Agreement, Buyer is subject to certain restrictions on the solicitation and hiring of the employees of Sellers and their Affiliates. However, Sellers agree that, (i) solely during the period beginning on the Execution Date and ending on the earlier to occur of (A) the Closing Date and (B) the termination of this Agreement, Buyer or one of its Affiliates may make offers of employment to any or all of the employees of Sellers or their Affiliates listed on Schedule 7.06 (each such employee, a "Seller Employee" and

each such offer, an "Employment Offer"); *provided, however,* that any such Employment Offer must comply with Section 7.06(b), and (ii) if, and only if, the Closing has occurred, Buyer or its applicable Affiliate(s) may hire any employee of Sellers or their Affiliates pursuant to any Employment Offer made in compliance with Section 7.06(a)(i).

(b) Within five (5) days after the execution of this Agreement, Buyer shall deliver to Sellers written notice setting forth a list of the Seller Employee(s) to which Buyer is potentially interested in making an Employment Offer, and within three (3) days after receipt of such notice Sellers will deliver to Buyer a schedule (the "Compensation Schedule") of the base salary or base wage, as applicable, of each Seller Employee listed in such notice for reference purposes only. Each Employment Offer shall be on terms determined by Buyer in its sole discretion (including with respect to compensation and irrespective of the base salary or base wage as set forth on the Compensation Schedule) and shall be subject to and conditioned upon the occurrence of the Closing, and any employment by Buyer or its Affiliates of any employee of Sellers or their Affiliates shall not become effective prior to the Closing. A copy of any Employment Offer shall be delivered to Sellers at least one (1) Business Day prior to being delivered to the applicable employee. Buyer shall provide to Sellers, not later than the Closing Date, the names of each Seller Employee who has then accepted an Employment Offer from Buyer or any of its Affiliates (each Seller Employee who accepts such an offering being a "Continuing Employee") and the names of the Seller Employees who have then declined an Employment Offer from Buyer or its Affiliates. Each Continuing Employee shall, as of the Closing Date (if he or she is still employed by Sellers or their Affiliate), be terminated by Sellers or their Affiliate, as applicable (and Sellers shall and shall cause their Affiliates to release such Continuing Employee from all non-compete or similar restrictions that would restrict or be violated in any way by, such Continuing Employee's activities as an employee of Buyer or its Affiliate) and become an employee of Buyer or its Affiliate.

(c) Sellers shall reasonably assist Buyer and its Affiliates, as applicable, in communicating with the employees of Sellers and their Affiliates regarding potential employment with Buyer or its Affiliates; *provided* that, Buyer shall coordinate with a Person designated by Sellers in discussing Employment Offers with the Seller Employees and shall not directly communicate with any Seller Employee regarding potential employment by Buyer or its Affiliates other than as directed or consented to by such designee.

(d) Buyer acknowledges that, except for solicitations expressly permitted by Section 7.06(a)(i) and hiring expressly permitted by Section 7.06(a)(ii), Buyer remains subject to the restrictions on the solicitation of the employees of Sellers and their Affiliates contained in Section 6 of the Confidentiality Agreement.

Section 7.07 *Tax Matters; Apportionment of Tax Liability.*

(a) Non-Income Taxes. All Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period before the Effective Time shall be for Sellers' account and all Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period after and including the Effective Time shall be for Buyer's account. All real estate, personal property, and similar ad valorem Taxes (and any refunds thereof) assessed with respect to the Assets for 2020 shall be prorated based on the number of full days in such period that occur before the Effective Time, on the one hand, and the number of days in such period that occur on

or after the date on which the Effective Time occurs, on the other hand. All Non-Income Taxes (and any refunds thereof) attributable to the production of Hydrocarbons shall be deemed attributable to the period during which such production occurred. All other Non-Income Taxes (and refunds thereof) with respect to the Assets shall be allocated between Sellers and Buyer as though the 2020 taxable period ended as of the close of business on the day before the date on which the Effective Time occurs, and all such Non-Income Taxes with respect to the Assets attributable to taxable periods ending as of the close of business on the day before the date on which the Effective Time occurs shall be for Sellers' account and all such Non-Income Taxes with respect to the Assets attributable to taxable periods beginning on or after the date on which the Effective Time occurs shall be for Buyer's account. The apportionment of Non-Income Taxes (and any refunds thereof) with respect to the Assets between the Parties shall take place in the Closing Statement and the Final Settlement Statement using estimates of such Non-Income Taxes (and refunds thereof) if actual numbers are not available. If estimates of Non-Income Taxes with respect to the Assets are used in the Closing Statement and the Final Settlement Statement to apportion Non-Income Taxes, upon determination of the actual amount of such Non-Income Taxes, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Non-Income Tax that is allocable to such Party under this Section 7.07(a). If estimates of such refunds are used in the Closing Statement and the Final Settlement Statement to apportion such refunds, upon determination of the actual amount of such refunds, timely payments will be made from one Party to the other to the extent necessary to cause each Party to receive the benefit of such refunds that are allocable to such Party under this Section 7.07(a).

(b) Tax Returns. Sellers agree to file all Tax Returns for Non-Income Taxes applicable to the Assets that become due prior to the Closing Date, and Buyer agrees to file all other Tax Returns for Non-Income Taxes with respect to any tax period beginning prior to the Effective Time that become due on or after the Closing Date. The Party not filing the Tax Return agrees to provide the filing party with appropriate information that is necessary to file any required Tax Returns. The Party filing a Tax Return for a taxable period beginning before the Effective Time and ending after the Effective Time shall provide the other Party with a copy of such Tax Return at least fifteen (15) days prior to the due date thereof for such Party's review and comment.

(c) Transfer Taxes. Buyer shall be liable for and shall indemnify Sellers for any sales, use, transfer, documentary, stamp, registration or similar Taxes due as a result of the transfer of the Assets pursuant to this Agreement ("Transfer Taxes"). If required by Applicable Law, Sellers shall, in accordance with Applicable Law, calculate and remit any Transfer Taxes that are required to be paid as a result of the transfer of the Assets to Buyer and Buyer shall promptly reimburse Sellers therefor. If Sellers receive notice that any Transfer Taxes are due, Sellers shall promptly forward a copy of such notice to Buyer for handling.

(d) Purchase Price Allocation. Sellers shall provide to Buyer a statement (the "Allocation") allocating the Purchase Price and any Assumed Liabilities or other items that are treated as additional consideration for Tax purposes among the Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder within ninety (90) days after the Closing Date. Such allocation shall become conclusive and binding on the Parties fifteen (15) days after timely delivery by Sellers unless Buyer objects in writing to the Allocation. If Buyer objects, the Parties shall use commercially reasonable efforts to resolve any disputes within fifteen (15) days after Sellers' receipt of written notice of Buyer's objection. Any unresolved disputes

shall be submitted to the Referee or an accounting firm selected pursuant to the procedures in Section 2.06(d) (the "Accounting Firm"). The resolution of the dispute by the Accounting Firm shall be conclusive and binding on all Parties and the Allocation shall be updated to reflect such resolution. Sellers and Buyer shall use commercially reasonable efforts to update the Allocation in a manner consistent with section 1060 of the Code following any adjustment to the Purchase Price pursuant to this Agreement. Sellers and Buyer shall, and shall cause their Affiliates to, report consistently with the Allocation, as adjusted, in all Tax Returns, including IRS Form 8594, which Buyer and Sellers shall file with the Internal Revenue Service or any other Governmental Authority and neither Sellers nor Buyer shall take any position in any such Tax Return that is inconsistent with the Allocation, as adjusted, in each case, unless required to do so by a determination as defined in section 1313(a) of the Code. Sellers and Buyer agree to promptly advise each other regarding the existence of any tax audit, controversy or litigation related to the Allocation.

Section 7.08 *Supplemental Disclosures*. Prior to the Closing, Sellers shall have the right to supplement or amend the Disclosure Schedules relating to the representations and warranties of Sellers set forth in Article III with respect to any matter hereafter arising or discovered which, if existing (or in the case of any representation or warranty qualified by Sellers' Knowledge, known) at the Execution Date, would have been required to be set forth or described in Sellers' Disclosure Schedules. In the event that Sellers supplement or amend their Disclosure Schedules pursuant to the preceding sentence, Sellers shall deliver a copy of the amendment or supplement (in either case, the "Supplemental Disclosure") to Buyer and the relevant Disclosure Schedule will be deemed to be amended or supplemented as described in the Supplemental Disclosure as of the Execution Date if such matter arose after the Execution Date; *provided* that such Supplemental Disclosure shall be disregarded for purposes of determining whether Buyer's condition to Closing specified in Section 8.02(a) has been satisfied or for determining any remedies available under this Agreement. If a Supplemental Disclosure would result in (or contribute to) the failure of Buyer's condition to Closing specified in Section 8.02(a) to be satisfied at the Closing, Buyer may terminate this Agreement pursuant to Section 9.01(d)(ii), subject to the terms of Section 9.01. Any termination of this Agreement pursuant to Section 9.01(d)(ii) shall be Buyer's sole remedy for a breach of a representation and warranty disclosed by a Supplemental Disclosure that results from a matter that arose after the Execution Date.

Section 7.09 *Replacement of Existing Letters of Credit*. The Parties acknowledge that none of the Existing Letters of Credit, if any, posted by Sellers with Governmental Authorities and relating to the Assets are to be transferred to Buyer. On or before Closing, Buyer shall use commercially reasonable efforts to obtain, or cause to be obtained in the name of Buyer (or Buyer's designated operating Affiliate), replacements for any Existing Letters of Credit to the extent necessary (and then only in the amounts that are necessary) to consummate the Transactions contemplated by this Agreement. Buyer may also provide evidence that such replacements are not necessary as a result of existing bonds, letters of credit or guarantees that Buyer has previously posted as long as such existing bonds, letters of credit or guarantees are adequate to secure the cancellation of the Existing Letters of Credit at Closing. Notwithstanding the foregoing, in the event Buyer is unable to obtain any such bonds, letters of credit and guarantees prior to Closing, the Parties shall nonetheless proceed with Closing and Buyer shall indemnify and hold Sellers harmless for any failure to obtain such bonds, letters of credit and guarantees.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.01 *Conditions to Obligations of Buyer and Sellers*. The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction (or, in the case of clauses (b) and (c) of this Section 8.01, waiver by each to the extent permitted under Applicable Law) of each of the following conditions:

(a) no Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b) all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained (other than those actions or filings that are customarily obtained after the Closing); and

(c) no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect which prohibits, restrains or enjoins the consummation of the Transactions; *provided* that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to prevent the entry of such injunction, order, decree or judgment.

Section 8.02 *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a) (i) each Seller shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date; (ii) the Fundamental Representations shall be true and correct in all respects at and as of the Closing Date as if made at and as of the Closing Date (other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date); and (iii) the representations and warranties of Sellers set forth in Article III of this Agreement (other than the Fundamental Representations) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date *(provided*, that, in each case, for purposes of this Section 8.02(a)(iii), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded), except, for purposes of this Section 8.02(a)(iii), for those failures to be true and correct that, individually or in the aggregate, do not constitute a Seller Material Adverse Effect;

(b) the Sale Order shall have been entered by the Bankruptcy Court and such order shall be a Final Order and in full force and effect;

(c) Intentionally omitted;

(d) the Required Consents set forth on Schedule 8.02(d) (the "Specified Required Consents") shall have been obtained by Sellers, or the Bankruptcy Court shall have entered an order approving or permitting (or resolving any objection so as to permit) the sale and assignment of the Assets subject to such Specified Required Consent to Buyer Free and Clear of such Specified Required Consent (as applicable to the sale and assignment of the Assets to Buyer pursuant to this Agreement);

(e) Intentionally omitted; and

(f) Sellers shall have delivered each of the items required by Section 2.05(c) to be delivered by Sellers at the Closing.

Section 8.03 *Conditions to Obligation of Sellers*. The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a) (i) Buyer shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date and (ii)(A) the representations and warranties of Buyer contained in this Agreement (other than the representations and warranties contained in Section 4.06 and Section 4.10) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date (*provided,* that, in each case, for purposes of this Section 8.03(a)(ii)(A), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Buyer Material Adverse Effect or similar materiality qualifiers shall be disregarded), except for those failures to be true and correct that, individually or in the aggregate, do not constitute a Buyer Material Adverse Effect; and (B) the representations and warranties of Buyer contained in Section 4.06 and Section 4.10 shall be true and correct in all respects at and as of the Closing Date, as if made at and as of such date;

(b) the Sale Order shall have been entered by the Bankruptcy Court and each such order shall be a Final Order and in full force and effect; and

(c) Buyer shall have delivered each of the items required by Section 2.05(d), and made each of the payments required by Section 2.05(e) to be made by Buyer at the Closing.

## ARTICLE IX
## TERMINATION

Section 9.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Sellers and Buyer;

(b) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if the Closing shall not have been consummated on or before November 30, 2020 (the "End Date"), unless extended by mutual written agreement of the Parties;

(c) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if:

(i) a Governmental Authority of competent jurisdiction shall have issued an order, injunction or judgment or law that permanently restrains, prohibits, enjoins or declares illegal the transactions contemplated by this Agreement and such order, injunction or judgment becomes final and non-appealable; or

(ii) the Bankruptcy Court enters an order dismissing, or converting to a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Cases, where such order was not requested, encouraged or supported by Sellers and Buyer;

(d) by Buyer upon written notice by Buyer to Sellers if:

(i) if Buyer is selected as the Successful Bidder at the Auction, at any time if Sellers file any motion, document, or pleading with the Bankruptcy Court to approve any Alternative Transaction, or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Sellers shall have breached any of their representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.02 and (A) such breach is not waived in writing by Buyer (subject to Sellers' right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Buyer to Resources specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Resources' receipt of such written notice from Buyer; or

(iii) [Reserved];

(iv) [Reserved];

(v) the Sale Order is amended, modified, vacated, reversed, or terminated without the prior written consent of Buyer;

(vi) [Reserved]; or

(vii) any condition set forth in Section 8.01 or Section 8.02 that has not been waived by Buyer shall have become incapable of being satisfied by the End Date;

*provided* that each deadline set forth in clauses (i) and (ii) of this Section 9.01(d) shall be subject to the Bankruptcy Court's docket, and accordingly, (A) shall be deemed extended through the date

of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (B) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, Sellers are unable to conclude such hearing(s) prior to such deadline and (C) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (A) and (B), cannot be complied with prior to such deadline; or

(e) by Sellers upon written notice by Sellers to Buyer if:

(i) the Bankruptcy Court shall have approved any Alternative Transaction or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Buyer shall have breached any of its representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.03 and (A) such breach is not waived in writing by Sellers (subject to Buyer's right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Sellers to Buyer specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Buyer's receipt of such written notice from Sellers; or

(iii) any condition set forth in Section 8.01 or Section 8.03 that has not been waived by Sellers shall have become incapable of being satisfied by the End Date.

Notwithstanding the foregoing, (x) Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are then in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the condition to closing set forth in clauses (i) and (ii) of Section 8.02(a) shall not be satisfied or (B) such breach or failure to perform or comply by Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred, and (y) Buyer shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyer is then in breach of its representations and warranties or shall have failed to perform or comply with any of its covenants and agreements such that either (A) the condition to closing set forth in Section 8.03(a) shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.

Section 9.02 *Effect of Termination.*

(a) If the obligation to close the transactions contemplated by this Agreement is terminated pursuant to any provision of Section 9.01, then, except for the provisions of Section 5.04(b), Section 7.04, this Section 9.02 and Article XIV and such of the defined terms on Exhibit

A necessary to give context to the surviving provisions, this Agreement shall forthwith become void and the Parties shall have no liability or obligation hereunder.

(b) If Sellers are entitled to terminate this Agreement pursuant to (i) Section 9.01(e)(ii), (ii) Section 9.01(e)(iii) as a result of Buyer's Willful Breach of this Agreement or (iii) Section 9.01(b) and, in the case of clause (iii), (A) Buyer is then in Willful Breach of this Agreement, or (B) Buyer has failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.02 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Sellers (or waived by Buyer), (2) each Seller is ready, willing and able to perform its obligations under Section 2.05, and (3) Buyer nevertheless fails to close, then, in each such event, Sellers shall be entitled to, at their option, (x) obtain specific performance in lieu of termination or (y) terminate this Agreement and receive a distribution of the Deposit Escrow Funds (or if Buyer terminates this Agreement pursuant to Section 9.01(b) at a time when Sellers had the right to terminate this Agreement and receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall be entitled to a distribution of the Deposit Escrow Funds) as liquidated damages for such termination (the Parties agree that the foregoing liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date, shall not serve as a penalty and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Sellers). Sellers agree that, to the fullest extent permitted by Applicable Law, Sellers' rights set forth in the preceding sentence shall be the sole and exclusive remedies of Sellers (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if the Closing does not occur as a result of the termination of this Agreement in the circumstances described in this Section 9.02(b). Nothing herein shall be construed to prohibit Sellers from first seeking specific performance in accordance with the penultimate sentence of this Section 9.02(b), but thereafter terminating this Agreement and receiving a distribution of the Deposit Escrow Funds as liquidated damages in lieu of fully prosecuting its claim for specific performance. Each Party acknowledges that the remedies at law of Sellers for a breach or threatened breach of this Agreement by Buyer as contemplated pursuant to this Section 9.02(b) may be inadequate and, in recognition of this fact, Sellers, without posting any bond or the necessity or proving the inadequacy as a remedy of monetary damages, and in addition to all other remedies that may be available, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available. If at any time Sellers are entitled to receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(c) If at any time after the Sale Hearing, Buyer is entitled to terminate this Agreement pursuant to (i) Section 9.01(d)(ii) as a result of a Seller's Willful Breach of this Agreement or (ii) Section 9.01(b) and, in the case of clause (ii), (A) a Seller is then in Willful Breach of this Agreement, or (B) Sellers have failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.03 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Buyer (or waived by Sellers), (2) Buyer is ready, willing and able to perform its obligations under Section 2.05, and (3) Sellers nevertheless fails to close, or if Sellers terminate this Agreement pursuant to either Section 9.01(b) at a time when Buyer had the right to terminate this Agreement for the reasons

described in this Section 9.01(c), then, in each such event, Buyer shall be entitled to (x) terminate this Agreement (in which event Buyer shall be entitled to a return of the Deposit Escrow Funds) and seek to recover its actual, direct damages up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds or (y) subject to entry of the Sale Order, obtain specific performance in lieu of termination. Sellers agree that, to the extent Buyer is entitled to recover its actual, direct damages (up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds) pursuant to an order of the Bankruptcy Court, any such amounts shall be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, and that Sellers shall not contest the characterization of such amounts as administrative expenses. Buyer agrees that, to the fullest extent permitted by Applicable Law, Buyer's rights set forth in the preceding sentence shall be the sole and exclusive remedies of Buyer (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if Buyer has the right to terminate this Agreement in the circumstances described in this Section 9.02(c).

(d) Subject to and without limiting Section 9.01(c), if at any time after the Sale Hearing (i) Sellers terminate this Agreement pursuant to Section 9.01(e)(i) or (ii) Buyer terminates this Agreement pursuant to Section 9.01(d)(i), then in any such case, in addition to returning to Buyer the Deposit Escrow Funds, Sellers shall reimburse and pay to Buyer an amount equal to the reasonable and documented out of pocket expenses incurred by Buyer in connection with the Transactions, up to a maximum of $750,000 (the "Expense Reimbursement"), which Expense Reimbursement shall be payable within ten (10) days following such termination. Notwithstanding anything contained herein to the contrary, Buyer agrees that, upon any termination of this Agreement under circumstances where the Expense Reimbursement is payable by Sellers and such Expense Reimbursement is paid in full to Buyer by Sellers, Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recover, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against Sellers or any of their respective Representatives, equityholders or Affiliates in connection with this Agreement or the Transactions and Sellers and their respective Representatives, equityholders and Affiliates shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Transactions. Sellers' obligation to pay the Expense Reimbursement, as provided herein, shall constitute an administrative expense Claim against any Seller under section 503(b) or 507(a)(2) of the Bankruptcy Code.

(e) If this Agreement is terminated prior to the Closing by Sellers or by Buyer pursuant to Section 9.01 other than under the circumstances described in Section 9.02(b), within two (2) Business Days after such termination, Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(f) Subject to this Section 9.02, upon the termination of this Agreement, neither Party shall have any other liability or obligation hereunder, and Sellers shall be free to immediately enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any Person without any restriction under this Agreement.

## ARTICLE X
## CASUALTY LOSS

Section 10.01 *Casualty Loss.*

(a) Notwithstanding anything herein to the contrary, Buyer shall assume all risk of loss with respect to the Assets from and after the Effective Time, including with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of any Asset due to ordinary wear and tear.

(b) As used herein, the term "Casualty Loss" means any destruction by fire, blowout, storm or other casualty or any taking in condemnation or expropriation or under the right of eminent domain, in each case with respect to all or any material portion of the Oil and Gas Properties to the extent such destruction or taking occurred during the Interim Period. If any Casualty Loss occurs during the Interim Period, notwithstanding such Casualty Loss, Buyer shall acquire all Oil and Gas Properties that suffer such Casualty Loss and all rights to receive all unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss, and reduce the Purchase Price by an amount equal to all sums paid to Sellers prior to Closing as insurance proceeds, awards or other payments arising out of such Casualty Loss and Sellers shall not voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Buyer; *provided, however,* that Sellers shall reserve and retain (and Buyer shall assign to Sellers) all rights, title, interests and claims against Third Parties for the recovery of Sellers' costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims or other rights against Third Parties with respect to any such Casualty Loss.

## ARTICLE XI
## RESERVED

## ARTICLE XII
## RESERVED

## ARTICLE XIII
## SURVIVAL AND INDEMNIFICATION

Section 13.01 *Survival; Limited Recourse Against Sellers.*

(a) Other than the Special Warranty, the representations and warranties of Sellers contained herein and in any certificate or other writing delivered by Sellers pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability (whether arising in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which any entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims)) thereafter in respect thereof. The Special Warranty shall survive the Closing until the Cut-Off Date. Each of the covenants of Sellers contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in

accordance with this Agreement or, (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant. The intended effect of termination of representations, warranties, covenants and agreements is to bar, from and after the date of termination, any claim or cause of action based on (x) the alleged inaccuracy of such representation or breach of such warranty or (y) such alleged breach or failure to fulfill such covenant or agreement; *provided* that if a written notice of any claim with respect to any covenant to be performed after Closing is given to Sellers prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

(b) Except with respect to any Excluded Assets or Excluded Liabilities and without limiting the Special Warranty, Buyer shall have no recourse against any Seller Indemnified Party or any of their Affiliates or their respective lenders or creditors from and after Closing for any Losses relating to the Assets or this Agreement (including title and environmental matters) or Sellers' breach of any representations and warranties, covenants or other provision of this Agreement, subject to Buyer's rights under Section 14.11 with respect to those covenants of Sellers the performance of which is to take place after Closing, as contemplated by Section 13.01(a).

(c) Subject to Section 13.01(a), the remainder of this Agreement shall survive the Closing without time limit. Representations, warranties, covenants, obligations and agreements of Sellers shall be of no further force and effect after the date of their expiration as set forth in Section 13.01(a). For the avoidance of doubt, nothing in this Agreement shall prohibit Sellers from ceasing operations or winding up its affairs following the Closing.

(d) Any representation and warranty insurance policy obtained by Buyer in connection with the transactions contemplated by this Agreement shall include a complete and unconditional (except in cases of fraud) waiver of subrogation and contribution rights against all of the Seller Indemnified Parties, and neither Buyer nor any of its Affiliates shall amend or waive such waiver in any respect without the prior written consent of Sellers.

Section 13.02 *Indemnification by Buyer*. From and after Closing, Buyer hereby assumes and agrees to release, defend, indemnify and hold Sellers and their Affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors (collectively, the "Seller Indemnified Parties") harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from:

(a) any breach of any representation or warranty of Buyer set forth in Article IV, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer pursuant to this Agreement;

(b) any breach of any covenant or other agreement on the part of Buyer under this Agreement;

(c) the Assumed Liabilities;

(d) any Buyer Taxes; and

(e) any other indemnity obligations of Buyer and its Affiliates expressly set forth in this Agreement.

Section 13.03 *Indemnification Procedures.*

(a) In the event that any Proceedings shall be instituted or that any claim or demand shall be asserted by any Indemnified Party in respect of which payment may be sought under Section 13.02 (an "Indemnification Claim"), the Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnifying Party. The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder. If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the Indemnified Party of its intent to do so. If the Indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the Indemnifying Party shall assume the defense of any Indemnification Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided, however,* that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and *provided, further,* that the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Indemnification Claim. The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 13.03 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. If the Indemnifying Party makes any payment on any Indemnification Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Indemnification Claim.

(b) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter.

Section 13.04 *Express Negligence*. THE INDEMNIFICATION, RELEASE, ASSUMED LIABILITIES, WAIVER AND LIMITATION OF LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY; *PROVIDED*, *HOWEVER*, SUCH PROVISIONS SHALL NOT APPLY TO LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES. BUYER AND SELLERS ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

Section 13.05 *Tax Treatment of Indemnity Payments*. Sellers and Buyer agree to treat any indemnity payment made pursuant to this Article XIII as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes. Any indemnity payment under this Article XIII shall be treated as an adjustment to the value of the asset upon which the underlying Indemnification Claim was based, unless a final determination (within the meaning of section 1313 of the Code) with respect to the Indemnified Party or any of its Affiliates causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

Section 13.06 *Sole and Exclusive Remedy*. Except for the post-Closing payments contemplated in Section 2.07 and Section 7.07(a), the Special Warranty, the remedies provided in this Article XIII and in Section 14.11 shall be the sole and exclusive legal and equitable remedies of the Parties, from and after the Closing, with respect to this Agreement and the transactions contemplated hereby, and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which such entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims), it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the Parties to the fullest extent permitted by law. No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Sellers or any of their Affiliates (the "Seller Non-Party Group") shall have any liability for any obligations or liabilities of Sellers under this Agreement of or for any Claim based on, in respect of, or by reason of, the transactions contemplated hereby.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.01 *Notices*. All notices and communications which are required or may be given to a Party hereunder shall be in writing, addressed as indicated below and shall be deemed to have been duly given upon the earliest of: (a) if by personal delivery, then the date of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then the next Business Day, (b) if sent by U.S. certified mail, postage prepaid, return receipt requested, then the date shown as received on the return notice, (c) if sent by email, with delivery receipt to sender or upon an affirmative reply by email by the

intended recipient that such email was received, or (d) if by Federal Express overnight delivery (or other reputable overnight delivery service), the date shown on the notice of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then on the next Business Day:

if to Buyer, to:

Mesquite Energy, Inc.
Pennzoil Place
700 Milam Street, Suite 600
Houston, Texas 77002
Attention: Gregory Kopel
Executive Vice President and General Counsel
Email: gkopel@mesquite-energy.com

with a copy to:

Foley & Lardner, LLP
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Attention: Timothy Spear
Email: tspear@foley.com

if to Sellers, to:

c/o Gavilan Resources Holdings, LLC
920 Memorial City Way, Suite 1400
Houston, Texas 77024
Attention: General Counsel
Email: john.zabaneh@gavilanresources.com

with a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Rodney L. Moore
Samuel C. Peca
Email: rodney.moore@weil.com
samuel.peca@weil.com

The Parties may change the identity, address and email addresses to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this Section 14.01.

Section 14.02 *Amendments and Waivers.*

(a) Any provision of this Agreement may be amended or waived if but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No waiver by any Party of any condition, or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation, or warranty. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 14.03 *Expenses*. Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 14.04 *Successors and Assigns/Liquidating Trust.*

(a) Subject to Section 14.04(b), the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; *provided* that neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto; *provided, however,* that Sellers may assign their respective rights and obligations under this Agreement to any liquidating trust or other representative of Sellers created or appointed pursuant to a Bankruptcy Court order; and *provided, further*, that Buyer may assign its rights and obligations under this Agreement to any Affiliate of Buyer without prior consent of Sellers, but no such transfer or assignment will release Buyer of its obligations hereunder or enlarge, alter or change any obligation of Sellers to Buyer.

(b) If a Liquidating Trust is established, from and after the formation of the Liquidating Trust all rights and obligations of Sellers under this Agreement shall accrue to and be for the benefit of an shall be exercisable by the Liquidating Trust, as provided by any order of the Bankruptcy Court and the Liquidating Trustee shall be entitled to exercise all of the rights of Sellers under this Agreement.

Section 14.05 *Governing Law.* EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT, THE TRANSACTION DOCUMENTS, AND ANY OTHER DOCUMENT OR INSTRUMENT DELIVERED PURSUANT HERETO, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICTS OF LAW OR PRINCIPLE THAT

MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.

Section 14.06 *Jurisdiction*. Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement and the Transaction Documents (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01.

Section 14.07 *Waiver of Jury Trial*. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when all Parties shall have received a counterpart hereof signed by all of the other Parties. Until and unless all Parties have received a counterpart hereof signed by the other Parties, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns prior to Closing; *provided, however,* (a) the Seller Indemnified Parties are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Article XIII, (b) the Seller Non-Party Group are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Section 13.06 and (c) the Buyer Non-Recourse Parties are intended to be, and shall be, third party beneficiaries of Section 14.15. From and after the establishment of the Liquidating Trust, the Liquidating Trustee shall be a third party beneficiary of Sellers' rights under this Agreement.

Section 14.09 *Entire Agreement*. This Agreement, the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 14.10 *Severability*. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable,

the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in. terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 14.11 *Specific Performance*. Without limiting Sellers' rights under Section 9.02(b), the Parties agree that, from and after Closing, irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (without posting any bond or other undertaking) or to enforce specifically the performance of the terms and provisions hereof in addition to any other remedy to which they are entitled at law or in equity.

Section 14.12 *Certain Acknowledgements and Limitations.*

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents. No implied obligation of good faith or fair dealing shall require any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation of good faith or fair dealing.

(b) WITHOUT LIMITING SECTION 13.03(b), UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), SPECIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), PUNITIVE, INCIDENTAL, SPECULATIVE, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY) OF ANY KIND ARISING UNDER, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT (EXCEPT TO THE EXTENT INDEMNIFIABLE PURSUANT TO ARTICLE XIII BECAUSE PAYABLE BY SELLERS OR ANY SELLER INDEMNIFIED PARTY TO A THIRD PARTY).

Section 14.13 *Disclosure Schedules*. All references to Schedules and Disclosure Schedules in Article III of this Agreement refer to Schedules contained in the Disclosure Schedule. The information in the Disclosure Schedule constitutes exceptions, qualifications and/or supplements to particular representations or warranties of Sellers as set forth in this Agreement. The Disclosure Schedule shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the Ordinary Course of Business of, or required to be disclosed by, Sellers

or constitutes, individually or in the aggregate, a Seller Material Adverse Effect. Capitalized terms used in the Disclosure Schedule that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Disclosure Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement. The statements in each Schedule of the Disclosure Schedule qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedule is apparent on its face.

Section 14.14 *Preparation of Agreement*. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 14.15 *No Recourse*. Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, each Seller, on behalf of itself and its Affiliates and their respective representatives and the Seller Indemnified Parties, covenants, agrees and acknowledges that no Person other than Buyer (and its successors or assignees, as applicable) has any obligation hereunder and that, neither Sellers, their respective Affiliates or their respective representatives, or any Seller Indemnified Parties, shall have any right of recovery under this Agreement or any other Transaction Document against, and no personal liability under this Agreement or any Transaction Document shall attach to, any of Buyer's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including Buyer, a "Buyer Non-Recourse Party"), through Sellers or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of Sellers or any Seller Indemnified Party against any Buyer Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

GAVILAN RESOURCES, LLC

By: ______________________________
Name: Dave Roberts
Title: Chief Executive Officer

GAVILAN RESOURCES
MANAGEMENT SERVICES, LLC

By: ______________________________
Name: Dave Roberts
Title: Chief Executive Officer

BUYER:

MESQUITE ENERGY, INC.

By: ________________________________
Name: Cameron W. George
Title: Chief Executive Officer

**Exhibit A**
**Definitions**

"1933 Act" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"365 Contracts" means all Applicable Contracts and other executory contracts and unexpired leases to which a Seller is a party that relate to the Assets, in each case that may be assumed by one or more Sellers pursuant to section 365 of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Allocated Value" means, with respect to any Oil and Gas Property, the value of Sellers' interest therein as set forth on Schedule 1.01(a). If any Oil and Gas Property is not set forth on Schedule 1.01(a) or, if no value is set forth on Schedule 1.01(a) with respect to such Oil and Gas Property, the Allocated Value of such Oil and Gas Property shall be zero.

"Alternative Transaction" means, other than the Transactions or any transactions effected in the Ordinary Course of Business, any (a) sale, transfer or other disposition, directly or indirectly, of all or substantially all of the assets of Sellers (except any such sale, transfer or other disposition to the extent permitted by Section 5.01(b)), (b) issuance, sale, transfer or other disposition, in each case by any Seller, of any class of equity securities, ownership interests or voting securities of any Seller, (c) merger, consolidation, recapitalization, business combination or other similar transaction involving any Seller, (d) the consummation of any state court foreclosure action as to a material portion of the Assets or (e) successful credit bid transaction with respect to the Assets.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, applicable anti-bribery legislation enacted by member states of the European Union and signatories implementing the OECD Convention Combating Bribery of Foreign Officials, and other similar laws and regulations applicable to the Sellers or their subsidiaries from time to time.

"Applicable Contracts" means (a) all Contracts (*provided* that, for clarity, any "Operating Agreement" or "Joint Operating Agreement" identified on the 365 Schedule shall be deemed a Contract for purposes of this definition) to which a Seller is a party or is bound to the extent covering, attributable to or relating to any of the Assets or to which an Oil and Gas Property is subject or bound, including, without limitation, operating agreements, crude oil, condensate and natural gas purchase and sale agreements, gathering agreements, transportation agreements, marketing, disposal or injection agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, exploration agreements, development agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements, confidentiality agreements and any other similar contracts, agreements and instruments, and all amendments thereto, and (b) all ROW Interests, including without

limitation, in the case of each of clause (a) and clause (b) of this definition, those Contracts and ROW Interests described on Annex C.

"Applicable Law" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, order, injunction or judgment adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Applicable Schedule 3.06(a) Consent" means any Consent required to be set forth on Disclosure Schedule 3.06(a) (irrespective of whether such Consent is actually listed on Disclosure Schedule 3.06(a)) (a) relating to an Applicable Contract for which the counterparty's consent to assignment would be required for such Applicable Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code, or (b) that burdens a Lease.

"Assigned Contracts" means the Desired 365 Contracts and all other Applicable Contracts that are not 365 Contracts (other than Excluded Assets).

"Assumed Liabilities" means:

(a) all Property Expenses to the extent attributable to the Assets and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is increased pursuant to Section 2.04(a));

(b) all Liabilities (other than Property Expenses) that attach to or run with the Assets (excluding any personal Liabilities of Sellers or their Affiliates that are not attached to the Assets), to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Effective Time;

(c) other than the Excluded Environmental Liabilities, all Liabilities under, associated with or appurtenant to the Assets with respect to Environmental Claims, whether arising on, before or after the Effective Time, including without limitation those related to the control, storage, handling, or discharge of all materials, substances and wastes from the Assets (including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes);

(d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Assets, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits;

(e) Taxes allocated to Buyer pursuant to Section 7.07(a) and Section 7.07(c);

(f) all Liabilities related to the payment of Burdens (i) attributable to Buyer Hydrocarbons (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A)), (ii) attributable to Effective Time Hydrocarbons to the extent not paid or borne by Sellers as of Closing and (iii) arising out of, in connection with or attributable to the failure to pay or report, or mispayment or underpayment of, any Burdens attributable to Seller Hydrocarbons to the extent (and only to the extent) that Buyer realizes the economic benefit of such non-payment, mispayment or underpayment (but excluding any and all Liabilities related to

items 3 through 44 of Disclosure Schedule 3.10 or the facts or allegations forming the basis thereof, to the extent attributable to Seller Hydrocarbons);

(g) all of Sellers' Liabilities under the Leases and the Purchased Contracts arising on or after the Effective Time (excluding any default penalties, charges or interest pertaining to breaches, defaults or non-performance under such Leases or Purchased Contracts prior to Closing), subject to the immediately preceding clause (f);

(h) all of Sellers' Liabilities with respect to Imbalances with Third Parties attributable to the Assets; and

(i) all Liabilities with respect to the Cure Costs required to be paid by Buyer in accordance with Section 5.03(i);

*provided, however,* that notwithstanding anything to the contrary in clauses (a) through (i) above, the Assumed Liabilities shall not include (i) Seller Taxes, (ii) any Liabilities pertaining to the Excluded Assets, (iii) any Liabilities discharged or from which the Assets are otherwise released as of the Closing in accordance with the Sale Order, (iv) any Excluded Environmental Liability, (v) any Excess Cure Costs, (vi) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, (vii) claims, investigations, administrative proceedings, arbitration or litigation arising out of or resulting from actual or claimed personal injury; illness or death; other torts; private rights of action given under any Applicable Law; or violation of any Applicable Law, or (viii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters, each of which clauses (i) - (viii) shall be deemed an Excluded Liability.

"Auction" means the auction for the sale of the Assets to be conducted in accordance with the Bid Procedures.

"Auction Participant" has the meaning set forth in the Bid Procedures Order.

"Avoidance Action" means any claim, right or cause of action of Sellers arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"Bid Procedures" means the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order.

"Bid Procedures Order" means the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* entered by the Bankruptcy Court on June 9, 2020 [Docket No. 115] in the Bankruptcy Cases, as amended by the *Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 215], the *Revised Order Pursuant to 11 U.S.C. §§ 363*

*and 105(a) for Modification of Sales Process* [Docket No. 268] entered on July 29, 2020, and the *Corrected Revised Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 278] entered on August 14, 2020 (as may be amended, supplemented or modified from time to time).

"Burden" means any and all Royalties, reversionary interests, net profits interests, production payments and other burdens upon, measured by or payable out of production.

"Business Day" means any day, excluding Saturdays, Sundays or legal holidays, on which commercial banks are open for business in New York, NY and Houston, TX.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a party.

"Buyer's Knowledge" means the actual knowledge of the executive officers of Buyer.

"Buyer Taxes" means any Taxes that are apportioned to Buyer under Section 7.07.

"Claim" means a claim against any Seller as defined in Bankruptcy Code section 101(5).

"Closing Date" means the date of the Closing.

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement between Resources and Buyer dated September 28, 2020.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Contract" means any contract or agreement, but excluding, however, (a) any Lease, easement, right-of-way (including any ROW Interest) or other instrument, in each case, creating any oil and gas mineral interests or other real property interests, or (b) any Permit.

"Deposit Escrow Agreement" means that certain Escrow Agreement dated as of the Execution Date, by and among Sellers, Buyer and the Escrow Agent.

"Designation Deadline" means 5:00 p.m. (Central Prevailing Time) on the date that is two (2) Business Days prior to the Closing Date.

"Disclosure Schedule" means the letter dated as of the Execution Date, executed by Sellers and delivered to Buyer on the Execution Date in connection with the execution and delivery of this Agreement, which letter is identified therein as the Disclosure Schedule for purposes of this Agreement.

"Effective Time" means 7:00 a.m. (Central Prevailing Time) on April 1, 2020.

"Environmental Claim" means any obligation (whether presently existing or that would exist with the passage of time, giving of notice or both) to affect cleanup or remediation under, or resolve noncompliance with, any Environmental Law and any Liability associated with or arising

therefrom. For the avoidance of doubt, (a) the fact that a Well is no longer capable of producing sufficient quantities of oil or gas to continue to be classified as a "producing well" shall not form the basis of an Environmental Claim, (b) the fact that a pipe is temporarily not in use shall not form the basis of an Environmental Claim and (c) except with respect to personal property (i) that causes or has caused contamination of the environment (including air, soil, surface water or groundwater) or (ii) the use or condition of which is a violation of Environmental Law, the physical condition of any surface or subsurface personal property, including water or oil tanks, separators or other ancillary equipment, shall not form the basis of an Environmental Claim.

"Environmental Law" means any Applicable Law or any agreement with any Governmental Authority relating to human health and safety, pollution, protection of the environment or to pollutants, contaminants, wastes, chemicals, materials or toxic or other Hazardous Substances. The term "Environmental Laws" does not include good or desirable operating practices or standards that may be employed or adopted by other oil and gas well operators or recommended, but not required, by a Governmental Authority.

"Escrow Account" means the escrow account established pursuant to the Deposit Escrow Agreement.

"Escrow Agent" means that certain Third Party that is a party, as escrow agent, to the Deposit Escrow Agreement and the Post-Closing Escrow Agreement, as applicable.

"Excess Cure Costs" means (i) any Cure Costs attributable to any period prior to the Effective Time (whether constituting a Property Expense or otherwise) and (ii) any Cure Costs with respect to the JDA (to the extent the JDA is a Desired 365 Contract) or with respect to Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule (which are required to be Desired 365 Contracts), in each case, that do not constitute Property Expenses attributable to the period on or after the Effective Time, as determined (for purposes of this clause (ii)) disregarding any Cure Costs described in clause (i) above.

"Excluded Environmental Liabilities" means all Liabilities relating to, associated with or appurtenant to (i) the migration, disposal, or transportation (or arrangement therefor) of any Hazardous Substances by or on behalf of Sellers off the premises of the Assets; and (ii) any fines or penalties relating to violations of Environmental Law, in each case resulting from facts or circumstances existing or occurring on or prior to the Petition Date.

"Excluded Records" means any items that are (a) Tax records that relate to the business of Sellers generally, (b) not transferable without payment of additional consideration (unless Buyer has agreed in writing to pay such additional consideration), (c) employee files and personnel records and employment benefits files and records (other than, in each case, for any Continuing Employees), (d) legal records and legal files of Sellers, including all work product of and attorney-client communications with Sellers' legal counsel or any other documents or instruments, in each case that may be protected by an attorney-client privilege (but excluding any title opinions or environmental, health and safety reports, or any such records that relate to the Assumed Liabilities), (e) reserve reports, valuations, and estimates of any quantities of Hydrocarbons or the valuation thereof with respect to the Assets, and any Hydrocarbon or other Hydrocarbon pricing assumptions, forward Hydrocarbon or other pricing estimates, Hydrocarbon or price decks, or

Hydrocarbon or pricing studies related thereto, (f) economic projections, (g) data, correspondence, materials, documents, descriptions or records relating to the Auction, marketing, sales negotiation or sale of any of the Assets, including the existence or identities of any prospective inquirers, bidders or prospective purchasers of any of the Assets, any bids received from and records of negotiations with any such prospective purchasers and any analyses of such bids by any Person, (h) correspondence between or among any Seller or its Affiliate or their respective representatives, and any prospective purchaser other than Buyer, and correspondence between any Seller or its Affiliates or any of their respective representatives with respect to any of the bids, the prospective purchasers or the Transactions, or (i) copies of the Data that relate to both the Assets and any Excluded Assets.

"Existing Letters of Credit" means all performance bonds, surety bonds, letters of credit, guarantees, security deposits and similar assurances in effect as of the Execution Date that relate to the Oil and Gas Properties.

"Expenses" means any and all notices, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties and expenses, including attorneys' and other professionals' fees and disbursements incident to the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (a) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (b) with respect to which no stay shall be in effect.

"Free and Clear" means free and clear of all claims, encumbrances, Liens or Liabilities other than the Assumed Liabilities and Permitted Liens, in each case to the maximum extent permitted by section 363(f) of the Bankruptcy Code.

"Fundamental Representations" means the representations of Sellers set forth in Section 3.01, Section 3.02, Section 3.03, Section 3.04 and Section 3.18.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, administrative body, agency or official, including any political subdivision thereof, or any tribal authority.

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including petroleum, its derivatives, by-products and other Hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

"Imbalance" or "Imbalances" means any over-production, under-production, over-delivery, underdelivery or similar imbalance of Hydrocarbons produced from or allocated to the Oil and Gas Properties, regardless of whether such over-production, under-production, over-delivery, underdelivery or similar imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"Imbalance Adjustment Amount" means the product of (a) any Imbalance allocated to the Oil and Gas Properties as of the Effective Time *multiplied by* (b) the Imbalance Price (which product shall be a positive number if such Imbalance is owed to Sellers by a Third Party and a negative number if such Imbalance is owed by Sellers to a Third Party).

"Imbalance Price" means the settlement price applicable to the Hydrocarbons that are the subject of the Imbalance under the applicable balancing agreement or, if no balancing agreement applies (or if the applicable balancing agreement does not provide for cash settlement), the market price for such Hydrocarbons as of the Effective Time.

"Indemnified Party" means a Party entitled to indemnification under Article XIII, whether on behalf of itself or, with respect to Sellers, any of the Seller Indemnified Parties.

"Indemnifying Party" means a Party from whom indemnification is sought under Article XIII by an Indemnified Party.

"Initial Highest Bid" has the meaning set forth in the Bid Procedures Order.

"Intellectual Property" means inventions and invention, disclosures; patents and patent applications (including statutory invention registrations); trademarks, service marks, logos, trade dress, trade names, Web addresses, domain names, and other indicia of commercial source or origin, including registrations and applications for registration thereof, and goodwill associated with any of the foregoing; copyrights, including registrations and applications for registration thereof; trade secrets, know-how, software, formulae, customer lists, data (including seismic data), processes, protocols, specifications, analyses, plans, techniques, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as notebooks, samples, studies and summaries); and other proprietary rights and intellectual property.

"Interim Period" means the period commencing at the Effective Time and ending at 7:00 a.m. (Central Prevailing Time) on the Closing Date.

"JDA" means that certain Joint Development Agreement dated March 1, 2017, by and among SN EF Maverick, LLC, SN EF Unsub, LP and Gavilan Resources, LLC (as amended).

"Liability" means any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured.

"Lien" means, with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and

other consensual or non-consensual lien, whenever granted and including without limitation those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code.

"Liquidating Trust" means a liquidating or similar trust as may be established with respect to Sellers' estates in conjunction with the Bankruptcy Cases.

"Liquidating Trustee" means the Trustees or other representative of the Liquidating Trust.

"Net Revenue Interest" or "net revenue interest" means the percentage share in all oil, gas and other Hydrocarbons produced from or allocated to a Conveyed Well or Lease after giving effect to all Burdens applicable thereto.

"Maverick Basin Area Participation Agreement" means that certain Maverick Basin Area Participation Agreement by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP Texas dated as of March 17, 2011 but effective as of January 1, 2011, as amended if amended.

"Non-Income Tax" means any Tax imposed on or with respect to the Assets other than any U.S. federal income tax, income tax imposed by any state or subdivision of the U.S., franchise tax (including the Texas Margin Tax) or Transfer Tax, but including any property tax, severance tax, production tax and sales and use tax.

"Oil and Gas Interests" means (a) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (b) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (c) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (d) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Seller has an ownership interest.

"Oil and Gas Lease" means any contract or agreement pursuant to which Sellers lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

"<u>Ordinary Course of Business</u>" means the ordinary course of business of Sellers, consistent in all material respects with past custom and practice of Sellers, including reasonable and prudent changes in response to the COVID-19 pandemic and governmental actions related thereto. Without limiting the effect of the foregoing, the term "Ordinary Course of Business" as used herein shall be no broader than the term "ordinary course of business" as used in section 363 of the Bankruptcy Code.

"<u>Organizational Documents</u>" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"<u>Permits</u>" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

"<u>Person</u>" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"<u>Plan</u>" means, if applicable, the joint plan of reorganization of Sellers under chapter 11 of the Bankruptcy Court with respect to the Bankruptcy Cases.

"<u>Post-Closing Escrow Account</u>" means the escrow account with respect to the Settlement Statement Escrow Amounts pursuant to the Post-Closing Escrow Agreement.

"<u>Post-Closing Escrow Agreement</u>" means that certain Escrow Agreement by and among Sellers, Buyer and the Escrow Agent, dated as of the Closing Date, and substantially in the form of <u>Exhibit G</u> attached hereto.

"<u>Proceeding</u>" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"<u>Property Expenses</u>" means all expenses, charges, capital expenses, joint interest billings, lease operating expenses, exploration expenses, production expenses, development expenses, drilling expenses, workover expenses, marketing fees and expenses, gathering, treating, transportation and processing fees and expenses, and any other exploration or development expenditures charged or incurred under applicable Oil and Gas Leases, operating agreements or other Purchased Contracts, that are attributable to the ownership, maintenance and operation of Sellers' interest in the Oil and Gas Properties during the period in question, and shall expressly include without limitation (a) all capital expenditures, including drilling costs, reworking costs, shut-in royalties and all other capital expenditures incurred in connection with the development, exploration, operation and maintenance of the Oil and Gas Properties during the Interim Period (and, for such amounts incurred after the Execution Date, only insofar as such amounts are incurred in accordance with the terms of this Agreement); (b) amounts paid under the Purchased Contracts (excluding any default penalties, charges or interest); and (c) overhead charges charged by Third Parties with respect to Oil and Gas Properties; *provided* that Property Expenses shall not include any costs, expenses or other Liabilities for or attributable to: (i) personal injury or death, property damage, torts, breach of

contract or violation of any Applicable Law; (ii) obligations relating to the abandonment or plugging of Wells, dismantling or decommissioning facilities, closing pits and restoring the surface around such Wells, facilities and pits; (iii) obligations with respect to Imbalances; (iv) obligations to pay Burdens or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets; (v) obligations with respect to hedging Contracts; (vi) obligations with respect to Taxes; (vii) amounts (if any) incurred to obtain any Required Consent; (viii) any amounts incurred to cure or attempt to cure any breaches of this Agreement or any Casualty Loss; (ix) deficiency payments; (x) any costs to maintain credit support associated with the Assets (including any Existing Letters of Credit); (xi) any Party's Expenses incurred in connection with negotiating this Agreement or consummating the Transaction; (xii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters; (xiii) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, and (xiv) claims for indemnification or reimbursement from any Third Party with respect to costs of the types described in the preceding clauses (i) through (xiii), whether such claims are made pursuant to contract or otherwise

"Release Agreement" means a Release Agreement substantially in the form of Exhibit H attached hereto.

"Representatives" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"ROW Interests" means all contracts and agreements pursuant to which Sellers hold any interest in any easement, right-of-way, license, crossing right and other subsurface interest (other than the Leases) used or held for use in connection with the ownership or operation of the Oil and Gas Properties, including the gathering or transportation of Hydrocarbons produced therefrom.

"Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

"Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

"Sale Hearing" has the meaning set forth in the Bid Procedures Order.

"Sale Order" means an order or orders of the Bankruptcy Court in the form and containing such terms, to the extent such terms pertain to the transactions contemplated by this Agreement, as are reasonably acceptable to Buyer and Sellers, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions; *provided* that, such order may be the Confirmation Order.

"Sanctioned Person" means at any time any Person: (a) listed on any Sanctions-related list of designated or blocked persons; (b) resident in or organized under the laws of a country or territory that is the subject of comprehensive restrictive Sanctions (including Cuba, Iran, North Korea, Syria, and the Crimea region); or (c) majority-owned (in the aggregate) or controlled by any of the foregoing.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the United States, (ii) the United Nations Security Council, (iii) the European Union, (iv) the United Kingdom, and (v) the respective governmental institutions of any of the foregoing including, without limitation, Her Majesty's Treasury, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of Commerce, and the U.S. Department of State.

"Seller Material Adverse Effect" means a material adverse effect on (a) the ownership or value (as determined relative to the Purchase Price) of the Oil and Gas Properties, taken as a whole, as currently owned and used as of the Execution Date or (b) the ability of Sellers to perform their respective obligations under the Transaction Documents or consummate the Transactions; *provided* that any such material adverse effect that results from any of the following matters shall not be taken into account in determining whether a material adverse effect has occurred under clause (a) or clause (b) of this definition: (i) entering into this Agreement or the announcement of the Transactions; (ii) changes in financial or securities markets generally; (iii) changes in general economic or political conditions in the United States or worldwide, except to the extent disproportionately affecting Sellers or the Assets; (iv) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Assets are located, including, but not limited to, changes in the market price of oil and natural gas; (v) acts of God, including hurricanes, storms or other naturally occurring events; (vi) acts or failures to act of Governmental Authorities, except as a result of any action or inaction by or on behalf of Sellers; (vii) matters disclosed on any Exhibit or Annex or in the Disclosure Schedule (but subject in all instances to Section 7.08 with respect to any Supplemental Disclosures); (viii) actions taken or omissions made after the Execution Date as expressly required under this Agreement or taken or omitted with the express written consent of Buyer; (ix) any epidemic, pandemic or disease outbreak (including the COVID-19 virus) or hostilities, terrorist activities or war or any similar disorder and, in each case, governmental actions related thereto; (x) matters that are cured or no longer exist by the earlier of Closing and the termination of this Agreement, including matters to the extent a purchase price adjustment is provided for under this Agreement; (xi) any change in laws or in GAAP and any interpretations thereof from and after the Execution Date; (xii) Casualty Losses; (xiii) any reclassification or recalculation of reserves in the Ordinary Course of Business; (xiv) natural declines in well performance; (xv) the commencement or pendency of the Bankruptcy Cases; (xvi) the departure of officers or directors of Sellers after the Execution Date; (xvii) any objections in the Bankruptcy Court to (A) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of any Seller and any related plan of reorganization or disclosure statement or (C) the Bid Procedures or the sale motion; and (xviii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit Sellers from consummating the Transactions) or any actions or omissions of Sellers in compliance therewith.

"Seller Tax Period" means any Tax period for which only Sellers are apportioned Taxes under Section 7.07.

"Seller Taxes" means any Taxes that are apportioned to Sellers under Section 7.07.

"Sellers' Knowledge" means the actual knowledge of Dave Roberts, George Fairchild, John Zabaneh, Joe Ketzner and Jeff Mobley.

"Special Warranty" means the special warranty of Acceptable Title described on Exhibit I.

"Springfield Gathering Contracts" means (a) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC, (b) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC and (c) that certain Springfield Gathering Assumption Agreement dated as June 1, 2017, by and among Sanchez Energy Corporation, Anadarko E&P Onshore, LLC and Kerr-Mcgee Oil & Gas Onshore, LP.

"Straddle Tax Period" means any Tax period for which both Sellers and Buyer are apportioned Taxes under Section 7.07.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"Successful Bidder" has the meaning set forth in the Bid Procedures Order.

"Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under this Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

"Tax" means (a) any tax, levy, unclaimed property and escheat obligation, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), and (b) any liability for any of the foregoing that arises by reason of a contract, assumption, transferee or successor liability, operation of Applicable Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxing Authority" has the meaning set forth in the definition of Tax.

"Third Party" means any Person other than a Party or its Affiliates.

"Transaction Documents" means this Agreement, the Assignment and Bill of Sale, the Assumption Agreement, any other agreement between or among Buyer and any Seller that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents and instruments entered into by Buyer, on the one hand, and a Seller, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the transactions contemplated hereby (as each such document, agreement and instrument may be amended, supplemented or modified).

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of Assets Free and Clear for the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement and the other Transaction Documents.

"Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

"Willful Breach" means, with respect to any Party, that such Party knowingly does one or more of the following: (a) such Party willfully and intentionally breaches in any material respect (by refusing to perform or taking an action prohibited) any material pre-Closing covenant, obligation or agreement applicable to such Party, or (b) such Party willfully and intentionally causes any of its representations or warranties under this Agreement to not be true and correct in all material respects after the Execution Date and prior to the Closing Date. For clarity, if a Party is obligated hereunder to use its commercially reasonable efforts to perform an action or to achieve a result, the failure to use such commercially reasonable efforts would constitute a willful and intentional breach of this Agreement.

"Working Interest" or "working interest" means a fraction or percentage of the costs and expenses associated with the maintenance, exploration, development, operation and abandonment of any Lease or Conveyed Well, but without regard to the effect of any Burdens.

(b) Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| 365 Schedule | 5.03(a) |
| Acceptable Title | Exhibit I |
| Accounting Firm | 7.07(d) |
| Adjusted Purchase Price | 2.03 |
| Agreement | Preamble |
| Allocation | 7.07(d) |
| Asset | 2.01 |
| Assignment and Bill of Sale | 2.05(c)(i) |
| Assumption Agreement | 2.05(c)(iii) |
| Audit Fees | 2.06(f) |
| Bankruptcy Cases | Recitals |
| Buyer | Preamble |
| Buyer Hydrocarbons | 2.01(d) |
| Buyer Non-Recourse Party | 14.15 |
| Casualty Loss | 10.01(b) |
| Chosen Courts | 14.06 |
| Closing | 2.05 |
| Closing Amount Overpayment | 2.07(b) |
| Closing Amount Shortfall | 2.07(a) |
| Closing Date Adjusted Purchase Price | 2.04(d)(i) |

| Term | Section |
|---|---|
| Closing Statement | 2.04(d)(i) |
| Code | 3.14(f) |
| Compensation Schedule | 7.06(b) |
| Consent | 3.06 |
| Consent Notice | 2.13 |
| Continuing Employee | 7.06(b) |
| Conveyed Wells | 2.01(b) |
| Cure Costs | 5.03(i) |
| Cut-Off Date | 2.06(g) |
| Data | 2.01(f) |
| Defect Deductible | Exhibit I |
| Defect Excess | Exhibit I |
| Deposit Escrow Funds | 2.09(a) |
| Desired 365 Contracts | 5.03(b) |
| Effective Time Hydrocarbons | 2.01(d) |
| Employment Offer | 7.06(a) |
| End Date | 9.01(b) |
| Equipment | 2.01(c) |
| Equitable Limitations | 3.03 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.05(b) |
| Execution Date | Preamble |
| Expense Reimbursement | 9.02(d) |
| Final Settlement Statement | 2.06(a) |
| Indemnification Claim | 13.03(a) |
| Lands | 2.01(a) |
| Leases | 2.01(a) |
| Letters in Lieu | 2.05(c)(ii) |
| Loss | 13.02 |
| Losses | 13.02 |
| ManagementCo | Preamble |
| Material Contract | 3.05(a) |
| Objection Notice | 2.06(c) |
| Oil and Gas Properties | 2.01(a) |
| Parties | Preamble |
| Party | Preamble |
| Permitted Liens | Exhibit I |
| Petition Date | Recitals |
| Post-Closing Consent Period | 2.13(c) |
| Preferential Purchase Rights | 3.17 |
| Pre-Paid Cure Costs | 5.03(i) |
| Prorated Expense Items | 2.04(c)(ii) |
| Purchase Price | 2.03 |
| Purchased Contracts | 2.01(g) |
| PwC | 2.06(d) |

| Term | Section |
|---|---|
| Referee | 2.06(d) |
| Required Consent | 2.13(a) |
| Resources | Preamble |
| Seller | Preamble |
| Seller Employee | 7.06(a) |
| Seller Hydrocarbons | 2.02(d) |
| Seller Indemnified Parties | 13.02 |
| Seller Non-Party Group | 13.06 |
| Sellers | Preamble |
| Settlement Statement Escrow Amounts | 2.06(g) |
| Supplemental Disclosure | 7.08 |
| Tax Proceeding | 7.05 |
| Taxing Authority | Exhibit A |
| Title Defect | Exhibit I |
| Title Well | Exhibit I |
| Transfer Taxes | 7.07(c) |

(c) *References and Rules of Construction. The* words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Annexes, Exhibits and Schedules are to Articles, Sections, Annexes, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The word "extent" in the phrase "to the extent" shall mean the degree or proportion to which a subject or other things extends, and such phrase shall not mean simply "if." References to any date shall mean such date in Houston, Texas and for purposes of calculating the time period in which any notice or action is to be given or undertaken

hereunder, such period shall be deemed to begin at 12:01 a.m. on the applicable date in Houston, Texas. If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. **THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.**

# Exhibit B

## ASSIGNMENT AND BILL OF SALE

THE STATE OF [____________]

COUNTY OF [____________]

THIS ASSIGNMENT AND BILL OF SALE (this "Assignment and Bill of Sale") is executed and delivered by Gavilan Resources, LLC, a Delaware limited liability company, and Gavilan Resources Management Services, LLC, a Delaware limited liability company (each an "Assignor" and collectively, the "Assignors"), each with an address of c/o Gavilan Resources Holdings, LLC, 920 Memorial City Way, Suite 1400, Houston, Texas 77024, to Mesquite Energy, Inc., a Delaware corporation ("Assignee"), with an address of 700 Milam Street, Suite 600, Houston, Texas 77002, and is made to be effective as of 7:00 a.m., April 1, 2020, Central Prevailing Time (the "Effective Time"). Reference is made to that certain Asset Purchase Agreement, dated October 16, 2020, by and between Assignors, as Sellers, and Assignee, as Buyer (the "Purchase Agreement"). All capitalized terms used herein that are not otherwise defined herein shall have the meanings attributed to such terms in the Purchase Agreement.

1. For and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors hereby transfer and convey to Assignee all of their respective right, title and interest, if any, in and to the properties and interests described in clauses (a) through (k) below (the "Assets") in their "as is" and "where is" condition and without warranty of title of any kind:

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Assignors in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Assignors as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Assignors' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties"; the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Assignors to Assignee, all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Assignors to Assignee, and subject to the payment by Assignee of any fees required as a condition to the assignment thereof to Assignee, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided*, *however*, that (1) Assignee's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (*provided* that Assignors shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to

pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Assignee only to the same extent as such rights are vested in Assignors, and (3) after the Closing, Assignee shall provide Assignors with access to, and Assignors shall have the right to receive copies of, the Data as provided in Article VI of the Purchase Agreement;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (the "Purchased Contracts"), including those Assigned Contracts set forth on Annex C hereto;

(h) Permits. To the extent assignable by Assignors to Assignee, all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights. (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

2. Notwithstanding anything to the contrary in the Purchase Agreement or elsewhere in this Assignment and Bill of Sale, the "Assets" shall not include any rights with respect to any Excluded Assets. "Excluded Assets" means all of the following assets:

(a) all cash and cash equivalents of Assignors;

(b) all corporate and financial records of Assignors to the extent they relate to Assignors' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Assignors arising under the Purchase Agreement;

(f) all of the matters listed on Annex E[1] (other than (i) item 1 of Annex E and (ii) item 45 of Annex E to the extent such item does not relate to the Contracts or other assets listed on Annex F) rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Assignors attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Assignors under Section 7.07 of the Purchase Agreement;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Assignors' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Annex F hereto[2];

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Assignors, other than the Equipment;

---

[1] Note to Draft: Annex E to include all matters listed on Disclosure Schedule 3.10 of the Purchase Agreement.

[2] Note to Draft: Annex F to include a list of any Contracts or other assets listed on Schedule 2.02(k) of the Purchase Agreement.

(o) all assets excluded pursuant to the express terms of the Purchase Agreement, including those assets listed on Annex G hereto[3];

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 1(e), Section 1(f)(ii) and Section 1(h) of this Assignment and Bill of Sale, in each case, that are not assignable to Assignee pursuant to the Purchase Agreement after giving effect to the Bid Procedures Order and the Sale Order;

(r) all engagements and similar letters and agreements with Assignors' legal advisors, it being agreed that Assignee shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Assignors or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii) of the Purchase Agreement; and

(t) any assets or properties otherwise expressly identified as Excluded Assets under the Purchase Agreement.

3. Assignors warrant Acceptable Title to the Title Wells included within the Assets unto Assignee, its successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Assignors, but not otherwise, subject to the Permitted Liens, and only as to claims raised by Assignee in writing to Assignors pursuant to the notice provisions of the Purchase Agreement prior to the Cut-Off Date. Assignors hereby assign to Assignee all rights, claims and causes of action on title warranties given or made by Assignors' respective predecessors with respect to the Title Wells, and Assignee is specifically subrogated to all rights which Assignors may have against their predecessors with respect to the Title Wells, to the extent Assignors may legally transfer such rights and grant such subrogation.

4. For purposes of this Assignment and Bill of Sale, the following terms shall be defined as follows:

(a) "Avoidance Action" means any claim, right or cause of action of Assignors arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

(b) "Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other

[3] Note to Draft: Annex G to include a list of any assets excluded pursuant to Section 2.12(d), Section 2.13 or Section 5.03 of the Purchase Agreement.

hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

(c) "Oil and Gas Interests" means (i) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (ii) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (iii) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (iv) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Assignor has an ownership interest.

(d) "Oil and Gas Lease" means any contract or agreement pursuant to which Assignors lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

(e) "Permits" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

(f) "Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

(g) "Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

(h) "Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under the Purchase Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

(i) "Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of

Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

5. On May 15, 2020, each Assignor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and these cases have been jointly administered for procedural purposes only under Case No. 20-32656 (MI). On [__], 2020, the Bankruptcy Court entered an order (the "Order"), authorizing the Assignors to sell the Assets, a certified copy of which Order is attached hereto as Exhibit A and incorporated herein for all purposes by this reference. This Assignment and Bill of Sale is made pursuant to the Order.

6. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflicts of law or principle that might refer to construction of such provisions to the laws of another jurisdiction. Each Assignor and Assignee agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01 of the Purchase Agreement. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS ASSIGNMENT AND BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. This Assignment and Bill of Sale is expressly subject to the terms and conditions of the Purchase Agreement, which terms are hereby incorporated into this Assignment and Bill of Sale by reference for all purposes. In the event of a conflict between the terms of this Assignment and Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8. Each of Assignors and Assignee agree (a) to furnish upon request to each other such further information, (b) to execute, acknowledge, and deliver to each other such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Assignment and Bill of Sale and the Purchase Agreement and the documents referred to in this Assignment and Bill of Sale and the Purchase Agreement.

9. If any term, provisions, covenant or restriction contained in this Assignment and Bill of Sale is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment and Bill of Sale shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Assignment and Bill of Sale a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

10. This Assignment and Bill of Sale may be executed in any number of counterparts, and all counterparts so executed shall constitute one Assignment and Bill of Sale, binding upon all of the parties hereto, notwithstanding that all the parties are not signatory to the original or same counterpart.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Bill of Sale, to be effective at the Effective Time.

ASSIGNORS:

**GAVILAN RESOURCES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on ______________, 2020, by [____________________], as [____________________] of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on ______________, 2020, by [____________________], as [____________________] of Gavilan Resources Management Services, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**Annex A**

**Leases**

[To be attached]

**Annex B**

**Conveyed Wells**

[To be attached]

**Annex C**

**Assigned Contracts**

[To be attached]

**Annex D**

**Permits**

[To be attached]

**Annex E**

**<u>Litigation</u>**

[To be attached]

**Annex F**

**<u>Excluded Contracts and Other Assets</u>**

[To be attached]

**Annex G**

**Other Excluded Assets**

[To be attached]

**Exhibit A**

**Order**

[To be attached]

# Exhibit C

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT (this "Agreement") is entered into as of the [_____] day of [_____________], 2020 (the "Closing Date"), by and among Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, the "Sellers").

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Buyer and Sellers (the "Purchase Agreement"), Sellers have agreed to sell, transfer and assign to Buyer, and Buyer has agreed to purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Assets;

WHEREAS, pursuant to Section 2.05(b) of the Purchase Agreement, Buyer has agreed to assume, from and after the Closing, the Assumed Liabilities (as defined below); and

WHEREAS, simultaneously herewith the Closing has occurred.

NOW, THEREFORE, for and in consideration of the transfer by Sellers to Buyer of the Assets, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by Buyer, Buyer hereby agrees as follows:

1. Definitions. Unless the context otherwise requires, all capitalized terms used but not defined herein and defined in the Purchase Agreement, shall have the meanings ascribed to such terms in the Purchase Agreement.

2. Assumption. Buyer hereby undertakes, assumes, covenants to pay, perform, observe the terms of, satisfy and/or discharge if, as, when and to the extent due in accordance with the terms thereof, the following liabilities and obligations of Sellers (individually an "Assumed Liability" and collectively, the "Assumed Liabilities"):

(a) all Property Expenses to the extent attributable to the Assets and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is increased pursuant to Section 2.04(a) of the Purchase Agreement);

(b) all Liabilities (other than Property Expenses) that attach to or run with the Assets (excluding any personal Liabilities of Sellers or their Affiliates that are not attached to the Assets), to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Effective Time;

(c) other than the Excluded Environmental Liabilities, all Liabilities under, associated with or appurtenant to the Assets with respect to Environmental Claims, whether arising on, before or after the Effective Time, including without limitation those related to the control, storage, handling, or discharge of all materials, substances and wastes from the

Assets (including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes);

(d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Assets, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits;

(e) Taxes allocated to Buyer pursuant to Section 7.07(a) and Section 7.07(c) of the Purchase Agreement;

(f) all Liabilities related to the payment of Burdens (i) attributable to Buyer Hydrocarbons (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A) of the Purchase Agreement), (ii) attributable to Effective Time Hydrocarbons to the extent not paid or borne by Sellers as of Closing and (iii) arising out of, in connection with or attributable to the failure to pay or report, or mispayment or underpayment of, any Burdens attributable to Seller Hydrocarbons to the extent (and only to the extent) that Buyer realizes the economic benefit of such non-payment, mispayment or underpayment (but excluding any and all Liabilities related to items 3 through 44 of Disclosure Schedule 3.10 of the Purchase Agreement or the facts or allegations forming the basis thereof, to the extent attributable to Seller Hydrocarbons);

(g) all of Sellers' Liabilities under the Leases and the Purchased Contracts (including the Purchased Contracts set forth on Annex A hereto) arising on or after the Effective Time (excluding any default penalties, charges or interest pertaining to breaches, defaults or non-performance under such Leases or Purchased Contracts prior to Closing), subject to the immediately preceding clause (f);

(h) all of Sellers' Liabilities with respect to Imbalances with Third Parties attributable to the Assets; and

(i) all Liabilities with respect to the Cure Costs required to be paid by Buyer in accordance with Section 5.03(i) of the Purchase Agreement;

*provided, however*, that notwithstanding anything to the contrary in clauses (a) through (i) above, the Assumed Liabilities shall not include (i) Seller Taxes, (ii) any Liabilities pertaining to the Excluded Assets, (iii) any Liabilities discharged or from which the Assets are otherwise released as of the Closing in accordance with the Sale Order, (iv) any Excluded Environmental Liability, (v) any Excess Cure Costs, (vi) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, (vii) claims, investigations, administrative proceedings, arbitration or litigation arising out of or resulting from actual or claimed personal injury; illness or death; other torts; private rights of action given under any Applicable Law; or violation of any Applicable Law; or (viii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters each of which clauses (i) - (viii) shall be deemed an Excluded Liability.

3. Excluded Liabilities. Notwithstanding anything to the contrary in the Purchase Agreement or elsewhere in this Agreement, the "Assumed Liabilities" shall not include any rights with respect to any Excluded Liabilities. "Excluded Liabilities" means all Liabilities or obligations of Sellers that are not expressly Assumed Liabilities.

4. Effect. The undertakings, covenants and agreements contained herein shall be binding upon Buyer and its successors, assignees and legal representatives and shall inure to the benefit of Sellers and Buyer and their respective successors, assigns and legal representatives.

5. Counterparts. This Agreement may be executed in any number of counterparts, and all counterparts so executed shall constitute one Agreement, binding upon all of the parties hereto, notwithstanding that all the parties are not signatory to the original or same counterpart.

6. Governing Law; Jurisdiction. Except to the extent the mandatory provision of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflicts of law or principle that might refer to construction of such provisions to the laws of another jurisdiction. Each Seller and Assignee agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or the transactions contained in or contemplated by this Agreement (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01 of the Purchase Agreement.

7. Agreement Subject to Purchase Agreement. This Agreement is expressly subject to the terms and conditions of the Purchase Agreement, which terms are hereby incorporated into this Agreement by reference for all purposes. In the event of a conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8. Assignment. No party may assign their respective rights or delegate their respective duties or obligations arising under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of the other party.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

MESQUITE ENERGY, INC.

By: ______________________________________
Name:
Title:

**SELLERS:**

**GAVILAN RESOURCES, LLC**

By: ________________________________________
Name:
Title:

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ________________________________________
Name:
Title:

**Annex A**

**<u>Purchased Contracts</u>**

[To be attached]

**Exhibit D**

**SELLER CERTIFICATE**

**[●], 2020**

THIS CERTIFICATE ("Certificate") is being delivered pursuant to Section 2.05(c)(v) of that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers", and such agreement, as the same may be amended, modified or supplemented from time to time, the "Purchase Agreement").

The undersigned, being a duly appointed officer of each of Sellers, hereby certifies that he or she is authorized to execute and deliver this Certificate on behalf of each Seller and further certifies to Buyer, on behalf of each Seller (and not in his or her individual capacity), that:

1. each Seller has performed in all material respects all of its covenants and other obligations under the Purchase Agreement required to be performed by it on or prior to the Closing Date;

2. the Fundamental Representations are true and correct in all respects at and as of the Closing Date as if made at and as of the Closing Date (other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date); and

3. the representations and warranties of Sellers set forth in Article III of the Purchase Agreement (other than the Fundamental Representations) are true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date (*provided*, that, in each case, for purposes of this paragraph 3, in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded), except, for purposes of this paragraph 3, for those failures to be true and correct that, individually or in the aggregate, do not constitute a Seller Material Adverse Effect.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, each of the undersigned has executed this Certificate as of the date first written above.

**BUYER:**

**GAVILAN RESOURCES, LLC**

By:______________________________________
Name:
Title:

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By:______________________________________
Name:
Title:

*Final Form*

**Exhibit E-1**

**CERTIFICATE OF NON-FOREIGN STATUS**

**[●], 2020**

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445 of the Code), the first regarded owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. Gavilan Resources, LLC, a Delaware limited liability company (the "Disregarded Entity"), is disregarded as separate from Gavilan Resources Holdco, LLC, a Delaware limited liability company ("Transferor"), under Treasury Regulations Section 301.7701-3, and is therefore a disregarded entity as defined in Treasury Regulations 1.1445-2(b)(2)(iii). To inform Mesquite Energy, Inc., a Delaware corporation ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by the Disregarded Entity, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury Regulations);

2. Transferor is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3. Transferor's U.S. employer identification number is 36-4856425; and

4. Transferor's office address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

[*Signature Page Follows*]

**TRANSFEROR:**

**GAVILAN RESOURCES HOLDCO, LLC**

By: ________________________________________
Name:
Title:

*Final Form*

**Exhibit E-2**

**CERTIFICATE OF NON-FOREIGN STATUS**

**[●], 2020**

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445 of the Code), the first regarded owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform Mesquite Energy, Inc., a Delaware corporation ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by Gavilan Resources Management Services, LLC, a Delaware limited liability company ("Transferor"), the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury Regulations);

2. Transferor is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3. Transferor's U.S. employer identification number is 81-5403961; and

4. Transferor's office address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

[*Signature Page Follows*]

**TRANSFEROR:**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ______________________________
Name:
Title:

**Exhibit F**

**BUYER CERTIFICATE**

**[●], 2020**

THIS CERTIFICATE ("Certificate") is being delivered pursuant to Section 2.05(d)(i) of that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers", and such agreement, as the same may be amended, modified or supplemented from time to time, the "Purchase Agreement").

The undersigned, being a duly appointed officer of Buyer, hereby certifies that he or she is authorized to execute and deliver this Certificate on behalf of Buyer and further certifies to Sellers, on behalf of Buyer (and not in his or her individual capacity), that:

1. Buyer has performed in all material respects all of its covenants and other obligations under the Purchase Agreement required to be performed by it at or prior to the Closing Date; and

2. (A) the representations and warranties of Buyer contained in the Purchase Agreement (other than the representations and warranties contained in Section 4.06 and Section 4.10 of the Purchase Agreement) are true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date (*provided*, that, in each case, for purposes of this paragraph 2(A), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Buyer Material Adverse Effect or similar materiality qualifiers shall be disregarded), except for those failures to be true and correct that, individually or in the aggregate, do not constitute a Buyer Material Adverse Effect; and (B) each of the representations and warranties of Buyer contained in Section 4.06 and Section 4.10 of the Purchase Agreement are true and correct in all respects at and as of the Closing Date, as if made at and as of such date.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**BUYER:**

MESQUITE ENERGY, INC.

By:________________________________________
Name:
Title:

**<u>Exhibit G</u>**
**POST-CLOSING ESCROW AGREEMENT**

[Attached]

*Final Form*

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of [●], 2020, by and among Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and together with Resources, each a "Seller" and collectively, "Sellers"), Mesquite Energy, Inc., a Delaware corporation ("Buyer" and, together with the "Sellers", sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement dated as of October 16, 2020, by and between Sellers and Buyer (as the same may be amended from time to time in accordance with the provisions thereof, the "Purchase Agreement").

RECITALS

WHEREAS, Sellers and certain of their affiliates are debtors in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and, on May 15, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Sellers and Buyer entered into the Purchase Agreement, pursuant to which, among other things, Buyer agreed to purchase and acquire from Buyer the Assets and assume the Assumed Liabilities upon the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, the Closing occurred on [●], 2020;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement (and pursuant to Section 2.06(g) thereof), Buyer is delivering (on behalf of Sellers) to the Escrow Agent an amount equal to $[●][1] (the "Escrow Amount"); and

WHEREAS, Sellers and Buyer desire that the Escrow Agent act as escrow agent in accordance with the terms hereof, and the Escrow Agent is willing to act in such capacity on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. Appointment. The Parties hereby appoint the Escrow Agent as the escrow agent for the purposes set forth herein. The Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

---

[1] Note to Draft: The Escrow Amount will be equal to the greater of (x) an amount equal to five percent (5%) of the unadjusted Purchase Price or (y) any unresolved amounts with respect to the Closing Statement disputed by Buyer in good faith in accordance with Section 2.04(d) of the Purchase Agreement.

2. Escrow Funds. Simultaneous with the execution and delivery of this Agreement, Buyer is depositing (on behalf of Sellers) with the Escrow Agent the Escrow Amount in immediately available funds. The Escrow Agent hereby acknowledges receipt of the Escrow Amount (the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income earned with respect thereto, the "Escrow Funds") in separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

3. Investment of Escrow Funds.

(a) Unless otherwise instructed in writing by the Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b) The Escrow Agent shall prepare and send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c) The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Funds, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the Escrow Funds in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4. Disposition and Termination of the Escrow Funds.

(a) Escrow Funds. The Escrow Agent shall hold and release the Escrow Funds as provided in this Section 4(a) as follows:

(i) Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction;

(ii) If at any time either Party receives a Final Determination (as defined below), such Party shall concurrently deliver to the Escrow Agent and the other Party a copy of such Final Determination, and upon receipt by the Escrow Agent of such copy, the Escrow Agent shall (i) promptly (but in any event within two (2) Business Days) deliver a copy of such Final Determination to the other Party; provided, however, that the Escrow Agent shall incur no liability for failing to deliver any courtesy copy of such Final Determination nor shall its delivery or failed delivery thereof give any Party any additional rights or otherwise extend the payment timeframe, and (ii) on the fifth Business Day following receipt by the Escrow Agent of the Final Determination, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent of available Escrow Funds) in accordance with such Final Determination. Subject to the terms of this Section 2(b), the Escrow Agent will act on such Final Determination without further inquiry; or

(iii) By delivering the Escrow Funds to a successor escrow agent pursuant to the provisions of Section 6.

All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction or Final Determination, as applicable.

Any instructions setting forth, claiming, containing, objecting to or in any way related to the transfer or distribution of any funds on deposit in the Escrow Account under the terms of this Agreement must be in writing, executed by the Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 and, if delivered by e-mail, delivered to the Escrow Agent as an attachment to such e-mail from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated on Exhibit A-1 and/or Exhibit A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b) Termination. The Escrow Account shall be deemed terminated and dissolved upon the disbursement by the Escrow Agent of the entire amount of the Escrow Funds in accordance with this Agreement.

(c) Certain Definitions.

(i) "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii) "Final Determination" means, with respect to the disposition of the Escrow Funds in the Escrow Account, a final non-appealable order of any arbitrator, including the "Referee" (as defined in the Purchase Agreement), or court of competent jurisdiction, including the Bankruptcy Court, which may be issued, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from an arbitrator or court of competent jurisdiction having proper authority and (B) the written payment instructions executed by an authorized signer of the prevailing Party to effectuate such order.

(iii) "Joint Release Instruction" means the joint written instruction executed by an authorized signer of each Seller and Buyer directing the Escrow Agent to

disburse all or a portion of the Escrow Funds, as applicable. A Joint Release Instruction shall contain complete payment instructions, including wiring instructions.[2]

(iv) "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5. Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties. Concurrent with the execution of this Agreement, each Party shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments that may be due to the Escrow Agent or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in the Escrow Agent's opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction (subject to Section 13) or may seek a declaratory judgment from a court of competent jurisdiction (subject to Section 13) with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable

[2] Note to Draft: Joint Release Instruction to be delivered to the Escrow Agent following the final determination of the Adjusted Purchase Price in accordance with the terms of the Purchase Agreement.

for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except in the case of the Escrow Agent's fraud, gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction.

6. Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving sixty (60) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Sellers and Buyer acting jointly at any time by providing written notice to the Escrow Agent; provided that any such resignation or removal shall not relieve the Escrow Agent from any liability that arose from any action or inaction that occurred prior to the effective date of such resignation or removal. Any Person into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any Person to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. Except as otherwise set forth in this Agreement, the Escrow Agent's sole responsibility after such sixty (60) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of sixty (60) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction (subject to Section 13) for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7. Fees and Expenses. All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid one-half by Seller and one-half by Buyer. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8. Indemnity. Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding resulting from this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as determined by a court of competent jurisdiction, in a final non-appealable judgment, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from Sellers or Buyer in accordance with this Agreement. The Parties hereby grant the

Escrow Agent a lien on, right of set-off against and security interest in, the Escrow Funds for the payment of any reasonable claim for indemnification, expenses and amounts due hereunder. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, upon prior written notice to the Parties, to charge against and withdraw from the Escrow Funds for its own account or for the account of an indemnitee any amounts due to the Escrow Agent or to an indemnitee under this Section 8. Notwithstanding anything to the contrary herein, Seller and Buyer agree, solely as between themselves, that any obligation for indemnification under this Section 8 (or for the fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Sellers and one-half by Buyer. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9. Tax Matters.

(a) Sellers shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Funds to the Internal Revenue Service ("IRS") or other taxing authority on IRS Form 1099. Each Party shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

(b) The Escrow Agent shall be responsible only for income reporting to the IRS with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c) The Escrow Agent, its affiliates and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10. Covenant of Escrow Agent. The Escrow Agent hereby agrees and covenants with Sellers and Buyer that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11. Notices. All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the applicable Party or the Escrow Agent, as applicable to the e-mail address given below, and written confirmation of receipt is obtained (provided that the recipient shall promptly acknowledge receipt thereof), (iii) by overnight delivery

Case 22-90308 Document 1363 Filed in TXSB on 10/17/22 Page 122 of 483

with a reputable national overnight delivery service, or (iv) by mail or certified mail, return receipt requested and postage prepaid. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Sellers, then to:

c/o Gavilan Resources Holdings, LLC
920 Memorial City Way, Suite 1400
Houston, Texas 77024
Attention: General Counsel
E-mail: john.zabaneh@gavilanresources.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Rodney L. Moore
Samuel C. Peca
E-mail: rodney.moore@weil.com
samuel.peca@weil.com

or, if to Buyer, then to:

Mesquite Energy, Inc.
Pennzoil Place
700 Milam Street, Suite 600
Houston, Texas 77002
Attention: Gregory Kopel
Executive Vice President and General Counsel
E-mail:gkopel@mesquite-energy.com

with a copy (which shall not constitute notice) to:

Foley & Lardner LLP
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Attention: Timothy Spear
E-mail: tspear@foley.com

or, if to the Escrow Agent, then to:

> Citibank, N.A.
> Citi Private Bank
> 388 Greenwich Street, 29th Floor
> New York, NY 10013
> Attention: William T. Lynch, Director
> E-mail: william.lynch@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent, or, if any notice is mailed, it shall be deemed given two (2) Business Days after the date such notice is deposited with the United States Postal Service. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12. Termination. This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Account in accordance with this Agreement and (b) subject to Section 6, (i) delivery to the Escrow Agent of a written notice of termination executed jointly by Sellers and Buyer or (ii) the Escrow Agent's delivery of a notice of resignation to Sellers and Buyer, after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13. Miscellaneous. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties; provided, however, that each Seller and Buyer may (i) assign any or all of their respective rights and interests hereunder to one or more of their respective Affiliates and (ii) designate one or more of their respective Affiliates to perform their respective obligations hereunder (in any or all of which cases Sellers or Buyer, as the case may be, nonetheless shall remain responsible for the performance of all of its obligations hereunder). This Agreement shall be governed by and construed under the laws of the State of Delaware without giving effect to the conflict of law principles thereof. Each party irrevocably waives any objection on the grounds of venue, *forum non-conveniens* or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Bankruptcy Court or if, for any reason the Bankruptcy Court shall not have jurisdiction, any other court of competent jurisdiction located in the State of Delaware. The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability

without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each party hereto represents, warrants and covenants to the other parties hereto that each document, notice, instruction or request provided by such party to such other parties shall comply with applicable laws and regulations. Except as expressly provided in Section 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder. As between the Parties, nothing in this Agreement waives or modifies any right or obligation under the Purchase Agreement and in the event of any conflict between this Agreement and the Purchase Agreement, the applicable provisions of the Purchase Agreement shall control to the extent of such conflict.

14. Compliance with Court Orders. In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, that it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree the Escrow Agent shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15. Further Assurances. Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16. Force Majeure. The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18. Compliance with Federal Law. To help the United States Government fight the funding of terrorism and money laundering activities and to comply with federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number and remitting bank for all Parties depositing funds into the Escrow Account pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see

financial statements, licenses and identification and authorization documents from individuals claiming authority to represent any entity or other relevant documentation.

19. Use of Citibank Name. No publicly distributed printed or other material in any language, including prospectuses, notices, reports and promotional material that mentions "Citibank" by name or the rights, powers or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent. By execution of this Agreement, the Escrow Agent consents to any disclosure of the rights, powers and duties of the Escrow Agent under this Agreement in connection with any filings made by a Seller in the Bankruptcy Cases and in any notices required to be made in the Bankruptcy Cases.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

SELLERS:

**GAVILAN RESOURCES, LLC**

By: ______________________________
Name: ____________________________
Its: ______________________________

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ______________________________
Name: ____________________________
Its: ______________________________

BUYER:

**MESQUITE ENERGY, INC.**

By: ______________________________
Name: ____________________________
Its: ______________________________

ESCROW AGENT:

**CITIBANK, N.A.**

By: ______________________________
Name: ____________________________
Its: ______________________________

## Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**

To cover the acceptance of the Escrow Agency appointment, the study of the Agreement and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: WAIVED**

**Administration Fee**

The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

**Fee: WAIVED**

**Tax Preparation Fee**

To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

**Fee: WAIVED**

**Transaction Fees**

To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

**Fee: WAIVED**

**Other Fees**

Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

# EXHIBIT A-1

## Certificate as to Sellers' Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Sellers and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Sellers. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
| --- | --- |
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

# EXHIBIT A-2

## Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Buyer. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

**<u>Exhibit H</u>**
**RELEASE AGREEMENT**

[Attached]

*Final Form*

# RELEASE AGREEMENT

This Release Agreement (this "Agreement") is being executed as of ____________________, 2020 by and among SN EF Maverick, LLC ("SN EF") and Mesquite Energy, Inc. ("Mesquite" and together with SN EF, the "Buyer Group"), on the one hand, and Gavilan Resources Holdings, LLC ("Resources Holding"), Gavilan Resources HoldCo, LLC ("HoldCo"), Gavilan Resources, LLC ("Resources") and Gavilan Resources Management Services, LLC ("ManagementCo", and together with Resources Holding, HoldCo and Resources, the "Seller Group"), on the other hand. Each of the foregoing shall be referred to individually as the "Party" or "Parties".

WHEREAS, the Parties are entering into and delivering this Agreement in accordance with Sections 2.05(c)(vi) and 2.05(d)(v) of that certain Asset Purchase Agreement dated as of October 16, 2020 by and among Resources, ManagementCo and Mesquite, as may be amended, restated or otherwise modified from time to time (the "Purchase Agreement"). Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement;

WHEREAS, the Parties have asserted against each other certain claims, defenses, and causes of actions, currently pending before the United States Bankruptcy Court for the Southern District of Texas in *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508, Adversary Proceeding No. 20-321 (*Gavilan Resources, LCC v. SN EF Maverick, LLC, et al.*); and in *In re Gavilan Resources, LLC et al.*, Case No. 20-32656, Adversary Proceeding No. 20-03378 (*Mesquite Energy Inc., et al. v. Gavilan Resources, LLC*); and before the United States District Court for the Southern District of Texas in *SN EF Maverick, LLC et al. v. Gavilan Resources, LLC*, Case No. 4:20-cv-2640 (together, the "Pending Litigation");

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound, the Parties hereto hereby agree as follows:

1. Mutual Release.

(a) Subject to the succeeding sentence, each of the Buyer Group, on the one hand, and the Seller Group, on the other hand (each, a "Releasing Party"), on its own behalf and on behalf of each of its subsidiaries, affiliates, directors, officers, employees, agents and successors and assigns (the "Related Persons"), hereby releases and forever discharges, as applicable, the other Parties and each of their subsidiaries, affiliates, directors, officers, employees, agents and successors and assigns (individually, each a "Releasee" and collectively, the "Releasees"), from any and all claims, agreements, promises, demands, proceedings, causes of action, orders, obligations, contracts, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, contingent or otherwise, of every kind and nature (collectively, "Claims"), which a Releasing Party or any of its Related Persons now has, has ever had or may hereafter have against the Releasees arising prior to the Closing or on account of or arising out of any matter, cause or event occurring prior to the Closing, including but not limited to any matters asserted or that could have been asserted in the Pending Litigation. The foregoing notwithstanding, this Agreement shall not be deemed to release (i) any claims that may arise under this Agreement or in connection with the Purchase Agreement, the Assignment and Bill of Sale, the Assumption Agreement or any certificates or other instruments delivered at the Closing or (ii) any claims or other rights of the Seller Group with respect to any Contract or other asset listed on Exhibit A to this Agreement.

(b) Each Releasing Party hereby irrevocably covenants to, and to cause each of its Related Persons to, (i) refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee based upon any matter purported to be released hereby or (ii) transfer, assign or otherwise dispose of any right or interest it may have in any Claims.

(c) Without in any way limiting any of the rights and remedies otherwise available to any Releasee, each Releasing Party agrees to indemnify, defend and hold harmless each Releasee from and against any and all loss, liability, claim, damage (including incidental or consequential damage) or expense (including costs of investigation and defense and reasonable attorney's fees), whether or not involving third-party claims, arising directly or indirectly from or in connection with (i) the assertion by or on behalf of each Releasing Party and/or any Related Persons of any claim or other matter purported to be released pursuant to this Agreement and (ii) the assertion by any third party of any claim or demand against any Releasee which claim or demand arises directly or indirectly from, or in connection with, any assertion by or on behalf of each Releasing Party against such third party of any claims or other matters purported to be released pursuant to this Agreement.

2. Dismissal of Pending Litigation.

No later than 7 days following the Closing, the Parties shall file agreed notices with the appropriate courts dismissing with prejudice all Pending Litigation. All Parties agree that they will bear their own attorneys' fees and costs incurred in connection with this matter.

3. No Admission of Liability.

Nothing herein shall be taken as an admission as to the validity or invalidity of any claims or defenses raised by the Parties in connection with the Pending Litigation or of any fact alleged therein against any Party. The Parties expressly deny all liability asserted against them by any other Party.

4. Bankruptcy Court's Retention of Jurisdiction.

The United States Bankruptcy Court for the Southern District of Texas shall retain jurisdiction to, among other things, hear and resolve disputes arising under or related to this Agreement and each Party agrees that it will not challenge the jurisdiction of the Bankruptcy Court for the Southern District of Texas to, among other things, hear and resolve such disputes or exercise jurisdiction over the Party as related to the same.

5. Choice of Venue.

**EACH PARTY AGREES ANY LEGAL ACTION OR OTHER LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT SHALL BE BROUGHT SOLELY AND EXCLUSIVELY IN THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS.**

6. Miscellaneous.

(a) If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.

Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

(b) This Agreement shall be governed by and construed under the laws of the State of Texas without regard to principles of conflicts of law.

(c) This Agreement constitutes the entire agreement between the parties hereto with regard to the subject matters contained herein, and supersedes all prior understandings and agreements, whether written or verbal, related thereto.

(d) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. A signature page of this Agreement executed and transmitted via facsimile shall be deemed an original for all purposes.

[*Signature Page to Follow*]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as the date first above written.

SN EF MAVERICK, LLC

By:______________________________
Name:___________________________
Title:____________________________

MESQUITE ENERGY, INC.

By:______________________________
Name:___________________________
Title:____________________________

GAVILAN RESOURCES HOLDINGS, LLC

By:______________________________
Name:___________________________
Title:____________________________

GAVILAN RESOURCES HOLDCO, LLC

By:______________________________
Name:___________________________
Title:____________________________

GAVILAN RESOURCES, LLC

By:______________________________
Name:___________________________
Title:____________________________

GAVILAN RESOURCES MANAGEMENT SERVICES, LLC

By:______________________________
Name:___________________________
Title:____________________________

*[Signature Page to Release Agreement]*

# Exhibit A

## Big Wells – Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625001 | ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | 02/08/1973 | Dimmit | | 27 | 384 |
| T0625002 | FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | 02/13/1973 | Zavala | | 3 | 172 |
| T0625003 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | 03/01/1978 | Zavala | | 3 | 251 |
| T0625004 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625005 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625006 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625007 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625008 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | 01/09/1979 | Zavala | | 3 | 251 |
| T0625009-001 | DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | 05/06/1974 | Dimmit | | 29 | 322 |
| T0625009-002 | CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | Dimmit | | 37 | 257 |
| T0625010 | MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | 05/16/1974 | Dimmit | | 29 | 332 |
| T0625011 | G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 355 |
| T0625012-001 | MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 377 |
| T0625012-002 | L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 381 |
| T0625013 | LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 366 |

Case 23-90020 Document 1363 Filed in TXSB on 05/16/22 Page 1040 of 1867

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625014 | RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | 06/06/1974 | Dimmit | | 29 | 359 |
| T0625015 | JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 29 | 469 |
| T0625016 | DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 30 | 10 |
| T0625017 | ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | Dimmit | | 31 | 330 |
| T0625018 | LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | 06/26/1975 | Dimmit | | 31 | 464 |
| T0625019-001 | AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | Dimmit | | 33 | 505 |
| T0625019-002 | PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | 11/10/1976 | Dimmit | | 39 | 193 |
| T0625020 | B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | Dimmit | | 29 | 293 |
| T0625021 | MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | Dimmit | | 147 | 136 |
| T0625022 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | Zavala | | 97<br>55 | 145<br>185 |
| T0625023 | JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | 05/30/1994 | Zavala | | 57 | 53 |
| T0625024-001 | ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 68 |
| T0625024-002 | MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 65 |
| T0625024-003 | FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 76 |
| T0625025-001 | BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 666 |
| T0625025-002 | ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 671 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625025-003 | MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 676 |
| T0625026 | I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | 04/01/1980 | Dimmit | | 33 | 122 |
| T0625027 | MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | Dimmit | | 30 | 460 |
| T0625028 | WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | Dimmit | | 30 | 270 |
| T0625029 | SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | 04/18/1975 | Dimmit | | 30 | 495 |
| T0625030 | ERIN BAIN JONES | W W OATMAN | 05/11/1970 | 05/11/1975 | Dimmit | | 3 | 578 |

## Big Wells – Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337500000 | 4212733750 | BOYD GG 1H | |

## Big Wells – Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; Eagle Ford TX LP. Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC JOA - Big Wells) | January 1, 2011 |

## Big Wells – Joint Operating Agreements

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |

**<u>Exhibit I</u>**
**SPECIAL WARRANTY**

Seller hereby agrees to warrant and defend for a period ending on the Cut-Off Date, Acceptable Title to the Title Wells unto Buyer, its successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Seller, but not otherwise, subject to the Permitted Liens, and only as to claims raised by Buyer in writing to Seller pursuant to the notice provisions of this Agreement prior to the Cut-Off Date. Buyer shall not be entitled to recovery on a claim against the Special Warranty set forth in this Exhibit I (i) except to the extent such claim constitutes a Title Defect (*provided* Sellers shall, upon Sellers request, have at least thirty (30) days after receipt of notice of any claim of a Title Defect to attempt to cure such Title Defect), (ii) as to any Title Well with respect to which a Title Defect exists, for an amount exceeding the Allocated Value of the affected Title Well and (iii) unless and until the total amount of all Title Defects exceeds $200,000 (the "Defect Deductible," and the amount of such excess over the Defect Deductible is referred to as the "Defect Excess"), at which time Buyer would be entitled to recovery in an amount equal to the Defect Excess. Notwithstanding anything in this Exhibit I or otherwise in this Agreement to the contrary, in no event shall Sellers be liable to Buyer for any claims against the Special Warranty for any amounts other than out of amounts in the Post-Closing Escrow Account.

The Special Warranty described in this Exhibit I shall be and hereby is incorporated by reference into the Assignment and Bill of Sale delivered to Buyer at Closing.

As used in this Exhibit I, the following capitalized terms shall have the meanings ascribed below:

(a) "Acceptable Title" means, as to each Well set forth on Annex B (each, a "Title Well"), such right, title and interest that, although not constituting perfect, merchantable or marketable title, (x) is deducible of record or, (y) if not deducible of record, title evidenced by pooling orders, communitization agreements or elections under joint operating agreements, in each case, except for Permitted Liens, as of the Effective Time and the Closing Date:

(i) entitles Sellers to receive not less than the Net Revenue Interest set forth on Annex B for such Title Well for Hydrocarbons produced, saved and marketed from such Title Well (subject to rounding), except for (1) decreases in connection with those operations in which Sellers or their successors or assigns may from and after the Execution Date be a non-consenting co-owner, (2) decreases resulting from the establishment or amendment from and after the Execution Date of pools or units, (3) decreases required to allow other Working Interest owners to make up past underproduction or pipelines to make up past under deliveries, (4) decreases resulting from changes in tract or production allocations resulting from elections to participate or not participate in operations after the Execution Date, (5) decreases resulting from actions taken by (or directed to be taken by) Buyer, (6) decreases resulting from any reversion of interest to a co-owner with respect to operations in which such co-owner, after the Execution Date, elects not to consent, and (7) as otherwise expressly set forth on Annex B;

(ii) obligates Sellers to pay or otherwise bear costs and expenses attributable to the operation and development of such Title Well in an amount not greater than the Working Interest set forth in Annex B (subject to rounding) for such Title Well, except for (1) increases resulting from contribution requirements with respect to defaulting co-owners from and after the Execution Date under applicable operating agreements, communitization agreements or pooling orders, (2) increases resulting from the carrying of non-participating interest owners or co-tenants in Leases with respect to the drilling of any Well from and after the Execution Date, (3) increases to the extent that such increases are accompanied by a proportionate increase in Sellers' Net Revenue Interest with respect to such Title Well as set forth on Annex B, (4) increases resulting from actions taken by (or directed to be taken by) Buyer, (5) increases resulting from the establishment or amendment from and after the Execution Date of pools or units and (6) as otherwise expressly set forth on Annex B; and

(iii) is free and clear of all Liens.

(b) "Permitted Liens" means:

(i) easements, restrictive covenants, servitudes, permits, surface leases and other rights with, respect to surface operations, and rights-of-way on, over or in respect of any of the Oil and Gas Properties that, singularly or in the aggregate, do not prevent or materially interfere with the ownership, value or operation of the affected Oil and Gas Properties for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(ii) all Applicable Laws and all rights reserved to or vested in any Governmental Authority: (1) to control or regulate the Assets in any manner, (2) by the terms of any right, power, franchise, grant, license or Permit issued by any Governmental Authority, or by any provision of Applicable Law, to terminate such right, power, franchise, grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any Asset; (3) to use such Asset in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated; or (4) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit;

(iii) the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained (1) in the Leases, (2) the Contracts, instruments and documents disclosed on Disclosure Schedule 3.05(a), (3) the Preferential Purchase Rights disclosed on Disclosure Schedule 3.05(a) or Disclosure Schedule 3.17, and (4) the ROW Interests, in each case, to the extent the same do not (x) prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons, (y) operate to reduce Sellers' Net Revenue Interest in an Oil and Gas Property below that shown in Annex B or (z) operate to increase

Sellers' Working Interest in an Oil and Gas Property above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(iv) Liens for Taxes or other governmental fees (1) not yet due and payable, (2) the nonpayment of which is permitted or required by the Bankruptcy Court or (3) that are being contested in good faith;

(v) mechanic's, materialmen's, carrier's, supplier's, vendor's, repairer's or other similar statutory Liens arising in the ordinary course of business securing amounts that are not yet due or delinquent or, if delinquent, that are being contested in good faith;

(vi) utility easements, restrictive covenants, zoning, entitlement, building, subdivision, environmental and other similar restrictions that, singularly or in the aggregate, do not prevent or materially interfere with the operation of the Oil and Gas Properties for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(vii) Liens created by Buyer or any of their respective successors or assigns;

(viii) inchoate liens or security interests created pursuant to statutory provisions in favor of working interest owners in jurisdictions where the Oil and Gas Properties are located, to the extent not subject to any pending or threatened enforcement or foreclosure proceeding;

(ix) all lessors' Royalties, net profits interests, carried interests, and reversionary interests, and all other Liens, rights to take in kind and any burden or right, provided for in any Oil and Gas Lease or in any other Contract or instrument disclosed on Disclosure Schedule 3.05(a) or otherwise reflected on Annex B that do not, individually or in the aggregate operate to (1) reduce Sellers' Net Revenue Interest in an Oil and Gas Property below that shown in Annex B or (2) increase Sellers' Working Interest in an Oil and Gas Property above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(x) any charge, equitable interest, privilege, lien, mortgage, deed of trust, production payment, option, pledge, collateral assignment, security interest, right of first refusal, restriction, encroachment, defect, or other arrangement substantially equivalent thereto, or other defect or irregularity of any kind that (1) will be permanently and fully extinguished with respect to the Assets pursuant to the Sale Order or (2) does not, individually or in the aggregate, operate to (A) prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons, (B) operate to reduce Sellers' Net Revenue Interest in a Title Well below that shown in Annex B or

(C) operate to increase Sellers' Working Interest in a Title Well above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(xi) all Consents and all rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the conveyance of the Oil and Gas Properties, if the same are customarily sought and received after Closing;

(xii) such other defects or irregularities of title or encumbrances as Buyer may have waived in writing, or which Buyer is deemed to have waived pursuant to this Agreement;

(xiii) any maintenance of uniform interest provision in a joint or unit operating agreement if waived by the party or parties having the right to enforce such provision or if the violation of such provision would not give rise to the unwinding of the sale of the affected Oil and Gas Property from Sellers to Buyer;

(xiv) to the extent the same have not previously been triggered, conventional rights of reassignment obligating Sellers to reassign their interest in any portion of the Oil and Gas Properties to a Third Party, if such right is only triggered upon an express indication of intent to release or abandon such interest prior to the expiration of the primary term or other termination of such interest;

(xv) any Lien affecting the Assets that is fully discharged by Sellers at or prior to the Closing;

(xvi) Liens created under Leases, Permits, easements, rights-of-way (including ROW Interests) or Purchased Contracts, or by operation of law in respect of obligations that are not yet due or delinquent or, if delinquent, that are being contested in good faith by appropriate proceedings by or on behalf of Sellers;

(xvii) rights of a common owner of any interest in rights-of-way, Permits or easements (including ROW Interests) held by Sellers and such common owner as tenants in common or through common ownership that do not, individually or in the aggregate, operate to prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons;

(xviii) any matters set forth on Annex A, all litigation and claims set forth on Disclosure Schedule 3.10, and all Imbalances set forth on Disclosure Schedule 3.09;

(xix) limitations (including drilling and operating limitations) imposed on the Assets by reason of the rights of subsurface owners or operators in a common property (including the rights of coal, utility and timber owners) that do not, individually or in the aggregate, operate to prevent or materially interfere with the

ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons;

(xx) all depth restrictions or limitations applicable to any Asset to the extent set forth on Annex A or Annex B;

(xxi) zoning and planning ordinances and municipal regulations; and

(xxii) any other Liens that do not, individually or in the aggregate, materially interfere with the ownership or operation of the Oil and Gas Properties subject thereto or affected thereby for the production of Hydrocarbons (as currently operated) and that would be acceptable by a prudent owner or operator of oil and gas properties.

(c) "Title Defect" means any condition, effect or change which, in Buyer's reasonable opinion based on customary industry standards, causes Sellers' right, title or interest in and to a Title Well to be less than Acceptable Title to such Title Well; *provided* that (x) if an Allocated Value has not been given with respect to a Title Well then the Allocated Value of such Title Well for purposes of this Exhibit I shall be deemed to be $0 and (y) the term "Title Defect" shall not be deemed to exist based solely upon:

(i) (A) lack of information in Sellers' files, (B) references to an unrecorded document to which no Seller nor any Affiliate of Sellers is a party, if such document is not in Sellers' files, or (C) any Tax assessment, Tax payment or similar records or the absence of such activities or records;

(ii) defects asserting a change in net revenue interests or Working Interests based on an after-payout decrease in net revenue interests or increase in Working Interests pursuant to a farm-in, farm-out or other agreement that is listed on Disclosure Schedule 3.05(a), if the effect of such change is accurately reflected in the net revenue interests and Working Interests set forth in Annex B;

(iii) defects that have been conclusively established to have been cured by applicable Laws of limitations or prescription;

(iv) defects arising from any Lease failing to have pooling provisions (*provided* that the applicable lessors have ratified unit declarations, if required);

(v) defects arising from any change in Applicable Laws after the Effective Time;

(vi) Liens created under deeds of trust, mortgages and similar instruments by the lessor under a Lease covering the lessor's surface and mineral interests in the land covered thereby that would customarily be accepted in taking or purchasing such Leases and for which a reasonably prudent lessee would not customarily seek a subordination of such Lien to the oil and gas leasehold estate prior to conducting drilling activities on the Lease; *provided*, *however*, that no such

Lien encumbering or otherwise affecting any Title Well or other drill site shall be excluded from being a Title Defect pursuant to this subpart (vi);

(vii) defects arising from any Imbalances, whether resulting from overproduction or underproduction;

(viii) defects based upon the exercise of any Preferential Purchase Right following the Execution Date;

(ix) any Lien or loss of title resulting from Sellers' conduct of business after the Execution Date pursuant to actions specifically required of Sellers pursuant to this Agreement;

(x) defects based upon the failure to record (A) any state or federal Leases or rights-of-way (including ROW Interests) included in the Assets or any assignments of interests in such Leases or rights-of-way (including ROW Interests) included in the Assets or (B) any forced pooling order executed and delivered by a Governmental Authority, in each case, in any applicable county records, unless such failure could reasonably be expected to result in another Person's superior claim of title to the relevant Asset;

(xi) any maintenance of uniform interest provision in any Lease or Purchased Contract; and

(xii) defects that affect only which Person has the right to receive Burden payments (rather than the amount of the proper payment of such Burden payment) and that do not affect the validity of the underlying Lease, in each case, to the extent the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Title Well to an amount less than the Net Revenue Interest set forth in Annex B for such Title Well or (B) obligate Sellers to bear a Working Interest with respect to any Title Well in an amount greater than the Working Interest set forth in Annex B for such Title Well (unless the Net Revenue Interest for such Title Well is greater than the Net Revenue Interest set forth in Annex B in the same proportion as any increase in such Working Interest).

[End of Exhibit I]

*Final Form*

---

**ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES**

**to the**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 16, 2020**

**by and between**

**GAVILAN RESOURCES, LLC and**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC,**

**as Sellers**

**and**

**MESQUITE ENERGY, INC.,**

**as Buyer**

---

## ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES

### Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Applicable Contracts |
| Annex D | Permits |

### Schedules

| | |
|---|---|
| Schedule 1.01 | Allocated Values |
| Schedule 2.02(k) | Excluded Contracts and Other Assets |
| Schedule 5.03(a) | 365 Schedule |
| Schedule 5.03(b) | Desired 365 Contracts |
| Schedule 7.06 | Seller Employees |
| Schedule 8.02(d) | Specified Required Consents |

### Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05(a) | Material Contracts |
| Disclosure Schedule 3.05(b) | Material Contract Defaults |
| Disclosure Schedule 3.06(a) | Approvals |
| Disclosure Schedule 3.07 | Environmental Matters |
| Disclosure Schedule 3.08 | Well Status |
| Disclosure Schedule 3.09 | Imbalances |
| Disclosure Schedule 3.10 | Litigation |
| Disclosure Schedule 3.12 | Intellectual Property |
| Disclosure Schedule 3.13 | Insurance Coverage |
| Disclosure Schedule 3.14 | Taxes |
| Disclosure Schedule 3.16 | Outstanding Obligations |
| Disclosure Schedule 3.17 | Preferential Purchase Rights |
| Disclosure Schedule 3.20 | Working Interest Payments |
| Disclosure Schedule 3.22 | Violations of Applicable Laws |

# Annex A
## Oil and Gas Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621017-004 | 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 105 |
| T0620034-005 | A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 752 |
| T0621019-023 | AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 544 | 756 |
| T0616008-035 | ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | 05/22/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 493 | 598 |
| T0621003-062 | AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 107 |
| T0621001-015 | AHAUS, PAULA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 36 |
| T0616008-022 | ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 120 |
| T0621020-009 | ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 537 | 78 |
| T0620036-014 | ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 332 |
| T0619016-015 | ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 729 |
| T0619007-003 | ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 388 |
| T0618023 | ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 01/01/2019 | 12/31/2021 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 169 |
| T0620036-007 | ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 21 |
| T0621007-007 | ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | 11/22/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 61 |
| T0620043-024 | AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 534 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620033-002 | AMFAR THE FOUNDATION FOR AIDS RESEA | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2017 | Dimmit | F/T 2341, SEC 31, DENTON | 534 | 313 |
| T0619017 | ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | 04/07/2018 | Dimmit | A-1163, SURVEY 59 | | |
| T0616008-011 | ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 410 | 831 |
| T0620043-026 | ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 537 |
| T0620033-001 | ANIMAL HUMANE SOCIETY OF HENNEPIN C | ANADARKO E&P ONSHORE LLC | 04/30/2013 | 04/30/2016 | Dimmit | F/T 2341, SEC 31, DENTON | 476 | 298 |
| T0616008-010 | ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 410 | 828 |
| T0619007-026 | ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 422 | 391 |
| T0621019-007 | ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 553 | 582 |
| T0620006-003 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 69 |
| T0621002-004 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 69 |
| T0620050-003 | ANNE GATLIN BURKEL | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 647 | 266 |
| T0621003-001 | ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 663 |
| T0621007-028 | ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | 08/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 837 |
| T0620046 | ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | 04/27/2021 | Dimmit | F/T 1970, BLK 10, SEC 27, DENTON | 445 | 74 |
| T0619001-014 | APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 651 |
| T0620039-012 | ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | 05/19/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 1 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618025 | ARTHUR LEE HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 188 |
| T0616003-022 | ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 442 |
| T0620038-004 | AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 453 | 531 |
| T0620038-001 | AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 678 |
| T0621017-013 | AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 99 |
| T0620017 | AUSTIN PRESBYTERIAN THEOLOGICAL SEM | ANADARKO E&P COMPANY LP | 03/21/2011 | 03/21/2014 | Dimmit | F/T 1640, SEC 23, BLK 10, DENTON | 406 | 724 |
| T0621001-019 | AXTON, TINA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 63 |
| T0624002 | B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | 10/15/2011 | Webb | | 2672 | 185 |
| T0621003-059 | B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 117 |
| T0621006-002 | BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | Dimmit | F/T 532, 533, BLK 6, SEC 43, DENTON | 576 | 239 |
| T0620039-018 | BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 821 |
| T0621019-011 | BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | 08/04/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 555 | 335 |
| T0616008-008 | BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | 03/25/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 409 | 667 |
| T0618015-003 | BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | | 629 | 603 |
| T0618017-002 | BARBARA J FARROW REVOCABLE TRUST | SN EF MAVERICK, LLC | 01/02/2019 | 01/02/2022 | Dimmit | Lot 4, Blk 112, Sub G Taft Catarina Properties | 629 | 603 |
| T0620010-004 | BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 411 |
| T0621016-010 | BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 620 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620040-002 | BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 548 | 474 |
| T0616008-058 | BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 259 |
| T0620002-020 | BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | 08/22/2018 | Dimmit | F/T 2123, SEC 18, DENTON | 456 | 530 |
| T0619006-014 | BECKY DEWAN | | 11/16/2010 | 11/16/2018 | Dimmit | | 405 | 560 |
| T0620043-004 | BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 528 |
| T0621007-020 | BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 718 |
| T0620020 | BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | 07/09/2017 | Dimmit | F/T 2294, SEC 31, DENTION | 393 | 414 |
| T0619008-011 | BERTRICE F SCRIBNER MARCH 1988 TRUS | ANADARKO E&P COMPANY LP | 10/26/2011 | 10/26/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 394 |
| T0620018-012 | BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 656 |
| T0620039-002 | BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | 05/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 837 |
| T0621019-014 | BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 386 |
| T0619008-045 | BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 469 |
| T0620041-003 | BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 250 |
| T0619002-006 | BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | 05/31/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 624 |
| T0619002-009 | BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 387 | 582 |
| T0616008-039 | BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 251 |
| T0621007-011 | BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 109 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-023 | BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 154 |
| T0618007-012 | BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2023 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 433 | 136 |
| T0618007-021 | BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | 07/12/2018 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 196 |
| T0621025-003 | BISHOP, DEBORAH LYNN | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 123 |
| T0619007-017 | BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 740 |
| T0616008-043 | BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 307 |
| T0618022 | BOBBY W. HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 654 |
| T0619001-003 | BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 709 |
| T0619002-002 | BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 226 |
| T0621001-025 | BOYD, BILLY T | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 24 |
| T0621001-014 | BOYD, STEVEN | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 21 |
| T0620047-005 | BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 550 |
| T0619016-002 | BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | 05/12/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 392 | 490 |
| T0619008-001 | BRAZORIA COUNTY OIL AND GAS CORPORA | ANADARKO E&P COMPANY LP | 08/01/2010 | 08/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 392 | 370 |
| T0620042-003 | BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 741 |
| T0619008-048 | BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 460 |
| T0619008-025 | BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 125 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-021 | BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | 10/21/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 395 |
| T0620035-004 | BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 632 | 558 |
| T0616001-001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | Dimmit | | 329 | 131 |
| T0616002-001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | La Salle | | 329 | 131 |
| T0619001-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 329 | 131 |
| T0619005 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 329 | 397 |
| T0623001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | 02/12/2020 | Webb | | 329 | 131 |
| T0623002 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0623003 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0623004 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | 02/12/2020 | Webb | | 329 | 131 |
| T0623005-001 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0626002 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | 10/15/2017 | Webb | | 329 | 131 |
| T0619003 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 335 | 276 |
| T0619002-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 338 | 617 |
| T0619004 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | 10/15/2017 | Dimmit | | 382 | 13 |
| T0626001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Webb | | 382 | 13 |
| T0619015-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2014 | Dimmit | S/2 LOT 7, BLK 148, CATARINA FARMS SUBD H | 405 | 563 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0622001-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0622002-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0622003-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0621001-020 | BROCKMAN, WILLIAM | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0621019-019 | BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | 09/11/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 367 |
| T0621003-002 | BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 631 |
| T0621022 | BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | 01/24/2021 | Dimmit | | 432 | 700 |
| T0622004-001 | CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | 03/01/2010 | Maverick | | 1076<br>369<br>2791 | 419<br>459<br>132 |
| T0620043-007 | CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 126 |
| T0621007-034 | CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 82 |
| T0619018-003 | CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | 04/20/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 674 |
| T0620039-047 | CARDWELL, KIM | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | | | |
| T0618021 | CARL ROGER MEISNER | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 626 | 25 |
| T0620039-025 | CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 496 |
| T0620036-012 | CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 463 | 337 |
| T0619007-010 | CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 372 |
| T0621003-017 | CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 810 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-012 | CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 624 |
| T0620034-002 | CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 749 |
| T0616008-005 | CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | 05/10/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 418 | 591 |
| T0621001-011 | CARR, BILL TODD | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 45 |
| T0621001-016 | CARR, CECIL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 48 |
| T0621001-026 | CARR, DANIEL JOEL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 17 |
| T0621001-028 | CARR, DERRICK GENE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 33 |
| T0621001-027 | CARR, GEORGE W. | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 10 |
| T0621001-007 | CARR, JEANETTA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 27 |
| T0621001-010 | CARR, VEEBAL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 42 |
| T0621003-024 | CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 272 |
| T0619001-021 | CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 633 |
| T0621007-035 | CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 86 |
| T0619006-009 | CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 754 |
| T0619008-021 | CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 438 |
| T0619016-014 | CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 737 |
| T0619006-007 | CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 764 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-013 | CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 383 |
| T0616008-024 | CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 322 |
| T0621001-013 | CHILDRESS, DARLA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 54 |
| T0620037-005 | CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2023 | Dimmit | F/T 1595, BLK 24, DENTON | 541 | 421 |
| T0618007-052 | CHRISTI BALLARD | SN EF MAVERICK, LLC | 01/01/2019 | 01/01/2022 | Dimmit | | 629 | 611 |
| T0620039-028 | CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 514 |
| T0618004-015 | CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 450 | 637 |
| T0620039-006 | CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 36 |
| T0619016-009 | CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 745 |
| T0621019-017 | CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 389 |
| T0621003-039 | CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 536 |
| T0621003-067 | CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 564 |
| T0619008-032 | CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 133 |
| T0620039-016 | CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | 02/09/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 363 |
| T0618026 | CLARA HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 642 |
| T0619016-012 | CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 753 |
| T0620035-003 | CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 212 |
| T0620043-020 | CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 123 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-016 | CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 114 |
| T0619006-015 | CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | 05/11/2019 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 425 | 586 |
| T0621007-027 | CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 532 | 357 |
| T0619014 | CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | 05/06/2015 | Dimmit | S/2 LOT 4, BLK 172 TAFT | 387 | 456 |
| T0621001-009 | CONTENTO, DEBBIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 39 |
| T0621003-065 | COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | 10/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 593 |
| T0621003-042 | CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 512 |
| T0619001-016 | CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 636 |
| T0620025 | CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | 10/17/2018 | Dimmit | F/T 2390, SEC 30, DENTON | 455 | 545 |
| T0619007-022 | DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 148 |
| T0621019-024 | DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 406 |
| T0619008-019 | DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 121 |
| T0619007-029 | DANIEL JOSEPH BYRD F/K/A HERBERT ES | ANADARKO E&P ONSHORE LLC | 07/09/2015 | 07/09/2018 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 551 | 752 |
| T0621001-017 | DANIEL, JULIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 57 |
| T0616008-029 | DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 829 |
| T0620043-027 | DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | 05/21/2018 | Dimmit | | 556 | 589 |
| T0619007-028 | DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | 02/05/2018 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 542 | 279 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621017-002 | DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 210 |
| T0619008-031 | DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 141 |
| T0616008-003 | DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | 02/10/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 505 |
| T0618117-040 | DAVID HARRIS | SN EF MAVERICK, LLC | 01/02/2019 | 01/02/2022 | Dimmit | | 629 | 599 |
| T0621003-053 | DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | 03/07/2019 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 63 |
| T0618007-053 | DAVID KING | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 587 |
| T0620036-003 | DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 11 |
| T0620018-006 | DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | 01/22/2016 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 465 | 235 |
| T0621017-011 | DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 559 | 379 |
| T0621025-002 | DAY, HAROLD D. III | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 612 | 270 |
| T0621025-001 | DAY, MICHAEL R. | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 612 | 267 |
| T0621025-008 | DAY, PATRICK B. | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 615 | 120 |
| T0621025-011 | DAY, ROBIN | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 615 | 117 |
| T0621007-018 | DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | 02/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 707 |
| T0621003-015 | DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 456 | 501 |
| T0619008-037 | DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 45 |
| T0620043-003 | DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 547 | 115 |
| T0616003-005 | DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 327 |
| T0618027 | DEBRA HARRIS MOORE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 650 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620016-005 | DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 139 |
| T0619010-010 | DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 400 | 113 |
| T0620039-045 | DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 479 |
| T0620039-033 | DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 542 | 220 |
| T0619008-004 | DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | 08/30/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 420 | 224 |
| T0620039-034 | DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 542 | 217 |
| T0616003-003 | DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 321 |
| T0620016-001 | DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 121 |
| T0620002-017 | DENNIS PAT VANWEY ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2020 | Dimmit | F/T 1783, 1784, BLK 22, DENTON | 420 | 762 |
| T0619008-035 | DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 76 |
| T0616003-001 | DIAMOND H RANCHES LIMITED PARTNERSH | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | Dimmit | | 344 | 6 |
| T0619006-001 | DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPAN | 11/05/2008 | 11/04/2011 | Dimmit | | 354 | 171 |
| T0618001 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2010 | Dimmit | | 338 | 621 |
| T0618003-001 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 621 |
| T0619007-004 | DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 396 |
| T0616008-040 | DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 310 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619001-018 | DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 456 | 469 |
| T0620036-009 | DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 818 |
| T0620005 | DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | 04/30/2013 | Dimmit | | 385 | 526 |
| T0619007-021 | DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 381 |
| T0618005-002 | DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | 06/08/2016 | Dimmit | | 419 | 106 |
| T0619008-029 | DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 137 |
| T0620010-008 | DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 394 | 192 |
| T0620039-011 | DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | 05/08/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 5 |
| T0622004-002 | DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | 02/01/2014 | Maverick | | 1281<br>405<br>3073 | 101<br>367<br>569 |
| T0620011-001 | DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | 01/01/2013 | Dimmit | WEST 7.4 ACS LOT 2516 & ALL LOT 1721, DENTONIO | 379 | 258 |
| T0621003-033 | E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 556 |
| T0621003-006 | EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | 05/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 260 |
| T0619008-007 | EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | 06/07/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 453 |
| T0616007-002 | EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | 02/25/2017 | Dimmit | | 406 | 681 |
| T0618024 | EARLENE HARRIS FOGLE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 646 |
| T0619010-001 | EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 29 |
| T0621016-005 | EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | Dimmit | F/T 764, BLK 30, DENTON | 500 | 795 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620036-001 | EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 1 |
| T0620039-010 | EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 829 |
| T0616008-032 | EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 714 |
| T0621007-024 | EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | 11/19/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 71 |
| T0620010-001 | ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 392 | 484 |
| T0619007-015 | ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 385 |
| T0621003-014 | ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 516 |
| T0620018-002 | ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 627 |
| T0618004-014 | ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 450 | 641 |
| T0619016-005 | ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 761 |
| T0621007-023 | ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 817 |
| T0621019-002 | ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 403 |
| T0619001-017 | ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 645 |
| T0620003-002 | ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 496 | 197 |
| T0621007-030 | ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 78 |
| T0619016-010 | ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 769 |
| T0621013-001 | ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 284 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619002-003 | EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 229 |
| T0621003-068 | ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | 08/07/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 532 |
| T0620018-010 | ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 651 |
| T0621003-027 | ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | 09/10/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 540 |
| T0620036-011 | EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 833 |
| T0619010-007 | EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 702 |
| T0616008-012 | EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | 05/01/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 319 |
| T0619007-001 | EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | 09/23/2015 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 402<br>415 | 201<br>461 |
| T0621001-003 | EWING ENTERPRISES LIMITED PARTNERSH | ANADARKO E&P COMPANY LP | 09/20/2006 | 09/20/2009 | Dimmit | | 344 | 1 |
| T0620012-001 | FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | 09/08/2020 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 427 | 741 |
| T0621005 | FITZSIMONS OIL AND GAS MANAGEMENT | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | Dimmit | | 517 | 763 |
| T0621011 | FITZSIMONS OIL AND GAS MANAGEMENT T | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | Dimmit | F/T 2050, SEC 15, DENTON | 517 | 759 |
| T0621001-001 | FITZSIMONS OIL AND GAS MANAGEMENT T | ANADARKO E&P COMPANY LP | 12/22/2005 | 12/22/2008 | Dimmit | | 332<br>1012 | 649<br>222 |
| T0620039-013 | FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | 08/04/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 32 |
| T0620041-006 | FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 679 |
| T0618004-020 | FORD, IDA E. SHEEHAN | SN EF MAVERICK, LLC | 08/17/2018 | 08/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 624 | 788 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-019 | FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 736 |
| T0619008-049 | FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 463 |
| T0616008-048 | FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | 11/13/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 714 |
| T0619007-007 | FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 356 |
| T0620043-029 | FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | 05/20/2018 | Dimmit | | 547 | 121 |
| T0621003-023 | FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 268 |
| T0621003-029 | FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 639 |
| T0618004-003 | FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 111 |
| T0617002-002 | G E LIGHT III TRUST ET AL | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 830<br>207 |
| T0621007-012 | GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | 06/11/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 821 |
| T0621003-020 | GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 798 |
| T0620043-010 | GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 814 |
| T0616008-042 | GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 316 |
| T0618009 | GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | 11/05/2013 | Dimmit | N/2 LOT 3, BLK 105 TAFT | 403 | 400 |
| T0620016-003 | GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 133 |
| T0619008-017 | GARY KOEHNE ET AL HEIRS RECEIVERSH | ANADARKO E&P ONSHORE LLC | 05/17/2013 | 05/17/2016 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 478 | 227 |
| T0621003-016 | GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 802 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618007-033 | GAY NELL WILLIAMS | SN EF MAVERICK, LLC | 10/26/2018 | 10/25/2021 | Dimmit | | 627 | 173 |
| T0621004-002 | GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 505 |
| T0616008-053 | GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 582 |
| T0621007-002 | GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 64 |
| T0620010-006 | GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 390 | 550 |
| T0620040-004 | GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 558 | 601 |
| T0619018-001 | GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 680 |
| T0620039-046 | GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 507 |
| T0617001-005 | GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 11 |
| T0617001-002 | GEORGE E LIGHT III, BILLIE RAE LIGH | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 1 |
| T0617001-004 | GEORGE E LIGHT JR & SARAH LIGHT TRU | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 7 |
| T0617002-003 | GEORGE E LIGHT JR AND SARAH LIGHT T | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 836<br>213 |
| T0620002-006 | GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | 07/28/2020 | Dimmit | F/T 1756-1762 DENTON | 395 | 522 |
| T0619008-003 | GEORGE L SPRINGMAN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 129 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618012 | GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | 12/13/2016 | Dimmit | S/2 LOT 8, BLK 102 TAFT | 378 | 674 |
| T0619008-044 | GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 52 |
| T0620036-002 | GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 327 |
| T0621003-064 | GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 601 |
| T0620035-002 | GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 208 |
| T0619007-006 | GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 392 |
| T0619007-002 | GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 384 |
| T0618004-005 | GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | 11/18/2015 | Dimmit | S/2 LOT 1, BLK 28, SUBD C, TAFT | 406 | 196 |
| T0616008-050 | GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 720 |
| T0621020-008 | GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | 10/27/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 532 | 361 |
| T0621001-008 | GOODELL, JENNIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 30 |
| T0618007-017 | GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 632 | 546 |
| T0619008-012 | GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | 06/27/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 418 | 157 |
| T0620006-001 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 54 |
| T0621002-001 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 54 |
| T0620050-001 | GREGORY FOWLER GATLIN | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 646 | 631 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621007-032 | GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 695 |
| T0621003-055 | GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 520 |
| T0619019 | HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | 06/01/2014 | Dimmit | | 444 | 569 |
| T0620024 | HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | Dimmit | F/T 2320, BLK 10, SEC 31, DENTON | 457 | 45 |
| T0616008-033 | HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 698 |
| T0620002-002 | HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | Dimmit | F/T 1768-1775, DENTON COLONY SUBD. | 426 | 580 |
| T0616008-015 | HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 825 |
| T0619007-012 | HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 360 |
| T0619006-012 | HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | 08/17/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 398 | 26 |
| T0619006-011 | HAZEN HIGH SCHOOL SCHOLARSHIP FUND | ANADARKO E&P COMPANY LP | 08/17/2015 | 08/17/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 555 | 13 |
| T0620039-029 | HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 360 |
| T0621003-036 | HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 524 |
| T0621019-001 | HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | 09/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 377 |
| T0621017-010 | HELEN IDA SAMMONS A/K/A HELEN IDA B | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 567 | 466 |
| T0618007-055 | HENRY LYNN HARRIS | SN EF MAVERICK, LLC | 01/29/2019 | 01/28/2022 | Dimmit | | 633 | 670 |
| T0621023 | HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | 05/01/2016 | Dimmit | F/T 2102, BLK 15, DENTON | 439 | 666 |
| T0621003-054 | HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 512 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620038-003 | HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 670 |
| T0621001-023 | HOWELL, VINCENT | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619007-014 | IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 380 |
| T0619008-008 | IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 390 |
| T0616008-023 | J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | 04/23/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 517 | 543 |
| T0621007-006 | JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | 12/05/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 58 |
| T0619007-009 | JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 376 |
| T0616003-009 | JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | 07/07/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 549 | 725 |
| T0620047-002 | JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 556 |
| T0621003-013 | JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 529 |
| T0620043-009 | JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 540 |
| T0616003-008 | JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 312 |
| T0621001-005 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | Dimmit | | 430 | 766 |
| T0621024-002 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | Dimmit | F/T 2098, DENTON | 430 | 766 |
| T0621001-024 | JACKSON, SHADRICK NEAL | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619008-028 | JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 753 |
| T0618004-004 | JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 108 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-008 | JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 370 |
| T0619002-011 | JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 628 |
| T0620003-003 | JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 496 | 194 |
| T0618007-001 | JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | 11/19/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 405 | 557 |
| T0620039-009 | JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 364 |
| T0621003-009 | JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | 09/25/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 573 |
| T0621007-022 | JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | 02/12/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 517 | 767 |
| T0619001-010 | JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 660 |
| T0621007-029 | JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | 07/23/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 833 |
| T0616003-015 | JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | 08/10/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 431 |
| T0621003-031 | JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | 09/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 589 |
| T0620043-019 | JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 519 |
| T0616008-038 | JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 255 |
| T0620039-004 | JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 90 |
| T0620039-032 | JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 491 |
| T0620042-002 | JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | 12/10/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 734 |
| T0621003-043 | JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | 10/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 577 |
| T0621017-009 | JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 553 | 585 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619006-008 | JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 759 |
| T0621015-002 | JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 508 |
| T0620040-003 | JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | 12/18/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 552 | 441 |
| T0620001-002 | JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2016 | Dimmit | F/T 2482, BLK 33, DENTON | 491 | 516 |
| T0620044 | JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | 04/30/2015 | Dimmit | F/T 2449, DENTON | 442 | 828 |
| T0621019-003 | JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 81 |
| T0619008-023 | JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 412 |
| T0619006-005 | JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 26 |
| T0621015-003 | JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 494 |
| T0619010-003 | JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 37 |
| T0621016-007 | JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 617 |
| T0620002-010 | JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 395 | 528 |
| T0621012 | JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2021 | Dimmit | F/T 2009, BLK 10, DENTON | 498 | 605 |
| T0620047-003 | JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 563 |
| T0621003-038 | JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | 09/23/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 560 |
| T0616003-018 | JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 439 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-010 | JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | 05/20/2016 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 127 |
| T0619002-005 | JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 385 | 752 |
| T0620011-003 | JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | Dimmit | | 438 | 409 |
| T0621019-012 | JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 380 |
| T0620018-015 | JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | 04/02/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 445 | 61 |
| T0618007-024 | JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 619 |
| T0620040-005 | JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | 12/16/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 536 | 382 |
| T0620035-005 | JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 627 | 203 |
| T0620018-011 | JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 637 |
| T0620036-013 | JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 462 | 813 |
| T0621003-003 | JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | 08/29/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 516 |
| T0621007-003 | JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 68 |
| T0616003-010 | JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | 07/02/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 549 | 728 |
| T0619008-024 | JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 404 |
| T0618007-048 | JIMMY JACK WALKER | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 615 |
| T0619006-004 | JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 32 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-008 | JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | 03/05/2016 | Dimmit | F/T 1990, BLK 7, DENTON | 470 | 825 |
| T0616008-019 | JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 128 |
| T0621019-009 | JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 398 |
| T0621007-036 | JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 90 |
| T0619008-043 | JOAN MAYS | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 58 |
| T0620047-004 | JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 569 |
| T0619008-042 | JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 61 |
| T0619001-002 | JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 695 |
| T0620048 | JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | 06/25/2018 | Dimmit | F/T 2346, BLK 31, DENTON | 453 | 535 |
| T0621007-039 | JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 522 | 312 |
| T0616003-024 | JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | 04/03/2020 | Dimmit | LOT 14, BLK 4, TAFT | 439 | 695 |
| T0619010-008 | JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2021 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 698 |
| T0621017-003 | JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 102 |
| T0620011-004 | JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | 03/29/2015 | Dimmit | | 438 | 407 |
| T0619008-034 | JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | 01/19/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 433 | 125 |
| T0621003-063 | JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 112 |
| T0618004-001 | JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2021 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 114 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-060 | JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 102 |
| T0621003-050 | JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 647 |
| T0619008-015 | JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 595 |
| T0620039-001 | JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | 05/20/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 9 |
| T0621007-038 | JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 691 |
| T0621013-003 | JOHN MICHAEL VESTAL JR TRUST U/W/O | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 278 |
| T0619018-004 | JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 671 |
| T0620034-001 | JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | 06/10/2019 | Dimmit | F/T 1959, BLK 27, DENTON | 519 | 511 |
| T0616008-031 | JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 196 |
| T0619010-002 | JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2021 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 33 |
| T0621007-019 | JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 714 |
| T0620015-001 | JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 499 | 837 |
| T0619008-020 | JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | 10/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 407 |
| T0620042-001 | JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | 11/14/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 738 |
| T0616008-020 | JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 124 |
| T0619008-002 | JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | 10/10/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 399 |
| T0621007-037 | JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 699 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618007-003 | JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 410 | 163 |
| T0621007-010 | JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 730 |
| T0616003-011 | JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 422 |
| T0620019 | JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2016 | Dimmit | F/T 2477, BLK 32, DENTON | 409 | 664 |
| T0620036-015 | JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 342 |
| T0620021 | JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | 03/10/2016 | Dimmit | F/T 2436, SEC 32, DENTON | 408 | 378 |
| T0619007-025 | JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | 09/22/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 422 | 387 |
| T0619002-010 | JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 620 |
| T0620012-002 | JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | 11/02/2020 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 427 | 738 |
| T0621019-018 | JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 392 |
| T0620047-006 | JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 575 |
| T0618028 | JULIE ANN HARRIS RICE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 607 |
| T0621007-021 | JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | 02/18/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 726 |
| T0621017-012 | JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 559 | 376 |
| T0620002-009 | KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | 08/03/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 382 |
| T0619008-039 | KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | 10/22/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 457 | 360 |
| T0619006-010 | KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 750 |
| T0619010-005 | KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 706 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-021 | KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 40 |
| T0620015-002 | KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 512 | 370 |
| T0621001-004 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | Dimmit | | 430 | 773 |
| T0621024-001 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | Dimmit | F/T 2098, DENTON | 430 | 773 |
| T0616008-055 | KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | 04/06/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 517 | 546 |
| T0621003-045 | KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 456 | 505 |
| T0621016-011 | KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 622 |
| T0619007-024 | KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 151 |
| T0621003-026 | KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 264 |
| T0616008-002 | KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 394 | 147 |
| T0616008-026 | KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 502 | 65 |
| T0621003-044 | KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 581 |
| T0620035-001 | KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | 08/21/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 204 |
| T0619006-006 | KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 38 |
| T0616008-052 | KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 516 | 701 |
| T0618017-001 | KERRCO, INC | SN EF MAVERICK, LLC | 01/22/2019 | 01/21/2022 | Dimmit | Lot 4, Blk 112, Sub G Taft Catarina Properties | 434 | 400 |
| T0616008-056 | KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 570 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-024 | KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 368 |
| T0620016-002 | KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 127 |
| T0619001-006 | KINGDON R HUGHES FAMILY LIMITED PAR | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2014 | Dimmit | LOT 4 & 5, BLK 150 | 425 | 589 |
| T0616003-021 | KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 445 |
| T0620012-005 | KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 627 | 200 |
| T0621001-002 | LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | 09/29/2009 | Dimmit | | 343 | 844 |
| T0616008-049 | LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 717 |
| T0620037-003 | LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | 05/29/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 385 |
| T0620037-006 | LARRY MOREAU | SN EF MAVERICK, LLC | 06/05/2019 | 06/05/2022 | Dimmit | Farm Tract 1595 in Block 24 of the Denton Colony Subdivision | 640 | 241 |
| T0620039-023 | LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 503 |
| T0616003-013 | LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 428 |
| T0619002-013 | LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 632 |
| T0621003-047 | LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 655 |
| T0616003-020 | LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 448 |
| T0616003-006 | LEAKE EXPLORATION LLC BY ARTHUR GAY | ANADARKO E&P ONSHORE LLC | 07/17/2015 | 07/17/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 318 |
| T0621019-015 | LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | 09/22/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 409 |
| T0618007-057 | LEI PEAVY | SN EF MAVERICK, LLC | 01/02/2019 | 01/01/2022 | Dimmit | | 634 | 402 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620030 | LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | 03/12/2019 | Dimmit | F/T 2325, SEC 31, BLK 10 DENTON | 487 | 772 |
| T0619013-001 | LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 568 |
| T0616005 | LESLIE EDDIE VIVION AND NANCY JOE V | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | 12/21/2012 | Dimmit | | 379 | 500 |
| T0620043-022 | LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 102 |
| T0620034-004 | LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 762 |
| T0621025-006 | LEVITZ, PAMELA PABST | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 132 |
| T0619008-026 | LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 145 |
| T0617001-001 | LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 379 | 840 |
| T0617002-001 | LIGHT MINERAL TRUST ET AL | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 825<br>202 |
| T0621016-001 | LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 626 |
| T0620043-025 | LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | 05/19/2018 | Dimmit | | 545 | 516 |
| T0620002-018 | LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2014 | Dimmit | F/T 2511, DENTON | 429 | 541 |
| T0620018-013 | LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 641 |
| T0619008-046 | LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 457 |
| T0620039-035 | LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | 06/18/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 487 |
| T0620036-008 | LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 828 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-008 | LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 545 | 531 |
| T0621004-003 | LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 508 |
| T0620016-004 | LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 145 |
| T0619007-011 | LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 368 |
| T0621016-017 | LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 672 |
| T0620002-013 | LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2021 | Dimmit | F/T 1756-1762 DENTON | 557 | 385 |
| T0621007-015 | LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 117 |
| T0621020-007 | LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 537 | 75 |
| T0620039-042 | LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | 10/14/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 746 |
| T0620039-003 | LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | 06/19/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 492 |
| T0618007-042 | LINDA STEWART | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 632 | 542 |
| T0621003-066 | LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 569 |
| T0619002-007 | LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 463 | 89 |
| T0620043-018 | LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 543 |
| T0621019-010 | LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | 11/03/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 553 | 588 |
| T0616008-001 | LOCKESBURG FIRST UNITED METHODIST C | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 423 | 615 |
| T0621019-006 | LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | 11/11/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 544 | 753 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619001-019 | LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 639 |
| T0620001-003 | LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | 06/14/2014 | Dimmit | F/T 1302, 1303, 1304, SEC 16, BLK 10 DENTON | 423 | 49 |
| T0620043-001 | LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | 04/15/2018 | Dimmit | | 545 | 546 |
| T0620002-011 | LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | Dimmit | F/T 1756-1762 DENTON | 545 | 549 |
| T0618007-027 | LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2020 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 563 | 557 |
| T0620018-009 | LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 646 |
| T0620002-019 | LUCILLE J SWANSON ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | Dimmit | F/T 2153, SEC 18, DENTON | 420 | 757 |
| T0619008-030 | M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 749 |
| T0618004-012 | MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | 08/15/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 455 | 623 |
| T0620037-004 | MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 391 |
| T0621003-041 | MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 520 |
| T0621003-028 | MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 794 |
| T0616003-002 | MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | 06/25/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 548 | 735 |
| T0620008 | MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | 02/23/2019 | Dimmit | TRACT 2419, BLOCK 29, DENTON | 383 | 654 |
| T0619001-011 | MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 648 |
| T0620047-001 | MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 458 | 295 |
| T0619016-001 | MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | 03/10/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 392 | 487 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620018-001 | MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | 06/06/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 445 | 56 |
| T0620002-003 | MARIE PREYSZ SCHOONOVER ET AL RECEI | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | Dimmit | F/T 1756-1762 DENTON | 426 | 577 |
| T0618007-002 | MARIEANNE HOLLARN AKA MARIANNE DUNA | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 410 | 169 |
| T0619008-050 | MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 466 |
| T0619008-022 | MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 745 |
| T0619008-033 | MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 442 | 304 |
| T0621013-004 | MARISSA LOUISE VESTAL TRUST U/W/O L | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 266 |
| T0620002-005 | MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 395 |
| T0621007-033 | MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 98 |
| T0619008-009 | MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 445 |
| T0620041-005 | MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 817 |
| T0619016-011 | MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 777 |
| T0619008-038 | MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 64 |
| T0620018-007 | MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | 04/12/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 443 | 152 |
| T0620036-004 | MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 6 |
| T0616008-044 | MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 544 | 260 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620040-001 | MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 548 | 471 |
| T0620043-015 | MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 522 |
| T0619016-013 | MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 785 |
| T0621025-004 | MARTIN, JOAN HERWECK | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 126 |
| T0621007-017 | MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | 01/27/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 703 |
| T0619008-027 | MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 757 |
| T0621003-056 | MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 87 |
| T0621003-012 | MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 790 |
| T0620018-003 | MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 661 |
| T0618007-025 | MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 467 | 91 |
| T0619010-004 | MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 41 |
| T0621016-003 | MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | Dimmit | F/T 764, BLK 30, DENTON | 523 | 830 |
| T0621003-007 | MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 256 |
| T0618003-002 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 636 |
| T0618003-004 | MARY MARSHALL SMITH TRUST FBO KATHA | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | Dimmit | | 385 | 255 |
| T0618003-005 | MARY MARSHALL SMITH TRUST FBO MARGA | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | Dimmit | | 385 | 262 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621007-016 | MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 687 |
| T0619007-008 | MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 364 |
| T0619001-015 | MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 627 |
| T0616008-021 | MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 132 |
| T0621003-018 | MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 627 |
| T0620002-001 | MAUND FAMILY LIMITED PARTNERSHIP ET | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 343 | 694 |
| T0621003-046 | MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 528 |
| T0621001-022 | MCKEE, DALE EDWARD | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0620009 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | 06/29/2017 | Dimmit | LOTS 1535-1538, BLK 24; LOT 2446, BLK 32, DENTON | 388 | 648 |
| T0620014 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | 08/02/2017 | Dimmit | F/T 1914, 1815, BLK 27, DENTON | 388 | 648 |
| T0619001-005 | MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2014 | Dimmit | LOT 4 & 5, BLK 150 | 417 | 612 |
| T0616008-046 | MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 528 | 175 |
| T0620039-030 | MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 483 |
| T0619008-047 | MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | 03/07/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 436 | 118 |
| T0616008-007 | MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 393 | 318 |
| T0620018-016 | MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 456 | 521 |
| T0618007-026 | MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | 02/25/2018 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 177 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-014 | MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 678 |
| T0621003-032 | MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 585 |
| T0621004-001 | MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 511 |
| T0618004-002 | MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 105 |
| T0620022 | MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | 08/01/2014 | Dimmit | F/T 2461, BLK 10, SEC 32, DENTON | 422 | 395 |
| T0620002-014 | MILDRED PATTERSON ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | Dimmit | LOTS 1816-1819, BLK 27 DENTON | 420 | 759 |
| T0619011 | MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | 05/01/2018 | Dimmit | LOT 6, BLK 152, CATARINA FARMS SUBD H | 545 | 243 |
| T0619008-041 | MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 67 |
| T0620043-005 | MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | Dimmit | | 544 | 117 |
| T0616003-004 | MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 324 |
| T0620039-031 | MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 499 |
| T0616001-002 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | Dimmit | | 329 | 484 |
| T0616002-002 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | La Salle | | 329 | 484 |
| T0621003-022 | MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 280 |
| T0619012 | MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | 02/06/2017 | Dimmit | TRACT 1, BLK 38, SUBD C, TAFT | 508 | 167 |
| T0621003-048 | NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 659 |
| T0621019-022 | NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 90 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-008 | NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 614 |
| T0621016-004 | NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | 09/19/2015 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 612 |
| T0621019-004 | NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 84 |
| T0616008-036 | NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 199 |
| T0619001-009 | NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 664 |
| T0620039-037 | NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 817 |
| T0618029 | NITA SUE SANDERS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 192 |
| T0621007-013 | NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE | 07/22/2014 | 07/22/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 829 |
| T0616008-014 | NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 702 |
| T0621017-008 | NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 204 |
| T0621003-035 | OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 544 |
| T0621026 | OLSEN, EDMUND SEVERN III | SN EF MAVERICK, LLC | 08/02/2018 | 08/02/2023 | Dimmit | | 623 | 28 |
| T0621025-007 | PABST, PATREA L. | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 120 |
| T0621025-009 | PABST, RICHARD EDWARD JR. | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 141 |
| T0619002-008 | PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 463 | 85 |
| T0620039-022 | PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 833 |
| T0616008-004 | PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | 06/27/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 325 |
| T0616003-017 | PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | 08/13/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 556 | 433 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-002 | PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 108 |
| T0616008-047 | PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 516 | 704 |
| T0621007-001 | PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | 11/26/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 711 |
| T0619006-003 | PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 35 |
| T0620037-002 | PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 388 |
| T0620043-006 | PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | Dimmit | | 544 | 105 |
| T0620002-004 | PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2018 | Dimmit | F/T 1756-1762 DENTON | 627 | 185 |
| T0621003-004 | PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 55 |
| T0619007-005 | PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 400 |
| T0618020 | PAUL L. SHEEHAN | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 626 | 21 |
| T0620041-001 | PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 814 |
| T0621007-004 | PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 74 |
| T0620039-041 | PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 734 |
| T0619001-013 | PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 642 |
| T0619008-010 | PHYLLIS E. MCELHENEY TRUST DTD 7/30 | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 425 | 311 |
| T0621001-018 | PINNELL, JONI | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 60 |
| T0619007-013 | PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 744 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619008-005 | R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 449 |
| T0620018-014 | RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 427 | 735 |
| T0617001-003 | RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 16 |
| T0619008-014 | RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 589 |
| T0621016-002 | RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 629 |
| T0619006-013 | RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 394 | 189 |
| T0621003-058 | RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 122 |
| T0621007-026 | RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 825 |
| T0620039-026 | REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 743 |
| T0620010-003 | REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 408 |
| T0619013-005 | REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 578 |
| T0621003-061 | RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 97 |
| T0619013-006 | RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 583 |
| T0620043-028 | RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 545 | 525 |
| T0618007-056 | RHONDA TESCH | SN EF MAVERICK, LLC | 01/02/2019 | 01/01/2022 | Dimmit | | 633 | 674 |
| T0620011-002 | RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | Dimmit | TRACT 2516, BLOCKS 19 & 20, DENTON | 438 | 412 |
| T0620034-006 | RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 759 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-020 | RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | 10/09/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 374 |
| T0619006-002 | RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 29 |
| T0620039-008 | RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 500 |
| T0621019-016 | RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 87 |
| T0618007-018 | RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 595 |
| T0619015-002 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2015 | Dimmit | S/2 LOT 7, BLK 148, CATARINA FARMS SUBD H | 445 | 66 |
| T0620001-004 | RISKEN FAMILY TRUST | SN EF MAVERICK, LLC | 03/22/2012 | 03/22/2020 | Dimmit | | 445 | 66 |
| T0620002-015 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2023 | Dimmit | F/T 1828, 1829, BLK 27, DENTON | 445 | 66 |
| T0619013-004 | RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 588 |
| T0616008-041 | ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 313 |
| T0619001-020 | ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 657 |
| T0621007-005 | ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 55 |
| T0618030 | ROBERT CHARLES VIVION | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 165 |
| T0618007-004 | ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | 02/03/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 412 | 384 |
| T0620039-027 | ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | 10/08/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 740 |
| T0616008-028 | ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 833 |
| T0621007-025 | ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 515 | 189 |
| T0621007-009 | ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 722 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-051 | ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 643 |
| T0620028 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2016 | Dimmit | F/T 2456, SEC 32, DENTON | 476 | 288 |
| T0620029 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2019 | Dimmit | F/T 2329, SEC 31, DENTON | 476 | 288 |
| T0621006-001 | ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | Dimmit | F/T 532, 533, BLK 6, SEC 43, DENTON | 570 | 236 |
| T0620010-002 | ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 405 |
| T0621017-001 | ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2015 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 96 |
| T0619001-023 | ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2014 | Dimmit | LOT 8, BLK 179 | 406 | 729 |
| T0616008-009 | ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | 09/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 528 | 179 |
| T0621003-034 | ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 552 |
| T0621016-009 | ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 669 |
| T0621003-040 | ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 524 |
| T0621003-030 | ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 597 |
| T0620039-014 | RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 356 |
| T0616003-016 | RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 556 | 436 |
| T0620036-010 | ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 823 |
| T0620001-001 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 344 | 46 |
| T0619001-012 | RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 630 |
| T0620039-044 | RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | 02/23/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 366 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-011 | RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 120 |
| T0620034-003 | RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 756 |
| T0618007-035 | RONNY O. WARD | SN EF MAVERICK, LLC | 10/26/2018 | 10/25/2021 | Dimmit | | 627 | 181 |
| T0620041-002 | ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 811 |
| T0616008-057 | ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 263 |
| T0620018-008 | ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 435 | 797 |
| T0618004-018 | RUSSO, MAUREEN | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | | 623 | 20 |
| T0620036-006 | RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 16 |
| T0619007-018 | RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 732 |
| T0619002-004 | SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 232 |
| T0616008-037 | SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 576 |
| T0619007-016 | SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 389 |
| T0619013-002 | SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 563 |
| T0619008-036 | SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 70 |
| T0620041-008 | SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 676 |
| T0621003-021 | SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 635 |
| T0619013-003 | SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 573 |
| T0619007-020 | SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 393 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619016-003 | SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 395 | 565 |
| T0618007-045 | SANDRA HARRIS SHAW | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 629 | 627 |
| T0621015-001 | SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 504 |
| T0616003-019 | SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 528 |
| T0621020-006 | SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | 10/13/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 532 | 364 |
| T0619002-012 | SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 636 |
| T0620039-017 | SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 556 | 592 |
| T0620039-019 | SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | 06/12/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 495 |
| T0616003-023 | SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2020 | Dimmit | LOT 14, BLK 4, TAFT | 392 | 478 |
| T0620038-002 | SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 674 |
| T0621003-005 | SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 59 |
| T0619001-008 | SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 654 |
| T0620012-003 | SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | 01/31/2021 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 435 | 803 |
| T0620013 | SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | 08/24/2013 | Dimmit | F/T 1732, 1733, BLK 6, SEC 19, DENTON | 393 | 385 |
| T0620043-030 | SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | 06/08/2018 | Dimmit | | 550 | 372 |
| T0621007-014 | SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 94 |
| T0616008-013 | SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 706 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-027 | SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | 07/26/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 425 | 695 |
| T0618004-013 | SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 629 | 638 |
| T0620002-008 | SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 398 |
| T0621025-005 | SHAW, MICHAEL L. | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 129 |
| T0621025-010 | SHAW, ROBERT L. | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 138 |
| T0618004-019 | SHEEHAN, MARTIN | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 24 |
| T0618004-016 | SHEEHAN, WILLIAM N. III | ANADARKO E&P COMPANY LP | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 12 |
| T0619008-006 | SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 441 |
| T0618007-019 | SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 632 | 550 |
| T0618007-051 | SHERRY MEALY | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 632 | 554 |
| T0616003-014 | SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 425 |
| T0620043-012 | SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | Dimmit | | 548 | 477 |
| T0620045 | SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 2374, DENTON | 439 | 691 |
| T0620003-001 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | 08/01/2018 | Dimmit | | 343 | 325 |
| T0621001-012 | SPURLOCK, REBECCA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 51 |
| T0621008 | STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | 08/01/2015 | Dimmit | F/T 743, BLK 42 DENTON | 498 | 608 |
| T0617002-004 | STATE OF TEXAS M-110600 | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | 01/28/2013 | Dimmit | | 391<br>513 | 488<br>32 |
| T0616010 | STATE OF TEXAS MF 119522 | SN EF MAVERICK, LLC | 03/01/2018 | 03/01/2021 | La Salle | | 1015 | 452 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0616004 | STATE OF TEXAS MF-107481 ET AL | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | Dimmit | | 336 | 199 |
| T0620004 | STATE OF TEXAS MF-110291 ET AL | ANADARKO E&P COMPANY LP | 03/06/2009 | 03/06/2011 | Dimmit | | 369 | 468 |
| T0620007 | STATE OF TEXAS MF-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2015 | Dimmit | | 392<br>396 | 363<br>579 |
| T0616006 | STATE OF TEXAS MF-112121 ET AL | ANADARKO E&P COMPANY LP | 09/01/2010 | 09/01/2013 | La Salle | | 530 | 251 |
| T0616009 | STATE OF TEXAS MF-118669 | SN EF MAVERICK, LLC | 03/17/2017 | 03/17/2021 | Dimmit | 124.79 ACRES BEING ALL OF AB&M SURVEY 508, A-1545, DIMMIT COUNTY, TEXAS. | | |
| T0620043-023 | STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 547 | 118 |
| T0620010-007 | STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 392 | 481 |
| T0621017-005 | STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 216 |
| T0621016-013 | STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 675 |
| T0616008-045 | STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 531 | 199 |
| T0620037-001 | STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2023 | Dimmit | F/T 1595, BLK 24, DENTON | 541 | 424 |
| T0620036-005 | STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 462 | 838 |
| T0620039-043 | SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | 10/20/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 728 |
| T0621016-006 | SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 500 | 792 |
| T0620003-004 | SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 500 | 6 |
| T0620006-002 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 59 |
| T0621002-003 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | proposed railroad through thc Denton Colony Subdivisior | 429 | 59 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620050-002 | SUSAN GATLIN KELLY | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 646 | 636 |
| T0616008-027 | SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 821 |
| T0619008-013 | SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | 08/02/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 420 | 221 |
| T0621017-007 | SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 207 |
| T0619008-016 | SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 592 |
| T0618007-041 | SUSAN MILLER | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 629 | 631 |
| T0621014-001 | SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | 10/26/2015 | Dimmit | F/T 790, SEC 30, DENTON | 459 | 498 |
| T0621003-037 | SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 500 | 798 |
| T0616008-034 | SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 710 |
| T0620018-005 | SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 442 | 832 |
| T0621003-052 | SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 806 |
| T0621014-002 | SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | 01/16/2016 | Dimmit | F/T 790, SEC 30, DENTON | 462 | 418 |
| T0618008 | SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | 07/14/2014 | Dimmit | N/2 LOT 1, BLK 104, TAFT | 399 | 715 |
| T0620039-005 | SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | 06/16/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 28 |
| T0620039-039 | TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 534 | 307 |
| T0621016-016 | TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | 12/04/2018 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 681 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-038 | TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 534 | 310 |
| T0620043-021 | TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 99 |
| T0619008-018 | TEXAS LAND AND MINERAL COMPANY LLC | ANADARKO E&P COMPANY LP | 11/20/2012 | 11/20/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 458 | 290 |
| T0616008-006 | THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | 01/20/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 509 |
| T0618003-003 | THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 626 |
| T0616008-017 | THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 190 |
| T0620038-005 | THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 682 |
| T0621019-005 | THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | 01/05/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 93 |
| T0621007-031 | THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 104 |
| T0621003-049 | THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 651 |
| T0620027 | THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | 04/25/2019 | Dimmit | F/T 1786, SEC 22, DENTON | 473 | 112 |
| T0621016-015 | THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 684 |
| T0616008-051 | THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | 11/18/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 792 |
| T0620039-020 | THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | 10/28/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 731 |
| T0616008-054 | TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 579 |
| T0620032-002 | TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | 10/11/2018 | Dimmit | F/T 1973, SEC 27, DENTON | 457 | 213 |
| T0620039-036 | TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 825 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619010-009 | TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 483 |
| T0619016-004 | TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 402 | 198 |
| T0616007-001 | TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | 11/25/2016 | Dimmit | | 401 | 548 |
| T0616003-007 | TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 315 |
| T0621013-002 | TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 272 |
| T0619018-002 | TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 677 |
| T0619016-008 | TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 793 |
| T0619001-022 | UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 461 | 254 |
| T0621001-021 | USHER, RHONDA L | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619008-040 | VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 73 |
| T0621003-057 | VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 92 |
| T0616008-025 | VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 500 | 316 |
| T0621007-008 | VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 113 |
| T0619016-006 | VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | 09/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 801 |
| T0619001-004 | VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 712 |
| T0616008-030 | VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 193 |
| T0619016-007 | VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 809 |
| T0618007-020 | VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 623 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-025 | WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 276 |
| T0618007-022 | WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 591 |
| T0620043-013 | WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 549 | 470 |
| T0620043-014 | WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 550 | 369 |
| T0616008-016 | WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 573 |
| T0620039-007 | WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 532 | 751 |
| T0620041-007 | WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 673 |
| T0620043-017 | WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 111 |
| T0620039-015 | WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | 02/04/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 360 |
| T0620050-004 | WESLEY G GATLIN III | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 648 | 530 |
| T0620006-004 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 64 |
| T0621002-002 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 64 |
| T0622005 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | Maverick | | 1067 | 185 |
| T0622006 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | Maverick | | 1067 | 185 |
| T0622007 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 06/09/2014 | Maverick | | 1067 2509 | 161 755 |
| T0620049 | WHITETAIL DIMMIT MINERALS, LLC | SN EF MAVERICK, LLC | 03/04/2019 | 03/04/2022 | Dimmit | | 633 | 678 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620026 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/04/2019 | 03/03/2022 | Dimmit | F/T 2373, BLK 30, DENTON | 465 | 107 |
| T0621009 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | Dimmit | F/T 538, SEC 43, DENTON | 465 | 107 |
| T0618005-001 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 12/15/2014 | Dimmit | | 403 | 403 |
| T0618010 | WILL ALSTON BEINHORN | ANDARKO E&P COMPANY LP | 12/15/2010 | 12/15/2016 | Dimmit | S/2 LOT 1, BLK 183 TAFT | 403 | 403 |
| T0618014 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 06/15/2015 | Dimmit | S/2 LOT 8, BLK 105, TAFT G | 403 | 403 |
| T0620015-003 | WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 512 | 365 |
| T0618002 | WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 343 | 690 |
| T0619001-007 | WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 667 |
| T0620002-012 | WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | Dimmit | F/T 1756-1762 DENTON | 548 | 622 |
| T0621017-006 | WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 213 |
| T0620010-005 | WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 392 |
| T0619010-006 | WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 691 |
| T0620039-040 | WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | 10/02/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 737 |
| T0621003-019 | WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 786 |
| T0620018-004 | WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | 04/23/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 632 |
| T0618011 | WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | 10/03/2018 | Dimmit | N/2 LOT 4, BLK 110 TAFT | 474 | 251 |
| T0616008-018 | WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 136 |

Case 23-90020 Document 1363 Filed in TXSB on 05/16/22 Page 1100 of 1867

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-011 | WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 548 |
| T0620041-004 | WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 571 | 726 |
| T0622001-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0622002-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0622003-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0618004-017 | WIRE, CATHY | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 16 |
| T0624001 | WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | 07/31/2015 | Webb | | 2750 | 95 |
| T0620015-004 | YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 500 | 1 |

# Annex B
## Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338800000 | 4212733880 | BEINHORN RANCH 10H | Producing |
| 42127341130000 | 4212734113 | BEINHORN RANCH 11H | Producing |
| 42127341140000 | 4212734114 | BEINHORN RANCH 12H | Producing |
| 42127342600000 | 4212734260 | BEINHORN RANCH 13H | Producing |
| 42127342590000 | 4212734259 | BEINHORN RANCH 14H | Producing |
| 42127342610000 | 4212734261 | BEINHORN RANCH 15H | Producing |
| 42127349970000 | 4212734997 | BEINHORN RANCH 16H | Producing |
| 42127349980000 | 4212734998 | BEINHORN RANCH 17H | Producing |
| 42127349990000 | 4212734999 | BEINHORN RANCH 18H | Producing |
| 42127343300000 | 4212734330 | BEINHORN RANCH 19H | Producing |
| 42127336240000 | 4212733624 | BEINHORN RANCH 1H | Shut In |
| 42127343280000 | 4212734328 | BEINHORN RANCH 20H | Producing |
| 42127341150000 | 4212734115 | BEINHORN RANCH 21H | Producing |
| 42127343290000 | 4212734329 | BEINHORN RANCH 22H | Producing |
| 42127343830000 | 4212734383 | BEINHORN RANCH 23H | Producing |
| 42127343840000 | 4212734384 | BEINHORN RANCH 24H | Producing |
| 42127343850000 | 4212734385 | BEINHORN RANCH 25H | Producing |
| 42127343860000 | 4212734386 | BEINHORN RANCH 26H | Producing |
| 42127350010000 | 4212735001 | BEINHORN RANCH 27H | Producing |
| 42127350000000 | 4212735000 | BEINHORN RANCH 28H | Producing |
| 42127350180000 | 4212735018 | BEINHORN RANCH 29H | Producing |
| 42127336440000 | 4212733644 | BEINHORN RANCH 2H | Producing |
| 42127350200000 | 4212735020 | BEINHORN RANCH 30H | Producing |
| 42127350190000 | 4212735019 | BEINHORN RANCH 31H | Producing |
| 42127350220000 | 4212735022 | BEINHORN RANCH 32H | Producing |
| 42127350320000 | 4212735032 | BEINHORN RANCH 33H | Producing |
| 42127350330000 | 4212735033 | BEINHORN RANCH 34H | Producing |
| 42127350350000 | 4212735035 | BEINHORN RANCH 35H | Producing |
| 42127350340000 | 4212735034 | BEINHORN RANCH 36H | Producing |
| 42127362140000 | 4212736214 | BEINHORN RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127362190000 | 4212736219 | BEINHORN RANCH 38H | Producing |
| 42127362200000 | 4212736220 | BEINHORN RANCH 39H | Producing |
| 42127336640000 | 4212733664 | BEINHORN RANCH 3H | Producing |
| 42127362210000 | 4212736221 | BEINHORN RANCH 40H | Producing |
| 42127362230000 | 4212736223 | BEINHORN RANCH 41H | Producing |
| 42127362240000 | 4212736224 | BEINHORN RANCH 42H | Producing |
| 42127362250000 | 4212736225 | BEINHORN RANCH 43H | Producing |
| 42127362260000 | 4212736226 | BEINHORN RANCH 44H | Producing |
| 42127336900000 | 4212733690 | BEINHORN RANCH 4H | Producing |
| 42127337600000 | 4212733760 | BEINHORN RANCH 5H | Producing |
| 42127337610000 | 4212733761 | BEINHORN RANCH 6H | Producing |
| 42127338710000 | 4212733871 | BEINHORN RANCH 7H | Producing |
| 42127338720000 | 4212733872 | BEINHORN RANCH 8H | Producing |
| 42127338790000 | 4212733879 | BEINHORN RANCH 9H | Producing |
| 42127362910000 | 4212736291 | BEINHORN RANCH UNIT A 10H | Producing |
| 42127362890000 | 4212736289 | BEINHORN RANCH UNIT A 11H | Producing |
| 42127362940000 | 4212736294 | BEINHORN RANCH UNIT A 12H | Producing |
| 42127362750000 | 4212736275 | BEINHORN RANCH UNIT A 1H | Producing |
| 42127362760000 | 4212736276 | BEINHORN RANCH UNIT A 2H | Producing |
| 42127362770000 | 4212736277 | BEINHORN RANCH UNIT A 3H | Producing |
| 42127362780000 | 4212736278 | BEINHORN RANCH UNIT A 4H | Producing |
| 42127362820000 | 4212736282 | BEINHORN RANCH UNIT A 5H | Producing |
| 42127362860000 | 4212736286 | BEINHORN RANCH UNIT A 6H | Producing |
| 42127362870000 | 4212736287 | BEINHORN RANCH UNIT A 7H | Producing |
| 42127362900000 | 4212736290 | BEINHORN RANCH UNIT A 8H | Producing |
| 42127362880000 | 4212736288 | BEINHORN RANCH UNIT A 9H | Producing |
| 42127337330000 | 4212733733 | BRISCOE CARLA RANCH 10H | Producing |
| 42127337350000 | 4212733735 | BRISCOE CARLA RANCH 11H | Producing |
| 42127337360000 | 4212733736 | BRISCOE CARLA RANCH 12H | Producing |
| 42127338750000 | 4212733875 | BRISCOE CARLA RANCH 13H | Producing |
| 42127376280000 | 4212737628 | BRISCOE CARLA RANCH 13HA | Producing |
| 42127376290000 | 4212737629 | BRISCOE CARLA RANCH 13HB | Surface Casing Only |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376300000 | 4212737630 | BRISCOE CARLA RANCH 13HC | Producing |
| 42127376310000 | 4212737631 | BRISCOE CARLA RANCH 13HD | Producing |
| 42127376320000 | 4212737632 | BRISCOE CARLA RANCH 13HE | Surface Casing Only |
| 42127376330000 | 4212737633 | BRISCOE CARLA RANCH 13HF | Producing |
| 42127376340000 | 4212737634 | BRISCOE CARLA RANCH 13HG | Producing |
| 42127376350000 | 4212737635 | BRISCOE CARLA RANCH 13HH | Surface Casing Only |
| 42127338760000 | 4212733876 | BRISCOE CARLA RANCH 14H | Producing |
| 42127338740000 | 4212733874 | BRISCOE CARLA RANCH 15H | Producing |
| 42127341330000 | 4212734133 | BRISCOE CARLA RANCH 16H | Producing |
| 42127381310000 | 4212738131 | BRISCOE CARLA RANCH 16HA | Producing |
| 42127381320000 | 4212738132 | BRISCOE CARLA RANCH 16HB | Producing |
| 42127381330000 | 4212738133 | BRISCOE CARLA RANCH 16HC | Producing |
| 42127381340000 | 4212738134 | BRISCOE CARLA RANCH 16HD | Producing |
| 42127341340000 | 4212734134 | BRISCOE CARLA RANCH 17H | Producing |
| 42127341350000 | 4212734135 | BRISCOE CARLA RANCH 18H | Producing |
| 42127382910000 | 4212738291 | BRISCOE CARLA RANCH 18HX | Producing |
| 42127382920000 | 4212738292 | BRISCOE CARLA RANCH 18HY | Producing |
| 42127382930100 | 4212738293 | BRISCOE CARLA RANCH 18HZ | Producing |
| 42127338890000 | 4212733889 | BRISCOE CARLA RANCH 19H | Producing |
| 42127336810000 | 4212733681 | BRISCOE CARLA RANCH 1H | Shut In |
| 42127338900000 | 4212733890 | BRISCOE CARLA RANCH 20H | Producing |
| 42127338910000 | 4212733891 | BRISCOE CARLA RANCH 21H | Producing |
| 42127338850000 | 4212733885 | BRISCOE CARLA RANCH 22H | Producing |
| 42127338930000 | 4212733893 | BRISCOE CARLA RANCH 23H | Producing |
| 42127338940000 | 4212733894 | BRISCOE CARLA RANCH 24H | Producing |
| 42127338950000 | 4212733895 | BRISCOE CARLA RANCH 25H | Producing |
| 42127349480000 | 4212734948 | BRISCOE CARLA RANCH 26H | Producing |
| 42127349490000 | 4212734949 | BRISCOE CARLA RANCH 27H | Producing |
| 42127349690000 | 4212734969 | BRISCOE CARLA RANCH 28H | Producing |
| 42127349590000 | 4212734959 | BRISCOE CARLA RANCH 29H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127336660000 | 4212733666 | BRISCOE CARLA RANCH 2H | Producing |
| 42127349600000 | 4212734960 | BRISCOE CARLA RANCH 30H | Producing |
| 42127349610000 | 4212734961 | BRISCOE CARLA RANCH 31H | Producing |
| 42127349670000 | 4212734967 | BRISCOE CARLA RANCH 32H | Shut In |
| 42127349620000 | 4212734962 | BRISCOE CARLA RANCH 33H | Shut In |
| 42127349630000 | 4212734963 | BRISCOE CARLA RANCH 34H | Shut In |
| 42127337050000 | 4212733705 | BRISCOE CARLA RANCH 3H | Shut In |
| 42127337060000 | 4212733706 | BRISCOE CARLA RANCH 4H | Producing |
| 42127349460000 | 4212734946 | BRISCOE CARLA RANCH 5H | Producing |
| 42127349470000 | 4212734947 | BRISCOE CARLA RANCH 6H | Producing |
| 42127338550000 | 4212733855 | BRISCOE CARLA RANCH 7H | Producing |
| 42127338560000 | 4212733856 | BRISCOE CARLA RANCH 8H | Producing |
| 42127338570000 | 4212733857 | BRISCOE CARLA RANCH 9H | Producing |
| 42127375250000 | 4212737525 | BRISCOE CARLA RANCH UNIT A 01HW | Producing |
| 42127375260000 | 4212737526 | BRISCOE CARLA RANCH UNIT A 01HX | Shut In |
| 42127375280000 | 4212737528 | BRISCOE CARLA RANCH UNIT A 01HY | Producing |
| 42127375270000 | 4212737527 | BRISCOE CARLA RANCH UNIT A 01HZ | Producing |
| 42127364450000 | 4212736445 | BRISCOE CARLA RANCH UNIT A 1H | Producing |
| 42127364460000 | 4212736446 | BRISCOE CARLA RANCH UNIT A 2H | Producing |
| 42127364470000 | 4212736447 | BRISCOE CARLA RANCH UNIT A 3H | Producing |
| 42127364500000 | 4212736450 | BRISCOE CARLA RANCH UNIT A 4H | Producing |
| 42127364490000 | 4212736449 | BRISCOE CARLA RANCH UNIT A 5H | Producing |
| 42127375400000 | 4212737540 | BRISCOE CARLA RANCH UNIT B 01HA | Producing |
| 42127375410000 | 4212737541 | BRISCOE CARLA RANCH UNIT B 01HB | Producing |
| 42127375430000 | 4212737543 | BRISCOE CARLA RANCH UNIT B 01HC | Producing |
| 42127375460000 | 4212737546 | BRISCOE CARLA RANCH UNIT B 02HA | Producing |
| 42127375470000 | 4212737547 | BRISCOE CARLA RANCH UNIT B 02HB | Producing |
| 42127375480000 | 4212737548 | BRISCOE CARLA RANCH UNIT B 02HC | Producing |
| 42127364640000 | 4212736464 | BRISCOE CARLA RANCH UNIT B 1H | Producing |
| 42127364650000 | 4212736465 | BRISCOE CARLA RANCH UNIT B 2H | Producing |
| 42127364660000 | 4212736466 | BRISCOE CARLA RANCH UNIT B 3H | Shut In |
| 42127364680000 | 4212736468 | BRISCOE CARLA RANCH UNIT B 4H | Producing |
| 42127364670000 | 4212736467 | BRISCOE CARLA RANCH UNIT B 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127364690000 | 4212736469 | BRISCOE CARLA RANCH UNIT B 6H | Producing |
| 42127364700000 | 4212736470 | BRISCOE CARLA RANCH UNIT B 7H | Producing |
| 42127359230000 | 4212735923 | BRISCOE CATARINA N UNIT A 10H | Producing |
| 42127359300000 | 4212735930 | BRISCOE CATARINA N UNIT A 1H | Producing |
| 42127359310000 | 4212735931 | BRISCOE CATARINA N UNIT A 2H | Shut In |
| 42127359320000 | 4212735932 | BRISCOE CATARINA N UNIT A 3H | Producing |
| 42127359330000 | 4212735933 | BRISCOE CATARINA N UNIT A 4H | Shut In |
| 42127359340000 | 4212735934 | BRISCOE CATARINA N UNIT A 5H | Producing |
| 42127359190000 | 4212735919 | BRISCOE CATARINA N UNIT A 6H | Shut In |
| 42127359200000 | 4212735920 | BRISCOE CATARINA N UNIT A 7H | Producing |
| 42127359210000 | 4212735921 | BRISCOE CATARINA N UNIT A 8H | Shut In |
| 42127359220000 | 4212735922 | BRISCOE CATARINA N UNIT A 9H | Producing |
| 42127367320000 | 4212736732 | BRISCOE CATARINA NORTH 100H | Producing |
| 42127367330000 | 4212736733 | BRISCOE CATARINA NORTH 101H | Producing |
| 42127367340000 | 4212736734 | BRISCOE CATARINA NORTH 102H | Producing |
| 42127367350000 | 4212736735 | BRISCOE CATARINA NORTH 103H | Producing |
| 42127368190000 | 4212736819 | BRISCOE CATARINA NORTH 104H | Producing |
| 42127368200000 | 4212736820 | BRISCOE CATARINA NORTH 105H | Producing |
| 42127368100000 | 4212736810 | BRISCOE CATARINA NORTH 106H | Producing |
| 42127368090000 | 4212736809 | BRISCOE CATARINA NORTH 107H | Producing |
| 42127368110000 | 4212736811 | BRISCOE CATARINA NORTH 108H | Producing |
| 42127368120000 | 4212736812 | BRISCOE CATARINA NORTH 109H | Producing |
| 42127339300000 | 4212733930 | BRISCOE CATARINA NORTH 10H | Producing |
| 42127368130000 | 4212736813 | BRISCOE CATARINA NORTH 110H | Producing |
| 42127368140000 | 4212736814 | BRISCOE CATARINA NORTH 111H | Producing |
| 42127368150000 | 4212736815 | BRISCOE CATARINA NORTH 112H | Producing |
| 42127368160000 | 4212736816 | BRISCOE CATARINA NORTH 113H | Producing |
| 42127368170000 | 4212736817 | BRISCOE CATARINA NORTH 114H | Producing |
| 42127368180000 | 4212736818 | BRISCOE CATARINA NORTH 115H | Producing |
| 42127368210000 | 4212736821 | BRISCOE CATARINA NORTH 116H | Producing |
| 42127368220000 | 4212736822 | BRISCOE CATARINA NORTH 117H | Producing |
| 42127368230000 | 4212736823 | BRISCOE CATARINA NORTH 118H | Producing |
| 42127368260000 | 4212736826 | BRISCOE CATARINA NORTH 119H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339320000 | 4212733932 | BRISCOE CATARINA NORTH 11H | Producing |
| 42127368280000 | 4212736828 | BRISCOE CATARINA NORTH 120H | Producing |
| 42127368270000 | 4212736827 | BRISCOE CATARINA NORTH 121H | Producing |
| 42127368290000 | 4212736829 | BRISCOE CATARINA NORTH 122H | Producing |
| 42127368300000 | 4212736830 | BRISCOE CATARINA NORTH 123H | Producing |
| 42127368310000 | 4212736831 | BRISCOE CATARINA NORTH 124H | Producing |
| 42127368320000 | 4212736832 | BRISCOE CATARINA NORTH 125H | Producing |
| 42127368330000 | 4212736833 | BRISCOE CATARINA NORTH 126H | Producing |
| 42127368340000 | 4212736834 | BRISCOE CATARINA NORTH 127H | Producing |
| 42127368620000 | 4212736862 | BRISCOE CATARINA NORTH 128H | Shut In |
| 42127368630000 | 4212736863 | BRISCOE CATARINA NORTH 129H | Producing |
| 42127339310000 | 4212733931 | BRISCOE CATARINA NORTH 12H | Producing |
| 42127368640000 | 4212736864 | BRISCOE CATARINA NORTH 130H | Producing |
| 42127368650000 | 4212736865 | BRISCOE CATARINA NORTH 131H | Producing |
| 42127368680000 | 4212736868 | BRISCOE CATARINA NORTH 132H | Producing |
| 42127368690000 | 4212736869 | BRISCOE CATARINA NORTH 133H | Producing |
| 42127368700000 | 4212736870 | BRISCOE CATARINA NORTH 134H | Producing |
| 42127368660000 | 4212736866 | BRISCOE CATARINA NORTH 135H | Producing |
| 42127368670000 | 4212736867 | BRISCOE CATARINA NORTH 136H | Producing |
| 42127339370000 | 4212733937 | BRISCOE CATARINA NORTH 13H | Producing |
| 42127339380000 | 4212733938 | BRISCOE CATARINA NORTH 14H | Producing |
| 42127339390000 | 4212733939 | BRISCOE CATARINA NORTH 15H | Producing |
| 42127339470000 | 4212733947 | BRISCOE CATARINA NORTH 16H | Producing |
| 42127339480000 | 4212733948 | BRISCOE CATARINA NORTH 17H | Producing |
| 42127339490000 | 4212733949 | BRISCOE CATARINA NORTH 18H | Producing |
| 42127350630000 | 4212735063 | BRISCOE CATARINA NORTH 19H | Producing |
| 42127336870000 | 4212733687 | BRISCOE CATARINA NORTH 1H | Producing |
| 42127341550000 | 4212734155 | BRISCOE CATARINA NORTH 20H | Producing |
| 42127341560000 | 4212734156 | BRISCOE CATARINA NORTH 21H | Producing |
| 42127341570000 | 4212734157 | BRISCOE CATARINA NORTH 22H | Producing |
| 42127341280000 | 4212734128 | BRISCOE CATARINA NORTH 23H | Producing |
| 42127341290000 | 4212734129 | BRISCOE CATARINA NORTH 24H | Producing |
| 42127341300000 | 4212734130 | BRISCOE CATARINA NORTH 25H | Shut In |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341740000 | 4212734174 | BRISCOE CATARINA NORTH 26H | Producing |
| 42127341750000 | 4212734175 | BRISCOE CATARINA NORTH 27H | Producing |
| 42127341760000 | 4212734176 | BRISCOE CATARINA NORTH 28H | Producing |
| 42127342060000 | 4212734206 | BRISCOE CATARINA NORTH 29H | Producing |
| 42127339950000 | 4212733995 | BRISCOE CATARINA NORTH 2H | Producing |
| 42127342080000 | 4212734208 | BRISCOE CATARINA NORTH 30H | Producing |
| 42127342090000 | 4212734209 | BRISCOE CATARINA NORTH 31H | Producing |
| 42127381240000 | 4212738124 | BRISCOE CATARINA NORTH 31HB | Producing |
| 42127381250000 | 4212738125 | BRISCOE CATARINA NORTH 31HC | Producing |
| 42127381260000 | 4212738126 | BRISCOE CATARINA NORTH 31HD | Producing |
| 42127381270000 | 4212738127 | BRISCOE CATARINA NORTH 31HE | Producing |
| 42127350640000 | 4212735064 | BRISCOE CATARINA NORTH 32H | Producing |
| 42127350700000 | 4212735070 | BRISCOE CATARINA NORTH 33H | Producing |
| 42127350660000 | 4212735066 | BRISCOE CATARINA NORTH 34H | Producing |
| 42127382470000 | 4212738247 | BRISCOE CATARINA NORTH 34HV | Producing |
| 42127382480000 | 4212738248 | BRISCOE CATARINA NORTH 34HW | Producing |
| 42127382490000 | 4212738249 | BRISCOE CATARINA NORTH 34HX | Producing |
| 42127382500000 | 4212738250 | BRISCOE CATARINA NORTH 34HY | Producing |
| 42127382510000 | 4212738251 | BRISCOE CATARINA NORTH 34HZ | Producing |
| 42127342210000 | 4212734221 | BRISCOE CATARINA NORTH 35H | Producing |
| 42127342220000 | 4212734222 | BRISCOE CATARINA NORTH 36H | Producing |
| 42127342230000 | 4212734223 | BRISCOE CATARINA NORTH 37H | Producing |
| 42127342240100 | 4212734224 | BRISCOE CATARINA NORTH 38H | Temporarily Abandoned |
| 42127342260000 | 4212734226 | BRISCOE CATARINA NORTH 39H | Producing |
| 42127340010100 | 4212734001 | BRISCOE CATARINA NORTH 3H | Producing |
| 42127342280000 | 4212734228 | BRISCOE CATARINA NORTH 40H | Producing |
| 42127342290000 | 4212734229 | BRISCOE CATARINA NORTH 41H | Producing |
| 42127342300000 | 4212734230 | BRISCOE CATARINA NORTH 42H | Producing |
| 42127342310000 | 4212734231 | BRISCOE CATARINA NORTH 43H | Producing |
| 42127343430000 | 4212734343 | BRISCOE CATARINA NORTH 44H | Producing |
| 42127343440000 | 4212734344 | BRISCOE CATARINA NORTH 45H | Producing |
| 42127343750000 | 4212734375 | BRISCOE CATARINA NORTH 46H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127343760000 | 4212734376 | BRISCOE CATARINA NORTH 47H | Producing |
| 42127343770000 | 4212734377 | BRISCOE CATARINA NORTH 48H | Producing |
| 42127343780000 | 4212734378 | BRISCOE CATARINA NORTH 49H | Producing |
| 42127338040000 | 4212733804 | BRISCOE CATARINA NORTH 4H | Producing |
| 42127345630000 | 4212734563 | BRISCOE CATARINA NORTH 50H | Surface Casing Only |
| 42127345640000 | 4212734564 | BRISCOE CATARINA NORTH 51H | Surface Casing Only |
| 42127345650000 | 4212734565 | BRISCOE CATARINA NORTH 52H | Surface Casing Only |
| 42127345660000 | 4212734566 | BRISCOE CATARINA NORTH 53H | Surface Casing Only |
| 42127345670000 | 4212734567 | BRISCOE CATARINA NORTH 54H | Surface Casing Only |
| 42127345680000 | 4212734568 | BRISCOE CATARINA NORTH 55H | Surface Casing Only |
| 42127345780000 | 4212734578 | BRISCOE CATARINA NORTH 56H | Producing |
| 42127345790000 | 4212734579 | BRISCOE CATARINA NORTH 57H | Producing |
| 42127345800000 | 4212734580 | BRISCOE CATARINA NORTH 58H | Producing |
| 42127345810000 | 4212734581 | BRISCOE CATARINA NORTH 59H | Shut In |
| 42127338050000 | 4212733805 | BRISCOE CATARINA NORTH 5H | Producing |
| 42127345820000 | 4212734582 | BRISCOE CATARINA NORTH 60H | Producing |
| 42127345830100 | 4212734583 | BRISCOE CATARINA NORTH 61H | Producing |
| 42127348660000 | 4212734866 | BRISCOE CATARINA NORTH 62H | Producing |
| 42127348690000 | 4212734869 | BRISCOE CATARINA NORTH 63H | Producing |
| 42127348700000 | 4212734870 | BRISCOE CATARINA NORTH 64H | Producing |
| 42127348710000 | 4212734871 | BRISCOE CATARINA NORTH 65H | Producing |
| 42127348740000 | 4212734874 | BRISCOE CATARINA NORTH 66H | Producing |
| 42127348750000 | 4212734875 | BRISCOE CATARINA NORTH 67H | Shut In |
| 42127348760000 | 4212734876 | BRISCOE CATARINA NORTH 68H | Producing |
| 42127348910000 | 4212734891 | BRISCOE CATARINA NORTH 69H | Shut In |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338060000 | 4212733806 | BRISCOE CATARINA NORTH 6H | Producing |
| 42127348900000 | 4212734890 | BRISCOE CATARINA NORTH 70H | Producing |
| 42127348940000 | 4212734894 | BRISCOE CATARINA NORTH 71H | Producing |
| 42127349360000 | 4212734936 | BRISCOE CATARINA NORTH 72H | Producing |
| 42127349300000 | 4212734930 | BRISCOE CATARINA NORTH 73H | Producing |
| 42127349320000 | 4212734932 | BRISCOE CATARINA NORTH 74H | Producing |
| 42127349330000 | 4212734933 | BRISCOE CATARINA NORTH 75H | Producing |
| 42127351590000 | 4212735159 | BRISCOE CATARINA NORTH 76H | Producing |
| 42127351680000 | 4212735168 | BRISCOE CATARINA NORTH 77H | Producing |
| 42127351690000 | 4212735169 | BRISCOE CATARINA NORTH 78H | Producing |
| 42127351700000 | 4212735170 | BRISCOE CATARINA NORTH 79H | Producing |
| 42127338250000 | 4212733825 | BRISCOE CATARINA NORTH 7H | Producing |
| 42127351710000 | 4212735171 | BRISCOE CATARINA NORTH 80H | Producing |
| 42127351720000 | 4212735172 | BRISCOE CATARINA NORTH 81H | Producing |
| 42127351730000 | 4212735173 | BRISCOE CATARINA NORTH 82H | Producing |
| 42127351740000 | 4212735174 | BRISCOE CATARINA NORTH 83H | Producing |
| 42127358160100 | 4212735816 | BRISCOE CATARINA NORTH 84H | Shut In |
| 42127358170000 | 4212735817 | BRISCOE CATARINA NORTH 85H | Producing |
| 42127358180000 | 4212735818 | BRISCOE CATARINA NORTH 86H | Producing |
| 42127358190200 | 4212735819 | BRISCOE CATARINA NORTH 87H | Producing |
| 42127358200000 | 4212735820 | BRISCOE CATARINA NORTH 88H | Shut In |
| 42127358210000 | 4212735821 | BRISCOE CATARINA NORTH 89H | Producing |
| 42127338260000 | 4212733826 | BRISCOE CATARINA NORTH 8H | Producing |
| 42127367220000 | 4212736722 | BRISCOE CATARINA NORTH 90H | Producing |
| 42127367230000 | 4212736723 | BRISCOE CATARINA NORTH 91H | Shut In |
| 42127367240000 | 4212736724 | BRISCOE CATARINA NORTH 92H | Shut In |
| 42127367250000 | 4212736725 | BRISCOE CATARINA NORTH 93H | Shut In |
| 42127367260000 | 4212736726 | BRISCOE CATARINA NORTH 94H | Shut In |
| 42127367270000 | 4212736727 | BRISCOE CATARINA NORTH 95H | Producing |
| 42127367280000 | 4212736728 | BRISCOE CATARINA NORTH 96H | Shut In |
| 42127367290000 | 4212736729 | BRISCOE CATARINA NORTH 97H | Producing |
| 42127367300000 | 4212736730 | BRISCOE CATARINA NORTH 98H | Producing |
| 42127367310000 | 4212736731 | BRISCOE CATARINA NORTH 99H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338290000 | 4212733829 | BRISCOE CATARINA NORTH 9H | Producing |
| 42127354300000 | 4212735430 | BRISCOE CATARINA RANCH 100H | Producing |
| 42127354310000 | 4212735431 | BRISCOE CATARINA RANCH 101H | Producing |
| 42127354710000 | 4212735471 | BRISCOE CATARINA RANCH 102H | Producing |
| 42127354720000 | 4212735472 | BRISCOE CATARINA RANCH 103H | Producing |
| 42127354730000 | 4212735473 | BRISCOE CATARINA RANCH 104H | Producing |
| 42127354740000 | 4212735474 | BRISCOE CATARINA RANCH 105H | Producing |
| 42127354750000 | 4212735475 | BRISCOE CATARINA RANCH 106H | Producing |
| 42127354760000 | 4212735476 | BRISCOE CATARINA RANCH 107H | Producing |
| 42127351990000 | 4212735199 | BRISCOE CATARINA RANCH 108H | Producing |
| 42127336770000 | 4212733677 | BRISCOE CATARINA RANCH 10H | Producing |
| 42127343630000 | 4212734363 | BRISCOE CATARINA RANCH 11H | Producing |
| 42127343640000 | 4212734364 | BRISCOE CATARINA RANCH 12H | Producing |
| 42127336800000 | 4212733680 | BRISCOE CATARINA RANCH 13H | Producing |
| 42127343650000 | 4212734365 | BRISCOE CATARINA RANCH 14H | Producing |
| 42127343660000 | 4212734366 | BRISCOE CATARINA RANCH 15H | Shut In |
| 42127337900000 | 4212733790 | BRISCOE CATARINA RANCH 16H | Producing |
| 42127337910000 | 4212733791 | BRISCOE CATARINA RANCH 17H | Producing |
| 42127337920000 | 4212733792 | BRISCOE CATARINA RANCH 18H | Producing |
| 42127337800000 | 4212733780 | BRISCOE CATARINA RANCH 19H | Producing |
| 42127333980100 | 4212733398 | BRISCOE CATARINA RANCH 1H | Producing |
| 42127337810000 | 4212733781 | BRISCOE CATARINA RANCH 20H | Producing |
| 42127337820000 | 4212733782 | BRISCOE CATARINA RANCH 21H | Producing |
| 42127343150000 | 4212734315 | BRISCOE CATARINA RANCH 22H | Producing |
| 42127343160000 | 4212734316 | BRISCOE CATARINA RANCH 23H | Producing |
| 42127343170000 | 4212734317 | BRISCOE CATARINA RANCH 24H | Producing |
| 42127343180000 | 4212734318 | BRISCOE CATARINA RANCH 25H | Producing |
| 42127343190000 | 4212734319 | BRISCOE CATARINA RANCH 26H | Producing |
| 42127343200000 | 4212734320 | BRISCOE CATARINA RANCH 27H | Producing |
| 42127343670000 | 4212734367 | BRISCOE CATARINA RANCH 28H | Producing |
| 42127343680000 | 4212734368 | BRISCOE CATARINA RANCH 29H | Producing |
| 42127336120000 | 4212733612 | BRISCOE CATARINA RANCH 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341540000 | 4212734154 | BRISCOE CATARINA RANCH 30H | Plugged and Abandoned |
| 42127343880000 | 4212734388 | BRISCOE CATARINA RANCH 31H | Producing |
| 42127343890000 | 4212734389 | BRISCOE CATARINA RANCH 32H | Producing |
| 42127343900000 | 4212734390 | BRISCOE CATARINA RANCH 33H | Producing |
| 42127344320000 | 4212734432 | BRISCOE CATARINA RANCH 34H | Producing |
| 42127344330000 | 4212734433 | BRISCOE CATARINA RANCH 35H | Producing |
| 42127344360000 | 4212734436 | BRISCOE CATARINA RANCH 36H | Producing |
| 42127344340000 | 4212734434 | BRISCOE CATARINA RANCH 37H | Producing |
| 42127344390000 | 4212734439 | BRISCOE CATARINA RANCH 38H | Producing |
| 42127344400000 | 4212734440 | BRISCOE CATARINA RANCH 39H | Producing |
| 42127336460000 | 4212733646 | BRISCOE CATARINA RANCH 3H | Producing |
| 42127344410000 | 4212734441 | BRISCOE CATARINA RANCH 40H | Producing |
| 42127344430000 | 4212734443 | BRISCOE CATARINA RANCH 41H | Producing |
| 42127344420000 | 4212734442 | BRISCOE CATARINA RANCH 42H | Producing |
| 42127344440000 | 4212734444 | BRISCOE CATARINA RANCH 43H | Producing |
| 42127344460000 | 4212734446 | BRISCOE CATARINA RANCH 44H | Producing |
| 42127344480000 | 4212734448 | BRISCOE CATARINA RANCH 45H | Producing |
| 42127347540000 | 4212734754 | BRISCOE CATARINA RANCH 46H | Producing |
| 42127347550000 | 4212734755 | BRISCOE CATARINA RANCH 47H | Producing |
| 42127347560000 | 4212734756 | BRISCOE CATARINA RANCH 48H | Producing |
| 42127347570000 | 4212734757 | BRISCOE CATARINA RANCH 49H | Producing |
| 42127336840000 | 4212733684 | BRISCOE CATARINA RANCH 4H | Producing |
| 42127347580000 | 4212734758 | BRISCOE CATARINA RANCH 50H | Producing |
| 42127347740000 | 4212734774 | BRISCOE CATARINA RANCH 51H | Producing |
| 42127347750000 | 4212734775 | BRISCOE CATARINA RANCH 52H | Producing |
| 42127347780000 | 4212734778 | BRISCOE CATARINA RANCH 53H | Producing |
| 42127347770000 | 4212734777 | BRISCOE CATARINA RANCH 54H | Producing |
| 42127347760000 | 4212734776 | BRISCOE CATARINA RANCH 55H | Producing |
| 42127352140000 | 4212735214 | BRISCOE CATARINA RANCH 56H | Producing |
| 42127352150000 | 4212735215 | BRISCOE CATARINA RANCH 57H | Producing |
| 42127352160000 | 4212735216 | BRISCOE CATARINA RANCH 58H | Producing |
| 42127351880000 | 4212735188 | BRISCOE CATARINA RANCH 59H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352920000 | 4212735292 | BRISCOE CATARINA RANCH 5H | Producing |
| 42127351900000 | 4212735190 | BRISCOE CATARINA RANCH 60H | Producing |
| 42127351840000 | 4212735184 | BRISCOE CATARINA RANCH 61H | Producing |
| 42127351830000 | 4212735183 | BRISCOE CATARINA RANCH 62H | Producing |
| 42127351850000 | 4212735185 | BRISCOE CATARINA RANCH 63H | Producing |
| 42127351860000 | 4212735186 | BRISCOE CATARINA RANCH 64H | Producing |
| 42127351930000 | 4212735193 | BRISCOE CATARINA RANCH 65H | Producing |
| 42127351940000 | 4212735194 | BRISCOE CATARINA RANCH 66H | Producing |
| 42127351950000 | 4212735195 | BRISCOE CATARINA RANCH 67H | Producing |
| 42127351960000 | 4212735196 | BRISCOE CATARINA RANCH 68H | Producing |
| 42127351970000 | 4212735197 | BRISCOE CATARINA RANCH 69H | Producing |
| 42127337490000 | 4212733749 | BRISCOE CATARINA RANCH 6H | Producing |
| 42127351980000 | 4212735198 | BRISCOE CATARINA RANCH 70H | Producing |
| 42127352170000 | 4212735217 | BRISCOE CATARINA RANCH 71H | Producing |
| 42127352180000 | 4212735218 | BRISCOE CATARINA RANCH 72H | Producing |
| 42127352190000 | 4212735219 | BRISCOE CATARINA RANCH 73H | Producing |
| 42127352930000 | 4212735293 | BRISCOE CATARINA RANCH 74H | Producing |
| 42127352960000 | 4212735296 | BRISCOE CATARINA RANCH 75H | Producing |
| 42127352970000 | 4212735297 | BRISCOE CATARINA RANCH 76H | Producing |
| 42127352980000 | 4212735298 | BRISCOE CATARINA RANCH 77H | Producing |
| 42127352990000 | 4212735299 | BRISCOE CATARINA RANCH 78H | Producing |
| 42127353000000 | 4212735300 | BRISCOE CATARINA RANCH 79H | Producing |
| 42127337230000 | 4212733723 | BRISCOE CATARINA RANCH 7H | Producing |
| 42127353010000 | 4212735301 | BRISCOE CATARINA RANCH 80H | Producing |
| 42127353020000 | 4212735302 | BRISCOE CATARINA RANCH 81H | Producing |
| 42127353030000 | 4212735303 | BRISCOE CATARINA RANCH 82H | Producing |
| 42127353040000 | 4212735304 | BRISCOE CATARINA RANCH 83H | Producing |
| 42127353050000 | 4212735305 | BRISCOE CATARINA RANCH 84H | Producing |
| 42127353310000 | 4212735331 | BRISCOE CATARINA RANCH 85H | Producing |
| 42127353320000 | 4212735332 | BRISCOE CATARINA RANCH 86H | Producing |
| 42127353300000 | 4212735330 | BRISCOE CATARINA RANCH 87H | Producing |
| 42127353450000 | 4212735345 | BRISCOE CATARINA RANCH 88H | Producing |
| 42127353460000 | 4212735346 | BRISCOE CATARINA RANCH 89H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337240000 | 4212733724 | BRISCOE CATARINA RANCH 8H | Producing |
| 42127353400000 | 4212735340 | BRISCOE CATARINA RANCH 90H | Producing |
| 42127353410000 | 4212735341 | BRISCOE CATARINA RANCH 91H | Producing |
| 42127353420000 | 4212735342 | BRISCOE CATARINA RANCH 92H | Producing |
| 42127353430000 | 4212735343 | BRISCOE CATARINA RANCH 93H | Producing |
| 42127353440000 | 4212735344 | BRISCOE CATARINA RANCH 94H | Producing |
| 42127354250000 | 4212735425 | BRISCOE CATARINA RANCH 95H | Producing |
| 42127354270000 | 4212735427 | BRISCOE CATARINA RANCH 96H | Producing |
| 42127354260000 | 4212735426 | BRISCOE CATARINA RANCH 97H | Producing |
| 42127354280000 | 4212735428 | BRISCOE CATARINA RANCH 98H | Producing |
| 42127354290000 | 4212735429 | BRISCOE CATARINA RANCH 99H | Producing |
| 42127336740000 | 4212733674 | BRISCOE CATARINA RANCH 9H | Producing |
| 42127377230000 | 4212737723 | BRISCOE CATARINA RANCH UNIT 28HV | Producing |
| 42127377240000 | 4212737724 | BRISCOE CATARINA RANCH UNIT 28HW | Producing |
| 42127377250000 | 4212737725 | BRISCOE CATARINA RANCH UNIT 28HX | Producing |
| 42127377270000 | 4212737727 | BRISCOE CATARINA RANCH UNIT 28HY | Producing |
| 42127377280000 | 4212737728 | BRISCOE CATARINA RANCH UNIT 28HZ | Producing |
| 42127375320000 | 4212737532 | BRISCOE CATARINA SOUTH 03P | Pilot Well |
| 42127344550000 | 4212734455 | BRISCOE CATARINA SOUTH 10H | Producing |
| 42127344560000 | 4212734456 | BRISCOE CATARINA SOUTH 11H | Producing |
| 42127344570000 | 4212734457 | BRISCOE CATARINA SOUTH 12H | Producing |
| 42127344590000 | 4212734459 | BRISCOE CATARINA SOUTH 13H | Producing |
| 42127344580000 | 4212734458 | BRISCOE CATARINA SOUTH 14H | Producing |
| 42127344600100 | 4212734460 | BRISCOE CATARINA SOUTH 15H | Producing |
| 42127353120000 | 4212735312 | BRISCOE CATARINA SOUTH 16H | Producing |
| 42127353130000 | 4212735313 | BRISCOE CATARINA SOUTH 17H | Producing |
| 42127353140000 | 4212735314 | BRISCOE CATARINA SOUTH 18H | Producing |
| 42127353160000 | 4212735316 | BRISCOE CATARINA SOUTH 19H | Producing |
| 42127337830000 | 4212733783 | BRISCOE CATARINA SOUTH 1H | Producing |
| 42127353220000 | 4212735322 | BRISCOE CATARINA SOUTH 20H | Producing |
| 42127353230000 | 4212735323 | BRISCOE CATARINA SOUTH 21H | Producing |
| 42127353240000 | 4212735324 | BRISCOE CATARINA SOUTH 22H | Producing |
| 42127374860000 | 4212737486 | BRISCOE CATARINA SOUTH 22HS | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127374870000 | 4212737487 | BRISCOE CATARINA SOUTH 22HT | Producing |
| 42127374930000 | 4212737493 | BRISCOE CATARINA SOUTH 22HU | Producing |
| 42127374940000 | 4212737494 | BRISCOE CATARINA SOUTH 22HV | Producing |
| 42127374950000 | 4212737495 | BRISCOE CATARINA SOUTH 22HW | Producing |
| 42127374960000 | 4212737496 | BRISCOE CATARINA SOUTH 22HX | Producing |
| 42127374970000 | 4212737497 | BRISCOE CATARINA SOUTH 22HY | Producing |
| 42127374980000 | 4212737498 | BRISCOE CATARINA SOUTH 22HZ | Producing |
| 42127353250000 | 4212735325 | BRISCOE CATARINA SOUTH 23H | Producing |
| 42127375150000 | 4212737515 | BRISCOE CATARINA SOUTH 23HR | Producing |
| 42127375170000 | 4212737517 | BRISCOE CATARINA SOUTH 23HS | Producing |
| 42127375180000 | 4212737518 | BRISCOE CATARINA SOUTH 23HT | Producing |
| 42127375190000 | 4212737519 | BRISCOE CATARINA SOUTH 23HU | Producing |
| 42127375200000 | 4212737520 | BRISCOE CATARINA SOUTH 23HV | Producing |
| 42127375210000 | 4212737521 | BRISCOE CATARINA SOUTH 23HW | Producing |
| 42127375220000 | 4212737522 | BRISCOE CATARINA SOUTH 23HX | Producing |
| 42127375230000 | 4212737523 | BRISCOE CATARINA SOUTH 23HY | Producing |
| 42127375240000 | 4212737524 | BRISCOE CATARINA SOUTH 23HZ | Producing |
| 42127353620000 | 4212735362 | BRISCOE CATARINA SOUTH 24H | Producing |
| 42127353630000 | 4212735363 | BRISCOE CATARINA SOUTH 25H | Producing |
| 42127353640000 | 4212735364 | BRISCOE CATARINA SOUTH 26H | Producing |
| 42127381530000 | 4212738153 | BRISCOE CATARINA SOUTH 26HX | Producing |
| 42127381550000 | 4212738155 | BRISCOE CATARINA SOUTH 26HY | Producing |
| 42127381560000 | 4212738156 | BRISCOE CATARINA SOUTH 26HZ | Producing |
| 42127353650000 | 4212735365 | BRISCOE CATARINA SOUTH 27H | Producing |
| 42127354590000 | 4212735459 | BRISCOE CATARINA SOUTH 28H | Producing |
| 42127355150000 | 4212735515 | BRISCOE CATARINA SOUTH 29H | Producing |
| 42127382760000 | 4212738276 | BRISCOE CATARINA SOUTH 29HA | Producing |
| 42127382770000 | 4212738277 | BRISCOE CATARINA SOUTH 29HB | Producing |
| 42127382780000 | 4212738278 | BRISCOE CATARINA SOUTH 29HC | Producing |
| 42127337840000 | 4212733784 | BRISCOE CATARINA SOUTH 2H | Producing |
| 42127354600000 | 4212735460 | BRISCOE CATARINA SOUTH 30H | Producing |
| 42127354610000 | 4212735461 | BRISCOE CATARINA SOUTH 31H | Producing |
| 42127354630000 | 4212735463 | BRISCOE CATARINA SOUTH 32H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127354620000 | 4212735462 | BRISCOE CATARINA SOUTH 33H | Producing |
| 42127354810000 | 4212735481 | BRISCOE CATARINA SOUTH 34H | Producing |
| 42127354840000 | 4212735484 | BRISCOE CATARINA SOUTH 35H | Producing |
| 42127355100000 | 4212735510 | BRISCOE CATARINA SOUTH 36H | Producing |
| 42127355110000 | 4212735511 | BRISCOE CATARINA SOUTH 37H | Producing |
| 42127355130000 | 4212735513 | BRISCOE CATARINA SOUTH 38H | Producing |
| 42127355120000 | 4212735512 | BRISCOE CATARINA SOUTH 39H | Producing |
| 42127337850000 | 4212733785 | BRISCOE CATARINA SOUTH 3H | Producing |
| 42127355320000 | 4212735532 | BRISCOE CATARINA SOUTH 40H | Producing |
| 42127355330000 | 4212735533 | BRISCOE CATARINA SOUTH 41H | Producing |
| 42127355340000 | 4212735534 | BRISCOE CATARINA SOUTH 42H | Producing |
| 42127355350000 | 4212735535 | BRISCOE CATARINA SOUTH 43H | Producing |
| 42127355360000 | 4212735536 | BRISCOE CATARINA SOUTH 44H | Producing |
| 42127355570000 | 4212735557 | BRISCOE CATARINA SOUTH 45H | Producing |
| 42127355610000 | 4212735561 | BRISCOE CATARINA SOUTH 46H | Producing |
| 42127355620000 | 4212735562 | BRISCOE CATARINA SOUTH 47H | Producing |
| 42127355630000 | 4212735563 | BRISCOE CATARINA SOUTH 48H | Producing |
| 42127356930000 | 4212735693 | BRISCOE CATARINA SOUTH 49H | Producing |
| 42127337690000 | 4212733769 | BRISCOE CATARINA SOUTH 4H | Producing |
| 42127356940000 | 4212735694 | BRISCOE CATARINA SOUTH 50H | Producing |
| 42127356950000 | 4212735695 | BRISCOE CATARINA SOUTH 51H | Producing |
| 42127356960000 | 4212735696 | BRISCOE CATARINA SOUTH 52H | Producing |
| 42127356980000 | 4212735698 | BRISCOE CATARINA SOUTH 53H | Producing |
| 42127357000000 | 4212735700 | BRISCOE CATARINA SOUTH 54H | Producing |
| 42127356990000 | 4212735699 | BRISCOE CATARINA SOUTH 55H | Producing |
| 42127357010000 | 4212735701 | BRISCOE CATARINA SOUTH 56H | Producing |
| 42127357060000 | 4212735706 | BRISCOE CATARINA SOUTH 57H | Producing |
| 42127357070000 | 4212735707 | BRISCOE CATARINA SOUTH 58H | Producing |
| 42127357080000 | 4212735708 | BRISCOE CATARINA SOUTH 59H | Producing |
| 42127337700000 | 4212733770 | BRISCOE CATARINA SOUTH 5H | Producing |
| 42127357090000 | 4212735709 | BRISCOE CATARINA SOUTH 60H | Producing |
| 42127364390000 | 4212736439 | BRISCOE CATARINA SOUTH 61H | Producing |
| 42127364400000 | 4212736440 | BRISCOE CATARINA SOUTH 62H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127364410000 | 4212736441 | BRISCOE CATARINA SOUTH 63H | Producing |
| 42127364420000 | 4212736442 | BRISCOE CATARINA SOUTH 64H | Producing |
| 42127364430000 | 4212736443 | BRISCOE CATARINA SOUTH 65H | Shut In |
| 42127364440000 | 4212736444 | BRISCOE CATARINA SOUTH 66H | Producing |
| 42127364170000 | 4212736417 | BRISCOE CATARINA SOUTH 67H | Producing |
| 42127364180000 | 4212736418 | BRISCOE CATARINA SOUTH 68H | Producing |
| 42127364190000 | 4212736419 | BRISCOE CATARINA SOUTH 69H | Producing |
| 42127337710000 | 4212733771 | BRISCOE CATARINA SOUTH 6H | Producing |
| 42127364200000 | 4212736420 | BRISCOE CATARINA SOUTH 70H | Producing |
| 42127364210000 | 4212736421 | BRISCOE CATARINA SOUTH 71H | Producing |
| 42127364100000 | 4212736410 | BRISCOE CATARINA SOUTH 72H | Producing |
| 42127364110000 | 4212736411 | BRISCOE CATARINA SOUTH 73H | Producing |
| 42127364120000 | 4212736412 | BRISCOE CATARINA SOUTH 74H | Producing |
| 42127364130000 | 4212736413 | BRISCOE CATARINA SOUTH 75H | Shut In |
| 42127364140000 | 4212736414 | BRISCOE CATARINA SOUTH 76H | Producing |
| 42127363930000 | 4212736393 | BRISCOE CATARINA SOUTH 77H | Shut In |
| 42127363940000 | 4212736394 | BRISCOE CATARINA SOUTH 78H | Producing |
| 42127363950000 | 4212736395 | BRISCOE CATARINA SOUTH 79H | Producing |
| 42127339520000 | 4212733952 | BRISCOE CATARINA SOUTH 7H | Producing |
| 42127363960000 | 4212736396 | BRISCOE CATARINA SOUTH 80H | Producing |
| 42127363970000 | 4212736397 | BRISCOE CATARINA SOUTH 81H | Producing |
| 42127364260000 | 4212736426 | BRISCOE CATARINA SOUTH 82H | Producing |
| 42127364270000 | 4212736427 | BRISCOE CATARINA SOUTH 83H | Producing |
| 42127339510000 | 4212733951 | BRISCOE CATARINA SOUTH 8H | Shut In |
| 42127339530000 | 4212733953 | BRISCOE CATARINA SOUTH 9H | Producing |
| 42127374530000 | 4212737453 | BRISCOE CATARINA WEST 01HA | Producing |
| 42127374540000 | 4212737454 | BRISCOE CATARINA WEST 01HB | Producing |
| 42127374560000 | 4212737456 | BRISCOE CATARINA WEST 01HC | Producing |
| 42127374570000 | 4212737457 | BRISCOE CATARINA WEST 01HD | Producing |
| 42127376710000 | 4212737671 | BRISCOE CATARINA WEST 01HU | Producing |
| 42127376720000 | 4212737672 | BRISCOE CATARINA WEST 01HV | Producing |
| 42127376730000 | 4212737673 | BRISCOE CATARINA WEST 01HW | Producing |
| 42127376740200 | 4212737674 | BRISCOE CATARINA WEST 01HX | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376750000 | 4212737675 | BRISCOE CATARINA WEST 01HY | Producing |
| 42127376760000 | 4212737676 | BRISCOE CATARINA WEST 01HZ | Producing |
| 42127336820000 | 4212733682 | BRISCOE CATARINA WEST 10H | Producing |
| 42127366450000 | 4212736645 | BRISCOE CATARINA WEST 116H | Producing |
| 42127366460000 | 4212736646 | BRISCOE CATARINA WEST 117H | Producing |
| 42127366470000 | 4212736647 | BRISCOE CATARINA WEST 118H | Producing |
| 42127366480000 | 4212736648 | BRISCOE CATARINA WEST 119H | Producing |
| 42127366490000 | 4212736649 | BRISCOE CATARINA WEST 120H | Producing |
| 42127366540000 | 4212736654 | BRISCOE CATARINA WEST 121H | Producing |
| 42127366510000 | 4212736651 | BRISCOE CATARINA WEST 125H | Producing |
| 42127366520000 | 4212736652 | BRISCOE CATARINA WEST 126H | Producing |
| 42127366530000 | 4212736653 | BRISCOE CATARINA WEST 127H | Producing |
| 42127366550000 | 4212736655 | BRISCOE CATARINA WEST 128H | Producing |
| 42127366560000 | 4212736656 | BRISCOE CATARINA WEST 129H | Producing |
| 42127337530000 | 4212733753 | BRISCOE CATARINA WEST 12H | Producing |
| 42127366570000 | 4212736657 | BRISCOE CATARINA WEST 130H | Temporarily Abandoned |
| 42127366580000 | 4212736658 | BRISCOE CATARINA WEST 131H | Producing |
| 42127366590000 | 4212736659 | BRISCOE CATARINA WEST 132H | Producing |
| 42127337620000 | 4212733762 | BRISCOE CATARINA WEST 13H | Producing |
| 42127337630000 | 4212733763 | BRISCOE CATARINA WEST 14H | Producing |
| 42127337770000 | 4212733777 | BRISCOE CATARINA WEST 15H | Producing |
| 42127337780000 | 4212733778 | BRISCOE CATARINA WEST 16H | Shut In |
| 42127337790000 | 4212733779 | BRISCOE CATARINA WEST 17H | Producing |
| 42127341660000 | 4212734166 | BRISCOE CATARINA WEST 18H | Producing |
| 42127341670000 | 4212734167 | BRISCOE CATARINA WEST 19H | Producing |
| 42127334210100 | 4212733421 | BRISCOE CATARINA WEST 1H | Shut In |
| 42127341690000 | 4212734169 | BRISCOE CATARINA WEST 20H | Producing |
| 42127341700000 | 4212734170 | BRISCOE CATARINA WEST 21H | Producing |
| 42127377920000 | 4212737792 | BRISCOE CATARINA WEST 21HV | Producing |
| 42127377940000 | 4212737794 | BRISCOE CATARINA WEST 21HX | Producing |
| 42127377960000 | 4212737796 | BRISCOE CATARINA WEST 21HZ | Producing |
| 42127341710000 | 4212734171 | BRISCOE CATARINA WEST 22H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341720000 | 4212734172 | BRISCOE CATARINA WEST 23H | Producing |
| 42127343350000 | 4212734335 | BRISCOE CATARINA WEST 24H | Producing |
| 42127343360000 | 4212734336 | BRISCOE CATARINA WEST 25H | Temporarily Abandoned |
| 42127343370000 | 4212734337 | BRISCOE CATARINA WEST 26H | Producing |
| 42127343380000 | 4212734338 | BRISCOE CATARINA WEST 27H | Producing |
| 42127343400000 | 4212734340 | BRISCOE CATARINA WEST 28H | Producing |
| 42127343390000 | 4212734339 | BRISCOE CATARINA WEST 29H | Producing |
| 42127336150000 | 4212733615 | BRISCOE CATARINA WEST 2H | Producing |
| 42127346820000 | 4212734682 | BRISCOE CATARINA WEST 30H | Producing |
| 42127346840000 | 4212734684 | BRISCOE CATARINA WEST 31H | Producing |
| 42127377720000 | 4212737772 | BRISCOE CATARINA WEST 31HC | Producing |
| 42127377730000 | 4212737773 | BRISCOE CATARINA WEST 31HD | Producing |
| 42127377740000 | 4212737774 | BRISCOE CATARINA WEST 31HE | Producing |
| 42127377750000 | 4212737775 | BRISCOE CATARINA WEST 31HF | Producing |
| 42127377760000 | 4212737776 | BRISCOE CATARINA WEST 31HG | Producing |
| 42127377770000 | 4212737777 | BRISCOE CATARINA WEST 31HH | Producing |
| 42127377780000 | 4212737778 | BRISCOE CATARINA WEST 31HI | Producing |
| 42127346850000 | 4212734685 | BRISCOE CATARINA WEST 32H | Producing |
| 42127346860000 | 4212734686 | BRISCOE CATARINA WEST 33H | Producing |
| 42127379820000 | 4212737982 | BRISCOE CATARINA WEST 33HU | Producing |
| 42127379830000 | 4212737983 | BRISCOE CATARINA WEST 33HV | Producing |
| 42127379840000 | 4212737984 | BRISCOE CATARINA WEST 33HW | Producing |
| 42127346870000 | 4212734687 | BRISCOE CATARINA WEST 34H | Producing |
| 42127346890000 | 4212734689 | BRISCOE CATARINA WEST 35H | Producing |
| 42127346900000 | 4212734690 | BRISCOE CATARINA WEST 36H | Producing |
| 42127346930000 | 4212734693 | BRISCOE CATARINA WEST 37H | Producing |
| 42127346940000 | 4212734694 | BRISCOE CATARINA WEST 38H | Producing |
| 42127346950000 | 4212734695 | BRISCOE CATARINA WEST 39H | Producing |
| 42127336160100 | 4212733616 | BRISCOE CATARINA WEST 3H | Plugged and Abandoned |
| 42127346960000 | 4212734696 | BRISCOE CATARINA WEST 40H | Producing |
| 42127346970000 | 4212734697 | BRISCOE CATARINA WEST 41H | Producing |
| 42127347170000 | 4212734717 | BRISCOE CATARINA WEST 42H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127347200000 | 4212734720 | BRISCOE CATARINA WEST 43H | Producing |
| 42127347180000 | 4212734718 | BRISCOE CATARINA WEST 44H | Producing |
| 42127347190000 | 4212734719 | BRISCOE CATARINA WEST 45H | Producing |
| 42127347220000 | 4212734722 | BRISCOE CATARINA WEST 46H | Producing |
| 42127347250000 | 4212734725 | BRISCOE CATARINA WEST 47H | Producing |
| 42127347260000 | 4212734726 | BRISCOE CATARINA WEST 48H | Producing |
| 42127347270000 | 4212734727 | BRISCOE CATARINA WEST 49H | Producing |
| 42127336290000 | 4212733629 | BRISCOE CATARINA WEST 4H | Producing |
| 42127347280000 | 4212734728 | BRISCOE CATARINA WEST 50H | Producing |
| 42127357800000 | 4212735780 | BRISCOE CATARINA WEST 51H | Producing |
| 42127357810000 | 4212735781 | BRISCOE CATARINA WEST 52H | Producing |
| 42127357820000 | 4212735782 | BRISCOE CATARINA WEST 53H | Producing |
| 42127357830000 | 4212735783 | BRISCOE CATARINA WEST 54H | Producing |
| 42127357840000 | 4212735784 | BRISCOE CATARINA WEST 55H | Producing |
| 42127357850000 | 4212735785 | BRISCOE CATARINA WEST 56H | Producing |
| 42127357860000 | 4212735786 | BRISCOE CATARINA WEST 57H | Temporarily Abandoned |
| 42127357870000 | 4212735787 | BRISCOE CATARINA WEST 58H | Producing |
| 42127357880000 | 4212735788 | BRISCOE CATARINA WEST 59H | Producing |
| 42127336370000 | 4212733637 | BRISCOE CATARINA WEST 5H | Producing |
| 42127357890000 | 4212735789 | BRISCOE CATARINA WEST 60H | Producing |
| 42127357900000 | 4212735790 | BRISCOE CATARINA WEST 61H | Producing |
| 42127357930000 | 4212735793 | BRISCOE CATARINA WEST 62H | Producing |
| 42127357940000 | 4212735794 | BRISCOE CATARINA WEST 63H | Producing |
| 42127357950000 | 4212735795 | BRISCOE CATARINA WEST 64H | Producing |
| 42127357960000 | 4212735796 | BRISCOE CATARINA WEST 65H | Producing |
| 42127358250000 | 4212735825 | BRISCOE CATARINA WEST 66H | Shut In |
| 42127358340000 | 4212735834 | BRISCOE CATARINA WEST 67H | Producing |
| 42127358360000 | 4212735836 | BRISCOE CATARINA WEST 68H | Producing |
| 42127358350000 | 4212735835 | BRISCOE CATARINA WEST 69H | Producing |
| 42127336480000 | 4212733648 | BRISCOE CATARINA WEST 6H | Producing |
| 42127358370000 | 4212735837 | BRISCOE CATARINA WEST 70H | Producing |
| 42127358590000 | 4212735859 | BRISCOE CATARINA WEST 71H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127358600000 | 4212735860 | BRISCOE CATARINA WEST 72H | Producing |
| 42127358610000 | 4212735861 | BRISCOE CATARINA WEST 73H | Producing |
| 42127358620000 | 4212735862 | BRISCOE CATARINA WEST 74H | Producing |
| 42127358820000 | 4212735882 | BRISCOE CATARINA WEST 75H | Producing |
| 42127358830000 | 4212735883 | BRISCOE CATARINA WEST 76H | Producing |
| 42127358850000 | 4212735885 | BRISCOE CATARINA WEST 77H | Producing |
| 42127358860000 | 4212735886 | BRISCOE CATARINA WEST 78H | Producing |
| 42127358880000 | 4212735888 | BRISCOE CATARINA WEST 79H | Producing |
| 42127336430000 | 4212733643 | BRISCOE CATARINA WEST 7H | Producing |
| 42127358890000 | 4212735889 | BRISCOE CATARINA WEST 80H | Producing |
| 42127358900000 | 4212735890 | BRISCOE CATARINA WEST 81H | Producing |
| 42127358910000 | 4212735891 | BRISCOE CATARINA WEST 82H | Producing |
| 42127368740000 | 4212736874 | BRISCOE CATARINA WEST 83H | Producing |
| 42127368750000 | 4212736875 | BRISCOE CATARINA WEST 84H | Producing |
| 42127368760000 | 4212736876 | BRISCOE CATARINA WEST 85H | Producing |
| 42127368770000 | 4212736877 | BRISCOE CATARINA WEST 86H | Producing |
| 42127368780000 | 4212736878 | BRISCOE CATARINA WEST 87H | Producing |
| 42127368790000 | 4212736879 | BRISCOE CATARINA WEST 88H | Producing |
| 42127368800000 | 4212736880 | BRISCOE CATARINA WEST 89H | Producing |
| 42127336850000 | 4212733685 | BRISCOE CATARINA WEST 8H | Producing |
| 42127368810000 | 4212736881 | BRISCOE CATARINA WEST 90H | Surface Casing Only |
| 42127368820000 | 4212736882 | BRISCOE CATARINA WEST 91H | Producing |
| 42127368830000 | 4212736883 | BRISCOE CATARINA WEST 92H | Producing |
| 42127368840000 | 4212736884 | BRISCOE CATARINA WEST 93H | Producing |
| 42127368860000 | 4212736886 | BRISCOE CATARINA WEST 94H | Producing |
| 42127368850000 | 4212736885 | BRISCOE CATARINA WEST 95H | Producing |
| 42127368870000 | 4212736887 | BRISCOE CATARINA WEST 96H | Producing |
| 42127368880000 | 4212736888 | BRISCOE CATARINA WEST 97H | Producing |
| 42127338010000 | 4212733801 | BRISCOE CATARINA WEST 9H | Producing |
| 42127377610000 | 4212737761 | BRISCOE CATARINA WEST UNIT A 30HA | Producing |
| 42127377620100 | 4212737762 | BRISCOE CATARINA WEST UNIT A 30HB | Producing |
| 42127377630000 | 4212737763 | BRISCOE CATARINA WEST UNIT A 30HC | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127377640000 | 4212737764 | BRISCOE CATARINA WEST UNIT A 30HD | Producing |
| 42127377660000 | 4212737766 | BRISCOE CATARINA WEST UNIT A 30HF | Producing |
| 42127377670000 | 4212737767 | BRISCOE CATARINA WEST UNIT A 30HG | Producing |
| 42127377690000 | 4212737769 | BRISCOE CATARINA WEST UNIT A 30HI | Producing |
| 42127378390000 | 4212737839 | BRISCOE CHIP EAST RANCH 08HY | Producing |
| 42127341520000 | 4212734152 | BRISCOE CHIP EAST RANCH 10H | Producing |
| 42127344780000 | 4212734478 | BRISCOE CHIP EAST RANCH 11H | Producing |
| 42127344790000 | 4212734479 | BRISCOE CHIP EAST RANCH 12H | Producing |
| 42127344800000 | 4212734480 | BRISCOE CHIP EAST RANCH 13H | Producing |
| 42127341530000 | 4212734153 | BRISCOE CHIP EAST RANCH 14H | Producing |
| 42127344810000 | 4212734481 | BRISCOE CHIP EAST RANCH 15H | Producing |
| 42127344820000 | 4212734482 | BRISCOE CHIP EAST RANCH 16H | Producing |
| 42127344830000 | 4212734483 | BRISCOE CHIP EAST RANCH 17H | Producing |
| 42127345070000 | 4212734507 | BRISCOE CHIP EAST RANCH 18H | Producing |
| 42127345080000 | 4212734508 | BRISCOE CHIP EAST RANCH 19H | Producing |
| 42127337680000 | 4212733768 | BRISCOE CHIP EAST RANCH 1H | Producing |
| 42127345090000 | 4212734509 | BRISCOE CHIP EAST RANCH 20H | Producing |
| 42127345100000 | 4212734510 | BRISCOE CHIP EAST RANCH 21H | Producing |
| 42127345110000 | 4212734511 | BRISCOE CHIP EAST RANCH 22H | Producing |
| 42127345120100 | 4212734512 | BRISCOE CHIP EAST RANCH 23H | Producing |
| 42127345220000 | 4212734522 | BRISCOE CHIP EAST RANCH 24H | Producing |
| 42127345230000 | 4212734523 | BRISCOE CHIP EAST RANCH 25H | Shut In |
| 42127345240000 | 4212734524 | BRISCOE CHIP EAST RANCH 26H | Producing |
| 42127361840000 | 4212736184 | BRISCOE CHIP EAST RANCH 27H | Producing |
| 42127362830000 | 4212736283 | BRISCOE CHIP EAST RANCH 28HR | Producing |
| 42127361860000 | 4212736186 | BRISCOE CHIP EAST RANCH 29H | Producing |
| 42127337720000 | 4212733772 | BRISCOE CHIP EAST RANCH 2H | Producing |
| 42127361880000 | 4212736188 | BRISCOE CHIP EAST RANCH 30H | Producing |
| 42127362060000 | 4212736206 | BRISCOE CHIP EAST RANCH 31H | Producing |
| 42127362070000 | 4212736207 | BRISCOE CHIP EAST RANCH 32H | Producing |
| 42127362360000 | 4212736236 | BRISCOE CHIP EAST RANCH 33H | Producing |
| 42127362370000 | 4212736237 | BRISCOE CHIP EAST RANCH 34H | Producing |
| 42127337730000 | 4212733773 | BRISCOE CHIP EAST RANCH 3H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338520000 | 4212733852 | BRISCOE CHIP EAST RANCH 4H | Producing |
| 42127338530000 | 4212733853 | BRISCOE CHIP EAST RANCH 5H | Producing |
| 42127338540000 | 4212733854 | BRISCOE CHIP EAST RANCH 6H | Producing |
| 42127340950000 | 4212734095 | BRISCOE CHIP EAST RANCH 7H | Producing |
| 42127340960000 | 4212734096 | BRISCOE CHIP EAST RANCH 8H | Producing |
| 42127341510000 | 4212734151 | BRISCOE CHIP EAST RANCH 9H | Producing |
| 42127370520000 | 4212737052 | BRISCOE CHIP EAST RANCH UNIT E 1H | Producing |
| 42127370530000 | 4212737053 | BRISCOE CHIP EAST RANCH UNIT E 2H | Producing |
| 42127370540000 | 4212737054 | BRISCOE CHIP EAST RANCH UNIT E 3H | Producing |
| 42127378150000 | 4212737815 | BRISCOE CHIP EAST UNIT 08HX | Producing |
| 42127378380000 | 4212737838 | BRISCOE CHIP EAST UNIT 08HZ | Producing |
| 42127361680000 | 4212736168 | BRISCOE CHIP EAST UNIT B 1H | Producing |
| 42127361690000 | 4212736169 | BRISCOE CHIP EAST UNIT B 2H | Producing |
| 42127361700000 | 4212736170 | BRISCOE CHIP EAST UNIT B 3H | Producing |
| 42127361710000 | 4212736171 | BRISCOE CHIP EAST UNIT B 4H | Producing |
| 42127361720000 | 4212736172 | BRISCOE CHIP EAST UNIT B 5H | Producing |
| 42127361730000 | 4212736173 | BRISCOE CHIP EAST UNIT B 6H | Producing |
| 42479412660000 | 4247941266 | BRISCOE CHUPADERA RANCH 10H | Producing |
| 42479412670000 | 4247941267 | BRISCOE CHUPADERA RANCH 11H | Producing |
| 42479419850000 | 4247941985 | BRISCOE CHUPADERA RANCH 12H | Producing |
| 42479419860000 | 4247941986 | BRISCOE CHUPADERA RANCH 13H | Producing |
| 42479441460000 | 4247944146 | BRISCOE CHUPADERA RANCH 13HX | Producing |
| 42479441470000 | 4247944147 | BRISCOE CHUPADERA RANCH 13HY | Producing |
| 42479441480000 | 4247944148 | BRISCOE CHUPADERA RANCH 13HZ | Producing |
| 42479419870000 | 4247941987 | BRISCOE CHUPADERA RANCH 14H | Producing |
| 42479442680000 | 4247944268 | BRISCOE CHUPADERA RANCH 14HA | Producing |
| 42479442690000 | 4247944269 | BRISCOE CHUPADERA RANCH 14HB | Producing |
| 42479442700000 | 4247944270 | BRISCOE CHUPADERA RANCH 14HC | Producing |
| 42479419880000 | 4247941988 | BRISCOE CHUPADERA RANCH 15H | Producing |
| 42479419890000 | 4247941989 | BRISCOE CHUPADERA RANCH 16H | Producing |
| 42479419900000 | 4247941990 | BRISCOE CHUPADERA RANCH 17H | Producing |
| 42479419940000 | 4247941994 | BRISCOE CHUPADERA RANCH 18H | Producing |
| 42479419980000 | 4247941998 | BRISCOE CHUPADERA RANCH 19H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479397860300 | 4247939786 | BRISCOE CHUPADERA RANCH 1H | Shut In |
| 42479420010000 | 4247942001 | BRISCOE CHUPADERA RANCH 20H | Producing |
| 42479420000000 | 4247942000 | BRISCOE CHUPADERA RANCH 21H | Producing |
| 42479420020000 | 4247942002 | BRISCOE CHUPADERA RANCH 22H | Producing |
| 42479420030000 | 4247942003 | BRISCOE CHUPADERA RANCH 23H | Producing |
| 42479426860000 | 4247942686 | BRISCOE CHUPADERA RANCH 24H | Producing |
| 42479426870000 | 4247942687 | BRISCOE CHUPADERA RANCH 25H | Producing |
| 42479426890000 | 4247942689 | BRISCOE CHUPADERA RANCH 26H | Producing |
| 42479426910000 | 4247942691 | BRISCOE CHUPADERA RANCH 27H | Producing |
| 42479426920000 | 4247942692 | BRISCOE CHUPADERA RANCH 28H | Producing |
| 42479426930000 | 4247942693 | BRISCOE CHUPADERA RANCH 29H | Producing |
| 42479413220000 | 4247941322 | BRISCOE CHUPADERA RANCH 2H | Producing |
| 42479426940000 | 4247942694 | BRISCOE CHUPADERA RANCH 30H | Producing |
| 42479426950000 | 4247942695 | BRISCOE CHUPADERA RANCH 31H | Temporarily Abandoned |
| 42479430080000 | 4247943008 | BRISCOE CHUPADERA RANCH 31HR | Producing |
| 42479426960000 | 4247942696 | BRISCOE CHUPADERA RANCH 32H | Producing |
| 42479426970000 | 4247942697 | BRISCOE CHUPADERA RANCH 33H | Producing |
| 42479427000000 | 4247942700 | BRISCOE CHUPADERA RANCH 34H | Producing |
| 42479427010000 | 4247942701 | BRISCOE CHUPADERA RANCH 35H | Producing |
| 42479427020000 | 4247942702 | BRISCOE CHUPADERA RANCH 36H | Producing |
| 42479427030000 | 4247942703 | BRISCOE CHUPADERA RANCH 37H | Producing |
| 42479427040000 | 4247942704 | BRISCOE CHUPADERA RANCH 38H | Producing |
| 42479427050000 | 4247942705 | BRISCOE CHUPADERA RANCH 39H | Producing |
| 42479412120000 | 4247941212 | BRISCOE CHUPADERA RANCH 3H | Producing |
| 42479427060000 | 4247942706 | BRISCOE CHUPADERA RANCH 40H | Producing |
| 42479427070000 | 4247942707 | BRISCOE CHUPADERA RANCH 41H | Producing |
| 42479427080000 | 4247942708 | BRISCOE CHUPADERA RANCH 42H | Producing |
| 42479427110000 | 4247942711 | BRISCOE CHUPADERA RANCH 43H | Producing |
| 42479412110000 | 4247941211 | BRISCOE CHUPADERA RANCH 4H | Producing |
| 42479412190000 | 4247941219 | BRISCOE CHUPADERA RANCH 5H | Producing |
| 42479412200000 | 4247941220 | BRISCOE CHUPADERA RANCH 6H | Producing |
| 42479412260000 | 4247941226 | BRISCOE CHUPADERA RANCH 7H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479412550000 | 4247941255 | BRISCOE CHUPADERA RANCH 8H | Producing |
| 42479412560000 | 4247941256 | BRISCOE CHUPADERA RANCH 9H | Producing |
| 42479437610000 | 4247943761 | BRISCOE CHUPADERA RANCH A 03HA | Producing |
| 42479437620000 | 4247943762 | BRISCOE CHUPADERA RANCH A 03HB | Producing |
| 42479437630000 | 4247943763 | BRISCOE CHUPADERA RANCH A 03HC | Producing |
| 42479437640100 | 4247943764 | BRISCOE CHUPADERA RANCH A 03HD | Producing |
| 42479442760000 | 4247944276 | BRISCOE CHUPADERA RANCH A 04HA | Producing |
| 42479442770000 | 4247944277 | BRISCOE CHUPADERA RANCH A 04HB | Producing |
| 42479442780000 | 4247944278 | BRISCOE CHUPADERA RANCH A 04HC | Producing |
| 42127378290000 | 4212737829 | BRISCOE COCHINA EAST RANCH 06HB | Producing |
| 42127378310000 | 4212737831 | BRISCOE COCHINA EAST RANCH 06HC | Producing |
| 42127378320000 | 4212737832 | BRISCOE COCHINA EAST RANCH 06HD | Producing |
| 42127378340000 | 4212737834 | BRISCOE COCHINA EAST RANCH 06HF | Producing |
| 42127378370000 | 4212737837 | BRISCOE COCHINA EAST RANCH 06HG | Producing |
| 42127375920100 | 4212737592 | BRISCOE COCHINA EAST RANCH 09DR | Producing |
| 42127375370000 | 4212737537 | BRISCOE COCHINA EAST RANCH 09HD | Plugged and Abandoned |
| 42127375360000 | 4212737536 | BRISCOE COCHINA EAST RANCH 09HE | Producing |
| 42127375380000 | 4212737538 | BRISCOE COCHINA EAST RANCH 09HF | Producing |
| 42127375390100 | 4212737539 | BRISCOE COCHINA EAST RANCH 09HX | Producing |
| 42127375420000 | 4212737542 | BRISCOE COCHINA EAST RANCH 09HY | Producing |
| 42127375440000 | 4212737544 | BRISCOE COCHINA EAST RANCH 09HZ | Producing |
| 42283344500000 | 4228334450 | BRISCOE COCHINA EAST RANCH 100H | Producing |
| 42283344530000 | 4228334453 | BRISCOE COCHINA EAST RANCH 101H | Producing |
| 42283344690000 | 4228334469 | BRISCOE COCHINA EAST RANCH 102H | Producing |
| 42127361010000 | 4212736101 | BRISCOE COCHINA EAST RANCH 103H | Producing |
| 42127361020000 | 4212736102 | BRISCOE COCHINA EAST RANCH 104H | Producing |
| 42127361170000 | 4212736117 | BRISCOE COCHINA EAST RANCH 105H | Producing |
| 42127361050000 | 4212736105 | BRISCOE COCHINA EAST RANCH 106H | Producing |
| 42127361060000 | 4212736106 | BRISCOE COCHINA EAST RANCH 107H | Producing |
| 42127361080000 | 4212736108 | BRISCOE COCHINA EAST RANCH 108H | Producing |
| 42127361090000 | 4212736109 | BRISCOE COCHINA EAST RANCH 109H | Producing |
| 42127336780000 | 4212733678 | BRISCOE COCHINA EAST RANCH 10H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361100000 | 4212736110 | BRISCOE COCHINA EAST RANCH 110H | Producing |
| 42127361120000 | 4212736112 | BRISCOE COCHINA EAST RANCH 111H | Producing |
| 42127361150000 | 4212736115 | BRISCOE COCHINA EAST RANCH 112H | Producing |
| 42127361160000 | 4212736116 | BRISCOE COCHINA EAST RANCH 113H | Producing |
| 42127360860000 | 4212736086 | BRISCOE COCHINA EAST RANCH 114H | Producing |
| 42127360870000 | 4212736087 | BRISCOE COCHINA EAST RANCH 115H | Producing |
| 42127360880000 | 4212736088 | BRISCOE COCHINA EAST RANCH 116H | Producing |
| 42127360900000 | 4212736090 | BRISCOE COCHINA EAST RANCH 117H | Producing |
| 42127360920000 | 4212736092 | BRISCOE COCHINA EAST RANCH 118H | Producing |
| 42127360930000 | 4212736093 | BRISCOE COCHINA EAST RANCH 119H | Producing |
| 42127338370000 | 4212733837 | BRISCOE COCHINA EAST RANCH 11H | Producing |
| 42127360940000 | 4212736094 | BRISCOE COCHINA EAST RANCH 120H | Producing |
| 42127360950000 | 4212736095 | BRISCOE COCHINA EAST RANCH 121H | Producing |
| 42127360970000 | 4212736097 | BRISCOE COCHINA EAST RANCH 122H | Producing |
| 42127360980000 | 4212736098 | BRISCOE COCHINA EAST RANCH 123H | Producing |
| 42127360990000 | 4212736099 | BRISCOE COCHINA EAST RANCH 124H | Producing |
| 42127361000000 | 4212736100 | BRISCOE COCHINA EAST RANCH 125H | Producing |
| 42127361030000 | 4212736103 | BRISCOE COCHINA EAST RANCH 126H | Producing |
| 42283348530000 | 4228334853 | BRISCOE COCHINA EAST RANCH 127H | Producing |
| 42283348540100 | 4228334854 | BRISCOE COCHINA EAST RANCH 128H | Producing |
| 42283348550000 | 4228334855 | BRISCOE COCHINA EAST RANCH 129H | Producing |
| 42127338380000 | 4212733838 | BRISCOE COCHINA EAST RANCH 12H | Producing |
| 42283348560000 | 4228334856 | BRISCOE COCHINA EAST RANCH 130H | Producing |
| 42283348570000 | 4228334857 | BRISCOE COCHINA EAST RANCH 131H | Producing |
| 42283348580000 | 4228334858 | BRISCOE COCHINA EAST RANCH 132H | Producing |
| 42283348590000 | 4228334859 | BRISCOE COCHINA EAST RANCH 133H | Producing |
| 42283348600000 | 4228334860 | BRISCOE COCHINA EAST RANCH 134H | Producing |
| 42283348610000 | 4228334861 | BRISCOE COCHINA EAST RANCH 135H | Producing |
| 42283348620000 | 4228334862 | BRISCOE COCHINA EAST RANCH 136H | Producing |
| 42283348630000 | 4228334863 | BRISCOE COCHINA EAST RANCH 137H | Producing |
| 42283348640000 | 4228334864 | BRISCOE COCHINA EAST RANCH 138H | Producing |
| 42283348650000 | 4228334865 | BRISCOE COCHINA EAST RANCH 139H | Producing |
| 42127338390000 | 4212733839 | BRISCOE COCHINA EAST RANCH 13H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42283348660100 | 4228334866 | BRISCOE COCHINA EAST RANCH 140H | Producing |
| 42283348670000 | 4228334867 | BRISCOE COCHINA EAST RANCH 141H | Producing |
| 42283348680000 | 4228334868 | BRISCOE COCHINA EAST RANCH 142H | Producing |
| 42283348690000 | 4228334869 | BRISCOE COCHINA EAST RANCH 143H | Producing |
| 42283348700000 | 4228334870 | BRISCOE COCHINA EAST RANCH 144H | Producing |
| 42283351490000 | 4228335149 | BRISCOE COCHINA EAST RANCH 145HR | Producing |
| 42283348720000 | 4228334872 | BRISCOE COCHINA EAST RANCH 146H | Producing |
| 42283348730000 | 4228334873 | BRISCOE COCHINA EAST RANCH 147H | Producing |
| 42127367090000 | 4212736709 | BRISCOE COCHINA EAST RANCH 163H | Producing |
| 42127367080000 | 4212736708 | BRISCOE COCHINA EAST RANCH 164H | Producing |
| 42127367100000 | 4212736710 | BRISCOE COCHINA EAST RANCH 165H | Producing |
| 42127339140000 | 4212733914 | BRISCOE COCHINA EAST RANCH 16H | Producing |
| 42127339160000 | 4212733916 | BRISCOE COCHINA EAST RANCH 17H | Producing |
| 42283356650000 | 4228335665 | BRISCOE COCHINA EAST RANCH 188H | Producing |
| 42283356660000 | 4228335666 | BRISCOE COCHINA EAST RANCH 189H | Producing |
| 42127339680000 | 4212733968 | BRISCOE COCHINA EAST RANCH 18H | Producing |
| 42283356670000 | 4228335667 | BRISCOE COCHINA EAST RANCH 190H | Producing |
| 42127339900000 | 4212733990 | BRISCOE COCHINA EAST RANCH 19H | Producing |
| 42127336200000 | 4212733620 | BRISCOE COCHINA EAST RANCH 1H | Shut In |
| 42127339940000 | 4212733994 | BRISCOE COCHINA EAST RANCH 20H | Producing |
| 42127339910000 | 4212733991 | BRISCOE COCHINA EAST RANCH 21H | Producing |
| 42127352040000 | 4212735204 | BRISCOE COCHINA EAST RANCH 22H | Producing |
| 42127352030000 | 4212735203 | BRISCOE COCHINA EAST RANCH 23H | Producing |
| 42127350810000 | 4212735081 | BRISCOE COCHINA EAST RANCH 24H | Producing |
| 42127350720100 | 4212735072 | BRISCOE COCHINA EAST RANCH 25H | Producing |
| 42127350860000 | 4212735086 | BRISCOE COCHINA EAST RANCH 26H | Producing |
| 42127350870000 | 4212735087 | BRISCOE COCHINA EAST RANCH 27H | Producing |
| 42127352050000 | 4212735205 | BRISCOE COCHINA EAST RANCH 28H | Producing |
| 42127352060000 | 4212735206 | BRISCOE COCHINA EAST RANCH 29H | Producing |
| 42127336210000 | 4212733621 | BRISCOE COCHINA EAST RANCH 2H | Producing |
| 42127352070000 | 4212735207 | BRISCOE COCHINA EAST RANCH 30H | Producing |
| 42127340980000 | 4212734098 | BRISCOE COCHINA EAST RANCH 31H | Producing |
| 42127341070000 | 4212734107 | BRISCOE COCHINA EAST RANCH 32H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352080000 | 4212735208 | BRISCOE COCHINA EAST RANCH 33H | Producing |
| 42127352230000 | 4212735223 | BRISCOE COCHINA EAST RANCH 34H | Producing |
| 42127352100000 | 4212735210 | BRISCOE COCHINA EAST RANCH 35H | Producing |
| 42127352110000 | 4212735211 | BRISCOE COCHINA EAST RANCH 36H | Producing |
| 42127352130000 | 4212735213 | BRISCOE COCHINA EAST RANCH 37H | Producing |
| 42127352280000 | 4212735228 | BRISCOE COCHINA EAST RANCH 38H | Producing |
| 42127352290000 | 4212735229 | BRISCOE COCHINA EAST RANCH 39H | Producing |
| 42127336670000 | 4212733667 | BRISCOE COCHINA EAST RANCH 3H | Producing |
| 42283341380000 | 4228334138 | BRISCOE COCHINA EAST RANCH 40H | Producing |
| 42283341470000 | 4228334147 | BRISCOE COCHINA EAST RANCH 41H | Producing |
| 42283341540000 | 4228334154 | BRISCOE COCHINA EAST RANCH 42H | Producing |
| 42283341560000 | 4228334156 | BRISCOE COCHINA EAST RANCH 43H | Producing |
| 42283341570000 | 4228334157 | BRISCOE COCHINA EAST RANCH 44H | Producing |
| 42283341580000 | 4228334158 | BRISCOE COCHINA EAST RANCH 45H | Producing |
| 42283341630100 | 4228334163 | BRISCOE COCHINA EAST RANCH 46H | Producing |
| 42283369790000 | 4228336979 | BRISCOE COCHINA EAST RANCH 46HX | Producing |
| 42283369800000 | 4228336980 | BRISCOE COCHINA EAST RANCH 46HY | Producing |
| 42283369780000 | 4228336978 | BRISCOE COCHINA EAST RANCH 46HZ | Producing |
| 42283341640000 | 4228334164 | BRISCOE COCHINA EAST RANCH 47H | Producing |
| 42283341650000 | 4228334165 | BRISCOE COCHINA EAST RANCH 48H | Producing |
| 42283341660000 | 4228334166 | BRISCOE COCHINA EAST RANCH 49H | Producing |
| 42127336680000 | 4212733668 | BRISCOE COCHINA EAST RANCH 4H | Producing |
| 42283341670000 | 4228334167 | BRISCOE COCHINA EAST RANCH 50H | Producing |
| 42283341680000 | 4228334168 | BRISCOE COCHINA EAST RANCH 51H | Producing |
| 42283341730000 | 4228334173 | BRISCOE COCHINA EAST RANCH 52H | Producing |
| 42283341740000 | 4228334174 | BRISCOE COCHINA EAST RANCH 53H | Producing |
| 42283341750000 | 4228334175 | BRISCOE COCHINA EAST RANCH 54H | Producing |
| 42283363810000 | 4228336381 | BRISCOE COCHINA EAST RANCH 54HX | Producing |
| 42283363820000 | 4228336382 | BRISCOE COCHINA EAST RANCH 54HY | Producing |
| 42283363830000 | 4228336383 | BRISCOE COCHINA EAST RANCH 54HZ | Producing |
| 42283341760000 | 4228334176 | BRISCOE COCHINA EAST RANCH 55H | Producing |
| 42283341770000 | 4228334177 | BRISCOE COCHINA EAST RANCH 56H | Producing |
| 42283342250000 | 4228334225 | BRISCOE COCHINA EAST RANCH 57H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376200000 | 4212737620 | BRISCOE COCHINA EAST RANCH 57HA | Producing |
| 42127376160000 | 4212737616 | BRISCOE COCHINA EAST RANCH 57HB | Producing |
| 42127376170000 | 4212737617 | BRISCOE COCHINA EAST RANCH 57HC | Producing |
| 42127376180000 | 4212737618 | BRISCOE COCHINA EAST RANCH 57HD | Producing |
| 42127376190000 | 4212737619 | BRISCOE COCHINA EAST RANCH 57HE | Producing |
| 42283342260000 | 4228334226 | BRISCOE COCHINA EAST RANCH 58H | Producing |
| 42283342270000 | 4228334227 | BRISCOE COCHINA EAST RANCH 59H | Producing |
| 42127336690000 | 4212733669 | BRISCOE COCHINA EAST RANCH 5H | Producing |
| 42283342280100 | 4228334228 | BRISCOE COCHINA EAST RANCH 60H | Producing |
| 42127344860000 | 4212734486 | BRISCOE COCHINA EAST RANCH 61H | Producing |
| 42127344870100 | 4212734487 | BRISCOE COCHINA EAST RANCH 62H | Producing |
| 42127344880000 | 4212734488 | BRISCOE COCHINA EAST RANCH 63H | Producing |
| 42127344890000 | 4212734489 | BRISCOE COCHINA EAST RANCH 64H | Producing |
| 42127344920000 | 4212734492 | BRISCOE COCHINA EAST RANCH 65H | Producing |
| 42127344940000 | 4212734494 | BRISCOE COCHINA EAST RANCH 66H | Producing |
| 42283330130000 | 4228333013 | BRISCOE COCHINA EAST RANCH 67H | Producing |
| 42283330150000 | 4228333015 | BRISCOE COCHINA EAST RANCH 68H | Producing |
| 42283330160000 | 4228333016 | BRISCOE COCHINA EAST RANCH 69H | Shut In |
| 42127336700000 | 4212733670 | BRISCOE COCHINA EAST RANCH 6H | Producing |
| 42283330170000 | 4228333017 | BRISCOE COCHINA EAST RANCH 70H | Producing |
| 42283330180000 | 4228333018 | BRISCOE COCHINA EAST RANCH 71H | Producing |
| 42283330190000 | 4228333019 | BRISCOE COCHINA EAST RANCH 72H | Producing |
| 42283343070000 | 4228334307 | BRISCOE COCHINA EAST RANCH 73H | Producing |
| 42283343080000 | 4228334308 | BRISCOE COCHINA EAST RANCH 74H | Producing |
| 42283343090000 | 4228334309 | BRISCOE COCHINA EAST RANCH 75H | Producing |
| 42283343100000 | 4228334310 | BRISCOE COCHINA EAST RANCH 76H | Producing |
| 42283343120000 | 4228334312 | BRISCOE COCHINA EAST RANCH 77H | Producing |
| 42283343130000 | 4228334313 | BRISCOE COCHINA EAST RANCH 78H | Producing |
| 42283343620000 | 4228334362 | BRISCOE COCHINA EAST RANCH 79H | Producing |
| 42127336620000 | 4212733662 | BRISCOE COCHINA EAST RANCH 7H | Producing |
| 42283343630000 | 4228334363 | BRISCOE COCHINA EAST RANCH 80H | Producing |
| 42283343640000 | 4228334364 | BRISCOE COCHINA EAST RANCH 81H | Producing |
| 42283343650000 | 4228334365 | BRISCOE COCHINA EAST RANCH 82H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42283343920000 | 4228334392 | BRISCOE COCHINA EAST RANCH 83H | Producing |
| 42283343930000 | 4228334393 | BRISCOE COCHINA EAST RANCH 84H | Producing |
| 42283343940000 | 4228334394 | BRISCOE COCHINA EAST RANCH 85H | Producing |
| 42283343950000 | 4228334395 | BRISCOE COCHINA EAST RANCH 86H | Producing |
| 42283343960000 | 4228334396 | BRISCOE COCHINA EAST RANCH 87H | Producing |
| 42283343990000 | 4228334399 | BRISCOE COCHINA EAST RANCH 88H | Producing |
| 42283344000000 | 4228334400 | BRISCOE COCHINA EAST RANCH 89H | Producing |
| 42127336710000 | 4212733671 | BRISCOE COCHINA EAST RANCH 8H | Producing |
| 42283344010000 | 4228334401 | BRISCOE COCHINA EAST RANCH 90H | Producing |
| 42283344020000 | 4228334402 | BRISCOE COCHINA EAST RANCH 91H | Producing |
| 42283344030000 | 4228334403 | BRISCOE COCHINA EAST RANCH 92H | Producing |
| 42283344040000 | 4228334404 | BRISCOE COCHINA EAST RANCH 93H | Producing |
| 42283344060000 | 4228334406 | BRISCOE COCHINA EAST RANCH 94H | Producing |
| 42283344070000 | 4228334407 | BRISCOE COCHINA EAST RANCH 95H | Producing |
| 42283344080000 | 4228334408 | BRISCOE COCHINA EAST RANCH 96H | Producing |
| 42283344090000 | 4228334409 | BRISCOE COCHINA EAST RANCH 97H | Producing |
| 42283344100000 | 4228334410 | BRISCOE COCHINA EAST RANCH 98H | Producing |
| 42283344510000 | 4228334451 | BRISCOE COCHINA EAST RANCH 99H | Producing |
| 42127336720000 | 4212733672 | BRISCOE COCHINA EAST RANCH 9H | Producing |
| 42127334000000 | 4212733400 | BRISCOE COCHINA RANCH 1 | Plugged and Abandoned |
| 42283323300000 | 4228332330 | BRISCOE COCHINA STATE UNIT A 1H | Producing |
| 42283323310000 | 4228332331 | BRISCOE COCHINA STATE UNIT B 1H | Producing |
| 42127374700000 | 4212737470 | BRISCOE COCHINA WEST RANCH 06HV | Producing |
| 42127374710000 | 4212737471 | BRISCOE COCHINA WEST RANCH 06HW | Shut In |
| 42127374720000 | 4212737472 | BRISCOE COCHINA WEST RANCH 06HX | Producing |
| 42127374730000 | 4212737473 | BRISCOE COCHINA WEST RANCH 06HY | Producing |
| 42127374740000 | 4212737474 | BRISCOE COCHINA WEST RANCH 06HZ | Producing |
| 42127363300000 | 4212736330 | BRISCOE COCHINA WEST RANCH 100H | Producing |
| 42127369140000 | 4212736914 | BRISCOE COCHINA WEST RANCH 101H | Producing |
| 42127369160000 | 4212736916 | BRISCOE COCHINA WEST RANCH 102H | Producing |
| 42127369170000 | 4212736917 | BRISCOE COCHINA WEST RANCH 103H | Producing |
| 42127369150000 | 4212736915 | BRISCOE COCHINA WEST RANCH 104H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127369180000 | 4212736918 | BRISCOE COCHINA WEST RANCH 105H | Producing |
| 42127348220000 | 4212734822 | BRISCOE COCHINA WEST RANCH 10H | Producing |
| 42127337590000 | 4212733759 | BRISCOE COCHINA WEST RANCH 11H | Producing |
| 42127338590000 | 4212733859 | BRISCOE COCHINA WEST RANCH 12H | Producing |
| 42127348230000 | 4212734823 | BRISCOE COCHINA WEST RANCH 13H | Producing |
| 42127348250000 | 4212734825 | BRISCOE COCHINA WEST RANCH 14H | Producing |
| 42127348240000 | 4212734824 | BRISCOE COCHINA WEST RANCH 15H | Producing |
| 42127341160000 | 4212734116 | BRISCOE COCHINA WEST RANCH 16H | Producing |
| 42127341180000 | 4212734118 | BRISCOE COCHINA WEST RANCH 17H | Producing |
| 42127341170000 | 4212734117 | BRISCOE COCHINA WEST RANCH 18H | Producing |
| 42127348310000 | 4212734831 | BRISCOE COCHINA WEST RANCH 19H | Producing |
| 42127357730000 | 4212735773 | BRISCOE COCHINA WEST RANCH 1B | Shut In |
| 42127357790000 | 4212735779 | BRISCOE COCHINA WEST RANCH 1E | Producing |
| 42127336580000 | 4212733658 | BRISCOE COCHINA WEST RANCH 1H | Producing |
| 42127348330000 | 4212734833 | BRISCOE COCHINA WEST RANCH 20H | Producing |
| 42127348320000 | 4212734832 | BRISCOE COCHINA WEST RANCH 21H | Producing |
| 42127344450000 | 4212734445 | BRISCOE COCHINA WEST RANCH 22H | Producing |
| 42127344470000 | 4212734447 | BRISCOE COCHINA WEST RANCH 23H | Producing |
| 42127344490000 | 4212734449 | BRISCOE COCHINA WEST RANCH 24H | Producing |
| 42127344500000 | 4212734450 | BRISCOE COCHINA WEST RANCH 25H | Producing |
| 42127344510000 | 4212734451 | BRISCOE COCHINA WEST RANCH 26H | Producing |
| 42127344520000 | 4212734452 | BRISCOE COCHINA WEST RANCH 27H | Producing |
| 42127348340000 | 4212734834 | BRISCOE COCHINA WEST RANCH 28H | Producing |
| 42127348360000 | 4212734836 | BRISCOE COCHINA WEST RANCH 29H | Producing |
| 42127336960000 | 4212733696 | BRISCOE COCHINA WEST RANCH 2H | Producing |
| 42127348370000 | 4212734837 | BRISCOE COCHINA WEST RANCH 30H | Producing |
| 42127348820000 | 4212734882 | BRISCOE COCHINA WEST RANCH 31H | Producing |
| 42127348830000 | 4212734883 | BRISCOE COCHINA WEST RANCH 32H | Producing |
| 42127348890000 | 4212734889 | BRISCOE COCHINA WEST RANCH 33H | Producing |
| 42127348840000 | 4212734884 | BRISCOE COCHINA WEST RANCH 34H | Producing |
| 42127348850000 | 4212734885 | BRISCOE COCHINA WEST RANCH 35H | Producing |
| 42127350380000 | 4212735038 | BRISCOE COCHINA WEST RANCH 36H | Producing |
| 42127350390000 | 4212735039 | BRISCOE COCHINA WEST RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127350410100 | 4212735041 | BRISCOE COCHINA WEST RANCH 38H | Producing |
| 42127344720000 | 4212734472 | BRISCOE COCHINA WEST RANCH 39H | Producing |
| 42127336990000 | 4212733699 | BRISCOE COCHINA WEST RANCH 3H | Producing |
| 42127344730000 | 4212734473 | BRISCOE COCHINA WEST RANCH 40H | Shut In |
| 42127344740000 | 4212734474 | BRISCOE COCHINA WEST RANCH 41H | Producing |
| 42127344750000 | 4212734475 | BRISCOE COCHINA WEST RANCH 42H | Producing |
| 42127344760000 | 4212734476 | BRISCOE COCHINA WEST RANCH 43H | Producing |
| 42127344770000 | 4212734477 | BRISCOE COCHINA WEST RANCH 44H | Producing |
| 42127350420000 | 4212735042 | BRISCOE COCHINA WEST RANCH 45H | Producing |
| 42127354920000 | 4212735492 | BRISCOE COCHINA WEST RANCH 46H | Producing |
| 42127355480000 | 4212735548 | BRISCOE COCHINA WEST RANCH 47H | Producing |
| 42127355490000 | 4212735549 | BRISCOE COCHINA WEST RANCH 48H | Producing |
| 42127355500000 | 4212735550 | BRISCOE COCHINA WEST RANCH 49H | Producing |
| 42127337000000 | 4212733700 | BRISCOE COCHINA WEST RANCH 4H | Producing |
| 42127355510000 | 4212735551 | BRISCOE COCHINA WEST RANCH 50H | Producing |
| 42127355520000 | 4212735552 | BRISCOE COCHINA WEST RANCH 51H | Producing |
| 42127356240000 | 4212735624 | BRISCOE COCHINA WEST RANCH 52H | Producing |
| 42127356260000 | 4212735626 | BRISCOE COCHINA WEST RANCH 53H | Producing |
| 42127356270000 | 4212735627 | BRISCOE COCHINA WEST RANCH 54H | Producing |
| 42127356280000 | 4212735628 | BRISCOE COCHINA WEST RANCH 55H | Producing |
| 42127356300000 | 4212735630 | BRISCOE COCHINA WEST RANCH 56H | Producing |
| 42127356290000 | 4212735629 | BRISCOE COCHINA WEST RANCH 57H | Producing |
| 42127356310000 | 4212735631 | BRISCOE COCHINA WEST RANCH 58H | Producing |
| 42127356320000 | 4212735632 | BRISCOE COCHINA WEST RANCH 59H | Producing |
| 42127339030000 | 4212733903 | BRISCOE COCHINA WEST RANCH 5H | Producing |
| 42127356330000 | 4212735633 | BRISCOE COCHINA WEST RANCH 60H | Producing |
| 42127356340000 | 4212735634 | BRISCOE COCHINA WEST RANCH 61H | Producing |
| 42127356360000 | 4212735636 | BRISCOE COCHINA WEST RANCH 62H | Producing |
| 42127356350000 | 4212735635 | BRISCOE COCHINA WEST RANCH 63H | Producing |
| 42127356400000 | 4212735640 | BRISCOE COCHINA WEST RANCH 64H | Producing |
| 42127356420000 | 4212735642 | BRISCOE COCHINA WEST RANCH 65H | Producing |
| 42127356430000 | 4212735643 | BRISCOE COCHINA WEST RANCH 66H | Producing |
| 42127356440000 | 4212735644 | BRISCOE COCHINA WEST RANCH 67H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361380000 | 4212736138 | BRISCOE COCHINA WEST RANCH 68H | Producing |
| 42127361390000 | 4212736139 | BRISCOE COCHINA WEST RANCH 69H | Producing |
| 42127339040000 | 4212733904 | BRISCOE COCHINA WEST RANCH 6H | Producing |
| 42127361480000 | 4212736148 | BRISCOE COCHINA WEST RANCH 70H | Producing |
| 42127361400000 | 4212736140 | BRISCOE COCHINA WEST RANCH 71H | Producing |
| 42127361410000 | 4212736141 | BRISCOE COCHINA WEST RANCH 72H | Producing |
| 42127361420000 | 4212736142 | BRISCOE COCHINA WEST RANCH 73H | Producing |
| 42127361430000 | 4212736143 | BRISCOE COCHINA WEST RANCH 74H | Producing |
| 42127361440000 | 4212736144 | BRISCOE COCHINA WEST RANCH 75H | Producing |
| 42127361450000 | 4212736145 | BRISCOE COCHINA WEST RANCH 76H | Producing |
| 42127361460000 | 4212736146 | BRISCOE COCHINA WEST RANCH 77H | Producing |
| 42127362500000 | 4212736250 | BRISCOE COCHINA WEST RANCH 78H | Producing |
| 42127362530000 | 4212736253 | BRISCOE COCHINA WEST RANCH 79H | Producing |
| 42127339050000 | 4212733905 | BRISCOE COCHINA WEST RANCH 7H | Producing |
| 42127362540000 | 4212736254 | BRISCOE COCHINA WEST RANCH 80H | Producing |
| 42127362550000 | 4212736255 | BRISCOE COCHINA WEST RANCH 81H | Producing |
| 42127362560000 | 4212736256 | BRISCOE COCHINA WEST RANCH 82H | Producing |
| 42127362570000 | 4212736257 | BRISCOE COCHINA WEST RANCH 83H | Producing |
| 42127362580000 | 4212736258 | BRISCOE COCHINA WEST RANCH 84H | Producing |
| 42127362590000 | 4212736259 | BRISCOE COCHINA WEST RANCH 85H | Producing |
| 42127362600000 | 4212736260 | BRISCOE COCHINA WEST RANCH 86H | Producing |
| 42127362610000 | 4212736261 | BRISCOE COCHINA WEST RANCH 87H | Producing |
| 42127362630000 | 4212736263 | BRISCOE COCHINA WEST RANCH 88H | Producing |
| 42127362640000 | 4212736264 | BRISCOE COCHINA WEST RANCH 89H | Producing |
| 42127348210000 | 4212734821 | BRISCOE COCHINA WEST RANCH 8H | Producing |
| 42127362650000 | 4212736265 | BRISCOE COCHINA WEST RANCH 90H | Producing |
| 42127362660000 | 4212736266 | BRISCOE COCHINA WEST RANCH 91H | Producing |
| 42127362670000 | 4212736267 | BRISCOE COCHINA WEST RANCH 92H | Producing |
| 42127362680000 | 4212736268 | BRISCOE COCHINA WEST RANCH 93H | Producing |
| 42127362690000 | 4212736269 | BRISCOE COCHINA WEST RANCH 94H | Producing |
| 42127362700000 | 4212736270 | BRISCOE COCHINA WEST RANCH 95H | Producing |
| 42127363260000 | 4212736326 | BRISCOE COCHINA WEST RANCH 96H | Producing |
| 42127363270000 | 4212736327 | BRISCOE COCHINA WEST RANCH 97H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127363280000 | 4212736328 | BRISCOE COCHINA WEST RANCH 98H | Producing |
| 42127363290000 | 4212736329 | BRISCOE COCHINA WEST RANCH 99H | Producing |
| 42127348260000 | 4212734826 | BRISCOE COCHINA WEST RANCH 9H | Producing |
| 42127357520000 | 4212735752 | BRISCOE EAST DELGADO UNIT A 10H | Producing |
| 42127357530000 | 4212735753 | BRISCOE EAST DELGADO UNIT A 11H | Producing |
| 42127357540000 | 4212735754 | BRISCOE EAST DELGADO UNIT A 12H | Producing |
| 42127357550000 | 4212735755 | BRISCOE EAST DELGADO UNIT A 13H | Producing |
| 42127357560000 | 4212735756 | BRISCOE EAST DELGADO UNIT A 14H | Producing |
| 42127357570000 | 4212735757 | BRISCOE EAST DELGADO UNIT A 15H | Producing |
| 42127357160000 | 4212735716 | BRISCOE EAST DELGADO UNIT A 1H | Producing |
| 42127357170000 | 4212735717 | BRISCOE EAST DELGADO UNIT A 2H | Producing |
| 42127357180000 | 4212735718 | BRISCOE EAST DELGADO UNIT A 3H | Producing |
| 42127357190000 | 4212735719 | BRISCOE EAST DELGADO UNIT A 4H | Producing |
| 42127357200000 | 4212735720 | BRISCOE EAST DELGADO UNIT A 5H | Producing |
| 42127357240000 | 4212735724 | BRISCOE EAST DELGADO UNIT A 6H | Producing |
| 42127357250000 | 4212735725 | BRISCOE EAST DELGADO UNIT A 7H | Producing |
| 42127357260000 | 4212735726 | BRISCOE EAST DELGADO UNIT A 8H | Producing |
| 42127357270000 | 4212735727 | BRISCOE EAST DELGADO UNIT A 9H | Producing |
| 42127352410000 | 4212735241 | BRISCOE ECKHARDT-SWONKE UNIT 1H | Producing |
| 42127352430000 | 4212735243 | BRISCOE ECKHARDT-SWONKE UNIT 2H | Producing |
| 42127352440000 | 4212735244 | BRISCOE ECKHARDT-SWONKE UNIT 3H | Producing |
| 42127352450000 | 4212735245 | BRISCOE ECKHARDT-SWONKE UNIT 4H | Producing |
| 42127352460000 | 4212735246 | BRISCOE ECKHARDT-SWONKE UNIT 5H | Producing |
| 42127352490000 | 4212735249 | BRISCOE ECKHARDT-SWONKE UNIT 6H | Producing |
| 42127352500000 | 4212735250 | BRISCOE ECKHARDT-SWONKE UNIT 7H | Producing |
| 42127379530000 | 4212737953 | BRISCOE FISHER UNIT 01HB | Producing |
| 42127379540000 | 4212737954 | BRISCOE FISHER UNIT 01HC | Producing |
| 42127379560000 | 4212737956 | BRISCOE FISHER UNIT 01HE | Producing |
| 42127379570000 | 4212737957 | BRISCOE FISHER UNIT 01HF | Producing |
| 42127379600000 | 4212737960 | BRISCOE FISHER UNIT 02HA | Producing |
| 42127379640000 | 4212737964 | BRISCOE FISHER UNIT 02HC | Producing |
| 42127379660000 | 4212737966 | BRISCOE FISHER UNIT 02HD | Producing |
| 42127341580000 | 4212734158 | BRISCOE FRIDAY RANCH 18H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341930000 | 4212734193 | BRISCOE FRIDAY RANCH 19H | Producing |
| 42127336890000 | 4212733689 | BRISCOE FRIDAY RANCH 1H | Producing |
| 42127341940000 | 4212734194 | BRISCOE FRIDAY RANCH 20H | Producing |
| 42127341950000 | 4212734195 | BRISCOE FRIDAY RANCH 21H | Producing |
| 42127341960000 | 4212734196 | BRISCOE FRIDAY RANCH 22H | Producing |
| 42127353850000 | 4212735385 | BRISCOE FRIDAY RANCH 23H | Producing |
| 42127353890000 | 4212735389 | BRISCOE FRIDAY RANCH 24H | Producing |
| 42127348070000 | 4212734807 | BRISCOE FRIDAY RANCH 25H | Producing |
| 42127348100000 | 4212734810 | BRISCOE FRIDAY RANCH 26H | Producing |
| 42127348080000 | 4212734808 | BRISCOE FRIDAY RANCH 27H | Producing |
| 42127348120000 | 4212734812 | BRISCOE FRIDAY RANCH 28H | Producing |
| 42127348130000 | 4212734813 | BRISCOE FRIDAY RANCH 29H | Producing |
| 42127337080000 | 4212733708 | BRISCOE FRIDAY RANCH 2H | Producing |
| 42127348150000 | 4212734815 | BRISCOE FRIDAY RANCH 30H | Producing |
| 42127348170000 | 4212734817 | BRISCOE FRIDAY RANCH 31H | Producing |
| 42127348160000 | 4212734816 | BRISCOE FRIDAY RANCH 32H | Producing |
| 42127348180000 | 4212734818 | BRISCOE FRIDAY RANCH 33H | Producing |
| 42127348200000 | 4212734820 | BRISCOE FRIDAY RANCH 34H | Shut In |
| 42127353870000 | 4212735387 | BRISCOE FRIDAY RANCH 35H | Producing |
| 42127353880000 | 4212735388 | BRISCOE FRIDAY RANCH 36H | Producing |
| 42127353920000 | 4212735392 | BRISCOE FRIDAY RANCH 37H | Producing |
| 42127353910000 | 4212735391 | BRISCOE FRIDAY RANCH 38H | Producing |
| 42127353930000 | 4212735393 | BRISCOE FRIDAY RANCH 39H | Shut In |
| 42127337090000 | 4212733709 | BRISCOE FRIDAY RANCH 3H | Producing |
| 42127353940000 | 4212735394 | BRISCOE FRIDAY RANCH 40H | Producing |
| 42127361640000 | 4212736164 | BRISCOE FRIDAY RANCH 41H | Temporarily Abandoned |
| 42127364560000 | 4212736456 | BRISCOE FRIDAY RANCH 41HR | Producing |
| 42127361650000 | 4212736165 | BRISCOE FRIDAY RANCH 42H | Temporarily Abandoned |
| 42127364570000 | 4212736457 | BRISCOE FRIDAY RANCH 42HR | Producing |
| 42127361660000 | 4212736166 | BRISCOE FRIDAY RANCH 43H | Producing |
| 42127361670100 | 4212736167 | BRISCOE FRIDAY RANCH 44H | Producing |
| 42127362080000 | 4212736208 | BRISCOE FRIDAY RANCH 45H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127363560000 | 4212736356 | BRISCOE FRIDAY RANCH 46HR | Producing |
| 42127362180000 | 4212736218 | BRISCOE FRIDAY RANCH 47H | Producing |
| 42127337200000 | 4212733720 | BRISCOE FRIDAY RANCH 4H | Producing |
| 42127337210000 | 4212733721 | BRISCOE FRIDAY RANCH 5H | Producing |
| 42127337220000 | 4212733722 | BRISCOE FRIDAY RANCH 6H | Producing |
| 42127337550000 | 4212733755 | BRISCOE FRIDAY RANCH 7H | Producing |
| 42127337560000 | 4212733756 | BRISCOE FRIDAY RANCH 8H | Producing |
| 42127337570000 | 4212733757 | BRISCOE FRIDAY RANCH 9H | Producing |
| 42127361960000 | 4212736196 | BRISCOE FRIDAY RANCH UNIT A 1H | Producing |
| 42127361970000 | 4212736197 | BRISCOE FRIDAY RANCH UNIT A 2H | Producing |
| 42127361980000 | 4212736198 | BRISCOE FRIDAY RANCH UNIT A 3H | Producing |
| 42127361990000 | 4212736199 | BRISCOE FRIDAY RANCH UNIT A 4H | Producing |
| 42127362000000 | 4212736200 | BRISCOE FRIDAY RANCH UNIT A 5H | Producing |
| 42127362010000 | 4212736201 | BRISCOE FRIDAY RANCH UNIT A 6H | Producing |
| 42127342730000 | 4212734273 | BRISCOE FRIDAY RANCH UNIT B 10H | Producing |
| 42127342750000 | 4212734275 | BRISCOE FRIDAY RANCH UNIT B 11H | Producing |
| 42127342740000 | 4212734274 | BRISCOE FRIDAY RANCH UNIT B 12H | Producing |
| 42127342760000 | 4212734276 | BRISCOE FRIDAY RANCH UNIT B 13H | Producing |
| 42127343090000 | 4212734309 | BRISCOE FRIDAY RANCH UNIT B 14H | Producing |
| 42127343100000 | 4212734310 | BRISCOE FRIDAY RANCH UNIT B 15H | Producing |
| 42127343110000 | 4212734311 | BRISCOE FRIDAY RANCH UNIT B 16H | Producing |
| 42127343130000 | 4212734313 | BRISCOE FRIDAY RANCH UNIT B 17H | Producing |
| 42127368980000 | 4212736898 | BRISCOE FRIDAY RANCH UNIT C 10H | Producing |
| 42127368990000 | 4212736899 | BRISCOE FRIDAY RANCH UNIT C 11H | Producing |
| 42127369010000 | 4212736901 | BRISCOE FRIDAY RANCH UNIT C 1H | Producing |
| 42127369020000 | 4212736902 | BRISCOE FRIDAY RANCH UNIT C 2H | Producing |
| 42127369030000 | 4212736903 | BRISCOE FRIDAY RANCH UNIT C 3H | Producing |
| 42127369040000 | 4212736904 | BRISCOE FRIDAY RANCH UNIT C 4H | Producing |
| 42127369050000 | 4212736905 | BRISCOE FRIDAY RANCH UNIT C 5H | Producing |
| 42127369060000 | 4212736906 | BRISCOE FRIDAY RANCH UNIT C 6H | Producing |
| 42127368950000 | 4212736895 | BRISCOE FRIDAY RANCH UNIT C 7H | Producing |
| 42127368960000 | 4212736896 | BRISCOE FRIDAY RANCH UNIT C 8H | Producing |
| 42127368970000 | 4212736897 | BRISCOE FRIDAY RANCH UNIT C 9H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339840000 | 4212733984 | BRISCOE FRIDAY SMITH 1H | Producing |
| 42127339850000 | 4212733985 | BRISCOE FRIDAY SMITH 2H | Producing |
| 42127339860000 | 4212733986 | BRISCOE FRIDAY SMITH 3H | Producing |
| 42127375970000 | 4212737597 | BRISCOE METCALF UNIT 01HS | Producing |
| 42127376090000 | 4212737609 | BRISCOE METCALF UNIT 01HT | Producing |
| 42127376100000 | 4212737610 | BRISCOE METCALF UNIT 01HU | Producing |
| 42127376120000 | 4212737612 | BRISCOE METCALF UNIT 01HV | Producing |
| 42127376130000 | 4212737613 | BRISCOE METCALF UNIT 01HW | Producing |
| 42127376110000 | 4212737611 | BRISCOE METCALF UNIT 01HX | Producing |
| 42127375990000 | 4212737599 | BRISCOE METCALF UNIT 01HY | Producing |
| 42127376000000 | 4212737600 | BRISCOE METCALF UNIT 01HZ | Producing |
| 42127376010000 | 4212737601 | BRISCOE METCALF UNIT 02HU | Producing |
| 42127376020000 | 4212737602 | BRISCOE METCALF UNIT 02HV | Producing |
| 42127376030000 | 4212737603 | BRISCOE METCALF UNIT 02HW | Producing |
| 42127376050000 | 4212737605 | BRISCOE METCALF UNIT 02HX | Producing |
| 42127376070100 | 4212737607 | BRISCOE METCALF UNIT 02HY | Producing |
| 42127376080000 | 4212737608 | BRISCOE METCALF UNIT 02HZ | Producing |
| 42127371360000 | 4212737136 | BRISCOE METCALF UNIT 1H | Producing |
| 42127371380000 | 4212737138 | BRISCOE METCALF UNIT 2H | Producing |
| 42127371370000 | 4212737137 | BRISCOE METCALF UNIT 3H | Producing |
| 42127371390000 | 4212737139 | BRISCOE METCALF UNIT 4H | Producing |
| 42127371400000 | 4212737140 | BRISCOE METCALF UNIT 5H | Producing |
| 42127371410000 | 4212737141 | BRISCOE METCALF UNIT 6H | Producing |
| 42127352780000 | 4212735278 | BRISCOE SPRINGMAN UNIT A 1H | Producing |
| 42127352790000 | 4212735279 | BRISCOE SPRINGMAN UNIT A 2H | Producing |
| 42127352800000 | 4212735280 | BRISCOE SPRINGMAN UNIT A 3H | Producing |
| 42127352810000 | 4212735281 | BRISCOE SPRINGMAN UNIT A 4H | Producing |
| 42127352830000 | 4212735283 | BRISCOE SPRINGMAN UNIT A 5H | Producing |
| 42127352820000 | 4212735282 | BRISCOE SPRINGMAN UNIT A 6H | Producing |
| 42127352840000 | 4212735284 | BRISCOE SPRINGMAN UNIT A 7H | Producing |
| 42127352850000 | 4212735285 | BRISCOE SPRINGMAN UNIT B 1H | Producing |
| 42127352860000 | 4212735286 | BRISCOE SPRINGMAN UNIT B 2H | Producing |
| 42127352870000 | 4212735287 | BRISCOE SPRINGMAN UNIT B 3H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352880000 | 4212735288 | BRISCOE SPRINGMAN UNIT B 4H | Producing |
| 42127352890000 | 4212735289 | BRISCOE SPRINGMAN UNIT B 5H | Producing |
| 42127352900000 | 4212735290 | BRISCOE SPRINGMAN UNIT B 6H | Producing |
| 42127354050000 | 4212735405 | BRISCOE THON UNIT 1H | Producing |
| 42127354070000 | 4212735407 | BRISCOE THON UNIT 2H | Producing |
| 42127354080000 | 4212735408 | BRISCOE THON UNIT 3H | Producing |
| 42127354060000 | 4212735406 | BRISCOE THON UNIT 4H | Producing |
| 42127354090000 | 4212735409 | BRISCOE THON UNIT 5H | Shut In |
| 42323332970000 | 4232333297 | CAGE 1TV | Producing |
| 42323333320000 | 4232333332 | CAGE 2TV | Shut In |
| 42323333360000 | 4232333336 | CAGE 3TV | Shut In |
| 42323333550000 | 4232333355 | CAGE 4RB | Producing |
| 42323333760000 | 4232333376 | CAGE 5TV | Producing |
| 42323333770000 | 4232333377 | CAGE 6TV | Producing |
| 42323333830000 | 4232333383 | CAGE 7TV | Producing |
| 42323333840000 | 4232333384 | CAGE 8TV | Producing |
| 42323334120100 | 4232333412 | CAGE 9TV | Producing |
| 42127375590000 | 4212737559 | CARLA SOUTH SPUR UNIT A 01HA | Producing |
| 42127375600000 | 4212737560 | CARLA SOUTH SPUR UNIT A 01HB | Shut In |
| 42127364760000 | 4212736476 | CARLA SOUTH SPUR UNIT A 1H | Producing |
| 42127364800000 | 4212736480 | CARLA SOUTH SPUR UNIT A 2H | Producing |
| 42127364810000 | 4212736481 | CARLA SOUTH SPUR UNIT A 3H | Producing |
| 42127348000000 | 4212734800 | CHAPARRAL WILDLIFE STATE 10H | Producing |
| 42127348020000 | 4212734802 | CHAPARRAL WILDLIFE STATE 11H | Producing |
| 42127348050000 | 4212734805 | CHAPARRAL WILDLIFE STATE 12H | Producing |
| 42127348030000 | 4212734803 | CHAPARRAL WILDLIFE STATE 13H | Producing |
| 42127364300000 | 4212736430 | CHAPARRAL WILDLIFE STATE 19H | Producing |
| 42127364310000 | 4212736431 | CHAPARRAL WILDLIFE STATE 20H | Producing |
| 42127364320000 | 4212736432 | CHAPARRAL WILDLIFE STATE 21H | Producing |
| 42127364330000 | 4212736433 | CHAPARRAL WILDLIFE STATE 22H | Producing |
| 42127364340000 | 4212736434 | CHAPARRAL WILDLIFE STATE 23H | Producing |
| 42127370470000 | 4212737047 | CHAPARRAL WILDLIFE STATE 24H | Producing |
| 42127370480000 | 4212737048 | CHAPARRAL WILDLIFE STATE 25H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127370500100 | 4212737050 | CHAPARRAL WILDLIFE STATE 26H | Producing |
| 42127370490100 | 4212737049 | CHAPARRAL WILDLIFE STATE 27H | Producing |
| 42127370510000 | 4212737051 | CHAPARRAL WILDLIFE STATE 28H | Producing |
| 42127347930000 | 4212734793 | CHAPARRAL WILDLIFE STATE 4H | Producing |
| 42127347940000 | 4212734794 | CHAPARRAL WILDLIFE STATE 5H | Producing |
| 42127347950000 | 4212734795 | CHAPARRAL WILDLIFE STATE 6H | Producing |
| 42127347960000 | 4212734796 | CHAPARRAL WILDLIFE STATE 7H | Producing |
| 42127347970000 | 4212734797 | CHAPARRAL WILDLIFE STATE 8H | Producing |
| 42127347980000 | 4212734798 | CHAPARRAL WILDLIFE STATE 9H | Producing |
| 42127357120000 | 4212735712 | DENTONIO STATE 22 UNIT 10H | Producing |
| 42127357140000 | 4212735714 | DENTONIO STATE 22 UNIT 11H | Producing |
| 42127357150000 | 4212735715 | DENTONIO STATE 22 UNIT 12H | Producing |
| 42127356790100 | 4212735679 | DENTONIO STATE 22 UNIT 1H | Producing |
| 42127356800000 | 4212735680 | DENTONIO STATE 22 UNIT 2H | Producing |
| 42127356810000 | 4212735681 | DENTONIO STATE 22 UNIT 3H | Producing |
| 42127356820000 | 4212735682 | DENTONIO STATE 22 UNIT 4H | Producing |
| 42127356860000 | 4212735686 | DENTONIO STATE 22 UNIT 5H | Producing |
| 42127356870000 | 4212735687 | DENTONIO STATE 22 UNIT 6H | Producing |
| 42127356880000 | 4212735688 | DENTONIO STATE 22 UNIT 7H | Producing |
| 42127356890000 | 4212735689 | DENTONIO STATE 22 UNIT 8H | Producing |
| 42127357110000 | 4212735711 | DENTONIO STATE 22 UNIT 9H | Producing |
| 42127349230000 | 4212734923 | DENTONIO WHITE 23 UNIT 10H | Producing |
| 42127349240000 | 4212734924 | DENTONIO WHITE 23 UNIT 11H | Producing |
| 42127349310000 | 4212734931 | DENTONIO WHITE 23 UNIT 12H | Producing |
| 42127349270000 | 4212734927 | DENTONIO WHITE 23 UNIT 13H | Producing |
| 42127349260000 | 4212734926 | DENTONIO WHITE 23 UNIT 14H | Producing |
| 42127349280000 | 4212734928 | DENTONIO WHITE 23 UNIT 15H | Producing |
| 42127345490000 | 4212734549 | DENTONIO WHITE 23 UNIT 1H | Producing |
| 42127345500000 | 4212734550 | DENTONIO WHITE 23 UNIT 2H | Producing |
| 42127345510000 | 4212734551 | DENTONIO WHITE 23 UNIT 3H | Producing |
| 42127345520000 | 4212734552 | DENTONIO WHITE 23 UNIT 4H | Producing |
| 42127345530000 | 4212734553 | DENTONIO WHITE 23 UNIT 5H | Producing |
| 42127345540000 | 4212734554 | DENTONIO WHITE 23 UNIT 6H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127349380000 | 4212734938 | DENTONIO WHITE 23 UNIT 7H | Producing |
| 42127349400000 | 4212734940 | DENTONIO WHITE 23 UNIT 8H | Producing |
| 42127349410000 | 4212734941 | DENTONIO WHITE 23 UNIT 9H | Producing |
| 42127378630000 | 4212737863 | DIAMOND H RANCH 04HA | Producing |
| 42127378620000 | 4212737862 | DIAMOND H RANCH 04HB | Producing |
| 42127378640000 | 4212737864 | DIAMOND H RANCH 04HC | Producing |
| 42127378660000 | 4212737866 | DIAMOND H RANCH 04HD | Producing |
| 42127378670000 | 4212737867 | DIAMOND H RANCH 04HE | Producing |
| 42127378680000 | 4212737868 | DIAMOND H RANCH 04HF | Producing |
| 42127347510000 | 4212734751 | DIAMOND H RANCH 10H | Producing |
| 42127350570000 | 4212735057 | DIAMOND H RANCH 11H | Producing |
| 42127379110000 | 4212737911 | DIAMOND H RANCH 11HA | Producing |
| 42127379140000 | 4212737914 | DIAMOND H RANCH 11HC | Producing |
| 42127379150000 | 4212737915 | DIAMOND H RANCH 11HD | Producing |
| 42127352010000 | 4212735201 | DIAMOND H RANCH 12H | Producing |
| 42127379100000 | 4212737910 | DIAMOND H RANCH 12HA | Producing |
| 42127379230000 | 4212737923 | DIAMOND H RANCH 12HC | Producing |
| 42127379290000 | 4212737929 | DIAMOND H RANCH 12HD | Producing |
| 42127379310000 | 4212737931 | DIAMOND H RANCH 12HF | Producing |
| 42127354030000 | 4212735403 | DIAMOND H RANCH 13H | Producing |
| 42127356460000 | 4212735646 | DIAMOND H RANCH 14H | Producing |
| 42127356470000 | 4212735647 | DIAMOND H RANCH 15H | Producing |
| 42127356480000 | 4212735648 | DIAMOND H RANCH 16H | Producing |
| 42127356490000 | 4212735649 | DIAMOND H RANCH 17H | Producing |
| 42127356510000 | 4212735651 | DIAMOND H RANCH 18H | Producing |
| 42127364750000 | 4212736475 | DIAMOND H RANCH 19H | Producing |
| 42127336610000 | 4212733661 | DIAMOND H RANCH 1H | Producing |
| 42127364820000 | 4212736482 | DIAMOND H RANCH 20H | Producing |
| 42127364830000 | 4212736483 | DIAMOND H RANCH 21H | Producing |
| 42127364740000 | 4212736474 | DIAMOND H RANCH 22H | Producing |
| 42127364840000 | 4212736484 | DIAMOND H RANCH 23H | Producing |
| 42127336930000 | 4212733693 | DIAMOND H RANCH 2H | Producing |
| 42127338190000 | 4212733819 | DIAMOND H RANCH 3H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338920000 | 4212733892 | DIAMOND H RANCH 4H | Producing |
| 42127343140000 | 4212734314 | DIAMOND H RANCH 5H | Producing |
| 42127341500000 | 4212734150 | DIAMOND H RANCH 6H | Producing |
| 42127344080000 | 4212734408 | DIAMOND H RANCH 7H | Producing |
| 42127344100000 | 4212734410 | DIAMOND H RANCH 8H | Producing |
| 42127346100000 | 4212734610 | DIAMOND H RANCH 9H | Shut In |
| 42127364360000 | 4212736436 | DIAMOND H STATE 10H | Producing |
| 42127363380000 | 4212736338 | DIAMOND H STATE 11H | Producing |
| 42127363390000 | 4212736339 | DIAMOND H STATE 12H | Producing |
| 42127363400000 | 4212736340 | DIAMOND H STATE 13H | Producing |
| 42127348960000 | 4212734896 | DIAMOND H STATE 15H | Producing |
| 42127351010000 | 4212735101 | DIAMOND H STATE 16H | Producing |
| 42127351920000 | 4212735192 | DIAMOND H STATE 17H | Producing |
| 42127350930000 | 4212735093 | DIAMOND H STATE 18H | Producing |
| 42127356550000 | 4212735655 | DIAMOND H STATE 19H | Producing |
| 42127336570000 | 4212733657 | DIAMOND H STATE 1H | Producing |
| 42127356520000 | 4212735652 | DIAMOND H STATE 20H | Producing |
| 42127356530000 | 4212735653 | DIAMOND H STATE 21H | Producing |
| 42127356540000 | 4212735654 | DIAMOND H STATE 22H | Producing |
| 42127336940000 | 4212733694 | DIAMOND H STATE 2H | Producing |
| 42127337860000 | 4212733786 | DIAMOND H STATE 3H | Producing |
| 42127338780000 | 4212733878 | DIAMOND H STATE 4H | Producing |
| 42127343120000 | 4212734312 | DIAMOND H STATE 5H | Producing |
| 42127341440000 | 4212734144 | DIAMOND H STATE 6H | Producing |
| 42127343950000 | 4212734395 | DIAMOND H STATE 7H | Producing |
| 42127344030000 | 4212734403 | DIAMOND H STATE 8H | Producing |
| 42127346030000 | 4212734603 | DIAMOND H STATE 9H | Producing |
| 42127376210000 | 4212737621 | DIAMOND H STATE UNIT A 01HT | Producing |
| 42127375610000 | 4212737561 | DIAMOND H STATE UNIT A 01HU | Producing |
| 42127375620000 | 4212737562 | DIAMOND H STATE UNIT A 01HV | Producing |
| 42127375630000 | 4212737563 | DIAMOND H STATE UNIT A 01HW | Producing |
| 42127375640000 | 4212737564 | DIAMOND H STATE UNIT A 01HX | Producing |
| 42127375650000 | 4212737565 | DIAMOND H STATE UNIT A 01HY | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127375660000 | 4212737566 | DIAMOND H STATE UNIT A 01HZ | Producing |
| 42127353960000 | 4212735396 | DIAMOND H STATE UNIT A 1H | Producing |
| 42127353980000 | 4212735398 | DIAMOND H STATE UNIT A 2H | Producing |
| 42127376220000 | 4212737622 | DIAMOND H STATE UNIT B 03HB | Producing |
| 42127376240000 | 4212737624 | DIAMOND H STATE UNIT B 03HC | Producing |
| 42127376230000 | 4212737623 | DIAMOND H STATE UNIT B 03HD | Producing |
| 42127370920000 | 4212737092 | DIAMOND H STATE UNIT B 10H | Producing |
| 42127370940000 | 4212737094 | DIAMOND H STATE UNIT B 11H | Producing |
| 42127370930000 | 4212737093 | DIAMOND H STATE UNIT B 12H | Producing |
| 42127370950000 | 4212737095 | DIAMOND H STATE UNIT B 13H | Producing |
| 42127370750000 | 4212737075 | DIAMOND H STATE UNIT B 1H | Producing |
| 42127370760000 | 4212737076 | DIAMOND H STATE UNIT B 2H | Producing |
| 42127370800100 | 4212737080 | DIAMOND H STATE UNIT B 3H | Producing |
| 42127370770000 | 4212737077 | DIAMOND H STATE UNIT B 4H | Producing |
| 42127370810000 | 4212737081 | DIAMOND H STATE UNIT B 5H | Producing |
| 42127370820000 | 4212737082 | DIAMOND H STATE UNIT B 6H | Producing |
| 42127370830000 | 4212737083 | DIAMOND H STATE UNIT B 7H | Producing |
| 42127370840000 | 4212737084 | DIAMOND H STATE UNIT B 8H | Producing |
| 42127370850000 | 4212737085 | DIAMOND H STATE UNIT B 9H | Producing |
| 42127377130000 | 4212737713 | DIAMOND H STATE UNIT D 02HA | Producing |
| 42127377170000 | 4212737717 | DIAMOND H STATE UNIT D 02HB | Producing |
| 42127377180100 | 4212737718 | DIAMOND H STATE UNIT D 02HC | Producing |
| 42127377190100 | 4212737719 | DIAMOND H STATE UNIT D 02HD | Producing |
| 42127377200000 | 4212737720 | DIAMOND H STATE UNIT D 02HE | Producing |
| 42127377210100 | 4212737721 | DIAMOND H STATE UNIT D 02HF | Producing |
| 42127380600000 | 4212738060 | DIAMOND H STATE UNIT D 04HX | Producing |
| 42127380610000 | 4212738061 | DIAMOND H STATE UNIT D 04HY | Producing |
| 42127380620000 | 4212738062 | DIAMOND H STATE UNIT D 04HZ | Producing |
| 42127370630000 | 4212737063 | DIAMOND H STATE UNIT D 10H | Producing |
| 42127370640000 | 4212737064 | DIAMOND H STATE UNIT D 11H | Producing |
| 42127370610000 | 4212737061 | DIAMOND H STATE UNIT D 7H | Producing |
| 42127370570000 | 4212737057 | DIAMOND H STATE UNIT D 8H | Producing |
| 42127370620000 | 4212737062 | DIAMOND H STATE UNIT D 9H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352380000 | 4212735238 | FOGMT 10SP | Producing |
| 42127352420000 | 4212735242 | FOGMT 11SP | Producing |
| 42127352400000 | 4212735240 | FOGMT 12SP | Producing |
| 42127349950000 | 4212734995 | FOGMT 13SP | Producing |
| 42127350020000 | 4212735002 | FOGMT 14SP | Producing |
| 42127350030000 | 4212735003 | FOGMT 15SP | Producing |
| 42127354190000 | 4212735419 | FOGMT 16SP | Producing |
| 42127354200000 | 4212735420 | FOGMT 17SP | Producing |
| 42127363500000 | 4212736350 | FOGMT 18SP | Producing |
| 42127363510000 | 4212736351 | FOGMT 19SP | Producing |
| 42127334110100 | 4212733411 | FOGMT 1SP | Producing |
| 42127363520000 | 4212736352 | FOGMT 20SP | Producing |
| 42127363530000 | 4212736353 | FOGMT 21SP | Producing |
| 42127363540000 | 4212736354 | FOGMT 22SP | Producing |
| 42127363550000 | 4212736355 | FOGMT 23SP | Producing |
| 42127354380000 | 4212735438 | FOGMT 24SP | Producing |
| 42127354410000 | 4212735441 | FOGMT 25SP | Producing |
| 42127354390000 | 4212735439 | FOGMT 26SP | Producing |
| 42127354400000 | 4212735440 | FOGMT 27SP | Producing |
| 42127359260000 | 4212735926 | FOGMT 28SP | Producing |
| 42127359270000 | 4212735927 | FOGMT 29SP | Producing |
| 42127334600000 | 4212733460 | FOGMT 2SP | Producing |
| 42127359280000 | 4212735928 | FOGMT 30SP | Producing |
| 42127359290000 | 4212735929 | FOGMT 31SP | Producing |
| 42127359480000 | 4212735948 | FOGMT 32SP | Producing |
| 42127359490000 | 4212735949 | FOGMT 33SP | Producing |
| 42127359500000 | 4212735950 | FOGMT 34SP | Producing |
| 42127359100000 | 4212735910 | FOGMT 35SP | Producing |
| 42127359110000 | 4212735911 | FOGMT 36SP | Producing |
| 42127359090000 | 4212735909 | FOGMT 37SP | Producing |
| 42127365810000 | 4212736581 | FOGMT 38SP | Producing |
| 42127365820000 | 4212736582 | FOGMT 39SP | Producing |
| 42127335920000 | 4212733592 | FOGMT 3SH | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127365830000 | 4212736583 | FOGMT 40SP | Producing |
| 42127365840000 | 4212736584 | FOGMT 41SP | Producing |
| 42127365850000 | 4212736585 | FOGMT 42SP | Producing |
| 42127365170000 | 4212736517 | FOGMT 43SP | Producing |
| 42127365180000 | 4212736518 | FOGMT 44SP | Producing |
| 42127365190000 | 4212736519 | FOGMT 45SP | Producing |
| 42127365200000 | 4212736520 | FOGMT 46SP | Producing |
| 42127365210000 | 4212736521 | FOGMT 47SP | Producing |
| 42127336280000 | 4212733628 | FOGMT 4SP | Producing |
| 42127370180000 | 4212737018 | FOGMT 54SP | Producing |
| 42127372110000 | 4212737211 | FOGMT 55SP | Producing |
| 42127336540000 | 4212733654 | FOGMT 5SH | Producing |
| 42127336950000 | 4212733695 | FOGMT 6SH | Producing |
| 42127339100000 | 4212733910 | FOGMT 7SP | Producing |
| 42127344910000 | 4212734491 | FOGMT 8SP | Producing |
| 42127344900000 | 4212734490 | FOGMT 9SP | Producing |
| 42127349960000 | 4212734996 | FOGMT E 1SP | Producing |
| 42127349920000 | 4212734992 | FOGMT E 2SP | Producing |
| 42127349930000 | 4212734993 | FOGMT F 1SP | Producing |
| 42127349940000 | 4212734994 | FOGMT G 1SP | Producing |
| 42127366690000 | 4212736669 | FOGMT UNIT A 10H | Producing |
| 42127366600000 | 4212736660 | FOGMT UNIT A 1H | Producing |
| 42127366610000 | 4212736661 | FOGMT UNIT A 2H | Producing |
| 42127366620000 | 4212736662 | FOGMT UNIT A 3H | Producing |
| 42127366630000 | 4212736663 | FOGMT UNIT A 4H | Producing |
| 42127366640000 | 4212736664 | FOGMT UNIT A 5H | Producing |
| 42127366650000 | 4212736665 | FOGMT UNIT A 6H | Producing |
| 42127366660000 | 4212736666 | FOGMT UNIT A 7H | Producing |
| 42127366670100 | 4212736667 | FOGMT UNIT A 8H | Producing |
| 42127366680000 | 4212736668 | FOGMT UNIT A 9H | Producing |
| 42127371350000 | 4212737135 | LA BANDERA RANCH 10H | Producing |
| 42127336180000 | 4212733618 | LA BANDERA RANCH 1H | Shut In |
| 42127336340000 | 4212733634 | LA BANDERA RANCH 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127336730000 | 4212733673 | LA BANDERA RANCH 3H | Producing |
| 42127337400000 | 4212733740 | LA BANDERA RANCH 4H | Producing |
| 42127338090000 | 4212733809 | LA BANDERA RANCH 5H | Producing |
| 42127339090000 | 4212733909 | LA BANDERA RANCH 6H | Shut In |
| 42127342040000 | 4212734204 | LA BANDERA RANCH 7H | Producing |
| 42127344020000 | 4212734402 | LA BANDERA RANCH 8H | Producing |
| 42127346290000 | 4212734629 | LA BANDERA RANCH 9H | Producing |
| 42127351170000 | 4212735117 | LA BANDERA RANCH UNIT A 1H | Producing |
| 42127350910000 | 4212735091 | LA BANDERA RANCH UNIT A 2H | Producing |
| 42127351130100 | 4212735113 | LA BANDERA RANCH UNIT A 3H | Producing |
| 42127355550000 | 4212735555 | LA BANDERA RANCH UNIT A 4H | Producing |
| 42127355560000 | 4212735556 | LA BANDERA RANCH UNIT A 5H | Producing |
| 42127355580000 | 4212735558 | LA BANDERA RANCH UNIT A 6H | Producing |
| 42127363310000 | 4212736331 | LA BANDERA RANCH UNIT A 7H | Producing |
| 42127363320000 | 4212736332 | LA BANDERA RANCH UNIT A 8H | Producing |
| 42127365860000 | 4212736586 | LA BANDERA RANCH UNIT B 1H | Producing |
| 42127365870000 | 4212736587 | LA BANDERA RANCH UNIT B 2H | Producing |
| 42127365880000 | 4212736588 | LA BANDERA RANCH UNIT B 3H | Producing |
| 42127365890000 | 4212736589 | LA BANDERA RANCH UNIT B 4H | Producing |
| 42127365900000 | 4212736590 | LA BANDERA RANCH UNIT B 5H | Producing |
| 42127365310000 | 4212736531 | LA BANDERA RANCH UNIT B 6H | Producing |
| 42127365320000 | 4212736532 | LA BANDERA RANCH UNIT B 7H | Producing |
| 42127365330000 | 4212736533 | LA BANDERA RANCH UNIT B 8H | Producing |
| 42127365340000 | 4212736534 | LA BANDERA RANCH UNIT B 9H | Producing |
| 42127376520000 | 4212737652 | LA BANDERA RANCH UNIT C 07HT | Producing |
| 42127376530000 | 4212737653 | LA BANDERA RANCH UNIT C 07HU | Producing |
| 42127376540000 | 4212737654 | LA BANDERA RANCH UNIT C 07HV | Producing |
| 42127376550000 | 4212737655 | LA BANDERA RANCH UNIT C 07HW | Producing |
| 42127376560000 | 4212737656 | LA BANDERA RANCH UNIT C 07HX | Producing |
| 42127376570000 | 4212737657 | LA BANDERA RANCH UNIT C 07HY | Producing |
| 42127381210000 | 4212738121 | LA BANDERA RANCH UNIT D 01HX | Producing |
| 42127381220000 | 4212738122 | LA BANDERA RANCH UNIT D 01HY | Producing |
| 42127381230000 | 4212738123 | LA BANDERA RANCH UNIT D 01HZ | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42323334520100 | 4232333452 | LLOYD BRISCOE 1H | Producing |
| 42323334510000 | 4232333451 | LLOYD BRISCOE 2H | Producing |
| 42323334500000 | 4232333450 | LLOYD BRISCOE 3H | Producing |
| 42127367950000 | 4212736795 | MAUND RANCH 18 UNIT 1H | Producing |
| 42127367960000 | 4212736796 | MAUND RANCH 18 UNIT 2H | Producing |
| 42127367990000 | 4212736799 | MAUND RANCH 18 UNIT 3H | Producing |
| 42127368000000 | 4212736800 | MAUND RANCH 18 UNIT 4H | Producing |
| 42127368010000 | 4212736801 | MAUND RANCH 18 UNIT 5H | Producing |
| 42127368030000 | 4212736803 | MAUND RANCH 18 UNIT 6H | Producing |
| 42127368040000 | 4212736804 | MAUND RANCH 18 UNIT 7H | Producing |
| 42127368050000 | 4212736805 | MAUND RANCH 18 UNIT 8H | Producing |
| 42127368060000 | 4212736806 | MAUND RANCH 18 UNIT 9H | Producing |
| 42127339990000 | 4212733999 | MAUND RANCH 19 UNIT 2H | Producing |
| 42127343870000 | 4212734387 | MAUND RANCH 19 UNIT 3H | Producing |
| 42127342640000 | 4212734264 | MAUND RANCH 19 UNIT 4H | Producing |
| 42127355530000 | 4212735553 | MAUND RANCH 19 UNIT 5H | Producing |
| 42127355540000 | 4212735554 | MAUND RANCH 19 UNIT 6H | Producing |
| 42127354960000 | 4212735496 | MAUND RANCH 23 UNIT 10H | Producing |
| 42127354970000 | 4212735497 | MAUND RANCH 23 UNIT 11H | Producing |
| 42127354980000 | 4212735498 | MAUND RANCH 23 UNIT 12H | Producing |
| 42127354320000 | 4212735432 | MAUND RANCH 23 UNIT 1H | Producing |
| 42127354330000 | 4212735433 | MAUND RANCH 23 UNIT 2H | Producing |
| 42127354350000 | 4212735435 | MAUND RANCH 23 UNIT 3H | Temporarily Abandoned |
| 42127354370000 | 4212735437 | MAUND RANCH 23 UNIT 4H | Producing |
| 42127354360000 | 4212735436 | MAUND RANCH 23 UNIT 5H | Producing |
| 42127354340000 | 4212735434 | MAUND RANCH 23 UNIT 6H | Producing |
| 42127354940000 | 4212735494 | MAUND RANCH 23 UNIT 7H | Producing |
| 42127354930000 | 4212735493 | MAUND RANCH 23 UNIT 8H | Producing |
| 42127354950000 | 4212735495 | MAUND RANCH 23 UNIT 9H | Producing |
| 42127361330000 | 4212736133 | MAUND RANCH 26 UNIT 10H | Producing |
| 42127361240000 | 4212736124 | MAUND RANCH 26 UNIT 1H | Producing |
| 42127361230000 | 4212736123 | MAUND RANCH 26 UNIT 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361250000 | 4212736125 | MAUND RANCH 26 UNIT 3H | Producing |
| 42127361260000 | 4212736126 | MAUND RANCH 26 UNIT 4H | Producing |
| 42127361270000 | 4212736127 | MAUND RANCH 26 UNIT 5H | Producing |
| 42127361280000 | 4212736128 | MAUND RANCH 26 UNIT 6H | Producing |
| 42127361290000 | 4212736129 | MAUND RANCH 26 UNIT 7H | Producing |
| 42127361300000 | 4212736130 | MAUND RANCH 26 UNIT 8H | Producing |
| 42127361310000 | 4212736131 | MAUND RANCH 26 UNIT 9H | Producing |
| 42127371070000 | 4212737107 | MAUND RANCH 27 UNIT 1H | Producing |
| 42127371080000 | 4212737108 | MAUND RANCH 27 UNIT 2H | Producing |
| 42127371030000 | 4212737103 | MAUND RANCH 27 UNIT 3H | Producing |
| 42127371040000 | 4212737104 | MAUND RANCH 27 UNIT 4H | Producing |
| 42127371050000 | 4212737105 | MAUND RANCH 27 UNIT 5H | Producing |
| 42127371060000 | 4212737106 | MAUND RANCH 27 UNIT 6H | Producing |
| 42127338660000 | 4212733866 | MAUND RANCH 27 UNIT 7H | Producing |
| 42127371090000 | 4212737109 | MAUND RANCH 27 UNIT 8H | Producing |
| 42127371100000 | 4212737110 | MAUND RANCH 27 UNIT 9H | Producing |
| 42127349110000 | 4212734911 | RANCHO ENCANTADO 10H | Producing |
| 42127349150000 | 4212734915 | RANCHO ENCANTADO 11H | Producing |
| 42127341610000 | 4212734161 | RANCHO ENCANTADO 12H | Producing |
| 42127341620000 | 4212734162 | RANCHO ENCANTADO 13H | Producing |
| 42127349430000 | 4212734943 | RANCHO ENCANTADO 14H | Producing |
| 42127349440000 | 4212734944 | RANCHO ENCANTADO 15H | Producing |
| 42127349450000 | 4212734945 | RANCHO ENCANTADO 16H | Producing |
| 42127341810000 | 4212734181 | RANCHO ENCANTADO 17H | Producing |
| 42127341820000 | 4212734182 | RANCHO ENCANTADO 18H | Producing |
| 42127341830000 | 4212734183 | RANCHO ENCANTADO 19H | Shut In |
| 42127337290000 | 4212733729 | RANCHO ENCANTADO 1H | Producing |
| 42127341840000 | 4212734184 | RANCHO ENCANTADO 20H | Producing |
| 42127341850000 | 4212734185 | RANCHO ENCANTADO 21H | Producing |
| 42127342110000 | 4212734211 | RANCHO ENCANTADO 22H | Producing |
| 42127342130000 | 4212734213 | RANCHO ENCANTADO 23H | Temporarily Abandoned |
| 42127342140000 | 4212734214 | RANCHO ENCANTADO 24H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127342150000 | 4212734215 | RANCHO ENCANTADO 25H | Producing |
| 42127342170000 | 4212734217 | RANCHO ENCANTADO 26H | Producing |
| 42127342180000 | 4212734218 | RANCHO ENCANTADO 27H | Producing |
| 42127343310000 | 4212734331 | RANCHO ENCANTADO 28H | Producing |
| 42127353280000 | 4212735328 | RANCHO ENCANTADO 29H | Producing |
| 42127353290000 | 4212735329 | RANCHO ENCANTADO 30H | Producing |
| 42127353340000 | 4212735334 | RANCHO ENCANTADO 31H | Producing |
| 42127353350000 | 4212735335 | RANCHO ENCANTADO 32H | Producing |
| 42127353360000 | 4212735336 | RANCHO ENCANTADO 33H | Producing |
| 42127359810000 | 4212735981 | RANCHO ENCANTADO 34H | Producing |
| 42127359820000 | 4212735982 | RANCHO ENCANTADO 35H | Producing |
| 42127359850000 | 4212735985 | RANCHO ENCANTADO 36H | Producing |
| 42127359870000 | 4212735987 | RANCHO ENCANTADO 37H | Producing |
| 42127359880000 | 4212735988 | RANCHO ENCANTADO 38H | Producing |
| 42127338330000 | 4212733833 | RANCHO ENCANTADO 3H | Producing |
| 42127338340000 | 4212733834 | RANCHO ENCANTADO 4H | Producing |
| 42127338350000 | 4212733835 | RANCHO ENCANTADO 5H | Producing |
| 42127339640000 | 4212733964 | RANCHO ENCANTADO 6H | Producing |
| 42127339610000 | 4212733961 | RANCHO ENCANTADO 7H | Temporarily Abandoned |
| 42127339650000 | 4212733965 | RANCHO ENCANTADO 8H | Producing |
| 42127349100000 | 4212734910 | RANCHO ENCANTADO 9H | Producing |
| 42127370690000 | 4212737069 | RANCHO ENCANTADO UNIT A 39H | Producing |
| 42127370680000 | 4212737068 | RANCHO ENCANTADO UNIT A 40H | Producing |
| 42127370660000 | 4212737066 | RANCHO ENCANTADO UNIT A 41H | Producing |
| 42127370670000 | 4212737067 | RANCHO ENCANTADO UNIT A 42H | Producing |
| 42127370650000 | 4212737065 | RANCHO ENCANTADO UNIT A 43H | Producing |
| 42127344250000 | 4212734425 | ROGERS DENTONIO 16 UNIT 1H | Producing |
| 42127344260000 | 4212734426 | ROGERS DENTONIO 16 UNIT 2H | Producing |
| 42127344310000 | 4212734431 | ROGERS DENTONIO 16 UNIT 3H | Producing |
| 42127354120000 | 4212735412 | ROGERS DENTONIO 16 UNIT 4H | Producing |
| 42127354160000 | 4212735416 | ROGERS DENTONIO 16 UNIT 5H | Producing |
| 42127354170000 | 4212735417 | ROGERS DENTONIO 16 UNIT 6H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127354130000 | 4212735413 | ROGERS DENTONIO 16 UNIT 7H | Producing |
| 42127354140000 | 4212735414 | ROGERS DENTONIO 16 UNIT 8H | Producing |
| 42127354150000 | 4212735415 | ROGERS DENTONIO 16 UNIT 9H | Producing |
| 42127378350000 | 4212737835 | ROGERS DENTONIO 29 UNIT 02HE | Producing |
| 42127378360000 | 4212737836 | ROGERS DENTONIO 29 UNIT 02HF | Producing |
| 42127378430000 | 4212737843 | ROGERS DENTONIO 29 UNIT 02HG | Producing |
| 42127375290000 | 4212737529 | ROGERS DENTONIO 31 UNIT 01HA | Producing |
| 42127375300200 | 4212737530 | ROGERS DENTONIO 31 UNIT 01HB | Producing |
| 42127375310000 | 4212737531 | ROGERS DENTONIO 31 UNIT 01HC | Shut In |
| 42127375330000 | 4212737533 | ROGERS DENTONIO 31 UNIT 01HD | Producing |
| 42127370440000 | 4212737044 | ROGERS DENTONIO 31 UNIT 10H | Producing |
| 42127370450000 | 4212737045 | ROGERS DENTONIO 31 UNIT 11H | Producing |
| 42127370350000 | 4212737035 | ROGERS DENTONIO 31 UNIT 1H | Producing |
| 42127370360000 | 4212737036 | ROGERS DENTONIO 31 UNIT 2H | Producing |
| 42127370370000 | 4212737037 | ROGERS DENTONIO 31 UNIT 3H | Producing |
| 42127370380100 | 4212737038 | ROGERS DENTONIO 31 UNIT 4H | Producing |
| 42127370390000 | 4212737039 | ROGERS DENTONIO 31 UNIT 5H | Producing |
| 42127370400000 | 4212737040 | ROGERS DENTONIO 31 UNIT 6H | Producing |
| 42127370410000 | 4212737041 | ROGERS DENTONIO 31 UNIT 7H | Producing |
| 42127370420000 | 4212737042 | ROGERS DENTONIO 31 UNIT 8H | Producing |
| 42127370430000 | 4212737043 | ROGERS DENTONIO 31 UNIT 9H | Producing |
| 42127360060000 | 4212736006 | ROGERS DENTONIO 32 UNIT 10H | Producing |
| 42127359970000 | 4212735997 | ROGERS DENTONIO 32 UNIT 1H | Producing |
| 42127359980000 | 4212735998 | ROGERS DENTONIO 32 UNIT 2H | Producing |
| 42127359990000 | 4212735999 | ROGERS DENTONIO 32 UNIT 3H | Producing |
| 42127360000000 | 4212736000 | ROGERS DENTONIO 32 UNIT 4H | Producing |
| 42127360010000 | 4212736001 | ROGERS DENTONIO 32 UNIT 5H | Producing |
| 42127360020000 | 4212736002 | ROGERS DENTONIO 32 UNIT 6H | Producing |
| 42127360030000 | 4212736003 | ROGERS DENTONIO 32 UNIT 7H | Producing |
| 42127360040000 | 4212736004 | ROGERS DENTONIO 32 UNIT 8H | Producing |
| 42127360050000 | 4212736005 | ROGERS DENTONIO 32 UNIT 9H | Producing |
| 42127360220000 | 4212736022 | ROGERS DENTONIO 33 UNIT 10H | Producing |
| 42127360230000 | 4212736023 | ROGERS DENTONIO 33 UNIT 11H | Producing |

Case 23-90086 Document 1633 Filed in TXSB on 05/16/22 Page 2419 of 1867

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127360130000 | 4212736013 | ROGERS DENTONIO 33 UNIT 1H | Producing |
| 42127360140000 | 4212736014 | ROGERS DENTONIO 33 UNIT 2H | Producing |
| 42127360150000 | 4212736015 | ROGERS DENTONIO 33 UNIT 3H | Producing |
| 42127360160000 | 4212736016 | ROGERS DENTONIO 33 UNIT 4H | Producing |
| 42127360170000 | 4212736017 | ROGERS DENTONIO 33 UNIT 5H | Producing |
| 42127360180000 | 4212736018 | ROGERS DENTONIO 33 UNIT 6H | Producing |
| 42127360190000 | 4212736019 | ROGERS DENTONIO 33 UNIT 7H | Producing |
| 42127360200000 | 4212736020 | ROGERS DENTONIO 33 UNIT 8H | Producing |
| 42127360210000 | 4212736021 | ROGERS DENTONIO 33 UNIT 9H | Producing |
| 42127342490000 | 4212734249 | ROGERS DENTONIO RANCH 12H | Producing |
| 42127342510000 | 4212734251 | ROGERS DENTONIO RANCH 13H | Producing |
| 42127341360000 | 4212734136 | ROGERS DENTONIO RANCH 14H | Producing |
| 42127341370000 | 4212734137 | ROGERS DENTONIO RANCH 15H | Producing |
| 42127342520000 | 4212734252 | ROGERS DENTONIO RANCH 16H | Producing |
| 42127336360000 | 4212733636 | ROGERS DENTONIO RANCH 1H | Shut In |
| 42127336790000 | 4212733679 | ROGERS DENTONIO RANCH 2H | Shut In |
| 42127338450000 | 4212733845 | ROGERS DENTONIO RANCH 3H | Producing |
| 42127338460000 | 4212733846 | ROGERS DENTONIO RANCH 4H | Producing |
| 42127338470000 | 4212733847 | ROGERS DENTONIO RANCH 5H | Producing |
| 42127338640000 | 4212733864 | ROGERS DENTONIO RANCH 6H | Producing |
| 42127336330000 | 4212733633 | SOUTH SPUR RANCH 1H | Producing |
| 42127338650000 | 4212733865 | SOUTH SPUR RANCH 2H | Producing |
| 42127363740000 | 4212736374 | SOUTH SPUR RANCH 3H | Producing |
| 42127363750000 | 4212736375 | SOUTH SPUR RANCH 4H | Producing |
| 42127336600000 | 4212733660 | SOUTH SPUR STATE 1H | Producing |
| 42127336860000 | 4212733686 | SOUTH SPUR STATE 2H | Producing |
| 42127338270000 | 4212733827 | SOUTH SPUR STATE 3H | Producing |
| 42127338280000 | 4212733828 | SOUTH SPUR STATE 4H | Temporarily Abandoned |
| 42127344650000 | 4212734465 | SOUTH SPUR STATE 5H | Producing |
| 42127344640000 | 4212734464 | SOUTH SPUR STATE 6H | Producing |
| 42127344660000 | 4212734466 | SOUTH SPUR STATE 7H | Producing |
| 42127341040000 | 4212734104 | SOUTH SPUR UNIT A 1H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127342160000 | 4212734216 | SOUTH SPUR UNIT A 2H | Producing |
| 42127344530000 | 4212734453 | SOUTH SPUR UNIT A 3H | Producing |
| 42127346750000 | 4212734675 | SOUTH SPUR UNIT A 4H | Producing |
| 42127346770000 | 4212734677 | SOUTH SPUR UNIT A 5H | Producing |
| 42127346760000 | 4212734676 | SOUTH SPUR UNIT A 6H | Producing |
| 42127354780000 | 4212735478 | SOUTH SPUR UNIT A 7H | Producing |
| 42127354790000 | 4212735479 | SOUTH SPUR UNIT A 8H | Producing |
| 42127354800000 | 4212735480 | SOUTH SPUR UNIT A 9H | Producing |
| 42127374840100 | 4212737484 | SOUTH SPUR UNIT B 01HY | Producing |
| 42127374830000 | 4212737483 | SOUTH SPUR UNIT B 01HZ | Producing |
| 42127374630100 | 4212737463 | SOUTH SPUR UNIT B 02HX | Producing |
| 42127374640000 | 4212737464 | SOUTH SPUR UNIT B 02HY | Producing |
| 42127374550000 | 4212737455 | SOUTH SPUR UNIT B 02HZ | Producing |
| 42127366840000 | 4212736684 | SOUTH SPUR UNIT B 10H | Producing |
| 42127366760000 | 4212736676 | SOUTH SPUR UNIT B 1H | Producing |
| 42127366770000 | 4212736677 | SOUTH SPUR UNIT B 2H | Producing |
| 42127366780000 | 4212736678 | SOUTH SPUR UNIT B 3H | Producing |
| 42127366790000 | 4212736679 | SOUTH SPUR UNIT B 4H | Producing |
| 42127366800000 | 4212736680 | SOUTH SPUR UNIT B 5H | Producing |
| 42127366810000 | 4212736681 | SOUTH SPUR UNIT B 6H | Producing |
| 42127366820000 | 4212736682 | SOUTH SPUR UNIT B 7H | Producing |
| 42127366830000 | 4212736683 | SOUTH SPUR UNIT B 8H | Producing |
| 42127369360000 | 4212736936 | SOUTH SPUR UNIT B 9H | Producing |
| 42479414280000 | 4247941428 | STANLEY RANCH 10H | Producing |
| 42479414290000 | 4247941429 | STANLEY RANCH 11H | Producing |
| 42479414300000 | 4247941430 | STANLEY RANCH 12H | Producing |
| 42479414310000 | 4247941431 | STANLEY RANCH 13H | Producing |
| 42479414320000 | 4247941432 | STANLEY RANCH 14H | Producing |
| 42479414330000 | 4247941433 | STANLEY RANCH 15H | Producing |
| 42479414340000 | 4247941434 | STANLEY RANCH 16H | Producing |
| 42479414220000 | 4247941422 | STANLEY RANCH 17H | Producing |
| 42479414240000 | 4247941424 | STANLEY RANCH 18H | Producing |
| 42479414230000 | 4247941423 | STANLEY RANCH 19H | Producing |

Case 23-90086 Document 1363-4 Filed in TXSB on 10/17/22 Page 1151 of 1867

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479407420000 | 4247940742 | STANLEY RANCH 1H | Producing |
| 42479414260000 | 4247941426 | STANLEY RANCH 20H | Producing |
| 42479411290000 | 4247941129 | STANLEY RANCH 21H | Producing |
| 42479411300000 | 4247941130 | STANLEY RANCH 22H | Producing |
| 42479411310000 | 4247941131 | STANLEY RANCH 23H | Producing |
| 42479412310000 | 4247941231 | STANLEY RANCH 24H | Producing |
| 42479412410000 | 4247941241 | STANLEY RANCH 25H | Producing |
| 42479423830000 | 4247942383 | STANLEY RANCH 26H | Producing |
| 42479423840000 | 4247942384 | STANLEY RANCH 27H | Producing |
| 42479422930000 | 4247942293 | STANLEY RANCH 28H | Producing |
| 42479421610100 | 4247942161 | STANLEY RANCH 29H | Shut In |
| 42479409400000 | 4247940940 | STANLEY RANCH 2H | Producing |
| 42479424490000 | 4247942449 | STANLEY RANCH 30H | Producing |
| 42479424500000 | 4247942450 | STANLEY RANCH 31H | Producing |
| 42479410510000 | 4247941051 | STANLEY RANCH 3H | Producing |
| 42479419070000 | 4247941907 | STANLEY RANCH 43H | Producing |
| 42479419600000 | 4247941960 | STANLEY RANCH 44H | Producing |
| 42479424560000 | 4247942456 | STANLEY RANCH 45H | Producing |
| 42479424580000 | 4247942458 | STANLEY RANCH 46H | Producing |
| 42479424570000 | 4247942457 | STANLEY RANCH 47H | Producing |
| 42479417190000 | 4247941719 | STANLEY RANCH 48H | Producing |
| 42479417230000 | 4247941723 | STANLEY RANCH 49H | Producing |
| 42479410530000 | 4247941053 | STANLEY RANCH 4H | Producing |
| 42479417220000 | 4247941722 | STANLEY RANCH 50H | Producing |
| 42479417270000 | 4247941727 | STANLEY RANCH 51H | Producing |
| 42479417280000 | 4247941728 | STANLEY RANCH 52H | Producing |
| 42479417290000 | 4247941729 | STANLEY RANCH 53H | Producing |
| 42479416960000 | 4247941696 | STANLEY RANCH 54H | Producing |
| 42479416930000 | 4247941693 | STANLEY RANCH 55H | Producing |
| 42479416950000 | 4247941695 | STANLEY RANCH 56H | Producing |
| 42479416830000 | 4247941683 | STANLEY RANCH 57H | Producing |
| 42479416840000 | 4247941684 | STANLEY RANCH 58H | Producing |
| 42479416850000 | 4247941685 | STANLEY RANCH 59H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479410540000 | 4247941054 | STANLEY RANCH 5H | Producing |
| 42479416600000 | 4247941660 | STANLEY RANCH 60H | Producing |
| 42479416610000 | 4247941661 | STANLEY RANCH 61H | Producing |
| 42479416630000 | 4247941663 | STANLEY RANCH 62H | Producing |
| 42479428750000 | 4247942875 | STANLEY RANCH 63H | Producing |
| 42479414210000 | 4247941421 | STANLEY RANCH 6H | Producing |
| 42479414350000 | 4247941435 | STANLEY RANCH 7H | Producing |
| 42479414360000 | 4247941436 | STANLEY RANCH 8H | Producing |
| 42479414370000 | 4247941437 | STANLEY RANCH 9H | Producing |
| 42127342330000 | 4212734233 | STUMBERG RANCH 10H | Producing |
| 42127342350000 | 4212734235 | STUMBERG RANCH 11H | Producing |
| 42127342340000 | 4212734234 | STUMBERG RANCH 12H | Producing |
| 42127343690000 | 4212734369 | STUMBERG RANCH 16H | Producing |
| 42127382420000 | 4212738242 | STUMBERG RANCH 16HA | Producing |
| 42127382430000 | 4212738243 | STUMBERG RANCH 16HB | Producing |
| 42127382440000 | 4212738244 | STUMBERG RANCH 16HC | Producing |
| 42127382450000 | 4212738245 | STUMBERG RANCH 16HD | Producing |
| 42127382460000 | 4212738246 | STUMBERG RANCH 16HE | Producing |
| 42127343700000 | 4212734370 | STUMBERG RANCH 17H | Producing |
| 42127343710000 | 4212734371 | STUMBERG RANCH 18H | Producing |
| 42127346110000 | 4212734611 | STUMBERG RANCH 19H | Producing |
| 42127337170000 | 4212733717 | STUMBERG RANCH 1H | Producing |
| 42127346120000 | 4212734612 | STUMBERG RANCH 20H | Producing |
| 42127346130000 | 4212734613 | STUMBERG RANCH 21H | Producing |
| 42127346140000 | 4212734614 | STUMBERG RANCH 22H | Producing |
| 42127346150000 | 4212734615 | STUMBERG RANCH 23H | Producing |
| 42127346160000 | 4212734616 | STUMBERG RANCH 24H | Producing |
| 42127346190000 | 4212734619 | STUMBERG RANCH 25H | Producing |
| 42127346200100 | 4212734620 | STUMBERG RANCH 26H | Producing |
| 42127347100000 | 4212734710 | STUMBERG RANCH 27HR | Producing |
| 42127346230000 | 4212734623 | STUMBERG RANCH 28H | Producing |
| 42127346240100 | 4212734624 | STUMBERG RANCH 29H | Producing |
| 42127337190000 | 4212733719 | STUMBERG RANCH 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127346650000 | 4212734665 | STUMBERG RANCH 30H | Producing |
| 42127346680000 | 4212734668 | STUMBERG RANCH 31H | Producing |
| 42127346660000 | 4212734666 | STUMBERG RANCH 32H | Producing |
| 42127346670000 | 4212734667 | STUMBERG RANCH 33H | Producing |
| 42127346700000 | 4212734670 | STUMBERG RANCH 34H | Producing |
| 42127346690000 | 4212734669 | STUMBERG RANCH 35H | Producing |
| 42127357720000 | 4212735772 | STUMBERG RANCH 36H | Producing |
| 42127357740000 | 4212735774 | STUMBERG RANCH 37H | Producing |
| 42127357750000 | 4212735775 | STUMBERG RANCH 38H | Producing |
| 42127357760000 | 4212735776 | STUMBERG RANCH 39H | Producing |
| 42127337250000 | 4212733725 | STUMBERG RANCH 3H | Producing |
| 42127358270000 | 4212735827 | STUMBERG RANCH 40H | Producing |
| 42127358290000 | 4212735829 | STUMBERG RANCH 41H | Producing |
| 42127358300000 | 4212735830 | STUMBERG RANCH 42H | Producing |
| 42127358310000 | 4212735831 | STUMBERG RANCH 43H | Producing |
| 42127358320000 | 4212735832 | STUMBERG RANCH 44H | Producing |
| 42127358330000 | 4212735833 | STUMBERG RANCH 45H | Producing |
| 42127358380000 | 4212735838 | STUMBERG RANCH 46H | Producing |
| 42127358390000 | 4212735839 | STUMBERG RANCH 47H | Producing |
| 42127358400000 | 4212735840 | STUMBERG RANCH 48H | Producing |
| 42127358410000 | 4212735841 | STUMBERG RANCH 49H | Producing |
| 42127337180000 | 4212733718 | STUMBERG RANCH 4H | Temporarily Abandoned |
| 42127339330000 | 4212733933 | STUMBERG RANCH 4HR | Producing |
| 42127358420000 | 4212735842 | STUMBERG RANCH 50H | Producing |
| 42127358430000 | 4212735843 | STUMBERG RANCH 51H | Producing |
| 42127358440000 | 4212735844 | STUMBERG RANCH 52H | Temporarily Abandoned |
| 42127371200000 | 4212737120 | STUMBERG RANCH 52HR | Producing |
| 42127372190000 | 4212737219 | STUMBERG RANCH 53H | Producing |
| 42127372220000 | 4212737222 | STUMBERG RANCH 54H | Producing |
| 42127372200000 | 4212737220 | STUMBERG RANCH 55H | Producing |
| 42127372210000 | 4212737221 | STUMBERG RANCH 56H | Producing |
| 42127339340000 | 4212733934 | STUMBERG RANCH 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339350000 | 4212733935 | STUMBERG RANCH 6H | Producing |
| 42127339790000 | 4212733979 | STUMBERG RANCH 7H | Producing |
| 42127339770000 | 4212733977 | STUMBERG RANCH 8H | Producing |
| 42127339780000 | 4212733978 | STUMBERG RANCH 9H | Producing |
| 42127355190000 | 4212735519 | STUMBERG RANCH UNIT A 1H | Producing |
| 42127355200000 | 4212735520 | STUMBERG RANCH UNIT A 2H | Producing |
| 42127355210000 | 4212735521 | STUMBERG RANCH UNIT A 3H | Producing |
| 42127355400000 | 4212735540 | STUMBERG RANCH UNIT A 4H | Producing |
| 42127355410000 | 4212735541 | STUMBERG RANCH UNIT A 5H | Producing |
| 42127355420000 | 4212735542 | STUMBERG RANCH UNIT A 6H | Producing |
| 42127355430000 | 4212735543 | STUMBERG RANCH UNIT A 7H | Producing |
| 42127356110000 | 4212735611 | STUMBERG RANCH UNIT B 1H | Producing |
| 42127356120000 | 4212735612 | STUMBERG RANCH UNIT B 2H | Producing |
| 42127356130000 | 4212735613 | STUMBERG RANCH UNIT B 3H | Producing |
| 42127356140000 | 4212735614 | STUMBERG RANCH UNIT B 4H | Producing |
| 42127356150000 | 4212735615 | STUMBERG RANCH UNIT B 5H | Producing |
| 42127356160000 | 4212735616 | STUMBERG RANCH UNIT B 6H | Producing |
| 42127356170000 | 4212735617 | STUMBERG RANCH UNIT B 7H | Producing |
| 42127367000000 | 4212736700 | STUMBERG RANCH UNIT C 10H | Producing |
| 42127368360000 | 4212736836 | STUMBERG RANCH UNIT C 11H | Producing |
| 42127368370000 | 4212736837 | STUMBERG RANCH UNIT C 12H | Producing |
| 42127368350000 | 4212736835 | STUMBERG RANCH UNIT C 13H | Producing |
| 42127368380000 | 4212736838 | STUMBERG RANCH UNIT C 14H | Producing |
| 42127368390000 | 4212736839 | STUMBERG RANCH UNIT C 15H | Producing |
| 42127366900000 | 4212736690 | STUMBERG RANCH UNIT C 1H | Producing |
| 42127366910000 | 4212736691 | STUMBERG RANCH UNIT C 2H | Producing |
| 42127366920000 | 4212736692 | STUMBERG RANCH UNIT C 3H | Producing |
| 42127366930000 | 4212736693 | STUMBERG RANCH UNIT C 4H | Producing |
| 42127366940000 | 4212736694 | STUMBERG RANCH UNIT C 5H | Producing |
| 42127366960000 | 4212736696 | STUMBERG RANCH UNIT C 6H | Producing |
| 42127366970000 | 4212736697 | STUMBERG RANCH UNIT C 7H | Producing |
| 42127366980000 | 4212736698 | STUMBERG RANCH UNIT C 8H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127366990000 | 4212736699 | STUMBERG RANCH UNIT C 9H | Plugged and Abandoned |
| 42127379440000 | 4212737944 | STUMBERG RANCH UNIT D 01HA | Producing |
| 42127379460000 | 4212737946 | STUMBERG RANCH UNIT D 01HC | Producing |
| 42127379470000 | 4212737947 | STUMBERG RANCH UNIT D 01HD | Producing |
| 42127379480000 | 4212737948 | STUMBERG RANCH UNIT D 01HF | Producing |
| 42127379740000 | 4212737974 | STUMBERG RANCH UNIT D 02HA | Producing |
| 42127379750000 | 4212737975 | STUMBERG RANCH UNIT D 02HC | Producing |
| 42127379760000 | 4212737976 | STUMBERG RANCH UNIT D 02HD | Producing |
| 42127379780000 | 4212737978 | STUMBERG RANCH UNIT D 02HF | Producing |
| 42127379090000 | 4212737909 | STUMBERG RANCH UNIT E 01ER | Producing |
| 42127376380000 | 4212737638 | STUMBERG RANCH UNIT E 01HA | Temporarily Abandoned |
| 42127376390000 | 4212737639 | STUMBERG RANCH UNIT E 01HB | Producing |
| 42127376410000 | 4212737641 | STUMBERG RANCH UNIT E 01HC | Producing |
| 42127376500000 | 4212737650 | STUMBERG RANCH UNIT E 01HD | Producing |
| 42127376430000 | 4212737643 | STUMBERG RANCH UNIT E 01HE | Temporarily Abandoned |
| 42127376440000 | 4212737644 | STUMBERG RANCH UNIT E 01HF | Producing |
| 42127376450000 | 4212737645 | STUMBERG RANCH UNIT E 01HG | Producing |
| 42127376490000 | 4212737649 | STUMBERG RANCH UNIT E 01HH | Producing |
| 42323334200000 | 4232333420 | TOVAR WEST-LLOYD 34 B UNIT 1H | Producing |
| 42323333510000 | 4232333351 | TOVAR WEST-LLOYD 34 UNIT 1H | Producing |
| 42323333890000 | 4232333389 | TOVAR WEST-LLOYD 63 A UNIT 1H | Shut In |
| 42323334000000 | 4232333400 | TOVAR WEST-LLOYD 63 B UNIT 1H | Producing |
| 42323334110000 | 4232333411 | TOVAR WEST-LLOYD 69 A UNIT 1H | Producing |
| 42323333600000 | 4232333360 | TOVAR WEST-LLOYD 75 A UNIT 1H | Shut In |
| 42323333480000 | 4232333348 | TOVAR WEST-LLOYD 77 UNIT 1H | Producing |
| 42323333900000 | 4232333390 | TOVAR WEST-LLOYD 79 A UNIT 1H | Producing |
| 42323334150000 | 4232333415 | TOVAR WLC A UNIT 1H | Producing |
| 42323334170000 | 4232333417 | TOVAR WLC A UNIT 2H | Producing |
| 42323334160000 | 4232333416 | TOVAR WLC A UNIT 3H | Shut In |
| 42323334350000 | 4232333435 | TOVAR WLC A UNIT 4H | Producing |
| 42323334360000 | 4232333436 | TOVAR WLC A UNIT 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42323334370000 | 4232333437 | TOVAR WLC A UNIT 6H | Producing |
| 42323334380000 | 4232333438 | TOVAR WLC B UNIT 1H | Producing |
| 42323334390000 | 4232333439 | TOVAR WLC B UNIT 2H | Producing |
| 42323334400000 | 4232333440 | TOVAR WLC B UNIT 3H | Producing |
| 42479411070000 | 4247941107 | WORTHEY RANCH 10H | Producing |
| 42479415000000 | 4247941500 | WORTHEY RANCH 11H | Producing |
| 42479415010000 | 4247941501 | WORTHEY RANCH 12H | Producing |
| 42479415020000 | 4247941502 | WORTHEY RANCH 13H | Producing |
| 42479414820000 | 4247941482 | WORTHEY RANCH 14H | Producing |
| 42479414830000 | 4247941483 | WORTHEY RANCH 15H | Producing |
| 42479414840000 | 4247941484 | WORTHEY RANCH 16H | Producing |
| 42479411320000 | 4247941132 | WORTHEY RANCH 17H | Producing |
| 42479411330000 | 4247941133 | WORTHEY RANCH 18H | Producing |
| 42479411340000 | 4247941134 | WORTHEY RANCH 19H | Producing |
| 42479407550000 | 4247940755 | WORTHEY RANCH 1H | Producing |
| 42479413760000 | 4247941376 | WORTHEY RANCH 20H | Producing |
| 42479413770000 | 4247941377 | WORTHEY RANCH 21H | Producing |
| 42479413780000 | 4247941378 | WORTHEY RANCH 22H | Producing |
| 42479414870000 | 4247941487 | WORTHEY RANCH 23H | Producing |
| 42479414880000 | 4247941488 | WORTHEY RANCH 24H | Producing |
| 42479414890000 | 4247941489 | WORTHEY RANCH 25H | Producing |
| 42479415150000 | 4247941515 | WORTHEY RANCH 26H | Producing |
| 42479415170000 | 4247941517 | WORTHEY RANCH 27H | Producing |
| 42479415180000 | 4247941518 | WORTHEY RANCH 28H | Producing |
| 42479415210000 | 4247941521 | WORTHEY RANCH 29H | Producing |
| 42479409410000 | 4247940941 | WORTHEY RANCH 2H | Producing |
| 42479423410000 | 4247942341 | WORTHEY RANCH 30H | Producing |
| 42479423420000 | 4247942342 | WORTHEY RANCH 31H | Producing |
| 42479423440000 | 4247942344 | WORTHEY RANCH 32H | Producing |
| 42479424370000 | 4247942437 | WORTHEY RANCH 34H | Producing |
| 42479424380000 | 4247942438 | WORTHEY RANCH 35H | Producing |
| 42479424400000 | 4247942440 | WORTHEY RANCH 36H | Producing |
| 42479424360000 | 4247942436 | WORTHEY RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479413560000 | 4247941356 | WORTHEY RANCH 38H | Shut In |
| 42479423390000 | 4247942339 | WORTHEY RANCH 39H | Producing |
| 42479411190000 | 4247941119 | WORTHEY RANCH 3H | Producing |
| 42479423400000 | 4247942340 | WORTHEY RANCH 40H | Producing |
| 42479423470000 | 4247942347 | WORTHEY RANCH 41H | Producing |
| 42479423460000 | 4247942346 | WORTHEY RANCH 42H | Producing |
| 42479419060000 | 4247941906 | WORTHEY RANCH 43H | Producing |
| 42479421600000 | 4247942160 | WORTHEY RANCH 44H | Producing |
| 42479424840000 | 4247942484 | WORTHEY RANCH 45H | Producing |
| 42479424850000 | 4247942485 | WORTHEY RANCH 46H | Producing |
| 42479424860000 | 4247942486 | WORTHEY RANCH 47H | Producing |
| 42479424870000 | 4247942487 | WORTHEY RANCH 48H | Producing |
| 42479424880000 | 4247942488 | WORTHEY RANCH 49H | Producing |
| 42479411200000 | 4247941120 | WORTHEY RANCH 4H | Producing |
| 42479424890000 | 4247942489 | WORTHEY RANCH 50H | Producing |
| 42479424910000 | 4247942491 | WORTHEY RANCH 51H | Producing |
| 42479424810000 | 4247942481 | WORTHEY RANCH 52H | Temporarily Abandoned |
| 42479424800000 | 4247942480 | WORTHEY RANCH 53H | Producing |
| 42479424820000 | 4247942482 | WORTHEY RANCH 54H | Producing |
| 42479424830000 | 4247942483 | WORTHEY RANCH 55H | Producing |
| 42479420160000 | 4247942016 | WORTHEY RANCH 56H | Producing |
| 42479421310000 | 4247942131 | WORTHEY RANCH 57H | Producing |
| 42479409710000 | 4247940971 | WORTHEY RANCH 5H | Producing |
| 42479411080000 | 4247941108 | WORTHEY RANCH 6H | Producing |
| 42479411940000 | 4247941194 | WORTHEY RANCH 7H | Producing |
| 42479409830000 | 4247940983 | WORTHEY RANCH 8H | Producing |
| 42479410190000 | 4247941019 | WORTHEY RANCH 9H | Producing |

# <u>Annex C</u>
## Applicable Contracts

## Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP,<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 |

## ROW Interests

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141176000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 457 | 658 |
| 1141199000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/4/2012 | TX | Dimmit | 455 | 217 |
| 1138496000 | DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/5/2007 | TX | Dimmit | | |
| 1138497000 | RIO BRAVO LAND CO ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/29/2007 | TX | Maverick Dimmit | 1042 339 | 294 557 |
| 1138888000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 6/9/2006 | TX | Maverick Webb | | |
| 1139504000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2006 | TX | Dimmit | 356 | 172 |
| 1139555000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/22/2010 | TX | Dimmit La Salle | 430 619 | 310 173 |
| 1139556000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2010 | TX | Dimmit | 432 | 749 |
| 1139557000 | HUGH A FITZSIMONS III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/5/2009 | TX | Dimmit | | |
| 1139558000 | LABANDERA RANCH LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/23/2009 | TX | Dimmit | 408 | 567 |
| 1139825000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 415 |
| 1139838000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 420 |
| 1139839000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139840000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139841000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139961000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 140 |
| 1139962000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 82 |
| 1139963000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/6/2010 | TX | Dimmit | 399 | 219 |
| 1139964000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/22/2010 | TX | Dimmit | 397 | 749 |
| 1139965000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2010 | TX | Dimmit | 399 | 432 |
| 1139966000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/19/2011 | TX | Dimmit | 401 | 10 |
| 1139967000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 258 |
| 1139968000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 267 |
| 1140110000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/3/2011 | TX | Dimmit | 403 | 744 |
| 1140111000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Surface/Subsurface Wellbore | 3/3/2011 | TX | Dimmit | 403 | 744 |
| 1140122000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 280 |
| 1140123000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 290 |
| 1140124000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 486 |
| 1140125000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 497 |
| 1140152000 | DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 86 |
| 1140170000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 107 |
| 1140171000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 96 |
| 1140172000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 85 |
| 1140197000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2011 | TX | Maverick | 1313 | 159 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140225000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | O/G LSE-Surface Rights/Rentals | 12/1/2011 | TX | Dimmit | | |
| 1140226000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140227000 | STATE OF TEXAS | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Webb | | |
| 1140228000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/15/2008 | TX | Webb | | |
| 1140229000 | GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140230000 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140231000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/1/2009 | TX | Webb | | |
| 1140232000 | FITZSIMONS ENTITY ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/22/2005 | TX | Maverick | 1348 | 125 |
| 1140233000 | MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 59 |
| 1140234000 | RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/29/2009 | TX | Dimmit | | |
| 1140235000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 55 |
| 1140236000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 57 |
| 1140237000 | WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | | |
| 1140238000 | RIO BRAVO LAND CO | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/7/2011 | TX | Maverick | 1308 | 408 |
| 1140267000 | WILLIAM K SPARKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/13/2011 | TX | Dimmit | 419 | 161 |
| 1140299000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 239 |
| 1140300000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 230 |
| 1140301000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | | |
| 1140410000 | PRIME OPERATING COMPANY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/22/2011 | TX | Dimmit | | |
| 1140411000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 210 |
| 1140412000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 221 |
| 1140413000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1327 | 229 |
| 1140469000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1336 | 5 |
| 1140523000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/28/2010 | TX | Webb | 3225 | 480 |
| 1140584000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 131 |
| 1140585000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 140 |
| 1140663000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/22/2012 | TX | Dimmit<br>Dimmit | 445<br>467 | 672<br>227 |
| 1140664000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 677<br>234 |
| 1140665000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 682<br>241 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140666000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/20/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 687<br>248 |
| 1140667000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 692<br>255 |
| 1140742000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit | 455 | 246 |
| 1140744000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | La Salle | 660 | 161 |
| 1140766000 | ALBERT WILEY BLAKEWAY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2012 | TX | Dimmit | 444 | 127 |
| 1140767000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/13/2012 | TX | Dimmit | 444 | 271 |
| 1140768000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Webb<br>Dimmit | 3365<br>440 | 294<br>689 |
| 1140780000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 102 |
| 1140781000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 111 |
| 1140782000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 462 |
| 1140784000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 254 |
| 1140785000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 263 |
| 1140786000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/23/2011 | TX | Dimmit | 409 | 693 |
| 1140787000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/10/2011 | TX | Dimmit | 403 | 735 |
| 1140788000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 683 |
| 1140789000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/19/2012 | TX | Dimmit | 435 | 342 |
| 1140790000 | DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/18/2012 | TX | Dimmit | 442 | 413 |
| 1140807000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 444 | 278 |
| 1140809000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/1/2011 | TX | Webb | 3305 | 219 |
| 1140835000 | RANCHO ENCANTADO LP (unrecorded letter agreement) | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/12/2011 | TX | Dimmit | | |
| 1140836000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 371 |
| 1140837000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 361 |
| 1140838000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 351 |
| 1141016000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/10/2011 | TX | Dimmit | 450 | 511 |
| 1141017000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Dimmit | 450 | 502 |
| 1141018000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/31/2011 | TX | Dimmit | 450 | 154 |
| 1141020000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3255 | 547 |
| 1141025000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3294 | 556 |
| 1141135000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/20/2012 | TX | Dimmit | 459 | 339 |
| 1141139000 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/5/2012 | TX | Dimmit | 455 | 228 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141141000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Dimmit | 451 | 23 |
| 1141175000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 455 | 223 |
| 1141181000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Webb | 3371 | 851 |
| 1141182000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 716 |
| 1141197000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Maverick | 1382 | 344 |
| 1141198000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/15/2012 | TX | Dimmit | 459 | 303 |
| 1141200000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Dimmit | 459 | 308 |
| 1141201000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 257 |
| 1141202000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 253 |
| 1141203000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/19/2012 | TX | Dimmit | 459 | 297 |
| 1141204000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 706 |
| 1141205000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 240 |
| 1141206000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 667 |
| 1141236000 | RUDOLFO SANTOSCOY | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 448 | 361 |
| 1141238000 | M.P.T. | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/1/2012 | TX | Dimmit | 448 | 400 |
| 1141239000 | DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/25/2012 | TX | Dimmit | 448 | 413 |
| 1141385000 | LEONARD SCARCELLA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 448 | 370 |
| 1141386000 | JOHN MARK FACHORN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/6/2012 | TX | Dimmit | 448 | 376 |
| 1141387000 | REGINA LYNN ANDREWS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/8/2012 | TX | Dimmit | 448 | 394 |
| 1141388000 | RITA JO FRAILICKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 388 |
| 1141389000 | RENEE DAWN MEDINA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/16/2012 | TX | Dimmit | 448 | 382 |
| 1141390000 | STEVEN ROSS FACHORN ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 468 | 86 |
| 1141391000 | RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/10/2012 | TX | Dimmit | 462 | 657 |
| 1141432000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3390 | 329 |
| 1141446000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1340 | 312 |
| 1141544000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Dimmit | 468 | 92 |
| 1142246000 | CHARLES NOLAN SMITH ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/13/2014 | TX | Dimmit | 509 | 73 |
| 1140783000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 471 |
| 1141237000 | TEJAS SALES INTERNATIONAL LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 406 |
| 1141233000 | DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit (road bore) | 2/14/2013 | TX | Dimmit | | |
| 1141300000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/26/2013 | TX | Dimmit | 469 | 471 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141338000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 240 |
| 1141339000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 252 |
| 1141342000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 230 |
| 1141427000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/10/2013 | TX | Dimmit | 466 | 26 |
| 1141429000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/24/2013 | TX | Dimmit | 465 | 344 |
| 1141430000 | MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/22/2013 | TX | Dimmit | 465 | 352 |
| 1141431000 | DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 3/7/2013 | TX | Dimmit | | |
| 1141433000 | WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/15/2013 | TX | Dimmit | 469 | 479 |
| 1141434000 | MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 470 | 799 |
| 1141441000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 709 |
| 1141442000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 699 |
| 1141444000 | 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/15/2013 | TX | Dimmit | 473 | 794 |
| 1141447000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 828 |
| 1141448000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 814 |
| 1141449000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 787 |
| 1141450000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 807 |
| 1141451000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 835 |
| 1141471000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick<br>Dimmit | 1405<br>475 | 117<br>541 |
| 1141472000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick | 1408 | 69 |
| 1141498000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 478 | 80 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141541000 | THOMAS R BURANUM ET UX | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/25/2013 | TX | Dimmit | | |
| 1141543000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/11/2013 | TX | Dimmit | 480 | 800 |
| 1141587000 | SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/21/2013 | TX | Dimmit | 465 | 225 |
| 1141588000 | THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/25/2013 | TX | Dimmit | 473 | 406 |
| 1141589000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 380 |
| 1141590000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 390 |
| 1141591000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 195 |
| 1141592000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 186 |
| 1141593000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 168 |
| 1141594000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 177 |
| 1141595000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 661 |
| 1141596000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 670 |
| 1141597000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 614 |
| 1141598000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 623 |
| 1141599000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 632 |
| 1141683000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Webb | 3488 | 4 |
| 1141705000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 494 | 297 |
| 1141706000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 484 | 290 |
| 1141733000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/24/2011 | TX | Dimmit | 489 | 416 |
| 1141740000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/9/2013 | TX | Dimmit | 490 | 63 |
| 1141741000 | RANCHO ENCANTADO LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/17/2013 | TX | Dimmit | 490 | 74 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141742000 | FAITH RANCH LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 1418 | 225 |
| 1141743000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/8/2013 | TX | Maverick | 1418 | 249 |
| 1141771000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 11/25/2013 | TX | Webb | 3566 | 35 |
| 1141872000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/30/2013 | TX | Webb | 3526 | 510 |
| 1141877000 | WORTHEY PROPERTIES LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/12/2013 | TX | Webb | 3526 | 521 |
| 1141878000 | B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb | 3526 | 535 |
| 1141879000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/19/2013 | TX | Maverick | 1418 | 235 |
| 1141882000 | 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/6/2013 | TX | Dimmit<br>Maverick | 490<br>1430 | 81<br>290 |
| 1141887000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Dimmit | 496 | 434 |
| 1141888000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2013 | TX | Dimmit | 496 | 441 |
| 1141997000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 526 |
| 1141998000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 517 |
| 1141999000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 508 |
| 1142037000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2013 | TX | Dimmit | 503 | 46 |
| 1142038000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2014 | TX | Dimmit | 504 | 505 |
| 1142039000 | COTULLA LAND & INVESTMENTS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb<br>Dimmit | 3545<br>503 | 625<br>1 |
| 1142040000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/25/2013 | TX | Dimmit | 503 | 15 |
| 1142041000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Maverick | 1442 | 142 |
| 1142142000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/17/2014 | TX | Dimmit | 506 | 413 |
| 1142145000 | WORTHEY PROPERTIES LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2014 | TX | Webb | 3575 | 243 |
| 1142148000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 28 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1142149000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 21 |
| 1142151000 | BEINHORN JR FAMILY LIMTED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/6/2014 | TX | Dimmit | 508 | 35 |
| 1142152000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | La Salle | 775 | 18 |
| 1142153000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/7/2014 | TX | Maverick | 1447 | 251 |
| 1142154000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 261 |
| 1142155000 | B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/13/2014 | TX | Webb | 3582 | 516 |
| 1142258000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | Dimmit | 512 | 586 |
| 1142259000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 512 | 593 |
| 1142373000 | SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/15/2014 | TX | Dimmit | 514 | 784 |
| 1142374000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Dimmit La Salle | 508 792 | 169 468 |
| 1142394000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/21/2014 | TX | Dimmit | 517 | 52 |
| 1142397000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 820 |
| 1142398000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 800 |
| 1142399000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Dimmit | 513 | 599 |
| 1142400000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit | 513 | 663 |
| 1142401000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 49 |
| 1142402000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 56 |
| 1142558000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit Webb | 513 3639 | 624 843 |
| 1142559000 | COMANCHE MAVERICK RANCH INVESTMENTS LP | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 11/25/2013 | TX | Maverick | 1437 | 50 |
| 1142560000 | INDIO FAITH LAND CO LLC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 270 |
| 1340261000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2014 | TX | Dimmit | 520 | 781 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1341352000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Webb<br>Dimmit | 3672<br>570 | 306<br>539 |
| 1341359000 | RANCHO ENCANTADO LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/29/2014 | TX | Dimmit | | |
| 1347518000 | FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 759 |
| 1347530000 | FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 763 |
| 1349965000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 526 | 461 |
| 1350515000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2014 | TX | Dimmit | 539 | 191 |
| 1350568000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2014 | TX | Dimmit | 539 | 198 |
| 1350575000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 107 |
| 1350580000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 100 |
| 1350582000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 540 | 754 |
| 1350613000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 0540 | 0761 |
| 1351039000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/12/2012 | TX | Dimmit | 531 | 108 |
| 1351042000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/5/2013 | TX | Dimmit | 529 | 510 |
| 1351043000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 531 | 103 |
| 1351044000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 124 |
| 1351045000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 117 |
| 1351046000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 131 |
| 1351047000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/11/2014 | TX | Dimmit | 526 | 456 |
| 1351064000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 98 |
| 1351250000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/29/2012 | TX | Dimmit | 537 | 604 |
| 1351252000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 537 | 599 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1351254000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/19/2012 | TX | Dimmit | 537 | 616 |
| 1351255000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/23/2015 | TX | Webb | 3752 | 159 |
| 1351256000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/2/2014 | TX | Dimmit | 529 | 517 |
| 1351258000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/26/2012 | TX | Dimmit | 537 | 609 |
| 1351259000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/14/2014 | TX | Dimmit | 529 | 505 |
| 1351260000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/23/2015 | TX | Dimmit | 540 | 768 |
| 1351285000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/11/2015 | TX | Dimmit | 541 | 114 |
| 1352817000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2014 | TX | La Salle | 863 | 313 |
| 1352868000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/20/2015 | TX | Webb | 3781 | 231 |
| 1354527000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2015 | TX | Dimmit | 547 | 806 |
| 1354911000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/30/2015 | TX | Dimmit | 546 | 449 |
| 1355178000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/5/2015 | TX | Dimmit | 546 | 466 |
| 1356773000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2015 | TX | Dimmit | 552 | 352 |
| 1362891000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 476 |
| 1362895000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 496 |
| 1362896000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 481 |
| 1362897000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 491 |
| 1362898000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 486 |
| 1360670000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2015 | TX | Dimmit | 560 | 49 |
| 1367778000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Surface Use Agreement | 11/15/2010 | TX | Dimmit | | |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140408000 | ST TX DOT 664-141 (driveway access to office off US 277) | ANADARKO PETROLEUM CORPORATION | Right of Way/Easement/Facility | 12/7/2011 | TX | Dimmit | | |
| 1140772000 | ADELA A SMITH FAMILY LIMITED PARTNERSHIP | KERR-MCGEE OIL & GAS ONSHORE LP | Right of Way/Easement/Facility | 1/1/2011 | TX | Dimmit | 427 | 335 |
| 1134095000 | CHARLES W WILSON SR ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 5/11/1994 | TX | Dimmit | 251 | 497 |
| 1134111000 | CHARLES H BARRIER ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 6/1/1994 | TX | Dimmit | 251 | 499 |

## Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 |

Case 23-90020 Document 1343 Filed in TXSB on 05/16/22 Page 29 of 1823

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 |

# Annex D
## Permits

None.

Case 23-90086 Document 1343 Filed in TXSB on 05/15/22 Page 390 of 433

# Schedule 2.02(k)
## Excluded Contracts and Other Assets

## Big Wells – Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625001 | ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | 02/08/1973 | Dimmit | | 27 | 384 |
| T0625002 | FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | 02/13/1973 | Zavala | | 3 | 172 |
| T0625003 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | 03/01/1978 | Zavala | | 3 | 251 |
| T0625004 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625005 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625006 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625007 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625008 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | 01/09/1979 | Zavala | | 3 | 251 |
| T0625009-001 | DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | 05/06/1974 | Dimmit | | 29 | 322 |
| T0625009-002 | CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | Dimmit | | 37 | 257 |
| T0625010 | MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | 05/16/1974 | Dimmit | | 29 | 332 |
| T0625011 | G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 355 |
| T0625012-001 | MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 377 |
| T0625012-002 | L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 381 |

Case 22-90085 Document 1363-4 Filed in TXSB on 10/16/22 Page 1202 of 1867

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625013 | LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 366 |
| T0625014 | RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | 06/06/1974 | Dimmit | | 29 | 359 |
| T0625015 | JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 29 | 469 |
| T0625016 | DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 30 | 10 |
| T0625017 | ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | Dimmit | | 31 | 330 |
| T0625018 | LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | 06/26/1975 | Dimmit | | 31 | 464 |
| T0625019-001 | AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | Dimmit | | 33 | 505 |
| T0625019-002 | PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | 11/10/1976 | Dimmit | | 39 | 193 |
| T0625020 | B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | Dimmit | | 29 | 293 |
| T0625021 | MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | Dimmit | | 147 | 136 |
| T0625022 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | Zavala | | 97<br>55 | 145<br>185 |
| T0625023 | JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | 05/30/1994 | Zavala | | 57 | 53 |
| T0625024-001 | ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 68 |
| T0625024-002 | MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 65 |
| T0625024-003 | FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 76 |
| T0625025-001 | BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 666 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625025-002 | ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 671 |
| T0625025-003 | MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 676 |
| T0625026 | I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | 04/01/1980 | Dimmit | | 33 | 122 |
| T0625027 | MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | Dimmit | | 30 | 460 |
| T0625028 | WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | Dimmit | | 30 | 270 |
| T0625029 | SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | 04/18/1975 | Dimmit | | 30 | 495 |
| T0625030 | ERIN BAIN JONES | W W OATMAN | 05/11/1970 | 05/11/1975 | Dimmit | | 3 | 578 |

## Big Wells – Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337500000 | 4212733750 | BOYD GG 1H | |

## Big Wells – Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; Eagle Ford TX LP. Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC JOA - Big Wells) | January 1, 2011 |

## Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |

<u>**Schedule 5.03(a)**</u>
**365 Schedule**

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 | 0 |

[1] Cure Amounts as of October 31, 2020.

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 | 17,474 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 | 116,743 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 | 1,691,924 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 | 111,103 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 | 0 |

Case 23-90020 Document 1363 Filed in TXSB on 07/15/22 Page 309 of 1867

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 | 0 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 | 0 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 | 0 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 | 0 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 | 0 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 | 0 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 | 0 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 | 2,088,041 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 | 6,487,546 |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 | 0 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 | 0 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 | 0 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 | 0 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 | 0 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 | 0 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 | 0 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 | 0 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 | 0 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 | 0 |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 | 0 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 | 0 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 | 0 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 | 0 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 | 0 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 | 0 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 | 0 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 | 0 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 | 0 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 | 0 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 | 0 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 | 0 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 | 0 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 | 0 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 | 0 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 | 0 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 | 0 |

# SCHEDULE 5.03(b)

## Desired 365 Contracts[2]

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC; Kerr-Mcgee Oil & Gas Onshore, LP; SN EF Maverick, LLC; SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC; Kerr-Mcgee Oil & Gas Onshore, LP; SN EF Maverick, LLC; SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC; Kerr-Mcgee Oil & Gas Onshore, LP; SN EF Maverick, LLC; SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation; SN EF Maverick, LLC; Anadarko Energy Services Company; Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC | Sanchez Energy Corporation; SN EF Maverick, LLC; SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 | 0 | **TBD** |
| Gavilan Resources, LLC | Sanchez Energy Corporation; SN EF Maverick, LLC; SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 | 0 | **TBD** |
| Gavilan Resources LLC | SN EF Maverick, LLC; SN EF Unsub, LP; Anadarko E&P Onshore LLC; Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 | 0 | **Reject** |

[2] **Note to Draft**: This Schedule 5.03(b) reflects Buyer's preliminary designations of Desired 365 Contracts. This list is subject to and does not limit the terms of the Agreement, including insofar as they pertain to revising these designations prior to the Designation Deadline. In addition, these preliminary designations are subject to and do not limit Buyer's conditions to Closing.
[3] Cure Amounts as of October 31, 2020.

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 | 0 | **Reject** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 | 17,474 | **Assume** |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 | 116,743 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 | 1,691,924 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 | 111,103 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 | 0 | **TBD** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC<br>Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 | 2,088,041 | **Reject** |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 | 6,487,546 | **Reject** |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 | 0 | **Assume** |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 | 0 | **Reject** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 | 0 | **Assume** |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 | 0 | **Reject** |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 | 0 | **Assume** |

# Schedule 8.02(d)
## Specified Required Consents

| AGREEMENT | AGREEMENT TYPE | PARTY | AGREEMENT NAME | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0616001-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0616002-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0619001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0623001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 01/02/2007 | Assignment: Consent required. |
| T0623002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0623005-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 10/02/2008 | Assignment: Consent required. |
| T0626002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0619003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2010 | Assignment: Consent required. |
| T0626001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619015-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2011 | Assignment: Consent required. |
| T0622001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | AGREEMENT NAME | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0622003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0619006-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | DIANA M STUMBERG ET AL | 11/05/2008 | Assignment: Consent required. |
| T0618001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0618003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0621001-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | EWING ENTERPRISES LIMITED PARTNERSH | 09/20/2006 | Assignment: Consent required. |
| T0618003-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 10/25/2005 | Assignment: Consent required. |
| T0616001-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0616002-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0618003-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | THE SOUTH TEXAS CHILDRENS HOME | 10/25/2005 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE RANCH LTA DTD 10/5/10 | October 5, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE FRIDAY RANCH DTD 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE CHIP EAST RANCH 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | MARY LOIS FRIDAY HULSMAN 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | SOUTH TEXAS CHILDRENS HOME 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | MOODY NATIONAL BANK GALV 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE COCHINA WEST & COCHINA EAST | October 14, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | SECOND AMENDMENT (STUMBERG LEASE) | January 1, 2011 | Assignment: Consent required. |

# Disclosure Schedule 3.05(a)
## Material Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC<br>Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 |

(xii)

1. Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
3. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
4. Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.
5. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
6. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

**<u>Disclosure Schedule 3.05(b)</u>**
**Material Contract Defaults**

(i)

1. Default under the Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Default under the Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.

(ii)

1. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
2. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
3. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
4. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

## .Disclosure Schedule 3.06(a)

## Approvals

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0616001-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0616002-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0619001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0623001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 01/02/2007 | Assignment: Consent required. |
| T0623002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0623005-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 10/02/2008 | Assignment: Consent required. |
| T0626002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0619003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2010 | Assignment: Consent required. |
| T0626001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619015-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0622001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0619006-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | DIANA M STUMBERG ET AL | 11/05/2008 | Assignment: Consent required. |
| T0618001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0618003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0621001-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | EWING ENTERPRISES LIMITED PARTNERSH | 09/20/2006 | Assignment: Consent required. |
| T0621005 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT | 04/30/2014 | Assignment: Consent required. |
| T0621011 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT T | 04/30/2014 | Assignment: Consent required. |
| T0621001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | FITZSIMONS OIL AND GAS MANAGEMENT T | 12/22/2005 | Assignment: Consent required. |
| T0617002-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | G E LIGHT III TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617001-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT III, BILLIE RAE LIGHT TR | 10/29/2009 | Assignment: Consent required. |
| T0621001-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | LA BANDERA RANCH LP | 09/29/2006 | Assignment: Consent required. |
| T0617001-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | LIGHT MINERAL TRUST | 10/29/2009 | Assignment: Consent required. |
| T0618003-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 10/25/2005 | Assignment: Consent required. |
| T0620002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET | 03/06/2006 | Assignment: Consent required. |
| T0616001-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0616002-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0620001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 03/06/2006 | Assignment: Consent required. |
| T0620003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 03/06/2006 | Assignment: Consent required. |
| T0618003-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | THE SOUTH TEXAS CHILDRENS HOME | 10/25/2005 | Assignment: Consent required. |
| T0618005-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618010 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618014 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 03/06/2006 | Assignment: Consent required. |
| T0624001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | WORTHEY PROPERTIES LTD | 03/01/2009 | Assignment: Consent required. |
| T0624002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | B L STANLEY LTD | 10/15/2008 | Assignment: Consent required. |
| T0617002-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | LIGHT MINERAL TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617002-003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-004 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-003 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | RANCHO ENCANTADO LP | 10/29/2009 | Assignment: Consent required. |
| T0617001-005 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | GEORGE E LIGHT III ET AL | 10/29/2009 | Assignment: Consent required. |
| T0616005 | Lease - Oil, Gas and Minerals | ROSETTA RESOURCES OPERATING LP | LESLIE EDDIE VIVION AND NANCY JOE V | 12/21/2009 | Assignment: Consent required. |
| T0621001-004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | KATHLEEN FITZSIMONS LOVE ET AL | 01/17/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0621001-005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | JACKSON BENJAMIN LOVE JR | 01/17/2012 | Assignment: Consent required. |
| T0620007 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | STATE OF TEXAS MF-111277 | 07/20/2010 | Assignment: Consent required. |
| 1141199000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/4/2012 | Assignment: Consent required. |
| 1138496000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III | 3/5/2007 | Assignment: Consent required. |
| 1139504000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2006 | Assignment: Consent required. |
| 1139555000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/22/2010 | Assignment: Consent required. |
| 1139556000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/21/2010 | Assignment: Consent required. |
| 1139557000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | HUGH A FITZSIMONS III | 11/5/2009 | Assignment: Consent required. |
| 1139825000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139839000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139840000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139841000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/1/2011 | Assignment: Consent required. |
| 1140225000 | O/G LSE-Surface Rights/Rentals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2011 | Assignment: Consent required. |
| 1140226000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 12/1/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140230000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 12/1/2011 | Assignment: Consent required. |
| 1140231000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WORTHEY PROPERTIES LTD | 3/1/2009 | Assignment: Consent required. |
| 1140232000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | FITZSIMONS ENTITY ET AL | 12/22/2005 | Assignment: Consent required. |
| 1140233000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET AL | 3/6/2006 | Assignment: Consent required. |
| 1140235000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 3/6/2006 | Assignment: Consent required. |
| 1140236000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 3/6/2006 | Assignment: Consent required. |
| 1140237000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 3/6/2006 | Assignment: Consent required. |
| 1140411000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140412000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140413000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140469000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140663000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/22/2012 | Assignment: Consent required. |
| 1140664000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140665000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140666000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/20/2012 | Assignment: Consent required. |
| 1140667000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140742000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140744000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140767000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/13/2012 | Assignment: Consent required. |
| 1140768000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/29/2011 | Assignment: Consent required. |
| 1140807000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1141016000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 2/10/2011 | Assignment: Consent required. |
| 1141017000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/29/2011 | Assignment: Consent required. |
| 1141018000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/31/2011 | Assignment: Consent required. |
| 1141135000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 12/20/2012 | Assignment: Consent required. |
| 1141139000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 9/5/2012 | Assignment: Consent required. |
| 1141175000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/1/2012 | Assignment: Consent required. |
| 1141181000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141182000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141198000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/15/2012 | Assignment: Consent required. |
| 1141200000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141201000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/3/2012 | Assignment: Consent required. |
| 1141202000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/3/2012 | Assignment: Consent required. |
| 1141203000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/19/2012 | Assignment: Consent required. |
| 1141204000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141205000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141206000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141446000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1141544000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1141300000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/26/2013 | Assignment: Consent required. |
| 1141429000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | ROGERS DENTONIO RANCH LTD | 2/24/2013 | Assignment: Consent required. |
| 1141430000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 2/22/2013 | Assignment: Consent required. |
| 1141433000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | 2/15/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141434000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 4/1/2013 | Assignment: Consent required. |
| 1141447000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141448000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141449000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141450000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141451000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141498000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/1/2013 | Assignment: Consent required. |
| 1141543000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/11/2013 | Assignment: Consent required. |
| 1141705000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141706000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141733000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 7/24/2011 | Assignment: Consent required. |
| 1141740000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/9/2013 | Assignment: Consent required. |
| 1141743000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/8/2013 | Assignment: Consent required. |
| 1141771000 | Surface License / Permit | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141872000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 9/30/2013 | Assignment: Consent required. |
| 1141879000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/19/2013 | Assignment: Consent required. |
| 1141887000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/1/2013 | Assignment: Consent required. |
| 1141888000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 10/1/2013 | Assignment: Consent required. |
| 1142037000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/1/2013 | Assignment: Consent required. |
| 1142038000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/1/2014 | Assignment: Consent required. |
| 1142040000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |
| 1142041000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2013 | Assignment: Consent required. |
| 1142142000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 1/17/2014 | Assignment: Consent required. |
| 1142148000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142149000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142151000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BEINHORN JR FAMILY LIMTED PARTNERSHIP | 2/6/2014 | Assignment: Consent required. |
| 1142152000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142153000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/7/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1142154000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142394000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 4/21/2014 | Assignment: Consent required. |
| 1142397000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142398000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142399000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142400000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1142401000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142402000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142558000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1340261000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 6/1/2014 | Assignment: Consent required. |
| 1347518000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |
| 1347530000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1349965000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1350515000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2014 | Assignment: Consent required. |
| 1350568000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2014 | Assignment: Consent required. |
| 1350582000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2015 | Assignment: Consent required. |
| 1350613000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 3/1/2015 | Assignment: Consent required. |
| 1351039000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 2/12/2012 | Assignment: Consent required. |
| 1351042000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/5/2013 | Assignment: Consent required. |
| 1351043000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1351044000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351045000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351046000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351047000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/11/2014 | Assignment: Consent required. |
| 1351064000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351250000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/29/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1351252000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2012 | Assignment: Consent required. |
| 1351254000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/19/2012 | Assignment: Consent required. |
| 1351255000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/23/2015 | Assignment: Consent required. |
| 1351256000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/2/2014 | Assignment: Consent required. |
| 1351258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/26/2012 | Assignment: Consent required. |
| 1351259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/14/2014 | Assignment: Consent required. |
| 1351260000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/23/2015 | Assignment: Consent required. |
| 1351285000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/11/2015 | Assignment: Consent required. |
| 1352817000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2014 | Assignment: Consent required. |
| 1352868000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/20/2015 | Assignment: Consent required. |
| 1354527000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 5/1/2015 | Assignment: Consent required. |
| 1354911000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/30/2015 | Assignment: Consent required. |
| 1360670000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2015 | Assignment: Consent required. |
| 1140772000 | Right of Way/Easement/ Facility | KERR-MCGEE OIL & GAS ONSHORE LP | ADELA A SMITH FAMILY LIMITED PARTNERSHIP | 1/1/2011 | Assignment: Notice and fee required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| HIGH PRESSURE GAS LIFT AGMT - CHIP EAST | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | February 26, 2015 | Assignment: Consent required. |
| Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | October 5, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | October 12, 2010 | Assignment: Consent required. |
| SOUTH TEXAS CHILDRENS HOME 10/12/10 (Letter Agmt) | Letter Agreement | Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | October 14, 2010 | Assignment: Consent required. |
| Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | Letter Agreement | Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | January 1, 2011 | Assignment: Consent required. |
| High Pressure Gas Lift Agrmt/ Chupadera | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | May 27, 2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agreement | Marketing | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | February 21, 2017 | Assignment: Consent required. |
| Crude Oil Production Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Natural Gas Liquids Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Residue Gas Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Second Amended and Restated Lease Dedication and Oil Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Second Amended and Restated Lease Dedication and Gas Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Joint 3D Seismic Acquisition Agreement (FOGMT) | Seismic | Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | Seismic | Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Non-Exclusive Data Use License and Access Agreement (providing access to well cores) | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |
| Purchase and Sale Agreement | | Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | January 12, 2017 | Assignment: Consent required. |
| Letter Agmt RECIPROCAL DATA EXCHANGE/CONFD. CHK | Seismic | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required. |
| Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | Seismic | Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | July 9, 2018 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | Seismic | Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina South | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina West | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift Agmt - Cat North | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | January 6, 2015 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Joint Development Agreement | Development Agreement | Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |
| Geophysical and Seismic Data Use Agreement | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | April 15, 2018 | Assignment: Consent required. |
| Development Agreement | Marketing | Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Firm Gas Gathering, Processing and Purchase Agreement | Marketing | Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | April 1, 2018 | Assignment: Consent potentially required.[4] |
| Ratification and Assumption Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC; Carnero G&P LLC | May 22, 2018 | Assignment: Consent potentially required.[5] |
| Firm Intrastate Gas Transportation Services Agreement | Marketing | Anadarko E&P Onshore LLC | Springfield Pipeline LLC | March 1, 2013 | Assignment: Notice required |

[4] Consent not required if (i) party acquiring all or substantially all of the assets of assigning party is directly or indirectly subject to the agreement or (ii) assignment is in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage, provided that the credit assurance requirements are continuously complied with by Producer and its assignee prior to and after any assignment by Producer. See Sec. 13.1(a)

[5] Consent requirement is identical to Firm Gas Gathering, Processing and Purchase Agreement consent requirement immediately above.

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Gathering, Processing and Purchasing Agreement (Dedication) | Marketing | Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | September 1, 2008 | Assignment: Notice required |
| Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | Letter Agreement | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required |
| Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | Seismic | Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | May 21, 2012 | Assignment: Consent required |
| IHS Community of Best Practices Agreement | Data sharing | Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | July 30, 2014 | Assignment: Consent required |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | Data sharing | Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | August 20, 2015 | Assignment: Consent required |
| Purchase/Sale Agmt | Purchase Agreement | Anadarko E&P Onshore LLC | TXCO Resources Inc. et al<br>Newfield Exploration Company | January 10, 2010 | Assignment: Consent required |

**<u>Disclosure Schedule 3.07</u>**
**Environmental Matters**

None.

**<u>Disclosure Schedule 3.08</u>**
**Well Status**

None.

**<u>Disclosure Schedule 3.09</u>**
**Imbalances**

None.

# Disclosure Schedule 3.12
## Intellectual Property

| Party Name | Counterparty | Title of Contract | Date of Contract |
|---|---|---|---|
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Venado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |

**Disclosure Schedule 3.14**
**Taxes**

None.

**<u>Disclosure Schedule 3.17</u>**
**Preferential Purchase Rights**

1. Tag-Along Right provided in Maverick Basin Area Participation Agreement dated as of January 1, 2011, by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP.
2. Tag-Along Right and Right of First Offer provided in Joint Development Agreement, dated March 1, 2017, by and among Gavilan Resources, LLC, SN EF Maverick, LLC, SN EN Unsub, LP and Sanchez Energy Corporation (solely with respect to Section 2.2, 4.2, 4.5 and Article VII).

**<u>Disclosure Schedule 3.20</u>**
**Working Interest Payments**

None.

**<u>Disclosure Schedule 3.22</u>**
**Violations of Applicable Laws**

None.

# EXHIBIT 24

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION REGARDING LIMITED OBJECTION AND RESERVATION OF RIGHTS OF GAVILAN RESOURCES, LLC TO ASSUMPTION AND REJECTION OF CONTRACTS UNDER SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**
[Related to Dkt. No. 1346]

This *Stipulation Regarding Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Stipulation") is made between Gavilan Resources, LLC ("Gavilan"), SN EF Maverick, LLC ("SN Maverick"), and Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) ("Mesquite"),

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

(Gavilan, SN Maverick, and Mesquite are each a "Party" and collectively the "Parties" to this Stipulation).

**RECITALS**

WHEREAS, the Parties have been involved in disputes concerning the Joint Development Agreement dated March 1, 2017 (as amended or supplemented) ("JDA") and the right to serve as operator under certain joint operating agreements;

WHEREAS, the Parties are involved in the following pending matters:

(a) Case No. 19-34508, *In re Sanchez Energy Corporation, et al*., pending in this Court ("Sanchez Bankruptcy Case"), involving the contested matter of the motion to reject, *inter alia*, the JDA ("JDA Rejection Matter") [*See* Dkt No. 1346];

(b) Case No. 20-32656, *In re Gavilan Resources, LLC, et al*., pending in this Court ("Gavilan Bankruptcy Case");

(c) Adversary Proceeding No. 20-03021, *Gavilan Resources, LLC v. SN EF Maverick, LLC, et al.*) (filed in the Sanchez Bankruptcy Case) ("Gavilan-SN Maverick Adversary Proceeding"), in which this Court entered a Final Judgment on July 13, 2020 (the "July 2020 Judgment") [Dkt. No. 90], finding that SN Maverick committed two Defaults (as defined in the JDA) under the JDA;

(d) Adversary Proceeding No. 20-03378, *SN EF Maverick, LLC v. Gavilan Resources, LLC* (pending in the Gavilan Bankruptcy Case) ("SN Maverick-Gavilan Adversary Proceeding");

(e) Adversary Proceeding No. 20-03307, *Gavilan Resources, LLC* v. *SN EF Maverick, LLC* (filed in the Gavilan Bankruptcy Case) ("Gavilan Dec Action"), in which this Court entered a Final Declaratory Judgment (the "August 2020 Judgment") [Dkt. No. 15], which confirmed that SN Maverick is presently the operator under the applicable joint operating agreements and affords

Gavilan the right to cause SN Maverick to resign as operator and to designate itself or its successor as the operator under the applicable joint operating agreements, subject to the terms of those operating agreements;

(f) Case No. 4:20-cv-2640, *SN EF Maverick, LLC et al. v. Gavilan Resources, LLC* (pending in the United States District Court for the Southern District of Texas) ("District Court Case"), which is the appeal of the July 2020 Judgment;

WHEREAS, Gavilan has a pending *Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* ("Gavilan Objection") to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, dated April 30, 2020 (as amended or supplemented from time to time, the "Sanchez Plan");

WHEREAS, on October 16, 2020 in the Gavilan Bankruptcy Case, the Court entered an order approving the sale of Gavilan's assets to Mesquite or its designee [Dkt. 361, Gavilan Bankruptcy Case] (the "Sale Order"), which incorporated the executed Asset Purchase Agreement between Gavilan and Mesquite (the "APA") [Dkt. No. 366, Gavilan Bankruptcy Case];

WHEREAS, upon the closing of the APA, Gavilan no longer owns the assets for which the August 2020 Judgment states it has the right to designate itself or its successor as the operator;

WHEREAS, as of closing of the APA, Mesquite or its designee, as applicable, is Gavilan's successor to those assets;

WHEREAS, as of closing, Mesquite or its designee maintain the right to direct Gavilan or Gavilan's successor as it concerns the treatment of the JDA;

WHEREFORE, in connection with the APA, the Parties executed a Release Agreement (the "Release"), which among other things, (i) releases and forever discharges rights, claims, and causes of action in connection with the JDA and operator dispute of the Parties, including their affiliates, which includes SN Maverick and (ii) requires the Parties to transfer, assign, or otherwise dispose of any right or interest each Party may have in any Claims (as defined in the Release);

WHEREAS, in connection with the APA and Release, the Parties agreed to dismiss with prejudice all pending litigation between them, including the Gavilan-SN Maverick Adversary Proceeding, the SN Maverick-Gavilan Adversary Proceeding, the Gavilan Dec Action, and the District Court Case, and

WHEREAS, also in connection with the APA and the Release, the Parties agreed to resolve the JDA Rejection Matter.

**STIPULATION**

NOW THEREFORE, the Parties agree and stipulate as follows:

1. Gavilan withdraws with prejudice the Gavilan Objection, including, but not limited to, any objections to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

2. Gavilan consents to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

Date: November 12, 2020

**AGREED AND ACCEPTED**:

FOLEY & LARDNER LLP

*/s/ John P. Melko*
John P. Melko
State Bar No. 13919600
Email: jmelko@foley.com
Sharon M. Beausoleil
State Bar No. 24025245
Email: sbeausoleil@foley.com
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone: 713-276-5500
Facsimile: 713-276-5555

and

MORRISON & FOERSTER LLP

Jamie A. Levitt (admitted Pro hac vice)
Michael D. Birnbaum (admitted Pro hac vice)
James E. Hough (admitted Pro hac vice)
Dennis L. Jenkins (admitted Pro hac vice)
Brett H. Miller (admitted Pro hac vice)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: jlevitt@mofo.com
mbirnbaum@mofo.com
jhough@mofo.com
djenkins@mofo.com
brettmiller@mofo.com

**ATTORNEY FOR REORGANIZED DEBTORS**

WEIL, GOTSHAL & MANGES LLP

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez (TX 15776275)
Brenda Funk (TX 24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: 713-546-5000
Facsimile: 713-224-9511
Emails: Alfredo.Perez@weil.com;
Brenda.Funk@weil.com

**ATTORNEYS FOR GAVILAN RESOURCES, LLC**

# EXHIBIT 25

ENTERED
10/16/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| | § | |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | **Re: Docket No. 99** |

**ORDER (A) APPROVING SALE OF DEBTORS' ASSETS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

Upon the motion, dated June 4, 2020 [Docket No. 99] (the "**Motion**"),[2] of Gavilan Resources, LLC ("**Gavilan**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") seeking an order (a) approving sale of Debtors' assets, (b) authorizing assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Bid Procedures (as defined herein), or the APA (as defined herein), as applicable.

such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion, and this Court having entered the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (as further amended and modified, the "**Bid Procedures Order**"); and the Auction having been held in accordance with the *Notice of Amended Bid Procedures Order Dates and Reset Video/Telephonic Sale Hearing* [Docket No. 294] on September 29, 2020 and concluding on October 2, 2020, and Mesquite Energy, Inc. (together with any affiliate of Mesquite Energy, Inc., to which the Oil and Gas Properties are assigned at Closing pursuant to the APA, the "**Buyer**") having been chosen as the Successful Bidder for the Assets; and upon the Buyer and the Debtors having agreed to the terms of that certain Asset and Purchase Agreement (together with all ancillary documents, as may be amended, modified, or supplemented, the "**APA**");[3] and this Court having reviewed the *Declaration of Kevin Bonebrake in Support of Approval of and Entry into Sale Transaction* [Docket No. 329]; and this Court having conducted a hearing on October 8, 2020 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this order (the "**Sale Order**"), including the objections to the Motion filed by the Oxy Parties [Docket No. 332] (the "**Oxy Objection**") and the WES Parties [Docket No. 333] (the "**WES Objection**") (with the "Oxy Parties" and the "WES Parties" each as defined as set forth in the Oxy Objection and the WES Objection, respectively); and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction (as defined in the Sale Notice), APA, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits except as set forth herein; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and this Court having determined

---

[3] A copy of the APA is attached hereto as **Exhibit I**.

that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.

C. **Venue**. Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules and the *Procedures for Complex Cases in the Southern District of Texas*.

E. **<u>Notice and Opportunity to Object</u>**. Notice of the Motion, the Bid Procedures, the assumption and/or assignment of the Desired 365 Contracts, the APA, the Auction, the Sale Hearing, and the deadlines related thereto, including any subsequent modifications, was provided to: (i) the United States Trustee for the Southern District of Texas; (ii) counsel for the Administrative Agent to the First Lien Secured Lenders; (iii) counsel for the Second Lien Ad Hoc Group; (iv) counsel for the Administrative Agent for the Second Lien Lenders; (v) all affected federal, state, and local regulatory and taxing authorities; (vi) the U.S. Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the counterparties to the 365 Contracts and all Leases and other applicable contracts, (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (x) all parties entitled to notice pursuant to Local Rule 9013-1(d) (collectively, the "**Sale Notice Parties**"), all in accordance with and as provided by the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (the "**Bid Procedures Order**"). *See* Affidavit of Service of Angharad Bowdler [Docket No. 143]. The Debtors also posted the Sale Notice on Epiq Corporate Restructuring LLC's website (https://dm.epiq11.com/case/gavilan/info). With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice in the *News Gram*, published in Maverick County, Texas, the *Laredo Morning Times*, published in Webb County, Texas, the *Carrizo Springs Javelin*, published in Dimmit County, Texas, the *Zavala County Sentinel*, published in Zavala County, Texas, the *San Antonio Express News*, published in Bexar County, Texas, and the *Frio-Nueces Current*, published in Frio and La Salle Counties, Texas, in June 2020, was sufficient and reasonably calculated under the circumstances to reach such entities. *See* Affidavits Regarding Publication [Docket Nos. 261–66]. Service and publication of the Sale Notice was appropriate, in full compliance with the Bid Procedures Order, and reasonably

Case 20-32656 Document 339-1 Filed on 10/16/20 in TXSB Page 5 of 39

calculated to provide all Sale Notice Parties with good and sufficient notice of the Sale Transaction and the APA by and between the Debtors and the Buyer, and provided a reasonable opportunity to object, and no further notice need be provided.

F. Service and publication of the Sale Notice was provided to all parties in interest, including those with one or more alleged preferential purchase rights listed on Disclosure Schedule 3.17 of the APA, including the Tag-Along Right provided in the Maverick Basin Area Participation Agreement and the Tag-Along Right and Right of First Offer provided in the Joint Development Agreement (the "**Preferential Purchase Rights**"), and those with one or more rights based on any alleged approval or consent right or anti-assignment provision contained in an Applicable Contract, Lease, or other Purchased Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object, all as described more fully in sections 2.12–2.14 of the APA. *See* Affidavit of Service of Angharad Bowdler of Epiq Corporate Restructuring, LLC [Docket No. 143].

G. The Debtors served notice substantially in the form of the *Notice of Designation of Successful Bid and Back-up Bid* [Docket No. 311] (the "**Post-Auction Notice**") on all parties entitled to receive such notice under the Bid Procedures Order and applicable rules. *See* Affidavit of Service of Angharad Bowdler [Docket No. 316]. Service of the Post-Auction Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the conclusion of the Auction and the identity of the Successful Bid.

H. The Debtors filed the Assumption and Assignment Notice and posted it on the case website at (https://dm.epiq11.com/case/gavilan/info). Service of the Assumption and Assignment Notice on all counterparties to the 365 Contracts and all parties on the Rule 2002 Notice List was appropriate and good and sufficient notice of the proposed assumption and

assignment of the Desired 365 Contracts, the applicable Cure Amounts (as defined in the Bid Procedures) related thereto, and the procedures for objecting thereto, and no other or further notice is necessary. All counterparties to 365 Contracts that are Desired 365 Contracts have had an adequate opportunity to object to the assumption and assignment of such 365 Contracts and the Cure Amounts related thereto.

I. The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures, the Bid Procedures Order, the APA, the assumption and/or assignment to the Buyer of the Assets (including the Desired 365 Contracts, the Leases, and the Other Purchased Contracts) the Auction, the Sale Hearing, the Sale Transaction, the Cure Amounts, the deadlines to submit an objection, and all other deadlines related thereto, is or shall be required.

J. **Assets Property of the Estate**. The Assets sought to be sold and assigned by the Debtors to the Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

K. **Sufficiency of Marketing**. The Debtors and their professionals, (i) marketed the Assets and conducted the marketing and sale process as set forth in, and in accordance with, the Motion and the Bid Procedures and (ii) conducted a fair and open sale process. The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Assets, and the process conducted by the Debtors (with the assistance of their advisors) pursuant to the Bid Procedures Order and the Bid Procedures obtained the highest or best value for the Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Assets. Based upon the record of these proceedings, all creditors and other

parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Assets, seek to exercise any alleged Preferential Purchase Rights, or submit an objection to the assumption and/or assignment of any Asset, as the case may be. The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

L. **APA**. On October 2, 2020, the Debtors and the Buyer agreed to the terms of the APA, attached hereto as **Exhibit I**. The transaction contemplated by the APA constituted a Qualifying Bid and the Buyer constituted a Qualified Bidder and ultimately Successful Bidder, each in accordance with the Bid Procedures.

M. **Bid Procedures**. The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Assets, and represent the best method for maximizing the value of the Debtors' estates. The Debtors conducted the sale process (including the Auction) without collusion and in accordance with the Bid Procedures.

N. **Auction**. The Auction began on September 29, 2020 and concluded on October 2, 2020. A total of four parties participated in the Auction. Following the bidding, the Debtors determined the highest, or otherwise best bid and designated the Buyer as the Successful Bidder.

O. On October 2, 2020, the Debtors filed the Post-Auction Notice identifying the Buyer as the Successful Bidder for the Assets in accordance with the Bid Procedures Order. *See* Docket No. 311. As established by the record of the Sale Hearing, the bidding and related

procedures established by the Bid Procedures Order have been complied with in all material respects by the Debtors and the Buyer and all of its affiliates.

P. **Corporate Authority**. Subject to and giving effect to the entry of this Order, the Debtors (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale Transaction.

Q. **Sound Business Purpose; Sale Highest or Best Offer**. Entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, creditors, and all parties in interest. This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Assets to the Buyer pursuant to the terms and conditions set forth in the APA. Additionally (i) the total consideration provided by the Buyer for the Assets as reflected in the APA is the highest or best offer for the Assets, (ii) the APA and the Closing thereon presents the best opportunity to realize the maximum value of the Assets and avoid a decline and devaluation of the Assets, (iii) there is risk of deterioration of the value of the Assets if the Sale Transaction is not consummated promptly, (iv) the APA and the consummation of the Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative, and (v) the Debtors' entry into the APA and consummation of the Sale Transaction is reasonable and appropriate under the circumstances.

R. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for consummating the Sale Transaction prior to, and outside of, a plan of reorganization. The Debtors' decision to enter into the APA and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers. Because the entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

S. **Arm's-Length Sale and Buyer's Good Faith**. The APA was negotiated and is undertaken by the Debtors and Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Assets and (ii) willingly subjected its bid to the Bid Procedures. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been disclosed and the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. As a result of the foregoing, the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed

or modified on appeal, and the Buyer has proceeded in good faith in all respects in connection with the Sale Transaction specifically and these chapter 11 cases generally.

T. **No Fraudulent Transfer**. The total consideration provided by the Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.004-006 (West 2019), and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyer have entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

U. **Free and Clear Transfer Required by Buyer**. If the Debtors did not sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than the Assumed Liabilities (as defined in Exhibit A to the APA) and Permitted Liens (as defined in Exhibit I to the APA), to the extent provided in the APA, such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale Transaction. The Buyer would not have submitted a bid, entered into the APA, and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests if the Sale Transaction and the assignment of the Assets, including the Purchased Contracts and Leases, to the Buyer were not free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA.

V. As of the Closing, pursuant and subject to the terms of the APA and this Sale Order, the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Buyer with all of the Debtors' rights, title, and interests in the Assets free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.

W. **Satisfaction of Section 363(f) Standards**. The Debtors are authorized to sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than Assumed Liabilities and Permitted Liens in accordance with the terms of the APA (with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) because, with respect to each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability in the Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of claims, encumbrances, Liens or

Liabilities who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Creditors or other persons or entities asserting a claim, encumbrance, Lien or Liability in or against the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability. Those holders of claims, encumbrances, Liens or Liabilities who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code by having their claims, encumbrances, Liens or Liabilities, if any, in each instance against the Debtors, their estates, or any of the Assets (other than Preferential Purchase Rights) attach to the proceeds of the Sale Transaction ultimately attributable to the Assets in which such holder alleges a claim, encumbrance, Lien or Liability, with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

X. **No Successor Liability**. Neither the Buyer nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; *provided* that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of

any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

Y. **Purchase Price Allocation**. Pursuant to the APA, the allocation of the Purchase Price and any Assumed Liabilities contemplated thereby after the Closing (the "**Allocation**") is a reasonable resolution of the issues among the Debtors and the Buyer with respect to the Allocation and shall constitute a good faith compromise and settlement of all claims, encumbrances, Liens or Liabilities in connection with the Allocation. The Motion shall be deemed a motion to approve the good faith compromise and settlement of all such claims, encumbrances, Liens or Liabilities, and the entry of the Sale Order shall constitute the Court's approval of such compromise and settlement, as well as a finding by the Court that such settlement and compromise is a valid exercise of the Debtors' business judgment, fair, equitable, reasonable and in the best interests of the Debtors and their estates.

Z. **Assigned Contracts and Leases**. Subject to paragraph 25 herein, each and every provision of the Assigned Contracts and Leases or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract or Lease has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Contracts or Leases that did not, or do not as permitted under paragraph 25 of this Sale Order, timely file an objection to the assumption and/or assignment of the Assigned Contract(s) or Lease(s) to which they are a counterparty are deemed to consent to the assumption and/or assignment by the Debtors of their Assigned Contract or Lease to the Buyer, and the Buyer shall

enjoy all of the rights and benefits under each such Assigned Contract or Lease as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to the Buyer in accordance with the terms of the APA, the Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts or Leases prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts or Leases other than as to any Excluded Liabilities thereunder. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Assigned Contracts and Leases to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and/or assignment of the Assigned Contracts and Leases is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assigned Contracts and Leases being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and/or assignment is reasonable and an enhancement to the value of the Debtors' estates.

AA. **Cure/Adequate Assurance**. Pursuant to the APA, the Cure Costs (other than Excess Cure Costs), if any, will be paid by the Buyer in accordance with the terms of the APA. The Buyer has demonstrated adequate assurance of future performance of each 365 Contract listed on the 365 Schedule that is an Assigned Contract within the meaning of section 365 of the Bankruptcy Code, by the Buyer or any of its permitted assignees to which such 365 Contract is assumed and assigned by the Debtors, including a commitment of performance with respect to the

Desired 365 Contracts from and after the Closing. The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such 365 Contracts that are Assigned Contracts. The Buyer's payment of Cure Costs in accordance with the terms of the APA and commitment under the APA of performance with respect to the Desired 365 Contracts from and after the Closing shall constitute adequate assurance of future performance under such 365 Contracts. Except as set forth herein, any objections to the Cure Costs with respect to the Desired 365 Contracts are hereby overruled. The Debtors are authorized to resolve any pending Cure Disputes (as defined in the Bid Procedures) without need for further order of the Court. To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective 365 Contract(s) to the Buyer and to have waived any other defaults or breaches. Notwithstanding the Cure Cost (including Cure Costs assigned no value) with respect to any particular Assigned Contract with, one or more of, Eagle Ford TX LP, Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF LP and its subsidiaries), Mitsui E&P Texas LP, or SN EF UnSub, LP (collectively, the "**WI Owner Contracts**"), and notwithstanding anything to the contrary in this or any other Order, as part of the adequate assurance for assumption and assignment of such WI Owner Contracts, (i) all obligations attributable to Gavilan arising under any such WI Owner Contracts in the ordinary course of business (including without limitation obligations arising from audits, balance of payments, true-ups, joint-interest billings, or other adjustments or reconciliations of the respective interests of the contract counterparties, collectively the "**Ordinary Course Obligations**"), whether arising before or after the Petition Date, shall be honored in the ordinary

course of business and paid by Buyer in accordance with the terms of the applicable WI Owner Contracts, and (ii) all rights attributable to Gavilan arising under any such WI Owner Contracts for Ordinary Course Obligations, whether arising before or after the Petition Date, shall accrue to the benefit of Buyer. The Court finds that with respect to all 365 Contracts that are Assigned Contracts, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each 365 Contract that is an Assigned Contract to be assumed and assigned to the Buyer as of the Closing.

BB. **Assets Assignable**. Each and every provision of the documents governing the Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been, or (subject to and in accordance with paragraph 25 of this Sale Order) will be (in accordance with paragraph 25 of this Sale Order), satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code in respect of the assignment pursuant to the Sale Transaction.

CC. **No Sub Rosa Plan**. The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan. The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

DD. **Final Order**. Time is of the essence in consummating the Sale Transaction. In order to maximize the value of the Debtors' Assets, it is essential that the sale and assignment of the Debtors' Assets occur within the time constraints set forth in the APA and the Bid Procedures Order. This Sale Order constitutes a final order within the meaning of

Case 21-32xxx Document 1362 Filed in TXSB on 07/xx/22 Page 1358 of 1867

28 U.S.C. § 158(a). Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the transactions contemplated by the APA at any time subject to the terms and conditions of the APA.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. **Objections Overruled**. All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2. **Approval**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the APA, the other Transaction Documents, the sale, assignment, conveyance and deliverance by the Debtors of all of the Debtors' right, title, and interest in and to the Assets to the Buyer as of the Closing are hereby approved, and the Debtors are authorized and directed to consummate the Sale Transaction, including the sale, assignment, conveyance and deliverance of all of the Debtors' right, title, and interest in, to, and under the Assets to the Buyer free and clear of any and all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Debtors' obligations to consummate the Sale Transaction set forth in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Buyer are each hereby authorized and directed to take any and all actions necessary or

appropriate to (i) consummate the Sale Transaction, (ii) enter into the Transaction Documents, (iii) assume and/or assign the Assigned Contracts, including the Desired 365 Contracts (as defined in the APA) listed on the 365 Schedule, all other Applicable Contracts (as defined in the APA) that are not 365 Contracts, and Leases subject to paragraph 25 of this Sale Order, (iv) perform the obligations of the Debtors under the APA, the other Transaction Documents, and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the APA and consummate, implement, and close fully the Sale Transaction and the other transactions contemplated thereby prior to or after the Closing without further order of this Court, and (v) enforce the terms of this Sale Order. The Buyer and the Debtors shall have no obligation to consummate the Sale Transaction except as is contemplated by and provided for in the APA. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Transaction Document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

3. **Binding Effect of Sale Order**. This Sale Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of claims, encumbrances, Liens or Liabilities in, against, or on all or any portion of the Assets (whether known or unknown), the Buyer and respective successors and permitted assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered and/or a

Case 20-32656 Document 355-1 Filed on 10/16/20 in TXSB Page 19 of 39

Liquidating Trust is formed in these chapter 11 cases, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that all rights and obligations of the Debtors under this Sale Order and the APA shall accrue to, and be for the benefit of, and shall be exercisable by, the Liquidating Trust, as provided by any order of the Bankruptcy Court, and the Liquidating Trustee shall be entitled to exercise all of the rights of the Debtors under the APA.

4. The APA, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyer, to the extent of any conflict between this Sale Order or the APA and such future plan or order, the terms of this Sale Order and the APA shall control.

5. **No Material Modifications**. The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

6. **Transfer of Assets Free and Clear**. The Buyer shall assume and be liable for only the Assumed Liabilities and Permitted Liens pursuant to the terms of the APA. For purposes of this Sale Order, "Lien," and "Liability" shall mean:

(i) with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, whenever granted and including, without limitation, those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code (each, a "**Lien**" and collectively, "**Liens**");

(ii) any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured (each a "**Liability**" and collectively, "**Liabilities**");

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all claims, encumbrances, Liens and Liabilities (other than the Assumed Liabilities, Permitted Liens, and Preferential Purchase Rights) shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7. **No Bulk Sales**. No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Sale Order.

8. **Valid Transfer**. Effective upon the Closing, the transfer to the Buyer of the Debtors' right, title, and interest in the Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Assets, and vests with, or will vest in, the Buyer all right, title, and interest of the Debtors in the Assets, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens).

9. **Transfer of Title**. Upon the Closing, this Sale Order shall be construed and shall constitute, for any and all purposes, a full and complete general assignment, conveyance, and

transfer of all of the Debtors' right, title, and interest in the Assets pursuant to the terms of the APA, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order; *provided, however,* that pursuant to Section 2.15(b) of the APA, except as and to the extent expressly set forth in the APA or referenced in Section 2.15 of the APA, the Debtors expressly disclaim any representation or warranty, express, statutory or implied, as to title to any of the Assets.

10. **Governmental Authorization to Effectuate Sale and Assignments**. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect,

regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

11. **Authorization to Assign**. Notwithstanding any provision of any contract governing the Assets, including any Assigned Contract or Lease to be assumed and/or assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Assigned Contract or Lease, at or after the Closing, the Debtors are authorized to (i) assign the Assets to the Buyer and (ii) assume and/or assign the Assigned Contracts and Leases to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in the APA or as otherwise provided by a separate order of this Court.

(i) There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Assets or the assumption and/or assignment of the Assigned Contracts and Leases.

(ii) The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are 365 Contracts to be assumed and assigned to the Buyer as of Closing. Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and/or assign any Assigned Contract or Lease, no Debtor shall be required by the Court to assume and/or assign any Assigned Contract or Lease, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract or Lease.

(iii) Subject to paragraphs 13 and 25 of this Sale Order, in respect of the assignment pursuant to the Sale Transaction, any provisions in any of the Assigned Contracts and Leases that prohibit or condition the assignment of such Assigned Contract and Lease on the consent of a non-Debtor counterparty to such Assigned Contract or Lease thereto or allow the non-Debtor counterparty to such Assigned Contract and Lease to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract and Lease, shall constitute unenforceable anti-assignment provisions which are

expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

(iv) The Debtors' assumption and/or assignment of the Assigned Contracts and Leases is subject to the consummation of the Sale Transaction with the Buyer. To the extent that an objection by a counterparty to any Assigned Contract related to the applicable Cure Cost, is not resolved prior to the Closing, the Buyer may, without any further approval of the Court or notice to any party, elect to (a) not have the Debtors assume and/or assign such Assigned Contract to it, or (b) have the Debtors postpone the assumption and/or assignment of such Assigned Contract until the resolution of such objection; *provided*, *however,* that the Debtors, the Buyer, and the relevant non-debtor counterparty under each Assigned Contract that is a 365 Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Cure Costs without further order of, or notice to, this Court, with any such agreed upon Cure Costs being paid to the appropriate counterparty by the Debtors as a condition subsequent to such assumption and/or assignment of the relevant Assigned Contract.

12. **Assigned Contracts and Leases**. Subject to the provisions of this Sale Order and in accordance with the APA, the Debtors are authorized to assign, pursuant to the APA, all Assigned Contracts, Leases and other Assets, including Assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements) free and clear of all claims, encumbrances, Liens or Liabilities (other than any (i) Assumed Liabilities and (ii) Permitted Liens other than Consent Rights and Preferential Purchase Rights as applicable to the Transaction). As of the Closing, the Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts and Leases, including any 365 Contracts to be assumed and assigned to the Buyer, first arising and attributable to the time period occurring on or after the Effective Time (as defined in the APA) and shall have all rights thereunder.

(i) Upon Closing, (a) all defaults (monetary and non-monetary) under the Assigned Contracts that are 365 Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Buyer with respect to amounts first arising or accruing, during, or attributable or related to, the period before Closing with respect

to such Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Buyer, or the Assets that any additional amounts are due or defaults exist under such Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Effective Time (other than claims against Buyer with respect to the Assumed Liabilities, claims arising from Ordinary Course Obligations, and rights attributable to Gavilan for Ordinary Course Obligations).

(ii) Upon assumption of those Assigned Contracts and Leases to be assumed by the Debtors and/or assigned to the Buyer as of the Closing, such Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Assigned Contract or Lease or other restrictions prohibiting assignment or transfer. To the extent any Assigned Contract or Lease is assumed and/or assigned to the Buyer under this Sale Order, such assumption and/or assignment will not take effect until the Closing. Furthermore, other than the Assigned Contracts and Leases, no other contract shall be deemed assumed by the Debtors and/or assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract or Lease shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Assigned Contract or Lease.

(iii) All counterparties to the 365 Contracts to be assumed and assigned to Buyer as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

Notwithstanding the foregoing, the Debtors may, at the Buyer's direction, amend the list of 365 Contracts to be assumed and assigned to Buyer under the APA to add or remove any 365 Contract to or from such list prior to the Closing of the Sale Transaction in accordance with the terms of the APA.

13. **Exclusion of Audit Rights**. Notwithstanding anything in the Sale Motion and this Sale Order to the contrary, any sale or transfer of oil and gas leases, or assumption and assignment of executory contracts, shall be subject to the ongoing audit rights contained in such

leases and contracts. Claim numbers 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 10008, and 10010 in the bankruptcy case of *Gavilan Resources, LLC, et al.* (20-32656 (MI)), which are based on the ongoing data exchange between SN EF Maverick, LLC and the claimants, are the liability of the estate of *Gavilan Resources, LLC* (20-32656 (MI)) to the extent that such are money damages for the Pre-Effective Time (as defined in the APA) and do not impact lease termination issues. To the extent such are for the Post-Effective Time (as defined in the APA) or impact lease termination issues, such are the liability of the Buyer. The Royalty Owners (as defined in Docket Nos. 307 and 309) and Briscoe Ranch, Inc. consent to the Sale, but the consent rights of the Royalty Owners, Briscoe Ranch, Inc., and Lessors (identified in paragraph 25 of this Sale Order) are preserved and their consent to the assignment under the Sale Transaction shall not be deemed a consent to future assignments (other than the Sale Transaction). The current consent is to the Buyer in this Sale Transaction, and conditioned on the current operator SN EF Maverick LLC remaining the operator. All parties reserve their rights.

14. **No Successor Liability**. Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Debtors, or (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; provided that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any

entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15. **Release of Interests**. Effective upon the Closing, this Sale Order (i) is and shall be effective as a determination that all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated (with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Buyer, and all recorded claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) against the Assets shall be deemed stricken from such entities records, official and otherwise.

16. **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing claims, encumbrances, Liens or Liabilities against or on the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) that the person or entity has or may assert with respect to the Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets. The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all claims, encumbrances, Liens or Liabilities against the Assets (other than the Assumed Liabilities and Permitted Liens). This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

17. **Surrender of Possession**. Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Buyer free and clear of all claims, encumbrances, Liens or Liabilities, except for the Assumed Liabilities and Permitted Liens, with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the APA).

18. **Allocation of Assets**. The Buyer is hereby authorized in connection with the consummation of the Sale Transaction to allocate the Assets, including the Assigned Contracts and Leases, among its affiliates in a manner as it in its sole discretion deems appropriate, and to assign any of the Assets, including the Assigned Contracts and Leases, to its affiliates with all of the rights and protections accorded to the Buyer under this Sale Order and the APA with respect thereto, in each case, to the extent permitted by, and in accordance with, the terms of the APA.

19. **Exculpation**. Because the entry into the APA and the other Transaction Documents, and the consummation of the Sale Transaction constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall neither have, nor incur, any liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20. **Indemnification by Buyer**. From and after Closing, the Buyer shall release, defend, indemnify and hold Sellers and their affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses based upon, attributable to or resulting from:

a. any breach of any representation or warranty of Buyer, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer;

b. any breach of any covenant or other agreement on the part of Buyer under the APA;

c. the Assumed Liabilities;

d. any Buyer Taxes (as defined in the APA); and

e. any other indemnity obligations of Buyer and its affiliates expressly set forth in the APA.

21. **Governmental Liabilities**: Nothing in this Sale Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order. Nothing in this Sale Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

22. **Texas Ad Valorem Taxes**. Notwithstanding any other provisions of this Order or the APA, the 2020 ad valorem taxes of Dimmit County (the "**Certain Texas Taxing Entity**") attributable to the Assets (as defined in the APA) are Permitted Liens, as defined in the APA. To the extent not paid prior to or at Closing, the Buyer assumes full responsibility for the 2020 ad valorem taxes attributable to the Assets and shall be responsible for paying the ad valorem taxes attributable to the Assets in full, in the ordinary course of business, when due. Any proration to the Seller shall be credited to the Buyer at closing or on terms agreed upon by the Buyer and Seller in accordance with the APA. Any dispute regarding the proration of the ad valorem taxes

between the Buyer and Seller shall have no effect on the Buyer's responsibility to pay the 2020 ad valorem taxes attributable to the Assets. The Certain Texas Taxing Entity shall retain its liens against the Assets until paid in full, including any applicable penalties or interest.

23. **Prohibition of Actions Against Buyer**. Except for the Assumed Liabilities and Permitted Liens, or as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors. Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities, all persons and entities shall be, and hereby are, forever barred and estopped from (i) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Assets to the Buyer in accordance with the terms of this Sale Order and the APA and (ii) asserting, prosecuting, or otherwise pursuing, whether in law or in

equity, in any judicial, administrative, arbitral or other proceeding, any claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever against the Buyer and its successors, designees, assigns, or property, or the Assets conveyed under this Sale Order in accordance with the APA. Without limiting the foregoing, each person or entity who holds or is the beneficiary of a Preferential Purchase Right or Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction, free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens), and from asserting any alleged Preferential Purchase Rights with respect to the Sale Transaction, and (ii) deemed to consent to and approve the transfer, sale, and assumption and/or assignment of the Debtors' right, title, and interest in, to and under such Assets free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens).

24. **Sale Proceeds**. The cash proceeds may be used by the Debtors in a manner consistent with the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Granting Related Relief* (the "**Cash Collateral Order**") [Docket No. 116] as may be amended. At Closing, the proceeds shall be used for (i) working capital, general corporate purposes and administrative costs and expenses of the Debtors incurred in the chapter 11 cases, subject to the terms of the Cash Collateral Order and in accordance with the Budget, subject to a Permitted Variance (each as defined in the Cash Collateral Order); (ii) adequate protection payments to the RBL Administrative

Agents and the other RBL Secured Parties (each as defined in the Cash Collateral Order); and (iii) adequate protection payments to the Second Lien Lenders (including the reasonable and documented fees, costs and expenses incurred by Fried Frank) for any amounts that have been incurred or accrued through the date of entry of this Sale Order in accordance with the Cash Collateral Order. This provision is without prejudice to the rights of the administrative agent to seek payment from the proceeds.

25. **Mineral Lessor Objections**. Notwithstanding anything herein to the contrary, objections filed by mineral lessors, including Miramar Holdings, LP (Docket No. 328), Janey Briscoe Marmion GST Trust (Docket No. 330), and Rancho La Cochina Minerals, Ltd. (Docket No. 331) (each a "**Lessor**", and collectively, the "**Lessors**"), are overruled without prejudice. The Lessors shall have until **October 15, 2020 at 5:00 p.m. (prevailing Central Time)** to assert any objections solely with respect to their asserted consent rights. To the extent a hearing is necessary, a hearing may be self-calendared for **October 19, 2020 at 10:30 a.m. (prevailing Central Time)**. Briscoe Ranch, Inc.'s objection, filed at Docket No. 327, is deemed moot as Briscoe Ranch, Inc. consents to the Sale Transaction.

26. **Provisions Related to UnSub (Docket No. 338)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The currently pending litigation in respect of the Comanche Agreements (as defined therein and which include the JDA) in *GSO ST Holdings LP v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, Adv. Pro. No. 20-03197 (MI) (Bankr. S.D. Tex.) and in *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex.) (such litigation, the "**Existing Litigation**") may continue.

(ii) The entry of this Sale Order shall not limit or curtail the Court's ability to fashion relief in the Existing Litigation.

(iii) Notwithstanding anything in the Sale Order or the APA, the rights of the parties to the Existing Litigation as to whether (i) the execution of the Release Agreement (as defined in the APA) constitutes a breach of the JDA; or (ii) a transfer of operatorship or the absence thereof under the terms of the JDA and joint operating agreements, including with respect to any argument that a transfer is or is not required, shall be preserved (or denied) in all respects consistent with the record.

(iv) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(v) Any determination made by a final, non-appealable order in the Existing Litigation as to (A) whether the JDA or the Development Agreement is a covenant running with the land or an equitable servitude, or (B) whether any of the Comanche Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

27. **Provisions Related to the Oxy Objection and the WES Objection (Docket Nos. 332 and 333)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The Buyers', SN EF Maverick's, the Oxy Parties', WES Parties' and Gavilan's (collectively, the "Parties-in-Interest" and each a "Party-in-Interest") agreement, as reflected in this Sale Order, to resolve objections to the Sale Motion or Sale Transaction will not be used against or prejudice such Parties-in-Interest in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (as defined below).

(ii) Nothing in this Sale Order or the APA will in any way modify, inhibit, or impair any Party-in-Interest's rights to or ability to assert any claims, rights, objections, arguments, and/or defenses in the adversary proceeding captioned *Occidental Petroleum Corp. et al. v. Sanchez Energy Corp.*, Adv. Case No. 20-3198 (Bankr. S.D. Tex. June 22, 2020) (the "**Sanchez Adversary**") or in the related rejection objection (the "**Sanchez Rejection Dispute**") pending in the bankruptcy cases captioned *In re Sanchez Energy Corp.*, Case No. 19-34508 (Bankr. S.D. Tex. Aug. 11, 2019) (the "**Sanchez Chapter 11 Case**"); and any such rights to or ability to assert such claims, rights, objections, arguments, and/or defenses in the Sanchez Adversary or in the Sanchez Rejection Dispute shall be unaffected by the granted relief as described herein.

(iii) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(iv) The Assets being sold will remain subject to any covenants, servitudes or similar agreements which the Oxy Parties and WES Parties contend are covenants running with the land or equitable servitudes and any agreements integrated with contracts assumed by the Debtors and assigned to the Buyer (collectively, the "**Agreements**"), in each case, only to the extent (A) such Agreements are being contested in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (defined below), as applicable, and (B) the Court determines in a final, non-appealable order such Assets are required by applicable law to remain subject to such Agreements.

(v) Any determination made by a final, non-appealable order in the Sanchez Adversary as to (A) whether the Development Agreement[4] is a covenant running with the land or an equitable servitude, or (B) to the extent that they are identical, whether any of the Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

(vi) Nothing in this order modifies, inhibits or impairs any party's rights or ability to assert any claims, rights, objections, arguments, and/or defenses regarding the Gavilan Springfield Agreements, including but not limited to the matters raised by the WES Dispute.

(vii) Nothing in this Sale Order or the APA shall be deemed or in any way constitute an adjudication of the *Application for Allowance and Payment of Administrative Expense Claim* filed by Springfield Pipeline LLC and appearing at Docket No. 287 in these chapter 11 cases.

28. **No Interference**. Following the Closing, no holder of a claim, encumbrance, Lien or Liability in or against the Debtors or the Assets shall interfere with the Buyer's title to or use and enjoyment of the Assets based on or related to such claim, encumbrance, Lien or Liability; *provided that* this paragraph shall not apply to, and shall not prejudice the WES

[4] The Development Agreement is that certain Development Agreement dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sn EF Maverick, LLC, Sn EF UnSub LP, Gavilan Resources LLC (f/k/.a Aguila Production, LLC) and Sanchez Energy Corporation.

[5] The "Gavilan Springfield Agreements" are (i) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC and (ii) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC.

Parties' prosecution and the Court's ability to adjudicate whether the Gavilan Springfield Agreements are covenants running with the land or equitable servitudes (the "**WES Dispute**"), the Sanchez Adversary, or the Sanchez Rejection Dispute, and further, should the Court resolve (i) all or any portion of the WES Dispute or (ii) any claims or arguments in the Sanchez Adversary or the Sanchez Rejection Dispute, in the Oxy Parties' or WES Parties' favor, the same shall not constitute an "interference" with the Buyer's title to, or use and enjoyment of, the Assets.

29. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to (i) compel delivery of the Assets or performance of other obligations owed to the Buyer, (ii) compel performance of obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the APA or the Sale Transaction, including, but not limited to, the WES Dispute, (iv) interpret, implement, and enforce the provisions of this Sale Order, (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyer to evidence the release of any claims, encumbrances, Liens or Liabilities in the Assets, (vi) protect the Buyer and its affiliates against (a) any claims, encumbrances, Liens or Liabilities in or against the Debtors or the Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in their possession, and (vii) protect the Debtors and their affiliates against any liabilities (other than any liabilities retained by the Debtors under the APA) in any way relating to the Assets arising on or after the Closing Date other than to the Buyer pursuant to the APA.

30. **Immediate Effect**. Notwithstanding the provisions set forth in Rule 60004(h) of the Bankruptcy Rules, this Sale Order shall be immediately effective and enforceable and its provisions shall be self-executing. The Debtors and the Buyer are free to close the Sale Transaction under the APA at any time in accordance with the terms of the APA.

31. **Good Faith Purchaser**. The Sale Transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Assets to the Buyer (including the assumption and assignment by the Debtors of any of the 365 Contracts), unless such authorization is duly stayed pending such appeal. The Buyer is a buyer in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

32. There has been no showing that the Debtors or the Buyer engaged in any action or inaction that would cause or permit the Sale Transaction and underlying transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

33. **Excluded Assets Held in Trust**. The assets sold pursuant to this Sale Order and the terms of the APA shall not include unclaimed property held in trust by the Seller, as defined pursuant to Texas state unclaimed property laws, including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

34. **Inconsistencies with Prior Orders, Pleadings, or Agreements**. To the extent of any conflict between the APA and this Sale Order, the terms of the Sale Order shall govern. To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading

in these chapter 11 cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.

35. **Subsequent Orders and Plan Provisions**. Unless otherwise agreed to by the Debtors and the Buyer, this Sale Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or any subsequent order(s) of this Court.

36. **Backup Bid APA**. In the event the Debtors proceed with the Backup Bid, the Debtors shall file and serve a notice of filing of an Asset Purchase Agreement for the Backup Bid (the "**Backup Bid APA**"), and a proposed order approving the sale pursuant to the Backup Bid APA, to all interested parties, and shall seek from the Court a hearing on the Backup Bid APA following a reasonable objection period.

37. **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

38. **Satisfaction of Conditions Precedent**. Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale Transaction have been satisfied or waived in accordance with the terms of the APA.

39. **Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Signed: October 16, 2020

Marvin Isgur
United States Bankruptcy Judge

# Exhibit I

## APA

Exhibit "A" will be filed by Notice on the CM/ECF docket sheet later today and is incorporated in this Order by reference.

# EXHIBIT 26

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
December 06, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) **Re: Docket Nos. 1326 and 2071** |

**STIPULATION AND AGREED ORDER AUTHORIZING ASSUMPTION OF COMANCHE NON-OPS' PRODUCTION MARKETING AGREEMENTS**

On October 14, 2021, Venado EF L.P., Eagle Ford TX LP, and Mitsui E&P Texas LP (collectively, the "Comanche Non-Ops") filed the *Limited Objection and Reservation of Rights of Comanche Non-Ops with Respect to Assumption of Production Marketing Agreements* [Docket No. 2071] (the "Objection"), objecting on a limited basis to the assumption by Reorganized Debtor SN EF Maverick, LLC ("Maverick" and together with the Comanche Non-Ops, the "Parties") of the executory contracts listed on Exhibit 1 attached hereto (collectively, the "PMAs"), pursuant to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").[2]

The Comanche Non-Ops and Maverick, by and through their respective counsel, have agreed to the entry of this stipulation and agreed order ("Order") by this Court, without trial or

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in Plan.

adjudication of any issue of fact or law. The Parties having requested that the Court enter this Order, it is therefore ORDERED, ADJUDGED, AND DECREED as follows:[3]

**FINDINGS**

A. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

B. The Comanche Non-Ops each own certain working interests in oil and gas properties in South Texas, referred to as the "Comanche Assets".

C. The Comanche Non-Ops[4] entered into their respective PMAs with Anadarko Energy Services Company and Anadarko E&P Onshore LLC (collectively, "Anadarko") between 2010 and 2012, pursuant to which, the Comanche Non-Ops agreed to sell, and Anadarko agreed to purchase the Comanche Non-Ops' oil and gas production associated with the Comanche Assets and thereafter arrange for the gathering, treating, transportation, marketing and/or sale of its own (and its affiliates') production volumes together with those of the Comanche Non-Ops.

D. Maverick, SN EF UnSub, LP ("UnSub"), and Gavilan Resources, LLC ("Gavilan"), the predecessor in interest to Mesquite Comanche Holdings, LLC ("MCom"), purchased Anadarko's working interest in the Comanche Assets in 2017 (the "Comanche Purchase Transaction").[5]

---

3 Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

4 References to "Comanche Non-Ops" in this paragraph refer to the Comanche Non-Ops and/or their respective predecessors in interest in the Comanche Assets, as applicable.

5 As of December 3, 2021, Maverick, UnSub, MCom, and the Comanche Non-Ops own all the working interests in the Comanche Assets.

E. Pursuant to the Comanche Purchase Transaction, Maverick became and continues to be the operator of the Comanche Assets pursuant to applicable joint operating agreements, and Anadarko assigned the PMAs to Maverick.

F. The PMAs facilitate Maverick's efficient operation of the Comanche Assets and also enable the Reorganized Debtors to maximize the value of the Comanche Assets for themselves and all the other working interest owners of the Comanche Assets by, among other things, allowing Maverick to negotiate the gathering, treating, processing, and transportation of the oil and gas production from the Comanche Assets on an aggregate basis, including production of the Reorganized Debtors and the Comanche Non-Ops. Currently, the Reorganized Debtors sell the Comanche Non-Ops' oil and gas production through certain agreements (the "Agency Agreements") with Occidental Petroleum Corporation, Western Midstream Partners LP, and their respective affiliates (collectively, "Oxy/WES"). The Reorganized Debtors have also been engaged in ongoing litigation with Oxy/WES with respect to rejection or assumption of the Agency Agreements (the "Oxy/WES Litigation").

G. Consistent with this Court's *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. 1110] ("Solicitation Procedures Order") and the Plan and Confirmation Order, on or about May 29, 2020, prior to the Plan's Effective Date, the Debtors listed each of the PMAs on the Schedule of Assumed Executory Contracts and Unexpired Leases, as contracts to be assumed under the Plan; and the PMAs have remained on that schedule ever since.

H. The "Contract Objection Deadline" for the Comanche Non-Ops to object to the proposed assumption of their respective PMAs—originally set in the Confirmation Order as May 20, 2020—was extended multiple times, consistent with the Confirmation Order and with the mutual consent of the parties, to October 14, 2021.

I. From the Effective Date of the Plan through the date of this Order, each of the PMAs is, and has at all relevant times been, an Executory Contract.

J. As set forth in the Objection, the Comanche Non-Ops raised issues with respect to adequate assurances for the assumption of the PMAs under section 365 of the Bankruptcy Code.

K. As of the Effective Date of the Plan, no Cure Claims with respect to the PMAs existed.

L. The Debtors' and Reorganized Debtors' decision, as applicable, to assume the PMAs is a reasonable exercise of the Debtors' and Reorganized Debtors', as applicable, business judgment and is consistent with the process for assuming agreements set forth in the Plan, the Confirmation Order, and otherwise applicable law.

**ASSUMPTION**

**IT IS FURTHER ORDERED that**:

1. The Comanche Non-Ops hereby withdraw the Objection.

2. For purposes of clarification, nothing in this Order is intended to alter the rights of the Comanche Non-Ops, if any, to receive copies of, or notices with respect to, any new or amendments to existing "Commitment Agreements" (as such term is defined in the applicable PMAs), if any, in connection with the settlement of the Oxy/WES Litigation, in each case to the extent required by the terms of the applicable PMAs. For the avoidance of doubt, the following agreements, which Maverick has informed the Comanche Non-Ops it intends to assume in

connection with the settlement of the Oxy/WES Litigation, are not "Commitment Agreements": (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation; and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as each may be assumed, amended, modified, or supplemented from time to time.

3. Maverick is authorized and directed to assume the PMAs, effective as of the Effective Date, pursuant to the Plan. All requirements for assumption of the PMAs, as of the Effective Date of the Plan, pursuant to the Plan and pursuant to 11 U.S.C. §§365 and 1123 are deemed satisfied.

4. Except as otherwise provided in this paragraph, all defaults, if any, arising under the PMAs on account of actions or inactions of any party to such PMAs as of the date of entry of this Order are hereby mutually waived, released, and discharged by the Parties; *provided, however,* the foregoing waiver, release, and discharge shall not constitute a waiver, release, or discharge of any default arising from or relating to Maverick's obligation to pay ordinary course amounts to each of the Comanche Non-Ops pursuant to a PMA for its respective production of hydrocarbons, solely relating to amounts not yet invoiced or otherwise paid by Maverick as the date of this Order for hydrocarbons either previously purchased by or delivered to Maverick (A) for gas and natural gas liquids, between September 1, 2021 and the date of this Order, and (B) for oil, between October 1, 2021, and the date of this Order. For the avoidance of doubt, notwithstanding the release, waiver, and discharge of defaults in this paragraph, the Comanche Non-Ops and Reorganized Debtors shall each retain their respective unexpired audit rights under the PMAs.

5. The PMAs shall remain in full force and effect and shall be binding upon each of the parties thereto in accordance with their terms, and the PMAs shall be enforceable in accordance with their terms pursuant to otherwise applicable law. For purposes of clarification, in connection with the entry of this Order, the Reorganized Debtors and the Comanche Non-Ops have not agreed to any amendments or modifications to the terms of the PMAs.

6. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7. Without further order of the Court, the Debtors and Reorganized Debtors, as applicable, and the Comanche Non-Ops are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, including, without limitation, the impact of the Debtors' or Reorganized Debtors', as applicable, assumption and/or rejection of any other executory contract on the parties' respective rights and obligations under the PMAs.

**IT IS SO ORDERED.**

Signed: December 06, 2021

Marvin Isgur
United States Bankruptcy Judge

**ACCCEPTED AND AGREED:**

*/s/* Aparna Yenamandra

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Aparna Yenamandra (admitted *pro hac vice*)
Conor P. McNamara (admitted *pro hac vice*)
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: conor.mcnamara@kirkland.com
aparna.yenamandra@kirkland.com

*Counsel to Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)*

*/s/* Duston McFaul

**SIDLEY AUSTIN LLP**
Duston McFaul (TX Bar No. 24003309)
Michael Fishel (TX Bar No. 24082998)
Maegan Quejada (TX Bar No. 24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 459-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

*Counsel to Mitsui E&P Texas LP*

*/s/* Julia Frost-Davis

**MORGAN LEWIS LLP**
Julia Frost-Davies (admitted *pro hac vice*)
Amy Kyle (admitted *pro hac vice*)
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

*Counsel to Eagle Ford TX LP*

*/s/* John P. Melko

**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko.@foley.com
sbeausoleil@foley.com

*/s/* Jamie A. Levitt

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

*/s/* Dennis L. Jenkins

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**

**PRODUCTION MARKETING AGREEMENTS**

1) Maverick Crude Oil Production Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

2) Maverick Residue Gas Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP, as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated February 1, 2014

3) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

4) Maverick Oil Production Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

5) Maverick Residue Gas Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

6) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company), as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated as of February 1, 2014

7) Maverick Oil Production Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

8) Maverick Residue Gas Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

9) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

# EXHIBIT 27

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION AND AGREED ORDER**

This Stipulation and Agreed Order (the "Order") is made pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (applicable herein pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure), between (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline, LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.[2]

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

**RECITALS**

**WHEREAS**, certain of the Parties are party to multiple agreements related to certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in the above-captioned Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], seeking to reject or assume the Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing the adversary proceeding captioned *Occidental Petroleum Corp. v. Sanchez Energy Corp.*, Adv. Pro. No. 20-03198 (S.D. Tex.) (the "OXY/WES Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Adv. Pro. No. 20-03198, Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89-90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Adv. Pro. Docket No. 97] (the "Reconsideration Motion") in the OXY/WES Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order to find that the Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, the Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to this Order (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to this Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan;[3] (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of the OXY/WES Adversary Proceeding; and (v) dismissal of the Appeal; and

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

---

[3] Certain of the agreements identified in Schedules 1 and 2 to the Complaint were previously assumed by the applicable Debtor(s) in connection with the *Stipulation of Dismissal and Agreed Order* [Docket No. 1973] and the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* [Docket No. 2201].

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon the occurrence of all of the following events: (a) entry by this Court on the docket of these Chapter 11 Cases; (b) the entry by this Court of the Stipulation of Dismissal in the form attached hereto as <u>Exhibit 3</u> (the "<u>AP Dismissal Stipulation</u>") in the OXY/WES Adversary Proceeding; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "<u>Order Effective Date</u>"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. The Parties are deemed to agree, and it is hereby found, that, as of the Order Effective Date, each of the Assumed Comanche Agreements is an Executory Contract that is capable of assumption pursuant to the Plan and each of the Rejected Comanche Agreements is an Executory Contact that is capable of rejection pursuant to the Plan; *provided, however*, consistent with the Partial Rejection Order, characterization of the Springfield Agreements as Executory Contracts does not alter or otherwise impact the real property interests granted to Springfield in the Springfield Agreements.

5. It is hereby found, and each of the Parties hereby agrees, that each applicable Mesquite Entity, as a Reorganized Debtor, is and shall be entitled, pursuant to the Plan and 11

U.S.C. §§365 and 1123, to assume each of the Assumed Comanche Agreements and to reject each of the Rejected Comanche Agreements, and all requirements for assumption or rejection, as applicable, pursuant to the Plan, the Confirmation Order, any other Orders of this Court in these proceedings or relating proceedings, and 11 U.S.C. §§365 and 1123 are hereby deemed satisfied.

6. All objections to the assumption and rejection of the Assumed Comanche Agreements and Rejected Comanche Agreements as contemplated by this Order, including but not limited to the Rejection Objection, are hereby deemed withdrawn or overruled, with prejudice, and all related contested matters are dismissed.

7. On the Order Effective Date, each of the applicable Mesquite Entities is hereby authorized and directed to assume each of the Assumed Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the assumption of the Assumed Comanche Agreements, in each case to the extent required by the Settlement effective as of the Effective Date of the Plan.

8. On the Order Effective Date, each of the applicable Debtors is hereby authorized to reject each of the Rejected Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the rejection of the Rejected Comanche Agreements, with such rejections being effective as of the Effective Date of the Plan.

9. As between the Parties, upon assumption pursuant to the Settlement and this Order, each of the Assumed Comanche Agreements, including the Springfield Agreements, as each may be amended, shall remain in full force and effect, and be binding upon each of the parties thereto in accordance with their respective terms and otherwise applicable law.

10. As a condition to assumption of the Springfield Agreements, Mesquite shall pay to Springfield Pipeline LLC (i) $51,832,780.72 in the aggregate and (ii) an amount equal to all unpaid

amounts, if any, (x) invoiced and (y) due and payable in the ordinary course of business between December 17, 2021 and the effective date of the Settlement pursuant to the Springfield Agreements and/or any applicable gas or oil gathering agreements with Gavilan Resources, LLC, in each case only as required by the Settlement (the "Springfield Cure Amount"). As a condition to assumption of the Assumed Comanche Agreements to which the Occidental Entities or Eagle Ford Midstream, LP are a party, Mesquite shall pay to the Occidental Entities and Eagle Ford Midstream, LP $0 on account of defaults occurring prior to December 1, 2021 and shall pay all amounts due and owing under the such agreements from and after December 1, 2021 in the ordinary course of business (the "OXY Cure Amount"). Other than the Springfield Cure Amount and the OXY Cure Amount, no Cure Claims with respect to the Assumed Comanche Agreements exist or shall otherwise be due or payable in connection with the assumption of the Assumed Comanche Agreements, and no adequate assurances for assumption of the Assumed Comanche Agreements shall be required by this Order or the Plan as a condition to the assumptions contemplated hereby. As between the Parties, subject to payment of the Springfield Cure Amount and the OXY Cure Amount, the Debtors and Reorganized Debtors shall also be deemed to be in compliance with each of the Assumed Comanche Agreements through the date of this Order for all purposes of the Confirmation Order.

11. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12. Each Party is to bear its own costs, expenses and attorneys' fees.

13. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Signed: December 21, 2021

Marvin Isgur
United States Bankruptcy Judge

**IT IS SO ORDERED.**

This Order is issued subject to entry of an order in Appeal No. 4:21-CV-1734 authorizing the undersigned judge to enter the order signed on this date in adversary proceeding 20-3198.

**STIPULATED AND AGREED AS TO FORM AND CONTENT:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

*/s/ Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**
**ASSUMED COMANCHE AGREEMENTS**

1) Second Amended and Restated Lease Dedication and Gas Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017 as amended and supplemented, from time to time*

2) Second Amended and Restated Lease Dedication and Oil Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017, as amended and supplemented, from time to time, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated as of August 14, 2017*

3) Agreement to Amend Gas Gathering Agreements, dated June 1, 2017 between Springfield Pipeline LLC, Sanchez Energy Corporation and Gavilan Resources, LLC

4) The Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017*

5) The Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil& Gas Onshore LP and Sanchez Energy Corporation*

6) Purchase and Sale Agreement, dated January 12, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation, as amended, including by that Amendment to Purchase and Sale Agreement, dated as of March 1, 2017, that Second Amendment to Purchase and Sale Agreement, dated effective as of March 1, 2017 and that Third Amendment to Purchase and Sale Agreement, dated June 28, 2017*

7) Assignment and Consent to Assignment Agreement, dated effective as of June 28, 2017 by and among Anadarko Energy Services Company, SN EF Maverick, LLC and Eagle Ford Midstream, LP

8) Firm Intrastate Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm Intrastate Gas Transportation Agreement, dated as of June 27, 2016

9) Firm NGPA Section 311 Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of

* Assumed as amended pursuant to terms of the Settlement Agreement.

Anadarko Energy Services Company), as amended, including by that First Amendment to Firm NGPA Section 311 Gas Transportation Agreement, dated as of June 27, 2016.

10) Joint Operating Agreement, dated effective as of March 1, 2017 by and between SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF UnSub, LP and Gavilan Resources, LLC

11) Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 between Anadarko E&P Onshore LLC, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

12) Non-Exclusive Seismic Data Use License, dated March 1, 2017 by and between Anadarko Petroleum Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

13) Springfield Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sanchez Energy Corporation, and Gavilan Resources, LLC

14) Downstream Marketing Agreements Assumption Agreement, dated as of June 1, 2017 by and between Anadarko Energy Services Company and SN EF Maverick, LLC

15) Specified Midstream Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and SN EF Maverick, LLC

16) Amended and Restated Marketing Transition Services Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Anadarko E&P Onshore LLC and Sanchez Energy Corporation

17) Specified Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC

18) Firm Intrastate Gas Transportation Services Agreement, dated March 1, 2013, by and between Springfield Pipeline LLC and SN EF Maverick (as assignor of Anadarko E&P Onshore LLC), including any Attachment to Firm Intrastate Gas Transportation Service Agreement

**EXHIBIT 2**
**REJECTED COMANCHE AGREEMENTS**

1) Development Agreement, dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

2) Memorandum of Development Agreement (Dimmit County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

3) Memorandum of Development Agreement (La Salle County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

4) Memorandum of Development Agreement (Maverick County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

5) Memorandum of Development Agreement (Webb County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

6) Memorandum of Development Agreement (Zavala County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

# EXHIBIT 3
# FORM OF AP DISMISSAL STIPULATION

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re:<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,<br><br>Debtors.[1] | ) | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| OCCIDENTAL PETROLEUM CORP., ANADARKO PETROLEUM CORPORATION, ANADARKO E&P ONSHORE LLC, ANADARKO ENERGY SERVICES COMPANY, KERR-MCGEE OIL & GAS ONSHORE LP, WESTERN MIDSTREAM PARTNERS LP, WGR OPERATING, LP, and SPRINGFIELD PIPELINE, LLC,<br><br>Plaintiffs,<br>v.<br><br>SANCHEZ ENERGY CORPORATION, SN CATARINA, LLC, and SN EF MAVERICK, LLC,<br><br>Defendants. | ) | Adv. Proc. No. 20-03198 |

**STIPULATION OF DISMISSAL AND AGREED ORDER**

This Stipulation of Dismissal and Agreed Order (the "Order")[2] is made, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure(applicable herein pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure), between (i) Plaintiffs Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Plaintiffs Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Defendants Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.

**RECITALS**

**WHEREAS**, certain of the Parties are party to a number of agreements related certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in their Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1326] seeking to reject or assume certain Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Case No. 19-34508, Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing this adversary proceeding (this "Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89, 90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Docket No. 97] (the "Reconsideration Motion") in this Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order, to find that the

Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Court's Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, such Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to the *Stipulation and Agreed Order* (the "Contested Matter Order")[3] filed in the Debtors' Chapter 11 cases (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to the Contested Matter Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of this Adversary Proceeding; and (v) dismissal of the Appeal;

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

[3] The form of Contested Matter Order is attached hereto as Exhibit 1.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon (a) its approval and entry by this Court on the docket for this Adversary Proceeding; (b) entry of the Contested Matter Order by this Court in the Debtors' Chapter 11 cases; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. As of the Order Effective Date, except to the extent expressly set forth in this Order otherwise, this Adversary Proceeding, including Counts I, II, III, IV, and V, is dismissed, with prejudice.

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

5. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order and to effectuate the relief granted pursuant to this Order.

6. Each Party is to bear its own costs, expenses, and attorneys' fees.

7. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**IT IS SO ORDERED.**

Signed: ____________________, 2021

__________________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**ACCCEPTED AND AGREED:**

*/s/ Lydia R. Webb*

**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

/s/ *Thomas MacWright*

**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*

**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

# EXHIBIT 28

7/30/2021 9:07 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 55852780
By: Cecilia Thayer
Filed: 7/30/2021 9:07 AM

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC,<br>Plaintiff, | §<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | HARRIS COUNTY, TEXAS |
| SN EF UNSUB, LP, EAGLE FORD TX LP, VENADO EF L.P., MITSUI E&P TEXAS LP, and MESQUITE ENERGY, INC.,<br>Defendants. | §<br>§<br>§<br>§<br>§ | ___ JUDICIAL DISTRICT |

# **Plaintiff's Original Petition**

Plaintiff CARNERO G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UNSUB, LP ("UnSub"), EAGLE FORD TX LP ("Eagle Ford"), VENADO EF L.P. ("Venado"), MITSUI E&P TEXAS LP ("Mitsui"), and MESQUITE ENERGY, INC. ("Mesquite") and alleges as follows:

## **I. Discovery Control Plan**

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## **II. Parties**

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

6. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

7. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. <u>Jurisdiction</u>

8. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. <u>Venue</u>

9. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute

provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

10. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief and attorney's fees and costs.

## VI. Factual Background

11. This is a dispute over the meaning of three contracts arising from oil and gas operations on the "Comanche Assets" in the Western Eagle Ford Shale.

**The Comanche Assets**

12. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**The Comanche Assets Acquisition**

13. In January, 2017, SN EF Maverick, LLC ("Maverick") (a subsidiary of Sanchez Energy Corporation ("Sanchez")) and various co-investors, including Gavilan Resources, LLC ("Gavilan")[1] and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets. The transaction closed on March 1, 2017.

---

[1] Gavilan Resources, LLC filed for bankruptcy on May 15, 2020, and later sold its interests in the Comanche Assets to Maverick (now known as Mesquite Energy, Inc., as explained below) in or about October 2020. As a result, the Plaintiff has not named Gavilan as a defendant.

**Comanche Assets Existing Commitments Dedications**

14. At the time of the Comanche Assets acquisition, the acreage conveyed to Maverick, Gavilan, and UnSub was dedicated by Anadarko for gathering and processing to other midstream providers pursuant to agreements that prevent, in part, the delivery of gas to other service providers (the "Existing Commitments").[2] Anadarko retained these Existing Commitments under the terms of the March 1, 2017 Comanche Assets acquisition agreements, specifically the Retained Midstream Contracts Services Agreement among Maverick, as "Provider," and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP, collectively as the "Recipient" (the "Midstream Agency Agreement"). The Midstream Agency Agreement required Provider to act as Recipient's agent for delivering gas on behalf of Recipient under the retained Existing Commitments.

15. Maverick, UnSub, and the WIPS never became parties to the underlying Existing Commitments. The Midstream Agency Agreement is the only agreement that required Maverick to deliver gas from the Comanche Assets to the Recipient for delivery under the Anadarko-retained Existing Commitments. UnSub and the WIPs never became parties to the Midstream Agency Agreement.

**Comanche Assets Marketing Agreement**

16. UnSub and Maverick agreed that Maverick would buy UnSub's share of the oil and gas produced by the Comanche Assets under the terms of a Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement") dated as of January 12, 2017. The Marketing Agreement

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time that Carnero, Mesquite and UnSub entered into the Ratification Agreement referenced herein.

is the only agreement that linked UnSub's gas from the Comanche Assets to the Existing Commitments.

**Comanche Assets Dedication to Carnero**

17. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). The GGPA obligates Maverick to deliver certain "Dedicated Gas" produced by the Comanche Assets (i.e., the "Dedicated Acreage") to Carnero. Section 3.1(b) of the GGPA excludes certain gas that is committed to other service providers under the Existing Commitments until the obligation to deliver gas thereunder terminates or expires. In addition, Section 3.1(b) of the GGPA requires Mesquite, as successor to Maverick, to terminate the obligation to deliver gas under any Existing Commitment at the earliest possible time.

18. UnSub, Maverick, and Carnero entered into a Ratification Agreement (the "UnSub Ratification Agreement") on the same day that Maverick and Carnero entered into the GGPA. Gavilan, Eagle Ford and Venado also executed ratification agreements in substantially the same form as UnSub's Ratification Agreement. These agreements together with the UnSub Ratification Agreement are collectively referred to as the "Ratification Agreements". As a consequence of the various Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have the same obligations as Maverick to terminate their delivery obligations under any Existing Commitments at the earliest possible time. Mitsui signed a Letter Agreement dated effective April 1, 2018 ("Letter Agreement"), that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA.

19. At the same time they signed the GGPA and the various Ratification Agreements and the Letter Agreement, Unsub, Eagle Ford, Venado, Maverick, Gavilan, and Carnero entered

into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment") dated effective April 1, 2018.

20. Through the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado ratified and confirmed the GGPA in all respects and each agreed to assume all obligations of *a Producer* (as defined in the GGPA) under the GGPA in all respects. Specifically, the various Ratification Agreements each provide:

a. **Section 2 –** "Producer [UnSub, Eagle Ford, and Venado each] hereby *ratifies and confirms the GGPA in all respects, and agrees that Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] will assume all the obligations of a* ***'Producer' (as defined in the GGPA)*** *under the GGPA in all respects and make all the representations and warranties of a 'Producer' under the GGPA."* [Emphasis Added.]

b. **Section 4** - "*Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA…*[3] *and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA….*" [Emphasis added.]

c. **Section 6 –** UnSub, Gavilan, Eagle Ford, and Venado each appointed Maverick as its "Producer's Representative"—"its agent and attorney-in-fact with respect to all matters under the GGPA," including receipt of notices and delivery of nominations as set forth in Article VI of the GGPA.

21. The GGPA provides that a "Producer" (as defined in the GGPA)—(which includes UnSub, Gavilan, Eagle Ford, and Venado per the various Ratification Agreements)—has the following obligations:

a. **Section 3.1(b) –** Producer's Gas that is subject to "Existing Commitments" is excluded from the dedication under Section 3.1(b) of the GGPA, *but only until "the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System … or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right*

[3] Venado's Ratification Agreement omits the language that is omitted in this quote ("(including with respect to after acquired interests)").

> *at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1*." [Emphasis added].

22. Based on these provisions in the GGPA and the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have *all* the obligations of Producers under the GGPA, including the obligation to comply with the terms of Section 3.1(b) of the GGPA. These obligations specifically include the obligation, upon termination of any Existing Commitment preventing delivery of their gas to Carnero, to deliver all gas previously subject to such Existing Commitment to Carnero for Carnero to gather, process, and purchase. Further, UnSub, Gavilan, Eagle Ford, and Venado appointed Maverick as their representative for purposes of delivering nominations with respect to all of their gas from the Comanche Assets under the GGPA. Under the Letter Agreement, Mitsui authorized Mesquite to market the gas from Mitsui's interest in the Comanche Assets under the GGPA.

**Maverick's Bankruptcy**

23. Maverick and certain of its affiliates (collectively, the "Sanchez Debtors") filed chapter 11 bankruptcy petitions on August 11, 2019 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") [Case No. 19-34508, jointly administered]. On April 30, 2020, the Bankruptcy Court entered an order confirming the Sanchez Debtors' Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1205, Case No. 19-34508] (the "Plan"). As part of the Plan confirmation process, Maverick assumed the GGPA. Upon the effective date of the Plan, Mesquite became the successor to Maverick.

24. On June 28, 2021, the Bankruptcy Court entered a Stipulation of Dismissal and Agreed Order confirming the agreed rejection of the Marketing Agreement and the assumption of the UnSub Ratification Agreement by Mesquite (the "Rejection-Assumption Order"). The rejection of the Marketing Agreement terminated Mesquite's right to UnSub's gas and triggered

the obligation under Section 3.1 of the GGPA and the UnSub Ratification Agreement for UnSub to deliver its gas to Carnero for gathering, processing, and purchase.

25. Mesquite commenced proceedings to reject the Midstream Agency Agreement, which would terminate any delivery obligation thereunder, as well as under each Existing Commitment. Termination of Mesquite's delivery obligation under the Existing Commitments (which Mesquite and UnSub, Eagle Ford, and Venado must undertake at the earliest possible time) requires the delivery of Mesquite's, UnSub's, and the WIPs' gas to Carnero under the GGPA and the Ratification Agreements. On information and belief, the WIPs are causing Mesquite to withdraw its rejection of the Midstream Agency Agreement and/or to enter into new midstream agreement(s) in violation of the GGPA and the Ratification Agreements, which would prevent delivery of the WIPs' gas to Carnero.

26. Additionally, the Rejection-Assumption Order indicates that UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement. On information and belief, UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (including the Existing Commitments) to prevent delivery of UnSub's gas to Carnero. On information and belief, the WIPs are taking a similar position that would prevent delivery of their gas to Carnero. These actions are in derogation of Carnero's rights under the GGPA, the various Ratification Agreements, and the Letter Agreement. If such agreement(s) are consummated, it will be a material breach of the UnSub Ratification Agreement and the GGPA. Additionally, UnSub's statements and actions in the Bankruptcy Court confirm that it does not intend to comply with the terms of the UnSub Ratification Agreement and the GGPA.

## VII. Causes of Action

### A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are affected by those contracts. Carnero may have determined any question of construction or validity arising under those contracts and obtain a declaration of rights, status, or other legal relations under the GGPA, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to its Ratification Agreement and the GGPA, all of UnSub's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(b) Pursuant to their respective Ratification Agreements and the GGPA, all of Eagle Ford's and Venado's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(c) Pursuant to the Letter Agreement and the GGPA, all of Mitsui's gas from the Comanche Assets is dedicated to Carnero;

(d) Their respective Ratification Agreements and the GGPA require UnSub, Eagle Ford, Venado, and Mesquite to exercise any and all options or rights at the earliest possible time to terminate any Existing Commitments (as defined in Section 3.1(b) of the GGPA);

(e) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), UnSub and Mesquite must tender for delivery all of their gas from the Comanche Assets to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(f) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Eagle Ford and Venado must tender for delivery all of their gas from the Comanche Assets

to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(g) The GGPA and the Letter Agreement require that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Mitsui must tender for delivery all of its gas from the Comanche Assets to Mesquite for delivery to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(h) In their respective Ratification Agreements UnSub, Eagle Ford, and Venado designate Mesquite their Producer's Representative with respect to all matters arising under the GGPA;

(i) In the Letter Agreement, Mitsui designates Mesquite as its marketer with respect to Mitsui's gas from the Comanche Assets to be processed through the GGPA;

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the Ratification Agreements, the Letter Agreement, and the GGPA.

**B. Attorney's Fees**

38. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code § 37.009 and as allowed by the GGPA and Ratification Agreements or other applicable agreement or statutory provision.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: July 30, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *__/s/ Eugene M. Nettles__*
Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

# EXHIBIT 29

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. ______________ |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. | § § § | |
| | § | |
| *Defendants.* | § | |

**NOTICE OF REMOVAL**

Defendants SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc. remove the state court action styled *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.,* Cause No. 2021-46431, in the 269th District Court of Harris County, Texas (the "**State Court Action**"), to the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), through referral by the

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

United States District Court for the Southern District of Texas, Houston Division (the "**District Court**"), pursuant to the District Court's General Order 2012-6. This Notice of Removal is filed pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, and Rules 9027-1 and 9027-2 of the Southern District of Texas Bankruptcy Local Rules. Jurisdiction of this case arises under 28 U.S.C. § 1334 and 11 U.S.C. §§1142, 105.

**PROCEDURAL BACKGROUND**

**A. The Parties**

1. Plaintiff Carnero G&P LLC ("**Carnero**") is a Delaware limited liability company, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("**Targa**") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**SNMP**") with its principal place of business in Houston, Texas. Plaintiff's counsel is:

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

2. Defendant SN EF UnSub, LP ("**UnSub**") is a limited partnership organized under the laws of Delaware with its principal place of business at 1111 Bagby Street, Suite 2050, Houston, Texas 77002. UnSub's counsel is:

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

and

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

3. Defendant Eagle Ford TX LP ("**Eagle Ford**") is a limited partnership organized under the laws of Texas with its principal place of business at 5599 San Felipe Road, Suite 725, Houston, Texas 77056. Eagle Ford's counsel is:

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701

julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

4. Defendant Venado EF L.P. ("**Venado**") is a limited partnership organized under the laws of Delaware with its principal place of business at 13215 Bee Cave Pkwy, Suite B-350, Austin, Texas 78738. Venado's counsel is:

Rex Manning
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rex.manning@kirkland.com

5. Defendant Mitsui E&P Texas LP ("**Mitsui**") is a limited partnership organized under the laws of Texas with its principal place of business at 1300 Post Oak Blvd., Suite 1800, Houston, Texas 77056. Mitsui's counsel is:

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

6. Defendant Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**") is a corporation organized under the laws of

Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Mesquite's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

In paragraphs 13 and 23 of *Plaintiff's Original Petition,* Carnero alleges that SN EF Maverick, LLC ("**Maverick**") is "now known as Mesquite Energy, Inc." and that, "[u]pon the effective date of the Plan, Mesquite became the successor to Maverick." This statement is incorrect; Mesquite and Maverick are separate entities. Mesquite and Maverick are affiliates.

**B. The Bankruptcy Case**

7. On August 11, 2019, Sanchez Energy Corporation and certain of its affiliates ("**Debtors**") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of Texas, Houston Division ("Bankruptcy Court"). On August 12, 2019, the Court entered an order directing joint administration of the bankruptcy cases of the Debtors, with the lead bankruptcy case as Case No. 19-3408, *In re Sanchez Energy Corporation, et al.* (the "**Bankruptcy Case**").

8. On April 30, 2020, the Bankruptcy Court entered the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates ("**Confirmation Order**").[2] The Confirmation Order approved the Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates (the "**Plan**").[3]

9. On June 30, 2020 (the "**Plan Effective Date**"), the Debtors filed the Notice of Effective Date. *See* Dkt. No. 1417.

10. Pursuant to the Plan, the debtors were required to identify certain executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "**Rejection Schedule**") or to be assumed as listed on Exhibit C (as amended, the "**Assumption Schedule**") to the Plan.[4] If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or Assumption Schedule, the executory contract or unexpired lease was deemed assumed or rejected as indicated, effective as of the Plan Effective Date.[5] For those contracts to which an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" of such executory contract or unexpired lease.[6]

---

[2] 19-34508 Dkt. 1212.

[3] 19-34508 Dkt. 1212.

[4] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55; see also Plan, Art. V.

[5] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55.

[6] 19-34508 Dkt. 1212 at 10 ¶¶17, 18; 55.

11. Section XI of the Plan further provides that the Bankruptcy Court would "retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "**resolve any matters related to Executory Contracts or Unexpired Leases**, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]"[7]

12. Paragraph 17 of the Confirmation Order provides that any "Executory contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory contract or Unexpired Lease . . . shall not be demed to be assumed or rejected, as applicable, until entry of an order resolving the dispute approving the assumption or rejection."[8] Paragraph 24 provides that, until the bankruptcy court resolves the dispute regarding assumption or rejection, the "agreement shall continue as in effect immediately prior to the effective date."[9]

## C. The State Court Action

13. Carnero filed *Plaintiff's Original Petition* and initiated the State Court Action on July 30, 2021.

14. UnSub was served on August 13, 2021.

15. Eagle Ford was served on August 13, 2021.

16. Venado was served on August 16, 2021.

17. Mitsui was served on August 13, 2021.

18. Mesquite was served on August 13, 2021.

19. None of the Defendants has filed an answer or other responsive pleading in state court. The Defendants and Plaintiff have executed a stipulation regarding the deadline for Defendants' responsive pleadings that is being filed along with this notice.

---

[7] 19-34508 Dkt. 1212 at 69 (emphasis added).

[8] 19-34508 Dkt. 1212 at 10 ¶17.

[9] 19-34508 Dkt. 1212 at 15 ¶24.

20. In the State Court Action, Carnero seeks a declaratory judgment regarding the effect of assumption and rejection on the rights and obligations of the Defendants under certain contracts that were included in the Assumption Schedule or Rejection Schedule in the Bankruptcy Case, including contracts that remain in dispute awaiting the Bankruptcy Court's resolution of matters relating to assumption or rejection of certain executory contracts. Specifically, the State Court action seeks declarations regarding the following agreements.

a. **The Marketing Agreement** – The Hydrocarbons Purchase and Marketing Agreement between Maverick and UnSub, dated January 12, 2017.[10]

The Marketing Agreement was included on the Rejection Schedule,[11] but in June and July 2020, UnSub objected[12] and initiated an adversary proceeding captioned *GSO ST Holdings LP, et. al. v. Sanchez Energy Corporation, et. al.*, Adv. Proc. No. 20-03197 (the "**GSO-Sanchez Adversary Proceeding**"). On June 28, 2021, pursuant to a settlement agreement, the Bankruptcy Court entered an order, which among other things, deemed the Marketing Agreement to be rejected, as of June 1, 2021 (the "**UnSub Stipulation and Agreed Order**").[13] Paragraph 10 of the UnSub Stipulation and Agreed Order provides that the Bankruptcy Court "shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Stipulation and Agreed Order.[14]

b. **The Midstream Agency Agreement** – The Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and solely for the purposes of a guaranty, Mesquite, entered on or around June 1, 2017.[15]

---

[10] 19-34508 Dkt. 1373-4.

[11] 19-34508 Dkt. 1326 at 114.

[12] 19-34508 Dkt. 1354, 1356, 1456.

[13] 19-34508 Dkt. 1983 at 9.

[14] 19-34508 Dkt. 1983 at 6.

[15] 19-34508 Dkt. 1544-3.

The Midstream Agency Agreement was also listed on the Rejection Schedule,[16] and the parties in interest to that agreement also filed an objection and initiated an adversary proceeding captioned *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corporation et. al., Adv. Proc. No.* 20 -03198 ("**Sanchez-Oxy Adversary Proceeding**"). The Sanchez-Oxy Adversary Proceeding remains pending.

c. **The GGPA** – The Firm Gas Gathering Processing and Purchasing Agreement between Maverick and Carnero, effective April 1, 2018.[17]

While the GGPA was initially listed on the Rejection Schedule,[18] it was ultimately assumed. The Bankruptcy Court's *Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, as Amended*, (the "Midstream Settlement Approval Order"), by which the GGPA was assumed, determined that ordered, among other things, that "[a]ny determination by SN Maverick as to whether to assume or reject a contract must be . . . made by [a fiduciary for SN Maverick];in the best interest of SN Maverick; . . . and considered after notice and hearing" and "[a]ny rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee" (which no longer exists) or "(ii) otherwise by Order of this Court.[19]

d. **The UnSub Ratification Agreement** – The Ratification and Assumption Agreement between UnSub, Maverick, and Carnero, effective April 1, 2018.[20]

The UnSub Ratification Agreement was listed on the Assumption Schedule, but parties in interest to that agreement filed objections.[21] Pursuant to the Stipulation and

---

[16] 19-34508 Dkt. 1326 at 86.

[17] 19-34508 Dkt. 1373-8. The GGPA was amended, through the Amendment to Firm Gas Gatherings, Processing and Purchase Agreement by and among SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018.

[18] *Compare* 19-34508 Dkt. 1326 at 193, with 19-34508 Dkt. 1188 at 93.

[19] 19-34508 Dkt. 1415 at 5-6 ¶¶10, 13.

[20] 19-34508 Dkt. 1373-7.

[21] 19-34508 Dkt. 1373.

Agreed Order discussed above, the UnSub Ratification Agreement was deemed assumed as of June 1, 2021.[22]

e. **The Letter Agreement** – The Letter Agreement between Mitsui, Carnero, and Maverick, effective April 1, 2018.[23] The Bankruptcy Court has not issued an order assuming or rejecting the Letter Agreement.[24]

21. Carnero's petition alleges that, ***if*** the Bankruptcy Court ultimately rejects the Midstream Agency Agreement (which, as noted above, was listed on the Rejection Schedule and is currently subject to an objection), the GGPA and certain ratification agreements would require delivery of the gas to Carnero that is currently subject to the Midstream Agency Agreement.[25]

22. The petition further alleges that Mesquite is obligated (under the GGPA) to continue pursuing rejection of the Midstream Agency Agreement in Bankruptcy Case. The petition claims that Mesquite "might withdraw its rejection" motion and "may be in active negotiations to enter into a new marketing agreement or modified version of the rejected Marketing Agreement."[26]

23. The petition asks the state court to issue an order declaring the Defendants' rights and obligations under various contracts as a matter of

[22] 19-34508 Dkt. 1983 at 8.

[23] 19-34508 Dkt. 1326 at 197.

[24] While only identified as the "Ratification Agreements" in the Original Petition, Carnero's claims relate to other agreements at issue in the Bankruptcy Case, including but not limited to the following:

- Memorandum of Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Ratification and Assumption Agreement by and among Venado EF L.P., SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018;
- Memorandum of Agreement by and among Eagle Ford TX LP, SN Ef Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018; and
- Ratification and Assumption Agreement by and among Eagle Ford TX, LP, SN EF Maverick, LLC, and Carnero G&P, LLC, dated as of April 1, 2018.

[25] Original Pet. at 7 ¶24.

[26] Original Pet. at 9 ¶¶25 – 26.

bankruptcy law. For example, Carnero asks the state court to issue an order declaring the legal effect of the rejection of the Marketing Agreement under 11 U.S.C. § 365, and declaring that, following such rejection, "UnSub must deliver UnSub's gas . . . to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement."[27]

24. Carnero also requests the state court declare that Mesquite is obligated to "pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. § 365" and that, after "rejection of the Midstream Agency Agreement under 11 U.S.C. § 365," the Defendants' gas in the "Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement" and the Defendants must deliver their gas to Carnero.[28]

## BASIS FOR REMOVAL

25. Section 1452 provides that a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 28 U.S.C. § 1452. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Chapter 11 or arises in or is related to the Bankruptcy Case.

26. "Subject matter jurisdiction remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (cleaned up); *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). This authority includes "jurisdiction

---

[27] Original Pet. at 10 ¶36(j).

[28] Original Pet. at 10 ¶36(k) – (l).

to interpret and enforce its own prior orders." *Burch v. Freedom Mortgage Corporation (Matter of Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021).

27. Specifically, bankruptcy courts maintain "'arising in or under' jurisdiction" (or "core" jurisdiction) over disputes centering on the interpretation of one of their orders. *Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*, 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd on other grounds*, 978 F.3d 323 (5th Cir. 2020); *see also Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

28. Bankruptcy courts have "related to" (or "non-core" jurisdiction) over matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.*), 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015); *see also Crown Vantage*, 421 F.3d 963 (9th Cir. 2005) (discussing factors for retention of "related to" jurisdiction).

29. Here, the State Court Action expressly requests declarations regarding the rejection or assumption of certain executory contracts under Section 365 of the Bankruptcy Code, including those agreements that have not yet been assumed or rejected in the Bankruptcy Case (and thus seeks a declaration as to the scope or effect of such assumption or rejection decision that the Bankruptcy Court may enter in the future). Carnero further seeks to preclude Mesquite[29] from withdrawing its rejection of the Midstream Agency

[29] Carnero named only Mesquite as a party to the State Court Action, but Maverick is the real party in interest because (i) Maverick is the counterparty to the various agreements and (ii) Maverick is the party that listed the Midstream Agency Agreement on the Rejection Schedule. The Defendants refer in this Notice of Removal to "Mesquite," as that is the entity that Carnero sued, but do not waive their objection that Mesquite is not the real party in interest.

To the extent that naming Mesquite—not Maverick—in the State Court Action was intentional and Carnero in fact seeks a judgment declaring that *Mesquite* is obligated under various agreements that it was not a party to, Carnero's claim against Mesquite requires the interpretation and enforcement of the Confirmation Order and Plan, and therefore arises in the Bankruptcy Case.

Agreement in the Bankruptcy Case and to preempt an order from this Court on the impact of any rejection of the Midstream Agency Agreement.

30. When the Bankruptcy Court entered the Midstream Settlement Approval Order, it recognized the complexities of the various agreements related to the Comanche Assets and required the rejection or termination of material agreements affecting the Comanche Assets to be approved by an order of the Bankruptcy Court (or Operating Committee).[30] Moreover, it imposed further conditions precedent to Maverick's assumption or rejection of executory contracts, including that any assumption or rejection has to be made by a fiduciary for Maverick, in the best interest of Maverick, and after notice and hearing.[31]

31. Through the State Court Action, Carnero attempts to interfere with the Bankruptcy Court's determinations regarding the rejection or assumption of certain executory contracts, pursuant to the process laid out in the Confirmation Order and Plan (and further supplemented by the Bankruptcy Court's orders, including the Midstream Settlement Approval Order). Moreover, the petition's invocation of the Bankruptcy Code and its attempt to affect (or preclude) future prospective orders from the Bankruptcy Court—and positions that Mesquite (or Maverick) may take in the Bankruptcy Case in the future, including in compliance with the Midstream Settlement Order—confer jurisdiction on this Court because Carnero's claims "arise in," or at the very least relate to, the Bankruptcy Case.

[30] 19-34508 Dkt. 1415 at 6 ¶13.

[31] 19-34508 Dkt. 1415 at 5-6 ¶11

## ADDITIONAL PROCEDURAL MATTERS

**A. Timely Removal under § 1446 and Bankruptcy Rule 9027(a)(3)**

32. This notice of removal is timely filed because it is filed within 30 days of service and within the period provided by Federal Rule of Bankruptcy Procedure 9027(a)(3) and 28 U.S.C. §1446(b).

**B. Proper Federal Court**

33. The 269th District Court of Harris County, Texas is located within the Southern District of Texas, Houston Division. Therefore, under 28 U.S.C. §§ 1334 and 1452, and Fed. R. Bankr. P. 9027, this action is properly removed to this Court. *See, e.g., In re SBMC Healthcare, LLC,* 519 B.R. 172 (Bankr. S.D. Tex. 2014).

34. Pursuant to Local Rule 9027-1, Defendants state that they do consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**C. State Court Documents Attached**

35. Pursuant to Fed. R. Bankr. P. 9027(a) and Bankruptcy Local Rule 9027-1, an appendix is attached to this notice, which includes a copy of the state-court docket sheet and all documents filed with the state court.

**D. Notice**

36. Upon the filing of this notice of removal, the Defendants will duly notify the Clerk for the 269th District Court for Harris County, Texas, attaching a copy of this notice of removal.

James G. Munisteri Date: 9/10/2021

DocuSigned by: James G. Munisteri

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax
713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax
214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant**
**Mesquite Energy, Inc.**

DocuSigned by:
Thomas A. Woolley, III
Date: 9/9/2021
0FC05CB27AE3457...

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

DocuSigned by:
Jared Wilkerson
3547C6B788AE472...

____________________________ Date: 9/9/2021

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

DocuSigned by:
Rex Manning
5F49358EDFCC492...

____________________________ Date: 9/9/2021

Rex Manning
**Kirkland & Ellis LLP**
Kirkland & Ellis International LLP
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
rex.manning@kirkland.com

**Attorney for Defendant Venado EF L.P.**

DocuSigned by:
Maegan Quejada
5720F5AE5E27497... Date: 9/9/2021

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

Angela C. Zambrano
**Sidley Austin LLP**
2021 McKinney Ave., Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
angela.zambrano@sidley.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on September 9, 2021, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*/s/ Sharon M. Beausoleil*
Sharon M. Beausoleil

# EXHIBIT 30

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 21-03908 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § § § | |
| | § | |
| Defendants. | § | |

**Adversary Plaintiff's Motion to Remand to State Court or for Abstention**
(Related to Doc. No. 1)

**If you object to the relief requested, you must respond in writing. Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed. If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

.

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

# Table of Contents


Summary of the Relief Requested ........................................ 1

Background ........................................ 2

Argument ........................................ 4

I. The Court lacks jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit. ........................................ 4

A. The Court's post-confirmation jurisdiction is limited to matters pertaining to the implementation or execution of the Plan, which is assessed under the Craig's Stores' three-factor test ........................................ 6

B. The Craig's Stores factors do not support jurisdiction over Carnero's claims. ........................................ 8

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts. ........................................ 8

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date. ........................................ 9

3. No facts or law deriving from the reorganization or Plan are necessary to decide Carnero's claims. ........................................ 9

II. The factors applicable to 28 U.S.C. 1334(c)(2) support mandatory abstention. ........................................ 11

A. Carnero has timely filed this motion for abstention and its claim is based on state law. ........................................ 12

B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b). ........................................ 12

C. Carnero's claims are non-core. ........................................ 12

D. Carnero filed its claims in the State Court Lawsuit. ........................................ 13

E. The state court can timely adjudicate Carnero's claims ........................................ 13

III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention ........................................ 14

A. The permissive abstention factors. ........................................ 14

B. The balance of the factors favors permissive abstention. ........................................ 16

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention. ........................................ 16

2. The extent to which state law issues predominate over bankruptcy issues. ........................................ 16

3. The difficult or unsettled nature of applicable law. ........................................ 16

4. The presence of related proceeding commenced in state court or other nonbankruptcy proceeding ........................................ 17

5. The jurisdictional basis, if any, other than § 1334. ........................................ 17

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case. ........................................ 17

7. The substance rather than the form of an asserted core proceeding. .................. 18

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court. ........................................................................................ 18

9. The burden on the bankruptcy court's docket. .................................................. 18

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties.................................................. 18

11. The existence of a right to a jury trial. ............................................................ 19

12. The presence in the proceeding of nondebtor parties. ....................................... 19

13. Comity. ........................................................................................................ 19

14. The possibility of prejudice to other parties in the action. ................................ 20

Conclusion ..................................................................................................................... 20


## Table of Authorities

**<u>Cases</u>**


*In re Austin Development Co.*, 19 F. 3d 1077 (5th Cir. 1994).................................................7, 11

*In re Craig's Stores of Tex., Inc.*, 266 F.3d 388 (5th Cir. 2001)...............................7, 8, 11, 12, 16

*In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813 (Bankr. S.D. Tex. 2006)......................................16

*In re Encompass Services Corp.*, 337 B.R. 864 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006).................................................................9

*Matter of Galaz,* 841 F.3d 316 (5th Cir. 2016).........................................................................7, 10

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589 (5th Cir. 2008) .........................................................................................10

*In re Hous. Reg'l Sports Network, L.P.*, 547 B.R. 717 (S.D. Tex. 2016).......................................7

*In re Mugica*, 362 B.R. 782 (Bankr. S.D. Tex. 2007).................................................................12

*In re Petroleum Products & Services, Inc.*, 561 B.R. 662 (Bankr. S.D. Tex. 2016)...............12, 13

*Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.),* 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005).........................................................................................5

*In re SBMC Healthcare, LLC*, 519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017)...............................................15, 16, 17, 18, 19, 20

*In re Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008) ..................................................11




13021737

*Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311 (5th Cir. 2015) ............................................4, 12

*Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999) ..............................13

*In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016)...12

*In re Ultra Petroleum Corp.*, No. 16-32202, 2019 WL 2524936 (Bankr. S.D. Tex. Jan. 9, 2019), *report and recommendation adopted*, No. 4:19-CV-00090, 2019 WL 2524704 (S.D. Tex. Feb. 25, 2019) ..........................................................................................................................9

*In re Wood*, 825 F.2d 90 (5th Cir.1987) ..........................................................................15

*Matter of Zale Corp.*, 62 F.3d 746 (5th Cir. 1995) ....................................................................4, 5

**Statutes**

28 U.S.C. §§ 157(b)(1) ..........................................................................................12

28 U.S.C. § 1334(b) ..............................................................................2, 4, 7, 12, 19,20

28 U.S.C. § 1334(c) ..............................................................................1, 2, 4, 11, 14, 21

28 U.S.C. § 1452(b) ..........................................................................................1, 2

Tex. Civ. Prac. & Rem. Code Ch. 37.......................................................................2, 3, 16

**Rules**

Fed. R. Bankr. P. 5011(b) ..........................................................................................1

Fed. R. Bankr. P. 9014..........................................................................................1

Bankr. Local Rule 9013-1..........................................................................................1

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Adversary Plaintiff Carnero G&P LLC ("Carnero") files this Motion to Remand to State Court or for Abstention to return this case to the 269th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. This suit arises out of contracts between Carnero and non-debtors SN EF UnSub LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (collectively, "WIPs"), and reorganized debtor Mesquite Energy, Inc. ("Mesquite")[2] (formerly known as Sanchez Energy Corporation) (collectively, the WIPs and Mesquite are the "Defendants"). Those contracts are as follows:

- April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC ("Maverick"), as amended by Carnero, the WIPs and Maverick, **Exhibit 1**;
- April 1, 2018 Ratification Agreements among Carnero, Maverick, UnSub, Eagle Ford, and Venado ratifying the GGPA ("Ratification Agreements"), **Exhibits 2-4**;
- April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui regarding the GGPA ("Letter Agreement"), **Exhibit 5**.

2. The Reorganized Debtors assumed all of these contracts (collectively, the "Assumed Contracts"). Post-confirmation, Carnero filed a lawsuit in state court against the Defendants as Cause No. 2021-46431 in the 269th Judicial District Court, Harris County, Texas ("State Court Lawsuit"). In the lawsuit, the sole relief that Carnero seeks is a declaratory judgment

---

[2] Carnero recognizes that it may have misidentified Mesquite as the correct contract counterparty on the contracts that are the subject of this dispute. Carnero intends to correct this issue by amending its petition. For purposes of this Motion, it does not change the analysis that remand or abstention is warranted. Both Mesquite and Maverick are Reorganized Debtors.

under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the Assumed Contracts. The Defendants removed the case to this Court based on purported bankruptcy jurisdiction under 28 U.S.C. § 1334(b). But the State Court Lawsuit raises only matters of post-confirmation contract interpretation under state law that do not relate to implementation or execution of the Reorganized Debtors' plan of reorganization. This Court should remand this case to the state court or abstain for three reasons: (i) the Court lacks post-confirmation subject matter jurisdiction over Carnero's state court claim under 28 U.S.C. § 1334(b); (ii) the factors applicable to 28 U.S.C. § 1334(c)(2) require mandatory abstention; and (iii) the factors applicable to 28 U.S.C. § 1334(c)(1) favor permissive abstention and equitable remand pursuant to 28 U.S.C. § 1452(b).

## Background

3. The Reorganized Debtors filed their Chapter 11 petitions on August 11, 2019. [Case No. 19-34508, Dkt. 1].

4. The Court entered its Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan or Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates (the "Plan") on April 30, 2020. [Case No. 19-34508, Dkt. 1212].

5. On June 17, 2020, the Reorganized Debtors filed their Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates listing the contracts they rejected and assumed. [Case No. 19-34508, Dkt. 1326]. The assumed contracts include the GGPA, the Ratification Agreements, other than UnSub's Ratification Agreement, and the Letter Agreement. [*Id*. at PDF p. 194].

6. On June 30, 2020, the Plan became effective.[Case No. 19-34508, Dkt. 1417].

7. On June 28, 2021, the Court entered the Stipulation of Dismissal and Agreed Order resolving the adversary proceeding Case No. 20-03197 filed by GSO ST Holdings LP, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, and SN EF UnSub, LP against Sanchez Energy Corporation, SN EF Maverick, LLC, SN UR Holdings, LLC and Carnero G&P LLC. [Case No. 19-34508, 1983]. Through this order, the Reorganized Debtors assumed the UnSub Ratification Agreement and rejected the Marketing Agreement (defined below).

8. On July 30, 2021, Carnero filed the State Court Lawsuit against the Defendants seeking declarations under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the Assumed Contracts. [Dkt. 1-4]. The Assumed Contracts relate to oil and gas assets referred to as the "Comanche Assets." The GGPA contains terms requiring the Defendants to deliver gas from the Comanche Assets to Carnero in certain circumstances. The declarations Carnero seeks include the parties' rights and obligations under the Assumed Contracts and how those rights and obligations may be affected by certain other contracts that currently cause the gas from the Comanche Assets to be delivered to gas gatherers, processors, and purchasers other than Carnero. Those other contracts include:

(i) a rejected Hydrocarbons Purchase and Marketing Agreement ("<u>Marketing Agreement</u>") between UnSub and Maverick dated January 12, 2017 [Case No. 19-34508, Dkt. 1373]; and

(ii) an executory Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and Mesquite as guarantor dated on or about June 1, 2017 ("<u>Midstream Agency Agreement</u>") [Case No. 19-34508, Dkt. 1544-2], which the Reorganized Debtors have not yet rejected or assumed.

9. Carnero does not seek any declarations ***under*** the Marketing Agreement or the Midstream Agency Agreement, and it cannot seek such declarations because it is not a party to either. Carnero also does not seek any declarations ***under*** the Bankruptcy Code, the Plan, any order

of this Court, or any other contract to which the Reorganized Debtors are parties other than the Assumed Contracts. Carnero does not seek to require the Reorganized Debtors to assume or reject any executory contract, including the Midstream Agency Agreement, or to interfere with this Court's determination of the assumption/rejection question for any executory contract under its prior orders.

10. On September 10, 2021, the Defendants filed the Notice of Removal of the State Court Lawsuit to this adversary proceeding. [Dkt. 1]. The only stated basis for jurisdiction is 28 U.S.C. § 1334(b).

## Argument

11. The Court should remand this adversary proceeding to the state court for three reasons. First, under 28 U.S.C. § 1334(b) this Court lacks jurisdiction to hear Carnero's state law contract interpretation claim under the Assumed Contracts. Second, the factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. Third, the factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention and remand.

### I. The Court lacks jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit.

12. To sustain removal of the State Court Action to the Bankruptcy Court, the Defendants bear the burden to show this Court has subject matter jurisdiction over Carnero's state law claim for declaratory relief under the Assumed Contracts. *See Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311, 313 (5th Cir. 2015) ("The removing party bears the burden of establishing both the existence of federal subject-matter jurisdiction and the propriety of removal."). This burden cannot be satisfied by pointing to allegations that merely share something in common with the Reorganized Debtors' bankruptcy. *See Matter of Zale Corp.*, 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of

themselves suffice to make the third-party action 'related to' the bankruptcy."). "Merely because an action may share common facts with a bankruptcy does not confer 'related to' jurisdiction on the Court." *Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.)*, 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005); *see also Zale Corp.*, 62 F.3d at 753.

13. The Defendants ground their argument for this Court's jurisdiction on declarations sought in the State Court Lawsuit petition (Dkt. 1-4) at ¶¶ 36(j)-36(l). They allege (paraphrased) that Carnero:

- seeks declarations that if the Midstream Agency Agreement is rejected, that rejection may require delivery of gas to Carnero under the Assumed Contracts (Removal ¶ 21);
- seeks declarations that the Assumed Contracts may require Mesquite to continue to pursue rejection of the Midstream Agency Agreement (*Id.* ¶ 22);
- seeks declarations of the parties' rights and obligations under the Assumed Contracts as a matter of bankruptcy law (*Id.* ¶ 23);
- seeks declarations that Mesquite is obligated to pursue rejection of the Midstream Agency Agreement under 11 U.S.C. § 365 (*Id.* ¶ 24) and to preclude Mesquite from withdrawing its rejection of the Midstream Agency Agreement (*Id.* ¶ 31);
- seeks declarations regarding the rejection or assumption of certain executory contracts under the Bankruptcy Code (*Id.* ¶ 29); and
- seeks to preempt an order from this Court on the impact of any rejection of the Midstream Agency Agreement (*Id.*) by attempting to interfere with the Bankruptcy Court's determinations regarding the rejection or assumption of certain executory contracts. *Id.* ¶ 31.

14. The Defendants misstate Carnero's allegations. Carnero's actual allegations, excerpted below and taken as pled, demonstrate that, in this post-confirmation dispute, Carnero seeks only state court relief under the Assumed Contracts:

> (j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,
>
> i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and
>
> ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

> (k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.
>
> (l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,
>
> i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;
>
> ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and
>
> iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

In these three paragraphs, Carnero seeks declarations to resolve a post-confirmation dispute with Mesquite/Maverick and the four non-debtor WIPs only under the various Assumed Contracts—not under the Bankruptcy Code, not under the Plan, not under any order entered by the Bankruptcy Court, and not under any executory contract yet to be assumed or rejected. The Defendants must fit these claims into the Court's post-confirmation jurisdiction. They cannot carry that burden.

### *A. The Court's post-confirmation jurisdiction is limited to matters pertaining to the implementation or execution of the Plan, which is assessed under the Craig's Stores' three-factor test.*

15. The Bankruptcy Court is a court of limited jurisdiction. Its jurisdiction extends to "'all civil proceedings arising under title 11, or arising in or related to cases under title 11,'" *In*



13021737

*Matter of Galaz,* 841 F.3d 316, 322 (5th Cir. 2016) (quoting 28 U.S.C. § 1334(b)). Once the court confirms a debtor's chapter 11 plan of reorganization, however, that jurisdiction ceases to exist, other than for "matters pertaining to the *implementation or execution* of the plan." *In re Craig's Stores of Tex., Inc.,* 266 F.3d 388, 390 (5th Cir. 2001). The Court confirmed the Reorganized Debtors' Plan on April 30, 2020, and the Plan went effective on June 30, 2020 [Case 19-34508, Dkt. 1417], so the Court's jurisdiction is the more narrow post-confirmation jurisdiction standard described in *Craig's Stores*.

16. While the Plan contains retention of jurisdiction language (*see* Plan at Art. XI; Confirmation Order, ¶ 43), the source of subject matter jurisdiction for the Bankruptcy Court post-confirmation is solely 28 U.S.C. § 1334. *See In re Hous. Reg'l Sports Network, L.P.,* 547 B.R. 717, 735 (S.D. Tex. 2016). Neither the Plan nor the Court can create jurisdiction where it does not exist. Similarly, the Midstream Settlement Approval Order (Dkt. 1415) (as defined in the Notice of Removal) cannot create subject matter jurisdiction where it does not exist. That order provides that "[a]s part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to…this Order." (*Id.* at 4.) That is the same scope of jurisdiction stated in *Craig's Stores*.

17. Important here, the parties' rights and obligations under Assumed Contracts post-confirmation—after contracts have been assumed or rejected—are matters of contract interpretation under state law and do not relate to the implementation or execution of the Plan or any order. *See Craig's Stores*, 266 F.3d at 390; *see also In re Austin Development Co.*, 19 F. 3d 1077, 1084 (5th Cir. 1994) (holding that after lease was rejected, cause of action for breach of lease "should be decided in state court" because "the debtor's estate had no remaining interest in

the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction").

18. The Fifth Circuit addressed a post-confirmation dispute concerning performance under an assumed contract in *Craig's Stores*. There, 18 months after the court confirmed debtor Craig's Stores' plan of reorganization, Craig's Stores sued a bank in bankruptcy court asserting state law claims based on a contract it had assumed. *Craig's Stores*, 266 F.3d at 390. The court determined the bankruptcy court lacked jurisdiction over the claim based on three factors: (1) it "dealt with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and was, by implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan was necessary" to Craig's Stores' claims. *Id*. at 391. Instead, reorganized Craig's Stores was "capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court" and could not "come running to the bankruptcy judge every time something unpleasant happens." *Id*. at 390-91 (internal quotations omitted). Considering the three *Craig's Stores* factors, the Court lacks jurisdiction over Carnero's claim.

### *B. The* **Craig's Stores** *factors do not support jurisdiction over Carnero's claims.*

1. <u>The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts.</u>

19. Mesquite/Maverick has suffered something unpleasant post-confirmation: Carnero has sued it and the four non-debtor WIPs seeking declaratory relief regarding a dispute that has arisen post-confirmation out of the Assumed Contracts. Specifically, the dispute relates to the Defendants' obligations under the Assumed Contracts *since their assumption* to deliver gas from the Comanche Assets to Carnero and to terminate, at the earliest possible time, any prior delivery

obligation that sends that gas to others. The dispute does not arise out of obligations imposed on Mesquite/Maverick by the Plan, but by the Assumed Contracts, and those contracts were not created by the Plan. *See In re Encompass Services Corp.*, 337 B.R. 864, 875 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006). The dispute, thus, relates to the post-confirmation relations of the parties under the terms of the Assumed Contracts.

2. <u>The claims in the State Court Lawsuit were not pending as of the Plan confirmation date.</u>

20. The Court confirmed the Plan on April 30, 2020. This dispute arose 15 months later when Carnero filed the State Court Lawsuit on July 30, 2021. Carnero's claims may share some common facts with the bankruptcy proceeding because Carnero seeks declarations under contracts the Reorganized Debtors assumed, but that is not enough to establish that the claims could affect the implementation or execution of the Plan. *See In re Ultra Petroleum Corp.*, No. 16-32202, 2019 WL 2524936, at *7 (Bankr. S.D. Tex. Jan. 9, 2019), *report and recommendation adopted*, No. 4:19-CV-00090, 2019 WL 2524704 (S.D. Tex. Feb. 25, 2019) (holding that common facts and circumstances between pre-confirmation complaint against debtor and debtor's post-confirmation counterclaim against different party were insufficient to establish "related to" jurisdiction under narrow post-confirmation jurisdictional standard). As in *Craig's Stores*, the dispute in the State Court Lawsuit arose only *after* the Assumed Contracts were assumed.

3. <u>No facts or law deriving from the reorganization or Plan are necessary to decide Carnero's claims.</u>

21. The state court can decide Carnero's claims without facts or law deriving from Mesquite/Maverick's reorganization, the Plan, or any order of this Court, and without reference to the Bankruptcy Code. Indeed, the Plan does not address resolving disputes concerning the Reorganized Debtors' rights and obligations under assumed contracts. Instead, the Plan creates

procedures for the assumption, assignment, and rejection of Executory Contracts (*see* Plan at Art. V.A.), a claims process for rejected contracts (*see id.* at Art. V.B.), and a cure process for assumed contracts (*see id.* at Art. V.C.). The Plan further addresses the scope of assumption and allows the Reorganized Debtors to alter their treatment of a contract following the resolution of certain disputes not at issue. *See* Plan at Art.V.F., Art. V.H. Resolving a dispute as to the Reorganized Debtors' rights and obligations under the Assumed Contracts does not impact compliance with the Plan or its completion. *See, e.g., Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where litigation at issue did not attempt to subvert confirmed plan).

22. While a bankruptcy court retains jurisdiction to interpret and enforce its own prior orders (*Galaz*, 665 Fed. Appx. at 376), Carnero's claim for declarations of the parties' rights and obligations under the Assumed Contracts *after* rejection of the Midstream Agency Agreement [Case No. 19-34508, Dkt. 1544-2] does not invoke that jurisdiction. The claim does not interfere with this Court's authority under the Midstream Settlement Approval Order [Case No. 19-34508, Dkt. 1415 ¶ 13] to approve any rejection, termination, or adoption of the Midstream Agency Agreement, or involve interpretation or enforcement of that order. Rather, the Reorganized Debtors are free to reject or assume the Midstream Agency Agreement, get an order from this Court approving their choice, and then face the legal and commercial consequences of that choice under the terms of the Assumed Contracts.

23. Nor does Carnero's claim for declarations under the Assumed Contracts following the June 28, 2021 rejection of the Marketing Agreement [Case No. 19-34508, Dkt. 1983] invoke such retained jurisdiction. The post-confirmation implications of the rejected Marketing

Agreement on the parties' rights and obligations under Assumed Contracts are just the sort of matter that involves contract interpretation under state law, and not implementation or execution of the Plan or any order of this Court. *See Craig's Stores*, 266 F.3d at 390 (holding that court lacked jurisdiction to hear post-confirmation cause of action for breach of assumed contract); *Austin Development*, 19 F. 3d at 1084 (holding that court lacked jurisdiction to hear post-confirmation cause of action regarding third party beneficiary's rights in rejected contract). For purposes of a post-confirmation jurisdictional analysis, there is no meaningful distinction between a post-confirmation breach of contract dispute regarding an assumed contract (as in *Craig's Stores*) or the State Court Lawsuit seeking declaratory relief of the parties' rights and obligations under the Assumed Contracts.

24. Considering the above, any dispute regarding the parties' relations under the Assumed Contracts on a post-assumption, go-forward basis simply does not impact compliance with the Plan or any Bankruptcy Court order, does not impact implementation of the Plan or enforcement of any Bankruptcy Court order, and, in fact, has no impact on the Plan or any Bankruptcy Court order whatsoever. *See In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted). Therefore, this Court lacks jurisdiction to hear the State Court Lawsuit and should remand it to the state court.

## II. The factors applicable to 28 U.S.C. 1334(c)(2) support mandatory abstention.

25. The Court must abstain from hearing claims when: (1) a motion requesting abstention has been timely filed; (2) the claim is essentially premised on state law; (3) the claims have no independent basis for federal jurisdiction other than § 1334(b); (4) the claims are non-core; (5) an action has been commenced in state court; and (6) the action can be timely adjudicated

in state court. *See In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *21 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.); *In re Petroleum Products & Services, Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016) (Isgur, J.) (quoting *In re Mugica*, 362 B.R. 782, 792 (Bankr. S.D. Tex. 2007) (Isgur, J.)). The factors applied to the State Court Lawsuit support mandatory abstention.

***A. Carnero has timely filed this motion for abstention and its claim is based on state law.***

26. The first two factors are met. This motion was timely filed on or before 30 days after the Defendants filed the Notice of Removal on September 10, 2021, and satisfies factor (1). Carnero's claim for declaratory relief to interpret the Assumed Contracts is a state law claim. *See Craig's Stores*, 266 F.3d. at 390. This satisfies factor (2). These two factors support mandatory abstention.

***B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b).***

27. The Defendants bear the burden to show the Court has jurisdiction. *See Smith*, 605 Fed. Appx. at 313. In their Notice of Removal [Dkt. 1], the Defendants allege only 28 U.S.C. § 1334(b) as the basis for this Court's jurisdiction. The Defendants misstate Carnero's purely state law contract interpretation claim in an attempt to fit Carnero's claims within the post-confirmation "related to" jurisdiction of this Court. But as explained in Section I, in these circumstances, the Court lacks such jurisdiction. No other basis for federal jurisdiction exists. This factor supports mandatory abstention.

***C. Carnero's claims are non-core.***

28. Non-core proceedings relate to a case under title 11, but do not arise under title 11, or arise in a case under title 11. 28 U.S.C. §§ 157(b)(1); *Petroleum Products*, 561 B.R. at 665. In contrast, core proceedings invoke a substantive right provided by title 11 or by their nature, can arise only in the context of a bankruptcy case. *Petroleum Products*, 561 B.R. at 665 (citing

*Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999)). Carnero's state law contract interpretation claims relate to the Reorganized Debtors' chapter 11 case only in the sense that the Reorganized Debtors were Debtors before June 30, 2020 (the Effective Date of the Plan). They do not invoke Section 365 or any other substantive rights under the Bankruptcy Code. The State Court Lawsuit did not arise under title 11 or in a case under title 11, as Carnero filed it post-confirmation when no estate to administer exists. Further, the State Court Lawsuit does not invoke any right provided by title 11. As a garden-variety contract interpretation declaratory relief action, it could—and does—arise outside the context of a bankruptcy case. Thus, the State Court Lawsuit is a non-core proceeding. *Id*. ("A claim based on state created rights, which could have proceeded in state court had there been no bankruptcy, is likely not core…Petroleum Products' claims do not invoke a substantive right provided by Title 11 nor are they of a nature that could only arise in a bankruptcy case—they are simply state contract claims."). This factor supports mandatory abstention.

***D. Carnero filed its claims in the State Court Lawsuit.***

29. Carnero filed the State Court Lawsuit in state court on July 30, 2021. The Defendants do not dispute this. This factor supports mandatory abstention.

***E. The state court can timely adjudicate Carnero's claims.***

30. Carnero bears the burden to show that the State Court Lawsuit can be timely adjudicated in the state court. *Petroleum Products*, 561 B.R. at 666. It can carry that burden. Official court and caseload statistics for the period September 2020 through September 2021 from The Texas Office of Court Administration Court Activity Reporting and Directory System for Harris County, Texas,[3] and for the period June 2020 through June 2021 from the United States

[3] The Texas Office of Court Administration data and records are available here: https://card.txcourts.gov/.

Courts Caseload Statistics Data Tables[4] show that both the Harris County District Courts and the United States Bankruptcy Court for the Southern District of Texas continue to manage significant caseloads during this pandemic affected period. *See* **Exhibit 6**, Harris County statistics, **Exhibit 7**, US Bankruptcy Court SD TX statistics. Those same statistics show that both courts are also clearing thousands of cases each year. Statistics show the judge of the 269th Harris County Judicial District Court where the State Court Lawsuit is pending resolves cases faster than the average case resolution for all Harris County District Courts. *See* **Exhibit 8**, Gavelytics Report for J. Sepolio. Considering these data, the state court can timely adjudicate the State Court Lawsuit.[5] This factor supports mandatory abstention.

31. In sum, Carnero can establish all six factors applicable to mandatory abstention under 28 U.S.C. § 1334(c)(2). The Court should mandatorily abstain from adjudicating this adversary proceeding and remand the case to the state court.

## III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention.

32. If the Court disagrees that mandatory abstention applies, it should permissively abstain from hearing the adversary proceeding and remand the case to state court because the factors applicable to 28 U.S.C. § 1334(c)(1) heavily favor permissive abstention or remand.

### *A. The permissive abstention factors.*

33. A bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). The

[4] The United States Courts Caseload Statistics Data Tables are available here: https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

[5] *See* **Exhibit 9**, the Affidavit of Amy C. Falcon, proving up the process by which Carnero obtained the court statistics reflected in Exhibits 6-8.

bankruptcy court has "broad power to abstain whenever appropriate." *In re Wood,* 825 F.2d 90, 93 (5th Cir.1987). The factors courts consider include:

(a) the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(b) the extent to which state law issues predominate over bankruptcy issues;

(c) the difficult or unsettled nature of applicable law;

(d) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(e) the jurisdictional basis, if any, other than § 1334;

(f) the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(g) the substance rather than the form of an asserted core proceeding;

(h) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(i) the burden on the bankruptcy court's docket;

(j) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(k) the existence of a right to a jury trial;

(l) the presence in the proceeding of nondebtor parties;

(m) comity; and

(n) the possibility of prejudice to other parties in the action.

*In re SBMC Healthcare, LLC*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017). Application of these factors to this adversary proceeding favor permissive abstention.

***B. The balance of the factors favors permissive abstention.***

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention.

34. The State Court Lawsuit largely involves non-debtor parties. Only Mesquite/Maverick is a Reorganized Debtor, the other five parties are non-debtors. The outcome of the suit will not deplete or increase the estate. First, post-confirmation, no estate exists. Second, the Reorganized Debtors assumed the Assumed Contracts. The effect of the assumption on the estate was established when the contracts were assumed. Remand to the state court to declare the parties' rights and obligations under the Assumed Contracts will not change that effect. This factor favors abstention. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 848 (Bankr. S.D. Tex. 2006) (Bohm, J.) (recognizing that this factor does not apply post-confirmation when no estate exists).

2. The extent to which state law issues predominate over bankruptcy issues.

35. The State Court Proceeding only involves state law issues—the parties' rights and obligations under the Assumed Contracts. *See Craig's Stores*, 266 F.3d at 390 (recognizing contract claims as state law claims). Carnero has not alleged claims seeking enforcement of the Plan or an order issued by this Court or requesting this Court take action on any executory contract. No bankruptcy issues arise from Carnero's declaratory relief claim. State law issues predominate over bankruptcy issues in this circumstance. This factor favors abstention. *See Doctors Hosp.*, 351 B.R. at 849 (recognizing that when proceeding includes only state law claims and no bankruptcy issues, state law claims predominate)

3. The difficult or unsettled nature of applicable law.

36. Carnero's declaratory relief claim is a garden-variety state law claim. The claim is premised on the Assumed Contracts and Carnero's statutory right under Tex. Civ. Prac. & Rem. Code Ch. 37 to have the state court declare the parties' rights and obligations under those contracts.

These are state law principles to which the state court is better able to respond. *See SBMC Healthcare*, 519 B.R. at 191. This factor favors abstention.

4. <u>The presence of related proceeding commenced in state court or other nonbankruptcy proceeding.</u>

37. Carnero filed the State Court Lawsuit in the state district court in Harris County, Texas. There are no other related state court proceedings. While there are continuing proceedings in the bankruptcy case, for the reasons set forth above, they do not implicate the claims asserted in the State Court Proceeding. This factor is likely neutral, at best, when viewed most favorably to the Defendants. *See SBMC Healthcare*, 519 B.R. at 191.

5. <u>The jurisdictional basis, if any, other than § 1334.</u>

38. The Defendants pleaded only Section 1334(b) as the basis for jurisdiction. As shown above, the Court lacks jurisdiction under that section. Even if the Court had jurisdiction under Section 1334(b), this is the only basis on which jurisdiction rests. The State Court Proceeding raises no federal question or complete diversity grounds for jurisdiction. This factor heavily favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

6. <u>The degree of relatedness or remoteness of proceeding to the main bankruptcy case.</u>

39. As discussed above, Carnero's claims are not "related to" the post-confirmation Reorganized Debtors' Chapter 11 case. Even if related, that relationship is remote. This dispute involves (1) mostly non-debtors (Mesquite/Maverick is the only Reorganized Debtor defendant); (2) events occurring after confirmation when no estate remains to be administered; and (3) exclusively non-bankruptcy issues—the parties' rights and obligations under the Assumed Contracts. At most, this dispute is remotely related to the Reorganized Debtors' Chapter 11 proceeding. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

7. The substance rather than the form of an asserted core proceeding.

40. Carnero's direct cause of action is non-core, as discussed above. Even if the claim was core, the substance of the dispute consists of a state law claim based on the rights and relationship of the parties post-confirmation under the Assumed Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court.

41. Carnero's direct cause of action is non-core, as discussed above. Thus, this factor does not apply. Even if Carnero's claim was core, the dispute consists of a state law claim with no bankruptcy matters that exist post-confirmation from which to sever the claims. The state court can enter and enforce an order that declares the parties' rights and obligations under the Assumed Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191-92.

9. The burden on the bankruptcy court's docket.

42. This Court is among the busiest bankruptcy courts in the country for complex bankruptcies such as that involving the Reorganized Debtors. While Carnero does not doubt the Court will prioritize this case, there is no question it will add strain to the Court's already taxed time and resources. *See* Ex. 7. As such, this factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties

43. Defendants are forum shopping. They removed the State Court Lawsuit involving only a state law claim for declarations under assumed contracts that arose post-confirmation against multiple non-debtor defendants and a single Reorganized Debtor defendant. As in *Craig's Stores*, the Defendants want to run to the bankruptcy court to protect themselves from

unpleasantness that arose after the Reorganized Debtors emerged from bankruptcy. To seek shelter from the state court in the bankruptcy court, in the Notice of Removal the Defendants misstate the nature of the declaratory relief pleaded as seeking declarations "under various contracts as a matter of bankruptcy law," "declaring the legal effect of rejection of the Marketing Agreement under 11 U.S.C. § 365," and "that Mesquite is obligated to 'pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. § 365." This is not what Carnero seeks. It seeks declarations solely under the Assumed Contracts as to the parties' rights and obligations under those contracts. Misstating Carnero's claim is the only way the Defendants can try to squeeze the claim into Section 1334(b) jurisdiction. As discussed above, Section 1334(b) does not authorize "related to" jurisdiction over Carnero's post-confirmation claims under the Assumed Contracts. This factor favors abstention.

11. The existence of a right to a jury trial.

44. The parties waived their right to trial by jury in the Assumed Contracts. This factor weighs against abstention. *See SBMC Healthcare*, 519 B.R. at 192.

12. The presence in the proceeding of nondebtor parties.

45. Of the six parties involved the State Court Lawsuit, only one is a Reorganized Debtor, Mesquite/Maverick, who was more than 15 months passed confirmation of the Plan when Carnero filed the lawsuit. This factor favors abstention. *See SBMC Healthcare,* 519 B.R. at 192.

13. Comity.

46. Carnero had already instituted its lawsuit in Texas state court when the Defendants removed the State Court Lawsuit to this Court. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

14. The possibility of prejudice to other parties in the action.

47. The issue is which court, this Court or the state court, should hear Carnero's state court claim. Both forums are capable of adjudicating the claim. But the State Court Lawsuit involves no active debtors; no debtor rights require this Court's protection. At best, this factor is neutral. *See SBMC Healthcare*, 519 B.R. at 192.

48. Eleven of the 14 permissive abstention factors favor abstention. Only factor (11) the existence of a right to a jury trial favors retention. Factor (4) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding and factor (14) the possibility of prejudice to other parties in the action are neutral. Because many more factors favor abstention than favor retention, permissive abstention is appropriate.

49. The Court may give greater weight to some factors. The Court should give more weight to the fact that: (a) the resolution of the Carnero's direct claim does not implicate the estate, because no estate exists post-confirmation, or the implementation or execution of the Plan (factor 1); (b) the law governing the dispute is entirely Texas state law (factor 2); (c) this Court has no subject matter jurisdiction over Carnero's direct claim, or even if it does, the only jurisdictional basis is 28 U.S.C. § 1334 (factor 5); and (d) five of the six parties in this dispute are non-debtors (factor 12). With greater weight to these factors, the Court should permissively abstain from hearing the adversary proceeding and remand the case to the Harris County District Court. *See SBMC Healthcare*, 519 B.R. at 193.

## Conclusion

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and three non-debtors, seeks only state court relief. As a result, this Court lacks post-confirmation jurisdiction under 28 U.S.C. § 1334(b) to hear this adversary proceeding and Carnero asks that it remand the case to the state court. Carnero also requests that this Court

mandatorily abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(2), and the factors support its request. Finally, the factors relating to permissive abstention under 28 U.S.C. § 1334(c)(1) favor this Court's permissively abstaining from hearing this adversary proceeding. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

**Dated: October 8, 2021.**

Respectfully submitted,

**PORTER HEDGES LLP**

By: *__/s/ Joshua W. Wolfshohl__*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on October 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 31

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CARNERO G&P, LLC. | § | CASE NO. 21-03908-ADV |
| | § | HOUSTON, TEXAS |
| VS | § | TUESDAY, |
| | § | DECEMBER 7, 2021 |
| SN EF UNSUB, LP, ET AL | § | 2:30 P.M. TO 2:58 P.M. |

MOTION HEARING (HYBRID HEARING)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES: SEE NEXT PAGE

(Recorded via CourtSpeak)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

| | |
|---|---|
| FOR THE DEBTOR: | (VIA TELEPHONE)<br>PAUL, WEISS, RIFKIND, WHARTON AND GARRISON<br>Justin Ward, Esq.<br>1285 Avenue of the Americas<br>New York, NY 10019<br>212-373-3000 |
| | MCLOSKEY ROBERSON, PLLC<br>Thomas Woolley, Esq.<br>945 Heights Blvd<br>Houston, TX 77008<br>713-337-3910 |
| FOR CARNERO G&P, LLC: | PORTER HEDGES LLP<br>Joshua Wolfshohl, Esq.<br>Amy Falcon, Esq.<br>1000 Main St, 36th Floor<br>Houston, TX 77002<br>713-226-6000 |
| FOR MESQUITE ENERGY, INC. | FOLEY GARDERE<br>James G. Munisteri, Esq.<br>Sara Brown, Esq.<br>1000 Louisiana Street<br>Suite 2000<br>Houston, TX 77002<br>713-276-5500 |
| | (VIA TELEPHONE)<br>WILLKIE FARR AND GALLAGHER LLP<br>Mark Stancil, Esq.<br>Dennis Jenkins, Esq.<br>1875 K Street, NW<br>Washington, DC 20006<br>202-303-1133 |
| FOR MITSUI E&P TEXAS LP: | SIDLEY AUSTIN LLP<br>Duston McFaul, Esq.<br>Maegan Quejada<br>1000 Louisiana St<br>Suite 6000<br>Houston, TX 77002<br>713-495-4500 |

APPEARANCES (CONT'D):

FOR EAGLE FORD TX LP: (VIA TELEPHONE)
MORGAN, LEWIS AND BOCKIUS LLP
Julia Frost Davies, Esq.
One Federal Street
Boston, MA 02215
617-341-7700

FOR VENADO EF L.P. (VIA TELEPHONE)
KIRKLAND AND ELLIS LLP
Sydney Corry, Esq.
609 Main Street
Houston, TX 77002
253-455-6202

(Please also see Electronic Appearances.)

INDEX


| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (None called.) | | | | |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Plaintiff's: Exhibits 25-1 to 25-13 | 9 | 9 |
| Defendant's: Exhibits 26-1 to 26-7 | 9 | 9 |

HOUSTON, TEXAS; TUESDAY, DECEMBER 7, 2021; 2:30 P.M.

THE BALIFF: All rise.

THE COURT: Please be seated.

All right. We are here in the Canero G&P, LLC versus SN EF UnSub LP, et al, Adversary Proceeding 21-3908. We'll start with appearances in court, we'll then take any appearances on the phone. If you wish to appear on the phone, please press five star.

Mr. Wolfshohl.

MR. WOLFSHOHL: Good afternoon, Your Honor. Joshua Wolfshohl and Amy Falcon, my colleague, for Carnero, the Plaintiff.

Good to see, Your Honor. Good to be back in the courtroom. This is my first hearing back, and I don't think I've been in this courthouse for two years and I'm actually glad to be here.

THE COURT: Glad to have you back.

MR. MUNISTERI: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. MUNISTERI: James Munisteri for Mesquite. Ditto, it's nice to be back.

THE COURT: It's very nice to have people back.

MR. MUNISTERI: And I'm on joined on the phone by Mr. Stancil and by Ms. Brown. And Ms. Brown just wanted me to make sure she's going to be designated as the presenter.

THE COURT: All right. Thank you.

MR. MCFAUL: Good afternoon, Your Honor. Duston McFaul, Sidley Austin for Mitsui E&P Texas, LP, which is one of the non-ops, and Ms. Maegan Quejada is on the phone, as well.

THE COURT: All right.

MR. MCFAUL: Thank you.

THE COURT: Thank you.

MR. MCFAUL: Nice to see you.

THE COURT: Ms. Frost-Davies, good afternoon.

MS. FROST-DAVIES: Good afternoon, Your Honor. Julia Frost-Davies, Morgan Lewis, on behalf of Eagle Ford Texas, LP also one of the non-op Defendants.

THE COURT: All right. Thank you.

From the 253 area code, is 253-456-6202. Let me see what I have.

MS. CORRY: Sydney Corry. This is Sydney Corry with Kirkland and Ellis on behalf of Venado EF LP.

THE COURT: Ms. Corry, good afternoon.

MS. CORRY: Good afternoon.

THE COURT: Mr. Ward.

MR. WARD: Good afternoon, Your Honor. Justin Ward from Paul Wiess on behalf of Defendant UnSub and possibly also attending today on behalf of Unsub are Thomas Woolley from McCloskey Roberson and also from Paul Weiss,

Alice (indiscernible).

THE COURT: Mr. Ward, thank you.

Mr. Stancil.

(No audible response.)

THE COURT: Mr. Stancil.

MR. STANCIL: Good afternoon, Your Honor. Mark Stancil from Willkie Farr & Gallagher on behalf of Mesquite Energy, Inc. I'M also joined by my colleague, Dennis Jenkins, also representing Mesquite.

THE COURT: Mr. Stancil, Mr. Jenkins, good afternoon.

From 212-728-8276.

MR. JENKINS: Your Honor, Dennis Jenkins of Willkie Farr. It's good to be back in front of Your Honor, thank you.

THE COURT: Good to have you here, Mr. Jenkins.

All right. I show that's all of the folks that wish to speak at today's hearing. If you change your mind and want to speak during the course of the hearing, just press five star.

I've now held a few, maybe you know half a dozen of these hybrid hearings, and they've worked pretty well. But if anyone has trouble hearing or seeing, just find a way to let me know, and we'll be sure that those of you that are remote can see what's happening in the court, and those of

you in court can see what's happening remotely.

So I think we'll go, I guess, to you Mr. Wolfshohl.

MR. WOLFSHOHL: I think that's right, Your Honor. And just as a housekeeping matter, we conferred -- well, we conferred with Mr. Munisteri, I think he was speaking for the entirety of the Defendants -- but I don't think that there's any objection to our exhibits and we had no objection to their exhibits being admitted.

THE COURT: All right. Can you give me those exhibit identifiers?

MR. WOLFSHOHL: Sure, Your Honor. For Carnero, our Exhibit List was at Docket No. 25. And so it would be all of the exhibits that were attached to that Docket entry which I think would be 25-1 through, I believe --

THE COURT: Thirteen?

MR. WOLFSHOHL: -- 13.

THE COURT: All right.

MR. WOLFSHOHL: And we also reference a number of documents that are on the Docket that were voluminous that we didn't want to have to refile. But in our Exhibit List, there's a number of documents we are going to refer to at least one of those. But I don't think there's any issue with those being admitted.

And then Mr. Munisteri, or whoever is in charge of

the Defendants, I just know we didn't have any objection to theirs. I don't think that they filed the actual exhibits, but they did file a list and they sent us their exhibits and we didn't have any issue with them, Your Honor.

MR. MUNISTERI: Your Honor, both parties agreed no objections to the other parties' exhibits.

THE COURT: But what are your exhibits? What are the exhibits, what -- how do I find them?

MR. STANCIL: Your Honor, this is Mark Stancil, we filed our Exhibit List, I believe it's -- I want to say Docket 26, but Ms. Brown may correct me. Our exhibits are listed there.

And essentially they are the same documents that Movants are relying on, and we just typically reference though a transcript from prior hearings in the bankruptcy and an Order. So I think all of our items are directly out of the Docket for the bankruptcy case.

THE COURT: All right. So without objection Exhibits 25-1 through -13 are admitted.

(Plaintiff's Exhibits 25-1 through 25-13 are offered and admitted in evidence.)

THE COURT: And the documents that are referenced in Exhibit 26 are admitted as to 1 through 7. I think that's what you-all are asking me to do.

(Defendant's Exhibits 26-1 through 26-7 are offered and

admitted in evidence.)

MR. WOLFSHOHL: That's my understanding Your Honor.

THE COURT: All right.

MR. WOLFSHOHL: If you will, Your Honor, could you please make Ms. Falcon the presenter?

THE COURT: Of course.

MR. WOLFSHOHL: And I think both parties are really just -- now that we've got the exhibits admitted, I think we're just going to really just argue our points and we both got presentations that we exchanged prior to the hearing.

But before I jump into my presentation I want to go through something -- to clear something up, because I think it's based on some of the arguments in the surreply that the Defendants filed, as well as the presentation that they provided to us right before the hearing. Ms. Falcon is pulling up -- this is one of the documents that we identified -- is it on the screen?

THE COURT: Oh, yeah. I'm going to split the screen here to where people in court can --

MR. WOLFSHOHL: Okay.

THE COURT: -- see both faces and --

All right. Go ahead, please.

MR. WOLFSHOHL: Thank you, Your Honor.

There seems to be confusion about -- as Your Honor, knows -- I know you've read the pleadings and you've probably digested quite a bit in the last several days -- but there seems to be some confusion about whether the GGBA was assumed pursuant to the Settlement Agreement that was entered into around confirmation on June the 30th of 2020. And I want to clarify because the GGBA that I'm seeking to enforce, in this State Court lawsuit, was in fact not assumed pursuant to that agreement, Your Honor.

And if you go to the Settlement Agreement -- this is the Settlement Agreement that was attached to the motion that was filed seeking to approve the Midstream Settlement Agreement. You look at the definition of assumption agreements and it says -- starts with the Carnero Agreements and then it says the Catarina Gathering Agreement and then it identifies a number of other documents that are not the GGBA that I'm seeking to enforce.

In fact, it references that agreement, but it does not say that, that's an assumption agreement. If you look at the -- read all the way through Your Honor. It talks about ratification agreements that ratified the FGGBA, the Comanche FGGBA, that's the agreement that I'm seeking to enforce. It's a defined term in the Settlement Agreement, but it is not an assumption agreement so we will go to --

Ms. Falcon, if you can go to the Carnero

Agreements first?

You see the Carnero Agreement references the Carnero Gathering Agreement and the Carnero Processing Agreement, and we'll start with the Gathering Agreement. This is an agreement with SN Caterina.

Your Honor, if you remember, and I'm sure that -- I'm sure that the Reorganized Debtor is going to tell you a little bit about the history of these contracts -- but the Debtor had essentially two large pieces of acreage. One was the -- they referred to as the "Catarina Acreage" and the other one they referred to as the "Comanche Acreage." Most of the benefit that the Debtor was getting under the Settlement Agreement -- the Midstream Settlement Agreement -- related to the Catarina Acreage. My client was making significant concessions on rates as to the Catarina Acreage.

The Carnero Gathering Agreement that's reference as a "Carnero Agreement" under this agreement is with SN Caterina, which is the entity that owned the Caterina assets.

If you look -- the same thing goes for the Carnero Processing Agreement. Also in agreement with SN Caterina.

These are not agreements with SN Maverick. And if you look -- the specific Comanche FGGBA is a defined agreement under the Settlement Agreement, but it is not an

agreement that was an assumption agreement. The way that my GGBA that I'm seeking to enforce was assumed was pursuant to the Plan. It was listed as a contract that was being assumed, and the time passed and nobody objected to it. But it was not assumed pursuant to that Order, it just wasn't.

And there seems to be some reliance on the idea that somehow it was assumed in a qualified fashion and that as a result -- I don't think this is relevant -- but as a result of the termination of the Settlement Agreement that somehow that combined with the way the Settlement Agreement was approved that there was some kind of qualified assumption of my agreement.

But as to the GGBA, the fundamental agreement that I'm seeking to enforce in my State Court action, it was assumed with no qualifications.

But I just wanted to clear that up, Your Honor, and I'll move to the presentation.

So Your Honor, we think that this -- this is a very straightforward analysis. The issue before the Court, we have a State Court lawsuit that was filed in July of 2021, more than a year after the Plan got confirmed and more than a year after the Plan went effective. We're seeking declarations under the Texas Civil Practice and Revenues Code. And there are declarations that we are asking a State Court to interpret related to the assumed contracts. The

fundamental contract being the GGBA that was assumed under the Plan.

Most of the Defendants are non-Debtors, but there are Reorganized Debtors that are Defendants, as well. But it has to do with -- the fundamental disputes have to do with actions that were taken post-confirmation, actions that were taken more than a year after confirmation, more than a year after the effective date. The Defendant's bear the burden to establish jurisdiction and we don't think that they can, Your Honor.

Most of Carnero's claims in the dec action don't reference the Code, the Plan, or any order of this Court. The thing that they have really focused on are the claims where we are asking the State Court to declare what our rights are once these contracts are rejected.

THE COURT: Actually, I think that's not quite right. This may be a bit of the inverse of that, but what I read the Complaint from them as being, is that you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court.

And as I read their Complaint -- and you've got the right sections up here, K and L -- K seems to say that the State Court can order action to be taken here and L

seems to interpret what that action might be. And I think that's the heart of the Complaint. Not what your rights are necessarily, but that your attempt to control what occurs at 515 Rusk Street, for lack of a better description, is the way I would describe what I read their concerns to be.

MR. WOLFSHOHL: I don't disagree with the way that they've cast their Complaints, Your Honor. And I will tell you -- and I'm just going to say -- if confusion about the language is something that is causing the problem, this can be amended to make it clear, but my client's intent was not to dictate what it was that they were going to do with respect to 365. The purpose of these provisions is specifically to deal with what happens in the event of rejection.

THE COURT: Well, I know, but take a look at L. If you think you can amend out K and L, it may be worth thinking about doing that before we continue with the hearing.

By the way there may be nothing wrong with doing it this way and I'm not necessarily saying that you lose --

MR. WOLFSHOHL: No.

THE COURT: -- because of this.

MR. WOLFSHOHL: I understand.

THE COURT: But I think what the Complaint is, is you're having the State Court declare the effect of

rejection of a contract before it's ever rejected under L. That's a big step that may or may not be a fatal step. But if you can take away K and L, it's going to change the discussion, I think, that we're going to have today. I'm just -- I'll let the other side speak up about this, but that's what I'm reading the graver unhappiness to be about.

MR. WOLFSHOHL: Well, I can tell you, Your Honor, that when this Complaint, or this Petition, was prepared, the concern that we had was that they were continuing to pursue the OXY litigation and continuing to pursue rejection.

THE COURT: Right.

MR. WOLFSHOHL: But we were concerned that once they rejected, that they weren't going to honor our agreement. And that was the -- that was the gist of the concern.

Now they have since announced to Your Honor, that they're going to do some sort of hybrid type of assumption and that they're going to --

THE COURT: Well, I think we're coming back on the 21st, understandably.

MR. WOLFSHOHL: Well, I mean, they say that, Your Honor, but you know, we've been here several times, we don't know exactly what's going to happen. I'm just saying that the concern that my client has is that whatever global

settlement that they're entering into in some way impairs my client's rights under the GGBA, which is an assumed contract. I don't think I have to adjudicate those rights in Your Honor's court. And if you think that -- I mean --

THE COURT: I'm doing my best to not cross that bridge right now, because I don't know where the day is going to end up. But if what you're telling me is you don't need K and L, it's going to change what's happening a lot. But if you need K and L, it's going to change things a lot, too. So I think if you're really telling me this was stylistic, but not substantive to do K and L and the way you did them, then you can amend it away, it certainly will make a different argument.

And you know that I'm going to react to sort of with this initial negative reaction that any other court can tell me what needs to happen in my court, just as I wouldn't do that to them. I don't know that necessarily means it's wrong, but it may suggest to you the -- good idea.

MR. WOLFSHOHL: I believed that the issue was more nuanced than that, Your Honor.

THE COURT: Okay.

MR. WOLFSHOHL: I believed that the issue -- and they've raised this -- is this notion -- and this is -- I'm going to tell you what we didn't intend to do.

They raised this issue that this somehow, that K

was meant to require them or have a State Court say that they were required to exercise their rejection rights under 365. The intent -- and I mean it may not be artfully worded -- but the intent, in saying "among other actions," was to qualify that there were a number of ways to basically effect the termination of the obligations under the existing commitments. And the Debtors know that that was a way for them to do it, because that was the purpose of the Midstream Settlement Agreement. The Midstream Settlement --

THE COURT: I read K, the plain language of K, to ask the State Court to make Mesquite pursue Section 365.

MR. WOLFSHOHL: That’s not the intent --

THE COURT: That is the way --

MR. WOLFSHOHL: That is not the intent and that could be amended. But here is where I’m getting to on how I think it’s more nuanced.

The -- I knew you were going to -- I mean, I knew that because they raised that and I thought, you know, what -- you know, if that needs to be amended to be clarified, I think it changes, you know -- if Your Honor, believes that, that’s what that means, that is not the intent. But the other question is if -- and you know, and it sounds like maybe you're going even further than that -- is if I’m asking the State Court to say "upon rejection," which is just a breach of contract under applicable law, that it has

an effect on my contract. And it has the effect of the Debtor's no longer obligated under those existing commitments and I just don't see how that could be -- fall under Your Honor's jurisdiction. Because once you reject, you know, you proceed, you know, as a Reorganized Debtor with the consequences of rejection.

THE COURT: So look -- and I said to you, I'm not necessarily saying there's anything wrong with this, but I'm not sure that every rejection order or rejection agreement has unmodified rights of a breach, right? The Court can certainly have a more nuanced order than that.

And I don't know -- first of all, I don't know if they're going to seek rejection. I don't know if I'm going to approve rejection. I don't know if I'm going to approve rejection if I say it's conditioned on certain events. There are all sorts of things that can happen, and to ask for declaration of what I'm going to do before I do it, before I know what I'm going to do, and to say anytime I act under 365, here's the consequence, that may be perfectly correct to go to State Court to do it. Not sure why we're doing it before we've decided.

MR. WOLFSHOHL: Can I have an opportunity to confer with my client? I actually think I -- I mean, I'm not sure I'm going to be able to get the right people on the phone immediately, I'm wondering if perhaps --

THE COURT: Well, let me ask the Defendants whether -- you're already telling me that I'm misreading K and I don't mean that you're doing that by saying it's my fault.

MR. WOLFSHOHL: I'm telling you that it's different than our intent, that's what --

THE COURT: Right.

MR. WOLFSHOHL: -- I'm saying. Yeah.

THE COURT: I know people are prepared for this hearing, but I see little point in going through it if I'm going to go through a hearing and then give you a chance to amend and then come back, as opposed to saying I would rather be arguing about what we're arguing about.

MR. WOLFSHOHL: Yeah.

THE COURT: And it may make sense to give you an amendment opportunity. Everyone here is going to be back on the 21st anyway, and then we just continue the hearing on the 21st and take everything up at the same time. Also adds more clarity to what the disputes about, I think.

Let me see what people think of that. I'll start in court with -- see if it makes any sense.

Mr. McFaul and Mr. Munisteri?

MR. MCFAUL: Yeah. Duston McFaul for Mitsui and well, I'll go ahead. I was going to say Mr. Stancil is taking the lead. But our position is that, of course, we're

fine with giving them an ability to amend, but we view this whole lawsuit as an attempt to get a court to say, "You are required to reject contracts and move the dedication of those minerals to us." We think K clearly says you are obligated to reject. That right only arises with Your Honor, so.

THE COURT: I think it does, too, but he's telling me that's not what he means to be asking for, so are you really going to spend an hour --

MR. MCFAUL: Understood. Understood.

THE COURT: I'm just asking --

MR. MCFAUL: We don't --

THE COURT: Does it make some sense to go a different direction?

MR. MCFAUL: We don't think they can amend and rectify it, but we're supportive of the opportunity.

THE COURT: It may be that --

MR. STANCIL: Your Honor --

THE COURT: -- they could is the problem and at which point, maybe you would be happy.

MR. MCFAUL: And I'll turn it over to Mr. Stancil.

THE COURT: I think at some point -- I'm going to now sort of -- at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of

that are a State Court issue. And so I don't know that this necessarily means this isn't going to go back to State Court, just because I'm concerned about that, because they can clearly fix at least some of the issues. I think.

Let me hear from folks on the phone.

MR. STANCIL: Your Honor.

THE COURT: Go ahead, Mr. Stancil.

MR. STANCIL: This is Mark Stancil, thank you -- for Mesquite.

Of course, understanding Your Honor will qualify that, I think we can cover a lot of ground today and I think would actually be very useful.

I think even if K were gone entirely, I think this would still be before, Your Honor, and I'm happy to get into that in a minute or now. But I think there are multiple independent bases for jurisdiction and I think it would actually significantly -- even if they're going to attempt to amend, which is not what they're supposed to be doing on removal, but even if they're going to attempt to amend, I think we could clarify the landscape significantly today to see if they're going to do it successfully.

But I think no matter what they amend, I think they're going to be back in front of Your Honor either way.

THE COURT: I think we're coming back either way, if that's what you mean. It's just a question whether I do

the amendment before the argument or after. Let me --

MR. STANCIL: Your Honor, I'll go one further and say we believe that Your Honor will have jurisdiction, and we think this lawsuit is going to be resolved on a motion to dismiss definitively by Your Honor with respect to the agreement that are in front of you. We don't agree that it's going to need to end up in State Court at all.

THE COURT: I don't know if it needs to end up in State Court or not. And that's the argument I'm going to eventually need to hear, whether it's today or another day.

Let me hear if anybody else wants to pitch in on that?

(No audible response.)

THE COURT: Okay. Well, look, I'm going to go ahead --

MR. WARD: Your Honor --

THE COURT: Yes. Go ahead.

MR. WARD: Your Honor, this is Justin Ward from Paul Weiss.

I do just want to raise the issue and to be candid, we haven't even looked into this of whether, you know, there are certain procedural issue with sort of defeating federal jurisdiction, bankruptcy jurisdiction by filing a Complaint that's within the Court's jurisdiction then amending after removal to sort of remove -- you know,

eliminate jurisdiction. I just want to make sure that, you know, it's not something we've thought about, but I'm not as I sit here today, if that's even possible.

MR. WOLFSHOHL: Your Honor, that's not --

MR. STANCIL: Your Honor, we have looked at that. It is removal jurisdiction is determined at the moment of filing a Complaint. But you know, I grant there might be some inefficiency to go going back to State Court with a new Complaint.

But we agree with the point I think Mr. Ward was making that I think it has to live or die at the moment of a filing with the Complaint when it comes to subject matter jurisdiction. They would be amending in front of you having put in front of you and then I guess they would be moving to dismiss for lack of subject matter jurisdiction.

THE COURT: I don't think it would be -- look, subject matter jurisdiction is plainly determined at the point of removal, but I'm not sure that abstention is the same as subject matter jurisdiction, so.

MR. WOLFSHOHL: Your Honor, also, you can always, you know, remove or, I mean, remand or dismiss a Complaint based on a lack of subject matter jurisdiction. The subject matter jurisdiction is a continuum, and if I modify the Complaint to make it clearer, I don't see how that could possibly in anyway interfere with --

THE COURT: Well, I do think that there may be a question of if the removal was proper, because there was subject matter jurisdiction, and you amend, I don't think that the remand motion gets to say that I don't have subject matter jurisdiction. I think it gets to say we should now abstain.

MR. WOLFSHOHL: For lack of subject matter jurisdiction?

THE COURT: No. Abstain on other principles.

MR. WOLFSHOHL: Right.

THE COURT: Maybe that had it been filed today there wouldn't be subject matter jurisdiction, but we would still have subject matter jurisdiction over something that was filed that way, I think. That part can be briefed as well. I'm not looking -- the Defendants aren't going to wave this argument by me allowing the amendment, but it may focus you more on the abstention argument.

MR. WOLFSHOHL: Yeah.

THE COURT: If you want the right to amend, I don't know that. I think so. I'm going to do this. I know it's frustrating for everybody, but probably more frustrating for me because I've got to read all this stuff and I'll have to read it again. I want you to amend.

MR. WOLFSHOHL: Okay.

THE COURT: If I'm misreading it, they're

misreading it, I don't want to hear the whole argument over the wrong issues. I'm going to require the amendment to be done -- can you get it done by Friday?

MR. WOLFSHOHL: I think I can. Yes, sir.

THE COURT: Not later than the 10th at 5:00 o'clock.

I want any supplement to the motions by the -- to the responses, I should say, by the Defendants to be filed by the 17th.

And then we'll come back on the 21st, along with the settlement implementation hearing at 1:30 on the 21st, and I'm going to tell Ms. Do to just block off the rest of the day for those two matters so that you won't get interrupted.

I'm sorry to bring everybody down for this, but I think it is the better course of action, so that we're all focused on what we need to be focused on. Their settlement may affect what you need, and what you amend may cause some relaxation by the Defendants, I don't know. But I want to see what that is.

So I think it's the most efficient thing to do and that's what we'll do today. I'll see you-all on the 21st.

THE COURT: Thank you.

MR. WOLFSHOHL: Thank you, Your Honor.

MR. STANCIL: Thank you, Your Honor.

THE COURT: We're in adjournment until 4:00 o'clock.

(Proceeding adjourned at 2:58 p.m.)

* * * * *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*
*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*
*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*
*JTT TRANSCRIPT #64921*
*DATE FILED: DECEMBER 13, 2021*

# EXHIBIT 32

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. 21-03908 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc., | § | |
| | § | |
| Defendants. | § | |

# Plaintiff's Notice of Dismissal without Prejudice

(Relates to Doc. No. 1-4)

Under Fed. R. Civ. P. 41(a)(1)(A)(i), made applicable to this proceeding by Fed. R. Bankr. P. 7041, Plaintiff Carnero G&P LLC files this Notice of Dismissal without Prejudice against Defendants SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.

On July 30, 2021, Plaintiff sued Defendants in Texas state court under Cause No. 2021-46431, *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P*

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

*Texas LP, and Mesquite Energy, Inc.*, in the 269th Judicial District Court, Harris County, Texas (the "Lawsuit").

The Defendants were served with process.

On September 10, 2021, Defendants removed the Lawsuit to this Court.

The Defendants have not served answers or a motion for summary judgment.

Plaintiff hereby dismisses the Lawsuit without prejudice to refiling its claims.

Dated: December 10, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Plaintiff Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on December 10, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 33

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SANCHEZ ENERGY CORPORATION,** | § | **Case No. 19-34508 (MI)** |
| ***et al.*,[1]** | § | |
| | § | **(Jointly Administered)** |
| ***Reorganized Debtors*.** | § | |
| | § | |
| | § | |
| **SN EF MAVERICK, LLC, MESQUITE ENERGY, INC., EAGLE FORD TX, LP, VENADO EF, L.P., MITSUI E&P TEXAS LP, AND SN EF UNSUB, LP,** | § | |
| | § | |
| ***Plaintiffs*,** | § | |
| **v.** | § | **Adversary No. 21-04419** |
| | § | |
| **CARNERO G&P LLC,** | § | |
| ***Defendant*.** | § | |

## Carnero G&P LLC's Rule 12(b)(1) and 12(b)(6) Motion to Dismiss <u>Plaintiffs' Amended Complaint</u>

(Relates to Doc. No. 3)

**If you object to the relief requested, you must respond in writing.**

**Unless otherwise directed by the court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed.**

**If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. otherwise, the**

---

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "<u>Reorganized Debtors</u>"). The location of the Reorganized Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002. Citations to docket entries in the main case are cited as "<u>Main Case Dkt.</u>"

**court may treat the pleading as unopposed and grant the relief requested.**

This Court should dismiss Plaintiffs' Amended Complaint (Doc. No. 3) against Defendant Carnero G&P LLC ("Carnero") on the basis that the Court does not have jurisdiction over the Complaint and the Complaint fails to state a claim.[2]

## I. Preliminary Statement

1. The Complaint is premature because it seeks to preempt alleged state law claims that Plaintiffs *assume* Carnero will file in the future. Carnero has never made the allegations assumed by Plaintiffs in the Complaint and, instead, has filed a new state court lawsuit with completely different, entirely state law, claims that are not addressed in the Complaint.[3] The Complaint is unripe because it requests declarations about hypothetical claims that have not been filed and, alternatively, moot because Carnero does not allege in the new state court petition the declarations sought in the Complaint.

2. At the hearing on the motion to remand the previous adversary proceeding,[4] Carnero stated on the record that its previous state court action (the "Carnero Action") was not intended to request a declaration that Maverick/Mesquite was required to take any particular action under Section 365 and Carnero never intended to take such a position. Not content with these representations on the record and the dismissal of Carnero's previous action, Plaintiffs filed this new, completely unnecessary, Complaint. Consistent with its previous statements at the hearing on the motion to remand, Carnero is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere

---

[2] Capitalized terms not defined herein are ascribed the meaning given to them in the Complaint.

[3] A copy of Plaintiff's Original Petition, *Carnero G&P LLC v. SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.* is attached hereto as Exhibit A.

[4] *See Carnero G&P, LLC v. SN EF UnSub LP, et. al.*, Adversary No. 21-03908, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Prior AP") [Prior AP Dkt. 6].

assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA. That stipulation alone should be sufficient for the Plaintiffs and prosecuting this Complaint would be a waste of the Court's and parties' time and resources. Accordingly, Carnero requests that the Court dismiss the Complaint.

## II. Background

3. In the Carnero Action, Carnero sought declarations under the GGPA. *See* Prior AP Dkt. 1-4. On December 7, 2021, the Court held a hearing on Carnero's motion to remand the Carnero Action. *See* Prior AP Dkt. 6. The Court expressed a concern that "you're asking that people be compelled to take action in the Bankruptcy Court to implement what you think your rights are, and you're asking the State Court to determine that before they ever act in the Bankruptcy Court." Doc. No. 1-1 at p.14:18-22. Carnero's counsel responded unequivocally that it was not Carnero's intent to ask the state court to dictate what Maverick/Mesquite's rights were under Section 365. *Id*. at 15:6-14; *see also* 17:22-18:16.

4. After acknowledging that the pending settlement agreement between Maverick and the Occidental Entities and Western Entities (discussed below) would change the facts, Carnero's counsel stated that "the concern my client has is that whatever global settlement that they're entering into in some way impairs my client's rights under the GPPA, which is an assumed contract. I don't think I have to adjudicate those rights in your honor's court." *Id*. at 16:25-17:4.

5. To address the Court's concern that Maverick/Mesquite were being compelled to a certain outcome before they acted in the Bankruptcy Court, on December 10, 2021, Carnero filed a notice voluntarily dismissing the Carnero Action. *See* Prior AP Dkt. 31.

6. On December 21, 2021, the Court held a hearing in the main bankruptcy case and the Occidental adversary proceeding (Adversary No. 20-3198 ("Oxy Adversary")) and approved

and entered a Stipulation and Agreed Order between Mesquite and the Occidental Entities and Western Entities (as defined in the Stipulation) (the "Agreed Order") (Main Case Dkt. 2253).

7. Mesquite's counsel began the hearing by emphasizing that "we're not here on a 9019 motion to approve the settlement." Dec. 21, 2021 Hr'g Trans. at 7:11-12; *see also* 9:21-10:4; 18:8-21:8. The exhibit to the Agreed Order listing "Assumed Comanche Agreements" footnotes that several of the agreements were being "assumed *as amended* pursuant to the terms of the Settlement Agreement." Main Case Dkt. 2253 at p. 10-11 (emphasis added). The Court could not have approved the parties' settlement agreement and the amendments to the Assumed Comanche Agreements because the parties did not file the settlement agreement with the Court or seek the Court's approval of the settlement agreement or contract amendments.

8. On December 21, 2021, Mesquite also filed the Complaint initiating this current adversary proceeding (Adv. No. 21-4419, Doc. No. 3). The Complaint seeks four declarations:

a. Count I seeks a declaration that "Section 365 gave the Debtors the statutory power to breach the Midstream Agency Agreements, not the 'right or option to terminate those contracts." Complaint at ¶ 47.

b. Count II seeks a declaration that "Mesquite would incur significant out-of-pocket costs if it rejected the Midstream Agency Agreements." Complaint at ¶ 52.

c. Count III seeks a declaration that "if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law, the Plan and the Confirmation Order." Complaint at ¶ 54.

d. Count IV seeks a declaration that Carnero breached the [June 6, 2020] Settlement Agreement [Main Case Dkt. 1309, 1415] by filing the Carnero Action in state court. Complaint at ¶ 66.

9. On January 21, 2022, Carnero filed its Original Petition against the Plaintiffs here (the "New Petition"). A copy of the New Petition is attached hereto as Exhibit A.

10. The New Petition does not make any of the alleged arguments that the Adversary Complaint assumes that Carnero will make. Specifically, the New Petition does not allege that Section 3.1(b) of the GGPA required Maverick/Mesquite to reject the Midstream Agency Agreements or that Maverick/Mesquite would have breached Section 3.1(b) of the GGPA by merely assuming the Midstream Agency Agreements as they existed on the petition date. The New Petition does not reference Section 365 of the Bankruptcy Code. Instead, the New Petition seeks declarations under the GGPA relating to the parties' obligations under that agreement with respect to the Existing Commitments (as defined in the GGPA) as they existed on the effective date of the GGPA.

## III. <u>Argument</u>

### A. The Court does not have jurisdiction over Counts I-III of the Complaint because there is no case or controversy.

11. Plaintiffs seek declaratory relief under 28 U.S.C. § 2201, which provides in pertinent part:

> In a case of ***actual controversy within its jurisdiction***, . . . any court of the United States, upon the filing of an appropriate pleading, ***may declare the rights and other legal relations of any interested party seeking such declaration***, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a) (emphasis added).

12. In deciding whether a complaint states a claim for declaratory relief, the Court asks "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "An actual controversy is a dispute that is definite and concrete, touching the legal relations of parties having adverse legal interests." *See Val-Com Acquisitions Tr. v. SunTrust*

*Mortg. Co.*, 434 F. App'x 391, 392 (5th Cir. 2011). "A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967).

13. Plaintiffs cannot carry their burden to show the existence of an actual controversy within this Court's jurisdiction. The Complaint does not describe a controversy that is immediate and real. Carnero stated on the record at the hearing on the motion to remand the Carnero Action that it was not asserting the alleged legal arguments which are the basis for Plaintiffs' requests for declaratory relief. As stated earlier in this Motion, Carnero is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements on the terms that were in place as of the petition date does not breach the Section 3.1(b) of the GGPA. Finally, neither the Plaintiffs nor the Court needs to speculate as to what arguments Carnero may make because it has already filed the New Petition in state court. Accordingly, there is no actual controversy because the declarations sought by Mesquite are not ripe or, in the alternative, moot and address only a conjectural or hypothetical dispute.

**B. The declarations sought by Mesquite are not ripe because Carnero has not taken the positions attributed to it in the Complaint.**

14. The issues presented by Mesquite for declaratory judgment are premature and not ripe. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (the ripeness doctrine prevents courts from "premature adjudication" of disputes and "entangling themselves in abstract disagreements"). "The ripeness inquiry focuses on whether an injury that has not yet occurred is sufficiently likely to happen to justify judicial intervention." *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153–54 (5th Cir. 1993). "A court should dismiss a case for lack of ripeness when the case

is abstract or hypothetical." *New Orleans Public Service, Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987).

15. The thesis of Mesquite's Complaint is that "Carnero has claimed—and undoubtedly will again—that the Debtors' exercise of their assumption rights under Section 365 of the Bankruptcy Code, as part of a Court-approved settlement with Defendant, exposes the Debtors and their counterparties to significant contractual liability." Complaint at ¶ 1. In the Carnero Action, Carnero did not make any allegation regarding Mesquite's right to assume contracts under Section 365 *and* disavowed on the record at the hearing on the motion to remand the Carnero Action that Section 365 required Mesquite to reject any contract. Moreover, Carnero affirmatively states in this Motion that it would stipulate that the decision merely to assume or reject an agreement as it existed on the petition date would not breach Section 3.1(b) of the GGPA. Mesquite misconstrued Carnero's allegations in the Carnero Action in an attempt to contrive bankruptcy court jurisdiction and, despite Carnero dismissing the Carnero Action, perpetuated its misstatements by filing the Complaint. The Court should dismiss the Complaint as not ripe because it seeks declarations regarding hypothetical state law claims which Carnero has not filed.

**C. The declarations sought by Mesquite are moot because the New Petition does not make the allegations that Mesquite presumed Carnero would make.**

16. "Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (1998), the question of whether a case is moot depends upon 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Nautilus Ins. Co. v. Nevco Waterproofing*, 202 Fed. App'x. 667, 668 (5th Cir. 2006) (quoting *Connell v. Shoemaker*, 555 F.2d 483, 486 (5th Cir. 1977)). "Generally, any set of circumstances

that eliminates actual controversy after the commencement of a lawsuit renders that action moot." *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006).

17. Plaintiffs base the Complaint on conjecture about Carnero's future legal arguments. But any controversy about what Carnero may or may not allege in state court following dismissal of the Carnero Action was rendered moot by the filing of the New Petition. In the alternative, Plaintiffs ask for advisory declarations about a hypothetical claim that Plaintiffs speculate Carnero will make. The Declaratory Judgment Act may not be used for advisory relief. *See In re Palmaz Sci., Inc.*, No. 16-50552-CAG, 2018 WL 3343597, at *3 (Bankr. W.D. Tex. June 4, 2018) (recognizing that courts may not enter an advisory opinion on a hypothetical set of facts and, thus, for Declaratory Judgment Act, Article III requires that dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests." (quoting *Medimmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

18. As set forth above, Carnero's New Petition does not allege any of the arguments that are the subject of the Complaint. Instead, the New Petition seeks declarations under the GGPA regarding the parties' obligations under that agreement with respect to the Existing Commitments as they existed on the effective date of the GGPA. Accordingly, the Court should dismiss the Complaint as moot or as seeking impermissible advisory opinions on hypothetical facts.

**D. If the Court determines there is a case or controversy, the Complaint should still be dismissed because the Court lacks post-confirmation jurisdiction.**

19. Once the court confirms a debtor's chapter 11 plan of reorganization, its jurisdiction ceases to exist, other than for "matters pertaining to the *implementation or execution* of the plan." *In re Craig's Stores of Tex., Inc.,* 266 F.3d 388, 390 (5th Cir. 2001). The Court confirmed the Reorganized Debtors' Plan on April 30, 2020, and the Plan went effective on June 30, 2020 [Main

Case Dkt. 1417], so the Court's jurisdiction is the more narrow post-confirmation jurisdiction standard described in *Craig's Stores*.

20. The parties' rights and obligations under contracts post-confirmation—after contracts have been assumed or rejected—are matters of contract interpretation under state law and do not relate to the implementation or execution of the Plan or any order. *See Craig's Stores*, 266 F.3d at 390; *see also In re Austin Development Co.*, 19 F. 3d 1077, 1084 (5th Cir. 1994) (holding that after lease was rejected, cause of action for breach of lease "should be decided in state court" because "the debtor's estate had no remaining interest in the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction").

21. The court in *Craig's Stores* determined the bankruptcy court lacked jurisdiction over the claim based on three factors: (1) "it dealt with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and was, by implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan was necessary" to Craig's Stores' claims. *Id*. at 391. Instead, reorganized Craig's Stores was "capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court" and could not "come running to the bankruptcy judge every time something unpleasant happens." *Id*. at 390-91 (internal quotations omitted). Considering the three *Craig's Stores* factors, the Court lacks jurisdiction over Plaintiffs' claims.

22. There is no dispute that the Complaint was filed post-confirmation. And though repeatedly couched in terms of Section 365 rights, the Complaint addresses state-law based contractual rights and obligations under the GGPA. Accordingly, Counts I-III of the Complaint actually seek declarations interpreting the terms of, and the parties' rights and obligations under,

the GGPA. The dispute does not arise out of the Plan, the Settlement Agreement, or any order of this Court. It would not be possible for the Court to grant the relief requested by Plaintiffs without making legal conclusions regarding the parties' post-confirmation state law rights under the GGPA. Even if the defensive declarations sought in Counts I-III require interpretation of the Plan, defenses based on an interpretation of the confirmation order or plan will not create core bankruptcy jurisdiction. *See Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brooks Mays Music Co.),* 363 B.R. 801, 810 (Bankr. N.D. Tex. 2007) (noting defense based on a release in a bankruptcy court order does not create "core" jurisdiction in bankruptcy court).

23. The claims in the Complaint were not pending as of the Plan confirmation date or effective date. The Complaint is only a retaliation to the filing of the Carnero Action, and the controversies Plaintiffs allege did not exist, if they really exist at all, until very recently.

24. The claims in the Complaint do not invoke the terms of the Plan. Resolving a dispute as to the Reorganized Debtors' rights and obligations under the GGPA does not impact compliance with the Plan or its completion. *See, e.g., Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where litigation at issue did not attempt to subvert confirmed plan).

25. Any dispute regarding the parties' relations under the GGPA on a post-confirmation, go-forward basis simply does not impact compliance with the Plan or any Bankruptcy Court order, does not impact implementation of the Plan or enforcement of any Bankruptcy Court order, and, in fact, has no impact on the Plan or any Bankruptcy Court order whatsoever. *See Seven Seas Petroleum,* 522 F.3d at 589 (recognizing that "jurisdiction extends to

matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted). Therefore, this Court lacks jurisdiction to hear the Complaint and should dismiss it.

**E. If the Court determines it has jurisdiction over the Complaint, it should permissively abstain.**

26. In paragraphs 43 and 50 of the Complaint, Plaintiffs admit that their purpose of their lawsuit is to preempt Carnero from filing a hypothetical breach of contract claim in state court. The Court should abstain from making advisory predeterminations about state law issues that will not be brought in state court. Abstention is particularly appropriate in light of the New Petition.

27. A bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). The bankruptcy court has "broad power to abstain whenever appropriate." *In re Wood,* 825 F.2d 90, 93 (5th Cir.1987). The factors courts consider include:

(a) the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(b) the extent to which state law issues predominate over bankruptcy issues;

(c) the difficult or unsettled nature of applicable law;

(d) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(e) the jurisdictional basis, if any, other than § 1334;

(f) the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(g) the substance rather than the form of an asserted core proceeding;

(h) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(i) the burden on the bankruptcy court's docket;

(j) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(k) the existence of a right to a jury trial;

(l) the presence in the proceeding of nondebtor parties;

(m) comity; and

(n) the possibility of prejudice to other parties in the action.

*In re SBMC Healthcare, LLC*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017).

28. The following factors applicable to 28 U.S.C. § 1334(c)(1) heavily favor permissive abstention:

(1) The Complaint will have no effect on the efficient administration of the estate if the Court recommends abstention because no estate exists post-confirmation. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 848 (Bankr. S.D. Tex. 2006) (Bohm, J.) (recognizing that this factor does not apply post-confirmation when no estate exists).

(2) The New Petition commenced a related proceeding in state court. Rather than this Court rule on hypothetical state court arguments the Plaintiffs think Carnero will make, this Court should abstain in favor of the state district court adjudicating the state law claims which Carnero actually asserted in the New Petition.

(3) For the reasons stated above, the Court does not have jurisdiction over the Complaint under 28 U.S.C. § 1334, and there is no other basis for federal court jurisdiction.

(4) The Complaint asserts non-core claims regarding the interpretation and enforcement of the parties' rights and obligations under a contract.

(5) The Court's docket should not be burdened deciding whether declaratory relief is appropriate when Carnero has made the stipulation set forth in this Motion and as previously stated on the record.

(6) The Complaint acknowledges Plaintiffs' attempted forum shopping because it is intended to preempt Carnero from filing suit in state court.

(7) Comity favors abstention under these circumstances. The Court acknowledged during the hearing on the motion to remand that at some point, the disputes between Plaintiffs and Carnero would likely become

> state law issues to be determined in state court. That time has arrived now that the Midstream Agency Agreements have been assumed and amended. Plaintiffs can no longer claim that Carnero's action could impact the exercise of their rights under Section 365 regarding the Midstream Agency Agreements.

29. Given the importance of these factors, the Court should permissively abstain from hearing the Complaint if it does not dismiss the Complaint.

**F. Under Rule 12(b)(6), Count III Fails to State a Claim for Relief Against Carnero.**

30. In considering a motion pursuant to Rule 12(b)(6), the Court must accept all well pleaded facts in the Complaint as true and view them in the light most favorable to the plaintiff. *See Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d. 673, 675 (5th Cir. 2007). While well pleaded facts are to be accepted as true, legal conclusions are not "entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Court is not to strain to find inferences favorable to the Plaintiffs and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *See R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005).

31. In Count III, Plaintiffs seek a declaration that "if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law, the Plan, and the Confirmation Order" because it "imposes liability on Mesquite for assuming the Midstream Agency Agreements," and "bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's rights to assume (and assign) its contracts." Complaint ¶¶ 54, 56-57. This is an argument that GGPA Section 3.1(b) is an ipso facto clause as to Maverick/Mesquite's Section 365 right to assume executory contract. Count III fails to state a claim for relief because Section 3.1(b) of the GGPA is not an ipso facto clause as a matter of law.

32. With respect to 11 U.S.C. § 365, an ipso facto clause is a "contract clause that specifies the consequences of a party's bankruptcy." *In re Mirant Corp.*, 440 F.3d 238, 240 n.1

(5th Cir. 2006). (quoting BLACK'S LAW DICTIONARY 847 (8th ed.2004)). It "operates automatically upon the bankruptcy or insolvency of a contract party." *In re Mirant Corp.*, 303 B.R. 319, 325 (Bankr. N.D. Tex. 2003) (citing *Bruder v. Peaches Records & Tapes, Inc. (In re Peaches Records & Tapes, Inc.)*, 51 B.R. 583, 587 n.6 (9th Cir. BAP 1985)). Examples of unenforceable ipso facto clauses include:

- A clause that allows a non-debtor contract party to "terminate the contract and claim liquidated damages if [the debtor contract party] petitioned for bankruptcy before the option period expired." *Mirant Corp*, 440 F.3d at 242;
- A contractual provision that states the debt is not dischargeable in bankruptcy and that the contract debtor will not enter bankruptcy. *In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2002); and
- A insurance policy provision that eliminates coverage for claims against debtor's officers and directors upon the filing of bankruptcy. *In re Fort Worth Osteopathic Hosp., Inc.*, 387 B.R. 706, 712 (Bankr. N.D. Tex. 2008).

33. Such clauses are unenforceable because they "terminate or modify a debtor's rights in an executory contract upon the filing of a bankruptcy petition…." *Mims v. Fid. Funding, Inc.*, 307 B.R. 849, 858 (N.D. Tex. 2002). Invalidating these clauses prevents "a loss of property rights or the elimination or limitation of obligations that existed prior to the commencement of a bankruptcy" that "occurs by reason of the debtor's bankruptcy." *Fort Worth Osteopathic Hosp.*, 387 B.R. at 711.

34. Here, nothing in Section 3.1(b) of the GGPA specified the consequences of Mesquite's/Maverick's bankruptcy or operated automatically upon Maverick/Mesquite's bankruptcy. Section 3.1(b) of the GGPA does not reference the filing of a bankruptcy petition or any section of the Bankruptcy Code. As Carnero has stipulated, nothing in Section 3.1(b) specifies or could operate to prevent Maverick/Mesquite from exercising its Section 365 right to assume executory contracts as they existed on the petition date or reject executory contracts.

35. In its entirety set out below, Section 3.1(b) provides that Carnero will receive for processing the Producer's Comanche Gas when an Existing Commitment reaches the end of its then-current term or after Producer terminates that Existing Commitment at the earliest time at which any right or obligation to terminate such Existing Commitment exercisable by Producer without out-of-pocket costs arises.

> (b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

36. This provision does not (***and did not***) prevent Maverick/Mesquite from exercising its Section 365 right to assume any executory contract as it existed on the petition date or to reject any executory contract. As a matter of law, this provision is not an unenforceable ipso facto provision such that Plaintiffs have failed to state a claim.

**G. Under Rule 12(b)(6), Count IV Fails to State a Claim for Relief Against Carnero**

37. Count IV of the Complaint also fails to state and claim and must be dismissed under Rule 12(b)(6). In Count IV, Plaintiffs seek a declaration that Carnero breached Section 6.2.1 of the June 6, 2020 Settlement Agreement [Complaint ¶ 28, citing Main Case Dkt. 1309] by bringing the Carnero Action [Complaint ¶ 36, citing Prior AP Dkt. 1-4] in state court because it arose from or related to the Settlement Agreement. Complaint ¶ 65. Section 6.2.1 states,

> Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in the Bankruptcy Court, and each of the Parties hereby irrevocably submits to the jurisdiction of the Bankruptcy Court for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Midstream Transaction. Each of the Parties agrees not to commence any proceeding relating hereto or to the Midstream Transaction or any of the other covenants or agreements set forth herein except in the Bankruptcy Court, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by the Bankruptcy Court.

38. In the seven paragraphs of Count IV, Plaintiffs fail to cite *any* portion of the Carnero Action that invoked the Settlement Agreement. The Plaintiffs cannot point to any portion of the Carnero Action that arises out of or relates to the Settlement Agreement because the state court petition, in fact, did not reference the Settlement Agreement at all. *See* PA Dkt. 1-4 at pdf p. 2-12. Instead, the Carnero Action asserted only a state law contract claim for declarations under the GGPA, making the Settlement Agreement entirely unnecessary to its claims. It was Defendants

(the Plaintiffs here) who invoked the Settlement Agreement in their notice of removal of the Carnero Action. *See* Prior AP Dkt. 1 (Notice of Removal)

39. To try to make the Carnero Action rise out of or relate to the Settlement Agreement, Plaintiffs assert that the GGPA was assumed pursuant to Section 2.2.1(d) of Settlement Agreement such that (apparently) any future claim under the GGPA would somehow arise out of or relate to the Settlement Agreement and must be brought in the Bankruptcy Court. *See* Complaint ¶¶ 63, 65.

40. But once again, the Plaintiffs misstate the contents of a document. Section 2.2.1(d) only states the Debtors would not remove any executory contracts from the schedule of assumed contracts [Main Case Dkt. 1309 at pdf p. 41]; it does not indicate that scheduled assumed contracts were being assumed *pursuant to* the Settlement Agreement. Moreover, the GGPA was not one of the contracts included in the defined term "Assumption Agreements" in the Settlement Agreement. *See* Main Case Dkt. 1309 at pdf p. 32.

41. Instead, the GGPA was assumed pursuant to the Plan through its inclusion on the schedule of assumed contracts. *See* Main Case Dkt. 1326 (June 17, 2020 Notice of Filing of Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates) at pdf p. 193. As noted, *the Defendants* in the Carnero Action (the Plaintiffs here) raised the Settlement Agreement. *See* Prior AP Dkt. 1 (Notice of Removal). Carnero alleged only a state law contract claim in the Carnero Action.

42. Despite this, without citing any portion of the petition in the Carnero Action, Plaintiffs assert that the Court had jurisdiction over the Carnero Action with only conclusory assertions that the petition "went to Mesquite's rights and Court's authority under Section 365" and "involved rights created by bankruptcy law and required interpretation and enforcement of

this Court's order." Complaint at ¶ 65. These assertions fail to connect the Carnero Action with the Settlement Agreement in any way.

43. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* That is, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft*, 556 U.S. at 678 (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (holding factual allegations insufficient to state plausible claim).

44. Plaintiffs labels and conclusions in Count IV as to what Carnero alleged in the Carnero Action without citing any portion of the state court petition where Carnero actually invoked the Settlement Agreement fail to meet the standard of pleading. That standard required Plaintiffs to allege facts, rather than mere conclusions, to state a claim for a declaration regarding Carnero's purported breach of Section 6.1.2 of the Settlement Agreement. *See R2 Invs. LDC*, 401 F.3d at 642 (finding factual allegations insufficient where plaintiff alleged no facts supporting strong inference of scienter). Because their inadequate factual allegations in Count IV do not demonstrate that the state court Carnero Action arose from or related to the Settlement Agreement, Plaintiffs have failed to state a claim and the Court should dismiss Count IV.

## IV. Conclusion

Carnero requests the Court dismiss the entire Complaint for lack of jurisdiction, abstain from hearing the Complaint, Dismiss Counts III and IV for failure to state claim, and grant Carnero other and further relief as is just and proper.

Dated: January 21, 2022

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on January 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 34

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, *et. al.* | § | Case No. 19-34508 |
| | § | |
| *Reorganized Debtors.*[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | |
| | § | Adversary No. ______________ |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | | |

**NOTICE OF REMOVAL**

Defendants SN EF UnSub LP, Eagle Ford TX LP, Javelin EF L.P. (f/k/a Venado EF L.P.), Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc. remove the state court action styled *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.,* Cause No. 2022-04224, in the 215th District Court of Harris County, Texas (the "**State Court Action**"), to the United States

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**"), through referral by the United States District Court for the Southern District of Texas, Houston Division (the "**District Court**"), pursuant to the District Court's General Order 2012-6. This Notice of Removal is filed pursuant to 28 U.S.C. § 1452 and Bankruptcy Rule 9027, and Rules 9027-1 and 9027-2 of the Southern District of Texas Bankruptcy Local Rules. Jurisdiction of this case arises under 28 U.S.C. § 1334 and 11 U.S.C. §§1142, 105.

## PROCEDURAL BACKGROUND

### A. The Parties

1. Plaintiff Carnero G&P LLC ("**Carnero**") is a Delaware limited liability company, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("**Targa**") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("**SNMP**") with its principal place of business in Houston, Texas. Plaintiff's counsel is:

Eugene M. Nettles
Joshua W. Wolfshohl
Amy C. Falcon
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

2. Defendant SN EF UnSub, LP ("**UnSub**") is a limited partnership organized under the laws of Delaware with its principal place of business at 1111 Bagby Street, Suite 2050, Houston, Texas 77002. UnSub's counsel is:

Paul M. Basta
Alice Belisle Eaton

Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

and

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

3. Defendant Eagle Ford TX LP ("**Eagle Ford**") is a limited partnership organized under the laws of Texas with its principal place of business at 5599 San Felipe Road, Suite 725, Houston, Texas 77056. Eagle Ford's counsel is:

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700

Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

4. Defendant Venado EF L.P., now known as Javelin EF L.P. ("**Javelin**"), is a limited partnership organized under the laws of Delaware with its principal place of business at 13215 Bee Cave Pkwy, Suite B-350, Austin, Texas 78738. Javelin's counsel is:

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

5. Defendant Mitsui E&P Texas LP ("**Mitsui**") is a limited partnership organized under the laws of Texas with its principal place of business at 1300 Post Oak Blvd., Suite 1800, Houston, Texas 77056. Mitsui's counsel is:

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

6. Defendant SN EF Maverick, LLC ("**Maverick**") is a limited liability company organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Maverick's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

7. Defendant Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("**Mesquite**") is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. Mesquite's counsel is:

James G. Munisteri
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555

jmunisteri@foley.com

and

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

8. Mitsui, Javelin, and Eagle Ford are referred to collectively as the "**WIPs**". The WIPs, along with UnSub, Maverick, and Mesquite are referred to collectively as "**Defendants**".

## B. The Bankruptcy Case

9. On August 11, 2019, Sanchez Energy Corporation and certain of its affiliates (the "**Debtors**") each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On August 12, 2019, the Court entered an order directing joint administration of the bankruptcy cases of the Debtors, with the lead bankruptcy case as Case No. 19-3408, *In re Sanchez Energy Corporation, et al.* (the "**Bankruptcy Case**").

10. As the Court is aware, these Chapter 11 cases followed an unusual course. On April 30, 2020, the Court confirmed the Debtors' Plan of reorganization under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [19-

34508 Dkt. No. 1212] (the "**Confirmation Order**") and *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "**Plan**"). The Plan provided for, among other things, the equitization of approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed litigation with respect to assumption or rejection of the Debtors' executory contracts until after the Plan Effective Date (as defined below), allowing for a restructuring of the Debtors' midstream arrangements. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp.*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). To forestall liquidation, Sanchez and its creditors agreed to confirm a Chapter 11 plan first and restructure the Debtors' midstream operations later. *Id.*

11. On June 30, 2020 (the "**Plan Effective Date**"), the Debtors filed the Notice of Effective Date. *See* Dkt. No. 1417.

12. Pursuant to the Plan, the Debtors were required to identify certain executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "**Rejection Schedule**") or to be assumed as listed on Exhibit C (as amended, the "**Assumption Schedule**") to the Plan. [19-34508 Dkt. 1212 at 10 ¶¶17, 18, 55]; *see also* Plan, Art. V. If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or Assumption Schedule, the executory contract or unexpired lease was deemed assumed or rejected as indicated, effective as of the Plan Effective Date. *Id.* For those contracts to which an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" of such executory contract or unexpired lease. *Id.*

13. Section XI of the Plan further provides that the Bankruptcy Court would "retain exclusive jurisdiction over all matters arising out of, or related

to, the Chapter 11 Cases and the Plan" including to "**resolve any matters related to Executory Contracts or Unexpired Leases**, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under any Executory Contract[.]" [19-34508 Dkt. 1212 at 69 (emphasis added).]

14. Paragraph 17 of the Confirmation Order provides that any "Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease . . . shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute approving the assumption or rejection." [19-34508 Dkt. 1212 at 10 ¶17.] Paragraph 24 provides that, until the bankruptcy court resolves the dispute regarding assumption or rejection, the "agreement shall continue as in effect immediately prior to the Effective Date." [19-34508 Dkt. 1212 at 15 ¶24.]

### C. The State Court Action

15. Carnero filed *Plaintiff's Original Petition* and initiated the State Court Action on January 21, 2022. Eagle Ford, Mitsui, and Javelin were each served with the Original Petition on January 27, 2022.

16. On January 27, 2022, Carnero filed *Plaintiff's Amended Petition*.

17. Maverick, Mesquite, Mitsui, Eagle Ford, Javelin, and UnSub, were served with Plaintiff's Amended Petition on February 2, 2022.

18. None of the Defendants has filed an answer or other responsive pleading in state court. The Defendants and Plaintiff executed a stipulation extending the Defendants' deadline to file responsive pleadings until February 28, 2022.

## BASIS FOR REMOVAL

19. Section 1452 provides that a "party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim

or cause of action under section 1334 of this title." 28 U.S.C. § 1452. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under Chapter 11 or arises in or is related to the Bankruptcy Case.

20. "Subject matter jurisdiction remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (cleaned up); *TXMS Real Estate Investments, Inc. v. Senior Care Centers, LLC (In re Senior Care Centers, LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). This authority includes "jurisdiction to interpret and enforce its own prior orders." *Burch v. Freedom Mortgage Corporation (Matter of Burch)*, 835 Fed. Appx. 741, 748 (5th Cir. 2021).

21. Specifically, bankruptcy courts maintain "'arising in or under' jurisdiction" (or "core" jurisdiction) over disputes centering on the interpretation of one of their orders. *Rohifard v. Brewer & Prichard, P.C. (In re ABC Dentistry, P.A.)*, 16-34221, 2019 WL 913356, at *3 (Bankr. S.D. Tex. Feb. 21, 2019), *aff'd*, BR H-16-34221-11, 2019 WL 6894775 (S.D. Tex. Dec. 17, 2019), *rev'd on other grounds*, 978 F.3d 323 (5th Cir. 2020); *see also Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

22. Bankruptcy courts have "related to" (or "non-core" jurisdiction) over matters that "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.*), 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015); *see also Crown Vantage*, 421 F.3d 963 (9th Cir. 2005) (discussing factors for retention of "related to" jurisdiction).

23. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).

24. This Court's jurisdiction over this adversary proceeding was expressly contemplated by Article XI of the Plan; paragraph 43 of the Confirmation Order; paragraph 6 of the *Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [19-34508 Dkt. No. 1415] (the "**Carnero Settlement Approval Order**"); and Section 6.2.1 of the Carnero Settlement Agreement (attached as Exhibit A to the *Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "**Carnero Settlement Motion**").

25. Carnero's allegations in the State Court Action, as set forth in the First Amended Petition, fall squarely within this Court's jurisdiction and directly affect the success of the Plan. Specifically, the State Court Action directly implicates the "implementation or execution" of the restructuring of the Reorganized Debtors' midstream and marketing arrangements under a global midstream settlement with the Oxy/Wes Parties[2] (the **"Midstream Restructuring**"), and requires interpretation of at least four Plan provisions, including:

- Article V, which established the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts;
- Article IV.D., which provided that all property of the estate "shall vest in each applicable Reorganized Debtor, free and clear" of all claims and other encumbrances;
- Article IV.F., which provided that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter . . . the validity, priority, or amount of

[2] The Oxy/Wes Parties include Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP.

any Claims that may arise in connection therewith"; and

- Article VIII of the Plan, which provided for the discharge of claims against the Reorganized Debtors as of the Effective Date, exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of . . . the formulation, preparation, dissemination, negotiation, filing, or termination of the . . . Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoined all claims released or discharged pursuant to the Plan.

26. The State Court Action also implicates the interpretation of at least three of the Court's prior orders, including:

- the Confirmation Order, which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, provided that it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do); and

- the Carnero Settlement Approval Order, which approved the Carnero Settlement Agreement but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interests;

- the Stipulation and Agreed Order in *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corporation*, et. al., Adv. No. 20-03198 (the "**Sanchez/Oxy Adversary Proceeding**"), which approved the assumption and rejection of certain of the Debtors' midstream contracts and effected the settlement with the Oxy/Wes Parties [No. 20-03198 Dkt. No. 157];

27. The State Court Action also raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, Section 3.1(b) of the Firm Gas Gathering Processing and Purchasing Agreement between

Maverick and Carnero, effective April 1, 2018 [19-34508 Dkt. 1373-8],[3] would be unenforceable as a matter of federal bankruptcy law, because it would subject the Debtors to significant liability simply because the Debtors negotiated improvements to their midstream cost structure which were necessary to effectuate the Midstream Restructuring.

28. Lastly, the State Court Action also implicates important federal policy interests underlying the Bankruptcy Code: whether the federal policy interests underlying section 365 preempt Carnero's rights to claim that the Midstream Restructuring breached the Firm Gas Gathering Processing and Purchasing Agreement when Carnero was otherwise restored to its prepetition status quo.

29. One of the most powerful tools in a debtor-in-possession's bankruptcy "tool kit" is the ability to, subject to court approval, assume or reject any executory contract under section 365 of the Bankruptcy Code. *See In re Szenda*, 406 B.R. 574, 579 (Bankr. D. Mass. 2009). Part and parcel of a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."); *In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for

[3] The GGPA was amended, through the Amendment to Firm Gas Gatherings, Processing and Purchase Agreement by and among SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC, and Carnero G&P LLC, dated as of April 1, 2018.

assumption"); *see also Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975) ("The practical effect of [the predecessor statute to section 365] is to force all creditors doing business under executory contracts with the debtor in economic distress to renegotiate their mutual rights.").

30. Here, the Debtors negotiated improvements to their midstream cost structure which were necessary to effectuate the Midstream Restructuring and benefited the estate. Importantly, the Midstream Restructuring did not alter the scope or duration of "Existing Commitments" under the Firm Gas Gathering Processing and Purchasing Agreement.[4] Despite being restored to its prepetition status quo, Carnero now claims it is entitled to damages because the Debtors successfully renegotiated certain terms of its prepetition executory contracts with Defendants. Defendants respectfully submit that allowing the State Court Action to proceed outside the Bankruptcy Case would not only undercut the federal policy interests underlying section 365, but would also permit Carnero to pursue a windfall at the expense of the estate. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (noting the federal bankruptcy policy that creditors should not receive a windfall merely by reason of the happenstance of bankruptcy).

## ADDITIONAL PROCEDURAL MATTERS

### A. Timely Removal under § 1446 and Bankruptcy Rule 9027(a)(3)

31. This notice of removal is timely filed because it is filed within 30 days of service and within the period provided by Federal Rule of Bankruptcy Procedure 9027(a)(3) and 28 U.S.C. §1446(b).

[4] The treatment of the "Existing Commitments" pursuant to the Midstream Restructuring is discussed in detail in the *Amended Complaint* filed contemporaneously herewith in Adversary Proceeding No. 21-04419.

**B. Proper Federal Court**

32. The 215th District Court of Harris County, Texas is located within the Southern District of Texas, Houston Division. Therefore, under 28 U.S.C. §§ 1334 and 1452, and Fed. R. Bankr. P. 9027, this action is properly removed to this Court. *See, e.g., In re SBMC Healthcare, LLC,* 519 B.R. 172 (Bankr. S.D. Tex. 2014).

33. Pursuant to Local Rule 9027-1, Defendants state that they do consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

**C. State Court Documents Attached**

34. Pursuant to Fed. R. Bankr. P. 9027(a) and Bankruptcy Local Rule 9027-1, an appendix is attached to this notice, which includes a copy of the state-court docket sheet and all documents filed with the state court.

**D. Notice**

35. Upon the filing of this notice of removal, the Defendants will duly notify the Clerk for the 215th District Court for Harris County, Texas, attaching a copy of this notice of removal.

*/s/ James G. Munisteri* Date: February 28, 2022

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III* Date: February 28, 2022

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Jared Wilkerson* Date: February 28, 2022

Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry* Date: February 28, 2022

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada* Date: February 28, 2022

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Defendant Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was served on February 28, 2022, on all persons entitled to receive service through the Court's Pacer ECF filing system.

*James G. Munisteri*
James G. Munisteri

# EXHIBIT 35

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508[2] |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |

**Adversary Plaintiff's Motion to Remand to State Court or for Abstention**
(Related to Dkt. No. 1)

**If you object to the relief requested, you must respond in writing.**

**Unless otherwise directed by the Court, you must file your response electronically at https://ecf.txsb.uscourts.gov/ within twenty-one days from the date this motion was filed.**

**If you do not have electronic filing privileges, you must file a written objection that is actually received by the clerk within twenty-one days from the date this motion was filed. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

1 The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2 Referred to as "Main Case" in docket entry references.

# Table of Contents


Summary of the Relief Requested ........................................................................................ 1

Background .......................................................................................................................... 3

Argument ............................................................................................................................. 7

I. The Court lacks both core and "related-to" jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit. ......................................................................... 7

A. The Court's post-confirmation jurisdiction is limited under Craig's Stores to matters pertaining to the implementation or execution of the Plan. ........................................ 10

1. Carnero's claims are non-core. ............................................................................ 10

2. *Craig's Stores* defines the post-confirmation "related to" standard for this Court's subject matter jurisdiction analysis. ...................................................... 11

B. The Craig's Stores factors do not support jurisdiction over Carnero's claims. ........... 13

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts. ........................................................ 13

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date. ................................................................................................ 13

3. No facts or law deriving from the Plan are necessary to decide Carnero's claims. ............................................................................................................. 14

II. The factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. ............... 16

A. Carnero has timely filed this motion for abstention and its claim is based on state law. ............................................................................................................................ 16

B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b). .............................................................................................................. 17

C. Carnero's claims are non-core. ..................................................................................... 17

D. Carnero filed its claims in the State Court Lawsuit. .................................................... 18

E. The state court can timely adjudicate Carnero's claims............................................. 18

III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention.......................................................................................................................... 19

A. The permissive abstention factors. ............................................................................... 19

B. The balance of the factors favors permissive abstention. ........................................... 20

1. The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention. .......................................................... 20

2. The extent to which state law issues predominate over bankruptcy issues. ......... 21

3. The difficult or unsettled nature of applicable law. ............................................ 21

4. The presence of a related proceeding commenced in state court or other nonbankruptcy proceeding...................................................................................... 21

5. The jurisdictional basis, if any, other than § 1334............................................. 22

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case. .......... 22

7. The substance rather than the form of an asserted core proceeding. .......... 22

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court. .......... 23

9. The burden on the bankruptcy court's docket. .......... 23

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties .......... 23

11. The existence of a right to a jury trial. .......... 24

12. The presence in the proceeding of nondebtor parties. .......... 24

13. Comity. .......... 24

14. The possibility of prejudice to other parties in the action. .......... 25

Conclusion .......... 26

## Table of Authorities

**Page(s)**

**Cases**

*In re Austin Development Co.*,
19 F. 3d 1077 (5th Cir. 1994) ....................12, 15

*City of Covington v. Covington Landing Ltd. P'ship*,
71 F.3d 1221 (6th Cir. 1995) ....................6

*In re Craig's Stores of Tex., Inc.*,
266 F.3d 388 (5th Cir. 2001) .................... *passim*

*Davis v. Retail Fin. Co. of Tex., Inc.*,
No. 06-7016, 2006 WL 2827270 (Bankr. S.D. Tex. Sept. 27, 2006) ....................11

*In re Doctors Hosp. 1997, L.P.*,
351 B.R. 813 (Bankr. S.D. Tex. 2006) (Bohm, J.) ....................20, 21

*In re Encompass Services Corp.*,
337 B.R. 864 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006) ....................13

*In Matter of Galaz*,
665 Fed. Appx. 372, 376 (5th Cir. 2016) ....................15

*In Matter of Galaz*,
841 F.3d 316 (5th Cir. 2016) ....................10

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*,
522 F.3d 575 (5th Cir. 2008) ....................15, 16

*In re Hous. Reg'l Sports Network, L.P.*,
547 B.R. 717 (S.D. Tex. 2016) ....................10

*Latham v. Wells Fargo Bank, N.A.*,
896 F.2d 979 (5th Cir. 1990) ....................10

*Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*,
408 B.R. 90 (Bankr. S.D. Tex. 2009) ....................11

*In re Lutfak*,
536 B.R. 765 (Bankr. S.D. Tex. 2015) ....................11

*In re OCA, Inc.*,
551 F.3d 359 (5th Cir. 2008) ....................................................................................10

*In re Performance Interconnect Corp.*,
No. 06-34482-BJH-7, 2007 WL 2088281 (Bankr. N.D. Tex. July 19, 2007) .........................16

*In re Petroleum Products & Services, Inc.*,
561 B.R. 662 (Bankr. S.D. Tex. 2016) ...............................................................11, 16, 17, 18

*Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brooks Mays Music Co.)*,
363 B.R. 801 (Bankr. N.D. Tex. 2007).......................................................................11

*Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.)*,
336 B.R. 286 (Bankr. S.D. Tex. 2005) ........................................................................7

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ...................................................................6, 11, 17

*In re SBMC Healthcare, LLC*,
519 B.R. 172 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017) ........................................................ *passim*

*Smith v. Bank of Am. Corp.*,
605 Fed. Appx. 311 (5th Cir. 2015).........................................................................7, 17

*In re Today's Destiny, Inc.*,
No. 05-90080, 2007 WL 2028111 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) .........................2

*In re Treyson Dev., Inc.*,
No. 14-70256, 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.).............................................................................................16

*In re TXNB Internal Case*,
483 F.3d 292 (5th Cir. 2007) ......................................................................................2

*In re U.S. Brass Corp.*,
301 F.3d 296 (5th Cir. 2002) ....................................................................................10

*In re Wood*,
825 F.2d 90 (5th Cir. 1987) ...............................................................................10, 19

*Matter of Zale Corp.*,
62 F.3d 746 (5th Cir. 1995) .......................................................................................7

**Statutes**


11 U.S.C. § 365 ........................................ 6, 9, 11, 17

28 U.S.C. § 157 ........................................ 2, 10

28 U.S.C. § 1334 ........................................ *passim*

28 U.S.C. § 1367 ........................................ 2

28 U.S.C. § 1452 ........................................ 1, 2, 3

Tex. Civ. Prac. & Rem Code Ch. 37 ........................................ 2, 21


**Other Authorities**


Bankr. L.R. 9013-1 ........................................ 1

Fed. R. Bankr. P. 5011(b) ........................................ 1

Fed. R. Bankr. P. 9014 ........................................ 1

Fed. R. Bankr. P. 9019 ........................................ 5

Under 28 U.S.C. § 1452(b), 28 U.S.C. § 1334(c), Rules 5011(b) and 9014 of the Federal Rules of Bankruptcy Procedure, and Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas, Adversary Plaintiff Carnero G&P LLC ("Carnero") files this Motion to Remand to State Court or for Abstention to return this case to the 215th Judicial District Court, Harris County, Texas:

## Summary of the Relief Requested

1. This suit involves a dispute that arose post-confirmation, post-effective date among largely non-debtor entities over contractual gas gathering, processing, and purchasing rights and obligations in assumed contracts. Carnero understands that the non-debtors control an approximate 87.5% of the oil and gas lease working interests subject to the contracts in dispute.[3] Specifically, the contracts between Carnero and SN EF UnSub LP ("UnSub"), Eagle Ford TX LP ("Eagle Ford"), Venado EF L.P. ("Venado"), Mitsui E&P Texas LP ("Mitsui") (collectively, the "WIPs"), former debtor Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) ("Mesquite"), and former debtor SN EF Maverick, LLC ("Maverick") (collectively, the WIPs, Maverick, and Mesquite are the "Defendants") are as follows:

- April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC ("Maverick"), as amended by Carnero, the WIPs and Maverick, **Exhibit 1**;

- April 1, 2018 Ratification Agreements among Carnero, Maverick, UnSub, Eagle Ford, Venado, and Mesquite Comanche Holdings, LLC ("MCom") (successor to Gavilan Resources, LLC ("Gavilan") and Mesquite subsidiary) ratifying the GGPA ("Ratification Agreements"), **Exhibit 2, Exhibit 3, Exhibit 4, Exhibit 5**;

- April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui regarding the GGPA ("Letter Agreement"), **Exhibit 6**.

---

3 Indeed, it appears that a full 25% of non-debtor working interests are held by an affiliate of Mesquite.

2. The Reorganized Debtors assumed all of these contracts (collectively, the "GGPA Contracts"). Twenty-one months after confirmation [Main Case Dkt. 1212], Carnero filed this lawsuit on January 21, 2022, in state court against Defendants as Cause No. 2022-04224 in the 215th Judicial District Court, Harris County, Texas ("State Court Lawsuit").

3. Carnero asserts claims for declaratory relief under Texas Civil Practice and Remedies Code Chapter 37 regarding the parties' rights and obligations under the GGPA Contracts, breach of the GGPA Contracts by all Defendants, and a separate breach of the GGPA Contracts by Mesquite,[4] as successor working interest owner to Gavilan. The claims arise from Defendants' post-confirmation, post-effective date amendments to certain assumed contracts (defined in the GGPA as "Existing Commitments") or to contracts affecting those Existing Commitments.

4. On February 28, 2022, Defendants removed the case to this Court based on purported bankruptcy jurisdiction under 28 U.S.C. § 1334(b) and 28 U.S.C. § 1452. But the State Court Lawsuit asserts only non-core, post-confirmation contract claims under state law that do not relate to implementation or execution of the Reorganized Debtors' plan of reorganization. This Court should remand this case to the state court or abstain for three reasons: (i) the Court lacks post-confirmation subject matter jurisdiction over the State Court Lawsuit under 28 U.S.C. § 157, § 1334(b), and § 1367; [5] (ii) the factors applicable to 28 U.S.C. § 1334(c)(2) require mandatory

---

[4] After filing the State Court Lawsuit, Carnero became aware that MCom acquired Gavilan's interest in the Comanche Assets.

[5] Defendants assert, without supporting argument, supplemental jurisdiction under 28 U.S.C. § 1367. [Dkt. 1 ¶ 23]. "Bankruptcy courts may not exercise supplemental jurisdiction." *In re TXNB Internal Case*, 483 F.3d 292, 300 (5th Cir. 2007). This Court agrees that it "does not have supplemental subject matter jurisdiction over pendent claims under 28 U.S.C. § 1367." *In re Today's Destiny, Inc.*, No. 05-90080, 2007 WL 2028111, at *2 (Bankr. S.D. Tex. July 6, 2007) (Isgur, J.) (cleaned up). If the Court were to have jurisdiction, it could only be under Section 1334 (*Id.*), but as explained in Carnero's argument, the Court lacks jurisdiction under that section, too.

abstention; and (iii) the factors applicable to 28 U.S.C. § 1334(c)(1) favor permissive abstention and equitable remand pursuant to 28 U.S.C. § 1452(b).

## Background

5. The Reorganized Debtors filed their Chapter 11 petitions on August 11, 2019. [Main Case Dkt. 1]. The Court approved the plan of reorganization (the "Plan") on April 30, 2020. [Main Case Dkt. 1212]. On June 30, 2020, the Plan became effective. [Main Case Dkt. 1417].

6. On July 30, 2021, Carnero filed a lawsuit ("First Carnero Action") against Defendants seeking declarations about the parties' rights and obligations under the GGPA Contracts.[6] [Prior RAP Dkt. 1-4].

7. The GGPA Contracts relate to oil and gas assets known as the "Comanche Assets." The GGPA contains terms requiring Defendants to deliver gas from the Comanche Assets to Carnero in certain circumstances. The declarations Carnero sought in the First Carnero Action addressed the parties' rights and obligations under the GGPA Contracts and how those rights and obligations may be affected by certain other contracts—to which Carnero is not a party—that currently cause the natural gas (and its components) to be delivered to gatherers, processors, or purchasers other than Carnero. Those other contracts—identified in the GGPA as "Existing Commitments"—include:

(i) a rejected Hydrocarbons Purchase and Marketing Agreement ("Marketing Agreement") between UnSub and Maverick dated January 12, 2017 [Main Case Dkt. 1373]; and

(ii) a then executory Retained Midstream Contracts Services Agreement, by and between Maverick, on the one hand, and Anadarko E&P Onshore, LLC, and Kerr-McGee Oil & Gas Onshore LP, on the other, and Mesquite as guarantor dated on or about June 1, 2017 ("Midstream Agency Agreement") [Main Case Dkt. 1544-2], which the Reorganized Debtors have since assumed.

---

6 Cause No. 2021-46431, *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, in the 269th Judicial District Court, Harris County, Texas.

8. Defendants removed the First Carnero Action to this Court.[7] [Prior RAP Dkt. 1]. Carnero moved to remand. [Prior RAP, Dkt. 6]. On December 7, 2021, the Court held a hearing on the motion to remand. [DAP[8] Dkt. 1-1]. Also pending at that time was the Oxy Adversary,[9] in which the issue in dispute was the rejection of the Midstream Agency Agreement. At the hearing, the Court expressed concern that Carnero sought to compel Maverick/Mesquite to take action in the Bankruptcy Court to implement Carnero's rights under the GGPA and to have the State Court determine those rights before Mesquite/Maverick ever acted in the Bankruptcy Court with respect to the Midstream Agency Agreement. [*Id*. at 14:16-15:5]. But the Court also recognized, "at some point this does become a State Court problem. In other words, once there is a rejection, assuming there is a rejection, it may be the consequences of that are a State Court issue." [*Id*. at 2:22-22:1].

9. The Court ordered Carnero to amend the First Carnero Action by December 10, 2021. [*Id*. at 26:1-6]. On December 10, 2021, to address the Court's concern and to allow Maverick/Mesquite time to decide to reject or assume the Midstream Agency Agreement, Carnero dismissed the First Carnero Action without prejudice. [Prior RAP Dkt. 31].

10. At a December 21, 2021 hearing in the Oxy Adversary, the Court entered a Stipulation and Agreed Order between Maverick/Mesquite and the plaintiffs ("Agreed Order") [Main Case Dkt. 2253] that settled the case for $50 million paid to Maverick/Mesquite in exchange for undisclosed amendments made to the Existing Commitments ("Oxy/Wes Settlement").

---

7 *Carnero G&P, LLC v. SN EF UnSub LP, et al.*, Adversary No. 21-03908, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Prior RAP").

8 *SN EF Maverick, LLC, et al. v. Carnero G&P, LLC,* Adversary No. 21-04419, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. This is Defendants' separate adversary proceeding abbreviated for docket references as "DAP."

9 Adversary No. 20-03198, *Occidental Petroleum Corp., et al. v. Sanchez Energy Corporation, et al.*, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Oxy Adversary").

11. Mesquite's counsel began that hearing by emphasizing that the parties were not before the Court on a Fed. R. Bankr. P. 9019 motion to approve the Oxy/Wes Settlement:

> So, let me start by putting out that we're not here on a 9019 motion to approve the settlement. And the reason for that is it's not necessary given the process that we've built into our plan of reorganization and confirmation order.

He then stated the order did only three things—none of which included the Court's approval of actions taken by Maverick/Mesquite to settle the Oxy Adversary:

> simple. First, these orders in these two cases provide for the amendment and modification of this Court's partial rejection order. That's the one, Your Honor, entered on May 6, 2020, Docket 89290

> In addition, Your Honor, it provides for the dismissal of the Oxy West litigation, both the contested matter commenced by the objections can be assumptions and rejections in this adversary proceedings.
>
> And then there's assumption of 18 agreements and the rejection of 6 agreements.

**December 21, 2021 Hearing Transcript** [Main Case Dkt. 2254, at 7:11-15, 8:6-11; *see also* 9:21-10:4; 18:8-21:8]. Thus, while the Agreed Order listing "Assumed Comanche Agreements" (which include the Existing Commitments) footnotes that several agreements were "assumed *as amended* pursuant to the terms of the Settlement Agreement," the Reorganized Debtors settled the Oxy Adversary and amended the Existing Commitments without supervision, review, or approval by the Court. [Main Case Dkt. 2253 at p. 10-11 (emphasis added)].

12. The Court could not have approved the Oxy/Wes Settlement or the amendments to the Assumed Comanche Agreements because the parties did not file the settlement agreement with



13292232

the Court or seek the Court's approval of the settlement agreement or the contract amendments. The decision to amend the Assumed Comanche Agreements was a post-confirmation operational decision pertaining to commercial transactions, not corporate transactions, undertaken by former debtors to "renegotiate their midstream contracts" and "restructure [their] midstream operations." [DAP Dkt. 29 ¶¶ 27, 31]. The amendments, according to the Plan, were outside the supervision, review, and approval of the Court and outside the restrictions of the Bankruptcy Code and Bankruptcy Rules. [Main Case Dkt. 1212, Art. V.G]. They were also beyond the bounds of Section 365. A renegotiation of the midstream contracts resulted in the amendments to the Assumed Comanche Agreements. [DAP Dkt. 29 ¶¶ 27, 31, 41]. This "***true renegotiation of [the Reorganized Debtors'] obligations…falls entirely outside of § 365's concern***." *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("Section 365 does not speak to the situation in which the parties to the contract negotiate an amended contract.").

13. The Oxy/Wes Settlement resolved the Court's timing concerns as stated at the December 7, 2021 hearing. Thereafter, on January 21, 2022, Carnero filed the State Court Lawsuit asserting claims under the GGPA Contracts. [Dkt. 1-4 at 2]. On February 28, 2022, Defendants removed the State Court Lawsuit to this Court. [Dkt. 1]. The Court's comment that at some point the consequences of rejection or assumption are "a State Court issue" is well taken. Carnero's claims that seek adjudication of the consequences of Defendants' obligations under the GGPA Contracts in light of Maverick/Mesquite's modifications to the Existing Commitments that were done without Court supervision, review, or approval are "State Court issue[s]" and should be remanded to state court.

## Argument

14. The Court should remand this adversary proceeding to the state court for three reasons. First, under 28 U.S.C. § 1334(b), this Court lacks jurisdiction to hear Carnero's state law contract interpretation claim under the GGPA Contracts. Second, the factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention. Third, the factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention and remand.

### I. The Court lacks both core and "related-to" jurisdiction under 28 U.S.C. § 1334(b) to hear the claims in the State Court Lawsuit.

15. To sustain removal of the State Court Lawsuit, Defendants bear the burden to show this Court has subject matter jurisdiction over Carnero's state law claims under the GGPA Contracts. *See Smith v. Bank of Am. Corp.*, 605 Fed. Appx. 311, 313 (5th Cir. 2015). This burden cannot be satisfied by pointing to allegations that merely share something in common with the Reorganized Debtors' bankruptcy. *See Matter of Zale Corp.*, 62 F.3d 746, 753 (5th Cir. 1995) ("Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action 'related to' the bankruptcy."). Even if the State Court Lawsuit may share a few common facts with the Reorganized Debtors' bankruptcy, this does not confer "related to" jurisdiction on the Court. *See Reliant Exploration Creditors' Tr. v. Opus Oil & Gas LP (In re Reliant Expl. Ltd.)*, 336 B.R. 286, 290 (Bankr. S.D. Tex. 2005); *see also Zale Corp.*, 62 F.3d at 753.

16. In the State Court Lawsuit, Carnero alleges three claims arising from amendments made to the Midstream Agency Agreements and other Existing Commitments. First, a claim for certain declarations under the GGPA Contracts:

> 36. Carnero seeks the following declarations:
>
> (a) Pursuant to the GGPA, the GGPA Amendment, the Ratification Agreements, and the Letter Agreement, Mesquite, Maverick, UnSub, and the WIPs all agreed that the delivery to Carnero of the Dedicated Gas from their respective interests in the Dedicated Acreage was subject only to the Existing Commitments as they "exist[ed] as of the Effective Date" of the GGPA and for the "then-current term of such Existing Commitment";
>
> (b) Mesquite, Maverick, UnSub, and the WIPs have breached the GGPA by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they "exist[ed] on the Effective Date" of the GGPA for the "then-current term of such Existing Commitment";
>
> (c) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of Mesquite's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;
>
> (d) Pursuant to the GGPA and the GGPA Amendment, all of Maverick's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;
>
> (e) Pursuant to the GGPA, the GGPA Amendment, and its Ratification Agreement, all of UnSub's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero;
>
> (f) Pursuant to the GGPA, the GGPA Amendment, and their respective Ratification Agreements, all of Eagle Ford's and Venado's interests in the Dedicated Acreage and the Dedicated Gas are dedicated to Carnero; and
>
> (g) Pursuant to the Letter Agreement and the GGPA, as a "Producer" under the GGPA, all of Mitsui's interest in the Dedicated Acreage and the Dedicated Gas is dedicated to Carnero.

[Dkt. 1-4 at 22, ¶ 36]. None of these declarations touches or concerns any aspect of the bankruptcy proceeding. Carnero also alleges two claims for breach of the GGPA Contracts. [*Id.* at 23-24, ¶¶ 38-50].

17. To persuade the Court to exercise jurisdiction, over these purely state law claims, Defendants posit that the Court must:

- interpret four Plan [Main Case Dkt. 1212] provisions in Article V (post-confirmation assumption/ rejection), Article IV.D (property vesting), Article IV.F (assumption includes modifications), and Article VIII (discharge provisions) (Dkt. 1 ¶ 25; Dkt. 5 ¶ 60);
- interpret three orders–Confirmation Order [Main Case Dkt. 1212], Carnero Settlement Approval Order [Mai Case Dkt. 1415], and the Oxy Adversary Stipulation and Agreed Order [Oxy Adversary Dkt. 159] (Dkt. 1 ¶ 26; Dkt. 5 ¶ 60);
- decide whether Section 3.1(b) in the GGPA is unenforceable under bankruptcy law (*Id.* ¶ 27); and

- decide whether Section 365 preempts Carnero's right to claim the amendments to the Midstream Agency Agreement breached the GGPA (*Id.* ¶ 28).

Defendants make these assertions even though (1) Carnero's claims arose post-confirmation when Maverick/Mesquite amended contracts in the course of operating the business without supervision or approval by the Court; (2) Carnero's claims arise only under the GGPA Contracts; (3) Maverick/Mesquite have already assumed *and* modified the Midstream Agency Agreement; and (4) amendments to executory contracts are outside the scope of Section 365. As explained below, the Court need not reference the Plan, its orders, or Section 365 to decide Carnero's state law contract claims, and as a result, this Court lacks jurisdiction to hear those claims.

18. Defendants also claim only this Court should hear the State Court Lawsuit because the amendments "benefited the estate" and Carnero's claims permit it to get a windfall "at the expense of the estate." That claim is without merit because after confirmation, no estate exists and the $50 million paid to Maverick/Mesquite does not flow into the non-existent estate to the benefit of any creditors.[10] Moreover, when Carnero prevails, it will not receive more distributions than estate creditors from Cash that was on hand at confirmation or from the New Common Stock set aside for satisfying Claims because Carnero's post-confirmation claims fall outside all Classes of

10 Article IV.C in the Plan provided that distributions to pay Claims under the Plan were funded from "Cash on hand on the Effective Date and the New Common Stock." [Main Case Dkt. 1212]. Article III prescribed the treatment for the various classes of Claims, which were to be paid from Cash or various types of distributions of New Common Stock. *Id*. The Plan does not provide that sums paid to Reorganized Debtors to settle adversary proceedings relating to proposed contract rejections—which settlement is carried out by the Reorganized Debtors after the Effective Date and free of supervision, review, and approval of the Court—flow to the estate to pay Claims. *Id*. at Art. IV.B, G. Further, after settlement of the Oxy Adversary, Reorganized Debtors have stipulated that certain claims are to be allowed [e.g., Main Case Dkt. 2424, 2428]. In these example stipulations, Reorganized Debtors designate the claims as General Unsecured Claims in Class 5 under the Plan. Article III.C.5 of the Plan provides that these Claims receive a "Pro Rata share of the Post-Effective Date Equity Distribution," not a portion of the settlement consideration paid to Maverick/Mesquite in the Oxy Adversary. The settlement of the Oxy Adversary did not benefit the non-existent estate. Any sums that Carnero recovers in the State Court Lawsuit will not detrimentally impact the estate because Carnero's contract claims are not based on any Claim filed in the bankruptcy proceeding and so receive no treatment under the Plan.

Claims given treatment under the Plan. Defendants' phantom complaints do not create jurisdiction in this Court.

***A. The Court's post-confirmation jurisdiction is limited under Craig's Stores to matters pertaining to the implementation or execution of the Plan.***

19. While the Plan contains retention of jurisdiction language (*see* Plan at Art. XI; Confirmation Order, ¶ 43), the source of subject matter jurisdiction for the Bankruptcy Court post-confirmation is solely 28 U.S.C. § 1334. *See In re Hous. Reg'l Sports Network, L.P.*, 547 B.R. 717, 735 (S.D. Tex. 2016). Neither the Plan nor any order nor the Court can create jurisdiction where it does not exist. *See In re U.S. Brass Corp.*, 301 F.3d 296, 303 (5th Cir. 2002).

20. Generally, the Bankruptcy Court's jurisdiction extends to "'all civil proceedings arising under title 11, or arising in or related to cases under title 11,'" *In Matter of Galaz*, 841 F.3d 316, 322 (5th Cir. 2016) (quoting 28 U.S.C. § 1334(b)). Core proceedings under 28 U.S.C. § 157 are those that arise under title 11 or in a title 11 proceeding. *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987). A proceeding arises under title 11 if it "involves a cause of action created or determined by a statutory provision of title 11." *Id*. at 96. Proceedings "arising in" bankruptcy are those "not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Id*. at 97. Once the court confirms a debtor's chapter 11 plan of reorganization, however, "related to" jurisdiction ceases to exist, other than for "matters pertaining to the *implementation or execution* of the plan." *In re Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001). As explained below, neither core nor related-to jurisdiction exists here.

1. <u>Carnero's claims are non-core.</u>

21. The Fifth Circuit has long held that state law contract actions, like the State Court Lawsuit, do not arise under title 11. *See Wood*, 825 F.2d at 97; *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 984 (5th Cir. 1990); *In re OCA, Inc.*, 551 F.3d 359, 367-68 (5th Cir. 2008). Because

Carnero's state law contract claims can—and do—exist outside bankruptcy, they do not arise in bankruptcy. *See In re Petroleum Products & Services, Inc.*, 561 B.R. 662, 665 (Bankr. S.D. Tex. 2016); *In re Lutfak*, 536 B.R. 765, 771 (Bankr. S.D. Tex. 2015); *Longhorn Partners Pipeline L.P. v. KM Liquids Terminals, L.L.C.*, 408 B.R. 90, 96 (Bankr. S.D. Tex. 2009).

22. Defendants assert core jurisdiction exists because their *defenses* to Carnero's claims that modifications to the Existing Commitments breach the GGPA Contracts require interpretation of the Court's orders, the Plan, and Section 365. [Dkt. 1 ¶ 21; Dkt. 5 ¶¶ 60-61]. But Carnero does not seek any relief under the Plan, the Code, or any order of this Court. When the plaintiff's complaint does not itself create federal jurisdiction, the court should not use the defendant's answer to determine if the case "arises under" federal law. *Davis v. Retail Fin. Co. of Tex., Inc.*, No. 06-7016, 2006 WL 2827270, at *1 (Bankr. S.D. Tex. Sept. 27, 2006) (holding counterclaims in answer did not create core jurisdiction) (citing *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831 (2002) (recognizing that federal defenses to claims do not create "arising under" jurisdiction)). Thus, Defendants' defenses based on an interpretation of an order, the Code, or the Plan (which are wholly lacking in merit) do not create core bankruptcy jurisdiction. *See Principal Life Ins. Co. v. JPMorgan Chase Bank, N.A. (In re Brooks Mays Music Co.)*, 363 B.R. 801, 810 (Bankr. N.D. Tex. 2007) (noting that defense based on release in bankruptcy court order does not create "core" jurisdiction in bankruptcy court); *Richmond Leasing*, 762 F.2d at 1311 (stating that renegotiation of executory contract obligations is not concern of Section 365).

2. *Craig's Stores* defines the post-confirmation "related to" standard for this Court's subject matter jurisdiction analysis.

23. The Court confirmed the Plan on April 30, 2020, and the Plan went effective on June 30, 2020. [Main Case Dkt. 1417]. Thus, absent core jurisdiction, which does not exist, the

Court's jurisdiction could only be the more narrow, post-confirmation "related to" jurisdiction standard described in *Craig's Stores*. Defendants cannot establish this related-to jurisdiction either.

24. Here, the parties' rights and obligations under GGPA Contracts post-confirmation—after contracts have been assumed or rejected—are matters of contract interpretation and enforcement under state law and do not relate to the implementation or execution of the Plan or any order. *See Craig's Stores*, 266 F.3d at 390; *see also In re Austin Development Co.*, 19 F. 3d 1077, 1084 (5th Cir. 1994) (holding that after lease was rejected, cause of action for breach of lease "should be decided in state court" because "the debtor's estate had no remaining interest in the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction").

25. The Fifth Circuit addressed a post-confirmation dispute about performance under an assumed contract in *Craig's Stores*. There, 18 months after the court confirmed debtor Craig's Stores' plan of reorganization, Craig's Stores sued a bank in bankruptcy court asserting state law claims under an assumed contract. *Craig's Stores*, 266 F.3d at 390. The court determined the bankruptcy court lacked jurisdiction over the claim based on three factors: (1) it "dealt with post-confirmation relations between the parties," (*even though* "the contract existed throughout the reorganization and was, by implication, assumed") with (2) "no antagonism or claim pending between the parties as of the date of reorganization" and (3) "no facts or law deriving from the reorganization or plan was necessary" to Craig's Stores' claim. *Id*. at 391. Instead, reorganized Craig's Stores was "capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court" and could not "come running to the bankruptcy judge every time something unpleasant happens." *Id*. at 390-91 (internal quotations omitted).

26. This is exactly where Mesquite and Maverick are now—out in the cold, cruel business world where they face the consequences of their business decision. And it is in this context that their decision to modify the Exiting Commitments should be analyzed. Considering the three *Craig's Stores* factors, the Court lacks jurisdiction over the State Court Lawsuit.

### *B. The* **Craig's Stores** *factors do not support jurisdiction over Carnero's claims.*

1. The State Court Lawsuit deals with the post-confirmation relations between the parties under assumed contracts.

27. Carnero seeks declaratory relief and alleges breach of contract claims (including associated damages) against Maverick/Mesquite and the WIPs arising from a post-confirmation dispute relating to the GGPA Contracts. Specifically, the dispute arises from Maverick/Mesquite's decision to modify the Midstream Agency Agreement and other Existing Commitments in a manner that violates theirs and the WIPs' obligations under the GGPA Contracts. Maverick/Mesquite made those amendments without supervision, review, or approval by the Court and with full knowledge of the existing obligations to Carnero under the GGPA Contracts. The dispute does not arise out of obligations imposed on Mesquite/Maverick by the Plan, and only implicates the post-confirmation relations of the parties under the terms of the GGPA Contracts. *See In re Encompass Services Corp.*, 337 B.R. 864, 875 (Bankr. S.D. Tex. 2006), *aff'd*, No. ADV. 02-43582-11, 2006 WL 1207743 (S.D. Tex. May 3, 2006).

2. The claims in the State Court Lawsuit were not pending as of the Plan confirmation date.

28. The Court confirmed the Plan on April 30, 2020. This dispute did not arise until December 2021—long after the Effective Date—when Defendants amended the Existing Commitments. Carnero had no inkling about what changes Maverick/Mesquite might make to the Existing Commitments at confirmation because Maverick/Mesquite's intent at that time was to reject the Midstream Agency Agreements. [Main Case Dkt. 1197 at 402]. Carnero filed the State

Court Lawsuit on January 30, 2022, complaining only of breaches of the GGPA Contracts caused by Defendants' amendments to the now assumed Existing Commitments.

29. Carnero's claims arising from those modifications cannot affect the implementation or execution of the Plan because the Plan provided that "[o]n and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules." [Main Case Dkt. Arts. IV.G]. That is, Maverick/Mesquite assumed the GGPA Contracts and have now amended the Existing Commitments during the ordinary course of their post-confirmation operations. No action under the Plan, any order, or the Code remains pending that could be affected by Carnero's claims.

3. No facts or law deriving from the Plan are necessary to decide Carnero's claims.

30. The state court can decide Carnero's claims without facts or law deriving from Mesquite/Maverick's the Plan or any order of this Court, and without reference to the Bankruptcy Code. The Plan does not address resolving disputes concerning the Reorganized Debtors' rights and obligations under assumed contracts. Instead, the Plan creates procedures for the assumption, assignment, and rejection of Executory Contracts (*see* Plan at Art. V.A.), a claims process for rejected contracts (*see id.* at Art. V.B.), and a cure process for assumed contracts (*see id.* at Art. V.C.). Moreover, Reorganized Debtors take all of these actions free from the supervision, review, and approval of the Court. *See* Plan at Arts. IV.A, G, N; Arts. V.B, C; Arts. VII.B, D.

31. The Reorganized Debtors have carried out the assumption/rejection process in full as to all contracts at issue here. Resolving a dispute as to the Reorganized Debtors' rights and obligations under the GGPA Contracts as they are impacted by the assumed but modified Existing

Commitments simply does not impact compliance with the Plan or its completion. *See, e.g., Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where litigation at issue did not attempt to subvert confirmed plan).

32. While a bankruptcy court retains jurisdiction to interpret and enforce its own prior orders (*In Matter of Galaz*, 665 Fed. Appx. 372, 376 (5th Cir. 2016)), Carnero's claims under the GGPA Contracts do not invoke that jurisdiction. Carnero does not assert claims under or arising from the Midstream Settlement Approval Order [Main Case Dkt. 1415] or otherwise seek enforcement of that order. As a result, the claims do not interfere with this Court's authority under that order or involve interpretation or enforcement of that order.

33. The post-confirmation implications of the amended Existing Commitments on the parties' rights and obligations under GGPA Contracts are just the sort of matter that involves contract interpretation under state law, and not implementation or execution of the Plan or any order of this Court. *See Craig's Stores*, 266 F.3d at 390 (holding that court lacked jurisdiction to hear post-confirmation cause of action for breach of assumed contract); *Austin Development*, 19 F.3d at 1084 (holding that court lacked jurisdiction to hear post-confirmation cause of action regarding third party beneficiary's rights in rejected contract). For purposes of a post-confirmation jurisdictional analysis, the Court can draw no meaningful distinction between the post-confirmation breach of contract dispute under an assumed contract in *Craig's Stores* and Carnero's post-confirmation State Court Lawsuit seeking declaratory relief of the parties' rights and obligations under the assumed GGPA Contracts.

34. Any dispute regarding the parties' relations under the GGPA Contracts on a post-confirmation, go-forward basis simply does not impact compliance with or implementation of the Plan or enforcement of any Bankruptcy Court order, and, in fact, has no impact on the Plan or any Bankruptcy Court order whatsoever. *See Seven Seas Petroleum*, 522 F.3d at 589 (recognizing that "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan'" and finding no jurisdiction where the litigation at issue did not attempt to subvert the confirmed plan) (citation omitted). Therefore, this Court lacks jurisdiction to hear the State Court Lawsuit and should remand it to the state court.

**II. The factors applicable to 28 U.S.C. § 1334(c)(2) support mandatory abstention.**

35. The Court must abstain from hearing claims when: (1) a motion requesting abstention has been timely filed; (2) the claim is essentially premised on state law; (3) the claims have no independent basis for federal jurisdiction other than § 1334(b); (4) the claims are non-core; (5) an action has been commenced in state court; and (6) the action can be timely adjudicated in state court. *See In re Treyson Dev., Inc.*, No. 14-70256, 2016 WL 1604347, at *21 (Bankr. S.D. Tex. Apr. 19, 2016) (Rodriguez, J.); *Petroleum Products*, 561 B.R. at 665 (quoting *In re Mugica*, 362 B.R. 782, 792 (Bankr. S.D. Tex. 2007) (Isgur, J.)). The factors applied to the State Court Lawsuit support mandatory abstention.

***A. Carnero has timely filed this motion for abstention and its claim is based on state law.***

36. The first two factors are met. Section 1334(c)(2) does not specify any deadline for motions to abstain. *In re Performance Interconnect Corp.*, No. 06-34482-BJH-7, 2007 WL 2088281, at *3 and n.2 (Bankr. N.D. Tex. July 19, 2007). They must only be "timely." 28 U.S.C. § 1344(c)(2). Carnero filed this motion for abstention timely with the motion for remand, which was filed within 30 days after Defendants filed the Notice of Removal on February 28, 2022. This

satisfies the first factor. Carnero's claims under the GGPA Contracts are state law claims. *See Craig's Stores*, 266 F.3d. at 390. This satisfies the second factor. These two factors support mandatory abstention.

***B. Carnero's claims have no independent basis for federal jurisdiction other than Section 1334(b).***

37. Defendants bear the burden to show the Court has jurisdiction. *See Smith*, 605 Fed. Appx. at 313. In their Notice of Removal [Dkt. 1], Defendants allege only 28 U.S.C. § 1334(b) as the basis for this Court's jurisdiction. As explained in Section I, in these circumstances, the Court lacks such jurisdiction. No other basis for federal jurisdiction exists. This factor supports mandatory abstention.

***C. Carnero's claims are non-core.***

38. As explained in Section I.A.1, Carnero's state law contract claims are non-core. They do not relate to the Reorganized Debtors' chapter 11 case. Carnero's claims do not invoke Section 365, which does not apply to amendments to assumed contracts. *Richmond Leasing*, 762 F.2d at 1311. Carnero's claims do not invoke any other substantive rights under the Bankruptcy Code. The State Court Lawsuit did not arise under title 11 or in a case under title 11, as Carnero filed it post-confirmation when no estate to administer exists. Further, the State Court Lawsuit does not invoke any right provided by title 11. As a garden-variety contract action, it could—and does—arise outside the context of a bankruptcy case. Thus, the State Court Lawsuit is a non-core proceeding. *See Petroleum Products*, 561 B.R. at 665 (citing *Southmark Corp. v. Coopers & Lybrand*, 163 F.3d 925, 930 (5th Cir. 1999)). ("A claim based on state created rights, which could have proceeded in state court had there been no bankruptcy, is likely not core…Petroleum Products' claims do not invoke a substantive right provided by Title 11 nor are they of a nature

that could only arise in a bankruptcy case—they are simply state contract claims.”). This factor supports mandatory abstention.

***D. Carnero filed its claims in the State Court Lawsuit.***

39. Carnero filed the State Court Lawsuit in state court on January 31, 2022. Defendants do not dispute this. This factor supports mandatory abstention.

***E. The state court can timely adjudicate Carnero’s claims.***

40. Carnero bears the burden to show that the State Court Lawsuit can be timely adjudicated in the state court. *Petroleum Products*, 561 B.R. at 666. It can carry that burden. Official court and caseload statistics for the period January 2020 through December 2021 from The Texas Office of Court Administration Court Activity Reporting and Directory System for Harris County, Texas,[11] and for the period January 2020 through December 2021 from the United States Courts Caseload Statistics Data Tables[12] show that both the Harris County District Courts and the United States Bankruptcy Court for the Southern District of Texas continue to manage significant caseloads during these periods. *See* **Exhibit 7**, Harris County statistics, **Exhibit 8**, US Bankruptcy Court SD TX statistics. Those same statistics show that both courts are also clearing thousands of cases each year. The Harris County District Courts data shows that even in pandemic-affected 2020 and 2021, the courts still disposed of most cases in 18 months or less. Ex. 6 (71% in 2020 and 62% in 2021). Considering these data, the state court can timely adjudicate the State Court Lawsuit.[13] This factor supports mandatory abstention.

---

11 The Texas Office of Court Administration data and records are available here: https://card.txcourts.gov/.

12 The United States Courts Caseload Statistics Data Tables are available here: https://www.uscourts.gov/statistics-reports/caseload-statistics-data-tables.

13 *See* **Exhibit 9**, the Affidavit of Amy C. Falcon, proving up the process by which Carnero obtained the court statistics reflected in Exhibits 7-8.

41. In sum, Carnero can establish all six factors applicable to mandatory abstention under 28 U.S.C. § 1334(c)(2). The Court should mandatorily abstain from adjudicating this adversary proceeding and remand the case to the state court.

## III. The factors applicable to 28 U.S.C. § 1334(c)(1) overwhelmingly favor permissive abstention.

42. If the Court disagrees that mandatory abstention applies, it should permissively abstain from hearing the adversary proceeding and remand the case to state court because the factors applicable to 28 U.S.C. § 1334(c)(1) heavily favor permissive abstention or remand.

### *A. The permissive abstention factors.*

43. A bankruptcy court may permissively abstain "from hearing a proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1). The bankruptcy court has "broad power to abstain whenever appropriate." *Wood,* 825 F.2d at 93. The factors courts consider include:

(a) the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(b) the extent to which state law issues predominate over bankruptcy issues;

(c) the difficult or unsettled nature of applicable law;

(d) the presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(e) the jurisdictional basis, if any, other than § 1334;

(f) the degree of relatedness or remoteness of proceeding to main bankruptcy case;

(g) the substance rather than the form of an asserted core proceeding;

(h) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(i) the burden on the bankruptcy court's docket;

(j) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(k) the existence of a right to a jury trial;

(l) the presence in the proceeding of nondebtor parties;

(m) comity; and

(n) the possibility of prejudice to other parties in the action.

*In re SBMC Healthcare, LLC*, 519 B.R. 172, 190 (Bankr. S.D. Tex. 2014), *aff'd*, No. AP 14-03126, 2017 WL 2062992 (S.D. Tex. May 11, 2017). Application of these factors to this adversary proceeding favor permissive abstention.

### *B. The balance of the factors favors permissive abstention.*

1. <u>The effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention.</u>

44. The State Court Lawsuit largely involves non-debtor parties. Only Maverick is a Reorganized Debtor as to its interest in the GGPA Contracts. The other five parties, including Mesquite, as successor to Gavilan's interest in the Comanche Assets (which it acquired post-confirmation), are non-debtors. The non-debtor parties control an approximate 87.5% of the working interest.

45. The outcome of the suit will not deplete or increase the estate. Post-confirmation, no estate exists. Moreover, the Reorganized Debtors assumed the GGPA Contracts and have either assumed or rejected the Existing Commitments. The effect of the assumption or rejection on the estate was established when the contracts were assumed or rejected. Remand to the state court to declare the parties' rights and obligations under the GGPA Contracts will not change those effects. Accordingly, this factor favors abstention. *See In re Doctors Hosp. 1997, L.P.*, 351 B.R. 813, 848 (Bankr. S.D. Tex. 2006) (Bohm, J.) (recognizing that this factor does not apply post-confirmation when no estate exists).

2. <u>The extent to which state law issues predominate over bankruptcy issues.</u>

46. The State Court Proceeding only involves state law issues—the parties' rights and obligations under the GGPA Contracts. *See Craig's Stores*, 266 F.3d at 390 (recognizing contract claims as state law claims). Carnero has not alleged claims seeking enforcement of the Plan or an order issued by this Court or requesting this Court take action on any executory contract. No bankruptcy issues arise from Carnero's claims. State law issues predominate over bankruptcy issues in this circumstance. This factor also favors abstention. *See Doctors Hosp.*, 351 B.R. at 849 (recognizing that when proceeding includes only state law claims and no bankruptcy issues, state law claims predominate)

3. <u>The difficult or unsettled nature of applicable law.</u>

47. Carnero's contract claims are garden-variety state law contract claims. The claims are premised on the GGPA Contracts and Carnero's rights under Texas common law and Tex. Civ. Prac. & Rem. Code Ch. 37. These are state law principles to which the state court is better able to respond. *See SBMC Healthcare*, 519 B.R. at 191. This factor favors abstention.

4. <u>The presence of a related proceeding commenced in state court or other nonbankruptcy proceeding.</u>

48. Carnero filed the State Court Lawsuit in the state district court in Harris County, Texas. There are no other related state court proceedings. While proceedings continue in the bankruptcy case, including Defendants' entirely defensive and baseless adversary complaint[14] that opposes the State Court Lawsuit, for the reasons set forth above, those proceedings do not

[14] Defendants' adversary proceeding is styled *SN EF Maverick, LLC, et al. v. Carnero G&P, LLC*, Case No. 21-04419, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division [DAP Dkt. 29]. For the reasons that Case No. 21-04419 does not negatively impact this Court's exercise of permissive abstention, please see the Motion to Dismiss Plaintiffs' March 23, 2022 Amended and Supplemental Complaint that will be filed in that adversary proceeding.

implicate the claims asserted in the State Court Lawsuit. This factor is likely neutral, at best, when viewed most favorably to Defendants. *See SBMC Healthcare*, 519 B.R. at 191.

5. The jurisdictional basis, if any, other than § 1334.

49. Defendants pleaded only Section 1334(b) as the basis for jurisdiction. As shown above, the Court lacks jurisdiction under that section. Even if the Court had jurisdiction under Section 1334(b), this is the only basis on which jurisdiction rests. The State Court Lawsuit raises no federal question or complete diversity grounds for jurisdiction. This factor heavily favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

6. The degree of relatedness or remoteness of proceeding to the main bankruptcy case.

50. As discussed above, Carnero's claims are not "related to" the post-confirmation Reorganized Debtors' Chapter 11 case. Even if related, that relationship is remote. This dispute involves (1) mostly non-debtors (Maverick is the only Reorganized Debtor defendant); (2) events occurring after confirmation when no estate remains to be administered; and (3) exclusively non-bankruptcy issues—the parties' rights and obligations under the GGPA Contracts. At most, this dispute is remotely related to the Reorganized Debtors' Chapter 11 proceeding. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

7. The substance rather than the form of an asserted core proceeding.

51. Carnero's direct causes of action are non-core, as discussed above. Even if the claims were core, the substance of the dispute consists of state law claims based on the rights and relationship of the parties post-confirmation under the GGPA Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191.

8. The feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court.

52. Carnero's direct causes of action are non-core, as discussed above. Thus, this factor does not apply. Even if Carnero's claims were core, the dispute consists of state law claims with no bankruptcy matters that exist post-confirmation from which to sever the claims. The state court can enter and enforce an order that decides the parties' rights and obligations under the GGPA Contracts. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 191-92.

9. The burden on the bankruptcy court's docket.

53. This Court remains among the busiest bankruptcy courts in the country for complex bankruptcies such as that involving the Reorganized Debtors. While Carnero does not doubt the Court will prioritize this case, there is no question that adding purely state law issues to the Court's docket will further tax the Court's time and resources unnecessarily. *See* Ex. 7. As such, this factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

10. The likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties

54. Defendants are forum shopping. Their removal of the State Court Lawsuit involving only state law claims under the GGPA Contracts that arose post-confirmation against multiple non-debtor defendants controlling an approximate 87.5% of the affected working interest and one Reorganized Debtor tells as much. As in *Craig's Stores*, Defendants want to run to the Bankruptcy Court to protect themselves from unpleasantness that arose after the Reorganized Debtors emerged from bankruptcy. To seek shelter from the state court in the Bankruptcy Court, in their Notice of Removal [Dkt. 1] and their Answer [Dkt. 5], Defendants must resort to urging the Court to find jurisdiction based only on their defenses, not Carnero's actual claims. As discussed above, 28 U.S.C § 1334(b) does not authorize "related to" jurisdiction over Carnero's

post-confirmation claims under the GGPA Contracts based on Defendants' defenses. This factor favors abstention.

11. <u>The existence of a right to a jury trial.</u>

55. The parties waived their right to trial by jury in the GGPA Contracts. This factor weighs against abstention. *See SBMC Healthcare*, 519 B.R. at 192.

12. <u>The presence in the proceeding of nondebtor parties.</u>

56. Of the six parties involved the State Court Lawsuit, only one is a Reorganized Debtor, Maverick, who was more than 21 months past confirmation of the Plan when Carnero filed the State Court Lawsuit. Mesquite is not a Reorganized Debtor for purposes of this proceeding because it acquired Gavilan's interest in the Comanche Assets in October 2020, nearly six months after confirmation in the main case here. This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

13. <u>Comity.</u>

57. Carnero instituted this lawsuit in Texas state court on January 21, 2022; Defendants removed it on February 28, 2022. While Defendants filed a wholly defensive separate adversary proceeding against Carnero's anticipated claims on December 21, 2021, they anticipated the wrong claims. [DAP Dkt. 3]. Thus, Defendants filed claims that were not ripe, moot, or sought impermissible advisory declarations as to claims Carnero does not assert along with a groundless claim that Carnero breached a settlement agreement [Main Case Dkt. 1309 at Ex. A] that does not implicate Carnero's post-confirmation claims. Defendants amended their complaint but request additional declarations that, again, only defend against Carnero's claims in this State Court Lawsuit.

58. In an attempt to salvage the "claims" in their separate adversary proceeding, Defendants amended their complaint on March 23, 2022, [DAP Dkt. 29] but did so only after

Carnero moved to dismiss their original complaint. Most of Defendants' amended claims are entirely new, defensive claims that merely respond to Carnero's claims in the State Court Lawsuit that was filed first. [DAP Dkt. 29]. The state court can decide Carnero's claims in the State Court Lawsuit *and* Defendants' defensive claims in their separate adversary proceeding (because they are asserted as defenses in the State Court Lawsuit). This factor favors abstention. *See SBMC Healthcare*, 519 B.R. at 192.

14. The possibility of prejudice to other parties in the action.

59. The issue is which court, this Court or the state court, should hear Carnero's state law claims. Both forums are capable of adjudicating the claims. But the State Court Lawsuit involves no active debtors; thus, no debtor rights require this Court's protection. At best, this factor is neutral. *See SBMC Healthcare*, 519 B.R. at 192.

60. Eleven of the 14 permissive abstention factors favor abstention; two factors are neutral. Only the lack of a right to a jury trial favors retention. Because the clear weight of factors favors abstention, the Court should permissively abstain.

61. The Court may give greater weight to some factors. The Court should give more weight to the fact that: (a) the resolution of the Carnero's direct claims does not implicate the estate, because no estate exists post-confirmation, or the implementation or execution of the Plan (factor 1); (b) the law governing the dispute is entirely Texas state law (factor 2); (c) this Court has no subject matter jurisdiction over Carnero's direct claims, or even if it does, the only jurisdictional basis is 28 U.S.C. § 1334 (factor 5); and (d) five of the six parties in this dispute are non-debtors (factor 12). Giving greater weight to these factors, the Court should permissively abstain from hearing the adversary proceeding and remand the case to the Harris County District Court. *See SBMC Healthcare*, 519 B.R. at 193.

## Conclusion

Carnero's State Court Lawsuit, which alleges claims that arose post-confirmation against one Reorganized Debtor and five non-debtors, seeks only state court relief. As a result, this Court lacks post-confirmation jurisdiction under 28 U.S.C. § 1334(b) to hear this adversary proceeding and Carnero asks that it remand the case to the state court. Alternatively, Carnero requests that this Court mandatorily abstain from hearing this adversary proceeding under 28 U.S.C. § 1334(c)(2), and the factors support its request. Finally, the factors relating to permissive abstention under 28 U.S.C. § 1334(c)(1) favor this Court's permissively abstaining from hearing this adversary proceeding. Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

Dated: March 30, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *\/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on March 30, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

# EXHIBIT 36

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**OBJECTION TO PLAINTIFF'S MOTION**
**<u>TO REMAND TO STATE COURT OR FOR ABSTENTION</u>**

1 The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "<u>Reorganized Debtors</u>"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "<u>Debtors</u>" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 4

I. The Comanche Midstream Commitments ..... 4

II. The GGPA, the Ratification Agreements, and the Letter Agreement ..... 6

III. MCom's Purchase of Gavilan's Interest in the Comanche Assets ..... 7

IV. The Midstream Restructuring ..... 8

V. Procedural History ..... 10

A. The Chapter 11 Cases ..... 10

B. The First Carnero Action and the Second Carnero Action ..... 12

LEGAL STANDARD ..... 14

ARGUMENT ..... 16

I. THE SECOND CARNERO ACTION IS A CORE PROCEEDING ..... 16

A. Because the Second Carnero Action Concerns Mesquite's Rights and this Court's Authority Under Section 365 of the Bankruptcy Code, it "Arises Under" Title 11 ..... 16

B. Because the Second Carnero Action Involves Rights Created By Bankruptcy Law and Requires Interpretation and Enforcement of At Least Five of This Court's Prior Orders, it "Arises In" the Debtors' Bankruptcy Cases ..... 20

II. AT MINIMUM, THIS COURT HAS "RELATED TO" JURISDICTION ..... 25

III. MANDATORY ABSTENTION DOES NOT APPLY ..... 30

IV. TO THE EXTENT PERMISSIVE ABSTENTION MAY APPLY, THE BALANCE OF FACTORS FAVORS THIS COURT RETAINING JURISDICTION ..... 31

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atencio v. Atencio (In re Petroleum Prods. & Servs., Inc.),*
556 B.R. 296 (Bankr. S.D. Tex. 2016) ....................30, 32

*Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP),*
581 B.R. 206 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020) ....................16

*Bissonnet Invs. LLC v. Quinlan (In re Bissonnet Invs. LLC),*
320 F.3d 520 (5th Cir. 2003) ....................14

*In re Blast Energy Servs., Inc.,*
396 B.R. 676 (Bankr. S.D. Tex. 2008) ....................26, 27, 28

*Burch v. Freedom Mortg. Corp. (Matter of Burch),*
835 F. App'x 741 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 253 (2021)....................16, 22

*Butner v. United States,*
440 U.S. 48 (1979)....................29

*Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin),*
507 B.R. 169 (W.D. Tex. 2014)....................26

*City of Covington v. Covington Landing Ltd. Partnership,*
71 F.3d 1221 (6th Cir. 1995) ....................18, 19

*Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.),*
266 F.3d 388 (5th Cir. 2001) ....................21, 25, 26, 27

*EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.),*
430 F.3d 260 (5th Cir. 2005) ....................15

*Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.),*
644 F.3d 259 (5th Cir. 2011) ....................21

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
No. 17 BK 3288-LTS, 2021 WL 2676983 (D. P.R. June 29, 2021)....................17

*Fire Eagle, LLC v. Spillman Dev. Grp., Ltd. ( In re Spillman Dev. Grp. Ltd.),*
710 F.3d 299 (5th Cir. 2013) ....................25

*G-I Holdings, Inc. v. G-I Holdings, Inc. (In re G-I Holdings, Inc.),*
564 B.R. 217 (Bankr. D. N.J. 2016) ..........25

*Galaz v. Katona (In re Galaz),*
841 F.3d 316 (5th Cir. 2016) ..........15, 30, 33

*Galaz v. Katona (In re Galaz),*
No. 5:14-CV-967, 2015 WL 5565266 (W.D. Tex. Sept. 21, 2015), *aff'd*, 841 F.3d 316 (5th Cir. 2016) ..........31, 33, 34

*In re: Gavilan Resources, LLC,*
Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) ..........3, 7, 8

*Gilbane Bldg. Corp. v. Air Systems Inc. (In re Encompass Servs. Corp.),*
337 B.R. 864 (Bankr. S.D. Tex. 2006) ..........26, 27

*Glasstex, Inc. v. Arch Aluminum & Glass Co. Inc. (In re Polvado),*
No. 06-70151, 2006 WL 2993333 (Bankr. S.D. Tex. Oct. 17, 2006)..........25

*Hassell Constr. Co. Inc. v. Hassell (In re Hassell),*
No. 19-30694, 2020 WL 728890 (Bankr. S.D. Tex. Jan. 7, 2020)..........35

*Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),*
522 F.3d 575 (5th Cir. 2008) ..........21

*Houston Reg'l Sports Network, L.P. v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.),*
514 B.R. 211 (Bankr. S.D. Tex. 2014) ..........32

*Maddox v. O'Cheskey (In re Amer. Hous. Found.),*
No. 09-ap-20232-RLJ, 2015 WL 5781396 (Bankr. N.D. Tex. Sept. 30, 2015) ..........15

*Mirant Corp. v. Potomac Elec. Power Corp. (In re Mirant Corp.),*
378 F.3d 511 (5th Cir. 2004) ..........17

*Mission Prod. Holdings, Inc. v. Tempnology, LLC,*
139 S. Ct. 1652 (2019)..........17, 18

*MPF Holding U.S. LLC v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC),*
495 B.R. 303 (Bankr. S.D. Tex. 2013) ..........18

*In re Nat'l Gypsum Co.*
118 F.3d 1056 (5th Cir. 1997) ..........26, 31

*In re Nat'l Gypsum Co.,*
208 F.3d 498 (5th Cir. 2000) ..........17

*New Orleans & Gulf Coast Ry. Co. v. Barrios*,
533 F.3d 321 (5th Cir. 2008) ....................22

*Newby v. Enron (In re Enron Corp. Sec.)*,
535 F.3d 325 (5th Cir. 2008) ....................26, 27

*NiGen Biotech, L.L.C. v. Paxton*,
804 F.3d 389 (5th Cir. 2015) ....................22

*Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
631 B.R. 847 (Bankr. S.D. Tex. 2021) .................... *passim*

*Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*,
No. 20-ap-3198, 2021 WL 1827708 (Bankr. S.D. Tex. May 6, 2021) ....................10–11, 12, 16

*In re Order of Reference to Bankruptcy Judges*,
General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012) ....................14

*Quarternorth Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*,
No. 20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021) ....................15

*Richmond Leasing Co. v. Capital Bank, N.A.*,
762 F.2d 1303 (5th Cir. 1985) ....................18, 19

*In re: Sanchez Energy Corp. et al.*,
Case No. 20-3197 (MI) (Bankr. S.D. Tex. 2021) ....................12

*Schlotzsky's Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's Inc.)*,
351 B.R. 430 (Bankr. W.D. Tex. 2006) ....................31, 32, 34

*Sportsman's Warehouse v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*,
457 B.R. 372 (D. Del. 2011) ....................22, 25, 33

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009) ....................15, 22

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*,
622 B.R. 680 (Bankr. N.D. Tex. 2020) ....................15, 34

*U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*,
301 F.3d 296 (5th Cir. 2002) ....................29

*Wood v. Wood (In re Wood),*
825 F.2d 90 (5th Cir. 1987) ....................15

**Statutes**

11 U.S.C. § 365(g) ....................17

28 U.S.C. § 157 ....................14, 30

28 U.S.C. § 157(b) ....................21

28 U.S.C. § 1334 .................... *passim*

28 U.S.C. § 1334(b) ....................30

28 U.S.C. § 1334(c)(1) ....................2, 31

28 U.S.C. § 1334(c)(2) ....................1, 30

28 U.S.C. § 1367 ....................14, 30

**Other Authorities**

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding “Rejection,”* 59 U. Colo. L. Rev. 845 (1988) ....................17

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite" or "Sanchez"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to collectively as the "WIPs"), and SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Defendants") respectfully submit, by and through counsel, this Objection (the "Objection") to the *Motion to Remand to State Court or for Abstention* (the "Motion") filed by Plaintiff Carnero G&P, LLC ("Carnero") [Carnero II Dkt. No. 6].[2]

**PRELIMINARY STATEMENT**

1. Carnero's latest lawsuit (captioned above), originally filed in Harris County District Court (the "Second Carnero Action"), is yet another attempt to evade this Court's jurisdiction. The Second Carnero Action is a core proceeding, as it involves interpreting the Debtors' confirmed Plan (as defined below), several of this Court's prior orders, and Mesquite's and Maverick's rights under the Bankruptcy Code. Moreover, Carnero's declaratory judgment and breach of contract claims arise under title 11 and would not exist but for the Debtors' bankruptcy cases. At the very least, the Second Carnero Action is "related to" the bankruptcy cases, thus affording this Court jurisdiction. With core jurisdiction established, mandatory abstention under 28 U.S.C. §

---

[2] Unless otherwise specified, capitalized terms used but not defined in this Objection have the meanings given them in the *Amended and Supplemental Complaint* filed on the docket of the Declaratory Action (as defined below). [Decl. Action Dkt. No. 29]. The Declaratory Action is captioned *SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub LP* v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI).

This Objection cites entries on the docket of the main bankruptcy case as "Dkt. No. _", entries on the docket of the Second Carnero Action as "Carnero II Dkt. No. _", entries on the docket of the Declaratory Action as "Decl. Action Dkt. No. _", and entries on the docket of the First Carnero Action (as defined below) as "Carnero I Dkt. No _."

The First Carnero Action is captioned *Carnero G&P, LLC* v. *SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc.*, Adv. Pro. No. 21-03908 (MI).

1334(c)(2) is inapplicable, and the factors governing permissive abstention under 28 U.S.C. § 1334(c)(1) weigh against remand.

2. Carnero frames the Second Carnero Action as a standalone post-confirmation dispute over assumed contracts with no relation to the bankruptcy cases that have been before this Court for the past two years. But that is not correct. In reality, the Debtors effected a comprehensive midstream restructuring by rejecting certain contracts and assuming others as amended pursuant to the Plan.

3. Carnero believes that the Debtors breached the GGPA by assuming certain midstream contracts as amended. Typically, assumption and rejection decisions are made and litigated before the effective date of a chapter 11 plan. If a party in interest believes that the proposed assumption or rejection of an executory contract may affect its contractual rights, it must object (or otherwise reserve its rights) at the time of assumption or rejection. Carnero strategically declined to do so here. Instead, Carnero chose to lay in wait and now seeks to litigate the effect of assumption in state court. That form of forum shopping should not be countenanced. If the Debtors had assumed the midstream contracts in connection with confirmation, Carnero's claims would have resulted, at best, in an administrative claim subject to the jurisdiction of this Court. The outcome does not change because of the bespoke post-confirmation (and in some cases, post-effective date) assumption and rejection process established under the Plan and the Confirmation Order (as defined below). In either scenario, this Court retains jurisdiction over any claim that the Debtors' assumption of midstream contracts, as amended, breached a third party agreement such as the GGPA.

4. In its quest to evade this Court's jurisdiction, Carnero seeks declaratory judgments that concern Mesquite's rights and obligations under section 365 of the Bankruptcy Code and

would interfere with several prior orders entered by this Court. For example, although Carnero asserts that its requested relief only concerns interpretation of the GGPA and related agreements, the GGPA is intrinsically tied to the implementation and finality of the Plan, the Confirmation Order, and various other agreements and orders entered by this Court (*i.e.*, the Oxy/Wes Stipulation and Agreed Order, the Oxy/Wes Settlement Agreement, the Carnero Settlement Approval Order (as defined below), the Carnero Settlement Agreement, the Stipulation of Dismissal and Agreed Order, and the WIP PMA Assumption Order (as defined below)).

5. Carnero maintains that its claims can be resolved without reference to this Court's prior orders. Yet it simultaneously alleges that Maverick cannot retain the existing commitments for those Comanche working interests previously owned by Gavilan Resources, LLC ("Gavilan") specifically because of this Court's prior order approving the section 363 sale of those assets to Mesquite and Mesquite Comanche Holdings, LLC ("MCom"), as Mesquite's assignee. Thus, Carnero's allegations put an order of this Court directly at issue. In fact, at least ***five*** of this Court's prior orders are implicated by the Second Carnero Action. Although, for purposes of their go-forward operations, the Reorganized Debtors have re-entered the non-bankruptcy world, the fact that the Plan has been confirmed does not divest this Court of jurisdiction with respect to key issues related to the bankruptcy cases—especially given the Plan's unique post-confirmation assumption and rejection procedures approved by this Court. Carnero did not object to the Plan's unique assumption and rejection procedures and cannot collaterally attack them now.[3]

6. The claims asserted in the Second Carnero Action also give rise to important legal and policy questions under federal bankruptcy law concerning Carnero's interpretation of section 3.1(b) of the GGPA and section 365 of the Bankruptcy Code. Carnero's new breach of contract

[3] *See Occidental Petroleum Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021) (denying a "collateral attack on the procedure set out in Sanchez's Plan").

claims and request for damages confirm that resolving this dispute could reduce the value of the Debtors' estates. Thus, at a minimum, "related to" jurisdiction exists.

7. Finally, as with the First Carnero Action, remand or abstention would lead to inefficiencies. This Court has more than two years of experience with the parties and the intricate matrix of contracts involved in the Debtors' bankruptcy cases. As much as Carnero may wish to avoid this Court, this is not a garden variety contract dispute, and it does not belong in Texas state court. Forcing the Defendants to litigate these issues in a forum that lacks the background and context obtained from the bankruptcy cases would waste significant time and resources as well as risk inconsistent or conflicting outcomes. To suggest that the Second Carnero Action exists in a vacuum outside this Court's jurisdiction is misguided. The Motion should be denied.

## BACKGROUND

### I. The Comanche Midstream Commitments

8. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties in South Texas (the "Comanche Assets"). *In re Sanchez Energy Corp.*, 631 B.R. at 851. In January 2017, pursuant to a Purchase and Sale Agreement dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan, purchased Anadarko's working interests in the Comanche Assets, and operatorship of all the Comanche Assets was ultimately transferred to Maverick. *Id.* at 852. The transaction closed on or about March 1, 2017. *Id.*

9. Before the sale of the Comanche Assets, Anadarko had developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production (including that of the WIPs) downstream to customers. *Id.* at 851–52. To that end, Anadarko and its affiliates contracted with midstream parties that invested in and built the infrastructure required to monetize

production from the Comanche Assets, in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Comanche Midstream Commitments").

10. As a condition to the sale of the Comanche Assets, Anadarko insisted that the purchasers assume and maintain the Comanche Midstream Commitments, which the purchasers agreed to do pursuant to a number of agreements. To facilitate and continue the gathering, processing, transportation, and marketing of Comanche hydrocarbons in accordance with the Comanche Midstream Commitments, Maverick agreed to purchase the hydrocarbon production from all the other working interest owners pursuant to separate purchase and marketing agreements with each of them (collectively the, "PMAs"). [Comanche PSA § 11.15(f)]. Maverick, in turn, then agreed to deliver all the Comanche production it owns and controls to be gathered, processed, transported, and ultimately sold consistent with the Comanche Midstream Commitments. [*Id*.]

11. Although the purchasers sought to buy all of Anadarko's interest in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their transfer. Maverick and Anadarko, therefore, entered into two agency agreements (collectively, the "Midstream Agency Agreements") through which Maverick would act as Anadarko's agent under the Retained Agreements. Maverick would receive the benefits of those agreements and undertake Anadarko's obligations under them.

12. Maverick, UnSub, and Gavilan agreed to process, transport, and sell hydrocarbons (including hydrocarbons Maverick purchases from the other working interest owners pursuant to the PMAs) as provided in the Midstream Agency Agreements. Accordingly, pursuant to the terms of the Comanche PSA and related agreements, the Comanche hydrocarbons remained subject to

the Comanche Midstream Commitments following the sale of Anadarko's interests to the purchasers.

## II. The GGPA, the Ratification Agreements, and the Letter Agreement

13. After the 2017 Anadarko sale closed, Maverick and Carnero entered into a back-up midstream gathering and processing agreement—the GGPA, dated April 1, 2018—for uncommitted production from the Comanche Assets. Pursuant to the GGPA, Carnero is second in line for Maverick's hydrocarbons, behind certain agreed-upon commitments and dedications. Section 3.1(b) of the GGPA provides:

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) ***is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero,*** or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), ***such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment . . . and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…***

GGPA § 3.1(b) (emphasis added). The agreements containing the Existing Commitments include without limitation, the agreements enumerated in Exhibit F to the GGPA.

14. On the same day the GGPA was executed, Carnero, UnSub, and Maverick entered into an agreement by which UnSub ratified Maverick's obligations under the GGPA. Eagle Ford, Javelin, and Gavilan also executed similar ratification agreements (the "Ratification Agreements"). UnSub, Eagle Ford, Javelin, and Gavilan thus ratified Maverick's commitment to deliver hydrocarbons to Carnero subject to the Existing Commitments. Concurrently, Mitsui

signed a letter agreement, authorizing Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the "Letter Agreement").

**III. MCom's Purchase of Gavilan's Interest in the Comanche Assets**

15. In 2017, both Gavilan and Maverick agreed through the Comanche PSA to assume and perform all obligations and liabilities "with respect to the undivided interest" in the Comanche Assets acquired by such party and to market its hydrocarbons in accordance with the Comanche Midstream Commitments. [Comanche PSA §§ 8.1(a) & 11.15(f)]. Gavilan also agreed to sell its Comanche production to Maverick through three purchase and marketing agreements (the "Gavilan PMAs"). [Dkt. No. 1967 n. 29]. Maverick, in turn, promised Anadarko that it would ensure that all co-working interest owner production, including Gavilan's, would remain subject to the Comanche Midstream Commitments, and in the case of Gavilan, subject to the Gavilan PMAs.[4] These agreements were part of the overall agreement to maintain and meet the Comanche Midstream Commitments.

16. In October 2020, pursuant to the "363" Asset Purchase Agreement dated October 16, 2020, and approved by this Court (the "Gavilan PSA"),[5] Mesquite and MCom, as Mesquite's assignee, acquired some of Gavilan's interests in the Comanche Assets, including the Gavilan PMAs, which were assumed and assigned by Gavilan to MCom, as Mesquite's assignee, without material amendment.[6] Because it acquired the Gavilan PMAs, MCom remains bound to sell its

4 *See* GPA Agency Agreement §3.1(j) (agreeing to take "all actions necessary to ensure that all co-working interest owner production" remains subject to the Retained Midstream Contracts governing the Comanche Midstream Commitments); *see also* GPA Agency Agreement §§ 3.1(h), (i), (o), (q), and (r).

5 The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020).

6 The Gavilan PMAs were listed on Exhibit B to the Debtors' Plan Supplement for assumption. Pursuant to a stipulation dated November 12, 2020, Gavilan consented to the assumption of the PMAs pursuant to the Plan [*see*

production to Maverick, and Maverick must gather, process, transport, and market those hydrocarbons in accordance with the Comanche Midstream Commitments, including the Existing Commitments.

17. Consistent with the Gavilan PSA, this Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in Mesquite "free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, ***other than the Assumed Liabilities and Permitted Liens****[.]*" *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S.D. Tex. 2020) [Dkt. No. 361 at ¶ V] (emphasis added). "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Gavilan PSA, Ex. I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA. Gavilan PSA, Disclosure Schedule 3.05(a) at 1. Accordingly, through the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the Comanche PSA and the Existing Commitments.

## IV. The Midstream Restructuring

18. On April 30, 2020, this Court confirmed the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan"). On the Effective Date of the Plan, the Reorganized Debtors had not yet finalized their comprehensive midstream restructuring (the "Midstream Restructuring"), and they had not yet finally determined which of the executory contracts and unexpired leases were to be assumed or rejected under the Plan. Following months of litigation and negotiations, the Reorganized Debtors determined that

Dkt. No. 1758], and they were deemed assumed by Reorganized Debtor Maverick as of the Effective Date of the Plan.

it was in their best interests, under the Plan and the confirmation order (the "Confirmation Order"), to assume and maintain the Existing Commitments as they existed pre-bankruptcy, while amending the terms of the Comanche Midstream Commitments to improve the economics for the Reorganized Debtors, UnSub, MCom, and the WIPs.

19. To effectuate this assumption, in part, the Reorganized Debtor, Maverick, and the WIPs entered into the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* (the "WIP PMA Assumption Order"), which this Court approved on December 6, 2021. [Dkt. No. 2201]. The WIP PMA Assumption Order found that the WIPs' Comanche production is sold by Maverick under the Agency Agreements and approves Maverick's assumption of the PMAs, as of the Effective Date of the Plan. [Dkt. No. 2201 ¶¶ F & 3].

20. In addition, in December 2021, to further evidence and consummate the Midstream Restructuring, Mesquite and Maverick entered into the Master Settlement Agreement with (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite, Maverick, and MCom (the "Settlement Agreement"). UnSub signed the Settlement Agreement for limited provisions as well.

21. Pursuant to the Settlement Agreement, the parties submitted the *Stipulation and Agreed Order* (the "Settlement Order"), which this Court entered on December 21, 2021, agreeing to the (a) dismissal of certain litigation, (b) rejection of the "Rejected Comanche Agreements" (as defined in the Settlement Order), and (c) assumption of the "Assumed Comanche Agreements" (as

defined in the Settlement Order). The Settlement Order identified which of the Assumed Comanche Agreements were being assumed with amendments. [Dkt. No. 2253].

22. Carnero did not object to entry of either the WIP PMA Assumption Order or the Settlement Order.

23. The Assumed Comanche Agreements left the Existing Commitments intact. In fact, the Midstream Restructuring did not amend or modify the Existing Commitments. Amendments, however, were made to the terms of the Comanche Midstream Commitments, improving certain midstream economics and making conforming and clarifying changes to the agreements. ***But the amendments did not alter the scope or duration of the Existing Commitments.*** Indeed, the Existing Commitments were unchanged and prevented any of the committed hydrocarbons from flowing to Carnero's facilities. There were in fact changes to the economics that these volumes could produce for the working interest parties over time, but those changes are irrelevant because none of them altered the scope or duration of the Existing Commitments. In short, the hydrocarbons subject to the Existing Commitments prior to the Midstream Restructuring will physically flow through the gathering, processing, transportation, and marketing system exactly as anticipated when the GGPA was executed in 2018.

## V. Procedural History

### A. The Chapter 11 Cases

24. As this Court is aware, the Debtors' chapter 11 cases have followed an unusual course. After an August 11, 2019 bankruptcy filing, [Dkt. No. 1], the Plan was confirmed on April 30, 2020. [Dkt. No. 1212]. The Plan became effective on June 30, 2020 (the "Plan Effective Date"). [Dkt. No. 1417].

25. The Plan provided for the assumption and rejection of contracts under section 365 of the Bankruptcy Code ***after*** confirmation and the Plan Effective Date. *See Occidental Petroleum*

*Corp. v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)* (hereinafter "*Sanchez-Oxy*"), No. 20-ap-3198, 2021 WL 1827708, at *4 (Bankr. S.D. Tex. May 6, 2021). As this Court has explained, this unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *Id.* at *1. "To forestall liquidation, Sanchez and its creditors agreed to confirm a chapter 11 plan first and litigate Sanchez's ability to reject executory contracts later." *Id.*

26. The Plan set out a procedure to resolve rejection disputes after the Plan Effective Date. The Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B to the Plan (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C to the Plan (as amended, the "Assumption Schedule"). [Dkt Nos. 1212 at 10–16 (¶¶ 17–26), and 1198 at 29 (Article V)]. If no party in interest filed a timely objection to a contract's inclusion on either the Rejection Schedule or the Assumption Schedule, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date. *Id.* If an objection was timely filed, the Plan provides that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" and in the interim, the "agreement shall continue as in effect immediately prior to the effective date." *Id.* Pursuant to the Confirmation Order, Carnero could have objected to the inclusion of a contract on either the Rejection Schedule or the Assumption Schedule. Carnero failed to do so and thereby should be deemed to have waived its right to pursue the claims in the Second Carnero Action.

27. Article XI of the Plan provides that this Court "retain[s] exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan," specifically

enumerating this Court's jurisdiction to "resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption . . . of any Executory Contract . . . to which a Debtor is a party" and "(b) any potential contractual obligation under an Executory Contract[.]" [Dkt. No. 1212 at 69 (emphasis added)].

28. Reserving determinations of assumption and rejection until after the date of the Confirmation Order and the Plan Effective Date necessarily affects the scope of this Court's post-confirmation jurisdiction; indeed, this Court has continued to hear core matters since the Plan Effective Date. *See, e.g.*, *Sanchez-Oxy*, 2021 WL 1822708, at *5. In *Sanchez-Oxy*, this Court denied Occidental's after-the-fact challenge to the rejection procedure, concluding that the Plan and the Confirmation Order are entitled to *res judicata* effect. *Id.* at *6–8 ("Occidental assented to this procedure at confirmation and failed to appeal the Confirmation Order. For those reasons, Occidental's argument against post-effective date rejection amounts to a collateral attack on the procedure set out in Sanchez's Plan. Occidental waived that argument in this case.").

29. On June 28, 2021, this Court entered the UnSub Stipulation and Agreed Order which, among other things, authorized the rejection of the Marketing Agreement and assumption of the UnSub Ratification Agreement. *In re: Sanchez Energy Corp. et al.*, Case No. 20-3197 (MI) (Bankr. S.D. Tex. 2021) [Dkt. No. 64].

**B. The First Carnero Action and the Second Carnero Action**

30. One month after this Court entered the UnSub Stipulation and Agreed Order, Carnero sued Mesquite, UnSub, and the WIPs in Harris County, Texas, seeking declarations that (a) the GGPA, the Ratification Agreements, and the Letter Agreement obligated Mesquite, UnSub and the WIPs to terminate their delivery obligations under certain midstream commitments at the earliest possible time, including the requirement that Mesquite pursue rejection of the Midstream Agency Agreements, and (b) following rejection of the Midstream Agency Agreements, Mesquite

and the WIPs would be obligated to deliver the gas from the Comanche Assets to Carnero (the "First Carnero Action"). *See Original Petition* [Carnero I Dkt. No. 1-4] (the "Petition") ¶ 36(k), (l).

31. Mesquite, UnSub, and the WIPs removed the First Carnero Action to this Court, *Notice of Removal*, [Carnero I Dkt. No. 1], and Carnero moved to remand the action to state court. *Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero I Dkt. No. 6].

32. This Court heard Carnero's motion to remand the First Carnero Action on December 7, 2021, and observed that "the plain language" of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" and to "declare the effect of rejection of a contract before it's ever rejected." December 7, 2021 Hr'g Tr. at 15:25–16:1 (discussing ¶ 36(l) and 18:10–11 (discussing ¶ 36(k)). After Carnero suggested that it could excise those requests from the First Carnero Action, this Court allowed for Carnero to amend its pleading until December 10, 2021. *Id.* at 17:11–13, 26:5–6. But rather than amend, Carnero dismissed the First Carnero Action without prejudice. *See Plaintiff's Notice of Dismissal Without Prejudice* [Carnero I Dkt. No. 31].

33. On December 21, 2021, this Court approved a *Stipulation and Agreed Order* [Dkt. No. 2253] dismissing certain litigation and paving the way for the Midstream Restructuring of the Reorganized Debtors' gathering, transportation, processing, and marketing agreements in accordance with the Plan and the Settlement Agreement. *See supra* at ¶¶ 18–23.

34. That same day, seeking resolution of the ongoing Carnero dispute, Maverick, Mesquite, UnSub, and the WIPs filed an adversary proceeding to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts (the "Declaratory Action").

35. But in another effort to evade this Court's jurisdiction, on January 21, 2022, Carnero moved to dismiss the Declaratory Action, [Decl. Action Dkt. No. 8], and filed the Second Carnero Action in Harris County, Texas, advancing a new meritless theory that the Defendants breached the GGPA by assuming and amending, or participating in amending, certain terms of the Comanche Midstream Commitments in connection with the Midstream Restructuring. [Carnero II Dkt. No. 1-4].

36. The Defendants removed the Second Carnero Action to this Court based on "arising in," "arising under," and "related to" jurisdiction, under 28 U.S.C. § 1334. [Carnero II Dkt. No. 1].

37. On March 30, 2022, Carnero filed its *Motion to Remand to State Court or for Abstention*. [Carnero II Dkt. No. 6]. Although the Second Carnero Action includes breach of contract claims, Carnero still seeks declaratory relief regarding the GGPA, the Ratification Agreements, and the Letter Agreement. Motion at ¶ 1. All of these agreements relate to oil and gas assets in Texas's Comanche Field and the complex web of interconnected contracts involved in the Debtors' bankruptcy cases. This Court has subject matter jurisdiction over the Second Carnero Action.

**LEGAL STANDARD**

38. "The existence of subject matter jurisdiction is determined at the time of removal." *Bissonnet Invs. LLC v. Quinlan (In re Bissonnet Invs. LLC)*, 320 F.3d 520, 525 (5th Cir. 2003) (internal citations omitted). As stated in the Defendants' *Notice of Removal* [Carnero II Dkt. No. 1], this Court has "arising in," "arising under," and "related to" jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012).

39. "Arising under" jurisdiction involves causes of action created or determined by a statutory provision of title 11, while "arising in" jurisdiction is not based on a right expressly

created by title 11, but rather based on claims that would have no existence outside of bankruptcy. *See Wood v. Wood (In re Wood)*, 825 F.2d 90, 96–97 (5th Cir. 1987). After confirmation, bankruptcy courts maintain "arising in" or "arising under" jurisdiction over disputes implicating the interpretation of their orders. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). Thus, state contract-law claims can be core proceedings "if they are dependent upon the rights created in bankruptcy." *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.*), 430 F.3d 260, 266–67 (5th Cir. 2005).

40. Although the Second Carnero Action asserts claims for declaratory judgment under state law, such claims are not fatal to jurisdiction because "bankruptcy courts have 'arising under' subject matter jurisdiction to issue declaratory judgments interpreting the plan." *Quarternorth Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*, No. 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15, 2021) (Isgur, J.).

41. Bankruptcy courts also have "related to" or ("non-core" jurisdiction) over matters that could "conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Amer. Hous. Found.)*, No. 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

42. Generally, subject matter jurisdiction "remains in the bankruptcy court, even after a bankruptcy case is closed, to assure that the rights afforded to a debtor by the Bankruptcy Code are fully vindicated." *Galaz v. Katona (In re Galaz)*, 841 F.3d 316, 322 (5th Cir. 2016) (internal quotations omitted); *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 622 B.R. 680, 688 (Bankr. N.D. Tex. 2020). If Carnero were to prevail on its causes of action for breach of contract and declaratory relief concerning the GGPA, the Reorganized

Debtors' relationships and rights under the Bankruptcy Code and the Plan would be substantially affected. Thus, this Court should retain jurisdiction to vindicate such rights.

43. Lastly, this Court maintains "jurisdiction to interpret and enforce its own prior orders." *Burch v. Freedom Mortg. Corp. (Matter of Burch)*, 835 F. App'x 741, 747–48 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 253 (2021) (affirming bankruptcy court's jurisdiction when a state-court claim rests on the debtor's "interpretation of a Chapter 11 bankruptcy order" and therefore "arises from or is related to his Title 11 bankruptcy proceedings"). Similarly, evaluation and enforcement of a debtor's plan fall within a bankruptcy court's jurisdiction because such actions concern the administration of the bankruptcy case and may arise only in the context of that case. *Beta Operating Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP)*, 581 B.R. 206, 215 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020).

## ARGUMENT

### I. THE SECOND CARNERO ACTION IS A CORE PROCEEDING

#### A. Because the Second Carnero Action Concerns Mesquite's Rights and this Court's Authority Under Section 365 of the Bankruptcy Code, it "Arises Under" Title 11

44. This Court has jurisdiction over the Second Carnero Action as a core proceeding because Carnero seeks declarations concerning matters that directly arise under title 11 or arise in the Debtors' bankruptcy cases.

45. It is undisputed that (a) this Court has jurisdiction over litigation regarding Mesquite's assumption or rejection of executory contracts, including the Midstream Agency Agreement, and (b) such litigation constitutes "core" proceedings. *See Sanchez-Oxy*, 2021 WL 1822708, at *5. The Second Carnero Action arises under section 365 of the Bankruptcy Code and

in the continuing assumption/rejection litigation, seeking determinations of the impact of section 365 assumptions and rejections, and Mesquite's rights and obligations under section 365.

46. Section 365(a) gives debtors the choice to breach ("reject") or perform ("assume") executory contracts. *Mirant Corp. v. Potomac Elec. Power Corp. (In re Mirant Corp.)*, 378 F.3d 511, 518 (5th Cir. 2004); *see also Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1658 (2019) ("Section 365(a) enables the debtor (or its trustee), upon entering bankruptcy to decide whether the contract is a good deal for the estate going forward"). If the debtor elects to reject, then "the rejection of an executory contract . . . of the debtor constitutes a breach of such contract." 11 U.S.C. § 365(g). That formal act of breach allows the non-debtor to make a pre-petition claim for damages that can be discharged through the ordinary claims allowance process. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L. Rev. 845, 888 (1988) ("Rejection does not . . . cause an executory contract to vanish or become unenforceable against the debtor, and is not a matter of the 'debtor reject[ing] its obligation.'").

47. "[T]he authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504–05 (5th Cir. 2000) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984)). "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3288-LTS, 2021 WL 2676983, at *5 (D. P.R. June 29, 2021) (quoting *Eagle Ins. Co. v. BankVest Cap. Corp.* (*In re BankVest Cap. Corp.*), 360 F.3d 291, 296 (1st Cir. 2004)). Therefore, bankruptcy courts retain jurisdiction to determine the

consequences of a debtor's assumption or rejection under section 365. *See, e.g.*, *Mission Prod.*, 139 S. Ct. at 1658 (noting that case began when creditor "returned to the Bankruptcy Court for a declaratory judgment confirming its view" of the consequence of rejection).

48. That the Oxy/Wes Settlement Agreement included amendments and modifications to the Midstream Agency Agreements does not excise the Oxy/Wes Stipulation and Agreed Order from the purview of section 365 and this Court's jurisdiction. Consensual modification of contracts to be assumed is permissible under section 365 and such modification "does not mean that section 365 no longer applies." *MPF Holding U.S. LLC v. Mustang Eng'g Ltd. (In re MPF Holding U.S. LLC)*, 495 B.R. 303, 321 (Bankr. S.D. Tex. 2013). However, Carnero argues that its claims for declaratory judgment fall outside this Court's jurisdiction because section 365 does not apply to modifications or renegotiations of executory contracts. *See* Motion at ¶¶ 11–13. Carnero relies on two cases: *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985), and *City of Covington v. Covington Landing Ltd. Partnership*, 71 F.3d 1221, 1227 (6th Cir. 1995)—neither of which supports this proposition.

49. In *Richmond Leasing*, the Fifth Circuit considered objections filed by bank creditors to a debtor's assumption of an ***amended*** lease. 762 F.2d at 1303. The objecting creditors argued that the creditor holding the lease acquired greater rights through the amendment and assumption was therefore improper. *Id.* at 1310. The Fifth Circuit rejected the objection, emphasizing that "the often-repeated statement that the debtor must accept the contract as a whole means only that debtor cannot choose to accept the benefits of the contract and reject its burdens to the detriment of the other party to the agreement." *Id.* at 1311 (citations omitted). This does not mean, however, that amendments to executory contracts are prohibited. Indeed the *Richmond Leasing* court concluded that the debtor's modifications to the lease agreement were consistent

with the requirements of section 365, and assumption of the modified lease agreement under that section was therefore appropriate. *Id.*

50. In *Covington,* the Sixth Circuit quoted *Richmond Leasing,* and held that where new agreements "fundamentally changed the parties' . . . relationship" the question was "outside strict application of Section 365." *Id.* But falling outside the "strict application of Section 365" did not mean that section 365 was inapplicable or that the amendments were outside of the bankruptcy process. In fact, the Sixth Circuit held just the opposite—concluding the bankruptcy court had the power to redraft and split a lease in two, but that this answer did not depend "solely" on section 365 and was also informed by the bankruptcy court's prior orders and the parties agreements in the course of the bankruptcy proceedings. 71 F.3d at 1227.[7]

51. In the Second Carnero Action, Carnero seeks declaratory judgments that directly concern Mesquite's rights and obligations under section 365 and interfere with this Court's authority to approve any rejection or assumption. These declarations "arise under" title 11 and address the heart of the restructuring of debtor-creditor relations. Section 365 exists for the benefit not just of the parties to any one contract, but also for the benefit of all creditors and the debtor's

---

[7] In *Covington,* the debtor owned and operated two vessels offering restaurants and retail shopping, that were anchored in the Ohio River. *Id.* at 1222. The debtor leased docking and parking facilities from the city. *Id.* at 1223. During the bankruptcy, the bankruptcy court approved the sale of one of the vessels; the city also approved the sale, committing to negotiate in good faith with the debtor on the impact of the sale on the lease. *Id.* Ultimately, however, the parties could not reach an agreement on all terms. *Id.* at 1224. The Court held "an evidentiary hearing to determine appropriate rental terms" for the city's facilities and "divided the Mooring lease into two separate leases" carving off a separate lease "pertaining to the area formerly occupied" by the vessel that had been sold. *Id.* at 1225. The city appealed, arguing that "the bankruptcy court lacked the power under 11 U.S.C. § 365 to redraft the lease as it did without the City's consent." *Id.*

The Sixth Circuit first noted that the city had "agreed to the sale of the [vessel], agreed that the sale would not constitute a default, agreed that the partnership would retain rights to the Wharf space under a modified rental schedule, and agreed to future action with respect to the space vacated by the [vessel]." *Id. a*t 1227. The court then held: "These agreements fundamentally changed the parties' leasehold relationship putting this case ***outside strict application of § 365***. The outcome of this case thus depends ***not solely on § 365***, but on the legal effect of the agreements made by the parties in this particular case, as reflected in the agreed order and the attorneys' remarks at the . . . hearing." *Id.* (emphasis added).

estate—it is therefore critical for the implementation of the Plan that this Court preside over the Second Carnero Action.

### B. Because the Second Carnero Action Involves Rights Created By Bankruptcy Law and Requires Interpretation and Enforcement of At Least Five of This Court's Prior Orders, it "Arises In" the Debtors' Bankruptcy Cases

52. In the Motion, Carnero maintains that its claims are divorced from the Debtors' bankruptcy cases and do not require a court to interpret or consult any part of the Plan, the Confirmation Order, or any order of this Court. *See* Motion at ¶ 17. That position is untenable.

53. This Court's jurisdiction over this adversary proceeding was expressly contemplated by Article XI of the Plan; paragraph 43 of the Confirmation Order; paragraph 6 of the Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts (the "Carnero Settlement Approval Order"); and section 6.2.1 of the Carnero Settlement Agreement (attached as Exhibit A to the Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties [Dkt. No. 1309]).

54. Next, the allegations in the Second Carnero Action fall within this Court's jurisdiction and directly affect the success of the Plan. The Second Carnero Action directly implicates the "implementation or execution" of the Midstream Restructuring settlement with the Oxy/Wes Parties, and requires interpretation of at least four Plan provisions, including:

- **Article V**, which establishes the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts;
- **Article IV, D.**, which provides that all property of the estate "shall vest in each applicable Reorganized Debtor free and clear" of all claims and other encumbrances;
- **Article IV, F.**, which provides that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter . . . the validity, the priority, or amount of any Claims that may arise in connection therewith; and

- **Article VIII**, which provides for the discharge of claims against the Reorganized Debtors as of the Effective Date, exculpates the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of . . . the formulation, preparation, dissemination, negotiation, filing, or termination of the . . . Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoins all claims released or discharged pursuant to the Plan.

Because the allegations in the Second Carnero Action implicate aspects of the Plan, this Court may assert jurisdiction. *See, e.g.*, *Evercore Cap. Partners II, L.L.C. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259, 262 n.3 (5th Cir. 2011) ("We are persuaded that [the Bankruptcy Court] had core jurisdiction to interpret the Plan and confirmation order pursuant to 28 U.S.C. § 157(b)"); *Highland Cap. Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) ("This jurisdiction extends to matters that impact compliance with or completion of the reorganization plan") (internal quotations omitted); *Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.").

55. The Second Carnero Action also implicates the interpretation of at least ***five*** of this Court's prior orders, including:

- the Confirmation Order [Dkt. No. 1212], which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, *as long as* it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do);

- the Carnero Settlement Approval Order [Dkt. No. 1415], which approved the Carnero Settlement Agreement [Dkt No. 1309], but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interests;

- the Stipulation of Dismissal and Agreed Order [Dkt. No. 1983], which approved the assumption and rejection of certain agreements with UnSub;

- the WIP PMA Assumption Order [Dkt. No. 2201], which approved the assumption of certain production marketing agreements pursuant to the Plan; and
- the Oxy/Wes Stipulation and Agreed Order [Dkt. No. 2253], which approved the assumption and rejection of some of the Debtors' midstream contracts as amended by the settlement with Oxy/Wes Parties and effected the Midstream Restructuring.

That five of this Court's prior orders are needed to resolve the issues at hand in the Second Carnero Action reinforces this Court's exercise of jurisdiction. *See Travelers Indem. Co.*, 557 U.S. at 151 ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *Burch*, 835 F. App'x at 747–48.

56. Carnero further argues that the Defendants rely on federal defenses against Carnero's declaratory judgment claims in order to manufacture subject matter jurisdiction and to frame the Second Carnero Action as a core proceeding. Motion at ¶ 22. However, because the Second Carnero Action seeks declaratory judgments, the relevant question is not whether ***Carnero's*** claims purport to sound in state law but "whether 'if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'" *New Orleans & Gulf Coast Ry. Co. v. Barrios*, 533 F.3d 321, 329 (5th Cir. 2008) (emphasis added) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983)); *see also NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) ("Since a declaratory judgment action is inherently anticipatory, the federal issue must form part of the hypothetical well-pleaded complaint that the ***declaratory judgment defendant*** would have filed but for the anticipatory action.") (emphasis added); *see also Sportsman's Warehouse v. McGillis/Eckman Invs.-Billings, LLC (In re Sportsman's Warehouse, Inc.)*, 457 B.R. 372, 387 (D. Del. 2011) ("Resolution of the various defenses that SWI asserts in Count VI ultimately requires the Court to interpret, validate, and enforce the Assumption Order.").

57. In this instance, adjudication of the Defendants' rights against Carnero must be pursued not through state law claims, but rather before this Court, applying the Bankruptcy Code: approval of the assumption and rejection decisions under section 365 pursuant to the Plan, and approval of the Midstream Restructuring and associated settlements under Bankruptcy Rule 9019 pursuant to the Plan. Indeed, that is precisely what the Defendants did when they filed the Declaratory Action in this Court in December 2021.

58. Additionally, Carnero cites *Davis v. Retail Fin. Co. of Tex., Inc.*, for the proposition that where a petition does not create federal jurisdiction, a court is prohibited from using the defendant's answer or counterclaims to determine if core jurisdiction exists. No. 06-7016, 2006 WL 2827270, at *1 (Bankr. S.D. Tex. Sept. 27, 2006). This is a recycled argument from the First Carnero Action, where Carnero maintained that this Court's authority to hear a petition depends on the "well-pleaded complaint rule," which compels federal courts to only look to the face of the petition to determine if a claim establishes federal jurisdiction. [Carnero I Dkt. No. 23 ¶¶ 6–7].

59. However, as this Court recently held in *ABC Dentistry, P.A. v. Brewer & Prichard, P.C. (In re ABC Dentistry)*, the well-pleaded complaint rule does not apply to jurisdiction under 28 U.S.C. § 1334, as it would nullify the "arising in" and "related to" language of that statute. No. 16-34221, 2021 WL 955932 at *3 (Bankr. S.D. Tex. Mar. 12, 2021) (Isgur, J.). In that case, this Court considered whether it retained jurisdiction over state law claims involving non-debtor parties that had been removed to federal court following the closure of the main bankruptcy case. *Id.* at *2–3. The plaintiff in *In re ABC Dentistry* argued that because his petition alleged exclusively state law claims, the bankruptcy court lacked subject matter jurisdiction on the face of the well-pleaded complaint. *Id.* at *3. This Court disagreed. Because "[t]he well-pleaded complaint rule seemingly prohibits bankruptcy courts from analyzing the effect an action might have on a

bankruptcy estate," *id*., rather than applying the well-pleaded complaint rule to ascertain jurisdiction, this Court ruled that it "must look to both the amended complaint ***and its relation to the ABC Dentistry bankruptcy*** to determine whether the Court has subject matter jurisdiction." *Id.* (emphasis added).

60. Similar to the petition in *In re ABC Dentistry*, even if the Second Carnero Action may not "directly challenge" the Plan's provisions or this Court's prior orders, the Plan and the prior orders "are factually central to this dispute. [The Second Carnero Action] is not just vaguely or tangentially related to the [Chapter 11] bankruptcy. The bankruptcy case is front and center." *Id.* at *4. Given the connection between the Second Carnero Action and the Debtors' chapter 11 cases, this Court should exercise jurisdiction over the Second Carnero Action.

61. Lastly, Carnero alleges that Mesquite cannot retain the midstream commitments as to the Comanche working interests previously owned by Gavilan because of this Court's approved section 363 sale of such assets to MCom. As a result, Carnero argues, the dedicated hydrocarbons associated with the Gavilan working interests acquired by MCom are now free of the midstream commitments. [Carnero II Dkt. No. 1-4 at 21, 24]. To test the viability of this argument, this Court must review the section 363 sale that it approved in the Gavilan bankruptcy case. The Second Carnero Action concedes that interpretation of one of this Court's prior orders is necessary to resolve Carnero's claims. The action therefore "arises in" the bankruptcy cases, affording this Court jurisdiction.

62. Because Carnero's claims invoke the effect of this Court's prior orders and the outcome will impact many other parties affected by the bankruptcy cases, those claims should be adjudicated by this Court, which presided over the bankruptcy cases. The Second Carnero Action arises in the bankruptcy cases because Carnero challenges the assumption/rejection proceedings

regarding the Midstream Agency Agreement and asks for determinations that implicate bankruptcy law. It is crucial for all parties and this Court to know what consequences might flow from a decision to reject or assume that contract.

## II. AT MINIMUM, THIS COURT HAS "RELATED TO" JURISDICTION

63. Even if this Court determines that it lacks "arising under" or "arising in" jurisdiction, "related to" jurisdiction still exists.

64. "An action is related to bankruptcy if the outcome could alter the debtors' rights, liabilities, opinions, or freedom of action (either positively or negatively) and which in any way impacts the handling and administration of the bankruptcy estate." *Glasstex, Inc. v. Arch Aluminum & Glass Co. Inc. (In re Polvado)*, No. 06-70151, 2006 WL 2993333, at *1 (Bankr. S.D. Tex. Oct. 17, 2006) (Isgur, J.); *see also Fire Eagle, LLC v. Spillman Dev. Grp., Ltd. ( In re Spillman Dev. Grp. Ltd.)*, 710 F.3d 299, 305 (5th Cir. 2013) ("related to" bankruptcy jurisdiction can emerge from attenuated, hypothetical effects of third-party litigation). Bankruptcy courts have determined that they at minimum had "related to" jurisdiction over a declaratory judgment action regarding the interpretation of assumed contracts. *In re Sportsman's Warehouse, Inc.*, 457 B.R. at 386–88; *see also G-I Holdings, Inc. v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 564 B.R. 217, 251–53 (Bankr. D. N.J. 2016) (court could exercise "related to" jurisdiction regarding breach of contract claims removed from state court).

65. While "related to" jurisdiction is curtailed after plan confirmation, bankruptcy courts retain subject matter jurisdiction over important debtor rights created by the Bankruptcy Code. *In re Craig's Stores of Tex., Inc.*, 266 F.3d at 390.

66. Carnero posits that under *In re Craig's Stores*—which it heavily relies on—this dispute is a non-core proceeding and therefore this Court lacks jurisdiction. Motion at ¶ 25. But subsequent decisions have made clear that the narrow language used in *In re Craig's Stores* was

unique to that case, which dealt with post-confirmation relations between the parties and where there was no dispute as of the date of confirmation and no facts or law derived from the chapter 11 plan were necessary to resolve the dispute. *In re Blast Energy Servs., Inc.*, 396 B.R. 676, 684 (Bankr. S.D. Tex. 2008); *see Newby v. Enron (In re Enron Corp. Sec.)*, 535 F.3d 325, 335 (5th Cir. 2008) (noting that the "facts in *Craig's Stores* were narrow; they involved post-confirmation claims based on post-confirmation activities"); *Calvin v. Amergy Mortg. Co., L.L.C. (In re Calvin)*, 507 B.R. 169, 178 (W.D. Tex. 2014) ("Although the holding of *Craig's Stores*—that bankruptcy jurisdiction exists after plan confirmation only 'for matters pertaining to the implementation or execution of the plan'—was somewhat broad, the facts that precipitated that holding were narrow, involving post-confirmation claims based on post-confirmation activities"). *In re Nat'l Gypsum Co.* 118 F.3d 1056, 1063–64 (5th Cir. 1997), holds that even where a debtor's claim could constitute an affirmative defense to a state law contract claim, a debtor's claim to enforce the Bankruptcy Code and provisions of a confirmed plan are ***core proceedings*** that are sufficient to convey subject matter jurisdiction.

67. The Bankruptcy Court for the Southern District of Texas has considered six factors to determine whether a bankruptcy court has post-confirmation "related to" jurisdiction. These factors include: (a) when the claim at issue arose; (b) what provisions in the confirmed plan exist for resolving disputes and whether there are provisions in the plan retaining jurisdiction for trying these suits; (c) whether the plan has been substantially consummated; (d) the nature of the parties involved; (e) whether state law or bankruptcy law applies; and (f) indices of forum-shopping. *Gilbane Bldg. Corp. v. Air Systems Inc. (In re Encompass Servs. Corp.)*, 337 B.R. 864, 873 (Bankr. S.D. Tex. 2006). *In re Blast Energy* is an instructive case applying these factors.

68. *In re Blast Energy* involved a dispute over prepetition contract claims where a creditor had assigned all of its rights in certain oil and gas wells to the debtor prepetition. The debtor eventually engaged in separate litigation against the assigning creditor and the remaining contract counterparty during the bankruptcy cases. Separate settlements were reached with the debtor and both parties during the bankruptcy cases and post-confirmation, respectively. However, one of the non-debtor parties sued the other non-debtor party for the same dispute post-confirmation. Out of fear that the state court dispute would jeopardize the parties' performance under the bankruptcy case settlements, the debtor filed a motion in the bankruptcy court seeking declaratory relief enforcing the bankruptcy court orders approving the settlements and the confirmed plan. The bankruptcy court found that it had subject matter jurisdiction over the dispute because it related primarily to pre-confirmation relationships among the parties and the antagonism between the parties had initiated pre-confirmation as well. 396 B.R. at 682–85.

69. To the extent this Court determines that it must resort to "related to" jurisdiction, as in *In re Blast Energy,* applying the *Encompass* factors to the Second Carnero Action demonstrates that this Court has "related to" subject matter jurisdiction:

- As laid out in the Carnero Settlement Agreement [Dkt. No. 1309], the disputes between the Defendants and Carnero relate back to the pre-confirmation period, and these current issues were at the heart of the settlement between the parties. Unlike *In re Craig's Stores*, the Second Carnero Action does not primarily address the post-confirmation relationship between the parties. 266 F.3d at 391. This dispute over the interpretation of the GGPA and section 365 did not emerge post-confirmation. Rather, the seeds of antagonism between the parties existed at the time of confirmation and the Plan Effective Date. Moreover, as stated previously, analysis of the facts surrounding the Plan and this Court's prior orders are necessary to resolve the claims at issue in the Second Carnero Action. *See Enron*, 535 F.3d at 335.

- The Carnero Settlement Approval Order and the Carnero Settlement Agreement both provide that this Court would retain jurisdiction over all matters arising from or relating to the Carnero Settlement Agreement, including any issues relating to the assumption of the

GGPA. Additionally, the dispute with Carnero requires interpretation of Articles IV, V, and VIII of the Plan.

- The Second Carnero Action does not focus on the post-confirmation business relationship between Carnero and the Defendants. Rather, the dispute is centered on the Reorganized Debtors' implementation of the Plan and their exercise of rights under section 365 of the Bankruptcy Code. As referenced in the Carnero Settlement Agreement [Dkt. No. 1309 at 30–31], the extraordinary circumstances the Debtors faced at the time of confirmation required assumption and rejection decisions to be preserved and addressed at a later time.

- The Second Carnero Action requires this Court to interpret the GGPA in connection with the Plan and prior orders entered by this Court. Bankruptcy law thus predominates over state law.

- As in *In re Blast Energy*, the parties' dispute underlying the Second Carnero Action has been litigated extensively before this Court, and the previous settlement was approved by order of this Court under Bankruptcy Rule 9019. In the First Carnero Action, Carnero withdrew its lawsuit despite agreeing to amend its claims. It then waited to bring this second lawsuit after the Midstream Restructuring was completed, never raising any objections along the way. To allow Carnero to proceed in state court now would constitute the same "egregious breed of forum shopping" that *In re Blast Energy* found impermissible. 396 B.R. at 688.

70. The Second Carnero Action also raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, section 3.1(b) of the GGPA would be unenforceable as a matter of federal bankruptcy law under section 365 of the Bankruptcy Code because it would subject the Debtors to significant liability or Carnero termination rights simply because—without extending the term of the Existing Commitments or otherwise expanding their scope—the Debtors negotiated improvements to their midstream cost structure, which were necessary to carry out the Midstream Restructuring and benefitted the Debtors' estates.

71. Moreover, the Second Carnero Action implicates important federal policy interests underlying the Bankruptcy Code: primarily, whether awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to

its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

72. Here, the Defendants negotiated improvements to their midstream cost structure, which were necessary to effectuate the Midstream Restructuring and benefited the Debtors' estates. The Midstream Restructuring did not alter the scope or duration of the Existing Commitments. Despite being restored to its prepetition status quo, Carnero now claims it is entitled to damages because the Defendants successfully renegotiated certain terms of prepetition executory contracts. The Defendants respectfully submit that allowing the Second Carnero Action to proceed outside this Court would not only undercut the federal policy interests underlying section 365 of the Bankruptcy Code but also permit Carnero to pursue a windfall at the expense of the estates. *See Butner v. United States*, 440 U.S. 48, 55 (1979) (noting the federal bankruptcy policy that creditors should not receive a windfall merely through the happenstance of bankruptcy). Indeed, Carnero is seeking over a million dollars in monetary relief. [Carnero II Dkt. No. 1-4 at 17].

73. Finally, permitting a state court to adjudicate questions regarding one part of the "web of contracts setting forth the parties' rights and obligations with respect to the Comanche Assets," *In re Sanchez Energy Corp.*, 631 B.R. at 851, would invade this Court's statutory authority to enter orders necessary for the consummation of a confirmed plan. *See U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002) ("Proceedings invoking the bankruptcy court's statutory authority to enter orders necessary for the consummation of a confirmed plan meet this criteria because the authority can be exercised only in the context of a bankruptcy case. In other words, such proceedings arise only in bankruptcy.").

74. Try as it might, Carnero cannot sever its claims in the Second Carnero Action from what preceded it. Because the Second Carnero Action involves rights created by bankruptcy law and requires interpretation and enforcement of at least five of this Court's prior orders, as well as four provisions of the Plan, this Court has "arising in," "arising under," or (at the very least) "related to" jurisdiction.

## III. MANDATORY ABSTENTION DOES NOT APPLY

75. "If an adversary proceeding is core, then mandatory abstention does not apply and a court would look to permissive abstention." *Atencio v. Atencio (In re Petroleum Prods. & Servs., Inc.)*, 556 B.R. 296, 301 (Bankr. S.D. Tex. 2016) (citing *Gober v. Terra + Corp.* (*In re Gober*), 100 F.3d 1195, 1206 (5th Cir. 1996)). Mandatory abstention is not warranted here because this Court has "arising in" or "arising under" jurisdiction over the Second Carnero Action, as described above. Even so, even if this Court determines that it has only "related to" jurisdiction, mandatory abstention would not apply under the factors listed in 28 U.S.C. § 1334(c)(2).

76. First, although it is true that Carnero has timely filed a motion requesting abstention, the Second Carnero Action is not merely premised on state law claims and is far from the typical contract action seen every day by Texas state courts. *See In re Galaz*, 841 F.3d at 323 (recognizing that even state law claims "may be considered core if they are dependent upon the rights created in bankruptcy") (internal quotations omitted). As discussed *supra* at ¶¶ 70–71, the Second Carnero Action raises important questions relating to bankruptcy law under section 365 of the Bankruptcy Code, as well as federal policy interests underlying the Bankruptcy Code. Moreover, Carnero is wrong in asserting that the Defendants have only alleged jurisdiction under 28 U.S.C. § 1334(b). As explicitly stated in the Defendants' *Notice of Removal*, this Court "has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367." [Carnero II Dkt. No. 1 at ¶ 23].

77. Second, although Carnero insists that the Second Carnero Action can be promptly resolved by the Harris County District Court, Carnero ignores the more than two years of time and resources invested by this Court into understanding these issues, as well as the various interconnected agreements. The Defendants do not dispute that the Harris County District Court is capable, but remand to the state level would almost certainly require additional resources and result in additional cost to educate the court and bring it up to speed.

78. For these reasons, mandatory abstention is inapplicable. Although Carnero asserted its claim through the procedural mechanism of a Texas declaratory judgment action, the substance of that claim is intertwined with the Debtors' bankruptcy cases and bankruptcy law, thus militating against mandatory abstention. *See In re Nat'l Gypsum Co.*, 118 F.3d at 1061 n.9 (noting that the bankruptcy court found that mandatory abstention did not apply to a declaratory judgment action raising a core matter); *Galaz v. Katona (In re Galaz)*, No. 5:14-CV-967, 2015 WL 5565266, at *7 (W.D. Tex. Sept. 21, 2015) (bankruptcy court did not abuse its discretion in holding that mandatory abstention did not apply in core proceeding involving a declaratory judgment action), *aff'd*, 841 F.3d 316 (5th Cir. 2016). Finally, to the extent that Carnero's claims also call for the interpretation of Texas contracts to determine whether a breach occurred, the claims raise no novel questions of state law.

## IV. TO THE EXTENT PERMISSIVE ABSTENTION MAY APPLY, THE BALANCE OF FACTORS FAVORS THIS COURT RETAINING JURISDICTION

79. Normally, abstention is the exception, not the rule. As a general principle, federal courts have a "virtually unflagging obligation to exercise their jurisdiction" except in "extraordinary circumstances." *Schlotzsky's Inc. v. Grant Thornton, L.L.P. (In re Schlotzsky's Inc.)*, 351 B.R. 430, 434 (Bankr. W.D. Tex. 2006) (internal quotations omitted). 28 U.S.C. § 1334(c)(1) governs permissive abstention, providing, "nothing in this section prevents a district

court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

80. The relevant factors for permissive abstention include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficult or unsettled nature of applicable law; (4) the presence of related proceedings commenced in state court or other non-bankruptcy proceedings; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of proceeding to main bankruptcy case; (7) the substance rather than the form of an asserted core proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy docket; (10) the likelihood that the commencement of the bankruptcy proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of the right to a jury trial; (12) comity; and (13) the possibility of prejudice to other parties in the action. *Atencio*, 556 B.R. at 301. As noted by other bankruptcy courts, these factors are not dispositive, but must be viewed in the larger context of arriving at the equitable application of the permissive abstention doctrine. *See Houston Reg'l Sports Network, L.P. v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.)*, 514 B.R. 211, 217 (Bankr. S.D. Tex. 2014); *In re Schlotzsky's Inc.*, 351 B.R. at 435.

81. The vast majority of these factors weighs against permissive abstention and in favor of this Court retaining jurisdiction over the Second Carnero Action:

- **Factor 1**: Resolving the action in this Court will benefit the efficient administration of the estate because it will keep critical issues with fundamental, core bankruptcy matters (*i.e.*, Mesquite's and Maverick's assumption and rejection of executory contracts) before this Court.

- **Factor 2**: Although Carnero asserts a declaratory judgment claim under Texas state procedural law, bankruptcy law issues (*i.e.*, the effect and meaning of this Court's authorization of the Debtors' assumption and rejection of executory contracts) predominate. The presence of a declaratory judgment claim and state law breach of contract claims does not require remanding an action to state court. *See In re Galaz*, 841 F.3d at 323; *In re Sportsman's Warehouse, Inc.*, 457 B.R. at 387.

- **Factor 3**: If there are difficult or unsettled questions of law, they relate to bankruptcy law (*i.e.*, the applicability of section 365 of the Bankruptcy Code) and not state law.

- **Factor 4**: There are no related state-court proceedings. There, is, however, a related adversary proceeding before this Court: the Declaratory Action (No. 21-04419).

- **Factor 6**: The action is closely related to the Debtors' bankruptcy cases.

- **Factor 7**: Although the action takes the form of a state court declaratory judgment claim and breach of contract claim, the substance of the claim is a core proceeding, implicating vital aspects of the bankruptcy cases.

- **Factor 8**: There is no way to sever Carnero's claims to permit the state court to proceed with portions of the action.

- **Factor 9**: The impact on this Court's docket will be minimal, especially considering this Court's experience in handling the related bankruptcy cases.

- **Factor 11**: Carnero did not make a jury demand in state court, which militates against abstention.

- **Factor 12**: This Court has spent years with the bankruptcy cases. To the extent comity is relevant, it favors the action remaining with the court that has far greater familiarity and history with the cases and the parties. "Given that the case is complicated and has a lengthy history, judicial efficiency supports retaining jurisdiction in this case, despite the [court's] large case load." *In re Galaz*, 2015 WL 5565266, at *9.

- **Factor 13**: No party will be prejudiced by this Court exercising jurisdiction over this action, particularly considering this Court's experience in handling the bankruptcy cases. Indeed, Carnero concedes that "[b]oth forums are capable of adjudicating the claims." Motion at ¶ 59.

82. Of the two remaining factors, Factor 10 is inapplicable because the Second Carnero Action was not initiated in this Court. Carnero accuses the Defendants of forum shopping, Motion

at ¶ 54, yet it is Carnero that has repeatedly sought to evade this Court's jurisdiction by filing actions in state court. Indeed, rather than amend its petition in the First Carnero Action, Carnero voluntarily dismissed the action, laid in wait, and decided to try its luck again in state court, where it alleged effectively the same facts and claims as in the First Carnero Action. Such efforts to abuse or game the judicial process constitute forum shopping on Carnero's part. *See In re Schlotzsky's*, 351 B.R. at 435–36. Carnero cannot complain that Mesquite, Maverick, and the other Defendants are forum shopping by invoking this Court's jurisdiction over the Second Carnero Action simply because they have had success during the course of the Debtors' chapter 11 cases. *See Galaz*, 2015 WL 5565266, at *10.

83. Finally, Factor 5 does not weigh in favor of abstention. Although the Defendants rely on 28 U.S.C. § 1334 for jurisdiction, as discussed *supra*, the Second Carnero Action is closely associated with the Debtors' bankruptcy cases, and there are numerous ties between the two actions. Carnero itself has challenged one of this Court's prior orders by referencing the section 363 sale in the Gavilan bankruptcy case. Resolving Carnero's requests for declaratory judgments will require the interpretation of bankruptcy law, including the effect of assumption and rejection under section 365 of the Bankruptcy Code, and interpretation of at least five of this Court's prior orders. These circumstances weigh against permissive abstention. *See, e.g.*, *In re Senior Care Ctrs. LLC*, 622 B.R. at 694 ("[I]t is readily apparent that the factors weigh heavily against permissive abstention and remand. The crux of this matter . . . requires interpretation of complex aspects of bankruptcy law, including the effect of section 365 lease assumption, plan and plan support document interpretation, plan implementation and consummation, and interpretation of this court's prior orders.").

84. There would be no prejudice to any party resulting from the adjudication of the Second Carnero Action by this Court. That this Court can most efficiently address the action will benefit the Debtors' estates, this Court, and the state court. *See, e.g.*, *Hassell Constr. Co. Inc. v. Hassell (In re Hassell)*, No. 19-30694, 2020 WL 728890, at *6 (Bankr. S.D. Tex. Jan. 7, 2020) (declining to exercise permissive abstention when state law claims were asserted where "efficiency, as well as the direct impact these claims have on the estate, supports hearing these claims in federal court"). Remand would only undermine the Debtors' chapter 11 cases, creating further inefficiency and potentially giving rise to conflicting decisions. Accordingly, this Court should retain jurisdiction over the Second Carnero Action.

**CONCLUSION**

85. For all of these reasons, the Defendants request that the Motion be denied in its entirety.

*[Signature pages to follow]*

Respectfully submitted this 27th day of April, 2022.

*/s/ James G. Munisteri*

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

Case 22-90305 Document 1343 Filed in TXSB on 04/25/22 Page 41 of 44

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, Texas 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, Massachusetts 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 27, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

# EXHIBIT 37

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**


**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*


Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ....1
A. Defined Terms ....1
B. Rules of Interpretation ....11
C. Computation of Time ....12
D. Governing Law ....12
E. Reference to Monetary Figures ....12
F. Reference to the Debtors or the Reorganized Debtors ....12
G. Controlling Document ....12
ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ....13
A. Administrative Claims ....13
B. Professional Fee Claims ....13
C. Priority Tax Claims ....14
D. Statutory Fees ....14
ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ....15
A. Formation of Debtor Group for Convenience Purposes Only ....15
B. Classification of Claims and Interests ....15
C. Treatment of Classes of Claims and Interests ....15
D. Special Provision Governing Unimpaired Claims ....19
E. Elimination of Vacant Classes ....19
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ....19
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ....19
H. Intercompany Interests ....19
I. Subordinated Claims and Interests ....19
ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ....20
A. General Settlement of Claims, Interests, and Causes of Action ....20
B. Restructuring Transactions ....20
C. Sources of Consideration for Plan of Reorganization Distributions ....20
D. Lien-Related Litigation ....21
E. Continuation of Gavilan Proceeding ....22
F. Corporate Existence ....22
G. Vesting of Assets in the Reorganized Debtors ....23
H. Corporate Action ....23
I. New Organizational Documents ....23
J. Directors and Officers of Reorganized SN ....23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ....24
L. Management Incentive Plan ....24
M. Effectuating Documents; Further Transactions ....24
N. Preservation of Causes of Action ....24
O. Exemption from Registration Requirements ....25
P. Cancellation of Instruments, Certificates, and Other Documents ....25
Q. Section 1146(a) Exemption ....26
R. DIP Agent Fees and Expenses ....26
ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....26
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ....26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ....27
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....27
D. Indemnification Obligations ....28
E. Insurance Policies ....28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ....28
G. Contracts and Leases After the Petition Date ....29
H. Reservation of Rights ....29
ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ....29
A. Distributions on Account of Claims Allowed as of the Effective Date ....29
B. Rights and Powers of the Disbursing Agent ....29
C. Special Rules for Distributions to Holders of Disputed Claims ....30

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....30
E. Claims Paid or Payable by Third Parties ....33
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....34
H. No Postpetition Interest on Claims ....34
**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....34**
A. Allowance of Claims ....34
B. Claims Administration Responsibilities ....34
C. Estimation of Claims ....35
D. Adjustment to Claims Without Objection ....35
E. Time to File Objections to Claims ....35
F. Disallowance of Claims ....35
G. Amendments to Claims ....36
H. No Distributions Pending Allowance ....36
I. Distributions After Allowance ....36
**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....36**
A. Discharge of Claims and Termination of Interests ....36
B. Exculpation ....37
C. Injunction ....37
D. Protection Against Discriminatory Treatment ....37
E. Release of Liens ....38
F. Reimbursement or Contribution ....38
G. Recoupment ....38
H. Subordination Rights ....38
**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....39**
A. Deadline for Occurrence of the Effective Date ....39
B. Conditions Precedent to the Effective Date of the Plan ....39
C. Waiver of Conditions ....39
D. Effect of Non-Occurrence of Conditions to Consummation ....39
E. Substantial Consummation ....39
**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....40**
A. Modification of Plan ....40
B. Effect of Confirmation on Modifications ....40
C. Revocation or Withdrawal of Plan ....40
**ARTICLE XI. RETENTION OF JURISDICTION ....40**
**ARTICLE XII. MISCELLANEOUS PROVISIONS ....42**
A. Immediate Binding Effect ....42
B. Additional Documents ....42
C. Dissolution of the Creditors' Committee ....42
D. Payment of Statutory Fees ....43
E. Reservation of Rights ....43
F. Successors and Assigns ....43
G. Service of Documents ....43
H. Term of Injunctions or Stays ....44
I. Entire Agreement ....44
J. Plan Supplement ....44
K. Non-Severability ....44
L. Votes Solicited in Good Faith ....44
M. Closing of Chapter 11 Cases ....45
N. Waiver or Estoppel ....45

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

Case 23-20-33233 Document 13-38 Filed in TXSB on 04/30/22 Page 1626 of 1867

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*Fee Examiner*" means a fee examiner selected by the Reorganized Debtors and appointed by an order of the Bankruptcy Court, which may be in the Confirmation Order, to review each of the Final Fee Applications of the Non-Participating Professionals and to issue the Fee Examiner Report as provided in Article II.B.

63. "*Fee Examiner Report*" means the report and recommendation with respect to the Final Fee Applications of each of the Non-Participating Professionals prepared by the Fee Examiner in accordance with Article II.B.

64. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

65. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

66. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

67. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

68. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

69. "*Gavilan*" means Gavilan Resources, LLC.

70. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

71. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

72. "*Holder*" means an entity holding a Claim or Interest, as applicable.

73. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

75. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

76. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date;

(ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

77. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

78. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

79. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

80. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

81. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

82. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

83. "*Lien-Related Litigation*" means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

84. "*Lien-Related Litigation Creditor Representative*" means a representative, as selected by the Creditors' Committee, of general unsecured creditors in the Lien-Related Litigation.

85. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

86. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

87. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

88. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

89. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

90. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

91. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

92. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

93. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

94. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

95. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

96. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

97. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

98. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

99. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

100. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

102. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

103. “*Priority Tax Claims*” means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

104. “*Pro Rata*” means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

105. “*Professional*” means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106. “*Professional Fee Claims*” means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

107. “*Professional Fee Settlement*” means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

108. “*Professional Fee Settlement Reserve*” means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

109. “*Professional Fee Settlement Reserve Amount*” means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

110. “*Proof of Claim*” means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

111. “*Reinstated*” or “*Reinstatement*” means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

112. “*Reorganized Boards*” means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

113. “*Reorganized Debtors*” means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

114. “*Reorganized SN*” means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

115. “*Reorganized SN Board*” means the initial board of directors of Reorganized SN.

116. “*Requisite DIP Lenders*” means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

117. “*Restructuring Fee*” has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors’ Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro*

*Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

118. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

119. "*Sanchez Parties*" means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

120. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

121. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

122. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

123. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

124. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

125. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

126. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

127. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

128. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

129. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

130. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

131. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

132. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

133. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

134. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

135. "*SN*" means Sanchez Energy Corporation.

136. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

137. "*SOG*" means Sanchez Oil & Gas Corporation.

138. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

139. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

140. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

141. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

142. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

143. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

144. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

145. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a

contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

**ARTICLE II.**
**ADMINISTRATIVE AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered

property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. <u>Final Fee Applications</u>

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "*Draft Report Review Period*"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the

earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided* that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of

an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant

to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. <u>Class 7 — Intercompany Interests</u>

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 — Existing SN Preferred Interests</u>

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. <u>Class 9 — Existing SN Common Interests</u>

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Section 510(b) Claims</u>

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**PROVISIONS FOR IMPLEMENTATION OF THE PLAN**

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the

New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court according to the following timeline:

- *Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- *Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Confirmation Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Confirmation Date.

- *Phase 3:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- *Post-Effective Date Equity Distribution Allocations:* The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect

shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of

incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal,

appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the

exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee

to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of

the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory

Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.

Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant

to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.**

**The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

**ARTICLE IX.**
**DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule

of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000

Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer,

issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 38

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

In re:

Sanchez Energy Corporation, *et al.*,

Reorganized Debtors.[1]

Chapter 11

Case No. 19-34508 (MI)

(Jointly Administered)

SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,

Plaintiffs,

v.

Carnero G&P, LLC,

Defendant.

**Adv. Pro. No. 21-04419 (MI)**

**RESPONSE TO MOTION TO DISMISS**

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), respond to the motion to dismiss filed by

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Carnero G&P LLC ("Carnero" or "Defendant"), and to the extent necessary, request that the Court grant them leave to amend their complaint in response to the motion to dismiss.[2]

Because the Motion to Dismiss is premised on new theories and allegations that Carnero made only after Plaintiffs filed the Original Complaint, Plaintiffs have responded to the Motion to Dismiss by preparing an Amended and Supplemental Complaint, pursuant to Federal Rules of Civil Procedure 15(a) and 15(d), made applicable to adversary proceedings by Federal Rule of Bankruptcy Proceedure 7015. The Amended and Supplemental Complaint addresses the evolution of Carnero's theories, which occurred after Plaintiffs filed their Original Complaint, and addresses the issues raised in the Motion to Dismiss (rendering the Motion to Dismiss moot). A copy of the Amended and Supplemental Complaint is attached as **Exhibit 1**; a redline comparing the original and amended pleading is attached as **Exhibit 2**.

The parties agreed to extend Plaintiffs' original deadline to respond to the Motion to Dismiss, and Plaintiffs believe that this also extended the deadline to amend as a matter of right, under Rule 15(a)(1)(B). However, out of an abundance of caution and because the Amended and Supplemental Complaint relates to events that occurred after Original Complaint was filed (as contemplated by Rule 15(d)), Plaintiffs request leave to amend and supplement their pleading.

## BACKGROUND

1. On July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The First Carnero Action sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the

---

2 Plaintiffs are filing a separate motion for leave contemporaneously with this response that incorporates this response by reference.

earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreement, and (ii) after rejection of the Midstream Agency Agreement, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See Petition* [Carnero Dkt. No. 1-4] at ¶36(k), (l).[3] The timing of the First Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that Oxy /Wes Parties were on the cusp of a global midstream settlement. The First Carnero Action was a last-ditch effort to derail this comprehensive deal.

2. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the First Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

3. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12. Rather, Carnero asserted, the purpose of paragraphs 36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear." *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition

---

3 For clarity, this complaint cites entries on the docket of the First Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13.

4. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6. Rather than file an amended complaint, however, Carnero dismissed the lawsuit without prejudice. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could continue to use state courts to disrupt these Chapter 11 cases and utilize the bankruptcy process to extract value for itself.

5. On December 21, in an effort to resolve the ongoing dispute with Carnero, Plaintiffs commenced this action (the "Adversary Proceeding") to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts. In response, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") [Adv. Pro. Dkt. No. 8], while at the same time filing a new state court lawsuit against Plaintiffs in Harris County, Texas, seeking to evade this Court's jurisdiction for the second time (the "Second Carnero Action" and, together with the Carnero Action, the "Carnero Actions").

6. In the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Adversary Proceeding Dkt. No. 8 at ¶ 2. Plaintiffs prepared and presented to Carnero a proposed stipulation to that effect.[4] Carnero, however, did not agree to either sign the stipulation or dismiss the First Carnero Action with prejudice.

[4] The proposed stipulation is attached to the Amended and Supplemental Complaint as Exhibit A.

7. The Second Carnero Action—filed contemporaneously with the Motion to Dismiss—purports to press an entirely distinct (yet meritless) theory: that the Debtors, by agreeing to amend certain of their midstream agreements in connection with the Midstream Restructuring as contemplated under the Plan and as was their right under section 365, and the other non-Debtor Plaintiffs, by participating in the negotiations related thereto, breached the GGPA.

## ARGUMENT

8. Carnero bases its Motion to Dismiss on the new theories alleged in the Second Carnero Action, arguing that the Original Complaint does not state a case or controversy because Carnero (a) has offered the stipulation and (b) has taken different positions in the Second Carnero Action, compared to the First Carnero Action (i.e., the positions that were the focus of the Original Complaint). Because the Motion to Dismiss is premised on new theories and allegations that Carnero made only after Plaintiffs filed the Original Complaint, Plaintiffs have responded to the Motion to Dismiss by preparing an Amended and Supplemental Complaint, pursuant to Federal Rules of Civil Procedure 15(a) and 15(d) (each made applicable to this Adversary Proceeding pursuant to Bankruptcy Rule 7015). The Amended and Supplemental Complaint addresses the issues raised in the Motion to Dismiss—including the issues Carnero raises regarding jurisdiction—and renders it moot. *See Forbes v. Harris County Tex.*, No. CV H-17-2256, 2018 WL 4901034, at *3 (S.D. Tex. Oct. 9, 2018) (denying without prejudice motion for judgment on the pleadings because the amendment moots it); *see also Dixon v. Youngblood*, No. CV 20-743, 2021 WL 765380, at *1 (E.D. La. Feb. 26, 2021) ("if applying the pending motion to the amended complaint would cause confusion or detract from the efficient resolution of the issues, then it makes sense to require the defendant to file a new motion specifically addressing the amended complaint.").

9. Rule 15(a)(1)(B) provides a party a one-time opportunity to amend its pleading as a matter right, within “21 days after service of a motion under Rule 12(b)”. Under Rule 15(a)(2), a party may amend its pleading with the court’s leave which the court “should freely give . . . when justice so requires.” Rule 15(d) provides that “on motion and reasonable notice, the court may . . . permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented.”

10. Plaintiffs believe that they may file the Amended and Supplemental Complaint as a matter of right under Rule 15(a)(1)(b), based on the parties’ agreement to extend the deadline to respond to the Motion to Dismiss [Carnero Dkt. 10, 13, 15]. However, even if leave were required, Plaintiffs respectfully submit it would be warranted under the circumstances.

11. Carnero purports to have abandoned its contention that the contracts in question “obligate[d] . . . Mesquite [to] pursu[e] rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365” (Original Carnero Pet. at 36(k)), and now presses an entirely distinct theory challenging the assumption of certain midstream agreements in the bankruptcy case. The Original Complaint addressed Carnero’s original arguments; the Motion to Dismiss was based on Carnero’s purported abandonment of those contentions. The Court should grant Plaintiffs leave to file the Amended and Supplemental Complaint under both Rule 15(a) and 15(d).

12. A court’s discretion to grant leave is severely limited by the bias of Rule 15(a) favoring amendment. *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 598 (5th Cir. 1981). Leave to amend “should not be denied ‘unless there is a substantial reason to do so.’” *Jacobsen v. Osbourne,* 133 F.3d 315, 318 (5th Cir. 1998) (*quoting Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)). A reason is substantial if the proposed amendment would cause undue delay or prejudice to the non-movant, if it is motivated by bad faith or dilatory motives, if there

have been repeated failures to cure deficiencies with prior amendment, or if the amendment is futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also* M*artin's Herend Imports, Inc. v. Diamond & Gem Trading*, 195 F.3d 765, 770 (5th Cir. 1999); *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993). An amendment is only futile if it fails to state a claim on which relief can be granted. *See e.g., Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 127 (5th Cir. 2019).

13. Here, there is no undue delay or prejudice—Plaintiffs seek leave to amend to address new theories Carnero first asserted on the day it filed the Motion to Dismiss, in the Second Carnero Action. The Amended and Supplemental Complaint addresses these new theories and other issues raised in the Motion to Dismiss, and is not futile.

14. The Plaintiffs have not unduly delayed. Preparing a comprehensive response to the new theory and coordinating with the various parties and their respective counsel has required substantial effort. These efforts included the drafting of a proposed stipulation to confirm what Carnero's (carefully worded) motion suggested—namely, that (a) the GGPA and the Ratification Agreements do not obligate Plaintiffs to pursue or obtain rejection of the Midstream Agency Agreements or any of the Existing Commitments; (b) the Debtors' failure to continue seeking to reject the Midstream Agency Agreements or the Existing Commitments did not expose Plaintiffs to damages or other liability for breach of the GGPA or any other agreement with Carnero; and (c) the Debtors' assumption of the Midstream Agency Agreements does not breach the GGPA or any other agreement with Carnero. Carnero has not agreed to that stipulation.

15. No prejudice will result to Carnero, especially in light of Carnero's last-minute decision to withdraw its original complaint (rather than amend it as suggested before this Court at the December 7, 2021 hearing) and then to wait until the final day for responding to the above-

captioned Adversary Proceeding to announce that it had filed yet another state-court lawsuit. As the primary source of delay in this dispute, Carnero cannot plausibly claim undue prejudice by virtue of the filing of the Amended and Supplemental Complaint.

**CONCLUSION**

For the reasons set forth above and in the Amended and Supplemental Complaint, Plaintiffs request that the Court deny the motion to dismiss as moot, grant them leave to file the Amended and Supplemental Complaint, and grant them any such further relief to which they have shown themselves entitled.

[*Remainder of page intentionally left blank.*]

Respectfully submitted on March 1, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

# EXHIBIT 39

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

For the reasons set forth in the response filed by Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), to the motion to dismiss filed by Carnero G&P LLC ("Carnero" or "Defendant" and the "Motion

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

to Dismiss"), Plaintiffs move for leave to amend and supplement their complaint, in response to the Motion to Dismiss. Plaintiffs incorporate their response to the Motion to Dismiss, which is being filed contemporaneously with this motion, herein by reference. A copy of Plaintiffs' Amended and Supplemental Complaint is attached to Plaintiffs' Response to the Motion to Dismiss as Exhibit 1.

For the reasons set forth in the Response to the Motion to Dismiss, Plaintiffs request that the Court deny the Motion to Dismiss as moot, grant them leave to file the Amended and Supplemental Complaint pursuant to Federal Rules of Civil Procedure 15(a) and 15(d), and grant them any such further relief to which they have shown themselves entitled.

[*Remainder of page intentionally left blank.*]

Respectfully submitted on March 1, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P.**
**(f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff Mitsui**
**E&P Texas LP**

# EXHIBIT 40

# Exhibit 1 – Plaintiffs' Response to Motion to Dismiss

## Amended and Supplemental Complaint

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**AMENDED AND SUPPLEMENTAL COMPLAINT**

1 The Reorganized Debtors in these Chapter 11 Cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), by and through counsel, each bring this Amended and Supplemental Complaint (the "Amended Complaint") against Carnero G&P LLC ("Carnero" or "Defendant"), and in support thereof state as follows:

**INTRODUCTION[2]**

1. This adversary proceeding seeks to bring much-needed closure to the midstream restructuring of Debtors Sanchez Energy Corporation and its affiliates (collectively, "Debtors"). The Debtors commenced these Chapter 11 cases in August 2019. In April of 2020, the Debtors entered into an agreement with Carnero, which had a contract to serve as the Debtors' *backup* midstream provider, pursuant to which the Debtors agreed to seek rejection of the existing *primary* midstream agreements—but only for a limited period of time and subject to numerous conditions. If that rejection were successful, Carnero stood to become one of the Debtors' primary midstream service providers. The rejection did not succeed, and (only after continuing such efforts well beyond the contractually required period), the Debtors validly terminated the agreement with Carnero.

2. Still needing to restructure their midstream agreements, the Debtors began negotiating certain favorable amendments to the existing primary midstream agreements. Carnero

---

[2] Unless otherwise specified, capitalized terms used but not defined in this Amended Complaint shall have the meaning given them in the *Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1205] (as amended or supplemented from time to time, the "Plan").

For clarity, this Amended Complaint cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

then sought to disrupt those negotiations by filing a state-court lawsuit claiming, among other things, that its backup midstream agreement with the Debtors "obligate[d]" the Debtors to take action in Bankruptcy Court to terminate the existing primary midstream agreements, including "***pursuing rejection of [those agreements] under 11 U.S.C. Section 365***." Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[3] Plaintiffs here (defendants in state court) promptly removed that action to this Court. When confronted with this transparent attempt to claim that the lawsuit sought to cause a state court to interfere with exercise of the Debtors' rights under 11 U.S.C. § 365, Carnero's counsel disclaimed any such intent and indicated that Carnero would amend its complaint. Instead, Carnero withdrew that action *without prejudice*. Plaintiffs therefore filed the original version of this adversary proceeding seeking to adjudicate (among other things) Carnero's theory that it could use its backup midstream agreement to constrain the Debtors' rights under Section 365.

3. The same day that adversary was filed, the Debtors presented for this Court's approval an order authorizing the assumption of, and amendment to, the existing primary midstream agreements. Carnero appeared at the hearing and lodged no objection. This Court approved the assumption and amendment—as of the Effective Date—as expressly contemplated by the Plan (to which Carnero also had not objected). At long last, the midstream restructuring for these assets was complete.

4. A few weeks later, Carnero responded to this adversary proceeding by presenting yet another theory by which it sought to punish the Debtors for validly exercising its rights under Section 365 and the Plan. While purporting to abandon its prior argument that the Debtors were contractually required to reject the existing primary midstream agreements, Carnero now claimed

---

[3] For clarity, this Amended Complaint cites entries on the docket of the First Carnero Action (as defined below) as "Carnero Dkt. No__." The First Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that the Debtors were contractually prohibited from making *any amendment whatsoever* to those agreements when assuming them. That is, Carnero now contends that it holds a valid contractual right that imposes *post-reorganization* liability on the Debtors for negotiating favorable amendments to contracts as part of a Section 365 assumption decision. The Debtors' Plan expressly contemplates and allows assumption of contracts on amended terms as part of a midstream restructuring, and Carnero never objected to these Plan provisions. In addition, the Debtors' contract with Carnero does not prohibit or restrict the assumption and amendment of other midstream contracts. Even if it did, it would turn the Bankruptcy Code on its head to allow contracting parties to tie a debtor's hands in Chapter 11. To make matters worse, it remains far from clear whether Carnero is actually willing to definitively abandon its prior theory that the contract *requires* the Debtors to pursue rejection. Accordingly, Plaintiffs bring this amended adversary proceeding to bring to a close, once and for all, Carnero's attempt to scuttle the Debtors' midstream restructuring.

**THE PARTIES**

5. Plaintiff Maverick is a limited liability company organized under the laws of Delaware with its principal place of business in Houston, Texas.

6. Plaintiff Mesquite is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas.

7. Plaintiff UnSub is a limited partnership organized under the laws of Delaware with its principal place of business in Houston, Texas.

8. Plaintiff Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

9. Plaintiff Javelin is a limited partnership organized under the laws of Delaware with its principal place of business in Austin, Texas.

10. Plaintiff Mitsui is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

11. Defendant Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners, LP) with its principal place of business in Houston, Texas.

**JURISDICTION, VENUE, PREDICATES FOR RELIEF[4]**

12. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012). Moreover, this Court's jurisdiction was expressly contemplated by Article XI of the Plan, paragraph 43 of the Confirmation Order, paragraph 6 of the Carnero Settlement Approval Order, and Section 6.2.1 of the Carnero Settlement Agreement. The parties have concrete disagreements that fall squarely within this Court's jurisdiction and directly affect the success of the Plan:

- This controversy directly implicates the "implementation or execution" of the Plan's Midstream Restructuring and requires interpretation of at least four Plan provisions, including:
  - Article IV.G. (Vesting of Assets of the Reorganized Debtors), which provided that, on the Plan Effective Date, all property in each Debtor estate, all Causes of Action, and any property acquired by any of the Debtors vested in each applicable Reorganized Debtor "free and clear" of all Liens, Claims, charges, or other encumbrances;
  - Article V (Treatment of Executory Contracts and Unexpired Leases), which established the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts and unexpired leases, with such assumptions or rejections effective as of the Effective Date of the Plan;
  - Article V.F. (Modifications, Amendments, Supplements, Restatements, or Other Agreements), which provided that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall

[4] Unless otherwise specified, capitalized terms used but not defined in this "Jurisdiction, Venue, and Predicates for Relief" section shall have the meaning given them in the "Facts" section of this Complaint.

not be deemed to alter the…validity, priority, or amount of any Claims that may arise in connection therewith"; and

- Article VIII (Effect of Confirmation of the Plan), which provided for the discharge of claims against the Reorganized Debtors as of the Effective Date and exculpated the Reorganized Debtors from "any claim related to any act or omission…in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoined all claims released or discharged pursuant to the Plan.

- This controversy requires interpretation of at least five of the Court's prior orders, including:
  - the Confirmation Order [Dkt. No. 1212], which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, *provided* that it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do);
  - the Carnero Settlement Approval Order [Dkt. No. 1415], which approved the Carnero Settlement Agreement but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interest;
  - the Stipulation of Dismissal and Agreed Order [Dkt. No. 1983], which approved the assumption and rejection of certain agreements with UnSub;
  - the PMA Assumption Order [Dkt. No. 2201], which approved the assumption of certain production marketing agreements pursuant to the Plan; and
  - the Oxy/Wes Stipulation And Agreed Order [Dkt. No. 2253], which approved the assumption of certain of the Debtors' midstream contracts as amended pursuant to the settlement with the Oxy/Wes Parties and effected the Midstream Restructuring.
- This controversy raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, Section 3.1(b) of the GGPA would be unenforceable as a matter of federal bankruptcy law because it would subject the Debtors to significant liability or Carnero termination rights simply because—without extending the term of the Existing Commitments or otherwise expanding their scope—the Debtors negotiated ***improvements*** to their midstream cost structure that benefited the estate and were necessary to effect the Midstream Restructuring.
- Lastly, this controversy implicates important federal policy interests underlying the Bankruptcy Code: primarily, whether awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying Section 365 of the Bankruptcy Code.

13. The statutory and legal predicates for the relief are 11 U.S.C. §§ 105(a), 365, 524, 1123, and 1141; 28 U.S.C. §§ 157, 1334, 1367, 2201 and 2202; Rules 3020(d), 4007, and 7001 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Plan, the Confirmation Order, the Oxy/Wes Stipulation and Agreed Order, the Oxy/Wes Settlement Agreement, the Carnero Settlement Approval Order, the Carnero Settlement Agreement, the Stipulation of Dismissal and Agreed Order, and the PMA Assumption Order.

14. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157, and the Court may enter final orders for matters contained herein.

15. Venue is proper in this district pursuant to 28 U.S.C. §1409, and because Carnero consented to this venue in the Carnero Settlement Agreement and resides in this District.

16. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7008-1, Plaintiffs consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### I. The Existing Commitments

17. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko"), and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in South Texas (the "Comanche Assets"). In January 2017, pursuant to that certain Purchase and Sale Agreement dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan Resources, LLC ("Gavilan"), purchased the working interests of Anadarko in the Comanche Assets. The transaction closed on or about March 1, 2017.

18. Prior to the sale of the Comanche Assets, Anadarko had acquired and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. To that end, Anadarko and certain of its affiliates contracted

with several midstream parties who made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Existing Commitments"). As relevant here, the Existing Commitments include, without limitation, the commitments contained in the agreements listed below:[5]

**Table 1: Existing Commitments**

| Agreement | Service Type |
|---|---|
| Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD ("**ETC Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP ("**Brasada Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC[6] | Infield gas gathering |
| Transportation Services Agreement dated March 1, 2012 between Enterprise Products Operating LLC and Anadarko Energy Services Company | Transportation |
| Purchase Agreement dated March 1, 2012 between Anadarko Energy Services Company and Enterprise Products Operating LLC | Purchases at tailgate of Brasada plant |

5 The summary of Existing Commitments contained herein is provided for descriptive purposes only, does not include all agreements, and is qualified in its entirety by the actual agreements, including any and all amendments and modifications thereto.

6 Each of the WIPs also had its own separate lease dedication and gas gathering agreements with Springfield Pipeline LLC, which agreements also constitute Existing Commitments.

19. While the purchasers sought to buy all of Anadarko's interests in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their transfer.[7] Maverick and Anadarko therefore entered into two agency agreements (collectively, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements.[8] Maverick would thus receive the benefits of such agreements and also undertake Anadarko's obligations thereunder.

## II. The GGPA and the Ratification Agreements

20. On April 1, 2018, Maverick and Carnero entered into a back-up midstream agreement—the Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA")—for production from the Comanche Assets. Pursuant to the GGPA, Carnero is second in line for Maverick's hydrocarbons, behind certain agreed-upon commitments and dedications, including the Existing Commitments. Specifically, Section 3.1(b) of the GGPA provides as follows:

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) **is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero**, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to

[7] The Retained Agreements included the Brasada Processing Agreement and the ETC Processing Agreement (collectively, the "Retained Gathering and Processing Agreements") as well as the following marketing contracts: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv) the Enterprise Products Purchase Agreement (collectively, the "Retained Marketing Agreements").

[8] The Midstream Agency Agreements include: (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, AEP, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 Agreements (collectively, the "Marketing Agency Agreement"); and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, AEP, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as amended and modified from time to time (the "GPA Agency Agreement").

> Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), **such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment…and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…**

GGPA, § 3.1(b) (emphasis added). Exhibit F to the GGPA lists the agreements described above in Table 1 "**and associated amendments if any**" to those agreements. GGPA, Ex. F (emphasis added).[9] The GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. Carnero's argument that the GGPA prohibits *all* amendments to the Existing Commitments is thus patently at odds with the plain language of the GGPA.

21. On the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford, Javelin, and Gavilan also executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively referred to as the "Ratification Agreements"). UnSub, the WIPs and Gavilan thus ratified Maverick's commitment to deliver hydrocarbons to Carnero subject to the Existing Commitments.

---

[9] While Exhibit F to the GGPA lists certain agreements not described in Table 1, those agreements either terminated pursuant to their terms before the date of this filing, were rejected pursuant to the Plan, and/or do not contain commitments that prevent delivery of the subject hydrocarbons to Carnero.

## III. **<u>Mesquite Purchases Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments</u>**

22. In October 2020, pursuant to that certain "363" Asset Purchase Agreement dated October 16, 2020 (the "<u>Gavilan PSA</u>"), approved by this Court,[10] Mesquite Comanche Holdings, LLC ("<u>MCom</u>"), a wholly-owned subsidiary of Mesquite, acquired certain of Gavilan's interests in the Comanche Assets. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Plaintiff's Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, pursuant to Section 2.05(a) of the Gavilan PSA, MCom acquired Gavilan's interest in the Comanche Assets "free and clear of all claims, encumbrances, Liens or Liabilities **<u>other than the Assumed Liabilities and Permitted Liens</u>**[.]" Gavilan PSA, §2.05(a) (emphasis added); Def. "Free and Clear." "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Gavilan PSA, Ex. I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA.[11] Gavilan PSA, Disclosure Schedule 3.05(a) at 1. Accordingly, while Gavilan did not assign the Comanche PSA to Mesquite or MCom, it sold its assets to Mesquite's designee, MCom, subject to the covenants in the Comanche PSA, including the requirement that Mesquite and MCom honor the Existing Commitments.

23. Consistent with the terms of the Gavilan PSA, this Court's order approving the sale (the "<u>Gavilan Sale Order</u>") provided that the assets vested in MCom "free and clear of all claims,

---

[10] The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020).

[11] Disclosure Schedule 3.05(a) also lists the GGPA and the Ratification and Assumption Agreement, dated May 22, 2018, among Gavilan, Maverick and Carnero whereby Gavilan ratified the GGPA. Gavilan PSA, Disclosure Schedule 3.05(a) at 24.

encumbrances, Liens or Liabilities of any kind or nature whatsoever, **other than the Assumed Liabilities and Permitted Liens**[.]" *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020) [Dkt. No. 361 at ¶ V] (emphasis added). Pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments.

24. In any event, pursuant to Section 3.1(j) of the GPA Agency Agreement, Mesquite (as successor to Maverick) is required to "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Midstream Contracts, including all Hydrocarbons attributable to…[Maverick], Unsub and [Gavilan]." The "Retained Midstream Contracts" are listed on Schedule 1.1(b) and include each of the Existing Commitments described above in Table 1. Moreover, Gavilan was bound to sell its hydrocarbons to Maverick pursuant to certain marketing agreements (the "Gavilan Marketing Agreements"), all of which were assumed and assigned to MCom. MCom thus remains bound to sell its hydrocarbons to Maverick who, in turn, must transport and sell them subject to the Existing Commitments pursuant to the GPA Agency Agreement. Even if MCom had not acquired Gavilan's assets subject to the Existing Commitments pursuant to the Gavilan PSA and the Gavilan Sale Order (which it did), the GPA Agency Agreement and the Gavilan Marketing Agreements independently require Maverick to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments.

## IV. The Debtors' Midstream Restructuring

25. As the Court is aware, these Chapter 11 Cases followed an unusual course. On April 30, 2020, the Court confirmed the Debtors' Plan of reorganization under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [Dkt. No. 1212] (the "Confirmation Order"). The Plan provided for, among other things, the equitization of

approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed the implementation of the Debtors' Midstream Restructuring. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp*., 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). To forestall liquidation, Sanchez and its creditors agreed to confirm a Chapter 11 plan first, and restructure the Debtors' midstream operations later. *Id.*

26. The Plan, however, could not be consummated until the DIP Lenders were satisfied that the Reorganized Debtors would have sufficient liquidity to operate in the ordinary course of business after the Effective Date. *See* Plan at 38 (Art. IX.B.3.).[12] Because the Debtors' midstream operations were weighed down by above-market contracts and rates, identifying a viable approach to improve the Debtors' midstream cost structure was crucial to securing the needed liquidity. *See Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "Carnero Settlement Motion") at ¶ 3; *see also* June 29, 2020 Hr'g Tr. at 30:21-22.

27. The Plan and Confirmation Order thus gave the Debtors flexibility to renegotiate their midstream contracts and established a post-confirmation procedure to resolve assumption and rejection disputes with midstream providers. Specifically, the Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C (as amended, the "Assumption Schedule") to the Plan Supplement. *See* Confirmation Order at ¶¶ 17 – 26; Plan at 26 - 37 (Art.

[12] Article IX.B.3 of the Plan provides that "it shall be a condition to the occurrence of the Effective Date" that Requisite DIP Lenders "be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date . . . reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date."

V.B.). If no party in interest filed a timely objection, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date, except insofar as the objection deadline had been extended. *Id.* If an objection was timely filed, the Confirmation Order provided that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" or as may be agreed upon by the parties. Confirmation Order at ¶ 17. All assumptions and rejections of executory contracts were deemed effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection was after the Effective Date. *Id.*

28. As is typical, the Plan and Confirmation Order provided that the Debtors would emerge from bankruptcy with a clean slate, free from any liability arising out of the implementation of the Midstream Restructuring. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Notably, Article IV.F. of the Plan provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]."[13] Confirmation Order at ¶ 23. Several counterparties preserved their rights by filing timely objections. Carnero did not.

[13] The May 20th deadline was extended to June 22, 2020, by an order of this Court dated May 20, 2020 [Dkt. No. 1267].

29. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] **any Restructuring Transaction**" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covered the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

30. Pursuant to Article XI of the Plan, the Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "resolve any matters related to…(c) the Debtors or the Reorganized Debtors **amending, modifying, or supplementing, after the Effective Date**, pursuant to the Plan, **any Executory Contracts** or Unexpired Leases[.]" Plan at 40 (Art. XI) (emphasis added). The Confirmation Order likewise provided that the Bankruptcy Court retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of th[e] Confirmation Order." Confirmation Order at ¶ 43.

### A. Settlement Agreement with Carnero

31. Following confirmation of the Plan, the Debtors continued to work on identifying, finalizing, and implementing a strategy to restructure their midstream arrangements to reduce costs, rates, and fees. In early June 2020, the Debtors reached a settlement with a group of existing

midstream and marketing service providers, including Carnero. *Id.* at ¶ 4. The Carnero Settlement Agreement[14] provided, among other things, as follows:

a) Carnero would return $8 million from the proceeds of a $17 million letter of credit drawn by Carnero under the existing GGPA. *See* Carnero Settlement Agreement at § 2.1;

b) Seco Pipeline would contribute to the Debtors a nearly $2 million administrative expense claim it had asserted in connection with the Debtors' postpetition termination of an agreement between the parties. *Id.* at § 2.4;

c) The Debtors agreed during the term of the Carnero Settlement Agreement not to remove any executory contracts or unexpired leases from the Assumption Schedule, which at the same time included the GGPA (*id.* at § 2.2.1(d));

d) The settlement parties agreed to conditionally amend certain existing agreements (the "Carnero Agreement Amendments"), but only if certain transactions contemplated by the Settlement Agreement successfully closed. *Id.* at § 2.5; and

e) The Debtors agreed to pursue rejection of the Affirmative Covenant Agreements (as defined in the Carnero Settlement Agreement), including the Midstream Agency Agreements. *Id.* at § 2.2.1(a)(iii). The Carnero Agreement Amendments would take effect only if the Debtors succeeded in rejecting the Affirmative Covenant Agreements. *Id.* at § 2.5.2.

By its plain terms, the Carnero Settlement Agreement did not purport to determine a definitive path to restructure the Debtors' midstream operations. To the contrary, the parties had the option to terminate the Carnero Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by then been entered rejecting the Affirmative Covenant Agreements. *See* Carnero Settlement Agreement at § 5.1.2. If the Debtors exercised their option to terminate instead of continuing to pursue rejection of the Affirmative Covenant Agreements, Carnero's sole remedy was to seek the return of all letter of credit amounts actually delivered by Carnero (*i.e.*, the $8 million). *Id.* at § 2.2.1(b). The Carnero Settlement Agreement specifically provided that return of the letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Affirmative Covenant

[14] The Carnero Settlement Agreement is attached as Exhibit A to the Carnero Settlement Motion.

Agreements. *Id*. Once the Settlement Agreement terminated, the Debtors were no longer required to continue to pursue rejection of the Affirmative Covenant Agreements. *See id.* at § 6.4.

32. Multiple parties, including UnSub and the WIPs, objected to the proposed Carnero Settlement Agreement, arguing that the settlement favored the Debtors' Catarina interests at the expense of the Comanche Assets.[15] The Court convened a hearing (at which Carnero's counsel appeared), ultimately approving the settlement without objection after all parties in interest agreed to substantial modifications to the settlement approval order. *See Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [Dkt. No. 1415] (the "Carnero Settlement Approval Order").

33. At the hearing, the Court and the parties extensively discussed the Carnero Settlement Approval Order's limited and conditional effect. More particularly, UnSub and the WIPs vigorously disputed any suggestion that the Carnero Settlement Approval Order would actually resolve the midstream restructuring of the Comanche Assets. The Court framed this question explicitly at the outset of the settlement hearing:

> THE COURT: Let me find out from the advocates again whether, if we approve this, there then becomes an irrevocable transaction that is set into motion where parties who could object today to it won't be able to object --

June 29, 2020 Hr'g Tr. at 18:15-18.[16]

---

15 *See Limited Objection of Venado Oil & Gas, LLC, And Its Direct and Indirect Subsidiaries, Eagle Ford TX LP, And Mitsui E&P Texas LP to Debtors' Settlement Motion* [Dkt. No. 1351]; *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP to Debtors' Settlement Motion* [Dkt. No 1373]; *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Settlement Motion* [Dkt No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Settlement Motion* [Docket No. 13200].

16 The June 29, 2020, hearing transcript is available at Dkt. No. 1418.

34. The parties' argument and colloquies with the Court—none of which Carnero's counsel disputed—repeatedly acknowledged that the Carnero Settlement Approval Order *would not* preordain the Debtors' ultimate midstream restructuring. Debtors' counsel stated as follows:

> Furthermore, Your Honor, as you will hear from Mr. Meghji, nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA, ADA, midstream contract, or any other contract. Again, it was the debtors' intent that all of their rights are preserved. And to the extent additional language should be crafted to add to the order to confirm that point, we are open and welcome that language.

June 29, 2020 Hr'g Tr. at 27:12-19. Counsel for the DIP lenders (which acquired the equity of the Reorganized Debtors pursuant to the Plan) agreed, explaining that the Carnero Settlement Agreement and resulting assumption of the GGPA was only the beginning of the midstream restructuring process:

> The settlement agreement itself does not effectuate a guarantee of midstream restructuring. It is only a roadmap; and frankly, a roadmap that was already signaled in the schedules filed before the plan was confirmed.

> successful. It's no guarantee that all the contracts can or will be assumed rejected. But that's not the issue for today. It gives the debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears. They give back the $8 million. And if it's not done by October 1st, they don't have to give the $8 million. They can still terminate in 95 days or so.

June 29, 2020 Hr'g Tr. at 34:22 – 25; 41:5 – 11.

35. Notably, counsel for the DIP Lenders explained that the Debtors would have to renegotiate the Affirmative Covenant Agreements (which had unsustainable, above-market rates) if they were unable to reject them, and explicitly acknowledged the settlement parties' understanding that the Carnero Settlement Agreement and resulting assumption of the GGPA would not prevent the Debtors from exploring all their options in such negotiations:

> In any event, the settlement agreement already acknowledges that there may be a need to continue negotiations with all of these parties. There are many conditions precedent here. And if any one of them cannot be met, the debtors will need to renegotiate terms. The objecting parties simply want more leverage in those negotiations.
>
> In addition, there is nothing in the agreement that prevents the debtors from considering all their options in such negotiations. The settlement agreement allows the debtors to

June 29, 2020 Hr'g Tr. at 37:25; 28:1-8. Carnero's counsel did not object to this characterization of the parties' commercial understanding.

36. Following these exchanges, the Court confirmed what the parties had acknowledged: that the Carnero Settlement Approval Order did not constrain the Debtors' ultimate restructuring of the existing Comanche midstream contracts:

THE COURT: No, that's -- I think I'm hearing
everybody tell me that when it comes time to determine whether
the contracts that affect the Comanche asset should be
rejected, that I'm going to be asked to determine whether
there's been a proper exercise of fiduciary duty with respect
to the manager of those assets.
And I -- that seems to say that everyone is agreeing
to that, which means approval of this has only upside and no
downside. But maybe I'm missing something and we'll hear --

June 29, 2020 Hr'g Tr. at 67:6 – 14.

37. At the conclusion of the hearing, the Court approved the settlement and entered the Carnero Settlement Approval Order. The Carnero Settlement Approval Order expressly and repeatedly reflected the settlement's limited and conditional nature. Specifically, the order (i) recognized that the Debtors *might not* ultimately reject the Affirmative Covenant Agreements (*id.* at ¶¶ 11, 13); (ii) preserved all rights and objections of UnSub and the WIPs to dispute rejection of the Affirmative Covenant Agreements (*id.* at ¶ 7); and (iii) preserved this Court's jurisdiction with respect to all matters "arising from or related to the [Carnero] Settlement Agreement or [the Carnero Settlement Approval Order]" (*id.* at ¶ 6).

38. Consistent with the terms of the Carnero Settlement Agreement and the Carnero Settlement Approval Order, Carnero returned the $8 million letter of credit proceeds to Mesquite, and Seco Pipeline contributed the $2 million administrative expense claim it had asserted against the Debtors. The Plan became effective on June 30, 2020. *See Notice of Effective Date* [Dkt. No. 1417].

39. As required by the Carnero Settlement Agreement, the Debtors diligently pursued rejection of the Affirmative Covenant Agreements via the adversary proceeding captioned

*Occidental Petroleum Corp., et al. v. Sanchez Energy Corp. et al*., Adv. Pro. No. 20-03198 [MI] ("Sanchez/Oxy Adversary"). Certain counterparties to the Affirmative Covenant Agreements (collectively, the "Oxy/Wes Parties")[17] objected to the Debtors' proposed rejection of those agreements, arguing that the agreements created covenants running with the land or equitable servitudes and were thus not subject to rejection under Section 365 of the Bankruptcy Code. *See Plaintiff's Motion for Summary Judgment* [Sanchez/Oxy Dkt. No. 50] at ¶¶ 37-133.[18] The Debtors aggressively pursued their efforts to reject the Affirmative Covenant Agreements, litigating cross-motions for summary judgment and exchanging voluminous discovery with the Oxy / Wes Parties.

40. At no point did Carnero offer to reimburse the Debtors for either the fees and expenses they incurred attempting to reject the Affirmative Covenant Agreements, or for the rejection damages Mesquite (as successor to Sanchez Energy Corporation) would owe if it succeeded in rejecting the agreements. Ultimately, on June 24, 2021—nearly a full year after approval of the Carnero Settlement Agreement and nine months *after* the Carnero Settlement Agreement's Closing Outside Date—Mesquite exercised its contractual right to terminate the Settlement Agreement. Mesquite subsequently returned the $8 million in letter of credit proceeds to Carnero.

**B. Settlement Agreement with the Oxy/Wes Parties**

41. The Debtors then began to explore other options to reduce their midstream costs. In December 2021, Mesquite reached a settlement with the Oxy/Wes Parties, which resolved the parties' dispute in the Oxy/Wes Adversary and provided a framework for the Debtors to obtain

[17] The Oxy/Wes Parties include Occidental Petroleum Corporation, Anadarko Petroleum, Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP.

[18] For clarity, this Amended Complaint cites entries on the docket of the Sanchez/Oxy Adversary proceeding as "Sanchez/Oxy Dkt. No__."

rate relief and implement the Midstream Restructuring. The Oxy/Wes Settlement Agreement provided, among other things, as follows:

a) the Reorganized Debtors agreed to assume certain midstream contracts (the "Assumed Comanche Agreements") pursuant to the Plan, including certain of the Affirmative Covenant Agreements;

b) the parties agreed to amend certain of the Assumed Comanche Agreements to reduce the Reorganized Debtors' midstream cost structure;

c) the Reorganized Debtors agreed to reject certain midstream contracts (the "Rejected Comanche Agreements") pursuant to the Plan; and

d) the Oxy/Wes Parties agreed to dismiss the Oxy/Wes Adversary Proceeding.

42. The Midstream Restructuring did not extend the term of the Existing Commitments or otherwise expand their scope.

43. On December 21, 2021, Mesquite filed a stipulation and agreed order (the "Oxy/Wes Stipulation and Agreed Order") dismissing the Sanchez/Oxy Adversary and for assumption of the Assumed Comanche Agreements and rejection of the Rejected Comanche Agreements. *See Stipulation and Agreed Order* [Dkt. No. 2253]. The Oxy/Wes Stipulation and Agreed Order clearly states that certain of the Assumed Comanche Agreements would be amended pursuant to the Oxy/Wes Settlement Agreement. Carnero did not object.

44. At a hearing on that same day, the Court approved the Oxy/Wes Stipulation and Agreed Order. Carnero's counsel appeared at the hearing but raised no objection to the assumption of the Assumed Comanche Agreements as amended pursuant to the Oxy/Wes Settlement Agreement. Instead, Carnero has repeatedly sought to use state courts to upend these Chapter 11 Cases and extract additional value to which it has no contractual right.

## V. <u>Carnero's Evolving Theories and Repeated Efforts to Upend the Debtors' Midstream Restructuring and Evade This Court's Jurisdiction</u>

45. On July 30, 2021, Carnero filed a lawsuit (the "<u>First Carnero Action</u>") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The First Carnero Action sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreement, and (ii) after rejection of the Midstream Agency Agreement, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See* Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[19] The timing of the First Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that Oxy/Wes Parties were on the cusp of a global midstream settlement. The First Carnero Action was a last-ditch effort to derail this comprehensive deal.

46. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the First Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

47. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed

---

19 For clarity, this complaint cites entries on the docket of the First Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12. Rather, Carnero asserted, the purpose of paragraphs 36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear. " *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13.

48. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6. Rather than file an amended complaint, however, Carnero dismissed the lawsuit without prejudice. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could continue to use state courts to extract value for itself as a result of these Chapter 11 Cases.

49. On December 21, Plaintiffs commenced this action (the "Adversary Proceeding") to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts. In response, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") [Adv. Pro. Dkt. No. 8] in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, seeking to evade this Court's jurisdiction for the second time (the "Second Carnero Action" and, together with the Carnero Action, the "Carnero Actions").

50. In the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Motion to Dismiss at ¶ 2. Plaintiffs

prepared and presented to Carnero a proposed stipulation to that effect.[20] Carnero, however, did not agree to either sign the stipulation or dismiss the First Carnero Action with prejudice. Nevertheless, the Second Carnero Action presses an entirely distinct (yet meritless) theory: that Plaintiffs breached the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring. This Amended Complaint seeks to confirm—free from doubt or further attempts by Carnero to use state courts to upend these Chapter 11 Cases—Debtors' rights under the Bankruptcy Code, the Plan, and the Confirmation Order, to restructure their midstream contracts.

## CLAIMS FOR RELIEF

## COUNT I

### (Plaintiffs Maverick and Mesquite Against Defendant Carnero)

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That MCom Acquired Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments

51. Plaintiffs Maverick and Mesquite incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

52. An actual controversy exists as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

53. The requested declaration from this Court would serve the important and much-needed purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

[20] The proposed stipulation is attached hereto as Exhibit A.

54. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, as demonstrated above, (i) the Gavilan PSA explicitly provided that MCom acquired Gavilan's interest in the Comanche Assets subject to "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the Comanche PSA, including the requirement that MCom honor the Existing Commitments; (ii) the Gavilan Sale Order provided that the assets vested in MCom subject to the covenants in the Comanche PSA; (iii) the GPA Agency Agreement independently requires MCom to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments; and (iv) the Gavilan Marketing Agreements require MCom to sell its hydrocarbons to Maverick who is bound to honor the Existing Commitments. *See supra* ¶¶ 22-24.

55. Accordingly, Plaintiffs Maverick and Mesquite respectfully request a declaratory judgment that, (i) pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments and (ii) the GPA Agency Agreement and Gavilan Marketing Agreements require Maverick to transport and sell all of Gavilan's hydrocarbons acquired by MCom subject to the Existing Commitments.

## COUNT II

### (All Plaintiffs Against Defendant Carnero)

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Plaintiffs Did Not Breach the Terms of the GGPA by Agreeing to Amend Certain of the Debtors' Midstream Contracts in Connection with the Midstream Restructuring

56. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

57. An actual controversy exists as to whether Plaintiffs breached the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

58. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code and the Plan to implement the Midstream Restructuring.

59. Carnero alleges that Plaintiffs breached the GGPA "by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they 'exist[ed] on the Effective Date' of the GGPA for the 'then-current term of such Existing Commitment.'" Amended Petition at ¶ 43 [Dkt. No. 2418-4]. Carnero is wrong.

60. As demonstrated above, the GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. *See supra* ¶ 20. Carnero's theory that the GGPA prohibits *all* amendments to the Existing Commitments is thus inconsistent with the plain terms of the GGPA. And even if the GGPA did prohibit *some* amendments to the Existing Commitments, it certainly does not prohibit the amendments and transactions at issue here, which did not deny Carnero of the benefit of its

prepetition contractual bargain to collect fees from gathering, processing, and purchasing the subject hydrocarbons per the terms of the GGPA.

61. Accordingly, Plaintiffs respectfully request a declaratory judgment that they did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

**COUNT III**

**(All Plaintiffs Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That—As Carnero Reads It—Section 3.1(b) of the GGPA is Unenforceable Under Bankruptcy Law)**

62. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

63. An actual controversy exists as to whether—if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law.

64. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether Mesquite may amend its midstream agreements to effectuate the Midstream Restructuring without incurring liability for breach of the GGPA.

65. Even if (as Carnero claims) the GGPA imposes liability on Plaintiffs for agreeing to amend certain of their midstream contracts, such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption…Such a policy… insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp.*, 19 B.R. 537, 544

(Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp.*, 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

66. Part and parcel of the federal bankruptcy policy underlying a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."). Indeed, the practical effect of section 365 is to force all creditors doing business under executory contracts with the debtor to renegotiate their mutual rights. *See Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975); *see also In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for assumption").

67. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (i) condition consent to assignment upon payment by the debtor of an "assumption fee;"[21] (ii) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the

---

21 *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S. D. 1987).

non-debtor third party to such contract upon assignment;[22] (iii) provide for any rights of first refusal on a counterparty's part;[23] and (iv) provide for any recapture or termination rights in favor of the counterparty.[24]

68. Courts routinely invalidate such punitive provisions because they contravene the central purpose of Section 365 by restricting the debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on the debtor for utilizing the tools of the Bankruptcy Code to negotiate better commercial terms that maximize the value of the estate, particularly where, as here, those terms do not injure said creditor. Awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

69. Accordingly, Plaintiffs respectfully request a declaratory judgment that (as Carnero reads it) Section 3.1(b) of the GGPA is unenforceable under bankruptcy law.

---

22 *See In re Golfsmith Int'l Holdings, Inc*., No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *Robb v. Schindler*, 142 B.R. 589 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196 (Bankr. S. D. N. Y. 1982).

23 *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

24 *See In re Fairway Group Holdings Corp.*, *et al.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc.*, *et al.*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008)

**COUNT IV**

**(Plaintiffs Mesquite and Maverick Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Carnero's Breach of Contract Claims Are Barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation And Agreed Order)**

70. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

71. An actual controversy exists as to whether Carnero's breach of contract claims are barred by the Plan and the Confirmation Order.

72. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Plan and Confirmation Order bar breach of contract claims arising out of the Debtors' implementation of the Midstream Restructuring.

73. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Article IV.F. of the Plan further provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]." Confirmation Order at ¶ 23. Carnero did not preserve its rights by filing a timely objection. Accordingly, Carnero is now barred from arguing that the amendments to certain of the Assumed Comanche Agreements breached the terms of the GGPA.

74. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covers the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

75. Moreover, the Oxy/Wes Stipulation and Agreed Order approved the assumption of the Assumed Comanche Agreements *as amended pursuant to the Oxy/Wes Settlement Agreement*. Carnero did not file a written objection to the Oxy/Wes Stipulation and Agreed Order. Nor did Carnero's counsel raise any objections at the hearing. Instead, in disregard of this Court's prior orders, Carnero filed an action in state court seeking (for the second time) to evade this Court's jurisdiction.

76. Plaintiffs Mesquite and Maverick respectfully request that the Court put an end to Carnero's repeated efforts to use state courts to upend these Chapter 11 Cases and seek a declaratory judgment that Carnero's breach of contract claims are barred by the Plan, Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order.

**COUNT V**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Section 365 Gives Mesquite the Power to Breach the Midstream Agency Agreements, Not The "Right or Option to Terminate" Those Agreements**

77. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

78. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether Mesquite's right under Section 365 to reject the Midstream Agency Agreements can be deemed a "right or option to **terminate**" those agreements. According to Carnero, because Section 365 provides Mesquite with a "right or option to terminate" the Midstream Agency Agreements (and the Existing Commitments contained therein), Mesquite's decision to assume (rather than reject) those agreements constitutes a breach of Section 3.1(b) of the GGPA, which requires that Mesquite exercise "any right or option to **terminate** such Existing Commitments . . . without out-of-pocket cost." GGPA, § 3.1(b) (emphasis added).

79. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code to assume the Midstream Agency Agreements.

80. The Bankruptcy Code is unequivocal that rejection of an executory contract such as the Midstream Agency Agreements does not present a "right or option to terminate" a contract; rather, rejection "constitutes a *breach* of such contract." 11 U.S.C. § 365(g) (emphasis added). Numerous courts, including the Fifth Circuit, have "held that this language does not mean that the

executory contract or lease has been terminated, but only that a breach has been deemed to occur." *Matter of Austin Dev. Co*., 19 F.3d 1077, 1082 (5th Cir. 1994) (citing *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank, Nat'l Ass'n*, 826 F.2d 434, 436–37 (6th Cir.1987). The "decision to reject is thus correctly viewed only as a *power to breach the executory contract*" not as a right or option to terminate such contract. *Id.* (emphasis added). The Supreme Court recently reaffirmed this understanding, holding in *Mission Product Holdings, Inc. v. Tempnology, LLC* that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach." 139 S. Ct. 1652, 1661 (2019); *see also In re United DC,* Inc., No. 12-32620, 2013 WL 310311, at *4 (Bankr. S.D. Tex. Jan. 25, 2013) (Isgur, J.) (holding that rejection "is considered a breach rather than termination").

81. As the Fifth Circuit explained, "Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract." *Id.* (emphasis in original). Congress was "not confused in its differing usages of the terms rejection, breach and termination." *Id.* at 1083.

82. Moreover, "breach and termination of leases or executory contracts are not synonymous terms under state law." *Id.* (citing *Resolution Trust Corp. v. Cramer*, 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law)); *In re Storage Technology, supra; In re Picnic 'N Chicken, Inc*., 58 B.R. 523, 525 (Bankr. S. D. Cal. 1986) (California law). Congress "could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so." *Id.*

83. Accordingly, Section 365 gave the Debtors the statutory power to *breach* the Midstream Agency Agreements, not the "right or option to *terminate*" those contracts.

**COUNT VI**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Rejection Imposes "Out-of-Pocket Cost" On the Debtor**

84. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

85. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether rejection imposes "out-of-pocket cost" on the Debtors.

86. A declaration from this Court would serve the important purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Debtors may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

87. Carnero has asserted that the Debtors can reject the Midstream Agency Agreements without incurring "out-of-pocket cost." Carnero is wrong. A "rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for **damages**." *Mission Product Holdings, Inc.*, 139 S. Ct. at 1661 (emphasis added). If Mesquite succeeded in rejecting the Midstream Agency Agreements, it would have owed its counterparties rejection damages for its failure to honor the Existing Commitments. Those damages would undoubtedly be substantial.

88. Accordingly, Mesquite would incur significant out-of-pocket cost if it rejected the Midstream Agency Agreements.

**COUNT VII**

**(Plaintiffs Mesquite and Maverick Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) that Carnero Breached the Settlement Agreement)**

89. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

90. An actual controversy exists as to whether Carnero breached the Carnero Settlement Agreement.

91. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, a declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Carnero Settlement Agreement's provision for conditional assumption of the GGPA reflected the parties' intent to impose liability on Mesquite if, after validly terminating the Settlement Agreement, Mesquite ultimately assumed the Midstream Agency Agreements.

92. Section 2.2.1(d) of the Carnero Settlement Agreement required that the Debtors not remove any executory contracts from the Assumption Schedule, which included the GGPA. The Carnero Settlement Agreement thus caused the conditional assumption of the GGPA. The assumption of the GGPA, however, was not unqualified. The Carnero Settlement Agreement gave the Debtors the option to terminate that agreement if an order rejecting the Midstream Agency

Agreements had not been entered by October 1, 2020, and specifically provided that return of the $8 million letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Midstream Agency Agreements. *Id*. The obligation to pursue rejection was not among the enumerated provisions that would survive termination of the Carnero Settlement Agreement. *Id*. at § 6.4.

93. The parties repeatedly acknowledged at the June 29-30, 2020 hearing that the Settlement Approval Order (and resulting assumption of the GGPA) would not preordain the Debtors' midstream restructuring. Carnero's counsel did not dispute any of these statements. Nor did Carnero object to the language of the Carnero Settlement Approval Order, which expressly recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements. Settlement Approval Order at ¶¶ 11, 13. The parties' understanding was crystal clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and failing to continue to pursue rejection of the Midstream Agency Agreements. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating the First Carnero Action.

94. Moreover, the Carnero Settlement Approval Order and the Carnero Settlement Agreement both provided that the Bankruptcy Court would retain jurisdiction with respect to all matters arising from or relating to the Carnero Settlement Agreement, including any issues relating to the Debtors' assumption of the GGPA. Settlement Approval Order at ¶ 6; Settlement Agreement, § 6.2.1. This Court had jurisdiction over both Carnero Actions as a core proceedings because the actions (i) went to both Mesquite's rights and the Court's authority under Section 365 and (ii) involved rights created by bankruptcy law and required interpretation and enforcement of this Court's orders. Even if the Carnero Actions were not core proceedings, the Court—at a

minimum—had "related to" jurisdiction which requires only that the matter "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

95. Carnero was thus obligated to bring the Carnero Actions before this Court and breached this obligation by filing them in state court. Section 6.3 of the Carnero Settlement Agreement awards non-breaching parties "attorneys' fees and costs" as "a remedy for any such breach." Accordingly, Mesquite and Maverick respectfully request attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

I. On Count II, declaring that Plaintiffs did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring;

II. On Count III, declaring that—if Carnero's reading were correct—Section 3.1(b) of the GGPA is unenforceable under bankruptcy law;

III. On Count V, declaring that, as a matter of bankruptcy law, Section 365 of the Bankruptcy Code gives Mesquite the power to breach the Midstream Agency Agreements, not the "right or option to terminate" those contracts;

IV. On Count VI, declaring that, as a matter of bankruptcy law, Mesquite would incur "out-of-pocket cost" if it chose to reject the Midstream Agency Agreements; and

V. Granting Plaintiffs such other and further relief as the Court deems just and proper.

**FURTHER,** Plaintiffs Maverick and Mesquite respectfully request that the Court enter judgment as follows:

I. On Count I, declaring Mesquite acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments;

II. On Count IV, declaring that Carnero's breach of contract claims are barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order;

III. On Count VII, declaring that Carnero breached the Carnero Settlement Agreement and awarding attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit; and

IV. Granting Plaintiffs such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank.*]

Respectfully submitted on March 1, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

# EXHIBIT A

## Proposed Stipulation and Agreed Order Regarding the First Carnero Action

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**STIPULATION AND AGREED ORDER**

This stipulation and agreed order (the "Stipulation and Agreed Order") is made and entered into by and between (a) Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"); and (b) Defendant Carnero G&P LLC

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

(“Carnero”). Carnero and each of the Plaintiffs is a “Party” and collectively are the “Parties” to this Stipulation and Agreed Order.

**RECITALS**

**WHEREAS**, Maverick and Carnero are parties to that certain Firm Gas Gathering, Processing and Purchase Agreement, effective as of April 1, 2018 (as amended, the “GGPA”);

**WHEREAS**, pursuant to Section 3.1(b) of the GGPA, the hydrocarbons subject to the Existing Commitments (as defined in the GGPA) are excluded from the dedication to Carnero until the earlier of (a) “the end of the then-current term of such Existing Commitment” or (b) the earliest time at which Maverick may exercise “any right or option to terminate such Existing Commitment . . . without out-of-pocket cost” to Maverick;

**WHEREAS**, on or about the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford and Javelin also each executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, effective as of April 1, 2018, that authorized Maverick to process Mitsui’s gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively, as amended, referred to as the “Ratification Agreements”);

**WHEREAS**, on August 11, 2019 (the “Petition Date”), Sanchez Energy Corporation and its affiliates (collectively, the “Debtors”) each filed chapter 11 bankruptcy petitions in this Court;

**WHEREAS**, on June 6, 2020, the Debtors entered into the Settlement Agreement by and among (a) the Debtors, (b) Catarina Midstream LLC, (c) Carnero, (d) Seco Pipeline, LLC, (e) Sanchez Midstream Partners, LP, (f) Sanchez Midstream Partners GP, LLC, (g) SP Holdings, LLC, and (h) TPL SouthTex Processing Company LP (as amended, the “Settlement Agreement”);

**WHEREAS**, on June 30, 2020, this Court entered an order approving the Settlement Agreement (the "Settlement Agreement Approval Order");

**WHEREAS**, pursuant to the Settlement Agreement, the Debtors agreed to pursue rejection of the Marketing Agency Agreement and the Midstream Agency Agreement (each as defined in the Settlement Agreement and referred to together herein as the "Midstream Agency Agreements") pursuant to the Plan (as defined in the Settlement Agreement) and 11 U.S.C. §365;

**WHEREAS**, Sections 5.1.2 and 5.1.3 of the Settlement Agreement provide that the parties thereto had the option to terminate the Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by that date been entered rejecting the Midstream Agency Agreements and the other conditions of such provisions had been met;

**WHEREAS**, on June 24, 2021, Mesquite (as successor to Maverick) exercised its contractual right to terminate the Settlement Agreement pursuant to and in accordance with Section 5.1.2 and/or Section 5.1.3 thereof;

**WHEREAS**, on July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Plaintiffs seeking, among other things, declarations (collectively, the "Carnero Declarations") that (a) "[t]he GGPA and the respective Ratification Agreements obligate Mesquite, Unsub, Eagle Ford, and Javelin to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365" (Plaintiff's Original Petition at ¶ 36(k)); and (b) "[a]fter rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365," Plaintiffs must deliver the gas from the Comanche Assets to Carnero (*id.* at ¶ 36(l));

**WHEREAS**, on September 10, 2021, Plaintiffs filed a notice of removal, removing the

First Carnero Action to this Court;

**WHEREAS**, on October 8, 2021, Carnero filed a motion to remand the First Carnero Action to state court or for abstention;

**WHEREAS**, at a December 7, 2021 hearing on the motion to remand, this Court suggested that Carnero amend the First Carnero Action to modify or remove the Carnero Declarations;

**WHEREAS**, on December 10, 2021, Carnero filed a notice of voluntary dismissal withdrawing the First Carnero Action without prejudice;

**WHEREAS**, on December 21, 2021, this Court approved a Stipulation and Agreed Order [Dkt. No. 2253][2] dismissing certain litigation and paving the way for a midstream restructuring of the Reorganized Debtors' gathering, transportation, processing, and marketing agreements pursuant to the Plan and global settlement among the following (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite Energy, Inc., SN EF Maverick, LLC, and Mesquite Comanche Holdings, LLC (the "December 2021 Stipulation and Agreed Order");

**WHEREAS**, pursuant to the December 2021 Stipulation and Agreed Order, the applicable Reorganized Debtors assumed, among other agreements, the Midstream Agency Agreements;

**WHEREAS**, on December 21, 2021, Plaintiffs commenced this adversary proceeding (this "Adversary Proceeding") seeking, among other relief, to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts;

---

[2] For clarity, this Stipulation and Agreed Order cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

**WHEREAS**, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, which was superseded by an amended complaint in state court on January 27, 2022 (the "Second Carnero Action");

**WHEREAS**, in the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Adv. Pro. Dkt. No. 8 at ¶ 2.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[3]

1. This Court has jurisdiction to enter this Stipulation and Agreed Order pursuant to 28 U.S.C. §§ 157, 1334, and 1367, Article XI of the Plan [Dkt. No. 1205], paragraph 43 of the order confirming the Plan [Dkt. No. 1212], Section 6.2.1 of the Settlement Agreement, and paragraph 6 of the Settlement Agreement Approval Order [Dkt. No. 1415].

2. Pursuant to Sections 5.1.2 and 5.1.3 of the Settlement Agreement, the Debtors had the option to terminate the Settlement Agreement at any time after the Closing Outside Date if an order had not been entered rejecting the Midstream Agency Agreements. The Debtors validly exercised that option in accordance with the terms of Section 5.1.2 and/or Section 5.1.3 of the Settlement Agreement on June 24, 2021.

3. Following termination of the Settlement Agreement, the Debtors were not required (under the Settlement Agreement, the GGPA, the Ratification Agreements, or otherwise) to pursue

---

[3] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

or obtain rejection of the Midstream Agency Agreements. The Debtors have not breached any of their obligations under the Settlement Agreement.

4. The First Carnero Action is withdrawn with prejudice as to all defendants named therein. Carnero is forever barred, estopped, and enjoined from asserting in any forum or in any manner that (a) the GGPA and the Ratification Agreements obligate Plaintiffs to pursue or obtain rejection of the Midstream Agency Agreements or any of the Existing Commitments; (b) the Debtors' failure to continue seeking to reject the Midstream Agency Agreements or the Existing Commitments exposed Plaintiffs to damages or other liability for breach of the GGPA or any other agreement with Carnero; and/or (c) the Debtors' assumption of the Midstream Agency Agreements and the Ratification Agreements breached the GGPA or any other agreement with Carnero.

5. Each of the Parties reserves any and all of its rights and defenses with respect to this Adversary Proceeding and the Second Carnero Action.

6. This Court shall have exclusive jurisdiction to resolve any and all disputes arising from this Stipulation and Agreed Order or the interpretation or enforcement hereof.

**IT IS SO ORDERED.**

Signed: _________, 2022

____________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**ACCEPTED AND AGREED:**


*/s/ DRAFT*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
denkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. Washington,
DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff**
**Mesquite Energy, Inc.**

*/s/ DRAFT*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Plaintiff**
**SN EF UnSub, LP**

*/s/ DRAFT*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*s/ DRAFT*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ DRAFT*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

*/s/ DRAFT*
Joshua W. Wolfshohl
Aaron J. Power
Eugene M. Nettles
Amy C. Falcon
**Porter Hedges LLP**
100 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshol@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Carnero G&P, LLC**

# EXHIBIT 41

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

**AMENDED AND SUPPLEMENTAL COMPLAINT**

1 The Reorganized Debtors in these Chapter 11 Cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"), by and through counsel, each bring this Amended and Supplemental Complaint (the "Amended Complaint") against Carnero G&P LLC ("Carnero" or "Defendant"), and in support thereof state as follows:

## INTRODUCTION[2]

1. This adversary proceeding seeks to bring much-needed closure to the midstream restructuring of Debtors Sanchez Energy Corporation and its affiliates (collectively, "Debtors"). The Debtors commenced these Chapter 11 cases in August 2019. In April of 2020, the Debtors entered into an agreement with Carnero, which had a contract to serve as the Debtors' *backup* midstream provider, pursuant to which the Debtors agreed to seek rejection of the existing *primary* midstream agreements—but only for a limited period of time and subject to numerous conditions. If that rejection were successful, Carnero stood to become one of the Debtors' primary midstream service providers. The rejection did not succeed, and (only after continuing such efforts well beyond the contractually required period), the Debtors validly terminated the agreement with Carnero.

2. Still needing to restructure their midstream agreements, the Debtors began negotiating certain favorable amendments to the existing primary midstream agreements. Carnero

[2] Unless otherwise specified, capitalized terms used but not defined in this Amended Complaint shall have the meaning given them in the *Second Amended Joint Chapter 11 Plan of Reorganization* [Dkt. No. 1205] (as amended or supplemented from time to time, the "Plan").

For clarity, this Amended Complaint cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

then sought to disrupt those negotiations by filing a state-court lawsuit claiming, among other things, that its backup midstream agreement with the Debtors "obligate[d]" the Debtors to take action in Bankruptcy Court to terminate the existing primary midstream agreements, including "***pursuing rejection of [those agreements] under 11 U.S.C. Section 365***." Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[3] Plaintiffs here (defendants in state court) promptly removed that action to this Court. When confronted with this transparent attempt to claim that the lawsuit sought to cause a state court to interfere with exercise of the Debtors' rights under 11 U.S.C. § 365, Carnero's counsel disclaimed any such intent and indicated that Carnero would amend its complaint. Instead, Carnero withdrew that action *without prejudice*. Plaintiffs therefore filed the original version of this adversary proceeding seeking to adjudicate (among other things) Carnero's theory that it could use its backup midstream agreement to constrain the Debtors' rights under Section 365.

3. The same day that adversary was filed, the Debtors presented for this Court's approval an order authorizing the assumption of, and amendment to, the existing primary midstream agreements. Carnero appeared at the hearing and lodged no objection. This Court approved the assumption and amendment—as of the Effective Date—as expressly contemplated by the Plan (to which Carnero also had not objected). At long last, the midstream restructuring for these assets was complete.

4. A few weeks later, Carnero responded to this adversary proceeding by presenting yet another theory by which it sought to punish the Debtors for validly exercising its rights under Section 365 and the Plan. While purporting to abandon its prior argument that the Debtors were contractually required to reject the existing primary midstream agreements, Carnero now claimed

---

[3] For clarity, this Amended Complaint cites entries on the docket of the First Carnero Action (as defined below) as "Carnero Dkt. No__." The First Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that the Debtors were contractually prohibited from making *any amendment whatsoever* to those agreements when assuming them. That is, Carnero now contends that it holds a valid contractual right that imposes *post-reorganization* liability on the Debtors for negotiating favorable amendments to contracts as part of a Section 365 assumption decision. The Debtors' Plan expressly contemplates and allows assumption of contracts on amended terms as part of a midstream restructuring, and Carnero never objected to these Plan provisions. In addition, the Debtors' contract with Carnero does not prohibit or restrict the assumption and amendment of other midstream contracts. Even if it did, it would turn the Bankruptcy Code on its head to allow contracting parties to tie a debtor's hands in Chapter 11. To make matters worse, it remains far from clear whether Carnero is actually willing to definitively abandon its prior theory that the contract *requires* the Debtors to pursue rejection. Accordingly, Plaintiffs bring this amended adversary proceeding to bring to a close, once and for all, Carnero's attempt to scuttle the Debtors' midstream restructuring.

## THE PARTIES

5. Plaintiff Maverick is a limited liability company organized under the laws of Delaware with its principal place of business in Houston, Texas.

6. Plaintiff Mesquite is a corporation organized under the laws of Delaware with its principal place of business in Houston, Texas.

7. Plaintiff UnSub is a limited partnership organized under the laws of Delaware with its principal place of business in Houston, Texas.

8. Plaintiff Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

9. Plaintiff Javelin is a limited partnership organized under the laws of Delaware with its principal place of business in Austin, Texas.

10. Plaintiff Mitsui is a limited partnership organized under the laws of Texas with its principal place of business in Houston, Texas.

11. Defendant Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners, LP) with its principal place of business in Houston, Texas.

**JURISDICTION, VENUE, PREDICATES FOR RELIEF[4]**

12. This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 1367. *See In re Order of Reference to Bankruptcy Judges*, General Order of the District Court No. 2012-6 (S.D. Tex. May 24, 2012). Moreover, this Court's jurisdiction was expressly contemplated by Article XI of the Plan, paragraph 43 of the Confirmation Order, paragraph 6 of the Carnero Settlement Approval Order, and Section 6.2.1 of the Carnero Settlement Agreement. The parties have concrete disagreements that fall squarely within this Court's jurisdiction and directly affect the success of the Plan:

- This controversy directly implicates the "implementation or execution" of the Plan's Midstream Restructuring and requires interpretation of at least four Plan provisions, including:
  - Article IV.G. (Vesting of Assets of the Reorganized Debtors), which provided that, on the Plan Effective Date, all property in each Debtor estate, all Causes of Action, and any property acquired by any of the Debtors vested in each applicable Reorganized Debtor "free and clear" of all Liens, Claims, charges, or other encumbrances;
  - Article V (Treatment of Executory Contracts and Unexpired Leases), which established the unusual (but necessary) post-confirmation process for the Debtors' assumption and rejection of executory contracts and unexpired leases, with such assumptions or rejections effective as of the Effective Date of the Plan;
  - Article V.F. (Modifications, Amendments, Supplements, Restatements, or Other Agreements), which provided that each assumed executory contract "shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall

4 Unless otherwise specified, capitalized terms used but not defined in this "Jurisdiction, Venue, and Predicates for Relief" section shall have the meaning given them in the "Facts" section of this Complaint.

not be deemed to alter the…validity, priority, or amount of any Claims that may arise in connection therewith"; and

- Article VIII (Effect of Confirmation of the Plan), which provided for the discharge of claims against the Reorganized Debtors as of the Effective Date and exculpated the Reorganized Debtors from "any claim related to any act or omission…in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction", and enjoined all claims released or discharged pursuant to the Plan.

- This controversy requires interpretation of at least five of the Court's prior orders, including:
  - the Confirmation Order [Dkt. No. 1212], which implemented the Plan provisions described above and reserved Carnero's right to object to its rights vesting "free and clear" of all claims against the Reorganized Debtors, *provided* that it file a written objection with this Court on or prior to May 20, 2020 (which Carnero failed to do);
  - the Carnero Settlement Approval Order [Dkt. No. 1415], which approved the Carnero Settlement Agreement but was expressly conditioned on the Debtors' ability to pursue a different midstream restructuring transaction in the Debtors' best interest;
  - the Stipulation of Dismissal and Agreed Order [Dkt. No. 1983], which approved the assumption and rejection of certain agreements with UnSub;
  - the PMA Assumption Order [Dkt. No. 2201], which approved the assumption of certain production marketing agreements pursuant to the Plan; and
  - the Oxy/Wes Stipulation And Agreed Order [Dkt. No. 2253], which approved the assumption of certain of the Debtors' midstream contracts as amended pursuant to the settlement with the Oxy/Wes Parties and effected the Midstream Restructuring.

- This controversy raises an important question of federal bankruptcy law: whether, as interpreted by Carnero, Section 3.1(b) of the GGPA would be unenforceable as a matter of federal bankruptcy law because it would subject the Debtors to significant liability or Carnero termination rights simply because—without extending the term of the Existing Commitments or otherwise expanding their scope—the Debtors negotiated ***improvements*** to their midstream cost structure that benefited the estate and were necessary to effect the Midstream Restructuring.

- Lastly, this controversy implicates important federal policy interests underlying the Bankruptcy Code: primarily, whether awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying Section 365 of the Bankruptcy Code.

13. The statutory and legal predicates for the relief are 11 U.S.C. §§ 105(a), 365, 524, 1123, and 1141; 28 U.S.C. §§ 157, 1334, 1367, 2201 and 2202; Rules 3020(d), 4007, and 7001 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Plan, the Confirmation Order, the Oxy/Wes Stipulation and Agreed Order, the Oxy/Wes Settlement Agreement, the Carnero Settlement Approval Order, the Carnero Settlement Agreement, the Stipulation of Dismissal and Agreed Order, and the PMA Assumption Order.

14. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157, and the Court may enter final orders for matters contained herein.

15. Venue is proper in this district pursuant to 28 U.S.C. §1409, and because Carnero consented to this venue in the Carnero Settlement Agreement and resides in this District.

16. Pursuant to Bankruptcy Rule 7008 and Local Bankruptcy Rule 7008-1, Plaintiffs consent to entry of final orders or judgment by this Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### I. The Existing Commitments

17. Through 2016, Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko"), and the WIPs owned working interests in approximately 300,000 gross acres of oil and gas properties located in South Texas (the "Comanche Assets"). In January 2017, pursuant to that certain Purchase and Sale Agreement dated January 12, 2017 (the "Comanche PSA"), Maverick and various co-investors, including UnSub and Gavilan Resources, LLC ("Gavilan"), purchased the working interests of Anadarko in the Comanche Assets. The transaction closed on or about March 1, 2017.

18. Prior to the sale of the Comanche Assets, Anadarko had acquired and developed a comprehensive system to gather, process, transport, and market Comanche hydrocarbon production downstream to customers. To that end, Anadarko and certain of its affiliates contracted

with several midstream parties who made substantial investments in building out the necessary infrastructure to monetize production from the Comanche Assets in exchange for certain contractual promises regarding, among other things, duration of agreements, delivery of hydrocarbons, and minimum volume commitments (collectively, the "Existing Commitments"). As relevant here, the Existing Commitments include, without limitation, the commitments contained in the agreements listed below:[5]

**Table 1: Existing Commitments**

| Agreement | Service Type |
|---|---|
| Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP | Transportation |
| Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD ("**ETC Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP ("**Brasada Processing Agreement**") | Gathering and processing & natural gas liquid purchase |
| Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC[6] | Infield gas gathering |
| Transportation Services Agreement dated March 1, 2012 between Enterprise Products Operating LLC and Anadarko Energy Services Company | Transportation |
| Purchase Agreement dated March 1, 2012 between Anadarko Energy Services Company and Enterprise Products Operating LLC | Purchases at tailgate of Brasada plant |

5 The summary of Existing Commitments contained herein is provided for descriptive purposes only, does not include all agreements, and is qualified in its entirety by the actual agreements, including any and all amendments and modifications thereto.

6 Each of the WIPs also had its own separate lease dedication and gas gathering agreements with Springfield Pipeline LLC, which agreements also constitute Existing Commitments.

19. While the purchasers sought to buy all of Anadarko's interests in the Comanche Assets, a group of key assets (collectively, the "Retained Agreements") could not be assigned because certain counterparties did not consent to their transfer.[7] Maverick and Anadarko therefore entered into two agency agreements (collectively, the "Midstream Agency Agreements") whereby Maverick would act as Anadarko's agent under the Retained Agreements.[8] Maverick would thus receive the benefits of such agreements and also undertake Anadarko's obligations thereunder.

## II. The GGPA and the Ratification Agreements

20. On April 1, 2018, Maverick and Carnero entered into a back-up midstream agreement—the Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA")—for production from the Comanche Assets. Pursuant to the GGPA, Carnero is second in line for Maverick's hydrocarbons, behind certain agreed-upon commitments and dedications, including the Existing Commitments. Specifically, Section 3.1(b) of the GGPA provides as follows:

> to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) **is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero**, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to

[7] The Retained Agreements included the Brasada Processing Agreement and the ETC Processing Agreement (collectively, the "Retained Gathering and Processing Agreements") as well as the following marketing contracts: (i) the Enterprise Products Transportation Agreement; (ii) the Double Eagle/Kinder Morgan Throughput Agreement; (iii) the BP Crude Oil Sales Agreement; and (iv) the Enterprise Products Purchase Agreement (collectively, the "Retained Marketing Agreements").

[8] The Midstream Agency Agreements include: (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, AEP, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 Agreements (collectively, the "Marketing Agency Agreement"); and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, AEP, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as amended and modified from time to time (the "GPA Agency Agreement").

> Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "<u>Existing Commitments</u>"), <u>**such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment…and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost…**</u>

GGPA, § 3.1(b) (emphasis added). Exhibit F to the GGPA lists the agreements described above in Table 1 "<u>**and associated amendments if any**</u>" to those agreements. GGPA, Ex. F (emphasis added).[9] The GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. Carnero's argument that the GGPA prohibits *all* amendments to the Existing Commitments is thus patently at odds with the plain language of the GGPA.

21. On the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford, Javelin, and Gavilan also executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, dated April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively referred to as the "<u>Ratification Agreements</u>"). UnSub, the WIPs and Gavilan thus ratified Maverick's commitment to deliver hydrocarbons to Carnero subject to the Existing Commitments.

---

[9] While Exhibit F to the GGPA lists certain agreements not described in Table 1, those agreements either terminated pursuant to their terms before the date of this filing, were rejected pursuant to the Plan, and/or do not contain commitments that prevent delivery of the subject hydrocarbons to Carnero.

## III. Mesquite Purchases Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments

22. In October 2020, pursuant to that certain "363" Asset Purchase Agreement dated October 16, 2020 (the "Gavilan PSA"), approved by this Court,[10] Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, acquired certain of Gavilan's interests in the Comanche Assets. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Plaintiff's Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, pursuant to Section 2.05(a) of the Gavilan PSA, MCom acquired Gavilan's interest in the Comanche Assets "free and clear of all claims, encumbrances, Liens or Liabilities **other than the Assumed Liabilities and Permitted Liens**[.]" Gavilan PSA, §2.05(a) (emphasis added); Def. "Free and Clear." "Permitted Liens" includes, among other things, "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the contracts disclosed on Disclosure Schedule 3.05(a). Gavilan PSA, Ex. I at I-2. Disclosure Schedule 3.05(a) lists the Comanche PSA.[11] Gavilan PSA, Disclosure Schedule 3.05(a) at 1. Accordingly, while Gavilan did not assign the Comanche PSA to Mesquite or MCom, it sold its assets to Mesquite's designee, MCom, subject to the covenants in the Comanche PSA, including the requirement that Mesquite and MCom honor the Existing Commitments.

23. Consistent with the terms of the Gavilan PSA, this Court's order approving the sale (the "Gavilan Sale Order") provided that the assets vested in MCom "free and clear of all claims,

[10] The Gavilan PSA is available at docket number 366 in the case captioned *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020).

[11] Disclosure Schedule 3.05(a) also lists the GGPA and the Ratification and Assumption Agreement, dated May 22, 2018, among Gavilan, Maverick and Carnero whereby Gavilan ratified the GGPA. Gavilan PSA, Disclosure Schedule 3.05(a) at 24.

encumbrances, Liens or Liabilities of any kind or nature whatsoever, **other than the Assumed Liabilities and Permitted Liens**[.]" *In re: Gavilan Resources, LLC*, Case No. 20-32656 (MI) (Bankr. S. D. Tex. 2020) [Dkt. No. 361 at ¶ V] (emphasis added). Pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments.

24. In any event, pursuant to Section 3.1(j) of the GPA Agency Agreement, Mesquite (as successor to Maverick) is required to "take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Midstream Contracts, including all Hydrocarbons attributable to…[Maverick], Unsub and [Gavilan]." The "Retained Midstream Contracts" are listed on Schedule 1.1(b) and include each of the Existing Commitments described above in Table 1. Moreover, Gavilan was bound to sell its hydrocarbons to Maverick pursuant to certain marketing agreements (the "Gavilan Marketing Agreements"), all of which were assumed and assigned to MCom. MCom thus remains bound to sell its hydrocarbons to Maverick who, in turn, must transport and sell them subject to the Existing Commitments pursuant to the GPA Agency Agreement. Even if MCom had not acquired Gavilan's assets subject to the Existing Commitments pursuant to the Gavilan PSA and the Gavilan Sale Order (which it did), the GPA Agency Agreement and the Gavilan Marketing Agreements independently require Maverick to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments.

## IV. The Debtors' Midstream Restructuring

25. As the Court is aware, these Chapter 11 Cases followed an unusual course. On April 30, 2020, the Court confirmed the Debtors' Plan of reorganization under the extraordinary circumstances of a global pandemic combined with continued stress in the oil and gas industry. *See Order Approving Disclosure Statement and Confirming Plan of Reorganization* [Dkt. No. 1212] (the "Confirmation Order"). The Plan provided for, among other things, the equitization of

approximately $100 million of postpetition, debtor-in-possession loans and, as is particularly relevant here, delayed the implementation of the Debtors' Midstream Restructuring. *See* Plan at 16 (Art. III.C.3); 26 – 27 (Art. V.B.). This unusual framework came together in the early weeks of the COVID-19 pandemic when "oil and gas prices collapsed" and Mesquite "faced a possible conversion of its Chapter 11 bankruptcy case to one under chapter 7." *In re Sanchez Energy Corp*., 631 B.R. 847, 851 (Bankr. S.D. Tex. 2021). To forestall liquidation, Sanchez and its creditors agreed to confirm a Chapter 11 plan first, and restructure the Debtors' midstream operations later. *Id.*

26. The Plan, however, could not be consummated until the DIP Lenders were satisfied that the Reorganized Debtors would have sufficient liquidity to operate in the ordinary course of business after the Effective Date. *See* Plan at 38 (Art. IX.B.3.).[12] Because the Debtors' midstream operations were weighed down by above-market contracts and rates, identifying a viable approach to improve the Debtors' midstream cost structure was crucial to securing the needed liquidity. *See Motion for Entry of an Order Approving Settlement with Certain Midstream Counterparties* [Dkt. No. 1309] (the "Carnero Settlement Motion") at ¶ 3; *see also* June 29, 2020 Hr'g Tr. at 30:21-22.

27. The Plan and Confirmation Order thus gave the Debtors flexibility to renegotiate their midstream contracts and established a post-confirmation procedure to resolve assumption and rejection disputes with midstream providers. Specifically, the Debtors were to identify executory contracts and unexpired leases either to be rejected as listed on Exhibit B (as amended, the "Rejection Schedule") or to be assumed as listed on Exhibit C (as amended, the "Assumption Schedule") to the Plan Supplement. *See* Confirmation Order at ¶¶ 17 – 26; Plan at 26 - 37 (Art.

---

[12] Article IX.B.3 of the Plan provides that "it shall be a condition to the occurrence of the Effective Date" that Requisite DIP Lenders "be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date . . . reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date."

V.B.). If no party in interest filed a timely objection, the contract was deemed assumed or rejected as indicated, effective as of the Plan Effective Date, except insofar as the objection deadline had been extended. *Id.* If an objection was timely filed, the Confirmation Order provided that the contract "shall not be deemed assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection" or as may be agreed upon by the parties. Confirmation Order at ¶ 17. All assumptions and rejections of executory contracts were deemed effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection was after the Effective Date. *Id.*

28. As is typical, the Plan and Confirmation Order provided that the Debtors would emerge from bankruptcy with a clean slate, free from any liability arising out of the implementation of the Midstream Restructuring. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Notably, Article IV.F. of the Plan provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]."[13] Confirmation Order at ¶ 23. Several counterparties preserved their rights by filing timely objections. Carnero did not.

13 The May 20th deadline was extended to June 22, 2020, by an order of this Court dated May 20, 2020 [Dkt. No. 1267].

29. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] **any Restructuring Transaction**" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covered the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

30. Pursuant to Article XI of the Plan, the Bankruptcy Court retained "exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" including to "resolve any matters related to…(c) the Debtors or the Reorganized Debtors **amending, modifying, or supplementing, after the Effective Date**, pursuant to the Plan, **any Executory Contracts** or Unexpired Leases[.]" Plan at 40 (Art. XI) (emphasis added). The Confirmation Order likewise provided that the Bankruptcy Court retained "exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of th[e] Confirmation Order." Confirmation Order at ¶ 43.

### A. Settlement Agreement with Carnero

31. Following confirmation of the Plan, the Debtors continued to work on identifying, finalizing, and implementing a strategy to restructure their midstream arrangements to reduce costs, rates, and fees. In early June 2020, the Debtors reached a settlement with a group of existing

midstream and marketing service providers, including Carnero. *Id.* at ¶ 4. The Carnero Settlement Agreement[14] provided, among other things, as follows:

a) Carnero would return $8 million from the proceeds of a $17 million letter of credit drawn by Carnero under the existing GGPA. *See* Carnero Settlement Agreement at § 2.1;

b) Seco Pipeline would contribute to the Debtors a nearly $2 million administrative expense claim it had asserted in connection with the Debtors' postpetition termination of an agreement between the parties. *Id.* at § 2.4;

c) The Debtors agreed during the term of the Carnero Settlement Agreement not to remove any executory contracts or unexpired leases from the Assumption Schedule, which at the same time included the GGPA (*id.* at § 2.2.1(d));

d) The settlement parties agreed to conditionally amend certain existing agreements (the "Carnero Agreement Amendments"), but only if certain transactions contemplated by the Settlement Agreement successfully closed. *Id.* at § 2.5; and

e) The Debtors agreed to pursue rejection of the Affirmative Covenant Agreements (as defined in the Carnero Settlement Agreement), including the Midstream Agency Agreements. *Id.* at § 2.2.1(a)(iii). The Carnero Agreement Amendments would take effect only if the Debtors succeeded in rejecting the Affirmative Covenant Agreements. *Id.* at § 2.5.2.

By its plain terms, the Carnero Settlement Agreement did not purport to determine a definitive path to restructure the Debtors' midstream operations. To the contrary, the parties had the option to terminate the Carnero Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by then been entered rejecting the Affirmative Covenant Agreements. *See* Carnero Settlement Agreement at § 5.1.2. If the Debtors exercised their option to terminate instead of continuing to pursue rejection of the Affirmative Covenant Agreements, Carnero's sole remedy was to seek the return of all letter of credit amounts actually delivered by Carnero (*i.e.*, the $8 million). *Id.* at § 2.2.1(b). The Carnero Settlement Agreement specifically provided that return of the letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Affirmative Covenant

[14] The Carnero Settlement Agreement is attached as Exhibit A to the Carnero Settlement Motion.

Agreements. *Id*. Once the Settlement Agreement terminated, the Debtors were no longer required to continue to pursue rejection of the Affirmative Covenant Agreements. *See id.* at § 6.4.

32. Multiple parties, including UnSub and the WIPs, objected to the proposed Carnero Settlement Agreement, arguing that the settlement favored the Debtors' Catarina interests at the expense of the Comanche Assets.[15] The Court convened a hearing (at which Carnero's counsel appeared), ultimately approving the settlement without objection after all parties in interest agreed to substantial modifications to the settlement approval order. *See Order Approving (A) Settlement Agreement And (B) Authorizing The Assumption of Certain Related Contracts* [Dkt. No. 1415] (the "Carnero Settlement Approval Order").

33. At the hearing, the Court and the parties extensively discussed the Carnero Settlement Approval Order's limited and conditional effect. More particularly, UnSub and the WIPs vigorously disputed any suggestion that the Carnero Settlement Approval Order would actually resolve the midstream restructuring of the Comanche Assets. The Court framed this question explicitly at the outset of the settlement hearing:

> THE COURT: Let me find out from the advocates again whether, if we approve this, there then becomes an irrevocable transaction that is set into motion where parties who could object today to it won't be able to object --

June 29, 2020 Hr'g Tr. at 18:15-18.[16]

---

15 *See Limited Objection of Venado Oil & Gas, LLC, And Its Direct and Indirect Subsidiaries, Eagle Ford TX LP, And Mitsui E&P Texas LP to Debtors' Settlement Motion* [Dkt. No. 1351]; *Objection of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP to Debtors' Settlement Motion* [Dkt. No 1373]; *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Settlement Motion* [Dkt No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Settlement Motion* [Docket No. 13200].

16 The June 29, 2020, hearing transcript is available at Dkt. No. 1418.

34. The parties' argument and colloquies with the Court—none of which Carnero's counsel disputed—repeatedly acknowledged that the Carnero Settlement Approval Order *would not* preordain the Debtors' ultimate midstream restructuring. Debtors' counsel stated as follows:

> Furthermore, Your Honor, as you will hear from Mr. Meghji, nothing in the settlement agreement, if approved, preordains a party's right with respect to any JOA, ADA, midstream contract, or any other contract. Again, it was the debtors' intent that all of their rights are preserved. And to the extent additional language should be crafted to add to the order to confirm that point, we are open and welcome that language.

June 29, 2020 Hr'g Tr. at 27:12-19. Counsel for the DIP lenders (which acquired the equity of the Reorganized Debtors pursuant to the Plan) agreed, explaining that the Carnero Settlement Agreement and resulting assumption of the GGPA was only the beginning of the midstream restructuring process:

> The settlement agreement itself does not effectuate a guarantee of midstream restructuring. It is only a roadmap; and frankly, a roadmap that was already signaled in the schedules filed before the plan was confirmed.

> successful. It's no guarantee that all the contracts can or will be assumed rejected. But that's not the issue for today. It gives the debtors a chance to work through this complicated midstream structure. They, at any time, can switch gears. They give back the $8 million. And if it's not done by October 1st, they don't have to give the $8 million. They can still terminate in 95 days or so.

June 29, 2020 Hr'g Tr. at 34:22 – 25; 41:5 – 11.

35. Notably, counsel for the DIP Lenders explained that the Debtors would have to renegotiate the Affirmative Covenant Agreements (which had unsustainable, above-market rates) if they were unable to reject them, and explicitly acknowledged the settlement parties' understanding that the Carnero Settlement Agreement and resulting assumption of the GGPA would not prevent the Debtors from exploring all their options in such negotiations:

> In any event, the settlement agreement already acknowledges that there may be a need to continue negotiations with all of these parties. There are many conditions precedent here. And if any one of them cannot be met, the debtors will need to renegotiate terms. The objecting parties simply want more leverage in those negotiations.
>
> In addition, there is nothing in the agreement that prevents the debtors from considering all their options in such negotiations. The settlement agreement allows the debtors to

June 29, 2020 Hr'g Tr. at 37:25; 28:1-8. Carnero's counsel did not object to this characterization of the parties' commercial understanding.

36. Following these exchanges, the Court confirmed what the parties had acknowledged: that the Carnero Settlement Approval Order did not constrain the Debtors' ultimate restructuring of the existing Comanche midstream contracts:

THE COURT: No, that's -- I think I'm hearing everybody tell me that when it comes time to determine whether the contracts that affect the Comanche asset should be rejected, that I'm going to be asked to determine whether there's been a proper exercise of fiduciary duty with respect to the manager of those assets.

And I -- that seems to say that everyone is agreeing to that, which means approval of this has only upside and no downside. But maybe I'm missing something and we'll hear --

June 29, 2020 Hr'g Tr. at 67:6 – 14.

37. At the conclusion of the hearing, the Court approved the settlement and entered the Carnero Settlement Approval Order. The Carnero Settlement Approval Order expressly and repeatedly reflected the settlement's limited and conditional nature. Specifically, the order (i) recognized that the Debtors *might not* ultimately reject the Affirmative Covenant Agreements (*id.* at ¶¶ 11, 13); (ii) preserved all rights and objections of UnSub and the WIPs to dispute rejection of the Affirmative Covenant Agreements (*id.* at ¶ 7); and (iii) preserved this Court's jurisdiction with respect to all matters "arising from or related to the [Carnero] Settlement Agreement or [the Carnero Settlement Approval Order]" (*id.* at ¶ 6).

38. Consistent with the terms of the Carnero Settlement Agreement and the Carnero Settlement Approval Order, Carnero returned the $8 million letter of credit proceeds to Mesquite, and Seco Pipeline contributed the $2 million administrative expense claim it had asserted against the Debtors. The Plan became effective on June 30, 2020. *See Notice of Effective Date* [Dkt. No. 1417].

39. As required by the Carnero Settlement Agreement, the Debtors diligently pursued rejection of the Affirmative Covenant Agreements via the adversary proceeding captioned

*Occidental Petroleum Corp., et al. v. Sanchez Energy Corp. et al*., Adv. Pro. No. 20-03198 [MI] ("Sanchez/Oxy Adversary"). Certain counterparties to the Affirmative Covenant Agreements (collectively, the "Oxy/Wes Parties")[17] objected to the Debtors' proposed rejection of those agreements, arguing that the agreements created covenants running with the land or equitable servitudes and were thus not subject to rejection under Section 365 of the Bankruptcy Code. *See Plaintiff's Motion for Summary Judgment* [Sanchez/Oxy Dkt. No. 50] at ¶¶ 37-133.[18] The Debtors aggressively pursued their efforts to reject the Affirmative Covenant Agreements, litigating cross-motions for summary judgment and exchanging voluminous discovery with the Oxy / Wes Parties.

40. At no point did Carnero offer to reimburse the Debtors for either the fees and expenses they incurred attempting to reject the Affirmative Covenant Agreements, or for the rejection damages Mesquite (as successor to Sanchez Energy Corporation) would owe if it succeeded in rejecting the agreements. Ultimately, on June 24, 2021—nearly a full year after approval of the Carnero Settlement Agreement and nine months *after* the Carnero Settlement Agreement's Closing Outside Date—Mesquite exercised its contractual right to terminate the Settlement Agreement. Mesquite subsequently returned the $8 million in letter of credit proceeds to Carnero.

**B. Settlement Agreement with the Oxy/Wes Parties**

41. The Debtors then began to explore other options to reduce their midstream costs. In December 2021, Mesquite reached a settlement with the Oxy/Wes Parties, which resolved the parties' dispute in the Oxy/Wes Adversary and provided a framework for the Debtors to obtain

---

17 The Oxy/Wes Parties include Occidental Petroleum Corporation, Anadarko Petroleum, Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP.

18 For clarity, this Amended Complaint cites entries on the docket of the Sanchez/Oxy Adversary proceeding as "Sanchez/Oxy Dkt. No__."

rate relief and implement the Midstream Restructuring. The Oxy/Wes Settlement Agreement provided, among other things, as follows:

a) the Reorganized Debtors agreed to assume certain midstream contracts (the "Assumed Comanche Agreements") pursuant to the Plan, including certain of the Affirmative Covenant Agreements;

b) the parties agreed to amend certain of the Assumed Comanche Agreements to reduce the Reorganized Debtors' midstream cost structure;

c) the Reorganized Debtors agreed to reject certain midstream contracts (the "Rejected Comanche Agreements") pursuant to the Plan; and

d) the Oxy/Wes Parties agreed to dismiss the Oxy/Wes Adversary Proceeding.

42. The Midstream Restructuring did not extend the term of the Existing Commitments or otherwise expand their scope.

43. On December 21, 2021, Mesquite filed a stipulation and agreed order (the "Oxy/Wes Stipulation and Agreed Order") dismissing the Sanchez/Oxy Adversary and for assumption of the Assumed Comanche Agreements and rejection of the Rejected Comanche Agreements. *See Stipulation and Agreed Order* [Dkt. No. 2253]. The Oxy/Wes Stipulation and Agreed Order clearly states that certain of the Assumed Comanche Agreements would be amended pursuant to the Oxy/Wes Settlement Agreement. Carnero did not object.

44. At a hearing on that same day, the Court approved the Oxy/Wes Stipulation and Agreed Order. Carnero's counsel appeared at the hearing but raised no objection to the assumption of the Assumed Comanche Agreements as amended pursuant to the Oxy/Wes Settlement Agreement. Instead, Carnero has repeatedly sought to use state courts to upend these Chapter 11 Cases and extract additional value to which it has no contractual right.

## V. Carnero's Evolving Theories and Repeated Efforts to Upend the Debtors' Midstream Restructuring and Evade This Court's Jurisdiction

45. On July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Mesquite, UnSub, and the WIPs. The First Carnero Action sought, among other things, declarations that (i) the GGPA and the Ratification Agreements obligate Plaintiffs to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include requiring Mesquite to pursue rejection of the Midstream Agency Agreement, and (ii) after rejection of the Midstream Agency Agreement, Plaintiffs must deliver the gas from the Comanche Assets to Carnero. *See* Petition [Carnero Dkt. No. 1-4] at ¶36(k), (l).[19] The timing of the First Carnero Action was no accident. As paragraph 25 of the Petition acknowledged, Carnero filed the lawsuit upon coming to the belief that Oxy/Wes Parties were on the cusp of a global midstream settlement. The First Carnero Action was a last-ditch effort to derail this comprehensive deal.

46. On September 10, 2021, Mesquite, UnSub, and the WIPs filed a notice of removal, removing the First Carnero Action to this Court. *See Notice of Removal* [Carnero Dkt. No. 1]. On October 8, 2021, Carnero filed a motion to remand the action to state court or for abstention. *See Adversary Plaintiff's Motion to Remand to State Court or for Abstention* [Carnero Dkt. No. 6].

47. At the December 7 hearing on the motion to remand, the Court observed that "the plain language" of paragraph 36(k) of the Petition "ask[ed] the State Court to make Mesquite pursue [rejection of the Midstream Agency Agreement under] Section 365" (December 7, 2021 Hr'g Tr. at 18:10 – 11) and that paragraph 36 (l) asked the State Court to "declare the effect of rejection of a contract before it's ever rejected." *Id.* at 15:25 – 16:1. Carnero's counsel disclaimed

---

19 For clarity, this complaint cites entries on the docket of the First Carnero Action as "Carnero Dkt. No__." The Carnero Action is captioned *Carnero G&P, LLC v. SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and Mesquite Energy, Inc*., Adv. Pro. No. 21-03908 [MI].

that understanding, stating that Carnero's "intent was not to dictate what . . . [Mesquite] was going to do with respect to § 365." *Id.* at 15:10 – 12. Rather, Carnero asserted, the purpose of paragraphs 36(k) & (l) was to "specifically deal with what happens in the event of rejection . . . if confusion about the language [of paragraphs 36(k) & (l)] is something that is causing the problem, this can be amended to make it clear. " *Id.* at 15:9 – 14. The Court suggested that Carnero amend the Petition to remove those paragraphs, explaining that doing so "certainly [would] make a different argument." *Id.* at 17:11 – 13.

48. Carnero agreed to file an amended complaint by December 10. *Id.* at 26:5 – 6. Rather than file an amended complaint, however, Carnero dismissed the lawsuit without prejudice. *See Plaintiff's Notice of Dismissal without Prejudice* [Carnero Dkt. No. 31]. Carnero's dismissal was explicitly without prejudice so that Carnero could continue to use state courts to extract value for itself as a result of these Chapter 11 Cases.

49. On December 21, Plaintiffs commenced this action (the "Adversary Proceeding") to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts. In response, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") [Adv. Pro. Dkt. No. 8] in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, seeking to evade this Court's jurisdiction for the second time (the "Second Carnero Action" and, together with the Carnero Action, the "Carnero Actions").

50. In the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Motion to Dismiss at ¶ 2. Plaintiffs

prepared and presented to Carnero a proposed stipulation to that effect.[20] Carnero, however, did not agree to either sign the stipulation or dismiss the First Carnero Action with prejudice. Nevertheless, the Second Carnero Action presses an entirely distinct (yet meritless) theory: that Plaintiffs breached the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring. This Amended Complaint seeks to confirm—free from doubt or further attempts by Carnero to use state courts to upend these Chapter 11 Cases—Debtors' rights under the Bankruptcy Code, the Plan, and the Confirmation Order, to restructure their midstream contracts.

## CLAIMS FOR RELIEF

## COUNT I

**(Plaintiffs Maverick and Mesquite Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That MCom Acquired Gavilan's Interest in the Comanche Assets Subject to the Existing Commitments**

51. Plaintiffs Maverick and Mesquite incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

52. An actual controversy exists as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

53. The requested declaration from this Court would serve the important and much-needed purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether MCom acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments.

[20] The proposed stipulation is attached hereto as Exhibit A.

54. Carnero argues "upon information and belief" that because Gavilan did not assign the Comanche PSA to Mesquite, "Mesquite's Dedicated Gas from the former Gavilan Dedicated Acreage was conveyed free and clear of all covenants in the Comanche PSA and free and clear of the Existing Commitments." Amended Petition at ¶ 24 [Dkt. No. 2418-4]. However, as demonstrated above, (i) the Gavilan PSA explicitly provided that MCom acquired Gavilan's interest in the Comanche Assets subject to "the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained in" the Comanche PSA, including the requirement that MCom honor the Existing Commitments; (ii) the Gavilan Sale Order provided that the assets vested in MCom subject to the covenants in the Comanche PSA; (iii) the GPA Agency Agreement independently requires MCom to transport and sell all of Gavilan's hydrocarbons subject to the Existing Commitments; and (iv) the Gavilan Marketing Agreements require MCom to sell its hydrocarbons to Maverick who is bound to honor the Existing Commitments. *See supra* ¶¶ 22-24.

55. Accordingly, Plaintiffs Maverick and Mesquite respectfully request a declaratory judgment that, (i) pursuant to the Gavilan PSA and as so-ordered by this Court, MCom acquired Gavilan's interest in the Comanche Assets subject to the covenants in the Comanche PSA and the Existing Commitments and (ii) the GPA Agency Agreement and Gavilan Marketing Agreements require Maverick to transport and sell all of Gavilan's hydrocarbons acquired by MCom subject to the Existing Commitments.

**COUNT II**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Plaintiffs Did Not Breach the Terms of the GGPA by Agreeing to Amend Certain of the Debtors' Midstream Contracts in Connection with the Midstream Restructuring**

56. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

57. An actual controversy exists as to whether Plaintiffs breached the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

58. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code and the Plan to implement the Midstream Restructuring.

59. Carnero alleges that Plaintiffs breached the GGPA "by amending or participating in amending (1) the Midstream Agency Agreement or other agreements that flow gas from the Dedicated Acreage to the midstream providers under the Existing Commitments; or (2) the Existing Commitments themselves, so that the Existing Commitments no longer exist as they 'exist[ed] on the Effective Date' of the GGPA for the 'then-current term of such Existing Commitment.'" Amended Petition at ¶ 43 [Dkt. No. 2418-4]. Carnero is wrong.

60. As demonstrated above, the GGPA explicitly contemplates subsequent amendments to the Existing Commitments and incorporates those amendments by reference. *See supra* ¶ 20. Carnero's theory that the GGPA prohibits *all* amendments to the Existing Commitments is thus inconsistent with the plain terms of the GGPA. And even if the GGPA did prohibit *some* amendments to the Existing Commitments, it certainly does not prohibit the amendments and transactions at issue here, which did not deny Carnero of the benefit of its

prepetition contractual bargain to collect fees from gathering, processing, and purchasing the subject hydrocarbons per the terms of the GGPA.

61. Accordingly, Plaintiffs respectfully request a declaratory judgment that they did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring.

**COUNT III**

**(All Plaintiffs Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That—As Carnero Reads It—Section 3.1(b) of the GGPA is Unenforceable Under Bankruptcy Law)**

62. Plaintiffs incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

63. An actual controversy exists as to whether—if Carnero's reading of Section 3.1(b) of the GGPA is correct—that provision would be unenforceable under bankruptcy law.

64. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether Mesquite may amend its midstream agreements to effectuate the Midstream Restructuring without incurring liability for breach of the GGPA.

65. Even if (as Carnero claims) the GGPA imposes liability on Plaintiffs for agreeing to amend certain of their midstream contracts, such a provision would be unenforceable under bankruptcy law. The authority to assume or reject an executory contract is a "vital part of the bankruptcy process." *In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001). Section 365 "expresses a clear Congressional policy favoring assumption…Such a policy… insure[s] that potential valuable assets will not be lost by a debtor who is reorganizing his affairs or liquidating assets for distribution to creditors." *Matter of U. L. Radio Corp.*, 19 B.R. 537, 544

(Bankr. S.D.N.Y. 1982). Section 365 reflects the "fundamental bankruptcy policy allowing a debtor to realize maximum value from its [contracts] for the benefit of its estate and creditors." *In re Jamesway Corp.*, 201 B.R. 73, 79 (Bankr. S.D.N.Y. 1996).

66. Part and parcel of the federal bankruptcy policy underlying a debtor's power to assume or reject an executory contract is the ability to renegotiate the terms of an executory contract to be assumed. *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984) (expressly endorsing "voluntary modification[s]" to preexisting contracts as a desirable alternative to rejection motions in the context of collective bargaining agreements); *Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("Nothing in the Code suggests that the debtor may not modify its contracts when all parties to the contract consent."). Indeed, the practical effect of section 365 is to force all creditors doing business under executory contracts with the debtor to renegotiate their mutual rights. *See Bhd. of Ry., Airline & S. S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. REA Exp., Inc.*, 523 F.2d 164, 169 (2d Cir. 1975); *see also In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 9 F.4th 1, 12 (1st Cir. 2021) (rejecting argument that renegotiation resulted in brand new contract because "adopting this reasoning would bar debtors from negotiating amendments to pre-petition contracts as a quid pro quo for assumption").

67. To effectuate this policy, bankruptcy courts routinely invalidate prepetition contractual provisions that restrict or condition the debtor's right to assume (and assign) its contracts. For example, courts have invalidated provisions that (i) condition consent to assignment upon payment by the debtor of an "assumption fee;"[21] (ii) provide for additional payments (*e.g.*, profit sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the

---

[21] *See In re Howe*, 78 B.R. 226, 228 (Bankr. D. S. D. 1987).

non-debtor third party to such contract upon assignment;[22] (iii) provide for any rights of first refusal on a counterparty's part;[23] and (iv) provide for any recapture or termination rights in favor of the counterparty.[24]

68. Courts routinely invalidate such punitive provisions because they contravene the central purpose of Section 365 by restricting the debtor's ability to realize the value of its assets. A creditor cannot impose a penalty on the debtor for utilizing the tools of the Bankruptcy Code to negotiate better commercial terms that maximize the value of the estate, particularly where, as here, those terms do not injure said creditor. Awarding Carnero damages for breach of contract in connection with the Midstream Restructuring when Carnero was otherwise restored to its prepetition status quo would violate the federal policy interests underlying section 365 of the Bankruptcy Code.

69. Accordingly, Plaintiffs respectfully request a declaratory judgment that (as Carnero reads it) Section 3.1(b) of the GGPA is unenforceable under bankruptcy law.

---

[22] *See In re Golfsmith Int'l Holdings, Inc*., No. 16-12033 (LSS), 2017 WL 5564291, at *9 (Bankr. D. Del. Jan. 19, 2017); *see also In re Jamesway Corp.*, 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996); *Robb v. Schindler*, 142 B.R. 589 (D. Mass. 1992); *South Coast Plaza v. Standor Jewelers West, Inc. (In re Standor Jewelers West, Inc.)*, 129 B.R. 200 (9th Cir. BAP 1991); *In re The National Sugar Refining Co*., 21 B.R. 196 (Bankr. S. D. N. Y. 1982).

[23] *See In re Golfsmith Int'l Holdings, Inc*., 2017 WL 5564291, at *9.

[24] *See In re Fairway Group Holdings Corp., et al.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Apr. 20, 2020); *see also In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005); *In re Boscov's Inc.*, *et al.*, Case No. 08-11637 (Bankr. D. Del. Aug. 15, 2008)

## COUNT IV

**(Plaintiffs Mesquite and Maverick Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) That Carnero's Breach of Contract Claims Are Barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation And Agreed Order)**

70. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Amended Complaint as if set forth fully herein.

71. An actual controversy exists as to whether Carnero's breach of contract claims are barred by the Plan and the Confirmation Order.

72. A declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Plan and Confirmation Order bar breach of contract claims arising out of the Debtors' implementation of the Midstream Restructuring.

73. Pursuant to Article IV.D of the Plan, on the Effective Date, all property of the estate vested in the Reorganized Debtors "free and clear of all Liens, Claims, charges, or other encumbrances." Article IV.F. of the Plan further provided that each assumed executory contract vested in the Reorganized Debtors with "all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract" and that such amendments "shall not be deemed to alter…the validity, priority, or amount of any Claims that may arise in connection therewith." Contract counterparties wishing to object to the Plan's vesting provision were "required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to [May 20, 2020]." Confirmation Order at ¶ 23. Carnero did not preserve its rights by filing a timely objection. Accordingly, Carnero is now barred from arguing that the amendments to certain of the Assumed Comanche Agreements breached the terms of the GGPA.

74. The Plan also (i) discharged all claims against the Reorganized Debtors as of the Effective Date (Art. VIII.A); (ii) exculpated the Reorganized Debtors from "any claim related to any act or omission . . . in connection with, relating to, or arising out of the…the formulation, preparation, dissemination, negotiation, filing, or termination of the…Plan, or any other documents relating to the Plan [or] any Restructuring Transaction" (Art. VIII.B) (emphasis added); and (iii) enjoined all claims released or discharged pursuant to the Plan (Art. VIII.C). "Restructuring Transactions" was defined broadly to include all "corporate transactions necessary or appropriate to implement the Plan" and thus covers the Midstream Restructuring, which was crucial to obtaining the liquidity necessary to implement the Plan.

75. Moreover, the Oxy/Wes Stipulation and Agreed Order approved the assumption of the Assumed Comanche Agreements *as amended pursuant to the Oxy/Wes Settlement Agreement*. Carnero did not file a written objection to the Oxy/Wes Stipulation and Agreed Order. Nor did Carnero's counsel raise any objections at the hearing. Instead, in disregard of this Court's prior orders, Carnero filed an action in state court seeking (for the second time) to evade this Court's jurisdiction.

76. Plaintiffs Mesquite and Maverick respectfully request that the Court put an end to Carnero's repeated efforts to use state courts to upend these Chapter 11 Cases and seek a declaratory judgment that Carnero's breach of contract claims are barred by the Plan, Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order.

## COUNT V

### (All Plaintiffs Against Defendant Carnero)

### Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Section 365 Gives Mesquite the Power to Breach the Midstream Agency Agreements, Not The "Right or Option to Terminate" Those Agreements

77. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

78. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether Mesquite's right under Section 365 to reject the Midstream Agency Agreements can be deemed a "right or option to **terminate**" those agreements. According to Carnero, because Section 365 provides Mesquite with a "right or option to terminate" the Midstream Agency Agreements (and the Existing Commitments contained therein), Mesquite's decision to assume (rather than reject) those agreements constitutes a breach of Section 3.1(b) of the GGPA, which requires that Mesquite exercise "any right or option to **terminate** such Existing Commitments . . . without out-of-pocket cost." GGPA, § 3.1(b) (emphasis added).

79. The requested declaration from this Court would serve the important and much-needed purpose of ending Carnero's attempts to impose liability for the exercise of the Debtors' rights under the Bankruptcy Code to assume the Midstream Agency Agreements.

80. The Bankruptcy Code is unequivocal that rejection of an executory contract such as the Midstream Agency Agreements does not present a "right or option to terminate" a contract; rather, rejection "constitutes a *breach* of such contract." 11 U.S.C. § 365(g) (emphasis added). Numerous courts, including the Fifth Circuit, have "held that this language does not mean that the

executory contract or lease has been terminated, but only that a breach has been deemed to occur." *Matter of Austin Dev. Co*., 19 F.3d 1077, 1082 (5th Cir. 1994) (citing *In re Continental Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1993)); *In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir. 1990); *Leasing Serv. Corp. v. First Tenn. Bank, Nat'l Ass'n*, 826 F.2d 434, 436–37 (6th Cir.1987). The "decision to reject is thus correctly viewed only as a *power to breach the executory contract*" not as a right or option to terminate such contract. *Id.* (emphasis added). The Supreme Court recently reaffirmed this understanding, holding in *Mission Product Holdings, Inc. v. Tempnology, LLC* that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach." 139 S. Ct. 1652, 1661 (2019); *see also In re United DC,* Inc., No. 12-32620, 2013 WL 310311, at *4 (Bankr. S.D. Tex. Jan. 25, 2013) (Isgur, J.) (holding that rejection "is considered a breach rather than termination").

81. As the Fifth Circuit explained, "Congress knew how to authorize the termination of executory contracts and leases in § 365. 'Termination' is used in § 365(h), (i), and (n) as one option available respectively to the purchaser of an interest in a timeshare project, the vendee of real property, or the licensee from the debtor of a right to intellectual property *if* the trustee has rejected the executory contract." *Id.* (emphasis in original). Congress was "not confused in its differing usages of the terms rejection, breach and termination." *Id.* at 1083.

82. Moreover, "breach and termination of leases or executory contracts are not synonymous terms under state law." *Id.* (citing *Resolution Trust Corp. v. Cramer,* 6 F.3d 1102, 1108 (5th Cir.1993) (describing options available to landlords under Texas law)); *In re Storage Technology, supra; In re Picnic 'N Chicken, Inc*., 58 B.R. 523, 525 (Bankr. S. D. Cal. 1986) (California law). Congress "could have chosen to depart from the state law meanings of these terms, but taken as a whole, § 365 suggests that it did not do so." *Id.*

83. Accordingly, Section 365 gave the Debtors the statutory power to *breach* the Midstream Agency Agreements, not the "right or option to *terminate*" those contracts.

**COUNT VI**

**(All Plaintiffs Against Defendant Carnero)**

**Declaratory Judgment Pursuant to 28 U.S.C. § 2201, Bankruptcy Rule 7001(9), and 11 U.S.C. § 365 That Rejection Imposes "Out-of-Pocket Cost" On the Debtor**

84. Plaintiffs incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

85. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, an actual controversy exists as to whether rejection imposes "out-of-pocket cost" on the Debtors.

86. A declaration from this Court would serve the important purpose of providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Debtors may assume the Midstream Agency Agreements without incurring liability for breach of the GGPA.

87. Carnero has asserted that the Debtors can reject the Midstream Agency Agreements without incurring "out-of-pocket cost." Carnero is wrong. A "rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for **damages**." *Mission Product Holdings, Inc.*, 139 S. Ct. at 1661 (emphasis added). If Mesquite succeeded in rejecting the Midstream Agency Agreements, it would have owed its counterparties rejection damages for its failure to honor the Existing Commitments. Those damages would undoubtedly be substantial.

88. Accordingly, Mesquite would incur significant out-of-pocket cost if it rejected the Midstream Agency Agreements.

**COUNT VII**

**(Plaintiffs Mesquite and Maverick Against Defendant Carnero)**

**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) that Carnero Breached the Settlement Agreement)**

89. Plaintiffs Mesquite and Maverick incorporate by reference all of the preceding allegations of this Complaint as if set forth fully herein.

90. An actual controversy exists as to whether Carnero breached the Carnero Settlement Agreement.

91. As of the date of this filing, Carnero has not agreed to sign a stipulation stating that Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements and that mere assumption of the Midstream Agency Agreements does not breach Section 3.1(b) of the GGPA. Accordingly, a declaration from this Court would serve a useful purpose by promoting judicial efficiency and providing clarity to Plaintiffs, Carnero, and all parties-in-interest to the Comanche Assets as to whether the Carnero Settlement Agreement's provision for conditional assumption of the GGPA reflected the parties' intent to impose liability on Mesquite if, after validly terminating the Settlement Agreement, Mesquite ultimately assumed the Midstream Agency Agreements.

92. Section 2.2.1(d) of the Carnero Settlement Agreement required that the Debtors not remove any executory contracts from the Assumption Schedule, which included the GGPA. The Carnero Settlement Agreement thus caused the conditional assumption of the GGPA. The assumption of the GGPA, however, was not unqualified. The Carnero Settlement Agreement gave the Debtors the option to terminate that agreement if an order rejecting the Midstream Agency

Agreements had not been entered by October 1, 2020, and specifically provided that return of the $8 million letter of credit proceeds was the sole remedy for the Debtors' "failure to continue to diligently pursue rejection and related appeals" of the Midstream Agency Agreements. *Id*. The obligation to pursue rejection was not among the enumerated provisions that would survive termination of the Carnero Settlement Agreement. *Id*. at § 6.4.

93. The parties repeatedly acknowledged at the June 29-30, 2020 hearing that the Settlement Approval Order (and resulting assumption of the GGPA) would not preordain the Debtors' midstream restructuring. Carnero's counsel did not dispute any of these statements. Nor did Carnero object to the language of the Carnero Settlement Approval Order, which expressly recognized that the Debtors *might not* ultimately reject the Midstream Agency Agreements. Settlement Approval Order at ¶¶ 11, 13. The parties' understanding was crystal clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and failing to continue to pursue rejection of the Midstream Agency Agreements. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating the First Carnero Action.

94. Moreover, the Carnero Settlement Approval Order and the Carnero Settlement Agreement both provided that the Bankruptcy Court would retain jurisdiction with respect to all matters arising from or relating to the Carnero Settlement Agreement, including any issues relating to the Debtors' assumption of the GGPA. Settlement Approval Order at ¶ 6; Settlement Agreement, § 6.2.1. This Court had jurisdiction over both Carnero Actions as a core proceedings because the actions (i) went to both Mesquite's rights and the Court's authority under Section 365 and (ii) involved rights created by bankruptcy law and required interpretation and enforcement of this Court's orders. Even if the Carnero Actions were not core proceedings, the Court—at a

minimum—had "related to" jurisdiction which requires only that the matter "could conceivably have any effect on the estate being administered in bankruptcy." *Maddox v. O'Cheskey (In re Am. Hous. Found.)*, 09-ap-20232-RLJ, 2015 WL 5781396, at *12 (Bankr. N.D. Tex. Sept. 30, 2015).

95. Carnero was thus obligated to bring the Carnero Actions before this Court and breached this obligation by filing them in state court. Section 6.3 of the Carnero Settlement Agreement awards non-breaching parties "attorneys' fees and costs" as "a remedy for any such breach." Accordingly, Mesquite and Maverick respectfully request attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment as follows:

I. On Count II, declaring that Plaintiffs did not breach the terms of the GGPA by agreeing to amend certain of the Debtors' midstream contracts in connection with the Midstream Restructuring;

II. On Count III, declaring that—if Carnero's reading were correct—Section 3.1(b) of the GGPA is unenforceable under bankruptcy law;

III. On Count V, declaring that, as a matter of bankruptcy law, Section 365 of the Bankruptcy Code gives Mesquite the power to breach the Midstream Agency Agreements, not the "right or option to terminate" those contracts;

IV. On Count VI, declaring that, as a matter of bankruptcy law, Mesquite would incur "out-of-pocket cost" if it chose to reject the Midstream Agency Agreements; and

V. Granting Plaintiffs such other and further relief as the Court deems just and proper.

**FURTHER,** Plaintiffs Maverick and Mesquite respectfully request that the Court enter judgment as follows:

I. On Count I, declaring Mesquite acquired Gavilan's interest in the Comanche Assets subject to the Existing Commitments;

II. On Count IV, declaring that Carnero's breach of contract claims are barred by the Plan, the Confirmation Order, and the Oxy/Wes Stipulation and Agreed Order;

III. On Count VII, declaring that Carnero breached the Carnero Settlement Agreement and awarding attorneys' fees for removing the Carnero Actions, defending them in Bankruptcy Court, and enforcing this lawsuit; and

IV. Granting Plaintiffs such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank.*]

Respectfully submitted on March 1, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

# EXHIBIT A

**Proposed Stipulation and Agreed Order Regarding the First Carnero Action**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Plaintiffs,<br><br>v.<br><br>Carnero G&P, LLC,<br><br>Defendant. | **Adv. Pro. No. 21-04419 (MI)** |

## STIPULATION AND AGREED ORDER

This stipulation and agreed order (the "Stipulation and Agreed Order") is made and entered into by and between (a) Plaintiffs SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. f/k/a Sanchez Energy Corporation ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Plaintiffs"); and (b) Defendant Carnero G&P LLC

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

("Carnero"). Carnero and each of the Plaintiffs is a "Party" and collectively are the "Parties" to this Stipulation and Agreed Order.

**RECITALS**

**WHEREAS**, Maverick and Carnero are parties to that certain Firm Gas Gathering, Processing and Purchase Agreement, effective as of April 1, 2018 (as amended, the "GGPA");

**WHEREAS**, pursuant to Section 3.1(b) of the GGPA, the hydrocarbons subject to the Existing Commitments (as defined in the GGPA) are excluded from the dedication to Carnero until the earlier of (a) "the end of the then-current term of such Existing Commitment" or (b) the earliest time at which Maverick may exercise "any right or option to terminate such Existing Commitment . . . without out-of-pocket cost" to Maverick;

**WHEREAS**, on or about the same day that Maverick and Carnero entered into the GGPA, UnSub, Maverick, and Carnero entered into a ratification agreement, pursuant to which UnSub ratified the GGPA. Eagle Ford and Javelin also each executed ratification agreements in substantially the same form as the UnSub ratification agreement. Mitsui signed a Letter Agreement, effective as of April 1, 2018, that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA (the Letter Agreement and the UnSub, Eagle Ford, and Javelin ratification agreements are collectively, as amended, referred to as the "Ratification Agreements");

**WHEREAS**, on August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation and its affiliates (collectively, the "Debtors") each filed chapter 11 bankruptcy petitions in this Court;

**WHEREAS**, on June 6, 2020, the Debtors entered into the Settlement Agreement by and among (a) the Debtors, (b) Catarina Midstream LLC, (c) Carnero, (d) Seco Pipeline, LLC, (e) Sanchez Midstream Partners, LP, (f) Sanchez Midstream Partners GP, LLC, (g) SP Holdings, LLC, and (h) TPL SouthTex Processing Company LP (as amended, the "Settlement Agreement");

**WHEREAS**, on June 30, 2020, this Court entered an order approving the Settlement Agreement (the "Settlement Agreement Approval Order");

**WHEREAS**, pursuant to the Settlement Agreement, the Debtors agreed to pursue rejection of the Marketing Agency Agreement and the Midstream Agency Agreement (each as defined in the Settlement Agreement and referred to together herein as the "Midstream Agency Agreements") pursuant to the Plan (as defined in the Settlement Agreement) and 11 U.S.C. §365;

**WHEREAS**, Sections 5.1.2 and 5.1.3 of the Settlement Agreement provide that the parties thereto had the option to terminate the Settlement Agreement at any time after October 1, 2020 (the "Closing Outside Date") if an order had not by that date been entered rejecting the Midstream Agency Agreements and the other conditions of such provisions had been met;

**WHEREAS**, on June 24, 2021, Mesquite (as successor to Maverick) exercised its contractual right to terminate the Settlement Agreement pursuant to and in accordance with Section 5.1.2 and/or Section 5.1.3 thereof;

**WHEREAS**, on July 30, 2021, Carnero filed a lawsuit (the "First Carnero Action") in the District Court of Harris County, Texas against Plaintiffs seeking, among other things, declarations (collectively, the "Carnero Declarations") that (a) "[t]he GGPA and the respective Ratification Agreements obligate Mesquite, Unsub, Eagle Ford, and Javelin to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365" (Plaintiff's Original Petition at ¶ 36(k)); and (b) "[a]fter rejection of the Midstream Agency Agreement[s] under 11 U.S.C. Section 365," Plaintiffs must deliver the gas from the Comanche Assets to Carnero (*id.* at ¶ 36(l));

**WHEREAS**, on September 10, 2021, Plaintiffs filed a notice of removal, removing the

First Carnero Action to this Court;

**WHEREAS**, on October 8, 2021, Carnero filed a motion to remand the First Carnero Action to state court or for abstention;

**WHEREAS**, at a December 7, 2021 hearing on the motion to remand, this Court suggested that Carnero amend the First Carnero Action to modify or remove the Carnero Declarations;

**WHEREAS**, on December 10, 2021, Carnero filed a notice of voluntary dismissal withdrawing the First Carnero Action without prejudice;

**WHEREAS**, on December 21, 2021, this Court approved a Stipulation and Agreed Order [Dkt. No. 2253][2] dismissing certain litigation and paving the way for a midstream restructuring of the Reorganized Debtors' gathering, transportation, processing, and marketing agreements pursuant to the Plan and global settlement among the following (a) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), and Kerr-McGee Oil & Gas Onshore LP, (b) Western Midstream Partners, LP, Springfield Pipeline LLC, and WGR Operating, LP, and (c) Mesquite Energy, Inc., SN EF Maverick, LLC, and Mesquite Comanche Holdings, LLC (the "December 2021 Stipulation and Agreed Order");

**WHEREAS**, pursuant to the December 2021 Stipulation and Agreed Order, the applicable Reorganized Debtors assumed, among other agreements, the Midstream Agency Agreements;

**WHEREAS**, on December 21, 2021, Plaintiffs commenced this adversary proceeding (this "Adversary Proceeding") seeking, among other relief, to confirm the Debtors' rights under the Bankruptcy Code and the Plan to restructure their midstream contracts;

---

2 For clarity, this Stipulation and Agreed Order cites entries on the docket of the main bankruptcy case as "Dkt. No. __" and entries on the docket of this Adversary Proceeding as "Adv. Pro. Dkt. No. __."

**WHEREAS**, on January 21, 2022, Carnero filed a motion to dismiss the Adversary Proceeding (the "Motion to Dismiss") in this Court and a new state court lawsuit against Plaintiffs in Harris County, Texas, which was superseded by an amended complaint in state court on January 27, 2022 (the "Second Carnero Action");

**WHEREAS**, in the Motion to Dismiss, Carnero stated that it "is willing to stipulate that (i) Section 3.1(b) of the GGPA did not require Maverick/Mesquite to reject the Midstream Agency Agreements; and (ii) mere assumption of the Midstream Agency Agreements as they existed on the petition date does not breach Section 3.1(b) of the GGPA." Adv. Pro. Dkt. No. 8 at ¶ 2.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[3]

1. This Court has jurisdiction to enter this Stipulation and Agreed Order pursuant to 28 U.S.C. §§ 157, 1334, and 1367, Article XI of the Plan [Dkt. No. 1205], paragraph 43 of the order confirming the Plan [Dkt. No. 1212], Section 6.2.1 of the Settlement Agreement, and paragraph 6 of the Settlement Agreement Approval Order [Dkt. No. 1415].

2. Pursuant to Sections 5.1.2 and 5.1.3 of the Settlement Agreement, the Debtors had the option to terminate the Settlement Agreement at any time after the Closing Outside Date if an order had not been entered rejecting the Midstream Agency Agreements. The Debtors validly exercised that option in accordance with the terms of Section 5.1.2 and/or Section 5.1.3 of the Settlement Agreement on June 24, 2021.

3. Following termination of the Settlement Agreement, the Debtors were not required (under the Settlement Agreement, the GGPA, the Ratification Agreements, or otherwise) to pursue

[3] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

or obtain rejection of the Midstream Agency Agreements. The Debtors have not breached any of their obligations under the Settlement Agreement.

4. The First Carnero Action is withdrawn with prejudice as to all defendants named therein. Carnero is forever barred, estopped, and enjoined from asserting in any forum or in any manner that (a) the GGPA and the Ratification Agreements obligate Plaintiffs to pursue or obtain rejection of the Midstream Agency Agreements or any of the Existing Commitments; (b) the Debtors' failure to continue seeking to reject the Midstream Agency Agreements or the Existing Commitments exposed Plaintiffs to damages or other liability for breach of the GGPA or any other agreement with Carnero; and/or (c) the Debtors' assumption of the Midstream Agency Agreements and the Ratification Agreements breached the GGPA or any other agreement with Carnero.

5. Each of the Parties reserves any and all of its rights and defenses with respect to this Adversary Proceeding and the Second Carnero Action.

6. This Court shall have exclusive jurisdiction to resolve any and all disputes arising from this Stipulation and Agreed Order or the interpretation or enforcement hereof.

**IT IS SO ORDERED.**

Signed: _________, 2022

____________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**ACCEPTED AND AGREED:**

*/s/ DRAFT*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Tel. 713.276.5500 / Fax 713.276.5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Tel. 214.999.4887 / Fax 214.999.4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
denkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W. Washington,
DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff**
**Mesquite Energy, Inc.**

*/s/ DRAFT*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
rwoolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
Justin D. Ward
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

**Attorneys for Plaintiff**
**SN EF UnSub, LP**

*/s/ DRAFT*
Michelle Pector, Esq.
Jared Wilkerson, Esq.
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies, Esq.
Amy L. Kyle, Esq.
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*s/ DRAFT*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ DRAFT*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidley.com

**Attorneys for Plaintiff Mitsui E&P Texas LP**

*/s/ DRAFT*
Joshua W. Wolfshohl
Aaron J. Power
Eugene M. Nettles
Amy C. Falcon
**Porter Hedges LLP**
100 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshol@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Carnero G&P, LLC**

# EXHIBIT 42

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Carnero G&P, LLC,<br>Plaintiff,<br>v.<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br>Defendants. | Adv. No. 22-03035 |

**<u>DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED PETITION</u>**

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui"), and SN EF UnSub, LP ("UnSub") (collectively, the "Defendants"), by and through their undersigned attorneys, submit the following as their Answer to Plaintiff's Amended Petition.

Except as expressly admitted below, Defendants deny each and every allegation in the Amended Petition.

**DISCOVERY CONTROL PLAN**

1. The allegations in Paragraph 1 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue discovery in the manner pleaded in Paragraph 1.

**PARTIES**

2. Defendants deny knowledge and information sufficient to admit or deny the allegations in Paragraph 2, and on that basis deny the allegations in Paragraph 2.

3. Defendants admit that UnSub is a limited partnership organized under the laws of Delaware, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for UnSub's principal place of business is 1000 Main Street, Suite 3000, Houston, Texas.

4. Defendants admit that Eagle Ford is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Eagle Ford's principal place of business is 555 San Felipe Road, Suite 1175, Houston, Texas 77056.

5. Defendants admit the allegations in Paragraph 5.

6. Defendants admit that Javelin is a limited partnership organized under the laws of Delaware, that its principal place of business is in Austin, Texas, and that it may be served as alleged in Paragraph 6. Defendants deny that the address for Javelin's principal place of business is 13501 Galleria Circle, Suite 350, Austin, Texas 78738.

7. Defendants admit that Mitsui is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Mitsui's principal place of business is 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

8. Defendants admit the allegations in Paragraph 8.

**JURISDICTION**

9. The allegations in Paragraph 9 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter, as set forth in the *Notice of Removal* [Dkt. No. 1] filed by Defendants on February 28, 2022. Defendants deny any remaining allegations in Paragraph 9.

## VENUE

10. The allegations in Paragraph 10 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 10.

## RULE 47 STATEMENT OF RELIEF

11. The allegations in Paragraph 11 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue the relief pleaded in Paragraph 11, but deny any entitlement to such relief.

## FACTUAL BACKGROUND

12. Defendants admit that the dispute involves, in part, contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas. To the extent Plaintiff contends that the allegations in Paragraph 12 fully describe this dispute, Defendants deny the allegations in Paragraph 12.

13. Defendants admit, prior to January 2017, Eagle Ford, Javelin, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil & Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights predominantly in the western portion of the Eagle Ford Shale.

14. Defendants admit that certain parties entered into a Purchase and Sale Agreement ("PSA") dated January 12, 2017, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

15. Defendants admit that Gavilan and Mesquite entered into an Asset Purchase Agreement (the "Gavilan APA") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

16. Defendants admit that, currently, Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, Maverick, UnSub, and the WIPs own all of the working interests in the Comanche Assets.

17. Defendants admit that Anadarko (and/or certain of its affiliates) entered into various agreements with midstream service providers to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants further admit that certain of those agreements were not subsequently directly assigned to Maverick, Gavilan, and UnSub. Defendants otherwise deny Plaintiff's characterization of those agreements and the "Existing Commitments" (as defined in either the Amended Petition or the GGPA (as defined below)).

18. Defendants admit that Anadarko and Maverick entered into the Midstream Agency Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

19. Paragraph 19 constitutes legal conclusions purporting to define legal relationships among Maverick, UnSub, and the WIPs with respect to the Existing Commitments and the Midstream Agency Agreement, to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 19.

20. Defendants admit that Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "GGPA"), to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof, including but not limited to Defendants' obligations under the GGPA. Defendants further admit that UnSub, Maverick, Gavilan, Eagle Ford, Javelin and Carnero entered into certain Ratification Agreements, to which Defendants refer the Court for their true and correct terms, which speak

for themselves, and deny Plaintiff's characterization thereof, including but not limited to Plaintiff's characterization of Defendants' obligations under such agreements.

21. Defendants admit that Mitsui, Maverick, and Carnero signed a Letter Agreement effective April 1, 2018 ("Letter Agreement") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

22. Defendants admit that certain parties entered into the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and which agreement defines "Dedicated Gas," "Dedicated Acreage," and "Producer," but otherwise deny Plaintiff's characterization of Defendants' obligations under the agreement.

23. Defendants admit that certain parties entered into or ratified the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

24. Defendants admit that Gavilan sold its interest in the Comanche Assets to MCom on or about October 16, 2020, through the Gavilan APA to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

25. Defendants admit that (A) on December 21, 2021, pursuant to that certain Stipulation and Agreed Order (the "Oxy/Wes Stipulation and Order") [Dkt. No. 2253] entered by the Court, and that certain Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (the "Plan") [Dkt. No. 1205], Maverick and Mesquite assumed certain executory contracts and unexpired leases relating to the Existing Commitments, in some cases with amendments, and that in connection therewith, (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), Kerr-McGee Oil & Gas

Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, WGR Operating, LP, Mesquite, Maverick, MCom, and for limited purposes UnSub, entered into a Master Settlement Agreement, and (ii) Maverick and UnSub entered into an amendment in respect of the Hydrocarbons Purchase and Marketing Agreement (the "HPMA"), and (B) on June 28, 2021, pursuant to the Plan and that certain Stipulation of Dismissal and Agreed Order (the "UnSub Stipulation and Order"), [Dkt. No. 1983] entered by the Court, Mesquite and Maverick, among others, assumed and rejected certain executory contracts and unexpired leases related to the Existing Commitments, and, in connection therewith, Maverick and UnSub entered into an amendment in respect of the HPMA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.[1]

## CAUSES OF ACTION

34. Defendants incorporate by reference their responses in the preceding paragraphs.[2]

35. The allegations in Paragraph 35 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Carnero purports to pursue a claim pursuant to Texas Uniform Declaratory Judgment Act, §37.001, *et seq.* of the Texas Civil Practice and Remedies Code, admit that Carnero is party to the contracts identified in Paragraph 35, and otherwise deny the allegations in Paragraph 35.

36. The allegations in Paragraph 36 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 36.

---

1 For clarity, this Answer cites entries on the docket of the main bankruptcy case as "Dkt. No. __".

2 Paragraphs 26-33 have been omitted from the Amended Petition. Defendants therefore have omitted Paragraphs 26-33 from their Answer to avoid confusion.

37. Paragraph 37 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 37.

38. Paragraph 38 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 38.

39. Defendants admit the allegations in Paragraph 39.

40. Defendants deny the allegations in Paragraph 40.

41. Defendants admit that Mitsui is a party to the Letter Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

42. Defendants deny the allegations in Paragraph 42.

43. Defendants deny the allegations in Paragraph 43.

44. Defendants deny the allegations in Paragraph 44.

45. The allegations in Paragraph 45 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 45.

46. Defendants deny the allegations in Paragraph 46.

47. Defendants deny the allegations in Paragraph 47.

48. Defendants admit that on or about October 16, 2020, MCom acquired certain of Gavilan's interests in the Comanche Assets pursuant to the Gavilan APA, but otherwise deny Plaintiff's characterization of the Gavilan APA or the other agreements referenced in Paragraph 48, to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants otherwise deny the allegations in Paragraph 48.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50.

51. The allegations in Paragraph 51 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 51.

52. The allegations in Paragraph 52 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 52.

**AFFIRMATIVE DEFENSES**

53. Plaintiff's claims are barred, in whole or part, because it has failed to state any claim for which relief can be granted.

54. Plaintiff's claims are barred, in whole or part, because they were not damaged.

55. Plaintiff's claims are barred, in whole or part, because of the doctrine of laches.

56. Plaintiff's claims are barred, in whole or part, because of the doctrine of estoppel.

57. Plaintiff's claims are barred, in whole or part, because of the doctrine of unclean hands.

58. Plaintiff's claims are barred, in whole or part, because of the doctrine of waiver.

59. Plaintiff's claims are barred, in whole or part, because of Plaintiff's failure to comply with Section 15.2 of the GGPA.

60. Plaintiff's claims are barred, in whole or in part, by the Plan, the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization [Dkt. No. 1212], the Oxy/Wes Stipulation and Order, the UnSub Stipulation and Order and/or bankruptcy law.

61. Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the settlement agreement, dated June 6, 2020, by and among Plaintiff, the Debtors (as defined in the

Plan), Catarina Midstream LLC, Seco Pipeline, LLC, Sanchez Midstream Partners, LP, Sanchez Midstream Partners GP, LLC, SP Holdings, LLC and TPL SouthTex Processing Company LP (the "Carnero Settlement Agreement"). The parties acknowledged at the June 29-30, 2020 hearing before the Court that the Carnero Settlement Agreement would not preordain the Debtors' midstream restructuring, and that the Debtors would have to renegotiate the terms of the Midstream Agency Agreement if they were unable to reject it. Carnero's counsel did not dispute these statements. The parties' understanding was clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and renegotiating and assuming the Midstream Agency Agreement. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating this action. Carnero also breached Section 6.2.1 of the Carnero Settlement Agreement by suing Defendants in Texas state court.

Respectfully submitted this 7th day of March, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Plaintiff Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Plaintiff SN EF UnSub, LP**

*/s/ Michelle Pector*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Plaintiff Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Plaintiff Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Plaintiff**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 7, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

# EXHIBIT 43

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Carnero G&P, LLC,<br>Plaintiff,<br>v.<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br>Defendants. | Adv. No. 22-03035 |

# DEFENDANTS' ANSWER TO PLAINTIFF'S AMENDED PETITION

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui"), and SN EF UnSub, LP ("UnSub") (collectively, the "Defendants"), by and through their undersigned attorneys, submit the following as their Answer to Plaintiff's Amended Petition.

Except as expressly admitted below, Defendants deny each and every allegation in the Amended Petition.

## DISCOVERY CONTROL PLAN

1. The allegations in Paragraph 1 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue discovery in the manner pleaded in Paragraph 1.

## PARTIES

2. Defendants deny knowledge and information sufficient to admit or deny the allegations in Paragraph 2, and on that basis deny the allegations in Paragraph 2.

3. Defendants admit that UnSub is a limited partnership organized under the laws of Delaware, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for UnSub's principal place of business is 1000 Main Street, Suite 3000, Houston, Texas.

4. Defendants admit that Eagle Ford is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Eagle Ford's principal place of business is 555 San Felipe Road, Suite 1175, Houston, Texas 77056.

5. Defendants admit the allegations in Paragraph 5.

6. Defendants admit that Javelin is a limited partnership organized under the laws of Delaware, that its principal place of business is in Austin, Texas, and that it may be served as alleged in Paragraph 6. Defendants deny that the address for Javelin's principal place of business is 13501 Galleria Circle, Suite 350, Austin, Texas 78738.

7. Defendants admit that Mitsui is a limited partnership organized under the laws of Texas, that its principal place of business is in Houston, Texas, and that it may be served as alleged in Paragraph 3. Defendants deny that the address for Mitsui's principal place of business is 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

8. Defendants admit the allegations in Paragraph 8.

## JURISDICTION

9. The allegations in Paragraph 9 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter, as set forth in the *Notice of Removal* [Dkt. No. 1] filed by Defendants on February 28, 2022. Defendants deny any remaining allegations in Paragraph 9.

## VENUE

10. The allegations in Paragraph 10 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 10.

## RULE 47 STATEMENT OF RELIEF

11. The allegations in Paragraph 11 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Plaintiff purports to pursue the relief pleaded in Paragraph 11, but deny any entitlement to such relief.

## FACTUAL BACKGROUND

12. Defendants admit that the dispute involves, in part, contracts relating to oil and gas operations on a lease in the Western Eagle Ford Shale in Texas. To the extent Plaintiff contends that the allegations in Paragraph 12 fully describe this dispute, Defendants deny the allegations in Paragraph 12.

13. Defendants admit, prior to January 2017, Eagle Ford, Javelin, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil & Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights predominantly in the western portion of the Eagle Ford Shale.

14. Defendants admit that certain parties entered into a Purchase and Sale Agreement ("PSA") dated January 12, 2017, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

15. Defendants admit that Gavilan and Mesquite entered into an Asset Purchase Agreement (the "Gavilan APA") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

16. Defendants admit that, currently, Mesquite Comanche Holdings, LLC ("MCom"), a wholly-owned subsidiary of Mesquite, Maverick, UnSub, and the WIPs own all of the working interests in the Comanche Assets.

17. Defendants admit that Anadarko (and/or certain of its affiliates) entered into various agreements with midstream service providers to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants further admit that certain of those agreements were not subsequently directly assigned to Maverick, Gavilan, and UnSub. Defendants otherwise deny Plaintiff's characterization of those agreements and the "Existing Commitments" (as defined in either the Amended Petition or the GGPA (as defined below)).

18. Defendants admit that Anadarko and Maverick entered into the Midstream Agency Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

19. Paragraph 19 constitutes legal conclusions purporting to define legal relationships among Maverick, UnSub, and the WIPs with respect to the Existing Commitments and the Midstream Agency Agreement, to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 19.

20. Defendants admit that Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "GGPA"), to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof, including but not limited to Defendants' obligations under the GGPA. Defendants further admit that UnSub, Maverick, Gavilan, Eagle Ford, Javelin and Carnero entered into certain Ratification Agreements, to which Defendants refer the Court for their true and correct terms, which speak

for themselves, and deny Plaintiff's characterization thereof, including but not limited to Plaintiff's characterization of Defendants' obligations under such agreements.

21. Defendants admit that Mitsui, Maverick, and Carnero signed a Letter Agreement effective April 1, 2018 ("Letter Agreement") to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

22. Defendants admit that certain parties entered into the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and which agreement defines "Dedicated Gas," "Dedicated Acreage," and "Producer," but otherwise deny Plaintiff's characterization of Defendants' obligations under the agreement.

23. Defendants admit that certain parties entered into or ratified the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

24. Defendants admit that Gavilan sold its interest in the Comanche Assets to MCom on or about October 16, 2020, through the Gavilan APA to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

25. Defendants admit that (A) on December 21, 2021, pursuant to that certain Stipulation and Agreed Order (the "Oxy/Wes Stipulation and Order") [Dkt. No. 2253] entered by the Court, and that certain Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (the "Plan") [Dkt. No. 1205], Maverick and Mesquite assumed certain executory contracts and unexpired leases relating to the Existing Commitments, in some cases with amendments, and that in connection therewith, (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko Energy Services Company, Anadarko E&P Onshore LLC (f/k/a Anadarko E&P Company LP), Kerr-McGee Oil & Gas

Onshore LP, Western Midstream Partners, LP, Springfield Pipeline LLC, WGR Operating, LP, Mesquite, Maverick, MCom, and for limited purposes UnSub, entered into a Master Settlement Agreement, and (ii) Maverick and UnSub entered into an amendment in respect of the Hydrocarbons Purchase and Marketing Agreement (the "HPMA"), and (B) on June 28, 2021, pursuant to the Plan and that certain Stipulation of Dismissal and Agreed Order (the "UnSub Stipulation and Order"), [Dkt. No. 1983] entered by the Court, Mesquite and Maverick, among others, assumed and rejected certain executory contracts and unexpired leases related to the Existing Commitments, and, in connection therewith, Maverick and UnSub entered into an amendment in respect of the HPMA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.[1]

## CAUSES OF ACTION

34. Defendants incorporate by reference their responses in the preceding paragraphs.[2]

35. The allegations in Paragraph 35 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that Carnero purports to pursue a claim pursuant to Texas Uniform Declaratory Judgment Act, §37.001, *et seq.* of the Texas Civil Practice and Remedies Code, admit that Carnero is party to the contracts identified in Paragraph 35, and otherwise deny the allegations in Paragraph 35.

36. The allegations in Paragraph 36 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 36.

---

1 For clarity, this Answer cites entries on the docket of the main bankruptcy case as "Dkt. No. __".

2 Paragraphs 26-33 have been omitted from the Amended Petition. Defendants therefore have omitted Paragraphs 26-33 from their Answer to avoid confusion.

37. Paragraph 37 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 37.

38. Paragraph 38 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 38.

39. Defendants admit the allegations in Paragraph 39.

40. Defendants deny the allegations in Paragraph 40.

41. Defendants admit that Mitsui is a party to the Letter Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

42. Defendants deny the allegations in Paragraph 42.

43. Defendants deny the allegations in Paragraph 43.

44. Defendants deny the allegations in Paragraph 44.

45. The allegations in Paragraph 45 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 45.

46. Defendants deny the allegations in Paragraph 46.

47. Defendants deny the allegations in Paragraph 47.

48. Defendants admit that on or about October 16, 2020, MCom acquired certain of Gavilan's interests in the Comanche Assets pursuant to the Gavilan APA, but otherwise deny Plaintiff's characterization of the Gavilan APA or the other agreements referenced in Paragraph 48, to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants otherwise deny the allegations in Paragraph 48.

49. Defendants deny the allegations in Paragraph 49.

50. Defendants deny the allegations in Paragraph 50.

51. The allegations in Paragraph 51 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 51.

52. The allegations in Paragraph 52 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 52.

**AFFIRMATIVE DEFENSES**

53. Plaintiff's claims are barred, in whole or part, because it has failed to state any claim for which relief can be granted.

54. Plaintiff's claims are barred, in whole or part, because they were not damaged.

55. Plaintiff's claims are barred, in whole or part, because of the doctrine of laches.

56. Plaintiff's claims are barred, in whole or part, because of the doctrine of estoppel.

57. Plaintiff's claims are barred, in whole or part, because of the doctrine of unclean hands.

58. Plaintiff's claims are barred, in whole or part, because of the doctrine of waiver.

59. Plaintiff's claims are barred, in whole or part, because of Plaintiff's failure to comply with Section 15.2 of the GGPA.

60. Plaintiff's claims are barred, in whole or in part, by the Plan, the Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization [Dkt. No. 1212], the Oxy/Wes Stipulation and Order, the UnSub Stipulation and Order and/or bankruptcy law.

61. Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the settlement agreement, dated June 6, 2020, by and among Plaintiff, the Debtors (as defined in the

Plan), Catarina Midstream LLC, Seco Pipeline, LLC, Sanchez Midstream Partners, LP, Sanchez Midstream Partners GP, LLC, SP Holdings, LLC and TPL SouthTex Processing Company LP (the "Carnero Settlement Agreement"). The parties acknowledged at the June 29-30, 2020 hearing before the Court that the Carnero Settlement Agreement would not preordain the Debtors' midstream restructuring, and that the Debtors would have to renegotiate the terms of the Midstream Agency Agreement if they were unable to reject it. Carnero's counsel did not dispute these statements. The parties' understanding was clear—Mesquite would not face liability (beyond returning the $8 million letter of credit proceeds to Carnero) for terminating the Carnero Settlement Agreement and renegotiating and assuming the Midstream Agency Agreement. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating this action. Carnero also breached Section 6.2.1 of the Carnero Settlement Agreement by suing Defendants in Texas state court.

Respectfully submitted this 7th day of March, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Agustina G. Berro
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
aberro@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendant Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta Alice
Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New
York, New York 10019 Telephone:
(212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant SN EF UnSub, LP**

*/s/ Michelle Pector*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorney for Defendant Javelin EF L.P.**
**(f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 7, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

# EXHIBIT 44

ENTERED
06/30/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | § | Case No. 19-34508 (MI) |
| Debtors. | § | (Jointly Administered) |

**ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

Upon consideration of the *Emergency Motion of the Debtors Pursuant to Section 365(A) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [DKT. # 1309] (the "Motion")[2], seeking among other things:

(1) Authorization to enter into and perform under a Settlement Agreement with certain of the Debtors' existing midstream and marketing service providers;

(2) Approval of the Debtors' assumption, in accordance with the Settlement Agreement, of (a) the Carnero Agreements, as amended by the Carnero Agreement Amendment, and (b) the Catarina Gathering Agreement, as amended by the Catarina Gathering Amendment (collectively, the "***Assumed Agreements***");

(3) Authorization to enter into the New Seco Pipeline Agreements;

and upon consideration of the evidence admitted and representations made on the record at the hearing on the Motion held on June 29, 2020 (the "Hearing"); and all objections to the Motion

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis, LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 700 Milam, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

having been withdrawn, resolved, or overruled on the merits; and this Court having considered the legal and factual bases for the relief requested in the Motion; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. This Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Hearing.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The matters raised in the Motion are core proceedings pursuant to 28 U.S.C. § 157(b)(2).

C. Venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. Proper, sufficient, and adequate notice of the Motion and the Hearing have been given in accordance with the Bankruptcy Code and the Bankruptcy Rules, and no other or further notice is necessary.

E. The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, and the transactions proposed in the Settlement Agreement are reasonable and appropriate under the circumstances, and the Debtors have demonstrated both (i) good, sufficient, and sound business purposes and justification for the transactions proposed by the Settlement Agreement and (ii)

compelling circumstances for approval of the transactions contemplated as part of the Settlement Agreement pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rule 9019. The terms of the Settlement Agreement are fair and reasonable, falling above the lowest point in the range of reasonableness, and are in the best interests of the Debtors' estates and their stakeholders as a whole.

F. Based upon the evidence and arguments made at the Hearing, this Court has weighed the probability of success in litigation, the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending to it. This Court has also taken into account the paramount interest of creditors and, based on all of the foregoing, has determined that the relief requested in the Motion is fair and equitable, in the best interests of the Debtors and their estates as a whole, and should be approved in all respects.

G. In the absence of the Settlement Agreement, the Debtors and their estates face considerable litigation expense, risk, and delay. The disputes between the Settlement Parties involve numerous legal and factual issues, and judicial resolution of these disputes will require extensive and costly briefing and discovery. Even if the Debtors were successful in litigating their alleged claims against the other Settlement Parties, any judgment obtained may be subject to appeal with no guarantee as to the ultimate outcome. Moreover, there is no doubt that the Settlement Parties' combined legal spend during a protracted litigation process would be substantial and further forestall any return of value to the Debtors and their stakeholders. The Settlement Agreement, however, resolves the Settlement Parties' disputes now without the need for costly, uncertain litigation.

H. The Settlement Agreement and the transactions contemplated thereby were negotiated, proposed, and entered into by the Settlement Parties, each of whom were represented by competent counsel, in good faith, without collusion, and as a result of arm's-length bargaining.

**IT IS HEREBY FOUND AND DETERMINED THAT:**

1. The Settlement Agreement is approved in its entirety, and the Debtors are authorized to enter into and perform under the Settlement Agreement and take all actions necessary to effectuate the terms of the Settlement Agreement.

2. In accordance with the Settlement Agreement, the Debtors hereby assume, pursuant to section 365 of the Bankruptcy Code, the Assumed Agreements. Effective as of the Closing Date, each of the Assumption Agreements will be deemed amended by the applicable Amendment Agreement and ratified for all purposes under the Plan. The Debtors are authorized to perform thereunder, in each case subject to and in accordance with the terms of the Settlement Agreement.

3. To the extent applicable, the Debtors are authorized, pursuant to section 363 of the Bankruptcy Code, to enter into and perform under the New Seco Pipeline Agreements.

4. The Settlement Parties are authorized to take such steps and actions as may be necessary or appropriate to implement the terms of the Settlement Agreement and this Order.

5. Notwithstanding any Bankruptcy Rule (including, but not limited to, Bankruptcy Rule 6004(h)), the terms and conditions of this Order shall be effective and enforceable upon its entry.

6. As part of the implementation and execution of the Plan, this Court shall retain jurisdiction with respect to all matters arising from or related to the Settlement Agreement or this Order.

7. Nothing in the Settlement Agreement or this Order requires any Other Comanche Working Interest Holder to deliver to and transport its hydrocarbons through the SECO Pipeline to the extent such Other Comanche Working Interest Holder's consent is necessary and such consent has not been obtained. This same principle applies to other matters related to the Settlement Agreement on which an Other Comanche Working Interest Holder's consent is necessary and consent has not been obtained.

8. Nothing in this Order impairs, modifies, prejudices, or otherwise affects rights of Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries), Eagle Ford TX LP, Mitsui E&P Texas LP, Gavilan Resources LLC, and GSO ST Holdings LP and each of its affiliates, GSO ST Holdings Associates LLC, SN EF UnSub GP, LLC, SN EF UnSub LP, SN EF UnSub Holdings, LLC and each of their respective affiliates (collectively, the "Comanche Non-Ops"), with respect to each of the Comanche Non-Ops' contracts, including, but not limited to, each of the Comanche Non-Ops' production marketing agreements with SN Maverick (as assignee of Anadarko E&P Onshore LLC) (the "PMAs"). For the avoidance of doubt and notwithstanding anything to the contrary in this Order, nothing in this Order shall constitute a finding that SN Maverick has or has not acted in a manner consistent with its obligations to act in good faith and in a commercially reasonable manner under the circumstances (as set forth in such PMAs) in its performance under the PMAs.

9. Notwithstanding anything to the contrary in this Order, this Order shall not waive, limit, impair, operate to preclude, or otherwise impact in any manner any claims or causes of action arising out of, in connection with, or related to (in any manner) the Settlement Agreement.

10. Any determination by SN Maverick as to whether to assume or reject a contract must be:

a. made by a fiduciary for SN Maverick;

b. made by the fiduciary after the fiduciary has exercised sufficient due diligence to determine whether the assumption or rejection is in the best interest of SN Maverick;

c. in the best interest of SN Maverick; and

d. considered after notice and hearing.

11. If all or any portion of the $8,000,000 must be refunded, SN Maverick will be liable for the return only of that portion of the $8,000,000 actually received by SN Maverick.

12. Any party-in-interest that has standing to object to the relief sough in ECF No. 1309 will continue to have standing to object to any motion by SN Maverick to assume or reject a contract that is filed in accordance with this order.

13. Any rejection or termination of any material agreement affecting the Comanche Assets or any adoption of a material agreement affecting the Comanche Assets must be approved by either (i) the Operating Committee under the Comanche Joint Development Agreement, in accordance with its terms, if required under the terms of the Comanche Joint Development Agreement; or (ii) otherwise by Order of this Court.

14. Notwithstanding anything to the contrary in this Order, the Motion, the Assumed Agreements, the New Seco Pipeline Agreements or the Settlement Agreement (including the Amendment to the Settlement Agreement), (i) the Debtors and Reorganized Debtors shall continue to comply with all executory contracts and unexpired leases until they are assumed or rejected as set forth in paragraphs 23 and 24 of the Confirmation Order and (ii) the Settlement Agreement (including the Amendment to the Settlement Agreement) and this Order does not modify or impact any rights or defenses of any Counterparty (as defined in the Confirmation Order) in connection with any objection to the assumption or rejection of any executory contracts or unexpired leases (and to prosecute any timely filed objection) under the Plan or Confirmation Order.

15. Nothing in this Order shall alter in any way the rights of the Lien-Related Litigation Creditor Representative (as defined in the Plan) under the terms of the Plan.

Signed: June 30, 2020

Marvin Isgur
United States Bankruptcy Judge

# EXHIBIT 45

# (FILED UNDER SEAL)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.,*<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND TO STATE COURT OR FOR ABSTENTION**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "Debtors" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

ARGUMENT .......... 4

**A.** The assumptions, rejections, and amendments through which the Reorganized Debtors effected the Midstream Restructuring are central to Plan implementation. .......... 4

**B.** This Court has jurisdiction over the Second Carnero Action. .......... 9

**C.** The "well-pleaded complaint" rule is relevant only to "arising under" jurisdiction and, in any event, confirms jurisdiction over the Second Carnero Action. .......... 14

**D.** Neither mandatory nor permissive abstention applies. .......... 16

CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beta Op. Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP)*, 581 B.R. 206 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020) ....10, 12

*Collins v. Sidharthan (In re KSRP, Ltd.)*, 809 F.3d 263 (5th Cir. 2015) ....14

*Eagle Ins. Co. v. BankVest Cap. Corp. (In re BankVest Cap. Corp.)*, 360 F.3d 291 (1st Cir. 2004) ....13

*Evercore Cap. Partners II, LLC. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259 (5th Cir. 2011) ....9

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2021 WL 2676983 (D.P.R. June 29, 2021) ....13

*Firefighters' Ret. Sys. v. Consulting Grp. Servs., LLC*, 541 B.R. 337 (M.D. La. 2015) ....14

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1 (1983) ....15

*Highland Cap. Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575 (5th Cir. 2008) ....9–10

*New Orleans & Gulf Coast Ry. Co. v. Barrios*, 533 F.3d 321 (5th Cir. 2008) ....15

*Newby v. Enron (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 511 F. Supp. 2d 742 (S.D. Tex. 2005) ....14

*NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389 (5th Cir. 2015) ....14

*Okla. State Treasurer v. Linn Op., Inc. (In re Linn Energy, LLC)*, 927 F.3d 862 (5th Cir. 2019) ....3, 13

*Principal Life Ins. Co. v. JP Morgan Chase Bank, N.A.* (*In re Brooks Mays Music Co.)*,
363 B.R. 801 (Bankr. N.D. Tex. 2007)....................14

*Quarternorth Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*,
No. 20-33948, 2021 WL 4839321 (Bankr. S.D. Tex. Oct. 15, 2021)....................12–13

*Schermerhorn v. Centurytel, Inc. (In re SkyPort Glob. Commc'ns Inc.)*,
No. 08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013), *aff'd*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part*, 642 F. App'x 301 (5th Cir. 2016)....................9

*In re Trans World Airlines, Inc.*,
261 B.R. 103 (Bankr. D. Del. 2001)....................13–14

*Travelers Indemnity Co. v. Bailey*,
557 U.S. 137 (2009)....................3, 14

*TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*,
622 B.R. 680 (Bankr. N.D. Tex. 2020)....................2–3, 11, 14, 15

*U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*,
301 F.3d 296 (5th Cir. 2002)....................2, 10, 11

*Wildwood Prop. Owners Ass'n v. Bordelon (In re Wildwood Prop. Owners Ass'n)*,
No. 82-04155, 2017 WL 3189874 (Bankr. S.D. Tex. July 25, 2017)....................9

The Defendants submit this sur-reply in opposition to Carnero's *Motion to Remand to State Court or for Abstention* (the "Motion") [Carnero II Dkt. No. 6].[2]

**PRELIMINARY STATEMENT**

1. Carnero attempts to brand the Reorganized Debtors' Midstream Restructuring, including its related contract assumptions, as post-confirmation activity, involving nothing more than a breach of contract that lies outside the purview of this Court. Carnero's gambit, however, ignores the history of the Debtors' bankruptcy cases, the various orders of this Court, the explicit terms of the Plan, the terms of the Midstream Restructuring (including assumed contracts and other agreements Carnero initially never saw), and Carnero's prior participation in the Midstream Restructuring process during which it had the opportunity to object or reserve rights but remained silent.[3]

2. This lawsuit is Carnero's second attempt to obtain a judgment from a state court declaring that the Existing Commitments have been (or must be) terminated as a result of activities in the Debtors' bankruptcy cases and, as a result, the Comanche Gas must be delivered to Carnero's facilities. [Carnero I Dkt. No. 1-4 at 11 ¶¶ 36(j) – (l); Carnero II Dkt. No. 1-4 at 22 ¶¶ 36(c) – (g)].

---

[2] Unless otherwise specified, capitalized terms have the meanings provided in the *Amended and Supplemental Complaint* in the Declaratory Action (as defined below) [Decl. Action Dkt. No. 29] and *Defendants' Objection to Plaintiff's Motion to Remand to State Court or for Abstention* (the "Objection") in the Second Carnero Action (as defined below) [Carnero II Dkt No. 14]. References to the main bankruptcy case docket are cited as "Dkt. No. __" with citations to the relevant adversary proceedings as follows:

- the "Second Carnero Action" (this lawsuit, captioned above) is cited as "Carnero II Dkt. No. __";
- the "Declaratory Action" (*SN EF Maverick, LLC, et al.,* v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI)) is cited as "Decl. Action Dkt. No. __ "; and
- the "First Carnero Action" (*Carnero G&P, LLC* v. *SN EF UnSub LP, et al.*, Adv. Pro. No. 21-03908 (MI)) is cited as "Carnero I Dkt. No. __".

[3] Carnero also misrepresents the facts. In paragraph 2 of its reply, Carnero argues, without citing any authority, that "only an approximate 12.5% of the Comanche working interest was subject to the Reorganized Debtors' bankruptcy case." [Carnero II Dkt. No. 18]. But this is not true. Maverick purchases the other working interest owners' hydrocarbons produced from the Comanche field, pursuant to certain marketing purchase agreements, and then markets and sells those hydrocarbons pursuant to certain midstream gathering, transportation, processing, and marketing agreements.

But redirecting the Comanche Gas volumes (or their economic value) to Carnero's facilities would directly contravene relief approved and granted by this Court.

3. The Second Carnero Action is a broadside attack on a complicated restructuring integral to implementation of the Plan. Restructuring the midstream contracts and improving their economic terms through post-confirmation assumption, rejection, and renegotiation, is central to the Plan, its implementation, and the Reorganized Debtors' rights under the Bankruptcy Code. Pursuant to the Settlement Order, the Reorganized Debtors assumed the Assumed Comanche Agreements (as defined in that order), including the Existing Commitments. A judgment from a state court declaring that the Comanche Gas is dedicated to Carnero without regard to the Existing Commitments or that any amendment to "agreements that flow gas . . . to the midstream providers under the Existing Commitments" is a breach of the GGPA (as requested in paragraph 36 of Carnero's Amended Petition) would directly conflict with the Settlement Order and effectively unwind the Midstream Restructuring. Allowing a state court to adjudicate the Second Carnero Action would invade this Court's authority to enter orders necessary for the consummation of a confirmed plan. *See, e.g.*, *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 306 (5th Cir. 2002). Accordingly, this Court has and should exercise jurisdiction over the Second Carnero Action.

4. Carnero contends that this Court should ignore the defenses and claims that the Defendants have raised both in the Second Carnero Action and the related Declaratory Action. That is wrong. "[T]he court may consider unfiled claims (provided that they are not immaterial, made solely for the purpose of obtaining jurisdiction, or wholly insubstantial and frivolous) to determine whether it has subject-matter jurisdiction over this proceeding." *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 622 B.R. 680, 693 (Bankr.

N.D. Tex. 2020). Courts in the Fifth Circuit have routinely held that actions to enforce the terms of a confirmed plan are "core" and that "claims that are based on state law defenses may be considered core if they are dependent upon rights created in bankruptcy." *Id.*

5. Here, Carnero's Amended Petition does not merely seek interpretation of the GGPA under Texas state law, without further consequences for the Plan. To the contrary, Carnero's Amended Petition effectively challenges the assumption of the Existing Commitments, the Midstream Restructuring, the agreements effecting the Midstream Restructuring, and the very process provided under the Plan to effectuate it through this Court's orders and section 365 of the Bankruptcy Code. As such, the Second Carnero Action is clearly a core proceeding.

6. None of this should come as a surprise to Carnero, which has been an active participant in the Debtors' bankruptcy cases and in the post-Effective Date Midstream Restructuring process. Rather than follow the process as outlined in the Plan and approved by this Court, however, Carnero chose to lie in wait rather than object to the assumption of contracts that Carnero now claims violates its rights. The time for Carnero to object to the Plan has long passed. "When parties to a bankruptcy case have been given a 'fair chance to challenge [a] [b]ankruptcy [c]ourt's subject matter jurisdiction' or a provision of a plan approved by the bankruptcy during the case and fail to do so, they cannot challenge the court's order later through a collateral attack." *Okla. State Treasurer v. Linn Op., Inc. (In re Linn Energy, LLC)*, 927 F.3d 862, 867 (5th Cir. 2019) (quoting *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 152 (2009)).

7. As discussed in greater detail below and in the Defendants' Objection [Carnero II Dkt. No. 14], this Court should retain jurisdiction and deny Carnero's repeated efforts to remand the Second Carnero Action to state court.

## ARGUMENT

### A. The assumptions, rejections, and amendments through which the Reorganized Debtors effected the Midstream Restructuring are central to Plan implementation.

8. The Plan and the Confirmation Order expressly contemplated a post-Effective Date restructuring of, among other things, the gathering, processing, transportation, and marketing of Comanche hydrocarbons.[4] This process was a central feature of the Plan, granting the Reorganized Debtors broad authority to assume, amend, and reject executory contracts after the Effective Date, with the assumptions nevertheless being effective as of the Effective Date.

9. The Debtors, contract counterparties, and this Court agreed that the assumption and rejection process would continue after confirmation and the Effective Date. That decision was based on the exigencies present at the time; that process (including the Midstream Restructuring) was crucial to the Debtors' reorganization. More particularly, when this Court confirmed the Plan, there were three main remaining hurdles to the Debtors' successful reorganization: (a) marshalling sufficient liquidity for the Plan to go effective on the Effective Date, (b) resolving the dispute with Gavilan regarding the Debtors' operatorship rights over the Comanche assets, and (c) restructuring the Debtors' midstream gathering, transportation, processing, and marketing contracts. Resolving

---

[4] Under Article V.A of the Plan, the Reorganized Debtors could assume, assume and assign, assume with amendments, and reject executory contracts following the Effective Date [Dkt. No. 1205 at 26]. Pursuant to Articles IV.G and V.A, prior to assumption, executory contracts do not re-vest in the Reorganized Debtors [*Id.* at 22, 26]. The Confirmation Order governed the assumption/rejection process, providing that:

- contract counterparties could object to assumptions and rejections following Confirmation;
- the Reorganized Debtors could amend the assumption and rejection schedules after Confirmation, subject to objection deadline extensions;
- contracts could not be assumed or rejected while objections were pending without a court order; and
- executory contracts and unexpired leases with "Counterparties" (including Carnero) would be performed by the Reorganized Debtors pending assumption or rejections.

[Dkt. No. 1212 at ¶¶ 17–24].

these hurdles—especially the third and final hurdle—required a post-confirmation assumption and rejection process.

10. Indeed, the Reorganized Debtors pursued a strategy ***with Carnero*** to restructure certain of the midstream agreements, ultimately reaching an agreement pursuant to which the Reorganized Debtors would attempt to reject the Existing Commitments so the Comanche Gas could potentially flow to Carnero's facilities (the "SNMP-Targa Settlement"). The SNMP-Targa Settlement was negotiated and agreed to during the period between confirmation of the Plan and the Effective Date to provide the Debtors with (a) additional liquidity and (b) a potential path to a midstream restructuring. [Dkt. Nos. 1309 at 4; 1415]. The restructuring contemplated by that agreement would have, if rejection of the Existing Commitments were ultimately successful, dismantled the pre-existing framework for the marketing, gathering, processing, and transportation of hydrocarbons from the Comanche Assets, allowing for the potential flow of the Comanche Gas to Carnero's facilities years earlier than anticipated.[5]

11. On the Effective Date, the Debtors filed a motion to approve the SNMP-Targa Settlement discussing the importance of the post-confirmation assumption process:

> Under the extraordinary circumstances of the global pandemic combined with general stress in the oil and gas industry, ***this Court confirmed the Plan prior to the Debtors determining*** on a final basis whether certain critical midstream contracts, agreements, and relationships could or ***should be assumed, rejected, or renegotiated. The Plan contemplates addressing such issues after confirmation***.
>
> ***[M]any of these matters are critical*** to the Debtors' businesses and reorganization plans . . . ***Development and implementation of a viable strategy with midstream providers*** to reduce such costs, rates, and fees ***is crucial*** . . . [and] the Debtors have been working tirelessly leading up to and following the confirmation of the Plan to

[5] At the hearing regarding the SNMP-Targa Settlement, the counterparties to the relevant contracts appeared and reserved their rights. Carnero, notably, did not.

> identify, finalize, and implement a strategy to improve their midstream cost structure.

[Dkt. No. 1309 at 3 (emphasis added)]. The motion explained that the "Settlement Agreement will provide the Debtors with a path to materially lower costs" and allow the Debtors "to emerge from these chapter 11 cases on a course to become a stronger, more resilient enterprise." [*Id.* at 6 (emphasis added)].

12. Under the SNMP-Targa Settlement, the Debtors were to "***assume . . . and amend*** certain existing agreements among the Settlement Parties [including Carnero]" [*Id.* (emphasis added)] and attempt to "reject certain midstream and marketing agreements currently in place with respect to the Comanche Assets" (*i.e.*, the Marketing Agency Agreement and Midstream Agency Agreement[6] with the Oxy/Wes Parties[7]). [Dkt. No. 1309 at 10, 45]. In other words, Carnero was well aware of the power to assume and amend executory contracts under the Plan as part of the Midstream Restructuring. If the Reorganized Debtors had been successful in rejecting the contemplated agreements, Carnero could have benefitted mightily, receiving hydrocarbons from the Comanche Assets more than a decade earlier than provided by the GGPA.

13. Critically, however, the SNMP-Targa Settlement set a "Closing Outside Date" of October 1, 2020. If the proposed restructuring was not consummated by that date, any party then had the option to terminate the settlement agreement. [*Id.* at 33, 47]. The Reorganized Debtors' effort to reject the agreements resulted in protracted litigation with the Oxy/Wes Parties, and the proposed transaction was never consummated. Ultimately, in mid-2021, the Reorganized Debtors determined that it was in their best interests to terminate the settlement, assume the agreements

---

[6] The agreements are defined in the SNMP-Targa Settlement [Dkt. No. 1309 at 36].

[7] The Oxy/Wes Parties were plaintiffs in the adversary proceeding captioned *Occidental Petroleum Corp., et. al. v. Sanchez Energy Corp. et. al.,* Adv. Pro. 20-03198 (MI).

containing the Existing Commitments, and seek to renegotiate better economics. Through these negotiations, the Reorganized Debtors charted a new course for the Midstream Restructuring based on the pre-existing framework for gathering, processing, transportation, and marketing (in exchange for improved economic terms). Under that pre-existing framework, the Comanche Assets would remain subject to the Existing Commitments, meaning that Carnero would remain in its role as backup-up processor under the GGPA until 2033. As a result, Carnero would occupy the same position with respect to the Comanche Assets as it had before the Debtors filed their chapter 11 petitions.

14. But Carnero decided it wanted those volumes ***immediately***, as had been contemplated in the SNMP-Targa Settlement if rejection of the Existing Commitments had been successful. Accordingly, shortly after receiving notice terminating the SNMP-Targa Settlement, Carnero sought to derail the Reorganized Debtors' new plan for the Midstream Restructuring. In fact, a centerpiece of Carnero's strategy was to wait until the Midstream Restructuring was consummated and then attempt to drag this dispute into Texas state court, because Carnero's claims flouted the Midstream Restructuring process provided for under the Plan and the Confirmation Order.

15. Restructuring the midstream contracts and improving the economic terms for the Reorganized Debtors through post-confirmation assumption, rejection, and renegotiation is, and has always been, central to implementation of the Plan and the Reorganized Debtors' rights under the Bankruptcy Code. The fact that the Midstream Restructuring included ***amendments*** to some of the Assumed Comanche Agreements, does not change the jurisdictional analysis or the centrality of the restructuring to the implementation of the Plan. Article V.F of the Plan expressly

provides that each contract assumed is assumed with any amendments and that amendments do not amend or alter the prepetition nature of the contract:

> F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*
>
> Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.
>
> Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

[Dkt. No. 1205 at 28]. Regardless of when assumption occurs, the Plan provides that assumption—which includes any amendments—is "effective as of the Effective Date." [*Id.* at 26].

16. In addition, the Midstream Restructuring improved economics for the Reorganized Debtors through settlements and compromises of claims and controversies among certain parties to the Existing Commitments. These, too, were expressly contemplated and approved by the Plan. Article IV.A of the Plan is explicit that upon the Effective Date, "the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan[.]" [Dkt. No. 1205 at 19]. Furthermore, Article IV.A of the Plan provides that the Confirmation Order constitutes this Court's approval of such settlements and compromises as well as a finding that they are "in the best interests of the Debtors, their Estates, and Holders of Claims and Interests" and are fair, equitable and reasonable. [*Id.*]. In sum, the Midstream Restructuring under the Plan is a combination of agreements, settlements, compromises, assumptions, rejections, and amendments, all contemplated by and incorporated into the Plan and approved by the Confirmation Order.

**B. This Court has jurisdiction over the Second Carnero Action.**

17. "The Fifth Circuit has consistently held that a bankruptcy court has post-confirmation jurisdiction over matters that bear on the interpretation or execution of the debtor's plan." *Schermerhorn v. Centurytel, Inc., (In re SkyPort Glob. Commc'ns Inc.)*, No. 08-36737-H4-11, 2013 WL 4046397, at *39 (Bankr. S.D. Tex. Aug. 7, 2013), *aff'd*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part*, 642 F. App'x 301 (5th Cir. 2016) *and aff'd*, 661 F. App'x 835 (5th Cir. 2016) (internal quotations omitted). This includes jurisdiction over actions to "protect[] the confirmation, prevent[] interference with the reorganization and aid[e] the plan's execution. *Wildwood Prop. Owners Ass'n v. Bordelon, (In re Wildwood Prop. Owners Ass'n)*, No. 82-04155, 2017 WL 3189874, at *3 (Bankr. S.D. Tex. July 25, 2017) (Isgur, J.) (internal quotation omitted).

18. Carnero challenges the assumption of the Existing Commitments, the Midstream Restructuring, the agreements effectuating the Midstream Restructuring, and the very process provided under the Plan to effectuate it through the application of various orders of this Court and section 365 of the Bankruptcy Code.[8] Therefore, the Second Carnero Action is a core proceeding. *See, e.g.*, *Evercore Cap. Partners II, LLC. v. Nancy Sue Davis Tr. (In re Davis Offshore, L.P.)*, 644 F.3d 259, 262 n.3 (5th Cir. 2011) ("We are persuaded that [the Bankruptcy Court] had core jurisdiction to interpret the Plan and confirmation order pursuant to 28 U.S.C. § 157(b)"); *Highland Cap. Mgmt. L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 589 (5th Cir. 2008) ("The jurisdiction extends to matters that impact compliance with or

---

[8] In paragraph 25 of its Amended Petition, Carnero alleges as follows:

> On information and belief, effective December 21, 2021, Anadarko, Mesquite, Maverick, and others, with the input and participation of UnSub and the WIPs, entered into agreements that (i) modify the commercial terms of or applicable to the Existing Commitments; (ii) cause the extension the Existing Commitments; and/or (iii) otherwise modify (or in the case of the Gavilan acreage, reinstate) the Existing Commitments in a manner that violates the GGPA. As a result, Mesquite, Maverick, UnSub, and the WIPs have undermined the purpose of the GGPA and breached their representations and promises to Carnero and their obligations as "Producers" under the GGPA.

completion of the reorganization plan") (internal quotations omitted); *Beta Op. Co., LLC v. Aera Energy, LLC (In re Mem'l Prod. Partners LP)*, 581 B.R. 206, 216 (Bankr. S.D. Tex. 2018) (Isgur, J.), *aff'd*, No. CV-H-18-412, 2018 WL 5634142 (S.D. Tex. Oct. 31, 2018), *aff'd*, 799 F. App'x 221 (5th Cir. 2020) ("Because this proceeding involves the administration of the Debtors' chapter 11 plan, as well as the impairment status of the Previous Owners' interests and claims by that plan, this proceeding arises only in the context of bankruptcy and is thus within this Court's subject matter jurisdiction.").

19. Under Article XI of the Plan and sections 105(a) and 1142 of the Bankruptcy Code, this Court "retained exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan" (*e.g.*, (a) matters related to executory contracts, including: (i) assumption, rejection, and assignment of executory contracts and the liquidation of claims arising therefrom; (ii) potential contractual obligations under assumed executory contracts; and (iii) amending, modifying, or supplementing, after the Effective Date and pursuant to the Plan, any executory contracts; (b) issuance of injunctions and other orders or actions necessary or appropriate to restrain interference with consummation or enforcement of the Plan; and (c) resolution of any controversies or disputes in any way related to the Chapter 11 Cases). [Dkt. No. 1205 at 40]. There can be no dispute that this Court has retained jurisdiction to interpret the Plan, the Confirmation Order, and all related orders implementing the Midstream Restructuring.

20. Under the standards articulated by the Fifth Circuit in *U.S. Brass*, bankruptcy court subject matter jurisdiction exists here, even under the narrowest test. In *U.S. Brass,* the chapter 11 plan had "been substantially consummated, but it ha[d] not been *fully* consummated," and the debtor still had an obligation to resolve certain claims and that obligation was "at the heart of [the] dispute." 301 F.3d at 305 (emphasis in original). The Fifth Circuit concluded that the bankruptcy

court had "arising under" jurisdiction over the dispute, which was a core proceeding, because the relief requested was "necessary to the implementation or execution of the . . . plan" and the "dispute would not exist outside of this bankruptcy case." *Id.*

21. In *Senior Care Centers,* the Bankruptcy Court for the Northern District of Texas considered a chapter 11 plan that, similar to *U.S. Brass*, had been substantially but not fully consummated, and found that the dispute at issue "must be resolved prior to the full consummation of the Plan[.]" 622 B.R. at 689. There, a lessor, whose lease had been assumed by the reorganized debtor, sought a state court determination after the effective date of a plan that a proposed sale of reorganized equity held by a liquidating trust for unsecured creditors would trigger a change of control under, and potentially constitute a breach of, the assumed lease. *Id.* at 686. The court noted that the litigation had been filed as an attempt to "restrict the Liquidating Plan Trust's actions in contravention of this court's Confirmation Order." *Id.* at 690. Thus, the court found that the "proceeding will certainly impact compliance with or completion of, the reorganization plan" and that it had subject matter jurisdiction over the dispute. *Id.* at 691.

22. Here, as in *U.S. Brass* and *Senior Care Centers*, the Plan has been substantially consummated, but it has not been ***fully*** consummated. Approximately 80% of the New Common Stock has yet to be distributed, and its value hinges on the improved economics of the Midstream Restructuring. Carnero's claims thus directly affect compliance with, or completion of, the Plan and, like in *U.S. Brass* and *Senior Care Centers*, this Court has subject matter jurisdiction.

23. Carnero's Amended Petition is a collateral attack on the Plan and the Midstream Restructuring, notwithstanding Carnero's efforts to characterize its attack as a simple breach of contract claim.[9] Indeed, Carnero's Amended Petition is clear that it is attacking the entire

---

[9] Carnero's breach of contract claims are without merit. Prior to filing its Amended Petition, Carnero had never seen any of the documents that it alleges were violated. Rather, Carnero merely speculates that a breach must

Midstream Restructuring. Carnero claims that the Midstream Restructuring is "denying it the benefit of its bargain to collect millions of dollars in fees from receiving" the Comanche hydrocarbons [Carnero II Dkt. No. 1-4 at 25 ¶ 50]. Carnero has run to state court seeking all "general or special, legal or equitable" relief to which it may be entitled, without regard to its effect on the Plan [Carnero II Dkt. No. 1-4 at 25 ¶ 52]. It now seeks the very flow of Comanche Gas that is promised to others pursuant to the Plan and the assumed Existing Commitments. That is, Carnero's Amended Petition claims that the Reorganized Debtors should have restructured the midstream contracts for Carnero's benefit, not in the manner this Court approved pursuant to the Plan.

24. Obviously, the Reorganized Debtors cannot flow the Comanche Gas both to Carnero and the parties to the Existing Commitments. The relief Carnero seeks would override the Midstream Restructuring and frustrate and/or modify a key element of the Plan and the Reorganized Debtors' rights to elect how to market their hydrocarbons consistent with their rights under section 365 of the Bankruptcy Code.

25. Evaluation and enforcement of a chapter 11 plan fall within a bankruptcy court's jurisdiction because such actions concern the administration of the bankruptcy case and may arise only in the context of that case. *In re Mem'l Prod. Partners LP*, 581 B.R. at 215. "In the post-confirmation context, the Fifth Circuit has determined that bankruptcy courts have 'arising under' subject matter jurisdiction to issue declaratory judgments interpreting the plan." *Quarternorth*

have occurred. Carnero admits as much, stating it "continues to believe that the amendments [to certain of the Midstream Restructuring contracts] have a material impact on the parties' rights and obligations under the GGPA to the detriment of Carnero." [Carnero II Dkt. No. 18 at 11 fn.7]. Not only does Carnero fail to identify a specific breach of any of the agreements, but it also cannot explain how—even if a breach occurred—such a breach operates outside of the Midstream Restructuring process under the Plan or implicates only state law. Carnero complains that it has not seen the agreements. [*Id.*] Yet, it fails to mention the months' long effort by the Defendants to provide Carnero with the agreements pursuant to an NDA or protective order. Indeed, it was only at the end of April 2022 when Carnero finally agreed to a protective order. The Defendants have attached the agreements as exhibits to their *Motion for Judgment on the Pleadings*. [Carnero II Dkt. Nos. 19, 20].

*Energy, LLC v. Atl. Mar. Servs., LLC (In re Fieldwood Energy LLC)*, No. 20-33948, 2021 WL 4839321, at *4 (Bankr. S.D. Tex. Oct. 15, 2021) (Isgur, J.) (citing *Mackey v. M.C. Inv. (In re Martinez)*, No. 00–40412, 2000 WL 34508398, at *1 (5th Cir. Oct. 5, 2000) and *Ins. Co. of N. Am. v. NGC Settlement Tr. & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1064 (5th Cir. 1997)).

26. The time for Carnero, an active participant in the post-Effective Date Midstream Restructuring process, to object to the Plan has long passed. "[W]hen parties to a bankruptcy case have been given 'a fair chance to challenge [a] [b]ankruptcy [c]ourt's subject matter jurisdiction' or a provision of a plan approved by the bankruptcy court during the case and fail to do so, they cannot challenge the court's order later through a collateral attack." *In re Linn Energy, L.L.C.*, 927 F.3d at 867 (quoting *Travelers*, 557 U.S. at 152).

27. Allowing a party like Carnero to lie in wait and then run to a state court to disrupt a carefully stitched together chapter 11 plan runs counter to the purposes of the Bankruptcy Code generally and section 365 thereof specifically. "By permitting debtors to shed disadvantageous contracts but keep beneficial ones, § 365 advances one of the core purposes of the Bankruptcy Code: 'to give worthy debtors a fresh start.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, No. 17 BK 3283-LTS, 2021 WL 2676983, at *5 (D.P.R. June 29, 2021) (quoting *Eagle Ins. Co. v. BankVest Cap. Corp. (In re BankVest Cap. Corp.)*, 360 F.3d 291, 296 (1st Cir. 2004)). This is even more true when considering that the policy behind section 365 is focused on creditors, not debtors:

> ***The interests of third-party creditors is at the core of § 365***. Even more so than the protections of the automatic stay which serve to protect the debtor from piecemeal dismemberment, the ability to reject an executory contract is ***rooted in the principle of maximizing the return to creditors*** by permitting a debtor in possession to renounce title to and abandon burdensome property if such action is in the best interests of the estate.

*In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001) (internal citations omitted) (emphasis added).

**C. The "well-pleaded complaint" rule is relevant only to "arising under" jurisdiction and, in any event, confirms jurisdiction over the Second Carnero Action.**

28. Carnero argues that this Court cannot rely on matters that Carnero describes as "defenses" to establish this Court's jurisdiction (*i.e.*, the issues related to the interpretation of the Bankruptcy Code and this Court's prior orders). However, courts in the Fifth Circuit have routinely held that actions to enforce the terms of a confirmed plan are "core" and that "claims that are based on state law defenses may be considered core if they are dependent upon rights created in bankruptcy." *Senior Care Ctrs.,* 622 B.R. at 693.

29. Moreover, the "well-pleaded complaint" rule "does not apply in determining whether a bankruptcy court has 'related to' jurisdiction over a removed case." *Collins v. Sidharthan (In re KSRP, Ltd.),* 809 F.3d 263, 268 n.3 (5th Cir. 2015); *Senior Care Ctrs.*, 622 B.R. at 691 ("The well-pleaded complaint rule is rarely applicable in the bankruptcy removal context because bankruptcy jurisdiction under 28 U.S.C. § 1334 extends farther than 28 U.S.C. § 1331."). Indeed, the well-pleaded complaint rule is relevant only to "arising under" jurisdiction. *See, e.g., Firefighters' Ret. Sys. v. Consulting Grp. Servs., LLC,* 541 B.R. 337, 348 (M.D. La. 2015) (citing *Am. Nat'l Red Cross v. S.G.,* 505 U.S. 247, 258 (1992)); *Principal Life Ins. Co. v. JP Morgan Chase Bank, N.A.,* (*In re Brooks Mays Music Co.)*, 363 B.R. 801, 815 (Bankr. N.D. Tex. 2007) (same); *Newby v. Enron (In re Enron Corp. Sec., Derivative & "ERISA" Litig.)*, 511 F. Supp. 2d 742, 764 (S.D. Tex. 2005) (same). Because this Court has "arising in" and "related-to" jurisdiction over the Second Carnero Action (in addition to the other forms of jurisdiction), the well-pleaded complaint rule is irrelevant.

30. Even if only "arising under" jurisdiction existed, the well-pleaded complaint rule would confirm the Court's jurisdiction. Because the Second Carnero Action seeks a declaratory judgment, the relevant question is not whether ***Carnero's*** claims purport to sound in state law, but "whether 'if the ***declaratory judgment defendant*** brought a coercive action to enforce its rights, that suit would necessarily present a federal question.'" *New Orleans & Gulf Coast Ry. Co. v. Barrios,* 533 F.3d 321, 329 (5th Cir. 2008) (emphasis added) (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983)); *see also NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) ("Since a declaratory judgment action is inherently anticipatory, the federal issue must form part of the hypothetical well-pleaded complaint that ***the declaratory judgment defendant*** would have filed but for the anticipatory action." (emphasis added)).

31. Here, the Defendants seek to vindicate their rights against Carnero regarding the matters in the Second Carnero Action before this Court under the Bankruptcy Code. In fact, after Carnero dismissed the First Carnero Action, the Defendants filed their own adversary proceeding asking the Court to clarify the parties' rights and obligations. This Court is free to consider the claims and defenses filed by the Defendants to ascertain whether it has jurisdiction here. Indeed, the court in *Senior Care Centers* assessed the "unfiled claims" of a declaratory action that a liquidating plan trust was considering to bring in order to determine "whether [the court] has subject-matter jurisdiction over this proceeding. It logically flows that the court can consider whether those unfiled claims are core or non-core." 622 B.R. at 693. Thus, the Defendants' filed claims and defenses certainly can be considered by this Court when ascertaining jurisdiction.

32. The Defendants later amended their adversary complaint when Carnero belatedly announced that it had changed its theory of the case. The Second Carnero Action is an obvious

attempt to interfere with the Defendants' ability to seek such relief, wrapped in the guise of a state-law declaratory judgment action. Tellingly, Carnero's reply does not identify any coercive state-law action that the Defendants could bring against Carnero, and that omission is fatal to Carnero's invocation of the well-pleaded complaint rule.

**D. Neither mandatory nor permissive abstention applies.**

33. The Second Carnero Action directly invokes the Plan, the Confirmation Order, and multiple orders of this Court (including, without limitation, the Settlement Order, the Carnero Settlement Approval Order, and the WIP PMA Assumption Order). Mandatory abstention does not apply because the Second Carnero Action is a core proceeding and, even if this Court finds that it is non-core, the substance of the Second Carnero Action is intertwined with the Debtors' bankruptcy cases. Furthermore, as discussed in greater detail in the Objection [Carnero II Dkt. No. 14 at 31–35], nearly all permissive abstention factors weigh against permissive abstention.

**CONCLUSION**

34. For all of the foregoing reasons, and for the reasons set forth in the Objection, the Defendants request that the Motion be denied.

Respectfully submitted on May 16, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana St., Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

/s/ *Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I hereby certify that, on May 16, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**DEFENDANTS' EMERGENCY MOTION TO SCHEDULE A STATUS CONFERENCE AND A COMMON HEARING DATE FOR THE MOTION TO REMAND, THE MOTION <u>TO DISMISS, AND THE MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NO LATER THAN THURSDAY MAY 19, 2022.**

**IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU**

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively, the "<u>Reorganized Debtors</u>"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002. References to the "<u>Debtors</u>" are to the debtors and their estates that filed the above-referenced chapter 11 cases prior to their reorganization.

**MUST EITHER APPEAR AT THE HEARING, IF ANY, OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Pursuant to Rule 6(b) of the Federal Rules of Civil Procedure and Rule 9006(b) of the Federal Rules of Bankruptcy Procedure, Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), and SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Defendants") file this motion (the "Motion") to schedule (1) a status conference for this Thursday, May 19, 2022, and (2) a common hearing date for three overlapping matters pending before this Court. Plaintiff Carnero G&P, LLC ("Plaintiff") opposes the Motion. The Defendants respectfully request that the Motion be granted, and in support thereof state as follows:[2]

1. The overlapping matters arise from two adversary proceedings: the Declaratory Action and the Second Carnero Action. The following is an abridged timeline, summarizing the relevant procedural history.

- July 30, 2021: Carnero files the First Carnero Action in Harris County District Court. [Carnero I Dkt. No. 1-4].

- September 10, 2021: The Defendants remove the First Carnero Action. [Carnero I Dkt. No. 1].

---

[2] Unless otherwise specified, capitalized terms have the meanings provided in the *Amended and Supplemental Complaint* in the Declaratory Action (as defined below) [Decl. Action Dkt. No. 29]. Entries on the docket of the main bankruptcy case will be cited as, "Dkt. No. __", while citations to the adversary proceedings are as follows:

- the "Second Carnero Action" (this lawsuit, captioned above) is cited as "Carnero II Dkt. No. __";
- the "Declaratory Action" (*SN EF Maverick, LLC, et al.*, v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI)) is cited as "Decl. Action Dkt. No. __ "; and
- the "First Carnero Action" (*Carnero G&P, LLC* v. *SN EF UnSub LP, et al.*, Adv. Pro. No. 21-03908 (MI)) is cited as "Carnero I Dkt. No. __".

- December 7, 2021: At a hearing on its motion to remand, Carnero states that it can amend its petition to address this Court's jurisdictional concerns. [Carnero I Dkt. No. 32].

- December 10, 2021: Carnero dismisses the First Carnero Action. [Carnero I Dkt. No. 31].

- December 21, 2021: The Defendants file the Declaratory Action to resolve the disputes raised in the First Carnero Action. [Decl. Action Dkt. No. 1].

- December 21, 2021: After a hearing, this Court approves the Debtors' assumption of certain amended midstream agreements. [Dkt. No. 2253]. Carnero, a contractual counterparty, attends the hearing but does not object or reserve its rights.

- January 21, 2022: Carnero files the Second Carnero Action in Harris County District Court, purportedly abandoning the theories espoused in the First Carnero Action and advancing a revised theory.

- January 21, 2022: Carnero moves to dismiss the Declaratory Action, arguing that the suit addresses theories Carnero has purportedly abandoned. [Decl. Action Dkt. No. 8].

- February 28, 2022: The Defendants remove the Second Carnero Action.

- March 2, 2022: The Defendants move to amend the Declaratory Action complaint to address Carnero's new theories in the Second Carnero Action. [Decl. Action Dkt. No. 23].

- March 17, 2022: Carnero states it will not oppose the Defendants' motion for leave to amend their complaint in the Declaratory Action. [Decl. Action Dkt. No. 27].

- March 23, 2022: The Defendants amend and supplement the Declaratory Action complaint. [Decl. Action Dkt. No. 29].

- **March 30, 2022: Carnero moves to remand the Second Carnero Action (the "<u>Motion to Remand</u>"). [Carnero II Dkt. No. 6].**

- **April 6, 2022: Carnero moves to dismiss the amended Declaratory Action complaint (the "<u>Motion to Dismiss</u>"). [Decl. Action Dkt. No. 31].**

- May 9, 2022: Briefing complete on the Motion to Dismiss in the Declaratory Action.

- **May 11, 2022: The Defendants move for judgment on the pleadings in the Second Carnero Action (the "Motion for Judgment on the Pleadings"). [Carnero II Dkt. Nos. 19, 20].**

- May 16, 2022: Briefing complete on the Motion to Remand the Second Carnero Action.

- May 23, 2022: Current hearing date for the Motion to Remand the Second Carnero Action.

- June 1, 2022: Under the current (default) schedule, Carnero's opposition to the Motion for Judgment on the Pleadings is due no later than June 1, 2022.

2. Between the Declaratory Action and the Second Carnero Action, there are three matters pending (each noted in **bold** above): (1) Carnero's Motion to Remand the Second Carnero Action; (2) Carnero's Motion to Dismiss the Declaratory Action; and (3) the Defendants' Motion for Judgment on the Pleadings in the Second Carnero Action. Briefing on the Motion to Remand and Motion to Dismiss is complete, and any opposition to the Motion for Judgment on the Pleadings is due no later than June 1, 2022, under the current schedule. The Defendants anticipate that they would file a reply in support of their Motion for Judgment on the Pleadings sufficiently in advance of a hearing. As noted, there is a hearing set for Monday, May 23, 2022, on Carnero's Motion to Remand (the "May 23 Hearing"). No hearing date has been set for either the Motion to Dismiss or the Motion for Judgment on the Pleadings.

3. These three motions overlap in numerous respects and should be considered simultaneously because they stem from one long-running dispute. All three require an understanding of (1) the assumed (as amended) midstream contracts approved by this Court on December 21, 2021 [Dkt. No. 2253]; (2) Carnero's midstream contracts with the Defendants (the GGPA and related Ratification Agreements); and (3) the complicated history of the Debtors'

bankruptcy cases, particularly, the post-confirmation process for assuming and rejecting contracts related to the Debtors' Midstream Restructuring.

4. There is no realistic way to argue any of these matters in isolation from one another. For example, resolution of the Motion for Judgement on the Pleadings requires the Court to interpret the Confirmation Order to resolve whether Carnero forfeited its right to attack the midstream settlement—highly relevant to the Court's jurisdictional analysis in the Second Carnero Action. Moreover, the assumed (as amended) midstream agreements attached to the Motion for Judgment on the Pleadings will also help inform the jurisdictional analysis. Indeed, the relief Carnero seeks or opposes in both the Declaratory Action and the Second Carnero Action turns on the substance of the agreements that were attached to the Defendants' Motion for Judgment on the Pleadings. Likewise, Carnero's Motion to Dismiss the Declaratory Action rests in large part on the jurisdictional arguments it advances in its Motion to Remand. Simply put, argument on any one of these matters will require constant cross-reference to the other matters.

5. The Defendants, therefore, submit that good cause exists to convene a single hearing on all three matters, and that proceeding in such a manner would be far and away the more efficient course of action. The Defendants anticipate that Carnero will seek an extension of time for its response to the Motion for Judgment on the Pleadings, and it appears that (even with such an extension) briefing will be complete on all three matters by mid-June. This Court can then convene a hearing at its convenience thereafter in late June or early July. This Court has the inherent authority to "protect its jurisdiction and judgments and to control its docket," *In re Cauthen*, 152 B.R. 149, 154 (Bankr. S.D. Tex. 1993) (quoting *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 360 (5th Cir. 1986)), and these circumstances support the requested relief.

6. In addition to the significant efficiencies this approach would generate, the Defendants also seek to avoid further delay via procedural maneuvering. As the above timeline recounts, Carnero first filed its state court lawsuit in July 2021—more than 10 months ago—but the parties have yet to join issue on a single substantive matter. Consolidating these three matters for a single hearing is far more likely to lead to a more expeditious overall resolution than the piecemeal procedural maneuvering that Carnero has pursued to date.

7. The requested relief will not prejudice Carnero. Indeed, Carnero presumably will benefit from additional time to complete briefing on the Motion for Judgment on the Pleadings. Conversely, the Defendants will be significantly prejudiced if Carnero is permitted to proceed in a piecemeal fashion, inviting it to again modify its strategy and pleadings if the winds are not in its favor.

8. Counsel for the Defendants contacted Carnero's counsel and proposed the following schedule, extending the deadlines for the briefing on the Motion for Judgment on the Pleadings and resetting the May 23 Hearing:

- Carnero's Objection to the Motion for Judgment on the Pleadings: June 15, 2022
- The Defendants' Reply in Support of the Motion for Judgment on the Pleadings: June 29, 2022
- Proposed Hearing on the Motion to Remand, the Motion for Judgment on the Pleadings, and the Motion to Dismiss: Week of July 11, 2022.

The Defendants asked Carnero for a response by Tuesday, May 17, at 5 PM Eastern. Carnero failed to respond, thus prompting this Motion.

9. At a minimum, the Defendants respectfully request that this Court schedule a status conference for this Thursday, May 19, so that the parties may discuss scheduling as well as logistics for the May 23 Hearing should this Court decide to maintain the existing schedule.

10. For the foregoing reasons, the Defendants respectfully request that the Motion be granted.

Respectfully submitted on May 17, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
Joseph Bretschneider
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 17, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC.<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035(MI)** |

**Order Granting Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to Dismiss, and the Motion for Judgment on the Pleadings**
[Relates to Docket No. __]

Pending before this Court is Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing for the Motion to Remand, the Motion to Dismiss, and the Motion for Judgment on the Pleadings (the "Motion"). After considering the Motion, response, pertinent pleadings, and all papers and argument submitted by the parties regarding the Motion, the Court finds that the Motion should be, and it is hereby, **GRANTED**. It is therefore **ORDERED** that:

1. A status conference concerning the above-captioned action shall be scheduled for Thursday, May 19, 2022 (the "May 19, 2022 Status Confernece"), at the Court's convenience.

2. The hearing on Plaintiff Carnero G&P, LLC's Motion to Remand, originally scheduled for May 23, 2022, (Dkt. No. 9), shall be rescheduled to a later date, pending further discussion between the parties and the Court during the May 19, 2022 Status Conference.

Signed: _______________, 2022

________________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

**CARNERO G&P LLC'S OBJECTION TO DEFENDANTS' EMERGENCY MOTION TO SCHEDULE A STATUS CONFERENCE AND A COMMON HEARING DATE FOR THE MOTION TO REMAND, THE MOTION TO DISMISS, AND THE MOTION FOR JUDGMENT ON THE PLEADINGS**

(Related to Dkt. No. 22)

Carnero G&P LLC ("Carnero") files this Objection to the Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to Dismiss, and the Motion for Judgment on the Pleadings (the "Emergency Scheduling Motion").

---

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**SUMMARY**

Defendants desperately want to avoid a state court reviewing and interpreting the GGPA and the amendments to the Midstream Agency Agreements. The Motion for Judgment on the Pleadings, the timing of its filing and now the Emergency Scheduling Motion, are the Defendants seeking to conflate the matters pending before the Court in the hope that the Court will gloss over the jurisdictional and abstention arguments raised by Carnero in favor of reaching the merits of the dispute. The Court should not delay adjudication of the threshold jurisdictional issue based on the Defendants' gamesmanship. The parties agreed to a schedule for briefing the Motion to Remand and a hearing date of May 23rd. The Court should hold the parties to this agreement and proceed as planned with the hearing on May 23rd. The Court should not consider the Motion for Judgment on the Pleadings until after it has ruled on the Motion to Remand.

**ARGUMENT**

1. On April 6, 2022, the Court held a scheduling conference at which the parties agreed to a schedule for briefing and a hearing on Carnero's Motion to Remand. At no point during that hearing did the Defendants express an intent to file a motion for judgment on the pleadings. Both parties complied with the briefing schedule, and Carnero is prepared to argue its motion for remand on May 23, 2022 as the parties originally agreed.

2. On May 11, 2022, more than a month after the scheduling conference and less than two weeks before the hearing on the Motion to Remand, Defendants filed their Motion for Judgment on the Pleadings (Doc. No. 19). Calling the Defendants' motion a Rule 12(c) motion "on the pleadings" is, to be generous, a misnomer. The Defendants attached **45 exhibits** to their motion for judgment "on the pleadings." In reality, the Defendants' motion goes far beyond the

pleadings in this case and, pursuant to Rule 12(d), must be treated as a motion for summary judgment under Rule 56.

3. The Defendants have sought summary judgment from this Court before it has made the determination, which is central to the Motion to Remand, that it has jurisdiction. "A federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430-431 (2007) (citing *Steel Co.* v. *Citizens for Better Environment*, 523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)). "Without jurisdiction the court cannot proceed at all in any cause; it may not assume jurisdiction for the purpose of deciding the merits of the case." *Id.*

4. Prior to any consideration of the underlying merits, the Court must first determine (a) whether it has jurisdiction, and (b) even if it has jurisdiction, whether it should permissively abstain—issues that are to be decided by a ruling on the Motion to Remand. The Motion for Judgment on the Pleadings is a premature motion for summary judgment that is meant only to distract the Court from the issues raised in the Motion to Remand. The Court does not need to refer to the 45 exhibits attached to the Motion for Judgment on the Pleadings in order to rule on the Motion to Remand.

5. A single hearing on all three motions would generate inefficiencies and prejudice Carnero. If the Court determines that it does not have jurisdiction or that it should abstain, then it will never reach the merits of the complaint. In that scenario, it would be a waste of Carnero's resources to concurrently brief and prepare for a joint hearing on the Motion for Judgment on the Pleadings when it is likely that the motion will be moot. Defendants' complaint that they are

prejudiced by separate hearings is undercut by the fact that they filed the Motion for Judgment on the Pleadings and controlled the timing of that filing.

6. The most efficient process going forward would be to hold the hearing on the Motion to Remand because it is fully briefed and the parties agreed to a hearing on May 23rd. If the Court rules on the Motion to Remand at the conclusion of the hearing on May 23rd, either there will be no need for further discussion or scheduling related to the Motion for Judgment on the Pleadings (because the Court remanded the case) or the Court and the parties can then discuss a schedule for the Motion for Judgment on the Pleading and Motion to Dismiss (because the Court denied remand). If the Court takes the Motion to Remand under advisement, the Court should abate Carnero's deadline to respond to Motion for Judgment on the Pleadings until at least 21 days after the Court issues its ruling on the Motion to Remand. There is no reason for Carnero to be forced to respond to a premature Motion for Judgment on the Pleadings, which is substantively a motion for summary judgment, when the Court has not determined if it has jurisdiction.

## Conclusion

Carnero requests the Court deny the Emergency Scheduling Motion and grant Carnero such other and further relief as is just.

Dated: May 18, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Adversary Plaintiff**
**Carnero G&P, LLC**

## Certificate of Service

I hereby certify that on May 18, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

**ORDER DENYING DEFENDANTS' EMERGENCY MOTION TO SCHEDULE A STATUS CONFERENCE AND A COMMON HEARING DATE FOR THE MOTION TO REMAND, THE MOTION TO DISMISS, AND THE MOTION FOR JUDGMENT ON THE PLEADINGS**
(Related to Dkt. No. 22)

Pending before the Court is Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing for the Motion to Remand, the Motion to Dismiss, and the Motion for Judgment on the Pleadings (the "Motion"). After considering the Motion and Carnero's response, the Court finds that the Motion lacks merit. It is therefore ORDERED that:

1. The Motion is DENIED.

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. The hearing on the Motion to Remand will proceed as currently scheduled on May 23, 2022 at 9:00 a.m.

3. Carnero's deadline to file a response to the Motion for Judgment on the Pleadings is abated until 21 days after the Court enters an order denying the Motion to Remand.

Dated: May ___ , 2022.

Honorable Marvin Isgur
United States Bankruptcy Judge

United States Bankruptcy Court
Southern District of Texas

**ENTERED**
May 18, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC.<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035(MI)** |

**Order Granting Defendants' Emergency Motion to Schedule a Status Conference and a Common Hearing Date for the Motion to Remand, the Motion to Dismiss, and the Motion for Judgment on the Pleadings**
[Relates to Docket No. __]

Although the Court appreciates the efficiency of the proposal contained in the motion, the abstention and remand issues must be addressed first.

C
M
pe
th
tha

Signed: May 18, 2022

Marvin Isgur
United States Bankruptcy Judge

2. The hearing on Plaintiff Carnero G&P, LLC's Motion to Remand, originally scheduled for May 23, 2022, (Dkt. No. 9), shall be rescheduled to a later date, pending further discussion between the parties and the Court during the May 19, 2022 Status Conference.

Signed: _______________, 2022

______________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE