**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**Carnero G&P, LLC's Emergency Motion for Entry of an Order (I) Authorizing the Filing of Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint Under Seal and (II) Granting Related Relief**

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN JULY 14, 2022.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") states as follows in support of this motion (this "Motion"):

**Emergency Relief Requested**

1. Carnero seeks entry of an order, substantially in the form attached hereto (the "Proposed Order") (a) authorizing Carnero to file the *Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint* **(**"Motion to Leave") under seal; and (b) granting related relief.

2. Carnero requests emergency consideration of this Motion to preserve the confidentiality of the information contained in the Motion for Leave.

**Jurisdiction and Venue**

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. § 1408.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), rule 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Local Rule 9037-1, and the Court's *Protective Order* (Doc. No. 42).

**Background**

5. On May 11, 2022 Defendants filed a Motion for Judgment on the Pleadings [Dkt 19] attaching numerous exhibits that Defendants both stamped Highly Confidential under the April 29, 2022 Protective Order [Dkt. 16] and redacted (the "Redacted Exhibits"). In accordance with the Protective Order, Defendants filed the Redacted Exhibits under seal.

6. In its Motion for Leave and the Exhibit A Second Amended Complaint attached

thereto, Carnero cites, quotes, and summarizes certain portions of those Redacted Exhibits to support its pleading. To maintain confidentiality of the Redacted Exhibits, Carnero seeks authority to file the Motion for Leave and the Second Amended Complaint under seal.

**Basis for Relief**

7. The Bankruptcy Code provides strong support for sealing the Motion for Leave and the Second Amended Complaint. Section 105(a) of the Bankruptcy Code codifies the inherent equitable powers of the bankruptcy court and empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect parties from potential harm that may result from the disclosure of certain confidential information. *See* 11 U.S.C. § 107(b) ("On request of a party in interest, the bankruptcy court shall, . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information" or "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title"); *see In re Gen. Homes Corp.*, 181 B.R. 898, 903 (Bankr. S.D. Tex. 1995) ("The court has authority to seal court records, in order to protect trade secrets or confidential research, development, or confidential information, or to protect a person with regard to a scandalous or defamatory matter."). Although section 107(b) of the Bankruptcy Code is an exception to the general rule, its application in a bankruptcy proceeding is appropriate. *See In re 50-Off Stores, Inc.*, 213 B.R. 646, 654 (Bankr. W.D. Tex. 1997) ("[T]he very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world.").

8. Further, Bankruptcy Rule 9018 defines the procedures by which a party may move for relief under section 107(b) of the Bankruptcy Code. Specifically, Bankruptcy Rule 9018

provides, in relevant part, that on motion "the court may make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information," or "to protect an entity against scandalous or defamatory matter contained in any paper filed in a case under the Code." FED. R. BANKR. P. 9018. Additionally, the Sealing Order, which governs the filing of sealed documents, provides, in relevant part, that "[c]oncurrently with the filing of a sealed document, a motion to seal must be filed electronically," and "[a]fter reviewing the motion to seal, the Court may order appropriate relief." Sealing Order, ¶ 2(d).

9. Carnero also submits that the Motion for Leave and the Second Amended Complaint may involve commercial information that may be protected by the Court pursuant to section 107(b)(1) of the Bankruptcy Code and Bankruptcy Rule 9018. Commercial information is information which would result in "an unfair advantage to competitors by providing them information as to the commercial operations of the debtor." *Wyndham Vacation Resorts, Inc. v. Faucett* (*In re Faucett),* 438 B.R. 564, 567 (Bankr. W.D. Tex. 2010) (citing *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.),* 21 F.3d 24, 27 (2d Cir. 1994)). Commercial information need not rise to the level of a "trade secret" to be protected under section 107(b) of the Bankruptcy Code. *See In re Northstar Energy, Inc.*, 315 B.R. 425, 429 (Bankr. E.D. Tex. 2004) ("A bankruptcy court is required to seal 'documentary information filed in court that does not rise to the level of a trade secret but that is so critical to the operations of the entity seeking the protective order that its disclosure will unfairly benefit that entity's competitors.'" (quoting *In re Barney's, Inc.*, 201 B.R. 703, 708–09 (Bankr. S.D.N.Y. 1996)). Rather, section 107(b) of the Bankruptcy Code is "designed to protect business entities from disclosure of information that could reasonably be expected to cause the entity commercial injury." *Id.* (quoting *In re Glob. Crossing, Ltd.*, 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003)).

10. Here, the Motion for Leave and the Second Amended Complaint references, quotes, and summarizes information that may be commercially sensitive information regarding the terms of the Redacted Exhibits. Thus, under section 107(b) of the Bankruptcy Code, sealing the Motion for Leave is appropriate. Specifically, the Motion for Leave and the Second Amended Complaint contain detailed contractual information stamped Highly Confidential under the Protective Order and that is not typically disclosed to the public or to competitors. Accordingly, the Motion for Leave and the Second Amended Complaint have been filed under seal.

11. In light of the foregoing, Carnero respectfully requests that the Court enter an order authorizing the Motion for Leave and the Second Amended Complaint to be filed under seal.

**Notice**

12. Notice of this Motion shall be given to any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and any party required to be served under Bankruptcy Local Rule 9013-1(d). Due to the nature of the relief requested herein, Carnero submits that no other or further notice need be provided.

Carnero respectfully requests that the Court (i) enter the Proposed Order substantially in the form attached hereto and (ii) grant Carnero such other and further relief as is just, proper, and equitable.

Dated: July 12, 2022

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on July 12, 2022, a true and complete copy of the foregoing was duly served to all registered ECF users appearing in the case.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Order Authorizing the Filing of Carnero's Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint Under Seal and (II) Granting Related Relief**

[Relates to Docket No. ____]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint* (the "Motion for Leave") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Motion for Leave, the Second Amended Complaint, and having heard the statements of counsel regarding the relief

[2] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

requested in the Motion at a hearing before the Court, if any (the "Hearing"); and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Motion for Leave and its Exhibit A Second Amended Complaint under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Motion for Leave is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: ___________________, 2022.
Houston, Texas

______________________________________
**HONORABLE MARVIN ISGUR**
**UNITED STATES BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br>Case No. 19-34508 (MI)<br>(Jointly Administered) |
| Carnero G&P, LLC<br>Plaintiff,<br>v.<br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br>Defendants. | **Adv. Pro. No. 22-03035 (MI)** |

**DEFENDANTS' RESPONSE TO CARNERO G&P, LLC'S EMERGENCY MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**
**(Related to Dkt. No. 53)**

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. (f/k/a Venado EF L.P.) ("Javelin"), Mitsui E&P Texas LP ("Mitsui") (Mitsui, Javelin, and Eagle Ford are referred to herein collectively as the "WIPs"), and SN EF UnSub, LP ("UnSub" and, together with Maverick, Mesquite, and the WIPs, the "Defendants") file this Response to Plaintiff Carnero G&P, LLC ("Carnero")'s *Emergency*

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

*Motion for Leave to File Second Amended Complaint* [Dkt. No. 53] (the "Motion for Leave") and state as follows:[2]

## SUMMARY

1. Although Carnero filed its motion without providing any notice or attempt to meet and confer, Defendants do not oppose the granting of leave to file the Second Amended Complaint, subject to the conditions described below. As explained below, granting such relief should be conditioned on Carnero's acknowledgement that this is the **final** time Carnero will be permitted to shift its legal theories seeking to dismantle the Debtors' Midstream Restructuring. A proposed order to that effect, which also establishes a reasonable but definitive schedule for further proceedings to resolve this case, is attached (the "Proposed Order").

## ARGUMENT

2. As a threshold matter, Carnero has devoted the past year to filing a series of ever-changing lawsuits in search of a legal theory. Indeed, to appreciate why the conditions set forth in the Proposed Order are appropriate, it is necessary to briefly recap the legal whack-a-mole Defendants have been forced to play in response to Carnero's attempts to disrupt the Midstream Restructuring that was essential to the Debtors' successful emergence from chapter 11.

3. For starters, Carnero's Motion for Leave omits any mention of its first complaint, filed on July 30, 2021 (the "First Carnero Action"). The First Carnero Action claimed that the

---

[2] Unless otherwise specified, capitalized terms have the meanings provided in the *Amended and Supplemental Complaint* in the Declaratory Action (as defined below) [Decl. Action Dkt. No. 29]. Entries on the docket of the main bankruptcy case will be cited as, "Dkt. No. __", while citations to the adversary proceedings are as follows:

- the "Second Carnero Action" (this lawsuit, captioned above) is cited as "Carnero II Dkt. No. __";
- the "Declaratory Action" (*SN EF Maverick, LLC, et al.*, v. *Carnero G&P, LLC*, Adv. Pro. No. 21-04419 (MI)) is cited as "Decl. Action Dkt. No. __ "; and
- the "First Carnero Action" (*Carnero G&P, LLC* v. *SN EF UnSub LP, et al.*, Adv. Pro. No. 21-03908 (MI)) is cited as "Carnero I Dkt. No. __".

GGPA and related agreements "obligate[d]" Defendants to take certain actions, including "Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365." [Carnero I Dkt. No. 1-4 at ¶ 36(k).] When this Court indicated that seeking a declaration that a contract required a party to take action in Bankruptcy Court could foreclose Carnero's attempt to remand the case to state court, Carnero said it would amend the complaint by the Court's specified deadline. Instead, at the appointed time, Carnero withdrew the First Carnero Action without prejudice. [Carnero I Dkt. No. 31.]

4. On December 21, 2021, Defendants filed an adversary proceeding (the "Declaratory Action") seeking declarations that would, among other things, foreclose the legal theory Carnero had advanced in the First Carnero Action. [Decl. Action Dkt. No. 1.] Defendants simultaneously sought and obtained entry of an order approving the assumption (with amendments) of various agreements, effectuating the Midstream Restructuring it had reached pursuant to the Plan. [Dkt. No. 2253.] Carnero's counsel appeared at that hearing, but voiced no objection. Nor did Carnero's counsel ask that the Court delay entry of the order pending Carnero's review of the amended agreements. **Indeed, Carnero did not even request to see the amended agreements.**

5. Rather, on the very last day for responding to the Declaratory Action (approximately a month after the December 21 hearing approving the assumption of the amended agreements), Carnero filed another lawsuit in state court (the "Second Carnero Action"). This complaint purported to abandon Carnero's prior theory, which Carnero claimed mooted the need to respond substantively to the Declaratory Action. In the new state lawsuit, Carnero's principal claim was that Defendants had breached the GGPA because **any** amendment of the Debtors'

Midstream Restructuring contracts would violate the GGPA. **Yet again, Carnero did not request to see the amended agreements.**

6. Defendants removed the Second Carnero Action to this Court and filed an answer. Defendants also moved for leave to amend the Declaratory Action to account for Carnero's new theory. Carnero initially indicated that it might oppose the motion for leave to amend, but, after extracting still further delay to consider the question, consented. [Decl. Action Dkt. No. 27.] In the meantime, and despite the absence of a demand by Carnero to access the amended agreements, Defendants undertook the laborious process of seeking the requisite consents to share redacted versions of the agreements with Carnero. Defendants did so on a voluntary basis, in the hope that Carnero would realize that (even assuming that Carnero had not waived any right to object several times over) none of the amendments violated Carnero's rights under the GGPA.

7. On May 11, 2022, after Defendants had secured the necessary consents to share the agreements in redacted form pursuant to the *Stipulated Protective Order*, Defendants filed a Rule 12(c) motion for judgment on the pleadings. **Defendants attached the redacted agreements, making them immediately available to Carnero's counsel on May 11**, contrary to Carnero's insinuation in the Motion for Leave that the contents of the agreements were unknown until they were provided with still fewer redactions on June 17 and June 26. Indeed, Carnero's counsel did not complain about the redactions or restrictions on sharing materials with in-house counsel for approximately four weeks (and did so only after this Court denied Carnero's motion to remand this lawsuit to state court).

8. Throughout this process, Defendants' counsel have worked tirelessly to obtain the necessary consents and Court orders to provide Carnero with the information it claims to need. Any implication that Defendants have sought to keep Carnero in the dark or frustrate its access to

these documents is incorrect. To the contrary, while Defendants have sought to have this Court address the merits of whatever claims Carnero flings against the wall, Carnero has taken every conceivable opportunity to dodge and delay its day of reckoning.

9. Carnero's new proposed complaint (the "Third Carnero Action") is of a piece with that strategy. Carnero claims to have "discovered" purportedly new facts underlying the latest lawsuit. But Carnero's contention elides the fact that Defendants have been working for months with the numerous counterparties to obtain permission to deliver this information to Carnero and to satisfy Carnero's shifting demands.

10. More telling still is that Carnero waited until the last possible moment to reveal that it intends to change its path yet again. By Carnero's own account, it has had all of this purportedly new information for weeks—the overwhelming majority of what Carnero calls the "Revised Exhibits" were provided on June 17. Carnero notes that it filed a motion to compel with respect to a small subset of information sought from one of the various counterparties, but omits mention that it resolved that dispute consensually in a matter of two days.

11. Nonetheless, Carnero did not file its Motion for Leave until late in the evening of July 12, less than three full days before its objection to the pending Rule 12(c) motion would be due on July 15. Nor did Carnero seek to meet and confer with Defendants—or otherwise discuss how the case might proceed on its new complaint—prior to filing its Motion for Leave. As a result, Defendants' counsel have been devoting significant resources to preparing to respond to Carnero's forthcoming Rule 12(c) objection (Defendants' reply brief was to be due 7 days later) and for the July 27 hearing. Those preparations have been particularly onerous because, as noted above, Carnero has not said one word that allowed the parties to focus or narrow their dispute.

12. Given the winding, nearly year-long path by which Carnero has delayed defending the merits of its collateral attack on the Debtors' Midstream Restructuring—to say nothing of Carnero's numerous opportunities during the pre- and post-confirmation chapter 11 proceedings to object—Defendants should be assured that this is truly Carnero's last bite at the apple.

13. That is particularly important given the allegations set forth in the Third Carnero Action. Carnero's legal strategy has morphed from the First Carnero Action's claim that the GGPA "obligated" the Defendants to reject other Midstream Restructuring contracts, to the Second Carnero Action's generalized allegations that amending those contracts violated the GGPA, and now to the Third Carnero Action's 17 separate causes of action spread across what Carnero labels as seven different "schemes." Carnero now seeks to bring numerous breach of contract claims, as well as claims for "anticipatory breach" and for breach of a purported "implied duty to cooperate," as well as a claim styled "Equitable Relief from the Plan."

14. One would hope, and Defendants are justified in expecting, that Carnero's **third** attempt to articulate its legal theories will be its final one. Put differently, Carnero cannot reasonably expect to further revise, explain, or expand its theories as to why the Midstream Restructuring, effected pursuant to a plan of reorganization confirmed more than two years ago, is somehow improper. Defendants have been under the cloud of Carnero's litigation for a year, causing significant harm to their businesses, in addition to millions of dollars in fees Defendants have incurred navigating Carnero's tactics of delay and obfuscation. There needs to be an end—or at least a clear path to an end—to this litigation.

## CONCLUSION

15. For those reasons, and as set forth in the terms of the attached Proposed Order, Defendants do not object to the Motion for Leave to file the Third Carnero Action, but respectfully request that such relief be granted on the following express conditions:

a. The Third Carnero Action will be deemed filed immediately upon entry of the Court's order.

b. Defendants may file an answer and motion for judgment on the pleadings by August 24, 2022.

c. Carnero's objection to that motion must be filed by September 14, 2022.

d. Defendants' reply must be filed by September 28, 2022.

e. No sur-reply shall be permitted.

f. The Court shall schedule oral argument at its convenience following completion of the briefing.

g. Carnero will not be granted further leave to amend absent extraordinary and compelling circumstances.

Respectfully submitted on July 13, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com
jbretschneider@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 7002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 13, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035 (MI)** |

**[PROPOSED] ORDER**

Following consideration of Plaintiff Carnero G&P, LLC (Plaintiff)'s *Emergency Motion for Leave to File Second Amended Complaint* [Dkt. No. 53] and Defendants' *Response to Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint*, [Dkt. No. 55].

**IT IS HEREBY ORDERED**:

1. Plaintiff's *Second Amended Complaint* (the "Second Amended Complaint") [Dkt. No. 53-1] shall be deemed filed immediately upon entry of this Order.

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. Plaintiff shall cause the Second Amended Complaint to be filed under seal pursuant to the *Stipulated Protective Order* entered in this Adversary Proceeding [Dkt. No. 16].

3. Plaintiff shall not be permitted to seek leave to further amend or modify the Second Amended Complaint absent compelling circumstances.

4. Defendants' *Motion for Judgment on the Pleadings* [Dkt. No. 19] is hereby dismissed without prejudice.

5. The hearing on Defendants' *Motion for Judgment on the Pleadings* scheduled for July 27, 2022, at 9:30 am Central Time [Dkt. No. 41], is hereby adjourned.

6. No later than **August 24, 2022**, Defendants shall file their response to Plaintiff's Second Amended Complaint.

7. No later than **September 14, 2022**, Plaintiff shall file any objection to Defendants' response to the Second Amended Complaint.

8. No later than **September 28, 2022**, Defendants shall file any reply in further support of their response to the Second Amended Complaint.

9. No sur-reply shall be permitted.

10. A hearing on the Defendants' response to Plaintiff's Second Amended Complaint shall be scheduled at the Court's convenience following completion of the above briefing.

SIGNED: _____________, 2022

______________________________
Marvin Isgur
United States Bankruptcy Judge

AGREED AS TO FORM:

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana St., Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Conor P. McNamara*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 13, 2022, a true and correct copy of the foregoing was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508[2] |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

**Carnero's Reply in Support of Its**
**Emergency Motion for Leave to File Second Amended Complaint**
(Related to Dkts. 53, 55)

1. Carnero appreciates that Defendants are no longer "strenuously opposed" to Carnero amending its Complaint after Carnero has had the benefit of less than one-month's time to review in unreacted form the thousands of pages of the December 21, 2021 Master Settlement Agreement and related exhibits ("Sealed Exhibits") attached to Defendants' Motion for Judgment on the Pleadings [Dkt. 19]—documents served on June 17, 2022.

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Referred to as "Main Case" in docket entry references.

2. Carnero and Defendants began discussing access to the documents in early February 2022, soon after Carnero filed its original Petition in state court. The parties then spent months negotiating the issue because Carnero could not yet conduct discovery under the rules. During those negotiations, the scope of access and the extent of redactions were the key sticking points, which this Court addressed on June 13, 2022. [Dkt. 37]. Since receiving the documents, Carnero has expeditiously reviewed the Sealed Exhibits, and additional documents later sent by Defendants, and filed its Emergency Motion for Leave to File Second Amended Complaint as soon as it could. Contrary to Defendants' assertions, Carnero has not shifted its legal theories from the Amended Petition. Rather, Carnero has refined them based on concrete information in the Sealed Exhibits that Defendants finally disclosed less than a month ago.

3. Carnero has no objection to most of the components of Defendants' proposed relief consisting of items a-f [Dkt. 55 ¶ 15]:

a. The Third Carnero Action will be deemed filed immediately upon entry of the Court's order.

b. Defendants may file an answer and motion for judgment on the pleadings by August 24, 2022.

c. Carnero's objection to that motion must be filed by September 14, 2022.

d. Defendants' reply must be filed by September 28, 2022.

e. No sur-reply shall be permitted.

f. The Court shall schedule oral argument at its convenience following completion of the briefing.

4. Carnero is, however, opposed to entry of an order denying it any further opportunity to amend its Complaint "absent extraordinary and compelling circumstances." This is an inappropriate point in this adversary proceeding to grant Defendants such extraordinary relief. The parties have conducted no discovery. Indeed, discovery may lead to evidence that Carnero has

additional grounds for the claims in the proposed Second Amended Complaint or altogether new claims. If discovery supports further amendment, Carnero should not be unduly restrained in the manner Defendants' propose.

5. Carnero additionally has been unable to involve directly any of its commercial decision-makers for input in this case. The June 17, 2022 Scheduling and Disclosure Order [Dkt. 41] ("Protective Order") restricts to specific in-house counsel the individuals permitted to review the Sealed Exhibits. As Carnero noted at the June 13 hearing on the Protective Order, it was trying to "bridge the gap on the issue of our commercial people at Carnero seeing the documents by proposing that in-house counsel be…allowed to simply because in-house counsel is who has been part of this transaction from the beginning." [Dkt. 37 at 6:14-17]. However, Carnero could not allow even a single business decision-maker to read the Second Amended Complaint; it could only describe generally the contents to its business representatives. That hampers Carnero—i.e., the business people who are "Carnero" the client—from participating meaningfully in the case. Carnero intends to seek relief from the Protective Order for at least some of its business people to have access to the Sealed Exhibits so they can participate in refining Carnero's claims, which may result in the need to further amend its Complaint.

6. Finally, Federal Rule of Civil Procedure 15(a)(2), applicable to this adversary proceeding through Fed. R. Bankr. P. 7015, specifies the standard that a plaintiff must meet when seeking leave to amend a complaint. That rule does not require "extraordinary and compelling circumstances." Instead, it provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." At this early stage, justice does not require that Carnero's hands be tied from amending

its Complaint. Carnero has confidence that this Court is able to apply the standard in Rule 15 to determine whether any future amendments should be allowed.

## Conclusion

Carnero respectfully asks the Court to enter an order that Defendants' Motion for Judgment on the Pleadings [Dkt. 19] is moot and ordering the following:

a. Carnero's Second Amended Complaint will be deemed filed immediately upon entry of the Court's order.

b. Defendants may file an answer and motion for judgment on the pleadings by August 24, 2022.

c. Carnero's objection to that motion must be filed by September 14, 2022.

d. Defendants' reply must be filed by September 28, 2022.

e. No sur-reply shall be permitted.

f. The Court shall schedule oral argument at its convenience following completion of the briefing.

Accordingly, Carnero asks the Court to remand the State Court Lawsuit to state court.

Dated: July 14, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *_/s/ Joshua W. Wolfshohl_*

Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com
**Attorneys for Plaintiff Carnero G&P, LLC**

**Certificate of Service**

I hereby certify that on July 14, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

United States Bankruptcy Court
Southern District of Texas
ENTERED
July 15, 2022
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br><br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| Carnero G&P, LLC<br><br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br><br>Defendants. | **Adv. Pro. No. 22-03035 (MI)** |

**ORDER ON MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

Following consideration of Plaintiff Carnero G&P, LLC (Plaintiff)'s *Emergency Motion for Leave to File Second Amended Complaint* [Dkt. No. 53] and Defendants' *Response to Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint*, [Dkt. No. 55].

**IT IS HEREBY ORDERED**:

1. Plaintiff's *Second Amended Complaint* (the "Second Amended Complaint") [Dkt. No. 53-1] is deemed filed immediately upon entry of this Order.

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

2. Defendants may file an answer and motion for judgment on the pleadings by August 24, 2022.

3. Carnero's objection to that motion must be filed by September 14, 2022.

4. Defendants' reply must be filed by September 28, 2022.

5. No sur-reply shall be permitted.

6. The Court shall schedule oral argument at its convenience following completion of the briefing.

7. The hearing on Defendants' *Motion for Judgment on the Pleadings* scheduled for July 27, 2022, at 9:30 am Central Time [Dkt. No. 41], is canceled.

8. Carnero may seek leave to file a further amended complaint only (i) after conferring with opposing counsel; and (ii) either (x) upon a showing that Carnero seeks to file a further amendment based on (A) newly discovered evidence, but then only within 30-days of such discovery; or, (B) consultation with Carnero's decision makers within 30 days of the date on which the Court authorizes the sharing of "professional eyes only information" with its decision-makers; or (y) upon a showing of compelling circumstances.

Signed: July 14, 2022

Marvin Isgur
United States Bankruptcy Judge

AGREED AS TO FORM:

*/s/ James G. Munisteri*

James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana St., Suite 2000
Houston, TX 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, TX 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for SN EF Maverick LLC & Mesquite Energy, Inc.**

*/s/ Thomas A. Woolley, III*

Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, TX 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for SN EF UnSub, LP**

*/s/ Julia Frost-Davies*

Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Eagle Ford TX, LP**

*/s/ Conor P. McNamara*

Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Javelin EF L.P. (f/k/a Venado EF L.P.)**

*/s/ Duston K. McFaul*

Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, TX 77002
Telephone: (713) 495-4500
dmcfaul@sidley.com
mquejada@sidly.com

**Attorneys for Mitsui E&P Texas LP**

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2022, a true and correct copy of the foregoing was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

B2500A (Form 2500A) (12/15)

# United States Bankruptcy Court

SOUTHERN District Of TEXAS

| | |
|---|---|
| In re Sanchez Energy Corporation, et al., Debtor | Case No. 19-34508 |
| | Chapter 11 |
| Carnero G&P, LLC, Plaintiff | |
| v. | Adv. Proc. No. 22-03035 (MI) |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., n/k/a Javelin EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, Mesquite Comanche Holdings, LLC, and Mesquite Energy, Inc., Defendants | |

## SUMMONS IN AN ADVERSARY PROCEEDING

YOU ARE SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the bankruptcy court within 30 days after the date of issuance of this summons, except that the United States and its offices and agencies shall file a motion or answer to the complaint within 35 days.

Address of the clerk:
Nathan Ochsner
Clerk of Court
P. O. Box 61010
Houston, Texas 77208

At the same time, you must also serve a copy of the motion or answer upon the plaintiff's attorney.

Name and Address of Plaintiff's Attorney:
Joshua W. Wolfshohl
Porter Hedges LLP
1000 Main St., 36th Fl
Houston, TX 77002
(713) 226-6000; jwolfshohl@porterhedges.com

If you make a motion, your time to answer is governed by Fed. R. Bankr. P. 7012.

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE BANKRUPTCY COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**




*Nathan Ochsner, Clerk of Court*

Date: July 25, 2022

*s/ A. Michael*
*Signature of Clerk or Deputy Clerk*

B2500A (Form 2500A) (12/15)

# CERTIFICATE OF SERVICE

I, Joshua W. Wolfshohl (name), certify that service of this summons and a copy of the complaint was made on July 25, 2022 (date) by: / Plaintiff's Second Amended Complaint and Notice of 10/5/2022 hearing /and Certified Mail - Return Receipt Requested

☒ Mail service: Regular, first class United States mail, postage fully pre-paid, addressed to: Mesquite Comanche Holdings, LLC
c/o Registered Agent - C T Corporation System
1999 Bryan St., Suite 900
Dallas, Texas 75201

☐ Personal Service: By leaving the process with the defendant or with an officer or agent of defendant at:

☐ Residence Service: By leaving the process with the following adult at:

☐ Certified Mail Service on an Insured Depository Institution: By sending the process by certified mail addressed to the following officer of the defendant at:

☐ Publication: The defendant was served as follows: [Describe briefly]

☐ State Law: The defendant was served pursuant to the laws of the State of ________, as follows: [Describe briefly]

If service was made by personal service, by residence service, or pursuant to state law, I further certify that I am, and at all times during the service of process was, not less than 18 years of age and not a party to the matter concerning which service of process was made.

Under penalty of perjury, I declare that the foregoing is true and correct.

Date 08/01/2022 Signature /s/ ***Joshua W. Wolfshohl***

Print Name: Joshua W. Wolfshohl

Business Address: 1000 Main St., 36th Floor
Houston, TX 77002

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 03, 2022
Nathan Ochsner, Clerk

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |
| | § | |

**Order Authorizing the Filing of Carnero's Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint Under Seal and (II) Granting Related Relief**

[Relates to Docket No. 54]

Upon Carnero G&P, LLC's motion (the "Motion") for the entry of an order (i) authorizing the filing of *Carnero G&P, LLC's Emergency Motion for Leave to File Second Amended Complaint and Its Ex. A Second Amended Complaint* (the "Motion for Leave") under seal; and (ii) granting related relief; and the Court having reviewed the Motion, the Motion for Leave, and the Second Amended Complaint;

[2] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

and the Court having found that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b); (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) it may enter a final order consistent with Article III of the United States Constitution; (d) venue is proper before the Court pursuant to 28 U.S.C. § 1408; and (e) due and proper notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; now, therefore,

**It is hereby ordered that:**

1. Carnero G&P, LLC is authorized to file the Motion for Leave and its Exhibit A Second Amended Complaint under seal, pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018.

2. Except upon further order of the Court after notice to Carnero G&P, LLC, the Motion for Leave is confidential, shall remain under seal, and shall not be made available to anyone without Carnero G&P, LLC's consent.

3. Carnero G&P, LLC is authorized to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

4. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

5. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: August 03, 2022

Marvin Isgur
United States Bankruptcy Judge

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC | § | Adversary No. 22-03035 |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, | § | |
| Venado EF L.P., Mitsui E&P Texas LP, | § | |
| SN EF Maverick, LLC, and Mesquite | § | |
| Energy, Inc., | § | |
| Defendants. | § | |
| | § | |

**Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material**

(Relates to Dkt. Nos. 57, 41, 16)

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS APPLICATION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

[1] The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

**To the Honorable Marvin Isgur,**
**United States Bankruptcy Judge:**

Carnero G&P LLC ("Carnero") files this Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material (the "Motion"). In support of this Motion, Carnero would respectfully show the Court as follows:

## Summary

Carnero asks the Court to authorize certain Business Representatives of Carnero to review the Revised Exhibits attached to Defendants' May 11, 2022 Motion for Judgment on the Pleadings [Dkt. 19] and other documents stamped Highly Confidential. As counsel stated at the June 13, 2022 hearing [Dkt. 37 at 6:13-20], review of these documents by business people has been an issue because Carnero's counsel requires input from the business to properly and fully assess the factual and legal basis for Carnero's claims and legal arguments. Carnero, as the client, cannot direct the general objectives and significant decisions without input from its business people to assist its counsel. Therefore, Carnero asks the Court to grant this Motion to allow the Business Representatives to assist is representation in this lawsuit.

## Factual Background

1. The Reorganized Debtors assumed all of the following contracts with Carnero (collectively, the "GGPA Contracts"):

- April 1, 2018 Firm Gas Gathering, Processing and Purchasing Agreement ("GGPA") between Carnero and SN EF Maverick, LLC ("Maverick"), as amended by Carnero, the WIPs and Maverick;
- April 1, 2018 Ratification Agreements among Carnero, Maverick, UnSub, Eagle Ford, Venado, and Mesquite Comanche Holdings, LLC ("MCom") (successor to Gavilan Resources, LLC ("Gavilan") and Mesquite subsidiary) ratifying the GGPA ("Ratification Agreements");
- April 1, 2018 Letter Agreement among Carnero, Maverick, and Mitsui regarding the GGPA ("Letter Agreement").

2. The GGPA Contracts relate to oil and gas assets known as the "Comanche Assets." The GGPA contains terms requiring Defendants to deliver gas from the Comanche Assets to Carnero in certain circumstances.

3. On January 21, 2022, Carnero filed this lawsuit [Dkt. 1-4 at 2] asserting state law claims under the GGPA Contracts arising from the post-confirmation, post-effective date amendments to the Existing Commitments.

4. On January 27, 2022, Carnero filed its Amended Petition in state court. [Dkt. 1-4 at p. 15]. On February 28, 2022, the Defendants removed Carnero's Amended Petition to this Court. [Dkt. 1].

5. On April 29, 2022, the court entered the parties' Stipulated Protective Order ("Protective Order") governing the production of documents in this case. [Dkt 16]. The Protective Order limits the review of material designated "Highly Confidential" to outside counsel only.

6. On May 11, 2022, Defendants filed their Motion for Judgment on the Pleadings. [Dkt. 19] ("Motion for Judgment"). The Motion for Judgment attached 45 exhibits, many of which were stamped Highly Confidential, redacted, and filed under seal.

7. On June 17, 2022, the Court entered its Scheduling and Disclosure Order, ordering the Defendants to provide Carnero's outside counsel revised copies of Exhibits 7-13, 22, and 45 (collectively, the "Revised Exhibits") attached to the Motion for Judgment, subject to certain conditions. [Dkt. 41 at ¶ 1]. The Scheduling and Disclosure Order allowed Carnero's outside counsel to share the Revised Exhibits on a professionals'-eyes-only basis with Carnero's in-house counsel, subject to certain conditions.

8. On June 17, 2022, Carnero received most of the Revised Exhibits attached to the Motion for Judgment. On June 26, 2022, Carnero received the final Revised Exhibits and other

documents stamped Highly Confidential but not attached to the Motion for Judgment (collectively, the Revised Exhibits and the other documents are the "Highly Confidential Material").

9. On July 12, 2022, after Carnero's outside counsel and authorized in-house counsel reviewed the Highly Confidential Material, Carnero filed its Motion for Leave to File Second Amended Complaint. [Dkt. 53] ("Motion for Leave"). The Court granted the Motion for Leave on July 15, 2022 and deemed the Second Amended Complaint filed as of that date. [Dkt. 57]

10. In the Order on the Motion for Leave, the Court recognized that Carnero "decision makers" may be required to assist with its representation. [Dkt. 57 ¶ 8]. Carnero now moves the Court for an order allowing specified Business Representatives to review the Highly Confidential Material[2] and assist Carnero with its representation.

## Legal Authority and Argument

11. Carnero filed the Motion for Leave and the Second Amended Complaint under seal because the complaint references, quotes, and summarizes much of the Highly Confidential Material. Carnero's amended claims arise from intersecting obligations and rights among the GGPA Contracts and the Highly Confidential Material, all of which, like the GGPA Contracts, are complex commercial contracts governing the gathering, processing, and purchase of gas from the Comanche Assets. Carnero's business people work daily with such contracts and understand the commercial context in which the documents were negotiated, implemented and now operate.

12. Yet, because of the restrictions stated in the Protective Order and the Scheduling and Disclosure Order regarding who can review the Highly Confidential Material, Carnero's outside counsel and in-house counsel could not review the substance of the Second Amended Complaint

[2] For purposes of this request, "Highly Confidential Material" includes any document stamped Highly Confidential and produced to Carnero, whether attached to a pleading, motion or other filing, voluntarily produced, or produced during discovery.

with Carnero business people or show them the actual factual bases in the Highly Confidential Material for the amended claims. The inability of Carnero business representatives to view the Highly Confidential Material hampers Carnero's ability to work with its outside counsel and in-house counsel to investigate and support factual assertions and legal argument as well as to make business decisions relating to its claims and this lawsuit.

13. Carnero, the corporate organization, not its in-house counsel, is the client. *See Bus. Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 550 (1991) (recognizing corporate clients may have in-house counsel who can conduct the Fed. R. Civ. P. 11 inquiry); *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488 (Tex. 2019) (recognizing corporate client is separate from its in-house counsel for purposes of attorney fee award). And, the "*client* controls the significant decisions concerning his representation." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 568 (1990) (emphasis added); *Perez v. Stephens*, 745 F.3d 174, 181 (5th Cir. 2014) (recognizing that Tex. Disciplinary R. Prof'l Conduct R. 1.02 provides that "client controls general objectives and methods of representations").

14. Given the complexity of the contracts at issue, Carnero's outside counsel and in-house counsel must rely upon the knowledge, experience, and expertise of the *client*—the Carnero business people—for information as to the facts underlying Carnero's claims and arguments and to guide the litigation. *See* Fed. R. Civ. P. 11 & comments to 1983 amendments (recognizing reliance on client for information is a factor used to assess Rule 11 compliance).

15. Thus, Carnero asks the Court to authorize the following Carnero business representatives to review the Highly Confidential Material. The list includes three representatives

from each of Carnero's 50% owners: TPL SouthTex Processing Company LP ("Targa") and Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("Evolve"):

- Targa:
  - Pat J. McDonie – Carnero Board Member (Targa)
  - John Coonce – Carnero Board Member (Targa)
  - Scott Smith –Commercial Representative, Carnero (but not responsible for South Texas)

- Evolve:
  - John Steen – Carnero Board Member (Stonepeak Partners LP)
  - Michael Bricker – Carnero Board Member (Stonepeak Partners LP)
  - Claire Campbell – In-house Counsel (Stonepeak Partners LP)

(collectively, the "Business Representatives"). The company agreement governing Carnero gives Targa the right to control the litigation and Evolve absolute consultation rights for material matters involving Carnero. The Evolve board members and their counsel are the persons who would exercise the consultation rights under the Carnero company agreement.

16. Carnero believes that, going forward, these Business Representatives possess the commercial knowledge necessary (i) to assist outside counsel and in-house counsel to understand and represent the facts relating to Carnero's claims and arguments; and (ii) to understand and direct the general objectives and significant decisions concerning this lawsuit based on their review of the Highly Confidential Material.

17. Carnero additionally believes that with the redactions allowed by the Scheduling and Disclosure Order and the limited list of authorized Business Representatives within Carnero's owners, Defendants face minimal commercial or competitive risk from the Business Representatives' review of the Highly Confidential Material. The redactions largely addressed the "secret sauce" commercial information that were of concern to the Defendants and their contract counterparties at the June 13, 2022 hearing [Dkt. 37]. Further, the senior nature of the Business

Representatives demonstrates Carnero's awareness of the sensitive nature of the Highly Confidential Material and the importance of protecting that material.

18. Carnero has conferred with counsel for Defendants and counsel for counterparties on some of the Highly Confidential documents. After those conferences, the Defendants agree to allow the Business Representatives the requested access to the following Highly Confidential Material (collectively, "Group A Documents"), subject to a mutually agreeable stipulation that limits the disclosure of Group A Documents as proposed in this Motion:

- The Purchase and Marketing Agreements (the "PMAs") for Venado EF LP, Eagle Ford TX LP, and Mitsui E&P Texas LP
- The UnSub Hydrocarbons PMA
- The Gavilan PMAs
- The Amendment to the Retained Midstream Contracts Services Agreement
- The Third Amendment to the Retained Marketing Contracts Services Agreement

Carnero and the Defendants will file a stipulation covering the Groups A Documents.

19. As to Highly Confidential Material other than the Group A Documents, Defendants are unable to stipulate to their access by the Business Representatives because Defendants' counterparties will not agree. The following table lists those counterparties that Carnero is aware of who have expressed their opposition:

| **Party** | **Status** |
|---|---|
| ETC Texas Pipeline Ltd. | Opposed |
| WGR Operating LP (Western) | Opposed |
| Enterprise Products Operating LLC | Opposed |

Carnero will update the status of any these and any other of Defendants' counterparties as it becomes aware.

## Requested Relief

20. For the reasons above, Carnero requests that the following Business Representatives be added to the list of persons that may review the Highly Confidential Material:

- Targa:
  - Pat J. McDonie – Carnero Board Member (Targa)
  - John Coonce – Carnero Board Member (Targa)
  - Scott Smith –Commercial Representative, Carnero (but not responsible for South Texas)
- Evolve:
  - John Steen – Carnero Board Member (Stonepeak Partners LP)
  - Michael Bricker – Carnero Board Member (Stonepeak Partners LP)
  - Claire Campbell – In-house Counsel (Stonepeak Partners LP)

Carnero also pleads for such other and further relief, general or special, at low or in equity, to which it may be justly entitled.

Dated: August 22, 2022.

Respectfully submitted,

**PORTER HEDGES LLP**

By: */s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl SBN 24038592
Aaron J. Power SBN 24058058
Eugene M. Nettles SBN 14927300
Amy C. Falcon SBN 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
jwolfshohl@porterhedges.com
apower@porterhedges.com
enettles@porterhedges.com
afalcon@porterhedges.com

**Attorneys for Defendant Carnero G&P, LLC**

**Certificate of Conference**

Counsel for Carnero has had numerous email and telephone conferences with Defendants' counsel and their contract counterparties since making this request on August 2, 2022. The Motion and table set out in the Motion reflect the outcome of those various conferences. Some are opposed and some are not opposed to the relief sought.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**Certificate of Service**

I hereby certify that on August 22, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system for the United States Bankruptcy Court for the Southern District of Texas and all counsel of record were served accordingly.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

**THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Sanchez Energy Corporation, et. al., | § | Case No. 19-34508 |
| | § | |
| Reorganized Debtors.[1] | § | (Jointly Administered) |
| | § | |
| | § | |
| Carnero G&P, LLC<br>Plaintiff, | § | Adversary No. 22-03035 |
| | § | |
| v. | § | |
| | § | |
| SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, SN EF Maverick, LLC, and Mesquite Energy, Inc.,<br>Defendants. | § | |

**Order Granting**
**Carnero's Motion to Authorize Carnero Business Representatives**
**to Review Highly Confidential Material**
(Relates to Dkt. _________)

After considering Carnero G&P, LLC's Motion to Authorize Carnero Business Representatives to Review Highly Confidential Material, the Court GRANTS the Motion. It is therefore

ORDERED that the following Business Representatives of Carnero may on an eye's-only basis review the exhibits filed under seal and attached to Defendants' Motion for Judgment on the

1 The "Reorganized Debtors," along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102) (now known as Mesquite Energy, Inc.); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Pleadings [Dkt. 19], including any amendment to that motion; and any other document designated by Defendants as Highly Confidential under the Stipulated Protective Order [Dkt. 16], regardless whether attached to a pleading or motion, produced voluntarily, or produced during discovery:

- Pat J. McDonie
- John Coonce
- Scott Smith
- John Steen
- Michael Bricker
- Claire Campbell

It is further

ORDERED that the Business Representatives sign the Exhibit A Acknowledgement attached to the Stipulated Protective Order and return it to Carnero's outside counsel, who shall provide a copy to Defendants.

Signed this ______ day of ________________, 2022

**HONORABLE MARVIN ISGUR**
**UNITED STATES BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>Sanchez Energy Corporation, *et al.*,<br>Reorganized Debtors.[1] | Chapter 11<br><br>Case No. 19-34508<br><br>(Jointly Administered) |
| Carnero G&P, LLC,<br>Plaintiff,<br><br>v.<br><br>SN EF Maverick, LLC, Mesquite Energy, Inc., Mesquite Comanche Holdings, LLC, Eagle Ford TX LP, Venado EF L.P., Mitsui E&P Texas LP, and SN EF UnSub, LP,<br>Defendants. | Adv. Pro. No. 22-03035 (MI) |

**DEFENDANTS' ANSWER TO PLAINTIFF'S SECOND AMENDED COMPLAINT**

Defendants SN EF Maverick, LLC ("Maverick"), Mesquite Energy, Inc. ("Mesquite"), Eagle Ford TX LP ("Eagle Ford"), Javelin EF L.P. ("Javelin") (f/k/a Venado EF L.P.) ("Venado"), Mitsui E&P Texas LP ("Mitsui"), Mesquite Comanche Holdings, LLC ("MCom"), and Crown Eagle Energy LP (f/k/a SN EF UnSub, LP) ("Crown Eagle") (collectively, the "Defendants"), by and through their undersigned attorneys, submit the following as their Answer to Plaintiff Carnero G&P LLC's ("Carnero" or "Plaintiff") Second Amended Complaint.

Except as expressly admitted below, Defendants deny each and every allegation in the Second Amended Complaint.

## INTRODUCTION

1. The allegations in Paragraph 1 constitute Plaintiff's description of its own claims to which no response is required. To the extent that a response is required, Defendants respond as follows: Defendants admit that Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "GGPA"), to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof, including, but not limited to, Defendants' obligations with respect to the GGPA. Defendants otherwise deny the allegations in Paragraph 1.[1]

2. Defendants admit that (A) Maverick and Mesquite entered into a settlement agreement with Carnero and certain other parties in June 2020 (the "Carnero Settlement Agreement"), and (B) Mesquite provided written notice of its termination of the Carnero Settlement Agreement on or about June 24, 2021. Defendants refer the Court to the Carnero Settlement Agreement for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants deny that Mitsui ratified the GGPA.

3. The allegations in Paragraph 3 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that on December 21, 2021, certain parties entered into the Master Settlement Agreement, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 3.

4. The allegations in Paragraph 4 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) Maverick and Carnero entered into the GGPA and (B) certain parties entered into the Master

[1] Throughout this Answer, references to "Paragraph _" include any footnotes referenced therein.

Settlement Agreement. Defendants refer the Court to the aforementioned agreements for their true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 4.

5. Defendants deny the allegations in Paragraph 5.

6. The allegations in Paragraph 6 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 6.

**PARTIES**

7. Defendants deny knowledge and information sufficient to admit or deny the allegations in Paragraph 7, and on that basis deny the allegations in Paragraph 7.

8. Defendants admit that Crown Eagle appeared and answered Plaintiff's Amended Petition. Defendants deny that the address for Crown Eagle's principal place of business is 1000 Main Street, Suite 3000, Houston, Texas 77002.

9. Defendants admit that Eagle Ford appeared and answered Plaintiff's Amended Petition.

10. Defendants admit that Maverick's principal place of business is 700 Milam Street, Suite 600, Houston, Texas 77002. Defendants admit that Maverick appeared and answered Plaintiff's Amended Petition.

11. Defendants admit that Javelin appeared and answered Plaintiff's Amended Petition. Defendants deny that the address for Javelin's principal place of business is 13501 Galleria Circle, Suite 350, Austin, Texas 78738.

12. Defendants admit that Mitsui appeared and answered Plaintiff's Amended Petition. Defendants deny that the address for Mitsui's principal place of business is 9 Greenway Plaza, Suite 1250, Houston, Texas 77046.

13. Defendants admit that MCom is a limited liability company, organized under the laws of Delaware, with its principal place of business located at 700 Milam Street, Suite 600, Houston, Texas 77002. Defendants admit that the address for MCom's registered agent for service of process is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

14. Defendants admit that Mesquite's principal place of business is 700 Milam Street, Suite 600, Houston, Texas 77002. Defendants admit that Mesquite appeared and answered Plaintiff's Amended Petition.

**JURISDICTION**

15. The allegations in Paragraph 15 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that this Court has already determined that it has jurisdiction over this matter.

**VENUE**

16. The allegations in Paragraph 16 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 16.

**FACTUAL BACKGROUND**

17. Paragraph 17 constitutes legal conclusions purporting to define legal relationships among Eagle Ford, Venado, and Mitsui as "WIPs," to which no response is required. To the extent that a response is required, Defendants admit that Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC ("AEP"), and Kerr-McGee Oil and Gas Onshore LP owned working interests in approximately 318,000 gross acres in south Texas (the "Comanche Assets").

18. Defendants admit that certain parties entered into a Purchase and Sale Agreement dated January 12, 2017, to which Defendants refer the Court for its true and correct terms, which speaks for itself, and deny Plaintiff's characterization thereof. Paragraph 18 also contains legal

conclusions to which no response is required. Defendants admit that after closing the Comanche Acquisition (as defined in the Second Amended Complaint), Maverick served as the operator with respect to the Comanche Assets. Defendants otherwise deny the allegations in Paragraph 18.

19. Defendants admit that at the time of the Comanche Acquisition, Anadarko (as defined in the Second Amended Complaint) was a party to certain agreements, and Defendants refer the Court to such agreements for their true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants admit that, at the time of the Comanche Acquisition, certain midstream agreements, to which Anadarko or one of its affiliates was a party, were not assigned directly to Maverick, UnSub, and/or Gavilan and that the counterparties to certain of these agreements included Enterprise Products Operating LLC ("Enterprise"), Eagle Ford Midstream LP, WGR Operating, LP, and ETC Texas Pipeline, Ltd. Defendants refer the Court to the exhibits to the following two agreements, which speak for themselves, for a listing of certain agreements not directly assigned to Maverick, UnSub, and/or Gavilan at the time of the Comanche Acquisition: (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, SN Catarina LLC, AEP, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended or modified from time to time, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017, and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017 (the "Marketing Agency Agreement"); and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, AEP, Kerr-McGee Oil & Gas Onshore LP, and Sanchez Energy Corporation (the "Midstream Agency Agreement"; together with the Marketing

Agency Agreement, the "Agency Agreements"). Defendants otherwise deny the allegations in Paragraph 19.

20. Defendants admit that Anadarko and Maverick entered into the Agency Agreements. Defendants refer the Court to the Agency Agreements for their true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 20.

21. Paragraph 21 constitutes legal conclusions with respect to the Retained Agreements (as defined in the Second Amended Complaint), the Agency Agreements, and the GGPA, to which no response is required. To the extent that a response is required, Defendants admit that Anadarko and/or certain affiliates of Anadarko entered into various agreements with midstream service providers to which Defendants refer the Court for their true and correct terms, which speak for themselves. Defendants further admit that certain of those agreements were not subsequently directly assigned to Maverick, UnSub, Gavilan Resources, LLC ("Gavilan"), and the WIPs. Defendants otherwise deny Plaintiff's characterization of those agreements and Defendants' attendant rights and obligations.

22. Defendants admit that Gavilan sold certain interest in the Comanche Assets to MCom pursuant to that certain Asset Purchase Agreement dated as of October 16, 2020, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

23. Defendants deny the allegations in Paragraph 23.

24. The allegations in Paragraph 24 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that (A) Maverick and Carnero entered into the GGPA, (B) Crown Eagle, Maverick, and

Carnero entered into a ratification agreement with respect to the GGPA, (C) MCom (as successor to Gavilan), Eagle Ford, and Venado entered into ratification agreements with respect to the GGPA, and (D) Crown Eagle, Eagle Ford, Venado, Maverick, MCom (as successor to Gavilan), and Carnero entered into an amendment to the GGPA. Defendants refer the Court to the aforementioned agreements for their true and correct terms, which speak for themselves, and deny any characterization thereof, including, but not limited to, Defendants' obligations under the agreements and the relationships of the parties under the agreements.

25. The allegations in Paragraph 25 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Mitsui, Maverick, and Carnero entered into a Letter Agreement dated effective April 1, 2018, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

26. The allegations in Paragraph 26 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof.

27. The allegations in Paragraph 27 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof, including, but not limited to, Defendants' obligations under the GGPA.

28. The allegations in Paragraph 28 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants

admit that Maverick and Carnero entered into the GGPA, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof, including, but not limited to, Defendants' obligations under the GGPA. Defendants otherwise deny the allegations in paragraph 28.

29. The allegations in Paragraph 29 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof, including, but not limited to, Defendants' obligations under the GGPA.

30. Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer the Court for its true and correct terms, which speak for themselves, and deny Plaintiff's characterization thereof.

31. The allegations in Paragraph 31 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer this Court for its true and correct terms, which speak for themselves, and deny any characterization thereof, including, but not limited to, Defendants' obligations with respect to the GGPA.

32. Defendants admit that the entities that are now Maverick and Mesquite filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code on August 11, 2019. Defendants further admit that the GGPA, the Ratification Agreements, and the Letter Agreement were assumed by Maverick and Mesquite in their bankruptcy proceedings pursuant to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Dkt. No. 1205] (the "Plan"), and deny Plaintiff's characterization with

respect to the terms of their assumption. Defendants refer the Court to the Agency Agreement, the Retained Agreements and other agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof, including, but not limited to, the terms, fees, and expenses imposed by those agreements.

33. Defendants admit that (A) the Plan was confirmed on April 30, 2020, (B) Maverick, Mesquite and Carnero entered into the Carnero Settlement Agreement on June 6, 2020, and (C) the plaintiffs in the Oxy Adversary (as defined in the Second Amended Complaint) filed a lawsuit against Maverick and Mesquite. Defendants refer the Court to the aforementioned filings in this matter and in the Oxy Adversary, and the Carnero Settlement Agreement for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

34. Defendants admit that (A) Maverick and Mesquite terminated the Midstream Settlement (as defined in the Second Amended Complaint) on June 24, 2021, and (B) Occidental Petroleum Corp., Anadarko Petroleum Corporation, AEP, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Western Midstream Partners LP, WGR Operating, LP, Springfield Pipeline, LLC ("Springfield"), Mesquite, Maverick, and MCom entered into the Master Settlement Agreement on December 21, 2021. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

35. The allegations in Paragraph 35 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that certain parties entered into (A) the Master Settlement Agreement and (B) the Working Interest Side Letter Agreement. Defendants refer the Court to the aforementioned agreements for

their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in paragraph 35.

36. The allegations in Paragraph 36 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that certain parties entered into the Master Settlement Agreement. Defendants refer the Court to the Master Settlement Agreement for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 36.

## CAUSES OF ACTION

37. Defendants incorporate by reference their responses in the preceding paragraphs.

38. Defendants admit that the Purchase Agreement, dated March 1, 2012, between Anadarko Energy Services Company and Enterprise (the "Anadarko/Enterprise PA") is listed on Exhibit F to the GGPA and refer the Court to the Anadarko/Enterprise PA for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

39. Defendants admit that Maverick and Enterprise entered into that certain Y-Grade Purchase and Sale Agreement, dated December 21, 2021 (the "Maverick/Enterprise PA"), to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 39.

40. The allegations in Paragraph 40 constitute a statement of Plaintiff's legal conclusions to which no response is required. To the extent a response is required, Defendants admit that (A) Maverick and Carnero entered into the GGPA and (B) Maverick and Enterprise entered into the Maverick/Enterprise PA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's

characterization, including but not limited to Defendants' obligations under the agreements. Defendants otherwise deny the allegations in Paragraph 40.

41. The allegations in Paragraph 41 constitute a statement of Plaintiff's legal conclusions purporting to define the rights of the parties to the Maverick/Enterprise PA and the Anadarko/Enterprise PA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 41.

42. The allegations in Paragraph 42 constitute a statement of Plaintiff's legal conclusions purporting to define legal relationships among certain parties that entered into the Maverick/Enterprise PA. To the extent a response is required, Defendants admit that (A) Maverick and Carnero entered into the GGPA and (B) Maverick and Enterprise entered into the Maverick/Enterprise PA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 42.

43. The allegations in Paragraph 43 constitute a statement of Plaintiff's legal position with respect to the Maverick/Enterprise PA, the Anadarko/Enterprise PA, and the GGPA to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 43.

44. The allegations in Paragraph 44 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) Carnero purports to pursue a claim pursuant to the Uniform Commercial Code and (B) Maverick and Carnero entered into the GGPA. Defendants refer the Court to the GGPA for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof,

including but not limited to Defendants' obligations with respect to the GGPA. Defendants otherwise deny the allegations in Paragraph 44.

45. Defendants deny the allegations in Paragraph 45.

46. Defendants deny the allegations in Paragraph 46.

47. Defendants deny the allegations in Paragraph 47.

48. The allegations in Paragraph 48 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 48.

49. Defendants incorporate by reference their responses in the preceding paragraphs.

50. The allegations in Paragraph 50 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that certain parties entered into (A) the GGPA, (B) the Agency Agreements, and (C) the Retained Agreements. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 50.

51. The allegations in Paragraph 51 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants admit that (A) certain parties entered into the Master Settlement Agreement and (B) certain parties entered into the Agency Agreements. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 51.

52. The allegations in Paragraph 52 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 52.

53. Defendants deny the allegations in Paragraph 53.

54. The allegations in Paragraph 54 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 54.

55. Defendants deny the allegations in Paragraph 55.

56. Defendants deny the allegations in Paragraph 56.

57. The allegations in Paragraph 57 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that certain parties entered into (A) the Agency Agreements, (B) the Midstream Settlement Agreement, and (C) the GGPA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 57.

58. Defendants deny the allegations in Paragraph 58.

59. The allegations in Paragraph 59 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 59.

60. Defendants incorporate by reference their responses in the preceding paragraphs.

61. Defendants admit that certain agreements between Springfield and certain Defendants are listed on Exhibit F to the GGPA and refer the Court to (A) the aforementioned agreements, (B) that certain Gas Processing Agreement dated February 27, 2012 between

Anadarko E&P Company LP and WGR Operating, LP (the "Brasada Agreement") and (C) that certain Gathering & Processing Agreement dated April 1, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, Ltd. (the "ETC Agreement") for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

62. The allegations in Paragraph 62 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that the Brasada Agreement and the ETC Agreement are listed on Exhibit F to the GGPA and refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization of the Brasada Agreement, the ETC Agreement, and the GGPA.

63. The allegations in Paragraph 63 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that Springfield and Gavilan entered into that certain First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated August 14, 2017, to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 63.

64. The allegations in Paragraph 64 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that, in connection with the Master Settlement Agreement, Springfield and Mesquite entered into (i) the Second Amendment to the Second Amended and Restated Lease Dedication and Gas Gathering Agreement and (ii) the First Amendment to the Second Amended and Restated Lease Dedication and Oil Gathering Agreement (together, the "SOGGA Amendments"). Defendants refer the Court to the SOGGA Amendments for their true and correct contents, which speak for themselves, and

deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 64.

65. The allegations in Paragraph 65 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that Springfield and Mesquite entered into the SOGGA Amendments, to which Defendants refer the Court for their true and correct contents, which speak for themselves, and deny the allegations in Paragraph 65.

66. The allegations in Paragraph 66 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) Springfield and Mesquite entered into the SOGGA Amendments and (B) Maverick and Carnero entered into the GGPA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny the allegations in Paragraph 66.

67. Defendants deny the allegations in Paragraph 67.

68. Defendants incorporate by reference their responses in the preceding paragraphs.

69. The allegations in Paragraph 69 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) Anadarko E&P Company LP and WGR Operating, LP entered into the Brasada Agreement and (B) the Brasada Agreement is listed on Exhibit F to the GGPA. Defendants refer the Court to the Brasada Agreement and the GGPA for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 69.

70. The allegations in Paragraph 70 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that

Anadarko entered into the Brasada Amendment, to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 70.

71. The allegations in Paragraph 71 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 71.

72. Defendants deny the allegations in Paragraph 72.

73. Defendants deny the allegations in Paragraph 73.

74. Defendants deny the allegations in Paragraph 74.

75. Defendants deny the allegations in Paragraph 75.

76. The allegations in Paragraph 76 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) AEP and WGR Operating, LP entered into the Brasada Amendment and (B) Maverick and Carnero entered into the GGPA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 76.

77. Defendants deny the allegations in Paragraph 77.

78. The allegations in Paragraph 78 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 78.

79. Defendants incorporate by reference their responses in the preceding paragraphs.

80. Paragraph 80 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 80.

81. Paragraph 81 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 81.

82. Paragraph 82 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Maverick and Carnero entered into the GGPA, to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

83. Paragraph 83 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 83.

84. Paragraph 84 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that MCom executed the MCom Assumption Agreement, to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 84.

85. Defendants deny the allegations in Paragraph 85.

86. Defendants deny the allegations in Paragraph 86.

87. Defendants incorporate by reference their responses in the preceding paragraphs.

88. The allegations in Paragraph 88 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit (A) certain parties entered into ratification agreements, (B) Mitsui, Maverick, and Plaintiff entered into a Letter Agreement and (C) Maverick and Carnero entered into the GGPA Amendment. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 88.

89. The allegations in Paragraph 89 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit (A) Eagle Ford, Venado, and Mitsui entered into the Working Interest Side Letter and (B) Crown Eagle is a party to the Master Settlement Agreement. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 89.

90. Paragraph 90 constitutes legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 90.

91. Defendants deny the allegations in Paragraph 91.

92. Defendants deny the allegations in Paragraph 92.

93. Defendants deny the allegations in Paragraph 93.

94. Defendants deny the allegations in Paragraph 94.

95. Defendants deny the allegations in Paragraph 95.

96. The allegations in Paragraph 96 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) Maverick and Carnero entered into the GGPA, (B) Crown Eagle entered into the Master Settlement Agreement, and (C) Eagle Ford, Venado, and Mitsui entered into the Working Interest Side Letter. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 96.

97. Defendants deny the allegations in Paragraph 97.

98. The allegations in Paragraph 98 constitute a statement of Plaintiff's legal position to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 98.

99. Defendants incorporate by reference their responses in the preceding paragraphs.

100. Defendants deny the allegations in Paragraph 100.

101. The allegations in Paragraph 101 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) certain parties entered into the Master Settlement Agreement and (B) Maverick and Carnero entered into the GGPA. Defendants refer the Court to the aforementioned agreements for their true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof. Defendants otherwise deny the allegations in Paragraph 101.

102. Defendants deny the allegations in Paragraph 102.

103. Defendants incorporate by reference their responses in the preceding paragraphs.

104. The allegations in Paragraph 104 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization* (the "Confirmation Order") [Dkt. No. 1212] contains a "Contract Objection Deadline." The Defendants refer the Court to the Confirmation Order for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

105. The allegations in Paragraph 105 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 105.

106. Defendants deny the allegations in Paragraph 106.

107. Defendants deny the allegations in Paragraph 107.

108. The allegations in Paragraph 108 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that (A) the Confirmation Order contains a "Contract Objection Deadline," and (B) Plaintiff purports to pursue equitable relief pursuant to Rule 60(b)(4). Defendants refer the Court to the Confirmation Order for its true and correct contents, which speak for themselves, and deny the allegations in Paragraph 108.

109. The allegations in Paragraph 109 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that Plaintiff purports to pursue a claim pursuant to Rule 60(d)(1), to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

110. The allegations in Paragraph 110 constitute a statement of Plaintiff's legal position to which no response is required. To the extent a response is required, Defendants admit that Plaintiff purports to pursue a claim pursuant to Rule 60(d)(1), to which Defendants refer the Court for its true and correct contents, which speak for themselves, and deny Plaintiff's characterization thereof.

111. The allegations in Paragraph 111 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 111.

112. The allegations in Paragraph 112 constitute legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 112.

**AFFIRMATIVE DEFENSES**

113. Plaintiff's claims are barred, in whole or part, because it has failed to state any claim for which relief can be granted.

114. Plaintiff's claims are barred, in whole or part, because they were not damaged.

115. Plaintiff's claims are barred, in whole or part, because of the doctrine of estoppel.

116. Plaintiff's claims are barred, in whole or part, because of the doctrine of unclean hands.

117. Plaintiff's claims are barred, in whole or part, because of the doctrine of waiver.

118. Plaintiff's claims are barred, in whole or part, because of Plaintiff's failure to comply with section 15.2 of the GGPA.

119. Plaintiff's claims are barred, in whole or part, by (i) the Plan, (ii) the Confirmation Order, (iii) the *Stipulation of Dismissal and Agreed Order* entered on June 28, 2021 between Crown Eagle, Maverick, and certain other parties [Dkt. No. 1983], (iv) the *Stipulation and Agreed Order* [Dkt. No. 2253] entered on December 21, 2021 between Anadarko, Springfield, Mesquite and certain other respective affiliates, and/or (v) bankruptcy law.

120. Plaintiff's claims are barred, in whole or in part, by Plaintiff's breach of the Carnero Settlement Agreement, dated June 6, 2020, by and among Plaintiff, the Debtors (as defined in the Plan), Catarina Midstream LLC, Seco Pipeline, LLC, Sanchez Midstream Partners, LP, Sanchez Midstream Partners GP, LLC, SP Holdings, LLC and TPL SouthTex Processing Company LP. The parties acknowledged at the June 29–30, 2020 hearing before the Court that the Carnero Settlement Agreement would not preordain the Debtors' midstream restructuring, and that the Debtors would have to renegotiate the terms of the Midstream Agency Agreement if they were unable to reject it. Carnero's counsel did not dispute these statements. The parties' understanding was clear—Mesquite would not face liability (beyond returning the $8 million letter of credit

proceeds to Carnero) for terminating the Carnero Settlement Agreement and renegotiating and assuming the Midstream Agency Agreement. Carnero breached the Carnero Settlement Agreement by repudiating this clear understanding and initiating this action. Carnero also breached Section 6.2.1 of the Carnero Settlement Agreement by suing Defendants in Texas state court.

**STATEMENT PURSUANT TO BANKRUPTCY RULE 7012(b)**

121. Pursuant to Bankruptcy Rule 7012(b), Defendants consent to entry of final orders or judgment by the Court if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments under Article III of the United States Constitution.

Respectfully submitted this 24th day of August, 2022.

*/s/ James G. Munisteri*
James G. Munisteri
Texas Bar No. 14667380
Sharon M. Beausoleil
Texas Bar No. 24025245
**Foley & Lardner LLP**
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
jmunisteri@foley.com
sbeausoleil@foley.com

Sara Ann Brown
**Foley & Lardner LLP**
Texas Bar No. 24075773
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-4887
Facsimile: (214) 999-4667
sabrown@foley.com

Dennis Jenkins
**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8276
Facsimile: (212) 728-8111
djenkins@willkie.com

Mark T. Stancil
**Willkie Farr & Gallagher LLP**
1875 K Street, N.W.
Washington, DC 20006-1238
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
mstancil@willkie.com

**Attorneys for Defendants Mesquite Energy, Inc., SN EF Maverick, LLC, & Mesquite Comanche Holdings, LLC**

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III
**McCloskey Roberson, PLLC**
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
woolley@mrwpllc.com

Paul M. Basta
Alice Belisle Eaton
Andrew J. Ehrlich
Sean A. Mitchell
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas New York, New York 10019 Telephone: (212) 373-3000
Facsimile: (212) 757-3900
pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com

**Attorneys for Defendant Crown Eagle Energy LP (f/k/a SN EF UnSub, LP)**

*/s/ Julia Frost-Davies*
Michelle Pector
Jared Wilkerson
**Morgan, Lewis & Bockius LLP**
1000 Louisiana St., Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
Facsimile: (713) 890-5001
michelle.pector@morganlewis.com
jared.wilkerson@morganlewis.com

Julia Frost-Davies
Amy L. Kyle
**Morgan, Lewis & Bockius LLP**
One Federal Street
Boston, MA 02215
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

**Attorneys for Defendant Eagle Ford TX, LP**

*/s/ Sydney Corry*
Sydney Corry
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
609 Main Street
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
sydney.corry@kirkland.com

Conor P. McNamara
**Kirkland & Ellis LLP**
**Kirkland & Ellis International LLP**
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
conor.mcnamara@kirkland.com

**Attorneys for Defendant Javelin EF L.P.**
**(f/k/a Venado EF L.P.)**

*/s/ Maegan Quejada*
Duston K. McFaul
Maegan Quejada
**Sidley Austin LLP**
1000 Louisiana St., Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
dmcfaoul@sidley.com
mquejada@sidly.com

**Attorneys for Defendant**
**Mitsui E&P Texas LP**

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 24, 2022, a true and correct copy of the foregoing pleading was served via CM/ECF to all parties authorized to receive electronic notice in this matter.

*/s/ James G. Munisteri*
James G. Munisteri

# <u>Exhibit Nos. 1-35</u>

## Defendants' Motion for Judgment on the Pleadings [Filed Under Seal at Doc. No. 67]

# EXHIBIT 1

***Execution Version***

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i or (ii will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s, the Treating Facility, the Delivery Point(s and the Plant(s, Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c or Section 6.6(e.

"Cashout Price" for any Month means (i if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i Emissions or (ii the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i Producer and (ii each of SN EF UnSub, LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s.

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s" means the inlet flange of the custody transfer meter(s owned by the Redelivery Pipeline(s at the Residue Gas Delivery Point(s, as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii Gathering L&U, plus (iii Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s connecting the Receipt Point(s to the Plant(s.

"Governmental Authority" means: (i the United States of America; (ii any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1 Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73 psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a. The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c.

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s" means the processing plant(s at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s, including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income; (ii the T&F Fee; and (iii any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i and (iii above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges.

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000 and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s" means the inlet flange of the custody transfer meter(s on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s.

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c.

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant.

"Taxes" means taxes, fees, or charges (including penalties and interest thereon now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s. Theoretical Gallons will be determined by multiplying: (i the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities.

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c.

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1 year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1 year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP or Released Well shall again be subject to the dedication hereunder as of the end of such one (1 year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3 years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells or Released Well (and associated Dedicated Acreage included in the proration unit for such well, as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e to retain all liquids (and title to such liquids separated from Producer's Gas by the use of conventional lease separators prior to delivery of Producer's Gas to Carnero at the Receipt Point(s, provided that Producer will not be permitted to remove or recover hydrocarbons from Producer's Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer's Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer's obligations are as follows:

(a Subject to Sections 3.1(c, 3.1(d, 3.1(e and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5;

(b Notwithstanding Section 3.1(a, to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of Producer's acquisition (collectively, the "Existing Commitments", such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; *provided, however*, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure, Carnero may, within sixty (60 Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10% of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a the Maximum Daily Quantity, or (b the Maximum Receipt Capacity for the Receipt Point(s, as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c.

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corporation that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

**ARTICLE 4**
**POINTS OF RECEIPT AND DELIVERY; PRESSURE**

**Section 4.1** Receipt Point(s. Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s.

**Section 4.2** Delivery Point(s. Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s.

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder, and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s at the pressures existing in the Redelivery Pipeline(s, from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s for the account of Producer on any Day differs from the Scheduled Quantity(ies for such Receipt Point(s, then Carnero shall only be obligated to deliver at the Delivery Point(s on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i no obligation to accept variations from a uniform hourly rate of flow, and (ii the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice, as applicable:

[redacted]

[redacted]

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees" shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any between the Consumer Price Index (All Urban Consumers (CPI-U; U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS" (the "CPI" for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10 calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30 Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24 Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB", or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time, two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1 the Receipt Quantity, and (2 the Delivery Quantity.

(a Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO.

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s. Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i while such Gas is within Carnero's control and possession; or (ii to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER.

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT, CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO. CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero's disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate, which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero's sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

## ARTICLE 9
## TERM

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term" and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term".

## ARTICLE 10
## QUALITY AND MEASUREMENT

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, *Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography* and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

## ARTICLE 11
## FORCE MAJEURE AND CURTAILMENT

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

**ARTICLE 14**
**FAILURE TO PAY; REMEDIES**

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b if Producer fails to post credit assurance as required pursuant to Section 5.8(e, and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e;

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc..

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d if delivered personally, upon the date of actual delivery; and (e if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly.

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY. THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement, and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives" in the following circumstances:

(a to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f to independent certified public accountants for purposes of obtaining a financial audit; and

(g as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s. This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period from the earlier of (i the date such Change in Law becomes effective or (ii the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ____________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ____________________

Name: ____________________

Title: ____________________

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ______________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ______________________________

Name: Antonio R. Sanchez III

Title: Chief Executive Officer



HIGHLY CONFIDENTIAL-PURSUANT TO PROTECTIVE ORDER

**EXHIBIT A**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Receipt Point(s; Delivery Point(s**

**Receipt Point(s**

| ***Meter Number*** | ***Receipt Point*** | ***Maximum Receipt Capacity (MMcf/d)*** |
|---|---|---|
| 4043654 | Maverick CDP | 235 MMcfd |
| 4043653 | Highway 83 – Carnero CDP | 75 MMcfd |
| 2048026 | Highway 83 – T2 CDP* | 75 MMcfd |

**Delivery Point(s)**

| ***Meter Number(s)*** | ***Residue Gas Delivery Point(s)*** | |
|---|---|---|
| 4034034 | Western | 115 MMcfd |
| TBD*** | Eagle Ford Midstream Pipeline (NET)** | 150 MMcfd |
| 4034036 | SECO | 250 MMcfd |
| 02-T2-09-8090 | TPL SouthTex Transmission Company LP* | 35 MMcfd |
| 02-T2-09-3630 | TPL SouthTex Transmission Company LP* | 35 MMcfd |

*Deliveries to Silver Oak II Plant only

**Potential future Delivery Point – there is no current interconnect

***Meter number not currently available

**EXHIBIT B**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**FEES**

Gathering Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s pursuant to the terms set forth in Section 3.4 of the Agreement at the same fees, the Gathering Fee shall be $0.15 MMBtu (based on MMBtu received at the Receipt Point(s and subject to adjustment in accordance with Section 5.9 of the Agreement.

Treating Fee (based on $CO_2$ content and Mcf as determined at the Receipt Point(s:

| | |
|---|---|
| If $CO_2$ content is 2.00% or less | no fee |
| If $CO_2$ content is greater than 2.0% | **To be determined when service is required.** |

Compression Fee: **To be determined when compression is required**

Processing Fee: For Firm volumes and any volumes that Carnero accepts on a Priority Interruptible basis at the Receipt Point(s) pursuant to the terms set forth in Section 3.4 of the Agreement, the Processing Fee shall be $0.253 MMBtu (based on MMBtu received at the Receipt Point(s) and subject to adjustment in accordance with Section 5.9 of the Agreement).

Gathering and Processing Fees for Excess Gas: The Gathering Fee, Treating Fee, Compression Fee, and Processing Fee set forth above shall apply with respect to the Firm Volumes (as determined with respect to the then-effective MDQ) and the Priority Interruptible volumes that Carnero accepts under the terms of Section 3.4 of the Agreement. Carnero may refuse to accept any Excess Gas for gathering and processing under this Agreement due to lack of available capacity on the Carnero System. All Excess Gas that Carnero does not accept from Producer shall be, at Producer's sole discretion, temporarily released from the dedication hereunder, subject to the following paragraph.

Producer will give Carnero not less than one hundred twenty (120) days prior written notice and the applicable production projections and forecast, identifying the scope, source and nature of the applicable volumes in reasonable detail (the "Excess Gas Notice") in the event Producer anticipates delivering volumes of Excess Gas on a continuing basis for which Carnero has insufficient capacity on the Carnero System and which Carnero does not accept. Within forty-five (45) days following delivery of Producer's Excess Gas Notice, Carnero may, acting in its sole discretion, propose to accept Excess Gas at adjusted gathering and processing fees (the "Adjusted Gathering, Treating, Compression and Processing Fees"), mutually agreed between the parties that are reflective of: (i) Carnero's capital expenditures (including a reasonable return

on investment with respect to such expenditures; and (ii any incremental expenses, fees or other costs, in each case, with respect to the receipt, gathering, processing and redelivery (including delivery of contractually allocated Residue Gas and Plant Products of Producer's Gas. Within ninety (90 days following receipt of Producer's Excess Gas Notice, Producer and Carnero shall negotiate in good faith to arrive at mutually agreeable Adjusted Gathering, Treating, Compression and Processing Fees and an incremental maximum daily quantity, including the period during which such fees will be effective. If Producer and Carnero are unable to agree on the Adjusted Gathering, Treating, Compression and Processing Fees during the Negotiation Period, then Producer may enter into negotiations with a third party for the gathering, processing or redelivery of the Excess Gas. Once Producer has substantially negotiated definitive agreements with a third party, such that all commercial terms (and terms allocating risk have been finally determined (the "Third Party Offer", Producer will provide such agreements to Carnero and offer to Carnero, by irrevocable written notice, the option to enter into such agreements, with such changes as are necessary to reflect usage of Carnero's facilities and Carnero shall have 30 days after receipt of the Third Party Offer to elect to accept the Third Party Offer, except that the Receipt Point(s and Redelivery Point(s shall be the same as the Receipt and Redelivery Point(s set forth under this Agreement. In the event that Carnero declines to accept the Third Party Offer, Producer may thereafter elect to cause such Excess Gas to be permanently released from dedication under this Agreement; provided that in no event will Excess Gas be released under this provision if such release would cause (or be reasonably expected to cause Producer to not be able to deliver the then existing MDQ hereunder.

**EXHIBIT C**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**Allocations**

1. Allocation of Producer's Condensate. A share of Condensate recovered by Carnero upstream of the Plant(s will be allocated to Producer each Month in accordance with the following formula:

$$\text{Producer's Share of Condensate} = AC \times \frac{PHV}{THV}$$

Where:

AC = the aggregate volume of Condensate delivered from the Carnero System for such Month;

PHV = the total MMBtus attributable to the C5+ component of Producer's Gas gathered and received at all Receipt Point(s) during such Month; and

THV = the total MMBtus attributable to the C5+ component of all Gas gathered and received in the Carnero System upstream of the Plant(s) during such Month.

2. Allocation of Producer's Products.

(a) In the event Producer has elected Full Recovery Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated in paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 90% |
| Propane | 96% |
| Butanes plus | 99% |

(b) In the event Producer has elected Ethane Rejection Allocation, the ethane, propane and butanes plus components of Producer's Products at each Receipt Point will be determined for each Plant Product by multiplying the Theoretical Gallons for each such Plant Product component determined at each Receipt Point, less FL&U and shrinkage attributable to Producer's Share of Condensate (as calculated under paragraph 1 of this Exhibit C), by the Fixed Recovery Percentages shown below. If the quality and/or characteristics of the Gas received at the Receipt Point change in such a manner that prevents Carnero from meeting the specifications of any Gas or liquids pipeline downstream of the Plant, or if the specifications of any such pipeline are revised, then Carnero shall have the right to adjust the below fixed recovery percentages to enable it to meet such specifications.

Fixed Recovery Percentages:

| | |
|---|---|
| Ethane | 35% |
| Propane | 94% |
| Butanes plus | 99% |

(c) At Carnero's election, Carnero may implement a different allocation methodology that it determines, in good faith, provides for a reasonable allocation of Plant Products.

3. Residue Gas. Producer's allocated share of Residue Gas for all Receipt Point(s) under this Agreement will be the quantity of Producer's Gas, in MMBtus, as measured at all Receipt Point(s), minus each of the following: (i) FL&U, (ii) shrinkage attributable to Producer's Condensate and (iii) Product Shrinkage. Plant Fuel, Gathering L&U and Compression Fuel (each as comprising a part of FL&U), Product Shrinkage and shrinkage attributable to Producer's Condensate will be determined as follows.

(a) Producer's share of Plant Fuel, stated in MMBtus, will be determined each Month by multiplying the actual quantity of MMBtus utilized or incurred in the operation of the Plant(s) for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee), use requirements and Gas lost as a result of, but not limited to, leakage, venting or flaring, discrepancies due to meter inaccuracies or variations of temperature and/or pressure at the Plant(s), as well as any Gas that is otherwise unaccounted for in the Plant(s) by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas delivered to the inlet of the Plant(s) during that Month, and (ii) the denominator of which is the total MMBtus attributable to all Gas delivered to the inlet of the Plant(s) during such Month.

(b) Producer's share of Gathering L&U, stated in MMBtus, will be determined each Month by multiplying the actual Gas that is lost and Gas that is unaccounted for in the Gathering System (which is the total MMBtus attributable to all Gas received into the Gathering System, less the total MMBtus attributable to all Gas delivered to facilities downstream of the Gathering System, less Compression Fuel and less shrinkage attributable to Condensate), by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) and transported on the Gathering System during that Month, and (ii) the denominator of

which is the total MMBtus attributable to all Gas received into and transported on the Gathering System during such Month.

(c) Producer's share of Compression Fuel, stated in MMBtus, will be determined each Month by multiplying the actual fuel in MMBtus used by Carnero in the operation of the compression facilities by a factor: (i) the numerator of which is the total MMBtus attributable to Producer's Gas received at all Receipt Point(s) during that Month that require compression at the compression facilities, and (ii) the denominator of which is the total MMBtus attributable to all Gas received into the Carnero System during such Month that require compression at the compression facilities.

(d) Producer's allocated share of product shrinkage (the "Product Shrinkage") for each Month will be the aggregate Btus determined by multiplying the gallons of each Plant Product, by component, of Producer's Products at all Receipt Point(s) by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145*, and superseding revisions thereof, and as adjusted to 60º Fahrenheit and a 14.73 psia pressure base.

(e) Producer's allocated share of shrinkage attributable to Producer's Condensate will be calculated by Carnero each Month by multiplying the number of gallons of each component of Condensate attributable to Producer's Gas by the Btu equivalent of each such component as set forth in the *GPA Technical Standards Publication No. 2145,* and superseding revisions thereof, and as adjusted to 60° Fahrenheit and a 14.73 psia pressure base. The aggregate Btu of all such components will constitute the shrinkage attributable to Producer's Condensate hereunder.

**EXHIBIT D**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**DEDICATED ACREAGE**

**For SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is all of Maverick, Webb, Dimmit and LaSalle Counties, Texas.**

**For each Comanche Producer other than SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC, the "Dedicated Acreage" is such Comanche Producer's existing right, title and interest as of the Effective Date (excluding any after acquired interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce Gas therefrom located in the area circled in red in the below diagram, excluding Mexico.**



**EXHIBIT E**

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

**MEMORANDUM OF AGREEMENT**

THIS MEMORANDUM OF Agreement (this "Memorandum" is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date", among SN EF Maverick, LLC, a Delaware limited liability company ("Producer", and Carnero G&P LLC, a Delaware limited liability company ("Carnero".

**RECITALS**

WHEREAS, on the Effective Date, Producer and Carnero entered into a Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "Agreement" under which Carnero agreed to provide gas gathering and gas processing services to Producer for its benefit and for the benefit of certain other producers;

WHEREAS, Producer and Carnero desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreement and certain provisions contained therein.

1. **Term**. The term of the Agreement commenced on the Effective Date and continues in effect until the fifteenth anniversary of such date (the "Primary Term" and will continue year-to-year thereafter unless the Agreement is terminated by Carnero or Producer upon at least 90 days' written notice to the other Party prior to the expiration of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreement, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreement and shall deliver thereunder to Carnero (the "Dedication" 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreement or otherwise excluded as provided in the Agreement owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage" or a pooled unit that contains acreage within the Dedicated Acreage, excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released or excluded from the Dedication in accordance with the Agreement (such gas, the "Dedicated Gas".

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, treat, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreement.

4. **Covenant Running with the Land**. So long as the Agreement is in effect, such Agreement shall (i be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns.

5. **Incorporation of Terms**. The terms and conditions of the Agreement are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreement in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreement.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

Producer and Carnero have signed this Memorandum as of the date first above written, but effective as of the Effective Date.

**CARNERO:**
**CARNERO G&P LLC**

By:____________________________
Name:__________________________
Title:___________________________

**PRODUCER:**
**SN EF MAVERICK, LLC**

By:____________________________
Name:__________________________
Title:___________________________

**THIS INSTRUMENT PREPARED BY:**

_________________
_________________
_________________
Attention: _________

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said limited liability company.

____________________________________
Notary Public, State of Texas

## EXHIBIT A TO MEMORANDUM OF AGREEMENT

## DEDICATED INSTRUMENTS

See attached.

# EXHIBIT F

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## EXISTING COMMITMENTS

Residue Gas Commitment Agreements

1. Firm Gas Transportation Agreement dated October 1, 2012 between Anadarko Energy Services Company and Enterprise Texas Pipeline LLC and associated amendments if any
2. Firm NGPA Section 311 Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP and associated amendments if any
3. Firm Intrastate Gas Transportation Agreement dated January 17, 2012 between Anadarko Energy Services Company and Eagle Ford Midstream, LP, and associated amendments if any
4. Firm Intrastate Gas Transportation Agreement dated March 01, 2013 between Anadarko E&P Onshore, LLC and Springfield Pipeline, LLC and associated amendments if any
5. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any
6. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any
7. Firm Transportation Agreement dated October 05, 2010 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any
8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any
9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

11. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

<u>Natural Gas Liquids Commitment Agreements</u>

1. Gathering & Processing Agreement dated April 01, 2011 between Anadarko E&P Company LP and ETC Texas Pipeline, LTD and associated amendments if any

2. Gas Processing Agreement dated February 27, 2012 between Anadarko E&P Company LP and WGR Operating, LP and associated amendments if any

3. Firm Transportation Agreement dated October 01, 2009 between Anadarko E&P Company LP, and Texas Pipeline LLC and associated amendments if any

4. Transportation Services Agreement between Enterprise Products Operating LLC and Anadarko Energy Services Company dated March 1, 2012, and associated amendments if any

5. Purchase Agreement between Anadarko Energy Services Company and Enterprise Products Operating LLC, dated March 1, 2012, and associated amendments if any

6. Raw Make (Y-Grade) Purchase and Sale Agreement between Anadarko E&P Onshore LLC and Plains Gas Solutions LLC, dated August 1, 2015, and associated amendments if any
7. Amended and Restated Lease Dedication and Gas Gathering Agreement dated June 1, 2017 between Sanchez Energy Corporation and Springfield Pipeline LLC and associated amendments if any

8. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Mitsui E&P Texas LP and Springfield Pipeline LLC and associated amendments if any

9. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Eagle Ford TX LP and Springfield Pipeline LLC and associated amendments if any

10. Amended and Restated Lease Dedication and Gas Gathering Agreement dated January 1, 2016 between Venado EF L.P. (successor in interest to SM Energy Company) and Springfield Pipeline LLC and associated amendments if any

## EXHIBIT G

**Attached to and made a part of the Firm Gas Gathering, Processing and Purchase Agreement between Carnero G&P LLC and SN EF Maverick LLC dated April 1, 2018**

## TRANSPORTATION AND FRACTIONATION FEE

A. For the first four (4) Contract Years during the Term, T&F Fee (expressed in cents per gallon) shall mean the following:

T&F Fee (expressed in cents per gallon) = (Combined T&F Fee) + (.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

B. Beginning on the fourth (4th) anniversary of the Effective Date and continuing for the remainder of the Term, the T&F Fee shall be comprised of each of the following components:

(i) Transportation Fee: means the actual out-of-pocket cost for transportation of Producer's Products, including any (i) pipeline transportation or exchange fees; (ii) truck and tank car rental fees incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product; and (iii) any other out-of-pocket costs incurred by Carnero in selling or marketing such Plant Product or Additional Plant Product (other than take or pay fees or demand charges), plus (ii) Fractionation Fee (expressed in cents per gallon) = (Base Fractionation Fee) + [(.132 cpg x Gas Price) + (10.6 cpg x Electricity Price)]

where:

*Combined T&F Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product

*Base Fractionation Fee* means 6.0 cents per gallon of Plant Product or Additional Plant Product, adjusted annually beginning on the 5th anniversary of the Effective Date by multiplying the then effective Base Fractionation Fee by the FERC Index

*FERC Index* means the FERC Oil Pipeline Index "Multiplier to Use", as published by the Federal Energy Regulatory Commission pursuant to 18 CFR 342.3, or its successor index then in effect.

*Gas Price* means the sum of (i) the Houston Ship Channel-Index (HSC) as published in the first issue of such Month of INSIDE FERC's GAS MARKET REPORT (or any replacement thereof mutually agreeable to the Parties if it is no longer published), expressed in $/MMBtu, plus (ii) a market differential expressed in $/MMBtu, which is currently $0.15/MMBtu. Producer acknowledges that the market differential represents Carnero's best approximation of the costs reasonably to be incurred by a fractionator of all natural gas fuel being delivered to the fractionator in relation to the HSC Index, and

*Execution Version*

**AMENDMENT TO**

**FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT**

This Amendment to Firm Gas Gathering, Processing and Purchase Agreement, (this "Amendment"), is effective as of the 1st day of April, 2018 (the "Effective Date") and is entered into by and among SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, SN EF Maverick, LLC (collectively the "Producers") and Carnero G&P LLC ("Carnero"). Carnero and each Producer are each referred to herein individually as a "Party" and collectively as the "Parties".

**Recitals**

A. Effective as of the Effective Date, SN EF Maverick, LLC and Carnero entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (the "FGGPPA").

B. Also effective as of the Effective Date, each of the other Producers ratified the FGGPPA pursuant to a Ratification Agreement, by and among such Producer, Carnero and SN EF Maverick, LLC (each, a "Ratification Agreement").

C. The Parties desire to amend the FGGPPA as set forth herein.

**Agreement**

For and in consideration of the foregoing and the mutual covenants and agreements contained herein and in the FGGPPA and the Ratification Agreements, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. Amendment of FGGPPA. The FGGPPA is hereby amended as follows:

(a) The following definitions are inserted in Section 1.1 of the FGGPPA in appropriate alphabetic order:

""Carnero Group" has the meaning set forth in Section 7.1."

""Producer Group" has the meaning set forth in Section 7.2."

(b) Section 7.1 of the FGGPPA is deleted and replaced with the following:

"Section 7.1 Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully

responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination arising from: (i) such Gas while such Gas is within Producer's control and possession; (ii) the failure of Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof; or (iii) the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "CARNERO GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO GROUP)."

(c) Section 7.2 of the FGGPPA is deleted and replaced with the following:

"Section 7.2 Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, arising from: (i) such Gas while such Gas is within Carnero's control and possession (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof); or (ii) the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES (THE "PRODUCER GROUP") HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING

TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER GROUP)."

2. Effectiveness. All matters contemplated in this Amendment will become effective, for all purposes, as of the Effective Date.

3. Effect on FGGPPA and Ratification Agreements. Except as expressly amended by this Amendment, the FGGPPA remains in full force and effect. The Parties acknowledge and agree that this Amendment shall in no manner impair or affect the validity or enforceability of the FGGPPA or any Ratification Agreement.

4. Counterparts. This Amendment may be executed in any number of counterparts (including by .pdf or other electronic means), each of which shall be an original but all of which together shall constitute one instrument.

**[Signature Pages Follow]**

The Parties have executed this Amendment as of the day and year first above written.

**CARNERO G&P LLC**

By: ______________________ GPS

Name: Patrick J. McDonie

Title: President

**SN EF MAVERICK, LLC**

By: ______________________

Name: Antonio R. Sanchez, III

Title: Chief Executive Officer

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

**EAGLE FORD TX LP**

By: _______________________

Name: Joo hyo Lee

Title: Treasury and Commercial Manager

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**GAVILAN RESOURCES, LLC**

By: ______________________

Name: David E. Roberts Jr.

Title: Chief Executive Officer

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

**VENADO EF L.P.**

By: ______________________

Name: Stacy Shivers

Title: VP of Operations

Signature Page to Amendment to Firm Gas Gathering, Processing and Purchase Agreement

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

# SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ........ 1**
A. Defined Terms ........ 1
B. Rules of Interpretation ........ 11
C. Computation of Time ........ 12
D. Governing Law ........ 12
E. Reference to Monetary Figures ........ 12
F. Reference to the Debtors or the Reorganized Debtors ........ 12
G. Controlling Document ........ 12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........ 12**
A. Administrative Claims ........ 12
B. Professional Fee Claims ........ 13
C. Priority Tax Claims ........ 14
D. Statutory Fees ........ 14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........ 14**
A. Formation of Debtor Group for Convenience Purposes Only ........ 14
B. Classification of Claims and Interests ........ 15
C. Treatment of Classes of Claims and Interests ........ 15
D. Special Provision Governing Unimpaired Claims ........ 18
E. Elimination of Vacant Classes ........ 18
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ........ 18
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........ 19
H. Intercompany Interests ........ 19
I. Subordinated Claims and Interests ........ 19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........ 19**
A. General Settlement of Claims, Interests, and Causes of Action ........ 19
B. Restructuring Transactions ........ 19
C. Sources of Consideration for Plan of Reorganization Distributions ........ 20
D. Lien-Related Litigation ........ 21
E. Continuation of Gavilan Proceeding ........ 22
F. Corporate Existence ........ 22
G. Vesting of Assets in the Reorganized Debtors ........ 22
H. Corporate Action ........ 23
I. New Organizational Documents ........ 23
J. Directors and Officers of Reorganized SN ........ 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ........ 23
L. Management Incentive Plan ........ 24
M. Effectuating Documents; Further Transactions ........ 24
N. Preservation of Causes of Action ........ 24
O. Exemption from Registration Requirements ........ 24
P. Cancellation of Instruments, Certificates, and Other Documents ........ 25
Q. Section 1146(a) Exemption ........ 25
R. DIP Agent Fees and Expenses ........ 26
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 26**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ........ 26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 27
D. Indemnification Obligations ........ 28
E. Insurance Policies ........ 28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........ 28
G. Contracts and Leases After the Petition Date ........ 28
H. Reservation of Rights ........ 28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........ 29**
A. Distributions on Account of Claims Allowed as of the Effective Date ........ 29
B. Rights and Powers of the Disbursing Agent ........ 29
C. Special Rules for Distributions to Holders of Disputed Claims ........ 29

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....30
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....34**

A. Allowance of Claims ....34
B. Claims Administration Responsibilities ....34
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....35
E. Time to File Objections to Claims ....35
F. Disallowance of Claims ....35
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....36**

A. Discharge of Claims and Termination of Interests ....36
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....37
E. Release of Liens ....37
F. Reimbursement or Contribution ....38
G. Recoupment ....38
H. Subordination Rights ....38

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**

A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....39
D. Effect of Non-Occurrence of Conditions to Consummation ....39
E. Substantial Consummation ....39

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**

A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....40**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**

A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....42
D. Payment of Statutory Fees ....42
E. Reservation of Rights ....42
F. Successors and Assigns ....42
G. Service of Documents ....43
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....44
J. Plan Supplement ....44
K. Non-Severability ....44
L. Votes Solicited in Good Faith ....44
M. Closing of Chapter 11 Cases ....44
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

63. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

64. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

65. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

66. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

67. "*Gavilan*" means Gavilan Resources, LLC.

68. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

69. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

70. "*Holder*" means an entity holding a Claim or Interest, as applicable.

71. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

73. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

74. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date; (ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

75. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

76. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

77. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

Case 19-34508 Document 1296 Filed in TXSB on 04/30/20 Page 16 of 48

78. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

79. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

81. "*Lien-Related Litigation*" means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

82. "*Lien-Related Litigation Creditor Representative*" means a representative, as selected by the Creditors' Committee, of general unsecured creditors in the Lien-Related Litigation.

83. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

84. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

85. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

86. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

87. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

88. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

89. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

90. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

92. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

93. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

94. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

95. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

96. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

97. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

98. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

99. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

100. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

102. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

103. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

104. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

105. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

106. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

107. "*Professional Fee Settlement Reserve Amount*" means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

108. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

109. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

111. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

112. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

113. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

114. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

115. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

116. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

117. "*Sanchez Parties*" means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

118. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by

the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

120. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

121. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

123. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

124. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

125. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

126. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

127. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

128. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

129. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

130. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

131. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

132. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

133. "*SN*" means Sanchez Energy Corporation.

134. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

135. "*SOG*" means Sanchez Oil & Gas Corporation.

136. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

137. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

138. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

139. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

140. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

141. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

142. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

143. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders,

rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and

the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. Final Fee Applications

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided*

that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any

Case 19-34508 Document 1235 Filed in TXSB on 04/28/20

Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New

Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Confirmation Date by the Bankruptcy Court according to the following timeline:

- *Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- *Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Effective Date.

- *Phase 3:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- *Post-Effective Date Equity Distribution Allocations:* The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ

professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity

Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected

Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned**

**shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory

or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in

the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be

distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery

on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest

shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or**

**(3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of

Case 19-34508 Document 1256 Filed in TXSB on 04/30/20 Page 48 of 88

Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

Case 19-34508 Document 1236 Filed in TXSB on 04/30/20 Page 49 of 48

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

Case 19-34508 Document 1235 Filed in TXSB on 04/30/20 Page 49 of 81

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 3

ENTERED
04/09/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: Docket No. 1110** |

**ORDER APPROVING DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) CONDITIONALLY APPROVING THE ADEQUACY OF THE DISCLOSURE STATEMENT; (II) APPROVING THE SOLICITATION AND NOTICE PROCEDURES WITH RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED JOINT PLAN OF REORGANIZATION; (III) APPROVING THE FORM OF BALLOT, AND NOTICES IN CONNECTION THEREWITH; (VI) SCHEDULING CERTAIN DATES WITH RESPECT THERETO; AND (V) GRANTING RELATED RELIEF**

Upon the *Debtors' Emergency Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (this "Order") (i) conditionally approving the adequacy of the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement");

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

(ii) approving the Solicitation and Voting Procedures; (iii) approving the Voting Record Date; (iv) approving the manner and form of the Solicitation Packages and the materials contained therein; (v) approving the Non-Voting Status Notices; (vi) approving the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan; (vii) approving the Voting and Tabulation Procedures; (viii) approving the Combined Hearing Notice; (ix) scheduling certain dates and deadlines related thereto; and (x) granting related relief; all as more fully set forth in the Motion; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of the cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the Debtors provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefore; it is HEREBY ORDERED THAT:

1. Omitted.

2. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**I. CONDITIONAL APPROVAL OF THE DISCLOSURE STATEMENT.**

3. The Disclosure Statement, attached as **Schedule 1**, is hereby conditionally approved as providing Holders of Claims and Interests entitled to vote on the Plan with adequate

information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1121(a)(1).

4. The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the injunction and exculpation provisions contained in Articles VIII.B and C of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II. APPROVAL OF THE SOLICITATION AND VOTING PROCEDURES.

5. The Debtors shall solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached as **<u>Schedule 2</u>**, which are hereby approved in their entirety.

## III. APPROVAL OF THE MATERIALS AND TIMELINE FOR SOLICITING VOTES AND THE PROCEDURES FOR CONFIRMING THE PLAN AND FOR APPROVING THE DISCLOSURE STATEMENT ON A FINAL BASIS.

### A. Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

6. Cause exists to shorten the deadlines set forth by Bankruptcy Rule 2002(b). The following dates are hereby established (subject to modification as necessary) with respect to the solicitation of votes to accept, and voting on, the Plan, as well as filing objections to the Plan and Disclosure Statement and approving the Disclosure Statement and confirming the Plan:

| | |
|---|---|
| Voting Record Date | April 8, 2020 |
| Solicitation Deadline | April 13, 2020 |
| Voting Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Deadline | April 27, 2020, at 5:00 p.m., prevailing Central Time |
| Plan and Disclosure Statement Objection Response Deadline | April 29, 2020 at 12:00 p.m., prevailing Central Time |
| Deadline to File Voting Report | April 29, 2020 at 12:00 p.m., prevailing Central Time |

[redacted]

| | |
|---|---|
| Combined Hearing Date | April 30, 2020, at 9:00 a.m., prevailing Central Time, or such other time as may be scheduled by the Court |

**B. Approval of the Form of, and Distribution of, Solicitation Packages to Parties Entitled to Vote on the Plan.**

7. In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits), the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those Holders of Claims in the Voting Class entitled to vote on the Plan as of the Voting Record Date shall include the following, the form of each of which is hereby approved:

(a) a copy of the Solicitation and Voting Procedures attached as **Schedule 2**;[2]

(b) an appropriate form of Ballot attached as **Schedule 3A, 3B, 3C, and 3D**; and

(c) the Combined Hearing Notice attached as **Schedule 4**.

8. The Solicitation Packages provide the Holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

9. The Debtors shall distribute Solicitation Packages to all Holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline. Such service shall satisfy the requirements of the Bankruptcy Code, Bankruptcy Rules, and the Bankruptcy Local Rules.

2 The Debtors will use commercially reasonable efforts to ensure that any Holder of a Claim who has filed duplicate Claims or Interests against the Debtors (whether against the same or multiple Debtors) receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim.

10. The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to Holders of Claims entitled to vote on the Plan in electronic format. On or before the Solicitation Deadline, the Debtors shall provide (i) complete Solicitation Packages (other than Ballots) to the U.S. Trustee and (ii) the Order (in electronic format) and the Combined Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

11. Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Balloting Agent and request paper copies of the corresponding materials received in electronic format (to be provided at the Debtors' expense).

12. The Balloting Agent is authorized to assist the Debtors in (i) distributing the Solicitation Packages; (ii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by Holders of Claims or Interests; (iii) responding to inquiries from Holders of Claims and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan; and (iv) if necessary, contacting creditors and equity holders regarding the Plan.

13. The Balloting Agent is also authorized to accept Ballots via electronic online transmission through a customized online balloting portal on the Debtors' case website. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this manner, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

**C. Approval of the Combined Hearing Notice.**

14. The Combined Hearing Notice, substantially in the form attached as **Schedule 4** filed by the Debtors and served upon parties in interest in these chapter 11 cases on or before the Solicitation Deadline, constitutes adequate and sufficient notice of the hearing to consider

adequacy of the Disclosure Statement and approval of the Plan, the manner in which a copy of the Plan can be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

15. The Combined Hearing Notices provide Holders of Claims, Holders of Interests, and other parties in interest with sufficient notice of the exculpation and injunction provisions contained in Article VIII.B and C of the Plan and the effect thereof.

**D. Approval of the Form of Notices to Non-Voting Classes.**

16. Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to Holders of Claims or Interests in Non-Voting Classes because such Holders are not entitled to vote on the Plan. Instead, on or before the Solicitation Deadline, the Balloting Agent shall mail (first class, postage prepaid) a Non-Voting Status Notice in lieu of Solicitation Packages, the form of each of which is hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
|---|---|---|
| 1, 2, and 7 | Unimpaired-Presumed to Accept | Will receive a notice, substantially in the form attached hereto as **Schedule 5A** in lieu of a Solicitation Package. |
| 8, 9 and 10 | Impaired-Deemed to Reject | Will receive a notice, substantially in the form attached hereto as **Schedule 5B** in lieu of a Solicitation Package. |

17. The Debtors are not required to provide the Holders of Class 6 Intercompany Claims with a Solicitation Package or any other type of notice in connection with solicitation.

18. The Debtors are not required to mail Solicitation Packages or other solicitation materials to (i) Holders of Claims or Interests that have already been paid in full during these chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant

to an order previously entered by this Court or (ii) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

**E. Approval of Notices to Contract and Lease Counterparties.**

19. The Debtors shall mail a notice of assumption or rejection of any Executory Contracts or Unexpired Leases (and any corresponding Cure Claims), substantially in the forms attached hereto as **Schedule 6** and **Schedule 7**, to the applicable counterparties to the Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan prior to the Combined Hearing. The deadline for objections to the Cure Claims and/or the assumption or rejection of Executory Contracts or Unexpired Leases is May 20, 2020.

**F. Approval of the Procedures for Filing Objections to the Plan.**

20. Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order. Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, must (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) state the name and address of the objecting party and the nature and amount of the Claim against or Interest in the Estates or property of the Debtors; (iv) state, with particularity, the legal and factual bases for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (v) be filed with the Court.

21. The Debtors (and other parties in support of the Plan) may file a reply to any objections to Confirmation of the Plan and a memorandum in support of Confirmation by April 29, 2020, at 12:00 p.m., prevailing Central Time.

## IV. MISCELLANEOUS.

22. The Debtors' rights are reserved to modify, revoke, or withdraw the Plan in accordance with the provisions of Article X of the Plan.

23. Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

24. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

25. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

26. Notice of the Motion satisfies the requirements of Bankruptcy Rule 6004(a).

27. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

28. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

29. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: April 09, 2020

Marvin Isgur
United States Bankruptcy Judge

# Schedule 1

## Disclosure Statement

Case 19-34508 Document 1136 Filed in TXSB on 04/09/20 Page 1 of 251

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

# DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES


**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
Email: mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff (admitted *pro hac vice*)
Lisa Beckerman (admitted *pro hac vice*)
Jason P. Rubin (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Email: idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin (admitted *pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
Email: jsavin@akingump.com

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
Email: mcavenaugh@jw.com
efreeman@jw.com


Dated: April 9, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>[2]

**THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.**

<u>**THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.**</u>

**THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.**

**THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION,**

---

2 Terms shall have the meaning ascribed to them, if any, elsewhere in this Disclosure Statement.

**MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.**

**THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCE AND CONFIRMATION OF THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.**

**UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED**

**THEREUNDER (THE "<u>SECURITIES ACT</u>"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.**

**THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, INCLUDING THE FOLLOWING, TO BE FORWARD-LOOKING STATEMENTS:**

- **BUSINESS STRATEGY;**
- **THE AMOUNT OF OIL AND NATURAL GAS THE DEBTORS PRODUCE;**
- **OIL, NATURAL GAS AND NATURAL GAS LIQUIDS ("<u>NGLs</u>") RESERVES;**
- **THE DEBTORS' ABILITY TO REPLACE RESERVES AND INCREASE RESERVE VALUE;**
- **THE DEBTORS' DRILLING LOCATIONS AND THEIR ABILITY TO CONTINUE DEVELOPMENT ACTIVITIES AT ECONOMICALLY ATTRACTIVE COSTS;**
- **THE DEBTORS' ABILITY TO DIVEST NON-CORE ASSETS AT ECONOMICALLY ATTRACTIVE PRICES;**
- **FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;**
- **LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;**
- **FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;**
- **OIL AND NATURAL GAS PRICES AND THE OVERALL HEALTH OF THE OIL AND NATURAL GAS INDUSTRY;**
- **THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;**
- **AVAILABILITY AND TERMS OF CAPITAL;**
- **SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;**
- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**
- **EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;**
- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**
- **UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;**
- **PLANS, OBJECTIVES, AND EXPECTATIONS;**
- **THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY; AND**
- **THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE, BUT ARE NOT LIMITED TO, THE FOLLOWING: THE OUTCOME OF THE CHAPTER 11 CASES; RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES, INCLUDING THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN OR TO DEVELOP, CONFIRM AND CONSUMMATE AN ALTERNATIVE RESTRUCTURING TRANSACTION IF THE PLAN IS NOT CONFIRMED, WHICH MAY BE NECESSARY TO CONTINUE AS A GOING CONCERN; THE DEBTORS' OR THE REORGANIZED DEBTORS' ABILITY TO MAINTAIN RELATIONSHIPS WITH SUPPLIERS, CUSTOMERS, EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THE CHAPTER 11 FILINGS; EACH DEBTOR'S**

**ABILITY TO OBTAIN SUFFICIENT FINANCING TO ALLOW IT TO EMERGE FROM BANKRUPTCY AND EXECUTE ITS BUSINESS PLAN POST-EMERGENCE; THE LENGTH OF TIME THAT THE DEBTORS WILL OPERATE UNDER CHAPTER 11 PROTECTION AND THE CONTINUED AVAILABILITY OF OPERATING CAPITAL DURING THE PENDENCY OF THE CHAPTER 11 CASES; RISKS ASSOCIATED WITH THIRD PARTY MOTIONS IN THE CHAPTER 11 CASES, WHICH MAY INTERFERE WITH THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE A PLAN OF REORGANIZATION; THE POTENTIAL ADVERSE EFFECTS OF THE CHAPTER 11 CASES ON THE DEBTORS' LIQUIDITY AND RESULTS OF OPERATIONS; INCREASED ADVISORY COSTS TO EXECUTE A REORGANIZATION; THE TIMING AND EXTENT OF CHANGES IN PRICES OF, AND DEMAND FOR, COMMODITIES; THE EXTENT TO WHICH THE DEBTORS' DRILLING PLANS ARE SUCCESSFUL; EACH DEBTOR'S ABILITY TO REPLACE THE RESERVES IT PRODUCES; EACH DEBTOR'S ABILITY TO SATISFY ITS CAPITAL EXPENDITURE, DEBT SERVICE AND OTHER FUNDING REQUIREMENTS THROUGH INTERNALLY GENERATED CASH FLOWS, ASSET SALES AND OTHER ACTIVITIES; THE ACCURACY OF RESERVE ESTIMATES; AND OTHER FACTORS DESCRIBED IN THIS DISCLOSURE STATEMENT OR THE PLAN.**

**SEE "RISK FACTORS" IN THE ANNUAL REPORT OF SANCHEZ ENERGY CORPORATION ("SN") ON FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2018 FOR A FURTHER DESCRIPTION OF ADDITIONAL RISK FACTORS THAT COULD HAVE A SIGNIFICANT IMPACT ON THE DEBTORS' OPERATING PERFORMANCE, AND SEE SN'S OTHER FILINGS WITH THE SEC FOR ADDITIONAL DISCLOSURES REGARDING RISKS AND FORWARD-LOOKING STATEMENTS.**

# TABLE OF CONTENTS

Page

**I. INTRODUCTION. 1**

**II. PRELIMINARY STATEMENT. 1**

**III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN. 3**

A. What is chapter 11? 3
B. Why are the Debtors sending me this Disclosure Statement? 4
C. Am I entitled to vote on the Plan? 4
D. What will I receive from the Debtors if the Plan is consummated? 4
E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim? 7
F. Are any regulatory approvals required to consummate the Plan? 10
G. What happens to my recovery if the Plan is not confirmed or does not go effective? 10
H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" 10
I. Is there potential litigation related to the Plan? 10
J. How will the preservation of the Causes of Action impact my recovery under the Plan? 11
K. Will there be releases and exculpation granted to parties in interest as part of the Plan? 11
L. How do I vote for or against the Plan? 13
M. What is the deadline to vote on the Plan? 14
N. When is the Confirmation Hearing set to occur? 14
O. What is the purpose of the Confirmation Hearing? 14
P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? 15
Q. Do the Debtors recommend voting in favor of the Plan? 15
R. Who supports the Plan? 15

**IV. THE DEBTORS' PLAN. 16**

A. The Plan. 16
B. Cancellation of Instruments, Certificates, and Other Documents. 25
C. Section 1146(a) Exemption. 25
D. DIP Agent Fees and Expenses. 26

**V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW. 26**

A. The Company's Corporate History. 26
B. The Debtors' Assets. 27
C. The Debtors' Prepetition Capital Structure. 29

**VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES. 33**

A. First Day Relief. 33
B. Other Procedural and Administrative Motions. 33
C. Schedules and Statements. 34
D. Establishment of a Claims Bar Date. 34
E. The GSO Tolling Agreement. 35
F. Investigation of Related Party Transactions. 35

| | | |
|---|---|---|
| G. | Litigation Matters. | 36 |
| H. | Retention of Professionals. | 39 |
| I. | Rejection and Assumption of Executory Contracts and Unexpired Leases. | 40 |
| J. | Appointment and Retention of Chief Restructuring Officer. | 40 |
| K. | Appointment of Examiner. | 40 |
| L. | Exclusivity. | 41 |
| M. | Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts. | 41 |
| N. | Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property. | 41 |
| O. | DIP Motion. | 42 |
| P. | Analysis of Lien Perfection Regarding Secured Notes. | 42 |
| Q. | Creditors' Committee Claim Objection. | 43 |
| R. | Creditors' Committee Related Party Transaction Standing Motion. | 44 |
| S. | Shared Services. | 44 |
| T. | Analysis of the Debtors' Midstream and Marketing Contract Review. | 44 |
| U. | Postpetition Restructuring Process. | 45 |

**VII. RISK FACTORS. ....... 46**

| | | |
|---|---|---|
| A. | Bankruptcy Law Considerations. | 46 |
| B. | Risks Related to Recoveries under the Plan. | 49 |
| C. | Risks Related to the Debtors' and the Reorganized Debtors' Businesses. | 52 |

**VIII. SOLICITATION AND VOTING PROCEDURES. ....... 60**

| | | |
|---|---|---|
| A. | Holders of Claims and Interests Entitled to Vote on the Plan. | 61 |
| B. | Voting Record Date. | 61 |
| C. | Voting on the Plan. | 61 |
| D. | Ballots Not Counted. | 62 |

**IX. CONFIRMATION OF THE PLAN. ....... 62**

| | | |
|---|---|---|
| A. | Requirements for Confirmation of the Plan. | 62 |
| B. | Best Interests of Creditors/Liquidation Analysis. | 63 |
| C. | Feasibility. | 63 |
| D. | Acceptance by Impaired Class. | 64 |
| E. | Confirmation without Acceptance by All Impaired Classes. | 64 |
| F. | Valuation of the Debtors. | 65 |

**X. CERTAIN SECURITIES LAW MATTERS. ....... 65**

| | | |
|---|---|---|
| A. | New Common Stock. | 65 |
| B. | Issuance and Resale of New Common Stock Under the Plan. | 66 |

**XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN. ....... 69**

| | | |
|---|---|---|
| A. | Introduction. | 69 |
| B. | Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors. | 70 |
| C. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. | 73 |
| D. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims. | 77 |
| E. | Information Reporting and Backup Withholding. | 80 |

**XII. RECOMMENDATION. ........................................................................ 82**

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Plan of Reorganization |
| EXHIBIT B | Corporate Organization Chart |
| EXHIBIT C | Liquidation Analysis |
| EXHIBIT D | Financial Projections |
| EXHIBIT E | Valuation Analysis |

## I. INTRODUCTION.

Sanchez Energy Corporation ("SN") and its debtor affiliates, as debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors"), and its non-debtor subsidiaries and certain affiliates (collectively, the "Non-Debtor Affiliates," and together with the Debtors, the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates [Docket No. [●] (the "Plan"), filed contemporaneously herewith.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. The Plan constitutes a separate chapter 11 Plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THESE CHAPTER 11 CASES. ACCORDINGLY, THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II. PRELIMINARY STATEMENT.

SN, a publicly-owned Delaware corporation headquartered in Houston, Texas, is, together with its direct and indirect Debtor and non-Debtor subsidiaries, an independent oil and natural gas exploration and production ("E&P") company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources. SN was formed by the Sanchez Group[2] in August 2011 and completed its initial public offering ("IPO") in December 2011. SN's common stock (the "Existing SN Common Stock") subsequently traded on the New York Stock Exchange (the "NYSE") until the opening of trading on February 20, 2019 when the NYSE suspended the trading of the Existing SN Common Stock and commenced delisting proceedings. As a result of delisting proceedings initiated by the NYSE, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date). The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit B**. As set forth therein, SN is either the direct or indirect parent company of each of the other Debtors.

The sustained decline and volatility in commodity prices have weighed heavily on the energy industry globally and, in particular, on U.S. independent oil and natural gas producers such as the Debtors. The E&P industry has been challenged by low oil and natural gas prices for years. Beginning in 2014, oil prices declined precipitously from a price of more than $100 per barrel, and continued to languish throughout 2015 into the start of 2016, ultimately reaching a 13-year low of approximately $26 per barrel in February 2016. Oil prices made a slight rebound in 2017, only to decline again in the second half of 2018. The extreme volatility continued in 2019 through early 2020, and oil prices trended downward beginning in late January 2020. Even more recently, the coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial and consumer activity and travel and social distancing restrictions that are expected to continue and may expand in the near future. Disagreements between the Organization of Petroleum Exporting Countries ("OPEC") and Russia in early March 2020 have caused additional historic price declines and volatility. Oil prices fell to a four-year low

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan will govern.

[2] The "Sanchez Group" comprises Sanchez Oil & Gas Corporation and certain other affiliated entities.

in March 2020 below $20 per barrel, and have somewhat abated to the high $20 to low $30 per barrel range over the first several trading sessions in April 2020 in response to headlines regarding potential further OPEC actions. This market downturn has negatively impacted and continues to negatively impact the volume and discounted future net cash flows of the Debtors' estimated proved reserves, and the prolonged price volatility also has caused the Debtors to incur losses related to their commodity hedging arrangements, the last of which expired as of January 31, 2020. Additionally, the Debtors' revenue, profitability, and cash flow depend on the prices of and demand for oil, natural gas, and NGLs, and continued low and volatile commodity prices have significantly and adversely affected the Debtors' financial results and prospects for long-term operation under their current capital structure. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crisis, reflecting fears of a global recession and potential further global economic damage from the coronavirus pandemic, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

Deteriorating commodity market conditions have impacted energy companies throughout the industry and around the world. Companies throughout the oil and natural gas industry have endured the effects of this downward trend, and the Debtors are no exception. Specifically, U.S. independent E&P companies like the Debtors have suffered enormously, as their revenues are generated from the sale of oil and natural gas. Many U.S. oil and natural gas companies have filed for chapter 11 bankruptcy protection over the last few years, which is an indicator of difficult and unsustainable market conditions. In addition, many other oil and natural gas companies have defaulted on their debt obligations, negotiated covenant relief with creditors to avoid defaulting, or have pursued out-of-court restructurings.

The Company's success depends on receiving market-based prices for its oil and natural gas production that allow the Company to generate a profit after accounting for capital expenditures and costs. Additionally, the Company depends upon the vitality of the midstream and downstream companies that comprise its customer base to purchase and transport its hydrocarbons to the market. Similar to the Company, these other companies and the physical markets have also experienced detrimental impacts and disruptions caused by the price downturn and supply imbalance.

Operating their businesses in light of the extended downturn in commodity prices has negatively impacted the Company's liquidity. The Company's cash position has declined steadily through 2017, 2018, and 2019. As of August 11, 2019 (the "Petition Date"), the Debtors had a total of approximately $91 million in cash. The Debtors' cash on hand in addition to the Debtors' DIP financing has been, and will continue to be, used to fund operations during the Chapter 11 Cases.

On a prepetition basis, SN, as borrower, and certain of the Debtor entities which constitute restricted subsidiaries (the "Restricted Subsidiaries") under the Credit Agreement (as defined below), as guarantors, had an approximately $17.1 million issued and undrawn letter of credit under the $25 million first-out senior secured working capital and letter of credit facility (the "First-Out Senior Secured Revolving Credit Facility") pursuant to the Third Amended and Restated Credit Agreement (the "Credit Agreement") dated as of February 14, 2018 with Royal Bank of Canada ("RBC"), as administrative agent. This letter of credit was drawn by the beneficiary thereof on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral (as defined below). On January 28, 2020, in conjunction with the closing of the DIP Facility (as defined below), SN used its available cash, including net proceeds of the borrowings under the DIP Facility, to pay off all $7.9 million of borrowings and the additional $17.1 million in such reimbursement obligations, together with $0.7 million in accumulated fees and interest on such amounts since the Petition Date.

In addition to liquidity concerns, the Debtors faced impending maturities of their 7.75% Senior Notes[3] at a time when the Company was navigating dire financial circumstances. Any attempt to re-finance that maturity would likely have been extremely difficult in the environment at that time under the Debtors' existing capital structure, shown below as of the Petition Date.

As of the Petition Date, the Existing SN Common Stock was trading at $0.08 per share, with a total market capitalization of $7.5 million. As detailed herein, SN struggled prepetition to maintain compliance with the NYSE's listing standards when the average closing price per share of the Existing SN Common Stock fell below $1.00, and SN's average market capitalization fell below $50 million. On January 3, 2019, SN was notified in writing by the NYSE that it was out of compliance with the NYSE's continued listing standards requiring that a company maintain an average market capitalization of $50 million over a consecutive 30 trading day period, which subsequently caused the NYSE to initiate delisting proceedings of the Existing SN Common Stock. As a result, the Existing SN Common Stock began trading on the OTC Pink market under ticker symbol "SNEC" upon the opening of trading on February 21, 2019 (and under the ticker symbol "SNECQ" following the Petition Date).

This confluence of circumstances, and the related adverse effects and negative prospects for satisfying their future financial obligations, directly caused the Debtors to commence these Chapter 11 Cases. To protect their residual values and to successfully restructure their businesses in light of these challenges, the Debtors have been actively implementing strategies designed to maximize liquidity and preserve capital. Specifically, in the past several years the Debtors have substantially reduced personnel, divested a number of assets, and implemented numerous technical processes to further develop assets to increase production. The Debtors also significantly reduced drilling and development activity and reduced their capital expenditures from approximately $593 million in 2018 to $83 million in 2019.

The Plan provides for a comprehensive restructuring of the Debtors' outstanding indebtedness and equity interests through a plan of reorganization.

The formulation of the Plan is a significant achievement for the Debtors. Each of the Debtors strongly believes that the Plan is in the best interests of its estate and represents the best available alternative for all of its stakeholders. The Debtors are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtors' long-term viability and success. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote to accept or reject the Plan vote to accept the Plan.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code

---

[3] SN has issued and outstanding $600 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "7.75% Senior Notes"), $1,150 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "6.125% Senior Notes" and together with the 7.75% Senior Notes, the "Senior Unsecured Notes"), and $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes," and together with the Senior Unsecured Notes, the "Notes").

provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

### D. What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE**

**DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**[4]

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| | | Classified Claims Against and Interests In the Debtors | | |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:<br>i. payment in full in Cash;<br>ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;<br>iii. reinstatement of such Other Secured Claim; or<br>iv. other treatment rendering such Claim Unimpaired. | $0 | 100% |
| 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:<br>i. Cash in an amount equal to such Allowed Other Priority Claim; or<br>ii. such other treatment rendering such Other Priority Claim Unimpaired. | $0 | 100% |
| 3 | DIP Claims | In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of | $ 151.4 MM | 11%-53% |

[4] The recoveries set forth below may change based upon changes in the amount of Claims or Interests that are Allowed, as well as other factors related to the Debtors' business operations and general economic conditions.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| | | an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:<br>i. the DIP Equity Distribution on the Effective Date; and<br>ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code. | | |
| 4 | Secured Notes Claims | In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code | $ 450 MM | 0%-TBD |
| 5 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code. | $1.815 MM | 0%-TBD |
| 6 | Intercompany Claims | On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:<br>i. Reinstated;<br>ii. compromised;<br>iii. released, or<br>iv. offset, contributed, and/or distributed to the applicable Debtor. | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims or Interests ($MM)** | **Projected Recovery Under the Plan** |
| 7 | Intercompany Interests | On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 8 | Existing SN Preferred Interests | On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 9 | Existing SN Common Interests | On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest. | N/A | 0% |
| 10 | Section 510(b) Claims | On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim. | N/A | 0% |

### E. What will I receive from the Debtors if I hold an Allowed Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1. Administrative Claims.

Except as otherwise provided in Article II.A of the Plan and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

**2. Professional Fee Claims.**

**A. Professional Fee Settlement.**

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly,

any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

**B. Final Fee Applications.**

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "Draft Report Review Period"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

**3. Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**4. Statutory Fees.**

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### F. Are any regulatory approvals required to consummate the Plan?

There are not expected to be any known regulatory approvals that are required to consummate the Plan. However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G. What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article IX.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 63, and the Liquidation Analysis attached hereto as **Exhibit C**.

### H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After the Plan is confirmed, there are conditions that need to be satisfied or waived so that the Plan can be Consummated and go effective. *See* Article IX of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion on the confirmation procedures.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for such Allowed Claims in accordance with the applicable Class on the date the Plan becomes effective, *i.e.*, the "Effective Date," or as soon as reasonably practicable thereafter, unless the Plan provides otherwise.

### I. Is there potential litigation related to the Plan?

Parties in interest may object to the Plan being confirmed, which potentially gives rise to litigation. In the event that it becomes necessary to confirm the Plan over a Class's objection to or vote to reject the Plan, the Debtors may seek to confirm the Plan notwithstanding such objecting Class's dissent. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan that an impaired class has rejected, if it determines that the plan meets certain requirements for confirmation.

The Bankruptcy Court has established **April 27, 2020, at 5:00 p.m. prevailing Central Time**, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtors believe the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

### J. How will the preservation of the Causes of Action impact my recovery under the Plan?

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

### K. Will there be releases and exculpation granted to parties in interest as part of the Plan?

The Plan proposes to exculpate the Exculpated Parties, but will not grant any other releases. The exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations with respect to the Plan. The exculpation provisions not only benefit the Exculpated Parties, but also the Debtors' post-emergence enterprise as a whole.

The Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. In addition, many of the

Case 19-34054-sgj11 Doc 1136 Filed 09/23/20 Entered 09/23/20 14:09:20 Page 32 of 51

Exculpated Parties are entitled to indemnification by the Debtors, which indemnification obligations are expressly preserved under the Plan. Accordingly, each of the Exculpated Parties warrants the benefit of the exculpation provisions.

**1. Exculpation.**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**2. Injunction.**

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any**

**manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

### 3. Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

## L. How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. Additional information on the voting process is contained in Article VIII below, entitled "Solicitation and Voting Procedures."

| BALLOTS |
|---|
| The Balloting Agent[5] must **actually receive** ballots on or before the Voting Deadline, which is **April 27, 2020, at 5:00 p.m., prevailing Central Time**, either (i) via the online portal, https://cases.primeclerk.com/sanchezenergy or (ii) at the following address:<br>**Sanchez Ballot Processing**<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165<br>or (iii) if permitted under the instructions accompanying your ballot, via email to sanchezballots@primeclerk.com<br>If you have any questions on the procedure for voting on the Plan, please call the Debtors at:<br>(844) 232-0067 (U.S. and Canada toll free) or (917) 942-6393 (international) |

### M. What is the deadline to vote on the Plan?

The Voting Deadline is April 27, 2020, at 5:00 p.m. (prevailing Central Time).

### N. When is the Confirmation Hearing set to occur?

On April [9], 2020, the Bankruptcy Court entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (VI) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. #] (the "Scheduling Order"). As part of the Scheduling Order, the Bankruptcy Court has scheduled a Combined Hearing to consider the adequacy of this Disclosure Statement and Confirmation of the Plan for April 30, 2020, at 9:00 a.m. (prevailing Central Time) (the "Combined Hearing"). The Combined Hearing may be adjourned from time to time without further notice.

In addition, pursuant to the Scheduling Order, objections to Confirmation or the adequacy of this Disclosure Statement must be filed and served on the Debtors, and certain other parties, by no later than April 27, 2020, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Combined Hearing that accompanies this Disclosure Statement and is incorporated herein by reference.

### O. What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain

---

[5] "Balloting Agent" refers to the Claims, Noticing and Solicitation Agent with respect to the performance of its solicitation activities.

limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

The Combined Hearing will consider the adequacy of this Disclosure Statement, as well as Confirmation of the Plan.

### P. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Balloting Agent, Prime Clerk LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
**Sanchez Ballot Processing**
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

*By electronic mail at:*
sanchezballots@primeclerk.com

*By telephone (toll free) at:*
(844) 232-0067 (U.S. and Canada)
(917) 942-6393 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Balloting Agent at the address above or by downloading the exhibits and documents from the website of the Balloting Agent at http://cases.primeclerk.com/sanchezenergy (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

To the extent that you have questions about your rights pursuant to the Plan or the Disclosure Statement, you should seek the advice of your own counsel.

### Q. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### R. Who supports the Plan?

The Plan is the product of a negotiated settlement reached through mediation. The Plan is supported by the Debtors and the Secured Ad Hoc Group.

## IV. THE DEBTORS' PLAN.

### A. The Plan.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

The Plan contains the following provisions:

#### 1. Sources of Consideration for Plan of Reorganization Distributions.

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

#### 2. Issuance and Distribution of New Common Stock.

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2 of the Plan. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

### 3. Distribution of Post-Effective Date Equity Distribution.

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

### 4. Lien-Related Litigation.

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; provided that in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection

with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

**5. Continuation of Gavilan Proceeding.**

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

**6. Corporate Existence.**

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

**7. Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**8. Corporate Action.**

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have

occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.H of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 9. New Organizational Documents.

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

### 10. Directors and Officers of Reorganized SN.

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

### 11. Retention of Current Workforce by Reorganized SN; Severance Payments.

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by

SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

**12. Management Incentive Plan.**

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

**13. Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

**14. Preservation of Causes of Action.**

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the

Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

**15. Distributions.**

**(i) Distributions on Account of Claims Allowed as of the Effective Date.**

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. A Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

**(ii) Rights and Powers of the Disbursing Agent.**

**(a) Powers of Disbursing Agent.**

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(b) Expenses Incurred On or After the Effective Date.**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

**(iii) Special Rules for Distributions to Holders of Disputed Claims.**

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to

Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

### 16. Executory Contracts and Unexpired Leases.

#### (i) Assumption or Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in Article V of the Plan, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

#### (ii) Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy

Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**(iii) Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or

ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

**17. Exemption from Registration Requirements.**

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**18. Conditions Precedent.**

**(i) Conditions Precedent to the Effective Date of the Plan.**

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

(1) the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

(2) the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

(3) the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

(4) the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

(5) the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

(6) the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

(7) the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

**(ii) Waiver of Conditions.**

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may only be waived only by the Debtors, with the consent of the DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**(iii) Effect of Non-Occurrence of Conditions to Consummation.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

**(iv) Substantial Consummation.**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**B. Cancellation of Instruments, Certificates, and Other Documents.**

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

**C. Section 1146(a) Exemption.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the

Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### D. DIP Agent Fees and Expenses.

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## V. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.

### A. The Company's Corporate History.

SN was formed by certain members of the Sanchez Group in August 2011 and completed its IPO in December 2011. SN is engaged in the development and production of onshore domestic oil and natural gas properties, with a particular focus on the horizontal development of the Eagle Ford Shale in South Texas.

Concurrently with the IPO, the Debtors acquired certain assets in the Eagle Ford Shale, where they continued to expand their presence, predominantly in the western portion, and as of December 31, 2019, hold approximately 415,000 gross (215,000 net) acres (collectively, the "Eagle Ford Assets"). The Debtors' core acreage position, which is large and strategically concentrated within an approximately 40-mile radius, provides a unique competitive advantage by offering the potential for significant synergies of scale. These synergies include the opportunity to derive cost savings in connection with the positioning of rigs and equipment, shared resources for in-field gathering, water and water transportation, more efficient drilling processes and field operations, substantial asset-level knowledge, and enhanced pricing based on the close proximity to attractive markets along the U.S. Gulf Coast. In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, also hold certain other producing properties and

Case 20-34045 Document 11 Filed 07/09/20 Page 26 of 251

undeveloped acreage, including in the Tuscaloosa Marine Shale (the "TMS") in Mississippi and Louisiana as well as other locations in Louisiana and Texas.[6]

In connection with the IPO, the Debtors entered into certain agreements with Sanchez Oil & Gas Corporation ("SOG"), a full-service oil and natural gas operating company founded in 1972 and privately owned by members of the Sanchez family. These agreements govern SOG's performance of various services, on a pass-through cost basis, that support the Debtors' operations, including, among other things, general and administrative, reserve engineering, operational, and geological and geophysical services. Additionally, pursuant to these arrangements, SOG has granted the Debtors unrestricted access to certain extensive seismic and other data developed or licensed by SOG. Moreover, as a result of the Debtors' shared services arrangements with SOG (collectively, the "Shared Services"), all individuals comprising the Debtors' workforce, including their executive officers, are SOG employees, as the Debtors do not have any employees of their own.

SN's direct and indirect subsidiaries total 22 (including the Non-Debtor Affiliates).

The Debtors are highly experienced and historically proven low-cost operators for many types of onshore oil and natural gas assets, and the Debtors act as operators for most of their oil and natural gas assets. While the Debtors' businesses primarily involve the operation of unconventional oil and natural gas properties (e.g., shale assets) using advanced horizontal drilling and completion techniques, with a current focus on the Eagle Ford Shale, they are also highly experienced in operating conventional assets using traditional development methods. Indeed, the Debtors are currently one of the largest and most active operators in the Eagle Ford Shale and have vast amounts of experience and technical expertise in all facets of the oil and natural gas E&P industry, and, therefore, are well-positioned as industry leading operators.

## B. The Debtors' Assets.

As of December 31, 2019, approximately 94% of the Debtors' net acreage was held by production and/or continuous operations. Leases that are not held by production and/or continuous operations represent approximately 14,000 net acres (all in the Eagle Ford Shale) of which approximately 6,000 net acres are set to expire in 2020, approximately 6,900 net acres are set to expire in 2021 and approximately 1,100 net acres are set to expire in 2022 and beyond. Of the 6,000 net Eagle Ford acres set to expire in 2020, approximately 5,100 net acres are subject to two-year extension options, which would permit the Debtors to extend the primary term of those leases into 2022. The typical oil and natural gas lease agreement covering the Debtors' properties provides for the payment of royalties to the mineral owner for all oil and natural gas produced from any well drilled on the lease premises. The lessor royalties and other leasehold burdens on the majority of the Debtors' wells range from approximately 20%-28%, resulting in a net revenue interest ranging from approximately 72%-80%.[7]

### 1. The Eagle Ford Assets.

#### (i) The Catarina Assets.

On June 30, 2014, the Debtors acquired certain Eagle Ford Shale properties of Royal Dutch Shell plc, which included approximately 106,000 net acres in Dimmit, La Salle, and Webb Counties, Texas

[6] All acreage figures discussed herein exclude interests held by the Debtors in certain undeveloped acreage in Louisiana and Texas.

[7] For more details on the agreements and arrangements governing the Debtors' oil and natural gas business, see the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Obligations Owed to Holders of Mineral and Other Interests and Non-Op Working Interests and (B) Joint Interest Billings and (II) Granting Related Relief* and the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Marketing Expenses and (C) Shipping and Warehousing Claims and (II) Granting Related Relief.*

representing a unique single block of acreage on one ranch in the Western Eagle Ford (the "Catarina Assets"). The Debtors have a drilling commitment with respect to the Catarina Assets that requires them to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 (subject to certain well banking rights) and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Debtor SN Operating, LLC ("SN Operating") is the operator of the Catarina Assets, and Debtor SN Catarina, LLC ("SN Catarina") holds 100% of the working interests in the Catarina Assets.

**(ii) The Comanche Assets.**

On March 1, 2017, SN EF Maverick, LLC ("SN Maverick") and SN UnSub, along with Gavilan Resources, LLC ("Gavilan"), an unaffiliated entity controlled by The Blackstone Group Inc. ("Blackstone"), completed the acquisition of approximately 318,000 gross (155,000 net) acres largely adjacent and in many areas adjoining to the Catarina Assets, comprising (i) 252,000 gross (122,000 net) Eagle Ford Shale acres and (ii) 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing, in the aggregate, an approximately 49% average working interest therein (the "Comanche Assets") from Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (collectively, "Anadarko") for an adjusted purchase price of approximately $2.1 billion in cash (the "Comanche Acquisition"). In connection with the closing of the Comanche Acquisition, SN, SN Maverick, SN UnSub, and Gavilan entered into a joint development agreement regarding the operation of the Comanche Assets (the "Comanche JDA"). Simultaneously therewith, SN, SN Maverick, SN UnSub, Gavilan, and Anadarko also entered into a development agreement (the "Anadarko Development Agreement") which, among other things, sets forth certain minimum annual drilling obligations on the Comanche Assets as described below.

Collectively, SN Maverick and SN UnSub represent a working interest of approximately 24% in the Comanche Assets (the "SN Comanche Assets"). Upon closing of the Comanche Acquisition, the SN Comanche Assets were further divided between SN Maverick and SN UnSub, whereby SN UnSub retained a 100% interest in the estimated proved developed producing reserves (essentially all of the producing wells) at the acquisition closing, and a 40% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development, while SN Maverick retained the remaining 60% interest in the estimated proved developed non-producing reserves and proved undeveloped reserves associated with future development (in each case represented as a percentage of the SN Comanche Assets). Accordingly, through SN Maverick, the Debtors have a working interest estimated at approximately 15% in new wells that were developed post-acquisition (*e.g.*, 60% interest in the post-acquisition development attributable to the approximately 24% total working interest of the SN Comanche Assets).

SN Maverick is the operator of all of the Comanche Assets under various operating agreements, and operates existing wells and manages and performs drilling and completion activities of new wells, on behalf of itself and the other working interest partners: SN UnSub, Gavilan, and third parties Venado Oil and Gas, LLC, Korea National Oil Corporation, and Mitsui E&P USA, LLC.

As noted above, the Debtors have a development commitment under the Anadarko Development Agreement, which the Debtors are also obligated to satisfy under the Comanche JDA, with respect to the Comanche Assets that, in addition to other requirements in the leases that must be met in order to maintain the Debtors' acreage position, requires the Debtors to complete and equip 60 wells in each annual period (subject to certain well banking rights) commencing on September 1, 2017 and continuing for five years thereafter until September 1, 2022 or, with Gavilan, pay jointly to Anadarko a cash penalty amounting to $200,000 per well for the failure to do so. The Debtors are currently in compliance with their drilling and development commitments with respect to the Comanche Assets. As explained in more detail below, the Comanche JDA is currently the subject of a pending dispute between SN Maverick and Gavilan.

In aggregate, the Catarina Assets and the Comanche Assets represent a substantial and geologically diverse land position, which stretches approximately 70 miles from west to east in four counties in South Texas.

### 2. The Maverick Assets.

The Debtors have approximately 40,000 net acres in Dimmit, Frio, La Salle, and Zavala Counties, Texas (the "Maverick Assets"). The Debtors have a drilling commitment that requires the Debtors to drill and complete three Eagle Ford wells by June 1, 2020 in order to maintain access to approximately 2,000 net undeveloped acres. The Debtors cannot provide assurance that their current and future drilling plans along with selected lease extensions will address the majority of their leases subject to potential expiration with respect to the Maverick Assets in 2020 and beyond. SN Operating is the operator of the Maverick Assets, and Debtor SN Cotulla Assets, LLC holds 100% of the working interests in the Maverick Assets.

### 3. The Palmetto Assets.

The Debtors have approximately 7,600 net acres in Gonzales County, Texas (the "Palmetto Assets") near the prolific Karnes Trough, which is located in the eastern portion of the Eagle Ford Shale and generally considered to be the core area of the basin. Marathon Oil Corporation is the operator of the Palmetto Assets, in which Debtor SN Palmetto, LLC owns a non-operated working interest (approximately 50% of future development). Marathon Oil Corporation drilled four gross wells for the 2019 commitment period, and completed ten gross wells, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain the Debtors' Palmetto acreage position. Rather than participating in such operations as a consenting working interest partner, the Debtors elected to not participate and, instead, reserve and retain an overriding royalty interest in and to production from such wells as provided for in the applicable joint operating agreement. The Debtors cannot provide assurance that current and future drilling plans along with selected lease extensions will address the majority of leases subject to potential expiration with respect to the Palmetto Assets in 2020 and beyond.

### 4. The TMS and Other Assets.

In addition to the Eagle Ford Assets, the Debtors, along with certain of their non-Debtor subsidiaries, hold other producing properties and undeveloped acreage, including in the TMS located in Mississippi and Louisiana as well as other locations in Louisiana and Texas. Successful and economic TMS development has been and continues to be challenged due to high well costs and low commodity prices.

## C. The Debtors' Prepetition Capital Structure.

As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $2.3 billion. Prior to the Petition Date, SN had issued approximately 3.12 million shares of Existing SN Preferred Stock (as defined below) that remained outstanding immediately prior to the Petition Date with a liquidation preference of $50 per share and approximately 100 million shares of outstanding Existing SN Common Stock. The Existing SN Preferred Stock is currently trading on the over-the-counter markets under ticker symbol "SNZYQ" and "SCAZQ." The Existing SN Common Stock is currently trading on the over-the-counter markets under ticker symbol "SNECQ." The primary components of the Debtors' consolidated funded debt obligations outstanding and equity interests as of the Petition Date are as follows:

| Obligation | Maturity | Principal Amount |
|---|---|---|
| **First-Out Senior Secured Revolving Credit Facility** | 2023 | $25,000,000 |
| **7.25% Senior Secured Notes** | 2023 | $500,000,000 |
| **Aggregate Secured Debt:** | | **$525,000,000** |
| **7.75% Senior Notes** | 2021 | $600,000,000 |
| **6.125% Senior Notes** | 2023 | $1,150,000,000 |
| **Aggregate Unsecured Debt:** | | **$1,750,000,000** |
| **Aggregate Total Debt:** | | **$2,275,000,000** |

### 1. First-Out Senior Secured Revolving Credit Facility.

As of the Petition Date, SN, as borrower, and the Restricted Subsidiaries[8] under the Credit Agreement, as guarantors, had outstanding $25 million in aggregate principal amount, including approximately $17.1 million issued and undrawn letter of credit under the First-Out Senior Secured Revolving Credit Facility pursuant to the Credit Agreement. The letter of credit was drawn on December 14, 2019 and represented a portion of the Debtors' outstanding balance under the Credit Agreement in the form of reimbursement obligations. The First-Out Senior Secured Revolving Credit Facility was secured by a first-priority lien on the Shared Collateral. In addition, as of the Petition Date, the Debtors had approximately $400,000 in obligations under cash-settled commodity hedging arrangements with certain counterparties that were secured on a pari passu basis with the obligations under the First-Out Senior Secured Revolving Credit Facility, pursuant to the terms of the Credit Agreement and the CTA (as defined below).

Although secured by the Shared Collateral (as defined below) with the 7.25% Senior Secured Notes (as defined below), the obligations under the Credit Agreement and specified hedging and cash management obligations had, pursuant to the terms of the CTA, "first-out" status as to proceeds of the Shared Collateral and thus the 7.25% Senior Secured Notes were, to the extent of the value of the collateral securing the Credit Agreement, subject to the discharge of the obligations under the Credit Agreement and such specified hedging and cash management obligations. In connection with the Final DIP Order and entry into the amended and restated DIP Facility on January 28, 2020, on January 31, 2020 the Debtors used approximately $25.7 million from the proceeds of the initial borrowing made under the DIP Facility on August 19, 2019, which included $0.7 million in accumulated fees and interest on such amounts since the Petition Date, to pay off the Credit Agreement in full (the "Discharge"), and the Credit Agreement terminated as of such date.

### 2. The 7.25% Senior Secured Notes.

On February 14, 2018, SN issued $500 million in principal amount of 7.25% senior secured notes due February 2023 (the "7.25% Senior Secured Notes") under an indenture among SN, as issuer, the

---

[8] The Restricted Subsidiaries consist of Debtors SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, and SN EF Maverick, LLC. Unrestricted subsidiaries (collectively, the "Unrestricted Subsidiaries,") consist of Debtors SN UR Holdings, LLC, Sanchez Resources, LLC, SN UnSub Holdings and non-Debtors SN Capital, LLC, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN EF UnSub GP, LLC, SR TMS, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC, and SN EF UnSub, LP.

guarantors party thereto, Delaware Trust Company ("Delaware Trust"), as trustee and RBC, as collateral trustee (as supplemented by a First Supplemental Indenture dated as of April 3, 2018, the "7.25% Senior Secured Notes Indenture"). The Restricted Subsidiaries are guarantors of the 7.25% Senior Secured Notes. The 7.25% Senior Secured Notes and the guarantees thereto were intended to be secured on a first-priority basis by substantially all of the assets of SN and the Restricted Subsidiaries. However, pursuant to a collateral trust agreement among SN, RBC, as the first-out representative, Delaware Trust, as the first lien representative, and RBC, as collateral trustee, dated as of February 14, 2018 (the "CTA"), repayment of the 7.25% Senior Secured Notes was subject to the "first-out" obligations under the Credit Agreement and certain hedging and cash management arrangements permitted under the Credit Agreement to the extent of the value of, certain shared collateral described in more detail below (the "Shared Collateral"). Following the Discharge, the 7.25% Senior Secured Notes and the guarantees are secured on a first-priority basis, subject in priority only to permitted collateral liens and to "first-out" obligations under the CTA, if any, and as set forth in the Final DIP Order. The Shared Collateral consists of: (i) SN's and the Restricted Subsidiaries' oil and natural gas properties with proved reserves; (ii) 100% of the equity interest of the Restricted Subsidiaries and any of their future direct material subsidiaries that qualify as Restricted Subsidiaries; and (iii) substantially all of SN's and the Restricted Subsidiaries' other material personal property, but in each case excluding, among other things, deposit accounts, oil and natural gas properties with no proved reserves, equity interests in SN UnSub and other existing and future subsidiaries designated as "Unrestricted Subsidiaries." The 7.25% Senior Secured Notes are senior to all unsecured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing the 7.25% Senior Secured Notes and the guarantees thereto. Following the Discharge, Wilmington Savings Fund Society, FSB ("WSFS"), as trustee under the Indenture, replaced RBC as the "Controlling Priority Lien Representative" under the CTA. Subsequently, Wilmington Trust, National Association, was appointed by WSFS (as permitted under the CTA) to replace RBC as the collateral trustee under the Indenture pursuant to the Successor Collateral Trustee Agreement, dated as of January 31, 2020, between the Company, WSFS and Wilmington Trust, National Association.

### 3. The 7.75% Senior Notes.

On June 13, 2013, SN issued $400 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Original 7.75% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "7.75% Senior Notes Indenture"). On September 18, 2013, SN issued an additional $200 million in principal amount of 7.75% senior unsecured notes due June 2021 (the "Additional 7.75% Senior Notes" and together with the Original 7.75% Senior Notes, the "7.75% Senior Notes") in a private offering, as permitted under the 7.75% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 7.75% Notes. The 7.75% Senior Notes are unsecured obligations and rank equally in right of payment with all of existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

### 4. The 6.125% Senior Notes.

On June 27, 2014, SN issued $850 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Original 6.125% Senior Notes") under an indenture among SN, as issuer, the guarantors party thereto and Delaware Trust, as successor trustee (as supplemented thereafter from time to time) (the "6.125% Senior Notes Indenture"). On September 12, 2014, SN also issued an additional $300 million in principal amount of 6.125% senior unsecured notes due January 2023 (the "Additional 6.125% Notes" and together with the Original 6.125% Senior Notes, the "6.125% Senior Notes") in a private offering, as permitted under the 6.125% Senior Notes Indenture and the other then existing indentures. The Restricted Subsidiaries are guarantors of the 6.125% Senior Notes. The 6.125% Senior Notes are unsecured

obligations and rank equally in right of payment with all existing and future unsecured indebtedness of SN and the Restricted Subsidiaries, and effectively junior to the secured obligations of SN and the Restricted Subsidiaries to the extent of the value of the collateral securing such secured obligations.

**5. The Debtors' Equity Interests.**

**(i) Preferred Stock.**

On September 17, 2012, SN issued 3,000,000 shares of Series A Convertible Perpetual Preferred Stock ("Series A Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 619,503 shares of Series A Preferred Stock were issued and outstanding. The annual dividend rate for each share of Series A Preferred Stock is 4.875%. The Series A Preferred Stock currently trades over-the-counter in the OTC Pink market. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by SN's board of directors (the "Board"). The liquidation preference for each share of Series A Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.325 shares of Existing SN Common Stock per share of Series A Preferred Stock, subject to certain specified adjustments.

On March 26, 2013, SN issued 4,500,000 shares of Series B Convertible Perpetual Preferred Stock ("Series B Preferred Stock," and together with the Series A Preferred Stock, the "Existing SN Preferred Stock") pursuant to a private placement at an issue price of $50 per share. As of December 31, 2019, 2,466,013 shares of Series B Preferred Stock were issued and outstanding. The Series B Preferred Stock currently trades over-the-counter in the OTC Pink market. The annual dividend rate for each share of Series A Preferred Stock is 6.500%. The dividends are paid quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when and if declared by the Board. The liquidation preference for each share of Series B Preferred Stock is $50, and each share is convertible at any time at the option of the holder at an initial conversion rate of 2.337 shares of Existing SN Common Stock per share of Series B Preferred Stock, subject to certain specified adjustments.

The Board suspended the dividends on the Series A Preferred Stock and the Series B Preferred Stock, beginning with the three-month period ending March 31, 2019.

**(ii) Common Stock.**

There are approximately 100 million shares of Existing SN Common Stock issued and outstanding, along with outstanding warrants to purchase 8.5 million shares of Existing SN Common Stock at an exercise price of $10 per share. The Existing SN Common Stock traded on the NYSE until its delisting in 2019. The Existing SN Common Stock currently trades over-the-counter on the OTC Pink market. SN has never paid dividends on its Existing SN Common Stock. As of the Petition Date, members of the Sanchez family, SOG and other affiliated entities collectively owned approximately 10% of the Existing SN Common Stock.

On July 28, 2015, in order to protect the Debtors' tax attributes, the Debtors adopted an "NOL Rights Plan" that operates to dilute the holdings of certain parties that acquire Existing SN Common Stock without the approval of the Board. As of December 31, 2018, the Debtors estimate that they had federal consolidated net operating losses ("NOLs") in the amount of approximately $1.9148 billion.[9]

Despite these efforts to preserve equity value, on February 20, 2019, the NYSE notified the Company that it had initiated delisting proceedings against the Existing SN Common Stock because the Debtors' average market capitalization over a consecutive 30 trading day period fell below the NYSE's

[9] The Debtors also have an additional $106 million in state NOLs in Montana, Mississippi, Louisiana, Kansas and Oklahoma.

minimum $50 million threshold. The Existing SN Common Stock now trades exclusively on over-the-counter markets under the ticker symbol "SNECQ."

**(iii) Warrants.**

In connection with the Comanche Acquisition, SN issued warrants to the GSO Funds to purchase approximately 1.9 million shares in the aggregate of Existing SN Common Stock. Such warrants will expire March 1, 2032 in accordance with the terms of the applicable warrant agreement. In addition, SN issued warrants to three affiliates of Blackstone to purchase 6.5 million shares of Existing SN Common Stock pursuant to three separate warrant agreements, which will expire by their terms on March 1, 2022. In March 2019, the Debtors were notified that the GSO Funds and Blackstone affiliates donated all of the foregoing warrants to various charitable organizations. In the aggregate, the Debtors have 8.5 million warrants which remain outstanding.

## VI. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES.

### A. First Day Relief.

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (collectively, the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Cameron W. George, Executive Vice President and Chief Financial Officer of Sanchez Energy Corporation, in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 16] (the "First Day Declaration"). At a hearing on August 13, 2019, the Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions.

On September 9, 2019, the Debtors held their "second day" hearing before the Bankruptcy Court. At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including: (i) notification and hearing procedures for certain transfers of and declarations of worthlessness with respect to stock; (ii) authority to continue to pay certain compensation obligations; (iii) authority to provide adequate assurance for future utility services; (iv) authority to continue prepetition insurance coverage and renew or enter into new insurance policies; (v) authority to pay certain taxes and fees; (vi) authority to pay certain prepetition claims; and (vii) authority to continue using the Debtors' cash management system and maintain existing bank accounts.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at http://cases.primeclerk.com/sanchezenergy.

### B. Other Procedural and Administrative Motions.

The Debtors filed several procedural and administrative motions subsequent to the Petition Date to facilitate further the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- OCP Motion. On September 9, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Used in the Ordinary Course of Business Effective Nunc Pro Tunc* [Docket No. 277] (the "OCP Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief

requested in the OCP Motion [Docket No. 412]. On October 8, 2019, the Bankruptcy Court entered an amended order including (a) revisions to the OCP Cap and OCP Case Cap (each as defined therein), (b) additional language regarding procedures with respect to contingency fees paid to certain OCPs and (c) certain revisions to the OCP List (as defined in the OCP Motion) [Docket No. 443].

- Interim Compensation Motion. On September 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 273] (the "Interim Compensation Motion"). On October 1, 2019, the Bankruptcy Court entered an order granting the relief requested in the Interim Compensation Motion [Docket No. 412] (the "Interim Compensation Order").

- Motion to Extend Removal Deadlines. On October 7, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 436]. On November 6, 2019, the Bankruptcy Court entered an order enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including March 8, 2020 [Docket No. 562]. On February 10, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order Extending the Period Within Which the Debtors May Remove Actions Pursuant to 28 U.S.C. § 1462 and Rule 9027 of the Federal Rules of Bankruptcy Procedure* [Docket No. 913]. On March 4, 2020, the Bankruptcy Court entered an order further enlarging the time period within which the Debtors may file notices of removal of any and all civil action by 120 days, to and including July 6, 2020 [Docket No. 1009].

- Record Date Motion. On October 4, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Certain Claims Against the Debtors' Estates* [Docket No. 433] (the "Record Date Motion"). On November 7, 2019, the Bankruptcy Court entered an order granting the relief requested in the Record Date Motion [Docket No. 566].

- Claims Objection Procedures. On January 10, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Approving Omnibus Claims Objection Procedures and Filing of Substantive Omnibus Claims Objections* [Docket No. 807] (the "Claims Objection Procedures"). On January 31, 2020, the Bankruptcy Court entered an order granting the relief requested in the Claims Objection Procedures Motion [Docket No. 898].

### C. Schedules and Statements.

On September 24, 2019, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs (the "SOFAs and Schedules") [Docket Nos. 374-395]. Consistent with ongoing disclosure requirements, on October 4, 2019, the Debtors subsequently filed amended schedules E/F for certain of the filing entities.

### D. Establishment of a Claims Bar Date.

On October 24, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date;(III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 520] (the "Bar Date Motion"). By the Bar Date Motion, the Debtors sought entry

of an order by the Bankruptcy Court that establishes January 10, 2020, as the general claims bar date and February 7, 2020 as the governmental claims bar date, before which any party that is required, but that fails, to file a proof of claim in accordance with the procedures set forth in the Bar Date Motion and order shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors, and the Debtors and their property shall be forever discharged from any indebtedness or liability with respect to or arising from such claim. Such party will be prohibited from voting to accept or reject the Plan or any chapter 11 plan filed in these Chapter 11 Cases, participating in any distribution in the Chapter 11 Cases on account of such claim, or receiving further notices regarding such claim. On November 21, 2019, the Bankruptcy Court entered an order granting the relief requested in the Bar Date Motion and establishing the bar dates therein [Docket No. 617].

**E. The GSO Tolling Agreement.**

Prior to the Petition Date, on August 10, 2019, SN entered into a tolling agreement (the "Tolling Agreement"), along with SN UR Holdings, SN UnSub Holdings, SN Maverick (together with the Company, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP ("GSO LP" and, together with GSO LLC, the "GSO Parties").

On August 29, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing (I) Performance of Obligations Under Tolling Agreement and (II) Limited Modification of the Automatic Stay* [Docket No. 239], and on September 19, 2019, the Bankruptcy Court entered an order authorizing the Debtors' performance of their obligations under the Tolling Agreement [Docket No. 352].

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "GP LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any such Investor Redemption Event will be tolled during the Tolling Period.

The Tolling Agreement will expire on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the GP LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary Chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; or (2) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

**F. Investigation of Related Party Transactions.**

On November 9, 2018, the Board established a standing special committee (the "Special Committee") pursuant to Article V, Section 5.1 of SN's Amended and Restated By-Laws. The Special Committee is comprised of two disinterested and independent directors—Eugene I. Davis (Chairman) and

Adam C. Zylman (Member). The Board initially assigned the Special Committee the task of considering, evaluating, or negotiating strategic and/or financial alternatives for the Company, including a potential sale, restructuring, reorganization, or other transaction.

Subsequently, the Board also delegated to the Special Committee the exclusive power and authority to conduct an investigation into, and pursue or resolve as it determines to be in the best interests of SN, potential causes of action SN may have against affiliated entities or individuals, including SOG, Sanchez Midstream Partners LP ("SNMP"), and SN's directors and officers, in connection with any actual or potential related party transaction (the "Investigation"). The Special Committee retained Ropes & Gray LLP ("Ropes") as its counsel in connection with the Investigation. Alvarez & Marsal North America, LLC ("A&M") and Moelis, as advisors to SN, assisted Ropes with regards to certain aspects of the Investigation.

In connection with the Investigation, Ropes collected emails from twenty-three current or former executives, directors, or employees of SOG and/or SN, consisting of approximately 3.6 million documents. In addition to the email collection, Ropes submitted multiple sets of targeted diligence requests to SOG and SN, comprising more than forty requests, seeking documents relevant to the Investigation, including transaction documents, board materials and minutes, and other documents. SOG and SN fully cooperated with the diligence requests and produced approximately 1,500 responsive documents. Ropes also conducted 25 interviews—with Sanchez family members, all current named executive officers, three former CFOs, all current and former members of the Audit and Compensation Committees, internal and external counsel, including counsel to the Audit and Compensation Committees, and the CEO of SNMP.

Upon completion of the Investigation, Ropes prepared and delivered to the Special Committee a comprehensive report concerning its investigation into various actual or potential related party transactions and subsequently evaluated certain other transactions and potential claims.

### G. Litigation Matters.

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases. Significantly, the Debtors are engaged in various litigations matters, certain of which are the subject of adversary proceedings pending in these Chapter 11 Cases, as discussed further below.

#### 1. The Derivative Action.

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain SN directors (*Armato et al. v. A.R. Sanchez, Jr. et al.*, No. 2018-0642, the "Derivative Action"). The Derivative Action complaint, which does not specify damages sought, alleges breach of fiduciary duty, unjust enrichment, and waste of corporate assets against directors of SN based on purportedly excessive compensation of SN's non-employee directors. On October 22, 2018, SN and defendant directors filed an answer in the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. The Derivative Action remains

in its preliminary stages. As a result, the Debtors are unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution.

### 2. The Comanche JDA Dispute.

SN Maverick is currently engaged in a disagreement with Gavilan regarding operations of the Comanche Assets under the Comanche JDA with Gavilan. Among other things, Gavilan has asserted that SN Maverick is in default of the Comanche JDA and Gavilan has the right to take over operations of the Comanche Assets. SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan. However, if Gavilan prevails in the disagreement, SN Maverick would potentially lose its rights to operate the Comanche Assets and certain rights under the Comanche JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the Comanche JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the Comanche JDA. SN Maverick disputes that Gavilan has the ability to invoke the division of operatorship provision under the Comanche JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the Comanche JDA, could have a material adverse effect on the Debtors' business, financial condition or results of operations.

Gavilan served its initial arbitration demand against SN Maverick on February 18, 2019. SN Maverick and SN answered that demand and served their counterclaim against Gavilan on February 26, 2019. The American Arbitration Association appointed an arbitrator on April 8, 2019. On August 23, 2019, Gavilan filed *Gavilan Resources, LLC's Motion for Relief from the Automatic Stay to Allow Completion of Arbitration* [Docket No. 222] ("Gavilan Lift Stay Motion"), seeking relief from the automatic stay to allow the arbitration to proceed. On September 12, 2019, the Debtors filed an Objection to the Gavilan Lift Stay Motion [Docket No. 292]. The Secured Ad Hoc Group and the Creditors' Committee each filed a joinder to the Debtors' objection [Docket Nos. 670 and 673, respectively].

The arbitration was initially set for hearing the week of October 14, 2019. A hearing on the Gavilan Lift Stay Motion was set for September 19, 2019, and then reset to be heard on December 12, 2019. At the hearing on December 12, 2019, the parties agreed that (a) the arbitration and the underlying dispute should be resolved by the Bankruptcy Court with a trial to begin on March 9, 2020 at 8:30 am (CT), (b) the matter, including discovery, continued to be stayed until January 23, 2020, (c) pre-trial briefing by Gavilan and the Debtors was due on March 2, 2020, and (d) the Bankruptcy Court conducted a pre-trial conference on March 3, 2020. On March 9, 2020, the Bankruptcy Court began the trial on the Comanche JDA Dispute. On March 10, the parties agreed to continue the remainder of the trial to engage in settlement negotiations. On March 12, the Bankruptcy Court held a status conference to discuss the status of the settlement discussions. The Bankruptcy Court scheduled a further status conference regarding settlement discussions for March 18, 2020. On March 24, 2020, the Bankruptcy Court cancelled the hearing on the Gavilan Lift Stay Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1086]. On April 2, 2020, Gavilan filed *Gavilan Resources' Emergency Motion for Status Conference on Schedule to Consider Dispositive Legal Issues and, if Necessary, to Resume Trial* [Docket No. 38] requesting a status conference in the adversary proceeding. The Bankruptcy Court held a status conference on the matter on April 7, 2020, at which the Bankruptcy Court ruled in part in favor of Gavilan. The Bankruptcy Court will set a trial schedule for the matter at the next status conference currently scheduled for May 5, 2020.

### 3. Dimension Litigation.

In December 2017, Dimension Energy Services, LLC ("Dimension") commenced *Dimension Energy Services, LLC v. Sanchez Oil & Gas Corporation, Sanchez Energy Corporation, and Sanchez*

*Midstream Partners, LP*, Cause No. 2017-85247 (the "Dimension State Court Action") in the 165th Judicial District, Harris County, Texas (the "Dimension State Court") against SN and non-debtor SOG. Dimension alleges claims for breach of the Master Services Agreement (the "Dimension MSA") between Dimension and SOG, fraud, quantum meruit/unjust enrichment, violations of the Texas Prompt Payment Act, and foreclosure of liens based on a pipeline construction project (the "Project"). On February 9, 2018, SOG and SN answered and asserted a counterclaim against Dimension for breach of the Dimension MSA based on Dimension's failure to substantiate additional payments for increased work costs and failure to pay subcontractors, which led to various liens being placed on the Project and lawsuits against SOG, including the Sunbelt Litigation. Dimension later filed its First Amended Original Petition adding non-debtor SNMP as a defendant. Non-debtor SNMP signed the work order at issue in the Dimension State Court Action and owns the property that is subject to the liens for which Dimension is seeking foreclosure.

On September 5, 2019, Dimension filed an adversary proceeding (Case No. 19-03606) against SN seeking to remove the Dimension State Court Action. SN filed a motion to remand the proceeding back to the state court on October 7, 2019. [Adv. Docket No. 7]. The Court heard arguments on the motion on November 4, 2019, and issued an order remanding the adversary proceeding. [Adv. Docket No. 14].

On January 21, 2010, Dimension filed *Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 856] (the "Dimension Lift Stay Motion"). On February 11, 2020, the parties filed a *Stipulation and Agreed Order Resolving Dimension Energy Services, LLC's Motion for Relief from the Automatic Stay* [Docket No. 923] (the "Dimension Agreed Order") modifying the automatic stay to permit Dimension to continue the Dimension State Court Action starting February 28, 2020. The Court entered the Dimension Agreed Order on February 12, 2020 [Docket. No. 933]. The Dimension State Court set the trial for February 1, 2021.

#### 4. Sunbelt Litigation.

Dimension hired several sub-subcontractors to complete the pipeline Project, including (1) Sunbelt Tractor & Equipment Company ("Sunbelt") and (2) Swan Transportation Service, Ltd. ("Swan"). Sunbelt filed lawsuits in Webb County and LaSalle County, Texas, to recover unpaid amounts from Dimension and foreclose on subcontractor liens against SOG, SNMP, and SN. *Sunbelt Tractor v. Dimension Energy Servs., et al.*, Cause No. 2018-CV-I00165-D1 (49th Judicial District Court of Webb County, Texas); *Sunbelt Tractor v. Dimension Energy Servs., et al.*, Cause No. 18-08-00177-CVL (81st Judicial District Court of LaSalle County, Texas) (the "Sunbelt State Court Actions"). Swan also filed a lawsuit in Smith County, Texas, but that case has been resolved. *Swan Transp. v. Dimension Energy Servs., et al.*, Cause No. 18-0244-B (114th Judicial District Court of Smith County, Texas).

On October 25, 2019, Sunbelt filed an adversary proceeding (Case No. 19-03641) against SN seeking to remove the Sunbelt State Court Actions. The Debtors and Sunbelt filed an agreed order remanding the actions on November 22, 2019 [Adv. Docket No. 11] (the "Sunbelt Agreed Order"). The Court entered the Sunbelt Agreed Order on December 12, 2019 [Adv. Docket No. 12]. Sunbelt has since non-suited SN in the Sunbelt State Court Actions.

#### 5. Automatic Stay Motions.

Following commencement of the Chapter 11 Cases, certain litigation counterparties have filed, or may file in the future, requests to modify or lift the automatic stay to continue pursuing prepetition litigation against the Debtors. The Debtors also filed one motion relating to the automatic stay. In addition to the Gavilan Lift Stay Motion and the Dimension Lift Stay Motion described above, the following motions have been filed to lift the automatic stay:

**(i) Fernandez Lift Stay Motion**

On September 30, 2019, Ricardo Fernandez ("Fernandez") filed the *Motion for Relief from the Automatic Stay* [Docket No. 410] (the "Fernandez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, non-debtor SOG, non-Debtor SNMP, and Scientific Drilling International, Inc. On December 10, 2019, the parties filed a *Stipulation and Agreed Order Resolving Ricardo Fernandez's Motion for Relief from the Stay* [Docket No. 717] (the "Fernandez Agreed Order"). The Fernandez Agreed Order modified the automatic stay so as to limit discovery against SN and non-Debtor SOG and limited Fernandez's recovery to insurance proceeds. The Court entered the Fernandez Agreed Order on December 12, 2019 [Docket No. 728].

**(ii) Valdez Lift Stay Motion.**

On August 30, 2019, Marco Valdez filed the *Marco Valdez's Motion for Relief from the Automatic Stay* [Docket No. 246] (the "Valdez Lift Stay Motion"), seeking relief from the automatic stay to proceed in his personal injury suit against SN, SN Operating, non-debtor SOG, non-Debtor SNMP, and other non-debtor parties. On October 16, 2019, Debtors filed the *Objection of the Debtors to Marco Valdez's Motion for Relief from the Stay* [Docket No. 471] (the "Debtors' Valdez Objection"), and non-debtor SOG filed a *Response of Sanchez Oil & Gas Corporation to Marco Valdez's Motion for Relief from Stay* [Docket No. 472]. On December 5, 2019, the hearing for the Valdez Lift Stay Motion was adjourned and has not yet been reset. *See Sixth Notice of Reset Hearing on Marco Valdez's Motion for Relief from Stay* [Docket No. 682]. On January 2, 2020, Valdez filed *Plaintiffs' Motion to Sever Bankrupt Defendants Sanchez Energy Corporation and SN Operating, LLC* (the "Valdez Motion to Sever") in the Valdez state court action. *Marco Valdez v. RDZ Oilfield Lease Services, Inc. et al.*, Cause No. 18-10-13542-DCV (293rd District Court of Dimmit County, Texas). The Valdez Motion to Sever has yet not been set for hearing or ruled upon by the state court judge.

**(iii) Terra Lift Stay Motion.**

On February 18, 2020, Debtors filed the *Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket No. 975] (the "Terra Lift Stay Motion"), seeking an order allowing a state court action and interlocutory appeal involving Terra Energy Partners LLC and certain individual defendants to proceed or, alternatively, lifting the automatic stay. On March 16, 2020, the parties filed, and the Bankruptcy Court entered, a *Stipulation and Agreed Order Resolving the Debtors' Motion to Proceed in the State Court Action and Interlocutory Appeal, or in the Alternative, Motion to Lift the Automatic Stay* [Docket Nos. 1045, 1047] (the "Terra Agreed Order"). The Terra Agreed Order modified the automatic stay to permit certain individual defendants to continue to judgment or other resolution to determine the amount of attorneys' fees and sanctions which may be awarded, if any, by the state court pursuant to its order dated September 25, 2018, as well as any attorney's fees or costs, if any, that may be awarded to those certain individual defendants in connection with the state court action.

**H. Retention of Professionals.**

Beginning on the Petition Date, the Debtors filed applications to retain the following professionals:

- Akin Gump Strauss Hauer & Feld (Co-Counsel) [Docket No. 268];
- Jackson Walker (Co-Counsel) [Docket No. 269];

- Alvarez & Marsal (Financial Advisor) [Docket No. 270];
- Moelis & Company (Investment Banker) [Docket No. 271];
- Ropes & Gray (Counsel to Special Committee of Sanchez Energy Corporation Board of Directors) [Docket No. 272];
- Prime Clerk (Claims and Noticing Agent) [Docket No. 13];
- KPMG (Audit and Tax Consultant) [Docket No. 283];
- Gibbs & Bruns (Special Litigation Counsel) [Docket No. 284]; and
- Richards Layton & Finger (Special Counsel to the Audit Committee) [Docket No. 1012].

### I. Rejection and Assumption of Executory Contracts and Unexpired Leases.

#### 1. Motion to Reject Shell Sublease.

On October 22, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Shell Sublease Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 504]. On November 15, 2019, the Bankruptcy Court entered an order authorizing rejection of the Shell Sublease Agreement [Docket No. 592].

#### 2. Motion to Reject Cornerstone Master Agreement.

On October 27, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Cornerstone Master Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 533], seeking to reject a human capital management software agreement. On November 20, 2019, the Bankruptcy Court entered an order authorizing rejection of the Cornerstone Master Agreement *nunc pro tunc* to October 27, 2019 [Docket No. 608].

#### 3. Motion to Reject Lease Participation Agreement.

On January 3, 2020, the Debtors filed a motion to reject the *Debtors' Motion for Entry of an Order Authorizing Rejection of the Lease Participation Agreement Effective Nunc Pro Tunc to the Date Hereof* [Docket No. 781]. On January 28, 2020, the Bankruptcy Court entered an order authorizing rejection of the Lease Participation Agreement effective *nunc pro tunc* to January 3, 2020 [Docket No. 890].

### J. Appointment and Retention of Chief Restructuring Officer.

On November 15, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Retention of M-III Advisory Partners, LP and (B) Designation of Mohsin Y. Meghji as Chief Restructuring Officer; and (II) Granting Related Relief* [Docket No. 593], seeking to retain M-III Advisory Partners, LP ("M-III") and to designate Mohsin Y. Meghji ("Mr. Meghji") as the Debtors' Chief Restructuring Officer ("CRO"). On December 9, 2019, the Bankruptcy Court entered an order retaining M-III and designating Mr. Meghji as the Debtors' CRO [Docket No. 704].

### K. Appointment of Examiner.

On November 26, 2019, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Emergency Motion, Pursuant to Sections 105(a), 1104(c), 1106(b), and 1107(a) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2007.1, For Entry of an Order Appointing an Examiner with Power to Prosecute* [Docket No. 638] (the "Examiner Motion"). On December 12, 2019, the Bankruptcy Court entered an order directing the U.S. Trustee to appoint an

examiner [Docket No. 735]. The Examiner Motion has been adjourned at the request of the Ad Hoc Group of Unsecured Noteholders and is currently set for a status conference on April 16, 2020, to determine if the Ad Hoc Group of Unsecured Noteholders will continue to prosecute the Examiner Motion.

### L. Exclusivity.

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 694]. On January 8, 2020, the Bankruptcy Court entered an order extending the Debtors' exclusivity period to March 9, 2020 [Docket No. 800]. On February 26, 2020, the Debtors filed the *Debtors' Second Motion for Entry of an Order to Extend Their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof*, seeking to further extend the Debtors' exclusive plan filing and solicitation period to June 8, 2020 [Docket No. 694] ("Exclusivity Motion"). On March 20, 2020, the Ad Hoc Group of Unsecured Noteholders filed the *Ad Hoc Group of Unsecured Noteholders' Objection to Debtors' Second Motion to Extend Exclusivity Periods to File Chapter 11 Plan and Solicit Acceptances* [Docket No. 1061] opposing an extension of exclusivity. On March 24, 2020, the Secured Ad Hoc Group filed a *Statement of the Secured Ad Hoc Group Regarding Debtors' Second Motion for Entry of an Order to Extend their Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1088] supporting a short extension of exclusivity to April 30, 2020. That same day, the Bankruptcy Court cancelled the hearing on the Exclusivity Motion pursuant to General Order 2020-4, pending further order or notice of hearing [Docket No. 1087].

### M. Motion to Extend Time Within Which the Debtors May Assume or Reject Any Unexpired Leases or Executory Contracts.

On December 6, 2019, the Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 693]. On February 3, 2020, the Bankruptcy Court entered an order extending the deadline within which the Debtors may assume or reject unexpired leases of non-residential real property and executory contracts to March 9, 2020 [Docket No. 904]. Additionally, the Debtors are party to three unexpired leases of nonresidential real property for: (i) their corporate headquarters in Houston, Texas; (ii) their field office in Carrizo Springs, Texas; and (iii) their office in San Antonio, Texas (collectively, the "Office Leases"). The Debtors filed the *Debtors' Motion for Entry of an Order Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* (the "Office Lease Motion"), seeking approval of stipulations with the landlords for each of these leases, which provide for an extension of the time within which the Debtors must assume or reject the three Office Leases to the earlier of (a) June 30, 2020, and (b) the effective date of a confirmed plan of reorganization, without prejudice to the rights of the Debtors to seek additional extensions of time to assume or reject the Office Leases. [Docket No. 1001]. On March 24, 2020, the Bankruptcy Court entered the *Order Approving Stipulations Extending the Time Within Which the Debtors Must Assume or Reject Certain Unexpired Leases of Nonresidential Real Property* [Docket No. 1081] approving the Office Lease Motion.

### N. Omnibus Motion for Entry of an Order Authorizing Assumption of Unexpired Leases of Non-Residential Real Property.

On March 6, 2020, the Debtors filed the *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing Assumption of Unexpired Leases of Non-Residential Real Property and (II) Granting Related Relief* (the "Rejection Motion"), seeking authority to assume certain unexpired oil and natural gas leases and related surface leases, rights of way, easements and other similar types of surface access agreements [Docket No. 1016]. No objections to the Rejection Motion have been Filed. Certain informal objections are in the process of being resolved.

## O. DIP Motion.

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing* Limited *Use of Cash Collateral; (II) Obtaining Postpetition Credit Secured by Senior Liens; (III) Granting Adequate Protection; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 15] (the "DIP Motion"), seeking approval of the DIP Facility in an aggregate amount of $350 million (including a roll-up of $175 million of obligations arising under the Secured Notes Indenture held by the DIP Lenders) (the "DIP Facility"), provided by the Secured Ad Hoc Group (the "DIP Lenders").

The Debtors received objections to the DIP Motion from each of: (a) the Creditors' Committee [Docket No. 300], (b) the Ad Hoc Group of Unsecured Noteholders [Docket No. 301], (c) certain Texas taxing authorities [Docket No. 295], (d) certain equity security holders [Docket No. 297], (e) M. Light Acomb Materials LLC [Docket No. 330], and (f) Tulsa Inspection Resource, LLC [Docket No. 332]. On August 13, 2019, over the unresolved objections of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the DIP facility on an interim basis, which authorized the Debtors to access an interim draw of $50 million [Docket No. 97].

On September 19, 2019, the Court withheld approval of the DIP Motion on a final basis. Following hard-fought negotiations with the Debtors' various creditor constituencies, the Debtors requested that the final hearing on the DIP Motion be scheduled for January 22, 2020, and filed a revised proposed final DIP order on January 10, 2020 [Docket No. 808], and a further revised proposed final DIP order on January 21, 2020 (the "Further Revised Proposed Final DIP Order") [Docket No. 857]. The Further Revised Proposed Final DIP Order (a) reduced the aggregate principal amount of the new money component of DIP Facility from $175 million to $150 million and (b) reduced the roll-up amount from $175 to $50 million.

On January 21, 2020, the Creditors' Committee filed the only remaining objection to the DIP Motion, concerning the DIP Facility maturity date [Docket No. 858]. At the final hearing on January 22, 2020, after modifying the final order to resolve the Creditors' Committee's limited objection, the Court granted the DIP Motion on a final basis [Docket No. 865].

## P. Analysis of Lien Perfection Regarding Secured Notes.

### 1. The Correction Instruments

In April 2018, the initial collateral trustee or an agent of the initial collateral trustee recorded a series of Amended and Restated Mortgages, Deeds of Trust, Security Agreements, Financing Statements, and Assignments of Production (the "Deeds of Trust") with respect to the collateral pledged in support of the Secured Notes and the other secured obligations. Certain of the Deeds of Trust contained errors in the description of the county, book numbers, page numbers and instrument numbers in the official county records.

In June and July 2019, the Secured Ad Hoc Group, acting through its designated landman agent, delivered for recording notices of correction and correction affidavits (the "Correction Instruments") in at least nine counties in Texas pursuant to section 5.028 of the Texas Property Code to make certain corrections to the original Deeds of Trust, including to add, correct, or clarify the recording data for instruments referenced in the Correction Instruments, and to correct land descriptions and add land descriptions to certain conveyances.

### 2. The Lien Investigation and the Creditors' Committee Lien Challenge Standing Motion

Prior to the Petition Date, the Debtors, through their professionals and led by Jackson Walker, began a review and investigation of the Liens which purport to secure the Secured Notes, with a particular focus on the effect and validity of the Correction Instruments discussed above and the particular deficiencies which were the subject of such Correction Instruments (the "Lien Investigation").

The Lien Investigation, which continued following the Petition Date, revealed that the Debtors' estates have colorable claims or causes of action (i) that certain of the Deeds of Trust did not provide adequate notice to third parties of the underlying security interest, and are insufficient under Texas Property Code § 13.002 to perfect the security interests, and (ii) to the extent that the Correction Instruments had the effect of perfecting the Secured Noteholders' otherwise unperfected Liens in the underlying collateral, the Correction Instruments are avoidable transfers under 11 U.S.C. §§ 544, 547, and 548 (the "Potential Claims").

On January 24, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 875] (the "Lien Challenge Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve the Potential Claims. Following a hearing on February 20, the Court entered the *Order Resolving Committee's Standing Motion* [Docket No. 984] (the "Lien Challenge Standing Motion Order"). The Lien Challenge Standing Motion Order provides that the Debtors retain the exclusive right to file a lien challenge complaint in an adversary proceeding through March 10, 2020. If the Debtors do not file such a complaint by that time, the exclusive right to file such a complaint will vest with the Creditors' Committee. The Lien Challenge Standing Motion Order further provides that if the Debtors file a motion under Bankruptcy Rule 9019 in respect of any lien challenge adversary proceeding, the complaint in respect of such adversary proceeding will be abated pending a ruling on such motion. The Debtors, through their co-counsel, Jackson Walker, filed an adversary proceeding pursuing the Potential Claims under case number 20-03057 on March 10, 2020 [Docket No. 1026].

### Q. Creditors' Committee Claim Objection.

On March 10, 2020, the Creditors' Committee filed *The Official Committee of Unsecured Creditors' Objection to Claim Number 216 Filed by Wilmington Savings Fund Society, FSB As Indenture Trustee on Behalf of the 7.25% Senior Secured First Lien Notes* [Docket No. 1027] (the "Creditors' Committee Claim Objection"). By the Creditors' Committee Claim Objection, the Creditors' Committee seeks disallowance of claim number 216, filed by WSFS, as Indenture Trustee on behalf of the holders of the 7.25% Senior Secured Notes, asserting a secured claim against the Debtors' estates in "the aggregate principal amount of not less than $500,000,000.00, plus any other amounts owing under the Claim Documents (as defined in the proof of claim), including, without limitation all accumulated and unpaid interest, fees, premiums, and expenses, plus contingent unliquidated claims as described" therein ("Claim Number 216"). The Creditors' Committee Claim Objection is based on the following grounds: (a) Claim Number 216 should be disallowed in its entirety pursuant to section 502(d) of the Bankruptcy Code because the holders of the 7.25% Senior Secured Notes are in possession of transfers avoidable under section 547 of the Bankruptcy Code and of property recoverable under section 550 of the Bankruptcy Code; (b) Claim Number 216 should be disallowed to the extent that it seeks to recover any unamortized original issue discount ("OID") associated with the 7.25% Senior Secured Notes because such OID constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code; (c) Claim Number 216 should be disallowed to the extent it seeks recovery of any make-whole premium because the 7.25% Senior Secured Notes were accelerated upon the Debtors' chapter 11 filing and the 7.25% Senior Secured Notes Indenture does not provide for the payment of make-whole premiums upon or after acceleration; and (d) Claim Number 216 should be disallowed to the extent it seeks to recover any make-whole premium because

such premium constitutes unmatured interest that is not allowed under section 502(b)(2) of the Bankruptcy Code. The response deadline for the Creditors' Committee Claim Objection is April 9, 2020.

### R. Creditors' Committee Related Party Transaction Standing Motion.

On March 13, 2020, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1032] (the "Related Party Transactions Standing Motion"), by which the Creditors' Committee sought authority to assert, litigate, exclusively settle, and otherwise resolve certain claims and causes of action on behalf of the Debtors' estates against SNMP, SN Catarina, SOG, and certain of Sanchez Midstream Partners GP LLC's and SOG's officers and directors (the "Proposed Defendants"). The proposed claims that the Creditors' Committee seeks to assert include: (i) recharacterization of a transaction between SN and SNMP as a disguised financing arrangement (in the alternative, avoidance of the Catarina Arrangement (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer); (ii) breach of fiduciary duty against certain of the Proposed Defendants in connection with the approval of the Catarina Arrangement and Catarina Gathering Agreement Amendment (both as defined in the Related Party Transactions Standing Motion); (iii) avoidance of payments made as a result of increased rates payable for water and gas delivered through the gathering system subject to the Catarina Arrangement as constructively fraudulent transfers; (iv) avoidance of the Carnero Sale (as defined in the Related Party Transactions Standing Motion) as a constructively fraudulent transfer; (v) avoidance of excessive compensation payments made by SN to certain Sanchez family members as constructively fraudulent transfers; (vi) breach of fiduciary duty against Antonio R. Sanchez, III; (vii) breach of fiduciary duty against certain of the Proposed Defendants in connection with allowing SN to enter into and continue the Lease Participation Agreement between SN and SOG; and (viii) breach of contract against SOG in connection with SOG's failure to perform its obligations under a services agreement between SOG and SN. The hearing on the Related Party Transactions Standing Motion is continued to a date to be determined [Docket No. 1091].

### S. Shared Services.

On August 12, 2019, the Debtors filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Continued Performance of Obligations Under Shared Services Arrangements* [Docket No. 10] (the "Shared Services Motion"), seeking to continue performing under certain shared services arrangements with SOG. On August 16, 2019, the Court entered an order approving certain of the relief requested in the Shared Services Motion on an interim basis [Docket No. 189]. The Court entered subsequent interim orders on September 11, 2019 [Docket No. 287] and October 23, 2019 [Docket No. 510].

The Debtors entered into negotiations with the Creditors' Committee regarding the Shared Services Motion and were able to negotiate a form of agreed upon final order. On December 2, 2019, the Ad Hoc Group of Unsecured Noteholders filed an objection to the Shared Services Motion [Docket No. 660]. On December 12, 2019, after resolving the objection of the Ad Hoc Group of Unsecured Noteholders, the Court entered an order approving the Shared Services Motion on a final basis [Docket No. 733].

### T. Analysis of the Debtors' Midstream and Marketing Contract Review.

As the operator of substantially all of the Debtors' assets, the Debtors have a complex midstream and marketing contract program that governs their gathering, processing and marketing of hydrocarbons. Since the Petition Date, the Debtors have undertaken an extensive review of their midstream and marketing contracts in order to develop an actionable midstream strategy that will maximize value of the Debtors' estates for the benefit of their stakeholders. In connection with confirmation of the Plan, the Debtors or the

Reorganized Debtors, as applicable, anticipate seeking to reject and/or renegotiate certain of their midstream and marketing contracts in order to maximize value for the Debtors estates.

## U. Postpetition Restructuring Process.

### 1. Negotiations with Creditors.

Following the appointment of the Debtors' CRO, the Debtors embarked on the intensive process of revising their business plan to account for current market conditions. This process required the Debtors' newly appointed CRO to take on the substantial task of learning about all elements of the Debtors' complex business and operations and consumed substantially all of the months of December and January.

On January 26, 2020, the Debtors shared their business plan and an illustrative restructuring term sheet for a proposed a plan of reorganization with each of the Creditors' Committee, the advisors for the Secured Ad Hoc Group, and the Ad Hoc Group of Unsecured Noteholders. To aid negotiations, on February 23 and 24, 2020, the Debtors entered into confidentiality agreements with (a) eight members of the Secured Ad Hoc Group and (b) three members of the Ad Hoc Unsecured Noteholder Group. On February 25, 2020 the Debtors met with the Creditors' Committee, Secured Ad Hoc Group and Ad Hoc Group of Unsecured Noteholders to further advance plan negotiations. On March 11, 2020, SN filed a Form 8-K disclosing a presentation regarding its proposed business plan and related materials, as required under the terms of the confidentiality agreements with members of the Ad Hoc Unsecured Noteholder Group.

Despite their best efforts, the Debtors were unable to obtain consensus on a plan of reorganization before the unprecedented disruption in the financial markets in mid-March due to the COVID-19 pandemic and the Russian-Saudi oil price war. To reach a comprehensive resolution in light of the foregoing, the Debtors requested that the key creditor groups participate in a mediation conducted by the Bankruptcy Court. On March 26, 2020, the Honorable Chief Judge David R. Jones was appointed as a mediator in the Chapter 11 Cases [Docket No. 1068]. Mediation commenced on March 27, 2020, and continued several days, ultimately resulting in an agreement between the Debtors and the Secured Ad Hoc Group, which agreement is embodied in the Plan.

### 2. Notice of Default under DIP Facility.

On March 27, 2020, WSFS filed the *Notice of Filing of Enforcement Notice in Accordance with Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(B), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, and 507(B)* [Docket No. 1098] (the "Enforcement Notice"). The Enforcement Notice referenced a default under the DIP Facility, terminated all remaining New Money Commitments and declared all Obligations and DIP Obligations (as defined the DIP Order) immediately due and payable after the requisite notice and cure period set forth in the DIP Order. On March 27, 2020, WSFS delivered a "Carve-Out Trigger Notice" (as defined the DIP Order) indicating that a Termination Event had occurred, and, among other things, placing a cap of $5 million dollars on professional fees incurred by "Debtor Professionals" and "Committee Professionals" (each as defined in the DIP Order) after the first business day following delivery of the Carve-Out Trigger Notice. In accordance with the DIP Order, upon receipt of the Carve-Out Trigger Notice, the Debtors funded the Carve-Out Reserves for the payment of all unpaid Allowed Professional Fees. On March 27, 2020, the Secured Ad Hoc Group filed the *Emergency Motion of the Secured Ad Hoc Group for Entry of an Order Suspending Interim Compensation Order* [Docket No. 1099] ("Emergency Interim Comp Motion"), asking the Bankruptcy Court to immediately suspend the Interim Compensation Order and require the Debtors to pay professional fees no more than once every 120 days. On March 30, 2020, the Secured Ad Hoc Group (i) cancelled the hearing on the Emergency Interim

Comp Motion and abated the Emergency Interim Comp Motion [Docket No. 1102], and (ii) abated the Enforcement Notice [Docket No. 1103].

## VII. RISK FACTORS.

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation. For additional risk factors that may affect the Debtors' restructuring, please refer to the Debtors' publicly available filings with the SEC.

**THE DEBTORS HAVE PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE AND DISCUSSION OF ADDITIONAL RISK FACTORS RELATED TO THE DEBTORS' BUSINESS MAY BE FOUND IN PUBLICALLY AVAILABLE SECURITIES FILINGS.**

### A. Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Class to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Class.

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

#### 3. The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6. Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 cases, changes in demand for oil and natural gas (and thus demand for the services the Debtors provide), and increasing expenses. *See* Article VII.C of this Disclosure Statement, entitled "Risks Related to the Debtors' and the Reorganized Debtors' Businesses," which begins on page 52. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no

guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. The Bankruptcy Court has issued an order extending the Debtors' exclusive period to propose a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve Confirmation of the Plan to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7. The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim or Interest.

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. Occurrence of the Effective Date is, among other things, contingent upon the Requisite DIP Lenders being satisfied, in the exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient operating cash flow to operate in the ordinary course of business. There is no assurance that the Effective Date conditions will be satisfied quickly after the Confirmation Date, if at all.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Class to accept or reject the Plan or require any sort of revote by the Impaired Class.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11. Injunctions and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain injunctions, exculpations, and a release of liens. The injunctions and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

The exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts. Additionally, the directors and officers of the Debtors, who are Exculpated Parties, have contributed significant efforts to the Debtors' reorganization by maintaining the Debtors' operations, guiding the Debtors through difficult financial circumstances, and facilitating a value-maximizing restructuring transaction in the midst of contentious Chapter 11 cases. The Plan's exculpation provisions are an inextricable component of the Plan and the significant deleveraging and financial benefits that they embody.

## B. Risks Related to Recoveries under the Plan.

### 1. The Reorganized Debtors May Not Be Able to Achieve their Projected Financial Results.

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular (the "Financial Projections"). The Financial Projections are attached hereto as **Exhibit D**. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Reorganized Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not

be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 2. A Liquid Trading Market for the New Common Stock May Not Develop.

There can be no assurance that an active trading market for the New Common Stock will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Stock may be substantially limited.

### 3. The Trading Price for the Shares of New Common Stock May Be Depressed Following the Effective Date.

Assuming that the Effective Date occurs, shares of New Common Stock will be issued to Holders of certain Classes of Claims. Holders of Claims or Interests (as applicable) that receive shares of New Common Stock may seek to sell such securities in an effort to obtain liquidity. These sales and the volume of New Common Stock available for trading could cause the trading price for the shares of New Common Stock to be depressed, particularly in the absence of an established trading market for the New Common Stock.

### 4. Certain Holders of New Common Stock May Be Restricted in their Ability to Transfer or Sell their Securities.

To the extent that shares of the New Common Stock issued under the Plan are covered by section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims who receive New Common Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Stock may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New Common Stock to freely resell the New Common Stock. *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

### 5. Restricted Securities or Securities Held by "Underwriters" Under Section 1145(b) of the Bankruptcy Code Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies.

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144. A non-affiliate who has not been an affiliate

of the issuer during the preceding three months may resell restricted securities after a six-month holding period (if the issuer is a reporting company under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and has been for the past 90 days (a "Reporting Issuer")) unless certain current public information regarding the issuer is not available at the time of sale, in which case (or if the issuer is not a Reporting Issuer) the non-affiliate may resell after a one-year holding period. An affiliate may resell restricted securities after a six-month holding period (or one year, if the issuer is not a Reporting Issuer) but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144. In any event, holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

As the New Common Stock may be held by fewer than 300 holders, the Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension. The New Organizational Documents or the New Stockholders' Agreement, if any, may include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require any Reorganized Debtors to continue or resume filing periodic or other reports pursuant to the Exchange Act. These restrictions may adversely impact the value of the shares of New Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares, at a time when they may wish to do so.

Holders of New Common Stock who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 65.

### 6. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review Article X of this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," which begins on page 69, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims and Interests entitled to vote on the Plan.

### 7. The Debtors May Not Be Able to Accurately Report Their Financial Results.

The Debtors have established internal controls over financial reporting. However, even an effective system of internal control over financial reporting, no matter how well designed, has inherent limitations, including the possibility of human error, circumvention of controls or overriding of controls and, therefore, can provide only reasonable assurance with respect to reliable financial reporting. Furthermore, the effectiveness of a system of internal control over financial reporting in future periods can change as conditions change. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. If the Debtors or the Reorganized Debtors, as applicable, fail to maintain the adequacy of their internal controls, they may be unable to provide financial information in a timely and reliable manner within the time periods required for their financial reporting under SEC rules and regulations, the terms of the agreements governing the Debtors' indebtedness, or as otherwise required. Any such difficulties or failure could materially adversely affect the Debtors' or Reorganized Debtors' business, results of operations, and financial condition. Further, the Debtors or Reorganized Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect their businesses, results of operations, and financial condition.

### C. Risks Related to the Debtors' and the Reorganized Debtors' Businesses.

#### 1. The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service their Indebtedness.

The Reorganized Debtors' ability to meet their debt obligations depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay their debt as it comes due and/or fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

#### 2. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3. Financial Results May Be Volatile and May Not Reflect Historical Trends.

If the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Reorganized Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Reorganized Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections

contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### 4. The Debtors' Substantial Liquidity Needs May Impact Revenue.

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities, issuances of bonds, and issuances of equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to maintain adequate cash on hand; (b) their ability to generate cash flow from operations; (c) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (d) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions, commodity prices and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 5. Market Conditions for Oil, Natural Gas, and NGLs are Highly Volatile. A Sustained Decline in Prices for These Commodities Could Adversely Affect the Debtors' Revenue, Cash Flows, Profitability, and Growth.

The prices for oil, natural gas and NGLs fluctuate widely in response to a variety of factors that are beyond the Debtors' control, such as:

- domestic and foreign supply of and demand for oil, natural gas and NGLs;
- weather conditions and the occurrence of natural disasters, pandemics, epidemics, and outbreaks of disease such as the recent coronavirus, which may reduce demand for oil, NGLs and natural gas because of reduced global or national economic activity;
- overall domestic and global economic conditions;
- political and economic conditions in countries producing oil, natural gas and NGLs, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;

- actions of OPEC and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on prices for oil, natural gas and NGLs;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting the Debtors' ability to apply hydraulic fracturing to the Debtors' wells, and taxation;
- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of production and transportation facilities for oil, natural gas and NGLs;
- the availability of refining capacity; and
- the price and availability of, and consumer demand for, alternative fuels.

Governmental actions may also affect prices for oil, natural gas and NGLs. In the past, prices for oil, natural gas and NGLs have been extremely volatile, and the Debtors expect this volatility to continue. Beginning in the latter half of 2014, oil prices declined precipitously, and continued to decline throughout 2015 as well as the start of 2016. Although oil prices rebounded somewhat in 2017, they declined again in the fourth quarter of 2018 and remained lower through 2019 and into 2020 and trended downward beginning in late January 2020. Even more recently, the recent coronavirus outbreak has caused oil and natural gas prices to further decline due to, among other things, reduced industrial activity and travel restrictions that are expected to continue and expand in the near future. Disagreements between OPEC and Russia in early March 2020 have caused additional price declines and volatility, and oil prices fell to a four-year low in March 2020. Such downward volatility has negatively affected the amount of the Debtors' net estimated proved reserves and the Standardized Measure of discounted future net cash flows of the Debtors' net estimated proved reserves. These low and volatile commodity prices are expected to continue at least for the near term and possibly longer—March 2020 saw two one-day drops in the S&P 500 Index of over 7%, its biggest losses since the 2008 global financial crises, reflecting fears of a global recession and potential further global economic damage from the coronavirus, including factory shutdowns, travel bans, closings of schools and stores, and cancellations of conventions and similar events, resulting in, among other things, reduced fuel demand, lower manufacturing activity, and high inventories of oil and natural gas, which would further negatively impact oil and natural gas prices.

In addition, the Debtors' revenue, profitability and cash flows depend upon the prices of and demand for oil, natural gas and NGLs, and continued price volatility and low commodity prices, or a sustained drop in prices could continue to negatively affect the Debtors' financial results and further impede the Debtors' growth. In particular, sustained declines in commodity prices have and will:

- limit the Debtors' ability to enter into commodity derivative contracts at attractive prices;
- reduce the value and quantities of the Debtors' reserves, because declines in prices for oil, natural gas and NGLs would reduce the amount of oil, natural gas and NGLs that the Debtors can economically produce;
- reduce the amount of cash available to fund capital expenditures;

- limit the Debtors' ability to borrow money or raise additional capital; and
- make it uneconomical for the Debtors' and their operating partners to commence or continue production levels of oil, natural gas and NGLs.

**6. The Debtors' Derivative Risk Management Activities Could Result in Financial Losses or Reduced Income.**

To mitigate the effect of commodity price volatility on the Debtors' net cash provided by operating activities, support the Debtors' annual capital budgeting and expenditure plans and reduce commodity price risk associated with certain capital projects, the Debtors have historically entered into derivative contracts covering a portion of the Debtors' production. The Debtors terminated their derivative contracts postpetition, but the Reorganized Debtors may decide to engage in post-emergence hedging activities following the reorganization, and certain of the non-Debtor subsidiaries that report on a consolidated basis with the Debtors may have or enter into derivative agreements or continue to engage in hedging activities. These derivative arrangements will be subject to mark to market accounting treatment, and the changes in fair market value of the contracts will be reported in the Reorganized Debtors' statements of operations each quarter, which may result in significant non-cash gains or losses. These derivative contracts may also expose the Reorganized Debtors to risk of financial loss (or reduced income) in certain circumstances, including when:

- production is less than the contracted derivative volumes, in which case the Reorganized Debtors might be forced to satisfy all or a portion of their hedging obligations without the benefit of the cash flow from the Reorganized Debtors' sale of the underlying physical commodity;
- the counterparty to the derivative contract defaults on its contractual obligations;
- there is a widening of price basis differentials between delivery points for the Reorganized Debtors' production and the delivery point assumed in the hedge instrument, which limits the effectiveness of the hedge itself; or
- the derivative contracts limit the benefit the Reorganized Debtors would otherwise receive from increases in commodity prices.

Such financial losses (or reduced income) could materially impact our liquidity, business, financial condition and results of operations.

**7. The Debtors are Subject to Complex Federal, State, Local and Other Laws and Regulations that Could Adversely Affect the Cost, Manner or Feasibility of Conducting their Operations. In Addition, the Third Parties on Whom the Debtors Rely for Gathering and Transportation Services are also Subject to Complex Federal, State and Other Laws that Could Adversely Affect the Cost, Manner or Feasibility of Conducting the Debtor's Business.**

The Debtors' oil and natural gas development and production operations are subject to complex and stringent laws and regulations. To conduct operations in compliance with these laws and regulations, the Debtors must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. The Debtors may incur substantial costs in order to maintain compliance with these existing laws and regulations. In addition, the Debtors' costs of compliance may increase if existing laws and regulations are revised or reinterpreted, or if new laws and regulations become

applicable to their operations. Failure to comply with such laws and regulations, as interpreted and enforced, could have a material adverse effect on their business, financial condition and results of operations.

In addition, the operations of the third parties on whom the Debtors rely for gathering and transportation services are also subject to complex and stringent laws and regulations that require obtaining and maintaining numerous permits, approvals and certifications from various federal, state and local government authorities. These third parties may incur substantial costs in order to comply with existing laws and regulations. If existing laws and regulations governing such third party services are revised or reinterpreted, or if new laws and regulations become applicable to their operations, these changes may affect the costs that the Debtors pay for such services. Similarly, a failure to comply with such laws and regulations by the third parties on whom the Debtors rely could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**8. The Debtors' Operations are Subject to Operational Hazards and Unforeseen Interruptions for Which the Debtors May Not Be Adequately Insured.**

There are a variety of operating risks inherent in the Debtors' wells and other operating properties and facilities, such as leaks, explosions, mechanical problems, natural disasters, pandemics, epidemics and outbreaks of disease, all of which could cause substantial financial losses. Any of these or other similar occurrences could result in the disruption of the Debtors' operations, substantial repair costs, personal injury or loss of human life, significant damage to property, environmental pollution, impairment of the Debtors' operations and substantial revenue losses. The location of the Debtors' wells and other operating properties and facilities near populated areas, including residential areas, commercial business centers and industrial sites, could significantly increase the level of damages resulting from these risks.

Insurance against all operational risks is not available to the Debtors. The Debtors are not fully insured against all risks, including development and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable. Additionally, the Debtors may elect not to obtain insurance if the Debtors believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs or on commercially reasonable terms. Changes in the insurance markets due to weather, adverse economic conditions, and the aftermath of the Macondo well incident in the Gulf of Mexico have made it more difficult for the Debtors to obtain certain types of coverage. As a result, the Debtors may not be able to obtain the levels or types of insurance the Debtors would otherwise have obtained prior to these market changes, and the Debtors cannot be sure the insurance coverage the Debtors do obtain will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on the Debtors' business, financial condition and results of operations.

**9. The Reorganized Debtors May Be Adversely Affected by Potential Litigation.**

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

**10. The Loss of Key Personnel Could Adversely Affect the Reorganized Debtors' Operations.**

The Reorganized Debtors' operations will depend on a relatively small group of key management personnel, including the Reorganized Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Reorganized Debtors may experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Reorganized Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Reorganized Debtors' ability to operate their business. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect.

**11. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

**12. The Debtors' Estimated Reserves and Future Production Rates are Based on Many Assumptions that May Prove to Be Inaccurate. Any Material Inaccuracies in These Reserve Estimates or Underlying Assumptions Will Materially Affect the Quantities and Present Value of the Debtors' Estimated Reserves.**

Numerous uncertainties are inherent in estimating reserves of oil, natural gas and NGLs and future production. It is not possible to measure underground accumulations of oil, natural gas and NGLs in an exact way. Reserve engineering is complex, requiring subjective estimates of underground accumulations of oil, natural gas and NGLs and assumptions concerning future prices for oil, natural gas and NGLs, future production levels and operating and development costs. In estimating the Debtors' reserves of oil, natural gas and NGLs, the Debtors and their independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- prices for oil, natural gas and NGLs;
- future production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;
- the accuracy and reliability of the underlying engineering and geologic data; and
- the availability of funds.

If these assumptions prove to be incorrect, the Debtors' estimates of their reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery and the Debtors' estimates of the future net cash flows from their estimated reserves could change significantly.

The Debtors' Standardized Measure is calculated using unhedged prices for oil, natural gas and NGLs and is determined in accordance with the rules and regulations of the SEC. Over time, the Debtors may make material changes to reserve estimates to take into account changes in their assumptions and the results of actual development and production.

The reserve estimates the Debtors make for wells or fields that do not have a lengthy production history are less reliable than estimates for wells or fields with lengthy production histories. A lack of production history may contribute to inaccuracy in our estimates of proved reserves, future production rates and the timing of development expenditures.

**13. The Debtors' Estimated Reserves of Oil, Natural Gas and NGLs Will Naturally Decline Over Time, and the Debtors May Be Unable To Develop, Find or Acquire Additional Reserves to Replace Their Current and Future Production at Acceptable Costs, Which Would Adversely Affect Their Business, Financial Condition and Results of Operations.**

The Debtors' future reserves of oil, natural gas and NGLs, production volumes and cash flows depend on their success in efficiently developing their current reserves and economically finding or acquiring additional recoverable reserves. The Debtors' estimated reserves of oil, natural gas and NGLs will naturally decline over time as they are produced. The Debtors' success depends, in part, on their ability to economically develop, find or acquire additional reserves to replace their own current and future production. If the Debtors are unable to do so, or if expected development is delayed, reduced or cancelled, their production and reserves will continue to decline. To the extent cash flows from operations and external sources of capital remain limited or become unavailable, the Debtors' ability to make the necessary capital investments needed to maintain or expand their asset base of oil and natural gas reserves may be diminished. Over the long term, a continuing decline in their production and reserves would further reduce their liquidity and ability to satisfy their debt obligations by negatively affecting their cash flows from operations and the value of their assets.

**14. The Debtors' Identified Drilling Location Inventories are Scheduled out over Several Years, Making Them Susceptible to Uncertainties that Could Materially Alter the Occurrence or Timing of Their Drilling.**

The Debtors' management has specifically identified and scheduled drilling locations as an estimation of their future drilling activities on their existing acreage. Developing these identified drilling locations represents a significant part of the Debtors' long term business strategy. The Debtors' ability to drill and develop these locations depends on a number of uncertainties, including the availability of capital, seasonal conditions, regulatory approvals, prices for oil, natural gas and NGLs, costs, drilling results, the outcome of the Chapter 11 Cases and other factors. In connection with the Chapter 11 Cases, the Debtors may revise their capital budget or development plan due to the aforementioned uncertainties or other reasons, including in connection with ongoing negotiations or discussions with their various stakeholders as part of the Chapter 11 Cases. Because of these uncertainties, the Debtors do not know if the numerous potential drilling locations they have identified will ever be drilled or if they will be able to produce oil, natural gas or NGLs from these or any other potential drilling locations. As such, the Debtors' actual drilling activities may materially differ from those presently identified, which could adversely affect their business, financial condition and results of operations.

### 15. Developing and Producing Oil, Natural Gas and NGLs are Costly and High Risk Activities With Many Uncertainties That Could Adversely Affect the Debtors' Business, Financial Condition and Results Of Operations.

The cost of developing, completing and operating a well is often uncertain, and cost factors can adversely affect the economics of a well. Additionally, drilling wells with no or sub-economic levels of production (dry holes) will negatively impact the Debtors' financial position. In addition, the Debtors' use of 2D and 3D seismic data and visualization techniques to identify subsurface structures and hydrocarbon indicators do not enable the interpreter to know whether hydrocarbons are, in fact, present in those structures and requires additional pre development expenditures. Furthermore, the Debtors' development and production operations may be curtailed, delayed or canceled as a result of other factors, including:

- high costs, shortages or delivery delays of rigs, equipment, labor or other services;
- composition of sour gas, including sulfur and mercaptan content;
- unexpected operational events and conditions;
- reductions in prices for oil, natural gas and NGLs;
- increases in severance taxes;
- adverse weather conditions and natural disasters, pandemics, epidemics, and outbreaks of disease;
- facility or equipment malfunctions and equipment failures or accidents, including acceleration of deterioration of the Debtors' facilities and equipment due to the highly corrosive nature of sour gas;
- title problems;
- pipe or cement failures, casing collapses or other downhole failures;
- compliance with ever changing environmental and other governmental requirements;
- environmental hazards, such as chemical or hydrocarbon leaks or spills, salt water leaks or spills, pipeline ruptures, discharges of toxic gases or other releases of hazardous substances;
- lost or damaged oilfield development and service tools;
- unusual or unexpected geological formations and pressure or irregularities in formations;
- loss of drilling fluid circulation;
- fires, blowouts, surface craterings and explosions;
- uncontrollable flows of oil, natural gas, NGLs or well fluids;

- loss of leases due to incorrect payment of royalties;
- limited availability of financing on acceptable terms, or at all; and
- other hazards, including those associated with sour gas such as an accidental discharge of hydrogen sulfide gas, that could also result in personal injury and loss of life, pollution and suspension of operations.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their' investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their business, financial condition and results of operations.

The Debtors routinely apply hydraulic fracturing techniques in many of their drilling and completion operations. Hydraulic fracturing has become subject to increased public scrutiny and recent changes in federal and state law, as well as proposed legislative changes, could significantly restrict the use of hydraulic fracturing. Such laws could make it more difficult or costly for us to perform fracturing to stimulate production from dense subsurface rock formations and, in the event of local prohibitions against commercial production of natural gas, may preclude their ability to drill wells. In addition, such laws could make it easier for third parties opposing the hydraulic fracturing process to initiate legal proceedings based on allegations that specific chemicals used in the fracturing process could adversely affect groundwater. If hydraulic fracturing becomes regulated at the federal level as a result of federal legislation or regulatory initiatives by the EPA or other federal agencies, the Debtors' fracturing activities could become subject to additional permitting requirements and result in permitting delays, financial assurance requirements, more stringent construction specifications, increased monitoring, reporting and recordkeeping obligations, more stringent plugging and abandonment requirements and potential increases in costs.

Additionally, hydraulic fracturing, drilling, transportation and processing of hydrocarbons bear an inherent risk of loss of containment. Potential consequences include loss of reserves, loss of production, loss of economic value associated with the affected wellbore, contamination of soil, ground water, and surface water, as well as potential fines, penalties or damages associated with any of the foregoing consequences.

## VIII. SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order [Docket No. #].

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.***

**<u>THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY</u>.**
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER [DOCKET NO. #] FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims and Interests Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan from Holders of Claims in Class 3, Class 4 and Class 5 (collectively, the "<u>Voting Classes</u>"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 6, 7, 8, 9 or 10.

### B. Voting Record Date.

**<u>The Voting Record Date is April 8, 2020</u>**. The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C. Voting on the Plan.

**<u>The Voting Deadline is April 27, 2020 at 5:00 p.m. (prevailing Central Time)</u>**. Holders of DIP Claims in Class 3, Secured Notes Claims in Class 4, and General Unsecured Claims in Class 5 should submit their ballots such that it is **<u>actually</u>** **<u>received</u>** by the Balloting Agent by the Voting Deadline. To be counted as votes to accept or reject the Plan, all votes must be submitted pursuant to the instructions and deadlines set forth on the ballot.

| DELIVERY OF BALLOTS |
|---|
| 1. All Ballots should be sent to:<br>(a) if by U.S. Postal Service, courier or personal delivery, to:<br>**Sanchez Ballot Processing<br>c/o Prime Clerk LLC<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165**<br>(b) if permitted pursuant to the instructions accompanying your ballot, via electronic mail, to: sanchezballots@primeclerk.com.<br>2. Ballots may also be submitted via the e-ballot system at https://cases.primeclerk.com/sanchezenergy. To have their votes to accept or reject the Plan counted, Holders of Claims in Classes 3, 4, and 5 must properly execute, complete, and deliver their ballots according to the instructions so that it is actually received by the Balloting Agent no later than the Voting Deadline. |

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE BALLOTING AGENT AT (844) 232-0067 (U.S. and Canada) or (917) 942 6393 (International). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

### D. Ballots Not Counted.

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

## IX. CONFIRMATION OF THE PLAN.

### A. Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the

Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B. Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit C** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the material going concern value of their businesses, which is reflected in the New Common Stock to be distributed under the Plan. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections attached hereto as **Exhibit D** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D. Acceptance by Impaired Class.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[10]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims or interests in that class, counting only those claims or interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. There are no Classes of Interests entitled to vote on the Plan.

Pursuant to Article III.F of the Plan, if a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

### E. Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is Impaired under, and has not accepted, the plan.

If any impaired class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. Subject to the requirements of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1. No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same

---

[10] A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100% of the amount of the allowed claims or interests in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of their advisors, produced the Valuation Analysis that is set forth in **Exhibit E** attached hereto and incorporated herein by reference. As set forth in the Valuation Analysis, the Debtors' going concern value is substantially less than the aggregate amount of its funded-debt obligations. Accordingly, the Valuation Analysis further supports the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## X. CERTAIN SECURITIES LAW MATTERS.

### A. New Common Stock.

As discussed herein, the Plan provides for the Reorganized Debtors to issue New Common Stock to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

The Debtors believe that the New Common Stock will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Stock pursuant to the Plan is, and subsequent transfers of the New Common Stock issued pursuant to section 1145 of the Bankruptcy Code by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

**RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM**

**REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

**B. Issuance and Resale of New Common Stock Under the Plan.**

**1. Issuance under Section 1145 of the Bankruptcy Code, Private Placement Exemptions.**

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

**RECIPIENTS OF THE NEW COMMON STOCK ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW**.

**2. Resale of New Common Stock; Definition of Underwriter.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act. In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more

intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Stock would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Stock and, in turn, whether any Person may freely resell New Common Stock.

Resales of the New Common Stock by entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their New Common Stock pursuant to the limited safe harbor resale provisions of Rule 144 promulgated under the Securities Act. Generally, Rule 144 promulgated under the Securities Act would permit the public sale of securities received by such Person if the required holding period for "restricted securities" has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is, or within the three months prior to the sale has been, an affiliate of the issuer. In addition, Rule 144 provides an exemption for the public resale of "control securities" (i.e., securities that are not restricted securities but held by an affiliate or a person that was an affiliate within the past three months) if certain conditions are met. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the three months preceding the sale may resell restricted securities after a six-month holding period if the issuer is a Reporting Issuer (or a 12-month holding period if the issuer is not a Reporting Issuer) if at the time of the sale there is available certain current public information regarding the issuer (or without regard to the current public information requirement after the 12-month holding period). Adequate current public information is available for a Reporting Issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Exchange Act during the twelve months (or for such shorter period that the issuer was required to file such reports) preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension and the current public information requirement may not be satisfied in future periods.

An affiliate may resell (i) restricted securities after the applicable holding period or (ii) control securities if, in each case, at the time of the sale certain current public information regarding the issuer is

available. As noted above, the Debtors currently expect that Reorganized SN may not be a Reporting Issuer and, as a result, this current public information requirement may not be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of securities sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that such securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of securities except in certain situations. Third, if the sale involves more than 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to New Common Stock, if any, issued in reliance upon section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder (whether held by non-affiliates or affiliates) until at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, after the Effective Date. Accordingly, holders of any such New Common Stock will be required to hold such New Common Stock for at least six months, or twelve months if Reorganized SN is not a Reporting Issuer, and, thereafter, to sell New Common Stock only in accordance with the applicable requirements of Rule 144, unless such New Common Stock is registered under the Securities Act (or is otherwise resold pursuant to an exemption from registration under the Securities Act).

**ANY PERSONS RECEIVING "RESTRICTED SECURITIES" UNDER THE PLAN OR WHO MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES. POTENTIAL RECIPIENTS OF NEW COMMON STOCK ARE URGED TO CONSULT THEIR OWN COUNSEL CONCERNING THEIR ABILITY TO FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL LAW AND ANY APPLICABLE STATE BLUE SKY LAW.**

## XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.

### A. Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Allowed Class 3 DIP Claims, Class 4 Secured Note Claims, and Class 5 General Unsecured Claims, and it does not address the U.S. federal income tax consequences to all other Holders of Claims or Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors or the Reorganized Debtors), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or Interests who will hold the New Common Stock as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the Claims to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and Holders of Claims and Interests described below also may vary depending on the nature of any Restructuring Transactions that the Debtors and/or Reorganized Debtors engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including a beneficial owner of Claims or Interests) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more

United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities for U.S. federal income tax purposes) that are Holders of Claims or Interests are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES.**

## B. Certain U.S. Federal Income Tax Consequences to the Debtors and Reorganized Debtors.

### 1. Effects of Restructuring on the Debtors.

As of December 31, 2019, the Debtors estimate that they have approximately $1.93 billion of federal NOL carryforwards and $318 million of interest deductions deferred under section 163(j) of the Tax Code ("163(j) Deductions"). The Debtors may generate additional tax attributes, potentially including 163(j) Deductions, prior to the Effective Date in 2020. Any NOLs remaining upon implementation of the Plan may be able to offset future taxable income for up to 20 years in the case of NOLs arising before 2018 and indefinitely for NOLs arising in taxable years starting in 2018, thereby reducing the Debtors' future aggregate tax obligations. NOLs arising before 2018 may offset 100% of future taxable income, and NOLs arising in taxable years starting with 2018 may be used to offset 80% of taxable income in a given year. Further, the 163(j) Deductions may remain available for use following the implementation of the Plan, subject to the discussion below regarding section 382 of the Tax Code. However, just enacted Coronavirus Air, Relief and Economic Security Act ("CARES Act") made several changes with respect to NOL's and related components of same as follows:

- NOL's arising in taxable years beginning after Dec. 31, 2017 and before Jan. 1, 2021 can be carried back to each of the five tax years preceding the tax year of such loss.

- The 80% taxable income limitation on NOL deduction is temporarily repealed so that for tax years beginning before 2021 taxpayers can take an NOL deduction equal to 100% of taxable income and for tax years beginning after 2021, taxpayers will be able to take a 100% deduction of NOLs arising in tax years prior to 2018 and a deduction limited to 80% of modified taxable income for NOLs arising in tax years after 2017.

- Repeals certain limits on claiming any refundable corporate minimum tax credit of a corporation and provides for an election claim a tentative carryback refund claim of any such credit for 2018.

- Temporarily and retroactively increases the deductibility of certain interest expense.

The Debtors have not yet determined the impact, if any, of these changes on its financial and tax situation including the amount of any NOL's and refundable corporate minimum tax credit which can be carried back to prior tax years and which might survive the reduction of such tax attributes upon confirmation of the Plan.

**(i) Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, the Debtors will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the fair market value of the New Common Stock, given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, the Debtors will not, however, be required to include any amount of COD Income in gross income if the Debtors are under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, the Debtors must reduce their tax attributes by the amount of COD Income that they excluded from gross income pursuant to section 108 of the Tax Code. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Reorganized Debtors will remain subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. Alternatively, the Debtors may elect first to reduce the basis of their depreciable (but not depletable) assets pursuant to section 108(b)(5) of the Tax Code. Although not free from doubt, in the absence of contrary guidance, it appears to be the case that the 163(j) Deductions are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize COD Income; however, the exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, however, the Debtors expect that the amount of such COD Income will reduce some of their NOLs and tax credits allocable to taxable periods prior to the Effective Date pursuant to section 108 of the Tax Code. Depending on the amount of COD Income, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

**(ii) Limitation on NOLs, 163(j) Deductions, and Other Tax Attributes.**

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence will be subject to certain limitations under sections 382 and 383 of the Tax Code.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change," the amount of any remaining NOL carryforwards, tax credit carryforwards, 163(j) Deductions, net unrealized built-in losses, and possibly certain other attributes (potentially including losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For this purpose, if a corporation (or

consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10.0 million, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Common Stock pursuant to the Plan will result in an "ownership change" of the Debtors for these purposes, and that the Reorganized Debtors' use of the Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

**(a) General Section 382 Annual Limitation.**

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments), and (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs, currently 1.63 percent for April 2020 but which may decline due to the recent precipitous drop in yields). The annual limitation may be increased to the extent that the Reorganized Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

**(b) Special Bankruptcy Exceptions.**

Special rules may apply in the case of a corporation that experiences an "ownership change" as a result of a bankruptcy proceeding. An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the debtor corporation (or a controlling corporation if also in chapter 11) as reorganized pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). If the requirements of the 382(l)(5) Exception are satisfied, a debtor's Pre-Change Losses would not be limited on an annual basis, but, instead, NOL carryforwards would be reduced by the amount of any interest deductions claimed by the debtor during the three taxable years preceding the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization in respect of all debt converted into stock pursuant to the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (i) the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or

(ii) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

The Debtors have not determined whether the 382(l)(5) Exception will be available or, if it is available, whether the Reorganized Debtors will elect out of its application.

### C. Certain U.S. Federal Income Tax Consequences to the U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

The U.S. federal income tax consequences to a U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claims will depend, in part, on whether the Claim surrendered constitutes a "security" of a Debtor for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations promulgated thereunder define the term "security." Whether a debt instrument constitutes a "security" is determined based on all relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that the instrument is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, U.S. Holders are urged to consult their tax advisors regarding the status of the Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims as "securities" for U.S. federal income tax purposes.

#### 1. U.S. Federal Income Tax Consequences to the Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 3 DIP Claims, each Holder thereof will receive its Pro Rata share of the DIP Equity Distribution; and the Post-Effective Date Equity Distribution allocated, if any, to the DIP Claims based upon the outcome of the Lien-Related Litigation to the DIP Claims in an amount determined in the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 4 Secured Notes Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of Class 5 General Unsecured Claims, each Holder thereof will receive its Pro Rata share of the Post-Effective Date Equity Distribution allocated, if any, to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation in accordance with section 726 of the Bankruptcy Code.

Whether and to what extent the U.S. Holder of a Class 3 DIP Claim, Class 4 Secured Notes Claim or Class 5 General Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim pursuant to the Plan depends, in part, on whether the exchange qualifies as a tax-free recapitalization pursuant to Section 368(e)(1)(E) of the Tax Code (a "Tax-Free Exchange") or if, instead, the consideration under the Plan is treated as having been received in a fully taxable disposition. If Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims qualify as a "security" of the Company, then the Holders of Class 3 DIP Claim, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims, as applicable, would be treated as receiving its distribution under the Plan in a "recapitalization", and therefore a Tax-Free Exchange for U.S. federal income tax purposes. Subject to the rules regarding accrued but untaxed interest, discussed below, a Holder of such Claim should recognize gain, but not loss, with the amount of recognized gain equal to the lesser of (i) the fair market value of property not entitled to be received tax-free under section 354 of the Tax Code; and (ii) the difference between (1) the fair market value of all consideration received pursuant to the Plan and (2) such Holder's adjusted basis, if any, in such Allowed Claim. The Holder should generally obtain a tax basis, apart from amounts allocable to accrued but untaxed interest, in the consideration received equal to (a) the tax basis of the Allowed Claim surrendered by such Holder increased by (b) gain recognized (if any) by such Holder, allocated between the non-cash consideration received in accordance with the respective fair market values. Subject to the rules regarding accrued but untaxed interest, a U.S. Holder's holding period for its interest in the consideration received should include the holding period for the exchanged Allowed Claim. The holding period for any other property received should begin on the day following the receipt of such property.

If the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims do not qualify as a "security" of the Debtors, then the Holders of the Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims, as applicable, will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the Holder should recognize gain or loss in an amount equal to the difference, if any, between the fair market value of all the consideration received and the Holder's adjusted tax basis in its Claim. The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the Holder, the rules regarding "market discount," as discussed below and accrued but untaxed interest, whether the Claim constitutes a capital asset in the hands of the Holder, and whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The holding period for the property received should begin on the day following the Effective Date. Subject to the rules regarding accrued but untaxed interest, the Holder should obtain a tax basis in the property received equal to its fair market value.

### 2. Accrued Interest.

A portion of the consideration received by U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims may be able to recognize a deductible loss to the extent that any accrued interest

on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to untaxed interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims are urged to consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but untaxed interest.

### 3. Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of an Allowed Class 4 Secured Notes Secured Claim, Allowed Class 5 Secured Notes Claims, and Allowed Class 5 General Unsecured Claims may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID (as defined below), its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claim (as described below) that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claim, and Allowed Class 5 General Unsecured Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on such Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

U.S. federal income tax laws enacted in December 2017 added section 451 of the Tax Code. This new provision generally would require accrual method U.S. Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code) to include certain items of income (such as market discount) no later than the time such amounts are reflected on such a financial statement. The application of this rule to income of a debt instrument with market discount is effective for taxable years beginning after December 31, 2018. However, the IRS recently announced in Notice 2018-80 that it intends to issue proposed Treasury Regulations confirming that taxpayers may continue to defer income (including market discount income) for tax purposes until there is a payment or sale at a gain. Accordingly, although market

discount may have to be included in income currently as it accrues for financial accounting purposes, taxpayers may continue to defer the income for tax purposes. U.S. Holders are urged to consult their own tax advisors concerning the application of the market discount rules to their Claims.

### 4. Net Investment Income Tax.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts are urged to consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

### 5. Limitation on Use of Capital Losses.

A U.S. Holder of an Allowed Class 3 DIP Claim, Allowed Class 4 Secured Notes Secured Claim, and Allowed Class 5 General Unsecured Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 6. U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Stock.

#### (i) Dividends on New Common Stock.

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(ii) Sale, Redemption, or Repurchase of New Common Stock.**

Unless a non-recognition provision applies, and subject to the market discount rules discussed above, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above under Section Limitation on Use of Capital Losses.

**D. Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.**

**1. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Holders of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders of Allowed Class 3 DIP Claims, Allowed Class 4 Secured Notes Claims, and Holders of Class 5 General Unsecured Claims. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock.

**2. Gain Recognition.**

Any gain realized by a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, such Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply). In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 3. Accrued but Untaxed Interest.

Payments made to a Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, and Class 5 General Unsecured Claims under the Plan that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that (a) such Non-U.S. Holder is not a bank, (b) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors, and (c) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E, as applicable) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder of Class 3 DIP Claims, Class 4 Secured Notes Claims, or Class 5 General Unsecured Claims that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 4. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock.

#### (i) Dividends on New Common Stock.

Any distributions made with respect to New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtors' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Except as described below under "FIRPTA" and "FATCA," dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or, if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E, as applicable (or such successor form as the IRS designates), upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to

such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**(ii) Sale, Redemption, or Repurchase of New Common Stock.**

Subject to the discussion below under "FIRPTA," "FATCA" and "Information Reporting and Backup Withholding," a Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock unless: (1) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (2) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (3) the Reorganized Debtors is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty). If the third exception applies, the Non-U.S. Holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed below under "FIRPTA."

**5. FIRPTA.**

Under the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA"), gain or loss of a foreign person on a disposition of a United States real property interest ("USRPI") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("USRPHC"). Any class of stock that is regularly traded on an established securities market is, however, excepted from treatment as a USRPI if the holder of such stock does not, at any time during an applicable measuring period, own more than 5% of that class of stock (the "5% Public Shareholder Exception").

If the common stock of the corporation were not considered regularly traded on an established securities market during the calendar year in which the relevant disposition by a Non-U.S. Holder occurs, the Non-U.S. Holder (regardless of the percentage of common stock owned) would be subject to U.S. federal income tax on a taxable disposition of the common stock, and a 15% withholding tax would apply to the gross proceeds from such disposition.

The Debtors expect that SN will be a USRPHC. Accordingly, the New Common Stock Stock will be treated as USRPI, unless a Non-U.S. Holder qualifies for the 5% Public Shareholder Exception.

Following the Effective Date, SN may take steps to create a market for the New Common Stock, but no assurance can be given that SN will take such steps or, that if they do, SN's action will permit certain Non-U.S. Holders to rely on the 5% Public Shareholder Exception.

### 6. FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Stock and U.S.-source interest (including OID)), and also include gross proceeds from the sale of any property of a type which can produce U.S.-source interest or dividends (which would include New Common Stock). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

FATCA withholding rules currently apply to withholdable payments other than payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source interest or dividends and under current law will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S.-source income or dividends that occurs after December 31, 2018.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS OR INTERESTS PURSUANT TO THE PLAN.**

### E. Information Reporting and Backup Withholding.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim or Interest under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim or Interest may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). The current backup withholding rate is 24 percent. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holders' tax returns.

### F. Recent and Possible Future Legislative Tax Changes.

The just enacted CARES Act made a variety of tax and other changes in addition to those outlined the preceding discussion at Section XI.B.1., *Effects of Restructuring on the Debtors,* which may have material consequences to both the Debtors and Holders. Additionally, Congress and the President are discussing additional legislation which could further impact the Debtors and Holders. The consequences of the new CARES Act, implementation of same and any future legislative changes is not known at this time and could materially impact Debtors and Holders as well as suppliers and customers of the Debtors.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF CLASS 3 DIP CLAIMS, CLASS 4 SECURED NOTES CLAIMS, AND CLASS 5 GENERAL UNSECURED CLAIMS IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-U.S., NON-INCOME, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII. RECOMMENDATION.

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: April 9, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

Case 23-34508 Document 11-6 Filed in TXSB on 04/08/20 Page 229 of 251

**Exhibit A**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

Dated: April 6, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES ........ 1**
A. Defined Terms ........ 1
B. Rules of Interpretation ........ 11
C. Computation of Time ........ 12
D. Governing Law ........ 12
E. Reference to Monetary Figures ........ 12
F. Reference to the Debtors or the Reorganized Debtors ........ 12
G. Controlling Document ........ 12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS ........ 13**
A. Administrative Claims ........ 13
B. Professional Fee Claims ........ 13
C. Priority Tax Claims ........ 14
D. Statutory Fees ........ 14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS ........ 15**
A. Formation of Debtor Group for Convenience Purposes Only ........ 15
B. Classification of Claims and Interests ........ 15
C. Treatment of Classes of Claims and Interests ........ 15
D. Special Provision Governing Unimpaired Claims ........ 19
E. Elimination of Vacant Classes ........ 19
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ........ 19
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........ 19
H. Intercompany Interests ........ 19
I. Subordinated Claims and Interests ........ 19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN ........ 20**
A. General Settlement of Claims, Interests, and Causes of Action ........ 20
B. Restructuring Transactions ........ 20
C. Sources of Consideration for Plan of Reorganization Distributions ........ 20
D. Lien-Related Litigation ........ 21
E. Continuation of Gavilan Proceeding ........ 22
F. Corporate Existence ........ 22
G. Vesting of Assets in the Reorganized Debtors ........ 22
H. Corporate Action ........ 22
I. New Organizational Documents ........ 22
J. Directors and Officers of Reorganized SN ........ 23
K. Retention of Current Workforce by Reorganized SN; Severance Payments ........ 23
L. Management Incentive Plan ........ 23
M. Effectuating Documents; Further Transactions ........ 23
N. Preservation of Causes of Action ........ 23
O. Exemption from Registration Requirements ........ 24
P. Cancellation of Instruments, Certificates, and Other Documents ........ 24
Q. Section 1146(a) Exemption ........ 25
R. DIP Agent Fees and Expenses ........ 25
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 25**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases ........ 25
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ........ 26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ........ 26
D. Indemnification Obligations ........ 27
E. Insurance Policies ........ 27
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements ........ 28
G. Contracts and Leases After the Petition Date ........ 28
H. Reservation of Rights ........ 28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........ 28**
A. Distributions on Account of Claims Allowed as of the Effective Date ........ 28
B. Rights and Powers of the Disbursing Agent ........ 29
C. Special Rules for Distributions to Holders of Disputed Claims ........ 29

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....29
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....33**
A. Allowance of Claims ....33
B. Claims Administration Responsibilities ....33
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....34
E. Time to File Objections to Claims ....34
F. Disallowance of Claims ....34
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....35**
A. Discharge of Claims and Termination of Interests ....35
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....36
E. Release of Liens ....37
F. Reimbursement or Contribution ....37
G. Recoupment ....37
H. Subordination Rights ....37

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**
A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....38
D. Effect of Non-Occurrence of Conditions to Consummation ....38
E. Substantial Consummation ....38

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**
A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....39**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**
A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....41
D. Payment of Statutory Fees ....41
E. Reservation of Rights ....41
F. Successors and Assigns ....42
G. Service of Documents ....42
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....43
J. Plan Supplement ....43
K. Non-Severability ....43
L. Votes Solicited in Good Faith ....43
M. Closing of Chapter 11 Cases ....43
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544,545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on [●], 2020 [Docket No. [●]].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*Fee Examiner*" means a fee examiner selected by the Reorganized Debtors and appointed by an order of the Bankruptcy Court, which may be in the Confirmation Order, to review each of the Final Fee Applications of the Non-Participating Professionals and to issue the Fee Examiner Report as provided in Article II.B.

63. "*Fee Examiner Report*" means the report and recommendation with respect to the Final Fee Applications of each of the Non-Participating Professionals prepared by the Fee Examiner in accordance with Article II.B.

64. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

65. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

66. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

67. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

68. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

69. "*Gavilan*" means Gavilan Resources, LLC.

70. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

71. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

72. "*Holder*" means an entity holding a Claim or Interest, as applicable.

73. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

75. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

76. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date;

(ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

77. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

78. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

79. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

80. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

81. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

82. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

83. "*Lien-Related Litigation*" means all litigation related to challenges to the scope or validity of the liens of the Prepetition Secured Parties (as defined in the Final DIP Order) or DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims, (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code and (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

84. "*Lien-Related Litigation Creditor Representative*" means a representative selected by the Creditors' Committee.

85. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

86. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

87. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

88. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

89. “*New Stockholders’ Agreement*” means the stockholder or similar agreement, if any, with respect to the New Common Stock.

90. “*Non-Participating Professional*” means any Professional that is not a Participating Professional on or before the Confirmation Date.

91. “*Notice of Assumption*” means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

92. “*Notice of Rejection*” means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

93. “*Other Priority Claim*” means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

94. “*Other Secured Claim*” means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

95. “*Participating Professionals*” means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

96. “*Person*” means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

97. “*Petition Date*” means the date on which the Debtors commenced the Chapter 11 Cases.

98. “*Plan*” means this joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

99. “*Plan Supplement*” means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

100. “*Post-Carve-Out Trigger Notice Reserve*” has the meaning ascribed to it in the Final DIP Order.

101. “*Post-Effective Date Equity Distribution*” means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

102. “*Pre-Carve-Out Trigger Notice Reserve*” has the meaning ascribed to it in the Final DIP Order.

103. “*Priority Tax Claims*” means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

104. “*Pro Rata*” means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that

Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

105. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

107. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

108. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

109. "*Professional Fee Settlement Reserve Amount*" means $22.8 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

110. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

111. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

112. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

113. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

114. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

115. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

116. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

117. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

118. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

119. "*Sanchez Parties*" means A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

120. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

121. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

122. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

123. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

124. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

125. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

126. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

127. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

128. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

129. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

130. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

131. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

132. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

133. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

134. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

135. "*SN*" means Sanchez Energy Corporation.

136. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

137. "*SOG*" means Sanchez Oil & Gas Corporation.

138. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

139. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

140. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

141. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

142. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

143. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

144. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

145. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to

Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. Professional Fee Settlement

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clause (b)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; and (c) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to

the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court. In addition, as part of the Professional Fee Settlement, Final Fee Applications of Participating Professionals shall not be subject to review by the Fee Examiner.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. Final Fee Applications

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

The Fee Examiner shall review the Final Fee Applications of all Non-Participating Professionals only and within 120 days after the Effective Date serve an initial draft of the Fee Examiner Report on all Non-Participating Professionals, providing a copy to the Reorganized Debtors. The Non-Participating Professionals shall have 30 days to provide any comments or additional information to the Fee Examiner in response to such initial draft (the "*Draft Report Review Period*"). The Fee Examiner will issue and File the final Fee Examiner Report within 30 days after the Draft Report Review Period. The Reorganized Debtors and any party in interest shall have the opportunity to object to any Final Fee Application of a Non-Participating Professional within 30 days after the final Fee Examiner Report is Filed, and the Bankruptcy Court shall hear and determine any such objection as soon as reasonably practicable. The Reorganized Debtors shall pay the Professional Fee Claim of a Non-Participating Professional in the amount Allowed by the Bankruptcy Court in a Final Order as soon as reasonably practicable after the entry of such Final Order.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the

earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided* that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of

an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

   a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

   b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

      i. payment in full in Cash;

      ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

      iii. reinstatement of such Other Secured Claim; or

      iv. other treatment rendering such Claim Unimpaired.

   c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

   a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

   b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

      i. Cash in an amount equal to such Allowed Other Priority Claim; or

      ii. such other treatment rendering such Other Priority Claim Unimpaired.

   c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

   a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

   b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

      i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. Class 5 — General Unsecured Claims

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. Class 6 — Intercompany Claims

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant

to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. Class 7 — Intercompany Interests

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. Class 8 — Existing SN Preferred Interests

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. Class 9 — Existing SN Common Interests

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. Class 10 – Section 510(b) Claims

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement prior to the Effective Date. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, if any. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is

intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Effective Date by the Bankruptcy Court. The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Confirmation Date to fully and finally resolve disputes regarding the scope and validity of the DIP Claims and liens securing such claims under paragraphs 9 and 10 of the Final DIP Order. If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary, the relevant parties shall seek a hearing for determination of such additional issues not more than 60 days after the Confirmation Date with, to the extent reasonably practicable, no fact witnesses and stipulated facts regarding the public record and relevant documents, supplemented by expert testimony if desired by the relevant parties. Expert reports shall be exchanged 14 days prior to any hearing. Any litigation claims or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined within 60 days after the Effective Date (or as soon thereafter as the Bankruptcy Court's calendar permits) and in accordance with the provisions of the Plan. The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Lien-Related Litigation, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock

as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required,

each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and

may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue and prosecute all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. Without limiting the foregoing and for purposes of clarification, under no circumstances shall the Lien-Related Litigation Creditor Representative have authority or standing to expand the scope of such Lien Challenge Complaint, expand the timeframe for resolution of such Causes of Action provided in the Plan, seek or obtain access to Debtors' privileged information, or seek change of venue. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all such Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated

in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed

Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of

future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a

change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common

Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable

Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity,

including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims,

regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any**

**further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.**

**The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but

before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, and all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule

of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicated, decide, or resolve any motions, adversary proceedings, contested or litigation matters, and any other matters involving the Lien-Related Litigation, SOG or SNMP;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

Notwithstanding the foregoing, the Bankruptcy Court retains jurisdiction, but not exclusive jurisdiction, to determine whether environmental liabilities asserted by any Governmental Unit are discharged or otherwise barred by the Confirmation Order or the Plan, or the Bankruptcy Code.

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an

admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 6, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

**Exhibit B**

**Corporate Organization Chart**

# Organizational Chart

SANCHEZ ENERGY CORPORATION




1. As of March 8, 2019.
2. GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.

006135

© 2017 Sanchez Energy Corporation

Case 4:23-cv-04587 Document 11-6 Filed on 12/27/23 in TXSD Page 348 of 1882

**<u>Exhibit C</u>**

**Liquidation Analysis**

# Liquidation Analysis

## I. Introduction

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtor liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the Bankruptcy Court would: (1) estimate the cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee (the "Trustee") would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's estate were liquidated; (2) determine the distribution (the "Liquidation Distribution") that each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated by chapter 7; and (3) compare each such Holder's Liquidation Distribution to the distribution under the Plan (the "Plan Distribution") that such Holder would receive if the Plan were confirmed and consummated. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The analysis (the "Liquidation Analysis") is based upon certain assumptions discussed herein and in the Disclosure Statement.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION. ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

## II. Basis of Presentation

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding. Any recoveries on account of non-Debtor affiliates would be recovered, after payment of non-Debtor claims, by the parent Entity according to the corporate structure.

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about April 30, 2020 (the "Conversion Date"). Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' unaudited pro forma, consolidated balance sheets as of December 31, 2019, and those values are assumed to be representative of the Debtors' assets and liabilities as of the Conversion Date. The Liquidation Analysis was prepared on an unconsolidated basis.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee, who would sell the Debtors' assets and distribute the cash proceeds, net of liquidation related costs, to Holders of Claims and Interests in accordance with applicable bankruptcy and non-bankruptcy law.

The Liquidation Analysis assumes that all cash, excluding cash held by SN EF Maverick LLC., would be immediately distributed to the DIP Lenders. The Trustee would then utilize cash generated by the conversion of working capital to fund ongoing operations for the estate wind down period. The recovery

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Plan").

by the DIP Lenders does not account for any potential discount related to a hold back or carve out for potential P&A liability of the reserves. Such discount could be significant.

The Liquidation Analysis assumes the continuation of production for the three months following a conversion to chapter 7 to allow a reasonable amount of time for the sale of producing assets; however, post-Conversion revenue and production related disbursements would be included in the final sale price as post-Effective Date working capital adjustments. The Liquidation Analysis further assumes negative operating cash flows during the initial wind-down period prior to sale of assets as production receivables and joint interest billing ("JIB") receivables would be collected from pre-Conversion produced oil and gas.

The cessation of business in a liquidation is likely to trigger certain Claims that otherwise would not exist absent a liquidation, including potential administrative expense Claims, including for any unpaid amounts under the shared services agreements for such items as severance and any unpaid compensation and bonuses payable to SOG employees who performed services for the Debtors, and Claims for Executory Contract and Unexpired Lease rejection damages. Some of these Claims could be significant.

The Liquidation Analysis assumes recoveries on account of retained Causes of Action, including, but not limited to, claims against the Sanchez Parties, SOG, or SNMP, based upon estimates from counsel of net recoveries to the Estates. For purposes of comparison of the Plan and this Liquidation Analysis, however, any recovery on account of such claims would increase the Plan Distribution (which is based upon entitlements pursuant to section 726 of the Bankruptcy Code) and Liquidation Distribution by equivalent amounts, meaning that, in no event will Holders of Claims or Interests receive more in a Chapter 7 liquidation than in a Plan scenario.

Further, the Liquidation Analysis also assumes that the prepetition secured creditors prevail in the Lien-Related Litigation. Once again, however, because the Lien-Related Litigation is preserved by the Plan and the Plan Distributions are based upon entitlement pursuant to section 726 of the Bankruptcy Code, the outcome of the Lien-Related Litigation would not result in Holders of Claims or Interests receiving more in a Chapter 7 liquidation than in a Plan scenario. Accordingly, the assumption regarding the Lien-Related Litigation should have no impact on the "best interests" test.

The Debtors have assumed that a liquidation would occur over an approximately six-month time period during which the Trustee would sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the Estates. In an actual liquidation, the process and length of wind-down could be materially longer and more expensive than assumed herein and thereby significantly reduce the actual recoveries shown herein.

For example, the potential for Priority, contingent, litigation, rejection, and other Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to Holders of Claims and Interests. Also, in the context of a liquidation, there would likely be a myriad of potential offset claims, particularly with respect to JIB receivables, that would take time to reconcile and resolve. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were in fact to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

Pursuant to Bankruptcy Code section 1129, no junior creditor may receive any distributions until all senior creditors are paid in full, and no equity holder may receive any distribution until all creditors are paid in full. Further, Trustee fees, Professional Fee Claims, Administrative Claims, and Priority Claims, among other such Claims that may arise in a liquidation scenario, would have to be paid in full from the Liquidation Proceeds prior to proceeds being made available to the Holders of Unsecured Claims.

The Liquidation Analysis does not include estimates for the tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material.

## III. Liquidation Process

The Debtors' liquidation would be conducted in Chapter 7 cases with the Trustee managing the Estates to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors in accordance with the priority scheme dictated in Chapter 7. The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, marketed and sold in order to maximize value to the Estates;
- costs related to the liquidation process, such as post-Conversion Date operating disbursements and Estate wind-down costs including professional fees, Trustee fees, and other administrative fees; and
- distribution of net proceeds generated from asset sales to claimants in accordance with the priority scheme dictated in Chapter 7.

## IV. Distribution of Net Proceeds to Claimants

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

- Certain Administrative Expense Claims: Includes fees and expenses of certain professionals retained in the Debtors' Chapter 7 cases, the Trustee's fees, and critical post-Petition Date disbursements required for the maintenance of the Debtors' assets until the sale date;
- Superpriority Secured Claims: Includes outstanding balances owed under the DIP Facility and professional Carve-Out pursuant to the DIP Order;
- Secured Claims: Includes claims relating to the Debtors' prepetition Secured Notes;
- Administrative and Priority Expense Claims: Includes claims for postpetition accounts payable, postpetition accrued expenses, certain accrued / unpaid Professional Fee Claims not covered by the Carve-Out, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code;
- Unsecured Claims: Any non-secured, non-priority debt, including Unsecured Notes, deficiency claims related to Secured Notes, prepetition trade payables, Intercompany Claims, and various other General Unsecured Claims.

## V. Conclusion

As summarized in the below table and subsequent detailed analysis, the Debtors have determined that upon the Effective Date, the Plan will provide all creditors and equity security holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under

Chapter 7 of the Bankruptcy Code, and therefore believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

The Best Interests Test Summary in the below table compares the Plan creditor recoveries against those estimated in the low and high cases of the Liquidation Analysis.

**Best Interests Test Summary**

| | Recovery Estimates | | |
|---|---|---|---|
| | Plan of | Chapter 7 Liquidation | |
| **Claims:** | **Reorganization** | **Low** | **High** |
| Administrative Claims | 100% | 0% | 0% |
| Priority Tax Claims | 100% | 0% | 0% |
| Class 1: Other Secured Claims | 100% | 0% | 0% |
| Class 2: Other Priority Claims | 100% | N/A | N/A |
| Class 3: DIP Claims | 11% to 53% | 21% | 21% |
| Class 4: Secured Notes Claims | 0% to TBD | 0% | 0% |
| Class 5: General Unsecured Claims | 0% to TBD | 0% | 0% |
| Class 6: Intercompany Claims | N/A | 0% | 0% |
| Class 7: Intercompany Interests | N/A | 0% | 0% |
| Class 8: Existing SN Preferred Interests | 0% | 0% | 0% |
| Class 9: Existing SN Common Interests | 0% | 0% | 0% |
| Class 10: Section 510(b) Claims | 0% | 0% | 0% |

## Liquidation Summary

| Asset Recovery Summary | | | | | Potential Recovery | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Balance Sheet | Adjustments | Pro Forma | Recovery Estimate % | | | Recovery Estimate $ | | |
| *$ in Millions* | | As of 12/31/19 | | As of 4/30/20 | Low | Mid | High | Low $ | Mid $ | High $ |
| Cash | [A] | $ 153.4 | $ (111.4) | $ 42.0 | 100% | 100% | 100% | $ 42.0 | $ 42.0 | $ 42.0 |
| AR | [B] | 59.6 | 4.1 | 63.7 | 100% | 100% | 100% | 63.7 | 63.7 | 63.7 |
| O&G Assets | [C] | 828.8 | (696.4) | 132.4 | 36% | 45% | 53% | 48.2 | 59.3 | 70.4 |
| PP&E | [D] | 34.9 | - | 34.9 | 2% | 4% | 6% | 0.6 | 1.4 | 2.1 |
| Other Assets | [E] | 268.1 | (259.1) | 9.0 | 6% | 13% | 19% | 0.6 | 1.2 | 1.7 |
| Investments | [F] | 4.6 | (3.3) | 1.3 | 100% | 100% | 100% | 1.3 | 1.3 | 1.3 |
| Investments in Subsidiaries | [G] | 204.0 | - | 204.0 | - | - | - | - | - | - |
| Intercompany Receivables | [H] | (9.4) | 168.7 | 159.3 | 0% | 0% | 0% | 0.4 | 0.4 | 0.4 |
| **Total Asset Value** | | $ 1,544.1 | $ (897.5) | $ 646.6 | **24%** | **26%** | **28%** | $ 156.9 | $ 169.3 | $ 181.7 |
| *Net Encumbered Proceeds* | | | | | | | | *119.6* | *131.8* | *143.9* |
| *Net Unencumbered Proceeds* | | | | | | | | *37.3* | *37.6* | *37.8* |
| **Total Asset Recovery** | | | | | | | | **$ 156.9** | **$ 169.3** | **$ 181.7** |
| Liquidation Adjustments: | | | | | | | | | | |
| Chapter 7 Trustee | [I] | | | | | | | (3.4) | (3.8) | (4.2) |
| Chapter 7 Professional Fees | [I] | | | | | | | (8.1) | (8.1) | (8.1) |
| Purchase Price Adjustments | [I] | | | | | | | (4.6) | (4.6) | (4.6) |
| Post Conversion Cash Flow | [I] | | | | | | | (137.2) | (137.2) | (137.2) |
| Wind Down Costs | [I] | | | | | | | (14.1) | (14.1) | (14.1) |
| Total Liquidation Adjustments | | | | | | | | (167.4) | (170.3) | (173.2) |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after Liquidation Adjustments** | | | | | | | | **$ -** | **$ -** | **$ -** |
| **Claims Recovery Summary** | | **Claims** | | | **Potential Recovery of Claims** | | | | | |
| | | | | | Recovery Estimate % | | | Recovery Estimate $ | | |
| | | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| Class 3: DIP Claims | [J] | $ 151.4 | $ 151.4 | $ 151.4 | 21% | 21% | 21% | $ 32.1 | $ 32.1 | $ 32.1 |
| *Net Encumbered Proceeds Remaining* | | | | | | | | - | - | - |
| *Net Unencumbered Proceeds Remaining* | | | | | | | | - | - | - |
| **Proceeds Available after DIP Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 4: Secured Notes Claims | [K] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 1: Other Secured Claims | [K] | - | - | - | - | - | - | - | - | - |
| Total Secured Claims | | $ 450.0 | $ 450.0 | $ 450.0 | - | - | - | $ - | $ - | $ - |
| **Proceeds Available after Secured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Administrative Claims | [L] | 5.9 | 5.9 | 5.9 | - | - | - | - | - | - |
| Priority Tax Claims | [L] | - | - | - | - | - | - | - | - | - |
| Class 2: Other Priority Claims | [L] | - | - | - | - | - | - | - | - | - |
| Total Administrative and Priority Claims | | $ 5.9 | $ 5.9 | $ 5.9 | - | - | - | $ - | $ - | $ - |
| **Proceeds Available to Unsecured Claims** | | | | | | | | **$ -** | **$ -** | **$ -** |
| Class 5: General Unsecured Claims | [M] | 1,815.3 | 1,815.3 | 1,815.3 | - | - | - | - | - | - |
| Class 4: Secured Notes Claims (Deficiency) | [M] | 450.0 | 450.0 | 450.0 | - | - | - | - | - | - |
| Class 6: Intercompany Claims | [M] | TBD | TBD | TBD | - | - | - | - | - | - |
| Total Unsecured Claims | | $ 2,265.3 | $ 2,265.3 | $ 2,265.3 | - | - | - | $ - | $ - | $ - |
| **Net Proceeds Remaining** | | | | | | | | **$ -** | **$ -** | **$ -** |

## Specific Notes to the Liquidation Analysis

## Gross Liquidation Proceeds

### A. Cash and Cash Equivalents

- Cash consists of cash held in bank accounts and highly liquid investment securities that have original maturities of three months or less.

- According to the 13 week cash forecast, Sanchez cash balances are estimated as of April 30, 2020 to be:

  - Sanchez Energy Corporation: $6.3mm
  - SN UR Holdings LLC: $27.7mm
  - SN EF Maverick: $29.4mm

- The cash balance will further be increased by $2.0mm related to cash disbursements withheld on account of administrative expenses offset by an additional $4.0mm of Post-Trigger Carve out payments not accounted for in the 13 week cash forecast.

- All projected cash and equivalents are assumed to be 100% recoverable.

### B. Accounts Receivable

- Accounts receivable balances are based on the Debtors' estimated unaudited pro forma accounts receivable as of the Conversion Date.

- Accounts receivable includes amounts due from purchasers of the Debtors' oil and gas production, joint interest billings, and miscellaneous receivables.

- Accounts receivable balances have an estimated recovery of 100%.

### C. Oil & Gas Assets

- Given the daily production and depletion of the oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prudent, prompt, and broad marketing of the assets over a three-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets.

- The liquidation value of the Debtors' Oil & Gas Reserves is based on a present value analysis of the Debtors' reserves, based on a reserves plan which includes all costs associated with maintaining the Debtors' leases. Proved Developed Producing Reserves ("**PDP**") are viewed as having the highest realizable value of the Debtors' reserve categories, followed by Proved Undeveloped Reserves ("**PUD**"), which reflect a higher recovery risk (compared to PDP) and are discounted accordingly. Other reserve categories are discounted at higher discount factors to account for the risk associated with the likelihood of recovery of probable and possible reserves.

- In assessing the reasonableness of the estimates provided by the above-mentioned present value analysis, the results were compared to two supplementary data points. First, the Liquidation Analysis high case is generally in line with recent going-concern transactions for comparable assets in the Eagle Ford. Additionally, valuation factors presented in the latest Society of Petroleum Evaluation Engineers ("**SPEE**") discount rate survey imply that the values obtained in the Liquidation Analysis high case generally correspond to the lower end recovery value if reserve adjusted discount rates ("**RADRs**") from the survey were applied. These SPEE discount rates reflect respondent petroleum engineers' assumptions when evaluating a target acquisition price or value of a going-concern asset.

- Given the nature of a going-concern sale versus a liquidation, it would be expected that each of these going-concern metrics would, on-average, exceed the values that could be obtained in a liquidation scenario. As each of these independently derived data points generally exceeds or overlaps the higher end of the values provided by the Liquidation Analysis, the reasonableness of the Liquidation Analysis outcomes are favorably supported.

- Based on the methodology outlined above, a sale of the Debtors' Oil & Gas Reserves implies a liquidation value in the range of $48.2mm to $70.4mm. This liquidation value provides for a blended recovery in the range of 36% to 53% of the April 30, 2020 pro forma PV-10 of proved reserves.

**D. Other PP&E**

- "Other PP&E" includes the Debtors' facilities, computers, software, and other PP&E.

- For purposes of the Liquidation Analysis, the recovery of "Other PP&E" is estimated to be 2% to 6% of pro forma net book value.

**E. Other Assets**

- "Other Assets" includes prepaid expenses, deposits, and unsold crude inventory. Recoveries are estimated to be 6% to 19% pro forma net book value.

**F. Investments**

- "Investments" consists of investments in publicly traded entities including SNMP and Lonestar Resources. Pro forma values are based on closing share prices as of 3/30/2020. Recoveries are estimated to be 100% pro forma market values.

**G. Investments in Subsidiary**

- "Investment in Subsidiary" includes Sanchez's investment in its Non-Debtor affiliates. No recoveries are expected.

**H. Intercompany Receivables**

- "Intercompany Receivables" includes intercompany balances between debtor and non-debtor entities. No recoveries are expected.

## Liquidation Adjustments

### I. Liquidation Adjustments

- "Liquidation Adjustments" consists of Post-Conversion Receipts and Disbursements, Chapter 7 Trustee Fees, Chapter 7 Professional Fees, and Mineral Payments.
- "Chapter 7 Trustee Fees" includes the maximum compensation as allowed by Section 326 of the Bankruptcy Code, or 25% of the initial $5,000 disbursed, 10% of anything between $5,001 and $50,000, 5% of anything between $50,001 and $1,000,000, and 3% of any amount over $1,000,000.
- "Chapter 7 Professional Fees" include estimates for outside legal counsel, investment banking professionals, and other professionals required and retained by the Trustee during the wind-down period. Legal professionals are assumed to charge on an hourly basis for assistance with asset monetization, Estate wind-down, and administration of the claims reconciliation and related processes. To maximize the value of the Estates, it is assumed that the Trustee would retain an investment banking firm to lead the asset sale process. The investment banking firm is assumed to charge a flat nominal monthly fee and a transaction fee equal to 1% of oil and gas asset sale value.
- "Causes of Action" includes estimated investigation claims value from $0 to $5.0 mm.
- "Purchase Price Adjustments" includes assumed liabilities related to Oil & Gas Assets which would serve as a reduction to sale proceeds as a purchaser of the Oil & Gas Assets. Adjustments are primarily related to revenue in suspense, accrued ad valorem tax, and prepayments from Gavilan and UnSub, and are offset by prepayments to Springfield LLC and line-fill. The Liquidation Analysis estimates Purchase Price Adjustments to be $4.6mm.
- "Post-Conversion Cash Flow" includes cash disbursements from operations from May 1, 2020 through September 30, 2020. The Liquidation Analysis assumes that operations will continue during the sale process and any short-term pre-Conversion liabilities, including accrued capital expenditures, lease operating expenses, gathering expenses, royalty and working interest, and production tax would be satisfied prior to sale of the Oil & Gas Assets. Receipts related to Pre-Conversion activity are accounted for in the recovery of Accounts Receivable. The Liquidation Analysis assumes that the Bankruptcy Court would authorize the Debtors, through a lien or joint interest billing motion and order, to make Post-Conversion Disbursements necessary to maintain the value of their assets.
- "Wind-Down Costs" include the Post-Conversion estate administration expenses and consist primarily of the regularly occurring general and administrative costs (such as facilities' rent, telephone, internet, office supplies, etc.) which will be required to operate the Debtors' businesses for the six-month asset monetization and Estate wind-down period.

## Claims:

### J. Class 3: DIP Claims

- "Class 3: DIP Claims" include principal and accrued interest of $151.4mm on account of the DIP Facility. DIP Claims would be increased by any additional professional fees of the DIP Lenders' advisors, which are not included in this claim amount.

**K. Secured Claims - Class 4: Secured Notes Claims and Class 1: Other Secured Claims**

- "Class 4: Secured Notes Claims" includes $450.0 mm of Secured Notes Claims plus $17.7mm of accrued prepetition interest.

- The Liquidation Analysis assumes that no "Class 1: Other Secured Claims" would exist at Conversion as any Pre-Conversion operating expenses are accounted for in Post-Conversion Cash Flow.

**L. Administrative & Priority Claims - Administrative Claims, Priority Tax Claims, and Class 2: Other Priority Claims**

- "Administrative Claims" consist of unpaid postpetition expenses as of the Conversion Date not included in Post-Conversion Cash Flow and are estimated to be $5.9mm

- The Liquidation Analysis assumes that no additional "Priority Tax Claims" would exist as of the Conversion Date as severance tax and ad-valorem tax are included in purchase price adjustments and Post-Conversion Cash Flow.

- The Liquidation Analysis assumes no additional "Class 2: Other Priority Claims" as of the Conversion Date.

**M. Unsecured Claims - Class 5: Unsecured Claims and Class 6: Intercompany Claims**

- "Class 5: Unsecured Claims" includes the following:
    - $606.4mm of principal and accrued interest on account of 7.75% Senior Notes due 2021
    - $1,189.3mm of principal and accrued interest on account of 6.125% Senior Notes due 2023.
    - $19.6mm of general unsecured claims of the Debtor. General unsecured claims do not include certain rejection claims related to marketing and midstream contracts which could significantly increase the total unsecured claims.

- "Class 6: Intercompany Claims" are to be determined.

# Exhibit D

## Financial Projections

## Financial Projections

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "Financial Projections") for the Reorganized Debtors for the periods ending December 31, 2020 through December 31, 2023 (the "Projection Period"). The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized Debtors, and reflect management's judgment and expectations regarding their future operations and financial position. The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil, natural gas, and natural gas liquids. Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices;

2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;

3. the timing and amount of future production of oil and natural gas;

4. changes in the availability and cost of capital;

5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;

6. proved and unproved drilling locations and future drilling plans; and

7. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

Should one or more of the risks or uncertainties referenced in the Disclosure Statement occur, or should underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Further, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections. The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction or guaranty of Reorganized Sanchez future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("FASB"), particularly for reorganization accounting. The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS. MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE

REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

## I. OVERVIEW

The Debtors are a publicly-traded Houston, Texas-based independent oil and natural gas company engaged in the exploration, development, production, and acquisition of oil and natural gas properties in the United States, more specifically in Texas.

## II. ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

## III. REORGANIZED SANCHEZ ENERGY PRO FORMA BALANCE SHEET FOR THE PERIODS ENDING DECEMBER 31, 2020 THROUGH DECEMBER 31, 2023

The Debtor's opening balance sheet was prepared utilizing the preliminary, unaudited December 31, 2019 balance sheet and projected results of operations and cash flows over the projected period to the assumed emergence date of April 30, 2020. Actual balances may vary from those reflected in the opening balance sheet due to variances in projections and potential changes in cash needed to consummate the Plan. The reorganized pro forma balance sheets for the periods ending December 31, 2020 through December 31, 2023 contain certain pro forma adjustments as a result of consummation of the Plan. The reorganized pro forma balance sheets include the debt and other obligations of Reorganized Sanchez Energy that remain outstanding after the Effective Date that will be paid in the ordinary course of operations. The estimated pro forma adjustments regarding the equity value of Reorganized Sanchez Energy, its assets, or estimates of its liabilities as of the Effective Date will be based upon the fair value of its assets and liabilities as of that date, which could be materially different than the values assumed in the foregoing estimates.[1]

---

[1] The above pro forma balance sheet assumes a mid-point TEV of Reorganized Sanchez of $80 million for purpose of determining the fair value of the assets on the Effective Date.

## IV. METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Debtors' operating divisions. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

## V. ASSUMPTIONS

The Financial Projections include projected financial statements for 2020–2023 assuming that the Effective Date of the Plan is April 30, 2020 (the "Emergence Date"). The Financial Projections include consolidated financial statements for Debtor entities only. Further, the Financial Projections assume specific midstream contract rejections, but no renegotiation of remaining midstream contracts. There is also an assumption of $2.6M for causes of action, which is an estimate provided by Counsel; Actual recoveries may materially differ with an estimated range of $0 - $5M.

## VI. GENERAL ASSUMPTIONS

### A. Exit Financing

The Financial Projections assume no exit financing. The Financial Projections do not estimate any borrowings over the forecast period, however post-emergence financing will be available to fund working capital and general corporate needs, as necessary.

### B. Total Revenue

Total revenue consists of production revenue and other revenue. Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids. The Financial Projections make no assumption for Reorganized Sanchez Energy hedge revenue.

### C. Commodity Pricing

Commodity pricing is based on March 27, 2020 New York Mercantile Exchange ("NYMEX") forward pricing for crude oil, natural gas, and NGL/petrochemicals. Management estimates realized pricing based on forecasted oil and gas differentials for each producing area and includes select gathering, processing, and transportation ("GPT") offsets against sold volumes.

| | Fiscal Year | | | |
|---|---|---|---|---|
| | 2020 [2] | 2021 | 2022 | 2023 |
| **REALIZED PRICING** | | | | |
| Oil ($/Bbl) | $ 27.12 | $ 33.60 | $ 36.45 | $ 38.37 |
| Gas ($/Mcf) | $ 1.93 | $ 2.35 | $ 2.29 | $ 2.31 |
| NGLs ($/Bbl) | $ 6.37 | $ 7.71 | $ 8.63 | $ 8.89 |

**D. Operating Expenses**

Operating expenses consist of lease operating expenses, transportation expenses, processing fees, pre-drilling, workover, and other non-operating expenses.

Lease operating expenses ("LOE") for Reorganized Sanchez Energy reserves are forecasted at the well level and are expected to range from approximately $12.12 to $13.20 per boe over the Projection Period.

**E. Production and Property Taxes**

Production and property taxes includes severance and ad valorem taxes, and are forecasted at the well level based on tax rates applicable in the jurisdiction of production.

**F. Cash General and Administrative Expenses**

Cash general and administrative ("G&A") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory and public company requirements. The Reorganized Debtors' projected G&A expenses are based on the current development and operational plans, and exclude non-cash expenses.

**G. Capital Expenditures**

Capital expenditures include capital expenditures related to developing and optimizing oil & gas properties, capitalized engineering expenses, and expenditures to acquire properties. The Company's capital budget for 2020 is $12 million, of which $11 million is dedicated to drilling and completing wells and $1 million is for workovers, leasing, and other capital projects. Of the $12 million drilling and completion budget, all capital expenditures are for Comanche.

**H. Changes In Working Capital**

Management projects a change in net working capital during the year ending December 31, 2020 of $11.1 million. Annual working capital changes for FY 2021 through 2023 are expected to be a source of cash totaling $4.1 million.

**I. Cash Interest & Fees**

The current plan does not provide for a financing facility upon exit and therefore does not contemplate any post-Effective Date interest.

# REORGANIZED DEBTORS FINANCIAL PROJECTIONS

| | Fiscal Year | | | |
|---|---|---|---|---|
| | 2020 [2] | 2021 | 2022 | 2023 |
| **Total Production** | | | | |
| Oil (MBbl) | 2,366 | 3,017 | 2,820 | 2,725 |
| Gas (MMcf) | 2,674 | 3,378 | 3,056 | 2,826 |
| NGL (MBbl) | 2,939 | 3,730 | 3,417 | 3,191 |
| **Total (Mboe)** | **7,979** | **10,125** | **9,293** | **8,742** |
| *($ in thousands)* | | | | |
| **Revenue** | **$ 113,848** | **$ 177,831** | **$ 174,258** | **$ 172,029** |
| **Operating Expenses** | **(96,735)** | **(128,708)** | **(122,686)** | **(111,330)** |
| **Production & Property Taxes** | **(6,814)** | **(10,685)** | **(10,559)** | **(10,541)** |
| **Cash G&A** | **(14,814)** | **(3,913)** | **(3,204)** | **(2,400)** |
| **EBITDAX** | **$ (4,515)** | **$ 34,524** | **$ 37,808** | **$ 47,758** |
| Capital Expenditures | (11,945) | (40,442) | (49,059) | (46,289) |
| Net Change in Working Capital | 11,118 | 738 | (1,809) | 5,141 |
| **Unlevered Operating Cash Flow** | **$ (5,343)** | **$ (5,179)** | **$ (13,059)** | **$ 6,610** |
| Cash Interest & Fees | - | - | - | - |
| **Levered Cash Flow** | **$ (5,343)** | **$ (5,179)** | **$ (13,059)** | **$ 6,610** |
| **Beginning Cash** | **$ 43,690** | **$ 38,347** | **$ 33,168** | **$ 20,109** |
| **Ending Cash** | **$ 38,347** | **$ 33,168** | **$ 20,109** | **$ 26,719** |

2 For avoidance of doubt, FY2020 estimates based on NewCo stub period from April 30, 2020 (Effective Date) through year-end.

Case 23-34508 Document 1113-6 Filed 04/08/20 Page 1305 of 2182

# Exhibit E

**Valuation Analysis**

**VALUATION ANALYSIS**

The Debtors have been advised by Moelis with respect to the enterprise value of the Reorganized Debtors (the "Enterprise Value") on a going concern basis.

The valuation analysis herein is based on information as of the date of this Disclosure Statement and is based on the Business Plan provided by management (the "Business Plan"). For purposes of this valuation, Moelis has assumed that no material changes that would affect value occur between the date of this Disclosure Statement and May 1, 2020 (the "Assumed Effective Date").

As a result of the analysis described herein, Moelis estimates the Enterprise Value of the Reorganized Debtors to be approximately $65 million to $95 million, with a mid-point of $80 million, as of the Assumed Effective Date. Further, this analysis assumes that the Reorganized Debtors will emerge with no debt on the balance sheet and will have no excess cash after accounting for net working capital obligations as of the Assumed Effective Date. Moelis' mid-point estimate of Enterprise Value of $80 million therefore implies an equity value for the Reorganized Debtors, of approximately $80 million (the "Equity Value"). Other restructuring costs and professional fees were also taken into account when estimating the pro-forma cash balance of the Reorganized Debtors.

Moelis' estimate of a range of Enterprise Values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MAY 1, 2020, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF MARCH 30, 2020. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT MOELIS' CONCLUSIONS, MOELIS DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

MOELIS DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH MOELIS' ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY MOELIS REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION

TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Moelis assumed the Business Plan was reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate, currently-available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the Reorganized Debtors will achieve their projections in all material respects, including revenue, EBITDA margins, and cash flows. If the business performs at levels below or above those set forth in the Business Plan, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, Moelis (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial, reserves and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly-available financial data for, and considered the market value of, public companies that Moelis deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other analyses, inquiries and investigations as it deemed appropriate. Moelis assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly-available information. Moelis does not offer an opinion as to the attainability of the Business Plan, as future results are dependent on various factors, many of which are beyond the control or knowledge of the Reorganized Debtors and Moelis, and thus are difficult to project.

The following is a brief summary of analyses performed by Moelis to arrive at its recommended range of estimated Enterprise Value for the Reorganized Debtors and does not purport to be a complete description of all of the analyses and factors undertaken. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances.

In performing its analysis, Moelis applied the following valuation methodologies as applicable to the operations of the Debtors: (a) a net asset valuation analysis; and (b) a selected publicly-traded companies analysis. In addition, Moelis considered a precedent transactions analysis but because the precedent transactions occurred in different commodity pricing environments and other market conditions, Moelis believed the inclusion of this approach was of limited applicability.

**Net Asset Valuation Analysis**

The value of the Debtors' oil and gas reserves was estimated using a net asset value ("NAV") approach. The Debtors' reserve report associated with its Business Plan calculates the estimated sum of net cash flows directly attributable to the Debtors' oil and gas properties. Future production volumes attributable to the properties are estimated and multiplied by the projected realized price, which incorporates the projected market price less an expected differential between the market price and the price at which the Debtors can sell their production. Projected severance taxes, ad valorem taxes, lease operating expenses, gathering, processing, transportation and marketing expenses, and capital expenditures are then subtracted from revenue to calculate net cash flows. Moelis then risk adjusted the reserve values by reserve category using both reserve adjustment factors and risk adjusted discount rates as detailed by the Society of Petroleum Evaluation Engineers in its 38th annual survey dated June 2019. These values were then adjusted for other non-reserve assets and liabilities, including general and administrative expenses, maintenance capital expenditures, and marketing deficiencies of the Debtors not reflected in the reserve report to determine the net asset value of the Debtors.

**Selected Publicly-Traded Companies Analysis**

A selected publicly-traded companies analysis estimates the value of a company based on a comparison with certain other publicly-traded companies in lines of business and operating characteristics similar in certain respects to the company being valued. Under this methodology, certain financial multiples and ratios that measure financial performance and value are calculated for each selected company and then applied to certain of the Debtors' financial metrics to imply an enterprise value for the Debtors. Moelis used enterprise value as a multiple of each selected company's publicly-available consensus projected 2021 EBITDA adjusted for estimates deemed to be stale based on the recent commodity price downturn. This implies a range of EV/EBITDA multiples that Moelis then applied to the Debtors' Business Plan projections to determine a range of the Debtors' Enterprise Value. Although the selected companies were compared to the Debtors for purposes of this analysis, no entity used in this analysis is identical to the Reorganized Debtors. The selection of public entities for this purpose was based upon characteristics that were deemed relevant based on Moelis' professional judgment. The selection of appropriate companies is a matter of judgment and subject to limitations due to sample size and the availability of meaningful

market-based information. Accordingly, Moelis' comparison of the selected companies to the business of the Reorganized Debtors and analysis of the results of such comparisons was not purely mathematical, but instead necessarily involved complex considerations and judgments concerning differences in financial and operating characteristics, diversity of business operations, diversity of geographic locations, size and other factors that could affect the relative values of the selected companies and the Debtors.

Moelis did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Moelis believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The estimated Enterprise Value and Equity Value do not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Moelis has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time. The estimated Enterprise Value and Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Moelis did not account for the impact of any income tax attributes. The impact of any income tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Moelis' valuation analysis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY MOELIS REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH MOELIS' VALUATION ANALYSIS.

MOELIS IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, OR LEGAL ADVICE.

# Schedule 2

## Solicitation and Voting Procedures

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**SOLICITATION AND VOTING PROCEDURES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order (the "Disclosure Statement Order"): (a) authorizing Sanchez Energy Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit votes on the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**A. The Voting Record Date**

The Court has established April 8, 2020 as the record date for purposes of determining which Holders of Claims in Class 3 (DIP Claims), Class 4 (Secured Notes Claims), and Class 5 (General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

**B. The Voting Deadline**

The Court has established the date of April 27, 2020 at 5:00 p.m., prevailing Central Time as the voting deadline (the "Voting Deadline") for the Plan. The Debtors may extend the Voting Deadline, in their discretion, without further notice or order of the Court. To be counted as votes to accept or reject the Plan, all ballots ("Ballots") must be properly executed, completed, and returned in accordance with the instructions provided on the applicable Ballot, so that they are *actually received*, in any case, no later than the Voting Deadline by Prime Clerk LLC (the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

"Balloting Agent"). Delivery of a Ballot to the Balloting Agent by e-mail or facsimile shall not be valid with the exception of Class 3 DIP Claim Ballots and Master Ballots transmitted by Nominees via e-mail. To have their votes to accept or reject the Plan counted, Beneficial Holders must properly submit their vote to the appropriate broker, bank, other nominee, or their agent (each of the foregoing, a "Nominee"), in sufficient time so that such Nominee can verify, tabulate, and include such Ballots in a master ballot and timely return such master ballot, so that it is actually received no later than the Voting Deadline by the Balloting Agent. In the case of Beneficial Holders[2] of the Secured Notes Claims and the General Unsecured Claims who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by such Nominee.

## C. Form, Content and Manner of Notices

### 1. The Solicitation Package

The Solicitation Packages shall contain the following materials:

a. the Disclosure Statement Order (excluding the exhibits thereto, except as set forth below);

b. the approved Disclosure Statement (annexed as **Schedule 1** to the Disclosure Statement Order) and the exhibits thereto, including the Plan;

c. these Solicitation and Voting Procedures (annexed as **Schedule 2** to the Disclosure Statement Order);

d. the applicable form of Ballot, in substantially the form of Ballots annexed as **Schedule 3A, 3B, 3C, and 3D** to the Disclosure Statement Order;

e. the *Notice of Hearing to Consider (A) the Adequacy of the Debtors' Disclosure Statement, and (B) Confirmation of the Chapter 11 Plan Filed By the Debtors*, in substantially the form annexed as **Schedule 4** to the Disclosure Statement Order (the "Combined Hearing Notice");

f. a pre-addressed, postage pre-paid reply envelope; and

g. any additional documents that the Court has ordered to be made available.

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose Claims or Interests have not been satisfied prior to the Voting Record Date pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees.

2. **Distribution of Solicitation Package**

The Plan, the Disclosure Statement, the Disclosure Statement Order (including exhibits) will be available by visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy. All other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format but would prefer paper format may contact Balloting Agent by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy; (b) writing to Sanchez Energy Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022; (c) emailing sanchezballots@primeclerk.com and requesting paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense); and (d) calling the Debtors' restructuring hotline at the following number:

**US/Canada Toll Free: (855) 631-5345**

**International: (347) 338-6451**

The Debtors shall serve, or cause to be served, electronically and by first-class U.S. mail (a) all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee, and (b) the Disclosure Statement Order (in electronic format) and the Combined Hearing Notice to all parties who have requested service of papers in these cases pursuant to Bankruptcy Rule 2002 as of the Voting Record Date.

The Debtors shall serve, or cause to served, the Solicitation Package (minus the Disclosure Statement, Plan, and Disclosure Statement Order, which will be posted online) to all Holders of Claims in the Voting Class who are entitled to vote, as described in section D below on or before April 13, 2020 (the "Solicitation Deadline").

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any Holder of a Claim who has filed duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claims and with respect to that Class as against that Debtor.

3. **Non-Voting Status Notices**

Certain Holders of Claims or Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code, or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept or reject the Plan under sections 1126(f) and 1126(g) of the Bankruptcy Code, will receive the applicable Notice of Non-Voting Status, substantially in the forms annexed as **Schedule 5A and 5B** to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots).

## 4. Resolution of Disputed Claims for Voting Purposes; Resolution Events

a. Absent a further order of the Court, the Holder of a Claim or Interest in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

b. If a Claim in a Voting Class is subject to an objection (other than a "reduce and allow" objection) that is filed with the Court on or prior to 7 days before the Voting Deadline, the applicable Holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

c. If a Claim in a Voting Class is subject to an objection by the Debtors (other than a "reduce and allow" objection) that is filed with the Court less than 7 days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the Holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d. A "Resolution Event" means the occurrence of one or more of the following events no later than two business days prior to the Voting Deadline:

   i. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

   ii. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

   iii. a stipulation or other agreement is executed between the Holder and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

   iv. the pending objection is voluntarily withdrawn by the objecting party.

e. No later than one business day following the occurrence of a Resolution Event, the Debtors shall cause the Balloting Agent to distribute via electronic mail, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package.

5. **Notices in Respect of Executory Contracts and Unexpired Leases**

Counterparties to Executory Contracts and Unexpired Leases that receive an *Assumption Notice* or a *Rejection Notice*, substantially in the forms attached as **Schedule 6** and **Schedule 7** to the Disclosure Statement Order, respectively, may file an objection to the Debtors' proposed assumption, rejection, and/or cure amount, as applicable. Such objections must be filed with the Court (contemporaneously with a proof of service) and served upon the applicable notice parties (as set forth in the *Assumption Notice* or *Rejection Notice*) by May 20, 2020.

**D. Voting and Tabulation Procedures**

1. **Holders of Claims Entitled to Vote**

Only the following Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a. Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date; and (ii) is not the subject of a pending objection (other than a "reduce and allow" objection) filed with the Court at least 7 days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided,* that a Holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package (minus the Disclosure Statement, Plan, and Disclosure Statement Order, which will be posted online) and be entitled to vote such Claim in the reduced amount contained in such objection pending the occurrence of a Resolution Event as provided herein or further order of the Court;

b. Holders of Claims that are subject to an objection that is filed less than 7 days prior to the Voting Deadline;

c. Holders of Claims and Interests that are listed in the Schedules for which a timely Proof of Claim was not filed; *provided* that if the applicable Bar Date has expired prior to the Voting Record Deadline, a Claim listed on the Schedules as contingent, disputed, or unliquidated shall be disallowed for voting purposes; *provided further* that if the applicable Bar Date has not expired prior to the Voting Record Deadline, a Claim listed on the Schedules as contingent, disputed, or unliquidated shall be allowed to vote only in the amount of $1.00;

d. Holders of Claims and Interests that arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court (other than the Schedules), in each case regardless of whether a Proof of Claim has been filed;

e. Holders of Disputed Claims that have been temporarily allowed to vote on the

Plan pursuant to Bankruptcy Rule 3018; and

f. the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date.

**2. Establishing Claim Amounts for Voting Purposes**

**Class 3 DIP Claims**. The amount of DIP Claims for voting purposes only will be established by reference to the list of record holders maintained by the DIP Agent, dated as of the Voting Record Date, which shall be provided by counsel for the DIP Agent to the Debtors or the Balloting Agent no later than one (1) Business Day following the Voting Record Date.

**Class 4 Secured Notes Claims and Unsecured Notes Claims in Class 5**. The Claims amount of Secured Notes Claims and Unsecured Notes Claims for voting purposes only will be established by reference to (a) the Debtors' applicable books and records and (b) the list of record holders maintained by the applicable agent, indenture trustee, or Nominee as reflected in the securities position report(s) from DTC or other applicable depository firm, dated as of the Voting Record Date, which shall be provided by the applicable agent, indenture trustee, or Nominee to the Debtors or the Balloting Agent no later than one (1) Business Day following the Voting Record Date.

**Class 5 General Unsecured Claims (Other than Unsecured Notes Claims)**. Each Holder (other than the Holders of Unsecured Notes Claims) of a Claim in Class 5 as of the Voting Record Date shall be entitled to vote the amount of its claim in accordance with the procedures set forth below for Filed and Scheduled Claims.

**Filed and Scheduled Claims**. The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim. Moreover, any amounts filled in on Ballots by the Debtors through the Balloting Agent, as applicable, are not binding for purposes of allowance and distribution. In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a. the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court (other than the Schedules);

b. the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event under section C.3(d) of these Solicitation Procedures;

c. the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the

Petition Date; *provided* that any Ballot cast by a Holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Balloting Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim will be Allowed for voting purposes only in the liquidated amount; *provided*, *further*, that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes; provided, further, that any Claim filed in an amount denominated by a currency other than USD will vote at $1.00;

d. the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); provided that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided* that if the applicable Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00;

e. in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

**3. Voting and Ballot Tabulation Procedures**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a. except as otherwise provided in the Solicitation Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors, in their sole discretion, shall be entitled to reject such Ballot as invalid and, therefore, not count it in connection with Confirmation of the Plan;

b. the Debtors will file with the Court by no later than April 29, 2020 at 12:00 p.m. (prevailing Central Time) a voting report (the "Voting Report"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures, or lacking necessary information, received via facsimile, or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report

shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c. the method of delivery of Ballots to be sent to the Balloting Agent is at the election and risk of each Holder. Except as otherwise provided, a Ballot will be deemed delivered only when the Balloting Agent actually receives the properly executed Ballot;

d. an executed Ballot is required to be submitted by the Entity submitting such Ballot. Subject to the other procedures and requirements herein, completed, executed Ballots (except Beneficial Holders' Ballots) may be submitted via the online "E-Balloting" portal maintained by the Balloting Agent;

e. Ballots should not be submitted by facsimile—any Ballots submitted by facsimile will not be valid;

f. Class 3 DIP Claims Ballots and Master Ballots ***may*** be submitted by Nominees via e-mail to sanchezballots@primeclerk.com;

g. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Balloting Agent), or the Debtors' financial or legal advisors, and if so sent will not be counted;

h. if multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot received will be counted and all prior received Ballots will be disregarded;

i. Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot (other than a Master Ballot) that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims held by the same Holder within the same Class, the applicable Debtor may, in its discretion, seek to aggregate the Claims of any particular Holder within a Class for the purpose of counting votes. The Debtors shall identify any such aggregation of multiple Claims in the Voting Report, and any party in interest may contest such aggregation at the Confirmation Hearing including, without limitation, on the basis that the Debtors have not satisfied Bankruptcy Code section 1129(a)(8)(A) for failure to meet the numerosity requirement of Bankruptcy Code section 1126(c).

j. A Holder of a Claim that may be asserted against multiple Debtors must vote all such Claims in the same way (*i.e.*, either all to accept the Plan at each Debtor against whom they have Claims or all to reject the Plan at each Debtor against whom they have Claims and may not vote any such Claim to accept at one Debtor and reject at another Debtor). Accordingly, a Ballot (other than a Master Ballot) that rejects the Plan for a Claim at one Debtor and accepts the Plan for the same Claim at another Debtor will not be counted;

k. a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a Holder of Claims must indicate such capacity when signing;

l. the Debtors, unless subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

m. neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

n. unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

o. in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

p. subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

q. if a Claim has been estimated or a Claim has otherwise been Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

r. if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

s. the following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (i) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (ii) any Ballot cast by an Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the

amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, Ballots submitted through the online "E-Balloting" portal or a Master Ballot sent by a Nominee via electronic mail shall be deemed to include an original signature); (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by an Entity not entitled to vote pursuant to the procedures described herein;

t. after the Voting Deadline, and subject to the requirements of Bankruptcy Rule 3018(a), no Ballot may be withdrawn or modified without the prior written consent of the Debtors and order of the Court;

u. the Debtors are authorized to enter into stipulations with the Holder of any Claim agreeing to the amount of a Claim for voting purposes;

v. where any portion of a single Claim has been transferred to a transferee, all Holders of any portion of such single Claim will be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other voting and solicitation procedures set forth herein), and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that (i) a Ballot, (ii) a group of Ballots within a Voting Class received from a single creditor, or (iii) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted; and

w. for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class may be aggregated and treated as if such creditor held one Claim in such Class, in which case all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided*, *however*, that if separate affiliated entities, including any funds or accounts that are advised or managed by the same entity or by affiliated entities, hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity or managed fund or account will be counted separately as a vote to accept or reject the Plan.

**Master Ballot Voting Procedures**

These rules will apply with respect to the tabulation of master ballots cast by Nominees for Beneficial Holders of certain Claims (the "Master Ballots"):

a. votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees of certain Claims, as applicable, as of the Voting Record Date, as evidenced by the applicable records. Votes submitted by a Nominee will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

b. if conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

c. if over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of certain Claims;

d. for the purposes of tabulating votes, each Beneficial Holder shall be deemed (regardless of whether such Holder includes interest in the amount counted on its Ballot) to have voted only the principal amount of its position in the applicable Secured Notes Claims or Unsecured Notes Claims; and

e. a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.

**E. Amendments to the Plan and Solicitation and Voting Procedures**

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan (including, for the avoidance of doubt, the Plan Supplement), Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

* * *

## Schedule 3A

**DIP Claims Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**CLASS 3 – DIP CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on **April [9], 2020** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

You are receiving this Class 3 DIP Claims ballot (this "Ballot") because you are a Holder of a DIP Claim as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Prime Clerk LLC (the "Balloting Agent"), at no charge by: (i) accessing the Debtors' restructuring website at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 3 DIP Claims under the Plan.

**ITEM 1. CLAIM AMOUNT FOR VOTING PURPOSES.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 3 DIP Claim in the following aggregate unpaid amount:[2]

| |
|---|
| $ _______________________ |

**ITEM 2. VOTE ON PLAN.**

The Holder of the Class 3 DIP Claim set forth in Item 1 votes to (please check one):

| ACCEPT THE PLAN | REJECT THE PLAN |
|---|---|
| ☐ | ☐ |

2 For voting purposes only, subject to tabulation rules.

Any Ballot that is executed by the Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**ITEM 3. CERTIFICATION.**

By signing this Ballot, the undersigned Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Class 3 DIP Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 3 DIP Claim being voted;

b. that the Entity (or in the case of an authorized signatory, the Holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Class 3 DIP Claims; and

d. that no other Ballots with respect to the amount of the Class 3 DIP Claim identified in Item 1 have been cast or, if any other Ballots have been cast with respect to such Class 3 DIP Claim, then any such earlier Ballots are hereby revoked.

| | |
|---|---|
| Name of Claim Holder (Print or Type): | |
| Social Security or Federal Tax I.D. No. (Optional): | |
| Signature: | |
| Name of Signatory: | |
| If Authorized Agent of Claimant, Title of Agent: | |
| Street Address: | |
| City, State, and Zip Code: | |
| Telephone Number: | |
| Email Address: | |
| Date Completed: | |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Ballot shall not constitute or be deemed to be proof of claim or an assertion of a claim.

[*Remainder of Page Intentionally Left Blank, Continued on Next Page*]

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

**<u>If by electronic, online submission</u>:**

**The Balloting Agent will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit http://cases.primeclerk.com/sanchezenergy, click on the "Submit E-Ballot" section of the website, and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:____________________________________________**

**The Balloting Agent's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in <u>Item 1</u> of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the E-Balloting Portal should NOT also submit a paper Ballot.**

**If your Ballot is not received by the Balloting Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

**If by e-mail:**

The Balloting Agent will accept a scan of the completed signed Ballot at sanchezballots@primeclerk.com.

**<u>If by U.S. Postal Service mail, overnight delivery or personal delivery by hand</u>:**

Sanchez Ballot Processing,
c/o Prime Clerk LLC,
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**INSTRUCTIONS FOR COMPLETING THIS BALLOT**

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which also accompany the Ballot.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. In order for your vote to count, you ***must either***: (a) complete and submit this hard copy Ballot, or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/sanchezenergy. **Ballots will not be accepted by facsimile.**

4. **Use of Hard Copy Ballot**. To ensure that your Ballot is counted, you must:

    i. Complete and certify the amount of your Claim in Item 1;

    ii. Cast ONE vote to accept or reject the Plan by checking the proper box in Item 2;

    iii. Review and sign the certifications in Item 4;

    iv. Return your original Ballot in order for your vote to count.

        i. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing, and provide proof of your authorization to so sign. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

        ii. Please either return the original, completed Ballot to Prime Clerk **by U.S. Postal Service mail, overnight delivery or personal delivery by hand** in the pre-addressed, stamped envelope enclosed with this Ballot, or

        iii. Scan and e-mail the signed Ballot to sanchezballots@primeclerk.com.

**Ballots Should Be Returned to Prime Clerk to the Below Address Prior to the Voting Deadline:**

**Sanchez Ballot Processing,**
**c/o Prime Clerk LLC,**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

**OR VIA E-MAIL TO:** sanchezballots@primeclerk.com

5. **Use of Online Ballot Portal**. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/sanchezenergy. You will need to enter your unique E-Ballot identification number indicated above. **Ballots will not be accepted by facsimile**.

6. Your Ballot ***must*** be returned to Prime Clerk so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is April 27, 2020, at 5:00 p.m.**, prevailing Central Time.

7. You must vote all of your Claims within a particular class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a holder has multiple Claims, within the same Class the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

8. If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise. The method of delivery of Ballots to the Balloting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery. **No Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

9. If multiple Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Ballot timely received will supersede and revoke any earlier received Ballot.

10. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Ballot.

11. This Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

12. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

13. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the

identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (e) any unsigned Ballot; and (f) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

14. If you believe you have received the wrong Ballot, you should contact Prime Clerk immediately at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international).

**PLEASE RETURN YOUR BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

Case 4:21-cv-04057 Document 11-3 Filed on 01/13/22 in TXSD Page 199 of 2518

## Schedule 3B

**Form Beneficial Holder Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**BENEFICIAL HOLDER BALLOT FOR ACCEPTING OR REJECTING THE DEBTORS' CHAPTER 11 PLAN**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**THE DEADLINE FOR THE RECEIPT OF BALLOTS AND MASTER BALLOTS IS APRIL 27, 2020, AT 5:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE")**

***IF YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE (AS DEFINED HEREIN)*, PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT PROMPTLY IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE. PLEASE ALLOW SUFFICIENT TIME FOR YOUR BALLOT TO BE RECEIVED BY YOUR NOMINEE AND INCLUDED ON A MASTER BALLOT COMPLETED BY YOUR NOMINEE. THE MASTER BALLOT MUST BE ACTUALLY RECEIVED BY THE BALLOTING AGENT ON OR BEFORE THE VOTING DEADLINE.**

***IF YOUR BENEFICIAL HOLDER BALLOT WAS "PRE-VALIDATED" BY YOUR NOMINEE AND YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO THE BALLOTING AGENT (PRIME CLERK LLC)*, PLEASE COMPLETE THE BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED SO THAT IT IS ACTUALLY RECEIVED BY THE BALLOTING AGENT BY THE VOTING DEADLINE.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on **April 9, 2020** (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this ballot for Beneficial Holders[2] (this "Beneficial Holder Ballot") because you are a Beneficial Holder of a Claim in the Class indicated on **Exhibit A** hereto as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan. You can cast your vote through this Beneficial Holder Ballot and, in accordance with the instructions provided by your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), either: (i) return your completed Beneficial Holder Ballot to your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of the Class of Claims indicated on **Exhibit A** hereto, or (ii) return your completed pre-validated Beneficial Holder Ballot directly to Prime Clerk LLC (the "Balloting Agent").

Your rights are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact your Nominee ***immediately***.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class of Claims indicated on **Exhibit A** hereto, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

---

[2] A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

**ITEM 1.** **CLAIM AMOUNT FOR VOTING PURPOSES.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of a Claim in the Class and CUSIP indicated on **Exhibit A** hereto in the following principal amount (insert amount in box below, unless otherwise completed by your Nominee):

| |
|---|
| $ _______________________ |

**ITEM 2.** **VOTE ON PLAN.**

The Beneficial Holder of the Claim against the Debtors set forth in Item 1 votes to (please check one):

| **ACCEPT THE PLAN** | **REJECT THE PLAN** |
|---|---|
| ☐ | ☐ |

Any Beneficial Holder Ballot that is executed by the Beneficial Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**ITEM 3.** **OTHER BENEFICIAL HOLDER BALLOTS SUBMITTED.**

By returning this Beneficial Holder Ballot, the Beneficial Holder of the Claims identified in Item 1 certifies that (i) this Beneficial Holder Ballot is the only Beneficial Holder Ballot submitted for the Claims identified in Item 1 owned by such Beneficial Holder, except as identified in the following table, and (ii) *all* Beneficial Holder Ballots submitted by the Beneficial Holder indicate the same vote to accept or reject the Plan that the Beneficial Holder has indicated in Item 2 of this Beneficial Holder Ballot (please use additional sheets of paper if necessary):

| Account Number with Nominee of Other Claims Voted | Name of Nominee through which You Held Other Claims Voted | CUSIP Number or Description of Other Claims Voted | Principal Amount of Other Claims Voted |
|---|---|---|---|
| 1. | | | $ |
| 2. | | | $ |
| 3. | | | $ |

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

**ITEM 4.** **CERTIFICATION.**

By signing this Beneficial Holder Ballot, the undersigned Beneficial Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Beneficial Holder of the Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Beneficial Holder of the Claims being voted;

b. that the Entity (or in the case of an authorized signatory, the Beneficial Holder) has accessed the Solicitation Materials and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Claims in a single Class; and

d. that no other Beneficial Holder Ballots with respect to the amount of the Claims identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such Claims, then any such earlier Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Beneficial Holder (Print or Type): | ____________________ |
| Social Security or Federal Tax I.D. No. (Optional): | ____________________ |
| Signature: | ____________________ |
| Name of Signatory: | ____________________ |
| If Authorized Agent of Claimant, Title of Agent: | ____________________ |
| Street Address: | ____________________ |
| City, State, and Zip Code: | ____________________ |
| Telephone Number: | ____________________ |
| Email Address: | ____________________ |
| Date Completed: | ____________________ |

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Beneficial Holder Ballot shall not constitute or be deemed to be a Proof of Claim or an assertion of a Claim.

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

# INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Beneficial Holder Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which are available at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. Unless otherwise instructed by your Nominee, to ensure that your vote is counted, you must submit your Beneficial Holder Ballot to your Nominee so that your Nominee can submit a Master Ballot that reflects your vote so that the Master Ballot is actually received by the Balloting Agent by the Voting Deadline. You may instruct your Nominee to vote on your behalf in the Master Ballot as follows: (a) complete the Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Beneficial Holder Ballot; and (c) sign and return the Beneficial Holder Ballot to your Nominee in accordance with the instructions provided by your Nominee. **The Voting Deadline for the receipt of Master Ballots by the Balloting Agent is April 27, 2020, at 5:00 p.m., prevailing Central Time.** Your completed Beneficial Holder Ballot must be received by your Nominee in sufficient time to permit your Nominee to deliver your votes to the Balloting Agent on or before the Voting Deadline. If it is your Nominee's customary practice to collect your vote through the use of a "voting instruction form", online voting, phone, facsimile, e-mail, or other methods in lieu of (or in addition to) a Beneficial Holder Ballot, you are authorized to follow your Nominee's customary practice as instructed by your Nominee.

4. If your Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Beneficial Holder Ballot to your Nominee. No Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors, and if so sent will not be counted.

5. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting

Agent; (g) any unsigned Ballot; and (h) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

6. You must vote all of your Claims within a particular Class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Beneficial Holder Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

7. If multiple Beneficial Holder Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Beneficial Holder Ballot timely received will supersede and revoke any earlier received Beneficial Holder Ballot.

8. This Beneficial Holder Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

9. **Please be sure to sign and date your Beneficial Holder Ballot**. If you are signing a Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder.

10. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

11. The Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, Holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Beneficial Holder Ballot.

12. If you believe you have received the wrong Beneficial Holder Ballot, you should contact your Nominee immediately.

**<u>PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT PROMPTLY</u>!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BENEFICIAL HOLDER BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT YOUR NOMINEE. IF YOU HAVE ANY QUESTIONS ABOUT THE DEBTORS' CHAPTER 11 CASES OR UPCOMING HEARINGS, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**<u>PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.</u>**

<u>PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.</u>

[Plan Class and CUSIP Indicated on **<u>Exhibit A</u>** hereto]

<u>**Exhibit A**</u>

**Please check one (1) box below to indicate the Plan Class and CUSIP/ISIN to which this Beneficial Holder Ballot pertains (or clearly indicate such information directly on the Beneficial Holder Ballot or on a schedule thereto). If you check more than one (1) box, you risk your vote being invalidated.**

| | | |
|---|---|---|
| **Class 4 (Secured Notes Claims)** | | |
| | 7.25% senior secured notes due February 2023 (144A) | CUSIP 79970YAE5<br>ISIN US79970YAE59 |
| | 7.25% senior secured notes due February 2023 (REG-S) | CUSIP U7967PAE7<br>ISIN USU7967PAE70 |
| **Class 5 (General Unsecured Claims)** | | |
| | 7.75% senior unsecured notes due June 2021 | CUSIP 79970YAB1<br>ISIN US79970YAB11 |
| | 7.75% senior unsecured notes due June 2021 (144A) | CUSIP 79970YAA3<br>ISIN US79970YAA38 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAA5<br>ISIN USU7967PAA58 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAB3<br>ISIN USU7967PAB32 |
| | 6.125% senior unsecured notes due January 2023 | CUSIP 79970YAD7<br>ISIN US79970YAD76 |
| | 6.125% senior unsecured notes due January 2023 (144A) | CUSIP 79970YAC9<br>ISIN US79970YAC93 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAD9<br>ISIN USU7967PAD97 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAC1<br>ISIN USU7967PAC15 |

# Schedule 3C

## Form Master Ballot

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**MASTER BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS MASTER BALLOT.**

**THE MASTER BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on April [9], 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

You are receiving this master ballot (this "Master Ballot") because you are the Nominee (as defined below) for one or more Beneficial Holders[2] of Claims indicated on **Exhibit A** hereto as of **April 8, 2020** (the "Voting Record Date").

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy Holder of a Nominee for certain Beneficial Holders of the Claims indicated on Exhibit A hereto, to transmit to the Balloting Agent (as defined below) the votes of such Beneficial Holders in respect of their Claims to accept or reject the Plan.** This Master Ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

**THE VOTES TRANSMITTED ON THIS MASTER BALLOT FOR BENEFICIAL HOLDERS OF CLAIMS SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form", online voting, phone, facsimile, e-mail, or other methods in lieu of (or in addition to) a Beneficial Holder Ballot.

The Court may confirm the Plan and thereby bind all Holders of Claims and Interests. **To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Balloting Agent *actually receives* it on or before the Voting Deadline.**

**THE VOTING DEADLINE IS ON APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME.**

---

[2] A "Beneficial Holder" means a beneficial owner of publicly traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees (as defined herein) holding through the respective indenture trustee.

**ITEM 1. CERTIFICATION OF AUTHORITY TO VOTE.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

- ☐ is a Nominee for the Beneficial Holders of the aggregate amount of the Claims listed in Item 2 below and is the record Holder of such bonds; or

- ☐ is acting under a power of attorney and/or agency agreement (a copy of which will be provided upon request) granted by a Nominee that is the registered holder of the aggregate amount of the Claims listed in Item 2 below; or

- ☐ has been granted a proxy (an original of which is annexed hereto) from (a) a Nominee or (b) a Beneficial Holder, that is the registered holder of the aggregate amount of the Class Claims listed in Item 2 below;

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Claims described in Item 2 below.

**ITEM 2. CLAIMS VOTE ON PLAN.**

The undersigned transmits the following votes and releases of Beneficial Holders of Claims in the Class and CUSIP indicated on **Exhibit A** hereto and certifies that the following Beneficial Holders of Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table. Please note that each Beneficial Holder must vote all such Beneficial Holder's Claims to accept or reject the Plan and may not split such vote. Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

| **Your Customer Account Number for Each Beneficial Owner of Claims** | **Principal Amount Held as of Voting Record Date** | **Indicated the vote cast on the Beneficial Holder Ballot in Item 2 by checking the appropriate box below** | |
|---|---|---|---|
| | | **Accept the Plan** | **Reject the Plan** |
| **1.** | **$** | | |
| **2.** | **$** | | |
| **3.** | **$** | | |
| **4.** | **$** | | |
| **5.** | **$** | | |
| **6.** | **$** | | |
| **TOTALS:** | **$** | | |

**<u>ITEM 3.</u>** **<u>OTHER BALLOTS SUBMITTED BY BENEFICIAL HOLDERS.</u>**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 3 of the Beneficial Holder Ballot:

| **Your Customer Account Number for Each Beneficial Owner Who Completed Item 3 of the Beneficial Holder Ballot** | **TRANSCRIBE FROM ITEM 3 OF THE BENEFICIAL HOLDER BALLOTS:** | | | |
|---|---|---|---|---|
| | **Your Customer's Account Number with Other Nominee** | **Name of Other Nominee** | **CUSIP Number or Description of Other Claims Voted** | **Principal Amount of Other Class Claims Voted** |
| 1. | | | | $ |
| 2. | | | | $ |

[Plan Class and CUSIP Indicated on **<u>Exhibit A</u>** hereto]

| | | | | |
|---|---|---|---|---|
| 3. | | | | $ |
| 4. | | | | $ |
| 5. | | | | $ |
| 6. | | | | $ |
| 7. | | | | $ |
| 8. | | | | $ |
| 9. | | | | $ |
| 10. | | | | $ |

**ITEM 5. CERTIFICATION.**

By signing this Master Ballot, the undersigned certifies to the Bankruptcy Court and the Debtors:

a. it has reviewed the Solicitation Materials, the Master Ballots, and the Beneficial Holder Ballots and has delivered the same (or otherwise conveyed the pertinent information) to the Beneficial Holders of Claims listed in Item 2 above;

b. it has received a completed and signed Beneficial Holder Ballot (or other appropriate communication conveying a vote) from each Beneficial Holder listed in Item 2 of this Master Ballot;

c. it is the registered Holder of all Claims listed in Item 2 above being voted, or it has been authorized by each Beneficial Holder of Claims listed in Item 2 above to vote on the Plan;

d. no other Master Ballots with respect to the same Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

e. it has properly disclosed: (a) the number of Beneficial Holder of Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Claims owned, as the case may be, by each Beneficial Holder of Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Claims' certification as to other Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Claims; and

f. it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Claims (whether properly completed or defective) for at

least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

[*Remainder of Page Intentionally Left Blank, Continued Below*]

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

Case 19-34508 Document 1113 Filed in TXSB on 04/03/20 Page 249 of 521

| | |
|---|---|
| Name of Holder (Print or Type): | |
| Participant Number: | |
| Name of Proxy Holder or Agent for Nominee (if applicable): | |
| Signature: | |
| Name of Signatory: | |
| Street Address: | |
| City, State, and Zip Code: | |
| Telephone Number: | |
| Email Address: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

**By mail, courier, or personal delivery, to:**

Sanchez Ballot Processing,
c/o Prime Clerk LLC,
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**Via electronic mail service to:** sanchezballots@primeclerk.com

[Plan Class and CUSIP Indicated on **Exhibit A** hereto]

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Master Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, accessible at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind the Holders by the terms of the Plan. Please review the Disclosure Statement for more information.

3. You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds. You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and to collect votes from Beneficial Holders through online voting or by phone, facsimile, or other electronic means. Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Balloting Agent, a Master Ballot that reflects the vote of such Beneficial Holders by April 27, 2020, at 5:00 p.m., prevailing Central Time.

4. If a Nominee is transmitting the votes of any Beneficial Holder of Claims other than itself, the Nominee may either:

   i. "Pre-validate" the individual Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Claim for voting within three (3) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Balloting Agent in the return envelope to be provided in the Solicitation Package. A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their DTC participant number; indicating the account number of the Beneficial Holder and the principal amount of Claims held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder. The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Balloting Agent. A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Effective Date.

   ii. Within three (3) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee. In such case, the Nominee will tabulate the votes of its respective

owners on a Master Ballot that will be provided to the Nominee separately by the Balloting Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Balloting Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Balloting Agent so that the Master Ballot is actually received by the Balloting Agent on or before the Voting Deadline. For the avoidance of doubt, a Nominee is authorized to circulate the information contained in the Solicitation Package and Beneficial Holder Ballot to its Beneficial Holder client(s) in accordance with its customary practices, including the use of a "voting instruction form," phone, facsimile, or other electronic means in lieu of (or in addition to) a Beneficial Holder Ballot, and the Nominee is similarly authorized to collect votes from Beneficial Holders through such "voting information form," online voting or by phone, facsimile, or other electronic means.

5. With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Balloting Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

The Master Ballot must be returned to the Balloting Agent so as to be actually received by the Balloting Agent on or before the Voting Deadline. The Voting Deadline is **April 27, 2020, at 5:00 p.m., prevailing Central Time**.

6. If a Master Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, the following Master Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Master Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Master Ballot cast by an entity that is not entitled to vote on the Plan; (d) any Master Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Master Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Master Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (g) any unsigned Ballot; and (h) any Master Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

7. The method of delivery of Master Ballots to the Balloting Agent is at the election and risk of each Nominee. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery. **No Master Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

8. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the last valid Master Ballot timely received will supersede and revoke any earlier received Master Ballot.

9. This Master Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

10. **Please be sure to sign and date the Master Ballot.** You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Balloting Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

11. If you are both the Nominee and the Beneficial Holder of any of the Claims indicated on **Exhibit A** of the Master Ballot or Beneficial Holder Ballot, as applicable, and you wish to vote such Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Claims and you must vote your entire Claims in the same Class to either to accept or reject the Plan and may not split your vote. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

12. The following additional rules shall apply to Master Ballots:

    i. Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Claims as of the Record Voting Date, as evidenced by the record and depository listings.

    ii. Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Holder Ballots, will not be counted in excess of the record amount of the Claims held by such Nominee;

    iii. To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Balloting Agent will attempt to reconcile discrepancies with the Nominee;

iv. To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Balloting Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Claims; and

v. For purposes of tabulating votes, each Holder holding through a particular account will be deemed to have voted the principal amount relating its holding in that particular account, although the Balloting Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

**Exhibit A**

**Please check one (1) box below to indicate the Plan Class and CUSIP/ISIN to which this Master Ballot pertains (or clearly indicate such information directly on the Master Ballot or on a schedule thereto). If more than one (1) box is checked, you risk the votes cast through this Master Ballot being invalidated.**

| | | |
|---|---|---|
| **Class 4 (Secured Notes Claims)** | | |
| | 7.25% senior secured notes due February 2023 (144A) | CUSIP 79970YAE5<br>ISIN US79970YAE59 |
| | 7.25% senior secured notes due February 2023 (REG-S) | CUSIP U7967PAE7<br>ISIN USU7967PAE70 |
| **Class 5 (General Unsecured Claims)** | | |
| | 7.75% senior unsecured notes due June 2021 | CUSIP 79970YAB1<br>ISIN US79970YAB11 |
| | 7.75% senior unsecured notes due June 2021 (144A) | CUSIP 79970YAA3<br>ISIN US79970YAA38 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAA5<br>ISIN USU7967PAA58 |
| | 7.75% senior unsecured notes due June 2021 (REG-S) | CUSIP U7967PAB3<br>ISIN USU7967PAB32 |
| | 6.125% senior unsecured notes due January 2023 | CUSIP 79970YAD7<br>ISIN US79970YAD76 |
| | 6.125% senior unsecured notes due January 2023 (144A) | CUSIP 79970YAC9<br>ISIN US79970YAC93 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAD9<br>ISIN USU7967PAD97 |
| | 6.125% senior unsecured notes due January 2023 (REG-S) | CUSIP U7967PAC1<br>ISIN USU7967PAC15 |

**Schedule 3D**

**Form General Unsecured Creditor Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**BALLOT FOR ACCEPTING OR REJECTING**
**THE DEBTORS' CHAPTER 11 PLAN**

**CLASS 5 – GENERAL UNSECURED CLAIMS**

**PLEASE READ AND FOLLOW THE ENCLOSED VOTING INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE BALLOTING AGENT BY APRIL 27, 2020, AT 5:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), are soliciting votes with respect to the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has conditionally approved the Disclosure Statement as containing adequate information pursuant to Bankruptcy Code section 1125, by entry of an order on April **[9]**, 2020 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

You are receiving this Class 5—General Unsecured Claims ballot (this "Class 5 GUC Ballot") because you are a Holder of a General Unsecured Claim in Class 5 as of **April 8, 2020** (the "Voting Record Date"). Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which is available along with the Plan, Disclosure Statement Order, and certain other materials (collectively, the "Solicitation Materials") (a) at no charge by: (i) accessing the Debtors' restructuring website maintained by Prime Clerk LLC (the "Balloting Agent") at http://cases.primeclerk.com/sanchezenergy; (ii) writing to Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; (iii) calling (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international); or (iv) emailing sanchezballots@primeclerk.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov/bankruptcy.

This Class 5 GUC Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 GUC Ballot in error, or if you believe that you have received the wrong ballot, please contact the Balloting Agent ***immediately*** at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5 General Unsecured Claims under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**ITEM 1. CLAIM AMOUNT FOR VOTING PURPOSES.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder of a Class 5 General Unsecured Claim in the following aggregate unpaid amount:[2]

| |
|---|
| $ ______________________ |

**ITEM 2. VOTE ON PLAN.**

The Holder of the Class 5 General Unsecured Claim set forth in Item 1 votes to (please check one):

| **ACCEPT THE PLAN** | **REJECT THE PLAN** |
|---|---|
| ☐ | ☐ |

[2] For voting purposes only, subject to tabulation rules.

Any Class 5 GUC Ballot that is executed by the Holder of a Claim but that indicates both an acceptance and a rejection of the Plan or does not indicate either an acceptance or rejection of the Plan will not be counted.

**ITEM 3. CERTIFICATION.**

By signing this Class 5 GUC Ballot, the undersigned Holder certifies to the Bankruptcy Court and the Debtors:

a. that, as of the Voting Record Date, either: (i) the Entity is the Holder of the Class 5 General Unsecured Claim being voted; or (ii) the Entity is an authorized signatory for an Entity that is a Holder of the Class 5 General Unsecured Claim being voted;

b. that the Entity (or in the case of an authorized signatory, the Holder) has accessed the Solicitation Materials and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c. that the Entity has cast the same vote with respect to all Class 5 General Unsecured Claims in a single Class; and

d. that no other Class 5 GUC Ballots with respect to the amount of the Class 5 General Unsecured Claims identified in Item 1 have been cast or, if any other Class 5 GUC Ballots have been cast with respect to such Class 5 General Unsecured Claims, then any such earlier Class 5 GUC Ballots are hereby revoked.

| | |
|---|---|
| Name of Claim Holder (Print or Type): | ________________________________________ |
| Social Security or Federal Tax I.D. No. (Optional): | ________________________________________ |
| Signature: | ________________________________________ |
| Name of Signatory: | ________________________________________ |
| If Authorized Agent of Claimant, Title of Agent: | ________________________________________ |
| Street Address: | ________________________________________ |
| City, State, and Zip Code: | ________________________________________ |
| Telephone Number: | ________________________________________ |
| Email Address: | ________________________________________ |
| Date Completed: | ________________________________________ |

No fees, commissions, or other remuneration will be payable to any broker, dealer, or other person for soliciting votes on the Plan. This Ballot is not a letter of transmittal and may not be used for any purpose other than to cast votes to accept or reject the Plan. Moreover, this Ballot shall not constitute or be deemed to be proof of claim or an assertion of a claim.

[*Remainder of Page Intentionally Left Blank, Continued on Next Page*]

**PLEASE COMPLETE, SIGN, AND DATE THE BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) PROMPTLY BY *ONLY ONE* OF THE FOLLOWING RETURN METHODS:**

| |
|---|
| **If by electronic, online submission:**<br><br>**The Balloting Agent will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit http://cases.primeclerk.com/sanchezenergy, click on the "Submit E-Ballot" section of the website, and follow the instructions to submit your Ballot.**<br><br>**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**<br><br>**Unique E-Ballot ID#:______________________________________**<br><br>**The Balloting Agent's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.**<br><br>**Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable. Creditors who cast a Ballot using the E-Balloting Portal should NOT also submit a paper Ballot.**<br><br>**If your Ballot is not received by the Balloting Agent on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.** |
| **If by U.S. Postal Service mail:**<br><br>Sanchez Ballot Processing,<br>c/o Prime Clerk LLC,<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 |
| **If by overnight delivery or personal delivery by hand:**<br><br>Sanchez Ballot Processing,<br>c/o Prime Clerk LLC,<br>One Grand Central Place<br>60 East 42nd Street, Suite 1440<br>New York, NY 10165 |

**INSTRUCTIONS FOR COMPLETING THIS CLASS 5 GUC BALLOT**

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached to the Disclosure Statement. Capitalized terms used in the Ballot or in these instructions but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order, as applicable, copies of which are accessible at http://cases.primeclerk.com/sanchezenergy.

2. The Court may confirm the Plan and thereby bind you by the terms of the Plan. Please review the Disclosure Statement for more information.

3. In order for your vote to count, you ***must either***: (a) complete and submit this hard copy Ballot or (b) vote through the Debtors' online balloting portal accessible through the Debtors' case website http://cases.primeclerk.com/sanchezenergy. **Ballots will not be accepted by e-mail or facsimile.**

4. **Use of Hard Copy Ballot**. To ensure that your hard copy Ballot is counted, you must:

   i. Complete and certify the amount of your Claim in Item 1;

   ii. Cast ONE vote to accept or reject the Plan by checking the proper box in Item 2;

   iii. Review and sign the certifications in Item 4;

   iv. Return your original Ballot in order for your vote to count;

   v. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing, and provide proof of your authorization to so sign. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot; and

   vi. Return the original, completed Ballot to Prime Clerk in the pre-addressed, stamped envelope enclosed with this Ballot.

**Ballots Should Be Returned to Prime Clerk to the Below Address Prior to the Voting Deadline:**

**Sanchez Ballot Processing,**
**c/o Prime Clerk LLC,**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**

5. **Use of Online Ballot Portal**. To ensure that your electronic Ballot is counted, please follow the instructions of the Debtors' case administration website at http://cases.primeclerk.com/sanchezenergy. You will need to enter your unique E-Ballot identification number indicated above. The online balloting portal is the sole manner in which Ballots will be accepted via electronic or online transmission. **Ballots will not be accepted by facsimile or electronic means (other than the online portal)**.

6. Your Ballot ***must*** be returned to Prime Clerk so as to be ***actually received*** by the Balloting Agent on or before the Voting Deadline. **The Voting Deadline is April 27, 2020, at 5:00 p.m.**, prevailing Central Time.

7. You must vote all of your Claims within a particular Class either to accept or reject the Plan and may **not** split your vote. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes.

8. If a Ballot is received after the Voting Deadline, it will not be counted unless the Debtors determine otherwise. The method of delivery of Ballots to the Balloting Agent is at the election and risk of each Holder of a Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Balloting Agent ***actually receives*** the originally executed Ballot. In all cases, Holders should allow sufficient time to assure timely delivery. **No Ballot should be sent to any of the Debtors, the Debtors' agents (other than Prime Clerk), or the Debtors' financial or legal advisors, and if so sent will not be counted**.

9. If multiple Ballots are received from the same person with respect to the same Claims prior to the Voting Deadline, the last valid Ballot timely received will supersede and revoke any earlier received Ballot.

10. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan. Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor Prime Clerk will accept delivery of any such certificates or instruments surrendered together with a Ballot.

11. This Ballot does not constitute, and shall not be deemed to be: (a) a Proof of Claim; or (b) an assertion or admission of a Claim.

12. If you hold Claims in more than one Class under the Plan or in multiple accounts, you may receive more than one Ballot coded for each different Class or account. Each Ballot votes only your Claims indicated on that Ballot. Please complete and return each Ballot you received.

13. The following Ballots shall not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot that was transmitted by means other than as specifically set forth in the ballots; (c) any Ballot cast by an entity that is not

entitled to vote on the Plan; (d) any Ballot cast for a Claim or Interest listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (e) any Ballot cast for a Claim or Interest that is subject to an objection other than a "reduce and allow" objection pending as of the Voting Deadline (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Balloting Agent), or the Debtors' financial or legal advisors instead of the Balloting Agent; (g) any unsigned Ballot; and (h) any Ballot not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.

14. If you believe you have received the wrong Ballot, you should contact Prime Clerk immediately at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (international).

**PLEASE RETURN YOUR BALLOT PROMPTLY!**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT PRIME CLERK AT (844) 232-0067 (U.S. AND CANADA) OR (917) 942-6393 (INTERNATIONAL).**

**PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.**

PRIME CLERK IS NOT AUTHORIZED TO, AND WILL NOT PROVIDE, LEGAL ADVICE.

# Schedule 4

## Combined Hearing Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE OF HEARING TO CONSIDER (A) THE ADEQUACY OF THE DEBTORS' DISCLOSURE STATEMENT AND (B) CONFIRMATION OF THE DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Sanchez Energy Corporation and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan");[2] (b) conditionally approving the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Disclosure Statement") as, together with the Disclosure Statement Supplement, containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (c) approving the supplemental solicitation materials and documents to be included in the solicitation package; and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider final approval of the Disclosure Statement and Confirmation of the Plan (the "Combined Hearing") will commence on **April 30, 2020 at 9:00 a.m.** prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas 77002.

**Please be advised: The Combined Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court, by agenda filed with the Court, or by a Notice of Adjournment filed with the Court and served on all parties entitled to notice.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

## IMPORTANT INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is **April 8, 2020** (the "Voting Record Date"), which is the date for determining which Holders of Claims in Class 3 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **April 27, 2020, at 5:00 p.m.**, prevailing Central Time (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot and intend to vote on the Plan you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' balloting agent, Prime Clerk LLC (the "Balloting Agent") on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote**.

## CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

| |
|---|
| **ARTICLE VIII** OF THE PLAN CONTAINS EXCULPATION AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER. |

**Plan Objection Deadline.** The deadline for filing objections to the Plan is **April 27, 2020, at 5:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). All objections to the relief sought at the Combined Hearing must: (a) be in writing; (b) conform to the Bankruptcy Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials), please feel free to contact the Debtors' Balloting Agent, by: (a) visiting the Debtors' restructuring website at: https://cases.primeclerk.com/sanchezenergy; (b) writing Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 E. 42nd Street, Suite 1440, New York, NY 10165; (c) emailing sanchezballots@primeclerk.com; and/or (d) calling the Debtors' restructuring hotline at: (844) 232-0067 (toll free) or (917) 942-6393 (international). You may also obtain copies of any pleadings filed in the Chapter 11 Cases for a fee via PACER at: http://www.txs.uscourts.gov. Please be advised that the Balloting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may ***not*** advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement on or before April [22], 2020, and will serve notice on all Holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement; (b) list the information contained in the Plan Supplement; and (c) explain how parties may obtain copies of the Plan Supplement. Notwithstanding the foregoing, the Debtors have the right to amend and supplement the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, in accordance with the terms of the Plan.

**BINDING NATURE OF THE PLAN**

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS OR INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Houston, Texas
Dated: April __, 2020

/s/

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and*
*Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and*
*Debtors in Possession*

## Schedule 5A

**Presumed to Accept Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NON-VOTING STATUS NOTICE WITH RESPECT TO UNIMPAIRED CLASSES PRESUMED TO ACCEPT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. ___] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under § 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"); and (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package may be obtained by (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (International), or (d) emailing sanchezballots@primeclerk.com. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because, pursuant to the terms of Article III of the Plan, and the applicable provisions of the Bankruptcy Code, your Claim(s) against the Debtors are Unimpaired and, therefore, pursuant to Bankruptcy Code § 1126(f), you are conclusively presumed to have accepted the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the Combined Hearing Notice are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the **Combined Hearing will commence on April 30, 2020, at 9:00 a.m., prevailing Central Time**, before Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **April 27, 2020, at 5:00 p.m., prevailing Central Time (the "Plan Objection Deadline")**. Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claim(s), you should contact the Balloting Agent in accordance with the instructions provided above.

## Schedule 5B

**Deemed to Reject Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NON-VOTING STATUS NOTICE WITH RESPECT TO IMPAIRED CLASSES DEEMED TO REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered an order [Docket No. ___] (the "Disclosure Statement Order") that, among other things: (a) conditionally approved the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") as containing adequate information, as required under § 1125(a) of title 11 of the United States Code (the "Bankruptcy Code"); and (b) authorized the Debtors to solicit votes with regard to the acceptance or rejection of the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. ___] (as may be amended or supplemented from time to time and including all exhibits and supplements thereto, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package may be obtained by (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067 (U.S. and Canada) or (917) 942-6393 (International), or (d) emailing sanchezballots@primeclerk.com. You may also obtain copies of any pleadings filed in this chapter 11 case for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because, under the terms of Article III of the Plan, and the applicable provisions of the Bankruptcy Code, your Claim(s) against the Debtors are Impaired and pursuant to Bankruptcy Code § 1126(g), you are deemed to have rejected the Plan and are, therefore, not entitled to vote on the Plan. Accordingly, this notice and the Combined Hearing Notice are being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the **Combined Hearing will commence on April 30, 2020 at 9:00 a.m., prevailing Central Time**, before Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street, Courtroom 404, Houston, Texas, 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan **is April 27, 2020 at 5:00 p.m., prevailing Central Time (the "Plan Objection Deadline")**. Any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (e) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be actually received on or before the Plan Objection Deadline:

(i) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, Attn: Ira S. Dizengoff (idizengoff@akingump.com), Jason Rubin (jrubin@akingump.com), and James Savin (jsavin@akingump.com);

(ii) counsel to the Debtors, Jackson Walker LLP, Attn: Matthew D. Cavenaugh (mcavenaugh@jw.com) and Elizabeth C. Freeman (efreeman@jw.com);

(iii) the Office of the U.S. Trustee for the Southern District of Texas, Attn: Hector Duran (hector.duran.jr@usdoj.gov) and Stephen Statham (stephen.statham@usdoj.gov);

(iv) counsel to the Official Committee of Unsecured Creditors, Milbank LLP, Attn: Evan Fleck (efleck@milbank.com);

(v) counsel to the DIP Agent and Notes Trustee, Arnold & Porter Kaye Scholer LLP, Attn: Jonathan I. Levine (jonathan.levine@arnoldporter.com);

(vi) counsel to the Ad Hoc Group of Secured Noteholders, Morrison Foerster LLP, Attn: Dennis Jenkins (djenkins@mofo.com); and

(vii) counsel to the Ad Hoc Group of Unsecured Noteholders, Quinn Emanuel Urquhart & Sullivan LLP, Attn: Benjamin Finestone (benjaminfinestone@quinnemanuel.com).

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claim(s), you should contact the Balloting Agent in accordance with the instructions provided above.

# Schedule 6

## Assumption Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE TO CONTRACT COUNTERPARTIES OF ASSUMPTION, OR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Forms of Ballot and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. [●] (the "Disclosure Statement Order") that, among other things: (i) conditionally approved the adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) approved the Solicitation and Voting Procedures; (iii) approved the Voting Record Date; (iv) approved the manner and form of the Solicitation Packages and the materials contained therein; (v) approved the Plan Supplement Notice; (vi) approved the Non-Voting Status Notices; (vii) approved the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed pursuant to the Plan; (viii) approved the Voting and Tabulation Procedures; (ix) approved the Combined Hearing Notice; and (x) granted related relief; all as more fully set forth in the Motion.[2]

**PLEASE TAKE FURTHER NOTICE** that the hearing (the "Combined Hearing") to approve the adequacy of the Disclosure Statement and confirm the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Plan") will commence on April 30, 2020, at 9:00 a.m. (prevailing Central Time).

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the Schedule of Assumed Executory Contract and Unexpired Leases [Docket No. [●]] (the "Assumption Schedule") with the Court as part of the Plan Supplement on [●], 2020, as contemplated under the Plan. **The Debtors or Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection.**

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to an Executory Contract or Unexpired Lease that is listed on the Assumption Schedule. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Assumption Schedule.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors are proposing to assume the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto to which you are a party.[3]

**PLEASE TAKE FURTHER NOTICE THAT** Bankruptcy Code section 365(b)(1) requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the assumed Executory Contact(s) and Unexpired Lease(s), which amounts are listed in **Exhibit A**. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** if you object to the proposed assumption or assumption and assignment or disagree with the proposed Cure Claim, you must file an objection with the Bankruptcy Court and serve it **no later than 11:59 p.m. (prevailing Central Time) on May 20, 2020** (the "Cure Objection Deadline"). Any objection must (a) be in writing; (b) conform to the Bankruptcy rules, the Bankruptcy local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Cure Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification that would resolve such objection; and (e) be filed with the Court and served upon the following parties so as to be actually received on or before the Cure Objection Deadline: (i) Jackson Walker LLP, 1401

[3] Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption Schedule, nor anything contained in the Plan, the Plan Supplement, or each Debtors' schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption, that any Debtor(s) or Reorganized Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors or Reorganized Debtors, as applicable, expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, at any time through the Effective Date and (b) dispute Cure Claim asserted in connection with assumption of any Executory Contract or Unexpired Lease.

McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh, Elizabeth C. Freeman; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Lisa Beckerman, Jason Rubin; Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, District of Columbia 20006, Attn: James Savin; and (iii) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019. Attn: Dennis Jenkins, Brett Miller; and (iv) each of the entities listed on the Master Service List (available on the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/).

**PLEASE TAKE FURTHER NOTICE THAT** if no objection to (a) the Cure Claim(s) or (b) the proposed assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which you are a counterparty is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Claim as determined by the Debtor is correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Claim under the proposed assigned Executory Contract or Unexpired Lease, and (iii) you will be forever barred, estopped, and enjoined from objecting to any assumption or assumption and assignment of the Executory Contract or Unexpired Lease to which you are a counterparty.

**PLEASE TAKE FURTHER NOTICE THAT** assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtor assumes such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed, in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases attached to the Plan Supplement; (2) those that have previously been rejected by a Final Order; (3) those that are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** if you are a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive a Solicitation Package in accordance with the Solicitation Procedures. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk LLC ("Prime Clerk"), the balloting agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the

Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if you are not a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive notice of non-voting status. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT FOR DETAILS REGARDING THE POSSIBLE ASSUMPTION, ASSUMPTION AND ASSIGNMENT, AND REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE PLAN'S TREATMENT OF YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE.**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE DEBTORS' BALLOTING AGENT AT THE ABOVE INSTRUCTIONS.**

**Exhibit A**

Schedule of Contracts and Leases and Proposed Cure Cost

| Debtor | Counterparty | Description of Assumed Contracts or Leases | Cure Cost |
|---|---|---|---|
| | | | |

# Schedule 7

## Rejection Notice

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| Debtors. | ) | (Jointly Administered) |

**NOTICE TO CONTRACT COUNTERPARTIES OF**
**REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE THAT** on April [9], 2020, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Forms of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. [●]] (the "Disclosure Statement Order") that, among other things: (i) conditionally approved the adequacy of the Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement"); (ii) approved the Solicitation and Voting Procedures; (iii) approved the Voting Record Date; (iv) approved the manner and form of the Solicitation Packages and the materials contained therein; (v) approved the Plan Supplement Notice; (vi) approved the Non-Voting Status Notices; (vii) approved the form of notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan; (viii) approved the Voting and Tabulation Procedures; (ix) approved the Combined Hearing Notice; and (x) granted related relief; all as more fully set forth in the Motion.[2]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing (the "Combined Hearing") to approve the adequacy of the Disclosure Statement and confirm the *Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. [●]] (the "Plan") will commence on April 30, 2020, at 9:00 a.m. (prevailing Central Time).

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan, Disclosure Statement, or Disclosure Statement Order, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the [Schedule of Rejected Executory Contracts and Unexpired Leases] [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on [April __, 2020], as contemplated under the Plan. **The Debtors or Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases and move it to the Schedule of Assumed Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection.**

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to an Executory Contract or Unexpired Lease that is listed on the Rejection Schedule. Therefore, you are advised to carefully review the information contained in this notice and the related provisions of the Plan, including the Rejection Schedule.

**PLEASE TAKE FURTHER NOTICE THAT** any objection to the Debtors' decision to reject the Executory Contract or Unexpired Lease must (a) be in writing; (b) conform to the Bankruptcy rules, the Bankruptcy local Rules, and any orders of the Court; (c) set forth the name and address of the objector and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or property; (d) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification that would resolve such objection; and (e) be filed with the Court and served upon the following parties so as to be actually received **no later than 11:59 p.m. (prevailing Central Time) on May 20, 2020** (the "Objection Deadline"): (i) Jackson Walker LLP, 1401 McKinney Street, Suite 1900, Houston, Texas 77010, Attn.: Matthew D. Cavenaugh, Elizabeth C. Freeman; (ii) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Lisa Beckerman, Jason Rubin; Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, District of Columbia 20006, Attn: James Savin; (iii) Morrison & Foerster LLP, 250 West 55th Street, New York, New York 10019, and (iv) each of the entities listed on the Master Service List (available on the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/).

**PLEASE TAKE FURTHER NOTICE THAT** if you do not object to the proposed rejection of any Executory Contract or Unexpired Lease to which you are a counterparty by the Objection Deadline, then you will be forever barred, estopped, and enjoined from asserting a future objection with regard to any Executory Contract or Unexpired Lease to which you are a counterparty.

**PLEASE TAKE FURTHER NOTICE THAT** on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed, in accordance with the provisions and requirements of Bankruptcy Code §§ 365 and 1123, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases attached to the Plan Supplement; (2) those that have previously been rejected by a Final Order; (3) those that are the subject of a motion to reject an Executory Contract or Unexpired Lease that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

**PLEASE TAKE FURTHER NOTICE THAT** if the Debtors reject an Executory Contract(s) or Unexpired Lease(s) to which you are a counterparty, you may be entitled to an unsecured claim for which a Proof of Claim must be filed. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within thirty (30) calendar days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the applicable Debtor, its Estate, or property of the foregoing parties without the need for any objection by the Debtor, or further notice to, or action, order, or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article II of the Plan, as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you are a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive a Solicitation Package in accordance with the Solicitation Procedures. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk LLC ("Prime Clerk"), the balloting agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE TAKE FURTHER NOTICE THAT** if you are not a Holder of a Claim in a Voting Class as of the Voting Record Date, you shall receive notice of non-voting status. The Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, the Plan, and any documents and materials included in the Solicitation Package may be obtained by contacting Prime Clerk, the Balloting Agent retained by the Debtors in these chapter 11 cases, by: (a) accessing the Balloting Agent's website at https://cases.primeclerk.com/sanchezenergy/, (b) writing to the Balloting Agent at Sanchez Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, (c) calling the Balloting Agent's toll-free information line with respect to the Debtors at (844) 232-0067. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://ecf.txsb.uscourts.gov/.

**PLEASE REVIEW THE PLAN, THE DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT FOR DETAILS REGARDING THE POSSIBLE REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND THE PLAN'S TREATMENT OF YOUR EXECUTORY CONTRACT OR UNEXPIRED LEASE.**

Case 4:23-cv-03415 Document 11-6 Filed on 09/21/23 in TXSD Page 446 of 1882

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE DEBTORS' BALLOTING AGENT AT THE ABOVE INSTRUCTIONS.**

# EXHIBIT 4

ENTERED
04/30/2020

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34506 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Upon the filing by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") of the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] on April 30, 2020 (the "Plan"),[2] a copy of which is attached as **Exhibit 1**, which Plan amends and replaces the previously filed plans of reorganization at Docket Nos. 1119 and 1149; and this Court previously having conditionally approved the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1124] (the "Disclosure Statement") and the solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan, in each case pursuant to the *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

*Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (VI) Scheduling Certain Dates With Respect Thereto, and (V) Granting Related Relief* [Docket No. 1118], entered on April 9, 2020 (the "Solicitation Procedures Order"); and the Debtors having served the Disclosure Statement, ballots for holders of Claims entitled to vote on the Plan, and all required notices in compliance with the requirements and procedures set forth in the Solicitation Procedures Order, *see Affidavit Re: Mailings for the Period from April 10, 2020 through April 16, 2020* [Docket No. 1142]; and the Debtors having filed the documents comprising the Plan Supplement on April 25, 2020 and April 29, 2020 [Docket Nos. 1148, 1194, 1196, 1197]; and this Court having considered the record in these chapter 11 cases, the creditor support for the Plan evidenced in the *Declaration of Craig Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* (the "Solicitation and Voting Declaration") [Docket No. 1181], filed on April 29, 2020, the compromises and settlements embodied in and contemplated by the Plan, the briefs and arguments regarding Confirmation of the Plan, and the evidence regarding Confirmation of the Plan; and this Court having found that notice and opportunity for any party in interest to object to Confirmation has been adequate and appropriate as to all parties affected by the Plan and the transactions contemplated thereby; and a hearing on Confirmation of the Plan and the adequacy of the Disclosure Statement having commenced on April 30, 2020 (the "Combined Hearing"); and this Court having considered the sworn testimony of the witnesses proffered or called at the Combined Hearing, the exhibits admitted into evidence at the Combined Hearing, the arguments of counsel and other parties-in-interest presented at the Combined Hearing, and the objections filed or asserted with respect to final approval of the Disclosure Statement and/or Confirmation of the

Plan (the "Objections"); and after due deliberation, it is HEREBY FOUND AND ORDERED THAT:

1. The Disclosure Statement contains "adequate information" within the meaning of, and is approved on a final basis pursuant to, section 1125 of the Bankruptcy Code.

2. As described in and evidenced by the Solicitation and Voting Declaration, transmittal and service of the Solicitation Packages (as defined in the Solicitation Procedures Order) (collectively, the "Solicitation") was timely, adequate, appropriate, and sufficient under the circumstances. The Solicitation (a) was conducted in good faith, and (b) complied with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Solicitation Procedures Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation.

3. Each of the Debtors has met the burden of proving each element of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence. The Plan, including (a) all of the modifications to the Plan filed with this Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement (including the final forms thereof to be filed on or before the Effective Date), satisfies all of the requirements of and is confirmed pursuant to section 1129 of the Bankruptcy Code.

4. Pursuant to a settlement between the Debtors, the DIP Lenders, the Creditors' Committee and the Unsecured Noteholder Ad Hoc Group (the "Settling Parties") stated on the record at the Combined Hearing, the Settling Parties stipulate for settlement purposes only that the enterprise value of the Reorganized Debtors on a going concern basis shall be deemed to be $85 million (the "Enterprise Value") for all purposes of confirmation, including section 1129 of the Bankruptcy Code. The Enterprise Value does not include the value of Debtors' Causes of Action,

and the Enterprise Value (excluding the value of such Causes of Action) shall be binding for purposes of the Lien-Related Litigation.

5. Any and all Objections to the final approval of the Disclosure Statement and/or Confirmation of the Plan that have not been withdrawn or resolved prior to or during the Combined Hearing are hereby overruled.

6. The documents contained in the Plan Supplement are an integral part of the Plan. The Debtors and the Reorganized Debtors (in each case, as applicable) are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan, including, but not limited to, (a) the implementation of the Restructuring Transactions; (b) the selection of the directors and officers for the Reorganized Debtors; (c) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board pursuant to Article IV.L of the Plan; (d) the issuance and distribution of the New Common Stock pursuant to Article IV.C of the Plan; (e) the entry into the New Organizational Documents pursuant to Article IV.I of the Plan; (f) the entry into the New Executive Employment Agreements; (g) the retention and employment by the Reorganized Debtors of certain members of the Debtors' current workforce and the payment of severance consistent with Article IV.K of the Plan; (h) the assumption of the D&O Liability Insurance Policies; and (i) the assumption of the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpated Claims.

7. The terms of the Plan, the Plan Supplement, and any exhibits thereto are incorporated herein by reference, and are an integral part of this order (the "Confirmation Order"). The terms of the Plan, the Plan Supplement, any exhibits thereto, and all other relevant and necessary documents to effectuate the Plan shall be effective and binding as of the Effective Date. The failure to specifically include or refer to any particular article, section, or provision of the Plan,

the Plan Supplement, or any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision, it being the intent of this Court that the Plan, the Plan Supplement, and the exhibits thereto be confirmed in their entirety. In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between this Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, this Confirmation Order shall control.

8. Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including (a) any dispute regarding the treatment of any Intercompany Claims and (b) the Professional Fee Settlement. The compromise and settlement of all such Claims, Interests, Causes of Action, and controversies is hereby approved and found to be in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and fair, equitable and reasonable.

9. Except to the extent expressly provided otherwise in this Confirmation Order, pursuant to Bankruptcy Rule 3020(c)(1), the following provisions in the Plan are hereby approved and shall be immediately effective on the Effective Date without further order or action by this

Case 19-34508 Document 1216 Filed in TXSB on 04/30/20 Page 6 of 74

Court, any of the parties to such provisions, or any other Entity: (a) Exculpation (Article VIII.B); (b) Injunction (Article VIII.C); and (c) Release of Liens (Article VIII.E).

10. **Exculpation.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, and without limiting in any way the Exculpation in Article VIII.B of the Plan for the benefit of the Exculpated Parties, this paragraph 10 applies. If in a proceeding against one or more of the Sanchez Parties, but for the exculpation provisions in the Plan or this Confirmation Order, applicable non-bankruptcy law would have entitled one or more of Sanchez Parties to a claim against or a credit on account of the liability of any Exculpated Party, the obligation of any Sanchez Party to satisfy a judgment shall be reduced by the amount of any such credit or claim in the amount that would have existed under applicable non-bankruptcy law.

11. **Injunction.** Except to the extent expressly provided otherwise in this Confirmation Order, to the extent permitted by applicable law, and for the avoidance of doubt, pursuant to the Injunction set forth in Article VIII.C of the Plan, and without limiting any other provision of the Plan, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or (3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in

connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

12. **Lien-Related Litigation.** The Lien-Related Litigation shall be adjudicated following the Effective Date by this Court pursuant to and in accordance with the terms of Article IV.D of the Plan.

13. There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by this Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by this Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of this Court, which order shall designate the allocation of New Common Stock as between

Case 19-34508 Document 1314 Filed in TXSB on 04/30/20 Page 45 of 74

the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

14. **Professional Fee Settlement**. The Professional Fee Settlement, as set forth in Article II.B of the Plan, is approved. Upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and, with such funds and other funds as necessary, the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors, and such funds shall be maintained in trust solely for the Participating Professionals and used to pay the amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, within two (2) business days after such Professional Fee Claims are Allowed by an order of this Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of this Court.

15. If the Effective Date does not occur within 45 days of the Confirmation Date, except to the extent a Participating Professional agrees to a later date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise, and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

16. Notwithstanding anything to the contrary in the Plan, including in Article II.B. thereof, the following settlement among the Committee, the Participating Committee's Professionals (as defined below), the Debtors, and the Secured Ad Hoc Group is hereby approved (the "Committee Professional Fee Settlement"):

(a) The "Participating Committee Professionals" are: Milbank LLP; Locke Lord LLP; Jefferies LLC; and FTI Consulting, Inc.

(b) The Participating Committee Professionals agree to limit the aggregate payments on account of their Professional Fee Claims (including amounts paid on an interim basis to date) to $24,000,000.00 (exclusive of Committee member expenses that are submitted with Participating Committee Professionals' fee statements for convenience). Participating Committee Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims from the Debtors or Reorganized Debtors, either as Administrative Claims or otherwise.

(c) The Participating Committee Professionals consent to the DIP Agent releasing the Carve-out Trigger Notice Reserves to the Reorganized Debtors on the Effective Date, provided that the Reorganized Debtors shall immediately fund the a reserve account (the "Committee Professional Fee Settlement Reserve") in an amount equal to $24,000,000.00 minus any amounts previously paid to the Participating Committee Professionals, solely for the unpaid Professional Fee Claims of the Participating Committee Professionals.

(d) The Committee Professional Fee Settlement Reserve shall be an interest-bearing escrow account (or a segregated account with similar protections as an escrow account, maintained in trust solely for the Participating Committee Professionals with the consent of the Participating Committee Professionals). Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Committee Professional Fee Settlement Reserve; provided that any fees and expenses due up from or in excess of the interest accruing on the funds in the Committee Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors.

(e) The amount of Professional Fee Claims owing to the Participating Committee Professionals, as limited by the Committee Professional Fee Settlement, shall be paid in Cash to such Participating Committee Professionals by the Reorganized Debtors from the Committee Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all

such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Committee Professional Fee Settlement, any remaining amount in the Committee Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(f) No Fee Examiner shall be appointed or shall review the Final Fee Applications of the Participating Committee Professionals. The Professional Fee Claims of any Participating Committee Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Committee Professional Fee Settlement.

(g) The Debtors, Reorganized Debtor, and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Committee Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

(h) If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Committee Professional Fee Settlement shall be withdrawn, (b) the Participating Committee Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Committee Professionals shall be withdrawn, and all rights of all parties are reserved.

17. **Executory Contracts and Unexpired Leases.** Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties and except as expressly otherwise provided in paragraphs 23-25 of this Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease is May 20, 2020 (the "Contract Objection Deadline"), which may be after the Effective Date. Any Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease that is filed prior to the Contract Objection Deadline shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute and

approving the assumption or rejection, as applicable, of such Executory Contract or Unexpired Lease or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty; *provided that* after the Effective Date, the Reorganized Debtors may settle any dispute regarding any Cure Claim without any further notice to any party or any action, order, or approval of this Court.

18. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the *Schedule of Assumed Executory Contracts and Unexpired Leases* and move it to the *Schedule of Rejected Executory Contracts and Unexpired Leases* or remove an Executory Contract or Unexpired Lease from the *Schedule of Rejected Executory Contracts and Unexpired Leases* and move it to the *Schedule of Assumed Executory Contracts and Unexpired Leases*, as applicable, until the later of (a) the Contract Objection Deadline or (b) if an objection is Filed by the Contract Objection Deadline, prior to the date of a decision by this Court with respect to such objection. Any such objection shall be heard at a date determined by this Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim by the Contract Objection Deadline shall be deemed to have assented to such assumption or Cure Claim.

19. A Cure Claim, if any, under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan that is undisputed or, if disputed, either resolved consensually by the Reorganized Debtors and the counterparty to such Executory Contract or Unexpired Lease or by a Final Order shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, (a) by payment in Cash as soon as reasonably practicable following the later of the Effective Date and the order authorizing assumption, or (b) as otherwise agreed by the Reorganized Debtors and the counterparty to such Executory Contract or Unexpired Lease. For the avoidance of doubt, a Cure

Claim shall not include amounts that have been incurred as of the Effective Date but are not yet due and payable. Such amounts shall be paid by the Reorganized Debtors in the ordinary course of business subsequent to the Effective Date.

20. Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of this Court or any other Entity.

21. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with this Court by no later than forty-five (45) calendar days after the date of entry of an order of this Court (including this Confirmation Order) approving such rejection or any other order of this Court establishing the date by which such Proofs of Claim must be Filed. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed as required by the preceding sentence shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of this Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully

satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

22. Notwithstanding anything in the Plan or this Confirmation Order to the contrary, it is the intent of the Debtors to reject any Executory Contract or Unexpired Lease with SOG, SNMP, SN EF UnSub, LP, SN EF UnSub GP, LLC and SN EF UnSub Holdings, LLC that is not expressly assumed. For the avoidance of doubt, that certain Master Service Agreement between Sanchez Energy Corporation and SOG shall be deemed rejected as of the Effective Date. SOG is barred from issuing any new work orders, or taking any other action, on behalf of the Debtors or the Reorganized Debtors, as applicable.

23. **Executory Contract Counterparties**. Notwithstanding any other provision in this Confirmation Order or the Plan to the contrary, nothing in this Confirmation Order or the Plan (and neither the confirmation nor consummation of the Plan) shall eliminate, alter or impair (or otherwise prevent any Counterparty (as defined below) from asserting), any or all of the Counterparties' respective defenses, arguments or appellate rights to the extent relating to (a) any proposed assumption or rejection of any Executory Contract or Unexpired Lease with such Counterparty or real property interests of such Counterparty (including rights, defenses, or arguments that such agreements or interests, as applicable, constitute covenants running with the land not subject to assumption or rejection, do not constitute Executory Contracts or Unexpired Leases under the Bankruptcy Code and the terms of the Plan, or are not otherwise subject to assumption or rejection) and (b) the vesting of any property in the Reorganized Debtors free and clear of any real property interests of such Counterparty, including any covenants that run with the

land (notwithstanding anything herein to the contrary, whether the Bankruptcy Code and the United States Constitution would permit the Plan to discharge any such property interests and transfer such property free and clear of any such property interests is not being determined at this time and shall be adjudicated by the Court at a later date together with any related rejection or assumption disputes, and the rights, defenses and arguments of each party to such disputes are hereby fully preserved); *provided* that each Counterparty shall be required to assert such rights, defenses, or arguments in a written objection filed with this Court on or prior to the Contract Objection Deadline. For purposes of this Confirmation Order, "Counterparty" shall mean each of the following: (i) Occidental Petroleum Corporation, and each of its affiliates that have a contractual relationship with the Debtors, including Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP, (ii) Western Midstream Partners, LP, and each of its affiliates that have a contractual relationship with the Debtors, including Springfield Pipeline, LLC, (iii) GSO ST Holdings LP, and each of its affiliates that have a contractual relationship with the Debtors, (iv) GSO ST Holdings Associates LLC, and each of its affiliates that have a contractual relationship with the Debtors, (v) SNEF UnSub GP, LLC, (vi) SN EF UnSub LP, (vii) SN EF UnSub Holdings, LLC, (viii) Catarina Midstream, LLC, (ix) Carnero G&P LLC and its affiliates, (x) Eagle Ford TX LP, (xi) Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries, (xii) Gavilan Resources, LLC and its affiliates and predecessors in interest, (xiii) Seco Pipeline, LLC, (xiv) Sanchez Midstream Partners LP, and (xv) Sanchez Midstream Partners GP LLC, (xvi) Marathon Oil EF LLC and its affiliates or subsidiaries ("Marathon"), including but not limited to, Marathon's rights as successors-in-interest/assignees of Hilcorp Energy I, L.P. ("Hilcorp") under the Joint Operating Agreement dated December 28, 2009 by and between SEP Holdings II, LLC

and Hilcorp, (xvii) Archrock Partners Operating LLC and Archrock Services LP, (xviii) Plains South Texas Gathering, LLC and Plains Gas Solutions, LLC, (xix) Eagle Ford TX LP, (xx) TPL SouthTex Processing Company LP and TPL SouthTex Transmission Company LP, (xxi) Mitsui E&P Texas LP and Mitsui & Co. Energy Marketing & Services (USA), Inc., and (xxii) B.L. Stanley, Ltd., Worthey Properties, Ltd., Robert Edward Worthey Trust, Teressa Kountz Trust and Tonya Hedleston Trust in Webb County, Texas.

24. Except as agreed upon by the applicable Counterparty and the Reorganized Debtors, notwithstanding any other provision of this Order or the Plan, from the period commencing on the Effective Date through the date of the entry of an order of this Court resolving any and all disputes raised in a timely filed objection by one or more applicable Counterparties with this Court relating to the proposed assumption or rejection of any agreement, (i) such agreement shall continue as in effect immediately prior to the Effective Date, (ii) the terms of such agreement shall continue to apply to the applicable Reorganized Debtor and Counterparty in accordance with otherwise applicable law, without alteration or modification, including without limitation the obligation to pay all amounts due thereunder as and when due, and (iii) the relative obligations of the applicable Reorganized Debtor and Counterparty arising under such agreements during such time shall not be excused, relieved or otherwise impaired by the rejection of such agreements. Upon the Effective Date, the automatic stay shall not apply to limit the respective rights or remedies of the Counterparties or the Reorganized Debtors under such agreements, and nothing in this Order or the Plan shall prevent, alter, or impair any rights of the Reorganized Debtors or the Counterparties from exercising any and all rights afforded under such agreement (including cessation of services under the agreements) in the event of non-performance or breach by the other party or parties during such period, and any disputes arising out of or relating to the

same shall be heard by the Bankruptcy Court or any other court of competent jurisdiction. Notwithstanding anything to the contrary herein or in the Plan, including language in Article V.B. of the Plan, all Claims arising from the rejection of Executory Contracts and Unexpired Leases with the Counterparties shall be Allowed in accordance with applicable law and shall be classified in accordance therewith.

25. For any Executory Contract or Unexpired Lease removed from or added to the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases after the date of this Confirmation Order, the Contract Objection Deadline shall be extended to the date that is twenty-one (21) days after the date of such removal or addition.

26. **Retention of Defenses.** Notwithstanding anything to the contrary in the Plan or this Confirmation Order, nothing in the Plan or this Confirmation Order shall prevent Sanchez Midstream Partners LP, Catarina Midstream, LLC, Sanchez Midstream Partners GP LLC, and Carnero G&P LLC (and its affiliates) from asserting any rights, defenses, and/or counterclaims against the Debtors and/or the Reorganized Debtors in defense of any Causes of Action retained by the Debtors and the Reorganized Debtors under the Plan and pursued by or on behalf of the Debtors and the Reorganized Debtors, including, but not limited to, any retained Causes of Action relating to the *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1032]; *provided*, however, for purposes of clarification, this paragraph reserves such rights, defenses, and/or counterclaims solely to the extent asserted defensively, and nothing in this paragraph permits affirmative recovery from the Debtors or the Reorganized Debtors on account of any such rights, defenses, and/or counterclaims.

27. **Release of Liens.** Notwithstanding the language in Article VIII.E of the Plan, nothing in the Plan or this Confirmation Order shall discharge or release any valid, enforceable, and perfected Liens that constitute Permitted Liens under the DIP Order or similar Liens that arose after the Petition Date in connection with the Debtors' ordinary course operations, which Liens shall be fully preserved to the extent they continue to exist pursuant to applicable non-bankruptcy law until they are fully paid or otherwise satisfied.

28. Notwithstanding anything to the contrary herein or in the Plan, nothing in this Confirmation Order shall alter or impair the rights of any party to seek, in accordance with applicable law, the turnover from the Debtors or Reorganized Debtors of any property that is, as of the date such turnover is sought, (i) property of such party pursuant to applicable law, (ii) in the possession and control of the Debtors or the Reorganized Debtors, and (iii) is not in any respect property of the Estates or of the Reorganized Debtors, as applicable.

29. **RBC.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary (i) on the Effective Date, or as soon as reasonably practicable thereafter the Reorganized Debtors shall pay all reasonable accrued and unpaid expenses of Thompson & Knight LLP, as counsel to Royal Bank of Canada ("RBC"), in RBC's various capacities, in accordance with the Final DIP Order, (ii) any rights or defenses of RBC arising from or relating to the Lien-Related Litigation are preserved and not prejudiced by Confirmation of the Plan, (iii) all rights, claims and obligations in favor of RBC in respect of any First-Out Obligations (as defined in the Collateral Trust Agreement and Final DIP Order), which may include claims for indemnification by RBC pursuant to the Final DIP Order or the First Out Documents (as defined in the Collateral Trust Agreement) to the extent such indemnification claims constitute First Out Obligations, shall not be discharged by the Plan and any liens or security interests for the benefit of RBC, including liens,

security interests, super-priority claims, or other elevated payment priorities granted for the benefit of RBC under the Final DIP Order, if any, in respect of the First Out Obligations shall not be released, shall be deemed enforceable by RBC, and shall be held with the same priority and extent against the Reorganized Debtors as such liens or claims had under the Collateral Trust Agreement or the Final DIP Order, as applicable, (iv) the satisfaction and discharge of the DIP Claims or treatment of any DIP Obligations (as defined in the Final DIP Order) pursuant to the Plan shall not impair or prejudice any rights of RBC pursuant to the Final DIP Order, the Collateral Trust Agreement or this Confirmation Order in respect of any First-Out Obligations, and (v) the Collateral Trust Agreement, the Prepetition Credit Agreement (as defined in the Final DIP Order), and the Final DIP Order each shall survive for purposes of enforcing the terms of this paragraph. For the avoidance of doubt, but without limiting the foregoing, (x) nothing herein shall prejudice the right of the Reorganized Debtors to contest whether any right, claim or obligation in favor of RBC is a valid First Out Obligation entitled to the treatment provided in clause (iii) above.

30. **Ongoing Royalty Audits.** Notwithstanding anything in the Plan (including Article VII.G) and this Confirmation Order to the contrary, claim numbers 357, 366, 390, 402, 403, 406, 409, 412, 417, 428, 432, 442, 506, 525, 526, 528, 529, 534, 535, 536, 538, 539, 540, 542, 544, 549, 550, 551, 556, 558, 564, 565, 566, 567, 568, 582 and 583 in the estate of SN EF Maverick, LLC (19-34516), which are the subject of ongoing data exchange between the Debtor SN EF Maverick, LLC and the claimants, may be amended within forty-five (45) days from the conclusion of the ongoing royalty review and audit, solely to reflect any results or conclusions related to that review and audit.

31. Notwithstanding anything in the Plan (including Article VII.G) and this Confirmation Order to the contrary, claim number 231 in the estate of Sanchez Energy Corporation

(19-34508), which is the subject of ongoing data exchange between the Debtors and the claimants, may be amended within forty-five (45) days from the conclusion of the ongoing review and audit, solely to reflect any results or conclusions related to that review and audit.

32. **Dimension Litigation.** For the avoidance of doubt and notwithstanding anything to the contrary in the Plan or this Confirmation Order, in the remanded state court action in the 165th Judicial District, Harris County, Texas, assigned cause number 2017-85247, styled Dimension Energy Services, LLC v. Sanchez Oil & Gas Corporation, Sanchez Energy Corporation and Sanchez Midstream Partners, LP (the "Dimension State Court Action"), none of the parties to said Dimension State Court Action are required to seek approval of any settlement or compromise of any causes of action asserted by Dimension Energy Services, LLC. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, this Court shall not retain jurisdiction over the causes of action asserted by and between the parties in the remanded Dimension State Court Action, and jurisdiction for the claims at issue in the Dimension State Court Action shall rest with the Harris County, Texas 165th Judicial District Court, or other court of competent jurisdiction.

33. **Texas Attorney General; Federal Leases.** Nothing in this Confirmation Order or the Plan discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any police or regulatory liability to a Governmental Unit that any entity would be subject to as the owner or operator of property after Confirmation; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors or the Reorganized Debtors. Nor shall anything in this Confirmation Order or the Plan enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

Case 20-33948 Document 1231-6 Filed in TXSB on 04/13/20 Page 40 of 74

Notwithstanding any provision of the Plan or this Confirmation Order, the United States' setoff rights under federal law as recognized in section 553 of the Bankruptcy Code, and recoupment rights, shall be preserved and are unaffected. Nothing in this Confirmation Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Confirmation Order or the Plan or to adjudicate any defense asserted under this Confirmation Order or the Plan. Nor shall anything in the Plan (1) affect the rights of the United States (including any agencies or subagencies thereof) to assert setoff and recoupment and such rights are expressly preserved; (2) be construed as a compromise or settlement of any claim, interest or cause of action of the United States; or (3) affect the entitlement of the United States to the payment of interest on its Allowed Claims.

34. **Federal Leases.** Moreover, nothing in the Plan shall affect the treatment of any interest in contracts, leases, covenants, operating rights agreements, rights-of-use and easement, and rights-of-way or other interests or agreements with the federal government or involving federal land or minerals (collectively, the "Federal Lease(s)"). For the avoidance of doubt and without limiting the foregoing, any assumption, assignment, and/or transfer of any interests in the Federal Leases will be ineffective absent the consent of the United States. Nothing in the Plan shall be interpreted to set cure amounts or require the United States to novate, approve or consent to the assumption, sale, assignment and/or transfer of any interests in the Federal Leases except pursuant to existing regulatory requirements and applicable law.

35. Moreover, nothing in the Plan shall be interpreted to release the Debtors from any reclamation, plugging and abandonment, or other operational requirement under applicable Federal law; to address or otherwise affect any decommissioning obligations and financial assurance requirements under the Federal Leases, as determined by the United States, that must be

met by the Debtors or their successors and assigns on the Federal Leases going forward; or to impair audit rights. In addition, nothing in the Plan nullifies the United States' right to assert, against the Debtors and their estates, any decommissioning liability and/or claim arising from the Debtors' interest in any Federal Lease not assumed by the Debtors. Notwithstanding any provision to the contrary in the Plan, the United States will retain and have the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtors and/or their successor(s) and assign(s) in full any additional monies owed by the Debtors prior to the assumption and/or assignment of the Federal Leases without those rights being adversely affected by these bankruptcy cases; and such rights shall be preserved in full as if this bankruptcy had not occurred. The Debtors and their successors and assigns will retain all defenses and/or rights, other than defenses and/or rights arising from these bankruptcy cases, to challenge any such determination: *provided*, *however*, that any such challenge, including any challenge associated with these bankruptcy cases, must be raised in the United States' administrative review process leading to a final agency determination by the Department of the Interior. The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996, 30 U.S.C. § 1702, et seq. Nothing in the Plan or this Confirmation Order shall cause or otherwise be deemed to require any Holders of Claims receiving New Common Stock to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operations or management of the Debtors within the meaning of 42 U.S.C. § 9601(20)(F).

36. **Texas Taxing Authorities.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, any and all tax liens securing the property tax claims of Dimmit County, Maverick County, La Pryor Independent School District, Atascosa County, Bee

County, Cameron County LaSalle County, Cotulla ISD, Dewitt County, Dilley ISD, Duval County, Eagle Pass ISD, Freer ISD, Frio Hospital District, Goliad County, Goliad ISD Gonzales County, Harris County, Hidalgo County, Jackson County, Jim Wells CAD, Kenedy County, Lasara ISD, Matagorda County, Pearsall ISD, City of Pleasanton, Raymondville ISD, Roma ISD, Smith County, Jim Wells CAD, Starr County, Willacy County and Zavala County (the "Texas Taxing Authorities") for the 2020 tax year are retained. The Reorganized Debtors shall pay the 2020 tax claims of the Texas Taxing Authorities in the ordinary course of business and prior to delinquency under Texas law. In the event the 2020 taxes are not paid prior to delinquency as required under Texas law, penalties and interest shall accrue as provided under Texas law and the Texas Taxing Authorities are authorized to immediately commence any and all collection actions authorized under Texas law, in state court without further order of this Court. The Debtors or the Reorganized Debtors, as applicable, shall maintain any of their rights under Texas law to contest, protest, or appeal the 2020 tax claims of the Texas Taxing Authorities.

37. **Zavala CAD.** Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the Reorganized Debtors shall pay the pre-petition tax claim of Zavala CAD in a manner consistent with 11 U.S.C. §1129(a)(9)(D) with applicable statutory interest pursuant to 11 U.S.C. §§506(b) and 511. The pre-petition tax lien shall be retained until said taxes are paid in full. In the event the Zavala CAD pre-petition claim is not paid consistent with this provision, penalties and interest shall accrue as provided under Texas law and Zavala CAD is authorized to immediately commence any and all collection actions authorized under Texas law in state court without further order of this Court. The Debtors or the Reorganized Debtors, as applicable, shall maintain any of their rights under Texas law to contest, protest, or appeal the tax claims of Zavala CAD.

38. **Harrison and Cathexis.** Nothing in the Plan or this Confirmation Order, including, without limitation, the provisions within Articles V and VIII of the Plan, shall reduce, expand, amend, or supplement the rights, obligations, claims, and defenses, of (i) DJH Minerals, LP, DJH Ranching, LP, Cathexis Royalties & Minerals, LP, and Cat HIL Piloncillo, LLC, or any of the foregoing's successors or assignees (collectively, the "Catarina Lessors") or (ii) the Debtors, the Reorganized Debtors, or their successors or assignees under the Catarina Agreements (as defined below); *provided further* that to the extent, as of the Petition Date, a Catarina Lessor held a validly perfected and unavoidable lien, encumbrance or interest arising under a Catarina Agreement—including reversionary interests—such lien, encumbrance or interest shall not be modified or otherwise altered by anything in the Plan or Confirmation Order. Any Cure Claims under the Catarina Agreements shall be resolved in accordance with the Plan; *provided, however*, that nothing in this Confirmation Order or the Plan shall be construed as making a determination that any Catarina Agreement is or is not an Executory Contract, and all parties expressly reserve their rights with respect to such determination. For purposes of this paragraph, the term "Catarina Agreements" means each of the following agreements, in each case, as amended, supplemented and in effect on the date hereof: (i) the Oil and Gas Lease, dated as of May 12, 2010 (as amended), by and between DJH Minerals, LP, DJH Ranching, LP, Cathexis Royalties & Minerals, LP, Cat HIL Piloncillo, LLC, and SN Catarina, LLC (the "Lease"); (ii) that certain First Amended and Restated Water Injection Agreement, dated as of December 1, 2015, by and between DJH Ranching, LP, Cat HIL Piloncillo, LLC, and SN Catarina, LLC; (iii) those certain Voluntary Pooling Agreements related to the Lease; (iv) that certain Guaranty, dated as of June 30, 2014, with Sanchez Energy Corporation; (v) that certain Guaranty, dated as of June 30, 2014, with SN Operating, LLC; (vi) that Mineral Deed, dated as of May 12, 2010, with P Ranch Working Interest,

LLC; and (vii) that certain Conveyance of Non-Participating Royalty Interest, dated as of May 12, 2010, with P Ranch Royalty Interest, LLC.

39. **Amendment of New Organizational Documents.** At the Effective Date, the Reorganized Debtors and the Reorganized SN Board are authorized and directed to amend, restate, and file with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation or formation the Reorganized Debtors' respective New Organizational Documents and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation, the New Organizational Documents, and the organizational documents of the non-Debtor subsidiaries, as applicable.

40. **Abandonment.** All of the rights of the Debtors or the Reorganized Debtors, as applicable, to abandon property prior to or after the Effective Date pursuant to section 554 of the Bankruptcy Code are preserved, and the Debtors or the Reorganized Debtors, as applicable, may seek to abandon any such property on or after the Effective Date.

41. Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Confirmation Order shall be immediately effective and enforceable upon its entry.

42. The Debtors and the Reorganized Debtors are authorized to take all actions necessary to effectuate the relief granted in this Confirmation Order in accordance with the Plan.

43. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Confirmation Order.

Signed: April 30, 2020



Marvin Isgur
United States Bankruptcy Judge

Case 19-34054 Document 1213 Filed in TXSB on 04/15/20 Page 46 of 74

# Exhibit 1

**Plan**

Case 19-34508 Document 1265 Filed on 04/30/20 in TXSB Page 1 of 48

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Elizabeth Freeman (TX Bar No. 24009222)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

*Counsel for the Debtors and Debtors in Possession*

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Marty L. Brimmage, Jr. (TX Bar No. 00793386)
Lacy M. Lawrence (TX Bar No. 24055913)
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

- and -

Ira S. Dizengoff (*pro hac vice*)
Lisa Beckerman (*pro hac vice*)
Jason P. Rubin (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

- and -

James Savin (*pro hac vice*)
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

*Counsel for the Debtors and Debtors in Possession*

Dated: April 30, 2020

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES .....1**
A. Defined Terms .....1
B. Rules of Interpretation .....11
C. Computation of Time .....12
D. Governing Law .....12
E. Reference to Monetary Figures .....12
F. Reference to the Debtors or the Reorganized Debtors .....12
G. Controlling Document .....12
**ARTICLE II. ADMINISTRATIVE AND PRIORITY CLAIMS .....12**
A. Administrative Claims .....12
B. Professional Fee Claims .....13
C. Priority Tax Claims .....14
D. Statutory Fees .....14
**ARTICLE III. CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS .....14**
A. Formation of Debtor Group for Convenience Purposes Only .....14
B. Classification of Claims and Interests .....15
C. Treatment of Classes of Claims and Interests .....15
D. Special Provision Governing Unimpaired Claims .....18
E. Elimination of Vacant Classes .....18
F. Voting Classes; Presumed Acceptance by Non-Voting Classes .....18
G. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .....19
H. Intercompany Interests .....19
I. Subordinated Claims and Interests .....19
**ARTICLE IV. PROVISIONS FOR IMPLEMENTATION OF THE PLAN .....19**
A. General Settlement of Claims, Interests, and Causes of Action .....19
B. Restructuring Transactions .....19
C. Sources of Consideration for Plan of Reorganization Distributions .....20
D. Lien-Related Litigation .....21
E. Continuation of Gavilan Proceeding .....22
F. Corporate Existence .....22
G. Vesting of Assets in the Reorganized Debtors .....22
H. Corporate Action .....23
I. New Organizational Documents .....23
J. Directors and Officers of Reorganized SN .....23
K. Retention of Current Workforce by Reorganized SN; Severance Payments .....23
L. Management Incentive Plan .....24
M. Effectuating Documents; Further Transactions .....24
N. Preservation of Causes of Action .....24
O. Exemption from Registration Requirements .....24
P. Cancellation of Instruments, Certificates, and Other Documents .....25
Q. Section 1146(a) Exemption .....25
R. DIP Agent Fees and Expenses .....26
**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....26**
A. Assumption or Rejection of Executory Contracts and Unexpired Leases .....26
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases .....26
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .....27
D. Indemnification Obligations .....28
E. Insurance Policies .....28
F. Modifications, Amendments, Supplements, Restatements, or Other Agreements .....28
G. Contracts and Leases After the Petition Date .....28
H. Reservation of Rights .....28
**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .....29**
A. Distributions on Account of Claims Allowed as of the Effective Date .....29
B. Rights and Powers of the Disbursing Agent .....29
C. Special Rules for Distributions to Holders of Disputed Claims .....29

**TABLE OF CONTENTS (CONT'D)**

**Page**


D. Delivery of Distributions ....30
E. Claims Paid or Payable by Third Parties ....32
F. Setoffs ....33
G. Allocation Between Principal and Accrued Interest ....33
H. No Postpetition Interest on Claims ....33

**ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ....34**

A. Allowance of Claims ....34
B. Claims Administration Responsibilities ....34
C. Estimation of Claims ....34
D. Adjustment to Claims Without Objection ....35
E. Time to File Objections to Claims ....35
F. Disallowance of Claims ....35
G. Amendments to Claims ....35
H. No Distributions Pending Allowance ....35
I. Distributions After Allowance ....35

**ARTICLE VIII. EFFECT OF CONFIRMATION OF THE PLAN ....36**

A. Discharge of Claims and Termination of Interests ....36
B. Exculpation ....36
C. Injunction ....36
D. Protection Against Discriminatory Treatment ....37
E. Release of Liens ....37
F. Reimbursement or Contribution ....38
G. Recoupment ....38
H. Subordination Rights ....38

**ARTICLE IX. DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....38**

A. Deadline for Occurrence of the Effective Date ....38
B. Conditions Precedent to the Effective Date of the Plan ....38
C. Waiver of Conditions ....39
D. Effect of Non-Occurrence of Conditions to Consummation ....39
E. Substantial Consummation ....39

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ....39**

A. Modification of Plan ....39
B. Effect of Confirmation on Modifications ....39
C. Revocation or Withdrawal of Plan ....39

**ARTICLE XI. RETENTION OF JURISDICTION ....40**

**ARTICLE XII. MISCELLANEOUS PROVISIONS ....41**

A. Immediate Binding Effect ....41
B. Additional Documents ....41
C. Dissolution of the Creditors' Committee ....42
D. Payment of Statutory Fees ....42
E. Reservation of Rights ....42
F. Successors and Assigns ....42
G. Service of Documents ....43
H. Term of Injunctions or Stays ....43
I. Entire Agreement ....44
J. Plan Supplement ....44
K. Non-Severability ....44
L. Votes Solicited in Good Faith ....44
M. Closing of Chapter 11 Cases ....44
N. Waiver or Estoppel ....44

## INTRODUCTION

Sanchez Energy Corporation and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases propose this amended joint chapter 11 plan of reorganization pursuant to chapter 11 of title 11 of the United States Code. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof. Although proposed jointly for administrative purposes, the Plan constitutes a separate plan for each of the foregoing entities and each of the foregoing entities is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the accompanying *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* for a discussion of the Debtors' history, business, properties and operations, valuation, projections, risk factors, a summary and analysis of the Plan and the transactions contemplated thereby, and certain related matters.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

A. Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

1. "*2020 Non-Executive Bonus Program*" means the employee bonus program for 2020.

2. "*2021 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 13, 2013, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 7.75% senior notes due June 15, 2021.

3. "*2023 Unsecured Notes Indenture*" means that certain Indenture, dated as of June 27, 2014, among SN, the guarantors party thereto and Delaware Trust Company, as successor trustee, for 6.125% senior notes due January 15, 2023.

4. "*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 503(b) and entitled to priority under sections 507(a)(2) or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) any Allowed Claim of Royal Bank of Canada as predecessor collateral trustee under the Collateral Trust Agreement in the amount of any reasonable documented fees and expenses for services rendered in connection with outstanding First-Out Obligations (as defined in the Final DIP Order) and solely to the extent provided for in the Collateral Trust Agreement; and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

5. "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (i) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be 60 days after the Effective Date.

6. "*Affiliate*" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

7. "*Allowed*" means with respect to any Claim or Interest: (a) a Claim or Interest as to which no objection has been filed within the applicable time period fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Bar Date, or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; or (c) a Claim or Interest that is Allowed (i) pursuant to the Plan or Final Order, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

8. "*Authorized Plan Distribution Shares*" means the shares of New Common Stock available for distribution under the Plan on account of Claims, which shares shall be authorized on the Effective Date and issued in accordance with the Plan.

9. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under chapter 5 of the Bankruptcy Code or related applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

10. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § § 101-1532, as amended from time to time as applicable to these Chapter 11 Cases.

11. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

12. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code, and the general, local, and chambers rules of the Bankruptcy Court as applicable to these Chapter 11 Cases.

13. "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be filed pursuant to the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests; and (IV) Approving Notice of Bar Dates* [Docket No. 617] (the "Bar Date Order"), which is January 10, 2020 at 5:00 p.m., prevailing Central Time for all Holders of Claims except for (i) governmental units, for which the Bar Date is February 7, 2020 at 5:00 p.m., prevailing Central Time and (ii) certain other exceptions as set forth in the Bar Date Order.

14. "*Carve-Out Trigger Notice Reserves*" means the Pre-Carve-Out Trigger Notice Reserve and the Post-Carve-Out Trigger Notice Reserve.

15. "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16. "*Causes of Action*" means any Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims

pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

17. "*Certificate*" means any instrument evidencing a Claim or an Interest.

18. "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to more than one Debtor, the procedurally consolidated and jointly administered chapter 11 cases pending for all such Debtors in the Bankruptcy Court.

19. "*Claim*" has the meaning set forth in section 101(5) of the Bankruptcy Code.

20. "*Claims, Noticing and Solicitation Agent*" means Prime Clerk, LLC, the claims, noticing and solicitation agent retained by the Debtors in the Chapter 11 Cases.

21. "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

22. "*Claims Register*" means the official register of Claims maintained by the Claims, Noticing and Solicitation Agent or the Bankruptcy Court.

23. "*Class*" means a category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

24. "*Collateral Trust Agreement*" means the Collateral Trust Agreement, dated as of February 14, 2018, among SN, the grantors and guarantors from time to time party hereto, the First-Out Representative (as defined in the Collateral Trust Agreement), the First Lien Representative (as defined in the Collateral Trust Agreement), the other Priority Lien Representatives (as defined in the Collateral Trust Agreement) and the Collateral Trustee.

25. "*Collateral Trustee*" means Wilmington Trust, N.A., in its capacity as successor collateral trustee under the Collateral Trust Agreement.

26. "*Confirmation*" means entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

27. "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

28. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29. "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30. "*Consummation*" means the occurrence of the Effective Date, subject to the conditions set forth in the Plan.

31. "*Creditor*" has the meaning set forth in section 101(10) of the Bankruptcy Code.

32. "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed in these Chapter 11 Cases.

33. "*CRO*" means the Debtors' chief restructuring officer, Mohsin Y. Meghji.

34. "*Cure Claim*" means a Claim (unless waived or modified by the applicable counterparty) based upon a Debtors' default(s) prior to the Effective Date under an Executory Contract or an Unexpired Lease assumed, or assumed and assigned, by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365 of the Bankruptcy Code.

35. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for liability of any current or former directors, managers, officers, and members.

36. "*Debtors*" means SN and its direct and indirect subsidiaries that filed petitions under chapter 11 on the Petition Date.

37. "*DIP Agent*" means Wilmington Savings Fund Society, FSB, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

38. "*DIP Agent Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by the DIP Agent, to the extent payable or reimbursable under the DIP Credit Agreement. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

39. "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent in the amount of $150,000,000 plus (a) all amounts previously paid pursuant to the Final DIP Order, and (b) all accrued and unpaid interest, fees, costs, expenses and other amounts due and owing under the Final DIP Order, the DIP Credit Agreement, or otherwise. The DIP Claims are hereby Allowed Secured Claims and/or Administrative Claims in an amount no less than the value of the DIP Equity Distribution.

40. "*DIP Credit Agreement*" means that certain Amended and Restated Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of January 28, 2020, by and among SN, as borrower, each of the other applicable Debtors, as guarantors, each of the lenders from time to time party thereto, and the DIP Agent, with any permitted amendments, modifications, or supplements thereto.

41. "*DIP Equity Distribution*" means 20% of the Authorized Plan Distribution Shares, which shall constitute 100% of the shares of New Common Stock issued by the Reorganized Debtors on the Effective Date.

42. "*DIP Fee Claims*" means (a) the DIP Agent Fees and Expenses, (b) the Secured Trustees Fees and Expenses and (c) the Secured Ad Hoc Group Fees.

43. "*DIP Lenders*" means lenders under the DIP Credit Agreement, solely in their capacity as such.

44. "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that: (a) has been disallowed by a Final Order; (b) is listed in the Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not listed in the Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court or the Claims, Noticing and Solicitation Agent pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

45. "*Disbursing Agent*" means the Debtors or the Reorganized Debtors, as applicable, or the Entity or Entities selected by the Debtors or the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

46. "*Disclosure Statement*" means the disclosure statement for the Plan, as supplemented from time to time, including all exhibits, supplements, modifications, amendments, annexes, attachments, and schedules thereto.

47. "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court conditionally approving the Disclosure Statement, entered on April 9, 2020 [Docket No. 1118].

48. "*Disputed*" means, with respect to any Claim, any Claim that is neither Allowed nor Disallowed.

49. "*Distribution Date*" means, except as otherwise set forth herein and except with respect to distributions to holders of securities held through DTC, the date or dates determined by the Debtors or Reorganized Debtors, as applicable, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims entitled to receive distributions under the Plan.

50. "*DTC*" means Depository Trust Company.

51. "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX. hereof have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective by the Debtors.

52. "*Entity*" means as defined in section 101(15) of the Bankruptcy Code.

53. "*Estate*" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

54. "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Creditors' Committee and its current and former members; and (c) with respect to each of the foregoing Entities in clauses (a) and (b), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors, in each case, solely in their capacity as such. For the avoidance of doubt, the Exculpated Parties shall not include the Sanchez Parties, SOG, SNMP or direct or indirect non-Debtor subsidiaries of SN.

55. "*Exculpation Claims*" has the meaning set forth in Article VIII.B.

56. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

57. "*Existing Interests*" means, collectively, (a) the Existing SN Preferred Interests and (b) the Existing SN Common Interests.

58. "*Existing SN Common Interests*" means Interests in SN arising from or related to the Existing SN Common Stock.

59. "*Existing SN Common Stock*" means the shares of common stock issued by SN.

60. "*Existing SN Preferred Interests* means Interests in SN arising from or related to the Existing SN Preferred Stock.

61. "*Existing SN Preferred Stock*" means the shares of (a) 4.875% Convertible Perpetual Preferred Stock, Series A and (b) 6.500% Convertible Perpetual Preferred Stock, Series B, each with a par value of $0.01 per share.

62. "*File*," "*Filed*," and "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court, or, with respect to the filing of a Proof Claim or proof of Interest, the Claims, Noticing and Solicitation Agent.

63. "*Final DIP Order*" means the *Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(b), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. §§ 363 and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [Docket No. 865].

64. "*Final Fee Application*" means an application for final request for payment of Professional Fee Claims.

65. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; *provided* that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

66. "*Final Shared Services Order*" means the *Final Order Authorizing Debtors to Continue Performance of Obligations Under the Shared Services Arrangements* [Docket No. 733].

67. "*Gavilan*" means Gavilan Resources, LLC.

68. "*Gavilan Proceeding*" means the adversary proceeding commenced against SN EF Maverick, LLC, et al., by Gavilan (Adv. Pro. No. 20-03021).

69. "*General Unsecured Claim*" means any Claims other than: (a) an Administrative Claim; (b) an Other Secured Claim; (c) an Other Priority Claim; (d) a Priority Tax Claim; (e) a Secured Notes Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; or (h) a DIP Claim.

70. "*Holder*" means an entity holding a Claim or Interest, as applicable.

71. "*Impaired*" means with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

72. "*Indentures*" means, collectively, the Secured Notes Indenture, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

73. "*Indenture Trustees*" means the Secured Notes Indenture Trustee and the Unsecured Notes Indenture Trustee.

74. "*Indemnified Parties*" means the following Exculpated Parties in their capacities as such: (i) members of the Debtors' current workforce who are employed by the Reorganized Debtors after the Effective Date; (ii) Mohsin Y. Meghji; (iii) Eugene I. Davis; (iv) Adam C. Zylman; (v) Cameron W. George; and (vi) Gregory B. Kopel.

75. "*Indemnification Obligations*" means each of the Debtors' existing indemnification provisions in place and effect as of the Effective Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, management or indemnification agreements, employment contracts, or otherwise, for the current and former directors, officers, managers, attorneys, accountants, investment bankers, and other professionals, advisors and agents of the Debtors, as applicable.

76. "*Intercompany Claim*" means a Claim held by a Debtor against another Debtor.

77. "*Intercompany Interest*" means an Interest in any Debtor other than SN.

78. "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including issued, unissued, authorized, or outstanding shares of stock, together with any warrants, options or rights to purchase or acquire such interests at any time.

79. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

80. "*Lien Challenge Complaint*" means the complaint filed by the Debtors on March 10, 2020 in the adversary proceeding titled Sanchez Energy Corporation, et al. v. Royal Bank of Canada, Wilmington Savings Fund Society, FSB and Wilmington Trust, National Association (Adv. Pro. No. 20-03057).

81. "*Lien-Related Litigation*" means all litigation related to challenges to the allowance, priority, scope or validity of the liens and/or Claims of the Prepetition Secured Parties (as defined in the Final DIP Order) or the priority or scope of the liens and/or Claims of the DIP Lenders, including any litigation regarding (i) the interpretation of the Final DIP Order and other matters regarding the scope of the collateral securing the DIP Claims, (ii) the amount and characterization of the DIP Claims (including the Final DIP Order's treatment of new-money DIP Claims and roll-up DIP Claims), (iii) the amount of any deficiency claim of the DIP Lenders, (iv) adequate protection claims pursuant to section 507(b) of the Bankruptcy Code (including issues regarding diminution in value, and any recharacterization or disgorgement of adequate protection payments made pursuant to the Final DIP Order, or any prior interim order), (v) the applicability of the equities of the case doctrine under section 552 of the Bankruptcy Code, (vi) all Causes of Action referenced and asserted in the Lien Challenge Complaint, (vii) the claim objections filed by the Creditors' Committee on March 10, 2020, at Docket No. 1027, (viii) the value of Causes of Action, and (ix) the relative value of encumbered and unencumbered assets. For purposes of clarification, nothing in the Plan or the Confirmation Order shall alter, amend, or otherwise limit any rights, claims, or defenses that may or could be asserted by the DIP Lenders, DIP Agent, Collateral Trustee, Secured Notes Indenture Trustee, or any Holders of DIP Claims or Senior Notes Claims in connection with or in defense of the Lien-Related Litigation, irrespective of whether such rights, claims, or defenses arose before or after the Petition Date and whether provided or arising under the Final DIP Order, applicable agreements, applicable law, or otherwise.

82. "*Lien-Related Litigation Creditor Representative*" means a representative, as selected by the Creditors' Committee, of general unsecured creditors in the Lien-Related Litigation.

83. "*Management Incentive Plan*" means a post-Effective Date management incentive plan for the directors and officers of the Reorganized Debtors, which shall be implemented in accordance with Article IV of the Plan.

84. "*New Common Stock*" means the common stock of Reorganized SN to be issued pursuant to the Plan.

85. "*New Executive Employment Agreements*" means the new employment agreements, dated as of the Effective Date, to employ (a) Cameron W. George and (b) Gregory B. Kopel.

86. "*New Organizational Documents*" means the form of the certificates or articles of incorporation, certificates of designation, bylaws, or such other applicable formation documents, of each of the Reorganized Debtors, including the New Stockholders' Agreement, if any.

87. "*New Stockholders' Agreement*" means the stockholder or similar agreement, if any, with respect to the New Common Stock.

88. "*Non-Participating Professional*" means any Professional that is not a Participating Professional on or before the Confirmation Date.

89. "*Notice of Assumption*" means a notice to be sent to each applicable counterparty identified in the Schedule of Assumed Executory Contracts and Unexpired Leases as set forth in Article VI.C.

90. "*Notice of Rejection*" means a notice to be sent to each applicable counterparty identified in the Schedule of Rejected Executory Contracts and Unexpired Leases as set forth in Article VI.B.

91. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim.

92. "*Other Secured Claim*" means any Secured Claim other than the DIP Claims and the Secured Notes Claims.

93. "*Participating Professionals*" means all Professionals that have elected to participate in the Professional Fee Settlement on or before the Confirmation Date, specifically: Akin Gump Strauss Hauer & Feld LLP, Alvarez & Marsal North America, LLC, Gibbs & Bruns LLP, Jackson Walker LLP, KPMG LLP, M-III Advisory Partners LP, Moelis & Company LLC, Prime Clerk LLC, Ropes & Gray LLP, and Richards Layton & Finger, P.A. No Participating Professionals may be added to this list without the consent of the Requisite DIP Lenders.

94. "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, governmental entity, or political subdivision thereof, or any other Entity.

95. "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

96. "*Plan*" means this amended joint chapter 11 plan (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments hereto).

97. "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed by the Debtors as soon as reasonably practicable prior to the Confirmation Hearing, or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, and any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement. The Plan Supplement shall include the following (a) the New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Assumed Executory Contracts and Unexpired Leases; (d) a schedule of retained Causes of Action; (e) a disclosure of the members of the Reorganized SN Board; and (f) the New Executive Employment Agreements and the identities of the officers of Reorganized SN.

98. "*Post-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

99. "*Post-Effective Date Equity Distribution*" means 80% of the Authorized Plan Distribution Shares, which shall be issued and distributed to Holders of Allowed Claims in Classes 3, 4 and/or 5 as ordered by the Bankruptcy Court in connection with adjudication or other resolution of the Lien-Related Litigation.

100. "*Pre-Carve-Out Trigger Notice Reserve*" has the meaning ascribed to it in the Final DIP Order.

101. "*Priority Tax Claims*" means Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code.

102. "*Pro Rata*" means (a) when referring to Claims or Interests within a single Class, the proportion that an Allowed Claim or Interest in such Class bears to the aggregate amount of the Allowed Claims or Interests in that Class, or (b) when referring to Claims or Interests within more than one Class, the proportion that an Allowed Claim or Interest bears to the aggregate amount of the Allowed Claims or Interests within all applicable Classes.

103. "*Professional*" means an entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

104. "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date.

105. "*Professional Fee Settlement*" means the settlement between and among the Participating Professionals, the Debtors and the Secured Ad Hoc Group set forth in Article II.B.

106. "*Professional Fee Settlement Reserve*" means an interest bearing escrow account to hold the amounts set forth in Article II.B pursuant to the Professional Fee Settlement, which escrow account shall be funded on the Effective Date and maintained at a financial institution selected by the Debtors, with the consent of the Participating Professionals, solely for the purpose of paying all Allowed and unpaid Professional Fee Claims of Participating Professionals consistent with the Professional Fee Settlement. All fees and expenses of the escrow agent shall be paid from the interest accruing on funds in the Professional Fee Settlement Reserve; *provided that* any fees and expenses due up front or in excess of the interest accruing on the funds in the Professional Fee Settlement Reserve shall be paid by the Reorganized Debtors. The Professional Fee Settlement Reserve may be a segregated account, with similar protections as an escrow account, maintained by the Reorganized Debtors in trust solely for the Participating Professionals with the consent of the Participating Professionals.

107. "*Professional Fee Settlement Reserve Amount*" means $22.9 million, which shall be adjusted solely to the extent additional Professionals become Participating Professionals.

108. "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases, if applicable, by the applicable Bar Date.

109. "*Reinstated*" or "*Reinstatement*" means with respect to any Claim or Interest, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

110. "*Reorganized Boards*" means the initial board of directors of members, or managers, as applicable of each Reorganized Debtor.

111. "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto, including Reorganized SN.

112. "*Reorganized SN*" means SN, as reorganized pursuant to and under the Restructuring Transactions or any successor thereto.

113. "*Reorganized SN Board*" means the initial board of directors of Reorganized SN.

114. "*Requisite DIP Lenders*" means DIP Lenders holding at least 50.01% of the outstanding principal amount of loan issued under the DIP Credit Agreement.

115. "*Restructuring Fee*" has the meaning ascribed to it in the engagement letter between SN and Moelis & Company LLC, attached as Exhibit 1 to the *Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of Moelis & Company LLC as Financial Advisor and Investment Banker for the Debtors, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Time-Keeping Requirements; and (III) Granting Related Relief* [Docket No. 271].

116. "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, sales, dispositions, liquidations, dissolutions, or other corporate transactions necessary or appropriate to implement the Plan.

117. "*Sanchez Parties*" means (i) A.R. Sanchez, Jr., Antonio R. Sanchez, III, and Patricio D. Sanchez, and any other individual related to Antonio R. Sanchez, III by consanguinity or marriage, (ii) any trusts or similar Entities of which Sanchez Parties are individually or in the aggregate the majority direct or indirect beneficiaries, and (iii) any other Entities (other than SOG) for which the Sanchez Parties own, control or hold 50.01% or more of the voting interests. For the avoidance of doubt, the Sanchez Parties shall not include SOG or SNMP.

118. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any modifications or amendments thereto) of certain Executory Contracts and Unexpired Leases, to be identified by

the Secured Ad Hoc Group, to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

119. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto) of the Executory Contracts and Unexpired Leases, to be identified by the Secured Ad Hoc Group, to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended at the direction of the Secured Ad Hoc Group from time to time, prior to the Confirmation Date or otherwise, in accordance with the Plan.

120. "*Schedules*" means, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors.

121. "*Section 510(b) Claim*" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code.

122. "*Secured*" means when referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court (including the Final DIP Order), as a secured claim.

123. "*Secured Ad Hoc Group*" means the ad hoc group of unaffiliated funds, accounts, and advisors of funds or accounts, as Holders of Secured Notes Claims and DIP Claims.

124. "*Secured Ad Hoc Group Fees*" means all unpaid fees and expenses, including professional fees and expenses, due and payable to the Secured Ad Hoc Group's advisors and professionals, including fees and expenses payable under the Final DIP Order.

125. "*Secured Notes*" means the 7.25% Senior Secured First Lien Notes due 2023 issued pursuant to the Secured Notes Indenture.

126. "*Secured Notes Claim*" means any Secured Claim against the Debtors under, with respect to, on account of, arising from, based upon, or in connection with, the Secured Notes Indenture, the Secured Notes, or the Final DIP Order, including any Claim for principal amounts outstanding, unpaid interest, fees or expenses.

127. "*Secured Notes Indenture*" means that certain Indenture, dated February 14, 2018, among SN, the guarantors party thereto, Delaware Trust Company, as trustee, and Wilmington Trust, NA., in its capacity as successor collateral trustee, for the 7.25% senior secured first lien notes due February 15, 2023.

128. "*Secured Notes Indenture Trustee*" means WSFS, and any successor thereto, as trustee under the Secured Notes Indenture.

129. "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

130. "*Secured Trustees Fees and Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, including, without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by WSFS, solely in its capacity as the Secured Notes Indenture Trustee, and the Collateral Trustee, to the extent payable or reimbursable under the Secured Notes Indenture or Collateral Trust Agreement, as applicable. For the avoidance of doubt, the Secured Trustees Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

131. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

132. "*Servicer*" means an agent or other authorized representative of Holders of Claims or Interests.

133. "*SN*" means Sanchez Energy Corporation.

134. "*SNMP*" means Sanchez Midstream Partners LP and its subsidiaries and affiliates, including Catarina Midstream, LLC.

135. "*SOG*" means Sanchez Oil & Gas Corporation.

136. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to requests of the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

137. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

138. "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

139. "*Unsecured Notes Claim*" means any Claim against the Debtors arising from or based upon the 2021 Unsecured Notes Indenture or the 2023 Unsecured Notes Indenture.

140. "*Unsecured Notes Indentures*" means, collectively, the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture.

141. "*Unsecured Notes Indenture Trustee*" means the Delaware Trust Company, and any successor thereto, as trustee under the 2021 Unsecured Notes Indenture and the 2023 Unsecured Notes Indenture, respectively.

142. "*U.S. Trustee*" Means the Office of the United States Trustee for the Southern District of Texas.

143. "*WSFS*" means Wilmington Savings Fund Society, FSB.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (5) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to any particular portion of the Plan; (6) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (7) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (8) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (9) references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (10) all references to statutes, regulations, orders,

rules of courts, and the like shall mean as amended from time to time; (11) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (12) the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," and (13) any immaterial effectuating provisions may be interpreted by the Debtors or the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan and without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C. *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a business day, then such transaction shall instead occur on the next succeeding business day.

D. *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or Bankruptcy Rules), and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas, without giving effect to conflict of laws principles.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

F. *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the applicable Plan Supplement document shall control. In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. *Administrative Claims*

Except as otherwise provided in this Article II.A and except with respect to claims pursuant to 28 U.S.C. § 1930 and Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), or otherwise allowed by a Final Order, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and

the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims (but excluding DIP Fee Claims), and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, compromise, settlement, and release of and in exchange for its Claim, payment in full in Cash on the Effective Date or as soon as reasonably practicable thereafter.

The DIP Claims that are not DIP Fee Claims shall receive the treatment set forth in Article III.C.3. DIP Agent Fees and Expenses shall receive payment in accordance with Article IV.R. The parties entitled to (a) Secured Trustees Fees and Expenses and (b) Secured Ad Hoc Group Fees have agreed that the Administrative Claims relating to such amounts may be paid following the outcome of the applicable Lien-Related Litigation.

B. *Professional Fee Claims*

1. <u>Professional Fee Settlement</u>

Pursuant to the Professional Fee Settlement, (a) Participating Professionals agree to (i) limit the payment on account of their unpaid Professional Fee Claims (except as provided in clauses (b) and (c)) to 90% of the amount of such Participating Professional's accrued and unpaid fees and 100% of the amount of such Participating Professional's unpaid expenses, in each case, through March 27, 2020, plus an additional $5 million to Moelis & Company LLC on account of its Restructuring Fee and (ii) reduce the amount of unpaid Allowed Professional Fee Claims payable upon approval of their respective Final Fee Application by an amount equal to 10% of fees paid to such Participating Professional since the Petition Date, excluding the Professional Fee Claims in (i) above which already account for the 10% reduction of fees; (b) $1 million (in addition to the amounts in (a) above) shall be available exclusively for Professional Fee Claims of Professionals of the Debtors in connection with filing, prosecuting, confirming and consummating the Plan incurred after March 27, 2020; (c) $100,000 (in addition to any amounts in (a) and (b) above), shall be made available exclusively for KPMG for fees incurred after March 27, 2020, and (d) Participating Professionals otherwise waive all rights to seek payment of any additional Professional Fee Claims, either as an Administrative Claim or otherwise. For purposes of clarification, the aggregate amount identified in this paragraph shall not exceed the Professional Fee Settlement Reserve Amount.

As part of the Professional Fee Settlement, upon the Effective Date, the DIP Agent shall release the Carve-Out Trigger Notice Reserves to the Reorganized Debtors, and the Reorganized Debtors shall immediately fund the Professional Fee Settlement Reserve with the Professional Fee Settlement Reserve Amount, solely for the unpaid Professional Fee Claims of the Participating Professionals. The Professional Fee Settlement Reserve shall be an escrow account or segregated account, with similar protections as an escrow account, maintained in trust solely for the Participating Professionals with the consent of the Participating Professionals. Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Participating Professionals, as limited by the Professional Fee Settlement, shall be paid in Cash to such Participating Professionals by the Reorganized Debtors from the Professional Fee Settlement Reserve within two (2) business days after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court. When all such Allowed amounts owing to Participating Professionals have been paid in full consistent with the Professional Fee Settlement, any remaining amount in the Professional Fee Settlement Reserve shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Finally, as part of the Professional Fee Settlement, the Debtors, Reorganized Debtors and the Secured Ad Hoc Group, including each of its individual members, shall not (a) seek, directly or indirectly, any further reductions, discounts or concessions of any kind from the Participating Professionals or (b) object, directly or indirectly, to any Final Fee Applications of any Participating Professional.

If the Effective Date does not occur within 45 days of the Confirmation Date, (a) the Professional Fee Settlement shall be withdrawn, (b) the Participating Professionals shall reserve any and all rights under the Final DIP Order, the Bankruptcy Code and otherwise and (c) all agreements not to seek reductions or to object to any Final Fee Applications of the Participating Professionals shall be withdrawn, and all rights of all parties are reserved.

2. <u>Final Fee Applications</u>

All Professionals shall file Final Fee Applications no later than 60 days after the Effective Date. The Professional Fee Claims of any Participating Professional shall be Allowed in the event that no objection to such Final Fee Application is Filed within 21 days of the filing of such Final Fee Application in accordance with the Professional Fee Settlement.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the Debtors' election, (1) payment in full in Cash of its Allowed Priority Tax Claim or (2) treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS

A. *Formation of Debtor Group for Convenience Purposes Only*

The Plan (including, but not limited to, Article II and Article III of the Plan) groups the Debtors together solely for the purpose of describing treatment under the Plan and distributions to be made in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any assets. Except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities. The Plan is not premised on, and does not provide for, the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan, or otherwise.

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor within the meaning of section 1121 of the Bankruptcy Code, and the classifications set forth in Classes 1 through 10 shall be deemed to apply to each Debtor in accordance with section 1122 of the Bankruptcy Code, except where a Debtor does not have any Claim or Interest qualifying within a particular class. For voting purposes, each Class of Claims against or Interests in the Debtors shall be deemed to constitute separate sub-Classes of Claims against and Interests in each of the Debtors, as applicable. Each such sub-Class shall vote as a single separate Class for each of the Debtors, as applicable; *provided*

that any Class that does not contain any Allowed Claims or Existing Interests with respect to a particular Debtor will be treated in accordance with Article III.E below.

B. *Classification of Claims and Interests*

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | DIP Claims | Impaired | Entitled to Vote |
| 4 | Secured Notes Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Existing SN Preferred Interests | Impaired | Deemed to Reject |
| 9 | Existing SN Common Interests | Impaired | Deemed to Reject |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject |

C. *Treatment of Classes of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. The Debtors will not agree to different treatment of any Allowed Claim or Allowed Interest prior to the Effective Date without the consent of the Requisite DIP Lenders. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1. Class 1 — Other Secured Claims

a. *Classification*: Class 1 consists of all Other Secured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Other Secured Claim against the Debtors, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor:

i. payment in full in Cash;

ii. delivery of the collateral securing any such Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

iii. Reinstatement of such Other Secured Claim; or

iv. other treatment rendering such Claim Unimpaired.

c. *Voting*: Class 1 is Unimpaired. Holders of Allowed Other Secured Claims in Class 1 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy

Code. Holders of Allowed Other Secured Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Priority Claims

a. *Classification*: Class 2 consists of all Other Priority Claims against the Debtors.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor against which such Allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full and final satisfaction of each Allowed Other Priority Claim against the Debtors, each Holder of an Allowed Other Priority Claim shall receive either:

i. Cash in an amount equal to such Allowed Other Priority Claim; or

ii. such other treatment rendering such Other Priority Claim Unimpaired.

c. *Voting*: Class 2 is Unimpaired. Holders of Allowed Other Priority Claims in Class 2 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Other Priority Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3. Class 3 – DIP Claims

a. *Classification*: Class 3 consists of all DIP Claims (other than DIP Fee Claims) against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed DIP Claim (other than DIP Fee Claims), each Holder of an Allowed DIP Claim (other than DIP Fee Claims) shall receive its Pro Rata share of:

i. the DIP Equity Distribution on the Effective Date; and

ii. 100% of the Post-Effective Date Equity Distribution less any amount of such Post-Effective Date Equity Distribution, if any, allocated to Holders of Allowed Claims in Classes 4 and/or 5 based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 3 is Impaired. Holders of DIP Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. Class 4 — Secured Notes Claims

a. *Classification*: Class 4 consists of all Secured Notes Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed Secured Notes Claim (other than DIP Fee Claims), each Holder of an Allowed Secured Notes Claim (other than DIP Fee Claims) shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the Secured Notes Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 4 is Impaired. Holders of Secured Notes Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 — General Unsecured Claims</u>

a. *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

b. *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Post-Effective Date Equity Distribution, if any, allocated to the General Unsecured Claims based upon the outcome of the Lien-Related Litigation, which allocation shall be consistent with, as applicable, the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code.

c. *Voting*: Class 5 is Impaired. Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

6. <u>Class 6 — Intercompany Claims</u>

a. *Classification*: Class 6 consists of any Intercompany Claims.

b. *Treatment*: On the Effective Date, Intercompany Claims shall be, at the election of the Debtors:

i. Reinstated;

ii. compromised;

iii. released; or

iv. offset, contributed, and/or distributed to the applicable Debtor.

c. *Voting*: Class 6 is either Unimpaired or Impaired. Holders of Allowed Intercompany Claims in Class 6 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code or conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Allowed Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

7. <u>Class 7 — Intercompany Interests</u>

a. *Classification*: Class 7 consists of all Intercompany Interests.

b. *Treatment*: On the Effective Date, Intercompany Interests shall receive no recovery or distributions and be Reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure.

c. *Voting*: Class 7 is Unimpaired. Holders of Allowed Intercompany Interests in Class 7 are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Intercompany Claims in Class 7 are not entitled to vote to accept or reject the Plan.

8. <u>Class 8 — Existing SN Preferred Interests</u>

a. *Classification*: Class 8 consists of all Existing SN Preferred Interests.

b. *Treatment*: On the Effective Date, each Existing SN Preferred Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any

Existing SN Preferred Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 8 is Impaired. Holders of Existing SN Preferred Interests in Class 8 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Preferred Interests in Class 8 are not entitled to vote to accept or reject the Plan.

9. <u>Class 9 — Existing SN Common Interests</u>

a. *Classification*: Class 9 consists of all Existing SN Common Interests.

b. *Treatment*: On the Effective Date, each Existing SN Common Interest shall be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Existing SN Common Interest shall be entitled to any recovery or distribution under the Plan on account of such Interest.

c. *Voting*: Class 9 is Impaired. Holders of Existing Common Interests in Class 9 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Existing SN Common Interests in Class 9 are not entitled to vote to accept or reject the Plan.

10. <u>Class 10 – Section 510(b) Claims</u>

a. *Classification*: Class 10 consists of all Section 510(b) Claims.

b. *Treatment*: On the Effective Date, each Section 510(b) Claim will be cancelled, released and extinguished and shall be of no further force and effect. No Holder of any Section 510(b) Claim shall be entitled to any recovery or distribution under the Plan on account of such Claim.

c. *Voting*: Class 10 is Impaired. Holders of Section 510(b) Claims in Class 10 are conclusively deemed to have rejected the Plan under section 1126(f) of the Bankruptcy Code. Holders of Section 510(b) Claims in Class 10 are not entitled to vote to accept or reject the Plan.

D. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

E. *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Interest, or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote on the Plan and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

H. *Intercompany Interests*

To the extent Reinstated under the Plan, the Intercompany Interests shall be Reinstated for the ultimate benefit of the Holders of Claims that receive New Common Stock under the Plan, and shall receive no recovery or distribution. For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date (subject to the Restructuring Transactions).

I. *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A. *General Settlement of Claims, Interests, and Causes of Action*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan, including any dispute regarding the treatment of any Intercompany Claims. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, including the Professional Fee Settlement, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement, including the Professional Fee Settlement, is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

B. *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree, including, but not limited to the documents comprising the Plan Supplement and the New Organizational Documents, as applicable; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset,

property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities may agree; (3) the execution, delivery and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law, including any applicable New Organizational Documents; (4) such other transactions that are required to effectuate the Restructuring Transactions; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C. *Sources of Consideration for Plan of Reorganization Distributions*

The Reorganized Debtors will fund distributions under the Plan with Cash on hand on the Effective Date and the New Common Stock.

1. Issuance and Distribution of New Common Stock

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the New Common Stock to fund distributions to Holders of Allowed Claims in accordance with Article III of the Plan; *provided that* New Common Stock issued on account of the Post-Effective Date Equity Distribution shall occur in accordance with Article IV.C.2. The issuance of New Common Stock, as well as options, or other equity awards of interests in the Reorganized Debtors, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims. All shares of New Common Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

The Secured Ad Hoc Group shall prepare a New Stockholders' Agreement as part of the Plan Supplement. Each Entity intended to become a Holder of New Common Stock, as a condition to receiving such New Common Stock, shall be required to deliver an executed signature page to the New Stockholders' Agreement. Each Holder of New Common Stock shall be deemed a party to the New Stockholders' Agreement, without regard to whether such signature page is actually delivered. On the Effective Date, the Reorganized Debtors shall enter into and deliver the New Stockholders' Agreement to each known Entity that is intended to be a party thereto at such time, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Common Stock shall be bound thereby.

2. Distribution of Post-Effective Date Equity Distribution

The shares of New Common Stock comprising the Post-Effective Date Equity Distribution shall remain authorized but unissued pending the outcome of all or a portion of the Lien-Related Litigation, which shall occur following the Effective Date. Upon adjudication or other resolution of all or a portion of the Lien-Related Litigation, the Reorganized Debtors shall issue the Post-Effective Date Equity Distribution in the amount of New Common Stock allocated to Class 3, 4 and/or 5 Claims, to the extent such Claims are entitled to receive New Common Stock, pursuant to an order of the Bankruptcy Court. No shares of New Common Stock shall be issued on account of the Post-Effective Date Equity Distribution except as provided in an order of the Bankruptcy Court with respect to the Lien-Related Litigation, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any. Upon such order of allocation from the Bankruptcy Court, to the extent the New Stockholders' Agreement is not terminated in accordance with its terms, each proposed Holder of New Common Stock under such order shall, as a condition to receiving such New Common Stock, be required to deliver an executed signature page to the New

Stockholders' Agreement. Each Holder shall be deemed a party to the New Stockholders' Agreement, if any, without regard to whether an executed signature pages is actually delivered.

D. *Lien-Related Litigation*

The Lien-Related Litigation shall be adjudicated following the Confirmation Date by the Bankruptcy Court according to the following timeline:

- *Phase 1:* The parties to the Lien-Related Litigation shall seek a final hearing date that is not more than 30 days after the Effective Date to determine the interpretation of the Final DIP Order. This phase shall be initiated by a pleading filed by the DIP Lenders or DIP Agent.

- *Phase 2:* If the Bankruptcy Court determines that any additional Lien-Related Litigation is necessary in light of the determinations in Phase 1, other than as to the valuation of Causes of Action, the relevant parties shall seek a hearing for determination of such additional issues not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 1 and in no event 60 days after the Effective Date. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative on or before the 35th day following the Effective Date.

- *Phase 3:* If the Bankruptcy Court determines that the valuation of any Causes of Action are necessary as part of any Lien-Related Litigation in light of Phases 1 and 2, the relevant parties may seek a hearing for determination of such additional issues after the Bankruptcy Court's determination of issues presented in Phases 1 and 2. This phase shall be initiated by a pleading filed by the Lien-Related Litigation Creditor Representative not more than 30 days after the Bankruptcy Court's determination of issues presented in Phase 2.

- *Post-Effective Date Equity Distribution Allocations:* The Bankruptcy Court may, in its discretion, issue a final ruling as to the allocation of all or a part of the Post-Effective Date Equity Distribution at the conclusion of any of the three phases.

Discovery shall not occur except to the extent permitted and deemed necessary by the Bankruptcy Court. Expert reports, if any, shall be exchanged 14 days prior to any hearing. Any and all claims, objections, or challenges within the definition Lien-Related Litigation shall be dismissed with prejudice, released, and forever barred if not asserted and determined in accordance with the foregoing schedule and otherwise in accordance with the provisions of the Plan. The liquidation and valuation findings and conclusions in the Confirmation Order and in connection with Confirmation shall have preclusive effect in the Lien-Related Litigation, provided, however, such preclusive effect shall not apply to the valuation of the Debtors' Causes of Action, which shall be subject to valuation, if at all, in accordance with Phase 3 of the Lien-Related Litigation described in this section. .

The parties to the Lien-Related Litigation shall use all reasonable efforts to minimize the costs of such litigation. All costs of prosecuting the Lien-Related Litigation shall be borne by the respective parties to the litigation, and no costs shall be borne by the Reorganized Debtors or payable by one group of parties to the other; *provided that* in the event that (i) the DIP Lenders retain at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the DIP Lenders or Secured Ad Hoc Group at any time following the Effective Date or (ii) the holders of General Unsecured Claims hold at least 50.01% of the New Common Stock following the Post-Effective Date Equity Distribution, nothing herein shall restrict the ability of the Reorganized Debtors to pay the fees and expenses of the Lien-Related Litigation Creditor Representative at any time following the Effective Date. Notwithstanding the foregoing, nothing in this paragraph shall alter the rights of the DIP Lenders or DIP Agent to repayment or reimbursement to the extent provided under the Final DIP Order or DIP Credit Agreement. Notwithstanding anything in this Plan to the contrary, in connection with determining the Lien-Related Litigation, for purposes of clarification, all rights, claims, and defenses of the Holders of the DIP Claims, including all rights under sections 1129(a)(9)(A) and 726 of the Bankruptcy Code shall be deemed preserved. Without limiting the foregoing, for purposes of clarification, nothing herein restricts the ability of the Lien-Related Litigation Creditor Representative to employ

professionals and seek or secure funding or financing to pay for the reasonable fees and expenses incurred in connection with the Lien-Related Litigation to the extent permitted by otherwise applicable law.

There shall be no issuance and distribution of New Common Stock pursuant to the Post-Effective Date Equity Distribution except pursuant to an order entered by the Bankruptcy Court with respect to or following the resolution of the Lien-Related Litigation. Any and all issues regarding the proper allocation of the Post-Effective Date Equity Distribution shall be determined by the Bankruptcy Court in connection with the Lien-Related Litigation and consistent with the Final DIP Order and the priorities set forth in sections 1129(b) and 726 of the Bankruptcy Code, which determination regarding such allocation may include, among other things, the consideration of the value, if any, of any Causes of Action preserved by the Reorganized Debtors pursuant to the Plan and whether such value should be allocated to or offset by Secured Claims or Administrative Claims. The New Common Stock shall be issued pursuant to the Post-Effective Date Equity Distribution upon an order of the Bankruptcy Court, which order shall designate the allocation of New Common Stock as between the Holders of Allowed DIP Claims, if any, Holders of Allowed Secured Notes Claims, if any, and Holders of Allowed General Unsecured Claims, if any.

Reorganized SN shall not declare, pay, or make any dividend or other similar distribution on account of the New Common Stock or make any similar transfer with respect to the New Common Stock until the Post-Effective Date Equity Distribution has occurred. Prior to the earlier of (i) the resolution of the Lien-Related Litigation and (ii) the distribution of all New Common Stock comprising the Post-Effective Date Equity Distribution, the Reorganized Debtors will seek approval of any settlement or compromise of any Causes of Action against the Sanchez Parties, SOG, SNMP, or their respective transferees (within the meaning of section 550 of the Bankruptcy Code) or Lien-Related Litigation, following consultation with the Lien-Related Litigation Creditor Representative, pursuant to Bankruptcy Rule 9019, after notice and opportunity for a hearing.

E. *Continuation of Gavilan Proceeding*

The Gavilan Proceeding shall be litigated or compromised after the Effective Date exclusively by the Reorganized Debtors.

F. *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

G. *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

H. *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the adoption of the Management Incentive Plan, if any, by the Reorganized SN Board; (4) the issuance and distribution of the New Common Stock; and (5) all other actions contemplated under or necessary to implement the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors. On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I. *New Organizational Documents*

Prior to the Effective Date, the Secured Ad Hoc Group shall prepare the form of New Organizational Documents, which shall be included in the Plan Supplement. On the Effective Date, to the extent legally required, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents. Neither the preparation nor the filing of the New Organizational Documents shall be deemed to create a new corporate or other legal entity, and the New Organizational Documents shall be deemed amendments to or amendments and restatements of applicable organizational documents for purposes of any change of control determination.

J. *Directors and Officers of Reorganized SN*

The composition and membership of the Reorganized SN Board shall be determined prior to the Effective Date by the Secured Ad Hoc Group and included in the Plan Supplement. Thereafter, the members of the Reorganized SN Board shall be elected in accordance with the New Organizational Documents. Provisions regarding the removal, appointment, and replacement of members of the Reorganized SN Board in subsequent terms will be disclosed in the New Organizational Documents.

If the Secured Ad Hoc Group, the CRO and each applicable executive reach an agreement with respect to the terms and form of the New Executive Agreements, such agreement shall be included in the Plan Supplement and, on the Effective Date, the Reorganized Debtors shall enter into the New Executive Employment Agreements.

K. *Retention of Current Workforce by Reorganized SN; Severance Payments*

The CRO and the Secured Ad Hoc Group shall agree upon the members of the Debtors' current workforce that shall be retained and employed by the Reorganized Debtors as of the Effective Date. Such individuals shall be offered employment as soon as practicable. The continuation of SN's obligations by Reorganized SN under the 2020 Non-Executive Bonus Program for such retained employees will be set forth in the Plan Supplement.

Severance consisting of up to six (6) weeks' severance pay up to an aggregate amount of up to $1.4 million shall be provided to all members of the Debtors' current workforce who are SOG employees that provide services to the Debtors, other than the Sanchez Parties, that are not offered employment with the Reorganized Debtors, provided such member of the Debtors' workforce has not been paid severance by SOG. All such payments will be subject to any customary or required withholdings and other requirements of law.

L. *Management Incentive Plan*

The Reorganized SN Board shall be authorized to implement the Management Incentive Plan on terms to be determined by the Reorganized SN Board.

M. *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the Reorganized Boards are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Stock, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents.

N. *Preservation of Causes of Action*

Unless expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action, as applicable. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

Notwithstanding the foregoing, the Lien-Related Litigation Creditor Representative shall have standing to pursue, prosecute and sole authority to settle all Causes of Action referenced and asserted in the Lien Challenge Complaint as of the date hereof, solely to the extent and in accordance with the process and timing set forth in the Plan. The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action.

O. *Exemption from Registration Requirements*

The authorization, issuance, and distribution of all New Common Stock pursuant to the Plan, including the shares of New Common Stock issued pursuant to the DIP Equity Distribution and the Post-Effective Date Equity

Distribution, regardless of whether issued on or as soon as reasonably practicable after the Effective Date or following the outcome of the Lien-Related Litigation, will be exempt from the registration requirements of section 5 of the Securities Act and any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act and such similar federal, state and local laws.

All New Common Stock authorized, issued and distributed pursuant to the Plan in reliance upon the exemption from registration provided in section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act by the recipients thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) pursuant to the Plan, subject to: (1) compliance with any applicable state and foreign securities laws and obtaining any other applicable regulatory approval; and (2) the transfer restrictions set forth in the New Organizational Documents, if any. For the avoidance of doubt, if any shares of New Common Stock are issued pursuant to the exemption from registration in section 4(a)(2) of the Securities Act, such shares of New Common Stock will be considered "restricted securities" and may not be resold by the recipients thereof except pursuant to an effective registration statement under the Securities Act or an available exemption thereunder. Reorganized SN will not be a public reporting company as of the Effective Date.

P. *Cancellation of Instruments, Certificates, and Other Documents*

Except for the purpose of evidencing a right to and allowing Holders of Claims to receive a distribution under the Plan and except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all notes, instruments, Certificates, and other documents evidencing Claims or Interests, and any other credit agreements and indentures evidencing or creating a prepetition Claim or Interest, shall be terminated and canceled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. Notwithstanding the foregoing, DIP Credit Agreement, Indentures, and the Collateral Trust Agreement, as applicable, shall continue in effect solely to the extent necessary to: (i) allow the DIP Agent, a disbursing agent, or the Indenture Trustees to make distributions to the Holders of DIP Claims, Secured Notes Claims and Unsecured Notes Claims, as applicable; (ii) permit the DIP Agent, the Indenture Trustees, and the Collateral Trustee to assert their charging liens; and (iii) allow the DIP Agent, the Indenture Trustees, Holders of Secured and Unsecured Notes, and the Collateral Trustee to maintain any right of indemnification, contribution, subrogation or any other claim or entitlement they may have under the DIP Credit Agreement, the Indentures, or the Collateral Trust Agreement, as applicable, with respect to any party other than the Debtors or Reorganized Debtors. The provisions of the DIP Credit Agreement, the Indentures, and the Collateral Trust Agreement governing the relationships of each of the DIP Agent, the DIP Lenders, the Indenture Trustees, the respective Holders of Secured Notes and Unsecured Notes, and the Collateral Trustee shall not be affected by the Plan, Confirmation, or Effective Date. Notwithstanding confirmation or consummation of this Plan (and for the avoidance of doubt), the Unsecured Notes Indentures and any agreement that governs the rights of the Holders of Unsecured Notes Claims shall continue in effect (and the Unsecured Notes Indenture Trustee shall remain as trustee, register and paying agent) for the purposes of: (1) preserving any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant Indenture, including any rights to priority of payment and/or to exercise charging liens; (2) permitting the Unsecured Notes Indenture Trustee to enforce any obligations owed to it under the Plan; and (3) permitting the Unsecured Notes Indenture Trustee to appear in the case or any proceeding in the case in which it is or may become a party.

Q. *Section 1146(a) Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan (including the Restructuring Transactions) or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Restructuring Transactions), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar

tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

R. *DIP Agent Fees and Expenses*

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Credit Agreement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan or otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected in the Chapter 11 Cases, shall be assumed by the Reorganized Debtors, effective as of the Effective Date, in accordance with the requirements of sections 365 and 1123 of the Bankruptcy Code and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than: (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Schedule of Assumed Executory Contracts and Unexpired Leases, or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease may be after the Effective Date.

Each Executory Contract or Unexpired Lease assumed by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law or as otherwise agreed by the Debtors and the applicable counterparty to the Executory Contract or Unexpired Lease. Notwithstanding anything to the contrary in this Article V, the New Executive Employment Agreements shall be deemed to be entered into or assumed, as applicable, on the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Rejected Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Rejection to be sent to the applicable counterparties in the Schedule of Rejected

Executory Contracts and Unexpired Leases setting forth the date by which objections to the proposed rejection, if any, must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed rejection must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be Filed with the Bankruptcy Court by no later than the date provided in the Notice of Rejection, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such Proofs of Claim must be Filed. Any and all negotiation, litigation (including of any objection to rejection), dispute resolution or any other matters regarding the rejection of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time set in the Notice of Rejection or by the Bankruptcy Court in the Confirmation Order will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash as soon as reasonably practicable, subject to the limitations described below, by the Reorganized Debtors or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall only be paid following the entry of a Final Order resolving the dispute and approving the assumption.

Prior to the Confirmation Hearing, the Secured Ad Hoc Group will identify the Executory Contracts and Unexpired Leases to be included in the Schedule of Assumed Executory Contracts and Unexpired Leases, and the Debtors shall cause Notices of Assumption to be sent to applicable counterparties. Any objection to the proposed assumption or cure amount by such counterparty must be Filed by no later than the date provided in the Notice of Assumption, Confirmation Order or any other order of the Bankruptcy Court establishing the date by which such objections must be Filed. The Debtors or the Reorganized Debtors, as applicable, reserve the right to remove an Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases and move it to the Schedule of Rejected Executory Contracts and Unexpired Leases until the later of (a) the date by which objections to the proposed assumption must be Filed or (b) if such objection is Filed, prior to the date of a decision by the Bankruptcy Court with respect to such objection. Any such objection shall be heard after the Confirmation Date at a date determined by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim. Any and all negotiation, litigation (including of any objection to assumption), dispute resolution or any other matters regarding the assumption of Executory Contracts and Unexpired Leases shall be carried out by the Reorganized Debtors after the Effective Date

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned**

**shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D. *Indemnification Obligations*

On and as of the Effective Date, the Indemnification Obligations to indemnify any Indemnified Parties with respect to the Exculpation Claims (i) will be assumed; (ii) will survive the effectiveness of the Plan; (iii) will not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, the Confirmation Order or the New Organizational Documents; (iv) will not be limited, reduced, or terminated after the Effective Date; and (v) will survive unimpaired and unaffected. Any payment of Indemnification Obligations by the Reorganized Debtors shall be sought first to the extent of any available coverage under existing insurance policies.

E. *Insurance Policies*

Notwithstanding anything in the Plan to the contrary, unless otherwise listed on the Schedule of Rejected Executory Contracts and Unexpired Leases (provided that no D&O Liability Insurance Policies shall be rejected), all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto to which a Debtor is a party, named insured or beneficiary as of the Effective Date are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto, including all D&O Liability Insurance Policies (including tail coverage liability insurance). Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such insurance policies, including the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim or Cure Claim need be Filed, and shall survive the Effective Date.

F. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G. *Contracts and Leases After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed under section 365 of the Bankruptcy Code, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Such contracts and leases that are not rejected under the Plan shall survive and remain unaffected by entry of the Confirmation Order.

H. *Reservation of Rights*

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding (1) whether a contract or lease is or was executory

Case 19-34508 Document 1235 Filed in TXSB on 04/30/20 Page 32 of 48

or unexpired at the time of assumption, (2) the amount of any Cure Claim, (3) the ability of the Reorganized Debtors or any assignee, as applicable, to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (4) any other matter pertaining to assumption, the Reorganized Debtors shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A. *Distributions on Account of Claims Allowed as of the Effective Date*

Except with respect to the New Common Stock subject to the Post-Effective Date Equity Distribution, or except as provided in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Claim or Interest, on the first Distribution Date, the Disbursing Agent shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date; *provided*, *however*, that (1) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, and (2) Allowed Priority Tax Claims shall be paid in accordance with Article II.C. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business. Except as may be provided by an order of the Bankruptcy Court for the release of the New Common Stock subject to the Post-Effective Date Equity Distribution, which New Common Stock shall be released as soon as practicable following the entry of such order, a Distribution Date shall occur no more frequently than once in every 90-day period after the Effective Date, as necessary, in the sole discretion of the Reorganized Debtors.

B. *Rights and Powers of the Disbursing Agent*

1. <u>Powers of Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2. <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C. *Special Rules for Distributions to Holders of Disputed Claims*

Except as otherwise agreed by the relevant parties: (1) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (2) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order for the Claims have been Allowed or expunged. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

D. *Delivery of Distributions*

1. Record Date for Distributions

Except for distributions to holders of public securities, three (3) business days before the Effective Date, the Claims Register and the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after three (3) business days before the Effective Date. In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount. For the avoidance of doubt, no record date for distributions shall apply to holders of public securities.

2. Distribution Process

The Disbursing Agent shall make all distributions required under the Plan, except with respect to distributions to Holders of Allowed DIP Claims, Allowed Secured Notes Claims and Allowed Unsecured Notes Claims, as set forth herein, and shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan and the terms of the relevant governing agreement. Except as otherwise provided herein, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims, including Claims that become Allowed after the Effective Date, shall be made to Holders of record or their respective designees as of three (3) business days before the Effective Date: (a) to the address of such Holder or designee as set forth in the Debtors' books and records, provided that the address of such Holder shall be deemed to be the address set forth in any Proof of Claim filed by such Holder (or if the appropriate notice has been provided pursuant to the governing agreement in writing, on or before the date that is ten (10) calendar days before the Effective Date, of a change of address or an identification of designee, to the changed address or to such designee, as applicable); or (b) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, if no address exists in the applicable register or the Debtors' books and records, no Proof of Claim has been Filed, and the Disbursing Agent has not received a written notice of a change of address on or before the date that is ten (10) calendar days before the Effective Date. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

3. Delivery of Distributions to Holders of Allowed DIP Claims

Except as otherwise provided in the Plan or reasonably requested by the DIP Agent, all distributions to Holders of Allowed DIP Claims shall be deemed completed when made to (or with the consent of) the DIP Agent, which shall be deemed to be the Holder of all Allowed DIP Claims for purposes of distributions to be made hereunder. The DIP Agent shall hold or direct such distributions for the benefit of the Holders of Allowed DIP Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the DIP Agent shall arrange to deliver such distributions to or on behalf of such Holders of Allowed DIP Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The DIP Agent shall not incur any liability on account of any distributions under the Plan.

4. Delivery of Distributions to Holders of Allowed Secured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Secured Notes Indenture Trustee, all distributions to Holders of Allowed Secured Notes Claims shall be deemed completed when made to (or with the consent of) the Secured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Secured Notes Claims for purposes of distributions to be made hereunder. The Secured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Secured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Notwithstanding anything to the contrary in

the Plan, the Secured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Secured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Secured Notes Indenture Trustee or Collateral Trustee, as applicable, to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Secured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the Secured Notes Indenture. The Secured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

5. Delivery of Distributions to Holders of Allowed Unsecured Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Unsecured Notes Indenture Trustee, all distributions to Holders of Allowed Unsecured Notes Claims shall be deemed completed when made to (or with the consent of) the Unsecured Notes Indenture Trustee, which shall be deemed to be the Holder of all Allowed Unsecured Notes Claims for purposes of distributions to be made hereunder. The Unsecured Notes Indenture Trustee shall hold or direct such distributions for the benefit of the Holders of Allowed Unsecured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Unsecured Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of Allowed Unsecured Notes Claims. Notwithstanding anything to the contrary in the Plan, the Unsecured Notes Indenture Trustee may transfer or direct that the distribution be made to the holders of the Unsecured Notes directly on the books and records of the Reorganized SN's transfer agent or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Unsecured Notes Indenture Trustee to assert its applicable charging liens against such distributions. The Reorganized Debtors reserve the right to issue New Common Stock to Holders of Allowed Unsecured Notes Claims directly on the books and records of the transfer agent or to seek to make the New Common Stock eligible to be distributed through the facilities of DTC and as provided for under the 2021 Unsecured Notes Indentures and the 2023 Unsecured Notes Indenture. The Unsecured Notes Indenture Trustee shall not incur any liability on account of any distributions under the Plan.

6. Compliance Matters

In connection with the Plan, to the extent applicable, the Reorganized Debtors or the Disbursing Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors or the Disbursing Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, or withholding distributions pending receipt of information necessary to facilitate such distributions. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

7. Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

8. Fractional, Undeliverable, and Unclaimed Distributions

a. *Fractional Distributions*. Whenever any distribution of fractional shares of New Common Stock or Cash would otherwise be required pursuant to the Plan, the actual distribution shall reflect a rounding of such fraction down to the nearest whole interest or share or dollar, as applicable. The total number of authorized shares of New Common Stock to be

distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

b. *Minimum Distributions*. Holders of Allowed Claims entitled to distributions of less than $50 in the aggregate (whether Cash or otherwise) shall not receive distributions, and each such Claims shall be discharged pursuant to Article VIII and their Holders are forever barred pursuant to Article VIII from asserting such Claims against the Debtors, the Reorganized Debtors or their property.

c. *Undeliverable Distributions*. If any distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Holder on the next Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is canceled pursuant to Article VI.D.7.d of the Plan, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Shares of New Common Stock that are un-issuable or un-registerable because the prospective recipient fails to provide the Debtors with the information needed to issue or register such New Common Stock shall be treated as undeliverable and Unclaimed Distributions.

d. *Reversion*. Any distribution under the Plan that is an Unclaimed Distribution for a period of 6 months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the applicable Reorganized Debtor, and, to the extent such Unclaimed Distribution is comprised of New Common Stock, they shall be deemed canceled and/or remain unissued, as applicable, with no further action by any person or Entity. Upon such reverting or revesting, the Claim of the Holder or its successors with respect to such property shall be canceled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary.

9. Surrender of Canceled Instruments or Securities

On the Effective Date, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Disbursing Agent or a Servicer (to the extent the relevant Claim is governed by an agreement and administered by a Servicer). Such Certificate shall be canceled solely with respect to the Debtors, and such cancelation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding the foregoing, this provision shall not apply to any Claims and Interests Reinstated pursuant to the terms of the Plan.

E. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

A Claim shall be correspondingly reduced, and the applicable portion of such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on behalf of the Debtors on account of such Claim, such Holder shall, within 14 calendar days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the Holder's total recovery

on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each business day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurance Carriers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors or the Reorganized Debtors, as applicable, shall provide 21 calendar days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything to the contrary contained herein (including Article VIII), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

F. *Setoffs*

Except as otherwise expressly provided for herein and for purposes of clarification, excluding the DIP Equity Distribution to be made on the Effective Date, each Debtor or Reorganized Debtor, as applicable, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

G. *Allocation Between Principal and Accrued Interest*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Allowed Claims, to any portion of such Claims for accrued but unpaid interest.

H. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, or documents executed as required by the Plan, or required by applicable bankruptcy law, postpetition interest

Case 19-34508 Document 1283 Filed on 04/30/20 in TXSB Page 37 of 48

shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Notwithstanding the foregoing, all interest, fees, costs, charges, and other amounts due under the DIP Credit Agreement and the Final DIP Order with respect to the DIP Claims shall continue to accrue until the resolution of the Lien-Related Litigation.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

A. *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B. *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. On and after the Effective Date, the Reorganized Debtors will use commercially reasonable efforts to advance the claims resolution process through estimation or otherwise. For the avoidance of doubt, no claims administration shall occur prior to the Effective Date.

C. *Estimation of Claims*

On or after the Effective Date, the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D. *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E. *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F. *Disallowance of Claims*

Except as otherwise provided in the Plan, any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court. For purposes of clarification, this paragraph shall not apply to the DIP Equity Distribution on the Effective Date.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors any and all Proofs of Claim Filed after the Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G. *Amendments to Claims*

On or after the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H. *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors. For the avoidance of doubt, the foregoing shall not apply to a DIP Claim with respect to the DIP Equity Distribution.

I. *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order (or, if applicable, upon the Post-Effective Date Equity Distribution), the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in the Plan.

## ARTICLE VIII.
## EFFECT OF CONFIRMATION OF THE PLAN

A. *Discharge of Claims and Termination of Interests*

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

B. *Exculpation*

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission (including acts or omissions prior to the Petition Date) in connection with, relating to, or arising out of the Chapter 11 Cases, the preparation and filing of the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan, or any other documents relating to the Plan and the Chapter 11 Cases or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the preparation for and filing of the Chapter 11 Cases, administration of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct (collectively, the "Exculpation Claims"), but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

C. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that (1) have been released pursuant to the Plan, (2) shall be discharged pursuant to the Plan, or**

**(3) are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

D. *Protection Against Discriminatory Treatment*

In accordance with section 525 of the Bankruptcy Code, and consistent with Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

E. *Release of Liens*

Except as otherwise specifically provided in the Plan, or in any contract, instrument, release, or other agreement or document created, assumed, or Reinstated pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, to the extent securing any Claims discharged under the Plan, shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors, or the Debtors, as applicable, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, or any other Holder of a Secured Claim.

The DIP Agent, the Secured Notes Indenture Trustee, and the Collateral Trustee shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. The Secured Notes Indenture Trustee or the Collateral Trustee is authorized to release such mortgages, deeds of trust, Liens, pledges, and other security interests as of any date prior to the Effective Date as they may be authorized or directed in accordance with the Secured Notes Indenture, the Collateral Trustee Agreement, or any other documents governing the rights of Holders of Secured Notes Claims, and such release shall be deemed to occur on such prior date.

F. *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever Disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (1) such Claim has been adjudicated as non-contingent, or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

G. *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

H. *Subordination Rights*

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan take into account and conform to the relative priorities and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights.

## ARTICLE IX.
## DEADLINE FOR EFFECTIVE DATE; CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

A. *Deadline for Occurrence of the Effective Date*

The Effective Date shall occur as soon as practicable after the Confirmation Date, but in no event later than 45 days after the Confirmation Date; *provided* that the Debtors and the Requisite DIP Lenders may agree to extend the occurrence of the Effective Date.

B. *Conditions Precedent to the Effective Date of the Plan*

It shall be a condition to the occurrence of the Effective Date that the following shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

1. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance acceptable to the Requisite DIP Lenders;

2. the Plan and the applicable documents in the Plan Supplement, including any exhibits, schedules, documents, amendments, modifications, or supplements thereto, and inclusive of any modifications, amendments, or supplements made after the Confirmation Date but before the Effective Date, shall have been filed, in form and substance reasonably acceptable to the Requisite DIP Lenders;

3. the Requisite DIP Lenders shall be satisfied, in an exercise of their sole discretion, that the 13-week forecast and the monthly cash flow forecast for the next 12 months as of the Effective Date, which shall be prepared in good faith by the CRO, reflects that the Reorganized Debtors will have sufficient liquidity to operate in the ordinary course of business after the Effective Date;

4. the DIP Agent shall have released the Carve-Out Trigger Notice Reserves to the Reorganized Debtors;

5. the Reorganized Debtors shall have funded the Professional Fee Settlement Reserve;

6. the New Organizational Documents shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders; and

7. the New Executive Employment Agreements shall be in full force and effect, in form and substance acceptable to the Requisite DIP Lenders.

C. *Waiver of Conditions*

The conditions to the Confirmation and Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors, with the reasonable consent of the Requisite DIP Lenders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

D. *Effect of Non-Occurrence of Conditions to Consummation*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

E. *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A. *Modification of Plan*

Effective as of the date hereof: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order consistent with the terms set forth herein; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein; *provided* that no amendment or modification may be made by the Debtors without the consent, not to be unreasonably withheld, of the Requisite DIP Lenders.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation of votes thereon pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors before the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan will be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effectuated by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (3) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims, Interests, or Causes of

Action by any Entity, (b) prejudice in any manner the rights of any Debtor or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim against a Debtor, including the resolution of any request for payment of any Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims; *provided* that the Bankruptcy Court's jurisdiction with respect to the foregoing shall be on a non-exclusive basis;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth in the Schedule of Assumed Executory Contracts and Unexpired Leases or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor or the Estates that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigation matters, including the Lien-Related Litigation and any other matters involving the Sanchez Entities, SOG, SNMP, subsequent transferees of the foregoing, or current or former directors or officers of the Debtors or of any of the foregoing;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by a Final Order in the Chapter 11 Cases, and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

8. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. enforce or resolve disputes regarding the Professional Fee Settlement;

10. grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

Case 19-34508 Document 1265 Filed on 04/30/20 in TXSB Page 44 of 48

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. hear, determine, and resolve any cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases, including: (a) with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.E.1 of the Plan; (b) with respect to the exculpation, injunctions, and other provisions contained in Article VIII of the Plan, including entry of such orders as may be necessary or appropriate to implement such exculpation, injunctions, and other provisions; (c) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, and other agreements or documents created in connection with the Plan; or (d) related to section 1141 of the Bankruptcy Code;

13. enter and enforce any order for the sale of property pursuant to section 363, 1123, or 1146(a) of the Bankruptcy Code;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17. enter an order or Final Decree concluding or closing the Chapter 11 Cases;

18. enforce all orders previously entered by the Bankruptcy Court;

19. hear and determine disputes involving all matters the implementation of the Plan; and

20. hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to Article IX hereof, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of (i) prosecuting requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date by the Creditors' Committee and its Professionals and objecting to requests for payment of Professional Fee Claims, (ii) transitioning management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative, (iii) transitioning management of any other Causes of Action (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant), and (iv) appoint the Lien-Related Litigation Creditor Representative. The Debtors shall not be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date, except that (a) the Reorganized Debtors may, subject to Article IV.D. hereof, agree to pay for activities within the scope of clauses (ii) and (iv) as expenses of the Lien-Related Litigation Creditor Representative and (b) the Reorganized Debtors may agree to pay for activities within the scope of clause (iii).

The Lien-Related Litigation Creditor Representative and its professional advisors shall be entitled to become parties to the *Stipulated Protective Order* entered at Docket No. 306, which shall remain in effect following the Effective Date, subject to the provisions of this Plan and the Confirmation Order. The Creditors' Committee and its professional advisors shall be authorized to transition the management of the Lien-Related Litigation to the Lien-Related Litigation Creditor Representative and its advisors, and the Creditors' Committee and its professional advisors shall be authorized to transition the management of other litigation (including against SOG, SNMP, and the Sanchez Entities) to the Reorganized Debtors or other appropriate litigant and its advisors. In each case, the Creditors' Committee shall be deemed to share a common interest with the applicable successor litigant, and, pursuant to Rule 502(d) of the Federal Rules of Evidence, the transmission to the successor litigant of material protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection shall not result in a waiver or forfeiture of any such privilege or protection held by the Creditors' Committee.

D. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor and Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's or Reorganized Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of SN, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of SN.

E. *Reservation of Rights*

The Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G. *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

**Reorganized Debtors**

**Sanchez Energy Corporation**
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: Gregory Kopel

with copies to:

**Counsel to Debtors**

JACKSON WALKER L.L.P
Matthew D. Cavenaugh
Elizabeth Freeman
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4284
Facsimile: (713) 308-4184
mcavenaugh@jw.com
efreeman@jw.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Marty L. Brimmage
Lacy M. Lawrence
2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343
mbrimmage@akingump.com
llawrence@akingump.com

-and-

Ira S. Dizengoff
Jason P. Rubin
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
idizengoff@akingump.com
lbeckerman@akingump.com
jrubin@akingump.com

-and-

James Savin
2001 K Street NW
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
jsavin@akingump.com

H. *Term of Injunctions or Stays*

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

Case 19-34508 Document 1235 Filed in TXSB on 04/30/20 Page 47 of 48

I. *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J. *Plan Supplement*

After any of such documents included in the Plan Supplement are Filed, copies of such documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Claims, Noticing and Solicitation Agent's website at https://cases.primeclerk.com/sanchezenergy or the Bankruptcy Court's website at https://www.pacer.gov/.

K. *Non-Severability*

If, prior to Confirmation, the Bankruptcy Court holds any term or provision of the Plan to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) non-severable and mutually dependent.

L. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, equity holders (regardless of whether such interests are held directly or indirectly), officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

M. *Closing of Chapter 11 Cases*

After the full administration of the Chapter 11 Cases, the Reorganized Debtors shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N. *Waiver or Estoppel*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

Dated: April 30, 2020

SANCHEZ ENERGY CORPORATION
on behalf of itself and all other Debtors

*/s/ Mohsin Y. Meghji*

Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer
Sanchez Energy Corporation

# EXHIBIT 5

Case 4:23-cv-00587 Document 1-6 Filed 04/19/23 Page 523 of 1882

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Re: ECF No. 1248** |

**ORDER GRANTING EMERGENCY MOTION MODIFYING PARAGRAPH 17 OF THE ORDER APPROVING DISCLOSURE STATEMENT AND CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**

Upon the motion (the "Motion")[2] of the above-captioned Debtors (collectively, the "Debtors") for entry of an order (this "Order") modifying paragraph 17 of the Confirmation Order for the limited purpose of extending the Contract Objection Deadline (as defined in the Confirmation Order) from May 20, 2020 to June 22, 2020 with respect to specified counterparties and executory contracts, and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the circumstances warrant the

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

modification proposed by the Debtors, and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion was appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; this Court ORDERS:

1. The Confirmation Order is hereby modified by deleting paragraph 17 thereof in its entirety and replacing it with the following:

> 17. **Executory Contracts and Unexpired Leases**. Unless otherwise indicated or agreed by the Debtors and the applicable contract counterparties and except as expressly otherwise provided in paragraphs 23-25 of this Confirmation Order, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date, notwithstanding the fact that the deadline to object to assumption or rejection of an Executory Contract or Unexpired Lease is May 20, 2020, or such later date as the Debtors or Reorganized Debtors and the applicable party may agree (the "**Contract Objection Deadline**"), which may be after the Effective Date; *provided that* with respect to those parties identified on **Exhibit 2** and those Executory Contracts identified on **Exhibit 3**, the Contract Objection Deadline is June 22, 2020 or such later date as the Debtors or Reorganized Debtors and the applicable party may agree. Any Executory Contract or Unexpired Lease that is subject to an unresolved objection to the proposed assumption or rejection of such Executory Contract or Unexpired Lease that is filed prior to the Contract Objection Deadline shall not be deemed to be assumed or rejected, as applicable, until entry of an order resolving the dispute and approving the assumption or rejection, as applicable, of such Executory Contract or Unexpired Lease or as may be agreed upon by the Debtors or the Reorganized Debtors and the counterparty; *provided that* after the Effective Date, the Reorganized Debtors may settle any dispute regarding any Cure Claim without any further notice to any party or any action, order, or approval of this Court.

2. **Exhibits A** and **B** to the Motion are deemed annexed to the Confirmation Order as **Exhibits 2** and **3**, respectively.



1" = "1" "25885938v.1" "" 25885938v.1

Case 19-34508 Document 1266 Filed in TXSB on 05/20/20 Page 3 of 3

3. The requirements set forth in Local Rule 9013-1 are satisfied by the contents of the Motion.

4. The terms and conditions of this Order shall be immediately effective and enforceable upon entry.

Dated:

____________________________________

MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

Case 4:23-cv-04587 Document 1-6 Filed on 11/30/23 in TXSD Page 526 of 1882

# EXHIBIT A

## Specified Contract Counterparties

- Occidental Petroleum Corporation and Western Midstream Partners, LP and their respective direct and indirect subsidiaries and affiliates (collectively, the "Occidental and Western Parties"), including:[1]
    - Anadarko Petroleum Corporation
    - Anadarko Energy Services Company
    - Anadarko E&P Onshore, LLC
    - Anadarko E&P Company LP
    - Kerr-McGee Oil & Gas Onshore LP
    - Kerr-McGee Oil & Gas Onshore, LLC
    - Springfield Pipeline, LLC
    - WGR Operating, LP
    - Western Gas Operating, LLC
    - Western Gas Partners, LP
    - Western Midstream Partners, LP
- Marathon Oil EF, LLC
- Mitsui E&P Texas LP
- Mitsui & Co. Energy Marketing & Services (USA), Inc.
- Eagle Ford TX LP
- Gavilan Resources, LLC
- GSO ST Holdings LP, and each of its affiliates that have a contractual relationship with the Debtors
- GSO ST Holdings Associates LLC, and each of its affiliates that have a contractual relationship with the Debtors
- SN EF UnSub GP, LLC
- SN EF UnSub LP
- SN EF UnSub Holdings, LLC
- Catarina Midstream, LLC
- Plains South Texas Gathering, LLC and Plains Gas Solutions, LLC
- TPL SouthTex Processing Company LP

---

[1] The Occidental and Western Parties are provided an extension, through the Contract Objection Deadline, to raise any objections with respect to the Debtors' proposed rejection of all contracts listed on the Schedule of Rejected Executory Contracts and Unexpired Leases that name any of the Occidental and Western Parties and with respect to the counterparties listed below (solely with respect to the contracts identified below), or any other agreements that amend, supplement, or otherwise are related to or are allegedly integrated with such contracts; *provided* that (a) nothing contained herein shall confer upon the Occidental and Western Parties standing to object to the Debtors' proposed assumption or rejection of any such contracts and all parties' rights to raise any and all claims or defenses to such objections are expressly reserved, and (b) nothing contained in this footnote shall limit the rights of Gavilan Resources, LLC to object, through June 22, 2020, to the Debtors' proposed assumption or rejection of any contracts to which it is a party.

- Gavilan Resources, LLC (with respect to the Joint Development Agreement, Crude Oil Production Marketing Agreement, Residue Gas Marketing Agreement, and Natural Gas Liquids Marketing Agreement and any amendments to any of these agreements only).

- BP Oil Supply, a division of BP Products North America, Inc. (with respect to a certain "Amendment to the Purchase Agreement" and any other agreement to which it and any of the above-referenced entities are jointly listed as counterparties).

- TPL SouthTex Transmission Company LP
- Carnero G&P LLC and its affiliates
- Hilcorp Energy I, L.P.
- Archrock Partners Operation LLC, Archrock Sevices LP and their affiliates
- Seco Pipeline, LLC
- Sanchez Midstream Partners LP
- Sanchez Midstream Partners GP LLC
- Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)
- Targa Resources Corporation
- B.L. Stanley, Ltd., Worthey Properties, Ltd. Robert Edward Worthey Trust, Teressa Kountz Trust and Tonya Hedleston Trust

Case 4:19-cv-03508 Document 266 Filed on 11/19/20 Page 57 of 182

# EXHIBIT B

## Specified Contracts

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Frio LaSalle Pipeline, LP | Fourth Amendment to Gas Gathering Agreement |
| SN Palmetto, LLC | Marathon Oil EF LLC | Marketing Agreement |
| SN Cotulla Assets, LLC | Eagle Ford Gathering LLC | Amendment to Gas Services Agreement |
| SN Marquis, LLC | American Midstream (Lavaca) LLC | Firm Gas Gathering Agreement |
| SN Cotulla Assets, LLC | Regency Field Services LLC | Natural Gas Sale and Purchase Contract |
| SN Cotulla Assets, LLC | Frio Lasalle Pipeline LP | Letter Agreement |
| SN Catarina, LLC | Catarina Midstream, LLC | Firm Gathering and Processing Agreement |
| SN Cotulla Assets, LLC | ETC Field Services LLC | First Amendment to Gas Gathering Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>Shell Western E&P | Gathering and Natural Gas Services Agreement |
| SN Catarina, LLC | Houston Pipe Line Company, LP<br>Shell Western E&P<br>SWEPI, LP<br>Houston Pipe Line Company LP | Intrastate Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | Houston Pipe Line Company LP<br>SWEPI LP d/b/a Shell Western E&P<br>Houston Pipe Line Company LP | Interruptible Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>Shell Western E&P | Gathering and Natural Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP dba Shell Western E&P<br>Houston Pipe Line Company LP | Intrastate Natural Gas Transportation Service Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Eagle Ford<br>SWEPI LP | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford Gathering LLC | Interconnect Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | Humble Gas Pipeline Company<br>SWEPI LP | Gas Transportation Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Velocity South Texas Gathering, LLC<br>Velocity Midstream Partners, LLC | Oil Gathering Agreement |
| SN Catarina, LLC | Etc Texas Pipeline, Ltd<br>SWEPI LP, dba Shell Western E&P | Gathering and Processing Agreement |
| SN Catarina, LLC | Plains Gas Solutions, LLC<br>SWEPI LP | Interruptible Condensate Stabilization Agreement |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>SWEPI LP, dba Shell Western E&P | Second Amendment to Individual Transaction Confirmation |
| SN Catarina, LLC | ETC Texas Pipeline, Ltd.<br>SWEPI LP, dba Shell Western E&P | First Amendment to Individual Transaction Confirmation |
| SN Catarina, LLC | Gazelle Transportation Inc.<br>Shell Exploration & Production Company (SEPCOo) on behalf of SWEPI LP | Sale to and Purchase from Gazelle Transportation, Inc. |
| SN Catarina, LLC | Shell Exploration & Production Company (SEPCO) on behalf of SWEPI LP<br>Gazelle Transportation Inc. | Amendment to Purchase and Sale Agreement |
| SN Catarina, LLC | Gazelle Transportation<br>Shell Exploration & Production Company (SEPCO) on behalf of SWEPI LP | Amendment to Purchase and Sale Agreement |
| SN Catarina, LLC | Jag Energy USA, Inc.<br>SWEPI LP | Natural Gas Liquids. Commercial Terms Confirmation |
| SN Catarina, LLC | Eagle Ford Gathering LLC | First Amendment to Gas Services Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Extension Rider for License Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Anadarko E&P Onshore, LLC<br>Eagle Ford Gathering, LLC | Gas Service Agreement |
| SN Catarina, LLC | Axis Marketing, LLC | Raw Make Purchase/Sales Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | TPL Southtex Processing Company LP by TPL Southtex Pipeline Company LLC, its general partner | Amendment Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP by TPL Southtex Pipeline Company LLC, its general partner | First Amendment to Firm Gas Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP | Firm Gas Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP | Firm Gas Gathering Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company LP<br>Carnero Processing, LLC | Omnibus Amendment to the Gathering LLC and the Processing LLC Agreement |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | First Amendment to Gas Gathering Agreement |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | Second Agreement Gas Services |
| SN Catarina, LLC | Eagle Ford Gathering, LLC | Third Amendment to Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP<br>Eagle Ford Gathering LLC | Gas Services Agreement |
| SN Catarina, LLC | SWEPI LP, Doing Business As Shell Western E&P<br>Etc Texas Pipeline, Ltd | Individual Transaction Confirmation to Gathering and Processing Agreement |
| SN Catarina, LLC | SWEPI LP, doing business as SWEPI LP, doing business as Shell Western E&P<br>ETC Texas Pipeline, Ltd. | Gathering and Processing Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to the Purchase Agreement |

Case 19-34508 Document 1283 Filed in TXSB on 05/26/20 Page 51 of 61

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation<br>SN Catarina, LLC | Shell Trading (US) Company | Amendment 2 to the Purchase Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to the Purchase Agreement |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Trading (US) Company | Crude Oil Purchase Agreement |
| SN Catarina, LLC | Seco Pipeline, LLC | Firm Transportation Service Agreement |
| SN EF Maverick, LLC | Kerr-Mcgee Oil & Gas Onshore, LP<br>Anadarko E&P Onshore, LLC | Specified Midstream Assumption Agreement |
| SN EF Maverick, LLC | Bp Products North America, Inc.<br>Anadarko E&P Onshore, LLC | First Amendment to Service Contract |
| SN EF Maverick, LLC | Bp Oil Supply, a division of BP Products North America, Inc. | Amendment to the Purchase Agreement |
| SN EF Maverick, LLC | BP Products North America, Inc.<br>Anadarko E&P Onshore, LLC | Crude Oil Purchase Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Double Eagle Pipeline, LLC C/O Copano Double Eagle, LLC<br>Kinder Morgan Crude & Condensate, LLC | Throughput and Deficiency Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC, F.K.A. Anadarko E&P Company, LP<br>WGR Operating, LP by Western Gas Operating, LLC, its General Partner | Treating and Handling Fees - Brasada Gas Processing Plant |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 1 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 2 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 3 |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>WGR Operating, LP | Gas Processing Agreement Amendment No. 4 |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Wgr Operating, LP by Western Gas Operating, LLC, its General Partner<br>Anadarko E&P Company, LP | Gas Processing Agreement |
| SN EF Maverick, LLC<br>SN Catarina, LLC | WGR Operating, LP | WGR Gas Agreement |
| SN EF Maverick, LLC | TPL SouthTex Processing Company, LP by TPL Southtex Processing Company, LLC, its General Partner | First Amendment to the Interruptible Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Firm Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC<br>Sanchez Energy Corporation | TPL Southtex Processing Company, LP | Interruptible Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP By Net General Partners, LLC, Its General Partner | First Amendment to Firm Agreement NGPA Sec. 311 Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP by Net General Partners, LLC, its General Partner | First Amendment to Firm Intrastate Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP | Firm NGPA Section 311 Gas Transportation Agreement |
| SN EF Maverick, LLC | Eagle Ford Midstream, LP<br>Anadarko Energy Services Company | Firm Intrastate Gas Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP<br>Cima Energy, Ltd<br>Upstream Energy Services, LLC | Gas Gathering Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | First Amendment to Gas Gathering Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Endeavor Natural Gas, LP | Interconnection Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Enterprise Products Operating, LLC, By Enterprise Products Olpgp, Inc. | Purchase Agreement |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC<br>Anadarko Energy Services Company | Transportation Services Agreement |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC, By Enterprise Products Olpgp, Inc.<br>Anadarko Petroleum Corporation | First Amendment to Gas Gathering, Processing and Purchase Contract |
| SN EF Maverick, LLC | Anadarko Petroleum Corporation<br>Enterprise South Texas Gathering, LP | Second Amendment to Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC | Anadarko Petroleum Corporation<br>Enterprise South Texas Gathering, LP | Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC | Anadarko E&P Company, LP, c/o Anadarko Petroleum Corporation<br>Enterprise Hydrocarbons L.P., by Enterprise Products Operating, LLC, its general partner | Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise Texas Pipeline, LLC | Interruptible Gas Transportation Agreement for Intrastate Service |
| SN EF Maverick, LLC | Enterprise Texas Pipeline, LLC | Interruptible Gas Transportation Agreement for NGPA Section 311 Service |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Enterprise Hydrocarbons LP, by Enterprise Products Operating | Second Amendment to Gas Processing Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | LLC, its general partner, by Enterprise Products OLPGP Inc., its sole manager | |
| SN EF Maverick, LLC | Enterprise Hydrocarbons, LP; by Enterprise Products Operating, LLC; by Enterprise Products OLPGP, Inc. | Third Amendment to Gas Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>ETC Texas Pipeline, Ltd; by LG Pl, LLC | Individual Transaction Confirmation |
| SN EF Maverick, LLC | ETC Texas Pipeline, Ltd.<br>Anadarko E&P Company LP | Gathering and Processing Agreement |
| SN EF Maverick, LLC | ETC Texas Pipeline, Ltd.; by LG PL, LLC<br>Anadarko E&P Company LP | Second Amendment to Amended and Restated Individual Transaction Confirmation |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company, LP | First Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company, LP | Second Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore LLC<br>Texas Pipeline, LLC | Third Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Texas Pipeline, LLC<br>Anadarko E&P Company LP | Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Texas Pipeline LLC | Amendment to Firm Transportation Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Texas Pipeline, LLC, By Howard Midstream Energy Partners, LLC<br>Allocation Specialists, Ltd., By Petroleum Documentation, LLC | NGL Bank Service Agreement |
| SN EF Maverick, LLC | Amid Crude Trucking, LLC | Truck Purchase Agreement |
| SN EF Maverick, LLC | Anadarko E&P Company, LP<br>Trimac Transportation Central, Inc. | Motor Transportation Contract |
| SN EF Maverick, LLC | Dupre Logistics, LLC | Truck Transportation Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Plains Gas Solutions, LLC<br>Anadarko E&P Onshore, LLC | First Amendment to Firm Condensate Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Plains Gas Solutions, LLC | Condensate Processing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement |
| SN EF Maverick, LLC | Plains South Texas Gathering, LLC<br>Anadarko E&P Onshore, LLC | Shipping Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Crude Oil Production Marketing Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Gavilan Resources, LLC | Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Crude Oil Production Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX LP<br>Anadarko E&P Company LP<br>Anadarko Energy Services Company | Maverick Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | Maverick Crude Oil Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Maverick Residue Gas Marketing Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | Anadarko E&P Onshore, LLC<br>Mitsui E&P Texas, LP | |
| SN EF Maverick, LLC | Sm Energy Company<br>Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC | Maverick Residue Gas Marketing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC , f/k/a Anadarko E&P Company LP<br>Anadarko Energy Services Company<br>Sm Energy Company | Maverick Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC , f/k/a Anadarko E&P Company LP<br>Anadarko Energy Services Company<br>SM Energy Company | Maverick Oil Production Marketing Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Anadarko E&P Onshore, LLC<br>Anadarko Energy Services Company<br>Kerr-Mcgee Oil & Gas Onshore LP | First Amendment to the Retained Marketing Contracts Services Agreement |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Eagle Ford Midstream, LP | Assignment and Consent to Assignment Agreement |
| SN EF Maverick, LLC<br>Sanchez Energy Corporation | Anadarko E&P Onshore, LLC<br>Kerr-Mcgee Oil & Gas Onshore, LP | Retained Midstream Contracts Services Agreement |
| SN Catarina, LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation | Anadarko E&P Onshore LLC<br>Kerr-Mcgee Oil & Gas Onshore LP<br>Anadarko Energy Services Company | Retained Marketing Contracts Services Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Kerr-Mcgee Oil & Gas Onshore LP<br>Anadarko Energy Services Company<br>Anadarko E&P Onshore, LLC | Second Amendment to the Retained Marketing Contracts Services Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | TPL Southtex Transmission Company, LP | Interruptible Interstate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | TPL Southtex Transmission Company, LP | Interruptible Interstate Gas Transportation Service Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement |
| Sanchez Energy Corporation | Springfield Pipeline, LLC | Agreement to Amend Gas Gathering Agreements |
| SN EF Maverick, LLC | Anadarko E&P Onshore LLC Springfield Pipeline LLC | Attachment to Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Anadarko E&P Onshore, LLC Springfield Pipeline, LLC | Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Tauber Oil Company | Purchase Contract |
| SN EF Maverick, LLC | Tauber Oil Company | Sales Contract |
| SN EF Maverick, LLC | WGR Operating, LP | Confirmation for Delivery |
| Sanchez Energy Corporation | WGR Operating, LP | Master Agreement for Purchase, Sale or Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | Kinder Morgan Tejas Pipeline, LLC | Confirmation Email |
| SN EF Maverick, LLC | Kinder Morgan Tejas Pipeline, LLC | Confirmation Email |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | WTG Gas Marketing, Inc. | Transaction Confirmation for Immediate Delivery |
| SN EF Maverick, LLC | Anadarko Energy Services Company<br>Techgen SA De CV | Transaction Confirmation |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Interconnect Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Memorandum of Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | Arrowhead Gathering Company, LLC | Petroleum Transportation Agreement |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Chesapeake Energy Marketing, Inc. | First Amendment to Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | EXCOo Operating Company, LP<br>Chesapeake Energy Marketing, LLC | Second Amendment to Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Chesapeake Energy Marketing, Inc. | Crude Oil Purchase Contract |
| SN Cotulla Assets, LLC | Flint Hills Resources, LP | Purchase Agreement |
| SN Cotulla Assets, LLC | Flint Hills Resources, LP | Purchase Agreement |
| SN Cotulla Assets, LLC | Enterprise Hydrocarbons, LP<br>EXCO Operating Company, LP | Gas Processing Agreement |
| SN Cotulla Assets, LLC | EXCO Operating Company, LP<br>Mockingbird Midstream Gas Services, LLC | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC<br>Buffco Production, Inc. | Gas Gathering Contract |
| SN Cotulla Assets, LLC | Mockingbird Midstream Gas Services, LLC<br>Buffco Production, Inc. | Gas Gathering Contract |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 5 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 6 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 7 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 1 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 10 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 11 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 12 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 2 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 3 to Purchase Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 4 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 5 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 6 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 7 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 8 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 9 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 13 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 14 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 15 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 16 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 17 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 18 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 19 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 20 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 21 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 22 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 23 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 24 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 25 to Purchase Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 26 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 27 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 28 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 29 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Amendment 30 to Purchase Agreement |
| Sanchez Energy Corporation | Shell Trading (US) Company | Purchase Agreement |
| SN Cotulla Assets, LLC | Trafigura Trading, LLC | Amendment to Purchase Agreement |
| SN Cotulla Assets, LLC | Buffco Production, Inc.<br>Upstream Energy Services, LP | Natural Gas Marketing, Transportation and Processing Agency Agreement |
| SN Cotulla Assets, LLC | Upstream Energy Services, LLC | Natural Gas Marketing, Transportation and Processing Agency Agreement Amended |
| SN Cotulla Assets, LLC | Upstream Energy Services, LLC | Natural Gas Marketing, Transportation and Processing Agency Agreement |
| SN Catarina, LLC | BASF Intertrade Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | BASF Intertrade Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | ENGIE Energy Marketing Na, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | ENGIE Energy Marketing Na, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Anadarko Energy Services Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Air Liquide Large Industries US, LP | Base Contract for Sale and Purchase of Natural Gas |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | ARM Energy Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | BG Energy Merchants, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC<br>SN Catarina, LLC | BP Energy Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | CIMA Energy, Ltd | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Coahuila Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Conocophillips Company | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Conocophillips Company | Special Provisions to NAESB Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Direct Energy Business Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | DTE Energy Trading, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Hartree Partners, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Houston Pipe Line Company, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Howard Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Koch Energy Services, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Kinder Morgan Texas Pipeline, LLC<br>Kinder Morgan Tejas Pipeline, LLC | Amendment to Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Kinder Morgan Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Macquarie Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Mercuria Energy America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Mmgs, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | WTG Gas Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Occidental Energy Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Pacific Summit Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Petrochina International (America), Inc | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Repsol Energy North America Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Sempra Gas & Power Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Sempra Gas & Power Marketing, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC<br>Sanchez Energy Corporation | Shell Energy North America (US), LP | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Targa Gas Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tenaska Marketing Ventures | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tenaska Marketing Ventures | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trafigura Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trafigura Trading, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Trailstone NA Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Tripolarity Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |

Case 23-10455 Document 2263 Filed 04/05/20 Page 546 of 1882

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN Catarina, LLC | Twin Eagle Resource Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | United Energy Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | BP Energy Comopany | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | Kinder Morgan Texas Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Cotulla Assets, LLC | Texla Energy Management, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Occidental Energy Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Master Agreement for Purchase, Sale or Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | Air Liquide Large Industries US, LP | Master Agreement for Purchase, Sale and Exchange of Liquid Hydrocarbons |
| SN EF Maverick, LLC | ARM Energy Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | BP Energy Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Calpine Energy Services, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | CIMA Energy, Ltd | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Coahuila Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Cokinos Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Conocophillips Company | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Conocophillips Company | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |


1" = "1" "25885938v.1" "" 25885938v.1

Case 20-32631 Document 2636 Filed in TXSB on 05/20/20 Page 247 of 882

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Diamond Shamrock Refining Company, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Direct Energy Business Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | DTE Energy Trading, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Enterprise Products Operating, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Hartree Partners, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Houston Pipe Line Comapny, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Koch Energy Services, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Kinder Morgan Texas Pipeline, LLC<br>Kinder Morgan Texas Pipeline, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Macquarie Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mercuria Energy America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mitsui & Co. Energy Marketing And Services (USA), Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | WTG Gas Marketing, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Pacific Summit Energy, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Petrochina International (America), Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Sempra Gas & Power Markering,LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Sempra Gas & Power Marketing, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Shell Energy North America (US), LP | Base Contract for Sale and Purchase of Natural Gas |


1" = "1" "25885938v.1" "" 25885938v.1

006335

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | | |
| SN EF Maverick, LLC | Superior Natural Gas Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Superior Natural Gas Corporation | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Techgen SA DE CV | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tenaska Marketing Ventures | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tenaska Marketing Ventures | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trafigura Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trafigura Trading, LLC | Special Provisions to the Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Trailstone Na Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Tripolarity Energy Corporation | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Twin Eagle Resource Management, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | United Energy Trading, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Valero Refining - Texas, LP | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Targa Gas Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| Sanchez Energy Corporation | Tenaris Global Services (USA) Corporation | Agreement For The Provision Of Goods |
| SN Cotulla Assets, LLC | EP Energy E&P Company, LP | Letter Agreement to Purchase Oil and Gas Interests |
| Sanchez Energy Corporation | SN Midstream, LLC<br>Sanchez Midstream Partners LP | Gathering Letter Agreement |



1" = "1" "25885938v.1" "" 25885938v.1

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| Sanchez Energy Corporation | NGL Crude Terminals, LLC | Letter Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | Catarina Midstream, LLC | Amendment No.1 to Firm Gathering and Processing Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Firm Gas Gathering, Processing and Purchase Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Memorandum of Firm Gas Gathering Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Firm Gas Gathering, Processing, and Purchasing Agreement |
| SN EF Maverick, LLC | Eagle Ford TX, LP<br>Carnero G&P, LLC | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Carnero G&P LLC | Memorandum Of Agreement Relating To Firm Gas Gathering Agreement |
| SN EF Maverick, LLC | Venado EF L.P. | Approval Letter to Natural Gas Liquids Marketing Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC<br>Venado EF, L.P | Ratification and Assumption Agreement |
| SN EF Maverick, LLC | Venado EF, L.P<br>Carnero G&P, LLC | Memorandum of Agreement |
| SN EF Maverick, LLC | Mitsui E&P Texas, LP | Take-In-Kind Letter Agreement with Mitsui |
| SN EF Maverick, LLC | Mitsui E&P Texas, LP<br>Carnero G&P, LLC | Letter Agreement |
| SN EF Maverick, LLC | Carnero G&P, LLC | Memorandum of Agreement |
| SN Catarina, LLC | Nextera Energy Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Mitsui & Co. Energy Marketing And Services (USA), Inc. | Amendment to Special Provisions to Base Contract |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| | | for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | Nextera Energy Marketing, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Palmetto LLC | Marathon Oil EF LLC | Marketing Agreement (Oil-Gas) |
| SN EF Maverick, LLC | Enterprise Hydrocarbons LP | Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise Hydrocarbons LP | Amendment No. 2 to Gas Processing Agreement |
| SN EF Maverick, LLC | Enterprise South Texas Gathering LP | Amendment No. 2 to Gas Gathering, Processing and Purchase Contract No. 8527 |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Enterprise South Texas Gathering LP<br>Anadarko Petroleum Corporation | Gas Gathering, Processing, and Purchase Contract |
| SN EF Maverick, LLC | Jag Energy USA, Inc. | Purchase Order |
| SN Marquis, LLC | Lonestar Resources US Inc. | Amendment No. 1 to Purchase and Sale Agreement |
| SN Catarina, LLC | WWM Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC | WWM Logistics, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC | Total Gas & Power North America, Inc. | Base Contract for Sale and Purchase of Natural Gas |
| SN Catarina, LLC<br>SN EF Maverick, LLC | SN EF Maverick, LLC<br>SN Catarina, LLC | Base Contract for Sale and Purchase of Natural Gas |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Springfield Pipeline LLC<br>Anadarko E&P Onshore LLC | Firm Intrastate Gas Transportation Service Agreement |
| SN EF Maverick, LLC | Total Gas & Power North America, Inc. | Base Contract for Sale and Purchase of Natural Gas |


1" = "1" "25885938v.1" "" 25885938v.1

Case 19-34508 Document 1263 Filed in TXSB on 05/26/20 Page 391 of 1882

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Central Inc.<br>Anadarko E&P Company LP | Motor Transportation Contract |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Central Inc.<br>Anadarko E&P Onshore LLC | Revised Appendix A |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Trimac Transportation Inc.<br>Anadarko E&P Onshore LLC | Revised Appendix A |
| SN Cotulla Assets, LLC | EP Energy E&P Company LP | Letter Agreement Re Agreement to Purchase Oil & Gas Interests |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Exco Operating Company LP<br>Enterprise Hydrocarbons LP | Base Contract for Sale and Purchase of Natural Gas |
| Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC<br>SN EF Maverick, LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC | Anadarko Energy Services Company<br>Kerr Mcgee Oil & Gas Onshore LP<br>Anadarko E&P Onshore LLC<br>Anadarko Energy Services Company<br>Kerr Mcgee Oil & Gas Onshore LP<br>Anadarko E&P Onshore LLC<br>SN EF Maverick, LLC<br>Sanchez Energy Corporation | Marketing Transition Services Agreement |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Carnero G&P LLC<br>SN EF Unsub, LP | Memorandum of Agreement |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | Eagle Ford TX LP | Letter Agreement Re: Gas Agreements |
| SN EF Maverick, LLC<br>SN EF Maverick, LLC | Carnero G&P LLC<br>Eagle Ford TX LP | Memorandum of Agreement |
| SN EF Maverick, LLC | Venado EF LP | Letter Agreement Re: Gas Agreements |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment No. 1 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Oil Delivery Contract |
| SN EF Maverick, LLC | Anadarko Energy Services Company | Downstream Marketing Agreements Assumption Agreement |
| SN Cotulla Assets, LLC | Flint Hills Resources LP | Purchase Agreement |
| SN Catarina, LLC | Catarina Midstream, LLC | Letter Re: Notice of Rate Adjustment |
| SN Catarina, LLC | Conocophillips Company | Transaction Confirmation |
| SN EF Maverick, LLC<br>SN Catarina, LLC<br>SN Catarina, LLC<br>SN EF Maverick, LLC | Texas Pipeline Webb County Lean System LLC<br>SN Catarina, LLC<br>Texas Pipeline Webb County Lean System LLC<br>SN EF Maverick, LLC | Interruptible Transport Service Agreement |
| SN EF Maverick, LLC | BP Energy Company | Transaction Confirmation |
| SN EF Maverick, LLC | Conocophillips Company | Transaction Confirmation |
| SN EF Maverick, LLC | Eagle Ford Midstream, LP | Natural Gas Transportation Service Agreement |
| Sanchez Energy Corporation<br>Sanchez Energy Corporation<br>SN EF Maverick, LLC | Shell Energy North America (US), L.P.<br>SN EF Maverick, LLC<br>Shell Energy North America (US), L.P.<br>SN EF Maverick, LLC | Transaction Confirmation |

| Debtor(s) | Counterparty(ies) | Contract Description |
|---|---|---|
| SN EF Maverick, LLC | | |
| SN EF Maverick, LLC | Shell Trading (US) Company | STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment 002 to STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Shell Trading (US) Company | Amendment 0001 to STUSCO Contract Ref: No. CLP0001886 |
| SN EF Maverick, LLC | Twin Eagle Resource Management, LLC | Gas Transaction Confirmation |
| Sanchez Energy Corporation<br>SN Catarina, LLC | Shell Trading (US) Company | Supply Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | Shell Trading (US) Company | Price Amendment to Supply Agreement |
| Sanchez Energy Corporation<br>SN Payables, LLC | Shell Trading (US) Company | Price Amendment to Supply Agreement |
| Sanchez Energy Corporation<br>SN Catarina, LLC | Shell Trading (US) Company | Abstract of Amendment No. 3 to Price Contract |
| SN EF Maverick, LLC | BP Oil Supply | Oil Trade Confirmation |
| SN EF Maverick, LLC | BP Oil Supply | Trade Confirmation |
| SN EF Maverick, LLC | Flint Hills Resources LP | Purchase Agreement |


1" = "1" "25885938v.1" "" 25885938v.1

# EXHIBIT 6

# (FILED UNDER SEAL)

# EXHIBIT 7

# (FILED UNDER SEAL)

# EXHIBIT 8

# (FILED UNDER SEAL)

# EXHIBIT 9

# (FILED UNDER SEAL)

# EXHIBIT 10

# (FILED UNDER SEAL)

# EXHIBIT 11

# (FILED UNDER SEAL)

# EXHIBIT 12

# (FILED UNDER SEAL)

# EXHIBIT 13

# RETAINED MARKETING CONTRACTS SERVICES AGREEMENT

This Retained Marketing Contracts Services Agreement (the "Agreement") is entered as of the Effective Date defined below by and among SN EF Maverick, LLC ("SNEF") and SN Catarina, LLC ("SN Catarina") (collectively SNEF and SN Catarina are referred to herein as "Provider") and Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), and Anadarko Energy Services Company ("AESC") (collectively AEP, KMOG and AESC are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18, Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

WHEREAS, pursuant to Schedule 13.4 of that certain Purchase and Sale Agreement dated effective July 1, 2016 (as the same may be amended from time to time, the "PSA") by and among AEP and KMOG, on the one hand, and Provider, SN EF UnSub, LP ("UnSub") and Gavilan Resources, LLC (f/k/a Aguila Production, LLC) ("AcqCo") on the other hand, Provider shall serve as marketing agent on behalf of Recipient and its Affiliates with respect to Retained Marketing Contracts as of the date of termination of the Marketing Transition Services Agreement (as that term is defined in the PSA);

WHEREAS, Provider has requested that AESC also purchase gas from the tailgate of the Raptor Plant; and

WHEREAS, the Parties are entering into this Agreement to provide for the specific terms and conditions under which Provider shall perform Recipient's obligations with respect to such Retained Marketing Contracts and the Raptor Agreement(s) (as defined below).

NOW, THEREFORE, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I. DEFINITIONS AND INTERPRETATION

**1.1 Definitions**. The following terms when used herein shall have the meanings set forth below.

"**Accounting Services**" means those services to be performed hereunder which are set forth in Section 3.1(m).

"**AEP**" shall have the meaning as set out in the preamble.

"**AESC**" shall have the meaning as set out in the preamble.

"**Agreement**" shall have the meaning as set out in the preamble.

"**Affiliate**" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, another Person; *provided, however*, that the Western Gas Entities shall not be deemed to be Affiliates of Recipient. The term "***control***" and its derivatives with respect to any Person means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**AcqCo**" shall have the meaning as set out in the recitals.

"**Bankruptcy**" means with respect to any Party, (i) the filing by such Party of a petition or the commencement of, or the acquiescence in the commencement of, a proceeding or cause of action under any bankruptcy, insolvency or similar law providing for protection from its creditors, or a Party having any such proceeding or cause of action filed or commenced against it; (ii) the seeking by such Party of the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; (iii) the making of an assignment or any general arrangement for the benefit of its creditors, (iv) such Party admitting its inability to pay its debts as they fall due, (v) such Party becoming bankrupt or insolvent (however documented or evidenced), or (vi) such Party making a general assignment for the benefit of its creditors.

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"**Carrier**" means any one, as applicable, of the pipelines (or storage facilities), including gathering systems, identified in the applicable Transportation Agreement(s).

"**Claims**" shall have the meaning as set out in Section 3.6.

"**Commodity Contract(s)**" means a contract(s) for the purchase and sale of Hydrocarbons entered into by and between Recipient and a Third Party(ies) that has been retained by Recipient, as identified on Exhibit A hereto.

"**Day**" means a period of 24 consecutive hours, starting at 9:00 a.m. Central Clock Time on any calendar day.

"**Defaulting Party**" shall have the meaning as set out in Section 8.1.

"**Effective Date**" means the date on which the Marketing Transition Services Agreement (as defined in the PSA) terminates.

"**Event of Default**" shall have the meaning as set out in Section 8.1.

"**Governmental Body**" means any instrumentality, subdivision, court, administrative agency, commission, official or other governmental authority of the United States or any other country or any state, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any administrative, executive, judicial, legislative, police, regulatory, taxing, importing or other governmental or quasi-governmental body.

"**Hydrocarbons**" means hydrocarbons from the Assets, as well as the co-working interest owner's hydrocarbons from the Assets. In the context of the Raptor Agreement, Hydrocarbons shall mean gas, if any, purchased by AESC at the tailgate of the Raptor Plant.

"**KMOG**" shall have the meaning as set out in the preamble.

"**Month**" means the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

"**NET**" shall have the meaning as set out in Section 9.20.

"**NET Agreements**" shall have the meaning as set out in Section 9.20.

"**Non-Defaulting Party**" shall have the meaning as set out in Section 8.1(a).

"**Obligations**" shall have the meaning as set out in Section 9.18.

"**Operational Services**" means any and all services set forth hereunder which are not Accounting Services.

"**Parties**" shall have the meaning as set out in the preamble.

"**Production Marketing Agreements**" means those certain agreements set forth on Exhibit B, which is attached hereto and incorporated herein for all purposes.

"**Provider**" shall have the meaning as set out in the preamble.

"**PSA**" shall have the meaning as set out in the recitals.

"**Raptor Agreement**" shall have the meaning as set out in Section 9.18.

"**Recipient**" shall have the meaning as set out in the preamble.

"**Retained Marketing Contracts**" means the Commodity Contract(s) and the Transportation Agreement(s) collectively.

"**Sanchez Anadarko Contract(s)**" means the purchase and/or buy/sell agreement(s) entered into by and between Provider and Recipient pursuant to Sections 3.1 (a)-(c) as applicable.

"**Seller Indemnified Parties**" shall have the meaning as set out in the PSA.

"**SN Parent**" shall have the meaning as set out in the preamble.

"**SN Parent Guaranty**" shall have the meaning as set out in Section 9.18.

"**Taxes**" shall have the meaning as set out in Section 7.2.

"**Term**" shall have the meaning as set out in Article VI of this Agreement.

"**Transportation Agreement(s)**" means a contract(s) for processing, treating, gathering, transportation or storage service entered into by and between Recipient and a Carrier that has been retained by Recipient, as identified on Exhibit A hereto.

"**UnSub**" shall have the meaning as set out in the recitals.

"**Western Gas Entities**" shall mean Western Gas Equity Holdings, LLC, Western Gas Equity Partners, LP, Western Gas Holdings, LLC, Western Gas Partners, LP, and the direct and indirect subsidiaries of Western Gas Partners, LP.

"**Wyman**" shall have the meaning as set out in Section 9.19.

"**Wyman Hedge(s)**" shall have the meaning as set out in Section 9.19.

## ARTICLE II. APPOINTMENT OF AGENT

**2.1 Provider as Agent**. Recipient hereby appoints Provider to serve as its exclusive agent to manage and administer the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement (if applicable), and the Transportation Agreement(s) with respect to the specific duties set forth in Article III throughout the Term of this Agreement. Provider shall have no authority to undertake actions on behalf of Recipient that are beyond the scope of the authorizations stated in this Agreement. Recipient does not appoint Provider to act as its general agent, or as an agent for any other purpose other than the express authorizations granted in this Agreement. In no event shall Provider, in its capacity as agent or otherwise, take title to the Hydrocarbons being transported under the Transportation Agreements if such Transportation Agreement requires the shipper to have title to any such Hydrocarbons being transported unless such Transportation Agreement shall first have been permanently assigned by Recipient to Provider in accordance with Schedule 13.4 of the PSA.

**2.2 Implementing Notices**. Recipient shall provide each Carrier with notice under the applicable Transportation Agreement of the appointment of Provider as agent in time for Provider to administer and manage the contracts for which it has been given management and administrative authority, and Recipient agrees to also provide such notice to any counterparty to any of the Commodity Contract(s) that requests or requires such notice. Recipient further agrees to take any and all actions necessary to facilitate such appointment, including but not limited to executing documents required by the Carrier.

## ARTICLE III. PERFORMANCE OBLIGATIONS

**3.1 Provider's Specific Responsibilities**. Provider shall provide the following services under the terms of this Agreement:

(a) Where warranty of title is required under the applicable Commodity Contract or Transportation Agreement and where not prohibited under the terms of the Commodity Contract or Transportation Agreement, Recipient will engage in a buy/sell transaction in which Recipient each Month will purchase from Provider Hydrocarbons at a mutually agreed point upstream of the receipt point on the applicable Carrier's system at an agreed upon contract price set forth in a

written notice from Recipient to Provider and Recipient will agree to resell an equivalent volume (and to the extent applicable an equivalent grade), less fuel, loss allowance and other allowances as applicable, of Hydrocarbons to Provider at the same stated price after the point of delivery under the applicable Commodity Contract or Transportation Agreement (with Provider being liable for the payment of any and all transportation charges and all related fees, charges, or surcharges related to transportation of Hydrocarbons from the point of receipt to the point of delivery by the applicable Carrier that would otherwise have been due and payable by Recipient). To the extent there are any other amounts deducted from the amounts that would otherwise be payable to Recipient, Provider shall bear sole responsibility for those deductions;

(b) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed point upstream of the facilities of the applicable Carrier at a mutually agreed price, and Provider shall nominate and schedule such Hydrocarbons to which the Recipient has title to the appropriate delivery point(s) as specified in the applicable Commodity Contract or Transportation Agreement. Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(b) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(c) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed upon point downstream after transportation at a mutually agreed upon price and Provider shall nominate and schedule such Hydrocarbons to the appropriate delivery point(s) as specified in the applicable Transportation Agreement, and from and to the delivery point(s) thereafter on Recipient's behalf set forth in the applicable Commodity Contract(s). Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(c) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(d) Prepare and submit daily and monthly nominations, as applicable, to facilitate Recipient's receipt and/or delivery of such Hydrocarbons at the applicable delivery and/or receipt point(s) under the Transportation Agreement(s), the Commodity Contract(s), the Raptor Agreement, and/or the Sanchez Anadarko Contracts;

(e) On each Day, manage the receipts and deliveries of Hydrocarbons with the applicable Carriers so as to minimize Imbalance Charges, if possible;

(f) Manage any critical day events or operational issues affecting the Carriers or any other industry developments or circumstances of which Provider has become aware that may have a material effect on the transportation of the Hydrocarbons made the subject of the Commodity Contract(s), the Raptor Agreement, and/or the Sanchez Anadarko Contracts. Without limiting the foregoing, Provider shall immediately notify Recipient of any exercise of emergency response rights under any Production Marketing Agreement;

(g) Balance transportation activities in accordance with the terms and conditions of the applicable Commodity Contract(s), the Raptor Agreement, the Sanchez Anadarko Contracts and/or Transportation Agreement(s);

(h) Take any and all actions necessary to ensure that no modifications, alterations, revisions, or amendments are made to the Commodity Contract(s) or Transportation Agreement(s) without the prior written consent of Recipient, which would in any manner expand, increase, or alter Recipient's obligations to any Carrier, or would otherwise be detrimental in any manner to Recipient with respect to Recipient's obligations under any Commodity Contract(s) or Transportation Agreement(s);

(i) Take any and all actions necessary to ensure that no modifications, alterations, revisions, extensions or amendments to any joint operating agreement, Production Marketing Agreement, or any related agreement are made by Provider which would in any manner expand, increase, or alter Recipient's obligations in any detrimental manner under any Commodity Contract(s), the Sanchez Anadarko Contract(s), the Raptor Agreement, or Transportation Agreement(s). Without limiting the foregoing, Provider shall not, during the term of this Agreement, enter into any new commitment agreement under any Production Marketing Agreement or joint operating agreement that would, in any manner, restrict, minimize, reduce or limit the Hydrocarbons being transported and/or sold under any of the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), and/or the Raptor Agreement that are subject to this Agreement, including but not limited to any new transportation or transportation-related agreements that would provide for new pipeline or terminal connections or alternate transportation paths that would provide for the potential diversion of Hydrocarbons otherwise subject to the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), and/or the Raptor Agreement. In addition, Provider shall maintain all Production Marketing Agreements in full force and effect during the Term of this Agreement and shall not enter into any material modifications of any such Production Marketing Agreement in the absence of the express prior written consent of Recipient, which may be withheld in Recipient's sole discretion;

(j) Provider shall during the Term of this Agreement, take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Marketing Contracts, including all Hydrocarbons attributable to Provider, UnSub and AcqCo. If during the Term of this Agreement any co-working interest owner elects to take its product in-kind during the Term of this Agreement, Provider shall provide immediate notice to Recipient; provided that Provider shall ensure that none of Provider, UnSub or AcqCo elect to take its product in-kind during the term of this Agreement;

(k) Maintain an ongoing familiarity with the terms of the Transportation Agreements, including any pipeline tariffs and governing documents applicable thereto, including, without limitation, all provisions relating to scheduling, nominations, audit rights, quality specifications and confidentiality;

(l) Maintain an ongoing familiarity with the terms of the Commodity Contracts, including, without limitation, all provisions relating to invoicing, payment, audit rights, quality specifications, compliance with applicable Laws and ethics obligations set forth in the Commodity Contracts;

(m) Receive and pay any and all invoices related to the purchase and sale of Hydrocarbons pursuant to this Agreement, including but not limited to the Sanchez Anadarko Contracts, the Raptor Agreement, and the Commodity Contract(s) (as well as providing copies of invoices and

payments related to the same to Recipient, with such invoices necessarily reflecting the quantities of Gas sold and delivered thereunder along with the contract price, or otherwise separately provide such information to Recipient if it is not reflected on the invoice);

(n) Receive and pay any and all invoices related to payments owed to the Carriers;

(o) Provider will immediately provide to Recipient notice of any potential events of default received from any of the counterparties to any of the Commodity Contract(s) or the Transportation Agreement(s). Such notice must be provided no later than two (2) Business Days prior to the applicable timeline set forth for curing the applicable event of default in the relevant Commodity Contract(s) or Transportation Agreement(s);

(p) For avoidance of doubt, it is the mutual intent of the Parties that Provider will meet and serve all Recipient's performance obligations under each of the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, and/or the Transportation Contract(s) for the full term of this Agreement;

(q) Provider shall take commercially reasonable steps to resolve any title warranty issues jointly with Recipient during the Term of this Agreement, but notwithstanding the foregoing, Provider shall be responsible for any and all charges, damages, costs, fees, expenses or penalties related to any breach of such title warranty issues that occur under any Commodity Contract(s) and/or the Transportation Agreement(s);

(r) Provider shall during the Term of this Agreement take any and all actions necessary to ensure that Provider fulfills its obligations under the Retained Marketing Contracts before meeting any future commitments Provider may enter pursuant to any Production Marketing Agreement; and

(s) Provider shall not consent to the assignment of any Production Marketing Agreement by a co-working interest owner in the absence of the prior written consent of Recipient, which shall not be unreasonably withheld.

**3.2 Recipient's Responsibilities**. In order to enable Provider to perform its duties and obligations under this Agreement, Recipient shall:

(a) Take all actions in a timely manner required to effectuate Provider's responsibilities, such as executing applicable agency agreements with the Carriers, in order to enable Provider to provide the services provided for under this Agreement and entering into the Sanchez Anadarko Contracts;

(b) Take any and all actions necessary with any Carrier to ensure that no modifications, alterations, revisions, or amendments are made to the Transportation Agreement(s) without the prior written consent of Provider, which would in any manner expand, increase, or alter Provider's obligations to the Recipient under this Agreement, or would otherwise be detrimental in any manner to Provider with respect to Provider's obligations under this Agreement; and

(c) Comply with the provisions of Sections 3.1(a)-(c) to the extent applicable to Recipient.

**3.3 Balancing Services**. "Balancing" shall mean the services provided by Provider with respect to managing Recipient's Hydrocarbons made the subject of the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement and/or Transportation Agreement(s) and resulting financial outcomes related to Hydrocarbon nominations, and actual deliveries of Hydrocarbons pursuant to any applicable Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, or Transportation Agreement(s). Any economic consequences (including any liabilities, costs, gains, losses, damages, Imbalance Charges or other charges) arising under this Agreement (including the consequences of the Balancing), shall be borne solely by the Provider. Provider shall indemnify, defend and hold Recipient harmless from any and all claims and/or demands related to Balancing Services.

**3.4 Risk Allocation/Responsibility for Losses**. Notwithstanding anything else to the contrary in this Agreement, the Commodity Contract(s), the Sanchez Anadarko Contracts, the Raptor Agreement, and/or the Transportation Agreement(s), Provider shall be responsible for any liabilities, costs, losses, damages, Imbalance Charges or other charges of any nature whatsoever with respect to Provider's provision of services under this Agreement, necessarily including Provider's assumption of all risk of (i) the failure of the Provider to deliver or receive (or to cause to be delivered or received) Hydrocarbons at the applicable receipt and/or delivery point(s) under the Commodity Contract(s), the Raptor Agreement and/or the Sanchez Anadarko Contracts, (ii) the curtailment, interruption or the unavailability of the transportation capacity, including under the Transportation Agreement(s), as well as upstream/downstream of the receipt and/or delivery points(s), due to an event of force majeure or otherwise, either in whole or in part, and (iii) the failure of the Hydrocarbons to be transported and delivered to the receipt and/or delivery point(s) for any reason whatsoever.

**3.5 Responsibility for Charges**. **THE PARTIES AGREE AND UNDERSTAND THAT THE PARTIES HAVE AGREED TO ENTER INTO THIS AGREEMENT AS A RESULT OF CREDIT/ASSIGNMENT ISSUES RELATED TO THE PSA, AND ACCORDINGLY THE PARTIES FULLY INTEND FOR THE PROVIDER TO BE RESPONSIBLE FOR ANY AND ALL CHARGES, FEES, SURCHARGES, LIABILITIES, COSTS, LOSSES, EXPENSES, DAMAGES, IMBALANCE CHARGES OR OTHER CHARGES OF ANY NATURE WHATSOEVER ARISING FROM OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS, THE WYMAN HEDGE(S), THE RAPTOR AGREEMENT, AND/OR THE TRANSPORTATION AGREEMENT(S), IRRESPECTIVE OF THE CAUSE OR CAUSES OF THE FOREGOING, INCLUDING WHETHER THE CAUSE OR CAUSES ARE DERIVED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, PROVIDER, INVITEES AND/OR THIRD PARTIES.**

**3.6 Indemnity.**

**(A) PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND RECIPIENT AND EACH OF THE SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY CLAIMS, CHARGES, FEES, DAMAGES, LOSSES, EXPENSES, LIABILITIES, FINES, PENALTIES OF ANY TYPE OR DESCRIPTION,**

**(SPECIFICALLY INCLUDING FINES, PENALTIES OR DISGORGEMENT OF PROFITS ASSOCIATED WITH THE FAILURE TO COMPLY WITH ANY REGULATIONS, ORDERS, OR STATUTES) AND COSTS (INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS OF LITIGATION) (COLLECTIVELY "CLAIMS") ARISING OUT OF, RELATING TO OR RESULTING FROM THE PROVIDER'S PERFORMANCE OR LACK OF PERFORMANCE OF THE SERVICES HEREUNDER, NECESSARILY INCLUDING CLAIMS ARISING UNDER OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS, THE WYMAN HEDGE(S), THE RAPTOR AGREEMENT, AND/OR THE TRANSPORTATION AGREEMENT(S), AND EVEN IF SUCH CLAIMS ARE BASED UPON THE NEGLIGENCE (WHETHER JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE) OF THE RECIPIENT OR ANY OF THE SELLER INDEMNIFIED PARTIES. THE INDEMNITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE REGARDLESS OF FAULT, MEANING WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY: (i) THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, THE SELLER INDEMNIFIED PARTIES, PROVIDER, INVITEES AND/OR THIRD PARTIES; AND/OR (ii) A PRE-EXISTING DEFECT, WHETHER PATENT OR LATENT, OF THE PREMISES OF RECIPIENT'S PROPERTY OR THE PROPERTY OF THE SELLER INDEMNIFIED PARTIES (INCLUDING THE ASSETS), INVITEES AND/OR THIRD PARTIES. FOR THE AVOIDANCE OF DOUBT, ALL REFERENCES TO PROVIDER LIABILITY HEREIN SHALL MEAN SNEF AND SN CATARINA, WHICH ENTITIES SHALL BE JOINT AND SEVERALLY LIABLE FOR ANY AND ALL OBLIGATIONS HEREUNDER.**

**(B) All claims for indemnification for Claims will be asserted and resolved according to the procedures set forth in Section 8.9 of the PSA, which shall apply *mutatis mutandis* to this Agreement.**

## ARTICLE IV. AUDIT RIGHTS

**4.1 Audit Rights**. A Party shall have the right, at its own expense, upon reasonable written notice to the other Party and at reasonable times on any Business Day, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Agreement. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to this Agreement. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within one year after the Month that the service activities made the subject of the invoices or billings is performed. All retroactive adjustments under this section

shall be paid in full by the Party owing payment within thirty (30) Days of the written notice after the substantiation of such inaccuracy.

## ARTICLE V. ACCOUNT STATEMENTS

On or before the 10th Day of each Month, Provider shall deliver, or cause to be delivered to Recipient a statement that sets out for the previous Month a detailed calculation showing all purchases and sales (identifying both the volume and value of each such purchase or sale transaction) made pursuant to this Agreement, as well as all fees, charges and similar expenses invoiced by and/or paid to any Carrier (identifying invoiced and paid amounts separately). At the same time, Provider shall deliver, or cause to be delivered, to Recipient a statement that sets out for the previous Month an aging of payables and receivables for the previous Month.

In addition, on March 1, June 1, September 1 and December 1 of each Calendar Year during the term (or, if March 1, June 1, September 1 and December 1 of a given year do not fall on Business Days, the next Business Day following each such date), Provider shall deliver or cause to be delivered to Recipient a list of all remaining commitments (including future demand charges or fees) associated with the Retained Marketing Contracts, separately stated by for each such Retained Marketing Contract.

## ARTICLE VI. TERM.

Subject to any other applicable provision of this Agreement, the Retained Marketing Contract services to be provided under this Agreement shall commence on the date of termination of the Marketing Transition Services Agreement as defined in the PSA and shall terminate on the earlier to occur of (i) the date that this Agreement is terminated as the result of any Event of Default, (ii) the date that coincides with the termination date of the Retained Marketing Contract with the longest term, and (iii) the date that coincides with Provider (or one of its Affiliates) obtaining consent to assign the last remaining Retained Marketing Contract from the counterparty thereunder (the periods from the effective date until the termination of the services under (i), (ii) or (iii) collectively being the "Term").

Each Party's obligations regarding payment and indemnification hereunder shall survive the termination or expiration of this Agreement for a period of time equal to the time for which the applicable statute of limitations applies.

## ARTICLE VII. TAXES

**7.1 Tax Matters**. Each Party shall report to the Internal Revenue Service or any other applicable taxing authority, all information relevant to the economic benefits and burdens related to this Agreement and shall maintain the necessary records for such tax reporting. **Provider shall indemnify, defend and hold Recipient harmless as to any costs or liabilities claimed against or incurred by Recipient in connection with this Agreement, including claims for Taxes made by Third Parties or entities, including Governmental Bodies, arising out of the activities made the subject of this Agreement.** References to "costs" in connection with this section shall include all reasonable and necessary attorneys' fees and expenses, consultants' fees, travel expenses, and court costs, including costs incurred to enforce the indemnity obligations.

**7.2 Responsibility Taxes**. Provider shall be solely responsible for all taxes, fees, levies, penalties, licenses or charges imposed by any Governmental Body (collectively "Taxes") that are currently imposed on the sale and delivery or purchase and receipt of the Hydrocarbons under the Commodity Contract(s), the Raptor Agreement and/or the Sanchez Anadarko Contracts, as well as any Taxes attributable to the pipeline capacity under the Transportation Agreements and any Taxes related to the Wyman Hedge(s).

## ARTICLE VIII. DEFAULT AND REMEDIES

**8.1 Events of Default**. The following actions or inactions by the applicable Party (the "Defaulting Party") shall constitute an "Event of Default" under this Agreement:

(a) Breach of any material obligation under this Agreement, if such breach is not cured by the Defaulting Party within ten (10) Business Days after written notice of such breach from the other non-defaulting Party (the "Non-Defaulting Party");

(b) The Bankruptcy of a Party; and

(c) Provider's action or inaction results in a material breach of any of the Retained Marketing Contracts, the Sanchez Anadarko Contract(s), or the Raptor Agreement, if such breach is not cured within the shorter of (i) the applicable deadline in the Retained Marketing Contract(s), or (ii) five (5) Days following written notice from Recipient; provided, however, that if the Provider does not provide the notice within the required two (2) Business Days' notice period set forth in this Agreement, the otherwise applicable time to cure shall be shortened by the amount of time not provided to Recipient.

**8.2 Remedies**. If an Event of Default has occurred and is continuing, the Non-Defaulting Party may suspend performance on written notice to the Defaulting Party and, at its election, terminate this Agreement on written notice to the Defaulting Party. The Non-Defaulting Party must elect to terminate this Agreement within five (5) Business Days of the Event of Default or re-commence performance. During any time that Provider suspends performance in accordance with this section, it shall have no obligation to perform any services of any nature under this Agreement, until such time as Recipient has remedied the breach and provided notice thereof to Provider. During any such suspension hereunder, Recipient may notify the Carriers under the Transportation Agreement(s) that a Third Party other than Provider will handle daily nominations and scheduling of the affected Hydrocarbons until further notice. In the event Provider resumes performance either as a result of electing not to terminate this Agreement or by informing Recipient in writing that it rescinds its suspension of performance, Recipient shall take all necessary steps with the Carriers under the Transportation Agreement(s) to facilitate Provider's performance under this Agreement. Termination of this Agreement shall not preclude or limit the Non-Defaulting Party from pursuing any other remedies available at law or in equity in respect of the Event of Default under this Agreement, including the pursuit of damages.

If Provider shall fail to pay any amounts due under a Commodity Contract or Transportation Agreement even prior to an Event of Default occurring, Recipient may in its sole discretion terminate instructions to counterparties under Commodity Contracts and/or Transportation Agreements to make any direct payments to Provider until Recipient has recouped in full any

and all amounts that Recipient may be required to pay due to Provider's failure to pay any amount when due.

If this Agreement is terminated prior to the date that coincides with the termination date of the Retained Marketing Contract with the longest term, Provider shall ensure that any of its Hydrocarbons along with the Hydrocarbons of Provider's co-working interest owners governed by the Production Marketing Agreements will be sold to Recipient until the date of expiration of the Retained Marketing Contract with the longest term to enable Recipient to mitigate Recipient's losses under the Retained Marketing Contracts. All such sales by Provider to Recipient shall be under terms and conditions no less favorable than those set forth in the Commodity Contract(s) at the time of the termination.

## ARTICLE IX. MISCELLANEOUS

**9.1 No Partnership or Joint Venture.** Nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture between the Parties, and each Party shall be liable individually and severally for its own obligations under this Agreement. Both Parties agree that their relationship is strictly as one of principal and agent, as limited by the provisions of this Agreement and to the express purposes set forth herein.

**9.2 Compliance**. Provider shall comply with (i) the nomination and scheduling requirements of Carriers on the terms and conditions set forth in this Agreement, (ii) the Transportation Agreements and the applicable tariffs or governing documents, and (iii) all applicable Laws affecting the transportation, purchase and sale of Hydrocarbons that are related to this Agreement. Without limiting the generality of the foregoing and subject to Section 3.6 of this Agreement, if during the term of this Agreement any Governmental Body should determine that the obligations and duties contemplated in this Agreement cannot be performed in accordance with applicable Laws, wholly or in part, the Parties shall immediately suspend performance under this Agreement. Provider and Recipient shall, within five (5) Business Days of such a determination, meet to determine whether this Agreement can be revised so that the services contemplated herein can be performed fully in accordance with applicable Laws. In the absence of a superseding written agreement between the Parties following such event and following such meeting, this Agreement shall terminate prospectively with no damages being owed by either Party to the other Party from the date of termination forward, except for any amounts owed under this Agreement which relate to a period of time prior to termination under this Section 9.2. For the avoidance of doubt, any claims for damages, civil penalties, disgorgement of profit or similar Claims accruing prior to Termination of this Agreement shall survive and shall be subject to Section 3.6 of this Agreement, which shall survive termination of this Agreement.

**9.3 Further Assurances**. The Parties agree to execute and deliver such additional instruments or documents as may be necessary to carry out the purposes of this Agreement.

**9.4 Assignment**. Neither Party may assign, convey or otherwise transfer this Agreement whether through sale, merger, consolidation, reorganization, restructuring or otherwise, to any Affiliate or any Third Party without the express written consent of the other Party. Any attempted assignment, conveyance or transfer of this Agreement in violation of this section shall

be void and of no force and effect. This Agreement shall inure to the benefit of and bind the respective successors, heirs, representatives and permitted assigns of the Parties.

**9.5 Governing Law and Jurisdiction**. This Agreement shall be governed by the terms and conditions set forth in Section 15.13 of the PSA, which shall apply mutatis mutandis to this Agreement.

**9.6 Notices**. Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

**If to Recipient:**

Anadarko Energy Services Company
Attention: Tammy Campbell
9950 Woodloch Forest Drive
12th Floor
The Woodlands, TX 77380
Email: Tammy.Campbell@anadarko.com

**If to Provider:**

SN EF Maverick, LLC
Attention: Scott Wike
1000 Main Street
Suite 3000
Houston, TX 77002
Email: swike@sanchezog.com

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person provided such delivery is received by 5:00 p.m. on a Business Day, and if not the next Business Day, (ii) on the next Business Day after placed with an overnight delivery service when designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the receipt of such facsimile as evidenced by the sending Party's proof of successful transmission, provided that such facsimile is received at Recipient's location by 5:00 p.m. on a Business Day, and if not, by the next Business Day. Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States, but such notice shall not be effective until ten (10) Days after such notice is provided to the other Party in the manner set forth hereinabove.

**9.7 Authority to Execute**. Each of the Parties to this Agreement represents and warrants that, as of the Effective Date, (i) it has full and complete authority to enter into and perform this Agreement; (ii) the person who executes this Agreement on its behalf has full and complete authority to do so and is empowered to bind it thereby; and (iii) it is not insolvent and has not sought protection from its creditors in Bankruptcy and is not otherwise the subject of Bankruptcy.

**9.8 Miscellaneous**. This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Each Party's delivery of an executed counterpart signature page by facsimile or e-mail is as effective as executing and delivering this Agreement in the presence of the other Party. The headings and subheadings contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement between the Parties and shall not be used to construe or interpret the provisions of this Agreement. Each provision of this Agreement is intended to be severable. If any provision of this Agreement is determined to be illegal, invalid or unenforceable, for any reason, then, insofar as is practical and feasible, the remaining portions of this Agreement shall be deemed to be in full force and effect as if such invalid provision was not

contained herein. Except as expressly otherwise provided in this Agreement, all covenants, indemnities, representations, warranties, acknowledgments, agreements, rights and obligations of the Parties under this Agreement, that are capable of having effect after the termination of this Agreement for any reason, shall survive and remain in full force and effect beyond, and not be affected by, the termination of this Agreement.

**9.9 Waiver.** One or more waivers of any provision of this Agreement by a Party shall not be construed as a waiver of a subsequent breach or requirement of the same provision, and the consent by a Party to or approval of any act or omission by a Party requiring the other Party's consent or approval shall not be deemed to waive or render unnecessary such other Party's consent to or approval of any subsequent similar act or omission by such Party. Any and all waivers of this Agreement shall only be binding on a Party to the extent that the waiver is in writing.

**9.10 Entirety and Amendments**. This Agreement constitutes the entire agreement between the Parties regarding the services to be provided under this Agreement, and supersedes and replaces any prior and contemporaneous communications, understandings and agreements between Recipient and Provider related to such subject matter, whether written or verbal, express or implied. No modification, amendment, supplementation or alteration of the terms and provisions of this Agreement shall be or become effective except by written amendment executed by the duly authorized representative of the Parties.

**9.11 Definitions.** To the extent that any defined terms used in this Agreement are not otherwise defined herein, they shall have the definition set forth in the PSA.

**9.12 Confidentiality**. Section 12.2 of the PSA shall apply mutatis mutandis to this Agreement.

**9.13 Conspicuousness**. The Parties agree that provisions in this Agreement in "bold" or "all caps" type satisfy any requirements of the "express negligence rule" and any other requirements at law or in equity that provisions be conspicuously marked or highlighted.

**9.14 Laws.** The Parties agree to comply with all Laws applicable to this Agreement and the services provided hereunder, and Recipient agrees that it shall not require or request Provider to perform any action that is in violation of applicable Laws or omit to perform any action that Provider reasonably believes is required under applicable Laws.

**9.15 Standard of Care/Performance.** Provider shall perform all services to be provided in all material respects in accordance with applicable Laws and applicable contracts, and with respect to the Commodity Contract(s) and the Transportation Agreement(s) in a manner which is similar in nature, quality and timeliness to the manner in which such services were provided by Recipient's personnel immediately prior to the Closing. The services shall be performed with the standard of care, skill, prudence and diligence normally provided by a reasonably prudent operator in the performance of similar services in similar jurisdictions in the oil and gas industry.

**9.16 Sanchez Anadarko Contracts.** Provider and Recipient shall enter into the Sanchez Anadarko Contracts on terms and conditions materially consistent with the Commodity Contract(s) to which they apply (i.e., being entered into to avoid warranty of title issues), it being

the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Sanchez Anadarko Contracts, any and all gap risk shall be borne by Provider. Provided, further, than in instances where the Sanchez Anadarko Contracts are being entered into to avoid title warranty issues related to Transportation Agreements(s) which do not also involve an associated Commodity Contract(s), the terms and conditions of the Sanchez Anadarko Contract shall be based on industry standard terms and conditions (e.g., NAESB with no Special Provisions, Recipient's Paper (e.g., crude oil purchases and sales); provided, however, that any and all contractual gap risk between Provider's contract(s) with any subsequent downstream purchaser(s) of such Hydrocarbons shall be borne exclusively by Provider.

**9.17 Survival**. All remedies set forth in Section 8.2, and the provisions of Sections 3.4, 3.5, and 3.6 shall survive the termination of this Agreement until the expiration of the applicable statute of limitations.

**9.18 SN Parent Guaranty**. For good and valuable consideration, and to induce Recipient to enter into this Agreement, SN Parent hereby absolutely, unconditionally and irrevocably guarantees to Recipient the punctual and complete performance of all obligations of Provider under this Agreement (the "Obligations"). The guaranty set out in this Section 9.18 (the "SN Parent Guaranty") shall remain in full force and effect until Provider has fully discharged all of the Obligations. Upon default by Provider of any of the Obligations, Recipient may proceed directly against SN Parent without proceeding against Provider or any other Person or pursuing any other remedy. Recipient may, without notice to, or consent of, SN Parent, (a) extend or alter, together with Provider, the time, manner, place or terms of payment or performance of the Obligations, (b) waive, or, together with Provider, amend the terms of this Agreement, (c) release Provider from any or all of the Obligations, or (d) release any other guaranty or security for the Obligations, without in any way releasing or discharging SN Parent from liability hereunder. SN Parent waives any defenses (but not rights of set-off or counterclaims) which it may have with respect to the performance of the Obligations, other than defenses that Provider would have under the terms of this Agreement. SN Parent further waives notice of the acceptance of this SN Parent Guaranty, presentment, demand, protest, and notices of protest, nonpayment, default or dishonor of the Obligations. SN Parent represents and warrants that (x) it has the full power and authority to enter into and perform the SN Parent Guaranty, (y) there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to SN Parent's knowledge, threatened against SN Parent, and SN Parent is not insolvent or generally not paying its debts as they become due, and (z) the execution, delivery and performance by SN Parent of this SN Parent Guaranty has been duly and validly authorized and approved by all necessary corporate action on the part of SN Parent, and this SN Parent Guaranty constitutes the legal, valid and binding obligation of SN Parent, enforceable against SN Parent in accordance with its terms.

**9.19 Wyman Hedges**. Under the terms of that certain Transaction Confirmation No. 312537 dated November 3, 2016, by and between Recipient and Wyman-Gordon ("Wyman") which is one of the Commodity Contracts, Wyman has the right to request that the Contract Price be converted to a fixed price. To the extent that Wyman exercises its right to do so, and Recipient and Wyman thereafter agree to a fixed price for all or any portion of the Contract Quantity thereunder, Provider understands and appreciates that the Recipient will enter into a financial

derivative transaction(s) with a Third Party(ies) to hedge the fixed price risk associated with Wyman's election (such resulting financial transaction(s) being the "Wyman Hedge(s)"). Accordingly, the Parties agree that Provider shall be responsible for the financial costs, expenses and impacts of the Wyman Hedge(s) under this Agreement, whether arising from the natural expiration of the Wyman Hedge(s), or the financial exposure calculated and/or resulting from the early termination of the transaction comprising the Commodity Contract.

**9.20 Intentionally left blank**

**9.21 Raptor Agreement**. At Recipient's sole discretion, Provider and Recipient may enter into a gas purchase and sale agreement(s) (i) whereby Recipient will purchase gas at the tailgate of the Raptor plant upon mutually agreeable terms and (ii) whereby Recipient shall sell gas back to Provider less fuel lost and unaccounted for on mutually agreeable terms and at mutually agreement point(s) (individually or collectively (i) and/or (ii) are referred to herein as the "Raptor Agreement"), it being the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Raptor Agreement, any and all gap risk shall be borne by Provider. Provided, further, that any and all contractual gap risk between Recipient's contract with any subsequent downstream transporter and downstream purchaser of such Hydrocarbons shall be borne exclusively by Provider. For the avoidance of doubt, the Raptor Agreement shall not be assigned.

[*Signature page follows*]

# EXHIBIT A

## Retained Contracts

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| | Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| | Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| | Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| TPT4205 | Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| | Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE)(TPT Tranche 3) | 12/13/2013 |
| | Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |

## NASEB Contract Confirmations

| Gas Sales | | Volume (MMBtu/d) | End Date | Asset | Contract action |
|---|---|---|---|---|---|
| | Techgen (221544) | 30,000 | 9/31/2021 | Maverick Basin | Assignment |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 | Maverick Basin | Assignment |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 | Maverick Basin | Assignment |

## Exhibit B

### Production Marketing Agreements[1]

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| 20022 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| 20021 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| 20032 | Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Crude Oil Production Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Crude Oil Production Marketing Agreement | 10/1/2010 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| | Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |

[1] All Production Marketing Agreements listed on this "Exhibit B" have been assigned to SN EF Maverick , LLC pursuant to that certain Downstream Marketing Agreements Assumption Agreement, dated June 1, 2017, by and between Anadarko Energy Services Company and SN EF Maverick, LLC.

IN WITNESS WHEREOF, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** [signature] pr

**Name:** Brian T Kuck
**Title:** VP
**Date:** 5-30-17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** [signature] pr

**Name:** Brian T. Kuck
**Title:** VP
**Date:** 5.30.17

**ANADARKO ENERGY SERVICES COMPANY**

By: [signature] pr
Name: Brian T. Kuck
Title: VP

**SN EF MAVERICK, LLC**

By: [signature]
Name: John Happ
Title: SVP Marketing & Midstream

**SANCHEZ ENERGY CORPORATION**

By: [signature]
Name: SVP Marketing & Midstream
Title: John Happ

**FIRST AMENDMENT TO THE RETAINED MARKETING CONTRACTS SERVICES AGREEMENT**

This First Amendment to the Retained Marketing Contracts Services Agreement (the "Amendment") is effective as of June 28, 2017 (the "Effective Date") by and among SN EF Maverick, LLC ("SNEF") and SN Catarina, LLC ("SN Catarina") (collectively SNEF and SN Catarina are referred to herein as "Provider") and Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), and Anadarko Energy Services Company ("AESC") (collectively AEP, KMOG and AESC are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18 of the Agreement (as defined hereinafter), Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

**RECITALS**

**WHEREAS**, SNEF and Recipient entered into that certain Retained Marketing Contracts Services Agreement on or about June 1, 2017 (the "Agreement");

**WHEREAS**, SN Catarina failed to sign the Agreement and desires to ratify the Agreement; and

**WHEREAS**, the Parties desire to amend the Agreement by adding provisions related to the NET Agreements, among other amendments.

**NOW, THEREFORE**, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1. Ratification. SN Catarina hereby ratifies, confirms and approves the Agreement in its entirety.

2. Section 1.1. The following changes shall be made to the definitions section of the Agreement:

   a. The definition of "**NET**" shall be deleted in its entirety and replaced with: "'**NET**' shall mean Eagle Ford Midstream, LP."

   b. The definition of "NET Agreements" shall be deleted in its entirety and replaced with: "'**NET Agreements**' shall mean the Assigned Agreements (as defined in the Assignment Agreement)."

   c. The cross reference in the definition of "**Raptor Agreement**" shall be changed from "Section 9.18" to "Section 9.21".

3. Section 19.18. Section 19.18 of the Agreement shall be amended by adding the following sentence at the end of the paragraph: "The Parties agree that the SN Parent Guaranty shall be amended to cover Provider's obligations set forth under Section 9.20 of this Agreement."

4. Section 9.20. Section 9.20 of the Agreement shall be deleted in its entirety and replaced with the following:

"**Section 9.20 NET Agreements**. The Parties agree that to the extent that Provider is in breach of and/or failed to timely perform its obligations under (i) that certain Assignment and Consent to Assignment Agreement dated June 28, 2017 (the "Assignment Agreement") by and between Recipient, as assignor, Provider, as assignee, and Eagle Ford Midstream, LP, as the consenting party, and/or (ii) the Assigned Agreements, as defined in such Assignment Agreement, then an Event of Default shall also be deemed to have occurred under this Agreement and Recipient shall be afforded any and all rights available to it under this Agreement, at law or in equity as a result of such Event of Default."

5. Miscellaneous.

a. Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth for such terms in the Agreement.

b. Entire Agreement/Conflicts. Except as expressly set forth in this Amendment, the terms and conditions of the Agreement, are hereby ratified, confirmed and approved in their entirety and shall continue in full force and effect. This Amendment constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto. Should there be any conflict between this Amendment and the Agreement, the terms and conditions of this Amendment will control.

c. Governing Law. This Amendment will be governed by the governing law and jurisdiction as stated in the Agreement.

d. Counterparts. This Amendment may be executed in one or more counterparts, and by electronic signature (whether by facsimile, e-mail .pdf, DocuSign or otherwise), and each executed counterpart shall be deemed an original and all of which, together, shall constitute one and the same instrument.

(signature page follows)

**IN WITNESS WHEREOF**, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** Vice President

**ANADARKO ENERGY SERVICES COMPANY**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** **Vice President**

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** [signature]

**Name:** Brian T. Kuck
**Title:** Vice President

**SN EF MAVERICK, LLC**

**By:** ____________________

**Name:**
**Title:**

**SN CATARINA, LLC**

**By:** ____________________

**Name:**
**Title:**

**SANCHEZ ENERGY CORPORATION**

**By:** ____________________

**Name:**
**Title:**

**IN WITNESS WHEREOF,** and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** Vice President

**ANADARKO ENERGY SERVICES COMPANY**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** **Vice President**

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** ________________________

**Name:** Brian T. Kuck
**Title:** Vice President

**SN EF MAVERICK, LLC**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & Midstream

**SN CATARINA, LLC**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & Midstream

**SANCHEZ ENERGY CORPORATION**

**By:** ________________________

**Name:** John Happ
**Title:** SVP Marketing & MIDSTREAM

**SECOND AMENDMENT TO THE**
**RETAINED MARKETING CONTRACTS SERVICES AGREEMENT**

This Second Amendment to the Retained Marketing Contracts Services Agreement (the "Amendment") is effective as of September 15, 2015 ("Effective Date") by and among SN EF Maverick, LLC ("SNEF") and SN Catarina, LLC ("SN Catarina") (collectively, SNEF and SN Catarina are referred to herein as "Provider") and Anadarko E&P Onshore LLC ("AEP"), Kerr-McGee Oil & Gas Onshore LP ("KMOG"), and Anadarko Energy Services Company ("AESC") (collectively AEP, KMOG and AESC are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18, Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

**RECITALS**

**WHEREAS**, Provider and Recipient entered into that certain Retained Marketing Contracts Services Agreement effective on or about June 1, 2017, as amended and ratified by the First Amendment dated June 28, 2017 (collectively, the "Agreement");

**WHEREAS**, one of the Retained Marketing Contracts has been assigned from AESC to SNEF effective as of September 15, 2017, pursuant to the Consent to Assignment and Release Agreement by and among, AESC, SNEF, and Techgen SA de CV dated September 12, 2017 (the "Assignment"); and

**WHEREAS**, the Parties desire to amend the Agreement by modifying Exhibit A to reflect the Assignment.

**NOW, THEREFORE**, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1. Exhibit A. The NAESB Contract Confirmations table on Exhibit A shall be amended by removing the line referencing the Techgen Transaction Confirmation with number 221544 (the "Techgen Assigned Agreement").

2. Conflicts. Should there be any conflict between this Amendment and the Agreement, the terms and conditions of this Amendment will control. For the avoidance of doubt, nothing herein is intended to modify or alter or terminate any Party's rights or obligations or any indemnity, risk allocation, responsibility for charges, or other similar provision in the Agreement related to the Techgen Assigned Agreement which arose or accrued or relates to the period of time prior to the effective date of the Assignment. Notwithstanding anything to the contrary in this Amendment, nothing in this Amendment is intended to conflict with or modify Providers' assumption of the Assumed Obligations (as defined in the PSA) under the PSA and Providers' indemnities therefor, and the Parties agree that as of the effective date of the Assignment, the Techgen Assigned

Agreement shall be Assumed Obligations under the PSA. In the event of a conflict between the Amendment and the PSA, the terms of the PSA shall control.

3. Miscellaneous.

a. Definitions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth for such terms in the Agreement.

b. Entire Agreement. Except as expressly set forth in this Amendment, the terms and conditions of the Agreement, are hereby ratified, confirmed and approved in their entirety and shall continue in full force and effect. This Amendment constitutes the entire agreement and understanding of the Parties with respect to its subject matter and supersedes all oral communication and prior writings (except as otherwise provided herein) with respect thereto.

c. Governing Law. This Amendment will be governed by the governing law and jurisdiction as stated in the Agreement.

d. Counterparts. This Amendment may be executed in one or more counterparts, and by electronic signature (whether by facsimile, e-mail .pdf, DocuSign or otherwise), and each executed counterpart shall be deemed an original and all of which, together, shall constitute one and the same instrument.

(signature page follows)

**IN WITNESS WHEREOF**, and with the intent to be legally bound, the Parties hereto have caused this Amendment to be executed by their duly authorized officers or representatives on the date indicated below each signature to be effective as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** ______________________

**Name:** Brian T. Kuck
**Title:** Vice President
Corporate Development
**Date:** 9/26/17

**ANADARKO ENERGY SERVICES COMPANY**

**By:** ______________________

**Name:** Kevin Kelly
**Title:** General Manager, Southern Gas and NGL Marketing
**Date:** 9/26/17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** ______________________

**Name:** Brian T. Kuck
**Title:** Vice President
**Date:** 9/26/17

**SN EF MAVERICK, LLC**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

**SN CATARINA, LLC**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

**SANCHEZ ENERGY CORPORATION**

**By:** ______________________

**Name:** John Happ
**Title:** SVP Marketing
**Date:** 9/25/17

# EXHIBIT 14

***Execution Version***

# RETAINED MIDSTREAM CONTRACTS SERVICES AGREEMENT

This Retained Midstream Contracts Services Agreement (the "Agreement") is entered as of the Effective Date defined below by and among SN EF Maverick, LLC ("Provider") and Anadarko E&P Onshore LLC ("AEP") and Kerr-McGee Oil & Gas Onshore LP ("KMOG") (collectively AEP and KMOG are referred to herein as "Recipient"), and, solely for the purposes of Section 9.18, Sanchez Energy Corporation, a Delaware corporation ("SN Parent"). Recipient and Provider are sometimes referred to herein individually as a "Party" or collectively as the "Parties".

WHEREAS, pursuant to Schedule 13.4 of that certain Purchase and Sale Agreement dated effective July 1, 2016 (as the same may be amended from time to time, the "PSA") by and among Provider and Recipient, Provider shall serve as midstream agent on behalf of Recipient and its Affiliates with respect to Retained Midstream Contracts as of the date of termination of the Marketing Transition Services Agreement (as that term is defined in the PSA); and

WHEREAS, the Parties are entering into this Agreement to provide for the specific terms and conditions under which Provider shall perform Recipient's obligations with respect to such Retained Midstream Contracts.

NOW, THEREFORE, for and in consideration of the foregoing, the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I. DEFINITIONS AND INTERPRETATION

**1.1 Definitions**. The following terms when used herein shall have the meanings set forth below.

"**Accounting Services**" means those services to be performed hereunder which are set forth in Section 3.1(m).

"**AcqCo**" shall mean Gavilan Resources, LLC.

"**AEP**" shall have the meaning as set out in the preamble.

"**Agreement**" shall have the meaning as set out in the preamble.

"**Affiliate**" shall mean any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, another Person; *provided*, *however*, that the Western Gas Entities shall not be deemed to be Affiliates of Recipient. The term "***control***" and its derivatives with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership or other ownership interests, by contract or otherwise.

"**Balancing**" shall have the meaning as set out in Section 3.3.

"**Bankruptcy**" means with respect to any Party, (i) the filing by such Party of a petition or the commencement of, or the acquiescence in the commencement of, a proceeding or cause of action under any bankruptcy, insolvency or similar law providing for protection from its creditors, or a Party having any such proceeding or cause of action filed or commenced against it; (ii) the seeking by such Party of the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it; (iii) the making of an assignment or any general arrangement for the benefit of its creditors, (iv) such Party admitting its inability to pay its debts as they fall due, (v) such Party becoming bankrupt or insolvent (however documented or evidenced), or (vi) such Party making a general assignment for the benefit of its creditors.

"**Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks in Texas are generally open for business.

"**Carrier**" means any one, as applicable, of the pipelines (or storage facilities), including gathering systems, identified in the applicable Transportation Agreement(s).

"**Claims**" shall have the meaning as set out in Section 3.6.

"**Commodity Contract(s)**" means a contract(s) for the purchase and sale of Hydrocarbons entered into by and between Recipient and a Third Party(ies) that has been retained by Recipient, as identified on Schedule 1.1(b) of the PSA.

"**Day**" means a period of 24 consecutive hours, starting at 9:00 a.m. Central Clock Time on any calendar day.

"**Defaulting Party**" shall have the meaning as set out in Section 8.1.

"**Effective Date**" means the date on which the Marketing Transition Services Agreement (as defined in the PSA) terminates.

"**Event of Default**" shall have the meaning as set out in Section 8.1.

"**Governmental Body**" means any instrumentality, subdivision, court, administrative agency, commission, official or other governmental authority of the United States or any other country or any state, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any administrative, executive, judicial, legislative, police, regulatory, taxing, importing or other governmental or quasi-governmental body.

"**Hydrocarbons**" means hydrocarbons from the Assets, as well as the co-working interest owner's hydrocarbons from the Assets.

"**KMOG**" shall have the meaning as set out in the preamble.

"**Month**" means the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

"**Non-Defaulting Party**" shall have the meaning as set out in Section 8.1(a).

"**Obligations**" shall have the meaning as set out in Section 9.18.

"**Operational Services**" means any and all services set forth hereunder which are not Accounting Services.

"**Parties**" shall have the meaning as set out in the preamble.

"**Production Marketing Agreements**" means those certain agreements set forth on Exhibit A, which is attached hereto and incorporated herein for all purposes.

"**Provider**" shall have the meaning as set out in the preamble.

"**PSA**" shall have the meaning as set out in the recitals.

"**Recipient**" shall have the meaning as set out in the preamble.

"**Retained Midstream Contracts**" means the Commodity Contract(s) and the Transportation Agreement(s) collectively.

"**Sanchez Anadarko Contract(s)**" means the purchase and/or buy/sell agreement(s) entered into by and between Provider and Recipient pursuant to Sections 3.1 (a)-(c) as applicable.

"**Seller Indemnified Parties**" shall have the meaning as set out in the PSA.

"**SN Parent**" shall have the meaning as set out in the preamble.

"**SN Parent Guaranty**" shall have the meaning as set out in Section 9.18.

"**Taxes**" shall have the meaning as set out in Section 7.2.

"**Term**" shall have the meaning as set out in Article VI of this Agreement.

"**Transportation Agreement(s)**" means a contract(s) for processing, treating, gathering, transportation or storage service entered into by and between Recipient and a Carrier that has been retained by Recipient, as identified on Schedule 1.1(b) of the PSA.

"**Unsub**" shall mean SN EF Unsub, LP.

"**Western Gas Entities**" shall mean Western Gas Equity Holdings, LLC, Western Gas Equity Partners, LP, Western Gas Holdings, LLC, Western Gas Partners, LP, and the direct and indirect subsidiaries of Western Gas Partners, LP.

## ARTICLE II. APPOINTMENT OF AGENT

**2.1 Provider as Agent**. Recipient hereby appoints Provider to serve as its exclusive agent to manage and administer the Commodity Contract(s) and the Transportation Agreement(s) with respect to the specific duties set forth in Article III throughout the Term of this Agreement.

Provider shall have no authority to undertake actions on behalf of Recipient that are beyond the scope of the authorizations stated in this Agreement. Recipient does not appoint Provider to act as its general agent, or as an agent for any other purpose other than the express authorizations granted in this Agreement. In no event shall Provider, in its capacity as agent or otherwise, take title to the Hydrocarbons being transported under the Transportation Agreements if such Transportation Agreement requires the shipper to have title to any such Hydrocarbons being transported unless such Transportation Agreement shall first have been permanently assigned by Recipient to Provider in accordance with Schedule 13.4 of the PSA.

**2.2 Implementing Notices**. Recipient shall provide each Carrier with notice under the applicable Transportation Agreement of the appointment of Provider as agent in time for Provider to administer and manage the contracts for which it has been given management and administrative authority, and Recipient agrees to also provide such notice to any counterparty to any of the Commodity Contract(s) that requests or requires such notice. Recipient further agrees to take any and all actions necessary to facilitate such appointment, including but not limited to executing documents required by the Carrier.

## ARTICLE III. PERFORMANCE OBLIGATIONS

**3.1 Provider's Specific Responsibilities**. Provider shall provide the following services under the terms of this Agreement**:**

(a) Where warranty of title is required under the applicable Commodity Contract or Transportation Agreement and where not prohibited under the terms of the Commodity Contract or Transportation Agreement, Recipient will engage in a buy/sell transaction in which Recipient each Month will purchase from Provider Hydrocarbons at a mutually agreed point upstream of the receipt point on the applicable Carrier's system at an agreed upon contract price set forth in a written notice from Recipient to Provider and Recipient will agree to resell an equivalent volume (and to the extent applicable an equivalent grade), less fuel, loss allowance and other allowances as applicable, of Hydrocarbons to Provider at the same stated price after the point of delivery under the applicable Commodity Contract or Transportation Agreement (with Provider being liable for the payment of any and all midstream services charges and all related fees, charges, or surcharges related to transportation of Hydrocarbons from the point of receipt to the point of delivery by the applicable Carrier that would otherwise have been due and payable by Recipient). To the extent there are any other amounts deducted from the amounts that would otherwise be payable to Recipient, Provider shall bear sole responsibility for those deductions;

(b) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed point upstream of the facilities of the applicable Carrier at a mutually agreed price, and Provider shall nominate and schedule such Hydrocarbons to which the Recipient has title to the appropriate delivery point(s) as specified in the applicable Commodity Contract or Transportation Agreement. Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(b) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(c) Upon request by Recipient, Provider shall sell Hydrocarbons to Recipient at a mutually agreed upon point downstream after transportation at a mutually agreed upon price and Provider shall nominate and schedule such Hydrocarbons to the appropriate delivery point(s) as specified in the applicable Transportation Agreement, and from and to the delivery point(s) thereafter on Recipient's behalf set forth in the applicable Commodity Contract(s). Any amounts otherwise due Recipient from third party purchasers in connection with transactions executed pursuant to this Section 3.1(c) shall be due and payable to Provider; however, if and to the extent such amounts reflect deductions to the amount otherwise payable to Recipient, Provider shall bear sole responsibility for those deductions;

(d) Prepare and submit daily and monthly nominations, as applicable, to facilitate Recipient's receipt and/or delivery of such Hydrocarbons at the applicable delivery and/or receipt point(s) under the Transportation Agreement(s), the Commodity Contract(s) and/or the Sanchez Anadarko Contracts;

(e) On each Day, manage the receipts and deliveries of Hydrocarbons with the applicable Carriers so as to minimize Imbalance Charges, if possible;

(f) Manage any critical day events or operational issues affecting the Carriers or any other industry developments or circumstances of which Provider has become aware that may have a material effect on the transportation of the Hydrocarbons made the subject of the Commodity Contract(s) and/or the Sanchez Anadarko Contracts. Without limiting the foregoing, Provider shall immediately notify Recipient of any exercise of emergency response rights under any Production Marketing Agreement;

(g) Balance transportation activities in accordance with the terms and conditions of the applicable Commodity Contract(s), the Sanchez Anadarko Contracts and/or the Transportation Agreement(s);

(h) Take any and all actions necessary to ensure that no modifications, alterations, revisions, or amendments are made to the Commodity Contract(s) or the Transportation Agreement(s) without the prior written consent of Recipient, which would in any manner expand, increase, or alter Recipient's obligations to any Carrier, or would otherwise be detrimental in any manner to Recipient with respect to Recipient's obligations under any Commodity Contract(s) or Transportation Agreement(s);

(i) Take any and all actions necessary to ensure that no modifications, alterations, revisions, extensions or amendments to any joint operating agreement, Production Marketing Agreement, or any related agreement are made by Provider which would in any manner expand, increase, or alter Recipient's obligations in any detrimental manner under any Commodity Contract(s) or Transportation Agreement(s). Without limiting the foregoing, Provider shall not, during the term of this Agreement, enter into any new commitment agreement under any Production Marketing Agreement or joint operating agreement that would, in any manner, restrict, minimize, reduce or limit the Hydrocarbons being transported and/or sold under any of the Retained Midstream Contracts that are subject to this Agreement, including but not limited to any new transportation or transportation-related agreements that would provide for new pipeline or terminal connections or alternate transportation paths that would provide for the potential

diversion of Hydrocarbons otherwise subject to the Retained Midstream Contracts. In addition, Provider shall maintain all Production Marketing Agreements in full force and effect during the Term of this Agreement and shall not enter into any material modifications of any such Production Marketing Agreement in the absence of the express prior written consent of Recipient, which may be withheld in Recipient's sole discretion;

(j) Provider shall during the Term of this Agreement take all actions necessary to ensure that all co-working interest owner production is transported and/or sold pursuant to the Retained Midstream Contracts, including all Hydrocarbons attributable to Provider, UnSub and AcqCo. If during the Term of this Agreement any co-working interest owner elects to take its production in-kind during the Term of this Agreement, Provider shall provide immediate notice to Recipient; provided that Provider shall ensure that none of Provider, UnSub or AcqCo elect to take its production in-kind during the term of this Agreement;

(k) Maintain an ongoing familiarity with the terms of the Transportation Agreements, including any pipeline tariffs and governing documents applicable thereto, including, without limitation, all provisions relating to scheduling, nominations, audit rights, quality specifications and confidentiality;

(l) Maintain an ongoing familiarity with the terms of the Commodity Contracts, including, without limitation, all provisions relating to invoicing, payment, audit rights, quality specifications, compliance with applicable Laws and ethics obligations set forth in the Commodity Contracts;

(m) Receive and pay any and all invoices related to the purchase and sale of Hydrocarbons pursuant to this Agreement including but not limited to the Sanchez Anadarko Contracts (as well as providing copies of invoices and payments related to the same to Recipients), in addition to making all payments owed to the Carriers;

(n) Provider will immediately provide to Recipient notice of any potential events of default received from any of the counterparties to any of the Commodity Contract(s) or the Transportation Agreement(s). Such notice must be provided no later than two Business Days prior to the applicable timeline set forth for curing the applicable event of default in the relevant Commodity Contract(s) or Transportation Agreement(s);

(o) For avoidance of doubt, it is the mutual intent of the Parties that Provider will meet and serve all Recipient's performance obligations under each of the Commodity Contract(s) and/or the Transportation Contract(s) for the full term of this Agreement;

(p) Provider shall take commercially reasonable steps to resolve any title warranty issues jointly with Recipient during the Term of this Agreement, but notwithstanding the foregoing, Provider shall be responsible for any and all charges, damages, costs, fees, expenses or penalties related to any breach of such title warranty issues that occur under any Commodity Contract(s) and/or the Transportation Agreement(s);

(q) Provider shall during the Term of this Agreement take any and all actions necessary to ensure that Provider fulfills its obligations under the Retained Midstream Contracts before

meeting any future commitments Provider may enter pursuant to any Production Marketing Agreement; and

(r) Provider shall not consent to the assignment of any Production Marketing Agreement by a co-working interest owner in the absence of the prior written consent of Recipient, which shall not be unreasonably withheld.

**3.2 Recipient's Responsibilities**. In order to enable Provider to perform its duties and obligations under this Agreement, Recipient shall:

(a) Take all actions in a timely manner required to effectuate Provider's responsibilities, such as executing applicable agency agreements with the Carriers, in order to enable Provider to provide the services provided for under this Agreement and entering into the Sanchez Anadarko Contracts;

(b) Take any and all actions necessary with any Carrier to ensure that no modifications, alterations, revisions, or amendments are made to the Transportation Agreement(s) without the prior written consent of Provider, which would in any manner expand, increase, or alter Provider's obligations to the Recipient under this Agreement, or would otherwise be detrimental in any manner to Provider with respect to Provider's obligations under this Agreement; and

(c) Comply with the provisions of Sections 3.1(a)-(c) to the extent applicable to Recipient.

**3.3 Balancing Services**. "Balancing" shall mean the services provided by Provider with respect to managing Recipient's Hydrocarbons made the subject of the Commodity Contract(s), the Sanchez Anadarko Contracts and/or Transportation Agreement(s) and resulting financial outcomes related to Hydrocarbon nominations, and actual deliveries of Hydrocarbons pursuant to any applicable Commodity Contract(s), the Sanchez Anadarko Contracts or the Transportation Agreement(s). Any economic consequences (including any liabilities, costs, gains, losses, damages, Imbalance Charges or other charges) arising under this Agreement (including the consequences of the Balancing), shall be borne solely by the Provider. Provider shall indemnify, defend and hold Recipient harmless from any and all claims and/or demands related to Balancing Services.

**3.4 Risk Allocation/Responsibility for Losses**. Notwithstanding anything else to the contrary in this Agreement, the Commodity Contract(s), the Sanchez Anadarko Contracts and/or the Transportation Agreement(s), Provider shall be responsible for any liabilities, costs, losses, damages, Imbalance Charges or other charges of any nature whatsoever with respect to Provider's provision of services under this Agreement, necessarily including Provider's assumption of all risk of (i) the failure of the Provider to deliver or receive (or to cause to be delivered or received) Hydrocarbons at the applicable receipt and/or delivery point(s) under the Commodity Contract(s) and/or the Sanchez Anadarko Contracts, (ii) the curtailment, interruption or the unavailability of the transportation capacity, including under the Transportation Agreement(s), as well as upstream/downstream of the receipt and/or delivery points(s), due to an event of force majeure or otherwise, either in whole or in part, and (iii) the failure of the

Hydrocarbons to be transported and delivered to the receipt and/or delivery point(s) for any reason whatsoever.

**3.5 <u>Responsibility for Charges</u>. THE PARTIES AGREE AND UNDERSTAND THAT THE PARTIES HAVE AGREED TO ENTER INTO THIS AGREEMENT AS A RESULT OF CREDIT/ASSIGNMENT ISSUES RELATED TO THE PSA, AND ACCORDINGLY THE PARTIES FULLY INTEND FOR THE PROVIDER TO BE RESPONSIBLE FOR ANY AND ALL CHARGES, FEES, SURCHARGES, LIABILITIES, COSTS, LOSSES, EXPENSES, DAMAGES, IMBALANCE CHARGES OR OTHER CHARGES OF ANY NATURE WHATSOEVER ARISING FROM OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS AND/OR THE TRANSPORTATION AGREEMENT(S), IRRESPECTIVE OF THE CAUSE OR CAUSES OF THE FOREGOING, INCLUDING WHETHER THE CAUSE OR CAUSES ARE DERIVED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT PROVIDER OR INVITEES AND/OR THIRD PARTIES.**

**3.6 <u>Indemnity</u>.**

**(A) PROVIDER SHALL INDEMNIFY, HOLD HARMLESS AND DEFEND RECIPIENT AND EACH OF THE SELLER INDEMNIFIED PARTIES FROM AND AGAINST ANY CLAIMS, CHARGES, FEES, DAMAGES, LOSSES, EXPENSES, LIABILITIES, FINES, PENALTIES OF ANY TYPE OR DESCRIPTION, (SPECIFICALLY INCLUDING FINES, PENALTIES OR DISGORGEMENT OF PROFITS ASSOCIATED WITH THE FAILURE TO COMPLY WITH ANY REGULATIONS, ORDERS, OR STATUTES) AND COSTS (INCLUDING REASONABLE ATTORNEY'S FEES AND COSTS OF LITIGATION) (COLLECTIVELY "<u>CLAIMS</u>") ARISING OUT OF, RELATING TO OR RESULTING FROM THE PROVIDER'S PERFORMANCE OR LACK OF PERFORMANCE OF THE SERVICES HEREUNDER, NECESSARILY INCLUDING CLAIMS ARISING UNDER OR RELATED TO THE COMMODITY CONTRACT(S), THE SANCHEZ ANADARKO CONTRACTS AND/OR THE TRANSPORTATION AGREEMENT(S), AND EVEN IF SUCH CLAIMS ARE BASED UPON THE NEGLIGENCE (WHETHER JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE) OF THE RECIPIENT OR ANY OF THE SELLER INDEMNIFIED PARTIES. THE INDEMNITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE REGARDLESS OF FAULT, MEANING WITHOUT REGARD TO THE CAUSE OR CAUSES OF ANY CLAIM, INCLUDING, EVEN THOUGH A CLAIM IS CAUSED IN WHOLE OR IN PART BY: (i) THE NEGLIGENCE (WHETHER SOLE, JOINT, CONCURRENT, COMPARATIVE, CONTRIBUTORY, ACTIVE, PASSIVE, GROSS OR OTHERWISE), STRICT LIABILITY OR OTHER FAULT OF RECIPIENT, THE SELLER INDEMNIFIED PARTIES, PROVIDER, INVITEES AND/OR THIRD PARTIES; AND/OR (ii) A PRE-EXISTING DEFECT, WHETHER PATENT OR LATENT, OF THE PREMISES OF RECIPIENT'S PROPERTY OR THE**

**PROPERTY OF THE SELLER INDEMNIFIED PARTIES (INCLUDING THE ASSETS), INVITEES AND/OR THIRD PARTIES.**

**(B) All claims for indemnification for Claims will be asserted and resolved according to the procedures set forth in Section 8.9 of the PSA, which shall apply *mutatis mutandis* to this Agreement.**

## ARTICLE IV. AUDIT RIGHTS

**4.1 <u>Audit Rights</u>**. A Party shall have the right, at its own expense, upon reasonable written notice to the other Party and at reasonable times on any Business Day, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other Party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Agreement. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to this Agreement. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within one year after the Month that the service activities made the subject of the invoices or billings is performed. All retroactive adjustments under this section shall be paid in full by the Party owing payment within thirty (30) Days of the written notice after the substantiation of such inaccuracy.

## ARTICLE V. ACCOUNT STATEMENTS

On or before the 10th Day of each Month, Provider shall deliver, or cause to be delivered to Recipient a statement that sets out for the previous Month a detailed calculation showing all purchases and sales (identifying both the volume and value of each such purchase or sale transaction) made pursuant to this Agreement, as well as all fees, charges and similar expenses invoiced by and/or paid to any Carrier (identifying invoiced and paid amounts separately). At the same time, Provider shall deliver, or cause to be delivered, to Recipient a statement that sets out for the previous Month an aging of payables and receivables for the previous Month. ]

In addition, on March 1, June 1, September 1 and December 1 of each Calendar Year during the term (or, if March 1, June 1, September 1 and December 1 of a given year do not fall on Business Days, the next Business Day following each such date), Provider shall deliver or cause to be delivered to Recipient a list of all remaining commitments (including future demand charges or fees) associated with the Retained Midstream Contracts, separately stated by for each such Retained Midstream Contract.

## ARTICLE VI. TERM.

Subject to any other applicable provision of this Agreement, the Retained Midstream Contract services to be provided under this Agreement shall commence on the date of termination of the Marketing Transition Services Agreement as defined in the PSA and shall terminate on the earlier to occur of (i) the date that this Agreement is terminated as the result of any Event of Default, (ii) the date that coincides with the termination date of the Retained Midstream Contract with the longest term, and (iii) the date that coincides with Provider (or one of its Affiliates) obtaining consent to assign the last remaining Retained Midstream Contract from the

counterparty thereunder (the periods from the effective date until the termination of the services under (i), (ii) or (iii) collectively being the "Term").

Each Party's obligations regarding payment and indemnification hereunder shall survive the termination or expiration of this Agreement for a period of time equal to the time for which the applicable statute of limitations applies.

## ARTICLE VII. TAXES

**7.1 Tax Matters**. Each Party shall report to the Internal Revenue Service or any other applicable taxing authority, all information relevant to the economic benefits and burdens related to this Agreement and shall maintain the necessary records for such tax reporting. **Provider shall indemnify, defend and hold Recipient harmless as to any costs or liabilities claimed against or incurred by Recipient in connection with this Agreement, including claims for Taxes made by Third Parties or entities, including Governmental Bodies, arising out of the activities made the subject of this Agreement.** References to "costs" in connection with this section shall include all reasonable and necessary attorneys' fees and expenses, consultants' fees, travel expenses, and court costs, including costs incurred to enforce the indemnity obligations.

**7.2 Responsibility Taxes**. Provider shall be solely responsible for all taxes, fees, levies, penalties, licenses or charges imposed by any Governmental Body (collectively "Taxes") that are currently imposed on the sale and delivery or purchase and receipt of the Hydrocarbons under the Commodity Contract(s) and/or the Sanchez Anadarko Contracts, as well as any Taxes attributable to the pipeline capacity under the Transportation Agreements.

## ARTICLE VIII. DEFAULT AND REMEDIES

**8.1 Events of Default**. The following actions or inactions by the applicable Party (the "Defaulting Party") shall constitute an "Event of Default" under this Agreement:

(a) Breach of any material obligation under this Agreement , if such breach is not cured by the Defaulting Party within ten (10) Business Days after written notice of such breach from the other non-defaulting Party (the "Non-Defaulting Party");

(b) The Bankruptcy of a Party; and

(c) Provider's action or inaction results in a material breach of any of the Retained Midstream Contracts, if such breach is not cured within the shorter of (i) the applicable deadline in the Retained Midstream Contract(s), or (ii) five (5) Days following written notice from Recipient; provided, however, that if the Provider does not provide the notice within the required two (2) Business Days' notice period set forth in this Agreement, the otherwise applicable time to cure shall be shortened by the amount of time not provided to Recipient.

**8.2 Remedies**. If an Event of Default has occurred and is continuing, the Non-Defaulting Party may suspend performance on written notice to the Defaulting Party and, at its election, terminate this Agreement on written notice to the Defaulting Party. The Non-Defaulting Party must elect to terminate this Agreement within five (5) Business Days of the Event of Default or re-commence performance. During any time that Provider suspends performance in accordance

with this section, it shall have no obligation to perform any services of any nature under this Agreement, until such time as Recipient has remedied the breach and provided notice thereof to Provider. During any such suspension hereunder, Recipient may notify the Carriers under the Transportation Agreement(s) that a Third Party other than Provider will handle daily nominations and scheduling of the affected Hydrocarbons until further notice. In the event Provider resumes performance either as a result of electing not to terminate this Agreement or by informing Recipient in writing that it rescinds its suspension of performance, Recipient shall take all necessary steps with the Carriers under the Transportation Agreement(s) to facilitate Provider's performance under this Agreement. Termination of this Agreement shall not preclude or limit the Non-Defaulting Party from pursuing any other remedies available at law or in equity in respect of the Event of Default under this Agreement, including the pursuit of damages.

If Provider shall fail to pay any amounts due under a Commodity Contract or Transportation Agreement even prior to an Event of Default occurring, Recipient may in its sole discretion terminate instructions to counterparties under Commodity Contracts and/or Transportation Agreements to make any direct payments to Provider until Recipient has recouped in full any and all amounts that Recipient may be required to pay due to Provider's failure to pay any amount when due.

If this Agreement is terminated prior to the date that coincides with the termination date of the Retained Midstream Contract with the longest term, Provider shall ensure that any of its Hydrocarbons along with the Hydrocarbons of Provider's co-working interest owners governed by the Production Marketing Agreements will be sold to Recipient until the date of expiration of the Retained Midstream Contract with the longest term to enable Recipient to mitigate Recipient's losses under the Retained Midstream Contracts. All such sales by Provider to Recipient shall be under terms and conditions no less favorable than those set forth in the Commodity Contract(s) at the time of the termination.

## ARTICLE IX. MISCELLANEOUS

**9.1 No Partnership or Joint Venture.** Nothing contained in this Agreement shall be construed to create an association, trust, partnership or joint venture between the Parties, and each Party shall be liable individually and severally for its own obligations under this Agreement. Both Parties agree that their relationship is strictly as one of principal and agent, as limited by the provisions of this Agreement and to the express purposes set forth herein.

**9.2 Compliance**. Provider shall comply with (i) the nomination and scheduling requirements of Carriers on the terms and conditions set forth in this Agreement, (ii) the Transportation Agreements and the applicable tariffs or governing documents, and (iii) all applicable Laws affecting the transportation, purchase and sale of Hydrocarbons that are related to this Agreement. Without limiting the generality of the foregoing and subject to Section 3.6 of this Agreement, if during the term of this Agreement any Governmental Body should determine that the obligations and duties contemplated in this Agreement cannot be performed in accordance with applicable Laws, wholly or in part, the Parties shall immediately suspend performance under this Agreement. Provider and Recipient shall, within five (5) Business Days of such a determination, meet to determine whether this Agreement can be revised so that the services contemplated herein can be performed fully in accordance with applicable Laws. In the absence

of a superseding written agreement between the Parties following such event and following such meeting, this Agreement shall terminate prospectively with no damages being owed by either Party to the other Party from the date of termination forward, except for any amounts owed under this Agreement which relate to a period of time prior to termination under this Section 9.2. For the avoidance of doubt, any claims for damages, civil penalties, disgorgement of profit or similar Claims accruing prior to Termination of this Agreement shall survive and shall be subject to Section 3.6 of this Agreement, which shall survive termination of this Agreement.

**9.3 Further Assurances**. The Parties agree to execute and deliver such additional instruments or documents as may be necessary to carry out the purposes of this Agreement.

**9.4 Assignment**. Neither Party may assign, convey or otherwise transfer this Agreement whether through sale, merger, consolidation, reorganization, restructuring or otherwise, to any Affiliate or any Third Party without the express written consent of the other Party. Any attempted assignment, conveyance or transfer of this Agreement in violation of this section shall be void and of no force and effect. This Agreement shall inure to the benefit of and bind the respective successors, heirs, representatives and permitted assigns of the Parties.

**9.5 Governing Law and Jurisdiction**. This Agreement shall be governed by the terms and conditions set forth in Section 15.13 of the PSA, which shall apply mutatis mutandis to this Agreement.

**9.6 Notices**. Any communications between the Parties hereto or notices provided herein to be delivered may be delivered to the following addresses:

**If to Recipient:**

Anadarko Energy Services Company
Attention: Tammy Campbell
9950 Woodloch Forest Drive
12th Floor
The Woodlands, TX 77380
Email: Tammy.Campbell@anadarko.com

**If to Provider:**

SN EF Maverick, LLC
Attention: Scott Wike
1000 Main Street
Suite 3000
Houston, TX 77002
Email: swike@sanchezog.com

All notices and communications required or permitted to be delivered hereunder shall be in writing and shall be considered as properly delivered (i) when delivered in person provided such delivery is received by 5:00 p.m. on a Business Day, and if not the next Business Day, (ii) on the next Business Day after placed with an overnight delivery service when designated for next-Day service with proof of delivery, or (iii) if delivered by facsimile, upon the receipt of such facsimile as evidenced by the sending Party's proof of successful transmission, provided that such facsimile is received at Recipient's location by 5:00 p.m. on a Business Day, and if not, by the next Business Day. Any Party shall have the right to change its address for notices hereunder to any other location within the continental United States, but such notice shall not be effective until ten (10) Days' after such notice is provided to the other Party in the manner set forth hereinabove.

**9.7 Authority to Execute**. Each of the Parties to this Agreement represents and warrants that, as of the Effective Date, (i) it has full and complete authority to enter into and perform this

Agreement; (ii) the person who executes this Agreement on its behalf has full and complete authority to do so and is empowered to bind it thereby; and (iii) it is not insolvent and has not sought protection from its creditors in Bankruptcy and is not otherwise the subject of Bankruptcy.

**9.8 __Miscellaneous__**. This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which together shall constitute one and the same instrument. Each Party's delivery of an executed counterpart signature page by facsimile or e-mail is as effective as executing and delivering this Agreement in the presence of the other Party. The headings and subheadings contained in this Agreement are used solely for convenience and do not constitute a part of this Agreement between the Parties and shall not be used to construe or interpret the provisions of this Agreement. Each provision of this Agreement is intended to be severable. If any provision of this Agreement is determined to be illegal, invalid or unenforceable, for any reason, then, insofar as is practical and feasible, the remaining portions of this Agreement shall be deemed to be in full force and effect as if such invalid provision was not contained herein. Except as expressly otherwise provided in this Agreement, all covenants, indemnities, representations, warranties, acknowledgments, agreements, rights and obligations of the Parties under this Agreement, that are capable of having effect after the termination of this Agreement for any reason, shall survive and remain in full force and effect beyond, and not be affected by, the termination of this Agreement.

**9.9 __Waiver__.** One or more waivers of any provision of this Agreement by a Party shall not be construed as a waiver of a subsequent breach or requirement of the same provision, and the consent by a Party to or approval of any act or omission by a Party requiring the other Party's consent or approval shall not be deemed to waive or render unnecessary such other Party's consent to or approval of any subsequent similar act or omission by such Party. Any and all waivers of this Agreement shall only be binding on a Party to the extent that the waiver is in writing.

**9.10 __Entirety and Amendments__**. This Agreement constitutes the entire agreement between the Parties regarding the services to be provided under this Agreement, and supersedes and replaces any prior and contemporaneous communications, understandings and agreements between Recipient and Provider related to such subject matter, whether written or verbal, express or implied. No modification, amendment, supplementation or alteration of the terms and provisions of this Agreement shall be or become effective except by written amendment executed by the duly authorized representative of the Parties.

**9.11 __Definitions__.** To the extent that any defined terms used in this Agreement are not otherwise defined herein, they shall have the definition set forth in the PSA.

**9.12 __Confidentiality__**. Section 12.2 of the PSA shall apply mutatis mutandis to this Agreement.

**9.13 __Conspicuousness__**. The Parties agree that provisions in this Agreement in "bold" or "all caps" type satisfy any requirements of the "express negligence rule" and any other requirements at law or in equity that provisions be conspicuously marked or highlighted.

**9.14 Laws.** The Parties agree to comply with all Laws applicable to this Agreement and the services provided hereunder, and Recipient agrees that it shall not require or request Provider to perform any action that is in violation of applicable Laws or omit to perform any action that Provider reasonably believes is required under applicable Laws.

**9.15 Standard of Care/Performance.** Provider shall perform all services to be provided in all material respects in accordance with applicable Laws and applicable contracts, and with respect to the Commodity Contract(s) and the Transportation Agreement(s) in a manner which is similar in nature, quality and timeliness to the manner in which such services were provided by Recipient's personnel immediately prior to the Closing. The services shall be performed with the standard of care, skill, prudence and diligence normally provided by a reasonably prudent operator in the performance of similar services in similar jurisdictions in the oil and gas industry.

**9.16 Sanchez Anadarko Contracts**. Provider and Recipient shall enter into the Sanchez Anadarko Contracts on terms and conditions materially consistent with the Commodity Contract(s) to which they apply (i.e., being entered into to avoid warranty of title issues), it being the clear intent of the Parties that any contract gap risk be borne solely by Provider, and in any and all cases, notwithstanding the terms of the Sanchez Anadarko Contracts, any and all gap risk shall be borne by Provider. Provided, further, than in instances where the Sanchez Anadarko Contracts are being entered into to avoid title warranty issues related to Transportation Agreements(s) which do not also involve an associated Commodity Contract(s), the terms and conditions of the Sanchez Anadarko Contract shall be based on industry standard terms and conditions (e.g., NAESB with no Special Provisions, Recipient's Paper (e.g., crude oil purchases and sales); provided, however, that any and all contractual gap risk between Provider's contract(s) with any subsequent downstream purchaser(s) of such Hydrocarbons shall be borne exclusively by Provider.

**9.17 Survival**. All remedies set forth in Section 8.2, and the provisions of Sections 3.4, 3.5, and 3.6 shall survive the termination of this Agreement until the expiration of the applicable statute of limitations.

**9.18 SN Parent Guaranty**. For good and valuable consideration, and to induce Recipient to enter into this Agreement, SN Parent hereby absolutely, unconditionally and irrevocably guarantees to Recipient the punctual and complete performance of all obligations of Provider under this Agreement (the "Obligations"). The guaranty set out in this Section 9.18 (the "SN Parent Guaranty") shall remain in full force and effect until Provider has fully discharged all of the Obligations. Upon default by Provider of any of the Obligations, Recipient may proceed directly against SN Parent without proceeding against Provider or any other Person or pursuing any other remedy. Recipient may, without notice to, or consent of, SN Parent, (a) extend or alter, together with Provider, the time, manner, place or terms of payment or performance of the Obligations, (b) waive, or, together with Provider, amend the terms of this Agreement, (c) release Provider from any or all of the Obligations, or (d) release any other guaranty or security for the Obligations, without in any way releasing or discharging SN Parent from liability hereunder. SN Parent waives any defenses (but not rights of set-off or counterclaims) which it may have with respect to the performance of the Obligations, other than defenses that Provider would have under the terms of this Agreement. SN Parent further waives notice of the acceptance of this SN Parent Guaranty, presentment, demand, protest, and notices of protest,

nonpayment, default or dishonor of the Obligations. SN Parent represents and warrants that (x) it has the full power and authority to enter into and perform the SN Parent Guaranty, (y) there are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to SN Parent's knowledge, threatened against SN Parent, and SN Parent is not insolvent or generally not paying its debts as they become due, and (z) the execution, delivery and performance by SN Parent of this SN Parent Guaranty has been duly and validly authorized and approved by all necessary corporate action on the part of SN Parent, and this SN Parent Guaranty constitutes the legal, valid and binding obligation of SN Parent, enforceable against SN Parent in accordance with its terms.

[*Signature page follows*]

IN WITNESS WHEREOF, and with the intent to be legally bound, the Parties hereto have caused this Agreement to be executed by their duly authorized officers or representatives as of the Effective Date.

**ANADARKO E&P ONSHORE LLC**

**By:** BTK

**Name:** Brian T. Kuck
**Title:** Vice President

DR

**Date:** 6-1-17

**KERR-MCGEE OIL & GAS ONSHORE LP**

**By:** BTK
**Name:** Brian T. Kuck
**Title:** Vice President

DR

**Date:** 6-1-17

[*Signature Page to Midstream Agency Agreement*]

**SN EF MAVERICK, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SANCHEZ ENERGY CORPORATION**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

# EXHIBIT A

| Number | Anadarko Entity | External Entity | Contract Type | Effective Date |
|---|---|---|---|---|
| | Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| 9142-100 | Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |

# EXHIBIT 15

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ______________________________
Name: Cameron W. George
Title: Chief Financial Officer and Treasurer

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**SN EF UnSub LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ________________________________
Name:
Title:

**Carnero G&P LLC**

By: ________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF UnSub GP, LLC, the general partner of SN EF UnSub LP, a Delaware limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

**EXHIBIT A**

**DEDICATED INSTRUMENTS**

**All of Producer's right, title and interest in and to lands, leaseholds, property rights, and/or wells (and the right to produce gas therefrom located in Maverick, Webb, Dimmit and LaSalle Counties, Texas, including the instruments listed on the attached Exhibit A.**

# EXHIBIT 16

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case solely with respect to Producer's Share of such representations and warranties and obligations and subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, or otherwise satisfy Producer's Share of such payment or obligation; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Termination. This Agreement shall terminate in its entirety upon the earlier to occur of (i) termination of GGPA, or (ii) the mutual written agreement between Parties. Upon termination Producer shall not have any further obligations or liability under this Agreement beyond that prescribed in the GGPA.

10. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name: Joohyo Lee
Title: Treasury and Commercial Manager

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Eagle Ford TX LP**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Eagle Ford TX LP, a Texas limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**Eagle Ford TX LP**

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Eagle Ford TX LP, a Texas limited partnership, on behalf of said partnership.

____________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

____________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 17

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as such term is defined in the GGPA). In addition, if Carnero seeks payment directly from Producer as

permitted in Section 5.8(c) of the GGPA, Producer will have the rights provided in Sections 5.10 and 5.11 of the GGPA to dispute such invoices and audit the records applicable to such invoices.

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Venado EF L.P.**

By:________________________________
Name:
Title:

**Carnero G&P LLC**

By:________________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:________________________________
Name:
Title:

**Venado EF L.P.**

By: Venado EF GP LLC, its general partner

By:________________________________
Name: Stacy L. Shivers
Title: Vice President – Operations

**Carnero G&P LLC**

By:________________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Venado EF L.P.**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

**EXHIBIT A**

**FORM OF MEMORANDUM**

**See Attached.**

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is made and entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by Venado EF L.P., a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, on April 1, 2018, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for their benefit and for the benefit of certain other producers;

WHEREAS, on the Effective Date, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ______________________________
Name:
Title:

**Venado EF L.P.**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

___________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Venado EF L.P., a Delaware limited partnership, on behalf of said partnership.

___________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

___________________________________
Notary Public, State of _____________

# EXHIBIT A

## DEDICATED INSTRUMENTS

# EXHIBIT 18

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is dated May 22, 2018, to be effective as of April 1, 2018, by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ______________________________
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Gavilan Resources, LLC**

By: ______________________________
Name:
Title:

**Carnero G&P LLC**

By: ______________________________
Name: Patrick J. McDonie
Title: President

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name: David E. Roberts Jr.
Title: Chief Executive Officer

**Carnero G&P LLC**

By:______________________________
Name:
Title:

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By:______________________________
Name:
Title:

**Gavilan Resources, LLC**

By:______________________________
Name:
Title:

**Carnero G&P LLC**

By:______________________________ GPS
Name: Patrick J. McDonie
Title: President

# MEMORANDUM OF AGREEMENT

THIS MEMORANDUM OF AGREEMENT (this "Memorandum") is dated May ____, 2018, to be effective as of April 1, 2018 (the "Effective Date"), by Gavilan Resources, LLC, a Delaware limited liability company (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "GGPA") under which Carnero agreed to provide gas gathering and gas processing services to Maverick for its benefit and for the benefit of certain other producers;

WHEREAS, Carnero, Maverick and Producer entered into that certain Ratification and Assumption Agreement effective as of the Effective Date (as amended, restated, modified or supplemented from time to time, the "Ratification Agreement" and, together with the GGPA, the "Agreements") under which Producer agreed to dedicate its interests in the Dedicated Acreage to Carnero under the GGPA and be responsible for certain obligations under the GGPA, among other things;

WHEREAS, the Parties desire to file this Memorandum in the applicable real property records to give notice of the existence of the Agreements and certain provisions contained therein.

1. **Term**. The term of the GGPA commenced on the Effective Date and both Agreements continue in effect until the fifteenth anniversary of such date (the "Primary Term") and will continue year-to-year thereafter unless the GGPA is terminated by Carnero or Maverick upon at least 90 Days' written notice to the other parties thereto prior to the end of the Primary Term or any subsequent anniversary thereof.

2. **Dedication**. Subject to the terms and conditions of the Agreements, as of the Effective Date, Producer has dedicated for gathering and processing under the Agreements and shall deliver thereunder to Carnero (the "Dedication") 100% of gas (other than gas used in lease operations as permitted pursuant to the Agreements or otherwise excluded as provided in the Agreements) owned or controlled by Producer that is produced from a well or wellbore now or hereafter located on the lands covered by the oil and gas instruments described on **Exhibit A** (the "Dedicated Acreage") or a pooled unit that contains acreage within the Dedicated Acreage excluding any such oil and gas

instruments solely to the extent such oil and gas instruments have been released from the Dedication in accordance with each of the Agreements (such gas, the "Dedicated Gas").

3. **Gathering and Processing Services**. Carnero has agreed to receive, gather, process and redeliver Dedicated Gas for the fees and on and subject to the terms and conditions provided in the Agreements.

4. **Covenant Running with the Land**. So long as any Agreement is in effect, such Agreement shall (i) be a covenant running with the Dedicated Acreage owned by Producer or its Affiliates and their successors and assigns and (ii) be binding on and enforceable by Carnero and its successors and assigns against Producer, its Affiliates and their respective successors and assigns to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. **Incorporation of Terms**. The terms and conditions of the Agreements are incorporated herein and made a part hereof for all purposes by this reference. This Memorandum is executed and recorded solely for the purpose of giving notice and does not amend or modify the Agreements in any way. Capitalized terms used herein, but not defined herein, have the meanings assigned to such terms in the Agreements.

6. **Counterparts**. This Memorandum may be executed in one or more originals, all of which together shall constitute one and the same instrument.

[*Signature Pages Follow*]

The Parties have signed this Memorandum as of the Effective Date.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**Gavilan Resources, LLC**

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name:
Title:

**THIS INSTRUMENT PREPARED BY:**

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attention: South Texas Contract Administration

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of Texas

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said limited liability company.

_________________________________
Notary Public, State of Texas

STATE OF ___________________
COUNTY OF ___________________

This instrument was acknowledged before me on ____________, 2018 by _______________, ____________ of Carnero G&P LLC, a Delaware limited liability company, on behalf of said company.

_________________________________
Notary Public, State of _____________

**EXHIBIT A TO MEMORANDUM OF AGREEMENT**

**DEDICATED ACREAGE**

**Maverick, Webb, Dimmit and LaSalle Counties, Texas**

**The area circled in red in the below diagram**



# EXHIBIT 19

MEPTX
Mitsui E&P Texas LP

SN EF Maverick, LLC
1000 Main St. Suite 3000
Houston, TX 77002
Attn: John Happ

Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: Patrick McDonie

Attn: Mr. John Happ and Mr. Patrick McDonie

RE: Retained Take-In-Kind Rights of Mitsui E&P Texas LP in Volumes Committed to the Raptor Gas Processing Facility in La Salle County, Texas

This Letter Agreement ("Agreement") is hereby entered into by and among Mitsui E&P Texas LP, a Texas Limited Partnership ("Mitsui") and SN EF Maverick, LLC, a Delaware Limited Liability Company ("Sanchez") and Carnero G&P LLC, a Delaware Limited Liability Company ("Carnero"), dated this ___ day of April, 2018 and effective as of April 1, 2018 ("Effective Date"). Mitsui, Sanchez and Carnero may be referred to herein individually as "Party", or collectively as "Parties.

Whereas, Mitsui and Sanchez are now parties to that certain Maverick Natural Gas Liquids Marketing Agreement dated effective January 1st, 2012, and that certain Maverick Residue Gas Marketing Agreement dated effective January 1st, 2012 (the "PMAs"), and said PMAs give broad powers to Sanchez as a marketer of Mitsui's share of gas and natural gas liquids (collectively, "Products") produced from the contract areas of seventeen joint operating agreements to which both Mitsui and Sanchez are parties ("Comanche Area"), and said marketing powers include the ability to enter into certain contracts with third parties covering the gathering, treating, processing, transportation, etc., of Mitsui's Products ("Commitment Agreements").

Whereas, if Mitsui rejects a Commitment Agreement per the PMAs, then said Commitment Agreement is deemed a "Rejected Commitment Agreement" under the PMAs, and Mitsui retains the right to take-in-kind its Products as to any excess volumes over and above the volumes committed pursuant to that particular Rejected Commitment Agreement.

Whereas, Sanchez is now considering entering into a Firm Gas Gathering Processing and Purchase Agreement with Carnero for gas produced from the Comanche Area ("the FGGPPA"), and the FGGPPA would be considered a new Commitment Agreement under the PMAs requiring a written election by Mitsui to either approve or reject the FGGPPA.

Whereas, prior to the inception of the FGGPPA, Mitsui rejected a Commitment Agreement dated September 1st, 2016 committing an aggregate of 299,000 MMBtus/day in volumes in the Comanche Area to the Brasada gas processing plant currently owned by WGR Operating, LP in La Salle County, Texas, resulting in Mitsui's ability to take its Products in-kind as to any volumes in excess of the 299,000 MMBtus/day committed to the Brasada plant ("Mitsui Excess Production").

Now, therefore, in consideration of the premises and covenants contained herein, the Parties hereby agree as follows:

1. In accordance with the election procedures provided for in the PMAs, Mitsui shall hereby agree to grant in writing via a ballot its consent to, and acceptance of, Sanchez entering into the FGGPPA with Carnero, resulting in the FGGPPA becoming a Commitment Agreement under the PMAs. However, irrespective of the FGGPPA's status as an accepted Commitment Agreement under the PMAs and of any terms of the PMAs to the contrary, subject to Paragraph 2. below, Mitsui shall retain its right to take the Mitsui Excess Production in-kind throughout the "Initial Term" of the FGGPPA (as said term is defined in the FGGPPA).

2. Notwithstanding Mitsui's retained right to take the Mitsui Excess Production in-kind pursuant to Paragraph 1. above, and subject to Paragraph 3. below, Mitsui hereby agrees and promises to not exercise its right to take the Mitsui Excess Production in-kind during the entire Initial Term of the FGGPPA, to the extent such Mitsui Excess Production would be dedicated to the FGGPPA under the terms thereof as if Mitsui had ratified the FGGPPA as a Comanche Producer (as defined in the FGGPPA).

3. It is hereby understood by the Parties that if, during the Initial Term, the FGGPPA is subsequently amended or the terms thereof waived by Sanchez and Carnero without Mitsui's prior written consent (but excluding elections or actions expressly contemplated by Section 2.1 (to the extent providing for connection of Additional CGPs, new wells or Released Wells within the Dedicated Acreage), Section 3.1 (to the extent providing for releases of volumes of Gas), Section 3.3(a) (to the extent authorizing reductions in MDQ), Section 3.7 (relating to ethane rejection/recovery elections), Section 5.9 (to the extent providing for annual adjustments in fees), Section 10.1(c) (to the extent providing for modification of specifications based upon specifications of Redelivery Pipelines or T2 Pipeline) and Section 10.4(b)(vii) (to the extent adopting revised GPA standards) of the FGGPPA), and said amendment or waiver is:

a. Adverse or disadvantageous to Mitsui's interests or the marketing of Mitsui's Products as determined by Mitsui in its reasonable discretion, when such amendment or waiver addresses:

   i. Fees (other than implementation of the existing annual adjustment in Section 5.9);
   ii. Purchase price for Plant Products, Additional Plant Products and Condensate;
   iii. Imbalance cash out arrangements and the Cashout Price;
   iv. Treatment of disputed billing statements and audit rights;
   v. Plant Products, Additional Plant Products and Condensate allocation procedures in Exhibit C;
   vi. Change to the Dedicated Acreage (other than as a result of lease termination);
   vii. Elimination of any Receipt Point or Delivery Point;
   viii. Change to the Maximum Daily Quantity, or Maximum Receipt Capacity for any Receipt Point, other than pursuant to Section 3.3;
   ix. Alteration of Carnero's obligations described in Section 3.2 or 11.5;
   x. Procedures, costs and standards for connection of new wells and Additional CGPs as set out in Section 2.1;
   xi. Producer's reservations in Section 2.3;
   xii. Treatment of Subject Volumes not accepted, as described in Section 3.1(c) or Producer's Gas volumes not accepted as a result of Force Majeure or other reasons under Sections 3.1(d), (e) and (f) and Section 11.4, or otherwise;
   xiii. Priorities, whether under Section 3.3(b), Section 3.5, or otherwise; or
   xiv. Term of the Agreement; or

b. materially adverse or materially disadvantageous to Mitsui's interests or the marketing of Mitsui's Products in cases other than those set forth in Paragraph 3(a),

(each such amendment or waiver, an "Amendment"), then Sanchez and Carnero may proceed with the Amendment; however Paragraph 2. above shall no longer have any force or effect, and Mitsui shall again have the right to take the Mitsui Excess Production in-kind. This right to take-in-kind by Mitsui shall take effect sixty (60) days from the effective date of any Amendment which Mitsui did not consent to in writing. Notwithstanding the preceding, before exercising its right to take in kind under this Agreement, Mitsui shall send notice to Sanchez and Carnero, and Sanchez and Carnero shall have thirty (30) days following receipt of notice (which may fall within the sixty (60) day period noted above) in which to retract the Amendment, revise the Amendment so it does not apply in any manner to Mitsui and Mitsui's Products, or reach an alternate solution accepted by Mitsui in writing, in which case the right to take in kind shall no longer apply with respect to that specific Amendment (without prejudice to Mitsui's rights with respect to any subsequent proposed amendment or waiver). If sixty (60) days have passed since the effective date of the relevant Amendment, and the thirty (30) day cure period for Sanchez and Carnero under the preceding sentence has passed

without resolution, then Mitsui is free to commence taking the Mitsui Excess Production in kind, notwithstanding any provisions of the PMAs to the contrary..

4. Provided that the consent requirement of Paragraph 3. above is complied with at all times, in the event the PMAs expire, in whole or in part, prior to the expiration of the Initial Term of the FGGPPA, then Mitsui agrees that Sanchez can continue to market Mitsui's Products to the extent necessary and required by the FGGPPA throughout the entire Initial Term of the FGGPPA and Mitsui will execute a mutually-acceptable form of agreement with Sanchez providing for such rights.

5. Provided that the consent requirement of Paragraph 3. above is complied with at all times, Mitsui agrees that, without prejudice to any other rights it may have against Sanchez for any default or failure to perform its duties and obligations under the PMAs with respect to the FGGPPA ("Default"), Mitsui will not suspend deliveries of gas under, or otherwise suspend performance under, or terminate, any PMA in a manner that would impact Sanchez's performance of or ability to perform its then-existing commitments under the FGGPPA due to any default by Sanchez that is capable of being cured by Carnero without first notifying Carnero in writing of the details of any such Default with reasonable specificity, providing Carnero a copy of the applicable PMA, and providing Carnero 30 days (or in the case of a payment default, 10 business days) following Carnero's receipt of such notice to cure such Default on behalf of Sanchez. If Carnero, in its sole discretion, cures the Default within such 30-day (or in the case of a payment default, 10 business day) period in accordance with the terms of the applicable PMA, the Default will be deemed cured in accordance with the applicable PMA and Mitsui will not have any further right (to the extent arising due to that cured Default) to suspend performance under, or otherwise terminate, the applicable PMA.

6. So long as Mitsui is not exercising its right to take Mitsui Excess Production in-kind and the FGGPPA is still in effect, Carnero agrees that, without prejudice to any other rights it may have in respect of any default by Sanchez under the FGGPPA, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA in a manner that would impact Mitsui's production, marketing and sale of Products, or ability to produce, market and sell Products, due to any default by Sanchez that is capable of being cured by Mitsui without first notifying Mitsui in writing of the nature and details of such default with reasonable specificity and providing Mitsui 30 days (or in the case of a payment default, 10 business days) following Mitsui's receipt of such notice to cure such default, including the right to step into the position of Sanchez and assume the obligations and responsibilities of Sanchez hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share of such responsibilities and obligations. If Mitsui, in its sole discretion, cures the default within such 30 day (or in the case of a payment default, 10 business day) period in accordance with the terms of the FGGPPA, then as to Mitsui, the default will be deemed cured in accordance with the FGGPPA and Sanchez and Carnero will not (to the extent arising due to the cured default) suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the FGGPPA with respect to Mitsui's Producer's Share. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Comanche

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By: [signature]

Its: SVP & COO

Dated: May 9th, 2018

SN EF Maverick, LLC

By:____________________

Its:____________________

[initials]

Area that is attributable to Mitsui's working interest in the Comanche Area delivered to Carnero under the FGGPPA during any period, by (b) the aggregate volume of gas produced from the Comanche Area and delivered to Carnero under the FGGPPA during the same period.

7. The Parties agree that to the extent of any conflicts between the terms of this Agreement and the terms of the PMAs, the terms of this Agreement shall prevail to the extent of the conflict.

8. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

9. This Agreement shall be binding upon the Parties and their permitted successors and assigns; provided that no Party shall have the right to assign this Agreement without the prior written consent of the other Party, with such consent to not be unreasonably withheld. However, notwithstanding the foregoing sentence, a Party's rights and obligations hereunder shall automatically transfer to and be binding upon any transferee of such Party's rights and obligations under the PMAs (whether in whole or in part).

10. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

11. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the Effective Date above.

Mitsui E&P Texas LP

By:____________________

Its:____________________

Dated:____________________

SN EF Maverick, LLC

By: [signature]
Antonio R. Sanchez, III

Its: Chief Executive Officer

Dated:______________________________

Carnero G&P LLC

By:_________________________________

Its:_________________________________

Dated:______________________________

Dated:____________________________

Carnero G&P LLC

By:____________________________ GPS

Its: President

Dated:____________________________

# EXHIBIT 20

# (FILED UNDER SEAL)

# EXHIBIT 21

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| | § | |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | |

**<u>NOTICE OF FILING OF ASSET AND PURCHASE AGREEMENT</u>**

**PLEASE TAKE NOTICE** that, on October 16, 2020, the Court entered the *Order (A) Approving Sale of Debtors' Assets, (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 361] (the "**Sale Order**").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file, in accordance with the Sale Order, the final and executed Asset and Purchase Agreement between the Debtors and Mesquite Energy, Inc., attached hereto as **<u>Exhibit A</u>**.

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Dated: October 16, 2020
Houston, Texas

*/s/ Alfredo R. Pérez*

WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
Brenda Funk (24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Alfredo.Perez@weil.com
Brenda.Funk@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
Garrett A. Fail (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Ray.Schrock@weil.com
Garrett.Fail@weil.com

*Attorneys for Debtors and Debtors in Possession*

**Certificate of Service**

I hereby certify that on October 16, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez

Case 4:23-cv-03560 Document 366 Filed 07/13/23 in TXSD Page 671 of 1882

# Exhibit A

**Asset and Purchase Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 16, 2020**

**by and between**

**GAVILAN RESOURCES, LLC and**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC,**

**as Sellers**

**and**

**MESQUITE ENERGY, INC.,**

**as Buyer**

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS ....................................................................................1**

Section 1.01 *Definitions* ....................................................................................1

**ARTICLE II PURCHASE AND SALE ....................................................................................1**

Section 2.01 *Purchase and Sale of the Assets* ....................................................................................1
Section 2.02 *Excluded Assets* ....................................................................................4
Section 2.03 *Consideration* ....................................................................................5
Section 2.04 *Adjustments to the Purchase Price* ....................................................................................5
Section 2.05 *Closing* ....................................................................................10
Section 2.06 *Final Settlement Statement* ....................................................................................12
Section 2.07 *Post-Closing Payments* ....................................................................................14
Section 2.08 *No Duplicative Effect; Methodologies* ....................................................................................14
Section 2.09 *Purchase Price Deposit* ....................................................................................15
Section 2.10 *Division of Hydrocarbons* ....................................................................................15
Section 2.11 *Division of Expenses; Burdens* ....................................................................................16
Section 2.12 *Preferential Purchase Rights* ....................................................................................16
Section 2.13 *Consents to Assign* ....................................................................................17
Section 2.14 *Consents for Leases and Purchased Contracts* ....................................................................................19
Section 2.15 *Assets Sold "As Is, Where Is"* ....................................................................................19
Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos* ....................................................................................20

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS....................................................................................20**

Section 3.01 *Organization* ....................................................................................20
Section 3.02 *Authority and Authorization* ....................................................................................20
Section 3.03 *Enforceability* ....................................................................................21
Section 3.04 *Conflicts* ....................................................................................21
Section 3.05 *Material Contracts* ....................................................................................21
Section 3.06 *Approvals* ....................................................................................23
Section 3.07 *Environmental Matters* ....................................................................................23
Section 3.08 *Well Status* ....................................................................................24
Section 3.09 *Imbalances* ....................................................................................24
Section 3.10 *Litigation* ....................................................................................24
Section 3.11 *Hedging* ....................................................................................24
Section 3.12 *Intellectual Property* ....................................................................................25
Section 3.13 *Insurance Coverage* ....................................................................................25
Section 3.14 *Taxes* ....................................................................................25
Section 3.15 *Letters of Credit* ....................................................................................25
Section 3.16 *Outstanding Obligations* ....................................................................................25
Section 3.17 *Preferential Purchase Rights* ....................................................................................26
Section 3.18 *Broker* ....................................................................................26
Section 3.19 *[Reserved]* ....................................................................................26
Section 3.20 *Working Interest Payments* ....................................................................................26

Section 3.21 *[Reserved]* ....26
Section 3.22 *[Reserved]* ....26
Section 3.23 *FCPA; Sanctions* ....26

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ....27**

Section 4.01 *Organization* ....27
Section 4.02 *Authorization and Authority* ....27
Section 4.03 *Enforceability* ....27
Section 4.04 *Conflicts* ....27
Section 4.05 *Broker* ....27
Section 4.06 *Financial Ability* ....28
Section 4.07 *Approvals* ....28
Section 4.08 *Litigation* ....28
Section 4.09 *Bankruptcy* ....28
Section 4.10 *Investor Status; Investigation* ....28
Section 4.11 *Qualification* ....29
Section 4.12 *No Other Representations* ....29

**ARTICLE V COVENANTS OF SELLERS ....30**

Section 5.01 *Operating Covenants* ....30
Section 5.02 *Operatorship* ....31
Section 5.03 *Assumption and Rejection of Executory Contracts and Leases* ....32
Section 5.04 *Access.* ....34

**ARTICLE VI COVENANTS OF BUYER ....35**

Section 6.01 *Access; Data Retention* ....35

**ARTICLE VII COVENANTS OF BUYER AND SELLERS ....36**

Section 7.01 *Commercially Reasonable Efforts; Further Assurances* ....36
Section 7.02 *Bankruptcy Proceedings* ....36
Section 7.03 *Public Announcements* ....38
Section 7.04 *Confidentiality* ....39
Section 7.05 *Audits and Other Tax Proceedings* ....39
Section 7.06 *Employee Matters* ....39
Section 7.07 *Tax Matters; Apportionment of Tax Liability* ....40
Section 7.08 *Supplemental Disclosures* ....42
Section 7.09 *Replacement of Existing Letters of Credit* ....42

**ARTICLE VIII CONDITIONS TO CLOSING ....43**

Section 8.01 *Conditions to Obligations of Buyer and Sellers* ....43
Section 8.02 *Conditions to Obligation of Buyer* ....43
Section 8.03 *Conditions to Obligation of Sellers* ....44

**ARTICLE IX TERMINATION ....44**

Section 9.01 *Grounds for Termination* ....44
Section 9.02 *Effect of Termination* ....46

**ARTICLE X CASUALTY LOSS ...................................................49**

Section 10.01 *Casualty Loss* ...................................................49

**ARTICLE XI RESERVED ...................................................49**

**ARTICLE XII RESERVED...................................................49**

**ARTICLE XIII SURVIVAL AND INDEMNIFICATION ...................................................49**

Section 13.01 *Survival; Limited Recourse Against Sellers*...................................................49
Section 13.02 *Indemnification by Buyer* ...................................................50
Section 13.03 *Indemnification Procedures*...................................................51
Section 13.04 *Express Negligence* ...................................................52
Section 13.05 *Tax Treatment of Indemnity Payments*...................................................52
Section 13.06 *Sole and Exclusive Remedy*...................................................52

**ARTICLE XIV MISCELLANEOUS...................................................52**

Section 14.01 *Notices*...................................................52
Section 14.02 *Amendments and Waivers* ...................................................54
Section 14.03 *Expenses*...................................................54
Section 14.04 *Successors and Assigns/Liquidating Trust*...................................................54
Section 14.05 *Governing Law*...................................................54
Section 14.06 *Jurisdiction*...................................................55
Section 14.07 *Waiver of Jury Trial* ...................................................55
Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries.*...................................................55
Section 14.09 *Entire Agreement* ...................................................55
Section 14.10 *Severability*...................................................55
Section 14.11 *Specific Performance* ...................................................56
Section 14.12 *Certain Acknowledgements and Limitations*...................................................56
Section 14.13 *Disclosure Schedules* ...................................................56
Section 14.14 *Preparation of Agreement*...................................................57
Section 14.15 *No Recourse* ...................................................57

**EXHIBITS, ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES**

Exhibits

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Assignment and Bill of Sale |
| Exhibit C | Form of Assumption Agreement |
| Exhibit D | Form of Seller Certificate |
| Exhibit E-1 | Form of Seller FIRPTA Certificate – Resources |
| Exhibit E-2 | Form of Seller FIRPTA Certificate – ManagementCo |
| Exhibit F | Form of Buyer Certificate |
| Exhibit G | Form of Post-Closing Escrow Agreement |
| Exhibit H | Form of Release Agreement |
| Exhibit I | Special Warranty |

Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Purchased Contracts |
| Annex D | Permits |

Schedules

| | |
|---|---|
| Schedule 1.01 | Allocated Values |
| Schedule 2.02(k) | Excluded Contracts and Other Assets |
| Schedule 5.03(a) | 365 Schedule |
| Schedule 5.03(b) | Desired 365 Contracts |
| Schedule 7.06 | Seller Employees |
| Schedule 8.02(d) | Specified Required Consents |

Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05(a) | Material Contracts |
| Disclosure Schedule 3.05(b) | Material Contract Defaults |
| Disclosure Schedule 3.06(a) | Approvals |
| Disclosure Schedule 3.07 | Environmental Matters |
| Disclosure Schedule 3.08 | Well Status |
| Disclosure Schedule 3.09 | Imbalances |
| Disclosure Schedule 3.10 | Litigation |
| Disclosure Schedule 3.12 | Intellectual Property |
| Disclosure Schedule 3.13 | Insurance Coverage |
| Disclosure Schedule 3.14 | Taxes |
| Disclosure Schedule 3.16 | Outstanding Obligations |

| | |
|---|---|
| Disclosure Schedule 3.17 | Preferential Purchase Rights |
| Disclosure Schedule 3.20 | Working Interest Payments |
| Disclosure Schedule 3.22 | No Violation of Laws |

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") dated as of October 16, 2020 (the "Execution Date"), is entered into by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers"). Buyer and Sellers are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## WITNESETH:

**WHEREAS**, on May 15, 2020 (the "Petition Date"), each Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "Bankruptcy Cases");

**WHEREAS**, on June 9**,** 2020, the Bankruptcy Court entered the Bid Procedures Order (which has been further modified as described in the definition thereof);

**WHEREAS**, pursuant to section 363 of the Bankruptcy Code and upon the terms and conditions set forth herein, effective as of the Effective Time, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase and acquire from Sellers, the Assets, and, in connection therewith, the Parties desire for Buyer to assume the Assumed Liabilities; and

**WHEREAS**, Sellers' ability and obligation to consummate the Transactions are subject to, among other things, the entry of the Sale Order.

**NOW, THEREFORE,** in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01 *Definitions*. The capitalized terms used but not defined herein and defined in Exhibit A shall have the meanings set forth in Exhibit A hereto, which is incorporated herein by reference.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01 *Purchase and Sale of the Assets*. Subject to the terms and conditions and for the consideration herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers agree to sell, assign, convey and deliver to Buyer, and Buyer agrees to purchase and acquire from Sellers at the Closing, to the extent permitted under section 363 and 365 of the Bankruptcy Code after giving effect to the Bid Procedures Order and the Sale Order, all of Sellers' right, title and interest in and to the properties and interests described below, other than the Excluded Assets (collectively, the "Assets"):

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Sellers in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Sellers as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Sellers' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties": the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time ("Effective Time Hydrocarbons") and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Sellers to Buyer, and subject to the payment by Buyer of any fees required as a condition to the assignment thereof to Buyer, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided, however,* that (1) Buyer's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (*provided* that Sellers shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Buyer only to the same extent as such rights are vested in Sellers, and (3) after the Closing, Buyer shall provide Sellers with access to, and Sellers shall have the right to receive copies of, the Data as provided in Article VI;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (collectively, the "Purchased Contracts");

(h) Permits. To the extent assignable by Sellers to Buyer (*provided* that Sellers shall use commercially reasonable efforts prior to Closing to obtain any necessary consent to assignment, but shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights, (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

Section 2.02 *Excluded Assets.* Notwithstanding the foregoing provisions of this Article II, any assets of Sellers that are not described or otherwise identified as Assets in Section 2.01, together with all of the following assets, shall not constitute Assets and shall not be sold, assigned or conveyed to Buyer pursuant to this Agreement (such assets as described herein below, the "Excluded Assets"):

(a) all cash and cash equivalents of Sellers;

(b) all corporate and financial records of Sellers to the extent they relate to Sellers' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Sellers arising under this Agreement;

(f) all of the matters listed on Disclosure Schedule 3.10 (other than (i) item 1 of Disclosure Schedule 3.10 and (ii) item 45 of Disclosure Schedule 3.10 to the extent such item does not relate to the Contracts or other assets listed on Schedule 2.02(k)), and all rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Seller except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Sellers attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Sellers under Section 7.07;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Sellers' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Schedule 2.02(k);

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Sellers, other than the Equipment;

(o) all assets excluded pursuant to the express terms of this Agreement, including Section 2.12(d), Section 2.13 or Section 5.03;

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 2.01(e), Section 2.01(f)(ii) and Section 2.01(h), in each case, that are not assignable to Buyer pursuant to this Agreement after giving effect to the Bid Procedures Order and the Sale Order (*provided* that Sellers have used commercially reasonable efforts to obtain any necessary consents to assignment with respect thereto in accordance with this Agreement);

(r) all engagements and similar letters and agreements with Sellers' legal advisors, it being agreed that Buyer shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Sellers or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii); and

(t) any assets or properties otherwise expressly identified as Excluded Assets under this Agreement.

Section 2.03 *Consideration*. As consideration for the Assets, Buyer shall pay or deliver to Sellers in accordance with this Agreement, Fifty Million Dollars ($50,000,000.00) in cash (the "Purchase Price") and assume all Assumed Liabilities in accordance with this Agreement. The Purchase Price shall be paid as provided in Section 2.05 and shall be subject to adjustment as provided in Section 2.04, Section 2.06, Section 2.12, Section 2.13 and Section 7.07. The Purchase Price, as increased or reduced, as applicable, in accordance with this Agreement, is referred to as the "Adjusted Purchase Price".

Section 2.04 *Adjustments to the Purchase Price*. Adjustments to the Purchase Price shall be made according to this Section 2.04, as applied in accordance with GAAP (as applied on a basis consistent for the periods covered).

(a) Upward Adjustments. The Purchase Price shall be adjusted upward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses paid or borne by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), whether paid by (or applied as an offset against amounts (including Suspended Revenue Receivables) due and payable to) Sellers prior to the Closing Date or after the Closing Date but prior to the determination of the Adjusted Purchase Price, to the extent attributable to the period on or after the Effective Time; *provided, however,* that to the extent that any Property Expenses would be deemed to be an upward adjustment pursuant to this Section 2.04(a)(i) but such expenses have not been paid by Sellers (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Sellers), no upward adjustment to the Purchase Price shall be made but instead the obligation to perform and pay when due with respect to such Property Expense shall be an Assumed Liability;

(ii) to the extent not covered in Section 2.04(a)(i), an amount equal to all prepaid Property Expenses attributable to the Assets to the extent related to periods on or after the Effective Time that were paid or borne by Sellers as of the Closing, including without limitation, prepaid drilling and/or completion costs, insurance costs through Closing and prepaid utility charges;

(iii) to the extent the proceeds thereof are not received by Sellers or any of their Affiliates as of the Closing Date, an amount equal to the value of Sellers' interest in the Effective Time Hydrocarbons, to be calculated as follows: the value shall be the product of (A) the volume of marketable Effective Time Hydrocarbons (attributable to Sellers' interest) as of the Effective Time as shown by the gauging reports prepared by Sellers as of the Effective Time (absent any manifest errors), *multiplied by* (B) the price that would have been received by Sellers with respect to such Effective Time Hydrocarbons if such Effective Time Hydrocarbons were sold at the Effective Time pursuant to the contract price in effect as of the Effective Time, or, if there is no contract price in effect, the posted price in the field in which such Hydrocarbons were produced in effect as of the Effective Time, in each case, net of the following (without duplication of any such amounts that are taken into account in determining the contract price, if applicable): (1) Non-Income Taxes and Burdens paid or payable out of such proceeds or otherwise borne by Buyer and not taken into account for purposes of Section 2.04(b)(v); and (2) expenses (other than Property Expenses) incurred or payable to Third Parties under Applicable Contracts in earning or receiving such proceeds;

(iv) an amount equal to any Imbalance Adjustment Amount owed to Sellers by a Third Party;

(v) the amount of Non-Income Taxes allocated to Buyer pursuant to Section 7.07 but paid or borne by Sellers or any of their Affiliates;

(vi) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(a)(i) or Section 2.04(a)(ii), the amount of Cure Costs, if any, by which the Purchase Price is to be increased pursuant to Section 5.03, but only to the extent such Cure Costs are Property Expenses which were incurred after the Effective Time;

(vii) [Reserved]; and

(viii) any other adjustment expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(b) Downward Adjustments. The Purchase Price shall be adjusted downward by the following, but only to the extent such items relate to the Assets:

(i) an amount equal to all Property Expenses attributable to the Assets to the extent related to periods prior to the Effective Time that are actually paid or economically borne by Buyer, including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement;

(ii) an amount equal to all proceeds actually received by Sellers and attributable to the sale of Hydrocarbons produced from or allocable to the Oil and Gas Properties (excluding any Excluded Assets) during the Interim Period, net of the following (without duplication of any such amounts previously deducted from the proceeds paid to Sellers): (A) amounts paid or borne by Sellers as Burdens on such production; (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds; and (C) applicable Non-Income Taxes paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v);

(iii) the Allocated Value of any Oil and Gas Property excluded from the Assets pursuant to Section 2.12(a), Section 2.12(d) or Section 2.13;

(iv) an amount equal to the absolute value of any Imbalance Adjustment Amount owed by Sellers to a Third Party;

(v) the amount of Non-Income Taxes allocated to Sellers or any of their Affiliates pursuant to Section 7.07 but paid or borne by Buyer;

(vi) [Reserved];

(vii) without duplication of any amounts for which an adjustment is made pursuant to Section 2.04(b)(i), an amount equal to all Excess Cure Costs, if any, paid or economically borne by Buyer;

(viii) if applicable, the amount of the Suspended Revenue Receivables (provided that either (A) a corresponding increase to the Purchase Price is made for

Property Expenses attributable to periods from and after the Effective Time that are payable by Sellers under the operating agreements under which such Suspended Revenue Receivables are payable or (B) Buyer has paid or economically borne the Property Expenses described in clause (A), including by application of netting, setoff or similar recoveries against proceeds (including Hydrocarbon proceeds) that are due and payable to Buyer pursuant to this Agreement, by payment of Cure Costs or otherwise); and

(ix) any other amount expressly provided for in this Agreement or as otherwise mutually agreed by the Parties.

(c) Tax Adjustments/Apportionment of Prepaid Expense Items; Withholding.

(i) To adjust the Purchase Price for the apportionment of Non-Income Taxes and Tax refunds, the Parties agree to adjust the Purchase Price, downward or upward, as appropriate, pursuant to the provisions of Section 7.07.

(ii) For purposes of the Purchase Price, to the extent not otherwise expressly provided for under Section 2.04(a) and Section 2.04(b), any Property Expenses with respect to the Oil and Gas Properties that are paid or payable on an annual, quarterly, monthly or other regular periodic basis and relate to a period before or after the Effective Time ("Prorated Expense Items") shall be prorated as of the Effective Time and apportioned, such that Buyer will receive the economic benefit or burden, as applicable, of all such items on and after the Effective Time and Sellers shall receive the economic benefit or burden, as applicable, of all such items for the period prior to the Effective Time. After the Closing Date, (x) if Buyer receives any bills or accounts or any reimbursement for prepaid Property Expenses in relation to Prorated Expense Items that are attributable in whole to the period prior to the Effective Time, then Buyer shall promptly forward the same to Sellers (for payment, in the case of any such bills or accounts), (y) if Sellers receive any bills or accounts or any reimbursement for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in whole to the period on or after the Effective Time, then Sellers shall promptly forward the same to Buyer (for payment, in the case of any such bills or accounts) and (z) if Buyer or Sellers receive any bills or accounts or any reimbursements for prepaid Property Expenses in relation to the Prorated Expense Items that are attributable in part to the period prior to the Effective Time, and in part to the period on and after the Effective Time, the amount thereof shall be apportioned between Sellers, on the one hand, and Buyer, on the other hand, respectively, as of the Effective Time, based on the number of days in such period falling prior to the Effective Time, on the one hand, and on and after the Effective Time, on the other hand. In the case of bills or accounts referred to in clause (z), the party receiving the same shall be required to pay only such portion of such bill or account for which it is responsible in accordance with this Section 2.04(c)(ii).

(iii) Buyer shall be entitled to deduct and withhold from any consideration otherwise payable or deliverable to Sellers pursuant to this

Agreement such amounts as may be required to be deducted or withheld therefrom under any Applicable Law. The Parties shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any such deduction or withholding. To the extent such amounts are so deducted or withheld, and timely remitted to the applicable Governmental Authority in accordance with Applicable Law, such amounts shall be treated for all purposes as having been paid to the Person to whom such amounts would otherwise have been paid absent such deduction or withholding.

(d) Closing Statement.

(i) Sellers shall prepare and deliver to Buyer, not less than five (5) Business Days before the Closing Date, a statement (the "Closing Statement") setting forth the adjustments to the Purchase Price provided in this Section 2.04, using estimates where actual amounts are not known at such time, and Sellers' calculation of the estimated Adjusted Purchase Price; such estimated Adjusted Purchase Price (as such may be modified pursuant to any changes proposed by Buyer and accepted by Sellers) shall be referred to as the "Closing Date Adjusted Purchase Price." The Closing Statement shall be prepared by Sellers in good faith in accordance with this Agreement, including Section 2.08 and shall include reasonable supporting detail for each adjustment or estimate included therein. If Buyer has any questions or disagreements regarding the Closing Statement, then, upon written request by Buyer, at least two (2) Business Days prior to the Closing Date, Sellers and Buyer shall in good faith attempt to resolve any disagreements, and Sellers shall afford Buyer the opportunity to examine the Closing Statement and Sellers' calculation of the Closing Date Adjusted Purchase Price, and shall provide to Buyer such additional supporting schedules, analyses, workpapers or other data on which the Closing Statement is based or from which the Closing Statement is derived as are reasonably requested by Buyer. If (A) Buyer and Sellers agree on changes to the Closing Statement based on such discussions, then the Closing Date Adjusted Purchase Price shall be paid at Closing based on such changes; or (B) Buyer and Sellers do not agree on changes to the Closing Statement, then the Closing Date Adjusted Purchase Price shall be paid at the Closing based on the amounts set forth in the Closing Statement; *provided, however*, that in the case of clause (B), appropriate adjustments to the Purchase Price shall be made after the Closing pursuant to Section 2.06.

(ii) Sellers will include in the Closing Statement Sellers' good faith calculation of the prorations provided for in Section 2.04(c). If final bills or accounts in relation to any Prorated Expense Items referred to in Section 2.04(c) are not available or have not been issued prior to that date for any Prorated Expense Item, Sellers shall estimate the amount of each such item in good faith and in accordance with customary industry practices, and such estimate shall be reflected in the Closing Statement. The amount payable by Buyer at the Closing will be increased or decreased to reflect the net amount owing between the Parties as shown on the Closing Statement, using such estimates where necessary. Final adjustment between the Parties as to any item used in the preparation of the Closing Statement

in accordance with this Section 2.04 shall be made in accordance with Section 2.06 and Section 7.07.

(e) If, prior to Closing, Sellers discover an error in the Imbalances set forth in Disclosure Schedule 3.09, then the Purchase Price shall be adjusted at Closing pursuant to Section 2.04(a)(iv) or Section 2.04(b)(iv), as applicable, and Disclosure Schedule 3.09 will be deemed amended immediately prior to Closing to reflect the Imbalances for which the Purchase Price is so adjusted.

Section 2.05 *Closing*. The closing of the purchase and sale of the Assets, the assumption by Buyer of the Assumed Liabilities and the other transactions contemplated herein (the "Closing") shall take place at the offices Weil, Gotshal & Manges LLP, 700 Louisiana, Suite 1700, Houston, Texas 77002, on October 30, 2020 (the "Target Closing Date"); *provided* that, if the conditions to Closing set forth in Article VIII have not yet been satisfied or waived as of the Target Closing Date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), then the Closing shall occur on November 30, 2020 if the conditions to Closing set forth in Article VIII have been satisfied or waived as of such date (other than those conditions that by their nature cannot be satisfied until the time of Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), or at such other time or place as Buyer and Sellers may agree in writing. At and as of the Closing:

(a) Pursuant to section 363 of the Bankruptcy Code, effective as of the Closing, Sellers shall sell, assign and convey all Assets (other than Excluded Assets) to Buyer Free and Clear;

(b) Buyer shall assume, and from and after the Closing, shall perform and pay when due, all Assumed Liabilities; *provided* that Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any Liability or obligation of Sellers that are not expressly Assumed Liabilities (referred to herein collectively as the "Excluded Liabilities");

(c) Sellers shall deliver (or cause to be delivered) to Buyer the following instruments, each dated as of the Closing Date, properly executed by an authorized officer or representative of each Seller or signatory party thereto and, where appropriate, acknowledged:

(i) executed counterparts to an Assignment and Bill of Sale in the form of Exhibit B (the "Assignment and Bill of Sale") in sufficient counterparts for recording in the real property records in each county where the Oil and Gas Properties are located;

(ii) executed counterparts to letters in lieu of division orders or other appropriate designation of assignment, on forms prepared by Sellers and reasonably acceptable to Buyer, directing all operators of the Oil and Gas Properties and/or purchasers of production to make payment to Buyer of proceeds attributable to production from the Oil and Gas Properties from and after the Effective Time, for

delivery by Buyer to such operators and/or purchasers of production (collectively, the "Letters in Lieu");

(iii) executed counterparts to an Assumption Agreement between Sellers and Buyer in the form of Exhibit C (the "Assumption Agreement");

(iv) executed counterparts to the Post-Closing Escrow Agreement;

(v) a certificate in the form of Exhibit D;

(vi) a certificate in the form of Exhibit E-1 or Exhibit E-2, as applicable;

(vii) an executed counterpart of the Closing Statement;

(viii) duly executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interests over the Assets, in each case, securing indebtedness for borrowed money of Sellers or any of their respective Affiliates;

(ix) the Release Agreement (and Sellers shall cause Gavilan Resources Holdings, LLC and Gavilan Resources HoldCo, LLC to execute and deliver a counterpart of the Release Agreement to Buyer at the Closing); and

(x) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Sellers at or prior to the Closing;

(d) Buyer shall deliver to Sellers executed counterparts of the following instruments each dated as of the Closing Date, properly executed by an authorized officer or representative of Buyer and, where appropriate, acknowledged:

(i) a certificate in the form of Exhibit F;

(ii) the Assignment and Bill of Sale;

(iii) the Assumption Agreement;

(iv) the Post-Closing Escrow Agreement;

(v) the Letters in Lieu;

(vi) an executed counterpart of the Closing Statement;

(vii) the Release Agreement (and Buyer shall cause SN EF Maverick to execute and deliver a counterpart of the Release Agreement to Sellers at the Closing); and

(viii) any other agreements, instruments and documents that are required by other terms of this Agreement to be executed and/or delivered by Buyer at or prior to the Closing; and

(e) Buyer shall deliver an amount equal to the Closing Date Adjusted Purchase Price, *less* the amount of the Deposit Escrow Funds, by wire transfer of immediately available funds, to one or more accounts designated by Sellers.

Section 2.06 *Final Settlement Statement.*

(a) As soon as practical and, in any event, no later than ninety (90) calendar days after the Closing Date, Resources shall prepare and deliver to Buyer a statement (the "Final Settlement Statement") setting forth the adjustments to the Purchase Price in accordance with Section 2.04. The Final Settlement Statement shall be prepared in good faith in accordance with this Agreement and on a basis consistent with the preparation of the Closing Statement as described in Section 2.04(d), and shall set forth Resources' calculation of the Adjusted Purchase Price and include reasonable supporting detail for each adjustment included therein.

(b) Following the delivery of the Final Settlement Statement, Resources shall afford Buyer the opportunity to examine the Final Settlement Statement and Resources' calculation of the Adjusted Purchase Price, and such supporting schedules and analyses as are reasonably necessary and appropriate in connection with such review. Resources shall cooperate with Buyer in such examination, including responding to questions asked by Buyer, and Resources shall make available to Buyer any records under Sellers' control or otherwise available to Sellers that are requested by Buyer in connection with such review.

(c) If, within fifteen (15) calendar days following delivery of the Final Settlement Statement to Buyer, Buyer has not delivered to Resources written notice (the "Objection Notice") of Buyer's objections to the Final Settlement Statement or Resources' calculation of the Adjusted Purchase Price (which Objection Notice in order to be valid must contain a statement describing in reasonable detail the items objected to, the basis of such objections and Buyer's calculation of the amount(s) for the items objected to that Buyer asserts should be used for purposes of the Final Settlement Statement), then the Adjusted Purchase Price as set forth in such Final Settlement Statement shall be deemed final and conclusive. In addition, any of Resources' calculations of the Adjusted Purchase Price as set forth in the Final Settlement Statement which are not objected to in the Objection Notice shall be deemed final and conclusive.

(d) If Buyer delivers the Objection Notice satisfying Section 2.06(c) above, within such fifteen (15)-day period, then Resources and Buyer shall endeavor in good faith to resolve the objections of Buyer set forth in the Objection Notice for a period not to exceed fifteen (15) calendar days from the date of delivery of the Objection Notice. If at the end of such fifteen (15)-day period there are any objections that remain in dispute, then either Buyer or Resources may require by written notice to the other that the remaining objections in dispute be submitted for resolution to an independent accounting firm to be selected jointly by Buyer and Resources within the ten (10) calendar days following a written request by Buyer or Resources or, if Buyer and Resources are unable to mutually agree within such ten (10)-day period, such accounting firm shall be the Houston, Texas office of PricewaterhouseCoopers ("PwC") (such jointly selected

accounting firm or PwC (the "Referee"). The Referee's engagement shall be limited to the resolution of disputed amounts set forth in the Final Settlement Statement that have been identified by Buyer in the Objection Notice, which resolution shall be in accordance with this Agreement and no other matter relating to the Final Settlement Statement shall be subject to determination by the Referee except to the extent affected by resolution of the disputed amounts. In connection with the engagement of the Referee, each of Buyer and Resources shall execute any engagement, indemnity and other agreement as the Referee shall require as a condition to such engagement. If PwC is unable or unwilling to serve as the Referee and Buyer and Resources are unable to agree upon the designation of a Person as substitute arbitrator, then Buyer or Resources, or either of them, may in writing request the Bankruptcy Court to appoint the substitute referee; *provided* that such Person so appointed shall be a national or regional accounting firm with no current or prior material relationships with Buyer or Sellers or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities.

(e) The Referee shall determine such items of the calculation of the Adjusted Purchase Price as are disputed within thirty (30) calendar days after the objections that remain in dispute are submitted to it.

(f) If any disputed items are submitted to the Referee for resolution, (i) each of Buyer and Resources shall furnish to the Referee such workpapers and other documents and information relating to such disputed items as the Referee may request and are available to that Party or its Affiliates (or its independent public accountants) and will be afforded the opportunity to present to the Referee any materials relating to the determination of the matters in dispute and to discuss such determination with the Referee prior to any written notice of determination hereunder being delivered by the Referee; (ii) the Referee shall not assign a value to such objection that is greater than the greatest value for such objection claimed by either Party or less than the smallest value for such objection claimed by either Party; (iii) the determination by the Referee of items of the calculation of the Adjusted Purchase Price, as applicable, as set forth in a written notice delivered to Resources and Buyer by the Referee, shall be made in accordance with this Agreement and shall be binding and conclusive on the Parties and shall constitute an arbitral award that is final, binding and unappealable (absent manifest error or fraud) and upon which a judgment may be entered by a court having jurisdiction thereof; and (iv) the fees and expenses of the Referee (the "Audit Fees") shall be paid by and apportioned one-half by Buyer and one-half by Sellers.

(g) Upon agreement of Buyer and Resources to the Adjusted Purchase Price set forth in the Final Settlement Statement, or upon final determination by the Referee of the disputed items set forth in the Objection Notice, as the case may be (such date of determination being the "Cut-Off Date"), the Final Settlement Statement (as adjusted pursuant to such agreement or determination by the Referee) will be deemed final and binding on the Parties. From and after the Closing Date, Sellers (and, after formation of a Liquidating Trust, if applicable, the Liquidating Trustee) shall retain in the Post-Closing Escrow Account a portion of the Closing Date Adjusted Purchase Price equal to the greater of (x) an amount equal to five percent (5%) of the unadjusted Purchase Price or (y) any unresolved amounts with respect to the Closing Statement disputed by Buyer in good faith in accordance with Section 2.04(d) (as applicable, the "Settlement Statement Escrow Amounts") as a cash reserve for the express purpose of fulfilling Sellers' obligations under this Section 2.06 and Section 2.07, and any claims against the Special Warranty, until the Cut-Off

Date and, if a payment is due by Sellers pursuant to Section 2.07(b), the date that such payment is made pursuant to Section 2.07(b).

Section 2.07 *Post-Closing Payments.*

(a) If the Closing Date Adjusted Purchase Price is less than the Adjusted Purchase Price determined in accordance with Section 2.06 (the amount by which the Adjusted Purchase Price exceeds the Closing Date Adjusted Purchase Price herein referred to as the "Closing Amount Shortfall"), then (i) Buyer shall pay to Sellers the amount of the Closing Amount Shortfall within five (5) Business Days of the final determination of the Adjusted Purchase Price in accordance with Section 2.06 and (ii) Sellers and Buyer shall jointly instruct the Escrow Agent to disburse to Sellers from the Post-Closing Escrow Account all of the Settlement Statement Escrow Amounts.

(b) If the Adjusted Purchase Price determined in accordance with Section 2.06 is less than the Closing Date Adjusted Purchase Price (the amount by which the Closing Date Adjusted Purchase Price exceeds the Adjusted Purchase Price herein referred to as the "Closing Amount Overpayment"), then Sellers and Buyer shall jointly instruct the Escrow Agent to disburse from the Post-Closing Escrow Account (i) to Buyer, a portion of the Settlement Statement Escrow Amounts equal to the Closing Amount Overpayment and (ii) if the Closing Amount Overpayment is less than the Settlement Statement Escrow Amounts, to Sellers the remaining portion of the Settlement Statement Escrow Amounts. Notwithstanding anything in this Agreement to the contrary, in no event shall Sellers be liable to Buyer for any Closing Amount Overpayment or any claims against the Special Warranty for any amounts other than out of amounts in the Post-Closing Escrow Account.

(c) Sellers shall pay to Buyer, and Buyer shall pay to Sellers, as applicable, any post-Closing payments as may be required herein, including pursuant to Section 2.10, Section 2.11, or Section 7.07. Notwithstanding the foregoing, (i) subject to the following clause (ii), neither Party shall be obligated to account for or remit to the other Party any Property Expenses, Burdens or proceeds (including Hydrocarbon proceeds) attributable to the Assets after the date that is thirty (30) days following the date the final Adjusted Purchase Price is agreed by the Parties or finally determined by the Referee in accordance with Section 2.06 and (ii) if Buyer receives after the Closing any Suspended Revenue Receivables for which an adjustment to the Purchase Price is made pursuant to Section 2.04(b)(viii), Buyer shall pay such Suspended Revenue Receivables to Sellers within three (3) Business Days after Buyer's receipt of same.

Section 2.08 *No Duplicative Effect; Methodologies*. The provisions of Section 2.04, Section 2.06, this Section 2.08 and of any other Transaction Document shall apply in such a manner so as not to give the components and calculations duplicative effect to any item of adjustment and the Parties covenant and agree that no amount shall be (or is intended to be) included, in whole or in part (either as an increase or reduction) more than once in the calculation of (including any component of) the Adjusted Purchase Price, or any other calculated amount pursuant to this Agreement if the effect of such additional inclusion (either as an increase or reduction) would be to cause such amount to be overstated or understated for purposes of such calculation. "Earned" and "incurred", as used in this Agreement, shall be interpreted in accordance with GAAP and COPAS standards, as applied by Sellers consistent with past practice, subject to

the other provisions in this Section 2.08; *provided* if not determinable pursuant to the foregoing, the date an item or work is ordered is not the date of a transaction or incurrence for settlement purposes in the Closing Statement or Final Settlement Statement and otherwise under this Agreement, as applicable, but rather the date on which the item ordered is delivered to the job site, or the date on which the work ordered is performed, is the relevant date, regardless of when the applicable invoice was sent (i.e., on an accrual basis). The Parties acknowledge and agree that, if there is a conflict between a determination, calculation, methodology, procedure or principle set forth in the definitions contained in this Agreement, as applicable, on the one hand, and those provided by GAAP or COPAS, on the other hand, (i) the determination, calculation, methodology, procedure or principle set forth in this Agreement, as applicable, shall control to the extent that the matter is specifically provided for in this Agreement and (ii) the determination, calculation, methodology, procedure or principle prescribed by GAAP or COPAS, as applied by Sellers consistent with past practice, shall control to the extent the matter is not so addressed in this Agreement, as applicable, or requires reclassification as an asset or liability to be included in a line item or specific adjustment.

Section 2.09 *Purchase Price Deposit.*

(a) Escrow Deposit. Buyer previously deposited into the Escrow Account an amount equal to Eight Million Dollars ($8,000,000) (such amount, together with any interest earned thereon, the "Deposit Escrow Funds").

(b) Distribution of Deposit Escrow Funds. The Deposit Escrow Funds shall be distributed as follows:

(i) if the Closing occurs, the Deposit Escrow Funds shall be applied as a credit towards the Closing Date Adjusted Purchase Price as provided in Section 2.05(e) and Sellers shall deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to deliver to one or more accounts designated by Sellers the Deposit Escrow Funds; and

(ii) if this Agreement is terminated prior to Closing for any reason, the Deposit Escrow Funds shall be delivered in accordance with Section 9.02.

Section 2.10 *Division of Hydrocarbons*. After the Closing, all Buyer Hydrocarbons and Effective Time Hydrocarbons shall be owned by Buyer and all Seller Hydrocarbons shall be owned by Sellers. To the extent Sellers have sold Hydrocarbons (other than Seller Hydrocarbons) which constitute Assets and the Purchase Price has not been adjusted pursuant to Section 2.04(b)(i) for the proceeds of such sales, Sellers shall deliver such proceeds received after Closing (without duplication of any such amounts previously deducted from the proceeds paid to Sellers, net of (A) amounts payable as Burdens on such production paid or borne by Sellers, (B) expenses (other than Property Expenses) incurred by Sellers to Third Parties under Applicable Contracts in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Sellers and not reimbursed to Sellers by a Third Party and not taken into account for purposes of Section 2.04(a)(v)) to Buyer promptly upon Sellers' receipt thereof. To the extent Buyer actually receives proceeds or other income from the sale of any Seller Hydrocarbons, Buyer shall deliver such proceeds (without duplication of any such amounts previously deducted from

the proceeds paid to Buyer, net of (A) amounts payable as Burdens on such production paid or borne by Buyer, (B) expenses (other than Property Expenses) incurred by Buyer to Third Parties in earning or receiving such proceeds and (C) applicable Non-Income Taxes attributable to such proceeds paid or borne by Buyer and not reimbursed to Buyer by a Third Party and not taken into account for purposes of Section 2.04(b)(v)) to Sellers promptly upon Buyer's receipt thereof.

Section 2.11 *Division of Expenses; Burdens*. For purposes of determining the amount of the adjustments to the Purchase Price provided for in Section 2.04, the principles set forth in this Section 2.11 shall apply except as expressly provided otherwise in this Agreement. Subject to Section 2.04(c)(ii) with respect to any Prorated Expense Items, as between Buyer and Sellers, (i) all Property Expenses attributable to periods prior to the Effective Time and Burdens attributable to the Assets on the production of Hydrocarbons prior to the Effective Time, other than Assumed Liabilities shall be borne by Sellers and (ii) all Property Expenses attributable to periods from and after the Effective Time and Burdens (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A) attributable to Assets on the production of Hydrocarbons from and after the Effective Time), shall be borne by Buyer. For purposes of allocating production (and expenses, Burdens and proceeds with respect thereto) under this Agreement, (a) liquid Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the pipeline connecting into the storage facilities into which they are transported from the lands covered by the applicable Well, or if there are no storage facilities, when they pass through the LACT meter or similar meter at the entry point into the pipelines through which they are transported from such lands and (b) gaseous Hydrocarbons shall be deemed to be "from or attributable to" the Wells when they pass through the delivery point sales meters or similar meters at the entry point into the pipelines through which they are transported from such lands. Sellers shall utilize reasonable interpolative procedures to arrive at an allocation of production when exact meter readings (including gas production meters or sales meters) or gauging and strapping data is not available.

Section 2.12 *Preferential Purchase Rights.*

(a) Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Preferential Purchase Right with respect to any Oil and Gas Property a notice in compliance with the contractual provisions applicable to such Preferential Purchase Right and requesting a waiver thereof. If a bona fide Preferential Purchase Right with respect to any Oil and Gas Property is exercised prior to the Closing, such Oil and Gas Property and the related Contracts (solely to the extent related to such Oil and Gas Property) shall be excluded from the Assets conveyed to Buyer at the Closing, the affected Oil and Gas Property will be deemed to be an Excluded Asset, the Purchase Price shall be reduced by an amount equal to the Allocated Value for such Oil and Gas Property and related Contracts (or portions thereof), and Sellers shall be entitled to retain all proceeds received for the affected Oil and Gas Property and related Contracts (or portion thereof) from the Person exercising such Preferential Purchase Right.

(b) Buyer shall purchase at the Closing all Oil and Gas Property burdened by a Preferential Purchase Right that has not been exercised as of the Closing Date, regardless of whether the time period for the exercise of such right has expired, and no reduction of the Purchase Price paid at the Closing shall be made with respect thereto. If, for any reason, such Preferential

Purchase Right is successfully exercised by the holder thereof after the Closing, Buyer shall be entitled to retain all proceeds paid for the affected Oil and Gas Property by the holder of the relevant Preferential Purchase Right, and Sellers shall have no liability with respect to such affected Oil and Gas Property and no adjustment to the Purchase Price shall be made with respect thereto.

(c) To the extent any Asset is subject to a valid and enforceable Preferential Purchase Right in favor of a Third Party, Buyer and Sellers agree that the portion of the consideration to be paid under this Agreement allocable to each such Asset is the Allocated Value of such Asset, *plus* the assumption of the Assumed Liabilities related to such Asset.

(d) If prior to Closing any Person asserts that it is the beneficiary of a Preferential Purchase Right with respect to any Oil and Gas Property and objects to the sale of such Oil and Gas Property to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale of such Oil and Gas Property free and clear of such right (as applicable to the sale to Buyer pursuant to this Agreement) to Buyer (by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction), then, at Buyer's option, such Oil and Gas Property shall be excluded from the Assets and the Purchase Price shall be reduced by the Allocated Value of such Oil and Gas Property.

Section 2.13 *Consents to Assign*. Sellers shall, within five (5) Business Days after the Execution Date (to the extent not sent prior to the Execution Date), send to the holder of each Applicable Schedule 3.06(a) Consent with respect to each Lease and any Purchased Contract that is not a 365 Contract (for which notices regarding 365 Contracts are addressed in Section 5.03) a notice in compliance with the contractual provisions applicable to such Applicable Schedule 3.06(a) Consent seeking such holder's consent to the transactions contemplated hereby and any such other notice as necessary to permit the assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement upon entry of the Sale Order (a "Consent Notice"). With respect to each Consent (A) relating to a Contract for which the counterparty's consent to assignment would be required for such Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code or (B) that burdens a Lease, but which Consent is not set forth on Disclosure Schedule 3.06 and is discovered by Sellers (including, if applicable, any such Consent that is identified by Buyer) prior to Closing, all such Consents shall thereafter be Applicable Schedule 3.06(a) Consents and Sellers shall send to the holder of each such Consent a Consent Notice.

(a) If Sellers fail to obtain an Applicable Schedule 3.06(a) Consent prior to Closing and (A) with respect to any Lease or Purchased Contract that is not a 365 Contract, (1) the failure to obtain such Applicable Schedule 3.06(a) Consent would cause the assignment of the Assets affected thereby to Buyer to be void or voidable, or (2) the failure to obtain such Applicable Schedule 3.06(a) Consent could reasonably result in the termination of such Lease or Purchased Contract under the express terms thereof upon the purported assignment of such Lease or Purchased Contract to Buyer pursuant to this Agreement or (B) with respect to any Lease or Purchased Contract, a party holding such Applicable Schedule 3.06(a) Consent right has objected to the assignment of the affected Asset in accordance with the terms of the relevant Applicable Schedule 3.06(a) Consent right or based on any anti-assignment or consent to assign provision contained in such Lease or Purchased Contract (each Consent as to which clause (A) or (B) is

applicable, a "Required Consent"), then, unless the Bankruptcy Court has entered an order approving (or in the case of clause (B), such objection is resolved to permit) the sale and assignment of the affected Asset to Buyer pursuant to this Agreement without obtaining such Required Consent, the Assets (or portions thereof) affected by such un-obtained Required Consent shall be excluded from the Assets to be assigned to Buyer at Closing (and shall be considered Excluded Assets hereunder) and the Purchase Price shall be reduced by the Allocated Value(s) of such Assets (or portions thereof) so excluded. In the event that any such Required Consent with respect to any such excluded Asset (or portion thereof) is obtained during the Post-Closing Consent Period (or if during the Post-Closing Consent Period the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear (as applicable to the sale of the affected Assets to Buyer pursuant to this Agreement) of such Required Consent), then, (1) Sellers shall so notify Buyer and (2) on the tenth (10th) Business Day after the date such Consent is obtained and Sellers shall assign the Assets (or portions thereof) that were so excluded as a result of such previously un-obtained Consent to Buyer pursuant to an instrument in substantially the same form as the Assignment and Bill of Sale (and such Assets (or portions thereof) shall no longer be considered Excluded Assets hereunder) and, contemporaneously with said assignment, Buyer shall pay by wire transfer in same day funds to Sellers, to one or more accounts designated by Sellers, the amount by which the Purchase Price was reduced at Closing with respect to such excluded Assets (or portions thereof), subject to any adjustment in the allocable portion of the Purchase Price affecting such Asset (or portions thereof) pursuant to Section 2.04 and Buyer shall assume all Assumed Liabilities with respect thereto.

(b) If Sellers fail to obtain a Consent prior to Closing and such Consent is not a Required Consent (or if prior to Closing the Bankruptcy Court enters an order providing that (x) such Required Consent is not required to consummate the sale of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (y) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement Free and Clear of such Required Consent), then the Assets (or portions thereof) subject to such un-obtained Consent shall nevertheless be assigned by Sellers to Buyer at Closing as part of the Assets and Buyer shall be deemed to have assumed any and all Liabilities for the failure to obtain any such Consent as part of the Assumed Liabilities hereunder and Buyer shall have no claim against the Seller Indemnified Parties from any Liability for, the failure to obtain such Consent.

(c) Prior to Closing and until the earlier to occur of (x) the effective date of the Plan and (y) the one hundred twentieth (120th) day after Closing (the period from Closing until the earlier of clause (x) or (y), the "Post-Closing Consent Period"), with respect to any un-obtained Required Consents with respect to which the Bankruptcy Court shall not have entered an order providing that (A) such Required Consent is not required to consummate the sale and assignment of the affected Assets to Buyer pursuant to this Agreement without obtaining such Required Consent or (B) the affected Assets may be sold and assigned to Buyer pursuant to this Agreement free and clear of such Required Consent, Sellers shall use their commercially reasonable efforts to obtain all Consents; *provided, however,* that Sellers shall not be required to incur any Liability, pay any money or provide any other consideration in order to obtain any such Consent. Buyer shall use its commercially reasonable efforts (without any obligation to incur any Liability, pay money

or provide any other consideration) to assist and cooperate with Sellers in furtherance of Sellers' efforts pursuant to this Section 2.13(c).

Section 2.14 *Consents for Leases and Purchased Contracts*. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required Consents in respect of the assumption and/or assignment of any Lease or Purchased Contract if (a) Sellers have properly served under the Bankruptcy Code notice of assumption and assignment on the counterparty to such Lease or Purchased Contract, (b) any objections to assumption and/or assignment of such Lease or Purchased Contracts filed by such counterparty have been withdrawn or overruled (including pursuant to the Sale Order or other order of the Bankruptcy Court), and (c) pursuant to the Sale Order, Sellers are authorized to assume and/or assign such Leases or Purchased Contracts to Buyer Free and Clear pursuant to section 365 of the Bankruptcy Code or otherwise.

Section 2.15 *Assets Sold "As Is, Where Is"*.

(a) BUYER ACKNOWLEDGES AND AGREES THAT THE ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE AND THAT, EXCEPT AS SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE ASSETS OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. BUYER FURTHER ACKNOWLEDGES THAT SELLERS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE ASSETS BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH ASSETS IN THE CONDITION EXISTING ON THE CLOSING DATE "AS IS, WHERE IS" AND "WITH ALL FAULTS" AND WITHOUT WARRANTY OF TITLE.

(b) EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN ARTICLE III OF THIS AGREEMENT, THE CERTIFICATES DELIVERED BY SELLERS AT CLOSING AND THE SPECIAL WARRANTY, AND WITHOUT LIMITING THE GENERALITY OF SECTION 2.15(a), SELLERS EXPRESSLY DISCLAIM ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE PURCHASED ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF HYDROCARBONS FROM THE ASSETS, (vi) THE CONDITION,

QUALITY, SUITABILITY OR MARKETABILITY OF THE ASSETS, INCLUDING THE MARKETABILITY OF ANY HYDROCARBONS, (vii) THE AVAILABILITY OF GATHERING OR TRANSPORTATION FOR HYDROCARBONS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY OR ON BEHALF OF SELLERS OR THIRD PARTIES WITH RESPECT TO THE ASSETS, AND (ix) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO BUYER OR ANY AFFILIATE OF BUYER, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO. ANY AND ALL SUCH DATA, INFORMATION AND OTHER MATERIALS FURNISHED BY OR ON BEHALF OF SELLERS IS PROVIDED TO BUYER AS A CONVENIENCE, AND ANY RELIANCE ON OR USE OF THE SAME SHALL BE AT BUYER'S SOLE RISK.

Section 2.16 *Presence of Wastes, NORM, Hazardous Substances and Asbestos*. BUYER ACKNOWLEDGES THAT THE ASSETS HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON OR THEREFROM. ADDITIONALLY, THE ASSETS, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE ASSETS. SPECIAL PROCEDURES MAY BE REQUIRED FOR REMEDIATION, REMOVING, TRANSPORTING AND DISPOSING OF ASBESTOS, NORM, HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE ASSET. With respect to the Assets actually acquired by Buyer at Closing hereunder, Buyer assumes all liability for the assessment, remediation, removal, transportation and disposal of these materials and associated activities after the Closing (other than any Excluded Liabilities).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers, jointly and severally, represent and warrant to Buyer as follows, except as set forth in the Disclosure Schedule (and subject to Section 14.13):

Section 3.01 *Organization*. Each Seller is an entity duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of the jurisdiction of its organization. Each Seller is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Seller Material Adverse Effect.

Section 3.02 *Authority and Authorization*. Each Seller has full power and authority to carry on its business as presently conducted and to enter into this Agreement and the other

Transaction Documents to which such Seller is or will be a party and, subject to the entry of the Bid Procedures Order and the entry of the Sale Order, to perform its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party, and the performance by each Seller of its obligations under this Agreement and the other Transaction Documents to which such Seller is or will be a party and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite limited liability company action on the part of such Seller.

Section 3.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of each Seller and (assuming due authorization, execution and delivery thereof by Buyer), subject to requisite Bankruptcy Court approval, will constitute the legal, valid and binding obligation of each Seller enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization or moratorium statutes, or other similar Applicable Laws affecting the rights of creditors generally or equitable principles (collectively, "Equitable Limitations"). At the Closing, all other Transaction Documents required hereunder to be executed and delivered by each Seller shall be duly executed and delivered and (assuming due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of such Seller enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations, subject to the entry of the Sale Order and provided no stay exists with respect to the Sale Order.

Section 3.04 *Conflicts*. The execution and delivery by each Seller of this Agreement and the other Transaction Documents to which such Seller is or will be a party does not, and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which such Seller is or will be a party shall not, (a) violate or be in conflict with, or require the consent (other than consents that have been obtained) of any Person or entity under, any provision of such Seller's Organizational Documents, (b) subject to the entry of the Bid Procedures Order and the Sale Order and obtaining the consents described on Disclosure Schedule 3.06, conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both would constitute a default) or give rise to any right of termination, cancellation or acceleration under any agreement or instrument to which such Seller is a party or by which any of the Oil and Gas Properties are bound, (c) subject to the entry of the Bid Procedures Order and the Sale Order, violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to any Seller or the Oil and Gas Properties or (d) result in the creation of any Lien on any of the Oil and Gas Properties, other than Permitted Liens.

Section 3.05 *Material Contracts.*

(a) Disclosure Schedule 3.05(a) sets forth a complete list, as of the Execution Date, of all Applicable Contracts of the type described below and any and all amendments, extensions, or other modifications thereof and thereto (each, other than any such Contract that is an Excluded Asset or an Excluded Liability, a "Material Contract"):

(i) any Applicable Contract that constitutes a lease under which a Seller is the lessor or the lessee of real or personal property (other than any Lease) that

(A) cannot be terminated by Sellers without penalty upon ninety (90) days' or less notice and (B) involves an annual base rental of more than $25,000;

(ii) any Contract with any Affiliate of Sellers that will be binding on Buyer or the Oil and Gas Properties after the Closing;

(iii) any Applicable Contract that is a Hydrocarbon purchase and sale, transportation, gathering, treating, processing, compression or similar Contract that is not terminable without penalty on ninety (90) days' or less notice;

(iv) any Contract to sell, lease or otherwise dispose of any Sellers' interests in any of the Oil and Gas Properties;

(v) any tax partnership agreement or joint venture Contract;

(vi) any joint or unit operating agreement to which any Seller's interests in any of the Oil and Gas Properties is subject;

(vii) any Contract providing for an "earnout," "back-in" working interest, or other contingent payment or interest;

(viii) any Contract for drilling or well workover services or other well services agreement, rig Contracts or fracturing services Contracts;

(ix) any Contract for the providing, use, processing and/or analysis of seismic or geophysical data;

(x) any development Contract, participation Contract, exploration Contract, farm-in Contract, farm-out Contract, area of mutual interest Contract or similar Contract;

(xi) any Contract containing any preferential purchase rights, rights of purchase, rights of first offer, right of first refusal or other similar rights affecting the Oil and Gas Properties;

(xii) any Contract, the primary purpose of which is to provide indemnity rights;

(xiii) any Contract that includes non-competition restrictions, non-solicitation or no-hire obligations;

(xiv) any Contract that can reasonably be expected to result in aggregate payments by or on behalf of Sellers or aggregate revenues paid to Sellers, in each case, of more than One Hundred Thousand Dollars ($100,000.00) during the current or any subsequent fiscal year or Two Hundred Fifty Thousand Dollars ($250,000) in the aggregate over the term of such Contract (in each case, based solely on the terms thereof);

(xv) any Contract that contains mandatory drilling requirements with respect to the Oil and Gas Properties, which obligations have not yet been fulfilled; or

(xvi) any Applicable Contract that is an indenture, mortgage, loan, credit agreement, sale-leaseback, guaranty of financial obligation, bond, letter of credit or similar financial Contract.

(b) Except as set forth on Disclosure Schedule 3.05(b), (i) subject to entry of the Sale Order and payment of all Cure Costs, all of the Material Contracts are in full force and effect and no Seller nor, to Sellers' Knowledge, any other party to any such Material Contract is in material breach of or material default, or with the lapse of time or the giving of notice, or both, would be in material breach or material default, with respect to any of its obligations thereunder; and (ii) (A) except as set forth on Disclosure Schedule 3.05(b), as of the Execution Date, Sellers have made available to Buyer (electronically or otherwise) copies of all Material Contracts listed on Disclosure Schedule 3.05(a) and, (B) to Sellers' Knowledge, such copies are complete and accurate copies of such Material Contracts.

Section 3.06 *Approvals*.

(a) Disclosure Schedule 3.06(a) contains a complete and accurate list or description of all approvals, consents, filings and notifications required to be obtained, made or given by Sellers, after giving effect to the entry of the Bid Procedures Order and the Sale Order, for the consummation of the Transactions (each, a "Consent"), other than (i) for Preferential Purchase Rights, (ii) under Contracts that are terminable without cost upon not greater than thirty (30) days' notice, and (iii) any approvals, consents, filings and notifications of or with any Governmental Authority of the type customarily obtained, made or given after Closing.

(b) [Reserved]

Section 3.07 *Environmental Matters*.

(a) Except as set forth on Disclosure Schedule 3.07, Sellers have not entered into any agreements with or consents from any Governmental Authority and, to Sellers' Knowledge, are not subject to any order, decree or judgments issued against Sellers, with respect to the Assets, by a Governmental Authority, in each case, in existence as of the Execution Date and based on any material violation of, or Liability under, Environmental Laws, including any such violations or Liabilities that relate to the future use of any of the Assets or that presently require any material remedial or other corrective action with respect to any Asset. As of the Execution Date, (a) to Sellers' Knowledge, with respect to the Assets, neither Sellers nor any Third Party operator of the Oil and Gas Properties has released, disposed or arranged for disposal of, transported, treated, stored or exposed any Person to, any Hazardous Substances and (b) Sellers have not received written notice from any Person of any release, event, condition or disposal of any Hazardous Substances (for which all required remediation has not already been completed) concerning any of the Assets, in each case of clauses (a) or (b) that would (i) materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) result in any material liability of Sellers to any

Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(b) Except as set forth on Disclosure Schedule 3.07, no Seller has received any written notice from any Governmental Authority in the two-year period immediately preceding the Execution Date alleging that a violation of Environmental Law has occurred at any Asset that remains unresolved as of the Execution Date.

(c) To Sellers' Knowledge, except as set forth on Disclosure Schedule 3.07, as of the Execution Date, no Hazardous Substances are present, or have been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or have escaped on, in, from, under or in connection with the Assets such as to cause a condition or circumstance that (i) as of the Execution Date, materially interferes with or prevents material compliance, or would reasonably be expected to materially interfere with or prevent material compliance by Sellers or the Assets with any Environmental Law or the terms of any Permits issued pursuant thereto or (ii) has resulted or would reasonably be expected to result in any material liability of Sellers to any Person under applicable Environmental Law for which Buyer would be responsible after Closing based on the Assets acquired pursuant to this Agreement.

(d) All reports, studies or other material documents addressing the environmental conditions at the Oil and Gas Properties that are in Sellers' possession have been made available for Buyer's review.

This Section 3.07 shall constitute Sellers' sole representation and warranty as to Environmental Claims, compliance with Environmental Laws or environmental conditions of or affecting the Oil and Gas Properties

Section 3.08 *Well Status*. As of the Execution Date, except as set forth on Disclosure Schedule 3.08, to Sellers' Knowledge, there are no Wells located on the Oil and Gas Properties that: (i) were required by Applicable Law or Lease to be plugged and abandoned that have not been plugged and abandoned in accordance in all material respects with all Applicable Laws; or (ii) have been plugged and abandoned but have not been plugged and abandoned in accordance in all material respects with all Applicable Laws.

Section 3.09 *Imbalances*. To Sellers' Knowledge, Disclosure Schedule 3.09 sets forth all Imbalances with respect to the Oil and Gas Properties as of the date(s) shown on Disclosure Schedule 3.09.

Section 3.10 *Litigation*. Except as set forth in Disclosure Schedule 3.10, as of the Execution Date, there is no Proceeding pending or, to Sellers' Knowledge, threatened in writing against any Seller (a) with respect to the Assets, (b) that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions or (c) that affects or impairs the execution, delivery or performance by any Seller of this Agreement or any other Transaction Document to which any Seller is or will be a party.

Section 3.11 *Hedging*. There are no futures, hedges, swaps, collars, puts, calls, floors, caps, options or other Contracts that are intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in the price of commodities, including Hydrocarbons, that have been

entered into by any Seller or are otherwise binding on the Assets that will be binding on the Assets at any time following the Closing Date.

Section 3.12 *Intellectual Property*. Except as set forth on Disclosure Schedule 3.12, Sellers do not own any Intellectual Property related to or used in connection with the ownership of the Oil and Gas Properties.

Section 3.13 *Insurance Coverage*. Disclosure Schedule 3.13 sets forth a list of all material insurance policies and fidelity bonds of Sellers in effect as of the Execution Date relating to the Oil and Gas Properties.

Section 3.14 *Taxes*. Except as set forth on Disclosure Schedule 3.14, to Sellers' Knowledge:

(a) (i) all Tax Returns with respect to any material amount of Non-Income Taxes have, to the extent required by Applicable Law to be filed (taking into account extensions of time within which to file), been filed when due in accordance with all Applicable Law, (ii) as of the time of filing, such Tax Returns were true and complete in all material respects; and (iii) each Seller has paid (or has had paid on its behalf) or has withheld and remitted to the appropriate Taxing Authority all Taxes due and payable with respect to such filed Tax Returns;

(b) there are no liens for Taxes on the Assets, other than statutory liens for Taxes that are not yet due and payable;

(c) there is not currently in effect any extension or waiver of any statute of limitations of any jurisdiction regarding the assessment or collection of any material Non-Income Taxes;

(d) no claim has been made by a Governmental Authority in a jurisdiction where Seller does not file Tax Returns with respect to Non-Income Taxes that Seller is or may be subject to taxation by that jurisdiction with respect to Non-Income Taxes;

(e) there is no claim, audit, action, suit, proceeding or investigation pending against or with respect to any Seller in respect of any material amount of Non-Income Taxes; and

(f) no Oil and Gas Property is subject to any tax partnership agreement or provisions requiring a partnership income tax return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code (the "Code").

This Section 3.14 shall constitute Sellers' sole representation and warranty as to Tax matters.

Section 3.15 *Letters of Credit*. As of the Execution Date, there are no Existing Letters of Credit posted by Sellers.

Section 3.16 *Outstanding Obligations*. As of the Execution Date, except as described on Disclosure Schedule 3.16, there are no existing commitments or obligations for which Sellers have outstanding any unfunded amount under an authorization for expenditure in excess, individually

or in the aggregate, of $50,000 (net to Sellers' interests) for drilling, completing, equipping, maintaining, deepening, side tracking, reworking, plugging and abandonment or other costs or expenses arising from or relating to the ownership of the Oil and Gas Properties.

Section 3.17 *Preferential Purchase Rights*. Except as set forth on Disclosure Schedule 3.17, there are no preferential purchase rights, rights of first refusal, drag-along rights, tag-along rights or other similar rights that are applicable to the transfer of the Assets in connection with the Transactions (the "Preferential Purchase Rights").

Section 3.18 *Broker*. Other than amounts as may be payable by Sellers for which Buyer shall have no liability, no broker, finder, investment banker or other similar person is or will be, in connection with the transactions contemplated by this Agreement or the other Transaction Documents, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of Sellers.

Section 3.19 *[Reserved]*.

Section 3.20 *Working Interest Payments*. Except for any Cure Costs or as set forth on Disclosure Schedule 3.20, all joint interest billings, cash calls, invoices or other Working Interest payments attributable to Sellers' interest in the Oil and Gas Properties have been timely and properly paid.

Section 3.21 *[Reserved]*.

Section 3.22 *[Reserved]*.

Section 3.23 *FCPA; Sanctions.*

(a) In the past five (5) years, neither the Sellers or any of their Subsidiaries, any of their respective directors or officers, or, to Sellers' Knowledge, any agent or employee of the Sellers or any of their Subsidiaries or other Person acting for or on behalf or at the direction of any of the Sellers or any of their Subsidiaries have:

(i) directly or indirectly, (1) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (2) made any unlawful payment to any government official, (3) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment, nor (4) otherwise violated any applicable Anti-Corruption Laws; nor

(ii) been a Sanctioned Person nor has transacted business, directly or knowingly indirectly, with any Sanctioned Person nor otherwise violated Sanctions.

(b) In the past five (5) years, neither the Sellers nor any of their Subsidiaries have received any notice or communication that alleges that the Sellers or any of their Subsidiaries, or any representative or other Person acting for or on behalf or at the direction thereof may have violated any Anti-Corruption Laws or Sanctions.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

Section 4.01 *Organization*. Buyer is a corporation duly organized, validly existing and in good standing (if applicable) under the Applicable Laws of Delaware. Buyer is duly qualified or licensed to do business and is in good standing (if applicable) in each jurisdiction where the nature of its business or properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, reasonably be expected to result in a Buyer Material Adverse Effect.

Section 4.02 *Authorization and Authority*. Buyer has full power and authority to carry on its business as presently conducted, to enter into this Agreement and the other Transaction Documents to which Buyer is or will be a party, to purchase the Assets on the terms described in this Agreement and to perform its other obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party, and the performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite action on the part of Buyer.

Section 4.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by Sellers) constitutes a legal, valid and binding obligation of Buyer enforceable against it in accordance with its terms, except as enforceability may be limited by Equitable Limitations. At the Closing all other Transaction Documents required hereunder to be executed and delivered by Buyer shall be duly executed and delivered and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of Buyer enforceable against it in accordance with their terms, except as enforceability may be limited by Equitable Limitations.

Section 4.04 *Conflicts*. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party does not, and the consummation by Buyer of the transactions contemplated by this Agreement and the other Transaction Documents to which Buyer is or will be a party shall not, (a) violate or be in conflict with, or require the consent of any Person under, any provision of Buyer's Organizational Documents, (b) conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both, would constitute a default) under any agreement or instrument to which Buyer is a party or is bound, or (c) violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to Buyer.

Section 4.05 *Broker*. No broker, finder investment banker or other similar Person is or will be, in connection with the transactions contemplated by this Agreement or any other Transaction Documents, entitled to any brokerage, finders or other fee or compensation based on any arrangement or agreement made by or on behalf of Buyer.

Section 4.06 *Financial Ability*. As of the Execution Date, Buyer has sufficient funds committed and unconditionally available to it to perform all of Buyer's obligations under this Agreement, including without limitation to pay the Adjusted Purchase Price in accordance with the terms of this Agreement and to assume the Assumed Liabilities. Buyer's ability to consummate the transactions contemplated hereby is not contingent upon its ability to secure any financing or to complete any public or private placement of securities prior to or upon Closing.

Section 4.07 *Approvals*. There are no approvals, consents, filings or notifications required to be obtained, made or given by Buyer as a condition to or in connection with the performance by Buyer of its obligations under this Agreement or any other Transaction Documents to which Buyer is or will be a party or the consummation by Buyer of the transactions contemplated by this Agreement or such other Transaction Documents.

Section 4.08 *Litigation*. There are no Proceedings pending to which Buyer is a party or, to Buyer's Knowledge, which have been threatened against Buyer which affect the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which Buyer is or will be a party, the performance by Buyer of its obligations under this Agreement or such other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.09 *Bankruptcy*. There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to Buyer's Knowledge, threatened against Buyer.

Section 4.10 *Investor Status; Investigation.*

(a) The Assets are being acquired by Buyer for investment purposes only, for Buyer's own account and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the 1933 Act.

(b) Buyer is an "accredited investor" as defined in Regulation D promulgated under the 1933 Act. Buyer acknowledges that the sale of the Assets has not been registered under the 1933 Act or any state or foreign securities laws and that the Assets may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c) Buyer has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Assets. Buyer is knowledgeable of the oil and gas business and of the usual and customary practices of oil and gas producers, including those in the areas where the Assets are located. Further, Buyer is capable of making such investigation, inspection, review and evaluation of the Assets as a prudent purchaser would deem appropriate under the circumstances including with respect to all matters relating to the Assets, their value, operation and suitability.

(d) Buyer has had the opportunity to examine all aspects of the Assets that Buyer has deemed relevant and has had access to all information requested by Buyer with respect to the Assets in order to enter into this Agreement. In connection with the Transactions, Buyer has had the opportunity to ask such questions of, and has received sufficient answers from, the Representatives of Sellers and obtain such additional information about the Assets as Buyer deems necessary to enter into this Agreement.

(e) Buyer confirms, acknowledges and agrees that Buyer is relying entirely upon the representations and warranties of Sellers in this Agreement, as well as Buyer's own investigations and inspections of the books, records and assets of Sellers, including the Assets, prior to the execution of this Agreement in entering into this Agreement and proceeding with the Transactions on the terms as set forth herein. Buyer acknowledges and agrees that, other than the express representations and warranties of Sellers set forth in Article III, in the certificates delivered by Sellers at Closing and the Special Warranty, any description of Sellers, their businesses, operations and assets (including the Oil and Gas Properties) in this Agreement, the Disclosure Schedules or any other Transaction Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by Sellers in respect of the accuracy of any description. In deciding to enter into this Agreement, and to consummate the Transactions, other than the express representations and warranties of Sellers set forth in Article III, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis and not on any other disclosure or representation made by, or any duty to disclose on the part of, Sellers or Sellers' Representatives.

Section 4.11 *Qualification*. At the Closing, Buyer (or an Affiliate of Buyer to which the Oil and Gas Properties are assigned at Closing) will be qualified to own and, where applicable, Buyer or its designating operating Affiliate will be qualified to assume operatorship of, the Oil and Gas Properties in all jurisdictions where the Oil and Gas Properties are located. The consummation of the transactions contemplated by this Agreement will not cause Buyer or its applicable Affiliate to be disqualified as such an owner or operator. To the extent required by the applicable state and federal Governmental Authorities, as of Closing Buyer (or, if applicable (as contemplated by Section 5.02), Buyer's operating Affiliate) will have such lease bonds, area-wide bonds or any other surety bonds or insurance policies in each case as required by, and in accordance with, any Governmental Authorities with jurisdiction over the ownership or operatorship of such Oil and Gas Properties or any operating agreement or joint operating agreement applicable to such Oil and Gas Properties.

Section 4.12 *No Other Representations*. No Seller nor any other Person (on behalf of any Seller or otherwise) has made or is making any representation or warranty whatsoever, express or implied, at law or in equity, with respect to Sellers, the Assets, this Agreement or the transactions contemplated by this Agreement other than the representations and warranties expressly set forth in Article III (as modified by the Disclosure Schedules), and Buyer is not relying on and has not relied on any representation or warranty other than those representations or warranties set forth in Article III (as modified by the Disclosure Schedules) and any reliance by Buyer on any representation or warranty other than those representations and warranties set forth in Article III (as modified by the Disclosure Schedules) is hereby expressly disclaimed.

**ARTICLE V**
**COVENANTS OF SELLERS**

Section 5.01 *Operating Covenants*. From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (u) as required by this Agreement or any other Transaction Document, (v) as required by any Applicable Law or any Governmental Authority (including by order or directive of the Bankruptcy Court), (w) to the extent related solely to Excluded Assets and/or Excluded Liabilities, (x) for renewal of expiring insurance coverage in the Ordinary Course of Business, (y) for emergency operations or (z) as otherwise consented to in writing by Buyer:

(a) Sellers will:

(i) maintain or cause its Affiliates to maintain the books of account and records relating to the Assets in the usual, regular and ordinary manner, in accordance with its usual accounting practices;

(ii) give written notice to Buyer as soon as is practicable of any material damage or casualty to or destruction or condemnation of any Oil and Gas Property of which Sellers have Knowledge;

(iii) use reasonable best efforts to maintain insurance coverage on the Assets in the amounts and types described on Disclosure Schedule 3.13;

(iv) take such actions, at Buyer's expense (so long as such expenses are reasonable and documented expenses and do not exceed a maximum of $250,000, without prior consent of Buyer, and so long as such expenses would not have been incurred absent direction from Buyer), as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any final resolution or guarantee any outcome of any such actions);

(v) give appropriate notice to counterparties to the Maverick Basin Area Participation Agreement with respect to any co-sell rights or other similar rights thereunder;

(vi) not take any action to enforce any rights against Buyer or any of its Affiliates under the JDA or take any enforcement actions with respect to any related orders (except in cooperation with Buyer or a Buyer Affiliate); *provided* that, the Parties acknowledge and agree that, notwithstanding anything otherwise provided in this Agreement, all rights between them are preserved pending the occurrence of the Closing and the Parties shall be entitled to take any and all actions as such Party deems necessary or appropriate to preserve such rights (including with respect to the Applicable Contracts and the JDA);

(vii) if requested by Buyer, object to proofs of claim relating to oil and gas properties identified by Buyer, with reasonable legal fees and expenses related thereto paid by Buyer; and

(viii) notify and consult with Buyer of any election that Sellers are required or have the right to make with respect to the Oil and Gas Properties under any joint operating agreement, marketing or purchase contract, area of mutual interest agreement or farmout agreement, specifying the nature and time period associated with such election;

(b) no Seller shall:

(i) sell, lease or otherwise transfer any Oil and Gas Property, or otherwise voluntarily divest or relinquish any right or Asset, other than (A) sales of Hydrocarbons in the Ordinary Course of Business, (B) sales or other dispositions of materials, supplies, machinery, equipment, improvements or other personal property or fixtures which are obsolete and have been replaced with an item of equal suitability and (C) dispositions of Excluded Assets;

(ii) enter into, assume or acquire any Contract that if entered into prior to the Execution Date would be required to be listed in Disclosure Schedule 3.05(a) other than (A) Contracts for the sale of Hydrocarbons in the Ordinary Course of Business, not to exceed thirty (30) days in duration or terminable without penalty on thirty (30)-days' or less notice or (B) in connection with an Alternative Transaction (subject to the remaining provisions of this Agreement);

(iii) amend or modify in any material respect or terminate (other than termination or expiration in accordance with its terms) any Purchased Contract, Lease, Permit or any 365 Contract that could become a Purchased Contract;

(iv) settle any suit or litigation or waive any material Claims, in each case, relating or attributable to the Assets and affecting the period from and after the Effective Time for which Buyer will be responsible for all or any portion;

(v) grant or create any right to Consent to the disposition of, or Preferential Purchase Rights with respect to, any of the Assets;

(vi) make any elections or take any other actions that would require the Sellers (or, after Closing, Buyer) to take its share of Hydrocarbon production produced from or attributable to the Assets in-kind;

(vii) change the methods of accounting or accounting practice by Sellers, except as required by concurrent changes in Applicable Law or GAAP as agreed to by its independent public accountants; or

(viii) authorize, agree or commit to do any of the foregoing.

Section 5.02 *Operatorship*. Buyer acknowledges and agrees that Sellers cannot and do not covenant, represent or warrant that Buyer (or, if applicable, Buyer's operating Affiliate) shall become or have the right to become successor operator of any Oil and Gas Properties and that the Oil and Gas Properties may be subject to operating or other agreements that govern the right to operate the Oil and Gas Properties and the appointment of a successor operator. The failure of

Case 20-32658 Document 6 Filed 10/16/20 Page 47 of 413

Buyer (or an Affiliate of Buyer) to be designated as operator of any Oil and Gas Property or to have obtained the consents required therefor as of the Closing shall not cause the failure of any other condition to Closing or otherwise affect Buyer's obligations under Section 2.05.

Section 5.03 *Assumption and Rejection of Executory Contracts and Leases.*

(a) Schedule 5.03(a) (as may be amended from time to time or supplemented with written notice to Buyer) sets forth each 365 Contract and Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract (and if no Cure Cost is estimated to be payable in respect of any 365 Contract, the amount of such Cure Cost designated for such 365 Contract shall be "$0.00") (as such schedules may from time to time be amended or supplemented with written notice to Buyer, the "365 Schedule").

(b) Subject to Buyer's rights under Section 5.03(d) below to subsequently amend such designations, Schedule 5.03(b) sets forth a complete list of the 365 Contracts listed on the 365 Schedule that Buyer desires to be assumed by Sellers and transferred and conveyed to Buyer as a Purchased Contract, which shall include each Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule (collectively, and as further modified by Buyer pursuant to the provisions of this Section 5.03(b), the "Desired 365 Contracts"). Any 365 Contracts that are not Desired 365 Contracts shall be an Excluded Asset for all purposes and, for the avoidance of doubt, Buyer shall have no liability on account of any 365 Contracts that are not Desired 365 Contracts.

(c) Promptly following the Execution Date (to the extent not previously filed), Sellers shall file the 365 Schedule with the Bankruptcy Court and deliver a written notice, in a form acceptable to Buyer, of the proposed assignments of the Desired 365 Contracts and the proposed Cure Costs for each Desired 365 Contract (consistent with Sellers' good faith estimates set forth on Schedule 5.03(a)) to all non-debtor parties of the Desired 365 Contracts, which notice shall notify each non-debtor party to such Desired 365 Contract of (i) the proposed Cure Cost for such Desired 365 Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. To the extent that any formal or informal objections are received from such non-debtor parties in response to such notice, Sellers shall (A) promptly provide Buyer with written notice of any objection that is not filed publicly on the Bankruptcy Court's docket, and (B) take all reasonably necessary actions to resolve (excluding providing any payment of Cure Costs unless agreed to and funded by Buyer, without limiting Seller's retention of responsibility for any Excess Cure Costs) such disputes with the applicable non-debtor party; *provided* that any and all such resolutions with respect to any Desired 365 Contract shall be reasonably acceptable to Buyer.

(d) Notwithstanding the foregoing, at any time prior to the Designation Deadline (or, solely for the purpose of clause (i) below, if any 365 Contract is first identified to Buyer by Sellers after the Designation Deadline and prior to the Closing Date, within one (1) Business Day prior to the Closing Date), (i) Buyer may, in its absolute and sole discretion, designate any 365 Contract that has not been rejected as a Desired 365 Contract and upon receipt of any such notice Sellers shall use commercially reasonable efforts to effect the assumption of such 365 Contract by Sellers in accordance with the Bankruptcy Code, *provided* that, any Cure Cost on account of such 365 Contract shall be acceptable to Buyer in its sole discretion, and, if Sellers are successful in effecting such assumption as of Closing, such 365 Contract shall become

a Desired 365 Contract and transferred and conveyed to Buyer as a Purchased Contract at Closing, or (ii) Buyer may revise Schedule 5.03(b) by excluding one or more Desired 365 Contracts at any time prior to the Designation Deadline and upon such exclusion such Contract shall constitute an Excluded Asset; *provided, however,* that Buyer may not exclude from Schedule 5.03(b) any Desired 365 Contract that is identified as an "Operating Agreement" or "Joint Operating Agreement" on the 365 Schedule. If a Desired 365 Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Desired 365 Contract that has not been resolved to the satisfaction of Buyer, in Buyer's sole discretion, prior to the Designation Deadline, then, unless otherwise agreed to by Buyer and Sellers, the Designation Deadline shall be extended (but only with respect to such Desired 365 Contract) to no later than the earliest of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Sellers, (B) the date on which such 365 Contract is deemed rejected by operation of sections 365(d)(4) or 1123(b)(2) of the Bankruptcy Code, as applicable, or (C) the date required by the Bankruptcy Court and set forth in the Sale Order. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(d).

(e) If Buyer exercises its rights in Section 5.03(d) above to designate a 365 Contract (including a 365 Contract that was a Desired 365 Contract immediately before such designation) as an Excluded Asset, there shall be no change in the Purchase Price as a result of such designation or change in designation.

(f) Notwithstanding anything in this Agreement to the contrary, Sellers shall not reject any 365 Contracts without the prior written consent of Buyer in its sole discretion; *provided* that, after the Designation Deadline, Sellers may reject 365 Contracts (other than Desired 365 Contracts) without the consent of Buyer so long as such 365 Contracts were identified to Buyer in writing prior to the Designation Deadline. In the event that Sellers identify (whether before or after the Designation Deadline) any additional 365 Contracts capable of being assumed or rejected that were not previously identified as such, Sellers shall promptly notify Buyer of (i) such 365 Contracts and (ii) Sellers' good faith estimate of the amount of the Cure Costs payable in respect of each such 365 Contract by supplementing Schedule 5.03(a) as required by Section 5.03(a). For the avoidance of doubt and subject to Section 5.03(d), Buyer may, in its sole discretion, designate each such additional 365 Contract as a Desired 365 Contract or Excluded Asset pursuant to this Section 5.03(f), notwithstanding the passage of the Designation Deadline. Schedule 5.03(b) and the definition of Desired 365 Contracts shall be deemed automatically amended to reflect changes made pursuant to this Section 5.03(f).

(g) Notwithstanding anything in this Agreement to the contrary, including Section 5.03(d) above, Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule shall at all times constitute Desired 365 Contracts and shall be assigned to Buyer at the Closing.

(h) Buyer shall provide adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Sellers and assigned to Buyer at or prior to the Closing in accordance with the provisions of section 365 of the Bankruptcy Code and this Agreement; *provided* that Buyer shall cooperate with Sellers in providing such adequate assurance of future performance of all of the Desired 365 Contracts and Buyer acknowledges that such cooperation may require Buyer to provide reasonably necessary

information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts, and Sellers' obligation to assume and assign such Desired 365 Contracts is subject to the cooperation and providing of such information and commitment by Buyer.

(i) At the Closing, subject to Section 5.03(j), (i) the Purchase Price shall be increased by, pursuant to section 365 of the Bankruptcy Code, if applicable section 1123(b)(2) of the Bankruptcy Code, and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A), 365(b)(1)(B) and 1123(b)(2) of the Bankruptcy Code, as applicable, or any other applicable provision of the Bankruptcy Code to effectuate the assumption and assignment of the Desired 365 Contracts (such costs or expenses, if any, the "Cure Costs") with respect to the Desired 365 Contracts actually paid by Sellers prior to Closing if, and only to the extent that, Sellers have provided evidence of such pre-payment prior to Closing (the "Pre-Paid Cure Costs") and (ii) Buyer (and not Sellers) shall pay all Cure Costs with respect to the Desired 365 Contracts that are not Pre-Paid Cure Costs. Notwithstanding the foregoing, if any Desired 365 Contract is subject to a dispute as to Cure Costs that has not been resolved as of Closing and such Desired 365 Contract is assigned to Buyer (at or after Closing) then, upon resolution of such Cure Costs, Buyer shall pay such Cure Costs; *provided* that, any and all resolutions of disputes related to Cure Costs for any Desired 365 Contract shall be acceptable to Buyer in Buyer's reasonable discretion; *provided, further*, that Buyer retains any and all rights under Section 5.03(d) of this Agreement with respect to the 365 Contracts.

(j) Notwithstanding anything to the contrary in this Agreement, including in this Section 5.03, the Purchase Price shall not be increased by, and Buyer shall not be required to pay, (and Sellers shall retain and be responsible for) the amount of any Excess Cure Costs.

(k) Notwithstanding anything in this Agreement to the contrary, after the Closing, in the event that any Springfield Gathering Contract or the JDA is not assumed and/or assigned to Buyer, (i) Sellers (or a responsible Person appointed by Sellers), at Buyer's expense, shall take all actions as directed by Buyer with respect to the Springfield Gathering Contracts and the JDA, including if requested, filing a motion to reject such agreements (for clarity, this covenant shall not require any guarantee of any outcome of any such actions), and such Springfield Gathering Contract and/or the JDA, as applicable, shall not constitute Excluded Assets unless otherwise so designated as such in writing by the Buyer and (ii) if such actions are not promptly taken by Sellers (or the applicable responsible Person) following Buyer's request, Sellers hereby grant Buyer a limited power of attorney to take actions in Sellers stead to effectuate the purposes of this Section 5.03(k); *provided* that, nothing in this Section 5.03(k) shall (x) require any Seller to be a going concern or otherwise remain in existence for any period after the Closing or (y) prohibit any Seller from liquidating and dissolving at any time after the Closing and, upon such liquidation and dissolution, such Seller shall no longer be obligated to perform the covenants set forth in this Section 5.03(k).

Section 5.04 *Access.*

(a) Each Seller shall afford to Buyer and its authorized representatives from the Execution Date until the Closing Date, during normal business hours, reasonable access to the

Assets (subject to the terms, conditions and restrictions of agreements related to Assets to which such Seller is a party and the consent of the operator, as applicable), appropriate Seller personnel and to such Seller's title, Leases, Contracts, environmental and legal materials, books, records, statements and operating data and information relating to the Assets available as of the Execution Date and that becomes available to any Seller at any time prior to the Closing Date, together with the opportunity to make copies of such books, records and other documents at Buyer's expense, and will furnish to Buyer such other information in Sellers' possession with respect to the Assets as Buyer may reasonably request; *provided, however*, that all such information shall be held in confidence by Buyer in accordance with the terms of the Confidentiality Agreement; *provided, further,* that in no event shall Sellers be obligated to provide (i) access or information in violation of Applicable Law, (ii) any information (other than title opinions, runsheets or similar information) the disclosure of which would cause the loss of any legal privilege available to any Seller relating to such information or would cause any Seller to breach a confidentiality obligation to which it is bound; *provided* that the applicable Seller has used its reasonable efforts to protect the privilege or to obtain a waiver of the applicable contractual obligation, or (iii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications, except to the extent required in the Bid Procedures Order.

(b) BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD EACH SELLER, EACH OF THEIR SUCCESSORS, THEIR AFFILIATES AND ALL OF THEIR RESPECTIVE DIRECTORS AND OFFICERS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES CAUSED DIRECTLY OR INDIRECTLY BY THE ACTS OR OMISSIONS OF BUYER, BUYER'S AFFILIATES OR ANY PERSON ACTING ON BUYER'S OR ITS AFFILIATE'S BEHALF IN CONNECTION WITH ANY DUE DILIGENCE CONDUCTED PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY SITE VISITS CONDUCTED PURSUANT TO SECTION 5.04(a), EXCEPTING ONLY LIABILITIES TO THE EXTENT ACTUALLY RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY SELLER OR ANY SELLER INDEMNIFIED PARTIES. Buyer shall comply with all rules, regulations, policies and instructions reasonably required by Sellers, or any Third Party operator of any Assets, which are provided to Buyer regarding Buyer's actions while upon, entering or leaving any Asset, including any insurance requirements that Sellers may reasonably impose, or any such Third Party operator may impose, on contractors authorized to perform work on any Asset owned or operated by Sellers (or any such Third Party operator, as applicable).

## ARTICLE VI
## COVENANTS OF BUYER

Section 6.01 *Access; Data Retention*. Buyer agrees that, following the Closing, and subject to Applicable Law and any confidentiality restrictions to Third Parties, and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Subsidiaries to) upon advance written request give to Sellers and their Representatives reasonable access during normal business hours to the Data (unless Sellers were permitted to retain a copy of such Data as part of the Excluded Records) pertaining to any and all periods prior to and including the Closing Date as Sellers and their Representatives may reasonably request and to make copies of the same (at Sellers' sole cost and expense) in connection with (a) the preparation of Tax Returns or

information returns, (b) reports or other obligations by Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases (including objecting to proofs of claims or administrative expense claims), (d) preparing the Final Settlement Statement and any other matters contemplated by Section 2.06 and (e) any final determination of any audit or examination, Proceeding or determination. Buyer shall (and shall cause its Subsidiaries to) preserve all such Data for a period of three (3) years after the Closing; *provided, however,* that Buyer shall have the right at any time after the second (2nd) anniversary of the Closing Date to request in writing that Sellers take any such Data and, if Sellers do not agree to take such Data within ninety (90) Business Days after receipt of the request, Buyer (or its Subsidiaries, as applicable) may dispose of such records.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLERS

Section 7.01 *Commercially Reasonable Efforts; Further Assurances*. Subject to the terms and conditions of this Agreement, and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and Sellers each agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions; *provided* that the Parties understand and agree that the commercially reasonable efforts of any Party, and the reasonable best efforts of Buyer, shall not be deemed to include, except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions; *provided*, *further* that this Section 7.01 shall not (a) limit or affect the obligation of any Party to perform its obligations and covenants expressly set forth in this Agreement or (b) require any Party to incur any obligations or pay any fees or amounts to Third Parties not otherwise required under this Agreement. Sellers and Buyer agree to execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

Section 7.02 *Bankruptcy Proceedings.*

(a) Sellers shall take such actions as may be reasonably necessary to (i) obtain entry of the Sale Order as soon as reasonably practicable following completion of the Auction and (ii) consummate the Transactions, in each case, in accordance with this Agreement.

(b) Each Seller and Buyer acknowledge that this Agreement and the sale of the Assets and assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval. Each Seller and Buyer acknowledge that (i) to obtain such approval and to satisfy Sellers' fiduciary duties to all applicable stakeholders in accordance with Applicable Law, each Seller must demonstrate that it has taken reasonable steps to obtain the highest or otherwise best offer possible for the Assets, and that such demonstration shall include giving notice of the Transactions to creditors and other interested parties as ordered by the Bankruptcy Court and, if necessary, conducting the Auction, (ii) Buyer must provide adequate assurance of future performance as may be required under section 365 of the Bankruptcy Code with respect to the Purchased Contracts, and (iii) to the extent such adequate assurance of future performance is not provided with respect

to an Purchased Contract, then such Purchased Contract will be excluded from the Assets and included in the Excluded Assets.

(c) In the event an objection is filed, an appeal is taken or a stay pending appeal is requested, from either the Bid Procedures Order, the Sale Order or any other order reasonably necessary in connection with the Transactions, as applicable, Sellers shall promptly notify Buyer of such objection, appeal or stay request and shall provide to Buyer promptly a copy of the related objection, notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with an objection or any appeal from either of such orders and Sellers agree to take all action as may be reasonably necessary and appropriate to defend against such appeal, petition or motion and Buyer shall cooperate in such efforts.

(d) From and after the Execution Date and until the Closing, no Seller shall take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Bid Procedures Order. If Buyer is the Successful Bidder at the Auction, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

(e) From and after the Execution Date and until the Closing, at least one (1) Business Day prior to the filing thereof, to the extent reasonably practicable under the circumstances, Sellers shall deliver to Buyer, and make reasonable efforts to consult and cooperate with Buyer, regarding (i) any pleadings, motions, notices, statements, applications, schedules, reports or other papers to be filed with the Bankruptcy Court in relation to the implementation of the Transactions, (ii) any discovery taken in connection with the seeking entry of the Sale Order (including any depositions) and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(f) Without limiting the requirements of Section 7.02(a) through Section 7.02(e), from and after the Execution Date until the Closing, Sellers and the Buyer agree to:

(i) support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(ii) to the extent any legal or structural impediment arises that would prevent, hinder or delay the consummation of the Transactions, support and take all steps reasonably necessary and desirable to address any such impediment;

(iii) negotiate in good faith and use commercially reasonable efforts to execute and deliver the definitive documents and any other required agreements to effectuate and consummate the Transactions;

(iv) consult and negotiate in good faith with material stakeholders and their advisors regarding the execution of definitive documents and the implementation of the Transactions; and

(v) take such actions as reasonably requested by the other Party to abate, suspend or toll any existing adversarial proceedings or litigation among the Parties or any of their Affiliates, consistent with the purposes of the Release Agreement.

(g) Without limiting the requirements of Section 7.02(a) through Section 7.02(f), from and after the Execution Date and through the Closing or the termination of this Agreement in accordance with its terms, Seller agrees to:

(i) upon reasonable request of Buyer, inform legal counsel to Buyer as to: (A) the status and progress of the Transactions; and (B) the status of obtaining any necessary authorizations (including any consents) from each secured lender, any competent judicial body, Governmental Authority, banking, taxation, supervisory, or regulatory body, as applicable; and

(ii) inform legal counsel to Buyer as soon as reasonably practicable after becoming aware of: (A) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the Transactions; and (B) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any Person in respect of any Seller.

(h) Notwithstanding anything to the contrary in this Agreement, including this Section 7.02, each Seller's obligations hereunder are subject in all respects to its obligations as a debtor in possession, including its fiduciary obligations to its bankruptcy estate, and nothing in this Agreement shall require any manager, director or officer of a Seller to violate their fiduciary duties to such Seller or its estate. No action or inaction on the part of any manager, director or officer of a Seller that such manager, director or officer reasonably believes, based on and consistent with the written advice of outside counsel, is required by their fiduciary duties to such Seller shall be limited or precluded by this Agreement; *provided, however,* that no such action or inaction shall be deemed to prevent Buyer from exercising any termination rights it may have hereunder as a result of such action or inaction.

(i) INTENTIONALLY OMITTED

(j) The Deposit Escrow Funds shall be applied as provided in this Agreement or returned to Buyer in accordance with this Agreement and the Bid Procedures. Any instructions provided by Sellers to the Escrow Agent in respect of the Deposit Escrow Funds shall be consistent with this Agreement and the Bid Procedures.

Section 7.03 *Public Announcements*. Sellers and Buyer agree that, prior to Closing, the consent (as to both form and content), not to be unreasonably withheld, of the other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions, except to the extent that such press release or other public announcement is required in connection with the Auction, the Bid Procedures Order or by Applicable Law; *provided* that Sellers shall be permitted to issue a press release or make a public announcement upon the execution of this Agreement to announce such execution of this Agreement and will provide Buyer with a copy of such press release or public

announcement at least one (1) business day in advance of its release and provide Buyer with a reasonable opportunity to comment on the same. From the Closing until one (1) month after the Closing, Buyer and Resources will provide each other a copy, at least one (1) business day in advance of its release (to the extent reasonably practicable under the circumstances), of any press release or other public announcement with respect to this Agreement, the other Transaction Documents or the Transactions that Buyer or Resources proposes to issue or make in advance of its release and provide the other with a reasonable opportunity to comment on the same (*provided* that the issuing Party shall not be required to accept or incorporate the other Party's comments), except to the extent that such press release or other public announcement is required by Applicable Law and such prior notice is not practicable given the circumstances giving rise to the requirement to issue such release.

Section 7.04 *Confidentiality*. The Parties acknowledge that Buyer (or its Affiliates) and Resources previously executed the Confidentiality Agreement. Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail. The Parties acknowledge and understand that this Agreement may be filed with the Bankruptcy Court and may be made available by Sellers to Auction Participants if this Agreement is selected as the Initial Highest Bid pursuant to the Bid Procedures Order. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.04 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by Sellers or their Affiliates in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

Section 7.05 *Audits and Other Tax Proceedings.* Resources shall control the conduct of any audit, litigation or other administrative or judicial proceeding with respect to Non-Income Taxes (each a "Tax Proceeding") for any Seller Tax Period; *provided*, that Buyer may participate in such Tax Proceeding and no such Tax Proceeding that could have an adverse Tax impact on Buyer or the Assets shall be settled without the consent of Buyer, such consent not to be unreasonably withheld. Resources and Buyer shall jointly control the conduct of any Tax Proceeding for any Straddle Tax Period. Each Party shall promptly provide the other Parties with notice regarding the commencement of any Tax Proceeding for any Seller Tax Period or Straddle Tax Period and shall cooperate fully as and to the extent reasonably requested by the other Parties in connection therewith. Neither Party shall enter into any settlement or agreement of compromise with respect to any Tax Proceeding for any Straddle Tax Period without the prior written consent of the other Parties, such approval may not be unreasonably withheld, conditioned or delayed.

Section 7.06 *Employee Matters.*

(a) Pursuant to Section 6 of the Confidentiality Agreement, Buyer is subject to certain restrictions on the solicitation and hiring of the employees of Sellers and their Affiliates. However, Sellers agree that, (i) solely during the period beginning on the Execution Date and ending on the earlier to occur of (A) the Closing Date and (B) the termination of this Agreement, Buyer or one of its Affiliates may make offers of employment to any or all of the employees of Sellers or their Affiliates listed on Schedule 7.06 (each such employee, a "Seller Employee" and

each such offer, an "Employment Offer"); *provided, however,* that any such Employment Offer must comply with Section 7.06(b), and (ii) if, and only if, the Closing has occurred, Buyer or its applicable Affiliate(s) may hire any employee of Sellers or their Affiliates pursuant to any Employment Offer made in compliance with Section 7.06(a)(i).

(b) Within five (5) days after the execution of this Agreement, Buyer shall deliver to Sellers written notice setting forth a list of the Seller Employee(s) to which Buyer is potentially interested in making an Employment Offer, and within three (3) days after receipt of such notice Sellers will deliver to Buyer a schedule (the "Compensation Schedule") of the base salary or base wage, as applicable, of each Seller Employee listed in such notice for reference purposes only. Each Employment Offer shall be on terms determined by Buyer in its sole discretion (including with respect to compensation and irrespective of the base salary or base wage as set forth on the Compensation Schedule) and shall be subject to and conditioned upon the occurrence of the Closing, and any employment by Buyer or its Affiliates of any employee of Sellers or their Affiliates shall not become effective prior to the Closing. A copy of any Employment Offer shall be delivered to Sellers at least one (1) Business Day prior to being delivered to the applicable employee. Buyer shall provide to Sellers, not later than the Closing Date, the names of each Seller Employee who has then accepted an Employment Offer from Buyer or any of its Affiliates (each Seller Employee who accepts such an offering being a "Continuing Employee") and the names of the Seller Employees who have then declined an Employment Offer from Buyer or its Affiliates. Each Continuing Employee shall, as of the Closing Date (if he or she is still employed by Sellers or their Affiliate), be terminated by Sellers or their Affiliate, as applicable (and Sellers shall and shall cause their Affiliates to release such Continuing Employee from all non-compete or similar restrictions that would restrict or be violated in any way by, such Continuing Employee's activities as an employee of Buyer or its Affiliate) and become an employee of Buyer or its Affiliate.

(c) Sellers shall reasonably assist Buyer and its Affiliates, as applicable, in communicating with the employees of Sellers and their Affiliates regarding potential employment with Buyer or its Affiliates; *provided* that, Buyer shall coordinate with a Person designated by Sellers in discussing Employment Offers with the Seller Employees and shall not directly communicate with any Seller Employee regarding potential employment by Buyer or its Affiliates other than as directed or consented to by such designee.

(d) Buyer acknowledges that, except for solicitations expressly permitted by Section 7.06(a)(i) and hiring expressly permitted by Section 7.06(a)(ii), Buyer remains subject to the restrictions on the solicitation of the employees of Sellers and their Affiliates contained in Section 6 of the Confidentiality Agreement.

Section 7.07 *Tax Matters; Apportionment of Tax Liability.*

(a) Non-Income Taxes. All Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period before the Effective Time shall be for Sellers' account and all Non-Income Taxes (and any refunds thereof) with respect to the Assets attributable to the period after and including the Effective Time shall be for Buyer's account. All real estate, personal property, and similar ad valorem Taxes (and any refunds thereof) assessed with respect to the Assets for 2020 shall be prorated based on the number of full days in such period that occur before the Effective Time, on the one hand, and the number of days in such period that occur on

or after the date on which the Effective Time occurs, on the other hand. All Non-Income Taxes (and any refunds thereof) attributable to the production of Hydrocarbons shall be deemed attributable to the period during which such production occurred. All other Non-Income Taxes (and refunds thereof) with respect to the Assets shall be allocated between Sellers and Buyer as though the 2020 taxable period ended as of the close of business on the day before the date on which the Effective Time occurs, and all such Non-Income Taxes with respect to the Assets attributable to taxable periods ending as of the close of business on the day before the date on which the Effective Time occurs shall be for Sellers' account and all such Non-Income Taxes with respect to the Assets attributable to taxable periods beginning on or after the date on which the Effective Time occurs shall be for Buyer's account. The apportionment of Non-Income Taxes (and any refunds thereof) with respect to the Assets between the Parties shall take place in the Closing Statement and the Final Settlement Statement using estimates of such Non-Income Taxes (and refunds thereof) if actual numbers are not available. If estimates of Non-Income Taxes with respect to the Assets are used in the Closing Statement and the Final Settlement Statement to apportion Non-Income Taxes, upon determination of the actual amount of such Non-Income Taxes, timely payments will be made from one Party to the other to the extent necessary to cause each Party to bear the amount of such Non-Income Tax that is allocable to such Party under this Section 7.07(a). If estimates of such refunds are used in the Closing Statement and the Final Settlement Statement to apportion such refunds, upon determination of the actual amount of such refunds, timely payments will be made from one Party to the other to the extent necessary to cause each Party to receive the benefit of such refunds that are allocable to such Party under this Section 7.07(a).

(b) Tax Returns. Sellers agree to file all Tax Returns for Non-Income Taxes applicable to the Assets that become due prior to the Closing Date, and Buyer agrees to file all other Tax Returns for Non-Income Taxes with respect to any tax period beginning prior to the Effective Time that become due on or after the Closing Date. The Party not filing the Tax Return agrees to provide the filing party with appropriate information that is necessary to file any required Tax Returns. The Party filing a Tax Return for a taxable period beginning before the Effective Time and ending after the Effective Time shall provide the other Party with a copy of such Tax Return at least fifteen (15) days prior to the due date thereof for such Party's review and comment.

(c) Transfer Taxes. Buyer shall be liable for and shall indemnify Sellers for any sales, use, transfer, documentary, stamp, registration or similar Taxes due as a result of the transfer of the Assets pursuant to this Agreement ("Transfer Taxes"). If required by Applicable Law, Sellers shall, in accordance with Applicable Law, calculate and remit any Transfer Taxes that are required to be paid as a result of the transfer of the Assets to Buyer and Buyer shall promptly reimburse Sellers therefor. If Sellers receive notice that any Transfer Taxes are due, Sellers shall promptly forward a copy of such notice to Buyer for handling.

(d) Purchase Price Allocation. Sellers shall provide to Buyer a statement (the "Allocation") allocating the Purchase Price and any Assumed Liabilities or other items that are treated as additional consideration for Tax purposes among the Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder within ninety (90) days after the Closing Date. Such allocation shall become conclusive and binding on the Parties fifteen (15) days after timely delivery by Sellers unless Buyer objects in writing to the Allocation. If Buyer objects, the Parties shall use commercially reasonable efforts to resolve any disputes within fifteen (15) days after Sellers' receipt of written notice of Buyer's objection. Any unresolved disputes

shall be submitted to the Referee or an accounting firm selected pursuant to the procedures in Section 2.06(d) (the "Accounting Firm"). The resolution of the dispute by the Accounting Firm shall be conclusive and binding on all Parties and the Allocation shall be updated to reflect such resolution. Sellers and Buyer shall use commercially reasonable efforts to update the Allocation in a manner consistent with section 1060 of the Code following any adjustment to the Purchase Price pursuant to this Agreement. Sellers and Buyer shall, and shall cause their Affiliates to, report consistently with the Allocation, as adjusted, in all Tax Returns, including IRS Form 8594, which Buyer and Sellers shall file with the Internal Revenue Service or any other Governmental Authority and neither Sellers nor Buyer shall take any position in any such Tax Return that is inconsistent with the Allocation, as adjusted, in each case, unless required to do so by a determination as defined in section 1313(a) of the Code. Sellers and Buyer agree to promptly advise each other regarding the existence of any tax audit, controversy or litigation related to the Allocation.

Section 7.08 *Supplemental Disclosures*. Prior to the Closing, Sellers shall have the right to supplement or amend the Disclosure Schedules relating to the representations and warranties of Sellers set forth in Article III with respect to any matter hereafter arising or discovered which, if existing (or in the case of any representation or warranty qualified by Sellers' Knowledge, known) at the Execution Date, would have been required to be set forth or described in Sellers' Disclosure Schedules. In the event that Sellers supplement or amend their Disclosure Schedules pursuant to the preceding sentence, Sellers shall deliver a copy of the amendment or supplement (in either case, the "Supplemental Disclosure") to Buyer and the relevant Disclosure Schedule will be deemed to be amended or supplemented as described in the Supplemental Disclosure as of the Execution Date if such matter arose after the Execution Date; *provided* that such Supplemental Disclosure shall be disregarded for purposes of determining whether Buyer's condition to Closing specified in Section 8.02(a) has been satisfied or for determining any remedies available under this Agreement. If a Supplemental Disclosure would result in (or contribute to) the failure of Buyer's condition to Closing specified in Section 8.02(a) to be satisfied at the Closing, Buyer may terminate this Agreement pursuant to Section 9.01(d)(ii), subject to the terms of Section 9.01. Any termination of this Agreement pursuant to Section 9.01(d)(ii) shall be Buyer's sole remedy for a breach of a representation and warranty disclosed by a Supplemental Disclosure that results from a matter that arose after the Execution Date.

Section 7.09 *Replacement of Existing Letters of Credit*. The Parties acknowledge that none of the Existing Letters of Credit, if any, posted by Sellers with Governmental Authorities and relating to the Assets are to be transferred to Buyer. On or before Closing, Buyer shall use commercially reasonable efforts to obtain, or cause to be obtained in the name of Buyer (or Buyer's designated operating Affiliate), replacements for any Existing Letters of Credit to the extent necessary (and then only in the amounts that are necessary) to consummate the Transactions contemplated by this Agreement. Buyer may also provide evidence that such replacements are not necessary as a result of existing bonds, letters of credit or guarantees that Buyer has previously posted as long as such existing bonds, letters of credit or guarantees are adequate to secure the cancellation of the Existing Letters of Credit at Closing. Notwithstanding the foregoing, in the event Buyer is unable to obtain any such bonds, letters of credit and guarantees prior to Closing, the Parties shall nonetheless proceed with Closing and Buyer shall indemnify and hold Sellers harmless for any failure to obtain such bonds, letters of credit and guarantees.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.01 *Conditions to Obligations of Buyer and Sellers*. The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction (or, in the case of clauses (b) and (c) of this Section 8.01, waiver by each to the extent permitted under Applicable Law) of each of the following conditions:

(a) no Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b) all actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained (other than those actions or filings that are customarily obtained after the Closing); and

(c) no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect which prohibits, restrains or enjoins the consummation of the Transactions; *provided* that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to prevent the entry of such injunction, order, decree or judgment.

Section 8.02 *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a) (i) each Seller shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date; (ii) the Fundamental Representations shall be true and correct in all respects at and as of the Closing Date as if made at and as of the Closing Date (other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date); and (iii) the representations and warranties of Sellers set forth in Article III of this Agreement (other than the Fundamental Representations) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date *(provided*, that, in each case, for purposes of this Section 8.02(a)(iii), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded), except, for purposes of this Section 8.02(a)(iii), for those failures to be true and correct that, individually or in the aggregate, do not constitute a Seller Material Adverse Effect;

(b) the Sale Order shall have been entered by the Bankruptcy Court and such order shall be a Final Order and in full force and effect;

(c) Intentionally omitted;

(d) the Required Consents set forth on Schedule 8.02(d) (the "Specified Required Consents") shall have been obtained by Sellers, or the Bankruptcy Court shall have entered an order approving or permitting (or resolving any objection so as to permit) the sale and assignment of the Assets subject to such Specified Required Consent to Buyer Free and Clear of such Specified Required Consent (as applicable to the sale and assignment of the Assets to Buyer pursuant to this Agreement);

(e) Intentionally omitted; and

(f) Sellers shall have delivered each of the items required by Section 2.05(c) to be delivered by Sellers at the Closing.

Section 8.03 *Conditions to Obligation of Sellers*. The obligation of Sellers to consummate the Closing is subject to the satisfaction (or waiver by Sellers) of the following further conditions:

(a) (i) Buyer shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date and (ii)(A) the representations and warranties of Buyer contained in this Agreement (other than the representations and warranties contained in Section 4.06 and Section 4.10) shall be true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date (*provided*, that, in each case, for purposes of this Section 8.03(a)(ii)(A), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Buyer Material Adverse Effect or similar materiality qualifiers shall be disregarded), except for those failures to be true and correct that, individually or in the aggregate, do not constitute a Buyer Material Adverse Effect; and (B) the representations and warranties of Buyer contained in Section 4.06 and Section 4.10 shall be true and correct in all respects at and as of the Closing Date, as if made at and as of such date;

(b) the Sale Order shall have been entered by the Bankruptcy Court and each such order shall be a Final Order and in full force and effect; and

(c) Buyer shall have delivered each of the items required by Section 2.05(d), and made each of the payments required by Section 2.05(e) to be made by Buyer at the Closing.

**ARTICLE IX**
**TERMINATION**

Section 9.01 *Grounds for Termination*. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Sellers and Buyer;

(b) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if the Closing shall not have been consummated on or before November 30, 2020 (the "End Date"), unless extended by mutual written agreement of the Parties;

(c) by Sellers upon written notice to Buyer or by Buyer upon written notice to Sellers if:

(i) a Governmental Authority of competent jurisdiction shall have issued an order, injunction or judgment or law that permanently restrains, prohibits, enjoins or declares illegal the transactions contemplated by this Agreement and such order, injunction or judgment becomes final and non-appealable; or

(ii) the Bankruptcy Court enters an order dismissing, or converting to a case under chapter 7 of the Bankruptcy Code, the Bankruptcy Cases, where such order was not requested, encouraged or supported by Sellers and Buyer;

(d) by Buyer upon written notice by Buyer to Sellers if:

(i) if Buyer is selected as the Successful Bidder at the Auction, at any time if Sellers file any motion, document, or pleading with the Bankruptcy Court to approve any Alternative Transaction, or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Sellers shall have breached any of their representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.02 and (A) such breach is not waived in writing by Buyer (subject to Sellers' right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Buyer to Resources specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Resources' receipt of such written notice from Buyer; or

(iii) [Reserved];

(iv) [Reserved];

(v) the Sale Order is amended, modified, vacated, reversed, or terminated without the prior written consent of Buyer;

(vi) [Reserved]; or

(vii) any condition set forth in Section 8.01 or Section 8.02 that has not been waived by Buyer shall have become incapable of being satisfied by the End Date;

*provided* that each deadline set forth in clauses (i) and (ii) of this Section 9.01(d) shall be subject to the Bankruptcy Court's docket, and accordingly, (A) shall be deemed extended through the date

of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (B) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, Sellers are unable to conclude such hearing(s) prior to such deadline and (C) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (A) and (B), cannot be complied with prior to such deadline; or

(e) by Sellers upon written notice by Sellers to Buyer if:

(i) the Bankruptcy Court shall have approved any Alternative Transaction or Sellers shall have entered into any definitive agreement with respect to any Alternative Transaction;

(ii) Buyer shall have breached any of its representations, warranties, covenants or other obligations contained in this Agreement which would give rise to the failure of a condition set forth in Section 8.03 and (A) such breach is not waived in writing by Sellers (subject to Buyer's right to cure such breach as described in clause (B)) or (B) solely to the extent such breach is capable of being cured, following written notice thereof from Sellers to Buyer specifying the reason such condition is unsatisfied, such breach remains uncured for a period of ten (10) Business Days after Buyer's receipt of such written notice from Sellers; or

(iii) any condition set forth in Section 8.01 or Section 8.03 that has not been waived by Sellers shall have become incapable of being satisfied by the End Date.

Notwithstanding the foregoing, (x) Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are then in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the condition to closing set forth in clauses (i) and (ii) of Section 8.02(a) shall not be satisfied or (B) such breach or failure to perform or comply by Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred, and (y) Buyer shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyer is then in breach of its representations and warranties or shall have failed to perform or comply with any of its covenants and agreements such that either (A) the condition to closing set forth in Section 8.03(a) shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.

Section 9.02 *Effect of Termination.*

(a) If the obligation to close the transactions contemplated by this Agreement is terminated pursuant to any provision of Section 9.01, then, except for the provisions of Section 5.04(b), Section 7.04, this Section 9.02 and Article XIV and such of the defined terms on Exhibit

A necessary to give context to the surviving provisions, this Agreement shall forthwith become void and the Parties shall have no liability or obligation hereunder.

(b) If Sellers are entitled to terminate this Agreement pursuant to (i) Section 9.01(e)(ii), (ii) Section 9.01(e)(iii) as a result of Buyer's Willful Breach of this Agreement or (iii) Section 9.01(b) and, in the case of clause (iii), (A) Buyer is then in Willful Breach of this Agreement, or (B) Buyer has failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.02 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Sellers (or waived by Buyer), (2) each Seller is ready, willing and able to perform its obligations under Section 2.05, and (3) Buyer nevertheless fails to close, then, in each such event, Sellers shall be entitled to, at their option, (x) obtain specific performance in lieu of termination or (y) terminate this Agreement and receive a distribution of the Deposit Escrow Funds (or if Buyer terminates this Agreement pursuant to Section 9.01(b) at a time when Sellers had the right to terminate this Agreement and receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall be entitled to a distribution of the Deposit Escrow Funds) as liquidated damages for such termination (the Parties agree that the foregoing liquidated damages are reasonable considering all of the circumstances existing as of the Execution Date, shall not serve as a penalty and constitute the Parties' good faith estimate of the actual damages reasonably expected to result from such termination of this Agreement by Sellers). Sellers agree that, to the fullest extent permitted by Applicable Law, Sellers' rights set forth in the preceding sentence shall be the sole and exclusive remedies of Sellers (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if the Closing does not occur as a result of the termination of this Agreement in the circumstances described in this Section 9.02(b). Nothing herein shall be construed to prohibit Sellers from first seeking specific performance in accordance with the penultimate sentence of this Section 9.02(b), but thereafter terminating this Agreement and receiving a distribution of the Deposit Escrow Funds as liquidated damages in lieu of fully prosecuting its claim for specific performance. Each Party acknowledges that the remedies at law of Sellers for a breach or threatened breach of this Agreement by Buyer as contemplated pursuant to this Section 9.02(b) may be inadequate and, in recognition of this fact, Sellers, without posting any bond or the necessity or proving the inadequacy as a remedy of monetary damages, and in addition to all other remedies that may be available, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available. If at any time Sellers are entitled to receive a distribution of the Deposit Escrow Funds pursuant to this Section 9.02(b), Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(c) If at any time after the Sale Hearing, Buyer is entitled to terminate this Agreement pursuant to (i) Section 9.01(d)(ii) as a result of a Seller's Willful Breach of this Agreement or (ii) Section 9.01(b) and, in the case of clause (ii), (A) a Seller is then in Willful Breach of this Agreement, or (B) Sellers have failed to close in the instance where, as of the End Date, (1) all of the conditions in Section 8.01 and Section 8.03 (in each case excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied by Buyer (or waived by Sellers), (2) Buyer is ready, willing and able to perform its obligations under Section 2.05, and (3) Sellers nevertheless fails to close, or if Sellers terminate this Agreement pursuant to either Section 9.01(b) at a time when Buyer had the right to terminate this Agreement for the reasons

described in this Section 9.01(c), then, in each such event, Buyer shall be entitled to (x) terminate this Agreement (in which event Buyer shall be entitled to a return of the Deposit Escrow Funds) and seek to recover its actual, direct damages up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds or (y) subject to entry of the Sale Order, obtain specific performance in lieu of termination. Sellers agree that, to the extent Buyer is entitled to recover its actual, direct damages (up to an aggregate amount not to exceed the amount of the Deposit Escrow Funds) pursuant to an order of the Bankruptcy Court, any such amounts shall be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, and that Sellers shall not contest the characterization of such amounts as administrative expenses. Buyer agrees that, to the fullest extent permitted by Applicable Law, Buyer's rights set forth in the preceding sentence shall be the sole and exclusive remedies of Buyer (other than with respect to those provisions that survive termination pursuant to Section 9.02(a)) if Buyer has the right to terminate this Agreement in the circumstances described in this Section 9.02(c).

(d) Subject to and without limiting Section 9.01(c), if at any time after the Sale Hearing (i) Sellers terminate this Agreement pursuant to Section 9.01(e)(i) or (ii) Buyer terminates this Agreement pursuant to Section 9.01(d)(i), then in any such case, in addition to returning to Buyer the Deposit Escrow Funds, Sellers shall reimburse and pay to Buyer an amount equal to the reasonable and documented out of pocket expenses incurred by Buyer in connection with the Transactions, up to a maximum of $750,000 (the "Expense Reimbursement"), which Expense Reimbursement shall be payable within ten (10) days following such termination. Notwithstanding anything contained herein to the contrary, Buyer agrees that, upon any termination of this Agreement under circumstances where the Expense Reimbursement is payable by Sellers and such Expense Reimbursement is paid in full to Buyer by Sellers, Buyer shall be precluded from any other remedy against Sellers, at law or in equity or otherwise, and Buyer shall not seek to obtain any recover, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against Sellers or any of their respective Representatives, equityholders or Affiliates in connection with this Agreement or the Transactions and Sellers and their respective Representatives, equityholders and Affiliates shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Transactions. Sellers' obligation to pay the Expense Reimbursement, as provided herein, shall constitute an administrative expense Claim against any Seller under section 503(b) or 507(a)(2) of the Bankruptcy Code.

(e) If this Agreement is terminated prior to the Closing by Sellers or by Buyer pursuant to Section 9.01 other than under the circumstances described in Section 9.02(b), within two (2) Business Days after such termination, Sellers shall promptly deliver written instructions to the Escrow Agent and Buyer instructing the Escrow Agent to distribute to Sellers all of the Deposit Escrow Funds.

(f) Subject to this Section 9.02, upon the termination of this Agreement, neither Party shall have any other liability or obligation hereunder, and Sellers shall be free to immediately enjoy all rights of ownership of the Assets and to sell, transfer, encumber or otherwise dispose of the Assets to any Person without any restriction under this Agreement.

## ARTICLE X
## CASUALTY LOSS

Section 10.01 *Casualty Loss.*

(a) Notwithstanding anything herein to the contrary, Buyer shall assume all risk of loss with respect to the Assets from and after the Effective Time, including with respect to production of Hydrocarbons through normal depletion (including watering out of any Well, collapsed casing or sand infiltration of any Well) and the depreciation of any Asset due to ordinary wear and tear.

(b) As used herein, the term "Casualty Loss" means any destruction by fire, blowout, storm or other casualty or any taking in condemnation or expropriation or under the right of eminent domain, in each case with respect to all or any material portion of the Oil and Gas Properties to the extent such destruction or taking occurred during the Interim Period. If any Casualty Loss occurs during the Interim Period, notwithstanding such Casualty Loss, Buyer shall acquire all Oil and Gas Properties that suffer such Casualty Loss and all rights to receive all unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss, and reduce the Purchase Price by an amount equal to all sums paid to Sellers prior to Closing as insurance proceeds, awards or other payments arising out of such Casualty Loss and Sellers shall not voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Buyer; *provided, however,* that Sellers shall reserve and retain (and Buyer shall assign to Sellers) all rights, title, interests and claims against Third Parties for the recovery of Sellers' costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims or other rights against Third Parties with respect to any such Casualty Loss.

## ARTICLE XI
## RESERVED

## ARTICLE XII
## RESERVED

## ARTICLE XIII
## SURVIVAL AND INDEMNIFICATION

Section 13.01 *Survival; Limited Recourse Against Sellers.*

(a) Other than the Special Warranty, the representations and warranties of Sellers contained herein and in any certificate or other writing delivered by Sellers pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability (whether arising in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which any entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims)) thereafter in respect thereof. The Special Warranty shall survive the Closing until the Cut-Off Date. Each of the covenants of Sellers contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in

accordance with this Agreement or, (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant. The intended effect of termination of representations, warranties, covenants and agreements is to bar, from and after the date of termination, any claim or cause of action based on (x) the alleged inaccuracy of such representation or breach of such warranty or (y) such alleged breach or failure to fulfill such covenant or agreement; *provided* that if a written notice of any claim with respect to any covenant to be performed after Closing is given to Sellers prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

(b) Except with respect to any Excluded Assets or Excluded Liabilities and without limiting the Special Warranty, Buyer shall have no recourse against any Seller Indemnified Party or any of their Affiliates or their respective lenders or creditors from and after Closing for any Losses relating to the Assets or this Agreement (including title and environmental matters) or Sellers' breach of any representations and warranties, covenants or other provision of this Agreement, subject to Buyer's rights under Section 14.11 with respect to those covenants of Sellers the performance of which is to take place after Closing, as contemplated by Section 13.01(a).

(c) Subject to Section 13.01(a), the remainder of this Agreement shall survive the Closing without time limit. Representations, warranties, covenants, obligations and agreements of Sellers shall be of no further force and effect after the date of their expiration as set forth in Section 13.01(a). For the avoidance of doubt, nothing in this Agreement shall prohibit Sellers from ceasing operations or winding up its affairs following the Closing.

(d) Any representation and warranty insurance policy obtained by Buyer in connection with the transactions contemplated by this Agreement shall include a complete and unconditional (except in cases of fraud) waiver of subrogation and contribution rights against all of the Seller Indemnified Parties, and neither Buyer nor any of its Affiliates shall amend or waive such waiver in any respect without the prior written consent of Sellers.

Section 13.02 *Indemnification by Buyer*. From and after Closing, Buyer hereby assumes and agrees to release, defend, indemnify and hold Sellers and their Affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors (collectively, the "Seller Indemnified Parties") harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses (individually, a "Loss" and, collectively, "Losses") based upon, attributable to or resulting from:

(a) any breach of any representation or warranty of Buyer set forth in Article IV, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer pursuant to this Agreement;

(b) any breach of any covenant or other agreement on the part of Buyer under this Agreement;

(c) the Assumed Liabilities;

(d) any Buyer Taxes; and

(e) any other indemnity obligations of Buyer and its Affiliates expressly set forth in this Agreement.

Section 13.03 *Indemnification Procedures.*

(a) In the event that any Proceedings shall be instituted or that any claim or demand shall be asserted by any Indemnified Party in respect of which payment may be sought under Section 13.02 (an "Indemnification Claim"), the Indemnified Party shall reasonably and promptly cause written notice of the assertion of any Indemnification Claim of which it has knowledge which is covered by this indemnity to be forwarded to the Indemnifying Party. The Indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the Indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder. If the Indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, it shall within thirty (30) days (or sooner, if the nature of the Indemnification Claim so requires) notify the Indemnified Party of its intent to do so. If the Indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Indemnification Claim which relates to any Losses indemnified against hereunder, the Indemnified Party may defend against, negotiate, settle or otherwise deal with such Indemnification Claim. If the Indemnifying Party shall assume the defense of any Indemnification Claim, the Indemnified Party may participate, at his or its own expense, in the defense of such Indemnification Claim; *provided, however,* that such Indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the Indemnifying Party if (i) so requested by the Indemnifying Party to participate or (ii) in the reasonable opinion of counsel to the Indemnified Party a conflict or potential conflict exists between the Indemnified Party and the Indemnifying Party that would make such separate representation advisable; and *provided, further,* that the Indemnifying Party shall not be required to pay for more than one such counsel for all Indemnified Parties in connection with any Indemnification Claim. The Parties agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Indemnification Claim. Notwithstanding anything in this Section 13.03 to the contrary, neither the Indemnifying Party nor the Indemnified Party shall, without the written consent of the other party, settle or compromise any Indemnification Claim or permit a default or consent to entry of any judgment unless the claimant and such party provide to such other party an unqualified release from all liability in respect of the Indemnification Claim. If the Indemnifying Party makes any payment on any Indemnification Claim, the Indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Indemnified Party to any insurance benefits or other claims of the Indemnified Party with respect to such Indemnification Claim.

(b) After any final decision, judgment or award shall have been rendered by a Governmental Authority of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the Indemnified Party and the Indemnifying Party shall have arrived at a mutually binding agreement with respect to an Indemnification Claim hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by the Indemnifying Party pursuant to this Agreement with respect to such matter.

Section 13.04 *Express Negligence*. THE INDEMNIFICATION, RELEASE, ASSUMED LIABILITIES, WAIVER AND LIMITATION OF LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES IN QUESTION AROSE OR RESULTED SOLELY OR IN PART FROM THE SOLE, ACTIVE, PASSIVE, CONCURRENT OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR VIOLATION OF LAW OF OR BY ANY INDEMNIFIED PARTY; *PROVIDED*, *HOWEVER*, SUCH PROVISIONS SHALL NOT APPLY TO LIABILITIES, LOSSES, COSTS, EXPENSES AND DAMAGES TO THE EXTENT ARISING OUT OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNIFIED PARTIES. BUYER AND SELLERS ACKNOWLEDGE THAT THIS STATEMENT COMPLIES WITH THE EXPRESS NEGLIGENCE RULE AND IS CONSPICUOUS.

Section 13.05 *Tax Treatment of Indemnity Payments*. Sellers and Buyer agree to treat any indemnity payment made pursuant to this Article XIII as an adjustment to the Purchase Price for federal, state, local and foreign income tax purposes. Any indemnity payment under this Article XIII shall be treated as an adjustment to the value of the asset upon which the underlying Indemnification Claim was based, unless a final determination (within the meaning of section 1313 of the Code) with respect to the Indemnified Party or any of its Affiliates causes any such payment not to be treated as an adjustment to the value of the asset for United States federal income tax purposes.

Section 13.06 *Sole and Exclusive Remedy*. Except for the post-Closing payments contemplated in Section 2.07 and Section 7.07(a), the Special Warranty, the remedies provided in this Article XIII and in Section 14.11 shall be the sole and exclusive legal and equitable remedies of the Parties, from and after the Closing, with respect to this Agreement and the transactions contemplated hereby, and no Person will have any other entitlement, remedy or recourse, whether in contract, tort or otherwise, or whether at law or in equity, and regardless of the legal theory under which such entitlement, remedy or recourse may be sought or imposed (including all rights afforded by any statute which limits the effects of a release with respect to unknown claims), it being agreed that all of such other remedies, entitlements and recourse are expressly waived and released by the Parties to the fullest extent permitted by law. No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Sellers or any of their Affiliates (the "Seller Non-Party Group") shall have any liability for any obligations or liabilities of Sellers under this Agreement of or for any Claim based on, in respect of, or by reason of, the transactions contemplated hereby.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.01 *Notices*. All notices and communications which are required or may be given to a Party hereunder shall be in writing, addressed as indicated below and shall be deemed to have been duly given upon the earliest of: (a) if by personal delivery, then the date of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then the next Business Day, (b) if sent by U.S. certified mail, postage prepaid, return receipt requested, then the date shown as received on the return notice, (c) if sent by email, with delivery receipt to sender or upon an affirmative reply by email by the

intended recipient that such email was received, or (d) if by Federal Express overnight delivery (or other reputable overnight delivery service), the date shown on the notice of delivery if such date is a Business Day during normal business hours, or, if such date is not a Business Day during normal business hours, then on the next Business Day:

if to Buyer, to:

Mesquite Energy, Inc.
Pennzoil Place
700 Milam Street, Suite 600
Houston, Texas 77002
Attention: Gregory Kopel
Executive Vice President and General Counsel
Email: gkopel@mesquite-energy.com

with a copy to:

Foley & Lardner, LLP
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Attention: Timothy Spear
Email: tspear@foley.com

if to Sellers, to:

c/o Gavilan Resources Holdings, LLC
920 Memorial City Way, Suite 1400
Houston, Texas 77024
Attention: General Counsel
Email: john.zabaneh@gavilanresources.com

with a copy to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Rodney L. Moore
Samuel C. Peca
Email: rodney.moore@weil.com
samuel.peca@weil.com

The Parties may change the identity, address and email addresses to which such communications are to be addressed by giving written notice to the other Parties in the manner provided in this Section 14.01.

Section 14.02 *Amendments and Waivers.*

(a) Any provision of this Agreement may be amended or waived if but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No waiver by any Party of any condition, or any breach of any term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term, covenant, representation, or warranty. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 14.03 *Expenses*. Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 14.04 *Successors and Assigns/Liquidating Trust.*

(a) Subject to Section 14.04(b), the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; *provided* that neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto; *provided, however,* that Sellers may assign their respective rights and obligations under this Agreement to any liquidating trust or other representative of Sellers created or appointed pursuant to a Bankruptcy Court order; and *provided, further*, that Buyer may assign its rights and obligations under this Agreement to any Affiliate of Buyer without prior consent of Sellers, but no such transfer or assignment will release Buyer of its obligations hereunder or enlarge, alter or change any obligation of Sellers to Buyer.

(b) If a Liquidating Trust is established, from and after the formation of the Liquidating Trust all rights and obligations of Sellers under this Agreement shall accrue to and be for the benefit of an shall be exercisable by the Liquidating Trust, as provided by any order of the Bankruptcy Court and the Liquidating Trustee shall be entitled to exercise all of the rights of Sellers under this Agreement.

Section 14.05 *Governing Law.* EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT, THE TRANSACTION DOCUMENTS, AND ANY OTHER DOCUMENT OR INSTRUMENT DELIVERED PURSUANT HERETO, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT OR THE NEGOTIATION, EXECUTION, TERMINATION, PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICTS OF LAW OR PRINCIPLE THAT

MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION.

Section 14.06 *Jurisdiction*. Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement and the Transaction Documents (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01.

Section 14.07 *Waiver of Jury Trial*. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 14.08 *Counterparts; Effectiveness; Third Party Beneficiaries*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when all Parties shall have received a counterpart hereof signed by all of the other Parties. Until and unless all Parties have received a counterpart hereof signed by the other Parties, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties and their respective successors and assigns prior to Closing; *provided, however,* (a) the Seller Indemnified Parties are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Article XIII, (b) the Seller Non-Party Group are intended to be, and shall be, third party beneficiaries of the rights of Seller Indemnified Parties specified in Section 13.06 and (c) the Buyer Non-Recourse Parties are intended to be, and shall be, third party beneficiaries of Section 14.15. From and after the establishment of the Liquidating Trust, the Liquidating Trustee shall be a third party beneficiary of Sellers' rights under this Agreement.

Section 14.09 *Entire Agreement*. This Agreement, the Confidentiality Agreement and the other Transaction Documents constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 14.10 *Severability*. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable,

the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in. terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 14.11 *Specific Performance*. Without limiting Sellers' rights under Section 9.02(b), the Parties agree that, from and after Closing, irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (without posting any bond or other undertaking) or to enforce specifically the performance of the terms and provisions hereof in addition to any other remedy to which they are entitled at law or in equity.

Section 14.12 *Certain Acknowledgements and Limitations.*

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents. No implied obligation of good faith or fair dealing shall require any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation of good faith or fair dealing.

(b) WITHOUT LIMITING SECTION 13.03(b), UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY INDIRECT, CONSEQUENTIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), SPECIAL (WHICH SHALL NOT BE CONSTRUED TO INCLUDE DIRECT DAMAGES), PUNITIVE, INCIDENTAL, SPECULATIVE, EXEMPLARY OR PUNITIVE DAMAGES (INCLUDING DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS OPPORTUNITY) OF ANY KIND ARISING UNDER, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT (EXCEPT TO THE EXTENT INDEMNIFIABLE PURSUANT TO ARTICLE XIII BECAUSE PAYABLE BY SELLERS OR ANY SELLER INDEMNIFIED PARTY TO A THIRD PARTY).

Section 14.13 *Disclosure Schedules*. All references to Schedules and Disclosure Schedules in Article III of this Agreement refer to Schedules contained in the Disclosure Schedule. The information in the Disclosure Schedule constitutes exceptions, qualifications and/or supplements to particular representations or warranties of Sellers as set forth in this Agreement. The Disclosure Schedule shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the Ordinary Course of Business of, or required to be disclosed by, Sellers

or constitutes, individually or in the aggregate, a Seller Material Adverse Effect. Capitalized terms used in the Disclosure Schedule that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement. The captions contained in the Disclosure Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement. The statements in each Schedule of the Disclosure Schedule qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedule is apparent on its face.

Section 14.14 *Preparation of Agreement*. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 14.15 *No Recourse*. Notwithstanding anything that may be expressed or implied in this Agreement or any other Transaction Document, each Seller, on behalf of itself and its Affiliates and their respective representatives and the Seller Indemnified Parties, covenants, agrees and acknowledges that no Person other than Buyer (and its successors or assignees, as applicable) has any obligation hereunder and that, neither Sellers, their respective Affiliates or their respective representatives, or any Seller Indemnified Parties, shall have any right of recovery under this Agreement or any other Transaction Document against, and no personal liability under this Agreement or any Transaction Document shall attach to, any of Buyer's former, current or future debt or equity financing sources, equity holders, controlling Persons, directors, officers, employees, general or limited partners, members, managers, Affiliates or agents, or any former, current or future equity holder, controlling Person, director, officer, employee, general or limited partner, member, manager, Affiliate or agent of any of the foregoing (collectively, each of the foregoing but not including Buyer, a "Buyer Non-Recourse Party"), through Sellers or otherwise, whether by or through attempted piercing of the corporate, limited partnership or limited liability company veil, by or through a claim by or on behalf of Sellers or any Seller Indemnified Party against any Buyer Non-Recourse Party, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any applicable Law, whether in contract, tort or otherwise.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

SELLERS:

GAVILAN RESOURCES, LLC

By: ______________________________
Name: Dave Roberts
Title: Chief Executive Officer

GAVILAN RESOURCES
MANAGEMENT SERVICES, LLC

By: ______________________________
Name: Dave Roberts
Title: Chief Executive Officer

BUYER:

MESQUITE ENERGY, INC.

By: ______________________________
Name: Cameron W. George
Title: Chief Executive Officer

**Exhibit A**
**Definitions**

"1933 Act" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"365 Contracts" means all Applicable Contracts and other executory contracts and unexpired leases to which a Seller is a party that relate to the Assets, in each case that may be assumed by one or more Sellers pursuant to section 365 of the Bankruptcy Code.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Allocated Value" means, with respect to any Oil and Gas Property, the value of Sellers' interest therein as set forth on Schedule 1.01(a). If any Oil and Gas Property is not set forth on Schedule 1.01(a) or, if no value is set forth on Schedule 1.01(a) with respect to such Oil and Gas Property, the Allocated Value of such Oil and Gas Property shall be zero.

"Alternative Transaction" means, other than the Transactions or any transactions effected in the Ordinary Course of Business, any (a) sale, transfer or other disposition, directly or indirectly, of all or substantially all of the assets of Sellers (except any such sale, transfer or other disposition to the extent permitted by Section 5.01(b)), (b) issuance, sale, transfer or other disposition, in each case by any Seller, of any class of equity securities, ownership interests or voting securities of any Seller, (c) merger, consolidation, recapitalization, business combination or other similar transaction involving any Seller, (d) the consummation of any state court foreclosure action as to a material portion of the Assets or (e) successful credit bid transaction with respect to the Assets.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, as amended, the U.K. Bribery Act 2010, applicable anti-bribery legislation enacted by member states of the European Union and signatories implementing the OECD Convention Combating Bribery of Foreign Officials, and other similar laws and regulations applicable to the Sellers or their subsidiaries from time to time.

"Applicable Contracts" means (a) all Contracts (*provided* that, for clarity, any "Operating Agreement" or "Joint Operating Agreement" identified on the 365 Schedule shall be deemed a Contract for purposes of this definition) to which a Seller is a party or is bound to the extent covering, attributable to or relating to any of the Assets or to which an Oil and Gas Property is subject or bound, including, without limitation, operating agreements, crude oil, condensate and natural gas purchase and sale agreements, gathering agreements, transportation agreements, marketing, disposal or injection agreements, farmout and farmin agreements, unitization, pooling and communitization agreements, exploration agreements, development agreements, area of mutual interest agreements, exchange and processing contracts and agreements, partnership and joint venture agreements, confidentiality agreements and any other similar contracts, agreements and instruments, and all amendments thereto, and (b) all ROW Interests, including without

limitation, in the case of each of clause (a) and clause (b) of this definition, those Contracts and ROW Interests described on Annex C.

"Applicable Law" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, order, injunction or judgment adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"Applicable Schedule 3.06(a) Consent" means any Consent required to be set forth on Disclosure Schedule 3.06(a) (irrespective of whether such Consent is actually listed on Disclosure Schedule 3.06(a)) (a) relating to an Applicable Contract for which the counterparty's consent to assignment would be required for such Applicable Contract to be assumed and assigned to Buyer, after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code, or (b) that burdens a Lease.

"Assigned Contracts" means the Desired 365 Contracts and all other Applicable Contracts that are not 365 Contracts (other than Excluded Assets).

"Assumed Liabilities" means:

(a) all Property Expenses to the extent attributable to the Assets and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is increased pursuant to Section 2.04(a));

(b) all Liabilities (other than Property Expenses) that attach to or run with the Assets (excluding any personal Liabilities of Sellers or their Affiliates that are not attached to the Assets), to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Effective Time;

(c) other than the Excluded Environmental Liabilities, all Liabilities under, associated with or appurtenant to the Assets with respect to Environmental Claims, whether arising on, before or after the Effective Time, including without limitation those related to the control, storage, handling, or discharge of all materials, substances and wastes from the Assets (including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes);

(d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Assets, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits;

(e) Taxes allocated to Buyer pursuant to Section 7.07(a) and Section 7.07(c);

(f) all Liabilities related to the payment of Burdens (i) attributable to Buyer Hydrocarbons (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A)), (ii) attributable to Effective Time Hydrocarbons to the extent not paid or borne by Sellers as of Closing and (iii) arising out of, in connection with or attributable to the failure to pay or report, or mispayment or underpayment of, any Burdens attributable to Seller Hydrocarbons to the extent (and only to the extent) that Buyer realizes the economic benefit of such non-payment, mispayment or underpayment (but excluding any and all Liabilities related to

items 3 through 44 of Disclosure Schedule 3.10 or the facts or allegations forming the basis thereof, to the extent attributable to Seller Hydrocarbons);

(g) all of Sellers' Liabilities under the Leases and the Purchased Contracts arising on or after the Effective Time (excluding any default penalties, charges or interest pertaining to breaches, defaults or non-performance under such Leases or Purchased Contracts prior to Closing), subject to the immediately preceding clause (f);

(h) all of Sellers' Liabilities with respect to Imbalances with Third Parties attributable to the Assets; and

(i) all Liabilities with respect to the Cure Costs required to be paid by Buyer in accordance with Section 5.03(i);

*provided, however,* that notwithstanding anything to the contrary in clauses (a) through (i) above, the Assumed Liabilities shall not include (i) Seller Taxes, (ii) any Liabilities pertaining to the Excluded Assets, (iii) any Liabilities discharged or from which the Assets are otherwise released as of the Closing in accordance with the Sale Order, (iv) any Excluded Environmental Liability, (v) any Excess Cure Costs, (vi) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, (vii) claims, investigations, administrative proceedings, arbitration or litigation arising out of or resulting from actual or claimed personal injury; illness or death; other torts; private rights of action given under any Applicable Law; or violation of any Applicable Law, or (viii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters, each of which clauses (i) - (viii) shall be deemed an Excluded Liability.

"Auction" means the auction for the sale of the Assets to be conducted in accordance with the Bid Procedures.

"Auction Participant" has the meaning set forth in the Bid Procedures Order.

"Avoidance Action" means any claim, right or cause of action of Sellers arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"Bid Procedures" means the Bid Procedures attached as Exhibit 1 to the Bid Procedures Order.

"Bid Procedures Order" means the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* entered by the Bankruptcy Court on June 9, 2020 [Docket No. 115] in the Bankruptcy Cases, as amended by the *Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 215], the *Revised Order Pursuant to 11 U.S.C. §§ 363*

*and 105(a) for Modification of Sales Process* [Docket No. 268] entered on July 29, 2020, and the *Corrected Revised Order Pursuant to 11 U.S.C. §§ 363 and 105(a) for Modification of Sales Process* [Docket No. 278] entered on August 14, 2020 (as may be amended, supplemented or modified from time to time).

"Burden" means any and all Royalties, reversionary interests, net profits interests, production payments and other burdens upon, measured by or payable out of production.

"Business Day" means any day, excluding Saturdays, Sundays or legal holidays, on which commercial banks are open for business in New York, NY and Houston, TX.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a party.

"Buyer's Knowledge" means the actual knowledge of the executive officers of Buyer.

"Buyer Taxes" means any Taxes that are apportioned to Buyer under Section 7.07.

"Claim" means a claim against any Seller as defined in Bankruptcy Code section 101(5).

"Closing Date" means the date of the Closing.

"Confidentiality Agreement" means the Confidentiality and Non-Disclosure Agreement between Resources and Buyer dated September 28, 2020.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan.

"Contract" means any contract or agreement, but excluding, however, (a) any Lease, easement, right-of-way (including any ROW Interest) or other instrument, in each case, creating any oil and gas mineral interests or other real property interests, or (b) any Permit.

"Deposit Escrow Agreement" means that certain Escrow Agreement dated as of the Execution Date, by and among Sellers, Buyer and the Escrow Agent.

"Designation Deadline" means 5:00 p.m. (Central Prevailing Time) on the date that is two (2) Business Days prior to the Closing Date.

"Disclosure Schedule" means the letter dated as of the Execution Date, executed by Sellers and delivered to Buyer on the Execution Date in connection with the execution and delivery of this Agreement, which letter is identified therein as the Disclosure Schedule for purposes of this Agreement.

"Effective Time" means 7:00 a.m. (Central Prevailing Time) on April 1, 2020.

"Environmental Claim" means any obligation (whether presently existing or that would exist with the passage of time, giving of notice or both) to affect cleanup or remediation under, or resolve noncompliance with, any Environmental Law and any Liability associated with or arising

therefrom. For the avoidance of doubt, (a) the fact that a Well is no longer capable of producing sufficient quantities of oil or gas to continue to be classified as a "producing well" shall not form the basis of an Environmental Claim, (b) the fact that a pipe is temporarily not in use shall not form the basis of an Environmental Claim and (c) except with respect to personal property (i) that causes or has caused contamination of the environment (including air, soil, surface water or groundwater) or (ii) the use or condition of which is a violation of Environmental Law, the physical condition of any surface or subsurface personal property, including water or oil tanks, separators or other ancillary equipment, shall not form the basis of an Environmental Claim.

"Environmental Law" means any Applicable Law or any agreement with any Governmental Authority relating to human health and safety, pollution, protection of the environment or to pollutants, contaminants, wastes, chemicals, materials or toxic or other Hazardous Substances. The term "Environmental Laws" does not include good or desirable operating practices or standards that may be employed or adopted by other oil and gas well operators or recommended, but not required, by a Governmental Authority.

"Escrow Account" means the escrow account established pursuant to the Deposit Escrow Agreement.

"Escrow Agent" means that certain Third Party that is a party, as escrow agent, to the Deposit Escrow Agreement and the Post-Closing Escrow Agreement, as applicable.

"Excess Cure Costs" means (i) any Cure Costs attributable to any period prior to the Effective Time (whether constituting a Property Expense or otherwise) and (ii) any Cure Costs with respect to the JDA (to the extent the JDA is a Desired 365 Contract) or with respect to Contracts that are identified as "Operating Agreements" or "Joint Operating Agreements" on the 365 Schedule (which are required to be Desired 365 Contracts), in each case, that do not constitute Property Expenses attributable to the period on or after the Effective Time, as determined (for purposes of this clause (ii)) disregarding any Cure Costs described in clause (i) above.

"Excluded Environmental Liabilities" means all Liabilities relating to, associated with or appurtenant to (i) the migration, disposal, or transportation (or arrangement therefor) of any Hazardous Substances by or on behalf of Sellers off the premises of the Assets; and (ii) any fines or penalties relating to violations of Environmental Law, in each case resulting from facts or circumstances existing or occurring on or prior to the Petition Date.

"Excluded Records" means any items that are (a) Tax records that relate to the business of Sellers generally, (b) not transferable without payment of additional consideration (unless Buyer has agreed in writing to pay such additional consideration), (c) employee files and personnel records and employment benefits files and records (other than, in each case, for any Continuing Employees), (d) legal records and legal files of Sellers, including all work product of and attorney-client communications with Sellers' legal counsel or any other documents or instruments, in each case that may be protected by an attorney-client privilege (but excluding any title opinions or environmental, health and safety reports, or any such records that relate to the Assumed Liabilities), (e) reserve reports, valuations, and estimates of any quantities of Hydrocarbons or the valuation thereof with respect to the Assets, and any Hydrocarbon or other Hydrocarbon pricing assumptions, forward Hydrocarbon or other pricing estimates, Hydrocarbon or price decks, or

Hydrocarbon or pricing studies related thereto, (f) economic projections, (g) data, correspondence, materials, documents, descriptions or records relating to the Auction, marketing, sales negotiation or sale of any of the Assets, including the existence or identities of any prospective inquirers, bidders or prospective purchasers of any of the Assets, any bids received from and records of negotiations with any such prospective purchasers and any analyses of such bids by any Person, (h) correspondence between or among any Seller or its Affiliate or their respective representatives, and any prospective purchaser other than Buyer, and correspondence between any Seller or its Affiliates or any of their respective representatives with respect to any of the bids, the prospective purchasers or the Transactions, or (i) copies of the Data that relate to both the Assets and any Excluded Assets.

"Existing Letters of Credit" means all performance bonds, surety bonds, letters of credit, guarantees, security deposits and similar assurances in effect as of the Execution Date that relate to the Oil and Gas Properties.

"Expenses" means any and all notices, actions, suits, proceedings, claims, demands, assessments, judgments, costs, penalties and expenses, including attorneys' and other professionals' fees and disbursements incident to the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (a) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (b) with respect to which no stay shall be in effect.

"Free and Clear" means free and clear of all claims, encumbrances, Liens or Liabilities other than the Assumed Liabilities and Permitted Liens, in each case to the maximum extent permitted by section 363(f) of the Bankruptcy Code.

"Fundamental Representations" means the representations of Sellers set forth in Section 3.01, Section 3.02, Section 3.03, Section 3.04 and Section 3.18.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, administrative body, agency or official, including any political subdivision thereof, or any tribal authority.

"Hazardous Substances" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including petroleum, its derivatives, by-products and other Hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

"Imbalance" or "Imbalances" means any over-production, under-production, over-delivery, underdelivery or similar imbalance of Hydrocarbons produced from or allocated to the Oil and Gas Properties, regardless of whether such over-production, under-production, over-delivery, underdelivery or similar imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"Imbalance Adjustment Amount" means the product of (a) any Imbalance allocated to the Oil and Gas Properties as of the Effective Time *multiplied by* (b) the Imbalance Price (which product shall be a positive number if such Imbalance is owed to Sellers by a Third Party and a negative number if such Imbalance is owed by Sellers to a Third Party).

"Imbalance Price" means the settlement price applicable to the Hydrocarbons that are the subject of the Imbalance under the applicable balancing agreement or, if no balancing agreement applies (or if the applicable balancing agreement does not provide for cash settlement), the market price for such Hydrocarbons as of the Effective Time.

"Indemnified Party" means a Party entitled to indemnification under Article XIII, whether on behalf of itself or, with respect to Sellers, any of the Seller Indemnified Parties.

"Indemnifying Party" means a Party from whom indemnification is sought under Article XIII by an Indemnified Party.

"Initial Highest Bid" has the meaning set forth in the Bid Procedures Order.

"Intellectual Property" means inventions and invention, disclosures; patents and patent applications (including statutory invention registrations); trademarks, service marks, logos, trade dress, trade names, Web addresses, domain names, and other indicia of commercial source or origin, including registrations and applications for registration thereof, and goodwill associated with any of the foregoing; copyrights, including registrations and applications for registration thereof; trade secrets, know-how, software, formulae, customer lists, data (including seismic data), processes, protocols, specifications, analyses, plans, techniques, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as notebooks, samples, studies and summaries); and other proprietary rights and intellectual property.

"Interim Period" means the period commencing at the Effective Time and ending at 7:00 a.m. (Central Prevailing Time) on the Closing Date.

"JDA" means that certain Joint Development Agreement dated March 1, 2017, by and among SN EF Maverick, LLC, SN EF Unsub, LP and Gavilan Resources, LLC (as amended).

"Liability" means any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured.

"Lien" means, with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and

other consensual or non-consensual lien, whenever granted and including without limitation those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code.

"Liquidating Trust" means a liquidating or similar trust as may be established with respect to Sellers' estates in conjunction with the Bankruptcy Cases.

"Liquidating Trustee" means the Trustees or other representative of the Liquidating Trust.

"Net Revenue Interest" or "net revenue interest" means the percentage share in all oil, gas and other Hydrocarbons produced from or allocated to a Conveyed Well or Lease after giving effect to all Burdens applicable thereto.

"Maverick Basin Area Participation Agreement" means that certain Maverick Basin Area Participation Agreement by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP Texas dated as of March 17, 2011 but effective as of January 1, 2011, as amended if amended.

"Non-Income Tax" means any Tax imposed on or with respect to the Assets other than any U.S. federal income tax, income tax imposed by any state or subdivision of the U.S., franchise tax (including the Texas Margin Tax) or Transfer Tax, but including any property tax, severance tax, production tax and sales and use tax.

"Oil and Gas Interests" means (a) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (b) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (c) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (d) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Seller has an ownership interest.

"Oil and Gas Lease" means any contract or agreement pursuant to which Sellers lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

"Ordinary Course of Business" means the ordinary course of business of Sellers, consistent in all material respects with past custom and practice of Sellers, including reasonable and prudent changes in response to the COVID-19 pandemic and governmental actions related thereto. Without limiting the effect of the foregoing, the term "Ordinary Course of Business" as used herein shall be no broader than the term "ordinary course of business" as used in section 363 of the Bankruptcy Code.

"Organizational Documents" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"Permits" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

"Person" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"Plan" means, if applicable, the joint plan of reorganization of Sellers under chapter 11 of the Bankruptcy Court with respect to the Bankruptcy Cases.

"Post-Closing Escrow Account" means the escrow account with respect to the Settlement Statement Escrow Amounts pursuant to the Post-Closing Escrow Agreement.

"Post-Closing Escrow Agreement" means that certain Escrow Agreement by and among Sellers, Buyer and the Escrow Agent, dated as of the Closing Date, and substantially in the form of Exhibit G attached hereto.

"Proceeding" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"Property Expenses" means all expenses, charges, capital expenses, joint interest billings, lease operating expenses, exploration expenses, production expenses, development expenses, drilling expenses, workover expenses, marketing fees and expenses, gathering, treating, transportation and processing fees and expenses, and any other exploration or development expenditures charged or incurred under applicable Oil and Gas Leases, operating agreements or other Purchased Contracts, that are attributable to the ownership, maintenance and operation of Sellers' interest in the Oil and Gas Properties during the period in question, and shall expressly include without limitation (a) all capital expenditures, including drilling costs, reworking costs, shut-in royalties and all other capital expenditures incurred in connection with the development, exploration, operation and maintenance of the Oil and Gas Properties during the Interim Period (and, for such amounts incurred after the Execution Date, only insofar as such amounts are incurred in accordance with the terms of this Agreement); (b) amounts paid under the Purchased Contracts (excluding any default penalties, charges or interest); and (c) overhead charges charged by Third Parties with respect to Oil and Gas Properties; *provided* that Property Expenses shall not include any costs, expenses or other Liabilities for or attributable to: (i) personal injury or death, property damage, torts, breach of

contract or violation of any Applicable Law; (ii) obligations relating to the abandonment or plugging of Wells, dismantling or decommissioning facilities, closing pits and restoring the surface around such Wells, facilities and pits; (iii) obligations with respect to Imbalances; (iv) obligations to pay Burdens or other interest owners revenues or proceeds attributable to sales of Hydrocarbons relating to the Assets; (v) obligations with respect to hedging Contracts; (vi) obligations with respect to Taxes; (vii) amounts (if any) incurred to obtain any Required Consent; (viii) any amounts incurred to cure or attempt to cure any breaches of this Agreement or any Casualty Loss; (ix) deficiency payments; (x) any costs to maintain credit support associated with the Assets (including any Existing Letters of Credit); (xi) any Party's Expenses incurred in connection with negotiating this Agreement or consummating the Transaction; (xii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters; (xiii) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, and (xiv) claims for indemnification or reimbursement from any Third Party with respect to costs of the types described in the preceding clauses (i) through (xiii), whether such claims are made pursuant to contract or otherwise

"Release Agreement" means a Release Agreement substantially in the form of Exhibit H attached hereto.

"Representatives" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"ROW Interests" means all contracts and agreements pursuant to which Sellers hold any interest in any easement, right-of-way, license, crossing right and other subsurface interest (other than the Leases) used or held for use in connection with the ownership or operation of the Oil and Gas Properties, including the gathering or transportation of Hydrocarbons produced therefrom.

"Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

"Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

"Sale Hearing" has the meaning set forth in the Bid Procedures Order.

"Sale Order" means an order or orders of the Bankruptcy Court in the form and containing such terms, to the extent such terms pertain to the transactions contemplated by this Agreement, as are reasonably acceptable to Buyer and Sellers, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Sellers to consummate the Transactions; *provided* that, such order may be the Confirmation Order.

"Sanctioned Person" means at any time any Person: (a) listed on any Sanctions-related list of designated or blocked persons; (b) resident in or organized under the laws of a country or territory that is the subject of comprehensive restrictive Sanctions (including Cuba, Iran, North Korea, Syria, and the Crimea region); or (c) majority-owned (in the aggregate) or controlled by any of the foregoing.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (i) the United States, (ii) the United Nations Security Council, (iii) the European Union, (iv) the United Kingdom, and (v) the respective governmental institutions of any of the foregoing including, without limitation, Her Majesty's Treasury, the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of Commerce, and the U.S. Department of State.

"Seller Material Adverse Effect" means a material adverse effect on (a) the ownership or value (as determined relative to the Purchase Price) of the Oil and Gas Properties, taken as a whole, as currently owned and used as of the Execution Date or (b) the ability of Sellers to perform their respective obligations under the Transaction Documents or consummate the Transactions; *provided* that any such material adverse effect that results from any of the following matters shall not be taken into account in determining whether a material adverse effect has occurred under clause (a) or clause (b) of this definition: (i) entering into this Agreement or the announcement of the Transactions; (ii) changes in financial or securities markets generally; (iii) changes in general economic or political conditions in the United States or worldwide, except to the extent disproportionately affecting Sellers or the Assets; (iv) changes in conditions or developments generally applicable to the oil and gas industry in the area where the Assets are located, including, but not limited to, changes in the market price of oil and natural gas; (v) acts of God, including hurricanes, storms or other naturally occurring events; (vi) acts or failures to act of Governmental Authorities, except as a result of any action or inaction by or on behalf of Sellers; (vii) matters disclosed on any Exhibit or Annex or in the Disclosure Schedule (but subject in all instances to Section 7.08 with respect to any Supplemental Disclosures); (viii) actions taken or omissions made after the Execution Date as expressly required under this Agreement or taken or omitted with the express written consent of Buyer; (ix) any epidemic, pandemic or disease outbreak (including the COVID-19 virus) or hostilities, terrorist activities or war or any similar disorder and, in each case, governmental actions related thereto; (x) matters that are cured or no longer exist by the earlier of Closing and the termination of this Agreement, including matters to the extent a purchase price adjustment is provided for under this Agreement; (xi) any change in laws or in GAAP and any interpretations thereof from and after the Execution Date; (xii) Casualty Losses; (xiii) any reclassification or recalculation of reserves in the Ordinary Course of Business; (xiv) natural declines in well performance; (xv) the commencement or pendency of the Bankruptcy Cases; (xvi) the departure of officers or directors of Sellers after the Execution Date; (xvii) any objections in the Bankruptcy Court to (A) this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, (B) the reorganization of any Seller and any related plan of reorganization or disclosure statement or (C) the Bid Procedures or the sale motion; and (xviii) any order of the Bankruptcy Court (except any such order that would preclude or prohibit Sellers from consummating the Transactions) or any actions or omissions of Sellers in compliance therewith.

"Seller Tax Period" means any Tax period for which only Sellers are apportioned Taxes under Section 7.07.

"Seller Taxes" means any Taxes that are apportioned to Sellers under Section 7.07.

"Sellers' Knowledge" means the actual knowledge of Dave Roberts, George Fairchild, John Zabaneh, Joe Ketzner and Jeff Mobley.

"Special Warranty" means the special warranty of Acceptable Title described on Exhibit I.

"Springfield Gathering Contracts" means (a) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC, (b) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated as of June 1, 2017, by and between Resources and Springfield Pipeline LLC and (c) that certain Springfield Gathering Assumption Agreement dated as June 1, 2017, by and among Sanchez Energy Corporation, Anadarko E&P Onshore, LLC and Kerr-Mcgee Oil & Gas Onshore, LP.

"Straddle Tax Period" means any Tax period for which both Sellers and Buyer are apportioned Taxes under Section 7.07.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"Successful Bidder" has the meaning set forth in the Bid Procedures Order.

"Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under this Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

"Tax" means (a) any tax, levy, unclaimed property and escheat obligation, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), and (b) any liability for any of the foregoing that arises by reason of a contract, assumption, transferee or successor liability, operation of Applicable Law (including by reason of participation in a consolidated, combined or unitary Tax Return) or otherwise.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Taxing Authority" has the meaning set forth in the definition of Tax.

"Third Party" means any Person other than a Party or its Affiliates.

"Transaction Documents" means this Agreement, the Assignment and Bill of Sale, the Assumption Agreement, any other agreement between or among Buyer and any Seller that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents and instruments entered into by Buyer, on the one hand, and a Seller, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the transactions contemplated hereby (as each such document, agreement and instrument may be amended, supplemented or modified).

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of Assets Free and Clear for the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement and the other Transaction Documents.

"Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

"Willful Breach" means, with respect to any Party, that such Party knowingly does one or more of the following: (a) such Party willfully and intentionally breaches in any material respect (by refusing to perform or taking an action prohibited) any material pre-Closing covenant, obligation or agreement applicable to such Party, or (b) such Party willfully and intentionally causes any of its representations or warranties under this Agreement to not be true and correct in all material respects after the Execution Date and prior to the Closing Date. For clarity, if a Party is obligated hereunder to use its commercially reasonable efforts to perform an action or to achieve a result, the failure to use such commercially reasonable efforts would constitute a willful and intentional breach of this Agreement.

"Working Interest" or "working interest" means a fraction or percentage of the costs and expenses associated with the maintenance, exploration, development, operation and abandonment of any Lease or Conveyed Well, but without regard to the effect of any Burdens.

(b) Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
|---|---|
| 365 Schedule | 5.03(a) |
| Acceptable Title | Exhibit I |
| Accounting Firm | 7.07(d) |
| Adjusted Purchase Price | 2.03 |
| Agreement | Preamble |
| Allocation | 7.07(d) |
| Asset | 2.01 |
| Assignment and Bill of Sale | 2.05(c)(i) |
| Assumption Agreement | 2.05(c)(iii) |
| Audit Fees | 2.06(f) |
| Bankruptcy Cases | Recitals |
| Buyer | Preamble |
| Buyer Hydrocarbons | 2.01(d) |
| Buyer Non-Recourse Party | 14.15 |
| Casualty Loss | 10.01(b) |
| Chosen Courts | 14.06 |
| Closing | 2.05 |
| Closing Amount Overpayment | 2.07(b) |
| Closing Amount Shortfall | 2.07(a) |
| Closing Date Adjusted Purchase Price | 2.04(d)(i) |

| Term | Section |
|---|---|
| Closing Statement | 2.04(d)(i) |
| Code | 3.14(f) |
| Compensation Schedule | 7.06(b) |
| Consent | 3.06 |
| Consent Notice | 2.13 |
| Continuing Employee | 7.06(b) |
| Conveyed Wells | 2.01(b) |
| Cure Costs | 5.03(i) |
| Cut-Off Date | 2.06(g) |
| Data | 2.01(f) |
| Defect Deductible | Exhibit I |
| Defect Excess | Exhibit I |
| Deposit Escrow Funds | 2.09(a) |
| Desired 365 Contracts | 5.03(b) |
| Effective Time Hydrocarbons | 2.01(d) |
| Employment Offer | 7.06(a) |
| End Date | 9.01(b) |
| Equipment | 2.01(c) |
| Equitable Limitations | 3.03 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.05(b) |
| Execution Date | Preamble |
| Expense Reimbursement | 9.02(d) |
| Final Settlement Statement | 2.06(a) |
| Indemnification Claim | 13.03(a) |
| Lands | 2.01(a) |
| Leases | 2.01(a) |
| Letters in Lieu | 2.05(c)(ii) |
| Loss | 13.02 |
| Losses | 13.02 |
| ManagementCo | Preamble |
| Material Contract | 3.05(a) |
| Objection Notice | 2.06(c) |
| Oil and Gas Properties | 2.01(a) |
| Parties | Preamble |
| Party | Preamble |
| Permitted Liens | Exhibit I |
| Petition Date | Recitals |
| Post-Closing Consent Period | 2.13(c) |
| Preferential Purchase Rights | 3.17 |
| Pre-Paid Cure Costs | 5.03(i) |
| Prorated Expense Items | 2.04(c)(ii) |
| Purchase Price | 2.03 |
| Purchased Contracts | 2.01(g) |
| PwC | 2.06(d) |

| Term | Section |
|---|---|
| Referee | 2.06(d) |
| Required Consent | 2.13(a) |
| Resources | Preamble |
| Seller | Preamble |
| Seller Employee | 7.06(a) |
| Seller Hydrocarbons | 2.02(d) |
| Seller Indemnified Parties | 13.02 |
| Seller Non-Party Group | 13.06 |
| Sellers | Preamble |
| Settlement Statement Escrow Amounts | 2.06(g) |
| Supplemental Disclosure | 7.08 |
| Tax Proceeding | 7.05 |
| Taxing Authority | Exhibit A |
| Title Defect | Exhibit I |
| Title Well | Exhibit I |
| Transfer Taxes | 7.07(c) |

(c) *References and Rules of Construction. The* words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Annexes, Exhibits and Schedules are to Articles, Sections, Annexes, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits, Annexes and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The word "extent" in the phrase "to the extent" shall mean the degree or proportion to which a subject or other things extends, and such phrase shall not mean simply "if." References to any date shall mean such date in Houston, Texas and for purposes of calculating the time period in which any notice or action is to be given or undertaken

hereunder, such period shall be deemed to begin at 12:01 a.m. on the applicable date in Houston, Texas. If a date specified herein for giving any notice or taking any action is not a Business Day (or if the period during which any notice is required to be given or any action taken expires on a date which is not a Business Day), then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next day which is a Business Day. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. **THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.**

**Exhibit B**

**ASSIGNMENT AND BILL OF SALE**

THE STATE OF [____________]

COUNTY OF [____________]

THIS ASSIGNMENT AND BILL OF SALE (this "Assignment and Bill of Sale") is executed and delivered by Gavilan Resources, LLC, a Delaware limited liability company, and Gavilan Resources Management Services, LLC, a Delaware limited liability company (each an "Assignor" and collectively, the "Assignors"), each with an address of c/o Gavilan Resources Holdings, LLC, 920 Memorial City Way, Suite 1400, Houston, Texas 77024, to Mesquite Energy, Inc., a Delaware corporation ("Assignee"), with an address of 700 Milam Street, Suite 600, Houston, Texas 77002, and is made to be effective as of 7:00 a.m., April 1, 2020, Central Prevailing Time (the "Effective Time"). Reference is made to that certain Asset Purchase Agreement, dated October 16, 2020, by and between Assignors, as Sellers, and Assignee, as Buyer (the "Purchase Agreement"). All capitalized terms used herein that are not otherwise defined herein shall have the meanings attributed to such terms in the Purchase Agreement.

1. For and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignors hereby transfer and convey to Assignee all of their respective right, title and interest, if any, in and to the properties and interests described in clauses (a) through (k) below (the "Assets") in their "as is" and "where is" condition and without warranty of title of any kind:

(a) Oil and Gas Properties. All Oil and Gas Interests located in the Sale Area (whether the interest of Assignors in such properties is fee interests, leasehold interests, subleases, licenses, concessions, working interests, farmout rights, Royalty, production payments, net profit interests, overriding royalty or other non-working, non-operated or carried interests, reversionary interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties), including all rights, title and interests in, to or arising under (i) the Oil and Gas Leases located in the Sale Area, including the Oil and Gas Leases described on Annex A (the "Leases"), together with all rights and powers conferred upon Assignors as the holder of such Leases with respect to the use and surface of the Lands covered thereby, (ii) the lands covered by the Leases or otherwise located in the Sale Area, including the lands described on Annex A and lands included in any units with which the Leases or the lands covered thereby or otherwise located in the Sale Area may have been pooled, unitized or communitized (the "Lands") and (iii) the oil, gas and other minerals in and under or that may be produced from the Lands, whether or not such Lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Assignors' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties"; the term Oil and Gas Properties shall be deemed to include all Conveyed Wells);

(b) Wells. All Wells located on the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto (the "Conveyed Wells");

(c) Equipment. All equipment, machinery, fixtures, buildings, structures, physical assets and facilities (whether operational or not operational), including all oil and gas production, gathering, transmission, treating, processing, and storage facilities, tanks, tank batteries, pipelines and gathering systems, Well equipment, casing, tubing, pumps, pipes, valves, meters, motors, compressors, compression equipment, scrubbers, spare parts, pipeline markers, vents, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on Wells, regulators, gathering lines, fittings, processing and separation facilities, meters, separators, heaters, treaters, boilers, inventory, improvements, and other personal, mixed, or movable property or interests and appurtenances relating thereto, in each case, located within the Sale Area or otherwise used in connection with the ownership of the Oil and Gas Properties (the "Equipment");

(d) Hydrocarbons. All Hydrocarbons (i) produced from the Oil and Gas Properties that are in storage or existing at the Effective Time in stock tanks, pipelines and/or plants (including line fill and inventory) and not past a sales measuring point at the Effective Time and (ii) produced from or allocated to the Oil and Gas Properties on or after the Effective Time and all proceeds attributable thereto ("Buyer Hydrocarbons");

(e) Surface Rights. To the extent assignable by Assignors to Assignee, all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, and similar rights and interests (if any) used in connection with the Oil and Gas Properties or otherwise located in the Sale Area;

(f) Information and Data. All books, records, files, reports, data and information to the extent relating to the Assets, including without limitation: (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments, (ii) to the extent assignable by Assignors to Assignee, and subject to the payment by Assignee of any fees required as a condition to the assignment thereof to Assignee, geophysical, geological, engineering, seismic, exploration, production reports, core data, pressure data and other technical data and information, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, (iii) contract files, (iv) facility files (including construction records), (v) Well files, (vi) environmental, health and safety records and information, and (vii) other books, records and files containing financial, accounting, Non-Income Tax, title or other information (such materials, excluding the Excluded Records, the "Data"); *provided*, *however*, that (1) Assignee's right with respect to Data pursuant to clause (ii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (*provided* that Assignors shall use commercially reasonable efforts prior to the Closing to obtain any consent to such assignment and disclosure to the extent such restrictions exist, but shall not be required to

pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from Third Parties shall accrue to Assignee only to the same extent as such rights are vested in Assignors, and (3) after the Closing, Assignee shall provide Assignors with access to, and Assignors shall have the right to receive copies of, the Data as provided in Article VI of the Purchase Agreement;

(g) Contracts. All Assigned Contracts and any and all amendments, ratifications or extensions of the foregoing (the "Purchased Contracts"), including those Assigned Contracts set forth on Annex C hereto;

(h) Permits. To the extent assignable by Assignors to Assignee, all Permits relating to the ownership or operation of the Oil and Gas Properties, including the Permits described on Annex D hereto;

(i) Payment Rights. (i) All accounts receivable attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (ii) instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits attributable to the Buyer Hydrocarbons, the Assumed Liabilities or otherwise attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, (iii) claims of indemnity, contribution, or reimbursement relating to the Assumed Liabilities and (iv) Imbalances receivables;

(j) Claims. All Avoidance Actions, and all rights, claims, causes, causes of action, audit rights and liabilities, remedies, defenses, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor to the extent (and only to the extent) relating to the Assets (other than the Excluded Assets) with respect to any period of time on or after the Effective Time or any Assumed Liability; and

(k) Intangible Rights. All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to (i) the Assets described in clauses (a) through (j) above on or after the Effective Time or (ii) the Assumed Liabilities.

2. Notwithstanding anything to the contrary in the Purchase Agreement or elsewhere in this Assignment and Bill of Sale, the "Assets" shall not include any rights with respect to any Excluded Assets. "Excluded Assets" means all of the following assets:

(a) all cash and cash equivalents of Assignors;

(b) all corporate and financial records of Assignors to the extent they relate to Assignors' business generally, and all Excluded Records;

(c) all Contracts other than the Leases and the Purchased Contracts (including any 365 Contracts that are not Desired 365 Contracts);

(d) all Hydrocarbons produced and sold from and attributable to the Oil and Gas Properties prior to the Effective Time (collectively, the "Seller Hydrocarbons") and all proceeds attributable to Seller Hydrocarbons;

(e) all rights, claims, demands and causes of action of Assignors arising under the Purchase Agreement;

(f) all of the matters listed on Annex E[1] (other than (i) item 1 of Annex E and (ii) item 45 of Annex E to the extent such item does not relate to the Contracts or other assets listed on Annex F) rights, claims (including any claim as defined in section 101 of the Bankruptcy Code), causes, causes of action, remedies, defenses rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any Assignor except to the extent relating to the Assets with respect to any period of time on or after the Effective Time or any Assumed Liability;

(g) any refund of costs, Taxes or expenses actually paid or economically borne by Assignors attributable to periods, or portions thereof, prior to the Effective Time or that are otherwise apportioned to Assignors under Section 7.07 of the Purchase Agreement;

(h) any prepayments or good faith or other deposits submitted by any Third Party under the terms of the Bid Procedures Order;

(i) any of Assignors' rights, claims and causes of action under the Bankruptcy Code (excluding any Avoidance Actions);

(j) the name "Gavilan" and all variations and derivations thereof and any trademark, trade name, logo or symbol containing such names;

(k) all Contracts and other assets listed on Annex F hereto[2];

(l) all Existing Letters of Credit and cash deposits and proceeds of such Existing Letters of Credit;

(m) all equipment, Permits and Data to the extent (and only to the extent) related to Excluded Assets or Excluded Liabilities;

(n) all office equipment, computers, software, hardware and related Intellectual Property of Assignors, other than the Equipment;

[1] Note to Draft: Annex E to include all matters listed on Disclosure Schedule 3.10 of the Purchase Agreement.

[2] Note to Draft: Annex F to include a list of any Contracts or other assets listed on Schedule 2.02(k) of the Purchase Agreement.

(o) all assets excluded pursuant to the express terms of the Purchase Agreement, including those assets listed on Annex G hereto[3];

(p) except to the extent related to any Assumed Liabilities, all audit rights and liabilities arising under any of the Applicable Contracts or otherwise with respect to (i) any period prior to the Effective Time, with respect to the Assets or (ii) any of the Excluded Assets;

(q) any assets or properties described in Section 1(e), Section 1(f)(ii) and Section 1(h) of this Assignment and Bill of Sale, in each case, that are not assignable to Assignee pursuant to the Purchase Agreement after giving effect to the Bid Procedures Order and the Sale Order;

(r) all engagements and similar letters and agreements with Assignors' legal advisors, it being agreed that Assignee shall have no right to claim, own or waive any attorney-client or similar privilege in favor of Assignors or any of their Affiliates with respect to the ownership or operation of the Assets;

(s) all Suspended Revenue Receivables for which the Purchase Price has been adjusted pursuant to Section 2.04(b)(viii) of the Purchase Agreement; and

(t) any assets or properties otherwise expressly identified as Excluded Assets under the Purchase Agreement.

3. Assignors warrant Acceptable Title to the Title Wells included within the Assets unto Assignee, its successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Assignors, but not otherwise, subject to the Permitted Liens, and only as to claims raised by Assignee in writing to Assignors pursuant to the notice provisions of the Purchase Agreement prior to the Cut-Off Date. Assignors hereby assign to Assignee all rights, claims and causes of action on title warranties given or made by Assignors' respective predecessors with respect to the Title Wells, and Assignee is specifically subrogated to all rights which Assignors may have against their predecessors with respect to the Title Wells, to the extent Assignors may legally transfer such rights and grant such subrogation.

4. For purposes of this Assignment and Bill of Sale, the following terms shall be defined as follows:

(a) "Avoidance Action" means any claim, right or cause of action of Assignors arising under chapter 5 of the Bankruptcy Code and any analogous state or federal statutes and common law to the extent relating to the Oil and Gas Properties, the Leases, the Purchased Contracts and the Assumed Liabilities.

(b) "Hydrocarbons" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, other liquids and other

[3] Note to Draft: Annex G to include a list of any assets excluded pursuant to Section 2.12(d), Section 2.13 or Section 5.03 of the Purchase Agreement.

hydrocarbons and all other minerals and materials of every kind and description, including all products derived therefrom.

(c) "Oil and Gas Interests" means (i) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect, including working, leasehold and mineral interests and operating rights and Royalties, production payments, net profit interests and other non-working interests and non-operating interests; (ii) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Leases and Applicable Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (iii) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the completion and operation of any of the foregoing; and (iv) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Assignor has an ownership interest.

(d) "Oil and Gas Lease" means any contract or agreement pursuant to which Assignors lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

(e) "Permits" means all governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

(f) "Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons and payments in respect thereof, as applicable.

(g) "Sale Area" means Dimmit, LaSalle, Maverick and Webb Counties in the State of Texas.

(h) "Suspended Revenue Receivables" means the amount of all revenues attributable to Buyer Hydrocarbons to which Buyer is entitled under the Purchase Agreement, but that are being held in suspense by the operator (or prior operator) of the Oil and Gas Properties or any Third Party counterparty to a Purchased Contract.

(i) "Well" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of

Hydrocarbons, whether producing, not producing, temporarily abandoned, water source, water injection and other injection or disposal wells and systems.

5. On May 15, 2020, each Assignor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and these cases have been jointly administered for procedural purposes only under Case No. 20-32656 (MI). On [__], 2020, the Bankruptcy Court entered an order (the "Order"), authorizing the Assignors to sell the Assets, a certified copy of which Order is attached hereto as Exhibit A and incorporated herein for all purposes by this reference. This Assignment and Bill of Sale is made pursuant to the Order.

6. Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Assignment and Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflicts of law or principle that might refer to construction of such provisions to the laws of another jurisdiction. Each Assignor and Assignee agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Assignment and Bill of Sale or the transactions contained in or contemplated by this Assignment and Bill of Sale (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01 of the Purchase Agreement. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS ASSIGNMENT AND BILL OF SALE OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7. This Assignment and Bill of Sale is expressly subject to the terms and conditions of the Purchase Agreement, which terms are hereby incorporated into this Assignment and Bill of Sale by reference for all purposes. In the event of a conflict between the terms of this Assignment and Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8. Each of Assignors and Assignee agree (a) to furnish upon request to each other such further information, (b) to execute, acknowledge, and deliver to each other such other documents, and (c) to do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Assignment and Bill of Sale and the Purchase Agreement and the documents referred to in this Assignment and Bill of Sale and the Purchase Agreement.

9. If any term, provisions, covenant or restriction contained in this Assignment and Bill of Sale is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Assignment and Bill of Sale shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Assignment and Bill of Sale a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

10. This Assignment and Bill of Sale may be executed in any number of counterparts, and all counterparts so executed shall constitute one Assignment and Bill of Sale, binding upon all of the parties hereto, notwithstanding that all the parties are not signatory to the original or same counterpart.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Bill of Sale, to be effective at the Effective Time.

ASSIGNORS:

**GAVILAN RESOURCES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on _______________, 2020, by [_____________________], as [_____________________] of Gavilan Resources, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ________________________________
Name:
Title:

**STATE OF TEXAS §**
**COUNTY OF HARRIS §**

This instrument was acknowledged before me on _______________, 2020, by [_____________________], as [_____________________] of Gavilan Resources Management Services, LLC, a Delaware limited liability company, on behalf of said company.

[seal]

________________________________
Notary Public in and for the State of Texas

**Annex A**

**Leases**

[To be attached]

**Annex B**

**Conveyed Wells**

[To be attached]

**Annex C**

**Assigned Contracts**

[To be attached]

**Annex D**

**Permits**

[To be attached]

**Annex E**

**Litigation**

[To be attached]

# Annex F

## Excluded Contracts and Other Assets

[To be attached]

**Annex G**

**Other Excluded Assets**

[To be attached]

**Exhibit A**

**<u>Order</u>**

[To be attached]

## Exhibit C

## ASSUMPTION AGREEMENT

THIS ASSUMPTION AGREEMENT (this "Agreement") is entered into as of the [_____] day of [_____________], 2020 (the "Closing Date"), by and among Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, the "Sellers").

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Buyer and Sellers (the "Purchase Agreement"), Sellers have agreed to sell, transfer and assign to Buyer, and Buyer has agreed to purchase and acquire from Sellers, all of Sellers' right, title and interest in and to the Assets;

WHEREAS, pursuant to Section 2.05(b) of the Purchase Agreement, Buyer has agreed to assume, from and after the Closing, the Assumed Liabilities (as defined below); and

WHEREAS, simultaneously herewith the Closing has occurred.

NOW, THEREFORE, for and in consideration of the transfer by Sellers to Buyer of the Assets, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged by Buyer, Buyer hereby agrees as follows:

1. Definitions. Unless the context otherwise requires, all capitalized terms used but not defined herein and defined in the Purchase Agreement, shall have the meanings ascribed to such terms in the Purchase Agreement.

2. Assumption. Buyer hereby undertakes, assumes, covenants to pay, perform, observe the terms of, satisfy and/or discharge if, as, when and to the extent due in accordance with the terms thereof, the following liabilities and obligations of Sellers (individually an "Assumed Liability" and collectively, the "Assumed Liabilities"):

(a) all Property Expenses to the extent attributable to the Assets and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is increased pursuant to Section 2.04(a) of the Purchase Agreement);

(b) all Liabilities (other than Property Expenses) that attach to or run with the Assets (excluding any personal Liabilities of Sellers or their Affiliates that are not attached to the Assets), to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Assets from and after the Effective Time;

(c) other than the Excluded Environmental Liabilities, all Liabilities under, associated with or appurtenant to the Assets with respect to Environmental Claims, whether arising on, before or after the Effective Time, including without limitation those related to the control, storage, handling, or discharge of all materials, substances and wastes from the

Assets (including produced water, hydrogen sulfide gas, drilling fluids, NORM and other wastes);

(d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Assets, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits;

(e) Taxes allocated to Buyer pursuant to Section 7.07(a) and Section 7.07(c) of the Purchase Agreement;

(f) all Liabilities related to the payment of Burdens (i) attributable to Buyer Hydrocarbons (other than Burdens paid or borne by Sellers and taken into account pursuant to Section 2.04(b)(ii)(A) of the Purchase Agreement), (ii) attributable to Effective Time Hydrocarbons to the extent not paid or borne by Sellers as of Closing and (iii) arising out of, in connection with or attributable to the failure to pay or report, or mispayment or underpayment of, any Burdens attributable to Seller Hydrocarbons to the extent (and only to the extent) that Buyer realizes the economic benefit of such non-payment, mispayment or underpayment (but excluding any and all Liabilities related to items 3 through 44 of Disclosure Schedule 3.10 of the Purchase Agreement or the facts or allegations forming the basis thereof, to the extent attributable to Seller Hydrocarbons);

(g) all of Sellers' Liabilities under the Leases and the Purchased Contracts (including the Purchased Contracts set forth on Annex A hereto) arising on or after the Effective Time (excluding any default penalties, charges or interest pertaining to breaches, defaults or non-performance under such Leases or Purchased Contracts prior to Closing), subject to the immediately preceding clause (f);

(h) all of Sellers' Liabilities with respect to Imbalances with Third Parties attributable to the Assets; and

(i) all Liabilities with respect to the Cure Costs required to be paid by Buyer in accordance with Section 5.03(i) of the Purchase Agreement;

*provided, however*, that notwithstanding anything to the contrary in clauses (a) through (i) above, the Assumed Liabilities shall not include (i) Seller Taxes, (ii) any Liabilities pertaining to the Excluded Assets, (iii) any Liabilities discharged or from which the Assets are otherwise released as of the Closing in accordance with the Sale Order, (iv) any Excluded Environmental Liability, (v) any Excess Cure Costs, (vi) any overhead costs, fees or expenses that are paid or payable to a Seller or any Affiliate of a Seller or charged or chargeable by a Seller or any Affiliate of a Seller, (vii) claims, investigations, administrative proceedings, arbitration or litigation arising out of or resulting from actual or claimed personal injury; illness or death; other torts; private rights of action given under any Applicable Law; or violation of any Applicable Law; or (viii) costs or expenses related to, or claims made by, employees or consultants of Sellers or their Affiliates for wages, salaries, bonuses, overtime pay, severance, benefits, or similar matters each of which clauses (i) - (viii) shall be deemed an Excluded Liability.

3. Excluded Liabilities. Notwithstanding anything to the contrary in the Purchase Agreement or elsewhere in this Agreement, the "Assumed Liabilities" shall not include any rights with respect to any Excluded Liabilities. "Excluded Liabilities" means all Liabilities or obligations of Sellers that are not expressly Assumed Liabilities.

4. Effect. The undertakings, covenants and agreements contained herein shall be binding upon Buyer and its successors, assignees and legal representatives and shall inure to the benefit of Sellers and Buyer and their respective successors, assigns and legal representatives.

5. Counterparts. This Agreement may be executed in any number of counterparts, and all counterparts so executed shall constitute one Agreement, binding upon all of the parties hereto, notwithstanding that all the parties are not signatory to the original or same counterpart.

6. Governing Law; Jurisdiction. Except to the extent the mandatory provision of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas, without regard to any conflicts of law or principle that might refer to construction of such provisions to the laws of another jurisdiction. Each Seller and Assignee agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement (whether in contract or tort), exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases, or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston, Texas (together with the Bankruptcy Court, the "Chosen Courts"), and solely in connection with claims arising under this Agreement or the transactions contained in or contemplated by this Agreement (whether in contract or tort) (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 14.01 of the Purchase Agreement.

7. Agreement Subject to Purchase Agreement. This Agreement is expressly subject to the terms and conditions of the Purchase Agreement, which terms are hereby incorporated into this Agreement by reference for all purposes. In the event of a conflict between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

8. Assignment. No party may assign their respective rights or delegate their respective duties or obligations arising under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of the other party.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BUYER:**

MESQUITE ENERGY, INC.

By: ______________________________________
Name:
Title:

**SELLERS:**

**GAVILAN RESOURCES, LLC**

By: ______________________________
Name:
Title:

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ______________________________
Name:
Title:

**Annex A**

**Purchased Contracts**

[To be attached]

**Exhibit D**

**SELLER CERTIFICATE**

**[●], 2020**

THIS CERTIFICATE ("Certificate") is being delivered pursuant to Section 2.05(c)(v) of that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers", and such agreement, as the same may be amended, modified or supplemented from time to time, the "Purchase Agreement").

The undersigned, being a duly appointed officer of each of Sellers, hereby certifies that he or she is authorized to execute and deliver this Certificate on behalf of each Seller and further certifies to Buyer, on behalf of each Seller (and not in his or her individual capacity), that:

1. each Seller has performed in all material respects all of its covenants and other obligations under the Purchase Agreement required to be performed by it on or prior to the Closing Date;

2. the Fundamental Representations are true and correct in all respects at and as of the Closing Date as if made at and as of the Closing Date (other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date); and

3. the representations and warranties of Sellers set forth in Article III of the Purchase Agreement (other than the Fundamental Representations) are true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date (*provided*, that, in each case, for purposes of this paragraph 3, in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Seller Material Adverse Effect or similar materiality qualifiers shall be disregarded), except, for purposes of this paragraph 3, for those failures to be true and correct that, individually or in the aggregate, do not constitute a Seller Material Adverse Effect.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, each of the undersigned has executed this Certificate as of the date first written above.

**BUYER:**

**GAVILAN RESOURCES, LLC**

By:____________________________________
Name:
Title:

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By:____________________________________
Name:
Title:

*Final Form*

**Exhibit E-1**

**CERTIFICATE OF NON-FOREIGN STATUS**

**[●], 2020**

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445 of the Code), the first regarded owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. Gavilan Resources, LLC, a Delaware limited liability company (the "Disregarded Entity"), is disregarded as separate from Gavilan Resources Holdco, LLC, a Delaware limited liability company ("Transferor"), under Treasury Regulations Section 301.7701-3, and is therefore a disregarded entity as defined in Treasury Regulations 1.1445-2(b)(2)(iii). To inform Mesquite Energy, Inc., a Delaware corporation ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by the Disregarded Entity, the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury Regulations);

2. Transferor is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3. Transferor's U.S. employer identification number is 36-4856425; and

4. Transferor's office address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

[*Signature Page Follows*]

**TRANSFEROR:**

**GAVILAN RESOURCES HOLDCO, LLC**

By: ________________________________________
Name:
Title:

Case 4:20-cv-00587 Document 16-6 Filed 04/19/21 Page 780 of 1882

*Final Form*

**Exhibit E-2**

**CERTIFICATE OF NON-FOREIGN STATUS**

**[●], 2020**

Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445 of the Code), the first regarded owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform Mesquite Energy, Inc., a Delaware corporation ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by Gavilan Resources Management Services, LLC, a Delaware limited liability company ("Transferor"), the undersigned hereby certifies the following on behalf of Transferor:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Code and Treasury Regulations);

2. Transferor is not a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

3. Transferor's U.S. employer identification number is 81-5403961; and

4. Transferor's office address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

[*Signature Page Follows*]

**TRANSFEROR:**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ______________________________
Name:
Title:

# Exhibit F

## BUYER CERTIFICATE

**[●], 2020**

THIS CERTIFICATE ("Certificate") is being delivered pursuant to Section 2.05(d)(i) of that certain Asset Purchase Agreement, dated as of October 16, 2020, by and between Mesquite Energy, Inc., a Delaware corporation ("Buyer"), and Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), and Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and, together with Resources, each a "Seller" and, collectively, "Sellers", and such agreement, as the same may be amended, modified or supplemented from time to time, the "Purchase Agreement").

The undersigned, being a duly appointed officer of Buyer, hereby certifies that he or she is authorized to execute and deliver this Certificate on behalf of Buyer and further certifies to Sellers, on behalf of Buyer (and not in his or her individual capacity), that:

1. Buyer has performed in all material respects all of its covenants and other obligations under the Purchase Agreement required to be performed by it at or prior to the Closing Date; and

2. (A) the representations and warranties of Buyer contained in the Purchase Agreement (other than the representations and warranties contained in Section 4.06 and Section 4.10 of the Purchase Agreement) are true and correct at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations and warranties need not be true and correct as of the Closing Date but are true and correct as of such specific earlier date (*provided*, that, in each case, for purposes of this paragraph 2(A), in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Buyer Material Adverse Effect or similar materiality qualifiers shall be disregarded), except for those failures to be true and correct that, individually or in the aggregate, do not constitute a Buyer Material Adverse Effect; and (B) each of the representations and warranties of Buyer contained in Section 4.06 and Section 4.10 of the Purchase Agreement are true and correct in all respects at and as of the Closing Date, as if made at and as of such date.

Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date first written above.

**BUYER:**

MESQUITE ENERGY, INC.

By:____________________________________
Name:
Title:

**<u>Exhibit G</u>**
**POST-CLOSING ESCROW AGREEMENT**

[Attached]

*Final Form*

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of [●], 2020, by and among Gavilan Resources, LLC, a Delaware limited liability company ("Resources"), Gavilan Resources Management Services, LLC, a Delaware limited liability company ("ManagementCo" and together with Resources, each a "Seller" and collectively, "Sellers"), Mesquite Energy, Inc., a Delaware corporation ("Buyer" and, together with the "Sellers", sometimes referred to individually as a "Party" and collectively as the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in that certain Asset Purchase Agreement dated as of October 16, 2020, by and between Sellers and Buyer (as the same may be amended from time to time in accordance with the provisions thereof, the "Purchase Agreement").

RECITALS

WHEREAS, Sellers and certain of their affiliates are debtors in possession under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and, on May 15, 2020 filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, Sellers and Buyer entered into the Purchase Agreement, pursuant to which, among other things, Buyer agreed to purchase and acquire from Buyer the Assets and assume the Assumed Liabilities upon the terms and subject to the conditions set forth in the Purchase Agreement;

WHEREAS, the Closing occurred on [●], 2020;

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement (and pursuant to Section 2.06(g) thereof), Buyer is delivering (on behalf of Sellers) to the Escrow Agent an amount equal to $[●][1] (the "Escrow Amount"); and

WHEREAS, Sellers and Buyer desire that the Escrow Agent act as escrow agent in accordance with the terms hereof, and the Escrow Agent is willing to act in such capacity on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. Appointment. The Parties hereby appoint the Escrow Agent as the escrow agent for the purposes set forth herein. The Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

[1] Note to Draft: The Escrow Amount will be equal to the greater of (x) an amount equal to five percent (5%) of the unadjusted Purchase Price or (y) any unresolved amounts with respect to the Closing Statement disputed by Buyer in good faith in accordance with Section 2.04(d) of the Purchase Agreement.

2. Escrow Funds. Simultaneous with the execution and delivery of this Agreement, Buyer is depositing (on behalf of Sellers) with the Escrow Agent the Escrow Amount in immediately available funds. The Escrow Agent hereby acknowledges receipt of the Escrow Amount (the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income earned with respect thereto, the "Escrow Funds") in separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

3. Investment of Escrow Funds.

(a) Unless otherwise instructed in writing by the Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b) The Escrow Agent shall prepare and send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c) The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Funds, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the Escrow Funds in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4. Disposition and Termination of the Escrow Funds.

(a) Escrow Funds. The Escrow Agent shall hold and release the Escrow Funds as provided in this Section 4(a) as follows:

(i) Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction;

(ii) If at any time either Party receives a Final Determination (as defined below), such Party shall concurrently deliver to the Escrow Agent and the other Party a copy of such Final Determination, and upon receipt by the Escrow Agent of such copy, the Escrow Agent shall (i) promptly (but in any event within two (2) Business Days) deliver a copy of such Final Determination to the other Party; provided, however, that the Escrow Agent shall incur no liability for failing to deliver any courtesy copy of such Final Determination nor shall its delivery or failed delivery thereof give any Party any additional rights or otherwise extend the payment timeframe, and (ii) on the fifth Business Day following receipt by the Escrow Agent of the Final Determination, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent of available Escrow Funds) in accordance with such Final Determination. Subject to the terms of this Section 2(b), the Escrow Agent will act on such Final Determination without further inquiry; or

(iii) By delivering the Escrow Funds to a successor escrow agent pursuant to the provisions of Section 6.

All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction or Final Determination, as applicable.

Any instructions setting forth, claiming, containing, objecting to or in any way related to the transfer or distribution of any funds on deposit in the Escrow Account under the terms of this Agreement must be in writing, executed by the Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2 and, if delivered by e-mail, delivered to the Escrow Agent as an attachment to such e-mail from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by e-mail or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated on Exhibit A-1 and/or Exhibit A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b) Termination. The Escrow Account shall be deemed terminated and dissolved upon the disbursement by the Escrow Agent of the entire amount of the Escrow Funds in accordance with this Agreement.

(c) Certain Definitions.

(i) "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii) "Final Determination" means, with respect to the disposition of the Escrow Funds in the Escrow Account, a final non-appealable order of any arbitrator, including the "Referee" (as defined in the Purchase Agreement), or court of competent jurisdiction, including the Bankruptcy Court, which may be issued, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from an arbitrator or court of competent jurisdiction having proper authority and (B) the written payment instructions executed by an authorized signer of the prevailing Party to effectuate such order.

(iii) "Joint Release Instruction" means the joint written instruction executed by an authorized signer of each Seller and Buyer directing the Escrow Agent to

disburse all or a portion of the Escrow Funds, as applicable. A Joint Release Instruction shall contain complete payment instructions, including wiring instructions.[2]

(iv) "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5. Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between the Parties, in connection herewith, including without limitation the Purchase Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties. Concurrent with the execution of this Agreement, each Party shall deliver to the Escrow Agent authorized signers' forms in the form of Exhibit A-1 and Exhibit A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments that may be due to the Escrow Agent or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in the Escrow Agent's opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction (subject to Section 13) or may seek a declaratory judgment from a court of competent jurisdiction (subject to Section 13) with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable

[2] Note to Draft: Joint Release Instruction to be delivered to the Escrow Agent following the final determination of the Adjusted Purchase Price in accordance with the terms of the Purchase Agreement.

for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except in the case of the Escrow Agent's fraud, gross negligence or willful misconduct as adjudicated by a court of competent jurisdiction.

6. Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving sixty (60) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by Sellers and Buyer acting jointly at any time by providing written notice to the Escrow Agent; provided that any such resignation or removal shall not relieve the Escrow Agent from any liability that arose from any action or inaction that occurred prior to the effective date of such resignation or removal. Any Person into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any Person to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. Except as otherwise set forth in this Agreement, the Escrow Agent's sole responsibility after such sixty (60) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of sixty (60) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction (subject to Section 13) for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7. Fees and Expenses. All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid one-half by Seller and one-half by Buyer. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8. Indemnity. Each of the Parties shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable and documented fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding resulting from this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as determined by a court of competent jurisdiction, in a final non-appealable judgment, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from Sellers or Buyer in accordance with this Agreement. The Parties hereby grant the

Escrow Agent a lien on, right of set-off against and security interest in, the Escrow Funds for the payment of any reasonable claim for indemnification, expenses and amounts due hereunder. In furtherance of the foregoing, the Escrow Agent is expressly authorized and directed, but shall not be obligated, upon prior written notice to the Parties, to charge against and withdraw from the Escrow Funds for its own account or for the account of an indemnitee any amounts due to the Escrow Agent or to an indemnitee under this Section 8. Notwithstanding anything to the contrary herein, Seller and Buyer agree, solely as between themselves, that any obligation for indemnification under this Section 8 (or for the fees and expenses of the Escrow Agent described in Section 7) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by Sellers and one-half by Buyer. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9. Tax Matters.

(a) Sellers shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Funds to the Internal Revenue Service ("IRS") or other taxing authority on IRS Form 1099. Each Party shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may reasonably request.

(b) The Escrow Agent shall be responsible only for income reporting to the IRS with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c) The Escrow Agent, its affiliates and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10. Covenant of Escrow Agent. The Escrow Agent hereby agrees and covenants with Sellers and Buyer that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11. Notices. All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the applicable Party or the Escrow Agent, as applicable to the e-mail address given below, and written confirmation of receipt is obtained (provided that the recipient shall promptly acknowledge receipt thereof), (iii) by overnight delivery

with a reputable national overnight delivery service, or (iv) by mail or certified mail, return receipt requested and postage prepaid. If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to Sellers, then to:

c/o Gavilan Resources Holdings, LLC
920 Memorial City Way, Suite 1400
Houston, Texas 77024
Attention: General Counsel
E-mail: john.zabaneh@gavilanresources.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Rodney L. Moore
Samuel C. Peca
E-mail: rodney.moore@weil.com
samuel.peca@weil.com

or, if to Buyer, then to:

Mesquite Energy, Inc.
Pennzoil Place
700 Milam Street, Suite 600
Houston, Texas 77002
Attention: Gregory Kopel
Executive Vice President and General Counsel
E-mail:gkopel@mesquite-energy.com

with a copy (which shall not constitute notice) to:

Foley & Lardner LLP
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Attention: Timothy Spear
E-mail: tspear@foley.com

or, if to the Escrow Agent, then to:

> Citibank, N.A.
> Citi Private Bank
> 388 Greenwich Street, 29th Floor
> New York, NY 10013
> Attention: William T. Lynch, Director
> E-mail: william.lynch@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent, or, if any notice is mailed, it shall be deemed given two (2) Business Days after the date such notice is deposited with the United States Postal Service. In the event that the Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12. Termination. This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Account in accordance with this Agreement and (b) subject to Section 6, (i) delivery to the Escrow Agent of a written notice of termination executed jointly by Sellers and Buyer or (ii) the Escrow Agent's delivery of a notice of resignation to Sellers and Buyer, after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13. Miscellaneous. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties; provided, however, that each Seller and Buyer may (i) assign any or all of their respective rights and interests hereunder to one or more of their respective Affiliates and (ii) designate one or more of their respective Affiliates to perform their respective obligations hereunder (in any or all of which cases Sellers or Buyer, as the case may be, nonetheless shall remain responsible for the performance of all of its obligations hereunder). This Agreement shall be governed by and construed under the laws of the State of Delaware without giving effect to the conflict of law principles thereof. Each party irrevocably waives any objection on the grounds of venue, *forum non-conveniens* or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Bankruptcy Court or if, for any reason the Bankruptcy Court shall not have jurisdiction, any other court of competent jurisdiction located in the State of Delaware. The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability

without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each party hereto represents, warrants and covenants to the other parties hereto that each document, notice, instruction or request provided by such party to such other parties shall comply with applicable laws and regulations. Except as expressly provided in Section 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder. As between the Parties, nothing in this Agreement waives or modifies any right or obligation under the Purchase Agreement and in the event of any conflict between this Agreement and the Purchase Agreement, the applicable provisions of the Purchase Agreement shall control to the extent of such conflict.

14. Compliance with Court Orders. In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, that it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree the Escrow Agent shall not be liable to any of the Parties or to any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15. Further Assurances. Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16. Force Majeure. The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18. Compliance with Federal Law. To help the United States Government fight the funding of terrorism and money laundering activities and to comply with federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number and remitting bank for all Parties depositing funds into the Escrow Account pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see

financial statements, licenses and identification and authorization documents from individuals claiming authority to represent any entity or other relevant documentation.

19. Use of Citibank Name. No publicly distributed printed or other material in any language, including prospectuses, notices, reports and promotional material that mentions "Citibank" by name or the rights, powers or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent. By execution of this Agreement, the Escrow Agent consents to any disclosure of the rights, powers and duties of the Escrow Agent under this Agreement in connection with any filings made by a Seller in the Bankruptcy Cases and in any notices required to be made in the Bankruptcy Cases.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

SELLERS:

**GAVILAN RESOURCES, LLC**

By: ____________________
Name: ____________________
Its: ____________________

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC**

By: ____________________
Name: ____________________
Its: ____________________

BUYER:

**MESQUITE ENERGY, INC.**

By: ____________________
Name: ____________________
Its: ____________________

ESCROW AGENT:

**CITIBANK, N.A.**

By: ____________________
Name: ____________________
Its: ____________________

## Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: WAIVED**

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

**Fee: WAIVED**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

**Fee: WAIVED**

**Transaction Fees**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

**Fee: WAIVED**

**Other Fees**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

EXHIBIT A-1

Certificate as to Sellers' Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Sellers and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Sellers. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

# EXHIBIT A-2

## Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of Buyer and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of Buyer. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Phone | Mobile Phone |
| Name | Signature |
| Title | E-mail |
| Telephone | Mobile Phone |

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

**<u>Exhibit H</u>**
**RELEASE AGREEMENT**

[Attached]

*Final Form*

# RELEASE AGREEMENT

This Release Agreement (this "Agreement") is being executed as of ____________________, 2020 by and among SN EF Maverick, LLC ("SN EF") and Mesquite Energy, Inc. ("Mesquite" and together with SN EF, the "Buyer Group"), on the one hand, and Gavilan Resources Holdings, LLC ("Resources Holding"), Gavilan Resources HoldCo, LLC ("HoldCo"), Gavilan Resources, LLC ("Resources") and Gavilan Resources Management Services, LLC ("ManagementCo", and together with Resources Holding, HoldCo and Resources, the "Seller Group"), on the other hand. Each of the foregoing shall be referred to individually as the "Party" or "Parties".

WHEREAS, the Parties are entering into and delivering this Agreement in accordance with Sections 2.05(c)(vi) and 2.05(d)(v) of that certain Asset Purchase Agreement dated as of October 16, 2020 by and among Resources, ManagementCo and Mesquite, as may be amended, restated or otherwise modified from time to time (the "Purchase Agreement"). Capitalized terms used in this Agreement without definition have the respective meanings given to them in the Purchase Agreement;

WHEREAS, the Parties have asserted against each other certain claims, defenses, and causes of actions, currently pending before the United States Bankruptcy Court for the Southern District of Texas in *In re Sanchez Energy Corporation, et al.*, Case No. 19-34508, Adversary Proceeding No. 20-321 (*Gavilan Resources, LCC v. SN EF Maverick, LLC, et al.*); and in *In re Gavilan Resources, LLC et al.*, Case No. 20-32656, Adversary Proceeding No. 20-03378 (*Mesquite Energy Inc., et al. v. Gavilan Resources, LLC*); and before the United States District Court for the Southern District of Texas in *SN EF Maverick, LLC et al. v. Gavilan Resources, LLC*, Case No. 4:20-cv-2640 (together, the "Pending Litigation");

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and intending to be legally bound, the Parties hereto hereby agree as follows:

1. Mutual Release.

(a) Subject to the succeeding sentence, each of the Buyer Group, on the one hand, and the Seller Group, on the other hand (each, a "Releasing Party"), on its own behalf and on behalf of each of its subsidiaries, affiliates, directors, officers, employees, agents and successors and assigns (the "Related Persons"), hereby releases and forever discharges, as applicable, the other Parties and each of their subsidiaries, affiliates, directors, officers, employees, agents and successors and assigns (individually, each a "Releasee" and collectively, the "Releasees"), from any and all claims, agreements, promises, demands, proceedings, causes of action, orders, obligations, contracts, debts and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, contingent or otherwise, of every kind and nature (collectively, "Claims"), which a Releasing Party or any of its Related Persons now has, has ever had or may hereafter have against the Releasees arising prior to the Closing or on account of or arising out of any matter, cause or event occurring prior to the Closing, including but not limited to any matters asserted or that could have been asserted in the Pending Litigation. The foregoing notwithstanding, this Agreement shall not be deemed to release (i) any claims that may arise under this Agreement or in connection with the Purchase Agreement, the Assignment and Bill of Sale, the Assumption Agreement or any certificates or other instruments delivered at the Closing or (ii) any claims or other rights of the Seller Group with respect to any Contract or other asset listed on Exhibit A to this Agreement.

(b) Each Releasing Party hereby irrevocably covenants to, and to cause each of its Related Persons to, (i) refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee based upon any matter purported to be released hereby or (ii) transfer, assign or otherwise dispose of any right or interest it may have in any Claims.

(c) Without in any way limiting any of the rights and remedies otherwise available to any Releasee, each Releasing Party agrees to indemnify, defend and hold harmless each Releasee from and against any and all loss, liability, claim, damage (including incidental or consequential damage) or expense (including costs of investigation and defense and reasonable attorney's fees), whether or not involving third-party claims, arising directly or indirectly from or in connection with (i) the assertion by or on behalf of each Releasing Party and/or any Related Persons of any claim or other matter purported to be released pursuant to this Agreement and (ii) the assertion by any third party of any claim or demand against any Releasee which claim or demand arises directly or indirectly from, or in connection with, any assertion by or on behalf of each Releasing Party against such third party of any claims or other matters purported to be released pursuant to this Agreement.

2. Dismissal of Pending Litigation.

No later than 7 days following the Closing, the Parties shall file agreed notices with the appropriate courts dismissing with prejudice all Pending Litigation. All Parties agree that they will bear their own attorneys' fees and costs incurred in connection with this matter.

3. No Admission of Liability.

Nothing herein shall be taken as an admission as to the validity or invalidity of any claims or defenses raised by the Parties in connection with the Pending Litigation or of any fact alleged therein against any Party. The Parties expressly deny all liability asserted against them by any other Party.

4. Bankruptcy Court's Retention of Jurisdiction.

The United States Bankruptcy Court for the Southern District of Texas shall retain jurisdiction to, among other things, hear and resolve disputes arising under or related to this Agreement and each Party agrees that it will not challenge the jurisdiction of the Bankruptcy Court for the Southern District of Texas to, among other things, hear and resolve such disputes or exercise jurisdiction over the Party as related to the same.

5. Choice of Venue.

**EACH PARTY AGREES ANY LEGAL ACTION OR OTHER LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR THE ENFORCEMENT OF ANY PROVISION OF THIS AGREEMENT SHALL BE BROUGHT SOLELY AND EXCLUSIVELY IN THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS.**

6. Miscellaneous.

(a) If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.

Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

(b) This Agreement shall be governed by and construed under the laws of the State of Texas without regard to principles of conflicts of law.

(c) This Agreement constitutes the entire agreement between the parties hereto with regard to the subject matters contained herein, and supersedes all prior understandings and agreements, whether written or verbal, related thereto.

(d) This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. A signature page of this Agreement executed and transmitted via facsimile shall be deemed an original for all purposes.

[*Signature Page to Follow*]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as the date first above written.

SN EF MAVERICK, LLC

By:____________________________
Name:__________________________
Title:___________________________

MESQUITE ENERGY, INC.

By:____________________________
Name:__________________________
Title:___________________________

GAVILAN RESOURCES HOLDINGS, LLC

By:____________________________
Name:__________________________
Title:___________________________

GAVILAN RESOURCES HOLDCO, LLC

By:____________________________
Name:__________________________
Title:___________________________

GAVILAN RESOURCES, LLC

By:____________________________
Name:__________________________
Title:___________________________

GAVILAN RESOURCES MANAGEMENT SERVICES, LLC

By:____________________________
Name:__________________________
Title:___________________________

# Exhibit A

## Big Wells – Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625001 | ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | 02/08/1973 | Dimmit | | 27 | 384 |
| T0625002 | FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | 02/13/1973 | Zavala | | 3 | 172 |
| T0625003 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | 03/01/1978 | Zavala | | 3 | 251 |
| T0625004 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625005 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625006 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625007 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625008 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | 01/09/1979 | Zavala | | 3 | 251 |
| T0625009-001 | DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | 05/06/1974 | Dimmit | | 29 | 322 |
| T0625009-002 | CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | Dimmit | | 37 | 257 |
| T0625010 | MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | 05/16/1974 | Dimmit | | 29 | 332 |
| T0625011 | G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 355 |
| T0625012-001 | MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 377 |
| T0625012-002 | L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 381 |
| T0625013 | LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 366 |

Case 20-32021 Document 313-6 Filed in TXSB on 10/16/20 Page 138 of 432

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625014 | RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | 06/06/1974 | Dimmit | | 29 | 359 |
| T0625015 | JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 29 | 469 |
| T0625016 | DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 30 | 10 |
| T0625017 | ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | Dimmit | | 31 | 330 |
| T0625018 | LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | 06/26/1975 | Dimmit | | 31 | 464 |
| T0625019-001 | AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | Dimmit | | 33 | 505 |
| T0625019-002 | PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | 11/10/1976 | Dimmit | | 39 | 193 |
| T0625020 | B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | Dimmit | | 29 | 293 |
| T0625021 | MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | Dimmit | | 147 | 136 |
| T0625022 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | Zavala | | 97<br>55 | 145<br>185 |
| T0625023 | JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | 05/30/1994 | Zavala | | 57 | 53 |
| T0625024-001 | ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 68 |
| T0625024-002 | MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 65 |
| T0625024-003 | FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 76 |
| T0625025-001 | BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 666 |
| T0625025-002 | ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 671 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625025-003 | MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 676 |
| T0625026 | I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | 04/01/1980 | Dimmit | | 33 | 122 |
| T0625027 | MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | Dimmit | | 30 | 460 |
| T0625028 | WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | Dimmit | | 30 | 270 |
| T0625029 | SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | 04/18/1975 | Dimmit | | 30 | 495 |
| T0625030 | ERIN BAIN JONES | W W OATMAN | 05/11/1970 | 05/11/1975 | Dimmit | | 3 | 578 |

## Big Wells – Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337500000 | 4212733750 | BOYD GG 1H | |

## Big Wells – Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC JOA - Big Wells) | January 1, 2011 |

## Big Wells – Joint Operating Agreements

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |

**<u>Exhibit I</u>**
**SPECIAL WARRANTY**

Seller hereby agrees to warrant and defend for a period ending on the Cut-Off Date, Acceptable Title to the Title Wells unto Buyer, its successors and assigns, against every Person whomsoever lawfully claiming or to claim the same or any part thereof, by, through or under Seller, but not otherwise, subject to the Permitted Liens, and only as to claims raised by Buyer in writing to Seller pursuant to the notice provisions of this Agreement prior to the Cut-Off Date. Buyer shall not be entitled to recovery on a claim against the Special Warranty set forth in this Exhibit I (i) except to the extent such claim constitutes a Title Defect (*provided* Sellers shall, upon Sellers request, have at least thirty (30) days after receipt of notice of any claim of a Title Defect to attempt to cure such Title Defect), (ii) as to any Title Well with respect to which a Title Defect exists, for an amount exceeding the Allocated Value of the affected Title Well and (iii) unless and until the total amount of all Title Defects exceeds $200,000 (the "Defect Deductible," and the amount of such excess over the Defect Deductible is referred to as the "Defect Excess"), at which time Buyer would be entitled to recovery in an amount equal to the Defect Excess. Notwithstanding anything in this Exhibit I or otherwise in this Agreement to the contrary, in no event shall Sellers be liable to Buyer for any claims against the Special Warranty for any amounts other than out of amounts in the Post-Closing Escrow Account.

The Special Warranty described in this Exhibit I shall be and hereby is incorporated by reference into the Assignment and Bill of Sale delivered to Buyer at Closing.

As used in this Exhibit I, the following capitalized terms shall have the meanings ascribed below:

(a) "Acceptable Title" means, as to each Well set forth on Annex B (each, a "Title Well"), such right, title and interest that, although not constituting perfect, merchantable or marketable title, (x) is deducible of record or, (y) if not deducible of record, title evidenced by pooling orders, communitization agreements or elections under joint operating agreements, in each case, except for Permitted Liens, as of the Effective Time and the Closing Date:

(i) entitles Sellers to receive not less than the Net Revenue Interest set forth on Annex B for such Title Well for Hydrocarbons produced, saved and marketed from such Title Well (subject to rounding), except for (1) decreases in connection with those operations in which Sellers or their successors or assigns may from and after the Execution Date be a non-consenting co-owner, (2) decreases resulting from the establishment or amendment from and after the Execution Date of pools or units, (3) decreases required to allow other Working Interest owners to make up past underproduction or pipelines to make up past under deliveries, (4) decreases resulting from changes in tract or production allocations resulting from elections to participate or not participate in operations after the Execution Date, (5) decreases resulting from actions taken by (or directed to be taken by) Buyer, (6) decreases resulting from any reversion of interest to a co-owner with respect to operations in which such co-owner, after the Execution Date, elects not to consent, and (7) as otherwise expressly set forth on Annex B;

(ii) obligates Sellers to pay or otherwise bear costs and expenses attributable to the operation and development of such Title Well in an amount not greater than the Working Interest set forth in Annex B (subject to rounding) for such Title Well, except for (1) increases resulting from contribution requirements with respect to defaulting co-owners from and after the Execution Date under applicable operating agreements, communitization agreements or pooling orders, (2) increases resulting from the carrying of non-participating interest owners or co-tenants in Leases with respect to the drilling of any Well from and after the Execution Date, (3) increases to the extent that such increases are accompanied by a proportionate increase in Sellers' Net Revenue Interest with respect to such Title Well as set forth on Annex B, (4) increases resulting from actions taken by (or directed to be taken by) Buyer, (5) increases resulting from the establishment or amendment from and after the Execution Date of pools or units and (6) as otherwise expressly set forth on Annex B; and

(iii) is free and clear of all Liens.

(b) "Permitted Liens" means:

(i) easements, restrictive covenants, servitudes, permits, surface leases and other rights with, respect to surface operations, and rights-of-way on, over or in respect of any of the Oil and Gas Properties that, singularly or in the aggregate, do not prevent or materially interfere with the ownership, value or operation of the affected Oil and Gas Properties for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(ii) all Applicable Laws and all rights reserved to or vested in any Governmental Authority: (1) to control or regulate the Assets in any manner, (2) by the terms of any right, power, franchise, grant, license or Permit issued by any Governmental Authority, or by any provision of Applicable Law, to terminate such right, power, franchise, grant, license or permit or to purchase, condemn, expropriate or recapture or to designate a purchaser of any Asset; (3) to use such Asset in a manner which does not materially impair the use of such property for the purposes for which it is currently owned and operated; or (4) to enforce any obligations or duties affecting the Assets to any Governmental Authority with respect to any franchise, grant, license or permit;

(iii) the terms, conditions, restrictions, exceptions, reservations, limitations and other matters (including acreage dedications thereof) contained (1) in the Leases, (2) the Contracts, instruments and documents disclosed on Disclosure Schedule 3.05(a), (3) the Preferential Purchase Rights disclosed on Disclosure Schedule 3.05(a) or Disclosure Schedule 3.17, and (4) the ROW Interests, in each case, to the extent the same do not (x) prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons, (y) operate to reduce Sellers' Net Revenue Interest in an Oil and Gas Property below that shown in Annex B or (z) operate to increase

Sellers' Working Interest in an Oil and Gas Property above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(iv) Liens for Taxes or other governmental fees (1) not yet due and payable, (2) the nonpayment of which is permitted or required by the Bankruptcy Court or (3) that are being contested in good faith;

(v) mechanic's, materialmen's, carrier's, supplier's, vendor's, repairer's or other similar statutory Liens arising in the ordinary course of business securing amounts that are not yet due or delinquent or, if delinquent, that are being contested in good faith;

(vi) utility easements, restrictive covenants, zoning, entitlement, building, subdivision, environmental and other similar restrictions that, singularly or in the aggregate, do not prevent or materially interfere with the operation of the Oil and Gas Properties for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(vii) Liens created by Buyer or any of their respective successors or assigns;

(viii) inchoate liens or security interests created pursuant to statutory provisions in favor of working interest owners in jurisdictions where the Oil and Gas Properties are located, to the extent not subject to any pending or threatened enforcement or foreclosure proceeding;

(ix) all lessors' Royalties, net profits interests, carried interests, and reversionary interests, and all other Liens, rights to take in kind and any burden or right, provided for in any Oil and Gas Lease or in any other Contract or instrument disclosed on Disclosure Schedule 3.05(a) or otherwise reflected on Annex B that do not, individually or in the aggregate operate to (1) reduce Sellers' Net Revenue Interest in an Oil and Gas Property below that shown in Annex B or (2) increase Sellers' Working Interest in an Oil and Gas Property above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(x) any charge, equitable interest, privilege, lien, mortgage, deed of trust, production payment, option, pledge, collateral assignment, security interest, right of first refusal, restriction, encroachment, defect, or other arrangement substantially equivalent thereto, or other defect or irregularity of any kind that (1) will be permanently and fully extinguished with respect to the Assets pursuant to the Sale Order or (2) does not, individually or in the aggregate, operate to (A) prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons, (B) operate to reduce Sellers' Net Revenue Interest in a Title Well below that shown in Annex B or

(C) operate to increase Sellers' Working Interest in a Title Well above that shown in Annex B without a proportionate increase in the corresponding Net Revenue Interest shown in Annex B;

(xi) all Consents and all rights to consent by, required notices to, filings with, or other actions by Governmental Authorities in connection with the conveyance of the Oil and Gas Properties, if the same are customarily sought and received after Closing;

(xii) such other defects or irregularities of title or encumbrances as Buyer may have waived in writing, or which Buyer is deemed to have waived pursuant to this Agreement;

(xiii) any maintenance of uniform interest provision in a joint or unit operating agreement if waived by the party or parties having the right to enforce such provision or if the violation of such provision would not give rise to the unwinding of the sale of the affected Oil and Gas Property from Sellers to Buyer;

(xiv) to the extent the same have not previously been triggered, conventional rights of reassignment obligating Sellers to reassign their interest in any portion of the Oil and Gas Properties to a Third Party, if such right is only triggered upon an express indication of intent to release or abandon such interest prior to the expiration of the primary term or other termination of such interest;

(xv) any Lien affecting the Assets that is fully discharged by Sellers at or prior to the Closing;

(xvi) Liens created under Leases, Permits, easements, rights-of-way (including ROW Interests) or Purchased Contracts, or by operation of law in respect of obligations that are not yet due or delinquent or, if delinquent, that are being contested in good faith by appropriate proceedings by or on behalf of Sellers;

(xvii) rights of a common owner of any interest in rights-of-way, Permits or easements (including ROW Interests) held by Sellers and such common owner as tenants in common or through common ownership that do not, individually or in the aggregate, operate to prevent or materially interfere with the ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons;

(xviii) any matters set forth on Annex A, all litigation and claims set forth on Disclosure Schedule 3.10, and all Imbalances set forth on Disclosure Schedule 3.09;

(xix) limitations (including drilling and operating limitations) imposed on the Assets by reason of the rights of subsurface owners or operators in a common property (including the rights of coal, utility and timber owners) that do not, individually or in the aggregate, operate to prevent or materially interfere with the

ownership or operation of the affected Oil and Gas Properties for the production of Hydrocarbons;

(xx) all depth restrictions or limitations applicable to any Asset to the extent set forth on Annex A or Annex B;

(xxi) zoning and planning ordinances and municipal regulations; and

(xxii) any other Liens that do not, individually or in the aggregate, materially interfere with the ownership or operation of the Oil and Gas Properties subject thereto or affected thereby for the production of Hydrocarbons (as currently operated) and that would be acceptable by a prudent owner or operator of oil and gas properties.

(c) "Title Defect" means any condition, effect or change which, in Buyer's reasonable opinion based on customary industry standards, causes Sellers' right, title or interest in and to a Title Well to be less than Acceptable Title to such Title Well; *provided* that (x) if an Allocated Value has not been given with respect to a Title Well then the Allocated Value of such Title Well for purposes of this Exhibit I shall be deemed to be $0 and (y) the term "Title Defect" shall not be deemed to exist based solely upon:

(i) (A) lack of information in Sellers' files, (B) references to an unrecorded document to which no Seller nor any Affiliate of Sellers is a party, if such document is not in Sellers' files, or (C) any Tax assessment, Tax payment or similar records or the absence of such activities or records;

(ii) defects asserting a change in net revenue interests or Working Interests based on an after-payout decrease in net revenue interests or increase in Working Interests pursuant to a farm-in, farm-out or other agreement that is listed on Disclosure Schedule 3.05(a), if the effect of such change is accurately reflected in the net revenue interests and Working Interests set forth in Annex B;

(iii) defects that have been conclusively established to have been cured by applicable Laws of limitations or prescription;

(iv) defects arising from any Lease failing to have pooling provisions (*provided* that the applicable lessors have ratified unit declarations, if required);

(v) defects arising from any change in Applicable Laws after the Effective Time;

(vi) Liens created under deeds of trust, mortgages and similar instruments by the lessor under a Lease covering the lessor's surface and mineral interests in the land covered thereby that would customarily be accepted in taking or purchasing such Leases and for which a reasonably prudent lessee would not customarily seek a subordination of such Lien to the oil and gas leasehold estate prior to conducting drilling activities on the Lease; *provided*, *however*, that no such

Lien encumbering or otherwise affecting any Title Well or other drill site shall be excluded from being a Title Defect pursuant to this subpart (vi);

(vii) defects arising from any Imbalances, whether resulting from overproduction or underproduction;

(viii) defects based upon the exercise of any Preferential Purchase Right following the Execution Date;

(ix) any Lien or loss of title resulting from Sellers' conduct of business after the Execution Date pursuant to actions specifically required of Sellers pursuant to this Agreement;

(x) defects based upon the failure to record (A) any state or federal Leases or rights-of-way (including ROW Interests) included in the Assets or any assignments of interests in such Leases or rights-of-way (including ROW Interests) included in the Assets or (B) any forced pooling order executed and delivered by a Governmental Authority, in each case, in any applicable county records, unless such failure could reasonably be expected to result in another Person's superior claim of title to the relevant Asset;

(xi) any maintenance of uniform interest provision in any Lease or Purchased Contract; and

(xii) defects that affect only which Person has the right to receive Burden payments (rather than the amount of the proper payment of such Burden payment) and that do not affect the validity of the underlying Lease, in each case, to the extent the same does not operate to: (A) decrease the Net Revenue Interest with respect to any Title Well to an amount less than the Net Revenue Interest set forth in Annex B for such Title Well or (B) obligate Sellers to bear a Working Interest with respect to any Title Well in an amount greater than the Working Interest set forth in Annex B for such Title Well (unless the Net Revenue Interest for such Title Well is greater than the Net Revenue Interest set forth in Annex B in the same proportion as any increase in such Working Interest).

[End of Exhibit I]

*Final Form*

**ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES**

**to the**

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 16, 2020**

**by and between**

**GAVILAN RESOURCES, LLC and**

**GAVILAN RESOURCES MANAGEMENT SERVICES, LLC,**

**as Sellers**

**and**

**MESQUITE ENERGY, INC.,**

**as Buyer**

# ANNEXES, SCHEDULES AND DISCLOSURE SCHEDULES

## Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Applicable Contracts |
| Annex D | Permits |

## Schedules

| | |
|---|---|
| Schedule 1.01 | Allocated Values |
| Schedule 2.02(k) | Excluded Contracts and Other Assets |
| Schedule 5.03(a) | 365 Schedule |
| Schedule 5.03(b) | Desired 365 Contracts |
| Schedule 7.06 | Seller Employees |
| Schedule 8.02(d) | Specified Required Consents |

## Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05(a) | Material Contracts |
| Disclosure Schedule 3.05(b) | Material Contract Defaults |
| Disclosure Schedule 3.06(a) | Approvals |
| Disclosure Schedule 3.07 | Environmental Matters |
| Disclosure Schedule 3.08 | Well Status |
| Disclosure Schedule 3.09 | Imbalances |
| Disclosure Schedule 3.10 | Litigation |
| Disclosure Schedule 3.12 | Intellectual Property |
| Disclosure Schedule 3.13 | Insurance Coverage |
| Disclosure Schedule 3.14 | Taxes |
| Disclosure Schedule 3.16 | Outstanding Obligations |
| Disclosure Schedule 3.17 | Preferential Purchase Rights |
| Disclosure Schedule 3.20 | Working Interest Payments |
| Disclosure Schedule 3.22 | Violations of Applicable Laws |

# Annex A
## Oil and Gas Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621017-004 | 5 QUEENS LLC | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 105 |
| T0620034-005 | A JAY MUNOZ | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 752 |
| T0621019-023 | AARON BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 544 | 756 |
| T0616008-035 | ADELL MCLEOD | ANADARKO E&P ONSHORE LLC | 05/22/2013 | 05/22/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 493 | 598 |
| T0621003-062 | AGNES JAN SPAHN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 107 |
| T0621001-015 | AHAUS, PAULA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 36 |
| T0616008-022 | ALBERT EDWARD PATTERSON JR | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 120 |
| T0621020-009 | ALBERT S ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 537 | 78 |
| T0620036-014 | ALEX BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 332 |
| T0619016-015 | ALICE E WILSON A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 729 |
| T0619007-003 | ALICE KUEHLER | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 388 |
| T0618023 | ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | 01/01/2019 | 12/31/2021 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 169 |
| T0620036-007 | ALISON MONNICH | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 21 |
| T0621007-007 | ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | 11/22/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 61 |
| T0620043-024 | AMANDA JONES | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 534 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620033-002 | AMFAR THE FOUNDATION FOR AIDS RESEA | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2017 | Dimmit | F/T 2341, SEC 31, DENTON | 534 | 313 |
| T0619017 | ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | 04/07/2015 | 04/07/2018 | Dimmit | A-1163, SURVEY 59 | | |
| T0616008-011 | ANDREA CARROLL TIMMONS | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 410 | 831 |
| T0620043-026 | ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 537 |
| T0620033-001 | ANIMAL HUMANE SOCIETY OF HENNEPIN C | ANADARKO E&P ONSHORE LLC | 04/30/2013 | 04/30/2016 | Dimmit | F/T 2341, SEC 31, DENTON | 476 | 298 |
| T0616008-010 | ANITA CARROLL HAMILTON | ANADARKO E&P COMPANY LP | 04/13/2011 | 04/13/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 410 | 828 |
| T0619007-026 | ANNA M WINK | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 422 | 391 |
| T0621019-007 | ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 553 | 582 |
| T0620006-003 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 69 |
| T0621002-004 | ANNE GATLIN BURKEL | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 69 |
| T0620050-003 | ANNE GATLIN BURKEL | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 647 | 266 |
| T0621003-001 | ANNETTE DAVIS | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 663 |
| T0621007-028 | ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | 08/14/2014 | 08/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 837 |
| T0620046 | ANNIE BETTIE HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2012 | 04/27/2021 | Dimmit | F/T 1970, BLK 10, SEC 27, DENTON | 445 | 74 |
| T0619001-014 | APRIL P ELLIOTT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 651 |
| T0620039-012 | ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | 05/19/2014 | 05/19/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 1 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618025 | ARTHUR LEE HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 188 |
| T0616003-022 | ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 442 |
| T0620038-004 | AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 453 | 531 |
| T0620038-001 | AUDREY JO SCOTT BOLIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 678 |
| T0621017-013 | AUDREY WHITE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 99 |
| T0620017 | AUSTIN PRESBYTERIAN THEOLOGICAL SEM | ANADARKO E&P COMPANY LP | 03/21/2011 | 03/21/2014 | Dimmit | F/T 1640, SEC 23, BLK 10, DENTON | 406 | 724 |
| T0621001-019 | AXTON, TINA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 63 |
| T0624002 | B L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/15/2008 | 10/15/2011 | Webb | | 2672 | 185 |
| T0621003-059 | B R WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 117 |
| T0621006-002 | BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | Dimmit | F/T 532, 533, BLK 6, SEC 43, DENTON | 576 | 239 |
| T0620039-018 | BARBARA B JONES | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 821 |
| T0621019-011 | BARBARA BASSORE PRUENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | 08/04/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 555 | 335 |
| T0616008-008 | BARBARA FELTON LEVISAY | ANADARKO E&P COMPANY LP | 03/25/2011 | 03/25/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 409 | 667 |
| T0618015-003 | BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | | 629 | 603 |
| T0618017-002 | BARBARA J FARROW REVOCABLE TRUST | SN EF MAVERICK, LLC | 01/02/2019 | 01/02/2022 | Dimmit | Lot 4, Blk 112, Sub G Taft Catarina Properties | 629 | 603 |
| T0620010-004 | BARBARA JO STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 411 |
| T0621016-010 | BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 620 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620040-002 | BARBARA RUTH FAULES | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 548 | 474 |
| T0616008-058 | BARBARA S BENNEFELD | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 259 |
| T0620002-020 | BARRY LEE HUTCHISON | ANADARKO E&P COMPANY LP | 08/22/2012 | 08/22/2018 | Dimmit | F/T 2123, SEC 18, DENTON | 456 | 530 |
| T0619006-014 | BECKY DEWAN | | 11/16/2010 | 11/16/2018 | Dimmit | | 405 | 560 |
| T0620043-004 | BENITA LOU POWELL YORK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 528 |
| T0621007-020 | BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 718 |
| T0620020 | BERNARD PREECE ET AL | ANADARKO E&P COMPANY LP | 07/09/2010 | 07/09/2017 | Dimmit | F/T 2294, SEC 31, DENTION | 393 | 414 |
| T0619008-011 | BERTRICE F SCRIBNER MARCH 1988 TRUS | ANADARKO E&P COMPANY LP | 10/26/2011 | 10/26/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 394 |
| T0620018-012 | BETSY BOSBY HINES | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 656 |
| T0620039-002 | BETTE ROBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | 05/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 837 |
| T0621019-014 | BETTY BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 386 |
| T0619008-045 | BETTY BENNETT | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 469 |
| T0620041-003 | BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 250 |
| T0619002-006 | BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | 05/31/2012 | 05/31/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 624 |
| T0619002-009 | BETTY T THON | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 387 | 582 |
| T0616008-039 | BEVERLY JO MOORE | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 251 |
| T0621007-011 | BEVERLY JOAN GATTIS | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 109 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-023 | BILL M VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 154 |
| T0618007-012 | BILLIE MILLS HARRIS | ANADARKO E&P COMPANY LP | 01/23/2012 | 01/23/2023 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 433 | 136 |
| T0618007-021 | BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | 07/12/2012 | 07/12/2018 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 196 |
| T0621025-003 | BISHOP, DEBORAH LYNN | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 123 |
| T0619007-017 | BLANCHE C KOETTING | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 740 |
| T0616008-043 | BOBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 307 |
| T0618022 | BOBBY W. HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 654 |
| T0619001-003 | BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 709 |
| T0619002-002 | BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 226 |
| T0621001-025 | BOYD, BILLY T | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 24 |
| T0621001-014 | BOYD, STEVEN | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 21 |
| T0620047-005 | BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 550 |
| T0619016-002 | BRANDON CHRISTOPHER WESCOE | ANADARKO E&P COMPANY LP | 05/12/2010 | 05/12/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 392 | 490 |
| T0619008-001 | BRAZORIA COUNTY OIL AND GAS CORPORA | ANADARKO E&P COMPANY LP | 08/01/2010 | 08/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 392 | 370 |
| T0620042-003 | BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 741 |
| T0619008-048 | BRENDA PAYNE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 460 |
| T0619008-025 | BRENDA S BROWN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 125 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-021 | BRIAN NEELY | ANADARKO E&P ONSHORE LLC | 10/21/2014 | 10/21/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 395 |
| T0620035-004 | BRIAN R MASSIE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 632 | 558 |
| T0616001-001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | Dimmit | | 329 | 131 |
| T0616002-001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | La Salle | | 329 | 131 |
| T0619001-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 329 | 131 |
| T0619005 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 329 | 397 |
| T0623001 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 01/02/2007 | 02/12/2020 | Webb | | 329 | 131 |
| T0623002 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0623003 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 04/24/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0623004 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/06/2006 | 02/12/2020 | Webb | | 329 | 131 |
| T0623005-001 | BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/02/2008 | 12/31/2013 | Webb | | 329 | 131 |
| T0626002 | BRISCOE RANCH INC | EDWARD G VAUGHAN | 03/06/2006 | 10/15/2017 | Webb | | 329 | 131 |
| T0619003 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 335 | 276 |
| T0619002-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Dimmit | | 338 | 617 |
| T0619004 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2010 | 10/15/2017 | Dimmit | | 382 | 13 |
| T0626001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2005 | 10/15/2017 | Webb | | 382 | 13 |
| T0619015-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2014 | Dimmit | S/2 LOT 7, BLK 148, CATARINA FARMS SUBD H | 405 | 563 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0622001-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0622002-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0622003-001 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2006 | 10/15/2015 | Maverick | | 1073 | 94 |
| T0621001-020 | BROCKMAN, WILLIAM | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0621019-019 | BRUCE KEVIN NEELY | ANADARKO E&P ONSHORE LLC | 09/11/2014 | 09/11/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 367 |
| T0621003-002 | BRUCE R GARDNER | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 631 |
| T0621022 | BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | 01/24/2021 | Dimmit | | 432 | 700 |
| T0622004-001 | CAGE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 08/31/2006 | 03/01/2010 | Maverick | | 1076<br>369<br>2791 | 419<br>459<br>132 |
| T0620043-007 | CALEB GLENN PARKS TRUST | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 126 |
| T0621007-034 | CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 82 |
| T0619018-003 | CANDACE ALLEGRA CURRIE | ANADARKO E&P COMPANY LP | 04/20/2011 | 04/20/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 674 |
| T0620039-047 | CARDWELL, KIM | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | | | |
| T0618021 | CARL ROGER MEISNER | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 626 | 25 |
| T0620039-025 | CARLON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 496 |
| T0620036-012 | CAROL BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 463 | 337 |
| T0619007-010 | CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 372 |
| T0621003-017 | CAROLE CLARK NAGEL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 810 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-012 | CAROLYN MEISTER | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 624 |
| T0620034-002 | CAROLYN WROUGHTON SMITH BRADSHAW | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 749 |
| T0616008-005 | CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 05/10/2011 | 05/10/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 418 | 591 |
| T0621001-011 | CARR, BILL TODD | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 45 |
| T0621001-016 | CARR, CECIL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 48 |
| T0621001-026 | CARR, DANIEL JOEL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 17 |
| T0621001-028 | CARR, DERRICK GENE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 33 |
| T0621001-027 | CARR, GEORGE W. | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 10 |
| T0621001-007 | CARR, JEANETTA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 27 |
| T0621001-010 | CARR, VEEBAL | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 42 |
| T0621003-024 | CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 272 |
| T0619001-021 | CATHLEEN J STUBBLEFIELD | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 633 |
| T0621007-035 | CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 86 |
| T0619006-009 | CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 754 |
| T0619008-021 | CHARLES F KOEHNE | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 438 |
| T0619016-014 | CHERE MATLOCK | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 737 |
| T0619006-007 | CHERYL LYNN RINER | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 764 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-013 | CHERYL SCHOEN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 383 |
| T0616008-024 | CHET E STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 322 |
| T0621001-013 | CHILDRESS, DARLA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 54 |
| T0620037-005 | CHIN CHIN HO | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2023 | Dimmit | F/T 1595, BLK 24, DENTON | 541 | 421 |
| T0618007-052 | CHRISTI BALLARD | SN EF MAVERICK, LLC | 01/01/2019 | 01/01/2022 | Dimmit | | 629 | 611 |
| T0620039-028 | CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 514 |
| T0618004-015 | CHRISTINE BLAKENEY | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 450 | 637 |
| T0620039-006 | CHRISTINE GLAVIN | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 36 |
| T0619016-009 | CHRISTOPHER D WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 745 |
| T0621019-017 | CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 389 |
| T0621003-039 | CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 536 |
| T0621003-067 | CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 564 |
| T0619008-032 | CINDY BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 133 |
| T0620039-016 | CLARA FAY CUZZORT FAVREAU | ANADARKO E&P ONSHORE LLC | 02/09/2015 | 02/09/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 363 |
| T0618026 | CLARA HARRIS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 642 |
| T0619016-012 | CLARE A WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 753 |
| T0620035-003 | CLAUDE P MASSIE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 212 |
| T0620043-020 | CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 123 |

Case 4:20-cv-20587 Document 36-6 Filed TXSB 02/10/16/20 Page 58 of 432

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-016 | CLAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 114 |
| T0619006-015 | CONLEY EUGENE HOUSE ET UX | ANADARKO E&P COMPANY LP | 05/11/2011 | 05/11/2019 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 425 | 586 |
| T0621007-027 | CONNIE EMPOLEN | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 532 | 357 |
| T0619014 | CONSTANCE L YEAGER | ANADARKO E&P COMPANY LP | 05/06/2010 | 05/06/2015 | Dimmit | S/2 LOT 4, BLK 172 TAFT | 387 | 456 |
| T0621001-009 | CONTENTO, DEBBIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 39 |
| T0621003-065 | COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/21/2013 | 10/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 593 |
| T0621003-042 | CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 512 |
| T0619001-016 | CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 636 |
| T0620025 | CYPRESS ATLANTIC I LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | 10/17/2018 | Dimmit | F/T 2390, SEC 30, DENTON | 455 | 545 |
| T0619007-022 | DAN METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 148 |
| T0621019-024 | DANA BASSORE WILDERS | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 406 |
| T0619008-019 | DANIEL E SPRINGMAN | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 121 |
| T0619007-029 | DANIEL JOSEPH BYRD F/K/A HERBERT ES | ANADARKO E&P ONSHORE LLC | 07/09/2015 | 07/09/2018 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 551 | 752 |
| T0621001-017 | DANIEL, JULIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 57 |
| T0616008-029 | DANNY F GRAVES | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 829 |
| T0620043-027 | DANNY R FANKHAUSER | ANADARKO E&P ONSHORE LLC | 05/21/2015 | 05/21/2018 | Dimmit | | 556 | 589 |
| T0619007-028 | DANNY WAYNE CHISUM, JR., ET AL | ANADARKO E&P ONSHORE LLC | 02/05/2015 | 02/05/2018 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 542 | 279 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621017-002 | DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 210 |
| T0619008-031 | DAVID BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 141 |
| T0616008-003 | DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | 02/10/2015 | 02/10/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 505 |
| T0618117-040 | DAVID HARRIS | SN EF MAVERICK, LLC | 01/02/2019 | 01/02/2022 | Dimmit | | 629 | 599 |
| T0621003-053 | DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | 03/07/2013 | 03/07/2019 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 63 |
| T0618007-053 | DAVID KING | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 587 |
| T0620036-003 | DAVID M FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 11 |
| T0620018-006 | DAVID TRIM | ANADARKO E&P ONSHORE LLC | 01/22/2013 | 01/22/2016 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 465 | 235 |
| T0621017-011 | DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 559 | 379 |
| T0621025-002 | DAY, HAROLD D. III | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 612 | 270 |
| T0621025-001 | DAY, MICHAEL R. | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 612 | 267 |
| T0621025-008 | DAY, PATRICK B. | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 615 | 120 |
| T0621025-011 | DAY, ROBIN | SN EF MAVERICK, LLC | 12/18/2017 | 12/18/2020 | Dimmit | | 615 | 117 |
| T0621007-018 | DEANNA DONALDSON | ANADARKO E&P ONSHORE LLC | 02/14/2014 | 02/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 707 |
| T0621003-015 | DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 456 | 501 |
| T0619008-037 | DEBBIE GARRISON HUFF | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 45 |
| T0620043-003 | DEBORAH J PUTMAN | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 547 | 115 |
| T0616003-005 | DEBORAH K HICKS | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 327 |
| T0618027 | DEBRA HARRIS MOORE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 650 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620016-005 | DEBRA L BURNS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 139 |
| T0619010-010 | DEE ANN SCHALLHORN JOHNSON | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 400 | 113 |
| T0620039-045 | DELIA A SMITH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 479 |
| T0620039-033 | DELIA DAUGHERITY | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 542 | 220 |
| T0619008-004 | DELL M KELBY | ANADARKO E&P COMPANY LP | 08/30/2011 | 08/30/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 420 | 224 |
| T0620039-034 | DENISE SUTTON | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 542 | 217 |
| T0616003-003 | DENNIE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 321 |
| T0620016-001 | DENNIS G LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 121 |
| T0620002-017 | DENNIS PAT VANWEY ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2020 | Dimmit | F/T 1783, 1784, BLK 22, DENTON | 420 | 762 |
| T0619008-035 | DEVOIN E GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 76 |
| T0616003-001 | DIAMOND H RANCHES LIMITED PARTNERSH | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | Dimmit | | 344 | 6 |
| T0619006-001 | DIANA M STUMBERG ET AL | ST MARY LAND AND EXPLORATION COMPAN | 11/05/2008 | 11/04/2011 | Dimmit | | 354 | 171 |
| T0618001 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 10/25/2010 | Dimmit | | 338 | 621 |
| T0618003-001 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 621 |
| T0619007-004 | DONALD DETTEN | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 396 |
| T0616008-040 | DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 310 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619001-018 | DONALD K PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 456 | 469 |
| T0620036-009 | DONALD L BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 818 |
| T0620005 | DONNA W MERKEL ET AL | ANADARKO E&P COMPANY LP | 04/30/2010 | 04/30/2013 | Dimmit | | 385 | 526 |
| T0619007-021 | DORIS GABEL | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 381 |
| T0618005-002 | DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | 06/08/2011 | 06/08/2016 | Dimmit | | 419 | 106 |
| T0619008-029 | DOROTHY D WHITLOCK | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 137 |
| T0620010-008 | DOROTHY LYNN HOSTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 394 | 192 |
| T0620039-011 | DOUGLAS B ROBERSON | ANADARKO E&P ONSHORE LLC | 05/08/2014 | 05/08/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 5 |
| T0622004-002 | DOUGLAS M VANDER PLOEG ET UX | ANADARKO E&P COMPANY LP | 02/01/2011 | 02/01/2014 | Maverick | | 1281<br>405<br>3073 | 101<br>367<br>569 |
| T0620011-001 | DULLNIG INVESTMENTS LTD | JOINT RESOURCES COMPANY | 01/01/2010 | 01/01/2013 | Dimmit | WEST 7.4 ACS LOT 2516 & ALL LOT 1721, DENTONIO | 379 | 258 |
| T0621003-033 | E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 556 |
| T0621003-006 | EARDLEY MINERALS LLC | ANADARKO E&P ONSHORE LLC | 05/16/2013 | 05/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 260 |
| T0619008-007 | EARL SCHWARM INSURANCE TRUST | ANADARKO E&P COMPANY LP | 06/07/2011 | 06/07/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 453 |
| T0616007-002 | EARLENE F BRENNER ET AL | ANADARKO E&P COMPANY LP | 02/25/2011 | 02/25/2017 | Dimmit | | 406 | 681 |
| T0618024 | EARLENE HARRIS FOGLE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 646 |
| T0619010-001 | EDNA FELL | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 29 |
| T0621016-005 | EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | Dimmit | F/T 764, BLK 30, DENTON | 500 | 795 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620036-001 | EDWARD L FRETWELL III | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 1 |
| T0620039-010 | EDWARD ROBERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 829 |
| T0616008-032 | EDWIN HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 714 |
| T0621007-024 | EDWIN T ATKIN | ANADARKO E&P ONSHORE LLC | 11/19/2013 | 11/19/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 71 |
| T0620010-001 | ELAINE D HEFFLER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 392 | 484 |
| T0619007-015 | ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 385 |
| T0621003-014 | ELIZABETH DEE DOMINY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 516 |
| T0620018-002 | ELIZABETH EARHART | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 627 |
| T0618004-014 | ELIZABETH ENGWALL REVERE | ANADARKO E&P COMPANY LP | 07/25/2012 | 07/25/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 450 | 641 |
| T0619016-005 | ELIZABETH F ORTON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 761 |
| T0621007-023 | ELIZABETH FOGLE | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 817 |
| T0621019-002 | ELIZABETH JEAN LITTLE | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 403 |
| T0619001-017 | ELIZABETH KLOSTERMAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 645 |
| T0620003-002 | ELIZABETH L SEMMENS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 496 | 197 |
| T0621007-030 | ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 78 |
| T0619016-010 | ELIZABETH TAZEWELL WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 769 |
| T0621013-001 | ELIZABETH WITHERS KENNEDY | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 284 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619002-003 | EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 229 |
| T0621003-068 | ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | 08/07/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 532 |
| T0620018-010 | ERNEST JEFFREY BOSBY | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 651 |
| T0621003-027 | ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | 09/10/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 540 |
| T0620036-011 | EUGENE F BUMPAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 833 |
| T0619010-007 | EUGENIA TAYLOR | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 702 |
| T0616008-012 | EVELYN G THRELKELD | ANADARKO E&P ONSHORE LLC | 05/01/2013 | 05/01/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 319 |
| T0619007-001 | EVELYN I METCALF | ANADARKO E&P COMPANY LP | 09/23/2010 | 09/23/2015 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 402<br>415 | 201<br>461 |
| T0621001-003 | EWING ENTERPRISES LIMITED PARTNERSH | ANADARKO E&P COMPANY LP | 09/20/2006 | 09/20/2009 | Dimmit | | 344 | 1 |
| T0620012-001 | FAYRENE JACQUES REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 09/08/2011 | 09/08/2020 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 427 | 741 |
| T0621005 | FITZSIMONS OIL AND GAS MANAGEMENT | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | Dimmit | | 517 | 763 |
| T0621011 | FITZSIMONS OIL AND GAS MANAGEMENT T | ANADARKO E&P ONSHORE LLC | 04/30/2014 | 04/30/2017 | Dimmit | F/T 2050, SEC 15, DENTON | 517 | 759 |
| T0621001-001 | FITZSIMONS OIL AND GAS MANAGEMENT T | ANADARKO E&P COMPANY LP | 12/22/2005 | 12/22/2008 | Dimmit | | 332<br>1012 | 649<br>222 |
| T0620039-013 | FLAKE DIANE BARBER | ANADARKO E&P ONSHORE LLC | 08/04/2014 | 08/04/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 32 |
| T0620041-006 | FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 679 |
| T0618004-020 | FORD, IDA E. SHEEHAN | SN EF MAVERICK, LLC | 08/17/2018 | 08/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 624 | 788 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-019 | FRANCES ANN SINCLAIR | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 736 |
| T0619008-049 | FRANCES HEROD | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 463 |
| T0616008-048 | FRANCES KAYLEEN JOHNSTON | ANADARKO E&P ONSHORE LLC | 11/13/2014 | 11/13/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 714 |
| T0619007-007 | FRANK VANCE | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 356 |
| T0620043-029 | FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | 05/20/2015 | 05/20/2018 | Dimmit | | 547 | 121 |
| T0621003-023 | FRED G BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 268 |
| T0621003-029 | FRED W DAVIS JR | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 639 |
| T0618004-003 | FREDRICK MATTHEW BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 111 |
| T0617002-002 | G E LIGHT III TRUST ET AL | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 830<br>207 |
| T0621007-012 | GABRIEL HALL | ANADARKO E&P ONSHORE LLC | 06/11/2014 | 06/11/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 821 |
| T0621003-020 | GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 798 |
| T0620043-010 | GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 814 |
| T0616008-042 | GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 316 |
| T0618009 | GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | 11/05/2010 | 11/05/2013 | Dimmit | N/2 LOT 3, BLK 105 TAFT | 403 | 400 |
| T0620016-003 | GARY J LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 133 |
| T0619008-017 | GARY KOEHNE ET AL HEIRS RECEIVERSH | ANADARKO E&P ONSHORE LLC | 05/17/2013 | 05/17/2016 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 478 | 227 |
| T0621003-016 | GARY M CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 802 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618007-033 | GAY NELL WILLIAMS | SN EF MAVERICK, LLC | 10/26/2018 | 10/25/2021 | Dimmit | | 627 | 173 |
| T0621004-002 | GAYE L KOPAS | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 505 |
| T0616008-053 | GAYLYN GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 582 |
| T0621007-002 | GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 64 |
| T0620010-006 | GELA WEST | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 390 | 550 |
| T0620040-004 | GENE MARTIN HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 558 | 601 |
| T0619018-001 | GENEVIEVE C GREEN | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 680 |
| T0620039-046 | GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 507 |
| T0617001-005 | GEORGE E LIGHT III ET AL | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 11 |
| T0617001-002 | GEORGE E LIGHT III, BILLIE RAE LIGH | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 1 |
| T0617001-004 | GEORGE E LIGHT JR & SARAH LIGHT TRU | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 7 |
| T0617002-003 | GEORGE E LIGHT JR AND SARAH LIGHT T | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 836<br>213 |
| T0620002-006 | GEORGE F GRANTHAM | ANADARKO E&P COMPANY LP | 07/28/2010 | 07/28/2020 | Dimmit | F/T 1756-1762 DENTON | 395 | 522 |
| T0619008-003 | GEORGE L SPRINGMAN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 129 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618012 | GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | 12/13/2016 | Dimmit | S/2 LOT 8, BLK 102 TAFT | 378 | 674 |
| T0619008-044 | GEORGIA KAY BILLSING | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 52 |
| T0620036-002 | GILES BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 327 |
| T0621003-064 | GJERTRUD J WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 601 |
| T0620035-002 | GLADYS ELAINE MASSIE GOWAN | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 208 |
| T0619007-006 | GLADYS LOOTEN | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 392 |
| T0619007-002 | GLEN RAY METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 384 |
| T0618004-005 | GLORIA DELGADO | ANADARKO E&P COMPANY LP | 11/18/2010 | 11/18/2015 | Dimmit | S/2 LOT 1, BLK 28, SUBD C, TAFT | 406 | 196 |
| T0616008-050 | GLORIA GORBET | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 720 |
| T0621020-008 | GLORIA J ROBBINS | ANADARKO E&P ONSHORE LLC | 10/27/2014 | 10/27/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 532 | 361 |
| T0621001-008 | GOODELL, JENNIE | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 30 |
| T0618007-017 | GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 632 | 546 |
| T0619008-012 | GREGORY ALLEN GOLDSBORO | ANADARKO E&P COMPANY LP | 06/27/2011 | 06/27/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 418 | 157 |
| T0620006-001 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 54 |
| T0621002-001 | GREGORY FOWLER GATLIN | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 54 |
| T0620050-001 | GREGORY FOWLER GATLIN | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 646 | 631 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621007-032 | GREGORY J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 695 |
| T0621003-055 | GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 520 |
| T0619019 | HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 06/01/2012 | 06/01/2014 | Dimmit | | 444 | 569 |
| T0620024 | HARLOW ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | Dimmit | F/T 2320, BLK 10, SEC 31, DENTON | 457 | 45 |
| T0616008-033 | HAROLD HARRISON | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 698 |
| T0620002-002 | HAROLD M STARK ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | Dimmit | F/T 1768-1775, DENTON COLONY SUBD. | 426 | 580 |
| T0616008-015 | HARRY C COOPER | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 825 |
| T0619007-012 | HARRY VANCE JR | ANADARKO E&P COMPANY LP | 03/15/2011 | 03/15/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 360 |
| T0619006-012 | HAZEN FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 08/17/2010 | 08/17/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 398 | 26 |
| T0619006-011 | HAZEN HIGH SCHOOL SCHOLARSHIP FUND | ANADARKO E&P COMPANY LP | 08/17/2015 | 08/17/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 555 | 13 |
| T0620039-029 | HEATHER TALCOTT | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 360 |
| T0621003-036 | HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 524 |
| T0621019-001 | HELEN DAVIS TESS | ANADARKO E&P ONSHORE LLC | 09/30/2014 | 09/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 377 |
| T0621017-010 | HELEN IDA SAMMONS A/K/A HELEN IDA B | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 567 | 466 |
| T0618007-055 | HENRY LYNN HARRIS | SN EF MAVERICK, LLC | 01/29/2019 | 01/28/2022 | Dimmit | | 633 | 670 |
| T0621023 | HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2012 | 05/01/2016 | Dimmit | F/T 2102, BLK 15, DENTON | 439 | 666 |
| T0621003-054 | HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 512 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620038-003 | HILDA MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 670 |
| T0621001-023 | HOWELL, VINCENT | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619007-014 | IRENE DETTEN LEWIS | ANADARKO E&P COMPANY LP | 03/17/2011 | 03/17/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 380 |
| T0619008-008 | IRIS WHITEHEAD HALL | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 390 |
| T0616008-023 | J JOANN CARROLL ET AL | ANADARKO E&P ONSHORE LLC | 04/23/2014 | 04/23/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 517 | 543 |
| T0621007-006 | JACK C ATKIN JR | ANADARKO E&P ONSHORE LLC | 12/05/2013 | 12/05/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 58 |
| T0619007-009 | JACK JOHN METCALF | ANADARKO E&P COMPANY LP | 03/09/2011 | 03/09/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 376 |
| T0616003-009 | JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2015 | 07/07/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 549 | 725 |
| T0620047-002 | JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 556 |
| T0621003-013 | JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 529 |
| T0620043-009 | JACKIE POLK | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 540 |
| T0616003-008 | JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 312 |
| T0621001-005 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | Dimmit | | 430 | 766 |
| T0621024-002 | JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | Dimmit | F/T 2098, DENTON | 430 | 766 |
| T0621001-024 | JACKSON, SHADRICK NEAL | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619008-028 | JAKE F BROWN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 753 |
| T0618004-004 | JAMES A BRYMER | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 108 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-008 | JAMES A DORROH | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 370 |
| T0619002-011 | JAMES A THON | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 628 |
| T0620003-003 | JAMES ARTHUR MONSEN DANIELS | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 496 | 194 |
| T0618007-001 | JAMES B WINDHAM JR | ANADARKO E&P COMPANY LP | 11/19/2010 | 11/19/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 405 | 557 |
| T0620039-009 | JAMES C CANTRELL JR | ANADARKO E&P ONSHORE LLC | 08/06/2014 | 08/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 364 |
| T0621003-009 | JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/25/2013 | 09/25/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 573 |
| T0621007-022 | JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | 02/12/2014 | 02/12/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 517 | 767 |
| T0619001-010 | JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 660 |
| T0621007-029 | JAMES JOSEPH GILBERY | ANADARKO E&P ONSHORE LLC | 07/23/2014 | 07/23/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 833 |
| T0616003-015 | JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | 08/10/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 431 |
| T0621003-031 | JAMES L IRWIN | ANADARKO E&P ONSHORE LLC | 09/26/2013 | 09/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 589 |
| T0620043-019 | JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 519 |
| T0616008-038 | JAMES M BRANCH | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 255 |
| T0620039-004 | JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | 07/03/2014 | 07/03/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 90 |
| T0620039-032 | JAMES MARSHAL BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 491 |
| T0620042-002 | JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2013 | 12/10/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 734 |
| T0621003-043 | JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | 10/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 577 |
| T0621017-009 | JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 553 | 585 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619006-008 | JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 759 |
| T0621015-002 | JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 508 |
| T0620040-003 | JAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 12/18/2014 | 12/18/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 552 | 441 |
| T0620001-002 | JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2016 | Dimmit | F/T 2482, BLK 33, DENTON | 491 | 516 |
| T0620044 | JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | 04/30/2015 | Dimmit | F/T 2449, DENTON | 442 | 828 |
| T0621019-003 | JANE R SMITH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 81 |
| T0619008-023 | JANET D VAN SANT | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 412 |
| T0619006-005 | JANET LOUISE AREHART | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 26 |
| T0621015-003 | JANET RUTH STEWART GLYNN | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 494 |
| T0619010-003 | JANET SCHALLHORN VANDERFORD | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 37 |
| T0621016-007 | JANICE CAROL WEATHERWAX | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 617 |
| T0620002-010 | JAY M GATES III | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 395 | 528 |
| T0621012 | JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2021 | Dimmit | F/T 2009, BLK 10, DENTON | 498 | 605 |
| T0620047-003 | JEAN LOUISE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 563 |
| T0621003-038 | JEAN W MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/23/2013 | 09/23/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 560 |
| T0616003-018 | JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 439 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-010 | JEANINE HELEN RUBY | ANADARKO E&P ONSHORE LLC | 05/20/2013 | 05/20/2016 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 127 |
| T0619002-005 | JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | 04/05/2010 | 04/05/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 385 | 752 |
| T0620011-003 | JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | Dimmit | | 438 | 409 |
| T0621019-012 | JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 380 |
| T0620018-015 | JEFFERY L TRIM | ANADARKO E&P COMPANY LP | 04/02/2012 | 04/02/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 445 | 61 |
| T0618007-024 | JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 619 |
| T0620040-005 | JEFFREY JOHN MOELLER | ANADARKO E&P ONSHORE LLC | 12/16/2014 | 12/16/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 536 | 382 |
| T0620035-005 | JENICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 627 | 203 |
| T0620018-011 | JENNIFER BOSBY GEORGE | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 637 |
| T0620036-013 | JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 462 | 813 |
| T0621003-003 | JENNY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | 08/29/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 516 |
| T0621007-003 | JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/12/2013 | 11/12/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 68 |
| T0616003-010 | JERRY R SHIRES | ANADARKO E&P ONSHORE LLC | 07/02/2015 | 07/02/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 549 | 728 |
| T0619008-024 | JEWEL D BROWN | ANADARKO E&P COMPANY LP | 11/08/2011 | 11/08/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 404 |
| T0618007-048 | JIMMY JACK WALKER | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 615 |
| T0619006-004 | JO ANN SNOW | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 32 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-008 | JO BETH FAWCETT | ANADARKO E&P ONSHORE LLC | 03/05/2013 | 03/05/2016 | Dimmit | F/T 1990, BLK 7, DENTON | 470 | 825 |
| T0616008-019 | JO P POPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 128 |
| T0621019-009 | JOAN DOLAN | ANADARKO E&P ONSHORE LLC | 09/10/2014 | 09/10/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 398 |
| T0621007-036 | JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 90 |
| T0619008-043 | JOAN MAYS | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 58 |
| T0620047-004 | JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 569 |
| T0619008-042 | JOE A GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 61 |
| T0619001-002 | JOE P PRITCHETT | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 695 |
| T0620048 | JOE S SHANNON | ANADARKO E&P COMPANY LP | 06/25/2012 | 06/25/2018 | Dimmit | F/T 2346, BLK 31, DENTON | 453 | 535 |
| T0621007-039 | JOHN C GREEN ET AL RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 522 | 312 |
| T0616003-024 | JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | 04/03/2020 | Dimmit | LOT 14, BLK 4, TAFT | 439 | 695 |
| T0619010-008 | JOHN D SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2021 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 698 |
| T0621017-003 | JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 102 |
| T0620011-004 | JOHN F MILES | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | 03/29/2015 | Dimmit |  | 438 | 407 |
| T0619008-034 | JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | 01/19/2012 | 01/19/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 433 | 125 |
| T0621003-063 | JOHN G WOOD | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 112 |
| T0618004-001 | JOHN H BRYMER IV | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2021 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 114 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-060 | JOHN HILL LANDRUM | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 102 |
| T0621003-050 | JOHN HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 647 |
| T0619008-015 | JOHN J SPRINGMAN IV | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 595 |
| T0620039-001 | JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | 05/20/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 518 | 9 |
| T0621007-038 | JOHN MICHAEL LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 691 |
| T0621013-003 | JOHN MICHAEL VESTAL JR TRUST U/W/O | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 278 |
| T0619018-004 | JOHN QUIN BECKELHEIMER | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 671 |
| T0620034-001 | JOHN RICHARD DICUS | ANADARKO E&P ONSHORE LLC | 06/10/2014 | 06/10/2019 | Dimmit | F/T 1959, BLK 27, DENTON | 519 | 511 |
| T0616008-031 | JOHN RICHARD KIKER | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 196 |
| T0619010-002 | JOHN SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2021 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 33 |
| T0621007-019 | JOLENE D SCHWARTZ | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 714 |
| T0620015-001 | JON F DULLNIG ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 499 | 837 |
| T0619008-020 | JON S BROWN | ANADARKO E&P COMPANY LP | 10/31/2011 | 10/31/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 407 |
| T0620042-001 | JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2013 | 11/14/2018 | Dimmit | F/T 2240, BLK 26, DENTON | 505 | 738 |
| T0616008-020 | JOSEPH GEROME PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 124 |
| T0619008-002 | JOSEPH J SPRINGMAN SR TRUST | ANADARKO E&P COMPANY LP | 10/10/2011 | 10/10/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 427 | 399 |
| T0621007-037 | JOSEPH JAMES LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 699 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0618007-003 | JOSEPH MARSHALL HOLLARN III | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 410 | 163 |
| T0621007-010 | JOSETTE DORIUS | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 730 |
| T0616003-011 | JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 422 |
| T0620019 | JUANITA A PETERS | ANADARKO E&P COMPANY LP | 03/01/2011 | 03/01/2016 | Dimmit | F/T 2477, BLK 32, DENTON | 409 | 664 |
| T0620036-015 | JUD BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 342 |
| T0620021 | JUDITH L LEITCH | ANADARKO E&P COMPANY LP | 03/10/2011 | 03/10/2016 | Dimmit | F/T 2436, SEC 32, DENTON | 408 | 378 |
| T0619007-025 | JUDY DETTEN TRUST | ANADARKO E&P COMPANY LP | 09/22/2011 | 09/22/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 422 | 387 |
| T0619002-010 | JUDY M THON JONES | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 620 |
| T0620012-002 | JUDY WAY | ANADARKO E&P COMPANY LP | 11/02/2011 | 11/02/2020 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 427 | 738 |
| T0621019-018 | JULI BASSORE HEINZLER | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 392 |
| T0620047-006 | JULIE ANN FRITZ-RUBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 455 | 575 |
| T0618028 | JULIE ANN HARRIS RICE | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 629 | 607 |
| T0621007-021 | JULIE ANN NAISBITT | ANADARKO E&P ONSHORE LLC | 02/18/2014 | 02/18/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 726 |
| T0621017-012 | JULIE BOLES | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 559 | 376 |
| T0620002-009 | KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/03/2010 | 08/03/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 382 |
| T0619008-039 | KAREN LOMAS WOODY | ANADARKO E&P COMPANY LP | 10/22/2012 | 10/22/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 457 | 360 |
| T0619006-010 | KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | 08/20/2013 | 08/20/2016 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 492 | 750 |
| T0619010-005 | KAREN SULLARDS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 706 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-021 | KARI BRAUNE | ANADARKO E&P ONSHORE LLC | 06/26/2014 | 06/26/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 40 |
| T0620015-002 | KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 512 | 370 |
| T0621001-004 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | Dimmit | | 430 | 773 |
| T0621024-001 | KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2018 | Dimmit | F/T 2098, DENTON | 430 | 773 |
| T0616008-055 | KATHLEEN IRIS SLOAN | ANADARKO E&P ONSHORE LLC | 04/06/2014 | 04/06/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 517 | 546 |
| T0621003-045 | KATHRYN A CLARDY | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 456 | 505 |
| T0621016-011 | KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/15/2013 | 08/15/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 622 |
| T0619007-024 | KATHY TERRY | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 418 | 151 |
| T0621003-026 | KAY SHOUMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 264 |
| T0616008-002 | KAY WILLIAMS | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 394 | 147 |
| T0616008-026 | KEITH C STUART | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 502 | 65 |
| T0621003-044 | KELLY ANN WOOD | ANADARKO E&P ONSHORE LLC | 08/12/2013 | 08/12/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 581 |
| T0620035-001 | KENNETH A WITBRODT ET AL | ANADARKO E&P ONSHORE LLC | 08/21/2013 | 08/21/2021 | Dimmit | F/T 1899, SEC 26, BLK 10, DENTON | 495 | 204 |
| T0619006-006 | KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 38 |
| T0616008-052 | KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 516 | 701 |
| T0618017-001 | KERRCO, INC | SN EF MAVERICK, LLC | 01/22/2019 | 01/21/2022 | Dimmit | Lot 4, Blk 112, Sub G Taft Catarina Properties | 434 | 400 |
| T0616008-056 | KEVIN JAMES GREEN | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 570 |

Case 4:20-cv-02658 Document 313-6 Filed 09/29/21 in TXSD Page 843 of 1882

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-024 | KEVIN LEE TUCKER | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 368 |
| T0620016-002 | KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 127 |
| T0619001-006 | KINGDON R HUGHES FAMILY LIMITED PAR | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2014 | Dimmit | LOT 4 & 5, BLK 150 | 425 | 589 |
| T0616003-021 | KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 445 |
| T0620012-005 | KRISTI DOMAN | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 627 | 200 |
| T0621001-002 | LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 09/29/2006 | 09/29/2009 | Dimmit | | 343 | 844 |
| T0616008-049 | LANNY C MYERS | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 534 | 717 |
| T0620037-003 | LARRY MOREAU | ANADARKO E&P ONSHORE LLC | 05/29/2014 | 05/29/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 385 |
| T0620037-006 | LARRY MOREAU | SN EF MAVERICK, LLC | 06/05/2019 | 06/05/2022 | Dimmit | Farm Tract 1595 in Block 24 of the Denton Colony Subdivision | 640 | 241 |
| T0620039-023 | LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | 06/09/2014 | 06/09/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 503 |
| T0616003-013 | LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 428 |
| T0619002-013 | LAURIE A BURBANK | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 632 |
| T0621003-047 | LAWRENCE E ONEILL | ANADARKO E&P COMPANY LP | 10/02/2012 | 10/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 655 |
| T0616003-020 | LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 448 |
| T0616003-006 | LEAKE EXPLORATION LLC BY ARTHUR GAY | ANADARKO E&P ONSHORE LLC | 07/17/2015 | 07/17/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 318 |
| T0621019-015 | LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | 09/22/2014 | 09/22/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 409 |
| T0618007-057 | LEI PEAVY | SN EF MAVERICK, LLC | 01/02/2019 | 01/01/2022 | Dimmit | | 634 | 402 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620030 | LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 03/12/2013 | 03/12/2019 | Dimmit | F/T 2325, SEC 31, BLK 10 DENTON | 487 | 772 |
| T0619013-001 | LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 568 |
| T0616005 | LESLIE EDDIE VIVION AND NANCY JOE V | ROSETTA RESOURCES OPERATING LP | 12/21/2009 | 12/21/2012 | Dimmit | | 379 | 500 |
| T0620043-022 | LESLIE EVANS | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 102 |
| T0620034-004 | LESLIE KITTLEMAN | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 762 |
| T0621025-006 | LEVITZ, PAMELA PABST | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 132 |
| T0619008-026 | LEWIS S BROWN | ANADARKO E&P COMPANY LP | 02/10/2012 | 02/10/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 436 | 145 |
| T0617001-001 | LIGHT MINERAL TRUST | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 379 | 840 |
| T0617002-001 | LIGHT MINERAL TRUST ET AL | ST MARY LAND & EXPLORATION COMPANY | 10/29/2009 | 10/29/2012 | Dimmit | | 379<br>492 | 825<br>202 |
| T0621016-001 | LILA R SCHLOSSTEIN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 626 |
| T0620043-025 | LILLIAN E ANDERSON | ANADARKO E&P ONSHORE LLC | 05/19/2015 | 05/19/2018 | Dimmit | | 545 | 516 |
| T0620002-018 | LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2014 | Dimmit | F/T 2511, DENTON | 429 | 541 |
| T0620018-013 | LINDA BOSBY LICHTMAN | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 641 |
| T0619008-046 | LINDA CAGLE | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 457 |
| T0620039-035 | LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2014 | 06/18/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 487 |
| T0620036-008 | LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 828 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-008 | LINDA GAIL MCCOY | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 545 | 531 |
| T0621004-003 | LINDA H LEE | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 508 |
| T0620016-004 | LINDA K KRAMER | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2016 | Dimmit | F/T 2220, 2221, BLK 23, DENTON | 466 | 145 |
| T0619007-011 | LINDA KAY CARTER | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 368 |
| T0621016-017 | LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 672 |
| T0620002-013 | LINDA L MORROW | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2021 | Dimmit | F/T 1756-1762 DENTON | 557 | 385 |
| T0621007-015 | LINDA LEE STOKES | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 117 |
| T0621020-007 | LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | 10/23/2014 | 10/23/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 537 | 75 |
| T0620039-042 | LINDA MAGERS | ANADARKO E&P ONSHORE LLC | 10/14/2014 | 10/14/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 746 |
| T0620039-003 | LINDA ROBINSON-KELLY | ANADARKO E&P ONSHORE LLC | 06/19/2014 | 06/19/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 492 |
| T0618007-042 | LINDA STEWART | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 632 | 542 |
| T0621003-066 | LINN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 569 |
| T0619002-007 | LISA THON KOLLAR TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 463 | 89 |
| T0620043-018 | LITTA TURNER | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 543 |
| T0621019-010 | LLOYD T EVATT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | 11/03/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 553 | 588 |
| T0616008-001 | LOCKESBURG FIRST UNITED METHODIST C | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 423 | 615 |
| T0621019-006 | LOIS GRAY | ANADARKO E&P ONSHORE LLC | 11/11/2014 | 11/11/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 544 | 753 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619001-019 | LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 639 |
| T0620001-003 | LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | 06/14/2014 | Dimmit | F/T 1302, 1303, 1304, SEC 16, BLK 10 DENTON | 423 | 49 |
| T0620043-001 | LONA L ARCHER | ANADARKO E&P ONSHORE LLC | 04/15/2015 | 04/15/2018 | Dimmit | | 545 | 546 |
| T0620002-011 | LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | Dimmit | F/T 1756-1762 DENTON | 545 | 549 |
| T0618007-027 | LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2020 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 563 | 557 |
| T0620018-009 | LOUIS E BOSBY JR | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 646 |
| T0620002-019 | LUCILLE J SWANSON ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | Dimmit | F/T 2153, SEC 18, DENTON | 420 | 757 |
| T0619008-030 | M SUZANNE IMMEN | ANADARKO E&P COMPANY LP | 02/05/2012 | 02/05/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 749 |
| T0618004-012 | MARCIA LOUISE MENATH | ANADARKO E&P COMPANY LP | 08/15/2012 | 08/15/2021 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 455 | 623 |
| T0620037-004 | MARCIA MCLAUGHLIN | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 391 |
| T0621003-041 | MARGARET DAWN GORE | ANADARKO E&P ONSHORE LLC | 08/05/2013 | 08/05/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 520 |
| T0621003-028 | MARGARET J DAVIS | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 794 |
| T0616003-002 | MARGARET L WORD | ANADARKO E&P ONSHORE LLC | 06/25/2015 | 06/25/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 548 | 735 |
| T0620008 | MARGARET MITCHELL SEBERN | ANADARKO E&P COMPANY LP | 02/23/2010 | 02/23/2019 | Dimmit | TRACT 2419, BLOCK 29, DENTON | 383 | 654 |
| T0619001-011 | MARGARET P MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 648 |
| T0620047-001 | MARGARET T JENSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | Dimmit | F/T 1556, BLK 10, SECTION 24, DENTON | 458 | 295 |
| T0619016-001 | MARGARET WESCOE | ANADARKO E&P COMPANY LP | 03/10/2010 | 03/10/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 392 | 487 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620018-001 | MARIAN JEFFREY | ANADARKO E&P COMPANY LP | 06/06/2012 | 06/06/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 445 | 56 |
| T0620002-003 | MARIE PREYSZ SCHOONOVER ET AL RECEI | ANADARKO E&P COMPANY LP | 08/24/2011 | 08/24/2020 | Dimmit | F/T 1756-1762 DENTON | 426 | 577 |
| T0618007-002 | MARIEANNE HOLLARN AKA MARIANNE DUNA | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 410 | 169 |
| T0619008-050 | MARILYN JOHNSTON | ANADARKO E&P COMPANY LP | 08/10/2011 | 08/10/2014 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 423 | 466 |
| T0619008-022 | MARILYN M CALVERT | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 745 |
| T0619008-033 | MARION BROWN | ANADARKO E&P COMPANY LP | 01/30/2012 | 01/30/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 442 | 304 |
| T0621013-004 | MARISSA LOUISE VESTAL TRUST U/W/O L | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 266 |
| T0620002-005 | MARIUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 395 |
| T0621007-033 | MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 98 |
| T0619008-009 | MARJORIE M SPRINGMAN | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 445 |
| T0620041-005 | MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 817 |
| T0619016-011 | MARK E WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 777 |
| T0619008-038 | MARTHA GARRISON LIZZA | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 64 |
| T0620018-007 | MARTHA KIMBLE | ANADARKO E&P COMPANY LP | 04/12/2012 | 04/12/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 443 | 152 |
| T0620036-004 | MARTHA LIDJI | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 6 |
| T0616008-044 | MARTHA OATES | ANADARKO E&P ONSHORE LLC | 11/05/2014 | 11/05/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 544 | 260 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620040-001 | MARTIN FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 12/03/2014 | 12/03/2017 | Dimmit | 10.0 ACS, MORE OR LESS, OUT OF THE I&GNRR SVY, A-307, BEING FARM TRACT 2155 IN BLOCK 18 IN DENTON COLONY, DIMMIT CO/TX. | 548 | 471 |
| T0620043-015 | MARTIN POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 545 | 522 |
| T0619016-013 | MARTIN W WILSON, A MINOR | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 785 |
| T0621025-004 | MARTIN, JOAN HERWECK | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 126 |
| T0621007-017 | MARY ALLENE HAMBLEN | ANADARKO E&P ONSHORE LLC | 01/27/2014 | 01/27/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 703 |
| T0619008-027 | MARY B DUFFY | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 439 | 757 |
| T0621003-056 | MARY ELIZABETH BRAKER | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 87 |
| T0621003-012 | MARY ELIZABETH SIMS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 790 |
| T0620018-003 | MARY FRICKS | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 661 |
| T0618007-025 | MARY HELEN WINDHAM SEAGO ET UX | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 467 | 91 |
| T0619010-004 | MARY JEAN DABBS | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 398 | 41 |
| T0621016-003 | MARY L SLOMAN RECEIVERSHIP | ANADARKO E&P ONSHORE LLC | 08/05/2014 | 08/05/2019 | Dimmit | F/T 764, BLK 30, DENTON | 523 | 830 |
| T0621003-007 | MARY LILLIAN WILFONG | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 256 |
| T0618003-002 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 636 |
| T0618003-004 | MARY MARSHALL SMITH TRUST FBO KATHA | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | Dimmit | | 385 | 255 |
| T0618003-005 | MARY MARSHALL SMITH TRUST FBO MARGA | ANADARKO E&P COMPANY LP | 04/01/2010 | 04/01/2013 | Dimmit | | 385 | 262 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621007-016 | MARY NESTLER | ANADARKO E&P ONSHORE LLC | 01/28/2014 | 01/28/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 687 |
| T0619007-008 | MARY RUTH RICE | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 364 |
| T0619001-015 | MARY SUE KORUS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 627 |
| T0616008-021 | MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 132 |
| T0621003-018 | MATTHEW ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 627 |
| T0620002-001 | MAUND FAMILY LIMITED PARTNERSHIP ET | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 343 | 694 |
| T0621003-046 | MAURICE G ONEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 459 | 528 |
| T0621001-022 | MCKEE, DALE EDWARD | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0620009 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 06/29/2010 | 06/29/2017 | Dimmit | LOTS 1535-1538, BLK 24; LOT 2446, BLK 32, DENTON | 388 | 648 |
| T0620014 | MCROREY CHILDRENS TRUST | ANADARKO E&P COMPANY LP | 08/02/2010 | 08/02/2017 | Dimmit | F/T 1914, 1815, BLK 27, DENTON | 388 | 648 |
| T0619001-005 | MEKUSUKEY OIL COMPANY LLC | ANADARKO E&P COMPANY LP | 03/28/2011 | 03/28/2014 | Dimmit | LOT 4 & 5, BLK 150 | 417 | 612 |
| T0616008-046 | MELISSA BOWMAN | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 528 | 175 |
| T0620039-030 | MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 483 |
| T0619008-047 | MELISSA MUNOZ | ANADARKO E&P COMPANY LP | 03/07/2012 | 03/07/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 436 | 118 |
| T0616008-007 | MELRAY LLC | ANADARKO E&P COMPANY LP | 07/22/2010 | 07/22/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 393 | 318 |
| T0620018-016 | MEREDITH B TRIM | ANADARKO E&P COMPANY LP | 03/16/2012 | 03/16/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 456 | 521 |
| T0618007-026 | MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | 02/25/2015 | 02/25/2018 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 627 | 177 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-014 | MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 678 |
| T0621003-032 | MICHAEL R IRWIN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 585 |
| T0621004-001 | MICHELLE MOCK LUSIGNAN | ANADARKO E&P COMPANY LP | 04/09/2012 | 04/09/2023 | Dimmit | | 437 | 511 |
| T0618004-002 | MICHMER CONTRACTING INC | ANADARKO E&P COMPANY LP | 12/29/2011 | 12/29/2014 | Dimmit | S/2 LOT 1, BLK 28; S/2N/2 LOT 8, BLK 103; N/2 LOT 4, BLK 103 | 433 | 105 |
| T0620022 | MILBURN W HOBSON TRUST DTD 6/19/89 | ANADARKO E&P COMPANY LP | 08/01/2011 | 08/01/2014 | Dimmit | F/T 2461, BLK 10, SEC 32, DENTON | 422 | 395 |
| T0620002-014 | MILDRED PATTERSON ET AL RECEIVERSHI | ANADARKO E&P COMPANY LP | 07/25/2011 | 07/25/2017 | Dimmit | LOTS 1816-1819, BLK 27 DENTON | 420 | 759 |
| T0619011 | MIRAMAR HOLDINGS, LP ET AL | ANADARKO E&P COMPANY LP | 05/01/2015 | 05/01/2018 | Dimmit | LOT 6, BLK 152, CATARINA FARMS SUBD H | 545 | 243 |
| T0619008-041 | MITCHELL RAY WOODY | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 67 |
| T0620043-005 | MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | Dimmit | | 544 | 117 |
| T0616003-004 | MOLLIE E STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 324 |
| T0620039-031 | MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | 06/23/2014 | 06/23/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 499 |
| T0616001-002 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | Dimmit | | 329 | 484 |
| T0616002-002 | MOODY FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2005 | 11/30/2010 | La Salle | | 329 | 484 |
| T0621003-022 | MORRIS E BURNS | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 280 |
| T0619012 | MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/06/2014 | 02/06/2017 | Dimmit | TRACT 1, BLK 38, SUBD C, TAFT | 508 | 167 |
| T0621003-048 | NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 659 |
| T0621019-022 | NANCY BROWN | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 90 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621016-008 | NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/16/2013 | 07/16/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 614 |
| T0621016-004 | NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 09/19/2012 | 09/19/2015 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 612 |
| T0621019-004 | NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | 10/30/2014 | 10/30/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 84 |
| T0616008-036 | NELDA Y BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 199 |
| T0619001-009 | NELVIA LOUISE PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 664 |
| T0620039-037 | NINA MEEKS | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 817 |
| T0618029 | NITA SUE SANDERS | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 192 |
| T0621007-013 | NORMA DEVLIN FREESTONE | ANADARKO E&P ONSHORE | 07/22/2014 | 07/22/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 829 |
| T0616008-014 | NORMA MCLEOD RICE | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 702 |
| T0621017-008 | NORMAN LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 204 |
| T0621003-035 | OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 544 |
| T0621026 | OLSEN, EDMUND SEVERN III | SN EF MAVERICK, LLC | 08/02/2018 | 08/02/2023 | Dimmit | | 623 | 28 |
| T0621025-007 | PABST, PATREA L. | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 120 |
| T0621025-009 | PABST, RICHARD EDWARD JR. | SN EF MAVERICK, LLC | 02/20/2018 | 02/20/2021 | Dimmit | | 615 | 141 |
| T0619002-008 | PAIGE L THON TRUST | ANADARKO E&P ONSHORE LLC | 01/04/2013 | 01/04/2016 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 463 | 85 |
| T0620039-022 | PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | 05/27/2014 | 05/27/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 833 |
| T0616008-004 | PAMELA SUE WILLIAMS REVOCABLE TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2013 | 06/27/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 325 |
| T0616003-017 | PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | 08/13/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 556 | 433 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-002 | PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 108 |
| T0616008-047 | PATRICIA L LAKE | ANADARKO E&P ONSHORE LLC | 03/26/2014 | 03/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 516 | 704 |
| T0621007-001 | PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | 11/26/2013 | 11/26/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 711 |
| T0619006-003 | PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 35 |
| T0620037-002 | PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | 12/08/2014 | 12/08/2019 | Dimmit | F/T 1595, BLK 24, DENTON | 536 | 388 |
| T0620043-006 | PATRICIA PARKS MCCLENDON | ANADARKO E&P ONSHORE LLC | 04/28/2015 | 04/28/2018 | Dimmit | | 544 | 105 |
| T0620002-004 | PATRICIA PYATT COSIMANO | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2018 | Dimmit | F/T 1756-1762 DENTON | 627 | 185 |
| T0621003-004 | PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 55 |
| T0619007-005 | PAUL A DETTEN ET UX | ANADARKO E&P COMPANY LP | 03/18/2011 | 03/18/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 400 |
| T0618020 | PAUL L. SHEEHAN | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 626 | 21 |
| T0620041-001 | PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 814 |
| T0621007-004 | PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 74 |
| T0620039-041 | PEGGY NUETZMAN | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 734 |
| T0619001-013 | PHILLIP A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 642 |
| T0619008-010 | PHYLLIS E. MCELHENEY TRUST DTD 7/30 | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 425 | 311 |
| T0621001-018 | PINNELL, JONI | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 60 |
| T0619007-013 | PLUMA PETERSON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 744 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619008-005 | R L SUTHERLAND III | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 449 |
| T0620018-014 | RALPH J KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 427 | 735 |
| T0617001-003 | RANCHO ENCANTADO LP | ST MARY LAND AND EXPLORATION COMPAN | 10/29/2009 | 10/29/2012 | Dimmit | | 380 | 16 |
| T0619008-014 | RAND J SPRINGMAN | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 589 |
| T0621016-002 | RAND ROBERT BOOKMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 498 | 629 |
| T0619006-013 | RANDALL L GAMMILL | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2020 | Dimmit | E/2 LOT 3, BLK 45, TAFT SUBD F | 394 | 189 |
| T0621003-058 | RAYMOND A LANDRUM JR | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 122 |
| T0621007-026 | RAYMOND GILBERY | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 527 | 825 |
| T0620039-026 | REAVIS EDWARD CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/07/2014 | 10/07/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 743 |
| T0620010-003 | REBECCA ANN OLEY | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 408 |
| T0619013-005 | REGINA LYNN NOVOSAD SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 578 |
| T0621003-061 | RENEE BERRY | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 97 |
| T0619013-006 | RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 583 |
| T0620043-028 | RETHA JEAN POWELL | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 545 | 525 |
| T0618007-056 | RHONDA TESCH | SN EF MAVERICK, LLC | 01/02/2019 | 01/01/2022 | Dimmit | | 633 | 674 |
| T0620011-002 | RHONDA WEISENBERGER | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | Dimmit | TRACT 2516, BLOCKS 19 & 20, DENTON | 438 | 412 |
| T0620034-006 | RICARDO J MUNOZ DDS | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 759 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621019-020 | RICHARD BRENT NEELY | ANADARKO E&P ONSHORE LLC | 10/09/2014 | 10/09/2019 | Dimmit | F/T 2064, BLK 15, DENTON | 532 | 374 |
| T0619006-002 | RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2014 | Dimmit | N/2 LOT 3, BLK 154 TAFT | 397 | 29 |
| T0620039-008 | RICHARD JOSEPH ROBERSON JR | ANADARKO E&P ONSHORE LLC | 07/15/2014 | 07/15/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 523 | 500 |
| T0621019-016 | RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | 01/06/2015 | 01/06/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 87 |
| T0618007-018 | RICKY LEE HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 595 |
| T0619015-002 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2015 | Dimmit | S/2 LOT 7, BLK 148, CATARINA FARMS SUBD H | 445 | 66 |
| T0620001-004 | RISKEN FAMILY TRUST | SN EF MAVERICK, LLC | 03/22/2012 | 03/22/2020 | Dimmit | | 445 | 66 |
| T0620002-015 | RISKEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2012 | 03/22/2023 | Dimmit | F/T 1828, 1829, BLK 27, DENTON | 445 | 66 |
| T0619013-004 | RITA JO FRAILICKS | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 588 |
| T0616008-041 | ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/18/2013 | 04/18/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 482 | 313 |
| T0619001-020 | ROBERT A RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 657 |
| T0621007-005 | ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 55 |
| T0618030 | ROBERT CHARLES VIVION | SN EF MAVERICK, LLC | 01/01/2019 | 12/31/2021 | Dimmit | | 627 | 165 |
| T0618007-004 | ROBERT CHARLES WINDHAM ET UX | ANADARKO E&P COMPANY LP | 02/03/2011 | 02/03/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 412 | 384 |
| T0620039-027 | ROBERT D CLEMENTS | ANADARKO E&P ONSHORE LLC | 10/08/2014 | 10/08/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 740 |
| T0616008-028 | ROBERT GRAVES | ANADARKO E&P ONSHORE LLC | 07/01/2014 | 07/01/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 833 |
| T0621007-025 | ROBERT JAMES WALLWORK | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 515 | 189 |
| T0621007-009 | ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | 02/24/2014 | 02/24/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 511 | 722 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-051 | ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 643 |
| T0620028 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2016 | Dimmit | F/T 2456, SEC 32, DENTON | 476 | 288 |
| T0620029 | ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2019 | Dimmit | F/T 2329, SEC 31, DENTON | 476 | 288 |
| T0621006-001 | ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | Dimmit | F/T 532, 533, BLK 6, SEC 43, DENTON | 570 | 236 |
| T0620010-002 | ROBERT MICHAEL STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 405 |
| T0621017-001 | ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2015 | Dimmit | F/T 768, BLK 30, DENTON | 537 | 96 |
| T0619001-023 | ROBERT T PELLER ET UX | ANADARKO E&P COMPANY LP | 03/11/2011 | 03/11/2014 | Dimmit | LOT 8, BLK 179 | 406 | 729 |
| T0616008-009 | ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | 09/04/2014 | 09/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 528 | 179 |
| T0621003-034 | ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 552 |
| T0621016-009 | ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 669 |
| T0621003-040 | ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 524 |
| T0621003-030 | ROBIN E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 597 |
| T0620039-014 | RODGER OLSON | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 525 | 356 |
| T0616003-016 | RODNEY J LISBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 556 | 436 |
| T0620036-010 | ROGER M BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4, F/T 2487, BLK 33, DENTON | 462 | 823 |
| T0620001-001 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 344 | 46 |
| T0619001-012 | RONALD D RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 630 |
| T0620039-044 | RONNIE GUTHRIE | ANADARKO E&P ONSHORE LLC | 02/23/2015 | 02/23/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 366 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620043-011 | RONNIE KIDD | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 120 |
| T0620034-003 | RONNIE WROUGHTON SMITH | ANADARKO E&P ONSHORE LLC | 10/06/2014 | 10/06/2022 | Dimmit | F/T 1959, BLK 27, DENTON | 530 | 756 |
| T0618007-035 | RONNY O. WARD | SN EF MAVERICK, LLC | 10/26/2018 | 10/25/2021 | Dimmit | | 627 | 181 |
| T0620041-002 | ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 570 | 811 |
| T0616008-057 | ROSE D BRANCH | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 526 | 263 |
| T0620018-008 | ROY LOGAN KIMBLE | ANADARKO E&P COMPANY LP | 10/21/2011 | 10/21/2014 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 435 | 797 |
| T0618004-018 | RUSSO, MAUREEN | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | | 623 | 20 |
| T0620036-006 | RUTH J BUMPAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 463 | 16 |
| T0619007-018 | RUTH KINCANNON | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 406 | 732 |
| T0619002-004 | SALVATION ARMY | ANADARKO E&P COMPANY LP | 04/30/2011 | 04/30/2016 | Dimmit | LOT 7, BLK 175 TAFT | 409 | 232 |
| T0616008-037 | SAM L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 576 |
| T0619007-016 | SAM METCALF | ANADARKO E&P COMPANY LP | 03/16/2011 | 03/16/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 389 |
| T0619013-002 | SAM NED FACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 563 |
| T0619008-036 | SAM O GARRISON | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 70 |
| T0620041-008 | SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 676 |
| T0621003-021 | SAMMY NEAL CLARK | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 635 |
| T0619013-003 | SAMUEL FACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | Dimmit | N/2 LOT 4, BLK 37 TAFT | 497 | 573 |
| T0619007-020 | SAN JACINTO BAPTIST CHURCH | ANADARKO E&P COMPANY LP | 03/14/2011 | 03/14/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 408 | 393 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619016-003 | SANDRA D WESCOE | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 395 | 565 |
| T0618007-045 | SANDRA HARRIS SHAW | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 629 | 627 |
| T0621015-001 | SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2018 | Dimmit | F/T 2041, SEC 15, DENTON | 459 | 504 |
| T0616003-019 | SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2021 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 559 | 528 |
| T0621020-006 | SANDRA K PATTERSON | ANADARKO E&P ONSHORE LLC | 10/13/2014 | 10/13/2019 | Dimmit | F/T 1650, BLK 11, DENTON | 532 | 364 |
| T0619002-012 | SANDRA L MOLUMBY | ANADARKO E&P COMPANY LP | 06/04/2012 | 06/04/2015 | Dimmit | S/2 LOT 1, N 20 ACS LOT 8, BLK 179 | 445 | 636 |
| T0620039-017 | SANDRA SVITEK | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 556 | 592 |
| T0620039-019 | SARA B INNMON | ANADARKO E&P ONSHORE LLC | 06/12/2014 | 06/12/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 519 | 495 |
| T0616003-023 | SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2020 | Dimmit | LOT 14, BLK 4, TAFT | 392 | 478 |
| T0620038-002 | SARAH JEAN SCOTT BURGE | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 674 |
| T0621003-005 | SARAH VANDERVOORT HARRIS | ANADARKO E&P ONSHORE LLC | 02/21/2013 | 02/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 469 | 59 |
| T0619001-008 | SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 654 |
| T0620012-003 | SCOTT FAMILY TRUST | ANADARKO E&P COMPANY LP | 01/31/2012 | 01/31/2021 | Dimmit | F/T 1936, 1937, 1938, SEC 27, BLK 10, DENTON | 435 | 803 |
| T0620013 | SCOTT M FLEMING | ANADARKO E&P COMPANY LP | 08/24/2010 | 08/24/2013 | Dimmit | F/T 1732, 1733, BLK 6, SEC 19, DENTON | 393 | 385 |
| T0620043-030 | SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | 06/08/2015 | 06/08/2018 | Dimmit | | 550 | 372 |
| T0621007-014 | SHAREN MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 94 |
| T0616008-013 | SHARON CHANEY | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 706 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619007-027 | SHARON DAUGHTERS | ANADARKO E&P COMPANY LP | 07/26/2011 | 07/26/2016 | Dimmit | LOTS 5 & 6, BLK 175, SUBD L, TAFT | 425 | 695 |
| T0618004-013 | SHARRON BENTHAL VEREEN | ANADARKO E&P COMPANY LP | 09/26/2012 | 09/26/2018 | Dimmit | N/2 LOT 3, BLK 111, TAFT SUBD G | 629 | 638 |
| T0620002-008 | SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | Dimmit | F/T 1756-1762 DENTON | 393 | 398 |
| T0621025-005 | SHAW, MICHAEL L. | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 129 |
| T0621025-010 | SHAW, ROBERT L. | SN EF MAVERICK, LLC | 03/14/2018 | 03/14/2021 | Dimmit | | 615 | 138 |
| T0618004-019 | SHEEHAN, MARTIN | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 24 |
| T0618004-016 | SHEEHAN, WILLIAM N. III | ANADARKO E&P COMPANY LP | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 12 |
| T0619008-006 | SHELBY KUCHLER | ANADARKO E&P COMPANY LP | 08/29/2011 | 08/29/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 423 | 441 |
| T0618007-019 | SHERRI LYNN WEATHEREAD | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 632 | 550 |
| T0618007-051 | SHERRY MEALY | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 632 | 554 |
| T0616003-014 | SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 555 | 425 |
| T0620043-012 | SHIRL D MCCOY | ANADARKO E&P ONSHORE LLC | 04/22/2015 | 04/22/2018 | Dimmit | | 548 | 477 |
| T0620045 | SHIRLEY ANN ORMOND | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 2374, DENTON | 439 | 691 |
| T0620003-001 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | 03/06/2006 | 08/01/2018 | Dimmit | | 343 | 325 |
| T0621001-012 | SPURLOCK, REBECCA | SN EF MAVERICK, LLC | 03/20/2018 | 03/20/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | 619 | 51 |
| T0621008 | STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | 08/01/2012 | 08/01/2015 | Dimmit | F/T 743, BLK 42 DENTON | 498 | 608 |
| T0617002-004 | STATE OF TEXAS M-110600 | CHESAPEAKE EXPLORATION LLC | 01/28/2010 | 01/28/2013 | Dimmit | | 391<br>513 | 488<br>32 |
| T0616010 | STATE OF TEXAS MF 119522 | SN EF MAVERICK, LLC | 03/01/2018 | 03/01/2021 | La Salle | | 1015 | 452 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0616004 | STATE OF TEXAS MF-107481 ET AL | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | Dimmit | | 336 | 199 |
| T0620004 | STATE OF TEXAS MF-110291 ET AL | ANADARKO E&P COMPANY LP | 03/06/2009 | 03/06/2011 | Dimmit | | 369 | 468 |
| T0620007 | STATE OF TEXAS MF-111277 | ANADARKO E&P COMPANY LP | 07/20/2010 | 07/20/2015 | Dimmit | | 392<br>396 | 363<br>579 |
| T0616006 | STATE OF TEXAS MF-112121 ET AL | ANADARKO E&P COMPANY LP | 09/01/2010 | 09/01/2013 | La Salle | | 530 | 251 |
| T0616009 | STATE OF TEXAS MF-118669 | SN EF MAVERICK, LLC | 03/17/2017 | 03/17/2021 | Dimmit | 124.79 ACRES BEING ALL OF AB&M SURVEY 508, A-1545, DIMMIT COUNTY, TEXAS. | | |
| T0620043-023 | STEPHEN LABONTE | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 547 | 118 |
| T0620010-007 | STEVE GROTE | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 392 | 481 |
| T0621017-005 | STEVEN H LEE | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 216 |
| T0621016-013 | STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 675 |
| T0616008-045 | STEVEN L RAGLAND | ANADARKO E&P ONSHORE LLC | 07/21/2014 | 07/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 531 | 199 |
| T0620037-001 | STEVEN REINBOLT | ANADARKO E&P ONSHORE LLC | 03/09/2015 | 03/09/2023 | Dimmit | F/T 1595, BLK 24, DENTON | 541 | 424 |
| T0620036-005 | STUART BUMPAS | ANADARKO E&P ONSHORE LLC | 01/07/2013 | 01/07/2016 | Dimmit | SE/4 F/T 2487, BLK 33, DENTON | 462 | 838 |
| T0620039-043 | SUE BISHOP | ANADARKO E&P ONSHORE LLC | 10/20/2014 | 10/20/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 728 |
| T0621016-006 | SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | Dimmit | F/T 764, BLK 30, DENTON | 500 | 792 |
| T0620003-004 | SUSAN DANIELS SCHMITZ | ANADARKO E&P ONSHORE LLC | 07/25/2013 | 07/25/2018 | Dimmit | F/T 1038, SECTION 21, DENTON | 500 | 6 |
| T0620006-002 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 59 |
| T0621002-003 | SUSAN GATLIN KELLY | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | proposed railroad through thc Denton Colony Subdivisior | 429 | 59 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620050-002 | SUSAN GATLIN KELLY | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 646 | 636 |
| T0616008-027 | SUSAN L BESANCON | ANADARKO E&P ONSHORE LLC | 07/09/2014 | 07/09/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 821 |
| T0619008-013 | SUSAN L WODTKE REVOCABLE TRUST AGMT | ANADARKO E&P COMPANY LP | 08/02/2011 | 08/02/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 420 | 221 |
| T0621017-007 | SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 207 |
| T0619008-016 | SUSAN MARIE OLSON | ANADARKO E&P COMPANY LP | 06/01/2011 | 06/01/2014 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 416 | 592 |
| T0618007-041 | SUSAN MILLER | SN EF MAVERICK, LLC | 01/10/2019 | 01/09/2022 | Dimmit | | 629 | 631 |
| T0621014-001 | SUSAN S WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/26/2012 | 10/26/2015 | Dimmit | F/T 790, SEC 30, DENTON | 459 | 498 |
| T0621003-037 | SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 500 | 798 |
| T0616008-034 | SUSAN SMITH | ANADARKO E&P COMPANY LP | 02/03/2012 | 02/03/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 439 | 710 |
| T0620018-005 | SUSAN T ALLEN | ANADARKO E&P COMPANY LP | 04/17/2012 | 04/17/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 442 | 832 |
| T0621003-052 | SUSANNE PARRISH | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 806 |
| T0621014-002 | SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2013 | 01/16/2016 | Dimmit | F/T 790, SEC 30, DENTON | 462 | 418 |
| T0618008 | SWONKE FAMILY TRUST | ANADARKO E&P COMPANY LP | 07/14/2010 | 07/14/2014 | Dimmit | N/2 LOT 1, BLK 104, TAFT | 399 | 715 |
| T0620039-005 | SYLVIA A HAWKINS | ANADARKO E&P ONSHORE LLC | 06/16/2014 | 06/16/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 527 | 28 |
| T0620039-039 | TAMMIE PRACHYL | ANADARKO E&P ONSHORE LLC | 11/06/2014 | 11/06/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 534 | 307 |
| T0621016-016 | TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | 12/04/2018 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 681 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620039-038 | TERRY GRISSO | ANADARKO E&P ONSHORE LLC | 12/04/2014 | 12/04/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 534 | 310 |
| T0620043-021 | TERRY POWELL | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 544 | 99 |
| T0619008-018 | TEXAS LAND AND MINERAL COMPANY LLC | ANADARKO E&P COMPANY LP | 11/20/2012 | 11/20/2015 | Dimmit | 417 ACS, OUT OF BLOCKS 150 & 151, SUBD H, TAFT | 458 | 290 |
| T0616008-006 | THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | 01/20/2015 | 01/20/2018 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 509 |
| T0618003-003 | THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | 10/25/2005 | 02/22/2020 | Dimmit | | 338 | 626 |
| T0616008-017 | THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 190 |
| T0620038-005 | THOMAS GUIN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | Dimmit | F/T 1966, BLK 27, DENTON | 439 | 682 |
| T0621019-005 | THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | 01/05/2015 | 01/05/2020 | Dimmit | F/T 2064, BLK 15, DENTON | 537 | 93 |
| T0621007-031 | THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 104 |
| T0621003-049 | THOMAS M ONEILL | ANADARKO E&P COMPANY LP | 09/27/2012 | 09/27/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 455 | 651 |
| T0620027 | THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | 04/25/2019 | Dimmit | F/T 1786, SEC 22, DENTON | 473 | 112 |
| T0621016-015 | THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | Dimmit | F/T 764, BLK 30, DENTON | 511 | 684 |
| T0616008-051 | THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | 11/18/2014 | 11/18/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 538 | 792 |
| T0620039-020 | THOMAS W JONES | ANADARKO E&P ONSHORE LLC | 10/28/2014 | 10/28/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 731 |
| T0616008-054 | TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 579 |
| T0620032-002 | TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | 10/11/2018 | Dimmit | F/T 1973, SEC 27, DENTON | 457 | 213 |
| T0620039-036 | TOM CLIFTON | ANADARKO E&P ONSHORE LLC | 06/05/2014 | 06/05/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 517 | 825 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0619010-009 | TOM SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 483 |
| T0619016-004 | TRACI W MCDEVITT | ANADARKO E&P COMPANY LP | 05/13/2010 | 05/13/2018 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 402 | 198 |
| T0616007-001 | TRIPLE B INVESTMENTS LLC | ANADARKO E&P COMPANY LP | 11/26/2010 | 11/25/2016 | Dimmit | | 401 | 548 |
| T0616003-007 | TRUITT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | Dimmit | LOT 2 & 7, BLK 4, SUBD A, TAFT CATARINA | 551 | 315 |
| T0621013-002 | TRYON K HUGGINS III | ANADARKO E&P ONSHORE LLC | 05/14/2014 | 05/14/2017 | Dimmit | F/T 761, DENTON | 516 | 272 |
| T0619018-002 | TULLY R CURRIE | ANADARKO E&P COMPANY LP | 04/21/2011 | 04/21/2018 | Dimmit | SE/4NE/4 SEC 37, CARL ALBRECT RE-SURVEY | 409 | 677 |
| T0619016-008 | TYLER J WILSON | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 793 |
| T0619001-022 | UNA S HENG | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 461 | 254 |
| T0621001-021 | USHER, RHONDA L | SN EF MAVERICK, LLC | 03/30/2018 | 03/30/2021 | Dimmit | Farm Tract 363 in Block 61 of the Denton Colony Subdivision | | |
| T0619008-040 | VERNEAL ZOGRAN | THE POWELL GROUP | 09/08/2010 | 09/08/2015 | Dimmit | LOT 1 & NORTH 37 ACRES LOT 8, BLK 150 | 395 | 73 |
| T0621003-057 | VICKI ANN SPIEKERMAN | ANADARKO E&P ONSHORE LLC | 05/02/2013 | 05/02/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 478 | 92 |
| T0616008-025 | VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 500 | 316 |
| T0621007-008 | VICKI LOU ROLANDI | ANADARKO E&P ONSHORE LLC | 01/09/2014 | 01/09/2019 | Dimmit | F/T 2042, 2044, BLK 15, DENTON | 506 | 113 |
| T0619016-006 | VICTORIA A WILSON A MINOR | ANADARKO E&P COMPANY LP | 09/19/2011 | 09/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 801 |
| T0619001-004 | VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | 08/26/2010 | 08/26/2014 | Dimmit | LOT 4 & 5, BLK 150 | 399 | 712 |
| T0616008-030 | VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 512 | 193 |
| T0619016-007 | VIRGINIA ORTON HUBBARD | ANADARKO E&P COMPANY LP | 10/19/2011 | 10/19/2019 | Dimmit | W/2SE/4SW/4 SEC 37, CARL ABRECHT | 431 | 809 |
| T0618007-020 | VONNITA ANN LEONARDI | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 623 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-025 | WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 474 | 276 |
| T0618007-022 | WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | 01/02/2019 | 01/01/2022 | Dimmit | LOT 5, BLK 112, SUBD G, TAFT | 629 | 591 |
| T0620043-013 | WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | 04/30/2015 | 04/30/2018 | Dimmit | | 549 | 470 |
| T0620043-014 | WAYNE MCCOY | ANADARKO E&P ONSHORE LLC | 04/21/2015 | 04/21/2018 | Dimmit | | 550 | 369 |
| T0616008-016 | WEAVER JAMES BARKMAN JR | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 515 | 573 |
| T0620039-007 | WELDON L KNIGHT | ANADARKO E&P ONSHORE LLC | 10/29/2014 | 10/29/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 532 | 751 |
| T0620041-007 | WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 573 | 673 |
| T0620043-017 | WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | 04/20/2015 | 04/20/2018 | Dimmit | | 544 | 111 |
| T0620039-015 | WESLEY E BANKSTON | ANADARKO E&P ONSHORE LLC | 02/04/2015 | 02/04/2020 | Dimmit | F/T 2332, BLK 31, DENTON | 539 | 360 |
| T0620050-004 | WESLEY G GATLIN III | SN EF MAVERICK, LLC | 12/08/2019 | 12/08/2021 | Dimmit | Block 26 and being part of the right-of-way hundred (100) feet in width reserved for a proposed railroad through the Denton Colony Subdivision | 648 | 530 |
| T0620006-004 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2017 | Dimmit | | 429 | 64 |
| T0621002-002 | WESLEY GATLIN JR | ANADARKO E&P COMPANY LP | 12/08/2011 | 12/08/2020 | Dimmit | | 429 | 64 |
| T0622005 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | Maverick | | 1067 | 185 |
| T0622006 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 10/31/2013 | Maverick | | 1067 | 185 |
| T0622007 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 06/09/2014 | Maverick | | 1067<br>2509 | 161<br>755 |
| T0620049 | WHITETAIL DIMMIT MINERALS, LLC | SN EF MAVERICK, LLC | 03/04/2019 | 03/04/2022 | Dimmit | | 633 | 678 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0620026 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/04/2019 | 03/03/2022 | Dimmit | F/T 2373, BLK 30, DENTON | 465 | 107 |
| T0621009 | WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 03/13/2014 | 03/13/2019 | Dimmit | F/T 538, SEC 43, DENTON | 465 | 107 |
| T0618005-001 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 12/15/2014 | Dimmit | | 403 | 403 |
| T0618010 | WILL ALSTON BEINHORN | ANDARKO E&P COMPANY LP | 12/15/2010 | 12/15/2016 | Dimmit | S/2 LOT 1, BLK 183 TAFT | 403 | 403 |
| T0618014 | WILL ALSTON BEINHORN | ANADARKO E&P COMPANY LP | 12/15/2010 | 06/15/2015 | Dimmit | S/2 LOT 8, BLK 105, TAFT G | 403 | 403 |
| T0620015-003 | WILL MCGARRETT HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 512 | 365 |
| T0618002 | WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2006 | 03/06/2011 | Dimmit | | 343 | 690 |
| T0619001-007 | WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2015 | Dimmit | LOT 4 & 5, BLK 150 | 454 | 667 |
| T0620002-012 | WILLIAM ALLAN RAWLINGS | ANADARKO E&P ONSHORE LLC | 05/14/2015 | 05/14/2021 | Dimmit | F/T 1756-1762 DENTON | 548 | 622 |
| T0621017-006 | WILLIAM B KIEBERGER JR | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | Dimmit | F/T 768, BLK 30, DENTON | 546 | 213 |
| T0620010-005 | WILLIAM DAVID STAVINOHA | ANADARKO E&P COMPANY LP | 07/15/2010 | 07/15/2015 | Dimmit | F/T 2499, DENTON | 393 | 392 |
| T0619010-006 | WILLIAM DAY SCHALLHORN | ANADARKO E&P COMPANY LP | 10/14/2010 | 10/14/2018 | Dimmit | LOT 1, BLK 45, TAFT SUBD F | 399 | 691 |
| T0620039-040 | WILLIAM GERALD GUTHRIE JR | ANADARKO E&P ONSHORE LLC | 10/02/2014 | 10/02/2019 | Dimmit | F/T 2332, BLK 31, DENTON | 530 | 737 |
| T0621003-019 | WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | 08/16/2012 | 08/16/2015 | Dimmit | F/T 1990, BLK 7, DENTON | 452 | 786 |
| T0620018-004 | WILLIAM KEITH KIMBLE | ANADARKO E&P COMPANY LP | 04/23/2012 | 04/23/2015 | Dimmit | F/T 1299 & S/2 F/T 1300, BLK 10, SEC 16, DENTON | 439 | 632 |
| T0618011 | WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | 04/03/2013 | 10/03/2018 | Dimmit | N/2 LOT 4, BLK 110 TAFT | 474 | 251 |
| T0616008-018 | WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | Dimmit | LOT 3, BLK 13, TAFT-CATARINA A | 519 | 136 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0621003-011 | WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2018 | Dimmit | F/T 1990, BLK 7, DENTON | 498 | 548 |
| T0620041-004 | WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | Dimmit | F/T 2164, BLK 18, DENTON | 571 | 726 |
| T0622001-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0622002-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0622003-002 | WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2006 | 12/31/2013 | Maverick | | 1041 | 67 |
| T0618004-017 | WIRE, CATHY | SN EF MAVERICK, LLC | 07/17/2018 | 07/17/2023 | Dimmit | N/2 LOT 3, BLK 111; S/2 LOT 1, BLK 111, TAFT SUBD G | 623 | 16 |
| T0624001 | WORTHEY PROPERTIES LTD | ST MARY LAND & EXPLORATION COMPANY | 03/01/2009 | 07/31/2015 | Webb | | 2750 | 95 |
| T0620015-004 | YALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | Dimmit | F/T 1885, 1886, SEC 26, DENTON | 500 | 1 |

# Annex B
## Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338800000 | 4212733880 | BEINHORN RANCH 10H | Producing |
| 42127341130000 | 4212734113 | BEINHORN RANCH 11H | Producing |
| 42127341140000 | 4212734114 | BEINHORN RANCH 12H | Producing |
| 42127342600000 | 4212734260 | BEINHORN RANCH 13H | Producing |
| 42127342590000 | 4212734259 | BEINHORN RANCH 14H | Producing |
| 42127342610000 | 4212734261 | BEINHORN RANCH 15H | Producing |
| 42127349970000 | 4212734997 | BEINHORN RANCH 16H | Producing |
| 42127349980000 | 4212734998 | BEINHORN RANCH 17H | Producing |
| 42127349990000 | 4212734999 | BEINHORN RANCH 18H | Producing |
| 42127343300000 | 4212734330 | BEINHORN RANCH 19H | Producing |
| 42127336240000 | 4212733624 | BEINHORN RANCH 1H | Shut In |
| 42127343280000 | 4212734328 | BEINHORN RANCH 20H | Producing |
| 42127341150000 | 4212734115 | BEINHORN RANCH 21H | Producing |
| 42127343290000 | 4212734329 | BEINHORN RANCH 22H | Producing |
| 42127343830000 | 4212734383 | BEINHORN RANCH 23H | Producing |
| 42127343840000 | 4212734384 | BEINHORN RANCH 24H | Producing |
| 42127343850000 | 4212734385 | BEINHORN RANCH 25H | Producing |
| 42127343860000 | 4212734386 | BEINHORN RANCH 26H | Producing |
| 42127350010000 | 4212735001 | BEINHORN RANCH 27H | Producing |
| 42127350000000 | 4212735000 | BEINHORN RANCH 28H | Producing |
| 42127350180000 | 4212735018 | BEINHORN RANCH 29H | Producing |
| 42127336440000 | 4212733644 | BEINHORN RANCH 2H | Producing |
| 42127350200000 | 4212735020 | BEINHORN RANCH 30H | Producing |
| 42127350190000 | 4212735019 | BEINHORN RANCH 31H | Producing |
| 42127350220000 | 4212735022 | BEINHORN RANCH 32H | Producing |
| 42127350320000 | 4212735032 | BEINHORN RANCH 33H | Producing |
| 42127350330000 | 4212735033 | BEINHORN RANCH 34H | Producing |
| 42127350350000 | 4212735035 | BEINHORN RANCH 35H | Producing |
| 42127350340000 | 4212735034 | BEINHORN RANCH 36H | Producing |
| 42127362140000 | 4212736214 | BEINHORN RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127362190000 | 4212736219 | BEINHORN RANCH 38H | Producing |
| 42127362200000 | 4212736220 | BEINHORN RANCH 39H | Producing |
| 42127336640000 | 4212733664 | BEINHORN RANCH 3H | Producing |
| 42127362210000 | 4212736221 | BEINHORN RANCH 40H | Producing |
| 42127362230000 | 4212736223 | BEINHORN RANCH 41H | Producing |
| 42127362240000 | 4212736224 | BEINHORN RANCH 42H | Producing |
| 42127362250000 | 4212736225 | BEINHORN RANCH 43H | Producing |
| 42127362260000 | 4212736226 | BEINHORN RANCH 44H | Producing |
| 42127336900000 | 4212733690 | BEINHORN RANCH 4H | Producing |
| 42127337600000 | 4212733760 | BEINHORN RANCH 5H | Producing |
| 42127337610000 | 4212733761 | BEINHORN RANCH 6H | Producing |
| 42127338710000 | 4212733871 | BEINHORN RANCH 7H | Producing |
| 42127338720000 | 4212733872 | BEINHORN RANCH 8H | Producing |
| 42127338790000 | 4212733879 | BEINHORN RANCH 9H | Producing |
| 42127362910000 | 4212736291 | BEINHORN RANCH UNIT A 10H | Producing |
| 42127362890000 | 4212736289 | BEINHORN RANCH UNIT A 11H | Producing |
| 42127362940000 | 4212736294 | BEINHORN RANCH UNIT A 12H | Producing |
| 42127362750000 | 4212736275 | BEINHORN RANCH UNIT A 1H | Producing |
| 42127362760000 | 4212736276 | BEINHORN RANCH UNIT A 2H | Producing |
| 42127362770000 | 4212736277 | BEINHORN RANCH UNIT A 3H | Producing |
| 42127362780000 | 4212736278 | BEINHORN RANCH UNIT A 4H | Producing |
| 42127362820000 | 4212736282 | BEINHORN RANCH UNIT A 5H | Producing |
| 42127362860000 | 4212736286 | BEINHORN RANCH UNIT A 6H | Producing |
| 42127362870000 | 4212736287 | BEINHORN RANCH UNIT A 7H | Producing |
| 42127362900000 | 4212736290 | BEINHORN RANCH UNIT A 8H | Producing |
| 42127362880000 | 4212736288 | BEINHORN RANCH UNIT A 9H | Producing |
| 42127337330000 | 4212733733 | BRISCOE CARLA RANCH 10H | Producing |
| 42127337350000 | 4212733735 | BRISCOE CARLA RANCH 11H | Producing |
| 42127337360000 | 4212733736 | BRISCOE CARLA RANCH 12H | Producing |
| 42127338750000 | 4212733875 | BRISCOE CARLA RANCH 13H | Producing |
| 42127376280000 | 4212737628 | BRISCOE CARLA RANCH 13HA | Producing |
| 42127376290000 | 4212737629 | BRISCOE CARLA RANCH 13HB | Surface Casing Only |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376300000 | 4212737630 | BRISCOE CARLA RANCH 13HC | Producing |
| 42127376310000 | 4212737631 | BRISCOE CARLA RANCH 13HD | Producing |
| 42127376320000 | 4212737632 | BRISCOE CARLA RANCH 13HE | Surface Casing Only |
| 42127376330000 | 4212737633 | BRISCOE CARLA RANCH 13HF | Producing |
| 42127376340000 | 4212737634 | BRISCOE CARLA RANCH 13HG | Producing |
| 42127376350000 | 4212737635 | BRISCOE CARLA RANCH 13HH | Surface Casing Only |
| 42127338760000 | 4212733876 | BRISCOE CARLA RANCH 14H | Producing |
| 42127338740000 | 4212733874 | BRISCOE CARLA RANCH 15H | Producing |
| 42127341330000 | 4212734133 | BRISCOE CARLA RANCH 16H | Producing |
| 42127381310000 | 4212738131 | BRISCOE CARLA RANCH 16HA | Producing |
| 42127381320000 | 4212738132 | BRISCOE CARLA RANCH 16HB | Producing |
| 42127381330000 | 4212738133 | BRISCOE CARLA RANCH 16HC | Producing |
| 42127381340000 | 4212738134 | BRISCOE CARLA RANCH 16HD | Producing |
| 42127341340000 | 4212734134 | BRISCOE CARLA RANCH 17H | Producing |
| 42127341350000 | 4212734135 | BRISCOE CARLA RANCH 18H | Producing |
| 42127382910000 | 4212738291 | BRISCOE CARLA RANCH 18HX | Producing |
| 42127382920000 | 4212738292 | BRISCOE CARLA RANCH 18HY | Producing |
| 42127382930100 | 4212738293 | BRISCOE CARLA RANCH 18HZ | Producing |
| 42127338890000 | 4212733889 | BRISCOE CARLA RANCH 19H | Producing |
| 42127336810000 | 4212733681 | BRISCOE CARLA RANCH 1H | Shut In |
| 42127338900000 | 4212733890 | BRISCOE CARLA RANCH 20H | Producing |
| 42127338910000 | 4212733891 | BRISCOE CARLA RANCH 21H | Producing |
| 42127338850000 | 4212733885 | BRISCOE CARLA RANCH 22H | Producing |
| 42127338930000 | 4212733893 | BRISCOE CARLA RANCH 23H | Producing |
| 42127338940000 | 4212733894 | BRISCOE CARLA RANCH 24H | Producing |
| 42127338950000 | 4212733895 | BRISCOE CARLA RANCH 25H | Producing |
| 42127349480000 | 4212734948 | BRISCOE CARLA RANCH 26H | Producing |
| 42127349490000 | 4212734949 | BRISCOE CARLA RANCH 27H | Producing |
| 42127349690000 | 4212734969 | BRISCOE CARLA RANCH 28H | Producing |
| 42127349590000 | 4212734959 | BRISCOE CARLA RANCH 29H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed in TXSB on 10/16/20 Page 869 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127336660000 | 4212733666 | BRISCOE CARLA RANCH 2H | Producing |
| 42127349600000 | 4212734960 | BRISCOE CARLA RANCH 30H | Producing |
| 42127349610000 | 4212734961 | BRISCOE CARLA RANCH 31H | Producing |
| 42127349670000 | 4212734967 | BRISCOE CARLA RANCH 32H | Shut In |
| 42127349620000 | 4212734962 | BRISCOE CARLA RANCH 33H | Shut In |
| 42127349630000 | 4212734963 | BRISCOE CARLA RANCH 34H | Shut In |
| 42127337050000 | 4212733705 | BRISCOE CARLA RANCH 3H | Shut In |
| 42127337060000 | 4212733706 | BRISCOE CARLA RANCH 4H | Producing |
| 42127349460000 | 4212734946 | BRISCOE CARLA RANCH 5H | Producing |
| 42127349470000 | 4212734947 | BRISCOE CARLA RANCH 6H | Producing |
| 42127338550000 | 4212733855 | BRISCOE CARLA RANCH 7H | Producing |
| 42127338560000 | 4212733856 | BRISCOE CARLA RANCH 8H | Producing |
| 42127338570000 | 4212733857 | BRISCOE CARLA RANCH 9H | Producing |
| 42127375250000 | 4212737525 | BRISCOE CARLA RANCH UNIT A 01HW | Producing |
| 42127375260000 | 4212737526 | BRISCOE CARLA RANCH UNIT A 01HX | Shut In |
| 42127375280000 | 4212737528 | BRISCOE CARLA RANCH UNIT A 01HY | Producing |
| 42127375270000 | 4212737527 | BRISCOE CARLA RANCH UNIT A 01HZ | Producing |
| 42127364450000 | 4212736445 | BRISCOE CARLA RANCH UNIT A 1H | Producing |
| 42127364460000 | 4212736446 | BRISCOE CARLA RANCH UNIT A 2H | Producing |
| 42127364470000 | 4212736447 | BRISCOE CARLA RANCH UNIT A 3H | Producing |
| 42127364500000 | 4212736450 | BRISCOE CARLA RANCH UNIT A 4H | Producing |
| 42127364490000 | 4212736449 | BRISCOE CARLA RANCH UNIT A 5H | Producing |
| 42127375400000 | 4212737540 | BRISCOE CARLA RANCH UNIT B 01HA | Producing |
| 42127375410000 | 4212737541 | BRISCOE CARLA RANCH UNIT B 01HB | Producing |
| 42127375430000 | 4212737543 | BRISCOE CARLA RANCH UNIT B 01HC | Producing |
| 42127375460000 | 4212737546 | BRISCOE CARLA RANCH UNIT B 02HA | Producing |
| 42127375470000 | 4212737547 | BRISCOE CARLA RANCH UNIT B 02HB | Producing |
| 42127375480000 | 4212737548 | BRISCOE CARLA RANCH UNIT B 02HC | Producing |
| 42127364640000 | 4212736464 | BRISCOE CARLA RANCH UNIT B 1H | Producing |
| 42127364650000 | 4212736465 | BRISCOE CARLA RANCH UNIT B 2H | Producing |
| 42127364660000 | 4212736466 | BRISCOE CARLA RANCH UNIT B 3H | Shut In |
| 42127364680000 | 4212736468 | BRISCOE CARLA RANCH UNIT B 4H | Producing |
| 42127364670000 | 4212736467 | BRISCOE CARLA RANCH UNIT B 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127364690000 | 4212736469 | BRISCOE CARLA RANCH UNIT B 6H | Producing |
| 42127364700000 | 4212736470 | BRISCOE CARLA RANCH UNIT B 7H | Producing |
| 42127359230000 | 4212735923 | BRISCOE CATARINA N UNIT A 10H | Producing |
| 42127359300000 | 4212735930 | BRISCOE CATARINA N UNIT A 1H | Producing |
| 42127359310000 | 4212735931 | BRISCOE CATARINA N UNIT A 2H | Shut In |
| 42127359320000 | 4212735932 | BRISCOE CATARINA N UNIT A 3H | Producing |
| 42127359330000 | 4212735933 | BRISCOE CATARINA N UNIT A 4H | Shut In |
| 42127359340000 | 4212735934 | BRISCOE CATARINA N UNIT A 5H | Producing |
| 42127359190000 | 4212735919 | BRISCOE CATARINA N UNIT A 6H | Shut In |
| 42127359200000 | 4212735920 | BRISCOE CATARINA N UNIT A 7H | Producing |
| 42127359210000 | 4212735921 | BRISCOE CATARINA N UNIT A 8H | Shut In |
| 42127359220000 | 4212735922 | BRISCOE CATARINA N UNIT A 9H | Producing |
| 42127367320000 | 4212736732 | BRISCOE CATARINA NORTH 100H | Producing |
| 42127367330000 | 4212736733 | BRISCOE CATARINA NORTH 101H | Producing |
| 42127367340000 | 4212736734 | BRISCOE CATARINA NORTH 102H | Producing |
| 42127367350000 | 4212736735 | BRISCOE CATARINA NORTH 103H | Producing |
| 42127368190000 | 4212736819 | BRISCOE CATARINA NORTH 104H | Producing |
| 42127368200000 | 4212736820 | BRISCOE CATARINA NORTH 105H | Producing |
| 42127368100000 | 4212736810 | BRISCOE CATARINA NORTH 106H | Producing |
| 42127368090000 | 4212736809 | BRISCOE CATARINA NORTH 107H | Producing |
| 42127368110000 | 4212736811 | BRISCOE CATARINA NORTH 108H | Producing |
| 42127368120000 | 4212736812 | BRISCOE CATARINA NORTH 109H | Producing |
| 42127339300000 | 4212733930 | BRISCOE CATARINA NORTH 10H | Producing |
| 42127368130000 | 4212736813 | BRISCOE CATARINA NORTH 110H | Producing |
| 42127368140000 | 4212736814 | BRISCOE CATARINA NORTH 111H | Producing |
| 42127368150000 | 4212736815 | BRISCOE CATARINA NORTH 112H | Producing |
| 42127368160000 | 4212736816 | BRISCOE CATARINA NORTH 113H | Producing |
| 42127368170000 | 4212736817 | BRISCOE CATARINA NORTH 114H | Producing |
| 42127368180000 | 4212736818 | BRISCOE CATARINA NORTH 115H | Producing |
| 42127368210000 | 4212736821 | BRISCOE CATARINA NORTH 116H | Producing |
| 42127368220000 | 4212736822 | BRISCOE CATARINA NORTH 117H | Producing |
| 42127368230000 | 4212736823 | BRISCOE CATARINA NORTH 118H | Producing |
| 42127368260000 | 4212736826 | BRISCOE CATARINA NORTH 119H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339320000 | 4212733932 | BRISCOE CATARINA NORTH 11H | Producing |
| 42127368280000 | 4212736828 | BRISCOE CATARINA NORTH 120H | Producing |
| 42127368270000 | 4212736827 | BRISCOE CATARINA NORTH 121H | Producing |
| 42127368290000 | 4212736829 | BRISCOE CATARINA NORTH 122H | Producing |
| 42127368300000 | 4212736830 | BRISCOE CATARINA NORTH 123H | Producing |
| 42127368310000 | 4212736831 | BRISCOE CATARINA NORTH 124H | Producing |
| 42127368320000 | 4212736832 | BRISCOE CATARINA NORTH 125H | Producing |
| 42127368330000 | 4212736833 | BRISCOE CATARINA NORTH 126H | Producing |
| 42127368340000 | 4212736834 | BRISCOE CATARINA NORTH 127H | Producing |
| 42127368620000 | 4212736862 | BRISCOE CATARINA NORTH 128H | Shut In |
| 42127368630000 | 4212736863 | BRISCOE CATARINA NORTH 129H | Producing |
| 42127339310000 | 4212733931 | BRISCOE CATARINA NORTH 12H | Producing |
| 42127368640000 | 4212736864 | BRISCOE CATARINA NORTH 130H | Producing |
| 42127368650000 | 4212736865 | BRISCOE CATARINA NORTH 131H | Producing |
| 42127368680000 | 4212736868 | BRISCOE CATARINA NORTH 132H | Producing |
| 42127368690000 | 4212736869 | BRISCOE CATARINA NORTH 133H | Producing |
| 42127368700000 | 4212736870 | BRISCOE CATARINA NORTH 134H | Producing |
| 42127368660000 | 4212736866 | BRISCOE CATARINA NORTH 135H | Producing |
| 42127368670000 | 4212736867 | BRISCOE CATARINA NORTH 136H | Producing |
| 42127339370000 | 4212733937 | BRISCOE CATARINA NORTH 13H | Producing |
| 42127339380000 | 4212733938 | BRISCOE CATARINA NORTH 14H | Producing |
| 42127339390000 | 4212733939 | BRISCOE CATARINA NORTH 15H | Producing |
| 42127339470000 | 4212733947 | BRISCOE CATARINA NORTH 16H | Producing |
| 42127339480000 | 4212733948 | BRISCOE CATARINA NORTH 17H | Producing |
| 42127339490000 | 4212733949 | BRISCOE CATARINA NORTH 18H | Producing |
| 42127350630000 | 4212735063 | BRISCOE CATARINA NORTH 19H | Producing |
| 42127336870000 | 4212733687 | BRISCOE CATARINA NORTH 1H | Producing |
| 42127341550000 | 4212734155 | BRISCOE CATARINA NORTH 20H | Producing |
| 42127341560000 | 4212734156 | BRISCOE CATARINA NORTH 21H | Producing |
| 42127341570000 | 4212734157 | BRISCOE CATARINA NORTH 22H | Producing |
| 42127341280000 | 4212734128 | BRISCOE CATARINA NORTH 23H | Producing |
| 42127341290000 | 4212734129 | BRISCOE CATARINA NORTH 24H | Producing |
| 42127341300000 | 4212734130 | BRISCOE CATARINA NORTH 25H | Shut In |

Case 4:20-cv-20587 Document 36-6 Filed TXSD 02/10/20 Page 257 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341740000 | 4212734174 | BRISCOE CATARINA NORTH 26H | Producing |
| 42127341750000 | 4212734175 | BRISCOE CATARINA NORTH 27H | Producing |
| 42127341760000 | 4212734176 | BRISCOE CATARINA NORTH 28H | Producing |
| 42127342060000 | 4212734206 | BRISCOE CATARINA NORTH 29H | Producing |
| 42127339950000 | 4212733995 | BRISCOE CATARINA NORTH 2H | Producing |
| 42127342080000 | 4212734208 | BRISCOE CATARINA NORTH 30H | Producing |
| 42127342090000 | 4212734209 | BRISCOE CATARINA NORTH 31H | Producing |
| 42127381240000 | 4212738124 | BRISCOE CATARINA NORTH 31HB | Producing |
| 42127381250000 | 4212738125 | BRISCOE CATARINA NORTH 31HC | Producing |
| 42127381260000 | 4212738126 | BRISCOE CATARINA NORTH 31HD | Producing |
| 42127381270000 | 4212738127 | BRISCOE CATARINA NORTH 31HE | Producing |
| 42127350640000 | 4212735064 | BRISCOE CATARINA NORTH 32H | Producing |
| 42127350700000 | 4212735070 | BRISCOE CATARINA NORTH 33H | Producing |
| 42127350660000 | 4212735066 | BRISCOE CATARINA NORTH 34H | Producing |
| 42127382470000 | 4212738247 | BRISCOE CATARINA NORTH 34HV | Producing |
| 42127382480000 | 4212738248 | BRISCOE CATARINA NORTH 34HW | Producing |
| 42127382490000 | 4212738249 | BRISCOE CATARINA NORTH 34HX | Producing |
| 42127382500000 | 4212738250 | BRISCOE CATARINA NORTH 34HY | Producing |
| 42127382510000 | 4212738251 | BRISCOE CATARINA NORTH 34HZ | Producing |
| 42127342210000 | 4212734221 | BRISCOE CATARINA NORTH 35H | Producing |
| 42127342220000 | 4212734222 | BRISCOE CATARINA NORTH 36H | Producing |
| 42127342230000 | 4212734223 | BRISCOE CATARINA NORTH 37H | Producing |
| 42127342240100 | 4212734224 | BRISCOE CATARINA NORTH 38H | Temporarily Abandoned |
| 42127342260000 | 4212734226 | BRISCOE CATARINA NORTH 39H | Producing |
| 42127340010100 | 4212734001 | BRISCOE CATARINA NORTH 3H | Producing |
| 42127342280000 | 4212734228 | BRISCOE CATARINA NORTH 40H | Producing |
| 42127342290000 | 4212734229 | BRISCOE CATARINA NORTH 41H | Producing |
| 42127342300000 | 4212734230 | BRISCOE CATARINA NORTH 42H | Producing |
| 42127342310000 | 4212734231 | BRISCOE CATARINA NORTH 43H | Producing |
| 42127343430000 | 4212734343 | BRISCOE CATARINA NORTH 44H | Producing |
| 42127343440000 | 4212734344 | BRISCOE CATARINA NORTH 45H | Producing |
| 42127343750000 | 4212734375 | BRISCOE CATARINA NORTH 46H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127343760000 | 4212734376 | BRISCOE CATARINA NORTH 47H | Producing |
| 42127343770000 | 4212734377 | BRISCOE CATARINA NORTH 48H | Producing |
| 42127343780000 | 4212734378 | BRISCOE CATARINA NORTH 49H | Producing |
| 42127338040000 | 4212733804 | BRISCOE CATARINA NORTH 4H | Producing |
| 42127345630000 | 4212734563 | BRISCOE CATARINA NORTH 50H | Surface Casing Only |
| 42127345640000 | 4212734564 | BRISCOE CATARINA NORTH 51H | Surface Casing Only |
| 42127345650000 | 4212734565 | BRISCOE CATARINA NORTH 52H | Surface Casing Only |
| 42127345660000 | 4212734566 | BRISCOE CATARINA NORTH 53H | Surface Casing Only |
| 42127345670000 | 4212734567 | BRISCOE CATARINA NORTH 54H | Surface Casing Only |
| 42127345680000 | 4212734568 | BRISCOE CATARINA NORTH 55H | Surface Casing Only |
| 42127345780000 | 4212734578 | BRISCOE CATARINA NORTH 56H | Producing |
| 42127345790000 | 4212734579 | BRISCOE CATARINA NORTH 57H | Producing |
| 42127345800000 | 4212734580 | BRISCOE CATARINA NORTH 58H | Producing |
| 42127345810000 | 4212734581 | BRISCOE CATARINA NORTH 59H | Shut In |
| 42127338050000 | 4212733805 | BRISCOE CATARINA NORTH 5H | Producing |
| 42127345820000 | 4212734582 | BRISCOE CATARINA NORTH 60H | Producing |
| 42127345830100 | 4212734583 | BRISCOE CATARINA NORTH 61H | Producing |
| 42127348660000 | 4212734866 | BRISCOE CATARINA NORTH 62H | Producing |
| 42127348690000 | 4212734869 | BRISCOE CATARINA NORTH 63H | Producing |
| 42127348700000 | 4212734870 | BRISCOE CATARINA NORTH 64H | Producing |
| 42127348710000 | 4212734871 | BRISCOE CATARINA NORTH 65H | Producing |
| 42127348740000 | 4212734874 | BRISCOE CATARINA NORTH 66H | Producing |
| 42127348750000 | 4212734875 | BRISCOE CATARINA NORTH 67H | Shut In |
| 42127348760000 | 4212734876 | BRISCOE CATARINA NORTH 68H | Producing |
| 42127348910000 | 4212734891 | BRISCOE CATARINA NORTH 69H | Shut In |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338060000 | 4212733806 | BRISCOE CATARINA NORTH 6H | Producing |
| 42127348900000 | 4212734890 | BRISCOE CATARINA NORTH 70H | Producing |
| 42127348940000 | 4212734894 | BRISCOE CATARINA NORTH 71H | Producing |
| 42127349360000 | 4212734936 | BRISCOE CATARINA NORTH 72H | Producing |
| 42127349300000 | 4212734930 | BRISCOE CATARINA NORTH 73H | Producing |
| 42127349320000 | 4212734932 | BRISCOE CATARINA NORTH 74H | Producing |
| 42127349330000 | 4212734933 | BRISCOE CATARINA NORTH 75H | Producing |
| 42127351590000 | 4212735159 | BRISCOE CATARINA NORTH 76H | Producing |
| 42127351680000 | 4212735168 | BRISCOE CATARINA NORTH 77H | Producing |
| 42127351690000 | 4212735169 | BRISCOE CATARINA NORTH 78H | Producing |
| 42127351700000 | 4212735170 | BRISCOE CATARINA NORTH 79H | Producing |
| 42127338250000 | 4212733825 | BRISCOE CATARINA NORTH 7H | Producing |
| 42127351710000 | 4212735171 | BRISCOE CATARINA NORTH 80H | Producing |
| 42127351720000 | 4212735172 | BRISCOE CATARINA NORTH 81H | Producing |
| 42127351730000 | 4212735173 | BRISCOE CATARINA NORTH 82H | Producing |
| 42127351740000 | 4212735174 | BRISCOE CATARINA NORTH 83H | Producing |
| 42127358160100 | 4212735816 | BRISCOE CATARINA NORTH 84H | Shut In |
| 42127358170000 | 4212735817 | BRISCOE CATARINA NORTH 85H | Producing |
| 42127358180000 | 4212735818 | BRISCOE CATARINA NORTH 86H | Producing |
| 42127358190200 | 4212735819 | BRISCOE CATARINA NORTH 87H | Producing |
| 42127358200000 | 4212735820 | BRISCOE CATARINA NORTH 88H | Shut In |
| 42127358210000 | 4212735821 | BRISCOE CATARINA NORTH 89H | Producing |
| 42127338260000 | 4212733826 | BRISCOE CATARINA NORTH 8H | Producing |
| 42127367220000 | 4212736722 | BRISCOE CATARINA NORTH 90H | Producing |
| 42127367230000 | 4212736723 | BRISCOE CATARINA NORTH 91H | Shut In |
| 42127367240000 | 4212736724 | BRISCOE CATARINA NORTH 92H | Shut In |
| 42127367250000 | 4212736725 | BRISCOE CATARINA NORTH 93H | Shut In |
| 42127367260000 | 4212736726 | BRISCOE CATARINA NORTH 94H | Shut In |
| 42127367270000 | 4212736727 | BRISCOE CATARINA NORTH 95H | Producing |
| 42127367280000 | 4212736728 | BRISCOE CATARINA NORTH 96H | Shut In |
| 42127367290000 | 4212736729 | BRISCOE CATARINA NORTH 97H | Producing |
| 42127367300000 | 4212736730 | BRISCOE CATARINA NORTH 98H | Producing |
| 42127367310000 | 4212736731 | BRISCOE CATARINA NORTH 99H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338290000 | 4212733829 | BRISCOE CATARINA NORTH 9H | Producing |
| 42127354300000 | 4212735430 | BRISCOE CATARINA RANCH 100H | Producing |
| 42127354310000 | 4212735431 | BRISCOE CATARINA RANCH 101H | Producing |
| 42127354710000 | 4212735471 | BRISCOE CATARINA RANCH 102H | Producing |
| 42127354720000 | 4212735472 | BRISCOE CATARINA RANCH 103H | Producing |
| 42127354730000 | 4212735473 | BRISCOE CATARINA RANCH 104H | Producing |
| 42127354740000 | 4212735474 | BRISCOE CATARINA RANCH 105H | Producing |
| 42127354750000 | 4212735475 | BRISCOE CATARINA RANCH 106H | Producing |
| 42127354760000 | 4212735476 | BRISCOE CATARINA RANCH 107H | Producing |
| 42127351990000 | 4212735199 | BRISCOE CATARINA RANCH 108H | Producing |
| 42127336770000 | 4212733677 | BRISCOE CATARINA RANCH 10H | Producing |
| 42127343630000 | 4212734363 | BRISCOE CATARINA RANCH 11H | Producing |
| 42127343640000 | 4212734364 | BRISCOE CATARINA RANCH 12H | Producing |
| 42127336800000 | 4212733680 | BRISCOE CATARINA RANCH 13H | Producing |
| 42127343650000 | 4212734365 | BRISCOE CATARINA RANCH 14H | Producing |
| 42127343660000 | 4212734366 | BRISCOE CATARINA RANCH 15H | Shut In |
| 42127337900000 | 4212733790 | BRISCOE CATARINA RANCH 16H | Producing |
| 42127337910000 | 4212733791 | BRISCOE CATARINA RANCH 17H | Producing |
| 42127337920000 | 4212733792 | BRISCOE CATARINA RANCH 18H | Producing |
| 42127337800000 | 4212733780 | BRISCOE CATARINA RANCH 19H | Producing |
| 42127333980100 | 4212733398 | BRISCOE CATARINA RANCH 1H | Producing |
| 42127337810000 | 4212733781 | BRISCOE CATARINA RANCH 20H | Producing |
| 42127337820000 | 4212733782 | BRISCOE CATARINA RANCH 21H | Producing |
| 42127343150000 | 4212734315 | BRISCOE CATARINA RANCH 22H | Producing |
| 42127343160000 | 4212734316 | BRISCOE CATARINA RANCH 23H | Producing |
| 42127343170000 | 4212734317 | BRISCOE CATARINA RANCH 24H | Producing |
| 42127343180000 | 4212734318 | BRISCOE CATARINA RANCH 25H | Producing |
| 42127343190000 | 4212734319 | BRISCOE CATARINA RANCH 26H | Producing |
| 42127343200000 | 4212734320 | BRISCOE CATARINA RANCH 27H | Producing |
| 42127343670000 | 4212734367 | BRISCOE CATARINA RANCH 28H | Producing |
| 42127343680000 | 4212734368 | BRISCOE CATARINA RANCH 29H | Producing |
| 42127336120000 | 4212733612 | BRISCOE CATARINA RANCH 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341540000 | 4212734154 | BRISCOE CATARINA RANCH 30H | Plugged and Abandoned |
| 42127343880000 | 4212734388 | BRISCOE CATARINA RANCH 31H | Producing |
| 42127343890000 | 4212734389 | BRISCOE CATARINA RANCH 32H | Producing |
| 42127343900000 | 4212734390 | BRISCOE CATARINA RANCH 33H | Producing |
| 42127344320000 | 4212734432 | BRISCOE CATARINA RANCH 34H | Producing |
| 42127344330000 | 4212734433 | BRISCOE CATARINA RANCH 35H | Producing |
| 42127344360000 | 4212734436 | BRISCOE CATARINA RANCH 36H | Producing |
| 42127344340000 | 4212734434 | BRISCOE CATARINA RANCH 37H | Producing |
| 42127344390000 | 4212734439 | BRISCOE CATARINA RANCH 38H | Producing |
| 42127344400000 | 4212734440 | BRISCOE CATARINA RANCH 39H | Producing |
| 42127336460000 | 4212733646 | BRISCOE CATARINA RANCH 3H | Producing |
| 42127344410000 | 4212734441 | BRISCOE CATARINA RANCH 40H | Producing |
| 42127344430000 | 4212734443 | BRISCOE CATARINA RANCH 41H | Producing |
| 42127344420000 | 4212734442 | BRISCOE CATARINA RANCH 42H | Producing |
| 42127344440000 | 4212734444 | BRISCOE CATARINA RANCH 43H | Producing |
| 42127344460000 | 4212734446 | BRISCOE CATARINA RANCH 44H | Producing |
| 42127344480000 | 4212734448 | BRISCOE CATARINA RANCH 45H | Producing |
| 42127347540000 | 4212734754 | BRISCOE CATARINA RANCH 46H | Producing |
| 42127347550000 | 4212734755 | BRISCOE CATARINA RANCH 47H | Producing |
| 42127347560000 | 4212734756 | BRISCOE CATARINA RANCH 48H | Producing |
| 42127347570000 | 4212734757 | BRISCOE CATARINA RANCH 49H | Producing |
| 42127336840000 | 4212733684 | BRISCOE CATARINA RANCH 4H | Producing |
| 42127347580000 | 4212734758 | BRISCOE CATARINA RANCH 50H | Producing |
| 42127347740000 | 4212734774 | BRISCOE CATARINA RANCH 51H | Producing |
| 42127347750000 | 4212734775 | BRISCOE CATARINA RANCH 52H | Producing |
| 42127347780000 | 4212734778 | BRISCOE CATARINA RANCH 53H | Producing |
| 42127347770000 | 4212734777 | BRISCOE CATARINA RANCH 54H | Producing |
| 42127347760000 | 4212734776 | BRISCOE CATARINA RANCH 55H | Producing |
| 42127352140000 | 4212735214 | BRISCOE CATARINA RANCH 56H | Producing |
| 42127352150000 | 4212735215 | BRISCOE CATARINA RANCH 57H | Producing |
| 42127352160000 | 4212735216 | BRISCOE CATARINA RANCH 58H | Producing |
| 42127351880000 | 4212735188 | BRISCOE CATARINA RANCH 59H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed TXSD 09/23/20 10/16/20 Page 2187 of 4312

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352920000 | 4212735292 | BRISCOE CATARINA RANCH 5H | Producing |
| 42127351900000 | 4212735190 | BRISCOE CATARINA RANCH 60H | Producing |
| 42127351840000 | 4212735184 | BRISCOE CATARINA RANCH 61H | Producing |
| 42127351830000 | 4212735183 | BRISCOE CATARINA RANCH 62H | Producing |
| 42127351850000 | 4212735185 | BRISCOE CATARINA RANCH 63H | Producing |
| 42127351860000 | 4212735186 | BRISCOE CATARINA RANCH 64H | Producing |
| 42127351930000 | 4212735193 | BRISCOE CATARINA RANCH 65H | Producing |
| 42127351940000 | 4212735194 | BRISCOE CATARINA RANCH 66H | Producing |
| 42127351950000 | 4212735195 | BRISCOE CATARINA RANCH 67H | Producing |
| 42127351960000 | 4212735196 | BRISCOE CATARINA RANCH 68H | Producing |
| 42127351970000 | 4212735197 | BRISCOE CATARINA RANCH 69H | Producing |
| 42127337490000 | 4212733749 | BRISCOE CATARINA RANCH 6H | Producing |
| 42127351980000 | 4212735198 | BRISCOE CATARINA RANCH 70H | Producing |
| 42127352170000 | 4212735217 | BRISCOE CATARINA RANCH 71H | Producing |
| 42127352180000 | 4212735218 | BRISCOE CATARINA RANCH 72H | Producing |
| 42127352190000 | 4212735219 | BRISCOE CATARINA RANCH 73H | Producing |
| 42127352930000 | 4212735293 | BRISCOE CATARINA RANCH 74H | Producing |
| 42127352960000 | 4212735296 | BRISCOE CATARINA RANCH 75H | Producing |
| 42127352970000 | 4212735297 | BRISCOE CATARINA RANCH 76H | Producing |
| 42127352980000 | 4212735298 | BRISCOE CATARINA RANCH 77H | Producing |
| 42127352990000 | 4212735299 | BRISCOE CATARINA RANCH 78H | Producing |
| 42127353000000 | 4212735300 | BRISCOE CATARINA RANCH 79H | Producing |
| 42127337230000 | 4212733723 | BRISCOE CATARINA RANCH 7H | Producing |
| 42127353010000 | 4212735301 | BRISCOE CATARINA RANCH 80H | Producing |
| 42127353020000 | 4212735302 | BRISCOE CATARINA RANCH 81H | Producing |
| 42127353030000 | 4212735303 | BRISCOE CATARINA RANCH 82H | Producing |
| 42127353040000 | 4212735304 | BRISCOE CATARINA RANCH 83H | Producing |
| 42127353050000 | 4212735305 | BRISCOE CATARINA RANCH 84H | Producing |
| 42127353310000 | 4212735331 | BRISCOE CATARINA RANCH 85H | Producing |
| 42127353320000 | 4212735332 | BRISCOE CATARINA RANCH 86H | Producing |
| 42127353300000 | 4212735330 | BRISCOE CATARINA RANCH 87H | Producing |
| 42127353450000 | 4212735345 | BRISCOE CATARINA RANCH 88H | Producing |
| 42127353460000 | 4212735346 | BRISCOE CATARINA RANCH 89H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337240000 | 4212733724 | BRISCOE CATARINA RANCH 8H | Producing |
| 42127353400000 | 4212735340 | BRISCOE CATARINA RANCH 90H | Producing |
| 42127353410000 | 4212735341 | BRISCOE CATARINA RANCH 91H | Producing |
| 42127353420000 | 4212735342 | BRISCOE CATARINA RANCH 92H | Producing |
| 42127353430000 | 4212735343 | BRISCOE CATARINA RANCH 93H | Producing |
| 42127353440000 | 4212735344 | BRISCOE CATARINA RANCH 94H | Producing |
| 42127354250000 | 4212735425 | BRISCOE CATARINA RANCH 95H | Producing |
| 42127354270000 | 4212735427 | BRISCOE CATARINA RANCH 96H | Producing |
| 42127354260000 | 4212735426 | BRISCOE CATARINA RANCH 97H | Producing |
| 42127354280000 | 4212735428 | BRISCOE CATARINA RANCH 98H | Producing |
| 42127354290000 | 4212735429 | BRISCOE CATARINA RANCH 99H | Producing |
| 42127336740000 | 4212733674 | BRISCOE CATARINA RANCH 9H | Producing |
| 42127377230000 | 4212737723 | BRISCOE CATARINA RANCH UNIT 28HV | Producing |
| 42127377240000 | 4212737724 | BRISCOE CATARINA RANCH UNIT 28HW | Producing |
| 42127377250000 | 4212737725 | BRISCOE CATARINA RANCH UNIT 28HX | Producing |
| 42127377270000 | 4212737727 | BRISCOE CATARINA RANCH UNIT 28HY | Producing |
| 42127377280000 | 4212737728 | BRISCOE CATARINA RANCH UNIT 28HZ | Producing |
| 42127375320000 | 4212737532 | BRISCOE CATARINA SOUTH 03P | Pilot Well |
| 42127344550000 | 4212734455 | BRISCOE CATARINA SOUTH 10H | Producing |
| 42127344560000 | 4212734456 | BRISCOE CATARINA SOUTH 11H | Producing |
| 42127344570000 | 4212734457 | BRISCOE CATARINA SOUTH 12H | Producing |
| 42127344590000 | 4212734459 | BRISCOE CATARINA SOUTH 13H | Producing |
| 42127344580000 | 4212734458 | BRISCOE CATARINA SOUTH 14H | Producing |
| 42127344600100 | 4212734460 | BRISCOE CATARINA SOUTH 15H | Producing |
| 42127353120000 | 4212735312 | BRISCOE CATARINA SOUTH 16H | Producing |
| 42127353130000 | 4212735313 | BRISCOE CATARINA SOUTH 17H | Producing |
| 42127353140000 | 4212735314 | BRISCOE CATARINA SOUTH 18H | Producing |
| 42127353160000 | 4212735316 | BRISCOE CATARINA SOUTH 19H | Producing |
| 42127337830000 | 4212733783 | BRISCOE CATARINA SOUTH 1H | Producing |
| 42127353220000 | 4212735322 | BRISCOE CATARINA SOUTH 20H | Producing |
| 42127353230000 | 4212735323 | BRISCOE CATARINA SOUTH 21H | Producing |
| 42127353240000 | 4212735324 | BRISCOE CATARINA SOUTH 22H | Producing |
| 42127374860000 | 4212737486 | BRISCOE CATARINA SOUTH 22HS | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127374870000 | 4212737487 | BRISCOE CATARINA SOUTH 22HT | Producing |
| 42127374930000 | 4212737493 | BRISCOE CATARINA SOUTH 22HU | Producing |
| 42127374940000 | 4212737494 | BRISCOE CATARINA SOUTH 22HV | Producing |
| 42127374950000 | 4212737495 | BRISCOE CATARINA SOUTH 22HW | Producing |
| 42127374960000 | 4212737496 | BRISCOE CATARINA SOUTH 22HX | Producing |
| 42127374970000 | 4212737497 | BRISCOE CATARINA SOUTH 22HY | Producing |
| 42127374980000 | 4212737498 | BRISCOE CATARINA SOUTH 22HZ | Producing |
| 42127353250000 | 4212735325 | BRISCOE CATARINA SOUTH 23H | Producing |
| 42127375150000 | 4212737515 | BRISCOE CATARINA SOUTH 23HR | Producing |
| 42127375170000 | 4212737517 | BRISCOE CATARINA SOUTH 23HS | Producing |
| 42127375180000 | 4212737518 | BRISCOE CATARINA SOUTH 23HT | Producing |
| 42127375190000 | 4212737519 | BRISCOE CATARINA SOUTH 23HU | Producing |
| 42127375200000 | 4212737520 | BRISCOE CATARINA SOUTH 23HV | Producing |
| 42127375210000 | 4212737521 | BRISCOE CATARINA SOUTH 23HW | Producing |
| 42127375220000 | 4212737522 | BRISCOE CATARINA SOUTH 23HX | Producing |
| 42127375230000 | 4212737523 | BRISCOE CATARINA SOUTH 23HY | Producing |
| 42127375240000 | 4212737524 | BRISCOE CATARINA SOUTH 23HZ | Producing |
| 42127353620000 | 4212735362 | BRISCOE CATARINA SOUTH 24H | Producing |
| 42127353630000 | 4212735363 | BRISCOE CATARINA SOUTH 25H | Producing |
| 42127353640000 | 4212735364 | BRISCOE CATARINA SOUTH 26H | Producing |
| 42127381530000 | 4212738153 | BRISCOE CATARINA SOUTH 26HX | Producing |
| 42127381550000 | 4212738155 | BRISCOE CATARINA SOUTH 26HY | Producing |
| 42127381560000 | 4212738156 | BRISCOE CATARINA SOUTH 26HZ | Producing |
| 42127353650000 | 4212735365 | BRISCOE CATARINA SOUTH 27H | Producing |
| 42127354590000 | 4212735459 | BRISCOE CATARINA SOUTH 28H | Producing |
| 42127355150000 | 4212735515 | BRISCOE CATARINA SOUTH 29H | Producing |
| 42127382760000 | 4212738276 | BRISCOE CATARINA SOUTH 29HA | Producing |
| 42127382770000 | 4212738277 | BRISCOE CATARINA SOUTH 29HB | Producing |
| 42127382780000 | 4212738278 | BRISCOE CATARINA SOUTH 29HC | Producing |
| 42127337840000 | 4212733784 | BRISCOE CATARINA SOUTH 2H | Producing |
| 42127354600000 | 4212735460 | BRISCOE CATARINA SOUTH 30H | Producing |
| 42127354610000 | 4212735461 | BRISCOE CATARINA SOUTH 31H | Producing |
| 42127354630000 | 4212735463 | BRISCOE CATARINA SOUTH 32H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127354620000 | 4212735462 | BRISCOE CATARINA SOUTH 33H | Producing |
| 42127354810000 | 4212735481 | BRISCOE CATARINA SOUTH 34H | Producing |
| 42127354840000 | 4212735484 | BRISCOE CATARINA SOUTH 35H | Producing |
| 42127355100000 | 4212735510 | BRISCOE CATARINA SOUTH 36H | Producing |
| 42127355110000 | 4212735511 | BRISCOE CATARINA SOUTH 37H | Producing |
| 42127355130000 | 4212735513 | BRISCOE CATARINA SOUTH 38H | Producing |
| 42127355120000 | 4212735512 | BRISCOE CATARINA SOUTH 39H | Producing |
| 42127337850000 | 4212733785 | BRISCOE CATARINA SOUTH 3H | Producing |
| 42127355320000 | 4212735532 | BRISCOE CATARINA SOUTH 40H | Producing |
| 42127355330000 | 4212735533 | BRISCOE CATARINA SOUTH 41H | Producing |
| 42127355340000 | 4212735534 | BRISCOE CATARINA SOUTH 42H | Producing |
| 42127355350000 | 4212735535 | BRISCOE CATARINA SOUTH 43H | Producing |
| 42127355360000 | 4212735536 | BRISCOE CATARINA SOUTH 44H | Producing |
| 42127355570000 | 4212735557 | BRISCOE CATARINA SOUTH 45H | Producing |
| 42127355610000 | 4212735561 | BRISCOE CATARINA SOUTH 46H | Producing |
| 42127355620000 | 4212735562 | BRISCOE CATARINA SOUTH 47H | Producing |
| 42127355630000 | 4212735563 | BRISCOE CATARINA SOUTH 48H | Producing |
| 42127356930000 | 4212735693 | BRISCOE CATARINA SOUTH 49H | Producing |
| 42127337690000 | 4212733769 | BRISCOE CATARINA SOUTH 4H | Producing |
| 42127356940000 | 4212735694 | BRISCOE CATARINA SOUTH 50H | Producing |
| 42127356950000 | 4212735695 | BRISCOE CATARINA SOUTH 51H | Producing |
| 42127356960000 | 4212735696 | BRISCOE CATARINA SOUTH 52H | Producing |
| 42127356980000 | 4212735698 | BRISCOE CATARINA SOUTH 53H | Producing |
| 42127357000000 | 4212735700 | BRISCOE CATARINA SOUTH 54H | Producing |
| 42127356990000 | 4212735699 | BRISCOE CATARINA SOUTH 55H | Producing |
| 42127357010000 | 4212735701 | BRISCOE CATARINA SOUTH 56H | Producing |
| 42127357060000 | 4212735706 | BRISCOE CATARINA SOUTH 57H | Producing |
| 42127357070000 | 4212735707 | BRISCOE CATARINA SOUTH 58H | Producing |
| 42127357080000 | 4212735708 | BRISCOE CATARINA SOUTH 59H | Producing |
| 42127337700000 | 4212733770 | BRISCOE CATARINA SOUTH 5H | Producing |
| 42127357090000 | 4212735709 | BRISCOE CATARINA SOUTH 60H | Producing |
| 42127364390000 | 4212736439 | BRISCOE CATARINA SOUTH 61H | Producing |
| 42127364400000 | 4212736440 | BRISCOE CATARINA SOUTH 62H | Producing |

Case 4:20-cv-02058 Document 363-6 Filed on 09/23/20 in TXSD Page 881 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127364410000 | 4212736441 | BRISCOE CATARINA SOUTH 63H | Producing |
| 42127364420000 | 4212736442 | BRISCOE CATARINA SOUTH 64H | Producing |
| 42127364430000 | 4212736443 | BRISCOE CATARINA SOUTH 65H | Shut In |
| 42127364440000 | 4212736444 | BRISCOE CATARINA SOUTH 66H | Producing |
| 42127364170000 | 4212736417 | BRISCOE CATARINA SOUTH 67H | Producing |
| 42127364180000 | 4212736418 | BRISCOE CATARINA SOUTH 68H | Producing |
| 42127364190000 | 4212736419 | BRISCOE CATARINA SOUTH 69H | Producing |
| 42127337710000 | 4212733771 | BRISCOE CATARINA SOUTH 6H | Producing |
| 42127364200000 | 4212736420 | BRISCOE CATARINA SOUTH 70H | Producing |
| 42127364210000 | 4212736421 | BRISCOE CATARINA SOUTH 71H | Producing |
| 42127364100000 | 4212736410 | BRISCOE CATARINA SOUTH 72H | Producing |
| 42127364110000 | 4212736411 | BRISCOE CATARINA SOUTH 73H | Producing |
| 42127364120000 | 4212736412 | BRISCOE CATARINA SOUTH 74H | Producing |
| 42127364130000 | 4212736413 | BRISCOE CATARINA SOUTH 75H | Shut In |
| 42127364140000 | 4212736414 | BRISCOE CATARINA SOUTH 76H | Producing |
| 42127363930000 | 4212736393 | BRISCOE CATARINA SOUTH 77H | Shut In |
| 42127363940000 | 4212736394 | BRISCOE CATARINA SOUTH 78H | Producing |
| 42127363950000 | 4212736395 | BRISCOE CATARINA SOUTH 79H | Producing |
| 42127339520000 | 4212733952 | BRISCOE CATARINA SOUTH 7H | Producing |
| 42127363960000 | 4212736396 | BRISCOE CATARINA SOUTH 80H | Producing |
| 42127363970000 | 4212736397 | BRISCOE CATARINA SOUTH 81H | Producing |
| 42127364260000 | 4212736426 | BRISCOE CATARINA SOUTH 82H | Producing |
| 42127364270000 | 4212736427 | BRISCOE CATARINA SOUTH 83H | Producing |
| 42127339510000 | 4212733951 | BRISCOE CATARINA SOUTH 8H | Shut In |
| 42127339530000 | 4212733953 | BRISCOE CATARINA SOUTH 9H | Producing |
| 42127374530000 | 4212737453 | BRISCOE CATARINA WEST 01HA | Producing |
| 42127374540000 | 4212737454 | BRISCOE CATARINA WEST 01HB | Producing |
| 42127374560000 | 4212737456 | BRISCOE CATARINA WEST 01HC | Producing |
| 42127374570000 | 4212737457 | BRISCOE CATARINA WEST 01HD | Producing |
| 42127376710000 | 4212737671 | BRISCOE CATARINA WEST 01HU | Producing |
| 42127376720000 | 4212737672 | BRISCOE CATARINA WEST 01HV | Producing |
| 42127376730000 | 4212737673 | BRISCOE CATARINA WEST 01HW | Producing |
| 42127376740200 | 4212737674 | BRISCOE CATARINA WEST 01HX | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376750000 | 4212737675 | BRISCOE CATARINA WEST 01HY | Producing |
| 42127376760000 | 4212737676 | BRISCOE CATARINA WEST 01HZ | Producing |
| 42127336820000 | 4212733682 | BRISCOE CATARINA WEST 10H | Producing |
| 42127366450000 | 4212736645 | BRISCOE CATARINA WEST 116H | Producing |
| 42127366460000 | 4212736646 | BRISCOE CATARINA WEST 117H | Producing |
| 42127366470000 | 4212736647 | BRISCOE CATARINA WEST 118H | Producing |
| 42127366480000 | 4212736648 | BRISCOE CATARINA WEST 119H | Producing |
| 42127366490000 | 4212736649 | BRISCOE CATARINA WEST 120H | Producing |
| 42127366540000 | 4212736654 | BRISCOE CATARINA WEST 121H | Producing |
| 42127366510000 | 4212736651 | BRISCOE CATARINA WEST 125H | Producing |
| 42127366520000 | 4212736652 | BRISCOE CATARINA WEST 126H | Producing |
| 42127366530000 | 4212736653 | BRISCOE CATARINA WEST 127H | Producing |
| 42127366550000 | 4212736655 | BRISCOE CATARINA WEST 128H | Producing |
| 42127366560000 | 4212736656 | BRISCOE CATARINA WEST 129H | Producing |
| 42127337530000 | 4212733753 | BRISCOE CATARINA WEST 12H | Producing |
| 42127366570000 | 4212736657 | BRISCOE CATARINA WEST 130H | Temporarily Abandoned |
| 42127366580000 | 4212736658 | BRISCOE CATARINA WEST 131H | Producing |
| 42127366590000 | 4212736659 | BRISCOE CATARINA WEST 132H | Producing |
| 42127337620000 | 4212733762 | BRISCOE CATARINA WEST 13H | Producing |
| 42127337630000 | 4212733763 | BRISCOE CATARINA WEST 14H | Producing |
| 42127337770000 | 4212733777 | BRISCOE CATARINA WEST 15H | Producing |
| 42127337780000 | 4212733778 | BRISCOE CATARINA WEST 16H | Shut In |
| 42127337790000 | 4212733779 | BRISCOE CATARINA WEST 17H | Producing |
| 42127341660000 | 4212734166 | BRISCOE CATARINA WEST 18H | Producing |
| 42127341670000 | 4212734167 | BRISCOE CATARINA WEST 19H | Producing |
| 42127334210100 | 4212733421 | BRISCOE CATARINA WEST 1H | Shut In |
| 42127341690000 | 4212734169 | BRISCOE CATARINA WEST 20H | Producing |
| 42127341700000 | 4212734170 | BRISCOE CATARINA WEST 21H | Producing |
| 42127377920000 | 4212737792 | BRISCOE CATARINA WEST 21HV | Producing |
| 42127377940000 | 4212737794 | BRISCOE CATARINA WEST 21HX | Producing |
| 42127377960000 | 4212737796 | BRISCOE CATARINA WEST 21HZ | Producing |
| 42127341710000 | 4212734171 | BRISCOE CATARINA WEST 22H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341720000 | 4212734172 | BRISCOE CATARINA WEST 23H | Producing |
| 42127343350000 | 4212734335 | BRISCOE CATARINA WEST 24H | Producing |
| 42127343360000 | 4212734336 | BRISCOE CATARINA WEST 25H | Temporarily Abandoned |
| 42127343370000 | 4212734337 | BRISCOE CATARINA WEST 26H | Producing |
| 42127343380000 | 4212734338 | BRISCOE CATARINA WEST 27H | Producing |
| 42127343400000 | 4212734340 | BRISCOE CATARINA WEST 28H | Producing |
| 42127343390000 | 4212734339 | BRISCOE CATARINA WEST 29H | Producing |
| 42127336150000 | 4212733615 | BRISCOE CATARINA WEST 2H | Producing |
| 42127346820000 | 4212734682 | BRISCOE CATARINA WEST 30H | Producing |
| 42127346840000 | 4212734684 | BRISCOE CATARINA WEST 31H | Producing |
| 42127377720000 | 4212737772 | BRISCOE CATARINA WEST 31HC | Producing |
| 42127377730000 | 4212737773 | BRISCOE CATARINA WEST 31HD | Producing |
| 42127377740000 | 4212737774 | BRISCOE CATARINA WEST 31HE | Producing |
| 42127377750000 | 4212737775 | BRISCOE CATARINA WEST 31HF | Producing |
| 42127377760000 | 4212737776 | BRISCOE CATARINA WEST 31HG | Producing |
| 42127377770000 | 4212737777 | BRISCOE CATARINA WEST 31HH | Producing |
| 42127377780000 | 4212737778 | BRISCOE CATARINA WEST 31HI | Producing |
| 42127346850000 | 4212734685 | BRISCOE CATARINA WEST 32H | Producing |
| 42127346860000 | 4212734686 | BRISCOE CATARINA WEST 33H | Producing |
| 42127379820000 | 4212737982 | BRISCOE CATARINA WEST 33HU | Producing |
| 42127379830000 | 4212737983 | BRISCOE CATARINA WEST 33HV | Producing |
| 42127379840000 | 4212737984 | BRISCOE CATARINA WEST 33HW | Producing |
| 42127346870000 | 4212734687 | BRISCOE CATARINA WEST 34H | Producing |
| 42127346890000 | 4212734689 | BRISCOE CATARINA WEST 35H | Producing |
| 42127346900000 | 4212734690 | BRISCOE CATARINA WEST 36H | Producing |
| 42127346930000 | 4212734693 | BRISCOE CATARINA WEST 37H | Producing |
| 42127346940000 | 4212734694 | BRISCOE CATARINA WEST 38H | Producing |
| 42127346950000 | 4212734695 | BRISCOE CATARINA WEST 39H | Producing |
| 42127336160100 | 4212733616 | BRISCOE CATARINA WEST 3H | Plugged and Abandoned |
| 42127346960000 | 4212734696 | BRISCOE CATARINA WEST 40H | Producing |
| 42127346970000 | 4212734697 | BRISCOE CATARINA WEST 41H | Producing |
| 42127347170000 | 4212734717 | BRISCOE CATARINA WEST 42H | Producing |

Case 20-32058 Document 13-6 Filed in TXSB on 10/16/20 Page 884 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127347200000 | 4212734720 | BRISCOE CATARINA WEST 43H | Producing |
| 42127347180000 | 4212734718 | BRISCOE CATARINA WEST 44H | Producing |
| 42127347190000 | 4212734719 | BRISCOE CATARINA WEST 45H | Producing |
| 42127347220000 | 4212734722 | BRISCOE CATARINA WEST 46H | Producing |
| 42127347250000 | 4212734725 | BRISCOE CATARINA WEST 47H | Producing |
| 42127347260000 | 4212734726 | BRISCOE CATARINA WEST 48H | Producing |
| 42127347270000 | 4212734727 | BRISCOE CATARINA WEST 49H | Producing |
| 42127336290000 | 4212733629 | BRISCOE CATARINA WEST 4H | Producing |
| 42127347280000 | 4212734728 | BRISCOE CATARINA WEST 50H | Producing |
| 42127357800000 | 4212735780 | BRISCOE CATARINA WEST 51H | Producing |
| 42127357810000 | 4212735781 | BRISCOE CATARINA WEST 52H | Producing |
| 42127357820000 | 4212735782 | BRISCOE CATARINA WEST 53H | Producing |
| 42127357830000 | 4212735783 | BRISCOE CATARINA WEST 54H | Producing |
| 42127357840000 | 4212735784 | BRISCOE CATARINA WEST 55H | Producing |
| 42127357850000 | 4212735785 | BRISCOE CATARINA WEST 56H | Producing |
| 42127357860000 | 4212735786 | BRISCOE CATARINA WEST 57H | Temporarily Abandoned |
| 42127357870000 | 4212735787 | BRISCOE CATARINA WEST 58H | Producing |
| 42127357880000 | 4212735788 | BRISCOE CATARINA WEST 59H | Producing |
| 42127336370000 | 4212733637 | BRISCOE CATARINA WEST 5H | Producing |
| 42127357890000 | 4212735789 | BRISCOE CATARINA WEST 60H | Producing |
| 42127357900000 | 4212735790 | BRISCOE CATARINA WEST 61H | Producing |
| 42127357930000 | 4212735793 | BRISCOE CATARINA WEST 62H | Producing |
| 42127357940000 | 4212735794 | BRISCOE CATARINA WEST 63H | Producing |
| 42127357950000 | 4212735795 | BRISCOE CATARINA WEST 64H | Producing |
| 42127357960000 | 4212735796 | BRISCOE CATARINA WEST 65H | Producing |
| 42127358250000 | 4212735825 | BRISCOE CATARINA WEST 66H | Shut In |
| 42127358340000 | 4212735834 | BRISCOE CATARINA WEST 67H | Producing |
| 42127358360000 | 4212735836 | BRISCOE CATARINA WEST 68H | Producing |
| 42127358350000 | 4212735835 | BRISCOE CATARINA WEST 69H | Producing |
| 42127336480000 | 4212733648 | BRISCOE CATARINA WEST 6H | Producing |
| 42127358370000 | 4212735837 | BRISCOE CATARINA WEST 70H | Producing |
| 42127358590000 | 4212735859 | BRISCOE CATARINA WEST 71H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127358600000 | 4212735860 | BRISCOE CATARINA WEST 72H | Producing |
| 42127358610000 | 4212735861 | BRISCOE CATARINA WEST 73H | Producing |
| 42127358620000 | 4212735862 | BRISCOE CATARINA WEST 74H | Producing |
| 42127358820000 | 4212735882 | BRISCOE CATARINA WEST 75H | Producing |
| 42127358830000 | 4212735883 | BRISCOE CATARINA WEST 76H | Producing |
| 42127358850000 | 4212735885 | BRISCOE CATARINA WEST 77H | Producing |
| 42127358860000 | 4212735886 | BRISCOE CATARINA WEST 78H | Producing |
| 42127358880000 | 4212735888 | BRISCOE CATARINA WEST 79H | Producing |
| 42127336430000 | 4212733643 | BRISCOE CATARINA WEST 7H | Producing |
| 42127358890000 | 4212735889 | BRISCOE CATARINA WEST 80H | Producing |
| 42127358900000 | 4212735890 | BRISCOE CATARINA WEST 81H | Producing |
| 42127358910000 | 4212735891 | BRISCOE CATARINA WEST 82H | Producing |
| 42127368740000 | 4212736874 | BRISCOE CATARINA WEST 83H | Producing |
| 42127368750000 | 4212736875 | BRISCOE CATARINA WEST 84H | Producing |
| 42127368760000 | 4212736876 | BRISCOE CATARINA WEST 85H | Producing |
| 42127368770000 | 4212736877 | BRISCOE CATARINA WEST 86H | Producing |
| 42127368780000 | 4212736878 | BRISCOE CATARINA WEST 87H | Producing |
| 42127368790000 | 4212736879 | BRISCOE CATARINA WEST 88H | Producing |
| 42127368800000 | 4212736880 | BRISCOE CATARINA WEST 89H | Producing |
| 42127336850000 | 4212733685 | BRISCOE CATARINA WEST 8H | Producing |
| 42127368810000 | 4212736881 | BRISCOE CATARINA WEST 90H | Surface Casing Only |
| 42127368820000 | 4212736882 | BRISCOE CATARINA WEST 91H | Producing |
| 42127368830000 | 4212736883 | BRISCOE CATARINA WEST 92H | Producing |
| 42127368840000 | 4212736884 | BRISCOE CATARINA WEST 93H | Producing |
| 42127368860000 | 4212736886 | BRISCOE CATARINA WEST 94H | Producing |
| 42127368850000 | 4212736885 | BRISCOE CATARINA WEST 95H | Producing |
| 42127368870000 | 4212736887 | BRISCOE CATARINA WEST 96H | Producing |
| 42127368880000 | 4212736888 | BRISCOE CATARINA WEST 97H | Producing |
| 42127338010000 | 4212733801 | BRISCOE CATARINA WEST 9H | Producing |
| 42127377610000 | 4212737761 | BRISCOE CATARINA WEST UNIT A 30HA | Producing |
| 42127377620100 | 4212737762 | BRISCOE CATARINA WEST UNIT A 30HB | Producing |
| 42127377630000 | 4212737763 | BRISCOE CATARINA WEST UNIT A 30HC | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127377640000 | 4212737764 | BRISCOE CATARINA WEST UNIT A 30HD | Producing |
| 42127377660000 | 4212737766 | BRISCOE CATARINA WEST UNIT A 30HF | Producing |
| 42127377670000 | 4212737767 | BRISCOE CATARINA WEST UNIT A 30HG | Producing |
| 42127377690000 | 4212737769 | BRISCOE CATARINA WEST UNIT A 30HI | Producing |
| 42127378390000 | 4212737839 | BRISCOE CHIP EAST RANCH 08HY | Producing |
| 42127341520000 | 4212734152 | BRISCOE CHIP EAST RANCH 10H | Producing |
| 42127344780000 | 4212734478 | BRISCOE CHIP EAST RANCH 11H | Producing |
| 42127344790000 | 4212734479 | BRISCOE CHIP EAST RANCH 12H | Producing |
| 42127344800000 | 4212734480 | BRISCOE CHIP EAST RANCH 13H | Producing |
| 42127341530000 | 4212734153 | BRISCOE CHIP EAST RANCH 14H | Producing |
| 42127344810000 | 4212734481 | BRISCOE CHIP EAST RANCH 15H | Producing |
| 42127344820000 | 4212734482 | BRISCOE CHIP EAST RANCH 16H | Producing |
| 42127344830000 | 4212734483 | BRISCOE CHIP EAST RANCH 17H | Producing |
| 42127345070000 | 4212734507 | BRISCOE CHIP EAST RANCH 18H | Producing |
| 42127345080000 | 4212734508 | BRISCOE CHIP EAST RANCH 19H | Producing |
| 42127337680000 | 4212733768 | BRISCOE CHIP EAST RANCH 1H | Producing |
| 42127345090000 | 4212734509 | BRISCOE CHIP EAST RANCH 20H | Producing |
| 42127345100000 | 4212734510 | BRISCOE CHIP EAST RANCH 21H | Producing |
| 42127345110000 | 4212734511 | BRISCOE CHIP EAST RANCH 22H | Producing |
| 42127345120100 | 4212734512 | BRISCOE CHIP EAST RANCH 23H | Producing |
| 42127345220000 | 4212734522 | BRISCOE CHIP EAST RANCH 24H | Producing |
| 42127345230000 | 4212734523 | BRISCOE CHIP EAST RANCH 25H | Shut In |
| 42127345240000 | 4212734524 | BRISCOE CHIP EAST RANCH 26H | Producing |
| 42127361840000 | 4212736184 | BRISCOE CHIP EAST RANCH 27H | Producing |
| 42127362830000 | 4212736283 | BRISCOE CHIP EAST RANCH 28HR | Producing |
| 42127361860000 | 4212736186 | BRISCOE CHIP EAST RANCH 29H | Producing |
| 42127337720000 | 4212733772 | BRISCOE CHIP EAST RANCH 2H | Producing |
| 42127361880000 | 4212736188 | BRISCOE CHIP EAST RANCH 30H | Producing |
| 42127362060000 | 4212736206 | BRISCOE CHIP EAST RANCH 31H | Producing |
| 42127362070000 | 4212736207 | BRISCOE CHIP EAST RANCH 32H | Producing |
| 42127362360000 | 4212736236 | BRISCOE CHIP EAST RANCH 33H | Producing |
| 42127362370000 | 4212736237 | BRISCOE CHIP EAST RANCH 34H | Producing |
| 42127337730000 | 4212733773 | BRISCOE CHIP EAST RANCH 3H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338520000 | 4212733852 | BRISCOE CHIP EAST RANCH 4H | Producing |
| 42127338530000 | 4212733853 | BRISCOE CHIP EAST RANCH 5H | Producing |
| 42127338540000 | 4212733854 | BRISCOE CHIP EAST RANCH 6H | Producing |
| 42127340950000 | 4212734095 | BRISCOE CHIP EAST RANCH 7H | Producing |
| 42127340960000 | 4212734096 | BRISCOE CHIP EAST RANCH 8H | Producing |
| 42127341510000 | 4212734151 | BRISCOE CHIP EAST RANCH 9H | Producing |
| 42127370520000 | 4212737052 | BRISCOE CHIP EAST RANCH UNIT E 1H | Producing |
| 42127370530000 | 4212737053 | BRISCOE CHIP EAST RANCH UNIT E 2H | Producing |
| 42127370540000 | 4212737054 | BRISCOE CHIP EAST RANCH UNIT E 3H | Producing |
| 42127378150000 | 4212737815 | BRISCOE CHIP EAST UNIT 08HX | Producing |
| 42127378380000 | 4212737838 | BRISCOE CHIP EAST UNIT 08HZ | Producing |
| 42127361680000 | 4212736168 | BRISCOE CHIP EAST UNIT B 1H | Producing |
| 42127361690000 | 4212736169 | BRISCOE CHIP EAST UNIT B 2H | Producing |
| 42127361700000 | 4212736170 | BRISCOE CHIP EAST UNIT B 3H | Producing |
| 42127361710000 | 4212736171 | BRISCOE CHIP EAST UNIT B 4H | Producing |
| 42127361720000 | 4212736172 | BRISCOE CHIP EAST UNIT B 5H | Producing |
| 42127361730000 | 4212736173 | BRISCOE CHIP EAST UNIT B 6H | Producing |
| 42479412660000 | 4247941266 | BRISCOE CHUPADERA RANCH 10H | Producing |
| 42479412670000 | 4247941267 | BRISCOE CHUPADERA RANCH 11H | Producing |
| 42479419850000 | 4247941985 | BRISCOE CHUPADERA RANCH 12H | Producing |
| 42479419860000 | 4247941986 | BRISCOE CHUPADERA RANCH 13H | Producing |
| 42479441460000 | 4247944146 | BRISCOE CHUPADERA RANCH 13HX | Producing |
| 42479441470000 | 4247944147 | BRISCOE CHUPADERA RANCH 13HY | Producing |
| 42479441480000 | 4247944148 | BRISCOE CHUPADERA RANCH 13HZ | Producing |
| 42479419870000 | 4247941987 | BRISCOE CHUPADERA RANCH 14H | Producing |
| 42479442680000 | 4247944268 | BRISCOE CHUPADERA RANCH 14HA | Producing |
| 42479442690000 | 4247944269 | BRISCOE CHUPADERA RANCH 14HB | Producing |
| 42479442700000 | 4247944270 | BRISCOE CHUPADERA RANCH 14HC | Producing |
| 42479419880000 | 4247941988 | BRISCOE CHUPADERA RANCH 15H | Producing |
| 42479419890000 | 4247941989 | BRISCOE CHUPADERA RANCH 16H | Producing |
| 42479419900000 | 4247941990 | BRISCOE CHUPADERA RANCH 17H | Producing |
| 42479419940000 | 4247941994 | BRISCOE CHUPADERA RANCH 18H | Producing |
| 42479419980000 | 4247941998 | BRISCOE CHUPADERA RANCH 19H | Producing |

Case 20-32021 Document 316-6 Filed 09/19/20 Page 888 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479397860300 | 4247939786 | BRISCOE CHUPADERA RANCH 1H | Shut In |
| 42479420010000 | 4247942001 | BRISCOE CHUPADERA RANCH 20H | Producing |
| 42479420000000 | 4247942000 | BRISCOE CHUPADERA RANCH 21H | Producing |
| 42479420020000 | 4247942002 | BRISCOE CHUPADERA RANCH 22H | Producing |
| 42479420030000 | 4247942003 | BRISCOE CHUPADERA RANCH 23H | Producing |
| 42479426860000 | 4247942686 | BRISCOE CHUPADERA RANCH 24H | Producing |
| 42479426870000 | 4247942687 | BRISCOE CHUPADERA RANCH 25H | Producing |
| 42479426890000 | 4247942689 | BRISCOE CHUPADERA RANCH 26H | Producing |
| 42479426910000 | 4247942691 | BRISCOE CHUPADERA RANCH 27H | Producing |
| 42479426920000 | 4247942692 | BRISCOE CHUPADERA RANCH 28H | Producing |
| 42479426930000 | 4247942693 | BRISCOE CHUPADERA RANCH 29H | Producing |
| 42479413220000 | 4247941322 | BRISCOE CHUPADERA RANCH 2H | Producing |
| 42479426940000 | 4247942694 | BRISCOE CHUPADERA RANCH 30H | Producing |
| 42479426950000 | 4247942695 | BRISCOE CHUPADERA RANCH 31H | Temporarily Abandoned |
| 42479430080000 | 4247943008 | BRISCOE CHUPADERA RANCH 31HR | Producing |
| 42479426960000 | 4247942696 | BRISCOE CHUPADERA RANCH 32H | Producing |
| 42479426970000 | 4247942697 | BRISCOE CHUPADERA RANCH 33H | Producing |
| 42479427000000 | 4247942700 | BRISCOE CHUPADERA RANCH 34H | Producing |
| 42479427010000 | 4247942701 | BRISCOE CHUPADERA RANCH 35H | Producing |
| 42479427020000 | 4247942702 | BRISCOE CHUPADERA RANCH 36H | Producing |
| 42479427030000 | 4247942703 | BRISCOE CHUPADERA RANCH 37H | Producing |
| 42479427040000 | 4247942704 | BRISCOE CHUPADERA RANCH 38H | Producing |
| 42479427050000 | 4247942705 | BRISCOE CHUPADERA RANCH 39H | Producing |
| 42479412120000 | 4247941212 | BRISCOE CHUPADERA RANCH 3H | Producing |
| 42479427060000 | 4247942706 | BRISCOE CHUPADERA RANCH 40H | Producing |
| 42479427070000 | 4247942707 | BRISCOE CHUPADERA RANCH 41H | Producing |
| 42479427080000 | 4247942708 | BRISCOE CHUPADERA RANCH 42H | Producing |
| 42479427110000 | 4247942711 | BRISCOE CHUPADERA RANCH 43H | Producing |
| 42479412110000 | 4247941211 | BRISCOE CHUPADERA RANCH 4H | Producing |
| 42479412190000 | 4247941219 | BRISCOE CHUPADERA RANCH 5H | Producing |
| 42479412200000 | 4247941220 | BRISCOE CHUPADERA RANCH 6H | Producing |
| 42479412260000 | 4247941226 | BRISCOE CHUPADERA RANCH 7H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479412550000 | 4247941255 | BRISCOE CHUPADERA RANCH 8H | Producing |
| 42479412560000 | 4247941256 | BRISCOE CHUPADERA RANCH 9H | Producing |
| 42479437610000 | 4247943761 | BRISCOE CHUPADERA RANCH A 03HA | Producing |
| 42479437620000 | 4247943762 | BRISCOE CHUPADERA RANCH A 03HB | Producing |
| 42479437630000 | 4247943763 | BRISCOE CHUPADERA RANCH A 03HC | Producing |
| 42479437640100 | 4247943764 | BRISCOE CHUPADERA RANCH A 03HD | Producing |
| 42479442760000 | 4247944276 | BRISCOE CHUPADERA RANCH A 04HA | Producing |
| 42479442770000 | 4247944277 | BRISCOE CHUPADERA RANCH A 04HB | Producing |
| 42479442780000 | 4247944278 | BRISCOE CHUPADERA RANCH A 04HC | Producing |
| 42127378290000 | 4212737829 | BRISCOE COCHINA EAST RANCH 06HB | Producing |
| 42127378310000 | 4212737831 | BRISCOE COCHINA EAST RANCH 06HC | Producing |
| 42127378320000 | 4212737832 | BRISCOE COCHINA EAST RANCH 06HD | Producing |
| 42127378340000 | 4212737834 | BRISCOE COCHINA EAST RANCH 06HF | Producing |
| 42127378370000 | 4212737837 | BRISCOE COCHINA EAST RANCH 06HG | Producing |
| 42127375920100 | 4212737592 | BRISCOE COCHINA EAST RANCH 09DR | Producing |
| 42127375370000 | 4212737537 | BRISCOE COCHINA EAST RANCH 09HD | Plugged and Abandoned |
| 42127375360000 | 4212737536 | BRISCOE COCHINA EAST RANCH 09HE | Producing |
| 42127375380000 | 4212737538 | BRISCOE COCHINA EAST RANCH 09HF | Producing |
| 42127375390100 | 4212737539 | BRISCOE COCHINA EAST RANCH 09HX | Producing |
| 42127375420000 | 4212737542 | BRISCOE COCHINA EAST RANCH 09HY | Producing |
| 42127375440000 | 4212737544 | BRISCOE COCHINA EAST RANCH 09HZ | Producing |
| 42283344500000 | 4228334450 | BRISCOE COCHINA EAST RANCH 100H | Producing |
| 42283344530000 | 4228334453 | BRISCOE COCHINA EAST RANCH 101H | Producing |
| 42283344690000 | 4228334469 | BRISCOE COCHINA EAST RANCH 102H | Producing |
| 42127361010000 | 4212736101 | BRISCOE COCHINA EAST RANCH 103H | Producing |
| 42127361020000 | 4212736102 | BRISCOE COCHINA EAST RANCH 104H | Producing |
| 42127361170000 | 4212736117 | BRISCOE COCHINA EAST RANCH 105H | Producing |
| 42127361050000 | 4212736105 | BRISCOE COCHINA EAST RANCH 106H | Producing |
| 42127361060000 | 4212736106 | BRISCOE COCHINA EAST RANCH 107H | Producing |
| 42127361080000 | 4212736108 | BRISCOE COCHINA EAST RANCH 108H | Producing |
| 42127361090000 | 4212736109 | BRISCOE COCHINA EAST RANCH 109H | Producing |
| 42127336780000 | 4212733678 | BRISCOE COCHINA EAST RANCH 10H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361100000 | 4212736110 | BRISCOE COCHINA EAST RANCH 110H | Producing |
| 42127361120000 | 4212736112 | BRISCOE COCHINA EAST RANCH 111H | Producing |
| 42127361150000 | 4212736115 | BRISCOE COCHINA EAST RANCH 112H | Producing |
| 42127361160000 | 4212736116 | BRISCOE COCHINA EAST RANCH 113H | Producing |
| 42127360860000 | 4212736086 | BRISCOE COCHINA EAST RANCH 114H | Producing |
| 42127360870000 | 4212736087 | BRISCOE COCHINA EAST RANCH 115H | Producing |
| 42127360880000 | 4212736088 | BRISCOE COCHINA EAST RANCH 116H | Producing |
| 42127360900000 | 4212736090 | BRISCOE COCHINA EAST RANCH 117H | Producing |
| 42127360920000 | 4212736092 | BRISCOE COCHINA EAST RANCH 118H | Producing |
| 42127360930000 | 4212736093 | BRISCOE COCHINA EAST RANCH 119H | Producing |
| 42127338370000 | 4212733837 | BRISCOE COCHINA EAST RANCH 11H | Producing |
| 42127360940000 | 4212736094 | BRISCOE COCHINA EAST RANCH 120H | Producing |
| 42127360950000 | 4212736095 | BRISCOE COCHINA EAST RANCH 121H | Producing |
| 42127360970000 | 4212736097 | BRISCOE COCHINA EAST RANCH 122H | Producing |
| 42127360980000 | 4212736098 | BRISCOE COCHINA EAST RANCH 123H | Producing |
| 42127360990000 | 4212736099 | BRISCOE COCHINA EAST RANCH 124H | Producing |
| 42127361000000 | 4212736100 | BRISCOE COCHINA EAST RANCH 125H | Producing |
| 42127361030000 | 4212736103 | BRISCOE COCHINA EAST RANCH 126H | Producing |
| 42283348530000 | 4228334853 | BRISCOE COCHINA EAST RANCH 127H | Producing |
| 42283348540100 | 4228334854 | BRISCOE COCHINA EAST RANCH 128H | Producing |
| 42283348550000 | 4228334855 | BRISCOE COCHINA EAST RANCH 129H | Producing |
| 42127338380000 | 4212733838 | BRISCOE COCHINA EAST RANCH 12H | Producing |
| 42283348560000 | 4228334856 | BRISCOE COCHINA EAST RANCH 130H | Producing |
| 42283348570000 | 4228334857 | BRISCOE COCHINA EAST RANCH 131H | Producing |
| 42283348580000 | 4228334858 | BRISCOE COCHINA EAST RANCH 132H | Producing |
| 42283348590000 | 4228334859 | BRISCOE COCHINA EAST RANCH 133H | Producing |
| 42283348600000 | 4228334860 | BRISCOE COCHINA EAST RANCH 134H | Producing |
| 42283348610000 | 4228334861 | BRISCOE COCHINA EAST RANCH 135H | Producing |
| 42283348620000 | 4228334862 | BRISCOE COCHINA EAST RANCH 136H | Producing |
| 42283348630000 | 4228334863 | BRISCOE COCHINA EAST RANCH 137H | Producing |
| 42283348640000 | 4228334864 | BRISCOE COCHINA EAST RANCH 138H | Producing |
| 42283348650000 | 4228334865 | BRISCOE COCHINA EAST RANCH 139H | Producing |
| 42127338390000 | 4212733839 | BRISCOE COCHINA EAST RANCH 13H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42283348660100 | 4228334866 | BRISCOE COCHINA EAST RANCH 140H | Producing |
| 42283348670000 | 4228334867 | BRISCOE COCHINA EAST RANCH 141H | Producing |
| 42283348680000 | 4228334868 | BRISCOE COCHINA EAST RANCH 142H | Producing |
| 42283348690000 | 4228334869 | BRISCOE COCHINA EAST RANCH 143H | Producing |
| 42283348700000 | 4228334870 | BRISCOE COCHINA EAST RANCH 144H | Producing |
| 42283351490000 | 4228335149 | BRISCOE COCHINA EAST RANCH 145HR | Producing |
| 42283348720000 | 4228334872 | BRISCOE COCHINA EAST RANCH 146H | Producing |
| 42283348730000 | 4228334873 | BRISCOE COCHINA EAST RANCH 147H | Producing |
| 42127367090000 | 4212736709 | BRISCOE COCHINA EAST RANCH 163H | Producing |
| 42127367080000 | 4212736708 | BRISCOE COCHINA EAST RANCH 164H | Producing |
| 42127367100000 | 4212736710 | BRISCOE COCHINA EAST RANCH 165H | Producing |
| 42127339140000 | 4212733914 | BRISCOE COCHINA EAST RANCH 16H | Producing |
| 42127339160000 | 4212733916 | BRISCOE COCHINA EAST RANCH 17H | Producing |
| 42283356650000 | 4228335665 | BRISCOE COCHINA EAST RANCH 188H | Producing |
| 42283356660000 | 4228335666 | BRISCOE COCHINA EAST RANCH 189H | Producing |
| 42127339680000 | 4212733968 | BRISCOE COCHINA EAST RANCH 18H | Producing |
| 42283356670000 | 4228335667 | BRISCOE COCHINA EAST RANCH 190H | Producing |
| 42127339900000 | 4212733990 | BRISCOE COCHINA EAST RANCH 19H | Producing |
| 42127336200000 | 4212733620 | BRISCOE COCHINA EAST RANCH 1H | Shut In |
| 42127339940000 | 4212733994 | BRISCOE COCHINA EAST RANCH 20H | Producing |
| 42127339910000 | 4212733991 | BRISCOE COCHINA EAST RANCH 21H | Producing |
| 42127352040000 | 4212735204 | BRISCOE COCHINA EAST RANCH 22H | Producing |
| 42127352030000 | 4212735203 | BRISCOE COCHINA EAST RANCH 23H | Producing |
| 42127350810000 | 4212735081 | BRISCOE COCHINA EAST RANCH 24H | Producing |
| 42127350720100 | 4212735072 | BRISCOE COCHINA EAST RANCH 25H | Producing |
| 42127350860000 | 4212735086 | BRISCOE COCHINA EAST RANCH 26H | Producing |
| 42127350870000 | 4212735087 | BRISCOE COCHINA EAST RANCH 27H | Producing |
| 42127352050000 | 4212735205 | BRISCOE COCHINA EAST RANCH 28H | Producing |
| 42127352060000 | 4212735206 | BRISCOE COCHINA EAST RANCH 29H | Producing |
| 42127336210000 | 4212733621 | BRISCOE COCHINA EAST RANCH 2H | Producing |
| 42127352070000 | 4212735207 | BRISCOE COCHINA EAST RANCH 30H | Producing |
| 42127340980000 | 4212734098 | BRISCOE COCHINA EAST RANCH 31H | Producing |
| 42127341070000 | 4212734107 | BRISCOE COCHINA EAST RANCH 32H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352080000 | 4212735208 | BRISCOE COCHINA EAST RANCH 33H | Producing |
| 42127352230000 | 4212735223 | BRISCOE COCHINA EAST RANCH 34H | Producing |
| 42127352100000 | 4212735210 | BRISCOE COCHINA EAST RANCH 35H | Producing |
| 42127352110000 | 4212735211 | BRISCOE COCHINA EAST RANCH 36H | Producing |
| 42127352130000 | 4212735213 | BRISCOE COCHINA EAST RANCH 37H | Producing |
| 42127352280000 | 4212735228 | BRISCOE COCHINA EAST RANCH 38H | Producing |
| 42127352290000 | 4212735229 | BRISCOE COCHINA EAST RANCH 39H | Producing |
| 42127336670000 | 4212733667 | BRISCOE COCHINA EAST RANCH 3H | Producing |
| 42283341380000 | 4228334138 | BRISCOE COCHINA EAST RANCH 40H | Producing |
| 42283341470000 | 4228334147 | BRISCOE COCHINA EAST RANCH 41H | Producing |
| 42283341540000 | 4228334154 | BRISCOE COCHINA EAST RANCH 42H | Producing |
| 42283341560000 | 4228334156 | BRISCOE COCHINA EAST RANCH 43H | Producing |
| 42283341570000 | 4228334157 | BRISCOE COCHINA EAST RANCH 44H | Producing |
| 42283341580000 | 4228334158 | BRISCOE COCHINA EAST RANCH 45H | Producing |
| 42283341630100 | 4228334163 | BRISCOE COCHINA EAST RANCH 46H | Producing |
| 42283369790000 | 4228336979 | BRISCOE COCHINA EAST RANCH 46HX | Producing |
| 42283369800000 | 4228336980 | BRISCOE COCHINA EAST RANCH 46HY | Producing |
| 42283369780000 | 4228336978 | BRISCOE COCHINA EAST RANCH 46HZ | Producing |
| 42283341640000 | 4228334164 | BRISCOE COCHINA EAST RANCH 47H | Producing |
| 42283341650000 | 4228334165 | BRISCOE COCHINA EAST RANCH 48H | Producing |
| 42283341660000 | 4228334166 | BRISCOE COCHINA EAST RANCH 49H | Producing |
| 42127336680000 | 4212733668 | BRISCOE COCHINA EAST RANCH 4H | Producing |
| 42283341670000 | 4228334167 | BRISCOE COCHINA EAST RANCH 50H | Producing |
| 42283341680000 | 4228334168 | BRISCOE COCHINA EAST RANCH 51H | Producing |
| 42283341730000 | 4228334173 | BRISCOE COCHINA EAST RANCH 52H | Producing |
| 42283341740000 | 4228334174 | BRISCOE COCHINA EAST RANCH 53H | Producing |
| 42283341750000 | 4228334175 | BRISCOE COCHINA EAST RANCH 54H | Producing |
| 42283363810000 | 4228336381 | BRISCOE COCHINA EAST RANCH 54HX | Producing |
| 42283363820000 | 4228336382 | BRISCOE COCHINA EAST RANCH 54HY | Producing |
| 42283363830000 | 4228336383 | BRISCOE COCHINA EAST RANCH 54HZ | Producing |
| 42283341760000 | 4228334176 | BRISCOE COCHINA EAST RANCH 55H | Producing |
| 42283341770000 | 4228334177 | BRISCOE COCHINA EAST RANCH 56H | Producing |
| 42283342250000 | 4228334225 | BRISCOE COCHINA EAST RANCH 57H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127376200000 | 4212737620 | BRISCOE COCHINA EAST RANCH 57HA | Producing |
| 42127376160000 | 4212737616 | BRISCOE COCHINA EAST RANCH 57HB | Producing |
| 42127376170000 | 4212737617 | BRISCOE COCHINA EAST RANCH 57HC | Producing |
| 42127376180000 | 4212737618 | BRISCOE COCHINA EAST RANCH 57HD | Producing |
| 42127376190000 | 4212737619 | BRISCOE COCHINA EAST RANCH 57HE | Producing |
| 42283342260000 | 4228334226 | BRISCOE COCHINA EAST RANCH 58H | Producing |
| 42283342270000 | 4228334227 | BRISCOE COCHINA EAST RANCH 59H | Producing |
| 42127336690000 | 4212733669 | BRISCOE COCHINA EAST RANCH 5H | Producing |
| 42283342280100 | 4228334228 | BRISCOE COCHINA EAST RANCH 60H | Producing |
| 42127344860000 | 4212734486 | BRISCOE COCHINA EAST RANCH 61H | Producing |
| 42127344870100 | 4212734487 | BRISCOE COCHINA EAST RANCH 62H | Producing |
| 42127344880000 | 4212734488 | BRISCOE COCHINA EAST RANCH 63H | Producing |
| 42127344890000 | 4212734489 | BRISCOE COCHINA EAST RANCH 64H | Producing |
| 42127344920000 | 4212734492 | BRISCOE COCHINA EAST RANCH 65H | Producing |
| 42127344940000 | 4212734494 | BRISCOE COCHINA EAST RANCH 66H | Producing |
| 42283330130000 | 4228333013 | BRISCOE COCHINA EAST RANCH 67H | Producing |
| 42283330150000 | 4228333015 | BRISCOE COCHINA EAST RANCH 68H | Producing |
| 42283330160000 | 4228333016 | BRISCOE COCHINA EAST RANCH 69H | Shut In |
| 42127336700000 | 4212733670 | BRISCOE COCHINA EAST RANCH 6H | Producing |
| 42283330170000 | 4228333017 | BRISCOE COCHINA EAST RANCH 70H | Producing |
| 42283330180000 | 4228333018 | BRISCOE COCHINA EAST RANCH 71H | Producing |
| 42283330190000 | 4228333019 | BRISCOE COCHINA EAST RANCH 72H | Producing |
| 42283343070000 | 4228334307 | BRISCOE COCHINA EAST RANCH 73H | Producing |
| 42283343080000 | 4228334308 | BRISCOE COCHINA EAST RANCH 74H | Producing |
| 42283343090000 | 4228334309 | BRISCOE COCHINA EAST RANCH 75H | Producing |
| 42283343100000 | 4228334310 | BRISCOE COCHINA EAST RANCH 76H | Producing |
| 42283343120000 | 4228334312 | BRISCOE COCHINA EAST RANCH 77H | Producing |
| 42283343130000 | 4228334313 | BRISCOE COCHINA EAST RANCH 78H | Producing |
| 42283343620000 | 4228334362 | BRISCOE COCHINA EAST RANCH 79H | Producing |
| 42127336620000 | 4212733662 | BRISCOE COCHINA EAST RANCH 7H | Producing |
| 42283343630000 | 4228334363 | BRISCOE COCHINA EAST RANCH 80H | Producing |
| 42283343640000 | 4228334364 | BRISCOE COCHINA EAST RANCH 81H | Producing |
| 42283343650000 | 4228334365 | BRISCOE COCHINA EAST RANCH 82H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42283343920000 | 4228334392 | BRISCOE COCHINA EAST RANCH 83H | Producing |
| 42283343930000 | 4228334393 | BRISCOE COCHINA EAST RANCH 84H | Producing |
| 42283343940000 | 4228334394 | BRISCOE COCHINA EAST RANCH 85H | Producing |
| 42283343950000 | 4228334395 | BRISCOE COCHINA EAST RANCH 86H | Producing |
| 42283343960000 | 4228334396 | BRISCOE COCHINA EAST RANCH 87H | Producing |
| 42283343990000 | 4228334399 | BRISCOE COCHINA EAST RANCH 88H | Producing |
| 42283344000000 | 4228334400 | BRISCOE COCHINA EAST RANCH 89H | Producing |
| 42127336710000 | 4212733671 | BRISCOE COCHINA EAST RANCH 8H | Producing |
| 42283344010000 | 4228334401 | BRISCOE COCHINA EAST RANCH 90H | Producing |
| 42283344020000 | 4228334402 | BRISCOE COCHINA EAST RANCH 91H | Producing |
| 42283344030000 | 4228334403 | BRISCOE COCHINA EAST RANCH 92H | Producing |
| 42283344040000 | 4228334404 | BRISCOE COCHINA EAST RANCH 93H | Producing |
| 42283344060000 | 4228334406 | BRISCOE COCHINA EAST RANCH 94H | Producing |
| 42283344070000 | 4228334407 | BRISCOE COCHINA EAST RANCH 95H | Producing |
| 42283344080000 | 4228334408 | BRISCOE COCHINA EAST RANCH 96H | Producing |
| 42283344090000 | 4228334409 | BRISCOE COCHINA EAST RANCH 97H | Producing |
| 42283344100000 | 4228334410 | BRISCOE COCHINA EAST RANCH 98H | Producing |
| 42283344510000 | 4228334451 | BRISCOE COCHINA EAST RANCH 99H | Producing |
| 42127336720000 | 4212733672 | BRISCOE COCHINA EAST RANCH 9H | Producing |
| 42127334000000 | 4212733400 | BRISCOE COCHINA RANCH 1 | Plugged and Abandoned |
| 42283323300000 | 4228332330 | BRISCOE COCHINA STATE UNIT A 1H | Producing |
| 42283323310000 | 4228332331 | BRISCOE COCHINA STATE UNIT B 1H | Producing |
| 42127374700000 | 4212737470 | BRISCOE COCHINA WEST RANCH 06HV | Producing |
| 42127374710000 | 4212737471 | BRISCOE COCHINA WEST RANCH 06HW | Shut In |
| 42127374720000 | 4212737472 | BRISCOE COCHINA WEST RANCH 06HX | Producing |
| 42127374730000 | 4212737473 | BRISCOE COCHINA WEST RANCH 06HY | Producing |
| 42127374740000 | 4212737474 | BRISCOE COCHINA WEST RANCH 06HZ | Producing |
| 42127363300000 | 4212736330 | BRISCOE COCHINA WEST RANCH 100H | Producing |
| 42127369140000 | 4212736914 | BRISCOE COCHINA WEST RANCH 101H | Producing |
| 42127369160000 | 4212736916 | BRISCOE COCHINA WEST RANCH 102H | Producing |
| 42127369170000 | 4212736917 | BRISCOE COCHINA WEST RANCH 103H | Producing |
| 42127369150000 | 4212736915 | BRISCOE COCHINA WEST RANCH 104H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127369180000 | 4212736918 | BRISCOE COCHINA WEST RANCH 105H | Producing |
| 42127348220000 | 4212734822 | BRISCOE COCHINA WEST RANCH 10H | Producing |
| 42127337590000 | 4212733759 | BRISCOE COCHINA WEST RANCH 11H | Producing |
| 42127338590000 | 4212733859 | BRISCOE COCHINA WEST RANCH 12H | Producing |
| 42127348230000 | 4212734823 | BRISCOE COCHINA WEST RANCH 13H | Producing |
| 42127348250000 | 4212734825 | BRISCOE COCHINA WEST RANCH 14H | Producing |
| 42127348240000 | 4212734824 | BRISCOE COCHINA WEST RANCH 15H | Producing |
| 42127341160000 | 4212734116 | BRISCOE COCHINA WEST RANCH 16H | Producing |
| 42127341180000 | 4212734118 | BRISCOE COCHINA WEST RANCH 17H | Producing |
| 42127341170000 | 4212734117 | BRISCOE COCHINA WEST RANCH 18H | Producing |
| 42127348310000 | 4212734831 | BRISCOE COCHINA WEST RANCH 19H | Producing |
| 42127357730000 | 4212735773 | BRISCOE COCHINA WEST RANCH 1B | Shut In |
| 42127357790000 | 4212735779 | BRISCOE COCHINA WEST RANCH 1E | Producing |
| 42127336580000 | 4212733658 | BRISCOE COCHINA WEST RANCH 1H | Producing |
| 42127348330000 | 4212734833 | BRISCOE COCHINA WEST RANCH 20H | Producing |
| 42127348320000 | 4212734832 | BRISCOE COCHINA WEST RANCH 21H | Producing |
| 42127344450000 | 4212734445 | BRISCOE COCHINA WEST RANCH 22H | Producing |
| 42127344470000 | 4212734447 | BRISCOE COCHINA WEST RANCH 23H | Producing |
| 42127344490000 | 4212734449 | BRISCOE COCHINA WEST RANCH 24H | Producing |
| 42127344500000 | 4212734450 | BRISCOE COCHINA WEST RANCH 25H | Producing |
| 42127344510000 | 4212734451 | BRISCOE COCHINA WEST RANCH 26H | Producing |
| 42127344520000 | 4212734452 | BRISCOE COCHINA WEST RANCH 27H | Producing |
| 42127348340000 | 4212734834 | BRISCOE COCHINA WEST RANCH 28H | Producing |
| 42127348360000 | 4212734836 | BRISCOE COCHINA WEST RANCH 29H | Producing |
| 42127336960000 | 4212733696 | BRISCOE COCHINA WEST RANCH 2H | Producing |
| 42127348370000 | 4212734837 | BRISCOE COCHINA WEST RANCH 30H | Producing |
| 42127348820000 | 4212734882 | BRISCOE COCHINA WEST RANCH 31H | Producing |
| 42127348830000 | 4212734883 | BRISCOE COCHINA WEST RANCH 32H | Producing |
| 42127348890000 | 4212734889 | BRISCOE COCHINA WEST RANCH 33H | Producing |
| 42127348840000 | 4212734884 | BRISCOE COCHINA WEST RANCH 34H | Producing |
| 42127348850000 | 4212734885 | BRISCOE COCHINA WEST RANCH 35H | Producing |
| 42127350380000 | 4212735038 | BRISCOE COCHINA WEST RANCH 36H | Producing |
| 42127350390000 | 4212735039 | BRISCOE COCHINA WEST RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127350410100 | 4212735041 | BRISCOE COCHINA WEST RANCH 38H | Producing |
| 42127344720000 | 4212734472 | BRISCOE COCHINA WEST RANCH 39H | Producing |
| 42127336990000 | 4212733699 | BRISCOE COCHINA WEST RANCH 3H | Producing |
| 42127344730000 | 4212734473 | BRISCOE COCHINA WEST RANCH 40H | Shut In |
| 42127344740000 | 4212734474 | BRISCOE COCHINA WEST RANCH 41H | Producing |
| 42127344750000 | 4212734475 | BRISCOE COCHINA WEST RANCH 42H | Producing |
| 42127344760000 | 4212734476 | BRISCOE COCHINA WEST RANCH 43H | Producing |
| 42127344770000 | 4212734477 | BRISCOE COCHINA WEST RANCH 44H | Producing |
| 42127350420000 | 4212735042 | BRISCOE COCHINA WEST RANCH 45H | Producing |
| 42127354920000 | 4212735492 | BRISCOE COCHINA WEST RANCH 46H | Producing |
| 42127355480000 | 4212735548 | BRISCOE COCHINA WEST RANCH 47H | Producing |
| 42127355490000 | 4212735549 | BRISCOE COCHINA WEST RANCH 48H | Producing |
| 42127355500000 | 4212735550 | BRISCOE COCHINA WEST RANCH 49H | Producing |
| 42127337000000 | 4212733700 | BRISCOE COCHINA WEST RANCH 4H | Producing |
| 42127355510000 | 4212735551 | BRISCOE COCHINA WEST RANCH 50H | Producing |
| 42127355520000 | 4212735552 | BRISCOE COCHINA WEST RANCH 51H | Producing |
| 42127356240000 | 4212735624 | BRISCOE COCHINA WEST RANCH 52H | Producing |
| 42127356260000 | 4212735626 | BRISCOE COCHINA WEST RANCH 53H | Producing |
| 42127356270000 | 4212735627 | BRISCOE COCHINA WEST RANCH 54H | Producing |
| 42127356280000 | 4212735628 | BRISCOE COCHINA WEST RANCH 55H | Producing |
| 42127356300000 | 4212735630 | BRISCOE COCHINA WEST RANCH 56H | Producing |
| 42127356290000 | 4212735629 | BRISCOE COCHINA WEST RANCH 57H | Producing |
| 42127356310000 | 4212735631 | BRISCOE COCHINA WEST RANCH 58H | Producing |
| 42127356320000 | 4212735632 | BRISCOE COCHINA WEST RANCH 59H | Producing |
| 42127339030000 | 4212733903 | BRISCOE COCHINA WEST RANCH 5H | Producing |
| 42127356330000 | 4212735633 | BRISCOE COCHINA WEST RANCH 60H | Producing |
| 42127356340000 | 4212735634 | BRISCOE COCHINA WEST RANCH 61H | Producing |
| 42127356360000 | 4212735636 | BRISCOE COCHINA WEST RANCH 62H | Producing |
| 42127356350000 | 4212735635 | BRISCOE COCHINA WEST RANCH 63H | Producing |
| 42127356400000 | 4212735640 | BRISCOE COCHINA WEST RANCH 64H | Producing |
| 42127356420000 | 4212735642 | BRISCOE COCHINA WEST RANCH 65H | Producing |
| 42127356430000 | 4212735643 | BRISCOE COCHINA WEST RANCH 66H | Producing |
| 42127356440000 | 4212735644 | BRISCOE COCHINA WEST RANCH 67H | Producing |

Case 20-32058 Document 316 Filed 09/23/20 Page 309 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361380000 | 4212736138 | BRISCOE COCHINA WEST RANCH 68H | Producing |
| 42127361390000 | 4212736139 | BRISCOE COCHINA WEST RANCH 69H | Producing |
| 42127339040000 | 4212733904 | BRISCOE COCHINA WEST RANCH 6H | Producing |
| 42127361480000 | 4212736148 | BRISCOE COCHINA WEST RANCH 70H | Producing |
| 42127361400000 | 4212736140 | BRISCOE COCHINA WEST RANCH 71H | Producing |
| 42127361410000 | 4212736141 | BRISCOE COCHINA WEST RANCH 72H | Producing |
| 42127361420000 | 4212736142 | BRISCOE COCHINA WEST RANCH 73H | Producing |
| 42127361430000 | 4212736143 | BRISCOE COCHINA WEST RANCH 74H | Producing |
| 42127361440000 | 4212736144 | BRISCOE COCHINA WEST RANCH 75H | Producing |
| 42127361450000 | 4212736145 | BRISCOE COCHINA WEST RANCH 76H | Producing |
| 42127361460000 | 4212736146 | BRISCOE COCHINA WEST RANCH 77H | Producing |
| 42127362500000 | 4212736250 | BRISCOE COCHINA WEST RANCH 78H | Producing |
| 42127362530000 | 4212736253 | BRISCOE COCHINA WEST RANCH 79H | Producing |
| 42127339050000 | 4212733905 | BRISCOE COCHINA WEST RANCH 7H | Producing |
| 42127362540000 | 4212736254 | BRISCOE COCHINA WEST RANCH 80H | Producing |
| 42127362550000 | 4212736255 | BRISCOE COCHINA WEST RANCH 81H | Producing |
| 42127362560000 | 4212736256 | BRISCOE COCHINA WEST RANCH 82H | Producing |
| 42127362570000 | 4212736257 | BRISCOE COCHINA WEST RANCH 83H | Producing |
| 42127362580000 | 4212736258 | BRISCOE COCHINA WEST RANCH 84H | Producing |
| 42127362590000 | 4212736259 | BRISCOE COCHINA WEST RANCH 85H | Producing |
| 42127362600000 | 4212736260 | BRISCOE COCHINA WEST RANCH 86H | Producing |
| 42127362610000 | 4212736261 | BRISCOE COCHINA WEST RANCH 87H | Producing |
| 42127362630000 | 4212736263 | BRISCOE COCHINA WEST RANCH 88H | Producing |
| 42127362640000 | 4212736264 | BRISCOE COCHINA WEST RANCH 89H | Producing |
| 42127348210000 | 4212734821 | BRISCOE COCHINA WEST RANCH 8H | Producing |
| 42127362650000 | 4212736265 | BRISCOE COCHINA WEST RANCH 90H | Producing |
| 42127362660000 | 4212736266 | BRISCOE COCHINA WEST RANCH 91H | Producing |
| 42127362670000 | 4212736267 | BRISCOE COCHINA WEST RANCH 92H | Producing |
| 42127362680000 | 4212736268 | BRISCOE COCHINA WEST RANCH 93H | Producing |
| 42127362690000 | 4212736269 | BRISCOE COCHINA WEST RANCH 94H | Producing |
| 42127362700000 | 4212736270 | BRISCOE COCHINA WEST RANCH 95H | Producing |
| 42127363260000 | 4212736326 | BRISCOE COCHINA WEST RANCH 96H | Producing |
| 42127363270000 | 4212736327 | BRISCOE COCHINA WEST RANCH 97H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed 08/31/16/20 Page 898 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127363280000 | 4212736328 | BRISCOE COCHINA WEST RANCH 98H | Producing |
| 42127363290000 | 4212736329 | BRISCOE COCHINA WEST RANCH 99H | Producing |
| 42127348260000 | 4212734826 | BRISCOE COCHINA WEST RANCH 9H | Producing |
| 42127357520000 | 4212735752 | BRISCOE EAST DELGADO UNIT A 10H | Producing |
| 42127357530000 | 4212735753 | BRISCOE EAST DELGADO UNIT A 11H | Producing |
| 42127357540000 | 4212735754 | BRISCOE EAST DELGADO UNIT A 12H | Producing |
| 42127357550000 | 4212735755 | BRISCOE EAST DELGADO UNIT A 13H | Producing |
| 42127357560000 | 4212735756 | BRISCOE EAST DELGADO UNIT A 14H | Producing |
| 42127357570000 | 4212735757 | BRISCOE EAST DELGADO UNIT A 15H | Producing |
| 42127357160000 | 4212735716 | BRISCOE EAST DELGADO UNIT A 1H | Producing |
| 42127357170000 | 4212735717 | BRISCOE EAST DELGADO UNIT A 2H | Producing |
| 42127357180000 | 4212735718 | BRISCOE EAST DELGADO UNIT A 3H | Producing |
| 42127357190000 | 4212735719 | BRISCOE EAST DELGADO UNIT A 4H | Producing |
| 42127357200000 | 4212735720 | BRISCOE EAST DELGADO UNIT A 5H | Producing |
| 42127357240000 | 4212735724 | BRISCOE EAST DELGADO UNIT A 6H | Producing |
| 42127357250000 | 4212735725 | BRISCOE EAST DELGADO UNIT A 7H | Producing |
| 42127357260000 | 4212735726 | BRISCOE EAST DELGADO UNIT A 8H | Producing |
| 42127357270000 | 4212735727 | BRISCOE EAST DELGADO UNIT A 9H | Producing |
| 42127352410000 | 4212735241 | BRISCOE ECKHARDT-SWONKE UNIT 1H | Producing |
| 42127352430000 | 4212735243 | BRISCOE ECKHARDT-SWONKE UNIT 2H | Producing |
| 42127352440000 | 4212735244 | BRISCOE ECKHARDT-SWONKE UNIT 3H | Producing |
| 42127352450000 | 4212735245 | BRISCOE ECKHARDT-SWONKE UNIT 4H | Producing |
| 42127352460000 | 4212735246 | BRISCOE ECKHARDT-SWONKE UNIT 5H | Producing |
| 42127352490000 | 4212735249 | BRISCOE ECKHARDT-SWONKE UNIT 6H | Producing |
| 42127352500000 | 4212735250 | BRISCOE ECKHARDT-SWONKE UNIT 7H | Producing |
| 42127379530000 | 4212737953 | BRISCOE FISHER UNIT 01HB | Producing |
| 42127379540000 | 4212737954 | BRISCOE FISHER UNIT 01HC | Producing |
| 42127379560000 | 4212737956 | BRISCOE FISHER UNIT 01HE | Producing |
| 42127379570000 | 4212737957 | BRISCOE FISHER UNIT 01HF | Producing |
| 42127379600000 | 4212737960 | BRISCOE FISHER UNIT 02HA | Producing |
| 42127379640000 | 4212737964 | BRISCOE FISHER UNIT 02HC | Producing |
| 42127379660000 | 4212737966 | BRISCOE FISHER UNIT 02HD | Producing |
| 42127341580000 | 4212734158 | BRISCOE FRIDAY RANCH 18H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed in TXSB on 10/16/20 Page 899 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127341930000 | 4212734193 | BRISCOE FRIDAY RANCH 19H | Producing |
| 42127336890000 | 4212733689 | BRISCOE FRIDAY RANCH 1H | Producing |
| 42127341940000 | 4212734194 | BRISCOE FRIDAY RANCH 20H | Producing |
| 42127341950000 | 4212734195 | BRISCOE FRIDAY RANCH 21H | Producing |
| 42127341960000 | 4212734196 | BRISCOE FRIDAY RANCH 22H | Producing |
| 42127353850000 | 4212735385 | BRISCOE FRIDAY RANCH 23H | Producing |
| 42127353890000 | 4212735389 | BRISCOE FRIDAY RANCH 24H | Producing |
| 42127348070000 | 4212734807 | BRISCOE FRIDAY RANCH 25H | Producing |
| 42127348100000 | 4212734810 | BRISCOE FRIDAY RANCH 26H | Producing |
| 42127348080000 | 4212734808 | BRISCOE FRIDAY RANCH 27H | Producing |
| 42127348120000 | 4212734812 | BRISCOE FRIDAY RANCH 28H | Producing |
| 42127348130000 | 4212734813 | BRISCOE FRIDAY RANCH 29H | Producing |
| 42127337080000 | 4212733708 | BRISCOE FRIDAY RANCH 2H | Producing |
| 42127348150000 | 4212734815 | BRISCOE FRIDAY RANCH 30H | Producing |
| 42127348170000 | 4212734817 | BRISCOE FRIDAY RANCH 31H | Producing |
| 42127348160000 | 4212734816 | BRISCOE FRIDAY RANCH 32H | Producing |
| 42127348180000 | 4212734818 | BRISCOE FRIDAY RANCH 33H | Producing |
| 42127348200000 | 4212734820 | BRISCOE FRIDAY RANCH 34H | Shut In |
| 42127353870000 | 4212735387 | BRISCOE FRIDAY RANCH 35H | Producing |
| 42127353880000 | 4212735388 | BRISCOE FRIDAY RANCH 36H | Producing |
| 42127353920000 | 4212735392 | BRISCOE FRIDAY RANCH 37H | Producing |
| 42127353910000 | 4212735391 | BRISCOE FRIDAY RANCH 38H | Producing |
| 42127353930000 | 4212735393 | BRISCOE FRIDAY RANCH 39H | Shut In |
| 42127337090000 | 4212733709 | BRISCOE FRIDAY RANCH 3H | Producing |
| 42127353940000 | 4212735394 | BRISCOE FRIDAY RANCH 40H | Producing |
| 42127361640000 | 4212736164 | BRISCOE FRIDAY RANCH 41H | Temporarily Abandoned |
| 42127364560000 | 4212736456 | BRISCOE FRIDAY RANCH 41HR | Producing |
| 42127361650000 | 4212736165 | BRISCOE FRIDAY RANCH 42H | Temporarily Abandoned |
| 42127364570000 | 4212736457 | BRISCOE FRIDAY RANCH 42HR | Producing |
| 42127361660000 | 4212736166 | BRISCOE FRIDAY RANCH 43H | Producing |
| 42127361670100 | 4212736167 | BRISCOE FRIDAY RANCH 44H | Producing |
| 42127362080000 | 4212736208 | BRISCOE FRIDAY RANCH 45H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127363560000 | 4212736356 | BRISCOE FRIDAY RANCH 46HR | Producing |
| 42127362180000 | 4212736218 | BRISCOE FRIDAY RANCH 47H | Producing |
| 42127337200000 | 4212733720 | BRISCOE FRIDAY RANCH 4H | Producing |
| 42127337210000 | 4212733721 | BRISCOE FRIDAY RANCH 5H | Producing |
| 42127337220000 | 4212733722 | BRISCOE FRIDAY RANCH 6H | Producing |
| 42127337550000 | 4212733755 | BRISCOE FRIDAY RANCH 7H | Producing |
| 42127337560000 | 4212733756 | BRISCOE FRIDAY RANCH 8H | Producing |
| 42127337570000 | 4212733757 | BRISCOE FRIDAY RANCH 9H | Producing |
| 42127361960000 | 4212736196 | BRISCOE FRIDAY RANCH UNIT A 1H | Producing |
| 42127361970000 | 4212736197 | BRISCOE FRIDAY RANCH UNIT A 2H | Producing |
| 42127361980000 | 4212736198 | BRISCOE FRIDAY RANCH UNIT A 3H | Producing |
| 42127361990000 | 4212736199 | BRISCOE FRIDAY RANCH UNIT A 4H | Producing |
| 42127362000000 | 4212736200 | BRISCOE FRIDAY RANCH UNIT A 5H | Producing |
| 42127362010000 | 4212736201 | BRISCOE FRIDAY RANCH UNIT A 6H | Producing |
| 42127342730000 | 4212734273 | BRISCOE FRIDAY RANCH UNIT B 10H | Producing |
| 42127342750000 | 4212734275 | BRISCOE FRIDAY RANCH UNIT B 11H | Producing |
| 42127342740000 | 4212734274 | BRISCOE FRIDAY RANCH UNIT B 12H | Producing |
| 42127342760000 | 4212734276 | BRISCOE FRIDAY RANCH UNIT B 13H | Producing |
| 42127343090000 | 4212734309 | BRISCOE FRIDAY RANCH UNIT B 14H | Producing |
| 42127343100000 | 4212734310 | BRISCOE FRIDAY RANCH UNIT B 15H | Producing |
| 42127343110000 | 4212734311 | BRISCOE FRIDAY RANCH UNIT B 16H | Producing |
| 42127343130000 | 4212734313 | BRISCOE FRIDAY RANCH UNIT B 17H | Producing |
| 42127368980000 | 4212736898 | BRISCOE FRIDAY RANCH UNIT C 10H | Producing |
| 42127368990000 | 4212736899 | BRISCOE FRIDAY RANCH UNIT C 11H | Producing |
| 42127369010000 | 4212736901 | BRISCOE FRIDAY RANCH UNIT C 1H | Producing |
| 42127369020000 | 4212736902 | BRISCOE FRIDAY RANCH UNIT C 2H | Producing |
| 42127369030000 | 4212736903 | BRISCOE FRIDAY RANCH UNIT C 3H | Producing |
| 42127369040000 | 4212736904 | BRISCOE FRIDAY RANCH UNIT C 4H | Producing |
| 42127369050000 | 4212736905 | BRISCOE FRIDAY RANCH UNIT C 5H | Producing |
| 42127369060000 | 4212736906 | BRISCOE FRIDAY RANCH UNIT C 6H | Producing |
| 42127368950000 | 4212736895 | BRISCOE FRIDAY RANCH UNIT C 7H | Producing |
| 42127368960000 | 4212736896 | BRISCOE FRIDAY RANCH UNIT C 8H | Producing |
| 42127368970000 | 4212736897 | BRISCOE FRIDAY RANCH UNIT C 9H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339840000 | 4212733984 | BRISCOE FRIDAY SMITH 1H | Producing |
| 42127339850000 | 4212733985 | BRISCOE FRIDAY SMITH 2H | Producing |
| 42127339860000 | 4212733986 | BRISCOE FRIDAY SMITH 3H | Producing |
| 42127375970000 | 4212737597 | BRISCOE METCALF UNIT 01HS | Producing |
| 42127376090000 | 4212737609 | BRISCOE METCALF UNIT 01HT | Producing |
| 42127376100000 | 4212737610 | BRISCOE METCALF UNIT 01HU | Producing |
| 42127376120000 | 4212737612 | BRISCOE METCALF UNIT 01HV | Producing |
| 42127376130000 | 4212737613 | BRISCOE METCALF UNIT 01HW | Producing |
| 42127376110000 | 4212737611 | BRISCOE METCALF UNIT 01HX | Producing |
| 42127375990000 | 4212737599 | BRISCOE METCALF UNIT 01HY | Producing |
| 42127376000000 | 4212737600 | BRISCOE METCALF UNIT 01HZ | Producing |
| 42127376010000 | 4212737601 | BRISCOE METCALF UNIT 02HU | Producing |
| 42127376020000 | 4212737602 | BRISCOE METCALF UNIT 02HV | Producing |
| 42127376030000 | 4212737603 | BRISCOE METCALF UNIT 02HW | Producing |
| 42127376050000 | 4212737605 | BRISCOE METCALF UNIT 02HX | Producing |
| 42127376070100 | 4212737607 | BRISCOE METCALF UNIT 02HY | Producing |
| 42127376080000 | 4212737608 | BRISCOE METCALF UNIT 02HZ | Producing |
| 42127371360000 | 4212737136 | BRISCOE METCALF UNIT 1H | Producing |
| 42127371380000 | 4212737138 | BRISCOE METCALF UNIT 2H | Producing |
| 42127371370000 | 4212737137 | BRISCOE METCALF UNIT 3H | Producing |
| 42127371390000 | 4212737139 | BRISCOE METCALF UNIT 4H | Producing |
| 42127371400000 | 4212737140 | BRISCOE METCALF UNIT 5H | Producing |
| 42127371410000 | 4212737141 | BRISCOE METCALF UNIT 6H | Producing |
| 42127352780000 | 4212735278 | BRISCOE SPRINGMAN UNIT A 1H | Producing |
| 42127352790000 | 4212735279 | BRISCOE SPRINGMAN UNIT A 2H | Producing |
| 42127352800000 | 4212735280 | BRISCOE SPRINGMAN UNIT A 3H | Producing |
| 42127352810000 | 4212735281 | BRISCOE SPRINGMAN UNIT A 4H | Producing |
| 42127352830000 | 4212735283 | BRISCOE SPRINGMAN UNIT A 5H | Producing |
| 42127352820000 | 4212735282 | BRISCOE SPRINGMAN UNIT A 6H | Producing |
| 42127352840000 | 4212735284 | BRISCOE SPRINGMAN UNIT A 7H | Producing |
| 42127352850000 | 4212735285 | BRISCOE SPRINGMAN UNIT B 1H | Producing |
| 42127352860000 | 4212735286 | BRISCOE SPRINGMAN UNIT B 2H | Producing |
| 42127352870000 | 4212735287 | BRISCOE SPRINGMAN UNIT B 3H | Producing |

Case 4:20-cv-02587 Document 316-6 Filed 09/23/20 Page 350 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352880000 | 4212735288 | BRISCOE SPRINGMAN UNIT B 4H | Producing |
| 42127352890000 | 4212735289 | BRISCOE SPRINGMAN UNIT B 5H | Producing |
| 42127352900000 | 4212735290 | BRISCOE SPRINGMAN UNIT B 6H | Producing |
| 42127354050000 | 4212735405 | BRISCOE THON UNIT 1H | Producing |
| 42127354070000 | 4212735407 | BRISCOE THON UNIT 2H | Producing |
| 42127354080000 | 4212735408 | BRISCOE THON UNIT 3H | Producing |
| 42127354060000 | 4212735406 | BRISCOE THON UNIT 4H | Producing |
| 42127354090000 | 4212735409 | BRISCOE THON UNIT 5H | Shut In |
| 42323332970000 | 4232333297 | CAGE 1TV | Producing |
| 42323333320000 | 4232333332 | CAGE 2TV | Shut In |
| 42323333360000 | 4232333336 | CAGE 3TV | Shut In |
| 42323333550000 | 4232333355 | CAGE 4RB | Producing |
| 42323333760000 | 4232333376 | CAGE 5TV | Producing |
| 42323333770000 | 4232333377 | CAGE 6TV | Producing |
| 42323333830000 | 4232333383 | CAGE 7TV | Producing |
| 42323333840000 | 4232333384 | CAGE 8TV | Producing |
| 42323334120100 | 4232333412 | CAGE 9TV | Producing |
| 42127375590000 | 4212737559 | CARLA SOUTH SPUR UNIT A 01HA | Producing |
| 42127375600000 | 4212737560 | CARLA SOUTH SPUR UNIT A 01HB | Shut In |
| 42127364760000 | 4212736476 | CARLA SOUTH SPUR UNIT A 1H | Producing |
| 42127364800000 | 4212736480 | CARLA SOUTH SPUR UNIT A 2H | Producing |
| 42127364810000 | 4212736481 | CARLA SOUTH SPUR UNIT A 3H | Producing |
| 42127348000000 | 4212734800 | CHAPARRAL WILDLIFE STATE 10H | Producing |
| 42127348020000 | 4212734802 | CHAPARRAL WILDLIFE STATE 11H | Producing |
| 42127348050000 | 4212734805 | CHAPARRAL WILDLIFE STATE 12H | Producing |
| 42127348030000 | 4212734803 | CHAPARRAL WILDLIFE STATE 13H | Producing |
| 42127364300000 | 4212736430 | CHAPARRAL WILDLIFE STATE 19H | Producing |
| 42127364310000 | 4212736431 | CHAPARRAL WILDLIFE STATE 20H | Producing |
| 42127364320000 | 4212736432 | CHAPARRAL WILDLIFE STATE 21H | Producing |
| 42127364330000 | 4212736433 | CHAPARRAL WILDLIFE STATE 22H | Producing |
| 42127364340000 | 4212736434 | CHAPARRAL WILDLIFE STATE 23H | Producing |
| 42127370470000 | 4212737047 | CHAPARRAL WILDLIFE STATE 24H | Producing |
| 42127370480000 | 4212737048 | CHAPARRAL WILDLIFE STATE 25H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127370500100 | 4212737050 | CHAPARRAL WILDLIFE STATE 26H | Producing |
| 42127370490100 | 4212737049 | CHAPARRAL WILDLIFE STATE 27H | Producing |
| 42127370510000 | 4212737051 | CHAPARRAL WILDLIFE STATE 28H | Producing |
| 42127347930000 | 4212734793 | CHAPARRAL WILDLIFE STATE 4H | Producing |
| 42127347940000 | 4212734794 | CHAPARRAL WILDLIFE STATE 5H | Producing |
| 42127347950000 | 4212734795 | CHAPARRAL WILDLIFE STATE 6H | Producing |
| 42127347960000 | 4212734796 | CHAPARRAL WILDLIFE STATE 7H | Producing |
| 42127347970000 | 4212734797 | CHAPARRAL WILDLIFE STATE 8H | Producing |
| 42127347980000 | 4212734798 | CHAPARRAL WILDLIFE STATE 9H | Producing |
| 42127357120000 | 4212735712 | DENTONIO STATE 22 UNIT 10H | Producing |
| 42127357140000 | 4212735714 | DENTONIO STATE 22 UNIT 11H | Producing |
| 42127357150000 | 4212735715 | DENTONIO STATE 22 UNIT 12H | Producing |
| 42127356790100 | 4212735679 | DENTONIO STATE 22 UNIT 1H | Producing |
| 42127356800000 | 4212735680 | DENTONIO STATE 22 UNIT 2H | Producing |
| 42127356810000 | 4212735681 | DENTONIO STATE 22 UNIT 3H | Producing |
| 42127356820000 | 4212735682 | DENTONIO STATE 22 UNIT 4H | Producing |
| 42127356860000 | 4212735686 | DENTONIO STATE 22 UNIT 5H | Producing |
| 42127356870000 | 4212735687 | DENTONIO STATE 22 UNIT 6H | Producing |
| 42127356880000 | 4212735688 | DENTONIO STATE 22 UNIT 7H | Producing |
| 42127356890000 | 4212735689 | DENTONIO STATE 22 UNIT 8H | Producing |
| 42127357110000 | 4212735711 | DENTONIO STATE 22 UNIT 9H | Producing |
| 42127349230000 | 4212734923 | DENTONIO WHITE 23 UNIT 10H | Producing |
| 42127349240000 | 4212734924 | DENTONIO WHITE 23 UNIT 11H | Producing |
| 42127349310000 | 4212734931 | DENTONIO WHITE 23 UNIT 12H | Producing |
| 42127349270000 | 4212734927 | DENTONIO WHITE 23 UNIT 13H | Producing |
| 42127349260000 | 4212734926 | DENTONIO WHITE 23 UNIT 14H | Producing |
| 42127349280000 | 4212734928 | DENTONIO WHITE 23 UNIT 15H | Producing |
| 42127345490000 | 4212734549 | DENTONIO WHITE 23 UNIT 1H | Producing |
| 42127345500000 | 4212734550 | DENTONIO WHITE 23 UNIT 2H | Producing |
| 42127345510000 | 4212734551 | DENTONIO WHITE 23 UNIT 3H | Producing |
| 42127345520000 | 4212734552 | DENTONIO WHITE 23 UNIT 4H | Producing |
| 42127345530000 | 4212734553 | DENTONIO WHITE 23 UNIT 5H | Producing |
| 42127345540000 | 4212734554 | DENTONIO WHITE 23 UNIT 6H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127349380000 | 4212734938 | DENTONIO WHITE 23 UNIT 7H | Producing |
| 42127349400000 | 4212734940 | DENTONIO WHITE 23 UNIT 8H | Producing |
| 42127349410000 | 4212734941 | DENTONIO WHITE 23 UNIT 9H | Producing |
| 42127378630000 | 4212737863 | DIAMOND H RANCH 04HA | Producing |
| 42127378620000 | 4212737862 | DIAMOND H RANCH 04HB | Producing |
| 42127378640000 | 4212737864 | DIAMOND H RANCH 04HC | Producing |
| 42127378660000 | 4212737866 | DIAMOND H RANCH 04HD | Producing |
| 42127378670000 | 4212737867 | DIAMOND H RANCH 04HE | Producing |
| 42127378680000 | 4212737868 | DIAMOND H RANCH 04HF | Producing |
| 42127347510000 | 4212734751 | DIAMOND H RANCH 10H | Producing |
| 42127350570000 | 4212735057 | DIAMOND H RANCH 11H | Producing |
| 42127379110000 | 4212737911 | DIAMOND H RANCH 11HA | Producing |
| 42127379140000 | 4212737914 | DIAMOND H RANCH 11HC | Producing |
| 42127379150000 | 4212737915 | DIAMOND H RANCH 11HD | Producing |
| 42127352010000 | 4212735201 | DIAMOND H RANCH 12H | Producing |
| 42127379100000 | 4212737910 | DIAMOND H RANCH 12HA | Producing |
| 42127379230000 | 4212737923 | DIAMOND H RANCH 12HC | Producing |
| 42127379290000 | 4212737929 | DIAMOND H RANCH 12HD | Producing |
| 42127379310000 | 4212737931 | DIAMOND H RANCH 12HF | Producing |
| 42127354030000 | 4212735403 | DIAMOND H RANCH 13H | Producing |
| 42127356460000 | 4212735646 | DIAMOND H RANCH 14H | Producing |
| 42127356470000 | 4212735647 | DIAMOND H RANCH 15H | Producing |
| 42127356480000 | 4212735648 | DIAMOND H RANCH 16H | Producing |
| 42127356490000 | 4212735649 | DIAMOND H RANCH 17H | Producing |
| 42127356510000 | 4212735651 | DIAMOND H RANCH 18H | Producing |
| 42127364750000 | 4212736475 | DIAMOND H RANCH 19H | Producing |
| 42127336610000 | 4212733661 | DIAMOND H RANCH 1H | Producing |
| 42127364820000 | 4212736482 | DIAMOND H RANCH 20H | Producing |
| 42127364830000 | 4212736483 | DIAMOND H RANCH 21H | Producing |
| 42127364740000 | 4212736474 | DIAMOND H RANCH 22H | Producing |
| 42127364840000 | 4212736484 | DIAMOND H RANCH 23H | Producing |
| 42127336930000 | 4212733693 | DIAMOND H RANCH 2H | Producing |
| 42127338190000 | 4212733819 | DIAMOND H RANCH 3H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127338920000 | 4212733892 | DIAMOND H RANCH 4H | Producing |
| 42127343140000 | 4212734314 | DIAMOND H RANCH 5H | Producing |
| 42127341500000 | 4212734150 | DIAMOND H RANCH 6H | Producing |
| 42127344080000 | 4212734408 | DIAMOND H RANCH 7H | Producing |
| 42127344100000 | 4212734410 | DIAMOND H RANCH 8H | Producing |
| 42127346100000 | 4212734610 | DIAMOND H RANCH 9H | Shut In |
| 42127364360000 | 4212736436 | DIAMOND H STATE 10H | Producing |
| 42127363380000 | 4212736338 | DIAMOND H STATE 11H | Producing |
| 42127363390000 | 4212736339 | DIAMOND H STATE 12H | Producing |
| 42127363400000 | 4212736340 | DIAMOND H STATE 13H | Producing |
| 42127348960000 | 4212734896 | DIAMOND H STATE 15H | Producing |
| 42127351010000 | 4212735101 | DIAMOND H STATE 16H | Producing |
| 42127351920000 | 4212735192 | DIAMOND H STATE 17H | Producing |
| 42127350930000 | 4212735093 | DIAMOND H STATE 18H | Producing |
| 42127356550000 | 4212735655 | DIAMOND H STATE 19H | Producing |
| 42127336570000 | 4212733657 | DIAMOND H STATE 1H | Producing |
| 42127356520000 | 4212735652 | DIAMOND H STATE 20H | Producing |
| 42127356530000 | 4212735653 | DIAMOND H STATE 21H | Producing |
| 42127356540000 | 4212735654 | DIAMOND H STATE 22H | Producing |
| 42127336940000 | 4212733694 | DIAMOND H STATE 2H | Producing |
| 42127337860000 | 4212733786 | DIAMOND H STATE 3H | Producing |
| 42127338780000 | 4212733878 | DIAMOND H STATE 4H | Producing |
| 42127343120000 | 4212734312 | DIAMOND H STATE 5H | Producing |
| 42127341440000 | 4212734144 | DIAMOND H STATE 6H | Producing |
| 42127343950000 | 4212734395 | DIAMOND H STATE 7H | Producing |
| 42127344030000 | 4212734403 | DIAMOND H STATE 8H | Producing |
| 42127346030000 | 4212734603 | DIAMOND H STATE 9H | Producing |
| 42127376210000 | 4212737621 | DIAMOND H STATE UNIT A 01HT | Producing |
| 42127375610000 | 4212737561 | DIAMOND H STATE UNIT A 01HU | Producing |
| 42127375620000 | 4212737562 | DIAMOND H STATE UNIT A 01HV | Producing |
| 42127375630000 | 4212737563 | DIAMOND H STATE UNIT A 01HW | Producing |
| 42127375640000 | 4212737564 | DIAMOND H STATE UNIT A 01HX | Producing |
| 42127375650000 | 4212737565 | DIAMOND H STATE UNIT A 01HY | Producing |

Case 4:20-cv-20558 Document 313 Filed TXSB on 10/16/20 Page 239 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127375660000 | 4212737566 | DIAMOND H STATE UNIT A 01HZ | Producing |
| 42127353960000 | 4212735396 | DIAMOND H STATE UNIT A 1H | Producing |
| 42127353980000 | 4212735398 | DIAMOND H STATE UNIT A 2H | Producing |
| 42127376220000 | 4212737622 | DIAMOND H STATE UNIT B 03HB | Producing |
| 42127376240000 | 4212737624 | DIAMOND H STATE UNIT B 03HC | Producing |
| 42127376230000 | 4212737623 | DIAMOND H STATE UNIT B 03HD | Producing |
| 42127370920000 | 4212737092 | DIAMOND H STATE UNIT B 10H | Producing |
| 42127370940000 | 4212737094 | DIAMOND H STATE UNIT B 11H | Producing |
| 42127370930000 | 4212737093 | DIAMOND H STATE UNIT B 12H | Producing |
| 42127370950000 | 4212737095 | DIAMOND H STATE UNIT B 13H | Producing |
| 42127370750000 | 4212737075 | DIAMOND H STATE UNIT B 1H | Producing |
| 42127370760000 | 4212737076 | DIAMOND H STATE UNIT B 2H | Producing |
| 42127370800100 | 4212737080 | DIAMOND H STATE UNIT B 3H | Producing |
| 42127370770000 | 4212737077 | DIAMOND H STATE UNIT B 4H | Producing |
| 42127370810000 | 4212737081 | DIAMOND H STATE UNIT B 5H | Producing |
| 42127370820000 | 4212737082 | DIAMOND H STATE UNIT B 6H | Producing |
| 42127370830000 | 4212737083 | DIAMOND H STATE UNIT B 7H | Producing |
| 42127370840000 | 4212737084 | DIAMOND H STATE UNIT B 8H | Producing |
| 42127370850000 | 4212737085 | DIAMOND H STATE UNIT B 9H | Producing |
| 42127377130000 | 4212737713 | DIAMOND H STATE UNIT D 02HA | Producing |
| 42127377170000 | 4212737717 | DIAMOND H STATE UNIT D 02HB | Producing |
| 42127377180100 | 4212737718 | DIAMOND H STATE UNIT D 02HC | Producing |
| 42127377190100 | 4212737719 | DIAMOND H STATE UNIT D 02HD | Producing |
| 42127377200000 | 4212737720 | DIAMOND H STATE UNIT D 02HE | Producing |
| 42127377210100 | 4212737721 | DIAMOND H STATE UNIT D 02HF | Producing |
| 42127380600000 | 4212738060 | DIAMOND H STATE UNIT D 04HX | Producing |
| 42127380610000 | 4212738061 | DIAMOND H STATE UNIT D 04HY | Producing |
| 42127380620000 | 4212738062 | DIAMOND H STATE UNIT D 04HZ | Producing |
| 42127370630000 | 4212737063 | DIAMOND H STATE UNIT D 10H | Producing |
| 42127370640000 | 4212737064 | DIAMOND H STATE UNIT D 11H | Producing |
| 42127370610000 | 4212737061 | DIAMOND H STATE UNIT D 7H | Producing |
| 42127370570000 | 4212737057 | DIAMOND H STATE UNIT D 8H | Producing |
| 42127370620000 | 4212737062 | DIAMOND H STATE UNIT D 9H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127352380000 | 4212735238 | FOGMT 10SP | Producing |
| 42127352420000 | 4212735242 | FOGMT 11SP | Producing |
| 42127352400000 | 4212735240 | FOGMT 12SP | Producing |
| 42127349950000 | 4212734995 | FOGMT 13SP | Producing |
| 42127350020000 | 4212735002 | FOGMT 14SP | Producing |
| 42127350030000 | 4212735003 | FOGMT 15SP | Producing |
| 42127354190000 | 4212735419 | FOGMT 16SP | Producing |
| 42127354200000 | 4212735420 | FOGMT 17SP | Producing |
| 42127363500000 | 4212736350 | FOGMT 18SP | Producing |
| 42127363510000 | 4212736351 | FOGMT 19SP | Producing |
| 42127334110100 | 4212733411 | FOGMT 1SP | Producing |
| 42127363520000 | 4212736352 | FOGMT 20SP | Producing |
| 42127363530000 | 4212736353 | FOGMT 21SP | Producing |
| 42127363540000 | 4212736354 | FOGMT 22SP | Producing |
| 42127363550000 | 4212736355 | FOGMT 23SP | Producing |
| 42127354380000 | 4212735438 | FOGMT 24SP | Producing |
| 42127354410000 | 4212735441 | FOGMT 25SP | Producing |
| 42127354390000 | 4212735439 | FOGMT 26SP | Producing |
| 42127354400000 | 4212735440 | FOGMT 27SP | Producing |
| 42127359260000 | 4212735926 | FOGMT 28SP | Producing |
| 42127359270000 | 4212735927 | FOGMT 29SP | Producing |
| 42127334600000 | 4212733460 | FOGMT 2SP | Producing |
| 42127359280000 | 4212735928 | FOGMT 30SP | Producing |
| 42127359290000 | 4212735929 | FOGMT 31SP | Producing |
| 42127359480000 | 4212735948 | FOGMT 32SP | Producing |
| 42127359490000 | 4212735949 | FOGMT 33SP | Producing |
| 42127359500000 | 4212735950 | FOGMT 34SP | Producing |
| 42127359100000 | 4212735910 | FOGMT 35SP | Producing |
| 42127359110000 | 4212735911 | FOGMT 36SP | Producing |
| 42127359090000 | 4212735909 | FOGMT 37SP | Producing |
| 42127365810000 | 4212736581 | FOGMT 38SP | Producing |
| 42127365820000 | 4212736582 | FOGMT 39SP | Producing |
| 42127335920000 | 4212733592 | FOGMT 3SH | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127365830000 | 4212736583 | FOGMT 40SP | Producing |
| 42127365840000 | 4212736584 | FOGMT 41SP | Producing |
| 42127365850000 | 4212736585 | FOGMT 42SP | Producing |
| 42127365170000 | 4212736517 | FOGMT 43SP | Producing |
| 42127365180000 | 4212736518 | FOGMT 44SP | Producing |
| 42127365190000 | 4212736519 | FOGMT 45SP | Producing |
| 42127365200000 | 4212736520 | FOGMT 46SP | Producing |
| 42127365210000 | 4212736521 | FOGMT 47SP | Producing |
| 42127336280000 | 4212733628 | FOGMT 4SP | Producing |
| 42127370180000 | 4212737018 | FOGMT 54SP | Producing |
| 42127372110000 | 4212737211 | FOGMT 55SP | Producing |
| 42127336540000 | 4212733654 | FOGMT 5SH | Producing |
| 42127336950000 | 4212733695 | FOGMT 6SH | Producing |
| 42127339100000 | 4212733910 | FOGMT 7SP | Producing |
| 42127344910000 | 4212734491 | FOGMT 8SP | Producing |
| 42127344900000 | 4212734490 | FOGMT 9SP | Producing |
| 42127349960000 | 4212734996 | FOGMT E 1SP | Producing |
| 42127349920000 | 4212734992 | FOGMT E 2SP | Producing |
| 42127349930000 | 4212734993 | FOGMT F 1SP | Producing |
| 42127349940000 | 4212734994 | FOGMT G 1SP | Producing |
| 42127366690000 | 4212736669 | FOGMT UNIT A 10H | Producing |
| 42127366600000 | 4212736660 | FOGMT UNIT A 1H | Producing |
| 42127366610000 | 4212736661 | FOGMT UNIT A 2H | Producing |
| 42127366620000 | 4212736662 | FOGMT UNIT A 3H | Producing |
| 42127366630000 | 4212736663 | FOGMT UNIT A 4H | Producing |
| 42127366640000 | 4212736664 | FOGMT UNIT A 5H | Producing |
| 42127366650000 | 4212736665 | FOGMT UNIT A 6H | Producing |
| 42127366660000 | 4212736666 | FOGMT UNIT A 7H | Producing |
| 42127366670100 | 4212736667 | FOGMT UNIT A 8H | Producing |
| 42127366680000 | 4212736668 | FOGMT UNIT A 9H | Producing |
| 42127371350000 | 4212737135 | LA BANDERA RANCH 10H | Producing |
| 42127336180000 | 4212733618 | LA BANDERA RANCH 1H | Shut In |
| 42127336340000 | 4212733634 | LA BANDERA RANCH 2H | Producing |

Case 20-32658 Document 363-6 Filed in TXSB on 09/23/20 Page 909 of 1882

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127336730000 | 4212733673 | LA BANDERA RANCH 3H | Producing |
| 42127337400000 | 4212733740 | LA BANDERA RANCH 4H | Producing |
| 42127338090000 | 4212733809 | LA BANDERA RANCH 5H | Producing |
| 42127339090000 | 4212733909 | LA BANDERA RANCH 6H | Shut In |
| 42127342040000 | 4212734204 | LA BANDERA RANCH 7H | Producing |
| 42127344020000 | 4212734402 | LA BANDERA RANCH 8H | Producing |
| 42127346290000 | 4212734629 | LA BANDERA RANCH 9H | Producing |
| 42127351170000 | 4212735117 | LA BANDERA RANCH UNIT A 1H | Producing |
| 42127350910000 | 4212735091 | LA BANDERA RANCH UNIT A 2H | Producing |
| 42127351130100 | 4212735113 | LA BANDERA RANCH UNIT A 3H | Producing |
| 42127355550000 | 4212735555 | LA BANDERA RANCH UNIT A 4H | Producing |
| 42127355560000 | 4212735556 | LA BANDERA RANCH UNIT A 5H | Producing |
| 42127355580000 | 4212735558 | LA BANDERA RANCH UNIT A 6H | Producing |
| 42127363310000 | 4212736331 | LA BANDERA RANCH UNIT A 7H | Producing |
| 42127363320000 | 4212736332 | LA BANDERA RANCH UNIT A 8H | Producing |
| 42127365860000 | 4212736586 | LA BANDERA RANCH UNIT B 1H | Producing |
| 42127365870000 | 4212736587 | LA BANDERA RANCH UNIT B 2H | Producing |
| 42127365880000 | 4212736588 | LA BANDERA RANCH UNIT B 3H | Producing |
| 42127365890000 | 4212736589 | LA BANDERA RANCH UNIT B 4H | Producing |
| 42127365900000 | 4212736590 | LA BANDERA RANCH UNIT B 5H | Producing |
| 42127365310000 | 4212736531 | LA BANDERA RANCH UNIT B 6H | Producing |
| 42127365320000 | 4212736532 | LA BANDERA RANCH UNIT B 7H | Producing |
| 42127365330000 | 4212736533 | LA BANDERA RANCH UNIT B 8H | Producing |
| 42127365340000 | 4212736534 | LA BANDERA RANCH UNIT B 9H | Producing |
| 42127376520000 | 4212737652 | LA BANDERA RANCH UNIT C 07HT | Producing |
| 42127376530000 | 4212737653 | LA BANDERA RANCH UNIT C 07HU | Producing |
| 42127376540000 | 4212737654 | LA BANDERA RANCH UNIT C 07HV | Producing |
| 42127376550000 | 4212737655 | LA BANDERA RANCH UNIT C 07HW | Producing |
| 42127376560000 | 4212737656 | LA BANDERA RANCH UNIT C 07HX | Producing |
| 42127376570000 | 4212737657 | LA BANDERA RANCH UNIT C 07HY | Producing |
| 42127381210000 | 4212738121 | LA BANDERA RANCH UNIT D 01HX | Producing |
| 42127381220000 | 4212738122 | LA BANDERA RANCH UNIT D 01HY | Producing |
| 42127381230000 | 4212738123 | LA BANDERA RANCH UNIT D 01HZ | Producing |

Case 4:20-cv-02058 Document 13-6 Filed 10/13/20 Page 231 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42323334520100 | 4232333452 | LLOYD BRISCOE 1H | Producing |
| 42323334510000 | 4232333451 | LLOYD BRISCOE 2H | Producing |
| 42323334500000 | 4232333450 | LLOYD BRISCOE 3H | Producing |
| 42127367950000 | 4212736795 | MAUND RANCH 18 UNIT 1H | Producing |
| 42127367960000 | 4212736796 | MAUND RANCH 18 UNIT 2H | Producing |
| 42127367990000 | 4212736799 | MAUND RANCH 18 UNIT 3H | Producing |
| 42127368000000 | 4212736800 | MAUND RANCH 18 UNIT 4H | Producing |
| 42127368010000 | 4212736801 | MAUND RANCH 18 UNIT 5H | Producing |
| 42127368030000 | 4212736803 | MAUND RANCH 18 UNIT 6H | Producing |
| 42127368040000 | 4212736804 | MAUND RANCH 18 UNIT 7H | Producing |
| 42127368050000 | 4212736805 | MAUND RANCH 18 UNIT 8H | Producing |
| 42127368060000 | 4212736806 | MAUND RANCH 18 UNIT 9H | Producing |
| 42127339990000 | 4212733999 | MAUND RANCH 19 UNIT 2H | Producing |
| 42127343870000 | 4212734387 | MAUND RANCH 19 UNIT 3H | Producing |
| 42127342640000 | 4212734264 | MAUND RANCH 19 UNIT 4H | Producing |
| 42127355530000 | 4212735553 | MAUND RANCH 19 UNIT 5H | Producing |
| 42127355540000 | 4212735554 | MAUND RANCH 19 UNIT 6H | Producing |
| 42127354960000 | 4212735496 | MAUND RANCH 23 UNIT 10H | Producing |
| 42127354970000 | 4212735497 | MAUND RANCH 23 UNIT 11H | Producing |
| 42127354980000 | 4212735498 | MAUND RANCH 23 UNIT 12H | Producing |
| 42127354320000 | 4212735432 | MAUND RANCH 23 UNIT 1H | Producing |
| 42127354330000 | 4212735433 | MAUND RANCH 23 UNIT 2H | Producing |
| 42127354350000 | 4212735435 | MAUND RANCH 23 UNIT 3H | Temporarily Abandoned |
| 42127354370000 | 4212735437 | MAUND RANCH 23 UNIT 4H | Producing |
| 42127354360000 | 4212735436 | MAUND RANCH 23 UNIT 5H | Producing |
| 42127354340000 | 4212735434 | MAUND RANCH 23 UNIT 6H | Producing |
| 42127354940000 | 4212735494 | MAUND RANCH 23 UNIT 7H | Producing |
| 42127354930000 | 4212735493 | MAUND RANCH 23 UNIT 8H | Producing |
| 42127354950000 | 4212735495 | MAUND RANCH 23 UNIT 9H | Producing |
| 42127361330000 | 4212736133 | MAUND RANCH 26 UNIT 10H | Producing |
| 42127361240000 | 4212736124 | MAUND RANCH 26 UNIT 1H | Producing |
| 42127361230000 | 4212736123 | MAUND RANCH 26 UNIT 2H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127361250000 | 4212736125 | MAUND RANCH 26 UNIT 3H | Producing |
| 42127361260000 | 4212736126 | MAUND RANCH 26 UNIT 4H | Producing |
| 42127361270000 | 4212736127 | MAUND RANCH 26 UNIT 5H | Producing |
| 42127361280000 | 4212736128 | MAUND RANCH 26 UNIT 6H | Producing |
| 42127361290000 | 4212736129 | MAUND RANCH 26 UNIT 7H | Producing |
| 42127361300000 | 4212736130 | MAUND RANCH 26 UNIT 8H | Producing |
| 42127361310000 | 4212736131 | MAUND RANCH 26 UNIT 9H | Producing |
| 42127371070000 | 4212737107 | MAUND RANCH 27 UNIT 1H | Producing |
| 42127371080000 | 4212737108 | MAUND RANCH 27 UNIT 2H | Producing |
| 42127371030000 | 4212737103 | MAUND RANCH 27 UNIT 3H | Producing |
| 42127371040000 | 4212737104 | MAUND RANCH 27 UNIT 4H | Producing |
| 42127371050000 | 4212737105 | MAUND RANCH 27 UNIT 5H | Producing |
| 42127371060000 | 4212737106 | MAUND RANCH 27 UNIT 6H | Producing |
| 42127338660000 | 4212733866 | MAUND RANCH 27 UNIT 7H | Producing |
| 42127371090000 | 4212737109 | MAUND RANCH 27 UNIT 8H | Producing |
| 42127371100000 | 4212737110 | MAUND RANCH 27 UNIT 9H | Producing |
| 42127349110000 | 4212734911 | RANCHO ENCANTADO 10H | Producing |
| 42127349150000 | 4212734915 | RANCHO ENCANTADO 11H | Producing |
| 42127341610000 | 4212734161 | RANCHO ENCANTADO 12H | Producing |
| 42127341620000 | 4212734162 | RANCHO ENCANTADO 13H | Producing |
| 42127349430000 | 4212734943 | RANCHO ENCANTADO 14H | Producing |
| 42127349440000 | 4212734944 | RANCHO ENCANTADO 15H | Producing |
| 42127349450000 | 4212734945 | RANCHO ENCANTADO 16H | Producing |
| 42127341810000 | 4212734181 | RANCHO ENCANTADO 17H | Producing |
| 42127341820000 | 4212734182 | RANCHO ENCANTADO 18H | Producing |
| 42127341830000 | 4212734183 | RANCHO ENCANTADO 19H | Shut In |
| 42127337290000 | 4212733729 | RANCHO ENCANTADO 1H | Producing |
| 42127341840000 | 4212734184 | RANCHO ENCANTADO 20H | Producing |
| 42127341850000 | 4212734185 | RANCHO ENCANTADO 21H | Producing |
| 42127342110000 | 4212734211 | RANCHO ENCANTADO 22H | Producing |
| 42127342130000 | 4212734213 | RANCHO ENCANTADO 23H | Temporarily Abandoned |
| 42127342140000 | 4212734214 | RANCHO ENCANTADO 24H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127342150000 | 4212734215 | RANCHO ENCANTADO 25H | Producing |
| 42127342170000 | 4212734217 | RANCHO ENCANTADO 26H | Producing |
| 42127342180000 | 4212734218 | RANCHO ENCANTADO 27H | Producing |
| 42127343310000 | 4212734331 | RANCHO ENCANTADO 28H | Producing |
| 42127353280000 | 4212735328 | RANCHO ENCANTADO 29H | Producing |
| 42127353290000 | 4212735329 | RANCHO ENCANTADO 30H | Producing |
| 42127353340000 | 4212735334 | RANCHO ENCANTADO 31H | Producing |
| 42127353350000 | 4212735335 | RANCHO ENCANTADO 32H | Producing |
| 42127353360000 | 4212735336 | RANCHO ENCANTADO 33H | Producing |
| 42127359810000 | 4212735981 | RANCHO ENCANTADO 34H | Producing |
| 42127359820000 | 4212735982 | RANCHO ENCANTADO 35H | Producing |
| 42127359850000 | 4212735985 | RANCHO ENCANTADO 36H | Producing |
| 42127359870000 | 4212735987 | RANCHO ENCANTADO 37H | Producing |
| 42127359880000 | 4212735988 | RANCHO ENCANTADO 38H | Producing |
| 42127338330000 | 4212733833 | RANCHO ENCANTADO 3H | Producing |
| 42127338340000 | 4212733834 | RANCHO ENCANTADO 4H | Producing |
| 42127338350000 | 4212733835 | RANCHO ENCANTADO 5H | Producing |
| 42127339640000 | 4212733964 | RANCHO ENCANTADO 6H | Producing |
| 42127339610000 | 4212733961 | RANCHO ENCANTADO 7H | Temporarily Abandoned |
| 42127339650000 | 4212733965 | RANCHO ENCANTADO 8H | Producing |
| 42127349100000 | 4212734910 | RANCHO ENCANTADO 9H | Producing |
| 42127370690000 | 4212737069 | RANCHO ENCANTADO UNIT A 39H | Producing |
| 42127370680000 | 4212737068 | RANCHO ENCANTADO UNIT A 40H | Producing |
| 42127370660000 | 4212737066 | RANCHO ENCANTADO UNIT A 41H | Producing |
| 42127370670000 | 4212737067 | RANCHO ENCANTADO UNIT A 42H | Producing |
| 42127370650000 | 4212737065 | RANCHO ENCANTADO UNIT A 43H | Producing |
| 42127344250000 | 4212734425 | ROGERS DENTONIO 16 UNIT 1H | Producing |
| 42127344260000 | 4212734426 | ROGERS DENTONIO 16 UNIT 2H | Producing |
| 42127344310000 | 4212734431 | ROGERS DENTONIO 16 UNIT 3H | Producing |
| 42127354120000 | 4212735412 | ROGERS DENTONIO 16 UNIT 4H | Producing |
| 42127354160000 | 4212735416 | ROGERS DENTONIO 16 UNIT 5H | Producing |
| 42127354170000 | 4212735417 | ROGERS DENTONIO 16 UNIT 6H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127354130000 | 4212735413 | ROGERS DENTONIO 16 UNIT 7H | Producing |
| 42127354140000 | 4212735414 | ROGERS DENTONIO 16 UNIT 8H | Producing |
| 42127354150000 | 4212735415 | ROGERS DENTONIO 16 UNIT 9H | Producing |
| 42127378350000 | 4212737835 | ROGERS DENTONIO 29 UNIT 02HE | Producing |
| 42127378360000 | 4212737836 | ROGERS DENTONIO 29 UNIT 02HF | Producing |
| 42127378430000 | 4212737843 | ROGERS DENTONIO 29 UNIT 02HG | Producing |
| 42127375290000 | 4212737529 | ROGERS DENTONIO 31 UNIT 01HA | Producing |
| 42127375300200 | 4212737530 | ROGERS DENTONIO 31 UNIT 01HB | Producing |
| 42127375310000 | 4212737531 | ROGERS DENTONIO 31 UNIT 01HC | Shut In |
| 42127375330000 | 4212737533 | ROGERS DENTONIO 31 UNIT 01HD | Producing |
| 42127370440000 | 4212737044 | ROGERS DENTONIO 31 UNIT 10H | Producing |
| 42127370450000 | 4212737045 | ROGERS DENTONIO 31 UNIT 11H | Producing |
| 42127370350000 | 4212737035 | ROGERS DENTONIO 31 UNIT 1H | Producing |
| 42127370360000 | 4212737036 | ROGERS DENTONIO 31 UNIT 2H | Producing |
| 42127370370000 | 4212737037 | ROGERS DENTONIO 31 UNIT 3H | Producing |
| 42127370380100 | 4212737038 | ROGERS DENTONIO 31 UNIT 4H | Producing |
| 42127370390000 | 4212737039 | ROGERS DENTONIO 31 UNIT 5H | Producing |
| 42127370400000 | 4212737040 | ROGERS DENTONIO 31 UNIT 6H | Producing |
| 42127370410000 | 4212737041 | ROGERS DENTONIO 31 UNIT 7H | Producing |
| 42127370420000 | 4212737042 | ROGERS DENTONIO 31 UNIT 8H | Producing |
| 42127370430000 | 4212737043 | ROGERS DENTONIO 31 UNIT 9H | Producing |
| 42127360060000 | 4212736006 | ROGERS DENTONIO 32 UNIT 10H | Producing |
| 42127359970000 | 4212735997 | ROGERS DENTONIO 32 UNIT 1H | Producing |
| 42127359980000 | 4212735998 | ROGERS DENTONIO 32 UNIT 2H | Producing |
| 42127359990000 | 4212735999 | ROGERS DENTONIO 32 UNIT 3H | Producing |
| 42127360000000 | 4212736000 | ROGERS DENTONIO 32 UNIT 4H | Producing |
| 42127360010000 | 4212736001 | ROGERS DENTONIO 32 UNIT 5H | Producing |
| 42127360020000 | 4212736002 | ROGERS DENTONIO 32 UNIT 6H | Producing |
| 42127360030000 | 4212736003 | ROGERS DENTONIO 32 UNIT 7H | Producing |
| 42127360040000 | 4212736004 | ROGERS DENTONIO 32 UNIT 8H | Producing |
| 42127360050000 | 4212736005 | ROGERS DENTONIO 32 UNIT 9H | Producing |
| 42127360220000 | 4212736022 | ROGERS DENTONIO 33 UNIT 10H | Producing |
| 42127360230000 | 4212736023 | ROGERS DENTONIO 33 UNIT 11H | Producing |

Case 20-32021 Document 316-6 Filed in TXSB on 10/16/20 Page 247 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127360130000 | 4212736013 | ROGERS DENTONIO 33 UNIT 1H | Producing |
| 42127360140000 | 4212736014 | ROGERS DENTONIO 33 UNIT 2H | Producing |
| 42127360150000 | 4212736015 | ROGERS DENTONIO 33 UNIT 3H | Producing |
| 42127360160000 | 4212736016 | ROGERS DENTONIO 33 UNIT 4H | Producing |
| 42127360170000 | 4212736017 | ROGERS DENTONIO 33 UNIT 5H | Producing |
| 42127360180000 | 4212736018 | ROGERS DENTONIO 33 UNIT 6H | Producing |
| 42127360190000 | 4212736019 | ROGERS DENTONIO 33 UNIT 7H | Producing |
| 42127360200000 | 4212736020 | ROGERS DENTONIO 33 UNIT 8H | Producing |
| 42127360210000 | 4212736021 | ROGERS DENTONIO 33 UNIT 9H | Producing |
| 42127342490000 | 4212734249 | ROGERS DENTONIO RANCH 12H | Producing |
| 42127342510000 | 4212734251 | ROGERS DENTONIO RANCH 13H | Producing |
| 42127341360000 | 4212734136 | ROGERS DENTONIO RANCH 14H | Producing |
| 42127341370000 | 4212734137 | ROGERS DENTONIO RANCH 15H | Producing |
| 42127342520000 | 4212734252 | ROGERS DENTONIO RANCH 16H | Producing |
| 42127336360000 | 4212733636 | ROGERS DENTONIO RANCH 1H | Shut In |
| 42127336790000 | 4212733679 | ROGERS DENTONIO RANCH 2H | Shut In |
| 42127338450000 | 4212733845 | ROGERS DENTONIO RANCH 3H | Producing |
| 42127338460000 | 4212733846 | ROGERS DENTONIO RANCH 4H | Producing |
| 42127338470000 | 4212733847 | ROGERS DENTONIO RANCH 5H | Producing |
| 42127338640000 | 4212733864 | ROGERS DENTONIO RANCH 6H | Producing |
| 42127336330000 | 4212733633 | SOUTH SPUR RANCH 1H | Producing |
| 42127338650000 | 4212733865 | SOUTH SPUR RANCH 2H | Producing |
| 42127363740000 | 4212736374 | SOUTH SPUR RANCH 3H | Producing |
| 42127363750000 | 4212736375 | SOUTH SPUR RANCH 4H | Producing |
| 42127336600000 | 4212733660 | SOUTH SPUR STATE 1H | Producing |
| 42127336860000 | 4212733686 | SOUTH SPUR STATE 2H | Producing |
| 42127338270000 | 4212733827 | SOUTH SPUR STATE 3H | Producing |
| 42127338280000 | 4212733828 | SOUTH SPUR STATE 4H | Temporarily Abandoned |
| 42127344650000 | 4212734465 | SOUTH SPUR STATE 5H | Producing |
| 42127344640000 | 4212734464 | SOUTH SPUR STATE 6H | Producing |
| 42127344660000 | 4212734466 | SOUTH SPUR STATE 7H | Producing |
| 42127341040000 | 4212734104 | SOUTH SPUR UNIT A 1H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127342160000 | 4212734216 | SOUTH SPUR UNIT A 2H | Producing |
| 42127344530000 | 4212734453 | SOUTH SPUR UNIT A 3H | Producing |
| 42127346750000 | 4212734675 | SOUTH SPUR UNIT A 4H | Producing |
| 42127346770000 | 4212734677 | SOUTH SPUR UNIT A 5H | Producing |
| 42127346760000 | 4212734676 | SOUTH SPUR UNIT A 6H | Producing |
| 42127354780000 | 4212735478 | SOUTH SPUR UNIT A 7H | Producing |
| 42127354790000 | 4212735479 | SOUTH SPUR UNIT A 8H | Producing |
| 42127354800000 | 4212735480 | SOUTH SPUR UNIT A 9H | Producing |
| 42127374840100 | 4212737484 | SOUTH SPUR UNIT B 01HY | Producing |
| 42127374830000 | 4212737483 | SOUTH SPUR UNIT B 01HZ | Producing |
| 42127374630100 | 4212737463 | SOUTH SPUR UNIT B 02HX | Producing |
| 42127374640000 | 4212737464 | SOUTH SPUR UNIT B 02HY | Producing |
| 42127374550000 | 4212737455 | SOUTH SPUR UNIT B 02HZ | Producing |
| 42127366840000 | 4212736684 | SOUTH SPUR UNIT B 10H | Producing |
| 42127366760000 | 4212736676 | SOUTH SPUR UNIT B 1H | Producing |
| 42127366770000 | 4212736677 | SOUTH SPUR UNIT B 2H | Producing |
| 42127366780000 | 4212736678 | SOUTH SPUR UNIT B 3H | Producing |
| 42127366790000 | 4212736679 | SOUTH SPUR UNIT B 4H | Producing |
| 42127366800000 | 4212736680 | SOUTH SPUR UNIT B 5H | Producing |
| 42127366810000 | 4212736681 | SOUTH SPUR UNIT B 6H | Producing |
| 42127366820000 | 4212736682 | SOUTH SPUR UNIT B 7H | Producing |
| 42127366830000 | 4212736683 | SOUTH SPUR UNIT B 8H | Producing |
| 42127369360000 | 4212736936 | SOUTH SPUR UNIT B 9H | Producing |
| 42479414280000 | 4247941428 | STANLEY RANCH 10H | Producing |
| 42479414290000 | 4247941429 | STANLEY RANCH 11H | Producing |
| 42479414300000 | 4247941430 | STANLEY RANCH 12H | Producing |
| 42479414310000 | 4247941431 | STANLEY RANCH 13H | Producing |
| 42479414320000 | 4247941432 | STANLEY RANCH 14H | Producing |
| 42479414330000 | 4247941433 | STANLEY RANCH 15H | Producing |
| 42479414340000 | 4247941434 | STANLEY RANCH 16H | Producing |
| 42479414220000 | 4247941422 | STANLEY RANCH 17H | Producing |
| 42479414240000 | 4247941424 | STANLEY RANCH 18H | Producing |
| 42479414230000 | 4247941423 | STANLEY RANCH 19H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479407420000 | 4247940742 | STANLEY RANCH 1H | Producing |
| 42479414260000 | 4247941426 | STANLEY RANCH 20H | Producing |
| 42479411290000 | 4247941129 | STANLEY RANCH 21H | Producing |
| 42479411300000 | 4247941130 | STANLEY RANCH 22H | Producing |
| 42479411310000 | 4247941131 | STANLEY RANCH 23H | Producing |
| 42479412310000 | 4247941231 | STANLEY RANCH 24H | Producing |
| 42479412410000 | 4247941241 | STANLEY RANCH 25H | Producing |
| 42479423830000 | 4247942383 | STANLEY RANCH 26H | Producing |
| 42479423840000 | 4247942384 | STANLEY RANCH 27H | Producing |
| 42479422930000 | 4247942293 | STANLEY RANCH 28H | Producing |
| 42479421610100 | 4247942161 | STANLEY RANCH 29H | Shut In |
| 42479409400000 | 4247940940 | STANLEY RANCH 2H | Producing |
| 42479424490000 | 4247942449 | STANLEY RANCH 30H | Producing |
| 42479424500000 | 4247942450 | STANLEY RANCH 31H | Producing |
| 42479410510000 | 4247941051 | STANLEY RANCH 3H | Producing |
| 42479419070000 | 4247941907 | STANLEY RANCH 43H | Producing |
| 42479419600000 | 4247941960 | STANLEY RANCH 44H | Producing |
| 42479424560000 | 4247942456 | STANLEY RANCH 45H | Producing |
| 42479424580000 | 4247942458 | STANLEY RANCH 46H | Producing |
| 42479424570000 | 4247942457 | STANLEY RANCH 47H | Producing |
| 42479417190000 | 4247941719 | STANLEY RANCH 48H | Producing |
| 42479417230000 | 4247941723 | STANLEY RANCH 49H | Producing |
| 42479410530000 | 4247941053 | STANLEY RANCH 4H | Producing |
| 42479417220000 | 4247941722 | STANLEY RANCH 50H | Producing |
| 42479417270000 | 4247941727 | STANLEY RANCH 51H | Producing |
| 42479417280000 | 4247941728 | STANLEY RANCH 52H | Producing |
| 42479417290000 | 4247941729 | STANLEY RANCH 53H | Producing |
| 42479416960000 | 4247941696 | STANLEY RANCH 54H | Producing |
| 42479416930000 | 4247941693 | STANLEY RANCH 55H | Producing |
| 42479416950000 | 4247941695 | STANLEY RANCH 56H | Producing |
| 42479416830000 | 4247941683 | STANLEY RANCH 57H | Producing |
| 42479416840000 | 4247941684 | STANLEY RANCH 58H | Producing |
| 42479416850000 | 4247941685 | STANLEY RANCH 59H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed 09/19/20 Page 250 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479410540000 | 4247941054 | STANLEY RANCH 5H | Producing |
| 42479416600000 | 4247941660 | STANLEY RANCH 60H | Producing |
| 42479416610000 | 4247941661 | STANLEY RANCH 61H | Producing |
| 42479416630000 | 4247941663 | STANLEY RANCH 62H | Producing |
| 42479428750000 | 4247942875 | STANLEY RANCH 63H | Producing |
| 42479414210000 | 4247941421 | STANLEY RANCH 6H | Producing |
| 42479414350000 | 4247941435 | STANLEY RANCH 7H | Producing |
| 42479414360000 | 4247941436 | STANLEY RANCH 8H | Producing |
| 42479414370000 | 4247941437 | STANLEY RANCH 9H | Producing |
| 42127342330000 | 4212734233 | STUMBERG RANCH 10H | Producing |
| 42127342350000 | 4212734235 | STUMBERG RANCH 11H | Producing |
| 42127342340000 | 4212734234 | STUMBERG RANCH 12H | Producing |
| 42127343690000 | 4212734369 | STUMBERG RANCH 16H | Producing |
| 42127382420000 | 4212738242 | STUMBERG RANCH 16HA | Producing |
| 42127382430000 | 4212738243 | STUMBERG RANCH 16HB | Producing |
| 42127382440000 | 4212738244 | STUMBERG RANCH 16HC | Producing |
| 42127382450000 | 4212738245 | STUMBERG RANCH 16HD | Producing |
| 42127382460000 | 4212738246 | STUMBERG RANCH 16HE | Producing |
| 42127343700000 | 4212734370 | STUMBERG RANCH 17H | Producing |
| 42127343710000 | 4212734371 | STUMBERG RANCH 18H | Producing |
| 42127346110000 | 4212734611 | STUMBERG RANCH 19H | Producing |
| 42127337170000 | 4212733717 | STUMBERG RANCH 1H | Producing |
| 42127346120000 | 4212734612 | STUMBERG RANCH 20H | Producing |
| 42127346130000 | 4212734613 | STUMBERG RANCH 21H | Producing |
| 42127346140000 | 4212734614 | STUMBERG RANCH 22H | Producing |
| 42127346150000 | 4212734615 | STUMBERG RANCH 23H | Producing |
| 42127346160000 | 4212734616 | STUMBERG RANCH 24H | Producing |
| 42127346190000 | 4212734619 | STUMBERG RANCH 25H | Producing |
| 42127346200100 | 4212734620 | STUMBERG RANCH 26H | Producing |
| 42127347100000 | 4212734710 | STUMBERG RANCH 27HR | Producing |
| 42127346230000 | 4212734623 | STUMBERG RANCH 28H | Producing |
| 42127346240100 | 4212734624 | STUMBERG RANCH 29H | Producing |
| 42127337190000 | 4212733719 | STUMBERG RANCH 2H | Producing |

Case 4:20-cv-20587 Document 316-6 Filed 12/31/10 TX SD Page 25 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127346650000 | 4212734665 | STUMBERG RANCH 30H | Producing |
| 42127346680000 | 4212734668 | STUMBERG RANCH 31H | Producing |
| 42127346660000 | 4212734666 | STUMBERG RANCH 32H | Producing |
| 42127346670000 | 4212734667 | STUMBERG RANCH 33H | Producing |
| 42127346700000 | 4212734670 | STUMBERG RANCH 34H | Producing |
| 42127346690000 | 4212734669 | STUMBERG RANCH 35H | Producing |
| 42127357720000 | 4212735772 | STUMBERG RANCH 36H | Producing |
| 42127357740000 | 4212735774 | STUMBERG RANCH 37H | Producing |
| 42127357750000 | 4212735775 | STUMBERG RANCH 38H | Producing |
| 42127357760000 | 4212735776 | STUMBERG RANCH 39H | Producing |
| 42127337250000 | 4212733725 | STUMBERG RANCH 3H | Producing |
| 42127358270000 | 4212735827 | STUMBERG RANCH 40H | Producing |
| 42127358290000 | 4212735829 | STUMBERG RANCH 41H | Producing |
| 42127358300000 | 4212735830 | STUMBERG RANCH 42H | Producing |
| 42127358310000 | 4212735831 | STUMBERG RANCH 43H | Producing |
| 42127358320000 | 4212735832 | STUMBERG RANCH 44H | Producing |
| 42127358330000 | 4212735833 | STUMBERG RANCH 45H | Producing |
| 42127358380000 | 4212735838 | STUMBERG RANCH 46H | Producing |
| 42127358390000 | 4212735839 | STUMBERG RANCH 47H | Producing |
| 42127358400000 | 4212735840 | STUMBERG RANCH 48H | Producing |
| 42127358410000 | 4212735841 | STUMBERG RANCH 49H | Producing |
| 42127337180000 | 4212733718 | STUMBERG RANCH 4H | Temporarily Abandoned |
| 42127339330000 | 4212733933 | STUMBERG RANCH 4HR | Producing |
| 42127358420000 | 4212735842 | STUMBERG RANCH 50H | Producing |
| 42127358430000 | 4212735843 | STUMBERG RANCH 51H | Producing |
| 42127358440000 | 4212735844 | STUMBERG RANCH 52H | Temporarily Abandoned |
| 42127371200000 | 4212737120 | STUMBERG RANCH 52HR | Producing |
| 42127372190000 | 4212737219 | STUMBERG RANCH 53H | Producing |
| 42127372220000 | 4212737222 | STUMBERG RANCH 54H | Producing |
| 42127372200000 | 4212737220 | STUMBERG RANCH 55H | Producing |
| 42127372210000 | 4212737221 | STUMBERG RANCH 56H | Producing |
| 42127339340000 | 4212733934 | STUMBERG RANCH 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127339350000 | 4212733935 | STUMBERG RANCH 6H | Producing |
| 42127339790000 | 4212733979 | STUMBERG RANCH 7H | Producing |
| 42127339770000 | 4212733977 | STUMBERG RANCH 8H | Producing |
| 42127339780000 | 4212733978 | STUMBERG RANCH 9H | Producing |
| 42127355190000 | 4212735519 | STUMBERG RANCH UNIT A 1H | Producing |
| 42127355200000 | 4212735520 | STUMBERG RANCH UNIT A 2H | Producing |
| 42127355210000 | 4212735521 | STUMBERG RANCH UNIT A 3H | Producing |
| 42127355400000 | 4212735540 | STUMBERG RANCH UNIT A 4H | Producing |
| 42127355410000 | 4212735541 | STUMBERG RANCH UNIT A 5H | Producing |
| 42127355420000 | 4212735542 | STUMBERG RANCH UNIT A 6H | Producing |
| 42127355430000 | 4212735543 | STUMBERG RANCH UNIT A 7H | Producing |
| 42127356110000 | 4212735611 | STUMBERG RANCH UNIT B 1H | Producing |
| 42127356120000 | 4212735612 | STUMBERG RANCH UNIT B 2H | Producing |
| 42127356130000 | 4212735613 | STUMBERG RANCH UNIT B 3H | Producing |
| 42127356140000 | 4212735614 | STUMBERG RANCH UNIT B 4H | Producing |
| 42127356150000 | 4212735615 | STUMBERG RANCH UNIT B 5H | Producing |
| 42127356160000 | 4212735616 | STUMBERG RANCH UNIT B 6H | Producing |
| 42127356170000 | 4212735617 | STUMBERG RANCH UNIT B 7H | Producing |
| 42127367000000 | 4212736700 | STUMBERG RANCH UNIT C 10H | Producing |
| 42127368360000 | 4212736836 | STUMBERG RANCH UNIT C 11H | Producing |
| 42127368370000 | 4212736837 | STUMBERG RANCH UNIT C 12H | Producing |
| 42127368350000 | 4212736835 | STUMBERG RANCH UNIT C 13H | Producing |
| 42127368380000 | 4212736838 | STUMBERG RANCH UNIT C 14H | Producing |
| 42127368390000 | 4212736839 | STUMBERG RANCH UNIT C 15H | Producing |
| 42127366900000 | 4212736690 | STUMBERG RANCH UNIT C 1H | Producing |
| 42127366910000 | 4212736691 | STUMBERG RANCH UNIT C 2H | Producing |
| 42127366920000 | 4212736692 | STUMBERG RANCH UNIT C 3H | Producing |
| 42127366930000 | 4212736693 | STUMBERG RANCH UNIT C 4H | Producing |
| 42127366940000 | 4212736694 | STUMBERG RANCH UNIT C 5H | Producing |
| 42127366960000 | 4212736696 | STUMBERG RANCH UNIT C 6H | Producing |
| 42127366970000 | 4212736697 | STUMBERG RANCH UNIT C 7H | Producing |
| 42127366980000 | 4212736698 | STUMBERG RANCH UNIT C 8H | Producing |

Case 4:20-cv-00587 Document 363-6 Filed 09/19/21 0/16/20 Page 259 of 432

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127366990000 | 4212736699 | STUMBERG RANCH UNIT C 9H | Plugged and Abandoned |
| 42127379440000 | 4212737944 | STUMBERG RANCH UNIT D 01HA | Producing |
| 42127379460000 | 4212737946 | STUMBERG RANCH UNIT D 01HC | Producing |
| 42127379470000 | 4212737947 | STUMBERG RANCH UNIT D 01HD | Producing |
| 42127379480000 | 4212737948 | STUMBERG RANCH UNIT D 01HF | Producing |
| 42127379740000 | 4212737974 | STUMBERG RANCH UNIT D 02HA | Producing |
| 42127379750000 | 4212737975 | STUMBERG RANCH UNIT D 02HC | Producing |
| 42127379760000 | 4212737976 | STUMBERG RANCH UNIT D 02HD | Producing |
| 42127379780000 | 4212737978 | STUMBERG RANCH UNIT D 02HF | Producing |
| 42127379090000 | 4212737909 | STUMBERG RANCH UNIT E 01ER | Producing |
| 42127376380000 | 4212737638 | STUMBERG RANCH UNIT E 01HA | Temporarily Abandoned |
| 42127376390000 | 4212737639 | STUMBERG RANCH UNIT E 01HB | Producing |
| 42127376410000 | 4212737641 | STUMBERG RANCH UNIT E 01HC | Producing |
| 42127376500000 | 4212737650 | STUMBERG RANCH UNIT E 01HD | Producing |
| 42127376430000 | 4212737643 | STUMBERG RANCH UNIT E 01HE | Temporarily Abandoned |
| 42127376440000 | 4212737644 | STUMBERG RANCH UNIT E 01HF | Producing |
| 42127376450000 | 4212737645 | STUMBERG RANCH UNIT E 01HG | Producing |
| 42127376490000 | 4212737649 | STUMBERG RANCH UNIT E 01HH | Producing |
| 42323334200000 | 4232333420 | TOVAR WEST-LLOYD 34 B UNIT 1H | Producing |
| 42323333510000 | 4232333351 | TOVAR WEST-LLOYD 34 UNIT 1H | Producing |
| 42323333890000 | 4232333389 | TOVAR WEST-LLOYD 63 A UNIT 1H | Shut In |
| 42323334000000 | 4232333400 | TOVAR WEST-LLOYD 63 B UNIT 1H | Producing |
| 42323334110000 | 4232333411 | TOVAR WEST-LLOYD 69 A UNIT 1H | Producing |
| 42323333600000 | 4232333360 | TOVAR WEST-LLOYD 75 A UNIT 1H | Shut In |
| 42323333480000 | 4232333348 | TOVAR WEST-LLOYD 77 UNIT 1H | Producing |
| 42323333900000 | 4232333390 | TOVAR WEST-LLOYD 79 A UNIT 1H | Producing |
| 42323334150000 | 4232333415 | TOVAR WLC A UNIT 1H | Producing |
| 42323334170000 | 4232333417 | TOVAR WLC A UNIT 2H | Producing |
| 42323334160000 | 4232333416 | TOVAR WLC A UNIT 3H | Shut In |
| 42323334350000 | 4232333435 | TOVAR WLC A UNIT 4H | Producing |
| 42323334360000 | 4232333436 | TOVAR WLC A UNIT 5H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42323334370000 | 4232333437 | TOVAR WLC A UNIT 6H | Producing |
| 42323334380000 | 4232333438 | TOVAR WLC B UNIT 1H | Producing |
| 42323334390000 | 4232333439 | TOVAR WLC B UNIT 2H | Producing |
| 42323334400000 | 4232333440 | TOVAR WLC B UNIT 3H | Producing |
| 42479411070000 | 4247941107 | WORTHEY RANCH 10H | Producing |
| 42479415000000 | 4247941500 | WORTHEY RANCH 11H | Producing |
| 42479415010000 | 4247941501 | WORTHEY RANCH 12H | Producing |
| 42479415020000 | 4247941502 | WORTHEY RANCH 13H | Producing |
| 42479414820000 | 4247941482 | WORTHEY RANCH 14H | Producing |
| 42479414830000 | 4247941483 | WORTHEY RANCH 15H | Producing |
| 42479414840000 | 4247941484 | WORTHEY RANCH 16H | Producing |
| 42479411320000 | 4247941132 | WORTHEY RANCH 17H | Producing |
| 42479411330000 | 4247941133 | WORTHEY RANCH 18H | Producing |
| 42479411340000 | 4247941134 | WORTHEY RANCH 19H | Producing |
| 42479407550000 | 4247940755 | WORTHEY RANCH 1H | Producing |
| 42479413760000 | 4247941376 | WORTHEY RANCH 20H | Producing |
| 42479413770000 | 4247941377 | WORTHEY RANCH 21H | Producing |
| 42479413780000 | 4247941378 | WORTHEY RANCH 22H | Producing |
| 42479414870000 | 4247941487 | WORTHEY RANCH 23H | Producing |
| 42479414880000 | 4247941488 | WORTHEY RANCH 24H | Producing |
| 42479414890000 | 4247941489 | WORTHEY RANCH 25H | Producing |
| 42479415150000 | 4247941515 | WORTHEY RANCH 26H | Producing |
| 42479415170000 | 4247941517 | WORTHEY RANCH 27H | Producing |
| 42479415180000 | 4247941518 | WORTHEY RANCH 28H | Producing |
| 42479415210000 | 4247941521 | WORTHEY RANCH 29H | Producing |
| 42479409410000 | 4247940941 | WORTHEY RANCH 2H | Producing |
| 42479423410000 | 4247942341 | WORTHEY RANCH 30H | Producing |
| 42479423420000 | 4247942342 | WORTHEY RANCH 31H | Producing |
| 42479423440000 | 4247942344 | WORTHEY RANCH 32H | Producing |
| 42479424370000 | 4247942437 | WORTHEY RANCH 34H | Producing |
| 42479424380000 | 4247942438 | WORTHEY RANCH 35H | Producing |
| 42479424400000 | 4247942440 | WORTHEY RANCH 36H | Producing |
| 42479424360000 | 4247942436 | WORTHEY RANCH 37H | Producing |

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42479413560000 | 4247941356 | WORTHEY RANCH 38H | Shut In |
| 42479423390000 | 4247942339 | WORTHEY RANCH 39H | Producing |
| 42479411190000 | 4247941119 | WORTHEY RANCH 3H | Producing |
| 42479423400000 | 4247942340 | WORTHEY RANCH 40H | Producing |
| 42479423470000 | 4247942347 | WORTHEY RANCH 41H | Producing |
| 42479423460000 | 4247942346 | WORTHEY RANCH 42H | Producing |
| 42479419060000 | 4247941906 | WORTHEY RANCH 43H | Producing |
| 42479421600000 | 4247942160 | WORTHEY RANCH 44H | Producing |
| 42479424840000 | 4247942484 | WORTHEY RANCH 45H | Producing |
| 42479424850000 | 4247942485 | WORTHEY RANCH 46H | Producing |
| 42479424860000 | 4247942486 | WORTHEY RANCH 47H | Producing |
| 42479424870000 | 4247942487 | WORTHEY RANCH 48H | Producing |
| 42479424880000 | 4247942488 | WORTHEY RANCH 49H | Producing |
| 42479411200000 | 4247941120 | WORTHEY RANCH 4H | Producing |
| 42479424890000 | 4247942489 | WORTHEY RANCH 50H | Producing |
| 42479424910000 | 4247942491 | WORTHEY RANCH 51H | Producing |
| 42479424810000 | 4247942481 | WORTHEY RANCH 52H | Temporarily Abandoned |
| 42479424800000 | 4247942480 | WORTHEY RANCH 53H | Producing |
| 42479424820000 | 4247942482 | WORTHEY RANCH 54H | Producing |
| 42479424830000 | 4247942483 | WORTHEY RANCH 55H | Producing |
| 42479420160000 | 4247942016 | WORTHEY RANCH 56H | Producing |
| 42479421310000 | 4247942131 | WORTHEY RANCH 57H | Producing |
| 42479409710000 | 4247940971 | WORTHEY RANCH 5H | Producing |
| 42479411080000 | 4247941108 | WORTHEY RANCH 6H | Producing |
| 42479411940000 | 4247941194 | WORTHEY RANCH 7H | Producing |
| 42479409830000 | 4247940983 | WORTHEY RANCH 8H | Producing |
| 42479410190000 | 4247941019 | WORTHEY RANCH 9H | Producing |

# Annex C
## Applicable Contracts

## Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP,<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 |

Case 20-32587 Document 316-6 Filed in TXSB on 10/16/20 Page 259 of 432

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 |

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 |

## ROW Interests

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141176000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 457 | 658 |
| 1141199000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/4/2012 | TX | Dimmit | 455 | 217 |
| 1138496000 | DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/5/2007 | TX | Dimmit | | |
| 1138497000 | RIO BRAVO LAND CO ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/29/2007 | TX | Maverick Dimmit | 1042 339 | 294 557 |
| 1138888000 | WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 6/9/2006 | TX | Maverick Webb | | |
| 1139504000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2006 | TX | Dimmit | 356 | 172 |
| 1139555000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/22/2010 | TX | Dimmit La Salle | 430 619 | 310 173 |
| 1139556000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2010 | TX | Dimmit | 432 | 749 |
| 1139557000 | HUGH A FITZSIMONS III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/5/2009 | TX | Dimmit | | |
| 1139558000 | LABANDERA RANCH LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/23/2009 | TX | Dimmit | 408 | 567 |
| 1139825000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 415 |
| 1139838000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1308 | 420 |
| 1139839000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139840000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139841000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | | |
| 1139961000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 140 |
| 1139962000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/11/2011 | TX | Dimmit | 400 | 82 |
| 1139963000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/6/2010 | TX | Dimmit | 399 | 219 |
| 1139964000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/22/2010 | TX | Dimmit | 397 | 749 |
| 1139965000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/1/2010 | TX | Dimmit | 399 | 432 |
| 1139966000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/19/2011 | TX | Dimmit | 401 | 10 |
| 1139967000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 258 |
| 1139968000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/8/2011 | TX | Dimmit | 402 | 267 |
| 1140110000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/3/2011 | TX | Dimmit | 403 | 744 |
| 1140111000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Surface/Subsurface Wellbore | 3/3/2011 | TX | Dimmit | 403 | 744 |
| 1140122000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 280 |
| 1140123000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/18/2011 | TX | Maverick | 1282 | 290 |
| 1140124000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 486 |
| 1140125000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/23/2011 | TX | Maverick | 1285 | 497 |
| 1140152000 | DOLPH BRISCOE III | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 86 |
| 1140170000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 107 |
| 1140171000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 96 |
| 1140172000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/2/2011 | TX | Maverick | 1295 | 85 |
| 1140197000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2011 | TX | Maverick | 1313 | 159 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140225000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | O/G LSE-Surface Rights/Rentals | 12/1/2011 | TX | Dimmit | | |
| 1140226000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140227000 | STATE OF TEXAS | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Webb | | |
| 1140228000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/15/2008 | TX | Webb | | |
| 1140229000 | GARY ECKHARDT ET UX | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140230000 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/1/2011 | TX | Dimmit | | |
| 1140231000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/1/2009 | TX | Webb | | |
| 1140232000 | FITZSIMONS ENTITY ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 12/22/2005 | TX | Maverick | 1348 | 125 |
| 1140233000 | MAUND FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 59 |
| 1140234000 | RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 10/29/2009 | TX | Dimmit | | |
| 1140235000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 55 |
| 1140236000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | 437 | 57 |
| 1140237000 | WILLIAM A BEINHORN JR FAMILY LTD | ANADARKO E&P COMPANY LP | Surface Use Agmt | 3/6/2006 | TX | Dimmit | | |
| 1140238000 | RIO BRAVO LAND CO | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/7/2011 | TX | Maverick | 1308 | 408 |
| 1140267000 | WILLIAM K SPARKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/13/2011 | TX | Dimmit | 419 | 161 |
| 1140299000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 239 |
| 1140300000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | 425 | 230 |
| 1140301000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/17/2011 | TX | Dimmit | | |
| 1140410000 | PRIME OPERATING COMPANY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/22/2011 | TX | Dimmit | | |
| 1140411000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 210 |
| 1140412000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Maverick | 1327 | 221 |
| 1140413000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1327 | 229 |
| 1140469000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1336 | 5 |
| 1140523000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/28/2010 | TX | Webb | 3225 | 480 |
| 1140584000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 131 |
| 1140585000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/9/2012 | TX | Dimmit | 439 | 140 |
| 1140663000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/22/2012 | TX | Dimmit<br>Dimmit | 445<br>467 | 672<br>227 |
| 1140664000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 677<br>234 |
| 1140665000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 682<br>241 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140666000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/20/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 687<br>248 |
| 1140667000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit<br>Dimmit | 455<br>467 | 692<br>255 |
| 1140742000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | Dimmit | 455 | 246 |
| 1140744000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/1/2012 | TX | La Salle | 660 | 161 |
| 1140766000 | ALBERT WILEY BLAKEWAY ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/21/2012 | TX | Dimmit | 444 | 127 |
| 1140767000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/13/2012 | TX | Dimmit | 444 | 271 |
| 1140768000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Webb<br>Dimmit | 3365<br>440 | 294<br>689 |
| 1140780000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 102 |
| 1140781000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/10/2011 | TX | Dimmit | 422 | 111 |
| 1140782000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 462 |
| 1140784000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 254 |
| 1140785000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 439 | 263 |
| 1140786000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/23/2011 | TX | Dimmit | 409 | 693 |
| 1140787000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/10/2011 | TX | Dimmit | 403 | 735 |
| 1140788000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/1/2011 | TX | Dimmit | 409 | 683 |
| 1140789000 | SOUTH SPUR LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/19/2012 | TX | Dimmit | 435 | 342 |
| 1140790000 | DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 5/18/2012 | TX | Dimmit | 442 | 413 |
| 1140807000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 444 | 278 |
| 1140809000 | B L STANLEY LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/1/2011 | TX | Webb | 3305 | 219 |
| 1140835000 | RANCHO ENCANTADO LP (unrecorded letter agreement) | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/12/2011 | TX | Dimmit | | |
| 1140836000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 371 |
| 1140837000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 361 |
| 1140838000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/30/2012 | TX | Maverick | 1347 | 351 |
| 1141016000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/10/2011 | TX | Dimmit | 450 | 511 |
| 1141017000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/29/2011 | TX | Dimmit | 450 | 502 |
| 1141018000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 1/31/2011 | TX | Dimmit | 450 | 154 |
| 1141020000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3255 | 547 |
| 1141025000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3294 | 556 |
| 1141135000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/20/2012 | TX | Dimmit | 459 | 339 |
| 1141139000 | MARY LOIS FRIDAY HULSMAN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/5/2012 | TX | Dimmit | 455 | 228 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141141000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Dimmit | 451 | 23 |
| 1141175000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/1/2012 | TX | Dimmit | 455 | 223 |
| 1141181000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Webb | 3371 | 851 |
| 1141182000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 716 |
| 1141197000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 10/1/2012 | TX | Maverick | 1382 | 344 |
| 1141198000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/15/2012 | TX | Dimmit | 459 | 303 |
| 1141200000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/1/2012 | TX | Dimmit | 459 | 308 |
| 1141201000 | DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 257 |
| 1141202000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/3/2012 | TX | Dimmit | 455 | 253 |
| 1141203000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/19/2012 | TX | Dimmit | 459 | 297 |
| 1141204000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/9/2012 | TX | Dimmit | 455 | 706 |
| 1141205000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 240 |
| 1141206000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/21/2012 | TX | Dimmit | 455 | 667 |
| 1141236000 | RUDOLFO SANTOSCOY | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 448 | 361 |
| 1141238000 | M.P.T. | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 3/1/2012 | TX | Dimmit | 448 | 400 |
| 1141239000 | DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 6/25/2012 | TX | Dimmit | 448 | 413 |
| 1141385000 | LEONARD SCARCELLA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 448 | 370 |
| 1141386000 | JOHN MARK FACHORN | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/6/2012 | TX | Dimmit | 448 | 376 |
| 1141387000 | REGINA LYNN ANDREWS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/8/2012 | TX | Dimmit | 448 | 394 |
| 1141388000 | RITA JO FRAILICKS | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 388 |
| 1141389000 | RENEE DAWN MEDINA | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/16/2012 | TX | Dimmit | 448 | 382 |
| 1141390000 | STEVEN ROSS FACHORN ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/19/2012 | TX | Dimmit | 468 | 86 |
| 1141391000 | RANCHO ENCANTADO LP | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 7/10/2012 | TX | Dimmit | 462 | 657 |
| 1141432000 | WORTHEY PROPERTIES LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 12/2/2010 | TX | Webb | 3390 | 329 |
| 1141446000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 9/16/2010 | TX | Maverick | 1340 | 312 |
| 1141544000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 11/9/2011 | TX | Dimmit | 468 | 92 |
| 1142246000 | CHARLES NOLAN SMITH ET AL | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 2/13/2014 | TX | Dimmit | 509 | 73 |
| 1140783000 | BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 4/1/2012 | TX | Dimmit | 436 | 471 |
| 1141237000 | TEJAS SALES INTERNATIONAL LTD | ANADARKO E&P COMPANY LP | Right of Way/Easement/Facility | 8/2/2012 | TX | Dimmit | 448 | 406 |
| 1141233000 | DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit (road bore) | 2/14/2013 | TX | Dimmit | | |
| 1141300000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/26/2013 | TX | Dimmit | 469 | 471 |

Case 4:20-cv-20587 Document 363-6 Filed 04/19/21 in TXSD Page 253 of 432

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141338000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 240 |
| 1141339000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 252 |
| 1141342000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 470 | 230 |
| 1141427000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/10/2013 | TX | Dimmit | 466 | 26 |
| 1141429000 | ROGERS DENTONIO RANCH LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/24/2013 | TX | Dimmit | 465 | 344 |
| 1141430000 | MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/22/2013 | TX | Dimmit | 465 | 352 |
| 1141431000 | DIMMIT COUNTY REGULATORY COMPLIANCE | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 3/7/2013 | TX | Dimmit | | |
| 1141433000 | WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/15/2013 | TX | Dimmit | 469 | 479 |
| 1141434000 | MAUND FAMILY LIMITED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 470 | 799 |
| 1141441000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 709 |
| 1141442000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2013 | TX | Dimmit | 474 | 699 |
| 1141444000 | 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/15/2013 | TX | Dimmit | 473 | 794 |
| 1141447000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 828 |
| 1141448000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 814 |
| 1141449000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 787 |
| 1141450000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 807 |
| 1141451000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2013 | TX | Dimmit | 473 | 835 |
| 1141471000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick Dimmit | 1405 475 | 117 541 |
| 1141472000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2013 | TX | Maverick | 1408 | 69 |
| 1141498000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/1/2013 | TX | Dimmit | 478 | 80 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141541000 | THOMAS R BURANUM ET UX | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/25/2013 | TX | Dimmit | | |
| 1141543000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/11/2013 | TX | Dimmit | 480 | 800 |
| 1141587000 | SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/21/2013 | TX | Dimmit | 465 | 225 |
| 1141588000 | THOMAS R BRANUM ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/25/2013 | TX | Dimmit | 473 | 406 |
| 1141589000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 380 |
| 1141590000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/24/2013 | TX | Dimmit | 481 | 390 |
| 1141591000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 195 |
| 1141592000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 186 |
| 1141593000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 168 |
| 1141594000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 479 | 177 |
| 1141595000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 661 |
| 1141596000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2013 | TX | Dimmit | 464 | 670 |
| 1141597000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 614 |
| 1141598000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 623 |
| 1141599000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2013 | TX | Dimmit | 470 | 632 |
| 1141683000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Webb | 3488 | 4 |
| 1141705000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 494 | 297 |
| 1141706000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2013 | TX | Dimmit | 484 | 290 |
| 1141733000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/24/2011 | TX | Dimmit | 489 | 416 |
| 1141740000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/9/2013 | TX | Dimmit | 490 | 63 |
| 1141741000 | RANCHO ENCANTADO LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/17/2013 | TX | Dimmit | 490 | 74 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1141742000 | FAITH RANCH LP ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2013 | TX | Dimmit | 1418 | 225 |
| 1141743000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/8/2013 | TX | Maverick | 1418 | 249 |
| 1141771000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Surface License / Permit | 11/25/2013 | TX | Webb | 3566 | 35 |
| 1141872000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/30/2013 | TX | Webb | 3526 | 510 |
| 1141877000 | WORTHEY PROPERTIES LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/12/2013 | TX | Webb | 3526 | 521 |
| 1141878000 | B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb | 3526 | 535 |
| 1141879000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/19/2013 | TX | Maverick | 1418 | 235 |
| 1141882000 | 1812 PARTNERS LTD ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/6/2013 | TX | Dimmit<br>Maverick | 490<br>1430 | 81<br>290 |
| 1141887000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/1/2013 | TX | Dimmit | 496 | 434 |
| 1141888000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2013 | TX | Dimmit | 496 | 441 |
| 1141997000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 526 |
| 1141998000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 517 |
| 1141999000 | EL PESCADO MINERALS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2013 | TX | Dimmit | 484 | 508 |
| 1142037000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2013 | TX | Dimmit | 503 | 46 |
| 1142038000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/1/2014 | TX | Dimmit | 504 | 505 |
| 1142039000 | COTULLA LAND & INVESTMENTS LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/9/2013 | TX | Webb<br>Dimmit | 3545<br>503 | 625<br>1 |
| 1142040000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/25/2013 | TX | Dimmit | 503 | 15 |
| 1142041000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Maverick | 1442 | 142 |
| 1142142000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/17/2014 | TX | Dimmit | 506 | 413 |
| 1142145000 | WORTHEY PROPERTIES LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/22/2014 | TX | Webb | 3575 | 243 |
| 1142148000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 28 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1142149000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 508 | 21 |
| 1142151000 | BEINHORN JR FAMILY LIMTED PARTNERSHIP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/6/2014 | TX | Dimmit | 508 | 35 |
| 1142152000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | La Salle | 775 | 18 |
| 1142153000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/7/2014 | TX | Maverick | 1447 | 251 |
| 1142154000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 261 |
| 1142155000 | B L STANLEY LTD | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/13/2014 | TX | Webb | 3582 | 516 |
| 1142258000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | Dimmit | 512 | 586 |
| 1142259000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Dimmit | 512 | 593 |
| 1142373000 | SOUTH SPUR LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/15/2014 | TX | Dimmit | 514 | 784 |
| 1142374000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2013 | TX | Dimmit La Salle | 508 792 | 169 468 |
| 1142394000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/21/2014 | TX | Dimmit | 517 | 52 |
| 1142397000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 820 |
| 1142398000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Webb | 3630 | 800 |
| 1142399000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/10/2014 | TX | Dimmit | 513 | 599 |
| 1142400000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit | 513 | 663 |
| 1142401000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 49 |
| 1142402000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2014 | TX | La Salle | 797 | 56 |
| 1142558000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/9/2014 | TX | Dimmit Webb | 513 3639 | 624 843 |
| 1142559000 | COMANCHE MAVERICK RANCH INVESTMENTS LP | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 11/25/2013 | TX | Maverick | 1437 | 50 |
| 1142560000 | INDIO FAITH LAND CO LLC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/25/2014 | TX | Maverick | 1447 | 270 |
| 1340261000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/1/2014 | TX | Dimmit | 520 | 781 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1341352000 | BRISCOE RANCH INC ET AL | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/1/2014 | TX | Webb<br>Dimmit | 3672<br>570 | 306<br>539 |
| 1341359000 | RANCHO ENCANTADO LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/29/2014 | TX | Dimmit | | |
| 1347518000 | FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 759 |
| 1347530000 | FITZSIMONS OIL & GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | Surface Use Agmt | 4/30/2014 | TX | Dimmit | 517 | 763 |
| 1349965000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 526 | 461 |
| 1350515000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 12/1/2014 | TX | Dimmit | 539 | 191 |
| 1350568000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2014 | TX | Dimmit | 539 | 198 |
| 1350575000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 107 |
| 1350580000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 11/1/2014 | TX | Dimmit | 541 | 100 |
| 1350582000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 540 | 754 |
| 1350613000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/1/2015 | TX | Dimmit | 0540 | 0761 |
| 1351039000 | DOLPH BRISCOE III ET UX | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 2/12/2012 | TX | Dimmit | 531 | 108 |
| 1351042000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/5/2013 | TX | Dimmit | 529 | 510 |
| 1351043000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/16/2012 | TX | Dimmit | 531 | 103 |
| 1351044000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 124 |
| 1351045000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2014 | TX | Dimmit | 527 | 117 |
| 1351046000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 131 |
| 1351047000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/11/2014 | TX | Dimmit | 526 | 456 |
| 1351064000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/20/2014 | TX | Dimmit | 527 | 98 |
| 1351250000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/29/2012 | TX | Dimmit | 537 | 604 |
| 1351252000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 8/1/2012 | TX | Dimmit | 537 | 599 |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1351254000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/19/2012 | TX | Dimmit | 537 | 616 |
| 1351255000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/23/2015 | TX | Webb | 3752 | 159 |
| 1351256000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 9/2/2014 | TX | Dimmit | 529 | 517 |
| 1351258000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/26/2012 | TX | Dimmit | 537 | 609 |
| 1351259000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 4/14/2014 | TX | Dimmit | 529 | 505 |
| 1351260000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/23/2015 | TX | Dimmit | 540 | 768 |
| 1351285000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/11/2015 | TX | Dimmit | 541 | 114 |
| 1352817000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2014 | TX | La Salle | 863 | 313 |
| 1352868000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/20/2015 | TX | Webb | 3781 | 231 |
| 1354527000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 5/1/2015 | TX | Dimmit | 547 | 806 |
| 1354911000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 1/30/2015 | TX | Dimmit | 546 | 449 |
| 1355178000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 6/5/2015 | TX | Dimmit | 546 | 466 |
| 1356773000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 7/1/2015 | TX | Dimmit | 552 | 352 |
| 1362891000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 476 |
| 1362895000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 496 |
| 1362896000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 481 |
| 1362897000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 491 |
| 1362898000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 3/14/2016 | TX | Dimmit | 562 | 486 |
| 1360670000 | BRISCOE RANCH INC | ANADARKO E&P ONSHORE LLC | Right of Way/Easement/Facility | 10/1/2015 | TX | Dimmit | 560 | 49 |
| 1367778000 | BRASK DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | Surface Use Agreement | 11/15/2010 | TX | Dimmit | | |

| AGREEMENT # | LESSOR/GRANTOR | LESSEE/GRANTEE | AGREEMENT TYPE | EFFECTIVE DATE | STATE | COUNTY | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| 1140408000 | ST TX DOT 664-141 (driveway access to office off US 277) | ANADARKO PETROLEUM CORPORATION | Right of Way/Easement/Facility | 12/7/2011 | TX | Dimmit | | |
| 1140772000 | ADELA A SMITH FAMILY LIMITED PARTNERSHIP | KERR-MCGEE OIL & GAS ONSHORE LP | Right of Way/Easement/Facility | 1/1/2011 | TX | Dimmit | 427 | 335 |
| 1134095000 | CHARLES W WILSON SR ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 5/11/1994 | TX | Dimmit | 251 | 497 |
| 1134111000 | CHARLES H BARRIER ET AL | UNION PACIFIC RESOURCES COMPANY | Right of Way/Easement/Facility | 6/1/1994 | TX | Dimmit | 251 | 499 |

## Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 |

Case 4:20-cv-00587 Document 16-3 Filed in TXSB on 03/10/20 Page 275 of 332

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 |

Case 20-32658 Document 363-6 Filed in TXSB on 10/16/20 Page 279 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 |

Case 20-32058 Document 316 Filed in TXSB on 03/10/20 Page 294 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 |

Case 20-32658 Document 116-6 Filed in TXSB on 10/13/20 Page 295 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |

Case 4:20-cv-00587 Document 16-6 Filed on 03/10/20 in TXSD Page 293 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 |

Case 4:20-cv-02058 Document 316-3 Filed in TXSD on 10/14/20 Page 296 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 |

**Annex D**
**Permits**

None.

# Schedule 2.02(k)

**Excluded Contracts and Other Assets**

## Big Wells – Leases

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625001 | ALVAN BLALACK JR ET UX | SUN OIL COMPANY | 02/08/1968 | 02/08/1973 | Dimmit | | 27 | 384 |
| T0625002 | FLOYD R PORTER | SUN OIL COMPANY | 02/13/1968 | 02/13/1973 | Zavala | | 3 | 172 |
| T0625003 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 03/01/1968 | 03/01/1978 | Zavala | | 3 | 251 |
| T0625004 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625005 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625006 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625007 | ERIN BAIN JONES | SUN OIL COMPANY | 06/03/1968 | 06/03/1973 | Zavala | | 3 | 578 |
| T0625008 | JOHN B BAGGETT ET AL | SUN OIL COMPANY | 01/09/1969 | 01/09/1979 | Zavala | | 3 | 251 |
| T0625009-001 | DOYLE STANDIFER ET UX | SUN OIL COMPANY | 05/06/1969 | 05/06/1974 | Dimmit | | 29 | 322 |
| T0625009-002 | CHARLES B NICHOLS JR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | Dimmit | | 37 | 257 |
| T0625010 | MINNIE HELEN BORMAN | SUN OIL COMPANY | 05/16/1969 | 05/16/1974 | Dimmit | | 29 | 332 |
| T0625011 | G G BOYD ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 355 |
| T0625012-001 | MARILYN D ANDERSON ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 377 |
| T0625012-002 | L B BEACH ET AL | SUN OIL COMPANY | 05/13/1969 | 05/13/1974 | Dimmit | | 29 | 381 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625013 | LILLIAN SPEAS ET AL | SUN OIL COMPANY | 05/19/1969 | 05/19/1974 | Dimmit | | 29 | 366 |
| T0625014 | RUTH W HOLLINSHEAD ET AL | SUN OIL COMPANY | 06/06/1969 | 06/06/1974 | Dimmit | | 29 | 359 |
| T0625015 | JAMES F MINX | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 29 | 469 |
| T0625016 | DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | Dimmit | | 30 | 10 |
| T0625017 | ALLYEDEL H CROCKETT | SUN OIL COMPANY | 06/20/1970 | 06/20/1975 | Dimmit | | 31 | 330 |
| T0625018 | LARRY D GOMEZ | SUN OIL COMPANY | 06/26/1970 | 06/26/1975 | Dimmit | | 31 | 464 |
| T0625019-001 | AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1975 | Dimmit | | 33 | 505 |
| T0625019-002 | PAUL E EFAW ET UX | SUN OIL COMPANY | 11/10/1971 | 11/10/1976 | Dimmit | | 39 | 193 |
| T0625020 | B M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | Dimmit | | 29 | 293 |
| T0625021 | MARY M RODRIGUEZ | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | Dimmit | | 147 | 136 |
| T0625022 | OLGA R KINNARD ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1993 | Zavala | | 97<br>55 | 145<br>185 |
| T0625023 | JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/30/1989 | 05/30/1994 | Zavala | | 57 | 53 |
| T0625024-001 | ROY L BROWN JR | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 68 |
| T0625024-002 | MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 65 |
| T0625024-003 | FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/19/1994 | Zavala | | 57 | 76 |
| T0625025-001 | BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 666 |

| LEASE CODE | LEASE NAME | LESSEE | EFFECTIVE DATE | EXPIRATION DATE | COUNTY | LEGAL DESCRIPTION | BOOK | PAGE |
|---|---|---|---|---|---|---|---|---|
| T0625025-002 | ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 671 |
| T0625025-003 | MARY MAY PRICE RIHA ET VIR | FOX & HOLLAND | 02/08/1982 | 02/08/1987 | Dimmit | | 82 | 676 |
| T0625026 | I L TAYLOR | ROBERT C SINCLAIR | 04/01/1970 | 04/01/1980 | Dimmit | | 33 | 122 |
| T0625027 | MILDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1970 | 04/14/1975 | Dimmit | | 30 | 460 |
| T0625028 | WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | Dimmit | | 30 | 270 |
| T0625029 | SAL ALVIN ARMSTRONG | J W DOAK | 04/18/1970 | 04/18/1975 | Dimmit | | 30 | 495 |
| T0625030 | ERIN BAIN JONES | W W OATMAN | 05/11/1970 | 05/11/1975 | Dimmit | | 3 | 578 |

## Big Wells – Wells

| API14 | API10 | WELL NAME | WELL STATUS |
|---|---|---|---|
| 42127337500000 | 4212733750 | BOYD GG 1H | |

## Big Wells – Joint Operating Agreements

| SELLER PARTY | COUNTERPARTY | TITLE | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; Eagle Ford TX LP. Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC JOA - Big Wells) | January 1, 2011 |

## Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |

Case 4:20-cv-00587 Document 16-6 Filed on 03/31/20 in TXSD Page 970 of 1882

## Schedule 5.03(a)

## 365 Schedule

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 | 0 |

[1] Cure Amounts as of October 31, 2020.

Case 20-32658 Document 16 Filed 09/02/20 Page 309 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 | 17,474 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 | 116,743 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 | 1,691,924 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 | 111,103 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 | 0 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 | 0 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 | 0 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 | 0 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 | 0 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 | 0 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 | 0 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 | 0 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 | 0 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 | 0 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 | 0 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 | 2,088,041 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 | 6,487,546 |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 | 0 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 | 0 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 | 0 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 | 0 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 | 0 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 | 0 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 | 0 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 | 0 |

Case 4:20-cv-02658 Document 33-6 Filed on 11/10/20 in TXSD Page 330 of 432

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 | 0 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 | 0 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 | 0 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 | 0 |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 | 0 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 | 0 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 | 0 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 | 0 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 | 0 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 | 0 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 | 0 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 | 0 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 | 0 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 | 0 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 | 0 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 | 0 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 | 0 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 | 0 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[1] |
|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 | 0 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 | 0 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 | 0 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 | 0 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 | 0 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 | 0 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 | 0 |

# SCHEDULE 5.03(b)

## Desired 365 Contracts[2]

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 | 0 | **TBD** |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 | 0 | **TBD** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 | 0 | **Reject** |

[2] **Note to Draft**: This Schedule 5.03(b) reflects Buyer's preliminary designations of Desired 365 Contracts. This list is subject to and does not limit the terms of the Agreement, including insofar as they pertain to revising these designations prior to the Designation Deadline. In addition, these preliminary designations are subject to and do not limit Buyer's conditions to Closing.
[3] Cure Amounts as of October 31, 2020.

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 | 0 | **Reject** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 | 17,474 | **Assume** |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 | 116,743 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 | 1,691,924 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; TXCO Energy Corp.; St. Mary Land & Exploration Company. Current counterparties are Eagle Ford TX LP; Mitsui E&P Texas LP; Venado EF LP; SN EF Maverick, LLC SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; St. Mary Land & Exploration Company. Current counterparties are Eagle Ford TX LP; Mitsui E&P Texas LP; Venado EF LP; SN EF Maverick, LLC; SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; St. Mary Land & Exploration Company. Current counterparties are Eagle Ford TX LP; Mitsui E&P Texas LP; Venado EF LP; SN EF Maverick, LLC; SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC; SM Energy Company; Eagle Ford TX LP; Mitsui E&P Texas LP. Current counterparties are Eagle Ford TX LP; Mitsui E&P Texas LP; Venado EF LP; SN EF Maverick, LLC; SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 | 111,103 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP; St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 | 0 | **Assume** |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 | 0 | **TBD** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 | 0 | **Reject** |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC<br>Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 | 0 | **Assume** |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 | 2,088,041 | **Reject** |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 | 6,487,546 | **Reject** |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 | 0 | **Assume** |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 | 0 | **Reject** |

Case 20-32658 Document 363 Filed 10/16/20 Page 31 of 43

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 | 0 | **Assume** |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 | 0 | **Assume** |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 | 0 | **Reject** |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 | 0 | **Reject** |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 | 0 | **Assume** |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 | 0 | **Assume** |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE | PROPOSED CURE AMOUNT ($)[3] | INITIAL DESIGNATION |
|---|---|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 | 0 | **Assume** |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 | 0 | **Assume** |

<u>**Schedule 8.02(d)**</u>
**Specified Required Consents**

| AGREEMENT | AGREEMENT TYPE | PARTY | AGREEMENT NAME | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0616001-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0616002-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0619001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0623001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 01/02/2007 | Assignment: Consent required. |
| T0623002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0623005-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 10/02/2008 | Assignment: Consent required. |
| T0626002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0619003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2010 | Assignment: Consent required. |
| T0626001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619015-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2011 | Assignment: Consent required. |
| T0622001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | AGREEMENT NAME | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0622003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0619006-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | DIANA M STUMBERG ET AL | 11/05/2008 | Assignment: Consent required. |
| T0618001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0618003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0621001-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | EWING ENTERPRISES LIMITED PARTNERSH | 09/20/2006 | Assignment: Consent required. |
| T0618003-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 10/25/2005 | Assignment: Consent required. |
| T0616001-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0616002-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0618003-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | THE SOUTH TEXAS CHILDRENS HOME | 10/25/2005 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE RANCH LTA DTD 10/5/10 | October 5, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE FRIDAY RANCH DTD 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE CHIP EAST RANCH 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | MARY LOIS FRIDAY HULSMAN 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | SOUTH TEXAS CHILDRENS HOME 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | MOODY NATIONAL BANK GALV 10/12/10 | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | BRISCOE COCHINA WEST & COCHINA EAST | October 14, 2010 | Assignment: Consent required. |
| Letter Agmt | Letter Agreement | Anadarko E&P Onshore LLC | SECOND AMENDMENT (STUMBERG LEASE) | January 1, 2011 | Assignment: Consent required. |

# Disclosure Schedule 3.05(a)
## Material Contracts

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Purchase and Sale Agreement | January 12, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | First Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | Second Amendment to Purchase and Sale Agreement | March 1, 2017 |
| Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>Anadarko Energy Services Company;<br>Kerr-McGee Oil & Gas Onshore, LP | Third Amendment to Purchase and Sale Agreement | June 28, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Joint Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Letter Agreement re: Joint Development Agreement | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Assignment Notification to Buyer | February 28, 2017 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | Letter Agreement | February 21, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP and Eagle Ford TX LP.<br>Current counterparties are Eagle Ford TX LP, SN EF Maverick, LLC and<br>SN EF UnSub, LP | Joint Operating Agreement (KNOC APC) | January 1, 2011 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Bill D. Bassore;<br>Carolyn S. Wise;<br>Donald Powell, Life Tenant;<br>Kathy Kennedy, Remainderman.<br>Currrent counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Bill D. Bassore;<br>Carolyn Wise;<br>Donal Powell, Life Tenant;<br>Kathy Kennedy, Remainderman | Joint Operating Agreement (FOGMT Unit A) | November 1, 2014 |
| Gavilan Resources LLC | Executed by SN EF Maverick, LLC;<br>Anadarko E&P Onshore LLC;<br>Kerr-McGee Oil & Gas Onshore LP;<br>SN EF Unsub, LP.<br>Current parties are SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (SN EF Maverick) | March 1, 2017 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford Tx LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Carla South Spur Unit A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina South - BCATS Ranch) | August 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Catarina North, West, Carla, etc. - Briscoe Ranch Assorted) | October 1, 2008, as amended September 1, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company;<br>Chesapeake Exploration, L.L.C.;<br>OOGC America, Inc.<br>Current counterparties are Eagle Ford TX LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chaparral) | March 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Checkerboard) | June 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Chip East/Briscoe Friday Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>Rosetta Resources Operating LP;<br>SM Energy Company;<br>Eagle Ford Tx LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2011)) | March 1, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Crop and TXCO Resources, Inc.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Chupadera (2008)) | April 11, 2008, as amended September 1, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC<br>SN EF UnSub, LP. | Joint Operating Agreement (Briscoe Cochina) | December 1, 2008 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (RDU, Maund Ranch, South Spur Ranch) | March 1, 2009, as amended September 1, 2010 and July 1, 2013 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Diamond H Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Eagle Ford TX LP;<br>Mitsui E&P Texas LP.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Eckhardt-Swonke Unit) | October 1, 2012 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>TXCO Energy Corp.;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (FOGMT) | July 15, 2008 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company;<br>TXCO Energy Corp.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (La Bandera Ranch) | May 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Rancho Encantado) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stanley Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>SM Energy Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Stumberg & Beinhorn) | March 1, 2009 |
| Gavilan Resources LLC | Executed by Anadarko E&P Company LP;<br>St. Mary Land & Exploration Company.<br>Current counterparties are Eagle Ford TX LP;<br>Mitsui E&P Texas LP;<br>Venado EF LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP. | Joint Operating Agreement (Worthey Ranch) | January 1, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC;<br>SM Energy Company;<br>Mitsui E&P Texas LP;<br>Eagle Ford TX LP;<br>XTO Energy, Inc. | Joint Operating Agreement (BCATS Southern Portion (XTO Tract)) | September 16, 2016 |

Case 4:20-cv-32658 Document 363-6 Filed on 10/18/20 Page 1045 of 1882

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 1TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 1TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 2TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 2TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 3TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 3TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 4RB – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 4RB – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 5TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 5TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 6TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 6TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 7TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 7TV – WTD) | December 17, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 8TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (CAGE 9TV – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (CAGE 9TV – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LLOYD BRISCOE 1H 2H 3H – WTD) | October 29, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amended Well Tract Designation (LLOYD BRISCOE 1H 2H 3H – WTD) | December 17, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 18 UNIT) | October 7, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | March 3, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (MAUND RANCH 18 UNIT) | September 29, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CARLA RANCH UNIT A) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Consolidated Well Tract Designations (BRISCOE CARLA RANCH UNIT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>South Spur LP | Pooling/Unit Agreement (SOUTH SPUR UNIT B) | August 1, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT UNIT A) | August 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | First Amendment to Designation of Unit (FOGMT UNIT A) | August 17, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment to Designation of Unit (FOGMT UNIT A) | July 18, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FISHER UNIT) | October 20, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE FRIDAY RANCH UNIT C) | April 1, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO 31 UNIT) | January 1, 2015 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Commissioner of the General Land Office | Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | February 19, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT B | December 9, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Brask Diamond H Ranches, LP | Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | November 5, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC | Amendment Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | January 7, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP<br>Leslie Eddie Vivio and Nancy Joe Vivio Ardoin | Consent to Pool (DIAMOND H STATE UNIT D) | September 3, 2014 |
| Gavilan Resources LLC | Executed by Episcopal Foundation of Texas<br>Boy Scouts of America | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 31, 2015 |
| Gavilan Resources LLC | Executed by ELSR LP | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT D) | March 30, 2015 |
| Gavilan Resources LLC | Executed by EnerQuest Oil & Gas, LL, LLC<br>JHA LLC<br>Christ Leonard Christenson III Revocable Trust<br>TGT LLC | Ratification of Pooling/Unit Agreement (DIAMOND H STATE UNIT B) | April 27, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STANLEY RANCH 63H WTD) | December 18, 2014 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 14H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 15H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 16H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 23H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 24H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 25H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 30H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 31H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 32H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 34H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 35H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 36H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 37H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 39H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 40H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 41H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 42H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 43H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 44H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 45H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 46H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 47H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 48H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 49H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 50H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 51H WTD) | April 9, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 53H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 54H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 55H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 56H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (WORTHEY RANCH 57H WTD) | April 9, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Dillon, Itz & Williams, LP | Ratification of Unit (BRISCOE CHIP EAST RANCH UNIT E) | March 30, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 77 A UNIT) | May 12, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 34 UNIT) | July 4, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (TOVAR WEST-LLOYD 75 A UNIT) | August 28, 2010 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (MAUND RANCH 27 UNIT) | April 28, 2015 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 1H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (ROGERS DENTONIO RANCH 2H WTD) | January 21, 2011 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (RANCHO ENCANTADO UNIT A) | October 1, 2015 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT N) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT O) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT P) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Q) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT R) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT S) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT T) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT U) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT V) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT W) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT X) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Y) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT Z) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD | Pooling/Unit Agreement (BRISCOE CATARINA NORTH WELL TRACT AA) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Rogers Dentonio Ranch Ltd. | Pooling/Unit Agreement (ROGERS DENTONIO RANCH CONSOLIDATED WELL TRACT) | April 6, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Labandera Ranch, L.P. | Pooling/Unit Agreement (LA BANDERA RANCH WELL TRACT 1 - WELLS 5H-9H) | June 20, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 1H WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 2H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 3H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 4H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH 10H WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 1) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 2) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 3) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 4) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 5) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 6) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 7) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 8) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 9) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 10) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 11) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT WELL TRACT 12) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 2SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 3SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 4SP WELL TRACT) | April 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 5SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT 6SH WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT F 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (FOGMT G 1SP WELL TRACT) | April 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT A) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT B) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT C) | March 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT D) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT E) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT F) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT G) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT H) | March 1, 2016 |

Case 20-32658 Document 16-6 Filed 10/16/20 Page 39 of 41

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT I) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT J) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT K) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>El Pescado Minerals Ltd.<br>The South Texas Children's Home<br>MLFH Minerals, Ltd.<br>Friday Minerals, Ltd. | Pooling/Unit Agreement (BRISCOE FRIDAY WELL TRACT L) | March 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT A) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT B) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT C) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT D) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT E) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT F) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT G) | August 1, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT H) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT I) | August 1, 2016 |
| Gavilan Resources LLC | Executed by Anadarko E&P Onshore LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>Miramar Holdings LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, LTD. | Pooling/Unit Agreement (BRISCOE CHUPADERA RANCH WELL TRACT J) | August 1, 2016 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA WEST RANCH WELL TRACTS (50 WELLS) | October 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT D) | March 1, 2019 |
| Gavilan Resources, LLC | Rancho La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CATARINA UNIT 28) | March 2, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE COCHINA EAST STATE UNIT C) | December 17, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>EBS Mineral Holdings, Ltd.<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Janey Briscoe Marmion GST Trust<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT D) | May 1, 2018 |
| Gavilan Resources, LLC | Diana M. Stumberg<br>Aparicion Minerals, LP<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Ranch La Cochina Minerals, Ltd.<br>Miramar Holdings, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (STUMBERG RANCH UNIT E) | May 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (LA BANDERA RANCH UNIT C) | November 1, 2017 |
| Gavilan Resources, LLC | El Pescado Mineral, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF, L.P<br>Mitsui E&P Texas LP | Pooling/Unit Agreement (BRISCOE CHIP EAST UNIT F) | February 1, 2020 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | Development Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC<br>Carnero G&P LLC | Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Letter Agreement (Natural Gas Liquids Marketing Agreement & Residue Gas Marketing Agreement) | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P LLC | Ratification and Assumption Agreement | May 22, 2018 |
| Gavilan Resources, LLC | SN EF Maverick, LLC;<br>Carnero G&P, LLC;<br>Eagle Ford TX LP;<br>Venado EF L.P. | Amendment to Firm Gas Gathering, Processing and Purchase Agreement | April 1, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | SN EF Maverick, LLC | Crude Oil Production Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Natural Gas Liquids Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | SN EF Maverick, LLC | Residue Gas Marketing Agreement | March 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Oil Gathering Agreement | June 1, 2017 |
| Gavilan Resources, LLC | Springfield Pipeline LLC | Second Amended and Restated Lease Dedication and Gas Gathering Agreement | June 1, 2017 |
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>SM Energy Company<br>Mitsui E&P Texas LP | Amendment to Joint Exploration Agreement | January 15, 2016 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Gas Transportation Services Agreement | March 1, 2013 |
| Gavilan Resources, LLC | Sanchez Energy Corporation;<br>Anadarko E&P Onshore, LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP | Springfield Gathering Assumption Agreement | June 1, 2017 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purchasing Agreement (Dedication) | September 1, 2008 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | First Amendment to Gathering, Processing and Purchasing Agreement | October 28, 2009 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Second Amendment to Gathering, Processing and Purchasing Agreement | August 1, 2014 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>SN EF UnSub, LP<br>William A. Beinhorn, Jr. Family Limited Partnership<br>Will Alston Beinhorn | Letter Agmt (SAN YSIDRO RANCH RULES) | January 28, 2019 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SURFACE USE AND FAITH RANCH RULES AGREEMENT) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Exploration, LLC<br>SN Operating, LLC | Letter Agmt (OFFSITE PENETRATION POINT WAIVER - CHK - STUMBERG UNIT D) | August 10, 2018 |
| Anadarko E&P Company LP | Kerr-McGee Oil & Gas Onshore LP<br>Eagle Ford TX LP | Participation Agmt (MAVERICK BASIN AREA JV W/EAGLE FORD) | March 17, 2011 |
| Anadarko E&P Company, LP | Walter Scott Light<br>WSLight Family Interests, Ltd;<br>Lightning Oil Company | Letter Agmt (WSLIGHT FAMILY INTERESTS LETTER AGREEMENT) | July 2, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company, Eagle Ford TX LP, Mitsui E&P Texas LP, Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agmt - Briscoe Cat South) | October 21, 2014 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agr w/Briscoe Cat West) | October 21, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CAT NORTH) | January 6, 2015 |
| Anadarko E&P Onshore LLC | Sea Eagle Ford, LLC<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (CONFIDENTIALITY AGREEMENT WITH SEA EAGLE FORD, LLC) | February 23, 2015 |
| Anadarko E&P Onshore LLC | Anadarko E&P Onshore LLC,<br>SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | Letter Agmt (HIGH PRESSURE GAS LIFT AGMT - CHIP EAST) | February 26, 2015 |
| Anadarko E&P Onshore LLC | Rosetta Resources Operating LP<br>SM Energy Company<br>Eagle Ford TX LP<br>Mitsuie E&P Texas LP | Acreage Exchange Agmt (ACREAGE TRADE AGREEMENT - ROSETTA / AEP ONSHORE) | September 3, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | October 5, 2010 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | Letter Agmt (SOUTH TEXAS CHILDRENS HOME 10/12/10) | October 12, 2010 |
| Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | October 12, 2010 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | October 14, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | Seismic Agmt & Options (HYDRO FRAC SURVEY) | March 1, 2011 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND BRISCOE FRIDAY 12/2/10) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman<br>SM Energy Company | Letter Agmt (POOL AMEND MARY LOIS FRIDAY HULSMAN) | December 2, 2010 |
| Anadarko E&P Onshore LLC | The South Texas Children's Home<br>SM Energy Company | Letter Agmt (POOL AMEND SOUTH TEXAS CHILDRENS) | December 8, 2010 |
| Anadarko E&P Onshore LLC | Dolph Briscoe, III<br>Jill A. Briscoe<br>SM Energy Company | Letter Agmt (POOL AMEND CHIP BRISCOE EAST) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Dolph Briscoe, III<br>Briscoe Ranch, Inc. | Letter Agmt (LTR AGMT AMEND STUMBERG POOLING) | December 2, 2010 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Dolph Briscoe III | Seismic Agmt & Options (HYDRO FRAC SURVEY BRISCOE CAT SO) | March 21, 2011 |
| Anadarko E&P Onshore LLC | Labandera Ranch LP | Miscellaneous (WATER PURCHASE & TRANS AGR LABANDERA) | July 1, 2011 |
| Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | January 1, 2011 |
| Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | Letter Agmt (BRISCOE CHIP EAST RANCH – NPRI) | January 5, 2012 |
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | Eagle Ford TX LP<br>Mitsui E&P Texas LP<br>SM Energy Company | Participation Agmt (APC EAGLEFORD COMM OF BEST PRACTICE) | July 29, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | Letter Agreement re IHS Community of Best Practices Agreement | July 30, 2014 |
| Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>Miramar Holdings, LP<br>Janey Briscoe Marmion<br>Rancho La Cochina Minerals, Ltd. | Letter Agmt (MIRAMAR HOLDINGS ET AL LTA DTD) | June 10, 2015 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | Letter Agmt (High Pressure Gas Lift Agrmt/ Chupadera) | May 27, 2014 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>El Toro Resources LLC | Confidentiality Agmt | July 1, 2016 |
| Anadarko E&P Onshore LLC | TXCO Rsources Inc. et al<br>Newfield Exploration Company | Purchase/Sale Agmt | January 10, 2010 |
| Anadarko E&P Onshore LLC | Fitzsimons Oil and Gas Management Trust;<br>Garza-Romanos Consulting Services LLC<br>L3 Mineral Management, LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | June 15, 2015 |
| Anadarko E&P Onshore LLC | Rogers Dentonio Ranch, Ltd.<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |

| PARTY NAME | COUNTERPARTY | TITLE OF CONTRACT | DATE |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc.<br>William A. Beinhorn | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | Maund Family Limited Partnership<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | South Spur, LP<br>Garza-Romanos Consulting Services LLC<br>Huddleston & Co., Inc. | Confidentiality Agmt | August 15, 2016 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2018-2019 | January 23, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>El Pescado Minerals, Ltd | Letter Agreement - Continuous Development Clause - Briscoe Chip East 2019-2020 | March 16, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Equity Trust Company Custodian FBO Harold T. Duperier III, IRA | Letter Agreement - Continuous Development Clause - La Bandera (duPerier) | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Fitzsimons Oil and Gas Management Trust | Letter Agreement - Continuous Development Clause - FOGMT 2020-2021 | March 16, 2020 |
| Gavilan Resources, LLC | Fitzsimons Oil and Gas Management Trust<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - FOGMT 2019-2020 | January 28, 2019 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2020-2021 (La Estancia) | February 5, 2020 |
| Gavilan Resources, LLC | La Estancia Investments, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 (La Estancia) | January 29, 2019 |
| Gavilan Resources, LLC | La Bandera Ranch, LP<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera 2019-2020 | January 29, 2019 |
| Gavilan Resources, LLC | UMC Investments, LLC<br>SN EF Maverick, LLC | Letter Agreement - Continuous Development Clause - La Bandera (UMC) 2020-2021 | February 5, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2019-2020 | February 11, 2019 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Maund Family Limited Partnership | Letter Agreement - Continuous Development Clause - Maund 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2020-2021 | February 19, 2020 |
| Gavilan Resources, LLC | SN EF Maverick, LLC<br>Rogers Dentonio Ranch, Ltd. | Letter Agreement - Continuous Development Clause - Rogers Dentonio 2019-2020 | February 26, 2019 |

(xii)

1. Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
3. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
4. Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.
5. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
6. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

**<u>Disclosure Schedule 3.05(b)</u>**
**Material Contract Defaults**

(i)

1. Default under the Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent, Swingline Lender and an Issuing Bank, as amended by the First Amendment to Credit Agreement dated February 28, 2018, the Second Amendment to the Credit Agreement dated April 13, 2018, the Third Amendment to Credit Agreement dated October 19, 2018 and the Fourth Amendment to Credit Agreement dated May 2, 2019.
2. Default under the Second Lien Credit Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, as the Borrower, the several Lenders from time to time parties thereto, and Citibank, N.A., as Administrative Agent and Collateral Agent.

(ii)

1. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and JPMorgan Chase Bank, N.A., as Collateral Agent and Administrative Agent.
2. Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC, in favor of Michael A. Kamauf, as Trustee for the benefit of JPMorgan Chase Bank, N.A. as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.
3. Collateral Agreement dated as of March 1, 2017, among Gavilan Resources, LLC, Gavilan Resources Holdco, LLC, each Grantor listed on Schedule I thereto, and Citibank, N.A., as Collateral Agent and Administrative Agent.
4. Second Lien Deed of Trust, Assignment of As-Extracted Collateral, Security Agreement, Fixture Filing and Financing Statement dated as of March 1, 2017, by Gavilan Resources, LLC in favor of Joseph Ruffini, as Trustee for the benefit of Citibank, N.A., in its capacity as Administrative Agent, for its benefit and the benefit of the Secured Parties with respect to all Deed of Trust Property and with respect to all UCC Collateral.

## .Disclosure Schedule 3.06(a)

## Approvals

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0616001-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0616002-001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 12/01/2005 | Assignment: Consent required. |
| T0619001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0623001 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 01/02/2007 | Assignment: Consent required. |
| T0623002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 04/24/2008 | Assignment: Consent required. |
| T0623004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0623005-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | BRISCOE RANCH INC | 10/02/2008 | Assignment: Consent required. |
| T0626002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | BRISCOE RANCH INC | 03/06/2006 | Assignment: Consent required. |
| T0619003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2010 | Assignment: Consent required. |
| T0626001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/15/2005 | Assignment: Consent required. |
| T0619015-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 03/01/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0622001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0622003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 06/10/2006 | Assignment: Consent required. |
| T0619006-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | DIANA M STUMBERG ET AL | 11/05/2008 | Assignment: Consent required. |
| T0618001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0618003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 10/25/2005 | Assignment: Consent required. |
| T0621001-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | EWING ENTERPRISES LIMITED PARTNERSH | 09/20/2006 | Assignment: Consent required. |
| T0621005 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT | 04/30/2014 | Assignment: Consent required. |
| T0621011 | Lease - Oil, Gas and Minerals | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL AND GAS MANAGEMENT T | 04/30/2014 | Assignment: Consent required. |
| T0621001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | FITZSIMONS OIL AND GAS MANAGEMENT T | 12/22/2005 | Assignment: Consent required. |
| T0617002-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | G E LIGHT III TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617001-002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT III, BILLIE RAE LIGHT TR | 10/29/2009 | Assignment: Consent required. |
| T0621001-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | LA BANDERA RANCH LP | 09/29/2006 | Assignment: Consent required. |
| T0617001-001 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | LIGHT MINERAL TRUST | 10/29/2009 | Assignment: Consent required. |
| T0618003-002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 10/25/2005 | Assignment: Consent required. |
| T0620002-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET | 03/06/2006 | Assignment: Consent required. |
| T0616001-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |
| T0616002-002 | Lease - Oil, Gas and Minerals | EDWARD G VAUGHAN | MOODY FOUNDATION ET AL | 12/01/2005 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0620001-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 03/06/2006 | Assignment: Consent required. |
| T0620003-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 03/06/2006 | Assignment: Consent required. |
| T0618003-003 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | THE SOUTH TEXAS CHILDRENS HOME | 10/25/2005 | Assignment: Consent required. |
| T0618005-001 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618010 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618014 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILL ALSTON BEINHORN | 12/15/2010 | Assignment: Consent required. |
| T0618002 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 03/06/2006 | Assignment: Consent required. |
| T0624001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | WORTHEY PROPERTIES LTD | 03/01/2009 | Assignment: Consent required. |
| T0624002 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | B L STANLEY LTD | 10/15/2008 | Assignment: Consent required. |
| T0617002-001 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | LIGHT MINERAL TRUST ET AL | 10/29/2009 | Assignment: Consent required. |
| T0617002-003 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-004 | Lease - Oil, Gas and Minerals | ST MARY LAND & EXPLORATION COMPANY | GEORGE E LIGHT JR AND SARAH LIGHT T | 10/29/2009 | Assignment: Consent required. |
| T0617001-003 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | RANCHO ENCANTADO LP | 10/29/2009 | Assignment: Consent required. |
| T0617001-005 | Lease - Oil, Gas and Minerals | ST MARY LAND AND EXPLORATION COMPAN | GEORGE E LIGHT III ET AL | 10/29/2009 | Assignment: Consent required. |
| T0616005 | Lease - Oil, Gas and Minerals | ROSETTA RESOURCES OPERATING LP | LESLIE EDDIE VIVION AND NANCY JOE V | 12/21/2009 | Assignment: Consent required. |
| T0621001-004 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | KATHLEEN FITZSIMONS LOVE ET AL | 01/17/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| T0621001-005 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | JACKSON BENJAMIN LOVE JR | 01/17/2012 | Assignment: Consent required. |
| T0620007 | Lease - Oil, Gas and Minerals | ANADARKO E&P COMPANY LP | STATE OF TEXAS MF-111277 | 07/20/2010 | Assignment: Consent required. |
| 1141199000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/4/2012 | Assignment: Consent required. |
| 1138496000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III | 3/5/2007 | Assignment: Consent required. |
| 1139504000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2006 | Assignment: Consent required. |
| 1139555000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/22/2010 | Assignment: Consent required. |
| 1139556000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 6/21/2010 | Assignment: Consent required. |
| 1139557000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | HUGH A FITZSIMONS III | 11/5/2009 | Assignment: Consent required. |
| 1139825000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139839000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139840000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1139841000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/1/2011 | Assignment: Consent required. |
| 1140225000 | O/G LSE-Surface Rights/Rentals | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 12/1/2011 | Assignment: Consent required. |
| 1140226000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 12/1/2011 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140230000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 12/1/2011 | Assignment: Consent required. |
| 1140231000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WORTHEY PROPERTIES LTD | 3/1/2009 | Assignment: Consent required. |
| 1140232000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | FITZSIMONS ENTITY ET AL | 12/22/2005 | Assignment: Consent required. |
| 1140233000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | MAUND FAMILY LIMITED PARTNERSHIP ET AL | 3/6/2006 | Assignment: Consent required. |
| 1140235000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 3/6/2006 | Assignment: Consent required. |
| 1140236000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | SOUTH SPUR LP | 3/6/2006 | Assignment: Consent required. |
| 1140237000 | Surface Use Agmt | ANADARKO E&P COMPANY LP | WILLIAM A BEINHORN JR FAMILY LTD | 3/6/2006 | Assignment: Consent required. |
| 1140411000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140412000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1140413000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140469000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1140663000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/22/2012 | Assignment: Consent required. |
| 1140664000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140665000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140666000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/20/2012 | Assignment: Consent required. |
| 1140667000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1140742000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140744000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/1/2012 | Assignment: Consent required. |
| 1140767000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 4/13/2012 | Assignment: Consent required. |
| 1140768000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/29/2011 | Assignment: Consent required. |
| 1140807000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1141016000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 2/10/2011 | Assignment: Consent required. |
| 1141017000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/29/2011 | Assignment: Consent required. |
| 1141018000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 1/31/2011 | Assignment: Consent required. |
| 1141135000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | ROGERS DENTONIO RANCH LTD | 12/20/2012 | Assignment: Consent required. |
| 1141139000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | MARY LOIS FRIDAY HULSMAN | 9/5/2012 | Assignment: Consent required. |
| 1141175000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/1/2012 | Assignment: Consent required. |
| 1141181000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141182000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141197000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 10/1/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141198000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/15/2012 | Assignment: Consent required. |
| 1141200000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/1/2012 | Assignment: Consent required. |
| 1141201000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | DOLPH BRISCOE III ET UX | 7/3/2012 | Assignment: Consent required. |
| 1141202000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 7/3/2012 | Assignment: Consent required. |
| 1141203000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/19/2012 | Assignment: Consent required. |
| 1141204000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 8/9/2012 | Assignment: Consent required. |
| 1141205000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141206000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/21/2012 | Assignment: Consent required. |
| 1141446000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 9/16/2010 | Assignment: Consent required. |
| 1141544000 | Right of Way/Easement/ Facility | ANADARKO E&P COMPANY LP | BRISCOE RANCH INC | 11/9/2011 | Assignment: Consent required. |
| 1141300000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/26/2013 | Assignment: Consent required. |
| 1141429000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | ROGERS DENTONIO RANCH LTD | 2/24/2013 | Assignment: Consent required. |
| 1141430000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 2/22/2013 | Assignment: Consent required. |
| 1141433000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | WILLIAM A BEINHORN JR FAMILY LIMITED PARTNERSHIP | 2/15/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141434000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | MAUND FAMILY LIMITED PARTNERSHIP | 4/1/2013 | Assignment: Consent required. |
| 1141447000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141448000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141449000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141450000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141451000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2013 | Assignment: Consent required. |
| 1141498000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/1/2013 | Assignment: Consent required. |
| 1141543000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/11/2013 | Assignment: Consent required. |
| 1141705000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141706000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2013 | Assignment: Consent required. |
| 1141733000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 7/24/2011 | Assignment: Consent required. |
| 1141740000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/9/2013 | Assignment: Consent required. |
| 1141743000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/8/2013 | Assignment: Consent required. |
| 1141771000 | Surface License / Permit | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1141872000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 9/30/2013 | Assignment: Consent required. |
| 1141879000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/19/2013 | Assignment: Consent required. |
| 1141887000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/1/2013 | Assignment: Consent required. |
| 1141888000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 10/1/2013 | Assignment: Consent required. |
| 1142037000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/1/2013 | Assignment: Consent required. |
| 1142038000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/1/2014 | Assignment: Consent required. |
| 1142040000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 11/25/2013 | Assignment: Consent required. |
| 1142041000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2013 | Assignment: Consent required. |
| 1142142000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 1/17/2014 | Assignment: Consent required. |
| 1142148000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142149000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142151000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BEINHORN JR FAMILY LIMTED PARTNERSHIP | 2/6/2014 | Assignment: Consent required. |
| 1142152000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142153000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/7/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1142154000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/25/2014 | Assignment: Consent required. |
| 1142258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 2/1/2014 | Assignment: Consent required. |
| 1142394000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 4/21/2014 | Assignment: Consent required. |
| 1142397000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142398000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142399000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/10/2014 | Assignment: Consent required. |
| 1142400000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1142401000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142402000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2014 | Assignment: Consent required. |
| 1142558000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/9/2014 | Assignment: Consent required. |
| 1340261000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 6/1/2014 | Assignment: Consent required. |
| 1347518000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |
| 1347530000 | Surface Use Agmt | ANADARKO E&P ONSHORE LLC | FITZSIMONS OIL & GAS MANAGEMENT TRUST | 4/30/2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1349965000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1350515000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 12/1/2014 | Assignment: Consent required. |
| 1350568000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2014 | Assignment: Consent required. |
| 1350582000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/1/2015 | Assignment: Consent required. |
| 1350613000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 3/1/2015 | Assignment: Consent required. |
| 1351039000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | DOLPH BRISCOE III ET UX | 2/12/2012 | Assignment: Consent required. |
| 1351042000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/5/2013 | Assignment: Consent required. |
| 1351043000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/16/2012 | Assignment: Consent required. |
| 1351044000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351045000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/1/2014 | Assignment: Consent required. |
| 1351046000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351047000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/11/2014 | Assignment: Consent required. |
| 1351064000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/20/2014 | Assignment: Consent required. |
| 1351250000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/29/2012 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| 1351252000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 8/1/2012 | Assignment: Consent required. |
| 1351254000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/19/2012 | Assignment: Consent required. |
| 1351255000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/23/2015 | Assignment: Consent required. |
| 1351256000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 9/2/2014 | Assignment: Consent required. |
| 1351258000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 7/26/2012 | Assignment: Consent required. |
| 1351259000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 4/14/2014 | Assignment: Consent required. |
| 1351260000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/23/2015 | Assignment: Consent required. |
| 1351285000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/11/2015 | Assignment: Consent required. |
| 1352817000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2014 | Assignment: Consent required. |
| 1352868000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 3/20/2015 | Assignment: Consent required. |
| 1354527000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 5/1/2015 | Assignment: Consent required. |
| 1354911000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 1/30/2015 | Assignment: Consent required. |
| 1360670000 | Right of Way/Easement/ Facility | ANADARKO E&P ONSHORE LLC | BRISCOE RANCH INC | 10/1/2015 | Assignment: Consent required. |
| 1140772000 | Right of Way/Easement/ Facility | KERR-MCGEE OIL & GAS ONSHORE LP | ADELA A SMITH FAMILY LIMITED PARTNERSHIP | 1/1/2011 | Assignment: Notice and fee required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| HIGH PRESSURE GAS LIFT AGMT - CHIP EAST | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP, and<br>El Pescado Minerals, Ltd. | February 26, 2015 | Assignment: Consent required. |
| Letter Agmt (BRISCOE RANCH LTA DTD 10/5/10) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc.<br>SM Energy Company | October 5, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE FRIDAY RANCH DTD 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE CHIP EAST RANCH 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | El Pescado Minerals, Ltd. | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MARY LOIS FRIDAY HULSMAN 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | Mary Lois Friday Hulsman | October 12, 2010 | Assignment: Consent required. |
| SOUTH TEXAS CHILDRENS HOME 10/12/10 (Letter Agmt) | Letter Agreement | Anadarko E&P Onshore LLC | South Texas Children's Home<br>SM Energy Company | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (MOODY NATIONAL BANK GALV 10/12/10) | Letter Agreement | Anadarko E&P Onshore LLC | The Moody National Bank of Galveston<br>The Moody Foundation | October 12, 2010 | Assignment: Consent required. |
| Letter Agmt (BRISCOE COCHINA WEST & COCHINA EAST) | Letter Agreement | Anadarko E&P Onshore LLC | Briscoe Ranch, Inc. | October 14, 2010 | Assignment: Consent required. |
| Letter Agmt (SECOND AMENDMENT (STUMBERG LEASE)) | Letter Agreement | Anadarko E&P Onshore LLC | Diana M. Stumberg<br>Eric B. Stumberg<br>L. Herbert Stumberg, Jr.<br>Stanifer Creek Minerals, Ltd.<br>Womack Mineral Holdings, Ltd.<br>Briscoe Ranch, Inc.<br>SM Energy Company | January 1, 2011 | Assignment: Consent required. |
| High Pressure Gas Lift Agrmt/ Chupadera | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P.,<br>Janey Briscoe Marmion GST Trust | May 27, 2014 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agreement | Marketing | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko E&P Onshore LLC;<br>Kerr Mcgee Oil & Gas Onshore LP | February 21, 2017 | Assignment: Consent required. |
| Crude Oil Production Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Natural Gas Liquids Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Residue Gas Marketing Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC | March 1, 2017 | Assignment: Notice required. |
| Second Amended and Restated Lease Dedication and Oil Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Second Amended and Restated Lease Dedication and Gas Gathering Agreement | Marketing | Gavilan Resources, LLC | Springfield Pipeline LLC | June 1, 2017 | Assignment: Consent required. |
| Joint 3D Seismic Acquisition Agreement (FOGMT) | Seismic | Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Vedado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | Seismic | Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>SN EF UnSub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Non-Exclusive Data Use License and Access Agreement (providing access to well cores) | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | March 1, 2017 | Assignment: Consent required. |
| Purchase and Sale Agreement | | Gavilan Resources, LLC, f/k/a Aguila Production, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore, LP;<br>SN EF Maverick, LLC;<br>SN EF UnSub, LP | January 12, 2017 | Assignment: Consent required. |
| Letter Agmt RECIPROCAL DATA EXCHANGE/CONFD. CHK | Seismic | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required. |
| Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | Seismic | Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | July 9, 2018 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | Seismic | Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | May 1, 2018 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina South | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift - Briscoe Catarina West | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd.,<br>Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | October 21, 2014 | Assignment: Consent required. |
| Letter Agreement High Pressure Gas Lift Agmt - Cat North | Letter Agreement | Anadarko E&P Onshore LLC | SM Energy Company,<br>Eagle Ford TX LP,<br>Mitsui E&P Texas LP,<br>Rancho La Cochina Minerals, Ltd., Miramar Holdings, L.P., and<br>Janey Briscoe Marmion, Trustee of the Janey Briscoe Marmion GST Trust | January 6, 2015 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Joint Development Agreement | Development Agreement | Gavilan Resources, LLC | Sanchez Energy Corporation;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |
| Geophysical and Seismic Data Use Agreement | Seismic | Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | April 15, 2018 | Assignment: Consent required. |
| Development Agreement | Marketing | Gavilan Resources, LLC | Anadarko E&P Onshore LLC;<br>Kerr-Mcgee Oil & Gas Onshore LP;<br>SN EF Maverick, LLC;<br>SN EF Unsub, LP | March 1, 2017 | Assignment: Consent required. |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Firm Gas Gathering, Processing and Purchase Agreement | Marketing | Gavilan Resources, LLC | Originally by and between SN EF Maverick, LLC Carnero G&P LLC | April 1, 2018 | Assignment: Consent potentially required.[4] |
| Ratification and Assumption Agreement | Marketing | Gavilan Resources, LLC | SN EF Maverick, LLC; Carnero G&P LLC | May 22, 2018 | Assignment: Consent potentially required.[5] |
| Firm Intrastate Gas Transportation Services Agreement | Marketing | Anadarko E&P Onshore LLC | Springfield Pipeline LLC | March 1, 2013 | Assignment: Notice required |

[4] Consent not required if (i) party acquiring all or substantially all of the assets of assigning party is directly or indirectly subject to the agreement or (ii) assignment is in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage, provided that the credit assurance requirements are continuously complied with by Producer and its assignee prior to and after any assignment by Producer. See Sec. 13.1(a)
[5] Consent requirement is identical to Firm Gas Gathering, Processing and Purchase Agreement consent requirement immediately above.

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Gathering, Processing and Purchasing Agreement (Dedication) | Marketing | Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | September 1, 2008 | Assignment: Notice required |
| Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | Letter Agreement | Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | August 21, 2018 | Assignment: Consent required |
| Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | Seismic | Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | May 21, 2012 | Assignment: Consent required |
| IHS Community of Best Practices Agreement | Data sharing | Anadarko E&P Onshore LLC | IHS Global Canada, Ltd | July 30, 2014 | Assignment: Consent required |

| AGREEMENT | AGREEMENT TYPE | PARTY | COUNTERPARTY | DATE | ACTION REQUIRED |
|---|---|---|---|---|---|
| Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | Data sharing | Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | August 20, 2015 | Assignment: Consent required |
| Purchase/Sale Agmt | Purchase Agreement | Anadarko E&P Onshore LLC | TXCO Resources Inc. et al<br>Newfield Exploration Company | January 10, 2010 | Assignment: Consent required |

**<u>Disclosure Schedule 3.07</u>**

**Environmental Matters**

None.

Case 4:20-cv-00558 Document 36-6 Filed on 11/16/20 Page 420 of 432

**<u>Disclosure Schedule 3.08</u>**
**Well Status**

None.

**<u>Disclosure Schedule 3.09</u>**
**Imbalances**

None.

Case 23-30658 Document 363-6 Filed 10/16/20 Page 42 of 432

# Disclosure Schedule 3.12
## Intellectual Property

| Party Name | Counterparty | Title of Contract | Date of Contract |
|---|---|---|---|
| Anadarko E&P Company LP | TXCO Energy Corp. | Joint Exploration Agreement | March 1, 2008 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | Geophysical and Seismic Data Use Agreement | April 15, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>Fitzsimons Oil and Gas Management Trust;<br>Eagle Ford TX LP;<br>Venado EF LP;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development LLC;<br>Etna Energy LLC;<br>SN EF UnSub Holdings, LLC | First Amendment to Geophysical and Seismic Data Use Agreement | December 5, 2018 |
| Gavilan Resources LLC | SN EF Maverick, LLC;<br>SN EF Unsub, LP;<br>Anadarko Petroleum Corporation | Non-Exclusive Data Use License and Access Agreement | March 1, 2017 |
| Gavilan Resources, LLC (fka Aguila Production, LLC) | SN EF Maverick, LLC;<br>Anadarko Petroleum Corporation | Non-Exclusive Seismic Data Use License Cochina 3D; Pelon 3D DID# | March 1, 2017 |
| Gavilan Resources LLC | SN EF Maverick LLC;<br>SN EF UnSub, LP;<br>Eagle Ford TX, LP;<br>Venado EF L.P.;<br>Mitsui E&P Texas LP;<br>ENG San Miguel Development, LLC;<br>Etna Energy, LLC | Joint 3D Seismic Acquisition Agreement | May 1, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (COCHINA 3D SEISMIC) | April 25, 2012 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Amendment to Seismic Agmt & Options (COCHINA 3D SEISMIC) | July 1, 2014 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas LP | Second Amendment (Proprietary Survey) to Geophysical Data-Use Agreement | October 1, 2016 |
| Anadarko E&P Onshore LLC | St. Mary Land and Exploration Company | SEISMIC DATA USE LICENSE AGREEMENT | May 1, 2010 |
| Anadarko E&P Onshore LLC | SM Energy Company<br>Eagle Ford TX LP<br>Mitsui E&P Texas, LP | Confidentiality Agmt (Data Exchange, Confidentiality Agr, Amend to JOA) | June 23, 2016 |
| Anadarko E&P Onshore LLC | Mitsui E&P Texas LP<br>SN Catarina, LLC<br>SM Energy Company<br>Eagle Ford TX LP | Well Data Exchange Agmt (SN CATARINA LLC WELL DATA EXCH & CONF AGMT) | August 20, 2015 |
| Gavilan Resources, LLC | Shape Ranch, Ltd.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (SEISMIC SURFACE ACCESS AGREEMENT - SHAPE RANCH) | May 1, 2018 |
| Gavilan Resources, LLC | Wesley West Minerals, Ltd.<br>James Wendell West<br>Faith Ranch, L.P.<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP<br>ENG San Miguel Development, LLC<br>ETNA Energy, LLC | Letter Agmt (GEOPHYSICAL EXPLORATION AGREEMENT - FAITH RANCH) | July 9, 2018 |
| Gavilan Resources, LLC | Chesapeake Operating, LLC<br>Jamestown Resources, LLC<br>SN EF Maverick, LLC<br>SN EF UnSub, LP<br>Eagle Ford TX, LP<br>Venado EF L.P.<br>Mitsui E&P Texas LP | Letter Agmt (RECIPROCAL DATA EXCHANGE/CONFD. CHK) | August 21, 2018 |
| Anadarko E&P Onshore LLC | SM Energy Company | Confidentiality Agmt (MICRO SEISMIC DATA – GALVAN) | October 5, 2010 |

| | | | |
|---|---|---|---|
| Anadarko E&P Onshore LLC | Micro-Strat Inc.<br>SM Energy Company<br>Eagle Ford Texas LP<br>Mitsui E&P Texas LP | Seismic Agmt & Options (DATA LICENSE AGR W/MICRO-STRAT INC) | May 21, 2012 |

**<u>Disclosure Schedule 3.14</u>**

**Taxes**

None.

# Disclosure Schedule 3.17
## Preferential Purchase Rights

1. Tag-Along Right provided in Maverick Basin Area Participation Agreement dated as of January 1, 2011, by and among Anadarko E&P Company LP, Kerr-McGee Oil & Gas Onshore LP and Eagle Ford TX LP.
2. Tag-Along Right and Right of First Offer provided in Joint Development Agreement, dated March 1, 2017, by and among Gavilan Resources, LLC, SN EF Maverick, LLC, SN EN Unsub, LP and Sanchez Energy Corporation (solely with respect to Section 2.2, 4.2, 4.5 and Article VII).

**Disclosure Schedule 3.20**
**Working Interest Payments**

None.

**<u>Disclosure Schedule 3.22</u>**
**Violations of Applicable Laws**

None.

# EXHIBIT 22

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | (Jointly Administered) |

**STIPULATION REGARDING LIMITED OBJECTION AND RESERVATION OF RIGHTS OF GAVILAN RESOURCES, LLC TO ASSUMPTION AND REJECTION OF CONTRACTS UNDER SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SANCHEZ ENERGY CORPORATION AND ITS DEBTOR AFFILIATES**
[Related to Dkt. No. 1346]

This *Stipulation Regarding Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* (the "Stipulation") is made between Gavilan Resources, LLC ("Gavilan"), SN EF Maverick, LLC ("SN Maverick"), and Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) ("Mesquite"),

[1] The Reorganized Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

Case 19-34508 Document 1758 Filed in TXSB on 11/12/20 Page 12 of 15

(Gavilan, SN Maverick, and Mesquite are each a "Party" and collectively the "Parties" to this Stipulation).

**RECITALS**

WHEREAS, the Parties have been involved in disputes concerning the Joint Development Agreement dated March 1, 2017 (as amended or supplemented) ("JDA") and the right to serve as operator under certain joint operating agreements;

WHEREAS, the Parties are involved in the following pending matters:

(a) Case No. 19-34508, *In re Sanchez Energy Corporation, et al*., pending in this Court ("Sanchez Bankruptcy Case"), involving the contested matter of the motion to reject, *inter alia*, the JDA ("JDA Rejection Matter") [*See* Dkt No. 1346];

(b) Case No. 20-32656, *In re Gavilan Resources, LLC, et al*., pending in this Court ("Gavilan Bankruptcy Case");

(c) Adversary Proceeding No. 20-03021, *Gavilan Resources, LLC v. SN EF Maverick, LLC, et al.*) (filed in the Sanchez Bankruptcy Case) ("Gavilan-SN Maverick Adversary Proceeding"), in which this Court entered a Final Judgment on July 13, 2020 (the "July 2020 Judgment") [Dkt. No. 90], finding that SN Maverick committed two Defaults (as defined in the JDA) under the JDA;

(d) Adversary Proceeding No. 20-03378, *SN EF Maverick, LLC v. Gavilan Resources, LLC* (pending in the Gavilan Bankruptcy Case) ("SN Maverick-Gavilan Adversary Proceeding");

(e) Adversary Proceeding No. 20-03307, *Gavilan Resources, LLC* v. *SN EF Maverick, LLC* (filed in the Gavilan Bankruptcy Case) ("Gavilan Dec Action"), in which this Court entered a Final Declaratory Judgment (the "August 2020 Judgment") [Dkt. No. 15], which confirmed that SN Maverick is presently the operator under the applicable joint operating agreements and affords

Gavilan the right to cause SN Maverick to resign as operator and to designate itself or its successor as the operator under the applicable joint operating agreements, subject to the terms of those operating agreements;

(f) Case No. 4:20-cv-2640, *SN EF Maverick, LLC et al. v. Gavilan Resources, LLC* (pending in the United States District Court for the Southern District of Texas) ("District Court Case"), which is the appeal of the July 2020 Judgment;

WHEREAS, Gavilan has a pending *Limited Objection and Reservation of Rights of Gavilan Resources, LLC to Assumption and Rejection Of Contracts Under Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* ("Gavilan Objection") to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, dated April 30, 2020 (as amended or supplemented from time to time, the "Sanchez Plan");

WHEREAS, on October 16, 2020 in the Gavilan Bankruptcy Case, the Court entered an order approving the sale of Gavilan's assets to Mesquite or its designee [Dkt. 361, Gavilan Bankruptcy Case] (the "Sale Order"), which incorporated the executed Asset Purchase Agreement between Gavilan and Mesquite (the "APA") [Dkt. No. 366, Gavilan Bankruptcy Case];

WHEREAS, upon the closing of the APA, Gavilan no longer owns the assets for which the August 2020 Judgment states it has the right to designate itself or its successor as the operator;

WHEREAS, as of closing of the APA, Mesquite or its designee, as applicable, is Gavilan's successor to those assets;

WHEREAS, as of closing, Mesquite or its designee maintain the right to direct Gavilan or Gavilan's successor as it concerns the treatment of the JDA;

WHEREFORE, in connection with the APA, the Parties executed a Release Agreement (the "Release"), which among other things, (i) releases and forever discharges rights, claims, and causes of action in connection with the JDA and operator dispute of the Parties, including their affiliates, which includes SN Maverick and (ii) requires the Parties to transfer, assign, or otherwise dispose of any right or interest each Party may have in any Claims (as defined in the Release);

WHEREAS, in connection with the APA and Release, the Parties agreed to dismiss with prejudice all pending litigation between them, including the Gavilan-SN Maverick Adversary Proceeding, the SN Maverick-Gavilan Adversary Proceeding, the Gavilan Dec Action, and the District Court Case, and

WHEREAS, also in connection with the APA and the Release, the Parties agreed to resolve the JDA Rejection Matter.

**STIPULATION**

NOW THEREFORE, the Parties agree and stipulate as follows:

1. Gavilan withdraws with prejudice the Gavilan Objection, including, but not limited to, any objections to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

2. Gavilan consents to the assumption or rejection of, as applicable, any contracts to which Gavilan is a party or has an interest, pursuant to the Sanchez Plan.

Date: November 12, 2020

Case 19-34508 Document 1768 Filed in TXSB on 11/12/20 Page 5 of 5

**AGREED AND ACCEPTED**:

FOLEY & LARDNER LLP

*/s/ John P. Melko*
John P. Melko
State Bar No. 13919600
Email: jmelko@foley.com
Sharon M. Beausoleil
State Bar No. 24025245
Email: sbeausoleil@foley.com
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone: 713-276-5500
Facsimile: 713-276-5555

and

MORRISON & FOERSTER LLP

Jamie A. Levitt (admitted Pro hac vice)
Michael D. Birnbaum (admitted Pro hac vice)
James E. Hough (admitted Pro hac vice)
Dennis L. Jenkins (admitted Pro hac vice)
Brett H. Miller (admitted Pro hac vice)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: jlevitt@mofo.com
mbirnbaum@mofo.com
jhough@mofo.com
djenkins@mofo.com
brettmiller@mofo.com

**ATTORNEY FOR REORGANIZED DEBTORS**

WEIL, GOTSHAL & MANGES LLP

*/s/ Alfredo R. Pérez*
Alfredo R. Pérez (TX 15776275)
Brenda Funk (TX 24012664)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: 713-546-5000
Facsimile: 713-224-9511
Emails: Alfredo.Perez@weil.com; Brenda.Funk@weil.com

**ATTORNEYS FOR GAVILAN RESOURCES, LLC**

# EXHIBIT 23

ENTERED
10/16/2020

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **GAVILAN RESOURCES, LLC,** | § | **Case No. 20-32656 (MI)** |
| | § | |
| **Debtors.**[1] | § | **(Jointly Administered)** |
| | § | **Re: Docket No. 99** |

**ORDER (A) APPROVING SALE OF DEBTORS' ASSETS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

Upon the motion, dated June 4, 2020 [Docket No. 99] (the "**Motion**"),[2] of Gavilan Resources, LLC ("**Gavilan**") and its debtor affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") seeking an order (a) approving sale of Debtors' assets, (b) authorizing assumption and assignment of executory contracts and unexpired leases, and (c) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Gavilan Resources, LLC (6688); Gavilan Resources HoldCo, LLC (6425); Gavilan Resources Holdings, LLC (4496); and Gavilan Resources Management Services, LLC (3961). The Debtors' mailing address is 920 Memorial City Way, Suite 1400, Houston, Texas 77024.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the Bid Procedures (as defined herein), or the APA (as defined herein), as applicable.

such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion, and this Court having entered the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (as further amended and modified, the "**Bid Procedures Order**"); and the Auction having been held in accordance with the *Notice of Amended Bid Procedures Order Dates and Reset Video/Telephonic Sale Hearing* [Docket No. 294] on September 29, 2020 and concluding on October 2, 2020, and Mesquite Energy, Inc. (together with any affiliate of Mesquite Energy, Inc., to which the Oil and Gas Properties are assigned at Closing pursuant to the APA, the "**Buyer**") having been chosen as the Successful Bidder for the Assets; and upon the Buyer and the Debtors having agreed to the terms of that certain Asset and Purchase Agreement (together with all ancillary documents, as may be amended, modified, or supplemented, the "**APA**");[3] and this Court having reviewed the *Declaration of Kevin Bonebrake in Support of Approval of and Entry into Sale Transaction* [Docket No. 329]; and this Court having conducted a hearing on October 8, 2020 (the "**Sale Hearing**") to consider the relief requested in the Motion as set forth in this order (the "**Sale Order**"), including the objections to the Motion filed by the Oxy Parties [Docket No. 332] (the "**Oxy Objection**") and the WES Parties [Docket No. 333] (the "**WES Objection**") (with the "Oxy Parties" and the "WES Parties" each as defined as set forth in the Oxy Objection and the WES Objection, respectively); and all parties in interest having been heard or having had the opportunity to be heard regarding the Motion, the Sale Transaction (as defined in the Sale Notice), APA, and all relief set forth herein; and all objections, if any, to the Motion having been withdrawn, resolved, or overruled on the merits except as set forth herein; and upon the record of the Sale Hearing and all of the proceedings had before this Court; and this Court having determined

3 A copy of the APA is attached hereto as **Exhibit I**.

that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interest of the Debtors and their respective estates and creditors; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. **Fed. R. Bankr. P. 7052**. The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction**. The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. Without limiting the generality of the foregoing, this Court has exclusive *in rem* jurisdiction over the Assets pursuant to 28 U.S.C. § 1334(e), as such Assets are property of the Debtors' chapter 11 estates and, as a result of such jurisdiction, this Court has all necessary power and authority to grant the relief contained herein. This is a core proceeding within the meaning of 28 U.S.C. § 157(b) and, as such, this Court has the authority to enter a final order.

C. **Venue**. Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates**. The statutory and legal predicates for the relief requested in the Motion are sections 105, 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules and the *Procedures for Complex Cases in the Southern District of Texas*.

Case 20-32656 Document 359-1 Filed on 10/16/20 in TXSB Page 4 of 39

E. **Notice and Opportunity to Object**. Notice of the Motion, the Bid Procedures, the assumption and/or assignment of the Desired 365 Contracts, the APA, the Auction, the Sale Hearing, and the deadlines related thereto, including any subsequent modifications, was provided to: (i) the United States Trustee for the Southern District of Texas; (ii) counsel for the Administrative Agent to the First Lien Secured Lenders; (iii) counsel for the Second Lien Ad Hoc Group; (iv) counsel for the Administrative Agent for the Second Lien Lenders; (v) all affected federal, state, and local regulatory and taxing authorities; (vi) the U.S. Attorney's Office for the Southern District of Texas; (vii) the Internal Revenue Service; (viii) the counterparties to the 365 Contracts and all Leases and other applicable contracts, (ix) all parties that have requested notice pursuant to Bankruptcy Rule 2002; and (x) all parties entitled to notice pursuant to Local Rule 9013-1(d) (collectively, the "**Sale Notice Parties**"), all in accordance with and as provided by the *Order Establishing Bid Procedures Relating to the Sale of the Debtors' Assets* [Docket No. 115] (the "**Bid Procedures Order**"). *See* Affidavit of Service of Angharad Bowdler [Docket No. 143]. The Debtors also posted the Sale Notice on Epiq Corporate Restructuring LLC's website (https://dm.epiq11.com/case/gavilan/info). With respect to entities whose identities were not reasonably ascertained by the Debtors, publication of the Sale Notice in the *News Gram*, published in Maverick County, Texas, the *Laredo Morning Times*, published in Webb County, Texas, the *Carrizo Springs Javelin*, published in Dimmit County, Texas, the *Zavala County Sentinel*, published in Zavala County, Texas, the *San Antonio Express News*, published in Bexar County, Texas, and the *Frio-Nueces Current*, published in Frio and La Salle Counties, Texas, in June 2020, was sufficient and reasonably calculated under the circumstances to reach such entities. *See* Affidavits Regarding Publication [Docket Nos. 261–66]. Service and publication of the Sale Notice was appropriate, in full compliance with the Bid Procedures Order, and reasonably

calculated to provide all Sale Notice Parties with good and sufficient notice of the Sale Transaction and the APA by and between the Debtors and the Buyer, and provided a reasonable opportunity to object, and no further notice need be provided.

F. Service and publication of the Sale Notice was provided to all parties in interest, including those with one or more alleged preferential purchase rights listed on Disclosure Schedule 3.17 of the APA, including the Tag-Along Right provided in the Maverick Basin Area Participation Agreement and the Tag-Along Right and Right of First Offer provided in the Joint Development Agreement (the "**Preferential Purchase Rights**"), and those with one or more rights based on any alleged approval or consent right or anti-assignment provision contained in an Applicable Contract, Lease, or other Purchased Contract ("**Consent Rights**") with a reasonable and adequate opportunity to object, all as described more fully in sections 2.12–2.14 of the APA. *See* Affidavit of Service of Angharad Bowdler of Epiq Corporate Restructuring, LLC [Docket No. 143].

G. The Debtors served notice substantially in the form of the *Notice of Designation of Successful Bid and Back-up Bid* [Docket No. 311] (the "**Post-Auction Notice**") on all parties entitled to receive such notice under the Bid Procedures Order and applicable rules. *See* Affidavit of Service of Angharad Bowdler [Docket No. 316]. Service of the Post-Auction Notice was appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the conclusion of the Auction and the identity of the Successful Bid.

H. The Debtors filed the Assumption and Assignment Notice and posted it on the case website at (https://dm.epiq11.com/case/gavilan/info). Service of the Assumption and Assignment Notice on all counterparties to the 365 Contracts and all parties on the Rule 2002 Notice List was appropriate and good and sufficient notice of the proposed assumption and

assignment of the Desired 365 Contracts, the applicable Cure Amounts (as defined in the Bid Procedures) related thereto, and the procedures for objecting thereto, and no other or further notice is necessary. All counterparties to 365 Contracts that are Desired 365 Contracts have had an adequate opportunity to object to the assumption and assignment of such 365 Contracts and the Cure Amounts related thereto.

I. The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures, the Bid Procedures Order, the APA, the assumption and/or assignment to the Buyer of the Assets (including the Desired 365 Contracts, the Leases, and the Other Purchased Contracts) the Auction, the Sale Hearing, the Sale Transaction, the Cure Amounts, the deadlines to submit an objection, and all other deadlines related thereto, is or shall be required.

J. **Assets Property of the Estate**. The Assets sought to be sold and assigned by the Debtors to the Buyer pursuant to the APA are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

K. **Sufficiency of Marketing**. The Debtors and their professionals, (i) marketed the Assets and conducted the marketing and sale process as set forth in, and in accordance with, the Motion and the Bid Procedures and (ii) conducted a fair and open sale process. The sale process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Assets, and the process conducted by the Debtors (with the assistance of their advisors) pursuant to the Bid Procedures Order and the Bid Procedures obtained the highest or best value for the Assets, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Assets. Based upon the record of these proceedings, all creditors and other

parties in interest and all prospective buyers have been afforded a reasonable and fair opportunity to bid for the Assets, seek to exercise any alleged Preferential Purchase Rights, or submit an objection to the assumption and/or assignment of any Asset, as the case may be. The marketing process undertaken by the Debtors and their professionals and each of their respective agents and other representatives with respect to the Assets has been adequate and appropriate and reasonably calculated to maximize the value for the benefit of all stakeholders in all respects.

L. **APA**. On October 2, 2020, the Debtors and the Buyer agreed to the terms of the APA, attached hereto as **Exhibit I**. The transaction contemplated by the APA constituted a Qualifying Bid and the Buyer constituted a Qualified Bidder and ultimately Successful Bidder, each in accordance with the Bid Procedures.

M. **Bid Procedures**. The Bid Procedures were substantively and procedurally fair to all parties and all potential bidders and afforded notice and a full, fair, and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Assets, and represent the best method for maximizing the value of the Debtors' estates. The Debtors conducted the sale process (including the Auction) without collusion and in accordance with the Bid Procedures.

N. **Auction**. The Auction began on September 29, 2020 and concluded on October 2, 2020. A total of four parties participated in the Auction. Following the bidding, the Debtors determined the highest, or otherwise best bid and designated the Buyer as the Successful Bidder.

O. On October 2, 2020, the Debtors filed the Post-Auction Notice identifying the Buyer as the Successful Bidder for the Assets in accordance with the Bid Procedures Order. *See* Docket No. 311. As established by the record of the Sale Hearing, the bidding and related

procedures established by the Bid Procedures Order have been complied with in all material respects by the Debtors and the Buyer and all of its affiliates.

P. **Corporate Authority**. Subject to and giving effect to the entry of this Order, the Debtors (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, (ii) have all of the power and authority necessary to consummate the Sale Transaction, and (iii) have taken all corporate action necessary to authorize and approve the APA and any actions required to be performed by the Debtors to consummate the Sale Transaction. No consents or approvals of the Debtors, other than those expressly provided for in the APA or this Sale Order, are required for the Debtors to consummate the Sale Transaction.

Q. **Sound Business Purpose; Sale Highest or Best Offer**. Entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, creditors, and all parties in interest. This Court finds that the Debtors have articulated good and sufficient business reasons justifying the sale of the Assets to the Buyer pursuant to the terms and conditions set forth in the APA. Additionally (i) the total consideration provided by the Buyer for the Assets as reflected in the APA is the highest or best offer for the Assets, (ii) the APA and the Closing thereon presents the best opportunity to realize the maximum value of the Assets and avoid a decline and devaluation of the Assets, (iii) there is risk of deterioration of the value of the Assets if the Sale Transaction is not consummated promptly, (iv) the APA and the consummation of the Sale Transaction will provide a greater recovery for the Debtors' creditors than would be provided by any other presently available alternative, and (v) the Debtors' entry into the APA and consummation of the Sale Transaction is reasonable and appropriate under the circumstances.

R. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for consummating the Sale Transaction prior to, and outside of, a plan of reorganization. The Debtors' decision to enter into the APA and consummate the Sale Transaction constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers. Because the entry into the APA and consummation of the Sale Transaction constitutes the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction.

S. **Arm's-Length Sale and Buyer's Good Faith**. The APA was negotiated and is undertaken by the Debtors and Buyer at arm's length, without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Buyer (i) recognizes that the Debtors were free to deal with any other party interested in acquiring the Assets and (ii) willingly subjected its bid to the Bid Procedures. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale Transaction have been disclosed and the Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. As a result of the foregoing, the Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed

or modified on appeal, and the Buyer has proceeded in good faith in all respects in connection with the Sale Transaction specifically and these chapter 11 cases generally.

T. **No Fraudulent Transfer**. The total consideration provided by the Buyer pursuant to the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code Ann. § 24.004-006 (West 2019), and any other applicable law and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The APA was not entered into, and the Sale Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtors nor the Buyer have entered into the APA or is consummating the Sale Transaction with any fraudulent or otherwise improper purpose.

U. **Free and Clear Transfer Required by Buyer**. If the Debtors did not sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than the Assumed Liabilities (as defined in Exhibit A to the APA) and Permitted Liens (as defined in Exhibit I to the APA), to the extent provided in the APA, such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale Transaction. The Buyer would not have submitted a bid, entered into the APA, and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, their creditors, and holders of their equity interests if the Sale Transaction and the assignment of the Assets, including the Purchased Contracts and Leases, to the Buyer were not free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA.

V. As of the Closing, pursuant and subject to the terms of the APA and this Sale Order, the Sale Transaction will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Buyer with all of the Debtors' rights, title, and interests in the Assets free and clear of all claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order.

W. **<u>Satisfaction of Section 363(f) Standards</u>**. The Debtors are authorized to sell the Assets free and clear of all claims, encumbrances, Liens or Liabilities, other than Assumed Liabilities and Permitted Liens in accordance with the terms of the APA (with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) because, with respect to each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a claim, encumbrance, Lien or Liability in the Assets (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction, (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability, or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those holders of claims, encumbrances, Liens or

Liabilities who did not object (or who ultimately withdrew their objections, if any) to the Sale Transaction or the Motion are deemed to have consented to the Motion and Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Creditors or other persons or entities asserting a claim, encumbrance, Lien or Liability in or against the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such claim, encumbrance, Lien or Liability. Those holders of claims, encumbrances, Liens or Liabilities who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code by having their claims, encumbrances, Liens or Liabilities, if any, in each instance against the Debtors, their estates, or any of the Assets (other than Preferential Purchase Rights) attach to the proceeds of the Sale Transaction ultimately attributable to the Assets in which such holder alleges a claim, encumbrance, Lien or Liability, with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

X. **<u>No Successor Liability</u>**. Neither the Buyer nor any of its affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyer nor any of its affiliates shall assume, or in any way be responsible for, any liability or obligation of any of the Debtors and/or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; *provided* that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of

any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

Y. **Purchase Price Allocation**. Pursuant to the APA, the allocation of the Purchase Price and any Assumed Liabilities contemplated thereby after the Closing (the "**Allocation**") is a reasonable resolution of the issues among the Debtors and the Buyer with respect to the Allocation and shall constitute a good faith compromise and settlement of all claims, encumbrances, Liens or Liabilities in connection with the Allocation. The Motion shall be deemed a motion to approve the good faith compromise and settlement of all such claims, encumbrances, Liens or Liabilities, and the entry of the Sale Order shall constitute the Court's approval of such compromise and settlement, as well as a finding by the Court that such settlement and compromise is a valid exercise of the Debtors' business judgment, fair, equitable, reasonable and in the best interests of the Debtors and their estates.

Z. **Assigned Contracts and Leases**. Subject to paragraph 25 herein, each and every provision of the Assigned Contracts and Leases or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract or Lease has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code. All counterparties of the Assigned Contracts or Leases that did not, or do not as permitted under paragraph 25 of this Sale Order, timely file an objection to the assumption and/or assignment of the Assigned Contract(s) or Lease(s) to which they are a counterparty are deemed to consent to the assumption and/or assignment by the Debtors of their Assigned Contract or Lease to the Buyer, and the Buyer shall

enjoy all of the rights and benefits under each such Assigned Contract or Lease as of the applicable date of assumption and assignment without the necessity of obtaining such non-debtor party's written consent to the assumption or assignment thereof. Upon the assignment and sale to the Buyer in accordance with the terms of the APA, the Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts or Leases prohibiting or otherwise restricting assignment or transfer, and the Debtors, their estates, or any of their predecessors, successors, or assigns, shall have no further liability or obligation under the Assigned Contracts or Leases other than as to any Excluded Liabilities thereunder. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and/or assign the Assigned Contracts and Leases to the Buyer in connection with the consummation of the Sale Transaction, and the assumption and/or assignment of the Assigned Contracts and Leases is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Assigned Contracts and Leases being assigned to the Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and/or assignment is reasonable and an enhancement to the value of the Debtors' estates.

AA. **Cure/Adequate Assurance**. Pursuant to the APA, the Cure Costs (other than Excess Cure Costs), if any, will be paid by the Buyer in accordance with the terms of the APA. The Buyer has demonstrated adequate assurance of future performance of each 365 Contract listed on the 365 Schedule that is an Assigned Contract within the meaning of section 365 of the Bankruptcy Code, by the Buyer or any of its permitted assignees to which such 365 Contract is assumed and assigned by the Debtors, including a commitment of performance with respect to the

Desired 365 Contracts from and after the Closing. The Cure Costs are deemed the amounts necessary to "cure" (within the meaning of section 365(b)(l) of the Bankruptcy Code) all "defaults" (within the meaning of section 365(b) of the Bankruptcy Code) under such 365 Contracts that are Assigned Contracts. The Buyer's payment of Cure Costs in accordance with the terms of the APA and commitment under the APA of performance with respect to the Desired 365 Contracts from and after the Closing shall constitute adequate assurance of future performance under such 365 Contracts. Except as set forth herein, any objections to the Cure Costs with respect to the Desired 365 Contracts are hereby overruled. The Debtors are authorized to resolve any pending Cure Disputes (as defined in the Bid Procedures) without need for further order of the Court. To the extent that any counterparty failed to timely object to its Cure Cost or to raise any other alleged default or breach of contract, such counterparty is deemed to have consented to such Cure Cost and to the assignment of its respective 365 Contract(s) to the Buyer and to have waived any other defaults or breaches. Notwithstanding the Cure Cost (including Cure Costs assigned no value) with respect to any particular Assigned Contract with, one or more of, Eagle Ford TX LP, Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF LP and its subsidiaries), Mitsui E&P Texas LP, or SN EF UnSub, LP (collectively, the "**WI Owner Contracts**"), and notwithstanding anything to the contrary in this or any other Order, as part of the adequate assurance for assumption and assignment of such WI Owner Contracts, (i) all obligations attributable to Gavilan arising under any such WI Owner Contracts in the ordinary course of business (including without limitation obligations arising from audits, balance of payments, true-ups, joint-interest billings, or other adjustments or reconciliations of the respective interests of the contract counterparties, collectively the "**Ordinary Course Obligations**"), whether arising before or after the Petition Date, shall be honored in the ordinary

course of business and paid by Buyer in accordance with the terms of the applicable WI Owner Contracts, and (ii) all rights attributable to Gavilan arising under any such WI Owner Contracts for Ordinary Course Obligations, whether arising before or after the Petition Date, shall accrue to the benefit of Buyer. The Court finds that with respect to all 365 Contracts that are Assigned Contracts, the payment of the Cure Costs as provided in the APA is reasonable and appropriate and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Buyer, of each 365 Contract that is an Assigned Contract to be assumed and assigned to the Buyer as of the Closing.

BB. **Assets Assignable**. Each and every provision of the documents governing the Assets or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been, or (subject to and in accordance with paragraph 25 of this Sale Order) will be (in accordance with paragraph 25 of this Sale Order), satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code in respect of the assignment pursuant to the Sale Transaction.

CC. **No Sub Rosa Plan**. The APA and the Sale Transaction do not constitute a *sub rosa* chapter 11 plan. The APA neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a chapter 11 plan for the Debtors.

DD. **Final Order**. Time is of the essence in consummating the Sale Transaction. In order to maximize the value of the Debtors' Assets, it is essential that the sale and assignment of the Debtors' Assets occur within the time constraints set forth in the APA and the Bid Procedures Order. This Sale Order constitutes a final order within the meaning of

28 U.S.C. § 158(a). Buyer, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the transactions contemplated by the APA at any time subject to the terms and conditions of the APA.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

1. **Objections Overruled**. All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise resolved as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice. All objections to the entry of this Sale Order or to the relief granted herein that were not timely filed are hereby forever barred.

2. **Approval**. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the APA, the other Transaction Documents, the sale, assignment, conveyance and deliverance by the Debtors of all of the Debtors' right, title, and interest in and to the Assets to the Buyer as of the Closing are hereby approved, and the Debtors are authorized and directed to consummate the Sale Transaction, including the sale, assignment, conveyance and deliverance of all of the Debtors' right, title, and interest in, to, and under the Assets to the Buyer free and clear of any and all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) in accordance with the terms of and subject to the satisfaction or waiver of the conditions to the Debtors' obligations to consummate the Sale Transaction set forth in the APA, with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors and the Buyer are each hereby authorized and directed to take any and all actions necessary or

appropriate to (i) consummate the Sale Transaction, (ii) enter into the Transaction Documents, (iii) assume and/or assign the Assigned Contracts, including the Desired 365 Contracts (as defined in the APA) listed on the 365 Schedule, all other Applicable Contracts (as defined in the APA) that are not 365 Contracts, and Leases subject to paragraph 25 of this Sale Order, (iv) perform the obligations of the Debtors under the APA, the other Transaction Documents, and any and all additional instruments and documents that may be contemplated by or reasonably necessary or desirable to implement the APA and consummate, implement, and close fully the Sale Transaction and the other transactions contemplated thereby prior to or after the Closing without further order of this Court, and (v) enforce the terms of this Sale Order. The Buyer and the Debtors shall have no obligation to consummate the Sale Transaction except as is contemplated by and provided for in the APA. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Transaction Document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

3. **Binding Effect of Sale Order**. This Sale Order and the APA shall be binding in all respects upon the Debtors, their estates, all creditors of, and holders of equity interests in, the Debtors, any holders of claims, encumbrances, Liens or Liabilities in, against, or on all or any portion of the Assets (whether known or unknown), the Buyer and respective successors and permitted assigns of the Buyer, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the APA shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered and/or a

Liquidating Trust is formed in these chapter 11 cases, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that all rights and obligations of the Debtors under this Sale Order and the APA shall accrue to, and be for the benefit of, and shall be exercisable by, the Liquidating Trust, as provided by any order of the Bankruptcy Court, and the Liquidating Trustee shall be entitled to exercise all of the rights of the Debtors under the APA.

4. The APA, this Sale Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged, or otherwise affected by any chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyer, to the extent of any conflict between this Sale Order or the APA and such future plan or order, the terms of this Sale Order and the APA shall control.

5. **No Material Modifications**. The APA and any related agreements, documents, or other instruments in effect as of the date hereof may be modified, amended, or supplemented through a written document signed by the parties thereto in accordance with the terms thereof without further order of this Court; *provided*, *however*, that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

6. **Transfer of Assets Free and Clear**. The Buyer shall assume and be liable for only the Assumed Liabilities and Permitted Liens pursuant to the terms of the APA. For purposes of this Sale Order, "Lien," and "Liability" shall mean:

(i) with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, whenever granted and including, without limitation, those charges or interests in property within the meaning of "lien" under section 101(37) of the Bankruptcy Code (each, a "**Lien**" and collectively, "**Liens**");

(ii) any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, cause of action, damage, fee, fine, penalty, cost, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured (each a "**Liability**" and collectively, "**Liabilities**");

in each case, whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all claims, encumbrances, Liens and Liabilities (other than the Assumed Liabilities, Permitted Liens, and Preferential Purchase Rights) shall attach to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, subject to any claims, defenses, and objections, if any, that the Debtors or their estates may possess with respect thereto.

7. **No Bulk Sales**. No bulk sales laws or any similar law of any state or other jurisdiction shall apply in any way to the Sale Transaction, the Motion, and this Sale Order.

8. **Valid Transfer**. Effective upon the Closing, the transfer to the Buyer of the Debtors' right, title, and interest in the Assets pursuant to the APA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the Debtors' right, title, and interest in the Assets, and vests with, or will vest in, the Buyer all right, title, and interest of the Debtors in the Assets, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens).

9. **Transfer of Title**. Upon the Closing, this Sale Order shall be construed and shall constitute, for any and all purposes, a full and complete general assignment, conveyance, and

transfer of all of the Debtors' right, title, and interest in the Assets pursuant to the terms of the APA, free and clear of all claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) with such claims, encumbrances, Liens or Liabilities (other than Preferential Purchase Rights) attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order; *provided, however,* that pursuant to Section 2.15(b) of the APA, except as and to the extent expressly set forth in the APA or referenced in Section 2.15 of the APA, the Debtors expressly disclaim any representation or warranty, express, statutory or implied, as to title to any of the Assets.

10. **Governmental Authorization to Effectuate Sale and Assignments**. Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale Transaction. Except as otherwise provided in this Sale Order, to the greatest extent available under applicable law upon the Closing, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing. No governmental unit may revoke or suspend any lawful right, license, trademark, or other permission relating to the use of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction. For the avoidance of doubt, the Sale Transaction authorized herein shall be of full force and effect,

regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.

11. **Authorization to Assign**. Notwithstanding any provision of any contract governing the Assets, including any Assigned Contract or Lease to be assumed and/or assigned to the Buyer as of the Closing, pursuant to section 365(f) of the Bankruptcy Code or applicable non-bankruptcy law that prohibits, restricts, or conditions the assignment of the Assets, including any Assigned Contract or Lease, at or after the Closing, the Debtors are authorized to (i) assign the Assets to the Buyer and (ii) assume and/or assign the Assigned Contracts and Leases to the Buyer as of the Closing, in each case, which assignments shall take place on and be effective as of the Closing or such other date after the Closing Date, in each case, as provided in the APA or as otherwise provided by a separate order of this Court.

(i) There shall be no accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assignment of the Assets or the assumption and/or assignment of the Assigned Contracts and Leases.

(ii) The Debtors have met all of the requirements of section 365(b) of the Bankruptcy Code for each of the Assigned Contracts that are 365 Contracts to be assumed and assigned to the Buyer as of Closing. Notwithstanding the foregoing, unless required by the Buyer under the APA for the Debtors to assume and/or assign any Assigned Contract or Lease, no Debtor shall be required by the Court to assume and/or assign any Assigned Contract or Lease, and, if no such assumption and assignment occurs, no Cure Costs shall be due and no adequate assurance of future performance shall be required with respect to any such Assigned Contract or Lease.

(iii) Subject to paragraphs 13 and 25 of this Sale Order, in respect of the assignment pursuant to the Sale Transaction, any provisions in any of the Assigned Contracts and Leases that prohibit or condition the assignment of such Assigned Contract and Lease on the consent of a non-Debtor counterparty to such Assigned Contract or Lease thereto or allow the non-Debtor counterparty to such Assigned Contract and Lease to terminate, recapture, impose any penalty, condition, renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract and Lease, shall constitute unenforceable anti-assignment provisions which are

expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

(iv) The Debtors' assumption and/or assignment of the Assigned Contracts and Leases is subject to the consummation of the Sale Transaction with the Buyer. To the extent that an objection by a counterparty to any Assigned Contract related to the applicable Cure Cost, is not resolved prior to the Closing, the Buyer may, without any further approval of the Court or notice to any party, elect to (a) not have the Debtors assume and/or assign such Assigned Contract to it, or (b) have the Debtors postpone the assumption and/or assignment of such Assigned Contract until the resolution of such objection; *provided*, *however,* that the Debtors, the Buyer, and the relevant non-debtor counterparty under each Assigned Contract that is a 365 Contract shall have authority to compromise, settle, or otherwise resolve any objections to proposed Cure Costs without further order of, or notice to, this Court, with any such agreed upon Cure Costs being paid to the appropriate counterparty by the Debtors as a condition subsequent to such assumption and/or assignment of the relevant Assigned Contract.

12. **Assigned Contracts and Leases**. Subject to the provisions of this Sale Order and in accordance with the APA, the Debtors are authorized to assign, pursuant to the APA, all Assigned Contracts, Leases and other Assets, including Assets constituting real property interests (including all fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements) free and clear of all claims, encumbrances, Liens or Liabilities (other than any (i) Assumed Liabilities and (ii) Permitted Liens other than Consent Rights and Preferential Purchase Rights as applicable to the Transaction). As of the Closing, the Buyer shall succeed to the entirety of the Debtors' rights and obligations in the Assigned Contracts and Leases, including any 365 Contracts to be assumed and assigned to the Buyer, first arising and attributable to the time period occurring on or after the Effective Time (as defined in the APA) and shall have all rights thereunder.

(i) Upon Closing, (a) all defaults (monetary and non-monetary) under the Assigned Contracts that are 365 Contracts shall be deemed cured and satisfied in full through the payment of the Cure Costs, (b) no other amounts will be owed by the Debtors, their estates, or, other than the Assumed Liabilities, the Buyer with respect to amounts first arising or accruing, during, or attributable or related to, the period before Closing with respect



006917

to such Assigned Contracts, and (c) any and all persons or entities shall be forever barred and estopped from asserting a claim against the Debtors, their estates, the Buyer, or the Assets that any additional amounts are due or defaults exist under such Assigned Contracts that arose or accrued, or relate to or are attributable to the period before the Effective Time (other than claims against Buyer with respect to the Assumed Liabilities, claims arising from Ordinary Course Obligations, and rights attributable to Gavilan for Ordinary Course Obligations).

(ii) Upon assumption of those Assigned Contracts and Leases to be assumed by the Debtors and/or assigned to the Buyer as of the Closing, such Assigned Contracts and Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in such Assigned Contract or Lease or other restrictions prohibiting assignment or transfer. To the extent any Assigned Contract or Lease is assumed and/or assigned to the Buyer under this Sale Order, such assumption and/or assignment will not take effect until the Closing. Furthermore, other than the Assigned Contracts and Leases, no other contract shall be deemed assumed by the Debtors and/or assigned to the Buyer pursuant to section 365 of the Bankruptcy Code. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract or Lease shall not be a waiver of such terms or conditions, or of the Debtors' and the Buyer's rights to enforce every term and condition of such Assigned Contract or Lease.

(iii) All counterparties to the 365 Contracts to be assumed and assigned to Buyer as of the Closing shall cooperate and expeditiously execute and deliver, upon the reasonable request of the Buyer, and shall not charge the Debtors or the Buyer for, any instruments, applications, consents, or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

Notwithstanding the foregoing, the Debtors may, at the Buyer's direction, amend the list of 365 Contracts to be assumed and assigned to Buyer under the APA to add or remove any 365 Contract to or from such list prior to the Closing of the Sale Transaction in accordance with the terms of the APA.

13. **Exclusion of Audit Rights**. Notwithstanding anything in the Sale Motion and this Sale Order to the contrary, any sale or transfer of oil and gas leases, or assumption and assignment of executory contracts, shall be subject to the ongoing audit rights contained in such

Case 23-90611 Document 816 Filed in TXSB on 07/26/23 Page 1131 of 1882

leases and contracts. Claim numbers 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 10008, and 10010 in the bankruptcy case of *Gavilan Resources, LLC, et al.* (20-32656 (MI)), which are based on the ongoing data exchange between SN EF Maverick, LLC and the claimants, are the liability of the estate of *Gavilan Resources, LLC* (20-32656 (MI)) to the extent that such are money damages for the Pre-Effective Time (as defined in the APA) and do not impact lease termination issues. To the extent such are for the Post-Effective Time (as defined in the APA) or impact lease termination issues, such are the liability of the Buyer. The Royalty Owners (as defined in Docket Nos. 307 and 309) and Briscoe Ranch, Inc. consent to the Sale, but the consent rights of the Royalty Owners, Briscoe Ranch, Inc., and Lessors (identified in paragraph 25 of this Sale Order) are preserved and their consent to the assignment under the Sale Transaction shall not be deemed a consent to future assignments (other than the Sale Transaction). The current consent is to the Buyer in this Sale Transaction, and conditioned on the current operator SN EF Maverick LLC remaining the operator. All parties reserve their rights.

14. **No Successor Liability**. Neither the Buyer nor any of its affiliates are or shall be deemed, as a result of the consummation of the Sale Transaction, to (i) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (ii) have, de facto or otherwise, merged with or into the Debtors, or (iii) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Neither the Buyer nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors or their estates, other than the Assumed Liabilities and Permitted Liens, to the extent provided in the APA; provided that nothing in this Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any

Case 20-32586 Document 359-1 Filed on 10/16/20 in TXSB Page 1132 of 1882

entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order; authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

15. **Release of Interests**. Effective upon the Closing, this Sale Order (i) is and shall be effective as a determination that all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated (with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order) and that the conveyances described herein have been effected, (ii) is and shall be binding upon and shall govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Buyer, and all recorded claims, encumbrances, Liens or Liabilities (other than the Assumed Liabilities and Permitted Liens) against the Assets shall be deemed stricken from such entities records, official and otherwise.

16. **Approval to Release Interests**. If any person or entity that has filed financing statements, mortgages, mechanic's liens, or other documents or agreements evidencing claims, encumbrances, Liens or Liabilities against or on the Assets shall not have delivered to the Debtors before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all claims, encumbrances, Liens or Liabilities (other than Assumed Liabilities and Permitted Liens) that the person or entity has or may assert with respect to the Assets, the Debtors and the Buyer are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Assets. The Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all claims, encumbrances, Liens or Liabilities against the Assets (other than the Assumed Liabilities and Permitted Liens). This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

17. **Surrender of Possession**. Any and all Assets in the possession or control of any person or entity, including any vendor, supplier, or employee of the Debtors shall be transferred to the Buyer free and clear of all claims, encumbrances, Liens or Liabilities, except for the Assumed Liabilities and Permitted Liens, with such claims, encumbrances, Liens or Liabilities attaching to the proceeds with the same nature, validity, priority, extent, perfection, and force and effect that such claims, encumbrances, Liens or Liabilities encumbered the Assets immediately prior to the entry of this Sale Order, and shall be delivered to the Buyer and deemed delivered at the time of Closing (or such other time as provided in the APA).

18. **Allocation of Assets**. The Buyer is hereby authorized in connection with the consummation of the Sale Transaction to allocate the Assets, including the Assigned Contracts and Leases, among its affiliates in a manner as it in its sole discretion deems appropriate, and to assign any of the Assets, including the Assigned Contracts and Leases, to its affiliates with all of the rights and protections accorded to the Buyer under this Sale Order and the APA with respect thereto, in each case, to the extent permitted by, and in accordance with, the terms of the APA.

19. **Exculpation**. Because the entry into the APA and the other Transaction Documents, and the consummation of the Sale Transaction constitute the exercise by the Debtors of sound business judgment, the Debtors, their respective current and former members, managers, officers, directors, employees, advisors, professionals or agents, shall neither have, nor incur, any liability to the estates or any holder of a claim against or interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of the APA or the consummation of the Sale Transaction contemplated thereunder, other than liability of the Debtors arising out of or relating to any act or omission that constitutes a breach of the APA, gross negligence, or willful misconduct, in each case as determined by a court of competent jurisdiction pursuant to a final order.

20. **Indemnification by Buyer**. From and after Closing, the Buyer shall release, defend, indemnify and hold Sellers and their affiliates, and each of their respective officers, managers, directors, employees, equity owners, agents and successors harmless from and against any and all losses, liabilities, obligations, damages, costs and expenses based upon, attributable to or resulting from:

a. any breach of any representation or warranty of Buyer, as set forth in the APA, or any representation or warranty contained in any certificate delivered by or on behalf of Buyer;

b. any breach of any covenant or other agreement on the part of Buyer under the APA;

c. the Assumed Liabilities;

d. any Buyer Taxes (as defined in the APA); and

e. any other indemnity obligations of Buyer and its affiliates expressly set forth in the APA.

21. **Governmental Liabilities**: Nothing in this Sale Order or the APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Sale Order. Nothing in this Sale Order or the APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

22. **Texas Ad Valorem Taxes**. Notwithstanding any other provisions of this Order or the APA, the 2020 ad valorem taxes of Dimmit County (the "**Certain Texas Taxing Entity**") attributable to the Assets (as defined in the APA) are Permitted Liens, as defined in the APA. To the extent not paid prior to or at Closing, the Buyer assumes full responsibility for the 2020 ad valorem taxes attributable to the Assets and shall be responsible for paying the ad valorem taxes attributable to the Assets in full, in the ordinary course of business, when due. Any proration to the Seller shall be credited to the Buyer at closing or on terms agreed upon by the Buyer and Seller in accordance with the APA. Any dispute regarding the proration of the ad valorem taxes

Case 20-32586 Document 359-1 Filed on 10/16/20 in TXSB Page 1136 of 1882

between the Buyer and Seller shall have no effect on the Buyer's responsibility to pay the 2020 ad valorem taxes attributable to the Assets. The Certain Texas Taxing Entity shall retain its liens against the Assets until paid in full, including any applicable penalties or interest.

23. **Prohibition of Actions Against Buyer**. Except for the Assumed Liabilities and Permitted Liens, or as expressly permitted or otherwise specifically provided for in the APA or this Sale Order, the Buyer and its affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets or otherwise. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein and in the APA, the Buyer and its affiliates shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Buyer and its affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors. Effective upon the Closing, with the sole exception of any enforcement of rights related to the Assumed Liabilities, all persons and entities shall be, and hereby are, forever barred and estopped from (i) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Assets to the Buyer in accordance with the terms of this Sale Order and the APA and (ii) asserting, prosecuting, or otherwise pursuing, whether in law or in

equity, in any judicial, administrative, arbitral or other proceeding, any claims, encumbrances, Liens or Liabilities of any kind or nature whatsoever against the Buyer and its successors, designees, assigns, or property, or the Assets conveyed under this Sale Order in accordance with the APA. Without limiting the foregoing, each person or entity who holds or is the beneficiary of a Preferential Purchase Right or Consent Right will be (i) forever barred from objecting to the transfer, sale, assumption, and/or assignment of the Debtors' right, title, and interest in, to and under the Assets to be sold, assumed, and/or assigned in connection with the Sale Transaction, free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens), and from asserting any alleged Preferential Purchase Rights with respect to the Sale Transaction, and (ii) deemed to consent to and approve the transfer, sale, and assumption and/or assignment of the Debtors' right, title, and interest in, to and under such Assets free and clear of all liens, claims, interests, and encumbrances, including Consent Rights and Preferential Purchase Rights (other than Assumed Liabilities and Permitted Liens).

24. **Sale Proceeds**. The cash proceeds may be used by the Debtors in a manner consistent with the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Granting Related Relief* (the "**Cash Collateral Order**") [Docket No. 116] as may be amended. At Closing, the proceeds shall be used for (i) working capital, general corporate purposes and administrative costs and expenses of the Debtors incurred in the chapter 11 cases, subject to the terms of the Cash Collateral Order and in accordance with the Budget, subject to a Permitted Variance (each as defined in the Cash Collateral Order); (ii) adequate protection payments to the RBL Administrative

Agents and the other RBL Secured Parties (each as defined in the Cash Collateral Order); and (iii) adequate protection payments to the Second Lien Lenders (including the reasonable and documented fees, costs and expenses incurred by Fried Frank) for any amounts that have been incurred or accrued through the date of entry of this Sale Order in accordance with the Cash Collateral Order. This provision is without prejudice to the rights of the administrative agent to seek payment from the proceeds.

25. **Mineral Lessor Objections**. Notwithstanding anything herein to the contrary, objections filed by mineral lessors, including Miramar Holdings, LP (Docket No. 328), Janey Briscoe Marmion GST Trust (Docket No. 330), and Rancho La Cochina Minerals, Ltd. (Docket No. 331) (each a "**Lessor**", and collectively, the "**Lessors**"), are overruled without prejudice. The Lessors shall have until **October 15, 2020 at 5:00 p.m. (prevailing Central Time)** to assert any objections solely with respect to their asserted consent rights. To the extent a hearing is necessary, a hearing may be self-calendared for **October 19, 2020 at 10:30 a.m. (prevailing Central Time)**. Briscoe Ranch, Inc.'s objection, filed at Docket No. 327, is deemed moot as Briscoe Ranch, Inc. consents to the Sale Transaction.

26. **Provisions Related to UnSub (Docket No. 338)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The currently pending litigation in respect of the Comanche Agreements (as defined therein and which include the JDA) in *GSO ST Holdings LP v. Sanchez Energy Corp. (In re Sanchez Energy Corp.)*, Adv. Pro. No. 20-03197 (MI) (Bankr. S.D. Tex.) and in *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex.) (such litigation, the "**Existing Litigation**") may continue.

(ii) The entry of this Sale Order shall not limit or curtail the Court's ability to fashion relief in the Existing Litigation.

(iii) Notwithstanding anything in the Sale Order or the APA, the rights of the parties to the Existing Litigation as to whether (i) the execution of the Release Agreement (as defined in the APA) constitutes a breach of the JDA; or (ii) a transfer of operatorship or the absence thereof under the terms of the JDA and joint operating agreements, including with respect to any argument that a transfer is or is not required, shall be preserved (or denied) in all respects consistent with the record.

(iv) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(v) Any determination made by a final, non-appealable order in the Existing Litigation as to (A) whether the JDA or the Development Agreement is a covenant running with the land or an equitable servitude, or (B) whether any of the Comanche Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

27. **Provisions Related to the Oxy Objection and the WES Objection (Docket Nos. 332 and 333)**. Notwithstanding anything in this Sale Order or the APA to the contrary:

(i) The Buyers', SN EF Maverick's, the Oxy Parties', WES Parties' and Gavilan's (collectively, the "Parties-in-Interest" and each a "Party-in-Interest") agreement, as reflected in this Sale Order, to resolve objections to the Sale Motion or Sale Transaction will not be used against or prejudice such Parties-in-Interest in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (as defined below).

(ii) Nothing in this Sale Order or the APA will in any way modify, inhibit, or impair any Party-in-Interest's rights to or ability to assert any claims, rights, objections, arguments, and/or defenses in the adversary proceeding captioned *Occidental Petroleum Corp. et al. v. Sanchez Energy Corp*., Adv. Case No. 20-3198 (Bankr. S.D. Tex. June 22, 2020) (the "**Sanchez Adversary**") or in the related rejection objection (the "**Sanchez Rejection Dispute**") pending in the bankruptcy cases captioned *In re Sanchez Energy Corp*., Case No. 19-34508 (Bankr. S.D. Tex. Aug. 11, 2019) (the "**Sanchez Chapter 11 Case**"); and any such rights to or ability to assert such claims, rights, objections, arguments, and/or defenses in the Sanchez Adversary or in the Sanchez Rejection Dispute shall be unaffected by the granted relief as described herein.

(iii) Nothing in this Sale Order or the APA amends or otherwise alters the *Order Approving Disclosure Statement and Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates*, Docket No. 1212 in the Sanchez Chapter 11 Cases, or otherwise determines the rights of any parties under such Order.

(iv) The Assets being sold will remain subject to any covenants, servitudes or similar agreements which the Oxy Parties and WES Parties contend are covenants running with the land or equitable servitudes and any agreements integrated with contracts assumed by the Debtors and assigned to the Buyer (collectively, the "**Agreements**"), in each case, only to the extent (A) such Agreements are being contested in the Sanchez Adversary, the Sanchez Rejection Dispute, or the WES Dispute (defined below), as applicable, and (B) the Court determines in a final, non-appealable order such Assets are required by applicable law to remain subject to such Agreements.

(v) Any determination made by a final, non-appealable order in the Sanchez Adversary as to (A) whether the Development Agreement[4] is a covenant running with the land or an equitable servitude, or (B) to the extent that they are identical, whether any of the Agreements are integrated, shall, in the case of clauses (A) and (B), have the same force and effect as if such orders were entered in these chapter 11 cases.

(vi) Nothing in this order modifies, inhibits or impairs any party's rights or ability to assert any claims, rights, objections, arguments, and/or defenses regarding the Gavilan Springfield Agreements, including but not limited to the matters raised by the WES Dispute.

(vii) Nothing in this Sale Order or the APA shall be deemed or in any way constitute an adjudication of the *Application for Allowance and Payment of Administrative Expense Claim* filed by Springfield Pipeline LLC and appearing at Docket No. 287 in these chapter 11 cases.

28. **<u>No Interference</u>**. Following the Closing, no holder of a claim, encumbrance, Lien or Liability in or against the Debtors or the Assets shall interfere with the Buyer's title to or use and enjoyment of the Assets based on or related to such claim, encumbrance, Lien or Liability; *provided that* this paragraph shall not apply to, and shall not prejudice the WES

[4] The Development Agreement is that certain Development Agreement dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sn EF Maverick, LLC, Sn EF UnSub LP, Gavilan Resources LLC (f/k/.a Aguila Production, LLC) and Sanchez Energy Corporation.

[5] The "Gavilan Springfield Agreements" are (i) that certain Second Amended and Restated Lease Dedication and Oil Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC and (ii) that certain Second Amended and Restated Lease Dedication and Gas Gathering Agreement dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Gavilan Resources, LLC.

Parties' prosecution and the Court's ability to adjudicate whether the Gavilan Springfield Agreements are covenants running with the land or equitable servitudes (the "**WES Dispute**"), the Sanchez Adversary, or the Sanchez Rejection Dispute, and further, should the Court resolve (i) all or any portion of the WES Dispute or (ii) any claims or arguments in the Sanchez Adversary or the Sanchez Rejection Dispute, in the Oxy Parties' or WES Parties' favor, the same shall not constitute an "interference" with the Buyer's title to, or use and enjoyment of, the Assets.

29. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including retaining jurisdiction to (i) compel delivery of the Assets or performance of other obligations owed to the Buyer, (ii) compel performance of obligations owed to the Debtors, (iii) resolve any disputes arising under or related to the APA or the Sale Transaction, including, but not limited to, the WES Dispute, (iv) interpret, implement, and enforce the provisions of this Sale Order, (v) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyer to evidence the release of any claims, encumbrances, Liens or Liabilities in the Assets, (vi) protect the Buyer and its affiliates against (a) any claims, encumbrances, Liens or Liabilities in or against the Debtors or the Assets of any kind or nature whatsoever and (b) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets that may be in their possession, and (vii) protect the Debtors and their affiliates against any liabilities (other than any liabilities retained by the Debtors under the APA) in any way relating to the Assets arising on or after the Closing Date other than to the Buyer pursuant to the APA.

30. **Immediate Effect**. Notwithstanding the provisions set forth in Rule 60004(h) of the Bankruptcy Rules, this Sale Order shall be immediately effective and enforceable and its provisions shall be self-executing. The Debtors and the Buyer are free to close the Sale Transaction under the APA at any time in accordance with the terms of the APA.

31. **Good Faith Purchaser**. The Sale Transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyer has acted without collusion in undertaking the Sale Transaction contemplated by the APA. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the sale of the Assets to the Buyer (including the assumption and assignment by the Debtors of any of the 365 Contracts), unless such authorization is duly stayed pending such appeal. The Buyer is a buyer in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

32. There has been no showing that the Debtors or the Buyer engaged in any action or inaction that would cause or permit the Sale Transaction and underlying transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

33. **Excluded Assets Held in Trust**. The assets sold pursuant to this Sale Order and the terms of the APA shall not include unclaimed property held in trust by the Seller, as defined pursuant to Texas state unclaimed property laws, including Texas Property Code, Title 6, Chapter 72-76, and other applicable Texas laws.

34. **Inconsistencies with Prior Orders, Pleadings, or Agreements**. To the extent of any conflict between the APA and this Sale Order, the terms of the Sale Order shall govern. To the extent this Sale Order is inconsistent or conflicts with any prior order or pleading

Case 23-20-32656 Document 3361 Filed in TXSB on 07/19/23 Page 1143 of 1882

in these chapter 11 cases, the terms of this Sale Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.

35. **Subsequent Orders and Plan Provisions**. Unless otherwise agreed to by the Debtors and the Buyer, this Sale Order shall not be modified by any chapter 11 plan confirmed in these chapter 11 cases or any subsequent order(s) of this Court.

36. **Backup Bid APA**. In the event the Debtors proceed with the Backup Bid, the Debtors shall file and serve a notice of filing of an Asset Purchase Agreement for the Backup Bid (the "**Backup Bid APA**"), and a proposed order approving the sale pursuant to the Backup Bid APA, to all interested parties, and shall seek from the Court a hearing on the Backup Bid APA following a reasonable objection period.

37. **Failure to Specify Provisions**. The failure to specifically reference any particular provisions of the APA or other related documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA and other related documents be authorized and approved in their entirety.

38. **Satisfaction of Conditions Precedent**. Neither the Buyer nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the APA to each of their respective obligations to close the Sale Transaction have been satisfied or waived in accordance with the terms of the APA.

39. **Provisions Non-Severable**. The provisions of this Sale Order are non-severable and mutually dependent.

Signed: October 16, 2020

Marvin Isgur
United States Bankruptcy Judge

**Exhibit I**

**APA**

Exhibit "A" will be filed by Notice on the CM/ECF docket sheet later today and is incorporated in this Order by reference.

# EXHIBIT 24

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

December 06, 2021

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) **Re: Docket Nos. 1326 and 2071** |

**STIPULATION AND AGREED ORDER AUTHORIZING ASSUMPTION OF COMANCHE NON-OPS' PRODUCTION MARKETING AGREEMENTS**

On October 14, 2021, Venado EF L.P., Eagle Ford TX LP, and Mitsui E&P Texas LP (collectively, the "Comanche Non-Ops") filed the *Limited Objection and Reservation of Rights of Comanche Non-Ops with Respect to Assumption of Production Marketing Agreements* [Docket No. 2071] (the "Objection"), objecting on a limited basis to the assumption by Reorganized Debtor SN EF Maverick, LLC ("Maverick" and together with the Comanche Non-Ops, the "Parties") of the executory contracts listed on Exhibit 1 attached hereto (collectively, the "PMAs"), pursuant to the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").[2]

The Comanche Non-Ops and Maverick, by and through their respective counsel, have agreed to the entry of this stipulation and agreed order ("Order") by this Court, without trial or

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in Plan.

adjudication of any issue of fact or law. The Parties having requested that the Court enter this Order, it is therefore ORDERED, ADJUDGED, AND DECREED as follows:[3]

**FINDINGS**

A. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

B. The Comanche Non-Ops each own certain working interests in oil and gas properties in South Texas, referred to as the "Comanche Assets".

C. The Comanche Non-Ops[4] entered into their respective PMAs with Anadarko Energy Services Company and Anadarko E&P Onshore LLC (collectively, "Anadarko") between 2010 and 2012, pursuant to which, the Comanche Non-Ops agreed to sell, and Anadarko agreed to purchase the Comanche Non-Ops' oil and gas production associated with the Comanche Assets and thereafter arrange for the gathering, treating, transportation, marketing and/or sale of its own (and its affiliates') production volumes together with those of the Comanche Non-Ops.

D. Maverick, SN EF UnSub, LP ("UnSub"), and Gavilan Resources, LLC ("Gavilan"), the predecessor in interest to Mesquite Comanche Holdings, LLC ("MCom"), purchased Anadarko's working interest in the Comanche Assets in 2017 (the "Comanche Purchase Transaction").[5]

---

3 Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

4 References to "Comanche Non-Ops" in this paragraph refer to the Comanche Non-Ops and/or their respective predecessors in interest in the Comanche Assets, as applicable.

5 As of December 3, 2021, Maverick, UnSub, MCom, and the Comanche Non-Ops own all the working interests in the Comanche Assets.

E. Pursuant to the Comanche Purchase Transaction, Maverick became and continues to be the operator of the Comanche Assets pursuant to applicable joint operating agreements, and Anadarko assigned the PMAs to Maverick.

F. The PMAs facilitate Maverick's efficient operation of the Comanche Assets and also enable the Reorganized Debtors to maximize the value of the Comanche Assets for themselves and all the other working interest owners of the Comanche Assets by, among other things, allowing Maverick to negotiate the gathering, treating, processing, and transportation of the oil and gas production from the Comanche Assets on an aggregate basis, including production of the Reorganized Debtors and the Comanche Non-Ops. Currently, the Reorganized Debtors sell the Comanche Non-Ops' oil and gas production through certain agreements (the "<u>Agency Agreements</u>") with Occidental Petroleum Corporation, Western Midstream Partners LP, and their respective affiliates (collectively, "<u>Oxy/WES</u>"). The Reorganized Debtors have also been engaged in ongoing litigation with Oxy/WES with respect to rejection or assumption of the Agency Agreements (the "<u>Oxy/WES Litigation</u>").

G. Consistent with this Court's *Order Approving Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. 1110] ("<u>Solicitation Procedures Order</u>") and the Plan and Confirmation Order, on or about May 29, 2020, prior to the Plan's Effective Date, the Debtors listed each of the PMAs on the Schedule of Assumed Executory Contracts and Unexpired Leases, as contracts to be assumed under the Plan; and the PMAs have remained on that schedule ever since.

H. The "Contract Objection Deadline" for the Comanche Non-Ops to object to the proposed assumption of their respective PMAs—originally set in the Confirmation Order as May 20, 2020—was extended multiple times, consistent with the Confirmation Order and with the mutual consent of the parties, to October 14, 2021.

I. From the Effective Date of the Plan through the date of this Order, each of the PMAs is, and has at all relevant times been, an Executory Contract.

J. As set forth in the Objection, the Comanche Non-Ops raised issues with respect to adequate assurances for the assumption of the PMAs under section 365 of the Bankruptcy Code.

K. As of the Effective Date of the Plan, no Cure Claims with respect to the PMAs existed.

L. The Debtors' and Reorganized Debtors' decision, as applicable, to assume the PMAs is a reasonable exercise of the Debtors' and Reorganized Debtors', as applicable, business judgment and is consistent with the process for assuming agreements set forth in the Plan, the Confirmation Order, and otherwise applicable law.

**ASSUMPTION**

**IT IS FURTHER ORDERED that**:

1. The Comanche Non-Ops hereby withdraw the Objection.

2. For purposes of clarification, nothing in this Order is intended to alter the rights of the Comanche Non-Ops, if any, to receive copies of, or notices with respect to, any new or amendments to existing "Commitment Agreements" (as such term is defined in the applicable PMAs), if any, in connection with the settlement of the Oxy/WES Litigation, in each case to the extent required by the terms of the applicable PMAs. For the avoidance of doubt, the following agreements, which Maverick has informed the Comanche Non-Ops it intends to assume in

Case 21-10006 Document 2201 Filed 12/10/21 Page 15 of 8

connection with the settlement of the Oxy/WES Litigation, are not "Commitment Agreements": (i) the Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation; and (ii) the Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and Sanchez Energy Corporation, as each may be assumed, amended, modified, or supplemented from time to time.

3. Maverick is authorized and directed to assume the PMAs, effective as of the Effective Date, pursuant to the Plan. All requirements for assumption of the PMAs, as of the Effective Date of the Plan, pursuant to the Plan and pursuant to 11 U.S.C. §§365 and 1123 are deemed satisfied.

4. Except as otherwise provided in this paragraph, all defaults, if any, arising under the PMAs on account of actions or inactions of any party to such PMAs as of the date of entry of this Order are hereby mutually waived, released, and discharged by the Parties; *provided, however,* the foregoing waiver, release, and discharge shall not constitute a waiver, release, or discharge of any default arising from or relating to Maverick's obligation to pay ordinary course amounts to each of the Comanche Non-Ops pursuant to a PMA for its respective production of hydrocarbons, solely relating to amounts not yet invoiced or otherwise paid by Maverick as the date of this Order for hydrocarbons either previously purchased by or delivered to Maverick (A) for gas and natural gas liquids, between September 1, 2021 and the date of this Order, and (B) for oil, between October 1, 2021, and the date of this Order. For the avoidance of doubt, notwithstanding the release, waiver, and discharge of defaults in this paragraph, the Comanche Non-Ops and Reorganized Debtors shall each retain their respective unexpired audit rights under the PMAs.

5. The PMAs shall remain in full force and effect and shall be binding upon each of the parties thereto in accordance with their terms, and the PMAs shall be enforceable in accordance with their terms pursuant to otherwise applicable law. For purposes of clarification, in connection with the entry of this Order, the Reorganized Debtors and the Comanche Non-Ops have not agreed to any amendments or modifications to the terms of the PMAs.

6. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

7. Without further order of the Court, the Debtors and Reorganized Debtors, as applicable, and the Comanche Non-Ops are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

8. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, including, without limitation, the impact of the Debtors' or Reorganized Debtors', as applicable, assumption and/or rejection of any other executory contract on the parties' respective rights and obligations under the PMAs.

**IT IS SO ORDERED.**

Signed: December 06, 2021

Marvin Isgur
United States Bankruptcy Judge

**ACCCEPTED AND AGREED:**

*/s/* Aparna Yenamandra

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Aparna Yenamandra (admitted *pro hac vice*)
Conor P. McNamara (admitted *pro hac vice*)
300 N. LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: conor.mcnamara@kirkland.com
aparna.yenamandra@kirkland.com

*Counsel to Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)*

*/s/* Duston McFaul

**SIDLEY AUSTIN LLP**
Duston McFaul (TX Bar No. 24003309)
Michael Fishel (TX Bar No. 24082998)
Maegan Quejada (TX Bar No. 24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 459-7799
Email: dmcfaul@sidley.com
mquejada@sidley.com

*Counsel to Mitsui E&P Texas LP*

*/s/* Julia Frost-Davis

**MORGAN LEWIS LLP**
Julia Frost-Davies (admitted *pro hac vice*)
Amy Kyle (admitted *pro hac vice*)
One Federal Street
Boston, Massachusetts 02110
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

*Counsel to Eagle Ford TX LP*

*/s/* John P. Melko

**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko.@foley.com
sbeausoleil@foley.com

*/s/* Jamie A. Levitt

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

*/s/* Dennis L. Jenkins

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**

**PRODUCTION MARKETING AGREEMENTS**

1) Maverick Crude Oil Production Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

2) Maverick Residue Gas Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP, as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated February 1, 2014

3) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of April 14, 2011 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Eagle Ford TX LP

4) Maverick Oil Production Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

5) Maverick Residue Gas Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company)

6) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of October 1, 2010 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Venado EF L.P. (as successor to SM Energy Company), as amended, including by that First Amendment to Maverick Natural Gas Liquids Marketing Agreement, dated as of February 1, 2014

7) Maverick Oil Production Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

8) Maverick Residue Gas Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

9) Maverick Natural Gas Liquids Marketing Agreement, dated effective as of January 1, 2012 by and among SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company and Anadarko E&P Onshore LLC) and Mitsui E&P Texas LP

# EXHIBIT 25

United States Bankruptcy Court
Southern District of Texas
ENTERED
December 21, 2021
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*, | ) | Case No. 19-34508 (MI) |
| Reorganized Debtors.[1] | ) | (Jointly Administered) |

**STIPULATION AND AGREED ORDER**

This Stipulation and Agreed Order (the "Order") is made pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure (applicable herein pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure), between (i) Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline, LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.[2]

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102) (collectively the "Reorganized Debtors"). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

## RECITALS

**WHEREAS**, certain of the Parties are party to multiple agreements related to certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in the above-captioned Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Docket No. 1326], seeking to reject or assume the Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing the adversary proceeding captioned *Occidental Petroleum Corp. v. Sanchez Energy Corp.*, Adv. Pro. No. 20-03198 (S.D. Tex.) (the "OXY/WES Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Adv. Pro. No. 20-03198, Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89-90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Adv. Pro. Docket No. 97] (the "Reconsideration Motion") in the OXY/WES Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order to find that the Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, the Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to this Order (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to this Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan;[3] (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of the OXY/WES Adversary Proceeding; and (v) dismissal of the Appeal; and

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

**NOW, THEREFORE, IT IS STIPULATED, ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

---

[3] Certain of the agreements identified in Schedules 1 and 2 to the Complaint were previously assumed by the applicable Debtor(s) in connection with the *Stipulation of Dismissal and Agreed Order* [Docket No. 1973] and the *Stipulation and Agreed Order Authorizing Assumption of Comanche Non-Ops' Production Marketing Agreements* [Docket No. 2201].

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon the occurrence of all of the following events: (a) entry by this Court on the docket of these Chapter 11 Cases; (b) the entry by this Court of the Stipulation of Dismissal in the form attached hereto as Exhibit 3 (the "AP Dismissal Stipulation") in the OXY/WES Adversary Proceeding; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. The Parties are deemed to agree, and it is hereby found, that, as of the Order Effective Date, each of the Assumed Comanche Agreements is an Executory Contract that is capable of assumption pursuant to the Plan and each of the Rejected Comanche Agreements is an Executory Contact that is capable of rejection pursuant to the Plan; *provided, however*, consistent with the Partial Rejection Order, characterization of the Springfield Agreements as Executory Contracts does not alter or otherwise impact the real property interests granted to Springfield in the Springfield Agreements.

5. It is hereby found, and each of the Parties hereby agrees, that each applicable Mesquite Entity, as a Reorganized Debtor, is and shall be entitled, pursuant to the Plan and 11

U.S.C. §§365 and 1123, to assume each of the Assumed Comanche Agreements and to reject each of the Rejected Comanche Agreements, and all requirements for assumption or rejection, as applicable, pursuant to the Plan, the Confirmation Order, any other Orders of this Court in these proceedings or relating proceedings, and 11 U.S.C. §§365 and 1123 are hereby deemed satisfied.

6. All objections to the assumption and rejection of the Assumed Comanche Agreements and Rejected Comanche Agreements as contemplated by this Order, including but not limited to the Rejection Objection, are hereby deemed withdrawn or overruled, with prejudice, and all related contested matters are dismissed.

7. On the Order Effective Date, each of the applicable Mesquite Entities is hereby authorized and directed to assume each of the Assumed Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the assumption of the Assumed Comanche Agreements, in each case to the extent required by the Settlement effective as of the Effective Date of the Plan.

8. On the Order Effective Date, each of the applicable Debtors is hereby authorized to reject each of the Rejected Comanche Agreements, and the Occidental Entities and the Western Entities shall be deemed to consent and agree to the rejection of the Rejected Comanche Agreements, with such rejections being effective as of the Effective Date of the Plan.

9. As between the Parties, upon assumption pursuant to the Settlement and this Order, each of the Assumed Comanche Agreements, including the Springfield Agreements, as each may be amended, shall remain in full force and effect, and be binding upon each of the parties thereto in accordance with their respective terms and otherwise applicable law.

10. As a condition to assumption of the Springfield Agreements, Mesquite shall pay to Springfield Pipeline LLC (i) $51,832,780.72 in the aggregate and (ii) an amount equal to all unpaid

amounts, if any, (x) invoiced and (y) due and payable in the ordinary course of business between December 17, 2021 and the effective date of the Settlement pursuant to the Springfield Agreements and/or any applicable gas or oil gathering agreements with Gavilan Resources, LLC, in each case only as required by the Settlement (the "Springfield Cure Amount"). As a condition to assumption of the Assumed Comanche Agreements to which the Occidental Entities or Eagle Ford Midstream, LP are a party, Mesquite shall pay to the Occidental Entities and Eagle Ford Midstream, LP $0 on account of defaults occurring prior to December 1, 2021 and shall pay all amounts due and owing under the such agreements from and after December 1, 2021 in the ordinary course of business (the "OXY Cure Amount"). Other than the Springfield Cure Amount and the OXY Cure Amount, no Cure Claims with respect to the Assumed Comanche Agreements exist or shall otherwise be due or payable in connection with the assumption of the Assumed Comanche Agreements, and no adequate assurances for assumption of the Assumed Comanche Agreements shall be required by this Order or the Plan as a condition to the assumptions contemplated hereby. As between the Parties, subject to payment of the Springfield Cure Amount and the OXY Cure Amount, the Debtors and Reorganized Debtors shall also be deemed to be in compliance with each of the Assumed Comanche Agreements through the date of this Order for all purposes of the Confirmation Order.

11. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

12. Each Party is to bear its own costs, expenses and attorneys' fees.

13. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Signed: December 21, 2021

Marvin Isgur
United States Bankruptcy Judge

4879-7488-3847.1

**IT IS SO ORDERED.**

This Order is issued subject to entry of an order in Appeal No. 4:21-CV-1734 authorizing the undersigned judge to enter the order signed on this date in adversary proceeding 20-3198.

**STIPULATED AND AGREED AS TO FORM AND CONTENT:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

*/s/ Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

**EXHIBIT 1**
**ASSUMED COMANCHE AGREEMENTS**

1) Second Amended and Restated Lease Dedication and Gas Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017 as amended and supplemented, from time to time*

2) Second Amended and Restated Lease Dedication and Oil Gathering Agreement, by and between Springfield Pipeline LLC and Sanchez Energy Corporation, effective as of June 1, 2017, as amended and supplemented, from time to time, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated as of August 14, 2017*

3) Agreement to Amend Gas Gathering Agreements, dated June 1, 2017 between Springfield Pipeline LLC, Sanchez Energy Corporation and Gavilan Resources, LLC

4) The Retained Marketing Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Catarina, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Anadarko Energy Services Company and Sanchez Energy Corporation, as amended, including by that First Amendment to Retained Marketing Contracts Services Agreement, dated effective as of June 28, 2017 and that Second Amendment to Retained Marketing Contracts Services Agreement, dated effective as of September 15, 2017*

5) The Retained Midstream Contracts Services Agreement, dated as of June 1, 2017 by and among Maverick, Anadarko E&P Onshore LLC, Kerr-McGee Oil& Gas Onshore LP and Sanchez Energy Corporation*

6) Purchase and Sale Agreement, dated January 12, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation, as amended, including by that Amendment to Purchase and Sale Agreement, dated as of March 1, 2017, that Second Amendment to Purchase and Sale Agreement, dated effective as of March 1, 2017 and that Third Amendment to Purchase and Sale Agreement, dated June 28, 2017*

7) Assignment and Consent to Assignment Agreement, dated effective as of June 28, 2017 by and among Anadarko Energy Services Company, SN EF Maverick, LLC and Eagle Ford Midstream, LP

8) Firm Intrastate Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of Anadarko Energy Services Company), as amended, including by that First Amendment to Firm Intrastate Gas Transportation Agreement, dated as of June 27, 2016

9) Firm NGPA Section 311 Gas Transportation Agreement, dated effective as of January 17, 2012 between Eagle Ford Midstream, LP and SN EF Maverick, LLC (as assignee of

* Assumed as amended pursuant to terms of the Settlement Agreement.

Anadarko Energy Services Company), as amended, including by that First Amendment to Firm NGPA Section 311 Gas Transportation Agreement, dated as of June 27, 2016.

10) Joint Operating Agreement, dated effective as of March 1, 2017 by and between SN EF Maverick, LLC, Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF UnSub, LP and Gavilan Resources, LLC

11) Non-Exclusive Data Use License and Access Agreement, dated March 1, 2017 between Anadarko E&P Onshore LLC, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

12) Non-Exclusive Seismic Data Use License, dated March 1, 2017 by and between Anadarko Petroleum Corporation, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC*

13) Springfield Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, Sanchez Energy Corporation, and Gavilan Resources, LLC

14) Downstream Marketing Agreements Assumption Agreement, dated as of June 1, 2017 by and between Anadarko Energy Services Company and SN EF Maverick, LLC

15) Specified Midstream Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP and SN EF Maverick, LLC

16) Amended and Restated Marketing Transition Services Agreement, dated effective as of March 1, 2017 by and among SN EF Maverick, LLC, SN Catarina, LLC, Anadarko Energy Services Company, Kerr-McGee Oil & Gas Onshore LP, Anadarko E&P Onshore LLC and Sanchez Energy Corporation

17) Specified Gathering Assumption Agreement, dated as of June 1, 2017 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP and Gavilan Resources, LLC

18) Firm Intrastate Gas Transportation Services Agreement, dated March 1, 2013, by and between Springfield Pipeline LLC and SN EF Maverick (as assignor of Anadarko E&P Onshore LLC), including any Attachment to Firm Intrastate Gas Transportation Service Agreement

**EXHIBIT 2**
**REJECTED COMANCHE AGREEMENTS**

1) Development Agreement, dated March 1, 2017 by and among Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

2) Memorandum of Development Agreement (Dimmit County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

3) Memorandum of Development Agreement (La Salle County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

4) Memorandum of Development Agreement (Maverick County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

5) Memorandum of Development Agreement (Webb County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

6) Memorandum of Development Agreement (Zavala County), dated effective as of July 1, 2016 by and between Anadarko E&P Onshore LLC, Kerr-McGee Oil & Gas Onshore LP, SN EF Maverick, LLC, SN EF UnSub, LP, Gavilan Resources, LLC (f/k/a Aguila Production, LLC) and Sanchez Energy Corporation

**EXHIBIT 3**
**FORM OF AP DISMISSAL STIPULATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re:<br><br>SANCHEZ ENERGY CORPORATION, *et al.*,<br><br>Debtors.[1] | ) | Chapter 11<br><br>Case No. 19-34508 (MI)<br><br>(Jointly Administered) |
| OCCIDENTAL PETROLEUM CORP., ANADARKO PETROLEUM CORPORATION, ANADARKO E&P ONSHORE LLC, ANADARKO ENERGY SERVICES COMPANY, KERR-MCGEE OIL & GAS ONSHORE LP, WESTERN MIDSTREAM PARTNERS LP, WGR OPERATING, LP, and SPRINGFIELD PIPELINE, LLC,<br><br>Plaintiffs,<br>v.<br><br>SANCHEZ ENERGY CORPORATION, SN CATARINA, LLC, and SN EF MAVERICK, LLC,<br><br>Defendants. | ) | Adv. Proc. No. 20-03198 |

**STIPULATION OF DISMISSAL AND AGREED ORDER**

This Stipulation of Dismissal and Agreed Order (the "Order")[2] is made, pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure(applicable herein pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure), between (i) Plaintiffs Occidental Petroleum Corporation, Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC, Anadarko Energy

[1] The Reorganized Debtors in these Chapter 11 cases, along with the last four digits of each Reorganized Debtor's federal tax identification number, include: Mesquite Energy, Inc. (f/k/a Sanchez Energy Corporation) (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Reorganized Debtors' service address is 700 Milam Street, Suite 600, Houston, Texas 77002.

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1205] (as amended or supplemented from time to time, the "Plan").

Services Company, and Kerr-McGee Oil & Gas Onshore LP (collectively, the "Occidental Entities"), (ii) Plaintiffs Western Midstream Partners LP, WGR Operating, LP and Springfield Pipeline LLC (collectively, the "Western Entities," and together with the Occidental Entities, "OXY/WES") and (iii) Defendants Mesquite Energy, Inc. ("Mesquite") (formerly known as Sanchez Energy Corporation), SN Catarina, LLC ("SN Catarina"), and SN EF Maverick, LLC ("SN Maverick," and together with Mesquite and SN Catarina, the "Mesquite Entities"). Each of the Occidental Entities, each of the Western Entities and each of the Mesquite Entities is a "Party" and collectively are the "Parties" to this Order.

## RECITALS

**WHEREAS**, certain of the Parties are party to a number of agreements related certain working interests in oil and gas properties in South Texas (collectively, the "Comanche Agreements"), including with respect to the gathering, transportation, processing and marketing of hydrocarbons extracted from such working interests;

**WHEREAS**, on June 17, 2020, Sanchez Energy Corporation and certain of its affiliates (collectively, the "Debtors") filed in their Chapter 11 cases the *Fourth Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Sanchez Energy Corporation and its Debtor Affiliates* [Case No. 19-34508, Docket No. 1326] seeking to reject or assume certain Comanche Agreements pursuant to the Plan;

**WHEREAS**, on June 22, 2020, OXY/WES filed the *Objection to Schedule of Rejected Executory Contracts and Unexpired Leases* [Case No. 19-34508, Docket No. 1355] (the "Rejection Objection"), commencing a contested matter with respect to the proposed rejection of certain of the Comanche Agreements (the "Comanche Rejection Litigation");

**WHEREAS**, concurrent with the filing of the Rejection Objection, OXY/WES filed a complaint (the "Complaint") commencing this adversary proceeding (this "Adversary Proceeding") regarding certain legal issues in connection with the Comanche Rejection Litigation;

**WHEREAS**, on October 1, 2020, the Court held a hearing on the Debtors' and OXY/WES' cross-motions for summary judgment on certain limited issues, as ordered by the Court pursuant to a Scheduling Order [Docket No. 46] and took matters under advisement;

**WHEREAS**, on May 6, 2021, the Court entered its Opinion and Order (the "Partial Rejection Order") with respect to certain Comanche Agreements [Adv. Pro. No. 20-03198, Docket Nos. 89, 90; *see also* Main Case Docket Nos. 1923-1924];

**WHEREAS**, on May 18, 2021, the Court granted its own motion to reconsider, in part, the Partial Rejection Order with respect to whether the Debtors had exercised proper business judgment in connection with seeking to reject (i) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation, as amended, including by that First Amendment to Second Amended and Restated Lease Dedication and Gas Gathering Agreement, dated effective as of August 14, 2017, and (ii) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement, dated effective as of June 1, 2017 by and between Springfield Pipeline LLC and Sanchez Energy Corporation (collectively, the "Springfield Agreements") [Adv. Pro. No. 20-03198, Docket No. 94];

**WHEREAS**, on May 19, 2021, the Western Entities filed their *Motion for Reconsideration of Rejection Order and Certain Elements of Memorandum Opinion with Respect to Springfield Agreements* [Docket No. 97] (the "Reconsideration Motion") in this Adversary Proceeding, requesting that the Court reconsider and modify its Partial Rejection Order, to find that the

Springfield Agreements are reject*able* rather than reject*ed*, pending the Court's determination of whether the Debtors exercised proper business judgment in seeking to reject the Springfield Agreements;

**WHEREAS**, the Reconsideration Motion remains pending before the Court;

**WHEREAS**, by notice dated May 19, 2021, the Occidental Entities appealed certain aspects of the Court's Partial Rejection Order (the "Appeal"), which Appeal remains pending as of the date hereof;

**WHEREAS**, on June 16, 2021, the Parties filed cross-motions for summary judgment on Count V of the Complaint and the Rejection Objection [Adv. Pro. Docket Nos. 124 and 127], which were fully briefed on June 30, 2021;

**WHEREAS**, OXY/WES and the Mesquite Entities have since engaged in good faith and arm's length negotiations and reached a global settlement (the "Settlement"), pursuant to which, among other things, such Parties agreed to (i) the assumption of the Comanche Agreements identified on Exhibit 1 to the *Stipulation and Agreed Order* (the "Contested Matter Order")[3] filed in the Debtors' Chapter 11 cases (the "Assumed Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (ii) the rejection of the Comanche Agreements identified on Exhibit 2 to the Contested Matter Order (the "Rejected Comanche Agreements") by the Reorganized Debtors pursuant to the Plan; (iii) resolution of the Rejection Objection and the Motion for Reconsideration; (iv) dismissal of this Adversary Proceeding; and (v) dismissal of the Appeal;

**WHEREAS**, the Parties, in connection with the Settlement, by and through their undersigned counsel, have agreed to the entry of, and request that the Court enter, this Order.

[3] The form of Contested Matter Order is attached hereto as Exhibit 1.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**, as follows:[4]

1. This Court has jurisdiction over this matter pursuant to the Plan and 28 U.S.C. §1334; and this is a core proceeding pursuant to 28 U.S.C. §157.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon (a) its approval and entry by this Court on the docket for this Adversary Proceeding; (b) entry of the Contested Matter Order by this Court in the Debtors' Chapter 11 cases; and (c) the filing on the Main Case docket of a notice of effective date of the Settlement signed by counsel for OXY/WES and counsel for the Mesquite Entities (the "Order Effective Date"). Notwithstanding anything in this Order to the contrary, if the Order Effective Date does not occur, this Order shall not be binding on the Parties and shall be of no force or effect.

3. The Reconsideration Motion is hereby granted as of the Order Effective Date, and the Partial Rejection Order is hereby amended and modified, effective as of May 6, 2021, to provide that the Springfield Agreements are not, and have not been, rejected. All other elements of the Partial Rejection Order shall remain in full force and effect, including but not limited to the finding that Springfield was granted certain real property interests pursuant to the Springfield Agreements.

4. As of the Order Effective Date, except to the extent expressly set forth in this Order otherwise, this Adversary Proceeding, including Counts I, II, III, IV, and V, is dismissed, with prejudice.

[4] Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law. Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.

5. Without further order of the Court, the Parties are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order and to effectuate the relief granted pursuant to this Order.

6. Each Party is to bear its own costs, expenses, and attorneys' fees.

7. This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

**IT IS SO ORDERED.**

Signed: ____________________, 2021

____________________________________
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

**ACCCEPTED AND AGREED:**

*/s/ Lydia R. Webb*
**GRAY REED & McGRAW LLP**
Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Counsel to the Western Entities*

/s/ *Thomas MacWright*
**WHITE & CASE LLP**
J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Email: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Counsel to the Occidental Entities*

*/s/ Dennis L. Jenkins*
**FOLEY & LARDNER LLP**
John P. Melko
State Bar No. 13919600
Sharon M. Beausoleil
State Bar No. 24025245
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5500
Facsimile: (713) 276-5555
Email: jmelko@foley.com
sbeausoleil@foley.com

**MORRISON & FOERSTER LLP**
Jamie A. Levitt (admitted *pro hac vice*)
Michael D. Birnbaum (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: jlevitt@mofo.com
mbirnbaum@mofo.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: djenkins@willkie.com
bmiller@willkie.com

*Counsel to the Reorganized Debtors*

# EXHIBIT 26

# (FILED UNDER SEAL)

# EXHIBIT 27

7/30/2021 9:07 AM
Marilyn Burgess - District Clerk Harris County
Envelope No. 55852780
By: Cecilia Thayer
Filed: 7/30/2021 9:07 AM

CAUSE NO. ________

| | | |
|---|---|---|
| CARNERO G&P LLC, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | |
| | § | HARRIS COUNTY, TEXAS |
| SN EF UNSUB, LP, EAGLE FORD TX LP, | § | |
| VENADO EF L.P., MITSUI E&P TEXAS LP, | § | |
| and MESQUITE ENERGY, INC., | § | |
| Defendants. | § | |
| | § | ___ JUDICIAL DISTRICT |

# **Plaintiff's Original Petition**

Plaintiff CARNERO G&P LLC ("Carnero" or "Plaintiff") files this original petition against Defendants SN EF UNSUB, LP ("UnSub"), EAGLE FORD TX LP ("Eagle Ford"), VENADO EF L.P. ("Venado"), MITSUI E&P TEXAS LP ("Mitsui"), and MESQUITE ENERGY, INC. ("Mesquite") and alleges as follows:

## I. Discovery Control Plan

1. Plaintiff intends that discovery be conducted under Level 2 pursuant to TEX. R. CIV. P. 190.3.

## II. Parties

2. Carnero is a Texas joint venture, owned fifty percent (50%) by TPL SouthTex Processing Company LP ("Targa") and fifty percent (50%) by Evolve Transition Infrastructure LP (f/k/a Sanchez Midstream Partners LP) ("SNMP") with its principal place of business in Houston, Texas.

3. UnSub is a limited partnership organized under the laws of Delaware with its principal place of business at 1000 Main Street, Suite 3000, Houston, Texas 77002. It may be

served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

4. Eagle Ford is a limited partnership organized under the laws of Texas with its principal place of business at 555 San Felipe Road, Suite 1175, Houston, Texas 77056. It may be served through its registered agent Capitol Corporate Services, Inc., 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

5. Venado is a limited partnership organized under the laws of Delaware with its principal place of business at 13501 Galleria Circle, Suite 350, Austin, Texas 78738. It may be served through its registered agent Corporate Creations Network, Inc., 5444 Westheimer #1000, Houston, Texas 77056.

6. Mitsui is a limited partnership organized under the laws of Texas with its principal place of business at 9 Greenway Plaza, Suite 1250, Houston, Texas 77046. It may be served through its registered agent CT Corporation System, 1999 Bryan Street, Suite 900, Dallas Texas 75201.

7. Mesquite is a corporation organized under the laws of Delaware with its principal place of business at 700 Milam Street, Suite 600, Houston, Texas 77002. It may be served through its registered agent CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

## III. Jurisdiction

8. This Court has jurisdiction over this matter because it has the power to declare the rights between the parties pursuant to TEX. CIV. PRAC. & REM. CODE § 37.003, and the amount in controversy is within the jurisdictional limits of this Court.

## IV. Venue

9. Venue is proper in Harris County, Texas under Texas Civil Practice & Remedies Code section 15.002(a) (1), and 15.035(a). The agreements that form the basis of this dispute

provide that all disputes must be brought in Houston, Harris County, Texas. Moreover, all or a substantial part of the events or omissions giving rise to the claim occurred in Harris County, Texas.

## V. Rule 47 Statement of Relief

10. Under TEX. R. CIV. P. 47, Plaintiff seeks non-monetary relief and attorney's fees and costs.

## VI. Factual Background

11. This is a dispute over the meaning of three contracts arising from oil and gas operations on the "Comanche Assets" in the Western Eagle Ford Shale.

**The Comanche Assets**

12. Prior to January 2017, Eagle Ford, Venado, Mitsui, Anadarko E&P Onshore LLC, and Kerr-McGee Oil and Gas Onshore LP all owned working interests in approximately 300,000 gross acres of oil and gas rights in acreage known as the "Comanche Assets," which is primarily located in the Western Eagle Ford Shale. Eagle Ford, Venado, and Mitsui are collectively referred to as the "WIPs."

**The Comanche Assets Acquisition**

13. In January, 2017, SN EF Maverick, LLC ("Maverick") (a subsidiary of Sanchez Energy Corporation ("Sanchez")) and various co-investors, including Gavilan Resources, LLC ("Gavilan")[1] and UnSub, purchased the working interests of Anadarko E&P Onshore LLC and Kerr-McGee Oil and Gas Onshore LP (together, "Anadarko") in the Comanche Assets. The transaction closed on March 1, 2017.

[1] Gavilan Resources, LLC filed for bankruptcy on May 15, 2020, and later sold its interests in the Comanche Assets to Maverick (now known as Mesquite Energy, Inc., as explained below) in or about October 2020. As a result, the Plaintiff has not named Gavilan as a defendant.

**Comanche Assets Existing Commitments Dedications**

14. At the time of the Comanche Assets acquisition, the acreage conveyed to Maverick, Gavilan, and UnSub was dedicated by Anadarko for gathering and processing to other midstream providers pursuant to agreements that prevent, in part, the delivery of gas to other service providers (the "Existing Commitments").[2] Anadarko retained these Existing Commitments under the terms of the March 1, 2017 Comanche Assets acquisition agreements, specifically the Retained Midstream Contracts Services Agreement among Maverick, as "Provider," and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP, collectively as the "Recipient" (the "Midstream Agency Agreement"). The Midstream Agency Agreement required Provider to act as Recipient's agent for delivering gas on behalf of Recipient under the retained Existing Commitments.

15. Maverick, UnSub, and the WIPS never became parties to the underlying Existing Commitments. The Midstream Agency Agreement is the only agreement that required Maverick to deliver gas from the Comanche Assets to the Recipient for delivery under the Anadarko-retained Existing Commitments. UnSub and the WIPs never became parties to the Midstream Agency Agreement.

**Comanche Assets Marketing Agreement**

16. UnSub and Maverick agreed that Maverick would buy UnSub's share of the oil and gas produced by the Comanche Assets under the terms of a Hydrocarbons Purchase and Marketing Agreement (the "Marketing Agreement") dated as of January 12, 2017. The Marketing Agreement

---

[2] On information and belief, any dedication to other parties was not a complete dedication because some of the gas produced from the Comanche Assets was delivered to Carnero after the time that Carnero, Mesquite and UnSub entered into the Ratification Agreement referenced herein.

is the only agreement that linked UnSub's gas from the Comanche Assets to the Existing Commitments.

**Comanche Assets Dedication to Carnero**

17. On April 1, 2018, Maverick and Carnero entered into a Firm Gas Gathering, Processing and Purchasing Agreement (the "GGPA"). The GGPA obligates Maverick to deliver certain "Dedicated Gas" produced by the Comanche Assets (i.e., the "Dedicated Acreage") to Carnero. Section 3.1(b) of the GGPA excludes certain gas that is committed to other service providers under the Existing Commitments until the obligation to deliver gas thereunder terminates or expires. In addition, Section 3.1(b) of the GGPA requires Mesquite, as successor to Maverick, to terminate the obligation to deliver gas under any Existing Commitment at the earliest possible time.

18. UnSub, Maverick, and Carnero entered into a Ratification Agreement (the "UnSub Ratification Agreement") on the same day that Maverick and Carnero entered into the GGPA. Gavilan, Eagle Ford and Venado also executed ratification agreements in substantially the same form as UnSub's Ratification Agreement. These agreements together with the UnSub Ratification Agreement are collectively referred to as the "Ratification Agreements". As a consequence of the various Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have the same obligations as Maverick to terminate their delivery obligations under any Existing Commitments at the earliest possible time. Mitsui signed a Letter Agreement dated effective April 1, 2018 ("Letter Agreement"), that authorized Maverick to process Mitsui's gas from the Comanche Assets under the GGPA as if Mitsui had ratified the GGPA.

19. At the same time they signed the GGPA and the various Ratification Agreements and the Letter Agreement, Unsub, Eagle Ford, Venado, Maverick, Gavilan, and Carnero entered

into an Amendment to the Firm Gas Gathering, Processing, and Purchase Agreement ("GGPA Amendment") dated effective April 1, 2018.

20. Through the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado ratified and confirmed the GGPA in all respects and each agreed to assume all obligations of *a Producer* (as defined in the GGPA) under the GGPA in all respects. Specifically, the various Ratification Agreements each provide:

a. **Section 2 –** "Producer [UnSub, Eagle Ford, and Venado each] hereby *ratifies and confirms the GGPA in all respects, and agrees that Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] will assume all the obligations of a* ***'Producer' (as defined in the GGPA)*** *under the GGPA in all respects and make all the representations and warranties of a 'Producer' under the GGPA."* [Emphasis Added.]

b. **Section 4** - "*Producer [UnSub, Gavilan, Eagle Ford, and Venado* each*] hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA…*[3] *and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA….*" [Emphasis added.]

c. **Section 6 –** UnSub, Gavilan, Eagle Ford, and Venado each appointed Maverick as its "Producer's Representative"—"its agent and attorney-in-fact with respect to all matters under the GGPA," including receipt of notices and delivery of nominations as set forth in Article VI of the GGPA.

21. The GGPA provides that a "Producer" (as defined in the GGPA)—(which includes UnSub, Gavilan, Eagle Ford, and Venado per the various Ratification Agreements)—has the following obligations:

a. **Section 3.1(b) –** Producer's Gas that is subject to "Existing Commitments" is excluded from the dedication under Section 3.1(b) of the GGPA, *but only until "the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System … or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right*

[3] Venado's Ratification Agreement omits the language that is omitted in this quote ("(including with respect to after acquired interests)").

> *at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1*." [Emphasis added].

22. Based on these provisions in the GGPA and the Ratification Agreements, UnSub, Gavilan, Eagle Ford, and Venado have *all* the obligations of Producers under the GGPA, including the obligation to comply with the terms of Section 3.1(b) of the GGPA. These obligations specifically include the obligation, upon termination of any Existing Commitment preventing delivery of their gas to Carnero, to deliver all gas previously subject to such Existing Commitment to Carnero for Carnero to gather, process, and purchase. Further, UnSub, Gavilan, Eagle Ford, and Venado appointed Maverick as their representative for purposes of delivering nominations with respect to all of their gas from the Comanche Assets under the GGPA. Under the Letter Agreement, Mitsui authorized Mesquite to market the gas from Mitsui's interest in the Comanche Assets under the GGPA.

**Maverick's Bankruptcy**

23. Maverick and certain of its affiliates (collectively, the "Sanchez Debtors") filed chapter 11 bankruptcy petitions on August 11, 2019 in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") [Case No. 19-34508, jointly administered]. On April 30, 2020, the Bankruptcy Court entered an order confirming the Sanchez Debtors' Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 1205, Case No. 19-34508] (the "Plan"). As part of the Plan confirmation process, Maverick assumed the GGPA. Upon the effective date of the Plan, Mesquite became the successor to Maverick.

24. On June 28, 2021, the Bankruptcy Court entered a Stipulation of Dismissal and Agreed Order confirming the agreed rejection of the Marketing Agreement and the assumption of the UnSub Ratification Agreement by Mesquite (the "Rejection-Assumption Order"). The rejection of the Marketing Agreement terminated Mesquite's right to UnSub's gas and triggered

the obligation under Section 3.1 of the GGPA and the UnSub Ratification Agreement for UnSub to deliver its gas to Carnero for gathering, processing, and purchase.

25. Mesquite commenced proceedings to reject the Midstream Agency Agreement, which would terminate any delivery obligation thereunder, as well as under each Existing Commitment. Termination of Mesquite's delivery obligation under the Existing Commitments (which Mesquite and UnSub, Eagle Ford, and Venado must undertake at the earliest possible time) requires the delivery of Mesquite's, UnSub's, and the WIPs' gas to Carnero under the GGPA and the Ratification Agreements. On information and belief, the WIPs are causing Mesquite to withdraw its rejection of the Midstream Agency Agreement and/or to enter into new midstream agreement(s) in violation of the GGPA and the Ratification Agreements, which would prevent delivery of the WIPs' gas to Carnero.

26. Additionally, the Rejection-Assumption Order indicates that UnSub and Mesquite may be in active negotiations to enter into a new marketing agreement or a modified version of the rejected Marketing Agreement. On information and belief, UnSub and Mesquite may be attempting to negotiate a new dedication agreement or amend other agreements (including the Existing Commitments) to prevent delivery of UnSub's gas to Carnero. On information and belief, the WIPs are taking a similar position that would prevent delivery of their gas to Carnero. These actions are in derogation of Carnero's rights under the GGPA, the various Ratification Agreements, and the Letter Agreement. If such agreement(s) are consummated, it will be a material breach of the UnSub Ratification Agreement and the GGPA. Additionally, UnSub's statements and actions in the Bankruptcy Court confirm that it does not intend to comply with the terms of the UnSub Ratification Agreement and the GGPA.

## VII. Causes of Action

### A. Declaratory Judgment

34. Carnero adopts all prior paragraphs.

35. This is an action for declaratory judgment pursuant to Texas Uniform Declaratory Judgment Act, §37.001, et. seq. of the Texas Civil Practice and Remedies Code. Carnero is a person interested under a contract, namely the GGPA, the various Ratification Agreements, and the Letter Agreement. Carnero is a person whose rights, status, and other legal relations are affected by those contracts. Carnero may have determined any question of construction or validity arising under those contracts and obtain a declaration of rights, status, or other legal relations under the GGPA, the various Ratification Agreements, and the Letter Agreement.

36. Carnero seeks the following declarations:

(a) Pursuant to its Ratification Agreement and the GGPA, all of UnSub's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(b) Pursuant to their respective Ratification Agreements and the GGPA, all of Eagle Ford's and Venado's interests in the Comanche Assets, the Dedicated Acreage, and the Dedicated Gas are dedicated to Carnero;

(c) Pursuant to the Letter Agreement and the GGPA, all of Mitsui's gas from the Comanche Assets is dedicated to Carnero;

(d) Their respective Ratification Agreements and the GGPA require UnSub, Eagle Ford, Venado, and Mesquite to exercise any and all options or rights at the earliest possible time to terminate any Existing Commitments (as defined in Section 3.1(b) of the GGPA);

(e) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), UnSub and Mesquite must tender for delivery all of their gas from the Comanche Assets to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(f) The GGPA requires that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Eagle Ford and Venado must tender for delivery all of their gas from the Comanche Assets

to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(g) The GGPA and the Letter Agreement require that immediately upon termination of the Existing Commitments (as defined in Section 3.1(b) of the GGPA), Mitsui must tender for delivery all of its gas from the Comanche Assets to Mesquite for delivery to Carnero at the Primary Receipt Points (as defined in Section 3.1(a) of the GGPA);

(h) In their respective Ratification Agreements UnSub, Eagle Ford, and Venado designate Mesquite their Producer's Representative with respect to all matters arising under the GGPA;

(i) In the Letter Agreement, Mitsui designates Mesquite as its marketer with respect to Mitsui's gas from the Comanche Assets to be processed through the GGPA;

(j) After the rejection of the Marketing Agreement under 11 U.S.C. Section 365,

i). UnSub and UnSub's gas from the Comanche Assets continues to be subject to the obligations set forth in the GGPA and the Ratification Agreement; and

ii). UnSub must deliver UnSub's gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the Ratification Agreement.

(k) The GGPA and the respective Ratification Agreements obligate Mesquite, UnSub, Eagle Ford, and Venado to terminate their delivery obligations under the Existing Commitments at the earliest possible time, which would include, among other actions, Mesquite pursuing rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365.

(l) After rejection of the Midstream Agency Agreement under 11 U.S.C. Section 365,

i. Mesquite, UnSub, Eagle Ford, and Venado and their gas from the Comanche Assets automatically become and remain subject to the obligations set forth in the GGPA and the Ratification Agreement;

ii. Mesquite, UnSub, Eagle Ford, and Venado must deliver the gas from the Comanche Assets to Carnero for gathering, processing, and purchase under the terms of the GGPA and the respective Ratification Agreements; and

iii. Mitsui's gas from its interest in the Comanche Assets automatically becomes and remains subject to the obligations set forth in the GGPA and the Letter Agreement.

37. A genuine and justifiable controversy currently exists between the parties with respect to the rights and obligations under the Ratification Agreements, the Letter Agreement, and the GGPA.

**B. Attorney's Fees**

38. Carnero seeks an award of its attorney's fees under Texas Civil Practice & Remedies Code § 37.009 and as allowed by the GGPA and Ratification Agreements or other applicable agreement or statutory provision.

## VIII. Relief Requested

Plaintiff Carnero G&P LLC respectfully requests that the Court:

a. declare the parties' rights under the GGPA, the Ratification Agreements, and the Letter Agreement as set forth above;

b. award Plaintiff its reasonable and necessary attorney's fees; and

c. award Plaintiff such other and further relief, general or special, legal or equitable, to which it may be justly entitled.

Dated: July 30, 2021.

Respectfully submitted,

**PORTER HEDGES LLP**

By: *___/s/ Eugene M. Nettles______________*

Eugene M. Nettles
State Bar No. 14927300
Joshua W. Wolfshohl
State Bar No. 24038592
Amy C. Falcon
State Bar No. 24053576
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6295
enettles@porterhedges.com
jwolfshohl@porterhedges.com
afalcon@porterhedges.com

**ATTORNEYS FOR PLAINTIFF CARNERO G&P LLC**

# EXHIBIT 28

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al*.[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**PRELIMINARY OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This preliminary objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation ("**APC**"), Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**") and Kerr-McGee Oil and Gas Onshore LP ("**KMOG**," and together with APC, AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**"). In support of their objection, the Oxy Parties and the WES Parties (collectively, the "**Objecting Parties**") respectfully

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

represent as follows:

## PRELIMINARY OBJECTION

1. The Settlement Motion seeks to expedite approval of a settlement agreement with insider parties (the "**Settlement Agreement**")[2] that could conceivably result in the Debtors' breach of certain agreements with the Objecting Parties and a violation of this Court's recently-entered Confirmation Order. The Settlement Motion was filed Saturday evening (June 6) and was not served on the Objecting Parties until Monday (June 8) around noon Eastern Time. At the Debtors' request the Court set the Settlement Motion for hearing on June 18, 2020. Approval of the Settlement Motion, which is an insider transaction subject to heightened review, will require discovery and briefing on a complicated set of issues, most notably, whether the Settlement Agreement subverts the Confirmation Order. In seeking such relief, the Debtors provide no compelling justification for rushing approval of the Settlement Agreement. Therefore, the Objecting Parties request that the hearing scheduled for June 18, 2020 be adjourned and re-set to provide parties in interest no less than the standard 21-day objection period.

2. *First*, there is no "emergency" within the meaning of Local Rule 9013-1(i).[3] To date, the Debtors have taken an unhurried approach to dealing with their midstream arrangements and contracts. The Objecting Parties are parties to a number of interrelated agreements with the Debtors (collectively, the "**Agreements**") arising from the 2017 sale of the Comanche assets by AEP and KMOG to certain of the Debtors (and other non-Debtor buyers, including Gavilan Resources, LLC). As a result of this transaction, Anadarko assigned most of the leases and other Comanche assets to the Debtors and the other buyers. Anadarko, however, could not transfer certain key midstream and downstream contracts to Sanchez and

---

[2] Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Settlement Agreement.

[3] As provided by Local Bankruptcy Rule 9013-1(i) with respect to emergency motions: "The motion must include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency. The motion seeking an emergency hearing must be certified for its accuracy by the party seeking the emergency relief or by its counsel."

the other buyers because the counterparties did not consent to assignment. Instead, these agreements were retained by Anadarko (the "**Retained Agreements**"). As these contracts were critical to the operation and value of the Comanche assets, and in light of Anadarko's continuing obligations under such contracts, the parties entered into agency agreements (the "**Agency Agreements**") whereby certain of the Debtors committed to act as Anadarko's agent (with all attendant duties that position entails) under such contracts so that such Debtors would receive the benefits of, and in exchange bear the burdens under, the Retained Agreements.

3. Throughout the entire ten (10) months that these Chapter 11 Cases have been pending, the Debtors continued to benefit from and rely on the Agency Agreements and Retained Agreements to process, market, and transport (and thus monetize) production from certain of their oil and gas leases. It was not until the eve of the Confirmation Hearing that the Debtors provided notice of their intent to reject many, but not all, of the Agreements. The Objecting Parties intend to object to the rejection of the Agreements by the June 22 deadline (the "**Contract Objection Deadline**") and commence an adversary proceeding concomitantly therewith to address the many state law issues required to adjudicate such objection (including issues relating to covenants running with the land and integration of contracts).

4. To confirm the Plan and allow the Debtors to exit chapter 11, the Debtors proposed an atypical structure by which they could continue to delay their midstream and marketing operational restructuring until after the effective date of the Plan. Specifically, the Plan established a post-confirmation deadline for counterparties to file objections to rejection or assumption and provided that such objections had to be adjudicated by the Court prior to such contracts being deemed assumed or rejected. Notably, in order to avoid litigation over the unusual aspect of their chosen plan structure, the Debtors and Reorganized Debtors agreed, in the Confirmation Order, that they would continue to perform their obligations under the Agreements until such time as any objection to rejection of such Agreements was resolved by

an order of this Court. *See* Docket No. 1212 at ¶ 24. At that time the Debtors and the DIP Lenders were fully aware of what their obligations would be under those contracts (because they had been performing them for years) and fully appreciated that rejection or assumption of their midstream and marketing contracts was going to be hotly contested and would, at a minimum, require significant discovery and litigation.

5. Despite knowing all of that and having obtained the benefit of the Objecting Parties' non-objection to the Plan, the Debtors are now seeking to have this Court upend that deal and effectively modify the Confirmation Order on 12 days' notice. The Debtors' single justification for emergency relief is the expiration of the Professional Fee Settlement within the Plan—a deal the Debtors cut with estate professionals, all of whom owe fiduciary duties to the Debtors' estates and/or unsecured creditors and are subject to section 327 of the Bankruptcy Code. The Debtors claim that agreement expires on June 19 and, therefore, the Plan must go effective before the Debtors are forced to liquidate. In other words, the Debtors' proffered basis for this Court to expedite approval of an insider settlement that violates the Confirmation Order is that "certain" parties to the Professional Fee Settlement, Settlement Motion ¶ 46, are effectively threatening liquidation by refusing to provide sufficient runway to allow the Debtors to satisfy due process.

6. This Court may recall that the Debtors relied on a similar "emergency" to expedite confirmation and consummation of the Plan. Indeed, at a hearing on April 8, 2020 during which the Court scheduled the Confirmation Hearing for April 30, 2020, the Court specifically told all parties that the Plan would either be confirmed or not at such hearing, and that all parties should come "ready to close" that afternoon if the Plan was confirmed. Yet, more than a month later, the Plan has still not become effective. And, just as they did at the

Confirmation Hearing, the Debtors are claiming that their ability to exit chapter 11 is dependent on the emergency relief in the Settlement Motion.

7. It bears noting that while the DIP Lenders contacted several parties in these cases to discuss their proposed insider settlement (none of whom seem to have immediately seen its appeal), neither the Debtors nor the DIP Lenders discussed it with the Objecting Parties (the parties most immediately impacted by the relief sought). This is particularly frustrating given that just two days before the Settlement Motion was filed, counsels to the Objecting Parties spoke to counsel to the DIP Lenders and Reorganized Debtors regarding scheduling of the rejection disputes. At no point were the Objecting Parties informed of the proposed Settlement Agreement.

8. *Second,* there are significant legal and factual issues that need to be addressed before the Settlement Agreement can be approved. As noted above, it appears that, if approved, the Settlement Agreement would require the Debtors to breach their obligations under the Agency Agreements prior to this Court's resolution of the rejection objection. For example, section 2.3 of the Settlement Agreement requires certain Comanche gas volumes to be diverted to Seco Pipeline, LLC (a wholly-owned subsidiary of SNMP) in breach of the Agency Agreements. Such breach would be in direct violation of the requirements and obligations contained in the Confirmation Order for the Reorganized Debtors to continue performing under the Agreements, including the Agency Agreements.

9. Additionally, approval of the Settlement Agreement will require heightened scrutiny. Not only is it a transaction with the same insider parties that allegedly engaged in less than arms' length transactions with the Debtors prepetition, it also seeks to settle potentially valuable claims that were a focal point for the majority of these Chapter 11 Cases.

*See* Docket No. 1032-2 (Motion filed by the Unsecured Creditors' Committee seeking standing to assert various causes of action against SNMP and related parties).

10. In light of the complicated issues framed by the Settlement Motion, the Objecting Parties intend to take discovery with respect to several issues, including, (i) the impact the Settlement Agreement would have on the Debtors' or Reorganized Debtors' performance of the Agreements prior to their rejection (ii) the good-faith and arms' length nature of the transactions, and (iii) the Debtors' analysis of the value of the litigation claims being settled therein. The Objecting Parties, therefore, require sufficient time to conduct such discovery and prepare their objection. Additional time is also warranted given that the Objecting Parties are simultaneously preparing their objection to the rejection of the Agreements and related adversary complaint ahead of the June 22nd Contract Objection Deadline, which deadline the Debtors appear to be prohibited from extending under the terms of the Settlement Agreement.

11. Therefore, the Objecting Parties respectfully ask the Court to deny emergency consideration of the Settlement Motion, set the Settlement Motion on regular notice, provide the Objecting Parties until **June 27, 2020** to file an objection, and adjourn the hearing noticed for June 18, 2020 for a date after June 27.

## RESERVATION OF RIGHTS

12. The Objecting Parties reserve the right to amend or supplement this Preliminary Objection, to respond to any arguments raised by the Debtors or other parties, to make any arguments at the hearing on the Settlement Motion, and to seek any other or further relief.

## CONCLUSION

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Debtors' request to expedite consideration of the Settlement Motion, set the same for a date after June 27, 2020, and grant such other and further relief as the Court may deem just and proper.

Dated: June 8, 2020

Respectfully submitted,

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner

Case 19-34508 Document 1314 Filed in TXSB on 06/08/20 Page 1 of 8

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, *et al.*[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |

**PRELIMINARY OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This preliminary objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation ("**APC**"), Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**") and Kerr-McGee Oil and Gas Onshore LP ("**KMOG**," and together with APC, AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**"). In support of their objection, the Oxy Parties and the WES Parties (collectively, the "**Objecting Parties**") respectfully

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

represent as follows:

## PRELIMINARY OBJECTION

1. The Settlement Motion seeks to expedite approval of a settlement agreement with insider parties (the "**Settlement Agreement**")[2] that could conceivably result in the Debtors' breach of certain agreements with the Objecting Parties and a violation of this Court's recently-entered Confirmation Order. The Settlement Motion was filed Saturday evening (June 6) and was not served on the Objecting Parties until Monday (June 8) around noon Eastern Time. At the Debtors' request the Court set the Settlement Motion for hearing on June 18, 2020. Approval of the Settlement Motion, which is an insider transaction subject to heightened review, will require discovery and briefing on a complicated set of issues, most notably, whether the Settlement Agreement subverts the Confirmation Order. In seeking such relief, the Debtors provide no compelling justification for rushing approval of the Settlement Agreement. Therefore, the Objecting Parties request that the hearing scheduled for June 18, 2020 be adjourned and re-set to provide parties in interest no less than the standard 21-day objection period.

2. *First*, there is no "emergency" within the meaning of Local Rule 9013-1(i).[3] To date, the Debtors have taken an unhurried approach to dealing with their midstream arrangements and contracts. The Objecting Parties are parties to a number of interrelated agreements with the Debtors (collectively, the "**Agreements**") arising from the 2017 sale of the Comanche assets by AEP and KMOG to certain of the Debtors (and other non-Debtor buyers, including Gavilan Resources, LLC). As a result of this transaction, Anadarko assigned most of the leases and other Comanche assets to the Debtors and the other buyers. Anadarko, however, could not transfer certain key midstream and downstream contracts to Sanchez and

[2] Capitalized terms not otherwise defined herein shall have the meaning given to such terms in the Settlement Agreement.

[3] As provided by Local Bankruptcy Rule 9013-1(i) with respect to emergency motions: "The motion must include a detailed statement why an emergency exists, and the date relief is needed to avoid the consequences of the emergency. The motion seeking an emergency hearing must be certified for its accuracy by the party seeking the emergency relief or by its counsel."

the other buyers because the counterparties did not consent to assignment. Instead, these agreements were retained by Anadarko (the "**Retained Agreements**"). As these contracts were critical to the operation and value of the Comanche assets, and in light of Anadarko's continuing obligations under such contracts, the parties entered into agency agreements (the "**Agency Agreements**") whereby certain of the Debtors committed to act as Anadarko's agent (with all attendant duties that position entails) under such contracts so that such Debtors would receive the benefits of, and in exchange bear the burdens under, the Retained Agreements.

3. Throughout the entire ten (10) months that these Chapter 11 Cases have been pending, the Debtors continued to benefit from and rely on the Agency Agreements and Retained Agreements to process, market, and transport (and thus monetize) production from certain of their oil and gas leases. It was not until the eve of the Confirmation Hearing that the Debtors provided notice of their intent to reject many, but not all, of the Agreements. The Objecting Parties intend to object to the rejection of the Agreements by the June 22 deadline (the "**Contract Objection Deadline**") and commence an adversary proceeding concomitantly therewith to address the many state law issues required to adjudicate such objection (including issues relating to covenants running with the land and integration of contracts).

4. To confirm the Plan and allow the Debtors to exit chapter 11, the Debtors proposed an atypical structure by which they could continue to delay their midstream and marketing operational restructuring until after the effective date of the Plan. Specifically, the Plan established a post-confirmation deadline for counterparties to file objections to rejection or assumption and provided that such objections had to be adjudicated by the Court prior to such contracts being deemed assumed or rejected. Notably, in order to avoid litigation over the unusual aspect of their chosen plan structure, the Debtors and Reorganized Debtors agreed, in the Confirmation Order, that they would continue to perform their obligations under the Agreements until such time as any objection to rejection of such Agreements was resolved by

an order of this Court. *See* Docket No. 1212 at ¶ 24. At that time the Debtors and the DIP Lenders were fully aware of what their obligations would be under those contracts (because they had been performing them for years) and fully appreciated that rejection or assumption of their midstream and marketing contracts was going to be hotly contested and would, at a minimum, require significant discovery and litigation.

5. Despite knowing all of that and having obtained the benefit of the Objecting Parties' non-objection to the Plan, the Debtors are now seeking to have this Court upend that deal and effectively modify the Confirmation Order on 12 days' notice. The Debtors' single justification for emergency relief is the expiration of the Professional Fee Settlement within the Plan—a deal the Debtors cut with estate professionals, all of whom owe fiduciary duties to the Debtors' estates and/or unsecured creditors and are subject to section 327 of the Bankruptcy Code. The Debtors claim that agreement expires on June 19 and, therefore, the Plan must go effective before the Debtors are forced to liquidate. In other words, the Debtors' proffered basis for this Court to expedite approval of an insider settlement that violates the Confirmation Order is that "certain" parties to the Professional Fee Settlement, Settlement Motion ¶ 46, are effectively threatening liquidation by refusing to provide sufficient runway to allow the Debtors to satisfy due process.

6. This Court may recall that the Debtors relied on a similar "emergency" to expedite confirmation and consummation of the Plan. Indeed, at a hearing on April 8, 2020 during which the Court scheduled the Confirmation Hearing for April 30, 2020, the Court specifically told all parties that the Plan would either be confirmed or not at such hearing, and that all parties should come "ready to close" that afternoon if the Plan was confirmed. Yet, more than a month later, the Plan has still not become effective. And, just as they did at the

Confirmation Hearing, the Debtors are claiming that their ability to exit chapter 11 is dependent on the emergency relief in the Settlement Motion.

7. It bears noting that while the DIP Lenders contacted several parties in these cases to discuss their proposed insider settlement (none of whom seem to have immediately seen its appeal), neither the Debtors nor the DIP Lenders discussed it with the Objecting Parties (the parties most immediately impacted by the relief sought). This is particularly frustrating given that just two days before the Settlement Motion was filed, counsels to the Objecting Parties spoke to counsel to the DIP Lenders and Reorganized Debtors regarding scheduling of the rejection disputes. At no point were the Objecting Parties informed of the proposed Settlement Agreement.

8. *Second,* there are significant legal and factual issues that need to be addressed before the Settlement Agreement can be approved. As noted above, it appears that, if approved, the Settlement Agreement would require the Debtors to breach their obligations under the Agency Agreements prior to this Court's resolution of the rejection objection. For example, section 2.3 of the Settlement Agreement requires certain Comanche gas volumes to be diverted to Seco Pipeline, LLC (a wholly-owned subsidiary of SNMP) in breach of the Agency Agreements. Such breach would be in direct violation of the requirements and obligations contained in the Confirmation Order for the Reorganized Debtors to continue performing under the Agreements, including the Agency Agreements.

9. Additionally, approval of the Settlement Agreement will require heightened scrutiny. Not only is it a transaction with the same insider parties that allegedly engaged in less than arms' length transactions with the Debtors prepetition, it also seeks to settle potentially valuable claims that were a focal point for the majority of these Chapter 11 Cases.

*See* Docket No. 1032-2 (Motion filed by the Unsecured Creditors' Committee seeking standing to assert various causes of action against SNMP and related parties).

10. In light of the complicated issues framed by the Settlement Motion, the Objecting Parties intend to take discovery with respect to several issues, including, (i) the impact the Settlement Agreement would have on the Debtors' or Reorganized Debtors' performance of the Agreements prior to their rejection (ii) the good-faith and arms' length nature of the transactions, and (iii) the Debtors' analysis of the value of the litigation claims being settled therein. The Objecting Parties, therefore, require sufficient time to conduct such discovery and prepare their objection. Additional time is also warranted given that the Objecting Parties are simultaneously preparing their objection to the rejection of the Agreements and related adversary complaint ahead of the June 22nd Contract Objection Deadline, which deadline the Debtors appear to be prohibited from extending under the terms of the Settlement Agreement.

11. Therefore, the Objecting Parties respectfully ask the Court to deny emergency consideration of the Settlement Motion, set the Settlement Motion on regular notice, provide the Objecting Parties until **June 27, 2020** to file an objection, and adjourn the hearing noticed for June 18, 2020 for a date after June 27.

## RESERVATION OF RIGHTS

12. The Objecting Parties reserve the right to amend or supplement this Preliminary Objection, to respond to any arguments raised by the Debtors or other parties, to make any arguments at the hearing on the Settlement Motion, and to seek any other or further relief.

## CONCLUSION

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Debtors' request to expedite consideration of the Settlement Motion, set the same for a date after June 27, 2020, and grant such other and further relief as the Court may deem just and proper.

Dated: June 8, 2020

Respectfully submitted,

*/s/ Jason S. Brookner*
Jason S. Brookner (Texas Bar No. 24033684)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 8th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner

# EXHIBIT 29

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*,[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1309 |

**LIMITED OBJECTION OF VENADO OIL & GAS, LLC, AND ITS DIRECT AND INDIRECT SUBSIDIARIES, EAGLE FORD TX LP, AND MITSUI E&P TEXAS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries), Eagle Ford TX LP, and Mitsui E&P Texas LP (collectively, the "Comanche Non-Ops"), by and through the undersigned counsel, hereby submit this limited objection (this "Objection") to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "Settlement Motion"). In support of this Objection, the Comanche Non-Ops respectfully state as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**Limited Objection**

1. The Comanche Non-Ops are non-operating working interest owners representing, in the aggregate, an approximately 50 percent working interest in the Comanche Assets (as defined in the Settlement Motion).

2. Debtor SN EF Maverick LLC ("SN Maverick") is currently the designated operator of the Comanche acreage. In addition, and pursuant to certain production marketing agreements between SN Maverick (as assignee of Anadarko E&P Onshore LLC and Anadarko Energy Services Company) and each of the Comanche Non-Ops (with respect to each Comanche Non Op, its "PMA"), SN Maverick or its designated marketing affiliate markets each of the Comanche Non-Ops' respective oil, residue gas, and natural gas liquids produced from the oil and gas wells located on the Comanche acreage. As they indicated to this Court, the Debtors intend to assume the PMAs and continue marketing production on behalf of the Comanche Non-Ops upon the Debtors' emergence from the bankruptcy cases. *See Notice of Filing of Third Amended Exhibits B and C of the Plan Supplement for the Joint Chapter 11 Plan of Reorganization of Sanchez Energy Corporation and Its Debtor Affiliates* [Docket No. 1293].

3. The Comanche Non-Ops have sought to work constructively with the Debtors in the background of these bankruptcy cases to establish a mutually beneficial marketing plan for the Comanche acreage following the conclusion of the Debtors' bankruptcy cases. However, given the potential impact of the Debtors' Settlement Motion, the Comanche Non-Ops are now compelled to file this Objection to the Settlement Motion, and respectfully submit that the Settlement Motion should be denied unless and until (i) the Debtors provide sufficient information for the Court and parties in interest to evaluate the propriety of the Settlement, as described herein, and (ii) the Debtors demonstrate that the transactions contemplated by the Settlement Motion, and

the discontinuation of existing agreements, are consistent with the Debtors' duties to the Comanche Non-Ops under their respective PMAs.

4. The Comanche Non-Ops agree with the other objecting parties[2] that the Debtors' proposed settlement (the "Settlement") improperly presumes the resolution of a number of issues related to the Debtors' unusual assumption and rejection process, many of which raise complex factual questions that potentially necessitate discovery. The Comanche Non-Ops are concerned by the insider nature of the transactions proposed in the Settlement, especially whether certain of the proposed agreements with insiders were made at arms'-length and on prevailing market terms (or not).

5. As other objections have pointed out, the Settlement clearly favors the Debtors' Catarina operations over their Comanche operations, and is premised on using the Comanche Non-Ops' valuable production volumes to benefit the Debtors' Catarina operations. The Comanche Non-Ops seek to understand, and believe the Court should consider, how the Debtors and the insider parties to the Settlement arrived at the agreed-upon commercial terms and rates for the various proposed agreements, how those commercial terms and rates compare to prevailing market terms, and to what extent the Debtors sought better market terms from other parties, if at all. Moreover, the Settlement Motion fails to address the risks or potential negative impact that

---

2 *See Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1314]; *Preliminary Objection of Gavilan Resources, LLC to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1320]; *Joinder of GSO ST Holdings LP, GSO ST Holdings Associates LLC, and SN EF UnSub, LP* to *Preliminary Objection of Occidental Petroleum Corporation and Western Midstream Partners LP to Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No 1316].

discontinuing the rejected agreements and entering into new agreements may have on the Comanche Non-Ops' interests under the PMAs, which require the Debtors to act in good faith and in a manner that is commercially reasonable under the circumstances in marketing the Comanche Non-Ops' hydrocarbons. Each of these questions is directly relevant to whether the Settlement is in "the paramount interest of creditors" or "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion," *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917–18 (5th Cir. 1995), and the Settlement Motion notably lacks any answers to those questions. Indeed, the Comanche Non-Ops struggle to understand how they can meaningfully assess the Settlement without this information, and the Comanche Non-Ops respectfully submit that the Settlement should not be approved absent a showing that the Debtors acted in good faith and in a manner that is commercially reasonable under the circumstances.

6. The Comanche Non-Ops further believe that the Settlement implicates crucial substantive rights of a number of parties in interest, including the Comanche Non-Ops' rights under their respective PMAs with the Debtors, to make certain elections in the event the Debtors materially modify the manner in which the Comanche Non-Ops' hydrocarbons are processed, transported, marketed, and sold. To date, the Debtors have made no meaningful attempt to engage with the Comanche Non-Ops regarding the terms of these new agreements that implicate the Comanche Non-Ops' volumes. Further, the Debtors have failed to provide sufficient information for the Comanche Non-Ops to even determine whether the election rights under the PMAs referenced above could be triggered by the Settlement.

7. The Comanche Non-Ops look forward to a constructive and fulsome dialogue with the Debtors and other parties in interest on the issues raised in the Settlement and the Debtors'

assumption and rejection process generally. But the process required to resolve the myriad issues stemming from the Settlement must include more information from the Debtors for the Court and parties in interest to be in a position to consider and evaluate the full range of implications of the Settlement.

**Reservation of Rights**

8. The Comanche Non-Ops reserve the right to amend or supplement this Objection, raise additional objections to the Settlement Motion, including, among other things, to the nature of releases provided under the Settlement, and to seek any other or further relief. Further, to the extent that the Settlement implicates the Comanche Non-Ops' respective rights under the PMAs, each of the Comanche Non-Ops reserves any and all such rights.

**Conclusion**

9. The Comanche Non-Ops respectfully request that the Court deny the Debtors' request to approve the Settlement Motion unless and until the Debtors provide sufficient information for the Court and parties in interest to evaluate the propriety of the Settlement, and grant such other and further relief as the Court may deem just and proper.

[*Remainder of page intentionally left blank*]

Dated: June 22, 2020
Houston, Texas

/s/ *Jonathan G.C. Fombonne*

Jonathan G.C. Fombonne (TX Bar No. 24102702)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
609 Main St.
Houston, Texas 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: jonathan.fombonne@kirkland.com

- and -

Aparna Yenamandra (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: aparna.yenamandra@kirkland.com

*Counsel to Venado Oil & Gas, LLC and each of its direct and indirect subsidiaries (including, without limitation, Venado EF L.P. and its subsidiaries)*

Julia Frost-Davies (admitted *pro hac vice*)
Amy Kyle (admitted *pro hac vice*)
**MORGAN LEWIS LLP**
One Federal Street
Boston, MA 02110 - 1726
Telephone: (617) 341-7700
Facsimile: (617) 341-7701
Email: julia.frost-davies@morganlewis.com
amy.kyle@morganlewis.com

*Counsel to Eagle Ford TX LP*

Duston McFaul (24003309)
Michael Fishel (24082998)
Maegan Quejada (24105999)
**SIDLEY AUSTIN LLP**
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone: (713) 495-4500
Facsimile: (713) 495-7799
Email: mquejada@sidley.com

*Attorneys for Mitsui*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, a true and correct copy of the foregoing objection was served by e-mail on the parties who receive electronic notice in these cases pursuant to the Court's ECF filing system.

/s/ *Jonathan G.C. Fombonne*

# EXHIBIT 30

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| SANCHEZ ENERGY CORPORATION, et al.,[1] | ) | Case No. 19-34508 (MI) |
| Debtors. | ) | (Jointly Administered) |
| | ) | Re: Docket No. 1309 |

**OBJECTION OF GSO ST HOLDINGS LP, GSO ST HOLDINGS ASSOCIATES LLC AND SN EF UNSUB, LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

GSO ST Holdings LP, in its capacity as a preferred equity holder of SN EF UnSub, LP, a non-debtor affiliate of the above-captioned debtors (the "Debtors"), GSO ST Holdings Associates LLC (together with GSO ST Holdings LP, "GSO"), in its capacity as an equity holder of SN EF UnSub GP, LLC, the general partner of SN EF UnSub, LP ("UnSub"), and UnSub, by and through the undersigned counsel, hereby submit this Objection to *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* (the "Settlement Motion") [Docket No. 1309].

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

**PRELIMINARY STATEMENT**

In the Settlement Motion, the Debtors propose to overhaul the midstream charges for their Comanche and Catarina assets. But in order for their proposed settlement to close, they need the consent of UnSub. If the Debtors' attempt to reject the Marketing Agreement (defined below) with UnSub fails, as it should, that document would require UnSub's consent to moving UnSub's volumes of hydrocarbons to a different midstream processor. And if the Debtors succeed in rejection, they lose the contractual ability to control UnSub's volumes altogether. Either way, UnSub's consent to the settlement will be necessary, and proceeding down this path without it is futile and senseless.

But the Debtors did not seek UnSub's consent in advance of filing the motion because they know UnSub will not and cannot consent to this deal: it is fundamentally unfair, representing an effort to benefit some of the Debtors at the expense not only of UnSub but also of the other Comanche working interest owners—including SN EF Maverick, LLC ("Maverick"), which is itself one of the Debtors. The Debtors have candidly admitted that what this settlement represents is an attempt to reduce Catarina midstream rates (in which certain Debtors have a 100% ownership of the working interest) in exchange for shifting Comanche hydrocarbons (in which one Debtor, Maverick, has a working interest).

The Court should not approve a settlement that not only is incapable of being consummated in its current form, but also creates an economic framework for the marketer and operator of the Comanche assets to work *against* the interests of the Comanche working interest owners, in violation of Sanchez's duties as debtor-in-possession. Indeed, discovery has shown that Maverick gave *no* consideration to how to potentially maximize value from its hydrocarbons (and those of the other Comanche working interest owners), separate and apart from trading them for concessions on the Catarina midstream arrangements. This is not surprising, given the

governance failures: the evidence is undisputed that there was no thought given to Maverick's rights and remedies as distinct from those of the other Debtors and that Maverick's assumption and rejection decisions necessary to consummate the transaction are not in the best interest of Maverick.

GSO and UnSub therefore respectfully request that the Court deny the Settlement Motion.

## BACKGROUND[2]

### A. Sanchez's Comanche and Catarina Assets

1. The Settlement Motion concerns the midstream charges for the Debtors' two principal oil-and-gas assets: the Comanche assets and the Catarina assets. While Sanchez Energy Corporation ("Sanchez") has served as the operator for both assets, it has very different economic interests in each: Sanchez has only a small minority working interest in Comanche—which it holds indirectly through Maverick—but 100% of the Catarina working interests. (*See* UnSub Ex. A at 22–23.)

2. The Comanche field consists of 1,738 wells and currently produces, on a gross basis, approximately 51,700 barrels of oil per day and 369 million cubic feet of gas per day of gas. (*See id.* at 23) Sanchez has a working interest of around 15% in approximately 300 of the Comanche wells, but no working interest or economic stake in the remaining 1,500 wells, resulting in an overall interest of around 6% in Comanche's total production. (*See* UnSub Ex. A at 23.)[3]

---

[2] This background statement of facts relies on the following: the Settlement Motion ("Mot.") and exhibits thereto (each cited as "Mot. Ex. __"); the exhibits attached to this Objection (each cited as "UnSub Ex").

[3] Sanchez also has a common-equity interest in UnSub; however, that interest, which is subordinated to UnSub's RBL debt and GSO's preferred-equity interest, is out of the money.

Despite its small economic interest in Comanche hydrocarbons and no economic interest in more than two-thirds of the wells of the Comanche field, Sanchez serves as the operator of the Comanche field (although its position as operator is now the subject of dispute). (*See* UnSub Ex. B at 59.)

3. The Catarina asset consists of 457 PDP wells, and currently produces, on a gross basis, approximately 7,500 barrels of oil per day and 115 million cubic feet of gas per day. (*See* UnSub Ex. A at 22.) Sanchez has a 100% working interest in the Catarina assets and is the operator. (*See* UnSub Ex. A at 22.)

4. Sanchez receives gathering and midstream services for its Catarina assets from Sanchez Midstream Partners LP ("SNMP") and affiliated entities, including Carnero G&P LLC ("Carnero"), a joint venture of SNMP. (*See* UnSub Ex. C at 29.) As its name suggests, SNMP is a related party to Sanchez: while Sanchez and SNMP are publicly traded, both were founded by members of the Sanchez family, who long served as directors and officers of both companies. (*See id.* (identifying SNMP as a related party).) SNMP and its affiliates have imposed unilateral rate increases in respect of the Catarina assets that the Debtors believe are improper and have resulted in litigation. (*See* Mot. ¶ 27, at 18.)

5. Though it has only a minority working interest in the Comanche field, Sanchez has entered into agreements with the other working interest owners that give it a qualified authority to make midstream decisions for the entire Comanche relating to Sanchez's role as operator (which is in dispute). These agreements include the Hydrocarbons Purchase and Marketing Agreement by and between Maverick and UnSub, dated as of January 12, 2017 (the "Marketing Agreement"), as well as the Joint Development Agreement by and among Gavilan Resources, LLC ("Gavilan"), Maverick, UnSub, and Sanchez, dated as of March 1, 2017 (the "JDA"). Section 2.2 of the Marketing Agreement requires UnSub's consent before Sanchez materially alters the midstream

contracts that affect UnSub. (*See* UnSub Ex. D ("MA") § 2.2.) Section 3.1(h) of the JDA requires the unanimous approval of Gavilan, Maverick, and UnSub before approving or amending midstream contracts. (*See* UnSub Ex. E ("JDA") § 3.1(h).)

**B. Current Midstream Costs in the Comanche**

6. The Comanche working interest owners face midstream fees for gathering, processing and transportation. Gathering fees make up the majority of such midstream costs for both oil and gas.

7. Today, the gathering and processing fees paid by the Comanche working interest owners reflect above-market rates. Those high fees, combined with low oil and gas prices, threaten the long-term sustainability of oil and gas drilling in Comanche. Solving this problem requires a comprehensive restructuring of the Comanche midstream rates, including, most significantly, the rates under gathering agreements between Sanchez and Springfield Pipeline LLC ("Springfield"), a 50% owned subsidiary of Western Midstream Partners, LP (with its affiliates, "Western"). Western is by far the most significant midstream provider to the Comanche field.

8. The gathering agreements with Springfield are particularly concerning because they impose fixed demand charges even as production and prices decline. First, due to the pricing under the Springfield gathering agreements, it is not economical to operate the Comanche assets at the current gas production levels. Second, with regard to the future, oil and gas companies often manage lower prices by reducing their exploitation of existing wells and their development of new wells. But that is not feasible, because Springfield fixed demand charges are contractually scheduled to increase, and without volumes from new wells, Sanchez will be forced to cover increasing fixed demand charges from a production base in decline. This causes per-unit charges to escalate, leading to an economic "death spiral." Comanche operating margins are already slim, and any increase in per-unit charges would result in no material new drilling activity and could

potentially lead to the shutting-in of PDP production. The only away to avoid this outcome for Sanchez and the other Comanche working interest owners is to negotiate material amendments to the midstream contracts with Western.

9. GSO has repeatedly told Sanchez the importance of restructuring the midstream agreements with Western, including the Springfield gathering rates, and sent multiple formal proposals for how to do so. These overtures went unheeded. Regrettably, Sanchez has not even attempted to negotiate with Western on these gathering fees. Nor has Sanchez requested Western make a proposal for processing—or a combined proposal on processing and gathering together. Nor has Sanchez requested proposals from third parties for new processing or transportation arrangements for the Comanche field. Any reasonable operator focused on the Comanche assets would have engaged with Western, its predominant midstream provider, on a comprehensive solution to the midstream arrangements, including potentially a continued commitment of Comanche volumes to processing at the Brasada processing plant (in which Western has a 100% ownership interest) in return for much needed rate concessions under the agreements with Western and Springfield.

**C. The Proposed Settlement**

10. Instead of negotiating required rate reductions with Western, Sanchez has negotiated the Settlement Agreement with SNMP and its affiliates, obtaining rate reductions for its Catarina assets by leveraging its rights as marketer of the Comanche hydrocarbons pursuant to its marketing agreements with Comanche working interest owners (including the Marketing Agreement with UnSub). Put bluntly, Sanchez is selling out the Comanche working interest owners to benefit its Catarina assets. And it is doing so in order to settle claims brought by insiders who have been taking advantage of the Debtors by imposing what the Debtors themselves call improper rate hikes.

11. In the Settlement Motion, the Debtors seek approval of a proposed transaction in which Sanchez would receive (i) approximately $10 million up front, including contribution of a disputed administrative expense claim of nearly $2 million by Seco Pipeline, LLC ("Seco"), (ii) rate reductions on gathering services for Catarina assets that are still in excess of current market rates and reductions for processing and fractionation services that are contingent on obtaining consents from Comanche working interest owners, and (iii) releases from the Settlement Parties (as defined in footnote 5 of the Settlement Motion). (*See* Mot. ¶¶ 19–20, at 10–15.)

12. In exchange for these questionable benefits, Sanchez has agreed to direct over 350 million cubic feet of gas per day from the Comanche field—where it is currently processed by Western and other processors—to SNMP for processing. (*See id.* ¶¶ 15, 29, at 8, 19.) Sanchez proposes to do this by rejecting its current agreements with Western and other processors (together, the "Non-Carnero Processing Agreements"). (*See id.* ¶ 15 n.7, at 8.)[4] Rejecting the Non-Carnero Processing Agreements, the settlement presupposes, would cause gas produced by the Comanche assets to become deliverable to Carnero for processing under the Firm Gas Gathering, Processing and Purchase Agreement ("GGPA") dated April 1, 2018, between Maverick and Carnero. Further, the Carnero rates on incremental volumes are no better for Comanche than those provided in 2018, when commodity prices and margins were far higher, despite several available options and excess capacity of processing in the Eagle Ford. Thus, in order to settle unjustifiable rate hikes imposed

[4] The relevant Sanchez entity—Maverick—is not a named party to these processing agreements, but rather has agreed to take over the obligations of the named parties, Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP, under a services agreement with them. (Mot. ¶ 15 n.7, at 8.) So as a technical matter, Sanchez rejecting the services agreement, not the Non-Carnero Processing Agreements themselves. (*See id.*) But this technical distinction makes no difference to our analysis.

by insiders, the Debtors are rewarding SNMP with additional above-market business at the expense of the Comanche working interest owners.

13. This is not a disputed point. The Chief Restructuring Officer of the Debtors candidly admitted at his deposition that the principal benefit to the Debtors from the proposed settlement is the reduced midstream rates, and the principal benefit to the settlement counterparties, SNMP and Targa, is the additional volumes they secured from the Comanche assets. (Deposition Transcript of Mohsin Meghji dated June 22, 2020, at 130:21-132:6.)

14. To be clear, the Debtors did not even *try* to pursue a course that might maximize value for the Comanche working interest owners (including Maverick, a debtor). (Meghji Tr. at 26:4-8.) Indeed, Mr. Meghji, testified that he approved the proposed settlement on behalf of Maverick without doing ***any*** analysis to determine what additional consideration Maverick (and the other Comanche working interest owners) might achieve had they re-negotiated the Comanche midstream contracts separate and apart from the Catarina rate negotiation. (Meghji Tr. 136:2-18.)

**ARGUMENT**

15. The Court should deny the Settlement Motion and reject the proposed settlement. The "Court should only approve the settlement when the settlement is 'fair and equitable and in the best interest of the estate.'" *Connecticut General Life Ins. Co.* v. *United Companies Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). This settlement is not just inequitable, but unlawful and will be unable to close. Put simply, the settlement is Sanchez's attempt to exercise control over UnSub's hydrocarbons in violation of UnSub's contract and property rights. The Marketing Agreement and JDA—which Sanchez has improperly sought to reject—require UnSub's consent for the new midstream arrangements effectuated by the Settlement Agreement. Alternatively, in the absence of these agreements, Sanchez would have no right to market UnSub's property without its consent. UnSub does not—and will not—consent to

the proposed settlement, because it benefits Sanchez's Catarina assets at the expense of UnSub and the other Comanche working interest owners. In light of all this, the settlement does not pass muster under Bankruptcy Rule 9019(a), as it (a) cannot be closed without UnSub's consent (which will not be forthcoming), (b) provides largely illusory benefits to the Debtors, (c) provides SNMP restated above market rates, and (d) seeks to disadvantage Maverick in order to benefit the other Debtors.

## I. The proposed settlement requires UnSub's consent, whether or not the Marketing Agreement and JDA are rejected.

16. Sanchez cannot close the transactions contemplated by the settlement without UnSub's consent under the Marketing Agreement and the JDA, as the settlement itself acknowledges. As such, if Sanchez fails in its efforts to reject the Marketing Agreement and the JDA, UnSub's consent is required. On the other hand, if it succeeds in rejecting these contracts, Sanchez no longer has a contractual right to commit UnSub's hydrocarbons, and the settlement cannot be closed for that reason.

### A. New midstream arrangements or modifications to existing ones require UnSub's consent under the Marketing Agreement and the JDA.

17. In the Settlement Agreement, Sanchez proposes to lock UnSub's gas into two new midstream arrangements. First, by rejecting the Non-Carnero Processing Agreements, Sanchez seeks to move the Comanche gas from Western to Carnero for processing. Second, it seeks to enter into a new pipeline agreement with Seco Pipeline, which the Settlement Motion refers to as the "New Comanche-Seco Agreement."

18. While Sanchez has sought to reject the Marketing Agreement and the JDA (*see* Docket No. 1188, at 92, 116), the confirmation order provides that they shall remain in place until UnSub's objection to rejection (filed yesterday) is resolved (*see* Docket No. 1212 ¶ 17, at 10–11).

And they will continue to remain in place because—for reasons UnSub explained in its objection to rejection and the related adversary proceeding—they are not subject to rejection.[5]

19. The Marketing Agreement and the JDA both independently obligate Sanchez to obtain UnSub's consent before altering the Comanche midstream arrangements as proposed in the Settlement Motion.

20. Section 2.2 of the Marketing Agreement requires UnSub's "prior written consent" before Sanchez may, among other things, "(1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to [UnSub's] Hydrocarbons, . . . or (b) otherwise have an adverse effect, in any material respect, on [UnSub] . . . [or] (2) enter into any contract with an Affiliate of [Maverick] that is on terms materially less favorable to [UnSub] than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of [UnSub] that are in excess of $20 million in any calendar year." (MA § 2.2.) "Midstream Contracts" are defined to include certain specified contracts—including the Non-Carnero Processing Agreements—as well as "any gathering, processing, transportation or sales agreements entered into after the Effective Date [of the Marketing Agreement], including any amendments thereto, relating to [UnSub's] Interests and the Hydrocarbons produced therefrom." (MA Annex I.) Maverick's "Affiliates" are expressly defined to include "all member[s] of the Sanchez family." (*Id.*)

---

[5] More specifically, as UnSub has explained in its brief opposing rejection and related adversary proceeding, the Marketing Agreement and JDA cannot be rejected in bankruptcy. Among other reasons, such agreements are component parts of a single integrated contract containing covenants that run with the land that are not subject to rejection.

21. This language covers both Sanchez's rejection of the Non-Carnero Processing Agreements and its entry into the New Comanche-Seco Agreement, both of which require UnSub's consent.

22. Consider first Sanchez's rejection of the Non-Carnero Processing Agreements. Rejection under § 365 constitutes a breach. 11 U.S.C. § 365(g); ***Mission Prod. Holdings, Inc.*** v. ***Tempnology, LLC***, 139 S. Ct. 1652, 1662 (2019). By definition, this breach excuses each other party's performance—otherwise, there would be no "executory" contract subject to rejection in the first place. *See* ***In re Murexco Petroleum, Inc.***, 15 F.3d 60, 62–63 (5th Cir. 1994). Thus, by rejecting these agreements, Sanchez loses its ability to insist on the other parties' performance and thereby "waive[s] any material rights" it has under the Non-Carnero Processing Agreements, which are "Material Contracts" within the meaning of the MA. (MA § 2.2, Annex I, and Exhibit B.) As a result, Sanchez cannot take the suggested actions without UnSub's consent.

23. UnSub's consent is also required to enter into the New Comanche-Seco Agreement. Entry into this agreement, as part of the proposed restructuring of Sanchez's midstream operations, has a material "adverse effect" on UnSub for the reasons explained below. (*See infra* Section II.) Moreover, Seco Pipeline is a wholly-owned subsidiary of SNMP, which, in turn, is an affiliate of Sanchez Oil & Gas Corporation, Sanchez's "Affiliate" as defined under the Marketing Agreement. (UnSub Ex. G (SNMP 2019 10-K) at 41; MA Annex I.) As a result, the agreement must be on terms as materially favorable as "could have been obtained . . . in an arm's length transaction with a Third Party." (MA § 2.2.)

24. There appears to have been no market test of the New Comanche-Seco Agreement or Carnero, and so there is no reason to believe it is as favorable to UnSub as an arm's-length transaction with a third party would be. In fact, UnSub has received unsolicited proposals from

competing midstream providers offering the same services provided by Carnero and Seco for significantly lower rates. Finally, the New Comanche-Seco Agreement cannot be assessed in isolation, because this agreement is part of a package deal involving processing at Carnero. Thus, to assess whether the New Comanche-Seco Agreement has an adverse impact, one must compare to the but-for world in which Sanchez sought to renegotiate the Springfield gathering agreements, the Brasada processing agreement, and agreements with midstream providers downstream of the Brasada plant—which it is now undisputed it did not seek to do.

25. The same result obtains under the JDA. Section 3.2 of the JDA lists various actions that Sanchez can undertake only with the unanimous consent of all three parties—Sanchez, Gavilan, and UnSub. (*See* JDA § 3.2.) These actions include "approving or amending of any Material Contracts" (*id.* § 3.2(h)), which are defined to include all "gathering agreements, processing agreements, [or] transportation agreements, . . . in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000" (*id.* Annex I).

26. Here, the Non-Carnero Processing Agreements, the purported commitment of additional volumes under the Carnero GGPA, and the New Comanche-Seco Agreement are all "Material Contracts" as they are "processing" and "transportation" agreements worth more than $1 million. Sanchez cannot "approv[e]" the New Comanche-Seco Agreement without UnSub's permission.[6] And while Sanchez is not formally "amending" the Non-Carnero Processing Agreements or the Carnero GGPA, its rejection of the Non-Carnero Processing Agreements and the purported commitment of additional volumes under the Carnero GGPA effectively eliminates the processors' obligation to perform, materially amending the relationship between the parties.

---

[6] That is because UnSub has a representative on the Operating Committee, appointed pursuant to the JDA, which must unanimously approve any of the actions listed in Section 3.2.

27. In sum, there are multiple, independent reasons why Sanchez must obtain UnSub's consent before it could close the transactions contemplated by the proposed settlement, assuming the Marketing Agreement and JDA remain in place and are not rejected (as we submit they cannot be).

**B. Alternatively, if the Marketing Agreement and the JDA were rejected, then Sanchez would have no right to market UnSub's hydrocarbons to Carnero or anyone else.**

28. Of course, Sanchez has sought to reject the Marketing Agreement and the JDA, even though they are part of one integrated contract that runs with the land. It cannot do so, as UnSub demonstrated in its objection to rejection of these contracts. But assuming Sanchez could reject these contracts, rejection would simply provide yet another reason why the settlement cannot go forward without UnSub's consent.

29. UnSub owns an ~18% working interest in the Comanche assets. That means, of course, that UnSub owns ~18% of the hydrocarbons produced by the Comanche assets. It is fundamental that Sanchez cannot do anything with UnSub's property without its consent. Here, Sanchez can lawfully transport and sell UnSub's hydrocarbons solely by virtue of the Marketing Agreement—which Sanchez seeks to reject. Thus, without the Marketing Agreement, Sanchez could not enter into new midstream arrangements affecting UnSub's hydrocarbons without its consent.

30. Nonetheless, in the Settlement Motion, Sanchez attempts to identify a way to make an end-run around UnSub's property rights. As the motion explains, Sanchez and Maverick—which, despite its interest in the Comanche assets, has been enlisted by the other Debtors in their effort to undermine and degrade the value of those assets—seek to assume certain "Assumption Agreements," which include various "Ratification Agreements" related to the GGPA between Maverick and Carnero. (*See, e.g.*, Mot. ¶ 20, at 15; Mot. Ex A § 1.1, at 3 (definition of

"Assumption Agreements").) UnSub and other Comanche working interest owners entered into these agreements at the time Sanchez entered into the GGPA with Carnero. Sanchez appears to be operating under the mistaken assumption that UnSub's entry into one of these Ratification Agreements means that, with or without the Marketing Agreement, UnSub's gas can be shifted to Carnero for processing. Not so. Basic principles of contract interpretation and bankruptcy law provide that UnSub's gas volumes will not shift to Carnero as the Debtors expect.

31. As an initial matter, the Ratification Agreement (UnSub Ex. H ("RA")) is relevant *only* insofar as Sanchez seeks to shift additional gas to Carnero. It cannot support the other parts of the proposed settlement, including the New Comanche-Seco Agreement, which plainly requires UnSub's consent insofar as it affects UnSub's property interest in its hydrocarbons. That alone would render the settlement unable to close, regardless of whether the Marketing Agreement and JDA were rejected or if they were retained.

32. Moreover, the Ratification Agreement, by its terms, does not permit UnSub's gas to be processed by Carnero absent the Marketing Agreement. In the Ratification Agreement, UnSub agreed to do two things: to "assume all the obligations of [Maverick] ***under the GGPA***" and "confirm" the GGPA's dedication of its gas interests "to Carnero and to the performance of the GGPA, ***as provided in the GGPA***," which is being assumed by the Debtors. (RA §§ 2, 4 (*emphasis added*).) On its face, this language simply required UnSub to live up to Maverick's obligations under the GGPA in the event Maverick could not.

33. Maverick's obligations under the GGPA, however, *are limited to gas it has the right to control or market through arrangements such as the Marketing Agreement*. The GGPA obligates Maverick to deliver certain "Dedicated Gas" to Carnero. (UnSub Ex. I § 3.1(a).) "Dedicated Gas" is defined as "Producer's Gas" generated from certain specified land, and

"Producer's Gas" is defined as "all Gas that is owned ***or controlled*** by Producer [***i.e.***, Maverick] ***or which Producer has the right to market***." (*Id.* § 1.1 at 4, 6.) Thus, once Maverick cannot "control" or "market" any gas owned by a third party, it ceases to be "Dedicated Gas" subject to the delivery obligation in the GGPA. This result is eminently sensible, because Maverick cannot promise to deliver gas to which it has no legal entitlement.

34. As a result, the only thing UnSub ratified in the Ratification Agreement was Maverick's obligation to deliver UnSub's gas ***if the Marketing Agreement remained in place***.

35. Section 3 of the Ratification Agreement provides decisive support for this reading. Under Section 3, Carnero has the right to "cure" Maverick's breach of any agreement with UnSub (including the Marketing Agreement) by stepping into Maverick's shoes and performing Maverick's obligations to UnSub—in which case UnSub loses its right "to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement." (RA § 3.) This provision would be wholly unnecessary—and in fact pointless—if UnSub had to continue performing under the Ratification Agreement and GGPA even if Maverick breached the Marketing Agreement. Such a reading would be contrary to Texas law (which governs the Ratification Agreement, *see* RA § 7), under which "[i]nterpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage." *U.S. Metals, Inc.* v. *Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24 n.5 (Tex. 2015); *see also Smith* v. *Davis*, 453 S.W.2d 340, 345 (Tex. Civ. App. 1970) ("[A]n interpretation that gives effect to all parts of an instrument and a reasonable meaning to all its provisions will be [p]referred to one that leaves a part of a writing useless."). Instead, the only reasonable interpretation of the Ratification Agreement is that UnSub's obligations remain operative only so long as the Marketing Agreement stays in force.

36. Further confirmation is provided by a Letter Agreement entered into by Maverick and UnSub on March 23, 2018, contemporaneously with the Ratification Agreement. (UnSub Ex. J.) In the letter, Maverick explained that it was requesting UnSub's consent—pursuant to Section 2.2 of the Marketing Agreement—to enter into the GGPA, and requested that UnSub also enter into the Ratification Agreement. (*Id.* at 1.) Section 3 of the Letter Agreement then provided:

> The parties acknowledge that UnSub's production that will be subject to the FGGPA will continue to be sold by UnSub to Maverick ***pursuant to the terms of the [Marketing] Agreement***. Unless otherwise set forth in the Ratification Agreement, the FGGPPA or this letter agreement, if there is any conflict between the terms of the [Marketing] Agreement and the Ratification Agreement, the terms of the [Marketing] Agreement will govern.

(*Id.* § 3, at 2.)

37. This language confirmed what the text and structure of the Ratification Agreement, as well as common sense, provide: Maverick cannot deliver UnSub's gas to Carnero under the GGPA unless Maverick retains the right, under the Marketing Agreement, to do so. Indeed, the Marketing Agreement was the predicate for Maverick's request that UnSub execute the Ratification Agreement. Thus, if the Marketing Agreement is rejected, Sanchez and Carnero have no basis to process UnSub's gas, and they must seek UnSub's consent to do so.

38. Finally, even if the GGPA somehow continued to bind UnSub even without the Marketing Agreement, rejecting the Non-Carnero Processing Agreements would not be effective in shifting UnSub's gas volumes from Western to Carnero. As discussed, Section 3.1(a) of the GGPA obligates Maverick to deliver "Dedicated Gas" to Carnero for processing. (*Id.* § 3.1(a).) Section 3.2(b) carves out from this obligation any gas that must be delivered to other processors until "the end of the then-current term" of each relevant Non-Carnero Processing Agreement. (*Id.* § 3.2(b).) The term of the Brasada contract ends in 2034. As a result, until 2034, the minimum volumes specified in those agreements are not subject to the Carnero agreement.

39. While Sanchez appears to be taking the position that rejecting the Non-Carnero Processing Agreement will make the gas volumes committed to Western automatically shift to Carnero, that is mistaken. Rejection is breach, not termination. *Mission*, 139 S. Ct. at 1659. As a result, rejection of the Western agreements does not cause the agreement to end or otherwise bring forward the "end of the []current term" of the agreement, meaning the gas committed to Western does not become subject to the Carnero agreement. Thus, Sanchez cannot use rejection to turn UnSub's property into a bargaining chip, trading it to Carnero for better rates on Sanchez's Catarina gas volumes. For all of these reasons, the settlement will be unable to close if the Debtors succeed in rejecting the Marketing Agreement and JDA.

**C. Under the Settlement Agreement, closing is conditioned on obtaining the consent of UnSub and the other Comanche Working Interest Owners.**

40. The closing of the transactions contemplated by the Settlement Agreement is conditioned on UnSub and the other Comanche working interest owners having delivered all consents required to consummate the transaction.

41. In Section 3.3.1(e) of the proposed settlement agreement, Sanchez represents and warrants that:

> there are no other agreements to which any of the Debtors is a party or by which any of the Debtors is bound that would reasonably be expected, following the Closing Date, to prevent or materially restrict the Debtors from delivering gas produced from the Comanche Acreage to Carnero G&P under the Comanche FGGPA (and the various Ratification Agreements by and among Carnero G&P, SN Maverick, and each of the Other Comanche Working Interest Holders pursuant to which the Other Comanche Working Interest Holders ratified the Comanche FGGPA).

(Mot. Ex. A § 3.1.1(e), at 15.)

42. That is, Sanchez represents in Section 3.3.1(e) that it can deliver the gas owned by the other Comanche working interest owners. However, as set forth above, the consent of UnSub

and the other Comanche working owners remains outstanding, which means that the other parties can terminate the Settlement Agreement. (Mot. Ex. A §§ 4.2.1, 5.1.2, at 16, 18.)

43. Moreover, Seco Pipeline's obligation to close is also conditioned on obtaining UnSub's consent: it depends on Sanchez having confirmed "that it has obtained all necessary consents under existing contractual arrangements and/or has otherwise secured all necessary contractual agreements from all Other Comanche Working Interest Holders in order to ensure the delivery for transportation and redelivery by Seco Pipeline in accordance with the terms of the New Comanche-Seco Agreement." (Mot. Ex. A § 4.5.2.)

44. Without UnSub's consent, the conditions precedent to the proposed settlement fail at the outset, meaning it will likely never be consummated. To be sure, the other parties to the agreement ***could*** excuse Sanchez's failure to meet these conditions precedent. But this just means the proposed settlement agreement is, in reality, an option contract in the hands of Sanchez's counterparties.

45. Even if Sanchez's counterparties did choose to waive these conditions precedent, a lack of consent from UnSub (and other Comanche working interest owners) would cause the settlement to become significantly less favorable to Sanchez, potentially resulting in Sanchez paying the same rates to Carnero it did before the settlement agreement. One of the amendments to the Catarina processing contract between Sanchez and Carnero is a new Exhibit G, which provides that the price for processing Catarina gas will increase to the extent that any of the Comanche gas is not delivered to Carnero. (Mot. Ex. C, Annex IV.) In effect, Exhibit G is a liquidated damages clause: it acknowledges that Sanchez is promising to deliver ***all*** of the Comanche gas to Carnero—which, of course, it can only do with the Comanche working interest owners' consent—and provides that Sanchez must compensate Carnero (in the words of Exhibit

G, "keep Carnero economically whole") if it cannot do so. If none of the Comanche working interest owners consent to the movement of their volumes from Brasada to Carnero, then it appears that there would be no rate reduction under the Carnero contract for the Catarina assets. Therefore, the purported rate reductions are illusory and dependent on actions that Sanchez cannot control.

* * *

46. For all these reasons, the proposed settlement cannot be consummated without UnSub's consent. And for reasons we will now explain, UnSub does not consent to the settlement.

## II. UnSub does not consent to the proposed settlement because it is unfair to UnSub and the other Comanche working interest owners.

47. UnSub does not—and cannot—consent to the proposed settlement structure. That is because, instead of achieving an optimal outcome for the Comanche working interest owners, it sacrifices their interests to benefit its Catarina assets.

48. As the proposed settlement demonstrates, Sanchez's economic objectives are not aligned with those of the other Comanche working interest owners. While Sanchez controls the Comanche field in its (disputed) role as operator, Sanchez has only a small economic interest in the Comanche oil and gas produced and no economic interest in over a majority of the wells in the field. Rather, Sanchez's economic interest is concentrated in its Catarina assets.

49. For that reason, Sanchez has bargained for rate reductions for Catarina while leaving in place materially above-market Comanche rates that jeopardize the viability of the Comanche field without attempting to negotiate with Western or solicit third party proposals; rather it is seeking to move volumes to Carnero, at the same rates that were agreed to in 2018, when commodity prices were higher, industry conditions were generally more favorable, and profit margins in the Comanche were higher. Given excess processing capacity in the Eagle Ford, Sanchez could have used the opportunity to seek proposals from Western or other third-party

processors but is instead ***using Comanche volumes*** to take negotiating leverage away from the Comanche working interest owners and, once again, achieve rate reductions only for Catarina.

50. UnSub has long believed, and has repeatedly told Sanchez, that the solution to the problems facing UnSub and Sanchez lies in negotiating the best midstream prices it can for the Comanche Assets. To do so, Sanchez must be willing to engage with its largest midstream counterparty and owner of the Springfield gathering system and Brasada processing plant that service the Comanche—Western—to negotiate better rates.

51. Yet Sanchez has never negotiated with Western or solicited third party proposals, despite UnSub's repeated requests that Sanchez do so. Instead of seeking improved, comprehensive midstream arrangements with Western, the primary midstream provider in the Comanche field, Sanchez is simply entering into arrangements with two entities affiliated with SNMP: Carnero and Seco Pipeline – in order to settle previous damage done by insider, affiliate actions. All the settlement accomplishes is lower gas gathering fees (although the gathering rates remain above-market) and contingent lower processing fees for Catarina, while harming the Comanche working interest owners. If the settlement goes forward as currently structured, Sanchez will have locked the Comanche owners into an inadequate deal that forecloses it from seeking a better one with Western or a third party.

52. Thus, instead of preserving its current leverage with Western to negotiate a comprehensive resolution, or preserving its ability to enter into a deal with a third party, Sanchez has, for all intents and purposes, abandoned its comparatively smaller Comanche interest in favor of improving the rates at Catarina (where it holds a substantially larger working interest).

**III. The proposed settlement cannot be approved under Rule 9019(a).**

53. In light of the foregoing, there are three independent reasons why the settlement cannot be approved under Rule 9019(a), which requires any settlement be "fair and equitable and in the best interest of the estate." *Connecticut General Life Ins.*, 68 F.3d at 917.

54. *First*, the settlement is not lawful because it is predicated on a violation of UnSub's contract and property rights: Sanchez is seeking permission to move UnSub's hydrocarbons, with or without rejection of the Marketing Agreement and JDA, UnSub's consent is required—and it has not been given. A settlement that violates a party's legal rights cannot be "fair and equitable" under any standard. "To the extent a proposed settlement includes provisions, the enforcement of which would be illegal or against public policy, it matters not whether the settlement is in the best interests of the estate." *In re Telcar Grp., Inc.*, 363 B.R. 345, 357 (Bankr. E.D.N.Y. 2007); *see also In re Levine*, 287 B.R. 683, 690 (Bankr. E.D. Mich. 2002) (explaining that bankruptcy judges' "independent duty to preserve the integrity of the judiciary would prevent [them] from giving judicial approval to an agreement which is otherwise unlawful"). And a "party simply cannot, through an agreement approved by a court, secure authority to engage in an activity which is not otherwise permitted by law." *Levine*, 287 B.R. at 691. The Court should not put its imprimatur on an agreement that is predicated on violating UnSub's contract and property rights to benefit other creditors.

55. *Second*, the settlement is not "in the best interest of the estate" because, without UnSub's consent, the supposed benefits to the Debtors' estates are illusory. As explained above, Sanchez cannot satisfy the representations, warranties, and conditions precedent set forth in the Settlement Agreement unless UnSub and the other Comanche working interest owners consent. UnSub does not consent. Therefore, the Settlement Agreement is really just an option contract that Carnero and Seco Pipeline can choose to exercise if they wish—giving them leverage to

negotiate another agreement, less favorable to the estate, between now and closing. And even if the proposed settlement does make it past closing, Sanchez will have to pay higher rates if it cannot deliver UnSub's gas (or the other Comanche working interest owners')—which is precisely what will occur without UnSub's (or the other owners') consent. As a result, there is no guarantee that the supposed benefits to the Debtors' estates will ever materialize. The Court should not approve a contract whose benefits are liable to vanish into thin air.

56. *Finally*, even if the Court found a benefit to ***some*** Debtors, there is at least one Debtor that is harmed by the proposed settlement—Maverick, which is being recruited to further these transactions. Furthermore Maverick's actions—which are against its own interest—form the lynchpin of the proposed transaction: it is Maverick that is the principal party-in-interest in respect of the Non-Carnero Processing Agreements, and, thus it is Maverick that is the key Debtor party that must dutifully pursue rejection of these agreements or else Debtors will be obligated to return the funds received from Carnero under the settlement. Moreover, Maverick is enlisted to take other key actions, such as committing to assume the Ratification Agreement and other agreements in furtherance of diverting the Comanche volumes. Here, Maverick is key to actions to effectuate the settlement and the transactions contemplated thereby, but as further discussed below, there is no demonstrated value ***to Maverick***. To be approved under Rule 9019(a), a settlement must be "in the best interest of the estate." *Connecticut General Life Ins.*, 68 F.3d at 917. Absent substantive consolidation, the Court must preserve the integrity of *each* Debtor's estate, which remains separate. *See, e.g., In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 692 (Bankr. S.D. Tex. 2009); *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 359 (S.D.N.Y. 2007); *cf. Irving Tanning Co.* v. *Kaplan*, 876 F.3d 384, 391 (1st Cir. 2017) (holding that "each [debtor] entity needs to be evaluated separately" for purposes of fraudulent-transfer claim). That standard was not upheld here.

57. Although settlements under Rule 9019 can only be approved if they are "in the best interest of the estate," the Debtors' Chief Restructuring Officer, Mohsin Meghji, who negotiated the settlement agreement on behalf of the Debtors, testified that in pursuing the settlement, he "essentially wanted to make sure that" Maverick was "no worse off, and better off, if possible" in determining whether the settlement was fair to Maverick. (Meghji Tr. 124:8–10.) Indeed, Mr. Meghji confirmed that the "standard [he] was focused on" was "making sure that given all the agreements in place and all the agreements that [Maverick] had – at a minimum, [Maverick was] no worse off." (*Id.* at 124:21–24.)

58. This is the wrong standard. By merely considering whether Maverick would be made "no worse off" under the terms of the proposed settlement, the Debtors failed to consider the "best interest of the estate," which is the standard that must be met for the settlement to be approved. The Court should not approve a settlement that was crafted according to a standard that fails to meet the minimum requirements of Rule 9019.

59. Indeed, as Mr. Meghji's testimony suggests, there is no conceivable benefit to ***Maverick's*** estate from the proposed settlement, as Maverick is not involved in the core disputes underlying the settlement. To the contrary: as Debtors candidly admitted in discovery, the proposed settlement seeks to use the Comanche, where Maverick's interests lie, as leverage to benefit Catarina, where Maverick has no stake. Unsurprisingly, a majority of Maverick's constituents have objected to this deal, and "a bankruptcy court may not ignore creditors' overwhelming opposition to a settlement." *Connecticut General Life Ins.*, 68 F.3d at 918. The Court should not accept a settlement that harms one Debtor to benefit the others.

## CONCLUSION

60. WHEREFORE, GSO and UnSub respectfully request that the Court deny the Settlement Motion.

Dated: June 24, 2020
Houston, Texas

/s/ *Thomas A. Woolley*

MCCLOSKEY ROBERSON, PLLC
Thomas A. Woolley, III
State Bar No. 24042193
945 Heights Blvd.
Houston, Texas 77008
Telephone: (713) 337-3910
Facsimile: (713) 868-1275
Email: rwoolley@mccloskeypllc.com

-and-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Paul M. Basta (admitted *pro hac vice*)
Alice Belisle Eaton (admitted *pro hac vice*)
Andrew J. Ehrlich (admitted *pro hac vice*)
Sean A. Mitchell (admitted *pro hac vice*)
Justin D. Ward (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
aeaton@paulweiss.com
aehrlich@paulweiss.com
smitchell@paulweiss.com
jward@paulweiss.com

*Counsel to GSO and Special Counsel to UnSub*

# Exhibit A

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

Results Driven. Manufacturing Focused.







# Sanchez Energy Business Plan

March 2020

SANCHEZ
ENERGY CORPORATION

007029

www.sanchezenergycorp.com

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Management Representatives

**Mo Meghji**
*Chief Restructuring Officer*

**Cam George**
*Executive Vice President and Chief Financial Officer*

**Greg Kopel**
*Executive Vice President, General Counsel and Secretary*

**Mike Blincow**
*Vice President, Production*

**Scott Dunlap**
*Vice President, Drilling and Completions*

**Holly Griffin**
*Director, Asset Development*

**Cham King**
*Director, Finance and Business Development*

**Scott Wike**
*Director, Marketing*

**Cheyne Hermes**
*Manager, Corporate Finance and Strategy*

# Table of Contents

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

I. Executive Summary 4

II. Business Plan and Financial Projections 8

III. Asset Development Plan 20

IV. Midstream 26

V. Corporate G&A 29

<u>Appendix</u>

A. PDP Reference Case 32

B. Other Supporting Items 34

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# I. Executive Summary

# Business Plan Approach and Summary

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**The Sanchez Energy management team and advisors ("SN," or the "Company") have been working diligently on a revised business plan, with the goal of maximizing value for stakeholders by focusing on (1) disciplined and optimized capital spend, (2) preservation of optionality for longer-term value realization (with key decision points clearly identified), (3) a simplified and reduced overhead cost structure and (4) a comprehensive midstream solution**

- **Approach and Objectives:**
  - The Company has put together the principal "building blocks" of a proposed, going concern business plan for the future owners of the Company, with a primary focus on asset development, midstream and corporate overhead expenses
  - The Company has explored three cases that bookend possible scenarios for the development of the asset base
    - The Option Preservation Case assumes drilling at Catarina to hold the lease through June 2021 (but no longer) and full participation/operatorship at Comanche
    - The Accelerated Completions Case assumes completing the drilled but uncompleted wells ("DUCs") at Catarina, full participation/operatorship at Comanche and no further participation in future drilling across the rest of the asset base
    - The PDP Reference Case assumes completing the drilled but uncompleted wells at Catarina, no participation in future drilling across the rest of the asset base and loss of Comanche operatorship
    - The Company and its advisors are exploring any combination or variants of these cases that maximize value and optionality
  - This process has included significant review, diligence and revisions to the Company's previous plan, with work still ongoing to identify additional upside
  - *All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments*
  - *Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation*
- **Key Building Blocks:**
  1. Asset Development
     - Catarina:
       - Option Preservation Case: Retain unique, single ~106,000 acre Catarina lease through 2021 by satisfying current leasehold commitments, but no further drilling after June 2020 (all locations are uneconomic at current prices, and continued activity at historical levels would require a substantial commodity recovery)
       - Accelerated Completions Case: Complete remaining 31 DUCs
     - Comanche: Retain operatorship of entire, multi-lease asset and focus development on highest rate of return opportunities (~50-80 wells per year)
     - At the request of the CRO, the Company's reserves, engineering and development plan assumptions were independently reviewed by the Debtor advisors' technical and E&P teams
       - The technical and E&P teams did not find any variances that would materially change assumptions
       - Feedback has also been solicited from creditor groups, with viable suggestions to be further considered and, if appropriate, incorporated
     - The overarching focus is on a near-term path to free cash flow generation while preserving longer term option value/upside where economically justified
       - We believe this can be achieved through disciplined capital spend on high-graded inventory and leasehold retention wells only 007033
     - See asset development section for additional detail on operational strategy

Case 4:23-cv-00508 Document 137-1 Filed 04/18/23 in TXSD Page 1246 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Approach and Summary *(continued)*

- **Key Building Blocks *(continued)*:**

2. Midstream and Marketing
   - A contract-by-contract financial model was created by SN's midstream team, with no involvement from Sanchez Midstream Partners LP ("SNMP") related personnel, to help inform midstream optimization strategy
     - A comprehensive analysis regarding the value of midstream contract optimization is ongoing
   - The SECO pipeline contract with SNMP was terminated on January 13, 2020 (30-day notice provided to SNMP)
3. Corporate G&A
   - A revised G&A plan has been created and evaluated on a bottom-up basis by the Company and its advisors

# Business Plan Approach and Summary *(continued)*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

- **Preliminary Conclusions**:
  - Preliminary analysis indicates higher asset value under the Option Preservation and Accelerated Completions Cases when compared to the PDP Reference Case
  - The Company believes a going concern business model that drills only economic or leasehold retention wells (as part of a near-term option preservation strategy) provides the best opportunity to maximize value for stakeholders
  - While the intentions and preferences of creditors are likely to shape the longer-term business plan, the Company believes a focused operating business provides stakeholders with potential upside opportunities for NAV accretion, as opposed to the PDP Reference Case
  - The material building blocks of the preliminary business plans are subject to additional input and consideration from the future owners of SN (whether they be the creditors or a new buyer), and therefore the assumptions used in these plans are subject to change

- **Open Issues, Ongoing Business Initiatives and Next Steps**:
  1. Net asset value figures contained throughout the presentation have been prepared using the Company's corporate model and corresponding ARIES database, both of which are subject to continuous review and revision by the Company
  2. Ryder Scott is reviewing PDP and PUD forecasts for the Company's year end reserve report
  3. Further legal and financial analysis on midstream strategy
  4. Potential negotiation with Catarina landowner
  5. Discussions with creditor groups around optimal development plan assumptions
  6. Potential capital structure at emergence (e.g., DIP refinancing, reinstated debt, etc.), which is not addressed by the current business plan
  7. Address issues of all other key stakeholders and counterparties, such as Sanchez Oil & Gas Corporation ("SOG"), Gavilan Resources LLC ("Gavilan"), SNMP, GSO Capital Partners, etc.
  8. The business plan may be further revised based on ongoing analysis in the context of maximizing value for the estate

007035

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# II. Business Plan and Financial Projections

# Business Plan Assumptions

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**The Company and its advisors have conducted a thorough review of business plan assumptions**

| Assumption | Commentary |
|---|---|
| Commodity Prices | ◆ Strip pricing as of 2/11/20<br>◆ Realized prices vs. benchmark prices (WTI and Henry Hub): oil (~93%-98%), natural gas (~100%) and NGLs (~15% of WTI oil price) |
| Midstream/Marketing | ◆ Option Preservation, Accelerated Completions and PDP Reference Cases assume current contracts remain in place (i.e., status quo)<br>◆ SECO contract terminated with 30-day notice to SNMP in January 2020<br>◆ Interruptible gathering rates at Eastern Catarina are held flat at current rate of $1.50/Mcf |
| Corporate G&A | ◆ Projected G&A profile is illustrative; assumes streamlined cost structure, renegotiated office lease and elimination of all non-core expenses under private company emergence assumption<br>◆ Gross G&A projection in the Option Preservation and Accelerated Completions Cases is reduced to approximately $35-$40MM, before adjustment for COPAS recovery<br>◆ The operator of oil and gas properties is generally entitled to receive COPAS recovery for reimbursement of expenses incurred on behalf of the other working interest owners of those properties; COPAS recovery to SN from operating Comanche is governed by the JOA and assumed at approximately $950 per well; 3% annual escalation of COPAS reimbursement based on 10-year historical average |
| Other Operating Expenses/Taxes | ◆ Based on 12-month historical averages for each asset from the lease operating statements ("LOS")<br>◆ Ad valorem and severance tax rates are based on latest county estimates as a percentage of production |
| Catarina | ◆ Option Preservation Case: Meet drilling requirement (24 additional wells) by June 2020; hold Catarina lease through June 2021; complete all drilled but uncompleted wells ("DUCs") over the next ~18 months<br>◆ Accelerated Completions Case: complete remaining DUCs by June 2020 |
| Comanche | ◆ High-graded and optimized development schedule for Comanche drilling (~50-80 wells per year for next 6-8 years)<br>◆ Focus on highest IRR wells within each type curve area, while meeting lease obligations; retains all material leases<br>◆ Ring-fenced, non-debtor subsidiary SN EF UnSub, LP ("UnSub") continues to self-fund its portion of new Comanche development spend |
| Other Assets | ◆ Maverick – undeveloped wells uneconomic at current commodity prices; plan assumes PDP only resulting in significant lease expirations<br>◆ Palmetto – non-consent 2020 development capital (10 wells with unproven type curves with net cost to SN of ~$40 million); potential upside from future option to participate in years 2021+ once well economics have been demonstrated. Non-consenting 2020 development program does not forfeit opportunity to participate in 2021+ development wells<br>◆ Other non-core assets include the Company's Tuscaloosa Marine Shale ("TMS") assets and assets operated by others ("OBO") |
| Well Economics | ◆ Assumes current authorization for expenditure ("AFE") estimates based on average lateral length<br>◆ Corporate model calculates the cost of every well with specific adjustments for lateral length<br>◆ Well costs supported by historical averages |

007037

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# NAV (PV-10) Analysis and Comparison

- **All forecasts are preliminary, and conclusions are subject to change based on further and ongoing assessments**
- **Nothing in this presentation is intended to be a valuation or reflect the Company's or any Company advisor's view on valuation**

*$ millions*

| Summary NAV Analysis[1] | Option Preservation Case | | | | |
|---|---|---|---|---|---|
| | $50/$2.50 | Strip[2] | $60/$2.50 | $70/$2.50 | $80/$2.50 |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $149 | $186 | $283 | $417 | $551 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$288** | **$357** | **$541** | **$795** | **$1,048** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$193** | **$262** | **$446** | **$700** | **$953** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$198** | **$269** | **$463** | **$728** | **$993** |

| Summary NAV Analysis[1] | Accelerated Completions Case | | | | |
|---|---|---|---|---|---|
| | $50/$2.50 | Strip[2] | $60/$2.50 | $70/$2.50 | $80/$2.50 |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4] | $49 | $77 | $140 | $230 | $321 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$336** | **$396** | **$571** | **$806** | **$1,042** |
| Total G&A[5] | *($95)* | *($95)* | *($95)* | *($95)* | *($95)* |
| **Asset Value (Post-G&A)** | **$241** | **$301** | **$476** | **$711** | **$947** |
| Est. Upside from Palmetto Participation[6] | $5 | $7 | $17 | $28 | $40 |
| **Optimized/Upside Asset Value** | **$246** | **$308** | **$493** | **$739** | **$986** |

| Summary NAV Analysis[1][7] | PDP Reference Case | | | | |
|---|---|---|---|---|---|
| | $50/$2.50 | Strip[2] | $60/$2.50 | $70/$2.50 | $80/$2.50 |
| Asset Values (PV-10): | | | | | |
| Catarina[3] | $197 | $225 | $313 | $429 | $544 |
| Comanche (Restricted Only)[4][8] | ($19) | ($12) | $21 | $61 | $100 |
| Maverick | $78 | $83 | $103 | $129 | $154 |
| Palmetto | $8 | $8 | $11 | $14 | $17 |
| OBO / Other | $3 | $3 | $4 | $5 | $5 |
| **Asset Value (Pre-G&A)** | **$268** | **$308** | **$452** | **$637** | **$821** |
| Total G&A[5] | *($223)* | *($223)* | *($223)* | *($223)* | *($223)* |
| **Asset Value (Post-G&A)** | **$45** | **$85** | **$230** | **$414** | **$599** |

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Valuation excludes estimated cash at emergence. Estimated at approximately $27MM for SN Operating and UR Holdings accounts.*

*(2) Strip pricing as of 2/11/20.*

*(3) The estimated split of PV-10 at strip between Central/Eastern and Western Catarina in the Option Preservation Case is 52% ($157MM) and 48% ($142MM), respectively. The estimated PV-10 split ignores field level expenses that are allocated to the entire field (PV-10 -$101MM) and non-D&C capital (-$12MM). The estimated total production split between Central/Eastern and Western Catarina is 43% and 57%, respectively. Note that blended marketing and LOE rates are applied to all wells. For the Accelerated Completions and PDP Reference Cases, the PV-10 split is Central/Eastern 47% ($158MM) and Western 53% ($181MM).*

*(4) Includes Springfield marketing bands.*

*(5) Represents 30-year PV-10 of corporate G&A. Includes COPAS recovery PV-10 impact of ~$245MM (Option Preservation), ~$245mm (Accelerated Completions) and $6MM (PDP Reference) for each scenario. Of the COPAS recovery PV-10 impact in the Option Preservation and Accelerated Completions cases, ~21% is attributable to UnSub and ~79% to 3rd parties.*

*(6) Assumes 50% non-operated participation in remaining economic type curve areas (estimated 11 well inventory) if initial 2020 well results are in-line with Marathon expectations; wells are assumed to be drilled and completed during 2021-2023 and are not included in Option Preservation, Accelerated Completions or PDP Blowdown Reference Case.*

*(7) Excludes any estimated upside from Palmetto participation as the blowdown case assumes no further D&C capital investment. Potential upside if another operator executes SN's current development plan.*

*(8) Assumes no development activity as another operator's plan/budget cannot be forecasted.*

007038

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Illustrative and Preliminary NAV (PV-10) Sensitivities

## PV-10 for Option Preservation Case, Accelerated Completions Case and PDP Case at Various Price Decks[(1) (2)(3)]

*($ in millions)*

| Gas Price (HH) | Oil Price (WTI) – Option Preservation | | | | |
|---|---|---|---|---|---|
| | $50 | Strip[(4)] | $60 | $70 | $80 |
| $2.25 | $158 | $199 | $412 | $665 | $919 |
| Strip[(4)] | $189 | $262 | $443 | $696 | $950 |
| $2.50 | $193 | $233 | $446 | $700 | $953 |
| $2.75 | $227 | $268 | $481 | $734 | $988 |
| $3.00 | $262 | $302 | $515 | $769 | $1,022 |

| Gas Price (HH) | Oil Price (WTI) – Accelerated Completions | | | | |
|---|---|---|---|---|---|
| | $50 | Strip[(4)] | $60 | $70 | $80 |
| $2.25 | $209 | $247 | $444 | $679 | $914 |
| Strip[(4)] | $237 | $301 | $472 | $708 | $943 |
| $2.50 | $241 | $279 | $476 | $711 | $947 |
| $2.75 | $273 | $311 | $508 | $744 | $979 |
| $3.00 | $305 | $343 | $541 | $776 | $1,011 |

| Gas Price (HH) | Oil Price (WTI) – PDP Reference Case | | | | |
|---|---|---|---|---|---|
| | $50 | Strip[(4)] | $60 | $70 | $80 |
| $2.25 | $18 | $46 | $202 | $387 | $571 |
| Strip[(4)] | $40 | $85 | $225 | $409 | $594 |
| $2.50 | $45 | $73 | $230 | $414 | $599 |
| $2.75 | $73 | $101 | $257 | $442 | $626 |
| $3.00 | $100 | $128 | $285 | $469 | $654 |

*Notes: All values are preliminary and are calculated based on a 5/31/20 effective date. Strip values were run through the Company's ARIES database. The flat price deck sensitivities are for estimation purposes only. These sensitivities were run in the Excel model which ties closely to the ARIES database but lacks the ability to extend the life of individual wells and/or shut-in production based on pricing (referred to as "LOSSNO").*

*(1) Mt. Belvieu Propane is assumed to proportionately increase with WTI (32% of WTI); this results in average realized SN NGL basket pricing of approximately 15% of WTI.*

*(2) Asset values after G&A (excludes Palmetto participation).*

*(3) Values excludes estimated cash at emergence.*

*(4) Strip pricing as of 2/11/20.*

007039

Case 20-34558 Document 1336-1 Filed in TXSB on 07/30/20 Page 1252 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case Financial Projections (Accrual)

| *$ millions* | 2017A | 2018A | 2019E[1] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,070 | 11,891 | 11,520 | 12,391 | 9,871 | 8,959 | 8,551 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 70,384 | 72,356 | 71,344 | 76,633 | 62,844 | 54,925 | 51,322 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,193 | 13,553 | 13,367 | 14,357 | 11,847 | 10,410 | 9,789 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **35,993** | **37,503** | **36,778** | **39,520** | **32,193** | **28,523** | **26,893** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.51 | $48.66 | $49.00 | $48.39 | $48.70 | $49.22 | $49.71 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.33 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.32 | $9.08 | $8.79 | $9.33 | $9.51 | $9.61 | $9.58 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $83 | $124 | $207 | $219 | $175 | $161 | $156 |
| Gas Revenue | 121 | 121 | 87 | 20 | 33 | 52 | 65 | 55 | 49 | 46 |
| NGL Revenue | 117 | 160 | 81 | 17 | 26 | 43 | 49 | 41 | 37 | 34 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$119** | **$183** | **$302** | **$333** | **$271** | **$246** | **$236** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (32) | (30) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (86) | (144) | (145) | (122) | (103) | (92) |
| Production Taxes | (18) | (30) | (18) | (5) | (7) | (12) | (13) | (11) | (10) | (10) |
| Ad Valorem Taxes | (5) | (10) | (10) | (2) | (4) | (6) | (7) | (6) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX [2] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$15** | **$54** | **$69** | **$121** | **$88** | **$84** | **$86** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *13%* | *29%* | *23%* | *36%* | *32%* | *34%* | *37%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(129)* | *$(233)* | *$(212)* | *$(183)* | *$(162)* | *$(150)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(70) | $(79) | $(149) | $(113) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(55)** | **$(25)** | **$(80)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(115)** | **$(25)** | **$(141)** | **$8** | **$38** | **$37** | **$39** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [3] | | | | | | *12,857* | *13,815* | *10,388* | *8,301* | *7,036* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

007040

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case 2020E Financial Projections (Accrual)

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,819 | 11,392 | 10,993 | 10,614 | 10,097 | 13,294 | 13,388 | 12,566 | 11,896 | 11,389 | 11,520 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,779 | 71,511 | 69,886 | 68,105 | 64,354 | 74,784 | 79,188 | 75,921 | 73,337 | 70,914 | 71,344 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,706 | 13,412 | 13,114 | 12,780 | 12,080 | 13,997 | 14,803 | 14,207 | 13,735 | 13,286 | 13,367 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,822** | **36,723** | **35,755** | **34,745** | **32,903** | **39,756** | **41,389** | **39,427** | **37,854** | **36,494** | **36,778** |
| | | | | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| | | | | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.88 | $48.05 | $48.34 | $48.57 | $48.77 | $48.51 | $48.53 | $48.68 | $48.76 | $48.77 | $49.00 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.94 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.20 | $8.12 | $8.71 | $8.96 | $9.19 | $9.36 | $9.53 | $9.71 | $8.79 |
| | | | | | | | | | | | | | |
| Oil Revenue | $19 | $15 | $16 | $16 | $16 | $15 | $15 | $20 | $19 | $19 | $17 | $17 | $207 |
| Gas Revenue | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | 52 |
| NGL Revenue | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 43 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$24** | **$23** | **$23** | **$29** | **$28** | **$28** | **$26** | **$27** | **$302** |
| | | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (12) | (12) | (12) | (11) | (11) | (13) | (13) | (13) | (12) | (12) | (144) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (12) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (6) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX [(1)] | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$2** | **$2** | **$2** | **$6** | **$10** | **$9** | **$9** | **$8** | **$9** | **$69** |
| *EBITDA Margin (%)* | *22%* | *9%* | *11%* | *10%* | *10%* | *8%* | *27%* | *34%* | *33%* | *33%* | *32%* | *33%* | *23%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(20)* | *$(20)* | *$(21)* | *$(21)* | *$(21)* | *$(17)* | *$(19)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(233)* |
| | | | | | | | | | | | | | |
| Capex | $(8) | $(22) | $(16) | $(14) | $(10) | $(36) | $(20) | $(7) | $(3) | $(3) | $(5) | $(4) | $(149) |
| **Adjusted EBITDAX Less Capex** | **$(2)** | **$(20)** | **$(14)** | **$(12)** | **$(7)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(80)** |
| | | | | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(28)** | **$(22)** | **$(21)** | **$(33)** | **$(34)** | **$(14)** | **$3** | **$6** | **$6** | **$3** | **$4** | **$(141)** |
| | | | | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(2)] | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *13,478* | *12,522* | *12,078* | *13,931* | *12,793* | *12,664* | *11,808* | *12,857* |
| | | | | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

007041

Case 19-34508 Document 1336 Filed in TXSB on 05/14/20 Page 154 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Accelerated Completions Case Financial Projections (Accrual)

| $ millions | 2017A | 2018A | 2019E (1) | Pre-Emergence Jan-May 2020E | Post-Emergence Jun-Dec 2020E | Full Year 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,949 | 8,658 | 8,212 | 8,001 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,128 | 79,765 | 76,396 | 64,498 | 55,569 | 50,308 | 47,897 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,515 | 14,919 | 14,299 | 12,118 | 10,505 | 9,558 | 9,157 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,910** | **41,155** | **39,291** | **32,817** | **28,425** | **26,154** | **25,140** |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.66 | $48.89 | $49.36 | $49.82 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.44 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.33 | $9.47 | $9.57 | $9.54 |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $177 | $154 | $148 | $146 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 49 | 45 | 43 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 36 | 33 | 32 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$273** | **$239** | **$226** | **$221** |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (29) | (29) |
| Marketing | (108) | (131) | (160) | (58) | (92) | (149) | (131) | (112) | (96) | (87) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (10) | (9) | (9) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (5) | (5) | (5) |
| Corporate G&A | (114) | (87) | (89) | (25) | (13) | (38) | (15) | (15) | (14) | (14) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (13) | (99) | (15) | (15) | (14) | (14) |
| Reconciling Items to EBITDAX (2) | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$63** | **$82** | **$79** | **$68** | **$73** | **$78** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *32%* | *25%* | *29%* | *29%* | *32%* | *35%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(136)* | *$(240)* | *$(194)* | *$(171)* | *$(153)* | *$(143)* |
| Capex | $(485) | $(512) | $(62) | $(97) | $(28) | $(125) | $(38) | $(50) | $(47) | $(47) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(78)** | **$35** | **$(43)** | **$41** | **$18** | **$26** | **$31** |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$35** | **$(104)** | **$41** | **$18** | **$26** | **$31** |
| *Memo: Catarina Central / East Volumes (Boe/d) (3)* | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$9* | *$16* | *$16* | *$17* | *$18* | *$19* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$5* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

007042

Case 4:23-cv-00587 Document 133-61 Filed in TXSD on 04/19/23 Page 1255 of 1882
Case 20-33495 Document 1337 Filed in TXSB on 07/24/20 Page 15 of 58

# Accelerated Completions Case 2020E Financial Projections (Accrual)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| *$ millions* | Jan 2020E | Feb 2020E | Mar 2020E | Apr 2020E | May 2020E | Jun 2020E | Jul 2020E | Aug 2020E | Sep 2020E | Oct 2020E | Nov 2020E | Dec 2020E | FY 2020E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 11,012 | 10,767 | 10,644 | 11,623 | 12,428 | 12,009 | 15,829 | 13,954 | 12,858 | 12,432 | 11,933 | 11,509 | 12,259 |
| Gas (Mcf/d) | 71,001 | 69,446 | 67,040 | 71,719 | 78,922 | 74,899 | 90,310 | 85,047 | 80,876 | 78,045 | 75,643 | 73,279 | 76,396 |
| NGL (Boe/d) | 13,294 | 13,007 | 12,570 | 13,451 | 14,781 | 14,033 | 16,869 | 15,890 | 15,115 | 14,599 | 14,161 | 13,722 | 14,299 |
| **Total Net Daily Production (Boe/d)** | **36,139** | **35,349** | **34,387** | **37,027** | **40,363** | **38,525** | **47,749** | **44,019** | **41,452** | **40,039** | **38,701** | **37,444** | **39,291** |
| | | | | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | | | | |
| WTI ($/Bbl) | $57.53 | $50.18 | $49.94 | $50.17 | $50.45 | $50.68 | $50.88 | $51.01 | $51.07 | $51.11 | $51.14 | $51.11 | $51.27 |
| Henry Hub ($/Mcf) | $2.02 | $1.83 | $1.79 | $1.82 | $1.88 | $1.95 | $2.03 | $2.07 | $2.07 | $2.11 | $2.24 | $2.46 | $2.02 |
| Mt. Belvieu Propane ($/Bbl) | $18.06 | $15.52 | $16.01 | $16.07 | $16.17 | $16.01 | $17.17 | $17.59 | $18.01 | $18.38 | $18.74 | $19.11 | $17.24 |
| | | | | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | | | | |
| Oil ($/Bbl) | $55.18 | $48.13 | $47.90 | $48.02 | $48.18 | $48.40 | $48.25 | $48.45 | $48.57 | $48.69 | $48.76 | $48.76 | $48.90 |
| Gas ($/Mcf) | $2.00 | $1.82 | $1.77 | $1.81 | $1.87 | $1.93 | $2.01 | $2.05 | $2.05 | $2.09 | $2.22 | $2.44 | $2.01 |
| NGL ($/Bbl) | $9.20 | $7.90 | $8.14 | $8.16 | $8.23 | $8.14 | $8.77 | $8.98 | $9.19 | $9.36 | $9.54 | $9.72 | $8.80 |
| | | | | | | | | | | | | | |
| Oil Revenue | $19 | $15 | $16 | $17 | $19 | $17 | $24 | $21 | $19 | $19 | $17 | $17 | $219 |
| Gas Revenue | 4 | 4 | 4 | 4 | 5 | 4 | 6 | 5 | 5 | 5 | 5 | 6 | 56 |
| NGL Revenue | 4 | 3 | 3 | 3 | 4 | 3 | 5 | 4 | 4 | 4 | 4 | 4 | 46 |
| Other Sales and Marketing Revenue | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$27** | **$22** | **$23** | **$24** | **$27** | **$25** | **$34** | **$31** | **$28** | **$28** | **$27** | **$27** | **$322** |
| | | | | | | | | | | | | | |
| Hedge Gain / (Loss) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (3) | (32) |
| Marketing | (12) | (11) | (11) | (11) | (13) | (12) | (15) | (14) | (13) | (13) | (12) | (12) | (149) |
| Production Taxes | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (13) |
| Ad Valorem Taxes | (1) | (0) | (0) | (0) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (1) | (7) |
| Corporate G&A | (5) | (5) | (5) | (5) | (5) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (38) |
| Restructuring & Chapter 11 Fees | (9) | (8) | (9) | (9) | (26) | --- | --- | --- | --- | --- | --- | --- | (61) |
| Total G&A | (13) | (13) | (14) | (14) | (32) | (5) | (1) | (1) | (1) | (1) | (1) | (1) | (99) |
| Reconciling Items to EBITDAX (1) | 9 | 8 | 9 | 9 | 26 | --- | --- | --- | --- | --- | --- | --- | 61 |
| **Adjusted EBITDAX** | **$6** | **$2** | **$3** | **$3** | **$4** | **$4** | **$13** | **$11** | **$9** | **$9** | **$9** | **$9** | **$82** |
| *EBITDA Margin (%)* | *23%* | *10%* | *12%* | *12%* | *15%* | *14%* | *37%* | *35%* | *33%* | *33%* | *33%* | *34%* | *25%* |
| *Memo: Total Operating Expenses* | *$(21)* | *$(19)* | *$(20)* | *$(21)* | *$(23)* | *$(22)* | *$(21)* | *$(20)* | *$(19)* | *$(19)* | *$(18)* | *$(18)* | *$(240)* |
| | | | | | | | | | | | | | |
| Capex | $(8) | $(16) | $(21) | $(5) | $(46) | $(6) | $(1) | $(5) | $(3) | $(3) | $(5) | $(4) | $(125) |
| **Adjusted EBITDAX Less Capex** | **$(1)** | **$(14)** | **$(19)** | **$(2)** | **$(42)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(43)** |
| | | | | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $(9) | $(8) | $(9) | $(9) | $(26) | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $(61) |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(10)** | **$(22)** | **$(28)** | **$(11)** | **$(68)** | **$(3)** | **$12** | **$6** | **$6** | **$6** | **$3** | **$5** | **$(104)** |
| | | | | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d) (2)* | *13,137* | *13,587* | *12,317* | *12,350* | *13,694* | *15,761* | *14,295* | *15,367* | *14,924* | *13,728* | *13,579* | *12,640* | *13,779* |
| | | | | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.3* | *$1.4* | *$1.4* | *$1.4* | *$15.7* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$0.4* | *$4.5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(2) Production volumes from ARIES database may not tie exactly to the company model.*

007043

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Option Preservation Case Provides Commodity Price Upside

**A going concern company best positions the assets for future rebound in commodity prices or monetization**




007044

*Note: Assumes strip pricing as of 2/11/20.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Key Ongoing Business Initiatives

**Immediate steps have been taken to delay capital spend, optimize operations and reduce costs; the Company is focused on key ongoing business initiatives to maximize asset value**

| | |
|---|---|
| **Asset Development** | ◆ **The drilling program at Catarina was thoroughly reviewed, with timing for continued activity pushed approximately one month, from early January to early February 2020; the existing rig was moved from Catarina to Comanche during the first week of January; as part of this review, the Company's drilling schedule was optimized, resulting in an overall lower rig count**<br>◆ The revised development plan has been designed to preserve the asset base and maintain optionality while minimizing near-term capital outlay<br>◆ The business plan assumes drilling only economic wells (minimum threshold of 20% IRR[(1)]), unless certain wells are required to be drilled to retain a major lease under CDC obligations – if the Accelerated Completions Case were to be adopted, the remaining DUC inventory would be completed with no further development activity in Catarina after June 2020<br>◆ The Company currently has 3 rigs across the entire asset base (1 at Catarina and 2 at Comanche); however, not all are active<br>◆ In the event that the Company pursues a plan that involves the drilling of additional wells in Catarina, that plan would result in 2 active rigs at Catarina and 1 at Comanche |
| **Midstream** | ◆ **The SECO midstream contract was terminated on January 13, 2020, with 30-day notice provided to SNMP**<br>◆ Midstream contract optimization opportunities are being evaluated, with consideration of commercial, economic and legal implications<br>◆ Value accretion to both SN and SNMP may be available through the Debtors' midstream optimization strategy; any value that may be captured by SNMP will be addressed through a comprehensive renegotiation (with the goal of capturing maximum value for SN and providing infill gathering rate certainty in Eastern Catarina) |
| **Corporate G&A** | ◆ **Non-essential overhead expenses, such as the company ranch participation, have been rejected or eliminated, saving approximately $2MM per annum on a run-rate basis; additional cost savings may be realized in the near-term through ongoing G&A review and contract renegotiation and/or rejection**<br>◆ Corporate G&A has been thoroughly reviewed by management, with a proposed plan to reduce overhead expenses from approximately $75MM (~$3.00/Boe) in 2019 to an average of approximately $19MM consolidated G&A after COPAS reimbursement (~$1.50/Boe) from 2021 through 2025 |
| **Asset Lease Preservation** | ◆ Catarina: TBD<br>◆ All major leases at Comanche are being reviewed on a case-by-case basis |

007045

*Note:*
*(1) IRR calculated at $50 oil/$2.50 gas/$14 NGL price deck.*

Case 4:23-cv-00587 Document 13-7 Filed 04/19/23 Page 1258 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Key Near Term Operational Decisions (2020)

**Outlined below are key operational decisions over the next 12 months**

| Category | Decision |
|---|---|
| Catarina | **<u>Option Preservation</u>**<br>◆ Drill remaining 24 wells required in the 2019-2020 lease period – *Project Capital: $45.0MM*<br>◆ Complete 5 DUCs scheduled in February – *Project Capital: $11.8MM completions + $1.3MM infrastructure and non-D&C*<br>◆ Complete 18 DUCs scheduled in June – *Project Capital: $45.6MM completions + $4.7MM infrastructure and non-D&C*<br>◆ Drill required wells for 2020-2021 lease term – *Source rigs for contract, September 2020 spud for 2-rig program*<br>◆ Leaves 31 DUCs to be completed in 2021 – *Project Capital: $66.2MM completions + $8.0MM infrastructure and non-D&C*<br><br>**<u>Accelerated Completions</u>**<br>◆ Complete 31 DUCs scheduled through June<br>◆ *Project Capital: $1.9MM drilling (Feb/Mar 2020 only) + $73.9MM completions + $8.0MM infrastructure and non-D&C* |
| Comanche | ◆ Renegotiate lease in La Bandera/FOGMT – *Current lease terms expire in April 2020*<br>◆ Drill required wells for 2020-2021 lease terms – *Source rigs for contract*<br>◆ Renegotiate lease in Maund – *Current lease terms expire in March 2021* |
| Midstream/ Marketing | ◆ TBD |

007046

# Potential Risks and Upsides to the Proposed Business Plan

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| Risk/Considerations | |
|---|---|
| **Commodity Prices** | ◆ Further degradation in commodity prices, realizations or differentials |
| **Loss of Comanche Operatorship** | ◆ No longer in control of development plan and capital spend<br>◆ Lose ability to collect COPAS from working interest partners and would have to reimburse new operator<br>◆ Likely lower value in a monetization given lack of control |
| **Midstream Rates** | ◆ Interruptible gathering rate on Eastern Catarina could be increased by SNMP<br>◆ Comanche infield gathering rates could increase with cost of service model if volumes significantly decline |
| **G&A Plan** | ◆ The proposed reduction in G&A corresponds to a reduction in required drilling operations per the business plan<br>◆ Talent retention may be difficult |

| Potential Upside to Business Plan Forecast | |
|---|---|
| **Commodity Prices** | ◆ Improvement in commodity prices, realizations or differentials<br>◆ Improved commodity prices would also unlock additional inventory that can be drilled at economic returns |
| **Contract Optimization** | ◆ TBD |
| **Type Curve Outperformance** | ◆ The Company has outperformed production by ~5% compared to its original 2019 budget<br>◆ Many of the Company's type curves have been recently refreshed at year-end based on new well data |
| **Palmetto** | ◆ If Marathon's 2020 development test is successful, the Company could participate in future development<br>◆ If Marathon's tests are not successful, the Company would still participate in cash flow sharing through an Overriding Royalty Interest ("ORRI") election that requires no capital spend on projects proposed in the first 8 months of a given lease year (1% override that converts to a 17.5% working interest after 1.0x payout) |
| **Catarina Lease CDC Relief** | ◆ While unlikely, if landowners are willing to provide near-term relief on drilling requirements, the Company could realize significant value from avoiding uneconomic wells and redirecting budgeted capex dollars towards completion activity |

007047

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# III. Asset Development Plan

# Asset Development Approach and Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**A comprehensive asset development assessment was completed since the last business plan presentation**

| | |
|---|---|
| **Strategy** | ◆ Previous mandate focused on holding assets together and preventing lease expiration as the primary driving objective<br>◆ Current strategy focuses on economic drilling and preserving optionality in the most cost-effective manner |
| **Asset Summary** | ◆ ~435,000 gross (~233,000 net) acres in the Eagle Ford<br>◆ More than half of net acreage is held by production and annual/continuous drilling obligations<br>◆ Diversified, lower decline production from significant PDP base with over 2,200 wells (on a gross basis) |
| **Catarina Type Curves** | ◆ Catarina type curves were reviewed and refreshed in Q4 2019 with the benefit of an additional 12 months of production history<br>◆ Type curve boundaries adjusted to incorporate similar well performance, rock properties, fluid properties and seismic characteristics<br>◆ As a result, significant inventory was lost and others shifted from South Central Catarina to Central Catarina, with no remaining "legacy" South Central locations |
| **Comanche Type Curves** | ◆ Utilized recent well performance results with wider well spacing and larger completion designs to refine type curves<br>◆ Identified and incorporated into forecast material changes to some type curves from development plan changes<br>◆ Inventory was reduced as a result of increased well spacing and removal of uneconomic targets/infill locations |
| **Inventory** | ◆ Complete refresh of inventory based on current development planning and spacing assumptions<br>◆ Created map layers that tie individual sticks on a map to model and ARIES |
| **Drilling and Completion Costs** | ◆ Updated to incorporate lower unit costs (sand and horsepower) and drilling and completion efficiencies (7.5 stages/day)<br>◆ Approximately ~12%-15% per well savings incorporated into business plan vs. 2019 budgeted costs |
| **Engineering and Financial Diligence** | ◆ The Debtor advisors' engineering team evaluated and performed diligence on the geological and technical aspects of the business plan<br>◆ The Debtor advisors reviewed the cost and expense assumptions for each asset<br>◆ Creditor feedback on development plan is being considered and may be incorporated where appropriate and value maximizing |

007049

# Catarina Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




**E35-E36 (East)**
- 5 DUCs Drilled Q418
- $10.8MM required to frac
- AVG 26% IRR* at $50 WTI

**A44-A45 (West)**
- 18 DUCs Drilled Q418 - Q319
- $47.2 MM required to frac
- AVG 35% IRR* at $50 WTI

**E37-E39 (East)**
- 7 DUCs Drilled Q419
- 4 Remain to be drilled
- $32.8 MM required to Finish drilling and Frac
- AVG 26% IRR* at $50 WTI

*Considers drilling capital on DUC inventory sunk
† Dashed lines denote East and Solid lines denote West

## Lease Summary

- ~106,000 gross / net acres
- EF wet gas / condensate window
- Annual lease term July 1-June 30
- 50-well annual drilling commitment
- 100% WI and 75% NRI
- Oil/Gas/NGL: 24%/37%/40%

- **2019 Production:** ~35,000 Boe/d
- **PDP Count:** 457 wells
- **Current DUC Inventory:** 30 wells
- **Total Planned 2020 Spuds / TTP:**
  - **Option Preservation**: 24 wells / 23 wells
  - **Accelerated Completions**: 1 well / 31 wells

## Rig – Completion Schedule

**Option Preservation**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling Well Count | | 4 | 6 | 6 | 5 | 3 | | | | | | | | | |
| Online Well Count | | | 5 | | | | 10 | 8 | | | | | | 17 | 14 |

**Accelerated Completions**

| Activity | JAN 2020 | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN 2021 | FEB | MAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Drilling Well Count | | 1 | | | | | | | | | | | | | |
| Online Well Count | | | 5 | 8 | | 18 | | | | | | | | | |

*Gross

## Inventory Analysis

| TC Area | Development Plan Drilled | AVG IRR @ $50 | Wells |
|---|---|---|---|
| CATWSO-A | 6 | 45% | 6 |
| CATC-C | 5 | 26% | 11 |
| CATW-A | 18 | 20% | 29 |
| CATWSO-C | 16 | 12% | 45 |
| CATSW-C | 6 | 13% | 51 |
| CATNW-C | 3 | 0% | 54 |
| CATSC-C | - | - | - |
| CATW-C | - | - | - |
| CATNC-C | - | - | - |
| CATNW-A | - | - | - |
| CATC5 - TIER1 | - | - | - |
| CATC5 - TIER2 | - | - | - |
| CATC5 - TIER3 | - | - | - |
| CATE-B | - | - | - |
| Total | 54 | | |

| TC Area | Undeveloped Inventory Count | WTI for 20% IRR | Cumulative Wells |
|---|---|---|---|
| CATC5 - TIER1 | 12 | $65 | 12 |
| CATNW-A | 16 | 68 | 28 |
| CATWSO-C | 12 | 71 | 40 |
| CATWSO-A | 9 | 74 | 49 |
| CATNC-C | 44 | 76 | 93 |
| CATC5 - TIER2 | 12 | 76 | 105 |
| CATNW-C | 17 | 77 | 122 |
| CATSW-C | 35 | 82 | 157 |
| CATC-C | 28 | 84 | 185 |
| CATC5 - TIER3 | 16 | 84 | 201 |
| CATW-A | 1 | 89 | 202 |
| CATE-B | 152 | 107 | 354 |
| Total | 354 | | |

## Asset Level Cash Flow




007050

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Comanche Asset Overview

## Asset Map




## Lease Summary

- ~250,000 gross / ~61,000 net acres
- EF volatile oil / condensate gas window
- 23 separate lease commitments
- ~40-60 well per year drilling commitment
- **2019 Production:** ~28,000 Boe/d
- **Gross PDP Count:** 1,738 wells
- **Total Planned 2020 Spuds:** 55 wells
- **Total Planned 2020 TTP**: 57 wells
- Average ~24% WI and ~18% NRI; Restricted average ~6% WI and ~4% NRI
- Oil/Gas/NGL: 37%/30%/33%; Restricted Oil/Gas/NGL: 45%/26%/29%

## Rig – Completion Schedule

| | 2020 | | | | | | | | | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR |
| **Drilling** *Well Count* | 11 | 3 | 2 | 5 | | 5 | 3 | 4 | 3 | 6 | 9 | 4 | 7 | 4 | |
| **Online** *Well Count* | 3 | 13 | 3 | 6 | 3 | | 1 | | 11 | 7 | 3 | 7 | 8 | 18 | 3 |

*Gross

## Inventory Analysis

| | Developed Inventory | | Cumulative |
|---|---|---|---|
| TC Area | Count | AVG IRR @ $50 | Wells |
| AREA-3-2 | 20 | 52% | 20 |
| AREA-5-7 | 28 | 52% | 48 |
| AREA-3-1B | 34 | 50% | 82 |
| AREA-3-1A | 41 | 47% | 123 |
| AREA-7-1 | 40 | 47% | 163 |
| AREA-7-2 | 33 | 41% | 196 |
| AREA-3-3S | 23 | 40% | 219 |
| AREA-3-3 | 75 | 37% | 294 |
| AREA-4-1 | 46 | 33% | 340 |
| AREA-5-1 | 11 | 27% | 351 |
| AREA-3-3_UEFAC_Gen10 | 21 | 22% | 372 |
| AREA-3-4 | 41 | 21% | 413 |
| AREA-5-3 | 9 | 17% | 422 |
| CATNW | 5 | 16% | 427 |
| AREA-2-1 | 7 | 6% | 434 |
| AREA-3-4_UEFAC | 4 | 3% | 438 |
| AREA-3-1C | 6 | 2% | 444 |
| AREA 1 | - | - | - |
| AREA 2-2 | - | - | - |
| AREA 2-3 | - | - | - |
| AREA-3-1B_UEFAC | - | - | - |
| AREA-3-2_UEFB | - | - | - |
| AREA-3-3_UEFAC_Gen2 | - | - | - |
| AREA 4-2 | - | - | - |
| AREA 5-2 | - | - | - |
| AREA 5-4 | - | - | - |
| AREA 6-1 | - | - | - |
| MAVERICK | - | - | - |
| Total | 444 | | |

| | Undeveloped Inventory | | |
|---|---|---|---|
| TC Area | Count | WTI for 20% IRR | Cumulative Wells |
| AREA 7-1 | 4 | $32 | 4 |
| AREA-7-2 | 1 | 35 | 5 |
| AREA-3-2 | 1 | 45 | 6 |
| AREA 3-1B | 12 | 51 | 18 |
| MAVERICK | 46 | 52 | 64 |
| AREA-3-3S | 1 | 52 | 65 |
| AREA 3-3 | 11 | 56 | 76 |
| AREA-5-1 | 11 | 61 | 87 |
| CATNW | 12 | 61 | 99 |
| AREA-5-3 | 31 | 62 | 130 |
| AREA-5-7 | 6 | 63 | 136 |
| AREA-3-3_UEFAC_Gen10 | 108 | 67 | 244 |
| AREA-5-2 | 37 | 68 | 281 |
| AREA-3-1A | 5 | 75 | 286 |
| AREA-6-1 | 12 | 79 | 298 |
| AREA-2-3 | 94 | 82 | 392 |
| AREA-3-3 | 14 | 82 | 406 |
| AREA-3-1C | 22 | 83 | 428 |
| AREA-4-2 | 81 | 83 | 509 |
| AREA-4-1 | 194 | 86 | 703 |
| AREA-3-4 | 38 | 90 | 741 |
| AREA-2-1 | 100 | 91 | 841 |
| AREA-2-2 | 118 | 93 | 959 |
| AREA-3-2_UEFB | 93 | 97 | 1,052 |
| AREA-1 | 67 | 99 | 1,119 |
| AREA-5-4 | 63 | 100 | 1,182 |
| AREA-3-2_UEFB | 1 | 119 | 1,183 |
| AREA-3-4_UEFAC | 282 | 130 | 1,465 |
| AREA-3-3_UEFAC_Gen2 | 217 | 311 | 1,682 |
| AREA-3-1B_UEFAC | 26 | 312 | 1,708 |
| Total | 1,708 | | |

## Asset Level Cash Flow (Restricted)

Option Preservation / Accelerated Completions




007051

*Note: Development plan counts are as of 1/1/20 and Comanche's maverick type curve area is largely exploratory with no wells on lease. Individual wells that appear economic at lower prices are isolated and have certain physical operational hinderances to drilling.*

# Palmetto Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




**Barnhart G Pad**
**TTP-ed:** May 2019

**Barnhart 100-103H**
**TTP-ed:** November 2019

**Barnhart 104-107H**
**Spud:** February 2020
**Complete:** Summer 2020

**Barnhart 108-111H**
**Spud:** April 2020
**Complete:** Summer 2020

**Barnhart 48H – 49H**
**Spud:** Q3 2020
**Complete:** Q4 2020

## Lease Summary

- ~15,500 gross / ~7,500 net acres
- EF black oil window
- Annual drilling commitment based on WTI
- Average 50% WI and 36.35% NRI
- Oil/Gas/NGL: 69%/15%/16%
- **2019 Production:** ~1,000 Boe/d
- **Gross PDP Count:** 83 wells
- **Total Planned 2020 Spuds(1):** 10 wells
- **Total Planned 2020 TTP(1):** 10 wells

## Rig – Completion Schedule(1)

| | 2020 | | | | | | | | | | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Activity** | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR |
| **Drilling** *Well Count* | | | | | | | | | | | | | | | |
| **Online** *Well Count* | | | | | | | | | | | | | | | |

## Inventory Analysis

| | | Development Plan | | Undeveloped Inventory | |
|---|---|---|---|---|---|
| **TC Area** | **Target** | **Drilled** | **Avg. IRR @ $50** | **Count** | **Avg. IRR @ $55** |
| BHM | LEF B | - | - | 17 | 10% |
| BHM – 10,000' | LEF B | 8 | 18% | 23 | 18% |
| BHN | LEF B | - | - | 27 | 2% |
| BHS R1 | LEF B | - | - | 21 | 9% |
| BHS R2 | LEF B | 2 | 6% | 13 | 6% |
| BHS R3 | LEF B | - | - | 11 | 0% |
| | **Total** | 10 | | 112 | |

## Asset Level Cash Flow




007052

(1) *Marathon (operator) intends to drill and complete 10 wells in 2020. Due to near term considerations, SN has elected not to participate in 8 of 10, without leasehold risk. Remaining elections pending.*
(2) *Represents gross well economics; new money returns on these 8 wells, net of SN's ORRI, is approximately 25%.*

# Maverick Asset Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Asset Map




## Lease Summary

- ~62,000 gross / ~40,000 net acres
- ~24,316 net acres held by production
- EF volatile oil / black oil
- 100% WI and 75% NRI
- Oil/Gas/NGL: 97%/2%/2%
- **2019 Production:** ~2,600 Boe/d
- **Gross PDP Count:** 79 wells
- **Total Planned 2020 Spuds:** 0 wells
- **Total Planned 2020 TTP**: 0 wells

## Rig – Completion Schedule

| | 2020 | | | | | | | | | | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Activity | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | JAN | FEB | MAR |
| Drilling *Well Count* | | | | | | | | | | | | | | | |
| Online *Well Count* | | | | | | | | | | | | | | | |

## Inventory Analysis

| | | Inventory Summary | | | |
|---|---|---|---|---|---|
| TC Area | Target | Development | Count | HBP | WTI for 20% IRR |
| HAUSSER | LEF B | 0 | 5 | 5 | $62 |
| NORTH DIMMIT | LEF B | 0 | 55 | 4 | $64 |
| VOTAW | LEF B | 0 | 42 | 29 | $66 |
| HOLDSWORTH | LEF B | 0 | 50 | 7 | $67 |
| HARGIS | LEF B | 0 | 23 | 23 | $73 |
| PETRO PARDS | LEF B | 0 | 119 | 76 | $75 |
| | **Total** | | 294 | 144 | |

## Asset Level Cash Flow




007053

*Note: Maverick asset is largely exploratory with minimal activity in the last year and type curves would need further risking if considering development.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# IV. Midstream

# Illustrative Catarina Marketing Diagram

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Diagrams below represent the flow of hydrocarbons from Catarina

### Gas Marketing




### Oil Marketing




007055

# Illustrative Comanche Marketing Diagram

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Diagrams below represent the flow of hydrocarbons from Comanche




007056

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# V. Corporate G&A

# COPAS Overview

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## General Summary

- The Council of Petroleum Accountants Societies ("COPAS") is a non-profit professional organization established in 1961 that outlines accounting guidelines and practices within the North American petroleum industry
- Base overhead rates that an operator can charge out to working interest partners must be agreed upon in the various Joint Operating Agreements ("JOA") between SN and its various counterparties. However, COPAS accounting procedures provide for the annual adjustment of the fixed rate overhead for drilling and producing wells
- COPAS does not publish or recommend any specific overhead rates or overhead surveys, as the rates are derived through negotiation among the parties to an agreement

## COPAS at SN

- JOAs that SN is party to are subject to the adjustment rates that COPAS releases on an annual basis
- With SN being the operator of the Comanche assets, SN is able to charge the other working interest partners monthly
- The amounts that SN can charge out to working interest parties depend entirely on the well count, irrespective of changes in the Company's expenses
- A charge to the Company's working interest partners is reflected as a credit to G&A on SN's books and records

## COPAS in Business Plan Model

- The business plan forecast calculates the average of the last 10 years of rate adjustments released by COPAS, which is approximately 3%
- The current average amount that SN is able to charge out to working interest partners is $950 per well, each month
- Beginning with the $950 monthly rate per well, the model assumes that the chargeable rate will increase at ~3% annually, as in the last ten years
- In a blowdown scenario where SN gives up operatorship, SN would then incur an additional expense per the JOA, instead of a receipt

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Appendix

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# A. PDP Reference Case

Case [illegible] Document [illegible] Filed [illegible] Page 1273 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# PDP Reference Case: Historical and Financial Projections (Accrual)

| *$ millions* | 2017A | 2018A | 2019E[(1)] | *Pre-Emergence Jan-May* 2020E | *Post-Emergence Jun-Dec* 2020E | *Full Year* 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| Oil (Boe/d) | 15,085 | 18,026 | 14,949 | 11,374 | 12,941 | 12,259 | 9,724 | 7,243 | 5,958 | 5,125 |
| Gas (Mcf/d) | 104,638 | 105,400 | 89,143 | 72,109 | 79,748 | 76,379 | 63,919 | 50,995 | 43,261 | 37,926 |
| NGL (Boe/d) | 15,171 | 18,762 | 15,829 | 13,511 | 14,916 | 14,296 | 11,999 | 9,562 | 8,105 | 7,101 |
| **Total Net Daily Production (Boe/d)** | **47,695** | **54,355** | **45,635** | **36,903** | **41,149** | **39,285** | **32,376** | **25,304** | **21,273** | **18,547** |
| | | | | | | | | | | |
| **Benchmark Commodity Prices:** | | | | | | | | | | |
| WTI ($/Bbl) | $50.97 | $64.66 | $57.02 | $51.65 | $51.00 | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| Henry Hub ($/Mcf) | $3.11 | $3.11 | $2.60 | $1.87 | $2.13 | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| Mt. Belvieu Propane ($/Bbl) | $20.48 | $23.45 | $22.46 | $16.36 | $17.86 | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |
| | | | | | | | | | | |
| **Realized Commodity Prices:** | | | | | | | | | | |
| Oil ($/Bbl) | $49.47 | $65.73 | $56.34 | $49.48 | $48.55 | $48.90 | $48.64 | $48.68 | $49.00 | $49.35 |
| Gas ($/Mcf) | $3.17 | $3.14 | $2.67 | $1.85 | $2.11 | $2.01 | $2.34 | $2.39 | $2.43 | $2.45 |
| NGL ($/Bbl) | $21.10 | $23.39 | $14.09 | $8.33 | $9.10 | $8.80 | $9.34 | $9.60 | $9.80 | $9.88 |
| | | | | | | | | | | |
| Oil Revenue | $272 | $432 | $307 | $85 | $134 | $219 | $173 | $129 | $107 | $93 |
| Gas Revenue | 121 | 121 | 87 | 20 | 36 | 56 | 55 | 45 | 38 | 34 |
| NGL Revenue | 117 | 160 | 81 | 17 | 29 | 46 | 41 | 34 | 29 | 26 |
| Other Sales and Marketing Revenue | --- | 26 | 18 | --- | --- | --- | --- | --- | --- | --- |
| **Oil, Gas, & NGL Revenue** | **$510** | **$739** | **$494** | **$122** | **$199** | **$322** | **$268** | **$207** | **$174** | **$152** |
| | | | | | | | | | | |
| Hedge Gain / (Loss) | $5 | $(86) | $8 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- |
| Other Sales and Marketing Expenses | --- | (24) | (17) | --- | --- | --- | --- | --- | --- | --- |
| Lease Operating Expenses | (49) | (64) | (43) | (13) | (19) | (32) | (30) | (29) | (27) | (27) |
| Marketing | (108) | (131) | (160) | (58) | (91) | (149) | (131) | (108) | (89) | (78) |
| Production Taxes | (18) | (30) | (18) | (5) | (8) | (13) | (11) | (8) | (7) | (6) |
| Ad Valorem Taxes | (5) | (10) | (10) | (3) | (4) | (7) | (6) | (4) | (4) | (3) |
| Corporate G&A | (114) | (87) | (89) | (26) | (25) | (51) | (17) | (17) | (18) | (18) |
| Restructuring & Chapter 11 Fees | --- | --- | (83) | (61) | --- | (61) | --- | --- | --- | --- |
| Total G&A | (114) | (87) | (173) | (86) | (25) | (111) | (17) | (17) | (18) | (18) |
| Reconciling Items to EBITDAX [(2)] | 28 | (6) | 87 | 61 | --- | 61 | --- | --- | --- | --- |
| **Adjusted EBITDAX** | **$249** | **$302** | **$167** | **$18** | **$52** | **$70** | **$74** | **$40** | **$29** | **$20** |
| *EBITDA Margin (%)* | *49%* | *41%* | *34%* | *15%* | *26%* | *22%* | *27%* | *19%* | *17%* | *13%* |
| *Memo: Total Operating Expenses* | *$(261)* | *$(437)* | *$(327)* | *$(104)* | *$(148)* | *$(252)* | *$(194)* | *$(167)* | *$(145)* | *$(132)* |
| | | | | | | | | | | |
| Capex | $(485) | $(512) | $(62) | $(97) | $(27) | $(124) | $(12) | $(1) | $(1) | $(1) |
| **Adjusted EBITDAX Less Capex** | **$(236)** | **$(210)** | **$105** | **$(79)** | **$25** | **$(54)** | **$62** | **$39** | **$28** | **$19** |
| | | | | | | | | | | |
| Restructuring & Chapter 11 Fees | $ --- | $ --- | $(83) | $(61) | $ --- | $(61) | $ --- | $ --- | $ --- | $ --- |
| **Unlevered Cash Flow (after Ch. 11 Fees)** | **$(236)** | **$(210)** | **$21** | **$(139)** | **$25** | **$(115)** | **$62** | **$39** | **$28** | **$19** |
| | | | | | | | | | | |
| *Memo: Catarina Central / East Volumes (Boe/d)* [(3)] | | | | | | *13,779* | *10,754* | *8,431* | *7,073* | *6,127* |
| | | | | | | | | | | |
| *Memo: COPAS Recovery/(Payment) - 3rd Parties* | *$11* | *$19* | *$16* | *$6* | *$(1)* | *$5* | *$(5)* | *$(5)* | *$(6)* | *$(6)* |
| *Memo: COPAS Recovery/(Payment) - UnSub* | *$2* | *$4* | *$4* | *$2* | *$3* | *$4* | *$5* | *$5* | *$5* | *$5* |

*Notes: Represents consolidated cash flow forecast net to Debtors. Presented on an accrual basis. Strip pricing as of 2/11/20.*

*(1) Q4 2019 quarter actuals are estimates and subject to change upon finalized earnings.*

*(2) Represents non-cash, non-recurring and other amounts included in the above line items which are traditionally added back or excluded in the determination of Adjusted EBITDAX. The amount primarily reflects restructuring fees and certain non-cash adjustments.*

*(3) Production volumes from ARIES database may not tie exactly to the company model.*

007061

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# B. Other Supporting Items

Case 4:23-cv-04058 Document 133-61 Filed 04/19/23 in TXSB Page 1275 of 1882

# UnSub Historical Financials (and 4Q19 Estimates)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**SN UNSUB**

| | 1Q 17 | 2Q 17 | 3Q 17 | 4Q 17 | 1Q 18 | 2Q 18 | 3Q 18 | 4Q 18 | 1Q 19 | 2Q 19 | 3Q 19 | 4Q 19* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Oil (MBbl) | 300 | 836 | 756 | 819 | 890 | 769 | 680 | 737 | 741 | 689 | 635 | 626 |
| Gas (MMcf) | 1,862 | 5,011 | 5,067 | 4,517 | 4,677 | 4,438 | 3,803 | 3,942 | 3,758 | 3,751 | 3,596 | 3,498 |
| NGL (MBbl) | 266 | 858 | 904 | 776 | 847 | 791 | 714 | 735 | 688 | 688 | 627 | 606 |
| **Total Production (Mboe)** | **877** | **2,529** | **2,504** | **2,348** | **2,516** | **2,300** | **2,027** | **2,129** | **2,055** | **2,002** | **1,862** | **1,815** |
| Oil (Boed) | 9,686 | 9,183 | 8,213 | 8,901 | 9,884 | 8,450 | 7,386 | 8,007 | 8,235 | 7,569 | 6,907 | 6,805 |
| Gas (Mcfd) | 60,077 | 55,066 | 55,072 | 49,101 | 51,969 | 48,764 | 41,335 | 42,844 | 41,754 | 41,223 | 39,083 | 38,022 |
| NGL (Boed) | 8,583 | 9,432 | 9,830 | 8,432 | 9,408 | 8,693 | 7,758 | 7,991 | 7,643 | 7,560 | 6,814 | 6,582 |
| **Total Production (Boed)** | **28,281** | **27,794** | **27,222** | **25,517** | **27,953** | **25,271** | **22,034** | **23,138** | **22,837** | **21,999** | **20,235** | **19,724** |
| **Commodity Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $48.20 | $48.20 | $48.20 | $55.40 | $62.87 | $67.88 | $69.08 | $58.81 | $54.90 | $59.82 | $56.44 | $56.94 |
| Gas ($/mcf) | $3.00 | $3.00 | $3.00 | $2.93 | $3.00 | $2.80 | $2.99 | $3.64 | $3.15 | $2.64 | $2.23 | $2.40 |
| NGL ($/bbl) | $0.44 | $0.44 | $21.37 | $22.84 | $20.95 | $23.21 | $28.40 | $21.26 | $27.82 | $22.78 | $18.29 | $20.95 |
| **Realized Price:** | | | | | | | | | | | | |
| Oil ($/bbl) | $42.97 | $42.19 | $42.47 | $53.46 | $60.21 | $63.92 | $68.46 | $57.44 | $55.21 | $60.61 | $55.16 | $53.39 |
| Gas ($/mcf) | $2.66 | $3.06 | $2.99 | $2.77 | $3.04 | $2.85 | $3.10 | $4.01 | $3.20 | $2.61 | $2.40 | $2.47 |
| NGL ($/bbl) | $15.64 | $16.08 | $20.98 | $21.94 | $22.20 | $22.07 | $28.95 | $20.39 | $17.11 | $13.38 | $11.44 | $13.78 |
| Oil Revenue | $12,901 | $35,257 | $32,090 | $43,783 | $53,562 | $49,148 | $46,519 | $42,312 | $40,913 | $41,748 | $35,053 | $33,421 |
| Gas Revenue | $4,951 | $15,338 | $15,127 | $12,520 | $14,197 | $12,665 | $11,786 | $15,794 | $12,035 | $9,806 | $8,632 | $8,652 |
| NGL Revenue | $4,162 | $13,806 | $18,973 | $17,022 | $18,800 | $17,458 | $20,664 | $14,989 | $11,768 | $9,203 | $7,169 | $8,348 |
| **Oil, Gas, & NGL Revenue** | **$22,014** | **$64,401** | **$66,190** | **$73,324** | **$86,559** | **$79,271** | **$78,969** | **$73,095** | **$64,716** | **$60,757** | **$50,854** | **$50,421** |
| Hedge Gain / (Loss) | $0 | $5,350 | $5,713 | $1,408 | ($3,843) | ($5,788) | ($6,883) | ($5,550) | ($1,522) | ($2,220) | $286 | ($577) |
| LOE | $1,676 | $3,816 | $5,540 | $5,844 | $8,511 | $7,076 | $7,832 | $9,094 | $10,539 | $7,684 | $7,158 | $6,986 |
| Marketing | $8,216 | $22,894 | $23,693 | $21,990 | $20,982 | $20,809 | $19,600 | $20,116 | $17,359 | $17,107 | $15,903 | $16,711 |
| Operating Expenses | $9,892 | $26,710 | $29,233 | $27,834 | $29,492 | $27,885 | $27,432 | $29,210 | $27,897 | $24,791 | $23,060 | $23,697 |
| Production Taxes | $865 | $2,288 | $2,501 | $2,421 | $3,004 | $2,824 | $2,839 | $2,593 | $2,231 | $2,135 | $1,670 | $1,644 |
| Ad Valorem Taxes | $388 | $1,163 | $1,948 | $1,240 | $1,536 | $1,613 | $1,583 | $911 | $1,668 | $1,671 | $1,671 | $1,092 |
| Total G&A | $3,786 | $1,978 | $1,786 | $1,551 | $1,813 | $1,479 | $1,370 | $1,370 | $1,921 | $1,149 | $869 | $77 |
| Reconciling Items to EBITDAX | ($0) | $192 | $0 | ($0) | ($0) | ($388) | $388 | ($0) | ($39) | ($0) | ($0) | $0 |
| **Adjusted EBITDAX** | **$7,083** | **$37,804** | **$36,435** | **$41,687** | **$46,870** | **$39,295** | **$39,249** | **$33,461** | **$29,437** | **$28,791** | **$23,870** | **$23,335** |
| Interest Expense | $756 | $2,299 | $2,352 | $2,232 | $2,301 | $2,202 | $2,131 | $2,201 | $2,283 | $2,147 | $1,952 | $1,795 |
| Preferred Dividends / Tax Distributions | $16,466 | $10,950 | $8,347 | $8,497 | $9,908 | $12,500 | $12,500 | $12,500 | $0 | $12,500 | $25,000 | $12,500 |
| **Discretionary Cash Flow** | **($10,138)** | **$24,555** | **$25,736** | **$30,958** | **$34,661** | **$24,593** | **$24,618** | **$18,760** | **$27,154** | **$14,144** | **($3,082)** | **$9,039** |
| Total Capex | $1,463 | $16,762 | $18,312 | $33,202 | $25,193 | $20,521 | $19,662 | $18,218 | $5,396 | $5,442 | $6,687 | $4,130 |
| **Free Cash Flow (before A&D)** | **($11,601)** | **$7,794** | **$7,424** | **($2,244)** | **$9,468** | **$4,072** | **$4,957** | **$542** | **$21,757** | **$8,702** | **($9,770)** | **$4,909** |
| Acquistions / Divestitures | ($673,500) | $0 | $0 | $1,984 | $2,980 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other / Working Capital Adjustment** | $0 | ($13,036) | $11,067 | $1,739 | ($3,944) | $7,675 | ($4,776) | ($17,199) | ($1,952) | $2,589 | ($1,086) | $3,914 |
| **Free Cash Flow (after A&D)** | **($685,101)** | **($5,242)** | **$18,491** | **$1,479** | **$8,504** | **$11,747** | **$180** | **($16,657)** | **$19,805** | **$11,292** | **($10,856)** | **$8,824** |

** Q4 2019 financials not finalized and subject to change.
* Reflects true-up to actual historical cash & RBL balances. This does not forecast a change in future working capital balances.

007063

Case 23-90055 Document 1336-1 Filed in TXSB on 04/16/23 Page 1276 of 1882

# Historical EBITDAX Reconciliation – Restricted Group

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

| (In Thousands) | 2017 Consolidated SN FY | 2017 Restricted Group (Model) FY | 2018 Consolidated SN FY | 2018 Restricted Group (Model) FY |
|---|---|---|---|---|
| **Adjusted EBITDAX:** | | | | |
| Net income (loss) | $ 43,191 | $ (6,851) | $ 85,205 | $ (22,501) |
| Adjusted by: | | | | |
| Interest expense | 128,189 | 120,550 | 165,233 | 156,398 |
| Amortization of debt costs (1) | 11,975 | 8,880 | 12,625 | 8,819 |
| Net losses (gains) on commodity derivative contracts (2) | 6,099 | 7,986 | 27,756 | 32,316 |
| Net settlements paid on commodity derivative contracts | 13,140 | 670 | (103,205) | (81,141) |
| Exploration expense | 5,755 | 5,755 | 3,295 | 3,284 |
| Depreciation, depletion, amortization and accretion (1) | 177,153 | 125,696 | 262,481 | 197,388 |
| Impairment of oil and natural gas properties (1) | 39,499 | 39,499 | 14,386 | 14,337 |
| Stock-based compensation (1) | 22,909 | 22,909 | 792 | 792 |
| Acquisition and divestiture costs included in G&A | 30,526 | 30,334 | 778 | 778 |
| Income tax expense (benefit) | (2,336) | (2,336) | - | - |
| Gains on sale of oil and natural gas properties | - | - | (1,528) | (1,528) |
| Gains on disposal of assets | (81,955) | (81,955) | - | - |
| Loss on impairment of other assets | - | - | - | - |
| Impairment of right of use assets | - | - | - | - |
| Accrued amount for executive bonuses included in G&A | - | - | - | - |
| (Gains) losses on embedded derivatives | 1,551 | 1,551 | (700) | (700) |
| (Gains) losses on investments | 871 | 871 | 21,798 | 21,798 |
| Amortization of deferred gain on Catarina Midstream sale | (23,718) | (23,718) | (23,720) | (23,720) |
| Interest income | (836) | (836) | (4,351) | (4,351) |
| **Adjusted EBITDAX** | **$ 372,013** | **$ 249,004** | **$ 460,845** | **$ 301,969** |

007064

(1) *Represent non-cash adjustments to net income.*
(2) *Includes cash received and non-cash (gains) losses.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Historical EBITDAX Reconciliation – UnSub

| *($ millions)* | 1Q 2017 | 2Q 2017 | 3Q 2017 | 4Q 2017 | 1Q 2018 | 2Q 2018 | 3Q 2018 | 4Q 2018 |
|---|---|---|---|---|---|---|---|---|
| **Adjusted EBITDA:** | | | | | | | | |
| Net income | $ 18.8 | $ 31.2 | $ 4.5 | $ (4.5) | $ 17.4 | $ (0.3) | $ 13.2 | $ 77.5 |
| Plus: | | | | | | | | |
| Interest expense | 0.8 | 2.3 | 2.4 | 2.2 | 2.3 | 2.2 | 2.1 | 2.2 |
| Net (gains) losses on commodity derivative contracts(1) | (19.1) | (20.9) | 14.4 | 23.7 | 14.2 | 25.5 | 14.3 | (58.5) |
| Net settlements received on commodity derivative contracts | 0.0 | 5.3 | 5.7 | 1.4 | (3.8) | (5.8) | (6.9) | (5.5) |
| Depreciation, depletion, amortization and accretion(2)(3) | 6.1 | 19.0 | 8.5 | 17.8 | 15.9 | 16.8 | 15.5 | 16.9 |
| Acquisition costs included in general and administrative expense | 0.0 | 0.2 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Amortization of debt issuance costs(3) | 0.3 | 0.9 | 0.9 | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 |
| Income tax benefit | 0.2 | (0.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Impairment of oil and natural gas properties(3) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Exploration expense | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Adjusted EBITDA** | **$ 7.1** | **$ 37.8** | **$ 36.4** | **$ 41.7** | **$ 46.9** | **$ 39.3** | **$ 39.2** | **$ 33.5** |

007065

*(1) Includes cash received and non-cash (gains) losses.*
*(2) Adjusted from prior period presentation due to conversion to successful efforts from full cost method during Q3 2017.*
*(3) Represent non-cash adjustments to net income.*

# Business Plan Assumptions (Option Preservation Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Pricing**
***(As of 2/11/20)***

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **WTI Oil ($/Bbl)** | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| **Henry Hub Gas ($/MMBtu)** | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| **Mt. Belvieu Propane ($/Bbl)** | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

**Commodity Price Realizations**

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| **Oil (% WTI)** | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| **Gas (% Henry Hub)** | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| **NGL (% Mt B Propane)** | 52% | 43% | 69% | 63% | 62% | - | - |

**Lease Operating Expense**




**G&A**




007066

*Note: Strip pricing sourced from Capital IQ as of 2/11/20.*

# Business Plan Assumptions (Option Preservation Case)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




024067

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Option Preservation Case)

**Capital Expenditures**




**Well Costs(1)**




007068

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Accelerated Completions Case)

## Pricing *(As of 2/11/20)*

| Strip | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **WTI Oil ($/Bbl)** | $51.27 | $50.89 | $50.96 | $51.32 | $51.69 |
| **Henry Hub Gas ($/MMBtu)** | $2.02 | $2.36 | $2.41 | $2.45 | $2.47 |
| **Mt. Belvieu Propane ($/Bbl)** | $17.24 | $18.45 | $18.93 | $19.30 | $19.43 |

## Commodity Price Realizations

- Differentials have been developed by asset area based on historical 12-month average as compared to current futures pricing and relevant contract changes.

| Realizations | Catarina | Comanche | Maverick | Palmetto | OBO | SR | TMS |
|---|---|---|---|---|---|---|---|
| **Oil (% WTI)** | 93% | 98% | 99% | 105% | 103% | 109% | 105% |
| **Gas (% Henry Hub)** | 99% | 100% | 100% | 103% | 62% | 100% | 100% |
| **NGL (% Mt B Propane)** | 52% | 43% | 69% | 63% | 62% | - | - |

## Lease Operating Expense




## G&A




007069

*Note: Strip pricing sourced from Capital IQ as of 2/11/20.*

Case 4:23-cv-00587 Document 133-61 Filed in TXSB on 08/30/20 Page 1282 of 1882

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Accelerated Completions Case)

**Drilling Activity (SPUD)**




**Completion Activity (TTP)**




007070

*Note: In comparison, PDP reference case drilling and completion activity is comprised of the following: Drilling – 1 well in Catarina (2020), 66 wells in Comanche (55 in 2020 and 11 in 2021), Completions - 31 wells in Catarina (all in 2020), 80 wells in Comanche (57 in 2020 and 23 in 2021)*

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Business Plan Assumptions (Accelerated Completions Case)

**Capital Expenditures**




**Well Costs[1]**




007071

*Note:*
*(1) Presented well costs are based on an average 6,000 ft lateral, but each well is adjusted based off its exact lateral length in all financial forecasts.*

# Forecast Liquidity

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

## Similar Liquidity Profile at Exit in Option Preservation, Accelerated Completions, and PDP Reference Scenarios




**PDP Reference scenario does not assume full conversion to non-operated cash based forecast*

- Liquidity at 5/31/2020 of $24.0MM in the Option Preservation scenario, $27.9MM in the Accelerated Completion scenario, and $27.4MM in a PDP Reference scenario.
- Cash Flows include:
  - Payment of accrued DIP interest at 5/31/2020 and exit fees of 1.5% of total new money commitment (~$1.8MM)
  - 1L adequate protection paid during case ($36MM) and accrued adequate protection paid on 5/31/2020 ($9.4MM)
  - Payment of all accrued & unpaid professional fees and success fees (~38.3MM)
- DIP commitment is $150MM of new money and $50MM of 1st lien roll-up to be refinanced upon exit
- No additional disbursements associated with emergence are included in this forecast

007072

# Sanchez Energy Organizational Structure (Pre-Petition)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




*Notes:*

(1) *GSO ST Holdings Associates LLC owns the Class B Unit in SN EF UnSub GP, LLC, which holds the GP interest in SN EF UnSub, LP. GSO ST Holdings LP owns 485,000 preferred units in SN EF UnSub, LP, and the remaining 15,000 preferred units in SN EF UnSub, LP are held by Intrepid Private Equity Fund I, LP and Intrepid Private Equity SPV-A, L.P.*

007073

# Comanche Ownership Structure

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




007074

*Note: Percentages shown represent interest in future development.*

# Annual NYMEX WTI Oil Strip Pricing

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $53.86 | $51.26 | $50.24 | $50.07 | $50.30 | $50.79 | $51.09 | $51.24 | $51.20 | $51.20 | $51.20 |
| Strip as of 12/15/2019 | $58.05 | $53.99 | $51.92 | $51.16 | $51.08 | $51.32 | $51.52 | $51.62 | $51.58 | $51.58 | $51.58 |
| Strip as of 12/31/2019 | $58.83 | $54.38 | $52.09 | $51.31 | $51.44 | $52.07 | $52.57 | $52.84 | $52.84 | $52.84 | $52.84 |
| Strip as of 1/15/2020 | $56.71 | $53.33 | $51.57 | $51.01 | $51.15 | $51.66 | $52.09 | $52.34 | $52.36 | $52.36 | $52.36 |
| Strip as of 2/11/2020 | $50.76 | $50.89 | $50.96 | $51.32 | $51.69 | $52.04 | $52.22 | $52.38 | $52.40 | $52.40 | $52.40 |

007075

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual NYMEX Henry Hub Gas Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $2.27 | $2.41 | $2.44 | $2.48 | $2.54 | $2.58 | $2.63 | $2.72 | $2.80 | $2.91 | $3.01 |
| Strip as of 12/15/2019 | $2.29 | $2.45 | $2.45 | $2.48 | $2.52 | $2.57 | $2.61 | $2.69 | $2.75 | $2.84 | $2.92 |
| Strip as of 12/31/2019 | $2.29 | $2.42 | $2.42 | $2.46 | $2.49 | $2.53 | $2.55 | $2.60 | $2.65 | $2.69 | $2.75 |
| Strip as of 1/15/2020 | $2.25 | $2.43 | $2.44 | $2.47 | $2.51 | $2.55 | $2.57 | $2.63 | $2.67 | $2.71 | $2.77 |
| Strip as of 2/11/2020 | $2.04 | $2.36 | $2.41 | $2.45 | $2.47 | $2.49 | $2.49 | $2.52 | $2.55 | $2.59 | $2.65 |

007076

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AGREEMENTS
SUBJECT TO MATERIAL REVISION
FOR SETTLEMENT AND DISCUSSION PURPOSES ONLY
SUBJECT TO FRE 408

# Annual Mt. Belvieu Propane Strip Pricing




**Annual Averages**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Strip as of 11/30/2019 | $21.35 | $21.31 | $21.75 | $22.13 | $22.27 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 | $22.79 |
| Strip as of 12/15/2019 | $21.57 | $22.15 | $22.62 | $22.97 | $23.11 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 | $23.63 |
| Strip as of 12/31/2019 | $19.04 | $20.16 | $20.86 | $21.24 | $21.38 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 | $21.89 |
| Strip as of 1/15/2020 | $19.40 | $20.45 | $20.86 | $21.24 | $21.38 | $21.27 | $21.79 | $21.79 | $21.79 | $21.79 | $21.79 |
| Strip as of 2/11/2020 | $17.26 | $18.39 | $18.85 | $19.27 | $19.43 | $19.35 | $19.41 | $19.33 | $19.33 | $19.33 | $19.33 |

007077

# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Form 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 1-35372**

# Sanchez Energy Corporation

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **45-3090102** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000 Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip Code) |

**(713) 783-8000**

(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| N/A | N/A | N/A |

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares of Registrant's common stock, par value $0.01 per share, outstanding as of November 4, 2019: 100,154,182

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Form 10-Q**
**For the Quarterly Period Ended September 30, 2019**

**Table of Contents**


| | | |
|---|---|---|
| | **PART I** | |
| Item 1. | Financial Statements | 9 |
| | Condensed Consolidated Balance Sheets as of September 30, 2019 (Unaudited) and December 31, 2018 | 9 |
| | Condensed Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 10 |
| | Condensed Consolidated Statements of Stockholders' Deficit for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 11 |
| | Condensed Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2019 and 2018 (Unaudited) | 13 |
| | Notes to the Condensed Consolidated Financial Statements (Unaudited) | 14 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 53 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 76 |
| Item 4. | Controls and Procedures | 79 |
| | **PART II** | |
| Item 1. | Legal Proceedings | 79 |
| Item 1A. | Risk Factors | 80 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 80 |
| Item 3. | Defaults Upon Senior Securities | 80 |
| Item 4. | Mine Safety Disclosures | 81 |
| Item 5. | Other Information | 81 |
| Item 6. | Exhibits | 82 |
| **SIGNATURES** | | 83 |

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Quarterly Report on Form 10-Q contains "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, included in this Quarterly Report on Form 10-Q that address activities, events or developments that we expect, believe or anticipate will or may occur in the future are forward-looking statements. These statements relate to certain assumptions made based on management's experience, perception of historical trends and technical analyses, current conditions, anticipated future developments and other factors we believe to be appropriate and reasonable. When used in this Quarterly Report on Form 10-Q, words such as "will," "potential," "believe," "estimate," "intend," "expect," "may," "should," "anticipate," "could," "plan," "predict," "forecast," "budget," "guidance," "project," "profile," "model," "strategy," "future" or their negatives or the statements that include these words or other similar words that convey the uncertainty of future events or outcomes, are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. In particular, statements, express or implied, concerning the outcome of the Chapter 11 Cases (as defined below), our restructuring plans and our ability to increase our financial flexibility, future operating results and returns or our ability to replace or increase reserves, increase production or generate income or cash flows, service our debt and other obligations and repay or otherwise refinance such obligations when due or at maturity, operational and commercial benefits of our partnerships, expected benefits from acquisitions, and our strategic relationship with Sanchez Midstream Partners LP ("SNMP") are forward-looking statements. Forward-looking statements are not guarantees of performance. Such statements are subject to a number of assumptions, risks and uncertainties, many of which are beyond our control. Although we believe that the expectations reflected in our forward-looking statements are reasonable and are based on reasonable assumptions, there can be no assurance that these assumptions are accurate or that any of these expectations will be achieved (in full or at all) or will prove to have been correct. Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- risks and uncertainties associated with the Chapter 11 Cases, including our ability to develop, confirm and consummate a plan of reorganization under Chapter 11 or an alternative restructuring transaction, which may be necessary to continue as a going concern;
- our ability to maintain relationships with suppliers, customers, employees and other third parties as a result of our filing of the Bankruptcy Petitions (as defined below);
- our ability to obtain sufficient financing to allow us to emerge from bankruptcy and execute our business plan post-emergence;
- the length of time that the Company will operate under Chapter 11 protection and the continued availability of operating capital during the pendency of the Chapter 11 Cases;
- our ability to obtain Bankruptcy Court (as defined below) approval of the various motions and forms of orders, including with respect to our DIP Facility (as defined below), and risks associated with third-party motions in the Chapter 11 Cases, which may interfere with our ability to confirm and consummate a plan of reorganization or an alternative restructuring transaction;
- the potential adverse effects of the Chapter 11 Cases on our liquidity and results of operations;
- increased professional fees and advisory costs to execute a reorganization;
- the timing and extent of changes in prices of, and demand for, crude oil and condensate, natural gas liquids ("NGLs"), natural gas and related commodities;
- our ability to comply with the financial and other covenants in our debt instruments, including our DIP Facility, to service and repay our debt, and to address our liquidity needs, particularly if commodity prices remain volatile and/or depressed;
- the extent to which we are able to pursue drilling plans and acquisitions that are successful in maintaining and economically developing our acreage, producing and replacing reserves and achieving anticipated production levels;

- our ability to realize the benefits of our various acquired assets, fully identify and address existing and potential issues or liabilities and accurately estimate reserves, production and costs with respect to such assets;
- the extent to which our current low share price, our listing in the over-the-counter market rather than on a national securities exchange and our ongoing Chapter 11 Cases will impair our access to the equity markets and ability to obtain financing;
- our ability to utilize the services, personnel and other assets of Sanchez Oil & Gas Corporation ("SOG") pursuant to an existing services agreement (the "Services Agreement");
- SOG's ability to attract and retain personnel and other resources to perform its obligations under the Services Agreement;
- the realized benefits of our partnerships and joint ventures, including our transactions with SNMP and our partnership with affiliates of The Blackstone Group Inc. ("Blackstone");
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may, therefore, be imprecise;
- the extent to which we can optimize reserve recovery and economically develop our properties utilizing horizontal and vertical drilling, advanced completion technologies, hydraulic stimulation and other techniques;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the effectiveness of our internal control over financial reporting;
- the availability, creditworthiness and performance of our counterparties, including financial institutions, operating partners and other parties;
- the extent to which requests for credit assurances from our contractual counterparties could have a material adverse effect on our business, financial condition and results of operations;
- the extent to which minimum volume commitments or "take-or-pay" obligations in excess of our oil and natural gas deliveries to, or transportation needs from, our contractual counterparties due to reduced activity levels or otherwise could have a material adverse effect on our business, financial condition and results of operations;
- results of litigation filed against us or other legal proceedings or out-of-court contractual disputes to which we are party or for which we owe an indemnity;
- competition in the oil and natural gas exploration and production industry generally and with respect to the marketing of oil, natural gas and NGLs, acquisition of leases and properties, attraction and retention of employees and other personnel, procurement of equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- the extent to which our production, revenue and cash flow from operating activities are derived from oil and natural gas assets which are concentrated in a single geographic area;

- developments in oil-producing and natural gas-producing countries, the actions of the Organization of Petroleum Exporting Countries ("OPEC") and other factors affecting the supply and pricing of oil and natural gas;

- the extent to which third parties operate our oil and natural gas properties successfully and economically;

- our ability to manage the financial risks where we share with more than one party the costs of drilling, equipping, completing and operating wells, including with respect to the Comanche Assets (as defined in "Item 1. Notes to the Condensed Consolidated Financial Statements—Note 14. Stockholders' and Mezzanine Equity");

- the use of competing energy sources, the development of alternative energy sources and potential economic implications and other effects therefrom;

- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage, including losses related to sabotage, terrorism or other malicious intentional acts (including cyber-attacks) that disrupt operations;

- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic stimulation and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws, regulations, restrictions and guidelines with respect to derivatives, hedging activities and commercial lending standards; and

- the other factors described under "Part I, Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," "Part II, Item 1A. Risk Factors" and elsewhere in this Quarterly Report on Form 10-Q and in our other public filings with the Securities and Exchange Commission (the "SEC").

In light of these risks, uncertainties and assumptions, the events anticipated by our forward-looking statements may not occur, and, if any of such events do, we may not have correctly anticipated the timing of their occurrence or the extent of their impact on our actual results. Accordingly, you should not place any undue reliance on any of our forward-looking statements. Any forward-looking statement speaks only as of the date on which such statement is made, and we undertake no obligation to correct or update any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by applicable law. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

**GLOSSARY OF SELECTED OIL AND NATURAL GAS TERMS**

The following includes a description of the meanings of some of the oil and natural gas industry terms used in this Quarterly Report on Form 10-Q. The definitions “development costs,” “development project,” “development well,” “economically producible,” “field,” “possible reserves,” “probable reserves,” “production costs,” “proved area,” “reservoir,” “resources,” and “unproved properties” have been excerpted from the applicable definitions contained in Rule 4-10(a) of Regulation S-X.

***American Petroleum Institute (“API”) gravity:*** A system of classifying oil based on its specific gravity, whereby the greater the gravity, the lighter the oil.

***Bbl:*** One stock tank barrel, or 42 U.S. gallons liquid volume, used in reference to oil or other liquid hydrocarbons.

***Boe:*** One barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Boe of oil.

***Boe/d:*** One Boe per day.

***Btu:*** One British thermal unit, the quantity of heat required to raise the temperature of a one-pound mass of water by one degree Fahrenheit.

***completion:*** The process of treating a drilled well followed by the installation of permanent equipment for the production of oil or natural gas, or in the case of a dry hole, the reporting of abandonment to the appropriate agency.

***condensate:*** A liquid hydrocarbon with an API gravity of 50-100°.

***developed acreage:*** The number of acres that are allocated or assignable to producing wells or wells capable of production.

***development costs:*** Costs incurred to obtain access to proved reserves and to provide facilities for extracting, treating, gathering and storing the oil and natural gas. More specifically, development costs, including depreciation and applicable operating costs of support equipment and facilities and other costs of development activities, are costs incurred to: (i) gain access to and prepare well locations for drilling, including surveying well locations for the purpose of determining specific development drilling sites, clearing ground, draining, road building, and relating public roads, gas lines, and power lines, to the extent necessary in developing the proved reserves; (ii) drill and equip development wells, development-type stratigraphic test wells, and service wells, including the costs of platforms and of well equipment such as casing, tubing, pumping equipment, and the wellhead assembly; (iii) acquire, construct, and install production facilities such as lease flow lines, separators, treaters, heaters, manifolds, measuring devices, and production storage tanks, natural gas cycling and processing plants, and central utility and waste disposal systems; and (iv) provide improved recovery systems.

***development project:*** A development project is the means by which petroleum resources are brought to the status of economically producible. As examples, the development of a single reservoir or field, an incremental development in a producing field or the integrated development of a group of several fields and associated facilities with a common ownership may constitute a development project.

***development well:*** A well drilled within the proved area of an oil or natural gas reservoir to the depth of a stratigraphic horizon known to be productive.

***differential:*** An adjustment to the price of oil or natural gas from an established spot market price to reflect differences in the quality and/or location of oil or natural gas.

***dry hole:*** A well found to be incapable of producing hydrocarbons in sufficient quantities such that proceeds from the sale of such production would exceed production expenses and taxes.

***economically producible:*** The term economically producible, as it relates to a resource, means a resource that generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

***field:*** An area consisting of a single reservoir or multiple reservoirs, all grouped on or related to the same individual geological structural feature and/or stratigraphic condition. The field name refers to both the surface and the underground productive formations.

***gross acres or gross wells:*** The total acres or wells, as the case may be, in which we have a working interest.

***horizontal development:*** A drilling technique used in certain formations where a well is drilled vertically to a certain depth and then drilled at a right angle within a specified interval.

***independent exploration and production company:*** A company whose primary line of business is the exploration and production of oil and natural gas.

***MBbls:*** One thousand Bbls.

***MBoe:*** One thousand Boe.

***Mcf:*** One thousand cubic feet of natural gas.

***MMBbls:*** One million Bbls.

***MMBoe:*** One million Boe.

***MMBtu:*** One million British thermal units.

***MMcf:*** One million cubic feet of natural gas.

***natural gas liquids ("NGLs"):*** The combination of ethane, propane, butane, natural gasolines and other components that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.

***net acres or net wells:*** Gross acres or wells, as the case may be, multiplied by our working interest ownership percentage.

***net production:*** Production that is owned by us less royalties and production due others.

***NYMEX:*** New York Mercantile Exchange.

***operator:*** The individual or company responsible for the exploration and/or production of an oil or natural gas well or lease.

***possible reserves:*** Additional reserves that are less certain to be recovered than probable reserves.

***probable reserves:*** Additional reserves that are less certain to be recovered than proved reserves but that, in sum with proved reserves, are as likely as not to be recovered.

***production costs:*** Costs incurred to operate and maintain wells and related equipment and facilities, including depreciation and applicable operating costs of support equipment and facilities and other costs of operating and maintaining those wells and related equipment and facilities.

***proved area:*** The part of a property to which proved reserves have been specifically attributed.

***proved developed reserves:*** Reserves that can be expected to be recovered through existing wells with existing equipment and operating methods.

***proved developed non-producing reserves***: Reserves that are expected to be recovered from completion intervals which are open at the time of the estimate but which have not yet started producing, wells which were shut-in for market conditions or pipeline connections, or wells not capable of production for mechanical reasons; reserves that are expected to be recovered from zones in existing well which will require additional completion work or future re-completion prior to start production.

***proved oil and natural gas reserves:*** The estimated quantities of oil, natural gas and NGLs that geological and engineering data demonstrate with reasonable certainty to be commercially recoverable in future years from known reservoirs under existing economic and operating conditions.

***proved undeveloped reserves ("PUDs"):*** Proved reserves that are expected to be recovered from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for recompletion.

***realized price:*** The cash market price less all expected quality, transportation and demand adjustments.

***recompletion:*** The action of reentering an existing wellbore to redo or repair the original completion in order to increase the well's productivity.

***reserve:*** That part of a mineral deposit which could be economically and legally extracted or produced at the time of the reserve determination.

***reservoir:*** A porous and permeable underground formation containing a natural accumulation of producible oil and/or natural gas that is confined by impermeable rock or water barriers and is individual and separate from other reservoirs.

***resources:*** Resources are quantities of oil and natural gas estimated to exist in naturally occurring accumulations. A portion of the resources may be estimated to be recoverable and another portion may be considered unrecoverable. Resources include both discovered and undiscovered accumulations.

***spacing:*** The distance between wells producing from the same reservoir. Spacing is often expressed in terms of feet (e.g., 600 foot well-spacing) and is often established by regulatory agencies.

***trend:*** A geographic area with hydrocarbon potential.

***undeveloped acreage:*** Lease acreage on which wells have not been drilled or completed to a point that would permit the production of commercial quantities of oil and natural gas regardless of whether such acreage contains proved reserves.

***unproved properties:*** Properties with no proved reserves.

***volatile oil:*** A quality of oil with an API gravity of 42-55° with a natural gas-to-oil ratio of 900-3,500 cubic feet per barrel.

***working interest:*** An interest in an oil and natural gas lease that gives the owner of the interest the right to drill for and produce oil and natural gas on the leased acreage and requires the owner to pay a share of the costs of drilling and production operations.

***WTI:*** West Texas Intermediate oil.

PART I—FINANCIAL INFORMATION

**Item 1. Financial Statements**

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Balance Sheets**
**(in thousands, except par value and share amounts)**

| | September 30, 2019 (Unaudited) | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 179,538 | $ 197,613 |
| Oil and natural gas receivables | 69,290 | 87,222 |
| Joint interest billings receivables | 10,979 | 33,263 |
| Accounts receivable - related entities | 10,161 | 6,099 |
| Fair value of derivative instruments | 6,263 | 15,714 |
| Other current assets | 24,679 | 33,070 |
| Total current assets | 300,910 | 372,981 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 3,864,327 | 3,792,431 |
| Unproved oil and natural gas properties | 299,456 | 328,643 |
| Total oil and natural gas properties | 4,163,783 | 4,121,074 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,947,558) | (1,761,949) |
| Total oil and natural gas properties, net | 2,216,225 | 2,359,125 |
| Other assets: | | |
| Fair value of derivative instruments | 9,346 | 12,102 |
| Right of use assets, net | 280,139 | — |
| Investments (includes investment in SNMP measured at fair value of $0.8 million and $3.9 million as of September 30, 2019 and December 31, 2018, respectively) | 12,200 | 16,664 |
| Other assets | 43,990 | 59,088 |
| Total assets | $ 2,862,810 | $ 2,819,960 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Other payables | 16,739 | 74,628 |
| Accrued liabilities: | | |
| Capital expenditures | 7,232 | 61,970 |
| Other | 66,298 | 102,728 |
| Fair value of derivative instruments | 700 | 706 |
| Short term debt | — | 304 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,961 | 75,581 |
| Total current liabilities | 296,796 | 348,299 |
| Long term debt, net of premium, discount and debt issuance costs | 166,956 | 2,395,408 |
| Asset retirement obligations | 49,183 | 46,175 |
| Fair value of derivative instruments | — | 366 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 3,085,032 | 2,811,655 |
| Commitments and contingencies (Note 17) | | |
| Mezzanine equity: | | |
| Preferred units ($1,000 liquidation preference, 500,000 units authorized, issued and outstanding as of September 30, 2019 and December 31, 2018) | 474,857 | 452,828 |
| Stockholders' deficit: | | |
| Preferred stock ($0.01 par value, 15,000,000 shares authorized; 619,503 and 1,838,985 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 4.875% Convertible Perpetual Preferred Stock, Series A; 2,466,013 and 3,527,830 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively, of 6.500% Convertible Perpetual Preferred Stock, Series B) | 31 | 53 |
| Common stock ($0.01 par value, 300,000,000 shares authorized; 100,154,824 and 87,328,424 shares issued and outstanding as of September 30, 2019 and December 31, 2018, respectively) | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (2,069,822) | (1,812,884) |
| Total stockholders' deficit | (697,079) | (444,523) |
| Total liabilities and stockholders' deficit | $ 2,862,810 | $ 2,819,960 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended September 30, 2019 | Three Months Ended September 30, 2018 | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|---|---|
| **REVENUES:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ 362,424 | $ 473,178 |
| Natural gas liquid sales | 22,675 | 69,995 | 92,891 | 175,833 |
| Natural gas sales | 26,572 | 39,460 | 100,932 | 122,330 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 162,546 | 277,710 | 574,350 | 788,251 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 74,740 | 75,594 | 231,441 | 225,186 |
| Exploration expenses | 164 | 2,698 | 4,983 | 3,247 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 9,867 | 15,221 | 34,682 | 42,898 |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 22,906 | 4,259 |
| General and administrative expenses | 20,915 | 21,312 | 66,266 | 73,199 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 198,214 | 193,125 | 606,644 | 554,802 |
| Operating income (loss) | (35,668) | 84,585 | (32,294) | 233,449 |
| Other income (expense): | | | | |
| Interest income | 221 | 1,130 | 1,447 | 3,400 |
| Other income (expense) | (12,829) | (7,677) | (13,785) | 2,467 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (22,884) | (44,154) | (111,998) | (132,664) |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | (20,827) | (142,384) |
| Total other expense | (22,292) | (78,987) | (145,163) | (267,653) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Income (loss) before income taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | (112,448) | 5,598 | (232,755) | (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Net loss per common share - basic and diluted | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |
| Weighted average number of shares used to calculate net loss attributable to common stockholders - basic and diluted | 97,395 | 82,073 | 95,272 | 81,597 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | Capital | Deficit | Deficit |
| **BALANCE, December 31, 2018** | 1,839 | $ 18 | 3,528 | $ 35 | 87,329 | $ 881 | $ 1,367,427 | $ (1,812,884) | $ (444,523) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 42,499 | 42,499 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 7,898 | 79 | 3,908 | (2,516) | 1,471 |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,033) | (7,033) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (270) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (1,059) | (11) | (1,017) | (10) | 4,837 | 48 | (27) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 141 | — | 141 |
| Net loss | — | — | — | — | — | — | — | (67,342) | (67,342) |
| **BALANCE, March 31, 2019** | **780** | **7** | **2,511** | **25** | **99,794** | **1,007** | **1,371,450** | **(1,859,776)** | **(487,287)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,325) | (2,325) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,358) | (7,358) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (81) | 4 | (4) | — | — |
| Exchange of preferred stock for common stock | (155) | (1) | — | — | 363 | 2 | (1) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 158 | — | 158 |
| Net loss | — | — | — | — | — | — | — | (52,965) | (52,965) |
| **BALANCE, June 30, 2019** | **625** | **6** | **2,511** | **25** | **100,076** | **1,013** | **1,371,603** | **(1,934,924)** | **(562,277)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (2,312) | (2,312) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (7,638) | (7,638) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (38) | (1) | 1 | — | — |
| Exchange of preferred stock for common stock | (5) | — | (45) | — | 117 | 2 | (2) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 96 | — | 96 |
| Net loss | — | — | — | — | — | — | — | (112,448) | (112,448) |
| **BALANCE, September 30, 2019** | **620** | **$ 6** | **2,466** | **$ 25** | **100,155** | **$ 1,014** | **$ 1,371,698** | **$ (2,069,822)** | **$ (697,079)** |

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Stockholders' Deficit (Continued)**
**(Unaudited)**
**(in thousands)**

| | Series A Preferred Stock | | Series B Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | Shares | Amount | | | |
| **BALANCE, December 31, 2017** | 1,839 | $ 18 | 3,528 | $ 35 | 83,985 | $ 845 | $ 1,362,118 | $ (1,832,156) | $ (469,140) |
| Adoption of accounting standards | — | — | — | — | — | — | — | 22,739 | 22,739 |
| Issuance of common stock | — | — | — | — | 100 | 1 | 565 | — | 566 |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | 805 | 8 | 3,979 | (3,987) | — |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Distributions - SN UnSub Preferred Units | — | — | — | — | — | — | — | 2,592 | 2,592 |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (5,930) | (5,930) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 283 | 4 | (4) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (375) | — | (375) |
| Net loss | — | — | — | — | — | — | — | (4,815) | (4,815) |
| **BALANCE, March 31, 2018** | **1,839** | **18** | **3,528** | **35** | **85,173** | **858** | **$ 1,366,283** | **(1,834,057)** | **(466,863)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,189) | (6,189) |
| Restricted stock awards, net of forfeitures | — | — | — | — | 2,625 | 26 | (26) | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | 4,651 | — | 4,651 |
| Net loss | — | — | — | — | — | — | — | (34,987) | (34,987) |
| **BALANCE, June 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,798** | **884** | **1,370,908** | **(1,891,720)** | **(519,875)** |
| Dividends on Series A and Series B Preferred Stock | — | — | — | — | — | — | — | (3,987) | (3,987) |
| Dividends on SN UnSub Preferred Units | — | — | — | — | — | — | — | (12,500) | (12,500) |
| Accretion of discount on SN UnSub Preferred Units | — | — | — | — | — | — | — | (6,458) | (6,458) |
| Restricted stock awards, net of forfeitures | — | — | — | — | (268) | (1) | 1 | — | — |
| Non-cash stock-based compensation | — | — | — | — | — | — | (1,398) | — | (1,398) |
| Net loss | — | — | — | — | — | — | — | 5,598 | 5,598 |
| **BALANCE, September 30, 2018** | **1,839** | **$ 18** | **3,528** | **$ 35** | **87,530** | **$ 883** | **$ 1,369,511** | **$ (1,909,067)** | **$ (538,620)** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

**Sanchez Energy Corporation (Debtor-in-Possession)**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 |
| Impairment of oil and natural gas properties | 22,906 | 4,259 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 20,827 | 142,384 |
| Net cash settlements paid on commodity derivative contracts | (5,799) | (69,317) |
| (Gain) loss on other derivatives | (276) | 5,262 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Amortization of debt issuance costs | 8,275 | 12,706 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 41,305 | 1,982 |
| Accounts receivable - related entities | (4,062) | (3,365) |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 59,218 | 17,595 |
| Other current liabilities | (20,519) | (12,531) |
| Other assets and liabilities, net | 5,330 | (2,225) |
| Net cash provided by operating activities | 99,750 | 249,526 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (114,655) | (452,296) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Acquisition of oil and natural gas properties | — | 2,834 |
| Payments for purchases of other assets | (761) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,788 |
| Net cash used in investing activities | (110,217) | (453,822) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | (18,327) | (103,262) |
| Financing costs, including costs related to DIP Facility | (9,505) | (12,995) |
| Preferred dividends paid | — | (11,961) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred unit distributions paid | (37,500) | (22,408) |
| Net cash (used in) provided by financing activities | (7,608) | 388,534 |
| (Decrease) increase in cash and cash equivalents | (18,075) | 184,238 |
| Cash and cash equivalents, beginning of period | 197,613 | 184,434 |
| Cash and cash equivalents, end of period | $ 179,538 | $ 368,672 |
| **NON-CASH INVESTING AND FINANCING ACTIVITIES:** | | |
| Change in asset retirement obligations | $ 129 | $ 1,532 |
| Change in accrued capital expenditures | (54,871) | 24,652 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 | — |
| **SUPPLEMENTAL DISCLOSURE:** | | |
| Cash paid for interest | $ 84,803 | $ 120,775 |
| Cash paid for reorganization items | $ 9,521 | $ — |

The accompanying notes are an integral part of these condensed consolidated financial statements

**Sanchez Energy Corporation (Debtor-in-Possession)**

**Notes to the Condensed Consolidated Financial Statements**

**(Unaudited)**

**Note 1. Organization and Business**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed in "—Note 3. Chapter 11 Cases," we are currently operating our business as "debtors-in-possession" in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

**Liquidity**

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions on the Petition Date (as defined below), prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

**Note 2. Basis of Presentation and Summary of Significant Accounting Policies**

The accompanying condensed consolidated financial statements are unaudited and were prepared from the Company's records. The condensed consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP" or "U.S. GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. The Company derived the condensed consolidated balance sheet as of December 31, 2018 from the audited financial statements filed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Annual Report"). Because this is an interim period filing presented using a condensed format, it does not include all of the disclosures required by U.S. GAAP. These condensed consolidated financial statements should be read in connection with the consolidated financial statements and notes thereto included in the 2018 Annual Report, which contains a summary of the Company's significant accounting policies and other disclosures. In the opinion of management, these financial statements include the adjustments and accruals, all of which are of a normal recurring nature, which are necessary for a fair presentation of the results for the interim periods. These interim results are not necessarily indicative of results to be expected for the entire year.

As of September 30, 2019, the Company's significant accounting policies are consistent with those discussed in "—Note 2. Basis of Presentation and Summary of Significant Accounting Policies," in the notes to the Company's consolidated financial statements contained in the 2018 Annual Report with the addition of the following:

***Leases***

The Company determines if a contractual arrangement is a lease at inception. Operating leases are included in right of use ("ROU") assets, short term lease liabilities and long term lease liabilities in the condensed consolidated balance sheets.

ROU assets represent the Company's right to use an underlying asset for the lease term, and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Operating lease ROU assets and lease liabilities are recognized at commencement date based on the present value of lease payments over the lease term. As most of the Company's leases do not provide an implicit rate, the Company's estimated incremental borrowing rate based on the information available at commencement date is used in determining the present value of lease payments, and the implicit rate is used when readily determinable. The operating lease ROU asset also includes any lease payments made and excludes lease incentives. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

We have lease agreements with lease and non-lease components, which are accounted for as a single lease component.

***Bankruptcy Accounting***

As further discussed in "—Note 3. Chapter 11 Cases," on August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").

The condensed consolidated financial statements have been prepared as if the Company is a going concern and reflect the application of Accounting Standards Codification 852 "Reorganizations" ("ASC 852"). ASC 852 requires that the financial statements, for periods subsequent to the filing of the Bankruptcy Petitions, distinguish transactions and events that are directly associated with the reorganization from the ongoing operations of the business. Accordingly, certain expenses, gains and losses that are realized or incurred in the bankruptcy proceedings are recorded in "Reorganization items" on the Company's condensed consolidated statements of operations. In addition, prepetition

unsecured and under-secured obligations that may be impacted by the bankruptcy reorganization process have been classified as "Liabilities subject to compromise" on the Company's condensed consolidated balance sheet at September 30, 2019. These liabilities are reported at the amounts expected to be allowed as claims by the Bankruptcy Court, although they may be settled for less. The Company has not taken a view with respect to the ultimate recoveries or payments under these agreements or on account of these liabilities in the presentation of such amounts on the financial statements.

The accompanying condensed consolidated financial statements do not purport to reflect or provide for the consequences of the Chapter 11 Cases. In particular, the condensed consolidated financial statements do not purport to show: (i) the realizable value of assets on a liquidation basis or their availability to satisfy liabilities; (ii) the amount of prepetition liabilities that may be allowed for claims or contingencies, or the status and priority thereof; (iii) the effect on stockholders' deficit accounts of any changes that may be made to the Company's capitalization; or (iv) the effect on operations of any changes that may be made to the Company's business. While operating as debtors-in-possession under Chapter 11 of the Bankruptcy Code, the Debtors may sell or otherwise dispose of or liquidate assets or settle liabilities in amounts other than those reflected on the Company's condensed consolidated financial statements, subject to the approval of the Bankruptcy Court or otherwise as permitted in the ordinary course of business. Further, a plan of reorganization could materially change the amounts and classifications on the Company's historical condensed consolidated financial statements.

***Principles of Consolidation***

The Company's condensed consolidated financial statements include the accounts of the Company and its subsidiaries. All intercompany balances and transactions have been eliminated.

***Use of Estimates***

The accompanying condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative ("G&A") expenses. Actual results could differ materially from those estimates.

***Recent Accounting Pronouncements***

In June 2018, the FASB issued ASU 2018-07 "Compensation – Stock Compensation (ASC 718) – Improvements to Nonemployee Share-Based Payment Accounting," which expands the scope of ASC 718, Compensation – Stock Compensation, to include share-based payment transactions for acquiring goods and services from nonemployees. We adopted this ASU effective January 1, 2019, which resulted in our remeasurement of the value of our outstanding unvested awards as of January 1, 2019 and changed the way we value our equity-classified equity awards going forward. Adoption of the standard did not have a material impact on our condensed consolidated financial statements.

In June 2016, the FASB issued ASU 2016-13 "Financial Instruments – Credit Losses (ASC 326): Measurement of Credit Losses on Financial Instruments." This ASU modifies the impairment model to utilize an expected loss methodology in place of the currently used incurred loss methodology, which will result in the more timely recognition of losses, if applicable. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2019, and earlier adoption is permitted. We are currently in the process of evaluating the impact of adoption of this guidance on our condensed consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02 "Leases (ASC 842)," effective for annual and interim periods for public companies beginning after December 15, 2018, with a modified retrospective approach to be used for implementation. The standard updates the previous lease guidance by requiring the recognition of a ROU asset and lease liability on the statement of financial position for all leases with lease terms of more than 12 months. The lease liability represents the discounted obligation to make future minimum lease payments and the corresponding ROU asset represents the lessee's right to use, or control the use of, a specified asset for the lease term. Recognition, measurement and presentation of expenses and cash flows arising from a lease will depend on classification as an operating or a finance lease. The Company adopted this standard effective January 1, 2019. We elected the package of practical expedients permitting us to not reassess under the new standard our prior conclusions regarding lease identification, lease classification and initial direct costs, the practical expedient to not separate lease and non– lease components for all of our existing lessee arrangements, and to elect an accounting policy to not apply the recognition requirements of ASC 842 to our short term leases. We did not elect the practical expedient for use of hindsight in determining the lease term and assessing impairment of our ROU assets. Adoption of ASC 842 resulted in the recognition of ROU assets and lease liabilities for operating leases on the balance sheet and the derecognition of the deferred gain previously recorded on a sale-leaseback transaction as a cumulative effect adjustment to retained earnings on January 1, 2019. Amounts recognized at January 1, 2019 for operating leases were as follows (in thousands):

| | December 31, 2018 | Adjustments due to Topic 842 | January 1, 2019 |
|---|---|---|---|
| ROU assets | $ — | $ 344,472 | $ 344,472 |
| Short term lease liabilities | — | 99,693 | 99,693 |
| Other current liabilities | 75,581 | (23,720) | 51,861 |
| Long term lease liabilities | — | 246,746 | 246,746 |
| Other long term liabilities | 21,407 | (20,745) | 662 |
| Accumulated deficit | (1,812,884) | 42,499 | (1,770,385) |

No impact was recorded to the condensed consolidated statement of operations related to the adoption of Topic 842.

**Note 3. Chapter 11 Cases**

***Voluntary Reorganization Under Chapter 11***

On the Petition Date, the Debtors filed the Bankruptcy Petitions for reorganization under the Bankruptcy Code in the Bankruptcy Court. The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer the Chapter 11 Cases under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below) and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub (as defined below), its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 Cases and are classified as "non-Debtors".

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until

confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves a Debtor of performing its future obligations under such executory contract or unexpired leases but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtor's estate(s) for such damages. Generally, the assumption of an executory contract or unexpired lease requires a Debtor to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtors in this quarterly report, including where applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the

common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable, is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;

- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;

- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;

- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);

- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;

- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with a variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and

- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC ("SN UnSub GP"), dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Liabilities Subject to Compromise***

The Company's condensed consolidated balance sheet includes amounts classified as "Liabilities subject to compromise," which represent prepetition liabilities that have been allowed, or that the Company anticipates will be allowed, as claims in its Chapter 11 Cases. The amounts represent the Company's current estimate of known or potential obligations to be resolved in connection with the Chapter 11 Cases. The differences between the liabilities the Company has estimated and the claims filed, or to be filed, will be investigated and resolved in connection with the claims resolution process. The Company will continue to evaluate these liabilities throughout the Chapter 11 Cases and adjust amounts as necessary. Such adjustments may be material.

The following table summarizes the components of liabilities subject to compromise included on the condensed consolidated balance sheet (in thousands):

| | September 30, 2019 |
|---|---|
| 7.75% Notes, due June 2021 | $ 600,000 |
| 6.125% Notes, due January 2023 | 1,150,000 |
| Credit Agreement[(1)] | 7,922 |
| 7.25% Senior Secured Notes, due February 2023 | 500,000 |
| Accounts payable | 22,349 |
| Other payables | 18,329 |
| Accrued interest payable | 65,371 |
| Other accrued expenses | 34,135 |
| Liabilities subject to compromise | $ 2,398,106 |

(1) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.

***Prepetition Restructuring Charges***

Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our consolidated statements of operations.

Prepetition restructuring charges, which primarily consisted of professional, consulting and legal fees related to the Chapter 11 Cases, were $18.2 million and $41.9 million for the three and nine months ended September 30, 2019, respectively. There were no prepetition restructuring charges for the three or nine months ended September 30, 2018.

***Reorganization Items***

The Company has incurred and is expected to continue to incur substantial costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statements of operations (in thousands):

| | Three and Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items[(1)] | $ 55,321 |

(1) Includes $9.5 million of cash paid for reorganization items.

***Interest Expense***

The Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date. The contractual interest on liabilities subject to compromise not reflected in the condensed consolidated statements of operations was approximately $21.1 million, representing interest expense from the Petition Date through September 30, 2019. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Debtor Financial Statements***

Condensed consolidated financial statements of the Debtors are set forth below. These condensed consolidated financial statements exclude the financial statements of the non-Debtors. Transactions and balances of receivables and payables between Debtors are eliminated in consolidation. However, the Debtors' condensed consolidated balance sheet includes receivables from and payables to related non-Debtors.

**Debtors**[1]
**Condensed Consolidated Balance Sheets (Unaudited)**
**(in thousands)**

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 173,959 | $ 194,723 |
| Oil and natural gas receivables | 42,778 | 55,083 |
| Joint interest billings receivables | 10,969 | 33,261 |
| Fair value of derivative instruments | 367 | 5,154 |
| Other current assets | 20,978 | 28,617 |
| Total current assets | 249,051 | 316,838 |
| Oil and natural gas properties, on the basis of successful efforts accounting: | | |
| Proved oil and natural gas properties | 2,947,641 | 2,890,471 |
| Unproved oil and natural gas properties | 205,121 | 236,931 |
| Total oil and natural gas properties | 3,152,762 | 3,127,402 |
| Less: Accumulated depreciation, depletion, amortization and impairment | (1,651,441) | (1,526,988) |
| Total oil and natural gas properties, net | 1,501,321 | 1,600,414 |
| Other assets: | | |
| Right of use assets, net | 280,139 | — |
| Investments | 4,921 | 9,384 |
| Investments in subsidiaries | 338,097 | 337,475 |
| Other assets | 31,631 | 45,524 |
| Total assets | $ 2,405,160 | $ 2,309,635 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| Current liabilities: | | |
| Debtor-in-possession financing | $ 50,000 | $ — |
| Accounts payable | 14,372 | 32,382 |
| Accounts payable - related entities | 7,745 | 8,707 |
| Other payables | 16,230 | 74,595 |
| Accrued liabilities: | | |
| Capital expenditures | 5,194 | 54,317 |
| Other | 46,909 | 87,656 |
| Fair value of derivative instruments | 700 | 307 |
| Short term lease liabilities | 109,494 | — |
| Other current liabilities | 31,962 | 75,581 |
| Total current liabilities | 282,606 | 333,545 |
| Long term debt, net of premium, discount and debt issuance costs | — | 2,213,223 |
| Asset retirement obligations | 34,456 | 32,432 |
| Long term lease liabilities | 173,990 | — |
| Liabilities subject to compromise | 2,398,106 | — |
| Other liabilities | 1 | 21,407 |
| Total liabilities | 2,889,159 | 2,600,607 |
| Stockholders' deficit: | | |
| Preferred stock | 31 | 53 |
| Common stock | 1,014 | 881 |
| Additional paid-in capital | 1,371,698 | 1,367,427 |
| Accumulated deficit | (1,856,742) | (1,659,333) |
| Total stockholders' deficit | (483,999) | (290,972) |
| Total liabilities and stockholders' deficit | $ 2,405,160 | $ 2,309,635 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors[(1)]**
**Condensed Consolidated Statements of Operations (Unaudited)**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **REVENUES:** | | | | |
| Oil sales | $ 69,597 | $ 113,183 | $ 242,064 | $ 323,019 |
| Natural gas liquid sales | 15,506 | 49,332 | 65,170 | 119,961 |
| Natural gas sales | 17,941 | 27,674 | 69,713 | 83,640 |
| Sales and marketing revenues | 7,283 | 7,012 | 18,103 | 16,910 |
| Total revenues | 110,327 | 197,201 | 395,050 | 543,530 |
| **OPERATING COSTS AND EXPENSES:** | | | | |
| Oil and natural gas production expenses | 51,196 | 47,262 | 154,064 | 138,322 |
| Exploration expenses | 146 | 2,668 | 4,724 | 3,171 |
| Sales and marketing expenses | 6,672 | 7,239 | 16,591 | 16,498 |
| Production and ad valorem taxes | 6,424 | 10,683 | 23,332 | 29,162 |
| Depreciation, depletion, amortization and accretion | 39,211 | 47,799 | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 9,597 | 3,103 | 18,206 | 3,543 |
| General and administrative expenses | 21,424 | 19,386 | 60,854 | 66,522 |
| Prepetition restructuring charges | 18,231 | — | 41,855 | — |
| Total operating costs and expenses | 152,901 | 138,140 | 448,602 | 386,030 |
| Operating income (loss) | (42,574) | 59,061 | (53,552) | 157,500 |
| Other income (expense): | | | | |
| Interest income | 220 | 1,129 | 1,442 | 3,397 |
| Other income (expense) | (12,814) | (8,217) | (13,527) | 1,186 |
| Gain on sale of oil and natural gas properties | — | — | — | 1,528 |
| Interest expense | (19,591) | (40,659) | (101,693) | (121,856) |
| Equity in net earnings of subsidiaries | 14,025 | 8,273 | 621 | 12,470 |
| Net (gains) losses on commodity derivatives | 2,774 | (13,989) | (10,748) | (88,429) |
| Total other expense | (15,386) | (53,463) | (123,905) | (191,704) |
| Reorganization items | 55,321 | — | 55,321 | — |
| Net income (loss) before taxes | (113,281) | 5,598 | (232,778) | (34,204) |
| Income tax benefit | (833) | — | (23) | — |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

**Debtors[(1)]**
**Condensed Consolidated Statements of Cash Flows (Unaudited)**
**(in thousands)**

| | Nine Months Ended September 30, 2019 | Nine Months Ended September 30, 2018 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (232,755) | $ (34,204) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation, depletion, amortization and accretion | 128,976 | 128,812 |
| Impairment of oil and natural gas properties | 18,206 | 3,543 |
| Gain on sale of oil and natural gas properties | — | (1,528) |
| Stock-based compensation expense | 355 | 4,344 |
| Net losses on commodity derivative contracts | 10,748 | 88,429 |
| Net cash settlements paid on commodity derivative contracts | (3,559) | (55,147) |
| (Gain) loss on other derivatives | (308) | 7,141 |
| Loss on investments | 4,464 | 3,361 |
| Loss (gain) on sale of inventory | 143 | (571) |
| Loss on other assets | 858 | — |
| Loss on prepaid asset impairment | 11,755 | — |
| Amortization of deferred gain on Western Catarina Midstream Divestiture | — | (17,790) |
| Equity in net earnings of subsidiaries | (621) | (12,470) |
| Amortization of debt issuance costs | 5,386 | 9,859 |
| Accretion of debt discount, net | 1,019 | 1,112 |
| Reorganization items | 39,238 | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 35,686 | 75 |
| Accounts receivable - related entities | (962) | 9,259 |
| Other payables | (40,452) | 8,537 |
| Accrued liabilities | 54,915 | 12,980 |
| Other current liabilities | (20,518) | (12,532) |
| Other assets and liabilities, net | 5,260 | (2,390) |
| Net cash provided by operating activities | 17,834 | 140,820 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Capital expenditures for the development of oil and natural gas properties | (91,375) | (379,321) |
| Proceeds from the sale of oil and natural gas properties | — | 1,425 |
| Payments for purchases of other assets | (736) | (9,573) |
| Proceeds from the sale of other assets | 5,199 | 3,642 |
| Net cash used in investing activities | (86,912) | (383,827) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from borrowings, including borrowings under DIP Facility | 57,922 | 539,865 |
| Repayment of borrowings | — | (95,000) |
| Financing costs, including borrowings under DIP Facility | (9,410) | (12,484) |
| Cash paid to tax authority for employee stock-based compensation awards | (198) | (705) |
| Preferred dividends paid | — | (11,961) |
| Net cash provided by (used in) financing activities | 48,314 | 419,715 |
| (Decrease) increase in cash and cash equivalents | (20,764) | 176,708 |
| Cash and cash equivalents, beginning of period | 194,723 | 171,052 |
| Cash and cash equivalents, end of period | $ 173,959 | $ 347,760 |

(1) Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC and SN UR Holdings, LLC.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (each term as defined below). Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement (as defined below). See "—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of the Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 4. Revenue Recognition**

***Revenue from Contracts with Customers***

We account for revenue from contracts with customers in accordance with ASC 606. The unit of account in ASC 606 is a performance obligation, which is a promise in a contract to transfer to a customer either a distinct good or service (or bundle of goods or services) or a series of distinct goods or services provided over a period of time. ASC 606 requires that a contract's transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is to be allocated to each performance obligation in the contract based on relative standalone selling prices and recognized as revenue when (point in time) or as (over time) the performance obligation is satisfied.

*Disaggregation of Revenue*

We recognized revenue of $162.5 million and $277.7 million for the three months ended September 30, 2019 and 2018, respectively, and revenue of $574.4 million and $788.3 million for the nine months ended September 30, 2019 and 2018, respectively. We disaggregate revenue in our income statement based on product type, and we further disaggregate our revenue related to sales and marketing activities.

*Oil, Natural Gas and NGL Revenues*

We recognize revenue from the sale of oil, natural gas and NGLs in the period that the performance obligations are satisfied. Our performance obligations are primarily comprised of the delivery of oil, natural gas or NGLs at a delivery point. Each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable and represents a distinct performance obligation to which the transaction price is allocated. Performance obligations are satisfied at a point in time once control of the product has been transferred to the customer through delivery of oil, natural gas and NGLs.

*Sales and Marketing Revenue*

Beginning in 2018, we entered into commodity purchase transactions with certain third parties and then subsequently sold the purchased commodity as separate revenue streams. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. We retain control of the purchased hydrocarbons prior to delivery to the purchaser. The Company has concluded that we are the principal in these arrangements and therefore we recognize revenue on a gross basis as Sales and Marketing Revenues, with costs to purchase and transport the commodity presented as Sales and Marketing Expenses, in each case within our consolidated statement of operations. Contracts to sell the third-party hydrocarbons are the same contracts as those for which we sell our produced hydrocarbons, and as such, we do not recognize this revenue any differently than our oil, natural gas and NGL revenue discussed previously.

*Remaining Performance Obligations*

Several of our sales contracts contain multiple performance obligations as each barrel of oil, MMBtu of natural gas, barrel of NGL or other unit of measure is separately identifiable. For these contracts, we have taken the optional exception under ASC 606-10-50-14A(b) which is available only for wholly unsatisfied performance obligations for which the criteria in ASC 606-10-32-40 have been met. Under this exception, neither estimation of variable consideration nor disclosure of the transaction price allocated to the remaining performance obligations is required. Revenue is alternatively recognized in the period that control of the commodity is transferred to the customer and the respective variable component of the total transaction price is resolved.

For forms of variable consideration that are not associated with a specific volume and thus do not meet the allocation exception, estimation is required. Examples of such variable consideration consist of deficiency payments, late payment fees, truck rejection charges, inflation adjustments and imbalance penalties; however, these items are immaterial to our condensed consolidated financial statements and/or have a low probability of occurrence. As significant reversals of revenue due to this variability are not probable, no estimation is required.

*Contract Balances*

Under our sales contracts, we invoice customers after our performance obligations have been satisfied, at which point payment is unconditional. Accordingly, our contracts do not give rise to contract assets or liabilities under ASC 606. At September 30, 2019 and December 31, 2018, our receivables from contracts with customers were $69.3 million and $87.2 million, respectively.

**Note 5. Cash and Cash Equivalents**

As of September 30, 2019 and December 31, 2018, cash and cash equivalents consisted of the following (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Cash at banks | $ 179,265 | $ 66,426 |
| Money market funds | 273 | 131,187 |
| Total cash and cash equivalents | $ 179,538 | $ 197,613 |

Our cash includes funds held in deposit accounts with highly rated banks, and our cash equivalents include funds held in stable and highly liquid money market accounts with major financial institutions.

**Note 6. Oil and Natural Gas Properties**

*Impairment of Oil and Natural Gas Properties* —The Company recorded a proved property impairment of $4.3 million during the nine months ended September 30, 2019. The Company did not record proved property impairments during the three months ended September 30, 2019 or the three and nine months ended September 30, 2018. Changes in

production rates, levels of reserves, future development costs, and other factors will impact the Company's actual impairment analyses in future periods.

*Unproved Properties*—The Company recorded impairment to our unproved oil and natural gas properties of $9.8 million and $18.6 million for the three and nine months ended September 30, 2019, respectively, and $3.1 million and $4.3 million for the three and nine months ended September 30, 2018, respectively, due to acreage expirations from changes in the development plan.

**Note 7. Debt**

As of September 30, 2019 and December 31, 2018, the Company's outstanding debt consisted of the following (in thousands):

| | Interest Rate | Maturity Date | September 30, 2019 | December 31, 2018 |
|---|---|---|---|---|
| **Short Term Debt:** | | | | |
| Debtor-in-possession financing[1] | Variable | June 11, 2020 | $ 50,000 | $ — |
| SR Credit Agreement[2][3] | Variable | - | $ — | $ 304 |
| Total short term debt | | | $ 50,000 | $ 304 |
| **Long Term Debt:** | | | | |
| 7.75% Notes | 7.75% | June 15, 2021 | $ 600,000 | $ 600,000 |
| SN UnSub Credit Agreement[2] | Variable | March 1, 2022 | 150,000 | 167,500 |
| 4.59% Non-Recourse Subsidiary Term Loan[2] | 4.59% | August 31, 2022 | 3,527 | 3,803 |
| SR Credit Agreement[2] | Variable | October 31, 2022 | 22,941 | 23,187 |
| 6.125% Notes | 6.125% | January 15, 2023 | 1,150,000 | 1,150,000 |
| Credit Agreement[4] | Variable | February 14, 2023[5] | 7,922 | — |
| 7.25% Senior Secured Notes | 7.25% | February 15, 2023[6] | 500,000 | 500,000 |
| | | | 2,434,390 | 2,444,490 |
| Unamortized discount on Additional 7.75% Notes[7] | | | — | (2,222) |
| Unamortized premium on Additional 6.125% Notes[7] | | | — | 1,090 |
| Unamortized discount on 7.25% Senior Secured Notes[7] | | | — | (4,241) |
| Unamortized debt issuance costs[7] | | | (9,512) | (43,709) |
| Total long term debt | | | 2,424,878 | 2,395,408 |
| Less liabilities subject to compromise[8] | | | (2,257,922) | — |
| Total long term debt not subject to compromise | | | $ 166,956 | $ 2,395,408 |

(1) Incurred interest at a weighted-average rate of approximately 10.1% for the postpetition period ended September 30, 2019.
(2) Represents debt instruments which are non-recourse to Sanchez Energy Corporation and its restricted subsidiaries.
(3) Incurred interest at a weighted-average rate of approximately 5.9% and 6.9% for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively.
(4) A standby letter of credit in the amount of approximately $17.1 million was issued under the Credit Agreement on January 10, 2019 and incurred fees at a rate of 3.25% through the Petition Date. The letter of credit remains outstanding and is undrawn as of September 30, 2019 but is currently proposed to be cash collateralized subject to entry of the Final DIP Order.

(5) The Credit Agreement would mature on the earlier of (i) February 14, 2023 or (ii) the 91st day prior to the scheduled maturity of any "material indebtedness," which is defined to include, without limitation, any indebtedness arising in connection with the 7.75% Notes, 6.125% Notes or the 7.25% Senior Secured Notes. The 7.75% Notes would mature on June 15, 2021; therefore, the Credit Agreement would, as of September 30, 2019, mature on March 15, 2021.
(6) The 7.25% Senior Secured Notes would mature on February 15, 2023, unless on October 10, 2022 either (i) some or all of the 6.125% Notes are still outstanding and have not been defeased or (ii) there is outstanding indebtedness of Sanchez Energy Corporation or any of its restricted subsidiaries that was used to purchase, repurchase, redeem, defease or otherwise acquire or retire for value the 6.125% Notes, and such indebtedness under this clause (ii) has a final maturity date that is earlier than May 17, 2023, in which case of either clause (i) or clause (ii), the 7.25% Senior Secured Notes would mature on October 14, 2022.
(7) Approximately $30.4 million in net discounts, premiums and debt issuance costs were reclassified as reorganization items in connection with the filing of the Bankruptcy Petitions.
(8) The Company's 7.75% Notes, 6.125% Notes, Credit Agreement, and 7.25% Senior Secured Notes were classified as liabilities subject to compromise at September 30, 2019.

The components of interest expense are as follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Interest on SR Credit Agreement | $ (342) | $ (360) | $ (917) | $ (1,188) |
| Interest on Senior Notes | (17,704) | (38,296) | (94,299) | (110,158) |
| Interest and commitment fees on SN UnSub Credit Agreement | (1,952) | (2,131) | (6,383) | (6,634) |
| Interest on Non-Recourse Subsidiary Term Loan | (31) | (46) | (116) | (140) |
| Interest, commitment fees and letter of credit fees on Credit Agreement | (106) | (32) | (389) | (726) |
| Interest on DIP Facility | (600) | — | (600) | — |
| Amortization of debt issuance costs | (1,961) | (2,873) | (8,275) | (12,706) |
| Amortization of discounts and premium on Senior Notes | (188) | (416) | (1,019) | (1,112) |
| Total interest expense | $ (22,884) | $ (44,154) | $ (111,998) | $ (132,664) |

On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes to continue ongoing discussions with certain of its bondholders and other stakeholders regarding a restructuring transaction. The indenture governing the 6.125% Notes provided for a 30-day grace period, which expired on August 14, 2019, to make the scheduled interest payment before such non-payment constituted an event of default under the indenture, which would have entitled the trustee under such indenture or the holders of at least 25% in aggregate principal amount of the outstanding 6.125% Notes to accelerate the maturity thereof. Such event of default would have triggered events of default under the Company's indentures governing the 7.75% Notes, the 7.25% Senior Secured Notes and the Credit Agreement. The Debtors filed the Bankruptcy Petitions prior to expiration of the grace period. Further, the Debtors have discontinued recording interest on debt instruments classified as subject to compromise as of the Petition Date.

***Credit Facilities***

*DIP Facility*

"—Note 3. Chapter 11 Cases" for information on the Company's DIP Facility.

*Third Amended and Restated Credit Agreement*

On February 14, 2018, the Company entered into a revolving credit facility, providing for a $25 million first-out senior secured working capital and letter of credit facility (the "Credit Agreement"), which amended and restated the Company's previous credit facility in its entirety.

On July 10, 2019, the Company borrowed the remaining $7.9 million available under the Credit Agreement. Additionally, on January 10, 2019, a standby letter of credit was issued on our behalf by the lender under the Credit Agreement in the amount of approximately $17.1 million. This letter of credit, as of September 30, 2019, remains

outstanding and is undrawn but is currently proposed to be cash collateralized subject to entry of the Final DIP Order. Further, subject to entry of the Final DIP Order, a portion of the proceeds from the DIP Facility will be used to pay off all $7.9 million of borrowings outstanding under the Credit Agreement and cash collateralize the approximate $17.1 million letter of credit issued under our Credit Agreement. The automatic stay under the Bankruptcy Code does not apply to letters of credit issued under the Credit Agreement and third-party beneficiaries may draw on the letter of credit if permitted by its terms.

The filing of the Bankruptcy Petitions also constituted an event of default which automatically accelerated the Company's obligations under the Credit Agreement. However, under the Bankruptcy Code, the lenders under the Credit Agreement are stayed from taking any action against the Company as a result of these defaults.

During the existence of an event of default and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement. In addition, as discussed above, subject to entry of the Final DIP Order, we anticipate paying off the borrowings outstanding under the Credit Agreement in full.

*SN UnSub Credit Agreement*

On March 1, 2017, SN UnSub entered into a credit agreement for a $500 million revolving credit facility with a maturity date of March 1, 2022 (the "SN UnSub Credit Agreement").

On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, SN UnSub would be required at its election to repay the deficiency within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement. Inability to do so would have a material adverse effect on SN UnSub's liquidity, financial condition and results of operations.

As of September 30, 2019, SN UnSub was in compliance with the covenants of the SN UnSub Credit Agreement.

*SR Credit Agreement*

In 2017, we acquired SR Acquisition I, LLC ("SRAI"). On November 16, 2018, SRAI's credit facility was amended and restated to convert the outstanding revolving loan to a term loan and extend the maturity date to October 31, 2022 (the "SR Credit Agreement"). As of September 30, 2019, there was approximately $22.9 million outstanding under the SR Credit Agreement, and SRAI was in compliance with the financial covenants of the SR Credit Agreement.

***Senior Notes***

*7.75% Senior Notes Due 2021*

On June 13, 2013, the Company completed a private offering of $400 million in aggregate principal amount of the 7.75% senior notes that would mature on June 15, 2021 (the "Original 7.75% Notes"). On September 18, 2013, we issued an additional $200 million in aggregate principal amount of our 7.75% senior notes due 2021 (the "Additional 7.75% Notes," and together with the Original 7.75% Notes, the "7.75% Notes") in a private offering at an issue price of 96.5% of the principal amount of the Additional 7.75% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.75% Notes. However, under the Bankruptcy Code, holders of the 7.75% Notes are stayed from taking any action against the Company as a result of the default.

*6.125% Senior Notes Due 2023*

On June 27, 2014, the Company completed a private offering of $850 million in aggregate principal amount of the 6.125% senior notes that would mature on January 15, 2023 (the "Original 6.125% Notes"). On September 12, 2014, we issued an additional $300 million in aggregate principal amount of our 6.125% senior notes due 2023 (the "Additional 6.125% Notes," and together with the Original 6.125% Notes, the "6.125% Notes," and together with the 7.75% Notes and the 7.25% Senior Secured Notes, the "Senior Notes") in a private offering at an issue price of 100.75% of the principal amount of the Additional 6.125% Notes.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 6.125% Notes. However, under the Bankruptcy Code, holders of the 6.125% Notes are stayed from taking any action against the Company as a result of the default.

*7.25% Senior Secured First Lien Notes due 2023*

On February 14, 2018, the Company completed a private offering to eligible purchasers of $500 million in aggregate principal amount of 7.25% senior secured first lien notes due 2023 (the "7.25% Senior Secured Notes") at an issue price of 99.0% of the principal amount.

The filing of the Bankruptcy Petitions constituted an event of default that accelerated the Company's obligations under the 7.25% Senior Secured Notes. However, under the Bankruptcy Code, holders of the 7.25% Senior Secured Notes are stayed from taking any action against the Company as a result of the default.

**Note 8. Derivative Instruments**

Hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. As of September 30, 2019, all of our derivative contracts were with lenders, affiliates of lenders or other secured counterparties. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited.

The following table presents open derivative positions for the periods indicated as of September 30, 2019:

| | October 1 - December 31, 2019 | 2020 | 2021 |
|---|---|---|---|
| **Oil positions:** | | | |
| Fixed price swaps (NYMEX WTI): | | | |
| Hedged volume (Bbls) | 580,000 | 1,105,860 | 650,400 |
| Average price ($/Bbl) | $ 52.41 | $ 55.29 | $ 54.23 |
| **Natural gas positions:** | | | |
| Fixed price swaps (NYMEX Henry Hub): | | | |
| Hedged volume (MMBtu) | 3,362,000 | 6,934,150 | 4,212,000 |
| Average price ($/MMBtu) | $ 2.87 | $ 2.67 | $ 2.56 |

The following table sets forth a reconciliation of the changes in fair value of the Company's commodity derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018 (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of commodity derivatives, beginning of period | $ 21,194 | $ (54,255) |
| Net losses on oil derivatives | (28,167) | (9,878) |
| Net gains (losses) on natural gas derivatives | 6,266 | (17,897) |
| Net settlements paid (received) on commodity derivative contracts: | | |
| Oil | 13,479 | 100,120 |
| Natural gas | (3,689) | 3,104 |
| Fair value of commodity derivatives, end of period | $ 9,083 | $ 21,194 |

*Embedded Derivatives:* In 2017, the Company entered into certain contracts for the purchase of sand and fractionation services that contain provisions that must be bifurcated from the contract and valued as derivatives. In the fourth quarter 2018, the Company amended certain of these contracts, removing the respective embedded derivative components, and as of September 30, 2019, all remaining embedded derivative contracts expired or had been terminated. The embedded derivatives were historically valued using a Monte Carlo simulation model which utilizes observable inputs, including the NYMEX WTI oil price and NYMEX Henry Hub natural gas price at various points in time. The Company marked these derivatives to market and, as a result, recorded a loss of approximately $1.1 million for the three months ended September 30, 2018. The Company did not record any gains or losses for the three months ended September 30, 2019 as the contracts had expired or terminated. For the nine months ended September 30, 2019 and 2018, the Company recorded a gain of approximately $0.3 million and a loss of $7.1 million, respectively. Any gains or losses related to embedded derivatives are recorded as a component of other income (expense) in the consolidated statement of operations.

*Earnout Derivative:* We are entitled to receive earnout payments from SNMP based on natural gas delivered above a threshold volume and a tariff at certain pipeline delivery points. These payments were deemed to be a derivative. The resulting earnout derivative was valued through the use of a Monte Carlo simulation model which utilized observable inputs, such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios. For the nine months ended September 30, 2019, the Company recorded an immaterial net gain due to settlement gains, which were partially offset by mark-to-market losses. The Company did not record any gains or losses for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded approximate net gains of $0.4 million and $1.9 million, respectively, primarily related to mark-to-market gains. Any gains or losses related to the earnout derivative are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

The following table sets forth a reconciliation of the changes in fair value of the Company's embedded and earnout derivatives for the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Fair value of other derivatives, beginning of period | $ 5,550 | $ (1,551) |
| Gain on embedded derivatives | 308 | 1,243 |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Fair value of other derivatives, end of period | $ 5,826 | $ 5,550 |

***Balance Sheet Presentation***

The Company nets derivative assets and liabilities by commodity for counterparties where a legal right to such netting exists. Therefore, the Company's derivatives are presented on a net basis as "Fair value of derivative instruments" on the condensed consolidated balance sheets. The following information summarizes the gross fair values

of derivative instruments, presenting the impact of offsetting derivative assets and liabilities on the Company's consolidated balance sheets (in thousands):

| | September 30, 2019 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 6,389 | $ (126) | $ 6,263 |
| Long term asset | 9,361 | (15) | 9,346 |
| Total asset | $ 15,750 | $ (141) | $ 15,609 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 826 | $ (126) | $ 700 |
| Long term liability | 15 | (15) | — |
| Total liability | $ 841 | $ (141) | $ 700 |

| | December 31, 2018 | | |
|---|---|---|---|
| | Gross Amount of Recognized Assets and Liabilities | Gross Amounts Offset in the Consolidated Balance Sheets | Net Amounts Presented in the Consolidated Balance Sheets |
| **Offsetting Derivative Assets:** | | | |
| Current asset | $ 16,302 | $ (588) | $ 15,714 |
| Long term asset | 12,178 | (76) | 12,102 |
| Total asset | $ 28,480 | $ (664) | $ 27,816 |
| **Offsetting Derivative Liabilities:** | | | |
| Current liability | $ 1,294 | $ (588) | $ 706 |
| Long term liability | 442 | (76) | 366 |
| Total liability | $ 1,736 | $ (664) | $ 1,072 |

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

**Note 9. Investments**

A subsidiary of the Company owns 1,500,000 shares of Class A Common Stock of Lonestar Resources US Inc. ("Lonestar"). As of September 30, 2019, we believe this ownership represents approximately 6% of Lonestar's outstanding shares of common stock. The Company accounts for the investment in Lonestar as an investment in equity securities measured at fair value in the condensed consolidated balance sheets at the end of each reporting period. The Company recorded a gain of $0.6 million and a loss of $1.4 million related to the investment in Lonestar for the three and nine months ended September 30, 2019, respectively, and the Company recorded a loss of $1.0 million and a gain of $5.7 million related to the investment in Lonestar for the three and nine months ended September 30, 2018, respectively. Any gains or losses related to the investment in Lonestar are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

A subsidiary of the Company owns 100 Class A Units of Gavilan Resources Holdco, LLC ("GRHL"). Tranches representing 20% of the Class A Units vest on each of the first five anniversaries from March 1, 2017. The Class A Units are entitled to distributions from Available Cash, as defined in and subject to the provisions of the GRHL amended and restated limited liability company agreement. The Company accounts for the investment in GRHL as a cost method

investment. As of September 30, 2019, the carrying value of the investment in GRHL was $7.3 million. The Company did not record any earnings or distributions from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019.

A subsidiary of the Company owns 2,272,727 common units of SNMP. As of September 30, 2019, we believe this ownership represents approximately 11.3% of SNMP's outstanding common units. The Company elected the fair value option to account for its interest in SNMP and records the equity investment at fair value at the end of each reporting period. For the three and nine months ended September 30, 2019, the Company recorded losses of $4.3 million and $3.1 million, respectively, related to the investment in SNMP. In addition, for the nine months ended September 30, 2019, the Company recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units. The Company did not record any dividend income from quarterly distributions on the SNMP common units for the three months ended September 30, 2019. For the three and nine months ended September 30, 2018, the Company recorded losses related to the investment in SNMP of approximately $10.7 million and $9.1 million, respectively. Further, for the three and nine months ended September 30, 2018, we recorded dividend income of approximately $1.0 million and $3.2 million, respectively. Any gains or losses and dividend income related to the investment in SNMP are recorded as a component of other income (expense) in the condensed consolidated statement of operations.

**Note 10. Fair Value of Financial Instruments**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

***Fair Value on a Recurring Basis***

The following tables set forth, by level within the fair value hierarchy, the Company's financial assets and liabilities that were accounted for at fair value on a recurring basis as of September 30, 2019 and December 31, 2018 (in thousands):

| | As of September 30, 2019 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 273 | $ — | $ — | $ 273 |
| *Equity investments:* | | | | |
| Investment in SNMP | 841 | — | — | 841 |
| Investment in Lonestar | 4,080 | — | — | 4,080 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 5,919 | — | 5,919 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 3,164 | — | 3,164 |
| *Other:* | | | | |
| Earnout derivative asset | — | — | 5,826 | 5,826 |
| Total | $ 5,194 | $ 9,083 | $ 5,826 | $ 20,103 |

| | As of December 31, 2018 | | | |
|---|---|---|---|---|
| | Active Market for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Total Carrying Value |
| *Cash equivalents:* | | | | |
| Cash equivalents | $ 131,187 | $ — | $ — | $ 131,187 |
| *Equity investments:* | | | | |
| Investment in SNMP | 3,909 | — | — | 3,909 |
| Investment in Lonestar | 5,475 | — | — | 5,475 |
| *Oil derivative instruments:* | | | | |
| Swaps | — | 20,608 | — | 20,608 |
| *Natural gas derivative instruments:* | | | | |
| Swaps | — | 586 | — | 586 |
| *Other:* | | | | |
| Embedded derivative instruments | — | (308) | — | (308) |
| Earnout derivative asset | — | — | 5,858 | 5,858 |
| Total | $ 140,571 | $ 20,886 | $ 5,858 | $ 167,315 |

(1) Level 1 measurements are fair value measurements which use quoted market prices (unadjusted) in active markets for identical assets or liabilities. We use Level 1 inputs when available, as Level 1 inputs generally provide the most reliable evidence of fair value.

(2) Level 2 measurements are fair value measurements which use inputs, other than quoted prices included within Level 1, which are observable for the asset or liability, either directly or indirectly.

(3) Level 3 measurements are fair value measurements which use unobservable inputs and require management to make certain assumptions in the determination of value.

*Financial Instruments*: The Level 1 instruments presented in the tables above consist of money market funds and time deposits included in cash and cash equivalents on the Company's condensed consolidated balance sheets at
September 30, 2019 and December 31, 2018. The Company's money market funds and time deposits represent cash equivalents held with banks and financial institutions. The Company identified the money market funds and time deposits as Level 1 instruments, as money market funds have daily liquidity, there are active markets for the underlying investments and quoted prices for the underlying investments can be obtained. In addition, the Level 1 instruments include the Company's equity investments in SNMP and Lonestar which are publicly traded companies.

The Company's commodity derivative instruments consist of swaps as of September 30, 2019 and December 31, 2018 as shown in the table above. The fair values of the Company's derivatives are based on third-party pricing models which utilize inputs that are either readily available in the public market, such as forward curves, or can be corroborated from active markets of broker quotes, and therefore are classified as Level 2. Derivative instruments are also subject to the risk that counterparties will be unable to meet their obligations. Such non-performance risk is considered in the valuation of the Company's derivative instruments, but to date has not had a material impact on estimates of fair values. Significant changes in the quoted forward prices for commodities and changes in market volatility generally lead to corresponding changes in the fair value measurement of the Company's derivative instruments.

There were no commodity derivative instruments classified as Level 3 as of September 30, 2019 or December 31, 2018.

*Embedded Derivatives:* The Company believes that substantially all of the inputs required to calculate the embedded derivatives are observable in the marketplace throughout the term of these derivative instruments or supported by observable levels at which transactions are executed in the marketplace, and are, therefore, classified as Level 2 inputs.

*Earnout Derivative:* These payments were deemed to be a derivative which utilize observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios.

The following table sets forth a reconciliation of changes in the fair value of the Company's earnout derivative instruments classified as Level 3 in the fair value hierarchy (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Beginning balance | $ 5,858 | $ — |
| Initial fair value of earnout derivative | — | 6,401 |
| Loss on earnout derivatives | (32) | (543) |
| Ending balance | $ 5,826 | $ 5,858 |

***Fair Value on a Non-Recurring Basis***

In connection with the voluntary conversions by certain holders of shares of the Company's 4.875% Convertible Perpetual Preferred Stock, Series A (the "Series A Preferred Stock") and 6.500% Convertible Perpetual Preferred Stock, Series B (the "Series B Preferred Stock") into shares of the Company's common stock in February, March, June, July and September 2019, the Company issued common stock according to the conversion rate established by the Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. The fair value of the common stock issued is based on the price of the Company's common stock on the date of issuance. There were no conversions of Series A Preferred Stock or Series B Preferred Stock into shares of the Company's common stock during the nine months ended September 30, 2018. As there is an active market for the Company's common stock, the Company has designated this fair value measurement as Level 1. For further information, see "—Note 14. Stockholders' and Mezzanine Equity."

The Company recorded proved property impairments of $4.3 million and $6.6 million during the nine months ended September 30, 2019 and the year ended December 31, 2018, respectively, related to oil and natural gas properties in the TMS. The carrying value of the impaired proved properties was reduced to a fair value of $11.0 million and $10.5 million for the nine months ended September 30, 2019 and year ended December 31, 2018, respectively, estimated using inputs characteristic of a Level 3 fair value measurement.

***Fair Value of Other Financial Instruments***

The carrying amounts of our oil and natural gas receivables, accounts payable not subject to compromise and accrued liabilities approximate fair value due to their highly liquid nature. The registered 7.75% Notes and 6.125% Notes are traded in an active market, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair values of the 7.75% Notes and 6.125% Notes were $37.8 million and $74.1 million, respectively, and were calculated using quoted market prices based on trades of such debt as of that date. The 7.25% Senior Secured Notes are traded in an active market under Rule 144A by institutional investors, and as such, are classified as Level 1 financial instruments. As of September 30, 2019, the estimated fair value of the 7.25% Senior Secured Notes was $369.3 million and was calculated using quoted market prices based on observed trades of such debt as of that date.

We believe that the carrying values of long term debt for the Credit Agreement, SN UnSub Credit Agreement and SR Credit Agreement approximate their fair values because the interest rates on the debt approximate market interest rates for debt with similar terms. These debts are classified as Level 2 inputs in the fair value hierarchy and represent the amounts at which the instruments could be valued in an exchange during a current transaction between willing parties.

**Note 11. Asset Retirement Obligations**

The changes in the asset retirement obligation for the nine months ended September 30, 2019 and the year ended December 31, 2018 were as follows (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Abandonment liability, beginning of period | $ 46,175 | $ 36,098 |
| Liabilities incurred during period | 275 | 1,965 |
| Divestitures | (147) | (158) |
| Revisions | — | 5,077 |
| Accretion expense | 2,879 | 3,193 |
| Abandonment liability, end of period | $ 49,183 | $ 46,175 |

**Note 12. Related Party Transactions**

*Sanchez Oil and Gas Corporation*

Expenses allocated to the Company from SOG for G&A expenses and oil and natural gas production expenses for the three months ended September 30, 2019 and 2018 were $17.3 million and $15.3 million, respectively, and expenses allocated to the Company for G&A expenses and oil and natural gas production expenses for the nine months ended September 30, 2019 and 2018 were $52.6 million and $48.8 million, respectively.

As of September 30, 2019 and December 31, 2018, the Company had a net receivable from SOG and its affiliates of $10.2 million and $6.1 million, respectively, which is reflected as "Accounts receivable—related entities" in the condensed consolidated balance sheets. The net receivable as of September 30, 2019 and December 31, 2018 consists primarily of advances related to G&A expenses and other costs paid to SOG in the ordinary course.

*Sanchez Midstream Partners*

As of September 30, 2019 and December 31, 2018, the Company had a net payable to SNMP of approximately $3.8 million and $6.1 million, respectively, that consists primarily of fees associated with oil and natural gas gathering and transportation services.

**Note 13. Accrued Liabilities and Other Current Liabilities**

The following information summarizes accrued liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Capital expenditures | $ 7,232 | $ 61,970 |
| Other: | | |
| General and administrative expenses | 20,635 | 19,460 |
| Production taxes | 2,483 | 5,157 |
| Ad valorem taxes | 6,655 | 445 |
| Lease operating expenses | 34,782 | 24,138 |
| Interest payable | 376 | 47,866 |
| Other accrued liabilities | 1,367 | 5,662 |
| Total accrued liabilities | $ 73,530 | $ 164,698 |

The following information summarizes other payables as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Revenue payable | $ 14,963 | $ 71,296 |
| Production tax payable | 448 | 3,443 |
| Other | 1,328 | (111) |
| Total other payables | $ 16,739 | $ 74,628 |

The following information summarizes other current liabilities as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Operated prepayment liability | $ 31,921 | $ 51,844 |
| Deferred gain on Western Catarina Midstream Divestiture - short term | — | 23,720 |
| Phantom compensation payable - short term | 40 | 17 |
| Total other current liabilities | $ 31,961 | $ 75,581 |

**Note 14. Stockholders' and Mezzanine Equity**

*Series A Preferred Stock*

Each share of Series A Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.325 shares of common stock per share of Series A Preferred Stock (which is equal to an initial conversion price of $21.51 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 1,440,343 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series A Preferred Stock.

The annual dividend on each share of Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock.

*Series B Preferred Stock*

Each share of Series B Preferred Stock is convertible at any time at the option of the holder thereof at an initial conversion rate of 2.337 shares of common stock per share of Series B Preferred Stock (which is equal to an initial conversion price of $21.40 per share of common stock) and is subject to specified adjustments. As of September 30, 2019, based on the initial conversion price, approximately 5,763,071 shares of common stock would be issuable upon conversion of all of the outstanding shares of the Series B Preferred Stock.

The annual dividend on each share of Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option, pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative and, beginning with the three month period ended March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through September 30, 2019 have been accrued. Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series B Preferred Stock.

*Preferred Stock Conversions*

On February 12, 2019, 72,500 shares of Series A Preferred Stock converted into 168,563 shares of our common stock and 245,832 shares of Series B Preferred Stock converted into 574,510 shares of our common stock at the election of the holders thereof. From March 6 to March 8, 2019, 563,832 shares of Series A Preferred Stock converted into 1,310,914 shares of our common stock and 770,986 shares of Series B Preferred Stock converted into 1,801,798 shares of our common stock, at the election of the holders thereof. On March 26, 2019, 422,222 shares of Series A Preferred Stock converted into 981,667 shares of our common stock, at the election of the holders thereof. As of June 14, 2019, 155,929 shares of Series A Preferred Stock converted into 362,535 shares of our common stock, at the election of the holders thereof. On July 29, 2019, 5,000 shares of Series A Preferred Stock converted into 11,625 shares of our common stock, at the election of the holder thereof. On September 30, 2019, 45,000 shares of Series B Preferred Stock converted into 105,165 shares of our common stock, at the election of the holder thereof.

Through the conversions, each of the holders effectively waived their rights to any accrued and unpaid dividends thereon under the conversion terms set forth in Certificates of Designations for the Series A Preferred Stock and Series B Preferred Stock, as applicable. As a result, the Company has reduced its quarterly dividend accruals on its Series A Preferred Stock and Series B Preferred Stock by approximately $1.6 million as compared to the amount that would have been payable based on the number of shares outstanding prior to these conversions.

*SN UnSub Preferred Unit Issuance*

On March 1, 2017, the Company, through two of its subsidiaries, SN UnSub and SN Maverick, along with Gavilan Resources, LLC ("Gavilan"), an entity controlled by The Blackstone Group Inc., completed the acquisition of approximately 318,000 gross (155,000 net) acres comprised of 252,000 gross (122,000 net) Eagle Ford Shale acres and 66,000 gross (33,000 net) acres of deep rights only, which includes the Pearsall Shale, representing an approximate 49% average working interest therein (the "Comanche Assets," with such acquisition, the "Comanche Acquisition").

At the closing of the Comanche Acquisition, certain funds managed or advised by GSO Capital Partners L.P. ("GSO") purchased 485,000 preferred units of SN UnSub and Intrepid Private Equity V-A LLC purchased 15,000 preferred units of SN UnSub (in aggregate, the "SN UnSub Preferred Units"). The SN UnSub Preferred Units are accounted for as mezzanine equity in the condensed consolidated balance sheet consisting of the following as of September 30, 2019 and December 31, 2018, respectively, (in thousands):

| | Nine Months Ended September 30, 2019 | Year Ended December 31, 2018 |
|---|---|---|
| Mezzanine equity, beginning balance | $ 452,828 | $ 427,512 |
| Accretion of discount | 22,029 | 25,316 |
| Dividends accrued | 37,500 | 50,000 |
| Dividends prepaid [(1)] | — | (2,592) |
| Dividends/distributions paid [(1)] | (37,500) | (47,408) |
| Mezzanine equity, ending balance | $ 474,857 | $ 452,828 |

(1) In 2017, tax distributions of approximately $2.6 million were paid in excess of the accrued dividend. The excess distribution was offset against a portion of the dividend accrued during the three months ended March 31, 2018.

*Earnings (Loss) Per Share*—The following table shows the computation of basic and diluted net loss per share for the three and nine months ended September 30, 2019 and 2018 (in thousands, except per share amounts):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Net income (loss)** | $ (112,448) | $ 5,598 | $ (232,755) | $ (34,204) |
| Less: | | | | |
| Preferred stock dividends | (2,312) | (3,987) | (7,153) | (11,961) |
| Preferred unit dividends and distributions | (12,500) | (12,500) | (37,500) | (34,908) |
| Preferred unit amortization | (7,638) | (6,458) | (22,029) | (18,577) |
| **Net loss attributable to common stockholders** | $ (134,898) | $ (17,347) | $ (299,437) | $ (99,650) |
| Weighted average number of unrestricted outstanding common shares used to calculate basic and dilutive net loss per share[(1)(2)] | 97,395 | 82,073 | 95,272 | 81,597 |
| **Net loss per common share - basic and diluted** | $ (1.39) | $ (0.21) | $ (3.14) | $ (1.22) |

(1) The three and nine months ended September 30, 2018 exclude 1,840,007 and 2,591,553 shares, respectively, of weighted average restricted stock and 12,520,179 shares of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

(2) The three and nine months ended September 30, 2019 exclude 433,369 and 942,551 shares, respectively, of weighted average restricted stock and 7,306,402 and 8,757,574 shares, respectively, of common stock resulting from an assumed conversion of the Company's Series A Preferred Stock and Series B Preferred Stock from the calculation of the denominator for diluted loss per common share as these shares were anti-dilutive.

**Note 15. Stock-Based Compensation**

The Company’s Third Amended and Restated Long Term Incentive Plan (the “LTIP”) allows for grants of stock options, stock appreciation rights, restricted shares, phantom stock, other stock based awards or stock awards, or any combination thereof.

Effective January 1, 2019, the Company records stock-based compensation expense for awards granted in accordance with the provisions of ASU 2018-07 “Compensation - Stock Compensation (ASC 718) - Improvements to Nonemployee Share-Based Payment Accounting,” which expands the scope of ASC 718, “Compensation – Stock Compensation,” to include share-based payment transactions for acquiring goods and services from nonemployees. Pursuant to this standard, stock-based compensation expense is based on the grant-date fair value of our stock awards and is recognized over the vesting period using the straight-line method. As a result of our adoption of ASU 2018-07, the Company remeasured the value of our outstanding unvested awards as of January 1, 2019. This did not have a material impact on our financial statements.

During the three and nine months ended September 30, 2019, the Company did not issue any shares of restricted common stock pursuant to the LTIP.

During the three months ended September 30, 2019, the Company did not issue any shares of phantom stock pursuant to the LTIP. During the nine months ended September 30, 2019, the Company issued an immaterial number of shares of phantom stock pursuant to the LTIP to certain employees of SOG, with whom the Company has a services agreement. These shares of phantom stock vest in equal annual amounts over a three year period.

For the 2018 performance period applicable to our performance phantom stock awards granted in 2017 (the “Performance Awards”), 0% of the target shares were awarded.

For the 2018 performance period applicable to our cash-settled performance-based phantom stock awards and stock-settled performance-based phantom stock awards granted in 2018 (together, the "PBPS Awards"), 71% of the target shares were awarded, equating to 419,430 cash-settled awards and 419,430 stock-settled awards. Stock-based compensation expense for these awards was calculated in accordance with ASC 718 and is being amortized over the vesting period.

The Company recognized the following stock-based compensation expense (in thousands) which is included in general and administrative expense in the condensed consolidated statements of operations:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Restricted stock awards, directors | $ — | $ 305 | $ 42 | $ 932 |
| Restricted stock awards, non-employees | 45 | (862) | 270 | 1,957 |
| Performance awards | 51 | (842) | 83 | (12) |
| Phantom stock awards | (101) | (2,652) | (40) | 1,467 |
| Total stock-based compensation expense | $ (5) | $ (4,051) | $ 355 | $ 4,344 |

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was approximately $0.3 million of unrecognized compensation cost related to the non-vested restricted shares outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated restricted stock outstanding. The cost is expected to be recognized over an average period of approximately 1.5 years.

Based on the $0.03 per share closing price of the Company's common stock on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the non-vested performance accelerated phantom stock ("PAPS") and phantom stock outstanding. The cost is expected to be recognized over an average period of approximately 1.7 years.

Based on the estimated per share price of the common stock underlying the Performance Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the Performance Awards. The cost is estimated to be recognized over a weighted average period of approximately 2.3 years.

Based on the estimated per share price of the common stock underlying the PBPS Awards on September 30, 2019, there was less than $0.1 million of unrecognized compensation cost related to the PBPS Awards. The cost is estimated to be recognized over a weighted average period of approximately 1.1 years.

A summary of the status of the non-vested restricted shares for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested common stock, beginning of period | 2,714 | 5,767 | 5,024 | 4,897 |
| Granted | — | 146 | — | 3,303 |
| Vested | (51) | (59) | (2,164) | (2,218) |
| Forfeited | (24) | (414) | (221) | (542) |
| Non-vested common stock, end of period | 2,639 | 5,440 | 2,639 | 5,440 |

As of September 30, 2019, approximately 8.4 million shares remained available for future issuance to participants under the LTIP.

A summary of the status of the non-vested phantom stock and PAPS for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| Non-vested phantom stock and PAPS, beginning of period | 2,857 | 5,888 | 5,125 | 3,589 |
| Granted | — | 253 | 7 | 3,905 |
| Vested | (60) | (46) | (1,874) | (1,197) |
| Forfeited | (58) | (465) | (519) | (667) |
| Non-vested phantom stock and PAPS, end of period | 2,739 | 5,630 | 2,739 | 5,630 |

**Note 16. Income Taxes**

The Company used a year-to-date effective tax rate method for recording income taxes for the nine month periods ended September 30, 2019 and 2018. This method is based on our determination at September 30, 2019 and 2018 that due to our valuation allowance position, the income tax provision does not materially change by using a year-to-date effective tax rate method as compared to an estimated full year annual effective tax rate method. Further, for the period ended September 30, 2018, a small change in our estimated ordinary income could have resulted in a large change in the estimated annual effective tax rate. We will use this year-to-date effective tax rate method each quarter until such time a return to the annualized effective tax rate method is deemed material or appropriate.

The Company's effective tax rate for the nine months ended September 30, 2019 and 2018 was approximately 0% and 0%, respectively. The difference between the statutory federal income taxes calculated using a U.S. Federal statutory corporate income tax rate of 21% and the Company’s effective tax rates is related to the valuation allowance on deferred tax assets.

The Company provides for deferred income taxes on the difference between the tax basis of an asset or liability and its carrying amount in the financial statements in accordance with authoritative guidance for accounting for income taxes. This difference will result in taxable income or deductions in future years when the reported amount of the asset or liability is recovered or settled, respectively. In recording deferred income tax assets, the Company considers whether it is more likely than not that some portion or all of the deferred income tax assets will be realized. The ultimate realization of deferred income tax assets is dependent upon the generation of future taxable income during the periods in which those deferred income tax assets would be deductible. The Company believes that after considering all the available objective evidence, both positive and negative, historical and prospective, with greater weight given to historical evidence, management is not able to determine that it is more likely than not that the deferred tax assets will be realized and, therefore, has established a valuation allowance to reduce the deferred tax assets as of September 30, 2019. The Company will continue to assess the valuation allowance against deferred tax assets considering all available information obtained in future reporting periods.

At September 30, 2019, the Company had no material uncertain tax positions.

**Note 17. Commitments and Contingencies**

*Stockholder Derivative Litigation*

On August 29, 2018, a derivative action was filed in the Court of Chancery of the State of Delaware against certain of the Company’s directors (Armato et al. v. A.R. Sanchez, Jr. et al., No. 2018-0642, the “Derivative Action”). The complaint alleges breach of fiduciary duty, unjust enrichment and waste of corporate assets against directors of the Company based on purportedly excessive compensation of the Company’s non-employee directors. On October 22, 2018, the Company and defendant directors filed an answer to the Derivative Action. In their answer, the defendant directors denied any wrongdoing or liability in response to the allegations in the complaint. On August 16, 2019 a suggestion of bankruptcy was filed in the Derivative Action by the Company, and there has been no activity in the case since that time. Given the status and the preliminary state of the Derivative Action, the Company is unable to reasonably predict an outcome of the Derivative Action or a timeframe for its resolution. The complaint does not specify damages sought.

From time to time, the Company may be involved in lawsuits or other legal proceedings that arise in the normal course of its business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition. We are not aware of any material governmental proceedings against us or contemplated to be brought against us.

*Catarina Drilling Commitment*

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. The lease also creates a customary security interest in the production therefrom in order to secure royalty payments to the lessor and other lease obligations. During the commitment period ending June 30, 2019, the Company drilled 13 wells that may be counted toward the next annual drilling commitment period, which began on July 1, 2019. Furthermore, our 2019 capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

*Comanche Drilling Commitment*

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. If we fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years), we and Gavilan are jointly and severally liable for a default fee of $0.2 million for each well we do not timely complete and equip. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position.

*Palmetto Drilling Commitment*

Marathon Oil EF LLC (“Marathon”) is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

*Volume Commitments*

As is common in our industry, the Company is party to certain oil and natural gas gathering and transportation and natural gas processing agreements that obligate us to deliver a specified volume of production over a defined time horizon. If not fulfilled, the Company is subject to deficiency payments to our midstream counterparties. As of September 30, 2019, the Company had approximately $406.3 million in future commitments related to oil and natural gas gathering and transportation agreements ($140.6 million for 2019 through 2021, $128.8 million from 2022 through 2024, and $136.9 million under commitments expiring after December 31, 2024, in the aggregate) and approximately $40.5 million in future commitments related to natural gas processing agreements ($39.8 million for 2019 through 2021,

and $0.7 million from 2022 through 2024, in the aggregate) that are not recorded in the accompanying condensed consolidated balance sheets.

For the three and nine months ended September 30, 2019, the Company incurred expenses related to deficiency fees of approximately $3.6 million and $7.5 million, respectively, and for the three and nine months ended September 30, 2018, the Company incurred expenses related to deficiency fees of approximately $1.6 million and $3.8 million, respectively. These expenses are reported on the condensed consolidated statements of operations in the "Oil and natural gas production expenses" line item. We expect to incur additional expenses related to our volume commitments in connection with our reduced capital activity.

*Loss Contingencies*

To the extent we are able to assess the likelihood of a negative outcome for a contingency, whether it be the loss or impairment of an asset or the incurrence of a liability, our assessments of such likelihood range from remote to probable. If we determine that a negative outcome is probable and the amount of loss is reasonably estimable, we accrue an undiscounted liability equal to the estimated amount. If a range of probable loss amounts can be reasonably estimated and no amount within the range is a better estimate than any other amount, then we accrue an undiscounted liability equal to the minimum amount in the range. In addition, we estimate legal fees that we expect to incur associated with loss contingencies and accrue those costs when they are material and probable of being incurred.

We do not record a contingent liability when the likelihood of loss is probable but the amount cannot be reasonably estimated or when the likelihood of loss is believed to be only reasonably possible or remote. For contingencies where an unfavorable outcome is reasonably possible and the impact would be material to our consolidated financial statements, we disclose the nature of the contingency and, where feasible, an estimate of the possible loss or range of loss.

For the three and nine months ended September 30, 2019, we recorded a loss on impairment of a prepaid asset of $11.8 million.

*Other Commitments and Contingencies*

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company's bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business, notwithstanding the filing of the Bankruptcy Petitions. In addition, the filing of the Bankruptcy Petitions may allow the Company to assume, assign or reject certain commitments as executory contracts. See "—Note 3. Chapter 11 Cases" for additional information.

**Note 18. Condensed Consolidating Financial Information**

The Company's 7.75% Notes and 6.125% Notes have been registered with the SEC and are guaranteed by all of the Company's subsidiaries, except for SN UR Holdings, SN Services, LLC, SN Terminal, LLC, SN Midstream, LLC, SN Comanche Manager, LLC, SN UnSub GP, SN UnSub Holdings, SN UnSub, SN Capital, LLC, Sanchez Resources, LLC, SR Acquisition I, LLC, SR Acquisition III, LLC and SR TMS, LLC which are unrestricted subsidiaries of the Company. As of September 30, 2019 such guarantor subsidiaries were 100% owned by the Company and the guarantees by these subsidiaries are full and unconditional (except for customary release provisions) and are joint and several.

Rule 3-10 of Regulation S-X requires that, in lieu of providing separate financial statements for subsidiary guarantors, condensed consolidating financial information be provided where the subsidiaries have guaranteed the debt of a registered security, where the guarantees are full, unconditional and joint and several and where the voting interest of the subsidiaries are 100% owned by the registrant.

The Company has no assets or operations independent of its subsidiaries and there are no significant restrictions upon the ability of its subsidiary guarantors to distribute funds to the Company by dividends or loans.

The following is a presentation of condensed consolidating financial information on a parent company, combined guarantor subsidiaries, combined non-guarantor subsidiaries and consolidated basis (in thousands) in

accordance with Rule 3-10 of Regulation S-X and should be read in conjunction with the condensed consolidated financial statements. The financial information may not necessarily be indicative of results of operations, cash flows or financial position had such guarantor subsidiaries operated as independent entities.

Investments in subsidiaries are accounted for by the respective parent company using the equity method for purposes of this presentation. Results of operations of subsidiaries are, therefore, reflected in the parent company's investment accounts and earnings. The principal elimination entries set forth below eliminate investments in subsidiaries and intercompany balances and transactions. Typically in a condensed consolidating financial statement, the net income and equity of the parent company equals the net income and equity of the consolidated entity.

The guarantor subsidiaries, along with non-guarantor subsidiary SN UR Holdings, LLC in addition to Sanchez Energy Corporation, constitute Debtors in the Chapter 11 Cases. Although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code. See "—Note 3. Chapter 11 Cases" and "—Note 7. Debt" for additional information.

A summary of the condensed consolidated guarantor balance sheets as of September 30, 2019 and December 31, 2018 is presented below (in thousands):

| | September 30, 2019 | | | | |
|---|---|---|---|---|---|
| **Assets** | **Parent Company** | **Combined Guarantor Subsidiaries** | **Combined Non-Guarantor Subsidiaries** | **Eliminations** | **Consolidated** |
| Total current assets | $ 243,889 | $ 122,817 | $ 106,561 | $ (172,357) | $ 300,910 |
| Total oil and natural gas properties, net | 60 | 1,498,844 | 717,321 | — | 2,216,225 |
| Investment in subsidiaries | 1,609,093 | — | (7,278) | (1,601,815) | — |
| Other assets | 52,146 | 259,623 | 33,906 | — | 345,675 |
| **Total Assets** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 77,254 | $ 202,889 | $ 189,010 | $ (172,357) | $ 296,796 |
| Long term liabilities | 2,370,695 | 235,861 | 181,680 | — | 2,788,236 |
| Mezzanine equity | — | — | 474,857 | — | 474,857 |
| Total stockholders' equity (deficit) | (542,761) | 1,442,534 | 4,963 | (1,601,815) | (697,079) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 1,905,188 | $ 1,881,284 | $ 850,510 | $ (1,774,172) | $ 2,862,810 |

| Assets | December 31, 2018 Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total current assets | $ 473,062 | $ 69,934 | $ 146,765 | $ (316,780) | $ 372,981 |
| Total oil and natural gas properties, net | 36 | 1,600,378 | 758,711 | — | 2,359,125 |
| Investment in subsidiaries | 1,577,054 | — | (7,280) | (1,569,774) | — |
| Other assets | 22,917 | 10,307 | 54,630 | — | 87,854 |
| **Total Assets** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |
| | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | |
| Current liabilities | $ 155,396 | $ 282,719 | $ 226,964 | $ (316,780) | $ 348,299 |
| Long term liabilities | 2,203,546 | 51,211 | 208,599 | — | 2,463,356 |
| Mezzanine equity | — | — | 452,828 | — | 452,828 |
| Total stockholders' equity (deficit) | (285,873) | 1,346,689 | 64,435 | (1,569,774) | (444,523) |
| **Total Liabilities and Stockholders' Equity (Deficit)** | $ 2,073,069 | $ 1,680,619 | $ 952,826 | $ (1,886,554) | $ 2,819,960 |

A summary of the condensed consolidated guarantor statements of operations for the three and nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Three Months Ended September 30, 2019 Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total revenues | $ — | $ 110,327 | $ 52,219 | $ — | $ 162,546 |
| Total operating costs and expenses | (35,928) | (116,966) | (45,410) | 90 | (198,214) |
| Other income (expense) | (27,494) | 1,533 | 3,759 | (90) | (22,292) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (118,743) | (5,106) | 10,568 | — | (113,281) |
| | | | | | |
| Income tax benefit | (833) | — | — | — | (833) |
| Equity in income (loss) of subsidiaries | 5,462 | — | — | (5,462) | — |
| **Net income (loss)** | $ (112,448) | $ (5,106) | $ 10,568 | $ (5,462) | $ (112,448) |

| | Three Months Ended September 30, 2018 Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total revenues | $ — | $ 197,203 | $ 80,507 | $ — | $ 277,710 |
| Total operating costs and expenses | (16,717) | (126,573) | (49,969) | 134 | (193,125) |
| Other income (expense) | (52,165) | 794 | (27,482) | (134) | (78,987) |
| **Income (loss) before income taxes** | (68,882) | 71,424 | 3,056 | — | 5,598 |
| | | | | | |
| Equity in income (loss) of subsidiaries | 74,480 | — | — | (74,480) | — |
| **Net income (loss)** | $ 5,598 | $ 71,424 | $ 3,056 | $ (74,480) | $ 5,598 |

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 395,050 | $ 179,300 | $ — | $ 574,350 |
| Total operating costs and expenses | (90,587) | (358,005) | (158,412) | 360 | (606,644) |
| Other income (expense) | (123,907) | 2,188 | (23,084) | (360) | (145,163) |
| Reorganization items | (55,321) | — | — | — | (55,321) |
| **Income (loss) before income taxes** | (269,815) | 39,233 | (2,196) | — | (232,778) |
| Income tax benefit | (23) | — | — | — | (23) |
| Equity in income (loss) of subsidiaries | 37,037 | — | — | (37,037) | — |
| **Net income (loss)** | $ (232,755) | $ 39,233 | $ (2,196) | $ (37,037) | $ (232,755) |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Total revenues | $ — | $ 543,529 | $ 244,722 | $ — | $ 788,251 |
| Total operating costs and expenses | (56,967) | (334,408) | (163,833) | 406 | (554,802) |
| Other income (expense) | (200,124) | (4,469) | (62,654) | (406) | (267,653) |
| **Income (loss) before income taxes** | (257,091) | 204,652 | 18,235 | — | (34,204) |
| Equity in income (loss) of subsidiaries | 222,887 | — | — | (222,887) | — |
| **Net income (loss)** | $ (34,204) | $ 204,652 | $ 18,235 | $ (222,887) | $ (34,204) |

A summary of the condensed consolidated guarantor statements of cash flows for the nine months ended September 30, 2019 and 2018 is presented below (in thousands):

| | Nine Months Ended September 30, 2019 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (166,502) | $ 233,600 | $ 32,652 | $ — | $ 99,750 |
| Net cash provided by (used in) investing activities | 109,510 | (81,169) | (34,665) | (103,893) | (110,217) |
| Net cash provided by (used in) financing activities | 48,315 | (159,599) | (217) | 103,893 | (7,608) |
| **Net increase (decrease) in cash and cash equivalents** | (8,677) | (7,168) | (2,230) | — | (18,075) |
| **Cash and cash equivalents, beginning of period** | 68,762 | 58,429 | 70,422 | — | 197,613 |
| **Cash and cash equivalents, end of period** | $ 60,085 | $ 51,261 | $ 68,192 | $ — | $ 179,538 |

| | Nine Months Ended September 30, 2018 | | | | |
|---|---|---|---|---|---|
| | Parent Company | Combined Guarantor Subsidiaries | Combined Non-Guarantor Subsidiaries | Eliminations | Consolidated |
| Net cash provided by (used in) operating activities | $ (175,586) | $ 326,068 | $ 99,044 | $ — | $ 249,526 |
| Net cash provided by (used in) investing activities | (136,290) | (396,492) | (58,365) | 137,325 | (453,822) |
| Net cash provided by (used in) financing activities | 419,714 | 128,026 | (21,881) | (137,325) | 388,534 |
| **Net increase (decrease) in cash and cash equivalents** | 107,838 | 57,602 | 18,798 | — | 184,238 |
| **Cash and cash equivalents, beginning of period** | 86,937 | 29,046 | 68,451 | — | 184,434 |
| **Cash and cash equivalents, end of period** | $ 194,775 | $ 86,648 | $ 87,249 | $ — | $ 368,672 |

**Note 19. Variable Interest Entities ("VIE")**

The Company's investment in GRHL represents a VIE that could expose the Company to losses limited to the estimated fair value of the investment. The carrying amounts of the investment in GRHL, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was in each case approximately $7.3 million. The Company did not record any earnings from its ownership of the Class A Units for the period from January 1, 2018 through September 30, 2019. The Company determined that Blackstone is the primary beneficiary of the VIE as the Company has no significant voting rights in GRHL under the LLC Agreement and no power over decisions related to the business activities of GRHL, other than operation of the properties.

The Company's investment in SNMP represents a VIE that could expose the Company to losses limited to the equity in the investment at any point in time. The carrying amounts of the investment in SNMP, and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018, was approximately $0.8 million and $3.9 million, respectively.

Below is a comparison of the carrying amounts of the assets and liabilities of the VIE and the Company's maximum exposure to loss as of September 30, 2019 and December 31, 2018 (in thousands):

| | September 30, 2019 | December 31, 2018 |
|---|---|---|
| Beginning balance | $ 11,189 | $ 32,507 |
| Gain (loss) from change in fair value of investment in SNMP | (3,068) | (21,318) |
| Maximum exposure to loss | $ 8,121 | $ 11,189 |

**Note 20. Leases**

We determine if an arrangement is a lease at inception. To the extent that we determine an arrangement represents a lease, we classify that lease as an operating lease or a finance lease. We currently do not have any finance leases. We capitalize our operating leases on our consolidated balance sheet through a ROU asset and a corresponding lease liability. ROU assets represent our right to use an underlying asset for the lease term and lease liabilities represent our obligation to make lease payments arising from the lease. Short term leases that have an initial term of one year or less are not capitalized but are disclosed below. Short term lease costs exclude expenses related to leases with a lease term of one month or less.

Our operating leases are reflected as operating lease ROU assets, short term operating lease liabilities and long term operating lease liabilities on our consolidated balance sheet. Operating lease ROU assets and liabilities are recognized at the commencement date of an arrangement based on the present value of lease payments over the lease term. In addition to the present value of lease payments, the operating lease ROU asset also includes any lease payments

made to the lessor prior to lease commencement less any lease incentives and initial direct costs incurred. Lease expense for operating lease payments is recognized on a straight-line basis over the lease term.

***Nature of Leases***

We lease property including corporate and field offices and facilities, vehicles, field equipment, and midstream gathering and processing facilities to support our operations. A more detailed description of our significant lease types is included below.

*Midstream Gathering and Processing Facilities*

We engage in various types of transactions with midstream entities to gather and/or process our products, leveraging integrated systems and facilities wholly owned by the midstream counterparty. Under certain of these arrangements, we utilize substantially all of the underlying gathering system or processing facility capacity and we have, therefore, concluded that those underlying assets meet the definition of an identified asset. These contracts have non-cancellable lease terms of approximately four to 17 years and continue thereafter on a renewable basis subject to termination by either party with notice. Consequently, certain of our gathering and/or processing contracts represent an operating lease of the underlying midstream system or facilities with a lease term that equals the primary non-cancellable contract term.

*Real Estate*

We rent space from third parties for our corporate and field office locations and lease acreage for general corporate purposes. Our office and acreage lease agreements are structured with non-cancellable lease terms of three to 10 years. We have concluded that these agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

*Field Equipment and Vehicles*

We enter into daywork contracts for drilling rigs with third parties to support our drilling activities. Our drilling rig arrangements are typically structured with a term that is in effect until drilling operations are completed on a specified well or well pad in accordance with the development plan. Upon mutual agreement with the contractor, we typically have the option to extend the contract term for additional wells or well pads by providing thirty days' notice prior to the end of the original contract term. We have concluded that our drilling rig arrangements represent operating leases with lease terms of six to 18 months. For those arrangements with terms of less than one year, we have determined those arrangements to be short term operating leases. Due to the continuously evolving nature of our drilling schedules and the potential volatility in commodity prices in an annual period, our strategy to enter into shorter term drilling rig arrangements allows us the flexibility to respond to changes in our operating and economic environment. We exercise our discretion in choosing to extend or not extend contracts on a rig-by-rig basis depending on the conditions present at the time the contract expires. At the time of contract commencement, we have determined we cannot conclude with reasonable certainty if we will choose to extend the contract beyond its original term. Pursuant to the successful efforts method of accounting, our net share of these costs is capitalized as part of oil and natural gas properties on the balance sheet as incurred.

We rent compressors from third parties to facilitate the downstream movement of our production from our drilling operations to market. Our compressor arrangements typically have non-cancellable lease terms of 12 to 24 months and continue thereafter on a month-to-month basis subject to termination by either party with thirty days' notice. We have concluded that our compressor arrangements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

We rent our vehicle fleet for our drilling and operations personnel. Our vehicle agreements have non-cancellable lease terms of 18 months. We have concluded that our vehicle agreements represent operating leases with a lease term that equals the primary non-cancellable contract term. Generally upon completion of the primary term, both parties have the right to terminate the lease.

***Significant Judgments***

*Discount Rate*

Our leases typically do not provide an implicit rate. Accordingly, we are required to use our estimated incremental borrowing rate in determining the present value of lease payments based on the information available at commencement date. Our estimated incremental borrowing rate reflects a reasonable projection of the interest that we would expect to pay to borrow, on a collateralized basis, over a similar term, an amount equal to the lease payments in a similar economic environment. The Company gives consideration to various factors, including the terms of the Company's outstanding debt instruments, publicly available data for instruments with similar characteristics and other information, together with internally generated estimates, assumptions and judgment to determine the Company's incremental borrowing rate for purposes of making these calculations.

*Practical Expedients and Accounting Policy Elections*

Certain of our lease arrangements include lease and non-lease components. For all existing asset classes with multiple component types, we have utilized the practical expedient to not separate lease and non-lease components. Accordingly, we account for the lease and non-lease components in an arrangement as a single lease component.

In addition, for all existing asset classes, we have elected an accounting policy to not apply the recognition requirements of Topic 842 to our short term leases. Accordingly, we recognize lease payments related to our short term leases in our statement of operations, which has not changed from our prior recognition.

The following are components of our lease expense for the three and nine months ended September 30, 2019, the majority of which are included in oil and natural gas production expenses on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 | Nine Months Ended September 30, 2019 |
|---|---|---|
| Operating lease expense | $ 25,069 | $ 74,997 |
| Short term and variable lease expense | 4,688 | 20,657 |
| Total lease expense | $ 29,757 | $ 95,654 |
| | | |
| Operating lease cost[(1)] | $ 3,118 | $ 6,175 |
| Short term lease cost[(1)] | 191 | 1,187 |
| Variable lease cost[(1)] | — | 65 |
| Total lease cost | $ 3,309 | $ 7,427 |

(1) Represents capital expenditures related to the use of drilling rigs for the three and nine months ended September 30, 2019 which are capitalized as part of oil and natural gas properties on our condensed consolidated balance sheets.

Other information related to our operating leases are as follows (in thousands, except lease term and discount rate):

| | Nine Months Ended September 30, 2019 |
|---|---|
| Operating cash flows from operating leases | $ 95,654 |
| Investing cash flows from operating leases | 7,427 |
| ROU assets obtained in exchange for operating lease obligations | 361,648 |
| Amortization of ROU assets | (81,509) |
| | |
| Weighted average remaining lease term (years) | 3.1 |
| Weighted average discount rate | 10% |

As of September 30, 2019, minimum future payments, including imputed interest, for our long term operating leases under ASC 842 are as follows (in thousands):

| | | |
|---|---|---|
| October 1, 2019 through December 31, 2019 | $ | 34,228 |
| 2020 | | 119,293 |
| 2021 | | 80,513 |
| 2022 | | 60,269 |
| 2023 | | 26,847 |
| Thereafter | | 9,797 |
| Total lease payments | | 330,947 |
| Less: Imputed interest | | 47,463 |
| Total lease liabilities | $ | 283,484 |

As of December 31, 2018, undiscounted minimum future payments for our long term operating leases under ASC 840 were as follows (in thousands):

| | | |
|---|---|---|
| 2019 | $ | 100,640 |
| 2020 | | 84,472 |
| 2021 | | 52,499 |
| 2022 | | 31,682 |
| 2023 | | 11,631 |
| Thereafter | | 8,467 |
| Total lease payments | $ | 289,391 |

**Note 21. Subsequent Events**

On October 22, 2019, the Debtors filed a motion for entry of an order authorizing rejection of an office sublease. The Bankruptcy Court has not yet ruled on the motion.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our condensed consolidated financial statements and related notes appearing in Part I, Item 1 of this Quarterly Report on Form 10-Q and information contained in our 2018 Annual Report. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, beliefs and expected performance. Please see "Cautionary Note Regarding Forward-Looking Statements."*

**Business Overview**

Sanchez Energy Corporation (together with our consolidated subsidiaries, "Sanchez Energy," the "Company," "we," "our," "us" or similar terms), a Delaware corporation formed in August 2011, is an independent exploration and production company focused on the acquisition and development of oil and natural gas resources in the onshore United States. We are currently focused on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas, and we also have other producing properties and undeveloped acreage, including in the Tuscaloosa Marine Shale ("TMS") in Mississippi and Louisiana, as well as other locations in Louisiana and Texas, which may offer potential future development opportunities. As of September 30, 2019, we held approximately 435,000 gross (233,000 net) leasehold acres in the Eagle Ford Shale, where we plan to invest the majority of our 2019 capital budget. We continually evaluate opportunities to manage our overall portfolio, which may include the acquisition of additional properties in the Eagle Ford Shale or other producing areas and, from time to time, the divestiture of non-core assets. Our successful acquisition or divestiture of such properties will generally depend on the circumstances and market conditions at the time we consider such opportunities. As discussed below, we are currently operating our business as debtors-in-possession in accordance with the applicable provisions of the Bankruptcy Code (as defined below).

At this time, we are primarily focused on lowering cash costs across our business and reducing our financial leverage, with an objective of maximizing our liquidity position and improving our balance sheet.

As previously disclosed, the Company substantially reduced its capital expenditures from approximately $593 million in 2018 to a budgeted amount of $100 to $150 million for 2019 in order to preserve capital in the current low and uncertain commodity price environment. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In addition, commodity prices remain depressed, and the Company's oil, natural gas and NGL production has declined in connection with reduced development activity. Lower commodity prices and declining production have adversely impacted the Company's revenues and cash flow. This has led to a reduction in forecasted liquidity, which has affected the Company's ability to service the significant obligations associated with its high level of indebtedness.

To improve its liquidity and position the Company for future success, Sanchez Energy undertook a review of various strategic alternatives with its advisors and Board of Directors (the "Board") beginning in 2018. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes (as defined below) for a 30-day grace period, which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. The Debtors filed their Bankruptcy Petitions (as defined below) on August 11, 2019, prior to the expiration of the grace period. Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility (as defined below) on an interim basis, as discussed below.

***Voluntary Reorganization Under Chapter 11***

On August 11, 2019 (the "Petition Date"), Sanchez Energy Corporation, SN Palmetto, LLC, SN Marquis LLC, SN Cotulla Assets, LLC, SN Operating, LLC, SN TMS, LLC, SN Catarina, LLC, Rockin L Ranch Company, LLC, SN Payables, LLC, SN EF Maverick, LLC ("SN Maverick") and SN UR Holdings, LLC ("SN UR Holdings") (collectively, the "Debtors") filed voluntary petitions (the "Bankruptcy Petitions") for reorganization under Chapter 11 of the U.S. Bankruptcy Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors filed a motion with the Bankruptcy Court seeking to jointly administer all of the Debtors' chapter 11 cases (the "Chapter 11 Cases") under the caption *In re Sanchez Energy Corporation*, Case No. 19-34508. The Debtors also filed various motions with the Bankruptcy Court, which were approved, seeking authorization to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. Additionally, the Bankruptcy Court has granted certain other relief requested by the Debtors, including interim relief allowing the Company to use its cash to fund the Chapter 11 Cases and to borrow an initial $50 million pursuant to the DIP Facility (as defined below), and giving the Company the authority to, among other things, continue to pay certain vendors and other third parties. During the pendency of the Chapter 11 Cases, all transactions outside the ordinary course of the Company's business require prior approval of the Bankruptcy Court. The Company expects ordinary course operations to continue substantially uninterrupted during the Chapter 11 Cases. SN UnSub, its general partner, and certain other unrestricted subsidiaries of the Company are not included in the Chapter 11 cases and are classified as "non-Debtors."

Subject to certain exceptions, under the Bankruptcy Code, the filing of the Bankruptcy Petitions automatically enjoined, or stayed, the continuation of most judicial or administrative proceedings or filing of other actions against the Debtors or their property to recover, collect or secure a claim arising prior to the date of the Bankruptcy Petitions. Accordingly, although the filing of the Bankruptcy Petitions triggered defaults on the Debtors' debt obligations, creditors are stayed from taking any actions against the Debtors as a result of such defaults, subject to certain limited exceptions permitted by the Bankruptcy Code. Substantially all of the Debtors' prepetition liabilities are subject to settlement and compromise under the Bankruptcy Code.

Under the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full before the holders of the Company's existing stockholders are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of settlements, if any, they will receive. A plan of reorganization could result in holders of the Debtors' liabilities and/or stockholders receiving no settlement on account of their interests and cancellation of their holdings.

For the duration of the Company's Chapter 11 Cases, the Company's operations and ability to develop and execute its business plan are subject to the risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2019. As a result of these risks and uncertainties, the number, amount or composition, as applicable, of the Company's stock and stockholders, assets, liabilities, officers and/or directors could be significantly different following the outcome of the Chapter 11 Cases, and the description of the Company's operations, properties and capital plans included in this quarterly report may not accurately reflect its operations, properties and capital plans following the Chapter 11 Cases.

***Executory Contracts***

Subject to certain exceptions, under the Bankruptcy Code, the Debtors may assume, assign or reject certain executory contracts and unexpired leases subject to the approval of the Bankruptcy Court and certain other conditions. Generally, the rejection of an executory contract or unexpired lease is treated as a prepetition breach of such executory contract or unexpired lease and, subject to certain exceptions, relieves the Debtors of performing their future obligations under such executory contract or unexpired lease but entitles the contract counterparty or lessor to a prepetition general unsecured claim for damages caused by such deemed breach. Counterparties to such rejected contracts or leases may assert unsecured claims in the Bankruptcy Court against the applicable Debtors' estate for such damages. Generally, the assumption of an executory contract or unexpired lease requires the Debtors to cure existing monetary defaults under such executory contract or unexpired lease and provide adequate assurance of future performance. Accordingly, any description of an executory contract or unexpired lease with the Debtor in this quarterly report, including where

applicable a quantification of a Debtor's obligations under any such executory contract or unexpired lease with the Debtor, is qualified by any overriding rejection rights such Debtor has under the Bankruptcy Code. Further, nothing herein is or shall be deemed an admission with respect to any claim amounts or calculations arising from the rejection of any executory contract or unexpired lease and the Debtors expressly preserve all of their rights with respect thereto. With limited exceptions, the Debtors have not yet made formal determinations with respect to the assumption or rejection of executory contracts or unexpired leases.

***Process for Plan of Reorganization***

Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company, the other Debtors, their creditors or other stakeholders, or at all.

The Debtors have the exclusive right for 120 days after the Petition Date to file a plan of reorganization (the "Exclusive Filing Period"), and if the Debtors' plan of reorganization is filed within the Exclusive Filing Period, the Debtors also have the exclusive right for 180 days after the Petition Date to solicit acceptances and rejections regarding such plan of reorganization, in each case, subject to extension for cause by the Bankruptcy Court. If the Exclusive Filing Period lapses, any party in interest may file a plan of reorganization for any of the Debtors.

In addition to being voted on by holders of impaired claims and equity interests, a plan of reorganization must satisfy certain requirements of the Bankruptcy Code and must be confirmed by the Bankruptcy Court in order to become effective. A plan of reorganization would be accepted by holders of claims against and equity interests in the Company if (i) more than one-half in number and at least two-thirds in dollar amount of allowed claims actually voting in each class of claims impaired by the plan have voted to accept the plan and (ii) at least two-thirds in amount of allowed equity interests actually voting in each class of equity interests impaired by the plan has voted to accept the plan. A class of claims or equity interests that does not receive or retain any property under the plan on account of such claims or interests is deemed to have voted to reject the plan.

Under certain circumstances set forth in Section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even if such plan has not been accepted by all impaired classes of claims and equity interests. The precise requirements and evidentiary showing for confirming a plan notwithstanding its rejection by one or more impaired classes of claims or equity interests depends upon a number of factors, including the status and seniority of the claims or equity interests in the rejecting class (i.e., secured or unsecured claims, subordinated or senior claims, preferred or common stock). Generally, with respect to common stock or preferred stock interests, a plan may be "crammed down" even if the stockholders receive no recovery if the proponent of the plan demonstrates that (1) no class junior to the common stock or class or series of preferred stock, as applicable, is receiving or retaining property under the plan and (2) no class of claims or interests senior to the common stock or class or series of preferred stock, as applicable is being paid more than in full.

The timeline for the Debtors to file a plan of reorganization will depend on the timing and outcome of numerous other ongoing matters in the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions, that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan will be implemented successfully.

***Magnitude of Potential Claims***

On September 24, 2019, the Debtors filed with the Bankruptcy Court schedules and statements setting forth, among other things, our assets and liabilities, subject to the assumptions filed in connection therewith (the "Schedules and Statements"). The Debtors may subsequently decide to amend or modify the Schedules and Statements.

On October 24, 2019, the Debtors filed a motion to set a bar date to assist with the claims reconciliation process, proposing a bar date of December 13, 2019 and a governmental bar date of February 7, 2020. Through the claims resolution process, differences in amounts scheduled by the Debtors and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court where appropriate. In light of the potential number and amount of claims filed, the claims resolution process may take considerable time to complete, and we expect that it will continue after our emergence from bankruptcy. Accordingly, the ultimate number and amount of allowed claims is not presently known, nor can the ultimate recovery with respect to allowed claims presently be ascertained.

***Effect of Filing on Creditors and Stockholders***

Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise, prepetition liabilities and postpetition liabilities must be satisfied in full or consensual agreement reached between parties before the holders of our existing common stock or preferred stock are entitled to receive or retain any property under a plan of reorganization. The ultimate recovery to creditors and/or stockholders, if any, will not be determined until confirmation and implementation of a plan or plans of reorganization. There can be no assurance as to what values, if any, will be ascribed in the Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they would receive. A plan of reorganization could result in holders of our liabilities and/or securities, including our common stock and preferred stock, receiving no distribution on account of their interests and cancellation of their holdings. As discussed above, if certain requirements of the Bankruptcy Code are met, a plan of reorganization can be confirmed notwithstanding its rejection by the holders of our common stock or preferred stock and notwithstanding the fact that such holders do not receive or retain any property on account of their equity interests under the plan. Because of such possibilities, the value of the Debtors' securities is highly speculative.

***Appointment of Creditors' Committee***

On August 26, 2019, the Bankruptcy Court appointed the official committee of unsecured creditors (the "Creditors' Committee"). The Creditors' Committee and its legal representatives have a right to be heard on all matters that come before the Bankruptcy Court with respect to the Debtors.

***Ability to Continue as a Going Concern***

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility should provide sufficient liquidity for the Company during the pendency of the Chapter 11 Cases. However, the significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described above raise substantial doubt about the Company's ability to continue as a going concern. The condensed consolidated financial statements have been prepared on a going concern basis of accounting, which contemplates continuity of operations, realization of assets, and satisfaction of liabilities and commitments in the normal course of business. The condensed consolidated financial statements do not include any adjustments that might result from the outcome of the going concern uncertainty. If the Company cannot continue as a going concern, adjustments to the carrying values and classification of its assets and liabilities and the reported amounts of income and expenses could be required and could be material.

***Covenant Violations***

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under its Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt.

Additionally, the filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties

terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***DIP Facility***

In connection with the Bankruptcy Petitions, the Debtors filed a motion seeking, among other things, interim and final approval of debtor-in-possession financing on terms and conditions set forth in a proposed Senior Secured Debtor-in-Possession Term Loan Credit Agreement (as amended, supplemented or otherwise modified, the "DIP Facility") among Sanchez Energy Corporation, as borrower, the financial institutions or other entities from time to time parties thereto, as lenders (the "DIP Lenders"), and Wilmington Savings Fund Society, FSB ("WSFS"), as administrative agent and collateral agent (the "DIP Agent"). The initial lenders under the DIP Facility are members of an ad hoc group of certain holders of the 7.25% Senior Secured Notes (the "Secured Noteholders") or affiliates of such Secured Noteholders. The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders (as defined in the DIP Facility) entered into an amendment to the DIP Facility (the "Amendment"). By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the DIP Facility (the "Final DIP Order") and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders. The DIP Facility, as it was approved on an interim basis, contains the terms as set forth below (although certain of the below terms are subject to modification prior to final approval of the DIP Facility):

- a senior secured priming superpriority debtor-in-possession term loan facility in an aggregate principal amount of up to $350 million, consisting of (i) a new money, multiple draw term loan facility in the amount of $175 million (the "New Money DIP Loans"), backstopped by certain Secured Noteholders (the "Backstop Lenders"), $50 million of which was available on an interim basis upon entry of the Bankruptcy Court's interim order (the "Interim DIP Order"); and (ii) a refinancing term loan effectuated by way of a conversion of $175 million of 7.25% Senior Secured Notes into obligations under the DIP Facility (the "Roll-Up Loans" and, together with the New Money DIP Loans, the "DIP Loans");

- borrowings under the (i) New Money DIP Loans will bear interest at a rate per annum equal to adjusted LIBOR (subject to a 2% floor) plus 8.00% and (ii) Roll-Up Loans will bear interest at the non-default rate of the 7.25% Senior Secured Notes of 7.25% per annum;

- the Company has paid the Backstop Lenders a 5.00% fee in cash in exchange for their commitment to backstop the New Money DIP Loans, and the Company is also required to pay (i) the DIP Lenders a 1.00% fee on the New Money DIP Loans payable upon the Debtors' emergence from the Chapter 11 Cases and (ii) the DIP Lenders a 0.5% per annum commitment fee on undrawn New Money DIP Loans payable monthly;

- the maturity of the DIP Facility is nine months after the Petition Date, subject to earlier termination upon occurrence of customary defaults;

- the proceeds of the New Money DIP Loans may be used for: (i) transaction costs, fees and expenses; (ii) working capital and general corporate purposes; (iii) bankruptcy-related costs and expenses (including restructuring fees and adequate protection payments); and (iv) subject to final approval of the Bankruptcy Court, refinancing all amounts existing under the Company's existing Credit Agreement;

- the obligations under the New Money DIP Loans will be secured (subject to the Carve-Out (as defined below) and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim; (ii) a perfected first priority senior security interest and lien on all unencumbered property (subject to certain exceptions set forth in the DIP Facility and/or the Interim DIP Order); (iii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and/or the Interim DIP Order); and (iv) a perfected junior lien on certain other property subject to valid, perfected and unavoidable prepetition liens;

- the obligations under the Roll-Up Loans will be secured (subject to the Carve-Out and certain "first-out" obligations as set forth in the Interim DIP Order) on the following bases: (i) a superpriority administrative claim and (ii) a perfected first priority, senior priming security interest and lien on all property subject to valid, perfected and nonavoidable prepetition liens securing the obligations under the 7.25% Senior Secured Notes (subject to certain exceptions as specified in the DIP Facility and the Interim DIP Order);

- the Debtors' Chapter 11 Cases are subject to certain milestones, including with respect to the filing and approvals of a disclosure statement and a Chapter 11 plan of reorganization;

- the DIP Facility will provide for certain customary covenants applicable to the Company, including covenants requiring (i) minimum liquidity in an amount of $15 million, subject to certain exclusions; (ii) beginning the first four-week period ending after the Petition Date, compliance with an approved operating debtor-in-possession budget (the "DIP Budget"), subject to permitted variance of 15% (with variance of 25% for midstream-related disbursements for the first four-week test period), tested on a rolling four-week basis on disbursements excluding certain professional fees, DIP Facility interest and fees and adequate protection payments; and (iii) delivery of a rolling 13-week operating cash flow forecast updated every four weeks and a weekly DIP Budget variance report; and

- the Debtors' obligations to the DIP Lenders and the liens and superpriority claims are subject in each case to a carve-out (the "Carve-Out") that accounts for certain administrative, court and legal fees payable in connection with the Chapter 11 Cases.

In addition, the Interim DIP Order contemplates that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the Senior Secured 7.25% Notes, and are required to continue to make the semi-annual interest payments as they come due under the indenture for the Senior Secured 7.25% Notes during the Chapter 11 Cases.

There can be no assurance that the DIP Facility will be approved on a final basis, on the terms described above, or at all. We are in ongoing conversations with the DIP Lenders and other stakeholders regarding the terms of the Final DIP Order and the DIP Facility.

***Derivative Contracts***

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Bankruptcy Petitions, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

***Basis of Presentation***

The condensed consolidated financial statements have been prepared in accordance with U.S. GAAP.

***Core Properties***

***Eagle Ford Shale***

We and our predecessor entities have a long history in the Eagle Ford Shale, where, as of September 30, 2019, we had assembled approximately 435,000 gross (233,000 net) leasehold acres.

In 2017, we acquired approximately 252,000 gross (61,000 net) acres in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (the "Comanche Acquisition"), representing a 24% working interest in the asset, which we refer to as the Comanche area.

In the Comanche area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires us to complete and equip 60 wells in each annual period commencing on September 1, 2017 and continuing thereafter until September 1, 2022 or pay a penalty for the failure to do so. Up to 30 wells completed and equipped in excess of the annual 60-well requirement can be carried over to satisfy part of the 60-well requirement in subsequent annual periods on a well-for-well basis. As of August 31, 2018, the Company had achieved a 30-well bank at Comanche that was applied toward the annual development commitment for the period that extended from September 1, 2018 to August 31, 2019. The Company completed and equipped an additional 63 wells at Comanche between September 1, 2018 and August 31, 2019, resulting in a total of 93 wells that were applied toward the annual development commitment of 60 wells. Accordingly, the Company has met its annual development commitment for the period September 1, 2018 to August 31, 2019, and has completed and equipped 30 wells that can be applied toward the development commitment for the period September 1, 2019 to August 31, 2020. The Company completed and equipped an additional six wells at Comanche between September 1, 2019 and September 30, 2019. We currently intend to drill at least the minimum number of wells required to satisfy the development agreement and to comply with applicable lease requirements necessary to maintain our Comanche acreage position. SN Maverick is currently engaged in a disagreement with Gavilan Resources, LLC ("Gavilan"), an entity controlled by Blackstone, regarding operations of the Comanche Assets under the joint development agreement with Gavilan (the "JDA"). Among other things, Gavilan has asserted that SN Maverick is in default of the JDA and Gavilan has the right to take over operations of the Comanche Assets. Although SN Maverick disputes Gavilan's assertions and has asserted defenses to the allegations and its own counterclaims against Gavilan, if Gavilan prevails in the disagreement, SN Maverick would lose its rights to operate the Comanche Assets and certain rights of SN Maverick under the JDA, including the ability to vote or appoint representatives to the operating committee or to transfer the Comanche Assets, among others. Furthermore, Gavilan has attempted to initiate a division of operatorship under the JDA pursuant to which operatorship of the Comanche Assets would be divided between Gavilan (or a third-party operator) and SN Maverick in accordance with certain procedures specified in the JDA. Arbitration regarding this dispute was initiated by Gavilan with the American Arbitration Association on February 18, 2019, seeking, among other things, a declaration that SN Maverick is in default under the JDA, and the Company submitted its answer and counterclaims on February 26, 2019 seeking, among other things, a declaration that Gavilan is in default under the JDA. Loss of operatorship of some portion or all of the Comanche Assets, or a finding that SN Maverick is in default under the JDA, would have a material adverse effect on our business, financial condition or results of operations. On the Petition Date, the arbitrator was notified by letter of the filing of the Bankruptcy Petitions and of the automatic stay under the Bankruptcy Code.

We have approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas representing a 100% working interest, which we refer to as the Catarina area.

In the Catarina area, we have a drilling commitment that requires us to drill (i) 50 wells in each 12-month period commencing on July 1, 2014 and (ii) at least one well in any consecutive 120-day period, in order to maintain rights to any future undeveloped acreage. Up to 30 wells drilled in excess of the minimum 50 wells in a given annual period can be carried over to satisfy part of the 50-well requirement in the subsequent 12-month period on a well-for-well basis. For the commitment period ending June 30, 2019, the Company drilled a total of 63 wells toward the annual drilling commitment of 50 wells. Accordingly, the Company met all of its 50-well annual drilling commitment for the period July 1, 2018 to June 30, 2019 and initiated a bank of 13 wells that will be counted toward the next annual drilling commitment period. We drilled four additional wells in the Catarina area during the third quarter 2019, bringing our total to 17 wells toward the commitment period July 1, 2019 to June 30, 2020. Furthermore, our 2019 drilling activities from July 1, 2019 to the present date and our capital budget and current plans include the additional activity needed to fulfill the commitment to drill at least one well in any 120-day period and the activity needed, when combined with expected activity in the first half of 2020, to comply with the 50-well annual drilling commitment for the period July 1, 2019 to June 30, 2020.

We have approximately 58,000 net acres in Dimmit, Frio, La Salle, and Zavala counties, Texas, which we refer to as the Maverick area, which we believe lies in the black oil window.

We have approximately 7,600 net acres in Gonzales County, Texas, which we refer to as the Palmetto area, which we believe lies in the volatile oil window.

Marathon Oil EF LLC ("Marathon") is the operator and other lessee of our Palmetto acreage position. In the Palmetto area, we have a development commitment that, in addition to other requirements in the leases that must be met in order to maintain our acreage position, requires the lessees thereof to (i) complete six gross (three net) wells and drill and complete an additional four gross (two net) wells during the 2019 calendar year and (ii) drill and complete up to 10 gross (five net) wells, depending on commodity pricing in each calendar year beginning in 2020. If the lessees under such leases fail to complete and equip the required number of wells in a given year (after applying any qualifying additional wells from previous years and any required additional wells drilled and completed prior to the applicable extension cutoff date in the following year), the leases terminate as to all lands and depths not included within a retained tract at the end of the applicable calendar year, as further described in, and pursuant to the terms and conditions of, each such lease. For the 2019 commitment, Marathon has completed six gross wells and drilled four gross wells that are currently in the process of completion, thereby satisfying the 2019 development commitment and complying with applicable lease requirements necessary to maintain our Palmetto acreage position if timely completed.

***Tuscaloosa Marine Shale***

As of September 30, 2019, we owned approximately 12,400 net acres in the TMS. Although TMS development is currently challenged due to well costs and commodity prices, we believe that the TMS play may offer significant future development potential as changes in technology, commodity prices and service costs occur.

***Recent Developments***

Please see the first paragraph under "*Business Overview*," "*—Voluntary Reorganization Under Chapter 11*" and "*—DIP Facility*" above, in addition to the other matters discussed above regarding our Bankruptcy Petitions and related matters.

***UnSub Tolling Agreement***

On August 10, 2019, the Company entered into a tolling agreement (the "Tolling Agreement") among Sanchez Energy Corporation, SN UR Holdings, SN EF UnSub Holdings, LLC ("SN UnSub Holdings"), SN Maverick (together with Sanchez Energy Corporation, SN UR Holdings and SN UnSub Holdings, the "Sanchez Parties"), GSO ST Holdings Associates LLC ("GSO LLC") and GSO ST Holdings LP (together with GSO LLC, the "GSO Parties").

Pursuant to the terms of the Tolling Agreement, except for participating in, or filing pleadings in respect of, any matter pending before the applicable bankruptcy court, during the Tolling Period (as defined below), the GSO Parties agreed to not exercise any rights or remedies with respect to any Investor Redemption Event, as defined in the Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated March 1, 2017 (the "LLC Agreement"), or the Amended and Restated Agreement of Limited Partnership of SN EF UnSub, LP, dated March 1, 2017, and all notice or cure periods that may exist with respect to any Investor Redemption Event (as such term is defined in the LLC Agreement) will be tolled during the Tolling Period.

The Tolling Agreement expires on the calendar day following the occurrence of any of the following events (the "Tolling Period"): (1) the occurrence of any Bankruptcy Event (as defined in the LLC Agreement) with respect to SN UnSub Holdings; provided, however, that unless a notice of termination has been provided by the GSO Parties or there is less than five calendar days before the Order Deadline (as defined below), the Sanchez Parties will be obligated to provide the GSO Parties at least five business days' written notice prior to commencement of a voluntary chapter 11 proceeding (a "Proceeding") by SN UnSub Holdings; (2) the failure of Sanchez Energy Corporation, SN Maverick or SN UR Holdings, to the extent such party has commenced a Proceeding (the earliest commencement date of a Proceeding by Sanchez Energy Corporation, SN Maverick or SN UR Holdings, as applicable, the "Initial Petition Date"), to obtain a bankruptcy court order approving the Tolling Agreement by the 20th day after the Initial Petition Date (the "Order Deadline"), unless the parties agree to extend such date by written agreement (the Order Deadline was subsequently extended to September 24, 2019); or (3) the effectiveness of delivery by any party of a written notice of

termination of the Tolling Period, with such notice to be effective on the fifth business day following delivery of notice to the other parties.

In the event that SN UnSub Holdings commences a Proceeding at any time, the parties have agreed that for all purposes the commencement by SN UnSub Holdings of a Proceeding will be deemed to have occurred on the Initial Petition Date immediately preceding the commencement of the Proceedings with respect to any other Sanchez entity.

On September 19, 2019, the Bankruptcy Court authorized the Debtors' performance of their obligations under the Tolling Agreement.

***Outlook***

We and other companies in our industry face significant risks related to business operations, the prices we receive for our production, competition for employees and capital, and other factors which could materially impact our results of operations and financial condition. Although commodity and capital markets showed signs of improvement, oil prices experienced a significant decline in the fourth quarter 2018 and have remained volatile in 2019 through the present date. As a result, we continue to manage our business for the potential of ongoing commodity price volatility. This volatility has significantly influenced our industry and operating environment in the past, and we believe it may again in the future. We face continuing uncertainty with respect to the demand for our products, commodity prices, service availability and costs, and our ability to fund capital projects, along with significant challenges associated with our financial position. The Company set its 2019 capital budget at a range of $100 million to $150 million for development and optimization activities in our core areas, which represents a substantial reduction from capital expenditures of approximately $593 million in 2018. We generally seek to remain flexible in our business strategy to make changes to this estimated capital budget as the commodity markets and our overall financial and business position evolve over time. As discussed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies," the Company is party to certain agreements that require it to meet annual drilling and development commitments to maintain undeveloped leasehold positions. To reduce its capital expenditures by this magnitude in 2019, the Company exercised privileges under certain of such agreements (primarily by utilizing well "banks" achieved through drilling and developing wells in excess of the quantity required to maintain the related acreage during prior annual periods) and negotiated deferral arrangements. If the Company is unable to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity necessary to maintain such undeveloped leasehold positions, it may be unable to continue to hold capital expenditures at comparable low levels in future years. As a result, the Company may be required to seek additional funding sources in order to pursue development plans which would maintain certain of its undeveloped acreage.

In November 2018, we engaged Moelis & Company LLC as financial advisor to explore strategic alternatives to strengthen our balance sheet and maximize the value of the Company. In anticipation of potential liquidity constraints, the Company commenced discussions with its bondholders, other stakeholders and potential third-party investors on a restructuring transaction to reduce the Company's debt and strengthen its overall financial flexibility. On July 15, 2019, the Company elected to defer making an interest payment of approximately $35.2 million on the Company's 6.125% Notes for a 30-day grace period which expired on August 14, 2019, in order to preserve liquidity and continue discussions with stakeholders. On the Petition Date, prior to the expiration of the grace period, the Company and other Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

Although the Company has not yet reached an agreement with any of its stakeholders on the terms of a comprehensive restructuring transaction, the Company obtained additional financing pursuant to the DIP Facility on an interim basis. Following the Petition Date, the Company has continued to engage with stakeholders in pursuit of a comprehensive restructuring transaction. The Company believes the Chapter 11 Cases provide the most expeditious manner in which to effect a capital structure solution. In order to successfully exit the Chapter 11 Cases, we will need to obtain confirmation by the Bankruptcy Court of a plan (or plans) of reorganization that satisfies the requirements of the Bankruptcy Code. A plan of reorganization would, among other things, resolve the Debtors' prepetition obligations, set forth the revised capital structure of the newly reorganized entity and provide for corporate governance subsequent to exit from the Chapter 11 Cases. However, there can be no assurance that the Company will be able to reorganize its capital structure on terms acceptable to the Company and the other Debtors, their creditors or other stakeholders, or at all.

**Results of Operations**

***Three Months Ended September 30, 2019 Compared to Three Months Ended September 30, 2018***

**Net Production and Revenues from Production**

The following table summarizes production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Three Months Ended September 30, | | Decrease 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| **Net Production:** | | | | |
| Oil (MBbls) | 1,926 | 2,300 | (374) | (16)% |
| Natural gas liquids (MBbls) | 2,029 | 2,473 | (444) | (18)% |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | (13)% |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | (16)% |
| **Average Sales Price Excluding Derivatives[(1)]:** | | | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 | $ (15.07) | (21)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.33 | 3.00 | (0.67) | (22)% |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 | $ (12.33) | (32)% |
| **Average Sales Price Including Derivatives[(2)]:** | | | | |
| Oil ($ per Bbl) | $ 53.64 | $ 55.19 | $ (1.55) | (3)% |
| Natural gas liquids ($ per Bbl) | 11.17 | 28.30 | (17.13) | (61)% |
| Natural gas ($ per Mcf) | 2.55 | 3.19 | (0.64) | (20)% |
| Oil equivalent ($ per Boe) | $ 26.49 | $ 34.29 | $ (7.80) | (23)% |
| **Revenues from Production[(1)(3)]:** | | | | |
| Oil sales | $ 106,016 | $ 161,243 | $ (55,227) | (34)% |
| Natural gas liquids sales | 22,675 | 69,995 | (47,320) | (68)% |
| Natural gas sales | 26,572 | 39,460 | (12,888) | (33)% |
| Total revenues from production | $ 155,263 | $ 270,698 | $ (115,435) | (43)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Three Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 917 | 1,011 |
| Catarina | 672 | 891 |
| Maverick | 220 | 347 |
| Palmetto | 95 | 25 |
| TMS / Other | 22 | 26 |
| Total | 1,926 | 2,300 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 807 | 932 |
| Catarina | 1,191 | 1,531 |
| Maverick | 4 | 3 |
| Palmetto | 27 | 7 |
| Total | 2,029 | 2,473 |
| **Natural gas (MMcf)** | | |
| Comanche | 4,644 | 4,895 |
| Catarina | 6,589 | 8,235 |
| Maverick | 20 | 10 |
| Palmetto | 151 | 34 |
| Total | 11,404 | 13,174 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 5,856 | 6,969 |
| Average daily production (Boe/d) | 63,652 | 75,750 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 55.04 | $ 70.11 |
| Natural gas liquids ($ per Bbl) | $ 11.17 | $ 28.30 |
| Natural gas ($ per Mcf) | $ 2.33 | $ 3.00 |
| Oil equivalent ($ per Boe) | $ 26.51 | $ 38.84 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.76 | $ 10.85 |
| Production and ad valorem taxes | $ 1.68 | $ 2.18 |
| General and administrative expenses | $ 3.57 | $ 3.06 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 9.75 |
| Impairment of oil and natural gas properties | $ 1.67 | $ 0.45 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 6,969 MBoe for the three months ended September 30, 2018 to 5,856 MBoe for the three months ended September 30, 2019, primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Three Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 2,498 | 1,701 | 2,758 |
| Catarina | 460 | 2,961 | 441 | 3,795 |
| Palmetto | 81 | 147 | 86 | 38 |
| Maverick | 66 | 227 | 66 | 352 |
| TMS / Other | 46 | 23 | 47 | 26 |
| Total | 2,435 | 5,856 | 2,341 | 6,969 |

For the three months ended September 30, 2019 and 2018, 33% of our production was oil, 35% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $155.3 million and $270.7 million for the three months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas for the three months ended September 30, 2019 decreased $55.2 million, $47.3 million and $12.9 million, respectively, as compared to the three months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues***. The Company recorded sales and marketing revenues of $7.3 million and $7.0 million during the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the three months ended September 30, 2018 to the three months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Three Months Ended September 30, | | | Three Months Ended September 30, 2018 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Average Sales Price | from Production |
| Oil (MBbls) | 1,926 | 2,300 | (374) | $ 70.11 | $ (26,220) |
| NGLs (MBbls) | 2,029 | 2,473 | (444) | $ 28.30 | $ (12,567) |
| Natural gas (MMcf) | 11,404 | 13,174 | (1,770) | $ 3.00 | $ (5,302) |
| Total oil equivalent (MBoe) | 5,856 | 6,969 | (1,113) | $ 38.84 | $ (44,089) |

| | Average Sales Price per Unit Three Months Ended September 30, | | | Three Months Ended September 30, 2019 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Production Volume | from Price |
| Oil (MBbls) | $ 55.04 | $ 70.11 | $ (15.07) | 1,926 | $ (29,007) |
| NGLs (MBbls) | $ 11.17 | $ 28.30 | $ (17.13) | 2,029 | $ (34,753) |
| Natural gas (MMcf) | $ 2.33 | $ 3.00 | $ (0.67) | 11,404 | $ (7,586) |
| Total oil equivalent (MBoe) | $ 26.51 | $ 38.84 | $ (12.33) | 5,856 | $ (71,346) |

Additionally, a 10% increase or decrease in our average realized sales prices for the three months ended September 30, 2019, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $15.5 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Three Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 74,740 | $ 75,594 | $ (854) | (1)% |
| Exploration expenses | 164 | 2,698 | (2,534) | (94)% |
| Sales and marketing expenses | 6,672 | 7,239 | (567) | (8)% |
| Production and ad valorem taxes | 9,867 | 15,221 | (5,354) | (35)% |
| Depreciation, depletion, amortization and accretion | 57,864 | 67,944 | (10,080) | (15)% |
| Impairment of oil and natural gas properties | 9,761 | 3,117 | 6,644 | * |
| General and administrative expenses[1] | 20,915 | 21,312 | (397) | (2)% |
| Prepetition restructuring charges | 18,231 | — | 18,231 | * |
| Total operating costs and expenses | 198,214 | 193,125 | 5,089 | 3 % |
| | | | | |
| Interest income | 221 | 1,130 | (909) | (80)% |
| Other expense | (12,829) | (7,677) | (5,152) | 67 % |
| Interest expense | (22,884) | (44,154) | 21,270 | (48)% |
| Net gains (losses) on commodity derivatives | 13,200 | (28,286) | 41,486 | * |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (833) | — | (833) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.1 million and non-cash stock-based compensation benefit $1.4 million for the three months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses decreased to $74.7 million ($12.76 per Boe) for the three months ended September 30, 2019, as compared to $75.6 million ($10.85 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the three months ended September 30, 2018, the Company recognized a benefit of approximately $5.9 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $81.5 million ($11.70 per Boe). The decrease in oil and natural gas production expenses from the three months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the three months ended September 30, 2019 is primarily attributable to a decrease in production. The increase in oil and natural gas production expenses per Boe for the three months ended September 30, 2019 compared to the three months ended September 30, 2018 is primarily related to a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $0.2 million and $2.7 million during the three months ended September 30, 2019 and 2018, respectively. The decrease in our exploration expenses for the three months ended September 30, 2019 as compared to the same period in 2018 was primarily due to a decrease in activity leading to reduced exploratory geological and geophysical seismic costs.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $6.7 million and $7.2 million for the three months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in

support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $9.9 million ($1.68 per Boe) and $15.2 million ($2.18 per Boe) for the three months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the third quarter 2019 compared to the same period in 2018 was primarily due to the decrease in production taxes based on the corresponding decrease in revenue during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $10.0 million from $67.9 million ($9.75 per Boe) for the three months ended September 30, 2018 to $57.9 million ($9.88 per Boe) for the three months ended September 30, 2019. The decrease in expense represented an approximate $10.8 million decrease from lower production which was partially offset by a $0.8 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We did not record proved property impairments for the three months ended September 30, 2019 or 2018. We recorded impairment of $9.8 million and $3.1 million to our unproved oil and natural gas properties for the three months and ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $20.9 million ($3.57 per Boe) for the three months ended September 30, 2019 compared to $21.3 million ($3.06 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $18.2 million for the three months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the three months ended September 30, 2018.

***Other Expense.*** For the three months ended September 30, 2019 and 2018, respectively, other expense totaled $12.8 million compared to other expense of $7.7 million for the three months ended September 30, 2018. The other expense during the three months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset. Additionally, we experienced a loss of $4.3 million associated with the decrease in fair value of the investment in SNMP, which was partially offset by a gain of $0.6 million associated with the increase in fair value of the investment in Lonestar. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets, and we experienced losses of $10.7 million and $1.0 million associated with the decreases in fair value of the investments in Lonestar and SNMP, respectively. Additionally, for the three month period ended September 30, 2019, we recorded $2.4 million of income from equipment rentals, we did not record any dividend income from the SNMP common units and we did not experience any gains or losses on embedded derivatives. For the three months ended September 30, 2018, we recorded income from equipment rentals of $3.0 million, dividend income of $1.1 million from the SNMP common units, and a loss on embedded derivatives of $1.1 million.

***Interest Expense.*** For the three months ended September 30, 2019, interest expense totaled $22.9 million and included $2.0 million in amortization of debt issuance costs. For the three months ended September 30, 2018, interest expense totaled $44.2 million and included $2.9 million in amortization of debt issuance costs. As of the Petition Date we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-

annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the three months ended September 30, 2019, we recognized a net gain of $13.2 million on our commodity derivative contracts, which included mark-to-market gains on unsettled oil derivatives of $15.8 million and mark-to-market losses on unsettled natural gas derivatives of $2.5 million. In addition, during the three months ended September 30, 2019, we experienced net settlement losses of $0.1 million, which included settlement losses of $2.7 million on our oil derivative contracts and settlement gains of $2.6 million on our natural gas derivative contracts. The mark-to-market gains and losses were a result of the decreases and increases, respectively, in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses and gains during the period were primarily a result of increases and decreases, respectively, in commodity prices from the time the positions were entered into until the time of settlement. During the three months ended September 30, 2018, we recognized a net loss of $28.3 million on our commodity derivative contracts, which included mark-to-market gains on our oil derivative contracts of $6.0 million and mark-to-market losses on our natural gas derivative contracts of $2.5 million. In addition, during the three months ended September 30, 2018, we experienced settlement losses on our oil derivative contracts of $34.3 million partially offset by settlement gains of $2.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Three Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the three months ended September 30, 2019, the Company recorded an income tax benefit of $0.8 million, and our effective tax rate was approximately 0.7%. The Company did not record an income tax expense or benefit for the three months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

*Nine Months Ended September 30, 2019 Compared to Nine Months Ended September 30, 2018*

**Net Production and Revenues from Production**

The following table summarizes net production, average sales prices and operating revenue for our oil, NGLs and natural gas operations for the periods indicated (in thousands, except average sales price and percentages):

| | Nine Months Ended September 30, 2019 | 2018 | Increase (Decrease) 2019 vs. 2018 $ | % |
|---|---|---|---|---|
| **Net Production:** | | | | |
| Oil (MBbls) | 6,375 | 7,198 | (823) | (11)% |
| Natural gas liquids (MBbls) | 6,539 | 7,363 | (824) | (11)% |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | (11)% |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | (11)% |
| **Average Sales Price Excluding Derivatives[1]:** | | | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 | $ (8.89) | (14)% |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.75 | 2.96 | (0.21) | (7)% |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 | $ (6.71) | (19)% |
| **Average Sales Price Including Derivatives[2]:** | | | | |
| Oil ($ per Bbl) | $ 55.08 | $ 53.75 | $ 1.33 | 2 % |
| Natural gas liquids ($ per Bbl) | 14.21 | 23.88 | (9.67) | (40)% |
| Natural gas ($ per Mcf) | 2.82 | 3.16 | (0.34) | (11)% |
| Oil equivalent ($ per Boe) | $ 28.78 | $ 32.32 | $ (3.54) | (11)% |
| **Revenues from Production[1][3]:** | | | | |
| Oil sales | $ 362,424 | $ 473,178 | $ (110,754) | (23)% |
| Natural gas liquids sales | 92,891 | 175,833 | (82,942) | (47)% |
| Natural gas sales | 100,932 | 122,330 | (21,398) | (17)% |
| Total revenues from production | $ 556,247 | $ 771,341 | $ (215,094) | (28)% |

(1) Excludes the realized impact of derivative instrument settlements.

(2) Includes the realized impact of derivative instrument settlements.

(3) Excludes revenues related to sales and marketing activities.

The following table sets forth information regarding combined net production of oil, NGLs and natural gas attributable to our properties for each of the periods presented:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Production:** | | |
| **Oil (MBbls)** | | |
| Comanche | 2,962 | 3,350 |
| Catarina | 2,435 | 2,491 |
| Maverick | 713 | 1,201 |
| Palmetto | 203 | 82 |
| TMS / Other | 62 | 74 |
| Total | 6,375 | 7,198 |
| **Natural gas liquids (MBbls)** | | |
| Comanche | 2,543 | 2,993 |
| Catarina | 3,931 | 4,325 |
| Maverick | 13 | 20 |
| Palmetto | 52 | 25 |
| Total | 6,539 | 7,363 |
| **Natural gas (MMcf)** | | |
| Comanche | 14,176 | 16,429 |
| Catarina | 22,123 | 24,716 |
| Maverick | 73 | 94 |
| Palmetto | 285 | 134 |
| Total | 36,657 | 41,373 |
| **Net production volumes:** | | |
| Total oil equivalent (MBoe) | 19,024 | 21,457 |
| Average daily production (Boe/d) | 69,685 | 78,597 |
| **Average sales price [(1)]:** | | |
| Oil ($ per Bbl) | $ 56.85 | $ 65.74 |
| Natural gas liquids ($ per Bbl) | $ 14.21 | $ 23.88 |
| Natural gas ($ per Mcf) | $ 2.75 | $ 2.96 |
| Oil equivalent ($ per Boe) | $ 29.24 | $ 35.95 |
| **Average unit costs per Boe:** | | |
| Oil and natural gas production expenses | $ 12.17 | $ 10.49 |
| Production and ad valorem taxes | $ 1.82 | $ 2.00 |
| General and administrative expenses | $ 3.48 | $ 3.41 |
| Depreciation, depletion, amortization and accretion | $ 9.88 | $ 8.83 |
| Impairment of oil and natural gas properties | $ 1.20 | $ 0.20 |

(1) Excludes the realized impact of derivative instrument settlements.

***Net Production.*** Production decreased from 21,457 MBoe for the nine months ended September 30, 2018 to 19,024 MBoe for the nine months ended September 30, 2019 primarily due to the reduction in our drilling and development activity. The number of gross wells producing at the period end and net production for the periods were as follows:

| | Nine Months Ended September 30, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | # Wells | MBoe | # Wells | MBoe |
| Comanche | 1,782 | 7,868 | 1,701 | 9,082 |
| Catarina | 460 | 10,053 | 441 | 10,935 |
| Palmetto | 81 | 738 | 86 | 129 |
| Maverick | 66 | 303 | 66 | 1,237 |
| TMS / Other | 46 | 63 | 47 | 74 |
| Total | 2,435 | 19,025 | 2,341 | 21,457 |

For the nine months ended September 30, 2019 and 2018, 34% of our production was oil, 34% was NGLs and 32% was natural gas.

***Revenues from Production.*** Sales revenue for oil, NGLs and natural gas from production totaled $556.2 million and $771.3 million for the nine months ended September 30, 2019 and 2018, respectively. Sales revenue for oil, NGLs and natural gas decreased $110.8 million, $82.9 million and $21.4 million, respectively, as compared to the nine months ended September 30, 2018. These decreases were due to decreases in production, as discussed above, as well as decreases in average realized prices as compared to the comparable period of 2018.

***Sales and Marketing Revenues.*** The Company recorded sales and marketing revenues of $18.1 million and $16.9 million during the nine months ended September 30, 2019 and 2018, respectively. We believe an opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related revenues from these activities are expected to fluctuate from period to period.

The following tables provide an analysis of the impacts of changes in average realized prices and production volumes between the periods on our revenues from production from the nine months ended September 30, 2018 to the nine months ended September 30, 2019 (in thousands, except average sales price).

| | Production Volume Nine Months Ended September 30, | | | Nine Months Ended September 30, 2018 | Revenue Decrease |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Average Sales Price | from Production |
| Oil (MBbls) | 6,375 | 7,198 | (823) | $ 65.74 | $ (54,102) |
| NGLs (MBbls) | 6,539 | 7,363 | (824) | $ 23.88 | $ (19,678) |
| Natural gas (MMcf) | 36,657 | 41,373 | (4,716) | $ 2.96 | $ (13,944) |
| Total oil equivalent (MBoe) | 19,024 | 21,457 | (2,433) | $ 35.95 | $ (87,724) |

| | Average Sales Price per Unit Nine Months Ended September 30, | | | Nine Months Ended September 30, 2019 | Revenue Increase/(Decrease) |
|---|---|---|---|---|---|
| | 2019 | 2018 | Difference | Production Volume | from Price |
| Oil (MBbls) | $ 56.85 | $ 65.74 | $ (8.89) | 6,375 | $ (56,652) |
| NGLs (MBbls) | $ 14.21 | $ 23.88 | $ (9.67) | 6,539 | $ (63,264) |
| Natural gas (MMcf) | $ 2.75 | $ 2.96 | $ (0.21) | 36,657 | $ (7,454) |
| Total oil equivalent (MBoe) | $ 29.24 | $ 35.95 | $ (6.71) | 19,024 | $ (127,370) |

Additionally, a 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues by approximately $55.6 million.

**Operating Costs and Expenses**

The table below presents details of operating costs and expenses for the periods indicated (in thousands, except percentages):

| | Nine Months Ended September 30, | | Increase (Decrease) 2019 vs. 2018 | |
|---|---|---|---|---|
| | 2019 | 2018 | $ | % |
| Oil and natural gas production expenses | $ 231,441 | $ 225,186 | $ 6,255 | 3 % |
| Exploration expenses | 4,983 | 3,247 | 1,736 | 53 % |
| Sales and marketing expenses | 16,591 | 16,498 | 93 | 1 % |
| Production and ad valorem taxes | 34,682 | 42,898 | (8,216) | (19)% |
| Depreciation, depletion, amortization and accretion | 187,920 | 189,515 | (1,595) | (1)% |
| Impairment of oil and natural gas properties | 22,906 | 4,259 | 18,647 | * |
| General and administrative expenses[1] | 66,266 | 73,199 | (6,933) | (9)% |
| Prepetition restructuring charges | 41,855 | — | 41,855 | * |
| Total operating costs and expenses | 606,644 | 554,802 | 51,842 | 9 % |
| | | | | |
| Interest income | 1,447 | 3,400 | (1,953) | (57)% |
| Other income (expense) | (13,785) | 2,467 | (16,252) | * |
| Gain on sale of oil and natural gas properties | — | 1,528 | (1,528) | * |
| Interest expense | (111,998) | (132,664) | 20,666 | (16)% |
| Net losses on commodity derivatives | (20,827) | (142,384) | 121,557 | (85)% |
| Reorganization items | 55,321 | — | 55,321 | * |
| Income tax benefit | (23) | — | (23) | * |

*Variances deemed to be not meaningful

(1) Includes non-cash stock-based compensation expense of $0.4 million and $2.9 million for the nine months ended September 30, 2019 and 2018, respectively.

***Oil and Natural Gas Production Expenses.*** Oil and natural gas production expenses are the costs incurred to produce our oil and natural gas, as well as the daily costs incurred to maintain our producing properties. Our oil and natural gas production expenses increased to approximately $231.4 million ($12.17 per Boe) for the nine months ended September 30, 2019 as compared to $225.2 million ($10.49 per Boe) for the same period in 2018. Upon adoption of ASC 842 on January 1, 2019, the Western Catarina Midstream deferred gain was derecognized. During the nine months ended September 30, 2018, the Company recognized a benefit of approximately $17.8 million related to the amortization of the Western Catarina Midstream deferred gain, and oil and natural gas production expenses, excluding the amortization of the Western Catarina Midstream deferred gain, were approximately $243.0 million ($11.32 per Boe). The decrease in oil and natural gas production expenses from the nine months ended September 30, 2018, excluding the amortization of the Western Catarina Midstream deferred gain, compared to the nine months ended September 30, 2019 is primarily attributable to a decrease in production. The decrease in oil and natural gas production expenses was slightly offset by an increase in transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina. The increase in oil and natural gas production expenses per Boe for the nine months ended September 30, 2019 compared to the nine months ended September 30, 2018 is primarily related to an increase in marketing and transportation expenses from an increase in gathering and transportation rates on volumes produced outside of the dedicated acreage in Catarina during January and April 2019 and a decrease in production.

***Exploration Expenses.*** The Company records exploration expenditures as charges against earnings for items such as exploratory dry holes, exploratory geological and geophysical costs and delay rentals. Exploration expenses totaled $5.0 million and $3.2 million during the nine months ended September 30, 2019 and 2018, respectively. The increase in our exploration expenses for the nine months ended September 30, 2019 as compared to the same period in 2018 was due to an increase in our exploratory geological and geophysical seismic costs and an increase in our delay rentals for the first half of 2019.

***Sales and Marketing Expenses.*** The Company incurred sales and marketing expenses of approximately $16.6 million and $16.5 million for the nine months ended September 30, 2019 and 2018, respectively. We believe an

opportunity exists, from time to time, to participate in additional economic benefits and operational efficiencies in support of our upstream activities by purchasing and reselling production from others, to a limited extent, in order to utilize existing firm transportation arrangements. The volumes associated with these activities are variable and, accordingly, the related expenses from these activities are expected to fluctuate from period to period.

***Production and Ad Valorem Taxes.*** Production taxes are paid on produced oil and natural gas based upon a percentage of gross revenues or at fixed rates established by state or local taxing authorities. Ad valorem taxes are paid based upon the appraised fair market value of producing properties using an estimated discounted cash flow approach and a fixed rate established by state or local taxing authorities. Our production and ad valorem taxes totaled $34.7 million ($1.82 per Boe) and $42.9 million ($2.00 per Boe) for the nine months ended September 30, 2019 and 2018, respectively. The decrease in production and ad valorem taxes in the first nine months of 2019 compared to the same period in 2018 was primarily due to the corresponding decrease in revenues during the period.

***Depreciation, Depletion, Amortization and Accretion.*** Depreciation, depletion, amortization and accretion expense decreased $1.6 million from $189.5 million ($8.83 per Boe) for the nine months ended September 30, 2018 to $187.9 million ($9.88 per Boe) for the nine months ended September 30, 2019. The decrease in expense represented an approximate $21.5 million decrease from lower production which was partially offset by a $19.9 million increase due to a higher depletion rate.

***Impairment of Oil and Natural Gas Properties.*** We recorded a proved property impairment of $4.3 million for the nine months ended September 30, 2019. We did not record a proved property impairment for the nine months ended September 30, 2018. We recorded impairment of $18.6 million and $4.3 million to our unproved oil and natural gas properties for the nine months ended September 30, 2019 and 2018, respectively, due to acreage expiration from changes in the development plan. Significant declines in commodity prices, further changes to the Company's drilling plans or reductions in proved reserve estimates could result in proved property impairments in the future, and such impairments could be substantial.

***General and Administrative Expenses.*** Our G&A expenses totaled $66.3 million ($3.48 per Boe) for the nine months ended September 30, 2019 compared to $73.2 million ($3.41 per Boe) for the same period in 2018. This decrease was primarily the result of lower professional, consulting and legal expenses, not related to restructuring activities, and a reduction in employee headcount. Additionally, we experienced a decrease in our stock-based compensation expense for the three months ended September 30, 2019 as compared to the same period in 2018 resulting from a decrease in the Company's stock price. Offsetting these decreases, we experienced increases in salaries and wages resulting from employee retention and executive compensation programs.

***Prepetition Restructuring Charges.*** Any expenses incurred before the Petition Date and in relation to the Chapter 11 Cases are recorded as prepetition restructuring charges on our condensed consolidated statements of operations. Prepetition restructuring charges totaled $41.9 million for the nine months ended September 30, 2019, which primarily consisted of professional, consulting and legal fees. There were no prepetition restructuring charges for the nine months ended September 30, 2018.

***Other Income (Expense).*** For the nine months ended September 30, 2019, other expense totaled $13.8 million compared to other income of $2.5 million for the nine months ended September 30, 2018. The other expense during the nine months ended September 30, 2019 relates primarily to an $11.8 million loss on impairment of a prepaid asset and $1.2 million in shortfall and idle rig costs. For the comparable period of 2018, we did not experience any losses on impairment of prepaid assets or idle rig costs. Additionally, for the nine months ended September 30, 2019 we experienced losses of $3.1 million and $1.4 million associated with the decreases in fair value of the investments in SNMP and Lonestar, respectively. For the nine months ended September 30, 2018, we experienced a loss of $9.1 million and a gain of $5.7 million associated with the decreases and increases in fair value of the investments in SNMP and Lonestar, respectively. Further, we received $2.6 million in income from equipment rentals during the nine months ended September 30, 2019 as compared to $7.3 million for the comparable period of 2018, we experienced a gain on our embedded derivative contracts of $0.3 million for the nine months ended September 30, 2019 as compared to a loss of $7.1 million for the comparable period of 2018, and we recorded dividend income of approximately $0.7 million from quarterly distributions on the SNMP common units as compared to $3.2 million for the comparable period of 2018.

***Interest Expense.*** For the nine months ended September 30, 2019, interest expense totaled $112.0 million and included $8.3 million in amortization of debt issuance costs. For the nine months ended September 30, 2018, interest

expense totaled $132.7 million and included $12.7 million in amortization of debt issuance costs. As of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise, which was the primary driver in the decrease in interest expense. However, it is currently proposed that under the terms of the Final DIP Order, we will be required to pay the approximately $18.1 million in interest that would have been due on August 15, 2019 under the indenture for the 7.25% Senior Secured Notes and are required to continue making the semi-annual interest payments as they come due under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases. Additionally as of the Petition Date, we expensed the related unamortized debt issuance costs as reorganization items.

***Commodity Derivative Transactions.*** We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in other income and expenses. During the nine months ended September 30, 2019, we recognized a net loss of $20.8 million on our commodity derivative contracts, which included net losses of $8.7 million associated with the settlements of commodity derivative contracts and mark-to-market losses of $12.1 million on unsettled commodity derivative contracts. The mark-to-market losses were a result of the increase in estimated future commodity prices as compared to the estimated future prices at the prior measurement date. The settlement losses during the period were primarily a result of increases in commodity prices from the time the positions were entered into until the time of settlement. During the nine months ended September 30, 2018, we recognized a net loss of $142.4 million on our commodity derivative contracts, which included mark-to-market losses on oil and natural gas derivative contracts of $50.0 million and $14.5 million, respectively. In addition, during the nine months ended September 30, 2018 we experienced settlement losses on our oil commodity derivative contracts of $86.3 million, which were partially offset by settlement gains of $8.5 million on our natural gas derivative contracts.

***Reorganization Items.*** The Company has incurred and is expected to continue to incur significant costs associated with the reorganization. These costs, which are expensed as incurred, are expected to significantly affect the Company's results of operations. Reorganization items represent costs directly associated with the Chapter 11 Cases since the Petition Date. Such costs include accruals related to the DIP Facility and postpetition fees and expenses of court-approved legal and financial advisors, which are subject to Bankruptcy Court orders and/or oversight.

The following table summarizes the components of reorganization items included on the condensed consolidated statement of operations (in thousands):

| | Nine Months Ended September 30, 2019 |
|---|---|
| DIP lender fee on initial borrowing | $ 8,814 |
| DIP Facility costs | 4,512 |
| Legal and other professional advisory fees | 11,571 |
| Unamortized deferred financing fees, discounts and premiums | 30,424 |
| Reorganization items | $ 55,321 |

***Income Tax Benefit.*** For the nine months ended September 30, 2019, the Company recorded an income tax benefit of less than $0.1 million and our effective tax rate was approximately 0%. The Company did not record an income tax expense or benefit for the nine months ended September 30, 2018, and our effective tax rate was 0%. The statutory rate was 21% for both periods, and the difference between the statutory rate and the Company's effective tax rates was primarily related to valuation allowances recorded during the periods.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in accordance with U.S. GAAP requires our management to select and apply accounting policies that provide the framework to report our results of operations and financial position. The selection and application of those policies requires our management to make difficult subjective or complex judgments concerning reported amounts of revenue and expenses during the reporting period and the reported amounts of assets and liabilities at the date of the financial statements. As a result, there exists the likelihood that materially different amounts would be reported under different conditions or using different assumptions.

As of September 30, 2019, our critical accounting policies were consistent with those discussed in our 2018 Annual Report.

**Use of Estimates**

The condensed consolidated financial statements are prepared in conformity with U.S. GAAP, which requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the depletion and impairment of proved oil and natural gas properties, the evaluation of unproved properties for impairment, the fair value of commodity derivative contracts, embedded derivatives and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of G&A expenses. Actual results could differ materially from those estimates.

**Liquidity and Capital Resources**

The primary source of liquidity and capital resources to fund our development program and other obligations has been cash flow from operations, available cash on hand and proceeds from borrowings and securities issuances. Operating cash flows, however, are largely dependent on oil and natural gas prices and differentials, sales volumes and costs. Oil and natural gas prices declined significantly during the fourth quarter 2018 and have remained low in 2019 through the present date. These lower commodity prices, in addition to reduced production levels from our decreased capital expenditures budget, have negatively impacted revenues, earnings and cash flows, and sustained low oil and natural gas prices have had and will continue to have a material and adverse effect on our liquidity position and our ability to raise additional funds through financing transactions. On the Petition Date, the Debtors filed the Bankruptcy Petitions with the Bankruptcy Court and were authorized to continue to operate their businesses as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases—Voluntary Reorganization Under Chapter 11" and above in "—Business Overview—Voluntary Reorganization Under Chapter 11" for additional information.

As of September 30, 2019, we had approximately $179.5 million in cash and cash equivalents and $90.0 million in available borrowing capacity under the SN UnSub Credit Agreement, resulting in aggregate liquidity of approximately $269.5 million. Borrowings under the DIP Facility are not available to SN UnSub or our other non-Debtor subsidiaries, and borrowings under the SN UnSub Credit Agreement are not available to the Debtors or any other non-Debtor subsidiary other than SN UnSub.

The Debtors' filing of the Bankruptcy Petitions described above constituted an event of default that accelerated the Company's obligations under the Credit Agreement, its 7.75% Notes, its 6.125% Notes and its 7.25% Senior Secured Notes (approximately $2.3 billion in aggregate principal). We do not have sufficient liquidity to pay such accelerated amounts. Additionally, other events of default, including cross-defaults, are present under these debt instruments. Under the Bankruptcy Code, the creditors under these debt agreements are stayed from taking any action against the Company as a result of an event of default. See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 7. Debt" for additional details about the Company's debt. The significant risks and uncertainties related to the Company's liquidity and Chapter 11 Cases described under "Business Overview" raise substantial doubt about the Company's ability to continue as a going concern. See above under "Business Overview" for a description of these and other developments. In addition, during the existence of an event of default under the Credit Agreement and the Chapter 11 Cases, we have no borrowing capacity under the Credit Agreement, even if any available borrowing capacity remained under the Credit Agreement (although, as noted below, we anticipate paying off the Credit Agreement in full subject to final approval of the Bankruptcy Court).

Neither SN UnSub nor its general partner are parties to the Chapter 11 Cases, and the Chapter 11 Cases did not result in an event of default under the SN UnSub Credit Agreement. On May 23, 2019, as part of the most recent semi-annual redetermination, the borrowing base under the SN UnSub Credit Agreement was decreased from $315 million to $240 million. As of September 30, 2019, there were approximately $150.0 million of borrowings and no letters of credit outstanding under the SN UnSub Credit Agreement. The next regularly scheduled borrowing base redetermination is expected in the fourth quarter 2019. Based upon current commodity prices and other factors, we believe that the borrowing base under the SN UnSub Credit Agreement will likely be decreased at the next redetermination and may be decreased at future redeterminations, and any or all such decreases may be material. Were the lenders under the SN UnSub Credit Agreement to reduce the borrowing base to an amount below the current outstanding borrowings of SN UnSub, and provided no waiver is granted by those lenders, we would be required at our election to repay the deficiency

within 30 days (in a single installment) to 180 days (in six equal monthly installments), pledge additional oil and natural gas assets as security for the amount of debt outstanding, or seek such other remedies available under the SN UnSub Credit Agreement, in which case we may not be able to satisfy the liquidity requirements of SN UnSub.

The DIP Facility was approved by the Bankruptcy Court on an interim basis and the Company closed and borrowed an initial $50 million of new money loans thereunder on August 19, 2019, following the Bankruptcy Court's entry of an interim order approving the DIP Facility on August 16, 2019. On September 19, 2019, the Bankruptcy Court declined to grant final approval of the DIP Facility at that time, and the Debtors, the DIP Lenders and certain other stakeholders are in ongoing discussions regarding the terms of the DIP Facility that will be presented to the Bankruptcy Court again for final approval at a subsequent hearing. The Company's ability to access the remaining additional principal amount of new term loans under the DIP Facility is subject to the final approval of the Bankruptcy Court. On September 24, 2019, the Company, the DIP Agent and the Required Lenders entered into the Amendment. By its terms, the Amendment was effective as of September 20, 2019. The Amendment provided for, among other things, an extension to October 2, 2019 of the milestone date set forth in the DIP Facility for the entry of a final order of the Bankruptcy Court authorizing the Debtors' entry into the DIP Facility and the other transactions contemplated by the Final DIP Order and provided for the further extension of such milestone date with the consent of the Required Lenders. The milestone date set forth in the Loan Agreement for the entry of the Final DIP Order was subsequently extended, as contemplated and permitted by the Amendment, by the Required Lenders until the earlier of (i) November 15, 2019 and (ii) the date on which any of the Debtors files any material motion with respect to the Debtors' business operations without the prior written consent of the Required Lenders.

We currently expect that the Company's cash flows, cash on hand and any financing that we are able to obtain through the DIP Facility will be sufficient to fund our anticipated 2019 operating needs. However, there can be no assurance that the Company's cash flows, cash on hand and any financing we are able to obtain through the DIP Facility will be sufficient to continue to fund its operations or to allow the Company to continue as a going concern until a Chapter 11 plan of reorganization is confirmed by the Bankruptcy Court or an alternative restructuring transaction is approved by the Bankruptcy Court and consummated. In addition, if we are required under the Final DIP Order to pay the past due interest, and to continue making the semi-annual interest payments due, under the indenture for the 7.25% Senior Secured Notes during the Chapter 11 Cases, or we fail to negotiate additional extensions, deferrals, waivers or other similar arrangements to delay or otherwise reduce the activity required to maintain undeveloped leasehold positions as discussed above, then that requirement or failure to negotiate could further limit our flexibility in planning for, or reacting to, changes in our business and the oil and natural gas exploration and production industry and could have a material adverse effect on our business, financial condition or results of operations. We have incurred significant professional fees and other costs in connection with our evaluation of strategic alternatives and preparation for the Chapter 11 Cases and expect that we will continue to incur significant professional fees and costs throughout our Chapter 11 Cases. The Company's long-term liquidity requirements, the adequacy of its capital resources and its ability to continue as a going concern are difficult to predict at this time and ultimately cannot be determined until a Chapter 11 plan of reorganization has been confirmed, if at all, by the Bankruptcy Court. The Debtors are subject to such liquidity risks as well as the other risks and uncertainties associated with the Chapter 11 Cases as described in Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019.

We continuously evaluate our current and projected capital spending, operating activities and funding requirements, with consideration of realized commodity prices and the results of our operations and may make further adjustments to our capital expenditures and related financing plans as warranted.

**Cash Flows**

Our cash flows for the nine months ended September 30, 2019 and 2018 (in thousands) are as follows:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| **Cash Flow Data:** | | |
| Net cash provided by operating activities | $ 99,750 | $ 249,526 |
| Net cash used in investing activities | $ (110,217) | $ (453,822) |
| Net cash (used in) provided by financing activities | $ (7,608) | $ 388,534 |

***Net Cash Provided by Operating Activities.*** Net cash provided by operating activities was $99.8 million for the nine months ended September 30, 2019 compared to cash provided by operating activities of $249.5 million for the same period in 2018. This decrease was primarily related to lower revenues from lower production and lower realized prices.

One of the primary sources of variability in the Company's cash flows from operating activities is fluctuations in commodity prices, the impact of which the Company has historically partially mitigated by entering into commodity derivative contracts. Production volume changes also impact cash flow, costs related to operations and debt service.

***Net Cash Used in Investing Activities.*** Net cash flows used in investing activities totaled $110.2 million for the nine months ended September 30, 2019 compared to $453.8 million for the same period in 2018. Capital expenditures incurred for drilling and leasehold activities for the nine months ended September 30, 2019 totaled $61.2 million, and cash paid for capital expenditures was $114.7 million. The capital expenditures incurred are primarily associated with bringing 48 gross wells on-line during the first three quarters of 2019. The difference between expenditures incurred and paid during the period is due to timing of payments associated with higher activity levels during the fourth quarter 2018. We also received $5.2 million from the sale of certain other assets. During the nine months ended September 30, 2018, capital expenditures incurred for drilling and leasehold activities totaled $479.0 million and cash paid for capital expenditures was $452.3 million. The capital expenditures incurred are primarily associated with bringing 172 gross wells on-line. In addition, we received $2.8 million related to the post-closing adjustments for the Comanche Acquisition during the nine months ended September 30, 2018.

***Net Cash Used in or Provided by Financing Activities.*** Net cash flows used in financing activities totaled $7.6 million for the nine months ended September 30, 2019 compared net cash flows provided by financing activities of $388.5 million for the same period in 2018. During the nine months ended September 30, 2019, we had borrowings of $50.0 million under our DIP Facility and $7.9 million under our Credit Facility. Additionally, we made payments of $18.3 million on the SN UnSub Credit Agreement and our other debt agreements and made payments of $37.5 million for distributions to holders of the SN UnSub Preferred Units. During the nine months ended September 30, 2018, we issued $500 million in 7.25% Senior Secured Notes (before discounts of $5.1 million) and had incremental borrowings of $45 million. Additionally, we made repayments on our prior credit facility of $95 million and payments on the SN UnSub Credit Agreement of $8.0 million. We also made payments of $22.4 million for distributions to holders of the SN UnSub Preferred Units and paid dividends on our Series A and B Preferred Stock of $12.0 million.

**Off-Balance Sheet Arrangements**

As of September 30, 2019, we did not have any off-balance sheet arrangements.

**Commitments and Contractual Obligations**

Refer to "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

There have been no material changes in our contractual obligations during the nine months ended September 30, 2019, other than those disclosed in "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies."

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to a variety of market risks, including the effects of adverse changes in commodity prices and, potentially, interest rates as described below.

The primary objective of the following information is to provide quantitative and qualitative information about our potential exposure to market risks. The disclosures are not meant to be precise indicators of expected future losses, but rather indicators of reasonably possible losses. All of our market risk sensitive instruments were entered into for purposes other than speculative trading.

**Commodity Price Risk**

Our primary market risk exposure relates to the prices we receive for our oil, natural gas and NGL production. The prices we ultimately realize for our oil, natural gas and NGLs are based on a number of variables, including prevailing index prices attributable to our production and certain differentials to those index prices. Pricing for oil, natural gas and NGLs is volatile and unpredictable, and this volatility is expected to continue in the future. In addition, the prices we receive for our oil, natural gas and NGLs depend on many factors outside of our control, such as the supply and demand for oil, natural gas and NGLs, the relative strength of the global economy, the actions of OPEC and international sanctions against countries such as Iran and Venezuela.

To reduce the impact on the Company's business and results of operations from fluctuations in the prices we receive for oil, natural gas and NGLs, and to protect the economics of property acquisitions at the time of execution, the Company periodically enters into derivative contracts with respect to a portion of its projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These transactions may include fixed price swaps (whereby, on the settlement date, the Company will receive or pay an amount based on the difference between a pre-determined fixed price and a variable market price for a notional quantity of production), put options (whereby the Company pays a cash premium in order to establish a fixed floor price for a notional quantity of production and, on the settlement date, receives the excess, if any, of the fixed price floor over a variable market price), and costless collars (whereby, on the settlement date, the Company receives the excess, if any, of a variable market price over a fixed floor price, up to a fixed ceiling price for a notional quantity of production). In addition, the Company periodically enters into call swaptions as a way to achieve greater downside price protection than offered under prevailing fixed price swaps by agreeing to increase the notional quantity hedged or extend the notional quantity settlement period under a fixed price swap at the counterparty's election on a designated date. The market for NGL hedging has historically been constrained in terms of price, tenor, liquidity and availability of counterparties. The Company does not currently have any NGL hedges in place. We continue to assess our exposure to NGL price volatility and the NGL hedging market in general and may seek to enter into derivatives in the future on a portion of our projected NGL production. In addition, from time to time, the Company may evaluate strategies to unwind, terminate, cancel, restructure or otherwise modify its existing commodity derivatives, as applicable, in connection with the ongoing assessment of its general risk profile, including projected future production levels, covenant and other compliance requirements, its overall financial position and other considerations.

These hedging activities, which, as of September 30, 2019 are regulated by, as applicable, the terms of the DIP Facility, the Credit Agreement, the SN UnSub Credit Agreement and SN UnSub's organizational documents, are intended to manage exposure to oil and natural gas price fluctuations. It is our policy to enter into derivative contracts only with counterparties that are creditworthy and competitive market participants. As of September 30, 2019, any derivatives that are, as applicable, with (a) lenders, or affiliates of lenders, to the SN UnSub Credit Agreement or (b) counterparties designated as secured under the DIP Facility or Credit Agreement are, in each case, collateralized by the assets securing the applicable facility, and, therefore, did not as of September 30, 2019 require the posting of cash collateral. As of September 30, 2019, any derivatives that are, as applicable, with (x) non-lenders (or non-lender affiliates) under the SN UnSub Credit Agreement or (y) counterparties that are not designated as secured under the DIP Facility and Credit Agreement are, in each case, unsecured and do not require the posting of cash or other collateral. It is never the Company's intention to enter into derivative contracts for speculative trading purposes. Please refer to Note 8, "Derivative Instruments" for a description of all of our derivatives covering anticipated future production as of September 30, 2019.

The prices at which we enter into commodity derivative contracts covering our production in the future will be dependent upon conditions in the commodity and financial markets at the time we enter into these transactions, which may result in higher or lower hedge prices for oil, natural gas and NGLs under these contracts, if any, as compared to the hedge prices under our current contracts. Accordingly, our hedging strategy may not protect us from significant or sustained declines in the prices of oil, natural gas and NGLs for future production. Conversely, our hedging strategy may limit our ability to realize incremental cash flows from commodity price increases during periods for which we have hedged our production. As such, our hedging strategy may not prove effective in adequately protecting us from changes in the prices of oil, natural gas and NGLs that could have a significant adverse effect on our liquidity, business, financial condition and results of operations.

At September 30, 2019, the fair value of our commodity derivative contracts was a net asset of approximately $9.1 million. A 10% increase or decrease in the oil and natural gas index prices above the September 30, 2019 prices

would result in a decrease or increase, respectively, in the fair value of our commodity derivative contracts of $15.1 million. On a consolidated basis as of September 30, 2019, the Company has hedged approximately 580,000 Bbls of its remaining 2019 oil production and 3,362,000 MMBtu of its remaining 2019 natural gas production. As of September 30, 2019, SN UnSub's production represents approximately 68% of the hedged oil volumes and approximately 73% of the hedged natural gas volumes.

The filing of Bankruptcy Petitions described above constituted an event of default that generally allows counterparties to certain of the Company's derivative contracts (excluding the counterparties to SN UnSub's derivative contracts) to unilaterally terminate contracts to their scheduled settlement date(s) and pursue remedies, which are not subject to the automatic stay. In August 2019, as a result of the Chapter 11 Cases, one of our counterparties terminated its derivative contracts with the Company (excluding SN UnSub's derivative contracts), resulting in a net payable of approximately $1.1 million due to the counterparty.

Following the filing of the Bankruptcy Petitions, our ability to enter into derivatives is limited. For further information, see "Part II, Item 1A. Risk Factors—We have significant exposure to fluctuations in commodity prices since only a portion of our estimated future production is covered by commodity derivatives and we may not be able to enter into commodity derivatives covering our estimated future production on favorable terms or at all" included in our Form 10-Q for the quarter ended June 30, 2019.

**Credit Risk**

Our credit risk relates primarily to trade receivables and financial derivative instruments. Credit exposure for each customer is monitored for outstanding balances and current activity. For derivatives entered into as part of our hedging program, we are subject to counterparty credit risk to the extent the counterparty is unable to meet its settlement commitments. We may also be exposed to credit risk due to the concentration of our customers in the energy industry, as our customers may be similarly affected by prolonged changes in economic and industry conditions, or by the sale of our oil and natural gas production to a limited number of purchasers.

We actively manage this credit risk by selecting counterparties that we believe to be highly creditworthy and continuing to monitor their financial position. Concentration of credit risk is regularly reviewed to ensure that counterparty credit risk is adequately diversified.

As of September 30, 2019, the substantial majority of our credit exposure was with investment grade counterparties. We believe exposure to losses related to credit risk at September 30, 2019 was not material, which is consistent with all periods presented.

**Interest Rate Risk**

As of September 30, 2019, we had $50.0 million outstanding under the DIP Facility, $7.9 million outstanding under the Credit Agreement, $150.0 million outstanding under the SN UnSub Credit Agreement and $22.9 million outstanding under the SR Credit Agreement, all of which carry variable interest rates. The DIP Facility, with respect to the New Money DIP Loans, bears interest at a variable rate, and the Roll-Up Loans, if and when approved, will bear interest at a fixed rate. Our Senior Notes bear interest at fixed interest rates. As of September 30, 2019, a one percent change in the interest rates on the SN UnSub Credit Agreement would result in an approximately $1.5 million change in annual interest expense, and a one percent change in the interest rates on the SR Credit Agreement or DIP Facility would be insignificant. Further, as of the Petition Date, we discontinued recording interest expense on all debt instruments classified as liabilities subject to compromise. We believe our exposure to interest-related losses at September 30, 2019 was not material.

We currently do not have any interest rate derivative contracts in place. We continue to assess our exposure to fluctuating interest rates and may seek to enter into interest rate derivatives in the future on a portion of our variable rate indebtedness.

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report pursuant to Rule 13a-15 promulgated pursuant to the Securities Exchange Act of 1934, as amended (the “Exchange Act”). Based upon that evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that material information required to be disclosed by us in reports that we file or submit under the Exchange Act is appropriately recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that information required to be disclosed by us in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls**

There was no change in our internal control over financial reporting during the three months ended September 30, 2019 that materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. The adoption of ASC 842, Leases, required the implementation of new controls and the modification of certain accounting processes. The impact of these changes was not material to the Company’s internal control over financial reporting.

**PART II—OTHER INFORMATION**

**Item 1. Legal Proceedings**

For a description of our material pending legal proceedings as of September 30, 2019, please refer to (i) “Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 17. Commitments and Contingencies.” and (ii) the “Business Overview” of “Part I, Item 2. Management’s Discussion and Analysis of Financial Condition and Results of Operations.”

The filing of the Bankruptcy Petitions automatically stayed certain actions against the Company, including actions to collect prepetition liabilities or to exercise control over the property of the Company’s bankruptcy estates. The Company sought and obtained authorization from the Bankruptcy Court to pay certain prepetition claims. The Company is paying all of its postpetition obligations in the ordinary course of business notwithstanding the filing of the Bankruptcy Petitions. If a Chapter 11 plan of reorganization is confirmed, it will provide for the treatment of claims against the Company’s bankruptcy estates, including prepetition liabilities that have not otherwise been satisfied or addressed during the Chapter 11 Cases. There can be no assurance at this time that the Debtors will be able to successfully develop, confirm and consummate a plan of reorganization or other alternative restructuring transactions

that satisfies the conditions of the Bankruptcy Code and is confirmed by the Bankruptcy Court, or that any such plan or transactions will be implemented successfully.

**Item 1A. Risk Factors**

Carefully consider the risk factors under the caption "Risk Factors" under Part I, Item 1A in our 2018 Annual Report and under Part II, Item 1A in our Form 10-Q for the quarter ended June 30, 2019, together with all of the other information included in this Quarterly Report on Form 10-Q and in our other public filings, press releases, and public discussions with our management. Additional risks and uncertainties not currently known to us or that we currently deem immaterial may materially adversely affect our business, financial condition or results of operations.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

*Unregistered Sales of Equity Securities*

None.

*Repurchase of Equity Securities*

| Period | Total number of shares withheld[1] | Average Price per share | Total number of shares repurchased as part of publicly announced plans | Maximum number of shares that may yet be repurchased under the plan |
|---|---|---|---|---|
| July 1, 2019 - July 31, 2019 | 1,362 | $ 0.11 | — | — |
| August 1, 2019 - August 31, 2019 | 10,480 | $ 0.08 | — | — |
| September 1, 2019 - September 30, 2019 | 1,227 | $ 0.02 | — | — |
| Total | 13,069 | $ 0.08 | — | — |

(1) Represents shares that were purchased by the Company to satisfy employee tax withholding obligations that arose upon the vesting of restricted stock awards

**Item 3. Defaults Upon Senior Securities**

See "Part I, Item 1. Notes to the Condensed Consolidated Financial Statements—Note 3. Chapter 11 Cases— Covenant Violations" which is incorporated in this item by reference.

The annual dividend on each share of our Series A Preferred Stock is 4.875% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series A Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series A Preferred Stock as of the date of filing of this report is approximately $1.4 million.

The annual dividend on each share of our Series B Preferred Stock is 6.500% on the liquidation preference of $50.00 per share and is payable quarterly, in arrears, on each January 1, April 1, July 1 and October 1, when, as and if declared by the Board. Subject to certain conditions, the Company may, at its option pay dividends in cash and, subject to certain additional conditions, common stock or any combination thereof. Dividends are cumulative. Beginning during the three month period ending March 31, 2019, the Board determined to suspend the dividend on our Series B Preferred Stock. Dividends accumulated through the date of filing this report have been accrued. The amount and total arrearage on the Series B Preferred Stock as of the date of filing of this report is approximately $7.4 million.

Pursuant to the terms of the DIP Facility, the Company may not pay any dividends on, make any distribution or payment on account of, redeem or acquire any shares of Series A Preferred Stock, Series B Preferred Stock or common stock.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

**EXHIBIT INDEX**

| | | |
|---|---|---|
| 3.1 | | Restated Certificate of Incorporation of Sanchez Energy Corporation, effective as of May 28, 2013 (filed as Exhibit 3.2 to the Company's Quarterly Report on Form 10-Q on November 8, 2013 (File No. 001-35372) and incorporated herein by reference). |
| 3.2 | | Certificate of Designations of Series C Junior Participating Preferred Stock of Sanchez Energy Corporation (filed as Exhibit 3.1 to the Company's Current Report on Form 8-K on July 29, 2015 (File No. 001-35372) and incorporated herein by reference). |
| 3.3 | | Amended and Restated Bylaws, dated as of December 13, 2011 (filed as Exhibit 3.2 to the Company's Current Report on Form 8-K on December 19, 2011 (File No. 001-35372) and incorporated herein by reference). |
| 10.1(a) | | Senior Secured Debtor-in-Possession Term Loan Credit Agreement dated as of August 16, 2019, among Sanchez Energy Corporation, a debtor and debtor-in-possession under Chapter 11 of Bankruptcy Code, as borrower, the several lenders from time to time parities thereto, and Wilmington Savings Fund Society, FSB as administrative Agent and collateral agent. |
| 10.2(a) | | Tolling Agreement dated August 10. 2019, by and among SN UR Holdings, LLC, SN EF UnSub Holdings, LLC, SN EF Maverick, LLC, Sanchez Energy Corporation, GSO ST Holdings Associates LLC, and GSO ST Holdings LP. |
| 10.3(a) | | First Amendment to Senor Secured Debtor-in-Possession Term Loan Credit Agreement dated September 24, 2019, by and among Sanchez Energy Corporation, the required lenders party thereto, and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent. |
| 31.1(a) | | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.2(a) | | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |
| 32.1(b) | | Sarbanes-Oxley Section 906 certification of Principal Executive Officer. |
| 32.2(b) | | Sarbanes-Oxley Section 906 certification of Principal Financial Officer. |
| 101.INS(a) | — | XBRL Instance Document. |
| 101.SCH(a) | — | XBRL Taxonomy Extension Schema Document. |
| 101.CAL(a) | — | XBRL Taxonomy Extension Calculation Linkbase Document. |
| 101.DEF(a) | — | XBRL Taxonomy Extension Definition Linkbase Document. |
| 101.LAB(a) | — | XBRL Taxonomy Extension Labels Linkbase Document. |
| 101.PRE(a) | — | XBRL Taxonomy Extension Presentation Linkbase Document |

(a) Filed herewith.

(b) Furnished herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on November 8, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ Kirsten A. Hink
Kirsten A. Hink
*Senior Vice President and Chief Accounting Officer*
(Duly Authorized Officer)

By: /s/ Cameron W. George
Cameron W. George
*Executive Vice President and Chief Financial Officer*
(Principal Financial Officer)

# Exhibit C

10-K/A 1 a19-9024_110ka.htm 10-K/A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 10-K/A

**(Amendment No. 1)**

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number: 1-35372**

## Sanchez Energy Corporation

(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **45-3090102**<br>(I.R.S. Employer Identification No.) |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>(Address of principal executive offices) | **77002**<br>(Zip Code) |

Registrant's telephone number, including area code **(713) 783-8000**

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, par value $0.01 per share | New York Stock Exchange |
| Rights to purchase Series C Junior Participating Preferred Stock, par value $0.01 per share | New York Stock Exchange |

Securities Registered Pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☒ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

Aggregate market value of the voting and non-voting common equity held by non-affiliates of Registrant as of June 30, 2018: $284,800,499

Number of shares of Registrant's common stock outstanding as of February 26, 2019: 95,866,121.

**Documents Incorporated By Reference:**

None.

Table of Contents

**Explanatory Note**

This Amendment No. 1 to Form 10-K (this "***Amendment***") amends the Annual Report on Form 10-K for the fiscal year ended December 31, 2018 originally filed on March 1, 2019 (the "***Original Filing***") by Sanchez Energy Corporation, a Delaware corporation ("***Sanchez Energy***," the "***Company***," "***we***," "***our***," "***us***" or similar terms). We are filing this Amendment to present the information required by Part III of Form 10-K as we do not believe our definitive proxy statement will be filed within 120 days of the end of our fiscal year ended December 31, 2018.

In addition, as required by Rule 12b-15 under the Securities Exchange Act of 1934, as amended, new certifications by our principal executive officer and principal financial officer are filed as exhibits to this Amendment under Item 15 of Part IV hereof.

Except as described above, no other changes have been made to the Original Filing. The Original Filing continues to speak as of the date of the Original Filing, and we have not updated the disclosures contained therein to reflect any events which occurred at a date subsequent to the filing of the Original Filing.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | **PART III** | |
| **Item 10.** | Directors, Executive Officers and Corporate Governance | 1 |
| **Item 11.** | Executive Compensation | 5 |
| **Item 12.** | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 26 |
| **Item 13.** | Certain Relationships and Related Transactions, and Director Independence | 27 |
| **Item 14.** | Principal Accountant Fees and Services | 31 |
| | **PART IV** | |
| **Item 15.** | Exhibits, Financial Statement Schedules | 32 |
| **Signatures** | | 33 |


In Sanchez Energy's filings with the Securities and Exchange Commission ("***SEC***"), information is sometimes "incorporated by reference." This means that we refer you to information previously filed with the SEC that should be considered as part of the particular filing. As provided under SEC regulations, the "Compensation Committee Report" contained in this Amendment specifically is not incorporated by reference into any other filings with the SEC and shall not be deemed to be "filed" with the SEC. In addition, this Amendment includes several website addresses. Those website addresses are intended to provide inactive, textual references only. The information on those websites is not part of this Amendment.

Table of Contents

## PART III

**Item 10. *Directors, Executive Officers and Corporate Governance***

**Directors and Executive Officers**

As of the filing of this Amendment with the SEC, the Board of Directors of the Company (the "***Board***") and the executive officers of the Company are:

| Name | Age | Position |
|---|---|---|
| A. R. Sanchez, Jr. | 76 | Executive Chairman of the Board |
| Antonio R. Sanchez, III | 45 | President and Chief Executive Officer and Director |
| T. Brian Carney(1)(2)(3) | 53 | Director |
| M. Gregory Colvin | 59 | Director |
| Eugene I. Davis(4) | 64 | Director |
| Gilbert A. Garcia(1)(2)(3) | 55 | Director |
| Alan G. Jackson(1) | 75 | Director |
| Sean M. Maher(1)(2)(3) | 45 | Director |
| Robert V. Nelson, III(1)(2)(3) | 43 | Director |
| Adam C. Zylman(4) | 44 | Director |
| Patricio D. Sanchez | 38 | Executive Vice President |
| Cameron W. George | 38 | Executive Vice President and Chief Financial Officer |
| Gregory B. Kopel | 47 | Executive Vice President, General Counsel and Secretary |
| Kirsten A. Hink | 52 | Senior Vice President and Chief Accounting Officer |

(1) Member of the Nominating and Corporate Governance Committee.
(2) Member of the Audit Committee.
(3) Member of the Compensation Committee.
(4) Member of the Special Committee (as defined below).

The Board currently consists of ten members. The directors are divided into three classes serving staggered three-year terms. Messrs. Garcia, Maher and Nelson are designated as Class I directors, and their terms of office expire on the date of the Company's next annual meeting of stockholders. Messrs. Carney, Colvin and Jackson are designated as Class II directors, and their terms of office expire on the date of the Company's 2020 annual meeting of stockholders. Messrs. Sanchez, Jr., Sanchez, III, Davis and Zylman are designated as Class III directors, and their terms of office expire on the date of the Company's 2021 annual meeting of stockholders.

Set forth below is biographical information about each of the Company's directors and executive officers as of the filing of this Amendment as well as the primary individual experience, qualifications, attributes and skills of each of our directors that led to the Nominating and Corporate Governance Committee's and Board's conclusion that such director should serve as a member of the Board.

***A. R. Sanchez, Jr.*** has served as our Executive Chairman of the Board since November 2012. Mr. Sanchez, Jr. is the co-founder, Chief Executive Officer and Chairman of the Board of Directors of Sanchez Oil & Gas Corporation ("***SOG***"), a privately owned full service oil and natural gas operating company founded in 1972 engaged in the exploration and development of oil and natural gas assets primarily in South Texas, Louisiana and the onshore Gulf Coast areas on behalf of certain of its affiliates. SOG is an affiliate of the Company. Mr. Sanchez, Jr. received his Bachelor of Arts and Doctor of Jurisprudence degrees from St. Mary's University in San Antonio, Texas. Mr. Sanchez, Jr. currently serves as president and director for the A. R. "Tony" and Maria J. Sanchez Family Foundation. He is also a director and stockholder of International Bancshares Corporation (NASDAQ: IBOC) ("***International Bancshares***"), a member of the Board of Visitors and Membership/Board Development Task Force at the University of Texas MD Anderson Cancer Center, a member of the Board of Advisors at Rice University's Baker Institute and a member of the Board of Trustees at Baylor College of Medicine. Because Mr. Sanchez, Jr. has over 46 years of experience in the oil and natural gas industry as well as a comprehensive understanding of oil and natural gas operations, we believe that Mr. Sanchez, Jr. is qualified to

serve as a director of the Company. Mr. Sanchez, Jr. is the father of Mr. Sanchez, III, our President and Chief Executive Officer and member of the Board and Mr. P. Sanchez, our Executive Vice President.

***Antonio R. Sanchez, III*** has served as our President and Chief Executive Officer since October 2018, and prior to that as our Chief Executive Officer since our formation in August 2011 and has been directly involved in the oil and natural gas industry for over 18 years. Mr. Sanchez, III served as our Chairman of the Board from August 2011 to November 2012 and continues to be a member of our Board. Mr. Sanchez, III served as our President from August 2011 until October 2015. Mr. Sanchez, III is also co-president of SOG, which he joined in October 2001. In his capacity as an officer of SOG, Mr. Sanchez, III manages all aspects of its daily operations, including exploration, production, engineering and land management. In addition, Mr. Sanchez, III is a member of the board of directors of Sanchez Midstream Partners GP LLC ("***SNMP GP***"), the general partner of Sanchez Midstream Partners LP (NYSE: SNMP) ("***SNMP***"). From 1999 to 2001, Mr. Sanchez, III worked in a variety of positions, including sales and marketing, product development and investor relations, at Zix Corporation (NASDAQ: ZIXI), a publicly traded encryption technology company listed on the Nasdaq Global Market. Mr. Sanchez, III was a member of the board of directors of Zix Corporation from May 2003 until June 2014. From 1997 to 1999, Mr. Sanchez, III was an investment banker specializing in mergers and acquisitions with J.P. Morgan Securities Inc. He earned a Bachelor of Business Administration degree from Georgetown University with a concentration in accounting and finance and a minor in economics and a Master of Business Administration degree from Harvard Business School. Mr. Sanchez, III has significant experience managing oil and natural gas operations and serving as a member of the board of directors of a publicly traded company as well as extensive knowledge of the energy industry. For these reasons, we believe that Mr. Sanchez, III is qualified to serve as a director of the Company. Mr. Sanchez, III is the son of Mr. Sanchez, Jr., our Executive Chairman of the Board, and the brother of Mr. P. Sanchez, our Executive Vice President.

***T. Brian Carney*** has served as our director since May 2015 and is a member of our Nominating and Corporate Governance Committee, our Compensation Committee and our Audit Committee. Mr. Carney is an attorney from Midland, Texas, where he has practiced law at the Law Office of Brian Carney since 1992. His practice focuses on litigation in both state and federal courts. Mr. Carney graduated from the University of Oklahoma with a Bachelor of Business Administration in Finance, and he received his Doctor of Jurisprudence from Oklahoma City University in 1991. We believe that Mr. Carney is well-qualified to serve as a member of our Board due to his legal background and experience.

***M. Gregory Colvin*** has served as our director since March 2012. Since April 2018, Mr. Colvin has also served as a director of Pure Acquisition Corp (NASDAQ: PACQ). Mr. Colvin was the Managing Partner, Chief Operating Officer and Head of Investor Relations of Sankofa Capital, an investment management firm, which he co-founded, from December 2011 to December 2016. From 2007 until he joined Sankofa Capital, Mr. Colvin was a licensed broker originating and raising capital for private equity and hedge fund clients. From 1997 to 2006, Mr. Colvin was a Managing Director of the Private Funds Group at Donaldson, Lufkin & Jenrette Securities Corp. and Credit Suisse LLC. Mr. Colvin started his professional career with Stephens Inc. specializing in placing primary and secondary fixed income products to institutional investors. From January 1, 2017 through the present, Mr. Colvin has managed his personal investments. Mr. Colvin received his Bachelor of Science in Business Administration degree from the University of Arkansas. Mr. Colvin currently serves on the advisory board of the Sam M. Walton College of Business at the University of Arkansas. We believe that Mr. Colvin is well-qualified to serve as a member of our Board. In addition to his extensive experience in leadership positions at large financial institutions, Mr. Colvin has a substantive understanding of the upstream oil and natural gas industry and a financial background that gives him the ability to understand and analyze our business and our opportunities.

***Eugene I. Davis*** has served as our director since October 2018 and Chairman of our Special Committee. Mr. Davis is the Chairman and Chief Executive Officer of PIRINATE Consulting Group, LLC, a private consulting firm specializing in turnaround management, merger and acquisition consulting, hostile and friendly takeovers, proxy contests and strategic planning, which Mr. David founded in 1997. Since forming PIRINATE, Mr. David has advised, managed, sold, liquidated and served as chief executive officer, chief restructuring officer, chairman or committee chairman of a number of businesses operating in diverse sectors. Before forming PIRINATE, Mr. Davis served as President, Vice Chairman and a director of Emerson Radio Corporation from 1990 to 1997. He also served as Chief Executive Officer and Vice Chairman of Sport Supply Group, Inc., a direct-mail marketer of sports equipment, from 1996 to 1997. Mr. Davis began his career in 1980 as an attorney and international negotiator with Exxon Corporation and Standard Oil Company (Indiana) and was in private practice from 1984 to 1992. Mr. Davis currently serves as a director of the following public companies: Seadrill Limited (NYSE: SDRL), Montage Resources Corporation (NYSE: MR) and Verso Corporation (NYSE: VRS), where he serves as Co-Chairman. In addition, Mr. Davis served on the board of directors of VICI Properties Inc. (NYSE: VICI) until April 2019 but has decided not to stand for re-election. Mr. Davis holds a bachelor's degree from Columbia College, a Master of International Affairs degree in international law and organization from the School of International Affairs of Columbia University, and a Juris Doctorate from Columbia University School of Law. We believe Mr. Davis is well-qualified to serve as a member of our Board due to his professional experiences, which have provided Mr. Davis with significant knowledge about strategic planning, mergers and acquisitions, finance, accounting, capital structure and board practices. In addition, Mr. Davis has served as a director of numerous public and private companies providing him with a wide range of experiences on which he can draw while serving as a director.

***Gilbert A. Garcia*** has served as our director since December 2011 and is a Co-Chair of our Audit Committee, Chairman of our Compensation Committee and a member of our Nominating and Corporate Governance Committee. Mr. Garcia is the Managing

Table of Contents

Partner of Garcia Hamilton & Associates, L.P., an institutional asset management firm, which he joined in 2002 and where he supervises all facets of the firm's investment decisions. Prior to joining Garcia Hamilton & Associates, L.P., Mr. Garcia worked at two other institutional asset management firms, Smith Graham & Company, where Mr. Garcia was most recently the Chief Investment Officer, and Cisneros Asset Management, where he was most recently President. Mr. Garcia started his professional career with Salomon Brothers specializing in mortgage-backed securities. Mr. Garcia received his Bachelor of Arts degree in Economics from Yale University. We believe that Mr. Garcia is well-qualified to serve as a member of our Board. In addition to his professional experience, Mr. Garcia also has extensive experience serving in leadership positions of community organizations, including as the Chairman of the Metropolitan Transit Authority of Harris County, Texas. We believe that Mr. Garcia's executive experience, including through his service on community organizations, provides valuable financial and management experience that is critical to his ability to identify, understand and address the challenges and opportunities that we face as a public company.

***Alan G. Jackson*** has served as our director since November 2012 and is the Chairman of our Nominating and Corporate Governance Committee. Mr. Jackson is the Senior Commercial Producer at IBC Insurance Agency, Ltd. ("***IBC***"). Mr. Jackson is the former co-owner of Inscorp, Inc., a leading commercial insurance agent/brokerage in South Texas, which was acquired by IBC in 2009. Mr. Jackson received his Bachelor of Business Administration degree from Texas A&M University at Kingsville, Texas, and is a graduate of the University of Texas, McCombs School of Business' Management Development Program. We believe that Mr. Jackson is well-qualified to serve as a member of our Board because of his experience working with many land and mineral owners and their representative brokers, bankers and attorneys and with many oil and natural gas operators, non-operators, investors, service companies and logistics carriers in the energy industry throughout South Texas, including the Eagle Ford Shale.

***Sean M. Maher*** has served as our director since November 2014 and is Co-Chair of our Audit Committee and a member of our Compensation Committee and our Nominating and Corporate Governance Committee. Mr. Maher is the Senior Portfolio Manager of RCH Energy, an investment management firm, which he joined in June 2008. From 2006 until joining RCH Energy, Mr. Maher was an Executive Director at Morgan Stanley and the Head of Master Limited Partnership and Integrated Natural Gas Research. From 2001 to 2006, Mr. Maher was a member of the Integrated Oils and Independent Refining Equity Research team for Morgan Stanley. From 1999 to 2001, Mr. Maher was an analyst in the Energy Investment Banking team at Morgan Stanley. Mr. Maher began his career at Morgan Stanley in 1997 within the Financial Reporting and Controllers Group that covered the Investment Banking business, including Mergers and Acquisitions, Equity Capital Markets, Debt Capital Markets and Private Equity. Mr. Maher received both his Bachelor of Business Administration in Finance and his Master of Business Administration in Finance and Accounting degrees from Saint Bonaventure University. We believe that Mr. Maher is well-qualified to serve as a member of our Board due to his extensive financial and energy experience.

***Robert V. Nelson, III*** has served as director since August 2016 and is a member of our Compensation Committee, our Nominating and Corporate Governance Committee, and our Audit Committee. Until April 2019, Mr. Nelson served as the President of Waste Disposal Services for NRC Group Holdings Corp. (NYSE: NRCG) ("***NRCG***"), an NYSE American listed provider of environmental, compliance and waste management services, following the business combination and sale of National Response Corporation ("***NRC***") and Sprint Energy Services ("***Sprint***") in October 2018. Prior to this, Mr. Nelson served as the President and Chief Executive Officer of Sprint from July 2017 until its merger with NRC and as the Chief Operating Officer of Sprint from September 2016 to July 2017. Mr. Nelson currently manages his personal investments. From February 2016 through August 2016, Mr. Nelson managed personal investments. Prior to this, after the sale of Nabors Completion & Production Services, Mr. Nelson was most recently with C&J Energy Services Ltd. (NYSE: CJES) ("***C&J***") from March 2015 to January 2016, where he was Vice President of Corporate Operational Development. Prior to joining C&J, Mr. Nelson served in positions of increasing responsibility with Nabors Industries Ltd. (NYSE: NBR) ("***Nabors***") and its subsidiaries from 2006 to March 2015. He began in Corporate Development followed by assignments in Treasury, Nabors Drilling USA, and finally in Nabors Well Services as Vice President and General Manager of the South Texas Region for Nabors Completion and Production Services. Mr. Nelson worked for UBS before beginning his career at Nabors. He holds a Bachelor of Arts degree from the University of Texas at Austin and a Master of Business Administration degree from Rice University's Jones Graduate School of Business. We believe that Mr. Nelson is well-qualified to serve as a member of our Board due to his extensive experience that spans all areas of oil and natural gas exploration, drilling and production, including with respect to operations in the Eagle Ford Shale, our core area of focus. We also believe Mr. Nelson's unique service sector insight and perspective will greatly benefit the Board and management as we work to continuously improve operations and develop our plans for the future.

***Adam C. Zylman*** has served as our director since October 2018 and is a member of our Special Committee. Mr. Zylman is the President and Chief Executive Officer of Sunland Capital LLC, a privately-owned holding company that invests in energy, industrial and infrastructure service companies, which Mr. Zylman co-founded in 2009. During his career, Mr. Zylman has been involved in dozens of new platform company recapitalizations and add-on acquisition transactions as well as the successful sale or initial public offering of several companies. Prior to co-founding Sunland Capital, Mr. Zylman spent more than a decade in private equity and investment banking at SCF Partners and Merrill Lynch's Global Energy & Power Group, respectively. Mr. Zylman graduated summa cum laude with a Bachelor of Arts in Economics and Managerial Studies from Rice University and is a member of the Houston Chapter of the Young Presidents'

Table of Contents

Organization. We believe Mr. Zylman is well-qualified to serve as a member of our Board due to his extensive experience in recapitalizations, private equity investments and investment banking.

***Patricio D. Sanchez*** has served as our Executive Vice President since November 2016. Mr. P. Sanchez also serves as President & Chief Operating Officer and a director of SNMP GP, which positions he has held since March 2017 and June 2015, respectively. Mr. P. Sanchez served as Chief Operating Officer of Sanchez Production Partners GP, LLC from May 2015 through March 2017, when he was appointed President & Chief Operating Officer. Mr. P. Sanchez has served as co-president of SOG since June 2014 and served as Executive Vice President prior to that from April 2010 to June 2014. Mr. P. Sanchez has also been the managing member of Santerra Holdings, LLC, an oil and natural gas production company, since February 2012. Mr. P. Sanchez holds a Bachelor of Arts from Bentley College and a Masters in Energy and Mineral Resources from the University of Texas at Austin. Mr. P. Sanchez is the brother of Mr. Sanchez, III, the Company's President and Chief Executive Officer and member of the Board, and the son of Mr. Sanchez, Jr., the Executive Chairman of the Board.

***Cameron W. George*** has served as our Executive Vice President and Chief Financial Officer since March 2019. In this role, he oversees the Company's finance, accounting, treasury, investor relations, corporate reserves and business development activities. Previously he served as our Interim Chief Financial Officer from October 2018 until his current appointment, and as Senior Vice President — Capital Markets of SOG since May 2016. Mr. George has more than 15 years of industry and investment banking experience. Prior to joining SOG, he served in positions of increasing responsibility at Linn Energy, LLC (NASDAQ: LINE) from August 2005 to May 2016, most recently as the Director of Finance, and was an investment banker in the energy group at RBC Capital Markets. Mr. George graduated summa cum laude with business honors and received a Bachelor of Business Administration from Southern Methodist University.

***Gregory B. Kopel*** has served as our Executive Vice President, General Counsel and Secretary since March 2019 and prior to that he served as our Senior Vice President, General Counsel and Secretary from December 2015 to March 2018. Prior to joining the Company, Mr. Kopel focused on energy transactions, with an emphasis on mergers and acquisitions and joint ventures as Vice President and Associate General Counsel at Breitburn Energy Partners LP (NASDAQ: BBEP) from April 2013 to December 2015 and in corporate legal positions at Linn Energy LLC from June 2010 to April 2013 and Occidental Petroleum Corporation from December 2005 to June 2010. Mr. Kopel began his legal career working at two international law firms. Mr. Kopel earned a B.A. in Government at the University of Texas at Austin, and a J.D. at the University of Houston.

***Kirsten A. Hink*** has served as our Senior Vice President and Chief Accounting Officer since January 2015, and previously served as our Vice President and Principal Accounting Officer since March 2012. Prior to joining us, Ms. Hink served as the Controller of Vanguard Natural Resources, LLC (NASDAQ: VNR) from January 2011 to February 2012, where she oversaw the company's financial reporting and accounting. From January 2010 to December 2010, she served as Assistant Controller of Mariner Energy, Inc., where she managed the revenue and production reporting as well as assisted with financial and bankruptcy reporting for the Edge Petroleum Corporation properties that were acquired by Mariner. She served as the Chief Accounting Officer for Edge from July 2008 through December 2009 and the Vice President and Controller for Edge from October 2003 through July 2008, where she oversaw the preparation of Edge's financial statements. Prior to that time she served as Controller of Edge from December 2000 to October 2003 and Assistant Controller of Edge from June 2000 to December 2000. Edge filed for Chapter 11 bankruptcy protection in October 2009. Before joining Edge, she served as Controller of Benz Energy Inc., an oil and natural gas exploration company, from June 1998 to June 2000. Ms. Hink received a Bachelor of Science in Accounting degree from Trinity University. Ms. Hink is a Certified Public Accountant in the State of Texas.

**Section 16(a) Beneficial Ownership Reporting Compliance**

The executive officers and directors of the Company and persons who beneficially own more than 10% of the Company's common stock are required to file reports with the SEC, disclosing the amount and nature of their beneficial ownership in common stock, as well as changes in that ownership. Based solely on its review of reports and written representations that the Company has received, the Company believes that all required reports were timely filed during 2018.

**Code of Business Conduct and Ethics**

The Board has adopted a Code of Business Conduct and Ethics applicable to our employees (including those employees of SOG that provide services to us), directors and officers, in accordance with the applicable rules of the SEC. Any waiver of this code may be made only by our Board. In accordance with the rules of the SEC, we will provide any person, without charge and upon request, with a copy of our Code of Business Conduct and Ethics. Requests should be directed to us at 1000 Main Street, Suite 3000, Houston, Texas 77002, Attention: Secretary. The Code of Business Conduct and Ethics is also available, and we will disclose any amendments to or waivers of the Code of Business Conduct and Ethics, on our website at www.sanchezenergycorp.com. The information on our website is not incorporated by reference into this Amendment.

**Audit Committee**

The Board has a separately-designated standing audit committee established in accordance with Section 3(a)(58)(A) of Securities Exchange Act of 1934 (the "***Exchange Act***"). Our Audit Committee currently consists of a total of four directors, Messrs. Garcia (Co-Chairperson), Maher (Co-Chairperson), Carney and Nelson, each of whom the Board has determined to be an "independent director" as defined by the New York Stock Exchange (the "***NYSE***") rules and Rule 10A-3 of the Exchange Act. The Board has determined that each member of the Audit Committee is "financially literate" as required by the NYSE rules. Additionally, the Board has determined that Mr. Garcia is an "Audit Committee Financial Expert" as defined by the Exchange Act. Stockholders should understand that this designation is a disclosure requirement of the SEC related to Mr. Garcia's experience and understanding with respect to certain accounting and auditing matters. The designation does not impose upon Mr. Garcia any duties, obligations or liability that are greater than those generally imposed on him as a member of the Audit Committee and the Board, and his designation as an Audit Committee Financial Expert pursuant to this SEC requirement does not affect the duties, obligations or liability of any other member of the Audit Committee or the Board.

**Item 11. *Executive Compensation***

**Compensation Discussion and Analysis**

***Introduction***

This Compensation Discussion & Analysis ("***CD&A***") explains our executive compensation program for our named executive officers listed below. This CD&A also describes the Compensation Committee's process for making such pay decisions, as well as its rationale for specific decisions related to fiscal 2018, and certain decisions made with respect to 2019 compensation matters. Except as expressly noted below, the CD&A relates to our 2018 compensation program, process and rationale.

| Named Executive Officer | Position |
|---|---|
| A. R. Sanchez, Jr. | Executive Chairman of the Board |
| Antonio R. Sanchez, III | President and Chief Executive Officer |
| Patricio D. Sanchez | Executive Vice President |
| Howard J. Thill | Former Executive Vice President and Chief Financial Officer(1) |
| Christopher D. Heinson | Former Senior Vice President and Chief Operating Officer(2) |
| Cameron W. George | Executive Vice President and Chief Financial Officer |
| Gregory B. Kopel | Executive Vice President, General Counsel and Secretary |

(1) Mr. Howard J. Thill resigned from the Company effective as of October 26, 2018.
(2) Mr. Christopher D. Heinson resigned from the Company effective as of July 9, 2018.

***Background on Our Organizational Structure***

Before reviewing our CD&A, it is important to understand our organizational structure and how it impacts our executive compensation program. Initially we note that management and the Board have the added benefit of Mr. Sanchez, Jr., the Company's full time Executive Chairman, who has a deep understanding of the cycles and challenges of the oil and natural gas industry from his over 46 years of experience in the industry. The close working relationship between the Executive Chairman and the President and Chief Executive Officer gives the Board and the Company's stockholders a strong leadership team that can address issues quickly and seamlessly. Second, all of our executive officers are employed by SOG and provide services both to us and other affiliates of SOG (SOG together with its affiliates (other than the Company), the "***Sanchez Group***") in their capacity as employees of SOG. Except as described below, our Compensation Committee determined and approved the base salary and annual bonus amounts for the services our named executive officers provided to us as well as equity awards granted under the Third Amended and Restated 2011 Long Term Incentive Plan (the "***Plan***") discussed in this CD&A. SOG pays all base salary and annual bonus amounts to our named executive officers and, pursuant to the services agreement between us and SOG, we reimburse SOG for the portion of compensation expenses (including base salary, benefits and annual bonuses) attributable to services provided to our business. We estimate that during 2018, our named executive officers other than Mr. P. Sanchez dedicated approximately 100% of their professional time to providing services to us. We estimate that during 2018, Mr. P. Sanchez dedicated approximately 43% of his professional time to providing services to us.

***Our Compensation Program and Philosophy for 2018***

We are committed to paying-for-performance and our executive compensation philosophy seeks to (i) motivate Sanchez Group employees to perform at the highest level consistent with our core values, (ii) reward those high performing employees and (iii) retain and attract top talent. More particularly, the cash and benefit portions of our executive compensation program were

Table of Contents

designed to attract and retain individuals with the background and skills necessary to successfully execute our business model in a demanding environment, and to reward success in reaching performance goals. Our equity award program sought to ensure that a substantial portion of each named executive officer's compensation was directly tied to our performance, which further aligns the interests of our named executive officers with those of our stockholders.

***Elements of 2018 Executive Compensation***

There are three primary elements of compensation that were used in our 2018 executive compensation program: (1) base salaries, (2) annual cash bonuses and (3) long-term equity incentive awards. Annual cash bonuses and equity incentive awards represent the at-risk elements of compensation intended to drive performance. They are also flexible in application and can be tailored to meet our objectives for the applicable year. Prior to 2018, we did not have any specific policies regarding the allocation of compensation between either long- or short-term compensation, or cash and non-cash compensation. In 2018, we adopted a compensation program that required 50% of our named executive officers' long-term equity awards to be directly linked to the achievement of specific performance goals. The determination of each named executive officer's cash bonus reflects his relative contribution to achieving or exceeding annual Company goals, while the overall long-term incentive award determination is based on his expected contribution in respect of long-term performance objectives.

| Element | Objective | Key Features |
|---|---|---|
| **Base Salaries (only fixed component)** | • Provide base compensation that is competitive for each position to reward and motivate individual performance | • Targeted to be in a competitive range compared to similarly situated executives at our peer companies<br>• Increased or decreased depending on responsibility, experience and skill of each executive and their respective position |
| **Annual Cash Bonuses (at risk, performance based)** | • Reward executives for the achievement of short-term Company objectives<br>• Fosters a results-driven pay-for-performance culture | • Variable compensation payable only in connection with achievement of strategic and financial goals<br>• Rewards individual contributions to Company success |
| **Long-Term Equity Incentive Awards (at risk, performance based)** | • Align executive interests with those of our stockholders<br>• Tie value of compensation to long-term share price performance<br>• Reinforce executive retention<br>• Provide share ownership opportunities | • The value of time-vested restricted stock and phantom stock granted increases or decreases as the value of our shares increases or decreases, incentivizing our executives to build long-term sustainable growth<br>• The value of performance-based awards is based on the level of achievement of the performance objective(s) during the performance period<br>• Multi-year vesting periods, which encourage long-term retention |

***Our 2018 Decision-Making Process***

The Compensation Committee has historically overseen the executive compensation program for our named executive officers and oversaw the compensation outlined in this Amendment, except as described in the following paragraph. The Compensation Committee is comprised of independent, non-employee members of the Board. The Compensation Committee worked very closely with its independent consultant and management to examine the effectiveness of the Company's executive compensation program throughout the year. Details of the Compensation Committee's authority and responsibilities are specified in its charter, which is available on the Company's website at http://investor.sanchezenergycorp.com/phoenix.zhtml?c=248475&p=irol-govHighlights. The information on our website is not incorporated by reference into this Amendment or the Original Filing.

Table of Contents

On November 9, 2018, the Board established the special committee of the Board (the "***Special Committee***") to, among other things, recommend approval of (subject to ultimate approval by the Board or the Compensation Committee, as applicable) any bonuses, incentive plans or other equity or equity-linked or cash compensation plans or awards to or for officers, employees or other service providers or consultants of the Company that may be related to or arise from any strategic transaction or that the Special Committee determines are necessary and appropriate to incentivize performance by such persons. Subsequently, on March 20, 2019, the Board delegated to the Special Committee the exclusive power and authority to (i) negotiate and approve, in its sole discretion, employment agreements and other similar agreements with SOG employees on behalf of the Company, including our named executive officers, and (ii) consider, evaluate and approve, in its sole discretion, one or more cash and/or equity executive incentive plans for SOG employees, including our named executive officers, regarding their services to the Company and its subsidiaries.

***The Role of the Compensation Committee***. For 2018 compensation, the Compensation Committee reviewed, assessed and monitored the performance, and reviewed the design and function, of the Company's incentive compensation arrangements to ensure that any risk-taking incentives were consistent with regulatory guidance and the safety and soundness of the organization. The Compensation Committee was responsible for assessing and approving the total compensation paid to the Chief Executive Officer and other named executive officers. The Compensation Committee was responsible for determining whether the compensation paid to each of these executives was fair, reasonable and competitive, and whether the compensation program served the interests of the Company's stockholders.

***Role of the Executive Officers in Setting Executive Compensation***. The Executive Chairman and Chief Executive Officer made recommendations to the Compensation Committee for each of the named executive officers based on the Executive Chairman's and Chief Executive Officer's assessment of each executive's personal performance, as well as the achievement of the overall Company goals for the fiscal year. The Compensation Committee reviewed the recommendations, made adjustments as it determined appropriate and approved compensation at its sole discretion.

***Role of the Compensation Consultant***. In November 2017, Pearl Meyer, LLC ("***Pearl Meyer***"), a leading independent compensation consulting firm, was engaged as the Compensation Committee's independent compensation consultant to assist the Compensation Committee in re-assessing the Company's executive compensation programs and in guiding the Compensation Committee in its actions impacting 2018 executive compensation. The Compensation Committee retained Pearl Meyer as its compensation consultant pursuant to its charter, which grants the Compensation Committee the authority to retain a compensation consultant. Pearl Meyer's tasks for 2018 were to:

- Review and develop an appropriate peer group of companies for executive market compensation practices;
- Review the Company's current compensation levels and proposals for 2018;
- Conduct a competitive market analysis of executive compensation for our named executive officers;
- Conduct a competitive market analysis of compensation for our outside directors;
- Provide an update on executive compensation trends and developments;
- Provide consulting on other matters pertaining to executive compensation as requested by the Compensation Committee; and
- Provide guidance and recommendations for assessing 2018 and ongoing compensation practices.

The Compensation Committee did not direct Pearl Meyer to perform its services in any particular manner or under any particular method.

The Compensation Committee evaluates its compensation consultant annually to determine its independence. The Compensation Committee determined that no conflicts of interest exist with respect to Pearl Meyer's consulting services for 2018. The factors considered by the Compensation Committee in conducting this analysis are as follows:

- The provision of other services to us by Pearl Meyer, if any;
- The amount of fees received from us by Pearl Meyer as a percentage of Pearl Meyer's total revenue;
- The policies and procedures of Pearl Meyer that are designed to prevent conflicts of interest;
- Any business or personal relationship of Pearl Meyer or its consultants with a member of the Compensation Committee;
- Any stock of the Company owned by Pearl Meyer's consultants;
- Any business or personal relationship of Pearl Meyer or its consultants with any of our executive officers; and
- Submission of a formal declaration by Pearl Meyer confirming its independence.

***Use of Market Data and Peer Comparisons***. Each year the Compensation Committee reviews and revises, as it determines appropriate, the peer group companies with which we compete for executive talent so that we could use compensation types and levels paid across the peer group as a reference point for assessing the allocated portion of executive compensation set by the Compensation Committee as well as the type, volume and terms of our equity compensation grants for the year. In late 2017, the Compensation Committee, working with Pearl Meyer and our management, established a new peer group that was used to assess compensation norms for the annual review of 2018 salaries and the formulation of the 2018 grants under the Plan, among other matters.

Based upon (1) industry surveys SOG participates in each year, (2) Pearl Meyer's database, (3) survey data from 2017 proxy filings of comparably-sized companies and (4) a market review conducted by Pearl Meyer in late 2017, the Compensation Committee established the following peer group, which the Compensation Committee believes more closely matches the Company's revenue and revenue projections than the peer group previously used by the Company.

| | | |
|---|---|---|
| Cabot Oil and Gas Corp. | EP Energy Corporation | Oasis Petroleum Inc. |
| Carrizo Oil & Gas Inc. | Halcon Resources Corp | Resolute Energy Corp. |
| Cimarex Energy Co. | Laredo Petroleum Inc. | SM Energy Company |
| Comstock Resources, Inc. | Matador Resources Co. | WPX Energy, Inc. |
| Denbury Resources, Inc. | Murphy Oil Corporation | |
| Diamondback Energy Inc. | Newfield Exploration Co. | |

The Compensation Committee reviewed data regarding both total compensation and each element of compensation paid to similarly situated executives at the peer group companies and data from an E&P compensation survey prepared by Pearl Meyer and other market data when evaluating compensation paid to our named executive officers and our equity grant types and amounts. Our Compensation Committee believes that providing compensation opportunities within a competitive range of our peer group will ensure we can attract and retain talented executive officers with the expertise and dedication required for our Company to excel.

***The Executive Compensation Program in Detail***

Provided below is a review of the Compensation Committee's determinations of base salary, annual cash bonuses and long-term equity incentive stock awards for our named executive officers for 2018 and 2019 through the date of this Amendment.

***Base Salary***. Our Compensation Committee establishes base salary levels for each of our named executive officers. The Compensation Committee reviews the named executive officers' base salaries on an annual basis and makes adjustments as necessary to maintain a competitive executive compensation structure. Our Compensation Committee also reviews and adjusts, as appropriate, base salaries in connection with a promotion or other change in responsibility of our named executive officers.

For 2018, the Compensation Committee elected to leave base salary levels for our Executive Chairman and President and Chief Executive Officer unchanged from 2017. The Compensation Committee elected to increase the base salaries of our former Executive Vice President and Chief Financial Officer and former Senior Vice President and Chief Operating Officer from $450,000 to $475,000 and $412,000 to $450,000, respectively, to better align these executives' compensation with those in similar roles at our peers. In addition, Mr. P. Sanchez's base salary was increased by the Compensation Committee from $250,000 to $300,000 from 2017 to 2018 due to his expanding involvement at the Company, including his assistance on closing the Comanche Acquisition (as defined in the Original Filing) and management of SN EF UnSub (as defined below) and the increased percentage of his time spent on our matters.

For 2019, in February 2019 the Compensation Committee elected to increase the base salary levels for our Executive Chairman, President and Chief Executive Officer, Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary from 2018 and leave the Executive Vice President's base salary level the same as it was in 2018. The Compensation Committee determined that Messrs. Sanchez, Jr. and Sanchez, III's base salaries should be increased due to their efforts related to the Company's restructuring and transformation processes as well as the fact that their salaries had not been increased since 2014 and fell within the bottom quartile of the Company's peer group, among other reasons. The Compensation Committee determined the increase in Mr. George's salary was warranted given the increase in responsibilities he assumed with the Interim Chief Financial Officer role and his efforts related to restructuring the balance sheet, among other reasons. The Compensation Committee determined the increase in Mr. Kopel's salary was warranted to better align his compensation with those in similar roles at our peers, his efforts related to the Company's restructuring and transformation processes and increased responsibilities at the Company, among other reasons.

Table of Contents

| Name | 2017 Base Salary | 2018 Base Salary | 2019 Base Salary |
|---|---|---|---|
| A. R. Sanchez, Jr. | $ 650,000 | $ 650,000 | $ 750,000 |
| Antonio R. Sanchez, III | 650,000 | 650,000 | 750,000 |
| Patricio D. Sanchez | 250,000 | 300,000(1) | 300,000(1) |
| Howard J. Thill | 450,000 | 392,708(2) | — |
| Christopher D. Heinson | 412,000(3) | 246,813(3) | — |
| Cameron W. George | — | 425,000(4) | 475,000 |
| Gregory B. Kopel | — | 393,750(5) | 412,000 |

(1) During 2017, 2018 and 2019, slightly less than half of Mr. P. Sanchez's base salary was or will be allocated to us. The amounts reported above for 2017, 2018 and 2019 reflect only that portion of his base salary attributable to us.

(2) Mr. Thill resigned from the Company effective as of October 26, 2018. During 2018, Mr. Thill's base salary was increased to $475,000 per year effective as of February 16, 2018. The salary reported above for Mr. Thill for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Executive Vice President and Chief Financial Officer in 2018.

(3) Mr. Heinson resigned from the Company effective as of July 9, 2018. During 2018, Mr. Heinson's base salary was set at $450,000 per year. The salary reported above for Mr. Heinson for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Senior Vice President and Chief Operating Officer in 2018.

(4) Mr. George was appointed as our Executive Vice President and Chief Financial Officer on March 19, 2019 and previously served as our Interim Chief Financial Officer from October 26, 2018 until March 19, 2019. His fiscal year 2018 base salary was $425,000 per year. Prior to his appointment as our Interim Chief Financial Officer, Mr. George provided services to us in his capacity as Senior Vice President — Capital Markets of SOG. The salary reported for 2018 above includes the salary he received from us in both his capacity as our Interim Chief Financial Officer and his capacity as Senior Vice President — Capital Markets of SOG.

(5) During 2018, Mr. Kopel's base salary was increased to $400,000 effective as of February 16, 2018.

***Annual Cash Bonus Awards***. Annual cash bonus awards are determined based on qualitative assessment of financial and individual performance achievements. The Compensation Committee and SOG review bonus awards for our named executive officers annually to determine award payments for the current fiscal year.

With regard to the annual cash bonus awards made for 2018, the Compensation Committee and SOG took a number of factors into account in making its award decisions, including:

- Certain operational metrics including the year-over-year increases in production, proved reserves, total assets and revenues and well performance;
- The Company's safety record;
- Work associated with the Company's restructuring and transformation processes;
- The size of the Company's asset base and production profile;
- Bonus opportunities and actual bonuses paid by the Company's peer group and competitors, including competitive bonus plans' payout opportunity ranges; and
- Individual performance of each of the named executive officers.

These efforts and the outcomes above were reviewed and considered, along with, and in consideration of, the challenges that the Company faced in 2018, to determine the bonus awards to our named executive officers. The Compensation Committee, in reviewing and determining the actual bonuses to be paid, with the input of Pearl Meyer, took into account the current base pay levels of our most senior executives in determining these awards, recognizing such base salaries are below the market median for comparable positions in the Company's peer group and no long-term equity awards were granted for 2019. Based on the foregoing, in February 2019, the Compensation Committee elected to award 2018 annual cash bonuses of $1,700,000 to our Executive Chairman and President and Chief Executive Officer, a reduction of $500,000 from the amount of their 2017 annual bonuses, 2018 annual cash bonuses of $650,000 and $500,000 to our Executive Vice President and Chief Financial Officer and Executive Vice President, General Counsel and Secretary, respectively, an increase of $150,000 and $40,000, respectively, from the amount of their 2017 annual bonuses, and a 2018 annual cash bonus of $625,000 to our Executive Vice President, a reduction of $625,000 from the amount of his 2017 annual bonus.

***Long-Term Incentive Plan***. We adopted the Plan in order to have the flexibility to grant equity and equity-based awards to employees (including Sanchez Group employees), officers, consultants and directors who perform services for us. Each of our named executive officers is eligible to receive awards under the Plan, which is administered by the Compensation Committee.

Our Plan allows for the grant of restricted shares, phantom shares, share options, share appreciation rights and other share-based awards. The purpose of awards under our Plan is to provide additional incentive compensation to individuals providing services to us and to align the economic interests of such individuals with the interests of our stockholders. Our Plan limits the number of shares that may be delivered under the Plan to 17,239,790 shares of our common stock plus, upon the issuance of additional shares of common stock after April 15, 2016, an additional number of shares equal to 15% of such issuance or such lesser number determined by the Compensation Committee.

Table of Contents

**2017 Plan Awards**. In March 2017, we granted our named executive officers target phantom shares of performance phantom stock units (the "***2017 Performance Awards***"), which are payable in shares of our common stock. The 2017 Performance Awards were intended to vest (if at all) in equal annual increments over a five-year period ranging from 0% to 200% of the target phantom shares granted based on our share price relative to the share price appreciation of the S&P Oil & Gas Exploration & Production Select Industry Index during a specified period.

In February 2018 and February 2019, the Compensation Committee determined that the threshold level of the applicable performance conditions was not met for either year, and therefore no payments were made under the 2017 Performance Awards for those measurement periods.

**2018 Plan Awards**. In late 2017 and early 2018, as part of Pearl Meyer's review of the types of equity incentive plans in place in the competitive market with management and the Compensation Committee, it was determined that the use of operational and financial measures reflecting the Company's long-term performance would provide more line-of-sight criteria for compensation and, therefore, a more direct link between these performance outcomes, equity performance and compensation opportunities. Following working sessions, strategy discussions and reviews of other programs in the industry, the Compensation Committee decided to modify the Company's long-term incentive program. Working with the Compensation Committee and Pearl Meyer, management developed measures with formal long-term performance goals that are both operational and financial.

A new long-term incentive program was implemented by the Compensation Committee in early 2018 that: (1) increases the percentage of the total grants under the Plan that are represented by stock-settled and cash-settled performance-based phantom stock awards (the "***2018 PSUs***"); (2) incorporates financial and operating performance measures that directly or indirectly impact the balance sheet and net value of the Company and (3) uses other metrics that are within the control or line-of-sight of our management.

Under this approach, 50% of our named executive officers' long-term equity awards for 2018 are directly linked to the achievement of specific performance goals. The awards linked to specific performance goals are in the form of the 2018 PSUs, the value of which is based upon the achievement of defined goals measured for each calendar year for a three-year performance period (January 1, 2018 through December 31, 2020). The Compensation Committee believed that this more structured and measurable performance-based equity program would better align management with shareholder interests. After careful consideration, the Compensation Committee established the following operating and financial metrics it believes drive greater returns and value for our stockholders, which are the metrics used in determining the final value of the 2018 PSUs granted in 2018: our leverage ratio, our reserve replacement ratio, operating costs and safety (each a "***2018 Award Performance Condition***" and, collectively, the "***2018 Award Performance Conditions***").

**Leverage Ratio**. With the volatility surrounding oil prices, investors are very keen on companies being able to deleverage, which made this metric a top priority, together with its planned management and reduction over time. We believe that improving the leverage ratio will demonstrate our progress in strengthening the balance sheet. Under the 2018 PSUs, the "Leverage Metric" is calculated as the Company's net debt to EBITDAX ratio, subject to adjustments for acquisitions, divestitures and non-recurring items.

**Reserve Replacement Ratio**. As an unconventional shale oil and natural gas company operating in a constantly depleting asset base or region, it is crucial for the Company to continue to organically replace its production with proved future reserves. Under the 2018 PSUs, "Reserve Replacement" is calculated using the Company's reserve replacement ratio subject to adjustment for acquisitions and divestitures.

**Operating Cost**. Minimizing operating costs is crucial to improving the Company's margins and driving cash flows. Reducing costs per barrel and other measures reflects directly on our production efficiency and profitability. We have set goals intended to maintain or increase these margins by lowering our costs to deliver hydrocarbons. Under the 2018 PSUs, "LOE/Boe" is calculated by dividing the Company's production expense by production, subject to adjustment for acquisitions, divestitures and non-recurring items.

**Safety**. To ensure management does what it can to create a safe work environment with limited incidents given our large operated position and multiple partners, we have established specific long-term goals related to the Company's total recordable injury rate. Under the 2018 PSUs, "TRIR" is calculated by SOG's total recordable injuries related to performance of services for the Company multiplied by 200,000 and divided by the number of labor hours at SOG for services to the Company.

The number of target 2018 PSUs that vest, if any, is determined by the level of achievement of 2018 Award Performance Conditions for each of the calendar year periods (each such year, a "***Measurement Period***") during a three-year period commencing on January 1, 2018 and ending on December 31, 2020. Within 60 days of the end of each of the three Measurement Periods, the level of achievement of each 2018 Award Performance Condition is determined and the results for each 2018 Award Performance Condition are weighted 30%, other than safety, which is weighted at 10%, to determine the number of target PSUs earned during the Measurement Period. The overall results of the target 2018 PSUs earned during each of the three Measurement Periods are weighted

Table of Contents

33.33% to determine the number of target 2018 PSUs earned during the entire three-year performance period. Subject to certain exceptions set forth in the applicable agreements, the 2018 PSU recipient must be employed by us on the applicable vesting date in order to become vested in the applicable portion of the 2018 PSUs.

The remaining 50% of our named executive officers' long term equity awards for 2018 was equally divided between (i) restricted shares of our common stock and (ii) phantom stock equal to a share of our common stock and payable only in cash. The awards vest in equal installments over a three-year period.

In determining the grant values of the equity awards, our Compensation Committee compared grant values of long-term awards to executives with similar positions at the Company's peer group that are between the 25% and 75% percentile of the peer group, reviewed and considered competitive market analysis of executive compensation prepared by Pearl Myer and considered the performance of each of our named executive officers.

The table below shows the values approved by the Compensation Committee in 2018.

**2018 Individual Targeted Grant Value Award Amount**

| Named Executive Officers | Targeted Grant Value Award Amount | |
|---|---|---|
| A. R. Sanchez, Jr. | $ | 6,500,000 |
| Antonio R. Sanchez, III | $ | 6,500,000 |
| Patricio D. Sanchez | $ | 3,250,000 |
| Howard J. Thill | $ | 2,400,000 |
| Christopher D. Heinson | $ | 2,400,000 |
| Cameron W. George | $ | 2,000,000 |
| Gregory B. Kopel | $ | 1,500,000 |

During the year ended December 31, 2018, our named executive officers were granted shares of restricted stock, phantom stock and 2018 PSUs consisting of performance cash-settled phantom shares and performance stock-settled phantom shares as indicated in the following table:

| Award Recipient | Vesting Schedule | Number of Shares Granted During 2018 |
|---|---|---|
| A. R. Sanchez, Jr. (1) | | |
| *Restricted Stock* | 3 year | 506,231 |
| *Phantom Stock* | 3 year | 506,231 |
| *Performance Cash Settled Phantom* | 3 year | 506,230 |
| *Performance Stock-Settled Phantom* | 3 year | 506,230 |
| Antonio R. Sanchez, III (2) | | |
| *Restricted Stock* | 3 year | 506,231 |
| *Phantom Stock* | 3 year | 506,231 |
| *Performance Cash-Settled Phantom* | 3 year | 506,230 |
| *Performance Stock-Settled Phantom* | 3 year | 506,230 |
| Patricio D. Sanchez (3) | | |
| *Restricted Stock* | 3 year | 253,116 |
| *Phantom Stock* | 3 year | 253,115 |
| *Performance Cash-Settled Phantom* | 3 year | 253,115 |
| *Performance Stock-Settled Phantom* | 3 year | 253,115 |
| Howard J. Thill (4) | | |
| *Restricted Stock* | 3 year | 186,916 |
| *Phantom Stock* | 3 year | 186,916 |
| *Performance Cash-Settled Phantom* | 3 year | 186,916 |
| *Performance Stock-Settled Phantom* | 3 year | 186,916 |

Table of Contents

| | | |
|---|---|---|
| Christopher D. Heinson (5) | | |
| *Restricted Stock* | 3 year | 186,916 |
| *Phantom Stock* | 3 year | 186,916 |
| *Performance Cash-Settled Phantom* | 3 year | 186,916 |
| *Performance Stock-Settled Phantom* | 3 year | 186,916 |
| Cameron W. George (6) | | |
| *Restricted Stock* | 3 year | 155,764 |
| *Phantom Stock* | 3 year | 155,763 |
| *Performance Cash-Settled Stock* | 3 year | 155,763 |
| *Performance Stock-Settled Phantom* | 3 year | 155,763 |
| Gregory B. Kopel (7) | | |
| *Restricted Stock* | 3 year | 116,823 |
| *Phantom Stock* | 3 year | 116,823 |
| *Performance Cash-Settled Phantom* | 3 year | 116,822 |
| *Performance Stock-Settled Phantom* | 3 year | 116,822 |

(1) Includes 506,231 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period on the first three anniversaries of the grant date and 2018 PSUs consisting of 506,230 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(2) Includes 506,231 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period on the first three anniversaries of the grant date and 2018 PSUs consisting of 506,230 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(3) Includes 253,116 shares of restricted stock and 253,115 shares of phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 253,115 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(4) Includes 186,916 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 186,916 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions. In connection with Mr. Thill's resignation from the Company, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock (which included the 186,916 restricted shares awarded to Mr. Thill in 2018) and 245,250 shares of phantom stock (which included the 186,916 phantom shares awarded to Mr. Thill in 2018) granted under the Plan. In connection with Mr. Thill's resignation from the Company, Mr. Thill became vested in the 186,916 restricted shares and the 186,916 phantom shares awarded to Mr. Thill in 2018 under the Plan; the 2018 PSUs granted to Mr. Thill in 2018 under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."

(5) Includes 186,916 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 186,916 shares of performance cash-settled phantom stock and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions. In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

(6) Includes 155,764 shares of restricted stock and 155,763 shares of phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 155,763 shares of performance cash-settled phantom stock granted and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

(7) Includes 116,823 shares of restricted stock and phantom stock granted on April 17, 2018 vesting in equal annual increments over a three-year period and 2018 PSUs consisting of 116,822 shares of performance cash-settled phantom stock granted and performance stock-settled phantom stock granted on April 17, 2018 vesting in three annual installments subject to satisfaction of the 2018 Award Performance Conditions.

With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period for the 2018 PSUs, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

**2019 Plan Awards**. After review and discussions with Pearl Meyer and management, the Compensation Committee determined not to grant any long-term equity awards to our named executive officers under the Company's long-term incentive program for 2019.

***Other Practices, Policies and Guidelines***

***Clawback Policy***. Our Board has adopted a clawback policy under which our Board has the right to cause the reimbursement by a current or former executive officer of the Company of certain incentive compensation if the compensation was predicated upon

the achievement of certain financial results that were subsequently the subject of a required restatement of the Company's financial statements. Incentive compensation subject to the policy includes all cash, equity or equity-based awards made pursuant to the Plan or any other formal or informal plan, adopted currently or in the future. Our Board may exercise this right regardless of the occurrence or absence of any fraud or responsibility on the part of any current or former executive officer.

***Stock Ownership and Retention Policy***. In April 2016, our Board adopted a formal written stock ownership and retention policy applicable to our non-executive directors and certain of our executive officers. The policy requires our non-executive directors and certain of our executive officers to acquire and retain a minimum level of stock ownership within five years of the effective date of the guidelines or their appointment as executive officers or directors, whichever is later. Our Executive Chairman and Chief Executive Officer must acquire and retain shares of our common stock equal to at least five times their annual base salary; our Chief Financial Officer and Chief Operating Officer must acquire and retain shares of our common stock equal to at least three times their annual base salary; and our directors who are not also executive officers must acquire and retain shares of our common stock equal to at least five times their annual retainer. Until the applicable minimum level of stock ownership is achieved, the executive officers or directors must retain all net shares obtained through the Plan (after payment of taxes and exercise price, if applicable). The stock ownership and retention policy provides that any failure to comply with the policy may be taken into account by the Company and the Compensation Committee in connection with compensation decisions, promotion opportunities and other related events to the extent that the Company and the Compensation Committee determine appropriate.

***Severance and Change in Control Benefits***. Other than the severance and Change in Control benefits provided under the Plan and our award agreements discussed in "Potential Payments Upon Termination or Change in Control," we do not provide any severance or change of control benefits to our executive officers. We view the limited benefits that we do provide as necessary to attract and retain executive talent in a highly competitive market and provide continuity of management in the event of an actual or contemplated change of control.

***Other Benefits***. SOG does not maintain a defined benefit pension plan for its executive officers because it believes such plans primarily reward longevity rather than performance. SOG provides a basic benefits package generally to all employees, which includes a 401(k) plan and health, disability and life insurance. SOG employees who provide services to us under the service agreement remain entitled to these benefits from SOG.

***Employment Agreements***

Neither SOG nor the Company entered into any employment agreements with any of our named executive officers during the fiscal years addressed in the Summary Compensation Table.

***Tax and Accounting Considerations***

Section 162(m) of the Internal Revenue Code of 1986, as amended (the "***Code***") generally provides that a public company may not deduct compensation paid in excess of $1 million during any fiscal year to a "covered employee". Prior to January 1, 2018, there was an exception to the Section 162(m) deduction limit for certain compensation meeting the requirements for "qualified performance-based compensation". Pursuant to the Tax Cuts and Jobs Act of 2017, as of January 1, 2018, the $1 million annual deduction limitation under Section 162(m) applies to compensation paid in a fiscal year to any individual who serves as the Chief Executive Officer, Chief Financial Officer or qualifies as one of the other three most highly compensated executive officers in 2017 or any later calendar year, and the exception under Code Section 162(m) for qualified performance-based compensation was eliminated. Although we did not award qualified performance-based compensation (within the meaning of Section 162(m) of the Code) prior to 2018, the Compensation Committee takes the potential tax deductibility of compensation into consideration under Section 162(m) of the Code into consideration, along with many other factors, when making compensation decisions.

Equity awards granted to our named executive officers are considered awards to non-employees, and, for the year ended December 31, 2018, the Company accounted for these awards at fair value in accordance with the provisions of FASB ASC Topic 505-50, "*Equity-Based Payments to Non-Employees*." See Note 8, "*Stock-Based Compensation*," to the Consolidated Financial Statements included under "Item 8. Financial Statements and Supplementary Data" in our Original Filing for additional detail and assumptions.

***Relation of 2018 Compensation Policies and Practices to Risk Management***

SOG's and our compensation policies and practices are designed to provide rewards for short-term and long-term performance, both on an individual basis and at the entity level. In general, optimal financial and operational performance, particularly in a competitive business, requires some degree of risk-taking. Accordingly, the use of compensation as an incentive for performance can foster the potential for management and others to take unnecessary or excessive risks to reach performance thresholds that qualify them for additional compensation.

From a risk management perspective, our policy is to conduct our commercial activities within pre-defined risk parameters that are closely monitored and are structured in a manner intended to control and minimize the potential for unwarranted risk-taking. We also routinely monitor and measure the execution and performance of our projects and acquisitions relative to expectations.

SOG's and our compensation arrangements and our Plan contain a number of design elements that serve to minimize the incentive for taking unwarranted risk to achieve short-term, unsustainable results. Those elements include delaying the rewards and subjecting such rewards to forfeiture for terminations related to violations of its risk management policies and practices or of our Code of Business Conduct and Ethics.

In combination with our risk-management practices, we do not believe that risks arising from our or SOG's compensation policies and practices for individuals providing services to us are reasonably likely to have a material adverse effect on us.

**Compensation Committee Report**

The Compensation Committee of our Board of Directors has reviewed and discussed the Compensation Discussion and Analysis set forth above with management. Based on this review and discussion, the Compensation Committee of our Board of Directors has approved the Compensation Discussion and Analysis for inclusion in this Amendment.

Compensation Committee of
the Board of Directors of
Sanchez Energy Corporation

Gilbert A. Garcia, Chairperson
T. Brian Carney, Member
Sean Maher, Member
Robert V. Nelson, III, Member

***Summary Compensation Table***

The following table shows information concerning the annual compensation for services provided to us by our named executive officers during the fiscal years ended December 31, 2018, 2017 and 2016. All amounts included in the table below were determined by our Compensation Committee and paid by SOG, except awards of restricted stock, phantom stock, performance accelerated restricted stock, performance accelerated phantom stock, performance cash-settled phantom stock and performance stock-settled phantom stock granted under our Plan, which were granted by our Compensation Committee alone. The amounts reported in the table below represent only amounts paid for services provided to us and do not include amounts paid by SOG to our named executive officers for services provided to other entities, including SOG.

| Name and Principal Position | Year | Salary (1) | Bonus (2) | Stock Awards (3) | All Other Compensation (4)(5) | Total |
|---|---|---|---|---|---|---|
| **A. R. Sanchez, Jr.** | 2018 | $ 650,000 | $ 1,700,000 | $ 7,036,604 | $ 117,942 | $ 9,504,546 |
| *Executive Chairman of the Board* | 2017 | $ 650,000 | $ 2,200,000 | $ 10,534,272 | $ 59,252 | $ 13,443,524 |
| | 2016 | $ 650,000 | $ 2,000,000 | $ 4,902,279 | $ 77,172 | $ 7,629,451 |
| **Antonio R. Sanchez, III** | 2018 | $ 650,000 | $ 1,700,000 | $ 7,036,604 | $ 236,351 | $ 9,622,955 |
| *President and Chief Executive Officer* | 2017 | $ 650,000 | $ 2,200,000 | $ 10,534,272 | $ 204,083 | $ 13,588,355 |
| | 2016 | $ 650,000 | $ 2,000,000 | $ 3,676,709 | $ 75,480 | $ 6,402,189 |
| **Patricio D. Sanchez** | 2018 | $ 300,000 | $ 625,000 | $ 3,518,302 | $ 149,473 | $ 4,592,775 |
| *Executive Vice President* | 2017 | $ 250,000 | $ 1,250,000 | $ 3,722,352 | $ 21,584 | $ 5,243,936 |
| **Howard J. Thill** | 2018 | $ 392,708 | $ — | $ 2,598,132 | $ 1,506,331 | $ 4,497,171 |
| *Former Executive Vice President and Chief Financial Officer* | 2017 | $ 450,000 | $ 800,000 | $ 2,394,000 | $ 100,030 | $ 3,744,030 |
| | 2016 | $ 103,125 | $ 250,000 | $ 2,929,500 | $ 1,016 | $ 3,283,641 |
| **Christopher D. Heinson** | 2018 | $ 246,813 | $ — | $ 2,598,132 | $ 25,963 | $ 2,870,909 |
| *Former Senior Vice President and Chief Operating Officer* | 2017 | $ 412,000 | $ 650,000 | $ 3,511,438 | $ 17,791 | $ 4,591,229 |
| | 2016 | $ 400,000 | $ 600,000 | $ 3,695,000 | $ 18,636 | $ 4,713,636 |
| **Cameron W. George** | 2018 | $ 425,000 | $ 650,000 | $ 2,165,109 | $ 38,099 | $ 3,278,208 |
| *Executive Vice President and Chief Financial Officer* | | | | | | |
| **Gregory B. Kopel** | 2018 | $ 393,750 | $ 500,000 | $ 1,623,833 | $ 39,505 | $ 2,557,088 |
| *Executive Vice President, General Counsel and Secretary* | | | | | | |

Table of Contents

(1) Mr. P. Sanchez was appointed as Executive Vice President of the Company effective November 3, 2016 and became a named executive officer in 2017. During 2017 and 2018, slightly less than half of Mr. P. Sanchez's base salary was allocated to us. The amounts reported for Mr. P. Sanchez above for 2017 and 2018 reflect only that portion of his base salary attributable to us. Mr. Thill was appointed as our Executive Vice President and Chief Financial Officer on October 10, 2016 and resigned effective as of October 26, 2018. Mr. Thill's base salary was increased to $475,000 per year effective as of February 16, 2018. The salaries reported above for Mr. Thill for 2016 and 2018 reflect the base salaries he was actually paid for services provided to us during his partial years as our Executive Vice President and Chief Financial Officer in 2016 and 2018, respectively. Mr. Heinson resigned effective as of July 9, 2018. During 2018, Mr. Heinson's base salary was set at $450,000 per year. The salary reported above for Mr. Heinson for 2018 reflects the base salary he was actually paid for services provided to us during his partial year as our Senior Vice President and Chief Operating Officer in 2018. Mr. George was appointed as our Executive Vice President and Chief Financial Officer on March 19, 2019 and previously served as our Interim Chief Financial Officer from October 26, 2018 until March 19, 2019. His fiscal year 2018 base salary was $425,000 per year. Prior to his appointment as our Interim Chief Financial Officer, Mr. George provided services to us in his capacity as Senior Vice President — Capital Markets of SOG. The salary reported for Mr. George for 2018 above includes the salary he received from us in both his capacity as our Interim Chief Financial Officer and his capacity as Senior Vice President — Capital Markets of SOG. During 2018, Mr. Kopel's base salary was increased to $400,000 effective as of February 16, 2018.

(2) On February 19, 2019, our Compensation Committee awarded each of Messrs. Sanchez, Jr. and Sanchez, III a cash bonus of $1,700,000, Mr. George a cash bonus of $650,000, Mr. P. Sanchez a cash bonus of $625,000 and Mr. Kopel a cash bonus of $500,000 for their work and efforts during 2018, which are reported as 2018 compensation in the table above in accordance with SEC rules. On February 16, 2018, our Compensation Committee awarded each of Messrs. Sanchez, Jr. and Sanchez, III a cash bonus of $2,200,000, Mr. P. Sanchez a cash bonus of $1,250,000 and each of Messrs. Thill and Heinson a cash bonus of $650,000 for their work and efforts during 2017, which are reported as 2017 compensation in the table above in accordance with SEC rules. In 2017, Mr. Thill also received one-half of a $300,000, or $150,000, sign-on bonus, which was paid in January 2017, and is included in his 2017 compensation in the table above. Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill and Heinson received cash bonuses of $2,000,000, $2,000,000, $1,000,000, $100,000 and $200,000, respectively, in January 2017 based on 2016 performance, which is reported at 2016 compensation in the table above in accordance with SEC rules. Mr. Heinson also received a $400,000 cash bonus in December 2016 based on 2016 performance, which is also reflected in the 2016 compensation in the table above, and Mr. Thill received one-half of a $300,000, or $150,000, sign-on bonus in 2016, which is included in his 2016 compensation in the table above.

(3) The amounts reported in this column reflect the aggregate grant date fair value of awards granted, if any, under our Plan for fiscal years 2018, 2017 and 2016, computed in accordance with Financial Accounting Standard Board ("FASB") Accounting Standards Codification ("ASC") Topic 718, excluding estimated forfeitures. The grant date values of the 2018 PSUs granted in 2018, assuming that the highest level of 2018 Award Performance Conditions will be achieved, were as follows: Mr. Sanchez, Jr.—$6,661,987; Mr. Sanchez, III—$6,661,987; Mr. P. Sanchez—$3,330,993; Mr. George—$2,049,841; Mr. Thill—$2,459,815; Mr. Heinson—$2,459,815; and Mr. Kopel—$1,573,378. The grant date values of the 2017 Performance Awards granted in 2017, assuming that the highest level of performance conditions will be achieved, were as follows: Mr. Sanchez, Jr.—$9,326,740; Mr. Sanchez, III—$9,326,740; Mr. Heinson—$3,108,926; and Mr. P. Sanchez—$3,295,663. Stock-based compensation expenses are recorded in the Company's financial statements in accordance with FASB ASC 505-50, "Equity-Based Payments to Non-Employees."

(4) In fiscal year 2018, "All Other Compensation" (i) for Mr. Sanchez, Jr., consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs and medical insurance costs; (ii) for Mr. Sanchez, III, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs, medical insurance costs and country club dues; (iii) for Messrs. George, Heinson and Kopel, consisted of parking costs allocated to us by SOG, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs and medical insurance costs; (iv) for Mr. Thill, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs, group term life insurance costs, disability insurance costs, medical insurance costs and $1,451,260 paid to Mr. Thill in connection with his resignation from the Company; and (v) for Mr. P. Sanchez, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, group term life insurance costs, disability insurance costs and medical insurance costs. In fiscal year 2017, "All Other Compensation" (i) for Messrs. Sanchez, Jr., Sanchez, III and Thill, consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs and group term life insurance costs; (ii) for Mr. P. Sanchez, consisted of parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group and group term life insurance costs; and (iii) for Mr. Heinson, consisted of the parking costs allocated to us by SOG, 401(k) matching contribution costs and group term life insurance costs. In fiscal year 2016, "All Other Compensation" (i) for Mr. Sanchez, III, consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group and group term life insurance costs; (ii) for Mr. Sanchez, Jr. consisted of the parking costs allocated to us by SOG, the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, 401(k) matching contribution costs and group term life insurance; (iii) for Mr. Heinson, consisted of the parking costs allocated to us by SOG, 401(k) matching contribution costs and group term life insurance; and (iv) for Mr. Thill, consisted of the parking costs allocated to us by SOG and group term life insurance. For additional information regarding the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, see footnote 5 below.

Table of Contents

(5) Pursuant to the Company's aircraft policy, our named executive officers and directors are permitted to use aircraft owned or provided by the Company or a member of the Sanchez Group for uses deemed by SEC rules to constitute personal usage of such aircraft. We calculate the aggregate incremental cost of such personal usage as set forth below.

- For aircraft owned by the Company or a member of the Sanchez Group, we calculate the aggregate incremental cost of personal usage by multiplying the number of hours of such personal usage by the average variable operating cost per hour of the aircraft, which we derive based on the costs of fuel, maintenance, landing, parking and catering costs, certain taxes and certain other miscellaneous fees and costs. Because our corporate aircraft are used primarily for business travel, we do not include in this figure fixed costs for such aircraft that generally do not change with use.
- For aircraft provided (but not owned) by the Company or a member of the Sanchez Group, we calculate the aggregate incremental cost of personal usage by calculating the percentage of the total hours the aircraft was used by Company personnel that were for personal purposes, and multiplying this ratio against the total cost of such aircraft to the Company or such member of the Sanchez Group.
- For trips that involve mixed personal and business usage, we determine the aggregate incremental cost attributable to personal use by subtracting the aggregate incremental cost of a "business-only" trip from the total aggregate incremental cost of the whole trip (both personal and business).

In 2018, we incurred aggregate incremental costs of $81,758, $182,103, $143,783 and $20,153 for personal use of aircraft owned or provided by the Company or a member of the Sanchez Group by Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Thill, respectively.

***2018 Grants of Plan-Based Awards***

The following table sets forth certain information with respect to stock awards granted under our Plan to our named executive officers in 2018.

| Name | Grant Date | Estimate Future Payouts under Equity Incentive Plan Awards(1) Threshold # | Target # | Maximum # | All Other Stock Awards: Number of Shares of Stock or Units # (2) | Grant Date Fair Value of Stock and Option Awards (3) |
|---|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | 04/17/2018 | — | — | — | 506,231(4) | $ 1,852,805 |
| | 04/17/2018 | — | — | — | 506,231(5) | $ 1,852,805 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| Antonio R. Sanchez, III | 04/17/2018 | — | — | — | 506,231(4) | $ 1,852,805 |
| | 04/17/2018 | — | — | — | 506,231(5) | $ 1,852,805 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| | 04/17/2018 | 126,558 | 506,230 | 1,012,460 | — | $ 1,665,497 |
| Patricio D. Sanchez | 04/17/2018 | — | — | — | 253,116(4) | $ 926,405 |
| | 04/17/2018 | — | — | — | 253,115(5) | $ 926,401 |
| | 04/17/2018 | 63,279 | 253,115 | 506,230 | — | $ 832,748 |
| | 04/17/2018 | 63,279 | 253,115 | 506,230 | — | $ 832,748 |
| Howard J. Thill (6) | 04/17/2018 | — | — | — | 186,916(4) | $ 684,113 |
| | 04/17/2018 | — | — | — | 186,916(5) | $ 684,113 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| Christopher D. Heinson (7) | 04/17/2018 | — | — | — | 186,916(4) | $ 684,113 |
| | 04/17/2018 | — | — | — | 186,916(5) | $ 684,113 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| | 04/17/2018 | 46,729 | 186,916 | 373,832 | — | $ 614,954 |
| Cameron W. George | 04/17/2018 | — | — | — | 155,764(4) | $ 570,096 |
| | 04/17/2018 | — | — | — | 155,763(5) | $ 570,093 |
| | 04/17/2018 | 38,941 | 155,763 | 311,526 | — | $ 512,460 |
| | 04/17/2018 | 38,941 | 155,763 | 311,526 | — | $ 512,460 |
| Gregory B. Kopel | 04/17/2018 | — | — | — | 116,823(4) | $ 427,572 |
| | 04/17/2018 | — | — | — | 116,823(5) | $ 427,572 |
| | 04/17/2018 | 29,206 | 116,822 | 233,644 | — | $ 384,344 |
| | 04/17/2018 | 29,206 | 116,822 | 233,644 | — | $ 384,344 |

(1) Represents the range of possible stated payouts to our named executive officers related 2018 PSUs granted to our named executive officers under the Plan during 2018. Vesting of these 2018 PSUs occurs over a three-year performance period beginning January 1, 2018 and ending

Table of Contents

December 31, 2020, generally subject to each executive's continuous service with the Company through each vesting date. Although the "Threshold" column includes the stated threshold payment under the awards, application of straight-line interpolation as contemplated in the applicable award agreements could result in such 2018 PSUs vesting (if at all) in equal annual increments ranging from 0% to 200% of the target based on achievement of the 2018 Award Performance Conditions. For each of the three Measurement Periods, the level of achievement of each 2018 Award Performance Condition is determined and the results for each 2018 Award Performance Condition are weighted 30%, other than safety, which is weighted at 10%, to determine the number of target 2018 PSUs earned during that specific Measurement Period. The overall results of the target 2018 PSUs earned during each of the three Measurement Periods are weighted 33.33% to determine the number of target 2018 PSUs earned during the entire three-year performance period. With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

(2) Represents the number of restricted stock and phantom stock awards granted to our named executive officers under the Plan during 2018.

(3) Reflects the aggregate grant date fair value of the restricted awards, phantom awards and 2018 PSUs granted under the Plan in 2018, calculated in accordance with FASB ASC Topic 718. For the 2018 PSUs, which are subject to performance-based conditions, the amounts shown in the "Target" column reflect satisfaction of the 2018 Award Performance Conditions such that 100% of the target shares are awarded, the amounts shown in the "Threshold" column represent the minimum stated amount, if any, payable for a certain level of performance under the 2018 Award Performance Conditions, and the amounts shown in the "Maximum" column refers to the maximum payout possible for a certain level of performance under the 2018 Award Performance Conditions (provided, that the Compensation Committee has the discretion to modify payouts up to the maximum payout amount and interpolate on a straight-line basis between 0% and the stated threshold, target and maximum payout amounts). Stock-based compensation expenses are recorded in the Company's financial statements in accordance with FASB ASC 505-50, "Equity-Based Payments to Non-Employees."

(4) Represents the number of restricted stock awards vesting in equal annual increments over a three-year period.

(5) Represents the number of phantom stock awards vesting in equal annual increments over a three-year period.

(6) In connection with Mr. Thill's resignation from the Company, Mr. Thill became vested in the 186,916 restricted shares and the 186,916 phantom shares awarded to Mr. Thill in 2018 under the Plan; the 2018 PSUs granted to Mr. Thill in 2018 under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."

(7) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards, including all of those unvested awards granted to him in 2018 under the Plan.

***Narrative Disclosure to the Summary Compensation Table and Grants of Plan Based Awards Table***

***2018 Grants**.* In 2018, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,231, 506,231, 253,116, 186,916, 186,916, 155,764 and 116,823, respectively, shares of restricted stock, which vest in equal installments over three years, in each case generally subject to continuous service with us through each vesting date. In 2018, we also granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,231, 506,231, 253,115, 186,916, 186,916, 155,763 and 116,823, respectively, shares of phantom stock, which vest in equal installments over three years, in each case generally subject to continuous service with us through each vesting date.

In addition, pursuant to our new Plan program, 50% of our named executive officers' long-term incentive awards were in the form of 2018 PSUs. In 2018, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 506,230, 506,230, 253,115, 186,916, 186,916, 155,763 and 116,822, respectively, target phantom shares of both performance cash settled phantom shares and performance stock-settled phantom shares. The performance cash settled phantom shares are payable in cash and the performance stock-settled phantom shares are payable in shares of our common stock. The 2018 PSUs will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions. Subject to certain exceptions set forth in the applicable agreements, the 2018 PSU recipient must be employed by us on the applicable vesting date in order to become vested in the applicable portion of the 2018 PSUs.

Recipients of shares of restricted stock have all the rights of a stockholder in us, including the right to receive dividends thereon if and when distributions are made by us to our stockholders. Recipients of our other awards do not have voting rights.

Pursuant to our award agreements governing our Plan awards during 2018, during the vesting period, our 2018 Plan awards are subject to restrictions on transferability and forfeiture. Our awards subject to vesting generally vest on a pro-rata basis on each remaining vesting date subject to acceleration of the restricted stock and phantom stock upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (each as defined in the respective award agreements and described further below). However, upon the occurrence of any of such events, 2018 PSU awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the 2018 Award Performance Conditions. Except as described in the preceding sentence, upon any termination for any or no reason, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the awarded shares become vested, all unvested awarded shares will be forfeited.

With respect to any named executive officer, shares of restricted stock and phantom stock granted in 2018 vest in substantially equal installments and the forfeiture restrictions will lapse on the first, second and third anniversaries of the date of grant

so long as the award recipient remains in our continuous service (subject, in the case of the 2018 PSUs, to satisfaction of the 2018 Award Performance Conditions). With respect to the Measurement Period beginning on January 1, 2018 and ending on December 31, 2018, which is the first Measurement Period for the 2018 PSUs, in February 2019 the Compensation Committee determined that the performance result was 71%, resulting in a payout of 71% of each recipient's applicable target under the 2018 PSUs for the 2018 Measurement Period.

Please see the section titled "Potential Payments Upon Termination or Change in Control" for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson's Plan awards in connection with their respective resignations from the Company in 2018.

***2017 Grants***. In 2017, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez, Thill, Heinson, George and Kopel 245,234, 245,234, 86,655, 100,000, 81,745, 100,000 and 50,000, respectively, shares of both restricted stock and phantom stock, which vest in equal installments over five years for each of Messrs. Sanchez, Jr., Sanchez, III and P. Sanchez and in equal installments over three years for Messrs. Thill, Heinson, George and Kopel.

In addition, in 2017, we granted Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Heinson 245,234, 245,234, 86,655 and 81,745 shares of the 2017 Performance Awards, respectively. These 2017 Performance Awards are payable in shares of our common stock. The 2017 Performance Awards will vest (if at all) in equal annual increments over a five-year period ranging from 0% to 200% of the target 2017 Performance Awards granted based on the performance conditions outlined in the award agreement, subject to the officer's continuous service with us through each vesting date.

Recipients of shares of restricted stock have all the rights of a stockholder in us, including the right to receive dividends thereon if and when distributions are made by us to our stockholders. Recipients of our other awards do not have voting rights.

Pursuant to our award agreements governing our Plan awards during 2017, during the vesting period, our awards are subject to restrictions on transferability and forfeiture. Our 2017 Plan awards subject to vesting generally vest on a pro-rata basis on each remaining vesting date subject to acceleration of the restricted stock and phantom stock upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (each as defined in the respective award agreements and described further below). However, upon the occurrence of any of such events, the 2017 Performance Awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the applicable performance conditions. Except as described in the preceding sentence, upon any termination for any or no reason, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the awarded shares become vested, all unvested awarded shares will be forfeited.

With respect to any named executive officer, shares of restricted stock and phantom stock awards granted in 2017 vest in substantially equal installments and the forfeiture restrictions will lapse on the first, second and third anniversaries of the date of grant or the first, second, third, fourth and fifth anniversaries of the date of grant, depending upon the terms of the applicable award, so long as the award recipient remains in our continuous service (subject, in the case of the performance phantom stock, to satisfaction of the applicable performance conditions). For the 2017 and 2018 performance periods applicable to our 2017 Performance Awards, 0% of the target shares were awarded in 2018 or 2019.

Please see the section titled "Potential Payments Upon Termination or Change in Control" for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson's Plan awards in connection with their respective resignations from the Company in 2018.

***2016 Grants***. In January 2016, we granted Mr. Heinson and Kopel 100,000 and 75,000 shares of restricted stock, respectively. In February 2016, we granted Messrs. Sanchez, III and Sanchez, Jr. 403,095 and 537,460 shares of restricted stock and 403,095 and 537,460 shares of phantom stock, respectively. In April 2016, we granted Mr. P. Sanchez 100,000 shares of restricted stock and 100,000 shares of phantom stock and Mr. Heinson an additional 100,000 shares of restricted stock and 200,000 shares of phantom stock. In June 2016, we granted Mr. George 100,000 shares of restricted stock. In connection with Mr. Thill's appointment as Executive Vice President and Chief Financial Officer in October 2016, we granted him 175,000 shares of restricted stock and 175,000 shares of phantom stock.

The restricted stock and phantom shares vest with respect to 33.33% of the number of restricted stock and phantom shares granted on each of the first three anniversaries of the date of grant (in each case, subject to certain forfeiture and vesting conditions.

Additionally, in February 2016, we granted Messrs. Sanchez, III and Sanchez, Jr. 207,654 and 276,872 shares of performance accelerated restricted stock and 207,654 and 276,872 shares of performance accelerated phantom stock, respectively. In April 2016, we granted Messrs. Heinson and P. Sanchez 100,000 and 100,000 shares of performance accelerated restricted stock and 100,000 and 100,000 shares of performance accelerated phantom stock, respectively.

Table of Contents

The performance accelerated restricted stock and performance accelerated phantom stock are payable in cash, which cliff vest in five years or earlier if the common stock closing price equals or exceeds certain benchmarks.

Because the adjusted closing price of our common stock for each day in a fifteen-day trading period equaled or exceeded an amount equal to 200% of the adjusted closing price of our stock on February 18, 2016, the performance accelerated restricted stock and performance accelerated phantom stock awards granted to Messrs. Sanchez, Jr. and Sanchez, III vested on February 18, 2017. Because the adjusted closing price of our common stock for each day in a fifteen-day trading period equaled or exceeded an amount equal to 150% of the adjusted closing price of our common stock on April 15, 2016, 50% of the performance accelerated phantom stock awards granted to Messrs. Heinson and P. Sanchez vested on the first anniversary of the grant date, April 15, 2017. If the adjusted closing price of our common stock for each day in a fifteen-day trading period equals or exceeds an amount equal to 200% of the adjusted closing price of our common stock on April 15, 2016, the remainder of the performance accelerated phantom stock awards granted to Mr. P. Sanchez will vest on such date, to the extent unvested as of such date (otherwise, the remaining 50,000 phantom shares will vest on April 15, 2021, subject to certain forfeiture and vesting procedures).

Please see the section titled “Potential Payments Upon Termination or Change in Control” for a more detailed description of the events that could result in a modification to the regular vesting schedules for our Plan awards, as well as a summary of the treatment of Messrs. Thill and Heinson’s Plan awards in connection with their respective resignations from the Company in 2018.

***2018 Outstanding Equity Awards at Fiscal Year-End***

The following table sets forth information concerning outstanding equity awards held by each of our named executive officers as of December 31, 2018.

| Name | Grant Date | Number of Shares of Stock or Equivalents That Have Not Vested (1) | Market Value of Shares of Stock That Have Not Vested (2) | Equity Incentive Plan Awards: Number of Unearned Shares or Other Rights that Have Not Vested (#) (1) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares or Other Rights that Have not Vested (2) |
|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | 04/17/2018 | 506,231(3) | $ 136,682 | — | $ — |
| | 04/17/2018 | 506,231(4) | $ 136,682 | — | $ — |
| | 04/17/2018 | — | $ — | 506,230(5) | $ 136,682 |
| | 04/17/2018 | — | $ — | 506,230(6) | $ 136,682 |
| | 03/01/2017 | 196,188(7) | $ 52,971 | — | $ — |
| | 03/01/2017 | 196,188(8) | $ 52,971 | — | $ — |
| | 03/01/2017 | — | $ — | 196,187(9) | $ 52,971 |
| | 02/18/2016 | 179,154(3) | $ 48,372 | — | $ — |
| | 02/18/2016 | 179,154(4) | $ 48,372 | — | $ — |
| Antonio R. Sanchez, III | 04/17/2018 | 506,231(3) | $ 136,682 | — | $ — |
| | 04/17/2018 | 506,231(4) | $ 136,682 | — | $ — |
| | 04/17/2018 | — | $ — | 506,230(5) | $ 136,682 |
| | 04/17/2018 | — | $ — | 506,230(6) | $ 136,682 |
| | 03/01/2017 | 196,188(7) | $ 52,971 | — | $ — |
| | 03/01/2017 | 196,188(8) | $ 52,971 | — | $ — |
| | 03/01/2017 | — | $ — | 196,187(9) | $ 52,971 |
| | 02/18/2016 | 134,365(3) | $ 36,279 | — | $ — |
| | 02/18/2016 | 134,365(4) | $ 36,279 | — | $ — |
| Patricio D. Sanchez | 04/17/2018 | 253,116(3) | $ 68,341 | — | $ — |
| | 04/17/2018 | 253,115(4) | $ 68,341 | — | $ — |
| | 04/17/2018 | — | $ — | 253,115(5) | $ 68,341 |
| | 04/17/2018 | — | $ — | 253,115(6) | $ 68,341 |
| | 03/01/2017 | 69,324(7) | $ 18,717 | — | $ — |
| | 03/01/2017 | 69,324(8) | $ 18,717 | — | $ — |
| | 03/01/2017 | — | $ — | 69,324(9) | $ 18,718 |
| | 04/15/2016 | 33,334(3) | — | — | $ 9,000 |
| | 04/15/2016 | 50,000(10) | — | — | $ 13,500 |
| | 04/15/2016 | 33,334(4) | — | — | $ 9,000 |
| | 04/15/2016 | 50,000(11) | — | — | $ 13,500 |
| Howard J. Thill (12) | 04/17/2018 | — | $ — | 186,916(5) | $ 50,467 |
| | 04/17/2018 | — | $ — | 186,916(6) | $ 50,467 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Christopher D. Heinson (13) | — | — | $ | — | — | $ | — |
| Cameron W. George | 04/17/2018 | 155,764(3) | $ | 42,056 | — | $ | — |
| | 04/17/2018 | 155,763(4) | $ | 42,056 | — | $ | — |
| | 04/17/2018 | — | $ | — | 155,763(5) | $ | 42,056 |
| | 04/17/2018 | — | $ | — | 155,763(6) | $ | 42,056 |
| | 03/01/2017 | 66,667(3) | $ | 18,000 | — | $ | — |
| | 03/01/2017 | 66,667(4) | $ | 18,000 | — | $ | — |
| | 06/01/2016 | 33,334(3) | $ | 9,000 | — | $ | — |
| Gregory B. Kopel | 04/17/2018 | 116,823(3) | $ | 31,542 | — | $ | — |
| | 04/17/2018 | 116,823(4) | $ | 31,542 | — | $ | — |
| | 04/17/2018 | — | $ | — | 116,822(5) | $ | 31,542 |
| | 04/17/2018 | — | $ | — | 116,822(6) | $ | 31,542 |
| | 03/01/2017 | 33,334(3) | $ | 9,000 | — | $ | — |
| | 03/01/2017 | 33,334(4) | $ | 9,000 | — | $ | — |
| | 01/01/2016 | 25,000(3) | $ | 6,750 | — | $ | — |

(1) The forfeiture conditions and the accelerated vesting conditions applicable to these awards are described under the sections titled "Potential Payments Upon Termination or Change in Control" and "Narrative Disclosure to the Summary Compensation Table and Grants of Plan Based Awards Table."
(2) The market value of the unvested shares of restricted stock, phantom stock, performance accelerated restricted stock, performance accelerated phantom stock, 2017 Performance Awards and 2018 PSUs constituting performance cash-settled phantom stock and performance stock-settled phantom stock was calculated by multiplying the number of shares outstanding as of December 31, 2018 by $0.27, the closing price of our common stock on December 31, 2018, the closing trading date in 2018.
(3) These restricted shares will vest as to 33.33% of the total number of restricted shares granted on each of the first three anniversaries of the date of grant.
(4) These phantom shares will vest as to 33.33% of the total number of phantom shares granted on each of the first three anniversaries of the date of grant and are payable in cash.
(5) These cash settled phantom shares will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions and are payable in cash.
(6) These performance stock-settled phantom shares will vest (if at all) in equal annual increments over a three-year period ranging from 0% to 200% of the target phantom shares granted based on the achievement of the 2018 Award Performance Conditions.
(7) These restricted shares will vest as to 20% of the total number of restricted shares granted on each of the first five anniversaries of the date of grant.
(8) These phantom shares will vest as to 20% of the total number of phantom shares granted on each of the first five anniversaries of the date of grant and are payable in cash.
(9) These performance phantom shares granted and payable in common stock vesting in equal annual installments over a five-year period, subject to satisfaction of the applicable performances conditions.
(10) These performance accelerated restricted shares cliff vest on the fifth anniversary of their grant subject to an early acceleration trigger based upon the price of our common stock.
(11) These performance accelerated phantom shares cliff vest on the fifth anniversary of their grant subject to an early acceleration trigger based upon the price of our common stock.
(12) In connection with Mr. Thill's resignation from the company, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. His 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein, as described under "Potential Payments Upon Termination or Change in Control."
(13) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

***2018 Stock Vested at Fiscal Year-End***

The following table provides information on the value realized by each of the named executive officers as a result of our stock awards that vested from January 1, 2018 through December 31, 2018.

Table of Contents

| Name | Cash Settled | | Stock-Settled | | |
|---|---|---|---|---|---|
| | Number of Phantom Shares Acquired on Vesting (1) | Value Realized On Vesting (2) | Number of Shares Acquired on Vesting (3) | Value Realized on Vesting (4) | Aggregate Value Realized on Vesting (5) |
| A. R. Sanchez, Jr. | 228,199 | $ 770,270 | 444,866 | $ 1,931,605 | $ 2,701,876 |
| Antonio R. Sanchez, III | 183,411 | $ 614,856 | 333,411 | $ 1,418,856 | $ 2,033,712 |
| Patricio D. Sanchez | 50,664 | $ 174,845 | 50,664 | $ 177,178 | $ 352,023 |
| Howard J. Thill (6) | 336,916 | $ 692,258 | 336,916 | $ 692,258 | $ 1,384,516 |
| Christopher D. Heinson | 83,016 | $ 294,205 | 166,349 | $ 699,038 | $ 993,243 |
| Cameron W. George | 33,333 | $ 100,999 | 66,666 | $ 234,664 | $ 335,663 |
| Gregory B. Kopel | 16,666 | $ 50,498 | 41,666 | $ 183,248 | $ 233,746 |

(1) The amounts in this column represent the number of phantom shares held by each of the named executive officers that vested during 2018, which are payable in cash upon vesting.
(2) The amount in this column represents the product of the number of phantom shares that vested during 2018 and the closing price of our common stock on the date of vesting.
(3) The amount in this column represents the number of restricted shares held by each of the named executive officers that vested during 2018.
(4) The amounts in this column represent the product of the number of shares of restricted stock that vested during 2018 and the closing sale price of our common stock on the date of vesting.
(5) The amount in this column represents the sum of the amounts realized during 2018 on the vesting of both the cash-settled and stock-settled awards.
(6) In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill became vested in 245,250 shares of restricted stock and 245,250 shares of phantom granted under the Plan, which is reflected in the table above.

***Pension Benefits***

Currently, we do not, and do not intend to, provide pension benefits to our named executive officers. SOG may revisit this policy in the future.

***Nonqualified Deferred Compensation***

Currently, we do not, and do not intend to, sponsor or adopt a nonqualified deferred compensation plan. SOG may revisit this policy in the future.

***Settlement of Vested Cash-Settled Phantom Stock Awards***

With respect to the shares of phantom stock issued under the Plan and the performance cash-settled phantom stock awards (and excluding the 2017 Performance Awards and the performance share-settled phantom stock awards) that become vested as of a given vesting date, the Company will pay an amount of cash equal to (x) the fair market value of one share of our common stock as of the vesting date multiplied by (y) the aggregate number of the phantom shares that become vested on the applicable vesting date. Our performance phantom stock awards are payable in shares of common stock on any given vesting date.

***Potential Payments Upon Termination or Change in Control***

Other than the accelerated vesting of our Plan awards upon the occurrence of certain events pursuant to the Plan and applicable award agreements, as of December 31, 2018, we did not provide any severance or change of control benefits to our executive officers. We view the limited benefits that we do provide as necessary to attract and retain executive talent in a highly competitive market and to ensure continuity of management in the event of an actual or contemplated change of control.

***2016 Grants***

The restricted stock, performance accelerated restricted stock, phantom stock and performance accelerated phantom stock awards granted in 2016 under the Plan automatically vest upon the occurrence of the following events (each term of which is defined below under "—Defined Terms"): a Change of Control, a Qualifying Termination, or the executive's death or Disability.

***2017 and 2018 Grants***

The restricted stock and phantom stock awards granted in 2017 and 2018 under the Plan automatically vest upon the occurrence of the following events (each term of which is defined below under "—Defined Terms"): a Change of Control, a Qualifying Termination, or the executive's death or Disability.

The 2017 Performance Awards and 2018 PSUs generally vest on a pro-rata basis on each remaining vesting date, provided that upon the occurrence of any of the following events: a Qualifying Termination, Constructive Termination, or the officer's death or Disability (i) the 2017 Performance Awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the applicable performance conditions and (ii) the 2018 PSU awards will vest on a pro-rata basis on each remaining vesting date, subject to the satisfaction of the 2018 Award Performance Conditions.

***Mr. Heinson & Mr. Thill***

In connection with Mr. Heinson's resignation from the Company on July 9, 2018, he forfeited all of his unvested awards.

In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan and became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. In connection with Mr. Thill's resignation, the Company and Mr. Thill entered into the Confidential Separation Agreement and General Release (the "***Separation Agreement***") dated October 26, 2018. Pursuant to the Separation Agreement, Mr. Thill received a payment of $451,260 with regard to such vested phantom stock described herein. Furthermore, Mr. Thill's 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein. See "Item 11. Executive Compensation—Compensation Disclosure and Analysis—The Executive Compensation Program in Detail—Long-Term Incentive Plan—2018 Plan Awards" and "—Settlement of Vested Cash-Settled Phantom Stock Awards."

***Forfeiture of Unvested Awards***

Other than provided above, including but not limited to voluntary resignation or termination by the Company with or without cause, before all of the named executive officers' awarded shares become vested, all unvested awarded shares will be forfeited.

***Defined Terms***

With respect to the Plan awards issued in 2016, 2017 and 2018 and described above, a "***Qualifying Termination***" is generally defined in the respective awards agreements as a termination by us or one of our affiliates, other than due to (i) the executive's commission of, conviction for, or plea of guilty or nolo contendere to a felony, or other material act or omission involving dishonesty or fraud, or (ii) gross negligence or willful malfeasance. A "***Disability***" is defined in the Plan generally as an illness or injury that lasts at least six months and is expected to be permanent and renders the executive unable to carry out his duties.

With respect to the Plan awards issued in 2017 and 2018 as described above, a "***Constructive Termination***" means, with respect to any executive, (i) the assignment of a duty or duties to him that are not commensurate with the position he holds as of the grant date or the material reduction in his duties; provided, that, the foregoing occurs without his consent, and provided, further, that, the executive has provided notice to another executive officer of the Company, with a copy to the Board, within 30 days after the initial occurrence of the event set forth in clause (i) of his intention to terminate his Continuous Service (as defined in the respective award agreements) due to a Constructive Termination, the Company has failed to cure such event to his reasonable satisfaction within 30 days after receipt of notice thereof, and the executive actually terminates Continuous Service within 7 days following the expiration of such cure period or (ii) any reduction in his title or position that he holds as of his grant date without his consent; provided, further, that, the executive has provided notice to another executive officer of the Company, with a copy to the Board, within 30 days after such reduction of his intention to terminate his Continuous Service due to a Constructive Termination, the Company has failed to cure such reduction to his reasonable satisfaction within 30 days after receipt of notice thereof, and he actually terminates Continuous Service within 7 days following the expiration of such cure period. For the avoidance of doubt, grounds for him to terminate Continuous Service due to a Constructive Termination shall not exist if the events in (i) or (ii) above occur while the executive controls, directly or indirectly, the Board or such events are initiated at his direction (in which case consent shall be deemed to have been given by the executive).

Pursuant to the applicable award agreements, awards granted under our Plan will generally vest and/or become exercisable, as applicable, upon a Change of Control. With respect to our shares of phantom stock awards consisting of our 2017 Performance Awards and our 2018 PSUs, the executive will vest in the greater of (x) the number of unvested phantom shares based on actual results determined as if the date of the Change of Control is the last day of each remaining measurement period or (y) the target number of unvested phantom shares for each remaining measurement period; vesting of the amounts determined under (x) or (y) for the executive's respective awards must be settled within 15 days of the Change in Control. Under our Plan, a "***Change of Control***" will be deemed to have occurred upon one or more of the following events: (i) any "person" or "group" within the meaning of those terms as used in Sections 13(d) and 14(d)(2) of the Exchange Act, other than a Sanchez Group Member (as defined in the Plan), becomes the beneficial owner, by way of merger, consolidation, recapitalization, reorganization or otherwise, of 50% or more of the combined voting power of the equity interests in the Company; (ii) the stockholders of the Company approve and implement, in one or

Table of Contents

a series of transactions, a plan of complete liquidation of the Company; or (iii) the sale or other disposition by the Company of all or substantially all of its assets in one or more transactions to any person other than a Sanchez Group Member.

***Estimated Payments Upon Termination or Change of Control Events***

The following table quantifies our best estimates as to the amounts that each of our named executive officers would potentially be entitled to receive upon a change of control event, or one of the above-described termination events, as applicable. The values of the potential payments are calculated assuming that such termination event occurred on December 31, 2018 and using our closing stock price on such date of $0.27. The value of the benefit that each of our named executive officers would actually receive cannot be determined until a change of control or a termination event has occurred. Therefore, such amounts should be considered "forward-looking statements." We have assumed for purposes of the table below that the Company has not used its discretion to accelerate any awards that do not accelerate pursuant to their terms.

| Name | Change of Control | Qualifying Termination (3) | Constructive Termination (3) | Death (3) | Disability (3) |
|---|---|---|---|---|---|
| A. R. Sanchez, Jr. | $ 802,385 | $ 476,050 | $ 476,050 | $ 476,050 | $ 476,050 |
| Antonio R. Sanchez, III | $ 778,199 | $ 451,864 | $ 451,864 | $ 451,864 | $ 451,864 |
| Patricio D. Sanchez | $ 374,516 | $ 201,116 | $ 174,116 | $ 201,116 | $ 201,116 |
| Howard J. Thill (1) | $ — | $ — | $ — | $ — | $ — |
| Christopher D. Heinson (2) | $ — | $ — | $ — | $ — | $ — |
| Cameron W. George | $ 213,224 | $ 129,112 | $ 129,112 | $ 129,112 | $ 129,112 |
| Gregory B. Kopel | $ 150,918 | $ 87,834 | $ 87,834 | $ 87,834 | $ 87,834 |

(1) In connection with Mr. Thill's resignation from the company effective October 26, 2018, Mr. Thill forfeited 66,667 shares of phantom stock and 66,667 shares of restricted stock granted under the Plan, became vested in 245,250 shares of restricted stock and 245,250 shares of phantom stock granted under the Plan. Upon the execution of the Separation Agreement, Mr. Thill received a payment of $451,260 with regard to such vested phantom stock. Mr. Thill's 2018 PSUs previously granted under the Plan will continue to vest on each applicable vesting date in in accordance with the terms unrelated to employment set forth therein. See "Item 11. Executive Compensation—Compensation Disclosure and Analysis—The Executive Compensation Program in Detail—Long-Term Incentive Plan—2018 Plan Awards" and "—Settlement of Vested Cash-Settled Phantom Stock Awards."

(2) In connection with Mr. Heinson's resignation from the Company on July 9, 2018, Mr. Heinson forfeited all of his unvested awards.

(3) With respect to our (i) 2017 Performance Awards and (ii) 2018 PSUs consisting of awards of performance stock-settled phantom shares and performance cash-settled phantom shares, upon a Qualifying Termination, Constructive Termination, death or Disability of the named executive officer, such outstanding awards in (i) and (ii) will vest on a pro-rata basis on the remaining vesting dates, subject to the satisfaction of (x) the applicable performance conditions with respect to the 2017 Performance Awards and (y) the 2018 Award Performance Conditions with respect to the 2018 PSUs. Because it is not possible to predict actual performance for the 2019-2021 measuring periods, our estimates of potential payments upon the occurrence of such event do not include payments under such 2017 Performance Awards or 2018 PSUs.

***2018 Director Compensation***

We have not and do not expect to pay our directors who are also our officers any additional amounts for their service to us in their capacities as directors. Accordingly, Messrs. Sanchez, Jr. and Sanchez, III do not receive additional compensation for their service as a director. Their compensation is reported in the section titled "Summary Compensation Table." Our current compensation package for our non-employee directors consists of both cash and equity compensation.

The Board-approved compensation for our non-employee directors for fiscal 2018 was as follows:

- an annual cash retainer fee of $75,000;
- cash payments of $1,000 for each Board and/or committee meeting attended via teleconference and cash payments of $1,500 for each Board and/or committee meeting attended in person;
- a committee chair fee for each chair of the Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee of $20,000, $15,000 and $10,000, respectively;
- a grant of restricted stock awards under the Plan; and
- reimbursement for travel and miscellaneous expenses incurred to attend meetings of our Board or its committees.

On November 9, 2018, the Board established a Special Committee. The Board appointed Messrs. Davis and Zylman to the Special Committee and appointed Mr. Davis as chairman of the Special Committee. In connection with the formation of the Special Committee, the Board established a $25,000 per month chair fee for the Special Committee.

In April 2019, the Board approved an annual cash retainer of $175,000 to our non-employee directors, representing an annual fixed retainer package of $70,000 and a cash-based award in lieu of restricted stock in the amount of $105,000. However, Mr. Davis

Table of Contents

will continue to receive an annual cash retainer of $75,000 and will not receive grants of restricted stock, consistent with his compensation arrangements for fiscal year 2018.

Each director, received the prorated amounts of the annual cash retainer fee and committee chair fee, as applicable, for the period of fiscal 2018 during which such director served as a member of the Board and, as applicable, as a committee chair. Each director also received cash payment of $1,000 or $1,500, respectively, for the Board meetings and committee meetings that such director attended.

In connection with their service to the Company as directors, 50,762 shares of restricted stock under the Plan were granted to Messrs. Carney, Colvin, Garcia, Jackson, Maher and Nelson on June 1, 2018. Each of these grants will vest on the one-year anniversary of its date of grant. In connection with Mr. Zylman's appointment to the Board on October 26, 2018, the Compensation Committee of the Board awarded 66,937 shares of restricted stock to Mr. Zylman pursuant to the Plan, which will vest on June 1, 2019. Mr. Davis was not awarded any restricted stock in connection with his appointment to the Board.

Notwithstanding such vesting period for the directors' restricted stock, upon the occurrence of a Change of Control, the shares of restricted stock will vest automatically. Moreover, in the event of a director's death, disability, termination or removal, all unvested shares will be forfeited; however, in the event of the respective director's death, the Compensation Committee may, but is not obligated to, accelerate the vesting of any or all of his shares of restricted stock. Further, notwithstanding the above, pursuant to the terms of the applicable restricted stock agreement, the Compensation Committee may, at its sole discretion, choose to accelerate the vesting of an award of restricted shares at any time.

Table of Contents

The following table provides information concerning the compensation of our non-employee directors for the fiscal year ended December 31, 2018.

| Name | Fees Earned or Paid in Cash (1) | Stock Awards (2) | All Other Compensation (3) | Total |
|---|---|---|---|---|
| T. Brian Carney | $ 115,500(4) | $ 203,556 | $ 105,845 | $ 424,900 |
| M. Gregory Colvin | $ 94,500(5) | $ 203,556 | $ 22,055 | $ 320,111 |
| Eugene I. Davis | $ 68,062(6) | $ —(6) | $ — | $ 271,618 |
| Gilbert A. Garcia | $ 147,000(7) | $ 203,556 | $ — | $ 350,556 |
| Alan G. Jackson | $ 106,000(8) | $ 203,556 | $ 21,986 | $ 331,541 |
| Sean M. Maher | $ 135,500(9) | $ 203,556 | $ 30,015 | $ 369,071 |
| Robert V. Nelson, III | $ 115,500(10) | $ 203,556 | $ — | $ 319,056 |
| Adam C. Zylman | $ 25,562(11) | $ 117,809(11) | $ — | $ 229,118 |

(1) Includes annual cash retainer fee, Board and committee meeting fees and committee chair fees, as applicable, for each non-employee director earned during fiscal 2018.

(2) The amounts reported in the "Stock Awards" column reflect the aggregate grant date fair value of restricted stock awards granted under our Plan for fiscal 2017, computed in accordance with FASB ASC Topic 718. See Note 8, "Stock-Based Compensation," to the Consolidated Financial Statements included under "Item 8. Financial Statements and Supplementary Data" in our Original Filing for additional detail regarding assumptions. As of December 31, 2018, Messrs. Carney, Colvin, Garcia, Jackson, Maher, Nelson each had 50,762 shares of restricted stock outstanding and Mr. Zylman had 66,937 shares of restricted stock outstanding.

(3) In fiscal 2018, "All Other Compensation" for Mr. Carney included group term life insurance costs and medical insurance costs paid by us on behalf of the director and the aggregate incremental cost of the personal use of aircraft owned or provided by the Company in the amount of $96,576; for Mr. Jackson included group term life insurance costs and medical insurance costs paid by us on behalf of the director; for Mr. Maher included the aggregate incremental cost of the personal use of aircraft owned or provided by the Company in the amount of $30,015; and for Mr. Colvin included medical insurance costs paid by us on behalf of the director. For additional information regarding the aggregate incremental cost of the personal use of aircraft owned or provided by the Company or a member of the Sanchez Group, see footnote 5 to the "Summary Compensation Table" above.

(4) Mr. Carney attended a total of 36 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings in person or telephonically and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.

(5) Mr. Colvin attended a total of 17 formal Board meetings and took action by unanimous written consent 10 times on behalf of the Board in fiscal 2018.

(6) Mr. Davis was appointed to the Board on October 26, 2018. Mr. Davis attended a total of 11 formal Board and Special Committee meetings of the Board in fiscal 2018.

(7) Mr. Garcia attended a total of 33 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.

(8) Mr. Jackson attended a total of 17 formal Board and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 11 times on behalf of the Board and Nominating and Corporate Governance Committee in fiscal 2018.

(9) Mr. Maher attended a total of 36 formal Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.

(10) Mr. Nelson attended a total of 37 formal Board, Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee meetings and took action by unanimous written consent 16 times on behalf of the Board, Audit Committee, Compensation Committee and Nominating and Corporate Governance Committee in fiscal 2018.

(11) Mr. Zylman was appointed to the Board on October 26, 2018. Mr. Zylman attended a total of 11 formal Board and Special Committee meetings in fiscal 2018.

**Compensation Committee Interlocks and Insider Participation**

As described above, the compensation decisions regarding our executive officers, other than awards under our Plan, are made by SOG, subject to the ability of our Audit Committee to review, verify and dispute the reasonableness of such compensation pursuant to procedures set forth in the services agreement.

None of our executive officers serves, or has served, during the last completed fiscal year, on the compensation committee or board of directors of any other company that has one or more executive officers serving on our Compensation Committee or the Board.

Table of Contents

**Item 12.** ***Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters***

**Securities Authorized for Issuance Under Equity Compensation Plan**

For information regarding securities authorized for issuance under an equity compensation plan, please see "Item 5. Part II" of the Original Filing.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth certain information regarding the beneficial ownership of common stock as of April 23, 2019 by (i) each person who is known by the Company to own beneficially more than 5% of the outstanding shares of common stock, (ii) each named executive officer of the Company, (iii) each director of the Company and (iv) all directors and executive officers as a group. The list of persons named in the table below is derived from our review of Form 3, Form 4, Form 5, Schedule 13D and Schedule 13G filings made with the SEC as of April 23, 2019. Unless otherwise noted, the mailing address of each person or entity named below is 1000 Main Street, Suite 3000, Houston, Texas 77002. "Beneficial Ownership" is a term broadly defined by the SEC in Rule 13d-3 under the Exchange Act. Beneficial ownership includes those shares of common stock held by someone who has investment and/or voting authority over such shares or has the right to acquire such shares within 60 days. The ownership includes common stock that is held directly and also common stock held indirectly through a relationship, a position as a trustee, or under a contract or understanding.

| Beneficial holders | Number of shares beneficially held | Percentage of beneficial ownership (1) |
|---|---|---|
| **5% Stockholders:** | | |
| None | | |
| **Directors and named executive officers:** | | |
| A. R. Sanchez, Jr. (2) | 6,256,408 | 6.27% |
| Antonio R. Sanchez, III (3) | 3,044,930 | 3.05% |
| Patricio D. Sanchez (4) | 1,255,906 | 1.26% |
| Cameron W. George (5) | 297,792 | *% |
| Gregory B. Kopel (6) | 217,176 | *% |
| T. Brian Carney (7) | 95,625 | *% |
| M. Gregory Colvin (8) | 192,506 | *% |
| Eugene I. Davis | — | —% |
| Gilbert A. Garcia (9) | 161,466 | *% |
| Alan G. Jackson (10) | 143,045 | *% |
| Sean M. Maher (11) | 116,940 | *% |
| Robert V. Nelson, III (12) | 91,280 | *% |
| Adam C. Zylman (13) | 66,937 | *% |
| **All directors and executive officers as a group (14 persons)** | 10,534,330 | 10.55% |

*Denotes less than 1% beneficially owned.

(1) Based upon an aggregate of 99,828,592 shares outstanding as of April 23, 2019. Total shares outstanding include shares of restricted stock subject to forfeiture conditions.

(2) SOG directly owns 799,472 of these shares. SOG is managed by Mr. Sanchez, Jr. and other members of the Sanchez family. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by SOG. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. Each of the following trusts (the "***Trusts***") directly owns 371,836 of these shares, except 1988 Trust No. 13, which owns 175,036 of these shares: (i) 1988 Trust No. 11: co-trustee/beneficiary Mr. Sanchez, III; (ii) 1988 Trust No. 12: co-trustee/beneficiary Ana Lee Sanchez Jacobs; (iii) 1988 Trust No. 13: co-trustee/beneficiary Eduardo Sanchez; and (iv) 1988 Trust No. 14: co-trustee/beneficiary Mr. P. Sanchez. Mr. Sanchez, Jr. is a co-trustee, along with the respective co-trustees and beneficiaries listed next to the name of the Trust above, of each of the Trusts set forth above. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by the Trusts. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. The Alicia M. Sanchez Charitable Lead Annuity Trust ("***CLAT***") directly owns 26,213 of these shares. Mr. Sanchez, Jr. is the sole trustee of CLAT. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interests therein. Sanexco, Ltd. ("***Sanexco***") directly owns 707,333 of these shares. Sanexco is controlled by its general partner, Sanchez Management Corporation ("***SMC***"), which is managed by Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by Sanexco. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. San Juan Oil & Gas No. 2, Ltd. ("***San Juan***") directly owns 707,333 of these shares. San Juan is controlled by its general partner, SMC, which is managed by Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to share voting and dispositive power over the shares held by San Juan. Mr. Sanchez, Jr. disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein. AEP Ltd. Partnership ("***AEP***") directly owns 474,800 of these shares. AEP is controlled by its general partner, Mr. Sanchez, Jr. Mr. Sanchez, Jr. may be deemed to

share voting and dispositive power over the shares of common stock held by AEP. Mr. Sanchez, Jr. disclaims beneficial ownership of the shares of common stock held by AEP except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. Sanchez, Jr. has sole voting and dispositive power over 2,250,713 shares (1,663,741 shares of common stock and 586,972 shares of restricted common stock).

(3) SOG directly owns 799,472 of these shares. SOG is managed by Mr. Sanchez, III and other members of the Sanchez family. Mr. Sanchez, III may be deemed to share voting and dispositive power over the shares of common stock held by SOG. Mr. Sanchez, III disclaims beneficial ownership of the shares of common stock held by SOG except to the extent of his pecuniary interests therein. 1988 Trust No. 11 directly owns 371,836 of these shares. Mr. Sanchez, III is a co-trustee, along with Mr. Sanchez, Jr., and beneficiary of 1988 Trust No. 11. Mr. Sanchez, III may be deemed to share voting and dispositive power over the shares of common stock held by 1988 Trust No. 11. Mr. Sanchez, III disclaims beneficial ownership of the shares of common stock held by 1988 Trust No. 11 except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. Sanchez, III has sole voting and dispositive power over 1,873,622 shares (1,286,650 shares of common stock and 586,972 shares of restricted common stock).

(4) 1988 Trust No. 14 directly owns 371,836 of these shares. Mr. P. Sanchez is a co-trustee, along with Mr. Sanchez, Jr., and beneficiary of 1988 Trust No. 14. Mr. P. Sanchez may be deemed to share voting and dispositive power over the shares of common stock held by 1988 Trust No. 14. Mr. P. Sanchez disclaims beneficial ownership of the shares of common stock held by 1988 Trust No. 14 except to the extent of his pecuniary interests therein. In addition to the shares over which he has shared voting and dispositive power, Mr. P. Sanchez has sole voting and dispositive power over 884,070 shares (562,161 shares of common stock and 321,909 shares of restricted common stock).

(5) Includes 200,443 shares of restricted common stock.

(6) Includes 124,008 shares of restricted common stock.

(7) Includes 50,762 shares of restricted common stock and 500 shares are held by one child.

(8) Includes 50,762 shares of restricted common stock and 16,204 shares are held by three children

(9) Includes 50,762 shares of restricted common stock.

(10) Includes 50,762 shares of restricted common stock. 21,600 shares are held by Mr. Jackson's wife. Mr. Jackson disclaims beneficial ownership of the shares of common stock held by his wife.

(11) Includes 50,762 shares of restricted common stock.

(12) Includes 50,762 shares of restricted common stock.

(13) Includes 66,937 shares of restricted common stock.

**Item 13.** ***Certain Relationships and Related Transactions, and Director Independence***

**Transactions with Related Persons**

***Related Party Transaction Policy***

A "***Related Party Transaction***" is a transaction, arrangement or relationship in which we or any of our subsidiaries was, is or will be a participant, the amount of which involved exceeds $120,000, and in which any related person (as defined below) had, has or will have a direct or indirect material interest. Pursuant to the Company's related party transactions policy, a "related person" means:

- any person who is, or at any time during the applicable period was, one of our executive officers or one of our directors or is currently one of our nominees for director;
- any person who is known by us to be the beneficial owner of more than 5% of our common stock;
- any immediate family member of any of the foregoing persons, which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law of a director, director nominee, executive officer or a beneficial owner of more than 5% of our common stock, and any person (other than a tenant or employee) sharing the household of such director, director nominee, executive officer or beneficial owner of more than 5% of our common stock;
- any entity in which any of the foregoing persons serves as an executive officer or principal or in a similar position, or, in the case of a partnership, serves as a general partner or holds any position other than that of a limited partner;
- any entity in which any of the foregoing persons owns, together with all other foregoing persons, 10% or more of the equity interest, or in the case of a partnership, 10% or more of an interest; or
- any entity in which any of the foregoing persons is employed if (a) the person is directly involved in the negotiation of the Related Party Transaction or will share or have primary responsibility at such entity for the performance of the Related Party Transaction, or (b) the person's compensation from the entity is directly tied to the Related Party Transaction.

The purposes of this policy are to identify, review, assess and, if deemed appropriate, approve Related Party Transactions. Pursuant to our related party transactions policy, the Audit Committee reviews all material facts of all Related Party Transactions and either approves or disapproves entry into the Related Party Transaction, subject to certain limited exceptions. In determining whether the Related Party Transaction is fair to the Company, the Audit Committee takes into account, among other factors, the following:

- whether there are demonstrable business reasons for the transaction;
- whether the transaction is material to the Company;

- the benefits that accrue to the Company as a result of the transaction;
- whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances;
- the impact of the transaction on a director's independence (in the event the related person is a director, an immediate family member of a director or an entity in which a director is a partner, stockholder or executive officer);
- the extent of the related person's interest in the transaction;
- the role the related person played in arranging the transaction;
- the availability of other sources for comparable products or services;
- whether it is a single transaction or a series of ongoing, related transactions; and
- whether entering into the transaction would be consistent with the Code of Business Conduct and Ethics.

Our related party transaction policy also requires that all Related Party Transactions required to be disclosed in our filings with the SEC be so disclosed in accordance with applicable laws, rules and regulations. There were no Related Party Transactions since the beginning of our last fiscal year that are required to be reported in "Transactions with Related Persons" where the procedures described above did not require review, approval or ratification or where these procedures were not followed.

The description below of agreements with various members of the Sanchez Group, our directors and executive officers and certain significant stockholders is a summary and, with respect to each such agreement, is qualified by reference to the terms of the agreement, each of which, if required, was filed as an exhibit to our 2018 10-K. We encourage you to read the full text of these filed agreements. These agreements have been negotiated among affiliated parties and, consequently, are not the result of arm's length negotiations. The prices and other terms of these agreements may be less favorable to us than those we could have obtained in arm's length negotiations with unaffiliated third parties for similar services or under similar agreements.

***International Bank of Commerce***

Mr. Sanchez, Jr., our Executive Chairman of the Board, is a director and greater than 10% stockholder of International Bancshares, the parent of IBC, which provides insurance brokerage services on a commission basis to the Company and its affiliates. For the fiscal year ended December 31, 2018, the Company and its affiliates paid IBC premiums of approximately $2.9 million.

***Sanchez Oil & Gas Corporation***

SOG, headquartered in Houston, Texas, is a privately owned full service oil and natural gas operating company engaged in the exploration and development of oil and natural gas assets primarily in the South Texas, Louisiana and onshore Gulf Coast areas on behalf of certain of its affiliates, including the Company, pursuant to existing management services agreements. Eduardo A. Sanchez and Ana Lee Sanchez Jacobs, immediate family members of the Executive Chairman of the Board, the President and Chief Executive Officer and an Executive Vice President of the Company, collectively with such individuals (the "***SN Members***"), either directly or indirectly, own 100% of the equity interests in SOG. In addition, Mr. Sanchez, Jr. is the sole member of the board of directors and chief executive officer of SOG, Mr. Sanchez, III and Mr. P. Sanchez are Co-Presidents of SOG, Ana Lee Sanchez Jacobs is an Executive Vice President of SOG, Cameron W. George is Executive Vice President — Chief Financial Officer of SOG, Gregory B. Kopel is Executive Vice President — General Counsel of SOG and Kirsten Hink is Sr. Vice President — Chief Accounting Officer of SOG.

Concurrently with the closing of our initial public offering ("***IPO***"), we entered into a services agreement with SOG pursuant to which, among other things, specified employees of SOG, including our executive officers, provide certain services to us with respect to our business under the direction, supervision and control of SOG. Salaries and associated benefits of SOG employees are allocated to the Company based on a fixed percentage that is reviewed periodically and adjusted, if needed, based on a detailed analysis of actual time spent by the professional staff on Company projects and activities. Our Audit Committee is able to review, verify and dispute the reasonableness of such allocated costs pursuant to procedures set forth in the services agreement. General and administrative expenses such as office rent, utilities, supplies and other overhead costs, are allocated on the same percentages as the SOG employee salaries. We reimburse SOG for the provision of services to us, including those provided by our executive officers, at a price equal to SOG's cost of providing such services, including all direct costs and indirect administrative and overhead costs (including the allocable portion of salary, bonus, incentive compensation and other amounts paid to persons that provide the services on SOG's behalf) allocated in accordance with SOG's regular and consistent accounting practices, including for any such costs arising from amounts paid directly by other members of the Sanchez Group on SOG's behalf or borrowed by SOG from other members of the Sanchez Group, in each case in connection with the performance by SOG of services on our behalf. We also reimburse SOG for sales, use or other taxes, or other fees or assessments imposed by law in connection with the provision of services to us (other than income, franchise or margin taxes measured by SOG's net income or margin and other than any gross receipts or other privilege taxes imposed on SOG) and for any costs and expenses arising from or related to the engagement or retention of third-party service providers. Expenses allocated to the Company by SOG for general and administrative expenses and oil and natural gas production expenses for the year ended December 31, 2018 were $64.9 million. As of December 31, 2018, the Company had a net receivable from SOG and

certain other members of the Sanchez Group of $6.1 million, which consisted primarily of advances paid related to leasehold and other costs paid to SOG.

Under the services agreement, we are entitled to indemnification for certain liabilities, and are required to indemnify SOG and its affiliates for certain liabilities. SOG is required to indemnify us for third-party infringement or misappropriation claims relating to the services performed by SOG or the data or other information provided to us or used by SOG in connection with the services, the related seismic, geological and geophysical licensing agreement or our operations based on the services provided by SOG. We, on the other hand, are otherwise required to indemnify SOG and its affiliates from liabilities relating to the services or products provided to us by SOG or our agreements with SOG, to the extent not directly caused by the gross negligence or willful misconduct of SOG or its affiliates. The initial term of the services agreement was for five years and expired in December 2016. The services agreement has continued on a year-to-year basis from December 2016. The term automatically extends for additional 12-month periods unless either party provides 180-days written notice otherwise prior to the expiration of the applicable 12-month period. Either party may terminate the agreement at any time upon 180-days written notice.

***Sanchez Midstream Partners LP***

Mr. Sanchez, III, the son of Mr. Sanchez, Jr. and brother of Eduardo A. Sanchez and Mr. P. Sanchez, is the Company's President and Chief Executive Officer and is a member of the board of directors of both the Company and of SNMP GP. Mr. P. Sanchez, an Executive Vice President of the Company, is the president & chief operating officer and a director of SNMP GP. Mr. Eduardo A. Sanchez, our former President, is also a member of the board of directors of SNMP GP. Messrs. Sanchez, Jr., Sanchez, III, P. Sanchez and Eduardo A. Sanchez all directly or indirectly own certain equity interests in the Company and SNMP. Mr. Sanchez, Jr., Mr. Sanchez, III, Eduardo A. Sanchez and Mr. P. Sanchez beneficially own approximately 0.80%, 3.01%, 3.00% and 4.14%, respectively, of the SNMP common units outstanding as of December 31, 2018 and, together with Ana Lee Sanchez Jacobs, indirectly own 100% of SNMP GP.

***SNMP Units***. On November 22, 2016, we purchased 2,272,727 common units of SNMP from SNMP for $25 million in a private placement that closed concurrently with SNMP's public offering of approximately 6.5 million common units. From January 1, 2018 through April 24, 2019, we received approximately $3.8 million in distributions on our SNMP common units.

***SECO Pipeline***. On September 1, 2017, SN Catarina, LLC ("***SN Catarina***") entered into an agreement with Seco Pipeline, LLC ("***Seco Pipeline***"), a wholly owned subsidiary of SNMP, whereby Seco Pipeline transports certain quantities of natural gas on a firm basis for $0.22 per MMBtu delivered on or after September 1, 2017. This agreement had an initial term of one month that expired on September 30, 2017, but the agreement continues month-to-month thereafter unless terminated by either party. The Company paid Seco Pipeline an aggregate of approximately $6.8 million for transportation services for the fiscal year ended December 31, 2018.

***Carnero JV Gathering and Processing***. In May 2018, SNMP executed a series of agreements (the "***Carnero G&P Transaction***") with an affiliate of Targa Resources Corp. ("***Targa***") pursuant to which, among other matters, the parties merged their respective 50% interests in Carnero Gathering, LLC ("***Carnero Gathering***") and Carnero Processing, LLC to form an expanded 50/50 joint venture in South Texas, Carnero G&P LLC ("***Carnero G&P***"). Effective April 1, 2018, SN EF Maverick, LLC, a subsidiary of the Company ("***SN Maverick***"), and Carnero G&P entered into a Firm Gas Gathering, Processing and Purchase Agreement (the "***Carnero Gas Gathering Agreement***") and other related documentation providing for certain natural gas gathering, treating and processing services in exchange for an approximately 315,000 gross acreage dedication from SN Maverick and its working interest partners in our Comanche area. Additionally, effective April 1, 2018, and in connection with the Carnero G&P Transaction, SN Catarina and an affiliate of Targa also amended their existing firm gas gathering agreement and firm gas processing agreement, which were subsequently assigned by the Targa counterparty to Carnero G&P. SN Maverick paid approximately $7.1 million to Carnero under the predecessor agreements in place from January 1, 2018 through March 31, 2018; SN Maverick paid approximately $14.9 million to Carnero G&P pursuant to the Carnero Gas Gathering Agreement from April 1, 2018 through December 31, 2018. However, the gathering and processing fees paid from SN Maverick to Carnero G&P pursuant to the Carnero Gas Gathering Agreement were netted against NGLs (as defined in the Original Filing) and natural gas proceeds from SN Maverick to Carnero. Therefore, there were no outgoing payments to Carnero G&P during the year ended December 31, 2018. In addition, on January 4, 2019, we caused an irrevocable letter of credit to be issued for the benefit of Carnero G&P in an aggregate face amount of approximately $17.1 million as credit assurance under the terms of the gathering and processing agreements with Carnero G&P.

In July 2016, SN Midstream, LLC, a wholly owned subsidiary of the Company ("***SN Midstream***"), sold its membership interests in Carnero Gathering to SNMP in exchange for cash and the assumption by SNMP of membership interests constituting 50% of the outstanding membership interests in Carnero Gathering. As part of the conveyance, SNMP was required to pay SN Midstream a monthly "earnout" based on receipt of natural gas. For the fiscal year ended December 31, 2018, the Company received approximately $67,260 for earnouts in 2018.

Table of Contents

***Catarina Gathering***. As of December 31, 2018, the Company had a net payable to SNMP of approximately $6.1 million that consists primarily of accruals for fees associated with a Firm Gathering and Processing Agreement (the "***Gathering Agreement***"), dated October 14, 2015, with an initial term of 15 years under which production from approximately 35,000 acres in Dimmit County and Webb County, Texas, has been dedicated for gathering by a wholly owned subsidiary of SNMP. In addition, for the first five years of the Gathering Agreement, SN Catarina is required to meet a minimum quarterly volume delivery commitment of 10,200 Bbl per day of crude oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. SN Catarina is required to pay gathering and processing fees of $0.96 per barrel for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through the gathering system, in each case, subject to an annual escalation for a positive increase in the consumer price index. In addition, SN Catarina has, under certain circumstances, a right of first refusal during the term of the agreement and afterwards with respect to dispositions by Catarina Midstream of its ownership interest in the gathering system. See "Item 7. "Management's Discussion & Analysis of Financial Condition and Results of Operations—Commitments and Contractual Obligations" in the Original Filing for additional information regarding the Gathering Agreement. On June 30, 2017, the Gathering Agreement was amended to, among other things, provide for an additional, incremental infrastructure fee payable to SNMP of $1.00 per barrel of water delivered by SNMP on or after April 1, 2017 through and including March 31, 2018. Since March 31, 2018, the Company and SNMP have agreed to continue the incremental fee on a month-to-month basis.

***Blackstone, Gavilan, GSO***

On March 1, 2017, the Company, SN EF Maverick, SN EF UnSub, LP, a subsidiary of the Company ("***SN UnSub***"), and Gavilan Resources, LLC ("***Gavilan***" and, together with SN Maverick and SN UnSub, the "***Buyers***"), an entity controlled by affiliates of The Blackstone Group L.P. ("***Blackstone***"), completed the closing of the transactions contemplated by the purchase and sale agreement (the "***Purchase Agreement***") among the Buyers and Anadarko E&P Onshore, LLC and Kerr-McGee Oil & Gas Onshore LP (together, the "***Sellers***"). At the closing, the Buyers collectively purchased all of the right, title and interest of the Sellers in the Comanche asset for aggregate consideration of approximately $2.1 billion, subject to customary purchase price adjustments. In addition, on March 1, 2017, we entered into a number of transactions with entities affiliated or associated with GSO Capital Partners LP ("***GSO***"), certain funds managed or advised by GSO (the "***GSO Funds***") and/or Blackstone. In connection with the closing of the transactions contemplated by the Purchase Agreement, pursuant to an Interim Investors Agreement, dated as of January 12, 2017, among the Company, SN Maverick, Blackstone Capital Partners VII L.P. and Blackstone Energy Partners II L.P. we issued to entities controlled by affiliates of Blackstone warrants (expiring on March 1, 2022) to purchase an aggregate of 6.5 million shares of our common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments, and pursuant to a Securities Purchase Agreement, dated as of January 12, 2017, among the Company, SN UnSub, SN EF UnSub GP, LLC, the general partner of SN UnSub (the "***SN UnSub General Partner***"), SN UR Holdings, SN EF UnSub Holdings, LLC, a subsidiary of SN UR Holdings, GSO ST Holdings Associates LLC ("***GSO Associates LLC***"), and GSO ST Holdings LP ("***GSO Associates LP***") (which was amended and restated on February 28, 2017 to add Intrepid Private Equity V-A, LLC as an additional party thereto): (i) GSO Associates LP purchased 485,000 preferred units of SN UnSub for $485,000,000; (ii) GSO Associates LLC purchased 1 Class B Unit in SN UnSub General Partner for nominal consideration; and (iii) the GSO Funds received (a) 1,455,000 shares of the Company's common stock and (b) warrants (expiring on March 1, 2032) to purchase 1,940,000 shares of the Company's common stock at an exercise price of $10 per share, subject to customary anti-dilution adjustments. As of March 2019, to the Company's knowledge, Blackstone's controlled affiliates have disposed of the Company warrants referenced above and the GSO Funds have disposed of the Company warrants and shares of common stock referenced above.

During the year ended December 31, 2018, GSO Associates LP was entitled to receive approximately $48.5 million in preferred distributions from SN UnSub, which amount was offset by approximately $2.5 million of cash distributions related to certain tax obligations paid to GSO during 2017, resulting in approximately $46.0 million in cash distributions being paid to GSO Associates LP during 2018.

We entered into a management services agreement between Gavilan Holdco (as defined in the Original Filing) and SN Comanche Manager, LLC ("***Manager***"), a wholly owned subsidiary of the Company, pursuant to which Manager serves as manager of Gavilan Holdco's business and provides comprehensive general, administrative, business and financial services at a price equal to Manager's actual cost of providing such services (including an "administrative fee" equal to 2% of SOG's total general and administrative ("***G&A***") costs), continuing until the occurrence of one or more events giving Manager or Gavilan Holdco the right to terminate the agreement. At the closing of the Comanche Acquisition, Gavilan Holdco paid $1.0 million to Manager under the agreement. The management services agreement provides that Manager may not bill more than $500,000 of G&A costs per month to Gavilan Holdco (subject to reasonable adjustments that are consistent with market terms as a result of an increase in actual G&A costs incurred, and based upon a reasonable allocation of such costs). Gavilan Holdco paid Manager approximately $6.0 million under the agreement for the fiscal year ended December 31, 2018. On February 28, 2019, Gavilan Holdco sent us a notice of partial termination of the management services agreement, but did not purport to terminate the agreement in its entirety. Furthermore, we are currently in a disagreement with Gavilan Holdco regarding charges invoiced to Gavilan during calendar year 2018 as well as charges invoiced to Gavilan Holdco through February 2019. We also entered into a back-to-back management arrangement between Manager and SOG, on substantially the same terms and conditions as the services agreement with Gavilan Holdco referred to above, pursuant to which

Manager delegated to SOG, and SOG agreed to perform for and on behalf of Manager, Manager's duties and obligations under such services agreement; Manager is required to remit amounts received directly from Gavilan Holdco to SOG, including the $1.0 million paid at closing to Manager, and to pay SOG the 2% administrative fee referred to above. For the fiscal year ended December 31, 2018 we paid SOG an additional approximately $6.0 million under the back-to-back agreement. In addition, we entered into a management services agreement between SOG and SN UnSub pursuant to which SOG serves as manager of SN UnSub's oil and natural gas properties and provides comprehensive general, administrative, business and financial services at a price equal to SOG's actual cost of providing such services (including an "administrative fee" equal to 2% of SOG's total G&A costs), with an initial term expiring on March 1, 2024 (subject to earlier termination as provided therein), renewing automatically for additional one-year terms thereafter unless either SN UnSub or SOG delivers written notice to the other of its desire not to renew the term at least 180 days prior to such anniversary date. SOG was not able to allocate G&A costs to SN UnSub in excess of $5 million per calendar year through March 1, 2019 and may not thereafter allocate in excess of $10 million per calendar year. For the fiscal year ended December 31, 2018 we paid SOG approximately $5.5 million under this agreement.

We entered into a crude oil production marketing agreement, a residue gas marketing agreement and a natural gas liquids marketing agreement between Gavilan and SN Maverick wherein Gavilan, subject to certain take-in-kind rights, agrees to sell all production from the Comanche asset to SN Maverick and SN Maverick purchases all such production from Gavilan, transports and sells such production pursuant to SN Maverick's downstream arrangements, and remits to Gavilan its proportionate share of the sale proceeds. The agreements are each for a primary term through December 31, 2022, with automatic year-to-year renewals thereafter unless terminated by either party. For year ended December 31, 2018, we remitted approximately $262.1 million in proceeds to Gavilan under these agreements from aggregate marketing revenues of approximately $322.7 million attributable to Gavilan's 50% share of the working interest acquired from the Sellers in the Comanche Acquisition. These agreements include a reconciliation mechanism that provides for estimated upfront payments by us with subsequent reconciliations in later months and, as a result, the reported amount includes both the estimated prepayments made by us for the post-transition services period as well as additional payments by us to make up for any shortfalls for the post-transition services period. The remitted amounts are net of certain expenses and costs incurred by us or the Sellers and/or their respective affiliates.

For additional information regarding related party transactions, see Note 7—"Stockholders' and Mezzanine Equity" and Note 10—"Related Party Transactions" in the notes to the audited consolidated financial statements in the Original Filing, as well as our Risk Factors in the Original Filing, including the Risk Factor titled "*We may lose our rights to the Sanchez Group's technological database, including its 3D and 2D seismic data, under certain circumstances*" and the Risk Factors on pages 36 and 37 of the Original Filing related to the JDA (as defined in the Original Filing) and our agreements with Blackstone and GSO, or their respective affiliates.

**Director Independence**

Our Board has determined that each of Messrs. Carney, Colvin, Davis, Garcia, Jackson, Maher, Nelson and Zylman are "independent directors" as defined by the rules of the NYSE and, that each of Messrs. Garcia, Carney, Maher and Nelson are "independent directors," as defined by applicable NYSE and Exchange Act rules, for purposes of each committee on which they serve, including our Audit Committee.

**Item 14. *Principal Accountant Fees and Services***

**Audit and Other Fees**

The table below sets forth the fees billed by KPMG, the Company's current independent registered public accounting firm, for the fiscal years presented:

| Fiscal Year | Audit Fees(1) | Audit-Related Fees(2) | Tax Fees(3) | All Other Fees(4) |
|---|---|---|---|---|
| Fiscal year ended December 31, 2018 | $ 2,327,465 | $ — | $ 222,686 | $ — |
| Fiscal year ended December 31, 2017 | $ 3,277,000 | $ — | $ 374,000 | $ — |

(1) Audit fees represent fees for professional services provided by our principal accountant in connection with the audit of our consolidated financial statements, the quarterly reviews of financial statements included in our Form 10-Q filings, the reviews of other statutory or regulatory filings and assistance with and review of documents filed with the SEC.
(2) Audit-related fees are fees for assurance and related services that are reasonably related to the performance by our principal accountant of the audit or review of our financial statements that are not audit fees.
(3) Tax fees include fees for professional services performed by our principal accountant for tax compliance, including the preparation of tax returns, and tax advice and tax planning.
(4) All other fees include the aggregate fees for products and services provided by our principal accountant that are not reported under "Audit Fees," "Audit-Related Fees" or "Tax Fees." There were no other fees incurred during the years ended December 31, 2018 and 2017.

Table of Contents

The charter of the Audit Committee requires that the Audit Committee review and pre-approve the plan and scope of KPMG's audit, tax and other services. The Audit Committee pre-approved 100% of the services described above under the captions "Audit Fees," "Audit-Related Fees," "Tax Fees" and "All Other Fees."

## PART IV

**Item 15.** ***Exhibits and Financial Statement Schedules***

(3) Exhibits:

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

b. The exhibits listed in the Exhibit Index of the Original Filing and the following exhibits filed with this Amendment:

| Exhibit No. | Description of Exhibit |
|---|---|
| 31.3(a) | Sarbanes-Oxley Section 302 certification of Principal Executive Officer. |
| 31.4(a) | Sarbanes-Oxley Section 302 certification of Principal Financial Officer. |

(a) Filed herewith.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized, on April 29, 2019.

SANCHEZ ENERGY CORPORATION

By: /s/ ANTONIO R. SANCHEZ, III
Antonio R. Sanchez, III
*President and Chief Executive Officer*

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ ANTONIO R. SANCHEZ, III<br>Antonio R. Sanchez, III | President and Chief Executive Officer<br>(Principal Executive Officer) | April 29, 2019 |
| *<br>Cameron W. George | Executive Vice President and Chief Financial Officer<br>(Principal Financial Officer) | April 29, 2019 |
| *<br>Kirsten A. Hink | Senior Vice President and Chief Accounting Officer<br>(Principal Accounting Officer) | April 29, 2019 |
| *<br>A. R. Sanchez, Jr. | Executive Chairman of the Board of Directors | April 29, 2019 |
| *<br>Gilbert A. Garcia | Director | April 29, 2019 |
| *<br>Greg Colvin | Director | April 29, 2019 |
| *<br>Alan G. Jackson | Director | April 29, 2019 |
| *<br>Sean M. Maher | Director | April 29, 2019 |
| *<br>Brian Carney | Director | April 29, 2019 |
| *<br>Robert V. Nelson, III | Director | April 29, 2019 |
| *<br>Eugene I. Davis | Director | April 29, 2019 |
| *<br>Adam C. Zylman | Director | April 29, 2019 |

* The undersigned, by signing his name hereto, does execute this Amendment No. 1 to the Annual Report on Form 10-K of Sanchez Energy Corporation on behalf of the above-named officers and directors of the registrant pursuant to the Power of Attorney executed by such officers and/or directors on the signature pages to the report previously filed on March 1, 2019.

/s/ ANTONIO R. SANCHEZ, III
Antonio R. Sanchez, III
*President and Chief Executive Officer*

# Exhibit D

# HYDROCARBONS PURCHASE AND MARKETING AGREEMENT

**Between**

**SN EF MAVERICK, LLC**

**and**

**SN EF UNSUB, LP**

**Dated as of January 12, 2017**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1. | Specific Definitions | 1 |
| 1.2. | Construction | 1 |
| ARTICLE II PURCHASE AND SERVICES | | 2 |
| 2.1. | Purchase by Marketer | 2 |
| 2.2. | Limitations | 2 |
| 2.3. | Standard of Care | 2 |
| 2.4. | Repurchase Right | 2 |
| 2.5. | Reporting | 3 |
| 2.6. | Right to Cure | 3 |
| ARTICLE III PRICE AND PAYMENT | | 3 |
| 3.1. | Price | 3 |
| 3.2. | Statements and Payments | 3 |
| 3.3. | Audit Rights | 4 |
| 3.4. | Statement Errors | 4 |
| 3.5. | Setoff and Recoupment | 4 |
| 3.6. | Deposit of Producer's Proceeds and Security Interest. | 5 |
| ARTICLE IV WARRANTY OF TITLE | | 6 |
| 4.1. | Title Warranties | 6 |
| 4.2. | Title and Risk of Loss | 6 |
| ARTICLE V FORCE MAJEURE | | 7 |
| 5.1. | Suspension of Obligations | 7 |
| 5.2. | Definition of Force Majeure | 7 |
| ARTICLE VI TAXES | | 7 |
| 6.1. | Taxes | 7 |
| 6.2. | Reimbursement | 7 |
| ARTICLE VII TERM AND TERMINATION | | 7 |
| 7.1. | Term and Termination | 7 |
| 7.2. | Early Termination | 7 |
| 7.3. | Effect of Termination | 8 |
| ARTICLE VIII GENERAL PROVISIONS | | 8 |
| 8.1. | Waivers | 8 |
| 8.2. | Assignment; Binding Effect | 8 |
| 8.3. | Joinder | 8 |
| 8.4. | Governing Law; Severability | 9 |
| 8.5. | Further Assurances | 9 |
| 8.6. | Counterparts | 9 |
| 8.7. | Notices | 9 |
| 8.8. | Remedies | 10 |
| 8.9. | Disputes | 10 |
| 8.10. | Expenses | 11 |
| 8.11. | Third Party Beneficiaries | 11 |
| 8.12. | Conflict | 12 |
| 8.13. | Subchapter K | 12 |
| 8.14. | Entire Agreement; Integrated Transaction | 12 |
| 8.15. | Sanchez Support | 12 |

Annex I — Definitions
Exhibit A — Springfield Agreements Allocable Share
Exhibit B — Midstream Contracts

**HYDROCARBONS PURCHASE AND MARKETING AGREEMENT**

This **HYDROCARBONS PURCHASE AND MARKETING AGREEMENT** (this "Agreement"), dated as of January 12, 2017 (the "Effective Date"), is between SN EF Maverick, LLC, a Delaware limited liability company ("Marketer"), SN EF UnSub, LP, a Delaware limited partnership ("Producer"), and solely for purposes of Sections 8.15 and 8.16 hereof, Sanchez Energy Corporation, a Delaware corporation ("Sanchez"). Each of Marketer and Producer is referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS**

A. The Parties entered into that certain Purchase and Sale Agreement, dated effective as of July 1, 2016, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko"), Aguila Production, LLC ("Aguila"), and the Parties, (together with any purchase agreement that may be entered into with Korea National Oil Corporation ("KNOC") pursuant to certain tag-along rights, the "Purchase Agreement"), pursuant to which Aguila and the Parties collectively purchased all of the working interests of Anadarko and KNOC to the extent that it exercises its tag-along rights, collectively in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas (collectively, the "Assets").

B. Marketer desires to purchase from Producer, and Producer desires to sell to Marketer, the oil, gas and other Hydrocarbons produced from and attributable to the Working Interests in the Assets acquired by Producer under the Purchase Agreement as well as other Working Interests acquired by Producer after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts (such interests, "Producer's Interests"), which Marketer will gather, process, transport, market and sell, as applicable, on the terms and conditions set forth in this Agreement and the Midstream Contracts.

NOW, THEREFORE, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1. Specific Definitions. Capitalized terms used in this Agreement have the meanings assigned to such terms in Annex I.

1.2. Construction. Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular includes the plural, and the plural includes the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections or subdivisions thereof refer to the corresponding article, section or subdivision of this Agreement unless specific reference is made to articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" will be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not to any particular section or article in which such words appear.

## ARTICLE II
## PURCHASE AND SERVICES

2.1. Purchase by Marketer. On each Day during the Term, Producer shall sell and deliver to Marketer, and Marketer shall purchase and receive from Producer, at the Receipt Points, all Hydrocarbons produced from and attributable to Producer's Interests, in accordance with the terms and conditions of this Agreement, other than Producer's Reserved Hydrocarbons.

2.2. Limitations. Marketer shall not, without Producer's prior written consent (such consent not to be unreasonably withheld) and only to the extent relating to or affecting Producer's Hydrocarbons, (1) enter into, terminate, waive any material rights under or amend any Midstream Contract, to the extent any such actions would (a) (i) materially increase rates and charges applicable to Producer's Hydrocarbons, (ii) impose minimum volume, take or pay, demand charges, reservation fees, or deficiency payments obligations or extensions thereof, or (iii) fix prices for the resale of Producer's Hydrocarbons for a term longer than six months (or that cannot be terminated without penalty upon six months' notice or less) or (b) otherwise have an adverse effect, in any material respect, on Producer, in each case, except to the extent the items set forth in in clauses (a) or (b) are required by Law, (2) enter into any contract with an Affiliate of Marketer that is on terms materially less favorable to Producer than terms that could have been obtained at the time such contract was entered into in an arm's length transaction with a Third Party or that would involve projected liabilities of Producer that are in excess of $20 million in any calendar year or (3) enter into any Midstream Contract after the Effective Date if such contract (a) is not also applicable to Sanchez's Hydrocarbons and Aguila's Hydrocarbons on a proportional basis (based upon reasonable forecasts of anticipated production that pertain to the Midstream Contract) or (b) has not been expressly approved by the independent members of the Sanchez board of directors or by the working interest owners that are subject to production marketing agreements or elections applicable to such Midstream Contract; *provided* that, if Producer does not consent or object in writing to Marketer's written request to undertake any of the actions described in preceding clauses (1) through (3) within 10 Business Days of Producer's receipt of such written request from Marketer, Producer shall be deemed to have consented to such action for purposes of this Section 2.2.

2.3. Standard of Care. Marketer shall purchase and provide services for Producer's Hydrocarbons delivered hereunder in accordance with all applicable Laws and in compliance with the terms of the applicable Midstream Contracts, and shall use commercially reasonable efforts to (a) obtain market rates in the area under any new contracts for the resale of Producer's Hydrocarbons, and (b) avoid any imbalances or scheduling variances and any penalty charges associated therewith under the Midstream Contracts. Producer's Hydrocarbons must be gathered, processed, transported and sold on terms and conditions no less favorable to Producer than the terms and conditions applicable to Sanchez's Hydrocarbons.

2.4. Repurchase Right. From and after April 1, 2023, for so long as the Springfield Agreements are in force and effect, Producer shall have the right for any Month, exercisable from time to time upon written notice to Marketer at least ten (10) days prior to the first day of such Month, to repurchase from Marketer at the applicable Delivery Point (as defined in the applicable Springfield Agreement) all volumes of Producer's Hydrocarbons delivered to Marketer at the Receipt Points in such Month less any LAUF or Line Fill deducted under the Springfield Agreements. If Producer exercises the repurchase right for any Month as to all or part of Producer's Hydrocarbons, then (a) Marketer shall redeliver, or cause to be redelivered, such volumes of Producer's Hydrocarbons to Producer at such applicable Delivery Point and transfer title to such Producer's Hydrocarbons to Producer at such applicable Delivery Point and (b) Producer shall pay Marketer an amount equal to Producer's Allocable Share of the Springfield Agreements for that Month attributable to such Hydrocarbons repurchased by Producer in such month. Notwithstanding the above, if Marketer has entered into Midstream Contracts that are attributable to Producer's Hydrocarbons and such contracts were approved by Producer prior to the exercise of its repurchase right hereunder, then Producer will not be entitled to exercise its repurchase rights

hereunder for the portion of Producer's Hydrocarbons committed to such approved Midstream Contracts during the term of such Midstream Contracts.

2.5. Reporting. Marketer shall consult with and provide reports to Producer on a quarterly basis regarding marketing activities concerning Producer's Hydrocarbons. Such reports will contain such information, details, and supporting documentation as Producer may reasonably request, and shall include (a) a schedule identifying the markets into which each of Producer's Hydrocarbons and Sanchez's Hydrocarbons are being sold and the realized net back pricing being received by each, broken down by sales point and by each Midstream Contract, (b) amendments to any of the Midstream Contracts pursuant to which Producer's Hydrocarbons are being gathered, processed, transported or sold, (c) upon request from Producer, any reports or other information provided to Marketer under the terms of any of the Midstream Contracts and (d) any material issues or disputes arising under such agreements. In addition to the foregoing reporting requirements, and the provisions of Section 2.6, prior to the Redemption Date, Marketer shall promptly deliver to GSO copies of all material notices delivered to Marketer under any Marketing Contract and Midstream Contract by the applicable counterparty with respect to Producer's Hydrocarbons.

2.6. Right to Cure. If Marketer defaults in the performance of any of its obligations under the Midstream Contracts, or upon the occurrence or non-occurrence of any event or condition under the Midstream Contracts that would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable the applicable counterparty to terminate or suspend its obligations or exercise any other right or remedy under such contracts or under applicable Law (a "Marketer Event"), then Marketer shall (a) promptly notify Producer of such Marketer Event, (b) use its commercially reasonable efforts to cause the applicable counterparty to allow Producer to cure such Marketer Event with respect to Producer's Hydrocarbons, and (c) use its commercially reasonable efforts to continue to perform each of Marketer's other obligations under the Midstream Contracts.

## ARTICLE III
## PRICE AND PAYMENT

3.1. Price. For each Month, in full consideration for Marketer's purchase of Producer's Hydrocarbons hereunder, Marketer shall pay to Producer an amount equal to (i) the payments received by Marketer from Third Parties upon the resale of Producer's Hydrocarbons and all constituents thereof (including any residue gas, condensate, and natural gas liquids, as applicable) during such Month after being gathered, treated, transported, and processed under the Midstream Contracts less (ii) Producer's Allocable Share of Midstream Charges for such Month less any actual or estimated deductions for the amounts set forth in Section 3.2(c)(ii) and (iii) (such amount, the "Net Amount"). Positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information.

3.2. Statements and Payments.

(a) Statements and Payments. Marketer shall pay to Producer the Net Amount for any given Month consistent with Marketer's normal business practice under similar circumstances, on or before the date that is 10 days after the date on which Marketer actually receives readily available funds for Producer's Hydrocarbons sold by Marketer or its Affiliates for such calendar Month from the applicable purchasers of such Producer's Hydrocarbons (such date, the "Due Date"), along with a detailed statement describing such amounts payable to Producer hereunder in such Month.

(b) Late Payments. Any amounts not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date to but excluding the date the delinquent amount is paid in full.

(c) Collection and Payment. Marketer shall use commercially reasonable efforts to (i) collect all production funds from the purchasers of such Producer's Hydrocarbons, (ii) arrange for the timely payment of severance taxes to any Governmental Authorities, (iii) make timely payment to royalty owners and third party working interest owners, and (iv) remit to Partnership its net proceeds from the sale of Producer's Hydrocarbons after making all necessary or appropriate allocations and distributions in connection with the receipt of such proceeds in accordance with Section 3.1. The Parties recognize that the calculation and payment of severance taxes and royalty payments set forth above may be based upon estimates at the time of the payment of the Net Amount in accordance with Section 3.1 and that positive or negative adjustments to the Net Amount for prior Months shall be made as soon as practicable following receipt of available information regarding actual severance tax and royalty payments.

(d) Notices. Marketer shall provide written notice to Producer not less than five Business Days prior to entering into, amending, or terminating any Midstream Contract.

3.3. Audit Rights. Upon not less than 10 Days' prior written notice to the other Party, either Party or its or representative, at reasonable times during business hours and at its own expense, may audit the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge or computation made under or pursuant to this Agreement.

3.4. Statement Errors. If an error is discovered in the amount shown to be due on any statement rendered by Marketer hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than 30 Days after the discovery of the error. If a dispute arises as to the amount payable in any invoice rendered hereunder, the disputed statement must nevertheless be paid in full, but payment will not waive the payor's right to dispute such statement in accordance with this Section 3.4. Any invoice dispute or statement adjustment must be in writing and must state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment must be made within 15 Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date to but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two years after the date on which the statement is rendered. The provisions of Section 3.3 and this Section 3.4 will survive the termination of this Agreement for the later of (a) 24 Months following the date on which such termination occurred, or (b) until a dispute initiated within such 24-Month period is finally resolved.

3.5. Setoff and Recoupment. Upon the occurrence of either or both of (a) an Event of Default of a Party, or (b) a circumstance under clauses (a), (b), (c) of Section 3.6(a), either Party may with respect to Section 3.5(a) and Producer may with respect to Section 3.5(b), in its sole discretion and without limiting any other rights or remedies, undertake any one or all of the following actions: (i) such Party may exercise recoupment by retaining, freezing, holding, and/or liquidating any proceeds that would otherwise be payable to the other Party to satisfy and apply to any amounts owed by such other Party under this Agreement or applicable Law as of the time of such recoupment or at any later time; and/or (ii) such Party may exercise setoff by retaining, freezing, holding, and liquidating any proceeds that would be otherwise deliverable or payable to such other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from such other Party to the other Party under this Agreement or applicable Law as of the time of the setoff or offset or at any later time. Should a Party elect to exercise its rights under this Section 3.5, such Party shall notify the other Party in writing, within 10 Days of such recoupment, setoff, and/or offset; provided, however, such Party will not be required to provide such other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party hereby agrees to (x) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable Law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (y) not oppose a motion by a Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 3.5, that any recoupment exercised as provided for herein will be considered to be within a

single transaction. The rights granted to the Parties pursuant to this Section 3.5 are in addition to any rights of recoupment, setoff, and/or offset the Parties may be otherwise entitled.

3.6. Deposit of Producer's Proceeds and Security Interest.

(a) Deposit of Producer Proceeds. If (a) an Investor Redemption Event occurs, (b) Marketer has failed to pay amounts owed to Producer under this Agreement within five (5) days of the applicable Due Date or (c) Producer otherwise has reasonable grounds for insecurity regarding the performance by Marketer of any obligation under this Agreement (with clause (c) being a "Basis For Requesting Assurance"), then, within 10 Business Days after written notice from Producer, Marketer and its Affiliates will direct all purchasers of Producer's Hydrocarbons to deposit amounts owed by such purchasers for Producer's Hydrocarbons into (a) a bank account or accounts designated by Producer (in which case Producer shall remit to Marketer Producer's Allocable Share of Midstream Charges or any other costs owed by Producer to Marketer) or (b) a mutually agreed escrow account (in which case Producer shall be entitled to receive amounts due each month under Section 3.1 and Marketer shall be entitled to the remainder of the amounts from such account). A Basis for Requesting Assurance will include, without limitation, any reasonable grounds for insecurity with respect to the performance of Marketer and/or any grounds that might constitute a basis for requesting adequate assurance of performance under Section 2.609 of the Uniform Commercial Code.

(b) Security Interest. Marketer is marketing Producer Hydrocarbon's on Producer's behalf and holding all proceeds from the sale of Producer's Hydrocarbons in trust on behalf of Producer. In addition, Producer retains, and Marketer grants to Producer, a first priority lien and security interest (subject to Permitted Liens (as defined below)) on (a) all of Producer's Hydrocarbons purchased under this Agreement, (b) all proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer and (c) all accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer (the "Collateral"). Marketer shall have the right to resell all of Producer's Hydrocarbons without obtaining a release of the lien or other permission from Producer. Upon the resale of Producer's Hydrocarbons, the lien and security interests retained and granted above shall be completely and automatically released by Producer without the need for execution of any document or instrument and, in lieu thereof, shall affix to the proceeds and accounts receivable resulting from the resale of Producer's Hydrocarbons to such purchasers. Producer may enforce its lien and security interest and exercise any and all of the rights and remedies available to a secured party under the Uniform Commercial Code, in addition to all of the rights and remedies otherwise provided by Law. Producer may file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of Marketer, in each case where permitted by Law, and may take any and all other actions necessary to secure its interest in the Collateral. In addition, Marketer agrees that from time to time it will promptly execute and deliver all instruments and documents, and take all further actions, that Producer may reasonably request as being necessary or desirable to perfect and protect the security interest granted or purported to be granted hereby or to enable Producer to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, Marketer will execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as Producer may request as being necessary or desirable in order to perfect and preserve the security interests granted or purported to be granted hereby. The lien and security interest granted herein are in addition to any statutory or common law liens on Producer's Hydrocarbons in favor of Producer. Marketer warrants that, except as set forth in the sentence after this sentence, it has not consensually granted and will not consensually grant any liens or security interests on the Collateral to any other Person. Without affecting any priority of the liens and security interests on the Collateral granted to it under this Agreement or arising pursuant to Section 9.343 of the Texas Business and Commerce Code, Producer agrees and acknowledges that Marketer may, as security for the "Obligations" as defined in the Credit Agreement (defined below) and any refinancing thereof or as security for any obligations under any junior lien indebtedness that is subject to a security grant consistent with such Credit Agreement or the refinancing thereof, grant a security interest over all of Marketer's assets, including, without limitation, Producer's Hydrocarbons purchased under

this Agreement, any deposit account of Marketer in which proceeds resulting from the resale of such Producer's Hydrocarbons by Marketer may be deposited and any accounts receivable now or hereafter owing to Marketer upon and by reason of any such resale by Marketer. As used in the preceding sentence, "Credit Agreement" means the Second Amended and Restated Credit Agreement among Sanchez, as borrower, Royal Bank of Canada, as administrative agent, and others, as amended to date and as the same may hereafter be amended, modified, refinanced, replaced, restated or supplemented. As used in this Section 3.6(b), "Permitted Liens" means (a) liens for taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; (b) statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like liens arising by operation of law incident to the exploration, development, operation and maintenance of oil and gas properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, (c) Liens (as defined in the Credit Agreement) arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, *provided* that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board (as defined in the Credit Agreement) and no such deposit account is intended by the Borrower (as defined in the Credit Agreement) or any of its Subsidiaries (as defined in the Credit Agreement) to provide collateral to the depository institution and (d) judgment liens.

3.7. Marketing Transition Services Agreement. Pursuant to the terms of the Marketing Transition Services Agreement, the Provider (as that term is defined in such agreement) will provide Marketer certain marketing transition services, including the purchase and sale of Producer's Hydrocarbons. For avoidance of doubt, the Parties agree that the billing and payment provisions set forth in this Article III will apply during the period in which the Marketing Transition Services Agreement is in effect, including the payment of amounts to Producer for the resale of Producer's Hydrocarbons and the allocation of demand charges under the Midstream Contracts.

## ARTICLE IV
## WARRANTY OF TITLE

4.1. Title Warranties.

(a) Producer represents and warrants to Marketer that Producer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Marketer hereunder, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes, subject to the performance by the Manager of its obligations under the MSA.

(b) If Producer elects to repurchase Producer's Hydrocarbons under Section 2.4, then Marketer shall represent and warrant to Producer that Marketer has title to and/or the right to sell and deliver all Producer's Hydrocarbons delivered to Producer under Section 2.4, free and clear of all royalties, liens, encumbrances and all applicable federal, state and local Taxes.

4.2. Title and Risk of Loss. Title to and risk of loss of Producer's Hydrocarbons purchased by Marketer from Producer hereunder will pass from Producer to Marketer at the inlet of Springfield's measurement facilities at the Receipt Points under the Springfield Agreements or at such other receipt points as the Parties agree. As between the Parties, title to and risk of loss of Producer's Hydrocarbons shall remain with Marketer thereafter unless such Producer's Hydrocarbons are repurchased by Producer under Section 2.4, in which case title to and

risk of loss of any such repurchased Producer's Hydrocarbons shall pass to Producer at the applicable Delivery Points under the Springfield Agreements or at such other delivery points as the Parties agree.

## ARTICLE V
## FORCE MAJEURE

5.1. Suspension of Obligations. If either Producer or Marketer is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Party, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder), so far as they are affected by such Force Majeure, will be suspended during the continuance of any inability so caused, but for no longer period, and such cause must be remedied with all reasonable dispatch.

5.2. Definition of Force Majeure. The term "Force Majeure" means any event or circumstance not reasonably within the control of the Party claiming suspension declared as Force Majeure by a counterparty to any of the Midstream Contracts.

## ARTICLE VI
## TAXES

6.1. Taxes. Manager under the MSA shall pay, on behalf of Producer, to the appropriate taxing authorities severance and other Taxes levied on Producer's Hydrocarbons prior to the delivery of such Producer's Hydrocarbons to the Receipt Points hereunder. Marketer or its Affiliates shall pay any and all Taxes levied on Producer's Hydrocarbons after title to such Hydrocarbons has transferred to Marketer.

6.2. Reimbursement. If Marketer or any of its Affiliates pays or remits any Tax for or on behalf of Producer, including severance Taxes on production, then Marketer may deduct such amounts in determining the Net Amount due hereunder as shown on the Monthly statement described in Section 3.2.

## ARTICLE VII
## TERM AND TERMINATION

7.1. Term and Termination. The term of this Agreement will commence on the Effective Date and, unless otherwise agreed by the Parties or earlier terminated in accordance with this Section 7.2, will continue until the earlier of (i) the date of termination of both Springfield Agreements and (ii) December 31, 2034 (the "Term").

7.2. Early Termination.

(a) Either Party may terminate this Agreement effective immediately upon notice to the other Party if the other Party (or its Affiliates, with respect to Marketer) (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding; (iv) files a petition or answer in a court of competent jurisdiction seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any Law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); (vi) seeks, consents, or acquiesces to the appointment of a trustee, receiver, or liquidator of all or any substantial part of such its assets or properties; or (vii) is liquidated and dissolved; or

(b) Either Party may terminate this Agreement upon notice to the other Party if (i) such other Party is in material breach of this Agreement and such breach is not remedied within 30 days after such other Party's receipt of such notice or (ii) all of the Midstream Contracts are terminated or otherwise no longer in full force and effect; provided that Marketer may not terminate this Agreement pursuant to this Section 7.1(b) (x) if at the time of such breach, Sanchez and its Affiliates hold a majority of the board of directors of SN EF UnSub, GP or (y) such breach was caused by a breach of Manager under the MSA; or

(c) Following an Investor Redemption Event, Producer may terminate this Agreement in whole or in part by written notice to Marketer, provided that Producer may not terminate its obligation related to the Springfield Agreements (including to pay to Marketer Producer's Allocable Share of the Springfield Agreements) without Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain if requested by Producer.

7.3. Effect of Termination. The expiration or termination of this Agreement, for any reason, will not release either Party from any obligation or Liability to the other Party, including any payment obligation, that has already accrued hereunder. Following early termination under Sections 7.2(a), 7.2(b), or 7.2(c) upon Producer's request, Marketer and its Affiliates shall use commercially reasonable efforts to work with Producer and the applicable counterparties to partially assign, or to enter into replacements for, any of the Midstream Contracts identified by Producer to assist in the continued delivery of Producer's Hydrocarbons following the termination of this Agreement.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1. Waivers. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, will not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

8.2. Assignment; Binding Effect. Neither Party may assign its rights or interests under this Agreement, or delegate any duties or obligations hereunder, without the prior written consent of the other Party, which consent may be withheld by the other Party in its sole discretion; *provided* that consent is not required for an assignment of rights or interests under this Agreement by a Party (a) to an Affiliate of a Party (without releasing the assigning Party of its obligations under this Agreement) or (b) subject to obtaining Springfield's prior consent, which the Parties will cooperate and use commercially reasonable efforts to obtain, to a Third Party in connection with a conveyance of all or a part of Producer's Interests. This Agreement is binding upon and inures to the benefit of the Parties and their respective legal representatives, successors, and permitted assigns.

8.3. Joinder. Marketer shall cause any of its Affiliates that acquire or own Working Interests in jointly owned properties with Producer after the Effective Date to ratify and become a party to this Agreement by an amendment executed and delivered by the Parties and such Affiliate or Affiliates.

8.4. Governing Law; Severability.

(a) **THIS AGREEMENT HAS BEEN EXECUTED AND DELIVERED AND WILL BE CONSTRUED, INTERPRETED AND GOVERNED PURSUANT TO AND IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES THAT , IF APPLIED, MIGHT PERMIT OR REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement, or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances will not be affected thereby and that provision will be enforced to the greatest extent permitted by applicable Law.

8.5. Further Assurances. Subject to the terms and conditions set forth in this Agreement, each of the Parties shall use all reasonable efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

8.6. Counterparts. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, will be deemed an original, and all of which will constitute but one and the same instrument.

8.7. Notices. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement must be in writing and sent to the address of the Party set forth below, or to such other more recent address of which the sending Party actually has received written notice. Any notice or communication provided to Producer pursuant to this Agreement shall be provided concurrently to GSO by electronic email:

(a) if to Marketer, to:

SN EF Maverick, LLC
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

(b) if to Producer, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

Case 19-34508 Document 1364 Filed in TXSB on 04/19/23 Page 142 of 217

prior to Redemption Date, with a copy to (which shall not constitute notice):
GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com
With a copy to:
Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com
(c) if to Sanchez, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attn: James O'Connor
Tel: 713.756.2782
Email: joconnor@sanchezog.com

Each such notice or other communication must be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

8.8. Remedies. Except as provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party will be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties shall not assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

8.9. Disputes.

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR

PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), WILL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES MUST BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY WILL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL WILL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN WILL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER WILL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

8.10. Expenses. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

8.11. Third Party Beneficiaries.

(a) Prior to the Redemption Date, GSO and its Affiliates shall be express third party beneficiaries of Producer's rights under this Agreement. Other than as set forth in the preceding sentence or in clause (b) below, the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns, and this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities or obligations are owed by a Party, or (b) any liquidator, trustee or creditor acting on behalf of any Party, and no such creditor or any other Person will have any rights under this Agreement.

(b) Subject to clause (a) above, notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties will have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith may be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, representative, general or limited partner, stockholder, manager or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

8.12. Conflict. In the event of a conflict between the terms of this Agreement and the terms of any joint operating agreement applicable to the Producer Interests, the terms of this Agreement will control as between the Parties.

8.13. Subchapter K. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code.

8.14. Entire Agreement; Integrated Transaction. This Agreement, the other Basic Documents and the other agreements and documents expressly referred to herein or therein are intended by the Parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Parties hereto in respect of the subject matter contained herein and therein. This Agreement, the other Basic Documents, and the other agreements and documents expressly referred to herein or therein supersede all prior agreements and understandings between the parties with respect to such subject matter. Each of the Parties acknowledges and agrees that in executing this Agreement (i) the intent of the Parties is this Agreement and the other Basic Documents shall constitute an unseverable and single agreement of the Parties with respect to the transactions contemplated hereby and thereby, (ii) it waives, on behalf of itself and each of its

Affiliates, any claim or defense based upon the characterization that this Agreement and the other Basic Documents are anything other than a true single agreement relating to such matters and (iii) the matters set forth in this Section 8.14 constitute a material inducement to enter into this Agreement and the other Basic Documents and to consummate the transactions contemplated hereby and thereby. Each of the Parties stipulates and agrees (i) not to challenge the validity, enforceability or characterization of this Agreement and the other Basic Documents as a single, unseverable instrument pertaining to the matters that are the subject of such agreements, (ii) this Agreement and the other Basic Documents shall be treated as a single integrated and indivisible agreement for all purposes, including the bankruptcy of any party and (iii) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in this Section 8.14.

8.15. Sanchez Support. Sanchez is executing this Agreement to evidence its agreement to cause Marketer to perform and comply with Marketer's obligations under Section 3.1, Section 3.2, Section 3.6, and Section 8.3. Sanchez hereby guarantees the performance of Marketer under such provisions and agrees to be directly liable to Producer under such provisions in the event of any breach by Marketer.

8.16. Fees to Marketer and Sanchez. In consideration for (a) certain services provided by Marketer to Producer, Producer hereby agrees to pay to Marketer an annual fee equal to $50,000 and (b) certain services provided by Sanchez to Producer, Producer hereby agrees to pay to Sanchez an annual fee equal to $50,000, which such fees, in the case of preceding clauses (a) and (b), shall be due and payable by Producer to Marketer and Sanchez, as applicable, on the Effective Date and each one year anniversary of the Effective Date.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

**SN EF MAVERICK, LLC:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UnSub GP, LLC, its general partner
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**Solely for purposes of Sections 8.15 and 8.16,**
**SANCHEZ ENERGY CORPORATION:**
By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**<u>Annex I</u>**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. The term "control" (including its derivatives and similar terms) means possessing the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise. Notwithstanding the foregoing, Marketer and its Affiliates, on the one hand, and Producer and its Affiliates, on the other hand, will not be considered Affiliates of one another. For purposes of this Agreement, Sanchez Oil & Gas Corporation and its Affiliates, including all member of the Sanchez family, shall be deemed to be Affiliates of Marketer.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Aguila</u>" has the meaning set forth in the recitals.

"<u>Aguila's Hydrocarbons</u>" means the Hydrocarbons, including all constituencies thereof, produced from the interests acquired by Aguila under the Purchase Agreement.

"<u>Anadarko</u>" has the meaning set forth in the recitals.

"<u>Assets</u>" has the meaning set forth in the recitals.

"<u>Basic Documents</u>" has the meaning given to such term in the Securities Purchase Agreement.

"<u>Basis for Requesting Assurance</u>" has the meaning set forth in <u>Section 3.6(a)</u>.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"<u>Central Time</u>" means Central Standard time, as adjusted for Central Daylight time.

"<u>Claims</u>" means all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

"<u>Collateral</u>" has the meaning given to such term in <u>Section 3.6</u>.

"<u>Day</u>" or "<u>Daily</u>" means a period of 24 hours, commencing at 7:00 a.m., Central Time, on a calendar day and ending at 7:00 a.m., Central Time, on the next succeeding calendar day.

"<u>Delivery Point</u>" means the "Delivery Points" as defined and listed in the Springfield Agreements, and any future Delivery Point thereunder.

"<u>Due Date</u>" has the meaning set forth in <u>Section 3.2(a)</u>.

"<u>Effective Date</u>" has the meaning set forth in the preamble.

"Event of Default" means, in respect of any Party, the failure to remedy, within 30 days of receipt of written notice thereof from any other Party, the material non-performance of or material non-compliance with any agreements, obligations or undertakings of such Party contained in this Agreement.

"Force Majeure" has the meaning set forth in Section 5.2.

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means GSO ST Holdings LP, a Delaware limited partnership.

"Hydrocarbons" means oil, gas, natural gas liquids, condensate, and other gaseous and liquid hydrocarbons, or any combination of the foregoing.

"Interest Rate" means an annual rate of interest equal to 2% above the prime rate published by *The Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

"Investor Redemption Event" has the meaning set forth in the LP Agreement.

"Joint Development Agreement" means the Joint Development Agreement to be entered into, among Producer, Aguila, and Marketer at the time of the closing pursuant to the Purchase Agreement.

"KNOC" has the meaning given to such term in the recitals.

"LAUF" means lost, unaccounted for, fuel and other losses of Producer's Hydrocarbons in connection with the services provided under an applicable Midstream Contract, in each case to the extent provided under the applicable Midstream Contract.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Liabilities" means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

"Line Fill" means line fill and tank bottom inventory and working tank inventory requirements, in each case required to be delivered to the applicable counterparty under a Midstream Contract.

"Losses" mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys' fees, experts' fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

"LP Agreement" means the Amended and Restated Agreement of Limited Partnership of SN EF Unsub, LP to be entered into at the time of the closing pursuant to the Purchase Agreement, as may be amended.

"Manager" means the Manager under the MSA.

"Marketer" has the meaning set forth in the preamble.

"Marketing Transition Services Agreement" means the Marketing Transition Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement by and among Marketer, Anadarko Energy Services Company, Kerr-McGeee Oil & Gas Onshore LP and Anadarko E&P Onshore LLC and Sanchez Energy Corporation solely for purposes of defined provisions in the agreement, pursuant to which certain marketing transition services will be provided to Marketer.

"Midstream Contracts" means the contracts listed on Exhibit B hereto, including any amendments thereto, and any gathering, processing, transportation or sales agreements entered into after the Effective Date, including any amendments thereto, relating to the Producer's Interests and the Hydrocarbons produced therefrom.

"Month" or "Monthly" means a period of time beginning at 7:00 a.m., Central Time on the first Day of a calendar month and ending at 7:00 a.m., Central Time on the first Day of the next succeeding calendar month.

"MSA" means the Management Services Agreement to be entered into at the time of the closing pursuant to the Purchase Agreement between Sanchez Oil & Gas Corporation and Producer.

"Net Amount" has the meaning set forth in Section 3.1.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 8.11(b).

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Producer" has the meaning set forth in the preamble.

"Producer's Allocable Share of Midstream Charges" means the sum of Producer's Allocable Share of the Springfield Agreements, plus Producer's Allocable Share of the Other Contracts.

"Producer's Allocable Share of the Other Contracts" means, for all Midstream Contracts other than the Springfield Agreements, a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to the counterparties under such Midstream Contracts during a Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to the counterparties under such Midstream Contracts during such Month, multiplied by the sum of (a) any deficiency payments or other similar fees, payments, or penalties resulting from failure to achieve minimum volume obligations that are paid by Marketer under such Midstream Contracts, (b) any commodity charges, and LAUF and Line Fill volumes incurred under such contracts that are borne by Marketer under such contracts and (c) any other amounts invoiced to Marketer under such Midstream Contracts. Notwithstanding the foregoing, (1) other than with respect to the Firm Intrastate Transportation Agreement dated January 17, 2012 between Eagle Ford Midstream, LP and Anadarko Energy Services and Transportation Services Agreement dated March 1, 2012 between Enterprise Products

Operating LLC and Anadarko Energy Services Company for the Intrastate Movement of NGLs, Producer shall not be obligated to bear any deficiency payment or other similar feeds, payments or penalties in (a) above in an amount greater than 40% of any such payments, fees or penalties that are attributable to the aggregate volume of Producer's Hydrocarbons and Marketer's and its Affiliates' Hydrocarbons produced from the Producer Interests and Sanchez's Interests and (2) Marketer shall not terminate or amend the obligation of other producers under producer marketing agreements or elections applicable to such Midstream Contracts that would increase Producer's Allocable Share of the Other Contracts in any material respect without the consent of Producer.

"Producer's Allocable Share of the Springfield Agreements" means, for as long as Marketer remains a party to the Springfield Agreements, the sum of: (i) the product of the Allocable Springfield Demand Rate in the applicable Month multiplied by the Monthly Minimum Volume Commitment (as defined in each of the Springfield Agreements) under each Springfield Agreement for such Month; (ii) the product of the Allocable Springfield Commodity Rate in the applicable Month multiplied by the volumes of Producer's Hydrocarbons delivered under each Springfield Agreement during such Month; (iii) any LAUF and Line Fill volumes retained by Springfield under the terms of the Springfield Agreements that are attributable to Producer's Hydrocarbons delivered under the Springfield Agreements; and (iv) any other amounts invoiced to Marketer under Article VII of the Springfield Agreements and attributable to Producer's Hydrocarbons being delivered under the Springfield Agreements. For purposes of this definition, (a) "Allocable Springfield Demand Rate" in any Month shall be equal to the applicable Demand Rate (as defined in each of the Springfield Agreements) multiplied by a fraction, the numerator of which is the total volumes of Producer's Hydrocarbons delivered to Springfield under each applicable Springfield Agreement during such Month and the denominator of which is the total volumes of Hydrocarbons delivered by Marketer and its Affiliates to Springfield under each applicable Springfield Agreement during such Month and (c) the Allocable Springfield Commodity Rate in any Month shall be equal to the applicable Commodity Rate (as defined in each of the Springfield Agreements); *provided* that, in any given Month, if the Total Allocable Rate for such Month is (x) greater than the "Max Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be equal to the product of the "Max Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month or (y) less than the "Min Rate" for the calendar year attributable to such Month as set forth on Exhibit A, then, notwithstanding the foregoing, Producer's Allocable Share of the Springfield Agreements for such Month shall be the product of the "Min Rate" attributable to such Month as set forth on Exhibit A multiplied by Producer's Hydrocarbons delivered under the applicable Springfield Agreement during such month.

"Producer's Hydrocarbons" means the Hydrocarbons produced from and attributable to Producer's Interests, including all constituencies thereof.

"Producer's Interests" has the meaning set forth in the recitals.

"Purchase Agreement" has the meaning set forth in the recitals.

"Receipt Points" means (i) the "Receipt Points" as defined and listed in the Springfield Agreements, and any future Receipt Point thereunder and (ii) for Hydrocarbons that are not delivered to Springfield, the first point at which Marketer delivers such Hydrocarbons from the wellhead to the facilities of a counterparty under a Midstream Contract.

"Redemption Date" is defined in the MSA.

"Representative" means officers, directors, employees, and other representatives of the referenced entity and its Affiliates.

"Reserved Hydrocarbons" means the volumes of Hydrocarbons that Producer does not deliver under the Springfield Agreements that are associated with field and other similar uses of Producer that are expressly reserved or excepted from the definition of Dedicated Production thereunder.

"Sanchez" has the meaning set forth in the preamble.

"Sanchez's Hydrocarbons" the Hydrocarbons produced from Sanchez's Interests, including all constituencies thereof.

"Sanchez's Interests" means the interests in the Assets acquired by Marketer under the Purchase Agreement as well as other Working Interests acquired by Marketer or its Affiliates after the Effective Date that are gathered, processed or transported pursuant to the Midstream Contracts.

"Springfield" means Springfield Pipeline LLC, or its permitted successors or assigns as party to the Springfield Agreements.

"Springfield Agreements" means (1) the Second Amended and Restated Lease Dedication and Gas Gathering Agreement between Springfield and Sanchez, and (2) the Second Amended and Restated Lease Dedication and Oil Gathering Agreement between Springfield and Sanchez, in each case to be entered into at the termination of the Marketing Transition Services Agreement and as each such contract may be amended from time to time.

"Taxes" means all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

"Term" has the meaning set forth in Section 7.1.

"Third Party" means any Person other than a Party or one of their Affiliates.

"Total Allocable Rate" means, for any given Month, the rate calculated separately for each of the Springfield Agreements equal to (a) the Producer's Allocable Share of the Springfield Agreement divided by (b) the total volumes of Producer's Hydrocarbons delivered to Springfield under such Springfield Agreement during such Month.

"Securities Purchase Agreement" the Securities Purchase Agreement, dated January 12, 2017, among Producer, Sanchez Energy Corporation, SN UR Holdings, LLC, SN EF UnSub GP, LLC, SN EF UnSub Holdings, LLC, GSO ST Holdings Associates LLC and GSO ST Holdings LP.

"Working Interest" means with respect to any lease or well or wellpad, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease, well, or wellpad.

* * *

---

**Exhibit A**

**Springfield Agreements Allocable Share**

| | WES Gas Fee ($/mcf) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 1.14 | 1.80 |
| 2017 | 1.04 | 1.58 |
| 2018 | 0.94 | 1.37 |
| 2019 | 0.86 | 1.20 |
| 2020 | 0.85 | 1.17 |
| 2021 | 0.87 | 1.21 |
| 2022 | 0.83 | 1.12 |
| 2023 | 0.80 | 1.04 |
| 2024 | 0.77 | 0.98 |
| 2025 | 0.73 | 0.89 |
| 2026 | 0.71 | 0.84 |
| 2027 | 0.69 | 0.79 |
| 2028 | 0.69 | 0.78 |
| 2029 | 0.68 | 0.76 |
| 2030 | 0.68 | 0.75 |
| 2031 | 0.70 | 0.78 |
| 2032 | 0.71 | 0.80 |
| 2033 | 0.72 | 0.81 |
| 2034 | 0.72 | 0.81 |

Case 23-30552 Document 1336 Filed 04/17/23 Page 243 of 278

| | WES Oil Fee ($/bbl) | |
|---|---|---|
| | Min Rate | Max Rate |
| 2016 | 2.41 | 3.67 |
| 2017 | 2.05 | 2.90 |
| 2018 | 1.82 | 2.42 |
| 2019 | 1.71 | 2.18 |
| 2020 | 1.74 | 2.22 |
| 2021 | 1.73 | 2.19 |
| 2022 | 1.73 | 2.15 |
| 2023 | 1.65 | 1.97 |
| 2024 | 1.55 | 1.76 |
| 2025 | 1.54 | 1.71 |
| 2026 | 1.53 | 1.68 |
| 2027 | 1.54 | 1.67 |
| 2028 | 1.53 | 1.64 |
| 2029 | 1.54 | 1.63 |
| 2030 | 1.56 | 1.66 |
| 2031 | 1.59 | 1.70 |
| 2032 | 1.61 | 1.73 |
| 2033 | 1.63 | 1.75 |
| 2034 | 1.64 | 1.76 |

**Exhibit B**

**Midstream Contracts**

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation | 10/1/2010 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm NGPA Section 311 Gas Transportation | 1/17/2012 |
| Anadarko Energy Services Company | Eagle Ford Midstream, LP (NET) | Firm Intrastate Gas Transportation | 1/17/2012 |
| Anadarko E&P Company LP | Texas Pipleline LLC (Howard) | Firm Transportation (gas) | 10/5/2010 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | Purchase Agreement (at Brasada) | 3/1/2012 |
| Anadarko Energy Services Company | Enterprise Products Operating LLC | NGL Transportation Services Agreement (into Cotulla) | 3/1/2012 |
| Anadarko Energy Services Company | Flint Hills Resources, LP | Crude Oil Supply Agreement (Sales Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | Arrowhead Gathering Company, L.P. | Crude Oil Throughput and Deficiency Agreement (TPT Tranche 1) | 3/18/2011 |
| Anadarko E&P Company LP | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 2) | 6/28/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Pipeline, LP | Crude Oil T&D (NuStar) (TPT Tranche 2) | 7/2/2012 |
| Anadarko E&P Onshore LLC | BP Products North America Inc | Crude Oil Sales Agreement (Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Double Eagle Pipeline LLC and KinderMorgan Crude&Condensate LLC | Crude Oil T&D (DE) (TPT Tranche 3) | 12/13/2013 |
| Anadarko E&P Onshore LLC | Plains Marketing, LP | Crude Oil Purchase Contract | 4/1/2014 |
| Anadarko E&P Onshore LLC | Shell Trading (US) Compnay | Crude Sales Contract | 12/1/2016 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Condensate Stabilization Agreement | 7/1/2014 |
| Anadarko E&P Onshore LLC | Plains South Texas Gathering LLC | Shipping Agreement | 5/1/2014 |
| Anadarko E&P Onshore LLC | Springfield Pipeline LLC | Firm Intrastate Transportation Service Agmnt | 3/1/2013 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Gas Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | Springfield Pipeline LLC | Lease Dedication and Oil Gathering Agreement | 3/1/2008 |
| Anadarko E&P Company LP | WGR Operating, LP | Gas Processing Agreement | 2/27/2012 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 1) | 9/1/2010 |

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Tranche 2) | 2/1/2011 |
| Anadarko E&P Company LP | ETC Texas Pipeline, Ltd | Gathering and Processing Agreement | 4/1/2011 |
| Anadarko E&P Onshore LLC | Enterprise Hydrocarbons L.P. | Gas Processing Agreement (Shoup) | 3/1/2013 |
| Anadarko E&P Onshore LLC | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2017 |
| Anadarko E&P Company LP | Eagle Ford Gathering LLC (KM) | Gas Services Agreement | 1/1/2011 |
| Anadarko E&P Onshore LLC | Texas Pipeline LLC | NGL Bank Service Agreement | 7/25/2013 |
| Anadarko Energy Services Company | Enterprise Texas Pipeline LLC | Firm Gas Transportation Agreement for NGPA Section 311 Service, No. 9138E | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | Purchase Contract | 10/13/2016 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Master Terminal Services Agreement | 7/2/2012 |
| Anadarko E&P Company LP | TexStar Crude Oil Services, LP (succeeded by NuStar Logistics, L.P.) | Terminal Services Schedule No. Anadarko E&P Company LP – 001 | 7/2/2012 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Gas Gathering (Clear Springs) | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 5/1/2015 |
| Anadarko E&P Onshore LLC | Endeavor Natural Gas LP | Interconnection Agreement | 9/9/2015 |
| Anadarko E&P Company LP | Enterprise Hydrocarbons L.P | Gas Processing Agreement | 8/1/2012 |
| Anadarko E&P Onshore LLC | Plains Gas Solutions, LLC | Raw Make (Y-Grade) Purchase and Sale Agreement | 8/1/2015 |
| Anadarko Petroleum Corp. | Enterprise South Texas Gathering L.P. | Gathering, Processing and Purch. Agreement | 9/1/2008 |
| Anadarko E&P Company LP | Trimac Transportation Central Inc. | Crude Trucking | 3/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Crude Oil Production Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Natural Gas Liquids Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Eagle Ford TX LP | Maverick Residue Gas Marketing Agreement | 4/14/2011 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Natural Gas Liquids Marketing Agreement | 1/1/2012 |

Case 19-34508 Document 1733 Filed in TXSB on 04/19/23 Page 1236 of 2882

| First Party | Second Party | Contract Type | Effective Date |
|---|---|---|---|
| Anadarko E&P Company LP & Anadarko Energy Services Company | Mitsui E&P Texas LP | Maverick Residue Gas Marketing Agreement | 1/1/2012 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Natural Gas Liquids Marketing Agreement | 10/1/2010 |
| Anadarko E&P Company LP & Anadarko Energy Services Company | SM Energy Company | Maverick Residue Gas Marketing Agreement | 10/1/2010 |
| Anadarko E&P Onshore LLC | JSK Holdings, Inc. | NGL Marketing | 10/13/2016 |

**NAESB Contract Confirmations**

| Gas Sales | Counterparty | Volume (MMBtu/d) | End Date |
|---|---|---|---|
| | Air Liquide (255602) | 12,500 | 3/31/2017 |
| | Air Liquide (255604) | 12,500 | 3/31/2017 |
| | Diamond Shamrock (248974) | 6,045 | 8/31/2017 |
| | Kinder Morgan (255681) | 10,000 | 3/31/2017 |
| | Repsol (244011) | 25,000 | 3/31/2017 |
| | Repsol (255144) | 10,000 | 3/31/2017 |
| | Techgen (221544) | 30,000 | 9/31/2021 |
| | Valero (248973) | 12,060 | 8/31/2017 |
| | Valero (248975) | 4,020 | 8/31/2017 |
| | Wyman Gordon (232520) | 4,156 | 3/31/2018 |
| | Wyman Gordon (233438) | 1,271 | 3/31/2018 |

# Exhibit E

EX-10.9 21 sn-20170331ex1098e1ee4.htm EX-10.9

**Exhibit 10.9**

**JOINT DEVELOPMENT AGREEMENT**

**By and Among**

**GAVILAN RESOURCES, LLC,**

**SN EF MAVERICK, LLC,**

**SN EF UNSUB, LP,**

**and**

**SANCHEZ ENERGY CORPORATION, but solely with respect to Section 2.2, Section 4.2, Section 4.5 and Article VII**

**Dated as of March 1, 2017**

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS | | 1 |
| 1.1 | SPECIFIC DEFINITIONS | 1 |
| 1.2 | CONSTRUCTION | 1 |
| ARTICLE II WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES | | 2 |
| 2.1 | WORKING INTEREST | 2 |
| 2.2 | REPRESENTATIONS AND WARRANTIES | 2 |
| ARTICLE III OPERATING COMMITTEE; BUDGETS AND WORK PLAN | | 2 |
| 3.1 | MANAGEMENT BY OPERATING COMMITTEE | 2 |
| 3.2 | FUNCTION OF THE OPERATING COMMITTEE | 2 |
| 3.3 | OPERATING COMMITTEE | 4 |
| 3.4 | MEETINGS OF THE OPERATING COMMITTEE | 5 |
| 3.5 | QUORUM AND VOTING | 6 |
| 3.6 | DEADLOCK MECHANISMS | 7 |
| 3.7 | BUDGETS AND WORK PLAN; AFES AND APPROVED OPERATIONS | 8 |
| 3.8 | OPERATORSHIP UNDER THE OPERATING AGREEMENT | 11 |
| 3.9 | DEFAULT | 18 |
| ARTICLE IV TRANSFER; EXIT OPPORTUNITIES | | 19 |
| 4.1 | RESTRICTIONS ON THE TRANSFER OF INTERESTS | 19 |
| 4.2 | TAG-ALONG RIGHT | 21 |
| 4.3 | RIGHT OF FIRST OFFER | 24 |
| 4.4 | INITIAL PUBLIC OFFERING | 26 |
| 4.5 | SALE TRANSACTION | 26 |
| ARTICLE V ADDITIONAL COVENANTS | | 34 |
| 5.1 | INFORMATION RIGHTS | 34 |
| 5.2 | AREA OF MUTUAL INTEREST | 35 |
| 5.3 | SPACING PROTECTIONS | 38 |
| 5.4 | COOPERATION | 40 |
| ARTICLE VI TERM AND TERMINATION | | 40 |
| 6.1 | TERM AND TERMINATION | 40 |
| 6.2 | EFFECT OF TERMINATION | 41 |
| ARTICLE VII GENERAL PROVISIONS | | 41 |
| 7.1 | ENTIRE AGREEMENT | 41 |
| 7.2 | WAIVERS | 41 |
| 7.3 | ASSIGNMENT; BINDING EFFECT | 42 |
| 7.4 | GOVERNING LAW; SEVERABILITY | 42 |
| 7.5 | FURTHER ASSURANCES | 42 |
| 7.6 | COUNTERPARTS | 42 |
| 7.7 | CONFIDENTIAL INFORMATION | 43 |
| 7.8 | NO THIRD PARTY BENEFICIARIES | 44 |
| 7.9 | NON-SOLICITATION | 45 |
| 7.10 | NOTICES | 45 |
| 7.11 | REMEDIES | 47 |
| 7.12 | DISPUTES | 48 |

| | | |
|---|---|---|
| 7.13 | EXPENSES | 49 |
| 7.14 | NO RECOURSE | 49 |
| 7.15 | CONFLICT | 50 |
| 7.16 | SUBCHAPTER K | 50 |
| 7.17 | RELATIONSHIP OF SN AND SN UNSUB | 50 |
| 7.18 | OPERATING COMMITTEE; AFFILIATES | 51 |
| 7.19 | FORCE MAJEURE | 51 |

| | |
|---|---|
| Annex I | Definitions |
| Annex II | Representatives |
| Annex III | Working Interests |
| Annex IV | Approved Financial Advisor Arbiters |
| Annex V | Existing Producing Wells |
| Annex VI | Existing Drilled and Uncompleted Wells |
| Annex VII | Restricted Areas |

| | |
|---|---|
| Exhibit A | [Intentionally omitted] |
| Exhibit B | Form of Operating Agreement |
| Exhibit C | Area of Mutual Interest |
| Exhibit D | Form of Assignment |
| Exhibit E | Form of Memorandum of Joint Development Agreement |
| Exhibit F | Form of Notice of Termination of the Joint Development Agreement |

**1. JOINT DEVELOPMENT AGREEMENT**

This **JOINT DEVELOPMENT AGREEMENT** (this "Agreement"), is entered into as of March 1, 2017 (the "Effective Date"), by and between SN EF Maverick, LLC, a Delaware limited liability company ("SN"), SN EF UnSub, LP, a Delaware limited partnership ("SN UnSub"), and Gavilan Resources, LLC (f/k/a Aguila Production, LLC), a Delaware limited liability company ("Blackstone"), and, solely for the purposes of Section 2.2, Section 4.2, Section 4.5 and Article VII, Sanchez Energy Corporation, a Delaware corporation ("Sanchez Energy"). Each of SN, SN UnSub, Sanchez Energy (with respect to the provisions of this Agreement to which it is a party) and Blackstone are referred to herein individually as a "Party" and collectively as the "Parties."

**RECITALS**

**WHEREAS**, the Parties and, solely for the purposes of Section 15.22 thereof, Sanchez Energy, entered into that certain Purchase and Sale Agreement, dated as of January 12, 2017, by and among Anadarko E&P Onshore LLC and Kerr-McGee Oil & Gas Onshore LP (together, "Anadarko") and the Parties (the "Purchase Agreement"), pursuant to which the Parties collectively purchased all of the Working Interests of Anadarko comprising an undivided fifty percent (50%) Working Interest in certain developed and undeveloped oil and gas assets in Maverick, Dimmit, Webb, and LaSalle Counties, Texas, as described in more detail in Annex III; and

**WHEREAS**, the Parties desire to enter into this Agreement in connection with the transactions and conveyances contemplated by the Purchase Agreement to, among other things, provide for certain capital planning, operatorship, transfer, and economic rights between the Parties with respect to the development, operation, and maintenance of the Assets and the Parties' interests therein.

**NOW, THEREFORE**, for and in consideration of the promises and the mutual covenants and agreements contained herein and other good and valuable consideration (the receipt and sufficiency of which are hereby confirmed and acknowledged), the Parties agree as follows:

**ARTICLE I**
**DEFINITIONS**

**1.1 Specific Definitions.** Capitalized terms used in this Agreement shall be given the meanings ascribed to such terms on Annex I.

**1.2 Construction.** Unless the context otherwise requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter, the singular shall include the plural, and the plural shall include the singular. Any references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits, Annexes and Schedules are to exhibits, annexes and schedules attached hereto, each of which is incorporated herein for all purposes. Article and section titles or headings are for convenience only, and neither limit nor amplify the provisions of the Agreement itself, and all references herein to articles, sections, or

subdivisions thereof shall refer to the corresponding article, section, or subdivision thereof of this Agreement unless specific reference is made to such articles, sections or subdivisions of another document or instrument. Unless the context of this Agreement clearly requires otherwise, the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," and the words "hereof," "herein," "hereunder," and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.

**ARTICLE II**
**WORKING INTERESTS; REPRESENTATIONS AND WARRANTIES**

**2.1** **Working Interest.** As of the Effective Date, the Parties each own the Working Interests in each of the Leases as set forth on Annex III.

**2.2** **Representations and Warranties**. Each of the Parties, severally and not jointly, solely in respect of itself and not another Party, hereby represents and warrants to the other Parties as follows as of the Effective Date: (a) such Party is duly formed, validly existing, and in good standing under the laws of its jurisdiction of formation, (b) such Party has taken all necessary action to authorize the execution, delivery, and performance of this Agreement and has adequate power, authority, and legal right to enter into, execute, deliver and perform this Agreement, (c) such Party has duly executed and delivered this Agreement and this Agreement is legal, valid, and binding with respect to such Party and is enforceable against such Party in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, or similar laws affecting creditors' rights generally, (d) except to the extent contemplated herein, no permit, consent, approval, authorization or order of, and no notice to or filing with, any Governmental Authority or Third Party (collectively, "Consents") is required in connection with the execution, delivery, or performance by such Party of this Agreement, or to consummate any transactions contemplated hereby that have not been obtained or waived prior to the Effective Date, and (e) *provided*, that the Consents are obtained, the authorization, execution, delivery, and performance of this Agreement by such Party does not, and will not, breach or conflict with or constitute a default under (A) such Party's organizational documents or (B) any agreement or arrangement to which such Party is a party or by which it is otherwise bound.

**ARTICLE III**
**OPERATING COMMITTEE; BUDGETS AND WORK PLAN**

**3.1** **Management by Operating Committee**. The Parties hereby establish an operating committee composed of representatives (each, a "Representative") from the Parties duly appointed in accordance with this Article III (the "Operating Committee"). The Operating Committee shall exercise its rights and carry out its duties over the Assets in compliance with this Agreement.

**3.2** **Function of the Operating Committee**. The Parties agree that, among the Parties, the timing, scope and budgeting of operations on the Assets (other than with respect to the Initial Budget and Work Plan) and amendments to the Initial Budget and Work Plan shall be ultimately

approved by the Operating Committee. To the extent permitted or allowed under the applicable Operating Agreement, the Operator shall, in its own discretion and in accordance with the applicable Operating Agreement, propose, approve, and undertake any actions or decisions pursuant to such applicable Operating Agreement unless Unanimous Consent of the Operating Committee is required under this Agreement. The Operating Committee shall have no authority over the ownership of any interest in an Asset, which authority shall remain exclusively with the Party holding such ownership interest, subject to the other terms of this Agreement, including Article IV. The matters set forth below shall require the Unanimous Consent of the Operating Committee, and each Party agrees that it will not take or knowingly facilitate, and will cause its Controlled Affiliates and shall use its reasonable best efforts to cause its other Affiliates not to take or knowingly facilitate, any action under any applicable Operating Agreement or otherwise with respect to the Assets contemplated by clauses (a) through (h) of this Section 3.2 without the Unanimous Consent of the Operating Committee.

(a) approving any Subsequent Budget and Work Plan;

(b) making any amendments or modifications of the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan; *provided*, that, any increase to the aggregate amount of expenditures in the previously approved Initial Budget and Work Plan or any Subsequent Budget and Work Plan (as applicable) shall not require Unanimous Consent of the Operating Committee so long as such increase would not exceed the approved budgeted amount by more than ten percent (10%) and is otherwise consistent with the applicable Approved Budget;

(c) approving any AFE with respect to an Approved Operation to the extent that all AFEs issued for such Approved Operation exceed one hundred twenty percent (120%) of the budgeted amount for such Approved Operation in an Approved Budget; *provided*, *however*, that any AFEs so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(d) approving any E&D Operations or S&A Operations proposed by a Third Party unless previously authorized pursuant to an Approved Budget; *provided*, *however*, that any such E&D Operations or S&A Operations that are so approved by Unanimous Consent shall not be counted toward the ten percent (10%) overage referenced above in Section 3.2(b);

(e) designating a new Operator (other than as provided in Section 3.8(e) or Section 3.8(f));

(f) commencing or settling litigation related to the Assets that affect or would reasonably be expected to affect all Parties with respect to their ownership of the Working Interests, if the claims or settlements at issue exceed, or would reasonably be expected to exceed, a total of $2,000,000 in the aggregate or otherwise involve any equitable relief, or request for equitable relief, related to the Assets;

(g) amending this Agreement or any applicable Operating Agreement; and

(h) approving or amending of any Material Contracts.

(i) In the event that the Operating Committee approves any matter under Section 3.2 by Unanimous Consent, each Party shall take, and shall cause its Affiliates to take, such actions within such Party's Control under an applicable Operating Agreement that are reasonably necessary to effectuate such approved matter (and shall not knowingly take any action that could reasonably be expected to subvert, or otherwise materially interfere with the effectuation of such approved matter, including by encouraging Third Party Working Interest holders under an Operating Agreement to submit alternative or competing proposals against those proposals approved by the Operating Committee pursuant to this Section 3.2). Without limiting the generality of the foregoing but subject to Section 3.7(c), each Party will vote its respective Working Interests under an applicable Operating Agreement in favor of, and make appropriate elections with respect to, and the Operator will make proposals for the activities contemplated by, matters that have been approved by the necessary consents required by this Section 3.2 as provided hereunder, and are otherwise in accordance with the terms of this Agreement and any applicable Operating Agreement. Once a matter is approved pursuant to the applicable Operating Agreement, the Joint Exploration Agreement, and the Participation Agreement, the provisions of such other agreements shall control the implementation of such matter other than as expressly set forth in this Agreement.

**3.3 Operating Committee.**

(a) *Composition.*

(i) The Operating Committee shall consist of six (6) natural persons.

(ii) SN shall have the right to appoint two (2) Representatives and SN UnSub shall have the right to appoint one (1) Representative (each, a "Sanchez Representative"), ***provided***, ***however***, at any time following a Qualified Foreclosure Transfer, the Qualified Foreclosure Transferee shall have the right to appoint one (1) Representative (the "Qualified Foreclosure Transferee Representative") and SN shall have the right to appoint two (2) Representatives (which such two (2) Representatives shall then be the only Sanchez Representatives hereunder), and SN UnSub will no longer have the right to appoint a Representative. Notwithstanding anything in this Agreement to the contrary, (a) SN shall have the right to direct the vote of each Sanchez Representative appointed by SN, (b) SN UnSub will have the right to direct the vote of the Sanchez Representative appointed by SN UnSub, and (c) the Qualified Foreclosure Transferee shall have the right to direct the vote of the Qualified Foreclosure Transferee Representative. Notwithstanding anything to the contrary in this Agreement, at any time that SN is in Default, the Sanchez Representative appointed by SN UnSub shall be an investment professional affiliated with GSO for so long as GSO owns any interest in SN UnSub.

(iii) Blackstone shall have the right to appoint three (3) Representatives (each, a "Blackstone Representative"). Notwithstanding anything in this Agreement to the contrary, Blackstone shall have the right to direct the vote of each Blackstone Representative.

(iv) The initial Representatives are set forth on Annex II.

(v) Each Representative may vote by delivering his or her written proxy to another Representative. A Representative shall serve until such Representative resigns or is removed as provided in Section 3.3(b).

(b) *Resignation; Removal and Vacancies*. Any Representative may resign at any time by giving written notice to the Operating Committee. The resignation of any Representative shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Any Sanchez Representative may be removed at any time, with or without cause, by (and only by) SN (if such Sanchez Representative was appointed by SN) or SN UnSub (if such Sanchez Representative was appointed by SN UnSub). Any Blackstone Representative may be removed at any time, with or without cause, by (and only by) Blackstone. Any Qualified Foreclosure Transferee Representative may be removed at any time, with or without cause, by (and only by) the Qualified Foreclosure Transferee. The removal of a Representative shall be effective only upon receipt of notice thereof by the remaining Representatives and by SN, SN UnSub, Blackstone, or the Qualified Foreclosure Transferee, as applicable. Any vacancy in the number of Representatives occurring for any reason shall be filled promptly by the appointment of a new Representative by (i) SN, with respect to a Sanchez Representative appointed by SN, (ii) SN UnSub, with respect to a Sanchez Representative appointed by SN UnSub, (iii) Blackstone, with respect to a Blackstone Representative, and (iv) the Qualified Foreclosure Transferee, with respect to the Qualified Foreclosure Transferee Representative. The appointment of a new Representative is effective upon receipt of notice thereof by or at such time as shall be specified in such notice to the remaining Representatives.

**3.4 Meetings of the Operating Committee.**

(a) Regular meetings of the Operating Committee shall be held on a regular basis, but not less than monthly, at such times or places as may be determined by the Operating Committee. Special meetings of the Operating Committee may be called by any of the Representatives, subject to the requirements listed under Section 3.4(b). Each Party shall use reasonable best efforts, in good faith, to cause its designated Representatives to attend each regular or special meeting of the Operating Committee. The Operating Committee and the Operator shall hold bi-monthly conference calls on the 1st and the 15th of each month (or if any such dates are not a Business Day, the immediately following Business Day) to discuss the daily drilling operations, the production reports required to be provided pursuant to Section 5.1(a) and other operational updates during regular business hours, and the Operator shall otherwise provide the Parties with full access to, and shall make its personnel available upon reasonable prior notice to discuss with the Operating Committee such matters; *provided*, that upon the reasonable request by any Party, the Operating Committee and Operator will hold additional conference calls not to exceed one conference call per week.

(b) Notice of the time and place of any regular meeting of the Operating Committee shall be in accordance with the meeting schedule approved by the Operating

Committee or as otherwise agreed to by the Parties. Special meetings of the Operating Committee may be called by any Party by providing notice to the Representatives at least three (3) days prior to such meeting. Special meetings of the Operating Committee to deal with emergencies may be called by a Party providing at least twelve (12) hours' notice prior to the meeting, so long as each Representative provides written confirmation of receipt of notice or waives notice (including by attending the emergency meeting). Written notice of meetings of the Operating Committee, including the purpose of the meeting for special (including emergency) meetings, shall be given to each Representative with the notice of the meeting. Any Representative may waive notice of any meeting by the execution of a written waiver prior or subsequent to such meeting. The attendance of a Representative at any meeting shall constitute a waiver of notice of such meeting, except where a Representative attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction or voting of any business or matter because the meeting has not been lawfully called or convened. Notice may be given by electronic mail to an electronic mail address provided in writing by a Representative, by facsimile to a facsimile number provided in writing by a Representative, by personal delivery, or by national reputable courier service such as Federal Express or United Parcel Service to an address specified in writing by a Representative.

(c) The Operating Committee may adopt whatever rules and procedures relating to its activities as it may deem appropriate; *provided*, that such rules and procedures shall not be inconsistent with or violate the provisions of this Agreement; and *provided*, *further*, that such rules and regulations shall permit Representatives to participate in meetings (and the representatives of the Parties to observe) by telephone, video conference or the like, or by written proxy, and such participation shall be deemed attendance for purposes of determining whether a Quorum is present.

(d) At each regular meeting of the Operating Committee, the Operator shall update the Operating Committee on the operational performance of the Assets being operated by the Operator, including by presenting relevant quality, health, safety and environmental metrics regarding operations.

**3.5 Quorum and Voting.**

(a) At all meetings of the Operating Committee, the presence of a majority of the Representatives (including at least one (1) Sanchez Representative appointed by SN, one (1) Blackstone Representative and either the Sanchez Representative appointed by SN UnSub or the Qualified Foreclosure Transferee Representative, as applicable) shall be necessary and sufficient to constitute a quorum of the Operating Committee for the transaction of business (a "Quorum").

(b) Each Representative shall be entitled to one (1) vote on each matter to be voted upon by the Operating Committee.

(c) All actions and approvals of the Operating Committee listed in Section 3.2(a)-(h) shall be approved and passed at a meeting at which a Quorum is present by Unanimous Consent.

(d) Any Representative may participate in a meeting of the Operating Committee via conference telephone or any communications equipment that allows all Representatives and other individuals participating in the meeting to communicate with each other.

(e) Any action required or permitted to be taken at any meeting of the Operating Committee may be taken without a meeting or a vote, if consents in writing, setting forth the action so taken, are signed by Representatives constituting Unanimous Consent. Each written consent shall bear the date and signature of each Representative who signs the consent.

**3.6 Deadlock Mechanisms.**

(a) If any matter or proposal requiring Unanimous Consent for approval by the Operating Committee (i) is brought before the Operating Committee and such matter or proposal is not approved by Unanimous Consent or (ii) would have been brought before the Operating Committee, but for the fact that a Quorum was not present at three (3) consecutive meetings called for the purpose of approving such matter or proposal, then any Representative(s), by written notice to the other Representatives may call a meeting of the Operating Committee to reconsider such matter or proposal. Such meeting shall be held when, where and as reasonably specified in such notice, but not less than three (3) Business Days nor more than seven (7) Business Days after such notice has been delivered. If such meeting is called and held as provided in the immediately preceding sentence and the matter or proposal is offered at such meeting again and (A) is not approved by Unanimous Consent or (B) a Quorum is not present at such Operating Committee meeting, then any Representative(s) may within three (3) Business Days thereafter, declare a deadlock (a "Deadlock") by giving written notice to the other Representatives containing a brief description of the nature of the issue subject to such Deadlock (a "Deadlock Notice"). A Deadlock may also be declared as provided in Section 5.3(e)(ii). All Deadlocks shall be subject to the provisions of Section 3.6(b) and, if applicable, mediation, in accordance with Section 3.6(c).

(b) Within ten (10) Business Days after the receipt of a Deadlock Notice, a designated senior executive from each Party shall meet in good faith effort to reach an accord that will end the Deadlock. If a decision is not made by common accord that ends the Deadlock within ten (10) Business Days after the date of such meeting, any Representative(s) may declare a final Deadlock (a "Final Deadlock") by providing written notice to the other Representative (a "Final Deadlock Notice"). Notwithstanding anything in this Agreement to the contrary, if the designated senior executive of any Party is unwilling or unable to meet with the designated senior representative of any other Party, then any Representative(s) may immediately invoke the provisions of Section 3.6(c).

(c) If within ten (10) Business Days following receipt of a Final Deadlock Notice, the matter or proposal subject to such Final Deadlock remains in contention, then any Representative may subject the matter or proposal to non-binding mediation, which process shall be conducted as promptly as reasonably practicable, and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such non-binding mediation.

**3.7 Budgets and Work Plan; AFEs and Approved Operations.**

(a) *Initial Budget and Work Plan.* On the Effective Date, the Parties approved an Initial Budget and Work Plan (as may be amended from time to time by Unanimous Consent under Section 3.2(a), the "Initial Budget and Work Plan"), which sets forth estimates of the amounts to be incurred by the Operator (subject to authorization required under an applicable Operating Agreement) to conduct (x) the activities approved in such Initial Budget and Work Plan and (y) other operations related to the Assets contemplated by such Initial Budget and Work Plan, in each case, from the Effective Date through the second (2nd) anniversary of the execution of the Purchase Agreement (such activities and operations being the "Initial Approved Operations"). Each AFE issued by the Operator to implement an Approved Operation shall be deemed an Approved AFE in accordance with Section 3.2(c) and each Party shall consent to such Approved AFEs under any applicable Operating Agreement. Operator shall promptly issue supplements to any Approved AFE that it reasonably anticipates will exceed the estimated expenditures thereunder by one hundred twenty percent (120%) of the budgeted amount subject to approval by Unanimous Consent of the Operating Committee.

(b) *Subsequent Budgets and Work Plans.*

(i) The Operator shall prepare and submit to the Operating Committee for approval no later than October 1, 2018, and every October 1 thereafter, (A) a proposal for E&D Operations and S&A Operations to be conducted by the Operator during the subsequent twelve (12) month period and (B) a proposed budget (together, a "Subsequent Budget and Work Plan") which sets forth in reasonable detail the projects and activities (the "Subsequent Proposed Operations") and estimated amounts expected to be incurred by the Operator during the subsequent twelve (12) month period to conduct (x) the Subsequent Proposed Operations and (y) other estimated operating expenses related to the Assets. For the avoidance of doubt the expiration of an Approved Budget shall not affect any Approved Operation in such Approved Budget which is not yet complete. In the event that there is more than one Operator as a result of a Division of Operatorship or any other reason, then the applicable Post-Division Operators shall cooperate in good faith to submit such proposals to the Operating Committee as contemplated above.

(ii) The Operating Committee shall work in good faith to approve or disapprove of the Subsequent Budget and Work Plan no later than forty-five (45) days prior to the expiration date of the Approved Budget then in effect. Upon approval, the Subsequent Budget and Work Plan shall become the Approved Budget (all Subsequent Proposed Operations, as may be approved or amended by the Operating Committee, shall become "Subsequent Approved Operations").

(iii) If the Operating Committee approves the Subsequent Budget and Work Plan, then the Operator shall (A) use its reasonable best efforts to propose to Working Interest holders under any applicable Operating Agreement and put into effect such Subsequent Approved Operations in accordance with the Approved Budgets and (B) incur

costs and expenses in accordance with the Approved Budget, in each case to the extent such actions are approved by the required vote under the applicable Operating Agreement.

(iv) If the Operating Committee fails to approve a Subsequent Budget and Work Plan by the expiration date of the Approved Budget then in effect, and such Approved Budget is (A) the Initial Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith (as among the Representatives and between the Operating Committee and the Operator, as applicable) for a six (6) month period following the expiration of the Initial Budget and Work Plan, or (B) any Subsequent Budget and Work Plan, then the Operating Committee shall continue to negotiate in good faith for a three (3) month period following the expiration of the applicable Approved Budget (as applicable, the "Budget Negotiation Period"). During the Budget Negotiation Period, until a Subsequent Budget and Work Plan is approved by the Operating Committee and agreed to by the Operator, the most recent Approved Budget shall remain in effect as between the Parties, subject to a ten percent (10%) increase for each line item of the then-existing Approved Budget during the Budget Negotiation Period, after which all activities shall cease if a Subsequent Budget and Work Plan is not approved; *provided*, that, during the Budget Negotiation Period, the Operator shall use its reasonable best efforts to (A) for the first three months during a Budget Negotiation Period, continue to engage in E&D Operations and S&A Operations which were approved pursuant to Approved Budgets (but for the avoidance of doubt, except as specifically approved by the Operating Committee pursuant to Section 3.2, the Operator shall not be authorized to engage in any E&D Operations or S&A Operations not included in an Approved Budget) (*provided*, that after such Budget Negotiation Period, no new E&D Operations and S&A Operations may be initiated regardless of whether they were previously included in an Approved Budget), (B) take such actions as may be necessary to comply with the APC Well Commitment and satisfy continuous drilling obligations and otherwise maintain the Leases in accordance with their terms, and (C) incur costs and expenses in the ordinary course of business in amounts consistent with the most recent Approved Budget, including with respect to producing wells pursuant to any applicable Operating Agreement, in each case to the extent such actions are approved by the required vote or are otherwise permissible under the applicable Operating Agreement.

(c) *Approval of Additional Activities.* From time to time, SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee may present to the Operating Committee, E&D Operations and S&A Operations proposed to be undertaken with respect to the Assets that were not included in an Approved Budget.

(i) For any new E&D Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional E&D Proposal"), SN, SN UnSub or Blackstone or, if applicable, the Qualified Foreclosure Transferee, shall present to the Operating Committee and the Operator (A) proposed revisions to the Approved Budget in respect of such activities, (B) the surface location and objective formation of each vertical and lateral wellbore included in the Additional E&D Proposal, (C) the proposed spud and completion dates for each such wellbore, (D) relevant seismic/geophysical and reservoir

data, anticipated oil, gas, and liquids ratios, initial production and estimated ultimate recovery figures, decline curves, and the drilling and completion design for each proposed well, (E) the total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by well, (F) an AFE in respect of such Additional E&D Proposal, and (G) any other information reasonably requested by the Operating Committee and the Operator. The Operating Committee and the Operator shall evaluate such Additional E&D Proposal and such portion of the Additional E&D Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the applicable Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.2 and Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(ii) For any new S&A Operations proposed to be undertaken that are not included in an Approved Budget (an "Additional S&A Proposal"), SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee shall present to the Operating Committee and the Operator, (A) proposed revisions to the Approved Budget in respect of such activities, (B) the proposed date of commencement of such activities and the proposed development and construction program for each included project (including the proposed timing and project scheduling), (C) the anticipated upside/cost saving for each included project and total estimated cost (including Capital Expenditures and allocable overhead) of such activities, allocated by project, (D) an AFE in respect of such Additional S&A Proposal, (E) any relevant data from any prior or comparable operations undertaken by SN, Blackstone or, if applicable, the Qualified Foreclosure Transferee or third parties relevant to the cost/benefit analysis of the proposed project(s), and (F) any other information reasonably requested by the Operating Committee or the Operator. The Operating Committee and the Operator shall evaluate such Additional S&A Proposal and such portion of the Additional S&A Proposal that receives the Unanimous Consent of the Operating Committee shall be incorporated into the Approved Budget and implemented by the Operator. Once approved, the Operator shall administer AFEs for such activities, subject to Section 3.7(a), which shall be deemed Subsequent Approved Operations and incorporated into an Approved Budget.

(d) *Timely Payment Commitment*. Notwithstanding anything in the applicable Operating Agreements to the contrary, on or before the 15th day of each month, Operator shall provide the other Party(ies) an invoice ("Monthly Invoice") for (i) such Party(ies) proportionate share of all projected cash outlays for the following month ("Estimated Cash Outlays") and (ii) any adjustments to the previously sent invoices so that the amount ultimately paid by a Party for a given month is equal to the actual amounts expended by Operator for such month ("True-Up Amount") (e.g., Operator will send a Monthly Invoice on or before June 15 and such Monthly Invoice will consist of the Estimated Cash Outlays for July plus or minus a True-Up Amount (if any) to reconcile the Estimated Cash Outlays for May). Each Party shall pay the Monthly Invoice on or before the last day of the month in which the Monthly Invoice was delivered to such Party.

(e) *APC Well Commitment; Other Required Actions.* Unless otherwise approved by the Operating Committee by Unanimous Consent, Operator will propose wells necessary to the meet the APC Well Commitment and avoid any financial penalty thereunder and shall be authorized to take any other action to the extent necessary to meet any continuous drilling obligations under any Lease. To the extent Operator does not propose such wells when required pursuant to the foregoing sentence, any Party is permitted to propose wells under any applicable Operating Agreements in order to ensure such APC Well Commitment is satisfied to the extent that failure to propose wells at such point in time would reasonably be likely to result in financial penalty under the APC Well Commitment. Further, any Party shall be permitted to propose the taking of any other action reasonably required to meet any continuous drilling obligations under any Lease.

**3.8 Operatorship Under the Operating Agreement.**

(a) As of the Effective Date, the Parties acknowledge and agree that SN is designated as the operator of the Assets pursuant to, and in accordance with, the Operating Agreements (in such capacity, "Sanchez Operator"). As contemplated by this Agreement, Blackstone or its designee, including a buyer or its designee in connection with a Sale Transaction may succeed to SN's status as operator of some or all of the Assets (in such capacity, "Blackstone Operator") and, in that event, Sanchez Operator may thereafter succeed to Blackstone Operator's status as operator of some or all of the Assets. Sanchez Operator and Blackstone Operator shall be referred to interchangeably as the "Operator," and each reference to the "Operator" herein means either Sanchez Operator or Blackstone Operator, depending on which of such parties holds the operatorship of the Assets in question following the receipt of all Required Operatorship Consents. For the avoidance of doubt, the term "Operator" does not include any successor Third Party operator of the Assets other than Blackstone Operator once such successor Third Party operator has obtained all Required Operatorship Consents with respect to any applicable Lease, Wellpad or other Asset. None of the Operating Committee or the Parties, by virtue of their ownership of an interest in the Assets, shall have any power, authority, or any Control over the day-to-day operation or management of the Assets, which authority and obligations reside with the Operator pursuant to the Operating Agreements. The Operator shall use its reasonable best efforts to execute an Approved Budget as agreed upon by the Parties pursuant to this Agreement and act under each Operating Agreement consistently with this Agreement, including with respect to carrying out the development plan and budget as set forth in an Approved Budget; *provided*, *however*, notwithstanding anything to the contrary herein, if this Agreement and the express requirements of the Operator under an Operating Agreement directly conflict, the Operator shall comply with such Operating Agreement to the extent necessary to avoid violating the terms of such Operating Agreement; *provided*, *further*, that Operator shall use reasonable best efforts to follow the estimated detailed drilling and completion specifications set forth in each Approved Budget but immaterial deviations shall not require an amendment of the applicable Approved Budget or an approval by Unanimous Consent of the Operating Committee nor shall such immaterial deviations be considered a default or breach of the Operator's obligations under this Agreement.

(b) Notwithstanding anything to the contrary in this Agreement, including the Operating Committee's actions pursuant to Section 3.2, if any Party reasonably believes there is any emergency involving actual or imminent loss of life, material damage to any of the Assets or the environment, or substantial and immediate financial loss, such Party may, in the sole exercise of its discretion, act for and on behalf of the Parties (including by causing the Operator to take such actions) in any manner reasonably necessary or useful under the circumstances without the necessity of giving prior notice to the other Parties or receiving any approval or consent from the Operating Committee or any Party. In the event that any Party takes any action pursuant to this Section 3.8(b) without the prior approval of the Operating Committee, such Party shall promptly (but in all events within twenty-four (24) hours) notify the Operating Committee of the taking of such actions.

(c) Without the prior written consent of Blackstone, SN UnSub, and if applicable, the Qualified Foreclosure Transferee, except as required to implement a transfer of operatorship required by this Agreement, SN (in its capacity as Sanchez Operator) shall not resign or attempt to resign as the operator under any Operating Agreement or take or omit to take any action that would effectively or constructively result in the termination of its status as operator under any Operating Agreement.

(d) In the event of a transfer of operatorship under any Operating Agreement in accordance with Section 3.8(f), the Alternate Operator or its designee as successor operator shall, as a condition to such transfer, be deemed to become a party to this Agreement as Operator under such Operating Agreement and be bound by the terms hereof in the same capacity as Operator, *mutatis mutandis*, and if not a Party to this Agreement, such operator shall be required to execute a joinder of this Agreement to such effect, and the Defaulting Operator shall be automatically discharged from all further obligations as the Operator under this Agreement with respect to any such Operating Agreement and the Assets subject to such Operating Agreement.

(e) *Division of Operatorship.* The following rights and procedures shall apply if (i) the Operating Committee is unable to approve a Subsequent Budget and Work Plan within the Budget Negotiation Period or (ii) either Blackstone or SN otherwise elects to cause a Division of Operatorship pursuant to this Section 3.8(e) for any reason during a Budget Negotiation Period or, as applicable, in the event that an Equitable Partition is to be consummated pursuant to Section 4.5, then, upon the expiration of such Budget Negotiation Period or at any time during such Budget Negotiation Period:

(i) Either Blackstone or SN shall have the right to cause a division of operatorship (a "Division of Operatorship") pursuant to which, subject to the terms of the applicable Operating Agreements and the other provisions of this Section 3.8(e), the rights to operatorship pursuant to applicable Operating Agreements for the Wellpads shall be divided between Blackstone Operator and Sanchez Operator on a geographic Wellpad-by-Wellpad basis approximating an alternating, checkerboard pattern (or such other pattern as may be mutually agreed by SN and Blackstone), such that once the Division of Operatorship is completed, such Division of Operatorship shall (A) result in Blackstone Operator and Sanchez Operator each having rights to operatorship pursuant to applicable

Operating Agreements over a number of Wellpads that constitute approximately fifty percent (50%) of the aggregate Fair Market Value of (x) the Working Interests underlying all the Wellpads and (y) the Existing Producing Wells and related offset locations and sections, and (B) evenly (or as evenly as commercially practicable) distribute to Blackstone Operator and Sanchez Operator: (1) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (2) producing wells and current production, (3) remaining reserves, (4) potential future well locations, and (5) operatorship of the Existing Producing Wells and related offset locations and sections (an "Equitable Division") and (6) in the case of an Alternative Equitable Partition, such other criteria set forth in Section 4.5(a). Upon the election of any Party to cause a Division of Operatorship, SN and Blackstone shall negotiate in good faith for a period of forty-five (45) days to designate by area, and based on substantially equal geographic divisions, all Wellpads under the Leases based on customary industry practices and their respective reserve reports covering the previous twelve (12) month period and agree upon an Equitable Division. If, following such forty-five (45) day period, SN and Blackstone are unable to agree upon an Equitable Division, each of them shall retain an independent, Third Party financial advisor or investment bank with expertise in valuing oil and gas assets in the Eagle Ford Shale (a "Financial Advisor") to determine an Equitable Division which will largely be based on such Party's engineering and geological reserve reports for the last twelve (12) month period and taking into account the then current strip pricing forecast. Sanchez and Blackstone shall each present the results of its Financial Advisor and provide its associated reserve reporting, including reasonable supporting information, after a period of thirty (30) days to the other Party and each such Party shall have ten (10) days to review the proposal of such other Party. If SN and Blackstone are unable to agree upon an Equitable Division after the period described in the preceding sentence, then SN and Blackstone shall choose within ten (10) Business Days a third Financial Advisor and an engineering and geological advisor to audit the reserve reports of SN and Blackstone (the "Reserve Auditor") from among the entities listed on Annex IV (or if SN and Blackstone are unable to agree on a Reserve Auditor and/or the third Financial Advisor within a reasonable timeframe, they shall cause the other Financial Advisors to choose a third Financial Advisor and Reserve Auditor from among the entities listed on Annex IV within the subsequent five (5) Business Day period) to determine an Equitable Division which shall (A) be based on the provisions set forth in this Section 3.8(e), (B) reflect the Equitable Division proposals by the two (or three, in the case of an Equitable Partition) Financial Advisors (unless such proposal is not consistent with the terms herein in which case such proposal will be rejected and not considered), (C) be rendered as promptly as practicable (but in any event no later than thirty (30) days after the appointment of such Financial Advisor and Reserve Auditor), and (D) be binding on the Parties. The Parties shall cooperate to provide all relevant information reasonably requested by such third Financial Advisor in connection with the determination of a final Equitable Division, including the audit of the Reserve Auditor of the reserve reports provided by SN and Blackstone. With respect to each applicable Operating Agreement, the Party (or its designee) who had operatorship prior to the Division of Operatorship shall be referred to as the "Pre-Division Operator," the Party who is awarded

operatorship pursuant to such Division of Operatorship (or where applicable pursuant to an Equitable Partition) shall be referred to as the "Post-Division Operator," and the other Party to such Division of Operatorship shall be referred to as the "Post-Division Non-Operator." For the avoidance of doubt, in the case of an Equitable Partition pursuant to Section 4.5(a), the provisions of this Section 3.8(e)(i) shall be deemed and interpreted to include SN UnSub as a participant in the Equitable Partition evaluation and determination process, such that GSO (acting on behalf of SN Unsub, as contemplated in Section 4.5 (i)) shall have full rights to participate equally with SN and Blackstone in determining the Equitable Partition in a manner consistent with the terms and conditions of Section 4.5(a) and this Section 3.8(e), including the right to appoint a Financial Advisor and Reserve Auditor.

(ii) Following the final resolution of an Equitable Division pursuant to Section 3.8(e)(i) or an Equitable Partition pursuant to Section 4.5, each Party shall use its reasonable best efforts to take or cause to be taken all actions required to obtain as promptly as practicable any necessary consents or amendments required for a change in operatorship (the "Required Operatorship Consents") under the Leases, Operating Agreements and any other Material Contracts, including all purchase, marketing, transportation, storage, processing and/or sales contracts, related to the Wellpads or Leases reasonably identified by a Party and any other actions reasonably necessary or desirable to effect a Division of Operatorship or an Equitable Partition, including any required notices or filings with applicable Governmental Authorities. If any such required consent or amendment for a Wellpad or Lease is not obtained by the time an Equitable Division or an Equitable Partition, respectively, has been finalized pursuant to Section 3.8(e)(i), then the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment and until such consent or amendment is obtained (or until such other time as the Post-Division Operator reasonably determines that it has the right and capability to assume operatorship), the Pre-Division Operator shall maintain formal rights of operatorship for such Wellpad or Lease and the Post-Division Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad or Lease based on customary terms and conditions, whereby the Post-Division Operator shall have the right to physically conduct all operations, and/or (B) direct the Pre-Division Operator in its exercise of all rights of a reasonable operator with respect to such Wellpad or Lease as though the Post-Division Operator had been appointed as successor operator for such Wellpad or Lease, to the extent (in either case (A) or (B)) reasonably consistent with the Pre-Division Operator's duties as operator under the applicable Operating Agreement, in which case the Pre-Division Operator shall remain the operator with respect to the applicable Asset and carry out all directions of the Post-Division Operator and not take any action under an Operating Agreement unless approved by the Post-Division Operator or required under the applicable Operating Agreement.

(iii) Upon the consummation of an Equitable Division, the Parties shall use their reasonable best efforts to (A) (1) cause all existing Operating Agreements to be terminated to the extent any such Operating Agreements apply to multiple Wellpads

allocated to both SN and Blackstone in connection with an Equitable Division and (2) execute and cause Third Party Working Interest holders in such Wellpads to execute, in place of each terminated Operating Agreement, the Form Operating Agreement (and agree to any reasonable modifications that may be requested by any such Third Party Working Interest holder to such Form Operating Agreement that are reasonably necessary to obtain any required approval), attached hereto as Exhibit B, for each individual Wellpad allocated to a Party pursuant to a Division of Operatorship or (B) with respect to any Wellpad that is subject to an Operating Agreement relating only to such Wellpad, take such action as may be necessary to obtain the required approval to transfer operatorship rights to the applicable Post-Division Operator as successor operator under such Operating Agreement. Additionally, each Post-Division Operator shall provide the other Parties on an annual basis with an approved one (1) year budget and work plan and a three (3) year budgeted forecast regarding the development of each Party's respective Assets for which such Post-Division Operator has been allocated rights of operatorship pursuant to a Division of Operatorship or an Equitable Partition.

(iv) Notwithstanding anything else to the contrary in this Agreement, at any time that a Non-Defaulting Party or its designee has rights to operatorship over one hundred percent (100%) of the Leases or Wellpads, or following the date upon which any Operator Default Event (as defined below) has occurred and is not cured as provided in Section 3.9, the Defaulting Party or its Affiliates shall no longer have the right to elect to cause a Division of Operatorship pursuant to this Section 3.8(e).

(v) Following a Division of Operatorship or an Equitable Partition, if a Post-Division Operator under any Operating Agreement elects to sell or otherwise transfer all of its interest in the assets covered by such Operating Agreement to a Third Party, and if such Third Party desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Non-Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for such Third Party to be selected as the successor operator, including a Third Party buyer in connection with a Sale Transaction or following an Equitable Partition. In all other circumstances in which a Post-Division Operator resigns (other than as a result of a transfer of operatorship to an Affiliate) or is removed as operator under an Operating Agreement, if the Post-Division Non-Operator desires and is duly qualified to be selected as the successor operator under such Operating Agreement, the Post-Division Operator and SN UnSub (to the extent they each then continue to own interests and have voting rights under such Operating Agreement) agree to vote for the Post-Division Non-Operator as successor operator. This Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten (10) years.

(vi) Promptly following the date of this Agreement, upon the request of Blackstone, the Parties shall use their good faith efforts to engage the Third Party owners of Working Interests in the Leases and enter into new joint operating agreements for each Wellpad consistent in all material respects with the existing Operating Agreements, in

addition to any modifications upon which the Parties may agree, in order to facilitate an orderly Division of Operatorship if and when pursued pursuant to this Agreement.

(vii) Blackstone will indemnify SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee, for all damages incurred by such Parties (a) to the Consenting Parties or any other parties whose consent is required under any applicable Operating Agreements arising out of any litigation brought by the Consenting Parties under the Consent Agreement as a result of the consummation of an Equitable Division or an Equitable Partition and (b) to counterparties from whom a Required Operatorship Consent is required in connection with effecting a Division of Operatorship or an Equitable Partition without having obtained any Required Operatorship Consents, which in either case shall include all reasonable legal expenses. In connection with any such litigation pursuant to which Blackstone is obligated to indemnify SN and SN UnSub under this Section 3.8(e)(vii), Blackstone shall have the right to control the defense on behalf of Blackstone, SN, SN UnSub and their respective Affiliates and SN, SN UnSub or, if applicable, the Qualified Foreclosure Transferee, and their respective Affiliates shall reasonably cooperate in connection with such defense; *provided*, that the appointment of counsel by Blackstone shall be subject to the consent of SN, not to be unreasonably withheld, conditioned or delayed, and SN and SN UnSub or, if applicable, the Qualified Foreclosure Transferee shall have the right to participate in connection with the defense of any such litigation. In connection with the consummation and implementation of an Equitable Division or an Equitable Partition, the Parties will use their respective commercially reasonable efforts to cooperate with the Consenting Parties to provide for an orderly transition of operatorship and consult with the consenting parties in connection with the implementation of such transition, in each case, in order to maintain an amicable working relationship with the Consenting Parties.

(f) *Transfer of Operatorship Generally*. Effective immediately upon the occurrence of any of the following: (i) Operator is removed as operator pursuant to the terms of any applicable Operating Agreement, (ii) Operator suffers a Specified Event of Default under a Specified Credit Agreement, (iii) Operator resigns as operator under any applicable Operating Agreement with or without the consent of the other parties thereto, (iv) Operator commits an act of gross negligence or willful misconduct with respect to its duties under an applicable Operating Agreement ("Negligent Operator Action"); *provided*, that notice of any Negligent Operator Action must be given to Operator detailing the alleged acts by Operator and Operator shall have a thirty (30) day period from receipt of such notice to cure any such Negligent Operator Action, unless the Negligent Operator Action concerns an ongoing operation being conducted, in which case, Operator must cure such Negligent Operator Action within forty-eight (48) hours of its receipt of the notice; (v) SN or any of its Affiliates breaches in any material respect its obligations under Section 4.5 or (vi) either Party while acting as Operator has committed a Default under this Agreement (any such event described in the preceding clauses (i) through (vi), collectively, an "Operator Default Event"), the operatorship of the applicable Assets (which, in cases (i), (iii), and (iv) above, for avoidance of doubt, shall mean only those Assets covered by the applicable Operating Agreement) and the right to serve as, or to designate, the operator of such Assets under the applicable Operating Agreement(s) shall, subject to the terms of such Operating Agreement(s),

be transferred to Blackstone (if SN is then the Operator) or SN (if Blackstone is then the Operator), as applicable (the "Alternate Operator") or its designated Affiliate or a qualified Third Party operator capable of operating the Assets and selected by the Alternate Operator (a "Third Party Operator"). The Operator who is replaced as a result of such Event of Default (the "Defaulting Operator") shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to) use their reasonable best efforts to (i) take all actions required (at the reasonable direction of the Alternate Operator to effectuate such transfer, including voting its and its Affiliates' interests for an election of the Alternate Operator, its designee or a Third Party Operator, including through one or a series of related transactions, in each case to the extent permitted under the applicable Operating Agreement, (ii) obtain any necessary consents or amendments otherwise required for a change in operatorship under the Leases and applicable Operating Agreements and any other applicable Material Contracts including all Required Operatorship Consents, and (iii) carry out any other actions reasonably necessary to effect such transfer of operatorship. In the event the operatorship of an Asset is transferred to the Alternate Operator, its designee or a Third Party Operator pursuant to this Section 3.8(f), the Alternate Operator shall (and shall cause the successor operator, if other than the Alternate Operator, to), defend, indemnify and hold harmless the Defaulting Operator from all claims, Losses and damages raised by any Third Party related to the applicable Operating Agreements with respect to which operatorship has been transferred to the extent resulting from, pertaining to or arising from the operation of the applicable Assets by the Alternate Operator, its designee or the Third Party Operator from and after the date of such transfer of operatorship of the applicable Assets. The Alternate Operator shall (and shall cause the successor operator, if other than such Alternate Operator to) also use its reasonable best efforts to comply with all requirements of an operator under the applicable Operating Agreement or applicable law. In connection with any transfer of operatorship pursuant to this Section 3.8, the Parties shall use their reasonable best efforts to ensure that the new Operator shall have access to all assets relating to the Assets in which the Parties all hold an ownership interest in the same manner as the Defaulting Operator had prior to any such operatorship transfer, to the extent that a Division of Operatorship has not occurred or this Agreement has not been terminated. If any required consent or amendment required to effect the transfer of operatorship under any applicable Operating Agreement or any required consent or amendment for any other Material Contract related to a Lease or Wellpad for which operatorship is to be transferred, in each case as contemplated by this Section 3.8(f), is not obtained, including all Required Operatorship Consents, then until such consent or amendment is obtained (or until such other time as the Alternate Operator reasonably determines that it has the right and capability to assume operatorship), (i) the Parties shall continue to use their respective reasonable best efforts to obtain each required consent or amendment, (ii) the Defaulting Operator shall maintain formal rights of operatorship for such applicable Lease or Wellpad, and (iii) the Alternate Operator shall have the right to (A) be designated as the contract operator pursuant to the applicable Operating Agreement with respect to such Wellpad based on customary terms and conditions, whereby the Alternate Operator shall have the right to physically conduct all operations, and/or (B) direct the Defaulting Operator in its exercise of all rights of an operator with respect to such Wellpad as though such Alternate Operator had been appointed as successor operator for such Wellpad to the extent reasonably consistent with the Defaulting Operator's express duties as operator under the applicable Operating Agreement, in which case the Defaulting Operator shall remain the operator

with respect to the applicable Asset and carry out all directions of the Alternate Operator and not take any action under an Operating Agreement unless approved by the Alternate Operator or expressly required under the applicable Operating Agreement. For the avoidance of doubt and notwithstanding anything in this Agreement to the contrary, the transfer of operatorship and the rights related thereto described in this Section 3.8(f) shall be triggered automatically upon the occurrence of an Operator Default Event and shall not be affected in any respect by any change in, or cure of, an Operator Default Event.

**3.9 Default.**

(a) *Remedy Upon Default*. For so long as SN, SN UnSub, Blackstone or, if applicable, the Qualified Foreclosure Transferee is in Default (a "Defaulting Party"), (i) its rights under Section 3.2 (Function of the Operating Committee), Section 3.7(b) (Subsequent Budgets and Work Plans), Section 3.8(e) (Operatorship) (such that a Defaulting Party shall not have the right to elect to cause a Division of Operatorship), Section 4.1(a) (Permitted Transfers) (such that a Defaulting Party shall not have a right to Transfer its Asset Interest to a Third Party even after the expiration of the three year limitation in Section 4.1(a), without the prior written consent of the Parties not in Default (the "Non-Defaulting Parties") and *provided*, *however*, that such Default shall not affect rights regarding Permitted Liens), Section 4.2 (Tag-Along Rights), Section 4.3 (Right of First Offer), Section 4.5 (Sale Transaction) (such that if Blackstone is the Defaulting Party, it shall not have a right to compel the other Parties to participate in a Sale Transaction,), and Section 5.2 (Area of Mutual Interest) shall be suspended and any control rights associated with such provisions shall revert to the benefit of the Non-Defaulting Parties in percentages equal to their proportionate share of an AMI acquisition pending such cure or resolution of such Default and in connection therewith, the Representative(s) appointed by the Defaulting Party shall lose all voting rights with respect to the Operating Committee, and the affirmative vote of the Representatives who have not lost voting rights shall be the only votes required for any action to be taken by the Operating Committee (and shall be deemed to constitute Unanimous Consent); *provided*, that, (i) such rights shall not be suspended in the event the Party alleged to be in Default is contesting such allegation in good faith, pursuant to a binding arbitration process in accordance with Section 7.12(c), which shall be conducted as promptly as reasonably practicable (and the Parties will use their good faith efforts to cause a Representative and/or a designated senior executive to participate in such process), and (ii) the Operating Committee shall not have the authority to bind the Defaulting Party and its Affiliates to Subsequent Budgets and Work Plans or to any increases to the then-existing Approved Budget except to the extent that all such increases in the aggregate do not exceed such Approved Budget by more than ten percent (10%). A Default shall not be deemed to be continuing after the Defaulting Party has (i) cured such Default, (ii) entered into and satisfied its obligations under a binding written settlement with the Non-Defaulting Parties related to such Default, or (iii) satisfied its obligations, if any, arising from any arbitration or judicial proceeding related to such Default.

(i) Any reasonable, documented legal fees and other out-of-pocket costs of each Party to a dispute governed under this Section 3.9 shall be borne solely by the non-prevailing Party, as determined in connection with the relevant proceedings and, the prevailing Party in such proceedings shall be entitled, in addition to such other relief

as may be granted, to reimbursement of such reasonable legal fees and costs from the non-prevailing Party.

(ii) Any monetary award granted to a Party in connection with a dispute governed under this Section 3.9 shall include interest accruing daily at a rate of 1.1% per month, compounding monthly, from the date upon which it is determined the applicable state of Default began, until the Party in Default has satisfied in full its obligations arising from the arbitration proceedings (including the payment of such interest amount).

(b) *Remedy Not Exclusive.* The rights of the Non-Defaulting Party set forth in this Section 3.9 or elsewhere in this Agreement shall be in addition to such other rights and remedies that may exist at Law, in equity or under contract on account of such Default.

## ARTICLE IV
## TRANSFER; EXIT OPPORTUNITIES

**4.1 Restrictions on the Transfer of Interests.**

(a) *Permitted Transfers.* Each Party may Transfer all or part of such Party's rights, title and interest to any Asset or related assets in the Core Area acquired after the Effective Date and held directly or indirectly by any of the Parties (an "Asset Interest"), including such Party's Working Interests, only in accordance with applicable Law and the provisions of this Agreement, including this Article IV. Prior to the third (3rd) anniversary of the Effective Date, except for transfers to Permitted Transferees and Foreclosure Transfers, none of the Parties shall be permitted to Transfer all or any portion of such Party's Asset Interests without the prior written consent of the non-transferring Parties (each, a "Non-Transferring Party"), which consent may be given or withheld in the sole discretion of such Party. Any purported Transfer in breach of the terms of this Agreement shall be null and void *ab initio,* and the Non-Transferring Party shall not recognize any such prohibited Transfer. Any Party who Transfers or attempts to Transfer any Asset Interests (the "Transferring Party") except in compliance herewith shall be liable to, and shall indemnify and hold harmless, the Non-Transferring Parties for all costs, expenses, damages, and other Liabilities resulting therefrom. No Party shall place or allow to be placed any Lien on any of its Asset Interests other than Permitted Liens. "Permitted Liens" means (i) Liens granted by the Parties and/or subsidiary guarantors under any Applicable Credit Agreement or any security document (including any mortgaged or deeds of trust) entered into in connection therewith (so long as such Applicable Credit Agreement and such security documents are not, after the Effective Date, amended, restated, modified, renewed, refunded, replaced or refinanced in a manner that restricts the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive (including in a manner that would adversely impact the exercise of any Party's rights under this Article IV) than the restrictions imposed by such Applicable Credit Agreement or security document on the Effective Date (or provided for by the applicable form of security document in a form agreed to as of the Effective Date as set forth in such Applicable Credit Agreement)) (ii) Liens under or required by an applicable Operating Agreement, (iii) statutory Liens securing amounts not yet due and payable or which are being contested in good faith, (iv) judgment Liens that are bonded for appeal or will be paid by insurance, (v) all overriding royalty

and net profits interests affecting the Assets on the Effective Date, (vi) Liens securing hedging related to the Assets, (vii) Liens related to debt financing arrangements that do not restrict the exercise of another Party's rights under this Agreement in a manner that is materially more restrictive than the restrictions imposed by Liens that were in place on the Effective Date under other debt arrangements of such Party or its Affiliates, (viii) Liens related to marketing or midstream arrangements, (ix) any volumetric production payment transaction affecting a Party's Asset Interest, *provided* such volumetric production payment transaction shall be released in connection with a Sale Transaction, (x) all cashiers', landlords', workmens', repairmens', mechanics', materialmens', warehousemens' and carriers' Liens and other similar Liens imposed by Law, in each case, incurred in the ordinary course of business, (xi) pledges, deposits or other Liens securing the performance of bids, trade contracts, leases or statutory obligations in each case, incurred in the ordinary course of business, (xii) purchase money Liens incurred in the ordinary course of business, (xiii) zoning, entitlement, conservation restriction and other land use and environmental regulations by Governmental Authorities which do not materially interfere with the present use of any of the Asset Interests, (xiv) encumbrances in favor of a bank or other financial institution encumbering deposits or other funds maintained with a bank or other financial institution (which in no event shall burden any Working Interests), or (xv) encumbrances arising out of, under or in connection with applicable securities Laws (which in no event shall burden any Working Interests and which shall be removed prior to the consummation of any Sale Transaction) or custodial arrangements with custodians of securities (which in no event shall burden any Working Interests).

(b) *Effect of Permitted Transfer*. Any Permitted Transferee must satisfy and comply with all requirements of a transferee of a Working Interest under any applicable Operating Agreement. Any Permitted Transferee to which any Asset Interests are Transferred hereunder shall be bound by, and sign on to and join, this Agreement, and shall become a Party for all purposes hereof and be bound by all provisions to which the Party that Transferred Asset Interests to it was or remains bound, *provided* that if a Permitted Transferee does not acquire all or substantially all Asset Interests of a Transferring Party hereunder, then it should obtain no rights under Article III. No Transfer of an Asset Interest shall relieve the Transferring Party of any obligations accruing prior to such Transfer under this Agreement or the applicable Operating Agreement. In a Foreclosure Transfer with respect to the Asset Interests of UnSub (a "Qualified Foreclosure Transfer"), the UnSub Agent or any designated special purpose vehicle established by the UnSub Agent, and in each case, any Permitted Transferee thereof (the "Qualified Foreclosure Transferee") (a) shall be bound by, and sign on to and join, this Agreement, (b) shall become a Party (and replace SN UnSub as a Party) for all purposes hereof and (c) each other Party shall be deemed to consent to the Qualified Foreclosure Transferee becoming a Party; *provided*, *however*, that if such Foreclosure Transfer covers less than all or substantially all of SN UnSub's Asset Interests, then unless otherwise agreed by SN UnSub and the Permitted Transferee, such Qualified Foreclosure Transferee shall not succeed to SN UnSub's rights under Article III. Except as provided in Section 6.2 or in a Foreclosure Transfer, if a Transfer is made to a Third Party in manner permitted by this Agreement or otherwise with the consent of the Non-Transferring Parties, then this Agreement shall terminate upon the consummation of such Transfer but only

with respect to the Asset Interest transferred (and this Agreement will remain in effect with respect to the remainder of the Asset Interests).

(c) *Expenses.* The Transferring Party shall bear all costs and expenses incurred in connection with any Transfer of all or any portion of its Asset Interests. Any transfer or similar taxes arising as a result of such Transfer shall be paid by the Transferring Party.

(d) *Certain Indirect Transfers*. Except for Transfers to Permitted Transferees, no Party shall indirectly Transfer any Asset Interests to the extent such Party is not permitted to Transfer Asset Interests directly pursuant to the terms hereof and any indirect Transfer shall be structured and consummated in such a manner that the Non-Transferring Party shall be provided the same rights and protections as it would have had if such Transfer were structured as a direct Transfer of such Asset Interests pursuant to the terms hereof; *provided*, *however*, that the sale of any Equity Interest in a Qualified Foreclosure Transferee to the extent necessary or desirable to comply with Law (including any bank regulatory requirements) shall not be subject to the restrictions set forth in Section 4.1(a). Notwithstanding anything in this Agreement to the contrary, a Transfer resulting from any change in control or transfer of ownership interests in Sanchez Energy shall not be treated as a Transfer under this Article IV unless such Transfer constitutes a Change of Control in which case Section 4.2 shall apply.

**4.2 Tag-Along Right.**

(a) Other than in connection with an IPO as contemplated by Section 4.4 and in connection with a Foreclosure Transfer, if at any time after the third (3rd) anniversary of the Effective Date and prior to an IPO of such Party (as defined herein), a Party proposes to Transfer all or any portion of its Asset Interests, whether in a single or series of related transactions, that constitute greater than thirty-five percent (35%) of such Party's total Asset Interests held as of the Effective Date to a Third Party purchaser or purchasers (a "Proposed Sale"), after complying with Section 4.3, the Transferring Party shall furnish to the other Parties (the "Non-Initiating Parties") a written notice of such Proposed Sale (the "Tag-Along Notice") and provide the Non-Initiating Parties the opportunity to participate in such Proposed Sale on the terms described in this Section 4.2 to the extent of their respective ownership interests in the assets to be transferred in such Proposed Sale. The Tag-Along Notice will include:

(i) the material terms and conditions of the Proposed Sale, including (A) the Asset Interests to be Transferred, (B) the name of the proposed transferee (the "Proposed Transferee"), (C) the proposed amount and form of consideration (including the proposed price on a per Working Interest percentage basis based on an allocation of value by applicable Leases, Wellpads, and other applicable Assets, which will include an allocation to individual producing wells and undeveloped acreage based on the bona fide third party offer), and (D) the proposed Transfer date, if known, which date shall not be less than forty-five (45) Business Days after delivery of such Tag-Along Notice*;* and

(ii) an invitation to the Non-Initiating Party to participate in such Proposed Sale at the same per Working Interest percentage price per applicable Asset, for

the same form of consideration and on the same terms and conditions as those offered to the Transferring Party in the Proposed Sale. The Transferring Party will deliver or cause to be delivered to the Non-Initiating Party copies of all transaction documents relating to the Proposed Sale as promptly as practicable after they become available.

(b) A Non-Initiating Party must exercise the tag-along rights provided by this Section 4.2 within twenty (20) Business Days following delivery of the Tag-Along Notice by delivering a notice (the "Tag-Along Offer") to the Transferring Party indicating its desire to exercise its tag-along rights hereunder. If the Non-Initiating Party does not make a Tag-Along Offer within twenty (20) Business Days following delivery of the Tag-Along Notice, the Non-Initiating Party shall be deemed to have waived its rights under this Section 4.2 with respect to such Proposed Sale, and the Transferring Party shall thereafter be free to Transfer the applicable Asset Interests (as defined in Section 4.5(a)) to the Proposed Transferee without the participation of such Non-Initiating Party, for the same form of consideration set forth in the Tag-Along Notice, at a per Working Interest percentage price no greater than the per Working Interest percentage price per applicable Asset set forth in the Tag-Along Notice, and on other terms and conditions which are not more favorable to the Transferring Party than those set forth in the Tag-Along Notice. If one or more Non-Initiating Parties elects to participate in the Proposed Sale pursuant to this Section 4.2, (i) the consideration to be received by the Parties in such sale (a "Tag-Along Transaction") will be calculated by taking the aggregate proceeds from such Tag-Along Transaction and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Leases, Wellpads, and other applicable Assets and other interests included by the Parties (collectively, the "Tag Interests"), as agreed by the Parties or as otherwise determined pursuant to the valuation process set forth in Section 4.5(c), taking into account (in either case) the Parties' proportionate ownership of the Working Interests in the properties transferred pursuant to the Tag-Along Transaction, the allocation of value among the Working Interests included in the sale as determined with the Third Party buyer (but only to the extent that all Parties approved in writing such allocation prior to execution of the applicable agreement), and any other relevant information, *provided*, that the total Fair Market Value of the aggregate interests to be sold for purposes hereunder will be equal to the sale price determined by the purchaser of the interests included by the Parties in the Proposed Sale; and (ii) the Non-Initiating Parties shall agree to make to the Proposed Transferee the same representations and warranties, covenants and indemnities as the Transferring Party agrees to make in connection with the Proposed Sale (which may be modified as necessary as to form to the extent one Party is Transferring Working Interests and the other Party is Transferring Equity Interests holding Working Interests, and such other distinctions as may be applicable to the Parties or their interests in the Leases, Wellpads, and other applicable Assets); *provided*, that (A) no Party shall be liable for the breach of any covenant by any other Party, (B) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, and (C) in no event shall a Non-Initiating Party be responsible for any Liabilities or indemnities in connection with such Proposed Sale in excess of the proceeds received by such Non-Initiating Party in the Proposed Sale.

(c) In the event that the consideration received in connection with a Proposed Sale consists of securities that are not registered under the Securities Act, and any Non-Initiating Party exercises its tag-along rights hereunder in connection with such Proposed Sale, if the

Transferring Party is entitled to registration rights in respect of such securities, the Transferring Party shall ensure that each Non-Initiating Party, as applicable, will receive pro rata piggy back registration rights on any registration in which the Transferring Party is entitled to register such securities (together with a pro rata number of the total demand registrations granted to the Transferring Party).

(d) The offer of a Non-Initiating Party contained in any Tag-Along Offer shall be irrevocable, and, to the extent such Tag-Along Offer is accepted, such Non-Initiating Party shall be bound and obligated to Transfer in the Proposed Sale on the same terms and conditions, with respect to each Asset Interest Transferred, as the Transferring Party; *provided*, *however*, that if the terms of the Proposed Sale change with the result that the per Working Interest percentage price shall be less than the per Working Interest percentage price set forth in the Tag-Along Notice, the form of consideration shall be different or the other terms and conditions (other than, for the avoidance of doubt, inside tax basis associated with such interests, if applicable) shall be materially less favorable to such Non-Initiating Party than those set forth in the Tag-Along Notice, such Non-Initiating Party shall be permitted to withdraw the offer contained in the applicable Tag-Along Offer by written notice to the Transferring Party and upon such withdrawal shall be released from such Party's obligations.

(e) If a Party exercises its rights under this Section 4.2, the closing of the sale of each Party's Asset Interest in the Tag-Along Transaction will take place concurrently, other than in connection with a Change of Control. If the closing with the Proposed Transferee (whether or not the Non-Initiating Party has exercised its rights under this Section 4.2) shall not have occurred by 5:00 p.m. Eastern Time on the date that is one-hundred and twenty (120) days after the date of the Tag-Along Notice, as such period may be extended to obtain any required regulatory approvals, and on terms and conditions not more favorable to the Transferring Party than those set forth in the Tag-Along Notice, all the restrictions on Transfer contained herein shall again be in effect with respect to such Asset Interest and proposed Transfer.

(f) The costs of any transactions contemplated by this Section 4.2 shall be deducted pro rata from the proceeds to be paid to each Party in connection with such transaction, other than in connection with a Change of Control, in which case each Party participating in a Tag Transaction shall bear its own costs and expenses.

(g) Notwithstanding anything in this Agreement to the contrary, the Parties agree that a Change of Control with respect to Sanchez Energy shall be treated as a Transfer pursuant to this Section 4.2, provided that (i) a Tag Notice in such circumstances shall be given no later than two (2) Business Days following the public announcement of definitive documentation providing for a Change of Control, (ii) such Change of Control may be consummated prior to the consummation of the acquisition of the Non-Initiating Party's Tag Interests (which at the election of the Non-Initiating Party may be effected as an asset sale or as the sale of Equity Interests of an entity directly or indirectly owning the Assets of the Non-Initiating Party (provided that the Proposed Transferee shall not be required to assume any indebtedness for borrowed money and such entity shall have had no material business operations since its formation other than as related to the Assets)), (iii) the Proposed Transferee and the Non-Initiating Party shall enter into a purchase

agreement providing for the acquisition of the Non-Initiating Party's Tag Interests no later than twenty five (25) Business Days after the Non-Initiating Party's acceptance of a Tag Offer, which purchase agreement shall be substantially similar in all material respects to the terms and conditions of the Purchase Agreement, and (iv) the purchase price to be paid for the Non-Initiating Party's Tag Interests shall be determined based on the Fair Market Value of such Tag Interests in accordance with Section 4.5(f), subject to any applicable purchase price adjustments set forth in the purchase agreement referenced in the foregoing clause (iii). Sanchez Energy shall use its reasonable best efforts to cause a proposed transferee to comply with the terms of this Section 4.2(g); provided that in any consensual transaction between Sanchez Energy and a proposed transferee that results in a Change of Control, including a transaction where the board of directors of Sanchez Energy approve such transaction, Sanchez Energy shall cause such transferee to comply with this Section 4.2(g).

**4.3 Right of First Offer.**

(a) Other than in connection with an IPO as contemplated by Section 4.4, or in connection with a Foreclosure Transfer, and subject to the terms of any applicable Operating Agreement, if any Party proposes to Transfer any of the Asset Interests held by such Party, including Blackstone pursuant to Section 4.5 (a "ROFO Transferor") to a Third Party purchaser, the ROFO Transferor agrees that, before entering into negotiations with a Third Party, the Transferring Party will first provide notice (a "ROFO Notice") to the other Parties (the "ROFO Recipients") that the ROFO Transferor proposes to pursue such a transaction. Each such ROFO Notice will invite the ROFO Recipient to submit to the ROFO Transferor an offer in writing (a "ROFO Offer"), which offer shall (i) be irrevocable and in good faith, (ii) be for all cash (except SN may choose to fund a ROFO Offer with cash or SN Common Stock or a combination thereof) (any such ROFO Offer including SN Common Stock as consideration an "SN Equity Financed Offer")), (iii) specify in reasonable detail the material terms and conditions of such offer (including as set forth in Section 4.3(b) with respect to a SN Equity Financed Offer), (iv) shall provide for a closing date of no longer than ninety (90) days from the execution of a definitive purchase agreement and provide for no holdback or escrow of purchase price, and (v) shall remain open for acceptance by the ROFO Transferor for thirty (30) days after the ROFO Transferor's receipt of such ROFO Offer, to purchase from the ROFO Transferor one hundred percent (100%) of the Asset Interests that are the subject of the ROFO Notice, which at the sole election of the ROFO Transferor may be structured as a purchase of Working Interests or Equity Interests of an entity holding Asset Interests (the "ROFO Interests"). The ROFO Offer shall be submitted to the ROFO Transferor within thirty (30) days after the ROFO Recipient's receipt of the ROFO Notice and shall include a proposed definitive purchase agreement that such ROFO Recipient is prepared to execute upon the acceptance by the ROFO Transferor of the ROFO Offer. Upon the receipt by the ROFO Transferor of any ROFO Offer, the ROFO Transferor and the applicable ROFO Recipient shall negotiate in good faith for a period of thirty (30) days regarding the ROFO Offer. In the event the Parties are unable to reach agreement during such period, the ROFO Transferor may elect by notice to such ROFO Recipient submitted at any time during the 30-day period following such negotiation period to accept or reject the ROFO Offer (it being understood that a failure of the ROFO Transferor to submit an unqualified acceptance notice within such 30-day period shall constitute a rejection of the ROFO Offer). If the ROFO Transferor timely submits an

acceptance notice, the ROFO Transferor and the applicable ROFO Recipient shall in good faith negotiate a definitive purchase and sale agreement (which shall include the terms and conditions set forth in the ROFO Offer) and use their reasonable best efforts to consummate the purchase and sale of the ROFO Interests as promptly as practicable and in any event within ninety (90) days from the execution of a definitive purchase agreement. If only one ROFO Recipient timely submits a ROFO Offer, the ROFO Transferor may effectuate the sale of all the ROFO Interests to such ROFO Recipient alone. If neither ROFO Recipient timely submits a ROFO Offer or any ROFO Offer is rejected (or deemed rejected as described above) by the ROFO Transferor, the ROFO Transferor may effectuate a sale of all the ROFO Interests to a Third Party so long as (i) if a ROFO Offer was made, the Transfer price is at least one hundred percent (100%) of the offer price set forth in such ROFO Offer (taking into account Section 4.3(b) below) and the other terms and conditions offered to the Third Party are not materially more favorable to the Third Party than those of such ROFO Offer; and (ii) the execution of definitive documentation for the sale of such ROFO Interests to such Third Party shall occur no later than two hundred and seventy (270) days after a rejection (or deemed rejection) of such ROFO Offer.

(b) In connection with any SN Equity Financed Offer:

(i) the determination of the value of SN Common Stock included in a SN Equity Financed Offer shall (i) apply an appropriate illiquidity discount, which may take into account, as applicable, the discounts applied to comparable private placements or block trades of comparable size as compared to the applicable market price of such securities and/or discounts applied to publicly traded common equity used as acquisition currency by relevant valuation methodologies customarily used by leading financial valuation firms in similar circumstances and (ii) be discounted for any adverse liquidity effects that are attributable to the payment of any applicable taxes associated with the receipt of such SN Common Stock, in each case (i) and (ii), as reasonably determined by the ROFO Transferor, *provided*, that no discount with respect to clause (ii) shall apply if the SN Equity Financed Offer includes a portion of cash consideration equal to or greater than the expected aggregate amount of tax payable by the ROFO Transferor, including Blackstone and any of its direct and indirect equity owners as a result of the consummation of such SN Equity Financed Offer and assuming that the aggregate amount of such tax shall be computed using an assumed tax rate equal to the highest maximum combined marginal federal, state and local income tax rates applicable to an individual or corporate taxpayer resident in New York, NY;

(ii) the ROFO Offer shall provide for a fixed value, including a fixed value for the portion of consideration represented by SN Common Stock, payable upon closing, unless otherwise agreed to by the ROFO Transferor;

(iii) if the ROFO Transferor would beneficially own on a pro forma basis (calculated in accordance with clause (vi) below) more than twenty percent (20%) of the outstanding SN Common Stock, Sanchez Energy shall provide representation rights for the Sanchez Energy Board of Directors to the ROFO Transferor approximately equal to its pro

forma beneficial ownership percentage of SN Common Stock following the consummation of any ROFO Offer pursuant to documentation reasonably acceptable to Blackstone;

(iv) no Event of Default (as such term may be then defined under the SN Credit Agreement) shall have occurred under the SN Credit Agreement;

(v) Sanchez Energy shall have a rating equal to or higher than "B3" (or the equivalent) by Moody's or its successors, or an equivalent rating by S&P or Fitch, Inc. (or either of its successors);

(vi) the resulting share issuance will not cause the ROFO Transferor to beneficially own more than thirty-five percent (35%) of outstanding SN Common Stock on a pro forma basis excluding any SN Common Stock owned prior to the Effective Date or issued to Blackstone or GSO pursuant to this Agreement after the Effective Date;

(vii) the SN Common Stock shall be listed on the New York Stock Exchange or the NASDAQ Stock Market (or their respective successors); and

(viii) the SN Common Stock to be issued to the ROFO Transferor shall be entitled to the benefits of a registration rights agreement substantially similar in form and substance to the Registration Rights Agreement.

**4.4 Initial Public Offering**. Notwithstanding anything to the contrary herein, at any time following the third (3rd) anniversary of the Effective Date, any Party shall have the right to consummate an initial public offering of a vehicle that includes its respective Working Interests in the Assets at the time such IPO is initiated ("IPO"). The Party planning to carry out the IPO (the "IPO Party") may elect to exercise such right by delivering written notice of such election (an "IPO Notice") to the other Parties (each a "Non-IPO Party"). Each Non-IPO Party shall (and shall cause its Controlled Affiliates, and shall use its reasonable best efforts to cause its other Affiliates, to), following receipt of an IPO Notice, cooperate and take such actions as are reasonably requested by the IPO Party or its Affiliates to help facilitate any such IPO, and the IPO Party shall reimburse each Non-IPO Party and its Affiliates for their reasonable out-of-pocket costs and expenses incurred in connection therewith.

**4.5 Sale Transaction.**

Subject to the limitations and conditions set forth in this Section 4.5 and the Right of First Offer set forth in Section 4.3:

(a) If at any time after the third (3rd) anniversary of the Effective Date (or within nine (9) months following the termination of this Agreement), Blackstone elects, pursuant to a Bona Fide Offer, to pursue a Transfer to a Third Party (other than GSO or any of its Affiliates) pursuant to the terms of such Bona Fide Offer (the "Sale Transaction Transferee") of all or substantially all of the Working Interests and other Assets acquired by Blackstone pursuant to the Purchase Agreement and all related assets in the Core Area acquired after the Effective Date and

then held directly or indirectly by Blackstone and its Affiliates (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads) (other than with respect to Excluded AMI Transactions (as defined in Section 5.2)), or all of the Equity Interests of any entity directly or indirectly owning all of such Working Interests and other Assets and related assets (a "Sale Transaction," which shall include a Sale Transaction Equitable Partition and the consummation of the sale contemplated thereby, but not an Alternative Equity Partition), and *provided*, that (i) Blackstone is not the Operator of all of the Assets, (ii) SN or any of its Affiliates is the Operator of any of the Assets and (iii) SN, SN UnSub and any of their respective Affiliates that then own any interests in the Asset Interests have not unconditionally agreed in writing to vote their applicable interests to support the designation of the Third Party who has made such Bona Fide Offer as operator under the applicable Operating Agreements, Blackstone shall, subject to Section 4.5, including Sections 4.5(h) and 4.5(i), have the right to compel Sanchez Energy, SN, SN UnSub, and their respective Affiliates to sell or otherwise convey to the Sale Transaction Transferee all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of SN and its Affiliates related to the Leases and/or Wellpads ("SN Operatorship Rights")) within an area of land comprising seventy-five percent (75%) of the Fair Market Value of the Core Area (the "Included Percentage") (*provided*, that if the transfer of such land would result in Sanchez Energy transferring all or substantially all of its assets pursuant to applicable Law, then such applicable percentage of Fair Market Value shall be such lesser percentage that would not constitute all or substantially all of the assets of Sanchez Energy pursuant to applicable Law, but in no event shall such percentage be lower than sixty-six percent (66%)) (it being agreed that for purposes of this Section 4.5, the Core Area shall not include any acreage for which a Party or any of its Affiliates does not then own Working Interests) (such area, the "Included Sale Transaction Area," and the remainder of the Core Area, the "Excluded Sale Transaction Area" and such remaining percentage, the "Excluded Percentage") to be determined as provided below in this Section 4.5(a), and in connection and contemporaneously with such Sale Transaction, Blackstone shall convey (and if applicable, cause its Affiliates to convey) all of their Working Interests and other Assets (and other related assets acquired following the Effective Date) (including all rights to operatorship of Blackstone and its Affiliates related to the Leases and/or Wellpads ("Blackstone Operatorship Rights")) within the Excluded Sale Transaction Area to SN and SN UnSub. Upon the election by Blackstone to pursue a Sale Transaction, SN, SN UnSub, and Blackstone shall negotiate in good faith for a period of forty-five (45) days to agree upon and designate the Included Sale Transaction Area and the Excluded Sale Transaction Area, based on substantially proportionate geographic divisions and customary industry practices and their respective reserve reports covering the previous twelve (12) month period, such that the Included Sale Transaction Area comprises the Included Percentage and the Excluded Sale Transaction Area comprises the Excluded Percentage, respectively, of the aggregate Fair Market Value of the Core Area (a "Sale Transaction Equitable Partition") in addition to an alternative partition such that the Included Sale Transaction Area comprises Assets in the Core Area equal to fifty percent (50%) of the aggregate Fair Market Value of the Core Area (or if at such time the relative ownership percentages of SN and its Affiliates and Blackstone and its Affiliates in the Core Area are not 50%/50%, then the percentage of the Fair Market Value owned in the Core Area by Blackstone and its Affiliates as compared to SN and its Affiliates) (such percentage, the "Blackstone Percentage") and the Excluded Sale Transaction Area comprises

that percentage of Assets in the Core Area equal to one hundred percent (100%) less the Blackstone Percentage (an "Alternative Equitable Partition" and together with a Sale Transaction Equitable Partition, each an "Equitable Partition"). An Equitable Partition shall (i) proportionately distribute to SN and SN UnSub, on the one hand, and the Sale Transaction Transferee or Blackstone, as applicable, on the other hand, in the same proportion and with substantially similar characteristics as each Party held in the Core Area, prior to the Equitable Partition, the following: (A) the remaining drilling obligations under the APC Well Commitment and continuous drilling obligations under the oil and gas leases to which the applicable Working Interests are subject, (B) producing wells and current production (including substantially similar decline profiles and cash flow profiles), proved developed non-producing acreage and undeveloped acreage, (C) remaining reserves, (D) potential future well locations, and (E) allocation of exposure to demand charges, minimum volume commitments and commodity charges (and other similar costs and obligations) under the midstream and marketing agreements in place in the Core Area; (ii) seek to allocate the entirety of a Lease and the acreage governed by an applicable joint operating agreement into either the Included Sale Transaction Area or the Excluded Sale Transaction Area; (iii) take into account any other relevant factors, including, if applicable, a prior Division of Operatorship, and any restrictions on assignment of the applicable Working Interests and other Assets and, subject to the other express provisions of this Section 4.5, seek to mitigate any such restrictions if they are reasonably likely to impede or delay an Equitable Partition and (iv) in the case of an Alternative Equitable Partition, in no event shall SN UnSub have lower values of PDP PV-10 or projected cash flow from PDP reserves after such Alternative Equitable Partition (*provided*, that any assignments and conveyances among the Parties under an Alternative Equitable Partition shall be on terms substantially similar to the assignment and conveyance terms under the Purchase Agreement). If, following such forty-five (45) day period, SN, SN UnSub, and Blackstone are unable to agree upon an Equitable Partition, then the Equitable Partition shall be decided by Financial Advisors and Reserve Auditor(s) using the same process as provided for an Equitable Division pursuant to Section 3.8(e)(i), *mutatis mutandis* (but with such modifications as may be necessary to determine a Sale Transaction Equitable Partition and an Alternative Equitable Partition in accordance with this Section 4.5, including in order to include SN UnSub as a party to such process), and after the final determination of the Equitable Partition by the Financial Advisors and upon the execution of definitive documentation as required to carry out the Sale Transaction or the Alternative Equitable Partition, as applicable, pursuant to this Section 4.5, the Parties hereto and their Affiliates shall use their respective reasonable best efforts to effectuate the applicable Equitable Partition as promptly as practicable (for no additional consideration other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied). In order to facilitate an efficient and orderly Sale Transaction process, Blackstone may elect to initiate (and cause Sanchez Energy to participate in) the determination of the Equitable Partition upon the delivery by Blackstone of a ROFO Notice, and from such time as a ROFO Notice is provided until the time that a Sale Transaction or Alternative Equitable Partition is consummated as provided for in this Section 4.5, neither SN nor its Affiliates shall initiate a Division of Operatorship. In the event that Blackstone is unable to cause Sanchez Energy, SN, SN UnSub and/or their respective Affiliates to participate in a Sale Transaction as a result of any of the limitations set forth in this Section 4.5, then Blackstone shall have the right to effectuate an Alternative Equitable Partition, whereby Blackstone shall be entitled to all Assets of

the Parties in the Included Sale Transaction Area and SN and SN UnSub shall be entitled to all Assets of the Parties in the Excluded Sale Transaction Area (in each case as such areas are determined pursuant to this Section 4.5(a) with respect to an Alternative Equitable Partition, for no consideration payable other than as may be necessary to ensure that the relative percentages of Fair Market Value in an Alternative Equitable Partition are satisfied), and the Parties shall use their respective reasonable best efforts to effect such Alternative Equitable Partition as promptly as practicable. In connection with the effectuation of an Alternative Equitable Partition and to the extent a Sale Transaction has not been consummated, the Parties shall use their respective reasonable best efforts to cause Blackstone or its designee (or if applicable a Sale Transaction Transferee) to become operator under each joint operating agreement applicable to the Assets included in the Included Sale Transaction Area and cause SN or its designee to become operator under each joint operating agreement applicable to the Assets included in the Excluded Sale Transaction Area, and in the event that such operatorship is not vested in the applicable party prior to the time that a Sale Transaction Equitable Partition (which shall be consummated as of the closing of a Sale Transaction or as promptly as practicable thereafter) or Alternative Equitable Partition is otherwise ready to be completed, then the principles of Section 3.8(e) shall apply, *mutatis mutandis*, as though the party to whom operatorship should be transferred were the Post-Division Operator and the Party or its Affiliate that is the operator under an applicable joint operatorship were the Pre-Division Operator (including, without limitation, Section 3.8(e)(ii)), and, if necessary, the Pre-Division Operator shall maintain a sufficient minimal interest so as to not effect an automatic resignation of operatorship under the applicable operating agreements.

(b) Each of Blackstone, Sanchez Energy, SN and SN UnSub and each of their applicable Affiliates shall consent to such Sale Transaction or to carry out an Alternative Equitable Partition and will cooperate in good faith and use reasonable best efforts to obtain all necessary approvals and authorizations from its and its subsidiaries' shareholders (including holders of any preferred equity interests), Board of Directors or other governing bodies, joint venture partners and lenders (including, for the avoidance of doubt, consent from lenders to an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, and regardless of whether any restriction or limitation in any financing arrangement that is otherwise permitted by this Section 4.5), as applicable, and will cooperate in good faith and use reasonable best efforts to remove all Permitted Liens (other than the Permitted Liens described in clauses (iv) and (xii) of the definition thereof) from the applicable Assets and other interests to be conveyed in a Sale Transaction or Alternative Equitable Partition and to take or cause to be taken all other reasonable actions, including seeking any necessary consents required for assignment of interests in the Assets and related interests to be conveyed in a Sale Transaction or Alternative Equitable Partition or a change in operatorship to the applicable purchaser in a Sale Transaction or in an Alternative Equitable Partition or any other actions reasonably necessary or desirable to cause the consummation of such Sale Transaction on the terms of the Bona Fide Offer and in order to maximize the value to be realized by the Parties in connection with a Sale Transaction or otherwise to effect an Alternative Equitable Partition. For the avoidance of doubt, the preceding sentence shall not be construed to require Sanchez Energy, SN or SN UnSub to restructure its ownership of the Assets, provided that, subject to the terms of this Agreement, none of Blackstone, Sanchez

Energy, SN and SN UnSub nor any of their Affiliates shall take any action for the purpose of preventing or materially impeding the consummation of a Sale Transaction or an Alternative Equitable Partition. Notwithstanding anything in Section 4.5 or this Agreement to the contrary, (i) Blackstone's rights to compel a Sale Transaction or an Alternative Equitable Partition and (ii) the obligations of Sanchez Energy, SN, SN UnSub, and their respective Affiliates to consent to such transaction, are subject to (a) compliance by SN, SN UnSub and their respective Affiliates with the requirements under each of their debt financing arrangements as of the Effective Date (as the same may be amended and together with any new debt financing arrangement, in each case that shall have been established in good faith and for valid business purposes and on market terms); *provided*, that Sanchez Energy, SN, SN UnSub and their respective Affiliates shall use their respective reasonable best efforts to ensure that any new debt financing arrangement or amendment of an existing financing arrangement entered into after the Effective Date shall not expressly restrict an Alternative Equitable Partition as required hereunder, notwithstanding any applicable minimum cash consideration requirement that would otherwise be applicable thereto, (b) compliance with all of the provisions of this Section 4.5 or (c) required landowner consents, midstream consents or other third party consents.

(c) [Intentionally Omitted]

(d) Subject to the limitations and conditions of this Section 4.5, the Parties will execute the agreement negotiated by Blackstone in connection with such a Sale Transaction (a "Sale Transaction Agreement") and will take such other actions as may be reasonably requested by Blackstone to effect such Sale Transaction; *provided*, *however*, that (i) Sanchez Energy, SN, SN UnSub or their Affiliates bound hereby, as applicable, shall only be required to make the same (or substantially similar in all material respects) representations, warranties and covenants and the same indemnities as Blackstone agrees to make in connection with the Sale Transaction (unless expressly contemplated otherwise in this Section 4.5), except that in no event shall any Party be required to agree to any non-competition or non-solicitation covenant in connection with the Sale Transaction or to make any representation or warranty that would be inaccurate when made without the ability to provide disclosure against such representation or warranty, (ii) no Party shall be liable for the breach of any covenants of any other Party, (iii) in no event shall any Party be required to make representations and warranties or provide indemnities as to any other Party, (iv) any liability relating to representations and warranties (and related indemnities) or other indemnification obligations in connection with the Sale Transaction and related to the Assets shall be shared by the Parties pro rata on a several (but not joint) basis in proportion to the proceeds received by each Party in the Sale Transaction, (v) no Party shall have aggregate liability relating to the representations and warranties (and related indemnities) or other indemnification obligations in excess of the purchase price (nor shall any Party have aggregate liability with respect to the breach of non-fundamental or tax-related representations and warranties (and related indemnities) in excess of twenty-five percent (25%) of the purchase price to be received in the Sale Transaction by such Party without such Party's consent, which may be withheld by such Party in its sole discretion) and (vi) any escrow or other holdback of proceeds shall be allocated on a pro rata basis among the applicable Parties.

(e) In connection with a Sale Transaction, the form of consideration will consist of either (i) all cash or (ii) cash and not more than twenty-five (25%) in value of publicly traded securities, subject to the following: in connection with such a Sale Transaction (i) if the form of consideration is a combination of cash and securities, the portion of such consideration that is cash shall be the greater percentage of (A) seventy-five (75%) percent cash and (B) the percentage of cash necessary for Sanchez Energy, SN and its Affiliates to meet any debt financing covenants which are then in existence (up to one hundred percent (100%) cash requirements) (*provided*, that Blackstone or its applicable Affiliate may elect to take a higher percentage of equity consideration in a Sale Transaction than the other participating sale parties in order to satisfy the requirements of this clause (i)), (ii) subject to the preceding clause (i), all Parties shall be allocated the same form of consideration, or if any Parties are given an option as to the form and amount of consideration to be received, all Parties will be given the same option and (iii) the consideration to be received by the Parties in a Sale Transaction will be calculated by taking the aggregate proceeds from such Sale Transaction (excluding all out-of-pocket costs incurred by the Parties in connection with such Sale Transaction, which shall be borne by the Parties in proportion to their respective rights to the aggregate sale proceeds; *provided*, that any agreements with accountants, attorneys, investment bankers or other such professional service firms in connection with a Sale Transaction shall be negotiated at arms-length and be at prevailing market rates and *provided*, *further*, that SN shall have the right to consent to any investment bank hired to direct the Sale Transaction process, such consent not to be unreasonably withheld, conditioned or delayed) and allocating such proceeds among the Parties based upon the relative Fair Market Value of the Assets and other interests included by Blackstone, SN and SN UnSub and their respective Affiliates in the Sale Transaction (collectively, the "Drag Interests"), as agreed by the Parties or as otherwise determined pursuant to an Equitable Partition.

(f) For purposes of Section 4.5(e) and Section 4.2(b), in the event the applicable Parties (for purposes of this paragraph, collectively, the "Dispute Parties") disagree as to the relative Fair Market Value of the Drag Interests or Tag Interests, as applicable, included by each Party and cannot resolve such dispute (after good faith negotiations lasting no more than ten (10) Business Days) (it being agreed that an Equitable Partition determined in accordance with Section 4.5(a) shall be final and binding on the Parties), then any Dispute Party may elect for the Dispute Parties to engage one mutually-agreeable reputable national or regional investment bank or valuation firm with experience in the valuation of oil and gas interests in the Eagle Ford Shale (the "Valuation Firm") to determine the relative Fair Market Value (on a percentage basis) of the Drag Interests or Tag Interests, as applicable, included by each Party. In the event that Blackstone has not effected a Division of Operatorship, any determination of the Fair Market Value shall assume that Blackstone holds rights to operatorship of such portion of the Assets as though an Equitable Division had been consummated. The Valuation Firm shall be selected by the Dispute Parties from among the parties included on Annex IV and if the Dispute Parties are unable to agree then SN in the case of a Sale Transaction or Blackstone in the case of a Proposed Sale shall choose. The Dispute Parties shall each cooperate fully with the Valuation Firm, including by providing all reasonably requested information, data and work papers of such Dispute Party and shall make available personnel and accountants to explain any such information, data or work papers. The Parties shall cause the Valuation Firm to render its determination as soon as reasonably practicable

but in no event later than fifteen (15) Business Days after the Valuation Firm was engaged; ***provided***, ***however***, if the dispute relates to Tag Interests, the Parties shall cause the Valuation Firm to render its determination no later than the second (2nd) Business Day prior to the expiration of the Tag-Along Offer. The Valuation Firm's determination of the relative value of the Drag Interests (the "Final Valuation") shall be final and binding on the Dispute Parties, and any proceeds to be received in such indirect approved sale shall be split between the Dispute Parties based upon the relative valuation percentages set forth in the Final Valuation. The fees and costs of the Valuation Firm shall be split equally between the Parties based on their respective proportionate amount of Working Interests to be conveyed in the applicable transaction, and the Parties shall provide, and shall cause their Controlled Affiliates, and shall use their reasonable best efforts to cause their other Affiliates to provide, all information available to them that may be reasonably requested by the Valuation Firm.

(g) In connection with a Sale Transaction, if reasonably requested by the applicable buyer, Sanchez Energy, if the Sanchez Operator remains the Operator for any Wellpads or Leases, shall use its commercially reasonable efforts to enter into a customary transition services agreement with the purchaser at the closing of such Sale Transaction, or Sanchez Energy shall cause any applicable Affiliate or entity then providing management services to Sanchez Energy and capable of providing transition services to enter into such agreement, which transition services agreement shall be substantially similar in all material respects to the transition services agreement with Affiliates of Anadarko pursuant to the Purchase Agreement, ***provided***, that the term shall be no more than two months and Sanchez Energy or its Affiliate shall be entitled to earn a mark-up of ten percent (10%) over cost on all services provided thereunder.

(h) Notwithstanding anything contained in this Section 4.5 to the contrary but, with respect to SN UnSub, subject to Section 4.5(i), (i) there shall be no liability or obligation on behalf of Blackstone or its Affiliates if such entities determine, for any reason, not to consummate a Sale Transaction or an Equitable Partition, and Blackstone shall be permitted to discontinue at any time any Sale Transaction or Equitable Partition initiated by Blackstone by providing written notice to SN and SN UnSub and (ii) Blackstone may not cause Sanchez Energy, SN, SN UnSub and their respective Affiliates to participate in a Sale Transaction unless the consideration received by Sanchez Energy, SN, SN UnSub and their respective Affiliates in such Sale Transaction (including distributions of cash on hand at SN and SN UnSub that are made to SN and UnSub in connection with such sale) would be greater than or equal to the sum (the "Required Return Sum"), without duplication, of (A) (x) the amount of capital which was invested, borrowed, used or otherwise provided in connection with the financing, acquisition, ownership or operation of the Assets, and any related assets (including for the avoidance of doubt, any assets being retained by SN or Unsub in the Sale Transaction) less all distributions previously made on account of any equity capital invested by Parties other than GSO (or its Affiliates), (y) payments by the relevant Person and its Affiliates arising under or related to the redemption, repayment or refinancing of any securities, credit facilities, financial vehicles, debentures, notes, guarantees or liabilities procured to carry out any and all transactions contemplated under the Purchase Agreement or this Agreement, in each case, that are required as a result of the consummation of a Sale Transaction and (z) disbursements, fees or costs reasonably incurred or to be incurred by the relevant Person and its Affiliates to suspend, reassign, demobilize, stack, terminate, sell off and restructure all

applicable personnel, equipment and operations related, directly or indirectly, to the Assets in connection with such Sale Transaction, (B) the amount of capital GSO (or its Affiliates) invested in SN UnSub, (C) the Base Preferred Return Amount as required under the SN UnSub Partnership Agreement and (D) the outstanding indebtedness for borrowed money of SN and SN UnSub upon such applicable date of determination (net of any cash and cash equivalents of SN and SN UnSub as of such date) to the extent that a buyer in connection with a Sale Transaction does not assume or directly repay such outstanding indebtedness; *provided*, for purposes of the foregoing subparts (A) through (D), that such equity or debt that is amended, incurred or established following the Effective Date is done so in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such equity or debt; *provided*, *further*, that with the written consent of GSO, the Required Return Sum will be adjusted downward equitably to reflect the percentage of Assets actually to be transferred in a Sale Transaction by SN and SN UnSub as compared to the Assets acquired by SN and SN UnSub pursuant to the Purchase Agreement. In addition, (i) a fair and reasonable allocation of the proceeds from a proposed Sale Transaction between SN and SN UnSub shall be made in the reasonable judgment, in good faith and for valid business purposes, of Sanchez Energy, SN and SN UnSub (in accordance with their then existing debt arrangements) and (ii) in no event shall SN or SN UnSub be compelled to enter into a Sale Transaction unless, after the application of the proceeds from such Sale Transaction, after satisfying the conditions in the foregoing subpart (i), the proceeds payable to SN UnSub shall be an amount sufficient to return to its equity holders one hundred percent (100%) of the equity invested in SN UnSub.

(i) Notwithstanding anything in this Section 4.5 or this Agreement to the contrary, prior to the Redemption Date, without the prior written consent of GSO, SN UnSub shall not (and shall not be required to), and no Party shall cause SN UnSub to participate in any transfer or disposition (or enter into definitive documentation providing for any transfer or disposition) of any of its Working Interests or other Assets (or any portion thereof) under this Section 4.5 (other than an Alternative Equitable Partition), and Blackstone shall not have the right to compel a Sale Transaction with respect to SN UnSub's Working Interests and Assets (or any portion thereof), unless (i) such transfer or disposition complies with the terms and conditions of SN UnSub's debt financing arrangements applicable as of the Effective Date and such other debt financing arrangements that as amended, or as incurred or established following the Effective Date in good faith and for valid business purposes and on terms determined in the reasonable judgment and in good faith by the party amending, incurring or establishing such debt, (ii) the Preferred Units receive an amount of cash equal to the Base Preferred Return Amount with respect to each Preferred Unit in redemption in full of all outstanding Preferred Units, pursuant to and in compliance with the SN UnSub GP LLC Agreement and SN UnSub Partnership Agreement, less any debt incurred, Preferred Units or Common Units issued by SN UnSub in connection with funding of properties outside of the AMI and (iii) GSO has the right to act on behalf of, and enforce all rights of, SN UnSub in connection with this Section 4.5. For the avoidance of doubt and for purposes of clarity, an Alternative Equitable Partition is intended to provide SN UnSub with substantially similar characteristics and value, after giving effect to such Alternative Equitable Partition, as SN UnSub held in the Core Area prior to the Alternative Equitable Partition, in accordance with the procedures in Section 4.5(a).

# ARTICLE V
# ADDITIONAL COVENANTS

**5.1 Information Rights.**

(a) Notwithstanding anything to the contrary in the Operating Agreements (but, for the avoidance of doubt, in addition to the information and data required to be provided to the Parties pursuant any Operating Agreement), Operator shall provide the Parties, in electronic format, with the following information and reports with respect to the Assets reasonably promptly after such information becomes available to Operator or could have been prepared without incurring unreasonable time and cost by Operator or any of its Affiliates:

(i) daily volumes for oil, gas, condensate, and water, choke size and tubing, casing, and flowing pressure;

(ii) monthly lease operating expense statement;

(iii) monthly oil, gas, and condensate sales reports;

(iv) drilling and workover reports, which shall include the current depth, the corresponding lithological information, data on drilling fluid characteristics, information about drilling difficulties or delays (if any), mud checks, mud logs, and hydrocarbon information, casing and cementation tallies, and estimated cumulative costs;

(v) daily drilling (including completion, stimulation, testing, artificial lifting, daily mud reports, mud logging, directional drilling, etc.) reports;

(vi) copies of all completion and plugging reports;

(vii) to the extent permissible, copies of all seismic data and reports, well tests, core data, microseismic, and associated analysis reports;

(viii) to the extent Operator prepares or receives such information, (A) geological and geophysical, reservoir engineering, drilling and well completion studies, development schedules, and annual progress reports on development projects and (B) well performance reports;

(ix) copies of written notices provided by Governmental Authorities or any Third Party regarding material violations or potential material violations of applicable Law;

(x) copies of all material reports provided by Operator to, or filings made by Operator with, any Governmental Authority relating to material violations or potential material violations of applicable Law;

(xi) copies of any material correspondence between Operator and any Governmental Authority relating to material violations or potential material violations of applicable law;

(xii) to the extent not included in clauses (i)-(xi) above, all material information, data, projections, interpretative data and analysis, operating plans, records, and analysis utilized by Operator in preparing (including the basis for proposing) a Subsequent Budget and Work Plan; and

(xiii) to the extent not included in clauses (i)-(xii) above, as soon as reasonably practicable following a request from a Party, all information reasonably requested by a Party for any purposes, including in connection with satisfying or complying with information requests and disclosure requirements in respect of financing or other capital market activities, including requests from current and prospective lenders and investors, rating agencies, securities exchanges, and Governmental Authorities.

(b) The information described in Section 5.1(a) shall be stored on a commercially available secure, third-party electronic database and document sharing platform and made available to each Party ("VDR"). Such VDR shall be Intralinks, Merrill Datasite, or another VDR platform that is mutually agreeable to the Parties. The VDR shall be maintained by Operator and such expenses shall be shared equally amongst the Parties.

**5.2 Area of Mutual Interest.**

(a) The Parties hereby establish an Area of Mutual Interest ("AMI"), commencing on the Effective Date of this Agreement and covering lands depicted on Exhibit C attached hereto, plus a 4-mile halo in any direction from the perimeter of such lands (excluding, however, any properties owned by SN and its Affiliates as of the Effective Date within the lands depicted on Exhibit C, which shall not be included within the AMI nor otherwise be subject to this Agreement). The AMI shall terminate and have no further force and effect on the earlier of (i) the date that is five (5) years after the Effective Date, or (ii) the date on which this Agreement is terminated in its entirety in accordance with Section 6.1.

(b) For purposes of this Section 5.2, an "Acquisition" shall mean any acquisition of, or agreement or option to acquire, rights, title or interests to any oil and gas properties covering lands within the AMI by a Party or any of its Affiliates (which in the case of Blackstone, for the avoidance of doubt, shall include HoldCo), subject to Section 5.2(h), between the Effective Date and the expiration of the AMI pursuant to Section 5.2(a). Such Acquisition whether acquired directly or indirectly, shall include without limitation, oil and gas leases, options to lease, farm-ins, options to farm-in, acreage contributions, bottom hole agreements or exploratory agreements. If an Acquisition includes lands located within the AMI and lands located outside the boundaries of the AMI, the Acquisition shall be deemed to include only the lands located inside the AMI, unless the Parties agree otherwise.

(c) All Acquisitions must be reported by the acquiring Party to the non-acquiring Parties thirty (30) days prior to the actual closing date of such Acquisition. Such notification shall include, but is not be limited to, a description of the interest acquired, the area covered, the terms of the Acquisition and the cost (including brokerage fees), and a copy of the proposed agreement for the Acquisition.

(d) For purposes of this Section 5.2, the proportionate shares of Blackstone, SN, and SN UnSub or the Qualified Foreclosure Transferee, if applicable, in the right to participate in an Acquisition shall be fifty percent (50%), thirty percent (30%), and twenty percent (20%), respectively. Each non-acquiring Party will have twenty (20) days after receipt of the notice to furnish the acquiring Party with written notice of its election to acquire, or cause its subsidiary to acquire, its proportionate share of the Acquisition for its proportionate share of the purchase price (or cash equal to fair equivalent value if the Acquisition was made for non-cash consideration); *provided*, *however*, that if Blackstone or its Affiliates is the acquiring Party, SN UnSub may assign its right to participate in such Acquisition to SN, or SN may assign its right to participate in such Acquisition to SN UnSub, in which case SN and SN UnSub shall provide a joint written notice evidencing SN's (or SN UnSub's) election to acquire both shares and SN UnSub's (or SN's) agreement to such election; *provided*, *further*, that if SN, SN Unsub or their respective Affiliates is the acquiring party, Blackstone shall have the right to assign its right to participate in such Acquisition to HoldCo, or, subject to the prior written consent of SN in its sole discretion, any other Affiliate. Failure of a Party to provide a written notice of its election within the twenty (20) day period will be deemed an election not to acquire its proportionate share of the Acquisition which will thereafter no longer be subject to the AMI provisions under this Agreement or any applicable Operating Agreement. Further, if neither non-acquiring Party elects to acquire its proportionate share of an Acquisition, the properties acquired in such Acquisition shall not be subject to this Agreement.

(e) If a non-acquiring Party elects to acquire its proportionate share (or, if applicable, SN elects to acquire both its share and SN UnSub's share or SN UnSub elects to acquire both its share and SN's share) of the Acquisition, such non-acquiring Party shall promptly (within ten (10) days of giving its notice) pay for its proportionate share(s) of the Acquisition, and the acquiring Party, within three (3) Business Days of receipt of that payment from the non-acquiring Party for its share(s) of the Acquisition cost, shall deliver (or cause its Affiliates to deliver) to the non-acquiring Party an assignment of the non-acquiring Party's proportionate share(s) of the Acquisition. Assignments pursuant to the AMI shall not contain any reservations in favor of the acquiring Party (or its Affiliates), other than the reservations burdening the Acquisition as of the date of the Acquisition by the acquiring Party (or its Affiliates). Such assignments shall be prepared in accordance with Exhibit D and be properly executed and notarized for recording purposes.

(f) The acquiring Party shall have the right to serve as operator pursuant to an applicable Operating Agreement for an Acquisition that such acquiring Party brings to the other Party pursuant to this Section 5.2 (to the extent permitted by such Operating Agreement); *provided*, that, prior to the occurrence of an Operator Default Event of SN, SN shall be entitled to serve as Operator for any Acquisitions within the Core Area and any oil and gas leasehold interests

covering lands within the Core Area shall be subject to the terms and conditions of this Agreement as though it were an Asset (and shall be deemed to be included in the definition of "Asset" for all purposes hereunder) and added to Annex III accordingly.

(g) If any Party is in Default, any other Party may (*provided*, that such other Party is not in Default) elect, by written notice, to have the terms of this Section 5.2 not restrict the activities of such other Party or any of its Affiliates during the period that the Default is continuing (*provided*, that a Party may thereafter continue to own and develop assets acquired during the applicable period) and any assets acquired by a Non-Defaulting Party during a Default shall be offered only to the other Non-Defaulting Party under this Section 5.2 and the Defaulting Party shall not be deemed to own or in any way otherwise be entitled to any rights or benefits in respect thereof.

(h) Notwithstanding the foregoing, the provisions set forth in this Section 5.2 shall not in any way limit or apply to (i) the activities of any Affiliate of SN or SN UnSub not Controlled by SN or SN UnSub, as applicable (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy), or (ii) (A) the activities of any Affiliate of Blackstone in its business other than the private equity investments made by the "Blackstone Capital Partners VI," "Blackstone Capital Partners VII," "Blackstone Energy Partners I," and/or "Blackstone Energy Partners II" investment funds (collectively, the "Blackstone Funds") affiliated with or managed by Blackstone Management Partners L.L.C., (B) the activities of GSO Capital Partners L.P. or any investment funds or vehicles managed by GSO Capital Partners L.P. or any portfolio companies or other investments of GSO Capital Partners L.P., or (C) the acquisition by any investment funds or vehicles managed by Blackstone Management Partners L.L.C. or any of its Affiliates to the extent such transaction represents the acquisition of any securities of an entity owning an interest in the AMI if such class of securities being acquired are listed on a national securities exchange and such acquisition does not provide for voting interests in excess of twenty-five percent (25%) of such entity, *provided*, that in each of clauses (ii)(A), (B) and (C), (y) Blackstone does not Control or have the right to Control any of the Persons mentioned in clauses (ii)(A), (B) or (C) above, and (z) any of such Persons does not act at the direction of or with encouragement from Blackstone with respect to any matters contemplated by this Section 5.2. For the avoidance of doubt, if any of the actions prohibited under clauses (y) or (z) above occurs, the respective Persons mentioned in clauses (ii)(A), (B) or (C) above shall be subject to, and their activities shall be limited in accordance with, this Section 5.2; provided, however, that for the avoidance of doubt, portfolio companies of GSO Capital Partners L.P. for which neither GSO Capital Partners L.P. nor its Affiliates have majority board control shall not be subject to the AMI provisions of this Section 5.2 notwithstanding the foregoing. The transactions and other activities excluded by this Section 5.2(h) from the other provisions of this Section 5.2 shall be referred to herein as "Excluded AMI Transactions."

(i) Agreement Memorandum. The Parties hereby agree to execute and promptly file a memorandum of this Agreement in the real property records of Maverick, Dimmit, Webb, and LaSalle Counties substantially in the form attached hereto as Exhibit E.

**5.3 Spacing Protections.**

(a) *Limited Restricted Zone.* With respect to each well drilled on lands in the AMI after the Effective Date but prior to the Redemption Date, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Limited Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Limited Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Limited Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Limited Spacing Restrictions").

(b) *Full Restricted Zone*. Except for Exception Wells as provided below, with respect to each well drilled on lands in the AMI after the Effective Date but prior to the earlier of (x) the fifth (5th) anniversary of the Effective Date, (y) the Redemption Date, or (z) mutual agreement of the Parties to modify these restrictions, each Party agrees:

(i) not to, and to cause its Affiliates not to, plan or propose, or permit the Operator to plan or propose, to drill any part or segment of the horizontal portion of the wellbore of such well within the Full Restricted Zone of any Existing Producing Well;

(ii) not to include in any Approved Budget or Work Plan any well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well;

(iii) not to participate in or consent to any operation proposed or conducted by a third party under an Operating Agreement to drill a well or wells that would be drilled into the Full Restricted Zone of any Existing Producing Well; and

(iv) not to complete or produce the horizontal portion of the wellbore of any well drilled into the Full Restricted Zone of an Existing Producing Well (unless, in the case of the Operator, it is required to do so under an applicable Operating Agreement) (collectively (i) through (iv) above, the "Full Spacing Restrictions").

(c) *Illustration*. Illustrations of the Limited Restricted Zone and Full Restricted Zones are shown in Annex VII attached hereto.

(d) *Exceptions to Full Spacing Restrictions*. Notwithstanding the foregoing, the Operator may drill and complete up to thirty (30) wells (the "Exception Wells") in the areas in the AMI shown in Annex VII that do not comply with the Full Spacing Restrictions as long as such Exception Wells comply with the Limited Spacing Restrictions.

(e) *Modifications to Full Restricted Zone*.

(i) *Notice*. Any Party may request that the Full Restricted Zone be modified by giving written notice to the other Parties if (1) twenty (20) Exception Wells have been drilled and completed, (2) at least six (6) Exception Wells have been drilled and completed in each AMI Test Area subject to the proposed modification of the Full Restricted Zone (the "Test Wells"), and (3) the Test Wells have been producing for at least six (6) months. Such written notice shall include a description of the proposed modifications to the Full Restricted Zone and reasonably detailed technical information and data from such requesting Party's consulting reservoir engineers supporting such modifications to the Full Restricted Zone (the "Proposed Modifications"). Each Party shall work in good faith to review the Proposed Modifications and all supporting information. The Proposed Modifications may not contain spacing restrictions that are less restrictive or protective in either the horizontal or vertical plane than those in the Limited Restricted Zone. If the other Parties (and their respective consulting engineers) agree that the Proposed Modifications will not lead to any material reduction in value to each Party's respective Asset base, then the Full Spacing Restrictions shall be modified pursuant to the Proposed Modifications until such time that the Parties agree to subsequent Proposed Modification.

(ii) *Failure to Agree*. If the other Parties (and their respective consulting engineers) fail to agree that the Proposed Modifications will not lead to any reduction in value to each Party's respective Asset base within 30 days after the date of the first notice provided in Section 5.3(e)(i), then any Party may within seven (7) Business Days thereafter, declare a Deadlock by providing a Deadlock Notice to the other Parties. Thereafter, such Deadlock shall be subject to the provisions of Section 3.6(b) and, if applicable, non-binding mediation, in accordance with Section 3.6(c). For the avoidance of doubt, as it relates to this Section 5.3, any decision on behalf of SN UnSub prior to the Redemption Date shall require the approval of the Class B Member of SN UnSub.

(iii) *Amendment*. Prior to drilling offset wells pursuant to such Proposed Modifications, then this Annex VII shall be amended to reflect the Proposed Modifications to the Full Restricted Zone agreed to by the Parties hereunder.

(f) *Covenants Running with the Land and Assumption*. The obligations of the Parties in this Section 5.3 are covenants running with the land and shall be binding upon the Parties and their successors and assigns. For the avoidance of doubt, the Parties agree that the obligations in this Section 5.3 will burden the lands in the AMI and create a privity of estate between the Parties. It is the Parties' express intent that such obligations will not be subject to rejection in the event of any bankruptcy involving any Party or any successor or assign to any of the leases, lands,

or wells that are subject to this Agreement. Each Party agrees to cause its successors and assigns to expressly assume the obligations under this Section 5.3 in connection with any Transfer of all or part of its Assets.

(g) *Existing Producing Wells and Drilled and Uncompleted Wells.* The restrictions listed in this Section 5.3 shall apply solely to wells that are drilled and completed within the Limited Restricted Zone or the Full Restricted Zone of an Existing Wellpad and shall not apply to the Existing Drilled and Uncompleted Wells.

(h) *Applicability to Blackstone.* Notwithstanding anything in Section 5.3, Blackstone shall not be subject to either the Full Spacing Restrictions or the Limited Spacing Restrictions in Section 5.3 after 5 years following the Effective Date.

**5.4 Cooperation**. The Parties agree to cooperate, and to cause their Affiliates to cooperate, with one another in connection with the arrangement of any debt financing related to the Assets as may be reasonably requested by a Party. Any reasonable, out-of-pocket expenses incurred by a Party and its Affiliates in providing reasonable cooperation to a Party in accordance with this Section 5.4 shall be reimbursed by the Party seeking such cooperation.

## ARTICLE VI
## TERM AND TERMINATION

**6.1 Term and Termination**. Subject to Section 6.2, the term of this Agreement shall commence on the Effective Date and continue until the earliest of:

(a) termination by mutual written agreement of each Party;

(b) the eighth anniversary of the Effective Date;

(c) with respect to any interest in the Assets transferred (other than pursuant to a Permitted Transfer or a Foreclosure Transfer) to a Third Party (which for the avoidance of doubt shall not include Sanchez Production Partners LP, Sanchez Oil & Gas Corporation or its Affiliates, any Permitted Holder or any other entity Controlled by any Permitted Holder), upon the consummation of such transfer but only with respect to the interest transferred (and this Agreement will remain in effect with respect to the remainder of the Assets), subject to Section 4.1(b) and the provisions that survive pursuant to Section 6.2 and which are assigned in connection with a Transfer pursuant to Section 7.3;

(d) termination by any Party in its sole discretion after a Division of Operatorship or an Alternative Equitable Partition is completed, but only within thirty (30) days after the consummation of the Alternative Equitable Partition or final Equitable Division resulting therefrom; and

(e) termination by a Non-Defaulting Party in its sole discretion following a Default, but only within thirty (30) days after such Default.

Following the termination of this Agreement in accordance with this Section 6.1, upon the written request of any Party, the Parties agree to execute and file for record a notice of termination of this Agreement in the form attached hereto as Exhibit G.

**6.2 Effect of Termination**. The expiration or termination of this Agreement, for any reason, shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) has already accrued hereunder, (ii) comes into effect due to the expiration or termination of the Agreement, or (iii) otherwise survives the expiration or termination of this Agreement. Notwithstanding anything in this Agreement to the contrary, (i) the right of Blackstone to pursue a Sale Transaction and/or an Equitable Division pursuant to Section 4.5 (and the provisions set forth in Article VII as they may relate to Section 4.5) shall survive termination due to Division of Operatorship for the later of (A) a period of nine (9) months following the consummation of such Division of Operatorship (it being understood that in the event an Alternative Equitable Partition is to be completed, then the parties shall complete such Alternative Equitable Partition regardless of whether such nine (9) month period has expired) or (B) five (5) months after determination of a final and binding Equitable Partition in accordance with Section 4.5; (ii) the information rights set forth in Section 5.1 shall survive a termination due to a Division of Operatorship indefinitely or until neither Blackstone, SN, nor any of their Affiliates (or any designee thereof) operates any of the Assets, (iii) Section 3.8(e)(i) shall survive for a period of six months following a termination resulting from a sale by SN, or any other Affiliate thereof serving as Operator, to a Third Party, or following a termination under Section 6.1(d), (iv) Section 3.8(e)(ii) and Section 3.8(e)(iii) and the penultimate sentence of Section 3.8(e) shall survive termination indefinitely until all Required Operatorship Consents are obtained (including to the extent a Division of Operatorship is effected following termination of the Agreement pursuant to the immediately preceding clause (iii)), provided that the last sentence of Section 3.8(e)(iii) shall survive the termination of this Agreement in any event for a period of ten years; (v) the provisions of Section 3.8(e)(v) shall survive the termination of this Agreement for a period of ten years; and (vi) the spacing restrictions in Section 5.3 shall survive termination until the dates set forth in Section 5.3 .

## ARTICLE VII
## GENERAL PROVISIONS

**7.1 Entire Agreement**. This Agreement, the Operating Agreements and the Purchase Agreement, constitute the entire agreement with respect to the subject matter covered hereby and supersede (i) all prior oral or written proposals, term sheets or agreements, (ii) all contemporaneous oral proposals or agreements, and (iii) all previous negotiations and all other communications or understandings between the Parties with respect to the subject matter hereof.

**7.2 Waivers**. Neither action taken (including any investigation by or on behalf of any Party) nor inaction pursuant to this Agreement shall be deemed to constitute a waiver of compliance with any representation, warranty, covenant or agreement contained herein by the Party not committing such action or inaction. A waiver by any Party of a particular right, including breach of any provision of this Agreement, shall not operate or be construed as a subsequent waiver of that same right or a waiver of any other right.

**7.3** **Assignment; Binding Effect**. Subject to the terms and conditions hereunder, each Party may assign its rights or interests under this Agreement, or delegate any duties hereunder, without the prior written consent of the other Party, *provided*, that such assignment or delegation is made in connection with the conveyance by a Party or its Affiliate of (i) all its interest in an Asset to a Third Party, (ii) all or some of its interests in an Asset to an Affiliate, in each case in accordance with the terms of this Agreement or (iii) otherwise in connection with a Sale Transaction, including, for the avoidance of doubt, all rights set forth in Section 3.8(e)(ii) (including with respect to the survival period of such provision as set forth under Section 6.2). This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors and permitted assigns; *provided*, *however*, that in the case of only a partial assignment by a Party of their rights or interests under this Agreement to an Affiliate or Permitted Transferee, such Affiliate or Permitted Transferee shall not succeed to such transferring Party's rights under Article III, unless otherwise agreed by the Parties and such Affiliate or Permitted Transferee.

**7.4** **Governing Law; Severability.**

(a) **This Agreement has been executed and delivered and shall be construed, interpreted and governed pursuant to and in accordance with the laws of the State of Texas, without regard to any conflict of Laws principles which, if applied, might permit or require the application of the Laws of another jurisdiction.**

(b) In the event of a direct conflict between the provisions of this Agreement and any mandatory provision of applicable Law, the applicable provision of Law shall control. If any provision of this Agreement or the application thereof to any Person or circumstance, is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by applicable Law.

**7.5** **Further Assurances**. Subject to the terms and conditions set forth in this Agreement, each of the Parties agrees to use its reasonable best efforts to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things necessary, proper or advisable under applicable Laws to consummate and make effective the transactions contemplated by this Agreement. In case, at any time after the execution of this Agreement, any further action is necessary or desirable to carry out its purposes, the proper officers or directors of the Parties shall take or cause to be taken all such necessary action.

**7.6** **Counterparts**. This Agreement may be executed in multiple counterparts and delivered by facsimile or portable document format, each of which, when executed, shall be deemed an original, and all of which shall constitute but one and the same instrument.

**7.7 Confidential Information.**

(a) The Parties acknowledge that they and their respective appointed Representatives (if any) shall receive information from or regarding Assets in the nature of trade secrets or that otherwise is confidential information or proprietary information (as further defined below in this Section 7.7(a), "Confidential Information"), the release of which would be damaging to the Parties or Persons with which the Parties conduct business. Each Party shall hold in strict confidence, and shall require that such Party's appointed Representatives (if any) hold in strict confidence, any Confidential Information that such Party or such Party's appointed Representative receives, and each Party shall not, and each Party shall require that such Party's appointed Representatives agree not to, disclose such Confidential Information to any Person other than another Party or Representative, or use such information for any purpose other than to evaluate, analyze, and keep apprised of the Assets and such Party's interest therein, except for disclosures (i) to comply with any Laws (including applicable stock exchange or quotation system requirements), ***provided***, that, if permitted by applicable Law, a Party or Representative must notify all the Parties promptly of any disclosure of Confidential Information which is required by Law, and any such disclosure of Confidential Information shall be to the minimum extent required by Law, (ii) to Affiliates, partners, members, stockholders, investors, directors, officers, employees, agents, attorneys, consultants, lenders, professional advisers or representatives of the Party or Representative or their Affiliates; ***provided***, that such Party or Representative shall be responsible for assuring such Affiliates,' partners,' members,' stockholders,' investors,' directors,' officers,' employees,' agents,' attorneys,' consultants,' lenders,' professional advisers' and representatives' compliance with the terms hereof (and such Party or Representative, as applicable, shall be liable for any non-compliance by such Persons as if such Persons were bound as a Party hereto), except to the extent any such Person who is not an Affiliate, partner, member, stockholder, director, officer or employee has agreed in writing addressed to all the Parties to be bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a), (iii) to Persons to which that Party's Asset Interests may be Transferred as permitted by this Agreement, but only if the recipients of such information have agreed to be bound by customary confidentiality and non-use undertakings similar to this Section 7.7(a), (iv) of information that a Party or Representative also has received from a source independent of another Party or Representative and that such Party or Representative reasonably believes such source obtained such information without breach of any obligation of confidentiality to another Party, Representative or any of their Affiliates, (v) that have been or become independently developed by a Party, a Representative or their Affiliates, or on their behalf without using any of the Confidential Information, (vi) that are or become generally available to the public (other than as a result of a prohibited disclosure by such Party or Representative or Persons for which such Party or Representative is responsible for under clause (ii) above), (vii) in connection with any proposed Transfer of all or part the Working Interests of a Party, the proposed sale of all or substantially all of a Party or its direct or indirect parent or the proposed debt or equity financing of a Party or its direct or indirect parent, to Persons to which such interest may be directly or indirectly transferred or which may provide such debt or equity financing (and their respective advisors or representatives), but only if the recipients of such information have agreed to be bound by customary undertakings with respect to confidential and proprietary information similar to this

Section 7.7(a) (unless, in the case of advisors or representatives, such Persons are otherwise bound by a duty of non-disclosure and non-use with respect to confidential and proprietary information), (viii) to Third Parties to the extent necessary for a Person to provide services in connection with its capacity as Operator, as applicable, or (ix) to the extent the non-disclosing Parties shall have consented to such disclosure in writing. The Parties agree that breach of the provisions of this Section 7.7(a) by such Party or such Party's appointed Representative (if any) would cause irreparable injury to the non-disclosing Parties for which monetary damages (or other remedy at Law) would be inadequate in view of (i) the complexities and uncertainties in measuring the actual damages that would be sustained by reason of the failure of a Party or Representative to comply with such provisions and (ii) the uniqueness of the Assets and the confidential nature of the Confidential Information. Accordingly, the Parties agree that the provisions of this Section 7.7(a) may be enforced by any Party by temporary or permanent injunction (without the need to post bond or other security, therefor), specific performance or other equitable remedy and by any other rights or remedies that may be available at law or in equity. The term "Confidential Information" shall include any information pertaining to the identity of the Parties and the Assets, which is not available to the public, whether written, oral, electronic, visual form or in any other media, including, such information that is proprietary, confidential or concerning the Parties ownership and operation of the Assets or related matter, including any actual or proposed operations or development project or strategies, other operations and business plans, actual or projected revenues and expenses, finances, contracts and books and records. Notwithstanding the foregoing, Blackstone and its Affiliates may make disclosures to its direct and indirect limited partners and members such information (including Confidential Information) as is customarily provided to current or prospective limited partners in private equity funds sponsored or managed by Affiliates of Blackstone, *provided*, that if such Persons are receiving Confidential Information such Persons are bound by customary undertakings with respect to confidential and proprietary information similar to this Section 7.7(a). In the event that a Party wishes to issue a press release relating in any respect to the Assets that in the opinion of such Party does not contain Confidential Information, each Party shall be consulted and have a reasonable amount of time to review and comment upon such proposed press release prior to its issuance. Notwithstanding anything herein to the contrary, in the event a Party has approved or been consulted with respect to any disclosures as required hereunder, the other Party, its Representatives or its Affiliates shall be entitled to make disclosures substantially similar (as to form and content) to those prior disclosures that the non-disclosing Party has approved or been consulted with respect to, as applicable.

(b) The Parties acknowledge and agree that none of the Parties shall furnish or otherwise provide a copy of this Agreement (or any part hereof) to any Person (other than the Parties, their Representatives, and Affiliates, and their respective representative(s) and adviser(s)), unless (i) otherwise agreed in writing by each of the Parties, (ii) required by applicable Laws (and if required by applicable Laws, a copy of the applicable portions of this Agreement shall be furnished only to the extent necessary to comply with such applicable Laws), (iii) by any Party, as required to implement any of the hedging arrangements and financings, and (iv) in compliance with clauses (i)-(ix) of Section 7.7(a), as if this Agreement were Confidential Information.

**7.8 No Third Party Beneficiaries**. Except as set forth in Section 7.14, except for the UnSub Agent in respect of the Cure Right and rights of a Qualified Foreclosure Transferee, and

except for the rights of GSO under Section 4.5 (which may be enforced by GSO) the provisions of this Agreement are for the exclusive benefit of the Parties and their respective successors and permitted assigns. Except for the foregoing, this Agreement is not intended to benefit or create rights in any other Person, including (a) any Person to whom any debts, Liabilities, or obligations are owed by a Party, or (b) any liquidator, trustee, or creditor acting on behalf of any Party, and no such creditor or any other Person shall have any rights under this Agreement.

**7.9** **Non-Solicitation**. For a period from and after the date hereof until the date that is sixty (60) months after the termination of this Agreement Blackstone shall not, and Blackstone shall cause entities that are Controlled Affiliates of the Blackstone Funds not to, directly or indirectly, (i) solicit, induce or encourage any such employee or officer of the SN, SN UnSub or any of their respective Affiliates to leave their respective positions of employment with SN, SN UnSub and/or or any of their respective Affiliates, (ii) hire or employ any of such employees or officers, whether as a consultant or otherwise, or (iii) hire or employ any such former employee or officer, whether as a consultant or otherwise, within six (6) months of such person's final employment date with SN, SN UnSub or or any of their respective Affiliates; *provided*, that this Section 7.9 shall not preclude Blackstone or any of its Affiliates from soliciting for employment or hiring any such employee, agent or contractor who has been terminated (and not rehired) by SN, SN UnSub or any of their respective Affiliates. Notwithstanding anything in this Agreement to the contrary, a breach of this Section 7.9 shall not be considered for purposes of determining a Default hereunder unless the breach was effected with the knowledge of a private equity professional of the Blackstone Funds and the action underlying such breach would violate the terms of this Section 7.9, or alternatively if Sanchez Energy is able to establish a sustained pattern of breaches of this Section 7.9, and in each case provided that Blackstone take such steps necessary to immediately terminate such employee unless otherwise waived in writing by Sanchez Energy.

**7.10** **Notices**. Except as otherwise provided in this Agreement to the contrary, any notice or communication required or permitted to be given under this Agreement shall be in writing and sent to the address of the Party (or Person) set forth below, or to such other more recent address of which the sending Party actually has received written notice:

(a) if to SN, to:

Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: Greg Kopel
Electronic Mail: gkopel@sanchezog.com

and with a copy to (which shall not constitute notice):

Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana Street, 43rd Floor
Houston, TX 77002
Fax: 713-236-0822

Attn: David Elder
Michael J. Byrd
Electronic Mail: delder@akingump.com
mbyrd@akingump.com

(b) if to SN UnSub, to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Tel: 713.756.2782

with a copy to:

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

With a copy to:

Christopher Richardson
Andrews Kurth Kenyon LLP
600 Travis
Suite 4200
Houston, TX 77002
Electronic Mail: crichardson@andrewskurth.com

(c) if to Blackstone, to:

Gavilan Resources, LLC
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia
Electronic Mail: acconcia@blackstone.com

and with copies to:

Blackstone Management Partners L.L.C.
345 Park Avenue, 43rd Floor
New York, New York 10154
Attention: Angelo Acconcia

Electronic Mail: acconcia@blackstone.com

and

Kirkland & Ellis LLP
600 Travis St., Suite 3300
Houston, Texas 77002
Attention: Andrew Calder, P.C.
Rhett Van Syoc
Electronic Mail: andrew.calder@kirkland.com
rhett.vansyoc@kirkland.com
and

(d) if to the UnSub Agent, to:

JPMorgan Chase Bank, N.A.
712 Main Street, 12th Floor South
Houston, TX 77002
Attention:Darren Vanek
Electronic Mail: darren.m.vanek@jpmorgan.com

and with a copy to (which shall not constitute notice):

Each such notice or other communication shall be sent by personal delivery, by registered or certified mail (return receipt requested), by national, reputable courier service (such as Federal Express or United Parcel Service) or by electronic mail.

**7.11** **Remedies**. Except as provided herein, the rights, obligations, and remedies created by this Agreement are cumulative and in addition to any other rights, obligations, or remedies otherwise available at Law or in equity. In addition, any successful Party is entitled to costs related to enforcing this Agreement, including, reasonable and documented attorneys' fees and court costs. Notwithstanding anything herein to the contrary, the Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed by either Party in accordance with the terms hereof and that monetary damages, even if available, would not be an adequate remedy therefor. As a result of the preceding sentence, each Party shall be entitled to specific performance to prevent breaches of this Agreement and the terms hereof (including the obligation consummate transactions contemplated herein), without proof of actual damages (and each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy) in addition to any other remedy at Law or equity. The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

**7.12 Disputes.**

(a) *Consent to Jurisdiction and Service of Process; Appointment of Agent for Service of Process.* EACH PARTY TO THIS AGREEMENT HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES DISTRICT COURT LOCATED IN HOUSTON, TEXAS OR TEXAS STATE COURT LOCATED IN HOUSTON, TEXAS AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER SUCH ACTIONS OR PROCEEDINGS ARE BASED IN STATUTE, TORT, CONTRACT OR OTHERWISE), SHALL BE LITIGATED IN SUCH COURTS. EACH PARTY (i) CONSENTS TO SUBMIT ITSELF TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR SUCH ACTIONS OR PROCEEDINGS, (ii) AGREES THAT IT WILL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (iii) AGREES THAT IT WILL NOT BRING ANY SUCH ACTION OR PROCEEDING IN ANY COURT OTHER THAN SUCH COURTS. EACH PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE EXCLUSIVE AND IRREVOCABLE JURISDICTION AND VENUE OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY NON-APPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH SUCH ACTIONS OR PROCEEDINGS. A COPY OF ANY SERVICE OF PROCESS SERVED UPON THE PARTIES SHALL BE MAILED BY REGISTERED MAIL TO THE RESPECTIVE PARTY EXCEPT THAT, UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY A PARTY REFUSES TO ACCEPT SERVICE, EACH PARTY AGREES THAT SERVICE UPON THE APPROPRIATE PARTY BY REGISTERED MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT OF A PARTY TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

(b) *Waiver of Jury Trial.* TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES TO THIS AGREEMENT HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL

CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(c) Notwithstanding anything contained in Section 7.12(a), in the event a Party wishes to contest whether it is in Default (the "Contesting Party"), such Party shall provide the Non-Defaulting Parties with its written objection within fifteen (15) days after receipt of a notice of Default (the "Objection Notice"). In such event, a representative of the Contesting Party and each of the Non-Defaulting Parties shall meet and use good faith efforts to mutually agree on a resolution. If such representatives are unable to resolve the disagreement within fifteen (15) days after receipt of the Objection Notice, then the disagreement shall be resolved by arbitration, which arbitration proceedings shall be held in Houston, Texas and conducted pursuant to the Rules for Commercial Arbitration promulgated by the American Arbitration Association, to the extent such rules do not conflict with the terms of this Section 7.12(c). In connection therewith, the arbitrator shall be selected by mutual agreement of the parties to such dispute, or absent such agreement, within ten (10) Business Days of becoming aware that such agreement cannot be made as to the selection of the arbitrator, by the American Arbitration Association. The arbitrator shall not have worked as an employee, consultant, independent contractor or outside counsel for any of the Parties to such dispute or any of their respective Affiliates during the ten (10) year period preceding the arbitration or have any financial interest in the dispute or any assets or businesses of the parties to such dispute. The arbitrator's determination shall be made within fifteen (15) Business Days after submission of the matters in dispute and, absent manifest error, shall be final and binding upon the Parties to such dispute, without right of appeal. In making its determination, the arbitrator shall be and remain at all times wholly impartial, and, once appointed, the arbitrator shall have no *ex parte* communications with any of the Parties to the dispute concerning the arbitration or the underlying dispute.

**7.13 Expenses**. Except as otherwise provided in this Agreement, each of the Parties shall bear its own costs and expenses (including any legal, accounting and other professional fees and expenses) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**7.14 No Recourse**. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith, and notwithstanding the fact that any Party may be a partnership or limited liability company, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees, and acknowledges

that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered contemporaneously herewith or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, or employee of any Party (or any of their successor or permitted assignees), against any former, current, or future general or limited partner, manager, stockholder, or member of any Party (or any of their successors or permitted assignees), or any Affiliate thereof, or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, Controlling Person, fiduciary, representative, general or limited partner, stockholder, manager, or member of any of the foregoing, but in each case not including the Parties (each, but excluding for the avoidance of doubt, the Parties, a "Party Affiliate"), whether by or through attempted piercing of the corporate veil, by or through a claim (whether in tort, contract, or otherwise) by or on behalf of such Party against the Party Affiliates, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation, or other applicable law, or otherwise; it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Party Affiliate, as such, for any obligations of the applicable Party under this Agreement or the transactions contemplated hereby, under any documents or instruments delivered contemporaneously herewith, in respect of any oral representations made or alleged to be made in connection herewith or therewith, or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, such obligations or their creation.

**7.15** **Conflict**. In the event of a conflict between the terms of this Agreement and the terms of any Operating Agreement applicable to the Assets, the terms of this Agreement shall control as among the Parties.

**7.16** **Subchapter K**. The Parties hereby agree that any arrangement established pursuant to this Agreement be excluded from the application of Subchapter K of Chapter 1 of the Code

**7.17** **Relationship of SN and SN UnSub**. Notwithstanding anything herein to the contrary, (a) the obligations under this Agreement of SN, on the one hand, and SN UnSub, on the other hand, are several and such obligations shall not be deemed "joint and several," (b) SN shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN UnSub, and (c) SN UnSub shall not have any liability, penalties, or limitation of rights for any breach of this Agreement or any provision hereof by SN. Furthermore, and for the avoidance of doubt, no Party shall be responsible in any way for the performance of the obligations of any other Party under this Agreement. Nothing contained herein, and no action taken by any Party pursuant thereto, shall be deemed to constitute or form a partnership, association, joint venture or any other kind of group or entity, or create a presumption that a Party is in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by this Agreement. Each Party shall be entitled to independently protect and enforce its rights, in equity, contract or law, including, the rights arising out of this Agreement, and it shall

not be necessary for any other Party to be joined as an additional party in any proceeding for such purpose.

**7.18** **Operating Committee; Affiliates**. To the extent that this Agreement expressly purports to require any Representative of a Party or the Operating Committee to take any action or refrain from taking any action, each such Party agrees to use its reasonable best efforts to cause its Representative(s) and the Operating Committee, as applicable, to take such action or refrain from taking such action, as applicable. To the extent this Agreement purports to require a Party to require any of its Affiliates to take any action or refrain from taking any action, each such Party shall only be required to use its reasonable best efforts to cause an Affiliate not Controlled by it (except for in the case of SN, Sanchez Energy and its subsidiaries (other than SN UnSub and its subsidiaries), so long as SN remains a Controlled Affiliate of Sanchez Energy) to take such action or refrain from taking such action, as applicable.

**7.19** **Force Majeure**. If any Party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this Agreement, other than the obligation to indemnify or make money payments or furnish security, that Party shall give to all other Parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon, the obligations of the Party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as used in this Section, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightning, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other event, circumstance or cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the Party claiming suspension. The affected Party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the Party concerned.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

IN WITNESS WHEREOF, the Parties have executed this Joint Development Agreement as of the date first set forth above.

**SANCHEZ ENERGY CORPORATION:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF MAVERICK, LLC:**

By: /s/ Antonio R. Sanchez, III
Name: Antonio R. Sanchez, III
Title: Chief Executive Officer

**SN EF UNSUB, LP:**
By: SN EF UNSUB GP, LLC,
its general partner

By: /s/ Patricio D. Sanchez
Name: Patricio D. Sanchez
Title: Chief Executive Officer

**GAVILAN RESOURCES, LLC:**

By: /s/ Angelo Acconcia
Name: Angelo Acconcia
Title: President

**Annex I**

**Defined Terms**

As used in this Agreement, the following terms have the following meanings:

"Acquisition" has the meaning set forth in Section 5.2(b).

"Additional E&D Proposal" has the meaning set forth in Section 3.7(c)(i).

"Additional S&A Proposal" has the meaning set forth in Section 3.7(c)(ii).

"AFE" means a written description and cost estimate of a proposed activity or operation accompanying a proposal for such activity or operation made pursuant to an Operating Agreement and forwarded to the Operating Committee by Operator pursuant to an Operating Agreement. Any AFE that proposes more than one operation shall be considered a separate AFE as to each operation only for those operations for which the Parties are permitted to make separate elections under the terms of the relevant Operating Agreement.

"Affiliate" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in the Partnership or the General Partner result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Alternate Operator" has the meaning set forth in Section 3.8(f).

"Alternative Equitable Partition" has the meaning set forth in Section 4.5(a).

"AMI" has the meaning set forth in Section 5.2(a).

"Anadarko" has the meaning set forth in the recitals.

"APC Well Commitment" means wells required to be drilled pursuant to that certain Development Agreement, dated as of the date hereof, by and among Anadarko, SN, SN UnSub and Blackstone.

"Applicable Credit Agreement" means, in the case of (i) SN, the Second Amended and Restated Credit Agreement, dated as of June 30, 2014, among Sanchez Energy, as borrower, Royal Bank of Canada, as administrative agent and the other financial institutions party thereto from time to time, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "SN Credit Agreement"), (ii) SN UnSub, that certain Credit Agreement, among SN UnSub, as borrower, JPMorgan Chase Bank, N.A., as administrative agent, collateral agent, and an issuing bank, the banks, financial institutions and other lending institutions from time to time parties as lenders thereto, dated as the date hereof, as amended, restated, amended and restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "UnSub Credit Agreement"), (iii) Blackstone, (x) that certain Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent and (y) that certain Second Lien Credit Agreement, dated as of the date hereof, by and among Blackstone, as borrower, the lenders from time to time party thereto and Citibank, N.A., as administrative agent and collateral agent, and (iv) a Third Party Operator, any of such Third Party Operator's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time (the "Third Party Credit Agreement"), and (v) a Qualified Foreclosure Transferee, any of such Qualified Foreclosure Transferee's debt facilities, indentures, commercial paper facilities, secured or unsecured capital market financings or other debt issuances, in each case with banks or other institutional lenders or institutional investors or other lenders or credit providers providing for revolving credit loans, term loans, receivables financing, letters of credit or other borrowings, capital markets financings or other debt issuances, in each case, as amended, restated, modified, renewed, refunded, replaced in any manner or refinanced in whole or in part from time to time.

"Approved AFE" means an AFE approved by the Operating Committee pursuant to Section 3.2(g) or deemed approved under Section 3.7(c).

"Approved Budget" means the Initial Budget and Work Plan, any Subsequent Budget and Work Plan approved under Section 3.7(b)(ii), and any amendment to the Initial Budget and Work Plan or approved Subsequent Budget and Work Plan approved as provided under Section 3.2.

"Approved Operation" means an Initial Approved Operation and any Subsequent Approved Operation.

"Area of Mutual Interest" has the meaning set forth in Section 5.2(a).

"Asset Interest" has the meaning set forth in Section 4.1(a).

"Assets" means collectively, the right, title and interest in and to the assets included in the term "Asset" as used in the Purchase Agreement.

"Base Preferred Return Amount" has the meaning give to such term in the SN UnSub Partnership Agreement as in effect as of the Effective Date.

"Blackstone" has the meaning set forth in the preamble.

"Blackstone Funds" has the meaning set forth in Section 5.2(h).

"Blackstone Operator" has the meaning set forth in Section 3.8(a).

"Blackstone Operatorship Rights" has the meaning set forth in Section 4.5(a).

"Blackstone Percentage" has the meaning set forth in Section 4.5(a).

"Blackstone Representative" has the meaning set forth in Section 3.3(a)(iii).

"Board of Directors" means the board of directors of SN.

"Bona Fide Offer" means a bona fide offer received by Blackstone from a Third Party that was obtained or marketed by Blackstone through a bona fide arms-length process (it being understood that such process need not be a broadly marketed process, but could be a direct negotiation and offer from a single party) designed to achieve the fair market value for the Working Interests, Assets and/or other related assets, or Equity Interests, as applicable, related to such offer. For the avoidance of doubt, a Bona Fide Offer will be deemed not to include a Foreclosure Transfer.

"Budget Negotiation Period" has the meaning set forth in Section 3.7(b)(iv).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized or required by applicable Law to be closed in New York, New York or Houston, Texas.

"BX Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Capital Expenditures" means any expenditure by a Party that is required to be capitalized for purposes of such Party's financial statements in accordance with GAAP.

"Change of Control" means, with respect to Sanchez Energy, any of the following transactions: (a) a merger, consolidation or other reorganization, unless securities representing more than thirty-five percent (35%) of the total combined voting power of the voting securities of the successor entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Persons who beneficially owned Sanchez Energy's outstanding voting securities immediately prior to such transaction; or (b) any transaction or series of transactions pursuant to which any "person" or "group" (within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934) becomes directly or indirectly the beneficial owner of any of Sanchez Energy's securities possessing more than sixty-five percent (65%) of the total combined voting power of Sanchez's securities (as measured in terms of the power to vote with respect to the election of its board of directors) outstanding immediately after the consummation of such transaction or series of transactions, whether such transaction involves a direct issuance from Sanchez Energy or the acquisition of outstanding securities held by one or more of Sanchez Energy's existing stockholders; excluding, in each case of (a) or (b) above, any transaction with a Permitted Transferee or a Permitted Holder.

"Confidential Information" has the meaning set forth in Section 7.7(a).

"Consents" has the meaning set forth in Section 2.2.

"Consent Agreement" means that certain Consent to Assignment of Interest dated December 24, 2016, from Briscoe Ranch, Inc. et al. to Sanchez Energy and Anadarko E&P Onshore LLC.

"Consenting Parties" means Briscoe Ranch, Inc., Miramar Holdings, L.P., Rancho la Cochina Minerals, Ltd., Janey Briscoe Marmion GST Trust, and El Pescado Minerals, Ltd.

"Contesting Party" has the meaning set forth in Section 7.12(c).

"Control" (including its derivatives and similar terms) means, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Core Area" means the area marked in blue on Exhibit C.

"Cure Right" has the meaning set forth in the definition of "Default".

"Deadlock" has the meaning set forth in Section 3.6(a).

"Deadlock Notice" has the meaning set forth in Section 3.6(a).

"Default" means, in respect of any Party, the failure by such Party or any of its Affiliates to remedy, within thirty (30) days of receipt of a Default Notice from any other Party, the material non-performance or material non-compliance with a material provision of this Agreement by such Party or any of its Affiliates (provided, however, that UnSub and SN shall not be considered to be "Affiliates" for the purposes of this definition of "Default", such that a Default by SN (or by SN's

Affiliates other than SN UnSub) shall not be deemed to be a default by SN UnSub, and a Default by SN UnSub shall not be deemed to be a Default by SN); provided, however, in the event of a failure by UnSub, the UnSub Agent shall also have the right (but not the obligation) to remedy any such failure within such thirty (30) day time period (the "Cure Right").

"Default Notice" means a written notice from a Party containing a detailed description of the basis of a claim that another Party has materially failed to perform or materially failed to comply with this Agreement, including specific references to the provisions in this Agreement that such Party has materially failed to comply with or perform; *provided*, *however*, in the event of an alleged failure by UnSub, such written notice shall also be delivered to the administrative agent under the UnSub Credit Agreement (the "UnSub Agent") substantially concurrently with delivery to UnSub.

"Defaulting Operator" has the meaning set forth in Section 3.8(f).

"Defaulting Party" has the meaning set forth in Section 3.9(a).

"Dispute Parties" has the meaning set forth in Section 4.5(f).

"Division of Operatorship" has the meaning set forth in Section 3.8(e)(i).

"Drag Interests" has the meaning set forth in Section 4.5(e).

"E&D Operations" means all activities and operations related to subsurface exploration and development of the Assets (including all drilling, reworking, plugging back, shutting-in, completing, re-completing, re-fracturing, stimulation, acidization, enhanced recovery operations, plugging and abandonment operations) as well as construction of wellpads and installation and operation of wellsite facilities.

"Effective Date" has the meaning set forth in the preamble.

"Equitable Division" has the meaning set forth in Section 3.8(e)(i).

"Equitable Partition" has the meaning set forth in Section 4.5(a).

"Equity Interest" means (a) with respect to a corporation, any and all shares of capital stock and any commitments with respect thereto, (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, equity interests or other partnership/limited liability company interests, and any commitments with respect thereto, and (c) any other direct or indirect equity ownership or participation in a Person.

"Estimated Cash Outlays" has the meaning set forth in Section 3.7(d).

"Excluded AMI Transactions" has the meaning set forth in Section 5.2(h).

"Excluded Percentage" has the meaning set forth in Section 4.5(a).

"Excluded Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Existing Drilled and Uncompleted Wells" means the oil and gas wells listed in Annex VI.

"Existing Producing Wells" means the oil and gas wells listed in Annex V.

"Existing Wellpad" means, as of any date of determination, each then-existing wellpad with average daily production in excess of 300 BOE/D over the prior twelve-month period under the Leases pursuant to which the Parties (including their respective Affiliates) retain any Working Interests.

"Fair Market Value" means the value of any specified interest or property, which shall not in any event be less than zero, that would be obtained in an arm's length transaction for cash between an informed and willing buyer and an informed and willing seller, neither of whom is under any compulsion to purchase or sell, respectively, and without regard to the particular circumstances of the buyer or seller, conveyance of operatorship associated with any specified interest or property or a control premium.

"Final Deadlock" has the meaning set forth in Section 3.6(b).

"Final Deadlock Notice" has the meaning set forth in Section 3.6(b).

"Final Valuation" has the meaning set forth in Section 4.5(f).

"Financial Advisor" has the meaning set forth in Section 3.8(e)(i).

"Foreclosure Transfer" means any assignment, transfer, conveyance, exchange or any other alienation resulting from any judicial or non-judicial foreclosure by the holder of a security interest or other encumbrance or any Transfer to the holder of a security interest or other encumbrance in connection with a workout, bankruptcy, restructuring or similar arrangement, including in each case to the extent effectuated pursuant to Sections 363 or 1129 of the U.S. Bankruptcy Code.

"Form Operating Agreement" means the form of AAPL Joint Operating Agreement attached hereto as Exhibit B.

"Full Restricted Zone" means, for each Existing Producing Well, a three dimensional area in the shape of a rectangular prism, defined by the following: the rectangular subsurface zone extending perpendicularly (i) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (ii) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

"Full Spacing Restrictions" has the meaning set forth in Section 5.3(b)(iv).

"Future Wellpads" means all prospective wellpads for acreage under the Leases on which there are no Existing Wellpads based on customary industry practices and the reserve report for each Party covering the previous twelve (12) month period.

"GAAP" means those generally accepted accounting principles and practices that are recognized as such by the Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Authority" means any legislature, court, tribunal, arbitrator, authority, agency, department, commission, division, board, bureau, branch, official or other instrumentality of the U.S., or any domestic state, county, city, tribal or other political subdivision, governmental department or similar governing entity, and including any governmental, quasi-governmental, regulatory, administrative or non-governmental body exercising similar powers of authority.

"GSO" means ST Holdings L.P.

"HoldCo" means Gavilan Resources HoldCo, LLC (f/k/a Aguila Production HoldCo, LLC).

"Included Percentage" has the meaning set forth in Section 4.5(a).

"Included Sale Transaction Area" has the meaning set forth in Section 4.5(a).

"Initial Approved Operations" has the meaning set forth in Section 3.7(a).

"Initial Budget and Work Plan" has the meaning set forth in Section 3.7(a).

"IPO" has the meaning set forth in Section 4.4.

"IPO Notice" has the meaning set forth in Section 4.4.

"IPO Party" has the meaning set forth in Section 4.4.

"Joint Exploration Agreement" means the Joint Exploration Agreement, dated to be effective as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended from time to time.

"Laws" means all federal, state and local statutes, laws (including common law), rules, regulations, codes, orders, ordinances, licenses, writs, injunctions, judgments, subpoenas, awards and decrees and other legally enforceable requirements enacted, adopted, issued or promulgated by any Governmental Authority.

"Leases" means, collectively, the oil, gas and mineral leases and subleases, royalties, overriding royalties, net profits interests, carried and convertible interests, and other rights included in the term "Leases" as used in the Purchase Agreement.

“Liabilities” means, as to any Person, all liabilities and obligations of such Person, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect, absolute, fixed or contingent, and whether or not required to be considered pursuant to GAAP.

“Lien” shall have the meaning ascribed to “Encumbrance” in the Purchase Agreement.

“Limited Restricted Zone” means, for each Existing Producing Well, two overlapping three dimensional areas, each in the shape of a rectangular prism, defined by the following: (i) the rectangular subsurface zone extending perpendicularly (A) 600 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 90 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well; and (ii) the rectangular subsurface zone extending perpendicularly (A) 275 feet on the horizontal plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well and (B) 150 feet on the vertical plane in either direction from any part of the perforated interval of the wellbore of such Existing Producing Well.

“Limited Spacing Restrictions” has the meaning set forth in Section 5.3(a)(iv).

“Losses” mean means any liabilities, losses (including first party losses), fines, penalties, interest, damages, costs, expenses (including expenses of actions, amounts paid in connection with any assessments, judgments or settlements relating thereto, interest and penalties recovered by a Third Party with respect thereto and out-of-pocket expenses and reasonable attorneys’ fees, experts’ fees and expenses reasonably incurred in defending against any such action) arising from or related to an injury, illness, death, property damage, property loss or environmental pollution or contamination, and any other costs associated with control, removal, restoration and cleanup of pollution or contamination.

“Material Contracts” means any contract related to E&D Operations or S&A Operations or otherwise relating to the Assets, including drilling and completion agreements, gathering agreements, processing agreements, transportation agreements, supply agreements, disposal agreements, electric supply agreements or marketing or sales agreements, in each case which individually, or with respect to any series of related contracts, are worth more than $1,000,000; provided, however, that contracts which are contemplated by any marketing agreements by and between SN or UnSub, as applicable, or any of their Affiliates, on the one hand, and Blackstone and any of its Affiliates, on the other hand, shall not be deemed Material Contracts hereunder.

“Monthly Invoice” has the meaning set forth in Section 3.7(d).

“Moody’s” means Moody’s Investors Service, Inc. and any successor thereto.

“Negligent Operator Action” has the meaning set forth in Section 3.8(f).

“Non-Defaulting Party” has the meaning set forth in Section 3.9(a).

“Non-Initiating Party” has the meaning set forth in Section 4.2(a).

"Non-IPO Party" has the meaning set forth in Section 4.4.

"Non-Transferring Party" has the meaning set forth in Section 4.1(a).

"Objection Notice" has the meaning set forth in Section 7.12(c).

"Operating Agreement" means any Joint Operating Agreement for any of the Leases and, to the extent applicable, the Joint Exploration Agreement and Participation Agreement as it may relate to a Party's ownership of any interest in a Lease.

"Operating Committee" has the meaning set forth in Section 3.1.

"Operator" has the meaning set forth in Section 3.8(a).

"Operator Default Event" has the meaning set forth in Section 3.8(f).

"Participation Agreement" means that certain Maverick Basin Area Participation Agreement, dated effective January 1, 2011, by and between Anadarko and Eagle Ford TX LP.

"Parties" has the meaning set forth in the preamble.

"Party" has the meaning set forth in the preamble.

"Party Affiliate" has the meaning set forth in Section 7.14.

"Permitted Holders" means (a) Antonio R. Sanchez, III and A.R. Sanchez, Jr., (b) any spouse or descendant of any individual named in (a), or (c) any other natural person who is related to, or who has been adopted by, any such individual or such individual's spouse referenced in (a)-(b) above within the second degree of kinship, or (d) any Person Controlled, directly or indirectly, by any of the Persons referenced in clauses (a)-(c) above, individually or collectively by one or more of such Persons.

"Permitted Liens" has the meaning set forth in Section 4.1(a).

"Permitted Transferee" means, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person. For purposes of this Agreement, (i) Sanchez Production Partners LP and its Controlled Affiliates shall be deemed to be a Permitted Transferee of SN, except with respect to Section 4.2 for which purposes Sanchez Production Partners LP and its Controlled Affiliates shall not be deemed to be a Permitted Transferee of Sanchez, (ii) Permitted Holders shall be a Permitted Transferee of SN; and (iii) SN and SN UnSub shall each be treated as a Permitted Transferee of each other.

"Person" means any individual or entity, including any corporation, limited liability company, partnership (general or limited), joint venture, association, joint stock company, trust, unincorporated organization or Governmental Authority.

"Post-Division Non-Operator" has the meaning set forth in Section 3.8(e)(i).

"Post-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Pre-Division Operator" has the meaning set forth in Section 3.8(e)(i).

"Preferred Units" has the meaning give to such term in the SN UnSub Partnership Agreement.

"Proposed Modifications" has the meaning set forth in Section 5.3(e)(i).

"Proposed Sale" has the meaning set forth in Section 4.2(a).

"Proposed Transferee" has the meaning set forth in Section 4.2(a)(i).

"Purchase Agreement" has the meaning set forth in the recitals.

"Qualified Foreclosure Transfer" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee" has the meaning set forth in Section 4.1(b).

"Qualified Foreclosure Transferee Representative" has the meaning set forth in Section 3.3(a)(ii).

"Quorum" has the meaning set forth in Section 3.5(a).

"Redemption Date" means the date of redemption of all outstanding Preferred Units in cash under the SN UnSub Partnership Agreement, as such agreement may be amended from time to time, issued as of the Effective Date pursuant to that certain Securities Purchase Agreement dated as of January 12, 2017, by and among Sanchez Energy, SN UR Holdings, LLC, a Delaware limited liability company; SN EF UnSub Holdings, LLC, a Delaware limited liability company; SN UnSub; SN EF UnSub GP, LLC, a Delaware limited liability company; GSO ST Holdings Associates LLC, a Delaware limited liability company; and GSO ST Holdings LP, a Delaware limited partnership.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the date hereof, by and between HoldCo and Sanchez Energy.

"Representative" has the meaning set forth in Section 3.1.

"Required Operatorship Consents" has the meaning set forth in Section 3.8(e)(ii).

"Required Return Sum" has the meaning set forth in Section 4.5(h).

"Reserve Auditor" has the meaning set forth in Section 3.8(e)(i).

"ROFO Interests" has the meaning set forth in Section 4.3(a).

"ROFO Notice" has the meaning set forth in Section 4.3(a)

"ROFO Offer" has the meaning set forth in Section 4.3(a).

"ROFO Recipient" has the meaning set forth in Section 4.3(a).

"ROFO Transferor" has the meaning set forth in Section 4.3(a).

"S&A Operations" means any and all activities and operations associated with development and operation of the Assets other than E&D Operations, including, without limitation, procurement, construction, and operation of non-wellsite surface facilities such as water supply, storage, gathering and disposal facilities; electric power facilities; lease roads, frac ponds, and central tank batteries; gathering, treating, compression, dehydration, stabilization, and fractionation facilities; in each case, insofar as such operations are not otherwise dedicated to third-parties pursuant to existing contractual commitments burdening the Assets.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and any successor thereto.

"Sale Transaction" has the meaning set forth in Section 4.5(a).

"Sale Transaction Agreement" has the meaning set forth in Section 4.5(d).

"Sale Transaction Equitable Partition" has the meaning set forth in Section 4.5(a).

"Sale Transaction Transferee" has the meaning set forth in Section 4.5(a).

"Sanchez Energy" means Sanchez Energy Corporation, a Delaware corporation, or for purposes of Section 4.3, any issuer of SN Common Stock.

"Sanchez Operator" has the meaning set forth in Section 3.8(a).

"Sanchez Representative" has the meaning set forth in Section 3.3(a)(ii).

"SN" has the meaning set forth in the preamble.

"SN Common Stock" means shares of common stock of Sanchez Energy, par value $0.01 per share, and any class of stock or other securities resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any liquidation, dissolution or winding up of Sanchez Energy, and any shares or other securities issued in respect of SN Common Stock in connection with any exchange for or replacement of such shares of SN Common Stock, recapitalization, merger, consolidation, conversion or similar transaction.

"SN Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"SN Equity Financed Offer" has the meaning set forth in Section 4.3(a).

"SN Operatorship Rights" has the meaning set forth in Section 4.5(a).

"SN UnSub" has the meaning set forth in the preamble.

"SN UnSub Partnership Agreement" means that certain Amended and Restated Agreement of Limited Partnership of SN UnSub, dated as of the Effective Date.

"SN UnSub GP LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement of SN EF UnSub GP, LLC, dated as of the Effective Date.

"Specified Credit Agreement" means if Operator is (i) SN, the SN Credit Agreement, (ii) BX, the BX Credit Agreement, or (iii) a Third Party, a Third Party Credit Agreement.

"Specified Event of Default" means an Event of Default as such may be defined from time to time under a Specified Credit Agreement, and as a result of such Event of Default, Operator's obligations thereunder have been accelerated prior to their stated maturity and the obligations which have been so accelerated exceed $20,000,000.

"Subsequent Approved Operations" has the meaning set forth in Section 3.7(b)(ii) and Section 3.7(c).

"Subsequent Budget and Work Plan" has the meaning set forth in Section 3.7(b)(i).

"Subsequent Proposed Operations" has the meaning set forth in Section 3.7(b)(i).

"Tag-Along Notice" has the meaning set forth in Section 4.2(a).

"Tag-Along Offer" has the meaning set forth in Section 4.2(b).

"Tag-Along Transaction" has the meaning set forth in Section 4.2(b).

"Tag Interests" has the meaning set forth in Section 4.2(b).

"Test Wells" has the meaning set forth in Section 5.3(e)(i).

"Third Party" means any Person other than a Party or one of their Affiliates or a Permitted Holder.

"Third Party Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Third Party Operator" has the meaning set forth in Section 3.8(f).

"Transfer" (including its derivatives and similar terms) means, with respect to an Asset Interest, a direct or indirect, voluntary or involuntary, sale, assignment, transfer, conveyance,

exchange, bequest, devise, gift or any other alienation, including, except to the extent constituting Permitted Liens, any pledge or grant of a security interest (in each case, with or without consideration and whether by operation of Law or otherwise, including, by merger or consolidation) of any rights, interests or obligations with respect to all or any portion of such Asset Interest.

"Transferring Party" has the meaning set forth in Section 4.1(a).

"True-Up Amount" has the meaning set forth in Section 3.7(d).

"Unanimous Consent" means (x) the affirmative vote of all of the Representatives of a Party not then in Default in attendance at a duly called and convened meeting of the Operating Committee, which for the avoidance of doubt (assuming no Party is in Default) shall include the affirmative vote of at least one (1) Sanchez Representative appointed by SN, at least one (1) Blackstone Representative, and, either (1) Sanchez Representative appointed by SN UnSub or, if applicable, the Qualified Foreclosure Transferee Representative, or (y) the affirmative written consent in lieu of a meeting executed by all of the Representatives of Parties not in Default then constituting the Operating Committee.

"UnSub Agent" has the meaning set forth in the definition of "Default Notice".

"UnSub Credit Agreement" has the meaning set for in the definition of "Applicable Credit Agreement."

"Valuation Firm" has the meaning set forth in Section 4.5(f).

"VDR" has the meaning set forth in Section 5.1(b).

"Wellpads" means, collectively, the Existing Wellpads and the Future Wellpads.

"Working Interest" means with respect to any lease or well or wellpad relating to the Assets, the fractional interest in and to such lease, well or wellpad that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in connection with such lease or well.

* * *

**Annex II**
**Representatives**

**Sanchez Representatives:**
Tony Sanchez III
Eduardo Sanchez
Chris Heinson

**Blackstone Representatives:**
Angelo Acconcia
Gary Levin
Dave Roberts

**Annex III**
**Working Interests**

(*see attached*)

---

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRIDGE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| JEANNE E LUFKIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | | [illegible] | [illegible] |
| BETTY J THOM | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] PRITCHETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| BOTTOM INVESTMENT COMPANY LTD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| VICTORIA TRADING COMPANY LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBERT T [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] OIL COMPANY LLC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] FAMILY LIMITED PARTNER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| JUDY [illegible] THOM JONES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| JAMES A THOM | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| BETTY LOU GLADEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| SANDRA L [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| LAURIE A BURBANK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| WILLIAM A PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| SCOTT EDWARD RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] PHILLIPS MORGAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| JAMES J PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| MARGARET [illegible] MATTHEWS REVOCABLE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| RONALD D RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| PHILLIP A RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| APRIL F ELLIOTT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| MARY SUE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| CYNTHIA M PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| DONALD E PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| LOIS M PHILLIPS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBERT A RUFF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| KATHLEEN J [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | [illegible] | [illegible] | [illegible] | [illegible] |
| [redacted] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cu Net | WI | [illegible] | [illegible] | [illegible] | Current Depths 8/1/2018 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BOY SCOUTS OF AMERICA | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| EPISCOPAL FOUNDATION OF TEXAS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| SALVATION ARMY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BARBARA C MARTIN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SOUTH SPUR LP | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Release | Y | [illegible] | [illegible] | [illegible] |
| ELIZABETH L SIMMONS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES ARTHUR [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH DANIEL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOLPH BRISCOE III ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Lack of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| THE SOUTH TEXAS CHILDRENS HOME | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | Lack of Description [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO KATHARINE MARSHALL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| MARY MARSHALL SMITH TRUST FBO MARGARET M [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] JR ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| LLOYD B PORTER | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| ERIN BAIN JONES | SUN OIL COMPANY | [illegible] | [illegible] | TX | Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| JOHN B BAGGETT ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit Zavala | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | | N | [illegible] | [illegible] | [illegible] |
| DOYLE STANDIFER ET UX | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |
| MINNIE HELEN [illegible] | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Release | N | [illegible] | [illegible] | [illegible] |
| G A BOYD ET AL | SUN OIL COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Austin Chalk | Survey? | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 4/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MARILYN D HAGGERSON ET AL | SUN OIL COMPANY | 05/13/1968 | 05/13/1974 | TX | Dimmit | 164.710 | 82.355 | 54.903 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 37 | 114750 |
| L STREACH ET AL | SUN OIL COMPANY | 03/13/1969 | 03/13/1974 | TX | Dimmit | 164.710 | 82.355 | 54.903 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 182 | 114780-A |
| LILLIAN SPEARS ET AL | SUN OIL COMPANY | 06/19/1969 | 06/19/1974 | TX | Dimmit | 41.250 | 41.250 | 27.500 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 356 | 114780 |
| RUTH W HOLLINGSHEAD ET AL | SUN OIL COMPANY | 06/04/1969 | 06/04/1974 | TX | Dimmit | 82.750 | 82.750 | 55.167 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 359 | 114777 |
| JAMES T MINS | SUN OIL COMPANY | 09/16/1968 | 09/16/1978 | TX | Dimmit | 15.060 | 15.060 | 10.040 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 463 | 114828 |
| DOLORES SEDLOCK ET VIR | SUN OIL COMPANY | 09/16/1969 | 09/16/1974 | TX | Dimmit | 41.420 | 41.420 | 27.613 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 29 | 10 | 114827 |
| ALFRED H CROCKETT | SUN OIL COMPANY | 08/28/1970 | 08/22/1975 | TX | Dimmit | 43.870 | 21.935 | 14.623 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 31 | 340 | 895 |
| LARRY D [illegible] | SUN OIL COMPANY | 08/26/1970 | 08/26/1975 | TX | Dimmit | 22.100 | 22.100 | 14.733 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 31 | 404 | 841 |
| AUDREY HAWKINS ET AL | SUN OIL COMPANY | 09/01/1970 | 09/01/1978 | TX | Dimmit | 26.100 | 4.374 | 2.916 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 33 | 320 | 1777 |
| PAUL S [illegible] ET UX | SUN OIL COMPANY | 11/15/1971 | 11/15/1976 | TX | Dimmit | 26.160 | 1.458 | 0.972 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 35 | 184 | 1997 |
| MARY M [illegible] | SUN OIL COMPANY | 04/14/1971 | 04/14/1976 | TX | Dimmit | 3.760 | 2.760 | 1.840 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 147 | 136 | 775 |
| CHARLES B NICHOLS SR ET UX | SUN OIL COMPANY | 04/21/1971 | 04/21/1976 | TX | Dimmit | 86.125 | 20.463 | 13.642 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Survey? | N | 37 | 257 | 108884 |
| LOLA B [illegible] ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/24/1988 | 06/24/1991 | TX | Dimmit Zavala | 353.090 | 353.090 | 235.393 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | interests/Survey? | N | 97 98 | 247 125 | 1886 46827 |
| A M PRICE ET UX | THE SUPERIOR OIL COMPANY | 02/17/1969 | 02/17/1979 | TX | Dimmit | 720.000 | 720.000 | 480.000 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | Release | N | 29 | 799 | 116410 |
| JOHN F ROBERTSON | SUN OPERATING LIMITED PARTNERSHIP | 05/02/1988 | 06/30/1994 | TX | Zavala | 162.400 | 162.400 | 108.267 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | 14 | [illegible] |
| ROY L BROWN III | SUN OPERATING LIMITED PARTNERSHIP | 06/14/1989 | 06/14/1994 | TX | Zavala | 31.150 | 56.926 | 37.984 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | 68 | 48151 |
| MARTHA W BAILEY | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/29/1994 | TX | Zavala | 31.100 | 12.177 | 8.118 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | 65 | 48150 |
| FRED L JOHNSTON JR ET AL | SUN OPERATING LIMITED PARTNERSHIP | 06/19/1989 | 06/29/1994 | TX | Zavala | 31.100 | 12.177 | 8.118 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 57 | 76 | 48144 |
| BETTY SUE PRICE OFFNER ET VIR | FOX AND HOLLAND | 02/08/1981 | 02/05/1987 | TX | Dimmit | 1221.510 | 407.183 | 271.456 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 82 | 664 | |
| ROBERT PRICE ET UX | FOX & HOLLAND | 02/08/1981 | 02/05/1987 | TX | Dimmit | 1221.510 | 407.183 | 271.456 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 82 | 672 | 646 |
| DAVID RAAY PRICE [illegible] ET VIR | FOX & HOLLAND | 02/08/1981 | 02/05/1987 | TX | Dimmit | 1221.510 | 407.183 | 271.456 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 82 | 678 | |
| L L TAYLOR | ROBERT C SINCLAIR | 04/01/1975 | 04/01/1980 | TX | Dimmit | 44.100 | 44.100 | 1.213 | 0.02750000 | 0.00550000 | 0.00825000 | 0.01375000 | Below Austin Chalk | Survey? | N | 33 | 122 | 800080 |
| NALDA M OLSON ET AL | ROBERT C SINCLAIR | 04/14/1975 | 04/14/1978 | TX | Dimmit | 50.460 | 50.460 | 8.423 | 0.55520081 | 0.01100000 | 0.01650000 | 0.02750000 | Below Austin Chalk | | N | 30 | 460 | 800044 |
| WALTER SCOTT LIGHT | LIGHTNING OIL COMPANY | 01/01/1970 | 01/01/1980 | TX | Dimmit | 121.880 | 121.880 | 1.909 | 0.10500000 | 0.01100000 | 0.01100000 | 0.01250000 | Below Austin Chalk | | N | 30 | 270 | 225 |
| SAL ALVAY ARMSTRONG | J W DOAK | 09/16/1970 | 09/16/1975 | TX | Dimmit | 7.500 | 7.500 | 5.000 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 30 | 486 | 466 |
| ERIN [illegible] | W W [illegible] | 09/11/1970 | 09/11/1975 | TX | Dimmit | 881.000 | 881.000 | 854.000 | 0.66666666 | 0.13333333 | 0.20000000 | 0.13333333 | Below Austin Chalk | | N | 31 | 180 | 4456 |
| BROCKE RANCH INC | ANADARKO E&P COMPANY LP | 10/15/2010 | 10/15/2013 | TX | Webb | 13127.840 | 13031.384 | 9116.492 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | amendment | Y | 2134 | 707 | 860211 |
| BROOKS FOUNDATION ET AL | EDWARD G VAUGHAN | 12/01/2000 | 11/30/2010 | TX | Dimmit | 8000.000 | 4000.000 | 2,000.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 378 | 494 | 7578 |
| BROOKS RANCH INC | EDWARD G VAUGHAN | 12/01/2000 | 11/30/2010 | TX | Dimmit | 8000.000 | 4,000.000 | 2,000.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 128 | 394 | 7561 |
| BROOKS [redacted] ET AL | EDWARD G VAUGHAN | 12/01/2000 | 11/30/2010 | TX | Dimmit | 773.000 | 11,588.035 | 5,784.018 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 440 329 | 731 467 | 79160 7578 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Ext. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Dimmit LaSalle | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] ET AL | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] FIRST BAPTIST CHURCH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RANDALL J [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JO ANN SNOW | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| JANET LOUISE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| PATRICIA MCALLISTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KENNETH M BRIGGS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 2.271 | 0.757 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| RICHARD E BRIGGS ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| BECKY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CONLEY EUGENE [illegible] ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| CHERYL LYNN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| JAMES SCOTT DURDEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| CHAD ALAN DURDEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | Survey/Unit | N | [illegible] | [illegible] | [illegible] |
| KAREN RENEE HALL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | Survey/Unit | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | EDWARD G VAUGHAN | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Olmos | ?????? | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Olmos | partial assn | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Olmos | partial assn | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Webb Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below Olmos | | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick Webb | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |
| WESLEY WEST MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Maverick | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | Eagle Ford Only | acres released | Y | [illegible] | [illegible] | [illegible] |

Items highlighted in yellow were excluded from the Closing because the relevant consent was not obtained.

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Tx Net | WI | Unsub WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments Art. 4 Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CASE MINERALS LTD ET AL | ANADARKO E&P COMPANY LP | 05/21/2008 | [illegible] | TX | Maverick Dimmit Webb | 4564.721 | 4,278.428 | 1,1[illegible]8.7[illegible] | [illegible] | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | across released | Y | 2779 385 1791 | 419 464 132 | 147391 [illegible] [illegible] |
| DOUGLAS M HAMDER PUGH ET AL | ANADARKO E&P COMPANY LP | [illegible] | 02/03/2014 | TX | Maverick Dimmit Webb | 4564.721 | 287.295 | 142.648 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | across released | Y | 1139 401 [illegible] | 102 367 543 | 164629 [illegible] [illegible] |
| DIAMOND H RANCHES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | TX | Dimmit | 7800.074 | 7,760.074 | 1,940.037 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | partial assn [illegible] | N | 344 | 8 | 8540 |
| SARA CAROLINE SPENCE | ANADARKO E&P COMPANY LP | 07/20/2008 | 07/20/2018 | TX | Dimmit | 40.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 392 | 478 | 15989 |
| JOHN CALHOUN MOORE | ANADARKO E&P COMPANY LP | 04/03/2012 | 04/03/2018 | TX | Dimmit | 40.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 419 | 490 | 13612 |
| WILLIAM A BENHOFF JR FAMILY LTD | ANADARKO E&P COMPANY LP | 03/06/2008 | 03/06/2011 | TX | Dimmit | 4222.553 | 4,222.553 | 1,407.184 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Below San Miguel | released | Y | 340 | 590 | 8504 |
| FITZSIMONS OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P COMPANY LP | 12/22/2008 | 12/22/2008 | TX | Dimmit Maverick | 52294.310 | 47,808.058 | 11,954.079 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 332 1612 | 444 327 | 7648 145803 |
| R WARD ENTERPRISES LIMITED PARTNERSHIP | ANADARKO E&P COMPANY LP | 08/20/2009 | 08/20/2009 | TX | Dimmit | 8109.480 | 1,558.415 | 928.218 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 344 | 1 | 8535 |
| LA BANDERA RANCH LP | ANADARKO E&P COMPANY LP | 08/25/2008 | 08/25/2009 | TX | Dimmit | 8109.482 | 1,938.446 | 969.213 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 345 | 644 | 9538 |
| DONNA RUTH RAMSEY | ANADARKO E&P COMPANY LP | 12/08/2012 | 12/08/2017 | TX | Dimmit | 14.400 | 7.200 | 1.600 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 429 | 61 | 21796 |
| KATHLEEN FITZSIMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | TX | Dimmit | 240.000 | 104.250 | 78.125 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 430 | 773 | 22088 |
| JACKSON BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2012 | 01/17/2021 | TX | Dimmit | 345.000 | 57.083 | 28.042 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | Y | 432 | 766 | 22807 |
| SARAH JANE HENDERSON [illegible] | ANADARKO E&P ONSHORE LLC | 03/26/2013 | 03/26/2018 | TX | Dimmit | 10.000 | 0.500 | 0.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 475 | 515 | 28085 |
| RALPH EDWIN HENDERSON JR | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 10.000 | 0.500 | 0.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 470 | 617 | 28346 |
| CHARLES LEONARD HENDERSON | ANADARKO E&P ONSHORE LLC | 03/28/2013 | 03/28/2018 | TX | Dimmit | 10.000 | 0.500 | 0.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 471 | 1 | 28827 |
| CARL DAVID HENDERSON | ANADARKO E&P ONSHORE LLC | 03/26/2013 | 03/26/2018 | TX | Dimmit | 10.000 | 0.500 | 0.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 470 | 629 | 28259 |
| BRUCE HARRISON HENDERSON | ANADARKO E&P ONSHORE LLC | 03/26/2013 | 03/26/2018 | TX | Dimmit | 10.000 | 0.500 | 0.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 471 | 7 | 28688 |
| ST TX MF 107889 & DIAMOND H RANCHES LP | ANADARKO E&P COMPANY LP | 05/14/2007 | 05/14/2010 | TX | Dimmit | 1808.500 | 1,808.500 | 904.250 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | Y | 236 | 239 | 8251 |
| WILLIAM WEST LLOYD ET AL | ANADARKO E&P COMPANY LP | 06/09/2008 | 12/31/2013 | TX | Maverick Webb | 411.407 | 155.719 | 87.860 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | across released | Y | 1092 2139 | 98 560 | 149133 [illegible] |
| BRISCOE RANCH INC | ANADARKO E&P COMPANY LP | 06/10/2008 | 03/19/2010 | TX | Maverick Webb | 311.407 | 155.719 | 77.858 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Eagle Ford Only | across released | Y | 1073 344 | 99 239 | 147023 15488 |
| ROGERS LEBSTONE RANCH LTD | ANADARKO E&P COMPANY LP | 03/06/2008 | 03/06/2011 | TX | Dimmit | 7245.108 | 6,354.085 | 2,118.028 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Below San Miguel | [illegible] | Y | 344 | 80 | 8530 |
| LOLA WRIGHT FOUNDATION | ANADARKO E&P COMPANY LP | 06/14/2011 | 06/14/2014 | TX | Dimmit | 30.000 | 15.300 | 5.050 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Surface to base of Eagle Ford | | N | 423 | 89 | 22796 |
| ROSEN FAMILY TRUST | ANADARKO E&P COMPANY LP | 03/22/2017 | 03/22/2020 | TX | Dimmit | 20.000 | 8.000 | 2.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 446 | 64 | 24489 |
| AUDREY JA SCOTT BOUN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 435 | 478 | 23607 |
| SARAH JEAN SCOTT BURKE | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 439 | 674 | 23608 |
| THOMAS GLEN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 439 | 682 | 23609 |
| TRISH MARIE SCOTT PERCIVAL | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2021 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 439 | 670 | 23605 |

007300

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Ex Net | WI | Unsub WI | SN WI | Sanchez WI | Current Depths 3/1/2016 | Comments Alt. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RALPH H GLENN | ANADARKO E&P COMPANY LP | 04/18/2012 | 04/18/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 511 | 25290 |
| AUDREY G BAILEY | ANADARKO E&P COMPANY LP | 05/29/2012 | 05/29/2015 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 451 | 121 | 25849 |
| KENNETH A MCBRIDE ET AL | ANADARKO E&P ONSHORE LLC | 08/11/2014 | 08/11/2016 | TX | Dimmit | 10.000 | 2.500 | 0.833 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 204 | 11491 |
| GLADYS ELAINE [illegible] | ANADARKO E&P ONSHORE LLC | 06/16/2012 | 06/16/2015 | TX | Dimmit | 10.000 | 0.833 | 0.278 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 209 | 11481 |
| CLAUDE F MAGEE | ANADARKO E&P ONSHORE LLC | 06/26/2013 | 06/26/2015 | TX | Dimmit | 10.000 | 0.833 | 0.278 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 212 | 11493 |
| BRIAN K MAGEE | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2016 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 216 | 11494 |
| JANE ANN SHAW | ANADARKO E&P ONSHORE LLC | 09/01/2013 | 09/01/2016 | TX | Dimmit | 40.000 | 20.000 | 6.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 518 | 11501 |
| JESSICA DAWN HERNDON | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2018 | TX | Dimmit | 10.000 | 0.417 | 0.139 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 50e | 77 | 12300 |
| MAURO FAMILY LIMITED PARTNERSHIP ET AL | ANADARKO E&P COMPANY LP | 01/06/2006 | 01/06/2011 | TX | Dimmit | 3627.183 | 3,557.400 | 1,185.877 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Below San Miguel | | Y | 343 | 694 | 3853 |
| LAWRENCE MCDANIEL GATES | ANADARKO E&P COMPANY LP | 06/01/2010 | 06/01/2017 | TX | Dimmit | 70.000 | 1.094 | 0.365 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 372 | 375 | 16062 |
| SHAUNA LOIS GATES BELL | ANADARKO E&P COMPANY LP | 07/11/2010 | 07/11/2020 | TX | Dimmit | 70.000 | 1.094 | 0.365 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 372 | 790 | 16246 |
| KAREN H GATES FIELDS | ANADARKO E&P COMPANY LP | 08/02/2010 | 08/02/2020 | TX | Dimmit | 70.000 | 1.094 | 0.365 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 381 | 681 | 16263 |
| MARCUS SMITH | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | TX | Dimmit | 70.000 | 4.375 | 1.458 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 381 | 399 | 16287 |
| PATRICIA PYATT [illegible] | ANADARKO E&P COMPANY LP | 08/16/2010 | 08/16/2018 | TX | Dimmit | 70.000 | 8.750 | 2.917 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 386 | 529 | 16586 |
| GEORGE F [illegible] | ANADARKO E&P COMPANY LP | 07/28/2010 | 07/28/2020 | TX | Dimmit | 70.000 | 2.188 | 0.729 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 390 | 122 | 16944 |
| JAY M GATES II | ANADARKO E&P COMPANY LP | 07/21/2010 | 07/21/2020 | TX | Dimmit | 70.000 | 1.094 | 0.365 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 395 | 528 | 16966 |
| [illegible] PATTERSON ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/29/2012 | 07/29/2017 | TX | Dimmit | 40.000 | 20.000 | 6.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 420 | 754 | 20412 |
| LUCILLE J [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/26/2012 | 07/26/2017 | TX | Dimmit | 10.000 | 5.000 | 1.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 420 | 757 | 20413 |
| DENNIS PAT [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 07/26/2012 | 07/26/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 420 | 761 | 20411 |
| HAROLD [illegible] ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2012 | 08/24/2020 | TX | Dimmit | 80.000 | 20.000 | 6.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 426 | 600 | 21449 |
| MARIE FRITZ SCHOONOVER ET AL RECEIVERSHIP | ANADARKO E&P COMPANY LP | 08/24/2012 | 08/24/2016 | TX | Dimmit | 70.000 | 13.125 | 4.375 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 426 | 577 | 21448 |
| LILLIE W BOYD ET AL | ANADARKO E&P COMPANY LP | 08/24/2012 | 08/24/2014 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 429 | 841 | 21886 |
| ROBERT [illegible] | ANADARKO E&P COMPANY LP | 01/12/2012 | 01/12/2016 | TX | Dimmit | 20.000 | 8.000 | 2.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 440 | 70 | 25500 |
| [illegible] LEE [illegible] | ANADARKO E&P COMPANY LP | 08/23/2012 | 08/23/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 456 | 630 | 28275 |
| JONATHAN MYERS | ANADARKO E&P ONSHORE LLC | 11/14/2014 | 11/14/2016 | TX | Dimmit | 10.000 | 0.278 | 0.093 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 509 | 736 | 02601 |
| JAMES MYERS | ANADARKO E&P ONSHORE LLC | 12/10/2014 | 12/10/2018 | TX | Dimmit | 10.000 | 0.278 | 0.093 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 509 | 734 | 02600 |
| BRENDA M LOPEZ | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2015 | TX | Dimmit | 10.000 | 0.278 | 0.093 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 500 | 741 | 02867 |
| R L STANLEY LTD | ST MARY LAND & EXPLORATION COMPANY | 10/16/2008 | 10/16/2013 | TX | Webb | 4463.038 | 4,463.038 | 1,341.795 | 0.30000000 | 0.30000000 | 0.10000000 | 0.20000000 | Surface to Base of Eagle Ford | | Y | 2672 | 188 | 1022807 |
| BRISCOE RANCH INC | ST MARY LAND & EXPLORATION COMPANY | 10/01/2008 | 12/01/2013 | TX | Webb | 3673.660 | 3,327.640 | 1,109.213 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | Below Olmos Base | | Y | 2568 | 441 | 1027036 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths [illegible] | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ST MARY LAND & EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | CHESAPEAKE EXPLORATION LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to 100' below depth drilled Eagle Ford | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ST MARY LAND AND EXPLORATION COMPANY | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

007302

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | RI | Unitholder WI | SIV WI | Gastar WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

Case 4:23-cv-04508 Document 13-5 Filed on 04/19/23 in TXSD Page 1516 of 1882

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unleased WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments Ad. a Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARPENTER LAND MANAGEMENT COMPANY | ANADARKO E&P COMPANY LP | 10/14/2011 | 10/13/2016 | TX | Dimmit | 40.000 | 1.500 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 428 | 531 | [illegible] |
| LOCKEDBURG FIRST UNITED METHODIST CHURCH | ANADARKO E&P COMPANY LP | 09/04/2011 | 09/04/2016 | TX | Dimmit | 40.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 423 | [illegible] | [illegible] |
| NORMA [illegible] RICE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWIN HARRISON | ANADARKO E&P COMPANY LP | 01/03/2012 | 01/03/2017 | TX | Dimmit | 40.000 | 0.140 | 0.070 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | 714 | [illegible] |
| HAROLD HARRISON | ANADARKO E&P COMPANY LP | 01/03/2012 | 01/03/2017 | TX | Dimmit | 40.000 | 0.140 | 0.070 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SMITH | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.140 | 0.070 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON CHANEY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.417 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA SUE WILLIAMS [illegible] TRUST | ANADARKO E&P ONSHORE LLC | 06/27/2014 | 06/27/2016 | TX | Dimmit | 40.000 | [illegible] | 1.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] E STUART | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.270 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DONALD K MARTIN | ANADARKO E&P ONSHORE LLC | 04/12/2013 | 04/12/2016 | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.069 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY A MCLEOD | ANADARKO E&P ONSHORE LLC | 04/13/2013 | 04/13/2016 | TX | Dimmit | 40.000 | 0.069 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE L MCLEOD | ANADARKO E&P ONSHORE LLC | 04/14/2013 | 04/14/2016 | TX | Dimmit | 40.000 | 0.069 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EVELYN G [illegible] | ANADARKO E&P ONSHORE LLC | 05/01/2013 | 05/01/2016 | TX | Dimmit | 40.000 | 0.832 | 0.416 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VICKI L SMITH | ANADARKO E&P ONSHORE LLC | 05/15/2013 | 05/15/2016 | TX | Dimmit | 40.000 | 0.277 | 0.139 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RUTH C STUART | ANADARKO E&P ONSHORE LLC | 05/13/2013 | 05/13/2016 | TX | Dimmit | 40.000 | 0.277 | 0.139 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| VIRGINIA MAE ALEXANDER | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | TX | Dimmit | 40.000 | 0.166 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD [illegible] | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 40.000 | 0.166 | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA L LANE | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KENNETH T GREEN | ANADARKO E&P ONSHORE LLC | 01/26/2014 | 01/26/2017 | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY J GREEN | ANADARKO E&P ONSHORE LLC | 04/04/2014 | 04/04/2017 | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| KATHLEEN [illegible] SUSAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | 0.[illegible] | 0.[illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] BRASHEAR | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 40.000 | 0.111 | 0.056 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARY L GREEN | ANADARKO E&P ONSHORE LLC | 01/21/2014 | 01/21/2017 | TX | Dimmit | 40.000 | 0.111 | 0.056 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] JAMES BARKSDALE JR | ANADARKO E&P ONSHORE LLC | 01/11/2014 | 01/11/2017 | TX | Dimmit | 40.000 | 0.333 | 0.167 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THELMA HOWELL | ANADARKO E&P ONSHORE LLC | 01/25/2014 | 01/25/2017 | TX | Dimmit | 40.000 | 0.333 | 0.167 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM MICHAEL PATTERSON | ANADARKO E&P ONSHORE LLC | 05/13/2014 | 05/13/2017 | TX | Dimmit | 40.000 | 0.333 | 0.167 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JO P TOPHAM | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2017 | TX | Dimmit | 40.000 | 0.333 | 0.167 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY SUZANNE PATTERSON BACK | ANADARKO E&P ONSHORE LLC | 05/11/2014 | 05/11/2017 | TX | Dimmit | 40.000 | 0.333 | 0.166 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 4/1/2016 | Comments Am. [illegible] Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | THE POWELL GROUP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN L [illegible] REVOCABLE TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | 1.922 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| CHARLES F [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| SHELBY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of [illegible] | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] M [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| PHYLLIS E [illegible] TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| R L SUTHERLAND II | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| JON L BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| JANET D VAN SANT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| JOSEPH I SPRINGMAN JR TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| BEATRICE F [illegible] MARCH [illegible] TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] D BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| JOHN F PETTIT JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |
| DAVID BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| BRENDA S BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] SPRINGMAN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| [illegible] BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| GEORGE J SPRINGMAN REVOCABLE TRUST [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| LEWIS E BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| DOROTHY [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| MELISSA MUNIZ | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| M SUZANNE [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| MARY B [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| MARILYN M CALVERT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| JAKE F BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| MARION BROWN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| KAREN [illegible] WOODY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TEXAS LAND AND MINERAL COMPANY LLC [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | [illegible] | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unsub WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments Art. x Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] | [illegible] | [illegible] | Current Depths 9/1/2016 | Comments Art. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ARTHUR LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RITA SUE SANDERS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALICE LANE COMPTON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GORDON WAYNE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RUBY LEE HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHERRI LYNN WEATHERHEAD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LEONARD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BILLY JACK GRAVES | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WALTER CHARLES HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MELINDA HARRIS WALKER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JEFFREY ALLEN HARRIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARY HELEN WINDHAM SEARS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILL ALSTON [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| DORIS R MONROE TRUST | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | N | [illegible] | [illegible] | [illegible] |
| WILL ALSTON [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| MARY EISENHARDT ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| WILL ALSTON [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| EVELYN I METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLEN RAY METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ALYCE KUEHLER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DONALD DITTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| PAUL A DITTEN ET UX | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| GLADYS LISTEN | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| FRANK VANCE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| MARY RUTH RICE | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| JACK JOHN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| CAROL JEAN MAYFIELD | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| LINDA KAY CARTER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| HARRY VANCE JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] PETERSON | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| IRENE DITTEN LEWIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH ANN METCALF | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths | [illegible] | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Eagle Ford Only | [illegible] | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co-Net | WI | Emilus WI | SN WI | Gastar WI | Current Depths 9/1/2016 | Comments Act & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

007310

| [illegible] | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co. Net | WI | Unitized WI | UN WI | Sanchez WI | Current Depths 8/1/2016 | Comments/A.A. Descriptions | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JEANNINE URIAS | CHESAPEAKE EXPLORATION LLC | 04/04/2012 | 04/04/2015 | TX | Dimmit | 7.400 | 0.617 | 0.106 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 420 | 405 | 23401 |
| JOHN T BREED | CHESAPEAKE EXPLORATION LLC | 03/29/2012 | 03/29/2015 | TX | Dimmit | 7.400 | 0.617 | 0.206 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 420 | 407 | 23399 |
| KATHLEEN FITZSIMMONS LOVE ET AL | ANADARKO E&P COMPANY LP | 01/17/2013 | 01/17/2018 | TX | Dimmit | 30.000 | 7.500 | 4.780 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | 472 | 739 | 22089 |
| JOCELYN BENJAMIN LOVE JR | ANADARKO E&P COMPANY LP | 01/17/2013 | 01/17/2018 | TX | Dimmit | 10.000 | 2.500 | 1.280 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | 493 | 734 | 22086 |
| SOUTHWEST PETROLEUM COMPANY LP | ANADARKO E&P COMPANY LP | 06/29/2012 | 06/29/2018 | TX | Dimmit | 60.000 | 18.000 | 7.000 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | 445 | 644 | 24807 |
| F AND L PROPERTIES | ANADARKO E&P COMPANY LP | 06/28/2013 | 06/28/2015 | TX | Dimmit | 20.000 | 5.600 | 1.500 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | 445 | 654 | 24895 |
| BIG SKY MINERAL TRUST | ANADARKO E&P COMPANY LP | 06/29/2012 | 06/29/2019 | TX | Dimmit | 60.000 | 4.400 | 1.600 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | Y | 445 | 649 | 24848 |
| BARBARA J FARROW REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 07/10/2012 | 07/10/2015 | TX | Dimmit | 80.000 | 20.000 | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 452 | 847 | 25404 |
| HAL BERDOLL ET UX | ANADARKO E&P COMPANY LP | 08/01/2012 | 08/01/2014 | TX | Dimmit | 84.390 | 84.390 | 25.100 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | | N | 444 | 568 | 24452 |
| JANE NORTH LYON | ANADARKO E&P COMPANY LP | 04/30/2012 | 04/30/2015 | TX | Dimmit | 10.000 | 10.000 | 4.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 44C | 835 | 24041 |
| SHIRLEY ANN OSMOND | ANADARKO E&P COMPANY LP | 09/18/2013 | 09/18/2011 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 475 | 891 | 23812 |
| BURRIS A WORKMAN ET UX | ANADARKO E&P COMPANY LP | 01/24/2012 | 01/24/2013 | TX | Dimmit | 14.700 | 23.700 | 11.850 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 442 | 739 | 23401 |
| ANNE BETTS HERREN LIVING TRUST | ANADARKO E&P COMPANY LP | 04/27/2013 | 04/27/2016 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 448 | 74 | 33565 |
| HENRY PETER HILLEBRANDT | ANADARKO E&P COMPANY LP | 05/01/2013 | 05/01/2018 | TX | Dimmit | 15.000 | 10.000 | 5.000 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 435 | 466 | 23695 |
| JACK RICHARD FRITZ | ANADARKO E&P COMPANY LP | 08/31/2012 | 08/31/2018 | TX | Dimmit | 10.000 | 1.667 | 0.556 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 470 | 334 | 28162 |
| JEAN LUCILLE BELL | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 10.000 | 1.667 | 0.556 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 350 | 553 | 25161 |
| JOANN GRACE FRITZ LIFE TENANT | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2021 | TX | Dimmit | 10.000 | 0.556 | 0.185 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 475 | 344 | 28264 |
| BRADLEY STEPHEN FRITZ | ANADARKO E&P COMPANY LP | 08/31/2011 | 08/31/2021 | TX | Dimmit | 10.000 | 0.556 | 0.185 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 492 | 540 | 25311 |
| JULIE ANN FRITZ ALBERT | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2021 | TX | Dimmit | 10.000 | 0.556 | 0.185 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 443 | 575 | 26180 |
| MARGARET T JANSEN REVOCABLE TRUST | ANADARKO E&P COMPANY LP | 03/21/2012 | 03/21/2021 | TX | Dimmit | 10.000 | 5.000 | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 456 | 299 | 26310 |
| JOE S SHANNON | ANADARKO E&P COMPANY LP | 09/25/2012 | 09/25/2018 | TX | Dimmit | 10.000 | 10.000 | 3.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | 441 | 535 | 25806 |
| KATHRYN A CLARCH | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | TX | Dimmit | 107.600 | 0.300 | 0.200 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 496 | 606 | 16771 |
| DEBBIE GARDNER SILVESTRI | ANADARKO E&P COMPANY LP | 11/26/2012 | 11/26/2018 | TX | Dimmit | 107.600 | 1.750 | 0.875 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 496 | 661 | 16771 |
| HERBERT HOLLAND | ANADARKO E&P COMPANY LP | 08/21/2012 | 08/21/2018 | TX | Dimmit | 107.600 | 0.417 | 0.110 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 409 | 512 | 16712 |
| MAURICE R O'NEILL | ANADARKO E&P COMPANY LP | 10/16/2012 | 10/16/2018 | TX | Dimmit | 107.600 | 0.750 | 0.280 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 409 | 520 | 16726 |
| HELEN DAVIS HUTTO | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 107.600 | 1.111 | 0.444 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 485 | 524 | 16721 |
| GREGORY W MONTGOMERY | ANADARKO E&P COMPANY LP | 09/06/2012 | 09/06/2018 | TX | Dimmit | 107.600 | 0.417 | 0.123 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 444 | 530 | 16729 |
| JIMMY GARDNER | ANADARKO E&P COMPANY LP | 08/29/2012 | 08/29/2018 | TX | Dimmit | 107.600 | 5.254 | 2.627 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 409 | 518 | 16713 |
| LAWRENCE E O'NEILL | ANADARKO E&P COMPANY LP | 12/02/2012 | 12/02/2018 | TX | Dimmit | 107.600 | 0.700 | 0.190 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 402 | 690 | 16275 |
| NANCY A WILSON | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2018 | TX | Dimmit | 107.600 | 0.700 | 0.280 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | 485 | 699 | 16277 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Survey | [illegible] | [illegible] | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 6/1/2016 | Comments Act. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANNETTE DAVIS | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JOHN HOLLAND | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT L MONTGOMERY | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| FRED W DAVIS JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| BRUCE R GARDNER | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GARY M CLARK | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM H GARDNER JR | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY ELIZABETH [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| GAIL GARDNER LEVERETT | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| DAVID HOLLAND | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA VANDERVOORT | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SARAH VANDERVOORT [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] MINERALS LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY LILLIAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARY ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| VICKI ANN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| RAYMOND A [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Outside WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments Art. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CARROLL ROSS BURNS | ANADARKO E&P ONSHORE LLC | 09/02/2013 | 09/02/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WALT BARNHILL | ANADARKO E&P ONSHORE LLC | 08/19/2013 | 08/19/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| KAY SHOEMAKER | ANADARKO E&P ONSHORE LLC | 04/19/2013 | 04/19/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| COURTNEY JACKSON | ANADARKO E&P ONSHORE LLC | 10/11/2013 | 10/11/2016 | TX | Dimmit | 157.400 | 0.117 | 0.058 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBBIE E CLARK | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES L EWAN | ANADARKO E&P ONSHORE LLC | 08/26/2013 | 08/26/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL R WHAM | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| KELLI ANN WOOD | ANADARKO E&P ONSHORE LLC | 09/12/2013 | 09/12/2016 | TX | Dimmit | 157.400 | 0.700 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES D CHANDLER | ANADARKO E&P ONSHORE LLC | 09/16/2013 | 09/16/2016 | TX | Dimmit | 157.400 | 2.627 | 1.313 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JAMES PATRICK SAUNDERS | ANADARKO E&P ONSHORE LLC | 10/02/2013 | 10/02/2016 | TX | Dimmit | 157.400 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| LYNN ALEXANDRA WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/01/2013 | 09/01/2016 | TX | Dimmit | 157.400 | 0.117 | 0.058 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WRIGHT WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/03/2013 | 09/03/2016 | TX | Dimmit | 157.400 | 0.117 | 0.058 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JUAN W. MCDERMOTT | ANADARKO E&P ONSHORE LLC | 09/13/2013 | 09/13/2016 | TX | Dimmit | 157.400 | 0.700 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| E KENT FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT W FELDMAN | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| OLLIE E CLARK JR | ANADARKO E&P ONSHORE LLC | 09/06/2013 | 09/06/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM NEWTON ROBINSON | ANADARKO E&P ONSHORE LLC | 09/09/2013 | 09/09/2016 | TX | Dimmit | 157.400 | 2.627 | 1.313 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ESTATE OF ROBERT ALLEN BURNS | ANADARKO E&P ONSHORE LLC | 09/10/2013 | 09/10/2016 | TX | Dimmit | 157.400 | 1.313 | 0.657 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ERIN WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/07/2013 | 08/07/2016 | TX | Dimmit | 157.400 | 0.117 | 0.058 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER WALLACE WILLIAMS | ANADARKO E&P ONSHORE LLC | 10/12/2013 | 10/12/2016 | TX | Dimmit | 157.400 | 0.701 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| JACK VANDERVOORT WILLIAMS | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2016 | TX | Dimmit | 157.400 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ROBERT WRIGHT WILLIAMS III | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2016 | TX | Dimmit | 157.400 | 0.701 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| MARGARET EANAN WISE | ANADARKO E&P ONSHORE LLC | 10/05/2013 | 10/05/2016 | TX | Dimmit | 157.400 | 0.751 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH DEE DOWNEY | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2016 | TX | Dimmit | 157.400 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| CRYSTAL RAGSDALE | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2016 | TX | Dimmit | 157.400 | 0.701 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| WINIFRED L WILLIAMS | ANADARKO E&P ONSHORE LLC | 09/03/2013 | 09/03/2016 | TX | Dimmit | 157.400 | 0.234 | 0.117 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| SUSAN SAUNDERS HALE | ANADARKO E&P ONSHORE LLC | 10/16/2013 | 10/16/2016 | TX | Dimmit | 157.400 | 0.701 | 0.350 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | Below San Miguel | | N | [illegible] | [illegible] | [illegible] |
| KATHRYN KUNZ | ANADARKO E&P COMPANY LP | 06/26/2012 | 06/26/2016 | TX | Dimmit | 10.000 | 10.000 | 3.333 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| HARALSON ROYALTIES LTD | ANADARKO E&P COMPANY LP | 10/04/2012 | 10/04/2016 | TX | Dimmit | 10.000 | 10.000 | 3.333 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM J COPPER | ANADARKO E&P COMPANY LP | 06/15/2012 | 06/15/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TIMOTHY W COPPER | ANADARKO E&P COMPANY LP | 10/11/2012 | 10/11/2016 | TX | Dimmit | 10.000 | 5.000 | 1.667 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CYPRESS ATLANTIC LTD | ANADARKO E&P COMPANY LP | 10/17/2012 | 10/17/2016 | TX | Dimmit | 10.000 | 10.000 | 3.333 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | Y | [illegible] | [illegible] | [illegible] |

007313

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Co Net | WI | [illegible] WI | SN WI | [illegible] WI | Current Depths 9/1/2016 | Comments/ Art. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SUSAN L WAGNER TRUST ET AL | ANADARKO E&P COMPANY LP | 10/24/2012 | 10/24/2015 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | 0.15000000 | 0.25000000 | All Depths | | N | 459 | [illegible] | 15719 |
| SUZANNE J PACHE | ANADARKO E&P ONSHORE LLC | 01/16/2014 | 01/16/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 482 | [illegible] | 27144 |
| SANDRA J CAUDLE | ANADARKO E&P COMPANY LP | 10/03/2012 | 10/03/2015 | TX | Dimmit | [illegible] | [illegible] | 1.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 459 | [illegible] | 15720 |
| JAMES STEVEN STEWART | ANADARKO E&P COMPANY LP | 10/01/2012 | 10/01/2015 | TX | Dimmit | [illegible] | [illegible] | 1.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 459 | [illegible] | 15721 |
| JANET RUTH STEWART [illegible] | ANADARKO E&P COMPANY LP | 10/01/2012 | 10/01/2015 | TX | Dimmit | [illegible] | [illegible] | 1.667 | [illegible] | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 459 | [illegible] | 15718 |
| DAVID W FRETWELL | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | 11 | 27114 |
| EDWARD L FRETWELL JR | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27112 |
| MARTHA LEA | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27113 |
| JENNIFER LYNN HALL | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27106 |
| LINDA E MAYFIELD | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27109 |
| STUART BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27111 |
| DONALD L BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27107 |
| RUTH J BURFAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27215 |
| ROGER M BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27208 |
| ALISON [illegible] | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 483 | 11 | 27216 |
| [illegible] F BURFAS JR | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 482 | [illegible] | 27141 |
| CAROL BURFAS LIFE TENANT | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | 27792 |
| ALEX BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | 27262 |
| [illegible] BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | 27261 |
| [illegible] BURFAS | ANADARKO E&P ONSHORE LLC | 01/07/2014 | 01/07/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | 27264 |
| WHITE [illegible] RESOURCES LLC | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENNIS E LANDBERG | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | 1.667 | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | 27646 |
| KEVIN W LANDBERG | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | 1.667 | [illegible] | [illegible] | [illegible] | [illegible] | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | 27647 |
| GARY L LANDBERG | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | 1.111 | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | 27648 |
| LINDA K [illegible] | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | 1.111 | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | [illegible] |
| DEBRA J [illegible] | ANADARKO E&P ONSHORE LLC | 02/11/2014 | 02/11/2016 | TX | Dimmit | [illegible] | [illegible] | 1.111 | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | Surface to base of Eagle Ford | | N | [illegible] | [illegible] | 27619 |
| STANLEY RAY CRAWFORD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS E BRANUM ET UX | ANADARKO E&P ONSHORE LLC | 04/25/2013 | 04/25/2015 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2016 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT LARRY WHELESS | ANADARKO E&P ONSHORE LLC | 05/14/2013 | 05/14/2015 | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANIMAL HUMANE SOCIETY OF [illegible] COUNTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | 1.667 | [illegible] | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM KENNETH SPARKS ET UX | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | 40.000 | 40.000 | [illegible] | [illegible] | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |

007314

Case 4:23-cv-03450 Document 173-6 Filed on 01/19/23 in TXSB Page 1527 of 1882

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unsub WI | SN WI | Sanchez WI | Current Depths 8/1/2016 | Comments Act. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DANIEL EACHORN | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 5.018 | 1.673 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 573 | 31746 |
| RITA JO FRALICK | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.673 | 0.558 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 558 | 31789 |
| REGINA LYNN BOVONAR SMITH | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.673 | 0.558 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 578 | 31747 |
| DAVI NED EACHORN LIVING TRUST | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 10.035 | 3.345 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 563 | 31744 |
| RENEE DAWN MEDINA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 1.673 | 0.558 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 583 | 31748 |
| LEONARD L SCARCELLA | ANADARKO E&P ONSHORE LLC | 06/18/2013 | 06/18/2016 | TX | Dimmit | 40.140 | 20.070 | 6.690 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | survey/unit | Y | 497 | 568 | 31745 |
| JEAN H HAMPTON | ANADARKO E&P ONSHORE LLC | 08/06/2013 | 08/06/2018 | TX | Dimmit | 10.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 895 | 31862 |
| LEONARD L BALL ET UX | ANADARKO E&P ONSHORE LLC | 01/12/2013 | 01/12/2019 | TX | Dimmit | 10.000 | 10.000 | 3.333 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | Y | 497 | 777 | 30808 |
| NANCY VAN DUYNE | ANADARKO E&P COMPANY LP | 05/18/2013 | 05/18/2015 | TX | Dimmit | 10.000 | 0.885 | 0.443 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | Y | 498 | 562 | 31844 |
| JANICE CAROL WEATHERMAN | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 617 | 31884 |
| NANCY JEAN PORTER | ANADARKO E&P ONSHORE LLC | 07/18/2013 | 07/18/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 614 | 31880 |
| LEA B STAUGHTON | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.000 | 1.667 | 0.834 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 626 | 31670 |
| RAND ROBERT BOUSMAN | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.000 | 1.667 | 0.834 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 675 | 31671 |
| BARBARA MEISTER CUMMINS | ANADARKO E&P ONSHORE LLC | 08/16/2013 | 08/16/2018 | TX | Dimmit | 10.000 | 0.295 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 620 | 31867 |
| KATHRYN MEISTER MATTHEWS | ANADARKO E&P ONSHORE LLC | 08/16/2013 | 08/16/2018 | TX | Dimmit | 10.000 | 0.295 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 622 | 31868 |
| CAROL PB MEISTER | ANADARKO E&P ONSHORE LLC | 08/16/2013 | 08/16/2018 | TX | Dimmit | 10.000 | 0.295 | 0.148 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 498 | 624 | 31869 |
| EDWARD H MEISTER | ANADARKO E&P ONSHORE LLC | 07/23/2013 | 07/23/2018 | TX | Dimmit | 10.000 | 0.885 | 0.443 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 500 | 795 | 32160 |
| SUSAN BATT | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 500 | 798 | 32159 |
| LINDA L MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 672 | 33416 |
| STEVEN J MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 679 | 33417 |
| MICHAEL EDWARD MEISTER | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 676 | 33419 |
| THOMAS R MEISTER ET AL | ANADARKO E&P ONSHORE LLC | 02/17/2014 | 02/17/2019 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 684 | 33421 |
| TERRIE L WASHBURN | ANADARKO E&P ONSHORE LLC | 12/04/2013 | 12/04/2018 | TX | Dimmit | 10.000 | 0.221 | 0.111 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 602 | 33418 |
| ROBERT W HAMMERSTEIN III | ANADARKO E&P ONSHORE LLC | 10/09/2013 | 10/09/2018 | TX | Dimmit | 10.000 | 0.833 | 0.417 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 511 | 665 | 33411 |
| GEORGE T SMITH ET UX | JOINT RESOURCES COMPANY | 12/13/2009 | 12/13/2016 | TX | Dimmit | 40.000 | 40.000 | 20.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | Y | 175 | 679 | 13611 |
| MPT FARM LLC | ANADARKO E&P ONSHORE LLC | 02/08/2014 | 02/08/2017 | TX | Dimmit | 77.510 | 115.440 | 11.012 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | Need to check Title | Y | 508 | 257 | 32953 |
| TONY LULLAN ET AL | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | TX | Dimmit | 20.000 | 10.000 | 3.333 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 499 | 857 | 32077 |
| DALE SMITH JR | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2020 | TX | Dimmit | 20.000 | 0.560 | 0.187 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 500 | 2 | 32006 |
| KATHERINE FROST HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 10.000 | 4.720 | 1.573 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 512 | 178 | 33533 |
| WILL MCGARRITY HARPER TRUST | ANADARKO E&P ONSHORE LLC | 03/10/2014 | 03/10/2021 | TX | Dimmit | 10.000 | 4.720 | 1.573 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | Y | 512 | 300 | 33519 |
| JOHN L ROBERTSON JR | ANADARKO E&P ONSHORE LLC | 05/20/2014 | 05/20/2019 | TX | Dimmit | 10.000 | 1.250 | 0.417 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 516 | 8 | 34455 |
| EDWARD ROBERTSON | ANADARKO E&P ONSHORE LLC | 05/15/2014 | 05/15/2019 | TX | Dimmit | 10.000 | 0.200 | 0.067 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 517 | 820 | 34487 |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co-Net | WI | Ending WI | UV WI | Gastar WI | Current Depths 9/1/2016 | Comments Act. ... Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BETTE RUBY | ANADARKO E&P ONSHORE LLC | 05/21/2014 | 05/21/2019 | TX | [illegible] | 10.000 | 1.000 | 0.333 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | 34481 |
| MELISSA G SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA DIANNE SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA ROBINSON KELLY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | 0.167 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CARLTON ARTHUR CLEMENTS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICHARD JOSEPH ROBERTSON JR | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DOUGLAS R ROBERTSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAMELA J HIRSCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ARTHUR BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GEORGE DWIGHT CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MONTY LLOYD BRIDGES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA A SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | 0.167 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES MARSHALL MICHAEL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA B KING | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | 0.111 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TOM CLIFTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTINE ANN FIRTH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NINA MEEKS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SARA B HARMON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | 0.111 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY RICHARD JONES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES M ROBINSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | 0.167 | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN RICHARD DAVIS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT ATKIN | ANADARKO E&P ONSHORE LLC | 11/18/2013 | 11/18/2018 | TX | [illegible] | 20.000 | 0.417 | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JACK C ATKIN III | ANADARKO E&P ONSHORE LLC | 12/05/2013 | 12/05/2018 | TX | [illegible] | 20.000 | 0.417 | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ALLAN RAWSON ATKIN | ANADARKO E&P ONSHORE LLC | 11/22/2013 | 11/22/2018 | TX | [illegible] | 20.000 | 0.417 | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GAYLYNN A DENNIS | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2018 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JERRY KAY FLOYD | ANADARKO E&P ONSHORE LLC | 11/11/2013 | 11/11/2018 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PAULINE ELIZABETH GREEN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH MOON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAMILLE LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CATHY ANN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOAN LOFFREDO | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SHARON MAY KINCAID | ANADARKO E&P ONSHORE LLC | 01/14/2014 | 01/14/2019 | TX | [illegible] | 20.000 | [illegible] | [illegible] | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration Date | State | County | Gross | Net | Ca Net | WI | Unitab WI | [illegible] WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. = Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS J DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA LEE [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GREGORY [illegible] DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOSEPH JAMES [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEANNA [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA LARSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOLENE D [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BERNARD GEORGE DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT JOSEPH DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JULIE ANN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES J DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDWIN T [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARJORIE DEVLIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BEVERLY JOAN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN MICHAEL [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT JAMES [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WHITETAIL RESOURCES LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| EDMUND [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ELIZABETH WITHERS [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN MICHAEL VESTAL JR TRUST [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARSHA LOUISE VESTAL TRUST [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CAROLYN [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | [illegible] | WI | [illegible] | [illegible] | [illegible] | Current Depths 9/1/2016 | Comments Arc. & Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Unsub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Art. + Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JEFF RICHARDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BETTY BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CHRISTOPHER TODD BASSORE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEE ANN DONOHO | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SANDRA F PATTERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANNETTE GORDON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LARRY MOREAU | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| FITZGERALD OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| FITZGERALD OIL AND GAS MANAGEMENT TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID FELTON WILLIAMS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | [illegible] | [illegible] | [illegible] | [illegible] |
| THE HARPER FAMILY TRUST | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | [illegible] WI | [illegible] WI | [illegible] WI | Current Depths 8/1/2016 | Comments Act. a Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| THOMAS W HOPPER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT TODD TEMPLETON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | Y | [illegible] | [illegible] | [illegible] |
| [illegible] BOWMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ANADARKO LAND CORP | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MICHAEL BOYD | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DELIA DAUGHERTY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DENICE SUTTON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LINDA M ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ROBBINS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NATIONAL AVENUE CHRISTIAN CHURCH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| RICHARD L NEELY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NANCY BROWN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| THOMAS H DAVIDSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| ROBERT PAUL CHRISTMAN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AUDREY WHITE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JOHN DAVID CARVER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] LLC | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] AND NANCY SUE [illegible] | ROSETTA RESOURCES OPERATING LP | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | Surface to Base of Eagle Ford | Partial assign from Rosetta | Y | [illegible] | [illegible] | [illegible] |
| MARTHA GATES | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| JAMES LARRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] POWELL YORK | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] TURNER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | Dimmit | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

007320

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | Shotola BR | SN WI | Sanchez BR | Current Depths 9/1/2016 | Comments/ Art. u. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ANGELA GENTRY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LORI ANN PLATTS | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| GARRY L ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAUDINE TEAGUE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MODENA PARKS JESTER | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PATRICIA PARKS WELLENDON (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LEN B EVANS (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CALEB GLENN PARKS TRUST (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| CLAY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| TERRY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WESLEY BLAKE POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| PARKER RAY POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DEBORAH J PUTNAM | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DANNY WAYNE CHOUNR JR. ET AL (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 160.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| AARON BAGGORE (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| LORI GRAY (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SUSAN LEE SMITH | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| NORMAN LEE | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEVEN N LEE (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM B [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| DAVID ALLAN MARTIN | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] HOLDINGS LP ET AL | ANADARKO E&P COMPANY LP | [illegible] | [illegible] | TX | [illegible] | 80.000 | 80.000 | 40.000 | [illegible] | [illegible] | [illegible] | [illegible] | Below San Miguel | | Y | [illegible] | [illegible] | [illegible] |
| FRANKIE GENE POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| STEPHEN LABONTE (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WILLIAM ALLAN RAWLINGS (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WANDA DEAN ANDERSON | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| MARTIN FAMILY TRUST (?) | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| BARBARA RUTH [illegible] | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | 10.000 | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| SCOTTY L POWELL | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |
| WAYNE MOODY | ANADARKO E&P ONSHORE LLC | [illegible] | [illegible] | TX | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | All Depths | | N | [illegible] | [illegible] | [illegible] |

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Cx Net | WI | Unlock WI | SN WI | Gastar WI | Current Depths 8/1/2016 | Comments A/L a Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DANIEL JOSEPH BURD F/K/A HERBERT ESTILLE [illegible] | ANADARKO E&P ONSHORE LLC | 07/09/2013 | 07/09/2018 | TX | Dimmit | 100.000 | 3.111 | 1.556 | 0.33333333 | 0.06666667 | 0.20000000 | 0.16666667 | All Depths | | N | 531 | 722 | 69193 |
| ANNABELLE GLEGHORN | ANADARKO E&P ONSHORE LLC | 11/12/2014 | 11/12/2019 | TX | Dimmit | 10.700 | 0.160 | 0.187 | 0.93333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 593 | 482 | 39410 |
| LLOYD T ELLIOTT | ANADARKO E&P ONSHORE LLC | 11/03/2014 | 11/03/2019 | TX | Dimmit | 10.000 | 0.139 | 0.032 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 614 | 586 | 39417 |
| IAN MILTON HAUSMANN | ANADARKO E&P ONSHORE LLC | 10/18/2014 | 10/18/2017 | TX | Dimmit | 10.000 | 0.188 | 0.063 | 0.03333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 592 | 441 | 39175 |
| MARGARET L MORO | ANADARKO E&P ONSHORE LLC | 06/25/2015 | 06/25/2020 | TX | Dimmit | 50.000 | 4.000 | 2.000 | 0.40000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 648 | 776 | 03882 |
| DENISE L LINDSEY | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 50.000 | 2.664 | 1.332 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 321 | 39161 |
| MOLLIE A STINSON | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 50.000 | 2.664 | 1.332 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 324 | 39163 |
| DEBORAH K MICKO | ANADARKO E&P ONSHORE LLC | 07/21/2015 | 07/21/2020 | TX | Dimmit | 60.000 | 2.668 | 1.332 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 327 | 39164 |
| LEAKE EXPLORATION LLC BY ARTHUR DAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/17/2015 | 07/17/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 318 | 39161 |
| TRUETT GENE LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 315 | 39160 |
| JACKIE RAY LEAKE | ANADARKO E&P ONSHORE LLC | 07/15/2015 | 07/15/2020 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 551 | 312 | 39159 |
| JACK L LEAKE | ANADARKO E&P ONSHORE LLC | 07/07/2010 | 07/07/2015 | TX | Dimmit | 80.000 | 4.000 | 1.000 | 0.50000000 | 0.20000000 | 0.10000000 | 0.25000000 | All Depths | | N | 649 | 722 | 03887 |
| JERRY E SHIRED | ANADARKO E&P ONSHORE LLC | 07/01/2015 | 07/01/2020 | TX | Dimmit | 96.000 | 4.000 | 1.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 549 | 726 | 38968 |
| JAMES R ADAMS | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.721 | 0.181 | 0.50000000 | 0.10000000 | 0.50000000 | 0.25000000 | All Depths | | N | 552 | 530 | 39411 |
| BARBARA BASSORE PRUDENTE | ANADARKO E&P ONSHORE LLC | 08/04/2015 | 08/04/2020 | TX | Dimmit | 10.000 | 0.089 | 0.099 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 555 | 130 | 39649 |
| HAZEN HIGH SCHOOL SCHOLARSHIP FUND INC | ANADARKO E&P COMPANY LP | 06/17/2015 | 06/17/2018 | TX | Dimmit | 40.000 | 6.000 | 1.000 | 0.33333333 | 0.06666667 | 0.20000000 | 0.16666667 | All Depths | | N | 559 | 13 | 39581 |
| DANNY F FARMHARDER | ANADARKO E&P ONSHORE LLC | 06/21/2013 | 06/21/2018 | TX | Dimmit | 10.000 | 0.083 | 0.025 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 556 | 107 | 39867 |
| SANDRA SAYER | ANADARKO E&P ONSHORE LLC | 11/04/2014 | 11/04/2019 | TX | Dimmit | 10.000 | 0.125 | 0.061 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 556 | 192 | 39811 |
| LINDA L MORRISON | ANADARKO E&P ONSHORE LLC | 04/03/2013 | 04/03/2018 | TX | Dimmit | 70.000 | 0.725 | 0.283 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 557 | 185 | 39902 |
| DIANE MARTIN HALDEMANN | ANADARKO E&P ONSHORE LLC | 11/08/2014 | 11/08/2017 | TX | Dimmit | 10.000 | 0.139 | 0.069 | 0.33333333 | 0.06666667 | 0.20000000 | 0.16666667 | All Depths | | N | 558 | 401 | 40206 |
| JOYCE MCDANIEL | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 60.000 | 3.499 | 0.444 | 0.50000000 | 0.20000000 | 0.15000000 | 0.25000000 | All Depths | | N | 555 | 412 | 39461 |
| LARRY W MCDANIEL | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2020 | TX | Dimmit | 60.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 555 | 405 | 39802 |
| SHERRY W TAYLOR | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 60.000 | 4.000 | 1.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 555 | 410 | 39462 |
| JAMES K WALKER | ANADARKO E&P ONSHORE LLC | 08/10/2015 | 08/10/2020 | TX | Dimmit | 60.000 | 4.000 | 1.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 555 | 451 | 39464 |
| RODNEY J LOBY | ANADARKO E&P ONSHORE LLC | 09/01/2015 | 09/01/2016 | TX | Dimmit | 60.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 556 | 456 | 39812 |
| PAMELA WELSH | ANADARKO E&P ONSHORE LLC | 08/13/2015 | 08/13/2020 | TX | Dimmit | 60.000 | 4.391 | 0.298 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 556 | 412 | 39814 |
| DAWN WEBSTER | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.161 | 0.080 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 375 | 40106 |
| JULIE BEGLEY | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.161 | 0.080 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 376 | 40107 |
| JEANETTE L MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2013 | 10/13/2018 | TX | Dimmit | 60.000 | 0.667 | 0.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 445 | 40185 |

007322

| Lessor | Lessee | Effective Date | Expiration | State | County | Gross | Net | Co Net | WI | UnSub WI | SN WI | Gavilan WI | Current Depths 8/1/2016 | Comments Act. v. Description | Assignment Restrictions | Book | Page | Reception |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SANDRA K NOBLES | ANADARKO E&P ONSHORE LLC | 09/29/2015 | 09/29/2018 | TX | Dimmit | 80.000 | 1.333 | 0.667 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 528 | 40204 |
| LEAH K PITTS | ANADARKO E&P ONSHORE LLC | 08/27/2015 | 08/27/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 448 | 40168 |
| KRISTA L LEWIS | ANADARKO E&P ONSHORE LLC | 08/05/2015 | 08/05/2020 | TX | Dimmit | 80.000 | 0.593 | 0.296 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 445 | 40167 |
| ARVIL WAYNE MORRIS | ANADARKO E&P ONSHORE LLC | 10/13/2015 | 10/13/2018 | TX | Dimmit | 80.000 | 0.667 | 0.333 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 559 | 442 | 40166 |
| LOUIS B REED | ANADARKO E&P ONSHORE LLC | 10/27/2015 | 10/27/2018 | TX | Dimmit | 80.000 | 1.250 | 0.625 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 563 | 557 | 40854 |
| HELEN IDA SAMMONS A/K/A HELEN IDA BENNETT, ET AL | ANADARKO E&P ONSHORE LLC | 11/01/2014 | 11/01/2017 | TX | Dimmit | 10.000 | 0.179 | 0.090 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 567 | 466 | 41367 |
| ROBERT M JOHNSON | ANADARKO E&P ONSHORE LLC | 03/01/2016 | 03/01/2021 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 570 | 236 | 41766 |
| PAULA ANN SMITH | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 814 | 41874 |
| ROSA LEE COOK | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 811 | 41873 |
| MARK DEWAYNE CARROZZA | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 817 | 41875 |
| BETTY JANE KIEREN | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 570 | 250 | 41768 |
| WILLIAM T JACKS SR | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.556 | 0.185 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 571 | 726 | 41988 |
| FLOYD WAYNE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 679 | 42227 |
| WENDELL RAY BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 673 | 42225 |
| SAMMY JOE BRISCOE | ANADARKO E&P ONSHORE LLC | 01/01/2015 | 01/01/2018 | TX | Dimmit | 10.000 | 0.139 | 0.046 | 0.33333333 | 0.06666667 | 0.10000000 | 0.16666667 | All Depths | | N | 573 | 676 | 42226 |
| BARBARA A HARRIS | ANADARKO E&P ONSHORE LLC | 10/20/2015 | 10/20/2020 | TX | Dimmit | 20.000 | 10.000 | 5.000 | 0.50000000 | 0.10000000 | 0.15000000 | 0.25000000 | All Depths | | N | 576 | 239 | 42491 |
| ST OF TEXAS 118148 (CHAPARRAL WMA) | ANADARKO E&P ONSHORE LLC | 07/19/2016 | 07/19/2019 | TX | Dimmit | 1639.310 | 273.218 | 204.914 | 0.75000000 | 0.15000000 | 0.22500000 | 0.37500000 | All Depths | | Y | 577 | 454 | 42708 |

**Annex IV**
**Approved Financial Advisor Arbiters**

Financial Advisors:
Evercore
Jefferies
Citigroup
Royal Bank of Canada
J.P. Morgan
Credit Suisse
Morgan Stanley
Tudor, Pickering, Holt & Co.

Reserve Auditors:
Ryder Scott
W.D. Von Gonten & Co.
Netherland Sewell & Associates
Cawley, Gillespie & Associates
DeGolyer and MacNaughton

**Annex V**
**Existing Producing Wells**

(*see attached*)

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BEINHORN RANCH 10H | 4212733880 |
| BEINHORN RANCH 11H | 4212734113 |
| BEINHORN RANCH 12H | 4212734114 |
| BEINHORN RANCH 13H | 4212734260 |
| BEINHORN RANCH 14H | 4212734259 |
| BEINHORN RANCH 15H | 4212734261 |
| BEINHORN RANCH 16H | 4212734997 |
| BEINHORN RANCH 17H | 4212734998 |
| BEINHORN RANCH 18H | 4212734999 |
| BEINHORN RANCH 19H | 4212734330 |
| BEINHORN RANCH 1H | 4212733624 |
| BEINHORN RANCH 20H | 4212734328 |
| BEINHORN RANCH 21H | 4212734115 |
| BEINHORN RANCH 22H | 4212734329 |
| BEINHORN RANCH 23H | 4212734383 |
| BEINHORN RANCH 24H | 4212734384 |
| BEINHORN RANCH 25H | 4212734385 |
| BEINHORN RANCH 26H | 4212734386 |
| BEINHORN RANCH 27H | 4212735001 |
| BEINHORN RANCH 28H | 4212735000 |
| BEINHORN RANCH 29H | 4212735018 |
| BEINHORN RANCH 2H | 4212733644 |
| BEINHORN RANCH 30H | 4212735020 |
| BEINHORN RANCH 31H | 4212735019 |
| BEINHORN RANCH 32H | 4212735022 |
| BEINHORN RANCH 33H | 4212735032 |
| BEINHORN RANCH 34H | 4212735033 |
| BEINHORN RANCH 35H | 4212735035 |
| BEINHORN RANCH 36H | 4212735034 |
| BEINHORN RANCH 37H | 4212736214 |
| BEINHORN RANCH 38H | 4212736219 |
| BEINHORN RANCH 39H | 4212736220 |
| BEINHORN RANCH 3H | 4212733664 |
| BEINHORN RANCH 40H | 4212736221 |
| BEINHORN RANCH 41H | 4212736223 |
| BEINHORN RANCH 42H | 4212736224 |
| BEINHORN RANCH 43H | 4212736225 |
| BEINHORN RANCH 44H | 4212736226 |
| BEINHORN RANCH 4H | 4212733690 |
| BEINHORN RANCH 5H | 4212733760 |
| BEINHORN RANCH 6H | 4212733761 |
| BEINHORN RANCH 7H | 4212733871 |
| BEINHORN RANCH 8H | 4212733872 |
| BEINHORN RANCH 9H | 4212733879 |
| BEINHORN RANCH UNIT A 10H | 4212736291 |
| BEINHORN RANCH UNIT A 11H | 4212736289 |
| BEINHORN RANCH UNIT A 12H | 4212736294 |
| BEINHORN RANCH UNIT A 1H | 4212736275 |
| BEINHORN RANCH UNIT A 2H | 4212736276 |
| BEINHORN RANCH UNIT A 3H | 4212736277 |
| BEINHORN RANCH UNIT A 4H | 4212736278 |
| BEINHORN RANCH UNIT A 5H | 4212736282 |
| BEINHORN RANCH UNIT A 6H | 4212736286 |
| BEINHORN RANCH UNIT A 7H | 4212736287 |
| BEINHORN RANCH UNIT A 8H | 4212736290 |
| BEINHORN RANCH UNIT A 9H | 4212736288 |
| BOYD, GG 1H | 4212733750 |
| BRISCOE CARLA RANCH 10H | 4212733733 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH 11H | 4212733735 |
| BRISCOE CARLA RANCH 12H | 4212733736 |
| BRISCOE CARLA RANCH 13H | 4212733875 |
| BRISCOE CARLA RANCH 14H | 4212733876 |
| BRISCOE CARLA RANCH 15H | 4212733874 |
| BRISCOE CARLA RANCH 16H | 4212734133 |
| BRISCOE CARLA RANCH 17H | 4212734134 |
| BRISCOE CARLA RANCH 18H | 4212734135 |
| BRISCOE CARLA RANCH 19H | 4212733889 |
| BRISCOE CARLA RANCH 1H | 4212733681 |
| BRISCOE CARLA RANCH 20H | 4212733890 |
| BRISCOE CARLA RANCH 21H | 4212733891 |
| BRISCOE CARLA RANCH 22H | 4212733885 |
| BRISCOE CARLA RANCH 23H | 4212733893 |
| BRISCOE CARLA RANCH 24H | 4212733894 |
| BRISCOE CARLA RANCH 25H | 4212733895 |
| BRISCOE CARLA RANCH 26H | 4212734948 |
| BRISCOE CARLA RANCH 27H | 4212734949 |
| BRISCOE CARLA RANCH 28H | 4212734969 |
| BRISCOE CARLA RANCH 29H | 4212734959 |
| BRISCOE CARLA RANCH 2H | 4212733666 |
| BRISCOE CARLA RANCH 30H | 4212734960 |
| BRISCOE CARLA RANCH 31H | 4212734961 |
| BRISCOE CARLA RANCH 32H | 4212734967 |
| BRISCOE CARLA RANCH 33H | 4212734962 |
| BRISCOE CARLA RANCH 34H | 4212734963 |
| BRISCOE CARLA RANCH 3H | 4212733705 |
| BRISCOE CARLA RANCH 4H | 4212733706 |
| BRISCOE CARLA RANCH 5H | 4212734946 |
| BRISCOE CARLA RANCH 6H | 4212734947 |
| BRISCOE CARLA RANCH 7H | 4212733855 |
| BRISCOE CARLA RANCH 8H | 4212733856 |
| BRISCOE CARLA RANCH 9H | 4212733857 |
| BRISCOE CATARINA N UNIT A 10H | 4212735923 |
| BRISCOE CATARINA N UNIT A 1H | 4212735930 |
| BRISCOE CATARINA N UNIT A 2H | 4212735931 |
| BRISCOE CATARINA N UNIT A 3H | 4212735932 |
| BRISCOE CATARINA N UNIT A 4H | 4212735933 |
| BRISCOE CATARINA N UNIT A 5H | 4212735934 |
| BRISCOE CATARINA N UNIT A 6H | 4212735919 |
| BRISCOE CATARINA N UNIT A 7H | 4212735920 |
| BRISCOE CATARINA N UNIT A 8H | 4212735921 |
| BRISCOE CATARINA N UNIT A 9H | 4212735922 |
| BRISCOE CATARINA NORTH 100H | 4212736732 |
| BRISCOE CATARINA NORTH 101H | 4212736733 |
| BRISCOE CATARINA NORTH 102H | 4212736734 |
| BRISCOE CATARINA NORTH 103H | 4212736735 |
| BRISCOE CATARINA NORTH 10H | 4212733930 |
| BRISCOE CATARINA NORTH 11H | 4212733932 |
| BRISCOE CATARINA NORTH 12H | 4212733931 |
| BRISCOE CATARINA NORTH 133H | 4212736869 |
| BRISCOE CATARINA NORTH 134H | 4212736870 |
| BRISCOE CATARINA NORTH 135H | 4212736866 |
| BRISCOE CATARINA NORTH 136H | 4212736867 |
| BRISCOE CATARINA NORTH 13H | 4212733937 |
| BRISCOE CATARINA NORTH 14H | 4212733938 |
| BRISCOE CATARINA NORTH 15H | 4212733939 |
| BRISCOE CATARINA NORTH 16H | 4212733947 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 17H | 4212733948 |
| BRISCOE CATARINA NORTH 18H | 4212733949 |
| BRISCOE CATARINA NORTH 19H | 4212735063 |
| BRISCOE CATARINA NORTH 1H | 4212733687 |
| BRISCOE CATARINA NORTH 20H | 4212734155 |
| BRISCOE CATARINA NORTH 21H | 4212734156 |
| BRISCOE CATARINA NORTH 22H | 4212734157 |
| BRISCOE CATARINA NORTH 23H | 4212734128 |
| BRISCOE CATARINA NORTH 24H | 4212734129 |
| BRISCOE CATARINA NORTH 25H | 4212734130 |
| BRISCOE CATARINA NORTH 26H | 4212734174 |
| BRISCOE CATARINA NORTH 27H | 4212734175 |
| BRISCOE CATARINA NORTH 28H | 4212734176 |
| BRISCOE CATARINA NORTH 29H | 4212734206 |
| BRISCOE CATARINA NORTH 2H | 4212733995 |
| BRISCOE CATARINA NORTH 30H | 4212734208 |
| BRISCOE CATARINA NORTH 31H | 4212734209 |
| BRISCOE CATARINA NORTH 32H | 4212735064 |
| BRISCOE CATARINA NORTH 33H | 4212735070 |
| BRISCOE CATARINA NORTH 34H | 4212735066 |
| BRISCOE CATARINA NORTH 35H | 4212734221 |
| BRISCOE CATARINA NORTH 36H | 4212734222 |
| BRISCOE CATARINA NORTH 37H | 4212734223 |
| BRISCOE CATARINA NORTH 39H | 4212734226 |
| BRISCOE CATARINA NORTH 3H | 4212734001 |
| BRISCOE CATARINA NORTH 40H | 4212734228 |
| BRISCOE CATARINA NORTH 41H | 4212734229 |
| BRISCOE CATARINA NORTH 42H | 4212734230 |
| BRISCOE CATARINA NORTH 43H | 4212734231 |
| BRISCOE CATARINA NORTH 44H | 4212734343 |
| BRISCOE CATARINA NORTH 45H | 4212734344 |
| BRISCOE CATARINA NORTH 46H | 4212734375 |
| BRISCOE CATARINA NORTH 47H | 4212734376 |
| BRISCOE CATARINA NORTH 48H | 4212734377 |
| BRISCOE CATARINA NORTH 49H | 4212734378 |
| BRISCOE CATARINA NORTH 4H | 4212733804 |
| BRISCOE CATARINA NORTH 50H | 4212734563 |
| BRISCOE CATARINA NORTH 51H | 4212734564 |
| BRISCOE CATARINA NORTH 52H | 4212734565 |
| BRISCOE CATARINA NORTH 53H | 4212734566 |
| BRISCOE CATARINA NORTH 54H | 4212734567 |
| BRISCOE CATARINA NORTH 55H | 4212734568 |
| BRISCOE CATARINA NORTH 56H | 4212734578 |
| BRISCOE CATARINA NORTH 57H | 4212734579 |
| BRISCOE CATARINA NORTH 58H | 4212734580 |
| BRISCOE CATARINA NORTH 59H | 4212734581 |
| BRISCOE CATARINA NORTH 5H | 4212733805 |
| BRISCOE CATARINA NORTH 60H | 4212734582 |
| BRISCOE CATARINA NORTH 61H | 4212734583 |
| BRISCOE CATARINA NORTH 62H | 4212734866 |
| BRISCOE CATARINA NORTH 63H | 4212734869 |
| BRISCOE CATARINA NORTH 64H | 4212734870 |
| BRISCOE CATARINA NORTH 65H | 4212734871 |
| BRISCOE CATARINA NORTH 66H | 4212734874 |
| BRISCOE CATARINA NORTH 67H | 4212734875 |
| BRISCOE CATARINA NORTH 68H | 4212734876 |
| BRISCOE CATARINA NORTH 69H | 4212734891 |
| BRISCOE CATARINA NORTH 6H | 4212733806 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA NORTH 70H | 4212734890 |
| BRISCOE CATARINA NORTH 71H | 4212734894 |
| BRISCOE CATARINA NORTH 72H | 4212734936 |
| BRISCOE CATARINA NORTH 73H | 4212734930 |
| BRISCOE CATARINA NORTH 74H | 4212734932 |
| BRISCOE CATARINA NORTH 75H | 4212734933 |
| BRISCOE CATARINA NORTH 76H | 4212735159 |
| BRISCOE CATARINA NORTH 77H | 4212735168 |
| BRISCOE CATARINA NORTH 78H | 4212735169 |
| BRISCOE CATARINA NORTH 79H | 4212735170 |
| BRISCOE CATARINA NORTH 7H | 4212733825 |
| BRISCOE CATARINA NORTH 80H | 4212735171 |
| BRISCOE CATARINA NORTH 81H | 4212735172 |
| BRISCOE CATARINA NORTH 82H | 4212735173 |
| BRISCOE CATARINA NORTH 83H | 4212735174 |
| BRISCOE CATARINA NORTH 84H | 4212735816 |
| BRISCOE CATARINA NORTH 85H | 4212735817 |
| BRISCOE CATARINA NORTH 86H | 4212735818 |
| BRISCOE CATARINA NORTH 87H | 4212735819 |
| BRISCOE CATARINA NORTH 88H | 4212735820 |
| BRISCOE CATARINA NORTH 89H | 4212735821 |
| BRISCOE CATARINA NORTH 8H | 4212733826 |
| BRISCOE CATARINA NORTH 90H | 4212736722 |
| BRISCOE CATARINA NORTH 91H | 4212736723 |
| BRISCOE CATARINA NORTH 92H | 4212736724 |
| BRISCOE CATARINA NORTH 93H | 4212736725 |
| BRISCOE CATARINA NORTH 94H | 4212736726 |
| BRISCOE CATARINA NORTH 95H | 4212736727 |
| BRISCOE CATARINA NORTH 96H | 4212736728 |
| BRISCOE CATARINA NORTH 97H | 4212736729 |
| BRISCOE CATARINA NORTH 98H | 4212736730 |
| BRISCOE CATARINA NORTH 99H | 4212736731 |
| BRISCOE CATARINA NORTH 9H | 4212733829 |
| BRISCOE CATARINA RANCH 100H | 4212735430 |
| BRISCOE CATARINA RANCH 101H | 4212735431 |
| BRISCOE CATARINA RANCH 102H | 4212735471 |
| BRISCOE CATARINA RANCH 103H | 4212735472 |
| BRISCOE CATARINA RANCH 104H | 4212735473 |
| BRISCOE CATARINA RANCH 105H | 4212735474 |
| BRISCOE CATARINA RANCH 106H | 4212735475 |
| BRISCOE CATARINA RANCH 107H | 4212735476 |
| BRISCOE CATARINA RANCH 108H | 4212735199 |
| BRISCOE CATARINA RANCH 10H | 4212733677 |
| BRISCOE CATARINA RANCH 11H | 4212734363 |
| BRISCOE CATARINA RANCH 12H | 4212734364 |
| BRISCOE CATARINA RANCH 13H | 4212733680 |
| BRISCOE CATARINA RANCH 14H | 4212734365 |
| BRISCOE CATARINA RANCH 15H | 4212734366 |
| BRISCOE CATARINA RANCH 16H | 4212733790 |
| BRISCOE CATARINA RANCH 17H | 4212733791 |
| BRISCOE CATARINA RANCH 18H | 4212733792 |
| BRISCOE CATARINA RANCH 19H | 4212733780 |
| BRISCOE CATARINA RANCH 1H EAGLEF | 4212733398 |
| BRISCOE CATARINA RANCH 20H | 4212733781 |
| BRISCOE CATARINA RANCH 21H | 4212733782 |
| BRISCOE CATARINA RANCH 22H | 4212734315 |
| BRISCOE CATARINA RANCH 23H | 4212734316 |
| BRISCOE CATARINA RANCH 24H | 4212734317 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 25H | 4212734318 |
| BRISCOE CATARINA RANCH 26H | 4212734319 |
| BRISCOE CATARINA RANCH 27H | 4212734320 |
| BRISCOE CATARINA RANCH 28H | 4212734367 |
| BRISCOE CATARINA RANCH 29H | 4212734368 |
| BRISCOE CATARINA RANCH 2H | 4212733612 |
| BRISCOE CATARINA RANCH 31H | 4212734388 |
| BRISCOE CATARINA RANCH 32H | 4212734389 |
| BRISCOE CATARINA RANCH 33H | 4212734390 |
| BRISCOE CATARINA RANCH 34H | 4212734432 |
| BRISCOE CATARINA RANCH 35H | 4212734433 |
| BRISCOE CATARINA RANCH 36H | 4212734436 |
| BRISCOE CATARINA RANCH 37H | 4212734434 |
| BRISCOE CATARINA RANCH 38H | 4212734439 |
| BRISCOE CATARINA RANCH 39H | 4212734440 |
| BRISCOE CATARINA RANCH 3H | 4212733646 |
| BRISCOE CATARINA RANCH 40H | 4212734441 |
| BRISCOE CATARINA RANCH 41H | 4212734443 |
| BRISCOE CATARINA RANCH 42H | 4212734442 |
| BRISCOE CATARINA RANCH 43H | 4212734444 |
| BRISCOE CATARINA RANCH 44H | 4212734446 |
| BRISCOE CATARINA RANCH 45H | 4212734448 |
| BRISCOE CATARINA RANCH 46H | 4212734754 |
| BRISCOE CATARINA RANCH 47H | 4212734755 |
| BRISCOE CATARINA RANCH 48H | 4212734756 |
| BRISCOE CATARINA RANCH 49H | 4212734757 |
| BRISCOE CATARINA RANCH 4H | 4212733684 |
| BRISCOE CATARINA RANCH 50H | 4212734758 |
| BRISCOE CATARINA RANCH 51H | 4212734774 |
| BRISCOE CATARINA RANCH 52H | 4212734775 |
| BRISCOE CATARINA RANCH 53H | 4212734778 |
| BRISCOE CATARINA RANCH 54H | 4212734777 |
| BRISCOE CATARINA RANCH 55H | 4212734776 |
| BRISCOE CATARINA RANCH 56H | 4212735214 |
| BRISCOE CATARINA RANCH 57H | 4212735215 |
| BRISCOE CATARINA RANCH 58H | 4212735216 |
| BRISCOE CATARINA RANCH 59H | 4212735188 |
| BRISCOE CATARINA RANCH 5H | 4212735292 |
| BRISCOE CATARINA RANCH 60H | 4212735190 |
| BRISCOE CATARINA RANCH 61H | 4212735184 |
| BRISCOE CATARINA RANCH 62H | 4212735183 |
| BRISCOE CATARINA RANCH 63H | 4212735185 |
| BRISCOE CATARINA RANCH 64H | 4212735186 |
| BRISCOE CATARINA RANCH 65H | 4212735193 |
| BRISCOE CATARINA RANCH 66H | 4212735194 |
| BRISCOE CATARINA RANCH 67H | 4212735195 |
| BRISCOE CATARINA RANCH 68H | 4212735196 |
| BRISCOE CATARINA RANCH 69H | 4212735197 |
| BRISCOE CATARINA RANCH 6H | 4212733749 |
| BRISCOE CATARINA RANCH 70H | 4212735198 |
| BRISCOE CATARINA RANCH 71H | 4212735217 |
| BRISCOE CATARINA RANCH 72H | 4212735218 |
| BRISCOE CATARINA RANCH 73H | 4212735219 |
| BRISCOE CATARINA RANCH 74H | 4212735293 |
| BRISCOE CATARINA RANCH 75H | 4212735296 |
| BRISCOE CATARINA RANCH 76H | 4212735297 |
| BRISCOE CATARINA RANCH 77H | 4212735298 |
| BRISCOE CATARINA RANCH 78H | 4212735299 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA RANCH 79H | 4212735300 |
| BRISCOE CATARINA RANCH 7H | 4212733723 |
| BRISCOE CATARINA RANCH 80H | 4212735301 |
| BRISCOE CATARINA RANCH 81H | 4212735302 |
| BRISCOE CATARINA RANCH 82H | 4212735303 |
| BRISCOE CATARINA RANCH 83H | 4212735304 |
| BRISCOE CATARINA RANCH 84H | 4212735305 |
| BRISCOE CATARINA RANCH 85H | 4212735331 |
| BRISCOE CATARINA RANCH 86H | 4212735332 |
| BRISCOE CATARINA RANCH 87H | 4212735330 |
| BRISCOE CATARINA RANCH 88H | 4212735345 |
| BRISCOE CATARINA RANCH 89H | 4212735346 |
| BRISCOE CATARINA RANCH 8H | 4212733724 |
| BRISCOE CATARINA RANCH 90H | 4212735340 |
| BRISCOE CATARINA RANCH 91H | 4212735341 |
| BRISCOE CATARINA RANCH 92H | 4212735342 |
| BRISCOE CATARINA RANCH 93H | 4212735343 |
| BRISCOE CATARINA RANCH 94H | 4212735344 |
| BRISCOE CATARINA RANCH 95H | 4212735425 |
| BRISCOE CATARINA RANCH 96H | 4212735427 |
| BRISCOE CATARINA RANCH 97H | 4212735426 |
| BRISCOE CATARINA RANCH 98H | 4212735428 |
| BRISCOE CATARINA RANCH 99H | 4212735429 |
| BRISCOE CATARINA RANCH 9H | 4212733674 |
| BRISCOE CATARINA SOUTH 10H | 4212734455 |
| BRISCOE CATARINA SOUTH 11H | 4212734456 |
| BRISCOE CATARINA SOUTH 12H | 4212734457 |
| BRISCOE CATARINA SOUTH 13H | 4212734459 |
| BRISCOE CATARINA SOUTH 14H | 4212734458 |
| BRISCOE CATARINA SOUTH 15H | 4212734460 |
| BRISCOE CATARINA SOUTH 16H | 4212735312 |
| BRISCOE CATARINA SOUTH 17H | 4212735313 |
| BRISCOE CATARINA SOUTH 18H | 4212735314 |
| BRISCOE CATARINA SOUTH 19H | 4212735316 |
| BRISCOE CATARINA SOUTH 1H | 4212733783 |
| BRISCOE CATARINA SOUTH 20H | 4212735322 |
| BRISCOE CATARINA SOUTH 21H | 4212735323 |
| BRISCOE CATARINA SOUTH 22H | 4212735324 |
| BRISCOE CATARINA SOUTH 23H | 4212735325 |
| BRISCOE CATARINA SOUTH 24H | 4212735362 |
| BRISCOE CATARINA SOUTH 25H | 4212735363 |
| BRISCOE CATARINA SOUTH 26H | 4212735364 |
| BRISCOE CATARINA SOUTH 27H | 4212735365 |
| BRISCOE CATARINA SOUTH 28H | 4212735459 |
| BRISCOE CATARINA SOUTH 29H | 4212735515 |
| BRISCOE CATARINA SOUTH 2H | 4212733784 |
| BRISCOE CATARINA SOUTH 30H | 4212735460 |
| BRISCOE CATARINA SOUTH 31H | 4212735461 |
| BRISCOE CATARINA SOUTH 32H | 4212735463 |
| BRISCOE CATARINA SOUTH 33H | 4212735462 |
| BRISCOE CATARINA SOUTH 34H | 4212735481 |
| BRISCOE CATARINA SOUTH 35H | 4212735484 |
| BRISCOE CATARINA SOUTH 36H | 4212735510 |
| BRISCOE CATARINA SOUTH 37H | 4212735511 |
| BRISCOE CATARINA SOUTH 38H | 4212735513 |
| BRISCOE CATARINA SOUTH 39H | 4212735512 |
| BRISCOE CATARINA SOUTH 3H | 4212733785 |
| BRISCOE CATARINA SOUTH 40H | 4212735532 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA SOUTH 41H | 4212735533 |
| BRISCOE CATARINA SOUTH 42H | 4212735534 |
| BRISCOE CATARINA SOUTH 43H | 4212735535 |
| BRISCOE CATARINA SOUTH 44H | 4212735536 |
| BRISCOE CATARINA SOUTH 45H | 4212735557 |
| BRISCOE CATARINA SOUTH 46H | 4212735561 |
| BRISCOE CATARINA SOUTH 47H | 4212735562 |
| BRISCOE CATARINA SOUTH 48H | 4212735563 |
| BRISCOE CATARINA SOUTH 49H | 4212735693 |
| BRISCOE CATARINA SOUTH 4H | 4212733769 |
| BRISCOE CATARINA SOUTH 50H | 4212735694 |
| BRISCOE CATARINA SOUTH 51H | 4212735695 |
| BRISCOE CATARINA SOUTH 52H | 4212735696 |
| BRISCOE CATARINA SOUTH 53H | 4212735698 |
| BRISCOE CATARINA SOUTH 54H | 4212735700 |
| BRISCOE CATARINA SOUTH 55H | 4212735699 |
| BRISCOE CATARINA SOUTH 56H | 4212735701 |
| BRISCOE CATARINA SOUTH 57H | 4212735706 |
| BRISCOE CATARINA SOUTH 58H | 4212735707 |
| BRISCOE CATARINA SOUTH 59H | 4212735708 |
| BRISCOE CATARINA SOUTH 5H | 4212733770 |
| BRISCOE CATARINA SOUTH 60H | 4212735709 |
| BRISCOE CATARINA SOUTH 61H | 4212736439 |
| BRISCOE CATARINA SOUTH 62H | 4212736440 |
| BRISCOE CATARINA SOUTH 63H | 4212736441 |
| BRISCOE CATARINA SOUTH 64H | 4212736442 |
| BRISCOE CATARINA SOUTH 65H | 4212736443 |
| BRISCOE CATARINA SOUTH 66H | 4212736444 |
| BRISCOE CATARINA SOUTH 67H | 4212736417 |
| BRISCOE CATARINA SOUTH 68H | 4212736418 |
| BRISCOE CATARINA SOUTH 69H | 4212736419 |
| BRISCOE CATARINA SOUTH 6H | 4212733771 |
| BRISCOE CATARINA SOUTH 70H | 4212736420 |
| BRISCOE CATARINA SOUTH 71H | 4212736421 |
| BRISCOE CATARINA SOUTH 72H | 4212736410 |
| BRISCOE CATARINA SOUTH 73H | 4212736411 |
| BRISCOE CATARINA SOUTH 74H | 4212736412 |
| BRISCOE CATARINA SOUTH 75H | 4212736413 |
| BRISCOE CATARINA SOUTH 76H | 4212736414 |
| BRISCOE CATARINA SOUTH 77H | 4212736393 |
| BRISCOE CATARINA SOUTH 78H | 4212736394 |
| BRISCOE CATARINA SOUTH 79H | 4212736395 |
| BRISCOE CATARINA SOUTH 7H | 4212733952 |
| BRISCOE CATARINA SOUTH 80H | 4212736396 |
| BRISCOE CATARINA SOUTH 81H | 4212736397 |
| BRISCOE CATARINA SOUTH 82H | 4212736426 |
| BRISCOE CATARINA SOUTH 83H | 4212736427 |
| BRISCOE CATARINA SOUTH 8H | 4212733951 |
| BRISCOE CATARINA SOUTH 9H | 4212733953 |
| BRISCOE CATARINA WEST 10H | 4212733682 |
| BRISCOE CATARINA WEST 116H | 4212736645 |
| BRISCOE CATARINA WEST 117H | 4212736646 |
| BRISCOE CATARINA WEST 118H | 4212736647 |
| BRISCOE CATARINA WEST 119H | 4212736648 |
| BRISCOE CATARINA WEST 120H | 4212736649 |
| BRISCOE CATARINA WEST 121H | 4212736654 |
| BRISCOE CATARINA WEST 125H | 4212736651 |
| BRISCOE CATARINA WEST 126H | 4212736652 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 127H | 4212736653 |
| BRISCOE CATARINA WEST 128H | 4212736655 |
| BRISCOE CATARINA WEST 129H | 4212736656 |
| BRISCOE CATARINA WEST 12H | 4212733753 |
| BRISCOE CATARINA WEST 130H | 4212736657 |
| BRISCOE CATARINA WEST 131H | 4212736658 |
| BRISCOE CATARINA WEST 132H | 4212736659 |
| BRISCOE CATARINA WEST 13H | 4212733762 |
| BRISCOE CATARINA WEST 14H | 4212733763 |
| BRISCOE CATARINA WEST 15H | 4212733777 |
| BRISCOE CATARINA WEST 16H | 4212733778 |
| BRISCOE CATARINA WEST 17H | 4212733779 |
| BRISCOE CATARINA WEST 18H | 4212734166 |
| BRISCOE CATARINA WEST 19H | 4212734167 |
| BRISCOE CATARINA WEST 1H (EAGLEF | 4212733421 |
| BRISCOE CATARINA WEST 20H | 4212734169 |
| BRISCOE CATARINA WEST 21H | 4212734170 |
| BRISCOE CATARINA WEST 22H | 4212734171 |
| BRISCOE CATARINA WEST 23H | 4212734172 |
| BRISCOE CATARINA WEST 24H | 4212734335 |
| BRISCOE CATARINA WEST 25H | 4212734336 |
| BRISCOE CATARINA WEST 26H | 4212734337 |
| BRISCOE CATARINA WEST 27H | 4212734338 |
| BRISCOE CATARINA WEST 28H | 4212734340 |
| BRISCOE CATARINA WEST 29H | 4212734339 |
| BRISCOE CATARINA WEST 2H | 4212733615 |
| BRISCOE CATARINA WEST 30H | 4212734682 |
| BRISCOE CATARINA WEST 31H | 4212734684 |
| BRISCOE CATARINA WEST 32H | 4212734685 |
| BRISCOE CATARINA WEST 33H | 4212734686 |
| BRISCOE CATARINA WEST 34H | 4212734687 |
| BRISCOE CATARINA WEST 35H | 4212734689 |
| BRISCOE CATARINA WEST 36H | 4212734690 |
| BRISCOE CATARINA WEST 37H | 4212734693 |
| BRISCOE CATARINA WEST 38H | 4212734694 |
| BRISCOE CATARINA WEST 39H | 4212734695 |
| BRISCOE CATARINA WEST 40H | 4212734696 |
| BRISCOE CATARINA WEST 41H | 4212734697 |
| BRISCOE CATARINA WEST 42H | 4212734717 |
| BRISCOE CATARINA WEST 43H | 4212734720 |
| BRISCOE CATARINA WEST 44H | 4212734718 |
| BRISCOE CATARINA WEST 45H | 4212734719 |
| BRISCOE CATARINA WEST 46H | 4212734722 |
| BRISCOE CATARINA WEST 47H | 4212734725 |
| BRISCOE CATARINA WEST 48H | 4212734726 |
| BRISCOE CATARINA WEST 49H | 4212734727 |
| BRISCOE CATARINA WEST 4H | 4212733629 |
| BRISCOE CATARINA WEST 50H | 4212734728 |
| BRISCOE CATARINA WEST 51H | 4212735780 |
| BRISCOE CATARINA WEST 52H | 4212735781 |
| BRISCOE CATARINA WEST 53H | 4212735782 |
| BRISCOE CATARINA WEST 54H | 4212735783 |
| BRISCOE CATARINA WEST 55H | 4212735784 |
| BRISCOE CATARINA WEST 56H | 4212735785 |
| BRISCOE CATARINA WEST 57H | 4212735786 |
| BRISCOE CATARINA WEST 58H | 4212735787 |
| BRISCOE CATARINA WEST 59H | 4212735788 |
| BRISCOE CATARINA WEST 5H | 4212733637 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CATARINA WEST 60H | 4212735789 |
| BRISCOE CATARINA WEST 61H | 4212735790 |
| BRISCOE CATARINA WEST 62H | 4212735793 |
| BRISCOE CATARINA WEST 63H | 4212735794 |
| BRISCOE CATARINA WEST 64H | 4212735795 |
| BRISCOE CATARINA WEST 65H | 4212735796 |
| BRISCOE CATARINA WEST 66H | 4212735825 |
| BRISCOE CATARINA WEST 67H | 4212735834 |
| BRISCOE CATARINA WEST 68H | 4212735836 |
| BRISCOE CATARINA WEST 69H | 4212735835 |
| BRISCOE CATARINA WEST 6H | 4212733648 |
| BRISCOE CATARINA WEST 70H | 4212735837 |
| BRISCOE CATARINA WEST 71H | 4212735859 |
| BRISCOE CATARINA WEST 72H | 4212735860 |
| BRISCOE CATARINA WEST 73H | 4212735861 |
| BRISCOE CATARINA WEST 74H | 4212735862 |
| BRISCOE CATARINA WEST 75H | 4212735882 |
| BRISCOE CATARINA WEST 76H | 4212735883 |
| BRISCOE CATARINA WEST 77H | 4212735885 |
| BRISCOE CATARINA WEST 78H | 4212735886 |
| BRISCOE CATARINA WEST 79H | 4212735888 |
| BRISCOE CATARINA WEST 7H | 4212733643 |
| BRISCOE CATARINA WEST 80H | 4212735889 |
| BRISCOE CATARINA WEST 81H | 4212735890 |
| BRISCOE CATARINA WEST 82H | 4212735891 |
| BRISCOE CATARINA WEST 8H | 4212733685 |
| BRISCOE CATARINA WEST 90H | 4212736881 |
| BRISCOE CATARINA WEST 93H | 4212736884 |
| BRISCOE CATARINA WEST 96H | 4212736887 |
| BRISCOE CATARINA WEST 9H | 4212733801 |
| BRISCOE CHIP EAST RANCH 10H | 4212734152 |
| BRISCOE CHIP EAST RANCH 11H | 4212734478 |
| BRISCOE CHIP EAST RANCH 12H | 4212734479 |
| BRISCOE CHIP EAST RANCH 13H | 4212734480 |
| BRISCOE CHIP EAST RANCH 14H | 4212734153 |
| BRISCOE CHIP EAST RANCH 15H | 4212734481 |
| BRISCOE CHIP EAST RANCH 16H | 4212734482 |
| BRISCOE CHIP EAST RANCH 17H | 4212734483 |
| BRISCOE CHIP EAST RANCH 18H | 4212734507 |
| BRISCOE CHIP EAST RANCH 19H | 4212734508 |
| BRISCOE CHIP EAST RANCH 1H | 4212733768 |
| BRISCOE CHIP EAST RANCH 20H | 4212734509 |
| BRISCOE CHIP EAST RANCH 21H | 4212734510 |
| BRISCOE CHIP EAST RANCH 22H | 4212734511 |
| BRISCOE CHIP EAST RANCH 23H | 4212734512 |
| BRISCOE CHIP EAST RANCH 24H | 4212734522 |
| BRISCOE CHIP EAST RANCH 25H | 4212734523 |
| BRISCOE CHIP EAST RANCH 26H | 4212734524 |
| BRISCOE CHIP EAST RANCH 27H | 4212736184 |
| BRISCOE CHIP EAST RANCH 28HR | 4212736283 |
| BRISCOE CHIP EAST RANCH 29H | 4212736186 |
| BRISCOE CHIP EAST RANCH 2H | 4212733772 |
| BRISCOE CHIP EAST RANCH 30H | 4212736188 |
| BRISCOE CHIP EAST RANCH 31H | 4212736206 |
| BRISCOE CHIP EAST RANCH 32H | 4212736207 |
| BRISCOE CHIP EAST RANCH 33H | 4212736236 |
| BRISCOE CHIP EAST RANCH 34H | 4212736237 |
| BRISCOE CHIP EAST RANCH 3H | 4212733773 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE CHIP EAST RANCH 4H | 4212733852 |
| BRISCOE CHIP EAST RANCH 5H | 4212733853 |
| BRISCOE CHIP EAST RANCH 6H | 4212733854 |
| BRISCOE CHIP EAST RANCH 7H | 4212734095 |
| BRISCOE CHIP EAST RANCH 8H | 4212734096 |
| BRISCOE CHIP EAST RANCH 9H | 4212734151 |
| BRISCOE CHIP EAST UNIT B 1H | 4212736168 |
| BRISCOE CHIP EAST UNIT B 2H | 4212736169 |
| BRISCOE CHIP EAST UNIT B 3H | 4212736170 |
| BRISCOE CHIP EAST UNIT B 4H | 4212736171 |
| BRISCOE CHIP EAST UNIT B 5H | 4212736172 |
| BRISCOE CHIP EAST UNIT B 6H | 4212736173 |
| BRISCOE CHIP EAST UNIT E 1H | 4212737052 |
| BRISCOE CHIP EAST UNIT E 2H | 4212737053 |
| BRISCOE CHIP EAST UNIT E 3H | 4212737054 |
| BRISCOE CHUPADERA RANCH 1 | 4247939786 |
| BRISCOE CHUPADERA RANCH 10H | 4247941266 |
| BRISCOE CHUPADERA RANCH 11H | 4247941267 |
| BRISCOE CHUPADERA RANCH 12H | 4247941985 |
| BRISCOE CHUPADERA RANCH 13H | 4247941986 |
| BRISCOE CHUPADERA RANCH 14H | 4247941987 |
| BRISCOE CHUPADERA RANCH 15H | 4247941988 |
| BRISCOE CHUPADERA RANCH 16H | 4247941989 |
| BRISCOE CHUPADERA RANCH 17H | 4247941990 |
| BRISCOE CHUPADERA RANCH 18H | 4247941994 |
| BRISCOE CHUPADERA RANCH 19H | 4247941998 |
| BRISCOE CHUPADERA RANCH 20H | 4247942001 |
| BRISCOE CHUPADERA RANCH 21H | 4247942000 |
| BRISCOE CHUPADERA RANCH 22H | 4247942002 |
| BRISCOE CHUPADERA RANCH 23H | 4247942003 |
| BRISCOE CHUPADERA RANCH 24H | 4247942686 |
| BRISCOE CHUPADERA RANCH 25H | 4247942687 |
| BRISCOE CHUPADERA RANCH 26H | 4247942689 |
| BRISCOE CHUPADERA RANCH 27H | 4247942691 |
| BRISCOE CHUPADERA RANCH 28H | 4247942692 |
| BRISCOE CHUPADERA RANCH 29H | 4247942693 |
| BRISCOE CHUPADERA RANCH 2H | 4247941322 |
| BRISCOE CHUPADERA RANCH 30H | 4247942694 |
| BRISCOE CHUPADERA RANCH 31HR | 4247943008 |
| BRISCOE CHUPADERA RANCH 32H | 4247942696 |
| BRISCOE CHUPADERA RANCH 33H | 4247942697 |
| BRISCOE CHUPADERA RANCH 34H | 4247942700 |
| BRISCOE CHUPADERA RANCH 35H | 4247942701 |
| BRISCOE CHUPADERA RANCH 36H | 4247942702 |
| BRISCOE CHUPADERA RANCH 37H | 4247942703 |
| BRISCOE CHUPADERA RANCH 38H | 4247942704 |
| BRISCOE CHUPADERA RANCH 39H | 4247942705 |
| BRISCOE CHUPADERA RANCH 3H | 4247941212 |
| BRISCOE CHUPADERA RANCH 40H | 4247942706 |
| BRISCOE CHUPADERA RANCH 41H | 4247942707 |
| BRISCOE CHUPADERA RANCH 42H | 4247942708 |
| BRISCOE CHUPADERA RANCH 43H | 4247942711 |
| BRISCOE CHUPADERA RANCH 4H | 4247941211 |
| BRISCOE CHUPADERA RANCH 5H | 4247941219 |
| BRISCOE CHUPADERA RANCH 6H | 4247941220 |
| BRISCOE CHUPADERA RANCH 7H | 4247941226 |
| BRISCOE CHUPADERA RANCH 8H | 4247941255 |
| BRISCOE CHUPADERA RANCH 9H | 4247941256 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 100H | 4228334450 |
| BRISCOE COCHINA EAST RANCH 101H | 4228334453 |
| BRISCOE COCHINA EAST RANCH 102H | 4228334469 |
| BRISCOE COCHINA EAST RANCH 103H | 4212736101 |
| BRISCOE COCHINA EAST RANCH 104H | 4212736102 |
| BRISCOE COCHINA EAST RANCH 105H | 4212736117 |
| BRISCOE COCHINA EAST RANCH 106H | 4212736105 |
| BRISCOE COCHINA EAST RANCH 107H | 4212736106 |
| BRISCOE COCHINA EAST RANCH 108H | 4212736108 |
| BRISCOE COCHINA EAST RANCH 109H | 4212736109 |
| BRISCOE COCHINA EAST RANCH 10H | 4212733678 |
| BRISCOE COCHINA EAST RANCH 110H | 4212736110 |
| BRISCOE COCHINA EAST RANCH 111H | 4212736112 |
| BRISCOE COCHINA EAST RANCH 112H | 4212736115 |
| BRISCOE COCHINA EAST RANCH 113H | 4212736116 |
| BRISCOE COCHINA EAST RANCH 114H | 4212736086 |
| BRISCOE COCHINA EAST RANCH 115H | 4212736087 |
| BRISCOE COCHINA EAST RANCH 116H | 4212736088 |
| BRISCOE COCHINA EAST RANCH 117H | 4212736090 |
| BRISCOE COCHINA EAST RANCH 118H | 4212736092 |
| BRISCOE COCHINA EAST RANCH 119H | 4212736093 |
| BRISCOE COCHINA EAST RANCH 11H | 4212733837 |
| BRISCOE COCHINA EAST RANCH 120H | 4212736094 |
| BRISCOE COCHINA EAST RANCH 121H | 4212736095 |
| BRISCOE COCHINA EAST RANCH 122H | 4212736097 |
| BRISCOE COCHINA EAST RANCH 123H | 4212736098 |
| BRISCOE COCHINA EAST RANCH 124H | 4212736099 |
| BRISCOE COCHINA EAST RANCH 125H | 4212736100 |
| BRISCOE COCHINA EAST RANCH 126H | 4212736103 |
| BRISCOE COCHINA EAST RANCH 127H | 4228334853 |
| BRISCOE COCHINA EAST RANCH 128H | 4228334854 |
| BRISCOE COCHINA EAST RANCH 129H | 4228334855 |
| BRISCOE COCHINA EAST RANCH 12H | 4212733838 |
| BRISCOE COCHINA EAST RANCH 130H | 4228334856 |
| BRISCOE COCHINA EAST RANCH 131H | 4228334857 |
| BRISCOE COCHINA EAST RANCH 132H | 4228334858 |
| BRISCOE COCHINA EAST RANCH 13H | 4212733839 |
| BRISCOE COCHINA EAST RANCH 163H | 4212736709 |
| BRISCOE COCHINA EAST RANCH 164H | 4212736708 |
| BRISCOE COCHINA EAST RANCH 165H | 4212736710 |
| BRISCOE COCHINA EAST RANCH 16H | 4212733914 |
| BRISCOE COCHINA EAST RANCH 17H | 4212733916 |
| BRISCOE COCHINA EAST RANCH 188H | 4228335665 |
| BRISCOE COCHINA EAST RANCH 189H | 4228335666 |
| BRISCOE COCHINA EAST RANCH 18H | 4212733968 |
| BRISCOE COCHINA EAST RANCH 190H | 4228335667 |
| BRISCOE COCHINA EAST RANCH 19H | 4212733990 |
| BRISCOE COCHINA EAST RANCH 1H | 4212733620 |
| BRISCOE COCHINA EAST RANCH 20H | 4212733994 |
| BRISCOE COCHINA EAST RANCH 21H | 4212733991 |
| BRISCOE COCHINA EAST RANCH 22H | 4212735204 |
| BRISCOE COCHINA EAST RANCH 23H | 4212735203 |
| BRISCOE COCHINA EAST RANCH 24H | 4212735081 |
| BRISCOE COCHINA EAST RANCH 25H | 4212735072 |
| BRISCOE COCHINA EAST RANCH 26H | 4212735086 |
| BRISCOE COCHINA EAST RANCH 27H | 4212735087 |
| BRISCOE COCHINA EAST RANCH 28H | 4212735205 |
| BRISCOE COCHINA EAST RANCH 29H | 4212735206 |

Case 19-34508 Document 373-5 Filed in TXSB on 06/24/20 Page 113 of 258

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 2H | 4212733621 |
| BRISCOE COCHINA EAST RANCH 30H | 4212735207 |
| BRISCOE COCHINA EAST RANCH 31H | 4212734098 |
| BRISCOE COCHINA EAST RANCH 32H | 4212734107 |
| BRISCOE COCHINA EAST RANCH 33H | 4212735208 |
| BRISCOE COCHINA EAST RANCH 34H | 4212735223 |
| BRISCOE COCHINA EAST RANCH 35H | 4212735210 |
| BRISCOE COCHINA EAST RANCH 36H | 4212735211 |
| BRISCOE COCHINA EAST RANCH 37H | 4212735213 |
| BRISCOE COCHINA EAST RANCH 38H | 4212735228 |
| BRISCOE COCHINA EAST RANCH 39H | 4212735229 |
| BRISCOE COCHINA EAST RANCH 3H | 4212733667 |
| BRISCOE COCHINA EAST RANCH 40H | 4228334138 |
| BRISCOE COCHINA EAST RANCH 41H | 4228334147 |
| BRISCOE COCHINA EAST RANCH 42H | 4228334154 |
| BRISCOE COCHINA EAST RANCH 43H | 4228334156 |
| BRISCOE COCHINA EAST RANCH 44H | 4228334157 |
| BRISCOE COCHINA EAST RANCH 45H | 4228334158 |
| BRISCOE COCHINA EAST RANCH 46H | 4228334163 |
| BRISCOE COCHINA EAST RANCH 47H | 4228334164 |
| BRISCOE COCHINA EAST RANCH 48H | 4228334165 |
| BRISCOE COCHINA EAST RANCH 49H | 4228334166 |
| BRISCOE COCHINA EAST RANCH 4H | 4212733668 |
| BRISCOE COCHINA EAST RANCH 50H | 4228334167 |
| BRISCOE COCHINA EAST RANCH 51H | 4228334168 |
| BRISCOE COCHINA EAST RANCH 52H | 4228334173 |
| BRISCOE COCHINA EAST RANCH 53H | 4228334174 |
| BRISCOE COCHINA EAST RANCH 54H | 4228334175 |
| BRISCOE COCHINA EAST RANCH 55H | 4228334176 |
| BRISCOE COCHINA EAST RANCH 56H | 4228334177 |
| BRISCOE COCHINA EAST RANCH 57H | 4228334225 |
| BRISCOE COCHINA EAST RANCH 58H | 4228334226 |
| BRISCOE COCHINA EAST RANCH 59H | 4228334227 |
| BRISCOE COCHINA EAST RANCH 5H | 4212733669 |
| BRISCOE COCHINA EAST RANCH 60H | 4228334228 |
| BRISCOE COCHINA EAST RANCH 61H | 4212734486 |
| BRISCOE COCHINA EAST RANCH 62H | 4212734487 |
| BRISCOE COCHINA EAST RANCH 63H | 4212734488 |
| BRISCOE COCHINA EAST RANCH 64H | 4212734489 |
| BRISCOE COCHINA EAST RANCH 65H | 4212734492 |
| BRISCOE COCHINA EAST RANCH 66H | 4212734494 |
| BRISCOE COCHINA EAST RANCH 67H | 4228333013 |
| BRISCOE COCHINA EAST RANCH 68H | 4228333015 |
| BRISCOE COCHINA EAST RANCH 69H | 4228333016 |
| BRISCOE COCHINA EAST RANCH 6H | 4212733670 |
| BRISCOE COCHINA EAST RANCH 70H | 4228333017 |
| BRISCOE COCHINA EAST RANCH 71H | 4228333018 |
| BRISCOE COCHINA EAST RANCH 72H | 4228333019 |
| BRISCOE COCHINA EAST RANCH 73H | 4228334307 |
| BRISCOE COCHINA EAST RANCH 74H | 4228334308 |
| BRISCOE COCHINA EAST RANCH 75H | 4228334309 |
| BRISCOE COCHINA EAST RANCH 76H | 4228334310 |
| BRISCOE COCHINA EAST RANCH 77H | 4228334312 |
| BRISCOE COCHINA EAST RANCH 78H | 4228334313 |
| BRISCOE COCHINA EAST RANCH 79H | 4228334362 |
| BRISCOE COCHINA EAST RANCH 7H | 4212733662 |
| BRISCOE COCHINA EAST RANCH 80H | 4228334363 |
| BRISCOE COCHINA EAST RANCH 81H | 4228334364 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 82H | 4228334365 |
| BRISCOE COCHINA EAST RANCH 83H | 4228334392 |
| BRISCOE COCHINA EAST RANCH 84H | 4228334393 |
| BRISCOE COCHINA EAST RANCH 85H | 4228334394 |
| BRISCOE COCHINA EAST RANCH 86H | 4228334395 |
| BRISCOE COCHINA EAST RANCH 87H | 4228334396 |
| BRISCOE COCHINA EAST RANCH 88H | 4228334399 |
| BRISCOE COCHINA EAST RANCH 89H | 4228334400 |
| BRISCOE COCHINA EAST RANCH 8H | 4212733671 |
| BRISCOE COCHINA EAST RANCH 90H | 4228334401 |
| BRISCOE COCHINA EAST RANCH 91H | 4228334402 |
| BRISCOE COCHINA EAST RANCH 92H | 4228334403 |
| BRISCOE COCHINA EAST RANCH 93H | 4228334404 |
| BRISCOE COCHINA EAST RANCH 94H | 4228334406 |
| BRISCOE COCHINA EAST RANCH 95H | 4228334407 |
| BRISCOE COCHINA EAST RANCH 96H | 4228334408 |
| BRISCOE COCHINA EAST RANCH 97H | 4228334409 |
| BRISCOE COCHINA EAST RANCH 98H | 4228334410 |
| BRISCOE COCHINA EAST RANCH 99H | 4228334451 |
| BRISCOE COCHINA EAST RANCH 9H | 4212733672 |
| BRISCOE COCHINA STATE UNIT A-1H | 4228332330 |
| BRISCOE COCHINA STATE UNIT B-1H | 4228332331 |
| BRISCOE COCHINA WEST RANCH 101H | 4212736914 |
| BRISCOE COCHINA WEST RANCH 102H | 4212736916 |
| BRISCOE COCHINA WEST RANCH 103H | 4212736917 |
| BRISCOE COCHINA WEST RANCH 104H | 4212736915 |
| BRISCOE COCHINA WEST RANCH 105H | 4212736918 |
| BRISCOE COCHINA WEST RANCH 11H | 4212733759 |
| BRISCOE COCHINA WEST RANCH 12H | 4212733859 |
| BRISCOE COCHINA WEST RANCH 16H | 4212734116 |
| BRISCOE COCHINA WEST RANCH 17H | 4212734118 |
| BRISCOE COCHINA WEST RANCH 18H | 4212734117 |
| BRISCOE COCHINA WEST RANCH 19H | 4212734831 |
| BRISCOE COCHINA WEST RANCH 1B | 4212735773 |
| BRISCOE COCHINA WEST RANCH 1E | 4212735779 |
| BRISCOE COCHINA WEST RANCH 1H | 4212733658 |
| BRISCOE COCHINA WEST RANCH 20H | 4212734833 |
| BRISCOE COCHINA WEST RANCH 21H | 4212734832 |
| BRISCOE COCHINA WEST RANCH 22H | 4212734445 |
| BRISCOE COCHINA WEST RANCH 23H | 4212734447 |
| BRISCOE COCHINA WEST RANCH 24H | 4212734449 |
| BRISCOE COCHINA WEST RANCH 25H | 4212734450 |
| BRISCOE COCHINA WEST RANCH 26H | 4212734451 |
| BRISCOE COCHINA WEST RANCH 27H | 4212734452 |
| BRISCOE COCHINA WEST RANCH 28H | 4212734834 |
| BRISCOE COCHINA WEST RANCH 29H | 4212734836 |
| BRISCOE COCHINA WEST RANCH 2H | 4212733696 |
| BRISCOE COCHINA WEST RANCH 30H | 4212734837 |
| BRISCOE COCHINA WEST RANCH 39H | 4212734472 |
| BRISCOE COCHINA WEST RANCH 3H | 4212733699 |
| BRISCOE COCHINA WEST RANCH 40H | 4212734473 |
| BRISCOE COCHINA WEST RANCH 41H | 4212734474 |
| BRISCOE COCHINA WEST RANCH 42H | 4212734475 |
| BRISCOE COCHINA WEST RANCH 43H | 4212734476 |
| BRISCOE COCHINA WEST RANCH 44H | 4212734477 |
| BRISCOE COCHINA WEST RANCH 47H | 4212735548 |
| BRISCOE COCHINA WEST RANCH 48H | 4212735549 |
| BRISCOE COCHINA WEST RANCH 49H | 4212735550 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA WEST RANCH 4H | 4212733700 |
| BRISCOE COCHINA WEST RANCH 50H | 4212735551 |
| BRISCOE COCHINA WEST RANCH 51H | 4212735552 |
| BRISCOE COCHINA WEST RANCH 52H | 4212735624 |
| BRISCOE COCHINA WEST RANCH 53H | 4212735626 |
| BRISCOE COCHINA WEST RANCH 54H | 4212735627 |
| BRISCOE COCHINA WEST RANCH 55H | 4212735628 |
| BRISCOE COCHINA WEST RANCH 56H | 4212735630 |
| BRISCOE COCHINA WEST RANCH 57H | 4212735629 |
| BRISCOE COCHINA WEST RANCH 58H | 4212735631 |
| BRISCOE COCHINA WEST RANCH 59H | 4212735632 |
| BRISCOE COCHINA WEST RANCH 5H | 4212733903 |
| BRISCOE COCHINA WEST RANCH 60H | 4212735633 |
| BRISCOE COCHINA WEST RANCH 61H | 4212735634 |
| BRISCOE COCHINA WEST RANCH 62H | 4212735636 |
| BRISCOE COCHINA WEST RANCH 63H | 4212735635 |
| BRISCOE COCHINA WEST RANCH 64H | 4212735640 |
| BRISCOE COCHINA WEST RANCH 65H | 4212735642 |
| BRISCOE COCHINA WEST RANCH 66H | 4212735643 |
| BRISCOE COCHINA WEST RANCH 67H | 4212735644 |
| BRISCOE COCHINA WEST RANCH 68H | 4212736138 |
| BRISCOE COCHINA WEST RANCH 69H | 4212736139 |
| BRISCOE COCHINA WEST RANCH 6H | 4212733904 |
| BRISCOE COCHINA WEST RANCH 70H | 4212736148 |
| BRISCOE COCHINA WEST RANCH 71H | 4212736140 |
| BRISCOE COCHINA WEST RANCH 72H | 4212736141 |
| BRISCOE COCHINA WEST RANCH 73H | 4212736142 |
| BRISCOE COCHINA WEST RANCH 74H | 4212736143 |
| BRISCOE COCHINA WEST RANCH 75H | 4212736144 |
| BRISCOE COCHINA WEST RANCH 76H | 4212736145 |
| BRISCOE COCHINA WEST RANCH 77H | 4212736146 |
| BRISCOE COCHINA WEST RANCH 7H | 4212733905 |
| BRISCOE COCHINA WEST RANCH 88H | 4212736263 |
| BRISCOE COCHINA WEST RANCH 89H | 4212736264 |
| BRISCOE COCHINA WEST RANCH 90H | 4212736265 |
| BRISCOE COCHINA WEST RANCH 91H | 4212736266 |
| BRISCOE COCHINA WEST RANCH 92H | 4212736267 |
| BRISCOE COCHINA WEST RANCH 93H | 4212736268 |
| BRISCOE COCHINA WEST RANCH 94H | 4212736269 |
| BRISCOE COCHINA WEST RANCH 95H | 4212736270 |
| BRISCOE EAST DELGADO UNIT A 10H | 4212735752 |
| BRISCOE EAST DELGADO UNIT A 11H | 4212735753 |
| BRISCOE EAST DELGADO UNIT A 12H | 4212735754 |
| BRISCOE EAST DELGADO UNIT A 13H | 4212735755 |
| BRISCOE EAST DELGADO UNIT A 14H | 4212735756 |
| BRISCOE EAST DELGADO UNIT A 15H | 4212735757 |
| BRISCOE EAST DELGADO UNIT A 1H | 4212735716 |
| BRISCOE EAST DELGADO UNIT A 2H | 4212735717 |
| BRISCOE EAST DELGADO UNIT A 3H | 4212735718 |
| BRISCOE EAST DELGADO UNIT A 4H | 4212735719 |
| BRISCOE EAST DELGADO UNIT A 5H | 4212735720 |
| BRISCOE EAST DELGADO UNIT A 6H | 4212735724 |
| BRISCOE EAST DELGADO UNIT A 7H | 4212735725 |
| BRISCOE EAST DELGADO UNIT A 8H | 4212735726 |
| BRISCOE EAST DELGADO UNIT A 9H | 4212735727 |
| BRISCOE ECKHARDT-SWONKE UNIT 1H | 4212735241 |
| BRISCOE ECKHARDT-SWONKE UNIT 2H | 4212735243 |
| BRISCOE ECKHARDT-SWONKE UNIT 3H | 4212735244 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE ECKHARDT-SWONKE UNIT 4H | 4212735245 |
| BRISCOE ECKHARDT-SWONKE UNIT 5H | 4212735246 |
| BRISCOE ECKHARDT-SWONKE UNIT 6H | 4212735249 |
| BRISCOE ECKHARDT-SWONKE UNIT 7H | 4212735250 |
| BRISCOE FRIDAY RANCH 18H | 4212734158 |
| BRISCOE FRIDAY RANCH 19H | 4212734193 |
| BRISCOE FRIDAY RANCH 1H | 4212733689 |
| BRISCOE FRIDAY RANCH 20H | 4212734194 |
| BRISCOE FRIDAY RANCH 21H | 4212734195 |
| BRISCOE FRIDAY RANCH 22H | 4212734196 |
| BRISCOE FRIDAY RANCH 23H | 4212735385 |
| BRISCOE FRIDAY RANCH 24H | 4212735389 |
| BRISCOE FRIDAY RANCH 25H | 4212734807 |
| BRISCOE FRIDAY RANCH 26H | 4212734810 |
| BRISCOE FRIDAY RANCH 27H | 4212734808 |
| BRISCOE FRIDAY RANCH 28H | 4212734812 |
| BRISCOE FRIDAY RANCH 29H | 4212734813 |
| BRISCOE FRIDAY RANCH 2H | 4212733708 |
| BRISCOE FRIDAY RANCH 30H | 4212734815 |
| BRISCOE FRIDAY RANCH 31H | 4212734817 |
| BRISCOE FRIDAY RANCH 32H | 4212734816 |
| BRISCOE FRIDAY RANCH 33H | 4212734818 |
| BRISCOE FRIDAY RANCH 34H | 4212734820 |
| BRISCOE FRIDAY RANCH 35H | 4212735387 |
| BRISCOE FRIDAY RANCH 36H | 4212735388 |
| BRISCOE FRIDAY RANCH 37H | 4212735392 |
| BRISCOE FRIDAY RANCH 38H | 4212735391 |
| BRISCOE FRIDAY RANCH 39H | 4212735393 |
| BRISCOE FRIDAY RANCH 3H | 4212733709 |
| BRISCOE FRIDAY RANCH 40H | 4212735394 |
| BRISCOE FRIDAY RANCH 41HR | 4212736456 |
| BRISCOE FRIDAY RANCH 42HR | 4212736457 |
| BRISCOE FRIDAY RANCH 43H | 4212736166 |
| BRISCOE FRIDAY RANCH 44H | 4212736167 |
| BRISCOE FRIDAY RANCH 45H | 4212736208 |
| BRISCOE FRIDAY RANCH 46HR | 4212736356 |
| BRISCOE FRIDAY RANCH 47H | 4212736218 |
| BRISCOE FRIDAY RANCH 4H | 4212733720 |
| BRISCOE FRIDAY RANCH 5H | 4212733721 |
| BRISCOE FRIDAY RANCH 6H | 4212733722 |
| BRISCOE FRIDAY RANCH 7H | 4212733755 |
| BRISCOE FRIDAY RANCH 8H | 4212733756 |
| BRISCOE FRIDAY RANCH 9H | 4212733757 |
| BRISCOE FRIDAY RANCH UNIT A 1H | 4212736196 |
| BRISCOE FRIDAY RANCH UNIT A 2H | 4212736197 |
| BRISCOE FRIDAY RANCH UNIT A 3H | 4212736198 |
| BRISCOE FRIDAY RANCH UNIT A 4H | 4212736199 |
| BRISCOE FRIDAY RANCH UNIT A 5H | 4212736200 |
| BRISCOE FRIDAY RANCH UNIT A 6H | 4212736201 |
| BRISCOE FRIDAY RANCH UNIT B 10H | 4212734273 |
| BRISCOE FRIDAY RANCH UNIT B 11H | 4212734275 |
| BRISCOE FRIDAY RANCH UNIT B 12H | 4212734274 |
| BRISCOE FRIDAY RANCH UNIT B 13H | 4212734276 |
| BRISCOE FRIDAY RANCH UNIT B 14H | 4212734309 |
| BRISCOE FRIDAY RANCH UNIT B 15H | 4212734310 |
| BRISCOE FRIDAY RANCH UNIT B 16H | 4212734311 |
| BRISCOE FRIDAY RANCH UNIT B 17H | 4212734313 |
| BRISCOE FRIDAY RANCH UNIT C 10H | 4212736898 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| BRISCOE FRIDAY RANCH UNIT C 11H | 4212736899 |
| BRISCOE FRIDAY RANCH UNIT C 1H | 4212736901 |
| BRISCOE FRIDAY RANCH UNIT C 2H | 4212736902 |
| BRISCOE FRIDAY RANCH UNIT C 3H | 4212736903 |
| BRISCOE FRIDAY RANCH UNIT C 4H | 4212736904 |
| BRISCOE FRIDAY RANCH UNIT C 5H | 4212736905 |
| BRISCOE FRIDAY RANCH UNIT C 6H | 4212736906 |
| BRISCOE FRIDAY RANCH UNIT C 7H | 4212736895 |
| BRISCOE FRIDAY RANCH UNIT C 8H | 4212736896 |
| BRISCOE FRIDAY RANCH UNIT C 9H | 4212736897 |
| BRISCOE FRIDAY SMITH 1H | 4212733984 |
| BRISCOE FRIDAY SMITH 2H | 4212733985 |
| BRISCOE FRIDAY SMITH 3H | 4212733986 |
| BRISCOE METCALF UNIT 1H | 4212737136 |
| BRISCOE METCALF UNIT 2H | 4212737138 |
| BRISCOE METCALF UNIT 3H | 4212737137 |
| BRISCOE METCALF UNIT 4H | 4212737139 |
| BRISCOE METCALF UNIT 5H | 4212737140 |
| BRISCOE METCALF UNIT 6H | 4212737141 |
| BRISCOE SPRINGMAN UNIT A 1H | 4212735278 |
| BRISCOE SPRINGMAN UNIT A 2H | 4212735279 |
| BRISCOE SPRINGMAN UNIT A 3H | 4212735280 |
| BRISCOE SPRINGMAN UNIT A 4H | 4212735281 |
| BRISCOE SPRINGMAN UNIT A 5H | 4212735283 |
| BRISCOE SPRINGMAN UNIT A 6H | 4212735282 |
| BRISCOE SPRINGMAN UNIT A 7H | 4212735284 |
| BRISCOE SPRINGMAN UNIT B 1H | 4212735285 |
| BRISCOE SPRINGMAN UNIT B 2H | 4212735286 |
| BRISCOE SPRINGMAN UNIT B 3H | 4212735287 |
| BRISCOE SPRINGMAN UNIT B 4H | 4212735288 |
| BRISCOE SPRINGMAN UNIT B 5H | 4212735289 |
| BRISCOE SPRINGMAN UNIT B 6H | 4212735290 |
| BRISCOE THON UNIT 1H | 4212735405 |
| BRISCOE THON UNIT 2H | 4212735407 |
| BRISCOE THON UNIT 3H | 4212735408 |
| BRISCOE THON UNIT 4H | 4212735406 |
| BRISCOE THON UNIT 5H | 4212735409 |
| CAGE 1TV | 4232333297 |
| CAGE 2TV | 4232333332 |
| CAGE 3TV | 4232333336 |
| CAGE 4RB | 4232333355 |
| CAGE 5TV | 4232333376 |
| CAGE 6TV | 4232333377 |
| CAGE 7TV | 4232333383 |
| CAGE 8TV | 4232333384 |
| CAGE 9TV | 4232333412 |
| CHAPARRAL WILDLIFE STATE 10H | 4212734800 |
| CHAPARRAL WILDLIFE STATE 11H | 4212734802 |
| CHAPARRAL WILDLIFE STATE 12H | 4212734805 |
| CHAPARRAL WILDLIFE STATE 13H | 4212734803 |
| CHAPARRAL WILDLIFE STATE 19H | 4212736430 |
| CHAPARRAL WILDLIFE STATE 20H | 4212736431 |
| CHAPARRAL WILDLIFE STATE 21H | 4212736432 |
| CHAPARRAL WILDLIFE STATE 22H | 4212736433 |
| CHAPARRAL WILDLIFE STATE 23H | 4212736434 |
| CHAPARRAL WILDLIFE STATE 24H | 4212737047 |
| CHAPARRAL WILDLIFE STATE 25H | 4212737048 |
| CHAPARRAL WILDLIFE STATE 26H | 4212737050 |

Case 4:19-34508 Document 373-6 Filed in TXSB on 07/24/20 Page 115 of 182

Existing Producing Wells

| WELL NAME | API |
|---|---|
| CHAPARRAL WILDLIFE STATE 27H | 4212737049 |
| CHAPARRAL WILDLIFE STATE 28H | 4212737051 |
| CHAPARRAL WILDLIFE STATE 4H | 4212734793 |
| CHAPARRAL WILDLIFE STATE 5H | 4212734794 |
| CHAPARRAL WILDLIFE STATE 6H | 4212734795 |
| CHAPARRAL WILDLIFE STATE 7H | 4212734796 |
| CHAPARRAL WILDLIFE STATE 8H | 4212734797 |
| CHAPARRAL WILDLIFE STATE 9H | 4212734798 |
| DENTONIO STATE 22 UNIT 10H | 4212735712 |
| DENTONIO STATE 22 UNIT 11H | 4212735714 |
| DENTONIO STATE 22 UNIT 12H | 4212735715 |
| DENTONIO STATE 22 UNIT 1H | 4212735679 |
| DENTONIO STATE 22 UNIT 2H | 4212735680 |
| DENTONIO STATE 22 UNIT 3H | 4212735681 |
| DENTONIO STATE 22 UNIT 4H | 4212735682 |
| DENTONIO STATE 22 UNIT 5H | 4212735686 |
| DENTONIO STATE 22 UNIT 6H | 4212735687 |
| DENTONIO STATE 22 UNIT 7H | 4212735688 |
| DENTONIO STATE 22 UNIT 8H | 4212735689 |
| DENTONIO STATE 22 UNIT 9H | 4212735711 |
| DENTONIO WHITE 23 UNIT 10H | 4212734923 |
| DENTONIO WHITE 23 UNIT 11H | 4212734924 |
| DENTONIO WHITE 23 UNIT 12H | 4212734931 |
| DENTONIO WHITE 23 UNIT 13H | 4212734927 |
| DENTONIO WHITE 23 UNIT 14H | 4212734926 |
| DENTONIO WHITE 23 UNIT 15H | 4212734928 |
| DENTONIO WHITE 23 UNIT 1H | 4212734549 |
| DENTONIO WHITE 23 UNIT 2H | 4212734550 |
| DENTONIO WHITE 23 UNIT 3H | 4212734551 |
| DENTONIO WHITE 23 UNIT 4H | 4212734552 |
| DENTONIO WHITE 23 UNIT 5H | 4212734553 |
| DENTONIO WHITE 23 UNIT 6H | 4212734554 |
| DENTONIO WHITE 23 UNIT 7H | 4212734938 |
| DENTONIO WHITE 23 UNIT 8H | 4212734940 |
| DENTONIO WHITE 23 UNIT 9H | 4212734941 |
| DIAMOND H RANCH 10H | 4212734751 |
| DIAMOND H RANCH 11H | 4212735057 |
| DIAMOND H RANCH 12H | 4212735201 |
| DIAMOND H RANCH 13H | 4212735403 |
| DIAMOND H RANCH 14H | 4212735646 |
| DIAMOND H RANCH 15H | 4212735647 |
| DIAMOND H RANCH 16H | 4212735648 |
| DIAMOND H RANCH 17H | 4212735649 |
| DIAMOND H RANCH 18H | 4212735651 |
| DIAMOND H RANCH 19H | 4212736475 |
| DIAMOND H RANCH 1H | 4212733561 |
| DIAMOND H RANCH 20H | 4212736482 |
| DIAMOND H RANCH 21H | 4212736483 |
| DIAMOND H RANCH 22H | 4212736474 |
| DIAMOND H RANCH 23H | 4212736484 |
| DIAMOND H RANCH 2H | 4212733693 |
| DIAMOND H RANCH 3H | 4212733819 |
| DIAMOND H RANCH 4H | 4212733892 |
| DIAMOND H RANCH 5H | 4212734314 |
| DIAMOND H RANCH 6H | 4212734150 |
| DIAMOND H RANCH 7H | 4212734408 |
| DIAMOND H RANCH 8H | 4212734410 |
| DIAMOND H RANCH 9H | 4212734610 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| DIAMOND H STATE 10H | 4212736436 |
| DIAMOND H STATE 11H | 4212736338 |
| DIAMOND H STATE 12H | 4212736339 |
| DIAMOND H STATE 13H | 4212736340 |
| DIAMOND H STATE 15H | 4212734896 |
| DIAMOND H STATE 16H | 4212735101 |
| DIAMOND H STATE 17H | 4212735192 |
| DIAMOND H STATE 18H | 4212735093 |
| DIAMOND H STATE 19H | 4212735655 |
| DIAMOND H STATE 1H | 4212733657 |
| DIAMOND H STATE 20H | 4212735652 |
| DIAMOND H STATE 21H | 4212735653 |
| DIAMOND H STATE 22H | 4212735654 |
| DIAMOND H STATE 2H | 4212733694 |
| DIAMOND H STATE 3H | 4212733786 |
| DIAMOND H STATE 4H | 4212733878 |
| DIAMOND H STATE 5H | 4212734312 |
| DIAMOND H STATE 6H | 4212734144 |
| DIAMOND H STATE 7H | 4212734395 |
| DIAMOND H STATE 8H | 4212734403 |
| DIAMOND H STATE 9H | 4212734603 |
| DIAMOND H STATE UNIT A 1H | 4212735396 |
| DIAMOND H STATE UNIT A 2H | 4212735398 |
| DIAMOND H STATE UNIT B 10H | 4212737092 |
| DIAMOND H STATE UNIT B 11H | 4212737094 |
| DIAMOND H STATE UNIT B 12H | 4212737093 |
| DIAMOND H STATE UNIT B 13H | 4212737095 |
| DIAMOND H STATE UNIT B 1H | 4212737075 |
| DIAMOND H STATE UNIT B 2H | 4212737076 |
| DIAMOND H STATE UNIT B 3H | 4212737080 |
| DIAMOND H STATE UNIT B 4H | 4212737077 |
| DIAMOND H STATE UNIT B 5H | 4212737081 |
| DIAMOND H STATE UNIT B 6H | 4212737082 |
| DIAMOND H STATE UNIT B 7H | 4212737083 |
| DIAMOND H STATE UNIT B 8H | 4212737084 |
| DIAMOND H STATE UNIT B 9H | 4212737085 |
| DIAMOND H STATE UNIT D 10H | 4212737063 |
| DIAMOND H STATE UNIT D 11H | 4212737064 |
| DIAMOND H STATE UNIT D 7H | 4212737061 |
| DIAMOND H STATE UNIT D 8H | 4212737057 |
| DIAMOND H STATE UNIT D 9H | 4212737062 |
| FOGMT 10SP | 4212735238 |
| FOGMT 11SP | 4212735242 |
| FOGMT 12SP | 4212735240 |
| FOGMT 13SP | 4212734995 |
| FOGMT 14SP | 4212735002 |
| FOGMT 15SP | 4212735003 |
| FOGMT 16SP | 4212735419 |
| FOGMT 17SP | 4212735420 |
| FOGMT 18SP | 4212736350 |
| FOGMT 19SP | 4212736351 |
| FOGMT 1SP | 4212733411 |
| FOGMT 20SP | 4212736352 |
| FOGMT 21SP | 4212736353 |
| FOGMT 22SP | 4212736354 |
| FOGMT 23SP | 4212736355 |
| FOGMT 24SP | 4212735438 |
| FOGMT 25SP | 4212735441 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| FOGMT 26SP | 4212735439 |
| FOGMT 27SP | 4212735440 |
| FOGMT 28SP | 4212735926 |
| FOGMT 29SP | 4212735927 |
| FOGMT 2SP | 4212733460 |
| FOGMT 30SP | 4212735928 |
| FOGMT 31SP | 4212735929 |
| FOGMT 32SP | 4212735948 |
| FOGMT 33SP | 4212735949 |
| FOGMT 34SP | 4212735950 |
| FOGMT 35SP | 4212735910 |
| FOGMT 36SP | 4212735911 |
| FOGMT 37SP | 4212735909 |
| FOGMT 38SP | 4212736581 |
| FOGMT 39SP | 4212736582 |
| FOGMT 3SH | 4212733592 |
| FOGMT 40SP | 4212736583 |
| FOGMT 41SP | 4212736584 |
| FOGMT 42SP | 4212736585 |
| FOGMT 43SP | 4212736517 |
| FOGMT 44SP | 4212736518 |
| FOGMT 45SP | 4212736519 |
| FOGMT 46SP | 4212736520 |
| FOGMT 47SP | 4212736521 |
| FOGMT 4SP | 4212733628 |
| FOGMT 54SP | 4212737018 |
| FOGMT 55SP | 4212737211 |
| FOGMT 5SH | 4212733654 |
| FOGMT 6SH | 4212733695 |
| FOGMT 7SP | 4212733910 |
| FOGMT 8SP | 4212734491 |
| FOGMT 9SP | 4212734490 |
| FOGMT E 1SP | 4212734996 |
| FOGMT E 2SP | 4212734992 |
| FOGMT F 1SP | 4212734993 |
| FOGMT G 1SP | 4212734994 |
| FOGMT UNIT A 10H | 4212736669 |
| FOGMT UNIT A 1H | 4212736660 |
| FOGMT UNIT A 2H | 4212736661 |
| FOGMT UNIT A 3H | 4212736662 |
| FOGMT UNIT A 4H | 4212736663 |
| FOGMT UNIT A 5H | 4212736664 |
| FOGMT UNIT A 6H | 4212736665 |
| FOGMT UNIT A 7H | 4212736666 |
| FOGMT UNIT A 8H | 4212736667 |
| FOGMT UNIT A 9H | 4212736668 |
| LA BANDERA RANCH 10H | 4212737135 |
| LA BANDERA RANCH 1H | 4212733618 |
| LA BANDERA RANCH 2H | 4212733634 |
| LA BANDERA RANCH 3H | 4212733673 |
| LA BANDERA RANCH 4H | 4212733740 |
| LA BANDERA RANCH 5H | 4212733809 |
| LA BANDERA RANCH 6H | 4212733909 |
| LA BANDERA RANCH 7H | 4212734204 |
| LA BANDERA RANCH 8H | 4212734402 |
| LA BANDERA RANCH 9H | 4212734629 |
| LA BANDERA RANCH UNIT A 1H | 4212735117 |
| LA BANDERA RANCH UNIT A 2H | 4212735091 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| LA BANDERA RANCH UNIT A 3H | 4212735113 |
| LA BANDERA RANCH UNIT A 4H | 4212735555 |
| LA BANDERA RANCH UNIT A 5H | 4212735556 |
| LA BANDERA RANCH UNIT A 6H | 4212735558 |
| LA BANDERA RANCH UNIT A 7H | 4212736331 |
| LA BANDERA RANCH UNIT A 8H | 4212736332 |
| LA BANDERA RANCH UNIT B 1H | 4212736586 |
| LA BANDERA RANCH UNIT B 2H | 4212736587 |
| LA BANDERA RANCH UNIT B 3H | 4212736588 |
| LA BANDERA RANCH UNIT B 4H | 4212736589 |
| LA BANDERA RANCH UNIT B 5H | 4212736590 |
| LA BANDERA RANCH UNIT B 6H | 4212736531 |
| LA BANDERA RANCH UNIT B 7H | 4212736532 |
| LA BANDERA RANCH UNIT B 8H | 4212736533 |
| LA BANDERA RANCH UNIT B 9H | 4212736534 |
| LLOYD BRISCOE 1H | 4232333452 |
| LLOYD BRISCOE 2H | 4232333451 |
| LLOYD BRISCOE 3H | 4232333450 |
| MAUND RANCH 18 UNIT 1H | 4212736795 |
| MAUND RANCH 18 UNIT 2H | 4212736796 |
| MAUND RANCH 18 UNIT 3H | 4212736799 |
| MAUND RANCH 18 UNIT 4H | 4212736800 |
| MAUND RANCH 18 UNIT 5H | 4212736801 |
| MAUND RANCH 18 UNIT 6H | 4212736803 |
| MAUND RANCH 18 UNIT 7H | 4212736804 |
| MAUND RANCH 18 UNIT 8H | 4212736805 |
| MAUND RANCH 18 UNIT 9H | 4212736806 |
| MAUND RANCH 19 UNIT 2H | 4212733999 |
| MAUND RANCH 19 UNIT 3H | 4212734387 |
| MAUND RANCH 19 UNIT 4H | 4212734264 |
| MAUND RANCH 19 UNIT 5H | 4212735553 |
| MAUND RANCH 19 UNIT 6H | 4212735554 |
| MAUND RANCH 23 UNIT 10H | 4212735496 |
| MAUND RANCH 23 UNIT 11H | 4212735497 |
| MAUND RANCH 23 UNIT 12H | 4212735498 |
| MAUND RANCH 23 UNIT 1H | 4212735432 |
| MAUND RANCH 23 UNIT 2H | 4212735433 |
| MAUND RANCH 23 UNIT 3H | 4212735435 |
| MAUND RANCH 23 UNIT 4H | 4212735437 |
| MAUND RANCH 23 UNIT 5H | 4212735436 |
| MAUND RANCH 23 UNIT 6H | 4212735434 |
| MAUND RANCH 23 UNIT 7H | 4212735494 |
| MAUND RANCH 23 UNIT 8H | 4212735493 |
| MAUND RANCH 23 UNIT 9H | 4212735495 |
| MAUND RANCH 26 UNIT 10H | 4212736133 |
| MAUND RANCH 26 UNIT 1H | 4212736124 |
| MAUND RANCH 26 UNIT 2H | 4212736123 |
| MAUND RANCH 26 UNIT 3H | 4212736125 |
| MAUND RANCH 26 UNIT 4H | 4212736126 |
| MAUND RANCH 26 UNIT 5H | 4212736127 |
| MAUND RANCH 26 UNIT 6H | 4212736128 |
| MAUND RANCH 26 UNIT 7H | 4212736129 |
| MAUND RANCH 26 UNIT 8H | 4212736130 |
| MAUND RANCH 26 UNIT 9H | 4212736131 |
| MAUND RANCH 27 UNIT 1H | 4212737107 |
| MAUND RANCH 27 UNIT 2H | 4212737108 |
| MAUND RANCH 27 UNIT 3H | 4212737103 |
| MAUND RANCH 27 UNIT 4H | 4212737104 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| MAUND RANCH 27 UNIT 5H | 4212737105 |
| MAUND RANCH 27 UNIT 6H | 4212737106 |
| MAUND RANCH 27 UNIT 7H | 4212733866 |
| MAUND RANCH 27 UNIT 8H | 4212737109 |
| MAUND RANCH 27 UNIT 9H | 4212737110 |
| RANCHO ENCANTADO 10H | 4212734911 |
| RANCHO ENCANTADO 11H | 4212734915 |
| RANCHO ENCANTADO 12H | 4212734161 |
| RANCHO ENCANTADO 13H | 4212734162 |
| RANCHO ENCANTADO 14H | 4212734943 |
| RANCHO ENCANTADO 15H | 4212734944 |
| RANCHO ENCANTADO 16H | 4212734945 |
| RANCHO ENCANTADO 17H | 4212734181 |
| RANCHO ENCANTADO 18H | 4212734182 |
| RANCHO ENCANTADO 19H | 4212734183 |
| RANCHO ENCANTADO 1H | 4212733729 |
| RANCHO ENCANTADO 20H | 4212734184 |
| RANCHO ENCANTADO 21H | 4212734185 |
| RANCHO ENCANTADO 22H | 4212734211 |
| RANCHO ENCANTADO 23H | 4212734213 |
| RANCHO ENCANTADO 24H | 4212734214 |
| RANCHO ENCANTADO 25H | 4212734215 |
| RANCHO ENCANTADO 26H | 4212734217 |
| RANCHO ENCANTADO 27H | 4212734218 |
| RANCHO ENCANTADO 28H | 4212734331 |
| RANCHO ENCANTADO 29H | 4212735328 |
| RANCHO ENCANTADO 30H | 4212735329 |
| RANCHO ENCANTADO 31H | 4212735334 |
| RANCHO ENCANTADO 32H | 4212735335 |
| RANCHO ENCANTADO 33H | 4212735336 |
| RANCHO ENCANTADO 34H | 4212735981 |
| RANCHO ENCANTADO 35H | 4212735982 |
| RANCHO ENCANTADO 36H | 4212735985 |
| RANCHO ENCANTADO 37H | 4212735987 |
| RANCHO ENCANTADO 38H | 4212735988 |
| RANCHO ENCANTADO 3H | 4212733833 |
| RANCHO ENCANTADO 4H | 4212733834 |
| RANCHO ENCANTADO 5H | 4212733835 |
| RANCHO ENCANTADO 6H | 4212733964 |
| RANCHO ENCANTADO 7H | 4212733961 |
| RANCHO ENCANTADO 8H | 4212733965 |
| RANCHO ENCANTADO 9H | 4212734910 |
| RANCHO ENCANTADO UNIT A 39H | 4212737069 |
| RANCHO ENCANTADO UNIT A 40H | 4212737068 |
| RANCHO ENCANTADO UNIT A 41H | 4212737066 |
| RANCHO ENCANTADO UNIT A 42H | 4212737067 |
| RANCHO ENCANTADO UNIT A 43H | 4212737065 |
| ROGERS DENTONIO 16 UNIT 1H | 4212734425 |
| ROGERS DENTONIO 16 UNIT 2H | 4212734426 |
| ROGERS DENTONIO 16 UNIT 3H | 4212734431 |
| ROGERS DENTONIO 16 UNIT 4H | 4212735412 |
| ROGERS DENTONIO 16 UNIT 5H | 4212735416 |
| ROGERS DENTONIO 16 UNIT 6H | 4212735417 |
| ROGERS DENTONIO 16 UNIT 7H | 4212735413 |
| ROGERS DENTONIO 16 UNIT 8H | 4212735414 |
| ROGERS DENTONIO 16 UNIT 9H | 4212735415 |
| ROGERS DENTONIO 31 UNIT 1H | 4212737035 |
| ROGERS DENTONIO 31 UNIT 2H | 4212737036 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| ROGERS DENTONIO 31 UNIT 3H | 4212737037 |
| ROGERS DENTONIO 31 UNIT 4H | 4212737038 |
| ROGERS DENTONIO 31 UNIT 5H | 4212737039 |
| ROGERS DENTONIO 31 UNIT 6H | 4212737040 |
| ROGERS DENTONIO 32 UNIT 10H | 4212736006 |
| ROGERS DENTONIO 32 UNIT 1H | 4212735997 |
| ROGERS DENTONIO 32 UNIT 2H | 4212735998 |
| ROGERS DENTONIO 32 UNIT 3H | 4212735999 |
| ROGERS DENTONIO 32 UNIT 4H | 4212736000 |
| ROGERS DENTONIO 32 UNIT 5H | 4212736001 |
| ROGERS DENTONIO 32 UNIT 6H | 4212736002 |
| ROGERS DENTONIO 32 UNIT 7H | 4212736003 |
| ROGERS DENTONIO 32 UNIT 8H | 4212736004 |
| ROGERS DENTONIO 32 UNIT 9H | 4212736005 |
| ROGERS DENTONIO 33 UNIT 10H | 4212736022 |
| ROGERS DENTONIO 33 UNIT 11H | 4212736023 |
| ROGERS DENTONIO 33 UNIT 1H | 4212736013 |
| ROGERS DENTONIO 33 UNIT 2H | 4212736014 |
| ROGERS DENTONIO 33 UNIT 3H | 4212736015 |
| ROGERS DENTONIO 33 UNIT 4H | 4212736016 |
| ROGERS DENTONIO 33 UNIT 5H | 4212736017 |
| ROGERS DENTONIO 33 UNIT 6H | 4212736018 |
| ROGERS DENTONIO 33 UNIT 7H | 4212736019 |
| ROGERS DENTONIO 33 UNIT 8H | 4212736020 |
| ROGERS DENTONIO 33 UNIT 9H | 4212736021 |
| ROGERS DENTONIO RANCH 12H | 4212734249 |
| ROGERS DENTONIO RANCH 13H | 4212734251 |
| ROGERS DENTONIO RANCH 14H | 4212734136 |
| ROGERS DENTONIO RANCH 15H | 4212734137 |
| ROGERS DENTONIO RANCH 16H | 4212734252 |
| ROGERS DENTONIO RANCH 1H | 4212733636 |
| ROGERS DENTONIO RANCH 2H | 4212733679 |
| ROGERS DENTONIO RANCH 3H | 4212733845 |
| ROGERS DENTONIO RANCH 4H | 4212733846 |
| ROGERS DENTONIO RANCH 5H | 4212733847 |
| ROGERS DENTONIO RANCH 6H | 4212733864 |
| SOUTH SPUR RANCH 1H | 4212733633 |
| SOUTH SPUR RANCH 2H | 4212733865 |
| SOUTH SPUR STATE 1H | 4212733660 |
| SOUTH SPUR STATE 2H | 4212733686 |
| SOUTH SPUR STATE 3H | 4212733827 |
| SOUTH SPUR STATE 4H | 4212733828 |
| SOUTH SPUR STATE 5H | 4212734465 |
| SOUTH SPUR STATE 6H | 4212734464 |
| SOUTH SPUR STATE 7H | 4212734466 |
| SOUTH SPUR UNIT A 1H | 4212734104 |
| SOUTH SPUR UNIT A 2H | 4212734216 |
| SOUTH SPUR UNIT A 3H | 4212734453 |
| SOUTH SPUR UNIT A 4H | 4212734675 |
| SOUTH SPUR UNIT A 5H | 4212734677 |
| SOUTH SPUR UNIT A 6H | 4212734676 |
| SOUTH SPUR UNIT A 7H | 4212735478 |
| SOUTH SPUR UNIT A 8H | 4212735479 |
| SOUTH SPUR UNIT A 9H | 4212735480 |
| STANLEY RANCH 10H | 4247941428 |
| STANLEY RANCH 11H | 4247941429 |
| STANLEY RANCH 12H | 4247941430 |
| STANLEY RANCH 13H | 4247941431 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STANLEY RANCH 14H | 4247941432 |
| STANLEY RANCH 15H | 4247941433 |
| STANLEY RANCH 16H | 4247941434 |
| STANLEY RANCH 17H | 4247941422 |
| STANLEY RANCH 18H | 4247941424 |
| STANLEY RANCH 19H | 4247941423 |
| STANLEY RANCH 1H | 4247940742 |
| STANLEY RANCH 20H | 4247941426 |
| STANLEY RANCH 21H | 4247941129 |
| STANLEY RANCH 22H | 4247941130 |
| STANLEY RANCH 23H | 4247941131 |
| STANLEY RANCH 24H | 4247941231 |
| STANLEY RANCH 25H | 4247941241 |
| STANLEY RANCH 26H | 4247942383 |
| STANLEY RANCH 27H | 4247942384 |
| STANLEY RANCH 28H | 4247942293 |
| STANLEY RANCH 29H | 4247942161 |
| STANLEY RANCH 2H | 4247940940 |
| STANLEY RANCH 30H | 4247942449 |
| STANLEY RANCH 31H | 4247942450 |
| STANLEY RANCH 3H | 4247941051 |
| STANLEY RANCH 43H | 4247941907 |
| STANLEY RANCH 44H | 4247941960 |
| STANLEY RANCH 45H | 4247942456 |
| STANLEY RANCH 46H | 4247942458 |
| STANLEY RANCH 47H | 4247942457 |
| STANLEY RANCH 48H | 4247941719 |
| STANLEY RANCH 49H | 4247941723 |
| STANLEY RANCH 4H | 4247941053 |
| STANLEY RANCH 50H | 4247941722 |
| STANLEY RANCH 51H | 4247941727 |
| STANLEY RANCH 52H | 4247941728 |
| STANLEY RANCH 53H | 4247941729 |
| STANLEY RANCH 54H | 4247941696 |
| STANLEY RANCH 55H | 4247941693 |
| STANLEY RANCH 56H | 4247941695 |
| STANLEY RANCH 57H | 4247941683 |
| STANLEY RANCH 58H | 4247941684 |
| STANLEY RANCH 59H | 4247941685 |
| STANLEY RANCH 5H | 4247941054 |
| STANLEY RANCH 60H | 4247941660 |
| STANLEY RANCH 61H | 4247941661 |
| STANLEY RANCH 62H | 4247941663 |
| STANLEY RANCH 63H | 4247942875 |
| STANLEY RANCH 6H | 4247941421 |
| STANLEY RANCH 7H | 4247941435 |
| STANLEY RANCH 8H | 4247941436 |
| STANLEY RANCH 9H | 4247941437 |
| STUMBERG RANCH 10H | 4212734233 |
| STUMBERG RANCH 11H | 4212734235 |
| STUMBERG RANCH 12H | 4212734234 |
| STUMBERG RANCH 16H | 4212734369 |
| STUMBERG RANCH 17H | 4212734370 |
| STUMBERG RANCH 18H | 4212734371 |
| STUMBERG RANCH 19H | 4212734611 |
| STUMBERG RANCH 1H | 4212733717 |
| STUMBERG RANCH 20H | 4212734612 |
| STUMBERG RANCH 21H | 4212734613 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| STUMBERG RANCH 22H | 4212734614 |
| STUMBERG RANCH 23H | 4212734615 |
| STUMBERG RANCH 24H | 4212734616 |
| STUMBERG RANCH 25H | 4212734619 |
| STUMBERG RANCH 26H | 4212734620 |
| STUMBERG RANCH 27HR | 4212734710 |
| STUMBERG RANCH 28H | 4212734623 |
| STUMBERG RANCH 29H | 4212734624 |
| STUMBERG RANCH 2H | 4212733719 |
| STUMBERG RANCH 30H | 4212734665 |
| STUMBERG RANCH 31H | 4212734668 |
| STUMBERG RANCH 32H | 4212734666 |
| STUMBERG RANCH 33H | 4212734667 |
| STUMBERG RANCH 34H | 4212734670 |
| STUMBERG RANCH 35H | 4212734669 |
| STUMBERG RANCH 36H | 4212735772 |
| STUMBERG RANCH 37H | 4212735774 |
| STUMBERG RANCH 38H | 4212735775 |
| STUMBERG RANCH 39H | 4212735776 |
| STUMBERG RANCH 3H | 4212733725 |
| STUMBERG RANCH 40H | 4212735827 |
| STUMBERG RANCH 41H | 4212735829 |
| STUMBERG RANCH 42H | 4212735830 |
| STUMBERG RANCH 43H | 4212735831 |
| STUMBERG RANCH 44H | 4212735832 |
| STUMBERG RANCH 45H | 4212735833 |
| STUMBERG RANCH 46H | 4212735838 |
| STUMBERG RANCH 47H | 4212735839 |
| STUMBERG RANCH 48H | 4212735840 |
| STUMBERG RANCH 49H | 4212735841 |
| STUMBERG RANCH 4HR | 4212733933 |
| STUMBERG RANCH 50H | 4212735842 |
| STUMBERG RANCH 51H | 4212735843 |
| STUMBERG RANCH 52HR | 4212737120 |
| STUMBERG RANCH 5H | 4212733934 |
| STUMBERG RANCH 6H | 4212733935 |
| STUMBERG RANCH 7H | 4212733979 |
| STUMBERG RANCH 8H | 4212733977 |
| STUMBERG RANCH 9H | 4212733978 |
| STUMBERG RANCH UNIT A 1H | 4212735519 |
| STUMBERG RANCH UNIT A 2H | 4212735520 |
| STUMBERG RANCH UNIT A 3H | 4212735521 |
| STUMBERG RANCH UNIT A 4H | 4212735540 |
| STUMBERG RANCH UNIT A 5H | 4212735541 |
| STUMBERG RANCH UNIT A 6H | 4212735542 |
| STUMBERG RANCH UNIT A 7H | 4212735543 |
| STUMBERG RANCH UNIT B 1H | 4212735611 |
| STUMBERG RANCH UNIT B 2H | 4212735612 |
| STUMBERG RANCH UNIT B 3H | 4212735613 |
| STUMBERG RANCH UNIT B 4H | 4212735614 |
| STUMBERG RANCH UNIT B 5H | 4212735615 |
| STUMBERG RANCH UNIT B 6H | 4212735616 |
| STUMBERG RANCH UNIT B 7H | 4212735617 |
| STUMBERG RANCH UNIT C 11H | 4212736836 |
| STUMBERG RANCH UNIT C 12H | 4212736837 |
| STUMBERG RANCH UNIT C 13H | 4212736835 |
| STUMBERG RANCH UNIT C 14H | 4212736838 |
| STUMBERG RANCH UNIT C 15H | 4212736839 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| TOVAR WEST-LLOYD 34 B UNIT 1H | 4232333420 |
| TOVAR WEST-LLOYD 34 UNIT 1H | 4232333351 |
| TOVAR WEST-LLOYD 63 A UNIT 1H | 4232333389 |
| TOVAR WEST-LLOYD 63 B UNIT 1H | 4232333400 |
| TOVAR WEST-LLOYD 69 A UNIT 1H | 4232333411 |
| TOVAR WEST-LLOYD 75 A UNIT 1H | 4232333360 |
| TOVAR WEST-LLOYD 77 UNIT 1H | 4232333348 |
| TOVAR WEST-LLOYD 79 A UNIT 1H | 4232333390 |
| TOVAR WLC A UNIT 1H | 4232333415 |
| TOVAR WLC A UNIT 2H | 4232333417 |
| TOVAR WLC A UNIT 3H | 4232333416 |
| TOVAR WLC A UNIT 4H | 4232333435 |
| TOVAR WLC A UNIT 5H | 4232333436 |
| TOVAR WLC A UNIT 6H | 4232333437 |
| TOVAR WLC B UNIT 1H | 4232333438 |
| TOVAR WLC B UNIT 2H | 4232333439 |
| TOVAR WLC B UNIT 3H | 4232333440 |
| WORTHEY RANCH 10H | 4247941107 |
| WORTHEY RANCH 11H | 4247941500 |
| WORTHEY RANCH 12H | 4247941501 |
| WORTHEY RANCH 13H | 4247941502 |
| WORTHEY RANCH 14H | 4247941482 |
| WORTHEY RANCH 15H | 4247941483 |
| WORTHEY RANCH 16H | 4247941484 |
| WORTHEY RANCH 17H | 4247941132 |
| WORTHEY RANCH 18H | 4247941133 |
| WORTHEY RANCH 19H | 4247941134 |
| WORTHEY RANCH 1H | 4247940755 |
| WORTHEY RANCH 20H | 4247941376 |
| WORTHEY RANCH 21H | 4247941377 |
| WORTHEY RANCH 22H | 4247941378 |
| WORTHEY RANCH 23H | 4247941487 |
| WORTHEY RANCH 24H | 4247941488 |
| WORTHEY RANCH 25H | 4247941489 |
| WORTHEY RANCH 26H | 4247941515 |
| WORTHEY RANCH 27H | 4247941517 |
| WORTHEY RANCH 28H | 4247941518 |
| WORTHEY RANCH 29H | 4247941521 |
| WORTHEY RANCH 2H | 4247940941 |
| WORTHEY RANCH 30H | 4247942341 |
| WORTHEY RANCH 31H | 4247942342 |
| WORTHEY RANCH 32H | 4247942344 |
| WORTHEY RANCH 34H | 4247942437 |
| WORTHEY RANCH 35H | 4247942438 |
| WORTHEY RANCH 36H | 4247942440 |
| WORTHEY RANCH 37H | 4247942436 |
| WORTHEY RANCH 38H | 4247941356 |
| WORTHEY RANCH 39H | 4247942339 |
| WORTHEY RANCH 3H | 4247941119 |
| WORTHEY RANCH 40H | 4247942340 |
| WORTHEY RANCH 41H | 4247942347 |
| WORTHEY RANCH 42H | 4247942346 |
| WORTHEY RANCH 43H | 4247941906 |
| WORTHEY RANCH 44H | 4247942160 |
| WORTHEY RANCH 45H | 4247942484 |
| WORTHEY RANCH 46H | 4247942485 |
| WORTHEY RANCH 47H | 4247942486 |
| WORTHEY RANCH 48H | 4247942487 |

Existing Producing Wells

| WELL NAME | API |
|---|---|
| WORTHEY RANCH 49H | 4247942488 |
| WORTHEY RANCH 4H | 4247941120 |
| WORTHEY RANCH 50H | 4247942489 |
| WORTHEY RANCH 51H | 4247942491 |
| WORTHEY RANCH 53H | 4247942480 |
| WORTHEY RANCH 54H | 4247942482 |
| WORTHEY RANCH 55H | 4247942483 |
| WORTHEY RANCH 56H | 4247942016 |
| WORTHEY RANCH 57H | 4247942131 |
| WORTHEY RANCH 5H | 4247940971 |
| WORTHEY RANCH 6H | 4247941108 |
| WORTHEY RANCH 7H | 4247941194 |
| WORTHEY RANCH 8H | 4247940983 |
| WORTHEY RANCH 9H | 4247941019 |

**Annex VI**
**Existing Drilling and Uncompleted Wells**

(*see attached*)

## Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE CARLA RANCH UNIT A 1H | 4212736445 |
| BRISCOE CARLA RANCH UNIT A 2H | 4212736446 |
| BRISCOE CARLA RANCH UNIT A 3H | 4212736447 |
| BRISCOE CARLA RANCH UNIT A 4H | 4212736450 |
| BRISCOE CARLA RANCH UNIT A 5H | 4212736449 |
| BRISCOE CARLA RANCH UNIT B 1H | 4212736464 |
| BRISCOE CARLA RANCH UNIT B 2H | 4212736465 |
| BRISCOE CARLA RANCH UNIT B 3H | 4212736466 |
| BRISCOE CARLA RANCH UNIT B 4H | 4212736468 |
| BRISCOE CARLA RANCH UNIT B 5H | 4212736467 |
| BRISCOE CARLA RANCH UNIT B 6H | 4212736469 |
| BRISCOE CARLA RANCH UNIT B 7H | 4212736470 |
| BRISCOE CATARINA NORTH 104H | 4212736819 |
| BRISCOE CATARINA NORTH 105H | 4212736820 |
| BRISCOE CATARINA NORTH 106H | 4212736810 |
| BRISCOE CATARINA NORTH 107H | 4212736809 |
| BRISCOE CATARINA NORTH 108H | 4212736811 |
| BRISCOE CATARINA NORTH 109H | 4212736812 |
| BRISCOE CATARINA NORTH 110H | 4212736813 |
| BRISCOE CATARINA NORTH 111H | 4212736814 |
| BRISCOE CATARINA NORTH 112H | 4212736815 |
| BRISCOE CATARINA NORTH 113H | 4212736816 |
| BRISCOE CATARINA NORTH 114H | 4212736817 |
| BRISCOE CATARINA NORTH 115H | 4212736818 |
| BRISCOE CATARINA NORTH 116H | 4212736821 |
| BRISCOE CATARINA NORTH 117H | 4212736822 |
| BRISCOE CATARINA NORTH 118H | 4212736823 |
| BRISCOE CATARINA NORTH 119H | 4212736826 |
| BRISCOE CATARINA NORTH 120H | 4212736828 |
| BRISCOE CATARINA NORTH 121H | 4212736827 |
| BRISCOE CATARINA NORTH 122H | 4212736829 |
| BRISCOE CATARINA NORTH 123H | 4212736830 |
| BRISCOE CATARINA NORTH 124H | 4212736831 |
| BRISCOE CATARINA NORTH 125H | 4212736832 |
| BRISCOE CATARINA NORTH 126H | 4212736833 |
| BRISCOE CATARINA NORTH 127H | 4212736834 |
| BRISCOE CATARINA NORTH 128H | 4212736862 |
| BRISCOE CATARINA NORTH 129H | 4212736863 |
| BRISCOE CATARINA NORTH 130H | 4212736864 |
| BRISCOE CATARINA NORTH 131H | 4212736865 |
| BRISCOE CATARINA NORTH 132H | 4212736868 |
| BRISCOE CATARINA WEST 83H | 4212736874 |
| BRISCOE CATARINA WEST 84H | 4212736875 |
| BRISCOE CATARINA WEST 85H | 4212736876 |
| BRISCOE CATARINA WEST 86H | 4212736877 |
| BRISCOE CATARINA WEST 87H | 4212736878 |
| BRISCOE CATARINA WEST 88H | 4212736879 |
| BRISCOE CATARINA WEST 89H | 4212736880 |
| BRISCOE CATARINA WEST 91H | 4212736882 |
| BRISCOE CATARINA WEST 92H | 4212736883 |
| BRISCOE CATARINA WEST 94H | 4212736886 |
| BRISCOE CATARINA WEST 95H | 4212736885 |
| BRISCOE CATARINA WEST 97H | 4212736888 |
| BRISCOE COCHINA EAST RANCH 133H | 4228334859 |
| BRISCOE COCHINA EAST RANCH 134H | 4228334860 |
| BRISCOE COCHINA EAST RANCH 135H | 4228334861 |
| BRISCOE COCHINA EAST RANCH 136H | 4228334862 |
| BRISCOE COCHINA EAST RANCH 137H | 4228334863 |

Existing Drilled and Uncompleted Wells

| WELL NAME | API |
|---|---|
| BRISCOE COCHINA EAST RANCH 138H | 4228334864 |
| BRISCOE COCHINA EAST RANCH 139H | 4228334865 |
| BRISCOE COCHINA EAST RANCH 140H | 4228334866 |
| BRISCOE COCHINA EAST RANCH 141H | 4228334867 |
| BRISCOE COCHINA EAST RANCH 142H | 4228334868 |
| BRISCOE COCHINA EAST RANCH 143H | 4228334869 |
| BRISCOE COCHINA EAST RANCH 144H | 4228334870 |
| BRISCOE COCHINA EAST RANCH 145HR | 4228335149 |
| BRISCOE COCHINA EAST RANCH 146H | 4228334872 |
| BRISCOE COCHINA EAST RANCH 147H | 4228334873 |
| BRISCOE COCHINA WEST RANCH 100H | 4212736330 |
| BRISCOE COCHINA WEST RANCH 10H | 4212734822 |
| BRISCOE COCHINA WEST RANCH 13H | 4212734823 |
| BRISCOE COCHINA WEST RANCH 14H | 4212734825 |
| BRISCOE COCHINA WEST RANCH 15H | 4212734824 |
| BRISCOE COCHINA WEST RANCH 31H | 4212734882 |
| BRISCOE COCHINA WEST RANCH 32H | 4212734883 |
| BRISCOE COCHINA WEST RANCH 33H | 4212734889 |
| BRISCOE COCHINA WEST RANCH 34H | 4212734884 |
| BRISCOE COCHINA WEST RANCH 35H | 4212734885 |
| BRISCOE COCHINA WEST RANCH 36H | 4212735038 |
| BRISCOE COCHINA WEST RANCH 37H | 4212735039 |
| BRISCOE COCHINA WEST RANCH 38H | 4212735041 |
| BRISCOE COCHINA WEST RANCH 45H | 4212735042 |
| BRISCOE COCHINA WEST RANCH 46H | 4212735492 |
| BRISCOE COCHINA WEST RANCH 78H | 4212736250 |
| BRISCOE COCHINA WEST RANCH 79H | 4212736253 |
| BRISCOE COCHINA WEST RANCH 80H | 4212736254 |
| BRISCOE COCHINA WEST RANCH 81H | 4212736255 |
| BRISCOE COCHINA WEST RANCH 82H | 4212736256 |
| BRISCOE COCHINA WEST RANCH 83H | 4212736257 |
| BRISCOE COCHINA WEST RANCH 84H | 4212736258 |
| BRISCOE COCHINA WEST RANCH 85H | 4212736259 |
| BRISCOE COCHINA WEST RANCH 86H | 4212736260 |
| BRISCOE COCHINA WEST RANCH 87H | 4212736261 |
| BRISCOE COCHINA WEST RANCH 8H | 4212734821 |
| BRISCOE COCHINA WEST RANCH 96H | 4212736326 |
| BRISCOE COCHINA WEST RANCH 97H | 4212736327 |
| BRISCOE COCHINA WEST RANCH 98H | 4212736328 |
| BRISCOE COCHINA WEST RANCH 99H | 4212736329 |
| BRISCOE COCHINA WEST RANCH 9H | 4212734826 |
| CARLA SOUTH SPUR UNIT A 1H | 4212736476 |
| CARLA SOUTH SPUR UNIT A 2H | 4212736480 |
| CARLA SOUTH SPUR UNIT A 3H | 4212736481 |
| ROGERS DENTONIO 31 UNIT 10H | 4212737044 |
| ROGERS DENTONIO 31 UNIT 11H | 4212737045 |
| ROGERS DENTONIO 31 UNIT 7H | 4212737041 |
| ROGERS DENTONIO 31 UNIT 8H | 4212737042 |
| ROGERS DENTONIO 31 UNIT 9H | 4212737043 |
| SOUTH SPUR RANCH 3H | 4212736374 |
| SOUTH SPUR RANCH 4H | 4212736375 |
| SOUTH SPUR UNIT B 10H | 4212736684 |
| SOUTH SPUR UNIT B 1H | 4212736676 |
| SOUTH SPUR UNIT B 2H | 4212736677 |
| SOUTH SPUR UNIT B 3H | 4212736678 |
| SOUTH SPUR UNIT B 4H | 4212736679 |
| SOUTH SPUR UNIT B 5H | 4212736680 |
| SOUTH SPUR UNIT B 6H | 4212736681 |

**Existing Drilled and Uncompleted Wells**

| WELL NAME | API |
|---|---|
| SOUTH SPUR UNIT B 7H | 4212736682 |
| SOUTH SPUR UNIT B 8H | 4212736683 |
| SOUTH SPUR UNIT B 9H | 4212736936 |
| STUMBERG RANCH 53H | 4212737219 |
| STUMBERG RANCH 54H | 4212737222 |
| STUMBERG RANCH 55H | 4212737220 |
| STUMBERG RANCH 56H | 4212737221 |
| STUMBERG RANCH UNIT C 10H | 4212736700 |
| STUMBERG RANCH UNIT C 1H | 4212736690 |
| STUMBERG RANCH UNIT C 2H | 4212736691 |
| STUMBERG RANCH UNIT C 3H | 4212736692 |
| STUMBERG RANCH UNIT C 4H | 4212736693 |
| STUMBERG RANCH UNIT C 5H | 4212736694 |
| STUMBERG RANCH UNIT C 6H | 4212736696 |
| STUMBERG RANCH UNIT C 7H | 4212736697 |
| STUMBERG RANCH UNIT C 8H | 4212736698 |

**Annex VII**
**Restricted Areas**



**Exhibit A**

[Intentionally omitted]

**<u>Exhibit B</u>**

**Form Operating Agreement**

(*see attached*)

**Exhibit B**

**to Joint Development Agreement, dated as of December 29, 2016,**
**by and among [SN Restricted Sub, SN Unsub, and Blackstone NewCo]**

**A.A.P.L. FORM 610 - 1989**

# MODEL FORM OPERATING AGREEMENT

**HORIZONTAL MODIFICATIONS**

**OPERATING AGREEMENT**

**DATED**

______________ , __________ ,
*Year*

**OPERATOR** ____________________

**CONTRACT AREA** See Exhibit "A" attached

**COUNTY ~~OR PARISH~~ OF** [Maverick, Dimmitt, Webb, LaSalle] **, STATE OF** Texas

**COPYRIGHT 2013 – ALL RIGHTS RESERVED AMERICAN ASSOCIATION OF PROFESSIONAL LANDMEN, 4100 FOSSIL CREEK BLVD. FORT WORTH, TEXAS, 76137, APPROVED FORM. A.A.P.L. NO. 610 - 1989 (Horz.)**

**TABLE OF CONTENTS**


| Article | Title | Page |
|---|---|---|
| **I.** | **DEFINITIONS** | 1 |
| **II.** | **EXHIBITS** | 3 |
| **III.** | **INTERESTS OF PARTIES** | 4 |
| | ~~A. OIL AND GAS INTERESTS~~ | 4 |
| | B. INTERESTS OF PARTIES IN COSTS AND PRODUCTION | 4 |
| | C. SUBSEQUENTLY CREATED INTERESTS | 4 |
| **IV.** | **TITLES** | 5 |
| | A. TITLE EXAMINATION | 5 |
| | B. LOSS OR FAILURE OF TITLE | 6 |
| | ~~1. Failure of Title~~ | 6 |
| | ~~2. Loss by Non-Payment or Erroneous Payment of Amount Due~~ | 6 |
| | 3. ~~Other~~ All Losses | 7 |
| | ~~4. Curing Title~~ | 7 |
| **V.** | **OPERATOR** | 7 |
| | A. DESIGNATION AND RESPONSIBILITIES OF OPERATOR | 7 |
| | B. RESIGNATION OR REMOVAL OF OPERATOR AND SELECTION OF SUCCESSOR | 8 |
| | 1. Resignation or Removal of Operator | 8 |
| | 2. Selection of Successor Operator | 8 |
| | 3. Effect of Bankruptcy | 8 |
| | C. EMPLOYEES AND CONTRACTORS | 9 |
| | D. RIGHTS AND DUTIES OF OPERATOR | 9 |
| | 1. Competitive Rates and Use of Affiliates | 9 |
| | 2. Discharge of Joint Account Obligations | 9 |
| | 3. Protection from Liens | 9 |
| | 4. Custody of Funds | 9 |
| | 5. Access to Contract Area and Records | 9 |
| | 6. Filing and Furnishing Governmental Reports | 10 |
| | 7. Drilling and Testing Operations | 10 |
| | 8. Cost Estimates | 10 |
| | 9. Insurance | 10 |
| **VI.** | **DRILLING AND DEVELOPMENT** | 10 |
| | ~~A. INITIAL WELL~~ | 10 |
| | B. SUBSEQUENT OPERATIONS | 11 |
| | 1. Proposed Operations | 11 |
| | 2. Operations by Less Than All Parties | 11 |
| | 3. Stand-By Costs | 14 |
| | 4. Deepening | 14 |
| | 5. Sidetracking | 15 |
| | 6. Order of Preference of Operations | 16 |
| | 7. Conformity to Spacing Pattern | 16 |
| | 8. Paying Wells | 16 |
| | 9. Spudder Rigs | 16 |
| | 10 Multi-Well Pads | 17 |
| | C. COMPLETION OF WELLS; REWORKING AND PLUGGING BACK | 17 |
| | 1. Completion | 17 |
| | 2. Rework, Recomplete or Plug Back | 18 |
| | D. OTHER OPERATIONS | 18 |
| | E. ABANDONMENT OF WELLS | 18 |
| | 1. Abandonment of Dry Holes | 18 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)


| Article | Title | Page |
|---|---|---|
| | 2. Abandonment of Wells That Have Produced | 19 |
| | 3. Abandonment of Non-Consent Operations | 20 |
| | F. TERMINATION OF OPERATIONS | 20 |
| | G. TAKING PRODUCTION IN KIND | 20 |
| | (Option 1) Gas Balancing Agreement | 20 |
| | ~~(Option 2) No Gas Balancing Agreement~~ | 21 |
| **VII.** | **EXPENDITURES AND LIABILITY OF PARTIES** | 22 |
| | A. LIABILITY OF PARTIES | 22 |
| | B. LIENS AND SECURITY INTERESTS | 22 |
| | C. ADVANCES | 23 |
| | D. DEFAULTS AND REMEDIES | 24 |
| | 1. Suspension of Rights | 24 |
| | 2. Suit for Damages | 24 |
| | 3. Deemed Non-Consent | 24 |
| | 4. Advance Payment | 25 |
| | 5. Costs and Attorneys' Fees | 25 |
| | E. RENTALS, SHUT-IN WELL PAYMENTS AND MINIMUM ROYALTIES | 25 |
| | F. TAXES | 25 |
| **VIII.** | **ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST** | 26 |
| | A. SURRENDER OF LEASES | 26 |
| | B. RENEWAL OR EXTENSION OF LEASES | 26 |
| | C. ACREAGE OR CASH CONTRIBUTIONS | 27 |
| | D. ASSIGNMENT; ~~MAINTENANCE OF UNIFORM INTEREST~~ | 27 |
| | E. WAIVER OF RIGHTS TO PARTITION | 28 |
| | ~~F. PREFERENTIAL RIGHT TO PURCHASE~~ | 28 |
| **IX.** | **INTERNAL REVENUE CODE ELECTION** | 29 |
| **X.** | **CLAIMS AND LAWSUITS** | 29 |
| **XI.** | **FORCE MAJEURE** | 29 |
| **XII.** | **NOTICES** | 30 |
| **XIII.** | **TERM OF AGREEMENT** | 30 |
| **XIV.** | **COMPLIANCE WITH LAWS AND REGULATIONS** | 31 |
| | A. LAWS, REGULATIONS AND ORDERS | 31 |
| | B. GOVERNING LAW | 31 |
| | C. REGULATORY AGENCIES | 31 |
| **XV.** | **MISCELLANEOUS** | 32 |
| | A. EXECUTION | 32 |
| | B. SUCCESSORS AND ASSIGNS | 32 |
| | C. COUNTERPARTS | 32 |
| | D. SEVERABILITY | 32 |
| **XVI.** | **OTHER PROVISIONS (Attached)** | 33 |
| | ~~A. CONFLICT OF TERMS~~ | 33 |
| | ~~B. OPERATOR'S DUTY~~ | 33 |
| | ~~C. PRIORITY OF OPERATIONS – HORIZONTAL WELLS~~ | 33 |

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**OPERATING AGREEMENT**

THIS AGREEMENT, entered into by and between ____________________________________, hereinafter designated and referred to as "Operator," and the signatory party or parties other than Operator, sometimes hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

**WITNESSETH:**

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A," and the parties hereto have reached an agreement to explore and develop these Leases and/or Oil and Gas Interests for the production of Oil and Gas to the extent and as hereinafter provided,

NOW, THEREFORE, it is agreed as follows:

**ARTICLE I.**
**DEFINITIONS**

As used in this agreement, the following words and terms shall have the meanings here ascribed to them:

A. The term "AFE" shall mean an Authority for Expenditure prepared by a party to this agreement for the purpose of estimating the costs to be incurred in conducting an operation hereunder. An AFE is not a contractual commitment. Rather it is only an estimate, made in good faith.

B. The term "Completion" or "Complete" shall mean a single operation intended to complete a well as a / well capable of producing ~~producer of~~ Oil and Gas in one or more Zones, including, but not limited to, the setting of production casing, perforating, well stimulation and production testing conducted in such operation.

C. The term "Contract Area" shall mean all of the lands, Oil and Gas Leases and/or Oil and Gas Interests intended to be developed and operated for Oil and Gas purposes under this agreement. Such lands, Oil and Gas Leases and Oil and Gas Interests are described in Exhibit "A."

D. The term "Deepen" shall mean a single operation whereby a well is drilled to an objective Zone below the deepest Zone in which the well was previously drilled, or below the ~~D~~deepest Zone proposed in the associated AFE, whichever is the lesser. ~~When used in connection with a Horizontal Well, the term "Deepen" shall mean an operation whereby a Lateral is drilled to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) to the Displacement to which the Lateral was drilled pursuant to a previous proposal.~~ "Deepen" shall not refer or apply to operations for the Extension of a Lateral.

E. The term "Displacement" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall otherwise mean the length of a Lateral.

F. The terms "Drilling Party" and "Consenting Party" shall mean a party who agrees to join in and pay its share of the cost of any operation conducted under the provisions of this agreement.

G. The term "Drilling Unit" shall mean the area fixed for the drilling of one well by order or rule of any state or federal body having authority. If a Drilling Unit is not fixed by any such rule or order, a Drilling Unit shall be the drilling unit as established by the pattern of drilling in the Contract Area unless fixed by express agreement of the Drilling Parties.

H. The term "Drillsite" shall mean the Oil and Gas Lease or Oil and Gas Interest on which a proposed well is to be located. When used in connection with a Horizontal Well, the term "Drillsite" shall mean

(i) the surface hole location, and (ii) the Oil and Gas Leases or Oil and Gas Interests within the Drilling Unit on or under which the wellbore, including the Lateral, is located.

I. The term "Horizontal Rig Move-On Period" shall mean the number of days after the date of rig release of a Spudder Rig until the date a rig capable of drilling a Horizontal Well to its Total Measured Depth has moved on to location.

J. The term "Horizontal Well" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean a well containing one or more Laterals which are drilled, Completed or Recompleted in a manner in which the horizontal component of the Completion interval (1) extends at least one hundred feet (100') in the objective formation(s) and (2) exceeds the vertical component of the Completion interval in the objective formation(s).

~~K. The term "Initial Well" shall mean the well required to be drilled by the parties hereto as provided in Article VI.A.~~[Intentionally Omitted.]

L. The term "Lateral" shall mean that portion of a wellbore / of a Horizontal Well between the point at which the wellbore initially penetrates the objective Zone and the Terminus. ~~that deviates from approximate vertical orientation to approximate horizontal orientation and all wellbore beyond such deviation to Total Measured Depth~~.

M. The term "Non-Consent Well" shall mean a well in which less than all parties have conducted an operation as provided in Article VI.B.2.

N. The terms "Non-Drilling Party" and "Non-Consenting Party" shall mean a party who elects not to participate in a proposed operation.

O. The term "Oil and Gas" shall mean oil, gas, casinghead gas, gas condensate, and/or all other liquid or gaseous hydrocarbons and other marketable substances produced therewith, unless an intent to limit the inclusiveness of this term is specifically stated.

P. The term "Oil and Gas Interests" or "Interests" shall mean unleased fee and mineral interests in Oil and Gas in tracts of land lying within the Contract Area which are owned by parties to this agreement.

Q. The terms "Oil and Gas Lease," "Lease" and "Leasehold" shall mean the oil and gas leases or interests therein covering tracts of land lying within the Contract Area which are owned by the parties to this agreement.

R. The term "Plug Back" shall mean a single operation whereby a deeper Zone is abandoned in order to attempt a Completion in a shallower Zone. When used in connection with a Horizontal Well, the term "Plug Back" shall mean an operation to test or Complete the well at a stratigraphically shallower Zone in which the operation has been or is being Completed and which is not in an existing Lateral.

S. The term "Recompletion" or "Recomplete" shall mean an operation whereby a Completion in one Zone is abandoned in order to attempt a Completion in a different Zone within the existing wellbore.

T. The term "Rework" shall mean an operation conducted in the wellbore of a well after it is Completed to secure, restore, or improve production in a Zone which is currently open to production in the wellbore. Such operations include, but are not limited to, well stimulation operations but exclude any ~~routine repair or maintenance work~~ Workover or drilling, Sidetracking, Deepening, Completing, Recompleting, or Plugging Back of a well.

U. The term "Sidetrack" shall mean the directional control and intentional deviation of a well from vertical so as to change the bottom hole location unless done to straighten the hole or drill around junk in the hole to overcome other mechanical difficulties. When used in connection with a Horizontal Well, the term "Sidetrack" shall mean the

directional control and deviation of a well outside the existing Lateral(s) so as to change the Zone or the direction of a Lateral from the approved proposal unless done to straighten the hole or drill around junk in the hole or to overcome other mechanical difficulties.

V. The term "Spudder Rig" shall mean a drilling rig utilized only for drilling all or part of the vertical component of a Horizontal Well; a rig used only for setting conductor pipe shall not be considered a Spudder Rig.

W. The term "Terminus" shall have the same meaning as the term defined by the state regulatory agency having jurisdiction over the Contract Area, in the absence of which the term shall mean the furthest point drilled in the Lateral.

X. The term "Total Measured Depth," when used in connection with a Horizontal Well, shall mean the distance from the surface of the ground to the Terminus, as measured along and including the vertical component of the well and Lateral(s). When the proposed operation(s) is the drilling of, or operation on, a Horizontal Well, the terms "depth" or "total depth" wherever used in this agreement shall be deemed to read "Total Measured Depth" insofar as it applies to such well.

Y. The term "Vertical Well" shall mean a well drilled, Completed or Recompleted other than a Horizontal Well.

Z. The term "Zone" shall mean a stratum of earth containing or thought to contain a common accumulation of Oil and Gas separately producible from any other common accumulation of Oil and Gas. See Article XVI for additional definitions.

Unless the context otherwise clearly indicates, words used in the singular include the plural, the word "person" includes natural and artificial persons, the plural includes the singular, and any gender includes the masculine, feminine, and neuter.

**ARTICLE II.**
**EXHIBITS**

The following exhibits, as indicated below and attached hereto, are incorporated in and made a part hereof:

X A. Exhibit "A," shall include the following information:

(1) Description of lands subject to this agreement,

(2) Restrictions, if any, as to depths, formations, or substances,

(3) Parties to agreement with addresses and telephone numbers for notice purposes,

(4) Percentages or fractional interests of parties to this agreement,

(5) Oil and Gas Leases and/or Oil and Gas Interests subject to this agreement.

(6) Burdens on production.

~~B. Exhibit "B," Form of Lease.~~

X C. Exhibit "C," Accounting Procedure.

X D. Exhibit "D," Insurance.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

X E. Exhibit "E," Gas Balancing Agreement.

X F. Exhibit "F," Non-Discrimination and Certification of Non-Segregated Facilities.

X G. Exhibit "G," Tax Partnership.

X H. Other: Form of Memorandum of Operating Agreement

If any provision of any exhibit, except Exhibits "E," "F" and "G," is inconsistent with any provision contained in the body of this agreement, the provisions in the body of this agreement shall prevail.

**ARTICLE III.**
**INTERESTS OF PARTIES**

~~**A. Oil and Gas Interests:**~~

~~If any party owns an Oil and Gas Interest in the Contract Area, that Interest shall be treated for all purposes of this agreement and during the term hereof as if it were covered by the form of Oil and Gas Lease attached hereto as Exhibit "B," and the owner thereof shall be deemed to own both royalty interest in such lease and the interest of the lessee thereunder.~~

**B. Interests of Parties in Costs and Production:**

Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and materials acquired in operations / conducted hereunder ~~on the Contract Area~~ shall be owned, by the parties as their interests are set forth in Exhibit "A." In the same manner, the parties shall also own all production of Oil and Gas from the Contract Area subject, however, to the payment of royalties and other burdens on production as described hereafter. See also Article XVI.

Regardless of which party has contributed any Oil and Gas Lease or Oil and Gas Interest on which royalty or other burdens may be payable and except as otherwise expressly provided in this agreement, each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area / except Subsequently Created Interests created by other parties hereto. ~~up to, but not in excess of, __________ and shall indemnify, defend and hold the other parties free from any liability therefor. Except as otherwise expressly provided in this agreement, if any party has contributed hereto any Lease or Interest which is burdened with any royalty, overriding royalty, production payment or other burden on production in excess of the amounts stipulated above, such party so burdened shall assume and alone bear all such excess obligations and shall indemnify, defend and hold the other parties hereto harmless from any and all claims attributable to such excess burden. However, so long as the Drilling Unit for the productive Zone(s) is identical with the Contract Area, each party shall pay or deliver, or cause to be paid or delivered, all burdens on production from the Contract Area due under the terms of the Oil and Gas Lease(s) which such party has contributed to this agreement, and shall indemnify, defend and hold the other parties free from any liability therefor.~~

No party shall ever be responsible, on a price basis higher than the price received by such party, to any other party's lessor or royalty owner, and if such other party's lessor or royalty owner should demand and receive settlement on a higher price basis, the party contributing the affected Lease shall bear the additional royalty burden attributable to such higher price.

Nothing contained in this Article III.B. shall be deemed an assignment or cross-assignment of interests covered hereby, and in the event two or more parties contribute to this agreement jointly owned Leases, the parties' undivided interests in said Leaseholds shall be deemed separate leasehold interests for the purposes of this agreement.

**C. Subsequently Created Interests:**

If any party has contributed hereto a Lease or Interest that is burdened with an assignment of production given as security for the payment of money, or if, after the date of this agreement, any party creates an overriding royalty, production payment, net profits interest, assignment of production or other burden payable out of production attributable to its working interest hereunder, such burden shall be deemed a "Subsequently Created Interest." Further, if any party has contributed hereto a Lease or Interest burdened with an overriding royalty, production payment, net profits interests, or other burden payable out of production created prior to the date of this agreement, and such burden is not shown on Exhibit "A," such burden also shall be deemed a Subsequently Created Interest to the extent such burden causes the burdens on such party's Lease or Interest to exceed the amount stipulated in Article III.B. above.

The party whose interest is burdened with the Subsequently Created Interest (the "Burdened Party") shall assume and alone bear, pay and discharge the Subsequently Created Interest and shall indemnify, defend and hold harmless the other parties from and against any liability therefor. Further, if the Burdened Party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the Subsequently Created Interest in the same manner as they are enforceable against the working interest of the Burdened Party. If the Burdened Party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said Subsequently Created Interest, and the Burdened Party shall indemnify, defend and hold harmless said other party, or parties, from any and all claims and demands for payment asserted by owners of the Subsequently Created Interest.

**ARTICLE IV.**
**TITLES**

**A. Title Examination**

Title examination shall be made on the Drillsite of any proposed well prior to commencement of drilling operations and, if a majority in interest of the Drilling Parties so request or Operator so elects, title examination shall be made on the entire Drilling Unit, or maximum anticipated Drilling Unit, of the well. The opinion will include the ownership of the working interest, minerals, royalty, overriding royalty and production payments under the applicable Leases. Each party contributing Leases and/or Oil and Gas Interests to be included in the Drillsite or Drilling Unit, if appropriate, shall furnish to Operator all abstracts (including federal lease status reports), title opinions, title papers and curative material in its possession free of charge. All such information not in the possession of or made available to Operator by the parties, but necessary for the examination of the title, shall be obtained by Operator. Operator shall cause title to be examined by attorneys on its staff or by outside attorneys. Copies of all title opinions shall be furnished to each Drilling Party. Costs incurred by Operator in procuring abstracts, fees paid outside attorneys / and outside landmen for title examination (including preliminary, supplemental, shut-in royalty opinions and division order title opinions) / title curative and other direct charges as provided in Exhibit "C" shall be borne by the Drilling Parties in the proportion that the interest of each Drilling Party bears to the total interest of all Drilling Parties as such interests appear in Exhibit "A." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions.

/ The Operator ~~Each party~~ shall be responsible for securing curative matter and pooling amendments or agreements required in connection with Leases or Oil and Gas Interests / included in the Contract Area ~~contributed by such party~~. Operator shall be responsible for the preparation and recording of pooling designations or declarations and communitization agreements as well as the conduct of hearings before governmental agencies for the securing of spacing or pooling orders or any other orders necessary or appropriate to the conduct of operations hereunder. This shall not prevent any party from appearing on its own behalf at such hearings. Costs incurred by Operator, including fees paid to outside attorneys, / landmen, or consultants which are associated with hearings before governmental agencies, and which costs are necessary and proper for the activities contemplated under this agreement, shall be direct

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

charges to the joint account and shall not be covered by the administrative overhead charges as provided in Exhibit "C." Operator shall make no charge for services rendered by its staff attorneys or other personnel in the performance of the above functions. No well shall be drilled on the Contract Area until after (1) the title to the Drillsite or Drilling Unit, if appropriate, has been examined as above provided, and (2) the title has been approved by the examining attorney / or the Operator or title has been accepted by all of the Drilling Parties in such well.

~~B. Loss or Failure of Title:~~

~~1.~~ Failure of Title~~: Should any Oil and Gas Interest or Oil and Gas Lease be lost through failure of title, which results in a reduction of interest from that shown on Exhibit "A," the party credited with contributing the affected Lease or Interest (including, if applicable, a successor in interest to such party) shall have ninety (90) days from final determination of title failure to acquire a new lease or other instrument curing the entirety of the title failure, which acquisition will not be subject to Article VIII.B., and failing to do so, this agreement, nevertheless, shall continue in force as to all remaining Oil and Gas Leases and Interests; and,~~

~~(a) The party credited with contributing the Oil and Gas Lease or Interest affected by the title failure (including, if applicable, a successor in interest to such party) shall bear alone the entire loss and it shall not be entitled to recover from Operator or the other parties any development or operating costs which it may have previously paid or incurred, but there shall be no additional liability on its part to the other parties hereto by reason of such title failure;~~

~~(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the Lease or Interest which has failed, but the interests of the parties contained on Exhibit "A" shall be revised on an acreage basis, as of the time it is determined finally that title failure has occurred, so that the interest of the party whose Lease or Interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the Lease or Interest failed;~~

~~(c) If the proportionate interest of the other parties hereto in any producing well previously drilled on the Contract Area is increased by reason of the title failure, the party who bore the costs incurred in connection with such well attributable to the Lease or Interest which has failed shall receive the proceeds attributable to the increase in such interest (less costs and burdens attributable thereto) until it has been reimbursed for unrecovered costs paid by it in connection with such well attributable to such failed Lease or Interest;~~

~~(d) Should any person not a party to this agreement, who is determined to be the owner of any Lease or Interest which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refunded;~~

~~(e) Any liability to account to a person not a party to this agreement for prior production of Oil and Gas which arises by reason of title failure shall be borne severally by each party (including a predecessor to a current party) who received production for which such accounting is required based on the amount of such production received, and each such party shall severally indemnify, defend and hold harmless all other parties hereto for any such liability to account;~~

~~(f) No charge shall be made to the joint account for legal expenses, fees or salaries in connection with the defense of the Lease or Interest claimed to have failed, but if the party contributing such Lease or Interest hereto elects to defend its title it shall bear all expenses in connection therewith; and~~

~~(g) If any party is given credit on Exhibit "A" to a Lease or Interest which is limited solely to ownership of an interest in the wellbore of any well or wells and the production therefrom, such party's absence of interest in the remainder of the Contract Area shall be considered a Failure of Title as to such remaining Contract Area unless that absence of interest is reflected on Exhibit "A."~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

~~2.~~ Loss by Non-Payment or Erroneous Payment of Amount Due~~: If, through mistake or oversight, any rental, shut-in well payment, minimum royalty or royalty payment, or other payment necessary to maintain all or a portion of an Oil and Gas Lease or interest is not paid or is erroneously paid, and as a result a Lease or Interest terminates, there shall be no monetary liability against the party who failed to make such payment. Unless the party who failed to make the required payment secures a new Lease or Interest covering the same interest within ninety (90) days from the discovery of the failure to make proper payment, which acquisition will not be subject to Article VIII.B., the interests of the parties reflected on Exhibit "A" shall be revised on an acreage basis, effective as of the date of termination of the Lease or Interest involved, and the party who failed to make proper payment will no longer be credited with an interest in the Contract Area on account of ownership of the Lease or Interest which has terminated. If the party who failed to make the required payment shall not have been fully reimbursed, at the time of the loss, from the proceeds of the sale of Oil and Gas attributable to the lost Lease or Interest, calculated on an acreage basis, for the development and operating costs previously paid on account of such Lease or Interest, it shall be reimbursed for unrecovered actual costs previously paid by it (but not for its share of the cost of any dry hole previously drilled or wells previously abandoned) from so much of the following as is necessary to effect reimbursement:~~

~~(a) Proceeds of Oil and Gas produced prior to termination of the Lease or Interest, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, previously accrued to the credit of the lost Lease or Interest, on an acreage basis, up to the amount of unrecovered costs;~~

~~(b) Proceeds of Oil and Gas, less operating expenses and lease burdens chargeable hereunder to the person who failed to make payment, up to the amount of unrecovered costs attributable to that portion of Oil and Gas thereafter produced and marketed (excluding production from any wells thereafter drilled) which, in the absence of such Lease or Interest termination, would be attributable to the lost Lease or Interest on an acreage basis and which as a result of such Lease or Interest termination is credited to other parties, the proceeds of said portion of the Oil and Gas to be contributed by the other parties in proportion to their respective interests reflected on Exhibit "A"; and,~~

~~(c) Any monies, up to the amount of unrecovered costs, that may be paid by any party who is, or becomes, the owner of the Lease or Interest lost, for the privilege of participating in the Contract Area or becoming a party to this agreement.~~

3. Other Losses: All losses of Leases or Interests committed to this agreement, ~~other than those set forth in Articles IV.B.1. and IV.B.2. above,~~ shall be joint losses and shall be borne by all parties in proportion to their interests shown on Exhibit "A." This shall include but not be limited to the loss of any Lease or Interest through failure to develop or because express or implied covenants have not been performed (other than performance which requires only the payment of money), and the loss of any Lease by expiration at the end of its primary term if it is not renewed or extended. There shall be no readjustment of interests in the remaining portion of the Contract Area on account of any joint loss.

~~4.~~ Curing Title~~: In the event of a Failure of Title under Article IV.B.1. or a loss of title under Article IV.B.2. above, any Lease or Interest acquired by any party hereto (other than the party whose interest has failed or was lost) during the ninety (90) day period provided by Article IV.B.1. and Article IV.B.2. above covering all or a portion of the interest that has failed or was lost shall be offered at cost to the party whose interest has failed or was lost, and the provisions of Article VIII.B. shall not apply to such acquisition.~~

## ARTICLE V.
## OPERATOR

**A. Designation and Responsibilities of Operator:**

______________________________ shall be the Operator of the Contract Area, and shall conduct and direct and have full control of all operations / conducted hereunder ~~on the Contract Area~~ as permitted and required by, and within the limits of this agreement. In its performance of services hereunder for the Non-Operators,

Operator shall be an independent contractor not subject to the control or direction of the Non-Operators except as to the type of operation to be undertaken in accordance with the election procedures contained in this 27 agreement. Operator shall not be deemed, or hold itself out as, the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by Operator as to any third party. Operator shall conduct its activities under this agreement as a reasonably prudent operator, in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, and in compliance with applicable law and regulation, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred / in connection with operations authorized or approved hereunder except such as may result from gross negligence or willful misconduct. See also Article XVI.

**B. Resignation or Removal of Operator and Selection of Successor:** **See Article XVI.**

~~1.~~ Resignation or Removal of Operator: ~~Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. Operator may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator; such vote shall not be deemed effective until a written notice has been delivered to the Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty-eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall mean not only gross negligence or willful misconduct but also the material breach of or inability to meet the standards of operation contained in Article V.A. or material failure or inability to perform its obligations under this agreement.~~

~~Subject to Article VII.D.1., such resignation or removal shall not become effective until 7:00 o'clock A.M. on the first day of the calendar month following the expiration of ninety (90) days after the giving of notice of resignation by Operator or action by the Non- Operators to remove Operator, unless a successor Operator has been selected and assumes the duties of Operator at an earlier date. Operator, after effective date of resignation or removal, shall be bound by the terms hereof as a Non-Operator. A change of a corporate name or structure of Operator or transfer of Operator's interest to any single subsidiary, parent or successor corporation shall not be the basis for removal of Operator.~~

~~2.~~ Selection of Successor Operator: ~~Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A"; provided, however, if an Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.~~

~~3.~~ Effect of Bankruptcy: ~~If Operator becomes insolvent, bankrupt or is placed in receivership, it shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor in possession, or by a trustee in bankruptcy, shall be deemed a resignation as Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a~~

~~majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator and the federal bankruptcy court shall be selected as a member of the operating committee, and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."~~

**C. Employees and Contractors:**

The number of employees or contractors used by Operator in conducting operations hereunder, their selection, and the hours of labor and the compensation for services performed shall be determined / by the Operator, and all such employees or contractors shall be the employees or contractors of Operator.

**D. Rights and Duties of Operator:**

1. Competitive Rates and Use of Affiliates: All wells drilled on the Contract Area shall be drilled on a competitive contract basis at the usual rates prevailing in the area. If it so desires, Operator may employ its own tools and equipment in the drilling of wells, but its charges therefor shall not exceed the prevailing rates in the area and the rate of such charges shall be agreed upon by the parties in writing before drilling operations are commenced, and such work shall be performed by Operator under the same terms and conditions as are customary and usual in the area in contracts of independent contractors who are doing work of a similar nature. All work performed or materials supplied by aAffiliates or related parties of Operator shall be performed or supplied at competitive rates, pursuant to written agreement, and in accordance with customs and standards prevailing in the industry.

2. Discharge of Joint Account Obligations: Except as herein otherwise specifically provided, Operator shall promptly pay and discharge expenses incurred in the development and operation of the Contract Area pursuant to this agreement and shall charge each of the parties hereto with their respective proportionate shares upon the expense basis provided in Exhibit "C." Operator shall keep an accurate record of the joint account hereunder, showing expenses incurred and charges and credits made and received.

3. Protection from Liens: Operator shall pay, or cause to be paid, as and when they become due and payable, all accounts of contractors and suppliers and wages and salaries for services rendered or performed, and for materials supplied on, to or in respect of the Contract Area or any operations for the joint account thereof, and shall keep the Contract Area free from liens and encumbrances resulting therefrom except for those resulting from a bona fide dispute as to services rendered or materials supplied.

4. Custody of Funds: Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non- Operator funds as herein specifically provided. ~~Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.~~

5. Access to Contract Area and Records: Operator shall, except as otherwise provided herein, permit each / Consenting Party ~~Non-Operator~~ or its duly authorized representative, at ~~the Non-Operator's~~ its sole risk and cost, full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account / hereunder , ~~on the Contract Area~~ and to the records of operations conducted thereon or production therefrom, including Operator's books and records relating thereto. Such access rights shall not be exercised in a manner / unreasonably interfering with Operator's conduct of an operation hereunder and shall not obligate Operator to furnish any geologic or geophysical data of an interpretive nature unless the cost of preparation of such interpretive data was charged to the joint account. Operator will furnish to each Consenting Party ~~Non-~~ Operator upon request copies of

any and all reports and information obtained by Operator in connection with production and related items, including, without limitation, meter and chart reports, production purchaser statements, run tickets and monthly gauge reports, but excluding purchase contracts and pricing information to the extent not applicable to the production of the Non-Operator seeking the information. Any audit of Operator's records relating to amounts expended and the appropriateness of such expenditures shall be conducted in accordance with the audit protocol specified in Exhibit "C." or other agreement of the parties. See also Article XVI.

6. Filing and Furnishing Governmental Reports: Operator will file, and upon written request promptly furnish copies to each requesting Non-Operator not in default of its payment obligations, all operational notices, reports or applications required to be filed by local, State, Federal or Indian agencies or authorities having jurisdiction over operations hereunder. Each Non-Operator shall provide to Operator on a timely basis all information necessary to Operator to make such filings.

7. Drilling and Testing Operations: The following provisions shall apply to each well drilled hereunder~~, including but not limited to the Initial Well~~:

(a) Operator will promptly advise Non-Operators of ~~the date on which the well is spudded, or~~ the date on which drilling operations are commenced.

(b) Operator will send to / the Consenting Parties ~~Non-Operators~~ such reports, test results and notices regarding the progress of operations on the well as the Y ~~Non-Operators~~ shall reasonably request, including, but not limited to, daily drilling reports, completion reports, and well logs.

(c) Operator may ~~shall~~ adequately test all Zones encountered / that fall within the Contract Area and which may reasonably be expected to be capable of producing Oil and Gas in paying quantities as a result of examination of the electric log or any other logs or cores or tests conducted hereunder.

8. Cost Estimates: Upon request of any Consenting Party, Operator shall furnish estimates of current and cumulative costs incurred for the joint account at reasonable intervals during the conduct of any operation pursuant to this agreement. Operator shall not be held liable for errors in such estimates so long as the estimates are made in good faith.

9. Insurance: At all times while operations are conducted hereunder, Operator shall comply with the workers compensation law of the state where the operations are being conducted; provided, however, that Operator may be a self- insurer for liability under said compensation laws in which event the only charge that shall be made to the joint account shall be as provided in Exhibit "C." Operator shall also carry or provide insurance for the benefit of the joint account of the parties as outlined in Exhibit "D" attached hereto and made a part hereof. Operator shall require all contractors engaged in work on or for the Contract Area to comply with the workers compensation law of the state where the operations are being conducted and to maintain such other insurance as Operator may require.

In the event automobile liability insurance is specified in said Exhibit "D," or subsequently receives the approval of the parties, no direct charge shall be made by Operator for premiums paid for such insurance for Operator's automotive equipment.

## ARTICLE VI.
## DRILLING AND DEVELOPMENT

~~**A. Initial Well:**~~

~~On or before the ______ day of _____, ________, Operator shall commence the drilling of the Initial Well at the following location (if a Horizontal Well, surface and Terminus/Termini of the Lateral(s)): and shall thereafter continue the drilling of the well (horizontally if a Horizontal Well) with due~~

~~diligence to The drilling of the Initial Well and the participation therein by all parties is obligatory, subject to Article VI.C.1. as to participation in Completion operations and Article VI.F. as to termination of operations and Article XI as to occurrence of force majeure.~~

**B. Subsequent Operations:**

1. Proposed Operations: If any party hereto should desire to drill any well on the Contract Area ~~other than the Initial Well~~, or if any party should desire to Rework, Sidetrack, Deepen, Recomplete or Plug Back a dry hole or a well no longer capable of producing in paying paying quantities in which such party has not otherwise relinquished its interest in the proposed objective Zone under this agreement, the party desiring to drill, Rework, Sidetrack, Deepen, Recomplete or Plug Back such a well shall give written notice of the proposed operation to the parties who have not otherwise relinquished their interest in such objective Zone under this agreement (and to all other parties in the case of a proposal for Sidetracking or Deepening as to a Vertical Well), specifying the work to be performed, the location, proposed depth, objective Zone and the estimated cost of the operation as outlined in an AFE. A proposal for the drilling of or other operations for a Horizontal Well shall: (1) state that the proposed operation is a Horizontal Well operation; (2) include drilling and Completion plans specifying the proposed: (i) Total Measured Depth(s), (ii) surface hole location(s), (iii) Terminus/Termini, (iv) Displacement(s), (v) utilization and scheduling of rig(s) (Spudder Rig, drilling and Completion), and (vi) stimulation operations, staging and sizing; and (3) include estimated drilling and Completion costs as set forth in an AFE. The parties to whom such a notice is delivered shall have thirty (30) days after receipt of the notice within which to notify the party proposing to do the work whether they elect to participate in the cost of the proposed operation. If a drilling rig is on location, notice of a proposal to Rework, Sidetrack, Recomplete, Plug Back or Deepen may be given by telephone and the response period shall be limited to forty-eight (48) hours, exclusive of Saturday, Sunday and legal holidays. Failure of a party to whom such notice is delivered to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any proposal by a party to conduct an operation conflicting with the operation initially proposed shall be delivered to all parties within the time and in the manner provided in Article VI.B.6.

If all parties to whom such notice is delivered elect to participate in such a proposed operation, the parties shall be contractually committed to participate therein provided such operations are commenced within the time period hereafter set forth, and Operator shall, no later than ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and thereafter complete it with due diligence at the risk and expense of the parties participating therein; provided, however, said commencement date may be extended upon written notice of same by Operator to the other parties, for a period of up to thirty (30) additional days if, in the sole opinion of Operator, such additional time is reasonably necessary to obtain permits from governmental authorities, surface rights (including rights-of-way) or appropriate drilling equipment, or to complete title examination or curative matter required for title approval or acceptance. If the actual operation has not been commenced within the time provided (including any extension thereof as specifically permitted herein or in the force majeure provisions of Article XI) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance herewith as if no prior proposal had been made. Those parties that did not participate in the drilling of a well for which a proposal to Deepen or Sidetrack is made hereunder shall, if such parties desire to participate in the proposed Deepening or Sidetracking operation, reimburse the Drilling Parties in accordance with Article VI.B.4. in the event of a Deepening operation and in accordance with Article VI.B.5. in the event of a Sidetracking operation.

2. Operations by Less Than All Parties:

(a) Determination of Participation. If any party to whom such notice is delivered as provided in Article VI.B.1. or VI.C.1. (Option No. 2) elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this Article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, no later than ninety (90) days after the expiration of the notice period of thirty (30) days (or as promptly as practicable after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may

be) actually commence the proposed operation and complete it with due diligence. Operator shall perform all work for the account of the Consenting Parties; provided, however, if no drilling rig or other equipment is on location, and if Operator is a Non-Consenting Party, the Consenting Parties shall either: (i) request Operator to perform the work required by such proposed operation for the account of the Consenting Parties, or (ii) designate one of the Consenting Parties as Operator to perform such work. The rights and duties granted to and imposed upon the Operator under this agreement are granted to and imposed upon the party designated as Operator for an operation in which the original Operator is a Non-Consenting Party. Consenting Parties, when conducting operations ~~on the Contract Area~~ pursuant to this Article VI.B.2., shall comply with all terms and conditions of this agreement.

If less than all parties approve any proposed operation, the proposing party, immediately after the expiration of the applicable notice period, shall advise all Parties of the total interest of the parties approving such operation and its recommendation as to whether the Consenting Parties should proceed with the operation as proposed. Each Consenting Party, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the proposing party of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interests of all Consenting Parties in the Contract Area) of Non-Consenting Parties' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of Non-Consenting Parties' interests together with all or a portion of its proportionate part of any Non-Consenting Parties' interests that any Consenting Party did not elect to take. Any interest of Non-Consenting Parties that is not carried by a Consenting Party shall be deemed to be carried by the party proposing the operation if such party does not withdraw its proposal. Failure to advise the proposing party within the time required shall be deemed an election under (i). In the event a drilling rig is on location, notice may be given by telephone, and the time permitted for such a response shall not exceed a total of forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays). The proposing party, at its election, may withdraw such proposal if there is less than 100% participation and shall notify all parties of such decision within ten (10) days, or within twenty-four (24) hours if a drilling rig is on location, following expiration of the applicable response period. If 100% subscription to the proposed operation is obtained, the proposing party shall promptly notify the Consenting Parties of their proportionate interests in the operation and the party serving as Operator shall commence such operation within the period provided in Article VI.B.1., subject to the same extension right as provided therein.

(b) Relinquishment of Interest for Non-Participation. The entire cost and risk of conducting such operations shall be borne by the Consenting Parties in the proportions they have elected to bear same under the terms of the preceding paragraph. Consenting Parties shall keep the leasehold estates involved in such operations free and clear of all liens and encumbrances of every kind created by or arising from the operations of the Consenting Parties. If such an operation results in a dry hole, then subject to Articles VI.B.6. and VI.E.3., the Consenting Parties shall plug and abandon the well and restore the surface location at their sole cost, risk and expense; provided, however, that those Non Consenting Parties that participated in the drilling, Deepening or Sidetracking of the well shall remain liable for, and shall pay, their proportionate shares of the cost of plugging and abandoning the well and restoring the surface location insofar only as those costs were not increased by the subsequent operations of the Consenting Parties. If any well drilled, Reworked, Sidetracked, Deepened, Recompleted or Plugged Back under the provisions of this Article results in a well capable of producing Oil and/or Gas in paying quantities, the Consenting Parties shall Complete and equip the well to produce at their sole cost and risk, and the well shall then be turned over to Operator (if the Operator did not conduct the operation) and shall be operated by it at the expense and for the account of the Consenting Parties. Upon commencement of operations for the drilling, Reworking, Sidetracking, Recompleting, Deepening or Plugging Back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom or, in the case of a Reworking, Sidetracking, Deepening, Recompleting or Plugging Back, or a Completion pursuant to Article VI.C.1. Option No. 2, all of such Non- Consenting Party's interest in the production obtained from the operation in which the Non-Consenting Party did not elect to participate. Such relinquishment shall be effective until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting applicable ad valorem, production, severance, and excise taxes, royalty, overriding royalty

and other interests not excepted by Article III.C. payable out of or measured by the production from such well accruing with respect to such interest until it reverts), shall equal the total of the following:

(i)___100____% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including but not limited to stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non- Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to such Non-Consenting Party had it participated in ~~the well from the beginning of~~ the proposed operations~~,~~; and

(ii)___300____% of (a) that portion of the costs and expenses of drilling, Reworking, Sidetracking, Deepening, Plugging Back, testing, Completing, and Recompleting, after deducting any cash contributions received under Article VIII.C., and of (b) that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated ~~there~~in the proposed operation. See Article XVI.

Notwithstanding anything to the contrary in this Article VI.B., if the well does not reach the deepest objective Zone described in the notice proposing the well for reasons other than the encountering of granite or practically impenetrable substance or other condition in the hole rendering further operations impracticable, Operator shall give notice thereof to each Non-Consenting Party who submitted or voted for an alternative proposal under Article VI.B.6. to drill the well to a shallower Zone than the deepest objective Zone proposed in the notice under which the well was drilled, and each such Non-Consenting Party shall have the option to participate in the initial proposed Completion of the well by paying its share of the cost of drilling the well to its actual depth, calculated in the manner provided in Article VI.B.4. (a). If any such Non-Consenting Party does not elect to participate in the first Completion proposed for such well, the relinquishment provisions of this Article VI.B.2. (b) shall apply to such party's interest.

(c) Reworking, Recompleting or Plugging Back. An election not to participate in the drilling, Sidetracking or Deepening of a well shall be deemed an election not to participate in any Reworking or Plugging Back operation proposed in such a well, or portion thereof, to which the initial non-consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Similarly, an election not to participate in the Completing or Recompleting of a well shall be deemed an election not to participate in any Reworking operation proposed in such a well, or portion thereof, to which the initial non- consent election applied that is conducted at any time prior to full recovery by the Consenting Parties of the Non-Consenting Party's recoupment amount. Any such Reworking, Recompleting or Plugging Back operation conducted during the recoupment period shall be deemed part of the cost of operation of said well and there shall be added to the sums to be recouped by the Consenting Parties _____300_____% of that portion of the costs of the Reworking, Recompleting or Plugging Back operation which would have been chargeable to such Non- Consenting Party had it participated therein. If such a Reworking, Recompleting or Plugging Back operation is proposed during such recoupment period, the provisions of this Article VI.B. shall be applicable as between said Consenting Parties in said well.

(d) Recoupment Matters. During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all ad valorem, production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production not excepted by Article III.C.

In the case of any Reworking, Sidetracking, Plugging Back, Recompleting or Deepening operation, the Consenting Parties shall be permitted to use, free of cost, all casing, tubing and other equipment in the well, but the ownership of all such equipment shall remain unchanged; and upon abandonment of a well after such Reworking, Sidetracking, Plugging Back, Recompleting or Deepening, the Consenting Parties shall account for all such equipment to the owners thereof, with each party receiving its proportionate part in kind or in value, less cost of salvage.

Within ninety (90) days after the completion of any operation under this Article, the party conducting the operations for the Consenting Parties shall furnish each Non-Consenting Party with an inventory of the equipment in and connected to the well, and an itemized statement of the cost of drilling, Sidetracking, Deepening, Plugging Back, testing, Completing, Recompleting, and equipping the well for production; or, at its option, the operating party, in lieu of an itemized statement of such costs of operation, may submit a detailed statement of monthly billings. Each month thereafter, during the time the Consenting Parties are being reimbursed as provided above, the party conducting the operations for the Consenting Parties shall furnish the Non-Consenting Parties with an itemized statement of all costs and liabilities incurred in the operation of the well, together with a statement of the quantity of Oil and Gas produced from it and the amount of proceeds realized from the sale of the well's working interest production during the preceding month. In determining the quantity of Oil and Gas produced during any month, Consenting Parties shall use industry accepted methods such as but not limited to metering or periodic well tests. Any amount realized from the sale or other disposition of equipment newly acquired in connection with any such operation which would have been owned by a Non-Consenting Party had it participated therein shall be credited against the total unreturned costs of the work done and of the equipment purchased in determining when the interest of such Non-Consenting Party shall revert to it as above provided; and if there is a credit balance, it shall be paid to such Non-Consenting Party.

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it as of 7:00 a.m. on the day following the day on which such recoupment occurs, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, Sidetracking, Reworking, Deepening, Recompleting or Plugging Back of said well. Thereafter, such Non- Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and Exhibit "C" attached hereto.

3. Stand-By Costs: When a well which has been drilled or Deepened has reached its authorized depth and all tests have been completed and the results thereof furnished to the parties, or when operations on the well have been otherwise terminated pursuant to

Article VI.F., stand-by costs incurred pending response to a party's notice proposing a Reworking, Sidetracking, Deepening, Recompleting, Plugging Back, / Extension or Completing operation in such a well (including the period required under Article VI.B.6. to resolve competing proposals) shall be charged and borne as part of the drilling or Deepening operation just completed. Stand-by costs subsequent to all responding, or expiration of the response time permitted, whichever first occurs, and prior to agreement as to the participating interests of all Consenting Parties pursuant to the terms of the second grammatical paragraph of Article VI.B.2. (a), shall be charged to and borne as part of the proposed operation, but if the proposal is subsequently withdrawn because of insufficient participation, such stand-by costs shall be allocated between the Consenting Parties in the proportion each Consenting Party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all Consenting Parties.

In the event that notice for a Sidetracking operation is given while the drilling rig to be utilized is on location, any party may request and receive up to five (5) additional days after expiration of the forty-eight hour response period specified in Article VI.B.1. within which to respond by paying for all stand-by costs and other costs incurred during such extended response period; Operator may require such party to pay the estimated stand-by time in advance as a condition to extending the response period. If more than one party elects to take such additional time to respond to the notice, standby costs shall be allocated between the parties taking additional time to respond on a day to-day basis in the proportion each electing party's interest as shown on Exhibit "A" bears to the total interest as shown on Exhibit "A" of all the electing parties.

4. Deepening: If less than all parties elect to participate in a drilling, Sidetracking, or Deepening operation proposed pursuant to Article VI.B.1., the interest relinquished by the Non-Consenting Parties to the Consenting Parties under Article VI.B.2. shall relate only and be limited to the lesser of (i) the total depth actually drilled or (ii) the objective depth or Zone of which the parties were given notice under Article VI.B.1. ("Initial

Objective"). / A Vertical ~~Such w~~Well shall not be Deepened beyond the Initial Objective without first complying with this Article to afford the Non-Consenting Parties the opportunity to participate in the Deepening operation.

In the event any Consenting Party desires to drill or Deepen a Non-Consent Well to a depth below the Initial Objective, such party shall give notice thereof, complying with the requirements of Article VI.B.1., to all parties (including Non-Consenting Parties). Thereupon, Articles VI.B.1. and 2. shall apply and all parties receiving such notice shall have the right to participate or not participate in the Deepening of such well pursuant to said Articles VI.B.1. and 2. If a Deepening operation is approved pursuant to such provisions, and if any Non-Consenting Party elects to participate in the Deepening operation, such Non-Consenting party shall pay or make reimbursement (as the case may be) of the following costs and expenses.

(a) If the proposal to Deepen is made prior to the Completion of such well as a well capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) that share of costs and expenses incurred in connection with the drilling of said well from the surface to the Initial Objective which Non-Consenting Party would have paid had such Non-Consenting Party agreed to participate therein, plus the Non-Consenting Party's share of the cost of Deepening and of participating in any further operations on the well in accordance with the other provisions of this Agreement; provided, however, all costs for testing and Completion or attempted Completion of the well incurred by Consenting Parties prior to the point of actual operations to Deepen beyond the Initial Objective shall be for the sole account of Consenting Parties.

(b) If the proposal is made for a Non-Consent Well that has been previously Completed as a well capable of producing in paying quantities, but is no longer capable of producing in paying quantities, such Non-Consenting Party shall pay (or reimburse Consenting Parties for, as the case may be) its proportionate share of all costs of drilling, Completing, and equipping said well from the surface to the Initial Objective, calculated in the manner provided in paragraph (a) above, less those costs recouped by the Consenting Parties from the sale of production from the well. The Non-Consenting Party shall also pay its proportionate share of all costs of re-entering said well. The Non-Consenting Parties' proportionate part (based on the percentage of such well Non-Consenting Party would have owned had it previously participated in such Non-Consent Well) of the costs of salvable materials and equipment remaining in the hole and salvable surface equipment used in connection with such well shall be determined in accordance with Exhibit "C." If the Consenting Parties have recouped the cost of drilling, Completing, and equipping the well at the time such Deepening operation is conducted, then a Non-Consenting Party may participate in the Deepening of the well with no payment for costs incurred prior to re-entering the well for Deepening

The foregoing shall not imply a right of any Consenting Party to propose any Deepening for a Non-Consent Well prior to the drilling of such well to its Initial Objective without the consent of the other Consenting Parties as provided in Article VI.F.

~~This Article VI.B.4 shall not apply to Deepening operations within an existing Lateral of a Horizontal Well.~~

5. Sidetracking: Any party having the right to participate in a proposed Sidetracking operation that does not own an interest in the affected wellbore at the time of the notice shall, upon electing to participate, tender to the wellbore owners its proportionate share (equal to its interest in the Sidetracking operation) of the value of that portion of the existing wellbore to be utilized as follows:

(a) If the proposal is for Sidetracking an existing dry hole, reimbursement shall be on the basis of the actual costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is initiated.

(b) If the proposal is for Sidetracking a well which has previously produced, reimbursement shall be on the basis of such party's proportionate share of drilling and equipping costs incurred in the initial drilling of the well down to the depth at which the Sidetracking operation is conducted, calculated in the manner described in Article VI.B.4(b) above. Such party's proportionate share of the cost of the well's salvable materials and equipment down to the depth

at which the Sidetracking operation is initiated shall be determined in accordance with the provisions of Exhibit "C." See Article XVI with respect to Extension operations.

~~This Article VI.B.5, "Sidetracking," shall not apply to operations in an existing Lateral of a Horizontal Well.~~

6. Order of Preference of Operations. Except as otherwise specifically provided in this agreement, if any party desires to propose the conduct of an operation that conflicts with a proposal that has been made by a party under this Article VI, such party shall have fifteen (15) days from delivery of the initial proposal, in the case of a proposal to drill a well or to perform an operation on a well where no drilling rig is on location, or twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, from delivery of the initial proposal, if a drilling rig is on location for the well on which such operation is to be conducted, to deliver to all parties entitled to participate in the proposed operation such party's alternative proposal, such alternate proposal to contain the same information required to be included in the initial proposal. Each party receiving such proposals shall elect by delivery of notice to Operator within five (5) days after expiration of the proposal period, or within twenty-four (24) hours (exclusive of Saturday, Sunday and legal holidays) if a drilling rig is on location for the well that is the subject of the proposals, to participate in one of the competing proposals. Any party not electing within the time required shall be deemed not to have voted. The proposal receiving the vote of parties owning the largest aggregate percentage interest of the parties voting shall have priority over all other competing proposals; in the case of a tie vote, the initial proposal shall prevail. Operator shall deliver notice of such result to all parties entitled to participate in the operation within five (5) days after expiration of the election period (or within twenty-four (24) hours, exclusive of Saturday, Sunday and legal holidays, if a drilling rig is on location). Each party shall then have two (2) days (or twenty four (24) hours if a rig is on location) from receipt of such notice to elect by delivery of notice to Operator to participate in such operation or to relinquish interest in the affected well pursuant to the provisions of Article VI.B.2.; failure by a party to deliver notice within such period shall be deemed an election not to participate in the prevailing proposal.

7. Conformity to Spacing Pattern. Notwithstanding the provisions of this Article VI.B.2., it is agreed that no wells shall be proposed to be drilled to or Completed in or produced from a Zone from which a well located elsewhere on the Contract Area is producing, unless such well conforms to the then-existing well spacing pattern for such Zone , unless agreed to by all Consenting Parties in the well, or approved as an exception to the then-existing spacing patterns by the appropriate regulatory agency.

8. Paying Wells. No party shall conduct any Reworking, Deepening, Plugging Back, Completion, Recompletion, / Extension or Sidetracking operation under this agreement with respect to any well then capable of producing in paying quantities except with the consent of all parties that have not relinquished interests in the well at the time of such operation.

9. Spudder Rigs.

(a) Within Approved Horizontal Well proposals (*i.e.* proposals which include an approved AFE). If an approved Horizontal Well proposal provides that a Spudder Rig shall be utilized, and Operator desires to extend the proposed Horizontal Rig Move-On Period, Operator may obtain one or more extensions, each for a period of time not to exceed 10 days only upon notice and the affirmative vote of not less than 51 % in interest of the Consenting Parties to the drilling of the proposed well.

(b) Not Within Approved Horizontal Well proposals. If an approved Horizontal Well proposal does not provide that a Spudder Rig may be utilized, and Operator subsequently desires to utilize a Spudder Rig, Operator may utilize a Spudder Rig upon notice to the Drilling Parties (which notice shall include a Horizontal Rig Move-On Period) and the affirmative vote of not less than 51 % in interest of the Consenting Parties. Extension(s) of the Horizontal Rig Move-On Period may be requested by Operator in the same manner as provided in Article VI.B.9.(a) immediately above.

(c) Failure to meet Horizontal Rig Move-On Period. If a rig capable of drilling a Horizontal Well to its Total Measured Depth has not commenced operations within the Horizontal Rig Move-On Period, or any approved extension(s) thereof, unless 51 % in interest of the Consenting Parties agree to abandon the operation, Operator shall re-propose the well in the manner provided in Article VI.B of this agreement. Any party who was a Non-Consenting Party to the original drilling proposal shall be entitled to a new election. Costs of the operation, incurred both before and after such re-proposal, shall be borne as follows:

(1) Operator shall promptly reimburse all unused funds previously advanced for the drilling of the well to each party who advanced such unused funds;

(2) If the well's drilling operations are subsequently resumed, all costs, whether incurred before or after the re-proposal, shall be borne by the Consenting Parties to the re-proposed well; and, the Consenting Parties shall proportionately reimburse each party who consented to the original proposal but did not consent to the re-proposal such party's share of costs incurred prior to the re-proposal.

(3) If the well's drilling operations are not subsequently resumed pursuant to a re-proposal as herein provided, all costs incurred prior to the re-proposal, and all costs of abandonment, shall be borne and paid by the original Consenting Parties.

(d) Commencement of Operations. For purposes of Article VI.B., and subject to the provisions of this sub-section 9, the date a Spudder Rig commences actual drilling operations shall be considered the commencement of drilling operations of the proposed well.

10. Multi-well Pads. If multiple Horizontal Wells are drilled or proposed to be drilled from a single pad or location, the costs of such pad or location shall be allocated, and/or reallocated as necessary, to the Consenting Parties in ~~of~~ each of the wells thereon.

**C. Completion of Wells; Reworking and Plugging Back:**

1. Completion: Without the consent of all parties, no well shall be drilled, Deepened or Sidetracked, except any well drilled, Deepened or Sidetracked pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the drilling, Deepening or Sidetracking shall include:

☐√Option No. 1: All necessary expenditures for the drilling, Deepening or Sidetracking, testing, Completion and equipping of a Horizontal ~~the~~ Well, including tankage and/or surface facilities. For any Horizontal Well subject to this Agreement, Completion operations shall be included in the proposed drilling operations for such well.

☐√Option No. 2: All necessary expenditures for the drilling, Deepening or Sidetracking and testing of a Vertical Well. When such well has reached its authorized depth, and all logs, cores and other tests have been completed, and the results thereof furnished to the parties, Operator shall give immediate notice to the Non-Operators having the right to participate in a Completion attempt whether or not Operator recommends attempting to Complete the well, together with Operator's AFE for Completion costs if not previously provided. The parties receiving such notice shall have forty-eight (48) hours (exclusive of Saturday, Sunday and legal holidays) in which to elect by delivery of notice to Operator to participate in a recommended Completion attempt or to make a Completion proposal with an accompanying AFE. Operator shall deliver any such Completion proposal, or any Completion proposal conflicting with Operator's proposal, to the other parties entitled to participate in such Completion in accordance with the procedures specified in Article VI.B.6. Election to participate in a Completion attempt shall include consent to all necessary expenditures for the Completing and equipping of such well, including necessary tankage and/or surface facilities but excluding any stimulation operation not contained on the Completion AFE. Failure of any party receiving such notice to reply within the period above fixed shall

constitute an election by that party not to participate in the cost of the Completion attempt; provided, that Article VI.B.6. shall control in the case of conflicting Completion proposals. If one or more, but less than all of the parties, elect to attempt a Completion, the provisions of Article VI.B.2. hereof (the phrase "Reworking, Sidetracking, Deepening, Recompleting or Plugging Back" as contained in Article VI.B.2. shall be deemed to include "Completing") shall apply to the operations thereafter conducted by less than all parties; provided, however, that Article VI.B.2. shall apply separately to each separate Completion or Recompletion attempt undertaken hereunder, and an election to become a Non-Consenting Party as to one Completion or Recompletion attempt shall not prevent a party from becoming a Consenting Party in subsequent Completion or Recompletion attempts regardless whether the Consenting Parties as to earlier Completions or Recompletions have recouped their costs pursuant to Article VI.B.2.; provided further, that any recoupment of costs by a Consenting Party shall be made solely from the production attributable to the Zone in which the Completion attempt is made. Election by a previous Non-Consenting party to participate in a subsequent Completion or Recompletion attempt shall require such party to pay its proportionate share of the cost of salvable materials and equipment installed in the well pursuant to the previous Completion or Recompletion attempt, insofar and only insofar as such materials and equipment benefit the Zone in which such party participates in a Completion attempt.

Notwithstanding anything to the contrary, including the selection of Option 2 above, or anything else in this agreement, Option 1 shall apply to all Horizontal Wells.

2. Rework, Recomplete or Plug Back: No well shall be Reworked, Recompleted or Plugged Back except a well Reworked, Recompleted, or Plugged Back pursuant to the provisions of Article VI.B.2. of this agreement. Consent to the Reworking, Recompleting or Plugging Back of a well shall include all necessary expenditures in conducting such operations and Completing and equipping of said well, including necessary tankage and/or surface facilities.

**D. Other Operations:**

Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of One Hundred Thousand Dollars ($100,000) except in connection with the drilling, Sidetracking, Reworking, Deepening, Completing, Recompleting or Plugging Back of a well that has been previously authorized by or pursuant to this agreement; provided, however, that, in case of explosion, fire, flood or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency to safeguard life and property but Operator, as promptly as possible, shall report the emergency to the other parties. If Operator prepares an AFE for its own use, Operator shall furnish any Non-Operator so requesting an information copy thereof for any single project costing in excess of One Hundred Thousand Dollars ($100,000). Any party who has not relinquished its interest in a well shall have the right to propose that Operator perform / Workovers ~~repair work~~ or undertake the installation of artificial lift equipment ~~or ancillary production facilities such as salt water disposal wells~~ or to conduct additional work with respect to a well drilled hereunder or other similar project (but not including the installation of gathering lines or other transportation or marketing facilities, the installation of which shall be governed by separate agreement between the parties) reasonably estimated to require an expenditure in excess of the amount first set forth above in this Article VI.D. (except in connection with an operation required to be proposed under Articles VI.B.1. or VI.C.1. Option No. 2, which shall be governed exclusively by ~~e~~ those Articles). Operator shall deliver such proposal to all parties entitled to participate therein. If within thirty (30) days thereof Operator secures the written consent of any party or parties owning at least 75% of the interests of the parties entitled to participate in such operation, each party having the right to participate in such project shall be bound by the terms of such proposal and shall be obligated to pay its proportionate share of the costs of the proposed project as if it had consented to such project pursuant to the terms of the proposal.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**E. Abandonment of Wells:**

1. Abandonment of Dry Holes: Except for any well drilled / Sidetracked, or Deepened pursuant to Article VI.B.~~2.~~, any well which has been drilled / Sidetracked, or Deepened under the terms of this agreement and is proposed to be completed as a dry hole shall not be plugged and abandoned without the consent of all parties/ then owning an interest in the well.. Should Operator, after diligent effort, be unable to contact any party, or should any party fail to reply within / thirty (30) days, or if a rig is on location, forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) after delivery of notice of the proposal to plug and abandon such well, such party shall be deemed to have consented to the proposed abandonment. All such wells shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of the parties who participated in the cost of drilling or Deepening such well. Any party who objects to plugging and abandoning such well by notice delivered to Operator within / thirty (30) days, or forty-eight (48) hours (~~ex~~inclusive of Saturday, Sunday and legal holidays) / (as applicable)after delivery of notice of the proposed plugging shall take over the well as of the end of such ~~forty-eight (48) hour~~ notice period and conduct further operations in search of Oil and/or Gas subject to the provisions of Article VI.B.; failure of such party to provide proof reasonably satisfactory to Operator of its financial capability to conduct such operations or to take over the well within such period or thereafter to conduct operations on such well or plug and abandon such well shall entitle Operator to retain or take possession of the well and plug and abandon the well. The party taking over the well shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations conducted on such well except for the costs of plugging and abandoning the well and restoring the surface, for which the abandoning parties shall remain proportionately liable.

2. Abandonment of Wells That Have Produced: Except for any well in which a Non-Consent operation has been conducted hereunder for which the Consenting Parties have not been fully reimbursed as herein provided, any / party may propose that a well which has been completed as a producer ~~shall not~~ be plugged and abandoned / which shall require ~~without~~ the consent of all parties. If all parties consent to such abandonment, the well shall be plugged and abandoned in accordance with applicable regulations and at the cost, risk and expense of all the parties hereto. Failure of a party to reply within sixty (60) days of delivery of notice of proposed abandonment shall be deemed an election to consent to the proposal. If, within sixty (60) days after delivery of notice of the proposed abandonment of any well, all parties do not agree to the abandonment of such well, those wishing to continue its operation from the Zone then open to production shall be obligated to take over the well as of the expiration of the applicable notice period and shall indemnify Operator (if Operator is an abandoning party) and the other abandoning parties against liability for any further operations on the well conducted by such parties. Failure of such party or parties to provide proof reasonably satisfactory to Operator of their financial capability to conduct such operations or to take over the well within the required period or thereafter to conduct operations on such well shall entitle operator to retain or take possession of such well and plug and abandon the well. Parties taking over a well as provided herein shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment, determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface; provided, however, that in the event the estimated plugging and abandoning and surface restoration costs and the estimated cost of salvaging are higher than the value of the well's salvable material and equipment, each of the abandoning parties shall tender to the parties continuing operations their proportionate shares of the estimated excess cost. Each abandoning party shall assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, or fitness for use of the equipment and material/ but free and clear of Subsequently Created Interests, all of its interest in the wellbore of the well and related equipment, together with its interest in the Leasehold insofar and only insofar as such Leasehold covers the right to obtain production from that wellbore in the Zone then open to production~~. If the interest of the abandoning party is or includes and Oil and Gas Interest, such party shall execute and deliver to the non- abandoning party or parties an oil and gas lease, limited to the wellbore and the Zone then open to production, for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the Zone covered thereby, such lease to be on the form attached as Exhibit "B~~." The assignments or leases so limited shall encompass the Drilling Unit upon which the well is located. The payments by, and the assignments or leases to, the assignees shall be in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all assignees. There shall be no readjustment of interests in the remaining portions of the Contract Area.

Thereafter, abandoning parties shall have no further responsibility, liability, or interest in the operation of or production from the well in the Zone then open other than the royalties retained in any lease made under the terms of this Article. Upon request, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well. Upon proposed abandonment of the producing Zone assigned or leased, the assignor or lessor shall then have the option to repurchase its prior interest in the well (using the same valuation formula) and participate in further operations therein subject to the provisions hereof.

3. Abandonment of Non-Consent Operations: The provisions of Article VI.E.1. or VI.E.2. above shall be applicable as between Consenting Parties in the event of the proposed abandonment of any well excepted from said Articles; provided, however, no well shall be permanently plugged and abandoned unless and until all parties having the right to conduct further operations therein have been notified of the proposed abandonment and afforded the opportunity to elect to take over the well in accordance with the provisions of this Article VI.E.; and provided further, that Non-Consenting Parties who own an interest in a portion of the well shall pay their proportionate shares of abandonment and surface restoration cost for such well as provided in Article VI.B.2.(b).

**F. Termination of Operations:**

Upon the commencement of an operation for the drilling, Reworking, Sidetracking, Plugging Back, Deepening, testing, Completion, / Extension or plugging of a well, ~~including but not limited to the Initial Well,~~ such operation shall not be terminated without consent of parties bearing 51 % of the costs of such operation; provided, however, that in the event granite or other practically impenetrable substance or condition in the hole is encountered which renders further operations impractical, Operator may discontinue operations and give notice of such condition in the manner provided in Article VI.B.1, and the provisions of Article VI.B. or VI.E. shall thereafter apply to such operation, as appropriate.

**G. Taking Production in Kind:**

~~☐~~☒ **Option No. 1: Gas Balancing Agreement Attached**

Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditure incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.

Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production.

If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise at any time its right to take in kind, or separately dispose of, its share of all Oil not previously delivered to a purchaser. Any purchase or sale by Operator of any other party's share of Oil shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.

Any such sale by Operator shall be in a manner commercially reasonable under the circumstances but Operator shall have no duty to share any existing market or to obtain a price equal to that received under any existing market. The sale or delivery by Operator of a non-taking party's share of Oil under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non-taking party a party to said contract. No purchase shall be made by Operator without first giving the non-taking party at least ten (10) days written notice of such intended purchase and the price to be paid or the pricing basis to be used.

All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.

In the event one or more parties' separate disposition of its share of the Gas causes split-stream deliveries to separate pipelines and/or deliveries which on a day-to-day basis for any reason are not exactly equal to a party's respective proportion- ate share of total Gas / production available for sale~~s~~ to be allocated to it, the balancing or accounting between the parties shall be in accordance with any Gas balancing agreement between the parties hereto, whether such an agreement is attached as Exhibit "E" or is a separate agreement. Operator shall give notice to all parties of the first sales of Gas from any well under this agreement.

☐ **Option No. 2:** ~~**No Gas Balancing Agreement:**~~

~~Each party shall take in kind or separately dispose of its proportionate share of all Oil and Gas produced from the Contract Area, exclusive of production which may be used in development and producing operations and in preparing and treating Oil and Gas for marketing purposes and production unavoidably lost. Any extra expenditures incurred in the taking in kind or separate disposition by any party of its proportionate share of the production shall be borne by such party. Any party taking its share of production in kind shall be required to pay for only its proportionate share of such part of Operator's surface facilities which it uses.~~

~~Each party shall execute such division orders and contracts as may be necessary for the sale of its interest in production from the Contract Area, and, except as provided in Article VII.B., shall be entitled to receive payment directly from the purchaser thereof for its share of all production~~.

~~If any party fails to make the arrangements necessary to take in kind or separately dispose of its proportionate share of the Oil and/or Gas produced from the Contract Area, Operator shall have the right, subject to the revocation at will by the party owning it, but not the obligation, to purchase such Oil and/or Gas or sell it to others at any time and from time to time, for the account of the non-taking party. Any such purchase or sale by Operator may be terminated by Operator upon at least ten (10) days written notice to the owner of said production and shall be subject always to the right of the owner of the production upon at least ten (10) days written notice to Operator to exercise its right to take in kind, or separately dispose of, its share of all Oil and/or Gas not previously delivered to a purchaser; provided, however, that the effective date of any such revocation may be deferred at Operator's election for a period not to exceed ninety (90) days if Operator has committed such production to a purchase contract having a term extending beyond such ten (10) -day period. Any purchase or sale by Operator of any other party's share of Oil and/or Gas shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, but in no event for a period in excess of one (1) year.~~

~~Any such sale by Operator shall be in a manner commercially reasonable under the circumstances, but Operator shall have no duty to share any existing market or transportation arrangement or to obtain a price or transportation fee equal to that received under any existing market or transportation arrangement. The sale or delivery by Operator of a non-taking party's share of production under the terms of any existing contract of Operator shall not give the non-taking party any interest in or make the non- taking party a party to said contract. No purchase of Oil and Gas and no sale of Gas shall be made by Operator without first giving the non-taking party ten days written notice of~~

~~such intended purchase or sale and the price to be paid or the pricing basis to be used. Operator shall give notice to all parties of the first sale of Gas from any well under this Agreement.~~

~~All parties shall give timely written notice to Operator of their Gas marketing arrangements for the following month, excluding price, and shall notify Operator immediately in the event of a change in such arrangements. Operator shall maintain records of all marketing arrangements, and of volumes actually sold or transported, which records shall be made available to Non-Operators upon reasonable request.~~

**ARTICLE VII.**
**EXPENDITURES AND LIABILITY OF PARTIES**

**A. Liability of Parties:**

The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area. Accordingly, the liens granted among the parties in Article VII.B. are given to secure only the debts of each severally, and no party shall have any liability to third parties hereunder to satisfy the default of any other party in the payment of any expense or obligation hereunder. It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

**B. Liens and Security Interests:**

Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

To perfect the lien and security agreement provided herein, each party hereto shall execute and acknowledge the recording supplement and/or any financing statement prepared and submitted by any party hereto in conjunction herewith or at any time following execution hereof, and Operator is authorized to file this agreement or the recording supplement executed herewith as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as Operator shall deem appropriate to perfect the security interest granted hereunder. Any party may file this agreement, the recording supplement executed herewith, or such other documents as it deems necessary as a lien or mortgage in the applicable real estate records and/or a financing statement with the proper officer under the Uniform Commercial Code.

Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of

said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by this Article VII.B. as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

To the extent that parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interests, ~~or~~ fees / or other financial obligations hereunder, or upon the improper use of funds by ~~the Operator~~ / a party, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest as provided in "Exhibit C," has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

If any party fails to pay its share of cost within one hundred twenty (120) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in Article VII.B., and each paying party may independently pursue any remedy available hereunder or otherwise.

If any party does not perform all of its obligations hereunder, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshaling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

Each party agrees that the other parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator.

**C. Advances:**

Operator, at its election, shall have the right from time to time to demand and receive from one or more of the other parties payment in advance of their respective shares of the estimated amount of the expense to be incurred in operations hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within / thirty (30) ~~fifteen (15)~~ days after such estimate and invoice is received. If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid. Proper adjustment

shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

**D. Defaults and Remedies:**

If any party fails to discharge any financial obligation under this agreement, including without limitation the failure to make any advance under the preceding Article VII.C. or any other provision of this agreement, within the period required for such payment hereunder, then in addition to the remedies provided in Article VII.B. or elsewhere in this agreement, the remedies specified below shall be applicable. For purposes of this Article VII.D., all notices and elections shall be delivered only by Operator, except that Operator shall deliver any such notice and election requested by a non-defaulting Non-Operator, and when Operator is the party in default, the applicable notices and elections can be delivered by any Non-Operator. Election of any one or more of the following remedies shall not preclude the subsequent use of any other remedy specified below or otherwise available to a non-defaulting party.

1. Suspension of Rights: Any party may deliver to the party in default a Notice of Default, which shall specify the default, specify the action to be taken to cure the default, and specify that failure to take such action will result in the exercise of one or more of the remedies provided in this Article. If the default is not cured within thirty (30) days of the delivery of such Notice of Default, all of the rights of the defaulting party granted by this agreement may upon notice be suspended until the default is cured, without prejudice to the right of the non-defaulting party or parties to continue to enforce the obligations of the defaulting party previously accrued or thereafter accruing under this agreement. If Operator is the party in default, the Non-Operators shall have in addition the right, by vote of Non-Operators owning a majority in interest in the Contract Area after excluding the voting interest of Operator, to appoint a new Operator effective immediately. The rights of a defaulting party that may be suspended hereunder at the election of the non-defaulting parties shall include, without limitation, the right to receive information as to any operation conducted hereunder during the period of such default, the right to elect to participate in an operation proposed under Article VI.B. of this agreement, the right to participate in an operation being conducted under this agreement even if the party has previously elected to participate in such operation, and the right to receive proceeds of production from any well subject to this agreement.

2. Suit for Damages: Non-defaulting parties or Operator for the benefit of non-defaulting parties may sue (at joint account expense) to collect the amounts in default, plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in Exhibit "C" attached hereto. Nothing herein shall prevent any party from suing any defaulting party to collect consequential damages accruing to such party as a result of the default.

3. Deemed Non-Consent: The non-defaulting party may deliver a written Notice of Non-Consent Election to the defaulting party at any time after the expiration of the thirty-day cure period following delivery of the Notice of Default, in which event if the billing is for the drilling a new well or the Plugging Back, Sidetracking, Reworking or Deepening of a well which is to be or has been plugged ~~as a dry hole~~, or for the Completion or Recompletion of any well, the defaulting party will be conclusively deemed to have elected not to participate in the operation and to be a Non-Consenting Party with respect thereto under Article VI.B. or VI.C., as the case may be, to the extent of the costs unpaid by such party, notwithstanding any election to participate theretofore made. If election is made to proceed under this provision, then the non-defaulting parties may not elect to sue for the unpaid amount pursuant to Article VII.D.2.

Until the delivery of such Notice of Non-Consent Election to the defaulting party, such party shall have the right to cure its default by paying its unpaid share of costs plus interest at the rate set forth in Exhibit "C," provided, however, such payment shall not prejudice the rights of the non-defaulting parties to pursue remedies for damages incurred by the non-defaulting parties as a result of the default. Any interest relinquished pursuant to this Article VII.D.3. shall be offered to the non-defaulting / Consenting ~~p~~Parties in proportion to their interests, and the non-defaulting / Consenting ~~p~~Parties electing to participate in the ownership of such interest shall be required to contribute their shares of the defaulted amount upon their election to participate therein.

4. Advance Payment: If a default is not cured within thirty (30) days of the delivery of a Notice of Default, Operator, or Non- Operators if Operator is the defaulting party, may thereafter require advance payment from the defaulting party of such defaulting party's anticipated share of any item of expense for which Operator, or Non-Operators, as the case may be, would be entitled to reimbursement under any provision of this agreement, whether or not such expense was the subject of the previous default. Such right includes, but is not limited to, the right to require advance payment for the estimated costs of drilling a well or Completion of a well as to which an election to participate in drilling or Completion has been made. If the defaulting party fails to pay the required advance payment, the non-defaulting parties may pursue any of the remedies provided in this Article VII.D. or any other default remedy provided elsewhere in this agreement. Any excess of funds advanced remaining when the operation is completed and all costs have been paid shall be promptly returned to the advancing party.

5. Costs and Attorneys' Fees: In the event any party is required to bring legal proceedings to enforce any financial obligation of a party hereunder, the prevailing party in such action shall be entitled to recover all court costs, costs of collection, and a reasonable attorney's fee, which the lien provided for herein shall also secure.

**E. Rentals, Shut-in Well Payments and Minimum Royalties:**

Rentals, shut-in well payments and minimum royalties which may be required under the terms of any lease shall be paid by the / Operator for and on behalf of the joint account, unless otherwise agreed by the parties in writing from time to time. ~~party or parties who subjected such lease to this agreement at its or their expense. In the event two or more parties own and have contributed interests in the same lease to this agreement, such parties may designate one of such parties to make said payments for and on behalf of all such parties.~~ Any party may request, and shall be entitled to receive, proper evidence of all such payments. In the event of failure to make proper payment of any rental, shut-in well payment or minimum royalty through mistake or oversight where such payment is required to continue the lease in force, any loss which results from such non-payment shall be borne in accordance with the provisions of Article IV.B.2.

Operator shall notify Non-Operators of the anticipated completion of a shut-in well, or the shutting in or return to production of a producing well, at least ~~five (5)~~ ten (10) days (excluding Saturday, Sunday, and legal holidays) prior to taking such action, or at the earliest opportunity permitted by circumstances, but assumes no liability for failure to do so. In the event of failure by Operator to so notify Non- Operators, the loss of any lease contributed hereto by Non-Operators for failure to make timely payments of any shut-in well payment shall be borne jointly by the parties hereto under the provisions of Article IV.B.3.

**F. Taxes:**

Beginning with the first calendar year after the effective date hereof, Operator shall render for ad valorem taxation all property subject to this agreement which by law should be rendered for such taxes, and it shall pay all such taxes assessed thereon before they become delinquent. Prior to the rendition date, each Non-Operator shall furnish Operator information as to burdens (to include, but not be limited to, royalties, overriding royalties and production payments) on Leases and Oil and Gas Interests contributed by such Non-Operator. If the assessed valuation of any Lease is reduced by reason of its being subject to outstanding excess royalties, overriding royalties or production payments, the reduction in ad valorem taxes resulting therefrom shall inure to the benefit of the owner or owners of such Lease, and Operator shall adjust the charge to such owner or owners so as to reflect the benefit of such reduction. If the ad valorem taxes are based in whole or in part upon separate valuations of each party's working interest, then notwithstanding anything to the contrary herein, charges to the joint account shall be made and paid by the parties hereto in accordance with the tax value generated by each party's working interest. Operator shall bill the other parties for their proportionate shares of all tax payments in the manner provided in Exhibit "C."

If Operator considers any tax assessment improper, Operator may, at its discretion, protest within the time and manner prescribed by law, and prosecute the protest to a final determination, unless ~~all~~ it ~~parties~~ agrees to

abandon the protest prior to final determination. During the pendency of administrative or judicial proceedings, Operator may elect to pay, under protest, all such taxes and any interest and penalty. When any such protested assessment shall have been finally determined, Operator shall pay the tax for the joint account, together with any interest and penalty accrued, and the total cost shall then be assessed against the parties, and be paid by them, as provided in Exhibit "C."

Each party shall pay or cause to be paid all production, severance, excise, gathering and other taxes imposed upon or with respect to the production or handling of such party's share of Oil and Gas produced under the terms of this agreement.

**ARTICLE VIII.**
**ACQUISITION, MAINTENANCE OR TRANSFER OF INTEREST**

**A. Surrender of Leases:**

The Leases covered by this agreement, insofar as they embrace acreage in the Contract Area, shall not be surrendered in whole or in part unless all parties consent thereto.

However, should any party desire to surrender its interest in any Lease or in any portion thereof, such party shall give written notice of the proposed surrender to all parties, and the parties to whom such notice is delivered shall have thirty (30) days after delivery of the notice within which to notify the party proposing the surrender whether they elect to consent thereto. Failure of a party to whom such notice is delivered to reply within said 30-day period shall constitute a consent to the surrender of the Leases described in the notice. If all parties do not agree or consent thereto, the party desiring to surrender shall assign, without express or implied warranty of title, all of its interest in such Lease, or portion thereof, and any well, material and equipment / acquired by the parties hereunder and used exclusively for the surrendered lease, ~~which may be located thereon~~ and any rights in production thereafter secured, to the parties not consenting to such surrender. If the interest of the assigning party is or includes an Oil and Gas Interest, the assigning party shall execute and deliver to the party or parties not consenting to such surrender an oil and gas lease covering such Oil and Gas Interest for a term of one (1) year and so long thereafter as Oil and/or Gas is produced from the land covered thereby, / or lands pooled therewith, such lease to be on ~~the~~ a form / mutually agreed by the parties. ~~attached hereto as Exhibit "B."~~ Upon such assignment or lease, the assigning party shall be relieved from all obligations thereafter accruing, but not theretofore accrued, with respect to the interest assigned or leased and the operation of any well attributable thereto, and the assigning party shall have no further interest in the assigned or leased premises and its equipment and production other than the royalties retained in any lease made under the terms of this Article. The party assignee or lessee shall pay to the party assignor or lessor the reasonable salvage value of the latter's interest in any well's salvable materials and equipment attributable to the assigned or leased acreage. The value of all salvable materials and equipment shall be determined in accordance with the provisions of Exhibit "C," less the estimated cost of salvaging and the estimated cost of plugging and abandoning and restoring the surface. If such value is less than such costs, then the party assignor or lessor shall pay to the party assignee or lessee the amount of such deficit. If the assignment or lease is in favor of more than one party, the interest shall be shared by such parties in the proportions that the interest of each bears to the total interest of all such parties. If the interest of the parties to whom the assignment is to be made varies according to depth, then the interest assigned shall similarly reflect such variances.

Any assignment, lease or surrender made under this provision shall not reduce or change the assignor's, lessor's or surrendering party's interest as it was immediately before the assignment, lease or surrender in the balance of the Contract Area; and the acreage assigned, leased or surrendered, and subsequent operations thereon, shall not thereafter be subject to the terms and provisions of this agreement but shall be deemed subject to an Operating Agreement in the form of this agreement.

**B. Renewal or Extension of Leases:**

If any party secures a renewal or replacement of an Oil and Gas Lease or Interest subject to this agreement, then all other parties shall be notified promptly upon such acquisition or, in the case of a replacement Lease taken before expiration of an existing Lease, promptly upon expiration of the existing Lease. The parties notified shall have the right for a period of thirty (30) days following delivery of such notice in which to elect to participate in the ownership of the renewal or replacement Lease, insofar as such Lease affects lands within the Contract Area, by paying to the party who acquired it their proportionate shares of the acquisition cost allocated to that part of such Lease within the Contract Area, which shall be in proportion to the interest held at that time by the parties in the Contract Area. Each party who participates in the purchase of a renewal or replacement Lease shall be given an assignment of its proportionate interest therein by the acquiring party.

If some, but less than all, of the parties elect to participate in the purchase of a renewal or replacement Lease, it shall be owned by the parties who elect to participate therein, in a ratio based upon the relationship of their respective percentage of participation in the Contract Area to the aggregate of the percentages of participation in the Contract Area of all parties participating in the purchase of such renewal or replacement Lease. The acquisition of a renewal or replacement Lease by any or all of the parties hereto shall not cause a readjustment of the interests of the parties stated in Exhibit "A," but any renewal or replacement Lease in which less than all parties elect to participate shall not be subject to this agreement but shall be deemed subject to a separate Operating Agreement in the form of this agreement.

If the interests of the parties in the Contract Area vary according to depth, then their right to participate proportionately in renewal or replacement Leases and their right to receive an assignment of interest shall also reflect such depth variances.

The provisions of this Article shall apply to renewal or replacement Leases whether they are for the entire interest covered by the expiring Lease or cover only a portion of its area or an interest therein. Any renewal or replacement Lease taken before the expiration of its predecessor Lease, or taken or contracted for or becoming effective within six (6) months after the expiration of the existing Lease, shall be subject to this provision so long as this agreement is in effect at the time of such acquisition or at the time the renewal or replacement Lease becomes effective; but any Lease taken or contracted for more than six (6) months after the expiration of an existing Lease shall not be deemed a renewal or replacement Lease and shall not be subject to the provisions of this agreement.

The provisions in this Article shall also be applicable to extensions of Oil and Gas Leases.

**C. Acreage or Cash Contributions:**

While this agreement is in force, if any party contracts for a contribution of cash towards the drilling of a well or any other operation / to be conducted hereunder ~~on the Contract Area~~, such contribution shall be paid to the party who conducted the drilling or other operation and shall be applied by it against the cost of such drilling or other operation. If the contribution be in the form of acreage, the party to whom the contribution is made shall promptly tender an assignment of the acreage, without warranty of title, to the Drilling Parties in the proportions said Drilling Parties shared the cost of drilling the well. Such acreage shall become a separate Contract Area and, to the extent possible, be governed by provisions identical to this agreement. Each party shall promptly notify all other parties of any acreage or cash contributions it may obtain in support of any well or any other operation on the Contract Area. The above provisions shall also be applicable to optional rights to earn acreage outside the Contract Area which are in support of well drilled inside the Contract Area.

If any party contracts for any consideration relating to disposition of such party's share of substances produced hereunder, such consideration shall not be deemed a contribution as contemplated in this Article VIII.C.

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

**D. Assignment~~; Maintenance of Uniform Interest~~:**

~~For the purpose of maintaining uniformity of ownership in the Contract Area in the Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production covered by this agreement no party shall sell, encumber, transfer or make other disposition of its interest in the Oil and Gas Leases and Oil and Gas Interests embraced within the Contract Area or in wells, equipment and production unless such disposition covers either:~~

~~1. the entire interest of the party in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production; or~~

~~2. an equal undivided percent of the party's present interest in all Oil and Gas Leases, Oil and Gas Interests, wells, equipment and production in the Contract Area.~~

Every sale, encumbrance, transfer or other disposition made by any party shall be made expressly subject to this agreement and shall be made without prejudice to the right of the other parties, and any transferee of an ownership interest in any Oil and Gas Lease or Interest shall be deemed a party to this agreement as to the interest conveyed from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after the~~y~~ / Operator has~~ve~~ received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. / Except as otherwise provided herein, the transferring party shall be relieved of liability for the cost and expense of operations attributable to the transferred interest which are conducted after the expiration of the 30-day period above; *provided* that ~~N~~no assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party hereunder with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an approved operation conducted hereunder in which such party has agreed to participate~~ prior to making such assignment~~, and the lien and security interest granted by Article VII.B. shall continue to burden the interest transferred to secure payment of any such obligations. / The transferee shall be jointly and severally liable with its transferor for payment of its share of the costs and expenses attributable to an approved operation in which its transferor had agreed to participate.

If, at any time the interest of any party is divided among and owned by four or more co-owners, Operator, at its discretion, may require such co-owners to appoint a single trustee or agent with full authority to receive notices, approve expenditures, receive billings for and approve and pay such party's share of the joint expenses, and to deal generally with, and with power to bind, the co-owners of such party's interest within the scope of the operations embraced in this agreement; however, all such co- owners shall have the right to enter into and execute all contracts or agreements for the disposition of their respective shares of the Oil and Gas produced from the Contract Area and they shall have the right to receive, separately, payment of the sale proceeds thereof.

**E. Waiver of Rights to Partition:**

If permitted by the laws of the state or states in which the property covered hereby is located, each party hereto owning an undivided interest in the Contract Area waives any and all rights it may have to partition and have set aside to it in severalty its undivided interest therein.

~~**F. Preferential Right to Purchase:**~~

~~☐ (Optional: Check if applicable)~~

~~Should any party desire to sell all or any part of its interests under this agreement, or its rights and interests in the Contract Area, it shall promptly give written notice to the other parties, with full information concerning its proposed disposition, which shall include the name and address of the prospective transferee (who must be ready, willing and able to purchase), the purchase price, a legal description sufficient to identify the property, and all other terms of the offer. The other parties shall then have an optional prior right, for a period of ten (10) days after notice is~~

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

~~delivered, to purchase for the stated consideration on the same terms and conditions the interest which the other party proposes to sell; and, if this optional right is exercised, the purchasing parties shall share the purchased interest in the proportions that the interest of each bears to the total interest of all purchasing parties. However, there shall be no preferential right to purchase in those cases where any party wishes to mortgage its interests, or to transfer title to its interest to its mortgagee in lieu of or pursuant to foreclosure of a mortgage of its interests, or to dispose of its interests by merger, reorganization, consolidation, or by sale of all or substantially all of its Oil and Gas assets to any party, or by transfer of its interests to a subsidiary or parent company or to a subsidiary of a parent company, or to any company in which such party owns a majority of the stock.~~

**ARTICLE IX.**
**INTERNAL REVENUE CODE ELECTION**

If, for federal income tax purposes, this agreement and the operations hereunder are regarded as a partnership, and if the parties have not otherwise agreed to form a tax partnership pursuant to Exhibit "G" or other agreement between them, each party thereby affected elects to be excluded from the application of all of the provisions of Subchapter "K," Chapter 1, Subtitle "A," of the Internal Revenue Code of 1986, as amended ("Code"), as permitted and authorized by Section 761 of the Code and the regulations promulgated thereunder. Operator is authorized and directed to execute on behalf of each party hereby affected such evidence of this election as may be required by the Secretary of the Treasury of the United States or the Federal Internal Revenue Service, including specifically, but not by way of limitation, all of the returns, statements, and the data required by Treasury Regulation §1.761. Should there be any requirement that each party hereby affected give further evidence of this election, each such party shall execute such documents and furnish such other evidence as may be required by the Federal Internal Revenue Service or as may be necessary to evidence this election. No such party shall give any notices or take any other action inconsistent with the election made hereby. If any present or future income tax laws of the state or states in which the Contract Area is located or any future income tax laws of the United States contain provisions similar to those in Subchapter "K," Chapter 1, Subtitle "A," of the Code, under which an election similar to that provided by Section 761 of the Code is permitted, each party hereby affected shall make such election as may be permitted or required by such laws. In making the foregoing election, each such party states that the income derived by such party from operations hereunder can be adequately determined without the computation of partnership taxable income. / For federal income tax purposes, the parties agree that any gas imbalances will be reported under the cumulative gas balancing method as defined in Treasury Regulations § 1.761-2(d)(3).

**ARTICLE X.**
**CLAIMS AND LAWSUITS**

Operator may settle any single / or related aggregate uninsured third party damage claim or suit arising from operations hereunder if the expenditure does not exceed One Hundred Thousand Dollars Dollars ($ 100,000 ) and if the payment is in complete settlement of such claim or suit. If the amount required for settlement exceeds the above amount / Operator shall promptly notify Non-Operators, and, the parties hereto shall assume and take over the further handling of the claim or suit, unless such authority is delegated to Operator. All costs and expenses of handling settling, or otherwise discharging such claim or suit shall be at the joint expense of the parties participating in the operation from which the claim or suit arises. If a claim is made against any party or if any party is sued on account of any matter arising from operations hereunder over which such individual has no control because of the rights given Operator by this agreement, such party shall immediately notify all other parties, and the claim or suit shall be treated as any other claim or suit involving operations hereunder.

**ARTICLE XI.**
**FORCE MAJEURE**

If any party is rendered unable, wholly or in part, by force majeure to carry out its obligations under this agreement, other than the obligation to indemnify or make money payments or furnish security, that party shall give to all other parties prompt written notice of the force majeure with reasonably full particulars concerning it; thereupon,

the obligations of the party giving the notice, so far as they are affected by the force majeure, shall be suspended during, but no longer than, the continuance of the force majeure. The term "force majeure," as here employed, shall mean an act of God, strike, lockout, or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, governmental action, governmental delay, restraint or inaction, unavailability of equipment, and any other cause, whether of the kind specifically enumerated above or otherwise, which is not reasonably within the control of the party claiming suspension.

The affected party shall use all reasonable diligence to remove the force majeure situation as quickly as practicable. The requirement that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes, lockouts, or other labor difficulty by the party involved, contrary to its wishes; how all such difficulties shall be handled shall be entirely within the discretion of the party concerned.

**ARTICLE XII.**
**NOTICES**

All notices authorized or required between the parties by any of the provisions of this agreement, unless otherwise specifically provided, shall be in writing and delivered in person or by United States mail, courier service, ~~telegram, telex, telecopier or any other form~~ o<u>r</u> ~~f~~ facsimile, postage or charges prepaid <u>/ each of which may also be delivered by attachment to electronic mail ("Email Notice")</u>, and addressed to such parties at the addresses listed on Exhibit "A." All telephone or oral notices permitted by this agreement shall be confirmed immediately thereafter by written notice. The originating notice given under any provision hereof shall be deemed delivered only when received by the party to whom such notice is directed, and the time for such party to deliver any notice in response thereto shall run from the date the originating notice is received. "Receipt" for purposes of this agreement with respect to written notice delivered hereunder shall be actual delivery of the notice to the address of the party to be notified specified in accordance with this agreement, or to the ~~telecopy,~~ facsimile <u>/ number or email address</u> ~~or telex machine~~ of such party. The second or any responsive notice shall be deemed delivered when deposited in the United States mail or at the office of the courier ~~or telegraph~~ service, or upon transmittal by ~~telex, telecopy or~~ facsimile, or when personally delivered to the party to be notified, provided, that when response is required within 24 or 48 hours, such response shall be given orally or by telephone, ~~telex, telecopy or other~~ facsimile <u>/ or Email Notice</u> within such period. Each party shall have the right to change its address at any time, and from time to time, by giving written notice thereof to all other parties. If a party is not available to receive notice orally or by telephone when a party attempts to deliver a notice required to be delivered within 24 or 48 hours, the notice may be delivered in writing by any other method specified herein and shall be deemed delivered in the same manner provided above for any responsive notice.
<u>/ Each Email Notice shall clearly state that it is a notice or response to a notice under this agreement. An Email Notice shall be deemed delivered only when affirmatively acknowledged by email reply from the recipient (automatic delivery receipts do not qualify). If the receiving party fails or declines to affirmatively acknowledge an Email Notice, then the transmitting party shall be required to deliver notice and confirm receipt by one of the other methods provided above.</u>

**ARTICLE XIII.**
**TERM OF AGREEMENT**

This agreement shall remain in full force and effect as to the Oil and Gas Leases and/or Oil and Gas Interests subject hereto for the period of time selected below; provided, however, no party hereto shall ever be construed as having any right, title or interest in or to any Lease or Oil and Gas Interest contributed by any other party beyond the term of this agreement.

☐<u>√</u> <u>Option No. 1:</u> So long as any of the Oil and Gas Leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise

~~☐~~ Option No. 2: ~~In the event the well described in Article VI.A., or any subsequent well drilled under any provision of this agreement, results in the Completion of a well as a well capable of production of Oil and/or Gas in paying quantities, this agreement shall continue in force so long as any such well is~~

~~capable of production, and for an additional period of ________ days thereafter; provided, however, if, prior to the expiration of such additional period, one or more of the parties hereto are engaged in drilling, Reworking, Deepening, Sidetracking, Plugging Back, testing or attempting to Complete or Re-complete a well or wells hereunder, this agreement shall continue in force until such operations have been completed and if production results therefrom, this agreement shall continue in force as provided herein. In the event the well described in Article VI.A., or any subsequent well drilled hereunder, results in a dry hole, and no other well is capable of producing Oil and/or Gas from the Contract Area, this agreement shall terminate unless drilling, Deepening, Sidetracking, Completing, Re- completing, Plugging~~ Back or Reworking operations are commenced within____________________days from the date of abandonment of said well. "Abandonment" ~~for such purposes shall mean either (i) a decision by all parties not to conduct any further operations on the well or (ii) the elapse of 180 days from the conduct of any operations on the well, whichever first occurs.~~

The termination of this agreement shall not relieve any party hereto from any expense, liability or other obligation or any remedy therefor which has accrued or attached prior to the date of such termination.

Upon termination of this agreement and the satisfaction of all obligations hereunder, in the event a memorandum of this Operating Agreement has been filed of record, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon request of Operator, if Operator has satisfied all its financial obligations.

## ARTICLE XIV.
## COMPLIANCE WITH LAWS AND REGULATIONS

**A. Laws, Regulations and Orders:**

This agreement shall be subject to the applicable laws of the state in which the Contract Area is located, to the valid rules, regulations, and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations and orders.

**B. Governing Law:**

**This agreement and all matters pertaining hereto, including but not limited o matters of performance, non- performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state in which the Contract Area is located. If the Contract Area is in two or more states, the law of the state of Texas______shall govern.**

**C. Regulatory Agencies:**

Nothing herein contained shall grant, or be construed to grant, Operator the right or authority to waive or release any rights, privileges, or obligations which Non-Operators may have under federal or state laws or under rules, regulations or orders promulgated under such laws in reference to oil, gas and mineral operations, including the location, operation, or production of wells, on tracts offsetting or adjacent to the Contract Area.

With respect to the operations hereunder, Non-Operators agree to release Operator from / liability above and beyond its proportionate share of any and all losses, damages, injuries, Claims and causes of action arising out of, incident to our resulting directly or indirectly from Operator's interpretation or application of rules, rulings, regulations or orders of / any governmental agency having jursidiction ~~the Department of Energy or Federal Energy Regulatory Commission or predecessor or successor agencies~~ to the extent such interpretation or application was made in good faith and does not constitute gross negligence / or willful misconduct. Each No-Operator further agrees to reimburse Operator for such Non-Operator's share of production or any refund, fine, levy or other governmental sanction that Operator may be required to pay as a result of such an incorrect interpretation or

application, together with interest and penalties thereon owing by Operator as a result of such incorrect interpretation or application.

## ARTICLE XV.
## MISCELLANEOUS

**A. Execution:**

This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area. ~~or which own, in fact, an interest in the Contract Area. Operator may, however, by written notice to all Non-Operators who have become bound by this agreement as aforesaid, given at any time prior to the actual spud date of the Initial Well but in no event later than five days prior to the date specified in Article VI.A. for commencement of the Initial Well, terminate this agreement if Operator in its sole discretion determines that there is insufficient participation to justify commencement of drilling operations. In the event of such a termination by Operator, all further obligations of the parties hereunder shall cease as of such termination. In the event any Non-Operator has advanced or prepaid any share of drilling or other costs hereunder, all sums so advanced shall be returned to such Non-Operator without interest. Except as otherwise provided in Article IV.B, in the event operations on a well shall be commenced without execution of this agreement by all persons listed on Exhibit "A" as having a current interest in such well, or in the event that subsequent to the commencement of operations on the well previously unknown or undisclosed persons owning working interests in a well are discovered, or both, the parties executing this agreement agree to one of the following:~~

☐ Option No. 1: Operator shall indemnify executing Non-Operators with respect to all costs incurred for the well which would ~~have been charged to each such person under this agreement as if such person had executed the same and Operator shall receive all revenues which would have been received by each such person under this agreement as if such person had executed the same.~~

☐ Option No. 2: The Operator shall advise all parties of the total interest of the parties that have executed this agreement. Each ~~party executing this agreement, within forty-eight (48) hours (exclusive of Saturday, Sunday, and legal holidays) after delivery of such notice, shall advise the Operator of its desire to (i) limit participation to such party's interest as shown on Exhibit "A" or (ii) carry only its proportionate part (determined by dividing such party's interest in the Contract Area by the interest of all parties executing this agreement) of non-executing persons' interests, or (iii) carry its proportionate part (determined as provided in (ii)) of non-executing persons' interests together with all or a portion of its proportionate part of any non-executing persons interests that any executing party did not elect to take. Any interest of non-executing persons that is not carried by an executing party shall be deemed to be carried by the Operator. Failure to advise the Operator within the time required shall be deemed an election under (i).~~

**B. Successors and Assigns:**

This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns, and the terms hereof shall be deemed to run with the Leases or Interests included within the Contract Area.

**C. Counterparts:**

This instrument may be executed in any number of counterparts, each of which shall be considered an original for all purposes.

**D. Severability:**

For the purposes of assuming or rejecting this agreement as an executory contract pursuant to federal bankruptcy laws, this agreement shall not be severable, but rather must be assumed or rejected in its entirety, and the failure of any party to this agreement to comply with all of its financial obligations provided herein shall be a material default.

**E. Conflict of Terms:**

Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Articles I through XV of this agreement, and the provisions of Article XVI, the provisions of Article XVI shall govern.

**ARTICLE XVI.**
**OTHER PROVISIONS (Attached)**

~~**A. Conflict of Terms:**~~

~~Notwithstanding anything in this agreement to the contrary, in the event of any conflict between the provisions of Article I through XV of this agreement and the provisions of this Article XVI, the provisions of this Article XVI shall govern.~~

~~**B. Operator's Duty:**~~

~~Unless drilling operations are terminated pursuant to Article VI.F, Operator shall drill a Horizontal Well to the objective Zone(s) and drill the Lateral in the Zone(s) at least to a Displacement to which a reasonably prudent operator would deem further drilling is neither justified nor required.~~

~~**C. Priority of Operations – Horizontal Wells:**~~

~~Notwithstanding Article VI.B.6 or anything else in this agreement to the contrary, it is agreed that where a Horizontal Well subject to this agreement has been drilled to the objective Displacement and the Consenting Parties cannot agree upon the sequence and timing of further operations regarding such Horizontal Well, the following elections shall control the order of priority enumerated hereafter:~~

~~First: Testing, coring or logging;~~

~~Second: Complete drilling operations of all proposed Laterals;~~

~~Third: Extend or Deepen a Lateral;~~

~~Fourth: Kick out and drill an additional Lateral in the same Zone;~~

Fifth: Plug Back the well to a Zone above the Zone in which a Lateral was drilled; if there is more than one proposal ~~to Plug Back, the proposal to Plug Back to the next deepest prospective Zone shall have priority over a proposal to Plug Back to a shallower prospective Zone;~~

~~Sixth: Sidetrack; and~~

~~Seventh: Plug and abandon as provided for in Article VI.E~~

~~Provided, however, that if, at the time the Consenting Parties are considering any of the above, the hole is in such a condition that a reasonably prudent operator would not conduct the particular contemplated operation involved for fear of placing the hole in jeopardy or losing the hole prior to Completing the Horizontal Well in the objective Zone, such operation shall be eliminated from the priorities set forth above.~~

IN WITNESS WHEREOF, this agreement shall be effective as of the________________________day of__________, _______. ~~__________________________________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610-1989 Model Form Operating Agreement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made~~ by strikethrough and/or insertion and that are clearly recognizable as changes in Articles____________, ~~have been made to the form.~~

**ATTEST OR WITNESS:**

**OPERATOR**

By

Type or print name

Title

Date

Tax ID or S.S. No.

**NON-OPERATORS**

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

Date

Tax ID or S.S. No.

By

Type or print name

Title

A.A.P.L. FORM 610 - MODEL FORM OPERATING AGREEMENT - 1989 (Horz.)

Date ______________________

Tax ID or S.S. No. ______________________

~~ACKNOWLEDGMENTS~~

~~Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~Individual acknowledgment:~~
~~State of~~ ____________ ~~)~~
~~) ss.~~
~~County of~~ ____________ ~~)~~

~~This instrument was acknowledged before me on~~

______________________ ~~by~~ ______________________.

~~(Seal, if any)~~

______________________

~~Title (and Rank)~~ ______________________

~~My commission expires~~ ______________________

~~Acknowledgment in representative capacity:~~
~~State of~~ ____________ ~~)~~
~~) ss.~~
~~County of~~ ____________ ~~)~~

~~This instrument was acknowledged before me on~~

______________________ ~~by~~ ______________________ ~~as~~ ______________________
~~of~~ ______________________

~~(Seal, if any)~~

______________________

~~Title (and Rank)~~ ______________________

~~My commission expires~~ ______________________

**Article XVI to Operating Agreement**

**(Other Provisions)**

A. Additional Definitions:

1. The term "**Affiliate**" shall mean, when used with respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person in question; *provided*, that, notwithstanding the foregoing, (a) SN and its respective Affiliates, (b) SN UnSub and its respective Affiliates, and (c) Blackstone and its Affiliates, shall not be considered Affiliates of one another solely by virtue of (x) their ownership or Control of the Assets or (y) being a Party to this Agreement, an Operating Agreement or any management services agreement. For purposes of this Agreement, (i) subject to the preceding sentence, Sanchez Oil & Gas Corporation and its Affiliates including all Permitted Holders, shall be deemed to be Affiliates of SN; *provided*, *however*, (i) The Blackstone Group, L.P. and all private equity funds, portfolio companies, parallel investment entities, and alternative investment entities owned, managed, or Controlled by The Blackstone Group, L.P. or its Affiliates that are not part of the credit-related businesses of The Blackstone Group L.P. shall not be considered or otherwise deemed to be an Affiliate of GSO or any of its Affiliates that are part of the credit-related businesses of The Blackstone Group L.P., and (ii) none of GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates shall constitute an Affiliate of SN, SN UnSub, or any of their Affiliates, nor shall ownership by GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates of any ownership interest in [the Partnership or the General Partner] result in GSO or its Affiliates or any fund or account managed, advised or subadvised by GSO or its Affiliates constituting an Affiliate of SN, SN UnSub, or any of their Affiliates.

2. The term "**Agreement**" and the phrase "**this agreement**" shall each mean this Operating Agreement, as amended from time to time.

3. The term "**Associated Agreements**" means, collectively, the JDA, MSA, JEA and LLCA, inclusive of all exhibits and schedules, and all other contracts, documents, and instruments entered into by and among the parties in connection with operations and activities under this Agreement, in each case, to the extent in effect and applicable as of the time of reference hereunder.

4. The term "**Business Day**" shall mean a day (other than a Saturday or Sunday) on which commercial banks in Houston, Texas and New York, New York are open for business.

5. The term "**Control**" (including its derivatives and similar terms) shall mean, with respect to any specified Person, the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by contract or otherwise.

6. The term "**Extension**" or "**Extend**" shall mean an operation related to a Horizontal Well whereby a Lateral is drilled in the same Zone to a Displacement greater than (i) the Displacement contained in the proposal for such operation approved by the Consenting Parties, or (ii) the Displacement to which the Lateral was drilled pursuant to a previous proposal.

7. The term "**JDA**" shall mean that certain Joint Development Agreement dated as of March 1, 2017, by and between SN EF Maverick, LLC ("**SN**"), Aguila Production, LLC ("**Aguila**"), and SN EF UnSub, LP ("**UnSub**"), as the same may be amended from time to time.

8. The term "**JEA**" shall mean that certain Joint Exploration Agreement, dated as of March 1, 2008, by and between Anadarko E&P Company LP and TXCO Energy Corp., as amended.

9. The term "**LLCA**" shall mean the Limited Liability Company Agreement of Aguila Production, LLC, as the same may be amended from time to time.

10. The term "**MSA**" shall mean that certain Management Services Agreement, dated as of March 1, 2017, by and among SN, Aguila, and Unsub, as the same may be amended from time to time.

11. The term "**RRC**" shall mean the Railroad Commission of Texas or its applicable successor agency or agencies.

12. The term "**Workover**" shall mean routine maintenance and repair work performed on a well but does not include a Rework operation.

B. Amendments to Exhibit "A": The Operator shall amend Exhibit "A" from time to time in order to correct mistakes therein or to reflect changes in ownership within the Contract Area. Operator's duty to amend Exhibit "A" shall be subject to the following:

1. If such amendment is a correction of the initial Exhibit "A," it shall be effective retroactively as of the effective date of this Agreement. If such amendment reflects a change occurring after the effective date of this Agreement, it shall be effective retroactively as of the effective date of such change. In either event, if the amendment changes the interests of any parties in the Contract Area, the accounts of the affected parties shall be thus adjusted.

2. If a proposed amendment to Exhibit "A" involves only one of the parties, Operator shall amend Exhibit "A" upon the written consent of such affected party.

3. If a proposed amendment to Exhibit "A" results in an increase or decrease in the percentage of ownership of one or more parties, Operator shall amend Exhibit "A" upon the written consent of all affected parties.

4. If any party affected by a proposed amendment to Exhibit "A" fails to give written consent to such amendment, Operator may nevertheless make such amendment in order to conform Exhibit "A" to ownership as reflected in an opinion issued by a licensed attorney, who is neither any employee of a party that is affected by the amendment, nor of any Affiliate of such party. Such amendment shall be binding upon the parties until and unless determined otherwise pursuant to Article XVI.B.6.

5. Whenever an amendment is made to Exhibit "A," Operator shall promptly furnish each party with a copy of the amended Exhibit "A," together with a copy of the attorney's opinion upon which such amendment is based, when applicable, irrespective of whether such party is affected by the amendment.

6. Any party who has not consented to an amendment to Exhibit "A" may pursue litigation as to the validity of the basis for the amendment in a court of competent jurisdiction, by joining all other affected parties as parties to such litigation. If such litigation results in a determination which is contrary to the amendment, Operator shall conform Exhibit "A" to such determination, retroactive to the effective date determined pursuant to Article XVI.B.1 and the accounts of the affected parties shall be thus adjusted.

C. Operator's Limited Agency Authority:

Notwithstanding the provisions of Article V.A., Non-Operators hereby designate and appoint Operator as their agent and attorney-in-fact for the sole purpose of executing, filing for RRC approval, and recording a declaration of pooling or communitization agreement to effectuate the pooling or communitization of the Oil and Gas Leases (to the extent permitted under the terms and conditions thereof) and/or Oil and Gas Interests to conform with the spacing rules or a spacing order of the RRC. However, said agency authority shall only be exercised by Operator after providing written notice (including a copy of the proposed pooling declaration or communitization agreement) to the Non-Operators, and shall be binding upon any Non-Operator failing to provide to Operator a written objection within ten (10) Business Days after receipt of such notice.

D. Third Party Operator:

The Operator shall own an interest in the Contract Area except as provided in this Article XVI.D and subject to the provisions of Article XVI.E.5. A qualified non-owning operator ("**Third Party Operator**") may serve as Operator to the extent authorized by, and subject to the applicable terms and conditions of, (i) the JDA, and/or (ii) a separate agreement of the parties hereto. Unless the JDA or such separate agreement provides otherwise, as a condition precedent to serving as Operator hereunder, the putative Third Party Operator must agree to be bound by all terms and conditions of this Agreement that would be applicable to it as Operator.

E. Resignation or Removal of Operator and Selection of Successor:

1. *Voluntary Resignation*: The Operator may resign at any time by giving written notice thereof to the Non-Operators.

2. *Deemed Resignation of Operator*: If, after the effective date of this agreement, (i) Operator terminates its legal existence, (ii) Operator and its Affiliates no longer own an interest in the Contract Area, or (iii) Operator is no longer capable of serving as Operator, then Operator shall be deemed to have resigned without any action by Non-Operators, except for the selection of a successor Operator. A change of a corporate name or business entity type of Operator shall not be deemed a resignation of Operator.

3. *Effect of Bankruptcy*: If Operator becomes insolvent, bankrupt, or is placed in receivership, it shall be deemed to have resigned without any action of Non-Operators, except the selection of a successor. If a petition for relief under the federal bankruptcy laws is filed by or against Operator, and the removal of Operator is prevented by the federal bankruptcy court, all Non-Operators and Operator shall comprise an interim operating committee to serve until Operator has elected to reject or assume this agreement pursuant to the Bankruptcy Code, and an election to reject this agreement by Operator as a debtor-in-possession, or by a trustee in bankruptcy, shall be deemed a resignation by Operator without any action by Non-Operators, except the selection of a successor. During the period of time the operating committee controls operations, all actions shall require the approval of two (2) or more parties owning a majority interest based on ownership as shown on Exhibit "A." In the event there are only two (2) parties to this agreement, during the period of time the operating committee controls operations, a third party acceptable to Operator, Non-Operator, and the federal bankruptcy court shall be selected as a member of the operating committee and all actions shall require the approval of two (2) members of the operating committee without regard for their interest in the Contract Area based on Exhibit "A."

4. *Removal of Operator*: Except as provided in Article XVI.E.5, an Operator that has not voluntarily resigned and is not deemed to have resigned may be removed only for good cause by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of Operator. Such vote shall not be effective until a written notice has been delivered to Operator by a Non-Operator detailing the alleged default and Operator has failed to cure the default within thirty (30) days from its receipt of the notice or, if the default concerns an operation then being conducted, within forty eight (48) hours of its receipt of the notice. For purposes hereof, "good cause" shall include, but not be limited to, Operator's (i) gross negligence or willful misconduct, (ii) material breach of or inability to meet the standards of operation contained in Article V.A, (iii) material failure to perform its obligations or duties under this Agreement, or (iv) without limiting the generality of the foregoing, Operator's intentional conduct of an approved operation in a manner that substantially deviates from the specifications of the AFE and/or proposal associated with such approved operation on more than two (2) occasions in any 365-day period other than as permitted in Article XVI.H.2.

5. *Third Party Operator*: Unless the parties have agreed otherwise, a Third Party Operator may be removed at any time, with or without cause, by the affirmative vote of parties owning a majority interest based on ownership as shown on Exhibit "A." Moreover if good cause (as defined in Article XVI.E.4) exists for

removal of such Third Party Operator, the Third Party Operator may be removed by the affirmative vote of Non-Operators owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of any Non-Operator that (i) is an Affiliate of such Third Party Operator, and/or (ii) initiated the appointment of the Third Party Operator under Article XVI.D.

6. *Selection of Successor Operator*: Upon the resignation or removal of Operator under any provision of this agreement, a successor Operator shall be selected by the parties. The successor Operator shall be selected by the affirmative vote of one (1) or more parties owning a majority interest based on ownership as shown on Exhibit "A" including the vote(s) of the former Operator and/or any transferee(s) of the former Operator's interest, to the extent that they are owners within the Contract Area; *provided*, however, if any Operator which has been removed or is deemed to have resigned fails to vote or votes only to succeed itself, the successor Operator shall be selected by the affirmative vote of the party or parties owning a majority interest based on ownership as shown on Exhibit "A" remaining after excluding the voting interest of the Operator that was removed or resigned. In the event that such vote results in a tie, the candidate supported by the former Operator or the majority of its transferee(s) shall become the successor Operator. The former Operator shall promptly deliver to the successor Operator all records and data relating to the operations conducted by the former Operator to the extent such records and data are not already in the possession of the successor Operator. Any cost of obtaining or copying the former Operator's records and data shall be charged to the joint account.

7. *Effective Time of Resignation or Removal of Operator*: In the event of the resignation or removal of Operator, pursuant to any of Articles XVI.E.1-5, such resignation shall become effective upon the earlier of:

   a. the time and date that a successor Operator has been selected pursuant to Article XVI.E.6, and assumes the duties of Operator; or

   b. 7:00 A.M. on the first day of the calendar month following the expiration of ninety (90) days after (i) the giving of notice of resignation by Operator, (ii) the event deemed to be Operator's resignation, or (iii) action by the Non-Operators to remove Operator.

   Thereafter, the former Operator shall be bound by the terms hereof as a Non-Operator to the extent it continues to be a party hereto.

F. Proposals for Vertical Wells: Any proposal for the drilling of, or other operation in, a Vertical Well shall include:

1. Notice that the proposed operation is for a Vertical Well;

2. Drilling and Completion plans specifying the proposed:

   i. depth;

   ii. surface location, and if deviated, bottom hole location;

   iii. objective Zone;

   iv. utilization and scheduling of rig(s) for drilling and Completion;

   v. stimulation operations, staging, and sizing; and

3. Estimating drilling and Completion costs as set forth in the AFE.

G. Non-Consenting Party's Access to Location and Records:

1. *Generally*: With the exception of information required to be furnished by Operator pursuant to Article VI.B.2(d) or Article XVI.G.2, a Non-Consenting Party is neither entitled by virtue of this agreement to, nor may compel Operator or any Consenting Party to provide, access to the well location, or information and reports (or parts thereof) solely relating to such non-consented operation, until the earlier of full recoupment by the Consenting Parties of the amounts provided for in Article VI.B.2(b)(i) or two (2) years following the date the non-consented operation was commenced. Thereafter, Operator shall promptly furnish such access, information, and reports upon receipt of a written request from the Non-Consenting Party.

2. *Payout Audit*: Except as provided in Article VII.D.1, prior to a payout, a Non- Consenting Party shall be entitled to review the joint account records pertaining to a non-consented operation to the extent necessary to conduct an audit of the payout account. Any such review shall be conducted in accordance with Exhibit "C" or other agreement of the parties.

H. Operator's Implementation of Approved Proposals:

1. *Drilling Horizontal Wells*: For any Horizontal Well drilled under this Agreement, Operator shall drill such well to the Objective Zone(s) and drill the Lateral in the Zone(s) to the proposed Displacement unless drilling operations are terminated pursuant to Article VI.F or modified pursuant to this Article XVI.H.

2. *Extensions*: If, in the event that during actual drilling operations on the Lateral of a Horizontal Well, and prior to reaching the Displacement specified in the approved proposal for such well (the "**Approved Displacement**") Operator desires to Extend the Lateral more than twenty percent (20%) (measured in feet) beyond the Approved Displacement, Operator shall give the Consenting Parties written notice of such intent to Extend, together with the estimated costs, not less than 24 hours before Operator anticipates reaching the Approved Displacement. Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the Extension within 48 hours of receipt of such notice, Operator shall not Extend the Lateral beyond the Approved Displacement and will proceed with Completion in accordance with the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the Extension shall be deemed approved and binding upon all Consenting Parties.[1]

[1] NTD: This Extension provision was added in the 2015 JOA form recently approved by the AAPL.

3. *Other Deviations*: If Operator, in its reasonable judgment, determines that a deviation from an approved proposal other than an Extension is necessary or appropriate based upon information derived from facts and circumstances determined subsequent to the commencement of the operations relating to such proposal (including, without limitation, revision of the original proposed Completion staging and design), Operator shall immediately upon making such determination notify the Consenting Parties of the proposed modification (including all appropriate detail on the basis, cost, and design thereof). Unless at least seventy five percent (75%) of the Consenting Parties provide written notice of their consent to the proposed modification within 48 hours of receipt of such notice, Operator shall not undertake the modification and will proceed with the operation as specified in the latest approved proposal. Failure of a Consenting Party to respond to such notice shall be deemed a rejection. If at least seventy five percent (75%) of the Consenting Parties consent, the proposed modification shall be deemed approved and binding upon all Consenting Parties.[2]

H. Non-Operator Materials: Each Non-Operator hereby agrees to provide Operator with all documentation, affidavits, reports or other materials in its possession as required by Operator to perform those tasks to be undertaken by Operator hereunder, or as may be required by regulations and laws of the governmental authorities having jurisdiction over operations in the Contract Area. Non-Operator Liability for Site Visits:

J. Non-Operator Liability for Site Visits:

EACH NON-OPERATOR SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS OPERATOR, ITS AFFILIATES, AND ITS AND THEIR RESPECTIVE MANAGERS, DIRECTORS, OFFICERS, MEMBERS, PARTNERS, EMPLOYEES, REPRESENTATIVES, AGENTS, CONTRACTORS AND SUBCONTRACTORS FROM AND AGAINST ANY AND ALL LIABILITY FOR INJURY TO SUCH NON-OPERATOR'S OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS, RESULTING FROM OR IN ANY WAY RELATING TO THE PRESENCE OF ANY SUCH OFFICERS, EMPLOYEES, INVITEES AND/OR AGENTS AT OR IN THE VICINITY OF ANY WELL LOCATION OR PRODUCTION FACILITY ON THE CONTRACT AREA OR FROM ANY SUCH PERSON'S TRAVELING TO OR FROM SUCH LOCATION OR FACILITY, OTHER THAN ANY SUCH INJURY AND RESULTING LIABILITY CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF OPERATOR.

K. Liability of Non-Consenting Parties:

Notwithstanding anything herein to the contrary, any party who elects or is deemed to have elected not to participate in any proposed operation, as set out in this Agreement, shall not be relieved of (i) any obligations accruing prior to its election or deemed election not to participate or (ii) any obligation with respect to any other operation in which such party is participating or has participated.

L. Right to Set-Off or Recoupment; Netting:

Operator (or any non-defaulting Non-Operator if Operator is the party in default) may take any action to which it may be entitled or pursue any remedy to collect the amounts in default, together with all damages suffered by the non-defaulting parties as a result of the default plus interest accruing on the amounts recovered from the date of default until the date of collection at the rate specified in the COPAS Accounting Procedure attached as Exhibit "C" (without duplication of any interest charges permitted under the Development Agreement), together with reasonable attorneys' fees and court costs related thereto. Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have and be entitled to exercise all rights and remedies of recoupment, setoff and any similar doctrines, and the exercise of such rights and remedies shall be in addition to all other rights and remedies. Without limiting the foregoing, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the additional right to notify the purchaser or purchasers of the defaulting party's Oil and Gas production, and recoup or collect any amounts in default out of the proceeds from the sale of the defaulting party's share of Oil and Gas production until the amount owed has been paid in full. In addition, Operator (or any non-defaulting Non-Operator if Operator is the party in default) may, by notice to a defaulting party, suspend the right of such defaulting party to take and sell or dispose of its share of Oil and Gas production until such default has been cured. With respect to any amount owed pursuant to this Agreement by a defaulting party, Operator (or any non-defaulting Non-Operator if Operator is the party in default) shall have the right, from time to time, to recoup from, and to offset against, proceeds from the sale of such defaulting party's share of Oil and Gas production until payment in full of all amounts owing by such defaulting party, and to remit to such defaulting party a net check in the amount of any such net proceeds to which the defaulting party is then entitled. Any purchaser of such production shall be entitled to rely on Operator's (or any non-defaulting Non-Operator if Operator is the party in default) statement concerning the amount owed by the defaulting party. For the avoidance of doubt, in the event Operator is the party in default, any Non-Operator may cause Operator, by delivering notice to Operator, to exercise the remedies set forth in this Article XVI.L. with respect to Operator's interest covered by this Agreement.

M. Separate Measurement Costs:

In the event separate measurement of production is required, the party creating the necessity for such separate measuremnt shall alone bear the cost of purchase, installation and operation of such measurement facilities.

N. Agreement Subject to Associated Agreements:

The rights, obligations and remedies of the parties under this Agreement are subject to a the provisions of the Associated Agreements, to the extent that such remain in effect as of the time of reference hereunder. To the extent there is a conflict between the terms of this Agreement and any provisions of the Associated Agreements that remain effective, the terms of the Associated Agreements shall control.

O. Headings:

The headings of the several articles and sections of this Agreement are for convenience only, and shall not control or affect the meaning or construction of the terms and provisions of this Agreement.

P. Confidentiality of Information:

No party to this Agreement shall use, publish, disseminate or otherwise disclose, directly or indirectly, any trade secrets, proprietary information or confidential information, including, without limitation, the identity of a party or Affiliates thereof (collectively, the "Confidential Information") that should come into the possession of such party other than: (i) as necessary for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements; (ii) to an Affiliate or representative; (iii) in presentations made by Operator in the ordinary course of business at investor or industry conferences; *provided* that Operator shall not use the name of any Non-Operator or its Affiliates or disclose any provisions of this Agreement or the Associated Agreements in such conferences; or (iv) to the extent a party is required to disclose such Confidential Information (A) pursuant to applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), (B) due to a subpoena or court order or other legal process or (C) in order to enforce its rights under this Agreement or the Associated Agreements; provided that each party may disclose Confidential Information to its prospective and current direct or indirect investors or equity or debt financing sources, advisors and bona fide prospective transferees so long as such parties are subject to a customary confidentiality agreement or duty of confidentiality with respect to the Confidential Information. Each party shall, and shall cause each of its Affiliates, and its and their respective directors, officers, members, partners, investors, employees, representatives and agents (i) to comply with this Article XVI.P, (ii) to refrain from using any Confidential Information other than for the purpose of performing its duties and obligations under this Agreement or the Associated Agreements and (iii) to refrain from disclosing any Confidential Information to a person known to be a competitor of the other party (for the avoidance of doubt, this clause (iii) should not restrict any disclosure in accordance with the proviso in the immediately preceding sentence). If a party is required by law or court order to disclose information that would otherwise be Confidential Information under this Agreement, such party shall immediately notify, to the extent permitted under applicable law, the other parties of such notice and provide each party the opportunity to resist such disclosure by appropriate proceedings.

Q. Media Releases:

1. The parties shall consult with each other with regard to all press releases and other public announcements concerning this Agreement or operations on the Contract Area. Except as expressly permitted in Article XVI.P, without the prior written approval from the other parties hereto, no party will issue, or permit

any Affiliate or representative of it to issue, any press releases or otherwise make, or cause any agent or Affiliate of it to make, any public statements with respect to this Agreement, the Associated Agreements or the activities contemplated hereby or thereby, in each case except where such release or statement is (i) required by applicable law or under the rules and regulations of a recognized stock exchange on which shares of such party or any of its affiliates are listed (provided that such disclosures shall be made only to the extent required thereunder and in any case, prior to making any such press release or public statement, the releasing party shall (if the urgency of the relevant law or stock exchange rule so permits) provide a copy of the press release or public statement to the other party), or (ii) limited to previously released publicly available information, which press releases or statements will not be restricted by this Article XVI.Q. Notwithstanding anything to the contrary in Article XVI.Q.1 or Article XVI.P, in the event of any emergency which imminently and materially endangers property, lives or the environment, Operator may issue such press releases or public announcements as it deems reasonably necessary in light of the circumstances and will promptly provide Non-Operators with a copy of any such press release or announcement, if commercially feasible, prior to such press releases or public announcements being released or made.

2. Notwithstanding anything contained herein to the contrary, except as may be required by applicable law or the applicable rules and regulations of any governmental agency or stock exchange, no party shall issue any press release or make any other public announcement (excluding announcements (which shall not include technical data) to limited partners or investors of a party given in the ordinary course of business of such party) that makes reference to the name of another party or such party's Affiliates without the prior written consent of such party, which consent shall not be unreasonably withheld. In no event shall any of the principals or officers of a party be identified in any press releases or public announcements by another party without such party's consent.

R. Memorandum of Operating Agreement:

The parties agree to execute simultaneously herewith the Memorandum of Operating Agreement in the form and language set forth in Exhibit "H", which is attached hereto and made a part hereof. The parties agree to execute amendments of same, from time to time, to accurately reflect the Contract Area covered by this Agreement and the current working interests of the parties. Such memoranda may be recorded as deemed appropriate by any party, including in the records of the relevant counties and in any other jurisdictions where the filing of a financing statement (or similar instrument) is necessary to perfect the security interests granted in this Agreement.

S. Severability:

It is the intent of the parties that the provisions contained in this Agreement shall be severable. If any provisions of this Agreement, in whole or in part, are held invalid, illegal or incapable of being enforced as a matter of law or public policy, such holding shall not affect the other portions of this Agreement, and all other such portions shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any adverse manner to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

T. Governing Law; Venue; Jury Waiver:

THIS AGREEMENT AND THE LEGAL RELATIONS BETWEEN THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION (EXCEPT THAT, WITH RESPECT TO ISSUES RELATING TO REAL PROPERTY FOR PROPERTIES LOCATED IN A

SPECIFIC STATE, THE LAWS OF SUCH STATE SHALL GOVERN). THE PARTIES AGREE THAT THE APPROPRIATE, EXCLUSIVE AND CONVENIENT FORUM FOR ANY DISPUTES BETWEEN THE PARTIES ARISING OUT OF THIS AGREEMENT, THE ASSOCIATED AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE IN ANY FEDERAL OR STATE COURT WITH SUBJECT MATTER JURISDICTION LOCATED IN HARRIS COUNTY, TEXAS, AND EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS SOLELY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT.

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH OF THE PARTIES HEREBY WAIVES ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY ASSOCIATED AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT AND THE RELATIONSHIP THAT IS BEING ESTABLISHED. EACH PARTY ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. EACH PARTY ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH PARTY HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH PARTY WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.

COPAS 2005 Accounting Procedure
Recommended by COPAS

**Exhibit "C"**
**ACCOUNTING PROCEDURE**
**JOINT OPERATIONS**

Attached to and made part of that certain Operating Agreement dated [ ] , by and among [ ] as Operator, and [ ], as Non- Operators
.

**I. GENERAL PROVISIONS**

**IF THE PARTIES FAIL TO SELECT EITHER ONE OF COMPETING "ALTERNATIVE" PROVISIONS, OR SELECT ALL THE COMPETING "ALTERNATIVE" PROVISIONS, ALTERNATIVE 1 IN EACH SUCH INSTANCE SHALL BE DEEMED TO HAVE BEEN ADOPTED BY THE PARTIES AS A RESULT OF ANY SUCH OMISSION OR DUPLICATE NOTATION.**

**IN THE EVENT THAT ANY "OPTIONAL" PROVISION OF THIS ACCOUNTING PROCEDURE IS NOT ADOPTED BY THE PARTIES TO THE AGREEMENT BY A TYPED, PRINTED OR HANDWRITTEN INDICATION, SUCH PROVISION SHALL NOT FORM A PART OF THIS ACCOUNTING PROCEDURE, AND NO INFERENCE SHALL BE MADE CONCERNING THE INTENT OF THE PARTIES IN SUCH EVENT.**

**1. DEFINITIONS**

All terms used in this Accounting Procedure shall have the following meaning, unless otherwise expressly defined in the Agreement:

**"Affiliate"** / has the meaning set forth in the Agreement. ~~means for a person, another person that controls, is controlled by, or is under common control with that person. In this definition, (a) control means the ownership by one person, directly or indirectly, of more than fifty percent (50% ) of the voting securities of a corporation or, for other persons, the equivalent ownership interest (such as partnership interests), and (b) "person" means an individual, corporation, partnership, trust, estate, unincorporated organization, association, or other legal entity.~~

**"Agreement"** means the operating agreement~~, farmout agreement, or other contract~~ between the Parties to which this Accounting Procedure is attached.

**"Controllable Material"** means Material that, at the time of acquisition or disposition by the Joint Account, as applicable, is so classified in the Material Classification Manual most recently recommended by the Council of Petroleum Accountants Societies (COPAS).

**"Equalized Freight"** means the procedure of charging transportation cost to the Joint Account based upon the distance from the nearest Railway Receiving Point to the property.

**"Excluded Amount"** means a specified excluded trucking amount most recently recommended by COPAS.

**"Field Office"** means a structure, or portion of a structure, whether a temporary or permanent installation, the primary function of which is to directly serve daily operation and maintenance activities of the Joint Property and which serves as a staging area for directly chargeable field personnel.

**"First Level Supervision"** means those employees whose primary function in Joint Operations is the direct oversight of the Operator's field employees and/or contract labor directly employed On-site in a field operating capacity. First Level Supervision functions may include, but are not limited to: 44

- Responsibility for field employees and contract labor engaged in activities that can include field operations, maintenance, construction, well remedial work, equipment movement and drilling
- Responsibility for day-to-day direct oversight of rig operations
- Responsibility for day-to-day direct oversight of construction operations
- Coordination of job priorities and approval of work procedures
- Responsibility for optimal resource utilization (equipment, Materials, personnel)
- Responsibility for meeting production and field operating expense targets
- Representation of the Parties in local matters involving community, vendors, regulatory agents and landowners, as an incidental
- part of the supervisor's operating responsibilities
- Responsibility for all emergency responses with field staff
- Responsibility for implementing safety and environmental practices
- Responsibility for field adherence to company policy
- Responsibility for employment decisions and performance appraisals for field personnel
- Oversight of sub-groups for field functions such as electrical, safety, environmental, telecommunications, which may have group or team leaders.

**"Joint Account"** means the account showing the charges paid and credits received in the conduct of the Joint Operations that are to be shared by the Parties, but does not include proceeds attributable to hydrocarbons and by-products produced under the Agreement.

**"Joint Operations"** means all operations necessary or proper for the exploration, appraisal, development, production, protection, maintenance, repair, abandonment, and restoration of the Joint Property.

**"Joint Property"** means the real and personal property subject to the Agreement.

**"Laws"** means any laws, rules, regulations, decrees, and orders of the United States of America or any state thereof and all other governmental bodies, agencies, and other authorities having jurisdiction over or affecting the provisions contained in or the transactions contemplated by the Agreement or the Parties and their operations, whether such laws now exist or are hereafter amended, enacted, promulgated or issued.

**"Material"** means personal property, equipment, supplies, or consumables acquired or held for use by the Joint Property.

**"Non-Operators"** means the Parties to the Agreement other than the Operator.

~~**"Offshore Facilities"** means platforms, surface and subsea development and production systems, and other support systems such as oil and gas handling facilities, living quarters, offices, shops, cranes, electrical supply equipment and systems, fuel and water storage and piping, heliport, marine docking installations, communication~~

~~facilities, navigation aids, and other similar facilities necessary in the conduct of offshore operations, all of which are located offshore.~~

**"Off-site"** means any location that is not considered On-site as defined in this Accounting Procedure.

**"On-site"** means on the Joint Property when in direct conduct of Joint Operations. The term "On-site" shall also include that portion of ~~Offshore Facilities, Shore Base Facilities,~~ fabrication yards, and staging areas from which Joint Operations are conducted, or other facilities that directly control equipment on the Joint Property, regardless of whether such facilities are owned by the Joint Account.

**"Operator"** means the Party designated pursuant to the Agreement to conduct the Joint Operations.

**"Parties"** means legal entities signatory to the Agreement or their successors and assigns. Parties shall be referred to individually as "Party."

**"Participating Interest"** means the percentage of the costs and risks of conducting an operation under the Agreement that a Party agrees, or is otherwise obligated, to pay and bear.

**"Participating Party"** means a Party that approves a proposed operation or otherwise agrees, or becomes liable, to pay and bear a share of the costs and risks of conducting an operation under the Agreement.

**"Personal Expenses"** means reimbursed costs for travel and temporary living expenses.

**"Railway Receiving Point"** means the railhead nearest the Joint Property for which freight rates are published, even though an actual railhead may not exist.

~~**"Shore Base Facilities"** means onshore support facilities that during Joint Operations provide such services to the Joint Property as a receiving and transshipment point for Materials; debarkation point for drilling and production personnel and services; communication, scheduling and dispatching center; and other associated functions serving the Joint Property.~~

**"Supply Store"** means a recognized source or common stock point for a given Material item.

**"Technical Services"** means services providing specific engineering, geoscience, or other professional skills, such as those performed by engineers, geologists, geophysicists, and technicians, required to handle specific operating conditions and problems for the benefit of Joint Operations; provided, however, Technical Services shall not include those functions specifically identified as overhead under the second paragraph of the introduction of Section III (*Overhead*). Technical Services may be provided by the Operator, Operator's Affiliate, Non-Operator, Non-Operator Affiliates, and/or third parties.

**2. STATEMENTS AND BILLINGS**

The Operator shall bill Non-Operators on or before the last day of the month for their proportionate share of the Joint Account for the preceding month. Such bills shall be accompanied by statements that identify the AFE (authority for expenditure), lease or facility, and all charges and credits summarized by appropriate categories of investment and expense. Controllable Material shall be separately identified and fully described in detail, or at the Operator's option, Controllable Material may be summarized by major Material classifications. Intangible drilling costs, audit adjustments, and unusual charges and credits shall be separately and clearly identified.

The Operator may make available to Non-Operators any statements and bills required under Section I.2 and/or Section I.3.A (*Advances and Payments by the Parties*) via email, electronic data interchange, internet websites or other equivalent electronic media in lieu of paper copies. The Operator shall provide the Non-Operators instructions and any necessary information to access and receive the statements and bills within the timeframes specified herein. A statement or billing shall be deemed as delivered twenty-four (24) hours (exclusive of weekends and holidays) after the Operator notifies the Non-Operator that the statement or billing is available on the website and/or sent via email or electronic data interchange transmission. Each Non-Operator individually shall elect to receive statements and billings electronically, if available from the Operator, or request paper copies. Such election may be changed upon thirty (30) days prior written notice to the Operator.

**3. ADVANCES AND PAYMENTS BY THE PARTIES**

A. Unless otherwise provided for in the Agreement, the Operator may require the Non-Operators to advance their share of the estimated cash outlay for the succeeding month's operations within / thirty (30) ~~fifteen (15)~~ days after receipt of the advance request or by the first day of the month for which the advance is required, whichever is later. The Operator shall adjust each monthly billing to reflect advances received from the Non-Operators for such month. If a refund is due, the Operator shall apply the amount to be refunded to the subsequent month's billing or advance, unless the Non-Operator sends the Operator a written request for a cash refund. The Operator shall remit the refund to the Non-Operator within / thirty (30) ~~fifteen (15)~~ days of receipt of such written request.

B. Except as provided below, each Party shall pay its proportionate share of all bills in full within / thirty (30) ~~fifteen (15)~~ days of receipt date. If payment is not made within such time, the unpaid balance shall bear interest compounded monthly at the prime rate published by the *Wall Street Journal* on the first day of each month the payment is delinquent, plus three percent (3%), per annum, or the maximum contract rate permitted by the applicable usury Laws governing the Joint Property, whichever is the lesser, plus attorney's fees, court costs, and other costs in connection with the collection of unpaid amounts. If the *Wall Street Journal* ceases to be published or Discontinues publishing a prime rate, the unpaid balance shall bear interest compounded monthly at the prime rate published by the Federal Reserve plus three percent (3%), per annum. Interest shall begin accruing on the first day of the month in which the payment was due. Payment shall not be reduced or delayed as a result of inquiries or anticipated credits unless the Operator has agreed. Notwithstanding the foregoing, the Non-Operator may reduce payment, provided it furnishes documentation and explanation to the Operator at the time payment is made, to the extent such reduction is caused by:

(1) being billed at an incorrect working interest or Participating Interest that is higher than such Non-Operator's actual working interest or Participating Interest, as applicable; or

(2) being billed for a project or AFE requiring approval of the Parties under the Agreement that the Non-Operator has not approved or is not otherwise obligated to pay under the Agreement; or

(3) being billed for a property in which the Non-Operator no longer owns a working interest, provided the Non-Operator has furnished the Operator a copy of the recorded assignment or letter in-lieu. Notwithstanding the foregoing, the Non-Operator shall remain responsible for paying bills attributable to the interest it sold or transferred for any bills rendered during the thirty (30) day period following the Operator's receipt of such written notice; or

(4) charges outside the adjustment period, as provided in Section I.4 (*Adjustments*).

COPAS 2005 Accounting Procedure
Recommended by COPAS

4. **ADJUSTMENTS**

A. Payment of any such bills shall not prejudice the right of any Party to protest or question the correctness thereof; however, all bills and statements, including payout statements, rendered during any calendar year shall conclusively be presumed to be true and correct, with respect only to expenditures, after twenty-four (24) months following the end of any such calendar year, unless within said period a Party takes specific detailed written exception thereto making a claim for adjustment. The Operator shall provide a response to all written exceptions, whether or not contained in an audit report, within the time periods prescribed in Section I.5 (*Expenditure Audits*).

B. All adjustments initiated by the Operator, except those described in items (1) through (4) of this Section I.4.B, are limited to the twenty-four (24) month period following the end of the calendar year in which the original charge appeared or should have appeared on the Operator's Joint Account statement or payout statement. Adjustments that may be made beyond the twenty-four (24) month period are limited to adjustments resulting from the following:

(1) a physical inventory of Controllable Material as provided for in Section V (*Inventories of Controllable Material*), or
(2) an offsetting entry (whether in whole or in part) that is the direct result of a specific joint interest audit exception granted by the Operator relating to another property, or
(3) a government/regulatory audit, or
(4) a working interest ownership or Participating Interest adjustment.

5. **EXPENDITURE AUDITS**

A. Non-Operator, upon written notice to the Operator and all other Non-Operators, shall have the right to audit the Operator's accounts and records relating to the Joint Account within the twenty-four (24) month period following the end of such calendar year in which such bill was rendered; however, conducting an audit shall not extend the time for the taking of written exception to and the adjustment of accounts as provided for in Section I.4 (*Adjustments*). Any Party that is subject to payout accounting under the Agreement shall have the right to audit the accounts and records of the Party responsible for preparing the payout statements, or of the Party furnishing information to the Party responsible for preparing payout statements. Audits of payout accounts may include the volumes of hydrocarbons produced and saved and proceeds received for such hydrocarbons as they pertain to payout accounting required under the Agreement. Unless otherwise provided in the Agreement, audits of a payout account shall be conducted within the twenty-four (24) month period following the end of the calendar year in which the payout statement was rendered. Where there are two or more Non-Operators, the Non-Operators shall make every reasonable effort to conduct a joint audit in a manner that will result in a minimum of inconvenience to the Operator. The Operator shall bear no portion of the Non-Operators' audit cost incurred under this paragraph unless agreed to by the Operator. The audits shall not be conducted more than once each year without prior approval of the Operator, except upon the resignation or removal of the Operator, and shall be made at the expense of those Non-Operators approving such audit.

The Non-Operator leading the audit (hereinafter "lead audit company") shall issue the audit report within ninety (90) days after completion of the audit testing and analysis; however, the ninety (90) day time period shall not extend the twenty-four (24) month requirement for taking specific detailed written exception as required in Section I.4.A (*Adjustments*) above. All claims shall be supported with sufficient documentation.

A timely filed written exception or audit report containing written exceptions (hereinafter "written exceptions") shall, with respect to the claims made therein, preclude the Operator from asserting a statute of limitations defense against such claims, and the Operator hereby waives its right to assert any statute of limitations defense against such claims for so long as any Non-Operator continues to comply with the deadlines for resolving exceptions provided in this Accounting Procedure. If the Non-Operators fail to comply with The additional deadlines in Section I.5.B or I.5.C, the Operator's waiver of its rights to assert a statute of limitations defense against the claims brought by the Non-Operators shall lapse, and such claims shall then be subject to the applicable statute of limitations, provided that such waiver shall not lapse in the event that the Operator has failed to comply with the deadlines in Section I.5.B or I.5.C.

B. The Operator shall provide a written response to all exceptions in an audit report within one hundred eighty (180) days after Operator receives such report. Denied exceptions should be accompanied by a substantive response. If the Operator fails to provide substantive response to an exception within this one hundred eighty (180) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

C. The lead audit company shall reply to the Operator's response to an audit report within ninety (90) days of receipt, and the Operator shall reply to the lead audit company's follow-up response within ninety (90) days of receipt; provided, however, each Non-Operator shall have the right to represent itself if it disagrees with the lead audit company's position or believes the lead audit company is not adequately fulfilling its duties. Unless otherwise provided for in Section I.5.E, if the Operator fails to provide substantive response to an exception within this ninety (90) day period, the Operator will owe interest on that exception or portion thereof, if ultimately granted, from the date it received the audit report. Interest shall be calculated using the rate set forth in Section I.3.B (*Advances and Payments by the Parties*).

D. If any Party fails to meet the deadlines in Sections I.5.B or I.5.C or if any audit issues are outstanding fifteen (15) months after Operator receives the audit report, the Operator or any Non-Operator participating in the audit has the right to call a resolution meeting, as set forth in this Section I.5.D or it may invoke the dispute resolution procedures included in the Agreement, if applicable. The meeting will require one month's written notice to the Operator and all Non-Operators participating in the audit. The meeting shall be held at the Operator's office or mutually agreed location, and shall be attended by representatives of the Parties with authority to resolve such outstanding issues. Any Party who fails to attend the resolution meeting shall be bound by any resolution reached at the meeting. The lead audit company will make good faith efforts to coordinate the response and positions of the Non-Operator participants throughout the resolution process; however, each Non-Operator shall have the right to represent itself. Attendees will make good faith efforts to resolve outstanding issues, and each Party will be required to present substantive information supporting its position. A resolution meeting may be held as often as agreed to by the Parties. Issues unresolved at one meeting may be discussed at subsequent meetings until each such issue is resolved.

If the Agreement contains no dispute resolution procedures and the audit issues cannot be resolved by negotiation, the dispute shall be submitted to mediation. In such event, promptly following one Party's written request for mediation, the Parties to the dispute shall choose a mutually acceptable mediator and share the costs of mediation services equally. The Parties shall each have present at the mediation at least one individual who has the authority to settle the dispute. The Parties shall make reasonable efforts to ensure that the mediation commences within sixty (60) days of the date of the mediation request. Notwithstanding the above, any Party may file a lawsuit or complaint (1) if the Parties are unable after reasonable efforts, to commence mediation within sixty (60) days of the date of the mediation request, (2) for statute of limitations

reasons, or (3) to seek a preliminary injunction or other provisional judicial relief, if in its sole judgment an injunction or other provisional relief is necessary to avoid irreparable damage or to preserve the status quo. Despite such action, the Parties shall continue to try to resolve the dispute by mediation.

~~E. ☐ ***(Optional Provision – Forfeiture Penalties)*** *If the Non-Operators fail to meet the deadline in Section I.5.C, any unresolved exceptions that were not addressed by the Non- Operators within one (1) year following receipt of the last substantive response of the Operator shall be deemed to have been withdrawn by the Non-Operators. If the Operator fails to meet the deadlines in Section I.5.B or I.5.C, any unresolved exceptions that were not addressed by the Operator within one (1) year following receipt of the audit report or receipt of the last substantive response of the Non-Operators, whichever is later, shall be deemed to have been granted by the Operator and adjustments shall be made, without interest, to the Joint Account.*~~

**6. APPROVAL BY PARTIES**

A. GENERAL MATTERS

Where an approval or other agreement of the Parties or Non-Operators is expressly required under other Sections of this Accounting Procedure and if the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Operator shall notify all Non-Operators of the Operator's proposal and the agreement or approval of a majority in interest of the Non-Operators shall be controlling on all Non-Operators.

This Section I.6.A applies to specific situations of limited duration where a Party proposes to change the accounting for charges from that prescribed in this Accounting Procedure. This provision does not apply to amendments to this Accounting Procedure, which are covered by Section I.6.B.

B. AMENDMENTS

If the Agreement to which this Accounting Procedure is attached contains no contrary provisions in regard thereto, this Accounting Procedure can be amended by an affirmative vote of __all__ (__100%_) / of the Parties ~~or more Parties, one of which is the Operator, having a combined working interest of at least percent ( %)~~, which approval shall be binding on all Parties~~, provided, however, approval of at least one (1) Non-Operator shall be required~~.

C. AFFILIATES

For the purpose of administering the voting procedures of Sections I.6.A and I.6.B, if Parties to this Agreement are Affiliates of each other, then such Affiliates shall be combined and treated as a single Party having the combined working interest or Participating Interest of such Affiliates.

For the purposes of administering the voting procedures in Section I.6.A, if a Non-Operator is an Affiliate of the Operator, votes under Section I.6.A shall require the majority in interest of the Non-Operator(s) after excluding the interest of the Operator's Affiliate.

**II. DIRECT CHARGES**

The Operator shall charge the Joint Account with the following items:

COPAS 2005 Accounting Procedure
Recommended by COPAS

**1. RENTALS AND ROYALTIES**

Lease rentals and royalties paid by the Operator, on behalf of all Parties, for the Joint Operations.

**2. LABOR**

A. Salaries and wages, including incentive compensation programs as set forth in COPAS MFI-37 ("Chargeability of Incentive Compensation Programs"), for:

(1) Operator's field employees directly employed On-site in the conduct of Joint Operations,

(2) Operator's employees directly employed on ~~Shore Base Facilities, Offshore Facilities, or other~~ facilities serving the Joint Property if such costs are not charged under Section II.6 (*Equipment and Facilities Furnished by Operator*) or are not a function covered under Section III (*Overhead*),

(3) Operator's employees providing First Level Supervision,

(4) Operator's employees providing On-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*),

(5) Operator's employees providing Off-site Technical Services for the Joint Property if such charges are excluded from the overhead rates in Section III (*Overhead*).

Charges for the Operator's employees identified in Section II.2.A may be made based on the employee's actual salaries and wages, ~~or in lieu thereof, a day rate representing the Operator's average salaries and wages of the employee's specific job category~~.

Charges for personnel chargeable under this Section II.2.A who are foreign nationals shall not exceed comparable compensation paid to an equivalent U.S. employee pursuant to this Section II.2, unless otherwise approved by the Parties pursuant to Section I.6.A (*General Matters*).

B. Operator's cost of holiday, vacation, sickness, and disability benefits, and other customary allowances paid to employees whose salaries and wages are chargeable to the Joint Account under Section II.2.A, excluding severance payments or other termination allowances. Such costs under this Section II.2.B may be charged on a "when and as-paid basis" or by "percentage assessment" on the amount of salaries and wages chargeable to the Joint Account under Section II.2.A. If percentage assessment is used, the rate shall be based on the Operator's cost experience.

C. Expenditures or contributions made pursuant to assessments imposed by governmental authority that are applicable to costs chargeable to the Joint Account under Sections II.2.A and B.

D. Personal Expenses of personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A when the expenses are incurred in connection with directly chargeable activities.

E. Reasonable relocation costs incurred in transferring to the Joint Property personnel whose salaries and wages are chargeable to the Joint Account under Section II.2.A. Notwithstanding the foregoing, relocation costs that result from reorganization or merger of a Party, or that are for the primary benefit of the Operator, shall not be chargeable to the Joint Account. Extraordinary relocation costs, such as those incurred as a result of

transfers from remote locations, such as Alaska or overseas, shall not be charged to the Joint Account unless approved by the Parties pursuant to Section I.6.A (*General Matters*).

F. Training costs as specified in COPAS MFI-35 ("Charging of Training Costs to the Joint Account") for personnel whose salaries and wages are chargeable under Section II.2.A. This training charge shall include the wages, salaries, training course cost, and Personal Expenses incurred during the training session. The training cost shall be charged or allocated to the property or properties directly benefiting from the training. The cost of the training course shall not exceed prevailing commercial rates, where such rates are available.

G. Operator's current cost of established plans for employee benefits, as described in COPAS MFI-27 ("Employee Benefits Chargeable to Joint Operations and Subject to Percentage Limitation"), applicable to the Operator's labor costs chargeable to the Joint Account under Sections II.2.A and B based on the Operator's actual cost not to exceed the employee benefits limitation percentage most recently recommended by COPAS.

H. Award payments to employees, in accordance with COPAS MFI-49 ("Awards to Employees and Contractors") for personnel whose salaries and wages are chargeable under Section II.2.A.

**3. MATERIAL**

Material purchased or furnished by the Operator for use on the Joint Property in the conduct of Joint Operations as provided under Section IV (Material *Purchases, Transfers, and Dispositions*). Only such Material shall be purchased for or transferred to the Joint Property as may be required for immediate use or is reasonably practical and consistent with efficient and economical operations. The accumulation of surplus stocks shall be avoided.

**4. TRANSPORTATION**

A. Transportation of the Operator's, Operator's Affiliate's, or contractor's personnel necessary for Joint Operations.

B. Transportation of Material between the Joint Property and another property, or from the Operator's warehouse or other storage point to the Joint Property, shall be charged to the receiving property using one of the methods listed below. Transportation of Material from the Joint Property to the Operator's warehouse or other storage point shall be paid for by the Joint Property using one of the methods listed below:

(1) If the actual trucking charge is less than or equal to the Excluded Amount the Operator may charge actual trucking cost or a theoretical charge from the Railway Receiving Point to the Joint Property. The basis for the theoretical charge is the per hundred weight charge plus fuel surcharges from the Railway Receiving Point to the Joint Property.. The Operator shall consistently apply the selected alternative.

(2) If the actual trucking charge is greater than the Excluded Amount, the Operator shall charge Equalized Freight. Accessorial charges such as loading and unloading costs, split pick-up costs, detention, call out charges, and permit fees shall be charged directly to the Joint Property and shall not be included when calculating the Equalized Freight.

**5. SERVICES**

The cost of contract services, equipment, and utilities used in the conduct of Joint Operations, except for contract services, equipment, and utilities covered by Section III (*Overhead*), or Section II.7 (*Affiliates*), or excluded under Section II.9 (*Legal Expense*). Awards paid to contractors shall be chargeable pursuant to COPAS MFI-49 ("Awards to Employees and Contractors").

The costs of third party Technical Services are chargeable to the extent excluded from the overhead rates under Section III (*Overhead*).

**6. EQUIPMENT AND FACILITIES FURNISHED BY OPERATOR**

In the absence of a separately negotiated agreement, equipment and facilities furnished by the Operator will be charged as follows:

A. The Operator shall charge the Joint Account for use of Operator-owned equipment and facilities, including but not limited to production facilities~~, Shore Base Facilities, Offshore Facilities,~~ and Field Offices, at rates commensurate with the costs of ownership and operation. The cost of Field Offices shall be chargeable to the extent the Field Offices provide direct service to personnel who are chargeable pursuant to Section II.2.A (*Labor*). Such rates may include labor, maintenance, repairs, other operating expense, insurance, taxes, depreciation using straight line depreciation method, and interest on gross investment less accumulated depreciation not to exceed ___twelve___ percent (___12___%) per annum; provided, however, depreciation shall not be charged when the COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. equipment and facilities investment have been fully depreciated. The rate may include an element of the estimated cost for abandonment, reclamation, and dismantlement. Such rates shall not exceed the average commercial rates currently prevailing in the immediate area of the Joint Property.

B. In lieu of charges in Section II.6.A above, the Operator may elect to use average commercial rates prevailing in the immediate area of the Joint Property, less twenty percent (20%). If equipment and facilities are charged under this Section II.6.B, the Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation. For automotive equipment, the Operator may elect to use rates published by the Petroleum Motor Transport Association (PMTA) or such other organization recognized by COPAS as the official source of rates.

**7. AFFILIATES**

A. Charges for an Affiliate's goods and/or services used in operations requiring an AFE or other authorization from the Non-Operators may be made without the approval of the Parties provided (i) the Affiliate is identified and the Affiliate goods and services are specifically detailed in the approved AFE or other authorization, and (ii) the total costs for such Affiliate's goods and services billed to such individual project do not exceed $_100,000.00__ If the total costs for an Affiliate's goods and services charged to such individual project are not specifically detailed in the approved AFE or authorization or exceed such amount, charges for such Affiliate shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

B. For an Affiliate's goods and/or services used in operations not requiring an AFE or other authorization from the Non-Operators, charges for such Affiliate's goods and services shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*), if the charges exceed $_100,000.00__ in a given calendar year.

C. The cost of the Affiliate's goods or services shall not exceed average commercial rates prevailing in the area of the Joint Property, unless the Operator obtains the Non-Operators' approval of such rates. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation; provided, however, documentation of commercial rates shall not be required if the Operator obtains Non-Operator approval of its Affiliate's rates or charges prior to billing Non-Operators for such Affiliate's goods and services. Notwithstanding the foregoing, direct charges for Affiliate-owned communication facilities or systems shall be made pursuant to Section II.12 (*Communications*).

If the Parties fail to designate an amount in Sections II.7.A or II.7.B, in each instance the amount deemed adopted by the Parties as a result of such omission shall be the amount established as the Operator's expenditure limitation in the Agreement. If the Agreement does not contain an Operator's expenditure limitation, the amount deemed adopted by the Parties as a result of such omission shall be zero dollars ($ 0.00).

**8. DAMAGES AND LOSSES TO JOINT PROPERTY**

All costs or expenses necessary for the repair or replacement of Joint Property resulting from damages or losses incurred, except to the extent such damages or losses result from a Party's or Parties' gross negligence or willful misconduct, in which case such Party or Parties shall be solely liable.

The Operator shall furnish the Non-Operator written notice of damages or losses incurred as soon as practicable after a report has been received by the Operator.

**9. LEGAL EXPENSE**

Recording fees and costs of handling, settling, or otherwise discharging litigation, claims, and liens incurred in or resulting from operations under the Agreement, or necessary to protect or recover the Joint Property, to the extent permitted under the Agreement. Costs of the Operator's or Affiliate's legal staff or outside attorneys, including fees and expenses, are not chargeable unless approved by the Parties pursuant to Section I.6.A (*General Matters*) or otherwise provided for in the Agreement.

/ Notwithstanding the foregoing paragraph, costs for procuring abstracts, fees paid to outside attorneys / and landment for title examinations (including preliminary, supplemental, shut-in royalty opinions, division order title opinions), and curative work shall be chargeable / to the Joint Account ~~to the extent permitted as a direct charge in the Agreement~~.

**10. TAXES AND PERMITS**

All taxes and permitting fees of every kind and nature, assessed or levied upon or in connection with the Joint Property, or the production therefrom, and which have been paid by the Operator for the benefit of the Parties, including penalties and interest, except to the extent the penalties and interest result from the Operator's gross negligence or willful misconduct.

If ad valorem taxes paid by the Operator are based in whole or in part upon separate valuations of each Party's working interest, then notwithstanding any contrary provisions, the charges to the Parties will be made in accordance with the tax value generated by each Party's working interest.

COPAS 2005 Accounting Procedure
Recommended by COPAS

COPAS 2005 Accounting Procedure Recommended by COPAS, Inc. Costs of tax consultants or advisors, the Operator's employees, or Operator's Affiliate employees in matters regarding ad valorem or other tax matters, are not permitted as direct charges / to the extent Operator handles such tax matters on behalf of the Joint Account ~~unless approved by the Parties pursuant to Section I.6.A (*General Matters*)~~.

Charges to the Joint Account resulting from sales/use tax audits, including extrapolated amounts and penalties and interest, are permitted, provided the Non-Operator shall be allowed to review the invoices and other underlying source documents which served as the basis for tax charges and to determine that the correct amount of taxes were charged to the Joint Account. If the Non-Operator is not permitted to review such documentation, the sales/use tax amount shall not be directly charged unless the Operator can conclusively document the amount owed by the Joint Account.

**11. INSURANCE**

Net premiums paid for insurance required to be carried for Joint Operations for the protection of the Parties. If Joint Operations are conducted at locations where the Operator acts as self-insurer in regard to its worker's compensation and employer's liability insurance obligation, the Operator shall charge the Joint Account manual rates for the risk assumed in its self-insurance program as regulated by the jurisdiction governing the Joint Property. In the case of offshore operations in federal waters, the manual rates of the adjacent state shall be used for personnel performing work On-site, and such rates shall be adjusted for offshore operations by the U.S. Longshoreman and Harbor Workers (USL&H) or Jones Act surcharge, as appropriate.

**12. COMMUNICATIONS**

Costs of acquiring, leasing, installing, operating, repairing, and maintaining communication facilities or systems, including satellite, radio and microwave facilities, between the Joint Property and the Operator's office(s) directly responsible for field operations in accordance with the provisions of COPAS MFI-44 ("Field Computer and Communication Systems"). If the communications facilities or systems serving the Joint Property are Operator-owned, charges to the Joint Account shall be made as provided in Section II.6 (*Equipment and Facilities Furnished by Operator*). If the communication facilities or systems serving the Joint Property are owned by the Operator's Affiliate, charges to the Joint Account shall not exceed average commercial rates prevailing in the area of the Joint Property. The Operator shall adequately document and support commercial rates and shall periodically review and update the rate and the supporting documentation.

**13. ECOLOGICAL, ENVIRONMENTAL, AND SAFETY**

Costs incurred for Technical Services and drafting to comply with ecological, environmental and safety Laws or standards recommended by Occupational Safety and Health Administration (OSHA) or other regulatory authorities. All other labor and functions incurred for ecological, environmental and safety matters, including management, administration, and permitting, shall be covered by Sections II.2 (*Labor*), II.5 (*Services*), or Section III (*Overhead*), as applicable.

Costs to provide or have available pollution containment and removal equipment plus actual costs of control and cleanup and resulting responsibilities of oil and other spills as well as discharges from permitted outfalls as required by applicable Laws, or other pollution containment and removal equipment deemed appropriate by the Operator for prudent operations, are directly chargeable.

**14. ABANDONMENT AND RECLAMATION**

Costs incurred for abandonment and reclamation of the Joint Property, including costs required by lease agreements or by Laws.

**15. OTHER EXPENDITURES**

Any other expenditure not covered or dealt with in the foregoing provisions of this Section II (*Direct Charges*), or in Section III (*Overhead*) and which is of direct benefit to the Joint Property and is incurred by the Operator in the necessary and proper conduct of the Joint Operations. Charges made under this Section II.15 shall require approval of the Parties, pursuant to Section I.6.A (*General Matters*).

**III. OVERHEAD**

As compensation for costs not specifically identified as chargeable to the Joint Account pursuant to Section II (*Direct Charges*), the Operator shall charge the Joint Account in accordance with this Section III.

Functions included in the overhead rates regardless of whether performed by the Operator, Operator's Affiliates or third parties and regardless of location, shall include, but not be limited to, costs and expenses of:

- warehousing, other than for warehouses that are jointly owned under this Agreement
- design and drafting (except when allowed as a direct charge under Sections II.13, III.1.A(ii), and III.2, Option B)
- inventory costs not chargeable under Section V (*Inventories of Controllable Material*)
- procurement
- administration
- accounting and auditing
- gas dispatching and gas chart integration
- human resources
- management
- supervision not directly charged under Section II.2 (*Labor*)
- legal services not directly chargeable under Section II.9 (*Legal Expense*)
- taxation, other than those costs identified as directly chargeable under Section II.10 (*Taxes and Permits*)
- preparation and monitoring of permits and certifications; preparing regulatory reports; appearances before or meetings with governmental agencies or other authorities having jurisdiction over the Joint Property, other than On-site inspections; reviewing, interpreting, or submitting comments on or lobbying with respect to Laws or proposed Laws.

COPAS 2005 Accounting Procedure
Recommended by COPAS

Overhead charges shall include the salaries or wages plus applicable payroll burdens, benefits, and Personal Expenses of personnel performing overhead functions, as well as office and other related expenses of overhead functions.

**1. OVERHEAD—DRILLING AND PRODUCING OPERATIONS**

As compensation for costs incurred but not chargeable under Section II (*Direct Charges*) and not covered by other provisions of this Section III, the Operator shall charge on either:

☑ **(Alternative 1)** Fixed Rate Basis, Section III.1.B.

~~☐ **(Alternative 2)** Percentage Basis, Section III.1.C.~~

A. TECHNICAL SERVICES

*(i)* Except as otherwise provided in Section II.13 (*Ecological Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **On-site** Technical Services, including third party Technical Services:

☑ **(Alternative 1 – Direct)** shall be charged **direct** to the Joint Account.

~~☐ **(Alternative 2 – Overhead)** shall be covered by the **overhead** rates.~~

*(ii)* Except as otherwise provided in Section II.13 (*Ecological, Environmental, and Safety*) and Section III.2 (*Overhead – Major Construction and Catastrophe*), or by approval of the Parties pursuant to Section I.6.A (*General Matters*), the salaries, wages, related payroll burdens and benefits, and Personal Expenses for **Off-site** Technical Services, including third party Technical Services:

☐ **(Alternative 1 – All Overhead)** shall be covered by the **overhead** rates / provided that, offsite geosteering costs shall be charged direct to the Joint Account.

~~☐ **(Alternative 2 – All Direct)** shall be charged **direct** to the Joint Account.~~

~~☐ **(Alternative 3 – Drilling Direct)** shall be charged **direct** to the Joint Account, **only** to the extent such Technical Services are directly attributable to drilling, redrilling, deepening, or sidetracking operations, through completion, temporary abandonment, or abandonment if a dry hole. Off-site Technical Services for all other operations, including workover, recompletion, abandonment of producing wells, and the construction or expansion of fixed assets not covered by Section III.2 (*Overhead - Major Construction and Catastrophe*) shall be covered by the overhead rates.~~

Notwithstanding anything to the contrary in this Section III, Technical Services provided by Operator's Affiliates are subject to limitations set forth in Section II.7 (*Affiliates*). Charges for Technical personnel performing non-technical work shall not be governed by this Section III.1.A, but instead governed by other provisions of this Accounting Procedure relating to the type of work being performed.

B. OVERHEAD—FIXED RATE BASIS

(1) The Operator shall charge the Joint Account at the following rates per well per month:

Drilling Well Rate per month $ 7,000.00 (prorated for less than a full month)

Producing Well Rate per month $ 700.00

(2) Application of Overhead—Drilling Well Rate shall be as follows:

(a) Charges for onshore drilling wells shall begin on the spud date and terminate on the date the drilling and/or completion equipment used on the well is released, whichever occurs later. ~~Charges for offshore and inland waters drilling wells shall begin on the date the drilling or completion equipment arrives on location and terminate on the date the drilling or completion equipment moves off location, or is released, whichever occurs first.~~ No charge shall be made during suspension of drilling and/or completion operations for fifteen (15) or more consecutive calendar days.

(b) Charges for any well undergoing any type of workover, recompletion, and/or abandonment for a period of five (5) or more consecutive work–days shall be made at the Drilling Well Rate. Such charges shall be applied for the period from date operations, with rig or other units used in operations, commence through date of rig or other unit release, except that no charges shall be made during suspension of operations for fifteen (15) or more consecutive calendar days.

(3) Application of Overhead—Producing Well Rate shall be as follows:

(a) An active well that is produced, injected into for recovery or disposal, or used to obtain water supply to support operations for any portion of the month shall be considered as a one-well charge for the entire month.

(b) Each active completion in a multi-completed well shall be considered as a one-well charge provided each completion is considered a separate well by the governing regulatory authority.

(c) A one-well charge shall be made for the month in which plugging and abandonment operations are completed on any well, unless the Drilling Well Rate applies, as provided in Sections III.1.B.(2)(a) or (b). This one-well charge shall be made whether or not the well has produced.

(d) An active gas well shut in because of overproduction or failure of a purchaser, processor, or transporter to take production shall be considered as a one-well charge provided the gas well is directly connected to a permanent sales outlet.

(e) Any well not meeting the criteria set forth in Sections III.1.B.(3) (a), (b), (c), or (d) shall not qualify for a producing overhead charge.

(4) The well rates shall be adjusted on the first day of April each year following the effective date of the Agreement; provided, however, if this Accounting Procedure is attached to or otherwise governing the payout accounting under a farmout agreement, the rates shall be adjusted on the first day of April each year following the effective date of such farmout agreement. The adjustment shall be computed by applying the adjustment factor most recently published by COPAS. The adjusted rates shall be the initial or amended rates agreed to by the Parties increased or decreased by the adjustment factor

COPAS 2005 Accounting Procedure
Recommended by COPAS

described herein, for each year from the effective date of such rates, in accordance with COPAS MFI-47 ("Adjustment of Overhead Rates").

~~C. OVERHEAD—PERCENTAGE BASIS~~

~~(1) Operator shall charge the Joint Account at the following rates:~~

~~(a) Development Rate____percent (___) % of the cost of development of the Joint Property, exclusive of costs rovided under Section II.9 (*Legal Expense*) and all Material salvage credits.~~

~~(b) Operating Rate ____percent (___%) of the cost of operating the Joint Property, exclusive of costs provided under Sections II.1 (*Rentals and Royalties*) and II.9 (*Legal Expense*); all Material salvage credits; the value of substances purchased for enhanced recovery; all property and ad valorem taxes, and any other taxes and assessments that are levied, assessed, and paid upon the mineral interest in and to the Joint Property.~~

~~(2) Application of Overhead—Percentage Basis shall be as follows:~~

~~(a) The Development Rate shall be applied to all costs in connection with:~~

~~[i] drilling, redrilling, sidetracking, or deepening of a well~~
~~[ii] a well undergoing plugback or workover operations for a period of five (5) or more consecutive work–days~~
~~[iii] preliminary expenditures necessary in preparation for drilling~~
~~[iv] expenditures incurred in abandoning when the well is not completed as a producer~~
~~[v] construction or installation of fixed assets, the expansion of fixed assets and any other project clearly discernible as a fixed asset, other than Major Construction or Catastrophe as defined in Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

~~(b) The Operating Rate shall be applied to all other costs in connection with Joint Operations, except those subject to Section III.2 (*Overhead-Major Construction and Catastrophe*).~~

**2. OVERHEAD—MAJOR CONSTRUCTION AND CATASTROPHE**

To compensate the Operator for overhead costs incurred in connection with a Major Construction project or Catastrophe, the Operator shall either negotiate a rate prior to the beginning of the project, or shall charge the Joint Account for overhead based on the following rates for any Major Construction project in excess of the Operator's expenditure limit under the Agreement, or for any Catastrophe regardless of the amount. If the Agreement to which this Accounting Procedure is attached does not contain an expenditure limit, Major Construction Overhead shall be assessed for any single Major Construction project costing in excess of $100,000 gross.

Major Construction shall mean the construction and installation of fixed assets, the expansion of fixed assets, and any other project clearly discernible as a fixed asset required for the development and operation of the Joint Property, or in the dismantlement, abandonment, removal, and restoration of platforms, production equipment, and other operating facilities.

COPAS 2005 Accounting Procedure
Recommended by COPAS

Catastrophe is defined as a sudden calamitous event bringing damage, loss, or destruction to property or the environment, such as an oil spill, blowout, explosion, fire, storm, hurricane, or other disaster. The overhead rate shall be applied to those costs necessary to restore the Joint Property to the equivalent condition that existed prior to the event.

A. If the Operator absorbs the engineering, design and drafting costs related to the project:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

B. If the Operator charges engineering, design and drafting costs related to the project directly to the Joint Account:

(1) 5.0 % of total costs if such costs are less than $100,000; plus

(2) 3.0 % of total costs in excess of $100,000 but less than $1,000,000; plus

(3) 2.0 % of total costs in excess of $1,000,000.

Total cost shall mean the gross cost of any one project. For the purpose of this paragraph, the component parts of a single Major Construction project shall not be treated separately, and the cost of drilling and workover wells and purchasing and installing pumping units and downhole artificial lift equipment shall be excluded. For Catastrophes, the rates shall be applied to all costs associated with each single occurrence or event.

On each project, the Operator shall advise the Non-Operator(s) in advance which of the above options shall apply.

For the purposes of calculating Catastrophe Overhead, the cost of drilling relief wells, substitute wells, or conducting other well operations directly resulting from the catastrophic event shall be included. Expenditures to which these rates apply shall not be reduced by salvage or insurance recoveries. Expenditures that qualify for Major Construction or Catastrophe Overhead shall not qualify for overhead under any other overhead provisions.

In the event of any conflict between the provisions of this Section III.2 and the provisions of Sections II.2 (*Labor*), II.5 (*Services*), or II.7 (*Affiliates*), the provisions of this Section III.2 shall govern.

**3. AMENDMENT OF OVERHEAD RATES**

The overhead rates provided for in this Section III may be amended from time to time if, in practice, the rates are found to be insufficient or excessive, in accordance with the provisions of Section I.6.B (*Amendments*).

**IV. MATERIAL PURCHASES, TRANSFERS, AND DISPOSITIONS**

The Operator is responsible for Joint Account Material and shall make proper and timely charges and credits for direct purchases, transfers, and dispositions. The Operator shall provide all Material for use in the conduct of Joint Operations; however, Material may be supplied by the Non-Operators, at the Operator's option. Material furnished

COPAS 2005 Accounting Procedure
Recommended by COPAS

by any Party shall be furnished without any express or implied warranties as to quality, fitness for use, or any other matter.

**1. DIRECT PURCHASES**

Direct purchases shall be charged to the Joint Account at the price paid by the Operator after deduction of all discounts received. The Operator shall make good faith efforts to take discounts offered by suppliers, but shall not be liable for failure to take discounts except to the extent such failure was the result of the Operator's gross negligence or willful misconduct. A direct purchase shall be deemed to occur when an agreement is made between an Operator and a third party for the acquisition of Material for a specific well site or location. Material provided by the Operator under "vendor stocking programs," where the initial use is for a Joint Property and title of the Material does not pass from the manufacturer, distributor, or agent until usage, is considered a direct purchase. If Material is found to be defective or is returned to the manufacturer, distributor, or agent for any other reason, credit shall be passed to the Joint Account within sixty (60) days after the Operator has received adjustment from the manufacturer, distributor, or agent.

**2. TRANSFERS**

A transfer is determined to occur when the Operator (i) furnishes Material from a storage facility or from another operated property, (ii) has assumed liability for the storage costs and changes in value, and (iii) has previously secured and held title to the transferred Material. Similarly, the removal of Material from the Joint Property to a storage facility or to another operated property is also considered a transfer; provided, however, Material that is moved from the Joint Property to a storage location for safe-keeping pending disposition may remain charged to the Joint Account and is not considered a transfer. Material shall be disposed of in accordance with Section IV.3 (*Disposition of Surplus*) and the Agreement to which this Accounting Procedure is attached.

A. PRICING

The value of Material transferred to/from the Joint Property should generally reflect the market value on the date of physical transfer. Regardless of the pricing method used, the Operator shall make available to the Non-Operators sufficient documentation to verify the Material valuation. When higher than specification grade or size tubulars are used in the conduct of Joint Operations, the Operator shall charge the Joint Account at the equivalent price for well design specification tubulars, unless such higher specification grade or sized tubulars are approved by the Parties pursuant to Section I.6.A (*General Matters*). Transfers of new Material will be priced using one of the following pricing methods; provided, however, the Operator shall use consistent pricing methods, and not alternate between methods for the purpose of choosing the method most favorable to the Operator for a specific transfer:

(1) Using published prices in effect on date of movement as adjusted by the appropriate COPAS Historical Price Multiplier (HPM) or prices provided by the COPAS Computerized Equipment Pricing System (CEPS).

(a) For oil country tubulars and line pipe, the published price shall be based upon eastern mill carload base prices (Houston, Texas, for special end) adjusted as of date of movement, plus transportation cost as defined in Section IV.2.B (*Freight*).

(b) For other Material, the published price shall be the published list price in effect at date of movement, as listed by a Supply Store nearest the Joint Property where like Material is normally

available, or point of manufacture plus transportation costs as defined in Section IV.2.B (*Freight*).

(2) Based on a price quotation from a vendor that reflects a current realistic acquisition cost.

(3) Based on the amount paid by the Operator for like Material in the vicinity of the Joint Property within the previous twelve (12) months from the date of physical transfer.

(4) As agreed to by the Participating Parties for Material being transferred to the Joint Property, and by the Parties owning the Material for Material being transferred from the Joint Property.

B. FREIGHT

Transportation costs shall be added to the Material transfer price using the method prescribed by the COPAS Computerized Equipment Pricing System (CEPS). If not using CEPS, transportation costs shall be calculated as follows:

(1) Transportation costs for oil country tubulars and line pipe shall be calculated using the distance from eastern mill to the Railway Receiving Point based on the carload weight basis as recommended by the COPAS MFI-38 ("Material Pricing Manual") and other COPAS MFIs in effect at the time of the transfer.

(2) Transportation costs for special mill items shall be calculated from that mill's shipping point to the Railway Receiving Point. For transportation costs from other than eastern mills, the 30,000-pound interstate truck rate shall be used. Transportation costs for macaroni tubing shall be calculated based on the interstate truck rate per weight of tubing transferred to the Railway Receiving Point.

(3) Transportation costs for special end tubular goods shall be calculated using the interstate truck rate from Houston, Texas, to the Railway Receiving Point.

(4) Transportation costs for Material other than that described in Sections IV.2.B.(1) through (3), shall be calculated from the Supply Store or point of manufacture, whichever is appropriate, to the Railway Receiving Point.

Regardless of whether using CEPS or manually calculating transportation costs, transportation costs from the Railway Receiving Point to the Joint Property are in addition to the foregoing, and may be charged to the Joint Account based on actual costs incurred. All transportation costs are subject to Equalized Freight as provided in Section II.4 (*Transportation*) of this Accounting Procedure.

C. TAXES

Sales and use taxes shall be added to the Material transfer price using either the method contained in the COPAS Computerized Equipment Pricing System (CEPS) or the applicable tax rate in effect for the Joint Property at the time and place of transfer. In either case, the Joint Account shall be charged or credited at the rate that would have governed had the Material been a direct purchase.

D. CONDITION

(1) Condition "A" – New and unused Material in sound and serviceable condition shall be charged at one hundred percent (100%) of the price as determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*). Material transferred from the Joint Property that was not placed in service shall be credited as charged without gain or loss; provided, however, any unused Material that was charged to the Joint Account through a direct purchase will be credited to the Joint Account at the original cost paid less restocking fees charged by the vendor. New and unused Material transferred from the Joint Property may be credited at a price other than the price originally charged to the Joint Account provided such price is approved by the Parties owning such Material, pursuant to Section I.6.A (*General Matters*). All refurbishing costs required or necessary to return the Material to original condition or to correct handling, transportation, or other damages will be borne by the divesting property. The Joint Account is responsible for Material preparation, handling, and transportation costs for new and unused Material charged to the Joint Property either through a direct purchase or transfer. Any preparation costs incurred, including any internal or external coating and wrapping, will be credited on new Material provided these services were not repeated for such Material for the receiving property.

(2) Condition "B" – Used Material in sound and serviceable condition and suitable for reuse without reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by seventy-five percent (75%).

Except as provided in Section IV.2.D(3), all reconditioning costs required to return the Material to Condition "B" or to correct handling, transportation or other damages will be borne by the divesting property.

If the Material was originally charged to the Joint Account as used Material and placed in service for the Joint Property, the Material will be credited at the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) multiplied by sixty-five percent (65%).

Unless otherwise agreed to by the Parties that paid for such Material, used Material transferred from the Joint Property that was not placed in service on the property shall be credited as charged without gain or loss.

(3) Condition "C" – Material that is not in sound and serviceable condition and not suitable for its original function until after reconditioning shall be priced by multiplying the price determined in Sections IV.2.A (*Pricing*), IV.2.B (*Freight*), and IV.2.C (*Taxes*) by fifty percent (50%).

The cost of reconditioning may be charged to the receiving property to the extent Condition "C" value, plus cost of reconditioning, does not exceed Condition "B" value.

(4) Condition "D" – Material that (i) is no longer suitable for its original purpose but useable for some other purpose, (ii) is obsolete, or (iii) does not meet original specifications but still has value and can be used in other applications as a substitute for items with different specifications, is considered Condition "D" Material. Casing, tubing, or drill pipe used as line pipe shall be priced as Grade A and B seamless line pipe of comparable size and weight. Used casing, tubing, or drill pipe utilized as line pipe shall be priced at used line pipe prices. Casing, tubing, or drill pipe used as higher pressure service lines than standard line pipe, e.g., power oil lines, shall be priced under normal pricing procedures for casing, tubing, or drill pipe. Upset tubular goods shall be priced on a non-upset basis. For other items, the price used should result in the Joint Account being charged or credited with the value of the service

rendered or use of the Material, or as agreed to by the Parties pursuant to Section 1.6.A (*General Matters*).

(5) Condition "E" – Junk shall be priced at prevailing scrap value prices.

E. OTHER PRICING PROVISIONS

(1) Preparation Costs

Subject to Section II (*Direct Charges*) and Section III (*Overhead*) of this Accounting Procedure, costs incurred by the Operator in making Material serviceable including inspection, third party surveillance services, and other similar services will be charged to the Joint Account at prices which reflect the Operator's actual costs of the services. Documentation must be provided to the Non-Operators upon request to support the cost of service. New coating and/or wrapping shall be considered a component of the Materials and priced in accordance with Sections IV.1 (*Direct Purchases*) or IV.2.A (*Pricing*), as applicable. No charges or credits shall be made for used coating or wrapping. Charges and credits for inspections shall be made in accordance with COPAS MFI-38 ("Material Pricing Manual").

(2) Loading and Unloading Costs

Loading and unloading costs related to the movement of the Material to the Joint Property shall be charged in accordance with the methods specified in COPAS MFI-38 ("Material Pricing Manual").

**3. DISPOSITION OF SURPLUS**

Surplus Material is that Material, whether new or used, that is no longer required for Joint Operations. The Operator may purchase, but shall be under no obligation to purchase, the interest of the Non-Operators in surplus Material.

Dispositions for the purpose of this procedure are considered to be the relinquishment of title of the Material from the Joint Property to either a third party, a Non-Operator, or to the Operator. To avoid the accumulation of surplus Material, the Operator should make good faith efforts to dispose of surplus within twelve (12) months through buy/sale agreements, trade, sale to a third party, division in kind, or other dispositions as agreed to by the Parties.

Disposal of surplus Materials shall be made in accordance with the terms of the Agreement to which this Accounting Procedure is attached. If the Agreement contains no provisions governing disposal of surplus Material, the following terms shall apply:

- The Operator may, through a sale to an unrelated third party or entity, dispose of surplus Material having a gross sale value that is less than or equal to the Operator's expenditure limit as set forth in the Agreement to which this Accounting Procedure is attached without the prior approval of the Parties owning such Material.
- If the gross sale value exceeds the Agreement expenditure limit, the disposal must be agreed to by the Parties owning such Material.
- Operator may purchase surplus Condition "A" or "B" Material without approval of the Parties owning such Material, based on the pricing methods set forth in Section IV.2 (*Transfers*).

- Operator may purchase Condition "C" Material without prior approval of the Parties owning such Material if the value of the Materials, based on the pricing methods set forth in Section IV.2 (*Transfers*), is less than or equal to the Operator's expenditure limitation set forth in the Agreement. The Operator shall provide documentation supporting the classification of the Material as Condition C.

- Operator may dispose of Condition "D" or "E" Material under procedures normally utilized by Operator without prior approval of the Parties owning such Material.

**4. SPECIAL PRICING PROVISIONS**

A. PREMIUM PRICING

Whenever Material is available only at inflated prices due to national emergencies, strikes, government imposed foreign trade restrictions, or other unusual causes over which the Operator has no control, for direct purchase the Operator may charge the Joint Account for the required Material at the Operator's actual cost incurred in providing such Material, making it suitable for use, and moving it to the Joint Property. Material transferred or disposed of during premium pricing situations shall be valued in accordance with Section IV.2 (*Transfers*) or Section IV.3 (*Disposition of Surplus*), as applicable.

B. SHOP-MADE ITEMS

Items fabricated by the Operator's employees, or by contract laborers under the direction of the Operator, shall be priced using the value of the Material used to construct the item plus the cost of labor to fabricate the item. If the Material is from the Operator's scrap or junk account, the Material shall be priced at either twenty-five percent (25%) of the current price as determined in Section IV.2.A (*Pricing*) or scrap value, whichever is higher. In no event shall the amount charged exceed the value of the item commensurate with its use.

C. MILL REJECTS

Mill rejects purchased as "limited service" casing or tubing shall be priced at eighty percent (80%) of K-55/J-55 price as determined in Section IV.2 (*Transfers*). Line pipe converted to casing or tubing with casing or tubing couplings attached shall be priced as K-55/J-55 casing or tubing at the nearest size and weight.

**V. INVENTORIES OF CONTROLLABLE MATERIAL**

The Operator shall maintain records of Controllable Material charged to the Joint Account, with sufficient detail to perform physical inventories.

Adjustments to the Joint Account by the Operator resulting from a physical inventory of Controllable Material shall be made within twelve (12) months following the taking of the inventory or receipt of Non-Operator inventory report. Charges and credits for overages or shortages will be valued for the Joint Account in accordance with Section IV.2 (*Transfers*) and shall be based on the Condition "B" prices in effect on the date of physical inventory unless the inventorying Parties can provide sufficient evidence another Material condition applies.

**1. DIRECTED INVENTORIES**

Physical inventories shall be performed by the Operator upon written request of a majority in working interests of the Non-Operators (hereinafter, "directed inventory"); provided, however, the Operator shall not be required to perform directed inventories more frequently than once every five (5) years. Directed inventories shall be commenced within one hundred eighty (180) days after the Operator receives written notice that a majority in interest of the Non-Operators has requested the inventory. All Parties shall be governed by the results of any directed inventory.

Expenses of directed inventories will be borne by the Joint Account; provided, however, costs associated with any post-report follow-up work in settling the inventory will be absorbed by the Party incurring such costs. The Operator is expected to exercise judgment in keeping expenses within reasonable limits. Any anticipated disproportionate or extraordinary costs should be discussed and agreed upon prior to commencement of the inventory. Expenses of directed inventories may include the following:

A. A per diem rate for each inventory person, representative of actual salaries, wages, and payroll burdens and benefits of the personnel performing the inventory or a rate agreed to by the Parties pursuant to Section I.6.A (*General Matters*). The per diem rate shall also be applied to a reasonable number of days for pre-inventory work and report preparation.

B. Actual transportation costs and Personal Expenses for the inventory team.

C. Reasonable charges for report preparation and distribution to the Non-Operators.

**2. NON-DIRECTED INVENTORIES**

A. OPERATOR INVENTORIES

Physical inventories that are not requested by the Non-Operators may be performed by the Operator, at the Operator's discretion. The expenses of conducting such Operator-initiated inventories shall not be charged to the Joint Account.

B. NON-OPERATOR INVENTORIES

Subject to the terms of the Agreement to which this Accounting Procedure is attached, the Non-Operators may conduct a physical inventory at reasonable times at their sole cost and risk after giving the Operator at least ninety (90) days prior written notice. The Non-Operator inventory report shall be furnished to the Operator in writing within ninety (90) days of completing the inventory fieldwork.

C. SPECIAL INVENTORIES

The expense of conducting inventories other than those described in Sections V.1 (*Directed Inventories*), V.2.A (*Operator Inventories*), or V.2.B (*Non-Operator Inventories*), shall be charged to the Party requesting such inventory; provided, however, inventories required due to a change of Operator shall be charged to the Joint Account in the same manner as described in Section V.1 (*Directed Inventories*).

**EXHIBIT "D"**

**Attached to and made a part of that certain Joint Operating Agreement dated effective _______, by and among ____________, as Operator, and ________________, as Non-Operators.**

The Operator shall carry insurance at the expense of and for the benefit of the joint account covering Operator's operations upon the Contract Area subject to the Operating Agreement to which this Exhibit "D" is attached as follows:

a) Workers' compensation insurance: In compliance with the workers' compensation laws of the State of Texas, including employer's liability with minimum limits of $[●].

b) Commercial general liability insurance: A limit of $[●] each occurrence for bodily injuries, $[●] aggregate. Property damage liability limit being $[●] each occurrence, $[●] aggregate.

c) Business automobile liability insurance. Limits of bodily injury $[●] each person; $[●] each occurrence; property damage $[●] each occurrence.

During drilling operations, Operator shall also carry Operator's Extra Expense insurance including coverage for well seepage, pollution, cleanup and containment and evacuation expenses. The limit of such insurance is $[●] for any one occurrence.

The insurance provided for herein for the benefit of the joint account provides for certain deductibles and or retentions to be borne by the insured parties. In the event a claim is made by the Operator on behalf of the joint account, and the insurance proceeds are subject to reduction as a result of a deductible and/or retention, said deductible/retention amount shall be a direct charge to the joint account.

No other insurance will be required other than as set forth above. Premiums associated with the insurance for the benefit of the joint account shall be charged to the joint account. Any party may at its own expense acquire such other insurance it deems proper to protect itself against any claims, losses, damages or destruction arising out of operations hereunder.

Operator and each Non-Operator agree to mutually waive subrogation in favor of each other on all insurance carried by each party and/or obtain such waiver from the insurance carrier if so required by the insurance contract.

## INSTRUCTIONS FOR USE OF GAS BALANCING AGREEMENT FORM

**GENERAL**

This Gas Balancing Agreement form is intended to be used as Exhibit "E" to the 1977, 1982 and 1989 A.A.P.L. Form 610 Model Form Operating Agreements. It is also generally suitable for use with other forms of operating agreements. However, before using this form, both it and the operating agreement in question should be reviewed and revised as required to ensure consistency.

If this form is used as an exhibit to an A.A.P.L. Form 610 Model Form Operating Agreement or other operating agreement, the provisions in Section 15 (Counterparts), the "IN WITNESS WHEREOF" paragraph on page 6 and the signature lines and acknowledgments on page 7 should be omitted.

This Gas Balancing Agreement may also be executed as a separate agreement for properties covered by an existing operating agreement where there is no gas balancing agreement or where the one employed is deemed inadequate. In that event, the properties subject to the form will have to be described, and the provisions of Section 15 (Counterparts), the "IN

WITNESS WHEREOF" on page 6 and the signature lines and acknowledgments will have to be employed.

The description of the area covered by the Agreement may be included in the definition of the Balancing Area in Section 1.02. Care should be taken in drafting this description, however, because it may be desirable to cover more than one Balancing Area. Such a definition might, for example, read as follows:

> Each well subject to that Operating Agreement dated ______, covering ________ that produces gas or is allocated a share of gas production. If a single well is completed in two or more reservoirs, such well shall be considered a separate well with respect to, but only with respect to, each reservoir from which the gas production is not commingled in the wellbore.

This Gas Balancing Agreement contains both "alternative" and "optional" provisions. In the case of alternative provisions, it will generally be necessary to select one alternative in order to make the Gas Balancing Agreement effective. Provisions which are designated as optional (or as Option 1, 2, etc.) may or may not be used. **Note that, in order for an Alternative or Option to be selected and effective, it must be checked. If, however, an Alternative is not selected, "Alternative 1" in each instance will be deemed to have been adopted by the Parties, but if an Option is not selected, it will not form a part of the Gas Balancing Agreement. See Section 12.6.**

HEADING - Indicate the applicable Operating Agreement and other information. If the Gas Balancing Agreement is to be used without an Operating Agreement, the heading on page 1 should be modified appropriately, and the following references to the "Operating Agreement" should be deleted or modified appropriately: Section 1.12; Section 7.1; Section 9; Section 12.4; Section 13.1; and Section 13.2.

SECTION 1.02 - Select the Balancing Area to be used, or insert a description of the Balancing Area. As a general rule, the use of a mineral lease as a Balancing Area will only be appropriate in certain situations involving offshore wells.

SECTION 1.16 - This definition should be used only if one of the optional seasonal limitation provisions in Section 4.2 is employed. The specific months during which makeup is to be restricted should be included, e.g., "the months of November,
December, and the following January and February."

SECTION 2.1 - The parties should decide whether the basis of balancing in the Balancing Area will be in Mcfs or MMBtus. One of the two Alternatives stipulated MUST be selected to avoid an automatic election that Alternative 1 applies.

SECTION 2.2 - Since most gas is now decontrolled, the primary purpose of this provision is to provide for separate application of the form to different price categories in the event that price controls are imposed in the future by governmental entity.

SECTION 3.5 - This provision is intended to limit Overproduction in order to keep a Party from getting too far out of balance. It should be noted that this Section will only have an impact if a Party owns less than a 1/3 working interest in the Balancing Area, since under it a party owning a 1/3 interest will be entitled to take 300%, x 1/3 = 100%.

SECTION 4.1 - Select the number of days' notification that an Underproduced Party must give prior to making up Gas. Also, indicate the percentage of each Overproduced Parties' Gas that Underproduced Parties will be allowed to make up. The percentages should be identical.

SECTION 4.2 - The form sets out two Options for imposing seasonal limitations on making up Gas. It should be noted that it is NOT required that any seasonal limitation be included. If Option 1 is selected, select the number of months prior to the Winter Period that will be used to determine how much Gas an Underproduced Party may make up during the Winter Period. This number and the number of months in the Winter Period (as defined in Section 1.16) should add up to 12 or less. If Option 2 is selected, indicate the percentage of an Overproduced Party's Gas that an Underproduced Party may make up during the Winter Period. This percentage should be lower than the percentage set out in Section 4.1.

SECTION 4.3 - Select the percentage of an Overproduced Party's Gas which it should be required to make available for make up once it has produced all of its share of ultimately recoverable reserves. This percentage should be greater than the percentage set out in Section 4.1.

SECTION 6.2 - One of the two Alternatives stipulated **MUST** be selected as the basis upon which Royalty is to be calculated and paid in order to avoid an automatic election that Alternative 1 applies.

SECTION 7.3 - One of the two Alternatives stipulated for payment of amounts due under a cash settlement **MUST** be selected in order to avoid an automatic election that Alternative 1 applies. Note that Section 7.3.1 is optional, and may **ONLY** be used with Section 7.3, Alternative 2.

SECTION 7.4 - One of the two alternatives stipulated for determining proceeds received by an Overproduced Party for cash settlement purposes **MUST** be selected in order to avoid an automatic election that Alternative 1 applies.

SECTION 7.5.1 through 7.5.2 - Before selecting any of these provisions, the Parties should review the relevant gas processing arrangements for the Gas. Section 7.5.2, Option 1, contemplates that all wellhead MMBtus of Overproduction(will be valued at the gas price per MMBtu received by the Overproduced Party, without regard to whether any of the gas may have been processed. Section 7.5.2, Option 2, on the other hand, would include any enhanced or impaired values resulting from processing in calculating a valuation for the Overproduction. Note that if Section 7.5.2, Option 1, is selected, and residue gas to be sold on an MMBtu basis, it will be necessary to measure the number of MMBtus produced at the well (even if the parties have elected to balance on Mcfs), in order to determine the total value of Overproduction.

SECTION 7.7 - Select the interest rate payable for unpaid amounts owed pursuant to a cash settlement.

SECTION 7.9 - In the event that the parties anticipate that Overproduction may be subject to a potential refund by an appropriate governmental authority, the Parties may choose this provision.

SECTION 7.10 - If the Parties adopt this provision, an Overproduced Party may make a cash settlement with Underproduced Parties for all or part of outstanding gas imbalances as often as once every twenty-four (24) months.

SECTION 8 - Select the number of days' prior notification required for well tests, as well as the length of such tests.

SECTION 12.9 - Select the appropriate method for computing and reporting income to the Internal Revenue Service based on the "entitlements" or "sales" methods.

SECTION 13 - The purpose of this Section is to stipulate the rights of Parties in the event that any Party sells, exchanges, transfers or assigns its interest in the Balancing Area. Section 13.2 gives the Underproduced Party an option to demand a cash settlement if an Overproduced Party sells its interest, and the number of days' notice and response should be selected to implement this procedure.

SECTION 14 - This provision is intended to provide the Parties an opportunity to modify or supplement any of the Gas balancing Agreement's provisions.

SECTION 15 - This provision is to be utilized ONLY if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, Section 15 should be omitted. Otherwise, the Parties must determine the appropriate Percentage Interest which must execute the form to make it effective and the date by which such interests must execute it.

SIGNATURE ELEMENT - The "IN WITNESS WHEREOF," signature and attest/witness elements are ONLY to be utilized if the Gas Balancing Agreement is NOT agreed to contemporaneously with the execution of an A.A.P.L. Form 610 Model Form Operating Agreement or another suitable operating agreement. If the Gas Balancing Agreement is agreed to contemporaneously with any such operating agreement, the "IN WITNESS WHEREOF," signature and attest/witness elements should be omitted. Otherwise, these items should be completed in an appropriate fashion, and any appropriate amendment made to the heading of the Gas Balancing Agreement.

NOTE: Instructions For Use of Gas Balancing Agreement MUST be reviewed before finalizing this document.

**EXHIBIT "E"**

**GAS BALANCING AGREEMENT ("AGREEMENT")**

**ATTACHED TO AND MADE PART OF THAT CERTAIN**

**OPERATING AGREEMENT DATED ____________________ BY AND BETWEEN ________________, as Operator ________________ AND , as Non Operators ________________ ("OPERATING AGREEMENT") RELATING TO THE AREA, [Maverick, Dimmit, Webb, LaSalle] COUNTY/PARISH, STATE OF** Texas.

**1. DEFINITIONS**

The following definitions shall apply to this Agreement:

1.01 "Arm's Length Agreement" shall mean any gas sales agreement with an unaffiliated purchaser or any gas sales agreement with an affiliated purchaser where the sales price and delivery conditions under such agreement are representative of prices and delivery conditions existing under other similar agreements in the area between unaffiliated parties at the same time for natural gas of comparable quality and quantity.

1.02 "Balancing Area" shall mean **(select one):**

☐ each well subject to the Operating Agreement that produces Gas or is allocated a share of Gas production. If a single well is completed in two or more producing intervals, each producing interval from which the Gas production is not commingled in the wellbore shall be considered a separate well.

☑ all of the acreage and depths subject to the Operating Agreement.

☐ ________________________________________

________________________________________

________________________________________

________________________________________

1.03 "Full Share of Current Production" shall mean the Percentage Interest of each Party in the Gas actually produced from the Balancing Area during each month.

1.04 "Gas" shall mean all hydrocarbons produced or producible from the Balancing Area, whether from a well classified as an oil well or gas well by the regulatory agency having jurisdiction in such matters, which are or may be made available for sale or separate disposition by the Parties, excluding oil, condensate and other liquids recovered by field equipment operated for the joint account. "Gas" does not include gas used in joint operations, such as for fuel, recycling or reinjection, or which is vented or lost prior to its sale or delivery from the Balancing Area.

1.05 "Makeup Gas" shall mean any Gas taken by an Underproduced Party from the Balancing Area in excess of its Full Share of Current Production, whether pursuant to Section 3.3 or Section 4.1 hereof.

1.06 "Mcf" shall mean one thousand cubic feet. A cubic foot of Gas shall mean the volume of gas contained in one cubic foot of space at a standard pressure base and at a standard temperature base.

1.07 "MMBtu" shall mean one million British Thermal Units. A British Thermal Unit shall mean the quantity of heat required to raise one pound avoirdupois of pure water from 58.5 degrees Fahrenheit to 59.5 degrees Fahrenheit at a constant pressure of 14.73 pounds per square inch absolute.

1.08 "Operator" shall mean the individual or entity designated under the terms of the Operating Agreement or, in the event this Agreement is not employed in connection with an operating agreement, the individual or entity designated as the operator of the well(s) located in the Balancing Area.

1.09 "Overproduced Party" shall mean any Party having taken a greater quantity of Gas from the Balancing Area than the Percentage interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.10 "Overproduction" shall mean the cumulative quantity of Gas taken by a Party in excess of its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

1.11 "Party" shall mean those individuals or entities subject to this Agreement, and their respective heirs, successors, transferees and assigns.

1.12 "Percentage Interest" shall mean the percentage or decimal interest of each Party in the Gas produced from the Balancing Area pursuant to the Operating Agreement covering the Balancing Area.

1.13 "Royalty" shall mean payments on production of Gas from the Balancing Area to all owners of royalties, overriding royalties, production payments or similar interests.

1.14 "Underproduced Party" shall mean any Party having taken a lesser quantity of Gas from the Balancing Area than the Percentage Interest of such Party in the cumulative quantity of all Gas produced from the Balancing Area.

1.15 "Underproduction" shall mean the deficiency between the cumulative quantity of Gas taken by a Party and its Percentage Interest in the cumulative quantity of all Gas produced from the Balancing Area.

~~1.16 ☐ **(Optional)** "Winter Period" shall mean the month(s) of ________________________ in one calendar year and the month(s) of ________________________________ in the succeeding calendar year.~~

**2. BALANCING AREA**

2.1 If this Agreement covers more than one Balancing Area, it shall be applied as if each Balancing Area were covered by separate but identical agreements. All balancing hereunder shall be on the basis of Gas taken from the Balancing Area measured in **(Alternative 1)** ☐ Mcfs or **(Alternative 2)** ☑ MMBtus.

2.2 In the event that all or part of the Gas deliverable from a Balancing Area is or becomes subject to one or more maximum lawful prices, any Gas not subject to price controls shall be considered as produced from a single Balancing Area and Gas subject to each maximum lawful price category shall be considered produced from a separate Balancing Area.

**3. RIGHT OF PARTIES TO TAKE GAS**

3.1 Each Party desiring to take Gas will notify the Operator, or cause the Operator to be notified, of the volumes nominated, the name of the transporting pipeline and the pipeline contract number (if available) and meter station relating to such delivery, sufficiently in advance for the Operator, acting with reasonable diligence, to

meet all nomination and other requirements. Operator is authorized to deliver the volumes so nominated and confirmed (if confirmation is required) to the transporting pipeline in accordance with the terms of this Agreement.

3.2 Each Party shall make a reasonable, good faith effort to take its Full Share of Current Production each month, to the extent that such production is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production.

3.3 When a Party fails for any reason to take its Full Share of Current Production (as such Share may be reduced by the right of the other Parties to make up for Underproduction as provided herein), the other Parties shall be entitled to take any Gas which such Party fails to take. To the extent practicable, such Gas shall be made available initially to each Underproduced Party in the proportion that its Percentage Interest in the Balancing Area bears to the total Percentage Interests of all Underproduced Parties desiring to take such Gas. If all such Gas is not taken by the Underproduced Parties, the portion not taken shall then be made available to the other Parties in the proportion that their respective Percentage Interests in the Balancing Area bear to the total Percentage Interests of such Parties.

3.4 All Gas taken by a Party in accordance with the provisions of this Agreement, regardless of whether such Party is underproduced or overproduced, shall be regarded as Gas taken for its own account with title thereto being in such taking Party.

3.5 Notwithstanding the provisions of Section 3.3 hereof, no Overproduced Party shall be entitled in any month to take any Gas in excess of three hundred percent (300%) of its Percentage Interest of the Balancing Area's then-current Maximum Monthly Availability; provided, however, that this limitation shall not apply to the extent that it would preclude production that is required to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production. "Maximum Monthly Availability" shall mean the maximum average monthly rate of production at which Gas can be delivered from the Balancing Area, as determined by the Operator, considering the maximum efficient well rate for each well within the Balancing Area, the maximum allowable(s) set by the appropriate regulatory agency, mode of operation, production facility capabilities and pipeline pressures.

3.6 In the event that a Party fails to make arrangements to take its Full Share of Current Production required to be produced to maintain leases in effect, to protect the producing capacity of a well or reservoir, to preserve correlative rights, or to maintain oil production, the Operator may sell any part of such Party's Full Share of Current Production that such Party fails to take for the account of such Party and render to such Party, on a current basis, the full proceeds of the sale, less any reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of such Full Share of Current Production. In making the sale contemplated herein, the Operator shall be obligated only to obtain such price and conditions for the sale as are reasonable under the circumstances and shall not be obligated to share any of its markets. Any such sale by Operator under the terms hereof shall be only for such reasonable periods of time as are consistent with the minimum needs of the industry under the particular circumstances, ~~but in no event for a period in excess of one year~~. Notwithstanding the provisions of Article 3.4 hereof, Gas sold by Operator for a Party under the provisions hereof shall be deemed to be Gas taken for the account of such Party.

**4. IN-KIND BALANCING**

4.1 Effective the first day of any calendar month following atleast __twenty__ (__20__) days' prior written notice to the Operator, any Underproduced Party may begin taking, in addition to its Full Share of Current Production and any Makeup Gas taken pursuant to Section 3.3 of this Agreement, a share of current production determined by multiplying __twenty-five__ percent (__25__%) of the Full Shares of Current Production of all Overproduced Parties by a fraction, the numerator of which is the Percentage Interest of such Underproduced Party and the denominator of which is the total of the Percentage Interests of all Underproduced Parties desiring to take Makeup Gas. In no event will an Overproduced Party be required to provide more than __twenty-five__ percent (__25__%) of its Full Share of Current Production for Makeup Gas. The Operator will promptly notify all Overproduced Parties of the election of an Underproduced Party to begin taking Makeup Gas.

~~4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 1) Notwithstanding the provisions of Section 4.1, the average monthly amount of Makeup Gas taken by an Underproduced Party during the Winter Period pursuant to Section 4.1 shall not exceed the average monthly amount of Makeup Gas taken by such Underproduced Party during the ( ) months immediately preceding the Winter Period.~~

~~4.2 ☐ (Optional - Seasonal Limitation on Makeup - Option 2) Notwithstanding the provisions of Section 4.1, no Overproduced Party will be required to provide more than percent ( %) of its Full Share of Current Production for Makeup Gas during the Winter Period.~~

4.3 ☑ **(Optional)** Notwithstanding any other provision of this Agreement, at such time and for so long as Operator, or (insofar as concerns production by the Operator) any Underproduced Party, determines in good faith that an Overproduced Party has produced all of its share of the ultimately recoverable reserves in the Balancing Area, such Overproduced Party may be required to make available for Makeup Gas, upon the demand of the Operator or any Underproduced Party, up to ________________________ percent (__100__%) of such Overproduced Party's Full Share of Current Production.

**5. STATEMENT OF GAS BALANCES**

5.1 The Operator will maintain appropriate accounting on a monthly and cumulative basis of the volumes of Gas that each Party is entitled to receive and the volumes of Gas actually taken or sold for each Party's account. Within / ninety (90) ~~forty-five (45~~) days after the month of production, the Operator will furnish a statement for such month showing (1) each Party's Full Share of Current Production, (2) the total volume of Gas actually taken or sold for each Party's account, (3) the difference between the volume taken by each Party and that Party's Full Share of Current Production, (4) the Overproduction or Underproduction of each Party, and (5) other data as recommended by the provisions of the Council of Petroleum Accountants Societies Bulletin No.24, as amended or supplemented hereafter. Each Party taking Gas will promptly provide to the Operator any data required by the Operator for preparation of the statements required hereunder.

5.2 If any Party fails to provide the data required herein for four (4) consecutive production months, the Operator, or where the Operator has failed to provide data, another Party, may audit the production and Gas sales and transportation volumes of the non-reporting Party to provide the required data. Such audit shall be conducted only after reasonable notice and during normal business hours in the office of the Party whose records are being audited. All costs associated with such audit will be charged to the account of the Party failing to provide the required data.

**6. PAYMENTS ON PRODUCTION**

6.1 Each Party taking Gas shall pay or cause to be paid all production and severance taxes due on all volumes of Gas actually taken by such Party.

~~6.2 ☐ **(Alternative 1 - Entitlements)** Each Party shall pay or cause to be paid all Royalty due with respect to Royalty owners to whom it is accountable as if such Party were taking its Full Share of Current Production, and only its Full Share of Current Production.~~

~~6.2.1 ☐ **(Optional - For use only with Section 6.2 - Alternative 1 - Entitlement)** Upon written request of a Party taking less than its Full Share of Current Production in a given month ("Current Underproducer"), any Party taking more than its Full Share of Current Production in such month ("Current Overproducer") will pay to such Current Underproducer an amount each month equal to the Royalty percentage of the proceeds received by the Current Overproducer for that portion of the Current Underproducer's Full Share of Current Production taken by the Current Overproducer; provided, however, that such payment will not exceed the Royalty percentage that is common to all Royalty burdens in the Balancing Area. Payments made pursuant to this Section 6.2.1 will be deemed payments to the Underproduced Party's Royalty owners for purposes of Section 7.5.~~

6.2 ☑ **(Alternative 2 - Sales)** Each Party shall pay or cause to be paid Royalty due with respect to Royalty owners to whom it is accountable based on the volume of Gas actually taken for its account.

6.3 In the event that any governmental authority requires that Royalty payments be made on any other basis than that provided for in this Section 6, each Party agrees to make such Royalty payments accordingly, commencing on the effective date required by such governmental authority, and the method provided for herein shall be thereby superseded.

**7. CASH SETTLEMENTS**

7.1 Upon the earlier of the plugging and abandonment of the last producing interval in the Balancing Area, the termination of the Operating Agreement or any pooling or unit agreement covering the Balancing Area, or at any time no Gas is taken from the Balancing Area for a period of twelve (12) consecutive months, any Party may give written notice calling for cash settlement of the Gas production imbalances among the Parties. Such notice shall be given to all Parties in the Balancing Area.

7.2 Within / ninety (90) ~~sixty (60)~~ days after the notice calling for cash settlement under Section 7.1, the Operator will distribute to each Party a Final Gas Settlement Statement detailing the quantity of Overproduction owed by each Overproduced Party to each Underproduced Party and identifying the month to which such Overproduction is attributed, pursuant to the methodology set out in Section 7.4.

7.3 ☑ **(Alternative I - Direct Party-to-Party Settlement)** Within/ ninety (90)~~sixty (60)~~ days after receipt of the Final Gas Settlement Statement, each Overproduced Party will pay to each Underproduced Party entitled to settlement the appropriate cash settlement, accompanied by appropriate accounting detail. At the time of payment, the Overproduced Party will notify the Operator of the Gas imbalance settled by the Overproduced Party's payment.

~~7.3 ☐ **(Alternative 2 - Settlement Through Operator)** Within sixty (60) days after receipt of the Final Gas Settlement Statement, each Overproduced Party will send its cash settlement, accompanied by appropriate accounting detail, to the Operator. The Operator will distribute the monies so received, along with any settlement owed by the Operator as an Overproduced Party, to each Underproduced Party to whom settlement is due within ninety (90) days after issuance of the Final Gas Settlement Statement. In the event that any Overproduced Party fails to pay any settlement due hereunder, the Operator may turn over responsibility for the collection of such settlement to the Party to whom it is owed, and the Operator will have no further responsibility with regard to such settlement.~~

~~7.3.1 ☐ **(Optional - For use only with Section 7.3, Alternative 2 - Settlement Through Operator)** Any Party shall have the right at any time upon thirty (30) days' prior written notice to all other Parties to demand that any settlements due such Party for Overproduction be paid directly to such Party by the Overproduced Party, rather than being paid through the Operator. In the event that an Overproduced Party pays the Operator any sums due to an Underproduced Party at any time after thirty (30) days following the receipt of the notice provided for herein, the Overproduced Party will continue to be liable to such Underproduced Party for any sums so paid, until payment is actually received by the Underproduced Party.~~

7.4 ☑ **(Alternative 1 - Historical Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the Gas taken from time to time by the Overproduced Party in excess of the Overproduced Party's Full Share of Current Production. Any Makeup Gas taken by the Underproduced Party prior to monetary settlement hereunder will be applied to offset Overproduction chronologically in the order of accrual.

~~7.4 ☐ **(Alternative 2 - Most Recent Sales Basis)** The amount of the cash settlement will be based on the proceeds received by the Overproduced Party under an Arm's Length Agreement for the volume of Gas that constituted Overproduction by the Overproduced Party from the Balancing Area. For the purpose of implementing the cash settlement provision of the Section 7, an Overproduced Party will not be considered to have produced any of an Underproduced Party's share of Gas until the Overproduced Party has produced cumulatively all of its Percentage Interest share of the Gas ultimately produced from the Balancing Area.~~

7.5 The values used for calculating the cash settlement under Section 7.4 will include all proceeds received for the sale of the Gas by the Overproduced Party calculated at the Balancing Area, after deducting any production or severance taxes paid and any Royalty actually paid by the Overproduced Party to an Underproduced Party's Royalty owner(s), to the extent said payments amounted to a discharge of said Underproduced Party's Royalty obligation, as well as any / post-production expenses, such as reasonable marketing, compression, treating, gathering or transportation costs incurred directly in connection with the sale of the Overproduction.

~~7.5.1 ☐ **(Optional - For Valuation Under Percentage of Proceeds Contracts)** For Overproduction sold under a gas purchase contract providing for payment based on a percentage of the proceeds obtained by the purchaser upon resale of residue gas and liquid hydrocarbons extracted at a gas processing plant, the values used for calculating cash settlement will include proceeds received by the Overproduced Party for both the liquid hydrocarbons and the residue gas attributable to the Overproduction.~~

~~7.5.2 ☐ **(Optional - Valuation for Processed Gas - Option 1)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the full quantity of the Overproduction will be valued for purposes of cash settlement at the prices received by the Overproduced Party for the sale of the residue gas attributable to the Overproduction without regard to proceeds attributable to liquid hydrocarbons which may have been extracted from the Overproduction.~~

7.5.2 ☑ **(Optional - Valuation for Processed Gas - Option 2)** For Overproduction processed for the account of the Overproduced Party at a gas processing plant for the extraction of liquid hydrocarbons, the values used for calculating cash settlement will include the proceeds received by the Overproduced Party for the sale of the liquid hydrocarbons extracted from the Overproduction, less the actual reasonable costs incurred by the Overproduced Party to process the Overproduction and to transport, fractionate and handle the liquid hydrocarbons extracted therefrom prior to sale.

7.6 To the extent the Overproduced Party did not sell all Overproduction under an Arm's Length Agreement, the cash settlement will be based on the weighted average price received by the Overproduced Party for any gas sold from the Balancing Area under Arm's Length Agreements during the months to which such Overproduction is attributed. In the event that no sales under Arm's Length Agreements were made during any such month, the cash settlement for such month will be based on the spot sales prices published for the applicable geographic area during such month in a mutually acceptable pricing bulletin.

7.7 Interest compounded at the rate of prime+one percent(1%) ~~percent (_____%)~~ per annum or the maximum lawful rate of interest applicable to the Balancing Area, whichever is less, will accrue for all amounts due under Section 7.1 beginning the first day following the date payment is due pursuant to Section 7.3. Such interest shall be borne by the Operator or any Overproduced Party in the proportion that their respective delays beyond the deadlines set out in Sections 7.2 and 7.3 contributed to the accrual of the interest.

7.8 In lieu of the cash settlement required by Section 7.3, an Overproduced Party may deliver to the Underproduced Party an offer to settle its Overproduction in-kind and at such rates, quantities, times and sources as may be agreed upon by the Underproduced Party. If the Parties are unable to agree upon the manner in which such in-kind settlement gas will be furnished within sixty (60) days after the Overproduced Party's offer to settle in kind, which period may be extended by agreement of said Parties, the Overproduced Party shall make a cash settlement as provided in Section 7.3. The making of an in-kind settlement offer under this Section 7.8 will not delay the accrual of interest on the cash settlement should the Parties fail to reach agreement on an in-kind settlement.

~~7.9 ☐ **(Optional - For Balancing Areas Subject to Federal Price Regulation)** That portion of any monies collected by an Overproduced Party for Overproduction which is subject to refund by orders of the Federal Energy Regulatory Commission or other governmental authority may be withheld by the Overproduced Party until such prices are fully approved by such governmental authority, unless the Underproduced Party furnishes a corporate undertaking, acceptable to the Overproduced Party, agreeing to hold the Overproduced Party harmless from financial loss due to refund orders by such governmental authority.~~

7.10 ☑ **(Optional - Interim Cash Balancing)** At any time during the term of this Agreement, any Overproduced Party may, in its sole discretion, make cash settlement(s) with the Underproduced Parties covering all or part of its outstanding Gas imbalance, provided that such settlements must be made with all Underproduced Parties proportionately based on the relative imbalances of the Underproduced Parties, and provided further that such settlements may not be made more often than once every twenty-four (24) months. Such settlements will be calculated in the same manner provided above for final cash settlements. The Overproduced Party will provide Operator a detailed accounting of any such cash settlement within thirty (30) days after the settlement is made.

**8. TESTING**

Notwithstanding any provision of this Agreement to the contrary, any Party shall have the right, from time to time, to produce and take up to one hundred percent (100%) of a well's entire Gas stream to meet the reasonable deliverability test(s) required by such Party's Gas purchaser, and the right to take any Makeup Gas shall be subordinate to the right of any Party to conduct such tests; provided, however, that such tests shall be conducted in accordance with prudent operating practices only after __thirty______ (__30__) days' prior written notice to the Operator and shall last no longer than __seventy-two______ (__72__) hours.

**9. OPERATING COSTS**

Nothing in this Agreement shall change or affect any Party's obligation to pay its proportionate share of all costs and liabilities incurred in operations on or in connection with the Balancing Area, as its share thereof is set forth in the Operating Agreement, irrespective of whether any Party is at any time selling and using Gas or whether such sales or use are in proportion to its Percentage Interest in the Balancing Area.

**10. LIQUIDS**

The / Operator shall market and settle, for the joint account, liquid hydrocarbons recovered with Gas production by field equipment and the Parties shall share proportionately in and own all liquid hydrocarbons ~~recovered with Gas by field equipment operated for the joint account~~ in accordance with their Percentage Interests in the Balancing Area.

**11. AUDIT RIGHTS**

Notwithstanding any provision in this Agreement or any other agreement between the Parties hereto, and further notwithstanding any termination or cancellation of this Agreement, for a period of two (2) years from the end of the calendar year in which any information to be furnished under Section 5 or 7 hereof is supplied, any Party shall have the right to audit the records of any other Party regarding quantity, including but not limited to information regarding Btu-content. Any Underproduced Party shall have the right for a period of two (2) years from the end of the calendar year in which any cash settlement is received pursuant to Section 7 to audit the records of any Overproduced Party as to all matters concerning values, including but not limited to information regarding prices and disposition of Gas from the Balancing Area. Any such audit shall be conducted at the expense of the Party or Parties desiring such audit, and shall be conducted, after reasonable notice, during normal business hours in the office of the Party whose records are being audited. Each Party hereto agrees to maintain records as to the volumes and prices of Gas sold each month and the volumes of Gas used in its own operations, along with the Royalty paid on any such Gas used by a Party in its own operations. The audit rights provided for in this Section 11 shall be in addition to those provided for in Section 5.2 of this Agreement.

**12. MISCELLANEOUS**

12.1 As between the Parties, in the event of any conflict between the provisions of this Agreement and the provisions of any gas sales contract, or in the event of any conflict between the provisions of this Agreement and the provisions of the Operating Agreement, the provisions of this Agreement shall govern.

12.2 Each Party agrees to defend, indemnify and hold harmless all other Parties from and against any and all liability for any claims, which may be asserted by any third party which now or hereafter stands in a contractual relationship with such indemnifying Party and which arise out of the operation of this Agreement or any activities of such indemnifying Party under the provisions of this Agreement, and does further agree to save the other Parties harmless from all judgments or damages sustained and costs incurred in connection therewith.

12.3 Except as otherwise provided in this Agreement, Operator is authorized to administer the provisions of this Agreement, but shall have no liability to the other Parties for losses sustained or liability incurred which arise out of or in connection with the performance of Operator's duties hereunder, except such as may result from Operator's gross negligence or willful misconduct. Operator shall not be liable to any Underproduced Party for the failure of any Overproduced Party, (other than Operator) to pay any amounts owed pursuant to the terms hereof.

12.4 This Agreement shall remain in full force and effect for as long as the Operating Agreement shall remain in force and effect as to the Balancing Area, and thereafter until the Gas accounts between the Parties are settled in full, and shall inure to the benefit of and be binding upon the Parties hereto, and their respective heirs, successors, legal representatives and assigns, if any. The Parties hereto agree to give notice of the existence of this Agreement to any successor in interest of any such Party and to provide that any such successor shall be bound by this Agreement, and shall further make any transfer of any interest subject to the Operating Agreement, or any part thereof, also subject to the terms of this Agreement.

12.5 Unless the context clearly indicates otherwise, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

~~12.6 In the event that any "Optional" provision of this Agreement is not adopted by the Parties to this Agreement by a typed, printed or handwritten indication, such provision shall not form a part of this Agreement, and no inference shall be made concerning the intent of the Parties in such event. In the event that any "Alternative" provision of this Agreement is not so adopted by the Parties, Alternative 1 in each such instance shall be deemed to have been adopted by the Parties as a result of any such omission. In those cases where it is indicated that an Optional provision may be used only if a specific Alternative is selected: (i) an election to include said Optional provision shall not be effective unless the Alternative in question is selected; and (ii) the election to include said Optional provision must be expressly indicated hereon, it being understood that the selection of an Alternative either expressly or by default as provided herein shall not, in and of itself, constitute an election to include an associated Optional provision.~~

12.7 This Agreement shall bind the Parties in accordance with the provisions hereof, and nothing herein shall be construed or interpreted as creating any rights in any person or entity not a signatory hereto, or as being a stipulation in favor of any such person or entity.

12.8 If contemporaneously with this Agreement becoming effective, or thereafter, any Party requests that any other Party execute an appropriate memorandum or notice of this Agreement in order to give third parties notice of record of same and submits same for execution in recordable form, such memorandum or notice shall be duly executed by the Party to which such request is made and delivered promptly thereafter to the Party making the request. Upon receipt, the Party making the request shall cause the memorandum or notice to be duly recorded in the appropriate real property or other records affecting the Balancing Area.

12.9 In the event Internal Revenue Service regulations require a uniform method of computing taxable income by all Parties, each Party agrees to compute and report income to the Internal Revenue Service **(select one)** ~~—— as if such Party were taking its Full Share of Current Production during each relevant tax period in accordance with such regulations, insofar as same relate to entitlement method tax computations; or~~ ☑ based on the quantity of Gas taken for its account in accordance with such regulations, insofar as same relate to sales method tax computations ____.

**13. ASSIGNMENT AND RIGHTS UPON ASSIGNMENT**

13.1 Subject to the provisions of Sections 13.2 (if elected) and 13.3 hereof, and notwithstanding anything in this Agreement or in the Operating Agreement to the contrary, if any Party assigns (including any sale, exchange or other transfer) any of its working interest in the Balancing Area when such Party is an Underproduced or Overproduced Party, the assignment or other act of transfer shall, insofar as the Parties hereto are concerned, include all interest of the assigning or transferring Party in the Gas, all rights to receive or obligations to provide or take Makeup Gas and all rights to receive or obligations to make any monetary payment which may ultimately be due hereunder, as applicable. Operator and each of the other Parties hereto shall thereafter treat the assignment accordingly, and the assigning or transferring Party shall look solely to its assignee or other transferee for any interest in the Gas or monetary payment that such Party may have or to which it may be entitled, and shall
cause its assignee or other transferee to assume its obligations hereunder.

13.2 ☑ **(Optional - Cash Settlement Upon Assignment)** Notwithstanding anything in this Agreement (including but not limited to the provisions of Section 13.1 hereof) or in the Operating Agreement to the contrary, and subject to the provisions of Section 13.3 hereof, in the event an Overproduced Party intends to sell, assign, exchange or otherwise transfer any of its interest in a Balancing Area, such Overproduced Party shall notify in writing the other working interest owners who are Parties hereto in such Balancing Area of such fact at least _fifteen____ (_15__) days prior to closing the transaction. Thereafter, any Underproduced Party may demand from such Overproduced Party in writing, within _thirty____ (_30__) days after receipt of the Overproduced Party's notice, a cash settlement of its Underproduction from the Balancing Area. The Operator shall be notified of any such demand and of any cash settlement pursuant to this Section 13, and the Overproduction and Underproduction of each Party shall be adjusted accordingly. Any cash settlement pursuant to this Section 13 shall be paid by the Overproduced Party on or before the earlier to occur (i) of sixty (60) days after receipt of the Underproduced Party's demand or (ii) at the closing of the transaction in which the Overproduced Party sells, assigns, exchanges or otherwise transfers its interest in a Balancing Area on the same basis as otherwise set forth in Sections 7.3 through 7.6 hereof, and shall bear interest at the rate set forth in Section 7.7 hereof, beginning sixty (60) days after the Overproduced Party's sale, assignment, exchange or transfer of its interest in the Balancing Area for any amounts not paid. Provided, however, if any Underproduced Party does not so demand such cash settlement of its Underproduction from the Balancing Area, such Underproduced Party shall look exclusively to the assignee or other successor in interest of the Overproduced Party giving notice hereunder for the satisfaction of such Underproduced Party's Underproduction in accordance with the provisions of Section 13.1 hereof.

13.3 The provisions of this Section 13 shall not be applicable in the event any Party mortgages its interest or disposes of its interest by merger, reorganization, consolidation or sale of substantially all of its assets to a subsidiary or parent company, or to any company in which any parent or subsidiary of such Party owns a majority of the stock of such company.

**14. OTHER PROVISIONS**

~~**15. COUNTERPARTS**~~

~~This Agreement may be executed in counterparts, each of which when taken with all other counterparts shall constitute a binding agreement between the Parties hereto; provided, however, that if a Party or Parties owning a Percentage Interest in the Balancing Area equal to or greater than a percent ( %) therein fail(s) to execute this Agreement on or before, this Agreement shall not be binding upon any Party and shall be of no further force and effect.~~

~~IN WITNESS WHEREOF, this Agreement shall be effective as of the day of __________, ____.~~

ATTEST OR WITNESS:

OPERATOR

BY: ____________________

Type or print name
Title
Date
Tax ID or S.S. No.

NON-OPERATORS

BY: ____________________

Type or print name
Title
Date
Tax ID or S.S. No.

BY: ____________________

Type or print name
Title
Date
Tax ID or S.S. No.

ACKNOWLEDGMENTS

Note: The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.

Individual acknowledgment:

State of ______________)

____________________) ss.

County of ____________)

This instrument was acknowledged before me on ______________________________________

by

(Seal, if any)

Title (and Rank)

My commission expires:

Acknowledgment in representative capacity:

State of ____________)
____________________) ss.
County of ____________)

This instrument was acknowledged before me on ______________ by ______ as ______ of ______. (Seal, if any)

Title (and Rank)

My commission expires:

**EXHIBIT "F"**
**Attached to and made a part of that certain Operating Agreement dated effective ________, by and among __________, as Operator, and _________________, as Non-Operators.**

**NON-DISCRIMINATION AND CERTIFICATION OF NON-SEGREGATED FACILITIES**

One or more parties to the attached Operating Agreement may be a Government Contractor as defined by law and therefore be required to obtain certification of compliance with certain applicable federal laws, orders, and regulations vendors, suppliers, parties, contractors, and subcontractors with whom they do business.

To ensure compliance with such requirements, Operator hereby agrees to materially comply with the following provisions contained in the Code of Federal Regulations (to the extent such provisions are applicable to Operator and unless Operator is exempted by applicable law), which are incorporated herein by reference: 41 C.F.R. § 60 - 1.4(a) (Equal Employment Opportunity); 41 C.F.R. § 60-741.5(a) (Equal Employment Opportunity for Workers with Disabilities); 41 C.F.R. 60-300.5(a) (Equal Opportunity for Disabled and Other Protected Veterans);

In addition, Operator hereby certifies that it: (a) has developed a written Affirmative Action Compliance Program consistent with the rules and regulations published by the Department of Labor in 41 C.F.R. § 60; (b) files an annual Employer Information Report EEO-1 Standard Form 100 in accordance with 41 C.F.R. § 60-1.7; and (c) that it does not, and will not maintain any facilities for employees in a segregated manner or permit its employees to perform their services at any location under its control, where segregated facilities are maintained, in accordance with 41 C.F.R. § 60-1.8.

**Exhibit "H"**

**Attached to and made a part of that certain Joint Operating Agreement dated [________], by and among [_______], as Operator and [________________________], as Non-Operators**

**MODEL FORM RECORDING SUPPLEMENT TO OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between ______, hereinafter referred to as "Operator," and the signatory party or parties other than Operator, hereinafter referred to individually as "Non-Operator," and collectively as "Non-Operators."

WHEREAS, the parties to this agreement are owners of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "Contract Area"), and in any instance in which the Leases or Interests of a party are not of record, the record owner and the party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the parties hereto have executed an Operating Agreement dated _______ (herein the "Operating Agreement"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas; and

WHEREAS, the parties hereto have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the parties hereto, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein shall have the meaning ascribed to them in the Operating Agreement.

2. The parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests of the parties comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement and the Operating Agreement, and the parties do hereby commit such Leases and Interests to the performance thereof.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement and the Operating Agreement shall be borne and paid, and all equipment and materials acquired in operations on the Contract Area shall be owned, by the parties hereto, as provided in the Operating Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Contract Area shall be owned by the parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Each party shall pay or deliver, or cause to be paid or delivered, all burdens on its share of the production from the Contract Area as provided in the Operating Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding

royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the party whose interest is burdened therewith, (ii) subject to suspension if a party is required to assign or relinquish to another party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the lease Contract Area.

H. The parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the parties and the adjustment of interests among them in the event of a failure or loss of title, each party's right to propose operations, obligations with respect to participation in operations on the Contract Area and the consequences of a failure to participate in operations, the rights and obligations of the parties regarding the marketing of production, and the rights and remedies of the parties for failure to comply with financial obligations shall be as provided in the Operating Agreement.

J. Each party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement.

3. The parties hereby grant reciprocal liens and security interests as follows:

A. Each party grants to the other parties hereto a lien upon any interest it now owns or hereafter acquires in Oil and Gas Leases and Oil and Gas Interests in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, to secure performance of all of its obligations under this agreement and the Operating Agreement including but not limited to payment of expense, interest and fees, the proper disbursement of all monies paid under this agreement and the Operating Agreement, the assignment or relinquishment of interest in Oil and Gas Leases as required under this agreement and the Operating Agreement, and the proper performance of operations under this agreement and the Operating Agreement. Such lien and security interest granted by each party hereto shall include such party's leasehold interests, working interests, operating rights, and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this agreement and the Operating Agreement, the Oil and Gas when extracted therefrom and equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells, tools, and tubular goods), and accounts (including, without limitation, accounts arising from the sale of

production at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom, and all proceeds and products of the foregoing.

B. Each party represents and warrants to the other parties hereto that the lien and security interest granted by such party to the other parties shall be a first and prior lien, and each party hereby agrees to maintain the priority of said lien and security interest against all persons acquiring an interest in Oil and Gas Leases and Interests covered by this agreement and the Operating Agreement by, through or under such party. All parties acquiring an interest in Oil and Gas Leases and Oil and Gas Interests covered by this agreement and the Operating Agreement, whether by assignment, merger, mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement and this instrument as to all obligations attributable to such interest under this agreement and the Operating Agreement whether or not such obligations arise before or after such interest is acquired.

C. To the extent that the parties have a security interest under the Uniform Commercial Code of the state in which the Contract Area is situated, they shall be entitled to exercise the rights and remedies of a secured party under the Code. The bringing of a suit and the obtaining of judgment by a party for the secured indebtedness shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof. In addition, upon default by any party in the payment of its share of expenses, interest or fees, or upon the improper use of funds by the Operator, the other parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting party's share of Oil and Gas until the amount owed by such party, plus interest, has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting party's share of Oil and Gas. All purchasers of production may rely on a notification of default from the non-defaulting party or parties stating the amount due as a result of the default, and all parties waive any recourse available against purchasers for releasing production proceeds as provided in this paragraph.

D. If any party fails to pay its share of expenses within one hundred-twenty (120) days after rendition of a statement therefor by Operator the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. The amount paid by each party so paying its share of the unpaid amount shall be secured by the liens and security rights described in this paragraph 3 and in the Operating Agreement, and each paying party may independently pursue any remedy available under the Operating Agreement or otherwise.

E. If any party does not perform all of its obligations under this agreement or the Operating Agreement, and the failure to perform subjects such party to foreclosure or execution proceedings pursuant to the provisions of this agreement or the Operating Agreement, to the extent allowed by governing law, the defaulting party waives any available right of redemption from and after the date of judgment, any required valuation or appraisement of the mortgaged or secured property prior to sale, any available right to stay execution or to require a marshalling of assets and any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each party hereby grants to the other parties a power of sale as to any property that is subject to the lien and security rights granted hereunder or under the Operating Agreement, such power to be exercised in the manner provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

F. The lien and security interest granted in this paragraph 3 supplements identical rights granted under the Operating Agreement.

G. To the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due under this agreement and the Operating Agreement for services performed or materials supplied by Operator.

H. The above described security will be financed at the wellhead of the well or wells located on the Contract Area and this Recording Supplement may be filed in the land records in the County or Parish in which the Contract Area is located, and as a financing statement in all recording offices required under the Uniform Commercial Code or other applicable state statutes to perfect the above-described security interest, and any party hereto may file a continuation statement as necessary under the Uniform Commercial Code, or other state laws.

4. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination, and each party hereto agrees to execute such a notice of termination as to Operator's interest, upon the request of Operator, if Operator has complied with all of its financial obligations.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition shall be made by any party of any interest in the Leases or Interests subject hereto except as expressly permitted under the Operating Agreement and, if permitted, shall be made expressly subject to this agreement and the Operating Agreement and without prejudice to the rights of the other parties. If the transfer is permitted, the assignee of an ownership interest in any Oil and Gas Lease shall be deemed a party to this agreement and the Operating Agreement as to the interest assigned from and after the effective date of the transfer of ownership; provided, however, that the other parties shall not be required to recognize any such sale, encumbrance, transfer or other disposition for any purpose hereunder until thirty (30) days after they have received a copy of the instrument of transfer or other satisfactory evidence thereof in writing from the transferor or transferee. No assignment or other disposition of interest by a party shall relieve such party of obligations previously incurred by such party under this agreement or the Operating Agreement with respect to the interest transferred, including without limitation the obligation of a party to pay all costs attributable to an operation conducted under this agreement and the Operating Agreement in which such party has agreed to participate prior to making such assignment, and the lien and security interest granted by Article VII.B. of the Operating Agreement and hereby shall continue to burden the interest transferred to secure payment of any such obligations.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon each Non-Operator when this agreement or a counterpart thereof has been executed by such Non-Operator and Operator notwithstanding that this agreement is not then or thereafter executed by all of the parties to which it is tendered or which are listed on Exhibit "A" as owning an interest in the Contract Area or which own, in fact, an interest in the Contract Area. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

8. Other provisions.

~~________, who has prepared and circulated this form for execution, represents and warrants that the form was printed from and, with the exception(s) listed below, is identical to the AAPL Form 610RS-1989 Model Form Recording Supplement to Operating Agreement and Financing Statement, as published in computerized form by Forms On-A-Disk, Inc. No changes, alterations, or modifications, other than those made by strikethrough and/or insertion and that are clearly recognizable as changes in Articles _____, have been made to the form.~~

IN WITNESS WHEREOF, this agreement shall be effective as of the _______ day of _______, _______.

**OPERATOR**

**ATTEST OR WITNESS**

______________________________

______________________________

By: ______________________________
**Type or Print Name**
Title: ______________________________
Date: ______________________________
Address: ______________________________

**NON-OPERATORS**

**ATTEST OR WITNESS**

______________________________

______________________________

By: ______________________________
**Type or Print Name**
Title: ______________________________
Date: ______________________________
Address: ______________________________

**ATTEST OR WITNESS**

______________________________

______________________________

By: ______________________________
**Type or Print Name**
Title: ______________________________
Date: ______________________________
Address: ______________________________

**ATTEST OR WITNESS**

______________________________

______________________________

By: ______________________________
**Type or Print Name**
Title: ______________________________
Date: ______________________________
Address: ______________________________

ACKNOWLEDGMENTS

~~NOTE:~~

~~The following forms of acknowledgment are the short forms approved by the Uniform Law on Notarial Acts. The validity and effect of these forms in any state will depend upon the statutes of that state.~~

~~Individual Acknowledgment~~

~~State of ____________ §~~

~~____________ § ss.~~

~~County of ____________ §~~

~~This instrument was acknowledged before me on ____________ by ____ (Seal, if any) ____________~~

~~Title (and Rank)~~

~~My commission expires:~~

~~Acknowledgment in Representative Capacity~~

State of ______________§

§ ss.

County of _____________ §

This instrument was acknowledged before me on ______________ by _________ as _____ of ______.

(Seal, if any)

______________________________________

Title (and Rank) ______________________

My commission expires: ______________________



007450

**ACKNOWLEDGEMENTS**

State of Texas §

§ ss.

County of Harris §

This instrument was acknowledged before me on ________ by ____ as [ ____ ] of ________.

(Seal, if any) ______________

Title (and Rank) ______________

My commission expires: ______________

State of Texas §

§ ss.

County of ________ §

This instrument was acknowledged before me on ________ by ____ as [ ____ ] of ________.

(Seal, if any) ______________

Title (and Rank) ______________

My commission expires: ______________

**Exhibit C**

**AMI & Core Area**



**Exhibit D**

**Form of Assignment**

**CONVEYANCE, ASSIGNMENT AND BILL OF SALE**

This **CONVEYANCE, ASSIGNMENT AND BILL OF SALE** ("Conveyance") is executed this ___ day of _________, 20__ (the "Execution Date"), and made effective as of 9:00 A.M., Eastern Time, on the ___ day of _________, 20__ (the "Effective Time") by and between _______________, a ______________, having as its address _______________ ("Assignor"), and ________________, a ______________, having as its address ________________ ("Assignee"). Assignor, on the one hand, and Assignee, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties". Capitalized terms used but not defined herein shall have the meanings set forth in that certain Joint Development Agreement dated as of January [●], 2017, by and between SN EF Maverick, LLC ("SN"), SN EF UnSub, LP ("SN UnSub"), and Aguila Production, LLC ("Blackstone") (the "Joint Development Agreement").

**ARTICLE I**
**GRANTING AND RESERVATION CLAUSES; HABENDUM CLAUSE**

1.1 **Grant**. Assignor, for and in consideration of $10.00, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby grants, transfers, bargains, sells, conveys, assigns and delivers unto Assignee an undivided [●] percent of all of Assignor's existing right, title and interest in and to the following, but only with respect to the rights and obligations arising thereunder from and after the Effective Time and less and except the Excluded Assets (as hereinafter defined) (the "Assigned Assets"):

(a) [________][1]

[1] NTD: Definition of "Assigned Assets" to conform to the specific Acquisition under the Joint Development Agreement giving rise to this Conveyance, and any conveyancing instruments included in such transaction, in order to transfer Assignee its proportionate interest in all such assets.

1.2 **Habendum**. TO HAVE AND TO HOLD the Assigned Assets, together with all rights and appurtenances in any way belonging thereto, unto Assignee and its respective successors and assigns forever, subject, however, to the terms and conditions of this Conveyance, including Section 3.1.

**ARTICLE II**
**SPECIAL WARRANTY; DISCLAIMERS; TARGET FORMATION**

2.1 **Special Warranty**. Assignor hereby warrants and forever defends all and singular title to the Assigned Assets unto Assignee, its successors and assigns, solely against all and singular persons claiming or to claim the same or any part thereof, by, through or under Assignor or any of Assignor's affiliates, but not otherwise.

2.2 **Disclaimers**.

(a) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, (I) ASSIGNOR MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, AND (II) ASSIGNOR EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO ASSIGNEE OR ANY OF ITS AFFILIATES,

EMPLOYEES, AGENTS, CONSULTANTS OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ASSIGNEE BY ANY OFFICER, DIRECTOR, EMPLOYEE, AGENT, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ASSIGNOR OR ANY OF ITS AFFILIATES).

(b) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THE SPECIAL WARRANTY OF TITLE IN SECTION 2.1, ASSIGNOR EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, AS TO (I) TITLE TO ANY OF THE ASSIGNED ASSETS, (II) THE CONTENTS, CHARACTER OR NATURE OF ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY ENGINEERING, GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION RELATING TO THE ASSIGNED ASSETS, (III) THE QUANTITY, QUALITY OR RECOVERABILITY OF HYDROCARBONS IN OR FROM THE ASSIGNED ASSETS, (IV) ANY ESTIMATES OF THE VALUE OF THE ASSIGNED ASSETS OR FUTURE REVENUES TO BE GENERATED BY THE ASSIGNED ASSETS, (V) THE PRODUCTION OF OR ABILITY TO PRODUCE HYDROCARBONS FROM THE ASSIGNED ASSETS, (VI) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSIGNED ASSETS, (VII) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY ASSIGNOR OR THIRD PARTIES WITH RESPECT TO THE ASSIGNED ASSETS, (VIII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE TO ASSIGNEE OR ITS AFFILIATES, OR ITS OR THEIR RESPECTIVE EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS CONVEYANCE OR THE JOINT DEVELOPMENT AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING HERETO AND THERETO AND (IX) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT. EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT OR THIS CONVEYANCE, ASSIGNOR FURTHER DISCLAIMS ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, OF MERCHANTABILITY, FREEDOM FROM LATENT VICES OR DEFECTS, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY OF THE ASSIGNED ASSETS, RIGHTS OF A PURCHASER UNDER APPROPRIATE STATUTES TO CLAIM DIMINUTION OF CONSIDERATION OR RETURN OF THE PURCHASE PRICE, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT, AS BETWEEN ASSIGNOR AND ASSIGNEE, ASSIGNEE WILL BE DEEMED TO BE OBTAINING THE ASSIGNED ASSETS IN THEIR PRESENT STATUS, CONDITION, ENVIRONMENTAL CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS OR DEFECTS (KNOWN OR UNKNOWN, LATENT, DISCOVERABLE OR UNDISCOVERABLE).

(c) EXCEPT AS AND TO THE LIMITED EXTENT EXPRESSLY REPRESENTED IN THE JOINT DEVELOPMENT AGREEMENT, ASSIGNOR HAS NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY REGARDING ANY MATTER OR CIRCUMSTANCE RELATING TO ENVIRONMENTAL LAWS, THE RELEASE OF MATERIALS INTO THE ENVIRONMENT OR THE PROTECTION OF HUMAN HEALTH, SAFETY, NATURAL RESOURCES OR THE ENVIRONMENT, OR ANY OTHER ENVIRONMENTAL CONDITION OF THE ASSIGNED ASSETS, AND NOTHING IN THIS CONVEYANCE, THE JOINT DEVELOPMENT AGREEMENT OR OTHERWISE WILL BE CONSTRUED AS SUCH A REPRESENTATION OR WARRANTY.

(d) THE PARTIES AGREE THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 2.2 ARE "*CONSPICUOUS*" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LAW.

2.3 **Subrogation**. Assignor hereby assigns to Assignee all rights, claims and causes of action under title warranties given or made by Assignor's predecessors in interest with respect to the Assigned Assets, and Assignee is specifically subrogated to all rights which Assignor may have against such predecessors in interest with respect to the Assigned Assets, to the extent Assignor may legally transfer such rights and grant such subrogation.

**ARTICLE III**
**ASSUMED OBLIGATIONS**

3.1 **Assumed Obligations**. Without limiting and except for Assignee's rights under Section 2.1 or in the Joint Development Agreement, Assignee hereby assumes and agrees to fulfill, perform, pay and discharge (or cause to be fulfilled, performed, paid or discharged) all of the obligations, expenses and liabilities, known or unknown, arising from, based upon or associated with the Assigned Assets, including obligations, expenses and liabilities relating in any manner to the use, ownership or operation of the Assigned Assets. [2]

[2] NTD: Section 3.1 herein to be revised as necessary to make clear that Assignee hereby assumes its proportionate share of the obligations incurred by Assignor under the Acquisition.

**ARTICLE IV**
**MISCELLANEOUS**

4.1 **Joint Development Agreement**. This Conveyance is delivered pursuant to, and hereby made subject to, the terms and conditions of the Joint Development Agreement. In the event that any provision of this Conveyance (other than any term defined herein) is construed to conflict with any provision of the Joint Development Agreement, the provisions of the Joint Development Agreement (other than with respect to terms defined herein) shall be deemed controlling to the extent of such conflict.

4.2 **Further Cooperation**. After the date hereof, Assignor and Assignee shall execute and deliver, or shall cause to be executed and delivered from time to time, such further instruments of conveyance and transfer, and shall take such other actions as any Party may reasonably request, to convey and deliver the Assigned Assets to Assignee.

4.3 **Successors and Assigns**. The provisions of this Conveyance shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

4.4 **GOVERNING LAW AND WAIVER OF JURY TRIAL**. THIS CONVEYANCE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, IN EACH CASE EXCLUDING ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT REFER CONSTRUCTION OF SUCH PROVISIONS TO THE LAWS OF ANOTHER JURISDICTION. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS CONVEYANCE.

4.5 **Exhibits**. All exhibits and attachments hereto are hereby made a part hereof and incorporated herein by this reference. References in such exhibits and attachments to instruments on file in the public records are notice of such instruments for all purposes. Unless provided otherwise, all recording references in such exhibits and schedules are to the appropriate records (the real property records, oil and gas records or other appropriate records) of the county in which the Assigned Assets are located.

4.6 **Captions**. The captions and article and section numbers in this Conveyance are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Conveyance.

4.7 **Counterparts**. This Conveyance may be executed in one or more originals, but all of which together shall constitute one and the same instrument. An executed original of this Conveyance containing complete copies of all exhibits is being filed of record in the county in which the Assigned Assets are located.

**[SIGNATURES ON FOLLOWING PAGE]**

Case 4:20-cv-00587 Document 1-3-5 Filed in TXSB on 06/29/20 Page 236 of 251

**IN WITNESS WHEREOF**, the authorized representatives of Assignor and Assignee have executed this Conveyance to be made effective for all purposes as of the Effective Time.

**ASSIGNOR:**

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNEE:**

**[•]**

By: ____________________
Name: ____________________
Title: ____________________

**ASSIGNOR:**

**THE STATE OF __________ §**

**COUNTY OF ________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

Notary Public, State of ______________________________

My commission expires: ______________________________

**ASSIGNEE:**

**THE STATE OF ____________ §**

**COUNTY OF _________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by ________________, ________________ of [●], a [●].

_____________________________________________
Notary Public, State of ___________________________

My commission expires: ______________________________

ASSIGNOR'S ADDRESS:

[●]
[●]
[●]
Attention: [●]

ASSIGNEE'S ADDRESS:

[●]
[●]
[●]
Attention: [●]

THIS INSTRUMENT PREPARED BY/WHEN RECORDED RETURN TO:

[●]
[●]
Attention: [●]

**EXHIBIT** [●]

ATTACHED TO AND MADE A PART OF THAT CERTAIN CONVEYANCE BETWEEN [●] AND [●]
[●]

**Exhibit E**

**Form of Memorandum of Joint Development Agreement**

***Final Form***

**MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT**

This **MEMORANDUM OF JOINT DEVELOPMENT AGREEMENT** (this "Memorandum"), effective for all purposes as of January [●], 2017 (the "Effective Date"), is by and between Aguila Production, LLC, a Delaware limited liability company ("Investor"), and Sanchez Energy Corporation, a Delaware corporation, SN EF Maverick, LLC, a Delaware limited liability company and SN EF UnSub, LP, a Delaware limited partnership (collectively, "Company"). Company, on the one hand, and Investor, on the other hand, are sometimes referred to herein each individually as a "Party" and collectively as the "Parties."

**Section 1.** The Parties have entered into that certain Joint Development Agreement dated as of January [●], 2017 (as it may be amended from time to time, the "Joint Development Agreement"), burdening land covered by the oil and gas leases or mineral interests owned or acquired by Parties located within Maverick, Dimmit, Webb, and LaSalle Counties, Texas, including those described on Exhibit A (the "Leases"). Capitalized terms used but not defined herein shall have the meanings set forth in the Joint Development Agreement.

**Section 2.** The Joint Development Agreement provides for the exploration, development and production of oil, gas and other hydrocarbons from the Leases, subject to all of the terms, conditions, rights and obligations set forth in the Joint Development Agreement.

**Section 3.** The Joint Development Agreement is effective as of the Effective Date and, subject to the other provisions thereof, shall continue in full force and effect for the term specified in Section 6.1 of the Joint Development Agreement. Upon termination of the Joint Development Agreement, Company is authorized to file of record in all necessary recording offices a notice of termination, and each Party hereto agrees to execute such a notice of termination as to such Party's interest, upon the request of either Party. It is not the intent of the Parties that any provisions in the Joint Development Agreement violate any law regarding the rule against perpetuities, the suspension of the absolute power of alienation, or other rules regarding the vesting or duration of estates, and the Joint Development Agreement shall be construed as not violating such rule to the extent the same can be so construed consistent with the intent of the Parties. In the event, however, that any provision of the Joint Development Agreement is determined to violate such rule, then such provision shall nevertheless be effective for the maximum period (but not longer than the maximum period) permitted by such rule that will result in no violation. To the extent the maximum period is permitted to be determined by reference to "lives in being," the Parties agree that "lives in being" shall refer to the lifetime of the last to die of the living lineal descendants of George Herbert Walker Bush (former President of the United States of America).

**Section 4.** Any Transfer of any interest in the Joint Development Agreement or of any Asset is subject to restrictions and obligations more particularly set forth in the Joint Development Agreement, including specified procedures for compliance with any such Transfer.

**Section 5.** For the term that is the earlier of (i) five (5) years from the date hereof and (ii) termination of the Joint Development Agreement, for any acquisition by a Party within the lands depicted on Exhibit B, such Party must offer a proportionate share, pursuant to the JDA, of such acquisition to the other Parties.

**Section 6.** The addresses of the Parties are as follows:

| | |
|---|---|
| To Sanchez Energy Corporation: | Sanchez Energy Corporation<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | Akin Gump Strauss Hauer & Feld LLP<br>1111 Louisiana Street, 43rd Floor<br>Houston, TX 77002<br>Fax: 713-236-0822<br>Attn: David Elder<br>Michael J. Byrd<br>Electronic Mail: delder@akingump.com<br>mbyrd@akingump.com |
| To SN EF Maverick, LLC: | SN EF Maverick, LLC<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To SN EF UnSub, LP: | SN EF UnSub, LP<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| With a copy to: | [●]<br>[●]<br>[●]<br>Attention: [●]<br>Electronic Mail: [●] |
| To Investor: | Aguila Production, LLC<br>345 Park Avenue, 43rd Floor<br>New York, New York 10154<br>Attention: Angelo Acconcia<br>Telephone: (713) 400-8210<br>Electronic Mail:<br>acconcia@blackstone.com |
| With a copy to: | Kirkland & Ellis LLP<br>600 Travis St., Suite 3300<br>Houston, Texas 77002<br>Attention: Andrew Calder, P.C.<br>Rhett Van Syoc<br>Electronic Mail:<br>andrew.calder@kirkland.com<br>hett.vansyoc@kirkland.com |

Case 4:19-cv-34508 Document 1373-5 Filed in TXSB on 06/24/20 Page 1677 of 1882

**Section 7.** It is the intention and agreement of the Parties that the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement be covenants running with the land during the term of the Joint Development Agreement, and are not solely covenants personal to the Parties, and by accepting an assignment, each successor, assignee or transferee of such assignment accepts the same subject to the provisions, covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement and agrees for itself, and its successors and assigns and transferees to be bound by the covenants, rights, benefits, burdens and restrictions set forth in the Joint Development Agreement.

**Section 8.** It is understood and agreed that the primary purpose of this Memorandum is to give notice to third parties of the Joint Development Agreement and the rights and obligations of the Parties thereunder. All rights and obligations of the Parties under the Joint Development Agreement are governed by the terms, covenants, conditions, limitations and restrictions contained in the Joint Development Agreement. Nothing contained in this Memorandum shall be deemed to modify, amend, alter, limit or otherwise change any of the provisions of the Joint Development Agreement itself or the rights or obligations of the Parties thereto. In the event of any inconsistency or ambiguity between the terms of this Memorandum and the terms of the Joint Development Agreement, the terms of the Joint Development Agreement shall prevail.

**Section 9.** This Memorandum may be executed in any number of counterparts, each of which shall be deemed an original, and both of which taken together shall constitute one agreement. In addition to filing this Memorandum, the Parties shall execute and file with the appropriate authorities, whether federal, state or local, all forms or instruments required by applicable law to effectuate the Memorandum, and such forms or instruments shall be deemed to contain all of the exceptions, reservations, rights, titles and privileges set forth herein as fully as though the same were set forth in each such instrument.

**[SIGNATURE PAGES AND ACKNOWLEDGMENTS ON FOLLOWING PAGES]**

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Joint Development Agreement.

Aguila Production, LLC
a Delaware limited liability company

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Aguila Production, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________
Notary Public, State of ______________________

Case 4:20-cv-3450 Document 13-6 Filed on 07/21/20 Page 1679 of 1882

Sanchez Energy Corporation
a Delaware corporation

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of Sanchez Energy Corporation, a Delaware corporation, on behalf of such corporation.

______________________
Notary Public, State of ______________________

SN EF Maverick, LLC
a Delaware limited liability company

By: ______________________
Name:
Title:
Date:

STATE OF ____________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by _________________, as _______________ of SN EF Maverick, LLC, a Delaware limited liability company, on behalf of such limited liability company.

______________________
Notary Public, State of

Case 4:19-cv-00587 Document 73-6 Filed on 07/28/20 in TXSD Page 245 of 252

SN EF UnSub, LP
a Delaware limited partnership

By: ______________________________
Name:
Title:
Date:

STATE OF __________ §
§
COUNTY OF §

This instrument was acknowledged before me this ________ day of _____, 20___ by __________________, as ________________ of SN EF Maverick, LLC, a Delaware limited partnership, on behalf of such limited partnership.

______________________________
Notary Public, State of ________________

**Exhibit F**
**Form of Notice of Termination of the Joint Development Agreement**

**NOTICE OF TERMINATION**

**WHEREAS**, Aguila Production, LLC, Sanchez Energy Corporation, SN EF Maverick, LLC and SN EF UnSub, LP (collectively, the "Parties") are parties to that certain Joint Development Agreement, dated January [●], 2017 (the "Terminated Agreement") a memorandum of which is recorded at ***[describe recording information for all memo(s) filed of record]***;

**WHEREAS**, pursuant to Section 6.1 of the Terminated Agreement, the Parties may terminate the Terminated Agreement; and

**NOW, THEREFORE**, the Parties wish to provide notice of termination effective as of [●].

1. Termination. The Terminated Agreement shall be terminated effective [●]. As of [●], [●] shall have no further claims, of any nature, on [●] in relation to the Terminated Agreement; provided, however, the termination described herein shall not release any Party from any obligation or liability to any other Party, including any payment obligation, that (i) accrued under the Terminated Agreement prior to the effective date hereof, (ii) comes into effect due to the expiration or termination of the Terminated Agreement or (iii) otherwise survives the expiration or termination of the Terminated Agreement.

[*Remainder of page intentionally left blank. Signature pages follow.*]

**Sincerely,**

**AGUILA PRODUCTION, LLC:** [●]

By: __________
Name: __________
Title: __________

**SANCHEZ ENERGY CORPORATION:** [●]

By: __________
Name: __________
Title: __________

**SN EF MAVERICK, LLC:** [●]

By: __________
Name: __________
Title: __________

**SN EF UNSUB, LP:** [●]

By: __________
Name: __________
Title: __________

**THE STATE OF ____________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by __________________, __________________ of [●], a [●].

__________________________________
Notary Public, State of __________________

My commission expires: ______________________________

Case 4:19-cv-00587 Document 3-5 Filed in TXSD on 07/29/20 Page 248 of 250
Case 4:23-cv-04505 Document 1373-6 Filed on 11/19/23 in TXSB Page 1685 of 1882

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by __________________, __________________ of [●], a [●].

________________________________________
Notary Public, State of ____________________

My commission expires: ________________________________

**THE STATE OF ______________ §**

**COUNTY OF ____________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

Notary Public, State of ________________________________

My commission expires: ________________________________

**THE STATE OF ____________________ §**

**COUNTY OF ______________________ §**

This instrument was acknowledged before me this ___ day of _______, 20__, by _________________, _________________ of [●], a [●].

______________________________________
Notary Public, State of ________________

My commission expires: ______________________________

# Exhibit G

10-K 1 snmp-20191231x10k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

## Form 10-K

**(Mark One)**

☒

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2019**

**OR**

☐

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from to .**
**Commission File Number 001-33147**

## Sanchez Midstream Partners LP

**(Exact Name of Registrant as Specified in Its Charter)**

| | |
|---|---|
| **Delaware**<br>**(State of organization)** | **11-3742489**<br>**(I.R.S. Employer Identification No.)** |
| **1000 Main Street, Suite 3000**<br>**Houston, Texas**<br>**(Address of Principal Executive Offices)** | **77002**<br>**(Zip Code)** |

**(713) 783-8000**
**(Registrant's Telephone Number, Including Area Code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Units representing limited partner interests | SNMP | NYSE American |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐ Accelerated filer ☐ Non-accelerated filer ☒ Smaller reporting company ☒ Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes ☐ No ☒

**The aggregate market value of Sanchez Midstream Partners LP common units held by non-affiliates as of June 28, 2019 was approximately $24,442,184 based upon the NYSE American closing price as of such date.**

Common units outstanding on March 13, 2020: 19,975,193 common units.

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| | PART I | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 53 |
| Item 2. | Properties | 53 |
| Item 3. | Legal Proceedings | 53 |
| Item 4. | Mine Safety Disclosures | 53 |
| | PART II | |
| Item 5. | Market for Registrant's Common Equity, Related Unitholder Matters and Issuer Purchases of Equity Securities | 54 |
| Item 6. | Selected Financial Data | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operation | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 70 |
| Item 8. | Financial Statements and Supplementary Data | 70 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 72 |
| | PART III | |
| Item 10. | Managers, Executive Officers and Corporate Governance | 72 |
| Item 11. | Executive Compensation | 77 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Unitholder Matters | 80 |
| Item 13. | Certain Relationships and Related Transactions, and Manager Independence | 82 |
| Item 14. | Principal Accounting Fees and Services | 85 |
| | PART IV | |
| Item 15. | Exhibits and Financial Statement Schedules | 86 |
| Item 16. | Form 10-K Summary | 91 |
| | Signatures | 92 |

**COMMONLY USED DEFINED TERMS**

As used in this Annual Report on Form 10-K (this "Form 10-K"), unless the context indicates or otherwise requires, the following terms have the following meanings:

- "Sanchez Midstream Partners," "SNMP," "the Partnership," "we," "us," "our" or like terms refer collectively to Sanchez Midstream Partners LP (formerly Sanchez Production Partners LP), its consolidated subsidiaries and, where the context provides, the entities in which we have a 50% ownership interest.
- "Bbl" means one barrel of 42 U.S. gallons of oil.
- "Bcf" means one billion cubic feet of natural gas.
- "Board" means the board of directors of our general partner.
- "Boe" means one barrel of oil equivalent, calculated by converting natural gas to oil equivalent barrels at a ratio of six Mcf of natural gas to one Bbl of oil.
- "Boe/d" means one Boe per day.
- "GHGs" mean greenhouse gases.
- "MBbl" means one thousand barrels of oil or other liquid hydrocarbons.
- "MBbl/d" means one thousand barrels of oil or other liquid hydrocarbons per day.
- "MBoe" means one thousand Boe.
- "Mcf" means one thousand cubic feet of natural gas.
- "MMBbl" means one million barrels of oil or other liquid hydrocarbons.
- "MMBoe" means one million Boe.
- "MMBtu" means one million British thermal units.
- "MMcf" means one million cubic feet of natural gas.
- "MMcf/d" means one million cubic feet of natural gas per day.
- "NGLs" refers to the combination of ethane, propane, butane, natural gasolines and other components that when removed from natural gas become liquid under various levels of higher pressure and lower temperature.
- "our general partner" refers to Sanchez Midstream Partners GP LLC (formerly Sanchez Production Partners GP LLC), our general partner.
- "Sanchez Energy" refers to Sanchez Energy Corporation (OTC Pink: SNECQ) and its consolidated subsidiaries.
- "SOG" refers to Sanchez Oil & Gas Corporation, an entity that provides operational support to us.
- "SP Holdings" or "Manager" refers to SP Holdings, LLC, the sole member of our general partner.

Table of Contents

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Form 10-K contains "forward-looking statements" as defined by the United States Securities and Exchange Commission (the "SEC") that are subject to a number of risks and uncertainties, many of which are beyond our control. These statements may include discussions about our business strategy; the ability of our customers to meet their drilling and development plans on a timely basis, or at all, and perform under gathering, processing and other agreements; our financing strategy; our acquisition strategy; our ability to make distributions; our future operating results; the ability of our partners to perform under our joint ventures; our future capital expenditures; and our plans, objectives, expectations, forecasts, outlook and intentions.

All of these types of statements, other than statements of historical fact included in this Form 10-K, are forward-looking statements. These forward-looking statements may be found in Part II, Item 7. and other items within this Form 10-K. In some cases, forward-looking statements can be identified by terminology such as "may," "could," "should," "expect," "plan," "project," "intend," "anticipate," "believe," "estimate," "predict," "potential," "pursue," "target," "continue," the negative of such terms or other comparable terminology.

The forward-looking statements contained in this Form 10-K are largely based on our expectations, which reflect estimates and assumptions made by the management of our general partner. These estimates and assumptions reflect our best judgment based on currently known market conditions and other factors. Although we believe such estimates and assumptions to be reasonable, they are inherently uncertain and involve a number of risks and uncertainties that are beyond our control. In addition, management's assumptions about future events may prove to be inaccurate.

Important factors that could cause our actual results to differ materially from the expectations reflected in the forward-looking statements include, among others:

- the resolution of the pending Sanchez Energy Chapter 11 Case (as defined in "Part I, Item 1A. Risk Factors") and its impact on our business, results of operations and financial condition;
- our ability to successfully execute our business, acquisition and financing strategies;
- the ability of our customers to meet their drilling and development plans on a timely basis, or at all, and perform under gathering, processing and other agreements;
- the creditworthiness and performance of our counterparties, including financial institutions, operating partners, customers and other counterparties;
- our ability to extend, replace or refinance our Credit Agreement (defined below);
- our ability to grow enterprise value;
- the ability of our partners to perform under our joint ventures;
- the availability, proximity and capacity of, and costs associated with, gathering, processing, compression and transportation facilities;
- our ability to utilize the services, personnel and other assets of Manager pursuant to the Services Agreement (as defined below);
- Manager's ability to retain personnel to perform its obligations under its shared services agreement with SOG;
- our ability to access the credit and capital markets to obtain financing on terms we deem acceptable, if at all, and to otherwise satisfy our capital expenditure requirements;
- the timing and extent of changes in prices for, and demand for, natural gas, NGLs and oil;

- our ability to successfully execute our hedging strategy and the resulting realized prices therefrom;
- the accuracy of reserve estimates, which by their nature involve the exercise of professional judgment and may, therefore, be imprecise;
- competition in the oil and natural gas industry for employees and other personnel, equipment, materials and services and, related thereto, the availability and cost of employees and other personnel, equipment, materials and services;
- the extent to which our assets operated by others are operated successfully and economically;
- our ability to compete with other companies in the oil and natural gas industry;
- the impact of, and changes in, government policies, laws and regulations, including tax laws and regulations, environmental laws and regulations relating to air emissions, waste disposal, hydraulic fracturing and access to and use of water, laws and regulations imposing conditions and restrictions on drilling and completion operations and laws and regulations with respect to derivatives and hedging activities;
- the use of competing energy sources and the development of alternative energy sources;
- unexpected results of litigation filed against us;
- disruptions due to extreme weather conditions, such as extreme rainfall, hurricanes or tornadoes;
- the extent to which we incur uninsured losses and liabilities or losses and liabilities in excess of our insurance coverage; and
- the other factors described under “Part I, Item 1A. Risk Factors” in this Form 10-K and any updates to those factors set forth in our subsequent Quarterly Reports on Form 10-Q or Current Reports on Form 8-K.

Management cautions all readers that the forward-looking statements contained in this Form 10-K are not guarantees of future performance, and we cannot assure any reader that such statements will be realized or the forward-looking events and circumstances will occur. Actual results may differ materially from those anticipated or implied in forward-looking statements. The forward-looking statements speak only as of the date made, and other than as required by law, we do not intend to publicly update or revise any forward-looking statements as a result of new information, future events or otherwise. These cautionary statements qualify all forward-looking statements attributable to us or persons acting on our behalf.

Table of Contents

## PART I

### Item 1.Business

### Overview

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development and ownership of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. We also own production assets in Texas and Louisiana. We have entered into a shared services agreement (the "Services Agreement") with Manager, pursuant to which Manager provides operational services to us including overhead, technical, administrative, marketing, accounting, operation, information systems, financial, compliance, insurance, acquisition, disposition and financing services. Manager owns our general partner and all of our incentive distribution rights. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Our common units are currently listed on the NYSE American under the symbol "SNMP."

### Our Relationship with Sanchez Energy, Manager and SOG

We believe that our relationship with Sanchez Energy and associated acreage dedications, provide us with a long range strategic advantage. As of March 13, 2020, Sanchez Energy owned approximately 11.4% of our outstanding common units. Since March 2015, we have completed three midstream asset acquisitions and two working interest acquisitions from Sanchez Energy. Pursuant to a right-of-first-offer, Sanchez Energy has agreed to offer us the right to acquire any midstream assets that it desires to sell. However, Sanchez Energy is under no obligation to sell any assets to us or to accept any offer for its assets that we may choose to make.

Manager is the sole member of our general partner, and has an interest in us through its ownership of all of our incentive distribution rights. To perform the scope of work defined in the Services Agreement, Manager has entered into a shared services agreement with SOG, which also has a shared services agreement in place with Sanchez Energy. We believe that our relationships with Manager and SOG provide us with a cost-effective means of operating our assets. SOG, which was formed in 1972, has a senior management team that averages over 20 years of industry experience. SOG has drilled or participated in over 4,000 wells, directly and through joint ventures, and has successfully built and operated extensive midstream and gathering assets associated with its exploration and production assets. We leverage SOG's extensive expertise and experience to execute on our business strategy.

### Business Strategy

Our primary business objective is to create long-term value by generating stable and predictable cash flows that allow us to make, maintain and grow our cash distributions per common unit over time through the safe and reliable operation of our assets. We plan to achieve this objective by executing the following business strategy:

- grow our business by acquiring fee-based midstream and other energy-related assets with minimal maintenance capital requirements and low overhead costs to increase unitholder value;
- support stable cash flows by aligning our asset base and operations with SOG's operational platform and Sanchez Energy's asset base;
- focus on stable, fixed-fee businesses;
- grow our business through increased throughput; and
- maintain financial flexibility and a strong capital structure.

Our business strategy is subject to risks, please read "Part I, Item 1A. Risk Factors."

**Business Segments**

Our business activities are conducted under two operating segments for which we provide information in our consolidated financial statements for the years ended December 31, 2019 and 2018. These two segments are based on the nature of the operations that are undertaken by each segment and are our:

- midstream business, which includes Western Catarina Midstream, the Carnero JV and Seco Pipeline (each as defined below); and
- production business, which includes non-operated oil and natural gas interests located in the Eagle Ford Shale in South Texas and in other areas of Texas and Louisiana.

For information about our segments' revenues, profits and losses and total assets, see Note 18 "Reporting Segments" of our Notes to Consolidated Financial Statements.

**Midstream Business**

*Western Catarina Midstream*

In October 2015, we acquired (the "Catarina Transaction") a gathering system from Sanchez Energy ("Western Catarina Midstream"), which is located on the western portion of Sanchez Energy's approximately 106,000 net acres in Dimmit, La Salle and Webb counties, Texas (such net acreage is collectively referred to herein as "Sanchez Energy's Catarina Asset," and the western portion of such net acreage is individually referred to herein as "Western Catarina"). Western Catarina Midstream consists of approximately 150 miles of gathering pipelines, four main gathering and processing facilities, including stabilizers, storage tanks, compressors and dehydration units, and other related assets in Western Catarina, which are located in Dimmit and Webb counties, Texas, and services upstream production from assets located in the Eagle Ford Shale in South Texas. The gathering lines range in diameter from 4 to 12 inches, with a capacity of 200 MMcf/d for natural gas, and 40 MBbl/d for crude oil and NGLs. There are four main gathering and processing facilities, which include eight stabilizers of 5,000 Bbls per day, approximately 25,000 Bbls of storage capacity, pressurized storage for NGLs, approximately 18,000 horsepower of compression and approximately 300 MMcf/d of dehydration capacity. The gathering system is currently used solely to support the gathering, processing and transportation of natural gas, NGLs and crude oil produced by Sanchez Energy at Sanchez Energy's Catarina Asset. The gathering system has oil interconnects with the Plains All American Pipeline, L.P. header system delivered to the Gardendale terminal, and to all four takeaway pipelines to Corpus Christi, and natural gas interconnects with Southcross Energy Partners, L.P., Kinder Morgan Inc., Energy Transfer Partners, L.P. and Targa Resources Corp.

In conjunction with the Catarina Transaction, we entered into a 15-year firm gas gathering and processing agreement with Sanchez Energy, pursuant to which Sanchez Energy agreed to tender all of its crude oil, natural gas and other hydrocarbon-based product volumes on approximately 35,000 dedicated acres in Western Catarina for processing and transportation through Western Catarina Midstream, with the potential to tender additional volumes outside of the dedicated acreage (the "Gathering Agreement").

All of the revenues from Western Catarina Midstream are currently earned from Sanchez Energy. During the first five years of the term of the Gathering Agreement (or through 2020), Sanchez Energy is required to meet a minimum quarterly volume delivery commitment for oil and natural gas, subject to certain adjustments. In addition, Sanchez Energy is required to pay contractually agreed upon gathering and processing fees for oil and natural gas volumes tendered through Western Catarina Midstream. In June 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that was delivered to Western Catarina Midstream through March 31, 2018. Since March 31, 2018, we have agreed with Sanchez Energy to continue adding the incremental infrastructure fee on a month-to-month basis.

During the year ended December 31, 2019, Sanchez Energy transported average daily production through Western Catarina Midstream of approximately 11.1 MBbls/d of oil, 131.7 MMcf/d of natural gas and 5.5 MBbls/d of water. The average age of the Western Catarina Midstream assets is approximately nine years, and such assets have an average expected life of approximately 21 additional years.

*Carnero JV*

In May 2018, we executed a series of agreements with Targa Resources Corp. (NYSE: TRGP) ("Targa") and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering, LLC ("Carnero Gathering") and Carnero Processing, LLC ("Carnero Processing") (the "Carnero JV Transaction") to form an expanded 50 / 50 joint venture in South Texas, Carnero G&P, LLC ("Carnero JV"), (2) Targa contributed 100% of the equity interest in the Silver Oak II Gas Processing Plant located in Bee County, Texas ("Silver Oak II"), to Carnero JV, which expanded the processing capacity of the joint venture from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the 45 miles of high pressure natural gas gathering pipelines owned by Carnero Gathering that connect Western Catarina Midstream to nearby pipelines and the Raptor Gas Processing Facility (the "Carnero Gathering Line") to Carnero JV resulting in the joint venture owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, (4) the Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's acreage in Dimmit, Webb, La Salle, Zavala and Maverick counties, Texas (such acreage is collectively referred to herein as "Sanchez Energy's Comanche Asset") pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche non-operated working interest owners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the 260 MMcf/d cryogenic natural gas processing plant in La Salle County, Texas (the "Raptor Gas Processing Facility.")

*Seco Pipeline*

In August 2017, we completed construction of a 100% owned and operated 30-mile natural gas pipeline with 400 MMcf/d capacity that is designed and used to transport dry gas from the Raptor Gas Processing Facility to multiple markets in South Texas (the "Seco Pipeline"). The Seco Pipeline provides upstream producers with optionality to southern gas markets and creates the potential to export natural gas to premium priced markets in Mexico. On September 1, 2017, we entered into a firm transportation service agreement with Sanchez Energy to transport certain quantities of Sanchez Energy's natural gas on a firm basis through the Seco Pipeline for $0.22 per MMBtu delivered on or after September 1, 2017 (the "Seco Pipeline Transportation Agreement"). The Seco Pipeline Transportation Agreement had an initial term of one month and renewed automatically on a month-to-month basis. On January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. During the year ended December 31, 2019, Sanchez Energy transported average daily production through Seco Pipeline of approximately 1.9 MMcf/d of natural gas. The Seco Pipeline has an expected life of approximately 40 years.

*Title to Properties*

Title to Western Catarina Midstream and the Seco Pipeline assets are either owned in fee or derived from leases, easements, rights-of-way, permits or licenses from landowners or governmental authorities, permitting the use of such land for our operations. We have no knowledge of any challenge to the underlying fee title of any material lease, easement, right-of-way, permit or license that is held by us or to the title to any material lease, easement, right-of-way, permit or lease we own, and we believe that we have satisfactory title to all of the material leases, easements, rights-of-way, permits and licenses with respect to all Western Catarina Midstream and Seco Pipeline assets.

**Production Business**

Our total estimated proved reserves at December 31, 2019, were approximately 3.0 MMBoe, all of which were classified as proved developed, with 11% being natural gas, 14% being NGLs, and 75% being oil. At December 31, 2019, we owned approximately 44 net producing wells. Our total average proved reserve-to-production ratio is approximately 10 years and our portfolio decline rate is 12% based on our estimated proved reserves at December 31, 2019.

Below is a description of our operations and our oil and natural gas properties by basin at December 31, 2019:

Table of Contents

*Locations*

Of our reserves, 99% were located in the Eagle Ford Shale on non-operated properties. Production during the year ended December 31, 2019 on these properties was 306.1 MBoe and approximately 2,955.2 MBoe of estimated proved reserves were held at December 31, 2019. All of these reserves were classified as proved developed, with 11% being natural gas, 14% being NGLs, and 75% being oil.

The remaining reserves were located on non-operated properties in Louisiana. During the year ended December 31, 2019, production on Louisiana properties was 2.9 MBoe, and approximately 44.1 MBoe of estimated proved reserves were held at December 31, 2019, all of which were classified as proved developed with 100% being oil.

*Operations*

We do not currently operate any of our production assets. The Eagle Ford Shale properties are operated by either SOG, Sanchez Energy or Marathon Oil Company and the Louisiana properties are operated by SOG.

*Proved Reserves of Natural Gas, NGLs, and Oil*

The following table reflects our estimates for proved natural gas, NGLs and oil reserves based on the SEC definitions that were used to prepare our financial statements for the periods presented. The standardized measure values shown in the table are not intended to represent the current market values of our estimated proved reserves.

| **Reserve data:** | **2019** | **2018** |
|---|---|---|
| Estimated proved reserves: | | |
| Oil (MMBbl) | 2.2 | 2.5 |
| Natural gas (MMcf) | 2.1 | 2.7 |
| NGLs (MMBbl) | 0.4 | 0.5 |
| Total proved reserves (MMBoe) | 3.0 | 3.5 |
| Estimated proved developed reserves: | | |
| Oil (MMBbl) | 2.2 | 2.5 |
| Natural gas (MMcf) | 2.1 | 2.7 |
| NGLs (MMBbl) | 0.4 | 0.5 |
| Total proved developed reserves (MMBoe) | 3.0 | 3.5 |
| Proved developed reserves as a percent of total reserves | 100% | 100% |
| Standardized measure ($ in millions)(a) | $ 38.4 | $ 52.2 |

(a) Standardized measure is the present value of estimated future net revenues to be generated from the production of proved reserves. It is determined using SEC-required prices and costs in effect as of the time of estimation without giving effect to non-property related expenses (such as general and administrative expenses or debt service costs) and discounted using an annual discount rate of 10%. Our standardized measure does not include the impact of derivative transactions or future federal income taxes because we are not subject to federal income taxes. Future prices received for production and costs may vary, perhaps significantly, from the prices and costs assumed for purposes of these estimates. The standardized measure shown should not be considered the current market value of our reserves. The 10% discount factor used to calculate present value, which is required, is not necessarily the most appropriate discount rate. The present value, no matter what discount rate is used, is materially affected by assumptions as to timing of future production, which may prove to be inaccurate. Please read "Part I, item 1A. Risk Factors."

Our 2019 estimates of total proved reserves decreased 0.5 MMBoe from 2018 due to production and revisions of previous estimates of 0.3 MMBoe and 0.2 MMBoe, respectively.

As of December 31, 2019, we had no remaining proved undeveloped reserves in our reserves base.

We expect to make minimal capital expenditures related to recompletion of existing wells during the year ending December 31, 2020.

At December 31, 2019 and December 31, 2018, Ryder Scott Co. LP ("Ryder Scott"), an independent oil and natural gas engineering firm, prepared estimates of all our proved reserves. We used these estimates of our proved reserves to prepare our financial statements. Ryder Scott maintains a degreed staff of highly competent technical personnel. The average experience level of Ryder Scott's technical staff of engineers, geoscientists and petrophysicists exceeds 20 years, including five to 15 years with a major oil company. The engineering information presented in their report was overseen

Table of Contents

by Mr. Eric Nelson, P.E. Mr. Nelson is an experienced reservoir engineer having been a practicing petroleum engineer since 2002. He has more than 13 years of experience in reserves evaluation with Ryder Scott. He has a Bachelor of Science degree in Chemical Engineering from the University of Tulsa and Master of Business Administration degree from the University of Texas. Mr. Nelson is a Registered Professional Engineer in the State of Texas. Our activities with Ryder Scott are coordinated by a reservoir engineer employed by us who has approximately 38 years of experience in the oil and natural gas industry and an engineering degree from the University of Tennessee and a Master of Business Administration from the University of New Orleans. He is a member of the Society of Petroleum Engineers. He has prior reservoir engineering and reserves management experience at Exxon Mobil Corporation, Dominion Resources and Hilcorp Energy. He has extensive experience in managing oil and natural gas reserves processes. He serves as the key technical person reviewing the reserve reports prepared by Ryder Scott prior to review by the Audit Committee and approval by the Board.

*Production and Price History*

The following table sets forth information regarding net production of natural gas, NGLs and oil and certain price and cost information for each of the periods indicated:

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Variance | |
| **Net production:** | | | | |
| Natural gas (MMcf) | 231 | 434 | (203) | (47%) |
| Oil production (MBbl) | 228 | 296 | (68) | (23%) |
| NGLs (MBbl) | 42 | 71 | (29) | (41%) |
| Total production (MBoe) | 309 | 439 | (130) | (30%) |
| Average daily production (Boe/d) | 847 | 1,203 | (356) | (30%) |
| **Average sales prices:** | | | | |
| Natural gas price per Mcf with hedge settlements | $ 2.24 | $ 2.30 | $ (0.06) | (3%) |
| Natural gas price per Mcf without hedge settlements | $ 1.84 | $ 2.39 | $ (0.55) | (23%) |
| Oil price per Bbl with hedge settlements | $ 62.94 | $ 62.64 | $ 0.30 | 0% |
| Oil price per Bbl without hedge settlements | $ 59.40 | $ 67.14 | $ (7.74) | (12%) |
| NGL price per Bbl without hedge settlements | $ 12.83 | $ 24.07 | $ (11.24) | (47%) |
| Total price per Boe with hedge settlements | $ 49.86 | $ 48.41 | $ 1.45 | 3% |
| Total price per Boe without hedge settlements | $ 46.94 | $ 51.52 | $ (4.58) | (9%) |
| **Average unit costs per Boe:** | | | | |
| Field operating expenses [(a)] | $ 21.04 | $ 17.82 | $ 3.22 | 18% |
| Lease operating expenses | $ 19.03 | $ 15.31 | $ 3.72 | 24% |
| Production taxes | $ 2.01 | $ 2.51 | $ (0.50) | (20%) |
| Depreciation, depletion and amortization | $ 12.76 | $ 10.93 | $ 1.83 | 17% |

(a) Field operating expenses include lease operating expenses and production taxes.

*Existing Wells*

The following table sets forth information at December 31, 2019, relating to the existing wells in which we owned a working interest as of that date. Gross wells are the total number of producing wells in which we have an interest, and net wells are the sum of our fractional working interests owned in gross wells.

| | Natural Gas | | Oil | |
|---|---|---|---|---|
| | Gross | Net | Gross | Net |
| Operated | — | — | — | — |
| Non-operated | — | — | 91 | 44 |
| Total | — | — | 91 | 44 |

We did not convert any proved undeveloped wells into proved producing wells in 2019.

*Drilling Activity*

With respect to oil and natural gas wells drilled and completed during the years ended December 31, 2019 and 2018, the information should not be considered indicative of future performance, nor should it be assumed that there is necessarily any correlation between the number of productive wells drilled, quantities of reserves found or economic value. Productive wells are those that are capable of producing commercial quantities of oil or natural gas, regardless of whether they produce a reasonable rate of return. No exploratory wells were drilled on any of our properties during the years ended December 31, 2019 or 2018. During the years ended December 31, 2019 and 2018, there were no wells drilled and there were no wells in progress.

*Developed and Undeveloped Acreage*

The following table sets forth information related to our leasehold acreage as of December 31, 2019.

| | Developed Acreage[a] | | Undeveloped Acreage[b] | |
|---|---|---|---|---|
| | Gross[c] | Net[d] | Gross[c] | Net[d] |
| Total | 702 | 140 | — | — |

(a) Developed acres are acres pooled within or assigned to productive wells/units.
(b) Undeveloped acres are acres on which wells have not been drilled or acres that have not been pooled into a productive unit.
(c) A gross acre is an acre in which a working interest is either fully or partially leased. The number of gross acres may include minerals not under lease as a result of leasing some but not all joint mineral owners under any given tract.
(d) A net acre is deemed to exist when the sum of the fractional ownership working interests in gross acres equals one. The number of net acres is the sum of the fractional working interests owned in gross acres expressed as whole numbers and fractions thereof.

*Leases*

Most of our reserves are comprised of wellbore rights only. We have a small lease position of less than 150 net acres in Louisiana.

**Marketing and Major Customers**

Our oil and natural gas production in Texas and Louisiana is marketed by the operators of our properties.

Sanchez Energy accounted for 86% and 71% of our total revenue for the years ended December 31, 2019 and 2018, respectively. We are highly dependent upon Sanchez Energy as our most significant customer, and we expect to derive a substantial portion of our revenue from Sanchez Energy in the foreseeable future. Accordingly, we are indirectly subject to the business risks of Sanchez Energy. Any development that materially and adversely affects Sanchez Energy's operations or financial condition could have a material adverse impact on us. Additional information regarding our relationship with Sanchez Energy is provided in "Part III, Item 13. Certain Relationships and Related Transactions, and Manager Independence." For additional information on the risks associated with our relationship with Sanchez Energy, please read "Part I, Item 1A. Risk Factors."

**Markets and Competition**

We operate in a competitive environment for acquiring properties, marketing oil, NGLs and natural gas and retaining trained personnel. Many of our competitors have substantially greater financial, technical and personnel resources than us. As a result, our competitors may be able to outbid us for assets, more competitively price their gathering and transportation services and oil and natural gas production, or utilize superior technical resources than our financial or personnel resources permit. Our ability to acquire additional assets will depend on our ability to evaluate and select suitable assets and to consummate transactions in a competitive environment.

The natural gas gathering, compression, treating and transportation business is very competitive. Upon such time that we seek to obtain customers in addition to Sanchez Energy for Western Catarina Midstream, our competitors will include other midstream companies, producers and intrastate and interstate pipelines. Competition for volumes is primarily based on reputation, commercial terms, reliability, service levels, location, available capacity, capital expenditures and fuel efficiencies.

Neither SOG nor any of its related companies are restricted from competing with us. Additional information regarding our relationship with SOG is provided in "Part III, Item 13. Certain Relationships and Related Transactions, and Manager Independence."

**Governmental Regulation**

*Environmental Laws*

Our operations are subject to stringent and complex federal, state and local laws and regulations governing environmental protection as well as the discharge of materials into the environment. These laws and regulations may, among other things:

- require the acquisition of various permits before drilling commences;
- restrict the types, quantities and concentrations of various substances, including water and waste, that can be released into the environment;
- limit or prohibit activities on lands lying within wilderness, wetlands and other protected areas; and
- require remedial measures to mitigate pollution from former and ongoing operations, such as requirements to close pits and plug abandoned wells.

These laws, rules and regulations may also restrict the rate of oil and natural gas production below the rate that would otherwise be possible in the absence of such regulations. The regulatory burden on the oil and natural gas industry increases the cost of doing business in the industry and consequently affects profitability. In addition, federal, state and local authorities frequently revise environmental laws and regulations, and any changes that result in more stringent and costly waste handling, disposal and cleanup requirements for the oil and natural gas industry could have a significant impact on our operating costs.

Environmental laws and regulations that could have a material impact on the oil and natural gas industry and our operations include the following:

*Waste Handling*

The Resource Conservation and Recovery Act ("RCRA") and comparable state laws regulate the generation, transportation, treatment, storage, disposal and cleanup of hazardous wastes and non-hazardous wastes. With the approval of the federal Environmental Protection Agency ("EPA"), the individual states can administer some or all of the provisions of RCRA, and some states have adopted their own, more stringent requirements. Drilling fluid, produced water and most other wastes associated with the exploration, development and production of oil and natural gas are currently regulated under RCRA's non-hazardous waste provisions. Although we do not believe that the current costs of managing any of our wastes are material under presently applicable laws, any future reclassification of oil and natural gas exploration, development and production wastes as hazardous wastes, could increase our costs to manage and dispose of wastes.

*Comprehensive Environmental Response, Compensation and Liability Act*

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), also known as the Superfund law, can impose joint and several liability, without regard to fault or legality of conduct, on classes of persons who are considered to be responsible for the release of a hazardous substance into the environment. These persons can include the owners or operators of the site where the release occurred, and anyone who disposed of, or arranged for the disposal of, a hazardous substance released at the site. Under CERCLA, such persons may be subject to joint and several liability for the costs of cleaning up the hazardous substances that have been released into the environment, including response costs, alternative water supplies, damages to natural resources and the costs of certain health studies. In addition, it is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property damage allegedly caused by the hazardous substances released into the environment. Each state also has environmental cleanup laws analogous to CERCLA.

We currently own, lease or operate numerous properties that have been used for oil and natural gas production for a number of years. Although we believe that operating and waste disposal practices utilized in the past with respect to these properties were typical for the industry at the time, hazardous substances, wastes or hydrocarbons may have been released on or under the properties owned or leased by us, or on or under other locations, including off-site locations, where such substances have been taken for disposal. In addition, these properties have been operated by third parties or by previous owners or operators whose practices, including the treatment and disposal or release of hazardous substances, wastes or hydrocarbons were not under our control. These properties and the substances disposed or released on them may be subject to CERCLA, RCRA and analogous state laws. Under such laws, we could be required to remove previously disposed substances and wastes, remediate contaminated property or perform remedial plugging or pit closure operations to prevent future environmental harm.

*Water Discharges*

The Federal Water Pollution Control Act (the “Clean Water Act”), and comparable state laws, impose restrictions and strict controls with respect to the discharge of pollutants, including spills and leaks of produced water and other oil and natural gas wastes, into waters of the United States. The discharge of pollutants into regulated waters is prohibited, except in accordance with the terms of a permit issued by the EPA or an analogous state agency. Federal and state regulatory agencies can impose administrative, civil and criminal penalties, impose investigatory or remedial obligations and issue injunctions limiting or preventing our operations for non-compliance with discharge permits or other requirements of the Clean Water Act and analogous state laws and regulations.

*Oil Pollution Act*

The Oil Pollution Act of 1990 amended the Clean Water Act in large part due to the Exxon Valdez incident. Under the Oil Pollution Act, the EPA was directed to promulgate regulations which would create a comprehensive prevention, response, liability and compensation program to deal with oil discharged into United States navigable waters. The Oil Pollution Act imposes ongoing requirements on owners and operators of facilities that handle certain quantities of crude oil, including the preparation of oil spill response plans and proof of financial responsibility to cover environmental cleanup and restoration costs that could be incurred in connection with a spill. The Oil Pollution Act imposes liability for removal costs and damages resulting from an incident in which oil is discharged into navigable waters and establishes liability for damages for injuries to, or loss of, natural resources.

*Air Emissions*

The Clean Air Act, and comparable state laws, regulate emissions of various air pollutants through air emissions permitting programs and the imposition of other requirements. In addition, the EPA has developed, and continues to develop, stringent regulations governing emissions of toxic air pollutants at specified sources. In October 2015, the EPA finalized rules that lower the National Ambient Air Quality Standard (“NAAQS”) for ozone from 75 parts per billion (“ppb”) to 70 ppb, and the EPA published a final rule in July 2018 completing the final designations. States can also impose air emissions limitations that are more stringent than the federal standards imposed by the EPA. Federal and state regulatory agencies can impose administrative, civil and criminal penalties for non-compliance with air permits or other requirements of the Clean Air Act and associated state laws and regulations. Rules restricting air emissions may require a number of modifications to our operations, including the installation of new equipment. Compliance with such rules could result in significant costs, including increased capital expenditures and operating costs, and could adversely impact our operating results. However, we believe that our operations will not be materially adversely affected by any such requirements, and the requirements are not expected to be any more burdensome to us than to other similarly situated companies. We believe that our operations are in substantial compliance with federal and state air emission standards.

*Climate Change*

While the U.S. Congress has from time to time considered legislation to reduce emissions of GHGs, there has not been significant activity in the form of adopted legislation to reduce GHG emissions at the federal level in recent years. In the absence of such federal climate legislation, the EPA has used existing Clean Air Act authority to regulate GHGs. For example, the EPA has adopted rules requiring the reporting of GHG emissions from various oil and natural gas operations on an annual basis. In addition, in June 2016, the EPA published New Source Performance Standards (“NSPS”) Subpart

OOOOa standards that require new, modified or reconstructed facilities in the oil and natural gas sector to reduce methane gas and volatile organic compound emissions. However, in June 2017, the EPA published a proposed rule to stay portions of the Subpart OOOOa standards for two years. In September 2018, the EPA issued proposed revisions to the NSPS applicable to new and modified oil and gas sources, which would reduce the monitoring obligations for wells and compressor stations. Further in October 2018, the EPA issued a draft report which includes a template designed to assist with compliance. Until the rules are finalized, the implementation of the 2016 rules remains uncertain. A number of state and regional efforts have also emerged that are aimed at tracking and/or reducing GHG emissions by means of cap and trade programs that typically require major sources of GHG emissions, such as electric power plants, to possess and acquire emission allowances which permit corresponding GHG emissions. Furthermore, the U.S. is currently a party to the Paris Agreement adopted in December 2015 to reduce global GHG emissions. However, in June 2017, President Trump announced that the United States plans to withdraw from the Paris Agreement in accordance with the Agreement's four-year exit process and to seek negotiations either to reenter the Paris Agreement on different terms or establish a new framework agreement. In August 2017, the U.S. Department of State officially informed the United Nations of the intent of the United States to withdraw from the Paris Agreement and in November 2019 began the formal process of withdrawl.

*Hydraulic Fracturing*

Hydraulic fracturing is an important and common practice that is used to stimulate production of hydrocarbons. The process involves the injection of water, sand and chemicals under pressure into formations to fracture the surrounding rock and stimulate production. The process is typically regulated by state oil and natural gas commissions. However, the EPA has asserted federal regulatory authority over certain hydraulic fracturing practices and has finalized a study of the potential environmental impacts of hydraulic fracturing activities, finding that under certain circumstances, the "water cycle" activities associated with hydraulic fracturing may impact drinking water resources. In 2014, the EPA released an Advanced Notice of Proposed Rulemaking seeking public comment on its plans to issue regulations under the Toxic Substances Control Act of 1976 to require companies to disclose information regarding chemicals used in hydraulic fracturing. Further, the Department of the Interior has released final regulations governing hydraulic fracturing on federal oil and natural gas leases which require lessees to file for approval of well stimulation work before commencement of operations and require well operators to disclose the trade names and purposes of additives used in the fracturing fluids. The states in which we operate have also adopted disclosure requirements related to fracturing fluids. Legislation has been introduced, but not adopted, in Congress to provide for federal regulation of hydraulic fracturing and to require disclosure of the chemicals used in the fracturing process. In addition, some states have adopted, and other states are considering adopting, regulations that could restrict hydraulic fracturing in certain circumstances. Currently, no states in which we utilize hydraulic fracturing have adopted these regulations. At this time, it is not possible to accurately estimate how potential future laws or regulations addressing hydraulic fracturing would impact our business.

*Endangered Species*

The federal Endangered Species Act ("ESA") was established to protect endangered and threatened species. Pursuant to the ESA, if a species is listed as threatened or endangered, restrictions may be imposed on activities adversely affecting that species' habitat. Similar protections are offered to migratory birds under the Migratory Bird Treaty Act. The U.S. Fish and Wildlife Service ("FWS") may designate critical habitat and suitable habitat areas that it believes are necessary for the survival of a threatened or endangered species. A critical habitat or suitable habitat designation could result in further material restrictions and may materially delay or prohibit land access for development. Moreover, as a result of a settlement approved by the U.S. District Court for the District of Columbia in September 2011, the FWS was required to make a determination on the listing of more than 250 species as endangered or threatened under the ESA by the end of the agency's 2017 fiscal year. The designation of previously unprotected species as threatened or endangered in areas where we operate could cause us to incur increased costs arising from species protection measures or could result in limitations on our activities.

*Gathering System Regulation*

Regulation of gathering facilities may affect certain aspects of our business and the market for our services. Historically, the transportation and sale for resale of natural gas in interstate commerce have been regulated by agencies of the U.S. federal government, primarily the Federal Energy Regulatory Commission ("FERC"). The FERC regulates

interstate natural gas transportation rates, terms and conditions of service, which affects the marketing of natural gas that we produce, as well as the revenues we receive for sales of our natural gas.

The transportation and sale for resale of natural gas in interstate commerce are regulated primarily under the Natural Gas Act ("NGA"), and by regulations and orders promulgated under the NGA by the FERC. In certain limited circumstances, intrastate transportation, gathering, and wholesale sales of natural gas may also be affected directly or indirectly by laws enacted by the U.S. Congress and by FERC regulations.

Section 1(b) of the NGA exempts natural gas gathering facilities from regulation by the FERC under the NGA. We believe that the natural gas pipelines in our gathering systems meet the traditional tests that the FERC has used to establish whether a pipeline is a gathering pipeline not subject to FERC jurisdiction. However, the distinction between FERC-regulated transmission services and federally unregulated gathering services has been the subject of substantial litigation and varying interpretations. In addition, the FERC determines whether facilities are gathering facilities on a case-by-case basis, so the classification and regulation of our natural gas gathering facilities are subject to change based on future determinations by the FERC, the courts, or the U.S. Congress. If the FERC were to determine that an individual gathering system is not exempt from FERC regulation and the pipelines associated with such gathering system provide interstate transportation, the rates for, and terms and conditions of, services provided by such gathering system would be subject to regulation by the FERC. Such regulation could decrease revenue, increase operating costs, and, depending upon the facility in question, could adversely affect results of operations and cash flows. If any of our facilities were found to have provided services or otherwise operated in violation of the NGA or the NGPA, this could result in the imposition of civil penalties as well as a requirement to disgorge charges collected for such service in excess of the cost-based rate established by the FERC.

Gathering services, which may occur upstream of transmission service subject to FERC jurisdiction, is regulated by the states. State regulation of gathering facilities generally includes various safety, environmental and, in some circumstances, nondiscriminatory take requirements and complaint-based rate regulation. Our purchasing and gathering operations are subject to ratable take and common purchaser statutes in the State of Texas. The ratable take statute generally requires gatherers to take, without undue discrimination, natural gas production that may be tendered to the gatherer for handling. Similarly, the common purchaser statute generally requires gatherers to purchase without undue discrimination as to source of supply or producer. These statutes are designed to prohibit discrimination in favor of one producer over another producer or one source of supply over another source of supply. These statutes have the effect of restricting our right as an owner of gathering facilities to decide with whom we contract to purchase or transport gas.

The Railroad Commission of Texas ("TRRC") requires gatherers to file reports, obtain permits, make books and records available for audit and provide service on a nondiscriminatory basis. Shippers and producers may file complaints with the TRRC to resolve grievances relating to natural gas gathering access and rate discrimination.

While our gathering systems have not been regulated by the FERC under the NGA, the U.S. Congress may enact legislation or the FERC may adopt regulations that may subject certain of our otherwise non-FERC jurisdictional facilities to further regulation. Changes in law and to FERC policies and regulations may adversely affect the availability and reliability of firm and/or interruptible transportation service on interstate pipelines, and we cannot predict what future action FERC will take. We do not believe, however, that any regulatory changes will affect us in a way that materially differs from the way they will affect other natural gas gatherers with which we compete. Failure to comply with those regulations in the future could subject us to civil penalty liability.

The Energy Policy Act of 2005 ("EPAct 2005"), amended the NGA to add an anti-market manipulation provision which makes it unlawful for any entity to engage in prohibited behavior to be prescribed by the FERC, and furthermore provides the FERC with additional civil penalty authority. The EPAct 2005 provided the FERC with the power to assess daily civil penalties for violations of the NGA and the Natural Gas Policy Act ("NGPA"). The civil penalty provisions are applicable to entities that engage in the sale of natural gas for resale in interstate commerce. In Order No. 670, the FERC promulgated rules implementing the anti-market manipulation provision of the EPAct 2005. The rules make it unlawful, in connection with the purchase or sale of natural gas subject to the jurisdiction of the FERC, or the purchase or sale of transportation services subject to the jurisdiction of the FERC, for any entity, directly or indirectly, to: (1) use or employ any device, scheme or artifice to defraud; (2) make any untrue statement of material fact or omit to make any such statement necessary to make the statements made not misleading; or (3) engage in any act or practice that operates as a fraud or

deceit upon any person. The anti-market manipulation rule does not apply to activities that relate only to intrastate or other non-jurisdictional sales or gathering, but does apply to activities of gas pipelines and storage companies that provide interstate services, as well as otherwise non-jurisdictional entities to the extent the activities are conducted "in connection with" gas sales, purchases or transportation subject to FERC jurisdiction.

*Pipeline Safety Regulation*

We are subject to regulation by the United States Department of Transportation ("DOT") through the Pipelines and Hazardous Materials Safety Administration ("PHMSA"), pursuant to the Hazardous Liquid Pipeline Safety Act of 1979, as amended ("HLPSA") and comparable state statutes with respect to design, installation, inspection, testing, construction, operation, replacement and maintenance of pipeline facilities. HLPSA, as amended, governs he design, installation, testing, construction, operation, replacement and management of crude oil pipeline facilities and also covers petroleum and petroleum products, including NGLs and condensate, and requires any entity that owns or operates pipeline facilities to comply with such regulations, to permit access to and copying of records and to file certain reports and provide information as required by the U.S. Secretary of Transportation. These regulations include potential fines and penalties for violations. We believe that we are in compliance in all material respects with these HLPSA regulations.

Our natural gas pipelines are subject to regulation by PHMSA pursuant to the Natural Gas Pipeline Safety Act of 1968 ("NGPSA") and the Pipeline Safety Improvement Act of 2002 ("PSIA"), as reauthorized and amended by the Pipeline Inspection, Protection, Enforcement and Safety Act of 2006 ("PIPES Act"). The NGPSA regulates safety requirements in the design, construction, operation and maintenance of gas pipeline facilities, while the PSIA establishes mandatory inspections for all U.S. oil and natural gas transmission pipelines in high-consequence areas ("HCAs").

PHMSA has developed regulations that require pipeline operators to implement integrity management programs, including more frequent inspections and other measures to ensure pipeline safety in HCAs. The regulations require operators, including us, to:

- perform ongoing assessments of pipeline integrity;
- identify and characterize applicable threats to pipeline segments that could impact HCAs;
- improve data collection, integration and analysis;
- repair and remediate pipelines as necessary; and
- implement preventive and mitigating actions.

The HLPSA has been amended by the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 ("2011 Pipeline Safety Act") and the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016 ("2016 Pipeline Safety Act The 2011 Pipeline Safety Act increased the penalties for safety violations, established additional safety requirements for newly constructed pipelines and required studies of safety issues that could result in the adoption of new regulatory requirements by PHMSA for existing pipelines. The 2011 Pipeline Safety Act doubled the maximum administrative fines for safety violations from $100,000 to $200,000 for a single violation and from $1 million to $2 million for a related series of violations, but provided that these maximum penalty caps do not apply to certain civil enforcement actions. Effective April 27, 2017, to account for inflation, those maximum civil penalties were increased to $213,268 per day, with a maximum of $2,132,679 for a series of violations. The 2016 Pipeline Safety Act extended PHMSA's statutory mandate through 2019. The 2016 Pipeline Safety Act also empowers PHMSA to address imminent hazards by imposing emergency restrictions, prohibitions and safety measures on owners and operators of hazardous liquid pipeline facilities without prior notice or an opportunity for a hearing. PHMSA issued interim regulations in October 2016 to implement the agency's expanded authority to address unsafe pipeline conditions or practices that pose an imminent hazard to life, property, or the environment.

PHMSA regularly revises its pipeline safety regulations and has published advanced notices of proposed rulemakings and notices of proposed rulemaking to solicit comments on the need for changes to its natural gas and liquid pipeline safety regulations. In the past few years, PHMSA issued advisory bulletins providing guidance on applicable

regulatory requirements, including those that must be followed for the abandonment of a pipeline; aspects of overall pipeline integrity, including the need for corrosion-control systems on buried and insulated pipeline segments, to conduct in-line inspections for all threats, and to ensure in-line inspection tool findings are accurate and verified; the need of owners and operators of natural gas facilities to take appropriate steps to prevent damage to pipeline facilities from accumulated snow or ice; actions pipeline operators should consider taking to ensure the integrity of pipelines in the event of severe flooding or hurricane damage; notice of construction; flow reversal procedures; product changes and conversion; integrity management program evaluation metrics; and incident response plans. Further changes to PHMSA's rules are expected in the future.

For example, in July 2015, PHMSA issued a notice of proposed rulemaking proposing, among other things, to extend operator qualification requirements to operators of certain natural gas gathering lines and to add a specific timeframe for operators' notifications of accidents or incidents. In January 2017, PHMSA issued a final rule adding a specific timeframe for operators' notifications of accidents or incidents but delayed final action on the operator qualification proposals until a later date. The final rule became effective March 24, 2017. In addition, in October 2015, PHMSA issued a notice of proposed rulemaking proposing changes to its hazardous liquid pipeline safety regulations, including to extend: (i) reporting requirements to all onshore or offshore, regulated or unregulated hazardous liquid gathering lines; and (ii) certain integrity management periodic assessment and remediation requirements to regulated onshore gathering lines. On January 13, 2017, PHMSA issued a final rule amending its regulations to impose new reporting requirements for certain unregulated pipelines, including all hazardous liquid gathering lines. The final rule also significantly extends and expands the reach of certain integrity management requirements, regardless of the pipeline's proximity to HCAs. However, this final rule remains subject to review and approval by the new administration, pursuant to a memorandum issued by the White House to heads of federal agencies. It is unclear whether the final rule will be revised and when it will be implemented. In April 2016, PHMSA issued a notice of proposed rulemaking that would expand integrity management requirements and impose new pressure requirements on currently regulated gas transmission pipelines and would also significantly expand the regulation of gas gathering lines, subjecting previously unregulated pipelines to requirements regarding damage prevention, corrosion control, public education programs, maximum allowable operating pressure limits and other requirements. On October 1, 2019, PHMSA issued its final rule which will become effective July 1, 2020. While we cannot predict the outcome of legislative or regulatory initiatives, such regulatory changes and any legislative changes could have a material effect on our operations, particularly by extending more stringent and comprehensive safety regulations (such as integrity management requirements) to pipelines and gathering lines not previously subject to such requirements. While we expect any legislative or regulatory changes to allow us time to become compliant with new requirements, costs associated with compliance may have a material effect on our operations.

Furthermore, DOT regulations have incorporated by reference the American Petroleum Institute Standard 653 ("API 653") as the industry standard for the inspection, repair, alteration and reconstruction of storage tanks. API 653 requires regularly scheduled inspection and repair of such tanks. These periodic tank maintenance requirements may result in significant and unanticipated capital and operating expenditures for repairs or upgrades deemed necessary to ensure the continued safe and reliable operation of our storage tanks.

States are largely preempted by federal law from regulating pipeline safety for interstate lines but most are certified by the DOT to assume responsibility for enforcing intrastate pipeline regulations and inspection of intrastate pipelines. For example, in Texas the Pipeline Safety Department of the TRRC inspects and enforces the pipeline safety regulations for intrastate pipelines, including gathering lines. States may adopt stricter standards for intrastate pipelines than those imposed by the federal government for interstate lines; however, states vary considerably in their authority and capacity to address pipeline safety. State standards may include more stringent requirements for facility design and management in addition to requirements for pipelines. We do not anticipate any significant difficulty in complying with applicable state laws and regulations. Our pipelines have ongoing inspection and compliance programs designed to keep the facilities in compliance with pipeline safety and pollution control requirements.

We have incorporated all existing requirements into our programs by the required regulatory deadlines and are continually incorporating the new requirements into procedures and budgets. We expect to incur increasing regulatory compliance costs, based on the intensification of the regulatory environment and upcoming changes to regulations as outlined above. In addition to regulatory changes, costs may be incurred when there is an accidental release of a commodity gathered on our system, or a regulatory inspection identifies a deficiency in our required programs.

*Other Laws and Regulation*

We are subject to the requirements of the federal Occupational Safety and Health Act (“OSHA”), and comparable state laws. These laws and the implementing regulations strictly govern the protection of the health and safety of employees. The OSHA hazard communications standard, OSHA Process Safety Management, the EPA community right-to-know regulations under Title III of CERCLA and similar state laws require that we organize and/or disclose information about hazardous materials used or produced in our operations. We believe that we are in substantial compliance with these applicable requirements.

We believe that we are in substantial compliance with existing environmental laws and regulations applicable to our current operations and that our continued compliance with existing requirements should not have a material adverse impact on our financial condition and results of operations. As of December 31, 2019, we had no accrued environmental obligations. We are not aware of any environmental issues or claims that will require material capital expenditures or that will otherwise have a material impact on our financial position or results of operations. However, we cannot predict how future environmental laws and regulations may impact our operations, and therefore, cannot provide assurance that the passage of more stringent laws or regulations in the future will not have a negative impact on our financial condition, results of operations or cash flows.

**Employees**

We do not have any employees. In connection with providing the services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties, (ii) reimbursement for all allocated overhead costs, as well as any direct third-party costs incurred and (iii) for each asset acquisition, disposition or financing, a fee not to exceed 2% of the value of such transaction.

As of March 13, 2020, nine (9) employees were employed by SOG with their primary function being to provide services for us, all of which were full-time employees.

None of SOG’s employees are subject to a collective bargaining agreement.

**Offices**

Our principal executive offices are located at 1000 Main Street, Suite 3000, Houston, Texas 77002. Our telephone number is (713) 783-8000.

**Available Information**

Our internet address is http://www.sanchezmidstream.com. We make our website content available for informational purposes only. It should not be relied upon for investment purposes, nor is it incorporated by reference in this Form 10-K. We make available free of charge on or through our website our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the “Exchange Act”), as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC. The SEC maintains an internet website that contains these reports at http://www.sec.gov.

Table of Contents

**Item 1A. Risk Factors**

*Our business involves a high degree of risk. Limited partner interests are inherently different from the capital stock of a corporation, although many of the business risks to which we are subject are similar to those that would be faced by a corporation engaged in a similar business. You should consider and read carefully all of the risks and uncertainties described below, together with all of the other information contained in this Form 10-K, including the financial statements and the related notes appearing at the end of this Form 10-K. If any of the following risks, or any risk described elsewhere in this Form 10-K, were to occur, our business, financial condition or results of operations could be adversely affected. If any of the following risks, or any risk described elsewhere in this Form 10-K, were to occur, our business, financial condition or results of operations could be adversely affected. The risks below are not the only ones facing the Partnership. Additional risks not currently known to us or that we currently deem immaterial may also adversely affect us. This Form 10-K also contains forward-looking statements, estimates and projections that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of specific factors, including the risks described below. Also, please read "Cautionary Note Regarding Forward-Looking Statements."*

The risk factors in this Form 10-K are grouped into the following categories:

- Risks Related to Our Midstream Business;
- Risks Related to Our Production Business;
- Risks Related to Our Midstream and Production Businesses;
- Risks Related to Financing and Credit Environment;
- Risks Related to Our Cash Distributions;
- Risks Related to Regulatory Compliance;
- Risks Inherent in an Investment and Our Common Units; and
- Tax Risks.

**Risks Related to Our Midstream Business**

***Because the majority of our total revenue, including substantially all of our revenue stemming from the operation of our midstream business, is derived from Sanchez Energy, the filing of voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code by Sanchez Energy and certain of its subsidiaries could have a material and adverse impact on us.***

Sanchez Energy accounted for approximately 86% of our total revenue and substantially all of our midstream business revenue for the year ended December 31, 2019. We are dependent on Sanchez Energy as our only current customer for utilization of Western Catarina Midstream, and as our primary customer for utilization of our other midstream assets. We expect that a majority of revenues relating to these assets will be derived from Sanchez Energy for the foreseeable future.

On August 11, 2019, Sanchez Energy Corporation and certain of its subsidiaries filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, jointly administered Case No. 19-34508 (the "Sanchez Energy Chapter 11 Case"). As a result, we are subject to an increased risk of non-payment, non-performance and/or underutilization of our midstream assets by Sanchez Energy. While Sanchez Energy Corporation has stated it intends to continue to operate in the normal course and intends to interact with its commercial counterparties as usual, no assurances can be given as to the timing or outcome of the bankruptcy process. Through December 31, 2019, we did not experience any significant losses as a result of non-performance. However, as disclosed herein, Sanchez Energy terminated the Seco Pipeline Transportation

Agreement effective on February 12, 2020. Any development that materially and adversely affects Sanchez Energy's operations or financial condition could have a material and adverse impact on us.

On March 13, 2020, the official committee of unsecured creditors in the Sanchez Energy Chapter 11 Case (the "Unsecured Committee") filed a motion titled *Motion of the Official Committee of Unsecured Creditors for Leave, Standing, and Authority to Prosecute Claims on Behalf of the Debtors' Estate and for Related Relief* (the "March 13 Motion"). The relief sought in the March 13 Motion is to grant the Unsecured Committee derivative standing to prosecute claims that Sanchez Energy allegedly has against the Partnership and others, including, but not limited to, claims to recharacterize or avoid the Catarina Transaction, the Carnero Gathering Transaction (as defined in Note 12 "Investments" of our Notes to Consolidated Financial Statements), and the Carnero Processing Transaction (as defined in Note 12 "Investments" of our Notes to Consolidated Financial Statements). While we do not believe these claims have any merit, if such claims are filed and prosecuted, the cost to defend against such claims and any judgment entered against us could have a material and adverse impact on our business, financial condition and operating results.

***Because of the natural decline in production from existing wells, our success depends, in part, on Sanchez Energy's ability to replace declining production. Any decrease in volumes of natural gas, NGLs and oil that Sanchez Energy produces or any decrease in the number of wells that Sanchez Energy completes could reduce throughput volumes that could adversely affect our business and operating results.***

The volumes that support our facilities depend on the level of production from wells connected to our facilities, which may be less than expected and will naturally decline over time. To the extent Sanchez Energy reduces its activity or otherwise ceases to drill and complete wells, especially on Sanchez Energy's Catarina Asset, revenues for our gathering and processing services will be directly and adversely affected. In addition, volumes from completed wells will naturally decline and our cash flows associated with these wells will also decline over time. In order to maintain or increase throughput levels on our facilities, we must obtain new sources of natural gas, NGLs and oil from Sanchez Energy or other third parties. The primary factors affecting our ability to obtain additional sources of natural gas, NGLs and oil include (i) the success of Sanchez Energy's drilling activity in our areas of operation, (ii) Sanchez Energy's acquisition of additional acreage and (iii) our ability to obtain additional dedications of acreage from Sanchez Energy or new dedications of acreage from other third parties.

We have no control over Sanchez Energy's or other producers' levels of development and completion activity in our areas of operation, the amount of reserves associated with wells connected to our facilities or the rate at which production from a well declines. We have no control over Sanchez Energy or other producers or their development plan decisions, which are affected by, among other things:

- the availability and cost of capital;
- prevailing and projected prices for natural gas, NGLs and oil;
- demand for natural gas, NGLs and oil;
- levels of reserves;
- geologic considerations;
- environmental or other governmental regulations, including the availability and maintenance of drilling permits and the regulation of hydraulic fracturing; and
- the costs of producing natural gas, NGLs and oil and the availability and costs of drilling rigs and other equipment.

Under the terms of the lease covering Sanchez Energy's Catarina Asset, Sanchez Energy is subject to annual drilling and development requirements. For example, at the present time, the lease requires Sanchez Energy to drill 50 wells per year (with the ability to bank up to 30 wells from a prior period). The pending Sanchez Energy Chapter 11 Case has resulted in significant delays to the drilling program on Sanchez Energy's properties, including Sanchez Energy's Catarina

Asset, and failure to drill the required number of wells could result in forfeiture of acreage not held by production during the current fiscal year. In addition, Sanchez has various drilling obligations under the leases covering Sanchez Energy's Comanche Asset. If Sanchez Energy fails to meet these drilling obligations, Sanchez Energy could forfeit its acreage under the applicable lease not held by production. Such a forfeiture could impact Sanchez Energy's ability to develop additional acreage and replace declining production.

Fluctuations in energy prices can also greatly affect the development of reserves. Declines in commodity prices could have a negative impact on Sanchez Energy's development and production activity, and if sustained, could lead Sanchez Energy to materially reduce its drilling and completion activities. Sustained reductions in development or production activity in our areas of operation could lead to reduced utilization of our services.

Due to these and other factors, even if reserves are known to exist in areas served by our facilities, Sanchez Energy and other producers may choose not to develop, or be prohibited from developing, those reserves. If reductions in development activity result in our inability to maintain the current levels of throughput on our facilities, those reductions could reduce our revenue and cash flows and adversely affect our ability to pay cash distributions to Stonepeak Catarina Holdings LLC ("Stonepeak Catarina"), as the holder of all of our Class C preferred units representing limited partner interests (the "Class C Preferred Units"). Restrictions under our Credit Agreement and our partnership agreement currently prohibit us from paying distributions to our common unitholders.

***The Gathering Agreement contains provisions that can reduce the stability in cash flows that the agreement was designed to achieve.***

The Gathering Agreement is designed to generate stable cash flows for us over the life of the minimum volume commitment contract term while also minimizing direct commodity price risk. Under the minimum volume commitment, subject to certain adjustments, Sanchez Energy has agreed to ship a minimum volume of natural gas and NGLs on Western Catarina Midstream or, in some cases, to pay a minimum monetary amount, over certain periods during the term of the minimum volume commitment, which is the first five years of the 15-year term of the Gathering Agreement (or through 2020). In addition, the Gathering Agreement also includes a minimum quarterly quantity, which is a total amount of natural gas and NGLs that Sanchez Energy must flow on Western Catarina Midstream (or an equivalent monetary amount) each quarter during the minimum volume commitment term. If Sanchez Energy's actual throughput volumes are less than its minimum volume commitment for the applicable period, it must extend the minimum volume commitment term on a nominal volume basis, but to no longer than the original five years (subject to certain exceptions), or, in some cases, make a shortfall payment to us at the end of that contract quarter, as applicable. The amount of the shortfall payment is based on the difference between the actual throughput volume shipped, processed or offset through an extension of the minimum volume commitment term for the applicable period and the minimum volume commitment for the applicable period, multiplied by the applicable fee. To the extent that Sanchez Energy's actual throughput volumes are above its minimum volume commitment for the applicable period, the Gathering Agreement contains provisions that allow Sanchez Energy to use the excess volumes as a credit to shorten the minimum volume commitment term, but to no less than four years. Through December 31, 2019, natural gas volumes from Sanchez Energy have shortened the primary terms of the volume commitments by 197 days, while the minimum oil volume commitment is no longer in effect.

Under certain circumstances, it is possible that the combined effect of the minimum volume commitment provisions could result in our receiving substantially reduced revenues or cash flows from Sanchez Energy in a given period. In the most extreme circumstances:

- we could incur operating expenses with substantially reduced corresponding revenues from Sanchez Energy; or
- Sanchez Energy could cease shipping throughput volumes at a time when its aggregate minimum volume commitment has been satisfied with previous throughput volume shipments.

If either of these circumstances were to occur, it would have a material adverse effect on our results of operations and financial condition and cash flows and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

Table of Contents

***Interruptions in operations at our facilities or facilities that Targa operates on behalf of the Carnero JV may adversely affect operations and cash flows available for distribution to Stonepeak Catarina.***

Any significant interruption at any of our facilities or the facilities that Targa operates on behalf of the Carnero JV, or in our ability or Targa's ability on behalf of the Carnero JV, as applicable, to gather, treat or process natural gas, NGLs and oil, would adversely affect operations and cash available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units. Operations at impacted facilities could be partially or completely shut down, temporarily or permanently, as the result of circumstances not within our control, such as:

- unscheduled turnarounds or catastrophic events at physical plants or pipeline facilities;
- restrictions imposed by governmental authorities or court proceedings;
- labor difficulties that result in a work stoppage or slowdown;
- a disruption or decline in the supply of resources necessary to operate a facility;
- damage to facilities resulting from natural gas, NGLs and oil that do not comply with applicable specifications; and
- inadequate transportation or market access to support production volumes, including lack of availability of pipeline capacity.

***We may not be able to attract additional third-party volumes, which could limit our ability to grow and would increase our dependence on Sanchez Energy.***

Part of our long-term growth strategy includes identifying additional opportunities to offer gathering, processing and transportation services to other third parties. Our ability to increase throughput on our facilities and any related revenue from third parties is subject to numerous factors beyond our control, including competition from third parties and the extent to which we have available capacity when requested by third parties. To the extent that we lack available capacity on our facilities for third-party volumes, we may not be able to compete effectively with third-party gathering or processing systems for additional volumes. In addition, some of our competitors for third-party volumes have greater financial resources and access to larger supplies of oil and natural gas than those available to us, which could allow those competitors to price their services more aggressively than us. Moreover, the underlying lease for the properties on which Western Catarina Midstream is located restricts Western Catarina Midstream to the handling of hydrocarbons produced on the properties covered by the lease.

We may not be able to attract material third-party service opportunities. Our efforts to attract new unaffiliated customers may be adversely affected by (i) our relationship with Sanchez Energy, certain rights that it has under applicable agreements and with respect to Western Catarina Midstream the fact that a substantial portion of the capacity of the facility will be necessary to service Sanchez Energy's production and development and completion schedule, (ii) the current nature of our facilities, (iii) our desire to provide services pursuant to fee-based contracts and (iv) the existence of current and future dedications to other gatherers by potential third-party customers. As a result, we may not have the capacity or ability to provide services to third parties, or potential third-party customers may prefer to obtain services pursuant to other forms of contractual arrangements under which we would be required to assume direct commodity exposure.

***All of our midstream assets are located in the Eagle Ford Shale in Texas, making us vulnerable to risks associated with operating in one major geographic area.***

All of our midstream assets are located in the Eagle Ford Shale in Texas. As a result of this concentration, we may be disproportionately exposed to the impact of regional supply and demand factors, delays or interruptions of production from wells in this area caused by governmental regulation, market limitations or interruption of the processing or transportation of natural gas, NGLs or oil.

Table of Contents

***We do not intend to obtain independent evaluations of reserves of natural gas, NGLs and oil reserves connected to Western Catarina Midstream on a regular or ongoing basis; therefore, in the future, volumes of natural gas, NGLs and oil on the gathering system could be less than we anticipate.***

We have not obtained and do not intend to obtain independent evaluations of the reserves of natural gas, NGLs and oil, including those of Sanchez Energy, connected to Western Catarina Midstream on a regular or ongoing basis. Moreover, even if we did obtain independent evaluations of the reserves of natural gas, NGLs and oil connected to Western Catarina Midstream, such evaluations may prove to be incorrect. Oil and natural gas reserve engineering requires subjective estimates of underground accumulations of oil and natural gas and assumptions concerning future oil and natural gas prices, future production levels and operating and development costs.

Accordingly, we may not have accurate estimates of total reserves dedicated to some or all of Western Catarina Midstream or the anticipated life of such reserves. If the total reserves or estimated life of the reserves connected to Western Catarina Midstream are less than we anticipate and we are unable to secure additional sources of natural gas, NGLs and oil, it could have a material adverse effect on our business, results of operations and financial condition and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***A shortage of equipment and skilled labor in the Eagle Ford Shale could reduce equipment availability and labor productivity and increase labor and equipment costs, which could have a material adverse effect on our business and results of operations.***

Gathering and processing services require special equipment and laborers skilled in multiple disciplines, such as equipment operators, mechanics and engineers, among others. Decreased levels of production and shrinking margins from lower commodity prices may result in shortages of equipment and skilled labor in the Eagle Ford Shale, as companies seek to deploy their resources in more profitable basins. If we experience shortages of necessary equipment or skilled labor in the future, our labor and equipment costs and overall productivity could be materially and adversely affected. If our equipment or labor prices increase or if we experience materially increased health and benefit costs for employees, our results of operations could be materially and adversely affected.

***Distributions we receive from the Carnero JV may fluctuate from quarter to quarter as Targa, the operator, has certain discretion over the amount and timing of distributions, which could adversely affect our ability to pay cash distributions.***

We received approximately $17.2 million in cash from the Carnero JV in the form of distributions during the year ended December 31, 2019. Targa, as the operator of the Carnero JV, has certain rights which permit it to affect the amount and timing of distributions to us. For example, Targa has certain discretion with regard to cash reserves and working capital adjustments that may cause the amount of our distributions to fluctuate from quarter-to-quarter. Fluctuations in the amount and timing of distributions from the Carnero JV could adversely affect our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our participation in joint ventures exposes us to liability or harm to our reputation resulting from failures by our partner.***

In May 2018, we executed a series of agreements with Targa and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering and Carnero Processing to form an expanded 50 / 50 joint venture in South Texas, Carnero JV, (2) Targa contributed 100% of the equity interest in Silver Oak II to Carnero JV, which expanded the processing capacity of the joint venture from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the Carnero Gathering Line to Carnero JV resulting in the joint venture owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, and (4) Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. We and Targa are jointly and severally liable for all liabilities and obligations of the Carnero JV. If Targa fails to perform or is financially unable to bear its portion of required capital contributions or other obligations, including liabilities stemming from claims or lawsuits, we could be required to make additional investments, provide additional services or pay more than our proportionate share of a liability to make up for Targa's shortfall. Further, if we are unable to adequately address Targa's performance issues, Sanchez Energy, the main customer on the facilities, may terminate its agreements, which could result in legal liability to us, harm our reputation and reduce cash flows generated from the Carnero Gathering Line and the Raptor Gas Processing Facility.

***Increased competition from other companies that provide gathering services could have a negative impact on the demand for our services, which could adversely affect our financial results.***

Our ability to flow a sufficient volume of throughput prior to and after the expiration of the Gathering Agreement to maintain current revenues and cash flows could be adversely affected by the activities of our competitors. Our facilities compete primarily with other gathering and processing systems. Some competitors have greater financial resources than us and may now, or in the future, have access to greater supplies of natural gas, NGLs and oil than we do. Some of these competitors may expand or construct facilities that would create additional competition for the services that we provide to Sanchez Energy or other future customers. In addition, Sanchez Energy or other future customers may develop their own facilities instead of using our midstream assets. Moreover, Sanchez Energy and its affiliates are not limited in their ability to compete with us outside of the dedicated areas.

All of these competitive pressures could make it more difficult for us to retain Sanchez Energy as a customer and/or attract new customers as we seek to expand our business, which could have a material adverse effect on our business, financial condition, results of operations and ability to make cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***If third-party pipelines or other midstream facilities interconnected to our facilities become partially or fully unavailable, our operating margin, cash flows and ability to pay cash distributions could be adversely affected.***

Our facilities connect to other pipelines or facilities owned and operated by unaffiliated third parties. The continuing operation of third-party pipelines, compressor stations and other midstream facilities is not within our control. These pipelines, plants and other midstream facilities may become unavailable because of testing, turnarounds, line repair, maintenance, reduced operating pressure, lack of operating capacity, regulatory requirements and curtailments of receipt or deliveries due to insufficient capacity or because of damage from severe weather conditions or other operational issues. In addition, if the costs to us to access and transport on these third-party pipelines significantly increase, our profitability could be reduced. If any such increase in costs occurs or if any of these pipelines or other midstream facilities become unable to receive or transport natural gas, NGLs or oil, our operating margin, cash flows and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units could be adversely affected.

***We do not own the land on which Western Catarina Midstream or the Seco Pipeline is located, which could result in disruptions to our operations.***

We do not own the land on which Western Catarina Midstream or the Seco Pipeline is located, and we are, therefore, subject to the possibility of more onerous terms or increased costs to retain necessary land use if we do not have valid rights-of-way or if such rights-of-way lapse or terminate. We currently have certain rights to construct and operate our

Table of Contents

pipelines on land owned by third parties for a specific period of time and may need to obtain other rights in the future from third parties and governmental agencies to continue these operations or expand Western Catarina Midstream or the Seco Pipeline. Our loss of these rights or inability to obtain additional rights, through our inability to renew or obtain right-of-way contracts or otherwise, could have a material adverse effect on our business, results of operations, financial condition and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our right-of-first-offer with Sanchez Energy for midstream assets is subject to risks and uncertainty, and thus may not enhance our ability to grow our business.***

Pursuant to a right-of-first-offer, Sanchez Energy has agreed to offer us the right to purchase midstream assets that it desires to transfer to any unaffiliated person through 2030. Sanchez Energy is under no obligation to sell any assets to us or to accept any offer for its assets that we may choose to make. Furthermore, for a variety of reasons, we may decide not to exercise this right when it becomes available.

The acquisition of additional assets in connection with the exercise of our right-of-first-offer will depend upon, among other things, our ability to agree on the price and other terms of the sale, our ability to obtain financing on acceptable terms for the acquisition of such assets and our ability to acquire such assets on the same or better terms than third parties. We can offer no assurance that we will be able to successfully acquire any assets pursuant to this right-of-first-offer.

***Our operations could be disrupted if our or SOG's information systems are hacked or fail, causing increased expenses and loss of revenue.***

We face various security threats, including cybersecurity threats to gain unauthorized access to sensitive information or to render data systems unusable, threats to the security of our facilities and infrastructure, Sanchez Energy's facilities and infrastructure or other third-party facilities and infrastructure, such as pipelines. The potential for such security threats has subjected our operations to increased risks that could have a material adverse effect on our business.

Our business is increasingly dependent on technology infrastructure, certain critical financial, accounting and other data processing systems and other communications and information systems, including such systems of SOG that we utilize pursuant to the Services Agreement. These systems include data network and telecommunications, internet access, our website, and various computer hardware equipment and software applications, including those that are critical to the safe operations of our assets. We process transactions on a daily basis and rely upon the proper functioning of computer systems. These systems are subject to damage or interruption from a number of potential sources including natural disasters, software viruses or other malware, power failures, cybersecurity threats to gain unauthorized access to sensitive information, cyber-attacks, which may render data systems unusable, and physical threats to the security of our and SOG's facilities and infrastructure or third-party facilities and infrastructure. If a key system were hacked or otherwise interfered with by an unauthorized access, or were to fail or experience unscheduled downtime for any reason, even if only for a short period, our financial results could be affected adversely.

Additionally, we rely on information systems across our operations, including the management of processes and transactions. A material disruption to any information systems at our operating locations, or at Sanchez Energy's or another third-party's pipelines, terminals or operating locations, may cause disruptions to our operations.

Cyber-attacks against us or others in our industry could result in additional regulations, and U.S. government warnings have indicated that infrastructure assets, including pipelines, may be specifically targeted by certain groups. These attacks include, without limitation, malicious software, ransomware, attempts to gain unauthorized access to data, and other electronic security breaches. These attacks may be perpetrated by state-sponsored groups, "hacktivists", criminal organizations or private individuals (including employee malfeasance). Current efforts by the federal government and any potential future regulations could lead to increased regulatory compliance costs, insurance coverage cost or capital expenditures. We cannot predict the potential impact to our business or the energy industry resulting from additional regulations.

Further, our business interruption insurance may not compensate us adequately for losses that may occur. We do not carry insurance specifically for cybersecurity events; however, certain of our insurance policies may allow for coverage

Table of Contents

of associated damages resulting from such events. If we were to incur a significant liability for which we were not fully insured, it could have a material adverse effect on our financial position, results or operations and cash flows. In addition, the proceeds of any such insurance may not be paid in a timely manner and may be insufficient if such an event were to occur.

**Risks Related to Our Production Business**

***Market conditions for natural gas, NGLs and oil are highly volatile. A sustained decline in prices for these commodities could adversely affect our revenue, cash flows, profitability and growth.***

Prices for natural gas, NGLs and oil fluctuate widely in response to a variety of factors that are beyond our control, such as:

- domestic and foreign supply of and demand for natural gas, NGLs and oil;
- weather conditions and the occurrence of natural disasters;
- overall domestic and global economic conditions;
- political and economic conditions in countries producing natural gas, NGLs and oil, including terrorist attacks and threats, escalation of military activity in response to such attacks or acts of war;
- actions of the Organization of Petroleum Exporting Countries ("OPEC") and other state-controlled oil companies relating to oil price and production controls;
- the effect of increasing liquefied natural gas and exports from the United States;
- the impact of the U.S. dollar exchange rates on prices for natural gas, NGLs and oil;
- technological advances affecting energy supply and energy consumption;
- domestic and foreign governmental regulations, including regulations prohibiting or restricting our ability to apply hydraulic fracturing to our wells, and taxation;
- the impact of energy conservation efforts and alternative fuel requirements;
- the proximity, capacity, cost and availability of production and transportation facilities for natural gas, NGLs and oil;
- events that impact global market demand, including impacts from global health epidemics and concerns, such as the coronavirus;
- the availability of refining capacity; and
- the price and availability of, and consumer demand for, alternative fuels.

Given that natural gas, NGLs and oil are global commodities, prices can also be significantly influenced by developments in other countries and markets, particularly in key consumption markets like China. For example, the ongoing coronavirus outbreak in China and other locations across the globe has resulted in a meaningful drop in the demand for crude oil and other petroleum products. Ultimately this can lead to a reduction in demand for the services we provide.

Governmental actions may also affect prices for natural gas, NGLs and oil. In the past, prices for natural gas, NGLs and oil have been extremely volatile, and we expect this volatility to continue. NYMEX WTI 12 month strip price for

crude oil was down more than ten percent at the end of fiscal 2019 and the NYMEX Henry Hub 12 month natural gas strip price was down approximately eight percent at the end of fiscal 2019, each when compared with fiscal 2018. Such downward volatility has negatively affected the amount of our net estimated proved reserves and has negatively affected the standardized measure of discounted future net cash flows of our net estimated proved reserves. For the years ended December 31, 2019 and 2018, we did not record impairment on our oil and natural gas properties.

In addition, our revenue, profitability and cash flows depend upon the prices of and demand for natural gas, NGLs and oil, and continued price volatility and low commodity prices, or a sustained drop in prices could negatively affect our financial results and impede our growth. In particular, sustained declines in commodity prices will:

- limit our ability to enter into commodity derivative contracts at attractive prices;
- reduce the value and quantities of our reserves, because declines in prices for natural gas, NGLs and oil would reduce the amount of natural gas, NGLs and oil that we can economically produce;
- reduce the amount of cash flows available for capital expenditures;
- limit our ability to borrow money; and
- make it uneconomical for our operating partners to commence or continue production levels of natural gas, NGLs and oil.

***Drilling for and producing oil and natural gas are costly and high-risk activities with many uncertainties that could adversely affect our business, financial condition, results of operation, operating cash flows and any ability to pay cash distributions.***

Drilling activities are subject to many risks, including the risk that commercially productive reservoirs will not be discovered. Drilling for oil and natural gas can be uneconomic, not only from dry holes, but also from productive wells that do not produce sufficient revenues to be commercially viable. In addition, drilling and producing operations may be curtailed, delayed or cancelled as a result of other factors, including:

- the high cost, shortages or delivery delays of drilling rigs, equipment, labor and other services;
- unexpected operational events and drilling conditions;
- adverse weather conditions;
- facility or equipment malfunctions;
- title problems;
- piping, casing or cement failures;
- compliance with environmental and other governmental requirements;
- unusual or unexpected geological formations;
- loss or damage to oilfield drilling and service tools;
- loss of drilling fluid circulation;
- formations with abnormal pressures;
- environmental hazards, such as natural gas leaks, oil spills, compressor incidents, pipeline ruptures and discharges of toxic gases;

Table of Contents

- water pollution;
- fires;
- accidents or natural disasters;
- blowouts, craterings and explosions;
- uncontrollable flows of oil, natural gas or well fluids;
- loss or theft of data due to cyber-attacks; and
- third party operations.

Any of these events can increase costs or restrict the ability to drill wells and conduct operations. Any delay in the drilling program or significant increase in costs could impact our ability to generate sufficient cash flows to operate our business. Increased costs could include losses from personal injury or loss of life; damage to or destruction or loss of property, natural resources, equipment, and data; pollution; environmental contamination; loss of wells; and regulatory penalties.

***Unless we replace the reserves that we produce, our existing reserves will decline, which could adversely affect our production and adversely affect our cash from operations and our ability to pay distributions to our unitholders.***

Producing oil and natural gas reservoirs are characterized by declining production rates that vary based on the reservoir characteristics and other factors. The rate of decline of our reserves and production included in our reserve report at the end of the most recently completed fiscal year will change if production from our existing wells declines in a different manner than we have estimated and may change when we make acquisitions and under other circumstances. The rate of decline may also be greater than we have estimated due to decreased capital spending or lack of available capital to make capital expenditures. Our future oil and natural gas reserves and production and, therefore, our cash flows and income, are highly dependent on our success in efficiently developing and exploiting our current reserves and economically acquiring additional recoverable reserves, as we do not intend to drill new wells. We may not be able to develop or acquire additional reserves to replace our current and future production at acceptable costs, which could adversely affect our business, financial condition, results of operations and ability to pay distributions to our unitholders.

***Our estimated reserves are based on many assumptions that may prove to be inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our estimated reserves.***

It is not possible to measure underground accumulations of oil and natural gas in an exact way. Oil and natural gas reserve engineering requires subjective estimates of underground accumulations of oil and natural gas and assumptions concerning future oil and natural gas prices, production levels and operating and development costs. Our independent reserve engineers do not independently verify the accuracy and completeness of information and data furnished by us. In estimating our level of oil and natural gas reserves, we and our independent reserve engineers make certain assumptions that may prove to be incorrect, including assumptions relating to:

- future oil and natural gas prices;
- production levels;
- capital expenditures;
- operating and development costs;
- the effects of regulation;
- the accuracy and reliability of the underlying engineering and geologic data; and

- the availability of funds.

If these assumptions prove to be incorrect, our estimates of reserves, the economically recoverable quantities of oil and natural gas attributable to any particular group of properties, the classifications of reserves based on risk or recovery and our estimates of the future net cash flows from our reserves could change significantly.

Our standardized measure is calculated using unhedged oil and natural gas prices and is determined in accordance with the rules and regulations of the SEC (except for the impact of income taxes as we are not a taxable entity). Over time, we may make material changes to reserve estimates to take into account changes in our assumptions and the results of actual drilling and production.

The reserve estimates that we make for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories. A lack of production history may contribute to inaccuracies in our estimates of proved reserves, future production rates and the timing of development expenditures.

***The present value of future net cash flows from our estimated proved reserves is not necessarily the same as the current market value of our estimated oil and natural gas reserves.***

We base the estimated discounted future net cash flows from our estimated proved reserves on prices and costs in effect on the day of the estimate. However, actual future net cash flows from our oil and natural gas properties also will be affected by factors such as:

- the actual prices that are received for oil and natural gas;
- actual operating costs in producing oil and natural gas;
- the amount and timing of actual production;
- the amount and timing of capital expenditures;
- supply of and demand for oil and natural gas; and
- changes in governmental regulations or taxation.

The timing of both production and the incurrence of expenses in connection with the development and production of oil and natural gas properties will affect the timing of actual future net cash flows from proved reserves, and thus, their actual present value. In addition, the 10% discount factor used when calculating our discounted future net cash flows in compliance with the Financial Accounting Standard Board's Accounting Standards may not be the most appropriate discount factor based on interest rates in effect from time to time and risks associated with us or the oil and natural gas industry in general. Any material inaccuracies in these reserve estimates or underlying assumptions could materially affect the quantities and present value of our reserves, which could adversely affect our business, results of operations, financial condition and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Future price declines or downward reserve revisions may result in write-downs of our asset carrying values, which could adversely affect our results of operations and limit our ability to borrow funds.***

Declines in oil and natural gas prices may result in our having to make substantial downward adjustments to our estimated proved reserves. If this occurs, or if our estimates of development costs increase or production data factors change, accounting rules may require us to write-down, as a noncash charge to earnings, the carrying value of our properties for impairments. We capitalize costs to acquire, find and develop our oil and natural gas properties under the successful efforts accounting method. We are required to perform impairment tests on our assets periodically and whenever events or circumstances warrant a review of our assets. To the extent such tests indicate a reduction of the estimated useful life or estimated future cash flows of our assets, the carrying value may not be recoverable and therefore would require a write-down. We have incurred impairment charges in the past and may do so again in the future. Any impairment could be substantial and have a material adverse effect on our results of operations in the period incurred and our ability to

borrow funds under our Credit Agreement, which in turn may adversely affect our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***We depend on certain key customers for sales of our oil and natural gas. To the extent these and other customers reduce the volumes of oil or natural gas they purchase from us and are not replaced by new customers, our revenues and cash available for distribution could decline.***

Our oil and natural gas production in Texas and Louisiana is marketed by the operators of our properties. To the extent these or other customers reduce the volumes of oil and natural gas that they purchase from us and are not replaced by new customers, or the market prices for oil and natural gas decline in our market areas, our revenues and cash available for distribution could decline.

***Seasonal weather conditions may adversely affect our ability to conduct production activities.***

Oil and natural gas operations are often adversely affected by seasonal weather conditions, primarily during periods of severe weather or rainfall, and during periods of extreme cold. Power outages and other damages resulting from tornados, ice storms, flooding and other strong storms or weather events may prevent wells from being operated in an optimal manner. These weather conditions may reduce oil and natural gas production, which could impact or reduce our future operating cash flows.

***Shortages of drilling rigs, supplies, oilfield services, equipment and crews could delay operations and reduce our future operating cash flows and cash available to make future investments or to pay cash distributions.***

Higher oil and natural gas prices generally increase the demand for drilling rigs, supplies, services, equipment and crews, and can lead to shortages of, and increasing costs for, drilling equipment, services and personnel. Shortages of, or increasing costs for, experienced drilling crews and equipment and services could restrict the ability to conduct the operations. Any significant increase in operating costs could reduce our revenues, operating cash flows and cash available to make future investments or to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our oil and natural gas properties may be exposed to unanticipated water disposal or processing costs.***

Where water produced from properties fails to meet the quality requirements of applicable regulatory agencies or wells produce water in excess of the applicable volumetric permit limit, the wells may have to be shut in or upgraded for water handling or treatment. The costs to treat or dispose of this produced water may increase if any of the following occur:

- permits cannot be renewed or obtained from applicable regulatory agencies;
- water of lesser quality or requiring additional treatment is produced;
- the wells produce excess water; or
- new laws and regulations require water to be disposed of or treated in a different manner.

***We may be unable to compete effectively with larger companies in the oil and natural gas industry, which may adversely affect our ability to generate sufficient revenue to allow us to pay cash distributions.***

The oil and natural gas industry is intensely competitive with respect to acquiring productive properties, marketing oil and natural gas and securing equipment and trained personnel, and we compete with other companies that have greater resources. Many of our competitors are major independent oil and natural gas companies and possess and employ financial, technical and personnel resources substantially greater than ours. Those companies may be able to develop and acquire more productive properties than our financial and personnel resources permit. Our ability to acquire additional properties will be dependent on our ability to evaluate, select and finance the acquisition of suitable properties and our ability to consummate transactions in a highly competitive environment. Factors that affect our ability to acquire properties include availability of desirable acquisition targets, staff and resources to identify and evaluate properties and available funds.

Many of our larger competitors not only drill for and produce oil and natural gas, but also carry on refining operations and market petroleum and other products on a regional, national or worldwide basis. These companies may be able to pay more for oil and natural gas properties and evaluate, bid for and purchase a greater number of properties than our financial or human resources permit. In addition, there is substantial competition for investment capital in the oil and natural gas industry. Our inability to compete effectively with other companies could have a material adverse effect on our business activities, financial condition, results of operations and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

**Risks Related to Our Midstream and Production Businesses**

***As a non-operator, our development of successful operations relies extensively on third-parties, including SOG, Sanchez Energy and Targa, which could adversely affect our business, financial condition and results of operations.***

We have only participated in wells, leasehold acreage and midstream assets operated by third parties, including SOG, Sanchez Energy and Targa. The success of our business operations depends on the success of such operators. If our operators are not successful in the development, exploitation, production and operating activities relating to our midstream and production businesses, or are unable or unwilling to perform, it could adversely affect our business, financial condition and results of operations.

The insolvency of an operator of any of our properties or assets, the failure of an operator of any of our properties or assets to adequately perform operations or an operator's breach of applicable agreements could reduce our production and revenue and result in our liability to governmental authorities for compliance with environmental, safety and other regulatory requirements, to the operator's suppliers and vendors and to royalty owners under oil and gas leases jointly owned with the operator or another insolvent owner.

Our operators will make decisions in connection with their operations (subject to their contractual and legal obligations), which may not be in our best interests and could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Financing and Credit Environment**

***Our Credit Agreement has substantial restrictions and financial covenants and requires periodic borrowing base redeterminations.***

We depend on our Credit Agreement (as defined below) for future capital needs. The Credit Agreement restricts our ability to obtain additional financing, make investments, lease equipment, sell assets and engage in business combinations. We are also required to comply with certain financial covenants and ratios. Our ability to comply with these restrictions and covenants in the future is uncertain and will be affected by the levels of cash flows from our operations and events or circumstances beyond our control, including events and circumstances that may stem from the condition of financial markets and commodity price levels. Our failure to comply with any of the restrictions and covenants under the Credit Agreement could result in an event of default, which could cause all of our existing indebtedness to become immediately due and payable. Each of the following is also an event of default:

- failure to pay any principal when due or any interest, fees or other amount prior to the expiration of certain grace periods;
- a representation or warranty made under the loan documents or in any report or other instrument furnished thereunder is incorrect when made;
- failure to perform or otherwise comply with the covenants in the Credit Agreement or other loan documents, subject, in certain instances, to certain grace periods;
- any event that permits or causes the acceleration of the indebtedness;
- bankruptcy or insolvency events involving us or our subsidiaries;

- certain changes in control as specified in the covenants to the Credit Agreement;
- the entry of, and failure to pay, one or more adverse judgments in excess of $2.5 million or one or more non-monetary judgments that could reasonably be expected to have a material adverse effect and for which enforcement proceedings are brought or that are not stayed pending appeal; and
- specified events relating to our employee benefit plans that could reasonably be expected to result in liabilities in excess of $2.5 million in any year.

The Credit Agreement will mature on September 30, 2021. We may not be able to renew or replace the facility at similar borrowing costs, terms, covenants, restrictions or borrowing base, or with similar debt issue costs.

The amount available for borrowing at any one time under the Credit Agreement is limited to the separate borrowing bases associated with our oil and natural gas properties and our midstream assets. The borrowing base for the credit available for the upstream oil and natural gas properties is re-determined semi-annually in the second and fourth quarters of the year, and may be re-determined at our request more frequently and by the lenders, in their sole discretion, based on reserve reports as prepared by petroleum engineers, using, among other things, the oil and natural gas pricing prevailing at such time. The borrowing base for the credit available for our midstream properties is equal to the rolling four quarter EBITDA of our midstream operations multiplied by 4.5. Outstanding borrowings in excess of our borrowing base must be repaid or we must pledge other oil and natural gas properties as additional collateral. We may elect to pay any borrowing base deficiency in three equal monthly installments such that the deficiency is eliminated in a period of three months. Any increase in our borrowing base must be approved by all of the lenders.

Our Credit Agreement contains a condition to borrowing and a representation that no material adverse effect has occurred, which includes, among other things, a material adverse change in, or material adverse effect on the business, operations, property, liabilities (actual or contingent) or condition (financial or otherwise) of us and our subsidiaries who are guarantors taken as a whole. If a material adverse effect were to occur, we would be prohibited from borrowing under the Credit Agreement and we would be in default under the Credit Agreement, which could cause all of our existing indebtedness to become immediately due and payable.

***We may not be able to extend, replace or refinance our Credit Agreement on terms reasonably acceptable to us, or at all, which could materially and adversely affect our business, liquidity, cash flows and prospects.***

Our Credit Agreement matures on September 30, 2021. We may not be able to extend, replace or refinance our existing Credit Agreement on terms reasonably acceptable to us, or at all, with our existing syndicate of banks or with replacement banks. In addition, we may not be able to access other external financial resources sufficient to enable us to repay the debt outstanding under our Credit Agreement upon its maturity. Any of the foregoing could materially and adversely affect our business, liquidity, cash flows and prospects.

***Changes in LIBOR reporting practices or the method in which LIBOR is determined may adversely affect the market value of our current or future debt obligations, including obligations under our Credit Agreement.***

As of March 13, 2020, we had approximately $144.0 million of debt outstanding under our Credit Agreement that bears interest at variable rates that use the London Interbank Offered Rate (“LIBOR”), as a benchmark rate. On July 27, 2017, the Financial Conduct Authority (the “FCA”), which regulates LIBOR, announced that it intends to stop persuading or compelling banks to submit LIBOR quotations after 2021. It is unclear whether LIBOR will cease to exist or if new methods of calculating LIBOR will be established such that it continues to exist after 2021, or whether any alternative benchmark rate will attain market acceptance as a replacement for LIBOR. It is not possible to predict the further effect of the rules of the FCA, any changes in the methods by which LIBOR is determined or any other reforms to LIBOR that may be enacted in the United Kingdom, the European Union or elsewhere. Any such developments may cause LIBOR to perform differently than in the past, or cease to exist. In addition, any other legal or regulatory changes made by the FCA, the European Commission or any other successor governance or oversight body, or future changes adopted by such body, in the method by which LIBOR is determined or the change from LIBOR to an alternative benchmark rate may result in, among other things, a sudden or prolonged increase or decrease in LIBOR, a delay in the publication of LIBOR, and changes in the rules or methodologies in LIBOR, which may discourage market participants from continuing to administer

or to participate in LIBOR's determination, and, in certain situations, could result in LIBOR no longer being determined and published.

Under our Credit Agreement, if (a) the administrative agent determines that reasonable means do not exist for ascertaining LIBOR and such circumstances are unlikely to be temporary, (b) the supervisor for the administrator of LIBOR or another governmental authority having jurisdiction over the administrative agent has made a public statement identifying a date after which LIBOR shall no longer be used, or (c) new syndicated loans have started to adopt a new benchmark interest rate, then we will be required to negotiate an amendment to our Credit Agreement with the administrative agent. The use of the alternative benchmark interest rate under any such amendment may result in interest obligations which are more than or do not otherwise correlate over time with the payments that would have been made on such debt if LIBOR was available in its current form. Further, the same costs and risks that may lead to the discontinuation or unavailability of LIBOR may make one or more of the alternative methods impossible or impracticable to determine. At this time, it is not possible to predict the effect of any establishment of any alternative benchmark rate(s) and we cannot predict what alternative benchmark rate(s) will be utilized. Any new benchmark rate will likely not replicate LIBOR exactly, and any changes to benchmark rates may have an uncertain impact on our cost of funds under our Credit Agreement. Any of these proposals or consequences could have a material adverse effect on our financing costs.

***We will be required to make substantial capital expenditures to increase our asset base. If we are unable to obtain needed capital or financing on satisfactory terms, our ability to pay cash distributions may be diminished or our financial leverage could increase.***

In order to increase our asset base, we will need to make expansion capital expenditures. If we do not make sufficient or effective expansion capital expenditures, we will be unable to expand our business operations which may diminish our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units. To fund our expansion capital expenditures and investment capital expenditures, we will be required to use cash from our operations or incur borrowings. Such uses of cash from our operations will reduce cash available for distribution. Alternatively, we may sell additional common units or other securities to fund our capital expenditures. Our ability to obtain bank financing or our ability to access the capital markets for future equity or debt offerings may be limited by our or Sanchez Energy's financial condition at the time of any such financing or offering and the covenants in our existing debt agreements, as well as by general economic conditions, contingencies and uncertainties that are beyond our control. Even if we are successful in obtaining the necessary funds, the terms of such financings could implement restrictions or limitations on our ability to pay cash distributions. For example, our Credit Agreement currently prohibits us from making distributions to our common unitholders. In addition, incurring additional debt may significantly increase our interest expense and financial leverage, and issuing additional limited partner interests may result in significant unitholder dilution and would increase the aggregate amount of cash required to make or maintain cash distributions to our unitholders in the future, if any, which could materially decrease our ability to pay cash distributions. None of our general partner, Sanchez Energy or any of their respective affiliates is committed to providing any direct or indirect support to fund our growth.

***Our Credit Agreement restricts us from paying any distributions on our outstanding common units.***

We do not have the ability to pay distributions to our common unitholders under our Credit Agreement other than in certain limited circumstances set forth in the Credit Agreement. We have obtained waivers of Credit Agreement limitations in the past and may need to do so in the future.

***Our ability to access the capital and credit markets to raise capital and borrow on favorable terms will be affected by disruptions in the capital and credit markets, which could adversely affect our operations, our ability to make acquisitions and our ability to pay cash distributions.***

Disruptions in the capital and credit markets could limit our ability to access these markets or significantly increase our cost to borrow. Some lenders may increase interest rates, enact tighter lending standards, refuse to refinance existing debt at maturity on favorable terms or at all and may reduce or cease to provide funding to borrowers. If we are unable to access the capital markets on favorable terms, our ability to make acquisitions and pay cash distributions could be affected.

Table of Contents

***We are exposed to credit risk in the ordinary course of our business activities.***

We are exposed to risks of loss in the event of nonperformance by our customers, vendors, lenders in our Credit Agreement and counterparties to our hedging arrangements. Some of our customers, vendors, lenders and counterparties may be highly leveraged and subject to their own operating and regulatory risks. For example, our largest customer, Sanchez Energy Corporation, who accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectfully, along with certain of its subsidiaries filed the Sanchez Energy Chapter 11 Case in August of 2019. Despite our credit review and analysis, we may experience financial losses in our dealings with these and other parties with whom we enter into transactions as a normal part of our business activities. Any nonpayment or nonperformance by our customers, vendors, lenders or counterparties could have a material adverse impact on our business, financial condition, results of operations or ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our future debt levels may limit our flexibility to obtain additional financing and pursue other business opportunities.***

We may incur substantial additional indebtedness in the future under our Credit Agreement or otherwise. Our future indebtedness could have important consequences to us, including:

- our ability to obtain additional financing, if necessary, for working capital, maintenance and investment capital expenditures, acquisitions or other purposes may be impaired or such financing may not be available on favorable terms;
- covenants and financial tests contained in our existing and future credit and debt instruments may affect our flexibility in planning for and reacting to changes in our business, including possible acquisition opportunities;
- increased cash flows required to make principal and interest payments on our indebtedness could reduce the funds that would otherwise be available to fund operations, capital expenditures, future business development or any cash distributions; and
- our debt level may make us more vulnerable than our competitors with less debt to competitive pressures or a downturn in our business or the economy generally.

Our ability to service our debt will depend upon, among other things, our future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond our control. If our operating results are not sufficient to service our current or future debt, we will be forced to take actions such as reducing or delaying business activities, acquisitions, investments and/or capital expenditures, selling assets, restructuring or refinancing our indebtedness, or seeking additional equity capital or bankruptcy protection. We may not be able to affect any of these remedies on satisfactory terms or at all.

***Periods of inflation or stagflation, or expectations of inflation or stagflation, could increase our costs and adversely affect our business and operating results.***

During periods of inflation or stagflation, our costs of doing business could increase, including increases in the variable interest rates that we pay on amounts we borrow under our Credit Agreement. As we have hedged a large percentage of our expected production volumes for 2020, the cash flows generated by that future hedged production will be capped. If any of our operating, administrative or capital costs were to increase as a result of inflation or increase in the cost of goods and services, such a cap could have a material adverse effect on our business, financial condition, results of operations, and ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***An increase in interest rates may cause the market price of our common units to decline and may increase our borrowing costs.***

Like all equity investments, an investment in our common units is subject to certain risks. In exchange for accepting these risks, investors may expect to receive a higher rate of return than would otherwise be obtainable from lower-risk investments. Accordingly, as interest rates rise, the ability of investors to obtain higher risk-adjusted rates of return by purchasing government-backed debt or other interest-bearing securities may cause a corresponding decline in demand for

riskier investments generally, including equity investments such as publicly-traded limited partnership interests. Reduced demand for our common units resulting from investors seeking other more favorable investment opportunities may cause the trading price of our common units to decline.

Higher interest rates may also increase the borrowing costs associated with our Credit Agreement. If our borrowing costs were to increase, our interest payments on our debt may increase, which would reduce the amount of cash available for our operating or capital activities or for any cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

**Risks Related to Our Cash Distributions**

***Our partnership agreement prohibits us from making certain distributions until all of the Class C Preferred Units are redeemed and, as a result, our ability to make, maintain and grow cash distributions is dependent on our ability to redeem the Class C Preferred Units.***

Under the terms of our partnership agreement, until the first quarter in which no Class C Preferred Units remain outstanding, we are not permitted to declare or make any distributions, redemptions or repurchases in respect of, among other partnership interests, our common units. Beginning January 1, 2021, our partnership agreement provides us with the ability to redeem the Class C Preferred Units without a premium to the liquidation preference of the Class C Preferred Units. If we are unable to access the capital markets on favorable terms or otherwise secure debt or equity financing to redeem the Class C Preferred Units, our ability to redeem the Class C Preferred Units and then to make, maintain and grow cash distributions to unitholders will be materially adversely affected.

***Our Credit Agreement restricts us from paying any distributions on our outstanding common units.***

We do not have the ability to pay distributions to our common unitholders under our Credit Agreement other than in certain limited circumstances set forth in the Credit Agreement.

***If we do not complete expansion projects or make and integrate acquisitions, our future growth may be limited.***

Our ability to enhance our financial position depends, in part, on our ability to complete expansion projects and make acquisitions that result in an increase in cash generated. We may be unable to complete successful, accretive expansion projects or acquisitions for any of the following reasons:

- an inability to identify attractive expansion projects or acquisition candidates or we are outbid by competitors;
- an inability to obtain necessary rights-of-way or governmental approvals, including from regulatory agencies;
- an inability to successfully integrate the businesses that we develop or acquire;
- an inability to obtain financing for such expansion projects or acquisitions on economically acceptable terms, or at all;
- incorrect assumptions about volumes, reserves, revenues and costs, including synergies and potential growth; or
- an inability to secure adequate customer commitments to use the newly developed or acquired facilities.

***We may not have sufficient available cash from operations to pay our quarterly cash distributions to Stonepeak Catarina following the establishment of cash reserves and the payment of fees and expenses.***

The amount of available cash from which we may pay distributions is defined in both our Credit Agreement and our partnership agreement. The amount of available cash that we distribute is subject to the definition of operating surplus in our partnership agreement and principally depends upon the amount of cash that we generate from our operations, which

will fluctuate from quarter to quarter based on numerous factors described in this Form 10-K, including this Item 1A."Risk Factors." These and other factors that affect that amount that we can distribute include:

- the amount of revenue generated from our midstream facilities;
- the amount of oil, natural gas and water that we produce;
- the demand for and the price at which we are able to sell our oil and natural gas production;
- the results of our hedging activity;
- the level of our operating costs;
- the costs that we incur to acquire midstream assets and oil and natural gas properties;
- whether we are able to continue our development activities at economically attractive costs;
- the borrowing base under our Credit Agreement as determined by our lenders;
- the amount of our indebtedness outstanding;
- the level of our interest expense, which depends on the amount of our indebtedness and the interest payable thereon;
- the amount of working capital required to operate our business and our ability to make working capital borrowings under our Credit Agreement;
- fluctuations in our working capital needs;
- the amount of cash reserves established by the Board for the proper conduct of our business; and
- the level of our maintenance capital expenditures.

As a result of these factors, we may not have sufficient available cash to pay a quarterly cash distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units. The amount of available cash that we could distribute from our operating surplus in any quarter to our unitholders may fluctuate significantly from quarter to quarter.

***The amount of cash that we may have available for distribution depends primarily upon our operating cash flows and not solely on our profitability.***

The amount of cash that we have available for distribution depends primarily upon our operating cash flows, including cash from reserves and working capital (which may include short-term borrowings), and not solely on our profitability, which is affected by non-cash items. As a result, we may be unable to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units even when we record net income, and we may pay cash distributions during periods when we incur net losses.

***Oil and natural gas prices are very volatile. If commodity prices decline significantly for a temporary or prolonged period, our cash from operations may decline and may adversely impact our ability to invest in new midstream facilities, our financial condition and our profitability.***

Our revenue, profitability and operating cash flows depend in part upon the prices and demand for oil and natural gas, and a drop in prices can significantly affect our financial results and impede our growth. Changes in oil and natural gas prices have a significant impact on the value of our reserves and on our operating cash flows and may also impact the fees generated by us from our midstream facilities. In particular, declines in commodity prices will directly reduce the value of our reserves, our operating cash flows, our ability to borrow money or raise capital and our ability to pay cash distributions and may indirectly reduce the cash flows from our midstream facilities. Prices for oil and natural gas may

fluctuate widely in response to relatively minor changes in the supply of and demand for oil and natural gas, market uncertainty and a variety of additional factors that are beyond our control, such as:

- the domestic and foreign supply of and demand for oil and natural gas;
- the price and level of foreign imports of oil and natural gas;
- the level of consumer product demand;
- weather conditions;
- overall domestic and global economic conditions;
- political and economic conditions in oil and natural gas producing countries, including those in West Africa, the Middle East and South America;
- the ability of members of OPEC to agree to and maintain oil price and production controls;
- the impact of U.S. dollar exchange rates on oil and natural gas prices;
- technological advances affecting energy consumption;
- domestic and foreign governmental regulations and taxation;
- the impact of energy conservation efforts;
- the costs, proximity and capacity of oil and natural gas pipelines and other transportation facilities;
- the price and availability of alternative fuels; and
- the increase in the supply of natural gas due to the development of natural gas.

In the past, the prices of oil and natural gas have been extremely volatile, and we expect this volatility to continue.

***Our operations require capital expenditures, which will reduce the amount of cash that we may have available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units.***

We will need to make capital expenditures to maintain our facilities and infrastructure over the long-term. These expenditures could increase as a result of, among others:

- changes in labor and material costs;
- changes in leasehold and right-of-way costs; and
- government regulations relating to safety, taxation and the environment.

Our capital expenditures will vary from quarter to quarter and will reduce the amount of cash that we may have available for distribution to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Each quarter we are required to deduct estimated maintenance capital expenditures from operating surplus, which may result in less cash available for distribution than if actual maintenance capital expenditures were deducted.***

Our partnership agreement requires us to deduct estimated, rather than actual, maintenance capital expenditures from operating surplus. The amount of estimated maintenance capital expenditures deducted from operating surplus will be subject to review and potential change by the Board at least once a year. In years when our estimated maintenance capital expenditures are higher than actual maintenance capital expenditures, the amount of cash available for distribution will be

Table of Contents

lower than if actual maintenance capital expenditures were deducted from operating surplus. If we underestimate the appropriate level of estimated maintenance capital expenditures, we may have less cash available for distribution in future periods when actual capital expenditures begin to exceed our previous estimates. If we do not set aside sufficient cash reserves or have available sufficient sources of financing and make sufficient expenditures to maintain our asset base, we will be unable to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Our hedging activities could result in financial losses and involve other risks, which may adversely affect our ability to pay cash distributions.***

To achieve more predictable cash flows and to reduce our exposure to adverse fluctuations in the prices of oil and natural gas, our current practice is to hedge, subject to the terms of our Credit Agreement, a significant portion of our expected production volumes for 2020. As a result, we will continue to have direct commodity price exposure on the unhedged portion of our production volumes. The extent of our commodity price exposure is related largely to the effectiveness and scope of our hedging activities. For example, the derivative instruments that we utilize are generally based on posted market prices, which may differ significantly from the actual oil and natural gas prices that we realize in our operations.

Our actual future production may be significantly higher or lower than we estimated at the time we entered into hedging transactions for such period. If the actual amount is higher than we estimate, we will have greater commodity price exposure than we intended. If the actual amount is lower than the nominal amount that is subject to our derivative financial instruments, we might be forced to satisfy all or a portion of our derivative transactions without the benefit of the cash flows from our sale or purchase of the underlying physical commodity, which may result in a substantial diminution of our liquidity. As a result of these factors, our hedging activities may not be as effective as we intend in reducing the volatility of our cash flows, and in certain circumstances may actually increase the volatility of our cash flows. In addition, our hedging activities are subject to the following risks:

- a counterparty may not perform its obligation under the applicable derivative instrument;
- there may be a change in the expected differential between the underlying commodity price in the derivative instrument and the actual price received; and
- the steps that we take to monitor our derivative financial instruments may not detect and prevent violations of our risk management policies and procedures.

As a result of the Dodd-Frank Wall Street Reform and Consumer Protection Act and other legislation, hedging transactions and many of our contract counterparties have come under increasing governmental oversight and regulations in recent years. Although we cannot predict the ultimate impact of these laws or other proposed laws and the related rulemaking, some of which is ongoing, existing or future regulations may adversely affect the cost and availability of our hedging arrangements, including by causing our counterparties, which include lenders under our Credit Agreement, to curtail or cease their derivative activities.

***Acquisitions involve potential risks that could adversely impact our future growth and our ability to pay cash distributions.***

Any acquisition involves potential risks, including, among other things:

- the risk of title defects discovered after closing;
- inaccurate assumptions about revenues and costs, including synergies;
- significant increases in our indebtedness and working capital requirements;
- an inability to transition and integrate successfully or timely the businesses we acquire;

- the cost of transition and integration of data systems and processes;
- potential environmental problems and costs;
- the assumptions of unknown liabilities;
- limitations on rights to indemnity from the seller;
- the diversion of management's attention from other business concerns;
- increased demands on existing personnel and on our organizational structure;
- disputes arising out of acquisitions;
- customer or key employee losses of the acquired businesses; and
- the failure to realize expected growth or profitability.

The scope and cost of these risks may ultimately be materially greater than estimated at the time of the acquisition. Furthermore, our future acquisition costs may be higher than those we have achieved historically. Any of these factors could adversely impact our future growth and our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units.

***Inadequate insurance could have a material adverse impact on our business, financial condition and results of operations.***

We ordinarily maintain insurance against certain losses and liabilities arising from our operations; however, insurance against all operational risks is not available to us. In addition, we may elect not to obtain insurance if we believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could therefore occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. The occurrence of an event that is not fully covered by insurance could have a material adverse impact on our business, financial condition and results of operations.

**Risks Related to Regulatory Compliance**

***Potential regulatory actions could increase our operating or capital costs and delay our operations or otherwise alter the way we conduct our business.***

Our business activities are subject to extensive federal, state, and local regulations. Changes to existing regulations or new regulations may unfavorably impact us, our suppliers or our customers. In the United States, legislation that directly impacts the oil and natural gas industry has been proposed covering areas such as emission reporting and reductions, hydraulic fracturing of wells, the repeal of certain oil and natural gas tax incentives and tax deductions and the treatment and disposal of produced water. The EPA has also ruled that carbon dioxide, methane and other greenhouse gases endanger human health and the environment. This allows the EPA to adopt and implement regulations restricting greenhouse gases under existing provisions of the federal Clean Air Act. In addition, provisions of the Dodd-Frank Act, which regulate financial derivatives, may impact our ability to enter into derivatives or require burdensome collateral or reporting requirements. These and other potential regulations could increase our costs, reduce our liquidity, impact our ability to hedge our future oil and natural gas sales, delay our operations or otherwise alter the way that we conduct our business, negatively impacting our financial condition, results of operations and cash flows.

We are subject to federal, state, and local laws and regulations as interpreted and enforced by governmental authorities possessing jurisdiction over various aspects of the production and transportation of oil and natural gas. The possibility exists that any new laws, regulations or enforcement policies could be more stringent than existing laws and could significantly increase our compliance costs. If we are not able to recover the resulting costs from insurance or through increased revenues, our ability to pay cash distributions to Stonepeak Catarina as the holder of all of our Class C Preferred Units could be adversely affected.

***Our failure to obtain or maintain necessary permits could adversely affect our operations.***

Our operations are subject to complex and stringent laws and regulations. In order to conduct our operations in compliance with these laws and regulations, we must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities. Failure or delay in obtaining regulatory approvals or leases could have a material adverse effect on our ability to develop our properties. In addition, regulations regarding conservation practices and the protection of correlative rights affect our operations by limiting the quantity of oil and natural gas we may produce and sell.

***Increased regulation of hydraulic fracturing could result in reductions or delays in the production of natural gas, NGLs and oil by Sanchez Energy, which could reduce the throughput on our facilities and adversely impact our revenues.***

A substantial portion of Sanchez Energy's production of natural gas, NGLs and oil is being developed from unconventional sources, such as shale formations. These reservoirs require hydraulic fracturing completion processes to release the liquids and natural gas from the rock so it can flow through casing to the surface. Hydraulic fracturing is a well stimulation process that utilizes large volumes of water and sand (or other proppant) combined with fracturing chemical additives that are pumped at high pressure to crack open previously impenetrable rock to release hydrocarbons. Hydraulic fracturing is typically regulated by state oil and gas commissions and similar agencies. Various studies are currently underway by the EPA and other federal and state agencies concerning the potential environmental impacts of hydraulic fracturing activities. For example, the EPA issued an advanced notice of proposed rulemaking under the Toxic Substances Control Act in 2014 requesting comments related to disclosures for hydraulic fracturing chemicals. At the same time, certain environmental groups have suggested that additional laws may be needed to more closely and uniformly regulate the hydraulic fracturing process, and legislation has been proposed by some members of the U.S. Congress to provide for such regulation. We cannot predict whether any such legislation will ever be enacted and if so, what its provisions would be. If additional levels of regulation and permits were required through the adoption of new laws and regulations at the federal or state level, that could lead to delays and process prohibitions that could reduce the volumes of liquids and natural gas that move through our facilities, which in turn could materially adversely affect our revenues and results of operations.

***We may incur significant liability under, or costs and expenditures to comply with, environmental and worker health and safety regulations, which are complex and subject to frequent change.***

As an owner, lessee or operator of gathering pipelines and compressor stations, we are subject to various stringent federal, state and local laws and regulations relating to the discharge of materials into, and protection of, the environment. Numerous governmental authorities, such as the EPA and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, oftentimes requiring difficult and costly response actions. These laws and regulations may impose numerous obligations that are applicable to our and our customer's operations, including the acquisition of permits to conduct regulated activities, the incurrence of capital or operating expenditures to limit or prevent releases of materials from our or our customers' operations, the imposition of specific standards addressing worker protection, and the imposition of substantial liabilities and remedial obligations for pollution or contamination resulting from our and our customer's operations. Failure to comply with these laws, regulations and permits may result in joint and several, strict liability and the assessment of administrative, civil and criminal penalties, the imposition of remedial obligations, and the issuance of injunctions limiting or preventing some or all of our operations. Private parties, including the owners of the properties through which our facilities pass and facilities where wastes resulting from our operations are taken for reclamation or disposal, may also have the right to pursue legal actions to enforce compliance, as well as to seek damages for non-compliance, with environmental laws and regulations or for personal injury or property damage. We may not be able to recover all or any of these costs from insurance, the operators of our facilities and properties or other third parties. In addition, we may experience a delay in obtaining or be unable to obtain required permits, which may interrupt our operations and limit our growth and revenues, which in turn could affect our profitability. There is no assurance that changes in or additions to public policy regarding the protection of the environment will not have a significant impact on our operations and profitability.

The operation of our facilities also poses risks of environmental liability due to leakage, migration, releases or spills from our facilities to surface or subsurface soils, surface water or groundwater. Certain environmental laws impose strict as well as joint and several liability for costs required to remediate and restore sites where hazardous substances,

hydrocarbons, or solid wastes have been stored or released. We may be required to remediate contaminated properties currently or formerly operated by us or facilities of third parties that received waste generated by our operations regardless of whether such contamination resulted from the conduct of others or from consequences of our own actions that were in compliance with all applicable laws at the time those actions were taken. In addition, claims for damages to persons or property, including natural resources, may result from the environmental, health and safety impacts of our operations. Moreover, public interest in the protection of the environment has increased dramatically in recent years. The trend of more expansive and stringent environmental legislation and regulations applied to the oil and natural gas industry could continue, resulting in increased costs of doing business and consequently affecting profitability.

***We may incur significant costs and liabilities as a result of pipeline integrity management program testing and any related pipeline repair or preventative or remedial measures.***

The DOT has adopted regulations requiring pipeline operators to develop integrity management programs for transportation pipelines located where a leak or rupture could do the most harm in HCAs. The regulations require operators to:

- perform ongoing assessments of pipeline integrity;
- identify and characterize applicable threats to pipeline segments that could impact a high consequence area;
- improve data collection, integration and analysis;
- repair and remediate the pipeline as necessary; and
- implement preventive and mitigating actions.

The 2011 Pipeline Safety Act, among other things, increases the maximum civil penalty for pipeline safety violations and directs the Secretary of Transportation to promulgate rules or standards relating to expanded integrity management requirements, automatic or remote-controlled valve use, excess flow valve use, leak detection system installation and testing to confirm the material strength of pipe operating above 30% of specified minimum yield strength in high consequence areas. Should our facilities fail to comply with DOT or comparable state regulations, we could be subject to substantial penalties and fines.

PHMSA has also published advanced notices of proposed rulemaking and notices of proposed rulemaking to solicit comments on the need for changes to its safety regulations as well as advisory bulletins. In April 2016, PHMSA issued a notice of proposed rulemaking that would expand integrity management requirements and impose new pressure requirements on currently regulated gas transmission pipelines and would also significantly expand the regulation of gas gathering lines, subjecting previously unregulated pipelines to requirements regarding damage prevention, corrosion control, public education programs, maximum allowable operating pressure limits and other requirements. In addition, in 2012, PHMSA issued an advisory bulletin providing guidance on the verification of records related to pipeline maximum allowable operating pressure, which could result in additional requirements for the pressure testing of pipelines or the reduction of maximum operating pressures. The adoption of these and other laws or regulations that apply more comprehensive or stringent safety standards could require us to install new or modified safety controls, pursue new capital projects, or conduct maintenance programs on an accelerated basis, all of which could require us to incur increased operational costs that could be significant. While we cannot predict the outcome of legislative or regulatory initiatives, such legislative and regulatory changes could have a material effect on our cash flows. Please read "Item 1. Business—Governmental Regulation—Pipeline Safety Regulation" for more information.

***Because we handle oil, natural gas and other petroleum products in our business, we may incur significant costs and liabilities in the future resulting from a failure to comply with new or existing environmental regulations.***

The operations of our wells, gathering systems, processing facilities, pipelines and other facilities are subject to stringent and complex federal, state and local environmental laws and regulations. Failure to comply with these laws and regulations may trigger a variety of administrative, civil and criminal enforcement measures, including the assessment of monetary penalties, the imposition of remedial requirements and the issuance of orders enjoining future operations. There

is an inherent risk that we may incur environmental costs and liabilities due to the nature of our business and the substances we handle. Certain environmental statues, including RCRA, CERCLA and analogous state laws and regulations, impose strict, joint and several liability for costs required to clean up and restore sites where hazardous substances have been disposed of or otherwise released. In addition, an accidental release from one of our facilities could subject us to substantial liabilities arising from environmental cleanup and restoration costs, claims made by neighboring landowners and other third parties for personal injury and property damage and fines or penalties for related violations of environmental laws or regulations.

Moreover, the possibility exists that stricter laws, regulations or enforcement policies could significantly increase our compliance costs and the cost of any remediation that may become necessary, and these costs may not be recoverable from insurance.

**Risks Inherent in an Investment in Our Common Units**

***Our general partner and its affiliates will have conflicts of interest with us. They will not owe any fiduciary duties to us or our common unitholders, but instead will owe us and our common unitholders limited contractual duties, and they may favor their own interests to the detriment of us and our other common unitholders.***

Manager, an affiliate of SOG, owns and controls our general partner and appoints all but two of the directors of our general partner. Although our general partner has a duty to manage us in a manner that is not adverse to us and our unitholders, the directors and officers of our general partner have a fiduciary duty to manage our general partner in a manner that is beneficial to Manager and its affiliates. Conflicts of interest will arise between SOG, Manager and their affiliates, including our general partner, on the one hand, and us and our unitholders, on the other hand. In resolving these conflicts of interest, our general partner may favor its own interests and the interests of Manager and its affiliates over our interests and the interests of our unitholders. These conflicts include the following situations, among others:

- Neither our partnership agreement nor any other agreement requires Manager and its affiliates to pursue a business strategy that favors us or utilizes our assets. The directors and officers of Manager and its affiliates have a fiduciary duty to make these decisions in the best interests of the members of Manager and its affiliates, which may be contrary to our interests. Manager and its affiliates may choose to shift the focus of its investment and growth to areas not served by our assets.

- Our general partner is allowed to take into account the interests of parties other than us, such as SOG, Manager and their affiliates, in resolving conflicts of interest.

- Manager and its affiliates may be constrained by the terms of their respective debt instruments from taking actions, or refraining from taking actions, that may be in our best interests.

- Our partnership agreement replaces the fiduciary duties that would otherwise be owed by our general partner with contractual standards governing its duties, limit our general partner's liabilities and restrict the remedies available to our unitholders for actions that, without such limitations, might constitute breaches of fiduciary duty.

- Except in limited circumstances, our general partner has the power and authority to conduct our business without unitholder approval.

- Disputes may arise under our commercial agreements with Manager, SOG and their affiliates.

- Our general partner determines the amount and timing of asset purchases and sales, borrowings, issuances of additional partnership units and the creation, reduction or increase of cash reserves, each of which can affect the amount of cash available for distribution.

- Our general partner determines the amount and timing of any capital expenditures and whether a capital expenditure is classified as a maintenance capital expenditure, which will reduce operating surplus, or an

expansion or investment capital expenditure, which will not reduce operating surplus. This determination can affect the amount of cash that is distributed.

- Our general partner determines which costs incurred by it are reimbursable by us, the amount of which is not limited by our partnership agreement.
- Our general partner may cause us to borrow funds in order to permit the payment of cash distributions, even if the purpose or effect of the borrowing is to make incentive distributions.
- Our partnership agreement permits us to classify up to $20.0 million as operating surplus, even if it is generated from asset sales, non-working capital borrowings or other sources that would otherwise constitute capital surplus. This cash may be used to fund distributions to Manager as the holder of the incentive distribution rights.
- Our partnership agreement does not restrict our general partner from causing us to pay it or its affiliates for any services rendered to us or entering into additional contractual arrangements with any of these entities on our behalf.
- Our general partner intends to limit its liability regarding our contractual and other obligations.
- Our general partner and its controlled affiliates may exercise their right to call and purchase all of the common units not owned by them if they own more than 80% of our common units.
- Our general partner controls the enforcement of the obligations that it and its affiliates owe to us, including the obligations of SOG and its affiliates under their commercial agreements with us.
- Our general partner decides whether to retain separate counsel, accountants or others to perform services for us.
- Our general partner may elect to cause us to issue common units to Manager in connection with a resetting of the target distribution levels related to our incentive distribution rights without the approval of the Conflicts Committee or our unitholders. This election may result in lower distributions to our common unitholders in certain situations.

***Our general partner has a limited call right that may require unitholders to sell their common units at an undesirable time or price.***

If at any time our general partner and its controlled affiliates hold more than 80% of any class of outstanding limited partner interests, then our general partner will have the right, which it may assign or transfer in whole or in part to any of its controlled affiliates or to us, but not the obligation to acquire all, but not less than all, of such class of limited partner interests held by unaffiliated persons at a price equal to the greater of (1) the average of the daily closing price of our common units over the 20 trading days preceding the date three days before notice of exercise of the limited call right is first mailed and (2) the highest per-unit price paid by our general partner or any of its controlled affiliates for common units during the 90-day period preceding the date such notice is first mailed. As a result, unitholders may be required to sell their common units at an undesirable time or price and may not receive any return or a negative return on their investment. Unitholders may also incur tax liability upon a sale of their units. Our general partner is not obligated to obtain a fairness opinion regarding the value of the common units to be repurchased by it upon exercise of the limited call right. There is no restriction in our partnership agreement that prevents our general partner from causing us to issue additional common units and then exercising its limited call right.

If our general partner exercised its limited call right, the effect would be to take us private and, if the units were subsequently deregistered, we would no longer be subject to the reporting requirements of the Exchange Act.

Table of Contents

***The standstill in the Board Representation and Standstill Agreement among us, our general partner and Stonepeak Catarina will expire upon the earlier of the occurrence of a material breach of our partnership agreement and the date of which all Class C Preferred Units have been redeemed.***

In connection with our August 2019 issuance of Class C Preferred Units to Stonepeak Catarina, an affiliate of Stonepeak Infrastructure Partners ("Stonepeak"), we entered into that certain Amended and Restated Board Representation and Standstill Agreement (the "Representation and Standstill Agreement"), among us, our general partner and Stonepeak Catarina. The Representation and Standstill Agreement includes a standstill provision pursuant to which Stonepeak Catarina, as the holder of all of our outstanding Class C Preferred Units, agreed that it and its affiliates would refrain from, among other things: (i) acquiring beneficial ownership of additional common units, Class C Preferred Units or other Partnership Interests (as defined in our partnership agreement); (ii) acquiring any debt or assets us or of our subsidiaries; (iii) engaging in any hostile takeover activities with respect to us or our general partner, including any merger, consolidation, recapitalization, business combination, partnership, joint venture, acquisition or similar transaction involving us or our general partner or any of our respective affiliates or properties (excluding Sanchez Energy and its properties); (iv) entering into any transaction the effect of which would be to "short" any of our securities; (v) forming, jointing or participating in any "group" (within the meaning of Section 13(d) of the Exchange Act) with respect to any voting securities of us or our affiliates in respect of any action otherwise prohibited pursuant to the standstill; (vi) calling (or participation in the calling of) a meeting of our partner for the purpose of removing (or approving the removal of) of Sanchez Midstream Partners GP LLC as our general partner and/or electing a successor general partner; (vii) "soliciting" any "proxies" (as such terms are used in the rules and regulation of the SEC) or voting for or in support of (A) the removal of Sanchez Midstream Partners GP LLC as our general partner or (B) the election of any successor general partner, or taking any action the direct effect or purpose of which would be to induce our partners to vote or provide proxies that may be voted in favor of any action contemplated by either of (A) or (B) of this subsection; (viii) seeking to advise of influence any person (within the meaning of Section 13(d)(3) if the Exchange Act) with respect to the voting of any Partnership Interest in connection with the removal (or approving the removal) of Sanchez Midstream Partners GP LLC as our general partner and/or the election of a successor general partner; (ix) issuing, inducing or assisting in the publication of any press release, media report or other publication in connection with the potential or proposed removal of Sanchez Midstream Partners GP LLC as our general partner and/or the election of a successor general partner for the Partnership; (x) advising, assisting or encouraging any third party to do any of the foregoing; or (xi) if Sanchez Midstream Partners GP LLC is removed as our general partner in violation of our partnership agreement, then participating in any way in the management, ownership and/or control of the successor general partner or the successor general partner's operation of us, other than participation by directors designated to the Board by Stonepeak Catarina in connection with the fulfillment of their duties as directors.

***SOG and its affiliates may compete with us.***

SOG and its affiliates may compete with us. As a result, SOG and its affiliates have the ability to acquire and operate assets that directly compete with our assets.

***Manager may not allocate corporate opportunities to us.***

Pursuant to the terms of our partnership agreement, the doctrine of corporate opportunity, or any analogous doctrine, does not apply to our general partner or any of its affiliates, including Manager and its executive officers and directors. Any such person or entity that becomes aware of a potential transaction, agreement, arrangement or other matter that may be an opportunity for us does not have any duty to communicate or offer such opportunity to us. Any such person or entity will not be liable to us or to any limited partner for breach of any fiduciary duty or other duty by reason of the fact that such person or entity pursues or acquires such opportunity for itself, directs such opportunity to another person or entity or does not communicate such opportunity or information to us. This may create actual and potential conflicts of interest between us and affiliates of our general partner and result in less than favorable treatment of us and our common unitholders.

***Our partnership agreement permits our general partner to redeem any partnership interests held by a limited partner who is an ineligible holder.***

If our general partner, with the advice of counsel, determines that our not being treated as an association taxable as a corporation or otherwise taxable as an entity for U.S. federal income tax purposes, coupled with the tax status (or lack of proof thereof) of one or more of our limited partners, has, or is reasonably likely to have, a material adverse effect on the maximum applicable rates chargeable to customers by us or our subsidiaries, or we become subject to federal, state or local laws or regulations that create a substantial risk of cancellation or forfeiture of any property that we have an interest in because of the nationality, citizenship or other related status of any limited partner, our general partner may redeem the units held by the limited partner at their current market price. In order to avoid any material adverse effect on rates charged or cancellation or forfeiture of property, our general partner may require each limited partner to furnish information about their U.S. federal income tax status or nationality, citizenship or related status. If a limited partner fails to furnish information about their U.S. federal income tax status or nationality, citizenship or other related status after a request for the information or our general partner determines after receipt of the information that the limited partner is not an eligible holder, our general partner may elect to treat the limited partner as an ineligible holder. An ineligible holder assignee does not have the right to direct the voting of their units and may not receive distributions in kind upon our liquidation.

***The market price of our common units may fluctuate significantly, and you could lose all or part of your investment.***

The market price of our common units may be influenced by many factors, some of which are beyond our control, including:

- the resolution of the Sanchez Energy Chapter 11 Case;
- provisions in our Credit Agreement which currently prohibit us from paying distributions to our common unitholders other than in certain limited circumstances set forth in our Credit Agreement;
- our quarterly or annual earnings or those of other companies in our industry;
- announcements by us or our competitors of significant contracts or acquisitions;
- changes in accounting standards, policies, guidance, interpretations or principles;
- general economic conditions, including interest rates and governmental policies impacting interest rates;
- the failure of securities analysts to cover our common units or changes in financial estimates by analysts;
- future sales of our common units; and
- other factors described in this proxy statement/prospectus and the documents incorporated herein.

***Our partnership agreement replaces our general partner's fiduciary duties to our common unitholders with contractual standards governing its duties.***

Our partnership agreement contains provisions that eliminate the fiduciary standards to which our general partner would otherwise be held by state fiduciary duty law and replace those duties with several different contractual standards. For example, our partnership agreement permits our general partner to make a number of decisions in its individual capacity, as opposed to in its capacity as our general partner, free of any duties to us and our unitholders other than the implied contractual covenant of good faith and fair dealing, which means that a court will fill gaps under the partnership agreement to enforce the reasonable expectations of the partners, but only where the language in the partnership agreement does not provide for a clear course of action. This provision entitles our general partner to consider only the interests and factors that it desires and relieves it of any duty or obligation to give any consideration to any interest of, or factors affecting, us, our affiliates or our limited partners. Examples of decisions that our general partner may make in its individual capacity include:

- how to allocate business opportunities among us and its other affiliates;

- whether to exercise its limited call right;
- whether to seek approval of the resolution of a conflict of interest by the Conflicts Committee; and
- whether or not to consent to any merger or consolidation of the partnership or amendment to the partnership agreement.

***Our partnership agreement restricts the remedies available to our common unitholders for actions taken by our general partner that might otherwise constitute breaches of fiduciary duty.***

The effect of eliminating fiduciary standards in our partnership agreement is that the remedies available to unitholders for actions taken by our general partner that might otherwise constitute breaches of fiduciary duty under state fiduciary duty law will be significantly restricted. For example, our partnership agreement provides that:

- whenever our general partner, the Board or any committee thereof (including the Conflicts Committee) makes a determination or takes, or declines to take, any other action in their respective capacities, our general partner, the Board and any committee thereof (including the Conflicts Committee), as applicable, is required to make such determination, or take or decline to take such other action, in good faith, and under our partnership agreement, a determination, other action or failure to act by our general partner and any committee thereof (including the Conflicts Committee) will be deemed to be in good faith unless the general partner, the Board or any committee thereof (including the Conflicts Committee) believed that such determination, other action or failure to act was adverse to the interests of the partnership or, with regard to certain determinations by the Board relating to the conflict transactions described below, the Board did not believe that the specified standards were met, and, except as specifically provided by our partnership agreement, neither our general partner, the Board nor any committee thereof (including the Conflicts Committee) will be subject to any other or different standard imposed by our partnership agreement, Delaware law, or any other law, rule or regulation, or at equity;
- our general partner will not have any liability to us or our unitholders for decisions made in its capacity as a general partner so long as such decisions are made in good faith;
- our general partner and its officers and directors will not be liable for monetary damages to us or our limited partners resulting from any act or omission unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that our general partner or its officers and directors, as the case may be, acted in bad faith or, in the case of a criminal matter, acted with knowledge that the conduct was criminal; and
- our general partner will not be in breach of its obligations under the partnership agreement (including any duties to us or our unitholders) if a transaction with an affiliate or the resolution of a conflict of interest is:
    - approved by the Conflicts Committee of the Board, although our general partner is not obligated to seek such approval;
    - approved by the vote of a majority of the outstanding common units, excluding any common units owned by our general partner and its affiliates;
    - determined by the Board to be on terms no less favorable to us than those generally being provided to or available from unrelated third parties; or
    - determined by the Board to be fair and reasonable to us, taking into account the totality of the relationships among the parties involved, including other transactions that may be particularly favorable or advantageous to us.

In connection with a situation involving a transaction with an affiliate or a conflict of interest, any determination by our general partner or the Conflicts Committee must be made in good faith. If an affiliate transaction or the resolution of a conflict of interest is not approved by our common unitholders or the Conflicts Committee and the Board determine that the resolution or course of action taken with respect to the affiliate transaction or conflict of interest satisfies either of the

standards set forth in the third and fourth sub-bullets above, then it will be presumed that, in making its decision, the Board acted in good faith, and in any proceeding brought by or on behalf of any limited partner or the partnership challenging such determination, the person bringing or prosecuting such proceeding will have the burden of overcoming such presumption.

Furthermore, if any limited partner, our general partner or any person holding any beneficial interest in us brings any claims, suits, actions or proceedings (including, but not limited to, those asserting a claim of breach of a fiduciary duty) and such person does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then such limited partner, our general partner or person holding any beneficial interest in us shall be obligated to reimburse us and our "affiliates," as defined in Section 1.1 of our partnership agreement (including our general partner, the directors and officers of our general partner, SOG and Manager) for all fees, costs and expenses of every kind and description, including, but not limited to, all reasonable attorney's fees and other litigation expenses, that the parties may incur in connection with such claim, suit, action or proceeding.

***Our partnership agreement includes exclusive forum, venue and jurisdiction provisions and limitations regarding claims, suits, actions or proceedings. By taking ownership of a common unit, a limited partner is irrevocably consenting to these provisions and limitations regarding claims, suits, actions or proceedings and submitting to the exclusive jurisdiction of Delaware courts.***

Our partnership agreement is governed by Delaware law. Our partnership agreement includes exclusive forum, venue and jurisdiction provisions designating Delaware courts as the exclusive venue to the fullest extent permitted by applicable law for most claims, suits, actions and proceedings involving us or our officers, directors and employees and limitations regarding claims, suits, actions or proceedings. By taking ownership of a common unit, a limited partner is irrevocably consenting to these provisions and limitations regarding claims, suits, actions or proceedings and submitting to the exclusive jurisdiction of Delaware courts. If a dispute were to arise between a limited partner and us or our officers, directors or employees, the limited partner may be required to pursue its legal remedies in Delaware, which may be an inconvenient or distant location and which is considered to be a more corporate-friendly environment. Furthermore, if any limited partner, our general partner or person holding any beneficial interest in us brings any claims, suits, actions or proceedings (including, but not limited to, those asserting a claim of breach of a fiduciary duty) and such person does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then such limited partner, our general partner or person holding any beneficial interest in us shall be obligated to reimburse us and our affiliates, (as defined in our partnership agreement, which includes our general partner, the directors and officers of our general partner, SOG and Manager) for all fees, costs and expenses of every kind and description, including, but not limited to, all reasonable attorneys' fees and other litigation expenses, that the parties may incur in connection with such claim, suit, action or proceeding. This provision may have the effect of increasing a unitholder's cost of asserting a claim and therefore, discourage lawsuits against us and our general partner's directors and officers. Because fee-shifting provisions such as these are relatively new developments in corporate and partnership law, the enforceability of such provisions are uncertain; in addition, future legislation could restrict or limit this provision of our partnership agreement and its effect of saving us and our affiliates from fees, costs and expenses incurred in connection with claims, actions, suits or proceedings.

Table of Contents

***Holders of our common units will have limited voting rights and will not be entitled to elect our general partner or its directors.***

Our common unitholders have limited voting rights on matters affecting our business and, therefore, limited ability to influence management's and our general partner's decisions regarding our business. Common unitholders will have no right on an annual or ongoing basis to elect our general partner or the Board. Rather, the Board will be appointed by Manager. Furthermore, if common unitholders are dissatisfied with the performance of our general partner, they will have little ability to remove our general partner. As a result of these limitations, the price at which our common units will trade could be diminished because of the absence or reduction of a takeover premium in the trading price. Our partnership agreement also contains provisions limiting the ability of common unitholders to call meetings or to acquire information about our operations, as well as other provisions limiting our common unitholders' ability to influence the manner or direction of management.

***Our partnership agreement restricts the voting rights of common unitholders owning 20% or more of our common units.***

Common unitholders' voting rights are further restricted by a provision of our partnership agreement providing that any units held by a person that owns 20% or more of any class of units then outstanding, other than our general partner, its affiliates, Stonepeak Catarina, their transferees and persons who acquired such units with the prior approval of the Board, cannot vote on any matter.

***Our general partner interest or the control of our general partner may be transferred to a third-party without unitholder consent.***

Our general partner is able to transfer its general partner interest to a third party in a merger or in a sale of all or substantially all of any assets it may own without the consent of our common unitholders. Furthermore, there is no restriction in the partnership agreement on the ability of Manager to transfer its membership interest in our general partner to a third party. The new members of our general partner would then be in a position to replace the directors and officers of our general partner in order to control the decisions taken by the Board or such officers.

***The incentive distribution rights held by Manager may be transferred to a third party without unitholder consent.***

Manager is able to transfer its incentive distribution rights to a third party at any time without the consent of our common unitholders. If Manager transfers its incentive distribution rights to a third party but retains its ownership interest in our general partner, our general partner may not have the same incentive to grow our partnership and increase quarterly distributions to unitholders over time as it would if Manager had retained ownership of the incentive distribution rights. For example, a transfer of incentive distribution rights by Manager could reduce the likelihood of SOG or its affiliates accepting offers made by us relating to assets owned by it or its affiliates, as they would have less of an economic incentive to grow our business, which in turn would impact our ability to grow our asset base.

***We are able to issue additional units without common unitholder approval, which would dilute unitholder interests.***

Our partnership agreement does not limit the number of additional limited partner interests, including limited partner interests that rank senior to our common units that we may issue at any time without the approval of our common unitholders. The issuance by us of additional common units or other equity securities of equal or senior rank will have the following effects:

- our existing limited partners' proportionate ownership interest in us will decrease;
- the amount of cash available for distribution on each limited partnership interest may decrease;
- because the amount payable to holders of incentive distribution rights is based on a percentage of the total cash available for distribution, the distributions to holders of incentive distribution rights will increase even if the per unit distribution on common units remains the same;
- the ratio of taxable income to distributions may increase;

- the relative voting strength of each previously outstanding limited partner interest may be diminished; and
- the market price of our common units may decline.

***Our general partner intends to limit its liability regarding our obligations.***

Our general partner intends to limit its liability under contractual arrangements so that the counterparties to such arrangements have recourse only against our assets and not against our general partner or its assets. Our general partner may therefore cause us to incur indebtedness or other obligations that are nonrecourse to our general partner. Our partnership agreement permits our general partner to limit its liability, even if we could have obtained more favorable terms without the limitation on liability. In addition, we are obligated to reimburse or indemnify our general partner to the extent that it incurs obligations on our behalf. Any such reimbursement or indemnification payments would reduce the amount of cash otherwise available for distribution to our unitholders.

***Manager, or any transferee holding a majority of the incentive distribution rights, may elect to cause us to issue common units to it in connection with a resetting of the minimum quarterly distribution and the target distribution levels related to the incentive distribution rights, without the approval of the Conflicts Committee of our general partner or our unitholders. This election may result in lower distributions to our common unitholders in certain situations.***

The holder or holders of a majority of the incentive distribution rights, which is currently Manager, has the right, at any time when such holders have received incentive distributions at the highest level to which they are entitled (35.5%) for each of the prior four consecutive fiscal quarters (and the amount of each such distribution did not exceed adjusted operating surplus for each such quarter), to reset the minimum quarterly distribution and the initial target distribution levels at higher levels based on our cash distribution at the time of the exercise of the reset election. Following a reset election, the minimum quarterly distribution will be reset to an amount equal to the average cash distribution per unit for the two fiscal quarters immediately preceding the reset election (such amount is referred to as the “reset minimum quarterly distribution”), and the target distribution levels will be reset to correspondingly higher levels based on percentage increases above the reset minimum quarterly distribution. Manager has the right to transfer the incentive distribution rights at any time, in whole or in part, and any transferee holding a majority of the incentive distribution rights will have the same rights as Manager with respect to resetting target distributions.

In the event of a reset of the minimum quarterly distribution and the target distribution levels, the holders of the incentive distribution rights will be entitled to receive, in the aggregate, the number of common units equal to that number of common units which would have entitled the holders to an average aggregate quarterly cash distribution in the prior two quarters equal to the distributions on the incentive distribution rights in the prior two quarters. We anticipate that Manager would exercise this reset right in order to facilitate acquisitions or internal growth projects that would not otherwise be sufficiently accretive to cash distributions per common unit. It is possible, however, that Manager or a transferee could exercise this reset election at a time when it is experiencing, or expects to experience, declines in the cash distributions that it receives related to its incentive distribution rights and may therefore desire to be issued common units rather than retain the right to receive incentive distribution payments based on target distribution levels that are less certain to be achieved in the then-current business environment. This risk could be elevated if our incentive distribution rights have been transferred to a third party. As a result, a reset election may cause our common unitholders to experience dilution in the amount of cash distributions that they would have otherwise received had we not issued common units to Manager in connection with resetting the target distribution levels.

***Your liability may not be limited if a court finds that unitholder action constitutes control of our business.***

A general partner of a partnership generally has unlimited liability for the obligations of the partnership, except for those contractual obligations of the partnership that are expressly made without recourse to the general partner. Our partnership is organized under Delaware law, and we conduct business in and outside of Delaware. The limitations on the liability of holders of limited partner interests for the obligations of a limited partnership have not been clearly established

in some of the other states in which we do business. You could be liable for any and all of our obligations as if you were a general partner if a court or government agency were to determine that:

- we were conducting business in a state but had not complied with that particular state's partnership statute; or
- your right to act with other unitholders to remove or replace our general partner, to approve some amendments to our partnership agreement or to take other actions under our partnership agreement constitute "control" of our business.

***Unitholders may have liability to repay distributions that were wrongfully distributed to them.***

Under certain circumstances, unitholders may have to repay amounts wrongfully returned or distributed to them. Under Section 17-607 of the Delaware Revised Uniform Limited Partnership Act (the "Delaware Act"), we may not make a distribution to you if the distribution would cause our liabilities to exceed the fair value of our assets. Delaware law provides that for a period of three years from the date of an impermissible distribution, limited partners who received the distribution and who knew at the time of the distribution that it violated Delaware law will be liable to the limited partnership for the distribution amount. Transferees of common units are liable both for the obligations of the transferor to make contributions to the partnership that were known to the transferee at the time of transfer and for those obligations that were unknown if the liabilities could have been determined from the partnership agreement. Neither liabilities to partners on account of their partnership interest nor liabilities that are non-recourse to the partnership are counted for purposes of determining whether a distribution is permitted.

***The NYSE American does not require a publicly traded limited partnership like us to comply with certain of its corporate governance requirements.***

Because we are a publicly traded limited partnership, the NYSE American does not require us to have a majority of independent directors on the Board or to establish a compensation committee or a nominating and corporate governance committee. Accordingly, unitholders will not have the same protections afforded to certain corporations that are subject to all of the NYSE American corporate governance requirements.

**Tax Risks**

***Our tax treatment depends on our status as a partnership for U.S. federal income tax purposes, as well as our not being subject to a material amount of entity-level taxation by states and localities. If the Internal Revenue Service ("IRS") were to treat us as a corporation for U.S. federal income tax purposes or if we were otherwise subject to a material amount of entity-level taxation, then our cash available for distribution would be substantially reduced.***

The anticipated after-tax economic benefit of an investment in our common units depends largely on us being treated as a partnership for U.S. federal income tax purposes. Despite the fact that we are a limited partnership under Delaware law, we will be treated as a corporation for U.S. federal income tax purposes unless we satisfy a "qualifying income" requirement. Based on our current operations, we believe that we satisfy the qualifying income requirement and will continue to be treated as a partnership for U.S. federal income tax purposes. Failure to meet the qualifying income requirement or a change in current law could cause us to be treated as a corporation for U.S. federal income tax purposes or otherwise subject us to taxation as an entity. We have not requested, and do not plan to request, a ruling from the IRS with respect to our treatment as a partnership for U.S. federal income tax purposes.

If we were treated as a corporation for U.S. federal income tax purposes, we would pay U.S. federal income tax on our taxable income at the corporate income tax rate, and we would also likely pay additional state and local income taxes at varying rates. Distributions to unitholders would generally be taxed again as corporate dividends (to the extent of our current and accumulated earnings and profits as determined for U.S. federal income tax purposes), and no income, gains, losses, deductions or credits recognized by us would flow through to the unitholders. Because a tax would be imposed on us as a corporation, our cash available for distribution to our unitholders would be reduced.

At the state level, several states have been evaluating ways to subject partnerships to entity-level taxation through the imposition of state income, franchise and other forms of taxation. Imposition of a material amount of any these taxes

in the jurisdictions in which we own assets or conduct business could substantially reduce the cash available for distribution to our unitholders.

If we were treated as a corporation for U.S. federal income tax purposes or otherwise subjected to a material amount of entity-level taxation, there would be a material reduction cash flows and after-tax return to our unitholders likely causing a substantial reduction in the value of our common units.

Our partnership agreement provides that if a law is enacted or existing law is modified or interpreted in a manner that subjects us to taxation as a corporation or otherwise subjects us to entity-level taxation for U.S. federal, state or local income tax purposes, the minimum quarterly distribution and the target distributions may be adjusted to reflect the impact of that law on us.

***The tax treatment of publicly traded partnerships or an investment in our common units could be subject to potential legislative, judicial or administrative changes and differing interpretations, possibly on a retroactive basis.***

The present U.S. federal income tax treatment of publicly traded partnerships, including us, or an investment in our common units may be modified by administrative or legislative changes or differing judicial interpretation at any time. For example, from time to time members of the U.S. Congress have proposed and considered substantive changes to the existing U.S. federal income tax laws that would affect publicly traded partnerships. In addition, the Treasury Department has issued, and in the future may issue, regulations interpreting those laws that affect publicly traded partnerships. We believe the income that we treat as qualifying satisfies the requirements under current regulations. However, there can be no assurance that there will not be further changes to U.S. federal income tax laws or the Treasury Department's interpretation of the qualifying income rules in a manner that could impact our ability to qualify as a partnership for U.S. federal income tax purposes in the future.

We are unable to predict whether legislation or other tax-related proposals will ultimately be enacted. Any modification to the U.S. federal income tax laws and interpretations thereof may or may not be applied retroactively and could make it more difficult or impossible for us to meet the exception for certain publicly traded partnerships to be treated as a partnership for U.S. federal income tax purposes. Any such change could negatively impact the value of an investment in our common units.

***Our common unitholders' share of our income will be taxable to them even if they do not receive any cash distributions from us.***

Common unitholders are required to pay U.S. federal income and other taxes and, in some cases, state and local income taxes, on their share of our taxable income, whether or not they receive cash distributions from us. Our Credit Agreement and partnership agreement currently prohibit us from paying distributions to our common unitholders. As a result, for the foreseeable future our common unitholders will not receive cash distributions from us equal to their share of our taxable income or even equal to the actual tax liability due from them with respect to that income.

***If the IRS contests the U.S. federal income tax positions we take, the market for our common units may be adversely impacted, and our cash available for distribution might be substantially reduced.***

We have not requested a ruling from the IRS with respect to our treatment as a partnership for U.S. federal income tax purposes or any other matter affecting us. The IRS may adopt positions that differ from the positions we take. It may be necessary to resort to administrative or court proceedings to sustain some or all of the positions we take, and a court may disagree with some or all of those positions. Any contest with the IRS may materially and adversely impact the market for our common units and the price at which they trade. In addition, our costs of any contest with the IRS will result in a reduction in cash available for distribution and thus will be borne indirectly by our unitholders.

Pursuant to legislation applicable for partnership tax years beginning after 2017 if the IRS makes audit adjustments to our partnership tax returns, it may assess and collect any taxes (including any applicable penalties or interest) resulting from such audit adjustments directly from us. To the extent possible under these new rules, our general partner may elect to either pay the taxes (including any applicable penalties and interest) directly to the IRS in the year in which the audit is completed, or, if we are eligible, issue a revised information statement to each current and former unitholder with respect to an audited and adjusted partnership tax return. Although our general partner may elect to have our current and former

unitholders take such audit adjustment into account and pay any resulting taxes (including applicable penalties or interest) in accordance with their interests in us during the tax year under audit, there can be no assurance that such election will be practical, permissible or effective in all circumstances. If we make payments of taxes and any penalties and interest directly to the IRS in the year in which the audit is completed, our cash available for distribution might be substantially reduced, in which case our current unitholders may bear some or all of the tax liability resulting from such audit adjustment even if the unitholders did not own units in us during the tax year under audit.

***Tax gain or loss on the disposition of our common units could be more or less than expected.***

If a common unitholder sells common units, the unitholder will recognize gain or loss equal to the difference between the amount realized and its tax basis in those common units. Because distributions in excess of a unitholder's allocable share of our net taxable income decrease the unitholder's tax basis in its common units, the amount, if any, of such prior excess distributions with respect to the common units a unitholder sells will, in effect, become taxable income to the unitholder if the unitholder sells such common units at a price greater than its tax basis in those common units, even if the price received is less than its original cost. Furthermore, a substantial portion of the amount realized, whether or not representing gain, may be taxed as ordinary income due to potential recapture items, including depreciation, depletion and intangible drilling cost recapture. In addition, because the amount realized may include a unitholder's share of our liabilities, a unitholder that sells common units may incur a tax liability in excess of the amount of cash received from the sale.

***Unitholders may be subject to limitations on their ability to deduct interest expense we incur.***

Our ability to deduct business interest expense is limited for U.S. federal income tax purposes to an amount equal to the sum of our business interest income and 30% of our "adjusted taxable income" during the taxable year, computed without regard to any business interest income or expense, and in the case of taxable years beginning before 2022, any deduction allowable for depreciation, amortization, or depletion. Business interest expense that we are not entitled to fully deduct will be allocated to each unitholder as excess business interest and can be carried forward by the unitholder to successive taxable years and used to offset any excess taxable income allocated by us to the unitholder. Any excess business interest expense allocated to a unitholder will reduce the unitholder's tax basis in its partnership interest in the year of the allocation even if the expense does not give rise to a deduction to the unitholder in that year.

***Tax-exempt entities face unique tax issues from owning common units that may result in adverse tax consequences to them.***

Investment in common units by tax-exempt entities, including employee benefit plans and individual retirement accounts (known as IRAs), raises issues unique to them. For example, virtually all of our income allocated to organizations exempt from U.S. federal income tax, including IRAs and other retirement plans, will be unrelated business taxable income and will be taxable to them. Tax-exempt entities with multiple unrelated trades or businesses cannot aggregate losses from one unrelated trade or business to offset income from another to reduce total unrelated business taxable income. As a result, it may not be possible for tax-exempt entities to utilize losses from an investment in us to offset unrelated business taxable income from another unrelated trade or business and vice versa. Tax-exempt entities should consult a tax advisor before investing in our common units.

***Non-U.S. unitholders will be subject to U.S. federal income taxes and withholding with respect to income and gain from owning our common units.***

Non-U.S. persons are generally taxed and subject to U.S. federal income tax filing requirements on income effectively connected with a U.S. trade or business. Income allocated to our unitholders and any gain from the sale of our units will generally be considered to be "effectively connected" with a U.S. trade or business. As a result, distributions to a non-U.S. unitholder will be subject to withholding at the highest applicable effective tax rate and a non-U.S. unitholder who sells or otherwise disposes of a common unit will also be subject to U.S. federal income tax on the gain realized from the sale or disposition of that unit.

The Internal Revenue Code also imposes a U.S. federal income tax withholding obligation of 10% of the amount realized upon a non-U.S. person's sale or exchange of an interest in a partnership that is engaged in a U.S. trade or business.

Table of Contents

However, application of this withholding rule to dispositions of publicly traded partnership interests has been suspended by the IRS until regulations or other guidance have been issued. It is not clear when or if such regulations or guidance will be issued. Non-U.S. persons should consult a tax advisor before investing in our common units.

***We treat each purchaser of our common units as having the same tax benefits without regard to the common units purchased. The IRS may challenge this treatment, which could adversely affect the value of our common units.***

Because we cannot match transferors and transferees of common units, we have adopted depletion, depreciation and amortization positions that may not conform with all aspects of existing U.S. Treasury regulations. A successful IRS challenge to those positions could adversely affect the amount of tax benefits available to our unitholders. A successful IRS challenge also could affect the timing of these tax benefits or the amount of gain on the sale of common units and could have a negative impact on the value of our common units or result in audits of and adjustments to our unitholders' tax returns.

***We prorate our items of income, gain, loss and deduction between transferors and transferees of common units each month based upon the ownership of our common units on the first day of each month, instead of on the basis of the date a particular common unit is transferred. The IRS may challenge this treatment, which could change the allocation of items of income, gain, loss and deduction among our unitholders.***

We prorate our items of income, gain, loss and deduction between transferors and transferees of common units each month based upon the ownership of our common units on the first day of each month, instead of on the basis of the date a particular common unit is transferred. Although Treasury regulations allow publicly traded partnerships to use a similar monthly simplifying convention, these regulations do not specifically authorize all aspects of our proration method. If the IRS were to successfully challenge our proration method, we may be required to change the allocation of items of income, gain, loss and deduction among our unitholders.

***A unitholder whose common units are the subject of a securities loan (e.g., a loan to a "short seller" to cover a short sale of common units) may be considered as having disposed of those common units. If so, the unitholder would no longer be treated for U.S. federal income tax purposes as a partner with respect to those common units during the period of the loan and may recognize gain or loss from the disposition.***

Because a unitholder whose common units are loaned to a "short seller" to cover a short sale of common units may be considered as having disposed of the loaned common units, the unitholder may no longer be treated for U.S. federal income tax purposes as a partner with respect to those common units during the period of the loan to the short seller, and the unitholder may recognize gain or loss from such disposition. Moreover, during the period of the loan to the short seller, any of our income, gain, loss or deduction with respect to those common units may not be reportable by the unitholder and any distributions received by the unitholder as to those common units could be fully taxable as ordinary income. Unitholders desiring to assure their status as partners and avoid the risk of gain recognition from a loan to a short seller are urged to consult with their tax advisor about whether it is advisable to modify any applicable brokerage account agreements to prohibit their brokers from loaning their common units.

***We have adopted certain valuation methodologies in determining a unitholder's allocations of income, gain, loss and deduction. The IRS may challenge these methodologies or the resulting allocations, and such a challenge could adversely affect the value of our common units.***

In determining the items of income, gain, loss and deduction allocable to our unitholders, we routinely determine the fair market value of our assets. Although we may from time to time consult with professional appraisers regarding valuation matters, we make many fair market value estimates ourselves using a methodology based on the market value of our common units as a means to determine the fair market value of our assets. The IRS may challenge these valuation methods and the resulting allocations of income, gain, loss and deduction.

A successful IRS challenge to these methods or allocations could adversely affect the timing, character or amount of taxable income or loss being allocated to our unitholders. It also could affect the amount of gain from our unitholders' sale of common units and could have a negative impact on the value of our common units or result in audit adjustments to our unitholders' tax returns without the benefit of additional deductions.

***As a result of investing in our common units, our unitholders may become subject to state and local taxes and return filing requirements in jurisdictions where we operate or own or acquire properties.***

In addition to U.S. federal income taxes, our unitholders will likely be subject to other taxes, including state and local income taxes, unincorporated business taxes and estate, inheritance or intangible taxes that are imposed by the various jurisdictions in which we do business or own property now or in the future, even if they do not reside in any of those jurisdictions. Our unitholders will likely be required to file state and local income tax returns and pay state and local income taxes in some or all of these various jurisdictions. Furthermore, our unitholders may be subject to penalties for failure to comply with those requirements. It is the responsibility of each unitholder to file all U.S. federal, state and local tax returns that may be required of such unitholder.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

A description of our properties is included in "Part I, Item 1. Business," and is incorporated herein by reference.

The obligations under our Credit Agreement are secured by mortgages on substantially all of our assets. See "Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Credit Agreement," in this Form 10-K for additional information concerning our Credit Agreement.

**Item 3. Legal Proceedings**

From time to time we may be the subject of lawsuits and claims arising in the ordinary course of business. Management cannot predict the ultimate outcome of such lawsuits or claims. Management does not currently expect the outcome of any of the known claims or proceedings to individually or in the aggregate have a material adverse effect on our results of operations or financial condition.

To date, no claims relating to the Sanchez Energy Chapter 11 Case have been filed against us. However, on March 13, 2020, the Unsecured Committee filed the March 13 Motion. The relief sought in the March 13 Motion is to grant the Unsecured Committee derivative standing to prosecute claims that Sanchez Energy allegedly has against the Partnership and others, including, but not limited to, claims to recharacterize or avoid the Catarina Transaction, the Carnero Gathering Transaction and the Carnero Processing Transaction. While we do not believe these claims have any merit, if such claims are filed and prosecuted, the cost to defend against such claims and any judgment entered against us could have a material and adverse impact on our business, financial condition and operating results. For additional information about the Sanchez Energy Chapter 11 Case please see https://cases.primeclerk.com/sanchezenergy and dm.epiq11.com/case/sanchez/info. Information contained on these websites, however, is not incorporated into or otherwise a part of this Form 10-K.

**Item 4. Mine Safety Disclosures**

Not applicable.

## PART II

### Item 5. Market for Registrant's Common Equity, Related Unitholder Matters and Issuer Purchases of Equity Securities

Our common units are listed on the NYSE American under the symbol "SNMP."

**Holders**

The number of unitholders of record of our common units was approximately 53 on March 13, 2020, which does not include beneficial owners whose shares are held by a clearing agency, such as a broker or a bank.

**Distributions**

*Rationale for Our Cash Distribution Policy*

Our partnership agreement requires us to distribute all of our available cash quarterly. Our cash distribution policy reflects a fundamental judgment that our unitholders generally will be better served by our distributing rather than retaining our available cash. However, other than the requirement in our partnership agreement to distribute all of our available cash each quarter, we have no legal obligation to make quarterly cash distributions in any amount, and our general partner has considerable discretion to determine the amount of our available cash each quarter. Our partnership agreement generally defines "available cash" as cash on hand at the end of a quarter after the payment of expenses, less the amount of cash reserves established by our general partner to provide for the conduct of our business and to comply with applicable law, any of our debt instruments or other agreements or to provide for future distributions to our unitholders for any one or more of the next four quarters. Our available cash may also include, if our general partner so determines, all or any portion of the cash on hand immediately prior to the date of distribution of available cash for the quarter resulting from working capital borrowings made subsequent to the end of such quarter. Because we are not subject to an entity-level federal income tax, we expect to have more cash to distribute to our unitholders than would be the case if we were subject to entity-level federal income tax. If we do not generate sufficient available cash from our operations, we may, but are under no obligation to, borrow funds to pay distributions to our unitholders.

*Limitations on Cash Distributions and Our Ability to Change Our Cash Distribution Policy*

There is no guarantee that we will make quarterly cash distributions to our unitholders. We do not have a legal or contractual obligation to pay quarterly distributions or any other distributions except as provided in our partnership agreement. Our cash distribution policy may be changed at any time and is subject to certain restrictions and uncertainties, including the following:

- Until the first quarter in which no Class C Preferred Units remain outstanding, we are not permitted to declare or make any distributions in respect to our common units.
- Our cash distribution policy is subject to restrictions on distributions under our Credit Agreement, which contains financial tests that we must meet and covenants that we must satisfy. Should we be unable to meet these financial tests or satisfy these covenants or if we are otherwise in default under our Credit Agreement, we will be prohibited from making cash distributions notwithstanding our cash distribution policy.
- Our general partner has the authority to establish cash reserves for the prudent conduct of our business and for future cash distributions to our unitholders, and the establishment of or increase in those reserves could result in a reduction in cash distributions from levels we currently anticipate pursuant to our stated cash distribution policy. Our partnership agreement does not set a limit on the amount of cash reserves that our general partner may establish. Any decision to establish cash reserves made by our general partner in good faith will be binding on our unitholders.
- Prior to making any distribution on our common units, and pursuant to the Services Agreement, we will pay Manager an administrative fee and reimburse our general partner and its affiliates, including Manager, for all direct and indirect expenses that they incur on our behalf. Neither our partnership agreement nor the Services

Agreement limits the amount of expenses for which our general partner and its affiliates may be reimbursed. These expenses may include salary, bonus, incentive compensation and other amounts paid to persons who perform services for us or on our behalf and expenses allocated to our general partner by its affiliates. Our partnership agreement provides that our general partner will determine in good faith the expenses that are allocable to us. The reimbursement of expenses and payment of fees, if any, to our general partner and its affiliates may impact our ability to pay distributions to our unitholders.

- While our partnership agreement requires us to distribute all of our available cash, our partnership agreement, including the provisions requiring us to make cash distributions contained therein, may be amended with the consent of our general partner and the approval of a majority of the outstanding common units (including common units held by Sanchez Energy and its affiliates, if any).
- Even if our cash distribution policy is not modified or revoked, the decisions regarding the amount of distributions to pay under our cash distribution policy and whether to pay any distribution are determined by our general partner, taking into consideration the terms of our partnership agreement.
- Under Section 17-607 of the Delaware Act, we may not make a distribution if the distribution would cause our liabilities to exceed the fair value of our assets.
- We may lack sufficient cash to pay distributions to our unitholders due to a shortfall in cash flows attributable to a number of operational, commercial or other factors as well as increases in our operating or general and administrative expenses, principal and interest payments on our outstanding debt, tax expenses, working capital requirements or anticipated cash needs.
- If we make distributions out of capital surplus, as opposed to operating surplus, any such distributions would constitute a return of capital and would result in a reduction in the minimum quarterly distribution and the target distribution levels. We do not anticipate that we will make any distributions from capital surplus.
- Our ability to make distributions to our unitholders depends on the performance of our assets and subsidiaries and the ability of our subsidiaries to distribute cash to us. The ability of our subsidiaries to make distributions to us may be restricted by, among other things, the provisions of future indebtedness, applicable state laws and other laws and regulations.

**General Partner Interest**

Our general partner owns a non-economic general partner interest in us, which does not entitle it to receive cash distributions. However, our general partner may in the future own common units or other equity interests in us and will be entitled to receive distributions on any such interests.

**Incentive Distribution Rights**

All of the incentive distribution rights are held by Manager. Incentive distribution rights represent the right to receive increasing percentages (13%, 23% and 35.5%) of quarterly distributions from operating surplus after the minimum quarterly distribution and the target distribution levels have been achieved.

For any quarter in which we have distributed cash from operating surplus to our common unitholders in an amount equal to the minimum distribution and distributed cash from surplus to the outstanding common units to eliminate any cumulative arrearages in payment of the minimum quarterly distribution, then we will distribute any additional cash from operating surplus for that quarter among the unitholders and the incentive distribution rights holders in the following manner:

| | | Marginal Percentage Interest in Distributions | |
|---|---|---|---|
| | Total Quarterly Distribution Per Common Unit | Common Unitholders | Manager (as Holder of Incentive Distribution Rights) |
| Minimum Quarterly Distribution | up to $0.50 | 100.00% | 0.00% |
| First Target Distribution | above $0.50 up to $0.575 | 100.00% | 0.00% |
| Second Target Distribution | above $0.575 up to $0.625 | 87.00% | 13.00% |
| Third Target Distribution | above $0.625 up to $0.875 | 77.00% | 23.00% |
| Thereafter | above $0.875 | 64.50% | 35.50% |

Manager's right to receive incentive distributions is reduced by a percentage equal to the number of common units held by Sanchez Energy and its affiliates resulting from the common unit issuance made to SN UR Holdings, LLC, a subsidiary of Sanchez Energy, in November 2016, divided by all common units outstanding as of the time of distribution.

**Securities Authorized for Issuance Under Equity Compensation Plans**

See "Part III, Item 12. Security Ownership of Certain Benefits Owners and Management and Related Unitholder Matters" for information regarding our equity compensation plan as of December 31, 2019.

**Recent Sales of Unregistered Securities**

In connection with providing services under the Services Agreement for the year ended December 31, 2019, the Partnership issued 2,576,760 common units to Manager. See Note 14 "Related Party Transactions" of our Notes to Consolidated Financial Statements for additional information related to the Services Agreement. The issuance of these common units was exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to section 4(a)(2) thereof as a transaction by an issuer not involving a public offering.

**Purchases of Equity Securities by Us and our Affiliates**

No common units were repurchased by us during the fourth-quarter 2019.

**Default Upon Senior Securities**

There were no defaults on senior securities for the years ended December 31, 2019 or 2018.

**Item 6. Selected Financial Data**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required by this Item.

Table of Contents

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with the financial statements and the summary of significant accounting policies and notes included herein this Form 10-K. The following discussion contains "forward-looking statements" that reflect our future plans, estimates, forecasts, guidance, beliefs and expected performance. The "forward-looking statements" are dependent upon events, risks and uncertainties that may be outside our control. Our actual results could differ materially from those discussed in these "forward-looking statements". Please read "Cautionary Note Regarding Forward-Looking Statements."*

***Overview***

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development, ownership and operation of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. Our assets include our wholly-owned Western Catarina Midstream gathering system, our wholly-owned Seco Pipeline, and a 50% interest in the Carnero JV, a 50/50 joint venture operated by Targa that owns the Carnero Gathering Line, Raptor Gas Processing Facility, and Silver Oak II, and reversionary working interests and other production assets in Texas and Louisiana. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Manager owns our general partner and all of our incentive distribution rights. Our common units are currently listed on the NYSE American under the symbol "SNMP."

**Significant Operational Factors in 2019**

Some key highlights of our business activities for the year ended December 31, 2019 were:

- On Western Catarina Midstream, the Partnership implemented two tariff rate increases on throughput volumes from approximately 71,000 net acres on Sanchez Energy's Catarina Asset which are not currently dedicated under the Gathering Agreement; and
- For the year ended December 31, 2019, we reduced cash related general and administrative expense by $2.6 million, or 20%, compared to the same period 2018.

**How We Evaluate Our Operations**

We evaluate our business on the basis of the following key measures:

- our throughput volumes on gathering systems upon those assets;
- our operating expenses; and
- our Adjusted EBITDA, a non-GAAP financial measure (for a reconciliation of Adjusted EBITDA to the most comparable GAAP financial measure please read "Non-GAAP Financial Measures—Adjusted EBITDA").

*Throughput Volumes*

Following the Catarina Transaction, our management began to analyze our performance based on the aggregate amount of throughput volumes on the gathering system. We must connect additional wells or well pads within Sanchez Energy's Catarina Asset, which consists of approximately 106,000 net acres in Dimmit, La Salle and Webb counties in Texas, in order to maintain or increase throughput volumes on Western Catarina Midstream. Our success in connecting additional wells is impacted by successful drilling activity by Sanchez Energy on the acreage dedicated to Western Catarina Midstream, our ability to secure volumes from Sanchez Energy from new wells drilled on non-dedicated acreage, our ability to attract hydrocarbon volumes currently gathered by our competitors and our ability to cost-effectively construct or acquire new infrastructure. Construction of the Seco Pipeline was completed in August 2017, and throughput volumes are dependent on gas processed at the Raptor Gas Processing Facility and demand for dry gas in markets in South Texas.

Future throughput volumes on the pipeline are dependent on execution of a new transportation agreement with Sanchez Energy or execution of an agreement with a third party.

*Operating Expenses*

Our management seeks to maximize Adjusted EBITDA, a non-GAAP financial measure, in part by minimizing operating expenses. These expenses are or will be comprised primarily of field operating costs (which generally consists of lease operating expenses, labor, vehicles, supervision, transportation, minor maintenance, tools and supplies expenses, among other items), compression expense, ad valorem taxes and other operating costs, some of which will be independent of our oil and natural gas production or the throughput volumes on the midstream gathering system, but fluctuate depending on the scale of our operations during a specific period.

*Non-GAAP Financial Measures—Adjusted EBITDA*

To supplement our financial results and guidance presented in accordance with U.S. generally accepted accounting principles ("GAAP"), we use Adjusted EBITDA, a non-GAAP financial measure, in this Form 10-K. We believe that non-GAAP financial measures are helpful in understanding our past financial performance and potential future results, particularly in light of the effect of various transactions effected by us. We define Adjusted EBITDA as net income (loss) adjusted by: (i) interest (income) expense, net, which includes interest expense, interest expense net (gain) loss on interest rate derivative contracts, and interest (income); (ii) income tax expense (benefit); (iii) depreciation, depletion and amortization; (iv) asset impairments; (v) accretion expense; (vi) (gain) loss on sale of assets; (vii) unit-based compensation expense; (viii) unit-based asset management fees; (ix) distributions in excess of equity earnings; (x) (gain) loss on mark-to-market activities; (xi) commodity derivatives settled early; (xii) (gain) loss on embedded derivatives; and (xiii) acquisition and divestiture costs.

Adjusted EBITDA is used as a quantitative standard by our management and by external users of our financial statements such as investors, research analysts, our lenders and others to assess: (i) the financial performance of our assets without regard to financing methods, capital structure or historical cost basis; (ii) the ability of our assets to generate cash sufficient to pay interest costs and support our indebtedness; and (iii) our operating performance and return on capital as compared to those of other companies in our industry, without regard to financing or capital structure.

We believe that the presentation of Adjusted EBITDA provides useful information to investors in assessing our financial condition and results of operations. The GAAP measure most directly comparable to Adjusted EBITDA is net income (loss). Our non-GAAP financial measure of Adjusted EBITDA should not be considered as an alternative to GAAP net income (loss). Adjusted EBITDA has important limitations as an analytical tool because it excludes some but not all items that affect net income (loss). Adjusted EBITDA should not be considered in isolation or as a substitute for analysis of our results as reported under GAAP. Because Adjusted EBITDA may be defined differently by other companies in our industry, our definition of Adjusted EBITDA may not be comparable to similarly titled measures of other companies, thereby diminishing its utility.

The following table sets forth a reconciliation of Adjusted EBITDA to net income (loss), its most directly comparable GAAP performance measure, for each of the periods presented (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Net income (loss) | $ (51,142) | $ 15,691 |
| Adjusted by: | | |
| Interest expense, net | 39,789 | 10,961 |
| Income tax expense | 202 | 190 |
| Depreciation, depletion and amortization | 25,333 | 25,987 |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| Gain on sale of assets | — | (3,186) |
| Unit-based compensation expense | 1,351 | 1,938 |
| Unit-based asset management fees | 7,321 | 8,646 |
| Distributions in excess of equity earnings | 11,352 | 9,754 |
| Gain on mark-to-market activities | (1,183) | (3,229) |
| Acquisition and divestiture costs | — | 2,150 |
| Adjusted EBITDA | $ 65,668 | $ 69,399 |

***Significant Operational Factors***

*Throughput.* The following table sets forth selected throughput data pertaining to the Midstream segment for the years ended December 31, 2019 and 2018:

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Western Catarina Midstream: | | |
| Oil (MBbls/d) | 11.1 | 12.8 |
| Natural gas (MMcf/d) | 131.7 | 157.2 |
| Water (MBbls/d) | 5.5 | 11.0 |
| Seco Pipeline: | | |
| Natural gas (MMcf/d) | 1.9 | 35.4 |

*Production.* Our production for the year ended December 31, 2019 was approximately 309 MBoe, or an average of 847 Boe/d, compared to approximately 439 MBoe, or an average of 1,203 Boe/d, for the same period in 2018.

*Capital Expenditures.* For the year ended December 31, 2019, we spent approximately $0.5 million in capital expenditures, consisting of $0.5 million related to the development of Western Catarina Midstream and less than $0.1 million related to the development of the Seco Pipeline. For the year ended December 31, 2018, we spent approximately $2.0 million in capital expenditures, consisting of $1.4 million related to the development of Western Catarina Midstream and $0.6 million related to the development of the Seco Pipeline.

*Hedging Activities.* For the year ended December 31, 2019, the non-cash mark-to-market loss for our commodity derivatives was approximately $4.7 million, compared to a gain of $2.7 million for the same period in 2018.

**Results of Operations by Segment**

***Midstream Operating Results***

The following table sets forth the selected financial and operating data pertaining to the Midstream segment for the periods indicated (in thousands):

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 | Variance | |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Gathering and transportation sales | $ 6,825 | $ 6,651 | $ 174 | 3% |
| Gathering and transportation lease revenues | 59,090 | 53,025 | 6,065 | 11% |
| Total gathering and transportation sales | 65,915 | 59,676 | 6,239 | 10% |
| **Operating costs:** | | | | |
| Lease operating expenses | 1,499 | 1,145 | 354 | 31% |
| Transportation operating expenses | 11,553 | 12,316 | (763) | (6%) |
| Depreciation and amortization | 21,391 | 21,189 | 202 | 1% |
| Asset impairments | 32,119 | — | 32,119 | NM [(a)] |
| Accretion expense | 326 | 299 | 27 | 9% |
| Total operating expenses | 66,888 | 34,949 | 31,939 | 91% |
| **Other income:** | | | | |
| Earnings from equity investments | 2,831 | 12,859 | (10,028) | (78%) |
| **Operating income** | $ 1,858 | $ 37,586 | $ (35,728) | (95%) |

(a) Variances deemed to be Not Meaningful "NM."

*Gathering and transportation sales.* Gathering and transportation sales increased by approximately $0.2 million to approximately $6.8 million for the year ended December 31, 2019, compared to approximately $6.7 million during the same period in 2018.

*Gathering and transportation lease revenues.* Gathering and transportation lease revenues increased by approximately $6.1 million, or 11%, to approximately $59.1 million for the year ended December 31, 2019, compared to approximately $53.0 million during the same period in 2018. This increase was primarily the result of an increase in the rate charged for natural gas transported on Western Catarina Midstream that was produced from outside the dedicated acreage under the Gathering Agreement.

*Lease operating expenses.* Lease operating expenses, which include ad valorem taxes, increased approximately $0.4 million, or 31%, to approximately $1.5 million for the year ended December 31, 2019, compared to approximately $1.1 million during the same period in 2018.

*Transportation operating expenses.* Our transportation operating expenses generally consist of gathering and transportation operating expenses, labor, vehicles, supervision, minor maintenance, tools, supplies, and integrity management expenses. Our transportation operating expense decreased approximately $0.8 million, or 6%, to approximately $11.6 million for the year ended December 31, 2019, compared to approximately $12.3 million during the same period in 2018.

*Depreciation and amortization expense.* Gathering and transportation assets are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 5 to 15 years for equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets. Our depreciation and amortization expense increased approximately $0.2 million, or 1%, to approximately $21.4 million for the year ended December 31, 2019, compared to approximately $21.2 million during the same period in 2018.

*Impairment expense.* For the year ended December 31, 2019, our non-cash impairment charge was approximately $32.1 million, to impair the Seco Pipeline. We received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective as of February 12, 2020. See Note 21 "Subsequent Events" of our Notes to

Consolidated Financial Statements for additional information on the termination of the Seco Pipeline Transportation Agreement. We did not record impairment on our gathering and transportation assets during the year ended December 31, 2018.

*Earnings from equity investments.* Earnings from equity investments decreased approximately $10.0 million, or 78%, to approximately $2.8 million for the year ended December 31, 2019, compared to approximately $12.9 million for the same period in 2018. This decrease in earnings was primarily the result of lower throughput during the year ended December 31, 2019.

***Production Operating Results***

The following tables set forth the selected financial and operating data pertaining to the Production segment for the periods indicated (in thousands, except net production and average sales and costs):

| | Years Ended December 31, | | Variance | |
|---|---|---|---|---|
| | 2019 | 2018 | | |
| **Revenues:** | | | | |
| Natural gas sales at market price | $ 424 | $ 1,037 | $ (613) | (59%) |
| Natural gas hedge settlements | 94 | (37) | 131 | NM [(a)] |
| Natural gas mark-to-market activities | 165 | (47) | 212 | NM [(a)] |
| Natural gas total | 683 | 953 | (270) | (28%) |
| Oil sales | 13,543 | 19,872 | (6,329) | (32%) |
| Oil hedge settlements | 807 | (1,330) | 2,137 | NM [(a)] |
| Oil mark-to-market activities | (4,838) | 2,730 | (7,568) | NM [(a)] |
| Oil total | 9,512 | 21,272 | (11,760) | (55%) |
| NGL sales | 539 | 1,709 | (1,170) | (68%) |
| Total revenues | 10,734 | 23,934 | (13,200) | (55%) |
| **Operating costs:** | | | | |
| Lease operating expenses | 5,879 | 6,719 | (840) | (13%) |
| Production taxes | 621 | 1,104 | (483) | (44%) |
| Gain on sale of assets | — | (3,186) | 3,186 | NM [(a)] |
| Depreciation, depletion and amortization | 3,942 | 4,798 | (856) | (18%) |
| Accretion expense | 200 | 198 | 2 | 1% |
| Total operating expenses | 10,642 | 9,633 | 1,009 | 10% |
| **Operating income** | $ 92 | $ 14,301 | $ (14,209) | (99%) |

(a) Variances deemed to be Not Meaningful "NM."

Table of Contents

| | Years Ended December 31, 2019 | | Years Ended December 31, 2018 | | Variance | |
|---|---|---|---|---|---|---|
| **Net production:** | | | | | | |
| Natural gas (MMcf) | | 231 | | 434 | (203) | (47%) |
| Oil production (MBbl) | | 228 | | 296 | (68) | (23%) |
| NGLs (MBbl) | | 42 | | 71 | (29) | (41%) |
| Total production (MBoe) | | 309 | | 439 | (130) | (30%) |
| Average daily production (Boe/d) | | 847 | | 1,203 | (356) | (30%) |
| **Average sales prices:** | | | | | | |
| Natural gas price per Mcf with hedge settlements | $ | 2.24 | $ | 2.30 | $ (0.06) | (3%) |
| Natural gas price per Mcf without hedge settlements | $ | 1.84 | $ | 2.39 | $ (0.55) | (23%) |
| Oil price per Bbl with hedge settlements | $ | 62.94 | $ | 62.64 | $ 0.30 | 0% |
| Oil price per Bbl without hedge settlements | $ | 59.40 | $ | 67.14 | $ (7.74) | (12%) |
| NGL price per Bbl without hedge settlements | $ | 12.83 | $ | 24.07 | $ (11.24) | (47%) |
| Total price per Boe with hedge settlements | $ | 49.86 | $ | 48.41 | $ 1.45 | 3% |
| Total price per Boe without hedge settlements | $ | 46.94 | $ | 51.52 | $ (4.58) | (9%) |
| **Average unit costs per Boe:** | | | | | | |
| Field operating expenses [(a)] | $ | 21.04 | $ | 17.82 | $ 3.22 | 18% |
| Lease operating expenses | $ | 19.03 | $ | 15.31 | $ 3.72 | 24% |
| Production taxes | $ | 2.01 | $ | 2.51 | $ (0.50) | (20%) |
| Depreciation, depletion and amortization | $ | 12.76 | $ | 10.93 | $ 1.83 | 17% |

(a) Field operating expenses include lease operating expenses (average production costs) and production taxes.

*Production,* For the year ended December 31, 2019, 74% of our production was oil, 14% was NGLs and 12% was natural gas compared to the year ended December 31, 2018, where 67% of our production was oil, 16% was NGLs and 17% was natural gas. The production mix between the periods has shifted to a higher oil production as a result of multiple asset divestitures in 2018 that were rich in natural gas. Combined production has decreased by 130 MBoe for the year ended December 31, 2019, primarily due to the closings during 2018 of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture.

*Sales of natural gas, NGLs and oil.* Unhedged oil sales decreased $6.3 million, or 32%, to $13.5 million for the year ended December 31, 2019, compared to approximately $19.9 million for the same period in 2018. Sales of NGLs decreased approximately $1.2 million, or 68%, to $0.5 million for the year ended December 31, 2019, compared to approximately $1.7 million for the same period in 2018. Unhedged natural gas sales decreased approximately $0.6 million, or 59%, to approximately $0.4 million for the year ended December 31, 2019, compared to approximately $1.0 million for the same period in 2018. The total decrease in sales of natural gas, NGLs and oil for the year ended December 31, 2019 was primarily the result of the same factors described under “Production” above as well as a decrease in average sales prices.

Including hedges and mark-to-market activities, our total production-related revenue decreased approximately $13.2 million for the year ended December 31, 2019, compared to the same period in 2018. This decrease was primarily the result of approximately $7.6 million of losses on oil mark-to-market activities and a decrease in oil sales of approximately $6.3 million.

Table of Contents

The following tables provide an analysis of the impacts of changes in production volumes and average realized prices between the periods on our unhedged revenues for the year ended December 31, 2019 compared to the year ended December 31, 2018 (in thousands, except average sales prices and volumes):

| | 2019 Average Sales Price | 2018 Average Sales Price | Average Sales Price Difference | 2019 Volume | Revenue Decrease due to Price |
|---|---|---|---|---|---|
| Natural gas (MMcf) | $ 1.84 | $ 2.39 | $ (0.55) | 231 | $ (127) |
| Oil (MBbl) | $ 59.40 | $ 67.14 | $ (7.74) | 228 | $ (1,765) |
| NGLs (MBbl) | $ 12.83 | $ 24.07 | $ (11.24) | 42 | $ (472) |
| Total oil equivalent (MBoe) | $ 46.94 | $ 51.52 | $ (4.58) | 309 | $ (2,364) |

| | 2019 Production Volume | 2018 Production Volume | Production Volume Difference | 2018 Average Sales Price | Revenue Decrease due to Production |
|---|---|---|---|---|---|
| Natural gas (MMcf) | 231 | 434 | (203) | $ 2.39 | $ (485) |
| Oil (MBbl) | 228 | 296 | (68) | $ 67.14 | $ (4,565) |
| NGLs (MBbl) | 42 | 71 | (29) | $ 24.07 | $ (698) |
| Total oil equivalent (MBoe) | 309 | 439 | (130) | $ 51.52 | $ (5,748) |

A 10% increase or decrease in our average realized sales prices, excluding the impact of derivatives, would have increased or decreased our revenues for the year ended December 31, 2019 by approximately $1.5 million.

*Hedging and mark-to-market activities.* We apply mark-to-market accounting to our derivative contracts; therefore, the full volatility of the non-cash change in fair value of our outstanding contracts is reflected in oil and natural gas revenues. For the year ended December 31, 2019, the non-cash mark-to-market losses were approximately $4.7 million, compared to gains of approximately $2.7 million for the same period in 2018. The 2019 non-cash mark-to-market loss resulted from higher future expected oil prices compared to the settlement prices on our oil fixed price basis swaps. Cash settlements received for our commodity derivatives were approximately $0.9 million for the year ended December 31, 2019, compared to settlements paid of approximately $1.4 million for the year ended December 31, 2018.

*Field operating expenses.* Our field operating expenses generally consist of lease operating expenses, labor, vehicles, supervision, transportation, minor maintenance, tools and supplies expenses, as well as production and ad valorem taxes.

*Lease operating expenses.* Lease operating expenses decreased approximately $0.8 million, or 13%, to approximately $5.9 million for the year ended December 31, 2019, compared to $6.7 million for the same period in 2018. This decrease in operating expenses was primarily due to the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture that closed during 2018.

*Depreciation, depletion and amortization expense.* Depreciation, depletion and amortization expense includes the depreciation, depletion and amortization of acquisition costs and equipment costs. Depletion is calculated using units-of-production under the successful efforts method of accounting. Assuming other variables remain constant, as the production of natural gas, NGLs and oil increases or decreases, our depletion expense would increase or decrease as well, respectively.

Our depreciation, depletion and amortization expense for the year ended December 31, 2019 was approximately $3.9 million, compared to approximately $4.8 million for the same period in 2018. The decrease was primarily the result of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture that closed during 2018. Our non-oil and natural gas properties are depreciated using the straight-line basis.

*Impairment expense.* For the years ended December 31, 2019 and 2018, we did not record impairment on our oil and natural gas properties.

Table of Contents

**Consolidated Earnings Results**

The following table sets forth the reconciliation of segment operating income to net income (loss) for periods indicated (in thousands):

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Variance | |
| **Reconciliation of segment operating income to net income (loss):** | | | | |
| Total production operating income | $ 92 | $ 14,301 | $ (14,209) | (99%) |
| Total midstream operating income | 1,858 | 37,586 | (35,728) | (95%) |
| Total segment operating income | 1,950 | 51,887 | (49,937) | (96%) |
| | | | | |
| General and administrative expense | (17,610) | (23,653) | 6,043 | (26%) |
| Unit-based compensation expense | (1,351) | (1,938) | 587 | (30%) |
| Interest expense, net | (39,789) | (10,961) | (28,828) | NM [(a)] |
| Other income | 5,860 | 546 | 5,314 | NM [(a)] |
| Income tax expense | (202) | (190) | (12) | 6% |
| **Net income (loss)** | $ (51,142) | $ 15,691 | $ (66,833) | NM [(a)] |

(a) Amounts Variances deemed to be Not Meaningful "NM"

*General and administrative expenses.* General and administrative expenses include indirect costs billed by Manager in connection with the Services Agreement, field office expenses, professional fees and other costs not directly associated with field operations. General and administrative expenses, inclusive of unit-based compensation expense, decreased approximately $6.0 million, or 26%, to approximately $17.6 million for the year ended December 31, 2019, compared to approximately $23.7 million for the same period in 2018. The decrease was primarily the result of reduced salaries and wages, as well as reduced asset management fees.

*Unit-based compensation expense.* Unit-based compensation expense decreased approximately $0.6 million, or 30%, to approximately $1.4 million for the year ended December 31, 2019, compared to approximately $1.9 million for the same period in 2018. This decrease was the result of a substantial decline in the price of our common units on the NYSE American during the two year period ended December 31, 2019.

*Interest expense, net.* Interest expense increased approximately $28.8 million, to approximately $39.8 million for the year ended December 31, 2019, compared to approximately $10.9 million for the same period in 2018. This increase was the result of the issuance of the Class C Preferred Units and the Warrant on August 2, 2019. The accrual of distributions on the Class C Preferred Units as well as the mark-to-market impact of the Warrant are charges to interest expense. Cash interest expense for the year ended December 31, 2019 was approximately $9.2 million compared to approximately $10.2 million for the same period in 2018. See Note 17. "Partner's Capital" of our Notes to Consolidated Financial Statements for additional information related to Class C Preferred Units and the Warrant.

*Other income (expense).* Other income was approximately $5.9 million for the year ended December 31, 2019, compared to approximately $0.5 million for the same period in 2018, resulting from changes in the fair value measurement of the earnout derivative.

*Income tax expense*. Income tax expense was approximately $0.2 million for the years ended December 31, 2019, and 2018, respectively.

**Liquidity and Capital Resources**

As of December 31, 2019, we had approximately $5.1 million in cash and cash equivalents and $15.0 million available for borrowing under the Credit Agreement in effect on such date, as discussed further below. During the years ended December 31, 2019 and 2018, we paid approximately $9.2 million and $9.8 million, respectively, in cash for interest on borrowings under our Credit Agreement, of which approximately $0.2 million was related to the fee on undrawn commitments during the year ended December 31, 2019.

Our capital expenditures during the year ended December 31, 2019 were funded with cash on hand. In the future, capital and liquidity are anticipated to be provided by operating cash flows, borrowings under our Credit Agreement and proceeds from the issuance of additional common units or other limited partner interests. We expect that the combination of these capital resources will be adequate to meet our short-term working capital requirements, long-term capital expenditures program and quarterly cash distributions, if any.

We expect that our future cash requirements relating to working capital, maintenance capital expenditures and quarterly cash distributions, if any to our partners will be funded from cash flows internally generated from our operations. Our expansion capital expenditures will be funded by borrowings under our Credit Agreement or from potential capital market transactions. However, there can be no assurance that operations and other capital resources will provide cash in sufficient amounts to maintain our current debt level, planned levels of capital expenditures, operating expenses or any cash distributions that we may make to unitholders.

*Credit Agreement*

We have entered into a credit facility with Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto as amended by the Ninth Amendment to Third Amended and Restated Credit Agreement (the "Credit Agreement"). The Credit Agreement provides a quarterly amortizing term loan of $155.0 million (the "Term Loan") and a maximum revolving credit amount of $20.0 million (the "Revolving Loan"). The Term Loan and Revolving Loan both have a maturity date of September 30, 2021. Borrowings under the Credit Agreement are secured by various mortgages of both midstream and upstream properties that we own as well as various security and pledge agreements among us, certain of our subsidiaries and the administrative agent.

Borrowings under the Credit Agreement are available for limited direct investment in oil and natural gas properties, midstream properties, acquisitions, and working capital and general business purposes. The Credit Agreement has a sub-limit of up to $2.5 million which may be used for the issuance of letters of credit. Pursuant to the Credit Agreement, the initial aggregate commitment amount under the Term Loan is $155.0 million, subject to quarterly $10.0 million principal and other mandatory prepayments. The borrowing base is equal to the sum of the rolling four quarter EBITDA of our midstream operations and the amount of distributions received from the Carnero JV multiplied by 4.5 or a lower number dependent upon natural gas volumes flowing through Western Catarina Midstream. Outstanding borrowings in excess of our borrowing base must be repaid within 45 days. As of December 31, 2019, the borrowing base under the Credit Agreement was $235.5 million and we had $150.0 million of debt outstanding, consisting of $145.0 million under the Term Loan and $5.0 million under the Revolving Loan. We are required to make mandatory payments of outstanding principal on the Term Loan of $10 million per fiscal quarter. The maximum revolving credit amount is $20.0 million which left us with $15.0 million in unused borrowing capacity at December 31, 2019. There were no letters of credit outstanding under our Credit Agreement as of December 31, 2019.

At our election, interest for borrowings under the Credit Agreement are determined by reference to (i) the London interbank offered rate ("LIBOR") plus an applicable margin between 2.50% and 3.00% per annum based on net debt to EBITDA or (ii) a domestic bank rate ("ABR") plus an applicable margin between 1.50% and 2.00% per annum based on net debt to EBITDA plus (iii) a commitment fee of 0.500% per annum based on the unutilized maximum revolving credit. Interest on the borrowings for ABR loans and the commitment fee are generally payable quarterly. Interest on the borrowings for LIBOR loans are generally payable at the applicable maturity date.

The Credit Agreement contains various covenants that limit, among other things, our ability to incur certain indebtedness, grant certain liens, merge or consolidate, sell all or substantially all of our assets, make certain loans, acquisitions, capital expenditures and investments, and pay distributions.

In addition, we are required to maintain the following financial covenants:

- current assets to current liabilities of at least 1.0 to 1.0 at all times; and
- senior secured net debt to consolidated adjusted EBITDA for the last twelve months, as of the last day of any fiscal quarter, of not greater than 3.5 to 1.0.

Table of Contents

The Credit Agreement also includes customary events of default, including events of default relating to non-payment of principal, interest or fees, inaccuracy of representations and warranties when made or when deemed made, violation of covenants, cross-defaults, bankruptcy and insolvency events, certain unsatisfied judgments, loan documents not being valid and a change in control. A change in control is generally defined as the occurrence of one of the following events: (i) our existing general partner ceases to be our sole general partner or (ii) certain specified persons shall cease to own more than 50% of the equity interests of our general partner or shall cease to control our general partner. If an event of default occurs, the lenders will be able to accelerate the maturity of the Credit Agreement and exercise other rights and remedies.

Our partnership agreement prohibits us from paying any distributions on our common units until we have redeemed all of the Class C Preferred Units. Following such redemption, the Credit Agreement further limits our ability to pay distributions to unitholders.

At December 31, 2019, we were in compliance with the financial covenants contained in the Credit Agreement. We monitor compliance on an ongoing basis. If we are unable to remain in compliance with the financial covenants contained in our Credit Agreement or maintain the required ratios discussed above, the lenders could call an event of default and accelerate the outstanding debt under the terms of the Credit Agreement, such that our outstanding debt could become then due and payable. We may request waivers of compliance from the violated financial covenants from the lenders, but there is no assurance that such waivers would be granted.

***Sources of Debt and Equity Financing***

As of December 31, 2019, we had $5.0 million of debt outstanding under the Revolving Loan, leaving us with $15.0 million in unused borrowing capacity. There were no letters of credit outstanding under our Credit Agreement at December 31, 2019. Our Credit Agreement matures on September 30, 2021.

In April 2017, we issued 84,577 common units in registered offerings for gross proceeds of approximately $1.3 million pursuant to a shelf registration statement originally filed with the SEC on March 6, 2015, as supplemented by that certain prospectus supplement filed with the SEC on April 6, 2017.

***Open Commodity Hedge Positions***

We periodically enter into hedging arrangements to reduce the impact of oil and natural gas price volatility on our operations. By removing the price volatility from a significant portion of our projected 2020 oil and natural gas production, we have mitigated, but not eliminated, the potential effects of changing prices on our cash flows. While mitigating the negative effects of falling commodity prices, these derivative contracts also limit the benefits we might otherwise receive from increases in commodity prices. These derivative contracts also limit our ability to have additional cash flows to fund higher severance taxes, which are usually based on market prices for oil and natural gas. Our operating cash flows are also impacted by the cost of oilfield services. In the event of inflation increasing service costs or administrative expenses, our hedging program will limit our ability to have increased operating cash flows to fund these higher costs. Increases in the market prices for oil and natural gas will also increase our need for working capital as our commodity hedging contracts cash settle prior to our receipt of cash from our sales of the related commodities to third parties.

It is our policy to enter into derivative contracts only with counterparties that are creditworthy financial institutions deemed by management as competent and competitive market makers. All of our derivatives are currently collateralized by the assets securing our Credit Agreement and therefore currently do not require the posting of cash collateral. This is significant since we are able to lock in sales prices on a substantial amount of our expected 2020 production without posting cash collateral based on price changes prior to the hedges being cash settled.

Table of Contents

The following tables as of December 31, 2019, summarize, for the periods indicated, our hedges currently in place through December 31, 2020. All of these derivatives are accounted for as mark-to-market activities.

*MTM Fixed Price Swaps—NYMEX (Henry Hub)*

| | Three Months Ended (volume in MMBtu) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 105,104 | $ 2.85 | 102,008 | $ 2.85 | 99,136 | $ 2.85 | 96,200 | $ 2.85 | 402,448 | $ 2.85 |

*MTM Fixed Price Basis Swaps–West Texas Intermediate (WTI)*

| | Three Months Ended (volume in Bbls) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 52,776 | $ 53.50 | 50,960 | $ 53.50 | 49,224 | $ 53.50 | 47,624 | $ 53.50 | 200,584 | $ 53.50 |

***Operating Cash Flows***

We had net cash flows provided by operating activities for the year ended December 31, 2019, of approximately $58.0 million, compared to net cash flows provided by operating activities of approximately $66.9 million for the same period in 2018. This decrease was primarily related to the impact of lower average commodity prices between the periods resulting in lower production for the period of approximately $5.7, as well as a decrease of approximately $2.4 million.

Our operating cash flows are subject to many variables, the most significant of which is the volume of oil and natural gas transported through our midstream assets, volatility of oil and natural gas prices and our level of production of oil and natural gas. Oil and natural gas prices are determined primarily by prevailing market conditions, which are dependent on regional and worldwide economic activity, weather and other factors beyond our control. Our future operating cash flows will depend on oil and natural gas transported through our midstream assets, as well as the market prices of oil and natural gas and our hedging program.

***Investing Activities***

We had net cash flows used in investing activities for the year ended December 31, 2019 of approximately $1.4 million, consisting of approximately $1.0 million related to midstream activities, including pipeline construction, and contributions to Carnero JV totaling approximately $0.2 million.

Our net cash flows provided by investing activities for the year ended December 31, 2018 were approximately $2.3 million, consisting of approximately $2.5 million related to midstream activities, including pipeline construction, and contributions to Carnero JV totaling approximately $2.8 million. These outflows were offset by approximately $7.7 million related to proceeds from sales of oil and natural gas properties.

***Financing Activities***

Net cash flows used in financing activities was approximately $54.4 million for the year ended December 31, 2019. During the year ended December 31, 2019, we distributed (i) approximately $17.7 million to Stonepeak Catarina, as the holder of all of our previously outstanding Class B Preferred Units and, starting with the distribution for the quarter ended June 30, 2019, the holder of all of our outstanding Class C Preferred Units, and (ii) approximately $5.2 million to our common unitholders. Additionally, we paid approximately $0.2 million in costs associated with the Exchange (as defined herein) and repaid $34.0 million of borrowings under the Credit Agreement.

Net cash flows used in financing activities were approximately $66.6 million for the year ended December 31, 2018. During the year ended December 31, 2018, we distributed approximately $33.3 million to Stonepeak Catarina, as the holder of all of our outstanding Class B Preferred Units, and approximately $23.2 million to our common unitholders.

Additionally, we paid approximately $0.1 million in offering costs and repaid $11.0 million of borrowings under the Credit Agreement.

**Off-Balance Sheet Arrangements**

As of December 31, 2019, we had no off-balance sheet arrangements with third parties, and we maintain no debt obligations that contained provisions requiring accelerated payment of the related obligations in the event of specified levels of declines in credit ratings.

**Credit Markets and Counterparty Risk**

We actively monitor the credit exposure and risks associated with our counterparties. Additionally, we continue to monitor global credit markets to limit our potential exposure to credit risk where possible. Our primary credit exposures result from the generation of substantially all of our midstream business segment revenues from a single customer, Sanchez Energy, the sale of oil and natural gas and our use of derivatives. On August 11, 2019, the Sanchez Energy Chapter 11 Case was filed. No assurances can be given as to the timing or outcome of this process. As of December 31, 2019, we had no past due receivables from Sanchez Energy, and through December 31, 2019, we have not suffered any significant losses with our counterparties as a result of nonperformance. However, on January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. Given our midstream focus, our primary credit exposure relates to the creditworthiness of the counterparties under our gathering and processing agreements. Sanchez Energy, whose earned revenues contribute to our midstream segment, accounted for 86% of total revenue for the year ended December 31, 2019. Any development that materially and adversely affects Sanchez Energy's operations or financial condition could have a material adverse impact on us, including but not limited to impairment losses on fixed assets. For additional information on the risks associated with our relationships with Sanchez Energy, please read "Part I, Item 1A. Risk Factors."

Certain key counterparty relationships are described below:

*Derivative Counterparties*

As of December 31, 2019, our derivatives were with ING, Comerica and Royal Bank of Canada, all of whom are lenders in our Credit Agreement. All of our derivatives are currently collateralized by the assets securing our Credit Agreement and therefore currently do not require the posting of cash collateral. As of December 31, 2019, each of these financial institutions had an investment grade credit rating.

*Credit Agreement*

As of December 31, 2019, the banks and their percentage commitments in our Credit Agreement were: Royal Bank of Canada (13%), BBVA USA f/k/a Compass Bank (12%), Trust Bank f/k/a SunTrust Bank (12%), Capital One, National Association (12%), Comerica Bank (12%), Citibank, N.A. (9%), Credit Suisse AG, Cayman Islands (9%), ING Capital LLC (9%), CIT Bank, N.A. (9%) and Macquarie Investments US Inc (5%). As of December 31, 2019, each of these financial institutions had an investment grade credit rating.

**Critical Accounting Policies and Estimates**

The discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of the financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates pertain to proved oil and natural gas reserves and related cash flow estimates used in the calculation of depletion and impairment of oil and natural gas properties, the fair value of commodity derivative contracts and asset retirement obligations, accrued oil and natural gas revenues and expenses and the allocation of general and administrative expenses. Actual results could differ materially from those estimates.

The policies disclosed included the accounting for oil and natural gas properties, oil and natural gas reserve quantities, revenue recognition and hedging activities. Please read Note 2 "Basis of Presentation and Summary of Significant Accounting Policies" to the consolidated financial statements for a discussion of additional accounting policies and estimates made by management.

***Oil and Natural Gas Properties***

We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties. Under this method of accounting, costs relating to the development of proved areas are capitalized when incurred.

Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold and proved property acquisition costs using all proved reserves. As more fully described in Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements, proved reserves estimates are subject to future revisions when additional information becomes available.

All other properties, including gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

Estimated asset retirement costs are recognized when the asset is acquired or placed in service. Costs associated with oil and natural gas properties are amortized over proved reserves using the units-of-production method. Costs associated with gathering and transportation assets are depreciated using the straight-line method over the useful lives of the asset. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

Oil and natural gas properties are reviewed for impairment when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. Cash flow estimates for the impairment testing are based on third party reserve reports and exclude derivative instruments. Refer to Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements for additional information.

Gathering and transportation assets are reviewed for impairment when facts or circumstances indicate that their carrying value may not be recoverable. Asset recoverability is measured by comparing the carrying value of the asset or asset group with its expected future pre-tax undiscounted cash flows. These cash flow estimates require us to make projections and assumptions for many years into the future for pricing, demand, competition, operating cost and other factors. If the carrying amount exceeds the expected future undiscounted cash flows, we recognize an impairment equal to the excess of net book value over fair value. The determination of the fair value using present value techniques requires us to make projections and assumptions regarding the probability of a range of outcomes and the rates of interest used in the present value calculations. Any changes we make to these projections and assumptions could result in significant revisions to our evaluation of recoverability of our gathering and transportation assets and the recognition of additional impairments. Refer to Note 8 "Oil and Natural Gas Properties and Related Equipment" to our consolidated financial statements for additional information.

***Reserves of Natural Gas, NGLs and Oil***

Our estimate of proved reserves is based on the quantities of natural gas, NGLs and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Management estimates the proved reserves attributable to our ownership based on various factors, including consideration of the reserve report prepared by Ryder Scott, an independent oil and natural gas consulting firm. On an annual basis, our proved reserve estimates and the reserve report prepared by Ryder

Scott are reviewed by the Audit Committee and the Board. Our financial statements for 2019 and 2018 were prepared using Ryder Scott's estimates of our proved reserves.

Reserves and their relation to estimated future net cash flows impact our depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The accuracy of our reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Our proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the actual quantities of oil and natural gas eventually recovered.

**Recent Accounting Pronouncements and Accounting Changes**

See Note 2 "Basis of Presentation and Summary of Significant Accounting Policies" to our consolidated financial statements included in this report for information on new accounting pronouncements.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

We are a smaller reporting company as defined by Rule 12b-2 of the Exchange Act and are not required to provide the information required by this Item.

**Item 8. Financial Statements and Supplementary Data**

The information required by this Item is included in this report as set forth in the "Index to Consolidated Financial Statements" beginning on page F-1 of this Form 10-K and is incorporated by reference herein.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, with the Partnership have been detected. These inherent limitations include error by personnel in executing controls due to faulty judgment or simple mistakes, which could occur in situations such as when personnel performing controls are new to a job function or when inadequate resources are applied to a process. Additionally, controls can be circumvented by the individual acts of some persons or by collusion of two or more people.

The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no absolute assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions or personnel, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

*Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15(b) under the Exchange Act, we have evaluated, under the supervision and with the participation of our management, including the principal executive officer and principal financial officer of our general partner, the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Form 10-K. Our disclosure controls and procedures are designed to provide reasonable assurance that the information required to be disclosed by us in reports that we file under the Exchange Act is accumulated and communicated to our management, including the principal executive officer and principal financial officer of our general partner, as appropriate, to allow timely decisions regarding required disclosure and is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC. The principal executive officer and principal financial officer of our general partner have concluded that our current disclosure controls and procedures were effective as of December 31, 2019 at the reasonable assurance level.

*Changes in Internal Control over Financial Reporting*

During the three months ended December 31, 2019, there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*Reports of Management*

*Financial Statements*

The management of our general partner is responsible for the information and representations in our financial statements. We prepare the financial statements in accordance with accounting principles generally accepted in the United States of America based upon available facts and circumstances and management's best estimates and judgments of known conditions.

The Audit Committee, which consists of three independent directors, meets periodically with management, our internal auditor and KPMG LLP to review the activities of each in discharging their responsibilities. Our internal auditor and KPMG LLP have free access to the Audit Committee.

*Management's Report on Internal Control Over Financial Reporting*

Our management, under the direction of the principal executive officer and principal financial officer of our general partner, is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) of the Exchange Act.

Our system of internal control over financial reporting is designed to provide reasonable assurance to our management and the Board regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America.

The management of our general partner conducted an evaluation of the effectiveness of our internal control over financial reporting using the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). As noted in the COSO framework, an internal control system, no matter how well conceived and operated, can provide only reasonable-not absolute-assurance to management and the Board regarding achievement of an entity's financial reporting objectives. Based upon the evaluation under this framework, management concluded that our internal control over financial reporting was effective as of December 31, 2019.

*Report of Independent Registered Public Accounting Firm*

Please see Report of Independent Public Accounting Firm under "Part II, Item 8. Financial Statements and Supplementary Data" of this Form 10-K.

**Item 9B. Other Information**

None.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The following table shows information for members of the Board and the executive officers of our general partner as of March 13, 2020. All of the directors of our general partner are elected by Manager, as the sole member of our general partner, except for two persons who are appointed by Stonepeak Catarina pursuant to the Representation and Standstill Agreement. Members of the Board hold office until their successors have been elected or qualified or until the earlier of their death, incapacity, resignation or removal. Executive officers hold office at the discretion of, and may be removed by, the Board.

| Name | Age | Position with Sanchez Midstream Partners LP |
|---|---|---|
| Alan S. Bigman | 52 | Independent Director |
| Kirsten A. Hink | 53 | Chief Accounting Officer |
| Jack Howell | 33 | Director |
| Richard S. Langdon | 69 | Independent Director |
| G.M. Byrd Larberg | 67 | Independent Director |
| Antonio R. Sanchez, III | 46 | Director; Chairman of the Board |
| Eduardo A. Sanchez | 40 | Director |
| Patricio D. Sanchez | 39 | Director; President & Chief Operating Officer |
| Luke R. Taylor | 42 | Director |
| Charles C. Ward | 59 | Chief Financial Officer & Secretary |
| Gerald F. Willinger | 52 | Director; Chief Executive Officer |

*Alan S. Bigman* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in July 2014. Mr. Bigman is an independent member of the Conflicts Committee of our general partner and is the Chair of the Audit Committee of our general partner. Mr. Bigman currently serves as an independent non-executive director and chairman of the audit committee of a $1.5 billion dollar privately held chemicals company. His extensive board experience also includes Basell Polyolefins, an international chemical producer and predecessor of LyondellBasell, where he served as a non-executive director before his appointment as Chief Financial Officer, and Svyazinvest, then Russia’s largest telecom company, as well as several others. Mr. Bigman’s executive experience includes fourteen years in positions with Access Industries, a privately-held, U.S.-based industrial group, and in senior positions with its portfolio companies. From June 1996 to March 1998, Mr. Bigman was Senior Vice President of Access Industries, overseeing strategic investments. From March 1998 until September 2003, Mr. Bigman served as Vice President and Director of Corporate Finance of Tyumen Oil Company (TNK), a major Russian oil and gas producer and refiner, where he raised over $5 billion to finance the growth of the company from its privatization in 1997 through a sale of a 50% stake to British Petroleum (BP) in 2003, creating TNK-BP, a $20 billion joint venture. From 2003 to 2004, he served as Vice President and Director of Corporate Finance for SUAL, a large Russian aluminum smelter, where he reorganized the finance function and executed strategic merger transactions. From September 2004 until December 2005, Mr. Bigman rejoined Access Industries as Senior Vice President. In January 2006, Mr. Bigman was appointed Chief Financial Officer of Basell Polyolefins, an international chemicals company based in The Netherlands, where he served through 2007 and co-led the acquisition of Lyondell to create one of the largest global chemical companies. In January 2008 Mr. Bigman was appointed Chief Financial Officer of LyondellBasell Industries, the successor company to Basell Polyolefins and Lyondell. LyondellBasell's US operations filed for bankruptcy in January 2009. Mr. Bigman continued to serve as Chief Financial Officer until August 2009, and worked for the company in a project role through March 2010. From 2011 through 2012, he served on a project basis as Director, Capital Markets and M&A of KCAD Deutag, an oilfield services company based in Aberdeen, UK, where he was responsible for reorganizing and staffing the company’s finance, corporate development and tax functions.

*Kirsten A. Hink* was elected Chief Accounting Officer of our general partner in May 2015. Mrs. Hink has served as Senior Vice President and Chief Accounting Officer of Sanchez Energy since January 2015, and she previously served as Sanchez Energy's Vice President and Principal Accounting Officer from March 2012. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Mrs. Hink has served as Senior Vice President – Chief Accounting Officer of SOG since March 2016. Prior to joining Sanchez Energy, Mrs. Hink served as Controller of Vanguard Natural Resources, LLC from January 2011 to February 2012. From January 2010 to December 2010, she served as Assistant Controller of Mariner Energy, Inc. She served as the Chief Accounting Officer for Edge Petroleum Corporation, or Edge, from July 2008 through December 2009 and the Vice President and Controller for Edge from October 2003 through July 2008. Prior to that time, she served as Controller of Edge from December 31, 2000 to October 2003 and Assistant Controller of Edge from June 2000 to December 2000. Edge filed for bankruptcy in October 2009. Mrs. Hink is a Certified Public Accountant in the State of Texas.

*Jack Howell* was elected as a member of the Board in October 2015. Mr. Howell is a Senior Managing Director at Stonepeak and a member of Stonepeak's Executive Committee. Mr. Howell has been with Stonepeak since 2015. Prior to joining Stonepeak, Mr. Howell covered the oil and gas sector for Davidson Kempner, a hedge fund that focuses on distressed investments, from 2014 to 2015. Prior to Davidson Kempner, Mr. Howell worked for Denham Capital, an energy-focused private equity firm from 2011 to 2014. Mr. Howell started his career as an Analyst in Credit Suisse's oil and gas investment banking group. Mr. Howell holds a Bachelor of Arts degree in Plan II Honors and Business Economics, Phi Beta Kappa, from the University of Texas at Austin.

*Richard S. Langdon* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in December 2006. Mr. Langdon is an independent member of the Audit Committee and the Conflicts Committee. Mr. Langdon is currently the Executive Vice President and Chief Financial Officer of Altamont Energy LLC, a privately held exploration and production company. Mr. Langdon previously served as the President and Chief Executive Officer of Badlands Energy, Inc., a privately held exploration and production company ("Badlands Energy"), and its publicly traded predecessor entity, Gasco Energy, Inc. ("Gasco"), from May 2013 to October 2018. Mr. Langdon also served as a director of Badlands Energy and its predecessor, Gasco since 2003. Badlands Energy filed for bankruptcy in August 2017. In addition to his Badlands Energy titles, Mr. Langdon also served as Debtor-in-Possession for Badlands Energy, Inc from August 2017 to October 2018. Mr. Langdon also currently serves on the board of directors, as chairman of the audit committee and as a member of the compensation committee of Gulfslope Energy, Inc., which capacities he has served in since March 2014. Mr. Langdon was the President and Chief Executive Officer of KMD Operating Company LLC ("KMD Operating"), a privately held production company, from November 2011 until December 2015 and Matris Exploration Company L.P., a privately held production company, from July 2004 until the merger of Matris Exploration into KMD Operating in November 2011, which merger was effective January 2011. Mr. Langdon also served as President and Chief Executive Officer of Sigma Energy Ventures, LLC, a privately held production company, from November 2007 until November 2013. From 1997 until 2002, Mr. Langdon served as Executive Vice President and Chief Financial Officer of EEX Corporation, a publicly traded exploration and production company that merged with Newfield Exploration Company in 2002. Prior to that, he held various positions with the Pennzoil Companies from 1991 to 1996, including Executive Vice President—International Marketing—Pennzoil Products Company; Senior Vice President—Business Development—Pennzoil Company; and Senior Vice President—Commercial & Control—Pennzoil Exploration & Production Company.

*G. M. Byrd Larberg* was elected as a member of the Board in March 2015. He was previously a director of Sanchez Production Partners LLC, having been first elected in July 2014. Mr. Larberg is an independent member of the Audit Committee and is the Chair of the Conflicts Committee. Mr. Larberg served as a member of the board of directors of Horizon Energy, a private Exploration Company with both domestic and international focus, from 2017 to 2019. From 2010 to 2012, Mr. Larberg served as a member of the board of directors of Risco Resources, a small independent exploration company headquartered in Jakarta, Indonesia, which was sold in 2012. Mr. Larberg served as a member of the board of directors of 3GIG, an exploration-focused software firm headquartered in Houston, Texas, from 2008 to 2013 and now serves as an advisor to the board. He is active on the board of directors of the Houston Metropolitan YMCA and was previously chairman of the board. He was a member of the board of directors of Meridian Resources, a Houston-based exploration company, from 2007 until it was acquired by Alta Mesa in 2010. Mr. Larberg began his career at Shell Exploration and Production Company as a geologist in 1976. Over the next 21 years, he held various leadership positions within various Shell entities, and served as Vice President of Exploration and Production, Africa and Latin America for Pecten International, an affiliate of Shell Oil Company, from 1993 to 1996. Mr. Larberg left Shell and joined Burlington

Table of Contents

Resources in 1998. From 1998 to 2006, Mr. Larberg held several key positions at Burlington Resources, beginning as Vice President of Exploration for Burlington Resources International. In 2000, Mr. Larberg was elected Executive Vice President and Chief Operating Officer of Burlington Resources International, a position he held until 2003, when he moved to the corporate office as Vice President of Geosciences. In this capacity, he was responsible for technical excellence for the geology and geophysical ("G&G") programs across the company, G&G technology business development, and management of the company-wide exploration portfolio. Mr. Larberg retired from Burlington Resources in April 2006 following the company's purchase by ConocoPhillips. Mr. Larberg was a director of Duma Hydrocarb Energy Corporation, a publicly traded production company, for a brief period in 2014. He occasionally consults in the areas of technical and portfolio management for exploration companies, and has provided such consulting services to a number of companies including Pemex, Maersk, ONGC, Ecopetrol, Repsol, HOCOL and the Kuwait National Petroleum Company.

*Antonio R. Sanchez, III* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in August 2013. Mr. Sanchez, III is Chairman of the Board. He currently serves as the President & Chief Executive Officer of Sanchez Energy and has been a member of Sanchez Energy's board of directors since its formation in August 2011. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. He has been directly involved in the oil and gas industry for over 13 years. Mr. Sanchez, III is also the Co-President of SOG, which he joined in October 2001. He was the President of SEP Management I, LLC and was a Managing Director of Sanchez Energy Partners I, LP until their dissolution in December 2016. In his capacities as a director and officer of these companies, Mr. Sanchez, III has managed all aspects of their daily operations, including exploration, production, finance, capital markets activities, engineering and land management. From 1997 to 1999, Mr. Sanchez, III was an investment banker specializing in mergers and acquisitions with J.P. Morgan Securities Inc. From 1999 to 2001, Mr. Sanchez, III worked in a variety of positions, including sales and marketing, product development and investor relations, at Zix Corporation, a publicly traded encryption technology company (NASDAQ: ZIXI). Mr. Sanchez, III was also a member of the board of directors of Zix Corporation from May 2003 to June 2014.

*Eduardo A. Sanchez* was elected as a member of the Board in June 2015. Mr. Sanchez served as president of Sanchez Energy from October 2015 to November 2017, President and Chief Executive Officer of Sanchez Resources, LLC from February 2010 until November 2017, co-president of SOG from July 2014 to November 2017, and chief executive officer of Sanchez Oil & Gas Mexico Holdings, LLC from August 2015 to December 2017. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Prior to his work at Sanchez Resources, LLC, Mr. Sanchez worked at Commonwealth Associates, Inc. focusing on private equity and debt placements in small and midsize market capitalization businesses including those in the energy sector.

*Patricio D. Sanchez* was elected President & Chief Operating Officer of our general partner in March 2017, Chief Operating Officer of our general partner in May 2015 and as a member of the Board in June 2015. Mr. Sanchez has served as co-president of SOG since June 2014 and prior to that from April 2010 to June 2014 as an Executive Vice President. Mr. Sanchez has served as an Executive Vice President of Sanchez Energy since November 2016. Sanchez Energy filed the Sanchez Energy Chapter 11 Case in August 2019. Mr. Sanchez has also been the managing member of Santerra Holdings, LLC, an oil and gas production company, since February 2012. Mr. Sanchez has managed many aspects of these companies' daily operations, including exploration, production, finance, capital markets activities, engineering and land management.

*Luke R. Taylor* was elected as a member of the Board in October 2015. Mr. Taylor has served as a Senior Managing Director with Stonepeak since August 2011 and serves as a member of Stonepeak's Executive Committee. Mr. Taylor has been investing across the infrastructure space for over 15 years and sits on the boards of Lineage Logistics, Golar Power and Ironclad Energy Partners, and is a former director of Paradigm Energy Partners, Tidewater Holdings, Carlsbad Desalination Project, Casper Crude to Rail and Northstar Renewable Power. Prior to joining Stonepeak, Mr. Taylor was a Senior Vice President with Macquarie Capital based in New York. Mr. Taylor has a Bachelor of Commerce and a Master of Business (Distinction) from the University of Otago (New Zealand).

*Charles C. Ward* was elected Chief Financial Officer & Secretary of our general partner in March 2015. He previously served as Chief Financial Officer and Treasurer of Sanchez Production Partners LLC from March 2008 until its conversion to a limited partnership in March 2015 and Secretary from July 2014 until March 2015. Mr. Ward also served as a Vice President of Constellation Energy Commodities Group, Inc. from November 2005 until December 2008. Prior to that time, he was a Vice President of Enron Creditors Recovery Corp. from March 2002 to November 2005.

*Gerald F. Willinger* was elected as a member of the Board in March 2015 and was previously a director of Sanchez Production Partners LLC, having been first elected in August 2013. Mr. Willinger was elected Interim Chief Executive Officer of our general partner in April 2015 and Chief Executive Officer in December 2015. Mr. Willinger has served as a Managing Director of Sanchez Capital Advisors, LLC since February 2010 and as Executive Vice President of SOG since 2014. Mr. Willinger was also a co-founder, officer and director of Sanchez Resources from February 2010 to November 2017 when Sanchez Resources was acquired by Sanchez Energy Corporation. From 1998 to 2000, Mr. Willinger was an investment banker with Goldman, Sachs & Co. Mr. Willinger served in various private equity investment management roles at MidOcean Partners, LLC and its predecessor entity, DB Capital Partners, LLC, from 2000 to 2003 and at the Cypress Group, LLC from 2003 to 2006. Prior to joining Sanchez Capital Advisors, LLC, Mr. Willinger was a Senior Analyst for Silver Point Capital, LLC, a credit-opportunity fund, from 2006 to 2009.

Messrs. Howell and Taylor were elected as members of the Board in October 2015 pursuant a Board Representation and Standstill Agreement, by and among us, our general partner and Stonepeak Catarina, which was subsequently amended and restated by that certain Amended and Restated Board Representation and Standstill Agreement, dated as of August 2, 2019, by and among us, our general partner and Stonepeak Catarina (as amended and restated, the "Representation and Standstill Agreement"). Pursuant to the Representation and Standstill Agreement, we and our general partner agreed to permit Stonepeak Catarina to designate two persons to serve on the Board. The right to designate one Board member will immediately terminate on such date as Stonepeak Catarina no longer owns at least 25% of the Partnership's outstanding Class C Preferred Units issued to it; and the right to designate the second Board member will immediately terminate on such date as Stonepeak Catarina does not hold any issued and outstanding Class C Preferred Units. Stonepeak Catarina also has the right to appoint the three independent members to the Board if all of the Class C Preferred Units have not been redeemed by December 31, 2021, with such right continuing until all Class C Preferred Units have been redeemed.

Messrs. Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez are brothers.

**Qualifications of the Board of Directors**

The sole member of our general partner elects all of the members of the Board, except for two members designated by Stonepeak Catarina pursuant to the Representation and Standstill Agreement. The following sets forth the specific experience, qualifications, attributes and skills that led the sole member of our general partner to conclude that the persons appointed by it should serve as directors:

Mr. Bigman brings considerable financial, managerial, transaction and corporate governance experience to the Board. During his career, he has held management positions of increasing responsibility in major energy corporations throughout the world where he has successfully lead financings, financial restructurings, mergers and acquisitions involving companies focused on various aspects of the hydrocarbon value chain. With respect to energy finance, as Vice President and Director of Corporate Finance for TNK, a leading Russian oil and gas producer, he raised capital to finance the growth of the company from its privatization in 1997 through a sale of a 50% stake to British Petroleum (BP) in 2003, creating TNK-BP, a $20 billion joint venture. In the area of corporate governance, Mr. Bigman served on the board of directors of Basell Polyolefins, where he was a member of the audit and compensation committees, which is beneficial for our board operations. He has also served on several international boards, including the board of Svyazinvest, Russia's largest telecommunications holding company, and JKX Oil and Gas, a UK public company focused on international oil and gas assets.

Mr. Langdon brings considerable financial and managerial experience in the energy industry to the Board as well as his entrepreneurial abilities, all of which are valuable to the Board. He has served as the Chief Financial Officer of EEX Corporation, a publicly traded production company that merged with Newfield Exploration. He has also held significant commercial positions with the Pennzoil Companies, including roles in business development and marketing. He was also the founder and owner of two privately held oil and gas companies. Mr. Langdon has extensive experience in finance and accounting that adds significant value to the board's oversight role of our financial reporting. He has prior public company board and audit committee experience, which is beneficial for our board operations, and served as the chairman of the audit committee of Gasco until he was named Gasco's President and Chief Executive Officer.

Mr. Larberg brings significant technical, operational and financial management experience in the oil and natural gas industry to the Board. His background provides a unique perspective on the dynamics of the oil and natural gas

production industry. He has considerable governance experience, having previously served on the boards of several other companies. Taken together, this wealth of experience is invaluable to our board.

Mr. Sanchez, III brings substantial oil and gas/energy industry experience in both public and private entities to the Board. In his current capacity as President & Chief Executive Officer of Sanchez Energy and as a member of the board of directors of Sanchez Energy, he brings the perspective of leading a publicly-traded upstream company. In his current capacity as Co-President of SOG, he brings particular expertise in operating multiple oil and natural gas entities through a shared service model.

Mr. Eduardo Sanchez brings substantial oil and gas/energy industry experience in both public and private entities to the Board. Through his past experience as the President of Sanchez Energy and co-president of SOG, he brings the perspective of leading a publicly-traded upstream company and particular expertise in operating multiple oil and natural gas entities through a shared service model.

Mr. Patricio Sanchez brings substantial oil and gas/energy industry experience in both public and private entities to the Board. As an Executive Vice President at Sanchez Energy, he brings the perspective of leading a publicly-traded upstream company. In his current capacity as Co-President of SOG, he brings particular expertise in operating multiple oil and gas entities through a shared service model.

Mr. Willinger brings substantial experience in risk management, finance and negotiated transactions in the energy industry to the Board. He has a valuable perspective on master limited partnerships, which provides the Board with unique insights into master limited partnership management and growth opportunities. In addition, he brings an expansive network of both private and public capital providers, which is useful for the Board when evaluating possible capital sources.

The following sets forth the specific experience, qualifications, attributes and skills that led the holders of our Class C Preferred Units to conclude that the persons appointed by them should serve as directors:

Mr. Howell brings extensive oil and gas investing experience, along with experience in oil and gas transaction financings and mergers and acquisitions to the Board.

Mr. Taylor brings significant investment experience in energy and infrastructure companies, along with experience in finance and mergers and acquisitions to the Board.

**Committees of the Board of Directors**

The Board has two standing committees: the Audit Committee and the Conflicts Committee. We do not have a compensation committee, but rather the Board approves executive officer salary changes and bonuses and equity grants to directors, executive officers, employees and service providers.

*Audit Committee*

As described in its charter, the Audit Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent public accountants to audit our financial statements, including assessing the independent auditor's qualifications and independence, and establishes the scope of, and oversees, the annual audit. The Audit Committee also approves any other services provided by public accounting firms. The Board has delegated to the Audit Committee the review and approval of our decision to enter into derivative transactions and our exemption from the swap clearing and swap execution requirements of the Dodd-Frank Act. The Audit Committee provides assistance to the Board in fulfilling its oversight responsibility to the unitholders, the investment community and others relating to the integrity of our financial statements, our compliance with legal and regulatory requirements, the independent auditor's qualifications and independence and the performance of our internal audit function. The Audit Committee oversees our system of disclosure controls and procedures and system of internal controls regarding financial, accounting, legal compliance and ethics that management and the Board established. In doing so, it is the responsibility of the Audit Committee to maintain free and open communication between the committee and our independent auditors, the internal accounting function and our management.

Messrs. Bigman (Chair), Langdon and Larberg are members of the Audit Committee. The Board has determined that Mr. Bigman is an "audit committee financial expert" as that term is defined in the applicable rules of the SEC and that he is "independent" as defined in applicable NYSE American listing standards.

*Conflicts Committee*

The Board has appointed a standing Conflicts Committee composed of the independent directors, Messrs. Larberg, (Chair), Bigman and Langdon, to review specific matters that the Board believes may involve conflicts of interest. The Conflicts Committee will review and evaluate the proposal, negotiate as the Conflicts Committee deems appropriate the terms of the proposal and determine if the resolution of a conflict of interest is fair and reasonable to us. If the Conflicts Committee approves a conflict of interest proposal, the proposal is then recommended to the entire Board. The members of the Conflicts Committee may not be security holders, officers or employees of our general partner, directors, officers, or employees of affiliates of the general partner or holders of any ownership interest in us other than common units or other publicly traded units and must meet the independence standards established by the NYSE American, the Exchange Act and other federal securities laws. If any resolution or course of action by our general partner or its affiliates with respect to a conflict of interest is approved by the Conflicts Committee, then such resolution or course of action shall be permitted and deemed approved by all of our partners, and shall not constitute a breach of our partnership agreement, or of any duty stated or implied by law or equity.

**Other**

We maintain on our website, http://www.sanchezmidstream.com, a copy of the Audit Committee charter as well as copies of the Corporate Governance Guidelines and Code of Business Conduct and Ethics that are applicable to us and our general partner. Copies of these documents are also available in print and may be obtained without charge, upon written request, by emailing our investor relations group at ir@sanchezmidstream.com. Our Code of Business Conduct and Ethics applies to our general partner's principal executive officer, principal financial officer and principal accounting officer, among others. We intend to post any changes to or waivers of our Code of Business Conduct and Ethics for the executive officers of our general partner on our website.

**Certifications**

The NYSE American requires the Chief Executive Officer of each listed company to certify annually that he is not aware of any violation by a listed company of the NYSE American's corporate governance listing standards, qualifying the certification to the extent necessary. In accordance with the rules of the NYSE American, we last provided such a certification on March 18, 2019. The certifications of the Chief Executive Officer and Chief Financial Officer of our general partners required by Sections 302 and 906 of the Sarbanes-Oxley Act have been included as exhibits to this Form 10-K.

**Item 11. Executive Compensation**

Our general partner has the sole responsibility for conducting our business and for managing our operations, and its Board makes decisions on our behalf. The executive officers of our general partner are employed by SOG and manage the day-to-day affairs of our business.

**Summary Compensation Table**

The following table sets forth the compensation of our named executive officers (which are the chief executive officer and the two next most highly compensated officers of our general partner) for 2019 and 2018:

| Name and Principal Position | Year | Salary (a) | Cash Bonus | Unit Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| **Gerald F. Willinger** | 2019 | $ 600,000 | $ 750,000 | $ 1,502,953 | $ 60,229 | $ 2,913,182 |
| Chief Executive Officer (e) | 2018 | $ 600,000 | $ 750,000 | $ 1,799,980 | $ 128,994 | $ 3,278,974 |
| **Patricio D. Sanchez** | 2019 | $ 400,000 | $ — | $ — | $ 19,273 | $ 419,273 |
| President & Chief Operating Officer (e) | 2018 | $ 400,000 | $ — | $ 1,299,989 | $ 52,043 | $ 1,752,032 |
| **Charles C. Ward** | 2019 | $ 375,000 | $ 350,000 | $ 635,864 | $ 45,367 | $ 1,406,231 |
| Chief Financial Officer and Secretary (e) | 2018 | $ 275,000 | $ 350,000 | $ 849,995 | $ 40,476 | $ 1,515,471 |

(a) On January 30, 2019, the Board increased Mr. Ward's base salary from $275,000 to $375,000 effective as of January 1, 2019.
(b) On August 2, 2019, the Board approved the Partnership's entry into Executive Agreements (defined below) with each of Messrs. Willing and Ward. The Executive Agreements contain annual cash bonuses ranges for each of Messrs. Willinger and Ward and also stipulate that, for the 2019 annual cash bonus, 50% of such bonuses were required to be paid no later than September 30, 2019 with the remainder to be paid no later than March 31, 2020. Pursuant to this requirement in the Executive Agreements, Messrs. Willinger and Ward were paid cash bonuses of $375,000 and $175,000 respectively, on September 30, 2019, as part of their 2019 annual cash bonus. Pursuant to the Executive Agreements (as defined below), we will pay Messrs. Ward and Willinger the remaining 50% of their 2019 annual cash bonuses on or before March 31, 2020.
(c) The amounts reported in this column reflect the aggregate grant date fair value of awards granted, if any, under our Plan for fiscal years 2019 and 2018, computed in accordance with FASB ASC Topic 718, excluding estimated forfeitures. See Note 15 "Unit-Based Compensation," to the Consolidated Financial Statements included under "Part II, Item 8. Financial Statements and Supplementary Data" for additional detail regarding these figures. On March 4, 2019, the Board awarded Messrs. Willinger and Ward long-term incentive awards, which were paid in the form of restricted units under the Plan that vest in equal installments over three years.
(d) The amount in this column reflects the amount of matching contributions made under our 401k plan; parking cost paid for our executive officers; the cost of life insurance, accidental death and dismemberment insurance, and health insurance for our executive officers; and for those executive officers who also serve as directors, this column includes cash fees they received for service as a director.
(e) Our named executive officers are eligible to participate in benefit plans such as medical, dental, vision, life and disability insurance, 401k and flexible spending accounts on the same terms as all employees or service providers.

**Executive Agreements**

On August 2, 2019, our general partner entered into Executive Services Agreements with each of Messrs. Willinger and Ward (each, an "Executive Agreement" and, collectively, the "Executive Agreements"). The Executive Agreements were approved by the Board on August 2, 2019. Each respective Executive Agreement provides (i) that the applicable executive will continue to serve in his current executive officer position with our general partner and provide services to us and our general partner during the applicable term, (ii) for an annual base salary (Mr. Willinger: $600,000 and Mr. Ward: $375,000), (iii) for an annual cash bonus equal to a percentage of the annual base salary (Mr. Willinger: 100%-150% and Mr. Ward: 75%-125%) based on a qualitative assessment of financial and individual performance achievements, and (iv) for eligibility to receive awards under our Plan or any successor thereto and to participate in any long-term incentive programs available generally to the executive officers of our general partner, as determined in the sole discretion of the Board. Under each Executive Agreement, in the event of the applicable executive's termination as an officer of the general partner due to (a) such executive's death or "disability," (b) the general partner terminating such executive without "cause," or (c) such executive terminating for "good reason" (as such terms are defined in the Executive Agreements), such executive (or such executive's designated beneficiaries, as applicable) will be entitled to receive payment of: (i) any accrued but unpaid then-current annual base salary through the date of termination, (ii) any unpaid annual bonus for the year prior to the year of termination and (iii) a pro-rated annual bonus for the year of termination. In addition, such executive will also be entitled to receive the following severance payments or benefits in the event of: (1) the general partner terminating such executive without "cause" (2) such executive terminating for "good reason" or (3)(A) the general partner terminating such executive without "cause," (B) such executive's death or "disability," or (C) such executive terminating for any reason, in the case of (A)-(C), during a period beginning 60 days prior to and ending two years following a Change in Control (as defined in the Executive Agreements) such executive will be entitled to receive (w) a lump-sum cash payment equal to two times such executive's then-current annual base salary plus two times the largest annual bonus paid (or due to be paid) to such executive for the year in which the termination occurs or any year in the three calendar year period immediately preceding the date of termination, (x) payment of the COBRA premiums for such

executive and such executive's eligible dependents during the COBRA continuation period, (y) to the extent not yet paid to such executive, a lump-sum cash payment equal to all outstanding amounts owed to such executive for services performed for or on behalf of us and our general partner, the amount of such executive's annual bonus for the last full year during which such executive performed services for us and our general partner, and the amount of such executive's annual bonus for the current year, based on such executive's annual bonus for such last full year (pro-rated to the date of termination), and (z) immediate vesting in full, as of the date of such Change in Control, of any units awarded to such executive under our Plan.

**Outstanding Equity Awards at Fiscal Year-End 2019**

The following table sets forth the outstanding equity awards and their market value using the closing price of our common units on NYSE American at December 31, 2019 for the named executive officers:

| Name | Number of Units Not Vested | Fair Market Value of Units Not Vested(a) |
|---|---|---|
| Gerald F. Willinger | 576,185 (b) | $ 172,856 |
| Patricio D. Sanchez | — | $ — |
| Charles C. Ward | 248,665 (b) | $ 74,600 |

(a) Amounts are based on the closing price of our common units of $0.30 as reported on the NYSE American on December 31, 2019.
(b) Reflects restricted units granted under the Plan on April 6, 2018, which units either vest on the first anniversary of the grant date or vest pro-rata over a three-year period and on their first anniversary, respectively, as well as units granted under the Plan on March 4, 2019, which units vest pro-rata over a three year period. See footnote (c) to the Summary Compensation Table for additional information on the vesting schedule for these units. Except in connection with a change in control (as defined in the Plan) or in the discretion of the board of directors of our general partner, any unvested restricted units will be forfeited upon such time as the holder is no longer an officer, employee, consultant or director of us, our general partner, any of their affiliates or any other person performing bona fide services for us.

**Compensation of Directors**

For the year ended December 31, 2019, compensation for the independent directors of the Board consisted of:

- a cash retainer of $10,000, payable quarterly on the last day of each fiscal quarter;
- an equity grant of $100,000 of fully vested common units on March 31 of each year;
- a $1,500 fee for each meeting of the Board and $1,000 for each substantive meeting of the Audit Committee and $3,500 for each substantive meeting of the Conflicts Committee attended by a member thereof;
- a cash retainer of $3,500 for the Chair of the Audit Committee and $2,500 for the Chair of the Conflicts Committee, each payable quarterly on the last day of each fiscal quarter; and
- eligibility for independent directors to participate in health benefits generally available to all employees and reimbursement for up to $500,000 of life and accidental death and dismemberment insurance.

Directors designated by Stonepeak, officers of our general partner and any director with ownership interests in SP Holdings, LLC, were not eligible for the 2019 director compensation program outlined above. However, on January 30, 2019, the Board approved a long-term incentive award for Mr. A. Sanchez, which was paid in the form of 210,970 restricted units under the Plan that vest in equal installments over three years.

Table of Contents

The following table sets forth a summary of the 2019 compensation for the directors except for Messrs. Willinger and P. Sanchez whose director compensation is included above under "—Summary Compensation Table":

| | Director Compensation | | | |
|---|---|---|---|---|
| **Name** | **Fees Earned or Paid in Cash** | **Unit Awards (a)** | **All Other Compensation (b)** | **Total** |
| Alan S. Bigman | $ 69,500 | $ 99,990 | $ 21,155 | $ 190,645 |
| Jack Howell (c) | $ — | $ — | $ — | $ — |
| Richard S. Langdon | $ 55,500 | $ 99,990 | $ 1,020 | $ 156,510 |
| G. M. Byrd Larberg | $ 62,000 | $ 99,990 | $ 15,681 | $ 177,671 |
| Antonio R. Sanchez, III (d) | $ — | $ 578,058 | $ — | $ 578,058 |
| Eduardo A. Sanchez (d) | $ — | $ — | $ — | $ — |
| Luke R. Taylor (c) | $ — | $ — | $ — | $ — |

(a) The amounts shown in this column for Messrs. Bigman, Langdon and Larberg represent the aggregate grant date fair value of the units granted under the Plan to Messrs. Bigman, Langdon and Larberg, computed in accordance with FASB ASC Topic 718, based on the $2.18 closing price per common unit on April 1, 2019. The amount shown in this column for Mr. A. Sanchez represents the aggregate grant date fair value of the units granted under the Plan to Mr. A. Sanchez, computed in accordance with FASB ASC Topic 718, based on the $2.74 closing price per common unit on March 4, 2019.

(b) All other compensation includes amounts for health, vision, dental, basic life and/or accidental death and dismemberment insurance premium fees paid by us for the director.

(c) As appointees of the holders of the Class C Preferred Units, Messrs. Howell and Taylor were not entitled to any compensation under our 2019 Board compensation program.

(d) As individuals with ownership interests in SP Holdings, Mr. A. Sanchez and Mr. E. Sanchez and Mr. P. Sanchez where not entitled to any compensation under our 2019 board compensation program, however, as noted above, Mr. A. Sanchez was awarded restricted units by the Board outside of the 2019 Board compensation program.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Unitholder Matters**

The following table sets forth the beneficial ownership of our units, as of March 13, 2020, held by:

- each unitholder known by us to beneficially own more than 5% of our outstanding units;
- each of the directors of the Board;
- each of our general partner's named executive officers (as such term is defined by the SEC); and
- the directors and executive officers of our general partner as a group.

The list of persons named in the table below is derived from our review of Form 3, Form 4, Form 5, Schedule 13D and Schedule 13G filings made with the SEC as of March 13, 2020. The amounts and percentage of common units and Class C Preferred Units beneficially owned are reported on the basis of the SEC rules governing the determination of beneficial ownership of securities. Under the SEC rules, a person is deemed to be a "beneficial owner" of a security if that person has or shares "voting power," which includes the power to vote or to direct the voting of such security, and/or "investment power," which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be a beneficial owner of any securities of which that person has a right to acquire beneficial ownership within 60 days. Under these rules, more than one person may be deemed a beneficial owner of the same securities, and a person may be deemed a beneficial owner of securities as to which he has no economic interest.

Table of Contents

Percentage of total units beneficially owned is based on 19,975,193 common units and 34,297,357 Class C Preferred Units outstanding as of March 13, 2020, the number of common units beneficially owned and the number of Class C Preferred Units beneficially owned is based upon ownership as of March 13, 2020, unless otherwise specified. Except as indicated by footnote, to our knowledge the persons named in the table below have sole voting and investment power with respect to all units shown as beneficially owned by them, subject to community property laws where applicable.

| Name and address of Beneficial Owner[(1)] | Common Units Beneficially Owned | | Class C Preferred Units Beneficially Owned | | Percentage of Total Units Beneficially Owned |
|---|---|---|---|---|---|
| | Number | Percentage | Number | Percentage | |
| Stonepeak Catarina Holdings, LLC[(2)] | 2,312,100 | 10.6 % | 34,297,357 | 100 % | 65.2 % |
| SN UR Holdings, LLC[(3)] | 2,272,727 | 11.4 % | — | — | 4.2 % |
| Invesco. Ltd[(4)] | 1,758,705 | 8.8 % | — | — | 3.2 % |
| Alan S. Bigman[(5)] | 77,254 | * | — | — | * |
| Kirsten A. Hink | 23,933 | * | — | — | * |
| Jack Howell | — | — | — | — | — |
| Richard S. Langdon | 81,827 | * | — | — | * |
| G. M. Byrd Larberg | 76,096 | * | — | — | * |
| Antonio R. Sanchez, III[(6)] | 1,337,508 | 6.7 % | — | — | 2.5 % |
| Eduardo A. Sanchez | 1,141,846 | 5.7 % | — | — | 2.1 % |
| Patricio D. Sanchez | 1,291,574 | 6.4 % | — | — | 2.4 % |
| Luke R. Taylor | — | — | — | — | — |
| Charles C. Ward | 381,048 | 1.9 % | — | — | * |
| Gerald F. Willinger | 1,104,614 | 5.5 % | — | — | 2.0 % |
| All directors and executive officers as a group (11 persons) | 5,515,700 | 27.6 % | — | — | 10.2 % |

* Less than 1%

(1) Unless otherwise set forth below, the address of all beneficial owners is c/o Sanchez Midstream Partners LP, 1000 Main Street, Suite 3000, Houston, Texas 77002.

(2) Ownership data as reported (i) on Schedule 13D/A filed on August 6, 2019 by Stonepeak Catarina Holdings LLC, Stonepeak Catarina Upper Holdings LLC, Stonepeak Infrastructure Fund (Orion AIV) LP, Stonepeak Associates LLC, Stonepeak GP Holdings LP, Stonepeak GP Investors LLC, Stonepeak GP Investors Manager LLC, Michael Dorrell and Trent Vichie (the "Stonepeak Beneficial Owners"), and (ii) publicly disclosed information regarding distributions of Class C Preferred PIK Units issued to Stonepeak Catarina Holdings LLC following the effective date of the Exchange, consisting of 939,327 Class C Preferred PIK Units issued on August 30, 2019, 1,007,820 Class C Preferred PIK Units issued on November 29, 2019 and 1,039,314 Class C Preferred PIK Units issued on February 28, 2020. The number of common units disclosed in the Schedule 13D/A includes 1,918,809 common units that the Stonepeak Beneficial Owners currently have the right to acquire within the next 60 days upon exercise of a Warrant held by Stonepeak Catarina Holdings LLC, such common units are not included for any other person on this table in accordance with Rule 13d-3(d)(1)(i) under the Exchange Act. The principal business address of each reporting person in the Schedule 13D/A is 55 Hudson Yards, 550 W. 34th St., 48th Floor, New York, NY 10001. The Schedule 13D/A filing lists each filing person as having shared voting and dispositive power over the common units and the Class C Preferred Units.

(3) Ownership data as reported on Schedule 13D filed on November 28, 2016 by SN UR Holdings, LLC and Sanchez Energy Corporation. The principal business address of each filing reporting person is 1000 Main Street, Suite 3000, Houston, Texas 77002. The filing lists each filing person as having shared voting and dispositive power over the common units.

(4) Ownership data as reported on a Schedule 13G filing dated February 13, 2020 by Invesco Ltd. The principle business address of the reporting person is 1555 Peachtree Street NE, Suite 1800, Atlanta, GA 30309. The filing lists the reporting person as having sole voting and dispositive power over the common units.

(5) Of these common units, 1,000 are held by Mr. Bigman's minor children.

(6) Of these common units, 35,320 are owned directly by SOG. SOG is managed by Mr. Sanchez and other members of the Sanchez family. Mr. Sanchez shares voting and dispositive power over the securities controlled by SOG. Mr. Sanchez disclaims beneficial ownership of these securities except to the extent of his pecuniary interest therein.

**Equity Compensation Plan Information**

The following table reflects our equity compensation plan information for our only equity compensation plan, the Sanchez Midstream Partners LP Long-Term Inventive Plan (the "Plan"), as of December 31, 2019:

| Plan Category | Number of Securities to be issued upon exercise of outstanding options, warrants, and rights | Weighted-average exercise price of outstanding options, warrants, and rights | Number of securities remaining available for future issuance under equity compensation plans |
|---|---|---|---|
| Equity compensation plans approved by security holders | — | $ — | 840,811 |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | — | $ — | 840,811 |

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

**Manager**

We are controlled by our general partner, Sanchez Midstream Partners GP LLC. The sole member of our general partner is Manager, which has no officers. The sole manager and member of Manager is SP Capital Holdings, LLC, which has no officers. The co-managers of SP Capital Holdings, LLC are Antonio R. Sanchez, III, a member of the Board and the Chairman of the Board; Eduardo A. Sanchez, a member of the Board; Patricio D. Sanchez, a member of the Board and the President and Chief Operation Officer of our general partner; and their father, Antonio R. Sanchez, Jr. SP Capital Holdings, LLC is owned by Antonio R. Sanchez, III (26%), Eduardo A. Sanchez (26%), and Patricio D. Sanchez (26%), along with their sister, Ana Lee Sanchez Jacobs (18%), and their father, Antonio R. Sanchez, Jr (4%).

In connection with providing the services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties other than our assets located in the Mid-Continent region, (ii) reimbursement for all allocated overhead costs as well as any direct third-party costs incurred and (iii) for each asset acquisition, asset disposition and financing, a fee not to exceed 2% of the value of such transaction. Prior to August 2, 2019 each of these fees, not including the reimbursement of costs, was paid in cash unless Manager elected for such fee to be paid in our equity. However, on August 2, 2019, we and Manager entered into a letter agreement providing that until such time as we redeem all of our issued and outstanding Class C Preferred Units, Manager will elect to receive its fees, not including reimbursement of costs, in common units rather than cash. In addition, on November 8, 2019, we and Manager entered into an additional letter agreement providing that during the period beginning with the fiscal quarter ended September 30, 2019 and continuing until the end of the fiscal quarter after the fiscal quarter in which we redeem all of our issued and outstanding Class C Preferred Units (the "Tolling Period"), Manager agrees to delay receipt of its fees, not including reimbursement of costs. During the Tolling Period, we are required to keep an accurate ledger of the dollar amount of the fee applicable to each quarter within the Tolling Period and the daily closing price of our common units on the NYSE. Following the end of the Tolling Period we will provide a notice to Manager including such ledgers and pay the accrued fees within thirty days of delivery of such notice. The Services Agreement has a ten-year term and will be automatically renewed for an additional ten years unless we or Manager provide notice of termination to the other with at least 180 days' notice. For the fees earned during the three months ended March 31, 2019 and June 30, 2019, Manager elected to receive 1,789,010 common units equal to approximately $3.9 million, in lieu of cash. For the fees earned during the three months ended September 30, 2019 and December 31, 2019, pursuant to the November 8, 2019 letter agreement, Manager did not receive any fees, other than reimbursement of its costs. However, pursuant to the requirements under the November 8, 2019 letter agreement, we have determined that the fees earned during the three months ended September 30, 2019 and December 31, 2019, are approximately $1.9, and $1.5 million, respectively. During the years ended December 31, 2019 and 2018, we incurred costs of approximately $7.3 million and $8.6 million, respectively, to Manager under the Services Agreement.

**SOG**

SOG provides services to us through a contractual relationship with SP Holdings. Antonio R. Sanchez, III and Patricio D. Sanchez are Co-Presidents of SOG; Antonio R. Sanchez, Jr. is the Chief Executive Officer and sole director of SOG; Ana Lee Sanchez Jacobs is an Executive Vice President of SOG; and Gerald F. Willinger is an Executive Vice President of SOG. The controlling owners of SOG are Antonio R. Sanchez, Jr. and Santig, Ltd. The general partner of Santig, Ltd. is Sanchez Management Corporation, which is owned 100% by Antonio R. Sanchez, Jr. Antonio R. Sanchez, Jr. is Chairman and President of Sanchez Management Corporation and Antonio R. Sanchez, III is Executive Vice President of Sanchez Management Corporation. For the years ended December 31, 2019 and 2018, SOG received $0.2 million and $0.3 million, respectively, as a result of its Services Agreement with SP Holdings.

**Sanchez Energy**

Since January 1, 2015, we have completed three midstream acquisitions and two working interest acquisitions from Sanchez Energy. Antonio R. Sanchez, Jr., the father of Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez, is a director and Executive Chairman of the board of directors of Sanchez Energy, Antonio R. Sanchez, III, is a director and President and Chief Executive Officer of Sanchez Energy, Eduardo A. Sanchez is the former President of Sanchez Energy and Patricio D. Sanchez is an Executive Vice President of Sanchez Energy. The employees of SOG, including Kirsten A. Hink, our Chief Accounting Officer, provide common services to both us and Sanchez Energy. The beneficial ownership of Sanchez Energy's common stock as of March 13, 2020 by Antonio R. Sanchez, Jr., Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez was 6.1%, 3.0%, 1.1% and 1.2%, respectively. As of March 13, 2020, Sanchez Energy indirectly, through one of its wholly owned subsidiaries, beneficially owned approximately 11.4% of the outstanding common units of SNMP.

We entered into the Gathering Agreement with Sanchez Energy in October 2015. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $59.4 million and $57.9 million, respectively, pursuant to the terms of the Gathering Agreement. On June 30, 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that is delivered through the gathering system through March 31, 2018. Subsequent to the conclusion of the incremental infrastructure fee amendment, the parties have agreed to continue the incremental infrastructure fee on a month-to-month basis. On January 1, 2019 and April 1, 2019, the Partnership increased the Western Catarina Midstream tariff rate for throughput volumes that are outside of the dedicated acreage under the Gathering Agreement.

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering's delivery points from Sanchez Energy and other producers. For the years ended December 31, 2019 and 2018, we made earnout payments to Sanchez Energy of $32.0 thousand and $64.0 thousand, respectively.

In September 2017, we entered into the Seco Pipeline Transportation Agreement. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $6.8 million and $7.2 million, respectively, pursuant to the terms of such agreement. On January 13, 2020, we received written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

In May 2018, the Carnero JV, which is operated by Targa, received a dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the Raptor Gas Processing Facility.

**Stonepeak**

*Class B Preferred Unit Issuance*

In accordance with our partnership agreement, in December 2016, we issued an additional 9,851,996 Class B Preferred Units to Stonepeak. Stonepeak disagreed with our calculation of the additional Class B Preferred Units due under our partnership agreement and in January 2017, we and Stonepeak entered into a settlement agreement to settle the disputed calculation. Pursuant to the settlement agreement, and in accordance with Section 5.4 of our partnership agreement then in effect, we issued 1,704,446 Class B Preferred Units to Stonepeak in a privately negotiated transaction as consideration for the Settlement Agreement, with the “Class B Preferred Unit Price” under our partnership agreement being established at $11.29 per Class B Preferred Unit.

In July 2018, the Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part in Class B Preferred PIK Units. Accordingly, the Partnership declared a cash distribution of $0.2258 per Class B Preferred Unit and an aggregate distribution of 310,009 Class B Preferred PIK Units, which was paid on August 31, 2018 to Stonepeak.

*Class C Preferred Unit Issuance*

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and a warrant exercisable for junior securities (the “Warrant”) in a privately negotiated transaction (the “Exchange”). In connection with the Exchange, the Partnership entered into (i) the Third Amended and Restated Agreement of Limited Partnership of the Partnership (the “Amended Partnership Agreement) to set forth the terms of the Class C Preferred Units, (ii) the Amended and Restated Registration Rights Agreement with Stonepeak relating to the registered resale of common units issuable upon the exercise of the Warrant, and (iii) the Amended and Restated Board Representation and Standstill Agreement with Stonepeak. In addition, on August 2, 2019, the Partnership’s general partner entered into Amendment No. 3 to its Limited Liability Company Agreement to provide certain changes necessary in connection with the Exchange.

On August 8, 2019, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership’s common units. As required by the Amended Partnership Agreement, the Board declared a second quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 939,327 Class C Preferred PIK Units, paid on August 30, 2019 to holders of record on August 20, 2019.

On October 30, 2019, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership’s common units. As required by the Amended Partnership Agreement, the Board declared a third quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 1,007,820 Class C Preferred PIK Units, paid on November 29, 2019 to holders of record on November 20, 2019.

*Warrant*

On August 2, 2019, in connection with the Exchange, Stonepeak Catarina received the Warrant. The Warrant may be exercised at any time and from time to time during the period beginning on August 2, 2019 and ending on the later of the seventh anniversary of such date and the date thirty days after the date on which all of the Class C Preferred Units have been redeemed for a number of Junior Securities (as such term is defined in the Warrant) equal to 10% of each applicable class of Junior Securities then outstanding as of the exercise date. No exercise price will be payable in connection with the exercise of the Warrant.

**Item 14. Principal Accounting Fees and Services**

We engaged our principal accountant, KPMG LLP ("KPMG"), to audit our financial statements and perform other professional services for the fiscal years ended December 31, 2019 and 2018.

*Audit Fees*. The aggregate fees billed for the financial statement audit or services provided in connection with statutory or regulatory filings for the years ended December 31, 2019 and 2018 were $978,885 and $1,192,912, respectively.

*Audit-Related Fees*. There were no audit-related fees billed by KPMG for the years ended December 31, 2019 and 2018.

*Tax Fees*. There were no tax fees billed by KPMG for the years ended December 31, 2019 and 2018.

*All Other Fees*. There were no other fees billed by KPMG for the years ended December 31, 2019 and 2018.

**Audit Committee Pre-Approval Policies and Practices**

The Audit Committee must pre-approve any audit and permissible non-audit services performed by our independent registered public accounting firm. In addition, the Audit Committee has oversight responsibility to ensure that the independent registered public accounting firm is not engaged to perform certain enumerated non-audit services, including, but not limited to, bookkeeping, financial information system design and implementation, appraisal or valuation services, internal audit outsourcing services and legal services. The Audit Committee has adopted an audit and non-audit services pre-approval policy, which sets forth the procedures and the conditions pursuant to which services proposed to be performed by the independent registered public accounting firm must be approved. Pursuant to the policy, all services must be reviewed and approved and the chairman of the Audit Committee has been delegated the authority to specifically pre-approve services, which pre-approval is subsequently reviewed with the committee. All of the services described as Audit Fees, Audit-Related Fees, Tax Fees and All Other Fees were approved by the Audit Committee.

Table of Contents

## PART IV

**Item 15. Exhibits and Financial Statement Schedules**

(a) The following documents are filed as a part of this Form 10-K:

1. Financial Statements:

See Item 8. Financial Statements and Supplementary Data.

2. Financial Statement Schedules:

None.

3. Exhibits Required by Item 601 of Regulation S-K.

The exhibits required by Item 601 of Regulation S-K are listed in subparagraph (b) below.

(b) The following exhibits are filed or furnished with this Form 10-K or incorporated by reference:

On June 2, 2017 we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP.

| Exhibit Number | Description |
|---|---|
| 2.1 | Contribution Agreement, dated as of August 9, 2013, by and between Constellation Energy Partners LLC and Sanchez Energy Partners I, LP (incorporated herein by reference to Exhibit 2.1 to the Current Report on Form 8-K field by Constellation Energy Partners LLC on August 9, 2013, File No. 001-33147). |
| 2.2 | Purchase and Sale Agreement, dated as of March 31, 2015, between SEP Holdings III, LLC, Sanchez Production Partners LP and SEP Holdings IV, LLC (incorporated herein by reference to Exhibit 2.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on April 1, 2015, File No. 001-33147). |
| 2.3 | Purchase and Sale Agreement, dated as of September 25, 2015, by and among Sanchez Energy Corporation, SN Catarina, LLC and Sanchez Production Partners LP (incorporated herein by reference to Exhibit 2.1 the Current Report on Form 8-K filed by Sanchez Production Partners LP on September 29, 2015, File No. 001-33147). |
| 2.4 | Purchase and Sale Agreement by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP, dated July 5, 2016 (incorporated by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 12, 2016, File No. 001-33147). |
| 2.5 | Purchase and Sale Agreement, dated October 6, 2016, by and among Sanchez Energy Corporation, SN Midstream, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |

Table of Contents

| | |
|---|---|
| 2.6 | Purchase and Sale Agreement, dated October 6, 2016, by and among SN Cotulla Assets, LLC, SN Palmetto, LLC, SEP Holdings IV, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |
| 2.7 | Purchase and Sale Agreement, dated October 6, 2016, by and among Sanchez Energy Corporation, SN Terminal, LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 2.3 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 7, 2016, File No. 001-33147). |
| 2.8 | Membership Interest Purchase and Sale Agreement, dated May 10, 2017, between Sanchez Midstream Partners LP (f/k/a Sanchez Production Partners LP) and Exponent Energy, LLC (incorporated by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.9 | Purchase and Sale Agreement, dated June 30, 2017, between SEP Holdings IV, LLC and Sendero Petroleum, LLC (incorporated by reference to Exhibit 2.2 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.10 | Amendment No. 1 to Purchase and Sale Agreement, dated July 31, 2017, between SEP Holdings IV, LLC and Sendero Petroleum, LLC (incorporated by reference to Exhibit 2.3 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 2.11 | Purchase and Sale Agreement between Sanchez Midstream Partners LP and Dallas Petroleum Group, LLC dated October 12, 2017 (incorporated by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on November 14, 2017, File No. 001-33147). |
| 2.12 | Agreement to Purchase Oil and Gas Interests between SEP Holdings IV, LLC and EP Energy E&P Company, L.P., dated April 30, 2018 (incorporated herein by reference to Exhibit 2.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on May 10, 2018, File No. 001-33147). |
| 3.1 | Certificate of Conversion of Sanchez Production Partners LLC (incorporated herein by reference to Exhibit 4.1 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.2 | Certificate of Limited Partnership of Sanchez Production Partners LP (incorporated herein by reference to Exhibit 4.2 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.3 | Certificate of Amendment to Certificate of Limited Partnership (incorporated herein by reference to Exhibit 3.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on June 2, 2017, File No. 001-33147). |
| 3.4 | Third Amended and Restated Agreement of Limited Partnership of Sanchez Production Partners LP (incorporated herein by reference to Exhibit 3.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 3.5 | Certificate of Formation of Sanchez Production Partners GP LLC (incorporated by reference to Exhibit 4.4 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 3.6 | Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 4.5 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |

| | |
|---|---|
| 3.7 | Amendment No. 1 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 3.1 to the Quarterly Report on Form 10-Q/A filed by Sanchez Production Partners LP on September 3, 2015, File No. 001-33147). |
| 3.8 | Amendment No. 2 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC (incorporated herein by reference to Exhibit 3.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 3.9 | Amendment No. 3 to Limited Liability Company Agreement of Sanchez Production Partners GP LLC, dated August 2, 2019 (incorporated herein by reference to Exhibit 3.2 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on August 5, 2019, File No. 001-33147). |
| 4.1 | Registration Rights Agreement, dated November 22, 2016, between Sanchez Production Partners LP and SN UR Holdings, LLC (incorporated by reference to Exhibit 4.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 22, 2016, File No. 001-33147). |
| 4.2 | Amended and Restated Registration Rights Agreement, dated August 2, 2019, by and among Sanchez Midstream Partners LP and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 4.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 4.3* | Description of Registrant Securities. |
| 10.1 | Purchase Agreement, dated November 16, 2016, between Sanchez Production Partners LP and SN UR Holdings, LLC (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 22, 2016, File No. 001-33147). |
| 10.2 | Third Amended and Restated Credit Agreement, dated as of March 31, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on April 1, 2015, File No. 001-33147). |
| 10.3 | Amendment and Waiver of Third Amended and Restated Credit Agreement, dated as of August 12, 2015, between Sanchez Production Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 14, 2015, File No. 001-33147). |
| 10.4 | Joinder, Assignment and Second Amendment to Third Amended and Restated Credit Agreement, dated as of October 14, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.3 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 10.5 | Third Amendment to Third Amended and Restated Credit Agreement, dated as of November 12, 2015, among Sanchez Production Partners LP, Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on November 13, 2015, File No. 001-33147). |

| | |
|---|---|
| 10.6 | Fourth Amendment to Third Amended and Restated Credit Agreement among Sanchez Production Partners LP, the guarantors party thereto, each of the lenders party thereto, and Royal Bank of Canada, as administrative agent and collateral agent, dated July 5, 2016 (incorporated by reference to Exhibit 10.3 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on August 12, 2016, File No. 001-33147). |
| 10.7 | Fifth Amendment to the Third Amended and Restated Credit Agreement dated as of April 17, 2017, between Sanchez Production Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2017, File No. 001-33147). |
| 10.8 | Sixth Amendment to the Third Amended and Restated Credit Agreement dated as of November 7, 2017, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on November 14, 2017, File No. 001-33147). |
| 10.9 | Seventh Amendment to the Third Amended and Restated Credit Agreement dated as of February 5, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.11 to the Annual Report on Form 10-K filed by Sanchez Midstream Partners LP on March 12, 2018, File No. 001-33147). |
| 10.10 | Eighth Amendment to the Third Amended and Restated Credit Agreement dated as of May 7, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada, as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on May 10, 2018, File No. 001-33147). |
| 10.11 | Ninth Amendment to the Third Amended and Restated Credit Agreement dated as of May 7, 2018, between Sanchez Midstream Partners LP, the Lenders party thereto and Royal Bank of Canada as Administrative Agent and as Collateral Agent (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on November 25, 2019, File No. 001-33147). |
| 10.12* | Summary Compensation of Executive Officers of Sanchez Midstream Partners GP LLC. |
| 10.13* | Summary Compensation of Directors of Sanchez Midstream Partners GP LLC. |
| 10.14 | Amended and Restated Shared Services Agreement, dated as of March 6, 2015, between SP Holdings, LLC and Sanchez Production Partners LP (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2015, File No. 001-33147). |
| 10.15 | Contract Operating Agreement, dated May 8, 2014, between Constellation Energy Partners LLC and Sanchez Oil & Gas Corporation (incorporated herein by reference to Exhibit 10.2 to the Current Report on Form 8-K filed by Constellation Energy Partners LLC on May 8, 2014, File No. 001-33147). |
| 10.16 | Geophysical Seismic Data Use License Agreement, dated May 8, 2014, between Constellation Energy Partners, LLC, certain subsidiaries thereof, and Sanchez Oil & Gas Corporation (incorporated herein by reference to Exhibit 10.4 to the Current Report on Form 8-K filed by Constellation Energy Partners LLC on May 8, 2014, File No. 001-33147). |

Table of Contents

| | |
|---|---|
| 10.17 | Amendment One to License Agreement, dated as of March 6, 2015, by and among Sanchez Oil and Gas Corporation, Sanchez Production Partners LP and SEP Holdings IV, LLC (incorporated herein by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q filed by Sanchez Production Partners LP on May 15, 2015, File No. 001-33147). |
| 10.18 | Firm Gathering and Processing Agreement, dated as of October 14, 2015, by and between Catarina Midstream, LLC and SN Catarina, LLC (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on October 14, 2015, File No. 001-33147). |
| 10.19 | Amendment No. 1 to Firm Gathering and Processing Agreement by and between SN Catarina, LLC and Catarina Midstream, LLC, dated June 30, 2017 (incorporated by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners LP on August 14, 2017, File No. 001-33147). |
| 10.20+ | Sanchez Production Partners LP Long-Term Incentive Plan (incorporated herein by reference to Exhibit 4.6 to the Post-Effective Amendment No. 1 to the Registration Statement on Form S-4 filed by Sanchez Production Partners LP on March 6, 2015, File No. 333-198440). |
| 10.21+ | Form of Award Agreement Relating to Restricted Units (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on December 3, 2015, File No. 001-33147). |
| 10.22+ | Form of Award Agreement Relating to Restricted Units (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on March 28, 2017, File No. 001-33147). |
| 10.23 | Settlement Agreement and Release, effective January 25, 2017, by and between Stonepeak Catarina Holdings LLC and Sanchez Production Partners LP (incorporated by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Production Partners LP on January 27, 2017, File No. 001-33147). |
| 10.24+ | Form of Award Agreement Relating to Restricted Units incorporated by reference to Exhibit 10.24 to the Annual Report on Form 10-K filed by Sanchez Midstream Partners LP on March 7, 2019, File No. 001-33147. |
| 10.25 | Amended and Restated Board Representation and Standstill Agreement, dated August 2, 2019, by and among Sanchez Midstream Partners LP, Sanchez Midstream Partners GP LLC and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 10.26+ | Form of Executive Services Agreement (incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q filed by Sanchez Midstream Partners on August 8, 2019, File No. 001-33147). |
| 10.27 | Warrant Exercisable for Junior Securities, dated August 2, 2019, by and between Sanchez Midstream Partners LP and Stonepeak Catarina Holdings LLC (incorporated herein by reference to Exhibit 10.2 to the Current Report on Form 8-K filed by Sanchez Midstream Partners LP on August 5, 2019, File No. 001-33147). |
| 21.1* | List of subsidiaries of Sanchez Midstream Partners LP. |

| | |
|---|---|
| 23.1* | Consent of KPMG LLP. |
| 23.2* | Consent of Ryder Scott Co. LP. |
| 31.1* | Certification of Chief Executive Officer of Sanchez Midstream Partners GP LLC pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Chief Financial Officer and Secretary of Sanchez Midstream Partners GP LLC pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Chief Executive Officer of Sanchez Midstream Partners GP LLC pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of Chief Financial Officer and Secretary of Sanchez Midstream Partners GP LLC pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.1* | Report of Ryder Scott Co. LP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Schema Document |
| 101.CAL* | XBRL Calculation Linkbase Document |
| 101.LAB* | XBRL Label Linkbase Document |
| 101.PRE* | XBRL Presentation Linkbase Document |
| 101.DEF* | XBRL Definition Linkbase Document |

* Filed herewith
\+ Management contract or compensatory plan or arrangement.

**Item 16. Form 10-K Summary**

None.

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant, has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Sanchez Midstream Partners LP

By: Sanchez Midstream Partners GP LLC, its general partner

Date: March 13, 2020

By /s/ Gerald F. Willinger
Name **Gerald F. Willinger**
Title **Chief Executive Officer**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below, constitutes and appoints Gerald F. Willinger and Charles C. Ward, and each of them, as his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or their or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

This report has been signed below by the following persons on behalf of the general partner of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Antonio R. Sanchez, III<br>**Antonio R. Sanchez, III** | Director; Chairman of the Board | March 13, 2020 |
| /s/ Gerald F. Willinger<br>**Gerald F. Willinger** | Director; Chief Executive Officer<br>(Principal Executive Officer) | March 13, 2020 |
| /s/ Charles C. Ward<br>**Charles C. Ward** | Chief Financial Officer & Secretary<br>(Principal Financial Officer) | March 13, 2020 |
| /s/ Patricio D. Sanchez<br>**Patricio D. Sanchez** | Director; President & Chief Operating Officer<br>(Principal Operating Officer) | March 13, 2020 |
| /s/ Kirsten A. Hink<br>**Kirsten A. Hink** | Chief Accounting Officer<br>(Principal Accounting Officer) | March 13, 2020 |
| /s/ Alan S. Bigman<br>**Alan S. Bigman** | Director | March 13, 2020 |
| /s/ Jack Howell<br>**Jack Howell** | Director | March 13, 2020 |
| /s/ Richard S. Langdon<br>**Richard S. Langdon** | Director | March 13, 2020 |
| /s/ G. M. Byrd Larberg<br>**G. M. Byrd Larberg** | Director | March 13, 2020 |
| /s/ Eduardo A. Sanchez<br>**Eduardo A. Sanchez** | Director | March 13, 2020 |
| /s/ Luke R. Tayler<br>**Luke R. Taylor** | Director | March 13, 2020 |

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**


| | Page |
|---|---|
| Sanchez Midstream Partners LP and Subsidiaries: | |
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Statements of Operations | F-3 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Cash Flows | F-5 |
| Consolidated Statements of Changes in Partners' Capital | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Partners of Sanchez Midstream Partners LP and the Board of Directors of Sanchez Midstream Partners GP LLC
Sanchez Midstream Partners LP:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Sanchez Midstream Partners LP and subsidiaries (the Partnership) as of December 31, 2019 and 2018, the related consolidated statements of operations, changes in partners' capital, and cash flows for each of the years in the two-year period ended December 31, 2019, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Partnership as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2019, in conformity with U.S. generally accepted accounting principles.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Partnership in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Partnership is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/KPMG LLP

We have served as the Partnership's auditor since 2013.

Houston, Texas
March 13, 2020

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Operations**
**(In thousands, except unit data)**

| | Years Ended December 31, 2019 | 2018 |
|---|---|---|
| **Revenues** | | |
| Natural gas sales | $ 683 | $ 953 |
| Oil sales | 9,512 | 21,272 |
| Natural gas liquid sales | 539 | 1,709 |
| Gathering and transportation sales | 6,825 | 6,651 |
| Gathering and transportation lease revenues | 59,090 | 53,025 |
| **Total revenues** | 76,649 | 83,610 |
| **Expenses** | | |
| **Operating expenses** | | |
| Lease operating expenses | 7,378 | 7,864 |
| Transportation operating expenses | 11,553 | 12,316 |
| Production taxes | 621 | 1,104 |
| General and administrative expenses | 17,610 | 23,653 |
| Unit-based compensation expense | 1,351 | 1,938 |
| Gain on sale of assets | — | (3,186) |
| Depreciation, depletion and amortization | 25,333 | 25,987 |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| **Total operating expenses** | 96,491 | 70,173 |
| **Other (income) expense** | | |
| Interest expense, net | 39,789 | 10,961 |
| Earnings from equity investments | (2,831) | (12,859) |
| Other income | (5,860) | (546) |
| **Total other (income) expenses** | 31,098 | (2,444) |
| **Total expenses** | 127,589 | 67,729 |
| **Income (loss) before income taxes** | (50,940) | 15,881 |
| Income tax expense | 202 | 190 |
| **Net income (loss)** | (51,142) | 15,691 |
| Preferred unit paid-in-kind distributions | (14,409) | (3,500) |
| Preferred unit distributions | (8,838) | (33,425) |
| Preferred unit amortization | (1,708) | (2,358) |
| Deemed contribution | 103,773 | — |
| **Net income (loss) attributable to common unitholders - Basic** | 27,676 | (23,592) |
| Mark-to-market on Warrant | (3,244) | — |
| **Net income (loss) attributable to common unitholders - Diluted** | $ 24,432 | $ (23,592) |
| **Net income (loss) per unit** | | |
| Common units - Basic | $ 1.46 | $ (1.55) |
| Common units - Diluted | $ 1.23 | $ (1.55) |
| Weighted average units outstanding | | |
| Common units - Basic | 18,939,145 | 15,264,284 |
| Common units - Diluted | 19,810,679 | 15,264,284 |

See accompanying notes to consolidated financial statements.

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Balance Sheets**
**(In thousands, except unit data)**

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 5,099 | $ 2,934 |
| Accounts receivable | 133 | 277 |
| Accounts receivable - related entities | 6,719 | 6,700 |
| Prepaid expenses | 1,193 | 931 |
| Fair value of commodity derivative instruments | 226 | 3,044 |
| **Total current assets** | 13,370 | 13,886 |
| **Oil and natural gas properties and related equipment** | | |
| Oil and natural gas properties, equipment and facilities (successful efforts method) | 112,476 | 112,173 |
| Gathering and transportation assets | 186,941 | 186,406 |
| Less: accumulated depreciation, depletion, amortization and impairment | (144,189) | (100,245) |
| **Oil and natural gas properties and equipment, net** | 155,228 | 198,334 |
| **Other assets** | | |
| Intangible assets, net | 145,246 | 158,706 |
| Fair value of commodity derivative instruments | — | 876 |
| Equity investments | 100,311 | 114,465 |
| Other non-current assets | 285 | 418 |
| **Total assets** | $ 414,440 | $ 486,685 |
| **LIABILITIES AND PARTNERS' CAPITAL** | | |
| **Current liabilities** | | |
| Accounts payable and accrued liabilities | $ 5,347 | $ 4,678 |
| Accounts payable and accrued liabilities - related entities | 631 | 5,641 |
| Royalties payable | 359 | 359 |
| Short-term debt, net of debt issuance costs | 39,374 | — |
| Fair value of commodity derivative instruments | 985 | 6 |
| Other liabilities | — | 125 |
| **Total current liabilities** | 46,696 | 10,809 |
| **Other liabilities** | | |
| Long term accrued liabilities - related entities | 4,892 | — |
| Asset retirement obligation | 6,898 | 6,200 |
| Long-term debt, net of debt issuance costs | 109,437 | 178,582 |
| Class C Preferred Units | 281,688 | — |
| Other liabilities | 629 | 5,857 |
| **Total other liabilities** | 403,544 | 190,639 |
| **Total liabilities** | 450,240 | 201,448 |
| **Commitments and contingencies (See Note 13)** | | |
| **Mezzanine equity** | | |
| Class B Preferred Units, zero and 31,310,896 units issued and outstanding as of December 31, 2019 and 2018, respectively | — | 349,857 |
| **Partners' deficit** | | |
| Common units, 20,087,462 and 16,486,239 units issued and outstanding as of December 31, 2019 and 2018, respectively | (35,800) | (64,620) |
| **Total partners' deficit** | (35,800) | (64,620) |
| **Total liabilities and partners' deficit** | $ 414,440 | $ 486,685 |

See accompanying notes to consolidated financial statements.

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Years Ended December 31, 2019 | Years Ended December 31, 2018 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net income (loss) | $ (51,142) | $ 15,691 |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | |
| Depreciation and depletion | 11,873 | 12,527 |
| Amortization of debt issuance costs | 1,266 | 783 |
| Accretion of Class C discount | 13,129 | — |
| Class C distribution accrual | 19,309 | — |
| Asset impairments | 32,119 | — |
| Accretion expense | 526 | 497 |
| Distributions from equity investments | 17,227 | 24,946 |
| Equity earnings in affiliate | (2,831) | (12,859) |
| Gain on sale of assets | — | (3,186) |
| Mark-to-market on Warrant | (3,244) | — |
| Net loss (gain) on commodity derivative contracts | 3,772 | (1,316) |
| Net cash settlements received (paid) on commodity derivative contracts | 1,101 | (1,326) |
| Unit-based compensation | 1,351 | 1,938 |
| Gain on earnout derivative | (5,856) | (546) |
| Amortization of intangible assets | 13,460 | 13,460 |
| **Changes in Operating Assets and Liabilities:** | | |
| Accounts receivable | (6) | (377) |
| Accounts receivable - related entities | (23) | 6,389 |
| Prepaid expenses | (262) | 1,739 |
| Other assets | 83 | 82 |
| Accounts payable and accrued liabilities | 6,378 | 13,719 |
| Accounts payable and accrued liabilities- related entities | (122) | (5,333) |
| Royalties payable | — | (12) |
| Other long-term liabilities | (123) | 126 |
| Net cash provided by operating activities | 57,985 | 66,942 |
| **Cash flows from investing activities:** | | |
| Development of oil and natural gas properties | (131) | (11) |
| Proceeds from sale of assets | — | 7,692 |
| Construction of gathering and transportation assets | (1,063) | (2,533) |
| Contributions to equity affiliates | (242) | (2,838) |
| Net cash provided by (used in) investing activities | (1,436) | 2,310 |
| **Cash flows from financing activities:** | | |
| Payments for offering costs | — | (50) |
| Payments for Class C Preferred Unit Exchange | (238) | — |
| Proceeds from issuance of debt | 4,000 | 2,000 |
| Repayment of debt | (34,000) | (11,000) |
| Distributions to common unitholders | (5,216) | (23,243) |
| Class B Preferred Unit cash distributions | (17,675) | (33,338) |
| Units tendered by SOG employees for tax withholdings | (218) | — |
| Debt issuance costs | (1,037) | (1,008) |
| Net cash used in financing activities | (54,384) | (66,639) |
| Net increase in cash and cash equivalents | 2,165 | 2,613 |
| Cash and cash equivalents, beginning of period | 2,934 | 321 |
| Cash and cash equivalents, end of period | $ 5,099 | $ 2,934 |
| **Supplemental disclosures of cash flow information:** | | |
| Change in accrued capital expenditures | $ 528 | $ 525 |
| Cash paid during the period for income taxes | $ 138 | $ — |
| Cash paid during the period for interest | $ 9,159 | $ 9,763 |

See accompanying notes to consolidated financial statements.

Table of Contents

**SANCHEZ MIDSTREAM PARTNERS LP and SUBSIDIARIES**
**Consolidated Statements of Changes in Partners' Capital**
**(In thousands, except unit data)**

| | Common Units | | Total |
|---|---|---|---|
| | Units | Amount | Capital |
| **Partners' Deficit, December 31, 2017** | 14,965,134 | $ (29,308) | $ (29,308) |
| Unit-based compensation programs | 531,561 | 1,938 | 1,938 |
| Issuance of common units, net of offering costs of $0.1 million | 989,544 | 9,585 | 9,585 |
| Cash distributions to common unit holders | — | (23,243) | (23,243) |
| Distributions - Class B Preferred Units | — | (39,283) | (39,283) |
| Net income | — | 15,691 | 15,691 |
| **Partners' Deficit, December 31, 2018** | 16,486,239 | $ (64,620) | $ (64,620) |
| Adoption of accounting standards | — | (181) | (181) |
| Preferred unit exchange | — | 103,773 | 103,773 |
| Unit-based compensation programs | 1,109,880 | 1,531 | 1,531 |
| Units tendered by SOG employees for tax withholdings | (85,417) | (218) | (218) |
| Common units issued for asset management fee | 2,576,760 | 5,228 | 5,228 |
| Cash distributions to common unitholders | — | (5,216) | (5,216) |
| Distributions - Class B Preferred Units | — | (24,955) | (24,955) |
| Net loss | — | (51,142) | (51,142) |
| **Partners' Deficit, December 31, 2019** | 20,087,462 | $ (35,800) | $ (35,800) |

See accompanying notes to consolidated financial statements.

**SANCHEZ MIDSTREAM PARTNERS LP AND SUBSIDIARIES**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**DECEMBER 31, 2019 and 2018**

**1. ORGANIZATION AND BUSINESS**

***Organization***

We are a growth-oriented publicly-traded limited partnership formed in 2005 focused on the acquisition, development, ownership and operation of midstream and other energy-related assets in North America. We have ownership stakes in oil and natural gas gathering systems, natural gas pipelines, and natural gas processing facilities, all located in the Western Eagle Ford in South Texas. We also own production assets in Texas and Louisiana. We have entered into the Services Agreement with Manager, the sole member of our general partner, pursuant to which Manager provides services we require to conduct our business, including overhead, technical, administrative, marketing, accounting, operational, information systems, financial, compliance, insurance, acquisition, disposition and financing services. On June 2, 2017, we changed our name to Sanchez Midstream Partners LP from Sanchez Production Partners LP. Manager owns our general partner and all of our incentive distribution rights. Our common units are currently listed on the NYSE American under the symbol "SNMP."

**2. BASIS OF PRESENTATION AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

***Basis of Presentation***

Accounting policies used by us conform to accounting principles generally accepted in the United States of America ("GAAP). The accompanying financial statements include the accounts of us and our wholly-owned subsidiaries. All intercompany accounts and transactions have been eliminated in consolidation. Our business consists of two reportable segments: Production and Midstream. Midstream includes Western Catarina Midstream, the Carnero JV and Seco Pipeline. Production consists of our oil and natural gas properties in Texas and Louisiana. Our management evaluates performance based on these two business segments.

***Recent Accounting Pronouncements***

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB"), which are adopted by us as of the specified effective date. Unless otherwise discussed, management believes that the impact of recently issued standards, which are not effective, will not have a material impact on our consolidated financial statements upon adoption.

In August 2018, the FASB issued Accounting Standards Update ("ASU") 2018-13 "Fair Value Measurement (ASC 820): Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurements," which modifies the disclosure requirements on fair value measurements. This ASU is effective for public business entities for annual and interim periods in fiscal years beginning after December 15, 2019. We do not anticipate the adoption of this standard to have a material impact on our consolidated financial statements.

In June 2018, the FASB issued ASU 2018-07 "Compensation - Stock Compensation (Topic 718) - Improvements to Nonemployee Share-Based Payment Accounting," which expands the scope of Topic 718, "Compensation – Stock Compensation", to include share-based payment transactions for acquiring goods and services from nonemployees. We adopted this ASU effective January 1, 2019, which resulted in the remeasurement of our outstanding unvested awards as of January 1, 2019 and changed the expense recorded for equity awards going forward. The adoption of this standard resulted in an approximately $0.2 million charge to retained earnings.

In June 2016, the FASB issued ASU No. 2016-13, "Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments." This ASU modifies the impairment model to utilize an expected loss methodology in place of the currently used incurred loss methodology, which will result in more timely recognition of

losses. Additionally, in November 2019, the FASB issued ASU 2019-10 "Financial Instruments – Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates," which changed the effective date for certain issuers to annual and interim periods in fiscal years beginning after December 15, 2022, and earlier adoption is permitted. We are currently in the process of evaluating the impact of adoption of this guidance on our consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02 "Leases (Topic 842)," effective for annual and interim periods for public companies beginning after December 15, 2018. Additionally, in July 2018, the FASB issued ASU 2018-10, "Codification Improvements to Topic 842 (Leases)," which provides narrow amendments to clarify how to apply certain aspects of ASU 2016-02. The Partnership elected the practical expedients disclosed in ASU 2018-10. The effective date in ASU 2018-10 is the same as that of ASU 2016-02. The standards update the previous lease guidance by requiring the recognition of a right-of-use asset and lease liability on the statement of financial position for those leases previously classified as operating leases under the old guidance. In addition, ASU 2016-02 updates the criteria for a lessee's classification of a finance lease. The Partnership adopted this standard effective January 1, 2019. The adoption of this standard did not have a material impact on our consolidated financial statements.

Other accounting standards that have been issued by the FASB or other standards-setting bodies are not expected to have a material impact on the Partnership's financial position, results of operations and cash flows.

***Use of Estimates***

The consolidated financial statements are prepared in conformity with GAAP, which requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. These estimates and the underlying assumptions affect the amounts of assets and liabilities reported, disclosures about contingent assets and liabilities and reported amounts of revenues and expenses. The estimates that are particularly significant to our financial statements include estimates of our reserves of natural gas, NGLs and oil; future cash flows from oil and natural gas properties; depreciation, depletion and amortization; asset retirement obligations; certain revenues and operating expenses; fair values of derivatives; and fair values of assets and liabilities. As fair value is a market-based measurement, it is determined based on the assumptions that market participants would use. These estimates and assumptions are based on management's best judgment using the data available. Management evaluates its estimates and assumptions on an on-going basis using historical experience and other factors, including the current economic environment, which management believes to be reasonable under the circumstances. Such estimates and assumptions are adjusted when facts and circumstances dictate. As future events and their effects cannot be determined with precision, actual results could differ from the estimates. Any changes in estimates resulting from continuing changes in the economic environment will be reflected in the financial statements in future periods.

***Revenue Recognition***

*Midstream*

We account for revenue from contracts with customers in accordance with ASC 606 and ASC 842 for our midstream segment. The Seco Pipeline Transportation Agreement is our only contract that we account for using ASC 606. Under the Seco Pipeline Transportation Agreement, we agreed to provide transportation services of certain quantities of natural gas from the receipt point to the delivery point. Each MMBtu of natural gas transported is distinct and the transportation services performed on each distinct molecule of product is substantially the same in nature. As such, we applied the series guidance and treat these services as a single performance obligation satisfied over time using volumes delivered as the measure of progress. Additionally, Seco Pipeline Transportation Agreement contains variable consideration in the form of volume variability. As the distinct goods or services (rather than the series) are considered for the purpose of allocating variable consideration, we have taken the optional exception under ASC 606. Under this exception, revenue is alternatively recognized in the period that control is transferred to the customer and the respective variable component of the total transaction price is resolved.

The Gathering Agreement (as defined in Note 14 "Related Party Transactions") was classified as an operating lease at inception and is accounted for under ASC 842, as Sanchez Energy controls the physical use of the property under the lease. Revenues relating to the Gathering Agreement is recognized in the period service is provided. Under this

arrangement, the Partnership receives a fee or fees for services provided. The revenue the Partnership recognizes from gathering and transportation services is generally directly related to the volume of oil and natural gas that flows through its systems.

*Production*

Our oil, natural gas, and NGL revenue is marketed and sold on our behalf by the respective asset operators. We are not party to the contracts with the third-party customers. However, we are party to joint operating agreements, which we account for under ASC 808, and revenues and expenses for these arrangements is recognized based on the information provided to us by the operators.

We additionally recognize and present changes in the fair value of our commodity derivative instruments within natural gas sales and oil sales in the consolidated statements of operations, which is accounted for under ASC 815, "Derivatives and Hedging".

*Accounts Receivable, Net*

Our accounts receivable are primarily from our contractual agreements with Sanchez Energy and its subsidiaries, operators of our oil and natural gas properties and counterparties to our financial instruments. Oil receivables are generally collected within 30 days after the end of the month. Natural gas receivables are generally collected within 60 days after the end of the month. We review all outstanding accounts receivable balances and record a reserve for amounts that we expect will not be fully recovered. Actual balances are not applied against the reserves until substantially all collection efforts have been exhausted. Our allowance for doubtful accounts was $0.4 million as of December 31, 2019 and 2018.

*Concentration of Credit Risk and Accounts Receivable*

Financial instruments that potentially subject us to a concentration of credit risk consist of cash and cash equivalents, accounts receivable and derivative financial instruments. We place our cash with high credit quality financial institutions. We place our derivative financial instruments with financial institutions that participate in our Credit Agreement and maintain an investment grade credit rating. Substantially all of our accounts receivable are due from operators of our oil and natural gas properties. These sales are generally unsecured and, in some cases, may carry a parent guarantee. We routinely assess the financial strength of our customers. Bad debt expense is recognized on an account-by-account review and when recovery is not probable. We have no off-balance-sheet credit exposure related to our operations or customers.

Sanchez Energy accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectively. We are highly dependent upon Sanchez Energy as our most significant customer, and we expect to derive a substantial portion of our revenue from Sanchez Energy in the foreseeable future. Accordingly, we are indirectly subject to the business risks of Sanchez Energy.

***Income Taxes***

SNMP and each of its wholly-owned subsidiary LLCs are treated as a partnership for federal and state income tax purposes. All of our taxable income or loss, which may differ considerably from net income or loss reported for financial reporting purposes, is passed through to the federal income tax returns of our members. As such, no federal income tax for these entities has been provided for in the accompanying financial statements.

***Earnings per Unit***

Net income (loss) per common unit for the period is based on any distributions that are made to the unitholders (common units) plus an allocation of undistributed net income (loss) based on provisions of the Amended Partnership Agreement, divided by the weighted average number of common units outstanding. The two-class method dictates that net income (loss) for a period be reduced by the amount of distributions and that any residual amount representing undistributed net income (loss) be allocated to common unitholders and other participating unitholders to the extent that each unit may share in net income (loss) as if all of the income for the period had been distributed in accordance with the Amended Partnership Agreement. Unit-based awards granted but unvested are eligible to receive distributions. The underlying unvested restricted unit awards are considered participating securities for purposes of determining net income

(loss) per unit. Undistributed income is allocated to participating securities based on the proportional relationship of the weighted average number of common units and unit-based awards outstanding. Undistributed losses (including those resulting from distributions in excess of net income) are allocated to common units based on provisions of the Amended Partnership Agreement. Undistributed losses are not allocated to unvested restricted unit awards as they do not participate in net losses. Distributions declared and paid in the period are treated as distributed earnings in the computation of earnings per common unit even though cash distributions are not necessarily derived from current or prior period earnings.

***Asset Retirement Obligations***

Asset retirement obligations represent the present value of the estimated cash flows expected to be incurred to plug, abandon and remediate producing properties, excluding salvage values, at the end of their productive lives in accordance with applicable laws. The significant unobservable inputs to this fair value measurement include estimates of plugging, abandonment and remediation costs, asset life, inflation and the credit-adjusted risk-free rate. The inputs are calculated based on historical data as well as current estimates. When the liability is initially recorded, the carrying amount of the related long-lived asset is increased. Over time, accretion of the liability is recognized each period, and the capitalized cost is amortized over the useful life of the related asset and is included in accretion expense in the our consolidated statements of operations.

To estimate the fair value of an asset retirement obligation, the Partnership employs a present value technique, which reflects certain assumptions, including its credit-adjusted risk-free interest rate, inflation rate, the estimated settlement date of the liability and the estimated current cost to settle the liability. Changes in timing or to the original estimate of cash flows will result in changes to the carrying amount of the liability.

***Oil and Natural Gas Properties***

We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties. Under this method of accounting, costs relating to the development of proved areas are capitalized when incurred.

Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold costs using all proved reserves. Acquisition costs of proved properties are amortized on the basis of all proved reserves, developed and undeveloped, and capitalized development costs (including wells and related equipment and facilities) are amortized on the basis of proved developed reserves. As more fully described in Note 8 “Oil and Natural Gas Properties and Related Equipment” to our consolidated financial statements, proved reserves estimates are subject to future revisions when additional information becomes available.

All other properties, including the gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

Estimated asset retirement costs are recognized when the asset is acquired or placed in service, and are amortized over proved reserves using the units-of-production method. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

Oil and natural gas properties are reviewed for impairment when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. Cash flow estimates for the impairment testing are based on third party reserve reports and exclude derivative instruments. Refer to Note 8 “Oil and Natural Gas Properties and Related Equipment” to our consolidated financial statements for additional information.

Table of Contents

***Reserves of Natural Gas, NGLs and Oil***

Our estimate of proved reserves is based on the quantities of natural gas, NGLs and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Management estimates the proved reserves attributable to our ownership based on various factors, including consideration of the reserve report prepared by Ryder Scott, an independent oil and natural gas consulting firm. On an annual basis, our proved reserve estimates and the reserve report prepared by Ryder Scott are reviewed by the Audit Committee and the Board. Our financial statements for 2019 and 2018 were prepared using Ryder Scott's estimates of our proved reserves.

Reserves and their relation to estimated future net cash flows impact our depletion and impairment calculations. As a result, adjustments to depletion and impairment are made concurrently with changes to reserve estimates. The accuracy of our reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Our proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the actual quantities of oil and natural gas eventually recovered.

***Unit-Based Compensation***

The Partnership records unit-based compensation expense for awards granted in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 718, "Compensation—Stock Compensation." Unit-based compensation expense for these awards is based on the grant-date fair value and recognized over the vesting period using the straight-line method.

***Investments***

We follow the equity method of accounting when we do not exercise control over the investee, but we can exercise significant influence over the operating and financial policies of the investee. Under this method, our equity investments are carried originally at our acquisition cost, increased by our proportionate share of the investee's net income and by contributions made, and decreased by our proportionate share of the investee's net losses and by distributions received. We evaluate our equity investments for impairment when evidence indicates the carrying amount of our investment is no longer recoverable. Evidence of a loss in value might include, but would not necessarily be limited to, absence of an ability to recover the carrying amount of the investment or inability of the equity method investee to sustain an earnings capacity that would justify the carrying amount of the investment. When the estimated fair value of an equity investment is less than its carrying value and the loss in value is determined to be other than temporary, we recognize the excess of the carrying value over the estimated fair value as an impairment loss within earnings from equity investments in our consolidated statements of operations.

***Earnout Derivative***

As part of the Carnero Gathering Transaction (defined in Note 12 "Investments"), we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. The earnout derivative is accounted for under ASC 815, and we measure its fair value through the use of a Monte Carlo simulation model which utilized observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios.

**3. REVENUE RECOGNITION**

***Revenue from Contracts with Customers***

We account for revenue from contracts with customers in accordance with ASC 606. The unit of account in ASC 606 is a performance obligation, which is a promise in a contract to transfer to a customer either a distinct good or service (or bundle of goods or services) or a series of distinct goods or services provided over a period of time. ASC 606 requires

Table of Contents

that a contract's transaction price, which is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, is to be allocated to each performance obligation in the contract based on relative standalone selling prices and recognized as revenue when (point in time) or as (over time) the performance obligation is satisfied.

*Disaggregation of Revenue*

We recognized revenue of $76.6 and $83.6 million for the years ended December 31, 2019 and 2018, respectively. We disaggregate revenue based on type of revenue and product type. In selecting the disaggregation categories, we considered a number of factors, including disclosures presented outside the financial statements, such as in our earnings release and investor presentations, information reviewed internally for evaluating performance, and other factors used by the Partnership or the users of its financial statements to evaluate performance or allocate resources. We have concluded that disaggregating revenue by type of revenue and product type appropriately depicts how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors.

Midstream Segment

The Seco Pipeline Transportation Agreement is the only contract that we account for under ASC 606. The Catarina Midstream Gathering Agreement (as defined in Note 14 "Related Party Transactions") is classified as an operating lease and is accounted for under ASC 842, "Leases", and is reported as gathering and transportation lease revenue in our consolidated statements of operations. Both of these contracts are further discussed in Note 14 "Related Party Transactions."

We account for income from our unconsolidated equity method investments as earnings from equity investments in our consolidated statements of operations. Earnings from these equity method investments are further discussed in Note 12 "Investments."

Production Segment

Our oil, natural gas, and NGL revenue is marketed and sold on our behalf by the respective asset operators. We are not party to the contracts with the third-party customers. However, we are party to joint operating agreements, which we account for under ASC 808 and revenues for these arrangements is recognized based on the information provided to us by the operators.

We additionally recognize and present changes in the fair value of our commodity derivative instruments within natural gas sales and oil sales in the consolidated statements of operations, which is accounted for under ASC 815, "Derivatives and Hedging".

*Performance Obligations*

Under the Seco Pipeline Transportation Agreement, we agreed to provide transportation services of certain quantities of natural gas from the receipt point to the delivery point. Each MMBtu of natural gas transported is distinct and the transportation services performed on each distinct molecule of product is substantially the same in nature. We applied the series guidance and treat these services as a single performance obligation satisfied over time using volumes delivered as the measure of progress. The Seco Pipeline Transportation Agreement requires payment within 30 days following the calendar month of delivery.

The Seco Pipeline Transportation Agreement contains variable consideration in the form of volume variability. As the distinct goods or services (rather than the series) are considered for the purpose of allocating variable consideration, we have taken the optional exception under ASC 606 which is available only for wholly unsatisfied performance obligations for which the criteria in ASC 606 have been met. Under this exception, neither estimation of variable consideration nor disclosure of the transaction price allocated to the remaining performance obligations is required. Revenue is alternatively recognized in the period that control is transferred to the customer and the respective variable component of the total transaction price is resolved.

For forms of variable consideration that are not associated with a specific volume (such as late payment fees) and thus do not meet allocation exception, estimation is required. These fees, however, are immaterial to our consolidated financial statements and have a low probability of occurrence. As significant reversals of revenue due to this variability are not probable, no estimation is required.

*Contract Balances*

Under our sales contracts, we invoice customers after our performance obligations have been satisfied, at which point payment is unconditional. Accordingly, our contracts do not give rise to contract assets or liabilities under ASC 606. At December 31, 2019, and 2018 our accounts receivable from contracts with customers were $1.1 million and $0.6 million, respectively, and are presented within accounts receivable – related entities on the consolidated balance sheets.

**4. ACQUISITIONS AND DIVESTITURES**

*Louisiana Divestiture*

In September 2018, we entered into a purchase and sale agreement to sell certain non-operated production assets located in Louisiana for cash consideration of approximately $1.3 million (the "Louisiana Divestiture"). The Louisiana Divestiture closed on October 22, 2018 and we recorded a gain of approximately $0.6 million on the sale.

*Briggs Divestiture*

In April 2018, we entered into a purchase and sale agreement to sell specified wellbores and related assets and interests in La Salle County Texas (the "Briggs Assets") for a base purchase price of approximately $4.5 million which, after giving effect to purchase price adjustments, was reduced to approximately $4.2 million in cash consideration (the "Briggs Divestiture"). In addition, other than limited obligations that we retained, the buyer agreed to assume all obligations relating to the Briggs Assets, including all plugging and abandonment costs, that may arise on or after March 1, 2018. The Briggs Divestiture closed on April 30, 2018 and we recorded a gain of approximately $1.8 million on the sale.

*Cola Divestiture*

In April 2018, we entered into multiple purchase and sale agreements to sell certain non-operated production assets located in Oklahoma for total cash consideration of approximately $1.0 million (collectively, the "Cola Divestiture"). The Cola Divestitures were all closed by May 8, 2018 and we recorded a total gain of approximately $1.1 million on the sale.

**5. FAIR VALUE MEASUREMENTS**

Measurements of fair value of derivative instruments are classified according to the fair value hierarchy, which prioritizes the inputs to the valuation techniques used to measure fair value. Fair value is the price that would be received upon the sale of an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurements are classified and disclosed in one of the following categories:

**Level 1**: Measured based on unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities. Active markets are considered those in which transactions for the assets or liabilities occur in sufficient frequency and volume to provide pricing information on an ongoing basis.

**Level 2:** Measured based on quoted prices in markets that are not active, or inputs which are observable, either directly or indirectly, for substantially the full term of the asset or liability. Substantially all of these inputs are observable in the marketplace throughout the term of the instrument, can be derived from observable data, or supported by observable levels at which transactions are executed in the marketplace.

**Level 3**: Measured based on prices or valuation models that require inputs that are both significant to the fair value measurement and less observable from objective sources (i.e., supported by little or no market activity).

Financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Management's assessment of the significance of a particular input to the fair value measurement requires judgment, and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

The following table summarizes the fair value of our assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2019 (in thousands):

| | Fair Value Measurements at December 31, 2019 | | | |
|---|---|---|---|---|
| | Active Markets for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Fair Value |
| Commodity derivative instrument | | | | |
| Derivative liability | $ — | $ (759) | $ — | $ (759) |
| Midstream derivative instrument | | | | |
| Earnout derivative liability | — | — | — | — |
| Other liabilities | | | | |
| Warrant | — | (629) | — | (629) |
| Total | $ — | $ (1,388) | $ — | $ (1,388) |

The following table summarizes the fair value of our assets and liabilities that were accounted for at fair value on a recurring basis as of December 31, 2018 (in thousands):

| | Fair Value Measurements at December 31, 2018 | | | |
|---|---|---|---|---|
| | Active Markets for Identical Assets (Level 1) | Observable Inputs (Level 2) | Unobservable Inputs (Level 3) | Fair Value |
| Commodity derivative instrument | | | | |
| Derivative assets | $ — | $ 3,914 | $ — | $ 3,914 |
| Midstream derivative instrument | | | | |
| Earnout derivative liability | — | — | (5,856) | (5,856) |
| Total | $ — | $ 3,914 | $ (5,856) | $ (1,942) |

As of December 31, 2019 and 2018, the estimated fair value of cash and cash equivalents, accounts receivable, other current assets and current liabilities approximated their carrying value due to their short-term nature.

*Fair Value on a Non-Recurring Basis*

The Partnership follows the provisions of Topic 820-10 for nonfinancial assets and liabilities measured at fair value on a non-recurring basis. The fair value measurements of assets acquired and liabilities assumed are based on inputs that are not observable in the market and therefore represent Level 3 inputs under the fair value hierarchy. We periodically review oil and natural gas properties and related equipment for impairment when facts and circumstances indicate that their carrying values may not be recoverable.

A reconciliation of the beginning and ending balances of the Partnership's asset retirement obligations is presented in Note 10 "Asset Retirement Obligation."

*Class C Preferred Units* – As part of the Exchange (defined in Note 17 "Partners' Capital"), Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and the Warrant in a privately negotiated transaction. The Class C Preferred Units were measured using valuation techniques that convert a future obligation to a single discounted amount. We have therefore classified the fair value measurements of the Class C Preferred units as Level 2 and are presented within "Class C Preferred Units" on the Consolidated Balance Sheets.

*Seco Pipeline* – We recorded a non-cash impairment charge of $32.1 million to impair the Seco Pipeline. The carrying value of the Seco Pipeline was reduced to a fair value of zero, estimated based on an inputs characteristic of a Level 3 fair value measurement.

The fair value of the Seco Pipeline was measured using probabilistic valuation techniques that convert future cash flows to a single discounted amount. Significant inputs to the valuation of the Seco Pipeline include estimates of: (i) future operating and development costs; (ii) estimated future cash flows; and (iii) a market-based weighted average cost of capital rate. These inputs require significant judgments and estimates by the Partnership's management at the time of the valuation and are the most sensitive and subject to change.

*Fair Value of Financial Instruments*

The estimated fair value amounts of financial instruments have been determined using available market information and valuation methodologies described below. We prioritize the use of the highest level inputs available in determining fair value such that fair value measurements are determined using the highest and best use as determined by market participants and the assumptions that they would use in determining fair value.

*Credit Agreement* – We believe that the carrying value of our Credit Agreement (defined in Note 7 "Debt") approximates its fair value because the interest rates on the debt approximate market interest rates for debt with similar terms. The debt is classified as a Level 2 input in the fair value hierarchy and represents the amount at which the instrument could be valued in an exchange during a current transaction between willing parties. The Credit Agreement is discussed further in Note 7 "Debt."

*Derivative Instruments* – The income valuation approach, which involves discounting estimated cash flows, is primarily used to determine recurring fair value measurements of our derivative instruments classified as Level 2 inputs. Our commodity derivatives are valued using the terms of the individual derivative contracts with our counterparties, expected future levels of oil and natural gas prices and an appropriate discount rate. Our interest rate derivatives are valued using the terms of the individual derivative contracts with our counterparties, expected future levels of the LIBOR interest rates and an appropriate discount rate. We did not have any interest rate derivatives as of December 31, 2019.

*Warrant* – As part of the Exchange, the Partnership issued to Stonepeak the Warrant which entitles the holder to receive junior securities representing ten percent of junior securities deemed outstanding when exercised. The Warrant expires on the later of August 2, 2026 or 30 days following the full redemption of the Class C Preferred Units. There is no strike price associated with the exercise of the Warrant. The Warrant is valued using ten percent of the junior securities deemed outstanding and the common unit price as of the balance sheet date. We have therefore classified the fair value measurements of the Warrant as Level 2 and is presented within other liabilities on the consolidated balance sheets.

*Earnout Derivative* – As part of the Carnero Gathering Transaction (defined in Note 12 "Investments"), we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. The earnout derivative was valued through the use of a Monte Carlo simulation model which utilized observable inputs such as the earnout price and volume commitment, as well as unobservable inputs related to the weighted probabilities of various throughput scenarios. We have therefore classified the fair value measurements of the earnout derivative as Level 3 inputs.

The following table sets forth a reconciliation of changes in the fair value of the Partnership's embedded and earnout derivatives classified as Level 3 in the fair value hierarchy (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | **2019** | **2018** |
| Beginning balance | $ (5,856) | $ (6,402) |
| Gain on earnout derivative | 5,856 | 546 |
| Ending balance | $ — | $ (5,856) |
| Gain included in earnings related to derivatives still held as of December 31, 2019 and December 31, 2018 | $ 5,856 | $ 546 |

Table of Contents

**6. DERIVATIVE AND FINANCIAL INSTRUMENTS**

To reduce the impact of fluctuations in oil and natural gas prices on our revenues, we periodically enter into derivative contracts with respect to a portion of our projected oil and natural gas production through various transactions that fix or modify the future prices to be realized. These hedging activities are intended to support oil and natural gas prices at targeted levels and to manage exposure to oil and natural gas price fluctuations. It is never our intention to enter into derivative contracts for speculative trading purposes.

Under Topic 815, "Derivatives and Hedging", all derivative instruments are recorded on the consolidated balance sheets at fair value as either short-term or long-term assets or liabilities based on their anticipated settlement date. We will net derivative assets and liabilities for counterparties where we have a legal right of offset. Changes in the derivatives' fair values are recognized currently in earnings unless specific hedge accounting criteria are met. We have not elected to designate any of our current derivative contracts as hedges; however, changes in the fair value of all of our derivative instruments are recognized in earnings and included in natural gas sales and oil sales in the consolidated statements of operations.

As of December 31, 2019, we had the following derivative contracts in place, all of which are accounted for as mark-to-market activities:

Table of Contents

*MTM Fixed Price Swaps – NYMEX (Henry Hub)*

| | Three Months Ended (volume in MMBtu) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 105,104 | $ 2.85 | 102,008 | $ 2.85 | 99,136 | $ 2.85 | 96,200 | $ 2.85 | 402,448 | $ 2.85 |

*MTM Fixed Price Basis Swaps – West Texas Intermediate (WTI)*

| | Three Months Ended (volume in Bbls) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, | | June 30, | | September 30, | | December 31, | | Total | |
| | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price | Volume | Average Price |
| 2020 | 52,776 | $ 53.50 | 50,960 | $ 53.50 | 49,224 | $ 53.50 | 47,624 | $ 53.50 | 200,584 | $ 53.50 |

The following table sets forth a reconciliation of the changes in fair value of the Partnership's commodity derivatives for the years ended December 31, 2019 and 2018 (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Beginning fair value of commodity derivatives | $ 3,914 | $ 1,231 |
| Net gain (loss) on crude oil derivatives | (4,031) | 1,400 |
| Net gain (loss) on natural gas derivatives | 259 | (84) |
| Net settlements paid (received) on derivative contracts: | | |
| Oil | (807) | 1,330 |
| Natural gas | (94) | 37 |
| Ending fair value of commodity derivatives | $ (759) | $ 3,914 |

The effect of derivative instruments on our consolidated statements of operations was as follows (in thousands):

| Derivative Type | Location of Gain (Loss) in Income | Years Ended December 31, 2019 | 2018 |
|---|---|---|---|
| Commodity – Mark-to-Market | Oil sales | $ (4,031) | $ 1,400 |
| Commodity – Mark-to-Market | Natural gas sales | 259 | (84) |
| | | $ (3,772) | $ 1,316 |

Derivative instruments expose us to counterparty credit risk. Our commodity derivative instruments are currently contracted with three counterparties. We generally execute commodity derivative instruments under master agreements which allow us, in the event of default, to elect early termination of all contracts with the defaulting counterparty. If we choose to elect early termination, all asset and liability positions with the defaulting counterparty would be net cash settled at the time of election. We include a measure of counterparty credit risk in our estimates of the fair values of derivative instruments. As of December 31, 2019 and 2018, the impact of non-performance credit risk on the valuation of our derivative instruments was not significant.

*Earnout Derivative*

Refer to Note 5 "Fair Value Measurements".

**7. DEBT**

***Credit Agreement***

We have entered into a credit facility with Royal Bank of Canada, as administrative agent and collateral agent, and the lenders party thereto (as amended by the Ninth Amendment to Third Amended and Restated Credit Agreement (the "Credit Agreement"). The Credit Agreement provides a quarterly amortizing term loan of $155.0 million (the "Term

Loan") and a maximum revolving credit amount of $20.0 million (the "Revolving Loan"). The Term Loan and Revolving Loan both have a maturity date of September 30, 2021. Borrowings under the Credit Agreement are secured by various mortgages of both midstream and upstream properties that we own as well as various security and pledge agreements among us, certain of our subsidiaries and the administrative agent.

Borrowings under the Credit Agreement are available for limited direct investment in oil and natural gas properties, midstream properties, acquisitions, and working capital and general business purposes. The Credit Agreement has a sub-limit of up to $2.5 million which may be used for the issuance of letters of credit. Pursuant to the Credit Agreement, the initial aggregate commitment amount under the Term Loan is $155.0 million, subject to quarterly $10.0 million principal and other mandatory prepayments. The initial borrowing base under the Credit Agreement was $235.5 million. The borrowing base is equal to the sum of the rolling four quarter EBITDA of our midstream operations and the amount of distributions received from the Carnero JV multiplied by 4.5 or a lower number dependent upon natural gas volumes flowing through Western Catarina Midstream. Outstanding borrowings in excess of our borrowing base must be repaid within 45 days. As of December 31, 2019, the borrowing base under the Credit Agreement was $235.5 million and we had $150.0 million of debt outstanding, consisting of $145.0 million under the Term Loan and $5.0 million under the Revolving Loan. We are required to make mandatory amortizing payments of outstanding principal on the Term Loan of $10 million per fiscal quarter. The maximum revolving credit amount is $20.0 million leaving us with $15.0 million in unused borrowing capacity. There were no letters of credit outstanding under our Credit Agreement as of December 31, 2019.

At our election, interest for borrowings under the Credit Agreement are determined by reference to (i) the LIBOR plus an applicable margin between 2.50% and 3.00% per annum based on net debt to EBITDA or (ii) a domestic bank rate ("ABR") plus an applicable margin between 1.50% and 2.00% per annum based on net debt to EBITDA plus (iii) a commitment fee of 0.500% per annum based on the unutilized maximum revolving credit. Interest on the borrowings for ABR loans and the commitment fee are generally payable quarterly. Interest on the borrowings for LIBOR loans are generally payable at the applicable maturity date.

The Credit Agreement contains various covenants that limit, among other things, our ability to incur certain indebtedness, grant certain liens, merge or consolidate, sell all or substantially all of our assets, make certain loans, acquisitions, capital expenditures and investments, and pay distributions to unitholders.

In addition, we are required to maintain the following financial covenants:

- current assets to current liabilities of at least 1.0 to 1.0 at all times; and
- senior secured net debt to consolidated adjusted EBITDA for the last twelve months, as of the last day of any fiscal quarter, of not greater than 3.5 to 1.0.

The Credit Agreement also includes customary events of default, including events of default relating to non-payment of principal, interest or fees, inaccuracy of representations and warranties when made or when deemed made, violation of covenants, cross-defaults, bankruptcy and insolvency events, certain unsatisfied judgments, loan documents not being valid and a change in control. A change in control is generally defined as the occurrence of one of the following events: (i) our existing general partner ceases to be our sole general partner or (ii) certain specified persons shall cease to own more than 50% of the equity interests of our general partner or shall cease to control our general partner. If an event of default occurs, the lenders will be able to accelerate the maturity of the Credit Agreement and exercise other rights and remedies.

At December 31, 2019, we were in compliance with the financial covenants contained in the Credit Agreement. We monitor compliance on an ongoing basis. If we are unable to remain in compliance with the financial covenants contained in our Credit Agreement or maintain the required ratios discussed above, the lenders could call an event of default and accelerate the outstanding debt under the terms of the Credit Agreement, such that our outstanding debt could become then due and payable. We may request waivers of compliance from the violated financial covenants from the lenders, but there is no assurance that such waivers would be granted.

*Debt Issuance Costs*

As of December 31, 2019 and 2018, our unamortized debt issuance costs were approximately $1.2 million and $1.4 million, respectively. These costs are amortized to interest expense in our consolidated statements of operations over the life of our Credit Agreement. Amortization of debt issuance costs recorded during the years ended December 31, 2019 and 2018 were approximately $1.3 million and $0.8 million, respectively.

**8. OIL AND NATURAL GAS PROPERTIES AND RELATED EQUIPMENT**

Gathering and transportation assets consist of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Gathering and transportation assets** | | |
| Midstream assets | $ 186,941 | $ 186,406 |
| Less: Accumulated depreciation, amortization and impairment | (74,648) | (34,598) |
| Total gathering and transportation assets, net | $ 112,293 | $ 151,808 |

Oil and natural gas properties consist of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Oil and natural gas properties and related equipment** | | |
| Proved property | $ 112,476 | $ 112,173 |
| Less: Accumulated depreciation, depletion, amortization and impairments | (69,541) | (65,647) |
| **Total oil and natural gas properties and equipment, net** | $ 42,935 | $ 46,526 |

*Oil and Natural Gas Properties.* We follow the successful efforts method of accounting for our oil and natural gas production activities. Under this method of accounting, costs relating to leasehold acquisition, property acquisition and the development of proved areas are capitalized when incurred. If proved reserves are found on an undeveloped property, leasehold cost is transferred to proved properties.

*Proved Reserves.* Accounting rules require that we price our oil and natural gas proved reserves at the preceding twelve-month average of the first-day-of-the-month reference prices as adjusted for location and quality differentials. Such SEC-required prices are utilized except where different prices are fixed and determinable from applicable contracts for the remaining term of those contracts. Our proved reserve estimates exclude the effect of any derivatives we have in place.

Our estimate of proved reserves is based on the quantities of natural gas, NGLs, and oil that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters. Proved reserves are calculated based on various factors, including consideration of an independent reserve engineers' report on proved reserves and an economic evaluation of all of our properties on a well-by-well basis. The process used to complete the estimates of proved reserves at December 31, 2019 and 2018 is described in detail in Note 20 "Supplemental Information on Oil and Natural Gas Producing Activities."

Reserves and their relation to estimated future net cash flows impact depletion and impairment calculations. As a result, adjustments to depletion and impairments are made concurrently with changes to reserve estimates. The accuracy of reserve estimates is a function of many factors including the following: the quality and quantity of available data, the interpretation of that data, the accuracy of various mandated economic assumptions and the judgments of the individuals preparing the estimates.

Proved reserve estimates are a function of many assumptions, all of which could deviate significantly from actual results. As such, reserve estimates may materially vary from the ultimate quantities of oil and natural gas eventually recovered.

*Depreciation, Depletion and Amortization.* Depreciation and depletion of producing oil and natural gas properties is recorded at the field level, based on the units-of-production method. Unit rates are computed for unamortized drilling and development costs using proved developed reserves and for unamortized leasehold and proved property acquisition costs using all proved reserves. Acquisition costs of proved properties are amortized on the basis of all proved reserves, developed and undeveloped, and capitalized development costs (including wells and related equipment and facilities) are amortized on the basis of proved developed reserves.

All other properties, including the gathering and transportation assets, are stated at historical acquisition cost, net of any impairments, and are depreciated using the straight-line method over the useful lives of the assets, which range from 3 to 15 years for furniture and equipment, up to 36 years for gathering facilities, and up to 40 years for transportation assets.

*Impairment of Oil and Natural Gas Properties and Other Non-Current Assets.* Oil and natural gas properties are reviewed for impairment on a field-by-field basis when facts and circumstances indicate that their carrying value may not be recoverable. We assess impairment of capitalized costs of proved oil and natural gas properties by comparing net capitalized costs to estimated undiscounted future net cash flows using expected prices. If net capitalized costs exceed estimated undiscounted future net cash flows, the measurement of impairment is based on estimated fair value, which would consider estimated future discounted cash flows. The cash flow estimates are based upon third-party reserve reports using future expected oil and natural gas prices adjusted for basis differentials. Other significant inputs, besides reserves, used to determine the fair values of proved properties include estimates of: (i) future operating and development costs; (ii) future commodity prices; and (iii) a market-based weighted average cost of capital rate. These inputs require significant judgments and estimates by the Partnership's management at the time of the valuation and are the most sensitive and subject to change. Cash flow estimates for impairment testing exclude derivative instruments.

Depreciation, depletion and amortization consisted of the following (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Depreciation, depletion and amortization of oil and natural gas-related assets | $ 3,942 | $ 4,798 |
| Depreciation and amortization of gathering and transportation related assets | 7,931 | 7,729 |
| Amortization of intangible assets | 13,460 | 13,460 |
| Total Depreciation, depletion and amortization | $ 25,333 | $ 25,987 |

The recoverability of gathering and transportation assets is evaluated when facts or circumstances indicate that their carrying value may not be recoverable. Asset recoverability is measured by comparing the carrying value of the asset or asset group with its expected future pre-tax undiscounted cash flows. These cash flow estimates require us to make projections and assumptions for many years into the future for pricing, demand, competition, operating cost and other factors. If the carrying amount exceeds the expected future undiscounted cash flows, we recognize an impairment equal to the excess of net book value over fair value. The determination of the fair value using present value techniques requires us to make projections and assumptions regarding the probability of a range of outcomes and the rates of interest used in the present value calculations. Any changes we make to these projections and assumptions could result in significant revisions to our evaluation of recoverability of our gathering and transportation assets and the recognition of additional impairments. Upon disposition or retirement of gathering and transportation assets, any gain or loss is recorded to operations.

On January 13, 2020, we received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020. For the year ended December 31, 2019, we recorded a non-cash charge of $32.1 million, to impair the Seco Pipeline. For the year ended December 31, 2018, we recorded no impairment charges.

*Asset Retirement Obligation.* As described in Note 10 "Asset Retirement Obligation," estimated asset retirement costs are recognized when the asset is acquired or placed in service. Costs associated with oil and natural gas properties

are amortized over proved developed reserves using the units-of-production method. Costs associated with gathering and transportation assets are depreciated using the straight-line method over the useful lives of the asset. Asset retirement costs are estimated by our engineers using existing regulatory requirements and anticipated future inflation rates.

*Exploration and Dry Hole Costs.* Exploration and dry hole costs represent abandonments of drilling locations, dry hole costs, delay rentals, geological and geophysical costs and the impairment, amortization and abandonment associated with leases on our unproved properties. All such costs on oil and natural gas properties relating to unsuccessful exploratory wells are charged to expense as incurred. We recorded no exploration or dry hole costs for the years ended December 31, 2019 and 2018.

*Materials and Supplies.* Materials and supplies consist of well equipment, parts and supplies. They are valued at the lower of cost or market, using either the specific identification or first-in first-out method, depending on the inventory type. Materials and supplies are capitalized as used in the development or support of our oil and natural gas properties.

**9. PROVISION FOR INCOME TAXES**

Publicly traded partnerships like ours are treated as corporations unless they have 90% or more in qualifying income (as that term is defined in the Internal Revenue Code). We satisfied this requirement in each of the years ended December 31, 2019 and 2018 and, as a result, are not subject to federal income tax. However, our partners are individually responsible for paying federal income taxes on their share of our taxable income. Net earnings for financial reporting purposes may differ significantly from taxable income reportable to our unitholders as a result of differences between the tax basis and financial reporting basis of certain assets and liabilities and other factors. We do not have access to information regarding each partner's individual tax basis in our limited partner interests.

Provision for income taxes reflects franchise tax obligations in the state of Texas (the “Texas Margin Tax”). Deferred income tax assets and liabilities are recognized for temporary differences between the assets and liabilities of our tax paying entities for financial reporting and tax purposes.

Our federal and state income tax provision (benefit) is summarized below:

| | Years Ended December 31, | |
|---|---|---|
| | **2019** | **2018** |
| Current: | | |
| Federal | $ — | $ — |
| State | 328 | 64 |
| Total current | 328 | 64 |
| Deferred: | | |
| Federal | — | — |
| State | (126) | 126 |
| Total deferred | (126) | 126 |
| Total provision for income taxes | $ 202 | $ 190 |

Table of Contents

A reconciliation of the provision for (benefit from) income taxes with amounts determined by applying the statutory U.S. federal income tax rate to income (loss) before income taxes is as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Pre-tax net book income (loss) | $ (50,940) | $ 15,881 |
| Texas Margin Tax [(a)] | 126 | 267 |
| Return to accrual | 76 | 9 |
| Valuation allowance | — | (86) |
| Provision for income taxes | $ 202 | $ 190 |
| Effective income tax rate | (0.40%) | 1.20% |

(a) Although the Texas Margin Tax is not considered a state income tax, it has the characteristics of an income tax since it is determined by applying a tax rate to a base that considers our Texas-sourced revenues and expenses.

The following table presents the significant components of deferred tax assets and deferred tax liabilities at the dates indicated (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Deferred tax assets (liabilities): | | |
| Derivative assets | $ (23) | $ (15) |
| Depreciable, depletable property, plant and equipment | 21 | (112) |
| Other | 2 | 1 |
| Deferred tax assets (liabilities): | — | (126) |
| Valuation allowance | — | — |
| Total deferred tax assets (liabilities) | $ — | $ (126) |

Deferred tax assets which required valuation allowances were related to assets sold in 2018. Therefore, the valuation allowance is no longer necessary and was removed as of December 31, 2018.

As of December 31, 2019 and 2018, the Partnership had no material uncertain tax positions.

The Partnership files income tax returns in the U.S. and various state jurisdictions. The Partnership is no longer subject to examination by federal income tax authorities prior to 2016. State statutes vary by jurisdiction.

**10. ASSET RETIREMENT OBLIGATION**

We recognize the fair value of a liability for an ARO in the period in which it is incurred if a reasonable estimate of fair value can be made. Each period, we accrete the ARO to its then present value. The associated asset retirement cost ("ARC") is capitalized as part of the carrying amount of our oil and natural gas properties, equipment and facilities or gathering and transportation assets. Subsequently, the ARC is depreciated using the units-of-production method for production assets and the straight-line method for midstream assets. The AROs recorded by us relate to the plugging and abandonment of oil and natural gas wells and decommissioning of oil and natural gas gathering and other facilities.

Inherent in the fair value calculation of ARO are numerous assumptions and judgments including the ultimate settlement amounts, inflation factors, credit adjusted discount rates, timing of settlement and changes in the legal, regulatory, environmental and political environments. To the extent future revisions to these assumptions result in adjustments to the recorded fair value of the existing ARO, a corresponding adjustment is made to the ARC capitalized as part of the oil and natural gas properties, equipment and facilities or gathering and transportation assets.

The following table is a reconciliation of the ARO (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Asset retirement obligation, beginning balance | $ 6,200 | $ 6,074 |
| Liabilities added from escalating working interests | 172 | 288 |
| Sales | — | (613) |
| Revisions to cost estimates | — | (46) |
| Accretion expense | 526 | 497 |
| Asset retirement obligation, ending balance | $ 6,898 | $ 6,200 |

Additional AROs increase the liability associated with new oil and natural gas wells and other facilities as these obligations are incurred. Abandonments of oil and natural gas wells and other facilities reduce the liability for AROs. In 2019 and 2018, there were no significant expenditures for abandonments and there were no assets legally restricted for purposes of settling existing AROs. During the year ended December 31, 2018, obligations were sold as part of the Briggs Divestiture, Louisiana Divestiture and Cola Divestiture.

**11. INTANGIBLE ASSETS**

Intangible assets are comprised of customer and marketing contracts. The intangible assets balance includes $145.2 million related to the Gathering Agreement with Sanchez Energy that was entered into as part of the Western Catarina Midstream transaction. Pursuant to the 15-year agreement, Sanchez Energy tenders all of its crude oil, natural gas and other hydrocarbon-based product volumes on 35,000 dedicated acres in the Western Catarina of the Eagle Ford Shale in Texas for processing and transportation through Western Catarina Midstream, with a right to tender additional volumes outside of the dedicated acreage. These intangible assets are being amortized using the straight-line method over the 15 year life of the agreement.

Amortization expense for the years ended December 31, 2019 and 2018 was $13.5 million, respectively. These costs are amortized to depreciation, depletion, and amortization expense in our consolidated statement of operations. Intangible assets as of December 31, 2019 and 2018 are detailed below (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Beginning balance | $ 158,706 | $ 172,166 |
| Amortization | (13,460) | (13,460) |
| Ending balance | $ 145,246 | $ 158,706 |

**12. INVESTMENTS**

In July 2016, we completed a transaction pursuant to which we acquired from Sanchez Energy a 50% interest in Carnero Gathering, LLC ("Carnero Gathering"), a joint venture that was 50% owned and operated by Targa Resources Corp. (NYSE: TRGP) ("Targa"), for an initial payment of approximately $37.0 million and the assumption of remaining capital commitments to Carnero Gathering, estimated at approximately $7.4 million as of the acquisition date (the "Carnero Gathering Transaction"). The fair value of the intangible asset for the contractual customer relationship related to Carnero Gathering was valued at approximately $13.0 million. This amount is being amortized over a contract term of 15 years and decreases earnings from equity investments in our consolidated statements of operations. As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. See Note 5 "Fair Value Measurements" for further discussion of the earnout derivative.

In November 2016, we completed a transaction pursuant to which we acquired from Sanchez Energy a 50% interest in Carnero Processing, LLC ("Carnero Processing"), a joint venture that was 50% owned and operated by Targa, for aggregate cash consideration of approximately $55.5 million and the assumption of remaining capital contribution commitments to Carnero Processing, estimated at approximately $24.5 million as of the date of acquisition (the "Carnero Processing Transaction").

In May 2018, we executed a series of agreements with Targa and other parties pursuant to which, among other things: (1) the parties merged their respective 50% interests in Carnero Gathering and Carnero Processing (the "Carnero JV Transaction") to form an expanded 50 / 50 joint venture in South Texas, within Carnero G&P, LLC ("the Carnero JV"), (2) Targa contributed 100% of the equity interest in the Silver Oak II Gas Processing Plant ("Silver Oak II"), located in Bee County Texas, to the Carnero JV, which expands the processing capacity of the Carnero JV from 260 MMcf/d to 460 MMcf/d, (3) Targa contributed certain capacity in the 45 miles of high pressure natural gas gathering pipelines owned by Carnero Gathering that connect Western Catarina Midstream to nearby pipelines and the Raptor Gas Processing Facility (the "Carnero Gathering Line") to the Carnero JV resulting in the Carnero JV owning all of the capacity in the Carnero Gathering Line, which has a design limit (without compression) of 400 MMcf/d, (4) the Carnero JV received a new dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the Carnero JV limited by the capacity of the Raptor Gas Processing Facility. As a result of the Carnero JV Transaction we now record our share of earnings and losses from the Carnero JV using the Hypothetical Liquidation at Book Value ("HLBV") method of accounting. The HLBV is a balance-sheet approach that calculates the amount we would have received if the Carnero JV were liquidated at book value at the end of each measurement period. The change in our allocated amount during the period is recognized in our consolidated statements of operations. In the event of liquidation of the Carnero JV, available proceeds are first distributed to any priority return and unpaid capital associated with Silver Oak II, and then to members in accordance with their capital accounts.

As of December 31, 2019, the Partnership had paid approximately $124.1 million for its investment in the Carnero JV related to the initial payments and contributed capital. The Partnership has accounted for this investment using the equity method. Targa is the operator of the Carnero JV and has significant influence with respect to the normal day-to-day capital and operating decisions. We have included the investment balance in the equity investments caption on our consolidated balance sheets. For the year ended December 31, 2019, the Partnership recorded earnings of approximately $4.0 million in equity investments from the Carnero JV, which was offset by approximately $1.2 million related to the amortization of the contractual customer intangible asset. We have included these equity method earnings in the earnings from equity investments line within the consolidated statements of operations. Cash distributions of approximately $17.2 million were received during the year ended December 31, 2019.

Summarized financial information of unconsolidated entities is as follows (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Sales | $ 159,508 | $ 321,607 |
| Total expenses | 145,837 | 290,073 |
| Net income | $ 13,671 | $ 31,534 |

**13. COMMITMENTS AND CONTINGENCIES**

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at designated delivery points from Sanchez Energy and other producers. This earnout has an approximate value of zero as of December 31, 2019. For the year ended December 31, 2019 payments totaling approximately $32.0 thousand were made. For the year ended December 31, 2018, natural gas received did not exceed the threshold.

**14. RELATED PARTY TRANSACTIONS**

*Sanchez-Related Agreements*

We are controlled by our general partner. The sole member of our general partner is Manager, which has no officers. The sole manager and member of Manager is SP Capital Holdings, LLC, which has no officers. The co-managers of SP

Capital Holdings, LLC are Antonio R. Sanchez, III, a member of and Chairman of the Board; Eduardo A. Sanchez, a member of the Board; Patricio D. Sanchez, a member of the Board and the President and Chief Operating Officer of our general partner; and their father, Antonio R. Sanchez, Jr. SP Capital Holdings, LLC is owned by Antonio R. Sanchez, III, Eduardo A. Sanchez , and Patricio D. Sanchez, along with their sister, Ana Lee Sanchez Jacobs, and Antonio R. Sanchez, Jr. In May 2014, we entered into the Services Agreement with Manager pursuant to which Manager provides services that we require to operate our business, including overhead, technical, administrative, marketing, accounting, operational, information systems, financial, compliance, insurance, and acquisition, disposition and financing services. In connection with providing services under the Services Agreement, Manager receives compensation consisting of: (i) a quarterly fee equal to 0.375% of the value of our properties other than our assets located in the Mid-Continent region, (ii) reimbursement for all allocated overhead costs as well as any direct third-party costs incurred and (iii) for each asset acquisition, asset disposition and financing, a fee not to exceed 2% of the value of such transaction. Each of these fees, not including the reimbursement of costs, is paid in cash unless Manager elects for such fee to be paid in our equity with the exception of the following modified payment terms under the Services Agreement. In November 2019, a letter agreement was executed modifying the payment terms under the Services Agreement beginning with the fee for the quarter ended September 30, 2019. Under the modified terms, payment is being withheld until such time as all issued and outstanding Class C Units have been redeemed. Following the redemption of all issued and outstanding Class C Units the fee will be paid in our equity. As of December 31, 2019, the amount owed under the Services Agreement was $4.9 million and is presented within long term accrued liabilities - related entities on the consolidated balance sheet. If all Class C Units had been redeemed on December 31, 2019, we would issue approximately 11.4 million common units to Manager to settle the portion of the liability related to the November 2019 letter agreement. During the years ended December 31, 2019 and 2018, we incurred costs of approximately $7.3 million and $8.6 million, respectively, to Manager under the Services Agreement. Manager utilizes SOG to provide the services under the Services Agreement. The Services Agreement has a ten-year term and will be automatically renewed for an additional ten years unless both Manager and the Partnership provide notice of termination to the other with at least 180 days' notice.

SOG, headquartered in Houston, Texas, is a private full-service oil and natural gas company engaged in the exploration and development of oil and natural gas primarily in the South Texas and onshore Gulf Coast areas on behalf of its affiliates. SOG has successfully built and operated extensive midstream and gathering assets associated with its aforementioned development activities. The Chairman of the Board, Antonio R. Sanchez, III, the President and Chief Operating Officer of our general partner as well as one of our directors, Patricio D. Sanchez, one of our directors, Eduardo A. Sanchez, along with their immediate family members Ana Lee Sanchez Jacobs and Antonio R. Sanchez, Jr., collectively, either directly or indirectly, own a majority of the equity interests of SOG. In addition, Antonio R. Sanchez, III and Patricio D. Sanchez are Co-Presidents of SOG; Antonio R. Sanchez, Jr. is the Chief Executive Officer and sole director of SOG; Ana Lee Sanchez Jacobs is an Executive Vice President of SOG; and Gerald F. Willinger is an Executive Vice President of SOG.

*Sanchez-Related Transactions*

We have entered into several transactions with Sanchez Energy since January 1, 2018.

In conjunction with the acquisition of Western Catarina Midstream, we entered into a 15-year gas gathering agreement with Sanchez Energy, pursuant to which Sanchez Energy agreed to tender all of its crude oil, natural gas and other hydrocarbon-based product volumes on approximately 35,000 dedicated acres in the Western Catarina area of the Eagle Ford Shale in Texas for processing and transportation through Western Catarina Midstream, with the potential to tender additional volumes outside of the dedicated acreage (the "Gathering Agreement"). During the first five years of the term of the Gathering Agreement, Sanchez Energy is required to meet a minimum quarterly volume delivery commitment of 10,200 Bbls per day of oil and condensate and 142,000 Mcf per day of natural gas, subject to certain adjustments. Sanchez Energy is required to pay gathering and processing fees of $0.96 per Bbl for crude oil and condensate and $0.74 per Mcf for natural gas that are tendered through Western Catarina Midstream, in each case, subject to an annual escalation for a positive increase in the consumer price index. On June 30, 2017, the Gathering Agreement was amended to add an incremental infrastructure fee to be paid by Sanchez Energy based on water that is delivered through the gathering system through March 31, 2018, and have subsequently agreed to continue the incremental infrastructure fee on a month-to-month basis. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $59.1 million and $57.9 million, respectively, pursuant to the terms of the gathering and processing agreement.

As part of the Carnero Gathering Transaction, we are required to pay Sanchez Energy an earnout based on natural gas received above a threshold volume and tariff at Carnero Gathering's delivery points from Sanchez Energy and other producers. For the year ended December 31, 2019, payments totaling approximately $32.0 thousand were made. For the year ended December 31, 2018, natural gas did not exceed the threshold.

In September 2017, we entered into the Seco Pipeline Transportation Agreement. For the years ended December 31, 2019 and 2018, Sanchez Energy paid us approximately $6.8 million and $7.2 million, respectively, pursuant to the terms of that agreement. On January 13, 2020, we received a written notice from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

In May 2018, the Carnero JV, which is operated by Targa, received a dedication from Sanchez Energy and its working interest partners of over 315,000 acres located in the Western Eagle Ford on Sanchez Energy's Comanche Asset pursuant to a new long-term firm gas gathering and processing agreement. The agreement with Sanchez Energy, which was approved by all of the unaffiliated Comanche working interest partners, establishes commercial terms for the gathering of gas on the Carnero Gathering Line and processing at the Raptor Gas Processing Facility and Silver Oak II. Prior to execution of the agreement, Comanche volumes were gathered and processed on an interruptible basis, with the processing capabilities of the joint ventures limited by the capacity of the Raptor Gas Processing Facility.

As of December 31, 2019 and 2018, the Partnership had a net receivable from related parties of approximately $6.7 million, respectively, which are included in accounts receivable – related entities in the consolidated balance sheets. As of December 31, 2019 and 2018, the Partnership also had a net payable to related parties of approximately $5.5 million, and $5.6 million, respectively. The net receivable/payable as of December 31, 2019 consist primarily of revenues receivable from oil and natural gas production and transportation, offset by costs associated with that production and transportation.

Sanchez Energy is an independent exploration and production company focused on the acquisition and development of U.S. onshore unconventional oil and natural gas resources, with a current focus on the horizontal development of significant resource potential from the Eagle Ford Shale in South Texas where it has assembled approximately 415,000 gross leasehold acres (215,000 net acres). The Chairman of the Board, Antonio R. Sanchez, III, is Sanchez Energy's Chief Executive Officer and a member of its board of directors. A member of the Board, Eduardo A. Sanchez, is the former President of Sanchez Energy. The President and Chief Operating Officer of our general partner, Patricio D. Sanchez, who is also a member of the Board, is an Executive Vice President of Sanchez Energy. Antonio R. Sanchez, Jr., the father of Antonio R. Sanchez, III, Eduardo A. Sanchez, and Patricio D. Sanchez, is the Executive Chairman of the board of directors of Sanchez Energy. Antonio R. Sanchez, Jr., Antonio R. Sanchez, III, Eduardo A. Sanchez and Patricio D. Sanchez beneficially own 6.1%, 3.0%, 1.1% and 1.2%, respectively, of Sanchez Energy's shares outstanding as of March 13, 2020. As of March 13, 2020, Sanchez Energy indirectly, through one of its wholly owned subsidiaries, beneficially owns approximately 11.4% of the outstanding common units of SNMP. The employees of SOG, including Kirsten A. Hink, our Chief Accounting Officer, provide services to both us and Sanchez Energy.

**15. UNIT-BASED COMPENSATION**

The Sanchez Midstream Partners LP Long-Term Incentive Plan allows for restricted common unit grants. Restricted common unit activity under the Plan during the period is presented in the following table:

As of December 31, 2019, 840,811 common units remained available for future issuance to participants under the LTIP.

| | Number of Restricted Units | | Weighted Average Grant Date Fair Value Per Unit |
|---|---|---|---|
| Outstanding at December 31, 2017 | 283,138 | $ | 14.64 |
| Granted | 622,534 | | 11.94 |
| Vested | (301,005) | | 13.60 |
| Returned/Cancelled | (90,973) | | 12.77 |
| Outstanding at December 31, 2018 | 513,694 | $ | 12.31 |

| | | | |
|---|---|---|---|
| Granted | 1,129,173 | | 2.35 |
| Vested | (382,690) | | 8.50 |
| Returned/Cancelled | (104,710) | | 12.04 |
| Outstanding at December 31, 2019 | 1,155,467 | $ | 3.86 |

In April 2019, the Partnership issued 137,613 restricted common units pursuant to the LTIP to certain directors of the Partnership's general partner that vested immediately on the date of grant. In March 2019, the Partnership issued 991,560 restricted common units pursuant to the LTIP to certain officers and directors of the Partnership's general partner that vest over three years from the date of grant. The unit-based compensation expense for the awards was based on the fair value on the day before the grant date.

In April 2018, the Partnership issued 63,630 restricted common units pursuant to the LTIP to certain directors of the Partnership's general partner that vested immediately on the date of grant. In April 2018, the Partnership issued 244,813 and 314,091 restricted common units pursuant to the LTIP to executives that vest on the first anniversary of the date of grant and to non-executive employees that vest over three years from the date of grant, respectively.

**16. DISTRIBUTIONS TO UNITHOLDERS**

The table below reflects the payment of cash distributions on common units relating to the years ended December 31, 2019 and 2018.

| Three months ended | | Distribution per unit | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|---|
| March 31, 2018 | $ | 0.4508 | May 8, 2018 | May 22, 2018 | May 31, 2018 |
| June 30, 2018 | $ | 0.4508 | August 8, 2018 | August 21, 2018 | August 31, 2018 |
| September 30, 2018 | $ | 0.1500 | November 9, 2018 | November 20, 2018 | November 30, 2018 |
| December 31, 2018 | $ | 0.1500 | February 7, 2019 | February 20, 2019 | February 28, 2019 |
| March 31, 2019 | $ | 0.1500 | May 3, 2019 | May 22, 2019 | May 31, 2019 |

The table below reflects the payment of distributions on Class B Preferred Units relating to the years ended December 31, 2019 and 2018.

| Three months ended | | Cash distribution per unit | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|---|
| March 31, 2018 | $ | 0.28225 | May 8, 2018 | May 22, 2018 | May 31, 2018 |
| June 30, 2018 [(a)] | $ | 0.22580 | August 8, 2018 | August 21, 2018 | August 31, 2018 |
| September 30, 2018 | $ | 0.28225 | November 9, 2018 | November 20, 2018 | November 30, 2018 |
| December 31, 2018 | $ | 0.28225 | February 7, 2019 | February 20, 2019 | February 28, 2019 |
| March 31, 2019 | $ | 0.28225 | May 3, 2019 | May 22, 2019 | May 31, 2019 |

(a) The Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part in Class B Preferred PIK Units. Accordingly, the Partnership declared a cash distribution of $0.2258 per Class B Preferred Unit and an aggregate distribution of 310,009 Class B Preferred PIK Units, which was paid on August 31, 2018 to holders of record on August 21, 2018.

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units (the "Class C Preferred Units"). Following the Exchange, no distribution was declared with respect to the Class B Preferred Units.

The table below reflects the payment of distributions on Class C Preferred Units related to the periods indicated.

| Three months ended | Class C Preferred PIK distribution | Date of declaration | Date of record | Date of distribution |
|---|---|---|---|---|
| June 30, 2019 | 939,327 | August 8, 2019 | August 20, 2019 | August 30, 2019 |
| September 30, 2019 | 1,007,820 | October 30, 2019 | November 29, 2019 | November 20, 2019 |

Table of Contents

| | | | | |
|---|---|---|---|---|
| December 31, 2019 | 1,039,314 | February 13, 2020 | February 28, 2020 | February 20, 2020 |

**17. PARTNERS' CAPITAL**

*Outstanding Units*

As of December 31, 2019, we had no Class B Preferred Units outstanding, 33,258,043 Class C Preferred Units outstanding and 20,087,462 common units outstanding, which included 1,155,467 unvested restricted common units issued under the LTIP.

*Common Unit Issuances*

The following table shows the common units issued by the Partnership in 2018 and 2019 to SP Holdings in connection with providing services under the Services Agreement:

| Three months ended | Common units | Date of issuance |
|---|---|---|
| December 31, 2017 | 210,978 | March 15, 2018 |
| March 31, 2018 | 220,214 | May 31, 2018 |
| June 30, 2018 | 224,342 | September 10, 2018 |
| September 30, 2018 | 334,010 | November 30, 2018 |
| December 31, 2018 | 787,750 | March 8, 2019 |
| March 31, 2019 | 887,269 | May 23, 2019 |
| June 30, 2019 | 901,741 | August 2, 2019 |

*Class B Preferred Unit Offering*

On October 14, 2015, pursuant to that certain Class B Preferred Unit Purchase Agreement dated September 25, 2015 between the Partnership and Stonepeak, the Partnership sold and Stonepeak purchased 19,444,445 of the Partnership's newly created Class B Preferred Units (the "Class B Preferred Units") in a privately negotiated transaction for an aggregate cash purchase price of $18.00 per Class B Preferred Unit, which resulted in gross proceeds to the Partnership of $350.0 million. The Partnership used the net proceeds to pay a portion of the consideration for the Catarina Transaction, along with the payment to Stonepeak of a fee equal to 2.25% of the consideration paid for the Class B Preferred Units.

Under the terms of our partnership agreement, holders of the Class B Preferred Units received a quarterly distribution, at the election of the Board, of 10.0% per annum if paid in full in cash or 12.0% per annum if paid in part cash (8.0% per annum) and in part Class B Preferred PIK Units (4.0% per annum), as defined in the Second Amended and Restated Agreement of Limited Partnership of the Partnership (the "Amended Partnership Agreement"). Distributions were to be paid on or about the last day of each of February, May, August and November after the end of each quarter.

In accordance with the partnership agreement, on December 6, 2016, we issued an additional 9,851,996 Class B Preferred Units to Stonepeak. On January 25, 2017, the Partnership and Stonepeak entered into a Settlement Agreement and Mutual Release (the "Settlement Agreement") to settle a dispute arising from the calculation of an adjustment to the number of Class B Preferred Units pursuant to Section 5.10(g) of the Amended Partnership Agreement. Pursuant to the Settlement Agreement, and in accordance with Section 5.4 of the Amended Partnership Agreement, the Partnership issued 1,704,446 Class B Preferred Units to Stonepeak in a privately negotiated transaction as partial consideration for the Settlement Agreement, with the "Class B Preferred Unit Price" being established at $11.29 per Class B Preferred Unit. Pursuant to the terms of the Amended Partnership Agreement, the Class B Preferred Units were convertible at any time, at the option of Stonepeak, into common units of the Partnership, subject to the requirement to convert a minimum of $17.5 million of Class B Preferred Units. The issuance of the Class B Preferred Units pursuant to the Settlement Agreement was made in reliance upon an exemption from the registration requirements of the Securities Act of 1933 pursuant to Section 4(a)(2) thereof.

Table of Contents

The Partnership elected to pay the second-quarter 2018 distribution on the Class B Preferred Units in part cash and part Class B Preferred PIK Units in accordance with the partnership agreement. Accordingly, the Partnership issued 310,009 Class B Preferred PIK Units on August 31, 2018, to Stonepeak.

The Class B Preferred Units are accounted for as mezzanine equity in the consolidated balance sheet consisting of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Mezzanine equity, beginning balance | $ 349,857 | $ 343,912 |
| Amortization of discount | 1,708 | 2,358 |
| Distributions | 23,247 | 36,925 |
| Distributions paid | (17,675) | (33,338) |
| Class B Preferred Unit exchange | (357,137) | — |
| Mezzanine equity, ending balance | $ — | $ 349,857 |

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and a warrant exercisable for junior securities (the "Warrant").

*Class C Preferred Units*

On August 2, 2019, Stonepeak exchanged all of the issued and outstanding Class B Preferred Units for newly issued Class C Preferred Units and the Warrant in a privately negotiated transaction (the "Exchange"). In connection with the Exchange, the Partnership entered into (i) the Third Amended and Restated Agreement of Limited Partnership of the Partnership (the "Amended Partnership Agreement) to set forth the terms of the Class C Preferred Units, (ii) the Amended and Restated Registration Rights Agreement with Stonepeak relating to the registered resale of common units issuable upon the exercise of the Warrant, and (iii) the Amended and Restated Board Representation and Standstill Agreement with Stonepeak.

Under the terms of the Amended Partnership Agreement, commencing with the quarter ended on September 30, 2019, the holders of the Class C Preferred Units will receive a quarterly distribution of 12.5% per annum payable in cash. To the extent that Available Cash (as defined in the Amended Partnership Agreement) is insufficient to pay the distribution in cash, all or a portion of the distribution may be paid in Class C Preferred PIK Units. Commencing with the quarter ending March 31, 2022, the distribution rate will increase to 14% per annum. Distributions are to be paid on or about the last day of each of February, May, August and November following the end of each quarter and are charged to interest expense in our consolidated statements of operations.

The Exchange was accounted for as an extinguishment with the difference between the book value of the redeemed instrument and the fair value of the new instrument being considered a deemed contribution to common equity of approximately $103.8 million. The Class C Preferred Units are accounted for as a long-term liability on the consolidated balance sheet consisting of the following (in thousands):

Table of Contents

| | | December 31, 2019 |
|---|---|---|
| Class C Preferred Units | | |
| Private placement of Class C Preferred Units | $ | 353,500 |
| Discount | | (104,250) |
| Amortization of discount | | 13,129 |
| Distributions | | 19,309 |
| Class C Preferred Units, ending balance | $ | 281,688 |

*Warrant*

On August 2, 2019, in connection with the Exchange, the Partnership issued to Stonepeak the Warrant which entitles the holder to receive junior securities representing ten percent of junior securities deemed outstanding when exercised. The Warrant expires on the later of August 2, 2026 or 30 days following the full redemption of the Class C Preferred Units. There is no strike price associated with the exercise of the Warrant. The Warrant is accounted for as a liability in accordance with ASC 480 and is presented within other liabilities on the consolidated balance sheet. Changes in the fair value of the Warrant are charged to interest expense in our consolidated statements of operations.

*Earnings per Unit*

Net income (loss) per common unit for the period is based on any distributions that are made to the unitholders (common units) plus an allocation of undistributed net income (loss), based on the provisions of the Amended Partnership Agreement, divided by the weighted average number of common units outstanding. The two-class method dictates that net income (loss) for a period be reduced by the amount of distributions and that any residual amount representing undistributed net income (loss) be allocated to common unitholders and other participating unitholders to the extent that each unit may share in net income (loss) as if all of the net income for the period had been distributed in accordance with the Amended Partnership Agreement. Unit-based awards granted but unvested are eligible to receive distributions. The underlying unvested restricted unit awards are considered participating securities for purposes of determining net income (loss) per unit. Undistributed income is allocated to participating securities based on the proportional relationship of the weighted average number of common units and unit-based awards outstanding. Undistributed losses (including those resulting from distributions in excess of net income) are allocated to common units based on provisions of the Amended Partnership Agreement. Undistributed losses are not allocated to unvested restricted unit awards as they do not participate in net losses. Distributions declared and paid in the period are treated as distributed earnings in the computation of earnings per common unit even though cash distributions are not necessarily derived from current or prior period earnings.

The Partnership's general partner does not have an economic interest in the Partnership and, therefore, does not participate in the Partnership's net income.

**18. REPORTING SEGMENTS**

"Midstream" and "Production" best describe the operating segments of the businesses that we separately report. The factors used to identify these reporting segments are based on the nature of the operations that are undertaken by each segment. The Midstream segment operates the gathering, processing and transportation of natural gas, NGLs and crude oil. The Production segment operates to produce crude oil and natural gas. These segments are broadly understood across the petroleum and petrochemical industries.

These functions have been defined as the operating segments of the Partnership because they are the segments (1) that engage in business activities from which revenues are earned and expenses are incurred; (2) whose operating results are regularly reviewed by the Partnership's chief operating decision maker ("CODM") to make decisions about resources to be allocated to the segment and to assess its performance; and (3) for which discrete financial information is available. Operating segments are evaluated for their contribution to the Partnership's consolidated results based on operating income, which is defined as segment operating revenues less expenses.

The following tables present financial information for each operating segment for the periods indicated based on our operating segments (in thousands):

Table of Contents

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2019 | | 2018 | |
| | Production | Midstream | Production | Midstream |
| **Segment revenues** | | | | |
| Natural gas sales | $ 683 | $ — | $ 953 | $ — |
| Oil sales | 9,512 | — | 21,272 | — |
| Natural gas liquid sales | 539 | — | 1,709 | — |
| Gathering and transportation sales | — | 6,825 | — | 6,651 |
| Gathering and transportation lease revenues | — | 59,090 | — | 53,025 |
| **Total segment revenues** | 10,734 | 65,915 | 23,934 | 59,676 |
| **Segment operating costs** | | | | |
| Lease operating expenses | 5,879 | 1,499 | 6,719 | 1,145 |
| Transportation operating expenses | — | 11,553 | — | 12,316 |
| Production taxes | 621 | — | 1,104 | — |
| Gain on sale of assets | — | — | (3,186) | — |
| Depreciation, depletion and amortization | 3,942 | 21,391 | 4,798 | 21,189 |
| Asset impairments | — | 32,119 | — | — |
| Accretion expense | 200 | 326 | 198 | 299 |
| **Total segment operating costs** | 10,642 | 66,888 | 9,633 | 34,949 |
| **Segment other income** | | | | |
| Earnings from equity investments | — | 2,831 | — | 12,859 |
| **Total segment other income** | — | 2,831 | — | 12,859 |
| **Segment operating income** | $ 92 | $ 1,858 | $ 14,301 | $ 37,586 |

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Reconciliation of segment operating income to net income (loss)** | | |
| Total production operating income | $ 92 | $ 14,301 |
| Total midstream operating income | 1,858 | 37,586 |
| Total segment operating income | 1,950 | 51,887 |
| General and administrative expense | (17,610) | (23,653) |
| Unit-based compensation expense | (1,351) | (1,938) |
| Interest expense, net | (39,789) | (10,961) |
| Other income | 5,860 | 546 |
| Income tax expense | (202) | (190) |
| **Net income (loss)** | $ (51,142) | $ 15,691 |

The following table summarizes the total assets and capital expenditures by operating segment as of December 31, 2019 and 2018 (in thousands):

| | December 31, 2019 | | | |
|---|---|---|---|---|
| | Production | Midstream | Corporate [a] | Total |
| **Other financial information** | | | | |
| Total assets | $ 45,550 | $ 362,961 | $ 5,929 | $ 414,440 |
| Capital expenditures[b] | $ 130 | $ 775 | $ — | $ 905 |

| | December 31, 2018 | | | |
|---|---|---|---|---|
| | Production | Midstream | Corporate [a] | Total |
| **Other financial information** | | | | |
| Total assets | $ 53,556 | $ 429,523 | $ 3,606 | $ 486,685 |
| Capital expenditures[b] | $ 11 | $ 4,856 | $ — | $ 4,867 |

(a) Corporate assets not reviewed by the CODM on a segment basis consists of cash, certain prepaid expenses, office furniture and other assets.
(b) Inclusive of capital contributions made to equity method investments.

Revenue from Sanchez Energy earned in our Midstream segment accounted for 86% and 71% of total revenue for the years ended December 31, 2019 and 2018, respectively. Because all remaining production properties are non-operated, there are no customers in the Production segment that exceed 10% of the Partnership's consolidated revenue.

**19. VARIABLE INTEREST ENTITIES**

The Partnership's investment in the Carnero JV represents a variable interest entity ("VIE") that could expose the Partnership to losses. The amount of losses the Partnership could be exposed to from the Carnero JV is limited to the capital investment of approximately $100.3 million.

As of December 31, 2019, the Partnership had invested approximately $124.1 million in the Carnero JV and no debt has been incurred by the Carnero JV. We have included this VIE in other assets, equity investments on the balance sheet.

Below is a tabular comparison of the carrying amounts of the assets and liabilities of the VIE and the Partnership's maximum exposure to loss as of December 31, 2019 and 2018 (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| Acquisitions, earnout and capital investments | $ 128,140 | $ 127,899 |
| Earnings in equity investments | 25,976 | 23,144 |
| Distributions received | (53,805) | (36,578) |
| Maximum exposure to loss | $ 100,311 | $ 114,465 |

**20. SUPPLEMENTAL INFORMATION ON OIL AND NATURAL GAS PRODUCING ACTIVITIES (UNAUDITED)**

The Supplementary Information on Oil and Natural Gas Producing Activities is presented as required by the appropriate authoritative guidance. The supplemental information includes capitalized costs related to oil and natural gas producing activities; costs incurred for the acquisition of oil and natural gas producing activities, exploration and development activities and the results of operations from oil and natural gas producing activities.

Supplemental information is also provided for per unit production costs; oil and natural gas production and average sales prices; the estimated quantities of proved oil and natural gas reserves; the standardized measure of discounted future net cash flows associated with proved reserves and a summary of the changes in the standardized measure of discounted future net cash flows associated with proved reserves.

***Costs***

The following table sets forth our capitalized costs as of December 31, 2019 and 2018 (in thousands):

| | December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Capitalized costs at the end of the period:** | | |
| Oil and natural gas properties and related equipment (successful efforts method) | | |
| Proved property | $ 112,476 | $ 112,173 |
| Less: Accumulated depreciation, depletion, amortization and impairments | (69,541) | (65,647) |
| Oil and natural gas properties and equipment, net | $ 42,935 | $ 46,526 |

(a) Capitalized costs include the cost of equipment and facilities for our oil and natural gas producing activities. Proved property costs include capitalized costs for leaseholds holding proved reserves; development wells and related equipment and facilities (including uncompleted development well costs); and support equipment. Unproved property costs include capitalized costs for oil and natural gas leaseholds where proved reserves do not exist.

The following table sets forth costs incurred for oil and natural gas producing activities for the years ended December 31, 2019 and 2018 (in thousands):

| | Years Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Costs incurred for the period:** | | |
| Acquisition of properties | | |
| Proved | $ — | $ — |
| Development costs | 131 | 11 |
| Oil and natural gas properties and equipment, net | $ 131 | $ 11 |

The development costs for the years ended December 31, 2019 and 2018 primarily represent costs related to recompletions.

We had no exploration and dry hole costs in 2019 and 2018.

***Results of Operations***

The revenues and expenses associated directly with oil and natural gas producing activities are reflected in the Consolidated Statements of Operations. All of our oil and natural gas producing activities are located in the United States.

***Net Proved Reserves of Natural Gas, NGLs and Oil***

The following table sets forth information with respect to changes in proved developed and undeveloped reserves. This information excludes reserves related to royalty and net profit interests. All of our reserves are located in the United States.

| | Total (MMBoe) | Oil (in MMBoe) | Natural Gas (in MMBoe) | Natural Gas Liquids (in MMBoe) |
|---|---|---|---|---|
| Net proved reserves | | | | |
| December 31, 2017 | 5,265 | 3,246 | 1,109 | 910 |
| Sales of reserves in place | (1,105) | (272) | (322) | (511) |
| Revisions of previous estimates | (268) | (199) | (261) | 192 |
| Production | (439) | (296) | (72) | (71) |
| December 31, 2018 | 3,453 | 2,479 | 454 | 520 |
| Sales of reserves in place | — | — | — | — |
| Revisions of previous estimates | (145) | (10) | (67) | (68) |
| Production | (309) | (228) | (39) | (42) |
| December 31, 2019 | 2,999 | 2,241 | 348 | 410 |
| | | | | |
| Proved developed reserves: | | | | |
| December 31, 2018 | 3,453 | 2,479 | 454 | 520 |
| December 31, 2019 | 2,999 | 2,241 | 348 | 410 |

***Reserves and Related Estimates***

Our estimate of proved reserves is based on the quantities of oil and natural gas that engineering and geological analyses demonstrate, with reasonable certainty, to be recoverable from established reservoirs in the future under current operating and economic parameters.

Our year end December 31, 2019 and 2018, proved reserve estimates were 3.0 MMBoe and 3.5 MMBoe, respectively. Reserve estimates for those periods were prepared by, Ryder Scott, an independent petroleum engineering firm, and are used for the applicable disclosures in our financial statements.

Our 2019 estimates of total proved reserves decreased 0.5 MMBoe from 2018 due to production of 0.3 MMBoe and revisions of previous estimates of 0.2 MMBoe. For proved reserves, the production weighted average product price over

Table of Contents

the remaining lives of the properties used in our reserve report were: $59.55 per Bbl for oil, $13.68 per Bbl for NGLs and $2.66 per Mcf for natural gas.

Our 2018 estimates of total proved reserves decreased 1.8 MMBoe from 2017 primarily due to a decrease in reserves of 1.1 MMBoe due to the Louisiana Divestiture, Briggs Divestiture and Cola Divestiture. For proved reserves, the production weighted average product price over the remaining lives of the properties used in our reserve report were: $66.95 per Bbl for oil, $23.00 per Bbl for NGLs and $3.21 per Mcf for natural gas.

***Standardized Measure of Discounted Future Net Cash Flows Relating to Proved Oil and Natural Gas Reserves, Including a Reconciliation of Changes Therein***

The following table sets forth the standardized measure of the discounted future net cash flows attributable to our proved oil and natural gas reserves. Certain information concerning the assumptions used in computing the valuation of proved reserves and their inherent limitations are discussed below.

Future cash inflows are calculated by applying the SEC-required prices of oil and natural gas relating to our proved reserves to the year-end quantities of those reserves. Future cash inflows exclude the impact of our hedging program. Future development and production costs represent the estimated future expenditures (based on year-end costs) to be incurred in developing and producing the proved reserves, assuming continuation of existing economic conditions. In addition, asset retirement obligations are included within future production and development costs. There are no future income tax expenses because the Partnership is a non-taxable entity.

The assumptions used to compute estimated future cash inflows do not necessarily reflect expectations of actual revenues or costs or their present values. In addition, variations from expected production rates could result directly or indirectly from factors outside of our control, such as unexpected delays in development, changes in prices or regulatory or environmental policies. The reserve valuation further assumes that all reserves will be disposed of by production; however, if reserves are sold in place, additional economic considerations could also affect the amount of cash eventually realized.

The following table summarizes the standardized measure of estimated discounted future cash flows from the oil and natural gas properties (in thousands):

| | Years Ended December 31, 2019 | 2018 |
|---|---|---|
| Future cash inflows | $ 144,628 | $ 186,675 |
| Future production costs | (80,007) | (99,187) |
| Future estimated development costs | (3,400) | (4,043) |
| Future net cash flows | 61,221 | 83,445 |
| 10% annual discount for estimated timing of cash flows | (22,871) | (31,199) |
| Standardized measure of discounted estimated future net cash flows related to proved oil and natural gas reserves | $ 38,350 | $ 52,246 |

The following table summarizes the principal sources of change in the standardized measure of estimated discounted future net cash flows (in thousands):

| | Years Ended December 31, 2019 | 2018 |
|---|---|---|
| Beginning of the period | $ 52,246 | $ 56,697 |
| Sales and transfers of oil and natural gas, net of production costs | (8,006) | (14,795) |
| Net changes in prices and production costs related to future production | (7,330) | 17,392 |
| Changes in development costs | 35 | 207 |
| Revisions of previous quantity estimates | (1,942) | (4,203) |
| Purchases and sales of reserves in place | — | (5,423) |
| Accretion discount | 5,225 | 5,670 |
| Change in production rates, timing, and other | (1,878) | (3,299) |
| Standardized measure of discounted future net cash flows related to proved oil and natural gas reserves | $ 38,350 | $ 52,246 |

**21. SUBSEQUENT EVENTS**

On February 13, 2020, the Board declared that after establishing a cash reserve for the payment of certain amounts outstanding under the Credit Agreement, the Partnership did not have any available cash and, as a result, there would be no cash distribution on the Partnership’s common units. As required by the Amended Partnership Agreement, the Board declared a fourth quarter distribution on the Class C Preferred Units payable 100% in Class C Preferred PIK Units. Accordingly, the Partnership declared an aggregate distribution of 1,039,314 Class C Preferred PIK Units, which was paid on February 28, 2020 to holders of record on February 20, 2020.

On January 13, 2020, we received written notice of termination from Sanchez Energy terminating the Seco Pipeline Transportation Agreement effective February 12, 2020.

Since December 31, 2019, the Partnership paid $6.0 million in principal outstanding under the Credit Agreement resulting in total debt outstanding of $144.0 million under the Credit Agreement as of March 13, 2020.

# Exhibit H

# RATIFICATION AND ASSUMPTION AGREEMENT

THIS RATIFICATION AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into effective as of the 1st day of April, 2018, by SN EF UnSub, LP, a Delaware limited partnership (the "Producer"), SN EF Maverick, LLC, a Delaware limited liability company ("Maverick"), and Carnero G&P LLC a Delaware limited liability company ("Carnero"). Producer, Maverick and Carnero are each referred to herein as a "Party" and collectively as the "Parties".

## RECITALS

Carnero and Maverick entered into that certain Firm Gas Gathering, Processing and Purchase Agreement, dated effective as of the effective date hereof (as amended, restated, modified or supplemented from time to time, the "GGPA"); and

The Parties desire to enter into this Agreement to clarify certain responsibilities and obligations of Producer with respect to the GGPA.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Parties hereby agree and covenant as follows:

1. Definitions. Capitalized terms used herein without definition shall have the meanings given to such terms in the GGPA. "Producer's Share" means the quotient, expressed as a percentage, obtained by dividing (a) the volume of gas produced from the Dedicated Acreage that is attributable to Producer's working interest in the Dedicated Acreage delivered to Carnero under the GGPA during any period, by (b) the aggregate volume of gas produced from the Dedicated Acreage and delivered to Carnero under the GGPA during the same period.

2. Ratification. Producer hereby ratifies and confirms the GGPA in all respects, and agrees that Producer will assume all the obligations of a "Producer" (as defined in the GGPA) under the GGPA in all respects and make all the representations and warranties of a "Producer" under the GGPA, in each case subject to the other terms of this Agreement, and in the case of Maverick's failure to pay any amount or perform or otherwise satisfy any obligation under the GGPA, Producer shall be responsible for and shall pay, perform or otherwise satisfy Producer's Share of such payment or obligation that Maverick failed to pay or perform; provided, however, Maverick shall have sole authority and responsibility for all elections and operational decisions relating to the delivery and sale of, and Carnero's gathering, processing and purchase of, all volumes of gas under the GGPA, except as expressly set forth in this Agreement. Producer's obligations under the GGPA are several and not joint, and Producer will not have liability for the actions or inactions of any other "Comanche Producers" (as defined in the GGPA).

3. Opportunity to Cure. Producer agrees that, without prejudice to any other rights it may have in respect of any default or failure to perform by Maverick of any of its obligations under any agreement between Producer and Maverick ("Default"), Producer will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the GGPA or any agreement or arrangement between Producer and Maverick in any way that may affect Maverick's performance, or ability to perform, under the GGPA without first notifying Carnero in writing of the nature and details of such Default with reasonable specificity and providing Carnero 30 days following Carnero's receipt of such notice to cure such Default, including the right to step into the position of Maverick and assume the obligations and responsibilities of Maverick under the relevant agreement in regards to any Default to the extent arising out of or attributable to Producer's Share of such responsibilities and obligations. If Carnero cures the Default within such 30 day period in accordance with the terms of the relevant agreement, the Default will be deemed cured in accordance with the terms of the relevant agreement and Producer will not have any further right (to the extent arising due to the cured Default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, the relevant agreement.

4. Dedication. Producer hereby ratifies and confirms the dedication of all of its interests in the Dedicated Acreage and Dedicated Gas under the GGPA to the extent provided in the GGPA (including with respect to after acquired interests) and agrees that (a) such interests will be dedicated to Carnero and to the performance of the GGPA, as provided in the GGPA, (b) the provisions of Section 3.1 of the GGPA shall be covenants running with the land and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto and (c) Producer shall, and shall require its Affiliates to, require any purchaser, assignee or other transferee of any portion of such interests to ratify the GGPA and to expressly assume and agree to the terms thereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

5. Memorandum. Contemporaneously with the execution of this Agreement and from time to time, the Parties will execute, acknowledge, deliver and record a short form memorandum of this Agreement substantially in the form of Exhibit A identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

6. Producer's Representative. Producer hereby appoints Maverick as its agent and attorney-in-fact with respect to all matters arising under the GGPA ("Producer's Representative"), including (but not limited to) the following:

(a) To give and receive all notices, and to make all payments due to Carnero;

(b) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(c) To receive all payments and disburse such payments to Producer, to the extent legally entitled thereto; and

(d) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the GGPA.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producer's Representative on behalf of Producer as fully and with the same effect as though Producer had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producer's Representative designated above, or designate a new Producer's Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of the Comanche Producers (as defined in the GGPA) under the GGPA. Producer's Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producer's Representative.

7. Choice of Law. This Agreement shall be construed and enforced in accordance with the laws of the State of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

8. Assignment. No Party shall have the right to assign this Agreement without the prior written consent of the other Parties, except for assignments permitted under the GGPA.

9. Entire Agreement. This Agreement and the GGPA constitute the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings of the Parties, oral and written, with respect to such subject matter. This Agreement may be modified only by an agreement in writing executed by all of the Parties.

10. Counterparts. This Agreement may be executed in one or more counterparts, including those delivered by facsimile or other electronic means, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the Parties has received this Agreement duly executed by the other Parties.

[Signature Page Follows]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement effective as of the date first above written.

**SN EF Maverick, LLC**

By: ___________________________________
Name:
Title:

**SN EF UnSub, LP**

By: SN EF UnSub GP, LLC, its general partner

By: ___________________________________
Name:
Title:

**Carnero G&P LLC**

By: ___________________________________
Name: Patrick J. McDonie
Title: President

# Exhibit I

*Execution Version*

# FIRM GAS GATHERING, PROCESSING AND PURCHASE AGREEMENT

This Firm Gas Gathering, Processing and Purchase Agreement (this "Agreement") is entered into effective as of the 1st day of April, 2018 (the "Effective Date"), by and among SN EF Maverick, LLC ("Producer"), a Delaware limited liability company, and Carnero G&P LLC, a Delaware limited liability company ("Carnero"). Producer and Carnero may be referred to in this Agreement individually as a "Party" and collectively as the "Parties."

Background:

Producer currently owns undivided working interests and/or controls Gas produced, or to be produced, from certain lands or oil and gas leases located in South Texas;

Carnero owns, or has interests in or rights to gathering, treating and processing facilities capable of receiving deliveries of Gas from Producer at the Receipt Point(s) and delivering Residue Gas to Producer at the Delivery Point(s); and

Producer desires that Carnero provide certain gathering, treating and processing services described in this Agreement, and Carnero desires to provide Producer those gathering, treating and processing services, all in accordance with the terms and conditions stated in this Agreement.

Agreement:

In consideration of the mutual covenants set forth in this Agreement, Carnero and Producer hereby agree and covenant as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1** Definitions. Except in those certain instances where the context states another meaning, the following terms when used in this Agreement have the following meanings:

"Additional CGP" has the meaning set forth in Section 2.1.

"Additional Plant Products" has the meaning set forth in Section 3.1(b).

"Additional Plant Product Receipt Points" has the meaning set forth in Section 3.1(b).

"Adequate Assurance of Performance" shall mean sufficient security in the amount and for the term reasonably acceptable to Carnero in the form of (i) an irrevocable standby letter of credit issued by a Qualified Financial Institution in a format reasonably acceptable to Carnero or (ii) cash (either as a deposit, or prepayment), in either case (i) or (ii), not to exceed such Comanche Producer's anticipated obligations over any ninety (90) day period. If the credit of such Comanche Producer's guarantor is deemed to be acceptable to Carnero, in Carnero's sole reasonable opinion, the demand for Adequate Assurance of Performance can be satisfied with a parental guaranty issued on behalf of such Comanche Producer in a format, amount and tenor

acceptable to Carnero, but only for as long as the credit of such Comanche Producer's guarantor continues to be acceptable to Carnero, after which time only Adequate Assurance of Performance in the form of (i) or (ii) will be acceptable to Carnero.

"Affiliate" means, with respect to either Party, any Person that directly or indirectly controls, is controlled by or is under common control with such Party, and "control" means the power to direct or cause the direction of the management and policies of such Person or Party, whether directly or indirectly, through one or more intermediaries or otherwise, and whether by virtue of the ownership of shares or other equity interests, the holding of voting rights or contractual rights, partnership interests or otherwise. Notwithstanding the foregoing, for purposes of this Agreement and any Ratification Agreement, (a) Producer and its Affiliates, on the one hand, shall not be considered Affiliates of Carnero and its Affiliates, on the other hand and (b) Producer and any other Comanche Producer shall not be considered Affiliates.

"Agreement" has the meaning set forth in the preamble.

"Applicable Law" means, with respect to any person, all laws, statutes, codes, acts, treaties, ordinances, orders, judgments, writs, decrees, injunctions, rules, regulations, governmental approvals, licenses, permits, directives and requirements, of any Governmental Authority, including all official interpretations thereof by any such Governmental Authority, as in effect at any time or from time to time and, in each case, applicable to or binding upon such person and, in the case of Carnero, the Carnero System.

"Business Day" means any Day on which the Federal Reserve member banks in Houston, Texas are open for business.

"Btu" means a British thermal unit, which is the amount of heat required to raise the temperature of one pound of pure water from 59 degrees Fahrenheit to 60 degrees Fahrenheit.

"Carnero" has the meaning set forth in the preamble.

"Carnero System" means the facilities Carnero will own, solely or jointly with others, or in which Carnero holds capacity, which will include the Gathering System, the Receipt Point(s), the Treating Facility, the Delivery Point(s) and the Plant(s), Condensate stabilization facilities and stabilized Condensate truck racks or pipeline loading facilities, including all related appurtenances and facilities and any expansions and modifications of any of the foregoing.

"Cashout Percentage" means the applicable percentage set forth in the applicable table contained in Section 6.6(c) or Section 6.6(e).

"Cashout Price" for any Month means (i) if the downstream pipeline balances in kind, the price per MMBtu as published in Platt's Gas Daily Price Guide for such Month under the headings "Daily Midpoint Averages", "East Texas-Houston Ship Channel" or, if mutually agreed by the Parties, another widely accepted, alternative Gas Daily Price for such Month and (ii) if the downstream pipeline does not balance in kind, the cashout prices for such Month of the downstream pipeline receiving Gas at the Residue Gas Delivery Points. With respect to clause (i) of the preceding sentence, if *Platt's* Gas Daily does not report the Cashout Price for a given Month or the Cashout Price or *Platt's* Gas Daily Price Guide is no longer published, the Parties,

will determine a mutually agreeable price in lieu of the Cashout Price that is representative of the value of Gas in LaSalle or Refugio County, Texas, depending on the location of the Redelivery Pipeline to which the imbalance relates.

"CGP" or "CDP" means a central gathering point and/or a central delivery point directly connected to the Carnero System at which Producer's Gas is received hereunder, as such points are specified on Exhibit A hereto.

"Change in Law" means (i) the adoption, promulgation, repeal or modification after the Effective Date of any Applicable Law, (ii) the imposition after the Effective Date of any term or condition in connection with the issuance, renewal, extension, replacement or modification of any approval of any Governmental Authority that establishes new, additional or modified requirements for the operation of the Carnero System, (iii) the non-approval or non-renewal of any approval of any Governmental Authority, or the renewal of the same on terms more onerous for Carnero than originally issued, other than as a result of Carnero's action or inaction in violation of Applicable Law, or (iv) any other restrictions or restraints imposed by Applicable Law after the Effective Date that were not in effect on or prior to the Effective Date.

"Change in Taxes" means any increase in Taxes directly attributable to Carnero imposed by the United States, the State of Texas or any other Governmental Authority exercising jurisdiction and arising from a Change in Law and imposed on or measured by: (i) Emissions or (ii) the provision of gathering or other services hereunder, including receipt of Gas or redelivery of Gas under this Agreement, but, for the avoidance of doubt, excluding any ad valorem taxes or Taxes imposed on Carnero with respect to its net income.

"Comanche Producers" means (i) Producer and (ii) each of SN EF UnSub LP, Eagle Ford TX LP, Venado EF L.P., Gavilan Resources, LLC, Mitsui E&P Texas LP and their respective Affiliates, successors and assigns that delivers Gas to Carnero from the Dedicated Acreage under one or more Ratification Agreements.

"Compression Fee" has the meaning set forth on Exhibit B.

"Compression Fuel" means the quantity of MMBtus utilized or incurred in the operation of the field compression facilities for fuel, fuel equivalents (excluding electricity or other energy sources, which will be invoiced as the Other Fuel Fee) and other use requirements.

"Condensate" means natural gas liquids in Gas that condense in the Carnero System or as a result of Carnero's operations prior to processing that Gas at the Plant(s).

"Contract Year" means that twelve-Month period commencing on the Effective Date and each subsequent twelve-Month period during the term of this Agreement commencing on each anniversary of the Effective Date.

"Cubic feet" or "cubic foot" means the volume of Gas, corrected for water vapor, which occupies one cubic foot of space at a temperature of 60° Fahrenheit and an absolute pressure of 14.73 pounds psia.

"Day" means the period of time beginning at 9:00 a.m. Central Time on any calendar day and ending at 9:00 a.m. Central Time on the calendar day immediately following.

"Dedicated Acreage" means the acreage designated on Exhibit D.

"Dedicated Gas" means Producer's Gas that is produced from any well or wellbore located within the Dedicated Acreage.

"Delivery Point(s)" means the inlet flange of the custody transfer meter(s) owned by the Redelivery Pipeline(s) at the Residue Gas Delivery Point(s), as such points are specified on Exhibit A attached hereto.

"Delivery Quantity" means that quantity of Residue Gas, expressed in MMBtus, delivered by Carnero at the Residue Gas Delivery Point(s) to, or for the account of, Producer.

"EBB" has the meaning set forth in Section 6.1.

"Effective Date" has the meaning set forth in the preamble.

"Excess Gas" shall mean all volumes of Gas tendered by Producer under this Agreement in excess of the MDQ.

"Exhibit" and "Exhibits" have the meanings set forth in Section 1.3.

"Firm" means, with respect to those obligations of a Party that are designated as such, that such Party may interrupt its performance without liability only to the extent its performance is prevented by an event of Force Majeure or as otherwise specifically allowed for in this Agreement.

"FL&U" means the aggregate of (i) Producer's share of Plant Fuel as determined in accordance with Exhibit C; plus (ii) Gathering L&U, plus (iii) Producer's share of Compression Fuel as determined in accordance with the allocation procedure set forth in Exhibit C.

"Force Majeure" has the meaning set forth in Section 11.1.

"Full Recovery Allocation" has the meaning set forth in Section 3.7.

"Gas" means natural gas produced from gas wells and gas produced in association with oil (casinghead gas) and includes all hydrocarbons and non-hydrocarbons produced with the gas.

"Gathering Fee" has the meaning set forth in Section 5.1.

"Gathering L&U" means the quantity of MMBtus calculated in accordance with the procedure set forth in Exhibit C.

"Gathering System" means the Gas gathering pipeline system(s) connecting the Receipt Point(s) to the Plant(s).

"Governmental Authority" means: (i) the United States of America; (ii) any state, county, parish, municipality, or other governmental subdivision within the United States of America; and (iii) any court or any governmental department, commission, board, bureau, agency, or other instrumentality of the United States of America or of any state, county, municipality, or other governmental subdivision within the United States of America.

"Gross Heating Value" means the number of Btu's produced by the combustion, on an as delivered basis and at a constant pressure, of the amount of the Gas which would occupy a volume of one (1) Cubic Foot at a temperature of 60°F and at a pressure of fourteen and seventy-three hundredths (14.73) psia, with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

"Imbalance" has the meaning set forth in Section 6.6.

"Initial Term" has the meaning set forth in Article 9.

"Insolvency Event" has the meaning set forth in Section 14.1.

"Interruptible" means all obligations of Carnero that are not designated as Priority Interruptible or Firm, as to which Carnero may interrupt its performance for any or no reason.

"Maximum Daily Quantity" and "MDQ" means 260 MMcf/day or such lesser volume determined under Section 3.3(a). The Maximum Daily Quantity or MDQ is the maximum quantity of Gas that Carnero is obligated to receive from all Comanche Producers on each Day, in the aggregate, on a Firm basis at the Primary Receipt Point(s) and thereafter, gather, treat, process and redeliver.

"Maximum Receipt Capacity" means the maximum volume that Carnero is obligated to receive at any Receipt Point from all Comanche Producers on any Day, as specified on Exhibit A.

"Maximum System Pressure" means the maximum pressure at which the Gathering System may be operated as specified by Carnero from time to time, which may be different for different segments of the Gathering System and which, until otherwise communicated in writing by Carnero to Producer, will be: (i) for Gas delivered at the Highway 83 – T2 CDP, identified on Exhibit A, 1440 psig; and (ii) for Gas delivered at either the Maverick CDP or Highway 83 – Carnero CDP, identified on Exhibit A, 1250 psig.

"Mcf" and "MMcf" mean 1,000 cubic feet of Gas and 1,000,000 cubic feet of Gas, respectively.

"MMBtu" means 1,000,000 Btu's.

"Month" means a period beginning at 9:00 a.m. Central Time on the first day of a calendar month and ending at 9:00 a.m. Central Time on the first day of the calendar month immediately thereafter.

"Other Fuel" means electricity or other energy sources (other than Gas) used as fuel in the operation of the Carnero System.

"Other Fuel Fee" means a fee for Other Fuel, which fee will be Producer's pro rata share of the actual cost of the Other Fuel incurred by Carnero.

"Overdelivered" has the meaning set forth in Section 6.6(c).

"Party" or "Parties" has the meaning set forth in the preamble.

"Person" includes any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, or Governmental Authority.

"Plant(s)" means the processing plant(s) at which Producer's Gas is actually delivered for processing and associated facilities, including facilities for treating and compression, and such other gas processing facilities that Carnero may make available from time to time in its sole discretion.

"Plant Fuel" will be determined as set forth on Exhibit C.

"Plant Products" means liquefiable hydrocarbon components, which Carnero removes and recovers from Gas in the cryogenic liquid extraction process at the Plant(s), including ethane, propane, normal butane, iso-butane and natural gasoline, and mixtures thereof.

"Primary Component" means ethane, propane, isobutene, normal butane and natural gasoline.

"Primary Receipt Points" means the Maverick CDP and Highway 83 – Carnero CDP, as described on Exhibit A.

"Priority Interruptible" means all obligations of Carnero that are not designated as Firm or Interruptible, as to which Carnero may interrupt its performance for any reason or no reason, or as otherwise specifically allowed for in this Agreement. Priority Interruptible obligations will be secondary to any Firm obligations and will have priority to any Interruptible obligations on the Carnero System.

"Processing Fee" has the meaning set forth in Section 5.3.

"Producer" has the meaning set forth in preamble.

"Producer's Gas" means all Gas that is owned or controlled by Producer or which Producer has the right to market.

"Producer's Products" means those Plant Products that are allocated to Producer's Gas in accordance with the allocation procedure set forth in Exhibit C.

"Producers' Representative" has the meaning set forth in Section 17.11.

"Product Price" means, for each gallon of Plant Product or Additional Plant Product calculated on a component by component basis and expressed in cents per gallon, the average Daily high and low prices per gallon, for the applicable Month, as quoted by Oil Price Information Service in the OPIS-LP-Gas Report for "Any Current Month" under "Mont Belvieu Spot Gas Liquids Prices" for each Primary Component contained in the Plant Products or Additional Plant Products for the applicable Month of delivery of Plant Products or Additional Plant Products by Carnero to the downstream purchaser, less (i) Taxes (excluding ad valorem taxes and taxes imposed on Carnero with respect to its net income); (ii) the T&F Fee; and (iii) any quality adjustment or similar fees charged or deducted by any purchaser of Plant Products or Additional Plant Products; provided that in the event a Force Majeure or other circumstance prevents Carnero's NGL purchaser from delivery of Plant Products or Additional Plant Products to Mont Belvieu, the Product Price will mean the weighted average sales price per gallon for each Plant Product or Additional Plant Product received by Carnero for the total volume of that Plant Product or Additional Plant Product sold by Carnero during the Month in which the Plant Product or Additional Plant Product is produced, expressed in cents per gallon (less the deductions set forth in clauses (i) and (iii) above, and less the actual transportation, fractionation, exchange or other fees incurred by Carnero in connection with any such disposition (other than take or pay fees or demand charges)).

"Product Shrinkage" is defined in Exhibit C.

"psia" means pounds per square inch absolute.

"psig" means pounds per square inch gauge.

"Qualified Financial Institution" means a U.S. commercial bank or the U.S. branch of a foreign bank which has assets of at least ten billion U.S. dollars ($10,000,000,000) and with a credit rating of at least A- by Standard & Poor's Financial Services, LLC, a subsidiary of The McGraw-Hill Companies, Inc. or its successor or at least A3 by Moody's Investors Service, Inc. or its successor.

"Raptor Plant" shall mean the Raptor gas processing facility owned by Carnero located in LaSalle County, Texas.

"Ratification Agreement" means an agreement executed by a Comanche Producer ratifying or otherwise committing such Comanche Producer to the performance of this Agreement, and on terms mutually agreeable to Carnero and the applicable Comanche Producer.

"Receipt Point(s)" means the inlet flange of the custody transfer meter(s) on the Carnero System at the CGPs, as such points are specified on Exhibit A and any Additional CGPs connected to the Carnero System pursuant to Section 2.1.

"Receipt Quantity" means the aggregate quantity of Producer's Gas, stated in MMBtu, received by Carnero at the Receipt Point(s) less FL&U, shrinkage attributable to Producer's Condensate and Producer's contractually allocated share of Product Shrinkage, as such allocations are determined in accordance with Exhibit C.

"Redelivery Pipelines" means the SECO, Western, Eagle Ford Midstream, TPL SouthTex Transmission Company LP natural gas pipelines or any other residue gas pipelines which Carnero may make available in its sole and absolute discretion at the tailgate of the Plant(s).

"Representatives" has the meaning set forth in Section 17.4.

"Residue Gas" means that portion of Producer's Gas remaining and available after the extraction of FL&U, shrinkage attributable to Producer's Condensate and Producer's allocated share of Product Shrinkage, which are each allocated in accordance with the procedures set forth on Exhibit C.

"Residue Gas Delivery Point(s)" has the meaning set forth in Exhibit A.

"Scheduled Quantity" means the quantity of Producer's Gas or Residue Gas (each in MMBtu) confirmed by Carnero to be received or delivered under this Agreement at a Receipt Point or a Residue Gas Delivery Point, as the case may be, subject to Producer's compliance with the nomination procedures set forth in this Agreement.

"Silver Oak II Plant" shall mean the Silver Oak II gas processing plant owned by Carnero and located in Bee County, Texas.

"Subject Gas" shall have the meaning set forth in Section 3.1(c).

"T2 Pipeline" means the Gas gathering pipeline system running from the inlet flange of meter #64-8038 (at the interconnection between the Carnero facilities and the T2 facilities) to the inlet flange of meter #69-3629 (at the interconnection between the T2 facilities and the Silver Oak II Plant).

"Taxes" means taxes, fees, or charges (including penalties and interest thereon) now or hereafter enacted, levied or assessed by any Governmental Authority.

"Term" has the meaning set forth in Article 9.

"Theoretical Gallons" means the number of gallons of each NGL component that are present in Gas as determined at the applicable Receipt Point(s). Theoretical Gallons will be determined by multiplying: (i) the gallons per Mcf of ethane, propane, butanes and pentanes plus derived from the chromatographic analysis at that point, by (ii) the volume in Mcf measured at that point.

"Third Party Gas" means all Gas that is owned and controlled by Persons other than Producer or its Affiliates.

"T&F Fee" has the meaning set forth on Exhibit G.

"Treating Facility" means an amine treating facility (including downstream dehydration facilities).

"Treating Fee" has the meaning set forth in Section 5.2.

"Underdelivered" has the meaning set forth in Section 6.6(c).

"Unit of Volume" means one cubic foot of Gas.

**Section 1.2** Rules of Interpretation. All references in this Agreement to articles, sections, subsections, Exhibits and other subdivisions refer to corresponding articles, sections, subsections, Exhibits and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any articles, sections, subsections, Exhibits and subdivisions are for convenience only and will not constitute part of such articles, sections, subsections, Exhibits and subdivisions and will be disregarded in construing the language contained in such articles, sections, subsections, Exhibits and subdivisions. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. Pronouns in masculine, feminine and neuter genders will be construed to include any other gender. This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. Examples will not be construed to limit, expressly or by implication, the matter they illustrate. The word "or" is not intended to be exclusive and the word "includes" and its derivatives means "includes, but is not limited to" and corresponding derivative expressions. No consideration will be given to the fact or presumption that one Party had a greater or lesser hand in drafting this Agreement.

**Section 1.3** Exhibits. The following exhibits (collectively "Exhibits", and each an "Exhibit") are attached to, form part of, and are incorporated herein by reference as though contained in the body of this Agreement:

| | | |
|---|---|---|
| Exhibit A | - | Receipt Point(s); Delivery Point(s) |
| Exhibit B | - | Fees |
| Exhibit C | - | Allocations |
| Exhibit D | - | Dedicated Acreage |
| Exhibit E | - | Memorandum of Agreement |
| Exhibit F | - | Existing Commitments |
| Exhibit G | - | Transportation and Fractionation Fee |

Whenever any term or condition, whether express or implied, of any Exhibit conflicts with or is at variance with any term or condition of the body of this Agreement, the latter will prevail to the extent of such conflict or variance.

## ARTICLE 2
## CARNERO AND PRODUCER FACILITIES

**Section 2.1** Additional Wells and CGPs.

(a) If Producer proposes to establish additional CGPs other than the CGPs set forth on Exhibit A (each, an "Additional CGP"), or complete additional wells within the Dedicated Acreage, then it shall notify Carnero of each such Additional CGP or additional well. Producer will have sole discretion as to the location of each Additional CGP or additional well. When notifying Carnero of an Additional CGP or a new well, Producer shall provide Carnero with the

CGP or a well location, projected production, drilling schedule, expected flow rate and gas analysis information reasonably acceptable to Carnero (as to such Additional CGP or new well, collectively, "CGP Information").

(b) For each Additional CGP requested by Producer, Carnero will develop and deliver a good faith estimated cost and estimated construction timeline to establish and connect any such Additional CGP to the Gathering System and will connect such Additional CGP and Producer will reimburse Carnero 112.5% of the cost of connecting such Additional CGP, including any costs for pipeline, connections, pipeline taps, measurement equipment, telemetry and dehydration. Notwithstanding the foregoing sentence, if the Additional CGP is more than 5 miles from (i) the then-existing Gathering System and (ii) any wellhead gathering system that either delivers Gas to the Gathering System or that has an interconnect to a gathering system that delivers Gas to the Gathering System, then (A) Carnero may, within 45 Days following Carnero's receipt of the CGP Information, decline to connect the Additional CGP, in which case such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect and (B) the Producer will be entitled to engage another party to gather and/or process the Gas. With respect to the Dedicated Gas released pursuant to this Section 2.1(b) and gathered from the Additional CGP or its associated wells and delivered to a Plant (but not through the Gathering System), Producer will not incur the Gathering Fee, but will incur the Processing Fee to the extent processed by or on behalf of Carnero and all other applicable fees due hereunder. For the avoidance of doubt, Producer has the right to construct, own and operate facilities upstream of the CGPs in accordance with this Agreement.

(c) With respect to wellhead connections only, Carnero may, in its sole discretion, decline to connect any well(s) that will produce Dedicated Gas, and any well(s) that Carnero declines to connect (and associated Dedicated Acreage included in the proration units for such wells) will be temporarily released from dedication to the Gathering System and the Plants for a period of one (1) year from the date of Carnero's election to not connect (each a "Released Well"). Producer may contract with other Persons to gather Gas produced from Released Wells. If Carnero does not agree, within 45 Days following Carnero's receipt of the relevant well information, to connect any well to the Gathering System, then Carnero will be deemed to have declined to connect such well to the Gathering System. With respect to any Released Well, Producer may elect, within 30 days after such well becomes a Released Well, to require Carnero to connect such Released Well to the Gathering System and reimburse Carnero 112.5% of the cost of connecting such Released Well. If Producer elects to require Carnero to connect a Released Well to the Gathering System, then such well shall, as of such date of election, cease to be a Released Well and shall be subject to dedication hereunder.

(d) No later than 90 Days prior to the end of the one (1) year period described in the foregoing subsection (b) or (c), or any applicable successive one (1) year period thereafter, Carnero may elect, pursuant to written notice delivered to Producer, to connect such Additional CGP or Released Well to the Gathering System. If Carnero does not deliver such election, declines to connect or delivers its election to connect but does not actually connect the Additional CGP or Released Well to the Gathering System such that the Additional CGP or

connection for the Released Well is ready and able to accept volumes of Gas prior to the end of such one (1) year period, then such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be temporarily released from the dedication hereunder for an additional one (1) year period. If Carnero timely elects to connect, and actually connects, the Additional CGP or Released Well to the Gathering System, such Additional CGP (and the wells producing Gas gathered to such Additional CGP) or Released Well shall again be subject to the dedication hereunder as of the end of such one (1) year period. Notwithstanding the foregoing, if any such Additional CGP or Released Well has not been connected to the Gathering System by the date that is three (3) years after the delivery of Carnero's election to not connect, such Additional CGP (and the wells producing Gas gathered to the Additional CGP and associated Dedicated Acreage included in the proration units for such wells) or Released Well (and associated Dedicated Acreage included in the proration unit for such well), as applicable, shall be permanently released from any dedication hereunder.

**Section 2.2** Grant of Producer's Land Rights. Producer agrees to grant to Carnero or its designee, without any warranty of title, insofar as Producer has the legal right to do so, the non-exclusive right of ingress and egress over, across and under all lands and leaseholds or premises of Producer, for the construction, maintenance and operation of pipelines and other facilities necessary or convenient for the gathering, treating, processing and redelivery of Producer's Gas under this Agreement. Carnero's use of such rights will not unreasonably interfere with Producer's operations or those of the surface owners. Producer will not be obligated to maintain in effect any underlying agreements granting Carnero such rights. Any use of such rights by Carnero or its designees shall be at the sole cost, risk and expense of Carnero and Carnero will indemnify Producer from claims related to Carnero's use of such rights.

**Section 2.3** Producer's Reservations. Producer reserves for itself the following rights:

(a) to operate (or cause to be operated) wells producing Producer's Gas in its sole discretion, including the right (but not the obligation) to drill new wells, repair and rework old wells, temporarily shut in wells or renew or extend, in whole or in part, any oil and gas lease or term mineral interest, and to cease production from or abandon any well or surrender any such oil and gas lease, in whole or in part, when no longer deemed by Producer to be capable of producing in paying quantities under normal methods of operation;

(b) to use Producer's Gas for lease operations (including reservoir pressure maintenance and enhanced recovery techniques, except, in each case, any such operations that are reasonably expected to decrease expected aggregate volumes of Gas to be delivered to Carnero hereunder over the Initial Term of this Agreement) and water treatment facility operations relating to the lands within the Dedicated Acreage;

(c) to deliver Producer's Gas or furnish Producer's Gas to Producer's lessors and holders of other burdens on production with respect to such Producer's Gas as is required to satisfy the terms of the applicable oil and gas leases or other applicable instruments;

(d) to pool, communitize or unitize Producer's interests with respect to Producer's Gas; *provided* that Producer's share of Producer's Gas produced from such pooled, communitized, or unitized interests shall be committed and dedicated pursuant to this Agreement; and

(e) to retain all liquids (and title to such liquids) separated from Producer's Gas by the use of conventional lease separators prior to delivery of Producer's Gas to Carnero at the Receipt Point(s), provided that Producer will not be permitted to remove or recover hydrocarbons from Producer's Gas other than through the use of conventional mechanical gas/oil field separators.

**Section 2.4** Downstream Arrangements. Producer agrees that it will, throughout the term of this Agreement, secure adequate transportation capacity and make necessary arrangements to market the Residue Gas re-delivered to Producer at the Residue Gas Delivery Point(s) in accordance with this Agreement.

**Section 2.5** Memorandum. Contemporaneously with the execution of this Agreement and from time to time during the Term, the Parties (including each Person included within the definition of Producer) will execute, acknowledge, deliver and record a Memorandum of this Agreement, substantially in the form of Exhibit E, identifying the Dedicated Acreage and identifying the lands, leases and wells in which Producer and its Affiliates own interests, which will be filed of record in each county that contains Dedicated Acreage.

## ARTICLE 3
## QUANTITY AND SERVICES

**Section 3.1** Producer's Delivery Obligations. Subject to the terms and conditions of this Agreement, Producer's obligations are as follows:

(a) Subject to Sections 3.1(c), 3.1(d), 3.1(e) and Exhibit B, Producer shall tender for delivery to Carnero at the Primary Receipt Points 100% of the Dedicated Gas (which may exceed, at each Receipt Point, the Maximum Receipt Capacity specified for that Receipt Point and may exceed the Maximum Daily Quantity in the aggregate at all Receipt Points to the extent Carnero accepts such additional quantities of Gas pursuant to Section 3.5);

(b) Notwithstanding Section 3.1(a), to the extent any Gas that would otherwise be Dedicated Gas or any natural gas liquids attributable to such Gas that would be Plant Products if such Gas had been processed by Carnero (i) is subject to binding contractual commitments set forth on Exhibit F that exist as of the Effective Date and prevent the delivery of such Gas hereunder or the sale of such natural gas liquids to Carnero, or (ii) with respect to which Producer or any of its Affiliates hereafter acquires the right to control, market or deliver, and is subject to binding contractual commitments preventing the delivery of such Gas or sale of such natural gas liquids to Carnero hereunder that were established prior to (and not in anticipation of) Producer's acquisition (collectively, the "Existing Commitments"), such Gas and/or natural gas liquids shall be excluded from the dedication hereunder until the earlier of (A) the end of the then-current term of such Existing Commitment (excluding any subsequent "evergreen" or "renewal" terms, it being understood that Producer shall give timely notice to terminate any

such Existing Commitment prior to commencement of any "evergreen" or "renewal" term) and (B) the earliest time at which any right or option to terminate such Existing Commitment, exercisable by Producer, without out-of-pocket cost (other than any such cost to deliver Producer's Gas to the Gathering System (including the costs for construction if any Additional CGP) or such costs for which Carnero agrees to reimburse Producer), it being understood that Producer shall exercise any such option or right at the earliest possible time, at which time Producer's Gas and/or natural gas liquids previously subject to such Existing Commitments shall be dedicated pursuant to this Section 3.1 (and with respect to any natural gas liquids that become dedicated pursuant to this Section 3.1 without dedication of the underlying Gas (the "Additional Plant Products"), Carnero will have the option, exercisable by written notice to Producer within 30 days of the expiration of the applicable Existing Commitment, to purchase those Additional Plant Products at the points at which they were being sold under the Existing Commitment (the "Additional Plant Product Receipt Points"), with any costs associated with purchasing such Additional Plant Products or connecting to the Additional Plant Product Receipt Points borne by Carnero);

(c) If Carnero is unable to accept any volumes of Dedicated Gas at the Primary Receipt Points for transport on the Gathering System or other pipeline systems owned by Carnero or on which Carnero has capacity or any Plant(s) are unable to accept any volumes of Dedicated Gas for processing, in either case, for more than 30 Days in any period of 60 Days other than as a result of Force Majeure (such volumes, the "Subject Gas"), then Carnero and Producer shall proceed as follows:

(i) Carnero shall have the obligation to gather and transport all of the Subject Gas to another processing plant owned or operated by Carnero, or in which Carnero has processing rights and process such Subject Gas at that plant, to the extent of available capacity;

(ii) To the extent Carnero does not accept the Subject Gas in Section 3.1(c)(i), the Subject Gas shall be immediately temporarily released from the dedication hereunder and Producer may enter into short term interruptible arrangements with third parties for the transportation and processing of such Subject Gas ("Temporary Arrangements"); provided that Producer must again deliver such Subject Gas to Carnero at the Receipt Points on the first (1st) Day of the Month immediately following 30 days after Producer receives notice from Carnero that Carnero is able to accept the Subject Gas;

(iii) At the request of either Party, Carnero shall cause the Board of Carnero to promptly meet to discuss and negotiate in good faith in respect of the possible expansion of either the Raptor Plant or the Silver Oak II Plant or the construction of new facilities to be owned by Carnero to process additional Gas;

(iv) Subject to Section 3.1(c)(i), if after 30 Days following the delivery by either Party of a request for a meeting of the Board of Carnero under Section 3.1(c)(iii), (A) Carnero has not adopted a plan by which Carnero will process such Subject Gas at a processing plant owned by Carnero (including the election of any Member to undertake construction of an Additional Plant as a sole risk project) and (B) Carnero and Producer

have not agreed on a plan by which Carnero by no later than 60 Days after the delivery of any such request will be able to process such Subject Gas at the Raptor Plant, the Silver Oak II Plant or another processing facility owned by Carnero, or in which Carnero has processing rights, or at another mutually agreeable processing plant, then upon Producer's request such Subject Gas will be temporarily released from the dedication hereunder and Producer may enter into Temporary Arrangements for the gathering and processing of such Subject Gas for a term that does not exceed the greater of (x) one year and (y) the expected period determined by Carnero in its reasonable discretion (based on then-existing contractual commitments in respect of firm capacity for processing at the Raptor Plant, Silver Oak II Plant and other processing plants owned by Carnero, or at which Carnero has processing rights) during which the Raptor Plant, Silver Oak II Plant and any such other processing plants will not have Firm capacity to process such Subject Gas (the "Capacity Limitation Period");

(v) Producer shall promptly give Carnero notice of execution of any Temporary Arrangement. To the extent as of 180 Days after the inception of any Temporary Arrangement, Producer and Carnero have not agreed on a plan to gather and process such Subject Gas at either the Raptor Plant, the Silver Oak II Plant, or another processing facility that Carnero owns or in which it has processing rights, then such Subject Gas shall again be temporarily released from the dedication hereunder and Producer may renew such (or enter into a new) Temporary Arrangement for a period not to exceed one year (or the Capacity Limitation Period, if longer);

(vi) Any of Producer's Gas temporarily released from this Agreement in accordance with this Section 3.1(c) shall not be Dedicated Gas hereunder; ***provided, however***, that such Gas shall become Dedicated Gas again at the conclusion of any temporary release.

(d) If, as a result of Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, are unable to accept any of Producer's Gas for more than 30 Days in any period of 90 Days, the volumes of Producer's Gas that cannot be accepted by Carnero shall be temporarily released from the dedication hereunder for the remainder of the then-current Month and the next three full Months, and Producer may enter into Temporary Arrangements for the gathering and processing of such released Gas for a term that does not exceed such Force Majeure period and succeeding periods of three Months if such processing facilities continue to be unable to accept Producer's Gas for reasons of Force Majeure upon the expiration of each three Month period;

(e) If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer may deliver the volume of Gas that is not accepted by Carnero to third parties for gathering and/or processing and such Gas will be temporarily released from dedication under this Agreement; provided, however, that if Carnero provides Producer notice that Carnero can accept any or all of such released Gas, as soon as commercially and operationally practicable (and in no event later than two (2) Days following receipt of such

notice), Producer will again deliver the volumes of released Gas specified in such notice to Carnero and such volumes of Gas will again be subject to the dedication hereunder; and

(f) If (i) for any reason, including Force Majeure, the Raptor Plant, the Silver Oak II Plant or any other processing facility owned by Carnero, or in which Carnero has processing rights, do not accept any of Producer's Gas up to the MDQ for more than 180 Days out of any 365 Day period, (ii) Carnero is not constructing a Plant to accommodate such Gas and (iii) Producer and Carnero have not otherwise agreed on a processing solution pursuant to Section 3.1(c), such volumes of Producer's Gas that are not accepted by Carnero shall be permanently released from the dedication hereunder, and Producer may enter into any alternative arrangements for the transportation and/or processing of such Gas.

(g) The provisions of this Section 3.1 shall be covenants running with the land, and any conveyance, assignment, sale or other transfer of all or a portion of Producer's or its Affiliates' interests or wells in the Dedicated Acreage shall be subject thereto. Producer and its Affiliates shall require any purchaser, assignee or other transferee of any portion of such interests to ratify this Agreement and to expressly assume and agree to the terms hereof to the extent of the portion of those interests acquired from Producer or its Affiliates by that party.

**Section 3.2** Carnero's Obligations. Subject to the terms and conditions of this Agreement, Carnero will provide the following Firm services:

(a) receive and gather at the Receipt Point(s) the quantity of Gas tendered by Producer from the Dedicated Acreage (not to exceed, when taken together with Gas tendered by all Comanche Producers from the Dedicated Acreage), the Maximum Receipt Capacity specified for that Receipt Point and not to exceed the Maximum Daily Quantity in the aggregate at all Receipt Point(s));

(b) subject to Section 5.2, treat at the Treating Facility, Producer's Gas that Carnero is obligated to receive at the Receipt Point(s) (as determined under subparagraph 3.2(a)) that requires treatment;

(c) process for the removal of Plant Products, Producer's Gas that Carnero receives at the Receipt Point(s) (as determined under subparagraph 3.2(a)), with the understanding that Producer's Gas shall be delivered to the Raptor Plant (including any expansion thereof or addition thereto) unless it is not available, in which case such Producer's Gas shall be processed at the Silver Oak II Plant (or another processing facility with available capacity that Carnero owns or in which it has processing rights);

(d) purchase Producer's Products; and

(e) deliver the quantity of Residue Gas in-kind attributable to Producer's Gas received at the Receipt Point(s).

**Section 3.3** Reduction of MDQ and Volume Limitations.

(a) Beginning on the fifth (5th) anniversary of the Effective Date, if, during any one (1) year rolling period (each, a "Determination Period"), the Comanche Producers fail to

deliver a daily average of least 90% of the then-effective MDQ (except for any such failure caused by Carnero not receiving properly tendered volumes up to the then-effective MDQ for any reason, including Force Majeure), Carnero may, within sixty (60) Days following the end of such Determination Period, elect to reduce the MDQ for all future periods to a quantity equal to the average volume delivered by all Comanche Producers during such Determination Period; provided, however, Carnero may not reduce the MDQ in any calendar quarter by an amount greater than ten percent (10%) of the MDQ then in effect, and the MDQ shall only be reduced to the extent that the volumes are unavailable and reasonably expected to not soon return. Any such notice shall be effective with respect to all Comanche Producers upon delivery to Producer hereunder.

(b) Subject to Section 3.4, Carnero's obligation to receive, gather, treat, dehydrate, process and deliver Producer's Gas will be on a Firm basis and will not, when taken with all Gas delivered by the Comanche Producers from the Dedicated Acreage, exceed either: (a) the Maximum Daily Quantity, or (b) the Maximum Receipt Capacity for the Receipt Point(s), as specified in Exhibit A. To the extent the Carnero System includes third party facilities in which Carnero holds capacity, such capacity shall be at least Firm or Priority Interruptible capacity, as applicable, to the extent Carnero provides Firm or Priority Interruptible capacity to Producer hereunder.

**Section 3.4** Priority Interruptible Volumes. Carnero will, on a Priority Interruptible basis, accept Excess Gas at all Receipt Point(s) to the extent of available capacity on the Carnero System and, if accepted by Carnero, Carnero will gather, treat and process those quantities as Priority Interruptible volumes in accordance with the terms of this Agreement, subject to Section 3.5(c).

**Section 3.5** Curtailment; Bypassing.

(a) If it becomes necessary to curtail the gathering, treating and processing of Producer's Gas for any reason (including Force Majeure or because the design capacity limit of any of the Carnero System has been reached); provided that (i) Carnero shall not enter into agreements for Firm gathering services that in the aggregate exceed the design capacity limit of the Carnero System or of any particular Plant at such time as such agreements are entered into; or (ii) offer any class(es) of service other than Firm, Priority Interruptible or Interruptible (each as defined herein) on the Carnero System; then, subject to the last sentence of this Section 3.5(a): (i) Carnero will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Priority Interruptible, and will curtail, on a prorated basis, the gathering, treating and processing of all Gas for which Carnero's obligations are Priority Interruptible before curtailing the gathering, treating and processing of Gas for which Carnero's delivery obligations are Firm; and (ii) Producer's Firm volumes will be accepted on a prorated basis with other Gas for which Carnero's obligations are designated as Firm, such prorating to be based on nominations submitted prior to the time that Carnero gives notice of curtailment to its customers. Notwithstanding anything in this Agreement to the contrary, all Gas received under the Firm Gas Gathering Agreement and the Firm Gas Processing Agreement between Carnero, SN Catarina, LLC and Sanchez Energy

Corp that is gathered to and processed at the Silver Oak II Plant will have priority over Gas delivered under this Agreement for gathering to and processing at the Silver Oak II Plant.

(b) Any portion of the Gas bypassed around the Plant(s) shall be bypassed in the following order of priority: (i) any bypass gas for the Day will be first attributed to any Gas delivered by any Person that does not have processing rights; (ii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Interruptible processing obligations; (iii) the next quantity of Gas, if any, bypassed around the Plant(s) for the Day will be ratably attributed to Gas delivered under Priority Interruptible processing obligations; and (iv) finally, subject to subparagraph 3.5(a), the remaining quantity of Gas, if any, bypassed around the Plant(s) will be ratably attributed to Gas delivered under Firm processing obligations. The share of Producer's Gas that will be ratably bypassed will be based on the ratio of all Producer's Gas received at the Receipt Point(s) having that priority of service (*i.e.*, Interruptible, Priority Interruptible or Firm) divided by all Gas (including Producer's Gas) received by Carnero having the same priority of service (i.e. Interruptible, Priority Interruptible or Firm). Carnero shall have no obligation to ratably bypass Gas for any Person that does not have processing rights and, with respect to such volumes, Carnero may, acting in its sole discretion, select the source and volume of Gas which is so bypassed.

(c) To the extent of Carnero's Firm processing obligations to the Comanche Producers with respect to Gas produced from the interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement, such volumes will be processed at the Raptor Plant (including any expansion thereof or additions thereto) in preference to other Gas delivered under this Agreement and Gas delivered under other agreements containing Firm processing obligations. To the extent Carnero accepts additional volumes of Producer's Gas under Section 3.4 hereof, Carnero will process such Gas: (i) at the Raptor Plant on a Priority Interruptible basis; and (ii) subject to the last sentence of Section 3.5(a), at the Silver Oak II Plant on a Priority Interruptible basis.

**Section 3.6** Commingling. Producer agrees that Producer's Gas received by Carnero under this Agreement will constitute part of the supply of Gas from all sources in Carnero System, and Carnero has the right to commingle Producer's Gas with other Gas, to deliver molecules different from those received from Producer and to handle the molecules received from Producer and others in any manner.

**Section 3.7** Ethane Rejection Settlement Option. Producer may elect, on its behalf and on behalf of all Comanche Producers as a single election, allocation of its and their Products and settlement of amounts due hereunder based on a methodology assuming either (a) minimized recovery of ethane as a Plant Product ("Ethane Rejection Allocation") or (b) maximized recovery of ethane as a Plant Product ("Full Recovery Allocation") for each Month during the Term, by submitting written notice of such election to Carnero not less than 15 Days prior to the first Day of the applicable Month. In the event Carnero does not timely receive the same election for all Comanche Producers delivering Gas from the Dedicated Acreage, the previous election for which all Comanche Producers delivered timely notice shall remain in effect. The corresponding Product recovery factors for each allocation are set forth in Exhibit C. In the event Producer fails to timely notify Carnero of a change to its election with respect to a given Month, Producer will be deemed to have elected the same allocation as elected for

the prior Month. Producer will not be entitled to cause the Plant to be operated in any particular manner, including to actually minimize or maximize ethane recovery. Carnero will accommodate Producer's request for Ethane Rejection Allocation or Full Recovery Allocation, provided Carnero has available Gas sufficient to operate the Plant to minimize or maximize ethane recovery, as applicable, in accordance with standard industry practice.

## ARTICLE 4
## POINTS OF RECEIPT AND DELIVERY; PRESSURE

**Section 4.1** Receipt Point(s). Subject to the terms of this Agreement, Carnero will receive Producer's Gas at the Receipt Point(s).

**Section 4.2** Delivery Point(s). Subject to the terms of this Agreement, Carnero will deliver Residue Gas to Producer at the Delivery Point(s).

**Section 4.3** Delivery Pressure. Producer will deliver Producer's Gas to Carnero at the Receipt Point(s) at a pressure sufficient to enter the Gathering System against the actual operating pressure, as the same may vary from time to time, but not to exceed Carnero's Maximum System Pressure. Carnero will use commercially reasonable efforts to maintain the pressure in the Gathering System as follows: (i) 1250 psig at the Highway 83 – T2 CDP identified on Exhibit A; and (ii) 1250 psig at the Maverick CDP identified on Exhibit A and the Highway 83 – Carnero CDP identified on Exhibit A. Producer will not be obligated to compress Producer's Gas in order to effectuate delivery of Producer's Gas to Carnero if the pressure in the Gathering System at the Receipt Points exceeds the Maximum System Pressure for such Receipt Point (notwithstanding any higher pressures at which the Gathering System is operated by Carnero hereunder), and any such volumes of Producer's Gas that would require compression in order to enter the Receipt Point at the time of delivery shall be released from the dedication hereunder.

**Section 4.4** Redelivery Pressure. Carnero will deliver Residue Gas at the Delivery Point(s) at the pressures existing in the Redelivery Pipeline(s), from time to time, but not to exceed the maximum allowable delivery pressure of the applicable Redelivery Pipeline.

**Section 4.5** Rate of Flow. Producer will use commercially reasonable efforts to balance the quantities of Producer's Gas delivered to and received from the Carnero System and, if necessary, make adjustments to the rate of Gas production or nominations to balance such receipts and deliveries. Carnero will endeavor to permit up to a 10% variance per Day in receipts and deliveries of Producers' Gas from the Scheduled Quantity for that Day, to the extent such variance does not impede Carnero's compliance with this Agreement, any other agreement, Applicable Law or any permit. In no event will Carnero be obligated to deliver or receive a quantity of Producers' Gas during any given Day that differs by more than 10% from the Scheduled Quantity for such Day. If the actual quantity of Producer's Gas received at the Receipt Point(s) for the account of Producer on any Day differs from the Scheduled Quantity(ies) for such Receipt Point(s), then Carnero shall only be obligated to deliver at the Delivery Point(s) on that Day the lesser of the actual quantity of Residue Gas attributable to Producer's Gas received on that Day or the Scheduled Quantity. The Parties will use commercially reasonable efforts to receive and deliver the Scheduled Quantity at a uniform

hourly rate of flow determined by dividing the Scheduled Quantity by 24. Carnero has (i) no obligation to accept variations from a uniform hourly rate of flow, and (ii) the ability, to be exercised in Carnero's sole discretion, to accept variations based on Carnero's operating conditions, without waiver of the uniform flow requirement set out in this Section.

## ARTICLE 5
## FEES, BILLING, AND PAYMENT

**Section 5.1** Gathering Fee. As consideration for the gathering services performed by Carnero under this Agreement, Producer will pay to Carnero the gathering fee set forth on Exhibit B (the "Gathering Fee").

**Section 5.2** Treating Fee. As consideration for the treating services performed by Carnero under this Agreement, Producer will pay to Carnero the treating fee set forth on Exhibit B (the "Treating Fee").

**Section 5.3** Processing Fee. Carnero will process Producer's Gas in accordance with this Agreement, and Producer will pay Carnero the processing fee set forth on Exhibit B (the "Processing Fee").

**Section 5.4** Compression Fee. Producer will pay Carnero the Compression Fee.

**Section 5.5** Other Fuel Fee. Producer will pay to Carnero the Other Fuel Fee.

**Section 5.6** FL&U, Plant Products and Condensate. In addition to the other charges set forth in this Agreement, Producer hereby conveys to Carnero, and title transfers at the Receipt Point(s) or Additional Plant Product Receipt Point(s), as applicable (free of charge and free of liens or encumbrances of any nature): (a) a quantity of Gas each Month equal to the FL&U attributable to Producer's Gas, (b) all Plant Products allocated to Producer (including, in each case, all components thereof, contained in Producer's Gas at the Receipt Point(s)) (c) all Additional Plant Products; and (d) all Condensate allocated to Producer contained in Producer's Gas at the Receipt Point(s).

**Section 5.7** Payment for Plant Products and Condensate. Carnero will pay Producer each Month for (i) Plant Products allocated to Producer and all Additional Plant Products, an amount equal to: (A) the Plant Products as determined in accordance with the allocation procedure set forth in Exhibit C plus all Additional Plant Products, multiplied by (B) the Product Price, for such Plant Products and Additional Plant Products, multiplied by (C) 100%, plus (ii) Condensate, an amount equal to: (A) the Condensate allocated to Producer as determined in accordance with the allocation procedure set forth in Exhibit C, to the extent recovered from the gathering facilities owned by Carnero, multiplied by (B) the weighted average sales price per gallon for the total volume of Condensate sold by Carnero at the Plant(s) to unaffiliated third parties during the applicable Month in which the Condensate is sold, multiplied by (C) 50%. If no Condensate is sold at the Plant(s) to unaffiliated third parties during the applicable Month, then for that Month, the price will be based on arms-length, third party condensate sale transaction data provided by Carnero in good faith.

**Section 5.8** Statements and Payments.

(a) If required by the Redelivery Pipelines, Carnero will provide the Redelivery Pipelines an allocation each Month for the Residue Gas delivered during the preceding Month on behalf of Producer. Such allocations will be based upon the Redelivery Pipelines' custody transfer measurement volume and allocated by Carnero on a pro-rata basis in accordance with all volumes received on the Carnero System for delivery to the Pipelines.

(b) On or before the 25th of each Month, Carnero will tender to Producer a monthly statement showing for the preceding Month the following:

(i) the actual metered volumes of Producer's Gas received by Carnero at each Receipt Point in Mcf and MMBtu;

(ii) Producer's allocated share of the Residue Gas delivered to the Residue Gas Delivery Point(s) (in MMBtu);

(iii) the Plant Fuel, Gathering L&U, Compression Fuel, shrinkage attributable to Producer's Condensate and Product Shrinkage allocated to Producer at each Receipt Point;

(iv) the volumes of Producer's Products;

(v) the applicable Product Price(s);

(vi) the volumes of Condensate;

(vii) the Gathering Fees;

(viii) the T&F Fees;

(ix) the Compression Fees, if any;

(x) the Treating Fees, if any;

(xi) the Processing Fees;

(xii) the Other Fuel Fees;

(xiii) any Imbalance cashout charges or credits;

(xiv) any amounts due Carnero pursuant to the terms of Section 17.7 hereof; and

(xv) the total net amount due to Producer or Carnero, as the case may be, under this Agreement.

(c) The Parties agree that all amounts owed under this Agreement (other than for indemnity obligations) will be netted between the Parties on a Monthly basis. If the monthly

statement reflects Carnero owes Producer, Carnero will remit the balance due on or before the last Day of the Month, or if the monthly statement reflects Producer owes Carnero, Producer will remit the balance due Carnero within ten calendar Days after their receipt of the Carnero monthly statement, provided that if the payment date is not a Business Day, payment is due on the next Business Day following that date. Carnero will have the right to pay and invoice each Comanche Producer independently and, upon Carnero's request, Producer shall promptly provide all information necessary for Carnero to calculate payments and invoices for each Comanche Producer and to make such payments to the Comanche Producers. If Carnero elects to pay the Comanche Producers directly, the payments will be made on the same terms and Carnero will have the same rights with respect to each Comanche Producer (including netting) as with the payments to Producer. If Producer is in default, Carnero will use commercially reasonable efforts to pay and invoice each Comanche Producer independently. Payment will be by ACH or wire transfer to the following accounts (which may be changed by such Party with advance written notice), as applicable:

Payments to Carnero:
For the account of: Carnero G&P LLC
Bank: Wells Fargo
ABA: 121000248
Account Number: 4122586654

Payments to Producer:
For the account of: SN EF Maverick, LLC
Bank: SunTrust Bank
ABA: 061000104
Account Number: 1000205698318

(d) If a Party fails to pay the entire undisputed amount of any invoice when the amount is due, the other Party may bill such nonpaying Party a charge for late payment which will be included by the other Party on the next regular invoice rendered, or by separate invoice. The charge for any late payment for amounts that are not disputed in good faith will be equal to the product of (i) the unpaid, undisputed portion of the invoice, times (ii) the ratio of the number of Days from the due date to the date of actual payment to 365, times (iii) the prime interest rate, as in effect from time to time, as published in the *Wall Street Journal*, plus 2% per annum; provided, however, that in no event will such interest rate exceed the maximum rate permitted by law.

(e) As to each individual Comanche Producer, in the event such Comanche Producer owes Carnero a net payment as set forth in the monthly statement provided pursuant to this Section 5.8, Carnero has the right to demand from such Comanche Producer Adequate Assurance of Performance for any of its obligations under this Agreement or its Ratification Agreement. In any event where Adequate Assurance of Performance is required by Carnero, it shall be posted by the relevant Comanche Producer within five (5) Business Days of written notice.

**Section 5.9** Annual Rate Adjustment. On June 1st of each year beginning in 2019, all fees for services by Carnero in accordance with this Agreement (including the Gathering

Fee, the Treating Fee, the Processing Fee, and the Compression Fee, but excluding the Other Fuel Fee (the "Fees")) shall be adjusted by the product of the Fees then in effect multiplied by the percentage increase (if any) between the Consumer Price Index (All Urban Consumers (CPI-U); U.S. City Average; All items, 1982-1984 reference base, issued by the United States Department of Labor, Bureau of Labor Statistics ("BLS") (the "CPI")) for January of the current year and the CPI for January of the immediately preceding year. For avoidance of doubt, in no event shall the Fees be reduced below those in effect for the immediately preceding year. If the 1982-1984 reference base is no longer used as the standard reference base by BLS, then the standard reference base shall be that chosen from time to time by BLS.

**Section 5.10** Disputed Statement. If Producer, in good faith, disputes any billing or statement, Producer will pay to Carnero any undisputed amount and will notify Carnero in writing within ten (10) calendar days following receipt of Carnero's invoice that Producer disputes other amounts, which notice will include adequate documentation demonstrating the amount of and basis for the dispute. The Parties will endeavor in good faith to resolve such dispute within thirty (30) Days following Carnero's receipt of such notice. Producer waives the right to dispute or challenge any invoice or statement if Producer does not dispute or challenge that invoice or statement in a written notice in accordance with the preceding sentence delivered to Carnero within twenty-four (24) Months after the invoice or statement was issued.

**Section 5.11** Examination of Books. Carnero and Producer, upon notice in writing to the other Party and upon execution of a mutually acceptable confidentiality agreement which is typical of this type of audit, with neither Party's consent to agree to such mutually acceptable confidentiality agreement to be unreasonably withheld, will have the right to examine and audit, at all reasonable times, books, records and charts of the other Party to the extent necessary to verify or audit the accuracy of any statement, bill, chart, or computation within the 24-Month period following the Month in which the same was rendered or made under or pursuant to this Agreement. This examination right will not be available with respect to any proprietary information or any information not directly relevant to transactions under this Agreement.

**Section 5.12** Information. Carnero and Producer will each preserve all books, records and charts applicable to this Agreement, including all test and measurement data and charts, for a period of at least 24 Months following the end of each calendar year, or such longer periods as will be required under law or regulation.

## ARTICLE 6
## NOMINATIONS, SCHEDULING AND IMBALANCES

**Section 6.1** Submission. Producer will submit nominations for Producer's Gas to the attention of the Gas Scheduling Department of Carnero, or its designee, in writing via Electronic Bulletin Board ("EBB"), or when such EBB is unavailable, by fax, email or other electronic means designated by Carnero.

**Section 6.2** Nominations. The deadline for submitting nominations each Month is 9:00 a.m. (Central Time), two Business Days prior to the beginning of each Month. Producer may nominate quantities of Producer's Gas up to the MDQ each Day on a Firm basis and in

Case 19-34508 Document 3368 Filed on 08/20 Page 124 of 158

excess of the MDQ each Day on a Priority Interruptible basis (subject in all cases to Section 3.5) and the nomination must include the following:

(a) Producer's name, contact name, email address and phone number;

(b) contract number assigned by Carnero;

(c) daily quantity of Producer's Gas to be received by Carnero at each Receipt Point;

(d) daily quantity of Residue Gas to be delivered by Carnero to the Residue Gas Delivery Point(s);

(e) daily quantity of Producer's Gas that is produced from interests in the Dedicated Acreage owned by the Comanche Producers as of the Effective Date of this Agreement;

(f) begin date for the nomination and end date for the nomination (not to extend past the last Day of the Month in which Gas would first flow under the nomination); and

(g) Producer's contract numbers with upstream and downstream Persons from whom Producer's Gas will be received and to whom Residue Gas will be delivered.

**Section 6.3** Daily Changes. By 9:00 a.m. Central Time on the Day before Producer's Gas is desired to flow, Producer may submit to Carnero a change to the Monthly nomination made in accordance with Section 6.2; provided, however, Producer may submit any number of subsequent nomination changes subject to the then-current scheduling practices used by intrastate and interstate pipelines to schedule natural gas transportation services and the following sentence. Producer shall make each nomination and Carnero shall confirm such nomination and schedule the nominated Producer's Gas or Residue Gas for delivery in conformance with the North American Energy Standards Board ("NAESB") timeline, as may be revised by NAESB from time to time.

**Section 6.4** Waiver of Nomination Requirements. Carnero, in its reasonable discretion, may accept nominations at such later time as operating conditions permit, and may waive any nomination requirement. Notwithstanding anything to the contrary, however, Carnero will not be obligated to provide service under this Agreement on any Day on which Producer does not nominate volumes pursuant to the procedures in this Agreement. It is understood by Producer that Producer is the sole responsible Party for Monthly nominations of Comanche Producer volumes into the Redelivery Pipelines. It is further understood by Producer that Producer is the sole responsible Party for daily, Monthly and cumulative Imbalances of Comanche Producer volumes with the Redelivery Pipelines.

**Section 6.5** Discrepancies in Nomination. If a discrepancy exists between Producer's nominated volumes and volumes confirmed by the Redelivery Pipeline for Producer at the Delivery Point(s), Carnero will notify Producer and Producer will be responsible for correcting the discrepancy and will timely re-nominate the corrected volumes. If the discrepancy is not resolved on a timely basis, the "corrected volumes" will be the lesser of the

volumes nominated by Producer at the Delivery Point(s) and the volumes confirmed by the Redelivery Pipeline.

**Section 6.6** Imbalances. "Imbalance" means the cumulative difference in a Month between (1) the Receipt Quantity, and (2) the Delivery Quantity.

(a) Producer's Gas to be gathered under this Agreement will be received, gathered and delivered by Carnero as set forth in Section 4.5, to the extent it is consistent with the operating conditions on the Carnero System as described in this Agreement. The quantities of Producer's Gas received from Producer and Residue Gas delivered to, or for the account of, Producer will be kept in balance on a daily as well as Monthly basis. It is the intent of Carnero and Producer that any variance, or Imbalance be minimal and incidental. Carnero may establish operational balancing agreements with Redelivery Pipelines.

(b) Each Party will notify the other Party as soon as practicable when it becomes aware of an Imbalance in receipts or deliveries. Carnero will provide written, oral or electronic notification to Producer of any Imbalance in receipts and deliveries, and Carnero and Producer will promptly make adjustments in receipts and deliveries as are consistent with Carnero's operating conditions in order to balance any Imbalance so shown. Carnero will settle any Imbalances each Month by using the methods set forth in this Section 6.6. In addition, there will be a final cashout immediately upon or following the termination of this Agreement, and in this regard, the provisions of this Section 6.6 will survive the termination of this Agreement. Carnero, at any time and with notice to Producer, may initiate an operational flow order to protect its pipeline operations that limits receipts and deliveries and requires hourly and daily rates of flow to be uniform and in balance. In such event, Carnero may adjust Producer's Scheduled Quantity to comply with the operational flow order.

(c) If for any Month the Receipt Quantity is less than the Delivery Quantity, then Producer will be deemed to be "Underdelivered" for such Month. If for any Month the Receipt Quantity is greater than the Delivery Quantity, then Producer will be deemed to be "Overdelivered" for such Month.

(d) Each Month, Overdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Carnero to Producer (by direct payment or offset) at a price equal to the applicable Cashout Percentage multiplied by the Cashout Price for each such tier set forth in Table A below and adding together the results of each calculation for such Month:

Table A

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤ 5% | 100% |
| >5% but ≤10% | 90% |
| >10% but ≤15% | 85% |
| >15% but ≤20% | 80% |
| > 20% | 75% |

(e) Each Month, Underdelivered Imbalances for each "Imbalance Percentage" tier will be cashed out and paid by Producer to Carnero at a price equal to the applicable Cashout

Percentage multiplied by the Cashout Price for tier set forth in Table B below and adding together the results of each calculation for such Month:

Table B

| Imbalance Percentage | Cashout Percentage |
|---|---|
| >0% but ≤5% | 100% |
| >5% but ≤ 10% | 110% |
| >10% but ≤ 15% | 115% |
| >15% but ≤ 20% | 120% |
| >20% | 125% |

(f) Imbalance Indemnity. PRODUCER WILL RELEASE, PROTECT, DEFEND, INDEMNIFY AND HOLD CARNERO HARMLESS FROM AND AGAINST ANY PENALTIES, FINES, FEES, LOSSES, CLAIMS, CAUSES OF ACTION (WHETHER IN TORT, CONTRACT OR OTHERWISE), OR JUDGMENTS OBTAINED (INCLUDING THE PAYMENT OF REASONABLE ATTORNEYS' FEES AND COURT COSTS) AGAINST CARNERO BY (I) ANY UPSTREAM OR DOWNSTREAM PIPELINES, (II) ANY PARTY WITH CURTAILED CAPACITY, AND (III) ANY OTHER THIRD PARTY, TO THE EXTENT ARISING OUT OF OR CAUSED BY IMBALANCES BETWEEN THE RECEIPT POINT(S) AND THE DELIVERY POINT(S) FROM PRODUCER'S FAILURE TO TIMELY BALANCE RECEIPTS AND DELIVERIES ON THE CARNERO SYSTEM.

(g) Safety. Carnero has no obligation to receive Imbalances from Producer; provided, however, if Producer continues to deliver a quantity of Producer's Gas at the Receipt Point(s) that results in delivery in excess of or less than the Scheduled Quantity to be received by Producer at the Delivery Point(s) and such Imbalance, as determined by Carnero acting in its sole discretion, jeopardizes the safety of Carnero's operations or its ability to meet its contractual commitments to others, Carnero has the right to (i) vent, without being held liable to Producer, all or such part of that excess quantity as Carnero, in its reasonable discretion, deems necessary; (ii) cease receipt of all or any portion of Producer's Gas at the Receipt Point(s) if Carnero, in its reasonable discretion, deems that action necessary; or (iii) cease delivery of all or any portion of Residue Gas at the Delivery Point(s) if Carnero, in its reasonable discretion, deems that action necessary.

## ARTICLE 7
## POSSESSION AND RESPONSIBILITY

**Section 7.1** Producer's Control. As between Producer and Carnero, Producer shall be deemed to be in control and possession of all Gas delivered under this Agreement (including all components contained therein), until such Gas is accepted by Carnero at the designated Receipt Point(s), and after Residue Gas has been tendered for delivery by Carnero for Producer's account at the designated Delivery Point(s). Producer will be fully responsible and liable for any and all such Gas (including all components contained therein) and any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, and contamination: (i) while such Gas is within Producer's control and possession; or (ii) to the extent arising from or relating to Producer's operation of its facilities, the failure of

Gas delivered by Producer hereunder to meet the specifications set forth in Article 10 hereof, the gross negligence or willful misconduct of Producer or violation of Applicable Law by Producer, and PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD CARNERO AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF CARNERO).

**Section 7.2** Carnero's Control. As between Carnero and Producer, Carnero will be in control and possession of Producer's Gas delivered under this Agreement (including all components contained therein) from and after the time Producer's Gas is received by Carnero at the Receipt Point until Residue Gas is tendered for delivery at the designated Delivery Point(s). Carnero will be fully responsible and liable for any and all loss, damages, claims, actions, expenses, liabilities, including reasonable attorneys' fees, injury to and death of persons, property damage claims, or penalties for environmental damage, pollution, or contamination, (i) while such Gas is within Carnero's control and possession; or (ii) to the extent arising from or relating to Carnero's operation of the Carnero System (expressly excluding any losses comprising FL&U or relating to the failure of Gas delivered by Producer under this Agreement to meet the specifications set forth in Article 10 hereof), the gross negligence or willful misconduct of Carnero or violation of Applicable Law by Carnero, and CARNERO AGREES TO RELEASE, INDEMNIFY, DEFEND AND HOLD PRODUCER AND ITS EMPLOYEES, OFFICERS, DIRECTORS, PARTNERS, MEMBERS, MANAGERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ALL LOSSES, CLAIMS, ACTIONS AND LIABILITIES, COSTS AND EXPENSES WITH RESPECT THERETO (EXCLUDING THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF PRODUCER).

## ARTICLE 8
## TITLE, WARRANTY, TAXES AND INDEMNIFICATION

**Section 8.1** Title, Warranty, Taxes and Indemnity.

(a) Producer warrants that it (i) has good and merchantable title and right to Producer's Gas (other than Third Party Gas) delivered to Carnero (including all components thereof), and that Producer's Gas will be free and clear of any and all liens, encumbrances and adverse claims of every kind (other than the lien described in Section 9.343 of the Texas Business and Commerce Code) and (ii) has the right to deliver all Third Party Gas delivered by Producer to Carnero hereunder. If the title to Gas delivered by Producer hereunder is disputed or is involved in any legal action, or if Carnero becomes aware of a claim that Producer is not disbursing funds received hereunder to a party entitled thereto, Carnero shall have the right to withhold payment (without interest), or cease receiving the Gas, to the extent of the interest or amount disputed or involved in legal action, during the pendency of the action or until the funds or title, as applicable, are freed from the dispute, or until Producer furnishes, or causes to be furnished, indemnification to save Carnero harmless from all claims arising out of the dispute or action, including penalties and interest, with surety acceptable to Carnero. Producer will pay all taxes levied on Gas that Producer delivers to Carnero at the Receipt Point(s), except

for income taxes, ad valorem, and property or similar taxes based upon the assessed value of the Carnero System. PRODUCER AGREES TO RELEASE, INDEMNIFY, DEFEND, AND SAVE CARNERO HARMLESS FROM AND AGAINST ANY AND ALL ROYALTIES, TAXES ALLOCABLE TO PRODUCER UNDER THIS AGREEMENT, PAYMENTS, LIENS, ENCUMBRANCES, SUITS, ACTIONS, CAUSES OF ACTION (WHETHER IN TORT OR IN CONTRACT), CLAIMS AND DEMANDS ARISING FROM OR OUT OF ANY ADVERSE CLAIMS BY TAXING AUTHORITIES OR THIRD PARTIES CLAIMING OWNERSHIP OF OR AN INTEREST IN GAS TENDERED UNDER THIS AGREEMENT OR FUNDS DERIVED THEREFROM (INCLUDING THE FL&U, PLANT PRODUCTS, CONDENSATE, COMPRESSION FUEL AND PLANT FUEL CONTAINED THEREIN, AND THE ADDITIONAL PLANT PRODUCTS, EACH OF WHICH ARE HEREBY CONVEYED TO CARNERO). CARNERO WARRANTS THAT RESIDUE GAS TENDERED FOR DELIVERY TO PRODUCER AT THE DELIVERY POINT(S) WILL BE FREE AND CLEAR OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. CARNERO AGREES TO INDEMNIFY, DEFEND, AND SAVE PRODUCER HARMLESS FROM AND AGAINST ALL CLAIMS AND DEMANDS TO THE EXTENT INCURRED BY PRODUCER ON ACCOUNT OF ANY AND ALL LIENS, ENCUMBRANCES AND ADVERSE CLAIMS BY, THROUGH AND UNDER CARNERO, BUT NOT OTHERWISE. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(b) Producer agrees to receive all payments for Gas sold hereunder, including payments for working interests, royalties, and other burdens, and to disburse such payments to the parties legally entitled thereto in strict accordance with the provision of the leases or agreements creating the respective interests of such parties, or as otherwise required by Applicable Law. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all losses, including interest, arising out of or in any way related to Carnero's disbursement of proceeds in accordance with the terms of this Agreement, and Producer agrees to indemnify and reimburse Carnero for any amount attributable to an interest erroneously claimed by Producer and/or paid by Carnero. Producer shall notify Carnero in writing of any future change in ownership or payment address and shall furnish Carnero with recorded documentation with respect thereto.

**Section 8.2** Substances Recovered in Pipeline. All substances, whether or not of commercial value, of whatever nature (excluding Residue Gas, Plant Products, and Condensate), which Carnero recovers in the course of rendering the gathering and processing services, will be Carnero's sole property, and Producer hereby conveys those substances to Carnero free and clear of any liens, claims, or other encumbrances. Except for payments expressly due Producer hereunder, Carnero will not be obligated to account to Producer for any value, whether or not realized by Carnero that may attach or be said to attach to such substances.

**ARTICLE 9**
**TERM**

This Agreement will commence on the Effective Date and remain in full force and effect until the fifteenth anniversary of the Effective Date (the "Initial Term") and will continue on a year to year basis thereafter unless and until terminated by either Carnero or Producer upon at least 90 Days' written notice to the other Party prior to the fifteenth anniversary of the Effective Date or any subsequent anniversary thereof (the "Term").

**ARTICLE 10**
**QUALITY AND MEASUREMENT**

**Section 10.1** Quality Specifications.

(a) Producer's Gas received and delivered at each Receipt Point will meet the following quality specifications:

(i) Oxygen – not to exceed 5 parts per million by volume;

(ii) Hydrogen Sulfide - not to exceed 4 parts per million by volume;

(iii) Total Sulfur - including mercaptans and hydrogen sulfide, not to exceed one grain per one hundred cubic feet of Gas;

(iv) Carbon Dioxide - not to exceed 2% by volume;

(v) Liquids - the Gas will be free of water and other objectionable liquids at the temperature and pressure at which the Gas is delivered;

(vi) Dust, Gums and Solid Matter - the Gas will be commercially free of dust, gums, gum forming constituents, inerts, and other media or solid matter;

(vii) Gross Heating Value - have a Gross Heating Value of not less than 1200 Btu per cubic foot;

(viii) Minimum GPM - have not less than 4.0 gallons of ethane plus natural gas liquids per Mcf of Producer's Gas;

(ix) Temperature - have a temperature of not less than 40° Fahrenheit and not more than 120° Fahrenheit;

(x) Nitrogen - not to exceed 1% by volume and total inert Gases not to exceed 3% by volume;

(xi) Water Vapor - not more than seven pounds per MMcf;

(xii) Other - not to contain any carbon monoxide, halogens or unsaturated hydrocarbons; and

(xiii) Hazardous Waste - not to contain hazardous waste as defined in the Resources Conservation and Recovery Act of 1976.

(b) If Producer delivers Gas not meeting the specifications set forth in Section 10.1(a) (as those specifications may be modified as provided in Section 10.1(c)), Carnero, upon written notice to Producer, has the right to (i) cease accepting deliveries of such non-specification Gas at the Receipt Point(s), or (ii) accept Gas not meeting the above specifications and charge a mutually agreeable out of specification fee; provided, however, that if the Parties cannot agree on such fee, Producer will cease deliveries of such non-specification Gas unless or until such Gas once again meets, or is brought into compliance with the specifications required in this Agreement.

(c) Notwithstanding the specifications in Section 10.1(a), should the operator of any Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline notify Carnero of different or additional quality specifications required for the receipt of Gas from the Carnero System, then Carnero will notify Producer of any such different or additional specifications as soon as practicable after being notified by the operator of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline, and such specifications will, upon Producer's receipt of such notice, modify the above quality specifications in Section 10.1(a) (other than Section 10.1(a)(vii) and Section 10.1(a)(viii)) to meet the most stringent quality specifications of such Redelivery Pipeline (or any pipeline downstream thereof) or the T2 Pipeline for as long as required by the operator thereof.

(d) To the extent that Producer tenders Gas at the Receipt Points meeting the specifications set forth in Section 10.1(a), Carnero shall deliver to Producer at the Delivery Point Gas meeting the specifications of the applicable Redelivery Pipeline.

**Section 10.2** Indemnification for Non-Specification Gas. Each Party hereby indemnifies and holds the other Party, and its Affiliates, subsidiaries and parent, and its and their employees, officers, directors, partners, members, managers, agents and insurers harmless from and against any and all losses, costs, damages, liabilities, claims, actions or expense (including court costs and attorneys' fees) of whatsoever nature whether arising out of contract, tort or strict liability arising from the indemnifying Party's delivery of Gas which (a) in the case of Producer, fails to comply with Section 10.1(a) and (b) in the case of Carnero, fails to comply with Section 10.1(d).

**Section 10.3** Additional Fees, Costs or Penalties. If a Redelivery Pipeline (or any pipeline downstream thereof) imposes additional fees, costs or penalties upon Carnero for the receipt of non-specification Gas, Carnero may, in its sole discretion, assess such additional fees, costs or penalties upon all producers, including Producer, which contributed to such additional fees, costs or penalties, on a pro-rata basis.

**Section 10.4** Measurement.

(a) For billing and payment purposes, Producer's Gas received and Residue Gas delivered under this Agreement will be measured by metering facilities installed, operated and maintained by Carnero or its designee. Such measurement stations shall be equipped with orifice meters or ultrasonic flow measurement devices. Carnero shall install composite

sampling devices and/or on line chromatographs at each Receipt Point. Producer shall not be permitted to install samplers or chromatographs or any other metering facilities at any Receipt Point.

(b) The measurement of Producer's Gas at Receipt Point(s) and Residue Gas at Delivery Point(s) will be conducted in accordance with the following:

(i) Measurement under this Agreement will be based on the Unit of Volume. The Unit of Volume shall be corrected for actual water vapor, at a pressure and temperature existing at the point of measurement, by applying industry accepted practices and procedures. All quantities given herein, unless expressly stated, are in terms of such unit. The average atmospheric pressure will be assumed to be fourteen and seven-tenths (14.7) pounds per square inch, irrespective of the actual natural atmospheric pressure from time to time. Whenever conditions of temperature and pressure differ from such standard, conversion of the volume of Gas from such conditions to the standard conditions will be made in accordance with the Ideal Gas Laws corrected for deviation of the Gas from Boyle's Law in accordance with the methods and formulae prescribed in the American Gas Association Report No. 8 *Compressibility Factors of Natural Gas and Other Hydrocarbon Gases*, as last amended.

(ii) Measurement, both volumetric and thermal, will be computed in accordance with the latest publications of the American Gas Association in AGA Report # 3, Orifice Metering of Natural Gas, ANSI/API 2530, latest revision or AGA Report #9, Measurement of Gas by Multi-path Ultrasonic Meters.

(iii) The specific gravity of the Gas will be determined at the points of measurement by one of the following methods, selected in Carnero's reasonable discretion: (1) an online chromatograph, (2) continuous sampling, or (3) spot sampling.

(iv) The temperature when Gas is flowing, the factor for specific gravity according to the latest test therefor and the corrections for deviation from Boyle's Law applicable during each metering period will be used to make proper computations of Gas volumes measured under this Agreement.

(v) At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will obtain a representative sample of the Gas at each point of measurement under this Agreement. The Gross Heating Value of Gas will, at Carnero's option, be determined at each point of measurement: (1) by an online chromatograph, (2) by a continuous sampler, or (3) by spot samples, taken by Carnero or its nominee by application of the methods contained in API/GPA standards and in such amendments and revisions thereto and superseding reports thereof as recommended by the API/GPA committee. The Gross Heating Value shall be computed per GPA standard 2172, *Calculation of Gross Heating Value, Relative Density, Compressibility and Theoretical Hydrocarbon Liquid Content for Natural Gas Mixtures for Custody Transfer*, and converted to the condition specified in the definition of Unit of Volume. The physical constants used in Btu computation for a perfect Gas

will be derived from the *"Table of Physical Constants of Paraffin Hydrocarbons and Other Compounds"* as published in the GPA Standard 2145 and superseding revisions thereof. The analysis will be complete and individual values in mol percent or fraction of each hydrocarbon compound will be listed through $CH_6$. The $CH_6$+ values will be as stated in GPA standard 2261, 7.3.6 Table IV (as may be revised from time to time) or, at Carnero's option, by use of an extended analysis. The analysis will further include the mol fraction or percent individually of additional compounds contained in chromatographically measurable quantity contained in the sample. The method to be used for chromatographic analysis will be that contained in GPA standard 2261, ***Analysis for Natural Gas and Similar Gaseous Mixtures by Gas Chromatography*** and any superseding revisions thereof.

(vi) At Carnero's discretion, other types of Btu per cubic foot measuring devices may be installed and operated, and the Gross Heating Value will be computed in accordance with the manufacturer's instructions for same and consistent with industry-accepted practices for transmission Btu per cubic foot measurement.

(vii) If any standards or methods for calculations or determinations set forth in any applicable GPA publications are revised, both Parties agree that this Agreement will be amended accordingly.

(viii) Carnero, or its designee, will install, own, operate and maintain industry standard type measuring and testing equipment necessary to measure and test Gas transported under this Agreement and will keep the same accurate and in good repair. At least once every 45 Days for Receipt Points averaging over 1 MMcfd and at least quarterly for Receipt Points averaging lesser volumes, Carnero will verify the accuracy of Carnero's measuring and testing equipment. Data editing, calibrations, repairs and adjustments of Carnero's measuring and testing equipment will be done only by employees of Carnero or its designated representatives. Producer or its designated representative may, in the presence of an employee of Carnero or Carnero's designated representative, have access to Carnero's measuring and analyzing equipment at any reasonable time, and has the right to witness tests, calibrations and adjustments thereof. All tests scheduled under this Agreement will be preceded by reasonable notice to Producer. Upon the request of Producer for a special test of any meter or auxiliary equipment, Carnero will permit an independent third party selected by Producer to witness a test of the accuracy of same; provided, however, that the cost of such special test will be borne by Producer, unless the percentage of inaccuracy found is more than 2% of a recording corresponding to the average hourly rate of Gas flow.

If, upon any test, any measuring equipment is found to be inaccurate, such inaccuracy will be taken into account in a practical manner in computing the deliveries. If the resultant aggregate inaccuracy in the computed receipts is not more than 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the last preceding test, previously calculated receipts will be deemed accurate. All equipment will, in any case, be adjusted at the time of test to record accurately. If, however, the resultant aggregate inaccuracy in computed receipts exceeds 2% of a recording corresponding to the average hourly rate of Gas flow for the period since the

last preceding test, the previous recordings of such equipment will be corrected to zero error for any period that is known definitely or agreed upon. If the period is not known definitely or agreed upon, such correction will be for a period extending back the lesser of (i) one-half of the time elapsed since the date of the last test, or (ii) 45 Days.

(ix) If any meter or auxiliary equipment is out of service or out of repair for a period of time so that the amount of Gas delivered cannot be ascertained or computed from the reading thereof, the Gas delivered during such period will be estimated based on the best data available, using the first of the following methods that is feasible: (1) by using the registration of any check meter or meters, if installed and accurately registering, (2) by correcting the error if the percentage of error is ascertainable by calibration tests or mathematical calculations, (3) by estimating Gas volumes on the basis of deliveries during the preceding periods under similar conditions when the equipment was registering accurately, or (4) by other methods mutually acceptable to both Parties.

(x) Upon request of Producer and if an EFM is installed, Carnero will provide an electronic measurement audit package that complies with *API Chapter 21.1 Measurement* to Producer for examination, the same to be returned within 30 Days; provided, however, that Carnero will provide only such EFM data that relates to Producer's Receipt Point(s) or wells, as the case may be, and not to the Carnero System. Carnero's measurement audit package for a given Month will be deemed correct if no written objection thereto is served on either Party by the other within the year following any Month, but the same will be retained for a two-year period. If measurement is provided with a chart recorder, then Producer will be entitled to review the original measurement records at Carnero's premises during normal business hours.

(xi) Producer, at its sole cost and expense, may install, operate and maintain, but in the same manner as is required for Carnero's equipment under this Agreement, check measuring and testing equipment of standard type; provided that the same does not interfere with the operation of Carnero's equipment. Sharing of the meter tube, meter taps, sensing lines, or data signals of Carnero's meter shall not be permitted as part of the check meter installation. The measurement and testing of Gas under this Agreement or for purposes of this Agreement will, nevertheless, be effected only by Carnero's equipment, except as provided in Section 10.4(b)(ix) above. Carnero has the same rights with respect to said check metering and testing equipment of Producer as are granted to Producer hereunder with respect to Carnero's metering and testing equipment.

(xii) If it is determined prior to, or as a result of, in-service tests, experience and observation by either Producer or Carnero that pulsations exist that affect the measurement accuracy, the operator of the facility or facilities agrees to install and operate mechanical dampening equipment necessary to eliminate such pulsations.

(xiii) If at any time during the term of this Agreement a new method or technique is developed with respect to Gas measurement or the determination of the factors used in such Gas measurement, such new method or technique may be substituted for the method set forth in this Section when, in Carnero's reasonable discretion,

employing such new method or technique is advisable. Carnero will notify Producer in writing of any such election prior to actually implementing such substitution.

**ARTICLE 11**
**FORCE MAJEURE AND CURTAILMENT**

**Section 11.1** Force Majeure. Except with regard to indemnity obligations and payment obligations under this Agreement, neither Carnero nor Producer will be liable in damages to the other for any act, omission, or circumstances occasioned by or in consequence of any blockades, insurrections, riots, epidemics, flood, washouts, landslides, mudslides, earthquakes, storms, hurricanes and tropical storms or threat of such, extreme cold or freezing weather, lightning, restraint of rulers and peoples, civil disturbances, terrorist activities, explosions, maintenance (whether routine or non-routine, or scheduled or unscheduled) or breakage of or accidents to machinery, lines of pipe or any portion of the Carnero System, the failure of any upstream or downstream pipeline to take Gas, Plant Products or Additional Plant Products or to install, repair or operate facilities to receive Gas, Plant Products or Additional Plant Products, the order of any court or governmental authority having jurisdiction, or any other cause, whether of the kind in this Agreement enumerated or otherwise, in each case, not reasonably within the control of the Party claiming suspension and which by the exercise of due diligence such Party is unable to prevent or overcome (any such event, "Force Majeure"). Neither the inability to obtain rights-of-way, easements, equipment, materials or labor on terms reasonably acceptable to Carnero, in its sole discretion, nor the failure to prevent or settle any strike or strikes, will be considered a matter reasonably within the control of the Party claiming suspension and each is excluded from any diligence or remedial requirements under this Agreement. For avoidance of doubt, any delay or inability of Carnero to obtain on terms acceptable to Carnero, acting in its sole discretion, any necessary permits or rights-of-way and any delay in receiving or inability to obtain equipment, material or labor, will be deemed to be a Force Majeure event.

**Section 11.2** Performance Excused; Mitigation Duty. The Party experiencing the condition of Force Majeure shall be excused from performance under this Agreement (except with regard to amounts due or becoming due hereunder, credit matters, or with regard to any indemnity obligations), and shall not be liable for any failure to perform (excepting the above-mentioned exceptions) during a Force Majeure Event. Except as provided herein, the Party experiencing a Force Majeure event shall use commercially reasonable efforts to mitigate the effects of any Force Majeure Event and to remedy any inability to perform its obligations hereunder due to such events (except as provided in Section 11.1) as promptly as reasonably practicable.

**Section 11.3** Notices. If any Force Majeure Event should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall: (a) state the date that the Force Majeure Event began, (b) describe the Force Majeure Event, and (c) provide an estimate of the date the condition of Force Majeure shall cease.

**Section 11.4** Force Majeure Release. If Carnero's ability to accept Producer's Gas is curtailed as a result of a Force Majeure event or due to insufficient capacity or if Carnero otherwise is unable or fails to accept Producer's Gas tendered to it by Producer in compliance with this Agreement, then during the relevant period in which such Gas is not accepted, Producer

may deliver such Gas to third parties for transportation or gathering or processing, provided, that, except to the extent otherwise provided in Article 3, Producer shall not enter into any agreements with third parties for transportation or gathering or processing services with respect to temporarily released Gas for a term greater than 30 Days, except as provided otherwise in Section 3.1.

**Section 11.5** Curtailment by Redelivery Pipeline. If any of the Redelivery Pipelines to which Carnero is delivering Residue Gas curtails physical receipts or deliveries of Residue Gas or experiences operating constraints, then subject to Section 3.5, Carnero will make commercially reasonable efforts to deliver Residue Gas under this Agreement to other Redelivery Pipelines.

## ARTICLE 12
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 12.1** Carnero's General Representations and Warranties. Carnero represents and warrants to Producer as follows:

(a) Carnero is a limited partnership formed and validly existing under the laws of the State of Texas;

(b) Carnero has all requisite power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or instrument to which Carnero is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to Carnero or of the constituent documents of Carnero; and

(d) this Agreement has been duly executed and delivered by Carnero and all documents required hereunder to be executed and delivered by Carnero have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Carnero enforceable in accordance with their respective terms.

**Section 12.2** Producer's Representations and Warranties. Producer represents and warrants to Carnero as follows:

(a) Producer is a limited liability company formed, validly existing and in good standing under the laws of the State of Delaware;

(b) Producer has the requisite corporate, limited liability company or limited partnership power and authority to enter into this Agreement on the terms described herein and to perform its obligations under this Agreement;

(c) the execution and delivery of this Agreement and each and every agreement or document to be executed and delivered hereunder and the consummation of the transactions contemplated herein will not violate, nor be in conflict with, any provision of any agreement or

instrument to which Producer is a party or is bound, or any judgment, decree, order, statute, rule or regulation applicable to such Producer or of the constituent documents of Producer; and

(d) this Agreement has been duly executed and delivered by Producer and all documents required hereunder to be executed and delivered by Producer have been duly executed and delivered and this Agreement and such documents constitute legal, valid and binding obligations of Producer enforceable in accordance with their respective terms.

## ARTICLE 13
## ASSIGNMENT

**Section 13.1** Assignment.

(a) Neither Party may assign or otherwise convey all or any portion of its right, title, or interest under this Agreement without obtaining the prior written consent of the other Party, which consent will not be unreasonably withheld, conditioned or delayed, and any purported assignment without such consent will be void; provided, that (i) either Party may assign this Agreement to a third party acquiring all or substantially all of the assets of such Party that are directly or indirectly subject to this Agreement, without the consent of the other Party, (ii) Carnero may assign this Agreement to an Affiliate without the consent of Producer, (iii) either Party may grant a security interest in its right, title and interest in, to and under this Agreement to secure any credit facility or indebtedness (including obligations under any swap agreement) of such Party or its Affiliates without the consent of the other Party, (iv) Carnero may assign this Agreement without Producer's consent in connection with a sale or transfer of the Carnero System, and (v) Producer may assign or partially assign this Agreement without Carnero's consent in connection with the sale or transfer of Producer's interest in all or part of the Dedicated Acreage; provided, in the case of clause (v), that the credit assurance requirements hereunder are continuously complied with by Producer and its assignee prior to and after any assignment by Producer.

(b) Any transfer in accordance with this Section 13.1, shall require, as a condition to its effectiveness, the transferee (other than any grantee under any lien, pledge, encumbrance or security interest) to assume in writing the obligations and liabilities of the transferor under this Agreement to the extent arising from and after the effective date of the assignment (including in the case of Producer, the dedication set forth in Section 3.1). No transfer or succession to the interest of Producer hereunder, wholly or partially, shall affect or bind Carnero until the first of the month following the date Carnero has received a copy of the recorded transfer document or other proof satisfactory to Carnero that the claimant is legally entitled to such interest. Notwithstanding anything to the contrary herein, no assigning Party will be released from any of its obligations or liabilities under this Agreement.

**ARTICLE 14**
**FAILURE TO PAY; REMEDIES**

**Section 14.1** Producer Default. The following shall constitute events of "Default" by Producer under this Agreement:

(a) if Producer fails to pay any amount to Carnero when the same is due, and Producer's account remains delinquent beyond a 10-Business Day period following receipt by Producer of written notice of such delinquency, exclusive of any amounts subject to a good faith dispute;

(b) if Producer fails to post credit assurance as required pursuant to Section 5.8(e), and such failure continues for a period of five Business Days after the date such credit assurance is required under Section 5.8(e);

(c) if Producer experiences an Insolvency Event; and

(d) if Producer is in material breach of this Agreement (other than for failure to pay amounts due, which is addressed in Section 14.1(a) or failure to post credit assurance in accordance with Section 5.8(e), which is addressed in Section 14.1(b)), and that breach or default is not cured within 45 Days after receipt by Producer of written notice from Carnero asserting a breach or default.

For purposes of this Article 14, "Insolvency Event" means, with respect to any Person, such Person (i) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (ii) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (iii) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (iv) institutes or has instituted against it, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or a regulator, supervisor or similar official, in each case which is not dismissed, discharged, stayed or restrained in each case within 60 Days of the institution or presentation thereof; (v) has a resolution passed for its winding-up, dissolution or liquidation (other than pursuant to a consolidation, amalgamation or merger); (vi) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (vii) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 60 Days thereafter; or (viii) takes any action in furtherance of, or consents to or approves of any of the foregoing acts.

**Section 14.2** Remedies. Carnero shall have the following remedies:

(a) if Producer is in Default, Carnero may, in addition and without prejudice to any other remedies Carnero may have under this Agreement or at law or in equity, suspend receipts,

deliveries and/or payments under this Agreement and/or terminate this Agreement, in each case upon written notice;

(b) if Producer fails to pay any amount due Carnero when the same is due, except for amounts disputed in good faith, Carnero may, in addition to any other remedy it may have under this Agreement, upon two Days prior written notice: (i) suspend further receipts and deliveries of Producer's Gas until such amount is paid, (ii) require advance payment in cash or payment on a more frequent billing cycle and/or (iii) require Producer to post credit support in accordance with Section 5.8(e). If Producer does not timely provide the security required pursuant to this Section 14.2(b) Carnero shall be entitled to terminate this Agreement upon written notice to Producer; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

**Section 14.3** Carnero Default. The following shall constitute events of "Default" by Carnero under this Agreement:

(a) if Carnero fails to pay any amount due Producer when the same is due, and Carnero's account remains delinquent beyond a 10-Day period, exclusive of any amounts subject to a good faith dispute;

(b) if Carnero experiences an Insolvency Event; and

(c) if Carnero is in material breach of this Agreement (other than as described in Section 14.3(a) and such material breach is not cured within 45 Days after receipt by Carnero of written notice from Producer asserting such material breach.

**Section 14.4** Producer Remedies. If Carnero is in Default, Producer may:

(a) suspend deliveries of Dedicated Gas to Carnero and transport or process such Dedicated Gas on another gathering system or at another gas processing plant and/or terminate this Agreement, in each case upon written notice;

(b) suspend payment under this Agreement upon written notice; and

(c) exercise any other remedies available under this Agreement or at law or in equity.

## ARTICLE 15
## CHOICE OF LAW; DISPUTE RESOLUTION; JURISDICTION; VENUE

**Section 15.1** Choice of Law. This Agreement will be interpreted, construed, and governed by the laws of the state of Texas, without reference to conflicts of law principles thereof that might apply the laws of another jurisdiction.

**Section 15.2** Dispute Resolution. Before submitting any dispute for resolution by a court, a Party will provide written notice to the other of the occurrence of such dispute. If the

Parties fail to resolve the dispute within 15 Business Days after such notice is given, then the Parties will seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel will endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within 30 Days after the original notice of dispute is given, then either Party may pursue any remedies available at law or in equity, but this Section 15.2 does not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 15.2 if application of such limitations would prevent a Party from filing a lawsuit or Claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

**Section 15.3** Jurisdiction; Venue. Each Party agrees that it will bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement exclusively in any federal or state court in Houston, Harris County, Texas. IN CONNECTION WITH CLAIMS ARISING UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS THAT ARE THE SUBJECT HEREOF, EACH PARTY (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE SPECIFIED COURTS; (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN THOSE COURTS; AND (III) WAIVES ANY OBJECTION THAT THOSE COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER ANY PARTY. EACH PARTY WAIVES ITS RIGHTS TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM RELATING TO THIS AGREEMENT.

## ARTICLE 16
## NOTICES

**Section 16.1** Notices. Any notice, request, demand, statement, bill, payment or other communication provided for in this Agreement or any notice which any Party may desire to give to the other, will be in writing and will be considered as duly delivered if delivered by mail, commercial courier, facsimile, e-mail or personally, to the addresses, e-mail addresses or facsimile numbers of the applicable Parties, and to the attention of their respective contact persons, as follows:

Carnero: Carnero G&P LLC
110 West 7th St, Suite 2300
Tulsa, OK 74119
Attn: South Texas Contract Administration
Phone: 918-925-3500
Fax: 918-925-3533
E-mail: TPLcontractadmin@targaresources.com

Producer: SN EF Maverick, LLC
1000 Main, Suite 3000
Houston, Texas 77002
Attn: Contracts Admin
Phone: 713-783-8000
Fax: 713-783-9993

E-mail: contractsadmin@sanchezog.com

Statements and invoices may also be delivered via email to the designated addresses set forth above. Either Party may at any time and from time to time by written notice to the other Party designate different persons or addresses for notice.

Notices will be deemed received: (a) if sent by first class mail, upon the postmark date when properly addressed and deposited in the United States mail, first class postage prepaid; (b) if sent by facsimile, upon the sending Party's receipt of its facsimile machine's confirmation of successful transmission, provided that if the Day on which such facsimile is sent is not a Business Day or is after 5:00 p.m. on a Business Day in the receiving Party's jurisdiction, then such facsimile will be deemed to have been delivered on the next Business Day; (c) if sent by commercial courier, upon the date of actual delivery as evidenced by the recipient's written acknowledgment of receipt; (d) if delivered personally, upon the date of actual delivery; and (e) if by e-mail, upon the date of an express confirmation of receipt of such e-mail by the intended recipient (which confirmation such recipient shall be obligated to deliver reasonably promptly).

## ARTICLE 17
## MISCELLANEOUS PROVISIONS

**Section 17.1** Counterparts. This Agreement may be executed in two counterparts, including those delivered by facsimile or other electronic means, each of which when so executed and delivered will be an original, and such counterparts together will constitute one instrument.

**Section 17.2** Entire Agreement. This Agreement, including the Exhibits referenced in and attached to this Agreement, contain the entire agreement of Carnero and Producer with respect to the matters addressed in this Agreement and will be amended only by an instrument in writing signed by both Parties. The Parties acknowledge that this Agreement will be deemed and considered for all purposes as prepared through the joint efforts of the Parties and will not be construed against a Party as a result of the preparation, submittal, negotiation or drafting of this Agreement.

**Section 17.3** Mutual Waiver of Certain Remedies. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, OTHER THAN REASONABLE ATTORNEYS' FEES AND COURT COSTS AND DAMAGES INDEMNIFIED AGAINST IN SECTION 10.2, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE FOR: (A) ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES; OR (B) FOR LOST OR DELAYED PRODUCTION OR LOST BUSINESS OPPORTUNITY, IN EACH CASE, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY BREACH HEREOF, INCLUDING CLAIMS ARISING IN CONTRACT, TORT OR OTHERWISE (OTHER THAN SUCH DAMAGES OR LOSSES PAID OR OWED TO A PERSON NOT A PARTY TO THIS AGREEMENT OR A RATIFICATION AGREEMENT (OTHER THAN AN AFFILIATE OF A PARTY)). THIS SECTION 17.3 WILL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, GROSS NEGLIGENCE OR OTHER FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS

PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.

**Section 17.4** Confidentiality. Carnero, Producer and any other Comanche Producer (upon execution of a Ratification Agreement), and their respective employees, agents, officers, directors, Affiliates and attorneys, will keep the terms of this Agreement confidential. It is understood and agreed upon that disclosure of the terms of this Agreement to any Person who is not a Party to this Agreement could result in damage to non-disclosing Party for which the disclosing Party may be held liable. However, any of the foregoing Persons disclosed in the first sentence of this Section 17.4 may disclose the terms of this Agreement, without prior permission of any Party, to the following Persons ("Representatives") in the following circumstances:

(a) to any potential contractors or professional consultants or advisers engaged by or on behalf of such Person and acting in that capacity where such disclosure is essential to such Representative's work;

(b) to financial institutions and other financing sources requiring such disclosure as a condition precedent to making, continuing or renewing a loan or making an investment in such Person or its Affiliates;

(c) as required by regulatory bodies, including the U.S. Securities and Exchange Commission and any stock exchange to which such Person or its Affiliates are subject, taxing authorities with jurisdiction over part or all of the subject matter of this Agreement and to other Persons to whom disclosure is required by such regulatory bodies;

(d) to courts or other tribunals having jurisdiction and requiring such disclosure, and to other Persons to whom disclosure is required by such courts or other tribunals;

(e) to current or prospective partners or joint venturers or purchasers of the assets or equity of such Person and their Affiliates;

(f) to independent certified public accountants for purposes of obtaining a financial audit; and

(g) as required by subpoena or other legal discovery processes;

provided, however, each Person shall be liable for breach of this Section 17.4 by its Representatives.

**Section 17.5** Consent to Disconnection. If this Agreement terminates for any reason whatsoever, Producer hereby consents and agrees that Carnero may disconnect any wells, leases, pipeline connections or other facilities utilized by Producer that deliver Producer's Gas at the Receipt Point(s) under this Agreement. "Disconnect" for the purposes of this paragraph means to remove metering facilities, pipelines and any other interconnection facilities through which Producer's Gas was delivered under this Agreement that are either owned by Carnero, or owned by the pipeline with which Carnero contracted for the gathering or transportation

services at the Delivery Point(s). This consent and agreement by Producer in this paragraph applies to both Carnero and Carnero's Affiliates, without distinction, and is intended in all respects to satisfy the laws, rules or regulations of any applicable jurisdiction.

**Section 17.6** Governmental Regulations; Change in Regulations. This Agreement will be subject to all valid applicable state, local and federal laws, orders, directives, rules and regulations of any Governmental Authority having jurisdiction over this Agreement and the gathering, treating and processing of Producer's Gas and delivery of Residue Gas under this Agreement.

**Section 17.7** Change in Law Costs. If in Carnero's reasonable determination there is a Change in Law resulting in a Governmental Authority requiring Carnero to incur any cost in connection with the sale, purchase, gathering, treating and processing of Producer's Gas or ownership or operation of the Carnero System, Carnero may charge Producer a fee to compensate Carnero for Producer's proportionate share of such cost (based on Producer's aggregate volumes utilizing the Carnero System for the applicable period as compared to the aggregate volumes of other parties utilizing the Carnero System for such period) from the earlier of (i) the date such Change in Law becomes effective or (ii) the date such costs are first incurred.

**Section 17.8** No Waiver. No waiver by either Party of any default of the other Party under this Agreement will operate as a waiver of any future default, whether of a like or different character or nature.

**Section 17.9** Survival. The provisions of Section 17.4 will survive any expiration or termination of this Agreement for a period of one year. The respective indemnification obligations of the Parties set forth in this Agreement will survive any expiration or termination of this Agreement. Any expiration or termination of this Agreement will not relieve Carnero or Producer of any accrued obligations to pay monies due, if any, to the other Party or any obligations to settle any Imbalances due, if any, to the other Party or a Redelivery Pipeline, or any other obligations incurred or accrued before any expiration or termination of this Agreement.

**Section 17.10** Severability. If any provision of this Agreement is determined to be invalid, illegal or unenforceable because it is contrary to Applicable Law, all other provisions of this Agreement shall nevertheless remain in full force and effect, and the Parties hereby agree to amend the Agreement (and/or enter into other mutually acceptable agreements or arrangements) to the extent necessary to effect the original intent of the Parties and maintain the Parties' relative economic burdens and benefits, as closely as possible.

**Section 17.11** Producers' Representative.

(a) Producer is hereby appointed by each Person executing a Ratification Agreement as their representative ("Producers' Representative") with respect to all matters arising under this Agreement, including but not limited to the following:

(i) To give and receive all notices, and to make all payments due to Carnero;

(ii) To make and witness any tests to be made of Producers' Gas and measuring equipment and adjustments to that equipment;

(iii) To receive all payments and disburse such payments to each Person executing a Ratification Agreement, to the extent legally entitled thereto; and

(iv) To deliver to Carnero, by facsimile, all nominations, if any, within the time specified in the Agreement.

Carnero may act, and shall be fully protected in acting, in reliance upon any and all acts and things done and performed by or agreements made with respect to all matters dealt with herein by Producers' Representative on behalf of each Person included within the definition of Producer or Comanche Producer as fully and with the same effect as though each such Person had done, performed, made or executed the same. Producer hereby indemnifies Carnero against and holds Carnero harmless from any and all damages arising out of or in any way related to Carnero's reliance upon the foregoing sentence. Producer may change Producers' Representative designated above, or designate a new Producers' Representative from time to time by delivery of written notice of change and designation to Carnero, provided that any new Producers' Representative shall be the same representative as designated by all of Producer and each Person executing and delivering a Ratification Agreement. Producers' Representative so designated shall have and may exercise all power and authority therein granted with like effect as though originally named as the Producers' Representative. Each Person executing and delivering a Ratification Agreement shall be liable to Carnero in accordance with the terms set forth therein.

(b) Notwithstanding the terms of Section 17.11(a) above, the obligations of each Comanche Producer shall be several and not joint to the extent of the Producer's Share, as set forth in the Ratification Agreement.

(c) Carnero agrees that, without prejudice to any other rights it may have in respect of any Default by Producer, Carnero will not suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise terminate, this Agreement due to any default by Producer that is capable of being cured by the Comanche Producers without first notifying each Comanche Producer in writing of the nature and details of such default with reasonable specificity and providing each Comanche Producer 30 days (or in the case of a payment default, 10 Business Days) following such Comanche Producer's receipt of such notice to cure such default, including the right to step into the position of Producer and assume the obligations and responsibilities of Producer hereunder in regards to such default, to the extent arising out of or attributable to its Producer's Share (as defined in the applicable Ratification Agreement) of such responsibilities and obligations. If a Comanche Producer cures the default within such 30 day (or in the case of a payment default, 10 Business Day) period in accordance with the terms of this Agreement, then as to such Comanche Producer, the default will be deemed cured in accordance with this Agreement and Producer and Carnero will not have any further right against such Comanche Producer (to the extent arising due to the cured default) to suspend performance under, take any enforcement action or exercise any remedy in respect of, or otherwise

terminate, this Agreement with respect to such Comanche Producer. For clarity, Carnero may provide the notice required by this paragraph to the Comanche Producers concurrently with or after notices provided to Producer under Section 14.1.

*(Signatures Follow on Next Page)*

Case 19-34508 Document 1736 Filed 04/19/22 Page 456 of 45

IN WITNESS WHEREOF, this Agreement has been executed by the Parties as of the date first written above.

**CARNERO:**
**CARNERO G&P LLC**

By: ____________________________

Name: Patrick J. McDonie

Title: President

**PRODUCER:**
**SN EF MAVERICK, LLC**

By: ____________________________

Name: __________________________

Title: ___________________________

# Exhibit J

SANCHEZ
ENERGY CORPORATION

March 23, 2018

**<u>Via U.S. Certified Mail and E-Mail</u>**
SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: James O'Connor

Re: Hydrocarbons Purchase and Marketing Agreement

Ladies and Gentlemen:

Reference is made to the Hydrocarbons Purchase and Marketing Agreement by and between SN EF Maverick, LLC ("<u>Maverick</u>") and SN EF UnSub, LP ("<u>Owner</u>") dated January 12, 2017 (the "<u>Agreement</u>").

As we have discussed, Maverick has been pursuing negotiations towards finalizing a long-term commercial arrangement for gas volumes originating from the Comanche acreage that will benefit Maverick and all working interest partners. This letter serves as notice to Owner under the Agreement that Maverick requests Owner's consent pursuant to Section 2.2 of the Agreement in connection with Maverick's entering into the Firm Gas Gathering, Processing and Purchase Agreement with Carnero G&P LLC ("<u>Carnero</u>"), a Midstream Contract as such term is defined under the Agreement, which is attached to this notice as Exhibit A (the "<u>Comanche FGGPPA</u>"). In addition, Maverick requests that Owner execute and notarize the attached ratification agreement and memorandum thereof (collectively, the "<u>Ratification Documents</u>"), with Owner's counterparts to be deemed held in escrow by Maverick until (and automatically released and delivered to Maverick and Carnero, with no further action, upon) Maverick and Carnero's execution of the Comanche FGGPPA, in substantially the form attached hereto as Exhibit A.

We respectfully request your written consent in connection with Maverick entering into the Comanche FGGPPA and your execution, notarization and delivery of the Ratification Documents as soon as reasonably practicable, but in any event within the ten (10) days of your receipt of this notice.

In connection with this written consent, the parties agree as follows:

1. This consent shall apply to the terms of the FGGPA as in effect on this date and any material amendments, waivers, extensions or termination of the FGGPA would require the further approval of UnSub (such approval not to be unreasonably withheld).

2. Maverick represents that each of the Comanche Producers (as such term is defined in the FGGPA) will be subject to the same FGGPA and to the extent that any more favorable terms under the FGGPA are offered to any Comanche Producer (other than UnSub) after the date of this letter, that Maverick will cooperate to obtain the same terms to UnSub.

3. The parties acknowledge that UnSub's production that will be subject to the FGGPA will continue to be sold by UnSub to Maverick pursuant to the terms of the Agreement. Unless otherwise set forth in the Ratification Agreement, the FGGPPA or this letter agreement, if there is any conflict between the terms of the Agreement and the Ratification Agreement, the terms of the Agreement will govern.

4. Pursuant to Section 5.8(c) of the FGGPA, Canero has the right to directly invoice UnSub for amounts owed under the FGGPA for UnSub's production being delivered under the FGGPA. For avoidance of doubt, there will be no deductions from the purchase price to be paid to UnSub pursuant to subsection (ii) of Section 3.1 of the Agreement to the extent of any such amounts are paid by UnSub directly to Carnero under the FGGPA.

[Signature Page and Election Follows]

Case 23-19-30587 Document 1373 Filed 04/19/23 in TXSB Page 1870 of 1882

As always, please feel free to reach out if you have any questions or concerns.

Best regards,

_______________________________

The undersigned hereby makes the following irreversible election regarding the Comanche FGGPPA and the Ratification Documents:

☐ **Owner hereby approves of Maverick entering into the Comanche FGGPPA and hereby delivers to Maverick contemporaneously herewith original executed and notarized counterparts to the Ratification Documents.**

☐ **Pursuant to Section 2.2 of the Agreement, Owner hereby rejects granting its approval.**

Sincerely,

_______________________________

SN EF UnSub, LP
By: SN EF UnSub GP, LLC, its general partner

Name:
Title:



1000 MAIN STREET, SUITE 3000, HOUSTON, TX 77002
TEL: (713) 783-8000 ♦ FAX: (713) 756-2784
WWW.SANCHEZENERGYCORP.COM

Enclosure

Copies by electronic mail to:

SN EF UnSub, LP
c/o Sanchez Energy Corporation
1000 Main Street, Suite 3000
Houston, Texas 77002
Attention: James O'Connor
Electronic Mail: joconnor@sanchezog.com

GSO ST Holdings LP
1111 Bagby Street, Suite 2050
Houston, TX 77002
Attention: Robert Horn
Electronic Mail: Robert.horn@gsocap.com

Hal Haltom
Andrews Kurth Kenyon LLP
600 Travis, Suite 4200
Houston, TX 77002
Electronic Mail: hhaltom@andrewskurth.com

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Thomas A. Woolley, III*
Thomas A. Woolley, III

# EXHIBIT 31

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SANCHEZ ENERGY CORPORATION, *et al.*[1] | ) | Case No. 19-34508 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF OCCIDENTAL PETROLEUM CORPORATION AND WESTERN MIDSTREAM PARTNERS LP TO DEBTORS' EMERGENCY MOTION PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR ENTRY OF AN ORDER (A) APPROVING A SETTLEMENT WITH CERTAIN MIDSTREAM COUNTERPARTIES AND (B) AUTHORIZING THE ASSUMPTION OF CERTAIN RELATED CONTRACTS, AS AMENDED**

This supplemental objection to the *Debtors' Emergency Motion Pursuant to Section 365(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order (A) Approving a Settlement with Certain Midstream Counterparties and (B) Authorizing the Assumption of Certain Related Contracts, As Amended* [Docket No. 1309] (the "**Settlement Motion**") filed in the above-captioned chapter 11 cases is submitted by and through undersigned counsel to (i) Occidental Petroleum Corporation, for itself and on behalf of its direct and indirect subsidiaries (collectively, the "**Oxy Parties**"), including Anadarko Petroleum Corporation, Anadarko E&P Onshore LLC ("**AEP**"), Anadarko Energy Services Company ("**AESC**"), and Kerr-McGee Oil & Gas Onshore LP ("**KMOG**," and together with AEP and AESC, "**Anadarko**"), and (ii) Western Midstream Partners LP, for itself and on behalf of its direct and indirect subsidiaries, including WGR Operating, LP, and Springfield Pipeline, LLC (collectively, the "**WES Parties**").

By the Settlement Motion, the Debtors seek expedited approval of a settlement

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Sanchez Energy Corporation (0102); SN Palmetto, LLC (3696); SN Marquis LLC (0102); SN Cotulla Assets, LLC (0102); SN Operating, LLC (2143); SN TMS, LLC (0102); SN Catarina, LLC (0102); Rockin L Ranch Company, LLC (0102); SN EF Maverick, LLC (0102); SN Payables, LLC (0102); and SN UR Holdings, LLC (0102). The location of the Debtors' service address is 1000 Main Street, Suite 3000, Houston, Texas 77002.

agreement (the "**Settlement Agreement**") between the Debtors and various non-debtor insider parties, including Catarina Midstream, LLC, Sanchez Midstream Partners LP ("**SNMP**"), Seco Pipeline, LLC, and TPL SouthTex Processing Company LP ("**Targa**", and collectively, the "**Sanchez Midstream Parties**"). On June 8, 2020, the Oxy Parties and the WES Parties (the "**Objecting Parties**") filed a preliminary objection to the Settlement Motion (the "**Preliminary Objection**") objecting to the Settlement Agreement and requesting that the Settlement Motion be heard on regular notice. [Docket No. 1314]. In support of this Supplement Objection, the Objecting Parties respectfully represent as follows:

## PRELIMINARY STATEMENT

Through discovery, the Objecting Parties have learned what truly transpired in the weeks leading up to confirmation of the Debtors' Plan,[2] and why that Plan has not been consummated. Since mid-April, the DIP lenders have been threatening to force these cases into chapter 7 in the absence of the deal now embodied in the Settlement Agreement.[3] Unbeknownst to the Court and parties, such settlement was an unstated condition to the effectiveness of the Plan at the time of the April 30th confirmation hearing. Even though the settlement negotiations were still in their infancy at that time, the DIP Lenders pushed the Court to confirm the Plan on an emergency basis, claiming that the cases would convert if the Debtors could not emerge by April 30.[4] Faced with this alleged emergency, the Court instructed the parties to come "ready to close" on April 30 if the Plan was confirmed.[5] Almost two months later, the Debtors still

---

2 The "Plan" refers to the *Second Amended Joint Chapter 11 Plan of Sanchez Energy Corporation and its Affiliated Debtors* [Docket No. 1198].

3 *See* Transcript of the Deposition of Joe Bob Perkins dated June 24, 2020 ("**Perkins Dep. Tr**.") at 95:7-25; 129:6-130:18 (discussing "messaging" that without a deal the case would convert to chapter 7).

4 *See* Perkins Dep. Tr. 134:16-24.

5 *See* Transcript of Deposition of Moshi Meghji dated June 22, 2020 ("**Meghij Dep. Tr.**") at 33:15-19 ("Q: So going into the confirmation hearing on April 30th, you didn't have any expectation that the plan was going to go effective that day, right? A: That day? Q: Yes, sir. A: No, I don't recall having that understanding or assumption."); *see also Debtors' Emergency Motion for Entry of an Order (I) Conditionally Approving the Adequacy of the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization; (III) Approving the Form of Ballot, and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* Docket. No. 1110 at ¶ 2 ("However, the Debtors must satisfy certain conditions to make this all possible, including confirmation of the Plan *and emergence not later than April 30, 2020*.") (emphasis added); Meghji, Dep. Tr. at 158:16-24; 160:2-161:8.

have not emerged from chapter 11, and the DIP Lenders now insist that they will not close on the confirmed Plan without entry into and approval of the Settlement Motion.[6] Apparently, the DIP Lenders believe the Plan is not (and never was) feasible without the $10 million of liquidity provided by the Settlement Agreement,[7] notwithstanding that oil prices have nearly doubled since the confirmation date. But neither the DIP Lenders nor the Debtors raised any concerns regarding the Debtors' feasibility at the April 30th confirmation hearing. And while discovery demonstrated the Debtors knew long before confirmation that the Objecting Parties' many agreements would be rejected,[8] they chose to wait until the literal eve of confirmation to schedule such agreements for rejection – asking this Court to approve an unorthodox procedure, on the basis of the purported emergency, to delay all assumption and rejection disputes until after confirmation and consummation of the Plan.

For their part, the Sanchez Midstream Parties, the non-debtor counterparties to the Settlement Agreement, have been pushing the Debtors to obtain expedited approval of the Settlement Agreement seeking to usurp the value of the Objecting Parties' contracts with the Debtors. Citing "deal fatigue" as their basis to refuse to have the Settlement Motion heard on regular notice,[9] the Sanchez Midstream Parties' real goal seems to be approving the Settlement Agreement before other alternatives materialize. Through affirmative covenants that they insisted upon in the Settlement Agreement, the Sanchez Midstream Parties are forcing the Debtors to pursue rejection of the Objecting Parties' agreements (the "**Comanche Agreements**") at all costs and, in the meantime, foreclosing the Debtors from pursuing a consensual renegotiation with the Objecting Parties and the working interest owners in the

---

[6] *See* Meghji, Dep. Tr. at 93:20-94:10; 37:2-22 (testifying that "the DIP lenders' financing commitment [needed for the Plan to go effective] is effectively conditional on the Midstream settlement getting approved").

[7] *See* Meghji, Dep. Tr. 26:15-23 (testifying that the receipt of the cash on closing of the Settlement Agreement was a key "component" to make the debtors' plan feasible).

[8] *See* Meghji, Dep. Tr. at 58:12-59:16 (testifying that the Debtors had always intended to reject the Comanche Agreements well before they filed the rejection schedule in April).

[9] *See* Perkins, Dep. Tr. at 132:24-134:24 (explaining that "negotiations had been tough," they wanted to "get things done with certainty and as quickly as possible," and there was therefore reluctance to extending the hearing date).

Comanche field. In fact, the Sanchez Midstream Parties are not only actively requiring the Debtors to reject the Comanche Agreements, *but are also paying the Debtors $10 million to do so*.

The Debtors meanwhile appear to have completely sidestepped their obligations to the Objecting Parties (as fiduciaries under the Agency Agreements), the other Comanche working interest owners (as operator of the Comanche assets), and the SN Maverick estate. The Debtors' focus appears to be on appeasing the DIP Lenders and taking whatever actions they believe are necessary to emerge from chapter 11, even if doing so means abusing their position as operator of the Comanche fields and pursuing a fruitless and costly litigation path against the Objecting Parties and Comanche working interest owners.

## OBJECTION

1. The Objecting Parties object to the Settlement Motion for three reasons. ***First***, the Settlement Agreement locks the Debtors (and, potentially, the Comanche working interest holders) into a deal that is premised on lengthy and expensive litigation and, in the meantime, prevents the Debtors from pursuing a consensual transaction with the Objecting Parties that could resolve such litigation. This was by design, as the lack of a "fiduciary out" in the Settlement Agreement was not an oversight. Targa's Executive Chairman and immediately former CEO, Joe Bob Perkins, insisted that the Settlement Agreement expressly require the Debtors to (i) list and maintain the Comanche Agreements on the rejected list and (ii) diligently pursue such rejection.[10] When concerns were raised that this Court would not approve such conditions if they violated the Debtors' fiduciary duties, Mr. Perkins testified that he was not

---

[10] *See* Perkins, Depo. Tr. at 42:16- 43:23, 44:7-14; *see also* Settlement Agreement § 2.2.1.

concerned with the Debtors' "fiduciary whatever" and was focused only on obtaining the benefits of his business deal.[11]

2. While it is a duty for all debtors in chapter 11, retaining the option to pursue a better deal is particularly important here. Not only are the Debtors unlikely to prevail in their rejection efforts (which fruitless pursuit will cause the estate and other parties to waste millions of dollars in legal fees), *but they have never explored with the Objecting Parties the prospect of a re-negotiation of the Comanche Agreements* (despite requests from the other Comanche working interest holders that they do so). Indeed, the Debtors admit to knowing for months prior to confirmation that they would be seeking to reject or renegotiate the Comanche Agreements, but neither informed the Objecting Parties of their intent to reject (until the literal eve of confirmation) nor initiated discussions regarding a potential consensual solution. Moreover, as discussed further below, the irony of this situation is that a fiduciary out is the only thing that may be able to save the Debtors from a breach of fiduciary duty on the Agency Agreements (and avoid numerous claims against the DIP Lenders and the Sanchez Midstream Parties).

3. ***Second***, discovery made clear that the Objecting Parties may have claims against the Sanchez Midstream Parties and the DIP Lenders for a variety of matters concerning the Settlement Agreement. The Settlement Agreement is premised on the Debtors rejecting certain agreements with the Objecting Parties relating to the Debtors' 2017 acquisition from Anadarko of certain working interests in mineral leases in an area referred to as "Comanche" in South Texas. Such agreements include two agency agreements (the "**Agency Agreements**"), pursuant to which certain Debtors committed to act as Anadarko's agent and fiduciary under certain key midstream and downstream contracts for which the counterparties did not consent to assignment to Sanchez. As Anadarko's divestiture of the Comanche assets

[11] *See* Perkins Depo. Tr. at 47:17-20.

made it impossible for it to meet its minimum volume obligations under such agreements, the Debtors agreed, as an integral part of the overall sale, to act as Anadarko's agent, and perform all of Anadarko's obligations, under such agreements.

4. Now, many of the same people (including Tony Sanchez III) that were involved in negotiating and agreeing to the Comanche Agreements on behalf of the Debtors are working on behalf of SNMP and requiring (and paying for) the Debtors to breach those fiduciary and contractual obligations. Given the potential for future litigation among various non-debtors, the Objecting Parties simply seek to ensure that if the Court enters an order approving the Settlement Motion, it be entirely without prejudice to, and in no way impact, any such litigation To ensure that, the Objecting Parties request that the below language be included in any order approving the Settlement Motion:

> Notwithstanding anything to the contrary in this Order, this Order shall not waive, limit, impair, operate to preclude, or otherwise impact in any manner any claims or causes of action arising out of, in connection with, or related to (in any manner) the Settlement Agreement (including the negotiation and performance of the Settlement Agreement) or the rejection of any executory contracts identified in the Settlement Agreement against Sanchez Midstream Partners GP LLC, Sanchez Midstream Partners LP, Catarina Midstream LLC, Seco Pipeline, LLC, Carnero G&P LLC, TPL Southtex Processing Company LP, or TPL SouthTex Pipeline Company LLC or any of the DIP Lenders (as defined in the Plan) or their respective current or former officers, directors, members, managers, partners, representatives, employees, agents and assigns, including, without limitation, any claims for aiding and abetting breach of fiduciary duty, conspiracy to commit breach of fiduciary duty or tortious interference with contract (and nothing contained in this Order shall create a justification or privilege for any alleged interference).

5. ***Third,*** as set forth in the Preliminary Objection, the Objecting Parties are concerned that the Debtors, in entering into the Settlement Agreement and obtaining court approval thereof, are seeking to avoid their obligations under the Confirmation Order to continue performance under the Comanche Agreements until an order is entered resolving all rejection disputes.[12] In an attempt to address this concern, the Debtors, in their reply to the

[12] Docket No. 1212 ¶¶ 23-24.

Objecting Parties' Preliminary Objection, stipulated that they will continue to perform on all executory contracts until they are assumed or rejected as set forth in the Confirmation Order.[13] While the Debtors and the Objecting Parties appear to be in agreement on this point, the Objecting Parties request that the below language be included in any order approving the Settlement Agreement so that it is binding on all parties:

> Notwithstanding anything to the contrary in this Order, the Motion, the Assumed Agreements, the New Seco Pipeline Agreements or the Settlement Agreement (including the Amendment to the Settlement Agreement), (i) the Debtors and Reorganized Debtors shall continue to comply with all executory contracts and unexpired leases until they are assumed or rejected as set forth in paragraphs 23 and 24 of the Confirmation Order and (ii) the Settlement Agreement (including the Amendment to the Settlement Agreement) and this Order does not modify or impact any rights or defenses of any Counterparty (as defined in the Confirmation Order) in connection with any objection to the assumption or rejection of any executory contracts or unexpired leases (and to prosecute any timely filed objection) under the Plan or Confirmation Order.

Inclusion of this language simply gives effect to the stipulation that the Debtors have offered and ensures that neither the Settlement Agreement, nor any order approving it, are in conflict with the Confirmation Order.

**CONCLUSION**

Based on the foregoing, the Objecting Parties respectfully request that the Court deny the Settlement Motion, and grant any other related relief as the Court otherwise deems just and proper.

*[remainder of page intentionally left blank]*

---

[13] Docket No. 1325 p. 2 ("For the avoidance of doubt, the Debtors expressly stipulate that, as set forth in paragraphs 23 and 24 of the Confirmation Order, the Debtors are required to continue to comply with all contracts until they are assumed or rejected.").

Respectfully submitted this 25th day of June, 2020.

/s/ Jason S. Brookner
Jason S. Brookner (Texas Bar No. 24033684)
Jonathan M. Hyman (Texas Bar No. 24032455)
Lydia R. Webb (Texas Bar No. 24083758)
**GRAY REED & McGRAW LLP**
1300 Post Oak Blvd., Suite 2000
Houston, Texas 77056
Telephone: (713) 986-7000
Facsimile: (713) 986-7100
Email: jbrookner@grayreed.com
lwebb@grayreed.com

*Attorneys for Western Midstream Partners, LP*

*/s/ Jason N. Zakia*
Thomas E Lauria (Texas Bar No. 11998025)
Amanda Parra Criste (admitted *pro hac vice*)
**WHITE & CASE LLP**
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
E-mail: tlauria@whitecase.com
aparracriste@whitecase.com

-and-

Jason N. Zakia (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, Illinois 6060-5055
Telephone: (312) 881-5400
Facsimile: (312) 881-5450
Email: jzakia@whitecase.com
erin.rosenberg@whitecase.com

-and-

J. Christopher Shore (admitted *pro hac vice*)
Philip Abelson (admitted *pro hac vice*)
Thomas MacWright (admitted *pro hac vice*)
**WHITE & CASE LLP**
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
E-mail: cshore@whitecase.com
philip.abelson@whitecase.com
tmacwright@whitecase.com

*Attorneys for Occidental Petroleum Corporation*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 25th day of June, 2020, he caused a true and correct copy of the foregoing pleading to be served via the Court's CM-ECF Notification System on all parties who have subscribed for notice in this case, and via e-mail on counsel to the Debtors, the DIP Agent and the Secured Notes Ad Hoc Group, as reflected below.

| | |
|---|---|
| Counsel to the Debtors:<br><br>**JACKSON WALKER**<br>Matt Cavenaugh(mcavenaugh@jw.com)<br>Liz Freeman (lfreeman@jw.com)<br><br>**AKIN GUMP**<br>Marty Brimmage (mbrimmage@akingump.com)<br>Lacy Lawrence (llawrence@akingump.com)<br>Ira Dizengoff (idizengoff@akingump.com)<br>Lisa Beckerman (lbeckerman@akingump.com)<br>Jason Rubin (jrubin@akingump.com<br>James Savin (jsavin@akingump.com) | Counsel to the DIP Agent:<br><br>**ARNOLD & PORTER KAYE SCHOLER**<br>Jonathan Levine<br>(jonathan.levine@arnoldporter.com)<br>Ginger Clements<br>(ginger.clements@arnoldporter.com)<br><br>**COLE SCHOTZ**<br>Michael Warner (mwarner@coleschotz.com) |
| Counsel to the Secured Notes Ad Hoc Group:<br><br>**MORRISON & FOERSTER**<br>Dennis Jenkins (djenkins@mofo.com)<br>Brett Miller (bmiller@mofo.com)<br><br>**FOLEY GARDERE**<br>John Melko (jmelko@foley.com) | |

*/s/ Jason S. Brookner*
Jason S. Brookner